P23nlivc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   BLAKE LIVELY,

4                   Plaintiff,

5           v.                          24-cv-10049 (LJL)
                                        25-cv-00449 (LJL)
6   WAYFARER STUDIOS LLC, *et al.*,     25-cv-00779 (LJL)

7                   Defendants.         Conference

8   ------------------------------x

9                                       New York, N.Y.
                                        February 3, 2025
10                                      11:00 a.m.

11  Before:

12                      HON. LEWIS J. LIMAN,

13                                      District Judge

14                          APPEARANCES

15  MANATT, PHELPS & PHILLIPS
         Attorneys for Plaintiff/Counter-Defendant
16  BY:  ESRA ACIKALIN HUDSON
         STEPHANIE A. ROESER
17          and
    WILLKIE FARR & GALLAGHER LLP
18       Attorneys for Plaintiff/Counter-Defendant
    BY:  MICHAEL GOTTLIEB
19       AARON E. NATHAN
         KRISTIN BENDER
20
    QUINN EMANUEL URQUHART & SULLIVAN
21       Attorneys for Plaintiffs Jones and Jonesworks
    BY:  KRISTIN TAHLER
22       NICHOLAS INNS

23  MEISTER SEELIG & FEIN PLLC
         Attorneys for Defendants/Counter-Plaintiffs
24  BY:  BRIAN FRIEDMAN
         SUMMER BENSON
25       KEVIN A. FRITZ
         MITCHELL SCHUSTER

P23nlivc

APPEARANCES (Continued)

BOIES SCHILLER FLEXNER LLP
     Attorneys for Defendants/Counter-Plaintiffs  Sloane and
Vision PR
BY:  SIGRID S. McCAWLEY
     ANDREW VILLACASTIN

P23nlivc

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (Case called)

2                THE DEPUTY CLERK:  Starting with counsel for

3     plaintiffs, please state your appearance for the record.

4                MR. GOTTLIEB:  Good morning, your Honor.  Mike

5     Gottlieb from Willkie Farr & Gallagher, on behalf of Ms. Lively

6     in the *Lively v. Wayfarer* action, and on behalf of Ms. Lively

7     and Mr. Reynolds on the *Wayfarer v. Lively* action.

8                I'm joined in the court today by my colleagues Aaron

9     Nathan and Kristin Binder, also from Willkie Farr & Gallagher.

10               THE COURT:  Good morning.

11               MS. HUDSON:  Good morning, your Honor.  Esra Hudson,

12    of Manatt, Phelps & Phillips representing the same parties as

13    Mr. Gottlieb.  I am joined here today by Stephanie Roeser, also

14    of Manat, Phelps & Phillips.

15               THE COURT:  Good morning.

16               MS. McCAWLEY:  Sigrid McCawley from Boies, Schiller &

17    Flexner.  I have here with me my partner Andrew Villacastin.

18    We are here on behalf of Leslie Sloane and Vision PR?

19               THE COURT:  Good morning.

20               And the defense table, plaintiff in the other action.

21               MR. FRIEDMAN:  Thank you, your Honor.

22               Brian Friedman, on behalf of Wayfarer Studios LLC,

23    Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us

24    Movie LLC, Melissa Nathan, Agency Group PR, LLC, Jennifer Abel

25    in the *Lively v. Wayfarer* matter.

1          In the *Wayfarer v. Lively* matter, Wayfarer Studios,

2     Justin Baldoni, Jamey Heath, It Ends With Us Movie LLC, Melissa

3     Nathan, Jennifer Abel Steve Sarowitz.

4          And in the Stephanie *Jones v. Jennifer Abel* matter, we

5     represent Jennifer Abel, Melissa Nathan, Justin Baldoni and

6     Wayfarer Studios LLC.

7          I am joined by my colleague from my firm, Summer

8     Benson.

9          THE COURT:  Good morning.

10         MR. SCHUSTER:  Good morning, your Honor.  Mitchell

11    Schuster, from Meister Seelig & Fein, on behalf of the same

12    parties as Mr. Friedman and Ms. Benson I am here with my

13    partner Kevin Fritz.

14         THE COURT:  Good morning.

15         MR. SCHUSTER:  Good morning.

16         THE COURT:  Do we have counsel for Ms. Jones in 25

17    Civ. 779?

18         MS. TAHLER:  Yes, your Honor.  Good morning.  Kristin

19    Tahler from Quinn Emanuel, representing Ms. Jones and

20    Jonesworks, and I'm here with my colleague Nicholas Inns.

21         THE COURT:  Good morning.

22         Any other counsel who have not identified themselves

23    who are making an appearance?

24         Okay.  So we are here for an initial conference.

25         I have got the case management plan in 24 Civ. 10049

1    and 25 Civ. 449, the *Lively v. Wayfarer Studios* matter, and the

2    *Wayfarer Studios v. Lively* matter.  Those two matters are

3    consolidated with one another.

4            I have also asked the parties in *Jones v. Abel* to

5    appear today.  That matter has been assigned to me as related.

6    It has not been consolidated, but one matter for discussion is

7    whether the discovery in the several matters should be

8    cross-designated to achieve efficiency purposes and whether the

9    discovery schedule in the *Jones v. Abel* matter should be the

10   same as the discovery schedule in the two consolidated matters.

11           What I would like to do is hear first from the

12   plaintiff in the *Lively v. Wayfarer Studios* matter; then from

13   plaintiff in the *Wayfarer Studios v. Lively* matter.

14           Then I will hear from the parties in the *Jones v. Abel*

15   matter.

16           In particular, I am not asking for the parties to

17   repeat what's in the lengthy pleadings in front of me, which

18   have been aired repeatedly.  What I am asking the parties to do

19   is to tell me the information I need in order to manage this

20   case; in other words, what type of discovery is expected, why I

21   should agree to the case management plan that has been

22   submitted by the parties, legal issues that the parties

23   anticipate arising, issues with respect to discovery that the

24   parties anticipate arising.

25           Then I have been informed that the defendants in the

1  *Wayfarer Studios* matter had planned to move against the

2  complaint in *Wayfarer Studios v. Lively*.  That complaint has

3  now been superseded by an amended complaint.  I would like to

4  know whether the defendant in this matter, who is the plaintiff

5  in the Lively matter has a present intention to move against

6  the amended complaint or to answer it.

7      With respect to *Wayfarer Studios v. Lively*, I note

8  that at least one new defendant has been added, the New York

9  Times.  It would be of interest to me, first of all, what the

10  status is, whether the New York Times has been served; and,

11  second, how the naming of the New York Times relates to the

12  action that I'm aware of that has been filed in California.

13      The parties are free to raise any other matters in

14  front of me, but let me hear from you first, Mr. Gottlieb.

15  Then I will hear from counsel for Wayfarer Studios.

16      MR. GOTTLIEB:  Thank you, your Honor.

17      I will try to address all those points, but if I miss

18  one I am sure the Court will remind me.

19      Let me start -- and I gather the Court only wants to

20  address the scheduling issues now, and defer discussion of the

21  Rule 3.6 issues to a later point in the hearing.

22      THE COURT:  You have to make a motion under Rule 3.6.

23  You are welcome to raise any of those issues.  I would like

24  them to be raised at the end, and I will hear from you and from

25  your adversary.

1              MR. GOTTLIEB:  Thank you, your Honor.

2          So with respect to the schedule, we think that the

3     schedule that the parties submitted to the Court unfortunately

4     is no longer workable.  We met and conferred in a 26(f)

5     conference in good faith on January 30, and the parties

6     submitted a joint schedule to the Court that evening, which is

7     the Docket No. 49 proposed schedule that the Court references.

8          Among other things, in our meet-and-confer we

9     discussed all the various dates required to be put into that

10    schedule, including a date for amending complaints, and we had

11    a discussion about extending that default date with the

12    Wayfarer parties and ultimately recommended a date that was

13    longer.

14          Counsel for the Wayfarer parties did not tell us

15    during this meet-and-confer that they were planning the next

16    day to file an amended complaint, which they did the next day.

17    That not only added significant amount of new materials,

18    including a 168-page compendium of materials as Exhibit A, but

19    it includes a new defendant that to our knowledge has not been

20    served and that did not have an opportunity to participate in

21    the 26(f) conference in an action that's already been

22    consolidated by this Court.

23          Those adjustments have significant effects potentially

24    on the consolidation of the cases because the New York Times

25    may have its own views on whether the cases should be

1    consolidated or not.  There is authority, of course, for

2    deconsolidating cases once they have been consolidated.  We are

3    not asking for that at this time but simply saying that there

4    is now a new additional defendant that has its own interests,

5    that a media defendant, an institutional defendant, will have a

6    perspective that is likely to be very different from the

7    perspective of the other parties in the case thus far.  So the

8    Court may have a reason in its exercise of discretion, once the

9    Times is served and once the Times appears, to make a different

10   ruling with respect to consolidation.

