## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

BLAKE LIVELY,

     Plaintiff,

v.

WAYFARER STUDIOS LLC, et al.,

     Defendants.

No. 24-cv-10049 (LJL) (lead case)

WAYFARER STUDIOS LLC, et al.,

     Plaintiffs,

v.

BLAKE LIVELY, et al.,

     Defendants.

No. 25-cv-449 (LJL) (member case)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BLAKE LIVELY'S MOTION TO DISMISS THE AMENDED COMPLAINT AND FOR RELATED RELIEF

Esra A. Hudson (admitted *pro hac vice*)
Stephanie A. Roeser (admitted *pro hac vice*)
Manatt, Phelps & Phillips LLP
2049 Century Park East, Suite 1700
Los Angeles, California 90067
(310) 312-4000
ehudson@manatt.com
sroeser@manatt.com

Matthew F. Bruno
Manatt, Phelps & Phillips LLP
7 Times Square
New York, NY 10036
(212) 790-4500
mbruno@manatt.com

Michael J. Gottlieb
Kristin E. Bender
Meryl C. Governski (admitted *pro hac vice*)
Willkie Farr & Gallagher LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1000
mgottlieb@willkie.com
kbender@willkie.com
mgovernski@willkie.com

Aaron E. Nathan
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8904
anathan@willkie.com

*Attorneys for Blake Lively*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 1

BACKGROUND .................................................................................................................. 5

    A.    The FAC Acknowledges Numerous On-Set Incidents That Make Up Ms. Lively's Sexual Harassment Claim ............................................................................... 5

    B.    Ms. Lively Privately Raised Her Sexual Harassment Concerns To Wayfarer, Mr. Baldoni, Mr. Heath, and Sony ........................................................... 6

    C.    Out Of Desperation And Fear That Their Reputations Were At Risk, Mr. Baldoni And Wayfarer Decide To Go On Offense .................................................... 7

    D.    Ms. Lively Takes Legal Action Concerning The Wayfarer Parties' Conduct During And After Production Of The Film, Which The Times Reports On ............................................................................................................... 8

    E.    In Response to Ms. Lively's Legal Complaints, The Wayfarer Parties Retaliate Against Ms. Lively With A Meritless Counterattack ............................... 9

LEGAL STANDARD ......................................................................................................... 9

ARGUMENT .................................................................................................................... 10

I.    THE PARTIES AGREE THAT CALIFORNIA LAW APPLIES TO ALL CLAIMS AGAINST MS. LIVELY ....................................................................... 10

II.    THE COURT SHOULD DISMISS THE FAC'S CLAIMS AGAINST MS. LIVELY WITH PREJUDICE BECAUSE THEY FAIL TO STATE CLAIMS UPON WHICH RELIEF MAY BE GRANTED. ....................................................... 11

    A.    The Defamation Claim Fails Because the Wayfarer Parties Fail to Identify Specific And Unprivileged Statements ................................................... 11

        1.    The Wayfarer Parties Fail To Meet Basic Pleading Requirements To Identify Specific Defamatory Statements By Ms. Lively .................. 12

        2.    The Statute Of Limitations Bars Defamation Liability Premised On Statements Made Before January 17, 2024 ............................................... 13

        3.    Multiple Privileges Bar The Defamation Claim ...................................... 15

            i.    Two Separate And Absolute Privileges Bar The Defamation Claim ......................................................................... 16

            ii.    California's Sexual Harassment Privilege Immunizes Ms. Lively From Liability For Defamation-Related Claims ............. 18

        4.    The FAC Fails to Allege Actual Malice ................................................. 21

            i.    Mr. Baldoni Is A Public Figure And Ms. Lively's Sexual Harassment Allegations Are A Matter Of Public Interest .......... 21

# TABLE OF CONTENTS
(continued)

Page

ii. The Wayfarer Parties Fail To Allege Non-Conclusory Facts Establishing That Ms. Lively Doubted The Truth Of Her Allegations ................................................................................. 22

5. All Other Causes Of Action Arising From The Same 'Injurious Falsehoods' Must Be Dismissed ............................................................. 25

B. The False Light Claim Must Be Dismissed As Duplicative Of Defamation ....... 25

C. There Is No Clear Private Right To Sue For "Civil Extortion," And, Even So, The Wayfarer Parties Fail To Allege Extortionate Conduct ......................... 26

D. The Breach Of Covenant Claim Must be Dismissed Based On The Wayfarer Parties' Failure To Satisfy Basic Pleading Requirements .................. 30

E. The Wayfarer Parties Fail To Allege That Ms. Lively Wrongfully Interfered With Any Contract Or Economic Relationship ................................. 31

1. The Wayfarer Parties Fail To Plead That Ms. Lively Intentionally Interfered With Any Specific Contract ........................................................ 31

2. The FAC Fails to Adequately Allege that Ms. Lively Interfered With Any Economic Relationship through an Independently Wrongful Act ................................................................................. 32

3. The FAC Fails to State a Claim for Negligent Interference .................. 33

4. The Wayfarer Parties Have Not Even Attempted to Explain or Quantify Their Alleged $400,000,000 Harm ........................................... 33

F. The FAC Muses About a Conspiracy But Fails to Plead the Basic Elements ................................................................................. 34

III. MS. LIVELY IS ENTITLED TO ATTORNEYS' FEES, TREBLE DAMAGES AND PUNITIVE DAMAGES ......................................................................... 35

# TABLE OF AUTHORITIES

**Page**

## CASES

*2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co.*,
  96 F. Supp. 3d 182 (S.D.N.Y. 2015) ................................................................................. 10

*Abraham v. Lancaster Cmty. Hosp.*,
  217 Cal. App. 3d 796 (1990) ................................................................................. 17, 18

*Action Apartment Assn., Inc. v. City of Santa Monica*,
  41 Cal. 4th 1232 (2007) ................................................................................. 17

*Albertson v. Raboff*,
  42 Cal. 2d 375 (1956) ................................................................................. 18

*Am. Chem. Co. v. Superior Ct.*,
  59 Cal. App. 4th 764 (1997) ................................................................................. 33

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*,
  7 Cal. 4th 503 (1994) ................................................................................. 35

*Arista Records v. Sanchez*,
  2006 WL 5908359 (C.D. Cal. Mar. 1, 2006) ................................................................................. 26, 28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................. 9, 32

*Automated Pet Care Prods., LLC v. PurLife Brands, Inc.*,
  703 F. Supp. 3d 1022 (N.D. Cal. 2023) ................................................................................. 31

*Bank of New York Mellon v. DeSelms*,
  2019 WL 8198310 (C.D. Cal. Mar. 25, 2019) ................................................................................. 26, 29

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................. 9, 35

*Bernard v. Care Design N.Y.*,
  2022 WL 4484556 (S.D.N.Y. Sept. 27, 2022) (Liman, J.) ................................................................................. 12

*Blatty v. New York Times Co.*,
  42 Cal. 3d 1033 (1986) ................................................................................. 25, 28

*Brown v. Kelly Broad. Co.*,
  48 Cal. 3d 711 (1989) ................................................................................. 22

*Choi v. 8th Bridge Cap., Inc.*,
  2018 WL 3469053 (C.D. Cal. July 16, 2018) ................................................................................. 33

*Cruey v. Gannett Co.*,
  64 Cal. App. 4th 356 (1998) ................................................................................. 17

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010) ................................................................................. 6

### TABLE OF AUTHORITIES
(continued)

**Page**

*Doe v. Mahboubi-Fardi*,
2024 WL 2206640 (C.D. Cal. Jan. 2, 2024) ........................................................................27

*Eade v. InvestorsHub.com, Inc.*,
2011 WL 13323344 (C.D. Cal. July 12, 2011).....................................................................22

*Ecogensus LLC v. Pacella*,
2022 WL 874727 (S.D.N.Y. Mar. 24, 2022) ........................................................................26

*Ellul v. Congregation of Christian Bros.*,
774 F.3d 791 (2d. Cir. 2014)...............................................................................................14

*Evliyaoglu Tekstil A.S. v. Turko Textile LLC*,
2020 WL 7774377 (S.D.N.Y. Dec. 30, 2020) ......................................................................12

*Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*,
2019 WL 1244294 (S.D.N.Y. Mar. 18, 2019) ......................................................................10

*Fuhrman v. California Satellite Sys.*,
179 Cal. App. 3d 408 (1986) .....................................................................................26, 27, 28

*G-I Holdings, Inc. v. Baron & Budd*,
179 F. Supp. 2d 233 (S.D.N.Y. 2001)..................................................................................28

*Goe v. Zucker*,
43 F.4th 19 (2d Cir. 2022) ...................................................................................................15

*Hagberg v. California Federal Bank*,
32 Cal. 4th 350 (2004) .........................................................................................................16

*Hagendorf v. Brown*,
699 F.2d 478 (9th Cir.), *amended*, 707 F.2d 1018 (9th Cir. 1983).........................................15

*Healthsmart Pac., Inc. v. Kabateck*,
7 Cal. App. 5th 416 (2016), *as modified* (Jan. 10, 2017).......................................................16

*Hebrew Acad. of San Francisco v. Goldman*,
42 Cal. 4th 883 (2007) .........................................................................................................13

*Heitkoetter v. Domm*,
2023 WL 2563647 (E.D. Cal. Mar. 17, 2023) ......................................................................25

*Intermarketing Media, LLC v. Barlow*,
2021 WL 5990190 (C.D. Cal. May 4, 2021) ..............................................................27, 29, 30

*Ixchel Pharma, LLC v. Biogen, Inc.*,
9 Cal. 5th 1130 (2020) .....................................................................................................31, 32

*Jacob v. Lorenz*,
626 F. Supp. 3d 672 (S.D.N.Y. 2022)..................................................................................6, 8

*Jacobson v. Schwarzenegger*,
357 F. Supp. 2d 1198 (C.D. Cal. 2004) ................................................................................12

# TABLE OF AUTHORITIES
(continued)

**Page**

*Jiajia Luo v. Sogou, Inc.*,
    465 F. Supp. 3d 393 (S.D.N.Y. 2020)...................................................................9

*Jiang v. KNTV Television LLC*,
    2025 WL 240798 (N.D. Cal. Jan. 17, 2025) ....................................................25

*Kamdem-Ouaffo v. Pepsico, Inc.*,
    160 F. Supp. 3d 553 (S.D.N.Y. 2016)...............................................................13

*Kashian v. Harriman*,
    98 Cal. App. 4th 982 (2002) .............................................................................17

*Kaurloto v. U.S. Bank, N.A.*,
    2016 WL 6808117 (C.D. Cal. Nov. 17, 2016)...................................................30

*Kidron v. Movie Acquisition Corp.*,
    40 Cal. App. 4th 1571 (1995) ...........................................................................34

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ....................................................................................33

*Lee v. Bankers Tr. Co.*,
    166 F.3d 540 (2d Cir. 1999)..............................................................................11

*Levitt v. Yelp! Inc.*,
    765 F.3d 1123 (9th Cir. 2014) ....................................................................27, 29

