## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

BLAKE LIVELY,

                    Plaintiff,

v.

WAYFARER STUDIOS LLC, et al.,

                    Defendants.

No. 24-cv-10049 (LJL) (lead case)

WAYFARER STUDIOS LLC, et al.,

                    Plaintiffs,

v.

BLAKE LIVELY, et al.,

                    Defendants.

No. 25-cv-449 (LJL) (member case)

## MEMORANDUM OF LAW IN OPPOSITION TO JED WALLACE AND STREET RELATIONS, INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT

Esra A. Hudson (admitted *pro hac vice*)
Stephanie A. Roeser (admitted *pro hac vice*)
Manatt, Phelps & Phillips LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
(310) 312-4000
ehudson@manatt.com
sroeser@manatt.com

Matthew F. Bruno
Manatt, Phelps & Phillips LLP
7 Times Square
New York, NY 10036
(212) 790-4525
mbruno@manatt.com

Michael J. Gottlieb
Kristin E. Bender
Meryl C. Governski (admitted *pro hac vice*)
Willkie Farr & Gallagher LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1000
mgottlieb@willkie.com
kbender@willkie.com
mgovernski@willkie.com

Aaron E. Nathan
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8904
anathan@willkie.com

*Attorneys for Blake Lively*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

BACKGROUND ................................................................................................. 4

    A.    The Wayfarer Parties Embark on a Conspiracy to "Destroy" Ms. Lively in Retaliation for Raising Concerns About Sexual Harassment. ................................. 4

    B.    The Wallace Parties Join and Become an Integral Part of the Conspiracy. ............. 6

    C.    The Wallace Parties Sue in California, Dismiss that Action, then Sue Ms. Lively in Texas After Learning that this Action Would Proceed in New York. ............................................................................................. 8

LEGAL STANDARD ......................................................................................... 10

ARGUMENT .................................................................................................... 10

    I.    THIS COURT HAS PERSONAL JURISDICTION OVER THE WALLACE PARTIES UNDER A CONSPIRACY THEORY OF JURISDICTION. .................... 10

    II.    THE WALLACE PARTIES' VENUE ARGUMENTS ARE MERITLESS. ............. 12

        A.    Venue Is Proper Under 28 U.S.C. § 1391(b). .......................................... 12

        B.    The Motion to Sever the Wallace Parties and Transfer Venue Should Be Denied. ...................................................................................... 14

            1.    The First-to-File Rule Favors This Action, Not the Texas Action. ................. 14

            2.    The Motion to Transfer Under 28 U.S.C. §§ 1404(a) and 1406(a) Should Be Denied. ................................................................................ 15

    III.    THE MOTION TO DISMISS SHOULD BE DENIED. ................................. 18

        A.    The Wallace Defendants' Sole Objection to the False Light Claim—that New York or Texas Law Must Apply to It—Is Meritless. .................................... 18

        B.    The Wallace Defendants' Attempt to Plead Ignorance of the Law Is No Excuse for Their Knowing Aiding-and-Abetting of Retaliatory Conduct that Violated FEHA. ........................................................................... 20

        C.    The Wallace Defendants' Objections to the IIED Claim Are Meritless. .............. 22

CONCLUSION ................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Al Thani v. Hanke*,
    2022 WL 489052 (S.D.N.Y. Feb. 17, 2022)...............................................................13

*Alch v. Superior Ct.*,
    122 Cal. App. 4th 339 (Cal. Ct. App. 2004).....................................................20, 21

*Alcorn v. Anbro Eng'g, Inc.*,
    468 P.2d 216 (Cal. 1970)..............................................................................................25

*All. For Env't Renewal, Inc. v. Pyramid Crossgates Co.*,
    436 F.3d 82 (2d Cir. 2006)...........................................................................................12

*Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*,
    457 F. Supp. 3d 401 (S.D.N.Y. 2020).........................................................................11

*Alwand Vahan Jewelry, Ltd. v. Lustour, Inc.*,
    2021 WL 3604517 (S.D.N.Y. Aug. 13, 2021)............................................................11

*Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.*,
    474 F. Supp. 2d 474 (S.D.N.Y. 2007).........................................................................15

*Bensky v. Indyke*,
    743 F. Supp. 3d 586 (S.D.N.Y. 2024).........................................................................24

*Berman v. Informix Corp.*,
    30 F. Supp. 2d 653 (S.D.N.Y. 1998)...........................................................................17

*Berry v. Indianapolis Life Ins. Co.*,
    608 F. Supp. 2d 785 (N.D. Tex. 2009).........................................................................20

*Brown v. APL Mar. Ltd.*,
    2023 WL 4912100 (N.D. Cal. Aug. 1, 2023)..............................................................25

*D.H. Blair & Co. v. Gottdiener*,
    462 F.3d 95 (2d Cir. 2006)...........................................................................................15

*Dickerson v. Novartis Corp.*,
    315 F.R.D. 18 (S.D.N.Y. 2016)......................................................................15, 16, 17

*Dish Network, LLC v. Am. Broad. Cos.*,
    2012 WL 2719161 (S.D.N.Y. July 9, 2012)................................................................15

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013).....................................................................................11, 12

*Federman Assocs. v. Paradigm Med. Indus.*,
    1997 WL 811539 (S.D.N.Y. Apr. 8, 1997) ............................................................ 16

*Fieger v. Pitney Bowes Credit Corp.*,
    251 F.3d 386 (2d Cir. 2001) .................................................................................. 20

*Flynn v. Higham*,
    149 Cal. App. 3d 677 (Cal. Ct. App. 1983) ......................................................... 23

*Hadley v. City of Anaheim*,
    2020 WL 2405259 (C.D. Cal. Jan. 28, 2020) ....................................................... 25

*Hustler Mag., Inc. v. Falwell*,
    485 U.S. 46 (1988) ................................................................................................ 22

*Jiajia Luo v. Sogou, Inc.*,
    465 F. Supp. 3d 393 (S.D.N.Y. 2020) .................................................................. 10

*Liapes v. Facebook, Inc.*,
    95 Cal. App. 5th 910 (2023) ................................................................................. 21

*Liberty Highrise Pvt. Ltd. v. Praxis Energy Agents DMCC*,
    632 F. Supp. 3d 562 (S.D.N.Y. 2022) .............................................................. 10, 11

*Marine Midland Bank, N.A. v. Miller*,
    664 F.2d 899 (2d Cir. 1981) .................................................................................. 11

*Marotto v. Kellogg Co.*,
    2018 WL 10667923 (S.D.N.Y. Nov. 29, 2018) ..................................................... 16

*Mobley v. Workday, Inc.*,
    740 F. Supp. 3d 796 (N.D. Cal. 2024) ................................................................. 20

*P.C. v. Driscoll*,
    2025 WL 104522 (S.D.N.Y. Jan. 15, 2025) ......................................................... 13

*Pagano v. Johnson Controls, Inc.*,
    2025 WL 786535 (S.D.N.Y. Mar. 12, 2025) ......................................................... 14

*Petro-Diamond Inc. v. SCB & Assocs., LLC*,
    2013 WL 12138724 (C.D. Cal. Sept. 18, 2013) ................................................... 20

*Rankins v. United Parcel Serv., Inc.*,
    2024 WL 3416508 (N.D. Cal. July 15, 2024) ....................................................... 25

*Reader's Dig. Assn. v. Superior Ct.*,
    690 P.2d 610 (Cal. 1984) ...................................................................................... 22

*Sanchez-Corea v. Bank of America*,
    701 P.2d 826 (Cal. 1985) ................................................................................. 25

