**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY,<br><br>       Plaintiff,<br><br>v.<br><br>WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, and JENNIFER ABEL,<br><br>       Defendants. | Civ. Action No. 1:24-cv-10049-LJL (Consolidated for pretrial purposes with 1:25-cv-00449-LJL) rel. 1:25-cv-00449-LJL<br><br>**THIRD-PARTY DEFENDANT JONESWORKS LLC's MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS JENNIFER ABEL'S THIRD-PARTY COMPLAINT SEEKING INDEMNIFICATION** |
| JENNIFER ABEL,<br><br>       Third-Party Plaintiff,<br><br>v.<br><br>JONESWORKS LLC,<br><br>       Third-Party Defendant | |
| WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, JENNIFER ABEL, and STEVE SAROWITZ,<br><br>       Plaintiffs,<br><br>v.<br><br>BLAKE LIVELY, RYAN REYNOLDS, LESLIE SLOANE, VISION PR, INC., and THE NEW YORK TIMES COMPANY,<br><br>       Defendants. | |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND .....................................................................................................7

I.     ABEL JOINS JONESWORKS.............................................................................7

II.    ABEL RUNS AN UNSANCTIONED SHADOW CAMPAIGN TO SMEAR
LIVELY AND ATTACK AND STEAL FROM JONESWORKS .........................8

III.   ABEL SEEKS INDEMNIFICATION FROM JONESWORKS FOR THE
SMEAR CAMPAIGN SHE CARRIED OUT IN PURSUIT OF HER OWN
INTERESTS AND WITHOUT JONESWORKS' KNOWLEDGE................................11

LEGAL STANDARD.............................................................................................12

ARGUMENT .........................................................................................................12

IV.   ABEL CANNOT INVOKE CALIFORNIA'S LABOR CODE SECTION 2802
WHEN SHE EXPRESSLY AGREED THAT NEW YORK LAW GOVERNS
THE PARTIES' EMPLOYMENT RELATIONSHIP.........................................12

    A.    The New York Choice-Of-Law Clause Is Valid and Enforceable ........13

    B.    The Application of the Choice of Law Clause Forecloses Abel's California
Statutory Indemnification Claim...............................................................15

V.    ABEL IS NOT ENTITLED TO COMMON LAW INDEMNIFICATION .................17

    A.    Abel's Agreement to Specific Contractual Indemnification Supersedes
Common Law Indemnification...................................................................17

    B.    Abel Is Not Entitled to Indemnification For Actions Taken When She
Went Rogue and Acted In Service of her Personal Interests in Direct
Defiance of Jonesworks' Instructions........................................................19

        1.    Abel Was Acting In Pursuit of her Own Interests—Not
Jonesworks'.......................................................................................20

        2.    Jonesworks Could Not Have Foreseen That Its Trusted Senior
Employee Would Betray It ................................................................22

        3.    Abel's Misconduct Far Exceeds a Mere "Error in Judgment" .................24

CONCLUSION........................................................................................................25

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Arnone v. Aetna Life Ins. Co.,*
  860 F.3d 97 (2d Cir. 2017) ................................................................................... 16

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .............................................................................................. 12

*BDO U.S.A., P.C. v. Rojas*,
  No. 24 Civ. 101 (CM), 2024 WL 3236822 (S.D.N.Y. June 27, 2024) ................... 13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (1955) .............................................................................................. 12

*Boatman v. Cnty. of Onondaga,*
  217 N.Y.S.3d 377 (N.Y. App. Div. 2024) ............................................................. 20

*Bracero v. State,*
  81 Misc.3d 1214(A), 2023 N.Y. Slip Op. 51336 (U) (N.Y. Ct. Cl. 2023) .............. 23

*Canyon Sterling Emerald, LLC v. 4 S Dev., LLC,*
  182 N.Y.S.3d 192 (N.Y. App. Div. 2023) ............................................................. 19

*Capstone Logistics Holdings, Inc. v. Navarrete,*
  No. 17-CV-4819 (GBD), 2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018), *aff'd and remanded in part*, 796 F. App'x 55 (2d Cir. 2020) ............................................. 15

*Centi v. McGillin,*
  34 N.Y.3d 1072 (N.Y. App. Div. 2019) ................................................................. 18

*Cosmas v. Hassett,*
  886 F.2d 8, 13 (2d Cir. 1989) ................................................................................. 7

*Danko v. Forest Lake Camp, Inc.*,
  882 N.Y.S.2d 280 (N.Y. App. Div. 2009) ............................................................. 24

*Danner-Cantalino v. City of New York,*
  926 N.Y.S.2d 109 (N.Y. App. Div. 2011) ......................................................... 20, 21

*Doe v. Guthrie,*
  710 F.3d 492 (2d Cir. 2013) ................................................................................... 21

*Dykes v. McRoberts Protective Agency, Inc.,*
  680 N.Y.S.2d 513 (N.Y. App. Div. 1998) ......................................................... 24, 25

*EMA Fin., LLC v. NFusz, Inc.*,
    444 F. Supp. 3d 530 (S.D.N.Y. 2020)..................................................... 16

*Fernandez v. Rustic Inn, Inc.*,
    876 N.Y.S.2d 99 (N.Y. App. Div. 2009) ................................................ 24

*Fin. One Pub. Co. v. Lehman Bros. Special Fin.*,
    414 F.3d 325 (2d Cir. 2005).......................................................... 13, 15

*Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*,
    No. 20-CV-5120 (LJL), 2022 WL 1997207 (S.D.N.Y. June 6, 2022) ...................... 16

*H.S.W. Enter., Inc. v. Woo Lae Oak, Inc.*,
    171 F. Supp. 2d 135 (S.D.N.Y. 2001)..................................................... 16

*Hammond v. Equinox Holdings LLC*,
    148 N.Y.S.3d 34 (N.Y. App. Div. 2021) ................................................ 21

*Judith M. v. Sisters of Charity Hosp.*,
    715 N.E.2d 95 (N.Y. 1999).............................................................. 22

*Knieriemen v. Bache Halsey Stuart Shields*,
    427 N.Y.S.2d 10 (N.Y. App. Div. 1980) ................................................ 17

*Krock v. Lipsay*,
    97 F.3d 640 (2d Cir. 1996)............................................................. 17

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
    84 N.Y.2d 430 (N.Y. App. Div. 1994) ............................................... 18, 19

*Mindspirit, LLC v. Evalueserve Ltd.*,
    346 F. Supp. 3d 552 (S.D.N.Y. 2018).................................................... 13

