# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

BLAKE LIVELY,

       Plaintiff,

v.

WAYFARER STUDIOS LLC, et al.,

       Defendants.

No. 24-cv-10049 (LJL) (lead case)

WAYFARER STUDIOS LLC, et al.,

       Plaintiffs,

v.

BLAKE LIVELY, et al.,

       Defendants.

No. 25-cv-449 (LJL) (member case)

**Brief of Elyse Dorsey as Amicus Curiae Supporting Blake Lively's Invocation of the Protecting Survivors from Weaponizing Defamation Lawsuits Act**

Michelle S. Kallen (*pro hac forthcoming*)
Elise K. Haverman (*pro hac forthcoming*)
Laura Niday (*pro hac forthcoming*)
STEPTOE LLP
1330 Connecticut Ave NW
Washington, D.C. 20036
(202) 429-3000
mkallen@steptoe.com
ehaverman@steptoe.com
lniday@steptoe.com

Elyse D. Echtman
STEPTOE LLP
1114 Avenue of the Americas
New York, N.Y. 10036
eechtman@steptoe.com

*Counsel for Amicus Curiae Elyse Dorsey*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

IDENTITY AND INTEREST OF AMICUS CURIAE ............................................................ 1

SUMMARY OF ARGUMENT .............................................................................................. 1

BACKGROUND .................................................................................................................... 3

ARGUMENT .......................................................................................................................... 4

   I.     Sexual Harassment in the Workplace and the Rise of Retaliatory Lawsuits ................. 4

   II.    Elyse Dorsey's Story and How Viriginia's Anti-SLAPP Statute Failed to Protect Her. 7

      A.   The Unwanted Sexual Relationship ............................................................................... 9

      B.   Telling Her Story .......................................................................................................... 10

      C.   Professor Wright's SLAPP Suit .................................................................................... 12

   III.   Anti-SLAPP in California and The Importance of Its Remedies Provision to Survivors of Sexual Assault and Harassment ................................................................................. 14

      A.   California Anti-SLAPP .................................................................................................. 15

      B.   Mr. Baldoni's and the Wayfarer Parties' Challenge to the Protecting Survivors Act Undermines California's Anti-SLAPP Legislation ...................................................... 17

CONCLUSION ...................................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Depp v. Heard*,
    CL-2019-2911, 2021 WL 6550462 (Va. Cir. Fairfax Jan. 4, 2021)…………………………..8

*Briggs v. Eden Council for Hope & Opportunity*,
    19 Cal. 4th 1106 (1999)………………………………………………………………..15

**Statutes**

Cal. Civ. Code § 47.1…………………………………………………………...2, 15–16

Cal. Civ. Code § 425.16…………………………………………………………………..15

Va. Code Ann. § 8.01-223.2 (2007)………………………………………………………..7

Va. Code Ann. § 8.01-223.2 (2023)………………………………………………………7, 8

**Public Laws**

2007 Va. Acts 798 (S.B. 1250)…………………………………………………………….7

**Case Filings**

ECF No. 1, Lively Complaint…………………………………………………………...3

ECF No. 50, Baldoni/Wayfarer First Amended Complaint…………………………………..3

ECF No. 84, Lively First Amended Complaint………………………………………….....3

ECF No. 144, Lively Motion to Dismiss………………………………………………...3

ECF No. 162, Baldoni/Wayfarer Memorandum in Opposition to Lively Motion to Dismiss……...3

ECF No. 172, Lively Reply Memorandum in Support of Lively Motion to Dismiss………………3

**Rules**

Fed. R. Civ. P. 11.

**Miscellaneous**

Aebra Coe, "Ex-GMU Law Prof. Says Sex With Students Was 'Consensual,'" *Law360* (Aug. 25,
    2023)………………………………………………………………………..12

Aebra Coe, "'I Suffered Silently': Ex-Law Professor Allegedly Preyed On Students," *Law360*
    (Aug. 14, 2023)………………………………………………………………7, 9

Aebra Coe, "'Open Secret': GMU Grads Say Concerns Over Prof Festered," *Law360* (Sept. 8,
    2023)………………………………………………………………………..11

Aebra Coe, "Wright Looked to 'Bankrupt' Accusers With Suit, Filing Claims," *Law360* (March 17, 2025)……………………………………………………………………………13

Aliza Shatzman, "It's Time For A #MeToo Movement In the Judiciary," *Above the Law* (Sept. 19, 2023)……………………………………………………………………………11

Anna Langlois, "Wright faces sanctions bid over 'frivolous' defamation lawsuit," *Global Competition Review* (March 17, 2025)……………………………………………...13

Brody Mullins, "Hubris, Revenge and a Breakup Brought Down Big Tech's Proudest Ally," *The Wall Street Journal* (June 9, 2024)…………………………………………………..9

Brody Mullins, "The Hidden Life of Google's Secret Weapon," *The Wall Street Journal* (June 6, 2024)……………………………………………………………………………9

Bryce Covert, "Years After #MeToo, Defamation Cases Increasingly Target Victims Who Can't Afford to Speak Out," *The Intercept* (July 22, 2023)……………………………………..7

C. Anderson, et al., *The experience of power: examining the effects of power on approach and inhibition tendencies*, J. OF PERSONALITY & SOC. PSYCH. (2002)…………………………4

Chai R. Feldblum, et al., *Report on Select Task Force on the Study of Harassment in the Workplace* (June 2016)……………………………………………………………………5

Chelsey N. Whynot, *Retaliatory Defamation Suits: The Legal Silencing of the #MeToo Movement*, 94 TULANE L. REV. 1 (2020)…………………………………………………6

Christine Charmosky, "Former GMU Law Professor Files $108M Lawsuit Against Women Accusing Him of Sexual Misconduct," *Law.com* (Aug. 25, 2023)……………………...12

Christine Chamosky, "In Wake of Sexual Misconduct Allegations Against Ex-Law Professor, GMU Bans Intimate Relationships With Students," *Law.com* (Sept. 14, 2023)………...11

Da Hae Kim, et al., "2023 #MeToo Workplace Anti-Harassment Reforms," *Nat'l. Women's Law Center* (September 2023)………………………………………………………………….5

