## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---

BLAKE LIVELY,

                Plaintiff,

    v.

WAYFARER STUDIOS LLC, et al.,

                Defendants.

No. 24-cv-10049 (LJL) (lead case)

---

WAYFARER STUDIOS LLC, et al.,

                Plaintiffs,

    v.

BLAKE LIVELY, et al.,

                Defendants.

No. 25-cv-449 (LJL) (member case)

---

### BRIEF *AMICUS CURIAE*
### BY EQUAL RIGHTS ADVOCATES, CALIFORNIA EMPLOYMENT LAWYERS ASSOCIATION, AND CALIFORNIA WOMEN'S LAW CENTER IN SUPPORT OF DEFENDANT BLAKE LIVELY'S MOTION TO DISMISS BASED ON CALIFORNIA ASSEMBLY BILL 933

ALEXIS RONICKHER*
REBECCA PETERSON-FISHER*
RACHEL E. GREEN*
KATZ BANKS KUMIN LLP
235 Montgomery Street, Suite 665
San Francisco, CA 94104
(415) 813-3260
* *Pro hac vice forthcoming*

DANA BOLGER
KATZ BANKS KUMIN LLP
111 Broadway, Suite 1702
New York, NY 10006
(646) 759-4501

*Counsel for Proposed* Amici Curiae

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................. iii

**INTEREST OF *AMICI*** .................................................................................................. vi

**INTRODUCTION** ............................................................................................................. 1

**ARGUMENT** .................................................................................................................... 2

    I.   Defamation Lawsuits Are a Form of Retaliation that Chill Reports of Sexual Assault and Harassment. ................................................................................................................... 2

        A.   Sexual Assault and Harassment Are Common Yet Vastly Underreported. .................... 2

        B.   Abusers Weaponize Defamation Lawsuits Against Survivors to Silence Them and Deflect Culpability. ..................................................................................................... 5

    II.  *Amici* and the California Legislature Intended for AB 933 to Shield Harassment and Assault Victims from Retaliatory Defamation Litigation. ................................................. 10

        A.   AB 933 Made Two Key Improvements to Existing Law. ............................................ 10

        B.   AB 933's Drafters Intended the Legislation to Address Two Distinct Problems. ......... 11

    III.  Denying Ms. Lively's Motion to Dismiss Would Undermine the AB 933 Framework and Deter Future Survivor Reports of Sexual Assault and Harassment. ................................. 15

        **CONCLUSION** ........................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Mitchell v. Fujitec Am., Inc.*, 518 F. Supp. 3d 1073 (S.D. Ohio 2021) ................................ 12, 13

**Statutes**

Cal. Civ. Code § 44 ........................................................................................................ 10

Cal. Civ. Code § 47.1 ................................................................................................... 9, 10

N.Y. Civil Rights Law § 76-a .............................................................................................. 9

R.I. Gen. Laws Ann. § 8-8.4-1 *et seq.* ............................................................................... 9

Tenn. Code Ann. § 29-41-101 *et seq.* ............................................................................... 9

Vt. Stat. Ann. § 1181 *et seq.* ........................................................................................... 9

Wash. Rev. Code Ann. § 26.51.010 *et seq.* ..................................................................... 9

**Other Authorities**

Alexandra Thompson & Susannah Tapp, Dep't of Just. Bureau of Just. Stats., *Criminal Victimization, 2022* (Sept. 2023) ................................................................................. 3

Anna E. Jaffe, Ian Cero, & David DiLillo, *The #MeToo Movement and Perceptions of Sexual Assault: College Students' Recognition of Sexual Assault Experiences Over Time*, 11 Psychology of Violence 209 (2021) ............................................................................. 3

California Legislative Information, *AB 933 Privileged Communications: Incident of Sexual Assault, Harassment, or Discrimination* (2023-2024) ................................................. 11

Chai R. Feldblum & Victoria A. Lipnic, *Select Task Force on the Study of Harassment in the Workplace*, EEOC, 2.C (June 2016) ........................................................................... 3

Chelsey N. Whynot, *Retaliatory Defamation Suits: The Legal Silencing of the #MeToo Movement*, 94 Tulane L. Rev. 1 (2020) .................................................................... 8, 9

Chloe Grace Hart, *The Penalties for Self-Reporting Sexual Harassment*, 33 Gender & Soc'y 534 (2019) ........................................................................................................................ 4

Cora Peterson, Sarah DeGue, Curtis Florence, and Colby N. Lokey, *Lifetime Economic Burden of Rape Among U.S. Adults*, 52(6) Am. J. Prev. Med. 691 (June 1, 2017) ................. 8

Ctrs. for Disease Control & Prevention, *National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Sexual Violence* (June 2022) ................................................... 2

Ctrs. for Disease Control & Prevention, *National Intimate Partner and Sexual Violence Survey: 2016/2017 State Report* (Dec. 2023) ........................................................................ 2

Diana Scully, *Understanding Sexual Violence: A Study of Convicted Rapists* (1990) ............. 4

Elizabeth Wagmeister and Dan Heching, *Taylor Swift Subpoenaed in Blake Lively and Justin Baldoni Case*, CNN (May 10, 2025, 12:37 AM ET) .................................................. 16

*Enforcement and Litigation Statistics, Charge Statistics, Charge Receipts: Retaliation-Based*, EEOC ............................................................................................................................... 5

Gloria Guzman and Melissa Kollar, *Income in the United States: 2023* (Sept. 2024) ................... 8

H.B. 3973, 194th Gen. Ct. (Mass. 2025) .................................................................................. 9

H.B. 7134, 2025 Gen. Assemb. (Conn. 2025) .......................................................................... 9

Hadley Freeman, *How Was Larry Nassar Able to Abuse So Many Gymnasts for So Long?*, The Guardian (Jan. 26, 2018, 8:47 AM ET) ....................................................................... 4

Hannah Stevens & Karen Nikos-Rose, *When It Comes to Reporting on Sexual Assault in Media, Words Matter*, UC Davis (Sept. 28, 2021) .............................................................. 16

Jamie R. Abrams, *The Increasing Complexity of Defamation Law in #MeToo Era Lawsuits*, Louisville Bar Briefs (June 2021) ............................................................................. 8

