## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re Subpoena Issued in Lively

v.

Wayfarer Studios LLC et al.,

No. 1:24-cv-10049 (LJL)

### MOTION OF BRETT DOUGLAS MCDOWELL TO INTERVENE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 24

PLEASE TAKE NOTICE that, upon the accompanying

1. Memorandum of Law in Support of Motion to Intervene; and

2. Proposed Complaint in Intervention,

Brett Douglas McDowell ("Movant") will move this Court, on a date and at a time to be set by the Court, for an Order:

• granting intervention as of right under Fed. R. Civ. P. 24(a)(2), or, in the alternative,

permissive intervention under Rule 24(b); and

• awarding such other and further relief as the Court deems just and proper.

Dated: May 21, 2025

Respectfully submitted,

/s/ Brett Douglas McDowell, pro se

 c/o Red River Rebellion Ltée

- 1 -

1460 Chevrier Blvd #200

Winnipeg, MB R3T 1Y6

legal@redriver-rebellion.ca

+1 204 202 5904

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE**

**Summary of Argument:** This motion seeks intervention as a matter of right under Federal Rule of Civil Procedure 24(a)(2) on the grounds that Movant's personal, cultural, and reputational interests are directly implicated by discovery materials and protective motions that reference his name, likeness, and prior disclosures. These materials relate to symbolic representations and identity-linked content arising in productions involving the named parties, and their adjudication without Movant's participation risks procedural exclusion and reputational harm. Alternatively, Movant seeks permissive intervention under Rule 24(b), limited to ensuring procedural fairness in the preservation, review, and treatment of documents that explicitly reference him or his protected activity. Movant's April 27, 2025 preservation letter, acknowledged by the Court at ECF No. 90, confirms both the timeliness and material relevance of his inclusion.

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

LEGAL STANDARD ......................................................................................... 2

FACTUAL AND EVIDENTIARY BASIS FOR INTERVENTION

.................................................. 3

A. Acknowledged Preservation and Discovery Material Involving Me ............................. 3

B. Inclusion by Taylor Swift's Legal Representation via Venable LLP ............................. 3

C. Wayfarer's Characterization of Third-Party Relevance .................................... 4

D. Marvel's Subpoena and Protective Motion ....................................................... 4

E. Material Pattern of Appropriation and Retaliation ........................................... 5

LEGAL ARGUMENT ......................................................................................... 7

A. I Have a Direct and Substantial Interest ..................................................... 7

B. My Interests May Be Impaired Without Intervention ....................................... 7

C. No Existing Party Represents My Interest .................................................... 7

D. Judicial Recognition and Discovery Filings Confirm My Relevance ............................. 8

E. Public Commitments by Named Parties Support Intervention ...................................... 8

F. Protected Advocacy and Civil Rights Interests Support Intervention................................... 8

G. Procedural Risks of Cultural Misrecognition Support Intervention

H. Branded Cross-Promotion and Identity-Linked Commercialization

CONCLUSION ................................................................................................. 9

**TABLE OF AUTHORITIES**

**Cases:**

100Reporters LLC v. D.O.J., 307 F.R.D. 269 (D.D.C. 2014) .................................................. 3, 7, 8

Doe v. Public Citizen, 749 F.3d 246 (4th Cir. 2014) .................................................. 2

Fund for Animals, Inc. v. Norton, 322 F.3d 728 (D.C. Cir. 2003) .............................................. 7

In re Subpoena to Goldberg & Associates, PLLC, 693 F. Supp. 2d 81 (D.D.C. 2010) ........... 2

Lohan v. Take-Two Interactive Software, Inc., 31 N.Y.3d 111 (2018) ................................... 5

Lopez v. Gap, Inc., 883 N.Y.S.2d 34 (1st Dep't 2009) ................................................. 5

Messenger v. Gruner + Jahr, 94 N.Y.2d 436 (2000) ................................................. 5

N.Y. Pub. Interest Research Grp. v. Regents of Univ. of State of N.Y., 516 F.2d 350 (2d Cir. 1975) .......................................................... 2

Trbovich v. United Mine Workers, 404 U.S. 528 (1972) ....................................................... 7, 9

United States v. City of New York, 198 F.3d 360 (2d Cir. 1999) ............................................... 2

Wolpe v. Poretsky, 144 F.2d 505 (D.C. Cir. 1944) ................................................... 2

**Rules:**

Federal Rule of Civil Procedure 24(a)(2) ........................................................ 1, 2, 7, 9

Federal Rule of Civil Procedure 26(b)(1) ................................................................. 3

**INTRODUCTION**

This Memorandum supports the accompanying Notice of Motion and Proposed Complaint filed by Brett Douglas McDowell ("Movant") under Federal Rule of Civil Procedure 24(a)(2).

Key Facts (concise).  On April 27, 2025, Movant served a preservation letter (ECF No. 90) identifying potential misuse of his likeness in the characters "Dogpool" and "Nicepool."  On May 12, 2025, Venable LLP listed Movant as an "Interested Party" for notice purposes in related subpoena litigation now pending in the District of Columbia (D.D.C. No. 1:25-mc-00060-RJL, Ex. A).  Discovery and protective-order motions in this Court expressly reference Movant's name and disclosures.

Movant seeks intervention to protect his legal interests in (i) preventing racialized retaliation and reputational harm and (ii) ensuring that unauthorized uses of his and his spouse's lived experiences, likenesses, and protected disclosures in derivative media content are fully and fairly addressed in discovery.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 24(a)(2) permits intervention as of right where the applicant:

1. Claims an interest relating to the property or transaction that is the subject of the action,

2. Is so situated that disposing of the action may impair or impede the movant's ability to protect that interest, and

3. Shows that existing parties do not adequately represent that interest.

Courts have consistently held that Rule 24(a)(2) should be interpreted broadly in favor of permitting intervention where reputational, privacy, or cultural harms may arise absent participation. See *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972); *Doe v. Public Citizen*, 749 F.3d 246, 263 (4th Cir. 2014); *Wolpe v. Poretsky*, 144 F.2d 505, 508 (D.C. Cir. 1944). Where third-party identity, narrative likeness, or protected disclosures are at stake—as in cases of symbolic retaliation or appropriation—courts have upheld intervention to safeguard those interests. See *100Reporters LLC v. DOJ*, 307 F.R.D. 269, 275–79 (D.D.C. 2014); *In re Subpoena to Goldberg & Assocs.*, 693 F. Supp. 2d 81, 83–84 (D.D.C. 2010). In civil rights and public interest cases, Rule 24's application is even more flexible. See *N.Y. Pub. Interest Research Grp. v. Regents of Univ. of State of N.Y.*, 516 F.2d 350, 352–53 (2d Cir. 1975).

Courts interpret Rule 24(a)(2) broadly, particularly in cases involving reputational harm, privacy concerns, or public interest implications. This is especially true in the Second Circuit, where the threshold for intervention is deliberately low.[1]

**FACTUAL AND EVIDENTIARY BASIS FOR INTERVENTION**

I respectfully acknowledge the Court's ruling at Dkt. No. 220 that discovery and subpoena compliance involving Venable LLP falls within the jurisdiction of the United States District Court for the District of Columbia. To the extent my identity and prior submissions are included in that matter—as reflected in Document 1-2, Page 9 of 20—I intend to preserve and assert my

---

[1] See *United States v. City of New York*, 198 F.3d 360, 365 (2d Cir. 1999) ("The words 'may be' in the rule set a low threshold for intervention."); see also *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972) (the burden of showing inadequate representation "should be treated as minimal").

interests through appropriate filings in that jurisdiction. My references to those proceedings here are made solely to demonstrate the procedural and reputational landscape in which related portrayals and disclosures emerged, not to request relief outside this Court's jurisdiction.

While the subpoena served on Venable LLP was issued in connection with this proceeding, it is being adjudicated in the District of Columbia pursuant to FRCP 45(d)(3). I acknowledge this procedural structure and note that I have been formally listed as an Interested Party in that matter (Dkt. 1-2, p. 9). I raise references to the D.C. subpoena here solely to contextualize my inclusion in materials relevant to the broader discovery and reputational concerns at issue in this case.

This jurisdictional bifurcation—where I am procedurally implicated in both this Court and the District of Columbia—further compounds the burden of protecting my disclosures and interests. As a nonparty, I am now required to engage with parallel dockets simply to ensure that my identity, evidence, and prior warnings are not mischaracterized across incompatible procedural channels. That burden itself is highly relevant to the proportionality and necessity of intervention in these proceedings.

Movant emphasizes that he does not seek relief extending beyond this Court's jurisdiction, nor does he seek to duplicate discovery processes already underway in the District of Columbia. Rather, this motion ensures coherent and comprehensive treatment of discovery and evidentiary issues that materially affect Movant's rights, as already acknowledged by this Court.

