# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BLAKE LIVELY,<br><br>         Plaintiff,<br><br>v.<br><br>WAYFARER STUDIOS LLC, et al.,<br>Defendants. WAYFARER STUDIOS LLC,<br>et al., Plaintiffs, v. BLAKE LIVELY, et al.,<br><br>         Defendants. | No. 24-cv-10049 (LJL) (lead case) |
| WAYFARER STUDIOS LLC, et al.,<br><br>         Plaintiffs,<br><br>v.<br><br>BLAKE LIVELY, et al.,<br><br>         Defendants. | No. 25-cv-449 (LJL) (member case) |

## BRIEF OF *AMICUS CURIAE* CHILD USA IN SUPPORT OF DEFENDANT BLAKE LIVELY'S MOTION TO DISMISS AND URGING THE COURT TO UPHOLD THE CONSTITUTIONALITY OF CALIFORNIA CIVIL CODE §47.1

Hillary Nappi, Esq.
Hach Rose Schirripa & Cheverie LLP
112 Madison Avenue, 10th Fl.
New York, NY 10016
Tel: 212-213-8311
hnappi@hrsclaw.com
*Counsel of Record for CHILD USA*

Prof. Marci A. Hamilton, Esq.
Founder & CEO, CHILD USA
3508 Market Street, Suite 211
Philadelphia, PA 19104
mhamilton@childusa.org

Jessica Schidlow, Esq.
Legal Director, CHILD USA
jschidlow@childusa.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF *AMICUS CURIAE* CHILD USA ................................ 1

SUMMARY OF ARGUMENT ............................................................ 2

ARGUMENT ...................................................................................... 4

I.   RETALIATORY DEFAMATION LAWSUITS SILENCE SURVIVORS, PERPETUATE MYTHS ABOUT FALSE ACCUSATIONS, AND EXACERBATE THE PUBLIC HEALTH EMERGENCY OF SEXUAL VIOLENCE ....................................................... 4

   A.   Sexual Violence is Pervasive and Vastly Underreported ...................... 5

   B.   Retaliatory Defamation Lawsuits Reinforce the Culture of Silence around Sexual Violence ................................................................. 10

II.  LEGISLATIVE HISTORY AND CONTEXT DEMONSTRATE THAT CALIFORNIA CIVIL CODE §47.1 WAS ENACTED TO ADDRESS EXISTING LEGAL GAPS AND PROTECT SURVIVORS FROM RETALIATORY DEFAMATION CLAIMS ................. 15

   A.   Assembly Bill 933 Was Enacted to Close a Gap in Existing Law ......... 16

   B.   The Legislature Recognized That Robust Remedies Were Necessary to Give the Privilege Meaningful Effect ............................................. 17

   C.   Assembly Bill 933 Reflects California's Broader Legislative Commitment to Empowering Survivors and Increasing Access to Justice ... ................................................................................................. 19

III. CALIFORNIA CIVIL CODE § 47.1 COMPORTS WITH FIRST AMENDMENT PRINCIPLES BY PROTECTING SURVIVOR SPEECH AND DETERRING ABUSIVE LITIGATION ...................................................................................... 21

   A.   Retaliatory Defamation Lawsuits Are Not Protected Petitioning Activity under the First Amendment ............................................. 21

**B.   California Civil Code §47.1 Advances Core First Amendment Values and Serves Compelling State Interests**........................................................24

**IV.   CALIFORNIA CIVIL CODE § 47.1 REFLECTS A NATIONAL TREND TOWARD INCREASED PROTECTIONS FOR SURVIVORS OF SEXUAL VIOLENCE** ..................28

**CONCLUSION**........................................................................................32

**CERTIFICATE OF SERVICE**..........................................................................33

# TABLE OF AUTHORITIES

**Cases**

Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240 (1975).................30

Bensussen v. Tadros, No. BC682869, 2018 WL 2390162, at *1 (Cal. Super. Ct. Mar. 8, 2018) ....................................................................................................17

Bernardo v. Planned Parenthood Fed'n of Am., 115 Cal. App. 4th 322, 361 (2004) ......................................................................................................................30

Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 743 (1983)...................31

Brandenburg v. Ohio, 395 U.S. 444 (1969) ...........................................................32

Briggs v. Eden Council for Hope & Opportunity, 19 Cal. 4th 1106, 1122–23 (1999) ......................................................................................................................29

California Motor Transport v. Trucking Unlimited, 404 U.S. 508, 510 (1972)......28

Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421–22 (1978) ..................30

Depp v. Heard, No. CL-2019-0002911, 2022 Va. Cir. LEXIS 84, at *1 (Va. Cir. Ct. June 24, 2022 ....................................................................................................17

Doe v. Corp. of President of Church of Jesus Christ of Latter-Day Saints, 280 P.3d 377, 386 (Wash. 2012). .......................................................................................37

E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961)..........28

Equilon Enters. v. Consumer Cause, Inc., 29 Cal. 4th 53, 65 (2002) .........18, 29, 30

Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974).....................................32, 34

Gottwald v. Sebert, 172 A.D.3d 445 (N.Y. App. Div. 2019)..................................17

New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964). .................................32

Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 17–18 (1991) .................................30

People ex rel. Lockyer v. Brar, 115 Cal. App. 4th 1315, 1317 (2004) ...................34

Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, 814 F.2d 358, 373 (7th Cir. 1987) ………………………………………………………………………………30

Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc. ("PREI"), 508 U.S. 49, 60–61 (1993) ...................................................................29

Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015) ................................................34

Schroeder v. Irvine City Council, 97 Cal. App. 4th 174, 196 (2002) .....................34

Snyder v. Phelps, 562 U.S. 443, 458 (2011) ..........................................................32

United Mine Workers of Am. v. Pennington, 381 U.S.657 (1965) .......................28

Whitney v. California, 274 U.S. 357, 376 (1927) ...................................................32

Wolfgram v. Wells Fargo Bank, 53 Cal. App. 4th 43, 56 (1997) ....................29, 31

**Statutes**

Cal. Code Civ. Proc. §1001 .......................................................................27

Cal. Code Civ. Proc. §340.16.....................................................................27

Cal. Penal Code §799 .................................................................................27

La. Acts 2024, No. 78 .................................................................................37

N.Y. C.P.L.R. § 214-j (McKinney 2022)....................................................38

N.Y. Civ. Rights Law § 76-a (McKinney 2020) .......................................36

Speak Out Act, Pub. L. No. 117-224, 136 Stat. 2291 (2022)....................37

**Other Authorities**

Angelakis, I., Gillespie, E.L., Panagioti, M., Childhood maltreatment and adult suicidality: a comprehensive systematic review with meta-analysis, PSYCHOLOGICAL MEDICINE 1-22 (2019) .............................................20

Assem. Comm. on Judiciary, Analysis of A.B. 933, 2023–2024 Leg., Reg. Sess. 5–6 (Cal. 2023).................................................................................18, 22, 25, 26, 32

Assem. Comm. on Judiciary, Analysis of Assemb. B. 933, 2023–2024 Leg., Reg. Sess. 2 (Cal. 2023). ...........................................................................................23

Assem. Judiciary Comm., Analysis of A.B. 2587, 2023–2024 Leg., Reg. Sess. (Cal. 2024) ....................................................................................................................38

California Employment Lawyers Ass'n, Statements on AB 933, (Apr. 4, 2025)...20

Catherine Hill & Holly Kearl, Crossing the Line: Sexual Harassment at School, AAUW 11 (2011), available at https://www.aauw.org/research/crossing-the-line/. ....................................................................................................................13, 15

Chai Feldblum & Victoria Lipnic, Select Task Force on the Study of Harassment in the Workplace, U.S. Equal Employment Opportunity Commission (2016), https://www.eeoc.gov/eeoc/task_force/harassment/upload/report.pdf ................14

CHILD USA, 50 State Statutes of Limitations for Sexual Assault and Abuse, https://childusa.org/law. ......................................................................................38

Cora Peterson et al., Lifetime Economic Burden of Rape Among U.S. Adults, 52 AM. J. PREV. MED. 691 (2017) .............................................................................19

