# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLAKE LIVELY,<br><br>                  Plaintiff,<br><br>    v.<br><br>WAYFARER STUDIOS LLC, a Delaware Limited Liability Company, JUSTIN BALDONI, an individual, JAMEY HEATH, an individual, STEVE SAROWITZ, an individual, IT ENDS WITH US MOVIE LLC, a California Limited Liability Company, MELISSA NATHAN, an individual, THE AGENCY GROUP PR LLC, a Delaware Limited Liability Company, JENNIFER ABEL, an individual, JED WALLACE, an individual, and STREET RELATIONS INC., a California Corporation,<br><br>                  Defendants. | No. 1:24-cv-10049-LJL<br>(Consolidated with 1:25-cv-00449-LJL)<br>rel. 1:25-cv-00779-LJL |
| WAYFARER STUDIOS LLC, a Delaware Limited Liability Company, JUSTIN BALDONI, an individual, JAMEY HEATH, an individual, IT ENDS WITH US MOVIE LLC, a California Limited Liability Company, MELISSA NATHAN, an individual, JENNIFER ABEL, an individual, and STEVE SAROWITZ, an individual,<br><br>                  Plaintiffs,<br><br>    v.<br><br>BLAKE LIVELY, an individual, RYAN REYNOLDS, an individual, LESLIE SLOANE, an individual, VISION PR, INC., a New York Corporation, and THE NEW YORK TIMES COMPANY, a New York Corporation,<br><br>                  Defendants. | |

## VISION PR, INC. AND LESLIE SLOANE'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR ATTORNEYS' FEES AND COSTS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 2

I.    The Wayfarer Parties File a Baseless Lawsuit and Launch a Defamatory Media Campaign Against the Sloane Parties. .................................................................. 2

II.    The Wayfarer Parties Cause the Sloane Parties to Incur Substantial Attorneys' Fees and Costs, All While Knowing Their Claims Lack a Basis in Law or Fact... 5

III.    The Record Confirms the Wayfarer Parties' Claims Are Baseless. ....................... 7

IV.    The Court Dismisses the Claims Against the Sloane Parties with Prejudice. ........ 8

LEGAL STANDARD ............................................................................................................. 9

ARGUMENT ........................................................................................................................ 9

I.    The Court Should Award the Sloane Parties Attorneys' Fees and Costs Pursuant to New York's Anti-SLAPP Statute. .................................................................... 9

A. New York Law Applies Here. .................................................................... 9

B. New York's Anti-SLAPP Law Is Satisfied Here. ................................... 13

i.    Ms. Sloane's Alleged Statements Were Made in Connection with a Matter of Public Interest. .......................................................... 13

ii.    The Wayfarer Parties' Claims Lack a Substantial Basis in Law and Fact. ............................................................................................... 15

a.    The Claims Lack a Substantial Basis in Law. ....................... 15

b.    The Claims Lack a Substantial Basis in Fact. ....................... 16

C. The Anti-SLAPP Statute's Fee-Shifting Provision Applies in Federal Court. ..... 18

i.    Fee-Shifting Provisions Are Substantive. .................................... 18

ii.    The Fee-Shifting Provision Does Not Violate the Rules Enabling Act.... 19

iii.    Applying the Fee-Shifting Provision in Federal Court Serves the Twin Purposes of Erie and New York's Policy Interests. ................................. 21

II.    In The Alternative, the Court Should Award the Sloane Parties Attorneys' Fees and Costs Pursuant to its Inherent Powers. ........................................................ 22

III.    The Sloane Parties Are Entitled to their Reasonable Attorneys' Fees and Costs. 24

# TABLE OF AUTHORITIES

**Cases**

*1st Amend. Praetorian v. New York Times Co.*,
2025 WL 949575 (S.D.N.Y. Mar. 28, 2025) .......................................................................... 18

*215 W. 84th St Owner LLC v. Bailey*,
191 N.Y.S.3d 368 (1st Dep't 2023) ..................................................................................... 16

*Adelson v. Harris*,
774 F.3d 803 (2d Cir. 2014) ........................................................................................ 18, 21

*AEI Life, LLC v. Lincoln Benefit Life Co.*,
225 F. Supp. 3d 136 (E.D.N.Y. 2016) ................................................................................ 13

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
421 U.S. 240 (1975) ..................................................................................................... 18, 21

*Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*,
2011 WL 1002439 (S.D.N.Y. Mar. 16, 2011) ...................................................................... 24

*Belya v. Kapral*,
2025 WL 963111 (S.D.N.Y. Mar. 31, 2025) .................................................................. 10, 12

*Black v. Ganieva*,
236 A.D.3d 427 (1st Dep't 2025) ....................................................................................... 16

*Block v. Tanenhaus*,
815 F.3d 218 (5th Cir. 2016) .............................................................................................. 19

*Bloom v. A360 Media LLC*,
735 F. Supp. 3d 466 (S.D.N.Y. 2024) ................................................................................. 14

*Bobulinski v. Tarlov*,
758 F. Supp. 3d 166 (S.D.N.Y. 2024) ......................................................................... passim

*Bongino v. Daily Beast Co., LLC*,
477 F. Supp. 3d 1310 (S.D. Fla. 2020) ............................................................................... 19

*Brady v. NYP Holdings, Inc.*,
2022 WL 992631 (S.D.N.Y. Mar. 31, 2022) ........................................................................ 19

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ............................................................................................................ 12

*Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*,
498 U.S. 533 (1991) ............................................................................................................ 20

*Carousel Foods of Am., Inc. v Abrams & Co., Inc.*,
423 F Supp 2d 119 (S.D.N.Y. 2006) ................................................................................... 22

*Casmento v. Volmar Constr., Inc.*,
2022 WL 17666390 (S.D.N.Y. Dec. 14, 2022) .................................................................... 20

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991)..........................................................................................20, 22

*Cianci v. New Times Pub. Co.*,
    88 F.R.D. 562 (S.D.N.Y. 1980) ............................................................................ 12

*Coleman v. Grand*,
    523 F. Supp. 3d 244 (E.D.N.Y. 2021) .................................................................. 14

*Cotton v. Slone*,
    4 F.3d 176 (2d Cir. 1993) .................................................................................... 18

*Degussa Admixtures, Inc. v. Burnett*,
    277 F. App'x 530 (6th Cir. 2008) ......................................................................... 20

*DeIuliis v. Engel*,
    2021 WL 4443145 (S.D.N.Y. Sept. 27, 2021)...................................................... 10

*Eliott v. Lions Gate Ent. Corp.*,
    639 F. Supp. 3d 1012 (C.D. Cal. 2022) ................................................................ 15

*Enmon v. Prospect Cap. Corp.*,
    675 F.3d 138 (2d Cir. 2012) ................................................................................ 22

*Gilani v. Teneo, Inc.*,
    2022 WL 4593040 (S.D.N.Y. Sept. 30, 2022)...................................................... 21

*Godin v. Schencks*,
    629 F.3d 79 (1st Cir. 2010).................................................................................. 19

*Goldman v. Abraham Heschel Sch.*,
    227 A.D.3d 544 (1st Dep't 2024) ................................................................... 16, 19

*Goldman v. Reddington*,
    2021 WL 4099462 (E.D.N.Y. Sept. 9, 2021) ....................................................... 14

*Haart v. Scaglia*,
    2023 WL 3472322 (N.Y. Sup. Ct. May 11, 2023) ................................................ 15

*Heilbut v. Cassava Scis., Inc.*,
    2025 WL 919654 (S.D.N.Y. Mar. 26, 2025)............................................... 15, 16, 19

*Holmes v. Winter*,
    22 N.Y.3d 300 (2013) ......................................................................................... 12

*Hong v. Mommy's Jamaican Mkt. Corp.*,
    2024 WL 3824394 (S.D.N.Y. Aug. 14, 2024)....................................................... 24

*Huebner v. Midland Credit Mgmt., Inc.*,
    897 F.3d 42 (2d Cir. 2018) ............................................................................ 22, 24

*Immuno AG. v. Moor-Jankowski*,
    77 N.Y.2d 235 (1991) ......................................................................................... 12

*In re Petrobras Secs Litig.*,
    2018 WL 4521211 (S.D.N.Y. Sep. 21, 2018)....................................................... 23

iii

*Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*,
   991 F.3d 361 (2d Cir. 2021) ............................................................................... 24

