UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

```
                                                    :
BLAKE LIVELY,                                       :
                                                    :
                         Plaintiff,                 :          24-cv-10049
                                                    :
         -v-                                        :          OPINION AND ORDER
                                                    :
WAYFARER STUDIOS LLC, JUSTIN BALDONI,               :
JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH           :
US MOVIE LLC, MELISSA NATHAN, THE AGENCY            :
GROUP PR LLC, JENNIFER ABEL, JED WALLACE,           :
STREET RELATIONS, INC.,                             :
                                                    :
                         Defendants.                :
                                                    :
```
---------------------------------------------------------------------X
```
                                                    :
WAYFARER STUDIOS LLC, JUSTIN BALDONI,               :
JAMEY HEATH, IT ENDS WITH US MOVIE LLC,             :
MELISSA NATHAN, JENNIFER ABEL, STEVE                :
SAROWITZ,                                           :
                                                    :
                         Plaintiffs,                :
                                                    :
         -v-                                        :
                                                    :
BLAKE LIVELY, RYAN REYNOLDS, LESLIE                 :
SLOANE, VISION PR, INC., THE NEW YORK TIMES         :
COMPANY,                                            :
                                                    :
                         Defendants.                :
                                                    X
```
---------------------------------------------------------------------

LEWIS J. LIMAN, United States District Judge:

Defendants Jed Wallace ("Wallace") and Street Relations, Inc. ("Street Relations," and

together with Wallace, the "Wallace Defendants") move, pursuant to Federal Rules of Civil

Procedure 12(b)(2), 12(b)(3), and 12(b)(6), to dismiss the claims brought against them by Blake

Lively ("Lively").  Dkt. No. 139.  In the alternative, the Wallace Defendants move to sever the

claims against them and transfer venue to the United States District Court for the Western District of Texas.  *Id.*

For the following reasons, the motion to dismiss is granted without prejudice.

## BACKGROUND

For the purposes of the Wallace Defendants' motion to dismiss for failure to state a claim, the Court assumes the truth of the well-pleaded allegations of Lively's Amended Complaint.  Dkt. No. 84.[1]  For the purposes of the Wallace Defendants' motion to dismiss for lack of personal jurisdiction, the Court may also consider affidavits, declarations, or exhibits submitted by the parties.  *See SPV OSUS Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 167 (S.D.N.Y. 2015), *aff'd*, 882 F.3d 333 (2d Cir. 2018).  The Court first reviews the allegations of the Amended Complaint and then the evidence submitted in connection with the Wallace Defendants' motion to dismiss for lack of personal jurisdiction.

## I.    Allegations of the Amended Complaint

The Amended Complaint contains extensive allegations regarding inappropriate conduct towards Lively on the set of the film *It Ends With Us* and a subsequent public relations campaign against Lively.  Dkt. No. 84.  Many of these allegations focus on the eight defendants who are not moving here (collectively, the "Wayfarer Parties"): Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, The Agency Group

---

[1] The Court may also consider "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  Lively attaches several documents to her Amended Complaint.  *See* Dkt. No. 84-1–84-5.  Relevant here are a document titled "Protections for Return to Production," Dkt. No. 84-1, a related contract, Dkt. No. 84-2, and a document titled "SCENARIO PLANNING—IT ENDS WITH US," Dkt. No. 84-4.  The Court will consider these documents for purposes of the motion to dismiss, as the Wallace Defendants do not object to their consideration, and they are each heavily referenced in Lively's Amended Complaint.  *See In re Turquoise Hill Res. Ltd.*, 2024 WL 4711185, at *9 (S.D.N.Y. Nov. 7, 2024); *Geiger v. Town of Greece*, 311 F. App'x 413, 416 (2d Cir. 2009) (summary order).

PR LLC, and Jennifer Abel.  The Court focuses here on the allegations most relevant to the claims against the Wallace Defendants.  The narrative set out below "do[es] not reflect the Court's own findings" but simply repeats the account of events stated by Lively in her Amended Complaint.  *Brown v. Maxwell*, 929 F.3d 41, 52 (2d Cir. 2019).

### A.    The Parties

Lively is an actor who played the lead role of Lily Bloom ("Lily") in the film *It Ends With Us* and served as an executive producer.  Dkt. No. 84 ¶¶ 1–2, 56.  She resides in New York, New York.  *Id.* ¶ 56.

Wayfarer Studios LLC ("Wayfarer") is a production company co-founded by Justin Baldoni ("Baldoni") and Steve Sarowitz ("Sarowitz").  *Id.* ¶ 57.  It is a Delaware limited liability company with its principal place of business in California, and none of its members are citizens of New York.  *Id.*  It co-financed and produced the film *It Ends With Us* via its production entity It Ends With Us Movie LLC ("IEWU").  *Id.*  Wayfarer employed all cast members and crew, including Lively.  *Id.*

Baldoni is the co-chairman and co-founder of Wayfarer and served as Director and Executive Producer of the film, as well as acting the lead role of Ryle Kincaid.  *Id.* ¶¶ 2, 58.  He resides in Santa Paula, California.  *Id.* ¶ 58.

Jamey Heath ("Heath") is the Chief Executive Officer ("CEO") of Wayfarer and was the president of Wayfarer during production of the film.  *Id.* ¶ 59.  He was also a producer of the film.  *Id.* ¶ 11.  He resides in Los Angeles, California.  *Id.* ¶ 59

Sarowitz is a multi-billionaire who is co-chairman and co-founder of Wayfarer.  *Id.* ¶¶ 26, 60.  He resides in Highland Park, Illinois.  *Id.* ¶ 60.

IEWU is a California limited liability company that entered into agreements with Lively regarding her acting services and contractual rider.  *Id.* ¶ 61.  On information and belief,

Wayfarer is the sole member of IEWU.  *Id.*  No members of IEWU are citizens of New York. *Id.*

Melissa Nathan ("Nathan") is a crisis management and communications professional who launched The Agency Group PR LLC ("TAG") in January 2024.  *Id.* ¶ 62.  She resides in North Hollywood, California, but lived in Brooklyn, New York during a portion of the events described herein.  *Id.*  TAG is a Delaware limited liability company that provides media relations and crisis communications services.  *Id.* ¶ 63.  On information and belief, no members of TAG are citizens of New York.  *Id.*

Jennifer Abel ("Abel") is the CEO and founder of RWA Communications LLC.  *Id.* ¶ 64. She resides in Beverly Hills, California.  *Id.*

Wallace is President, Director, Secretary, and sole manager of Street Relations, Inc., formerly known as Street Relations LLC.  *Id.* ¶¶ 65–66.  He resides in Dripping Springs, Texas. *Id.* ¶ 65.  He has described himself as a "PR consultant" who offers "crisis mitigation services." *Id.*  Street Relations describes itself as "a crisis mitigation firm engage[d] by clients to help navigate real-life human crisis, threats, trauma and mental health concerns."  *Id.* ¶ 66.  It is incorporated in California and has a principal place of business in Texas.  *Id.*

## B.    *It Ends With Us*

Production of *It Ends With Us* began in early May 2023.  *Id.* ¶ 77.  During production, Lively experienced invasive, unprofessional, and sexually inappropriate behavior by Baldoni and Heath.  *Id.* ¶ 78.  Among other incidents, Baldoni improvised kisses with Lively that were not preapproved in the script, *id.* ¶ 80, repeatedly kissed and attempted to kiss Lively during a slow dance scene which was not written to include intimate contact or kissing, *id.* ¶¶ 81–82, added graphic content to scenes that was not in the original script, *id.* ¶¶ 84–85, asked Lively about sex with her husband, *id.* ¶ 86, and repeatedly referred to her and other women as "sexy," *id.* ¶ 99–

102.  Both Heath and Baldoni spoke about their previous pornography addictions with Lively, *id.* ¶ 96, entered Lively's makeup trailer uninvited while she was undressed, *id.* ¶¶ 104–05, and pressured Lively to simulate full nudity in a scene in which her character gives birth, *id.* ¶ 87. Heath also attempted to show Lively a video of his wife giving birth.  *Id.* ¶ 90.

Sony was the distributor of the film.  *Id.* ¶ 11.  On May 26, 2023, Lively spoke with Ange Gianetti, a Sony executive assigned to the production, and told her that she wanted to file an HR complaint about Baldoni and Heath's misconduct.  *Id.* ¶ 120.  Gianetti told Lively that Sony was not empowered to oversee physical production in its role as distributor and that the concerns needed to be raised with Wayfarer.  *Id.*

Another female cast member also reached out to Gianetti to discuss her own discomfort with Baldoni and Heath's behavior.  *Id.* ¶ 121.  The same cast member talked to one of the film's producers about the same concerns.  *Id.* ¶ 124.  That producer reached out to Lively to say that she had spoken with both Gianetti and the other cast member.  *Id.* ¶ 125.  Lively thanked the producer for "taking the space to step up where we need it" and the producer thanked Lively because she "helped make the space for them to start listening to me."  *Id.* ¶ 126.  Baldoni told the other cast member in writing that he "was made aware" of her concerns, that the concerns were "fully received," and that "adjustments will be made accordingly."  *Id.* ¶ 128.

