UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BLAKE LIVELY,

        Plaintiff,

-v-

WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, JENNIFER ABEL, JED WALLACE, and STREET RELATIONS INC.,

        Defendants.

Case No. 1:24-cv-10049-LJL
(consolidated with 1:25-cv-00449-LJL)

**MOTION OF J. ALEXANDER TOWNSEND TO INTERVENE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 24**

May It Please The Court. For the reasons discussed herein and in the accompanying Memorandum of Law, the Movant, J. Alexander Townsend, respectfully requests that the Court grant the Movant's Motion to Intervene in this matter.

Movant seeks intervention as of right under The Federal Rules Of Civil Procedure 24(a)(2), or, in the alternative, permissive intervention under (FRCP) Rule 24(b).

Dated: July 20, 2025

Respectfully submitted,

/s/ J Alexander Townsend, pro se

720-200 Sherbourne Street

Toronto, Ontario   M5A 3Z5

JAlexGTownsend@gmail.com

1-647-768-0364

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE**

1. Movant is a man of limited means who, nevertheless, has invested several hundred dollars in various content creators' channels on YouTube, some of whom are the subject of subpoenas by the Plaintiff in this case, including the channel "Popcorned Planet". Movant has done so with the expectation and sometimes the promise that his investment will return in the form of more entertaining and more informative broadcasts. Movant feels his interests are at risk of being defeated should these channels be forced to spend tens of thousands of dollars on motions to quash intrusive propoundings on their journalistic privileges. Movant subjectively believes there are severe deficiencies in the Plaintiff's case which where objectively considered by the Court, may render the actions against movant's interest moot. Movant wishes to request an order from the Court, which he will specify at the end of this memorandum.

## INITIAL ARGUMENTS

2. The vast majority of Ms. Lively's claims of harm revolve around her allegations that Mr. Baldoni, through his agents, propagated truthful yet negative information about Ms. Lively which damaged her reputation. As well, that this propagation was allegedly motivated by an intention to unlawfully retaliate against her for her protected activities. In essence, that Mr. Baldoni engaged in speech and expression that violated State and Federal statutes against retaliation, namely California's FEHA, and The Federal Title VII.

3. More Specifically, her claims, set out in Lively v. Wayfarer Studios LLC (1:24-cv-10049) Docket No. 84 ¶ 224-293, are Summarized in Idem ¶ 230 as inclusive of: *"seeding of content on traditional and social media platforms, the boosting of content (sometimes the very content that TAG and its affiliates had seeded), the suppressing of negative content about Mr. Baldoni, and the amplifying of negative content about Ms. Lively (including through engagement via comments on social media)."*

4. Though Lively and her counsel do not detail specifics of what this involves, we can presume that it involves:
    A. Writing out prosaic articles and snippets of opinions accompanied by factual information to substantiate them and posting these written words into social media entries.
    B. Having one or more agents of Mr. Baldoni express Mr. Baldoni's positive opinion of these posts by liking the post, engaging the site's algorithm to increase the post's exposure across the network, otherwise known as boosting
    C. Having one or more agents of Mr. Baldoni express Mr. Baldoni's negative opinion of posts that are critical of Mr. Baldoni by disliking the post or commenting negatively using certain words that are flagged by internal programs, thus engaging the site's algorithm to decrease the post's exposure across the network, otherwise described as suppressing.

    D. Having one or more agents of Mr. Baldoni find negative posts critical of Ms. Lively written by other users, and then expressing Mr. Baldoni's positive opinion of these posts by liking the post, engaging the site's algorithm to increase the posts exposure across the network, otherwise known as amplifying.

5. Ms. Lively has not alleged that any of what she calls "social manipulation", that allegedly occurred during the summer of 2024 as a result of Mr. Baldoni's hiring of Crisis PR managers, amounted to defamation. Her claims are that they are wrong solely on the basis that they are pleaded to have been retaliatory. That truthful information damaged her.

6. Yes, it must be acknowledged that a claim of defamation, where statements that Mr. Freedman has made are concerned, has been added to the amended claim of Ms. Lively. However, it is very unlikely she could prevail on such, as Mr. Freedman has qualified privilege, and there is no evidence he disbelieves his client. The closest thing Ms. Lively has plead towards proving knowledge of falsity is a statement Justin made to Melissa Nathan regarding Ms. Lively at Idem ¶ 301: *"I just know her personality and this is the kind of person that genuinely believes she's right and that all of this is unjust."*

7. However even this statement is not dispositive of any such knowledge on Mr. Freedman's part. History is rife with examples of deceptive people who believed they were right despite their lies. Both Presidents Richard Nixon and Bill Clinton spring to mind. During their respective scandals, each genuinely believed they were right, and justified in their expressions, even where they were later found to have lied multiple times. In any case defamation is not adequately claimed.

