Lauren Neidigh
2285 Kingsley Ave Suite A #1104
(904-269-3324)
Non-party Movant in Pro Se

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY,<br><br>  Plaintiff,<br><br>v.<br><br>WAYFARER STUDIOS LLC, et al.,<br><br>  Defendant. | Case No.: 1:24-cv-10049-LJL<br><br>**DECLARATION IN SUPPORT OF NON-PARTY LAUREN NEIDIGH'S MOTION TO QUASH SUBPOENA AND FOR PROTECTIVE ORDER** |

I, Lauren Neidigh, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a non-party movant in the above-captioned matter and the owner of the Google account @LethalLauren904.
2. I submit this declaration in response to the subpoena to Google LLC (the "Subpoena") issued by Plaintiff Blake Lively (subpoena reference no. 100884180), served by Esra Hudson of Manatt, Phelps & Phillips LLP.
3. The first time I discussed the legal dispute between Blake Lively and Justin

1

Baldoni was on January 3, 2025. Prior to that, I was aware of the speculation of a rift between Ms. Lively and Mr. Baldoni, but did not cover this on my YouTube channel.

4. Prior to Ms. Lively's California Civil Rights Department complaint being filed and the New York Times article being published, I did not know much if anything about Ms. Lively or Mr. Baldoni outside of their respective career works. I was aware that Ms. Lively was married to Ryan Reynolds, whom I was a fan of.

5. I became interested in this case because I was a fan of Ms. Lively's work on *Gossip Girl* and *The Shallows*, and I saw there was an increasing number of people online who were discussing Ms. Lively's past behaviors. I felt this criticism was unfair as these behaviors occurred several years ago and I do not believe that past mistakes, statements, or behaviors always reflect one's character in the present.

6. I started my coverage of this case on YouTube with an open mind by reading Ms. Lively's original complaint against Mr. Baldoni and the Wayfarer parties, as well as related articles on popular news sites. I openly expressed my discomfort over the harsh judgments online of Ms. Lively's previous statements and behaviors.

7. As I continued in the early stages of my coverage, I specifically stated that my stance on the issues between Ms. Lively and Mr. Baldoni was "aggressively neutral."

8. After carefully considering Ms. Lively's complaints and the statements made to the press by her attorneys, as well as the legal filings and statements by all other parties involved, I determined that I did not find Ms. Lively's version of events to be credible. This has been presented as my subjective opinion, and I have named my channel coverage "The Court of Random

Opinion" to reflect my views as such.

9. Most of my opinions and YouTube videos are based on the federal court filings in this case, which I have purchased on my own from the PACER website. One needs to look no further than the hideous quarterly PACER bill attached in the exhibits of this filing to confirm this. **Exhibit A**

10. Based on what I have learned through my coverage, I personally do not believe that Ms. Lively was sexually harassed by Mr. Baldoni, and I personally do not believe there was a coordinated smear campaign against Ms. Lively. I arrived at these conclusions on my own, without contact with any of the parties involved in this lawsuit.

11. I have shared this personal, subjective belief frequently on my own social media platforms. I have a monetized YouTube channel, but I do not receive payment from any other social media platforms.

12. I have chosen to exercise my first amendment rights to free speech on my platforms when discussing this high-profile, public interest case. Ms. Lively need not pay attention to it if she does not enjoy listening to my opinions, especially as I have blocked Ms. Lively and Mr. Reynolds on social media.

13. Despite what has been heavily suggested by Ms. Lively's attorneys, I have never communicated with Melissa Nathan, Jennifer Abel, The Agency Group, or any other publicists involved in this lawsuit.

14. I have never been offered payment by any of the Wayfarer parties, their publicists, or their counsel for any reason.

15. I have never acted at the behest of any party or counsel involved in this lawsuit.

16. I have reached out to attorneys at Liner Freedman Taitelman Cooley LLP ("LFTC") on two occasions.

17. On one occasion, I made a request for an interview with Mr. Baldoni. I was

not plotting with LFTC to influence the media narrative about this case, as I specifically noted that the subject of the interview would be his Bahá'í faith, and that the interview would not be related to the lawsuit at all.

18. I did not receive a response from LFTC.

19. On the other occasion I contacted LFTC, I asked for clarification related to the court's docket as Mr. Freedman was temporarily no longer listed as an attorney for Wayfarer.

20. LFTC left me on read again. I later learned that Mr. Freedman's temporary absence from the docket was only due to a filing error.

21. I would prefer not to disclose these one-sided communications to LFTC, as my relative inexperience in journalism at the time led me to proceed like an utter dork. It did not even occur to me that I should contact a publicist rather than an attorney with these requests.

22. That said, if I am given no option but to embarrass myself by disclosing these emails in the interest of protecting my privacy from Ms. Lively's invasive Subpoena, I will do so.

23. I have only attempted to communicate with Ms. Lively's attorneys regarding the Subpoena. They were largely unresponsive.

24. To this day, it is unclear why Ms. Lively seeks my financial information and other private data. If Ms. Lively is eventually seeking to use this information to then subpoena my bank, she would only learn that I am very financially irresponsible, and that my expression of my thoughts and feelings about Ms. Lively's accusations against Mr. Baldoni has not been financially backed by any of the Wayfarer parties or their counsel. My financial decisions, including my exorbitant PACER bill, though I have characterized them broadly here, are private. I do not believe Ms. Lively has grounds to launch an expedition into my personal life using the federal court.

