## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLAKE LIVELY, | |
| Plaintiff, | |
| v. | No. 24-cv-10049 (LJL) (lead case) |
| WAYFARER STUDIOS LLC, et al., | |
| Defendants. | |
| WAYFARER STUDIOS LLC, et al., | |
| Plaintiffs, | |
| v. | No. 25-cv-449 (LJL) (member case) |
| BLAKE LIVELY, et al., | |
| Defendants. | |

### MEMORANDUM OF LAW IN SUPPORT OF BLAKE LIVELY'S
### MOTION FOR SANCTIONS AGAINST DEFENDANTS' COUNSEL

Esra A. Hudson (admitted pro hac vice)
Stephanie A. Roeser (admitted pro hac vice)
Manatt, Phelps & Phillips LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
(310) 312-4000
ehudson@manatt.com
sroeser@manatt.com

Matthew F. Bruno
Manatt, Phelps & Phillips LLP
7 Times Square
New York, NY 10036
(212) 790-4525
mbruno@manatt.com

Michael J. Gottlieb
Kristin E. Bender
Willkie Farr & Gallagher LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1000
mgottlieb@willkie.com
kbender@willkie.com

Aaron E. Nathan
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8904
anathan@willkie.com

DUNN ISAACSON RHEE LLP
Meryl C. Governski (admitted *pro hac vice*)
401 Ninth Street, NW

Washington, DC 20004
(202) 240-2900
mgovernski@dirllp.com

*Attorneys for Blake Lively*

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

    A.    The Court Adopted N.Y. Rule 3.6 After All Counsel Stipulated to Its
Application...............................................................................................................3

    B.    After the Order, Mr. Freedman Repeatedly Published Statements
Attacking Ms. Lively's Credibility, Character, and Reputation. .............................5

LEGAL STANDARD...............................................................................................................6

    A.    N.Y. Rule 3.6 .............................................................................................................6

    B.    Federal Rule 16(f) ....................................................................................................7

    C.    The Court's Inherent Power to Issue Sanctions ......................................................8

ARGUMENT .........................................................................................................................9

    I.    MR. FREEDMAN HAS VIOLATED N.Y. RULE 3.6 AND THIS COURT'S
ORDER. ......................................................................................................................9

    A.    Mr. Freedman Violated N.Y. Rule 3.6 by Calling Ms. Lively a Liar Who
Is Afraid of the Truth. ...........................................................................................10

    B.    Mr. Freedman Violated N.Y. Rule 3.6 by Attacking Ms. Lively as a
Person of Poor Character in Contrast With the Good Character of His
Clients. ...................................................................................................................12

    C.    Mr. Freedman Violated N.Y. Rule 3.6 By Claiming the Backlash Against
Ms. Lively Is an "Organic Response" To Ms. Lively's Poor Reputation.............13

    D.    Mr. Freedman Violated N.Y. Rule 3.6 By Asserting That Mr. Reynolds'
SNL Appearance Makes Him a Person Of Poor Character And Renders
Ms. Lively's Claims Not Credible. ........................................................................15

    II.    THE COURT SHOULD SANCTION MR. FREEDMAN FOR VIOLATING RULE
3.6 AND THE COURT'S ORDER. ...........................................................................16

    A.    Sanctions Are Appropriate Under Rule 16(f). .......................................................16

    B.    Sanctions Are Warranted for Mr. Freedman's Violations of the N.Y. Rule
3.6 Order Under the Court's Inherent Power........................................................17

CONCLUSION......................................................................................................................19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991)......................................................................................8, 17

*Chevrestt v. Barstool Sports, Inc.*,
    2020 WL 2301210 (S.D.N.Y. May 8, 2020) ..................................................7, 8, 16

*Gentile v. State Bar of Nev.*,
    501 U.S. 1030 (1991).....................................................................................10

*Huebner v. Midland Credit Mgmt., Inc.*,
    897 F.3d 42 (2d Cir. 2018).........................................................................6, 8, 16

*Liberty Holdings (NYC) LLC v. Aposta, Inc.*,
    2020 WL 2614722 (S.D.N.Y. May 21, 2020) ........................................................17

*Liebowitz v. Bandshell Artist Mgmt.*,
    6 F.4th 267 (2d Cir. 2021) .........................................................................18, 19

*Lott v. Este*,
    2023 WL 4278688 (S.D. Ga. June 29, 2023).............................................................9

*Perez v. Edwards*,
    2023 WL 5935029 (S.D.N.Y. Sept. 12, 2023).......................................................7, 8, 17

*Petrisch v. JP Morgan Chase*,
    789 F. Supp. 2d 437 (S.D.N.Y. 2011)...................................................................18

*Rekor Sys. Inc. v. Loughlin*,
    2022 WL 3141288 (S.D.N.Y. Aug. 5, 2022)............................................................16

*Rice v. NBCUniversal Media, LLC*,
    2019 WL 3000808 (S.D.N.Y. July 10, 2019) ........................................................8, 17, 18

*Selletti v. Carey*,
    173 F.3d 104 (2d Cir. 1999)..............................................................................9

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
    624 F.3d 123 (2d Cir. 2010) ..............................................................................8

*U.S. v. Khan*,
    538 F. Supp. 2d 929 (E.D.N.Y. 2007) ..................................................................11

**Rules**

Fed. R. Civ. P. 16 ................................................................................................ *passim*

Fed. R. Civ. P. 37 .........................................................................................................7

N.Y. Rules of Pro. Conduct, Rule 3.6 ............................................................... *passim*

Reilly Practice Commentaries, N.Y. Rules of Pro. Conduct 3.6 (2021) ......................................11