11        With respect to the schedule itself, we expect that

12   the Times will have its own views on those scheduling questions

13   that the parties met and conferred on.

14        And so we think that by itself warrants going through

15   the process of serving the new defendant and then allowing the

16   parties to meet and confer again and providing a new report

17   following that 26(f) conference to be able to provide a

18   schedule that works for all parties recommended to this Court.

19        But given that the Wayfarer defendants or plaintiffs

20   in that action have added a new defendant, we had been

21   contemplating amending our own complaint in the Lively action

22   and we're thinking about that on the timeline that had been

23   laid out by the proposed schedule.

24        Now that a new defendant has been added and we think

25   the schedule has to be reconfigured based on that anyway, our

1    plan is to just go ahead and amend our complaint now.  We have

2    two weeks essentially until February 14 as the operative date

3    that our amendment as of right is due given the answers of the

4    entity defendants in the *Lively v. Wayfarer* case.

5         We intend to add both claims and parties to our

6    complaint.  We think, given that, the most efficient course of

7    action, given that the matters still remain consolidated, would

8    be for us to go ahead and amend on or before the 14th and then

9    allow for service to take place.

10        Then all of the parties can again have a 26(f)

11   conference and produce a new operative schedule to the Court.

12   We are cognizant that this Court set a trial date, and we think

13   that that trial date can stay on the schedule.  We think that

14   we can provide a schedule once all of the operative and

15   necessary parties are before the Court, a schedule that will

16   work.  We are very eager to get discovery started in this case,

17   but we don't think it is fair or efficient to try to set that

18   schedule in motion without the relevant parties sitting at the

19   table.

20        So fundamentally that is our position.  The action of

21   amending to add a new party sort of requires us to redo the

22   26(f) conference and come to the Court with a new proposed

23   schedule that will allow for an efficient management of these

24   proceedings.

25        THE COURT:  So let me ask you a couple of questions.

1              One obvious one is why should I do that?

2              You've got a complaint that you are prosecuting.  You

3       have a complaint that you are defending against.  If I disagree

4       with you, it would mean you would get on with the business of

5       serving your initial disclosures, you get on with the business

6       of serving your initial requests for production and your

7       interrogatories, and at least the case is able to move forward.

8       That doesn't mean that you can't serve second requests for

9       documents or amend your initial disclosures, but at least we

10      get going.

11             As to the New York Times, it's not unusual for parties

12      to be added in.  I would hear from the New York Times once they

13      have been served and make an appearance.  It may result in the

14      case management plan being changed, but at least the parties

15      can get going.

16             MR. GOTTLIEB:  I think the difference between those

17      sort of typical situations your Honor is describing and this

18      one is that in this situation the 26(f) conference was held

19      while the defendants knew they were filing this amended

20      complaint the very next day and deprived us of an opportunity

21      to even consider what effect that might have on the schedule or

22      changes we might like to ask for with respect to the dates in

23      the 26(f) conference.

24             We would like an opportunity to be able to have that

25      discussion, the parties, in order to have an efficient schedule

1    to manage the matter.  We would like an opportunity to be able

2    to understand in that case what the Times intends to do, if

3    they intend to move against the complaint.

4          There are defendants in the *Wayfarer v. Lively* case

5    that have indicated that they intend to move to stay discovery

6    in that case in line with the motions to dismiss that they

7    expect.  It would be --

8          THE COURT:  Sorry.  Say is that again.  What did you

9    just say?

10          MR. GOTTLIEB:  In the *Wayfarer v. Lively* case there

11    are parties that have indicated that their intent is to move to

12    stay discovery.  I will let those parties speak for themselves

13    here, but in conjunction with motions to dismiss that are

14    expected to be filed in that case.

15          I'm simply suggesting that the net effect of all of

16    those actions is the actual parties against whom party

17    discovery may proceed may be affected by the positions that are

18    taken as well as the parties that we intend to add by next

19    Friday.

20          What I am suggesting, your Honor, is that those

21    parties have a right to be heard and they may have their own

22    views on whether party discovery should be stayed.  They may

23    have motions that they want to make as against the complaint,

24    and we just think, while discovery can move forward right now,

25    between now and next Friday, it just seems far more efficient

1    to let us go ahead and amend the complaint, add those new

2    parties, and give those new parties as defendants an

3    opportunity to advise the Court of their position as to whether

4    they intend to move to dismiss whether they intend to move to

5    stay discovery or the like.

6              THE COURT:  If I follow your suggestion, new parties

7    will be added by next Friday.  Then they will be served

8    presumably quickly, not the 90 days.

9              How quickly do you anticipate that they would be

10   served?

11             MR. GOTTLIEB:  As we did when we filed our initial

12   complaint, we would ask those defendants through their counsel

13   whether they would accept service immediately.  If they

14   declined to accept service immediately, we would begin to

15   attempt to serve the next day, which is exactly what we did in

16   the action in December.

17             THE COURT:  And then they would presumably have time

18   to get counsel, to decide whether to appear.

19             That's going to add what, another 30 days on to the

20   timetable?

21             MR. GOTTLIEB:  It may, your Honor.  I have reason to

22   think that it won't, given that there's currently sort of one

23   set of lawyers representing all of the defendants in this

24   action.  But we do think that the parties and claims we intend

25   to add may have an effect on issues with respect to

1    representation in the case.  That is another one of the reasons

2    why we think it would be most efficient to allow us to just

3    complete that amendment by next Friday before making decisions

4    about the discovery timeline in the case.

5            THE COURT:  So maybe be a little bit more concrete

6    with me.

7            You are a party already to this.  You are asking for

8    an extension of time to submit a revised case management plan

9    until what date?

10           MR. GOTTLIEB:  I would suggest, your Honor, that we

11   set that date as -- sorry.  I'm just trying to get my calendar

12   in front of me.

13           THE COURT:  Take your time if you want to look at your

14   calendar.

15           MR. GOTTLIEB:  So, your Honor, 21 days after the 14th

16   would be March 7.  We are happy to try to effectuate service

17   faster than that.

18           Of course, as I just stated, our intent would be on

19   the day we file the amended complaint to try to get service

20   just accepted.  But 21 days post the 14th would be March 7,

21   which would be sort of I think a reasonable default date for

22   the holding of the 26(f) following the amended complaint.  That

23   would allow all parties to participate.

24           THE COURT:  With the notion that maybe by March 11 you

25   would submit to me a revised case management plan?

1    MR. GOTTLIEB:  Correct, your Honor.

2    THE COURT:  Okay.

3    I will hear from your adversaries with respect to

4    that.  I am going to want to know right now what discovery you

5    anticipate taking, what questions and issues you anticipate

6    arising.

7    Before I get to that, two other questions for you

8    which relate to the amended complaint, whether you currently

9    have a plan to move against that on behalf of your clients or

10    to answer.

11    A second question has to do with the answers.  Your

12    client has made affirmative claims in the complaint against

13    Wayfarer Studios, some of which your client has alleged.  Maybe

14    much of it would also take the form of counterclaims to the

15    claims of Wayfarer Studios.

16    I'm sure, Mr. Gottlieb, you have given thought, when

17    it comes time to answer, whether to plead those as

18    counterclaims or whether to just stand on the complaint and how

19    the mechanics will work.

20    MR. GOTTLIEB:  So we have given thought to that.

21    To answer the first question, we do plan to move

22    against the amended complaint.  We submitted a letter on the

23    prior complaint.  We intend to submit -- or if you would like

24    us to submit a letter, but our intent is for both Ms. Lively

25    and for Mr. Reynolds to move to dismiss that complaint.

```
 1              As for the forms of the affirmative claims and which
 2     of them would be appropriate counterclaims, I am not sure we're
 3     all the way there yet and sort of through that.  It is a large
 4     complaint, an amended complaint that was just filed.
 5              I think the answer is some of them will properly rest
 6     upon the complaint, and some of them, assuming that the amended
 7     complaint were to survive a motion to dismiss, some of them
 8     would be properly pled as counterclaims.
 9              So I think we will have to see as we get there, but
10     our plan is to move to dismiss as to both of our clients
11     against the amended complaint.
12              THE COURT:  Okay.  Should I set a deadline right now
13     for you to make your motion, and when would you like to make
14     your motion?
15              MR. GOTTLIEB:  We are comfortable with the standard
16     motion to dismiss requirements, your Honor.
17              THE COURT:  Okay.  So that's 21 days?
18              MR. GOTTLIEB:  Yes, your Honor.
19              THE COURT:  All right.
20              What issues do you currently contemplate with respect
21     to discovery?
22              You indicate that it's going to be broad.
23              MR. GOTTLIEB:  Yes.  I think part of is that is going
24     to depend on how various issues with respect to the moving
25     defendants in the Wayfarer action are handled.  There are
```

1    significant components of discovery in that action that may

2    never come into the case, depending on how the Court resolves

3    motions to dismiss, particularly issues relating to, for

4    example, the defamation cause of action which brings with it an

5    entire set of fact and legal issues that are not present in

6    many of the other claims in the case.