*Mahan v. Roc Nation, LLC*,
    2015 WL 1782095 (S.D.N.Y. Apr. 15, 2015)...................................................15

*Med. Marijuana, Inc. v. ProjectCBD.com*,
    46 Cal. App. 5th 869 (2020) .......................................................................12, 13

*NetApp, Inc. v. Nimble Storage, Inc.*,
    41 F. Supp. 3d 816 (N.D. Cal. 2014) ...............................................................34

*Newberry v. Fiberglass Structural Eng'g, Inc.*,
    2007 WL 445450 (W.D. Wash. Feb. 6, 2007)..................................................15

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016)............................................................................6, 8

*Penrose Hill, Ltd. v. Mabray*,
    479 F. Supp. 3d 840 (N.D. Cal. 2020) .............................................................22

*Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*,
    11 Cal. App. 4th 1026 (1992) ...........................................................................30

*Reader's Dig. Assn. v. Superior Ct.*,
    37 Cal. 3d 244 (1984) ..................................................................................21, 22

*Republican Nat'l Comm. v. Google LLC*,
    742 F. Supp. 3d 1099,1120 (E.D. Cal. 2024)...................................................34

**TABLE OF AUTHORITIES**
(continued)

Page

*Resolute Forest Prods., Inc. v. Greenpeace Int'l*,
   302 F. Supp. 3d 1005 (N.D. Cal. 2017) ................................................................22

*Rockridge Trust v. Wells Fargo, N.A.*,
   985 F. Supp. 2d 1110 (N.D. Cal. Sept. 25, 2013) ..............................................30

*S. California Elec. Firm v. S. California Edison Co.*,
   668 F. Supp. 3d 1000 (C.D. Cal. 2023) ............................................................25

*Samzelius v. Bank of Am.*,
   2012 WL 12949683 (N.D. Cal. Oct. 9, 2012) ....................................................26

*Sanbourn v. Chronicle Pub. Co.*,
   18 Cal. 3d 406 (1976) ......................................................................................24

*Sanchez v. Am. Media, Inc.*,
   2020 WL 8816343 (C.D. Cal. Dec. 29, 2020) ..................................................34

*Scheidler v. Nat'l Org. of Women, Inc.*,
   537 U.S. 393 (2003) ..........................................................................................29

*Sekhar v. U.S.*,
   570 U.S. 729 (2013) ..........................................................................................29

*Soil Retention Products, Inc. v. Brentwood Industries, Inc.*,
   521 F. Supp. 3d 929 (S.D. Cal. 2021) ........................................................32, 34

*Storek & Storek, Inc. v. Citicorp Real Est., Inc.*,
   100 Cal. App. 4th 44 (2002) ............................................................................30

*SVGRP LLC v. Sowell Fin. Servs., LLC*,
   2017 WL 1383735 (N.D. Cal. Apr. 18, 2017) ..................................................12

*Taus v. Loftus*,
   40 Cal. 4th 683 (2007) ..........................................................................12, 15, 24

*Todd v. Lovecruft*,
   2020 WL 60199 (N.D. Cal. Jan. 6, 2020) ........................................................21

*Toretto v. Donnelley Fin. Sols., Inc.*,
   583 F. Supp. 3d 570 (S.D.N.Y. 2022) ..............................................................10

*Townsend v. McDonnell*,
   2019 WL 7882085 (C.D. Cal. Dec. 12, 2019) ..................................................25

*Tran v. Eat Club, Inc.*,
   2020 WL 4812634 (Ct. App. Aug. 18, 2020) ..................................................27

*UMG Recordings, Inc.*,
   117 F. Supp. 3d 1092 (C.D. Cal. 2015) ............................................................33

*United Bhd. Of Carpenters v. Bldg. & Const. Trades Dep't*,
   770 F.3d 834 (9th Cir. 2014) ......................................................................34, 35

vi

# TABLE OF AUTHORITIES
(continued)

**Page**

*United States v. McFall*,
    558 F.3d 951 (9th Cir. 2009) ...................................................................29

*Vogel v. Felice*,
    127 Cal. App. 4th 1006 (2005) ..............................................................22

*Wayfarer Studios LLC, et al. v. The New York Times Company*,
    Los Angeles Superior Court No. 24STCV34662 .....................................9

*Williams v. Deutsche Bank Sec., Inc.*,
    2005 WL 1414435 (S.D.N.Y. June 13, 2005) ........................................10

## STATUTES

Cal. Civ. Code § 47............................................................................ passim

Cal. Civ. Code § 47.1......................................................................... passim

Cal. Civ. Code § 48a..................................................................................24

Cal. Civ. Code § 51.9.................................................................................19

Cal. Civ. Code § 3425.3.............................................................................13

Cal. Code. Civ. P. § 340(c) ..................................................................13, 15

Cal. Gov't Code § 12930(f)(1)................................................................8, 17

Cal. Penal Code § 518................................................................................27

## OTHER AUTHORITIES

Assembly Bill 933 (Aguiar-Curry & Ward – 2023), Chapter 670 ................15

## RULES

Fed. R. Civ. P. 9(b) ...................................................................................27

Fed. R. Civ. P. 12(b)(6)................................................................................9

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>[1]

The Wayfarer Parties'[2] vengeful and rambling lawsuit against Blake Lively is a profound abuse of the legal process that has no place in federal court. The law prohibits weaponizing defamation lawsuits, like this one, to retaliate against individuals who have filed legal claims or have publicly spoken out about sexual harassment and retaliation. The right to seek legal redress and the right of the press to report on it are sacred principles that are protected by *multiple privileges*, including the **litigation and fair report privileges, which are absolute**. Moreover, by choosing to bring their claims under California law, the Wayfarer Parties have voluntarily subjected their entire lawsuit to the **sexual harassment privilege** in the recently enacted California Civil Code Section 47.1 ("Section 47.1"), which **bars retaliatory lawsuits based on public disclosures of sexual harassment and related allegations, including disclosures to the press**. Given all of these protections, the Wayfarer Parties' chief complaint that Ms. Lively and others supposedly "conspired" with *The New York Times* is barred as a matter of law – she was *legally entitled* to file her complaint and disclose it to the public.

On top of that, Section 47.1 contains a **mandatory fee shifting** provision that will require the Wayfarer Parties to pay not only Ms. Lively's attorneys' fees, but also **treble damages and punitive damages** if and when their defamation lawsuit is dismissed. In other words, in an epic self-own, the Wayfarer Parties have created *more liability* for themselves by their malicious efforts to sue Ms. Lively "into oblivion." Steve Sarowitz may indeed make good on his threat to spend "$100 million" litigating against Ms. Lively, but perhaps not in the way he planned.

---

[1] Pursuant to Paragraph 2(I) of the Court's Individual Rules, the Wayfarer Parties and Ms. Lively have agreed that the briefs in support of and in opposition to this motion will be limited to 35 pages, and the reply brief will be limited to 15 pages.

[2] The Wayfarer Parties are Justin Baldoni, Jamey Heath, Steve Sarowitz, Wayfarer Studios LLC, It Ends With Us Movie, LLC, Melissa Nathan, and Jennifer Abel.

Among its many additional incurable defects, the FAC does not allege a single element of the defamation or false light claims properly, starting with the failure to allege defamatory statements with specificity, instead lumping all Plaintiffs' claims together as an impermissible group pleading. Brushing aside this obvious problem, the Wayfarer Parties have repeatedly asserted in recent filings that *their claims against all the Consolidated Defendants* (including Ms. Lively) arise from "two principal categories" of defamatory statements:

- "Allegations that . . . [Mr.] Baldoni and [Mr.] Heath, engaged in sexual misconduct toward [Ms.] Lively"; and
- "Allegations the Wayfarer Parties orchestrated a retaliatory 'smear campaign' to damage Lively's image and reputation after she reported their purported misconduct."

ECF No. 121 at 22; ECF No. 127 at 16.[3] This admission is fatal to their claims. As these two "principal categories" make clear, the only alleged "wrongdoing" the FAC attributes to Ms. Lively stems from her speaking up about harassment and retaliation, which is firmly protected by each of the litigation, fair report, and sexual harassment privileges. In any event, the bulk of the Wayfarer Parties' reputation-based claims are time-barred because the FAC expressly admits that Ms. Lively first published her allegedly defamatory sexual harassment accusations in her "17-point list" in November 2023, more than one year before the Wayfarer Parties initiated this action and thus outside the one-year statute of limitations. And as for their menacing $400 million damages claim, the Wayfarer Parties do not even try to explain its basis, much less specifically allege their so-called injuries.

Yet another of the FAC's insurmountable deficiencies is its utter failure to allege "actual malice"—*i.e.,* that Ms. Lively **subjectively did not believe** the sexual harassment allegations she raised. Other than *many* pages of empty bluster, the FAC not only fails to allege actual malice, **it**

---

[3] Citations to page numbers of ECF docket entries refer to the ECF-stamped page numbers unless otherwise indicated.

***pleads just the opposite by demonstrating her good faith beliefs***. Among other things, the FAC incorporates by reference a damning text message between Mr. Baldoni and Ms. Nathan, in which both agree that Mr. Lively "***genuinely believes she's right*** and that all of this is unjust." ECF No. 50-1 at 155 (emphasis added), an admission which the FAC cannot overcome.

In lieu of concrete facts, the FAC resorts to implausible conjecture and conspiracy theories to allege that Ms. Lively "falsified" her allegations. On the one hand, the Wayfarer Parties insist that Ms. Lively is an immensely powerful Hollywood superstar who, along with her influential husband, wielded power to steal creative control over the Film; but on the other hand, they claim she was so powerless that the only way she could have any power was by manufacturing sexual harassment allegations almost a year in advance in a Machiavellian long game. These two concepts contradict each other and therefore cannot coexist. Even if these bizarre theories made sense, which they do not, the FAC offers no plausible facts to support the conclusory assertion that Ms. Lively ever *subjectively doubted* that any of the misconduct she alleged had occurred as she described it, including in the 17-point list that they signed, the disclosures made in the January 4th meeting, or her eventual legal complaints. Indeed, despite its narrative fury against her, the FAC repeatedly and consistently includes facts that demonstrate Ms. Lively's genuine, good faith belief that she was mistreated and her appropriate and ***private*** efforts to improve the situation for herself and others.

As for the FAC's other claims, it is unclear whether a civil extortion claim exists under California law, but even if it does, the nature of the alleged extortion is so convoluted that it cannot survive. The so-called "extortion" arises out of the exact same categories of protected speech that fail to support defamation—Ms. Lively's supposed "threats" to reveal her sexual harassment claims if the Wayfarer Parties did not give in to her "demands" for creative control of the movie

(threats which are never specifically identified anywhere in the FAC because they never happened). Moreover, the FAC does not allege what money or property Ms. Lively received from the Wayfarer Parties for supposedly "extorting" her way into editing a movie for no additional pay. Indeed, the FAC's self-defeating claim appears to be that Ms. Lively bullied her way into doing **more work** than she was contractually obligated to do, **without additional compensation**, while Wayfarer profited handsomely from the movie's blockbuster success. Notably, the Wayfarer Parties did not pursue any action against Ms. Lively for this supposed "extortion" until *after* she filed legal claims, which speaks volumes about this lawsuit's purpose.