*Save Power Ltd. v. Syntek Fin. Corp.*,
    121 F.3d 947 (5th Cir. 1997) ........................................................................... 14

*SEC v. Lybrand*,
    2000 WL 913894 (S.D.N.Y. July 6, 2000) ..................................................... 17

*Toretto v. Donnelley Fin. Sols., Inc.*,
    583 F. Supp. 3d 570 (S.D.N.Y. 2022) ............................................................ 18

*Tye v. Runyon*,
    2015 WL 13918024 (C.D. Cal. Jan. 28, 2015) ............................................... 25

*Vargas v. Vons Cos., Inc.*,
    2022 WL 17685801 (Cal. Ct. App. Dec. 15, 2022) ........................................ 23

*Yanowitz v. L'Oreal USA, Inc.*,
    36 Cal. 4th 1028 (Cal. 2005) ........................................................................... 22

**Statutes**

28 U.S.C. § 1391(b) .................................................................................................. 12

28 U.S.C. § 1404(a) .................................................................................................. 15

28 U.S.C. § 1406(a) .................................................................................................. 15

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 10

## INTRODUCTION AND SUMMARY OF ARGUMENT

Jed Wallace and his company Street Relations, Inc. ("Street Relations," and together with Mr. Wallace, the "Wallace Parties") were the covert operatives in Justin Baldoni, Jamey Heath, and Steve Sarowitz's conspiracy to retaliate against Plaintiff Blake Lively for speaking out about Mr. Baldoni and Mr. Heath's misconduct on the set of *It Ends With Us* (the "Film"). Mr. Wallace is a self-described "hired gun" who executes "untraceable" campaigns on social media platforms. In this case, despite Mr. Wallace's boasts about his clandestine abilities, he and his company got caught: even without discovery, the facts available to Ms. Lively already show that Mr. Wallace and Street Relations joined and actively participated in the conspiracy to "bury" Ms. Lively and destroy her reputation in retaliation for speaking up about sexual harassment.

Their co-defendants' own text messages and emails, including with Mr. Wallace, confirm that the Wallace Parties knowingly joined a conspiracy designed to harm Ms. Lively, knew what the conspiracy was trying to accomplish, and helped that happen. The other co-conspirators could barely contain their glee at how successfully the Wallace Parties executed the plan: Patting themselves on the back about their "amazing work," Defendants Melissa Nathan and Jennifer Abel celebrated the conspiracy's "total success" in achieving a "shift on social, ***due largely to Jed and his team's efforts to shift the narrative towards shining a spotlight on Blake and Ryan***," instead of on Mr. Baldoni's and Mr. Heath's misconduct. The Wallace Parties' efforts were so successful that Ms. Nathan commented that the "majority of socials are so pro Justin and I don't even agree with half of them [sic] lol," and added that ***"[i]t's actually sad because it just shows you have people [sic] really want to hate on women."*** Still, these were the efforts that Ms. Nathan saw "as a total success, as does Justin." When another woman came forward to describe similar misconduct she experienced at the hands of Mr. Baldoni, the co-conspirators turned to the Wallace Parties,

1

with Ms. Abel reporting that ***"we've flagged to Jed and his team for more serious action on the social side."***

The Wallace Parties' motion ignores all of this, along with the rest of the Amended Complaint, in favor of a self-serving (and unsupported) narrative, denying any wrongdoing, any joining of a conspiracy, and any connection to New York. Each of the Wallace Parties' individual arguments are legally meritless and contradicted by the detailed allegations in the Amended Complaint, which must be taken as true for the purposes of this motion.

*First*, the Wallace Parties argue that they are not subject to personal jurisdiction in this Court, but their sole argument against Ms. Lively's theory of personal jurisdiction—a conspiracy-based theory—is that the Wallace Parties did not join any conspiracy. To be clear, the Wallace Parties *do not dispute that a conspiracy existed*, or that other members of that conspiracy established sufficient contacts with New York, but *only* that the Wallace Parties did not join the conspiracy. In support of that contention, the Wallace Parties rely *exclusively* on a self-serving declaration from Mr. Wallace himself, which asserts in conclusory fashion that he did not join the conspiracy. But Mr. Wallace's self-serving declaration is contradicted by the verbatim text messages and emails in the Amended Complaint. At this stage, the Amended Complaint's more-than-plausible allegations trump Mr. Wallace's declaration, which the Court cannot even consider at this stage without first allowing discovery into Mr. Wallace's participation in the conspiracy—discovery that will only confirm what Ms. Lively was already able to allege based on the texts and emails she has obtained thus far.

*Second*, the Wallace Parties challenge venue in this Court and ask for transfer to the Western District of Texas. The Wallace Parties are simply incorrect that venue does not lie in this District (an argument that no other defendant has even attempted) and the motion for transfer is

unpersuasive. Most importantly, the Wallace Parties are wrong that the Texas lawsuit counts as "first-filed" for purposes of the motion to transfer simply because they were not named as defendants in this action until the Amended Complaint. The first-filed doctrine, however, asks only whether lawsuits are "substantially similar"—which the Wallace Parties admit is true here—not whether the parties in each case are identical. *This* is the first-filed action, not the Wallace Parties' attempt to force Ms. Lively (and every other witness) to litigate a duplicative action in Texas. For similar reasons, the Wallace Parties' other arguments for transfer are unpersuasive.

*Third*, the Wallace Parties' limited arguments about the merits of Ms. Lively's claims are all unavailing. The Wallace Parties' only argument against Ms. Lively's false light claim is choice-of-law, namely that New York or Texas law should apply (rather than California law, which Ms. Lively asserts). But the Wallace Parties are wrong: California law applies to Ms. Lively's false light claim, not least because of Mr. Wallace's *own sworn admission* in his declaration that he understood *all* of his conduct in connection with this case to constitute "*doing business . . . in California.*" The Wallace Parties' are also wrong about Ms. Lively's FEHA aiding-and-abetting claim: sole argument is that they cannot be liable for aiding-and-abetting unless they knew FEHA existed and what it meant. But aiding-and-abetting liability does not require defendants to have *studied the law* they are helping others to violate, only that they know about the conduct they are assisting. Finally, the Wallace Parties' challenges to the IIED claim are likewise meritless: (i) actual malice is ***not*** a required element for Ms. Lively's IIED claim (which, in any event, is well-pled); and (ii) Ms. Lively's allegations of FEHA violations are also sufficient to satisfy the "outrageousness" element of IIED.

## BACKGROUND

### A. The Wayfarer Parties Embark on a Conspiracy to "Destroy" Ms. Lively in Retaliation for Raising Concerns About Sexual Harassment.

Ms. Lively's claims against the Wallace Parties, like her claims against their co-defendants, ultimately trace back to Mr. Baldoni's and Mr. Heath's harassing and inappropriate behavior on the set of the Film. Ms. Lively raised complaints about that conduct to Mr. Baldoni, Mr. Heath, and others as early as spring 2023. ECF No. 84 ("Amended Complaint" or "AC"), at ¶¶ 84, 132, 134. She later reiterated those same concerns and others, negotiated a contract rider through which It Ends With Us Movie LLC agreed to 17 "protections" for the Film's return to production ("Protections for Return to Production"), and, as agreed to in those Protections, reiterated those concerns again to Mr. Baldoni and Mr. Heath at a January 4, 2024 All Hands Meeting. *Id.* ¶¶ 19-21, 150, 153-56. Those Protections included prohibitions on "spontaneous improvising" of intimate and sexual physical touching, simulated sex, or nudity; prohibitions on discussions about personal sexual experiences, entering Ms. Lively's trailer while she was in a state of undress, and retaliation against Ms. Lively for raising concerns, including during "publicity and promotional work." ECF No. 84-2 at 2-3; *see* AC ¶ 150.