*Ministers & Missionaries Benefit Bd. v. Snow*,
    45 N.E.3d 917 (N.Y. 2015)......................................................... 13, 15

*N.X. v. Cabrini Med. Ctr.*,
    765 N.E.2d 844 (N.Y. 2002)............................................................ 19

*Nomura Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, Nat'l Ass'n v. Nomura*
    *Credit & Cap., Inc.*,
    30 N.Y.3d 572 (N.Y. App. Div. 2017) .................................................. 18

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
    86 N.Y.2d 685 (N.Y. App. Div. 1995) ................................................... 18

*Process Am., Inc. v. Cynergy Holdings, LLC*,
    35 F. Supp. 3d 259 (E.D.N.Y. 2014), aff'd, 839 F.3d 125 (2d Cir. 2016) ............... 18

*Ramos v. Jake Realty Co.*,801 N.Y.S.2d 566 (N.Y. App. Div. 2005) ........................................... 25

*Rivera v. State*,
   142 N.E.3d 641 (N.Y. 2019)..................................................................................... 22

*Riviello v. Waldron*,
   391 N.E.2d 1278 (N.Y. 1979)................................................................................... 22

*Stevens & Co.  v. Espat*,
   No. 24-CV-5223, 2025 WL 950989 (S.D.N.Y. Mar. 28, 2025) ........................................ 13, 14

*Stevens*, 2025 WL 950989, at *8 ............................................................................ 14

*Troy v Fagelman*,
   135 N.Y.S.3d 841 (Mem)  (N.Y. App. Div. 2021) ..................................................... 24

*United States v. Moseley*,
   980 F.3d 9, 20 (2d Cir. 2020)................................................................................... 13, 15

*Washio v. City of New York*,
   654 N.Y.S.2d 773 (N.Y. App. Div. 1997) .............................................................. 24

*Webb v. United Health Servs., Inc.*,
   201 N.Y.S.3d 293 (N.Y. App. Div. 2023) .............................................................. 21

*Willis Re Inc. v. Herriott*,
   550 F. Supp. 3d 68 (S.D.N.Y. 2021)....................................................................... 13

**Statutes**

Cal. Lab. Code § 2802(a)........................................................................................... 16

California Fair Employment and Housing Act ........................................................... 11

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)............................................................................................. 12

## <u>PRELIMINARY STATEMENT</u>

Jennifer Abel went rogue. She ruthlessly pursued her own career advancement by leading an aggressive smear campaign and pinning it on her employer, Jonesworks, while contemporaneously seeking to take down her employer by spearheading a *Business Insider* hit piece against the company and its CEO, Stephanie Jones; stealing confidential documents; poaching clients; and seeking to ruin Jones' decades-built reputation—all before the dust had time to settle. Her duplicitous plan nearly succeeded until Jonesworks caught Abel red-handed executing her treasonous plan by stealing confidential company files on her way out the door. Jonesworks promptly terminated her for her theft, disloyalty, and replete contractual violations. Now, having been unmasked as the puppeteer behind this smear campaign and facing lawsuits that seek to hold her accountable for her own actions—actions she intentionally hid from Jonesworks and engaged in well outside the purview of her employment—Abel brazenly seeks indemnification from the employer she betrayed and sought to ruin. Abel's audacious ploy to evade responsibility fails as a matter of law for multiple reasons and should be rejected out of hand.

First, Abel entered into a valid and enforceable contract that mandated the application of New York law to her employment and all disputes relating to the performance of her duties to Jonesworks—a New York company. She cannot now renege on that agreement, while retaining the benefits she reaped from it, and seek indemnification under a California statute that is plainly inapplicable. Her California statutory indemnification claim should be dismissed.

Second, Abel cannot seek indemnification where she was acting in her own interests, which she actively hid from and were opposed to those of Jonesworks. Abel's pleadings make clear that was precisely what she was doing:

- Abel ***admits*** that, starting weeks before she left Jonesworks as early as July 29, 2024, and continuing through and past August 9, 2024—the exact time she was engaging in the conduct for which she now seeks indemnification—she was

communicating with co-conspirator Melissa Nathan about their duplicitous scheme for Abel to leave Jonesworks, poach its clients, and profit at Jonesworks' expense, Defendant Jennifer Abel's Answer to Complaint, Counterclaims, and Jury Trial Demand ("Abel Answer to Jones" and "Abel Counterclaims"), Dkt. 36, *Jones v. Abel*, No. 1:25-cv-00779-LJL (S.D.N.Y. Mar. 20, 2025), at Answer ¶ 4:



[…]

- Abel **admits** that, while employed at Jonesworks and during the period for which she seeks indemnification, she was boasting to Nathan about her overt hostility to Jonesworks, *id.* ¶ 11:



- Abel **admits** that she intended to shake down Jonesworks on her way out, *id.* ¶ 102:



[…]



- Abel **admits** that in parallel with the actions for which she now seeks indemnification, she and Nathan were encouraging Wayfarer and Baldoni to breach their contract with Jonesworks so they could steal them as clients, *id.* ¶¶ 12, 65:



- Abel **admits** that throughout this period, she facilitated and regularly communicated with a *Business Insider* reporter—including through at least four phone calls—one more than 27 minutes long—and numerous text messages with the reporter, and text messages coordinating the reporter's outreach to others—to actively undermine Jones's reputation and Jonesworks' business through a hit piece about Jones and Jonesworks, *id.* ¶¶ 76-86:



- Abel ***admits*** that the reporter thanked her for her help with the story, *id.* ¶ 86:



- Abel ***admits*** that as she was working at Jonesworks supposedly in the interest of its then-client Baldoni, she was simultaneously trashing him behind his back and crediting the very rumors she was working to suppress, *id.* ¶¶ 5-6, 67; Defendant Jennifer Abel's Answer to First Amended Complaint, Third-Party Complaint Against Jonesworks LLC, and Jury Trial Demand ("Abel Answer to Lively" and "Third Party Complaint"), Dkt. 154, at Answer ¶ 184:



[...]



- Abel also ***admits*** that, during this time, Nathan was also not safe from Abel's trash talk, labeling her an expletive even as she worked with her to harm and steal from Jones and Jonesworks, Abel Answer to Jones ¶ 63:



- And Abel ***admits*** that when Jonesworks finally discovered her subterfuge, self-serving thievery, and duplicity and limited her access to its electronic systems, she boasted about evading the company's efforts to stop her theft, Abel Answer to Jones ¶ 98:



Abel's claim that she is entitled to indemnification from the employer she was actively betraying is diabolically illogical, legally deficient, and must be dismissed.