Debra Cassens Weiss, "How did Scalia Law respond to seduction complaints against law prof? Lawmaker wants answers," *ABA Journal* (June 27, 2024)………………………………11

Elyse Dorsey, LinkedIn Post (Mar. 8, 2025)……………………………………………...13

Emily Sawicki, "Wright Says Defamation Suit Did Not Violate Anti-SLAPP Law," *Law360* (March 21, 2025)…………………………………………………………………………12

"Full Report – Still Broken: Sexual Harassment and Misconduct in the Legal Profession," *Women Lawyers on Guard* (2020)…………………………………………………….5, 6

Holly Kearl, "The Facts Behind the #metoo Movement: A National Study on Sexual Harassment and Assault," Stop Street Harassment (Feb. 2018)…………………………………………...4

"Updates to the Anti-SLAPP Report Card," *Institute for Free Speech,* updated May 1, 2025…..14

J.A. Bargh, et al., *Attractiveness of the underling: An automatic power/sex association and its consequences for sexual harassment and aggression*, J. OF PERSONALITY & SOC. PSYCH. (1995)……………………………………………………………………………………...4

Jodi Kantor, et al., "Harvey Weinstein paid off sexual harassment accusers for decades," *The New York Times* (Oct. 5, 2017)……………………………………………………………5

Joe Patrice, "We Shouldn't Have to Say This, But Job Interviews Are Not Your Personal Dating App," *Above the Law (*Aug. 9, 2023)……………………………………………………11

Kevin Robillard, "2 Republican FTC Nominees Face Questions About Ties To Controversial Legal Leader," *The Huffington Post* (Sept. 19, 2023)…………………………………...11

Krista J. Schoenheider, *A Theory of Tort Liability for Sexual Harassment in the Workplace*, 134 U. PENN. L.R. 1461 (1986)………………………………………………………………...6

Leah Nylen, "Ex-FTC Commissioner Faces Storm of Sexual Harassment Claims," *Bloomberg* (Aug. 29, 2023)……………………………………………………………………..7, 11

Mike Masnick, "If Your $108 Million Defamation Lawsuit Basically Admits To Everything People Are Horrified By, You Might Have Just Filed A SLAPP Suit," *TechDirt* (Aug. 30, 2023)……………………………………………………………………………………7

P.W. Eastwick, et al., *Act with authority: romantic desire at the nexus of power possessed and power perceived*, J. OF PERSONALITY & SOC. PSYCH. (2013)………………………………4

"State Workplace Anti-harassment Laws Enacted Since #MeToo Went Viral," *Nat'l Women's Law Center* (October 2023)……………………………………………………………..5

Tyler Kingkade, "As More College Students Say 'Me Too,' Accused Men Are Suing for Defamation," *BuzzFeed News* (Dec. 5, 2017)……………………………………………..7

U.S. Commission on Civil Rights, *Federal #MeToo: Examining sexual harassment in government workplaces* (2020)…………………………………………………………5

U.S. Equal Employment Opportunity Commission (EEOC), *EEOC Releases Preliminary FY 2018 Sexual Harassment Data* (Oct. 4, 2018)…………………………………………...5

U.S. Equal Employment Opportunity Commission (EEOC), *Sexual Harassment in Our Nation's Workplaces* (April 2022)………………………………………………………………..5

"Virginia Anti-SLAPP Report," *Institute for Free Speech*……………………………………..7, 8

William Alden, et al., "Facebook Director Peter Thiel is Leading The Search For Trump's Top Antitrust Officials," *Buzzfeed News* (Jan. 26, 2017)………………………………………9

## IDENTITY AND INTEREST OF AMICUS CURIAE[1]

Elyse Dorsey is an attorney and advocate for survivors of sexual harassment. Ms. Dorsey herself is a survivor of sexual harassment and, like Ms. Lively, was subject to a retaliatory defamation lawsuit. As a result of this experience, Ms. Dorsey advocates for stronger statutory protections for survivors of sexual harassment, especially for those who wish to speak up about their experience. Ms. Dorsey supports Ms. Lively's invocation of California's Protecting Survivors from Weaponizing Defamation Lawsuits Act, which codifies essential protections for whistleblowers against retaliatory defamation lawsuits.

## SUMMARY OF ARGUMENT

Ms. Lively and Ms. Dorsey's experiences show that sexual harassment remains deeply entrenched in the American workplace. In just about every industry, sexual harassment derails careers, shatters confidence, and silences voices. The #MeToo movement exposed the widespread nature of such misconduct and empowered survivors to share their experiences; but recent backlash has ushered in a troubling rise in retaliatory defamation lawsuits, which intimidate and stun survivors into inaction. These retaliatory lawsuits are a black mark on our legal system, undermining the fundamental rights of whistleblowers and rendering it nearly impossible to report misconduct.

Ms. Dorsey's story, like Ms. Lively's, exemplifies this disturbing trend. After overcoming years of sexual harassment from her law professor and then boss, Ms. Dorsey faced a retaliatory defamation lawsuit—seeking *$108 million* in damages—after telling her story. Telling one's story of sexual harassment or abuse is never easy; it is often a last resort. That was certainly the case for Ms. Dorsey. She saw coming forward as the only way to protect vulnerable women. Ms.

---

[1] No party's counsel authored this brief. No party or any other person contributed money intended to fund preparing or submitting this brief.

Dorsey first reported the (now former) professor to the university, which conducted an investigation lasting approximately 20 months and found multiple causes for termination. After this protracted and costly process, Ms. Dorsey and her co-defendant were forced to endure *yet another* 18 months of exhausting, expensive, and intrusive retaliatory litigation. The plaintiff in that litigation, Ms. Dorsey's former law professor, admitted in private text messages to his friends that he filed the litigation to bankrupt his accusers, not with any expectation of winning his defamation claims. He wrote: "maybe defamation for fun but not to win." He explicitly stated that wanted to "bankrupt" Ms. Dorsey and the other defendant as punishment for speaking out.