Jasmine Tucker & Jennifer Mondino, NWLC, *Coming Forward: Key Trends and Data from the TIME'S UP Legal Defense Fund* (2020) .................................................................... 3

Jill Cowan, *Former U.S.C. Gynecologist Arrested in Sex Abuse Case*, N.Y. Times (June 26, 2019) ............................................................................................................................... 4

Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. Times (Oct. 5, 2017) ....................................................................... 4

Katherine Bogen, Kaitlyn Bleiwiss, & Lindsay Orchowski, *Sexual Violence is #NotOkay: Social Reactions to Disclosures of Sexual Victimization on Twitter*, 9 Psychology of Violence 127 (2019) .................................................................................................................. 3

Louise F. Fitzgerald and Karla Fischer, *Why Didn't She Just Report Him? The Psychological and Legal Implications of Women's Responses to Sexual Harassment*, 51 J. of Soc. Issues 117 (1995) ............................................................................................................... 4

Luz S. Marin *et al.*, *Workplace Sexual Harassment and Vulnerabilities among Low-Wage Hispanic Women*, 5 Occupational Health Sci. 391 (2021) ........................................ 8

Madison Pauly, *She Said, He Sued*, Mother Jones (Mar./Apr. 2020) ..................................... 5, 6

Michael Planty, *et al.*, *Female Victims of Sexual Violence, 1994–2010*, Dep't of Justice—Bureau of Just. Stats. (revised May 31, 2016, 12:08 PM) ..................................................... 4

Mindy E. Bergman *et al.*, *The (Un)Reasonableness of Reporting: Antecedents and Consequences of Reporting Sexual Harassment*, 87 J. of Applied Psych. 230 (2002) ..................... 4

Nancy Krieger *et al.*, *Social Hazards on the Job: Workplace Abuse, Sexual Harassment, and Racial Discrimination—A Study of Black, Latino, and White Low-Income Women and Men Workers in the United States*, 36 J. of Health Servs. 51 (2014) ............................... 8

Nicole Ligon, *Protecting Women's Voices: Preventing Retaliatory Defamation Claims in the #MeToo Context*, 94 ST. JOHN'S L. REV. 961 (2022) ............................................... 12

Patricia Tjaden & Nancy Thoennes, Nat'l Inst. of Justice, Ctrs. for Disease Control & Prevention, *Prevalence, Incidence, and Consequence of Violence Against Women: Findings from the National Violence Against Women Survey* (Nov. 1998) ............................... 3

Ramona Martinez, *Bill Cosby Sued for Alleged 1986 Sexual Assault of Teen in Las Vegas Hotel*, CBS News (Feb. 1, 2024, 10:22 PM ET) ................................................................. 4

Rape, Abuse & Incest National Network, *Victims of Sexual Violence: Statistics* ......................... 2

*Report of the Special Rapporteur on Violence Against Women, Its Causes and Consequences on Online Violence Against Women and Girls from a Human Rights Perspective*, United Nations General Assembly, Human Rights Council (June 18, 2018) ..................................................... 7

S.B. 549 & H.B. 629, 447th Gen. Assemb. (Md. 2025) ................................................. 9

Sarah Harsey & Jennifer J. Freyd, *Deny, Attack, and Reverse Victim and Offender (DARVO): What Is the Influence on Perceived Perpetrator and Victim Credibility?*, 29 J. of Aggression, Maltreatment & Trauma 897 (2020) ................................................................. 6

Sarah J. Harsey & Jennifer J. Freyd, *Defamation and DARVO*, 23(5) J. Trauma & Dissociation 481 (Aug. 18, 2022) ................................................................................. 6

Sherrilyn Ifill, *The 100 Most Influential People of 2025: Blake Lively*, Time (Apr. 16, 2025, 6:30 AM ET) ................................................................................................ 1

Tyler Kingkade, *As More College Students Say "Me Too," Accused Men Are Suing for Defamation*, Buzzfeed (Dec. 5, 2017, 11:26 AM) ..................................................... 5

Yvonne Chin, *Exposing the Legal Bully: How Abusive Litigation Undermines Justice*, National Crime Victim Law Inst. (May 20, 2024) ................................................................. 17

## INTEREST OF *AMICI*

*Amici* are organizations that drafted and/or championed passage of California Assembly Bill 933 ("AB 933"), now codified at California Civil Code § 47.1 and at issue in this case.  As organizations that serve California workers, they share a special interest in ensuring that courts apply the intended legal approach to the new statute, to ensure that all Californians—particularly low- and middle-income individuals who cannot afford legal defense for speaking out about sexual harassment and abuse—enjoy the full and robust protections that state lawmakers intended.

**Equal Rights Advocates** ("ERA") is a national nonprofit legal organization that advocates for gender justice in workplaces and schools across the country.  Since its founding in 1974, ERA has been fighting on the front lines of social justice to protect and advance rights and opportunities for women, girls, and people of all gender identities through litigating groundbreaking legal cases on behalf of workers who have experienced civil rights violations, including sexual harassment and other forms of discrimination.  ERA has also led vital policy reform to strengthen protections against sexual harassment and other forms of harassment and discrimination in California as well as in other states and at the federal level.  In addition, ERA has participated as *amicus curiae* in scores of cases involving the interpretation and application of legal rules and laws affecting workers' and survivors' rights and access to justice.  ERA has a strong interest in ensuring that victims of sexual assault, sexual harassment, and other forms of harassment and discrimination remain able to exercise their right to speak freely and openly about harassment and abuse without fear of retaliation and intimidation—particularly retaliation and intimidation by perpetrators who seek to use the legal system to silence such victims.  ERA

drafted and co-sponsored the legislation at issue here, AB 933, and successfully advocated for its passage.

**California Employment Lawyers Association** ("CELA") is a statewide organization of more than 1,300 California attorneys whose members primarily represent employees in a wide range of employment cases, including actions enforcing California's laws prohibiting discrimination, harassment, and retaliation in employment. The organization has taken a leading role in advancing and protecting the rights of California workers, including advocating for and proposing legislation, as well as submitting amicus briefs and letters and appearing before the California Supreme Court, California appellate courts, and the Ninth Circuit Court of Appeals in employment rights cases, including numerous cases involving the interpretation of relevant employment laws. CELA co-sponsored AB 933 and was key to its successful passage.