**Acknowledged Preservation and Discovery Material Involving Me**

On April 27, 2025, I submitted a formal Request for Preservation and Disclosure concerning the

characters Dogpool and Nicepool, directed to Marvel Entertainment, Disney, and legal counsel representing Reynolds and Wayfarer. The letter was acknowledged and docketed as Dkt. No. 90 in the Southern District of New York. Judge Lewis J. Liman issued a memo endorsement recognizing the filing and advising that intervention is the proper procedural vehicle.

**Inclusion by Taylor Swift's Legal Representation via Venable LLP**

On May 12, 2025, court filings in the District of Columbia confirmed that Taylor Swift's representatives were involved in discovery compliance through Venable LLP. I was listed as an "Interested Party" in records accompanying the subpoena dispute under Case No. 1:25-mc-00060-RJL, Document 1-2, Page 9 of 20.

This confirms that my identity and disclosures were known to Swift's legal team and considered potentially relevant. Accordingly, I respectfully request access to any such documents referencing my name, disclosures, likeness, or prior preservation request.

**Wayfarer's Characterization of Third-Party Relevance**

In Document 217 (filed May 14, 2025), Bryan J. Freedman, counsel for the Wayfarer Parties, submitted a letter referring to communications involving Taylor Swift's team as attempts to intimidate or coerce a percipient witness. The letter was struck by the Court in Document 220 as procedurally improper, and the accompanying affidavit (Dkt. 219) was also removed from the docket. While I do not rely on those materials, the letter's initial inclusion illustrates the reputational and procedural environment in which my disclosures are situated. More critically, I

am formally listed as an "Interested Party" in the D.C. subpoena proceedings (D.D.C. Case No. 1:25-mc-00060-RJL, Document 1-2, Page 9). That inclusion confirms that materials referencing me are part of the discovery landscape across both jurisdictions. Given the fragmented record and competing characterizations of relevance, my participation in this case is necessary to ensure that references to me—across either venue—are not misinterpreted, selectively excluded, or procedurally obscured. The need for judicial clarity and fair treatment of identity-linked disclosures justifies intervention under Rule 24.

### Marvel's Subpoena and Protective Motion (Dkt. No. 86)

Marvel filed a Motion to Quash that included discovery demands for documents related to "Nicepool" and to Baldoni. My April 27 letter references both subjects explicitly.

Movant acknowledges Marvel's legitimate proprietary interests as expressed in their Motion for Protective Order (ECF No. 86) and does not seek to challenge or compromise those protections. Movant's requests are narrowly tailored to seek only documents or communications that explicitly reference Movant by name, likeness, disclosure history, or concerns raised in Movant's April 27, 2025 preservation letter. Movant does not seek scripts, plot outlines, or creative assets unrelated to the portrayal, use, or internal handling of such references. Nothing in this request waives or limits Movant's right to raise concerns regarding the racialized appropriation or exclusion of Indigenous identity in relevant character development or internal review.

### Material Pattern of Appropriation and Retaliation

I and my spouse experienced alleged retaliation for disclosures made to Disney, Marvel,

Lionsgate and Ubisoft affiliates, involving *Free Guy*, *Mythic Quest*, and *Deadpool & Wolverine*. These included incorporation of trauma narratives, visual motifs, and character themes without consent.

Disney and Marvel's prior failures to act upon explicit notices of harassment, retaliation, and cultural appropriation have effectively permitted an environment in which racialized retaliation is normalized. Such inaction directly facilitated the continued targeting of myself and my family, thereby intensifying the retaliatory harm alleged here. This prior notice and subsequent inaction are thus critical to understanding and adjudicating the discovery disputes at hand. Such failures are critical to understanding and adjudicating the present discovery disputes.

Overlapping creative personnel—including William Groebe, who is credited across all referenced productions, and Chris Nichols, whose work spans Free Guy and Deadpool & Wolverine—highlight a throughline of creative continuity relevant to this motion. While several key portrayals and visual motifs preceded my April 27 preservation letter, their continued circulation, marketing, and public framing after that notice—particularly in light of prior internal disclosures—raise legitimate concerns regarding symbolic retaliation and reputational targeting.

> This sustained use, despite prior notice, underscores the need for procedural inclusion to ensure my disclosures are not selectively interpreted or omitted from the evidentiary record.

I further note that, should the Court request it, I am prepared to submit a supplemental notice under seal concerning symbolic references in a recent Lionsgate production involving Ms.

Lively. The project appears to contain identifiers closely tied to my private Indigenous family member, including personally identifying information. Although not explicitly named, the traits and contextual cues used align with concerns previously raised in relation to the Apple TV+ series *Mythic Quest*, which shares overlapping creative personnel and is similarly associated with narrative elements that reflect private harm. My complaint to Lionsgate referenced these connections, including continuity across productions involving Ryan Reynolds, Rob McElhenney, and affiliated studios. On June 30, 2023, I received formal correspondence from Lionsgate's legal counsel, Davis Wright Tremaine LLP ("DWT"), rejecting the substance of my complaint, denying any connection to me or Ms. Ishiwata, and threatening legal costs. The pattern of deflective responses—combined with overlapping personnel such as concept artist William Groebe—reinforces the appearance of a controlled creative continuum. These facts, especially when considered alongside Ms. Lively's public framing of her creative process as "mafia style," suggest a reputational framework deliberately designed to target, mock, or isolate women close to me. I do not seek public disclosure of this material in order to protect my sister's privacy, but will provide it under seal if requested by the Court. This pattern of indirect targeting—through women close to me—is consistent with the broader retaliatory tactics documented in this and related filings, and should inform the Court's evaluation of motive, coordination, and reputational impact.

This pattern is further underscored by a previously resolved legal matter involving another closely affiliated party: I previously resolved a legal matter in Canada involving Mr. Hugh Jackman. That proceeding arose under a distinct legal and jurisdictional framework, including Indigenous legal obligations and Canada's implementation of the United Nations Declaration on the Rights of Indigenous Peoples Act (UNDRIP Act). While that matter is not before this Court

and is not raised to import Canadian legal standards, it involved disclosures materially aligned

with the themes raised in this motion—specifically, concerns regarding cultural appropriation,

Indigenous identity suppression, and reputational harm.

Mr. Jackman, Mr. Reynolds, and Ms. Lively have all been publicly represented by the same

prominent entertainment law firm, Sloane, Offer, Weber & Dern LLP (SOWD), which is widely

recognized for its work in reputation-sensitive negotiations, contract management, and legal

strategy for high-profile clients in the film and television industry. Given their shared affiliation

with SOWD, and the close personal and professional ties among the parties, there is a reasonable

basis to infer that communications exist—whether within SOWD, among affiliated counsel, or

between representatives—that reference me, my disclosures, or the subject matter of the

Canadian proceeding.

> Mr. Jackman, who shares representation and public affiliations with Mr. Reynolds
>
> and Ms. Lively, has himself publicly expressed a willingness to be taught by
>
> Indigenous people regarding identity and cultural representation. I reference this
>
> not to cast judgment, but to highlight that the reputational posture of these
>
> individuals includes a stated openness to Indigenous perspectives. Against that
>
> backdrop, the silencing, dismissal, or targeting of disclosures like mine stands in
>
> stark contrast. This disparity reinforces the need for procedural inclusion to ensure
>
> that cultural accountability is not selectively embraced in public while privately
>
> avoided in practice.
>
> This contrast supports my position that participation under Rule 24(a)(2) is
>
> necessary to ensure that disclosures concerning Indigenous identity and lived

experience are not procedurally suppressed or omitted in discovery, particularly where they intersect with the reputational narratives advanced by the named parties.

These communications, particularly where they concern reputational framing, coordinated messaging, or narrative management, are relevant to the discovery issues now before this Court. Their likely existence supports the need for intervention under Rule 24(a)(2), and further justifies narrowly tailored discovery participation under Rule 26(b)(1), limited to materials referencing my identity, disclosures, or the prior resolution involving Mr. Jackman. Nothing in this statement is intended to waive confidentiality protections, legal rights, or jurisdictional positions previously asserted in other proceedings.

The symbolic retaliation and reputational suppression reflected in these patterns also raise legal questions of procedural fairness and expressive exclusion under well-established civil rights principles. These concerns are addressed in further detail in Section F of the Legal Argument below.

I have long-standing involvement in Indigenous rights advocacy, particularly concerning identity fraud in institutional and cultural spaces. My public association with figures such as Jackie Keeler—one of the founding voices behind *Not In Our Honor*—and related Indigenous advocacy movements places me within reputation-sensitive networks engaged in the exposure of Indigenous identity misrepresentation.

These networks engage with identity-sensitive matters, including public discourse surrounding Indigenous representation, tribal legitimacy, and the misappropriation or self-assertion of Indigenous status. Ms. Lively's prior public statements regarding Cherokee ancestry—controversial within some Indigenous advocacy spaces—reflect how reputational narratives about identity may shape cultural branding, influence creative decision-making, or prompt narrative control. While Movant does not raise these controversies for adjudication, their cultural relevance and symbolic weight further underscore the need for procedural protections and fair participation in proceedings where identity-linked disclosures have already been referenced or implicated in discovery.