D. Finkelhor et al., Sexually Assaulted Children: National Estimates and Characteristics, US Dept. of Justice, Office of Justice Programs (2008) ............14

David Cantor et al., Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct, ASS'N OF AM. UNIV. 13-14 (Sept. 2015), available at https://www.aau.edu/key-issues/aau-climate-survey-sexualassault-and-sexual-misconduct-2015. ...................................................................................................13

DAVID KEATING, ESTIMATING THE COST OF FIGHTING A SLAPP, INST. FOR FREE SPEECH (2022) .....................................................................................................19

David Lisak et al., False Allegations of Sexual Assault: An Analysis of Ten Years of Reported Cases, 16 VIOLENCE AGAINST WOMEN 1318, 1326 (2010) .............21

Deborah Tuerkheimer, Beyond #MeToo, 94 N.Y.U. L. Rev. 1146, 1153–54 (2019 ............................................................................................................18, 20

Deborah Tuerkheimer, Incredible Women: Sexual Violence and the Credibility Discount, 166 U. PA. L. REV. 1, 6–7 (2017) ........................................................21

Delphine Collin-Vézina et al., A Preliminary Mapping of Individual, Relational, and Social Factors that Impede Disclosure of Childhood Sexual Abuse, 43 CHILD ABUSE NEGL. 123 (2015) ..................................................................................15, 18

Emily R. Dworkin et al., Sexual Assault Victimization and Psychopathology: A Review and Meta-Analysis, 56 CLINICAL PSYCHOL. REV. 65 (2017), https://doi.org/10.1016/j.cpr.2017.05.001 ............................................................15

G. Moody, et. al., Establishing the international prevalence of self-reported child maltreatment: a systematic review by maltreatment type and gender, 18(1164) BMC PUBLIC HEALTH (2018) ..............................................................................13

Gail Hornot, Childhood Trauma Exposure & Toxic Stress: What the PNP Needs to Know, J. PEDIATRIC HEALTHCARE (2015) ...........................................................20

Gary Fulcher, Litigation-Induced Trauma Sensitisation, 11 PSYCHIATRY, PSYCH. & L. 79, 82 (2004) ....................................................................................................19

Governor Kathy Hochul, Press Release: Governor Hochul Signs Adult Survivors Act into Law (May 24, 2022) .................................................................................38

H.B. 580, 2025 Leg., Reg. Sess. (N.H. 2025) .........................................................36

Kearl, H., The facts behind the #metoo movement: A national study on sexual harassment and assault, (Feb. 1, 2018), available at https://www.nsvrc.org/sites/default/files/2021-04/full-report-2018-national-study-on-sexual-harassment-and-assault.pdf. ....................................................12

Kimberly A. Lonsway et al., False Reports: Moving Beyond the Issue to Successfully Investigate and Prosecute Non-Stranger Sexual Assault 2–3 (2009) ..................................................................................................................21

Leah M. Slyder, Rape in the Civil and Administrative Contexts: Proposed Solutions to Problems in Tort Cases Brought by Rape Survivors, 68 CASE W. L. REV. 543, 552 (2017) ...........................................................................................................16

M. Stoltenborgh, et. al., <u>A Global Perspective on Child Sexual Abuse: Meta-Analysis of Prevalence Around the World</u>, 16(2) CHILD MALTREATMENT 79 (2011) ............................................................................................13

Michael D. De Bellis & Abigail Zisk, <u>The Biological Effects of Childhood Trauma,</u> 13 CHILD ADOLESC. PSYCHIATR. CLIN. N. AM. 1 (2014), https://doi.org/10.1016/j.chc.2013.06.003. ........................................................15

Michael Planty, et. al., <u>Female Victims of Sexual Violence</u>, 1994-2010, at 7 (2013), https://bjs.ojp.gov/content/pub/pdf/fvsv9410.pdf ................................................16

Michelle Elliott et al., *Child Sexual Abuse Prevention: What Offenders Tell Us*, 19  Child Abuse Negl.  579 (1995) ....................................................................33

Ms. Magazine, "SLAPPing Back: How Defamation Suits Silence #MeToo Voices" (2023). ...............................................................................................16, 18

N. Pereda, et. al., <u>The prevalence of child sexual abuse in community and student samples: A meta-analysis</u>, 29 CLINICAL PSYCH. REV. 328, 334 (2009) ...............13

NAT'L WOMEN'S LAW CENTER, <u>Coming Forward: Key Trends and Data from the TIME'S UP Legal Defense Fund,</u> (Feb. 1, 2022), https://nwlc.org/resource/coming-forward-key-trends-and-data-from-the-times-up-legal-defense-fund/. ........................................................................................16

Office of the Governor, Press Release (Sept. 29, 2020)..........................................27

Patricia A. Resick et al., <u>Effects of a Disclosure Intervention for PTSD</u>, 5 BMJ Open e030705 (2019) ..................................................................................................17

Patrick J. O'Leary & James Barber, <u>Gender Differences in Silencing following Childhood Sexual Abuse</u>, 17 J. CHILD SEX. ABUSE 133 (2008) ..........................14

PAULA HANNAFORD-AGOR & NICOLE WATERS, ESTIMATING THE COST OF CIVIL LITIGATION, 20 CASELOAD HIGHLIGHTS: NAT'L CTR. FOR STATE CTS. 1, 7 (2013). ............................................................................................................19

Perryman Group, <u>Suffer the Little Children: An Assessment of the Economic Cost of Child Maltreatment</u>, (2014) ............................................................................20

<u>Preventing Adverse Childhood Experiences</u>, CDC.GOV..........................................33

RAINN, The Criminal Justice System: <u>Statistics</u>, https://www.rainn.org/statistics/criminal-justice-system ..................................... 16

Ramona Alaggia et al., <u>Facilitators and Barriers to Child Sexual Abuse (CSA) Disclosures: A Research Update (2000-2016)</u>, 20 TRAUMA VIOLENCE ABUSE 260, 279 (2019) ...................................................................................................... 15

Rebecca Campbell et al., <u>Secondary Victimization of Rape Victims: Postrape Responses of Legal System and Mental Health Professionals</u>, 20 VIOLENCE & VICTIMS 55 (2005) ........................................................................................... 17

S.B. 180, 82d Leg. Assemb., Reg. Sess. (Or. 2025) ............................................... 35

S.B. 2419, 2025 Leg., Reg. Sess. (N.Y. 2025) ......................................................... 36

S.B. 549, 2025 Gen. Assemb., Reg. Sess. (Md. 2025) ............................................ 36

SARAH NESBITT & SAGE CARSON, KNOW YOUR TITLE IX, THE COST OF REPORTING: PERPETRATOR RETALIATION, INSTITUTIONAL BETRAYAL, AND STUDENT SURVIVOR PUSHOUT 4-6 (2021), https://www.knowyourix.org/wp-content/uploads/2021/03/Know-Your-IX2021-Report-Final- ............................. 18

Sen. Judiciary Comm., Analysis of Assemb. B. 933, 2023–2024 Leg., Reg. Sess. 5 (Cal. June 13, 2023) ...................................................................................... 24, 25

Sen. Judiciary Comm., Analysis of S.B. 820 (2017–2018 Reg. Sess.) (May 1, 2018) ................................................................................................................. 27

Shaina Weisbrot, *14 <u>The Impact of the #MeToo Movement on Defamation Claims Against Survivors</u>, 23 CUNY L. Rev. 332, 358 (2020) ...................................... 19

Sharon G. Smith et al., <u>The National Intimate Partner and Sexual Violence Survey: 2015 Data Brief – Updated Release</u>, Nat'l Ctr. for Injury Prevention & Control, Ctrs. for Disease Control & Prevention (Nov. 2018), https://stacks.cdc.gov/view/cdc/60893 .................................................................. 12

<u>Stop Silencing Survivors Act</u>, N.Y. Assemb. B. 8076, 2024–25 Leg. Sess., https://www.nysenate.gov ...................................................................................... 37

Susan Rees et al., <u>Believe #MeToo: Sexual Violence and Interpersonal Disclosure Experiences Among Women Attending a Sexual Assault Service in Australia: A</u>