*Jacob v. Lorenz*,
   626 F. Supp. 3d 672 (S.D.N.Y. 2022) ...................................................... 10, 12

*Ji Li v. New Ichiro Sushi, Inc.*,
   2020 WL 2094095 (S.D.N.Y. Apr. 30, 2020) ....................................................... 23

*Kaufman v. Equifax Info. Servs., LLC*,
   2019 WL 3997461 (E.D.N.Y. Aug. 22, 2019)........................................................ 23

*Kinsey v. N.Y. Times Co.*,
   991 F.3d 171 (2d Cir. 2021) ............................................................................... 10

*Lindberg v. Dow Jones & Co., Inc.*,
   2021 WL 3605621 (S.D.N.Y. Aug. 11, 2021) ....................................................... 14

*Margolies v. Rudolph*,
   2022 WL 2062460 (E.D.N.Y. June 6, 2022) ......................................................... 14

*Oliveri v. Thompson*,
   803 F.2d 1265 (2d Cir. 1986) ............................................................................... 23

*Omansky v. Tribeca Citizen LLC*,
   2022 WL 3647133 (N.Y. Sup. Ct. Aug. 24, 2022) ................................................ 15

*Paucek v. Shaulis*,
   2025 WL 1298457 (D.N.J. May 6, 2025) .............................................................. 19

*Prospect Cap. Corp. v. Enmon*,
   2010 WL 907956 (S.D.N.Y. Mar. 9, 2010) ........................................................... 23

*Reeves v. Associated Newspapers, Ltd.*,
   218 N.Y.S.3d 19 (1st Dep't 2024) ............................................................ 13, 15, 16

*Reichmann v. Neumann*,
   553 F. Supp. 2d 307 (S.D.N.Y. 2008) ...................................................... 23, 24, 25

*Reus v. ETC Hous. Corp.*,
   72 Misc. 3d 479 (N.Y. Sup. Ct. 2021) ........................................................... 15, 18

*RLS Assocs., LLC v. United Bank of Kuwait PLC*,
   464 F. Supp. 2d 206 (S.D.N.Y. 2006) .................................................................. 18

*Satanic Temple, Inc. v. Newsweek Mag. LLC*,
   2025 WL 919423 (S.D.N.Y. Mar. 26, 2025) ......................................................... 14

*Saved Mag. v. Spokane Police Dep't*,
   19 F.4th 1193 (9th Cir. 2021) .............................................................................. 12

*Sparrow Fund Mgmt. LP v. MiMedx Grp., Inc.*,
   2021 WL 12101061 (S.D.N.Y. Sept. 28, 2021)..................................................... 19

*Todd v. Lovecruft*,
   2020 WL 60199 (N.D. Cal. Jan. 6, 2020)............................................................. 14

*Travis v. Daily Mail*,
  2023 WL 2748858 (N.Y. Civ. Ct. Mar. 31, 2023) ................................................. 14

*Trierweiler v. Croxton & Trench Holding*,
  90 F.3d 1523 (10th Cir. 1996) ............................................................................... 20

*Vishipco Line v. Chase Manhattan Bank, N.A.*,
  660 F.2d 854 (2d Cir. 1981) .................................................................................. 21

*Williams v. Crichton*,
  891 F. Supp. 120 (S.D.N.Y. 1994) ........................................................................ 25

*Zeitlin v. Cohan*,
  220 A.D.3d 631 (1st Dep't 2023) ........................................................................... 14

**Statutes**

N.Y. Civ. Rights Law § 70-a ................................................................... 9, 13, 20

N.Y. Civ. Rights Law § 76-a ......................................................................... 9, 13

N.Y. Exec. L. § 297 ............................................................................................... 20

**Rules**

Fed. R. Civ. P. 54 ............................................................................................. 24, 25

N.Y. Court R. § 130 .............................................................................................. 21

**Other Authorities**

*About New York Post*,
  New York Post, https://nypost.com/about-new-york-post/, (last visited June 23, 2025) ......... 11

Christy Piña,
  *Blake Lively Files Legal Action Against 'It Ends With Us' Co-Star and Director Justin
  Baldoni for Sexual Harassment*, The Hollywood Reporter,
  https://www.hollywoodreporter.com/movies/movie-news/blake-lively-sues-justin-baldoni-
  sexual-harassment-1236092214/ (Dec. 21, 2024) .................................................... 5

Matthew L. Schafer & Tanvi Valsangikar,
  *The Application of the New York AntiSLAPP Scheme in Federal Court*, 2 J. Free Speech L.
  573, 599–614 (2023) ............................................................................................... 19

*Senior US Showbiz Reporter*,
  DAILYMAIL.COM, https://www.dailymail.co.uk/profile-461/james-vituscka.html (last visited
  June 23, 2025) ........................................................................................................ 11

Sponsor Mem. of Sen. Holyman (July 22, 2020),
  https://www.nysenate.gov/legislation/bills/2019/S52 ............................................... 22

The Megyn Kelly Show,
  *New Details About Publicists in PR War Between Blake Lively and Justin Baldoni, with Bryan
  Freedman*, https://www.youtube.com/watch?v=5t6xWWt65 (Jan. 7, 2025) ............................. 5

THE NEW YORK TIMES, https://www.nytimes.com/interactive/2024/12/21/us/statement-to-the-
  new-york-times.html (Dec. 21, 2024) ...................................................................... 5

Consolidated Defendants Leslie Sloane and Vision PR, Inc. (together, "the Sloane Parties"), respectfully submit this memorandum of law in support of their motion for attorneys' fees and costs pursuant to Federal Rule of Civil Procedure 54(d), New York's anti-SLAPP law, and/or the Court's inherent powers.

## PRELIMINARY STATEMENT

The Wayfarer Parties' claims against the Sloane Parties were an ill-advised publicity stunt that had no basis in law or fact. After suffering months of financially crippling and emotionally devastating litigation, the Sloane Parties have now been fully vindicated. The Court dismissed the claims against them with prejudice and held, on no uncertain terms, that "Sloane did not commit a tort." ECF No. 296 ("Order") at 103. In addition to the gaping legal deficiencies in the Wayfarer Parties' pleadings, discovery has confirmed that their factual allegations against Sloane were complete fabrications. After the Wayfarer Parties for months wrongfully refused in discovery to identify their sources or produce *anything* to support their allegations, discovery from third parties proved that their main allegation against Ms. Sloane—which the Wayfarer Parties repeated and sensationalized throughout their court filings—was utterly false. On June 4, 2025, Daily Mail reporter James Vituscka confirmed, contrary to the Wayfarer Parties' key allegation that Ms. Sloane told him "that Blake was 'sexually assaulted,'" ECF No. 50 ¶ 193, that "Ms. Sloane never told [Vituscka] that Ms. Lively was sexually harassed or sexually assaulted by Justin Baldoni or anyone else." ECF No. 286-1 ¶ 5. Vituscka also confirmed that the Wayfarer Parties did not conduct even a cursory investigation into their claims before recklessly dragging Ms. Sloane into this litigation and the surrounding media firestorm that they fueled. *Id.* ¶ 6. By the Wayfarer Parties' own admission, any claim that Lively was "sexually assaulted" in the way their complaints implied is "an unsubstantiated accusation that not even Lively had gone so far as to claim." ECF No. 50 ¶ 193. It is simply unbelievable that any Wayfarer Party (or any counsel that drafted that

allegation or signed those pleadings before filing) believed in good faith that Ms. Sloane indeed made such an accusation.

Given that the Wayfarer Parties' claims were utterly baseless, it is clear they were filed for an ulterior purpose: to distract from their own misconduct and silence Ms. Sloane's communications with the press concerning Blake Lively's credible claims of sexual harassment and retaliation by subjecting Ms. Sloane to costly litigation and attempting to ruin her reputation through false and defamatory accusations masked as legitimate court filings. This is therefore exactly the type of strategic lawsuit against public participation that New York's anti-SLAPP statute is meant to address. Through its 2020 amendments to New York's anti-SLAPP statute, the New York legislature made its purpose clear: to provide robust protections for the free speech rights of New Yorkers by ensuring that if a plaintiff "commence[s] or continue[s]" a suit against them that lacks a "substantial basis" and targets their lawful First Amendment expression, that plaintiff will have to foot the bill.