Lively also expressly told Baldoni and Heath that there were "serious HR problems on set."  *Id.* ¶ 127.  Heath responded that they already knew about the concerns and told Lively that he thought she had wanted to see the nude video of his wife.  *Id.*  In Exhibit A to Wayfarer and Baldoni's Amended Complaint filed in this action, Wayfarer and Baldoni acknowledge that

Wayfarer, Baldoni, and Heath were made aware of Lively's complaints on May 29, 2023.  *Id.* ¶ 132; Dkt. No. 50-1 at 32.[2]

Filming temporarily halted in June 2023 as a result of the Writers Guild of America ("WGA") strike.  Dkt. No. 84 ¶ 141.  While the WGA strike was underway, the Screen Actors Guild and the American Federation of Television and Radio Artists ("SAG-AFTRA") also went on strike.  *Id.* ¶¶ 141–142.  The WGA strike ended on September 27, 2023, and the SAG-AFTRA strike ended on November 9, 2023.  *Id.* ¶ 143.  Lively was concerned about returning to production and wanted to try to create a safer environment.  *Id.* ¶¶ 144–145.

On November 9, 2023, Lively's attorneys provided Wayfarer's attorneys with a document titled "Protections for Return to Production" (the "Protections").  *Id.* ¶ 146; Dkt. No. 84-1.  The Protections attempted to address Baldoni and Heath's alleged unprofessional and inappropriate behavior as reported by Lively.  Dkt. No. 84 ¶ 150.  They included, for example, that there would be no spontaneous improvising of intimate or sexual touching, simulated sex, or nudity, that comments on Lively's physical appearance would only be made in connection with her character, that there would be no discussion of personal experiences with sex or nudity, and that no one would enter Lively's trailer while she was undressed.  *Id.*  The document also states that there shall be "no retaliation of any kind against [Lively] for raising concerns about the conduct described in this letter."  *Id.* ¶ 150(g).  Wayfarer, through IEWU, agreed to these terms in a contractual rider executed on January 19, 2024.  *Id.* ¶ 149; *see* Dkt. No. 84-2.

---

[2] Lively's complaint alleges that Wayfarer and Baldoni's amended complaint makes this acknowledgement.  *Id.* ¶ 132.  The Court has reviewed Wayfarer and Baldoni's amended complaint and notes that it does in fact contain what Lively alleges it contains.  *See Ndremizara v. Swiss Re Am. Holding Corp.*, 93 F. Supp. 3d 301, 313 n.7 (S.D.N.Y. 2015) ("The Court may take judicial notice of pleadings filed in other cases."); *Ng v. Sedgwick Claims Mgmt. Servs. Inc.*, 2024 WL 4827574, at *11 (S.D.N.Y. Nov. 19, 2024) ("There is no need to request judicial notice of a document that is already on file before the Court in the same case.")

Production of the film then resumed on January 5, 2024, and concluded on February 9, 2024.  Dkt. No. 84 ¶ 157.

### C.     Promotion and Public Relations

The marketing plan for the film required Lively and other cast and crew to focus on Lily's "strength and resilience as opposed to describing the film as a story about domestic violence" and "[a]void talking about this film that makes it sad or heavy."  *Id.* ¶ 171.  Lively, other cast members, Baldoni, and the official social media pages for the film initially promoted the film using floral motifs and a positive tone.  *Id.* ¶¶ 171–174.

Wayfarer and Baldoni discussed publicity related to the film with Abel, their publicist. *Id.* ¶ 29.  As early as May 2024, Baldoni texted Abel regarding a plan for what to do if Lively blocked him on social media when the movie came out.  *Id.* ¶ 186.  In advance of the release of the film, cast members chose to appear in public separately from Baldoni due to concerns about his on-set behavior.  *Id.* ¶ 176.  On June 20, 2024, Abel texted Heath that "we can't have fans starting to guess why JB is left out of this stuff."  *Id.* ¶ 187.  A few days later, Baldoni suggested they should make an "offensive move showing [his] neuro divergence" and "social awkwardness" as a way to explain the things he has been "accused of."  *Id.* ¶ 188.  In July 2024, Abel discussed drafting context "to arm us in case we need to refute any of the claims."  *Id.* ¶¶ 189–90.  Eventually, Baldoni pivoted away from the marketing plan to focus on survivors and domestic violence organizations.  *Id.* ¶¶ 177–179.  On information and belief, Baldoni's change in marketing approach reflected an attempt to create the false impression that Baldoni had chosen not to appear alongside other cast members because he wanted to promote the film differently. *Id.* ¶ 181.

Lively alleges that in the days preceding the film's August 9, 2024, release, Wayfarer and Baldoni shifted to a publicity strategy that involved purposefully harming her reputation.  *Id.* ¶¶

193–244.  On July 29, 2024, Baldoni and Abel discussed a proposal to get ahead of any potential publicity regarding Lively's complaints with a "social and digital" combat plan.  *Id.* ¶ 192.  On July 31, 2024, Wayfarer and Baldoni retained Melissa Nathan and TAG.  *Id.* ¶¶ 193–197. Nathan was retained to help Baldoni "get ahead of the narrative" by utilizing a "rapid response communication system" and cataloging third-party advocates willing to engage with reporters on Baldoni and Heath's behalf.  *Id.* ¶ 199.  On August 1, 2024, Abel told Nathan that she had briefed a friend who wrote for *People*, *Fox News*, *In Touch*, and *Us Weekly* on "the situation" with Lively and the friend "is armed and ready to take this story of Blake weaponizing feminism to any of her outlets the minute we give her the green light."  *Id.* ¶ 200.  On August 2, 2024, Abel connected the writer with Nathan.  *Id.* ¶ 201.

The same day, TAG circulated a document entitled "SCENARIO PLANNING—IT ENDS WITH US" (the "Scenario Planning Document") to Baldoni and others.  *Id.* ¶ 203; Dkt. No. 84-4.  The Scenario Planning Document discusses scenarios to be prepared for "should [Lively] and her team make her grievances public."  Dkt. No. 84 ¶ 204; Dkt. No. 84-4.  It includes as "Key Messaging Points" that "[p]roduction members lost their jobs due to BL's takeover and insisted upon involvement," "[w]hen BL wasn't able to get her way on set or behind the scenes, she involved her husband to create an [i]mbalance of power between her and JB," and "BL's less than favorable reputation in the industry spans decades."  Dkt. No. 84-4 at 2. It also discusses "planting stories about the weaponization of feminism."  *Id.* at 4.  Baldoni told Heath that he was "[n]ot in love" with the document and not sure he was "feeling the protection [he] felt on the call," referencing a prior phone call with Nathan.  Dkt. No. 84 ¶ 207.  Abel then told Nathan that Baldoni wanted to feel like Lively can "be buried."  *Id.* ¶ 209.  Nathan responded "[o]f course—but you know when we send over documents we can't send over the

work we will or could do because that could get us in a lot of trouble.  We can't write it down to

him.  We can't write we will destroy her." *Id.*

On August 4, 2025, Abel texted Nathan that she was "having reckless thoughts of

wanting to plant pieces this week of how horrible Blake is to work with." *Id.* ¶ 210.  Nathan

responded: "Same / [] I already off the records [s]poke to the editor Daily Mail because she's my

friend / She's ready when we are." *Id.*

On August 5, 2024, Baldoni sent Abel a screenshot of a thread on X about a female

celebrity's "history of bullying many women" and stated "[t]his is what we would need." *Id.* ¶

211.  Abel responded: "Yes I literally just spoke to Melissa about this on the break what we

discussed last night for social and digital." *Id.* ¶ 212.

On August 6, 2025, even though Nathan and TAG had already started working for

Wayfarer and Baldoni, Nathan texted Abel and Heath regarding price quotes for their services.

*Id.* ¶ 213.  She stated:

> Quote one: $175k - this will be for a 3-4 month period and includes: website (to
> discuss) full reddit, full social account take downs, full social crisis team on hand
> for anything – engage with audiences in the right way, start threads of theories (to
> discuss) this is the way to be fully 100% protected.
>
> Quote two $25k per month - min 3 months as it needs to seed same as above - this
> will be for creation of social fan engagement to go back and forth with any negative
> accounts, helping to change narrative and stay on track.
>
> All of this will be most importantly untraceable.
>
> There is a lot more to both of these quotes but, easier to discuss via phone in terms
> of capabilities and what I have personally experienced in and out of crisis scenarios.

*Id.* ¶ 214.

On August 7, 2024, Abel and Nathan discussed putting "the social combat plan" into

motion. *Id.* ¶ 215.  On the same day, Abel asked a TAG employee about whether a quote

included the initial fee as well as "social media mitigation and proactive fan posting to counter

the narrative," or whether it was "IN ADDITION to the 15K previously agreed upon" and "does NOT include what we discussed with MN earlier regarding social manipulation (from the separate team based in Hawaii . . . )." *Id.* ¶ 224.