8. Thus, the legal question before us is whether Ms. Lively has sufficiently plead or can make a showing that truthful information involving her reputation that was already in the public eye, and which are matters of public concern, when expressed by Mr. Baldoni through his agents, constitute legally actionable retaliatory acts

## SELECT FACTUAL INFORMATION AND BACKGROUND AS RELEVANT TO THE MOTION

.

9. **The Allegedly Propagated Facts Ms. Lively Claims Harmed Her, With Plaintiff's Own Sources:**

    A. That Ms. Lively engineers situations in order to take creative control over productions she's involved in. (Dkt. No 84 P 229 Internal reference no. 35 [Several news sources which intimate a creative rift between actress and director, including one from The Hollywood Reporter. They reference competing edits of

    the film, one sponsored by Lively. Sources state that Ms. Lively and Mr. Baldoni "Lock[ed] Horns" over the creative direction of the film.])

B. That Ms. Lively and her associates were not promoting the film alongside its Director and that Blake Lively herself had unfollowed her director on social media accounts. (Idem A Deadline article "'It Ends With Us': Justin Baldoni Hires Crisis PR[...]" mentioned that people on tiktok had noticed Ms. Lively no longer followed her director on instagram *"rumors began to swirl, particularly among fans on TikTok, that there was a big fight between Baldoni and Lively. Fans pointed to myriad examples, read the duo didn't take photos together at the Aug. 6 NYC premiere; Baldoni arrived very early and Lively later. Some observed that Lively doesn't follow Baldoni on social."*)

C. That Ms. Lively, during the promotional events for the movie, discussed upbeat and banal subjects that were off-color to the seriousness of the film's premise. (Dkt. No 84 P 329 Internal reference no. 85, links to a Daily Mail article "How Blake Lively keeps getting it wrong: Ryan Reynolds' wife is criticised[...]" which had this to say: *"Blake finally addressed the domestic violence in her new film It Ends With Us this week - after fans slammed her 'tone deaf' and 'shallow' promotion of the drama."*)

D. That Ms. Lively called this movie about domestic violence her "Big Beautiful Summer Movie" and asked her audience to 'wear their florals', as though it were a romance comedy to which women should want their boyfriends to take them. And crucially, failed to discuss the subject of the film(Idem)

E. That Ms. Lively used the promotional events for the film to concurrently promote her personal hair care line and her drink products, some of which are alcoholic and therefore "tonedeaf" to the subject matter of the film which was ending domestic violence. (Dkt. No 84 P 329 Internal reference no. 85 again links to another Daily Mail Article: "Meghan McCain slams 'insensitive' and 'strange' Blake Lively over It Ends With Us controversy: 'I don't understand why she's famous'", DailyMail.com, (Aug. 22, 2024, 11:57):*"Blake,36, has been criticized in recent weeks for marketing her personal projects, including her haircare range and her drinks company, seemingly on the back of a film dealing with domestic violence"*)

F. Ms. Lively also claimed that the absence of her excuse that she was simply following the marketing plan enhanced the damage of claims C and D  (Dkt. No 84 ¶ 329)

10. Factual Demonstration That The Allegedly Disseminated Facts Were True Or Substantially True And Publicly Available, Respectively:

A. Blake's reputation for wrestling for creative control is substantially true. Her own public statements prove this. At the 2022 Forbes Power Women's Summit, Blake Lively herself had this to say: *"When I went in the meetings I would just seem like I'm*

*just there to be the actress and ready to get the gig, I wouldn't reveal that I actually need to have authorship in order to feel fulfilled. So I think that for them sometimes that might have felt like a rug pull because 'you're trying to assert yourself into something that we didn't hire you to do'"* In addition to her public statements, her own evidence proves this happened with the very film at issue. I direct the Court to Dkt. No 84-2, Lively's Contract Rider. In which at points 3, 5, 7, 11, 12, 13, 14, 15, 16, and 17, Blake Lively managed to finagle for herself various creative rights she did not earn via ownership of the intellectual property. Rights such as final script approval, choice of hiring of dayplayers and body doubles, the right to dictate other actresses' performances of their characters. The right to remove content from the film that had already been shot, and which she herself was not even present for. The right to multiple mediators to handle creative differences. The right to hire her own additional producer. The right to call her own all hands meeting. Ms. Lively's own evidence belies her assertion that she didn't take creative control she otherwise should not have gotten. This truthful information was publicly shared by Ms. Lively herself to all cast and crew, as well she shared it with a third party: Sony, which has no direct affiliation with It Ends With Us Movie, LLC. This was not invasion of privacy.