25. I do not find it appropriate for Ms. Lively to fish through my private data and information of any kind, given that it will not reasonably lead to any evidence to support her claims.

26. I do not consent to Ms. Lively obtaining any of my information from Google LLC as I believe this Subpoena was designed only to harass, intimidate, and punish my free speech.

Dated July 25, 2025

Signature: _____

By: Lauren Neidigh
2285 Kingsley Ave Suite A #1104
(904-269-3324)
LNeidigh2011@gmail.com

# EXHIBIT A

(Quarterly PACER Transaction Summary)

An official website of the United States government. Here's how you know.

# BILLING HISTORY

Logout

**Summary Transaction Report by Date**
**All**
**from 01/01/2025 to 04/01/2025**

Thu Jul 24 18:17:42 CDT 2025
**lneidigh**

Back    New Search

| Date | Pages | Audio | Cost |
| --- | --- | --- | --- |
| 01/30/2025 | 113 | 0 | $11.30 |
| 01/31/2025 | 48 | 0 | $4.80 |
| 02/01/2025 | 147 | 0 | $14.70 |
| 02/02/2025 | 85 | 0 | $8.50 |
| 02/03/2025 | 28 | 0 | $2.80 |
| 02/04/2025 | 97 | 0 | $9.70 |
| 02/06/2025 | 1 | 0 | $0.10 |
| 02/07/2025 | 1 | 0 | $0.10 |
| 02/11/2025 | 68 | 0 | $6.80 |
| 02/12/2025 | 73 | 0 | $7.30 |
| 02/13/2025 | 9 | 0 | $0.90 |
| 02/14/2025 | 28 | 0 | $2.80 |
| 02/17/2025 | 103 | 0 | $10.30 |
| 02/18/2025 | 948 | 0 | $94.80 |
| 02/19/2025 | 157 | 0 | $15.70 |
| 02/20/2025 | 75 | 0 | $7.50 |
| 02/21/2025 | 125 | 0 | $12.50 |
| 02/22/2025 | 76 | 0 | $7.60 |
| 02/23/2025 | 71 | 0 | $7.10 |
| 02/24/2025 | 642 | 0 | $64.20 |
| 02/25/2025 | 451 | 0 | $45.10 |
| 02/26/2025 | 750 | 0 | $75.00 |
| 02/27/2025 | 756 | 0 | $75.60 |
| 02/28/2025 | 1003 | 0 | $100.30 |
| 03/01/2025 | 62 | 0 | $6.20 |
| 03/02/2025 | 219 | 0 | $21.90 |
| 03/03/2025 | 404 | 0 | $40.40 |
| 03/04/2025 | 856 | 0 | $85.60 |
| 03/05/2025 | 823 | 0 | $82.30 |
| 03/06/2025 | 556 | 0 | $55.60 |
| 03/07/2025 | 1039 | 0 | $103.90 |
| 03/08/2025 | 43 | 0 | $4.30 |
| 03/09/2025 | 55 | 0 | $5.50 |
| 03/10/2025 | 1143 | 0 | $114.30 |
| 03/11/2025 | 1004 | 0 | $100.40 |
| 03/12/2025 | 957 | 0 | $95.70 |
| 03/13/2025 | 976 | 0 | $97.60 |
| 03/14/2025 | 808 | 0 | $80.80 |
| 03/15/2025 | 95 | 0 | $9.50 |
| 03/16/2025 | 73 | 0 | $7.30 |
| **Grand Total:** | **22742 pages** | | **$2,274.20** |
| | 0 audio files ($2.40 ea) | | $0.00 |
| | | | $2,274.20 |

| Date | Pages | Audio | Cost |
|---|---|---|---|
| 03/17/2025 | 659 | 0 | $65.90 |
| 03/18/2025 | 1046 | 0 | $104.60 |
| 03/19/2025 | 1779 | 0 | $177.90 |
| 03/20/2025 | 1732 | 0 | $173.20 |
| 03/21/2025 | 491 | 0 | $49.10 |
| 03/22/2025 | 30 | 0 | $3.00 |
| 03/23/2025 | 30 | 0 | $3.00 |
| 03/24/2025 | 308 | 0 | $30.80 |
| 03/25/2025 | 280 | 0 | $28.00 |
| 03/26/2025 | 182 | 0 | $18.20 |
| 03/27/2025 | 195 | 0 | $19.50 |
| 03/28/2025 | 342 | 0 | $34.20 |
| 03/29/2025 | 42 | 0 | $4.20 |
| 03/30/2025 | 4 | 0 | $0.40 |
| 03/31/2025 | 254 | 0 | $25.40 |
| 04/01/2025 | 400 | 0 | $40.00 |
| **Grand Total:** | **22742 pages** | | **$2,274.20** |
| | 0 audio files ($2.40 ea) | | $0.00 |
| | | | $2,274.20 |

Back    New Search

PACER FAQ

Privacy & Security

Contact Us

**PACER Service Center**
(800) 676-6856
pacer@psc.uscourts.gov

This site is maintained by the Administrative Office of the U.S. Courts on behalf of the Federal Judiciary.