## **INTRODUCTION**

Plaintiff Blake Lively respectfully moves to impose sanctions on Defendants' counsel Bryan Freedman for repeatedly violating Rule 3.6 of the New York Rules of Professional Conduct ("N.Y. Rule 3.6"), which this Court adopted as an order "applicable to all counsel of record" and susceptible to punishment "pursuant to Rule 16(f) of the Federal Rules of Civil Procedure or the Court's inherent power." ECF No. 57 at 2 (the "N.Y. Rule 3.6 Order" or "Order"). Almost immediately following the Court's Order, Mr. Freedman began violating it, and has continued to expose the public (and the jury pool) to his biased and inflammatory pre-trial indictments of Ms. Lively's character, credibility, and reputation. The lack of support for his statements appears irrelevant to Mr. Freedman because, as he personally explained to this Court on February 3, 2025 (the "February 3 Hearing"), "in these kinds of cases, ***once someone says something, it becomes fact.***" Mr. Freedman's pattern of prohibited attorney statements warrants the imposition of sanctions.

Despite his enthusiastic endorsement of the application of N.Y. Rule 3.6 to this case during the February 3 Hearing, Mr. Freedman resumed publicly slandering Ms. Lively's character and credibility within a matter of days, including in friendly interviews conducted by his former clients. On February 5, Mr. Freedman appeared on TMZ to discuss the Court's Order and whether Ms. Lively and her husband, Ryan Reynolds, would "try to avoid a deposition," and stated that he hoped he would not "get sanctioned as a result of" the interview but that he was "sure you guys will indemnify me. So we'll be good." In the following weeks, Mr. Freedman has repeatedly made public statements attacking Ms. Lively's "character, credibility," and "reputation," N.Y. Rule 3.6, stating for example that she: is "afraid of the truth," has been "testifying since the moment she auditioned for this part," is "obviously uncomfortable . . . [with] the truth," and is a "privileged elite," who has been "abusing our legal system," to cover up for "the self-concocted disaster she

initiated." During one interview conducted by his former client, Megyn Kelly, Mr. Freedman made numerous disparaging comments about Ms. Lively while Ms. Kelly referred to Ms. Lively as a "bitch." Through his comments, Mr. Freedman has sought to advance four themes designed to attack Ms. Lively's credibility, character, and reputation: Ms. Lively (1) is a liar who is "afraid of the truth" and cannot be believed; (2) is a person of bad character—namely, a "privileged elite" and "bully" who is manipulating the justice system—in contrast to Mr. Baldoni, who Mr. Freedman proclaims is a person of good character who should be credited and supported; (3) manufactured her sexual harassment and retaliation claims because (in Mr. Freedman's view) she could not accept the public's "organic response" disapproving of her (ignoring, of course, that Ms. Lively's retaliation claims are based on his clients own written words in dozens of texts and emails)[1]; and (4) cannot be believed because her husband, Mr. Reynolds, made an appearance on Saturday Night Live ("SNL") during the course of the litigation. All of this is improper and sanctionable.

N.Y. Rule 3.6 forbids Mr. Freedman's unrelenting campaign attacking the character, credibility, and reputation of both Ms. Lively and Mr. Reynolds. Now is the appropriate moment for this Court to ensure compliance with N.Y. Rule 3.6. The parties have just completed the first deposition in this case, and Mr. Freedman wasted no time in attempting a public relations stunt— namely, by filing the *entire* pre-reviewed and pre-corrected transcript on this Court's docket in a

---

[1] As laid out below, Mr. Freedman's strategy appears designed to harden public opinion in advance of the actual evidence being introduced at trial. For example, Mr. Freedman's repeated representations about the "organic" backlash to Ms. Lively is not only directly contradicted by numerous allegations in Ms. Lively's Amended Complaint, but a recently produced ███████

████████████████████████████████████████████████████████████████████████████████████████████

transparent ploy make the deposition a public event.[2] These tactics raise serious concerns (given Mr. Freedman's conduct to date) of efforts to improperly influence the jury pool by making misleading public statements about testimony, evidence, and the state of discovery. Sanctions are necessary and appropriate to address Mr. Freedman's infractions, and to prohibit further efforts to engage in a public relations strategy designed to malign Ms. Lively's character and credibility. For the reasons described herein, the Court should hold that Mr. Freedman violated N.Y. Rule 3.6 and the Order, and impose sanctions under Rule 16(f), including by admonishing him against making any future statements attacking the character, credibility, or reputation of Ms. Lively, Mr. Reynolds, and any other party or witness in this matter.

## BACKGROUND

**A.    The Court Adopted N.Y. Rule 3.6 After All Counsel Stipulated to Its Application.**

On January 21, 2025, Ms. Lively filed a letter informing the Court that Mr. Freedman had consistently "given television interviews, appeared on podcasts, issued inflammatory written statements, and leaked information . . . to the Hollywood press and tabloid media." ECF No. 17 at 1. Ms. Lively explained that Mr. Freedman "plainly violate[d] Rule 3.6 of the New York Rules of Professional Conduct" by engaging in "conduct [that] threatens to, and will, materially prejudice" Ms. Lively's case "by tainting the jury pool, because his statements are deliberately aimed at undermining the 'character, credibility, [and] reputation' of numerous relevant parties . . . and