7            So I think some of the question of how discovery

8    shakes out is going to depend on the resolution of those legal

9    issues in the Wayfarer action.

10            Types of discovery I think are not going to be a

11    secret or surprising.  I mean, there will be numerous

12    depositions that will take place of the parties, of course.

13    There will be significant third-party discovery around the

14    communications that were made from the underlying sexual

15    harassment and retaliation claims, as well as the false-light

16    claims that we have alleged and the contractual claims that we

17    have alleged.

18            We think that that discovery will involve the typical

19    types of discovery requests that one would expect in

20    contractual, sexual harassment, retaliation claims, and will

21    also include significant discovery relating to the manner in

22    which the defendants used the media and used their

23    relationships with the media in order to shape and push forward

24    the retaliation claim that's been alleged in the complaint.

25            That will include communications between the

1    defendants and their agents with media entities.  That will

2    include communications between the defendants and contractors.

3    It will include discovery over financial records of individuals

4    who may have been paid in exchange for taking certain positions

5    in public and the manner in which they were paid.

6         Those are the kinds of discovery issues we intend to

7    explore in this case.

8         THE COURT:  Have the parties discussed an appropriate

9    protective order with respect to discovery?

10        MR. GOTTLIEB:  We discussed in a meet-and-confer a

11   protective order.  We haven't yet exchanged drafts of that

12   protective order, but we're planning to do so shortly after the

13   meet-and-confer.  So we expect to be exchanging a draft of a

14   protective order with the defendants after this conference.

15        We do believe that there will be provisions in a

16   protective order that will be appropriate in this case, just

17   given the nature of the allegations and the high-profile aspect

18   of the dispute and some of the individuals who will be

19   involved.

20        It is a case involving a significant number of

21   high-profile individuals on both sides of the V as well as

22   third parties.  In particular, addressing interests and needs

23   of third parties and third-party privacy is going to be very

24   important in this case.

25        So we expect to seek protections under a Rule 26(c)

1    protective order that we believe will be very important,

2    particularly in a case where there's been a significant amount

3    of providing of materials and leaking of materials to the media

4    in this case.

5          We believe there is significant precedent from the

6    Second Circuit and the Southern District that addresses this

7    risk particularly in the context of third-party discovery.

8    This is another reason, by the way, why allowing for us to go

9    ahead and amend the complaint and get all the parties involved

10   before we move forward with discovery makes a lot of sense

11   here, because these issues are going to be of considerable

12   importance to anyone who is a party and likely will govern the

13   interests of third parties in discovery.

14         But, in any event, to circle back to the question, we

15   do intend to propose a protective order in this case.  We are

16   working up a draft of it to exchange with the defendants and

17   get their position on it, and we would like to, of course, get

18   the position of all parties.

19         THE COURT:  Is there any reason, if I agree to your

20   proposal to hold off on the case management plan until

21   March 11, why the work on the protective order can't proceed

22   and a proposed protective order be submitted to the Court let's

23   say by no later than March 11?

24         I mean, it would seem to me that, with the people you

25   already represent and with the people that your adversary

1    already represents, we've got a number of high-profile people

2    involved in the case.  You each know of the third parties who

3    are going to have interests that you are going to want to

4    protect.  You haven't revealed to me who's going to be named in

5    your amended complaint, but you already got a lot of

6    high-profile people.

7            MR. GOTTLIEB:  I wasn't suggesting going longer than

8    that, your Honor.  So, yes, I think March 11 would be a date

9    that we would very easily meet or perhaps even provide one in

10   advance of that.

11           THE COURT:  One of the topics that I will want to make

12   sure is being considered by you and by your adversary is the

13   sharing of discovery with the parties in *Jones v. Abel*.

14           From my glance at the captions, it appears that the

15   main party who is in *Jones v. Abel* but not otherwise in this

16   litigation is Jones and Jonesworks.  Given their relationship

17   to the parties, one would think that expanding the protective

18   order to them wouldn't be much of an issue, but I will hear

19   from them.

20           MR. GOTTLIEB:  We obviously can't speak for Ms. Jones

21   on that, your Honor.  But so far as we are concerned, we are

22   happy to work with both the defendants and all parties to all

23   of these actions in fashioning a protective order if that is

24   more efficient for the Court.

25           THE COURT:  Anything else I should hear from you other

1    than the issues that you've raised with respect to pretrial

2    publicity?

3            MR. GOTTLIEB:  No, your Honor.

4            THE COURT:  Okay.  I will hear from anybody else who

5    wants to be heard from in *Lively v. Wayfarer Studios*.

6            On plaintiff's side anybody else.  No?

7            All right.  On the defendants' side, *Lively v.*

8    *Wayfarer Studios*, on the plaintiffs' side on *Wayfarer Studios*

9    *v. Lively*?

10           MR. FRIEDMAN:  Thank you, your Honor.  Brian Friedman.

11           First and foremost, we would like to move the case

12   along as quickly as possible and think that the order that we

13   had agreed to works notwithstanding the amendment of the

14   complaint.  The reason why is adding the New York Times into

15   this action seemed to just make it simpler to have everyone in

16   one place and for judicial ease that having everybody together

17   seemed to be a more efficient way to deal with case management.

18           THE COURT:  What is the status of the California case,

19   and what are your plans with respect to the California case

20   against the New York Times?

21           MR. FRIEDMAN:  The plan is to dismiss that case

22   without prejudice today now that they have been added to this

23   case and to try and get them served today so we can move this

24   along as quickly as possible.  And we would like to move it

25   along as quickly as possible.  We don't think that the amended

1    complaint changes the core issues at all in the case.

2              THE COURT:  What have you added in the amended

3    complaint that was not in the original complaint besides adding

4    the New York Times and the defamation claim against the New

5    York Times?

6              MR. FRIEDMAN:  The only thing from a cause of action

7    or claim point of view that's been added were against the New

8    York Times for promissory fraud and breach of implied fact

9    contract against the New York Times.  And that's based on

10   information that we recently received regarding the metadata of

11   when the New York Times was involved.

12             Those are the only new claims that have been added,

13   and they only relate to the New York Times.  There are no new

14   claims that have been added as it retes to the parties that

15   already existed in the matters before you.

16             THE COURT:  Okay.

17             MR. FRIEDMAN:  So we think that we could proceed

18   forward and move forward and do it an efficient process.

19   There's no reason to wait at all.

20             I don't know, frankly, who the additional parties are

21   that are going to be added by counsel that just suggested that.

22   So I don't know whether they would need separate counsel or

23   they would be represented by us with appropriate conflict

24   waivers or otherwise.

25             I could answer that if I knew that and contacted them

1    and would be able to respond to that, and we would move that

2    along quickly.  But I don't think that changes at all the core

3    discovery and the core information that's needed to obtain,

4    which I believe that everybody is kind of aware of what's

5    needed in the case and what types of discovery will exist.

6            THE COURT:  How far along did the New York Times case

7    in California get?

8            Was there a case management plan in that or any

9    activity?

10           MR. FRIEDMAN:  No.  There was actually no activity at

11   all.  They had not been served.  There was some telephone calls

12   that were made, but they had not been served in the California

13   action at all.

14           After seeing kind of your case management order and

15   just for the efficiency of the case, it kind of made no sense

16   to be doing this on different coasts and with different courts.

17   It seemed that so many of the issues are going to be so similar

18   that to have it all in one proceeding in front of your Honor

19   would make the most sense.

20           THE COURT:  Okay.  I interrupted you.  You were going

21   to talk about the nature of the discovery and discovery issues.

22           MR. FRIEDMAN:  I think the nature of discovery is, you

23   know, I mean, is quite clear.  I mean, there's documents that

24   we need that we are not privy to.  There are documents that

25   were exchanged between Ms. Jones and her company, Leslie Sloane

1   and Vision PR, and the Lively and Reynolds parties.  There are

2   documents that are going to be needed, there are depositions

3   that are going to be needed in that respect.

4           As a matter of fact, we made a request to take

5   Ms. Lively's deposition as soon as possible.  We don't need

6   necessarily documents for that deposition, you know, at a date

7   that's sufficient for her.  We would like to be able to take

8   her deposition in the case.  We don't think we need any

9   documents for that deposition.  For other depositions, it's

10  going to be important to understand some of the other documents

11  that we don't have and that are in the possession of the other

12  parties that we are unaware of.