The FAC also claims that Ms. Lively violated the implied covenant of good faith and fair dealing, but cannot identify any term upon which that duty hinges. As with above, this claim seems to be based on Ms. Lively doing *more* than was contractually required, rather than a breach of any obligation. Finally, the Wayfarer Parties claim that Ms. Lively interfered with a contract, yet are unable to identify the contract, any of its terms, who it was with, or how it was breached.

In short, nothing in the FAC resembles an actionable legal claim. It is, instead, a blunt public relations instrument designed to further the Wayfarer Parties' sinister campaign to "bury" and "destroy" Ms. Lively for speaking out about sexual harassment and retaliation. The Court should dismiss the FAC and—as required by California law—hold further proceedings to calculate an appropriate award of Ms. Lively's attorneys' fees, treble damages for the harm this meritless lawsuit has inflicted on her, and punitive damages against each of the Wayfarer Parties.

## BACKGROUND

### A.    The FAC Acknowledges Numerous On-Set Incidents That Make Up Ms. Lively's Sexual Harassment Claim.

Far from suggesting her claims are untrue, the FAC—while quibbling with Ms. Lively's characterization of events—is full of admissions that the incidents underlying Ms. Lively's sexual harassment claims occurred.

As set forth in the FAC, shooting of the Film began on May 16, 2023. FAC, ¶¶ 54-55. Starting on the first day, *according to the FAC*, each of the following incidents occurred:[4]

- After the first day, Mr. Baldoni entered Ms. Lively's trailer to voice his concerns that Ms. Lively looked unflattering in publicly released photographs. *Id.*, ¶¶ 35-36. During the meeting, Mr. Baldoni became "emotional" and told Ms. Lively that he thought her appearance was failing to "meet audience expectations." *Id.*, ¶¶ 37-38.

- At some point in May or June 2023, a simulated nude scene was filmed without an intimacy coordinator present. *Id.*, ¶¶ 82, 108.

- Mr. Baldoni discussed orgasming while having sex with his wife, remarking that "those have been some of the most beautiful moments" between them. *Id.*, ¶ 100.

- Mr. Baldoni asked Mr. Heath to show Ms. Lively (while she was eating lunch) a video of Mr. Heath's wife giving birth at home, part of which Mr. Heath subsequently showed her. *Id.*, ¶ 101.

- Mr. Baldoni improvised while filming romantic scenes, which was consistent with his prior experience of "rehearsing or filming scenes multiple times—often with variations—without needing 'permission.'" *Id.*, ¶ 91.

- Mr. Heath was present in Ms. Lively's hair and makeup trailer while she had body makeup removed and, despite her asking him to turn away while they spoke, he may have "made eye contact" with her at one point and later apologized after Ms. Lively told him that it had "made her feel uncomfortable." *Id.*, ¶ 104.

---

[4] *Cf.* ECF No. 84 at ¶¶ 75-106, 108, 127, 140-151, 153-158

- Mr. Baldoni hired a friend to play the obstetrician in a scene in which Ms. Lively's character gives birth and in which he would be in close proximity to her genitalia. *Id.*, ¶ 119.

- Mr. Baldoni used the word "sexy" to describe Ms. Lively at least two times, including once when Ms. Lively was wearing a 'onesie' with a big coat. *Id.*, ¶¶ 61, 94.

**B.**     **Ms. Lively Privately Raised Her Sexual Harassment Concerns To Wayfarer, Mr. Baldoni, Mr. Heath, and Sony.**

As the FAC describes, following the writer strikes, which had ended by November 9, 2023, Ms. Lively's counsel wrote to Mr. Baldoni and Wayfarer "to address how to handle a return to the set" of the Film. *Id.*, ¶ 75 ("November 9, 2023 Email"). The November 9, 2023 Email explained that it "is no surprise to the Film's producers that the experience of shooting the Film has been deeply concerning on many levels" and that the "complaints of our client and others have been repeatedly conveyed and well-documented throughout pre-production and photography."[5] *Id.* The November 9, 2023 Email emphasized that Ms. Lively, at that time, was "willing to forego a more formal HR process" at the time, as long as "the set is safe moving forward" and attached a document with 17 "protections that will need to be guaranteed and observed by the Film's producers." *Id.*; *see* ECF No. 50-1 at 52 ("Protections for Return to Production").[6]

Many of these protections tracked the precise incidents described in the FAC—for example: Point 1 required that an intimacy coordinator be present at all times, FAC, ¶ 79; Point 3 prohibited spontaneous improvisation of scenes involving physical touching, simulated sex, or nudity and required the same to be choreographed with an intimacy coordinator, *id.*, ¶¶ 85, 87; Point 5 forbade discussing personal experiences with sex or nudity, including with respect to

---

[5] Notably, on this point, the Wayfarer Parties admit in the FAC that Ms. Lively raised concerns to them personally as far back as May 2023. FAC ¶ 104; ECF No. 50-1 at 25-26, 33.

[6] The Court may consider the November 9, 2023 Email and the Protections for Return to Production, as they are expressly incorporated by reference into the FAC and are both integral to it. *See Jacob v. Lorenz*, 626 F. Supp. 3d 672, 684 (S.D.N.Y. 2022); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

spouses, *id.*, ¶ 98; Point 6 prohibited anyone from entering Ms. Lively's trailer while she was "in a state of undress for any reason", *id.*, ¶ 104; Point 10 established that there would be no retaliation for the requests, *id.*, ¶ 112; Point 16 required that all day players be hired through talent agencies, not personal connections, *id.*, ¶ 119; and Point 17 required an All-Hands Meeting before production resumed, *id.*, ¶ 122. Notwithstanding its purported concerns, Wayfarer ultimately found the protections "agreeable," *id.*, ¶ 77, and signed an agreement committing to ***all*** of the terms of the Protections for Return to Production on January 19, 2024. *Id.*, ¶ 131. On January 4, 2024, the parties *attended the agreed-to All Hands Meeting*, during which the FAC alleges that Ms. Lively "read aloud" a "list of grievances" that the Wayfarer Parties allege they believed "were as troubling as they were fictional." *Id.,* ¶¶ 127-128, 131.

### C.   Out Of Desperation And Fear That Their Reputations Were At Risk, Mr. Baldoni And Wayfarer Decide To Go On Offense.

At some point in the summer of 2024, Mr. Baldoni and Wayfarer "grew increasingly fearful," "[d]esperate," and "terrified" that Ms. Lively would publicly discuss what happened on the set of the Film and decided to go on offense, engaging a team to discredit Ms. Lively before her previously documented sexual harassment concerns could become public. *Id.*, ¶ 162.[7] Among the individuals who Mr. Baldoni engaged for this work were his co-Plaintiffs Jennifer Abel and Melissa Nathan. *Id.*; ECF No. 50-1 at 102. In one text message between the two of them, Ms. Nathan explained that they could not "write we will destroy" Ms. Lively, because one could only "[i]magine if a document saying all the things that he wants ends up in the wrong hands." FAC, ¶ 162. Ms. Nathan wrote: "***you know we can bury anyone***." *Id.* (emphasis added).

---

[7] Although it makes no effort to explain what actual legal claims flow from these allegations, the FAC alleges that: (a) on information and belief, Ms. Lively directed the Sloane Parties to "orchestrate" a "smear campaign" against Baldoni in the media, including to *The Times*; and (b) a "talent agency executive told Heath and Abel that [Ms.] Lively believed Wayfarer, Baldoni and Heath were waging a shadow campaign against her." FAC, ¶¶ 187, 194, 251.

On August 10, 2024, Ms. Nathan's team reported that they had started to "see a shift on social, due largely to Jed [Wallace] and his team's efforts to shift the narrative towards shining a spotlight on Blake and Ryan." *Id.* In one text message, Ms. Nathan states that Mr. Baldoni "doesn't realize how lucky he is right now" because "[t]he whispering in the ear the sexual connotations . . . there is just so much" circulating in the press, including reports of other "members feeling uncomfortable[.]" *Id.* By August 13, 2024, the FAC alleges that Ms. Lively and Mr. Reynolds were facing an "overwhelming tide of negative publicity," and that "social media had turned against them." *Id.*, ¶¶ 253, 255.

### D.    Ms. Lively Takes Legal Action Concerning The Wayfarer Parties' Conduct During And After Production Of The Film, Which *The Times* Reports On.

On December 20, 2024, Ms. Lively filed a complaint with the California Civil Rights Department (the "CRD"). ECF Nos. 107-3–107-6.[8] The complaint alleges ten claims under California law, including sexual harassment, retaliation, failure to prevent harassment and retaliation, aiding and abetting the same, as well as others. *See id.*[9] The CRD Complaint is virtually identical to the initial complaint Ms. Lively filed on December 31, 2024 ("SDNY Complaint") (together with the CRD Complaint, the "Legal Complaints"). *See* ECF No. 1.

On December 21, 2024, the *Times* published an article titled '*We Can Bury Anyone': Inside a Hollywood Smear Machine* (the "Article"), reporting on—and "drawing heavily from"—the claims and allegations set forth in the CRD Complaint. FAC, ¶¶ 261-62. The Article is accompanied by a video, in which a *Times* reporter summarizes the Article, noting that it was based directly on the CRD Complaint (the "Video") (together with the Article, the "*Times* Publications").

---

[8] The Court may take judicial notice of the CRD Complaint and separately consider it because it is expressly incorporated by reference into the FAC and is a document integral to it. *See Jacob*, 626 F. Supp. 3d at 684; *Nicosia*, 834 F.3d at 230.

[9] The CRD is the state agency charged with investigating workplace misconduct. *See* Cal. Gov't Code § 12930(f)(1).

*Id.*, ¶ 266; *see also* ECF No. 107-2 (the "Video").[10] The Article reports on and, in the Wayfarer Parties' words, "draws heavily from" the CRD Complaint. FAC, ¶¶ 261-62, 270. The Wayfarer Parties sued the *Times* in California state court on December 31, 2024. *See Wayfarer Studios LLC, et al. v. The New York Times Company*, Los Angeles Superior Court No. 24STCV34662.

### E.    In Response to Ms. Lively's Legal Complaints, The Wayfarer Parties Retaliate Against Ms. Lively With A Meritless Counterattack.

On January 16, 2025, the Wayfarer Parties initiated this separate action against Ms. Lively, her husband (Ryan Reynolds), and her publicist (the Sloane Parties). *See* 25-cv-00449, ECF No. 1. Two weeks later, on January 31st, the Wayfarer Parties filed the operative FAC, adding *The Times* as a defendant, and attaching a 168-page, single-spaced narrative "timeline" as Exhibit A. *See* FAC; ECF No. 50-1. The FAC asserts seven causes of action against Ms. Lively, each based upon her exercise of her legal right to speak out about workplace misconduct: (1) Civil Extortion; (2) Defamation; (3) False Light Invasion of Privacy; (4) Breach of Implied Covenant of Good Faith and Fair Dealing; (5) Intentional Interference with Contractual Relations; (6) Intentional Interference with Prospective Economic Advantage; and (7) Negligent Interference with Prospective Economic Advantage. *See generally* FAC. The FAC seeks *at least* $400,000,000 in damages without elaboration or any facts supporting that figure. *Id.*, at 222.