As the Film's August 6, 2024 New York premier neared, Mr. Baldoni and Mr. Heath grew concerned that their misconduct would become public, and—in a blatant act of retaliation against Ms. Lively for bringing her concerns about that misconduct through appropriate professional channels—engaged in a coordinated campaign to "destroy" her reputation, distract from their own behavior with false narratives about Ms. Lively, and get away with their misconduct. *Id.* ¶¶ 26, 28-31, 33, 209. To advance those unlawful objectives, Mr. Baldoni and Mr. Heath enlisted a number of co-conspirators, including (i) Mr. Baldoni's billionaire partner Steve Sarowitz, who promised to spend "$100 million" to ruin Ms. Lively and her family's lives, *id.* ¶¶ 26, 169,

(ii) Wayfarer Studios and It Ends With Us Movie LLC (together with Baldoni, Heath, and Sarowitz, the "Wayfarer Parties"), (iii) Melissa Nathan and her company The Agency Group PR LLC ("TAG"), and (iv) Jennifer Abel. *Id.* ¶¶ 29, 193-94. Mr. Baldoni and Mr. Heath shared with these co-conspirators the Protections for Return to Production, which they styled as Ms. Lively's "grievances." *Id.* ¶¶ 31, 203-04.

Together, the conspiracy set out to "destroy" Ms. Lively and punish her for having the courage to come forward about the harassment she and others experienced on the set of the Film. *Id.* ¶¶ 203-06, 209. Specifically, on August 2, 2024, Ms. Nathan delivered a proposal to Mr. Baldoni, which included "[a] website (to discuss), full reddit, full social account take downs, full social crisis team on hand for anything – engage with audiences in the right way, start threads of theories (discuss) this is the way to be fully 100% protected." *Id.* ¶¶ 29, 214. Ms. Nathan also proposed the "creation of social fan engagement to go back and forth with any negative accounts, helping to change [sic] narrative and stay on track." *Id.* Per Ms. Nathan, "***All of this will be most importantly untraceable***." *Id.* As Ms. Abel described it, the plan was to engage in "social media mitigation and proactive fan posting to counter the negative" as well as "social manipulation." *Id.* ¶ 224. To "get ahead of this narrative," Ms. Nathan's plan proposed strategies to ***advance misleading counternarratives***, including pushing Ms. Nathan's narrative that Ms. Lively had a "less than favorable reputation," proposing to "explore planting stories about the weaponization of feminism," and blaming Ms. Lively for production members' job losses. *Id.* ¶¶ 31, 205-06.

Initially, Mr. Baldoni expressed concerns that TAG's written plan was insufficiently aggressive to "protect" him. *Id.* ¶ 32. Writing to Mr. Heath and Ms. Abel, he said he was "[n]ot in love with the document they sent – Not sure I'm feeling the protection I felt on the call" with Ms. Nathan and her colleagues. *Id.* ¶¶ 32, 207. Later that day, Ms. Abel and Ms. Nathan exchanged

more text messages, expressing that **Mr. Baldoni "wants to feel like [Ms. Lively] can be buried**." *Id.* ¶¶ 33, 209. Ms. Abel and Ms. Nathan agreed that they should not betray their true intentions in writing. "When we send over documents we can't send over the work we will or could do **because that could get us in a lot of trouble**." *Id.* ¶ 33. **We can't write it down to him. We can't write we will destroy her**. We will go to this. We will do this. We will do this. We will do this." *Id..* "**Imagine if a document saying all the things that he wants ends up in the wrong hands**." *Id.* Ms. Nathan followed this by assuring Ms. Abel: **"you know we can bury anyone [sic] But I can't write that to him."** *Id.* ¶ 34. A few days later, Mr. Baldoni set the tone for the "social combat" he and his co-conspirators would enact: sending Ms. Abel a thread on X that had accused another female celebrity of bullying women, Mr. Baldoni stated, "this is what we would need." *Id.* ¶ 35.

### B. The Wallace Parties Join and Become an Integral Part of the Conspiracy.

Jed Wallace and Street Relations joined and became an integral part of that conspiracy. Mr. Wallace is a public-relations consultant who has described himself as a "hired gun" with a "proprietary formula for defining artists and trends." AC ¶ 217. He specializes in executing confidential and "untraceable" campaigns on social media platforms like TikTok, Instagram, Reddit, and X, to shape public perception of his clients and their adversaries, flooding the zone with their manufactured narratives. *Id.* ¶ 218. Mr. Wallace does all this through his company Street Relations, which describes itself as a "crisis mitigation firm" that helps its clients "navigate . . . threats" and maintains a roster of high-profile and high-net-worth clients. *Id.* ¶ 220; ECF No. 142 ("MTD"), at 8.[1] One of the ways that Street Relations serves those clients is by subcontracting with other firms to perform "untraceable" assignments as part of an offensive "social combat" strategy. AC ¶¶ 214, 216 Mr. Wallace had a close relationship to Defendants' counsel Bryan

---

[1] Unless otherwise indicated, ECF citations refer to the docket in No. 24-cv-10049, and pincites to documents filed on ECF refer to the ECF docket-stamp pagination, rather than the internal pagination of the PDF document.

Freedman prior to this litigation—in Ms. Nathan's words, "very close"[2]—and had also worked with TAG and Ms. Nathan before. *Id.* ¶¶ 221-22; *see* ECF No. 37 ¶ 156.

Through TAG, Defendants engaged Mr. Wallace and Street Relations in early August 2024, when the press and public were beginning to notice none of Mr. Baldoni's fellow cast members would be seen with him. AC ¶¶ 216, 226. Mr. Wallace and Street Relations got to work seeding, manipulating, and advancing disparaging content on social media platforms and internet chat forums, including specific platforms that Ms. Abel told Mr. Baldoni they would "focus" on: Reddit, TikTok, and Instagram. *Id.* ¶ 223. Ms. Abel emailed Ms. Nathan and Mr. Wallace on August 8, 2024, saying to Ms. Nathan and her "TAG team" about Mr. Wallace and the Street Relations team, "is this something you can bring them up to speed on so they can hit the ground running?" *Id.* ¶ 226.

On August 9, Ms. Abel, Mr. Baldoni, Mr. Heath, Ms. Nathan, and other members of the TAG team exchanged text messages to celebrate the "narrative" that was "shifting online to pointing finger at Ryan being overly involved." *Id.* ¶ 228. In response to Mr. Baldoni, a TAG employee noted that they had "flagged to Jed and his team as well" this shifting narrative. *Id.* That same day, Ms. Abel circulated a screenshot of a post by another woman accusing Mr. Baldoni of additional misconduct, and announced that she had directed Mr. Wallace to take action to suppress it, stating: "I'm assuming this is not true in the slightest . . . ***Either way, we've flagged to Jed and his team for more serious actions on the social side.***" *Id.* ¶ 260. That same day, Ms. Nathan reported to the group Mr. Wallace's sentiment that "we are crushing it on Reddit." *Id.* ¶ 235. Around the same time, threads began to appear on Reddit speculating about a feud between Ms. Lively and Mr. Baldoni, calculated to paint Ms. Lively as being in the wrong. *Id.* ¶ 236.