Third, Abel cannot plausibly plead that she was acting in the scope of her employment

when she was actively refusing to follow Jonesworks' instructions and hiding her activity from the CEO. Indeed, Abel proudly pleads that she advised Wayfarer to hire Nathan knowing full well that Jones opposed this recommendation, Abel Counterclaims ¶ 83, that Abel objected to Jones "insert[ing] herself into the mix [of working on behalf of Wayfarer] in early August 2024," *id.* ¶ 85, and that "Wayfarer instructed Jones to cease all activities on behalf of Wayfarer and Baldoni," *id.* at ¶ 88. She even has the audacity to claim that she was working in the scope of her employment at Jonesworks in the same breath as attacking Jones—Jonesworks' CEO—for "refus[ing] to be sidelined." *Id.* at ¶ 90. But texts Abel ***admits*** to sending and receiving confirm that she and Nathan ***did*** sideline Jones and Jonesworks, including when those two co-conspirators ironically commiserated about the misogynistic nature of their vile campaign against Jones and Lively and, unbelievably, attempted to blame Lively for their ruthless campaign, Abel Answer to Lively ¶ 248:



Abel's assertion that Jonesworks, whom she is suing in related litigation in this Court, must now fund her defense in litigation that seeks to call her to account for her misconduct is beyond the pale. Her indemnification claims fail as a matter of law and should be dismissed.

# BACKGROUND

## I.    ABEL JOINS JONESWORKS

Jonesworks is "a well-known New York-based public relations firm" that maintains its principal place of business in New York; Stephanie Jones is its founder and CEO. Third Party Complaint ¶¶ 1-2, 9. The Chief Executive Officer and Chief of Staff of Jonesworks are based in New York, and its largest office is also in New York. Abel Counterclaims ¶¶ 3, 7, 8.

In July of 2020, Jonesworks hired Abel. Third Party Complaint ¶ 16. In November of 2021, Abel and Jonesworks executed a new employment agreement.[1] *Id.* ¶ 20. Abel was granted the title "Vice President, Talent," though the company began referring to her as a "Partner," and was provided with compensation tied to the company's performance. 2021 Employment Agreement §§ 2, 4.1-4.2, 4.6-4.7. Under the 2021 Employment Agreement, Abel agreed that she would not use any Jonesworks' proprietary information for any purpose other than benefiting the company, that she would not compete with Jonesworks for business during her employment or for a period of six months after her departure, that she would not solicit any business from Jonesworks' clients, and that she would not solicit any Jonesworks employees to depart the company. *Id.* §§ 6.1-6.7. Abel also expressly agreed that she owed Jonesworks "a fiduciary duty of loyalty, fidelity, and allegiance to act at all times in the best interests of Company and to do no act which might injure the business, interests, or reputation of the Company." *Id.* § 9.2.

The 2021 Employment Agreement provided that "This Agreement and the performance of the Parties' obligations hereunder will be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law principles." *Id.* § 11.7. The

---

[1]    By referencing the 2021 Employment Agreement in her Third Party Complaint, Abel incorporated it into her counterclaims and the Court can thus consider it in its entirety. *See, e.g., Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)

Agreement further defined the scope of the indemnification that Jonesworks owed to Abel:

> Except to the extent caused by Employee or resulting from a breach of this Agreement by Employee, Company shall indemnity, defend and hold harmless Employee from and against any and all liability, claims, costs, damages, and expenses (including reasonable outside attorneys' fees and court costs) arising out of or in connection with any breach by Company of the terms of this Agreement or any warranties and representations made herein.

*Id.* § 10.1. The Agreement had a reciprocal indemnification of Jonesworks by Abel. *Id.* § 10.2.

## II.    ABEL RUNS AN UNSANCTIONED SHADOW CAMPAIGN TO SMEAR LIVELY AND ATTACK AND STEAL FROM JONESWORKS

Shortly after joining Jonesworks, Abel began working on the Baldoni and Wayfarer accounts, for which Jonesworks entrusted Abel to be the point person. Third Party Complaint ¶¶ 26-27. Although Abel was the person with day-to-day responsibility for these relationships, Jonesworks, primarily through Jones, supervised and directed her work—until Abel went rogue.

In the summer of 2024, rumors swirled regarding Baldoni's misconduct on the set of *It Ends With Us*, particularly towards Baldoni's co-star Blake Lively. Dkt. 84 ("Lively Am. Compl."), ¶¶ 7-25, 237-38. News outlets began publishing stories about the *It Ends With Us* cast unfollowing Baldoni on social media, and cast members not appearing with Baldoni at press junkets and promotional events. *Id.* ¶¶ 24-29, 176, 229, 237-38; Abel Answer to Lively ¶¶ 229, 237-38; First. Am. Compl., Dkt. 50 ("Abel FAC"), ¶¶ 158-59. As the noise surrounding Baldoni's behavior increased, he turned to Abel. Abel FAC ¶ 29. Abel, in turn, recommended that Wayfarer retain Melissa Nathan to provide crisis PR services. Abel Answer to Lively ¶ 29. Jonesworks, through Jones, expressly objected to the retention of Nathan and conveyed to Abel that she should not make that recommendation, but, in defiance, Abel did so anyway and Wayfarer ultimately retained Nathan. Abel FAC ¶ 228; Abel Counterclaims ¶ 83.

Together, Abel and Nathan developed and executed , unbeknownst to Jonesworks, a smear campaign to "bury" and "destroy" Lively. Abel Answer to Lively ¶ 33; Lively Am. Compl. ¶ 33.

This strategy was, in part, outlined in a "Scenario Planning" document that Abel admits was circulated by Nathan to Baldoni. Abel Answer to Lively ¶¶ 203-07; Lively Am. Compl. ¶¶ 203-07. By her silence in her answer/counterclaims, Abel implicitly acknowledges that it was never sent to or approved by Jones. Among other strategies, the document recommended discrediting Lively's on-set experience with Baldoni and the harassment she faced at his hands by pejoratively casting her in the press as someone who has "weaponiz[ed] feminism" for her own benefit. Abel Answer to Lively ¶¶ 31, 200-07; Lively Am. Compl. ¶¶ 31, 200-07. The strategy document, however, was mild compared to the actual gravamen of the campaign. As Abel admits, she discussed the plan with Nathan: to "bur[y]" and "destroy" Lively. Abel Answer to Lively ¶ 33; Lively Am. Compl. ¶ 33. Abel also admits implicitly, by her silence, that she never discussed this with Jones or obtained Jones' approval. Abel and Nathan's smear campaign also included exploiting domestic violence "survivor content," covering up Baldoni's on set misconduct, and planting negative new articles and social media content about Lively. Lively Am. Compl. ¶¶ 180, 188, 237-241, 268-273; Abel Answer to Lively ¶¶ 180, 188, 237-241, 268-272.