Numerous states have enacted legislation designed to combat strategic lawsuits against public participation ("SLAPPs") like the litigation Ms. Dorsey faced. The Protecting Survivors from Weaponizing Defamation Lawsuits Act, California Code § 47.1 ("the Protecting Survivors Act"), is one such statute designed to safeguarding from retaliatory lawsuits survivors of sexual harassment who choose to speak out. By providing a legal shield, anti-SLAPP laws can empower whistleblowers like Ms. Dorsey and Ms. Lively to share their experiences without the threat of protracted retaliatory litigation. By imposing financial consequences on those who bring SLAPPs, the Protecting Survivors Act changes the calculus, adding a financial downside for SLAPP plaintiffs and thus deterring bad-faith harassers from weaponizing the courts and wasting valuable judicial resources. Elyse's experience shows that, without these critical remedies, anti-SLAPP statutes offer only illusory protection, forcing survivors to choose between silence and financial ruin, while allowing abusers to escape meaningful accountability and perpetuating misconduct in the workplace.

Accepting Mr. Baldoni's and the Wayfarer Parties' attack on the Protecting Survivors Act would destroy a crucial safeguard for *all* whistleblowers. This Court should not endorse this effort

to punish survivors who share their stories, nor should it entertain Mr. Baldoni's and the Wayfarer Parties' attempt to invalidate the remedial provisions contained in the Protecting Survivors Act.

## BACKGROUND

Blake Lively and Justin Baldoni were co-producers and lead actors in the film adaptation of Colleen Hoover's novel "*It Ends With Us*." After the film's release, Ms. Lively filed a complaint against Mr. Baldoni, as well as Wayfarer Studios and others (collectively, the "Wayfarer Parties"), accusing them of sexual harassment and retaliation for speaking out. ECF No. 1.[2] In response, Mr. Baldoni and the Wayfarer Parties countersued Ms. Lively, her husband Ryan Reynolds, and their publicist for $400 million, alleging civil extortion, defamation, and other claims. ECF No. 50. Ms. Lively then amended her complaint. ECF No. 84.

On March 20, 2025, Ms. Lively filed her pending motion to dismiss, arguing that the Protecting Survivors Act shields her from retaliatory defamation suits such as Mr. Baldoni's and the Wayfarer Parties' claims. ECF No. 144. The Wayfarer Parties opposed Ms. Lively's motion, claiming her statements were malicious and fabricated; they also challenged the constitutionality of the Protecting Survivors Act. ECF No. 162 at 23 n. 4, 23–28. Ms. Lively's reply emphasized her reasonable basis for sexual harassment allegations and argued that the Wayfarer Parties failed to plausibly allege actual malice. ECF No. 172 at 12. Ms. Lively also asserted that California's anti-SLAPP statute and the Protecting Survivors Act shields First Amendment rights from the risk of chilling reports of harassment, an interest which outweighs Mr. Baldoni's and the Wayfarer Parties' alleged constitutional concerns over fee-shifting and treble damages. *Id*. at 12–13, 19–20.

---

[2] All ECF cites will by to the Civil Docket for Case No. 1:24-cv-10049-LJL.

## ARGUMENT

While the rights to free speech and to workplaces free from discrimination and harassment are well-enshrined in our legal system, the path to speaking out against sexual harassment remains incredibly costly and full of barriers for survivors. Our court systems should not be among those barriers. We must not allow our justice system to become complicit in silencing whistleblowers.

As Ms. Lively and Ms. Dorsey's stories reveal, no person is immune from sexual harassment at work; today, whistleblowers—no matter their level of professional success—are too often subject to retaliatory lawsuits. Many state legislatures have passed statutes designed to prevent courts from being used as a weapon of retaliation against those who speak out about sexual harassment. Mr. Baldoni and the Wayfarer Parties ask this Court to invalidate California's effort to protect survivors by challenging the constitutionality of the essential remedies provision contained in California's Protecting Survivors Act. This challenge should be rejected.

### I.      Sexual Harassment in the Workplace and the Rise of Retaliatory Lawsuits

Sexual harassment in the workplace remains a pervasive issue, despite increased awareness and advocacy efforts following the #MeToo movement. According to recent studies, approximately 40% of women and 16% of men report experiencing sexual harassment at work.[3] Men in social positions of influence, dominance, or prominence are more likely than other groups to make positive associations between power and sex.[4] Although thousands of sexual harassment charges are filed yearly with the Equal Employment Opportunity Commission, many more go

---

[3] Holly Kearl, "The Facts Behind the #metoo Movement: A National Study on Sexual Harassment and Assault," *Stop Street Harassment* (Feb. 2018), https://www.nsvrc.org/sites/default/files/2021-04/full-report-2018-national-study-on-sexual-harassment-and-assault.pdf.

[4] J.A. Bargh, et al., *Attractiveness of the underling: An automatic power/sex association and its consequences for sexual harassment and aggression*, J. OF PERSONALITY & SOC. PSYCH. at 768–781 (1995); C. Anderson, et al., *The experience of power: examining the effects of power on approach and inhibition tendencies*, J. OF PERSONALITY & SOC. PSYCH. at 13–62 (2002); P.W. Eastwick, et al., *Act with authority: romantic desire at the nexus of power possessed and power perceived*, J. OF EXPERIMENTAL SOC. PSYCH. at 267–71 (2013).

unreported because survivors fear retaliation, social stigma, victim-blaming, and lack of effective legal protections.[5]

The #MeToo movement brought significant attention to the issue of sexual harassment. In October 2017, actress Alyssa Milano exposed Hollywood film producer Harvey Weinstein in a New York Times publication on sexual harassment.[6] In a viral social media burst, the list of powerful men joining the list of accused sexual harassers grew daily. The movement "expanded its scope to demonstrate the prevalence of harassment across industries of all types."[7] #MeToo swept the nation, allowing survivors of sexual abuse to share their experiences and expose the pervasiveness of sexual harassment and assault.[8] On a broad scale, #MeToo has helped bring about policy changes, workplace practices, and public awareness regarding sexual misconduct.[9]

Even in the legal profession—where we should be setting an example—women continue to face sexual harassment and assault. According to a survey of the legal profession, 75% of respondents experienced sexual harassment directly, but only 14% formally reported.[10] The study

---

[5] U.S. Equal Employment Opportunity Commission (EEOC), *Sexual Harassment in Our Nation's Workplaces* (April 2022), https://www.eeoc.gov/data/sexual-harassment-our-nations-workplaces; "Full Report – Still Broken: Sexual Harassment and Misconduct in the Legal Profession," *Women Lawyers on Guard*, at 20–21 (2020), https://womenlawyersonguard.org/still-broken/#; Chai R. Feldblum, et al., *Report on Select Task Force on the Study of Harassment in the Workplace* (June 2016), https://www.eeoc.gov/select-task-force-study-harassment-workplace#_Toc453686298.