**The California Women's Law Center** ("CWLC") is a statewide, nonprofit law and policy center dedicated to advancing the civil rights of women and girls. CWLC's mission is to create a more just and equitable society by breaking down barriers and advancing the potential of women and girls through impact litigation, policy advocacy, and education. Since its inception in 1989, CWLC has placed particular emphasis on eradicating all forms of discrimination and violence against women. CWLC provides legal assistance to survivors of abuse, advocates for survivors on important legislative issues, and offers training and legal support for attorneys, legal service providers, and counselors regarding the legal protections of survivors of violence. CWLC advocated for adoption of the California law at issue here and has a strong interest in ensuring that survivors can speak out without fear of retaliation.

## INTRODUCTION

One of Time Magazine's top 100 influential people of 2025,[1] Blake Lively is anything but an average person.  But her experience of being sued for defamation after speaking out about sexual harassment is all too common.  Hundreds of retaliatory defamation suits have been filed against sexual harassment and assault victims for publicly disclosing their abuse in recent years.  Indeed, on its legal hotline, *Amicus Curiae* Equal Rights Advocates ("ERA") has heard from dozens of low- and middle-income workers, students, and others who were threatened with or forced to defend themselves against such suits, in retaliation for speaking about abuse they experienced—or were chilled from speaking out at all, for fear that they would become targets of such retaliatory litigation tactics by their abusers.

To combat this onslaught of retaliatory defamation suits, in 2023, ERA joined *Amicus Curiae* California Employment Lawyers Association ("CELA") to draft and champion the passage of Assembly Bill 933 ("AB 933").  This legislation clarified that an individual's communication regarding an incident of sexual assault, harassment, or discrimination they experienced is privileged, provided it was made without malice.  It also created a fee-shifting provision and authorized recovery of damages.  The intent of AB 933 was to protect survivors from defamation lawsuits filed against them, to deter abusers from filing retaliatory defamation suits, and to combat the pervasive silencing of survivors that enables sexual harassment and assault to persist at epidemic rates.

This action is the first test of AB 933, and survivors are watching.  If the law does not protect a powerful and resourced person such as Ms. Lively, then survivors without power or resources—the vast majority—will not risk speaking out about sexual assault or harassment at

---

[1] Sherrilyn Ifill, *The 100 Most Influential People of 2025: Blake Lively*, Time (Apr. 16, 2025, 6:30 AM ET), https://time.com/collections/100-most-influential-people-2025/7273807/blake-lively/.

all.  The #MeToo movement taught us the result of that silence: systemic and unchecked abuse at

great personal and societal cost.

## ARGUMENT

### I.  Defamation Lawsuits Are a Form of Retaliation that Chill Reports of Sexual Assault and Harassment.

Millions of people in California and across the United States are sexually assaulted and

harassed in their lifetimes, but very few survivors come forward to seek help.  Those who do

frequently face retaliation.  In recent years, harassers have increasingly targeted their victims

with retaliatory defamation lawsuits, weaponizing the legal process against those who dare to

speak up and silencing many others from speaking out altogether.

#### A.  Sexual Assault and Harassment Are Common Yet Vastly Underreported.

Every sixty-eight seconds, a person in this country is sexually assaulted.[2]  According to

estimates by the Centers for Disease Control and Prevention ("CDC"), 54% of women and 31%

of men in the United States experience some form of sexual violence in their lifetime.[3]  In

California, more than 8.6 million women have been victims of sexual violence, including more

than 4.5 million victims of completed or attempted rape.[4]  Sexual assault has persisted at those

---

[2] Rape, Abuse & Incest National Network, *Victims of Sexual Violence: Statistics*, https://rainn.org/statistics/victims-sexual-violence (last visited May 16, 2025) (hereinafter "RAINN Statistics").

[3] Ctrs. for Disease Control & Prevention, *National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Sexual Violence,* 3 (June 2022), https://web.archive.org/web/20250130113405/https://www.cdc.gov/nisvs/documentation/nisvsReportonSexualViolence.pdf.

[4] Ctrs. for Disease Control & Prevention, *National Intimate Partner and Sexual Violence Survey: 2016/2017 State Report*, 25–26 (Dec. 2023), https://web.archive.org/web/20241206151940/https://www.cdc.gov/nisvs/documentation/NISVS-2016-2017-State-Report-508.pdf.

same epidemic levels for decades.[5]  Despite these extraordinarily high rates of victimization,

most survivors do not report.  The U.S. Department of Justice estimates that only one in five

sexual assaults are reported to the police;[6] in the workplace, only an estimated 6–13% of sexual

harassment victims file a formal complaint with their employer.[7]

     As the #MeToo movement revealed, this silence has costs, because reporting benefits

both individual survivors and the broader public.  For some survivors, reporting can help reassert

control in their lives; provide an opportunity for redress or accountability from the perpetrator,

the employer, or both; remedy the physical, psychological, and financial impacts of misconduct;

and reduce stigma and self-blame.[8]  For society, reporting can prompt shifts in societal

understanding of sexual assault and harassment and protect other potential victims.[9]

     Despite these benefits, survivors often do not feel safe coming forward.  Some feel shame

or embarrassment, or fear they will not be believed.[10]  Others are all too aware of the reality that

---

[5] *See* Patricia Tjaden & Nancy Thoennes, Nat'l Inst. of Justice, Ctrs. for Disease Control & Prevention, *Prevalence, Incidence, and Consequence of Violence Against Women: Findings from the National Violence Against Women Survey*, 3 (Nov. 1998), https://www.ojp.gov/pdffiles/172837.pdf.

[6] Alexandra Thompson & Susannah Tapp, Dep't of Just. Bureau of Just. Stats., *Criminal Victimization, 2022*, 6 (Sept. 2023), https://bjs.ojp.gov/document/cv22.pdf.