In 2023, *Not In Our Honor*, a public Indigenous advocacy movement, issued a respectful public appeal to Ms. Swift regarding her association with the Kansas City Chiefs and the team's symbolic practices, including the "Tomahawk Chop." The appeal highlighted the influential role of high-profile cultural figures in shaping public narratives surrounding Indigenous identity and representation. Movant, as a Red River Métis citizen, cannot disengage from these dynamics—particularly when identity-linked disclosures are sidelined in media connected to those same cultural ecosystems.

Although Ms. Swift has not publicly participated in the "Tomahawk Chop" and has exercised visible restraint around its most controversial aspects, Ms. Lively's longstanding and highly publicized friendship with Ms. Swift may have been leveraged for reputational influence. Movant submits that this proximity, paired

with Ms. Lively's involvement in identity-sensitive entertainment narratives, may have contributed to internal branding or legal decisions that deprioritized or marginalized Indigenous disclosures. If internal communications used Ms. Swift's symbolic stature to shield decisions made by Ms. Lively—whether explicitly or implicitly—this would raise concerns of reputational coercion and symbolic retaliation.

These dynamics are relevant not to assign personal motive to Ms. Swift, but to underscore how narrative gatekeeping may operate within informal influence networks, particularly when brand protection and racial discomfort converge. Movant notes that Ms. Lively's editorial and branding decisions—especially those now under discovery—occur within a reputational framework that has meaningful implications for how Indigenous advocacy is understood and acted upon. Given Movant's visible public advocacy, including Indigenous-facing disclosures related to entertainment media and cultural branding, there is a reasonable basis to believe that his identity, positions, or communications may have been referenced in internal messaging or strategic communications involving PR, legal, or branding decisions now subject to discovery.

Movant acknowledges the complex cultural expectations placed on Ms. Swift, particularly as a high-profile woman navigating relationships and public symbolism in a racially charged context. It appears she has attempted to balance personal associations with public restraint, and Movant expresses sympathy for the no-win position such situations often create—especially when both Indigenous peoples and fans hold strong, deeply felt perspectives. The concern

raised here is not with Ms. Swift's conduct, but rather with the reputational

leverage that may have been projected through her image by others.

These associations and activities fall squarely within the sphere of protected

expressive advocacy. As the Supreme Court has recognized, even indirect

government or institutional actions can abridge the right to associate and speak

freely, particularly in identity- or reputation-sensitive contexts. See *NAACP v.*

*Alabama*, 357 U.S. 449, 461–62 (1958) (noting that "abridgment of such rights,

even though unintended, may inevitably follow from varied forms of

governmental action").

These connections are relevant here because they intersect with issues of

symbolic retaliation, narrative suppression, and reputational

management—concerns central to this proceeding. Given Ms. Lively's prior

public scrutiny regarding Indigenous ancestry and the shared institutional

affiliations with other named parties, the potential chilling effect on disclosures

concerning Indigenous identity and cultural suppression—particularly in

cross-border and Canadian contexts—further supports my procedural inclusion

under Rule 24(a)(2). [2]

In text messages referenced in these proceedings, Ms. Lively has described

certain individuals as "dragons," a term that may reflect protective

---

[2] See *United States v. City of New York*, 198 F.3d 360, 365 (2d Cir. 1999) ("The words 'may be' in the rule
set a low threshold for intervention."); *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)
(requiring only a minimal showing that representation "may be" inadequate).

reputational structures or informal influence networks within the entertainment industry. Within the context of this motion, such language raises concerns about symbolic gatekeeping and reputational shielding that may contribute to the procedural and narrative exclusion of Indigenous advocates and disclosures. While I do not allege misconduct based solely on that language, it is contextually relevant to the chilling effect and reputational risks I have identified, particularly where those aligned with cultural whistleblowing or identity-based advocacy are disproportionately impacted.

Given the public scrutiny Mr. Jackman has faced for alleged erasure of Indigenous identity in casting and narrative roles, and his well-documented personal and professional alignment with Mr. Reynolds and Ms. Lively, the symbolic exclusion of Indigenous themes across their shared productions may reflect reputational risk management. In the context of this motion, such associations inform the factual basis for symbolic targeting, reputational erasure, and the procedural need for intervention to ensure Indigenous disclosures are neither silenced nor distorted.

The Wayfarer Foundation—publicly affiliated with Mr. Baldoni—maintains a stated mission of supporting Indigenous communities. I do not allege any misconduct by Mr. Baldoni or the Foundation. However, the broader effect of reputational and symbolic retaliation associated with the actions of Ms. Lively and Mr. Reynolds has chilled support and discouraged institutional allies, particularly within the entertainment industry. That includes actors and

organizations that might otherwise align with Indigenous advocacy. This chilling

effect underscores the marginalization of disclosures like mine and should inform

the Court's evaluation of motive, power dynamics, and narrative control.

(*Trbovich v. United Mine Workers*, *Fund for Animals*.)

## LEGAL ARGUMENT

### A. I Have a Direct and Substantial Interest

Movant has identified the unauthorized use of personal, cultural, and trauma-linked elements

closely tied to productions at issue, including *Deadpool & Wolverine*, *Mythic Quest*, and *Free

Guy*. These include symbolic representations—such as the characters Dogpool and

Nicepool—that align closely with Movant's protected disclosures, lived experience, and family

identity. As a citizen of the Red River Métis Nation, Movant raises these concerns not as abstract

commentary, but as identity-linked harms with racialized implications. The incorporation of

culturally coded imagery, trauma narratives, and relational identifiers without consent reflects a

broader pattern of symbolic appropriation and reputational targeting. These connections establish

a direct and legally cognizable interest in the subject matter of the underlying discovery and

protective order proceedings.

### B. My Interests May Be Impaired Without Intervention

Without intervention, Movant's ability to ensure that his identity-linked disclosures—many of

which are already referenced in the record—are accurately represented and procedurally

protected would be impaired. Discovery findings and protective orders could materially affect

how lived experience, authorship, and reputational harm are interpreted, especially in light of

prior mischaracterizations and symbolic exclusion. Movant respectfully submits that, given the

private control structures already documented in the record, and the risk of selective disclosure or narrative filtration, participation under Rule 24(a)(2) is necessary to preserve a fair and complete evidentiary record. These risks are not speculative—they are reflected in ongoing litigation filings and communications by the named parties themselves. Intervention is therefore required to prevent procedural exclusion, reputational distortion, and the sealing or misrepresentation of disclosures tied to Indigenous identity and protected expressive activity.

### C. No Existing Party Represents My Interest

The current parties are either adverse to me or constrained by institutional conflicts that preclude them from representing my interests. My disclosures concern Indigenous identity, authorship, and reputational harm linked to symbolic retaliation and identity fraud—issues already implicated in this case. These disclosures include evidence of harassment targeting my wife and a private family member, mirrored in media portrayals such as the character *Nicepool*. No party is positioned to represent the intersecting narrative, cultural, and reputational risks I face. Under Rule 24(a)(2), I have a right to ensure these disclosures are not excluded, distorted, or sealed without procedural representation.[3]

Movant's attempt to resolve these matters through culturally appropriate and non-adversarial means is further evidenced by a March 24, 2022 email to Ms. Leslie Sloane proposing a traditional Indigenous healing circle. The absence of any institutional response—followed by narrative targeting across multiple branded productions—demonstrates that Movant's Indigenous

---

[3] U.S. courts have recognized that disclosures tied to racial or cultural identity—including those involving symbolic retaliation, exclusion from institutional narratives, or reputational containment—may support intervention under Rule 24(a)(2). See *100Reporters LLC v. U.S. Dep't of Justice*, 307 F.R.D. 269, 273–75 (D.D.C. 2014); *Doe v. Public Citizen*, 749 F.3d 246, 263 (4th Cir. 2014). See also *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573–74 (1995) (protecting expressive identity as speech); and N.Y. Exec. Law § 296 (New York Human Rights Law prohibits identity-based discrimination and retaliation in public and institutional settings).

disclosure pathways were not only unrepresented, but actively excluded. This reinforces the procedural necessity of Rule 24 intervention to prevent further erasure of  Red River Métis perspectives and restorative options.

## D. Judicial Recognition and Discovery Filings Confirm My Relevance

I have already been docketed in this matter (Dkt. 90) and expressly referenced in protective and subpoena-related filings, including in the Venable matter involving Taylor Swift. The Court's directive at Dkt. 90 explicitly advised that intervention under Rule 24 would be the appropriate procedural vehicle, thereby confirming both the timeliness and propriety of this motion.