Mixed-Methods Study, 9 BMJ OPEN e026773 (2019), https://doi.org/10.1136/bmjopen-2018-026773. .................................................17

Tex. H.B. 4615, 88th Leg., Reg. Sess. (2025)..........................................................37

THE CULT OF THE CONSTITUTION, 149 (Stanford Univ. Press 2019)......................20

U.S. DEP'T OF ED., Office of the Under Secretary, Educator Sexual Misconduct: A Synthesis of Existing Literature, Washington, D.C., (2004), available at https://www2.ed.gov/rschstat/research/pubs/misconductreview/report.pdf ..13, 16

U.S. DEP'T OF HEALTH & HUMAN SERVICES, Substance Abuse and Mental Health Services Administration, Understanding the Impact of Trauma (2014) ..............15

U.S. DEP'T OF JUST., Off. of Just. Programs, Bureau of Just. Stats., National Crime Victimization Survey, 2019 (2020)......................................................................13

## Constitutional Provisions

Cal. Const., art. I, §3. ...........................................................................................28

U.S. Const., Amend. I ...........................................................................................28

## INTEREST OF *AMICUS CURIAE* CHILD USA[2]

CHILD USA is an interdisciplinary non-profit think tank dedicated to preventing child abuse and neglect and ensuring access to justice for survivors. CHILD USA's mission is to employ in-depth legal analysis and cutting-edge social science research to come up with the best policies needed to increase child protection and the common good.

CHILD USA's Founder, Professor Marci A. Hamilton, is a world-renowned constitutional law scholar, First Amendment expert, and Professor of Practice at the University of Pennsylvania. Her leadership has positioned CHILD USA at the forefront of legal scholarship and advocacy on the intersection of survivor rights and constitutional protections. CHILD USA is also the leading organization to study and track sexual abuse statutes of limitation ("SOLs") through its Sean P. McIlmail SOL Reform Institute and has spearheaded the national movement to align SOLs with the well-established science of delayed disclosure.

The organization has advised Congress, state legislatures, governors, and courts on the constitutionality of revival window legislation, anti-SLAPP protections, and other laws aimed at increasing survivors' opportunities to access

---

[2] Amicus state that no counsel for any party authored this brief in whole or in part and no entity or person, aside from amicus curiae, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

justice. CHILD USA has filed *amicus curiae* briefs in state and federal courts across the country, defending the constitutionality of such laws against First Amendment, Due Process, and Equal Protection challenges, including in cases involving retaliatory defamation claims.

CHILD USA has a strong interest in the outcome of this case which will shape the legal landscape for survivors in California and beyond. CHILD USA offers this brief to demonstrate that California Civil Code §47.1 is both constitutionally sound and essential to protect the rights of survivors of sexual violence, safeguard the integrity of public discourse, and ensure equitable access to justice.

## SUMMARY OF ARGUMENT

Sexual violence remains a pervasive and chronically underreported crime, particularly in cases involving child sexual abuse. Among the most formidable barriers to disclosure is survivors' fears of retaliation which increasingly takes the form of meritless defamation lawsuits designed to intimidate, silence, and punish those who speak out. These lawsuits drain victims' financial resources and cause them extensive emotional, psychological, and reputational harm. Worse still, they chill constitutionally protected speech, deterring survivors from coming forward and obstructing efforts to expose abuse, prevent future harm, and hold perpetrators and institutions accountable.

2

In direct response to this urgent threat, the California Legislature enacted Assembly Bill 933, amending Civil Code §47, to provide absolute privilege for good-faith disclosures of sexual assault, harassment, or discrimination, and meaningful remedies to survivors who are forced to defend against retaliatory defamation lawsuits. Critically, it targets only baseless claims—those that fall squarely within the "sham litigation" exception to Noerr-Pennington immunity— and imposes no liability on legitimate petitioning activity. It simply removes legal recourse for those who abuse the judicial process to suppress survivor speech— speech that rests at the heart of First Amendment protection.

Striking down §47.1 would force survivors into the untenable position of having to choose between remaining silent or facing emotional, reputational, and financial devastation through protracted, abusive litigation. It would also send a dangerous message to other survivors contemplating disclosure—that speaking out may carry intolerable risks—and it would embolden perpetrators and complicit institutions that depend on secrecy to perpetuate cycles of abuse. Such a result would be antithetical to California's long-standing commitment to dismantling barriers to justice for survivors and would frustrate the Legislature's efforts to align the law with our modern scientific understanding of trauma.

The implications of such a ruling would extend far beyond California. States across the country have looked to §47.1 as a model for safeguarding survivor speech,

3

and many have adopted or proposed similar laws. These reforms, alongside nationwide efforts to expand SOLs for child sexual abuse and sexual assault, reflect a growing consensus that survivor expression is essential to public safety and access to justice. Declaring §47.1 unconstitutional would not only place California's protections at risk, but it would also threaten to destabilize this broader national movement.

As the Legislature itself proclaimed, "the era of using defamation lawsuits to muzzle survivors must end." See Assem. Comm. on Judiciary, Analysis of Assemb. B. 933, 2023–2024 Leg., Reg. Sess. 5–6 (Cal. 2023). California Civil Code § 47.1 is a necessary and constitutionally sound vehicle to ensure that it does. To further the State's compelling interests in encouraging the reporting of sexual violence and shielding survivors from further harm, amicus respectfully urges this Court to uphold the statute in its entirety.

## ARGUMENT

## I. RETALIATORY DEFAMATION LAWSUITS SILENCE SURVIVORS, PERPETUATE MYTHS ABOUT FALSE ACCUSATIONS, AND EXACERBATE THE PUBLIC HEALTH EMERGENCY OF SEXUAL VIOLENCE

An absolute privilege for good-faith survivor disclosures is supported by compelling public policy considerations. Sexual violence constitutes a widespread and devastating public health crisis that remains chronically underreported. Survivors face numerous, well-documented barriers to disclosure, including fear of

4

retaliation, stigma, and systemic disbelief—barriers that perpetrators routinely exploit to ensure silence. The rise of retaliatory defamation lawsuits has only deepened this crisis, allowing perpetrators to weaponize the judicial system to discredit survivor accounts, deter others from coming forward, and conceal misconduct. Such lawsuits inflict ongoing harm, reinforce discredited myths about false accusations, and suppress essential public discourse, undermining both individual access to justice and the broader societal imperative of accountability.

## A.    Sexual Violence is Pervasive and Vastly Underreported

Sexual violence is a national public health crisis that affects individuals of every age, gender, race, and background.  An estimated 81% of women and 43% of men report experiencing some form of sexual harassment or assault during their lifetimes.[3] Nearly one in five women (18.3%) and one in seventy-one men (1.4%) in the United States have been raped, with even more reporting other forms of coercion and unwanted sexual contact.[4] Among children, the statistics are even more staggering with at least one in five girls and one in thirteen boys experiencing sexual

---

[33] Kearl, H., The facts behind the #metoo movement: A national study on sexual harassment and assault, (Feb. 1, 2018), available at https://www.nsvrc.org/sites/default/files/2021-04/full-report-2018-national-study-on-sexual-harassment-and-assault.pdf.
[4]  Sharon G. Smith et al., The National Intimate Partner and Sexual Violence Survey: 2015 Data Brief – Updated Release, Nat'l Ctr. for Injury Prevention & Control, Ctrs. for Disease Control & Prevention (Nov. 2018), https://stacks.cdc.gov/view/cdc/60893.

abuse before age eighteen.[5] On average, that means that an American is sexually assaulted every 68 seconds, and every 9 minutes that victim is a child.[6]

In institutional settings, the threat of sexual violence is compounded by steep power imbalances, credible fears of reprisal, and systemic indifference that collectively suppress survivor disclosures. Indeed, more than 4.5 million K-12 students—roughly 10% of all school-aged children—are subjected to sexual misconduct by a school employee.[7] Also 56% of girls and 40% of boys report experiencing sexual harassment.[8] At institutions of higher education, an estimated 62% of women and 61% of men experience sexual harassment, and approximately one in four women report sexual assault.[9]

---

[5] G. Moody, et. al., Establishing the international prevalence of self-reported child maltreatment: a systematic review by maltreatment type and gender, 18(1164) BMC PUBLIC HEALTH (2018); M. Stoltenborgh, et. al., A Global Perspective on Child Sexual Abuse: Meta-Analysis of Prevalence Around the World, 16(2) CHILD MALTREATMENT 79 (2011); N. Pereda, et. al., The prevalence of child sexual abuse in community and student samples: A meta-analysis, 29 CLINICAL PSYCH. REV. 328, 334 (2009).