The Sloane Parties respectfully submit that New York's anti-SLAPP statute applies and is satisfied here and accordingly request that the Court hold that the Sloane Parties are entitled to recover the reasonable attorneys' fees and costs that they incurred defending against the Wayfarer Parties' baseless claims.  In the alternative, the Sloane Parties respectfully request that the Court award them their reasonable attorneys' fees and costs pursuant to the Court's inherent powers.

## BACKGROUND

### I.    The Wayfarer Parties File a Baseless Lawsuit and Launch a Defamatory Media Campaign Against the Sloane Parties.

On January 16, 2025, the Wayfarer Parties sued the Sloane Parties in a misguided attempt to salvage Justin Baldoni's reputation after it was exposed that he is a sexual harasser who deliberately retaliated against his victim, Blake Lively. In fact, after Ms. Lively bravely spoke out

against Baldoni's sexual misconduct, Baldoni went so far as to hire a crisis PR manager to "bury" Ms. Lively and "destroy" her life. ECF No. 84 ¶ 209.

Rather than take responsibility for their egregious actions, the Wayfarer Parties attempted to distract from their own misconduct by peddling a false story about Ms. Sloane. Specifically, the Wayfarer Parties sued the Sloane Parties for extortion, defamation, and false light, based on the now debunked accusation that she helped orchestrate a smear campaign against Baldoni, when in reality, it was the Wayfarer Parties who were weaponizing the internet and media to "destroy" Ms. Lively's life. *See generally* ECF No. 50 ("Amended Complaint" or "AC").

The Wayfarer Parties never had a good faith basis for their invented storyline. Even by their own allegations, all Ms. Sloane did was respond to a press inquiry about a story that *Baldoni's team* planted. As shown in their own submissions, by August 4, 2024, Baldoni's publicist Jennifer Abel wrote that she wanted to "plant pieces this week of how horrible Blake is to work with." ECF No. 50-1 at 112. Melissa Nathan responded that she had "already off the record[] Spoke to the editor [of] [the] Daily Mail." *Id.* Ms. Sloane did not speak to the press until four days later, on August 8, 2024, when she responded to a Daily Mail reporter's inquiry. *See* AC ¶ 190.

Similarly, the thrust of the Wayfarer Parties' claims against Ms. Sloane is that she allegedly told a Daily Mail reporter, James Vituscka, "that Blake was 'sexually assaulted.'" AC ¶ 193. But the Wayfarer Parties' own pleadings indicate that "sexual[] assault[]" were *Vituscka's* chosen words. The Amended Complaint did not—because it could not—allege what specific words Ms. Sloane may have said. Instead, it merely included a screenshot of an undated text message between Vituscka and Melissa Nathan, which was purportedly exchanged "[f]ollowing the release of Lively's administrative complaint on December 20, 2024." *Id.* In the texts, Vituscka—not Ms. Sloane—writes, "now she's saying that Blake was sexually assaulted." *Id.*

The Wayfarer Parties knew or, at a minimum, should have known, that "sexually assaulted" was Vituscka's own characterization of details included in "Lively's administrative complaint," and not any words Ms. Sloane ever uttered. Indeed, the screenshot embeds an image of Vituscka's August 8, 2024 conversation with Ms. Sloane—which includes no allegations by Ms. Sloane of sexual assault—and Vituscka then expressly states that Ms. Sloane never mentioned any allegations of sexual assault. *Id.* Further, the Wayfarer Parties' complaint in their prior action against the New York Times included a screenshot of another text chain where Vituscka expressly told Melissa Nathan and Bryan Freedman that he "had many conversations with [Ms. Sloane] about Blake and **never once did she say anything about sexual assault.**" *See* ECF No. 190-3 at 16 (emphasis added). As discussed further below, during this litigation, Vituscka has yet again confirmed that Ms. Sloane never accused Baldoni of sexual assault. ECF No. 286-1.

Even taken as true, however, the Wayfarer Parties' claims were fundamentally defective. Among other deficiencies, the Wayfarer Parties failed to plead the essential elements of any claim asserted, ECF No. 87 at 7–11, 16–21, and failed to comply with the basic requirement of identifying or describing the statements they allege are defamatory, *see id.* at 3.

Making things worse, the Wayfarer Parties' pleading was littered with irrelevant and unfounded allegations meant solely to inflame the public and severely harm Ms. Sloane's business. For example, the Wayfarer Parties recklessly alleged that Vision PR, Inc. was "once backed by Harvey Weinstein," AC ¶ 282, which was, at best, deliberately misleading. The Sloane Parties have never represented Weinstein, and the stories that the Wayfarer Parties have apparently planted claiming that Ms. Sloane worked with Weinstein to silence victims are utterly baseless.

To compound the damage to the Sloane Parties, the Wayfarer Parties and their counsel launched a defamatory media campaign in connection with their lawsuit. For example, the

Wayfarer Parties' counsel, Bryan Freedman, stated to the New York Times,

> It was also discovered that Ms. Lively enlisted her own representative, **Leslie Sloan** [sic] with Vision PR . . . to **plant negative and completely fabricated and false stories with media, even prior to any marketing had commenced for the film**, which was another reason why Wayfarer Studios made the decision to hire a crisis professional to commence internal scenario planning . . .[1]

Mr. Freedman had no basis whatsoever for this highly damaging and demonstrably false accusation. He has spread similar lies in a variety of other outlets and platforms, as well.[2]

Being wrongfully dragged into this litigation caused the Sloane Parties serious reputational and economic injuries and caused Ms. Sloane severe emotional distress. Because of the Wayfarer Parties' deliberate efforts to mislead and inflame the public, Ms. Sloane continues to receive an onslaught of public ridicule and intimidating messages. *See* Declaration of Leslie Sloane ("Sloane Decl.") ¶ 3.

## II.    The Wayfarer Parties Cause the Sloane Parties to Incur Substantial Attorneys' Fees and Costs, All While Knowing Their Claims Lack a Basis in Law or Fact.

On February 20, 2025, the Sloane Parties filed a motion to dismiss the Wayfarer Parties claims against them, carefully outlining the myriad legal deficiencies in their claims. ECF No. 87. Nevertheless, the Wayfarer Parties continued to pursue their claims, including by representing— both in their filings and in the press—that they had "obtained additional information about the

---

[1]*Read the Statement*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2024/12/21/us/statement-to-the-new-york-times.html (Dec. 21, 2024) (emphasis added).

[2] *See, e.g.*, The Megyn Kelly Show, *New Details About Publicists in PR War Between Blake Lively and Justin Baldoni, with Bryan Freedman*, https://www.youtube.com/watch?v=5t6xWWt65X8 at 9:58 (Jan. 7, 2025) ("There are text messages, there are receipts that absolutely show that Blake Lively's publicist Leslie Sloane placing you know - actual stories and hit pieces about Justin in the Daily Mail and in TMZ, And we have texts with the actual reporters that show that this is exactly what's going on"); Christy Piña, *Blake Lively Files Legal Action Against 'It Ends With Us' Co-Star and Director Justin Baldoni for Sexual Harassment*, The Hollywood Reporter, https://www.hollywoodreporter.com/movies/movie-news/blake-lively-sues-justin-baldoni-sexual-harassment-1236092214/ (Dec. 21, 2024) (stating Ms. Sloane planted "negative and completely fabricated and false stories with media").

Sloane Parties' activities" that they would purportedly add to an "amended pleading." ECF No. 121 at 8; *see also id*. at 3, 4, 12 n.3, 36. Of course, that amended pleading never came, and that "additional information" was never revealed, because it does not exist. *See* ECF No. 190 at 3 (noting that the Wayfarer Parties inexplicably refused to produce documents upon which they "intend to rely in drafting a further amended complaint").

On March 17, 2025, the Sloane Parties moved to stay discovery pending resolution of their motion to dismiss. ECF No. 129. The Wayfarer Parties opposed, even though they were already on notice of the factual and legal deficiencies in their pleading. ECF No. 135. Had the Wayfarer Parties consented, the fees that the Sloane Parties incurred defending this lawsuit would have been dramatically reduced. *See* ECF No. 156 (denying Sloane Parties' motion to stay discovery).