Lively alleges on information and belief that TAG engaged Wallace around this time. *Id.* ¶ 216. Also on information and belief, Wallace "specializes in executing confidential and 'untraceable' campaigns across various social media platforms (including TikTok, Instagram, Reddit, and X) to shape public perception of his clients and their adversaries." *Id.* ¶ 218. Wallace has a close relationship with Baldoni and Wayfarer's counsel, Bryan Freedman. *Id.* ¶ 222. Nathan also worked with Wallace on previous matters. *Id.* Lively alleges on information and belief that TAG retained Wallace and Street Relations "to weaponize a digital army around the country, including in New York and Los Angeles, to create, seed, manipulate, and advance disparaging content that appeared to be authentic on social media platforms and internet chat forums." *Id.* ¶ 223. On information and belief, the referenced "team based in Hawaii" in Abel's text was led by Wallace. *Id.* ¶ 224.

On August 8, 2024, TAG employees met with Wallace and his team to "bring them up to speed . . . so they can hit the ground running." *Id.* ¶ 226. On August 9, 2024, Abel, Baldoni, Heath, Nathan, and TAG employees texted to discuss the "narrative" "shifting online to pointing finger at Ryan[3] being overly involved." *Id.* ¶ 228. A TAG employee stated that "we[']ve flagged to [Wallace] and his team as well." *Id.* Lively alleges that Abel, Nathan, Wallace, Street Relations, and TAG then "perpetrated a retaliation scheme against Ms. Lively . . . relying on direct and constant media engagement, the seeding of content on traditional and social media platforms, the boosting of content (sometimes the very content that TAG and its affiliates had

---

[3] "Ryan" presumably refers to Lively's husband, Ryan Reynolds. *Id.* ¶ 19.

seeded), the suppressing of negative content about Mr. Baldoni, and the amplifying of negative content about Ms. Lively (including through engagement via comments on social media)." *Id.* ¶ 230.  Also on information and belief, the Wayfarer team "seeded social media content with content creators, on online chat sites like Reddit, and into publications with small audiences and lax editorial standards; the team would then 'amplify' that content by sharing the content with publications like *Page Six*, *The Daily Mail*, *Newsweek*, *NY Post*, *TMZ*, and *BuzzFeed*." *Id.* ¶ 330.

Nathan and Abel spoke to the media to suppress negative stories about Baldoni.  *Id.* ¶¶ 231–232.  For example, Nathan texted Abel a Daily Mail article and Abel replied, "I can tell you've done a lot of work here," going on to suggest that Nathan had been able to take out comments that Baldoni made people "uncomfortable." *Id.* ¶ 239.  The same day, Nathan told Abel that she was on the phone with her sister Sara Nathan, a journalist at the *New York Post* and *Page Six*, and was telling Sara Nathan that Baldoni's religion and "the misogynistic" needed to be taken out of coverage.  *Id.* ¶¶ 240–241.  Nathan and Abel also engaged with media outlets to suppress any coverage of HR complaints against Baldoni, with Nathan noting her understanding that two such complaints were from Lively.  *Id.* ¶¶ 262–266.

Nathan and Abel referred social media publicity efforts to Wallace.  For example, on August 9, 2024, Abel flagged a social media post criticizing Baldoni for weaponizing therapeutic language and portraying himself as an ally to "mask his true intentions," directing Wallace to take "serious actions on the social side." *Id.* ¶¶ 234, 259–60.  The same day, Wallace told Nathan "we are crushing it on Reddit," a message Nathan relayed to Abel.  *Id.* ¶ 235.  Around the same time, threads on Reddit began to appear speculating about the feud between Lively and Baldoni.  *Id.* ¶ 236.  On August 10, 2024, a TAG employee stated that they had "started to see a shift on social, due largely to [Wallace] and his team's efforts to shift the narrative towards

shining a spotlight on Blake and Ryan." *Id.* ¶ 245. The same day, Abel texted Nathan that "[t]he narrative online is so freaking good and fans are still sticking up for Justin." *Id.* ¶ 246. Nathan further stated that "socials are really really ramping up . . . It's actually sad because it just shows you have people really want to hate on women." *Id.* ¶ 248.

In the following days, Nathan and Abel discussed working with Wallace and the "digital team" to "amplify" or "boost" narratives on TikTok and other social media. *Id.* ¶ 250. Any member of Wayfarer or the public relations team could text a positive story to Baldoni or a negative story about Lively and ask that someone "boost" the story or "engage in the comments" to fuel the desired narrative. *Id.* ¶ 250. For example, on August 12, 2024, Nathan said Wallace had contacted her about "speculation" posts on social media. *Id.* ¶ 252. On August 13 and 14, 2024, the team discussed using the digital team to "amplify" positive stories about Baldoni and to "boost" a TikTok calling negative reports about Baldoni "all nonsense." *Id.* ¶ 254. On August 18, 2024, Baldoni circulated a TikTok criticizing Lively for not speaking about domestic violence in interviews, and a member of Nathan's team responded that she would "let digital know." *Id.* ¶ 255.[4] Nathan stated she would "chat to [Wallace]" about a social media poster claiming that Baldoni invited her up to his hotel room years ago. *Id.* ¶ 256.

On August 13, 2024, Abel worked with Sara Nathan to revise draft language related to Lively's involvement in different cuts of the film, which was then included almost verbatim in a *Page Six* article written by Nathan. *Id.* ¶¶ 268–272. The article emphasized that Lively "contribut[ed] to almost every aspect of [the Film]," that her husband "wrote one of the most important scenes," that she was "begged" to remove a song, and that Baldoni owned "the rights

---

[4] TAG employees also internally circulated a salacious story and a negative video about Lively, stating "[y]ou guys will love this" and describing the video as "very helpful." *Id.* ¶ 233. It is not clear whether these items were sent to Wallace.

to the book via his production company, Wayfarer." *Id.* ¶ 272.  TAG shared this article on Reddit, prompting negative comments that Lively "steamrolled" or "bulldozed" Baldoni. *Id.* ¶ 273.

On August 15, 2024, Baldoni texted Nathan and Abel saying that Sarowitz suggested "flipping the narrative" about "ryan saying the script was a disaster," to something about "ryan claiming the female hired was feminist writer didn't know how to tackle a female film," "[u]sing their own words against them." *Id.* ¶ 276.  Nathan stated she was already working on a story for *Variety* to accomplish this goal. *Id.*

Lively expressly instructed her own publicist, Leslie Sloane, to "stay silent on everything and speak to nobody." *Id.* ¶ 281.  Lively and Reynolds reiterated that instruction multiple times, and Sloane confirmed that she was following it. *Id.*

Leading up to the release of the film in United States theaters on August 9, 2024, coverage of the film was mostly neutral. *Id.* ¶ 324.  However, shortly thereafter, Lively and other members of the cast who had not appeared in press with Baldoni experienced a sudden and large wave of negative public attention. *Id.* ¶¶ 282, 324.  The negative media and social media coverage spiked on August 8, 2024, and August 14, 2024. *Id.* ¶ 326.  Lively was criticized for the way she was marketing the film, being a "bully" and "mean girl," and allegedly marginalizing Baldoni from the film. *Id.* ¶ 329.  Lively's businesses[5] experienced a dramatic drop in sales and were forced to go dark on social media due to overwhelming negative comments. *Id.* ¶¶ 343–346.  Lively suspected that this rapid shift around the time of the film's release was orchestrated by Baldoni and Heath. *Id.* ¶¶ 282–293, 326.

---

[5] Lively's businesses include a haircare line, Blake Brown, and an alcohol brand, Betty Booze. *Id.* ¶¶ 342–346.

The online narrative against Lively continued to trend negative into 2025, including a spike in December 2024. *Id.* ¶¶ 332–334. When Lively announced a new movie on February 4, 2025, there was a steady stream of social media comments repeating negative statements about Lively that originated with the Wayfarer Parties' alleged smear campaign. *Id.* ¶ 336. Lively alleges that defendants have "continued to pursue their 'untraceable' digital social media manipulation campaign designed to impact social media algorithms against Ms. Lively" to this day. *Id.* ¶ 303.

## II.    Additional Evidence Submitted by the Wallace Defendants

The Wallace Defendants support their motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) or to transfer venue with a declaration by Wallace. Dkt. No. 141-1. Wallace declares that he is a citizen of Texas and is domiciled in Hays County, Texas. *Id.* ¶¶ 2–4. Street Relations was incorporated in California in 2008, but it has been incorporated in Texas since it was joined as a defendant in this case. *Id.* ¶ 9. Wallace is the only officer, director, or employee of Street Relations, and the corporation's principal place of business is in Texas. *Id.* ¶¶ 12, 16. Neither of the Wallace Defendants has any property in New York. *Id.* ¶¶ 7, 11.

Wallace avers that he was contacted by Melissa Nathan in early August 2024 to read, analyze, and assess media and trends related to Justin Baldoni and potential stories or social media attacks on him. *Id.* ¶ 24. He reviewed all forms of media, analyzed the sentiment of the coverage, and made comments mainly to Nathan. *Id.* ¶ 25. He saw that people on social media organically supported Baldoni and disliked Lively. *Id.* Therefore, his advice was not to do anything at that time. *Id.* He concluded work related to Baldoni in November 2024. *Id.* ¶ 26.