B. The facts that Blake Lively was not promoting the film alongside her Director, and that she had unfollowed her Director on social media accounts are substantially true as well as publicly available information. Several media outlets covered promotional events where the cast, including Lively, was not seen with Justin. Including the film's New York Premiere and an advance screening at Book Bonanza in Texas. Since these were also public events, it was publicly discernable information. With regard to the fact that Blake had unfollowed her Director, this was readily accessible information. A simple search on Blake's instagram account page is all one needs to do to find out if she is following someone. In addition Ms. Lively's own references to news articles demonstrate that several tiktokers had noticed this fact prior to the alleged "Digital Campaign" period. Not to mention that Blake herself admits to this unfollowing in her own complaint. (Dkt. No. 84 ¶ 186 Internal Reference No. 26 *"In fact, both Ms. Lively and her husband had unfollowed Mr. Baldoni's social media accounts ten months prior."*

C. (C + D) The underlying facts of both items C and D (and further substantiation for Justin's absence from promotions (B)), The discussion of banal and distracting subject matter, as well as the refusal to discuss the serious nature of the film, in the prior subheading can be found quite readily upon a viewing of Blake's very public promotional discussion panel at Book Bonanza 2024 that was also broadcast on YouTube:
   i. In Part I : (https://www.youtube.com/watch?v=irrDkMc7kcs&ab_channel=VRAIMagazineEntertainment) Blake starts off discussing how much she loves the character she plays, and how much the book's author loves her, and happily brings up the prospect of "easter eggs" in the film, How much she

        loved the Cinnamon Rolls she had during filming. How the production made simple aesthetical mistakes between the book and the film and how they corrected them using special effects. And she ends part I by calling the film "A Love Story"

    ii.    In Part II : (https://www.youtube.com/watch?v=bzkmbZXcizA&ab_channel=VRAIMagazineEntertainment) Blake variously laughs about how she's not 19 years old, how the actress playing her younger self looks just like her. She gleefully discusses the wonderful casting choices and her fabulous slippers she wears in the film.

    iii.    I couldn't find part three, but I did find the entire panel discussion on YouTube at (https://www.youtube.com/watch?v=8P5POKBU7Ys&ab_channel=TheMovieReport.com) Where additional subjects of Blake's criminal actions of stealing the hard drive from the studio which contained the not-yet-authorized cut of the film that Blake edited, and her character's difficult decision of which person she loves. Her character's 'Sophie's choice' between Ryle and Atlas are discussed very casually..

D.  It's a giddy fun and flippant interview, until one remembers this is a serious film about the heartbreak of domestic violence. In point of fact neither the word "domestic" nor "violence" can be found to be discussed throughout the entire panel discussion that day.

E.  Blake Lively did, as part of the marketing of the film, feature her own booze brand on New York morning television (Fox 5). Everyone had access and it was and is readily available across the country from YouTube:

    i.    (https://www.youtube.com/watch?v=hZsEUgFRqmQ&ab_channel=FOX5NewYork)

F.  The fact that Blake Lively was actively involved in creating the marketing plan is both public knowledge and a fact which belies her argument: Deadline Article from August 11th 2024 *'It Ends With Us': How Blake Lively Was "A Creative Tour De Force" In Transforming Colleen Hoover Novel Into A Motion Picture Event'* which stated *"Lively rolled up her sleeves, not just for rewrites, but also was involved in editing the movie, **all aspects of the pic's marketing**, directing the social media campaign and jumping into all aspects of it"* https://deadline.com/2024/08/it-ends-with-us-blake-lively-1236037203/ Since it was widely known that Blake Lively is the person who created the marketing plan for the film it makes no sense that she should shield herself from the backlash of the elements of her own plan by claiming she was just following orders. In other words, the fact that she was following her own marketing plan means its irrelevance to the allegedly propagated truths is substantially true. Therefore the fact of Blake marketing the film in a tonedeaf manner being allegedly restated by agents of Baldoni is simply balancing out the discussion on the national stage, and would not be deceptive in the least.