---

[2] *See* ECF No. 537. Ms. Lively is filing a Motion to Strike the Wayfarer Defendants' letter attaching the full transcript of Ms. Lively's deposition contemporaneously herewith. *See* ECF No. 540. In addition to the inappropriate filing, the press was reporting details regarding the deposition—details that only those present at the deposition, including all of the individual Wayfarer Defendants and their counsel, would have known—mere moments after the deposition began, raising significant suspicion that the Wayfarer Defendants or their counsel were leaking information to the press in real-time. *See id.* at 2; *see also Blake Lively's Deposition Facing Down Her Nemesis . . . Justin Baldoni's in the Room*, TMZ (July 31, 2025 10:15 AM), available at https://www.tmz.com/2025/07/31/justin-baldoni-attends-blake-lively-deposition/; Alison Boshoff, *'Team Blake Assemble': This Ends With Us star, 37, arrives for deposition hearing with husband Ryan Reynolds and EIGHT lawyers – but is there any sign of her 'bestie' Taylor Swift?*, Daily Mail (Aug. 1, 2025) (including details of what Ms. Lively wore to the deposition).

likewise includes 'information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial.'" *Id.* at 1–2 (quoting N.Y. Rules of Pro. Conduct 3.6(b)[1] and (b)[5]). In connection with her filing, Ms. Lively appended a chart outlining the volume and severity of Mr. Freedman's violative statements. *See* Ex. A.[3]

On January 27, 2025, Ms. Lively filed a second letter alerting the Court to Mr. Freedman's "continued extrajudicial misconduct," and requesting a conference to address Ms. Lively's concerns. ECF No. 43. In her letter, Ms. Lively pointed to additional statements Mr. Freedman had made to the tabloids to illustrate to the Court that the "endless stream of defamatory and extrajudicial media statements . . . will not stop without this Court's intervention." *Id.* at 3.

On February 3, 2025, the parties appeared before the Court for an initial pretrial conference, during which the Court heard argument regarding pretrial publicity. *See* ECF No. 63 ("Tr.") at 44–60. Counsel for Ms. Lively reiterated that Mr. Freedman's press statements violated N.Y. Rule 3.6 by attacking the "other party's character" and "making representations about the state of the evidence . . . that [is] subject to discovery" without an opportunity for rebuttal. Tr. at 52:11–53:5. Ms. Lively therefore requested that the Court adopt N.Y. Rule 3.6 as a rule of conduct, instruct all counsel to abide by Rule 3.6, and enforce compliance with N.Y. Rule 3.6 via Rule 16(f) of the Federal Rules of Civil Procedure ("Federal Rule") going forward. *Id.* at 48:2–7. Mr. Freedman was "in agreement with that relief," and stated that he "would stipulate to the professional rules of conduct and certainly want[s] to abide by that." *Id.* 57:21–22, 58:9–12.

In light of the parties' agreement to be bound by N.Y. Rule 3.6, the Court adopted it as an order of the Court:

"By consent of the parties, Rule 3.6 of the New York Rules of Professional Conduct is adopted as an order of the Court applicable to all counsel of record. ***Breach of***

---

[3] Citations to "Ex." refer to the exhibits attached to the Declaration of Michael J. Gottlieb, filed contemporaneously herewith.

***this Rule may be punished pursuant to Rule 16(f) of the Federal Rules of Civil Procedure or the Court's inherent power.***"

ECF No. 57; [4] *see* Tr. 58:18–21.

> **B.    After the Order, Mr. Freedman Repeatedly Published Statements Attacking Ms. Lively's Credibility, Character, and Reputation.**

Since the Court issued its N.Y. Rule 3.6 Order, Mr. Freedman has habitually made violative statements to the press attacking Ms. Lively's credibility, character, and reputation. The following list of written press statements and interviews is intended only as a sample of such statements, exemplifying Mr. Freedman's most egregious abuses. The content of these statements is discussed further below.

- On February 5, 2025, Mr. Freedman gave a ten-minute interview on the podcast *2 Angry Men* with TMZ, Ex. B, in which Mr. Freedman predicted Ms. Lively and Mr. Reynolds were "going to probably take some legal actions that are beyond the bounds of decency and we'll see if they can try to avoid a deposition,";

- On February 18, 2025, Mr. Freedman gave a thirty-minute interview on the podcast hosted by his former client, Billy Bush, Ex. C, in which, in reference to the parties in this case, he said that "Documents don't lie, people do," and further cautioned anyone who might be inclined to credit Ms. Lively's allegations that "I wouldn't want to be on the wrong side of history here";

- On February 19, 2025, Mr. Freedman responded to the filing of Ms. Lively's Amended Complaint in a press statement to TMZ, Ex. D, in which he asserted that Ms. Lively's claims are "false," "filled with unsubstantial hearsay of unnamed persons who are clearly no longer willing to come forward or publicly support her," and "lack[ing] . . . actual evidence," as "documents do not lie and people do";

- On March 19, 2025, Mr. Freedman gave a press statement to People magazine, Ex. E, where he described Mr. Reynolds' Motion to Dismiss (which was subsequently granted in full) as "arrogant[]," and Mr. Reynolds as someone who believes that "bullying is acceptable," alongside his false insistence that Mr. Reynolds was "publicly documented" to be a "key player" whose "fingerprints have been all over this smear campaign against Justin and the Wayfarer team since day one";

- On March 20, 2025, Mr. Freedman gave a press statement to TMZ, Ex. F, wherein he accused Ms. Lively's Motion to Dismiss (which was subsequently granted in full) of

---

[4] Unless indicated otherwise, all emphases are added.

attempting to cover up for "the self-concocted disaster she initiated," and further smeared Ms. Lively as being a "privileged elite[]" whose Motion to Dismiss "twisted and curated" the law to fit her "personal agenda" in "one of the most abhorrent examples of abusing our legal system";

- On April 4, 2025, Mr. Freedman gave a press statement to TMZ, Ex. G, in which he accused Ms. Lively of attempting to "divert the public's attention from the receipts, the actual documents, video footage and additional evidence," which Mr. Freedman asserted made it "irrefutable that there was no sexual harassment," that Ms. Lively's own conduct (rather than the retaliation campaign she alleged) was responsible for "the organic backlash that she received," and that Ms. Lively "does not need discovery to find out who smeared her. Just a mirror will do";