13          But for case efficiency sake and for moving this

14  along, we would really urge the Court to allow discovery to

15  take place and move forward, in part because the harms are

16  actually being suffered and have been suffered since the New

17  York Times article came out.

18          There's been a number of projects, to the hundreds of

19  millions of dollars, lost by Wayfarer.  There have been

20  significant damages from Tag PR and Melissa Nathan losing

21  clients.  You know, as the Court knows, when things hit the

22  press and especially hit the New York Times, people sometimes

23  react before there is a judicial determination as to who's

24  right or who's wrong.

25          These parties are suffering greatly.  So it's so

1    important from our client's perspective of having future

2    business of having a future livelihood that they have a right

3    to move forward as quickly as possible.

4          We don't think there's any prejudice whatsoever in not

5    moving forward.  We don't think there's any prejudice to the

6    other side in starting that discovery now and moving that

7    along.

8          Again, if counsel is willing to represent who the new

9    parties were and the new claims were, you know, I can work as

10    early as today and find out whether that party could be

11    represented by us legally and ethically with a conflict waiver,

12    or, alternatively, whether we needed to get separate counsel.

13          But if it's a party that needs to get separate

14    counsel, obviously they are going to take whatever time they

15    need to get separate counsel.  I am just concerned that that

16    process in and of itself could delay the proceeding.

17        THE COURT:  One reason for at least extending the

18    initial deadlines in the case management plan does have to do

19    with efficiency.  You are going to get document requests, no

20    doubt, from the other side, and you are going to get document

21    requests from the New York Times.

22          The New York Times is not going to be prejudiced by

23    whatever it is that the Lively parties have asked for.  They

24    are going to have the right to demand documents even if Lively

25    hasn't demanded those documents.

1              If I agreed with what you have suggested, then you may

2       have to do the same document review twice.  The same thing goes

3       for the other side, for every party that is involved, even if

4       it's just documents, there's some inefficiency to doing a

5       document review twice.

6              That is not to say depositions.  Depositions are not

7       going to go forward until we know who the parties are in the

8       case, because I am not going to have depositions done twice

9       unless there's some very good reason for that.

10             MR. FRIEDMAN:  We are happy to work 24 hours a day

11      seven days a week to make sure that those documents are

12      produced timely and right away.  We're not delaying this in any

13      way.  So even though it might require more effort on our side,

14      we are more than willing to do that.

15             THE COURT:  Okay.  All right.

16             Do you want to address your views with respect to an

17      appropriate protective order and timeline for an appropriate

18      protective order.  There's going to need to be something like

19      that in place before documents start to be exchanged.

20             MR. FRIEDMAN:  Sure.

21             We received a draft protective order, counsel

22      discussed on the phone.  We could review that today.  We could

23      provide comments as early as tomorrow to that and would agree

24      to an appropriate protective order that makes sense for the

25      case and be prepared right away to enter into one.

1              THE COURT:  Okay.  All right.  Thank you.

2              Let me hear from anybody else on the plaintiffs' side

3    in Wayfarer Studios and defendants' side in the Lively matter.

4              MR. FRIEDMAN:  Thank you, your Honor.

5              MS. McCAWLEY:  Judge, Sigrid McCawley.  I just want to

6    reiterate, we received --

7              THE COURT:  Remind me.  You represent?

8              MS. McCAWLEY:  I represent Leslie Sloane and Vision

9    PR.

10             THE COURT:  Okay.

11             MS. McCAWLEY:  We received the amended complaint on

12   Friday night.  We submitted a letter to your Honor on Thursday,

13   not knowing that they were going to amend the complaint.  We

14   still intend to move to dismiss that complaint, so we are

15   happy --

16             THE COURT:  What are you going to move against, and

17   what are you --

18             MS. McCAWLEY:  There are three claims against my

19   clients Leslie Sloane and Vision PR.  Two of those are not

20   actionable under New York law, which we contend would apply,

21   but even under California law are not valid.

22             THE COURT:  Which are those?

23             MS. McCAWLEY:  That's the false-light

24   invasion-of-privacy claim as well as the civil extortion claim.

25             As to the defamation claim, four of the five

```
1    plaintiffs don't even allege statements in the complaint

2    against my client or her company that she owns.  So there are

3    significant deficits in even the amended complaint after having

4    a shot to clean that up that have not been cleaned up.

5           So at this point we are in a position where we want

6    to, you know, be moving to dismiss quite quickly because we

7    don't believe they should have been dragged into this case to

8    begin with.

9           This was really a case about their crisis PR

10   management company making statements about burying people and

11   destroying people.  My client and her company simply have been

12   dragged in as a finger pointing mechanism.  We want to make

13   sure we get them out as quickly as possible.  So we would like

14   the opportunity to move to dismiss based on those legal

15   deficiencies in the amended complaint.

16          THE COURT:  Okay.

17          How soon do you plan to move to dismiss?

18          Will you move to dismiss within the timetable

19   permitted by the federal rules as against the amended

20   complaint, or do you need more time?

21          MS. McCAWLEY:  No, we will, your Honor.  In fact, we

22   may do it ahead of schedule.  That is our intent, is to get

23   that motion to dismiss before the court as quickly as we can to

24   have that resolution.

25          THE COURT:  Okay.  I don't hear you saying that you
```

1    are moving for a stay of discovery as against your clients.

2            Are you?

3            MS. McCAWLEY:  We did discuss that the

4    meet-and-confer, your Honor, because again I contend that my

5    client and her company never should have been dragged into

6    this.  So them being subject to the full-scale discovery that

7    is going to be in this case seems inherently unfair.

8            But, of course, I wanted to allow the Court the

9    opportunity to submit the motion to dismiss.  As you know, the

10   standard under New York law contemplates the Court having an

11   opportunity to look at that motion to dismiss before making

12   that determination on a stay.

13           So we would like to lay out that information for the

14   Court, but that is one of the things we contemplate, because we

15   believe it would be inherently unfair for our client and her,

16   you know, her female-run company to have to be dragged in

17   through this significant and very expensive discovery in this

18   case when we don't contend that they have any viable legal

19   claims against her.

20           THE COURT:  What significant prejudice would you

21   suffer by having to serve initial disclosures and requests for

22   production and interrogatories?

23           Those seem to me to be fairly standard.  There may be

24   some legal expense, but that's always going to be the case.

25           MS. McCAWLEY:  Sure.  That's fair, your Honor.  I just

1    think the difference is really on the receiving end, of course,

2    because there is always a difference -- you know, certainly as

3    a third party she may be subject to some discovery in this

4    case, and we will certainly cooperate in that regard to the

5    fullest extent.

6         However, you know, as the Court well knows, there is a

7    vast difference between being a party -- she has to be present

8    here today have counsel here today, you know, and for all of

9    the hearings upcoming, when we contend that when the Court sees

10   our motion to dismiss we believe that you will very readily,

11   after reviewing that amended complaint, realize the significant

12   deficits in how it's pled, and we will hopefully be able to get

13   her dismissed as a defendant in the case.

14        THE COURT:  All right.

15        MS. McCAWLEY:  Thank you, your Honor.

16        THE COURT:  Anybody else on the defendant's side in

17   the Wayfarer matter?

18        All right.  Let me now hear from the parties in *Jones*

19   *v. Abel*.

20        Counsel for Jones.

21        MS. TAHLER:  Good morning, your Honor.  We agree that

22   there are efficiencies here in terms of discovery proceeding

23   together in the cases.

24        We were not a part of the meet-and-confer that the

25   Lively and the Baldoni parties had last week, and so we have

```
1   begun a meet-and-confer on dates, but haven't agreed to dates
2   on our end.  So the idea of there being a collective discussion
3   among all of the related parties as suggested by the Lively
4   parties makes sense to us as well.
5           THE COURT:  Okay.  All right.
6           Anything further?
7           MS. TAHLER:  No, your Honor.
8           THE COURT:  Okay.
9           For Abel in Jones v. Abel?
10          MR. FRIEDMAN:  On behalf of the Abel parties, your
11  Honor, Brian Friedman.  As the Court --
12          THE COURT:  Before you speak, let me ask one other
13  question to counsel for Jones.
14          MR. FRIEDMAN:  Sure.
15          THE COURT:  So I assume that you have seen and had the
16  opportunity to review the case management plan that was
17  submitted by the parties in Lively v. Wayfarer and Wayfarer v.
18  Lively?
19          MS. TAHLER:  Yes, we have, your Honor.
20          THE COURT:  And do you see any challenges on behalf of
21  your clients being able to work with that case management plan?
22          MS. TAHLER:  Largely, your Honor, through the pretrial
23  discovery the dates are pretty workable.  There are a few dates
24  that we would suggest modifications of simply because of the
25  dates that our motion to dismiss, assuming that they will move
```

1    to dismiss and our opposition will be due, that we would want

2    to move back a little bit.