### LEGAL STANDARD

"In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court accepts all factual allegations as true, and draws all reasonable inferences in the plaintiff's favor." *Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 405-06 (S.D.N.Y. 2020). "This requirement 'is inapplicable to legal conclusions.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A complaint

---

[10] The Court may take judicial notice of the Video and separately consider it because it is expressly incorporated by reference into the FAC and is a document integral to it. *See Jacob*, 626 F. Supp. 3d at 684; *Nicosia*, 834 F.3d at 230.

must offer more than 'labels and conclusions,' or 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]' devoid of 'further factual enhancement' in order to survive dismissal." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)).

## ARGUMENT

## I.    THE PARTIES AGREE THAT CALIFORNIA LAW APPLIES TO ALL CLAIMS AGAINST MS. LIVELY.

The Wayfarer Parties "assert their claims under the substantive laws of the State of California." FAC, ¶ 211 n.27; ECF No. 121 at 24-29 (reiterating their insistence on the application of California law to the Wayfarer Parties' claims); ECF No. 127 at 17-21 (same). While other parties may dispute that a proper choice-of-law analysis would permit application of California law to the Wayfarer Parties' claims against *them*, Ms. Lively agrees that California law applies to the claims asserted against her.[11] That agreement, alone, "is sufficient to establish choice of law." *Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*, 2019 WL 1244294, at *6 (S.D.N.Y. Mar. 18, 2019).

Even in the absence of such agreement, an interest analysis would also mandate application of California law as "the jurisdiction having the greatest interest" in the claims asserted against Ms. Lively. *See Toretto v. Donnelley Fin. Sols., Inc.*, 583 F. Supp. 3d 570, 589 (S.D.N.Y. 2022). Unlike any other party to this action, Ms. Lively was employed by Wayfarer, which is based in California, FAC, ¶ 300, and Ms. Lively and Wayfarer agreed that all disputes related to Ms. Lively's employment would be governed by California law.[12] In addition, the Wayfarer Parties

---

[11] "Under New York law, the choice of law analysis is generally done separately for each claim and defense. . . ." *2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 200 (S.D.N.Y. 2015).
[12] The Wayfarer Parties allege that each of the "Wayfarer Parties entered into a contract by which Lively agreed to perform as an actor in the Film *It Ends With Us.*" FAC, ¶ 341. That contract contains a choice of law clause providing that California law "shall govern . . . *all other causes of action (whether sounding in contract or in tort) arising out of or relating to this agreement (or lender's engagement and/or [Lively's] services hereunder) . . . or otherwise relating to the picture.*" (Emphasis added). Under New York law, "a choice of law provision expressly stating that

base their claims on statements made by Ms. Lively in a complaint filed with a California state agency to seek relief from a California employer's violations of California law. FAC ¶¶ 4, 262; ECF No. 127 at 21. California has an interest in not only ensuring that its employers comply with its laws, but also in protecting Ms. Lively's exercise of her right to speak out about, and seek remedies for, sexual harassment and retaliation. ECF No. 127 at 19-21. Indeed, California provides additional protection from defamation-based suits, like this one, to those who choose to come forward with their stories about such conduct. California made this interest clear by recently adopting Assembly Bill 933 (AB 933) titled "Privileged communications: incident of sexual assault, harassment, or discrimination," codified in Section 47.1. Section 47.1 provides a qualified privilege designed to ensure that individuals who experience sexual harassment or retaliation are able to share their experiences with courts, agencies, the press, and others, without fear of being sued for doing so.[13] *See* Cal. Civ. Code § 47.1. For the foregoing reasons, this Court should apply California law to the claims asserted against Ms. Lively.

## II.     THE COURT SHOULD DISMISS THE FAC'S CLAIMS AGAINST MS. LIVELY WITH PREJUDICE BECAUSE THEY FAIL TO STATE CLAIMS UPON WHICH RELIEF MAY BE GRANTED.[14]

### A.     The Defamation Claim Fails Because the Wayfarer Parties Fail to Identify Specific And Unprivileged Statements.

The defamation claim fails as a matter of law. To state a claim, a plaintiff must plead "(a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural

---

controversies 'arising out of or relating to' the contract [is] sufficiently broad to include tort claims related to the contract." *Williams v. Deutsche Bank Sec., Inc.*, 2005 WL 1414435, at *3 (S.D.N.Y. June 13, 2005).

[13] As the Wayfarer Parties have repeatedly stated, their alleged harms have been suffered in California, where they are either domiciled and/or do business. FAC, ¶¶ 300-05; ECF No. 121 at 27 (where the Wayfarer Parties asserts that "the state of the plaintiff's domicile will usually have the most significant relationship to the case."); ECF No. 127 at 18 (same); *see Lee v. Bankers Tr. Co.*, 166 F.3d 540, 545 (2d Cir. 1999).

[14] Ms. Lively joins and incorporates as if fully set forth herein the motions made by Defendants Sloane and Vision, ECF No. 87, *The Times*, ECF No. 106, and Mr. Reynolds, ECF No. 133, and the arguments set forth therein seeking dismissal of the FAC for impermissible group pleading, dismissal of the defamation claim, and to strike Exhibit A to the FAC. *See* ECF No. 87 at 12-14, 16-27, 30-32; ECF No. 106 at 17-31; ECF No. 133 at 14-25, 37.

tendency to injure or that causes special damage." *Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007) (citation omitted) (emphasis added).[15] Not one of these elements is adequately pled.

 1. The Wayfarer Parties Fail To Meet Basic Pleading Requirements To Identify Specific Defamatory Statements By Ms. Lively.

As a preliminary matter, the defamation claims must be dismissed based on the Wayfarer Parties' utter failure to plead any allegedly defamatory statements with sufficient specificity. To survive dismissal, "the disparagement set forth in the complaint must be ***sufficiently close to the actual words*** proved to acquaint a defendant with what he must defend against." *Med. Marijuana, Inc. v. ProjectCBD.com*, 46 Cal. App. 5th 869, 894 (2020) (emphasis in original); *see also Evliyaoglu Tekstil A.S. v. Turko Textile LLC*, 2020 WL 7774377, at *3 (S.D.N.Y. Dec. 30, 2020) ("A long line of cases in this District holds that a defamation claim 'is only sufficient if it adequately identifies 'the purported communication, and an indication of who made the communication, when it was made, and to whom it was communicated.''" (citing cases)). "Even under liberal federal pleading standards, 'general allegations of the defamatory statements' which do not identify the substance of what was said are insufficient." *Jacobson v. Schwarzenegger*, 357 F. Supp. 2d 1198, 1216 (C.D. Cal. 2004) (dismissing complaint where plaintiff failed to identify and state the substance of the allegedly defamatory statement). This is especially true for libel. *Med. Marijuana*, 46 Cal. App. 5th at 888 (the "general rule" of which is that "the words constituting an alleged libel must be specifically identified, if not pleaded verbatim . . . ."). Even for slander, a plaintiff must plead with sufficient particularity to give notice of the issues and enable

---

[15] Regardless of choice of law, the elements for a claim of defamation are substantially the same under both California and New York law, and the claim fails under either choice of law. *Bernard v. Care Design N.Y.*, 2022 WL 4484556, at *14 (S.D.N.Y. Sept. 27, 2022) (Liman, J.) (cleaned up); *accord SVGRP LLC v. Sowell Fin. Servs., LLC*, 2017 WL 1383735, at *4 (N.D. Cal. Apr. 18, 2017).

defendant to prepare a defense. *Id.* A defamation claim must be dismissed unless it specifically identifies the specific words, as well as who said them, to whom, and when. *Id.*

As set forth above, the FAC ***does not assert a single defamatory statement attributable to Ms. Lively*** and instead identifies "two categories" of defamatory statements that are entirely contained within the four corners of the Legal Complaints. *See, e.g.*, *supra*, at 2, 4-6, 8. Yet nowhere do the Wayfarer Parties explain which of the eight Plaintiffs in this action was allegedly defamed, identify any purportedly defamatory statements made by Ms. Lively, or otherwise identify any "false allegation" asserted by her that supports their defamation claim—leaving Ms. Lively to guess at what to defend against. The claim fails for this reason alone.

2.  The Statute Of Limitations Bars Defamation Liability Premised On Statements Made Before January 17, 2024.

Even if the FAC does sufficiently allege defamatory statements, any such statements related to sexual harassment must be dismissed as outside the one-year statute of limitations. Cal. Code. Civ. P. § 340(c). Under California's Uniform Single Publication Act, "[n]o person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance. . . ." Cal. Civ. Code § 3425.3. This rule "applies without limitation to all publications." *Hebrew Acad. of San Francisco v. Goldman*, 42 Cal. 4th 883, 893 (2007). In other words, the *first* publication of an allegedly defamatory statement triggers the one-year limitations period. *Id.*; Cal. Code. Civ. P. § 340(c).[16]

To survive a motion to dismiss, the FAC's defamation claims ***must be premised on statements made on or after January 17, 2024***. Cal. Code. Civ. P. § 340(c); *see* 25-cv-00449, ECF No. 1 (initial complaint filed January 16, 2025). Here, it is obvious from the "face of the

---

[16] "New York Civil Practice Law and Rules ("CPLR") § 215(3) similarly requires that an action for defamation 'be commenced within one year,' that is, within one year of the original publication of the statements." *Kamdem-Ouaffo v. Pepsico, Inc.*, 160 F. Supp. 3d 553, 571 (S.D.N.Y. 2016) (citation omitted).

complaint," *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d. Cir. 2014), that Ms. Lively published the same sexual harassment allegations on which the FAC's defamation claims rest *well before* January 17, 2024. FAC, ¶¶ 75-131. The FAC, for example, asserts that Ms. Lively first conveyed her allegations via the 17-point Protections for Return to Production on ***November 9, 2023***, which was shared with both Wayfarer and Sony, although they admit she had raised some concerns as far back as May 2023. *Id.*, ¶¶ 73, 75-76, 104; ECF No. 50-1 at 25-26, 33. As early as November 2023, the Wayfarer Parties believed the document to contain "false accusations couched as demands" that "Mr. Baldoni and Mr. Heath engaged in sexually inappropriate conduct during filming." *Id.*, ¶¶ 75, 77, 124. The FAC goes on to admit that during the ***January 4, 2024*** All Hands Meeting, Ms. Lively "read aloud" a "list of grievances," including those in the Protections for Return Production as well as others, which, again, the Wayfarer Parties believed "were fictional" and "had either never happened or had been grossly mischaracterized." *Id.*, ¶¶ 128-29. The FAC thus confirms on its face that Ms. Lively published her sexual harassment allegations to Wayfarer, Mr. Baldoni, Mr. Heath, and others prior to January 17, 2024.