---

[2] On August 13, 2024, Ms. Nathan sent a text suggesting a Signal thread between herself, Ms. Abel, and Mr. Wallace "in case you need him [*i.e.*, Mr. Wallace] to connect you to Bryan [Freedman] because they're very close." AC ¶ 221.

On August 10, TAG expressly acknowledged the success of the Wallace Parties' efforts to shift public attention from stories about Mr. Baldoni's misconduct into a manufactured and harmful narrative about Ms. Lively, stating they had "started to see a shift on social, *due largely to Jed and his team's efforts to shift the narrative towards shining a spotlight on Blake and Ryan*." AC ¶ 245. Following this "shift," Ms. Nathan texted, "[t]he majority of socials are so pro Justin and I don't even agree with half of them lol." *Id.* ¶ 247. Ms. Nathan later bragged that "this went so well . . . It was genius." *Id.* ¶ 43. Over the days that followed, Mr. Wallace and Street Relations led a "digital team" that worked with Ms. Nathan, Ms. Abel, and TAG to further implement their social "manipulation" strategy. AC ¶¶ 250-57. When an allegation surfaced regarding additional misconduct by Mr. Baldoni—as Ms. Abel stated, "this girl is claiming that Justin invited her up to his hotel room years ago"—Ms. Nathan advised Ms. Abel, "[l]et us chat to Jed as well on this." AC ¶ 256. In response to Mr. Baldoni's concern that he did not want bots defending him online ("I really don't want bots defending me," AC ¶ 257), Ms. Nathan reassured him that something much more sophisticated was in motion, stating that the "other team"—a reference to the Wallace Parties—"is doing something very specific in terms of what they do," adding that "I know Jamey [Heath] &Jed [sic] connected on this." AC ¶ 257.

### C. The Wallace Parties Sue in California, Dismiss that Action, then Sue Ms. Lively in Texas After Learning that this Action Would Proceed in New York.

On December 20, 2024, Ms. Lively filed an administrative complaint with the California Civil Rights Department (the "CRD Complaint"), which included all of the allegations set forth above in Section A. ECF Nos. 107-3–107-6. The CRD Complaint asserted facts supporting ten claims under California law, including sexual harassment, retaliation, failure to prevent harassment and retaliation, aiding and abetting the same, as well as others. *See id.*

On December 31, the Wayfarer Parties, including Mr. Wallace, sued the New York Times for defamation in California State Court, arising out of an article it wrote covering Ms. Lively's CRD Complaint entitled *We Can Bury Anyone: Inside a Hollywood Smear Campaign.* Complaint, *Wayfarer Studios LLC, et al. v. N.Y. Times Co.*, 24STCV34662 (Cal. Super. Ct. Dec. 31, 2024). On January 16, 2025, the Wayfarer Parties, but not Mr. Wallace, sued Ms. Lively and others in this Court, and then dismissed the California state case. No. 25-cv-449, ECF No. 1; Request for Dismissal, *Wayfarer Studios LLC, et al. v. N.Y. Times Co.*, 24STCV34662 (Cal. Super. Ct. Feb. 3, 2025). At the February 3 initial conference in this matter, Bryan Freedman—who had represented the Wallace Parties in connection with their California lawsuit—explained that the Wayfarer Parties had filed in this Court because it "made no sense to be doing this on different coasts and with different courts," and since "so many of the issues are going to be so similar that to have it all in one proceeding in front of [this Court] would make the most sense." ECF No. 63, at 23.

The very next day, the Wallace Parties sued Ms. Lively in the Western District of Texas, asserting causes of action for: (i) a declaratory judgment that the Wallace Parties were not liable for the conduct alleged in the CRD Complaint (and in this action); and (ii) defamation based on the idea that Ms. Lively had defamed them by including their names in the caption of her CRD Complaint. *See Wallace, et al. v. Lively*, No. 25-CV-163 (W.D. Tex. Feb. 4, 2025), ECF No. 1 ("Texas Compl."). There, the Wallace Parties alleged that Street Relations "is a corporation organized under the laws of the State of California." Texas Compl. ¶ 3; *see* Wallace Decl. ¶ 8. On February 18, Ms. Lively amended her complaint in this action to add the Wallace Parties. ECF No. 84. The Amended Complaint is substantially similar to the CRD Complaint, including in that it names Wallace and Street Relations as members of the conspiracy. *Id.*; ECF No. 1.

## LEGAL STANDARD

"In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court accepts all factual allegations as true, and draws all reasonable inferences in the plaintiff's favor." *Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 405 (S.D.N.Y. 2020) (cleaned up) . Similarly, on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, "[w]here, as here, discovery has not yet been conducted, the Court assumes the truth of the plaintiff's factual allegations for purposes of the motion." *Liberty Highrise Pvt. Ltd. v. Praxis Energy Agents DMCC*, 632 F. Supp. 3d 562, 568 (S.D.N.Y. 2022) (cleaned up). If those "factual allegations constitute a *prima facie* showing of jurisdiction," that "suffices, *notwithstanding any controverting presentation by the moving party*, to defeat the motion." *Id.* (cleaned up). And the "legal standard governing pre-discovery motions to dismiss for improper venue under Federal Rule of Civil Procedure Rule 12(b)(3) is similar to a motion to dismiss for lack of personal jurisdiction." *Id.*

## ARGUMENT

### I.    THIS COURT HAS PERSONAL JURISDICTION OVER THE WALLACE PARTIES UNDER A CONSPIRACY THEORY OF JURISDICTION.

As the Wallace Parties concede, all that is necessary to establish personal jurisdiction at this stage is for Ms. Lively to allege (1) that "a conspiracy existed," (2) that the Wallace Parties "participated in the conspiracy," and (3) that a "co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with" New York "to subject that co-conspirator to jurisdiction in that state." MTD at 17 (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018)). The Wallace Parties do not dispute that the first and third requirements are satisfied: Wallace expresses "doubts" that the Wayfarer Parties' conspiracy existed, but does not dispute that the Amended Complaint sufficiently alleges such a conspiracy. Nor do the Wallace

Parties dispute that individual members of the conspiracy committed overt acts with sufficient contacts with New York to subject them to jurisdiction in New York.

Instead, the Wallace Parties' sole argument against this conspiracy theory of jurisdiction is to assert that Wallace "was not involved" in the conspiracy. MTD at 17. To support that assertion, the Wallace Parties ignore the Amended Complaint entirely, relying solely on Wallace's self-serving declaration. *Id.* at 17-18 (citing ECF No. 142-1 ("Wallace Decl."), at ¶ 31). But at this stage—on a Rule 12(b)(2) motion where no jurisdictional discovery has been conducted—Wallace's declaration is irrelevant to the personal jurisdiction analysis. Instead, "[w]here, as here, jurisdictional discovery has not been conducted, to defeat a motion to dismiss, the plaintiff need only put forth legally sufficient allegations of jurisdiction." *Alwand Vahan Jewelry, Ltd. v. Lustour, Inc.*, 2021 WL 3604517, at *4 (S.D.N.Y. Aug. 13, 2021) (cleaned up). So long as a plaintiff's "factual allegations constitute 'a *prima facie* showing' of jurisdiction," that "suffices, *notwithstanding any controverting presentation by the moving party*, to defeat the motion." *Liberty Highrise*, 632 F. Supp. 3d at 568 (quoting *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 87 (2d Cir. 2013)).[3]

The Amended Complaint more than sufficiently alleges the Wallace Parties' agreement to participate in the conspiracy alleged in the Amended Complaint. During the crucial period surrounding the August 2024 premiere of the Film—at which Mr. Sarowitz pledged to spend $100 million to ruin the lives of Ms. Lively and her family, AC ¶ 26—Ms. Nathan, Ms. Abel, and TAG began to fulfill Mr. Sarowitz's threat, engaging Mr. Wallace and Street Relations to design and implement a "social combat plan." *Id.* ¶¶ 215-16. Mr. Wallace and Street Relations were in close

---

[3] *Accord Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*, 457 F. Supp. 3d 401, 407 (S.D.N.Y. 2020); *see Dorchester*, 722 F.3d at 86 (explaining that under *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899 (2d Cir. 1981), "until an evidentiary hearing is held, 'a *prima facie* showing suffices, *notwithstanding any controverting presentation by the moving party*,'") (quoting *Marine Midland Bank*, 664 F.2d at 904).