Abel did all of this without the knowledge of Jonesworks and in express and known defiance of company instruction, including by Jones. For example, Jonesworks instructed Abel not to recommend that Wayfarer hire Nathan, but, in defiance and for her own purposes, Abel did so anyway. Abel Counterclaims ¶ 83. In early August 2024, when Jones attempted to advise Wayfarer on a positive media strategy to rebut the mounting criticisms of Baldoni—which, unbeknownst to Jones, was the polar opposite of the negative smear campaign Abel and Nathan were running— Abel, again in clear defiance, objected to Jones "insert[ing] herself into the mix [of working on behalf of Wayfarer] in early August 2024." *Id.* ¶ 85. Abel's disloyalty to Jonesworks and corresponding fidelity to her and Nathan's take down crusade ultimately led to Wayfarer wholly

rejecting and excluding Jones, as they "instructed Jones to cease all activities on behalf of Wayfarer and Baldoni" and instead went it alone with Abel, the rogue employee. *Id.* ¶ 88.

Simultaneously, Abel was actively planning to leave Jonesworks and start her own business to compete with Jonesworks, using Jonesworks' proprietary information and strategies and with Jonesworks' clients. Third Party Complaint ¶¶ 28-29. While still employed by and collecting a paycheck from Jonesworks, Abel set about pillaging the company for anything she could take on her way out the door. On July 19, 2024, despite still being a Jonesworks employee, Abel furtively filed articles of organization for her new company, RWA Communications. Abel Answer to Jones ¶ 95. She also stole Jonesworks' confidential documents and clients, both in express violation of her contract and her obligations as an employee. Indeed, as early as July 29, 2024, Abel and co-conspirator Nathan—at the exact time they were running their unsanctioned smear campaign for Wayfarer—were conniving a parallel takedown to steal clients from Jonesworks to "make really good money and be happy." Abel Answer to Jones ¶ 4. Abel's deliberate sidelining of Jones and insertion of Nathan into the Wayfarer relationship was in furtherance of their plan to separate Wayfarer from Jonesworks and take that client (and others) to Abel's new company. On August 9, Nathan further confirmed their plan, texting Abel that they would "steal this fucking client [Wayfarer] and never talk to her [Jones] again I swear to God." *Id.* Abel herself boasted to Nathan that she was "going to war" with Jonesworks—more than a week before her employment ended. Abel Answer to Jones ¶ 11. Two days before her termination, Abel wrote "omg love you" in response to Nathan persuading Wayfarer to breach its contract with Jonesworks and hire Abel. Abel Answer to Jones ¶ 12.

Abel further admits that she communicated regularly with a *Business Insider* reporter who was writing a "KILL STORY" about Jones and Jonesworks—while Abel was still employed by

Jonesworks. Abel Answer to Jones ¶¶ 84-86. She further arranged to remove from the story a letter of support for Jonesworks from Baldoni and coordinated others' negative participation in the article. Abel Answer to Jones ¶¶ 76-86. When the reporter published the story, she wrote to Abel just moments later thanking her for her help with the story. Abel Answer to Jones ¶ 86. Abel did this to undermine Jones' business so she could unfairly take her clients and compete with her after she left. Abel even admits to writing to a colleague—again, while employed by Jonesworks—that even though Jonesworks had detected her theft of documents and disabled her network access: "I have my way around that shit … so she [Jones] can suck it." Abel Answer to Jones ¶ 98.

On August 21, 2024, Jonesworks terminated Abel after discovering Abel's theft of confidential Jonesworks documents. Abel Answer to Jones ¶ 100. Wayfarer soon followed Abel, purporting to terminate its contract with Jonesworks and hiring Abel's new company. Abel FAC ¶ 240. Jonesworks only became aware of Abel's broader campaign of egregious misconduct—including the actions for which she now seeks indemnification—after discovery's Abel's conduct through messages on her company-issued phone. Lively Am. Compl. ¶ 29, n.10.

## III.    ABEL SEEKS INDEMNIFICATION FROM JONESWORKS FOR THE SMEAR CAMPAIGN SHE CARRIED OUT IN PURSUIT OF HER OWN INTERESTS AND WITHOUT JONESWORKS' KNOWLEDGE

On December 31, 2024, Lively filed this action against Abel, among others. Dkt. 1. On February 18, 2025, Lively filed an amended complaint asserting claims against Abel for (a) aiding and abetting harassment and retaliation in violation of California's Fair Employment and Housing Act (CFEHA); (b) intentional infliction of emotional distress; (c) false light invasion of privacy; and (d) civil conspiracy. Lively Am. Compl ¶¶ 408-415, 434-439, 447-453, 479-482. The misconduct underlying these claims stems from Abel's development and deployment of the smear campaign that she choreographed with co-conspirator Nathan—against Jonesworks' specific instruction—willfully concealed from Jonesworks, and carried out as part of her scheme that

included undermining Jones' reputation for her own competitive benefit, and stealing from and taking down Jonesworks. *Id*. Neither Jones nor Jonesworks is named as a defendant in Lively's action.

## LEGAL STANDARD

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts which, when taken as true, contain sufficient mater "to state a claim of relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (1955). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 555). Furthermore, allegations that do not make sense and those that are "'naked assertion[s]' devoid of 'further factual enhancement,'" do not have to be accepted on a motion to dismiss. *Pension Ben. Guar. Corp. v. Morgan Stanley Inv.t Mgmt. Inc.,* 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).

## ARGUMENT

### IV.  ABEL CANNOT INVOKE CALIFORNIA'S LABOR CODE SECTION 2802 WHEN SHE EXPRESSLY AGREED THAT NEW YORK LAW GOVERNS THE PARTIES' EMPLOYMENT RELATIONSHIP

Abel cannot invoke California's statutory indemnification because she expressly agreed that New York law would govern the terms of her employment and performance of her duties for Jonesworks, necessarily including whether her alleged misconduct fell within the scope of those duties (which it did not) and whether she is entitled to indemnification for her alleged performance of those duties (which she is not). Having agreed to those ground rules for her relationship with Jonesworks, Abel cannot now invoke a statute she agreed would not apply.