[6] *See* Jodi Kantor, et al., "Harvey Weinstein paid off sexual harassment accusers for decades," *The New York Times* (Oct. 5, 2017), https://nyti.ms/2z1x4OR.

[7] U.S. Commission on Civil Rights, *Federal #MeToo: Examining sexual harassment in government workplaces* (2020), https://www.usccr.gov/pubs/briefing-reports/2020-04-01- Federal-Me-Too.php.

[8] The EEOC reported that "in the two years following #MeToo going viral[,]" the EEOC "received 7,609 sexual harassment charges compared to 6,696 in FY 2017—an increase of 13.6%." *Sexual Harassment in Our Nation's Workplaces*, *supra* note 5. The EEOC reported retaliation claims related to sexual harassment are up by 13.6% since 2017. U.S. Equal Employment Opportunity Commission (EEOC), *EEOC Releases Preliminary FY 2018 Sexual Harassment Data* (Oct. 4, 2018), https://www.eeoc.gov/eeoc/newsroom/release/10-4-18.cfm.

[9] Since #MeToo, state lawmakers have worked to reform workplace anti-harassment laws. *See* Da Hae Kim, et al., "2023 #MeToo Workplace Anti-Harassment Reforms," *Nat'l. Women's Law Center* (September 2023), https://nwlc.org/resource/2023-metoo-workplace-anti-harassment-reforms/. 24 states and the District of Columbia have passed more than 80 workplace anti-harassment bills. *Id.*; *see also* "State Workplace Anti-harassment Laws Enacted Since #MeToo Went Viral," *Nat'l Women's Law Center* (October 2023), https://nwlc.org/resource/state-workplace-anti-harassment-laws-enacted-since-metoo-went-viral/ (providing a full listing of state workplace anti-harassment laws since October of 2017).

[10] "Still Broken," *supra* note 5, at 4.

revealed ineffective reporting systems in workplaces and minimal consequences for offenders that fail to deter harassment.[11] Women, including those in high positions, face significant professional and personal costs.[12] Protected classes experience compounded challenges due to their race, nationality, and sex.[13] While employers often focus on the legal expenses associated with workplace harassment, broader ripple effects permeate society. Sexual harassment carries significant personal, emotional, and psychological consequences for both those who experience it and those who witness it, including insomnia, depression and anxiety and even physical symptoms such as headaches, nausea, and appetite loss.[14] Even "fifty-five years after Title VII of the Civil Rights Act was enacted, and after at least 30 years of creating and deploying policies, procedures and training programs to address the problem of sexual harassment, people are still being harassed, still fear reporting and retaliation, remain unsure to whom to report, and/or believe that reporting will not end the harassment."[15]

In the wake of #MeToo, a surge of retaliatory lawsuits has emerged. These lawsuits pose significant barriers to survivors seeking justice, as the fear of such a lawsuit, alone, deters many survivors from coming forward. Not only is the legal defense be expensive, it forces survivors to relive their abuse over and over—often in hostile settings like depositions and open court—which tends to be "re-traumatizing" and "emotionally draining."[16] Retaliatory defamation lawsuits are

---

[11] *Id.* at 9, 20–21.

[12] *Id.*

[13] *Id.*

[14] Krista J. Schoenheider, *A Theory of Tort Liability for Sexual Harassment in the Workplace*, 134 U. PENN. L.R. 1461, 1464 (1986).

[15] "Still Broken," *supra* note 5, at 11.

[16] Even when a defamation claim is highly unlikely to succeed, the risk of astronomical damages could still make settlement rational. *See* Chelsey N. Whynot, *Retaliatory Defamation Suits: The Legal Silencing of the #MeToo Movement*, 94 TULANE L. REV. 1, 13, 27 (2020).

not even intended to be won, but to create a "legal hell" for survivors, which forces silence and "is a motivation for abusers to file[.]"[17]  That was precisely Ms. Dorsey's experience.

## II.    Elyse Dorsey's Story and How Viriginia's Anti-SLAPP Statute Failed to Protect Her

For years, women at George Mason University Law School ("GMU") warned each other through a "whisper network" about a prominent professor who was notorious for making sexual advances towards his students.[18]  This professor, Joshua Wright, manipulated Ms. Dorsey (then a law student at GMU) into an unwanted sexual relationship that he leveraged over her for nearly a decade.[19]  In an effort to end a yearslong pattern of abuse and to protect other women, Ms. Dorsey, and half a dozen other women, came forward to tell their stories.  Professor Wright retaliated by suing Ms. Dorsey and another former GMU student in Virginia for defamation, demanding $108 million in damages.[20]

Ms. Dorsey invoked Virginia's anti-SLAPP statute,[21] which is nationally ranked as very weak in its protections.[22]  Virginia law provides anti-SLAPP immunity for statements "regarding matters of public concern that would be protected under the First Amendment to the Constitution of the United States made by that person that are communicated to a third party[.]"[23]  These

---

[17] Bryce Covert, "Years After #MeToo, Defamation Cases Increasingly Target Victims Who Can't Afford to Speak Out," *The Intercept* (July 22, 2023), https://theintercept.com/2023/07/22/metoo-defamation-lawsuits-slapp/. *See also* Tyler Kingkade, "As More College Students Say 'Me Too,' Accused Men Are Suing for Defamation," *BuzzFeed News* (Dec. 5, 2017), https://www.buzzfeednews.com/article/tylerkingkade/as-more-college-students-say-me-too-accused-men-are-suing ("'I thought I was done suffering at the hand of this person,' Jane, 27, told BuzzFeed News. 'I thought he was done making my life miserable. All of a sudden I'm being sued.'").