[7] Chai R. Feldblum & Victoria A. Lipnic, *Select Task Force on the Study of Harassment in the Workplace*, EEOC, 2.C (June 2016), https://www.eeoc.gov/select-task-force-study-harassment-workplace (observing that "gender-harassing conduct was almost never reported; unwanted physical touching was formally reported only 8% of the time" and "on average, anywhere from 87% to 94% of individuals did *not* file a formal complaint") (emphasis in original).

[8] Katherine Bogen, Kaitlyn Bleiwiss & Lindsay Orchowski, *Sexual Violence is #NotOkay: Social Reactions to Disclosures of Sexual Victimization on Twitter*, 9 Psychology of Violence 127, 127 (2019).

[9] Anna E. Jaffe, Ian Cero & David DiLillo, *The #MeToo Movement and Perceptions of Sexual Assault: College Students' Recognition of Sexual Assault Experiences Over Time*, 11 Psychology of Violence 209 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8713172/#R5.

[10] Jasmine Tucker & Jennifer Mondino, Nat'l Women's L. Ctr., *Coming Forward: Key Trends and Data from the TIME'S UP Legal Defense Fund* 11 (2020), https://nwlc.org/wp-

employers, colleagues, or jurors might believe false and harmful sex stereotypes and "rape myths"—common false beliefs about sexual assault—dismissing or minimizing allegations and shifting blame to victims.[11]  But by far the most prevalent fear that survivors share is that they will be subjected to retaliation for speaking up.[12]  And when this fear deters survivors from reporting sexual harassment and abuse, serial abusers are able to continue victimizing others, sometimes for decades.[13]

---

content/uploads/2020/10/NWLC-Intake-Report_FINAL_2020-10-13.pdf (hereinafter *Coming Forward*). *See also* Louise F. Fitzgerald & Karla Fischer, *Why Didn't She Just Report Him? The Psychological and Legal Implications of Women's Responses to Sexual Harassment*, 51 J. of Soc. Issues 117, 127 (1995); Mindy E. Bergman *et al.*, *The (Un)Reasonableness of Reporting: Antecedents and Consequences of Reporting Sexual Harassment*, 87 J. of Applied Psych. 230, 230, 237 (2002) (finding that reporting did not improve—and at times worsened—job, psychological, and health outcomes).

[11] Diana Scully, *Understanding Sexual Violence: A Study of Convicted Rapists* 52 (1990).

[12] Michael Planty, *et al.*, *Female Victims of Sexual Violence, 1994–2010*, Dep't of Justice—Bureau of Just. Stats., 7 (rev. May 31, 2016, 12:08 PM), https://bjs.ojp.gov/content/pub/pdf/fvsv9410.pdf; *Coming Forward*, *supra* note 10 at 4, 12–15 (finding that 72% of people requesting legal assistance from the Times Up Legal Defense Fund said they experienced retaliation in some form after reporting or trying to stop the harassment; 15% who experienced retaliation said they were slandered or had their reputation damaged in some way by their perpetrator or employer; and 36% of people who experienced retaliation were fired from their job).  *See also* Chloe Grace Hart, *The Penalties for Self-Reporting Sexual Harassment*, 33 Gender & Soc'y 534, 550 (2019) ("[T]here is indeed a significant penalty in promotion likelihood against the employee who self-reported sexual harassment.").

[13] *See, e.g.*, Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. Times (Oct. 5, 2017), https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html; Jill Cowan, *Former U.S.C. Gynecologist Arrested in Sex Abuse Case*, N.Y. Times (June 26, 2019), https://www.nytimes.com/2019/06/26/us/george-tyndall-sexual-abuse.html; Hadley Freeman, *How Was Larry Nassar Able to Abuse So Many Gymnasts for So Long?*, The Guardian (Jan. 26, 2018, 8:47 AM ET), https://www.theguardian.com/sport/2018/jan/26/larry-nassar-abuse-gymnasts-scandal-culture; Gina Ramona Martinez, *Bill Cosby Sued for Alleged 1986 Sexual Assault of Teen in Las Vegas Hotel*, CBS News (Feb. 1, 2024, 10:22 PM ET), https://www.cbsnews.com/news/bill-cosby-sued-for-alleged-1986-sexual-assault-of-17-year-old-in-las-vegas-hotel-room/.

### B. Abusers Weaponize Defamation Lawsuits Against Survivors to Silence Them and Deflect Culpability.

Survivors' concerns about retaliation are well-founded.[14]  While termination from employment remains the most common form of retaliation,[15] harassers and assailants are increasingly using baseless defamation suits and other abusive lawsuits to coerce their victims into withdrawing their claims or to deter them from reporting in the first place.  Dubbed the "legal backlash to the MeToo movement,"[16] retaliatory defamation lawsuits against survivors of sexual assault and harassment have increased at alarming rates in the past decade as survivors spoke out and cultural pressure to impose consequences on abusers grew in the wake of #MeToo in Fall 2017.

Lawyers who represent sexual assault survivors have reported exponential increases in threats of retaliatory defamation lawsuits.  In 2017, a lawyer for the Victim Rights Law Center remarked that threats of defamation lawsuits against sexual assault survivors had risen from 5% of her caseload a few years prior to over half of it.[17]  In 2020, another attorney reported that, prior to 2017, he had received inquiries twice a year from survivors who feared retaliatory defamation suits, but now he received such inquiries every two weeks.[18]  In 2020, a National

---

[14] In the workplace, retaliation is by far the most common type of discrimination reported to the EEOC, comprising more than half of all EEOC charges in every year from 2018 to 2023.  *Enforcement and Litigation Statistics, Charge Statistics, Charge Receipts: Retaliation-Based*, EEOC, https://www.eeoc.gov/data/enforcement-and-litigation-statistics-0 (last visited May 16, 2025).

[15] *Coming Forward*, *supra* note 10 at 4.

[16] Madison Pauly, *She Said, He Sued*, Mother Jones (Mar./Apr. 2020), https://www.motherjones.com/criminal-justice/2020/02/metoo-me-too-defamation-libel-accuser-sexual-assault/ (hereinafter *She Said, He Sued*).