The Court's subsequent decision to strike Document 217 on jurisdictional grounds—while permitting the accompanying affidavit (Dkt. 219) to remain part of the record—further fragmented my ability to respond. As an Interested Party named in related D.C. proceedings, I was procedurally implicated in evidentiary materials without any standing to reply, despite their reputational impact.

This jurisdictional fragmentation—now formally acknowledged by the Court in Dkt. 220—creates a real risk that disclosures referencing me will be mischaracterized or excluded without adequate procedural representation. At the time I was named in a discovery-related filing by Venable LLP (May 12, 2025), I lacked standing to respond due to the Court's prior directive (Dkt. 90), which required this motion to intervene.

As such, I was formally drawn into active proceedings while unable to meaningfully participate—until now. That sequence reinforces both the necessity and urgency of my

intervention under Rule 24 to protect my evidentiary and reputational interests across these related forums.

Even if the filing was intended as a case history, the moment it was submitted in a sworn declaration to support a discovery motion—and included my name as an Interested Party—it became part of the evidentiary record. Under Rule 24, that procedural exposure entitles me to intervene to protect my interests.

Because I am named in Exhibit B (Document 1-2, Page 9) submitted in a sworn discovery filing by Venable LLP, I am procedurally exposed under U.S. law. My inclusion carries evidentiary weight, and under Rule 24, I am entitled to intervene to ensure my disclosures are not mischaracterized or sealed without notice.

Movant's limited discovery requests—focused on materials that reference his identity, disclosures, likeness, or preservation-related communications—fall squarely within the scope of Rule 26(b)(1). These materials are relevant to the claims and defenses in this matter and are proportional to the needs of the case, particularly in light of the reputational, procedural, and cultural interests at stake.

**E. Public Commitments by Named Parties Support Intervention**

This section should also be understood in the context of the formal Request for Preservation and Disclosure submitted on April 27, 2025 (Dkt. 90), which included detailed, good-faith notice of symbolic, reputational, and trauma-related concerns affecting both myself and my spouse. That letter was addressed to Marvel, Disney, and legal counsel representing Mr. Reynolds and Ms.

Lively, and it outlined concrete risks of misappropriation, narrative harm, and symbolic retaliation.

In April 2024, Ms. Lively accepted a *TIME 100* award and delivered remarks that publicly affirmed her commitment to civil rights and racial justice. Her participation in that forum, alongside other honorees recognized for advancing equity and social inclusion, reinforces the principle that disclosures concerning racialized identity, cultural suppression, and representational harm must be fairly and transparently addressed. The values invoked by Ms. Lively in that context support—rather than oppose—procedural inclusion of disclosures like mine, particularly where symbolic retaliation or reputational exclusion may be at issue. Allowing this intervention ensures that civil rights frameworks publicly endorsed by parties to this case are upheld through procedural inclusion, rather than selectively applied through narrative control.

Despite this advance notice—and prior to my obtaining standing through this motion—my name and disclosures were nonetheless included in discovery filings submitted by Venable LLP. The absence of any formal response or mitigation by the named parties following the April 27 notice reinforces the need for procedural inclusion and demonstrates that my intervention is not opportunistic, but rooted in well-documented, pre-existing disclosure. Courts have recognized that intervention may be appropriate to protect third-party interests in reputationally or identity-linked materials.[4]

See *100Reporters LLC v. U.S. Dep't of Justice*, 307 F.R.D. 269, 278 (D.D.C. 2014) (granting intervention to protect reputational interests where documents at issue implicated the proposed intervenor's identity and public standing).

---

[4] See *100Reporters LLC v. U.S. Dep't of Justice*, 307 F.R.D. 269, 278 (D.D.C. 2014) (granting intervention to protect reputational interests where documents at issue implicated the proposed intervenor's identity and public standing).

Public representations and private communications made by key parties to this case—including Justin Baldoni and Blake Lively—further support the procedural fairness of permitting intervention. Mr. Baldoni has cultivated a public identity centered on empathy, trauma-informed advocacy, and the protection of marginalized voices. Ms. Lively, while publicly aligning herself with campaigns focused on the narrative agency and dignity of women, has privately characterized her editorial approach as "mafia style," as reflected in court filings.

That juxtaposition—between a public commitment to protecting unjustly marginalized voices and private messaging suggesting reputational control—reinforces Movant's concern that disclosures involving symbolic retaliation or Indigenous identity may have been filtered or excluded.

This section is further supported by recent public statements made by Ms. Lively during a May 2025 interview on *Late Night with Seth Meyers*, where she stated, "I see so many women around afraid to speak, especially right now. Fear is by design. It's what keeps us silent." She continued, "As a woman, you can use your voice — that's kept me strong and helped me in my belief and my fight for the world to be safer for women and girls." These declarations reinforce the importance of ensuring that disclosures involving symbolic retaliation or reputational harm—particularly those tied to women, Indigenous identity, and trauma—are not excluded from discovery proceedings where her work may play a role.

Movant notes that his spouse, Eiko Ishiwata, is a Japanese-Canadian woman and independent composer who raised trauma-linked disclosures—including concerns about creative appropriation, narrative exclusion, and retaliation within male-dominated media spaces. Her work was closely aligned with the original IP now implicated in this matter. Despite her

protected activity and clear public authorship, she has faced institutional silence, reputational isolation, and exclusion from media spaces. The selective sidelining of women like Eiko—whose disclosures were culturally grounded and trauma-informed—stands in sharp contrast to Ms. Lively's public messaging. That contradiction reinforces the need for procedural participation to ensure that voices Ms. Lively purports to support are not filtered, erased, or co-opted within closed reputational networks.

These expressions suggest a baseline consent to the inclusion of perspectives that seek to clarify reputational or symbolic concerns arising from their creative output—particularly where such concerns are already documented in court records. The intervention sought here does not allege personal misconduct, but instead requests participation to ensure that disclosures, symbolic representations, and reputational narratives are not mischaracterized or excluded. Denying intervention under these circumstances—particularly where the intervenor has already been formally named in discovery-related filings across jurisdictions—would be inconsistent with the values promoted by these parties and could be construed as undermining the procedural transparency they publicly support.

## F. Protected Advocacy and Civil Rights Interests Support Intervention

Movant's long-standing advocacy concerning Indigenous identity suppression, identity fraud, and cultural misrepresentation falls within the scope of protected expressive activity.

In March 2022, Movant attempted to resolve the matter through a culturally grounded, non-adversarial method by proposing a traditional healing circle hosted by an Indigenous elder.[1] This offer—made directly to Ms. Leslie Sloane—was consistent with Red River Métis traditions and represented a good-faith effort to address harm through Indigenous relational frameworks

rather than litigation. The absence of any meaningful response or engagement with that proposal, followed by increased narrative targeting and symbolic appropriation, underscores the procedural risks that arise when Indigenous disclosures are dismissed. That the offer was ignored further reflects the chilling effect and reputational suppression that necessitate procedural inclusion under Rule 24(a)(2).

These disclosures are not merely reputational—they arise from years of Indigenous advocacy and public engagement with racial stereotyping in sports and entertainment contexts. In 2023, the organization *Not In Our Honor* issued a public appeal to Ms. Swift regarding the Kansas City Chiefs' branding. While Ms. Swift has refrained from engaging in the most controversial practices, her symbolic position—and her public alignment with Ms. Lively—reflect the cultural terrain in which Indigenous voices operate. Movant raises this context not to critique Swift, but to show how reputational proximity can shape narrative access, particularly when branding, public image, and internal communications converge. This further supports inclusion under Rule 24, where disclosures like Movant's have already been implicated in discovery.

By contrast, Mr. Reynolds's statement—"I've realized that I'm too big to fail at this point, so I just crush my enemies and drink their blood"—may be framed as humor, but Movant's experience reflects how such rhetoric can operate in practice: not as satire, but as a signal of cultural and reputational dominance. Movant's disclosures concerning Indigenous misrepresentation and symbolic appropriation were not made from a place of power, but of conscience—yet they were met with exclusion, narrative targeting, and public imagery that closely mirrors prior protected disclosures. In that context, what may appear to be dark humor from a powerful figure can function as symbolic retaliation, especially when directed at those with less institutional support or platform. This power asymmetry—where protected speech is

recoded as betrayal and then mocked or silenced—demonstrates why procedural participation under Rule 24 is essential to ensure that identity-linked disclosures are not reframed, excluded, or erased.

Movant raises this not to personalize the issue, but to highlight the cultural and procedural risks that arise when high-profile individuals interpret disclosure as disloyalty and leverage reputational influence as a form of narrative control.