[6] U.S. DEP'T OF JUST., Off. of Just. Programs, Bureau of Just. Stats., National Crime Victimization Survey, 2019 (2020).

[7] U.S. DEP'T OF ED., Office of the Under Secretary, Educator Sexual Misconduct: A Synthesis of Existing Literature, Washington, D.C., (2004), available at https://www2.ed.gov/rschstat/research/pubs/misconductreview/report.pdf.

[8] Catherine Hill & Holly Kearl, Crossing the Line: Sexual Harassment at School, AAUW 11 (2011), available at https://www.aauw.org/research/crossing-the-line/.

[9] David Cantor et al., Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct, ASS'N OF AM. UNIV. 13-14 (Sept. 2015), available at https://www.aau.edu/key-issues/aau-climate-survey-sexualassault-and-sexual-misconduct-2015.

Workplaces, too, remain fraught with risk, with as many as 85% of women experiencing sexual harassment or assault.[10] These numbers are even higher among women of color, immigrants, low-wage workers, and LGBTQ+ individuals, who often face additional vulnerabilities and reduced access to institutional support.[11]

The pervasive nature of sexual violence is matched only by the silence that surrounds it. Many victims—particularly children—suffer in silence for decades before they talk to anyone about their traumatic experiences. An estimated 70% of child sexual abuse survivors never report their abuse to law enforcement or child protection authorities.[12] Among adult survivors, many wait years—often decades— before disclosing their experiences to anyone. In fact, the best evidence shows that 44.9% of male and 25.4% of female child sexual abuse survivors delay disclosure by more than *twenty years*.[13]

Survivors often delay or avoid disclosure for a host of complex and interrelated reasons. To begin with, survivors frequently contend with post-traumatic stress disorder (PTSD), depression, anxiety, dissociation, and suicidality that make

---

[10] Chai Feldblum & Victoria Lipnic, <u>Select Task Force on the Study of Harassment in the Workplace</u>, U.S. Equal Employment Opportunity Commission (2016), https://www.eeoc.gov/eeoc/task_force/harassment/upload/report.pdf

[11] <u>Id</u>.

[12] D. Finkelhor et al., <u>Sexually Assaulted Children: National Estimates and Characteristics</u>, US Dept. of Justice, Office of Justice Programs (2008), https://www.ojp.gov/pdffiles1/ojjdp/214383.pdf.

[13] Patrick J. O'Leary & James Barber, <u>Gender Differences in Silencing following Childhood Sexual Abuse</u>, 17 J. CHILD SEX. ABUSE 133 (2008).

immediate disclosure difficult.[14] Among child victims, early trauma can profoundly disrupt neurological development, increasing risks for chronic health problems, poverty, substance abuse, and revictimization.[15] Survivors may also delay disclosure due to psychological barriers such as shame, self-blame, or fear of not being believed as well as social factors such as gender-based stereotypes or stigma regarding victimization.[16] Among child sexual abuse victims, fear of negative repercussions such as disruptions in family stability, loss of relationships, or involvement with the authorities can further deter disclosure.[17]

In educational and workplace settings, these fears are often exacerbated by structural and institutional barriers. Confidentiality agreements, forced arbitration, and hostile or dismissive responses to complaints can make reporting feel not only futile but dangerous. It is unsurprising then that up to 94% of individuals who experience workplace sexual harassment never file a formal complaint.[18] Similarly, in the school setting, less than 10% of harassed students in grades 7–12 notify a

---

[14] U.S. DEP'T OF HEALTH & HUMAN SERVICES, Substance Abuse and Mental Health Services Administration, Understanding the Impact of Trauma (2014); Emily R. Dworkin et al., Sexual Assault Victimization and Psychopathology: A Review and Meta-Analysis, 56 CLINICAL PSYCHOL. REV. 65 (2017), https://doi.org/10.1016/j.cpr.2017.05.001

[15] Michael D. De Bellis & Abigail Zisk, The Biological Effects of Childhood Trauma, 13 CHILD ADOLESC. PSYCHIATR. CLIN. N. AM. 1 (2014), https://doi.org/10.1016/j.chc.2013.06.003.

[16] Ramona Alaggia et al., Facilitators and Barriers to Child Sexual Abuse (CSA) Disclosures: A Research Update (2000-2016), 20 TRAUMA VIOLENCE ABUSE 260, 279 (2019).

[17] Delphine Collin-Vézina et al., A Preliminary Mapping of Individual, Relational, and Social Factors that Impede Disclosure of Childhood Sexual Abuse, 43 CHILD ABUSE NEGL. 123 (2015).

[18] Supra, n.8.

school official, and only 11% of college survivors report their experiences to campus authorities.[19]

Notably, fear of retaliation remains one of the strongest deterrents to disclosure across all demographics and settings.[20] Sadly, survivors who come forward have legitimate reason to anticipate that they will suffer adverse consequences as a result. In fact, a national review of more than 3,300 individuals who contacted the Time's Up Legal Defense Fund found that over 70% experienced some form of retaliation after reporting workplace sexual harassment—including termination, demotion, and reprisal or threats by the harasser.[21] More than 15% were explicitly threatened with legal action for disclosing their abuse.[22]

The way individuals and institutions respond to survivor disclosures can be as consequential as the abuse itself. Research shows that hostile or dismissive responses

[19] Supra n.6-7 AAUW, 2011; AAU, 2019.

[20] See Michael Planty, et. al., Female Victims of Sexual Violence, 1994-2010, at 7 (2013), https://bjs.ojp.gov/content/pub/pdf/fvsv9410.pdf (finding that fear of reprisal was one of the most important reasons for victims not reporting rape and sexual assault victimizations between 1994 and 2010); RAINN, The Criminal Justice System: Statistics, https://www.rainn.org/statistics/criminal-justice-system ("Of the sexual violence crimes not reported to police from 2005-2010, the victim gave the following reasons for not reporting: ... 20% feared retaliation[.]");Leah M. Slyder, Rape in the Civil and Administrative Contexts: Proposed Solutions to Problems in Tort Cases Brought by Rape Survivors, 68 CASE W. L. REV. 543, 552 (2017) (observing that rape survivors fear retaliation from their assailants in the form of defamation and malicious prosecution suits and that "[t]his fear may lead some survivors to not report having been raped").

[21] NAT'L WOMEN'S LAW CENTER, Coming Forward: Key Trends and Data from the TIME'S UP Legal Defense Fund, (Feb. 1, 2022), https://nwlc.org/resource/coming-forward-key-trends-and-data-from-the-times-up-legal-defense-fund/.

[22] Id. See Ms. Magazine, "SLAPPing Back: How Defamation Suits Silence #MeToo Voices" (2023).

to survivor disclosures significantly exacerbate psychological harm, including increased rates of major depressive disorder and PTSD.[23]  Many reported feelings of isolation, hopelessness, and a heightened vulnerability to future victimization.[24]

Together, these psychological, social, and institutional forces operate to silence survivors and shield perpetrators. Without legal protections like California Civil Code § 47.1. that address these barriers, disclosure remains the exception, not the norm—and the epidemic of sexual violence persists in the shadows.

## B.    Retaliatory Defamation Lawsuits Reinforce the Culture of Silence around Sexual Violence

The groundswell of survivor disclosures ushered in by the #MeToo movement was swiftly met with an aggressive legal counteroffensive, as powerful men accused of sexual violence turned to defamation lawsuits to punish their accusers.[25]  These lawsuits—often categorized as Strategic Lawsuits Against Public Participation ("SLAPPs")—are filed not to vindicate reputation, but to "chill the valid exercise of constitutional rights of freedom of speech and petition for the redress of grievances."