As discovery progressed, it quickly became clear that the Wayfarer Parties knew (or, at a minimum, should have known) that their claims were without merit. The Wayfarer Parties' characterizations of their own claims became increasingly vague, rather than increasingly clear. For example, in their Amended Complaint, the Wayfarer Parties alleged that Ms. Sloane said Lively was "sexually assaulted" and that she seeded stories calling Baldoni a "sexual predator." AC ¶¶ 193, 282. But once it became clear to the Wayfarer Parties that they had no basis for that contention, they began to argue only that Ms. Sloane seeded stories "***to the effect*** that Baldoni is a 'sexual predator' who sexually assaulted Lively." ECF No. 121 at 19 (emphasis added); *see also* ECF No. 193 at 1 (same).[3] Strikingly, during a meet and confer, the Wayfarer Parties' counsel refused to even confirm whether they were still alleging Ms. Sloane ever said the words "sexual predator" or "sexual assault" in reference to Baldoni, nor would they offer any other clarification

---

[3] Of course, the Wayfarer Parties have not produced a single document or otherwise furnished evidence substantiating either articulation of what they accused Ms. Sloane of doing.

as to what the Sloane Parties' allegedly defamatory statements were. ECF No. 190 at 2 n.5.

The Sloane Parties were therefore forced to incur substantial costs trying to obtain even a modicum of clarity concerning the Wayfarer Parties claims. For example, on April 30, 2025, the Sloane Parties filed a motion to compel responses to interrogatories clarifying (i) the statements the Wayfarer Parties claim defamed them or put them in a "false light," (ii) when or how those statements occurred, and (iii) to whom those statements were made, after the Wayfarer Parties refused to provide that clearly discoverable information. *See id.* at 1.

## III.    The Record Confirms the Wayfarer Parties' Claims Are Baseless.

The Wayfarer Parties' sheer inability to support their claims in discovery confirmed that—as the Sloane Parties argued all along—the Wayfarer Parties allegations against them were flat out lies. For instance, there was never a shred of evidence produced in this case connecting Ms. Sloane or her company to the New York Times article. Nor could there be, since—as repeatedly explained—Ms. Sloane had zero involvement in its publication. *See, e.g.*, ECF No. 126 at 1.

The Wayfarer Parties only ever attempted to connect Ms. Sloane to two reporters, and she did not make defamatory statements to either of them. Specifically, in their interrogatory responses, the Wayfarer Parties identified only two journalists with whom Ms. Sloane allegedly communicated: "Sara Nathan of the *New York Post* and an unknown journalist at the *Daily Mail*." ECF No. 191-1 at 11.

As to Sara Nathan, who is Melissa Nathan's sister, the communications confirm that Sara Nathan told Ms. Sloane about the sexual harassment allegations—not the other way around. On August 8, 2024, Sara Nathan texted Ms. Sloane saying she heard about "three things" that Baldoni did on set that were, in her words, "all a bit creepy." Sloane Decl. ¶ 4. Then, on August 11, 2024, Sara Nathan forwarded Ms. Sloane an anonymous "tip" that Page Six had received which said, among other things, that Baldoni made Ms. Lively "uncomfortable" on set. *Id.*

The first time Ms. Sloane discussed the sexual harassment allegations with a journalist was when Sara Nathan told Ms. Sloane about what she heard. *Id.* Even though Sara Nathan informed Ms. Sloane of the underlying conduct—not the other way around—Sara Nathan's sister, Melissa Nathan, has twisted those conversations to brazenly accuse Ms. Sloane of planting stories about Baldoni, all while knowing the exact opposite occurred.

As to the second journalist, discovery revealed the purportedly "unknown" Daily Mail journalist to be James Vituscka. *See* ECF No. 286-1 ¶ 2. Critically, on June 4, 2025, James Vituscka submitted a declaration confirming that, contrary to the Wayfarer Parties' allegations that Ms. Sloane told Vituscka that Ms. Lively was "sexually assaulted," AC ¶ 193, "**Ms. Sloane never told [him] that Ms. Lively was sexually harassed or sexually assaulted by Justin Baldoni or anyone else.**" ECF No. 286-1 ¶ 5 (emphasis added). Rather, Vituscka "mistake[nly]" used that phrase on his own accord, and only in reference to Ms. Lively's CRD complaint—"not in reference to any conversation [he] had" with Ms. Sloane. *Id.* ¶¶ 3–4.

Shockingly, Vituscka also testified that the Wayfarer Parties did not bother to investigate or confirm what Vituscka meant by his use of the phrase "sexually assaulted" before they wrongfully attributed those words to Ms. Sloane and filed their complaint against her. *Id.* ¶ 6 ("The Wayfarer Parties and their counsel did not consult me about what I meant by my use of the term 'sexually assaulted.'").

Vituscka has therefore confirmed that Ms. Sloane never accused Baldoni of sexual assault—a fact that the Wayfarer Parties knew or should have known well before they filed this lawsuit, and certainly before it was dismissed nearly six months later on June 9, 2025.

## IV.    The Court Dismisses the Claims Against the Sloane Parties with Prejudice.

On June 9, 2025, the Court dismissed the Wayfarer Parties' claims against the Sloane Parties with prejudice and held that the Wayfarer Parties' claims were utterly lacking and devoid

of merit. *See* Order at 70 (holding "there are no allegations supporting . . . Sloane's liability" on extortion claim); *id.* at 96 ("Even assuming Sloane accused Baldoni of sexual assault, the Wayfarer Parties fail to support an inference that she was not simply reporting what she was told by Lively and genuinely believed."); *id.* at 100 (holding that the majority of Sloane's alleged statements were "not actionable"); *id.* at 103 ("Sloane did not commit a tort.").

## LEGAL STANDARD

New York's anti-SLAPP statute applies to claims that, as here, are based upon any "lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest." N.Y. Civ. Rights Law § 76-a. In 2020, the New York Legislature amended the anti-SLAPP statute to broaden the scope of the law, including to provide that the term "'[p]ublic interest' shall be construed broadly and shall mean any subject other than a purely private matter." *Id.* § 76-a(1)(d).

Additionally, New York Civil Rights Law § 70-a was amended to mandate, rather than merely permit, the recovery of costs and attorneys' fees upon demonstration "that the action involving public petition and participation was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law." N.Y. Civ. Rights Law § 70-a(1)(a).

## ARGUMENT

### I.    The Court Should Award the Sloane Parties Attorneys' Fees and Costs Pursuant to New York's Anti-SLAPP Statute.

#### A.  New York Law Applies Here.

In 2020, New York expanded its anti-SLAPP law to "protect citizens' exercise of the rights of free speech and petition about matters of public interest." https://www.nysenate.gov/legislation/bills/2019/S52. New York's anti-SLAPP statute applies

because the Wayfarer Parties' claims against the Sloane Parties were based on Ms. Sloane's alleged involvement in the New York Times article, to which the Court held that New York law applied, Order at 42–44, and Ms. Sloane's conversations (while she was in New York) with New York-based journalists.

As the Court explained in its dismissal order, to determine what law applies in multistate defamation actions, courts apply the "significant relationship" test and consider "'where [the] plaintiff suffered the greatest injury; where the statements emanated and were broadcast; where the activities to which the allegedly defamatory statements refer took place; and the policy interests of the states whose law might apply.'" *Id.* at 42 (quoting *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176–78 (2d Cir. 2021)). In its dismissal order, the Court was "unable to determine what law applies" to the Wayfarer Parties' claims against the Sloane Parties "because it is unclear from the pleadings where the facts underlying the claims against" them occurred. *Id.* at 40–41. But the discovery record and the Wayfarer Parties' own admissions confirm that New York law governs.

*First*, the Wayfarer Parties' *own pleading* alleges that they suffered "injury . . . within [New York]." AC ¶ 314. By contrast, the Amended Complaint contains no allegation that the Wayfarer Parties suffered injury in California. Nor have the Wayfarer Parties produced a single document or other evidence demonstrating they suffered injury in California. Although several of the Wayfarer Parties reside in California, AC ¶¶ 300–05, a plaintiff's domicile is "not decisive" particularly where, as here, every other relevant factor favors application of New York law. Order at 43; *see Kinsey*, 991 F.3d at 176–78 (applying New York law to defamation claim where plaintiff was domiciled out of state); *Belya v. Kapral*, 2025 WL 963111, at *4 (S.D.N.Y. Mar. 31, 2025) (same); *Jacob v. Lorenz*, 626 F. Supp. 3d 672, 685–86 (S.D.N.Y. 2022) (same); *DeIuliis v. Engel*, 2021 WL 4443145, at *10 (S.D.N.Y. Sept. 27, 2021) (same).