Wallace has an understanding of what a "social combat" or "social manipulation plan" could be, but he did not provide such a service related to *It Ends With Us*, Wayfarer, Baldoni, Lively, or Reynolds. *Id.* ¶ 22. He did not publish, directly or indirectly, any information or

content about Lively, Reynolds, or *It Ends With Us*. *Id.* ¶¶ 17, 19.  He also did not ask or direct anyone else to post about, comment on, or "like" any social media posts about *It Ends With Us*, Baldoni, Wayfarer, Lively, or Reynolds.  *Id.* ¶ 18.  He did not cause content to be provided to journalists, content creators, or media entities anywhere, including the *New York Post* or *New York Times*.  *Id.* ¶ 29.  He does not have a "digital army" in any location and does not have, direct, or work with a team in Hawai'i.  *Id.* ¶ 21.  Wallace states that his role was merely passive observation and analysis of the social media environment.  *Id.* ¶ 30.

Wallace states he has only visited New York on four occasions since 1991 and conducted no business on any of these trips.  *Id.* ¶ 6.  All of his work concerning Baldoni and Wayfarer in August 2024 was done from Texas.  *Id.* ¶ 16.  He understood himself to be providing services to individuals or entities in California, namely Nathan and Wayfarer.  *Id.* ¶ 28.  It would be difficult for financial and other reasons for him to travel to and from New York.  *Id.* ¶¶ 34–35.

## PROCEDURAL HISTORY

On December 31, 2024, Lively filed a complaint against the Wayfarer Parties in this Court, bringing claims for sexual harassment, retaliation, breach of contract, and intentional and negligent infliction of emotional distress.  Dkt. No. 1.[6]  Prior to filing her complaint in this Court, Lively had filed a complaint with the California Civil Rights Department (the "CRD Complaint") which named Wallace and Street Relations as defendants.  Dkt. No. 141-7. However, Lively's original complaint in this Court did not include claims against the Wallace Defendants.  *See* Dkt. No. 1.

On January 16, 2025, the Wayfarer Parties filed a separate complaint against Lively and other parties related to the same events.  Dkt. No. 1, 25-cv-449.[7]  On January 30, 2025, the Court

---

[6] All citations which do not provide a case number are to the docket in 24-cv-10049.

[7] Filings in 25-cv-449 before consolidation with 24-cv-10049 are available only on the docket of

ordered the parties to show cause by January 30, 2025, why the case initiated by the Wayfarer Parties should not be consolidated with the previously filed case brought by Lively.  Dkt. No. 37, 25-cv-449.  No party objected to consolidation.  Dkt. Nos. 44–46, 25-cv-449.  On January 30, 2025, the Court ordered the cases to be consolidated.  Dkt. No. 49, 25-cv-449.  On January 31, 2025, the Wayfarer Parties filed an Amended Complaint naming the New York Times as a defendant.  Dkt. No. 50.  On June 9, 2025, the Court dismissed the Wayfarer Parties' Amended Complaint with leave to replead certain claims.  Dkt. No. 296.

On January 21, 2025, Lively filed a petition seeking a pre-suit deposition of Wallace in Hays County, Texas, District Court.  Dkt. No. 141-2.  On February 3, 2025, the Court held an initial pretrial conference and entered a Case Management Plan and Scheduling Order in this case.  Dkt. No. 58; February 3, 2025, Minute Entry.  On February 4, 2025, Lively nonsuited her Texas petition for a pre-suit deposition, stating that at the initial pretrial conference in this matter, the Wayfarer Parties' counsel had suggested that in the interests of case management and efficiency litigation related to "the underlying dispute at issue" should be centralized in this District.  Dkt. No. 141-3.  On the same day, the Wallace Defendants filed a new complaint in the United States District Court for the Western District of Texas seeking a declaration that Wallace was not liable to Lively as well as defamation damages for Lively's statements about Wallace in the CRD Complaint.  Dkt. No. 141-4; *see Jed Wallace & Street Relations, Inc. v. Blake Lively*, 25-cv-163 (W.D. Tex.).

On February 18, 2025, Lively filed an Amended Complaint naming the Wallace Defendants as defendants.  Dkt. No. 84.  On March 19, 2025, the Wallace Defendants moved to dismiss the claims against them, or in the alternative to sever the claims and transfer them to the

---

25-cv-449, and they are therefore cited to that docket.

Western District of Texas, where their lawsuit against Lively is pending.  Dkt. No. 139.  They also filed a memorandum of law in support of the motion, a declaration by Wallace, and six additional exhibits.  Dkt. No. 141; Dkt. Nos. 141-1–141-7.  On April 2, 2025, Lively filed a memorandum of law in opposition to the motion.  Dkt. No. 161.  On April 9, 2025, the Wallace Defendants filed a reply memorandum of law in further support of the motion.  Dkt. No. 170.

On June 26, 2025, the Court ordered supplemental briefing on the Wallace Defendants' assertion that "Lively never identifies any specific co-conspirator committing any specific act that qualifies under § 302(a)(2)—an act taken while physically present in New York—that she is seeking to impute to Wallace through the conspiracy theory jurisdiction."  Dkt. No. 379 (quoting Dkt. No. 170 at 4).  Lively submitted supplemental briefing addressing this issue on July 2, 2025. Dkt. No. 383.  The Wallace Defendants filed a response on July 7, 2025.  Dkt. No. 391.

## LEGAL STANDARD

"When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)).  "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'"  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  Where, as here, jurisdictional discovery has not been conducted, the plaintiff need only make a prima facie showing by his pleadings and affidavits that jurisdiction is proper.  *Id.* at 85; *see also Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).  While the Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs," *Dorchester*, 722 F.3d at 85, the Court need not "accept as true a legal

conclusion couched as a factual allegation," *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quotations omitted).

On a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *See York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002), *cert. denied*, 537 U.S. 1089 (2002). This requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). The ultimate question is whether "[a] claim has facial plausibility, [i.e.] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556.

## DISCUSSION

Lively's Amended Complaint alleges four claims against the Wallace Defendants: 1) aiding and abetting retaliation in violation of the California Fair Employment and Housing Action ("FEHA"), Cal. Gov't Code §§ 12900 *et seq.*, 2) intentional infliction of emotional distress, 3) false light invasion of privacy, and 4) civil conspiracy. *See* Dkt. No. 84 ¶¶ 408–415,

434–439, 447–453, 479–482.[8]  The Wallace Defendants first argue that the claims against them should be dismissed for lack of personal jurisdiction.  Dkt. No. 141 at 7–12.  They then argue that, in the alternative, venue is improper and the case should be transferred to the Western District of Texas.  *Id.* at 12–15.  Finally, they argue that the allegations against Wallace fail to state a claim.  *Id.* at 16–19.

The Wallace Defendant's motion to dismiss must be granted because the Court lacks personal jurisdiction over them.  Personal jurisdiction is claim-specific and defendant-specific.  It ensures that there is a connection between each defendant being sued and the place the defendant is being sued, so that a defendant is not forced to litigate in an unexpected and faraway forum. Lively's case against the other defendants will proceed in this Court.  But the Wallace Defendants are located in Texas, and Lively has not alleged that they are responsible for any act that would subject them to jurisdiction in New York.  The alleged negative publicity campaign against Lively largely took place outside of New York.  The few alleged actions targeting New York were taken by others, and there are no allegations suggesting the Wallace Defendants were aware of them.  Therefore, the Wallace Defendants cannot be forced to defend this lawsuit in New York.  If Lively wishes to pursue her claims against the Wallace Defendants, she must do so in another forum or replead her complaint to allege jurisdiction over the Wallace Defendants in this forum.

---

[8] Civil conspiracy is not an independent cause of action under California law, but rather "a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal. 1994).  The same is true under the laws of New York and Texas, the other jurisdictions with some conceivable connection to the claims here.  *See Alexander & Alexander of New York, Inc. v. Fritzen*, 503 N.E.2d 102, 102–03 (N.Y. 1986); *Agar Corp., Inc. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136, 142–43 (Tex. 2019).  Lively's civil conspiracy claim therefore functions not as an independent claim but as an alternative theory of liability on her non-conspiracy claims.

Because the motion to dismiss must be granted for lack of personal jurisdiction, the Court need not consider the Wallace Defendants' additional arguments.

## I.    Personal Jurisdiction

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins.*, 84 F.3d at 566. Where discovery has not been conducted, the plaintiff need only make a prima facie showing of jurisdiction, which "may be established solely by allegations." *Dorchester*, 722 F.3d at 85 (quoting *Ball*, 902 F.2d at 197). However, the plaintiff must provide "factual specificity" rather than relying on "conclusory statements." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998); *see Moussaoui v. Bank of Beirut & the Arab Countries*, 2024 WL 4615732, at *1 (2d Cir. Oct. 30, 2024) (summary order).