## Legal Standard

11. Supreme Court precedent holds that Court Judgments based on statutory law are considered State action, and therefore must conform themselves to constitutionality in order to be valid. New York Times V. Sullivan(1964) :"What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel"

12. Ms. Lively has brought suit under Californian and Federal Civil Statutes against retaliation. Specifically California Government Code Section 12940(h) A/K/A FEHA AND 42 U.S.C. § 2000e-3(a) A/K/A Title VII [of the Civil Rights Act of 1964]

13. Therefore if Ms. Lively desires to have this Court apply these statutes to punish or otherwise curtail truthful yet negative speech concerning her reputation, it is her burden to prove that such application in her case is not violative of the First Amendment or in the alternative, that her evidence exceeds the level of scrutiny that can form a justification to restrict the constitutional right at issue. 303 Creative LLC v. Elenis, 600 U.S. 570 (2023) *"When a law restricts speech based on its content, it is subject to strict scrutiny, meaning the government must demonstrate that the restriction is narrowly tailored to serve a compelling state interest"*

14. What we must ask ourselves is "what level of scrutiny is truthful speech protected by?", and then ask ourselves if the Plaintiff in this case can reasonably expect to surpass that level with the evidence she has so far.

15. Multiple landmark Supreme Court cases have set a very high bar for this:

    A. In Bartnicki v. Vopper, 532 U.S. 514 (2001), the Court upheld free and truthful speech on a matter of public concern even where Criminal Statutes against wiretapping were invoked.
    B. In Hustler Magazine, Inc. v. Falwell (1988), the U.S. Supreme Court held that even malicious opinion, widely publicized, was not actionable under tort law. That the intent to cause emotional and other harm was not justification enough to curtail free speech rights.
    C. Smith v. Daily Mail Publishing Co., 443 U. S. (1979) *"[S]tate action to punish the publication of truthful information seldom can satisfy constitutional standards."* AND *"[If there exists] truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent **a need ... of the highest order.**"*
    D. Butterworth v. Smith, 494 U. S.(1990): *"our decisions establish that **absent exceptional circumstances**, reputational interests alone cannot justify the proscription of truthful speech."*

    E. **Reed v. Town of Gilbert, 576 U.S. 155 (2015):** *"Innocent motives do not eliminate the danger of censorship presented by a facially content-based statute, as future government officials may one day wield such statutes to suppress disfavored speech. That is why **the First Amendment expressly targets the operation of the laws—i.e., the "abridg[ement] of speech"—rather than merely the motives of those who enacted them.**"*

16. Additional rulings for the Court's consideration: while the United States Supreme Court has not yet weighed in, social media engagement such as "liking" a post has been categorized by lower Courts as protected free speech. The case of *Bland v. Roberts* (4th Cir. 2013) remains unchallenged.

## ENDING ARGUMENTS AND SUMMARY

17. Movant is requesting an order from the Court which he feels is not wholly unreasonable given the fact that Plaintiff is likely to be facing the exact same question of law in a few months time, and given the additional fact that substantial discovery has already been completed. Movant also feels that it is not alleged by the plaintiff that any expressions of free speech in this case rose to the level of conduct, such as inciting people to obstruct her places of work during the promotional activities, or engaging in fighting words that did same, or that defendants' alleged exercise of his free speech rights were used as a necessary facilitator to a separate criminal act. And as stated earlier, was not plead to be defamatory. As such the expressions through Mr. Baldoni's agents that Ms. Lively contends happened could not have been subject to an exception to the First Amendment protections. The strict scrutiny standard thus applies.
18. Movant believes that the Defendants' counsel cannot adequately, and should not, represent Movants' interest, as they are bound by the case schedule to limit questions of law during the discovery period. However Movant also believes that Movant's interests are in danger of extreme prejudice by the delay, as Movant's interests are being infringed on due to, what the Movant believes to be, the Plaintiff's misuse of the discovery process itself.
19. And so we come to it. Movant is with the utmost respect, imploring the Court to issue upon the Plaintiff an Order To Show Cause, to make a showing with evidence that the operation of the Statutes underpinning her retaliation claims, as against the First Amendment protections afforded the Defendant, is justified by a State interest of exceptional circumstance and of the highest order. Can Plaintiff make a showing that her retaliation claim is on par with interests such as national security, the continued operation of government, securing State secrets, securing criminal investigations, curbing the threat of civil unrest, or even patient-doctor confidentiality?
20. If she cannot make this showing with the evidence she has so far, in the interest of Judicial expediency, I beg the Court to enter summary judgment and/or dismiss her

    retaliation claims with prejudice, before dozens of third parties are needlessly drained of their monetary resources.
21. Thank You For Your Time,

/s/ J Alexander Townsend, Movant Pro Se