- On April 4, 2025, Mr. Freedman gave a press statement to People magazine, Ex. H, in which Mr. Freedman characterized Ms. Lively as belonging to a "circle of Hollywood elites" seeking to advance "false and harmful" claims and "block access to the court system and weaken our nation's Constitution to service those who are in position of power";

- On May 8, 2025, Mr. Freedman gave a press statement to People magazine, Ex. I, wherein Mr. Freedman proposed holding Ms. Lively's deposition at Madison Square Garden and to "sell tickets or stream it";

- On June 10, 2025, in a five-minute interview with TMZ, Ex. J, Mr. Freedman proclaimed Ms. Lively is "afraid of the truth," said "we're gonna see if she's gonna appear at that deposition or not," and contrasted Ms. Lively's character with that of his clients, accusing her of filing "a lawsuit which you know accused some very good people of a smear campaign. And accused you know a terrific young man of sexual harassment."

- On June 11, 2025, in a fifty-minute interview on a podcast hosted by his former client, Megyn Kelly, Ex. K, Ms. Kelly opened the podcast by conveying that Mr. Freedman is "waging war against Blake Lively who he believes is not a good person," and later referred to Ms. Lively as having the reputation for being a "bitch," an assertion which Mr. Freedman endorsed in a lengthy discussion of Ms. Lively's character, noting that Ms. Lively appeared (to him) to be a "narcissist" who could not accept (in his view) "how she's behaved and how she's treated reporters and how she's treated people and how she's treated individuals, how she's treated waiting staff and others, and saying it's not okay. We don't like you."

## LEGAL STANDARD

### A.    N.Y. Rule 3.6

N.Y. Rule 3.6 provides that a "lawyer who is participating in or has participated in a criminal or civil matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a

substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." N.Y. Rules of Pro. Conduct 3.6(a). A "statement ordinarily is likely to prejudice materially an adjudicative proceeding when it refers to a civil matter triable to a jury . . . and the statement relates to: [1] the character, credibility, reputation, or criminal record of a party . . . or witness, or the identity of a witness or the expected testimony of a party or witness." *Id.* 3.6(b)[1]. The only exception to this rule is that "a lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client," however, "[a] statement made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity." *Id.* 3.6(d).

### B.    Federal Rule 16(f)

Federal Rule 16(f) states that "[o]n motion or on its own, the court may issue any just orders, including those authorized by Federal Rule 37(b)(2)(A)(ii)-(vii),[5] if a party or its attorney . . . fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C). Rule 16's "explicit reference to sanctions reflects the Rule's intention to encourage forceful judicial management and vests a district court with discretion to impose whichever sanction it feels is appropriate under the circumstances." *Chevrestt v. Barstool Sports, Inc.*, 2020 WL 2301210, at *2 (S.D.N.Y. May 8, 2020) (quoting *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 53 (2d Cir. 2018)) (internal quotation marks and citations omitted); *see also Perez v. Edwards*, 2023 WL 5935029, at *3 (S.D.N.Y. Sept. 12, 2023) (Liman, J.). "A district court may impose sanctions

---

[5] Federal Rule of Civil Procedure 37(b)(2)(A) sets forth permissible sanctions a court may enter, including (ii) "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence," (iii) "striking pleadings in whole or in part," (iv) "staying further proceedings until the order is obeyed," (v) "dismissing the action or proceeding in whole or in part," (vi) "rendering a default judgment against the disobedient party," or (vii) "treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination."

under Rule 16(f) when there is 'clear and convincing evidence that counsel disregarded a clear and unambiguous scheduling or other pretrial order.'" *Chevrestt*, 2020 WL 2301210, at *2 (quoting *Rice v. NBCUniversal Media, LLC*, 2019 WL 3000808 at *3 (S.D.N.Y. July 10, 2019)). Under Rule 16(f), "the court need not find that the party acted in bad faith," and "[t]he fact that a pretrial order was violated is sufficient to allow some sanction." *Huebner*, 897 F.3d at 53 (quoting 6A Charles Alan Wright et al., *Federal Practice and Procedure* § 1531 (3d ed. 2010)).

"[I]n addition to any other sanction, the court must order the party, its attorney, or both to pay the reasonable expenses—including attorney's fees—incurred because of any noncompliance with [Rule 16(f)], unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust." *Chevrestt*, 2020 WL 2301210, at *2 (quoting Fed. R. Civ. P. 16(f)(2)). "Under Rule 16(f), the [monetary] sanctions amount need[s] to be sufficiently substantial both to compensate and to deter." *Perez*, 2023 WL 5935029, at *5 (quoting *Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267, 292 (2d Cir. 2021)).

## C.    The Court's Inherent Power to Issue Sanctions

"'District courts have the inherent power' to sanction a party 'for bad faith conduct violating the court's orders even if procedural rules exist which sanction the same conduct.'" *Rice*, 2019 WL 3000808, at *3 (quoting *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010)). "Under this 'inherent power . . ., a court may assess attorney's fees as a sanction for the willful disobedience of a court order.'" *Id.* (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991)). Courts in this district have found attorneys acted with "willful disobedience" where, like here, the Court's orders "were explicit and there is no suggestion that [counsel] misread or misunderstood them," and where the attorney's "failure to comply is 'not isolated but rather [part of] a pattern' of non-compliance in this case and others." *Id.* at *4 (quoting *Petrisch v. JP*

*Morgan Chase*, 789 F. Supp. 2d 437, 455 (S.D.N.Y. 2011) and *S. New England Tel.*, 624 F.3d at 148).