3            THE COURT:  Say that again.  Which dates?

4            MS. TAHLER:  So, for example, the initial requests for

5    production shall be served by March 5.  As we read the

6    calendar, our opposition to a motion to dismiss from then would

7    be due on March 4, so we would ask that that be pushed back

8    until March 10 just so those two dates wouldn't align.

9            And then for initial disclosures, on this schedule it

10   was February 13.  We would ask that that be pushed back to

11   February 18, just to give us a little bit more time as well,

12   since we were, our case was just removed last week.

13           But the place where we significantly diverge is when

14   we get into pretrial and trial, because although there are some

15   issues of similar factual with respect to parties -- or, excuse

16   me, with respect to individuals and companies, the issues in

17   the case, both factual and legal, are very different than those

18   involving the Baldoni and the Lively parties.  So we would

19   suggest that our trial and pretrial should come after the

20   Baldoni and Lively parties.

21           THE COURT:  Okay.

22           Let me hear from counsel for Abel.

23           I should say in response to that last comment that no

24   motion has been made to me to consolidate *Jones v. Abel* for

25   trial purposes, and I have not *sua sponte* come to a conclusion

that they should be consolidated for trial purposes.  In fact,,

from my first glance, what I had anticipated is that the *Jones*

*v. Abel* trial, if there is a trial, would take place after

*Lively v. Wayfarer* and *Wayfarer v. Lively*, but if there is a

motion, I would consider that obviously with an open mind.

Okay.

MS. TAHLER:  Thank you, your Honor.  I was just

responding to the rest of the dates on the --

THE COURT:  I appreciate it.

MS. TAHLER:  Thank you.

MR. FRIEDMAN:  Thank you, your Honor.

Brian Friedman, on behalf of Jennifer Abel, which is

also a woman-owned company, along with Melissa Nathan's Tag

company, The Agency Group.

I do want to stress something that you might not know,

your Honor, which is that Ms. Jones and Jonesworks filed in the

Supreme Court in New York.  They had that case, which has been

now removed.  They immediately conducted discovery in that

case.

As a matter of fact, they served subpoenas in that

case.  And even though we removed the case, apparently there

were significant responses to those subpoenas, which I don't

know whether we've seen them or not.  I know that something

came over the e-mail this morning but I haven't looked at it

closely.  Cocounsel may be aware of what that is and what that

 1    isn't.

 2         But the Jones parties and Jonesworks were very eager

 3    to move quickly and start discovery very quickly and in fact

 4    got responses to discovery.  So to come into this court and say

 5    we should wait and we should not do discovery, go to the back

 6    of the bus, and there is no reason for us to be involved, and

 7    this is a different case feels disingenuous and feels

 8    inappropriate in light of the fact that they have initiated the

 9    discovery, already moved forward with it.

10         We are ready to respond and ready to move forward with

11    the discovery.  The problem is, you know -- truly, I say this

12    with all sincerity, my clients are devastated financially and

13    emotionally and need the case to move as quickly as it can

14    within the justice that your Honor sees.  But it's just a fact

15    that you should know that the Jones party and the Jonesworks

16    has already issued multiple subpoenas and already received

17    documents in connection with that.

18         So obviously they felt that important to do.  And we

19    feel it important to do that too and move the case along and

20    not wait.

21         So I just wanted to raise that issue with you, your

22    Honor.

23         THE COURT:  Mr. Gottlieb, I will give you a chance to

24    be heard since your adversary, just by the way things have

25    lined up, had two shots.

1              MR. GOTTLIEB:  Thank you, your Honor.

2          Just a few point.

3          One is the discussion that you had with my friend

4     about what's changed in the amended complaint.  One of the

5     complications with the amended complaint is that they have

6     appended this 168-page exhibit that is a lengthy factual

7     narrative that contains, as best as we can tell, sort of a

8     day-by-day recitation of their view of what happened.  This is

9     Docket No. 50-1.

10         That actually --

11             THE COURT:  Are you going to move to strike that?

12             MR. GOTTLIEB:  That is what I am getting to, your

13    Honor.  We haven't yet decided, but we may need to move to

14    strike document 50-1 in large part because there's no mechanism

15    we think for us to admit or deny the allegations in it.

16         They are raising defamation claims where their

17    pleading burden on an actual malice standard requires a

18    significant amount of specificity in terms of the allegations

19    that they are making.  So we anticipate moving to strike Docket

20    50-1, and that does affect a bunch of other things in terms of

21    the timing of how discovery may line up, and the motion --

22             THE COURT:  Let me interrupt you for a second and just

23    ask your adversary.

24         I mean, the way the federal rules work is that, as the

25    plaintiff, you can attach an instrument to a complaint.  For

1    example, you can attach a contract if you're suing on a

2    contract.

3         But the law in the circuit is pretty clear that you

4    can't just attach a factual narrative for the reasons that

5    Mr. Gottlieb has identified, which is that there's no mechanism

6    for responding to the factual narrative that's attached.

7         Frankly, it is not even clear that Rule 11 applies to

8    the attachment as opposed to the body of the pleadings itself.

9         So what is the purpose of that attachment?

10        MR. FRIEDMAN:  Your Honor, the purpose of the

11   attachment, your Honor, was to make sure that -- frankly, it

12   was almost -- to make sure that all of the text messages and

13   all of the information was provided that formed the basis for

14   the underlying claims.

15        That was the purpose of putting that forth, so there

16   would actually be the documents that we had.  It is going to

17   make discovery much easier, because we're putting it all out

18   there and have nothing to hide at all.

19        THE COURT:  Well, I mean, that is actually almost

20   exactly what the federal rules are designed to prevent as I

21   understand them.

22        You can quote an e-mail or text message in the body of

23   a complaint, but you can't then just attach the stuff that the

24   moving party, the defendant on a motion to dismiss, can then

25   refer to the documents to the extent that they're integral.

1    But you can't just give me a complaint and then give me a whole

2    bunch of documents.

3          MR. FRIEDMAN:  It is not a whole bunch of documents.

4    It is actually a timeline that is incorporated in the complaint

5    as an attachment.  Whether it was put in the body of the

6    attachment, where some of it already is, or whether it was

7    separated as an attachment and then incorporated by reference,

8    we are happy, if your Honor wishes to, include it in the body,

9    but it feels like it serves the same purpose.

10          THE COURT:  Well, I mean, that would be a second

11   amended complaint, and I am not going to express a view with

12   respect to that.  I am just asking my questions.

13          All right.  Mr. Gottlieb?

14          MR. GOTTLIEB:  I don't believe what Mr. Friedman has

15   just described is accurate.

16          If you just take one example as I am standing here,

17   your Honor, pages 80 to 81 of this document contain some images

18   but then contain lengthy paragraph explanations that are in

19   someone's voice.  Whose voice I don't know, because it doesn't

20   say in this document, so there's no way for us to even

21   articulate how to respond to the speaker, what the factual

22   allegations are.

23          I do think the rules require these kinds of

24   allegations or messages to be put in the paragraph allegations

25   of the complaint for the precise reason that we have an

1    opportunity to admit them or to deny them or to make a Rule 11

2    motion based on them.

3              We do intend to file that motion to strike, your

4    Honor.  We are happy to make that motion orally now, but we are

5    also happy to submit a letter motion to the Court as quickly as

6    we can when this hearing is done.

7              I think one thing Mr. Friedman didn't mention is that

8    he uploaded this complaint and this attachment to a website

9    that he created.  I think that the reason that it was created

10   was for the purpose of this case.

11             One of the things we plan to take discovery on is who

12   created that website, who funded it, who was involved in

13   devising it.

14             One of the reasons we've raised Rule 3.6 objections is

15   because there are significant amounts of material, including

16   just firsthand attorney narrative it appears, throughout this

17   document that are being portrayed as, you know, just recitation

18   of facts that are going out there into the world.

19             So we will make that motion promptly on the docket,

20   your Honor.

21             I just want to respond to the suggestion that we're

22   trying to delay the discovery in this case.  We are very eager

23   to have discovery start, both third-party and party discovery

24   in this case.  What we do not want to have happen is to have

25   things done twice.

1          In the meet-and-confer that we had with the parties,

2     Mr. Friedman just sort of announced in the middle of it that he

3     intended to take Ms. Lively's deposition immediately, tomorrow,

4     from now until eternity, some claims like that.