The face of the FAC makes clear that the sexual harassment allegations contained in Ms. Lively's Legal Complaints, and those that appear in *The Times* Publications, first appeared in the "17-point" Protections for Return to Production and/or the list of "grievances" read aloud on January 4th. This much the Wayfarer Parties cannot dispute, since their theory is that Ms. Lively ***used those grievances and the 17-points to "seed" her allegations "more than a year before" filing her CRD Complaint*** and they believe these points allegedly establish "the foundation for [Ms. Lively's] baseless claims of pervasive sexual harassment" in the "perfect narrative poison pill." *Id.*, ¶ 270. Consequently, this Court should dismiss with prejudice the category of defamation

claims in the FAC based upon Ms. Lively's sexual harassment allegations. Cal. Code. Civ. P. § 340(c).

### 3. Multiple Privileges Bar The Defamation Claim.

The defamation claim must also be dismissed because the FAC is missing a key element of the Wayfarer Parties' affirmative pleading burden. Specifically, the FAC fails to assert that Ms. Lively's allegedly defamatory conduct was "unprivileged." *Taus*, 40 Cal. 4th at 720. It is entirely appropriate to adjudicate privilege on a motion to dismiss and is more than warranted here. *Newberry v. Fiberglass Structural Eng'g, Inc.*, 2007 WL 445450, at *2 (W.D. Wash. Feb. 6, 2007) ("A defamation suit may be dismissed under Cal. Civ. Code § 47 on a Fed. R. Civ. P. 12(b) motion to dismiss."); *see also*, *Hagendorf v. Brown*, 699 F.2d 478, 481 (9th Cir.), *amended*, 707 F.2d 1018 (9th Cir. 1983) ("[T]he determination that a publication is privileged under section 47(2) is a conclusion of law, not a finding of fact."); *Mahan v. Roc Nation, LLC*, 2015 WL 1782095, at *6 (S.D.N.Y. Apr. 15, 2015) (applying Cal. Civ. Code § 47 privilege at the motion to dismiss stage).[17] Shockingly, *all* of the Wayfarer Parties have alleged defamation claims against Ms. Lively, *see* ¶¶ 324-31, yet the FAC does not attempt to explain how *any* of Ms. Lively's statements were unprivileged vis-à-vis *any* one of the Plaintiffs, such as Mr. Sarowitz or Wayfarer Studios LLC. To the contrary, the FAC's allegations establish that all of Ms. Lively's alleged conduct was privileged.

---

[17] Cases applying Section 47 are instructive because Section 47.1 was enacted to clarify existing protections under Section 47, expressly stating that a "communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination is privileged *under Section 47*." Cal. Civ. Code § 47.1 (emphasis added); Declaration of Esra A. Hudson, dated Mar. 20, 2025 ("Hudson Decl."), Ex. 1 (Legislative History Report and Analysis for Assembly Bill 933 (Aguiar-Curry & Ward – 2023), Chapter 670, Statutes of 2023) at 25, 29, 83-84, 87. "[A]s a fundamental matter, courts may take judicial notice of legislative history." *Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022).

     *i.* *Two Separate And Absolute Privileges Bar The Defamation Claim.*

  **The Fair Report Privilege.** The FAC accuses Ms. Lively of leaking the CRD Complaint to *The Times*, which, even if it was true, is protected by the fair report privilege, a definitive and separate bar to the defamation claim. The fair report privilege shields liability arising from "a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof." Cal. Civ. Code § 47(d). This privilege is absolute and construed broadly. *Healthsmart Pac., Inc. v. Kabateck*, 7 Cal. App. 5th 416, 431 (2016), *as modified* (Jan. 10, 2017) ("When, as here, the fair report privilege applies, it is absolute, and we have no occasion to consider the [] defendants' motives or whether the statements were uttered with malice."). And, importantly, it "applies to complaints to government agencies requesting that the agency investigate or remedy wrongdoing." *Hagberg v. California Federal Bank*, 32 Cal. 4th 350, 360 (2004). Although the fair report privilege is "typically invoked by news media defendants, it also protects those who communicate information to the media," including those who deliver copies of official documents to a news outlet. *See Healthsmart Pac.*, 7 Cal. App. 5th at 431. Indeed, the legislature amended Section 47, abrogating a prior ruling that "an attorney's transmittal of a copy of a pleading to a newspaper was not protected by the fair report privilege." *Id.* at 431-32. That amendment "'create[d] the bridge' between the litigation privilege (which covered statements made in judicial proceedings) and the fair report privilege (which covered media reports of judicial proceedings) 'to protect a third party who communicates this already privileged material to the press.'" *Id.* at 432. "Thus, fair and true communications to the news media about allegations in a complaint are covered by the privilege." *Id.*

  **The Litigation Privilege.** Ms. Lively's alleged statements, wholly contained within the Legal Complaints, are further absolutely protected by the litigation privilege, which protects publications in any legislative, judicial, or other official proceeding authorized by law, including

actions involving administrative agencies like the CRD. Cal. Civ. Code § 47(b); *see Kashian v. Harriman*, 98 Cal. App. 4th 982, 913 (2002); *Cruey v. Gannett Co.*, 64 Cal. App. 4th 356, 368 (1998) (statements made in EEOC complaint were privileged and could not be used to establish liability in defamation action, even if they were made maliciously). Critically, this privilege attaches even *before* official proceedings are initiated, where a good faith and serious contemplation of litigation exists. *See Action Apartment Assn., Inc. v. City of Santa Monica*, 41 Cal. 4th 1232, 1251 (2007) ("A prelitigation communication is privileged only when it relates to litigation that is contemplated in good faith and under serious consideration").

The litigation privilege is designed to "afford litigants and witnesses the utmost freedom of access to the courts," without fear of retribution through subsequent tort actions. *Id.* at 1241. To that end, "[t]his privilege is absolute in nature, applying 'to all publications, irrespective of their maliciousness.'" *Id.* (citation omitted). Here, there is no question the privilege applies to both the CRD Complaint (which the Wayfarer Parties concede, FAC, ¶¶ 4, 269) and the SDNY Complaint. Ms. Lively submitted the CRD Complaint to the state agency charged with investigating and rectifying harassment and retaliation, as she is legally required to do, *see* Cal. Gov't Code § 12930(f)(1), which clearly constitutes "a publication in the course of a judicial proceeding." *Abraham v. Lancaster Cmty. Hosp.*, 217 Cal. App. 3d 796, 822 (1990) (citation omitted). The Wayfarer Parties assert based solely on their purported "belief," that Ms. Lively never intended to file her CRD Complaint in federal court, a prediction that is legally irrelevant and that was disproven when Ms. Lively ***did just that***. More importantly, the privilege protects Ms. Lively's administrative complaint regardless of her intent to initiate additional subsequent civil litigation.

***California Law Protects The Bridge Between the Privileges.*** Where, as here, the Legal Complaints and *The Times* Publications are absolutely privileged, "it would defeat the purpose of

section 47[] to punish the transmittal of the privileged pleadings to the press." *Id.* at 823 (applying section 47 to communications with the press regarding allegations asserted in a proposed amended complaint, made *before* the court granted leave to file such complaint). That same outcome is warranted here. "It would be anomalous to hold that a litigant is privileged to make a publication necessary to bring an action but that he can be sued for defamation if he lets anyone know that he has brought it." *Id.* at 824 (citing *Albertson v. Raboff*, 42 Cal. 2d 375, 384 (1956)).

The Wayfarer Parties attempt to avoid these absolute privileges by speculating that Ms. Lively delivered to, and discussed her CRD Complaint with, *The Times before* filing it. FAC, ¶¶ 4, 36, 86, 131, 275. But even if true, that would not constitute a waiver of Ms. Lively's privileges. As explained in *Abraham*, such a holding "would defeat the purpose" of the privileges under Section 47. *Abraham*, 217 Cal. App. 3d at 823. This is especially true where, as here, the FAC concedes that *The Times* reported only *after* the CRD Complaint was filed and reported only on matters within the four corners of the *filed* CRD Complaint (allegedly "lifting it nearly verbatim"). FAC, ¶¶ 259, 261-62.

> ii. *California's Sexual Harassment Privilege Immunizes Ms. Lively From Liability For Defamation-Related Claims.*

Ms. Lively's statements about the sexual harassment she experienced on set and the subsequent retaliation campaign waged against her—whether made in legal filings, to the press, or to any other third party, *before or after* she filed the CRD Complaint—fall squarely within California's statutory sexual harassment privilege. Cal. Civ. Code § 47.1(a). That privilege provides that "communication[s] made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination are privileged under Section 47." *Id.* Section 47.1 also contains a **mandatory** fee-shifting provision for prevailing parties, which entitles individuals who speak out, like Ms. Lively, "to their reasonable attorney's fees and costs for successfully

defending themselves in the litigation, ***plus*** treble damages for any harm caused to them by the defamation action against them, in addition to punitive damages available under Section 3294 or any other relief otherwise permitted by law." Cal. Civ. Code § 47.1 (emphasis added).

California enacted Section 47.1 to clarify and codify existing law, in direct response to repeated attacks upon individuals who report sexual harassment, and to provide a strong remedy to disincentivize retaliatory litigation, "curb a pervasive culture of sexual assault and harassment," and "provide significant remedies for successful defendants in defamation claims." Hudson Decl., Ex. 1 at 27, 62, 83. Members of the California legislature explained that Section 47.1 was necessary because, while positive, the #MeToo movement also "unveiled a predatory culture that persists across all sectors of employment and society" in which many victims have been "served with defamation lawsuits." *Id.* at 87. The legislator went on to describe these retaliatory suits as "a weapon to threaten, silence, intimidate, and dissuade" their accusers. *Id.* at 87, 91-92.

To curb this weaponization of the legal system, Section 47.1 provides immunity against claims seeking to hold individuals liable for speaking out about their experiences with sexual harassment and related claims, including retaliation and aiding and abetting—***whether in a legal proceeding, to the press, or otherwise***. *See* Cal. Civ. Code § 47.1. Under Section 47.1, a covered communication is defined as any "factual information related to an incident of sexual assault, harassment, or discrimination experienced by the individual making the communication," including: (1) an act of sexual harassment ***by a director or producer***, under Civil Code Section 51.9, and (2) "[a]n act of workplace harassment or discrimination, failure to prevent an act of workplace harassment or discrimination, aiding, abetting, inciting, compelling, or coercing an act of workplace harassment or discrimination, or an act of retaliation against a person for reporting or opposing workplace harassment or discrimination. . . . " *Id.* §§ 47.1(d)(2)-(3).

To be protected by the sexual harassment privilege, the speaker need only have "or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not." *Id.* § 47.1(c) (emphasis added). In other words, the sexual harassment privilege attaches regardless of whether a complaint is ever filed and no matter who the communication is published to. As explained by California's legislature:

> *The protections* . . . *would apply to individuals who, after relaying any factual statement, whether in the form of a formal complaint or a statement outside a formal proceeding such as to a media outlet,* [*are*] *sued for defamation*.

*See* Hudson Decl., Ex. 1 at 28, 63, 84 (emphasis added). Indeed, the statute was enacted in large part to address defamation claims filed against harassment victims based upon statements made to the press.[18] *Id.* at 72, 83-84.