11

communication with Ms. Nathan and Ms. Abel over the coming days, receiving instructions on how to perform their role in the conspiracy, reporting back about their successes, and receiving credit from their satisfied co-conspirators for their efforts. *Supra* at 6-8. Taken as true, these allegations establish that the Wallace Parties were full members of the conspiracy, which defeats the Wallace Parties' sole challenge to a conspiracy-based theory of jurisdiction.

Alternatively, if there is any doubt as to personal jurisdiction over the Wallace Parties, the Court should order jurisdictional discovery. Further, because the sole "jurisdictional" issue— whether the Wallace Parties were members of the conspiracy—is "interwoven with the underlying merits," any such jurisdictional discovery can and should happen in parallel with merits discovery, with adjudication of the jurisdictional question deferred to summary judgment or trial. *Dorchester*, 722 F.3d at 87.[4] Without discovery into the merits issues raised by the Wallace Parties' jurisdictional arguments, Ms. Lively has no ability to test those arguments (including the unsupported assertions in Mr. Wallace's declaration). And, because discovery is already underway, the most efficient course would be for jurisdictional discovery to proceed as a component of merits discovery.

## II.    THE WALLACE PARTIES' VENUE ARGUMENTS ARE MERITLESS.

### A.  Venue Is Proper Under 28 U.S.C. § 1391(b).

The Wallace Parties assert that venue in this District is improper. They are wrong. "Section 1391(b)(2) permits venue in multiple judicial districts as long as 'a substantial part' of the underlying events took place in those districts. Under this framework, a district court is not required to determine the best venue, and venue is proper so long as significant events or omissions

---

[4] *See also All. For Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006) ("If . . . the overlap in the evidence is such that fact-finding on the jurisdictional issue will adjudicate factual issues required . . . to be resolved by a jury, then the Court must leave the jurisdictional issue for the trial.").

material to the plaintiff's claim occurred in the district in question, even if other material events occurred elsewhere." *Al Thani v. Hanke*, 2022 WL 489052, at *10 (S.D.N.Y. Feb. 17, 2022) (cleaned up). With respect to claims asserting vicarious liability, "[f]or venue purposes, the relevant activities are those that take place in connection with the underlying tort." *P.C. v. Driscoll*, No. 24-CV-2496 (LJL), 2025 WL 104522, at *8 (S.D.N.Y. Jan. 15, 2025).

Here, a substantial part of the events giving rise to the underlying torts—false light, intentional infliction of emotional distress, and FEHA harassment and retaliation—took place in this District. As the Amended Complaint alleges, the "All-Hands" Meeting at which Ms. Lively and others discussed Mr. Baldoni's and Mr. Heath's misconduct on set, occurred in this District. AC ¶¶ 19-21, 73. The Film itself premiered in Manhattan, and it was at that premiere that Mr. Sarowitz announced that he was prepared to spend $100 million to ruin Ms. Lively and her family's lives. AC ¶ 26. Mr. Baldoni and Mr. Heath, as officers of Wayfarer, also engaged with Jonesworks (a company with its principal place of business in New York)—an engagement that initiated the retaliation campaign at issue. AC ¶ 73. On the day of the Film's release, Ms. Nathan communicated with her sister—a journalist at the *New York Post* and contributor at *Page Six*—to shape her sister's coverage of Ms. Lively in the *Post*. AC ¶¶ 240-41. Ms. Sara Nathan continued to correspond with Ms. Abel and Ms. Nathan, even exchanging drafts of a story pushing the Wayfarer Parties' narrative about Ms. Lively's role in editing the Film. AC ¶¶ 268-72. These events are more than "substantial" enough to satisfy Section 1391(b)(2); even where defendants "may not have been physically present in New York in carrying out the alleged scheme[,]" that "is not necessarily relevant to the issue of whether a substantial part of the events or omissions giving rise to the claim occurred in New York." *Al Thani*, 2022 WL 489052, at *10 (finding venue proper where the defendant co-conspirators engaged in "multiple in-person meetings" in New York and where one

co-conspirator "participated in several telephone calls" with persons in New York on which case-related conversations took place) (cleaned up).

**B. The Motion to Sever the Wallace Parties and Transfer Venue Should Be Denied.**

1. The First-to-File Rule Favors This Action, Not the Texas Action.

The Wallace Parties are correct that the first-to-file rule is implicated by the co-existence of this action with the Texas Action, MTD at 20-21, but wrong about *which* action qualifies as the first-filed under the rule. As is well established, "the first-to-file rule does not require identical parties, only that the parties and claims be 'substantially similar.'" *Pagano v. Johnson Controls, Inc.*, 2025 WL 786535, at *3 (S.D.N.Y. Mar. 12, 2025) (cleaned up); *see Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 951 (5th Cir. 1997) (same). Here, the Wallace Parties have conceded that this action and the Texas Action are "substantially similar" such that the first-filed rule should apply. MTD at 20-21. According to the Wallace Parties, the only reason the Texas Action qualifies as first-filed, rather than this one, is that they were not named in this action until two weeks after the Texas Action was filed. But that difference is insufficient to render the Texas Action first-filed.

Instead, *this* action, which was filed on December 31, 2024, is the first-filed action. The more-than-"substantial" similarity between this action as it existed as of that date and the Texas Action is only further confirmed by the Texas Action itself. The Texas Action seeks a mirror-image declaratory judgment of non-liability for *precisely* the claims asserted in the CRD Complaint and seeks to impose defamation liability on Ms. Lively for including the Wallace Parties in the caption page of her CRD Complaint. Complaint. Texas Compl. Indeed, the Texas Action *expressly alleges* that it is an "anticipatory declaratory judgment action[]" brought for the purpose of obtaining "issue-preclusive effect," *id.* ¶ 18—a plain acknowledgement that the two cases are substantially similar and, as importantly, a concession that the Texas Action was "made under the apparent threat of a presumed adversary filing the mirror image of that suit in another

court," and was therefore an "improper anticipatory declaratory judgment action," that is not entitled to priority under the first-filed doctrine. *Dish Network, LLC v. Am. Broad. Cos.*, 2012 WL 2719161, at *2 (S.D.N.Y. July 9, 2012) (cleaned up).

2. The Motion to Transfer Under 28 U.S.C. §§ 1404(a) and 1406(a) Should Be Denied.

The Wallace Parties seek transfer to the Western District of Texas under Section 1406(a) or 1404(a). But Section 1406(a) applies only where venue is improper, and is therefore unavailable here. 28 U.S.C. § 1406(a); *supra* at 12-14. And the Wallace Parties have not carried their "burden" to "show that transfer [is] warranted" under Section 1404(a). *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006) (cleaned up). Factors relevant to that analysis include:

> (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties.