### A.    The New York Choice-Of-Law Clause Is Valid and Enforceable

"The validity of a contractual choice-of-law clause is a threshold question" that must be determined by the law of the forum"—in this case, New York. *See Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 332 (2d Cir. 2005); *Stevens & Co. v. Espat*, No. 24-CV-5223, 2025 WL 950989, at *5 (S.D.N.Y. Mar. 28, 2025). This Court recently articulated the standard that applies to determine the validity of a contractual choice-of-law provision under New York law: "a choice-of-law provision will be enforced if the chosen law 'has sufficient contacts with the transaction' and there is no 'fraud or violation of public policy.'" *Stevens,* 2025 WL 950989, at *5 (quoting *United States v. Moseley*, 980 F.3d 9, 20 (2d Cir. 2020)); *see also BDO U.S.A., P.C. v. Rojas*, No. 24 Civ. 101 (CM), 2024 WL 3236822, at *6 (S.D.N.Y. June 27, 2024) (*Moseley* standard is binding on "every district court within the Circuit"). As this Court rightly noted, "this standard does not contemplate a wide-ranging conflicts analysis to determine the state that is most interested in the transaction, but rather a limited inquiry aimed largely at protecting the interests of New York and its courts, which is consistent with the emphasis in New York decisions on "stability, certainty, predictability and convenience." *Stevens,* 2025 WL 950989, at *8 (citations omitted). Once this analysis has been satisfied, no further choice-of-law inquiry is required or appropriate. *Id*. at *8-9; *see also Ministers & Missionaries Benefit Bd. v. Snow*, 45 N.E.3d 917, 923 (N.Y. 2015); *Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 92 (S.D.N.Y. 2021); *Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 583 (S.D.N.Y. 2018).

Here, the New York choice-of-law clause in Abel's Employment Agreement is valid and enforceable, as New York has plentiful contacts with Abel's employment and this dispute. As Abel alleges, "Jonesworks is a well-known New York-based public relations firm" that "systemically and continuously conducts and solicits business within New York and has availed itself of the privileges of conducting business in the State of New York." Abel Counterclaims ¶¶ 7, 10; Third

Party Complaint ¶¶ 6, 9. The Chief Executive Officer of Jonesworks is based in New York, and its headquarters and largest office is also in New York. *See* Abel Counterclaims at ¶¶ 2-3, 7, 8. Abel concededly travelled to New York in the performance of her employment at Jonesworks. *Id.* ¶ 31. Abel initiated her own lawsuit in this Court against a host of defendants. Abel FAC. She again availed herself of this forum by bringing counterclaims in this Court against the very party from which she seeks indemnification. Abel Counterclaims ¶¶ 102-96. Abel cannot avail herself of this forum when it suits her, yet seek to eschew its law when it does not.

Abel's conduct and allegations demonstrate amply sufficient New York contacts to enforce her contractual choice-of-law clause. *See Stevens*, 2025 WL 950989, at *8 (contract had a reasonable relationship to New York, despite the former employee living and working in California, because the company was based in New York and the employee did some portion of his work for the company in New York); *Willis*, 550 F. Supp. 3d at 95 (sufficient contacts where company was based in New York and California-based employee reported to New York executive). This holds true despite the fact that Abel alleges that she resided in California during her employment and performed some of her work in California. Abel Counterclaims ¶ 31. As this Court has recognized, and as New York's overriding deference to contractual choice-of-law clauses underscores, where more than one jurisdiction might have an interest in the dispute, the parties' freedom to choose the governing law should be honored and that contractual choice upheld. *Stevens*, 2025 WL 950989, at *8.

With regard to the standard's limiting principle, Abel does not allege (nor could she) that the 2021 Employment Agreement was the product of any fraud. *See* Abel Counterclaims ¶¶ 25-29. And a litigant "cannot credibly claim that the application of New York law by a New York court would violate New York's public policy." *Mindspirit*, 346 F. Supp. 3d at 583–84 (citations

14

omitted). New York public policy is not concerned with, nor trumped by, the public policy interests of other states—here, as Abel alleges, California. *See Stevens*, 2025 WL 950989, at *9; *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819 (GBD), 2018 WL 6786338, at *22 (S.D.N.Y. Oct. 25, 2018), *aff'd and remanded in part*, 796 F. App'x 55 (2d Cir. 2020) ("[A] requirement that New York courts consider the fundamental public policy of a foreign law would swallow whole the *Ministers* holding that courts need not engage in conflicts analysis."). Where, as here, the contractual relationship that specifies New York law is with a New York employer, the public policy of New York supports its enforcement. *See id.*

Because New York law "has sufficient contacts with the transaction" and there is no "fraud or violation of public policy" in its application here, *Moseley*, 980 F.3d at 20 (citation omitted), no further choice-of-law analysis is required. *Ministers*, 45 N.E.3d at 923. The valid contractual choice-of-law clause mandating the application of New York law must therefore be applied.

### B.    The Application of the Choice of Law Clause Forecloses Abel's California Statutory Indemnification Claim

Abel's self-serving allegations doom her claim. By alleging that she engaged in her pattern of misconduct as part of her employment at Jonesworks (which, as detailed in Section V(b), below, she did not), Abel's indemnification claims fall within the 2021 Employment Agreement's choice of law clause, which broadly covers not only the contract itself, but also "the performance of the Parties' obligations." Abel Counterclaims ¶ 29. Abel cannot rely on the California statute where she (wrongly) claims that she acted within the scope of her employment, which she in turn agreed would be governed by New York law. Her First Cause of Action should be dismissed.

"The effect of [a] choice-of-law clause depends on . . . its scope." *Fin. One Pub. Co. v. Lehman Bros. Special Financing, Inc.*, 414 F.3d 325, 332 (2d Cir. 2005). Although "New York courts are 'reluctan[t] to read choice-of-law clauses broadly,'" *Arnone v. Aetna Life Ins. Co.*, 860

F.3d 97, 108 (2d Cir. 2017) (quoting *Fin. One Pub. Co.*, 414 F.3d at 335), they will give effect to broad clauses where the contract language supports it. *H.S.W. Enter., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 141 n.5 (S.D.N.Y. 2001). Even narrow choice-of-law clauses cover all "causes of action sounding in contract." *EMA Fin., LLC v. NFusz, Inc.*, 444 F. Supp. 3d 530, 540 (S.D.N.Y. 2020).