[18] Leah Nylen, "Ex-FTC Commissioner Faces Storm of Sexual Harassment Claims," *Bloomberg* (Aug. 29, 2023), https://www.bloomberg.com/news/articles/2023-08-28/ex-ftc-commissioner-faces-storm-of-sexual-harassment-accusations.

[19] Aebra Coe, "'I Suffered Silently': Ex-Law Professor Allegedly Preyed On Students," *Law360* (Aug. 14, 2023), https://www.law360.com/articles/1710427.

[20] Mike Masnick, "If Your $108 Million Defamation Lawsuit Basically Admits To Everything People Are Horrified By, You Might Have Just Filed A SLAPP Suit," *TechDirt* (Aug. 30, 2023), https://www.techdirt.com/2023/08/30/if-your-108-million-defamation-lawsuit-basically-admits-to-everything-people-are-horrified-by-you-might-have-just-filed-a-slapp-suit/.

[21] Va. Code Ann. § 8.01-223.2 (2007); 2007 Va. Acts 798 (S.B. 1250).

[22] "Virginia Anti-SLAPP Report," *Institute for Free Speech*, https://www.ifs.org/anti-slapp-states/virginia/.

[23] Va. Code Ann. § 8.01-223.2(A)(i), (iii) (2023).

theoretical protections, however, are hard to enforce in practice.  Virginia "provides for no impact on discovery proceedings, it creates no burden that the respondent must meet when faced with an anti-SLAPP claim, and it contains no provisions for interlocutory appeal of an order on an anti-SLAPP motion."[24]  Further, courts appear confused about whether the statute allows for an anti-SLAPP counterclaim, or merely an affirmative defense.[25]  Even if a Virginia court determines that the anti-SLAPP statute bars the plaintiff's defamation claim, the court has broad discretion on whether to award attorneys' fees and reasonable costs.[26]  This means that whistleblowers who have bravely spoken up are then forced, by their abusers and by the courts, to incur significant fees for their defense, with no assurance they will ever recover.

Virginia's anti-SLAPP statute failed to protect Ms. Dorsey, and she was forced to endure Professor Wright's SLAPP suit for more than a year.  Ms. Dorsey spoke up only to protect other vulnerable women—it was the harder path, by far, than remaining silent and moving on with her life.  She had a litany of others who corroborated the years of misconduct and abuse, and the University itself had already investigated and found multiple causes to terminate a tenured professor.  Still, Virginia's anti-SLAPP statute had no deterrent effect.  Instead, Ms. Dorsey's costs to defend against the retaliatory lawsuit continued to mount, month after month.  Individual survivors simply cannot withstand this financial onslaught, on top of what they have already endured.  As Ms. Dorsey's experience highlights, the high financial costs of defending wrongful SLAPP litigation, without knowing whether those costs might be recovered, renders the statute toothless.  In turn, this financial risk makes the very act of reporting misconduct—and seeking to vindicate one's basic rights—essentially impossible.

---

[24] "Virginia Anti-SLAPP Report," *supra* note 22.

[25] *See* Opinion, *Depp v. Heard*, CL-2019-2911, 2021 WL 6550462, at *2 (Va. Cir. Fairfax Jan. 4, 2021).

[26] Va. Code Ann. § 8.01-223.2(c) (2023).

### A.     The Unwanted Sexual Relationship

In 2009, 23-year-old Elyse Dorsey was a first-year law student at GMU in Virginia.[27] Among her professors was Joshua Wright, a prominent antitrust lawyer with powerful contacts in the legal industry.[28]  Ms. Dorsey worked hard in Professor Wright's contracts class, and at the end of her first year, Professor Wright asked Ms. Dorsey to serve as one of his research assistants in antitrust.  Ms. Dorsey was interested in antitrust and saw Professor Wright as a valuable mentor.

Instead of mentorship, Professor Wright took advantage of his position of power and began to blur the boundaries between professor and student to pursue Ms. Dorsey sexually.  In 2010, Professor Wright invited Ms. Dorsey to join him to meet with clients in California.  Professor Wright handled most of the logistics, including booking travel and hotel.  When they arrived at the hotel, Professor Wright had only booked one room—with *one* bed.  Ms. Dorsey, who did not have the means to book another room or arrange for her return trip across the country, reluctantly agreed to share the room with Professor Wright.

On the last day of the trip, Professor Wright asked Ms. Dorsey if he could touch her.  Again, Ms. Dorsey reluctantly agreed.  The power imbalance was central to Ms. Dorsey's acquiescence— Ms. Dorsey felt that she had no option but to accept sexual advances from Professor Wright or risk her academic and professional future.  The unwanted sexual advances escalated upon the return to campus, where Professor Wright pressured Ms. Dorsey into having intercourse in Professor

---

[27] Coe, "'I Suffered Silently,'" *supra* note 19; Brody Mullins, "Hubris, Revenge and a Breakup Brought Down Big Tech's Proudest Ally," *The Wall Street Journal* (June 9, 2024), https://www.wsj.com/us-news/law/joshua-wright-affair-revenge-breakup-0c75f916.

[28] *See* Brody Mullins, "The Hidden Life of Google's Secret Weapon," *The Wall Street Journal* (June 6, 2024), https://www.wsj.com/us-news/law/google-lawyer-secret-weapon-joshua-wright-c98d5a31; William Alden, et al., "Facebook Director Peter Thiel is Leading The Search For Trump's Top Antitrust Officials," *Buzzfeed News* (Jan. 26, 2017), https://www.buzzfeednews.com/article/williamalden/peter-thiel-is-leading-trump-search-for-antitrust-chiefs.

Wright's on-campus office. The relationship was on and off for nearly a decade. Whenever Wright held a position of power over Ms. Dorsey, he exploited it.

The sexual contact subsided after Ms. Dorsey graduated law school in 2012 and joined a law firm as an associate, while Wright was nominated to be a commissioner at the Federal Trade Commission in 2013. However, when he left the FTC in 2015, Wright joined the same law firm where Ms. Dorsey worked. Once Wright was back in a position of power over Ms. Dorsey, his pressure for sexual contact resumed.