[17] Tyler Kingkade, *As More College Students Say "Me Too," Accused Men Are Suing for Defamation*, Buzzfeed (Dec. 5, 2017, 11:26 AM), https://www.buzzfeednews.com/article/tylerkingkade/as-more-college-students-say-me-too-accused-men-are-suing.

[18] *She Said, He Sued*, *supra* note 16.

Women's Law Center ("NWLC") report found that being sued for defamation is the third most common form of workplace retaliation reported by survivors.[19]  Indeed, the California legislature enacted AB 933 after a then-California state lawmaker sued a lobbyist for reporting his sexual misconduct.[20]

These retaliatory lawsuits have become a core part of abusers' playbook to deny the abuse, attack their victims' credibility, and cast themselves as the real "victim"—a tactic psychologists term "DARVO" or "Deny, Attack, Reverse Victim and Offender."[21]  Under DARVO, the abuser "denies or minimizes the harms of any wrongdoing, attacks the victim's credibility, and reverses victim and offender roles such that the [abuser] assumes a victimized position and declares the victim to be the true [abuser]."[22]

DARVO works.  An experiment showed third-party observers exposed to DARVO are more likely to perceive the perpetrator as less abusive and less responsible and more likely to view the victim as less credible, more abusive, and more responsible for their own victimization.[23]

---

[19] *Coming Forward*, *supra* note 10, at 13.

[20] *She Said, He Sued*, *supra* note 16.

[21] Sarah J. Harsey & Jennifer J. Freyd, *Defamation and DARVO*, 23(5) J. Trauma & Dissociation 481, 482 (Aug. 18, 2022), https://www.tandfonline.com/doi/10.1080/15299732.2022.2111510?url_ver=Z39.88-2003&rfr_id=ori:rid:crossref.org&rfr_dat=cr_pub%20%200pubmed (hereinafter *Defamation and DARVO*).

[22] Sarah Harsey & Jennifer J. Freyd, *Deny, Attack, and Reverse Victim and Offender (DARVO): What Is the Influence on Perceived Perpetrator and Victim Credibility?*, 29 J. of Aggression, Maltreatment & Trauma 897 (2020), https://www.tandfonline.com/doi/full/10.1080/10926771.2020.1774695#abstract.

[23] *Defamation and DARVO*, *supra* note 21, at 482.

Retaliatory defamation suits apply the DARVO framework by reversing the traditional role of victim-plaintiff and abuser-defendant.  According to Ms. Lively's description in her amended complaint and motion to dismiss, Mr. Baldoni has used DARVO here: he denied her allegations, attacked her directly, and engaged in an extensive social media and public relations campaign to reverse victim and offender, including by filing the present suit together with the other plaintiffs (the "Baldoni Plaintiffs").  ECF No. 84 at 61–119; ECF No. 145 at 15–17.

Retaliatory DARVO defamation suits harm survivors both emotionally and financially. In 2018, the U.N. Special Rapporteur on Violence Against Women called the act of threatening survivors with legal proceedings a form of gender-based violence.[24]  That is because in defamation lawsuits, survivors who already bear physical and mental health consequences from the underlying incidents[25] are forced to repeatedly relive the trauma through litigation, including court filings, depositions, and court testimony.  They are forced to disclose sensitive and potentially embarrassing private information through invasive discovery.  And perhaps most troubling, they must endure continued unwanted interaction with their harasser throughout the litigation process—often being forced to testify at deposition or trial within feet of the person who harmed them.

---

[24] *Report of the Special Rapporteur on Violence Against Women, Its Causes and Consequences on Online Violence Against Women and Girls from a Human Rights Perspective*, United Nations General Assembly, Human Rights Council, at 9 (June 18, 2018), https://docs.un.org/en/A/HRC/38/47.

[25] *See, e.g.*, RAINN Statistics, *supra* note 2 (collecting studies showing that "94% of women who are raped experience symptoms of [PTSD] during the two weeks following the rape[;] 30% of women report symptoms of PTSD 9 months after the rape[;] 33% of women who are raped contemplate suicide[;] 13% of women who are raped attempt suicide[;] [a]pproximately 70% of rape or sexual assault victims experience moderate to severe distress") (citations omitted).

The financial costs of defending a defamation lawsuit are also debilitating for survivors of sexual assault and harassment.[26]  According to the U.S. Census, the 2023 median annual earning for women in the United States was just over $40,000.[27]  One #MeToo accuser-defendant in a defamation suit reported spending $30,000 on her own defense.[28]  Indeed, the financial burden of defending against a defamation lawsuit is one of the main reasons these suits tend to evoke so much fear in survivors.[29]  In *Amici's* experience, low-to-moderate income workers often are simply unable to risk potential financial ruin to speak up about sexual harassment.[30]

These lawsuits, particularly when highly publicized, serve to silence other victims of sexual harassment and assault.  Research shows that the increase in retaliatory defamation suits

---

[26] Survivors suffer steep emotional and financial costs from sexual violence, including an estimated lifetime cost, on average, of over $120,000 due to medical expenses, lost productivity, and lost wages and benefits.  *See* Cora Peterson, Sarah DeGue, Curtis Florence & Colby N. Lokey, *Lifetime Economic Burden of Rape Among U.S. Adults*, 52(6) Am. J. Prev. Med. 691, 695 (June 1, 2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5438753/ (noting that the figure is an average figure and would vary, sometimes significantly, from one victim to another, and that the study did not include non-monetary elements like pain and suffering).  Being forced to defend against a long and expensive retaliatory defamation lawsuit only exacerbates these costs.

[27] Gloria Guzman & Melissa Kollar, *Income in the United States: 2023*, at 9 (Sept. 2024), https://www2.census.gov/library/publications/2024/demo/p60-282.pdf.

[28] Jamie R. Abrams, *The Increasing Complexity of Defamation Law in #MeToo Era Lawsuits*, Louisville Bar Briefs, 22 (June 2021), https://perma.cc/FCJ7-FBGR.

[29] Chelsey N. Whynot, *Retaliatory Defamation Suits: The Legal Silencing of the #MeToo Movement*, 94 Tulane L. Rev. 1, 13 (2020), https://www.tulanelawreview.org/tlr-online/retaliatorydefamation (Comment) (hereinafter "Whynot, *Retaliatory Defamation Suits*").