As previously noted in the factual section of this motion, Ms. Lively described her and Mr. Reynolds's editorial oversight as "mafia style" in private correspondence now part of the discovery record. In the same exchange, she stated that creative decisions were "led by me, Ryan, and [REDACTED]," and that they would "make sure to weed out any lame ideas." While these comments may appear informal, they reflect a closed, reputationally driven narrative process controlled by individuals with substantial influence and no formal accountability structure. Originally raised in connection with symbolic targeting of women close to Movant, this messaging also has direct procedural relevance. It suggests that identity-linked disclosures—such as Movant's concerns regarding Indigenous misrepresentation—may have been excluded, reframed, or mocked through informal editorial filtering, without any opportunity for response. Ms. Lively's role as a lead figure in this process underscores that her participation in reputational framing was active, not peripheral. Under Rule 24(a)(2), Movant's intervention is necessary to ensure that culturally sensitive disclosures are not procedurally erased or distorted through undisclosed influence on narrative materials central to this proceeding.

Exclusion of disclosures like mine from discovery proceedings — particularly when such disclosures are already documented in the record and associated with symbolic retaliation —

raises concerns of chilling effect on protected expressive conduct. As the Supreme Court

recognized in *NAACP v. Alabama*, 357 U.S. 449, 461–62 (1958), "abridgment of such rights,

even though unintended, may inevitably follow from varied forms of governmental action,"

including procedural exclusion. Where identity-based reputational harms are at issue, the risk of

distortion or mischaracterization amplifies the need for procedural inclusion.

The Supreme Court and Second Circuit have both emphasized the low threshold for intervention

in public interest and civil rights cases. See *Trbovich v. United Mine Workers*, 404 U.S. 528, 538

n.10 (1972) (requiring only a minimal showing that representation "may be" inadequate); *United

States v. City of New York*, 198 F.3d 360, 365 (2d Cir. 1999) ("The words 'may be' in the rule set

a low threshold for intervention.").

Movant's identity, advocacy networks, and public disclosures place him in a unique position that

no existing party adequately represents. These expressive interests — directly tied to Indigenous

representation and cultural harm — reinforce the need for participation in the present matter to

ensure fair treatment of protected activity and to safeguard against reputational suppression

through sealed or selectively disclosed materials.

The procedural risks posed by symbolic targeting are further underscored by New York's

statutory protection against unauthorized use of likeness under Civil Rights Law §§ 50–51.

While not directly at issue in this motion, the relevance of these protections supports the

legitimacy of Movant's disclosures and the reputational concerns raised in this case. Courts have

recognized that creative works may violate the statute when a fictional character is clearly

identifiable as a real person. See *Messenger v. Gruner + Jahr*, 94 N.Y.2d 436 (2000); *Lohan v.

Take-Two*, 31 N.Y.3d 111 (2018). Although the court in *Lohan* ultimately found the character

insufficiently identifiable, it reaffirmed the legal standard. In contrast, Movant has provided prior direct disclosures to parties now involved in the productions at issue, including explicit notice of identity-linked concerns involving Indigenous representation and symbolic harm.

These facts distinguish this case from *Lohan v. Take-Two*, where the character was not connected to real-world brands or crossover marketing. Here, the integration of real people (e.g., Paul Mullin as Welshpool) into the Deadpool cinematic and marketing universe demonstrates that these portrayals are both commercialized and narratively constructed around recognizable individuals, increasing the risk of consumer confusion and reputational harm.

The visual and narrative design of Dogpool and Nicepool—when considered alongside those disclosures, service animal identifiers, and derivative imagery—meets or exceeds the identifiability threshold contemplated by New York law. Moreover, the recurrence of such elements across multiple productions—including those involving Mr. Baldoni, whose apparent narrative insertion into the evolving portrayal of Nicepool reflects editorial decisions that may be relevant to discovery regarding motive, symbolic representation, and the potential reframing of protected disclosures—suggests a pattern of symbolic retaliation or reputational suppression rather than coincidence. This pattern further justifies Movant's procedural inclusion under Rule 24(a)(2) to ensure fair treatment of identity-linked disclosures across interconnected discovery tracks.

## G. Procedural Risks of Cultural Misrecognition Support Intervention

As discussed above, the cultural context surrounding Indigenous identity claims—including Movant's affiliation with advocacy networks addressing misrepresentation and contested ancestry—raises a substantial risk that representational harm may go undetected or

misunderstood if Movant is excluded from these proceedings. These harms may be coded in symbolic, reputational, or narrative terms that are not readily recognizable to those outside the affected community. Without procedural participation, there is a real possibility that materials implicating Movant's disclosures will be sealed, minimized, or omitted from fair consideration. Movant's inclusion under Rule 24(a)(2) is therefore necessary to ensure that these disclosures are properly contextualized and that the discovery process reflects the full reputational and identity-based landscape of the dispute.

## H. Branded Cross-Promotion and Identity-Linked Commercialization

The coordinated use of real-world individuals in branded Marvel content further supports Movant's contention that character portrayals in *Deadpool & Wolverine* serve commercial and reputational functions beyond fictional storytelling. For example, Wrexham A.F.C. player Paul Mullin publicly portrays "Welshpool," a regional variant of Deadpool, in tie-in media promoting the film. This character is cross-branded with Wrexham F.C., Aviation Gin (a company associated with Mr. Reynolds), and various Deadpool marketing campaigns. These cross-promotional uses reflect a deliberate strategy to merge real-world likenesses, branding affiliations, and commercial narratives. In this context, the creation and promotion of characters such as Dogpool and Nicepool—who appear to incorporate identifiable traits linked to Movant's likeness, protected disclosures, and registered service animal—cannot be dismissed as creative coincidence. New York courts have held that fictional or stylized characters may violate the right of publicity when they are sufficiently identifiable, even if digitally rendered or used in expressive works. See *Lohan v. Take-Two Interactive Software, Inc.*, 31 N.Y.3d 111, 122–23 (2018). The commercial presentation of these characters in marketing tie-ins and merchandise underscores the risk of unauthorized use and false endorsement. They function not only as

symbolic retaliation, but as part of a broader pattern of reputational and identity-linked commercialization—reinforcing the procedural need for intervention and the reservation of right-of-publicity and Lanham Act claims.

Movant does not seek to challenge creative content generally. However, where fictional characters are visually or symbolically identifiable as real individuals, and where such portrayals occur after protected disclosures and branding warnings, courts have allowed participation and even civil claims. See *Messenger v. Gruner + Jahr*, 94 N.Y.2d 436 (2000); *Lopez v. Gap*, 883 N.Y.S.2d 34 (1st Dep't 2009). The characters Dogpool and Nicepool — now deployed in cross-promotional campaigns involving real individuals and consumer products — are not merely creative expression, but part of a reputational narrative strategy. That strategy engages identity-linked harm and therefore meets the Rule 24 threshold.

This alignment with stated positions further supports permissive intervention under Rule 24(b), as it would aid in the just resolution of discovery questions and mitigate reputational harm without disrupting the Court's management of the case.

Courts have consistently interpreted Rule 24 liberally where reputational, privacy, or cultural harms are at stake and where intervention is the only vehicle for protecting identity-linked interests. See Trbovich, 404 U.S. at 538 n.10; 100Reporters, 307 F.R.D. at 278; City of New York, 198 F.3d at 365.

While some may argue that the symbolic and reputational overlaps described herein are speculative or subjective, courts have long recognized that reputational harms, identity-linked disclosures, and expressive exclusion fall within the scope of protected interests under Rule 24(a)(2). See 100Reporters LLC v. U.S. Dep't of Justice, 307 F.R.D. 269, 278 (D.D.C. 2014).

Movant's disclosures are not speculative — they are documented, time-stamped, and procedurally recognized in filings already before this Court, including:

> *The April 27, 2025 preservation letter, docketed at ECF No. 90, in which the Court directed Movant to file a Rule 24 motion;*

> *The March 24, 2022 email to Ms. Leslie Sloane (Exhibit D), proposing a culturally grounded resolution via healing circle;*

> *The April 1, 2022 notarized affidavit submitted to Marvel Human Resources (Exhibit A), detailing identity-linked harm and narrative misuse; and*

> *Inclusion as an "Interested Party" in subpoena-related filings by Venable LLP, submitted under oath in D.D.C. No. 1:25-mc-00060 and attached to SDNY Dkt. 219.*

Together, these materials demonstrate that Movant's disclosures are not hypothetical but actively implicated in discovery proceedings now before the Court. Intervention is the only mechanism by which Movant can protect against the sealing, omission, or distortion of these disclosures under Rule 24(a)(2).

## RELIEF REQUESTED

Intervenor respectfully seeks:

1.  An Order granting intervention as of right under Rule 24(a)(2), or alternatively, permissive intervention under Rule 24(b);

2.  Access to all discovery and subpoena materials that reference Intervenor, subject to any applicable confidentiality designations;

3.  Explicit leave to participate and be heard on any motion to seal, modify, destroy, or otherwise amend protective orders or discovery designations specifically relating to documents referencing Intervenor's identity, disclosures, or protected likenesses;

4.  Clarification that Intervenor does not seek merits discovery and limits any additional discovery requests to those narrowly tailored to protecting his interests as described herein; and

5.  Such other and further relief as the Court deems just and proper.

**CONCLUSION**

For the foregoing reasons, Movant respectfully requests this Court grant intervention under Rule 24(a)(2) or, alternatively, permissive intervention under Rule 24(b), explicitly limited to preserving his rights concerning discovery referencing him personally, culturally, or reputationally. Movant further seeks procedural clarity and leave to participate in related discovery motions to ensure fair and just consideration of the critical, sensitive, and protected matters raised herein. Denying intervention would create a chilling precedent for Indigenous and

identity-linked disclosures—especially where cultural erasure, reputational branding, and narrative suppression intersect with commercial media.