---

[23] Rebecca Campbell et al., <u>Secondary Victimization of Rape Victims: Postrape Responses of Legal System and Mental Health Professionals</u>, 20 VIOLENCE & VICTIMS 55 (2005); see also Patricia A. Resick et al., <u>Effects of a Disclosure Intervention for PTSD</u>, 5 BMJ Open e030705 (2019).

[24] Susan Rees et al., <u>Believe #MeToo: Sexual Violence and Interpersonal Disclosure Experiences Among Women Attending a Sexual Assault Service in Australia: A Mixed-Methods Study</u>, 9 BMJ OPEN e026773 (2019), https://doi.org/10.1136/bmjopen-2018-026773.

[25] See, e.g., <u>Bensussen v. Tadros, No</u>. BC682869, 2018 WL 2390162, at *1 (Cal. Super. Ct. Mar. 8, 2018); <u>Depp v. Heard,</u> No. CL-2019-0002911, 2022 Va. Cir. LEXIS 84, at *1 (Va. Cir. Ct. June 24, 2022); <u>Gottwald v. Sebert</u>, 172 A.D.3d 445 (N.Y. App. Div. 2019).

Equilon Enters. v. Consumer Cause, Inc., 52 P.3d 685, 690 (Cal. 2002). They are designed to discredit survivor accounts, discourage others from speaking out, and regain narrative control by using the legal system as a tool of retribution.[26]

Since 2017, organizations like Legal Momentum and the TIME'S UP Legal Defense Fund have documented a significant increase in defamation claims brought against survivors.[27] One national study found that nearly one in four student survivors had been threatened with defamation, while others were explicitly warned that lawsuits would follow if they disclosed their abuse.[28]

Although such suits were once more common on college campuses—where nearly three in four were filed by male students or faculty—the trend has since shifted. Today, most defamation lawsuits brought in response to sexual harassment or assault allegations are filed by non-student professionals, including executives, politicians, celebrities, and athletes.[29]

---

[26] Deborah Tuerkheimer, Beyond #MeToo, 94 N.Y.U. L. Rev. 1146, 1153–54 (2019).

[27] Supra, n.17; see also Assem. Comm. on Judiciary, Analysis of Assemb. B. 933, 2023–2024 Leg., Reg. Sess. 5–6 (Cal. 2023), https://sjud.senate.ca.gov/sites/sjud.senate.ca.gov/files/ab_933_aguiar-curry_judiciary_analysis.pdf ("It is well-documented that many high-profile individuals accused of sexual abuse or harassment have turned around and filed defamation claims against the people who spoke up about their misconduct." ).

[28] SARAH NESBITT & SAGE CARSON, KNOW YOUR TITLE IX, THE COST OF REPORTING: PERPETRATOR RETALIATION, INSTITUTIONAL BETRAYAL, AND STUDENT SURVIVOR PUSHOUT 4-6 (2021), https://www.knowyourix.org/wp-content/uploads/2021/03/Know-Your-IX2021-Report-Final-

[29] Id.; see also Ms. Magazine, "SLAPPing Back: How Defamation Suits Silence #MeToo Voices" (2023).

Threatening or initiating a defamation suit can be a highly effective means of silencing a survivor, particularly because of the immense financial and emotional burden such litigation imposes. Estimates suggest that the average cost of defending a civil lawsuit ranges from $43,000 for a straightforward tort case to more than $90,000 for complex disputes.[30] When cases involve powerful and wealthy plaintiffs or extensive discovery litigation expenses can reach as much as $1 million to $7 million.[31] Survivors—particularly women, low-wage workers, and other economically marginalized groups—are often unable to shoulder these costs. High-profile cases like those involving Johnny Depp and Dr. Luke underscore how even well-resourced survivors can face financial devastation and public vilification.

The costs imposed by retaliatory defamation suits are compounded by the financial burden survivors already bear as a result of the underlying abuse. For example, a 2017 study estimated that the lifetime cost of rape per survivor exceeds $122,000, resulting in a cumulative societal burden of more than $3.1 trillion.[32] Likewise, the average cost per non-fatal female victim of child sexual abuse is estimated to be $282,734 including, but not limited to $14,357 in child medical costs,

---

[30] PAULA HANNAFORD-AGOR & NICOLE WATERS, ESTIMATING THE COST OF CIVIL LITIGATION, 20 CASELOAD HIGHLIGHTS: NAT'L CTR. FOR STATE CTS. 1, 7 (2013).

[31] DAVID KEATING, ESTIMATING THE COST OF FIGHTING A SLAPP, INST. FOR FREE SPEECH (2022); See also Gary Fulcher, Litigation-Induced Trauma Sensitisation, 11 PSYCHIATRY, PSYCH. & L. 79, 82 (2004); Shaina Weisbrot, *14 The Impact of the #MeToo Movement on Defamation Claims Against Survivors, 23 CUNY L. Rev. 332, 358 (2020).

[32] Cora Peterson et al., Lifetime Economic Burden of Rape Among U.S. Adults, 52 AM. J. PREV. MED. 691 (2017).

$9,882 in adult medical costs, $223,581 in lost productivity, $8,333 in child welfare costs, $2,434 in costs associated with crime, and $3,760 in special education costs.[33]

The emotional toll of defamation litigation is equally severe. Survivors are routinely subjected to invasive discovery, public character attacks, and forced reexamination of traumatic events.[34] Legal scholar Mary Anne Franks observes that, for survivors, "the process is the punishment."[35] Pamela Lopez, a survivor and SLAPP target, put it even more starkly: "Defamation lawsuits against survivors like me can feel like being assaulted all over again."[36] Even successful defendants experience deep harm. As Lopez explained, "I won, but it felt like I lost. [Defamation] lawsuits still provide a way for [perpetrators] to hit back... they're an easy way to threaten and intimidate survivors."[37] Indeed, "[f]or sexual misconduct survivors, SLAPPs are more than legal maneuvers—they are acts of ongoing violence, designed to restore power to the abuser and reinforce a system that rewards silence."[38]  But the harm is not only individual—it is systemic. For serial harassers

---

[33] See M. Merricka., et al., Unpacking the impact of adverse childhood experiences on adult mental health, 69 CHILD ABUSE & NEGLECT 10 (July 2017); Angelakis, I., Gillespie, E.L., Panagioti, M., Childhood maltreatment and adult suicidality: a comprehensive systematic review with meta-analysis, PSYCHOLOGICAL MEDICINE 1-22 (2019); Gail Hornot, Childhood Trauma Exposure & Toxic Stress: What the PNP Needs to Know, J. PEDIATRIC HEALTHCARE (2015); Perryman Group, Suffer the Little Children: An Assessment of the Economic Cost of Child Maltreatment (2014).

[34] Deborah Tuerkheimer, Beyond #MeToo, 94 N.Y.U. L. Rev. 1146, 1153–54 (2019).

[35] THE CULT OF THE CONSTITUTION, 149 (Stanford Univ. Press 2019).

[36] California Employment Lawyers Ass'n, Statements on AB 933, (Apr. 4, 2025).

[37] Id.

[38] Supra, n.35.

and abusers, pursuing a defamation suit or other SLAPP against one victim also sends a clear, threatening message to the perpetrator's other victims that they will face the same retaliatory response if they come forward. For serial abusers, a single retaliatory lawsuit can intimidate all potential accusers into staying quiet.

These legal tactics are also rooted in discredited myths about false reporting. Many retaliatory defamation suits rely on sexist tropes that presume survivors lie for revenge, fame, or regret.[39] Sadly, "[i]t can take three to four women testifying that they had been violated by the same man in the same way to even begin to make a dent in his denial. That ma[kes] a woman, for credibility purposes, one quarter of a person."[40] Yet rigorous studies consistently show that false reports of sexual assault are exceedingly rare—estimated between 2% and 8%, a rate comparable to or lower than other felonies.[41] Even these figures are likely inflated, as reports are often mislabeled "false" when victims recant under pressure or when cases are closed due to insufficient evidence rather than any proof of fabrication.[42] Simply put, the stereotypes about vengeful or fame-seeking accusers are not borne out by evidence. In fact, survivors gain little and often lose greatly—emotionally, economically,

---

[39]See David Lisak et al., <u>False Allegations of Sexual Assault: An Analysis of Ten Years of Reported Cases,</u> 16 VIOLENCE AGAINST WOMEN 1318, 1326 (2010).