*Second*, Ms. Sloane's alleged statements all emanated from New York, where she resides and where her company, Vision PR, Inc., is based. *See* AC ¶¶ 309–10. During the six months that their claims against Ms. Sloane were pending, the Wayfarer Parties specifically alleged Ms. Sloane was involved in only one allegedly defamatory article: the New York Times article that they have called "the genesis of this entire action." ECF No. 121 at 17. The Court already squarely held that that article "emanated from New York." Order at 43. And in their interrogatory responses, the Wayfarer Parties identified only two journalists with whom Ms. Sloane allegedly communicated: "Sara Nathan of the New York Post and an unknown journalist at the Daily Mail." ECF No. 191-1 at 11. Of course, like the New York Times, the New York Post is located in New York, as is Sara Nathan.[4] And discovery revealed that the "unknown" Daily Mail journalist was James Vituscka, *see* ECF No. 286-1 ¶ 2, who is likewise based in New York.[5]

*Third*, the activities to which the allegedly defamatory statements refer took place in New York. The Court already found that the "events underlying the allegedly defamatory statements took place in New York." Order at 43. The Wayfarer Parties have not shown—and cannot show—that any of Ms. Sloane's allegedly defamatory statements reference events or conduct that occurred in California. Quite the opposite, the Wayfarer Parties specifically allege that the conflict between Livley and Baldoni—the subject of Ms. Sloane's allegedly defamatory statements—occurred while the parties were filming "in New York," AC ¶ 67, inside Ms. Lively's "New York penthouse," *id.* ¶ 41, and during the "New York film premiere," *id.* ¶¶ 44, 168; *see also* ECF No.

---

[4] *See About New York Post*, New York Post, https://nypost.com/about-new-york-post/, (last visited June 23, 2025) (stating the New York Post is "headquartered in New York"). Sara Nathan also lives in, and was duly served with her subpoena, at her Brooklyn residence.

[5] *See, e.g.*, *Senior US Showbiz Reporter*, DAILYMAIL.COM, https://www.dailymail.co.uk/profile-461/james-vituscka.html (last visited June 23, 2025) (stating Vituscka is part of the " New York City team"). Vituscka also lives in, and was duly served with his subpoena, at his Manhattan residence.

50-1 at 11, 15, 60 (claiming certain key interactions occurred in Ms. Lively's "New York" apartment); *id.* at 100, 114, 128 (claiming Baldoni's conflict with Ms. Lively escalated due to circumstances surrounding the "New York" film premier).

*Finally*, New York has "an equal—if not stronger—interest [than California] in protecting the First Amendment rights of its citizens." *Belya*, 2025 WL 963111, at *4 (applying New York law to defamation claim even though plaintiff was domiciled out-of-state and **defendant was not a media defendant**). As the "cultural center for the Nation," New York has "long provided a hospitable climate for the free exchange of ideas." *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 249 (1991); *see, e.g.*, *Jacob*, 626 F. Supp. 3d at 685 (emphasizing New York's "strong policy interests in regulating the conduct of its citizens and its media"). There is no reason why New York's public policy interests that the Court already found apply to the New York Times, *see* Order at 43, should not also extend to Ms. Sloane, particularly considering that it is well-settled that the First Amendment rights of the press are no broader than those of the public. *See, e.g.*, *Cianci v. New Times Pub. Co.*, 88 F.R.D. 562, 564 (S.D.N.Y. 1980); *Saved Mag. v. Spokane Police Dep't*, 19 F.4th 1193, 1198 (9th Cir. 2021) ("Generally . . . a journalist's First Amendment rights are no more extensive than those of ordinary members of the public") (citing *Branzburg v. Hayes*, 408 U.S. 665, 683–84 (1972)).[6]

In short, Ms. Sloane has zero connection to California, and nothing in the Amended

---

[6] As the Court explained, New York has a "'significant interest in assuring that the risks and liabilities flowing from publishing . . . will be uniform,'" so that "publishers are able to 'mold their conduct' to predictable legal norms." Order at 43 (quoting *Jacob*, 626 F. Supp. 3d at 685). Although Ms. Sloane is not a "publisher," the Court's reasoning applies equally to publicists like Ms. Sloane, since she was sued in her capacity as a source for publishers, and journalists' sources likewise require predictable legal norms to mold their conduct. New York has a strong public policy interest in safeguarding the free exchange of information between publishers and their sources. *See, e.g.*, *Holmes v. Winter*, 22 N.Y.3d 300, 307 (2013) (describing "New York's well-established public policy" in favor of providing protections to confidential sources).

Complaint or record demonstrates otherwise. All of her allegedly defamatory statements were made from her home in New York in her capacity as a source for New York-based journalists. Her statements concerned conduct that occurred in New York and allegedly caused harm to the Wayfarer Parties within New York. For the avoidance of doubt, Ms. Sloane submits a declaration herewith confirming that she resides in and works out of New York, and that her relationship with Ms. Lively is centered in New York. *See* Sloane Decl. ¶ 2.[7] New York law therefore applies.

### B.  New York's Anti-SLAPP Law Is Satisfied Here.

The Sloane Parties are entitled to recover their attorneys' fees and costs under New York's anti-SLAPP statute because Ms. Sloane's statements were made "in connection with an issue of public interest," N.Y. Civ. Rights Law § 76-a, and the Wayfarer Parties' claims were "commenced or continued without a substantial basis in fact and law," N.Y. Civ. Rights Law § 70-a(1)(a).

### i.  Ms. Sloane's Alleged Statements Were Made in Connection with a Matter of Public Interest.

The term "public interest" as used in the amended anti-SLAPP statute is broadly defined as "any subject other than a purely private matter." N.Y. Civ. Rights Law § 76-a(1)(d); *see, e.g.*, *Reeves v. Associated Newspapers, Ltd.*, 218 N.Y.S.3d 19, 25, 27 (1st Dep't 2024) (noting "[t]he 2020 amendments expanded the scope of anti-SLAPP protection" and that the term "public interest" is to be "broadly construed"). "In light of the extremely broad interpretation of what qualifies as public interest by New York courts, cases where the subject matter was not a matter of legitimate public concern are extremely rare." *Lindberg v. Dow Jones & Co., Inc.*, 2021 WL

---

[7] The Sloane Parties respectfully submit that the record is more than sufficient for the Court to determine that New York's anti-SLAPP law applies but would be amenable to an evidentiary hearing if necessary to resolve issues concerning choice of law or to identify the "unspecified locations," Order at 41, not pleaded in the Wayfarer Parties' complaint. *See generally AEI Life, LLC v. Lincoln Benefit Life Co.*, 225 F. Supp. 3d 136, 144 (E.D.N.Y. 2016) (making findings of fact as to choice of law at evidentiary hearing).

3605621, at *8 (S.D.N.Y. Aug. 11, 2021) (cleaned up). Ms. Sloane's alleged statements concern an issue of "public interest" for multiple independent reasons.

*First*, Ms. Sloane's alleged statements were regarding sexual misconduct, *see* AC ¶ 193, and therefore concern the public interest, *see Goldman v. Reddington*, 2021 WL 4099462, at *4 (E.D.N.Y. Sept. 9, 2021) (statements accusing person of "sexual assault" concern the public interest); *Coleman v. Grand*, 523 F. Supp. 3d 244, 259 (E.D.N.Y. 2021) (statements concerning "sexual impropriety and power dynamics in the music industry" concern the public interest); *see also, e.g.*, *Satanic Temple, Inc. v. Newsweek Mag. LLC*, 2025 WL 919423, at *9 (S.D.N.Y. Mar. 26, 2025); *Margolies v. Rudolph*, 2022 WL 2062460, at *7 n.39 (E.D.N.Y. June 6, 2022). Indeed, "courts have regularly found that accounts or allegations of sexual assault, harassment or other impropriety constitute matters of public interest." *Travis v. Daily Mail*, 2023 WL 2748858, at *3 (N.Y. Civ. Ct. Mar. 31, 2023) (collecting cases).[8]

*Second*, it is undisputed that "Baldoni is a public figure," Order at 91–92, and it is well-settled that statements regarding public figures concern the public interest, *see, e.g.*, *Bloom v. A360 Media LLC*, 735 F. Supp. 3d 466, 477 (S.D.N.Y. 2024) ("There is no dispute that" reports in celebrity-gossip outlet concerning woman having babies with a public figure concerned "an issue of public interest."); *Coleman*, 523 F. Supp. 3d at 260 (holding statement concerning a "prominent" figure was a matter of public interest); *Zeitlin v. Cohan*, 220 A.D.3d 631, 632 (1st Dep't 2023) (statements concerning "well-known business executive and former nominee to a

---

[8] Courts in other jurisdictions are in accord. *See Moreira-Brown v. Las Vegas Rev. J., Inc.*, 648 F. Supp. 3d 1278, 1287 (D. Nev. 2023) (holding that reporting on allegations in complaint alleging sexual abuse "concern the public's interest in court proceedings"); *Todd v. Lovecruft*, 2020 WL 60199, at *13 (N.D. Cal. Jan. 6, 2020) ("[A]ccusations of abuse on their own can serve the interest of the public at large" because they "contribute to the discussion surrounding sexual assault because they invite discussion on identifying, responding to, and preventing sexual abuse").