The parties dispute whether the Court may properly consider at this stage the declaration submitted by Wallace, which states among other things that he was not part of any conspiracy against Lively and only participated in passive analysis of the media environment which he understood to be for clients in California. Dkt. No. 141-1; *see* Dkt. No. 170 at 2; Dkt. No. 161 at 2, 11. A court "may consider affidavits and other materials beyond the pleadings" when assessing a motion to dismiss for lack of personal jurisdiction. *Doherty v. Bice*, 101 F.4th 169, 172 (2d Cir. 2024). However, the Second Circuit has clarified that a court may not "discount" a plaintiff's allegations in favor of affidavits submitted by defendants "without holding an evidentiary hearing or permitting jurisdictional discovery." *See Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC* ("*Schwab II*"), 22 F.4th 103, 113, 124 (2d Cir. 2021) (reversing district court on this basis); *see Dorchester*, 722 F.3d at 84 (noting that it is only "after discovery" that "the prima facie showing must be factually supported"); *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 290 (S.D.N.Y. 2019) ("[A] prima facie showing suffices,

20

*notwithstanding any controverting presentation by the moving party*, to defeat the motion."
(quoting *Dorchester*, 722 F.3d at 86)); *Liberty Highrise Pvt. Ltd. v. Praxis Energy Agents DMCC*, 632 F. Supp. 3d 562, 568 (S.D.N.Y. 2022) (same).  Therefore, while the Court may consider Wallace's declaration, it may not credit it over conflicting allegations in the pleadings without holding an evidentiary hearing or ordering jurisdictional discovery.  There is no need for such procedures here because, as discussed below, even assuming the truth of the allegations in Lively's Amended Complaint, they do not establish personal jurisdiction over the Wallace Defendants.

The Court must conduct a two-part inquiry to "determine personal jurisdiction over a non-domiciliary."  *Multi Access Ltd. v. Guangzhou Baiyunshan Pharm. Holdings Co., Ltd.*, 2024 WL 3498180, at *5 (S.D.N.Y. July 22, 2024) (quoting *Spin Master Ltd. v. 158*, 463 F. Supp. 3d 348, 362 (S.D.N.Y. 2020)).  First, the Court considers whether there is a basis for personal jurisdiction under the laws of the forum state.  *Id.; see also Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010); *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006).  Second, the Court examines whether the exercise of personal jurisdiction comports with constitutional due process.  *See Licci ex rel Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 168 (2d Cir. 2014); *Bank Brussels Lambert*, 305 F.3d at 124.

### A.     State Law

"In New York, there are two ways to establish personal jurisdiction over a defendant: (1) 'general jurisdiction' under N.Y. C.P.L.R. § 301; and (2) 'specific jurisdiction' under N.Y. C.P.L.R. § 302."  *Kreit v. Byblos Bank S.A.L.*, 2023 WL 6977448, at *4 (S.D.N.Y. Oct. 22, 2023), *aff'd*, 2025 WL 338194 (2d Cir. Jan. 30, 2025) (summary order).  General jurisdiction exists under C.P.L.R. 301 if the defendant is domiciled in New York or has "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its

21

'presence' in this jurisdiction." *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918

F.2d 1039, 1043 (2d Cir. 1990) (quoting *McGowan v. Smith*, 419 N.E.2d 321, 323 (N.Y. 1981)).

C.P.L.R. 302 provides for specific jurisdiction in the following circumstances:

> [A] court may exercise personal jurisdiction over any non-domiciliary . . . who in person
> or through an agent*:*
>
> > 1. transacts any business within the state or contracts anywhere to supply goods or
> > services in the state; or
> >
> > 2. commits a tortious act within the state, except as to a cause of action for
> > defamation of character arising from the act; or
> >
> > 3. commits a tortious act without the state causing injury to person or property
> > within the state, except as to a cause of action for defamation of character arising
> > from the act, if he
> >
> > > (i) regularly does or solicits business, or engages in any other persistent
> > > course of conduct, or derives substantial revenue from goods used or
> > > consumed or services rendered, in the state, or
> > >
> > > ii) expects or should reasonably expect the act to have consequences in the
> > > state and derives substantial revenue from interstate or international
> > > commerce; . . .

N.Y. C.P.L.R. 302(a).

Plaintiff does not argue that the Wallace Defendants themselves had contacts with New

York that would satisfy C.P.L.R. 301 or 302. Dkt. No. 161 at 10–12. Nor could she. The

Wallace Defendants are not subject to general jurisdiction in New York. Wallace resides in

Texas, and Street Relations is incorporated in California with its principal place of business in

Texas. Dkt. No. 84 ¶¶ 65–66. There also are no factual allegations that either of the Wallace

Defendants has transacted any business in New York or committed tortious acts within New

York so as to establish specific jurisdiction based on the conduct of the Wallace Defendants in

isolation.  *See* N.Y. C.P.L.R. 302(a)(1), (2). [9]  The Amended Complaint does allege that the

Wallace Defendants' tortious acts caused injury to Lively in New York.  Dkt. No. 84 ¶ 73.

However, C.P.L.R. 302(a)(3) additionally requires a showing that the defendant either "regularly

does or solicits business . . . in the state" or "expects or should reasonably expect the act to have

consequences in the state and derives substantial revenue from interstate or international

commerce."  C.P.L.R. 302(a)(3); *see Charles Schwab Corp. v. Bank of Am. Corp.* ("*Schwab I*"),

883 F.3d 68, 87–88 (2d Cir. 2018) (noting that the "mere foreseeability" of injury would not

satisfy due process).  Plaintiff has not alleged any facts regarding the Wallace Defendants'

general course of business or revenue.

　　　　Plaintiff founds jurisdiction instead on "a conspiracy-based theory of jurisdiction"

pursuant to which other co-conspirators' actions in New York would be imputed to the Wallace

Defendants.  Dkt. No. 161 at 12.  Conspiracy jurisdiction is "based on the time-honored notion

that the acts of a conspirator in furtherance of a conspiracy may be attributed to the other

members of a conspiracy."  *In re Platinum and Palladium Antitrust Litig.*, 61 F.4th 242, 269 (2d

Cir. 2023) (quoting *Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1392 (7th Cir.

---

[9] Plaintiff alleges in the Amended Complaint that "Ms. Nathan, Ms. Abel, Mr. Wallace, and
Street Relations Inc. targeted New York by, among other things, communicating with (or causing
content to be provided to) journalists, content creators, and media entities based in New York,
including at least one journalist at the New York Post and another at the New York Times."  Dkt.
No. 84 ¶ 73.  However, such allegation is conclusory.  *See Gmurzynska v. Hutton,* 257 F. Supp.
2d 621, 625 (S.D.N.Y. 2003) ("[C]onclusory allegations are not enough to establish personal
jurisdiction." (quoting *Marczeski v. Kamba*, 2001 WL 237204, at *1 (D. Conn. Feb. 23, 2021),
*aff'd,* 355 F.3d 206 (2d Cir. 2004))); *accord Megna v. Biocomp Labs. Inc.*, 166 F. Supp. 3d 493,
496–97 (S.D.N.Y. 2016).  The Amended Complaint does not allege facts showing that Wallace
or Street Relations communicated with anyone based in New York, and it alleges that the
communications with the *New York Post* were made by Abel and Nathan.  *Id.* ¶¶ 240–41, 268–
70.  Lively does not rely on the conclusory allegation that "Wallace[] and Street Relations Inc.
targeted New York by . . .  communicating with (or causing content to be provided to)
journalists, content creators, and media entities based in New York" in her briefing, instead
focusing solely on conspiracy jurisdiction.  Dkt. No. 161 at 10–12.

1983)).  The theory posits that "'one conspirator's minimum contacts allow for personal jurisdiction over a co-conspirator' even when the co-conspirator lacks such contacts itself." *Id.* (quoting *Schwab I*, 883 F.3d at 86).  Plaintiff argues that such a theory supports jurisdiction under either C.P.L.R. 302(a)(1) or (a)(2).  Dkt. No. 383.

Under C.P.L.R. 302(a)(2), the argument is that tortious acts taken by co-conspirators within New York should subject the Wallace Defendants to personal jurisdiction in New York. *Id.* at 1.  Under C.P.L.R. 302(a)(1), the argument is that the conduct of some co-conspirators in sending communications into New York or transacting business here from outside the state should subject the Wallace Defendants to personal jurisdiction in New York.  *Id.* at 2.  The former theory is well-recognized, while the latter would be an extension of existing law.  *See United States v. Besneli*, 2018 WL 443747, at *5 (S.D.N.Y. Jan. 16, 2018); *Przewozman v. Charity*, 2023 WL 2562537, at *16 (E.D.N.Y. Mar. 17, 2023).  The Court therefore turns first to jurisdiction under C.P.L.R. 302(a)(2).