## ARGUMENT

### I.    MR. FREEDMAN HAS VIOLATED N.Y. RULE 3.6 AND THIS COURT'S ORDER.

In the five months since Mr. Freedman told the Court that he "want[s] to comply with Rule 3.6," and that he "certainly would stipulate to the professional rules of conduct," Tr. at 57:21–23, 58:9–12, he has engaged in a press tour designed to damage Ms. Lively's character and credibility. Specifically, Mr. Freedman has and continues to perpetuate four themes designed to undermine Ms. Lively's credibility, character, and reputation: Ms. Lively (1) is a liar who is "afraid of the truth" and cannot be believed; (2) is a person of bad character—namely, a "privileged elite" and "bully" who is manipulating the justice system—in contrast to Mr. Baldoni, who Mr. Freedman proclaims is a person of good character who should be credited and supported; (3) manufactured her sexual harassment and retaliation claims because she could not accept the public's "organic response" disapproving of her (ignoring, of course, that Ms. Lively's retaliation claims are based on his clients *own written words in dozens of texts and emails*); and (4) cannot be believed because her husband, Mr. Reynolds, made an appearance on Saturday Night Live ("SNL"). Each of these myths standing alone would "have a substantial likelihood of materially prejudicing" the adjudication of Ms. Lively's claims, and, when taken together, they reveal Mr. Freedman's willful efforts to use the court of public opinion to taint the jury pool. N.Y. Rules of Pro. Conduct 3.6(a).

Courts routinely police attorney statements that, like Mr. Freedman's statements, are designed to litigate a matter in the media or to taint the jury pool. *See Selletti v. Carey*, 173 F.3d 104, 110 (2d Cir. 1999) (sanctioning attorney for his "general strategy . . . to prosecute this action through the media rather than comply with" a discovery order); *see also Lott v. Este*, 2023 WL 4278688, at *6 (S.D. Ga. June 29, 2023) (sanctioning attorney who in media statements "presented

9

the allegations in the case and opinions on the law as fact such that it seemed there was no dispute regarding Defendant's conduct and liability."). This Court should impose sanctions here because Mr. Freedman's statements pose a significant risk of tainting the jury pool with deceptive, corrosive, and untrue statements cloaked with an illusion of lawyerly integrity. *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1074 (1991) ("Because lawyers have special access to information through discovery and client communications, their extrajudicial statements pose a threat to the fairness of a pending proceeding since lawyers' statements are likely to be received as especially authoritative.").

### A.    Mr. Freedman Violated N.Y. Rule 3.6 by Calling Ms. Lively a Liar Who Is Afraid of the Truth.

Just days after the Court's N.Y. Rule 3.6 Order issued, Mr. Freedman began attacking Ms. Lively's credibility with predictions that she and Mr. Reynolds would likely try to avoid discovery in this matter, and were "going to probably take some legal actions that are beyond the bounds of decency." Ex. B at 9:12–14. He consistently described her allegations as "false," Ex. D at 5, "fantastical," Ex. F at 4, "unsubstantial," Ex. D at 3, and "lack[ing] [] actual evidence," *id.* at 5. Repeating his mantra that "documents do not lie and people do," *id.* at 5, Ex. C at 17:25, Mr. Freedman attempted to prime potential jurors to believe that Ms. Lively had manufactured her claims, and is "afraid of the truth," Ex. J at 4:24, which will inevitably be exposed by the "actual, evidentiary proof," Ex. F at 4, also called the "receipts, real time documents, and video showing a completely different story than what has been manipulated and cherry picked to the media," Ex. D at 3. Mr. Freedman has characterized Ms. Lively's Amended Complaint as "filled with unsubstantial hearsay of unnamed persons who are clearly no longer willing to come forward," *id.* at 3, impermissibly commenting on what the witnesses referred to in Ms. Lively's Amended Complaint will or will not testify to at trial. *See* N.Y. Rules of Pro. Conduct 3.6(b)(1) (a statement

10

"ordinarily is likely to prejudice materially an adjudicative proceeding when it . . . relates to . . . "the identity of a witness or the expected testimony of a party or witness.") He has repeatedly suggested that Ms. Lively was likely to dodge her deposition, or that Ms. Lively's refusal to agree to an immediate public inquisition by Mr. Freedman at Madison Square Garden suggested that she had something to hide. *See* Ex. B at 9:14–15 ("we'll see if they can try to avoid a deposition"); Ex. I at 4 ("if she is suddenly now willing to sit for a deposition, I am available. How does tomorrow morning work for her?"); Ex. J at 7:6–7 ("I want to see if she shows up"). Mr. Freedman insists not only that Ms. Lively is lying, but also that she is doing so with "pure malice" to "falsely accus[e]" Mr. Baldoni, Ex. F at 4, and to "steer focus away from the actual facts." Ex. G at 3. According to Mr. Freedman, Ms. Lively is so lacking credibility that she will "look at a scene and say the sky is not blue." Ex. K at 27:5–8.

Mr. Freedman's statements are plainly designed to suggest that Ms. Lively is lying, that Ms. Lively is afraid of the truth because it does not favor her, that witnesses at trial will refuse to appear or will not corroborate Ms. Lively's claims, and that Ms. Lively has been trying to avoid the scrutiny of sworn testimony. Such statements are not true, but still effectively seed those ideas in the public mind with the intention that they will filter through into the jury pool. N.Y. Rule 3.6 exists to prevent attorneys from using pre-trial publicity, rather than their presentation of evidence in court, to sway the jury by misleading the public in this manner. N.Y. Rules of Pro. Conduct 3.6; Reilly Practice Commentaries, N.Y. Rules of Pro. Conduct 3.6 (2021) (explaining the main problem addressed by N.Y. Rule 3.6 is "the consequences for the integrity of the jury function" when "incorrect or biased information . . . leak through to the jury"); *See also U.S. v. Khan*, 538 F. Supp. 2d 929, 931–32 (E.D.N.Y. 2007) (counsel's comments "clearly prejudiced the due administration of justice and potentially interfered with a fair trial," violating an analogous Local

Rule of Criminal Procedure, when counsel "publicly tarnish[ed] the credibility of the witnesses he identified, as well as commented at length on the merits of the case, his opinion concerning Defendant's guilt or innocence, . . . and the evidence").