5          THE COURT:  I don't think that's going to happen, but

6     I also don't think that you are going to be the one to choose

7     who takes Ms. Lively's deposition.

8          Do you disagree with that?

9          MR. GOTTLIEB:  Your Honor, I think that discussions

10    about that are entirely premature because we don't have a

11    notice for the deposition yet.

12         THE COURT:  Okay.

13         MR. GOTTLIEB:  So we haven't even had an opportunity

14    to make an objection that we may or may not have.  The point

15    being --

16         THE COURT:  You've got my preliminary views both on

17    whether Ms. Lively's deposition is going to be taken before

18    there's some documents exchanged and with respect to whether

19    Ms. Lively gets to choose her interrogator.

20         MR. GOTTLIEB:  I understand that, your Honor.  That

21    was not the point that we were trying to make in that

22    meet-and-confer.

23         But, in any event, look, we would love for

24    Mr. Friedman to take Ms. Lively's deposition blind, without

25    documents.  That would be great for us.  The problem is there

1    are other parties who are going to be want to participate in

2    that deposition, and she is not going to sit for a deposition

3    more than once, just like his clients aren't going to sit for a

4    deposition more than once.

5            THE COURT:  I guess I should say that if the parties

6    all agree that a deposition can be taken without documents I am

7    not going to stand in the way.

8            Go ahead.

9            MR. GOTTLIEB:  Sure, your Honor.

10           My point is that we don't want a deposition to be

11   taken more than once.

12           So then with respect to the ongoing harm that

13   Mr. Friedman mentioned with respect to his clients, that is the

14   same issue that we have with respect to our clients, your

15   Honor.

16           Our clients have been subject since August to --

17   Ms. Lively in particular since August has been subject to an

18   ongoing campaign of retaliation for reporting sexual

19   harassment.  It has been devastating to her, as laid out in our

20   complaint.  It continues to this day being weaponized by the

21   defendants and their agents.

22           That harm has made our client very eager to move

23   forward with the discovery in this case and to have her day in

24   court.  All we're trying to do is to put an orderly, efficient

25   process around that so it can take place in a way that meets

1    the Court's schedule and has the appropriate respect for third

2    parties.

3              THE COURT:  All right.  Thank you.

4              Give me one moment to look at the case management

5    plan.  I do want to make two rulings before I do that on the

6    case management plan.

7              First of all, I am going to order that the parties

8    submit a proposed protective order no later than March 11, 2025

9    for the Court's review.

10             If there are competing forms of the proposed

11   protective order, those are to be submitted by March 11, 2025,

12   with legal authority supporting each sides' position.

13             With respect to the motion to strike, the motion to

14   strike can be made as soon as the defendant in the *Wayfarer v.*

15   *Lively* matter wants to make it.  It must be made within the

16   time period permitted by the Federal Rules of Civil Procedure.

17   It also must be made by way of formal motion rather than by

18   letter motion.

19             With respect to letter motions, the parties should

20   follow my individual practices, which limit the types of letter

21   motions that can be made without leave of the Court.

22             Give me one moment on the case management plan.

23             MR. FRIEDMAN:  Also, your Honor, when you have one

24   moment, I just want to be heard as to what was just stated, if

25   possible.

```
1              THE COURT:  If it's brief.

2              MR. FRIEDMAN:  Very brief.

3              THE COURT:  Okay.

4              MR. FRIEDMAN:  I just wanted to say that with respect

5    to the website, only public available documents that can be

6    downloaded by anyone exist on that website.

7              THE COURT:  All right.  I am going to hear from

8    Mr. Gottlieb regarding pretrial publicity in a moment.

9              I am going to adopt the case management plan submitted

10   at 49-1 in Lively v. Wayfarer Studios and Wayfarer Studios v.

11   Lively with the following changes:

12             Initial disclosures will be due on February 18 and not

13   on February 13.

14             Initial requests for production of documents will be

15   due on March 14, 2025.

16             Interrogatories pursuant to Rule 33.3(a) will be due

17   on March 14, 2025.

18             I am going to adopt the rest of the case management

19   plan as originally submitted in those two matters without

20   prejudice to an application to amend the case management plan

21   by any party under Rule 16 and after the filing of the amended

22   pleadings by the Lively parties and also on application by the

23   New York Times once they are served and appear in the case.

24             So that's my ruling with respect to that.

25             With respect to Jones v. Abel, I am going to adopt as
```

1    the case management plan the case management plan and

2    scheduling order in *Lively v. Wayfarer Studios* and *Wayfarer*

3    *Studios v. Lively* with the exception that I am not adopting the

4    date for the proposed joint pretrial order, and I am not

5    adopting the deadline with respect to summary judgment.  Those

6    deadlines will be discussed at a postdiscovery status

7    conference.

8         Finally, with respect to the postdiscovery status

9    conference in both matters, give me one moment.

10        THE COURT:  October 21, 2025 at 10:00 a.m. works for

11   the Court.  That will be a conference that will be held in the

12   consolidated matter as well as in *Jones v. Abel*.

13        The parties had previously indicated the deadlines on

14   which they plan to file their motions to dismiss.  Those are

15   the deadlines that are set forth in Federal Rules of Civil

16   Procedure.  The responses to the motions to dismiss will be due

17   on the deadlines under the Federal Rules of Civil Procedure.

18        Under my individual practices, the default page

19   numbers as set forth in the local rules apply, unless the

20   parties mutually reach an agreement to the contrary.  So you

21   can meet and confer with respect to additional pages.  If you

22   reach an agreement, that agreement will apply.

23        If a party is not happy with the default page limits

24   or with deadlines for filings, they will have to apply to me by

25   letter motion.

1          Okay.  Mr. Gottlieb, you wish to be heard with respect

2    to pretrial publicity.

3          MR. GOTTLIEB:   Thank you, your Honor.

4          In this Court's January 27 order it asked the parties

5    to be prepared to address the letter motion about pretrial

6    publicity.

7          The basis for our motion is encompassed in the letter

8    that we submitted at Docket No. 17 as well as No. 38 in the

9    Lively case and numbers 43 and 27 in the Wayfarer case.

10         The issue in our view is relatively straightforward.

11   It is that the conduct that Mr. Friedman has been engaged in

12   since December has been in direct violation of New York Rules

13   of Professional Conduct 3.6, particularly 3.6(a), which applies

14   to statements made by lawyers who are participating in

15   litigation of a matter and prohibits extrajudicial statements

16   that the lawyer knows or reasonably should know will be

17   disseminated by means of public communication and will have a

18   substantial likelihood of materially prejudicing an

19   adjudicative proceeding in the matter.

20         We believe we have laid out in our letters why the

21   statements that Mr. Friedman has made violate that provision.

22   We believe we have also laid out in our letters why the

23   statements do not fall within the exception provided at Rule

24   3.6(d), which does provide for responses that a lawyer can make

25   that shall be limited to such information as is necessary to

1   mitigate recent adverse publicity.

2           Mr. Friedman has acted in direct contravention of Rule

3   3.6 to date by making inflammatory extrajudicial comments

4   regarding Ms. Lively and her character as well as her motives

5   for entering into this litigation and conduct within the

6   litigation.

7           He has made that to the media across the country in

8   different sectors.  We have provided a list of his public

9   statements at Docket No. 17-2, and his statements have been

10  reposted or circulated hundreds of times, perhaps more, to

11  publications all around the world.

12          The statements also include not just sort of press

13  releases that Mr. Friedman has sent out to the media, but

14  appearances that Mr. Friedman has made shows, including shows

15  hosed by his former client, Megyn Kelly, and threats to

16  establish a website, which has since been established, that he

17  claimed would quash Ms. Lively's claims.

18          The website is now a reality.  While we agree that the

19  only things we've seen posted to that website to date are the

20  pleadings in this case, one of those two pleadings, the

21  exhibit, we believe was intended to convey information that

22  they weren't willing to put into the verified complaint that

23  they have filed with this Court, but instead attached as an

24  exhibit as a lengthy factual narrative.

25          We put Mr. Friedman on notice of his ethical

1    obligations no later than December 23 in the letter that we put

2    on the docket at Docket 17-3, when we sent him the letter

3    reminding him of his ethical obligations in connection with the

4    initial statement that he provided to the New York Times on

5    December 21, and in that letter we also notified him that he

6    was liable for claims of defamation that our client had, and as

7    well was a material fact witness in this case as a result of

8    the statements that he has made and conduct in which he was

9    engaged back in August, all of which is laid out at Docket No.

10   17-3.

11        Really the only response that Wayfarer's counsel has

12   offered in Docket No. 27 is that their efforts are not

13   prejudicial and that essentially we started it with the New

14   York Times article that they've cited.

15        But those arguments should be rejected out of hand.

16   We briefed this and addressed this in our papers, but Rule 3.6

17   is a specific rule that governs extrajudicial statements by

18   counsel, by lawyers, it is a rule directed at lawyers.