Section 47.1 plainly applies to each of the Wayfarer Parties' defamation claims against Ms. Lively. To begin, the FAC's allegations establish that the Wayfarer Parties' defamation claims rest on "communications" made by Ms. Lively "regarding an incident of sexual . . . harassment." Cal. Civ. Code § 47.1(a). In fact, the Wayfarer Parties have already conceded as much in their oppositions: they confirm that their claims arise from Ms. Lively's sexual harassment allegations against Mr. Baldoni and Mr. Heath and allegations of a retaliatory smear campaign against all the Wayfarer Parties after she reported the misconduct.[19] *See* ECF No. 121 at 22; ECF No. 127 at 16. Each and every factual statement that the FAC identifies as false or defamatory relates to "an incident of sexual assault, harassment, or discrimination experienced by" Ms. Lively at the hands of her director, producer, or employers. Cal Civ. Code § 47.1(d); *supra*, at 2, 4-8. Further, the FAC

---

[18] As the legislative history illustrates, Section 47.1 was passed to codify and clarify existing law attaching a privilege to communications regarding sexual harassment under Section 47. Ex. 1 at 27, 62, 83-84.

[19] To the extent that the defamation claim is premised on the "17-point" Protections for Return to Production, or any other statement by which Ms. Lively regarding her concerns of workplace conduct to her employers, it is additionally barred by California's common interest privilege. Cal. Civ. Code § 47(c).

fails to identify any particular statement within the CRD Complaint that Ms. Lively made with "malice" about *any* of the individual Plaintiffs, let alone *all* of them, and for this separate reason, Section 47.1 requires dismissal. *See infra*, at 21-24.

### 4.    The FAC Fails to Allege Actual Malice.

Because Mr. Baldoni is a public figure and Ms. Lively's allegations of sexual harassment concern matters of public interest, whether privileged or not, the constitutional standard requires that the Wayfarer Parties must plausibly allege that Ms. Lively acted with "actual malice," such that Ms. Lively had "serious doubts as to the truth of [her] publication." *Reader's Dig. Assn. v. Superior Ct.*, 37 Cal. 3d 244, 259 (1984). Likewise, to overcome the privilege conferred under Section 47.1, "actual malice" must be pled. Far from pleading "actual malice," the FAC does the opposite: it confirms that Ms. Lively reported her sexual harassment allegations based upon incidents that the FAC acknowledges took place and that she genuinely believed her allegations were true. These admissions are fatal to the Wayfarer Parties' defamation claims.

> i.    *Mr. Baldoni Is A Public Figure And Ms. Lively's Sexual Harassment Allegations Are A Matter Of Public Interest.*

The Wayfarer Parties concede that Mr. Baldoni is a public figure subject to the actual malice standard. *See* ECF No. 121 at 43-44; ECF No. 127 at 29. Similarly, with respect to matters of public concern, the Wayfarer Parties acknowledge that the "two principal categories" of purported defamatory statements center on allegations of sexual misconduct and retaliation aimed towards Ms. Lively, (*see* ECF No. 121 at 22; ECF No. 127 at 16)—issues that constitute matters of public interest. *Todd v. Lovecruft*, 2020 WL 60199, at *13 (N.D. Cal. Jan. 6, 2020) ("Publicly accusing individuals of rape and sexual assault is unquestionably controversial, but the controversy itself serves to demonstrate that it is a matter of public interest and debate.")

Where, as here, the defamation plaintiffs are public figures and the categories of alleged statements involve matters of public interest, they must plead actual malice in order to state a claim for defamation. *Reader's Dig.*, 37 Cal. 3d at 252-53; *Penrose Hill, Ltd. v. Mabray*, 479 F. Supp. 3d 840, 856 (N.D. Cal. 2020) ("If the plaintiff is a public figure, then he must prove that the defendant acted with 'actual malice.'"); *Brown v. Kelly Broad. Co.*, 48 Cal. 3d 711, 746 (1989) (speech involving a matter of public concern requires a private-figure plaintiff to prove actual malice); *Eade v. InvestorsHub.com, Inc.*, 2011 WL 13323344, at *8 (C.D. Cal. July 12, 2011) ("Defamatory statements regarding matters of public concern are actionable only if the plaintiff pleads and proves that the defendant acted with constitutional actual malice."). The "actual malice" standard is focused on the "subjective attitude of the publisher" and, therefore, requires the FAC to plead facts demonstrating that Ms. Lively's statements were made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Reader's Digest*, 37 Cal. 3d at 256.

It is well established that satisfying the actual malice standard requires more than bald recitation of the words "malicious" or "maliciously," nor is it sufficient to assert that a defendant "knew the statements were false, or had serious doubts about the truth of the statements." FAC, ¶ 328; *see Vogel v. Felice*, 127 Cal. App. 4th 1006, 1018 (2005) ("the conclusory boilerplate allegation that defendant acted 'maliciously and oppressively, and in conscious disregard of [plaintiffs'] rights. . .' is insufficient to state a cause of action"); *Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1018 (N.D. Cal. 2017) (accord).

ii.    *The Wayfarer Parties Fail To Allege Non-Conclusory Facts Establishing That Ms. Lively Doubted The Truth Of Her Allegations.*

The FAC utterly fails to satisfy the actual malice standard. Here, the FAC alleges generally that the CRD Complaint's allegations of sexual harassment and retaliation are false. FAC, ¶¶ 1, 3-4, 8, 14-17, 36, 46, 81, 83-85, 88-90, 96, 100-01, 104-05, 120, 124, 135, 144, 155, 162, 187, 190,

192-93, 260, 267, 273, 275, 276, 284, 287, 292-93. The "falsehoods" identified by the Wayfarer Parties, however, center on hair-splitting Ms. Lively's recounting of specific incidents within her Legal Complaints or, worse, attempt to justify the Wayfarer Parties' behavior—essentially asserting that Ms. Lively "asked for it."[20] Consequently, the FAC does nothing more than describe the exact same incidents from the Wayfarer Parties' points of view. Whatever relevance this "both sides" approach may have out of court, here it only highlights the FAC's total failure to allege that Ms. Lively *ever* doubted the truth of *her own allegations*.

At best, the FAC asserts that Ms. Lively published the alleged statements either to save her own reputation or as part of a power grab: (i) they allege that "she needed a scapegoat" to blame for her "missteps" in promoting the Film, *id.*, ¶¶ 3, 12, 271; (ii) they claim she was "driven by overweening ambition and a need for control," *id.*, ¶ 9; (iii) they assert she wanted to "match her star husband" or "boost[] her own brand and business ventures," *id.*, ¶¶ 176-78; and (iv) they state she was determined to "extract…creative control" and to "steal" the Film, *id.*, ¶¶ 130, 161, or "take over the production of the sequel, *It Starts With Us*," *id.*, ¶ 175. But, as described above none of this actually alleges that Ms. Lively *fabricated* the sexual harassment allegations or "insinuations" in the Protections for Return to Production, particularly given that so many of those "insinuations" directly tracked actual incidents that the FAC concedes occurred. *See supra,* at 2, 4-8, 21. Even taking the above as true, the FAC does not plausibly allege that Ms. Lively *actively disbelieved any* of the allegations set forth in her *verified* CRD Complaint.

The FAC also offers no plausible basis on which to infer that Ms. Lively, which the FAC asserts is "[one] of the most powerful stars in the world," FAC, ¶ 18, would—over a period of years— (i) *knowingly fabricate* sexual harassment claims; (ii) repeatedly report her concerns to

---

[20] FAC ¶¶ 36, 48-50, 61, 83, 85-86, 89-92, 100, 106-07, 110, 128-131, 158-159; *cf.* ECF No. 1, ¶¶ 6-7, 47-50, 52-54, 55-57, 59-60, 62, 65-66, 85-92, 100-01, 108.

her superiors (including, Baldoni, Heath, Wayfarer, and Sony); (iii) negotiate contractual protections to address her concerns, *id.*, ¶ 75; (iv) file complaints with state and federal government agencies, *id.*, ¶ 4; and (v) then years later initiate this litigation—further exposing herself to public comment and ridicule—all to simply have the kind creative control she presumably could have obtained simply by being the "powerful" star of the Film.

Instead, the FAC is replete with admissions confirming the truth of Ms. Lively's allegations. The FAC admits that misconduct on set did occur and that ***the Wayfarer Parties even apologized for their misconduct***. *See* FAC, ¶¶ 49, 94, 104; ECF No. 50-1 at 25, 29, 33-34. The FAC admits that Ms. Lively repeatedly raised concerns during production about the exact misconduct described in the CRD Complaint and *The Times* Publications. FAC, ¶¶ 49, 75, 88, 94, 100, 104, 128; ECF No. 50-1 at 25-26, 32. Most damning of all, the FAC references a text message between Mr. Baldoni and Ms. Nathan, in which both agree that Mr. Lively "***genuinely believes she's right*** and that all of this is unjust." ECF No. 50-1 at 155 (emphasis added).

For the same reasons, the FAC also fails to plead malice sufficiently to overcome application of the sexual harassment privilege under Section 47.1. Although neither Section 47 nor Section 47.1 define "malice," courts rely upon Section 48a's definition of "actual malice" as the governing standard. *See Taus*, 40 Cal. 4th at 721 (citing Cal. Civ. Code § 48a(d)(4)); *Sanbourn v. Chronicle Pub. Co.*, 18 Cal. 3d 406, 412-14 (1976) (accord). Under Section 48a, "actual malice" is defined as a "state of mind arising from hatred or ill will toward the plaintiff." Cal. Civ. Code § 48a(d)(4). However, the section further clarifies that "***a good faith belief on the part of the defendant in the truth of the libelous publication*** or broadcast at the time it is published or broadcast ***shall not constitute actual malice***." *Id.* (emphasis added). The Wayfarer Parties' own admissions, therefore, demonstrate the absence of actual malice.

5.     All Other Causes Of Action Arising From The Same 'Injurious Falsehoods' Must Be Dismissed.

Based on the above, all other causes of action—whether labeled defamation or not—similarly fail. *See Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1043 (1986) ("the various limitations rooted in the First Amendment are applicable to all injurious falsehood claims and not solely to those labeled 'defamation'"). The Wayfarer Parties cannot artfully plead around the First Amendment by dressing up a defamation claim as extortion, breach of the implied covenant of good faith and fair dealing, or any other tort. *Id.* at 1045 (". . . to prevent creative pleading from rendering the limitations nugatory, they must be broadly applicable ***whenever*** the gravamen of the claim is injurious falsehood.") (emphasis added); *see also S. California Elec. Firm v. S. California Edison Co.*, 668 F. Supp. 3d 1000, 1020 (C.D. Cal. 2023) (an intentional interference claim is "subject to the same First Amendment requirements that govern actions for defamation" when it is based on "constitutionally protected speech"); *Jiang v. KNTV Television LLC*, 2025 WL 240798, at *8-10 (N.D. Cal. Jan. 17, 2025) (dismissing, as duplicative, extortion claim). Each of the following claims fail for this reason.