*Id.* at 106-07 (cleaned up). These factors weigh heavily against transfer.

**The Plaintiff's choice of forum.** "A plaintiff's choice of forum is to be given substantial weight and should not be disturbed unless the balance of convenience and justice weighs heavily in favor of defendant's proposed forum." *Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.*, 474 F. Supp. 2d 474, 486 (S.D.N.Y. 2007). This deference is "even greater" where, as here, the plaintiff sues in her home district. *Id.* Meanwhile, the Wallace Parties' only argument as to this factor rests on the first-filed doctrine, but that argument is meritless for the reasons stated above. *Supra* at 14-15. Thus, "the heavy weight accorded to plaintiff's choice of forum remains undiminished." *Am. Steamship Owners*, 474 F. Supp. 2d at 486.

**The convenience of witnesses.** The Wallace Parties have failed to make *any* showing as to this "most important factor," including failing to "provide the Court with a detailed list of probable witnesses who will be inconvenienced if required to testify in the current forum." *Dickerson v.*

*Novartis Corp.*, 315 F.R.D. 18, 27 (S.D.N.Y. 2016) (cleaned up). Nor could they, because all of their co-defendants have consented to try the remainder of the consolidated actions in this District. *See* ECF Nos. 147-54. In other words, the Wallace Parties' proposed severance-and-transfer would make *all of the defendants in this action* essential witnesses in two far-flung districts, rather than one. The convenience of witnesses weighs heavily *against* transfer.[5]

**The convenience of parties.** The convenience of the parties "weighs neutrally" here because "[r]egardless of the forum in which the action takes place, one party will be obligated to travel." *Federman Assocs. v. Paradigm Med. Indus.*, 1997 WL 811539, at *3 (S.D.N.Y. Apr. 8, 1997). Here, Mr. Wallace nonetheless cites special circumstances, described in the redacted portion of his declaration, that he argues should weigh in the balance. MTD at 21; Wallace Decl. ¶ 34. But there is no need to consider or inquire into those factual assertions at this stage, because there is no reason to expect that Mr. Wallace will need to travel to this District except to testify at trial in March 2026—nearly one year from now. If at that time, Mr. Wallace still believes that the factual circumstances discussed in the redacted portion of his declaration are relevant, he can raise the issue then. And for the same reason, Mr. Wallace's (unredacted) concern that "travel-to-and-from New York would be hard financially" (despite his having traveled to New York for leisure as recently as December 2024, Wallace Decl. ¶ 6), or disruptive to his work, is immaterial. MTD at 21; Wallace Decl. ¶ 35. There is no reason to believe that frequent travel "to-and-from" New York will be required of him, just a single trip to testify at trial.

---

[5] The Wallace Parties make no argument as to the location of documents, nor would any such argument favor transfer, because "this factor is entitled to relatively little weight in the modern era of faxing, scanning, and emailing documents." *Dickerson*, 315 F.R.D. at 30 (cleaned up). Nor do the Wallace Parties make any argument as to the availability of process to compel the testimony of witnesses, rendering that factor immaterial. *See, e.g.*, *Marotto v. Kellogg Co.*, 2018 WL 10667923, at *6 (S.D.N.Y. Nov. 29, 2018) ("There is no indication that any witness would fail to testify without compulsion. As a result, this factor is neutral with respect to the question of transfer.").

***The locus of operative facts.*** The Wallace Parties contend that the "locus of operative facts" is in Texas, "at least as to Wallace and Street." MTD at 21. But as explained above, for venue purposes the relevant facts are those involved in the underlying torts for which Ms. Lively seeks to hold the Wallace Parties vicariously liable. *Supra* at 13; *see, e.g.*, *SEC v. Lybrand*, 2000 WL 913894, at *6 (S.D.N.Y. July 6, 2000). The Wallace Parties also cherry-pick three allegations from the 482-paragraph Amended Complaint as support for their contention that the "remaining conduct" occurred in California, Hawaii, or Texas, but not in New York. MTD at 21. But even that attempt to ignore the complaint's New York-based allegations does not satisfy the Wallace Parties' burden to demonstrate that transfer to *Texas*, in particular, is appropriate.

***The relative means of the parties.*** Mr. Wallace asserts that he perceives a disparity in financial means between himself and Ms. Lively. Wallace Decl. ¶ 36. But even a genuine (and substantiated) disparity—such as a *pro se* individual plaintiff suing a corporation—is irrelevant, absent a "showing . . . that litigating" in the forum "would impose an undue hardship." *Berman v. Informix Corp.*, 30 F. Supp. 2d 653, 659 (S.D.N.Y. 1998). The Wallace Parties have produced nothing on this score beyond conclusory assertions about Mr. Wallace's own perceptions. But "unsupported assertion[s]" of limited means, and "conclusory allegations in [an] affidavit," are insufficient to move the needle on this factor. *Dickerson*, 315 F.R.D. at 31, 32 (cleaned up).

Finally, given that Ms. Lively's action will proceed in this District against every other Defendant, basic considerations of judicial economy favor one action rather than two. The Wallace Parties' motion to transfer should be denied.

III.    **THE MOTION TO DISMISS SHOULD BE DENIED.**

A. **The Wallace Defendants' Sole Objection to the False Light Claim—that New York or Texas Law Must Apply to It—Is Meritless.**

The Wallace Parties' sole argument for dismissal of Ms. Lively's false light claim is that New York or Texas law applies, rather than California law. MTD at 22-23. That argument fails. The totality of the Wallace Parties' argument against application of California law is that "[u]nder Lively's theory of venue and personal jurisdiction, New York is the epicenter of this case," and therefore ruling in Ms. Lively's favor on those issues involves "necessarily accepting [her] theory that New York has the most significant relationship to the claims and certainly to the exclusion of California where no conduct is alleged to have taken place." *Id.* at 22. That is wrong twice over.

First, the Wallace Parties' argument that if personal jurisdiction and venue are proper in New York, New York choice-of-law principles consequently mandate application of New York law, is simply a non-sequitur. Accepting that logic would render the entire doctrine of conflict of laws meaningless, because answering threshold questions on personal jurisdiction and venue inquiries would "necessarily" dictate the answer to choice of law. Unlike the doctrines of personal jurisdiction and venue (which may yield multiple permissible forums), New York choice-of-law principles require that "the law of *the* jurisdiction having the *greatest* interest in the litigation will be applied" to any given issue. *Toretto v. Donnelley Fin. Sols., Inc.*, 583 F. Supp. 3d 570, 589 (S.D.N.Y. 2022) (cleaned up) (emphasis added). As this very case illustrates, it is routine for personal jurisdiction and venue to be proper in one jurisdiction while the choice-of-law inquiry dictates application of another's law. *See, e.g.*, ECF No. 50 (Wayfarer Parties' Amended Complaint asserting California-law claims against Ms. Lively in this District).

Applying that standard to the Amended Complaint reveals the deeper problem with the Wallace Parties' argument: their citation-free assertion that "no conduct is alleged to have taken

place" in California. MTD at 22. But that assertion is demonstrably false. The Wallace Parties conveniently omit that throughout the period that is the subject of the Amended Complaint, **Street Relations was incorporated in California**. *Supra* at 9.Worse yet, this argument is belied by Mr. Wallace's declaration, in which he confirms that he understood *his own* conduct in connection with the Wayfarer Parties' conspiracy to be directed at California, and *exclusively* California:

> Because I provided feedback to Ms. Nathan, who I understood to be in California most if not all the time**, *I only considered the impact of my work to be in California*.** The goal of my work was to inform her and her team, who I anticipated would be in California. And I thought of her work as for Wayfarer Studios, which I knew and know to be based in California. In other words, ***I thought I was doing business and providing my services to individuals in California.***

Wallace Decl. ¶ 28 (emphasis added).