Here, Abel's claim for indemnification relates directly to the "performance" of her contractual "obligations" to Jonesworks. Abel Counterclaims ¶ 29. It thus sounds in contract and is covered by the broad contractual choice-of-law clause. *See Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, No. 20-CV-5120 (LJL), 2022 WL 1997207, at *17 (S.D.N.Y. June 6, 2022) (conflict-of-law clause that applied to "the rights, duties, and obligations of the parties" was "relatively broad"). Indeed, the question of whether the allegations Lively has made against Abel fall within the scope of her employment by Jonesworks and her contractual obligations are at the heart of Abel's claim. The California statute Abel seeks to invoke crystalizes this: it applies, by its own terms, only to "losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer." Cal. Lab. Code § 2802(a); *see* Third Party Complaint ¶ 35. Abel herself alleges that she "was named as a defendant in Plaintiff's pleadings solely because of, and in direct consequence of, Abel's ***discharge of her duties to Jonesworks***." Third Party Complaint ¶ 32 (emphasis added). Although this allegation is transparently implausible, as detailed below, the claims against Abel—and Abel's indemnification claim—thus paradigmatically relate to "the performance of [her contractual] obligations" to Jonesworks, *see* Abel Counterclaims ¶ 29, and are covered by the New York choice-of-law clause.

For this reason, Abel's claim for indemnification stands in stark contrast to cases in which New York courts and courts in the Second Circuit have ruled that certain non-contractual claims

fall outside the scope of even narrower contractual choice-of-law clauses. For example, in *Krock v. Lipsay*, the Second Circuit ruled that claims sounding in fraud related to misrepresentations during a real estate sale fell outside the scope of a clause in a mortgage that provided that "[t]his Mortgage shall be governed by and construed in accordance" with Massachusetts law. 97 F.3d 640, 645 (2d Cir. 1996). And, in *Knieriemen v. Bache Halsey Stuart Shields*, the court ruled that an investor's claims against commodities broker for negligence and fraud related to investment losses fell outside a clause in the parties' agreement that stated that "[t]his contract shall be governed by the laws of the State of New York." 427 N.Y.S.2d 10, 12-14 (N.Y. App. Div. 1980). Here, by contrast, Abel does not bring independent tort claims tangentially related to her contractual relationship with Jonesworks. She brings a claim that she is entitled to indemnification expressly as a result of her "discharge of her duties to Jonesworks," Third Party Complaint ¶ 32, which falls squarely within the Employment Agreement's choice of law provision.

Because New York law governs Abel's performance of her duties to Jonesworks, and any indemnification she may be entitled to as a result of those duties, the California Labor Code does not apply and her First Cause of Action should be dismissed.

## V.    ABEL IS NOT ENTITLED TO COMMON LAW INDEMNIFICATION

Abel's claim for common law indemnification also fails because (1) she agreed to a specifically-scoped contractual indemnification clause that she cannot now abjugate in favor of more generous common law indemnification; and (2) in any event, her allegations make clear that she was not acting within the scope of her employment when she single handedly committed the misconduct for which Lively seeks redress here.

### A.    Abel's Agreement to Specific Contractual Indemnification Supersedes Common Law Indemnification

Abel is not entitled to common law indemnification for the torts Lively alleges she

committed because she contractually agreed to the scope of indemnification that would apply to her relationship with Jonesworks. 2021 Employment Agreement § 10.1; *See Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.,* 86 N.Y.2d 685, 695 (N.Y. App. Div. 1995) ("[F]reedom of contract prevails in an arm's length transaction between sophisticated parties."); *Centi v. McGillin*, 34 N.Y.3d 1072, 1073 (N.Y. App. Div. 2019) ("[A]greements are generally enforceable by their terms" under New York's "strong public policy favoring freedom of contract.").

Under well-settled New York law, this Court should hold Abel to the terms of the bargain she struck in the 2021 Employment Agreement, as courts regularly do in a host of contractual contexts. *See, e.g.*, *Nomura Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, Nat'l Ass'n v. Nomura Credit & Cap., Inc.*, 30 N.Y.3d 572, 581 (N.Y. App. Div. 2017) ("[C]ourts must honor contractual provisions that limit liability or damages because those provisions represent the parties' agreement on the allocation of the risk of economic loss in certain eventualities."); *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.,* 31 N.Y.3d 569, 581 (N.Y. App. Div. 2018); *see also U.S. Bank Nat'l Ass'n v. DLJ Mortg. Cap., Inc.,* 191 N.E.3d 355, 360-64 (N.Y. 2022) (enforcing sole remedy provision because "the parties to a contract are basically free to make whatever agreement they wish."); *Process Am., Inc. v. Cynergy Holdings, LLC*, 35 F. Supp. 3d 259, 260 (E.D.N.Y. 2014), aff'd, 839 F.3d 125 (2d Cir. 2016) (refusing to invalidate contractual limitation of liability because, under "New York law, parties to a contract may agree to limit the liability that the other may recover from a breach of contract"). Even where a party—like Abel here—comes to regret her an assumption of risk, courts are to "let them lie on the bed they made." *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436 (N.Y. App. Div. 1994).

Under the 2021 Employment Agreement, Abel agreed that Jonesworks is only obligated to indemnify her for "liability, claims, costs, damages, and expenses … arising out of or in connection

with any breach by Company of the terms of this Agreement or any warranties and representations made herein." 2021 Employment Agreement § 10.1. Thus, Abel is not entitled to indemnification for the array of tortious conduct alleged in Lively's Complaint because neither Lively nor even Abel herself allege that Abel's conduct had any connection whatsoever to any breach of the 2021 Employment Agreement by Jonesworks. Abel does not even allege that Jonesworks breached the Agreement at all (because it did not), which alone is fatal to her indemnification claim.

While this is more than ample basis to reject Abel's claim, there is yet more. The language of the Agreement that Abel willfully entered carves out indemnification for liabilities "caused by Employee or resulting from a breach of this Agreement by Employee" from Jonesworks' indemnification obligations. *Id.* § 10.1. This is precisely what Abel now seeks—indemnification for liabilities caused by her unsanctioned actions, as detailed in Lively's Amended Complaint. The parties' express intent to exclude this conduct is binding on Abel, so the claim should be dismissed. *See Canyon Sterling Emerald, LLC v. 4 S Dev., LLC,* 182 N.Y.S.3d 192, 194 (N.Y. App. Div. 2023) (language in written contract manifests parties' intent and should be enforced).