In 2018, Ms. Dorsey began teaching antitrust classes at GMU law as an adjunct professor. Professor Wright was then the head of the antitrust department at GMU. In 2021, Professor Wright offered Ms. Dorsey a contract position at a new law firm he was starting, and he also volunteered to help her fundraise for a fellowship at the University of Virginia. Ms. Dorsey turned down multiple job opportunities in favor of these positions. Towards the end of 2021, Ms. Dorsey discovered that Professor Wright had been engaged in another ongoing sexual relationship with *another* former GMU student, and her sexual entanglement with Professor Wright finally ended.

Shortly thereafter, Professor Wright withdrew his professional support for Ms. Dorsey. Ms. Dorsey lost her antitrust teaching position at GMU, she was not paid for her fellowship for months (until well after she filed a Title IX Complaint), and Professor Wright's law firm abruptly terminated its contract with her. Indeed, despite their close working relationship, Wright himself testified that he stopped responding to any emails or texts from Ms. Dorsey after the sexual relationship ended.

### B.    Telling Her Story

Ms. Dorsey filed a Title IX complaint against Professor Wright, detailing the hostile environment Professor Wright created, as well as the *quid pro quo* sexual harassment. Ms. Dorsey's primary and overwhelming concern was that countless other students were prey to

Professor Wright's conduct over the years.  Indeed, Ms. Dorsey later connected with several more former GMU students who had been in a sexual relationship with Wright while they were his students.

Professor Wright eventually announced on Twitter (now X) his plans to leave GMU.[29] This Twitter post prompted a wave of backlash, with a slew of allegations about Professor Wright's history of improper sexual advances.  A female law professor first came forward to share how Professor Wright propositioned her when she was seeking a position on GMU's faculty (while Professor Wright was the head of the law school's hiring committee).[30]  Ms. Dorsey, galvanized by the bravery of this professor, decided it was time to share her own experience.

On August 14, 2023, an article was published in *Law360* titled: "'I Suffered Silently': Ex-Law Prof Allegedly Preyed On Students."  In the article, Ms. Dorsey and another former GMU student shared their experiences with Professor Wright's inappropriate behavior.  This article was the lightning rod for many in the legal field to call out inappropriate behavior and abuses of power.[31]  Thus began Ms. Dorsey's advocacy for survivors.

---

[29] Joe Patrice, "We Shouldn't Have to Say This, But Job Interviews Are Not Your Personal Dating App," *Above the Law* (Aug. 9, 2023), https://abovethelaw.com/2023/08/we-shouldnt-have-to-say-this-but-job-interviews-are-not-your-personal-dating-app/.

[30] Nylen, *supra* note 18; Aebra Coe, "'Open Secret': GMU Grads Say Concerns Over Prof Festered," *Law360* (Sept. 8, 2023), https://www.law360.com/articles/1719284.

[31] *See* Christine Chamosky, "In Wake of Sexual Misconduct Allegations Against Ex-Law Professor, GMU Bans Intimate Relationships With Students," *Law.com* (Sept. 14, 2023), https://www.law.com/2023/09/14/in-wake-of-sexual-misconduct-allegations-against-ex-law-professor-gmu-bans-intimate-relationships-with-students/?slreturn=20250514160616; Aliza Shatzman, "It's Time For A #MeToo Movement In the Judiciary," *Above the Law* (Sept. 19, 2023), https://abovethelaw.com/2023/09/its-time-for-a-metoo-movement-in-the-judiciary/; Kevin Robillard, "2 Republican FTC Nominees Face Questions About Ties To Controversial Legal Leader," *The Huffington Post* (Sept. 19, 2023), https://www.huffpost.com/entry/key-gop-nominees-facing-questions-about-ties-to-controversial-legal-leader_n_650903a6e4b0d2303308db65; Debra Cassens Weiss, "How did Scalia Law respond to seduction complaints against law prof? Lawmaker wants answers," *ABA Journal* (June 27, 2024), https://www.abajournal.com/news/article/how-did-scalia-law-respond-to-seduction-complaints-against-law-prof-lawmaker-wants-answers.

### C.     Professor Wright's SLAPP Suit

What began as a freeing moment for Ms. Dorsey to tell her story, morphed into a devastating legal battle in Virginia state court that would last 18 months.[32]  Just weeks after Ms. Dorsey came forward publicly, Wright brought a retaliatory defamation lawsuit against Ms. Dorsey and the other former student from the *Law360* article, seeking $108 million in damages.[33]  In his own complaint, Wright admitted to multiple, overlapping sexual relationships with female students, research assistants, and other subordinates.[34]  Throughout discovery, Wright would admit to sexual relationships with at least seven students and two additional subordinates (again, often overlapping).

Virginia's weak anti-SLAPP statute failed to protect Ms. Dorsey.   After Ms. Dorsey filed her Title IX complaint, GMU hired multiple outside investigators and launched exhaustive investigations lasting nearly two years; several current and former students and employees were interviewed, and a consistent, inescapable picture emerged.  GMU ultimately determined that termination proceedings were warranted based on Wright's violations of multiple university policies, including those on professional ethics and consensual relationships.  *After all of this*, Ms. Dorsey endured another year and a half of expensive and burdensome retaliatory litigation that her harasser used as a tool to punish her.  Ms. Dorsey and her friends and coworkers were deposed, documentary discovery revealed embarrassing personal details of her life, and Ms. Dorsey was forced to devote tremendous time to the litigation.  But this discovery also revealed just how

---

[32] *See* Emily Sawicki, "Wright Says Defamation Suit Did Not Violate Anti-SLAPP Law," *Law360* (March 21, 2025), https://www.law360.com/articles/2314252/wright-says-defamation-suit-did-not-violate-anti-slapp-law.

[33] Aebra Coe, "Ex-GMU Law Prof. Says Sex With Students Was 'Consensual,'" *Law360* (Aug. 25, 2023), https://www.law360.com/articles/1715102; Christine Charmosky, "Former GMU Law Professor Files $108M Lawsuit Against Women Accusing Him of Sexual Misconduct," *Law.com* (Aug. 25, 2023), https://www.law.com/2023/08/25/former-gmu-law-professor-files-108m-lawsuit-against-women-accusing-him-of-sexual-misconduct/.