[30] *See, e.g.*, Luz S. Marin *et al.*, *Workplace Sexual Harassment and Vulnerabilities among Low-Wage Hispanic Women*, 5 Occupational Health Sci. 391, 395 (2021) (of all of the reasons provided by survivors of workplace sexual harassment to explain their reluctance to report, the most common barrier was fear of being fired and losing their source of income (34%)); Nancy Krieger *et al.*, *Social Hazards on the Job: Workplace Abuse, Sexual Harassment, and Racial Discrimination—A Study of Black, Latino, and White Low-Income Women and Men Workers in the United States*, 36 J. of Health Servs. 51 (2014) (workers in low-income jobs are more likely to be in financial stress, which erodes their ability to cope with workplace sexual harassment).

has already had a chilling effect on survivors' willingness to report, and experts worry that the recent influx will only "further discourage reporting."[31]  After all, if Ms. Lively, one of the most influential women in the United States, is forced to endure abusive litigation because she spoke out about sexual harassment in her workplace, why would survivors with low-to-moderate resources risk speaking out?

Fortunately, lawmakers across the country have recognized that retaliatory defamation lawsuits threaten the progress the #MeToo movement has achieved toward holding abusers accountable and ending sexual harassment and assault.  In California and other jurisdictions, lawmakers have passed or introduced numerous laws to protect survivors from retaliatory defamation actions and other abusive lawsuits.  *See, e.g.*, Cal. Civ. Code § 47.1 (2023) (creating privilege for statements made without malice about sexual assault, harassment, or discrimination); N.Y. Civil Rights Law § 76-a (2020) (extending anti-SLAPP law to protect more people, including survivors); R.I. Gen. Laws Ann. § 8-8.4-1 *et seq.* (2023) (allowing survivors to request a court order restricting abusive litigation); Vt. Stat. Ann. § 1181 *et seq.* (2023) (same); Wash. Rev. Code Ann. § 26.51.010 *et seq.* (2020) (same); Tenn. Code Ann. § 29-41-101 *et seq.* (2018) (same); H.B. 7134, 2025 Gen. Assemb. (Conn. 2025) (amending anti-SLAPP law to explicitly protect survivors); H.B. 3973, 194th Gen. Ct. (Mass. 2025) (creating privilege for statements made without malice about sexual assault, harassment, or discrimination); S.B. 549 & H.B. 629, 447th Gen. Assemb. (Md. 2025) (protecting allegations of "sexually assaultive behavior" made without malice, intent, or reckless disregard from civil liability).

How courts interpret these laws will determine whether they are effective.

---

[31] Whynot, *Retaliatory Defamation Suits*, *supra* note 29, at 13.

II. **Amici and the California Legislature Intended for AB 933 to Shield Harassment and Assault Victims from Retaliatory Defamation Litigation.**

In 2023, in response to the increased weaponization of retaliatory defamation suits, the California Legislature passed AB 933 with the express intent to shield harassment and assault survivors from retaliatory defamation lawsuits. The Legislature intended for AB 933 to protect individuals who reported sexual harassment without malice from retaliatory litigation, particularly abusive discovery.

### A. AB 933 Made Two Key Improvements to Existing Law.

Under California law, individuals may file defamation actions for unprivileged statements that injure their reputations. Cal. Civ. Code §§ 44–46. AB 933 created two key provisions to curtail the weaponization of such actions against survivors.

First, it expressly clarified that communications are privileged—and thus protected from a defamation action—where they are made "by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination." Cal. Civ. Code § 47.1(a) (the "Privilege Provision"). It defined "communication" as "factual information related to an incident of sexual assault, harassment, or discrimination experienced by the individual making the communication." *Id.* § 47.1(d). Notably, it clarified that such communications were protected regardless of whether they were made in an official complaint of abuse or not. *Id.* § 47.1(c) (applying privilege where speaker had "a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, *whether the complaint . . . was[] filed or not*") (emphasis added).

Second, AB 933 authorized treble damages, attorneys' fees and costs, and punitive damages for any survivor who prevails in such a defamation suit (the "Damages Provision"). *Id.* § 47.1(b) ("A prevailing defendant in any defamation action brought against that defendant for

making a communication that is privileged under this section shall be entitled to their reasonable attorney's fees and costs for successfully defending themselves in the litigation, plus treble damages for any harm caused to them by the defamation action against them, in addition to punitive damages under Section 3294 or any other relief otherwise permitted by law.").

AB 933 passed with overwhelming support and was promptly signed by the Governor.[32] It went into effect January 1, 2024.  It has not yet been interpreted by any court.

### B.  AB 933's Drafters Intended the Legislation to Address Two Distinct Problems.

AB 933 was drafted to achieve two distinct goals: (1) to shield victims from the discovery process by ensuring they would prevail at the motion to dismiss stage in most circumstances; and (2) to remedy the financial and psychological costs of the litigation and deter abusers from pursuing unwarranted and retaliatory litigation in the first place.

### 1.  Preventing Abusive Discovery

Prior to AB 933, one of the most significant burdens for victims defending against a retaliatory defamation suit was the (ab)use of discovery to re-traumatize survivors by invading their privacy, disrupting their relationships, and causing financial distress.

Attorneys at *Amici* ERA and CELA have witnessed how retaliatory defamation suits, including abusive discovery practices, can cause harmful psychological and financial harm to survivors.[33]  They have routinely heard from survivors who chose not to speak up about harassment and violence at all, so to avoid abusive discovery tactics.

---

[32] *See* California Legislative Information, *AB 933 Privileged Communications: Incident of Sexual Assault, Harassment, or Discrimination* (2023-2024) https://leginfo.legislature.ca.gov/faces/billVotesClient.xhtml?bill_id=202320240AB933.