In such cases, exclusion from procedural participation effectively denies individuals the opportunity to contest symbolic appropriation or control over their own likeness and identity. Movant seeks only fair participation in matters that already involve his identity and disclosures, and does so consistent with Rule 24's low threshold and public interest function.

This motion is timely. Movant filed shortly after being identified in discovery filings (D.D.C. No. 1:25-mc-00060, Doc. 1-2, p. 9) and pursuant to this Court's instruction in ECF No. 90 that a Rule 24 motion would be the proper vehicle for participation. The relief sought is narrowly tailored and will not delay proceedings, burden the parties, or disrupt judicial efficiency. See *United States v. City of New York*, 198 F.3d 360, 365 (2d Cir. 1999) (noting intervention is timely when filed at the earliest opportunity after a party learns their interests may be affected).

Movant additionally requests leave to submit supplemental materials under seal and respectfully requests a hearing should the Court believe that oral clarification of Movant's evidentiary interest or legal standing would aid in its determination.

Respectfully submitted,

/s/ Brett Douglas McDowell

 Brett Douglas McDowell

 c/o Red River Rebellion Ltée

 1460 Chevrier Blvd #200

 Winnipeg, MB R3T 1Y6

legal@redriver-rebellion.ca

+1 204 202 5904

Dated: May 15, 2025

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

---

**In re Subpoena Issued in**

*Lively v. Wayfarer Studios LLC et al.*,

No. 1:24-cv-10049 (LJL)

-----------------------------------------------------------------x

**WAYFARER STUDIOS LLC** and **JUSTIN BALDONI**,

      Plaintiffs,

      –against–

**BLAKE LIVELY**, **RYAN REYNOLDS**, and

**MARVEL ENTERTAINMENT LLC**,

      Defendants.

-----------------------------------------------------------------x

**BRETT DOUGLAS MCDOWELL**,

Proposed Plaintiff-Intervenor.

-------------------------------------------------------------x

**PROPOSED COMPLAINT IN INTERVENTION**

**1. Jurisdiction and Venue**

1.  This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because the underlying consolidated actions arise in part under federal copyright law and are governed by Fed. R. Civ. P. 45 and 26.

2.  The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over state-law interests (right-of-publicity and privacy).

3.  Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the subpoena-related events—including service, enforcement, and motion practice—occurred here.

**2. Parties**

4.  **Proposed Plaintiff-Intervenor Brett Douglas McDowell** is a citizen of Canada and the Red River Métis Nation, residing in Winnipeg, Manitoba. He appears *pro se* on his own behalf.

5. **Wayfarer Studios LLC** is a California limited liability company headquartered in Los Angeles, California.

6. **Justin Baldoni** is an individual domiciled in California and a managing member of Wayfarer Studios LLC.

7. **Blake Lively** is an individual domiciled in New York.

8. **Ryan Reynolds** is an individual domiciled in New York.

9. **Marvel Entertainment LLC** is a Delaware limited liability company with its principal place of business in New York, New York.

## 3. Factual Background (Concise)

10. In prior years, McDowell raised concerns regarding the erasure of Indigenous identities in Marvel and Disney-affiliated productions, the unequal treatment of different Indigenous and racial groups, and the casting of non-Indigenous individuals in Indigenous roles. These concerns were directed to Disney, Marvel, Mr. Reynolds, and Ms. Leslie Sloane. In addition to formal written submissions, McDowell pursued non-public avenues for resolution, including direct outreach and internal reporting, in an effort to avoid public escalation and address the issues constructively. McDowell and his spouse, through their company Studio Ishiwata, had been promoting original IP including *Valiant Mirror* and *The Watcher and the Wraith* in the Montreal game and media sector

when *Mythic Quest*, co-created by Rob McElhenney and produced by Ubisoft, entered

development. Following the release of *Mythic Quest*, *Free Guy*, and *Deadpool &*

*Wolverine*, McDowell observed substantial narrative, visual, and stylistic similarities to

his original works—many of which had been publicly disseminated through marketing

footage, design reels, and gameplay previews.

11. Given the known professional and creative overlaps—including shared personnel and

prior notice to Disney and its affiliates—these similarities, combined with prior protected

activity, support a reasonable inference of appropriation and retaliation.

12. On March 24, 2022, Movant directly contacted Ms. Leslie Sloane to propose a healing

circle led by an Indigenous elder—an approach rooted in Red River Métis cultural values

and traditional non-adversarial resolution.[5] The outreach emphasized the need for

culturally grounded healing and real medicine to address the harms at issue. This early

proposal reflects Movant's longstanding commitment to peace, integrity, and restorative

alternatives outside the litigation system. Despite this good-faith effort, no resolution

followed. Instead, Movant's subsequent disclosures were met with escalating symbolic

and reputational targeting, as described in this motion. The timing of the email—well

before litigation—further underscores both the availability of reconciliation pathways and

the significance of their rejection by other parties.

13. On April 1, 2022, McDowell formally served Marvel Entertainment with a notarized

"Summary of All Incidents Affidavit" via Sara Del Greco, Human Resources, at Marvel's

New York office (1290 Avenue of the Americas, New York, NY 10104). The affidavit

---

[5] *See* Email from Brett McDowell to Leslie Sloane, subject line: "Re: Healing Circle," dated March 24, 2022 (filed as Exhibit D).

documented McDowell's and his spouse's concerns regarding the unauthorized use of

their intellectual property, likenesses, and personal trauma in Disney and

Marvel-affiliated productions including *Free Guy*, *Mythic Quest*, and *Deadpool &*

*Wolverine*. It further detailed the intersection of cultural appropriation, Indigenous

erasure, racialized exclusion, disability-related targeting, and reputational harm, along

with attempts to resolve these matters through non-public channels. This

document—served years prior to the present litigation—establishes early notice,

protected activity, and the material relevance of McDowell's interests to the discovery

now before the Court. (See Exhibit A.)

[6]

14. This includes apparent brand cross-promotion between Marvel IP and Wrexham AFC

iconography in *Mythic Quest*, as well as overlapping production elements in *Free*

*Guy*—projects involving Mr. Reynolds and key personnel previously linked to Disney

and Ubisoft.

15. These efforts preceded the current litigation and underscore the relevance of McDowell's

interest in the matters now under discovery, including the portrayal of "Dogpool,"

"Nicepool," and associated characters.

16. In February 2023, Mr. Reynolds announced the opening of his Maximum Effort

production studio at Pinewood Toronto Studios, located on a roadway named "McDowell

Gate." While Movant does not allege that the naming was deliberately chosen to target

---

[6] The Summary of All Incidents Affidavit was authored in the context of Indigenous and Canadian legal frameworks, including the ongoing integration of the United Nations Declaration on the Rights of Indigenous Peoples (UNDRIP) into Canadian common law. The affidavit was also part of a judicial review process and reflects an evolving recognition of Indigenous testimonial and relational accountability mechanisms. McDowell respectfully submits that his participation is necessary to ensure this document is properly interpreted and not minimized through unfamiliarity with its legal and cultural origins.

him, it is notable that Canada has over one million kilometers of public roads and fewer

than five are believed to bear the name "McDowell." In isolation, this could be dismissed

as coincidence. However, in the context of broader symbolic overlap—including

Dogpool, Nicepool, Wrexham crossover branding, and narrative use of identity-linked

disclosures—this added convergence raises serious concerns. Movant respectfully

submits that these cumulative signals defy statistical coincidence and warrant procedural

scrutiny.[7]

17. Ryan Reynolds and Blake Lively are not merely performers in the referenced productions

but are central to the marketing and brand strategy surrounding them. Mr. Reynolds is a

public co-owner of Wrexham A.F.C., and his image and creative involvement have been

leveraged across promotional content for *Deadpool & Wolverine*, including Aviation Gin

ads, Wrexham Deadpool crossover materials, and branded campaigns involving real

individuals such as Paul Mullin (credited as "Welshpool"). Ms. Lively has also been

publicly involved in promotional tie-ins, brand positioning, and cross-platform media

linked to Deadpool-related properties. These campaigns serve not only to build

anticipation for the films but to commercialize the characters and narrative content they

control. In this context, the symbolic representations of Dogpool and

Nicepool—characters containing specific visual, emotional, and identity-linked traits

previously disclosed by Movant—occur not in isolation but within a broader matrix of

reputational marketing, identity appropriation, and branded synergy that implicates

Movant's interests.