[40] See Deborah Tuerkheimer, <u>Incredible Women: Sexual Violence and the Credibility Discount,</u> 166 U. PA. L. REV. 1, 6–7 (2017).

[41] Kimberly A. Lonsway et al., <u>False Reports: Moving Beyond the Issue to Successfully Investigate and Prosecute Non-Stranger Sexual Assault</u> 2–3 (2009).

[42] <u>Supra,</u> n.40 at 1321–22.

reputationally—by coming forward. By contrast, alleged perpetrators often have powerful incentives—financial, reputational, and political—to sue in an effort to suppress survivor speech. As the California Legislature acknowledged, "[t]his privilege is needed to ensure that victims are not punished for speaking out about abuse, particularly given the inherent imbalance of power between victims and their perpetrators." See Assem. Comm. on Judiciary, Analysis of Assemb. B. 933, 2023–2024 Leg., Reg. Sess. 5–6 (Cal. 2023). This asymmetry of risk and reward makes it clear who needs legal protection.

## II. LEGISLATIVE HISTORY AND CONTEXT DEMONSTRATE THAT CALIFORNIA CIVIL CODE §47.1 WAS ENACTED TO ADDRESS EXISTING LEGAL GAPS AND PROTECT SURVIVORS FROM RETALIATORY DEFAMATION CLAIMS

California Civil Code § 47.1, enacted through Assembly Bill 933 in 2024, is a targeted legislative response to the misuse of defamation law to punish survivors of sexual violence. Rooted in a strong legislative record, the statute ensures survivors can speak out without facing retaliatory litigation that causes emotional, reputational, and financial harm. By conferring absolute privilege on good-faith disclosures and providing meaningful remedies, § 47.1 closes a critical gap in the law and advances California's broader commitment to removing systemic barriers to justice for survivors.

15

## A.  Assembly Bill 933 Was Enacted to Close a Gap in Existing Law

The impetus for California Civil Code § 47.1 arose from a 2017 incident in which lobbyist Pamela Lopez accused then-Assemblymember Matt Dababneh of sexual assault. After filing an internal complaint and speaking publicly at a press conference, Lopez was sued by Dababneh for defamation based on both her official report and her public statements. Assem. Comm. on Judiciary, Analysis of Assemb. B. 933, 2023–2024 Leg., Reg. Sess. 2 (Cal. 2023).

Although Lopez's statements to the California Assembly were expressly protected by Civil Code §47(b)'s litigation privilege, her public disclosures at a press conference were not. Id.  In other words, while Lopez could safely report the assault through official channels, she faced potential civil liability for repeating her story in a public forum. While Lopez ultimately prevailed on appeal, the litigation dragged on for several years, exacting a significant emotional and financial toll. Id. Her case sent a chilling message: survivors who choose to speak publicly risked costly and retaliatory litigation. For the many survivors whose primary goal is not necessarily to file a formal complaint or seek legal redress but to tell their story and protect others, this oversight was perilous.

As the Assembly Judiciary Committee observed, "[t]he current law's limited privileges create a chilling effect on survivors who wish to share their experiences in public forums, particularly when they choose not to file formal complaints." Sen.

Judiciary Comm., Analysis of Assemb. B. 933, 2023–2024 Leg., Reg. Sess. 5 (Cal. June 13, 2023). The Legislature found that existing legal protections failed to reflect the realities of how survivors choose to come forward—and the emotional, financial, and institutional reasons many do not pursue formal processes.

In response, Assembly Bill 933 codified a new absolute privilege to protect informal disclosures—including social media posts, public statements, and private warnings—that do not fit within the preexisting litigation or employment privileges. As the Senate Judiciary Committee noted, the bill "protects the ability of survivors to speak out about abuse or harassment in settings that fall outside of formal investigative processes." Sen. Judiciary Comm., Analysis of Assemb. B. 933, 2023–2024 Leg., Reg. Sess. 7 (Cal. June 13, 2023).

Without broader protection, the law perversely incentivized silence outside narrow legal channels.

## B. The Legislature Recognized That Robust Remedies Were Necessary to Give the Privilege Meaningful Effect

The Legislature understood that without strong economic deterrents, the legal protections for survivor speech promised by Assembly Bill 933 would lack practical effect. For that reason, lawmakers included robust remedies—namely, reasonable attorney's fees, court costs, and treble and punitive damages—for survivors who prevail in retaliatory defamation suits. These provisions ensure that §47.1 not only

17

shields survivor speech from legal attack but also disincentivizes the filing of meritless lawsuits designed to punish or silence those who speak out.

As the Senate Judiciary Committee explained, "the financial burden of defending against a defamation suit is one of the main reasons those suits tend to evoke so much fear in survivors. Even if they ultimately prevail… survivors are often unable to take on the cost and emotional toll of such lengthy and costly litigation." Sen. Judiciary Comm., Analysis of Assemb. B. 933, 2023–2024 Leg., Reg. Sess. 8–9 (Cal. June 13, 2023). Retaliatory lawsuits, the Committee emphasized, "serve no legitimate purpose and merely impose years of emotional distress, reputational damage, and financial harm on individuals already harmed by misconduct." Id.

Prior to § 47.1, survivors who successfully defended against retaliatory defamation suits had limited avenues for recovery. Unless a case was dismissed early under California's anti-SLAPP statute, survivors bore the full financial burden of their defense. As the Assembly Judiciary Committee noted, "under current law, a defamation defendant generally has no further means to recover costs or attorney fees if it turns out that the plaintiff was lying—so even if the defendant prevails, the victory may be hollow because of the crushing legal fees they had to incur." Id.

To address this imbalance, the Legislature deliberately included enhanced damages in addition to fee-shifting, acknowledging that powerful plaintiffs may

otherwise treat ordinary litigation costs as an acceptable price for suppressing speech. "Financial intimidation remains a powerful deterrent to speech," the Committee wrote, and "wealthy plaintiffs can afford to weaponize the legal process without meaningful consequence unless enhanced remedies are available." Id. at 8. Treble damages were necessary to alter the cost-benefit analysis and to "force would-be plaintiffs to think twice before pursuing meritless and retaliatory claims." Id. at 5–6. Section 47.1 thus ensures that protections for survivor speech are not merely theoretical, but enforceable.

### C. Assembly Bill 933 Reflects California's Broader Legislative Commitment to Empowering Survivors and Increasing Access to Justice

Assembly Bill 933 was enacted as part of California's comprehensive legislative strategy to modernize its legal framework in response to the realities of sexual violence and the barriers survivors face in seeking justice. Over the past decade, the State has enacted a series of reforms designed to increase transparency, eliminate procedural obstacles, and promote accountability.

Notable examples include Assembly Bill 1619 (extending the civil statute of limitations for sexual assault to ten years), Senate Bill 813 (eliminating the criminal statute of limitations for certain felony sex offenses), and Senate Bill 820—the STAND Act—which prohibits nondisclosure clauses in settlement agreements involving claims of sexual assault, harassment, or discrimination. See Cal. Code Civ.

Proc. §340.16; Cal. Penal Code §799; Cal. Code Civ. Proc. §1001. Collectively, these laws reflect an evolving understanding that trauma, fear of retaliation, and institutional silencing have historically suppressed survivor voices.

In 2020 alone, Governor Gavin Newsom signed five bills aimed at "empowering survivors of crime and abuse to speak out against their abusers and provide them more time to seek justice." Office of the Governor, Press Release (Sept. 29, 2020). This policy trajectory continued with Assembly Bill 933, which filled a conspicuous gap in existing protections for out-of-court survivor speech.

As with the STAND Act, which targets secrecy in civil settlements, §47.1 recognizes that informal disclosures—though not part of official proceedings— serve a vital public function. As the Senate Judiciary Committee explained, such agreements "have the effect of preventing word from spreading about harassing or discriminatory behavior," enabling serial harassers to go undetected "sometimes for years" Sen. Judiciary Comm., Analysis of S.B. 820 (2017–2018 Reg. Sess.) (May 1, 2018). They alert others to potential harm, contribute to cultural change, and foster community accountability. They also reflect the only form of justice many survivors may ever seek.