United Nations post" concerned public interest).

*Third*, there is no dispute that the subject of Ms. Sloane's statements—the feud between Lively and Baldoni—has been subject to widespread media coverage, *see, e.g.*, AC ¶¶ 185, 226, 279 n.26, which is alone evidence that Ms. Sloane's statements concern the public interest. *See, e.g.*, *Haart v. Scaglia*, 2023 WL 3472322, at *6 (N.Y. Sup. Ct. May 11, 2023) ("[C]hallenged statements involve matters of public interest" where dispute "has been discussed on . . . Netflix show and in numerous media outlets."); *Reus v. ETC Hous. Corp.*, 72 Misc. 3d 479, 486 (N.Y. Sup. Ct. 2021), *aff'd*, 203 A.D.3d 1281 (2022) ("[C]ourts, for obvious reasons, are deferential to editors in terms of what is of interest to the public and thus what is newsworthy.").[9]

*Finally*, "[m]atters of public interest also include judicial proceedings," *Reeves*, 218 N.Y.S.3d at 19, so Ms. Sloane's alleged statements also concern the public interest to the extent they are alleged to concern Ms. Lively's CRD complaint. *See, e.g.*, *Omansky v. Tribeca Citizen LLC*, 2022 WL 3647133, at *5 (N.Y. Sup. Ct. Aug. 24, 2022).

### ii.    The Wayfarer Parties' Claims Lack a Substantial Basis in Law and Fact.

### a.    The Claims Lack a Substantial Basis in Law.

There is no question that the Wayfarer Parties claims against the Sloane Parties lacked a substantial basis in law, since the Court dismissed those claims without leave to amend. *See* Order at 129. The dismissal of the Wayfarer Parties' claims is alone sufficient to satisfy the "substantial basis" standard of the anti-SLAPP statute. *See, e.g.*, *Heilbut v. Cassava Scis., Inc.*, 2025 WL 919654, at *11 (S.D.N.Y. Mar. 26, 2025) (finding lawsuit "lacked a substantial basis in fact and law" where complaint "was dismissed for failure to state a claim"); *Bobulinski*, 758 F. Supp. 3d

---

[9] Again, courts in other jurisdictions are in accord. *See, e.g.*, *Eliott v. Lions Gate Ent. Corp.*, 639 F. Supp. 3d 1012, 1024 (C.D. Cal. 2022) (holding a controversy a matter of public concern when "major media outlets devoted substantial attention" to it).

166, 184–85 (S.D.N.Y. 2024) (granting request for attorney's fees upon a Rule 12(b)(6) dismissal).[10]

The New York Appellate Division, First Department, has confirmed that a complaint which fails to state a claim necessarily lacks a "substantial basis." *Reeves*, 218 N.Y.S.3d at 21; *see also, e.g.*, *Black v. Ganieva*, 236 A.D.3d 427, 428 (1st Dep't 2025) (finding dismissal of complaint entitled defendant to attorneys' fees and costs); *Goldman v. Abraham Heschel Sch.*, 227 A.D.3d 544, 545–46 (1st Dep't 2024) (same); *215 W. 84th St Owner LLC v. Bailey*, 191 N.Y.S.3d 368, 369 (1st Dep't 2023) (same). "That these decisions involved trial courts' dismissals under CPLR 3211(a)(7)—New York's version of Rule 12(b)(6)" is irrelevant. *Bobulinski*, 758 F. Supp. 3d at 185. The applicable standards under CPLR 3211(a)(7) and Rule 12(b)(6) are "parallel," *id.* at n.17 (collecting cases), and in any event, the Court's bases for dismissing the Wayfarer Parties' claims—including that the Wayfarer Parties "failed to plead actual malice"—would have "warranted dismissal in state court as well," *Heilbut*, 2025 WL 919654, at *11 (collecting cases).

Accordingly, the Court's dismissal of the Wayfarer Parties' Amended Complaint is alone sufficient to satisfy the "substantial basis" prong and entitle the Sloane Parties to the attorneys' fees and costs that they incurred defending against the Wayfarer Parties' baseless claims.

### b. The Claims Lack a Substantial Basis in Fact.

Further, the Wayfarer Parties' claims against the Sloane Parties also lacked a substantial basis in fact. In its June 9 Order, the Court appropriately noted the complete lack of a substantial *factual* basis in the Wayfarer Parties' allegations against Sloane. *See* Order at 80 (holding that "allegations of a conspiracy between the parties are conclusory"); *id*. at 82 n.40 (holding that "[t]he

---

[10] While the Court analyzed the Wayfarer Parties' claims under California law, dismissal would have been required had the Court applied New York law instead. *See* Order at 39 (noting that causes of action for civil extortion and false light do not exist under New York law and that New York defamation law has even greater protection for statements of opinion than California).

mere fact that they are related to Lively . . . does not provide the basis for an inference that they made or were responsible for any particular statements to the Times"); *id*. at 96 (holding that allegations that "Sloane was part of a 'conspiracy to spread knowing falsehoods'" was "entirely conclusory"). Indeed, the closest the Wayfarer Parties came to stating a plausible defamation claim against the Sloane Parties was their allegation that Ms. Sloane told James Vituscka, a reporter for the Daily Mail, "that Blake was 'sexually assaulted.'" AC ¶ 193; *see* Order at 100–02 (holding that all other alleged statements by Ms. Sloane are not actionable). In addition to the deficiencies of that allegation even assuming its truth, Order at 93–94, James Vituscka has now sworn under penalty of perjury that—as Ms. Sloane argued all along—"sexually assaulted" were Vituscka's chosen words and not words that Ms. Sloane ever uttered. *See* ECF No. 286-1. Vituscka unequivocally testified that "Ms. Sloane never told [him] that Ms. Lively was sexually harassed or sexually assaulted by Justin Baldoni or anyone else." *Id.* ¶ 5. Vituscka also revealed that the Wayfarer Parties did not bother to ask Vituscka what he meant by his use of the phrase "sexually assaulted" before they wrongfully attributed those words to Ms. Sloane and filed their complaint against her and her company. *Id.* ¶ 6. As further evidence that the allegations attributed to him were unreliable, Vituscka explicitly instructed Bryan Freedman **not** to reference him or the Daily Mail in support of the Wayfarer Parties' complaint. *See* Exhibit A (undated Vituscka text with Wayfarer Parties' counsel Bryan Freedman).

Given the ambiguity of the text message and available information directly contradicting the Wayfarer Parties' interpretation of it, the Wayfarer Parties certainly should have investigated its meaning before relying on it as their sole basis for a bombshell defamation lawsuit against the Sloane Parties. *See* Order at 93 n.48 (the Court observing the ambiguity of the "sexually assaulted" text message underlying the allegation); *see also, e.g.*, ECF No. 190-3 at 16 (confirming that

17

Vituscka told Melissa Nathan and Bryan Freedman that he "had many conversations with [Ms. Sloane] about Blake and **never once did she say anything about sexual assault**") (emphasis added). Despite a complete lack of a good faith basis for the allegation that Ms. Sloane accused Baldoni of "sexual assault" (or made any other allegedly defamatory statements concerning the Wayfarer Parties), the Wayfarer Parties sued the Sloane Parties for defamation and related claims based solely on their self-serving and likely intentional misreading of Vituscka's text.