### 1.    C.P.L.R. 302(a)(2)

C.P.L.R. 302(a)(2) permits "personal jurisdiction over a non-domiciliary who . . . 'commits a tortious act within the state' personally 'or through an agent.'"  *Fat Brands Inc. v. Ramjeet*, 75 F.4th 118, 125 (2d Cir. 2023) (quoting N.Y. C.P.L.R. 302(a)(2)).  "New York courts have long recognized [that] allegations of a conspiracy can satisfy [302(a)(2)] and a co-conspirator can be considered an agent so that [t]he acts of a co-conspirator may . . . be attributed to a defendant for the purpose of obtaining personal jurisdiction over that defendant."  *Id.* at 126 (quoting *Berkshire Bank v. Lloyds Banking Grp. PLC*, 2022 WL 569819, at *3 (2d Cir. Feb. 25, 2022) (summary order)).  "To establish personal jurisdiction over a co-conspirator under an agency theory of jurisdiction, a plaintiff must allege: first, that 'the defendant was a part of a conspiracy involving . . . overt . . . acts in New York,' and, second, that: '(a) the defendant had

an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control, or at the request of or on behalf of the out-of-state defendant.'" *Id.* (first quoting *Lawati v. Montague Morgan Slade Ltd.*, 961 N.Y.S.2d 5, 7 (1st Dep't 2013); and then quoting *Berkshire Bank*, 2022 WL 569819, at *3).

The first element of this test is "the defendant was a part of a conspiracy involving . . . overt . . . acts in New York." *Id.* (quoting *Lawati*, 961 N.Y.S.2d at 7).  In this context, overt acts "in New York" does not refer generally to any jurisdictional contacts with New York but specifically to acts taken physically within the boundaries of New York.  The words "within the state" in C.P.L.R. 302(a)(2) have been interpreted to "require[] that a defendant's act or omission occur while a defendant or its agent was physically present in the state."  *Bangladesh Bank v. Rizal Com. Banking Corp.*, 208 N.Y.S.3d 2, 19 (1st Dep't 2024); *see Bensusan Rest. Corp. v. King*, 126 F.3d 25, 28–29 (2d Cir. 1997) ("CPLR § 302(a)(2) reaches only tortious acts performed by a defendant who was physically present in New York when he performed the wrongful act."); *Yash Raj Films (USA) Inc. v. Dishant.com LLC*, 2009 WL 4891764, at *7 (E.D.N.Y. Dec. 15, 2009) ("For nearly half a century, the New York Court of Appeals has interpreted § 302(a)(2) to reach only tortious acts performed by a defendant while physically present in the state."); *Suber v. VVP Servs., LLC,* 2023 WL 115631, at *4 (2d Cir. Jan. 10, 2023) (summary order) ("As to section 302(a)(2), 'a Defendant's physical presence in New York is a prerequisite to jurisdiction.'" (quoting *Bank Brussels Lambert*, 171 F.3d at 790)); *Thackurdeen v. Duke Univ.*, 130 F. Supp. 3d 792, 803–04 (S.D.N.Y. 2015), *aff'd*, 660 F. App'x 43 (2d Cir. 2016) (summary order).  Accordingly, the cases recognizing conspiracy jurisdiction under 302(a)(2) involve overt acts taken physically within New York which are then imputed to

co-conspirators outside New York.  *See Fat Brands*, 75 F.4th at 126 (meeting in New York in furtherance of "New York-based fraud"); *Berkshire Bank*, 2022 WL 569819, at *1 (actions taken by executives at banks in New York); *Lawati*, 961 N.Y.S.2d at 7 (co-conspirator "predominantly existed in New York and committed the torts underpinning the conspiracy there").  Absent such "overt . . . acts in New York" there is no basis for jurisdiction under C.P.L.R. 302(a)(2).  *Fat Brands*, 75 F.4th at 126 (quoting *Lawati*, 961 N.Y.S.2d at 7).

Assuming that an overt act has been taken by an alleged co-conspirator in New York, the plaintiff must show that the act can be imputed to the defendant.  Such imputation requires that "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control, or at the request of or on behalf of the out-of-state defendant."  *Id.* (quoting *Berkshire Bank*, 2022 WL 569819, at *3).

The Second Circuit has held that "[t]he third requirement—that the New York-based co-conspirators acted at the direction or under the control of the out-of-state defendant—may be satisfied by an allegation that the out-of-state defendant was 'aware of the torts being committed by' co-conspirators in New York."  *Fat Brands*, 75 F.4th at 127 (quoting *Berkshire Bank*, 2022 WL 569819, at *3).  This holding is based on the First Department's decision in *Lawati v. Montague Morgan Slade Ltd.* that a defendant who joined a conspiracy with awareness that his co-conspirators were taking tortious acts in New York "purposely [availed himself] of the privilege of conducting activities within [New York]."  961 N.Y.S.2d at 8 (quoting *Cleft of the Rock Found. v. Wilson*, 992 F. Supp. 574, 585 (E.D.N.Y. 1998)).  In essence, a plaintiff need not

show control but only awareness and benefit.  *See Berkshire Bank*, 2022 WL 569819, at *3

("New York courts do not mandate a showing of control or direction.").

The Wallace Defendants argue that this understanding is not consistent with more recent

New York cases requiring that the out-of-state defendant have "some extent of control over the

in-state actor" in order for contacts to be imputed.  Dkt. No. 170 at 4 (quoting *Bangladesh Bank*,

208 N.Y.S.3d at 22).  This argument has some force.  The concept of conspiracy jurisdiction

derives from the New York Court of Appeals' holding in *Kreutter v. McFadden Oil Corp.* that

the words "through an agent" in C.P.L.R. 302 do not require a "formal agency relationship" but

may be satisfied by the fact that the "agent" "engaged in purposeful activities in this State . . . for

the benefit of and with the knowledge and consent of the [non-domiciliary defendants] and that

they exercised some control . . . in the matter."  522 N.E.2d 40, 44 (N.Y. 1988); *see Chrysler

Cap. Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991) ("Courts have

defined 'agent' [under C.P.L.R. 302] broadly to include not only a defendant's formal agents, but

also, under certain circumstances, a defendant's co-conspirators.").  When conspiracy is not

invoked, case law generally holds that "some control" is necessary to satisfy the agency language

of the C.P.L.R.  *See Al Thani v. Hanke*, 2021 WL 1895033, at *11–13 (S.D.N.Y. May 11, 2021);

*see also Edwardo v. Roman Cath. Bishop of Providence*, 66 F.4th 69, 74–75 (2d Cir. 2023)

(stating that some control is required to be considered an agent for purposes of C.P.L.R.

302(a)(2)).  And First Department cases involving conspiracy jurisdiction since *Lawati* have

consistently required some level of control rather than mere awareness.  *See Bangladesh Bank*,

208 N.Y.S.3d at 22; *Wimbledon Fin. Master Fund, Ltd. v. Weston Cap. Mgmt. LLC*, 76 N.Y.S.3d

121, 124 (1st Dep't 2018); *FIA Leveraged Fund Ltd. v. Grant Thornton LLP*, 56 N.Y.S.3d 12, 18

(1st Dep't 2017).

However, the New York Court of Appeals has not addressed the issue.  The Second Circuit has predicted that if it did so, it would follow *Lawati* in holding that the control prong "may be satisfied by an allegation that the out-of-state defendant was 'aware of the torts being committed by' co-conspirators in New York."  *Fat Brands*, 75 F.4th at 127 (quoting *Berkshire Bank*, 2022 WL 569819, at *3).  The Court is bound by this holding.  *Almazon v. JPMorgan Chase Bank, Nat'l Ass'n*, 2020 WL 1151313, at *11 (S.D.N.Y. Mar. 9, 2020) ("[A] district court is . . . bound by the circuit court's interpretation of state law, at least until the state's highest court has clearly ruled otherwise or the federal appellate court has reconsidered."); *King v. Town of Wallkill*, 302 F. Supp. 2d 279, 296 (S.D.N.Y. 2004) (noting that a Second Circuit ruling that "has been criticized" by intermediate state courts is still "binding upon this Court" (citation omitted)).  Plaintiff need not "show[] . . . control or direction to establish conspiracy-based personal jurisdiction" under C.P.L.R. 302.  *Berkshire Bank*, 2022 WL 569819, at *3.  Plaintiff need merely show that a co-conspirator took overt acts in furtherance of the conspiracy in New York, that the Wallace Defendants were aware of these actions, and that these actions were to the benefit of the Wallace Defendants.

Plaintiff's claim under C.P.L.R. 302(a)(2) fails at the threshold, however, because she has not alleged that any co-conspirator performed overt acts in furtherance of the conspiracy while that co-conspirator was physically present in New York.  The Amended Complaint alleges a number of actions and communications that formed the conspiracy to damage Lively's reputation, but not that any of them took place in New York.  *See* Dkt. No. 84 ¶¶ 189–276.  The alleged co-conspirators mainly reside and do business in California.  *Id.* ¶¶ 57–66.  Lively alleges that certain co-conspirators took actions within New York during the filming of *It Ends With Us*.  *Id.* ¶ 73 (noting Baldoni and Heath's meeting in New York with Lively to discuss

harassment and misconduct).  But these actions were not within the scope of or in furtherance of the alleged conspiracy to retaliate against Lively, which did not begin until after filming ended. *See id.* ¶ 194 ("This plan took shape with Wayfarer's retention (on behalf of Wayfarer and Mr. Baldoni) of Ms. Nathan, which occurred on or around July 31, 2024.").  The Amended Complaint alleges that Nathan lived in Brooklyn, New York "during a portion of the relevant period."  *Id.* ¶ 62.  But it does not specify "the relevant period" or, more importantly, any actions Nathan took in New York in furtherance of the conspiracy.  The fact that Nathan lived in New York at some unspecified time over the course of the conspiracy does not itself give rise to an inference that she took an action in furtherance of the conspiracy while in New York, particularly when she also resided in California and was working with others who lived in California and Texas.  *See Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*, 667 F. Supp. 3d 83, 143 (S.D.N.Y. 2023) (holding jurisdiction was not pled by general allegation that an entity used a New York address as its headquarters, when "Plaintiffs have not alleged what business activity occurred at that address that is related to any cause of action in this case").