**B.    Mr. Freedman Violated N.Y. Rule 3.6 by Attacking Ms. Lively as a Person of Poor Character in Contrast With the Good Character of His Clients.**

In addition to attacking Ms. Lively's credibility, Mr. Freedman also has attacked her (and Mr. Reynolds') character, smearing one or both of them as "arrogant," Ex. E at 3, a "bully," *id.*, "privileged elites," Ex. F at 3, and "cowardly," *id.* at 4. Beyond just name calling, Mr. Freedman consistently asserts that Ms. Lively and Mr. Reynolds are "Hollywood elites," Ex. G at 6, in a "position of power," who abuse that power to "block access to the court system and weaken our nation's Constitution." Ex. H at 7; *see also* Ex. F at 3 (Lively's motion to dismiss is "one of the most abhorrent examples of abusing our legal system" because "laws are not meant to be twisted and curated by privileged elites to fit their own personal agenda."). For maximum effect, Mr. Freedman contrasts these disparaging comments with his own clients' supposed good character and victim status. In Mr. Freedman's words, Mr. Baldoni "has really been very fair and not wanting . . . to attack anyone," Ex. B at 13:7–9, and just "wants his chance to be able to prove that he is a good person." Ex. C at 16:20–22. In Mr. Freedman's story, Ms. Lively has "accused some very good people of a smear campaign," Ex. J at 4:2–5, and "accused . . . a terrific young man of sexual harassment," *id.*, and yet it is Ms. Lively who is "walking around taking victory laps and victory tours," *id.* at 10:10–14, while Mr. Baldoni is "taking care of his family, and taking care of his loved ones," *id.* Mr. Freedman has even gone so far as to compare Mr. Baldoni to Martin Luther King Jr., responding that anyone who believes he is a "bad person" will "be on the wrong side of history." Ex. C at 20:6–9. Mr. Freedman's attempt to promote this fictional narrative—with Mr. Baldoni as the victim falsely accused by a powerful bully—is a transparent attempt to pre-bake

the Wayfarer Parties' trial themes into the jury pool. Mr. Freedman is free to pursue whatever themes he would like during trial subject to the rules of ethics, procedure, evidence, and this Court, but N.Y. Rule 3.6 does not permit attorneys to do so via the media outside of the familiar safeguards that protect against jury taint.

### C. Mr. Freedman Violated N.Y. Rule 3.6 By Claiming that the Source of the Retaliation Campaign Ms. Lively Has Challenged is an "Organic Response" To Ms. Lively's Poor Reputation and Character.

Mr. Freedman has repeatedly accused Ms. Lively of fabricating claims of sexual harassment and a smear campaign, Ex. K at 5:12–14, because, he says, she is unable to accept that the public just does not like her, *id.* at 17:14–20. Mr. Freedman has claimed that Ms. Lively finds herself in this "self-concocted disaster," Ex. F at 3, as a result of "organic backlash she received" due to "focusing" on "her hair care and alcohol products" instead of properly addressing the "survivor community" when promoting *It Ends With Us* ("the Film."). Ex. G at 4. This theme, of course, reflects the core public relations strategy that Ms. Lively has alleged the Wayfarer Parties launched against her in August of 2024. *See* ECF No. 84 ¶ 255, 274. Parroting his clients' retaliation campaign, Mr. Freedman has declared that Ms. Lively "does not need discovery to find out who smeared her. Just a mirror will do." Ex. G at 4. In his interview with his former client, Megyn Kelly—who at one point during the conversation referred to Ms. Lively as a "bitch"—Mr. Freedman explained his theory that Ms. Lively's bad character is to blame for the public backlash against her in detail:

> **Freedman**: [T]here was an organic response as a result of that. *I think that was too much for her . . . to believe that somebody could actually not like her, based on her own conduct. I think that was something that she couldn't handle, whether that's an interesting narcissism quality or otherwise, I don't know [I'm] not a doctor. But I can tell you . . .  the result . . . was her scurrying around trying to blame someone else for why her own behavior seemed to be the cause of people not liking her*. . . . Is this good for her? Is this good for her career? Is this good for her children? Is this good for her family? You know, you have to ask yourself, at some point, everybody has a part in it. Everyone has a part in everything, right?

13

Does she, is she, does she, is she capable of taking responsibility for her part in this and owning that? That's, we haven't seen that yet. And that's why, you know, that *people out there are finding evidence about how she's behaved, how she's treated reporters, how she's treated people, how she's treated individuals, how she's treated, you know, waiting staff and others, and saying it's not okay, we don't like you.*

**Kelly:** She's a bully (Freedman nods), that's my own conclusion. She's an obvious bully who can't take any rounds of negative press.

Ex. K at 16:12–17:24.