19        They have not made any allegation that there were any

20   extrajudicial statements by lawyers in the New York Times

21   article for starters.  But, in any event, they don't dispute

22   that they have been out regularly in the press making attorney

23   statements addressing the factual allegations in this case,

24   attacking the character of Ms. Lively, using words that

25   describe her motives, her character, describing the complaint

1    as being filed for PR purposes only, and the like.

2            As we've explained in our letter motions, that

3    assertion is both incorrect on its face, and it would gut the

4    purpose of Rule 3.6(d) because it would simply allow an

5    attorney, once somebody else has said something, to sort of

6    speak on and on and on in any way they wanted to rather than to

7    the limitations that are provided by Rule 3.6(d).

8            Contrary to Mr. Friedman's public statements, we have

9    not requested a gag order in this case.  What we have requested

10   in our initial letter in Docket 17 at page 3 is that the Court

11   should exercise control over its docket to avoid improper

12   conduct by counsel, and we cited a case, *Hice v. Lemon*, from

13   the Eastern District of New York, in which the Court, following

14   extensive media engagement by one of the counsel, adopted Rule

15   3.6 as an order of the court applicable to all counsel of

16   record and noticing that violations of it would be punished

17   under Rule 16(f) of the Federal Rules of Civil Procedure.

18           Although we cited that Eastern District case, there

19   are also Southern District cases that stand for the same

20   proposition.  There is a case *In Re General Motors LLC*, which

21   is 2015 WL 4522778, from 2015, holding the same proposition.

22           Another case, *Munoz v. City of New York*, which is 2013

23   WL 1953180, an S.D.N.Y. case from 2013, and then *Laugier v.*

24   *City of New York*, 2014 WL 6655283, in 2014, all of which

25   adopted 3.6 as a rule of conduct for attorneys participating in

1    the case.

2            That is really all we are asking for here, is that

3    this Court adopt Rule 3.6 as a rule of conduct going forward

4    and instruct that all of the counsel that have appeared before

5    this Court must follow Rule 3.6 going forward, and that it

6    would be enforceable via Rule 16(f) if not followed going

7    forward.

8            THE COURT:  So why isn't the harm that you identify

9    sufficiently addressed by the combination of the following:

10           Number one, with studious attention by the Court at

11   the request of the parties to the requirements with respect to

12   filing, and particularly making appropriate motions to strike.

13   And the Court does have sanction power if it looks like the

14   Court's docket is being abused for the purpose not of

15   litigating but of improperly disseminating information that

16   would prejudice a jury.

17           Number two, as Judge Furman noted in *Munoz*,

18   appropriate voir dire of the jury when the jury is impaneled.

19   And, as Judge Furman also noted in *Munoz*, the handling of any

20   ethical complaints by the appropriate body, which would be the

21   ethical authorities in New York and whichever other ethical

22   bodies are appropriate.

23           MR. GOTTLIEB:  So I think, taking those in reverse

24   order, the reason why just relying on ethical complaints to the

25   bar doesn't really work in this case is because you have

1    attorneys from multiple, different jurisdictions, including

2    Mr. Friedman, who is the attorney that we have addressed this

3    to, is appearing in this court pro hac vice.  So I think there

4    is a special need in this case to clarify the rule that will

5    govern the extrajudicial statements, given the conduct of the

6    attorneys in this case thus far, going forward.

7            It makes it different from a typical case where you

8    have, for example, the U.S. Attorney's Office and the Federal

9    Defenders office that are regularly appearing before this

10   Court, and it is obvious what bar organizations would be able

11   to resolve those kinds of complaints, whereas here it is a

12   little bit tricky.

13           We think that filing motions to strike and sanctions

14   power are, of course, remedies that are available, but they are

15   remedies that can't unring the bell once you have statements

16   that sort of ricochet out through the media, both through

17   traditional and social media.

18           We are in the process in this case of trying to trace

19   how far some of these statements have reached, but they are

20   into the thousands upon thousands when they're repeated on

21   TikTok and other social media platforms.  It's very difficult

22   to unring that bell when the attorney is specifically targeting

23   the sort of way that the public is consuming information about

24   a particular case and doing it in a way that is directly

25   attacking the character, integrity, truthfulness of a witness

1    without being subjected to the kind of tests that are provided

2    in the adversarial system, which is through cross-examination

3    and the rules that govern the Federal Rules of Civil Procedure.

4            So I think that same answer applies to what Judge

5    Furman wrote about using voir dire questions as well, which is

6    it is very hard to unring the bell if you don't have any

7    limitations on what the attorney is allowed to go out and say

8    about the case in public.

9            That's why New York has Rule 3.6 in the first place,

10   is because those rules are clearly not sufficient to cabin in

11   the behavior of attorney conduct in every case.  One would hope

12   they would be, but they are not in every case, and that's why

13   Rule 3.6 imposes the limitations that it does.

14           THE COURT:  Give me an example of one statement that

15   you are particularly concerned about, one or two statements.

16           MR. GOTTLIEB:  Sure.

17           So we have laid out these statements at document 17-2.

18   One example is a statement on January 7, where Mr. Friedman is,

19   I think it is a press statement that was released, and this one

20   was printed in People.

21           And he says:  "we are releasing all of the evidence

22   which will show a pattern of bullying and threats to take over

23   the movie.  None of this will come as a surprise because,

24   consistent with her past behavior, Blake Lively used other

25   people to communicate those threats and bullied her way to get

1    whatever she wanted.  We have all the receipts and more."

2         Which is making a statement about the witness's

3    character, but also characterizing the evidence that he

4    intended to release, which, as we pointed out in our papers, is

5    a one-sided presentation of evidence filled with attorney

6    testimony in it.

7         There's a series of statements from December 21

8    through December 28 in which he makes false representations

9    about the conduct of his own clients and that we have laid out

10   in the papers.

11        There is a statement that he made on his client's

12   show, the Megyn Kelly Show, also on January 7, where he claims

13   that evidence is being planted.  He says, "Unlike any other

14   case I've handled" -- sorry.  I'm searching for the right quote

15   here.

16        He says: "Blake Lively, if she was sexually harassed

17   to such a degree in this film and in this situation, you know,

18   she wouldn't have returned to the film.  It's very clear what's

19   being planted.  There's evidence for all those points.  There

20   are text messages for all these points."

21        He continues in a statement -- sorry.  Above is where

22   he said:  "Blake Lively was no victim.  She was in control.

23   She was in power.  She took over the film.  She used the

24   allegations of sexual harassment, she used these allegations to

25   bully and to try and leverage her position so she could be the

1    de facto director in this case."

2            THE COURT:  Isn't that in fact exactly what's stated

3    in his complaint?

4            MR. GOTTLIEB:  No, I don't think so, your Honor.

5    Especially the statements, there are statements from before he

6    even had a complaint that was filed.  So the answer would be

7    no.  But I think that --

8            THE COURT:  The vouching for this is unlike any other

9    case, I get your point on that.

10           MR. GOTTLIEB:  Yes.

11           I think also, your Honor, there is a mechanism by

12   which attorneys can make statements about the allegations in

13   the complaint without making statements about the character of

14   the opposing parties.

15           Those usually include words like "as alleged in the

16   complaint" or "as we have said at paragraph" whatever of the

17   complaint.  An attorney can make a statement to explain why

18   their allegations are correct or why their allegations are

19   false, but the point of Rule 3.6 is that you are not supposed

20   to launch attacks on the other party's character, which is

21   exactly what is being done here, once you have a matter that is

22   in litigation and once you have invoked the jurisdiction of a

23   court to hear the dispute.

24           He is also making representations about the state of

25   the evidence.  In each of these he's making representations

1   about the state of the evidence that is a representation about

2   materials that are subject to discovery and materials that,

3   when he makes those statements out to the media and releases

4   material in a one-sided fashion, we don't have an opportunity

5   to rebut it.

6          The only way we have an opportunity to rebut it is for

7   us to then go out and make competing statements in the media.

8   That's precisely what Rule 3.6 is defined to avoid.

9          The best example of that is at pages 6 through 7 of

10  document 17-2, when Mr. Friedman took a video clip that is a

11  video depicting one of the allegations from Ms. Lively's

12  complaint.  He released that video publicly to a number of

13  outlets, and then he made comments about what he believes the

14  video proves or doesn't prove, that precise factual allegation

15  that is at issue in Ms. Lively's complaint that they are

16  responding to through the press by releasing the underlying

17  evidence that's supposed to be provided in discovery, and then

18  making comments about his opinion and his views about what the

19  video does or does not show.