**B.     The False Light Claim Must Be Dismissed As Duplicative Of Defamation.**

The false light claim must be dismissed. In sum, this claim rests on the same alleged falsehoods—the statements within the Legal Complaints and *The Times* Publications—as the defamation claim and is therefore duplicative. *Compare* FAC, ¶¶ 325, 327 *with id.*, ¶¶ 333-34, 336; *see Heitkoetter v. Domm*, 2023 WL 2563647, at *2 (E.D. Cal. Mar. 17, 2023) (dismissing false light claim because "Plaintiffs fail[ed] to show that their false light claims [we]re factually distinct from their defamation claims[.]"); *Townsend v. McDonnell*, 2019 WL 7882085, at *10 (C.D. Cal. Dec. 12, 2019) (accord).

**C.**    **There Is No Clear Private Right To Sue For "Civil Extortion," And, Even So, The Wayfarer Parties Fail To Allege Extortionate Conduct.**

The Wayfarer Parties' claim for "civil extortion" likewise fails.[21] This claim appears to be premised upon the implausible theory that Ms. Lively was so desperate to seize "creative control" and to take over production of the Film, that (despite her power and influence in Hollywood) she manufactured claims of sexual harassment. In doing so, the FAC alleges that Ms. Lively delivered the Wayfarer Parties some unidentified "ultimatum" unless they conceded to her demands. FAC, ¶¶ 51-52; *see also id.*, ¶¶ 6, 9, 18, 53, 75, 77, 162-67, 173-74, 298. Yet, the FAC does not identify a single "threat" consistent with this theory and, instead, demonstrates that Mr. Baldoni invited Ms. Lively into the creative process and to collaborate with him and showered her with praise and compliments for her efforts. *Id.*, ¶¶ 28, 34, 42-43, 55-56; ECF No. 50-1 at 5, 11-14.

As a legal matter, although the Wayfarer Parties have admitted that their "civil extortion" claim is "based" on California's *criminal* extortion statute, ECF No. 121 at 46, they cite no California state-court case holding that California's criminal prohibition on extortion authorizes private civil claims. It does not. *See, e.g.*, *Arista Records v. Sanchez*, 2006 WL 5908359, at *2 (C.D. Cal. Mar. 1, 2006); *Samzelius v. Bank of Am.*, 2012 WL 12949683, at *9 (N.D. Cal. Oct. 9, 2012) (same). A small handful of California *federal* courts "have divided over whether California recognizes a civil cause of action for extortion." *Bank of New York Mellon v. DeSelms*, 2019 WL 8198310, at *4 (C.D. Cal. Mar. 25, 2019). But California's *state* courts have recognized civil "extortion" only where a cause of action is accompanied by "the threat of prosecution made with the knowledge of the falsity of the claim." *Fuhrman v. California Satellite Sys.*, 179 Cal. App. 3d 408, 426 (1986).

---

[21] New York does not recognize a claim for civil extortion. *Ecogensus LLC v. Pacella*, 2022 WL 874727, at *6 (S.D.N.Y. Mar. 24, 2022) (collecting cases).

As more recent state and federal decisions have recognized, *Furhman* is the only California state-court case to squarely confront the availability (and elements) of a civil extortion claim under California law. *Intermarketing Media, LLC v. Barlow*, 2021 WL 5990190, at *13 (C.D. Cal. May 4, 2021); *accord Doe v. Mahboubi-Fardi*, 2024 WL 2206640, at *12 (C.D. Cal. Jan. 2, 2024); *see Tran v. Eat Club, Inc.*, 2020 WL 4812634, at *13 (Ct. App. Aug. 18, 2020) (reviewing cases and concluding that "California has not recognized a tort of civil extortion corresponding to criminal extortion"). Thus, *Furhman* is the best "reasoned articulation of California law on this point." *Intermarketing Media, LLC*, 2021 WL 5990190, at *12. Under *Furhman*, California's civil extortion claim "is essentially a cause of action for moneys obtained by duress, a form of fraud." *Furhman*, 179 Cal. App. 3d at 426. "Recognized in this manner, a *civil* claim for extortion requires proof of elements not associated with the *crime* of extortion." *Intermarketing Media*, 2021 WL 5990190, at *12. A "plaintiff generally must show that (1) the defendant made a threatening demand for money; (2) the defendant knew the extortive demand was false; and (3) the plaintiff suffered actual damages." *Doe*, 2024 WL 2206640, at *12.[22] And because civil extortion, properly understood, is a "form of fraud," *Furhman*, 179 Cal. App. 3d at 426, "it is subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b)," *Doe*, 2024 WL 2206640, at *12; *accord Intermarketing Media*, 2021 WL 5990190, at *13.

Regardless of whether governed by common law or Section 518 of the Penal Code, the FAC does not even attempt to allege the basic elements of extortion, much less with the particularity required by Fed. R. Civ. P. 9(b). Nowhere does the FAC allege that Ms. Lively "obtained" any "money" or property from the Wayfarer Parties, much less through a "wrongful

---

[22] The elements of criminal extortion under the Penal Code are substantially the same and require "[1] obtaining property or other consideration from another, with his or her consent, . . ., [2] induced by a wrongful use of force or fear." Cal. Penal Code § 518(a); *see Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1133 (9th Cir. 2014).

threat of criminal or civil prosecution" made with "knowledge of the falsity of the claim."[23] *Fuhrman*, 179 Cal. App. 3d at 426.

The crux of the Wayfarer Parties' extortion claim rests on a theory that Ms. Lively made "extortionate threats to go public with her baseless claims of sexual harassment." ECF No. 121 at 12, 46-47. This theory fails for several reasons. ***First***, this theory relies entirely upon the same "injurious falsehoods" as defamation, and are thus impermissibly duplicative under *Blatty* and its progeny. *See supra*, at 25. ***Second***, because this theory is based upon Ms. Lively's workplace sexual harassment complaints and litigation arising from the same, it is not actionable as a matter of law. *See* FAC, ¶¶ 4, 75.[24] *See also G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233, 259 (S.D.N.Y. 2001) ("Threats of litigation, and even threats of meritless litigation or the actual pursuit of such litigation, have been held not to constitute acts of extortion.") (collecting cases); *Arista Records*, 2006 WL 5908359, at *2. ***Finally***, nowhere in the FAC do the Wayfarer Parties actually allege that Ms. Lively threatened to pursue litigation against them based on their misconduct or demanded any money or property in connection with such a threat. For each of these reasons, this theory fails.

Far from pleading facts demonstrating any improper threats made by Ms. Lively, the FAC confirms the opposite: before and throughout production, Mr. Baldoni and Ms. Lively worked collaboratively on the Film and Mr. Baldoni effusively praised her for her efforts. FAC, ¶¶ 28, 34, 43, 55-56; ECF No. 50-1 at 5, 11-14. And the idea that the Wayfarer Parties were somehow "induced" by any wrongful conduct is further contradicted by their own "evidence," in which they

---

[23] Although the defamation claim is brought on behalf of the "Wayfarer Parties," the FAC is devoid of facts relating to any actions directed towards Ms. Abel or Ms. Nathan. Based on the FAC, it is clear that Ms. Lively did not know either of them during production, much less engage in any extortionate conduct directed towards them.

[24] While the FAC dissects the 17 "non-negotiable conditions," *see* FAC, ¶¶ 78-133, it conveniently avoids addressing Mr. Baldoni's misconduct and the harassment that prompted those "conditions." That silence is damning.

openly admit that "*[they] were [not] literally forced to acquiesce*" to Ms. Lively's purported demands. ECF No. 50-1 at 93 (emphasis added). Stripping the FAC of its conclusory allegations and threadbare recitals lays bare that nothing Ms. Lively allegedly did falls within the "exceedingly narrow concept" of extortion. *See Levitt*, 765 F.3d at 1137.

As for the acquisition of property or other consideration—the FAC does not allege that Ms. Lively "obtain[ed]" any "property" based upon her purported wrongful use of force or fear. This was not a drafting oversight—it is undisputed that property was not acquired and money was not paid. On the contrary, the FAC makes clear that the "Wayfarer Parties" retained their rights to "their Film—a project they had financed, produced, and owned." FAC, ¶ 167. This, in turn, dooms any attempt to satisfy the second prong for extortion, which requires "not only the deprivation but also the ***acquisition*** of property." *Scheidler v. Nat'l Org. of Women, Inc.*, 537 U.S. 393, 404 (2003) (emphasis added); *Sekhar v. U.S.*, 570 U.S. 729, 734-35 (2013) (same); *DeSelms*, 2019 WL 8198310, at *4 (dismissing civil extortion claim where the complaint did not claim that the defendant "actually obtained property from her."); *see also Intermarketing Media*, 2021 WL 5990190, at *13 (collecting cases). At best, the FAC rests on a theory that the Wayfarer Parties' editing and movie production rights were hampered, not lost. FAC, ¶¶ 18, 142-43, 174. That, however, is not enough and torpedoes any claim of extortion. *See United States v. McFall*, 558 F.3d 951, 957 (9th Cir. 2009) ("an alleged extortionist must actually appropriate . . . the victim's property. . . . [i]t is not enough to gain some speculative benefit by hindering a competitor.").

Finally, regardless of the nature of the Wayfarer Parties' extortion claim, they have not alleged *any* damages in connection with the claim, whether the "recovery" of money purportedly extorted or any "damages" proximately caused. To the extent California courts have recognized a

civil extortion claim, actual damages are an essential element of the claim. *Intermarketing Media*, 2021 WL 5990190, at *13. The FAC alleges no such damages, much less with particularity.

**D.    The Breach Of Covenant Claim Must be Dismissed Based On The Wayfarer Parties' Failure To Satisfy Basic Pleading Requirements.**

The FAC fails to plead the essential elements of breach of the implied covenant claim. Under California law, a plaintiff must allege "(1) the existence of some specific contractual obligation; and (2) interference with plaintiff's performance of the contract or failure to cooperate with the plaintiff." *Kaurloto v. U.S. Bank, N.A.*, 2016 WL 6808117, at *6 (C.D. Cal. Nov. 17, 2016). Fundamental to this claim is the identification of the "specific contractual provision that was frustrated." *Rockridge Trust v. Wells Fargo, N.A.*, 985 F. Supp. 2d 1110, 1156 (N.D. Cal. Sept. 25, 2013). Further, "the implied covenant is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated in the contract," *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1032 (1992), or "contradict the express terms of a contract," *Storek & Storek, Inc. v. Citicorp Real Est., Inc.*, 100 Cal. App. 4th 44, 55 (2002).