California's interest in regulating the Wallace Parties' conduct becomes even clearer when viewed in light of the fact that, in this action, Ms. Lively seeks to impose, at a minimum, *vicarious liability* on the Wallace Parties for their participation in a conspiracy to commit the tort of false light against her. The Wallace Parties do not meaningfully dispute that the primary tortfeasors' conduct in committing that underlying tort is governed by California law. MTD at 19. Nor could they, for several reasons: those tortfeasors engaged in a substantial amount of tortious conduct in California, were themselves principally California residents or California entities, and (in the case of the Wayfarer Defendants) were bound by a contractual choice-of-law provision that encompasses related torts (including Ms. Lively's false light claim). AC ¶¶ 57-59, 61-64, 151 n.21, 417-21. By joining the conspiracy, the Wallace Parties became vicariously liable for their co-conspirators' commission of that California-law tort.

Finally, even if Texas law applied to the question whether the Wallace Parties' *joined* the conspiracy to commit those California-law torts[6] it would make no difference, because Texas and California law on civil conspiracy liability is the same. *See Petro-Diamond Inc. v. SCB & Assocs., LLC*, 2013 WL 12138724, at *3 n.4 (C.D. Cal. Sept. 18, 2013); *Berry v. Indianapolis Life Ins. Co.*, 608 F. Supp. 2d 785, 793 n.7 (N.D. Tex. 2009).

### B. The Wallace Defendants' Attempt to Plead Ignorance of the Law Is No Excuse for Their Knowing Aiding-and-Abetting of Retaliatory Conduct that Violated FEHA.

The Wallace Parties do not dispute that California law applies to Ms. Lively's FEHA aiding-and-abetting claim. Instead, they advance two related arguments under California law: first, that Ms. Lively has not adequately alleged the "knowledge" element of the claim, and second, that all of the relevant primary conduct occurred prior to the Wallace Parties' aiding-and-abetting began. MTD at 23-25. Both arguments are meritless.

FEHA makes it an unlawful for "any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under" the Act, "or to attempt to do so." *Alch v. Superior Ct.*, 122 Cal. App. 4th 339, 389 (Cal. Ct. App. 2004) (quoting Cal. Gov't Code § 12940(i)). As relevant here, to plead an aiding-and-abetting claim, "a plaintiff must allege that . . . the alleged aider and abettor knew that the employer's conduct violated FEHA." *Mobley v. Workday, Inc.*, 740 F. Supp. 3d 796, 813 (N.D. Cal. 2024). The totality of the Wallace Parties' argument challenges the Amended Complaint's allegations as to that element, asserting that Ms. Lively has not alleged "how or why Wallace or Street knew that the FEHA existed, let alone that anyone's conduct violated it in this case." MTD at 25. But aiding-and-abetting liability does not require that degree of knowledge— in particular, it does not require that the defendant *subjectively know the law*, much less *hold a*

---

[6] *See, e.g., Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 397 n.1 (2d Cir. 2001) ("Under the doctrine of depecage as applied by New York courts, the rules of one legal system are applied to regulate certain issues arising from a given transaction or occurrence, while those of another system regulate other issues.") (cleaned up).

*correct interpretation of the law.* All that is necessary is that the defendant subjectively know of facts that, properly (and objectively) understood, constitute a violation. The Wallace Parties' contrary rule would be absurd: a defendant could not be held liable on an aiding-and-abetting theory without an allegation that he or she had arrived at (or obtained) a legal opinion about their collaborator's conduct. The law does not require that the Wallace Parties knew "that the FEHA existed"—or Googled it, or fired up Westlaw, or asked ChatGPT whether it was unlawful to retaliate against someone for speaking up about harassment at work—in order to be liable for aiding and abetting. *See, e.g.*, *Liapes v. Facebook, Inc.*, 95 Cal. App. 5th 910, 926 (2023) (holding that an allegation that the defendant knew the primary violator "intentionally targeted its ads based on users' ages and gender," conduct that, if proven, would constitute "a violation of the Unruh" Act, satisfied the knowledge element of aiding-and-abetting liability); *Alch*, 122 Cal. App. 4th at 390 (allegations that the defendants "knew the employers were engaged in systemic discrimination on the basis of age" sufficiently "established [their] liability for aiding and abetting").

Here, the Amended Complaint demonstrates that the Wallace Parties knew that the Wayfarer Parties were retaliating against Ms. Lively for engaging in conduct protected by FEHA. Indeed, the *whole point* of retaining the Wallace Parties was so that they could help the Wayfarer Parties "shift the narrative" from "HR complaints on set" to "shining a spotlight on" Ms. Lively instead, in an effort to destroy her reputation. *Id.* ¶¶ 43, 245. During this process, Ms. Abel and Ms. Nathan (acting on behalf of the Wayfarer Parties) "flagged social media accounts questioning Mr. Baldoni's misconduct to Mr. Wallace, directing Mr. Wallace to take 'serious actions on the social side' in response." *Id.* ¶ 260. These actions occurred *after* the Wayfarer team had begun to receive inquiries from the press about HR complaints made regarding Mr. Baldoni and Mr. Heath's behavior on the set of the Film, and worked to suppress coverage of those complaints. *Id.*

¶¶ 260-66. Those allegations and the inferences they support are more than enough to establish that the Wallace Parties knew that the purpose of their work in "shifting the narrative" against Ms. Lively was in response to the concerns that she raised about Mr. Baldoni and Mr. Heath's harassing and inappropriate behavior. Knowledge of those facts equates to knowledge of a FEHA violation.[7]

For these same reasons, the Wallace Parties' second argument against the FEHA retaliation claim (that the retaliatory conduct occurred prior to the Wallace Parties' joining the conspiracy) fails. The Wallace Parties joined and assisted the Wayfarer Parties for the express purpose of "shifting the narrative" to one intended to destroy Ms. Lively's reputation. *Supra* at 6-8. That retaliatory conduct occurred *after* Mr. Wallace and Street Relations joined the scheme, and with their knowing, substantial assistance.

### C. The Wallace Defendants' Objections to the IIED Claim Are Meritless.

The Wallace Parties argue that Ms. Lively has failed to plead a sufficient claim for intentional infliction of emotional distress because she has failed to sufficiently allege actual malice, and because the alleged conduct "cannot possibly" amount to the requisite outrageousness for a viable claim. MTD at 24. Neither argument is correct.

At the outset, the Wallace Parties are incorrect that the "actual malice" standard even applies to Ms. Lively's IIED claim. The "actual malice" standard applies where an IIED claim rests exclusively on a "theory for what has been determined to be a constitutionally protected publication." *Reader's Dig. Assn. v. Superior Ct.*, 690 P.2d 610, 624 (Cal. 1984); *Hustler Mag.*,

---

[7] *See, e.g.*, *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042, 1053-54 (Cal. 2005) ("a plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action," and that an adverse employment action includes conduct that is "reasonably likely to adversely and materially affect an employee's . . . opportunity for advancement in his or her career"). Notably, Mr. Baldoni has confessed to the elements of the FEHA retaliation claim that the Wallace Parties aided and abetted, because Mr. Baldoni has admitted that Ms. Lively "genuinely believes she's right," a statement with which Ms. Nathan fully agreed ("She fully does. I know it."). AC ¶ 301. As is "well established," "a retaliation claim may be brought by an employee who has complained of or opposed conduct that the employee reasonably believes to be discriminatory." *Yanowitz*, 36 Cal. 4th at 1043.