Notwithstanding Abel's apparent newfound regret over agreeing to a contractual indemnification clause, she must now "lie on the bed [she] made," and her common law indemnification claim should be dismissed. *See Metro. Life Ins. Co.*, 84 N.Y.2d at 436.

### B. Abel Is Not Entitled to Indemnification For Actions Taken When She Went Rogue and Acted In Service of her Personal Interests in Direct Defiance of Jonesworks' Instructions

Even if Abel were entitled to seek common law indemnification, her claim should be dismissed. Under New York law, employer liability for the acts of its employees derives from the doctrine of *respondeat superior*. *See N.X. v. Cabrini Med. Ctr.*, 765 N.E.2d 844, 847 (N.Y. 2002). Under that doctrine, an employer is only liable for an employee's actions when the employee is acting "within the scope of employment" and in "furtherance of the employer's business."

*Ziccarelli v. NYU Hosps. Ctr*., 247 F. Supp. 3d 438, 451 (S.D.N.Y. 2017). Abel's actions were neither, so Jonesworks cannot be held liable, and her indemnification claim should be dismissed.

1.    <u>Abel Was Acting In Pursuit of her Own Interests—Not Jonesworks'</u>

A motion to dismiss a claim based on *respondeat superior* succeeds when "no reasonable factfinder could conclude that the [conduct at issue] constituted action taken within the scope of employment." *See Boatman v. Cnty. of Onondaga*, 217 N.Y.S.3d 377, 380 (N.Y. App. Div. 2024). Conduct falls within the scope of employment when the purpose of that conduct is "to further the employer's interest, or to carry out duties incumbent upon the employee in furthering the employer's business. . . . Conversely, where an employee's actions are taken for wholly personal reasons, which are not job related, his or her conduct cannot be said to fall within the scope of employment." *Danner-Cantalino v. City of New York,* 926 N.Y.S.2d 109, 110–11 (N.Y. App. Div. 2011) (internal citations omitted). Because Abel acted with the goal of benefitting herself—and her new venture – far from the benefit of, and, in fact, directly against Jonesworks' instructions and strategy, she cannot take refuge behind common law indemnification and must bear personal responsibility for her actions.

The sequence of events here and Abel's subterfuge bring her true motivations for her actions into stark relief: beginning at least as early as July 2024, Abel had one foot out the door at Jonesworks, having already registered a competing company. Abel Answer to Jones ¶ 4. She was also facilitating and supporting a "KILL STORY" about Jonesworks to competitively undermine her employer's reputation and business standing, *id.* ¶ 84, and stealing Jonesworks' clients, including Wayfarer and Baldoni, *id.* ¶¶ 12, 65. Her and her co-conspirator Nathan's motivations for these actions were plain: "make really good money" at the expense of Jonesworks'. *Id.* ¶ 4. When Jonesworks finally learned of her theft of company documents and tried to stop her misconduct, Abel proudly announced that she was able to circumvent Jonesworks' protections and

"get everything I needed" so Jones could "suck it." *Id.* ¶ 98. All the while, Abel was coordinating the misconduct for which she seeks indemnification—an unsanctioned smear campaign for the very clients, Wayfarer and Baldoni, that she was in the process of stealing from Jonesworks—in express defiance of instructions from her superiors at Jonesworks. Abel Counterclaims ¶¶ 82-88. This is beyond the pale of irony and no reasonable factfinder could ever conclude that Abel was stealing from and defying Jonesworks for Jonesworks' benefit.

A common law indemnification claim cannot succeed in such circumstances where the employee was pursuing her own goals rather than the company's. *See Danner-Cantalino,* 926 N.Y.S.2d at 110–11. Such self-serving acts, even when performed while on the job, fall outside the scope of an employee's performance. For example, in *Hammond v. Equinox Holdings LLC*, the plaintiff alleged that an Equinox employee "slandered him when he told another Equinox employee that he had witnessed plaintiff engaging in lewd conduct in an Equinox steam room." 148 N.Y.S.3d 34, 36 (N.Y. App. Div. 2021). The complaint alleged that the employee did this "to procure special benefits and protections from [Equinox] to which he was not entitled and to protect his otherwise threatened employment." *Id.* The court ruled that "[r]egardless of whether [the employee] was on or off duty at the time that he made this statement," Equinox was not liable for damages caused by the employee's statement because it "did not stand to benefit from [the employee's] misconduct." *Id.* And, in *Doe v. Guthrie Clinic, Ltd.*, a hospital was not liable for a nurse's disclosure of confidential patient information because she, for "purely personal reasons" texted confidential information about a patient to her sister-in-law. 710 F.3d 492, 495-96 (2d Cir. 2013); *see also Webb v. United Health Servs., Inc.*, 201 N.Y.S.3d 293, 298 (N.Y. App. Div. 2023) (employee accessing patient records "out of spite" outside the scope of employment).

So too here. Jonesworks not only had nothing to gain from Abel's actions—it was—and

continues to be—***actively harmed*** by its association with Abel and her smear campaign despite having no knowledge of or involvement in that campaign, and even despite Jones herself actively rejecting such a campaign and being "sidelined" as a result. *See* Abel Counterclaims ¶ 90; Abel FAC ¶ 228. By furthering her own interest at the expense of her employer, Abel was acting outside the scope of her employment and is not entitled to indemnification.

2.    Jonesworks Could Not Have Foreseen That Its Trusted Senior Employee Would Betray It

Even if Abel's actions were not motivated by self-interest (which they were), Jonesworks would only be liable for, and Abel would only be entitled to indemnification if, her "tortious conduct [were] generally foreseeable and a natural incident of the employment." *Judith M. v. Sisters of Charity Hosp.*, 715 N.E.2d 95, 96 (N.Y. 1999); *see also Riviello v. Waldron*, 391 N.E.2d 1278, 1281 (N.Y. 1979) (factors to be weighed in determining whether an employee is acting in the course of employment include "whether the specific act was one that the employer could reasonably have anticipated"). Actions that are a "significant departure from the normal methods of performance of the duties" of the employee are not foreseeable. *Rivera v. State*, 142 N.E.3d 641, 646 (N.Y. 2019).

Here, Abel's intentional disregard of Jonesworks' instructions rendered her conduct unforeseeable and a "significant departure" from her normal duties and thus beyond the scope of her employment. Indeed, Abel's admissions and allegations make clear that Jonesworks could not have possibly foreseen that she was engaging in conduct that it expressly told her not to engage in and that she actively excluded Jonesworks from, including the following:

- Abel recommended that Wayfarer hire Nathan even though Jonesworks expressly instructed otherwise. *See* Abel Counterclaims ¶ 83.