[34] Coe, "Ex-GMU Law Prof.," *supra* note 33.

retaliatory the lawsuit was.  Wright admitted in texts to his friends: "maybe defamation for fun but not to win" and that he wanted to "bankrupt" Ms. Dorsey and the other defendant for speaking out.[35]  He texted a friend, "you'll be pleased to know my brief to the mediator calculated my damages from these blood-sucking harlots at minimum of $2.5 million."  *Wright v. Dorsey*, No. CL-2023-12232 (Va. Cir. Mar. 24, 2025), Hearing Tr. at 167:2–4.  And, following a dispositive motion, he admitted "now we start to cook, drop expensive document requests, passing motion to dismiss means I can do that, raise the cost."  *Id.* at 167:18–20.  The week before the case was set to go to trial, Ms. Dorsey settled through her insurance carrier for less than 0.3% of the $108 million in damages Wright had sought—a sum far below what the scheduled three-week trial would have cost.  Wright nonsuited the claims against the other defendant.

During and after the litigation, Ms. Dorsey "remains steadfast in her commitment to fighting against sexual harassment and supporting survivors."[36]  In a statement following the settlement, Ms. Dorsey emphasized: "Knowing the pain, isolation and shame I felt for years, I could no longer stay silent if I believed even one other woman might be feeling the same.  The idea that other women would also feel that their career opportunities were tied to sexual interactions with Professor Wright—whether welcome or not—is never acceptable."[37]  While Ms. Dorsey is not subject to an anti-disparagement clause, she still fears further retaliation for publicly telling her story and continuing her advocacy.  As Ms. Dorsey's story reveals, seemingly powerful

---

[35] Anna Langlois, "Wright faces sanctions bid over 'frivolous' defamation lawsuit," *Global Competition Review* (March 17, 2025), https://globalcompetitionreview.com/gcr-usa/article/wright-faces-sanctions-bid-over-frivolous-defamation-lawsuit; Aebra Coe, "Wright Looked to 'Bankrupt' Accusers With Suit, Filing Claims," *Law360* (March 17, 2025), https://www.law360.com/articles/2311582/wright-looked-to-bankrupt-accusers-with-suit-filing-claims.

[36] Elyse Dorsey, LinkedIn Post (Mar. 8, 2025), available at https://www.linkedin.com/posts/elyse-dorsey-9b5123140_metoo-metoolaw-antislapp-activity-7304160266781351936-yBMe?utm_source=share&utm_medium=member_desktop&rcm=ACoAACvQvKkBpyE6aP1QM6-PiLYshhrFIofdC-c.

[37] *Id.*

professional women, such as successful attorneys, may be sexual harassment survivors and vulnerable to retaliatory SLAPP suits.

### III.    Anti-SLAPP in California and The Importance of Its Remedies Provision to Survivors of Sexual Assault and Harassment

A free society hinges upon freedom of speech and the ability to hold powerful actors to account.  Retaliatory lawsuits are, accordingly, anathema to the very foundation of our legal system.  They are designed to silence critical speech on matters of public importance—and they are devastatingly effective.

Despite efforts to protect survivors, many state anti-SLAPP statutes remain woefully deficient in providing meaningful protection.[38]  In Virginia, Ms. Dorsey and a fellow GMU law graduate were subject to the weak protection of Virginia's anti-SLAPP statute.  In contrast, Blake Lively has invoked the much stronger protections afforded by California's anti-SLAPP statute. California's Protecting Survivors Act was enacted to give survivors a clear, unambiguous pathway to justice—particularly when facing retaliatory SLAPP lawsuits intended to intimidate, silence, and financially cripple them.  The damages provision, a provision lacking in Virginia, is central to the strength of California's statute.  Those remedies are indispensable tools designed to meaningfully deter retaliatory conduct, level the playing field, and affirm California's commitment to protecting survivors.  Invalidating these provisions based on Mr. Baldoni's and the Wayfarer Parties' expansion of the *Noerr-Pennington* doctrine would dangerously undercut the statute's purpose and have a severe chilling effect on survivors' ability to safely report abuse.  This Court should not invalidate that crucial remedy, which is foundational to the integrity and purpose of the Protecting Survivors Act.

---

[38]  As of May 1, 2025, 37 states have enacted anti-SLAPP protections.  *See* "Updates to the Anti-SLAPP Report Card," *Institute for Free Speech,* updated May 1, 2025, https://www.ifs.org/blog/updates-to-the-2023-anti-slapp-report-card/.

A.    **California Anti-SLAPP**

In 1992, California became the first state to enact broad anti-SLAPP protections, codified as Section 425.16, thus recognizing the danger posed by retaliatory defamation suits.[39]  The anti-SLAPP statute targets the chilling effect that meritless retaliatory lawsuits have on public participation and reporting, and ensures that individuals may engage in matters of public significance without fear of retribution through judicial process.[40]

Thirty-one years later, California approved Assembly Bill ("AB") 933, codified under California Code of Civil Procedure Section 47.1: the Protecting Survivors Act.[41]  AB 933 was specifically introduced, and later enacted, to protect survivors of sexual misconduct from retaliatory defamation lawsuits.  The Protecting Survivors Act, while not explicitly part of California's Anti-SLAPP law, is closely related because it extends legal protections and specific privileges to survivors of sexual harassment when they communicate about their own experiences.[42]  Those "communications" are now privileged and provide a defense specifically against defamation actions, so long as the individual "has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not."[43]

The Protecting Survivors Act defines "communication" as "factual information related to an incident of sexual assault, harassment, or discrimination experienced by an individual making the communication, including, but not limited to, any of the following:" (1) sexual assault; (2) sexual harassment; (3) workplace harassment or discrimination; (4) retaliation for reporting such

---

[39] Cal. Civ. Code § 425.16.
[40] *See Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1122–23 (1999).
[41] Cal. Civ. Code § 47.1 (2024).
[42] *Id*. at § 47.1(a).
[43] *Id*. at § 47.1(c)–(d).

incidents; and (5) cyber sexual bullying.[44]   Additionally, the Protecting Survivors Act provides survivors with a legal and financial remedy if they are sued for defamation based on those privileged communications: if they prevail, sexual harassment survivors are entitled to reasonable attorney's fees and costs, treble damages, and punitive damages.[45]

By categorizing these communications as privileged, the Protecting Survivors Act and California's Anti-SLAPP statute offer a critical additional layer of protection from retaliation through the judicial system.   The Protecting Survivors Act aims to promote transparency and accountability via legal remedies, thereby reinforcing California's commitment to protecting survivors' right to free expression of their stories as matters of public concern.