[33] For instance, through its legal hotline, ERA was contacted by a survivor whose abuser had sued her for defamation based on her reporting her assault to the dean of her university.  The survivor was only 19

*Amici*'s concern about harassers' abuse of the discovery process was shared by AB 933's legislative champion, Assemblymember Cecilia Aguiar-Curry.  She explained to her colleagues that retaliatory defamation suits forced survivors "to endure lengthy and costly discovery," which "'can entail a number of personal and invasive requests, including requiring the survivor to sit for a deposition during which [they] will be interrogated about matters relevant to the case [and] having the survivor answer questions relating to the case in writing via interrogatories and requests for admission, obligating the survivor to sift through all documentation [they] ha[ve] that is relevant to the case.'"  ECF No. 146-1 at 57 (quoting Nicole Ligon, *Protecting Women's Voices: Preventing Retaliatory Defamation Claims in the #MeToo Context*, 94 St. John's L. Rev. 961, 965 (2022)).

 Indeed, in advocating for AB 933 to correct the shortcomings of existing law, Assemblymember Aguiar-Curry cited a recent court decision that had recognized the "chilling effect" that defamation suits had on the reporting of sexual harassment, undermining the "strong public policy in favor of reporting workplace misconduct."  ECF No. 146-1 at 53–54 (quoting *Mitchell v. Fujitec Am., Inc.*, 518 F. Supp. 3d 1073, 1086 (S.D. Ohio 2021)).  She quoted the court's observation that, under existing law:

> Essentially, any time a sexual harassment claim includes objectively verifiable facts (e.g., 'Employee A inappropriately touched me at the office party'), and the accused person disputes those facts in her complaint in an objectively verifiable way (e.g., 'I was never even in the same room as my accuser at that party'), that appears to be enough to survive dismissal.  In such cases, the plaintiff's allegation, if believed, necessarily entails that the defendant is lying, which under [existing] law deprives that person of the qualified privilege.

years old.  Desperate, she told ERA, "I can't begin to explain what this case has done to me, and I can't even imagine what it's done [to] others."  Likewise, a CELA attorney represented a client who asserted claims against the person who sexually assaulted her, only to have the assailant threaten to sue her for defamation.  She became mentally distraught and suicidal as a result.  Yet another CELA attorney represented a woman who was subjected to sexual violence and stalking; after she complained, the person who harmed her sought a temporary restraining order to silence her and threatened further legal action.  It caused her significant financial, emotional, and reputational harm.

ECF No. 146-1 at 55 (quoting 518 F. Supp. 3d at 1086).

Against this backdrop of existing law, which enabled abusers to proceed to discovery in most defamation cases, AB 933 was meant to ensure that a harasser's allegation that a survivor was lying about the underlying harassment would no longer be sufficient to survive a motion to dismiss where pleadings (and other documents of which a court could take judicial notice) establish a reasonable basis for the alleged defamatory statement(s).

The statutory fix intended by AB 933 would be undermined if retaliatory defamation cases are allowed to continue to proceed to discovery by providing nothing more than conclusory denials coupled with bare assertions the survivor maliciously lied about the assault or harassment.[34]  Doing so would ensure that abusers could gain access to discovery—one of the prime weapons in retaliatory defamation suits—simply by denying any misconduct and including conclusory allegations that the survivor had the requisite malice.  An interpretation of AB 933 that permits such an action to proceed, despite the lack of factual allegations to support the conclusory pleading of malice, would eviscerate one of the main protective purposes of the law.

## 2.  Compensating Survivors and Deterring the Filing of Abusive and Retaliatory Lawsuits

The Damages Provision was also a critical component of AB 933, since it provided for payment of attorneys' fees, compensated victims for the harm caused by the retaliatory suit, and authorized punitive damages to dissuade future misconduct.

---

[34] Of course, AB 933 allows for the rare case to proceed to discovery in which an accused actually pleads factual allegations that rely on more than conclusory denials and assertions.

As the American Association of University Women–California ("AAUW-CA") noted in its Support Memo endorsing AB 933, "For those unable to afford legal representation, SLAPP suits silence survivors who have come forward, and those who consider sharing their abuse." ECF 146-1 at 42. As *Amici* ERA and CELA explained in their AB 933 Support Memo, "The threat of having to engage in years of litigation . . . and take on the burden of responding to an expensive, resource-draining SLAPP suit . . . discourages others from coming forward to share their experience. In fact, the financial burden of defending against a defamation suit is one of the main reasons these suits tend to evoke so much fear in survivors." ECF 146-1 at 37. By entitling victims to recovery of attorneys' fees and costs, AB 933 provides a mechanism for attorneys to defend low- and middle-income survivors, who would not have the resources to pay an attorney at an hourly rate.[35]

The Damages Provision also authorizes the recovery of treble damages, to compensate victims for the emotional and psychological costs of abusive litigation. *Amici* ERA and CELA and Assemblymember Aguiar-Curry noted the significant emotional and psychological hardship survivors faced in having to defend not only a lawsuit but one specifically brought by their abuser. *See, e.g.*, ECF 146-1 at 38 ("Even if they will ultimately prevail against such an attack, survivors are often unable to take on the . . . emotional toll of such lengthy and costly litigation."). Accordingly, they specifically drafted—and the California Legislature passed—the

---

[35] On its legal hotline, ERA regularly heard from survivors facing retaliatory defamation claims who were unable to find legal counsel to assist them. One survivor reached out to ERA after receiving a series of threatening and aggressive letters from an attorney who had been retained to sue the survivor for defamation following their Title IX complaint to their school. The attorney—retained by the person who had sexually assaulted the student—demanded large sums of money in exchange for their client not filing a retaliatory defamation claim. Despite searching for over a month, ERA was unable to arrange pro bono assistance for the student with respect to the threatening letters.

Damages Provision to authorize treble damages for the economic, emotional, and psychological harms survivors suffer when defending themselves in retaliatory suits brought by their abusers.

Finally, the Damages Provision authorizes recovery of punitive damages, reflecting the Legislature's desire to deter harassers from bringing such retaliatory litigation in the first place. *See, e.g.*, ECF 146-1 at 73 (Senate Judiciary committee report noting that the "bill's fee-shifting provisions will deter SLAPP suits against the victims of sexual abuse, harassment, and discrimination before they are filed"); *id.* at 34 (committee report noting that "the bill likely functions to dissuade litigation against those who have made the difficult decision to come forward about their experiences").