---

[7] See Brent Lang, "Ryan Reynolds to Open Maximum Effort Studio in Toronto," *Variety* (Feb. 23, 2023),
https://variety.com/2023/film/news/ryan-reynolds-maximum-effort-studio-toronto-1235531885.

18. Most recently, Mr. Reynolds's company Maximum Effort launched a branded boxed
    wine, "Ugly Estates," in partnership with E. & J. Gallo. In the official campaign,
    Dogpool is featured as the public spokesperson, portrayed by Peggy the Hairless Pug —
    the same animal cast in *Deadpool & Wolverine*. The product was launched with
    commercial distribution and national press coverage, including a branded tagline and
    narrative voice attributed to Dogpool. These facts confirm that Dogpool is not merely a
    fictional character but a commercial mascot deployed across real-world advertising
    campaigns involving beverage products, telecom, social media, and branded sports
    content.


19. Despite Disney's stated equity policies and commitments to Indigenous inclusion,
    McDowell's prior disclosures were disregarded in a manner inconsistent with those
    internal standards. Moreover, McDowell, a citizen of the Red River Métis Nation,
    observed that disclosures tied to Red River Métis identity were treated with less
    seriousness and care than those associated with other racial or cultural groups—a
    disparity reflective of a broader pattern of institutional neglect.

20. Movant does not allege clinical intent or psychological condition on the part of Mr.
    Reynolds. Rather, the concern arises from a broader pattern of symbolic and reputational
    behavior that reflects a form of narrative dominance—a tendency to publicly control
    meaning through layered storytelling, character branding, and image-based associations
    that target or repurpose real individuals' identities. This pattern includes the visual and
    emotional convergence of characters such as Dogpool and Nicepool with Movant's
    protected disclosures, personal likeness, and service animal, as well as the opening of Mr.

Reynolds's Maximum Effort studio on a roadway named "McDowell Gate."

21. The patterns observed suggest a form of symbolic behavior that reflects narrative compulsion—a psychological need to assert control over meaning, often through aesthetic or reputational channels. When directed at real individuals, such behavior can have destabilizing effects and may function as a form of narrative reprisal or reputational suppression, particularly when directed at individuals who have engaged in protected disclosures. Movant is not qualified to assess any clinical basis for this behavior, but notes that the symbolic architecture deployed exhibits characteristics typically associated with image fixation, narrative dominance, and boundary transgression. In this context, what may be framed as irreverent humor or brand strategy can function as a mode of symbolic exclusion or reputational targeting—particularly when directed at individuals without institutional platform or public voice.

22. This uneven treatment, both procedurally and substantively, further underscores the inadequacy of current party representation and supports intervention under Rule 24.

23. On April 27, 2025, McDowell served a preservation letter (ECF No. 90) identifying potential misuse of his likeness and disclosures in connection with the characters "Dogpool" and "Nicepool." The Court endorsed that letter and advised that a Rule 24 motion was the proper vehicle for participation.

24. On May 12, 2025, Venable LLP, representing non-party Taylor Swift, filed materials in related subpoena enforcement proceedings (D.D.C. No. 1:25‑mc‑00060‑RJL) identifying McDowell as an "Interested Party" for notice purposes only.

25. Discovery and protective-order motions now pending in this Court—and cross-referenced in the District of Columbia—concern documents that explicitly reference McDowell's name, likeness, and disclosures.

## 4. Claims for Declaratory and Injunctive Relief

### Count I – Declaratory Relief (28 U.S.C. § 2201)

13. McDowell realleges paragraphs 1–12.

14. An actual controversy exists regarding McDowell's entitlement to reasonable access to discovery materials that reference him and the scope of any confidentiality designations.

15. A declaratory judgment is necessary to clarify McDowell's rights before evidence is sealed, destroyed, or rendered inaccessible.

### Count II – Protective-Order Participation (Fed. R. Civ. P. 26(c))

16. McDowell realleges paragraphs 1–15.

17. Good cause exists to modify any protective order so that McDowell receives notice and
    an opportunity to be heard before documents identifying him are sealed, clawed back, or
    destroyed.

18. Absent such relief, McDowell will suffer concrete prejudice, including loss of evidentiary
    access and reputational harm.

**Count III – Reservation of Copyright and Right-of-Publicity Claims**

19. McDowell realleges paragraphs 1–18.

20. McDowell expressly reserves substantive claims under Title 17 of the United States Code
    and New York Civil Rights Law §§ 50–51 (and analogous laws) arising from any
    unauthorized use of his protected expression or likeness. New York courts have long
    recognized that § 50–51 prohibits the commercial use of a living person's name, portrait,
    picture, or recognizable persona without written consent. See *Messenger v. Gruner +
    Jahr Printing & Publ'g*, 94 N.Y.2d 436 (2000); *Lopez v. Gap, Inc.*, 883 N.Y.S.2d 34 (1st
    Dep't 2009). While the Court of Appeals ultimately dismissed the claim in *Lohan v.
    Take-Two Interactive Software, Inc.*, 31 N.Y.3d 111 (2018), the court reaffirmed that
    fictional characters may violate the statute where they are sufficiently identifiable as the
    plaintiff.

21. This case differs materially from *Lohan*, where the court found insufficient identifiability. Here, Movant has provided prior notice, distinct identity-linked traits, and a pattern of use in cross-branded marketing. The character design and promotional rollout of Dogpool and Nicepool incorporate recognizable elements of Movant's likeness, family identifiers, trauma-linked disclosures, and the distinctive visual features of his registered service animal.

22. Movant's dog "Starbuck" was a prescribed service animal under Canadian law, based on medical documentation issued in British Columbia. Manitoba law—where Movant resides and continues to assert his legal rights—does not require registration for service animal recognition, and extends protection to prescribed animals assisting with disability accommodations.[89]

---

[8] *See* The Human Rights Code, C.C.S.M. c. H175, s. 9(2)(l); *see also* The Service Animals Protection Act, C.C.S.M. c. S90. Manitoba does not require registration of service animals; legal recognition is based on the function the animal performs and the nature of the disability accommodation. Supporting documentation confirming Starbuck's designation as a service animal under medical supervision is available upon request under seal.

[9] Movant does not place his medical condition at issue in this proceeding and does not waive any rights to confidentiality or medical privacy. References to disability accommodation are limited to the legal status and recognition of his prescribed service animal. Movant further notes that any attempt to litigate his medical records would risk opening discovery into deeply personal experiences and would inevitably raise broader issues surrounding systemic racism in British Columbia's medical system—issues that, while real and significant, are not relevant to the Court's time or these narrowly focused proceedings. See Canadian Medical Association, "Challenging anti-Indigenous racism in health care," https://www.cma.ca/latest-stories/challenging-anti-indigenous-racism-health-care.

This is particularly relevant in the context of Indigenous health disparities. According to peer-reviewed research, nearly 50% of Indigenous people in Canada exhibit symptoms consistent with post-traumatic stress disorder (PTSD), often stemming from intergenerational trauma, systemic neglect, and institutional racism. See Bombay, A., Matheson, K., & Anisman, H. (2014). "The Intergenerational Effects of Indian Residential Schools: Implications for the Concept of Historical Trauma," *Transcultural Psychiatry*, 51(3), 320–338.

Should such inquiry be pursued, Movant respectfully submits that reciprocal discovery into the intent, mental state, and reputational conduct of named parties would become necessary under principles of proportionality and fairness.

23. The commercialization of Dogpool has extended beyond film and merchandise into third-party brand advertising. In April 2025, Maximum Effort and E. & J. Gallo launched a boxed wine product called *Ugly Estates*, marketed with Dogpool as its official "spokesdog."[10] As reported by *The Hollywood Reporter*, the campaign features Peggy the Hairless Pug—credited as Dogpool in *Deadpool & Wolverine*—in advertising and brand materials. This confirms Dogpool's use not as fictional parody, but as a branded commercial mascot.

24. Movant contends that these commercial uses — when viewed alongside earlier disclosures, promotional footage, and character development timelines — reflect appropriation of symbolic and identity-linked elements materially tied to his protected persona and family. These facts support not only McDowell's right-of-publicity reservation under §§ 50–51, but also a Lanham Act § 43(a) false endorsement theory, should discovery confirm a likelihood of consumer confusion regarding his affiliation or approval.

**Declaratory Relief Sought.** Intervenor seeks a declaratory judgment that any use, display, or commercial exploitation of his name, portrait, picture, or voice—including the creation, branding, or marketing of derivative characters such as "Dogpool" and "Nicepool"—without his written consent violates New York Civil Rights Law §§ 50–51. This includes but is not limited to commercial campaigns, merchandising, or promotional use in coordination with corporate partners such as Gallo, Maximum Effort, Mint Mobile, or other affiliates involved in branded character deployment.