If §47.1 protections were rolled back, it would not only chill the very speech that the Legislature sought to protect in passing Assembly Bill 933 but also undermine the effectiveness of all other survivor-oriented legal reforms.

20

III. **CALIFORNIA CIVIL CODE § 47.1 COMPORTS WITH FIRST AMENDMENT PRINCIPLES BY PROTECTING SURVIVOR SPEECH AND DETERRING ABUSIVE LITIGATION**

California Civil Code § 47.1 is a constitutionally sound and narrowly tailored legislative measure that protects survivor speech and deters the misuse of defamation law. Contrary to Plaintiffs' assertions, the statute does not infringe upon the right to petition under the First Amendment or the Noerr-Pennington doctrine. Rather, it preserves access to the courts for legitimate claims while imposing consequences on those who use the legal system to retaliate against protected expression.

A. **Retaliatory Defamation Lawsuits Are Not Protected Petitioning Activity under the First Amendment**

The right to petition the government for redress of grievances is guaranteed by both the Federal and California State Constitutions. U.S. Const., Amend. I; Cal. Const., art. I, § 3. The Noerr-Pennington doctrine was developed to safeguard that right by conferring immunity from civil liability for genuine petitioning activities, including those involving the courts. See E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); United Mine Workers of Am. v. Pennington, 381 U.S.657 (1965); California Motor Transport v. Trucking Unlimited, 404 U.S. 508, 510 (1972). However, this immunity is not absolute. California Motor Transport, 404 U.S. at 510 ("The Noerr-Pennington doctrine does not create an absolute bar to liability for actions taken in course of petitioning the government."). Courts have

21

consistently held that the doctrine does not extend to litigation that is objectively baseless and intended to use the legal process itself as an instrument of harm. See Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc. ("PREI"), 508 U.S. 49, 60–61 (1993) (establishing the "sham litigation" exception).

Retaliatory defamation lawsuits against survivors of sexual violence often fall within this well-established "sham litigation" exception. These suits frequently lack credible evidence of falsity, malice, or actual harm, and are filed despite corroboration from witnesses, internal investigations, or contemporaneous reports. Their true purpose is to punish survivors for engaging in protected speech. See PREI, 508 U.S. at 60–61. California courts have repeatedly recognized that abusive litigation tactics fall outside Noerr-Pennington's scope. See Equilon Enters. v. Consumer Cause, Inc., 29 Cal. 4th 53, 65 (2002); Briggs v. Eden Council for Hope & Opportunity, 19 Cal. 4th 1106, 1122–23 (1999); Wolfgram v. Wells Fargo Bank, 53 Cal. App. 4th 43, 56 (1997). As one court explained, the right to petition "does not confer the right to clog the court system and impair everyone else's right to seek justice." Wolfgram, 53 Cal. 4th at 56.

Like California's anti-SLAPP statute, California Civil Code §47.1 targets only meritless lawsuits aimed at chilling protected expression. The statute imposes no civil liability for good-faith claims—it simply ensures that "the party that creates the costs [must] bear them." Equilon, 29 Cal. 4th at 62. Requiring a plaintiff who files

22

an objectively baseless lawsuit to bear the costs of doing so "is no more a violation of the first amendment than is a requirement that a person who wants to publish a newspaper pay for the ink, the paper, and the press. The exercise of rights may be costly, and the first amendment does not prevent the government from requiring a person to pay the costs incurred in exercising a right." Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, 814 F.2d 358, 373 (7th Cir. 1987). Simply put, fee-shifting provisions of this kind do not violate the Petition Clause. See Equilon, 29 Cal. 4th at 62; Bernardo v. Planned Parenthood Fed'n of Am., 115 Cal. App. 4th 322, 361 (2004); Premier, 814 F.2d at 373.

The same applies to treble damages, which serve a legitimate deterrent purpose and are constitutional so long as they are not grossly excessive. See Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 17–18 (1991). These remedies are not prior restraints, nor do they bar plaintiffs from accessing the courts. They simply deter the misuse of legal processes as a tool of harassment. See Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421–22 (1978); Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240 (1975). This is akin to malicious prosecution law, a longstanding doctrine that permits redress against baseless lawsuits and which have never been held to violate First Amendment petitioning rights. Section 47.1 is, in effect, a streamlined statutory analog that eliminates the need for a second lawsuit.

Ultimately, California Civil Code §47.1 strengthens First Amendment protections by shielding survivors from abusive litigation that seeks to silence truth. It does not bar access to the courts, but deters their misuse. Applying the Noerr-Pennington doctrine to invalidate this statute would not protect free expression—it would undermine it.

### B. California Civil Code §47.1 Advances Core First Amendment Values and Serves Compelling State Interests

Although Plaintiffs contend that § 47.1 impermissibly restricts the right to petition, that argument misconstrues the scope of First Amendment protections. The right to petition the government for redress of grievances, like other constitutional rights, is not absolute. See Wolfgram, 53 Cal. 4th at 56–57 ("[T]he general right of persons to file lawsuits… does not confer the right to clog the court system and impair everyone else's right to seek justice."). As the Supreme Court observed in Bill Johnson's Restaurants, Inc. v. NLRB, "the First Amendment interests are strongest when the suit raises a genuine grievance." 461 U.S. 731, 743 (1983). But where litigation is used as a tool of intimidation, particularly against vulnerable speakers, the government has not only the authority but the obligation to act. To that end, courts have long acknowledged that certain categories of communications are so vital to the integrity of societal and legal functioning that they warrant absolute privilege, even if doing so forecloses some otherwise viable claims.

Survivor disclosures fall squarely within the category of speech entitled to heightened First Amendment protection. See <u>Snyder v. Phelps</u>, 562 U.S. 443, 458 (2011); see also <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 345 (1974); <u>Whitney v. California</u>, 274 U.S. 357, 376 (1927) (Brandeis, J., concurring), overruled in part by <u>Brandenburg v. Ohio,</u> 395 U.S. 444 (1969) ("Fear of serious injury cannot alone justify suppression of free speech… It is the function of speech to free men from the bondage of irrational fears.").   In <u>New York Times Co. v. Sullivan</u>, the Court famously held that public debate must be "uninhibited, robust, and wide-open," even where such speech may damage reputations. 376 U.S. 254, 270 (1964). The Court further emphasized that "erroneous statement is inevitable in free debate," and thus must be protected to avoid chilling vital public discourse. <u>Id</u>. at 271. This rationale applies with equal—if not greater—force to disclosures of sexual abuse and harassment, which serve essential public functions: exposing misconduct, prompting institutional reform, and preventing future harm.

The chilling effect of retaliatory lawsuits is not hypothetical—it is well-documented and was explicitly recognized by the California Legislature. The Assembly Judiciary Committee noted that such lawsuits "bully the defendant into silence" and "intimidate others who might speak out," undermining both access to justice and public safety. Assem. Comm. on Judiciary, Analysis of A.B. 933, 2023–2024 Leg., Reg. Sess. 5–6 (Cal. 2023).  But the harm extends beyond the individual.

Silencing survivors has demonstrable public health and safety consequences. Sexual violence, especially child sexual abuse, is often serial in nature. In one study 7% of sampled offenders were responsible for abusing between 41 and 450 children, and the longest time between offense and conviction was thirty-six years.[43] The decades before a victim is ready to disclose give perpetrators and institutions wide latitude to suppress the truth to the detriment of children, parents, and the public.  By empowering survivors to speak out, § 47.1 reduces the time predators and complicit institutions remain hidden, which helps prevent those predators from inflicting further harm and allows the public to develop policies to inhibit new abuse from occurring in the long-term.[44]  Indeed, in high-profile abuse cases such as those involving Larry Nassar, Jeffrey Epstein, and the Catholic Church, a single survivor disclosure often catalyzed waves of additional reports, leading to institutional reckoning and widespread reform. Section 47.1 fosters that same dynamic by encouraging public dialogue and enabling survivors to speak without fear.