The Wayfarer Parties' claims against the Sloane Parties therefore had no basis whatsoever, let alone a "substantial basis." *See, e.g.*, *Reus*, 72 Misc. 3d at 488 ("Plaintiffs knew or should have known long ago of the non-meritorious and futile nature of the instant litigation.").

### C.  The Anti-SLAPP Statute's Fee-Shifting Provision Applies in Federal Court.

#### i.  Fee-Shifting Provisions Are Substantive.

The Sloane Parties do not invoke the anti-SLAPP law's procedural protections and instead invoke only the fees provision. Courts consistently hold that fee-shifting provisions are substantive and apply in federal court. *See Bobulinski*, 758 F. Supp. 3d at 183 ("The Second Circuit has consistently held that provisions for attorney's fees are a substantive, not procedural, right.") (collecting cases); *1st Amend. Praetorian v. New York Times Co.*, 2025 WL 949575, at *7 (S.D.N.Y. Mar. 28, 2025) ("The substantive provisions of New York's anti-SLAPP law govern a federal court sitting in diversity."); *see also Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 259 n.31 (1975) (state law fee shifting provisions are substantive and "should be followed" in diversity cases in federal court); *Cotton v. Slone,* 4 F.3d 176, 180 (2d Cir. 1993) ("Attorney's fees mandated by state statute are available when a federal court sits in diversity."); *RLS Assocs., LLC v. United Bank of Kuwait PLC*, 464 F. Supp. 2d 206, 213 (S.D.N.Y. 2006) ("[A]ttorneys' fees are considered substantive under the Erie doctrine"). In fact, the Second Circuit has noted that Nevada's similar anti-SLAPP statute's fee shifting provision is "substantive within

the meaning of *Erie*." *Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014).

Indeed, under New York's anti-SLAPP statute, entitlement to fees is not tied to a "specific state procedural mechanism," and instead "follows from the failure to state a claim as a matter of New York law." *Bobulinski*, 758 F. Supp. 3d at 184. Multiple courts have accordingly held that New York's anti-SLAPP fee provision applies in federal court. *See id.* at 188; *see also, e.g.*, *Goldman*, 2021 WL 4099462, at *5; *Heilbut*, 2025 WL 919654, at *9; *Sparrow Fund Mgmt. LP v. MiMedx Grp., Inc.*, 2021 WL 12101061, at *6 (S.D.N.Y. Sept. 28, 2021).[11]

### ii.    The Fee-Shifting Provision Does Not Violate the Rules Enabling Act.

As Judge Oetken explained in a recent opinion, the fee provision does not conflict with the Federal Rules of Civil Procedure. *Bobulinski*, 758 F. Supp. 3d at 183–86; *see, e.g.*, Matthew L. Schafer & Tanvi Valsangikar, *The Application of the New York AntiSLAPP Scheme in Federal Court*, 2 J. Free Speech L. 573, 599–614 (2023) (distinguishing contrary cases and analyzing why the fee provision applies in federal court) (cited with approval in *Bobulinski*). While this court reached a different conclusion in *Brady v. NYP Holdings, Inc.*, 2022 WL 992631, at *11 (S.D.N.Y. Mar. 31, 2022), there, the defendant requested anti-SLAPP fees in a footnote, without addressing whether the fee-shifting provision applies in federal court. *See Brady*, Case No. 21-cv-3482 (S.D.N.Y.), ECF No. 18 at 17 n.6. This Court therefore did not have the opportunity to consider

---

[11] Courts in other jurisdictions applying similar anti-SLAPP statutes have likewise held that their fee-shifting provisions are substantive and apply in federal court. *See, e.g.*, *Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1323 (S.D. Fla. 2020) (applying Florida's anti-SLAPP statute's "fee shifting provision" including because it was "enacted to accomplish a fundamental state policy—deterring SLAPP suits"); *Paucek v. Shaulis*, 2025 WL 1298457, at *14 (D.N.J. May 6, 2025) (holding New Jersey's anti-SLAPP statute applies in federal court because treating its "fee-shifting provision as a sanction 'would be contrary to the settled law that [mandatory fee-shifting provisions] are substantive under *Erie*' and 'should be followed' in federal diversity cases."); *Godin v. Schencks*, 629 F.3d 79, 85–87 (1st Cir. 2010) (holding Maine's anti-SLAPP statute applies in federal court because holding otherwise would "result in an inequitable administration of justice" and encourage forum shopping); *Block v. Tanenhaus*, 815 F.3d 218, 221 (5th Cir. 2016) (assuming without deciding that Louisiana's anti-SLAPP law applied in federal court).

those arguments or the reasoning later articulated in *Bobulinski*. Therefore, the Sloane Parties respectfully submit that the more recent reasoning set forth in *Bobulinski* should control here.

The anti-SLAPP statute does not violate the Rules Enabling Act because unlike Rule 11, the fee provision is not a "sanction." *Bobulinski*, 758 F. Supp. 3d at 189 n.24. Instead, it provides for attorneys' fees and costs so that defendants in meritless SLAPP suits can be made whole through "damages." N.Y. Civ. Rights Law § 70-a(1)(a). In contrast, "Rule 11 is not a fee-shifting statute," and its "main objective" is "not to reward parties who are victimized by litigation," but rather, to impose punitive sanctions for filings that violate certification standards in order to "deter" future abuses. *See Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 553 (1991). In other words, Rule 11 provides a procedural, punitive sanction, whereas the anti-SLAPP statute provides a substantive right to damages.

Further, Rule 11 is a general rule of civil procedure that applies to all parties in all federal litigations, whereas § 70-a(1) applies only to strategic lawsuits against public participation, and it may be invoked only by defendants in such actions. Because § 70-a(1) aims to "protect[] a particular class of defendants," it "vindicates substantive interests of [the state] not covered by Rule 11." *Trierweiler v. Croxton & Trench Holding*, 90 F.3d 1523, 1540 (10th Cir. 1996); *see, e.g.*, *Degussa Admixtures, Inc. v. Burnett*, 277 F. App'x 530, 533 (6th Cir. 2008) (holding fee-shifting provision does not conflict with Rule 11 because it "is not a 'general' sanctions statute that. . . applies to all civil actions" but instead "is a specific statute that applies only to [certain type of] claims"). Where, as here, a fee-shifting rule "permits a prevailing party in certain classes of litigation to recover fees," it "embod[ies] a substantive policy" and applies in federal diversity actions. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 52–54 (1991).

Federal courts routinely grant fee awards under statutes that include fee shifting

mechanisms and do not find that those provisions conflict with Rule 11 or other federal rules. *See, e.g.*, *Casmento v. Volmar Constr., Inc.*, 2022 WL 17666390, at *2 (S.D.N.Y. Dec. 14, 2022) (awarding fees under N.Y. Exec. L. § 297(10) to a "prevailing or substantially prevailing party") (Liman, J.); *Gilani v. Teneo, Inc.*, 2022 WL 4593040, at *2 (S.D.N.Y. Sept. 30, 2022) (applying the same provision's "frivolous" standard to a defendant's fee claim). Just as Rule 11 is no obstacle to a prevailing-party fee award in those cases, it is no obstacle to an award mandated by § 70a-(1).

In short, the anti-SLAPP statute's fee provision is categorically distinct from Rule 11 because it provides a substantive right to damages in a narrow class of cases, rather than operating as a procedural sanction applicable in all federal litigation.[12]

### iii. Applying the Fee-Shifting Provision in Federal Court Serves the Twin Purposes of Erie and New York's Policy Interests.

Application of § 70-a in federal court furthers the twin aims of *Erie*—avoiding forum shopping and the inequitable administration of the law. "When a federal court refuses to apply a substantive right in state court, forum shopping becomes a logical choice." *Bobulinski*, 758 F. Supp. 3d at 186. It would be fundamentally unfair if a prevailing defendant's "plainly given" right to attorneys' fees and costs in a SLAPP suit could be "destroyed by removal of the cause to the federal courts." *Alyeska*, 421 U.S. at 259 n.31; s*ee, e.g.*, *Adelson*, 774 F.3d at 809 (noting Nevada anti-SLAPP statute's fee-shifting provision applied in federal court in part because "enforcement in federal proceedings will serve to discourage forum shopping and avoid inequity"); *Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 866 (2d Cir. 1981) ("[I]t would be inequitable to allow a party to benefit or suffer from the existence of diversity jurisdiction . . . when a similarly situated non-diverse party would not face such a consequence.").