Finally, the Amended Complaint alleges that "Sarowitz threatened to ruin the lives of Ms. Lively and her family while attending the Film's New York premiere."  Dkt. No. 84 ¶ 73. Specifically, he stated "to a witness" at that event that he was "prepared to spend 100 million to ruin the lives of Ms. Lively and her family."  *Id.* ¶ 169.  However, Lively has not alleged facts showing that this was an overt act "performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy."  *In re Platinum and Palladium*, 61 F.4th at 271 (quoting *Lange*, 834 F.3d at 70).  A "conversation may constitute an overt act in furtherance of a conspiracy," but only if "it tends to carry out the object of the conspiracy."  *United States v. Mojica*, 2021 WL 982458, at *12 (S.D.N.Y. Mar. 16, 2021), *aff'd*, 2022 WL 1132223 (2d Cir.

Apr. 18, 2022) (summary order); *People v. Menache*, 470 N.Y.S.2d 171, 172 (2d Dep't 1983) ("We have no doubt, for example, that a telephonic conversation in which the implements of the crime are ordered would constitute an overt act in furtherance of a conspiracy."); *People v. Bongarzone*, 500 N.Y.S.2d 532, 537 (2d Dep't 1986), *aff'd*, 507 N.E.2d 1083 (N.Y. 1987).  Mere "conversations between two coconspirators" about the conspiracy do not suffice, *Menache*, 470 N.Y.S.2d at 172, nor does "conduct that might foreseeably result" from the conspiracy but does not further it, *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 81 (2d Cir. 2023) (internal quotation marks omitted).  Here, there is nothing to suggest an inference that Sarowitz was attempting to recruit a co-conspirator, trying to cause Lively distress, or taking any other action in furtherance of the conspiracy.  He simply stated to an unidentified witness that he was prepared to spend money to harm Lively.  This statement describes the existence of the conspiracy, but there is no basis to infer it was intended to advance the conspiracy.

Moreover, assuming that Nathan or Sarowitz took actions in New York in furtherance of the conspiracy, Lively has not shown that such acts may be imputed to the Wallace Defendants for jurisdictional purposes.  Such imputation requires a showing that the Wallace Defendants were "'aware of the torts being committed by' co-conspirators in New York."  *Fat Brands*, 75 F.4th at 127 (quoting *Berkshire Bank*, 2022 WL 569819, at *3).  There are no allegations indicating the Wallace Defendants were aware that Nathan was residing in New York or taking any actions there.  Wallace declares that he believed Nathan was in California.  Dkt. No. 141-1 ¶ 25.  The Wallace Defendants are not alleged to have been in close contact with Sarowitz, and there is no reason to infer they would be aware of statements he made when they were not present and several days before they were allegedly hired.  Even cases which have not required a showing of control over the co-conspirator have made it clear that awareness is required.  *See*

*Lawati*, 961 N.Y.S.2d at 7 (defendant "was aware of the torts being committed by MMS and other defendants in New York" when he joined the conspiracy); *Berkshire Bank*, 2022 WL 569819, at *3 (defendants communicated with New York co-conspirators regarding the alleged tortious acts); *Cleft of the Rock*, 992 F. Supp. at 584 (defendant was aware of conspiracy to defraud New York plaintiffs that largely occurred via meetings in New York); *Dixon v. Mack*, 507 F. Supp. 345, 351 (S.D.N.Y. 1980) (defendant "knew that prior overt acts in furtherance of the conspiracy had taken place in New York"). The absence of any allegations supporting awareness is an additional reason jurisdiction is lacking under 302(a)(2).

### 2.    C.P.L.R. 302(a)(1)

Lively also argues that "the co-conspirators had extensive suit-related (a)(1) contacts with New York that must be attributed to the Wallace Defendants." Dkt. No. 383 at 2. The Wallace Defendants argue that this theory is "without precedent" and inapplicable. Dkt. No. 391.[10]

C.P.L.R. 302(a)(1) provides jurisdiction over a non-domiciliary who "transacts any business within the state," and permits jurisdiction over a defendant who never physically enters the state but "'project[s] himself [or herself]' into this state to engage in a 'sustained and substantial transaction of business.'" *Fischbarg v. Doucet*, 880 N.E.2d 22, 27–28 (N.Y. 2007) (quoting *Parke-Bernet Galleries, Inc. v. Franklyn*, 256 N.E.2d 506, 508 (N.Y. 1970)). "To

---

[10] Lively argues that the Wallace Defendants' failure to address the sufficiency or imputation of contacts under 302(a)(1) in their initial briefing is sufficient to establish jurisdiction over them. Dkt. No. 383 at 2. This argument is unavailing. Wallace did not concede that other defendants' contacts could be imputed to him under 302(a)(1). Lively's Amended Complaint did not clarify her theory of jurisdiction over the Wallace Defendants, and her opposition briefing entirely failed to address the long-arm statute. *See* Dkt. No. 84 ¶¶ 67–74 (alleging personal jurisdiction via generalized pleading that "Defendants" are subject to jurisdiction "pursuant to §302 of the New York Civil Practice Law and Rules," without specifying the basis of jurisdiction as to any particular defendant); Dkt. No. 161. The Wallace Defendants vigorously argued against the imputation of other defendants' contacts to them as a general matter, and they cannot be faulted for failing to specifically address a novel theory that Lively had not raised. Dkt. No. 141 at 10–11; Dkt. No. 170 at 2–4.

determine the existence of jurisdiction under section 302(a)(1), a court must decide (1) whether

the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action

'aris[es] from' such a business transaction." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246

(2d Cir. 2007). "'The overriding criterion necessary to establish a transaction of business' within

the meaning of CPLR 302(a)(1) [is that] a non-domiciliary must commit an act by which it

'purposefully avails itself of the privilege of conducting activities within [New York].'" *Paterno

v. Laser Spine Inst*., 23 N.E.3d 988, 993 (N.Y. 2014) (quoting *Ehrenfeld v. Bin Mahfouz*, 881

N.E.2d 830, 834 (N.Y. 2007)). For a cause of action to arise from the transaction of business,

there must be "a relatedness between the transaction and the legal claim such that the latter is not

completely unmoored from the former." *D & R Glob. Selections, S.L. v. Bodega Olegario

Falcon Pineiro*, 78 N.E.3d 1172, 1176 (N.Y. 2017) (quoting *Licci v. Lebanese Canadian Bank*,

984 N.E.2d 893, 900 (N.Y. 2012)).

New York courts have never recognized a conspiracy-based theory of jurisdiction under

302(a)(1). *See Besneli*, 2018 WL 443747, at *5; *Przewozman*, 2023 WL 2562537, at *16

("[T]he court is unable to find any New York case relying on a co-conspirator theory to establish

personal jurisdiction under section 302(a)(1)."). The New York and Second Circuit cases

recognizing conspiracy jurisdiction under the C.P.L.R. have involved the imputation of acts

which took place physically within New York and conferred jurisdiction under 302(a)(2). *See

Fat Brands*, 75 F.4th at 126 (meeting in New York in furtherance of "New York-based fraud");

*Berkshire Bank*, 2022 WL 569819, at *1 (actions taken by executives at banks in New York);

*Lawati*, 961 N.Y.S.2d at 7 (co-conspirator "predominantly existed in New York and committed

the torts underpinning the conspiracy there"). Based on the lack of authority recognizing co-

conspirator jurisdiction under (a)(1), "numerous district courts sitting in New York have held

that Section 302(a)(1) of New York's long-arm statute . . . does not provide for co-conspirator jurisdiction." *Przewozman*, 2023 WL 2562537, at *16; *see Doe 1 v. Gov't of United States Virgin Islands*, 771 F. Supp. 3d 379, 391 (S.D.N.Y. 2025) ("With no cases or authorities of any kind recognizing conspiracy jurisdiction in this context, and no convincing argument for expansion of the doctrine, plaintiffs will have to establish jurisdiction under § 302(a)(1) the old-fashioned way."); *Suber*, 2021 WL 4429237, at *6; *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 400–01 (S.D.N.Y. 2021).