Mr. Freedman's contrived narrative—insisting that the public backlash against Ms. Lively is exclusively the result of Ms. Lively's own character and reputation—is improper and designed to sway public opinion (and thereby, future jurors) against the actual evidence being produced in discovery. That evidence, like the evidence already contained in Ms. Lively's Amended Complaint, demonstrates the patent falsity of Mr. Freedman's insistence that Ms. Lively's reputation prior to the release of the Film was responsible for the almost instantaneous and vitriolic backlash to Ms. Lively immediately after the Film's release.[6] For example, Ms. Lively recently received (only after litigating a Motion to Compel its production) ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[6] *See, e.g.*, ECF No. 84 ¶¶ 203–209; *id.* ¶ 210 (Abel expressing her "wanting to plant pieces this week of how horrible Blake is to work with"), 211–12 (Baldoni suggesting a narrative that Blake is a bully), *id.* ¶ 214 (engaged Wallace for "creation of social fan engagement," including to "go back and forth with any negative accounts, helping to change the narrative and stay on track," while remaining "untraceable"), *id.* ¶ 224 (implementation of the "social combat plan"); *id.* ¶ 234–35 (TAG instructing Wallace to take "serious actions on the social side," and his response that they are "crushing it on Reddit").

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████ ***And this is just one email among a mountain of other evidence.*** As the Court

acknowledged in prior rulings, it is readily apparent based on communications between the

Wayfarer Parties included in the pleadings that they engaged in a retaliatory smear

campaign. (ECF No. 296 at 115–16 (summarizing communications between Abel, Nathan, and

Baldoni and concluding that "[a] reader of those messages would have little doubt that the

Wayfarer Parties engaged in a smear campaign."); *id.* at 117 n.62 ("Some messages relied on by

the Wayfarer Parties for the claim that they were not engaging in negative messaging regarding

Lively and Reynolds can in fact be read to imply the opposite").

Mr. Freedman's attempt to blame Ms. Lively's allegedly poor reputation undermines the

*real* grounds on which this case must be decided: evidence presented to an impartial jury.

### D.    Mr. Freedman Violated N.Y. Rule 3.6 By Asserting That Mr. Reynolds' SNL Appearance Makes Him a Person Of Poor Character And Renders Ms. Lively's Claims Not Credible.

Mr. Freedman has distorted a seconds-long appearance by Mr. Reynolds on SNL—in

which Mr. Reynolds made a one-sentence reference to ***the incessant publicity*** prompted by this

litigation—as an inference that Ms. Lively must be lying about her allegations.[7] Shortly after the

SNL appearance, Mr. Freedman stated that he is "unaware of anybody frankly, whose wife has

been sexually harassed and has made jokes about that type of situation," insinuating Mr. Reynolds'

comment renders Ms. Lively's sexual harassment and retaliation claims false. Ex. C at 8:12–15. A

---

[7] During the show, the hosts called to Mr. Reynolds in the audience, asking "how's it going?" in response to which Mr. Reynolds merely stated: "Great. Why? What have you heard?" CNN Entertainment, *Ryan Reynolds Pokes Fun at Legal Battle During 'SNL' Special,* (Feb. 17, 2025), https://www.cnn.com/2025/02/17/entertainment/video/ryan-reynolds-blake-lively-snl-baldoni-digvid.

month later, Mr. Freedman built this narrative into his public statements following Mr. Reynolds'

(successful) Motion to Dismiss by stating that "Mr. Reynolds can appear on as many sketch shows

as he wants and feebly try to make light of his current situation, but we will not stop until he is

held accountable for his actions." Ex. E at 3. Mr. Freedman also used the SNL appearance as a

way to malign Mr. Reynolds's and Ms. Lively's character as compared to his client's moral

superiority. *See* Ex. C at 16:15–19 (Mr. Baldoni is "not making jokes . . . about the situation"); Ex.

D at 4 ("Our clients have taken this matter and these issues very seriously notwithstanding the

jokes made publicly by the plaintiff and her husband."). Mr. Freedman's public statements

regarding Mr. Reynolds's appearance on SNL have been part of his lengthy campaign to tar Ms.

Lively as a liar, and likewise violate N.Y. Rule 3.6 and this Court's Order.

## II.    THE COURT SHOULD SANCTION MR. FREEDMAN FOR VIOLATING RULE 3.6 AND THE COURT'S ORDER.

### A.    Sanctions Are Appropriate Under Rule 16(f).

Mr. Freedman has "fail[ed] to obey" the Court's "clear and unambiguous . . . pretrial order"

incorporating N.Y. Rule 3.6 as an order of the Court.  *See* Fed. R. Civ. P 16(f)(1)(C); *Chevrestt*,

2020 WL 2301210, at *2. That fact alone is sufficient for the Court "impose whichever sanction it

feels is appropriate under the circumstances." *Chevrestt*, 2020 WL 2301210, at *2; *see also*

*Huebner*, 897 F.3d at 53 ("The fact that a pretrial order was violated is sufficient to allow some

sanction."). Under the present circumstances, Ms. Lively respectfully requests that the Court find

that Mr. Freedman has violated its N.Y. Rule 3.6 Order, enter an order sanctioning him for his

misconduct, and admonishing Mr. Freedman against any further violations. In addition, because

Mr. Freedman's violations were not "substantially justified," the Court "must order" Mr. Freedman

"to pay the reasonable expenses—including attorney's fees—incurred because of" his

noncompliance with the Court's N.Y Rule 3.6 Order. *See Chevrestt*, 2020 WL 2301210, at *2; *see*

*also Rekor Sys. Inc. v. Loughlin*, 2022 WL 3141288, at *1–2 (S.D.N.Y. Aug. 5, 2022) (awarding sanctions, including attorneys' fees, for party's failure to comply with scheduling order); *Perez*, 2023 WL 5935029, at *3-5 (sanctioning party and attorney for repeated failures to comply with pretrial orders).