20         The only way we can respond to that, given that

21  there's no opportunity for us to yet respond to that in court,

22  is for us to then go out into the media and give our own views

23  and our own take on that evidence.

24         That is exactly the kind of arms race to the media

25  when you have a disputed factual matter in court that's

1    supposed to be resolved here in court.  It's not supposed to be

2    resolved out in the press with the lawyers going on shows

3    arguing about a piece of evidence that is likely to go before a

4    jury at trial in this case at the end of discovery.

5         So that's particularly concerning to us.  If there's

6    no guardrails in place, it basically means that throughout the

7    conduct of this case, we all have to do our work in this case

8    and then we have to go out on shows arguing against each other

9    about what a particular document or text message or video

10   means.

11        We think rule 3.6 is clearly designed to stop that

12   type of process when you have a case being litigated in New

13   York.

14        THE COURT:  Do you have any issue with respect to

15   Mr. Friedman creating a website if it was limited just to the

16   filings in this case, making available to the public for free

17   what members of the public otherwise might have to pay a fee to

18   the Court system for?

19        MR. GOTTLIEB:  Not at all.  We have no problem with

20   that.  Our objection is to the exhibit to the complaint that

21   they have attached, which we will address in a motion to

22   strike.  But we have no objection to Mr. Friedman creating a

23   website and putting publicly filed pleadings or motion papers

24   out on that.

25        We understand that to be a not uncommon practice, and

1      we don't have an objection to that under Rule 3.6.

2                  THE COURT:  All right.

3             Mr. Friedman?

4                  MR. FRIEDMAN:  Thank you, your Honor.

5             First, let me say that what is conspicuously missing

6      from the argument that you just heard is that for months before

7      any filing was made in this case, the New York Times, giving 12

8      hours' notice, having had months of working with counsel and

9      others put out an article that completely devastated --

10                 THE COURT:  You don't have evidence that Mr. Gottlieb

11     was the one who was making those statements or a lawyer.  I

12     understand the argument that those are the rules.  You have

13     some latitude to respond to the New York Times article, but

14     that only gets you so far.

15                 MR. FRIEDMAN:  I agree with your Honor.  But the point

16     is that they have very pointedly used the press, and the New

17     York Times used the lawyers to make sure that what they were

18     doing was appropriate and above board.  I do want --

19                 THE COURT:  That's a disputed issue in the case as I

20     understand it, correct?

21                 MR. FRIEDMAN:  I think it is a disputed issue in the

22     case, but we know it to be a fact.

23                 THE COURT:  What ends up being facts are things that

24     either the jury finds as facts or the Court finds as facts.  It

25     is not a party's assertion that something happens to be a fact.

1    That's not the way courts of law work.

2            MR. FRIEDMAN:  I completely respect that.

3            This has not been a one-way street in this case at

4    all.  I can walk through statements made by Ms. Lively's

5    attorneys that have the same force and effect.

6            "On December 31, Wayfarer and its associates had

7    violated federal and California state law by retaliating

8    against her for reporting sexual harassment and workplace

9    safety concerns."

10           "The actress/producer's attorneys said in a statement

11    in a federal complaint Ms. Lively has brought this litigation

12    in New York, where much of the relevant activities described in

13    the complaint took place, but we reserve right to pursue

14    further action in venues and jurisdictions appropriate by law."

15           On January 2, "Nothing in this lawsuit changes

16    anything about the claims advanced by Ms. Lively.  We look

17    forward to addressing each and every one of those allegations

18    in Court.  We encourage people to read Ms. Lively's complaint

19    in its entirety."

20           On January 6, "This is not a feud arising from

21    creative differences or a he said/she said situation.  Her

22    lawyers state" --

23           THE COURT:  That is exactly the point, which is that

24    you could have said, Listen, I encourage the parties to review

25    our pleadings in this case.  Look at our pleadings.  You will

1    see they tell a very different story.  But you went a little

2    bit further than that.

3             MR. FRIEDMAN:  Can I just read something else that

4    they said on January 6:

5             "And their response to the lawsuit was to launch more

6    attacks against Ms. Lively since the filing.  They said sexual

7    harassment and retaliation are illegal in every workplace and

8    every industry, a classic tactic to distract from allegations

9    of this type of misconduct is to blame the victim by suggesting

10   they invited the conduct, brought it on themselves,

11   misunderstood the intentions or even lied," Ms. Lively's team

12   wrote.

13            "Another classic tactic is to reverse the victim and

14   offender and suggest the offender is actually the victim.

15   These concepts normalize and trivialize allegations of serious

16   misconduct."  And it goes on.

17            I can keep reading from January 6.

18            THE COURT:  Maybe you are convincing me that I should

19   adopt as an order of the Court that the lawyers are required to

20   comply with Rule 3.6, which is the relief that is being sought.

21            MR. FRIEDMAN:  I am actually in agreement with that

22   relief.  We want to comply with Rule 3.6.  We have no objection

23   to that.  The way this showed itself today was a gag order on

24   me not being allowed to speak to the media at all.

25            But I do want to just raise one other issue, an issue

1    where they said, "A woman speaks up with concrete evidence of

2    sexual harassment and retaliation and the abuser attempts to

3    turn the tables on the victim.  This is what experts call

4    DARVO -- deny, attack reverse, victim, offender."

5          "Wayfarer has opted to use these resources of its

6    billionaire cofounder to issue media statements, launch

7    meritless lawsuits, threaten litigation."

8          And it just goes on and on.  This has not been a

9    one-way street.  There are pages of this.  I don't mean to

10   waste your Honor's time, but I certainly would stipulate to the

11   professional rules of conduct and certainly want to abide by

12   that.  My grave concern is that my client suffered hundreds of

13   millions of dollars in prejudice as a result of actions they

14   were blindsided by.

15         THE COURT:  You know, both sides are saying that they

16   suffered hundreds of millions of dollars in damages.  I hear

17   what you are saying.  I also hear what they are saying.

18         Although I was hesitant when I came on the bench to

19   adopt Rule 3.6 as an order of the Court, since you both are

20   agreeing to it, I am going to adopt it as an order of the

21   Court.

22         I was hesitant to adopt it and I still am adopting it

23   with some reluctance, because while it is my expectation that

24   the parties will comply with their ethical obligations, I don't

25   expect this case and I wouldn't want this case to devolve into

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    satellite litigation over the comments of a lawyer.  Both have

2    said a lot in the pleadings that you've got in front of the

3    Court.  That gives I think the public plenty to feast upon.

4            So I will adopt 3.6 as an order of the Court on the

5    consent of the parties.

6            MR. FRIEDMAN:  One final comment.

7            Not to sound like a four-year-old fighting a

8    four-year-old with the "they started it," but, you know, in

9    these kinds of cases, once someone says something, it becomes

10   fact.  There's no way to fight against it.  You start to lose

11   things immediately without the ability to have the Court's

12   adjudication.  This was not started by us, your Honor.

13           THE COURT:  So one of the things that I had also

14   contemplated was accelerating the date of the trial from the

15   date that I had previously disseminated and which I have now

16   set as an order of the Court.

17           I am not going to do that because I am convinced that

18   the parties need the time for discovery.  But if it turns out

19   that this ends up being litigated in the press in a way that

20   would prejudice the opportunity of the parties to a fair trial,

21   one of the tools that the Court does have available to it is to

22   accelerate the date of the trial, so that's something that is

23   out there.  I don't want to do that.

24           But we are sticking to the trial date that I set so

25   that there will come a time when, unless this case is settled,

1    a jury will speak on the issues that you both have raised.

2    Then you will deal with the jury verdict.

3              3.6 will apply.

4              MR. FRIEDMAN:  I appreciate that.  The unfortunate

5    thing is damage is done before a jury speaks.

6              THE COURT:  That's the reason why you each have sued.

7              I get it.

8              MR. FRIEDMAN:  Thank you, your Honor.

9              THE COURT:  Okay.

10             Is there anything else from the Lively parties?

11             MR. GOTTLIEB:  No, your Honor.

12             THE COURT:  Anything else from the Sloane parties?

13             MS. McCAWLEY:  No, your Honor.  Thank you.

14             THE COURT:  Okay.

15             Anything else from Wayfarer?

16             MR. FRIEDMAN:  No, your Honor.  I think you made clear

17   about who has the right to choose their own lawyer for

18   depositions, so we're fine.

19             THE COURT:  If there becomes an issue with respect to

20   that, meet and confer and then you can raise it with the Court.

21             Anything further from Jones and Jonesworks?

22             MS. TAHLER:  No, your Honor.  Thank you.

23             THE COURT:  Okay.  Have a good day, everybody.

24             (Adjourned)

25