Here, the FAC argues that Ms. Lively prevented the Wayfarer Parties from "receiving the benefits contemplated" by her actor agreement, allegedly depriving them of "the opportunity to produce, edit, and market" the Film. FAC, ¶ 344. The FAC, however, does not identify a "***specific contractual provision that was frustrated***," *Rockridge*, 985 F. Supp. 2d at 1156 (emphasis added), and does not plausibly allege that Ms. Lively interfered with the actor agreement (nor could it, given Ms. Lively completed her performance in the Film, which was released as the parties contemplated, to great commercial success). ECF No. 50-1 at 134. Indeed, the FAC does not even claim that the Wayfarer Parties had an exclusive contractual right to "creative control" over the Film or to "produce, edit, and market" the film free from creative contribution by Ms. Lively

30

(which Mr. Baldoni openly invited). FAC, ¶ 344. Nor does the FAC allege that Ms. Lively was contractually prohibited from having any "creative control" over any aspect of the Film, the only conduct alleged to constitute a breach of the implied covenant. *Id.* The Wayfarer Parties' grievance seems to be that Ms. Lively *volunteered* to do *more* than they wanted her to do, which is plainly not a breach. Moreover, as with the remaining claims, the FAC utterly fails to allege either *how* the Wayfarer Parties were damaged or what, if any, damages they incurred.

**E.    The Wayfarer Parties Fail To Allege That Ms. Lively Wrongfully Interfered With Any Contract Or Economic Relationship.**

1.    The Wayfarer Parties Fail To Plead That Ms. Lively Intentionally Interfered With Any Specific Contract.

To state a claim for intentional interference with contract, a plaintiff must allege: (1) a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach of, or disruption to, the contract; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1141 (2020). To survive a motion to dismiss, a plaintiff must specifically plead the existence of a valid contract, including the specific provisions of the contract allegedly breached or disrupted. *Id*. Because a claim for tortious interference requires a showing of breach or disruption, contracts that are terminable at-will generally cannot provide the basis for a claim. *Id.* at 1148 (holding that "to state a claim for interference with an at-will contract by a third party, the plaintiff must allege that the defendant engaged in an independently wrongful act"); *Automated Pet Care Prods., LLC v. PurLife Brands, Inc.*, 703 F. Supp. 3d 1022, 1034-36 (N.D. Cal. 2023) (granting motion to dismiss where plaintiff failed to "provide the terms of any contract").

The FAC fails to meet these requirements. The sole contract alleged in the FAC for this claim is a "contract between the Wayfarer Parties and [WME]." FAC, ¶ 348. But the FAC does

31

not allege any details about the contract—including, who the parties are to the contract or what the material contractual terms are. Worse yet, the FAC does not even allege *a single allegation* that the **WME** contract was actually breached or disrupted, much less a description of when, how, or what contractual term was allegedly violated or disrupted, and somehow damaged the Wayfarer Parties. *See Soil Retention Products, Inc. v. Brentwood Industries, Inc.*, 521 F. Supp. 3d 929, 960 (S.D. Cal. 2021) (granting motion to dismiss where the plaintiff pleaded only "[c]onclusory, threadbare recitals" and not the parties to the contract, the damages, or facts alleging "how Plaintiff's business was interfer[ed] with") (citing *Iqbal*, 556 U.S. at 686).

Instead, the Wayfarer Parties conclude that Ms. Lively (in some unknown way) and Mr. Reynolds "prevented performance of the contract or made performance more expensive or difficult," and "upon information and belief" "made threats and/or demands to induce WME to cease performing under its contract. . . ." FAC, ¶ 350. Missing, however, are well-pled allegations that specifically identify **any actions taken by Ms. Lively** demonstrating *how* she purportedly "prevented performance." *Ixchel*, 9 Cal. 5th at 114. The only specific allegations tied to the alleged breakdown of the WME relationship is Mr. Reynolds' alleged suggestion that "the agency was working with a 'sexual predator'. . . and, at a later date, demanded the agent 'drop' Baldoni." FAC ¶ 162. But those comments cannot support a tortious interference claim as to Ms. Lively (or any other defendant) for the reasons explained in Mr. Reynolds' motion. ECF No. 133 at 28-30.

2.    The FAC Fails to Adequately Allege that Ms. Lively Interfered With Any Economic Relationship through an Independently Wrongful Act.

Absent interference with a specific contract, the FAC must satisfy the more stringent requirements for a claim of intentional interference with prospective economic advantage. It does not. Such a claim requires a plaintiff to allege (1) a specific economic relationship with a third party, with a probability of future economic benefit; (2) the defendant's knowledge of the

relationship; (3) the defendant's intentional and independently wrongful acts to disrupt the relationship; (4) actual disruption of the relationship; and (5) resulting economic harm. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003). "Improper motive," economic pressure, competition, or persuasion is not enough to state actionable disruptive conduct. *Id.* at 1158. Instead, a plaintiff must plead conduct "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.* at 1159; *see also UMG Recordings, Inc.*, 117 F. Supp. 3d 1092, 1116 (C.D. Cal. 2015).

Once again, the FAC alleges only one economic relationship for this claim – that between "the Wayfarer Parties and WME" – without any additional details as to the actual parties to that relationship, what it entailed, the "future economic benefit" it conferred, or how or when it was "actually disrupted." FAC, ¶¶ 356-65. Beyond these omissions, the FAC *does not even attempt* to allege that Ms. Lively or (anyone else) engaged in illegal or independently tortious conduct, as is required to survive a motion to dismiss.[25] *Id*. The claim therefore fails.

> 3.    The FAC Fails to State a Claim for Negligent Interference.

Finally, the Negligent Interference Claim must be dismissed because, in addition to the defects common to the other interference claims, this claim is cognizable only where the defendant owes the plaintiff a preexisting duty of care. *See, e.g.*, *Am. Chem. Co. v. Superior Ct.*, 59 Cal. App. 4th 764, 780-83 (1997). The FAC alleges no such duty here.

> 4.    The Wayfarer Parties Have Not Even Attempted to Explain or Quantify
>       Their Alleged $400,000,000 Harm.

Finally, regardless of which interference claim the Wayfarer Parties pursue, each one requires actual, quantifiable damages, which the Wayfarer Parties have failed to adequately allege.

---

[25] As set forth in the Reynolds' motion to dismiss, his alleged statements to WME cannot qualify. ECF No. 133 at 30-31; *see also Choi v. 8th Bridge Cap., Inc.*, 2018 WL 3469053, at *12 (C.D. Cal. July 16, 2018) (dismissing an interference claim for failure to allege independently wrongful conduct based on unspecified defamatory statements).

*See Soil Retention Prods.*, 521 F. Supp. 3d at 960, 963-64. The FAC repeatedly asserts that the Wayfarer Parties "were harmed," FAC, ¶¶ 352, 362, 373, and prays for an award of at least $400 million, *id.* at 222, but it does not explain how, or how much, any of the Wayfarer Parties were in fact damaged. The FAC does not allege, for example, that any Wayfarer Party has lost specific creative projects, profits, contracts, or suffered any other quantifiable damage as a result of the supposed interference of the WME relationship, which is fatal to each of the tortious interference claims. *See, e.g.*, *Republican Nat'l Comm. v. Google LLC*, 742 F. Supp. 3d 1099,1120 (E.D. Cal. 2024); *Soil Retention Prods.*, 521 F. Supp. 3d at 960, 963-64.

### F.     The FAC Muses About a Conspiracy But Fails to Plead the Basic Elements.

The FAC falls woefully short of adequately pleading the existence of a conspiracy amongst the Lively Parties, which requires allegations demonstrating: "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." *Sanchez v. Am. Media, Inc.*, 2020 WL 8816343, at *10 (C.D. Cal. Dec. 29, 2020) (quoting *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1581 (1995)). Thus "'[t]o survive a motion to dismiss, plaintiff must allege with sufficient factual particularity that defendants reached some explicit or tacit understanding or agreement.'" *NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 836 (N.D. Cal. 2014). "[F]ormulaic recitations and conclusory statements will not suffice to allege conspiracy plausibly." *United Bhd. Of Carpenters v. Bldg. & Const. Trades Dep't*, 770 F.3d 834, 842 (9th Cir. 2014).

There are no facts alleged—none—that plausibly demonstrate that Ms. Lively and the Lively Parties had some "meeting of the minds" to commit wrongful acts intended to harm the Wayfarer Parties. It never happened. Realizing this, the FAC only alleges "***[o]n information and belief***" that Ms. Jones approached Ms. Lively "with an appealing offer" to purportedly "destroy" the Wayfarer Parties. FAC, ¶ 244 (emphasis added). This, however, does not come remotely close

34

to satisfying *Twombly*'s plausibility requirement. *Twombly*, 550 U.S. at 551, 557 (declining to accept allegations of a conspiracy that were made upon information and belief absent supporting factual allegations); *United Bhd. of Carpenters*, 770 F.3d at 842 (accord).

That aside, Ms. Lively cannot share liability with any other "Lively Party" under a civil conspiracy theory because the FAC fails to adequately plead an underlying tort; as stated above, allegedly "coordinating with" *The Times* is not wrongful as a matter of law. *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 511 (1994) (conspiracy "must be activated by the commission of an actual tort"). Because each of the underlying claims fail as a matter of law, so too must the FAC's civil conspiracy theory.

## III.   MS. LIVELY IS ENTITLED TO ATTORNEYS' FEES, TREBLE DAMAGES AND PUNITIVE DAMAGES.

As a prevailing party, Ms. Lively is entitled to her attorneys' fees and damages under Section 47.1, which provides: "[a] prevailing defendant . . . ***shall*** be entitled to their reasonable attorney's fees and costs for successfully defending themselves in the litigation, ***plus*** treble damages for any harm caused to them by the defamation action against them, in addition to punitive damages available under Section 3294 or any other relief otherwise permitted by law." Cal. Civ. Code § 47.1 (emphasis added). For the reasons discussed above, *see supra*, at 11-25, the Wayfarer Parties' defamation claim fails as a matter of law. Having successfully defended these claims, Ms. Lively is a "prevailing party" under the statute and is entitled to her reasonable attorneys' fees and costs, for which Ms. Lively will separately file a motion to recover in accordance with Section 47.1. Separate and apart from her costs and attorneys' fees, Ms. Lively is entitled to treble and punitive damages to compensate her for the reputational and emotional harm she has suffered as a result of the Wayfarer Parties' meritless and retaliatory lawsuit against her.

## **CONCLUSION**

The Court should dismiss all claims against Ms. Lively with prejudice, deny leave to amend, and award Ms. Lively all relief sought.

Respectfully submitted,

Dated: March 20, 2025                          /s/ Esra A. Hudson

Michael J. Gottlieb                                   Esra A. Hudson (admitted *pro hac vice*)
Kristin E. Bender                                     Stephanie A. Roeser (admitted *pro hac vice*)
Meryl C. Governski (admitted *pro hac vice*)          Manatt, Phelps & Phillips LLP
Willkie Farr & Gallagher LLP                          2049 Century Park East, Suite 1700
1875 K Street NW                                      Los Angeles, California 90067
Washington, DC 20006                                  (310) 312-4000
(202) 303-1000                                        ehudson@manatt.com
mgottlieb@willkie.com                                 sroeser@manatt.com
mgovernski@willkie.com

                                                      Matthew F. Bruno
Aaron E. Nathan                                       Manatt, Phelps & Phillips LLP
Willkie Farr & Gallagher LLP                          7 Times Square
787 Seventh Avenue                                    New York, NY 10036
New York, NY 10019                                    (212) 790-4500
(212) 728-8904                                        mbruno@manatt.com
anathan@willkie.com

*Attorneys for Blake Lively*