*Inc. v. Falwell*, 485 U.S. 46, 56 (1988) ("public figures and public officials may not recover for the tort of intentional infliction of emotional distress *by reason of publications*" without proving actual malice) (emphasis added). But, as applicable here, IIED claims may stand independent of reputational claims where they consist of "far more" than publications. *Flynn v. Higham*, 149 Cal. App. 3d 677, 682 (Cal. Ct. App. 1983) (finding IIED claim sufficiently pleaded independent of deficient libel claim, because "the facts giving rise to the infliction of emotional distress allegation consisted of far more than defamatory words"); *accord Vargas v. Vons Cos., Inc.*, 2022 WL 17685801, at *14 (Cal. Ct. App. Dec. 15, 2022) (conduct underlying viable FEHA claim "forms the basis of plaintiff's claim for intentional infliction of emotional distress").

Ms. Lively's IIED claim as to the Wallace Parties extends beyond a "gravamen" of falsehoods. *See* MTD at 24 ("There is no pleading that Wallace or Street made any particular false statement."). As detailed in the Amended Complaint, the conduct giving rise to Ms. Lively's IIED conduct was multi-faceted and "included soliciting, developing, implementing, and promoting a covert multi-tiered press and digital plan." AC ¶ 435. The Wallace Parties were at the core of the "covert multi-tiered . . . digital plan," pursuant to which they "weaponized a digital army around the country from New York to Los Angeles and beyond to create, seed, promote, and engage with content that appeared to be authentic on social media platforms and internet chat forums." *Id.* ¶ 38. Indeed, the co-conspirators unleashed the Wallace Parties to "perpetrate[] a retaliation scheme against Ms. Lively" that included not only "seeding of content" but also "boosting of content," "amplifying negative content about Ms. Lively (including through engagement via comments on social media)" and "suppressing of negative content about Mr. Baldoni." *Id.* ¶¶ 230, 250, 260. Because the Wallace Parties' digital weaponization and social algorithm manipulation are separate from the injurious falsehoods aimed at Ms. Lively, actual malice is not required.

Even if actual malice is required, the Amended Complaint satisfies this standard as well. The Wallace Parties admit that the Amended Complaint alleges actual malice in connection with Ms. Lively's false light claim: that "Defendants knew the public disclosures would create a false impression about Ms. Lively or acted with reckless disregard for the truth." MTD at 24 (citing AC ¶ 450). The Amended Complaint further demonstrates that Mr. Wallace and Street Relations knew, or recklessly disregarded, that their conduct would create a false impression about Ms. Lively: (i) a strategic plan was concocted in response to Ms. Lively's grievances and to "get ahead of the narrative[,]" AC ¶¶ 199, 205-06; Ex. D; (ii) TAG identified the Wallace Parties as one of two digital teams to orchestrate their online narrative, AC ¶¶ 214(a)-(b); Ex. D at 1 ("[O]ur team's digital experts will . . . mitigate if false narratives begin in the digital space."); and (iii) *TAG brought Mr. Wallace and his team "up to speed" by August 8, 2024*. AC ¶ 226. From that point, Mr. Wallace took aim at Ms. Lively—casting her in a false light as to "her marketing decisions, moral character, private life, and family," starting "threads of theories," and "seed[ing] social media content . . . on online chat sites like Reddit" that "helped create and sustain a negative news cycle and social media algorithm around Ms. Lively." AC ¶¶ 214(a), 235, 330-31, 448. And long after, the co-conspirators continued to create the impression that Ms. Lively fabricated sexual harassment claims to seize control of the Film, which they knew to be false. *Id.* ¶¶ 301, 467.

The Wallace Parties cannot credibly argue that their conduct was not extreme and outrageous. Their primary argument for this proposition is that "it is hard to imagine how a public relations point/counterpoint," could be a cognizable IIED claim. MTD at 24.[8] To be clear, working to "bury" and "destroy" someone who raises claims of sexual harassment is not a "PR

---

[8] In support of this proposition, they also state that "IIED is a highly disfavored [tort] under New York law." MTD at 24. Because California law applies, the Wallace Parties' invocation of New York's view of IIED is irrelevant, but even under New York is sufficiently pled. *See, e.g.*, *Bensky v. Indyke*, 743 F. Supp. 3d 586, 598 (S.D.N.Y. 2024).

counterpoint." AC ¶ 5. On the contrary, the Amended Complaint exhaustively details the outrageous nature of the retaliatory scheme in which the Wallace Parties participated, including the seeding of content that "create[d] and sustain[ed] a negative news cycle and social media algorithm around Ms. Lively," *id.* ¶¶ 330-31, and that resulted in online vitriol and violence inundating Ms. Lively, her business accounts, and her loved ones, *see, e.g.*, *id.* ¶¶ 45-47, 324-52. The Wallace Parties' actions here fall squarely within the outrageous conduct recognized by California courts that gives rise to an IIED claim. *See Tye v. Runyon*, 2015 WL 13918024, at *3 (C.D. Cal. Jan. 28, 2015) ("extensive and virulent" posting of comments on various internet forums "exceeded the bounds of that tolerated in a civilized society"); *Hadley v. City of Anaheim*, 2020 WL 2405259, at *1 (C.D. Cal. Jan. 28, 2020) "creat[ion of] fake email accounts and social media profiles"); *Alcorn v. Anbro Eng'g, Inc.*, 468 P.2d 216, 219 n.5 (Cal. 1970) (discriminatory epithets and "vindictive conduct" alongside other adverse employment conduct); *Sanchez-Corea v. Bank of America*, 701 P.2d 826, 837-38 (Cal. 1985) (same).

The outrageousness of such conduct is particularly striking given, as described above (III.B), the Wallace Parties' participation in the retaliatory "astroturfing" campaign—in direct violation of the FEHA. Such discriminatory conduct is plainly "outrageous" under California law. *See Brown v. APL Mar. Ltd.*, 2023 WL 4912100, at *12-13 (N.D. Cal. Aug. 1, 2023) (denying motion to dismiss IIED claim against defendant where plaintiff sufficiently pled "allegations of sexual harassment and sexual battery" by defendant's employees); *Rankins v. United Parcel Serv., Inc.*, 2024 WL 3416508, at *3 (N.D. Cal. July 15, 2024) ("Under California law, sexual harassment can satisfy the outrageous behavior element of an IIED claim.").

## <u>CONCLUSION</u>

The motions to dismiss and to transfer should be denied.

Respectfully submitted,

Dated: April 2, 2025

/s/ Michael J. Gottlieb

Esra A. Hudson (admitted *pro hac vice*)
Stephanie A. Roeser (admitted *pro hac vice*)
Manatt, Phelps & Phillips LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
(310) 312-4000
ehudson@manatt.com
sroeser@manatt.com

Matthew F. Bruno
Manatt, Phelps & Phillips LLP
7 Times Square
New York, NY 10036
(212) 790-4525
mbruno@manatt.com

Michael J. Gottlieb
Kristin E. Bender
Meryl C. Governski (admitted *pro hac vice*)
Willkie Farr & Gallagher LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1000
mgottlieb@willkie.com
kbender@willkie.com
mgovernski@willkie.com

Aaron E. Nathan
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8904
anathan@willkie.com

*Attorneys for Blake Lively*