- When Jones attempted to "insert[] herself into the mix" of Abel's work for Wayfarer, Abel objected. *See id.* ¶ 85.

22

- At Abel's prompting, "Wayfarer instructed Jones to cease all activities on behalf of Wayfarer and Baldoni." *See id.* ¶ 88.

- Abel harshly criticized Jones for "refus[ing] to be sidelined." *See id.* ¶ 90.

- Even Abel admitted that she was prepared to engage in "over the top" steps for Wayfarer and Baldoni, steps that were, without question outside of the instruction and desire of Jonesworks. *See* Abel Answer to Lively ¶ 295.

Frozen out from the Wayfarer account and barred from participating, Jonesworks could not have possibly foreseen that Abel was executing the opposite agenda to the one endorsed by Jonesworks. Abel Answer to Jones ¶ 59.

The court's decision in *Bracero v. State* is illustrative. 81 Misc.3d 1214(A), 2023 N.Y. Slip Op. 51336 (U) (N.Y. Ct. Cl. 2023). There, a prisoner alleged that he was attacked by a corrections officer and that the State should have foreseen the officer's actions because his employment involved the use of force and the officer had, during four and a half years working for the state engaged in dozens of uses of force, including some that were "without supervisory authorization." *Id.* at *2–*3. But because the officer "always performed professionally" and was "a fair to good officer," the State could not have foreseen that the officer would departure from the performance of his duties in such a dramatic and significant way. *Id.* at *2–*4, *7. As a result, the actions were outside the scope of the officer's duties and the State could not be held liable. *Id.* at *7.

The same logic applies here. Even though the actions for which Lively has sued Abel are, arguably in service of public relations, the manner in which Abel carried them out was an abject departure from her and Jonesworks' years of business practices. Moreover, unlike the *Bracero* corrections officer, Abel has alleged no facts related to her four years of prior work for Jonesworks that should have caused the company to foresee that she would go rogue and engage in an expressly disapproved smear campaign. *See* 81 Misc. 3d 1214(A) at *2–*4. Abel's express disregard for Jones' instructions not to recommend that Wayfarer hire Nathan crystalizes Abel's departure from

the scope of her employment: she did the opposite of what her employer instructed her to do and expected her to do. As a result, she, not Jonesworks, must bear the liability associated with that decision. *See also Troy v Fagelman*, 135 N.Y.S.3d 841 (Mem) (N.Y. App. Div. 2021) (employer could not have reasonably foreseen tortious conduct where employee had worked for company for eight years with no prior similar incidents).

Moreover, where conduct is motivated by personal interests—which Abel's was—that conduct falls outside the range of foreseeable actions by an employee. *See Fernandez v. Rustic Inn, Inc.*, 876 N.Y.S.2d 99, 102-03 (N.Y. App. Div. 2009); *Washio v. City of New York*, 654 N.Y.S.2d 773, 773 (N.Y. App. Div. 1997); *Danko v. Forest Lake Camp, Inc.*, 882 N.Y.S.2d 280, 281 (N.Y. App. Div. 2009).

Abel's unforeseeable departure from her years-long practice of performing her duties for Jonesworks thus bars her indemnification claim.

### 3. Abel's Misconduct Far Exceeds a Mere "Error in Judgment"

Finally, Abel cannot plead innocence or mistake. Although an employee's action that is a mere "error[] of judgement" may still render an unjustifiable action within the scope of employment, no such refuge applies here, where Abel's actions were not a fleeting mistake but a systematic, long-term campaign against Jonesworks motivated by a personal grudge and in furtherance of her scheme to poach Jonesworks clients and cause harm to Jonesworks. *See Dykes v. McRoberts Protective Agency, Inc.*, 680 N.Y.S.2d 513, 514 (N.Y. App. Div. 1998).

In *Dykes*, the court considered whether a security guard was acting within the scope of his employment when he assaulted an employee. *Id.* The court concluded that the attack was not a mere "error in judgement" because it was based upon a "personal grudge" that "was unconnected to, and, indeed, in complete contravention of, his responsibilities as a security guard." *Id*. The assault thus fell outside the scope of employment. *Cf.*, *Ramos v. Jake Realty Co.*, 801 N.Y.S.2d

566, 568 (N.Y. App. Div. 2005) (even action "in poor judgment" could be within scope of employment where no evidence of personal motivation and action may have benefited employer).

Here, Abel did not make a mere one-time "error in judgment." Rather, she embarked upon a smear campaign against Lively while simultaneously perpetrating her scheme against Jonesworks. Each day that Abel chose to perpetuate these interconnected schemes, she confirmed that her actions were the result of a deliberate, calculated plan, and not any mistake or temporary lapse. Abel's blatant disregard—and mockery—of Jones' instruction ***not*** to work with Nathan epitomizes the nefarious, not mistaken, nature of Abel's actions. *See* Abel FAC ¶ 228. Moreover, Abel's own admissions confirm that she ***did*** harbor a personal grudge against her employer—crowing that Jones could "suck it" on her way out the door, and conspiring with Nathan on a "KILL STORY" against Jones. *See* Abel Answer to Jones ¶ 98; *Dykes,* 680 N.Y.S.2d at 514. Abel cannot now seek to make Jonesworks liable for the very grudge that has already inflicted so much harm on the company.

Abel's underhanded smear campaign and her associated plan to pillage and tear down Jonesworks on her way out place her actions squarely outside any reasonable scope of possible indemnification, and her claim for indemnification should be firmly and soundly dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss Abel's Third-Party Complaint.

DATED:    April 14, 2025

QUINN EMANUEL URQUHART &
    SULLIVAN, LLP


By:*/s/ Kristin Tahler*
    Kristin Tahler
    865 S. Figueroa Street, 10th Floor
    Los Angeles, California 90017
    (213) 443-3000
    kristintahler@quinnemanuel.com

    Maaren A. Shah
    295 5th Avenue
    New York, New York 10016
    (212) 849-7000
    maarenshah@quinnemanuel.com

    Nicholas Inns (*pro hac vice*)
    1300 I Street NW
    Suite 900
    Washington, D.C. 20005
    (202) 538-8000
    nicholasinns@quinnemanuel.com

    *Attorneys for Plaintiffs Stephanie*
    *Jones and Jonesworks, LLC*