Unlike Virginia, the California Legislature created a statute with significant deterrent effect.   It is not toothless: the Protecting Survivors Act **mandates** attorneys' fees and reasonable costs, treble damages for the harm caused by bringing the claim, and punitive damages for defamation claims brought in violation of it.[46]   The remedies are essential to fulfilling the statute's core purpose because they deter retaliatory lawsuits and eliminate the strong financial disincentive survivors may face when speaking up.   Without these remedies, even prevailing defendants may be left in financial ruin; this risk often silences survivors, undermines the statute's protective function, and reinforces the notion that silence is the "safer" option.   An absence of strong remedies, moreover, may force survivors faced with a wrongful retaliatory lawsuit to settle with their abusers despite valid and truthful defenses, strictly to stop the financial bleeding and emotional trauma that the lawsuit itself caused.   That is exactly what happened to Ms. Dorsey,

---

[44] *Id.* at § 47.1(d)(1)–(7).
[45] *Id.* at § 47.1(b).
[46] *Id.* at § 47.1(b).

where Virigina's statute did not provide any assurance that a successful defense, in defending the truth, would leave her financially whole.

The Protecting Survivors Act's fee-shifting mechanism and availability of treble and punitive damages serve critical public policy interests. They deter bad-faith plaintiffs from misusing the courts to silence survivors and ensure that survivors—many of whom lack the financial resources to defend themselves—can obtain competent legal representation. These remedies also reinforce the condemnation of both sexual harassment and misuse of litigation.

For example, like sovereign immunity, the Protecting Survivors Act's safeguards are designed to shield individuals from the litigation itself when they are targeted for engaging in protected conduct. These remedies must be available at the earliest stage—typically through a motion to dismiss—to protect survivors from a punishing, protracted legal process. This is essential because forcing survivors, like Ms. Dorsey, to endure discovery or trial to prove their truths undermines the statute's core principle.

### B.    Mr. Baldoni's and the Wayfarer Parties' Challenge to the Protecting Survivors Act Undermines California's Anti-SLAPP Legislation

Mr. Baldoni's and the Wayfarer Parties' *Noerr-Pennington* challenge to the Protecting Survivors Act is an improper collateral attack on anti-SLAPP generally. Although framed as a critique of the Protecting Survivors Act's remedies, the argument effectively treats Federal Rule of Civil Procedure 11 (Rule 11) as both the floor and the ceiling for permissible sanctions.[47]

Although Rule 11 serves as a foundational safeguard against improper filings in federal court, it does not represent the upper limit of financial consequences a state legislature may impose for wrongful litigation. The Protecting Survivors Act illustrates how states can craft fulsome, targeted remedies supplemental to those permitted under Rule 11 to address abuse of the judicial

---

[47] Fed. R. Civ. P. 11.

process.  This longstanding legislative power is critical because it allows the state to respond to emerging forms of bad-faith litigation and, in so doing, upholds the integrity of the judicial system. Under Mr. Baldoni's and the Wayfarer Parties' misinterpretation of the *Noerr-Pennington* doctrine—suggesting that any law imposing consequences other than those embodied in Rule 11 would infringe on the right to petition and therefore be unconstitutional—this essential state power would be stripped away.

To the extent that Mr. Baldoni's and the Wayfarer Parties' argument is focused on the financial teeth of the provision, eliminating or invalidating these remedies would strip the statute of its practical force, reducing the Protecting Survivors Act to a merely symbolic protection (much like Viriginia's anti-SLAPP statute).  Survivors would be forced to choose between silence and financial devastation, while moneyed harassers would face little deterrent against leveraging their power and resources to intimidate and silence through litigation.  Such a result would directly contravene California's strong public policy against sexual harassment and retaliation.

The Protecting Survivors Act was enacted for the exact purpose and intent that Blake Lively raises here: to prohibit the type of vexatious SLAPP litigation Mr. Baldoni and the Wayfarer Parties filed against her for speaking out about the sexual harassment and retaliation that she experienced.

\*       \*       \*

Virginia's anti-SLAPP law failed to protect Ms. Dorsey from the devastating financial and emotional toll of a harassing lawsuit designed to subvert the legal system and silence her.  She had all the facts on her side, and she followed all the processes designed to protect whistleblowers. But she was still subjected to nearly two years of costly and invasive litigation because she tried to protect others by for telling her story of sexual harassment and abuse of power.  Her experience

exemplifies why existing protections are insufficient and why robust laws like California's Protecting Survivor's Act are absolutely necessary to protect survivors' right to report harassing behavior and tell their stories in a public manner without the fear of retaliatory litigation. This Court should not subject Ms. Lively—or any other California whistleblowers— to the same egregious burdens that Ms. Dorsey shouldered by invalidating California's Protecting Survivors Act.

## CONCLUSION

For the foregoing reasons, this Court should allow Ms. Lively to invoke the Protecting Survivors from Weaponizing Defamation Lawsuits Act in this litigation, and it should deny Mr. Baldoni's and the Wayfarer parties' effort to undermine the Protecting Survivors Act for other survivors.

Dated: May 27, 2025                          Respectfully submitted,

**Elyse Dorsey** (by and through counsel)

*/s/ Michelle S. Kallen*
Michelle S. Kallen (*pro hac forthcoming*)
Elise K. Haverman (*pro hac forthcoming*)
Laura Niday (*pro hac forthcoming*)
STEPTOE LLP
1330 Connecticut Ave NW
Washington, D.C. 20036
(202) 429-3000
mkallen@steptoe.com
ehaverman@steptoe.com
lniday@steptoe.com

Elyse D. Echtman
STEPTOE LLP
1114 Avenue of the Americas
New York, N.Y. 10036
eechtman@steptoe.com

*Counsel for Amicus Curiae Elyse Dorsey*

19