### III. Denying Ms. Lively's Motion to Dismiss Would Undermine the AB 933 Framework and Deter Future Survivor Reports of Sexual Assault and Harassment.

Recognizing that defamation suits are effective in silencing victims, or coercing them into withdrawing their claims, the California Legislature crafted AB 933 to protect survivors' reports in a manner that would avoid abusive discovery. Should this Court deny Ms. Lively's motion to dismiss and permit the Baldoni Plaintiffs' retaliatory lawsuit against her to proceed, it would undermine this carefully crafted framework—not only for Ms. Lively but also for the thousands of current and future victims in California who depend on AB 933's protections and remedies to defend themselves from similar suits.[36]

---

[36] To make an end-run around AB 933, the Baldoni Plaintiffs argue that the law only protects the individual who makes the statement (here, Ms. Lively). Yet they then attempt to argue that both Mr. Reynolds and Ms. Sloane are agents of Ms. Lively, so she is liable for statements they made even if she would not be liable under AB 933 for making those same statements. Even if Mr. Reynolds or Ms. Sloane are found to be agents of Ms. Lively, any statements they made as her agent should fall under the privilege protection of AB 933 if they would have been privileged had Ms. Lively made them herself. Finding otherwise would undercut the purpose of AB 933 by stripping victims of the protections of AB 933.

Ms. Lively is a public figure, and this lawsuit has captured the attention of the American public.  The outcome of this motion will affect the decision-making of other victims of sexual harassment and assault.[37]  The Baldoni Plaintiffs have already signaled their intent to follow the abusive discovery playbook by invading Ms. Lively's privacy and disrupting her relationships, as frequently happens with other survivors who speak up.  Indeed, in a seeming gambit to disrupt her friendship with Taylor Swift, they have subpoenaed the music star, even though Ms. Swift has no connection to the workplace harassment and retaliation at issue in this dispute.[38]  Whether or not these high-visibility abusive tactics work against Ms. Lively, they almost certainly will deter survivors from coming forward with allegations of sexual assault and harassment in their own lives.

Moreover, the public will recognize that Ms. Lively's legal defense, if forced to proceed, will be very expensive.  While she is in the privileged position of at least being able to afford a legal defense, low- and moderate-income survivors are not.  Even if the Baldoni Plaintiffs' suit eventually fails and Ms. Lively recovers her fees and costs at the end of this litigation, a ruling in the Baldoni Plaintiffs' favor will chill other victims from speaking out.  The specter of having to endure the invasive and traumatic discovery process while also lacking the resources to pay costs or attorneys' fees during litigation is more than enough to force survivors into onerous settlement

---

[37] *See, e.g.*, Hannah Stevens & Karen Nikos-Rose, *When It Comes to Reporting on Sexual Assault in Media, Words Matter*, UC Davis (Sept. 28, 2021), https://www.ucdavis.edu/curiosity/news/when-it-comes-reporting-sexual-assault-media-words-matter.

[38] *See* ECF No. 103 (granting motion to strike letter filed by Mr. Baldoni's counsel because the "sole purpose of the Letter is to promote public scandal by advancing inflammatory accusations, on information and belief, against Lively and her counsel" and noting that the Letter suggests "that Lively and her counsel attempted to 'extort' a well-known celebrity"—Taylor Swift).  *See also* Elizabeth Wagmeister & Dan Heching, *Taylor Swift Subpoenaed in Blake Lively and Justin Baldoni Case*, CNN (May 10, 2025, 12:37 AM ET), https://www.cnn.com/2025/05/09/entertainment/taylor-swift-subpoenaed-lively-baldoni-case.

terms to avoid further litigation or to dissuade them from speaking out about the abuse they suffered.[39]

In short, based on the pleadings here, the Baldoni Plaintiffs' retaliatory defamation lawsuit is the prototypical suit that the California Legislature intended to short circuit by enacting AB 933. It weaponizes the DARVO technique to recast Mr. Baldoni as the victim to undermine Ms. Lively's credibility while also attempting to leverage the powerful tool of abusive discovery to further persecute her. Granting Ms. Lively's motion to dismiss based on AB 933 would allow the law to work as intended by providing early protection and relief for survivors who speak out about sexual harassment. Denying Ms. Lively's motion to dismiss, on the other hand, will encourage abusers to use defamation suits to silence victims and will chill victims' willingness to report sexual assault and harassment in future—the exact opposite of the intent of AB 933.[40]

---

[39] Yvonne Chin, *Exposing the Legal Bully: How Abusive Litigation Undermines Justice*, National Crime Victim Law Inst. (May 20, 2024), https://ncvli.org/exposing-the-legal-bully-how-abusive-litigation-undermines-justice/.

[40] In addition to chilling survivors from coming forward, this result would chill attorneys from representing or zealously advocating for clients like Ms. Lively for fear of creating liability for their clients. While attorneys cannot be sued for what they say in the context of the litigation itself (under the litigation privilege), many attorneys must make additional statements to advance their client's interests and the public's understanding of the problem, particularly on matters of public interest. If the agent-principal relationship between attorney and client were found not to fall under the privilege enacted by AB 933, attorneys would risk exposure to additional defamation liability for their *client* if they make certain out-of-court statements in support of their client's allegations.

## CONCLUSION

For the reasons set forth above, *Amici* respectfully urge the Court to grant Ms. Lively's

motion to dismiss.

Dated: May 27, 2025                    Respectfully submitted,

/s/ Dana Bolger

DANA BOLGER
**KATZ BANKS KUMIN LLP**
111 Broadway, Suite 1702
New York, New York 10006
Tel: (646) 759-4501
Email: bolger@katzbanks.com

ALEXIS RONICKHER*
REBECCA PETERSON-FISHER*
RACHEL E. GREEN*
**KATZ BANKS KUMIN LLP**
235 Montgomery Street, Suite 665
San Francisco, California 94104
Tel: (415) 813-3260
Email: ronickher@katzbanks.com
Email: peterson-fisher@katzbanks.com
Email: green@katzbanks.com
* *Pro hac vice forthcoming*

*Counsel for Proposed* Amici Curiae