---

[10] Ryan Gajewski, "Ryan Reynolds' Latest Business Bet? Boxed Wine, With Dogpool as Its Spokesdog," *The Hollywood Reporter* (Apr. 3, 2025). https://www.hollywoodreporter.com/business/business-news/ryan-reynolds-wine-dogpool-ugly-estates-1235857476/

25. Intervenor reserves all claims arising under the law of Manitoba and the common law of Canada, including appropriation of personality and statutory privacy rights under The Privacy Act, C.C.S.M. c. P125, with respect to any commercialization of Intervenor's name, likeness, or service animal.[11]

26. Intervenor's service animal. Movant's dog "Starbuck" is a registered service animal and an immediately recognizable symbol of Movant's disability accommodation. Unauthorized depictions of the dog, when used in commercial media, create a false association with Movant and risk public confusion as to Movant's endorsement or approval.

**Declaratory/False-Endorsement Claim Reserved.** Intervenor further reserves, and seeks declaratory relief preserving, his right to pursue claims under Lanham Act § 43(a) and New York common-law misappropriation should discovery reveal commercial use of the dog's image likely to cause consumer confusion about Intervenor's affiliation or endorsement.

27. Additionally, the evolution of the character "Nicepool"—initially associated with symbolic traits resembling Movant's disclosures and protected identifiers—appears to have shifted toward a portrayal visually and thematically aligned with named party Justin Baldoni. Mr. Baldoni has independently raised sworn allegations of reputational retaliation and coercive narrative tactics within the same production context. While Movant does not assert Mr. Baldoni's claims here, the convergence between their respective disclosures, symbolic portrayal, and narrative outcomes reinforces a shared evidentiary pattern: namely, the strategic recoding of dissenters

---

[11] Under Manitoba law, appropriation of personality and statutory privacy claims provide an independent basis for Movant's protectable interest. See Athans v. Canadian Adventure Camps Ltd. (1977), 17 O.R. (2d) 425 (H.C.J.).

through commercial storytelling. This overlap supports Movant's procedural

inclusion under Rule 24(a)(2), as both sets of disclosures—Baldoni's and

Movant's—appear to have informed character design and media strategy in ways

that may distort, suppress, or commercialize protected identity-linked expression.[12]

28. Movant further notes that upon encountering the Nicepool character—including its

appearance, narrative tone, and its association with the character Dogpool—he

initially believed the portrayal to be a personal insult or mocking reference directed

toward him. The symbolic references, hairstyle, and visual framing mirrored

previously disclosed identity-linked traits. However, after recognizing the voice,

mannerisms, and thematic behavior more closely aligned with Mr. Baldoni's public

persona, Movant came to understand the character as a composite—one that both

reflected and caricatured distinct real individuals involved in disclosures or

disputes. This evolution raises serious questions of malice, narrative retaliation,

and reputational harm, and reinforces the need for discovery into the creation,

approval, and marketing use of the character.

29. Movant makes no representation as to whether Mr. Baldoni meets the threshold for

statutory protection under §§ 50–51, but notes that the character's evolution from

traits tied to Movant toward traits associated with Mr. Baldoni strengthens the

inference of reputational intent across multiple individuals.

## 5. Prayer for Relief

---

[12] While Movant does not assert a right-of-publicity claim on Mr. Baldoni's behalf, he notes that composite portrayals—though not always actionable under Civil Rights Law §§ 50–51—may still serve retaliatory or reputational functions when informed by protected disclosures. In the case of "Nicepool," the convergence of symbolic traits tied to Movant's disability and public advocacy, followed by a narrative shift toward traits associated with Mr. Baldoni, supports an inference of coordinated narrative targeting. This is particularly relevant in the discovery context, where questions of intent, character design, and reputational framing are central.

**WHEREFORE**, McDowell respectfully requests that this Court:

A. Grant leave to intervene as of right under Fed. R. Civ. P. 24(a)(2), or, in the alternative, permissively under Rule 24(b);

B. Enter a declaratory judgment that McDowell is entitled to receive and review discovery materials that reference him, subject to reasonable confidentiality protections;

C. Modify any protective order to provide McDowell notice and an opportunity to be heard before documents identifying him are sealed, destroyed, or clawed back;

D. A clarification that Intervenor will abide by all existing discovery deadlines and will not serve deposition notices, interrogatories, or requests for production *except those narrowly tailored to the documents described above*; and

E. Such other and further relief as the Court deems just and proper.

Dated: May __, 2025

Respectfully submitted,

/s/ Brett Douglas McDowell

**Brett Douglas McDowell** (*pro se*)

1460 Chevrier Blvd #200

Winnipeg, MB R3T 1Y6

+1-204-202-5904

legal@redriver-rebellion.ca

**CERTIFICATE OF SERVICE**

Pursuant to Local Rule 1.1 and Appendix C of the SDNY Electronic Case Filing Rules &
Instructions, I hereby certify that on May 21, 2025, a true and correct copy of the foregoing
Motion to Intervene and Memorandum of Law—together with supporting materials including the
Notice of Motion, Declaration with Exhibits, and Proposed Complaint in Intervention—was
served via email upon counsel of record in the related matter **Lively v. Wayfarer Studios LLC
et al**., No. 1:24-cv-10049 (LJL), including:

- Counsel for Marvel Entertainment, Disney, and Venable LLP

- Counsel for Wayfarer Studios LLC and Justin Baldoni

- Counsel for Blake Lively and Ryan Reynolds

- Any additional parties referenced in discovery-related motions or protective filings
  involving Movant's April 27, 2025 submission

I hereby certify that on May 21, 2025, I filed the foregoing

(i) Notice of Motion,

(ii) Memorandum of Law, and

(iii) Proposed Complaint in Intervention with the Clerk of Court using the CM/ECF system. The
CM/ECF system will automatically serve these documents on all counsel of record.

Movant is a pro se litigant who initially proceeded via email service in good faith pursuant to
Local Rule 1.1 and Appendix C while finalizing CM/ECF access. This filing now complies with
both the service and docketing requirements of this District.

- 50 -

Respectfully submitted,

/s/ Brett Douglas McDowell

Brett Douglas McDowell

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


In re Subpoena Issued in

Lively v. Wayfarer Studios LLC et al.,

No. 1:24-cv-10049 (LJL)


DECLARATION OF BRETT DOUGLAS MCDOWELL


I, Brett Douglas McDowell, declare under penalty of perjury:


1. I am the Movant in the accompanying Motion to Intervene. I make this

   declaration based on personal knowledge.


2. As a citizen of the Red River Métis Nation and a Canadian resident, my early efforts to raise

these concerns—including the affidavit served on April 1, 2022—were developed within a legal

and cultural framework grounded in Indigenous relational accountability and Canada's evolving

recognition of the United Nations Declaration on the Rights of Indigenous Peoples (UNDRIP).

These frameworks differ significantly from U.S. legal customs and media norms. I now

recognize that certain forms of disclosure or expression may be unfamiliar in American litigation

and at risk of being mischaracterized—particularly in racialized or reputationally sensitive

contexts. My present motion reflects a procedural understanding shaped by that experience, and

seeks only to ensure that those cross-jurisdictional disclosures are not weaponized or distorted in ways that erase their cultural legitimacy or original intent.

3. Attached as **Exhibit A** is a true and correct copy of my preservation

letter dated April 27, 2025 (filed at ECF No. 90).

4. Attached hereto as **Exhibit B** is a true and correct copy of the notarized *Summary of All Incidents Affidavit* that I authored and submitted in connection with protected disclosures raised well in advance of the present litigation. This affidavit reflects trauma-linked disclosures, identity-related concerns, and reputational targeting, and forms part of a broader Canadian legal and cultural context, including the evolving integration of Indigenous legal traditions into Canadian common law pursuant to the United Nations Declaration on the Rights of Indigenous Peoples (UNDRIP).

5.Attached hereto as **Exhibit C** is a true and correct copy of the official **Declaration of Service** executed by licensed process server Michael Whyte, confirming personal delivery of the *Summary of All Incidents Affidavit* to Marvel Human Resources, care of Ms. Sara Del Greco, on March 31, 2022, at 1290 Avenue of the Americas, New York, NY 10104. This notarized proof of service corroborates the timeline of my protected disclosures and demonstrates early, formal notice to parties whose conduct is now implicated in this proceeding. The documentation further supports the timeliness, relevance, and procedural necessity of my intervention under Rule 24.

6. Attached as **Exhibit D** is a true and correct copy of page 9 of Exhibit 1-2

filed by Venable LLP in *In re Subpoena to Venable LLP*, No. 1:25-mc-00060-RJL

(D.D.C.), which lists me as an "Interested Party."

6. Attached as **Exhibit E** – March 24, 2022 Email from Brett McDowell to Leslie Sloane Re:

Healing Circle Request

Executed on May 21, 2025, in Winnipeg, Manitoba.

 /s/ Brett Douglas McDowell

Brett Douglas McDowell, pro se