Importantly, § 47.1 is narrowly tailored to achieve these aims. It grants immunity only to disclosures made in good faith and without malice, and its remedies are available only when a defamation claim fails as a matter of law. By

---

[43] Michelle Elliott et al., Child Sexual Abuse Prevention: What Offenders Tell Us, 19 CHILD ABUSE NEGL. 579 (1995).  .

[44] See generally, Making the Case:  Why Prevention Matters, PREVENTCHILDABUSE.ORG (last visited February 22, 2022), https://preventchildabuse.org/resource/why-prevention-matters/; Preventing Adverse Childhood Experiences, CDC.GOV (last visited Feb. 23, 2022), https://www.cdc.gov/violenceprevention/pdf/preventingACES.pdf.

adopting the Supreme Court's actual malice standard, §47.1 carefully aligns survivor protection with well-established constitutional limits on defamation liability.  See Gertz, 418 U.S. at 323 (holding that false and defamatory statements knowingly or recklessly made are not entitled to First Amendment protection.). In doing so, it mirrors the structure of anti-SLAPP statutes and malicious prosecution doctrines that have repeatedly been upheld as valid constitutional exercises of state power. See People ex rel. Lockyer v. Brar, 115 Cal. App. 4th 1315, 1317 (2004); Schroeder v. Irvine City Council, 97 Cal. App. 4th 174, 196 (2002).

The statute is also content-neutral. It protects a category of speech—factual, non-malicious disclosures about sexual violence—without regard to viewpoint or ideological perspective. Courts have upheld such content classifications where they serve compelling state interests and are narrowly tailored. See Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015). Thus, to the extent that §47.1 incidentally burdens some petitioning activity, Assembly Bill 933 was carefully crafted to fit comfortably within established constitutional doctrines and reinforces rather than undermines First Amendment values.

To strike down the statute would grant individuals credibly accused of sexual abuse and harassment a constitutionally sanctioned weapon to sue their victims into silence. That result is antithetical to the values of a free and democratic society and incompatible with the constitutional framework protecting free expression.

## IV.   CALIFORNIA CIVIL CODE § 47.1 REFLECTS A NATIONAL TREND TOWARD INCREASED PROTECTIONS FOR SURVIVORS OF SEXUAL VIOLENCE

California Civil Code §47.1 is part of a growing national movement to enact speech-protective laws that guard against defamation suits and other forms of legal intimidation aimed at silencing survivors and to increase meaningful access to justice.

Since the #MeToo movement reignited a public reckoning with sexual violence, several states have enacted or proposed legislation that mirrors California's efforts.

Recently, the Oregon General Assembly introduced Senate Bill 180 which, if passed, would classify statements by survivors of sexual assault, harassment, or discrimination as privileged unless made with malice, and authorize fee-shifting and remedial sanctions for prevailing defendants. Advocates emphasized to the legislature that defamation lawsuits "silence survivors" and that the bill would "ensure that survivors in Oregon are empowered and protected when they speak against their assailant." See S.B. 180, 82d Leg. Assemb., Reg. Sess. (Or. 2025). Similarly, New Hampshire introduced House Bill 580, which would classify defamation suits filed by an alleged perpetrator as presumptively retaliatory and void, unless the plaintiff can overcome narrow exceptions. See H.B. 580, 2025 Leg., Reg. Sess. (N.H. 2025). The bill provides for attorney's fees, treble damages, and punitive damages for prevailing survivor-defendants. In Maryland, the "Stop

28

Silencing Survivors Act" creates a rebuttable presumption of good faith for survivor disclosures and requires courts to award costs to victims of meritless defamation lawsuits. See S.B. 549, 2025 Gen. Assemb., Reg. Sess. (Md. 2025).

New York has been at the forefront of these efforts. In 2020, it expanded its anti-SLAPP statute to cover any speech on matters of public interest and mandated attorney's fees for successful defendants. See N.Y. Civ. Rights Law § 76-a (McKinney 2020). Yet even with this reform, survivor advocates noted gaps in protection for disclosures made outside of formal proceedings. In 2025, New York lawmakers introduced the Adult Survivors Speech Act, which establishes an absolute privilege for good-faith, non-malicious survivor communications and includes similar remedies such as fee-shifting, treble damages, and punitive damages. See S.B. 2419, 2025 Leg., Reg. Sess. (N.Y. 2025). Notably, the legislative history cites § 47.1 as a model statute and underscores the need for strong deterrents against retaliatory litigation.

Similar bills have been introduced in New Mexico, Wisconsin, and other states. And courts around the country are similarly evolving the common law to recognize the public importance of survivor disclosures, even in the absence of codified statutes. See, e.g., Doe v. Corp. of President of Church of Jesus Christ of Latter-Day Saints, 280 P.3d 377, 386 (Wash. 2012).

In addition to these "survivor privilege" bills, states have increasingly moved to limit or prohibit the use of non-disclosure agreements (NDAs) in cases involving sexual assault, harassment, and related misconduct. In 2024, Louisiana enacted Act No. 781, banning enforcement of pre-dispute NDAs and non-disparagement clauses relating to sexual violence. See La. Acts 2024, No. 78.  Meanwhile, Texas passed "Trey's Law" which prohibits NDAs in civil settlements involving sexual abuse and sex trafficking, regardless of the survivor's age. See Tex. H.B. 4615, 88th Leg., Reg. Sess. (2025).

New York's recently proposed "Stop Silencing Survivors Act" would go even further, eliminating NDAs in workplace abuse and discrimination cases. See Stop Silencing Survivors Act, N.Y. Assemb. B. 8076, 2024–25 Leg. Sess., https://www.nysenate.gov. These state reforms build upon the federal Speak Out Act, Pub. L. No. 117-224, 136 Stat. 2291 (2022), which prohibits pre-dispute NDAs in cases of sexual assault or harassment. See Speak Out Act, Pub. L. No. 117-224, 136 Stat. 2291 (2022). Like §47.1, these legislative initiatives share a common goal: to ensure that survivors can safely disclose abuse without fear of legal or financial retaliation.

These speech-protection laws arise alongside a parallel wave of reforms to statutes of limitations for sexual violence. Since 2017, over 30 states and 3 territories

have extended or revived the time to sue abusers.[45] Many enacted revival windows or extended deadlines, explicitly based on the understanding that trauma and fear delay reporting. Legislators' findings often tie these reforms to empowering survivors' voices.  For example, California's A.B. 2587 revived claims by adult survivors, explicitly acknowledging that "it can take years for many survivors to come forward due to trauma, stigma, and fear of backlash." See Assem. Judiciary Comm., Analysis of A.B. 2587, 2023–2024 Leg., Reg. Sess. (Cal. 2024). New York's Adult Survivors Act similarly created a one-year revival window and was accompanied by statements from state leaders affirming that survivors need time and safety to speak out. See N.Y. C.P.L.R. § 214-j (McKinney 2022).  Governor Hochul's signing message observes that "for many survivors, it may take years to come to terms with the trauma… while possibly experiencing fear of retaliation or shame."[46]

These legislative reforms are united by a common policy rationale: dismantling the legal and structural barriers that have historically silenced survivors and shielded perpetrators from accountability. SOL reforms open the courthouse

---

[45] See CHILD USA, 50 State Statutes of Limitations for Sexual Assault and Abuse, https://childusa.org/law.
[46] Governor Kathy Hochul, Press Release: Governor Hochul Signs Adult Survivors Act into Law (May 24, 2022).

doors; laws like §47.1 ensure survivors can walk through them without being sued into silence.

A decision validating § 47.1 will strengthen the legislative momentum nationwide, empowering other jurisdictions to adopt similar measures that promote accountability, deter silence, and bring long-overdue justice to survivors.

## CONCLUSION

For the reasons set forth above, amici respectfully urge the Court to uphold the constitutionality of California Civil Code 47.1 in its entirety.

Respectfully submitted,

/s/ *Hillary Nappi, Esq.*
Hillary Nappi, Esq.
Hach Rose Schirripa & Cheverie LLP
112 Madison Avenue, 10th Fl.
New York, NY 10016
Tel: 212-213-8311
hnappi@hrsclaw.com
Counsel of Record for *Amicus Curiae* CHILD USA

Dated: June 3, 2025