---

[12] If Rule 11 were indeed sufficient to satisfy the substantive policy underlying the anti-SLAPP statute, the anti-SLAPP statute would serve no purpose even in New York state court, which has its own sanctions mechanism similar to Rule 11. *See* N.Y. Court R. § 130-1.1.

Further, refusing to apply the fee-shifting provision in federal court would thwart "the New York legislature's interest in protecting the robust free speech rights of New Yorkers beyond that of the federal First Amendment protections." *Bobulinski*, 758 F. Supp. 3d at 186; *see, e.g.*, Sponsor Mem. of Sen. Holyman (July 22, 2020), https://www.nysenate.gov/legislation/bills/2019/S52. The Court should not permit the Wayfarer Parties to eradicate the Sloane Parties' substantive rights and override the New York legislature's express policy goals simply because they filed their claims in federal court.[13]

## II.    In The Alternative, the Court Should Award the Sloane Parties Attorneys' Fees and Costs Pursuant to its Inherent Powers.

In the alternative, the Sloane Parties respectfully request that it award the Sloane Parties their attorneys' fees and costs pursuant to the Court's inherent powers. Courts have broad, inherent authority to make a prevailing party whole where, as here, the opposing party has acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 45–46; *see also Carousel Foods of Am., Inc. v Abrams & Co., Inc.,* 423 F Supp 2d 119, 124 (S.D.N.Y. 2006) ("The court's inherent sanction power is broader than its power to impose sanctions under either Rule 11 or [§ 1927].").

Specifically, courts may award a prevailing defendant its attorneys' fees and costs if a plaintiff's claims were (1) without merit; and (2) brought or maintained in bad faith or for an improper purpose. *See, e.g.*, *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 56 (2d Cir. 2018). Here, both elements are easily satisfied.

*First*, as illustrated above, Wayfarer Parties' claims "lack[ed] any legal or factual basis." *Enmon v. Prospect Cap. Corp.*, 675 F.3d 138, 143 (2d Cir. 2012). The Court acknowledged as

---

[13] Requiring the Sloane Parties to file a separate action in state court would not remedy this inequity, including because the Wayfarer Parties could simply remove the action to federal court.

much by dismissing every claim against the Sloane Parties with prejudice. *See, e.g.*, *Prospect Cap. Corp. v. Enmon*, 2010 WL 907956, at *4 (S.D.N.Y. Mar. 9, 2010) (awarding attorneys' fees in part because plaintiffs "did not prevail on a single claim"). Among other glaring deficiencies, the Wayfarer Parties did not even allege that Ms. Sloane made a single statement—let alone a defamatory statement—concerning six of the seven Wayfarer Parties, yet she was forced to defend claims brought by all seven of them. *See* Order at 92 n.47 ("The other Wayfarer Parties cannot recover for [the alleged defamatory] statements under any standard.").

Further, the Wayfarer Parties made no effort whatsoever to investigate Vituscka's text messages, which formed the sole basis for their claims against Ms. Sloane. *See* ECF No. 286-1 ¶ 6. Because the Wayfarer Parties failed to conduct even a cursory investigation, they filed a high-profile lawsuit against the Sloane Parties that contained patently false allegations. *See* AC ¶ 193. Such conduct is plainly sanctionable. *See, e.g.*, *Reichmann v. Neumann*, 553 F. Supp. 2d 307, 320–21 (S.D.N.Y. 2008) (sanctioning plaintiff where he "failed to make any reasonable investigation before bringing suit" and the facts supporting his claims were "shown to be false"); *Ji Li v. New Ichiro Sushi, Inc.*, 2020 WL 2094095, at *9–11 (S.D.N.Y. Apr. 30, 2020) (imposing sanctions for failing to withdraw claims when it became clear that those claims were "entirely meritless"); *Kaufman v. Equifax Info. Servs., LLC*, 2019 WL 3997461, at *3 (E.D.N.Y. Aug. 22, 2019) (awarding sanctions where "plaintiff and his counsel continued to litigate his meritless claims even after defendants provided documents clearly demonstrating that these claims were false").

*Second*, the Wayfarer Parties commenced and pursued this litigation against the Sloane Parties for improper purposes—namely, to distract from their own misconduct and silence Ms. Sloane. "Bad faith may be inferred" where, as here, "actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose" *In re*

23

*Petrobras Secs Litig.*, 2018 WL 4521211, at *6 (S.D.N.Y. Sep. 21, 2018) (internal citation omitted). "'Bad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation," *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986), and "even a single bad-faith filing" is sufficient to satisfy this requirement, *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 991 F.3d 361, 369 (2d Cir. 2021).

Here, the Wayfarer Parties' claims were utterly meritless and were filed as a mere publicity stunt. The Wayfarer Parties knew (or should have known) that their claims had no basis in law and fact, and they were thus filed, litigated, and amplified in the press in bad faith. *See, e.g.*, *Huebner*, 897 F.3d at 57 (upholding sanctions against a party merely for "initiat[ing] th[e] lawsuit" in bad faith); *Hong v. Mommy's Jamaican Mkt. Corp.*, 2024 WL 3824394, at *13–14 (S.D.N.Y. Aug. 14, 2024) (Liman, J.) (sanctioning defendants and their counsel where "claims were untrue and known to be untrue"); *Reichmann*, 553 F. Supp. 2d at 320–21 (sanctioning plaintiff because "[i]t was bad faith to bring this suit without having first made a minimal investigation, and it was bad faith to continue this suit once they had seen" evidence that proved plaintiff had no colorable claim).

Accordingly, the Sloane Parties respectfully request that, in the alternative to awarding the Sloane Parties' attorneys' fees and costs pursuant to New York's anti-SLAPP statute, the Court award that same relief pursuant to its inherent powers. *See, e.g.*, *Reichmann*, 553 F. Supp. 2d at 328 (sanctioning the plaintiff for 100% of the defendant's fees pursuant to its inherent powers); *Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*, 2011 WL 1002439, at *2 (S.D.N.Y. Mar. 16, 2011) (awarding "attorney's fees and related nontaxable expenses" pursuant to the Court's inherent authority and Fed. R. Civ. P. 54(d)(2)).

### III.    The Sloane Parties Are Entitled to their Reasonable Attorneys' Fees and Costs.

Pursuant to Rule 54(d)(2)(C), "[t]he court may decide issues of liability for fees before receiving submissions on the value of services." Accordingly, the Sloane Parties respectfully

request that if the Court finds that the Sloane Parties are entitled to attorneys' fees and costs pursuant to either New York's anti-SLAPP law and/or the Court's inherent powers, that the Court set a briefing schedule to determine the reasonable amount of fees to which the Sloane Parties are entitled. *See, e.g.*, *Bobulinski*, 758 F. Supp. 3d at 190 (awarding attorneys' fees under New York's anti-SLAPP law and setting a briefing schedule for the submission of appropriate documentation); *Reichmann*, 553 F. Supp. 2d at 327–28 (awarding attorneys' fees under the court's inherent powers and directing counsel for defendant to submit records of fees incurred in defense of the action). The Sloane Parties estimate that they will seek approximately $1,300,000 in attorneys' fees and approximately $38,000.00 in costs.[14]

---

[14] Rule 54 only requires the party seeking fees to "provide a fair estimate of" the fees sought. Fed. R. Civ. P. 54(d)(2)(B)(iii); *see also* Fed. R. Civ. P. 54(d) advisory committee note (amended 1993) ("The rule does not require that the motion be supported at the time of filing with the evidentiary material bearing on the fees."); *Williams v. Crichton*, 891 F. Supp. 120, 122 (S.D.N.Y. 1994) ("By providing an estimate of the amount sought and promptly filing, Defendants have fulfilled the requirements of Rule 54 for a fee award.").

Dated: June 23, 2025

Respectfully Submitted,

BOIES SCHILLER FLEXNER LLP

*/s/ Sigrid S. McCawley*
Sigrid S. McCawley
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
Telephone: (954) 356-0011
smccawley@bsfllp.com

Andrew Villacastin
Lindsey Ruff
Rachael Schafer
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
avillacastin@bsfllp.com
lruff@bsfllp.com
rschafer@bsfllp.com

*Attorneys for Leslie Sloane and Vision PR, Inc.*