Assuming, without deciding, that a defendant can be haled into a New York court based on conduct by a co-conspirator outside the state that would give rise to 302(a)(1) personal jurisdiction,[11] Lively has not alleged any such conduct by a co-conspirator of which the Wallace Defendants had knowledge. Lively alleges that as part of their efforts to "bury" Lively, Nathan, Abel, Wallace, and Street Relations "targeted New York by, among other things, communicating

---

[11] There is some force to the argument that the conduct of one conspirator giving rise to personal jurisdiction under 302(a)(1) should in an appropriate case give rise to personal jurisdiction over a co-conspirator who is aware of and benefits from that conduct. Section 302(a)(1) "is not limited to actions in contract; it applies as well to actions in tort when supported by a sufficient showing of facts." *Longines-Wittnauer Wach Co. v. Barnes & Reinecke, Inc.*, 200 N.E.2d 68, 81 (N.Y. 1965); *see Flame-Spray Indus. Inc. v. GTV Auto. GmbH*, 266 F. Supp. 3d 608, 618 (E.D.N.Y. 2017) ("Jurisdiction under CPLR 302(a)(1) is not limited to contract actions, but may also apply to tort claims where it is established that the tort arose out of the relevant transaction."); *Chloé*, 616 F.3d at 171; *Best Van Lines*, 490 F.3d at 247 n.10. A defendant who assists a co-conspirator in manufacturing a counterfeit product and selling it at the co-conspirator's storefront in New York would be subject to jurisdiction on the basis of its co-conspirator's New York contacts that satisfy 302(a)(2), if it has the requisite knowledge. Assuming that the co-conspirator instead ships the counterfeit goods into New York from just outside of New York and an infringement claim arises from that business, *see Chloé*, 616 F.3d at 171, it is not clear why the co-conspirator's conduct should not similarly be imputed to the defendant and give rise to personal jurisdiction. Conspiracy jurisdiction is based on an interpretation of the statutory language "through an agent," which applies to all prongs of C.P.L.R. 302(a). *See* N.Y. C.P.L.R. 302(a). The theory fundamentally concerns when contacts can be imputed to a co-conspirator, not what the contacts are in the first instance. *See In re Platinum and Palladium*, 61 F.4th at 269. The Court need not adopt a categorical rule that conspiracy jurisdiction can never be based on 302(a)(1) contacts, because here Lively's Amended Complaint fails for other reasons.

with (or causing content to be provided to) journalists, content creators and media entities based in New York, including at least one journalist at the New York Post and another at the New York Times." Dkt. No. 84 ¶ 73. This is supported by specific allegations that Abel and Nathan communicated with Nathan's sister Sara Nathan, a journalist at the *New York Post* and *Page Six*, on multiple occasions to shape coverage and contribute to stories that were eventually published in those outlets. *Id.* ¶¶ 240–41, 268–270. These allegations might support personal jurisdiction against Abel and Nathan under 302(a)(1), even if those two did not engage in their conduct from within New York. *See Fischbarg*, 880 N.E.2d at 380 (holding 302(a)(1) was satisfied when defendants sought out an attorney in New York and established a "continuing relationship," despite never entering the state); *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 850 N.E.2d 1140, 1143 (N.Y. 2006) (holding jurisdiction existed when "sophisticated institutional trader" contacted a broker in New York to complete multiple transactions).[12]

However, Lively has not alleged facts that would show that the Wallace Defendants were aware of those jurisdictional contacts. *Id.* (quoting *Berkshire Bank*, 2022 WL 569819, at *3). The Amended Complaint alleges that Wallace was generally in contact with Abel, Nathan, and TAG, and that they worked together to suppress negative content about Baldoni and amplify negative content about Lively. Dkt. No. 84 ¶¶ 226, 228, 234, 250, 259–60. It is fair to infer that Wallace would have known, as a general matter, that Abel and Nathan were talking to media

---

[12] The Wallace Defendants suggest that Plaintiff's remaining claims for false light and aiding and abetting harassment and retaliation "sound in defamation" and therefore should be subject to stricter jurisdictional standards. Dkt. No. 391; *see Best Van Lines*, 490 F.3d at 248 ("New York courts construe 'transacts any business within the state' more narrowly in defamation cases than they do in the context of other sorts of litigation."). Because Plaintiff has not established jurisdiction over the Wallace Defendants here in any case, the Court need not decide whether the allegations against Nathan and Abel are hypothetically sufficient under 302(a)(1), an issue which both parties have largely failed to address.

outlets in furtherance of this aim. However, there are crucially no allegations that Wallace was aware of Nathan and Abel's contacts with Sara Nathan or any other actions targeted at New York. Therefore, even if imputation of contacts on a theory of conspiracy could theoretically satisfy C.P.L.R. 302(a)(1), no such imputation can occur here.

### B. Due Process

For similar reasons, the exercise of personal jurisdiction here would not satisfy Due Process. Due process requires that the defendant establish "minimum contacts" with the forum state such that maintaining the suit does not "offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Compens. & Placement*, 326 U.S. 310, 316 (1945). For specific personal jurisdiction to be consistent with due process, a defendant must have "purposefully availed" itself of the forum such that it could "foresee being haled into court there." *Licci*, 732 F.3d at 165 (quoting *Bank Brussels Lambert*, 305 F.3d at 127); *see World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 296–297 (1980).

In the context of conspiracy jurisdiction, due process is satisfied by a showing that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with [the forum state] to subject that co-conspirator to jurisdiction in that state." *Schwab I*, 883 F.3d at 87 (citing *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013)).[13] If these requirements are met, the "co-conspirator's minimum contacts . . . in furtherance of the conspiracy" are sufficient to fulfill the due process requirement that the "defendant must have purposefully availed itself of the

---

[13] Overt acts are acts "performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy." *In re Platinum and Palladium*, 61 F.4th at 271 (quoting *United States v. Lange*, 834 F.3d 58, 70 (2d Cir. 2016)).

privilege of doing business in the forum." *In re Platinum & Palladium*, 61 F.4th at 271 (quoting *Schwab I*, 883 F.3d at 85–87). However, the showing that must be made in order to satisfy the due process clause is not relaxed because the plaintiff invokes conspiracy. The Second Circuit has emphasized that *Schwab I*'s three-prong test "serves the purposeful availment requirement [of due process], rather than supplants it." *Schwab II*, 22 F.4th at 125; *see Schwab I*, 883 F.3d at 87 ("To allow jurisdiction absent a showing that a co-conspirator's minimum contacts were in furtherance of the conspiracy would be inconsistent with the 'purposeful availment' requirement."). Therefore, "the conspiracy theory could not get off the ground if a defendant were altogether blindsided by its co-conspirator's contacts with the forum; the conspiratorial contacts must be of the sort that a defendant 'should reasonably anticipate being haled into court' in the forum as a result of them." *Schwab II*, 22 F.4th at 125 (quoting *World-Wide Volkswagen*, 444 U.S. at 297).

As stated above, the Amended Complaint contains no factual allegations that the Wallace Defendants directed or controlled any conduct into New York or were aware of any actions taken in New York or directed at New York. This lack of control or awareness is fatal under the Due Process clause just as it is under the C.P.L.R. *See Berkshire Bank*, 2022 WL 569819, at *3 ("Although the long-arm statute and the Due Process Clause are not technically coextensive, the New York requirements (benefit, knowledge, some control) are consonant with . . . due process." (quoting *Schwab I*, 883 U.S. at 85)). A defendant cannot "reasonably anticipate being haled into court" as a result of contacts that are unknown to him. *Schwab II*, 22 F.4th at 125 (quoting *World-Wide Volkswagen*, 444 U.S. at 297).

## C.    Jurisdictional Discovery

Lively argues that "if there is any doubt as to personal jurisdiction over the Wallace Parties, the Court should order jurisdictional discovery." Dkt. No. 161 at 12. "Jurisdictional

discovery is warranted where, even if plaintiff has 'not made a prima facie showing, [she has] made a sufficient start toward establishing personal jurisdiction.'" *City of Almaty v. Ablyazov*, 278 F. Supp. 3d 776, 809 (S.D.N.Y. 2017) (quoting *Stratagem Dev. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535, 547–48 (S.D.N.Y. 1994)).  However, a "district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (quoting *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).

Here, jurisdictional discovery is not necessary or appropriate.  Given that Lively has not alleged any action by anyone in the conspiracy within New York, or any contacts with New York whatsoever that the Wallace Defendants were aware of, she has not "made a sufficient start toward establishing personal jurisdiction."  *Ablyazov*, 278 F. Supp. 3d at 809 (quoting *Stratagem Dev.*, 153 F.R.D. at 547).  Moreover, if relevant jurisdictional contacts occurred, and Wallace was aware of them, this information is connected to the merits of Lively's claims and would logically be revealed by ongoing document discovery from Wallace and his co-conspirators, not separate jurisdictional discovery from Wallace.  The substantial completion deadline for such discovery has already passed.  In recognition of the possibility that jurisdictionally relevant facts may be revealed or already have been revealed in discovery, Lively shall have leave to amend her complaint by July 30, 2025, limited to the existing claims alleged against the Wallace Defendants.

## CONCLUSION

The motion to dismiss is GRANTED without prejudice.

The Clerk of Court is respectfully directed to close Dkt. No. 139.

SO ORDERED.

Dated: July 16, 2025
      New York, New York

_____
LEWIS J. LIMAN
United States District Judge