Although Ms. Lively seeks only a public admonishment and an award of costs and fees at this time, Ms. Lively reserves all rights to seek appropriate remedial instructions prior to trial, as well as to seek additional sanctions in the event Mr. Freedman continues to violate the N.Y. Rule 3.6 Order, including but not limited to revocation of Mr. Freedman's *pro hac vice* admission. *See Liberty Holdings (NYC) LLC v. Aposta, Inc.*, 2020 WL 2614722, at *4 (S.D.N.Y. May 21, 2020) (revoking attorney's *pro hac vice* admission for repeated failures to obey court orders). Indeed, there is serious reason for concern, as depositions and document discovery continue, that Mr. Freedman will spend the next eight months seeking to undermine or manipulate the material exchanged in discovery to litigate this case in the court of public opinion, prejudicing any future jury before the parties are able to make their respective cases in Court. Mr. Freedman's plea to the "people that'll be the jurors" that hopefully, "they'll be able to see the sky is blue" (contrary to Ms. Lively's supposed interpretation) demonstrates his intention and willingness to do just that. Ex. K at 27:11–16. Ms. Lively respectfully urges the Court to police these boundaries before irreparable damage is done.

### B.    Sanctions Are Warranted for Mr. Freedman's Violations of the N.Y. Rule 3.6 Order Under the Court's Inherent Power.

The Court may also sanction of Mr. Freedman under its inherent power in tandem with or in addition to any sanctions imposed under Rule 16(f). *See Rice*, 2019 WL 3000808, at *3 (imposing sanctions under both Rule 16(f) and the court's inherent power); *see also Chambers*, 501 U.S. at 50 ("[N]either is a federal court forbidden to sanction bad-faith conduct by means of

the inherent power simply because that conduct could also be sanctioned under the statute or the Rules."). Mr. Freedman's repeated press statements and appearances plainly amount to "willful disobedience" of the Court's Rule 3.6 Order. *Rice*, 2019 WL 3000808, at *3.

**First**, the Court's order "w[as] explicit and there is no suggestion that [Mr. Freedman] misread or misunderstood [it]." *Petrisch*, 789 F. Supp. 2d at 455. Indeed, Mr. Freedman happily agreed to be bound by N.Y. Rule 3.6 and expressed no confusion as to what compliance entailed. *See* Tr. 57:21–22 ("I am actually in agreement with that relief. We want to comply with Rule 3.6"); *id.* at 58:9–10 ("I certainly would stipulate to the professional rules of conduct and certainly want to abide by that."). Mr. Freedman's embrace of the Order, in combination with the fact that specific examples of Mr. Freedman's pre-February 3 statements were discussed at length with the Court, *see id.* 50:18–53:19; 57:21–58:12; Ex. A, leaves no doubt that Mr. Freedman understood the Order when it was entered. And yet, just two days after the Order was entered, Mr. Freedman began to violate it, and even joked about the prospect of being sanctioned by this Court in a public interview. Since that time, Mr. Freedman has unrelentingly engaged in pretrial publicity akin to—and, at times, worse than—those instances raised at the February 3 Hearing.

**Second**, the Court can conclude that Mr. Freedman's conduct is willful because it has been continuing for "several months," and is "'[part of] a pattern' of non-compliance." *Rice*, 2019 WL 3000808, at *4 (quoting *S. New England Tel.*, 624 F.3d at 148).[8] Putting aside the month-long press tour Mr. Freedman organized before the February 3 Hearing, since the Court issued the N.Y. Rule 3.6 Order, Mr. Freedman has habitually disobeyed its terms by making, at a minimum, over a dozen individual statements that unquestionably exceed the limits of N.Y. Rule 3.6. Because Mr. Freedman's routine and continuous violations of the Order indicate he acted willfully and in bad

---

[8] *See* ECF No. 413 at 1–2; ECF No. 402-2 at 8–9.

faith, the Court should impose additional sanctions under its inherent power. *See Liebowitz*, 6 F.4th at 292 (affirming a $20,000 sanction for "bad faith conduct" considering the attorney's "conduct in the case, his previous similar conduct, the need for deterrence, and similar sanctions approved by our sister courts"); *Rice*, 2019 WL 3000808, at *4 (collecting cases).

Mr. Freedman's willful violations of the N.Y. Rule 3.6 Order separately justify the imposition of sanctions—including a public reprimand and attorneys' fees, as well as any other sanctions the Court deems just—under the Court's inherent power.

## CONCLUSION

For the reasons stated above, this Court should impose sanctions against Mr. Freedman, in the form of findings that he has violated the N.Y. Rule 3.6 Order and an admonishment against future violations, in addition to an award of costs and attorneys' fees. Should the Court conclude that an award of fees and costs is appropriate, Ms. Lively respectfully requests that the Court set a briefing schedule for the calculation of that award.

Respectfully submitted,

Dated: August 4, 2025

/s/ *Michael J. Gottlieb*

Esra A. Hudson (admitted pro hac vice)
Stephanie A. Roeser (admitted pro hac vice)
Manatt, Phelps & Phillips LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
(310) 312-4000
ehudson@manatt.com
sroeser@manatt.com

Matthew F. Bruno
Manatt, Phelps & Phillips LLP
7 Times Square
New York, NY 10036
(212) 790-4525
mbruno@manatt.com

Michael J. Gottlieb
Kristin E. Bender
Willkie Farr & Gallagher LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1000
mgottlieb@willkie.com
kbender@willkie.com

Aaron E. Nathan
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8904
anathan@willkie.com

DUNN ISAACSON RHEE LLP
Meryl C. Governski (admitted *pro hac vice*)
401 Ninth Street, NW
Washington, DC 20004
(202) 240-2900
mgovernski@dirllp.com

*Attorneys for Blake Lively*