UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

BLAKE LIVELY,                                    :
                                                 :  Civ. Action No. 1:24-cv-10049-LJL
                    Plaintiff,                    :
                                                 :  Related to:
v.                                               :  Civ. Action No. 1:25-cv-00779-LJL
                                                 :
WAYFARER STUDIOS LLC, JUSTIN BALDONI,             :
JAMEY HEATH, STEVE SAROWITZ, IT ENDS              :
WITH US MOVIE LLC, MELISSA NATHAN, THE            :
AGENCY GROUP PR LLC, and JENNIFER ABEL,           :
                                                 :
                    Defendants.                   :
                                                 :
---------------------------------------------------------------- x
JENNIFER ABEL,                                   :
                                                 :
                    Third-Party Plaintiff,        :
                                                 :
v.                                               :
                                                 :
JONESWORKS LLC,                                  :
                                                 :
                    Third-Party Defendant.        :
                                                 :
---------------------------------------------------------------- x


## <u>OPPOSITION TO BLAKE LIVELY'S MOTION FOR SANCTIONS AGAINST DEFENDANTS' COUNSEL</u>

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION .................................................................................................. 4

II.    FACTUAL AND PROCEDURAL BACKGROUND ......................................... 7

    A. The History of Publicity Relating to Ms. Lively and It Ends With Us.............................. 7

    B. Ms. Lively's Relentless Campaign Against Mr. Freedman. ............................................... 8

III.    MS. LIVELY'S MOTION SHOULD BE DENIED ............................................ 10

    A. Ms. Lively Fails to Present any Evidence of a Substantial Likelihood of Materially
        Prejudicing the Adjudicative Proceeding in This Matter.................................................. 11

    B. Mr. Freedman's Statements Fall Within Rule 3.6's Express Exceptions. ........................ 14

        1.    Mr. Freedman's Statements Were Reasonably Required to Protect the Wayfarer
              Parties by Countering the Substantial Prejudicial Effect of Recent Publicity
              Initiated by Ms. Lively and her Counsel............................................................... 15

        2.    Other Exceptions to Rule 3.6 Apply to Shield Mr. Freedman From Sanctions. .. 22

    C. The Court Should Reject the Request to Effectively Disqualify Mr. Freedman by
        Revoking His *Pro Hac Vice* Admission. ......................................................................... 22

IV.    THE COURT SHOULD DECLINE TO EXERCISE ITS POWER TO SANCTION MR.
        FREEDMAN ......................................................................................................... 23

V.    CONCLUSION .................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Blidge v Ferguson*,
 2025 WL 1900009 (S.D. Georgia July 9, 2025) .................................................................12

*Gentile v. State Bar of Nev.*,
 501 U.S. 1030 (1991) ..........................................................................................................13

*Lott v. Este*,
 2023 WL 4278688 (S.D. Ga. June 29, 2023) .......................................................................12

*Muhaymin v. City of Phoenix*,
 2020 WL 3050572 (D. Ariz. June 5, 2020) .........................................................................14

*Murphy-Fauth v. BSNF Railway Company*,
 2018 WL 5312201 (D. Mont. April 4, 2018) .......................................................................14

*Niv v. Hilton Hotel Corp.*,
 2007 WL 2077003 (S.D.N.Y. July 18, 2007) ...............................................................22, 23

*Selletti v. Carey*,
 173 F.3d 104 (2d Cir. 1999) ..........................................................................................11, 12

*Sherrod, Teed, Vanderhagen and War v. VNA*,
 2022 WL 15523073 (E.D. Mich. Oct 26, 2022) .......................................................12, 13, 14

*Stroble v. California*,
 343 U.S. 181 (1952) ............................................................................................................13

*Sweet v. City of Mesa*,
 2021 WL 3130335 (D. Ariz. July 23, 2021) ........................................................................13

*Unite Here v. Cintas Corp.*,
 500 F. Supp. 2d 332 (S.D.N.Y. 2007) ..................................................................................23

*United States v. Claville*,
 2008 WL 1021364 (W.D. La. Apr. 8, 2008) ........................................................................13

**Other Authorities**

New York Rules of Professional Conduct Rule 3.6 ............................................................ *passim*

I.    **INTRODUCTION**

In her latest effort to curtail opposing counsel Bryan Freedman's speech and chill his ability to effectively defend his clients, Plaintiff Blake Lively now seeks a laundry list of sanctions under Rule 3.6 of the New York Rules of Professional Conduct ("Rule 3.6").  A lawyer has a right, indeed an obligation, to defend his or her client, even in the press.  Ms. Lively nevertheless insists that Mr. Freedman was the architect of a far-reaching scheme to "smear" Ms. Lively.  Ms. Lively points to ten statements in which Mr. Freedman questioned the validity of Ms. Lively's claims, addressed the possibility that Ms. Lively would continue her deposition (which she did) and referred to Ms. Lively as a "Hollywood elite" (which, of course, she is, having worked her whole career to become).

Ms. Lively contends that Rule 3.6 applies because Mr. Freedman's statements challenge her "character, credibility [or] reputation."  Ms. Lively misconstrues Rule 3.6 which does not bar public statements by counsel – even statements critical of an opposing party.  Rule 3.6 bars only those statements that create "a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter."  The chief failing in Ms. Lively's motion is the underlying assumption that any statement that touches on a party's character, credibility or reputation automatically triggers "a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter" and therefore violates Rule 3.6.  This is not the case.

Nevertheless, Ms. Lively glosses over the threshold requirement for Rule 3.6 sanctions which is that the negative publicly creates a "substantial likelihood of materially prejudicing the adjudicative proceedings."  Ms. Lively deftly sidesteps this requirement with the single, conclusory statement that "This Court should impose sanctions here because Mr. Freedman's

statements pose a significant risk of tainting the jury pool with deceptive, corrosive, and untrue statements cloaked with an illusion of lawyerly integrity."  Dkt. 544, p. 10.

Ms. Lively does not argue, much less provide any evidence, that Mr. Freedman's statements are likely to taint the jury.  Ms. Lively does not enlighten on the "significant risk" or explain how comments made eight to eleven months prior to trial could pose a significant risk of materially prejudicing the jury – particularly here, where the jury pool consists of literally millions of residents in the New York metropolitan area.  Ms. Lively simply ignores the need for temporal proximately to establish the requisite risk of prejudice.

Instead of enlightening on the risk of potential prejudice, Ms. Lively myopically focuses on the second part of the analysis, namely, whether Mr. Freedman's comments relate to Ms. Lively's credibility, character or reputation which may "ordinarily" create a prejudice – an analysis that is unnecessary absent a showing of a substantial risk of materially prejudicing the adjudicative process.  Ms. Lively's failure to demonstrate a substantial risk of material prejudice alone dooms Ms. Lively's latest request for sanctions against opposing counsel.

Moreover, even assuming that Ms. Lively's silence is sufficient to establish "a substantial likelihood of materially prejudicing an adjudicative proceeding" flowing from any statement made by Mr. Freedman, the cited statements fall under Rule 3.6's explicit exceptions, including, among others, the exception for statements "a reasonable lawyer would believe are required to protect a client from the substantial prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client" which is "necessary to mitigate the recent adverse publicity."  Rule 3.6(d).

In this vein, Ms. Lively conveniently ignores her own counsel's very public campaign to savage Defendants (and their counsel) in the public eye.  Ms. Lively similarly ignores that she

was a highly divisive figure long before Mr. Freedman came on the scene. Discord on the "It Ends with Us" set attracted media attention while the Film was still in production. Public and media interest spiked when Ms. Lively encouraged cast and crew members to "de-friend" or "unfollow" Mr. Baldoni on social media, froze Mr. Baldoni out of the marketing campaign for the Film he produced, directed and starred in and banished him and his family to the basement at the Film's premier in August 2024 – long before Mr. Freedman was engaged in late December 2024. Ms. Lively herself poured fuel on the fire when she and/or her counsel provided a draft of her CRD complaint to the New York Times before it was filed. Ms. Lively's post-litigation conduct has done nothing to endear her to the public, the press or "content creators." A recent barrage of subpoenas has angered and alienated those already critical of Ms. Lively, forcing a number of them to seek this Court's intervention.[1]

Blissfully tone deaf to her own conduct, Ms. Lively is not only unwilling to accept that her own celebrity and actions have generated the media frenzy she now complains of and the weight of negative publicity against her. She conveniently ignores that she and her counsel have been less than shy about publicly bashing Mr. Freedman and the Wayfarer Defendants in the press. Nevertheless, Ms. Lively seeks monetary sanctions, attorneys' fees, a reprimand and revocation of Mr. Freedman's *pro hac vice* admission for statements primarily relating to whether Ms. Lively would appear at deposition and the falsity of her claims.

In short, as explained below, Rule 3.6 does not, as Ms. Lively urges, render any public statement by a lawyer sanctionable. While statements that relate to a party's "character, credibility [or] reputation" may be "***ordinarily likely***" to create prejudice, the statements must

---

[1] To the best of the Wayfarer Parties' knowledge, the subpoenas have failed to yield any evidence of manipulation or interference by Mr. Freedman.

also create a substantial risk of materially prejudicing the adjudicative proceedings.  In other words, "ordinarily" does not translate to absolutely and the fact that a statement may relate to a party's character, credibility or reputation does not abrogate the requirement that there be a "substantial risk of material prejudice to the adjudicative proceeding."

As elaborated below, Ms. Lively's motion should be denied because (1) Ms. Lively fails to show that Mr. Freedman's statements raised a substantial risk of materially prejudicing the jury; and (2) the statements identified by Ms. Lively fall into Rule 3.6's express exceptions for statements concerning the claim, offense or defense, information in a public record, scheduling matters and, most importantly, statements that "a reasonable lawyer would believe is required to protect a client from the substantial prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client … to mitigate the recent adverse publicity."

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The History of Publicity Relating to Ms. Lively and It Ends With Us.

Ms. Lively is a celebrity who, for whatever reason, has long been a magnet for media attention.  During production of the popular film "It Ends With Us," well before the alleged 'smear campaign,' rumors of discord on the set were swirling.  By August 2024, roughly the time when the film was released, the rumor mill about troubles on set were already receiving significant media attention and both sides had retained public relations consultants.  Public scrutiny of Ms. Lively's conduct accelerated after she urged her followers to "de-friend" or "unfollow" Justin Baldoni on social media, froze Baldoni out of the marketing campaign for the film he produced, directed and starred in and banished Mr. Baldoni and his family to the basement during the film's premier.  Ms. Lively points to a chart showing an increase in negative

publicity beginning in early August 2024, and spiking on August 9, 2024, the day the Film was released – a natural point for a spike in public comment.

Ms. Lively further fueled the already brewing firestorm by leaking her CRD complaint to the New York Times in advance of its December 20, 2024 filing. The Complaint contains sensationalized allegations of sexual abuse and misconduct on the set of the Film. As part of Ms. Lively's very concerted efforts to shape the public narrative and sway potential jurors, Ms. Lively and her counsel have routinely exploited the media to advance their version of the facts. Ms. Lively's efforts to influence public opinion – primarily through her counsel – continue unabated. Nevertheless, Ms. Lively contends that the Wayfarer Parties and Mr. Freedman's efforts to counter the hurricane of negative publicity are a "smear campaign" which violates Rule 3.6.

**B.  Ms. Lively's Relentless Campaign Against Mr. Freedman.[2]**

After the Film's release, this Motion is the latest salvo in Ms. Lively's relentless war against Mr. Freedman. It comes on the heels of a string of motions calculated to intimidate counsel and curb Mr. Freedman's statements in defense of his clients including a Rule 11 sanctions motion against the Wayfarer Parties and their counsel and a subpoena directed to Mr. Freedman's law firm seeking, among other things, all communications and agreements with "content providers" from July 2024 to the present. But this is not all. Ms. Lively sought to bar Mr. Freedman from taking Ms. Lively's deposition (see Dkt. 48, p. 1), and has repeatedly added gratuitous swipes at Mr. Freedman in a string of motions unrelated to the negative publicity

---

[2] On August 8, 2025, this Court wisely issued a long overdue order advising all individuals filing documents in this case not to make submissions using language that is disrespectful to the parties, their Counsel or the Court. Dkt. 581. The Wayfarer Parties are hopeful that all parties will comply with this Order and cease from the incessant personal attacks on counsel.

which Ms. Lively alleges 'smeared' her. *See, e.g.*, Lively's Motion to Strike (Dkt. 540), pp. 1, 2

n.4; Lively's Motion for Protective Order (Dkt. 413), p. 3; *Liner Freedman Taitelman + Cooley,*

*LLP v. Blake Lively*, Civ. Action No. 1:25-mc-00289-LJL (S.D.N.Y. June 13, 2025), Dkt. 1-1, at

16, 18-19.

In this latest assault, Ms. Lively cites ten statements by Mr. Freedman issued between

February 5 and June 11, 2025, as violative of Rule 3.6:

(1) A February 5, 2025 interview on TMZ, predicting that Ms. Lively and Mr. Reynolds were "going to probably take some legal actions that are beyond the bounds of decency and we'll see if they can try to avoid a deposition";

(2) A February 18, 2025 interview with Billy Bush in which Mr. Freedman, referring to Ms. Lively's complaint, stated that "Documents don't lie, people do," and "I wouldn't want to be on the wrong side of history here";

(3) A February 19, 2025 statement to TMZ in response to the filing of Ms. Lively's Amended Complaint, stating that Ms. Lively's claims are "false," "filled with unsubstantial hearsay of unnamed persons who are clearly no longer willing to come forward or publicly support her," and "lack[ing] . . . actual evidence," as "documents do not lie and people do";

(4) A March 20, 2025 statement to TMZ that Lively's Motion to Dismiss was an attempt to cover up for "the self-concocted disaster she initiated" and Ms. Lively was a "privileged elite[]" whose Motion to Dismiss "twisted and curated" the law to fit her "personal agenda" in "one of the most abhorrent examples of abusing our legal system";

(5) An April 4, 2025 statement to TMZ that Ms. Lively was attempting to "divert the public's attention from the receipts, the actual documents, video footage and additional evidence," which Mr. Freedman asserted made it "irrefutable that there was no sexual harassment," that Ms. Lively's own conduct caused "the organic backlash that she received," and Ms. Lively "does not need discovery to find out who smeared her. Just a mirror will do";

(6) An April 4, 2025 statement to People magazine that Ms. Lively belonged to a "circle of Hollywood elites" seeking to advance "false and harmful" claims and "block access to the court system and weaken our nation's Constitution to service those who are in position of power";

(7) A May 8, 2025 statement to People magazine that there was so much interest that Ms. Lively's deposition should be held at Madison Square Garden and to "sell tickets or stream it";

(8) A June 10, 2025 statement to TMZ that Ms. Lively was "afraid of the truth" and "we're gonna see if she's gonna appear at that deposition or not" and that Ms. Lively filed "a lawsuit which you know accused some very good people of a smear campaign.  And accused you know a terrific young man of sexual harassment";

(9) A June 11, 2025 interview on Megyn Kelly's podcast in which Ms. Kelly (not Mr. Freedman) stated that Mr. Freedman is "waging war against Blake Lively who he believes is not a good person" and referring to Ms. Lively's reputation as a "bitch."[3] Although these statements were not made by Mr. Freedman, Mr. Freedman allegedly "endorsed" Ms. Kelly's comments and stated that she appeared to be a "narcissist" who could not accept "how she's behaved and how she's treated reporters and how she's treated people and how she's treated individuals, how she's treated waiting staff and others, and saying it's not okay.  We don't like you."; and

(10) A March 19, 2025, statement to People magazine describing Mr. Reynolds' Motion to Dismiss as "arrogant[]" and stating that Mr. Reynolds believes that "bullying is acceptable" and "publicly documented" to be a "key player" whose "fingerprints have been all over this smear campaign against Justin and the Wayfarer team since day one." [4]

Dkt. 544, pp. 5-6.

## III.    <u>MS. LIVELY'S MOTION SHOULD BE DENIED</u>

Rule 3.6 is not an absolute bar to a lawyer's statements to the press.  Rule 3.6 applies to extrajudicial statements that "the lawyer knows or reasonably should know … will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter."  Rule 3.6(a).  A statement in a civil proceeding "***ordinarily is likely*** to prejudice materially an adjudicative proceeding when … it relates to" a party's "character, credibility, [or] reputation" or to "information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would, if disclosed, create a substantial risk of prejudicing an impartial

---

[3] Ms. Kelly is not subject to Rule 3.6 sanctions and Rule 3.6 applies to statements by counsel, not a silent "endorsement" of a third party's comments.

[4] Mr. Reynolds is no longer a party to these proceedings.

trial."[5]  Rule 3.6(b)(1) and (b)(5) (emphasis added.).  "Ordinarily" does not equate to always and as noted, the first and fatal flaw to Ms. Lively's motion is her failure to show that Mr. Freedman's statement will have a substantial likelihood of materially prejudicing the jury.

**A.      Ms. Lively Fails to Present any Evidence of a Substantial Likelihood of Materially Prejudicing the Adjudicative Proceeding in This Matter.**

As noted, a predicate for Rule 3.6 sanctions is a showing that the statements will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.  Ms. Lively's Motion is bereft of any evidentiary or other support for the notion that Mr. Freedman's statements will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.  Ms. Lively does not even attempt to make this critical showing, asserting only a single, conclusory statement: "This Court should impose sanctions here because Mr. Freedman's statements pose a significant risk of tainting the jury pool with deceptive, corrosive, and untrue statements cloaked with an illusion of lawyerly integrity."  Dkt. 544, p. 10.

Ms. Lively focuses solely on the "ordinary" prejudice that attaches to statements impugning a party's credibility, character or reputation – ignoring the requirement that the statements must create a substantial likelihood of material prejudicing the jury.  The authority cited by Ms. Lively in support of this theory is sparse and distinguishable.  Ms. Lively relies primarily on *Selletti v. Carey*, 173 F.3d 104 (2d Cir. 1999).  However, the *Selletti* Court did not order sanctions under Rule 3.6 or for the lawyer's statements to the press.  Rather, plaintiff's counsel was sanctioned under Rule 37(b)(2) of the Federal Rules of Civil Procedure for serial abuses of the discovery including a failure to comply with the Court's order to timely serve

---

[5]  Ms. Lively does not argue that Mr. Freedman's statements publish evidence that he should reasonable have known was inadmissible.  Indeed, at this early juncture, without only a single deposition completed, any determination on admissibility is premature.

discovery responses and for failing to diligently prosecute the case. *Id*. at 110-11.  In sanctioning plaintiff, the Court noted that the merits of plaintiff's case were questionable as plaintiff's counsel appeared more interested in litigating in the press than complying with the Court's discovery orders. *Id*. at 111.  Sanctions, however, were not, as Ms. Lively urges, imposed for counsel's "general strategy … to prosecute this action through the media" but for a failure to comply with a discovery order.

Ms. Lively also cites *Lott v. Este*, 2023 WL 4278688 (S.D. Ga. June 29, 2023) decided under the Southern District of Georgia's Local Rule 11.2, that court's counterpart to Rule 3.6. However, the Southern District of Georgia rule differs from New York's version of Rule 3.6 in two significant ways.  First, the Southern District of Georgia rule permits sanctions where a lawyer's public statements raise "***a reasonable likelihood*** that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.  *See Blidge v Ferguson*, 2025 WL 1900009, *2 (S.D. Georgia July 9, 2025), *citing Lott,* 2023 WL 4278688.  In contrast Rule 3.6 require a showing of "a substantial likelihood of material prejudice" a far more stringent standard.  Second, the Southern District of Georgia rule does not provide the exceptions which are incorporated into the New York Rule and apply here. *Id*. at *4.

Numerous courts have denied sanctions under Rule 3.6 or its out-of-state equivalents.  In *Sherrod, Teed, Vanderhagen and War v. VNA*, 2022 WL 15523073, * 1 (E.D. Mich. Oct 26, 2022), the plaintiff's counsel made statements relating to a hung jury including that (1) plaintiffs were "only one juror shy from winning the case"; (2) counsel was "fired up" for the next trial; perhaps defendant was "trying to dig in and determine while all eight members of the jury determined [it] was liable, despite not understanding they could have come to a verdict on [defendant] even if they were not unanimous on the other trial defendant." *Id*.  The defendant

12

sought sanctions under Michigan's Rule of Professional Conduct that is the equivalent of Rule 3.6.

The court found "nonsensical" the notion that statements made to a reporter in 2022 "could possibly manipulate or impact a future jury" for the retrial. *Id*. at *3. The *Sherrod* Court noted the exceedingly large jury pool which would draw from the greater metropolitan area and explained that "[t]o believe the notion that [counsel's] media statements could possibly manipulate or impact a future jury would require one to believe that tens of thousands of individuals in the jury venire read and remember [counsel's] statements and that the same individuals would conceal this fact during jury selection and voir dire*." Id*. The court labeled "[t]his chain of reasoning [as] creative, but nonsensical." *Id*. The Court pointed to the defendant's failure to provide any support, such as an expert opinion showing that overwhelming adverse media attention had made it impossible to find an impartial jury. *Id*. Absent such support, the motion was insufficient to "create a substantial likelihood of materially prejudicing the jury and adjudicative proceedings." *Id*.

In *United States v. Claville*, 2008 WL 1021364, *1 (W.D. La. Apr. 8, 2008), the court found that statements made seven weeks before the scheduled trial date were too far in advance of trial to be prejudicial. *See also, Stroble v. California*, 343 U.S. 181, 195 (1952) (no showing of prejudice where most of the extensive pretrial publicity occurred six weeks before trial, and defendant made no "affirmative showing that any community prejudice ever existed"); *Gentile v. State Bar of Nev*., 501 U.S. 1030, 1039 (1991) (argument that statements made six months before trial created a substantial likelihood of materially prejudicing the proceeding "is, to say the least, most unconvincing"); *Sweet v. City of Mesa*, 2021 WL 3130335, at *4 (D. Ariz. July 23, 2021) (statements made over a year before trial were too remote to show a substantial likelihood of

13

prejudicing the jury pool.); *Murphy-Fauth v. BSNF Railway Company*, 2018 WL 5312201, at *4 (D. Mont. April 4, 2018) (finding publication fifteen months before trial too remote to create substantial likelihood of material prejudice"); *Muhaymin v. City of Phoenix*, 2020 WL 3050572, at *3 (D. Ariz. June 5, 2020) (denying sanctions where trial was not imminent).

Here, Mr. Freedman's statements were made between nine and eleven months before the scheduled trial date. The jury pool, which draws from the entire New York Metropolitan area, dwarfs the exceedingly large jury pool in the *Sherrod* case. Indeed, the notion that the entire jury pool is somehow riveted to Ms. Lively's claims and this spat between two actors is nonsensical as is the notion that an impartial jury cannot be seated.

### B.    Mr. Freedman's Statements Fall Within Rule 3.6's Express Exceptions.

Even assuming that the Court finds that any of the enumerated statements pose a substantial risk of materially tainting the jury, Mr. Freedman's statements are not prohibited by Rule 3.6, but are subject to its exceptions. Rule 3.6 does not apply to statements, asserted without elaboration, concerning "the claim, offense or defense … information contained in a public record; … [or] the scheduling or result of any step in litigation …" or to "a statement that a reasonable lawyer would believe is required to protect a client from the substantial prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client … to mitigate the recent adverse publicity." N.Y. Rules of Prof. Conduct, Rule 3.6 (c)(1), (2), and (4); and subsection (d). Comment [4] to Rule 3.6 elaborates that "[c]ertain subjects that are more likely than not to have a material prejudicial effect on a proceeding," but statements relating to "the claim, offense or defense involved" and "information contained in the public record," and "scheduling" depositions are not among them.

14

1.       **Mr. Freedman's Statements Were Reasonably Required to Protect the Wayfarer Parties by Countering the Substantial Prejudicial Effect of Recent Publicity Initiated by Ms. Lively and her Counsel.**

Mr. Freedman's statements were not made in a vacuum.  As recognized by the express exceptions to Rule 3.6, lawyers have a right, indeed a duty, to publicly defend their clients.  Put another way, nothing in Rule 3.6 divests a lawyer of his or her right to defend against adverse publicity promulgated by an opposing party or his or her counsel.  In fact, this Court has recognized a lawyer's right to speak out.  At the July 25, 2025 hearing on Liner Freedman Taitelman + Cooley, LLP's Motion to Quash Subpoena Duces Tecum, the Court recognized an attorney's right in a high profile case such as this, to communicate with the press about court proceedings and the lawyer's interpretation, opinion or "spin" on those proceedings:

> So if Ms. Garofalo leaves this courtroom and gives her spin on what I've said or what you've said or what she said, that would be picked up. If it was Mr. Freedman who was here and he gave his spin, that would be picked up. Clients do have a right to have their attorneys speak to members of the press, particularly in a high profile case, and give their interpretation. The public has an interest in that also. I wouldn't begrudge you speaking to members of the press and I'm not going to begrudge Ms. Garofalo doing that.

*Liner Freedman Taitelman + Cooley, LLP v. Blake Lively,* Civ. Action No. 1:25-mc-00289-LJL, Transcript of Hearing on July 30, 2025 at 2:00 p.m., pp. 34:22 – 35:5.

There can be no serious dispute that Ms. Lively and her lawyers, sometimes euphemistically called "spokespersons," have disseminated a barrage of negative statements impugning Mr. Baldoni and the Wayfarer Defendants' "credibility, character [or] reputation" by alleging, among other things, that Justin Baldoni lied about his longstanding commitment to women's rights and betrayed victims of sexual abuse.  For instance,

- On January 7, 2025, Lively's legal team released a statement to E! News that: "This is not a 'feud' arising from 'creative differences' or a 'he said/she said'

15

situation." "Sexual harassment and retaliation are illegal in every workplace and in every industry. A classic tactic to distract from allegations of this type of misconduct is to 'blame the victim' by suggesting that they invited the conduct, brought it on themselves, misunderstood the intentions, or even lied." "Another classic tactic is to reverse the victim and offender and suggest that the offender is actually the victim. These concepts normalize and trivialize allegations of serious misconduct." "Media statements are not a defense to Ms. Lively's legal claims. We will continue to prosecute her claims in federal court, where the rule of law determines who prevails, not hyperbole and threats."[6]

- In a January 16, 2025 Deadline quoted Lively's counsel as saying: "This latest lawsuit from Justin Baldoni, Wayfarer Studios, and its associates is another chapter in the abuser playbook. This is an age-old story: A woman speaks up with concrete evidence of sexual harassment and retaliation and the abuser attempts to turn the tables on the victim. This is what experts call DARVO. Deny. Attack. Reverse Victim Offender." Further, "Wayfarer has opted to use the resources of its billionaire co-founder [Defendant Steve Sarowitz] to issue media statements, launch meritless lawsuits, and threaten litigation to overwhelm the public's ability to understand that what they are doing is retaliation against sexual harassment allegations. They are trying to shift the narrative to Ms. Lively by falsely claiming that she seized creative control and alienated the cast from Mr. Baldoni. The evidence will show that the cast and others had their own negative experiences with Mr. Baldoni and Wayfarer. The evidence will also show that Sony asked Ms. Lively to oversee Sony's cut of the film, which they then selected for distribution and was a resounding success. Their response to sexual harassment allegations: she wanted it, it's her fault. Their justification for why this happened to her: look what she was wearing. In short, while the victim focuses on the abuse, the abuser focuses on the victim. The strategy of attacking the woman is desperate, it does not refute the evidence in Ms. Lively's complaint, and it will fail."[7]

- In a January 21, 2025 statement released to Deadline, Ms. Lively's counsel stated: "Any woman who has been inappropriately touched in the workplace will recognize Ms. Lively's discomfort. They will recognize her attempts at levity to try to deflect the unwanted touching. No woman should have to take defensive measures to avoid being touched by their employer without their consent. While they are focused on misleading media narratives, we are focused on the legal

---

[6] Olivia Evans, *Blake Lively's Attorneys Slam "More Attacks" From Justin Baldoni's Legal Team*, E! News (Jan. 7, 2025), https://www.eonline.com/news/1411908/blake-livelys-attorneys-slam-more-attacks-from-justin-baldonis-legal-team.

[7] Dominic Patten, *Blake Lively Accuses Justin Baldoni Of "Abuser Playbook" Tactics After 'It Ends With Us' Director Sues Co-Star & Ryan Reynolds For $400M, Deadline* (Jan. 16, 2025), https://deadline.com/2025/01/blake-lively-justin-baldoni-latest-2-1236259080/.

process. We are continuing our efforts to require Mr. Baldoni and his associates to answer in court, under oath, rather than through manufactured media stunts."[8]

- In a February 5, 2025 press release, Ms. Lively's counsel stated: "Another day, another state, another nine-figure lawsuit seeking to sue Ms. Lively 'into oblivion' for speaking out against sexual harassment and retaliation. This is not just a publicity stunt — it is transparent retaliation in response to allegations contained within a sexual harassment and retaliation complaint that Ms. Lively filed with the California Civil Rights Department."[9]

- In a February 18, 2025, statement to Deadline, Ms. Lively's counsel stated: "Over the next several weeks, we will move to dismiss the utterly meritless lawsuits brought against Ms. Lively and Mr. Reynolds, and we will move full speed ahead with discovery that we expect will reveal shocking details about the depth to which the Defendants have sunk in their unending efforts to 'bury,' 'ruin,' and 'destroy' Ms. Lively and her family."[10]

- A February 28, 2025, Deadline article quoted Lively's "spokesperson" as saying: "What is Bryan Freedman hiding? After promising to release all the receipts, Freedman ran into court to keep secret the phone records of who Baldoni, Heath, Sarowitz, Nathan, Wallace and Abel were calling during their retaliatory campaign."[11]

- Another February 28, 2025 statement from a Lively "spokesperson" stated: "In its motion to dismiss, the New York Times correctly calls out Justin Baldoni's lawsuit for what it is: a shameless PR document that has no business in a court of law," "For years, Baldoni urged men to listen to and believe women. But when a woman spoke out about his behavior, he and his billionaire backer Steve Sorowitz

---

[8] Dominic Patten, *Counterattack! Blake Lively Quickly Rebukes "Unethical" Justin Baldoni For Releasing 'It Ends With Us' Footage To Denigrate Her Sexual Harassment Claims*, Deadline (Jan. 21, 2025), https://deadline.com/2025/01/blake-lively-justin-baldoni-video-reaction-1236263012/.

[9] Dominic Patten, *Blake Lively's Team Shrugs Off $7M Defamation Suit From Alleged Smear Campaign Architect; Jed Wallace Says Claims Have Cost Him Big Bucks*, Deadline (Feb. 5, 2025), https://deadline.com/2025/02/blake-lively-defamation-suit-reaction-jed-wallace-1236279581/.

[10] Dominic Patten, *Blake Lively Alleges Justin Baldoni Made Other Women "Uncomfortable" On 'It Ends With Us' & Says They Will Testify At Trial; Defamation Claim Added To Suit*, Deadline (Feb. 18, 2025), https://deadline.com/2025/02/blake-lively-latest-lawsuit-justin-baldoni-1236294318/.

[11] Dominic Patten, *Blake Lively Claims "Tailored" Win In Justin Baldoni Telecom Subpoenas Skirmish; Hires Crisis PR Vet Nick Shapiro*, Deadline (Feb. 28, 2025), https://deadline.com/2025/02/blake-lively-legal-win-crisis-pr-hire-1236305306/.

[sic] used a social media combat plan' to scorch earth and try to 'bury' and 'destroy' her, along with the media who reports on it.  These bullying tactics will not survive in court, and everyone should see their meritless claims for what they are."[12]

- "Today, the Court rejected the Wayfarer Parties' objections and entered the protections needed to ensure the free flow of discovery material without any risk of witness intimidation or harm to any individual's security," a spokesperson for Lively told Deadline after Judge Liman's order hit the federal docket. "With this order in place, Ms. Lively will move forward in the discovery process to obtain even more of the evidence that will prove her claims in Court."[13]

- On March 20, 2025, in a statement to Deadline, Lively's counsel stated: "This meritless and retaliatory lawsuit runs head first into three legal obstacles, including the litigation, fair report, and sexual harassment privileges, the latter of which contains a mandatory fee shifting provision that will require the likes of billionaire Steve Sarowitz, Wayfarer Studios, and others that brought frivolous defamation claims against Ms. Lively to pay damages.  In other words, in an epic self-own, the Wayfarer Parties' attempt to sue Ms. Lively "into oblivion" has only created more liability for them, and deservedly so, given what they have done."[14]

- In a May 9, 2025 statement to Deadline and others, Ms. Lively's agents stated that "Mr. Baldoni, Mr. Sarowitz, and team continue to turn a case of sexual harassment and retaliation into entertainment for the tabloids, going as far as suggesting that they sell tickets to a concert venue – Madison Square Garden – to witness Ms. Lively's deposition, to subpoenaing Taylor Swift, a woman who has given a voice to millions the world over.  This is a very serious legal matter, not Barnum & Bailey's Circus. The defendants continue to publicly intimidate, bully, shame and attack women's rights and reputations. Including in the past month seeking to strike down for all, a powerful California victims' rights law, calling it 'unconstitutional.'  The disturbing actions by a billionaire, men who made their careers as 'female allies' and their team continue to show their true

---

[12] Dominic Patten, *Blake Lively Agrees New York Times Should Exit Justin Baldoni's "One-Sided" Legal War With Her & Ryan Reynolds – Update*, Deadline (Feb. 28, 2025), https://deadline.com/2025/02/blake-lively-justin-baldoni-new-york-time-1236305764/.

[13] Dominic Patten, *Justin Baldoni Loses "Highly Personal & Intimate Information" Court Battle With Blake Lively; "Risk Of Disclosure Is Great," Judge Warns Both Sides*, Deadline (Mar. 13, 2025), https://deadline.com/2025/03/blake-lively-justin-baldoni-legal-battle-latest-1236325555/.

[14] Dominic Patten, *Blake Lively Joins Ryan Reynolds, NYT In Wanting Justin Baldoni's $400M Suit Kicked To The Curb, With A California Twist*, Deadline (Mar. 20, 2025), https://deadline.com/2025/03/blake-lively-justin-baldoni-ryan-reynolds-latest-dismissal-1236345498/.

445075.1

colors."[15]

- On May 15, 2025, Michael Gottlieb told Deadline: "Another day, another bogus filing designed for click bait." "We reiterate our unequivocal denial, which Mr. Freedman has now admitted rely completely upon a source, no matter who it is, that doesn't even claim to have witnessed the conversations that Freedman describes, making this triple-hearsay statement as unreliable as information reported from children in a game of telephone," According to Deadline, Mr. Gottlieb added "These claims remain completely untethered from reality—to be clear: the conversations as described did not happen, and we will hold Mr. Freedman accountable for his misconduct."[16]

- On May 19, 2025, Deadline reported a statement from a Lively representative: "Does anyone believe that Wayfarer is genuinely investigating a film set workplace that no longer exists?"[17]

- On June 9. 2025, Michael Gottlieb told CNN's Jake Tapper that "these lawsuits that are designed to punish people that speak up won't work. This is a message for others who may want to do the same."[18]

- Also on June 9, 2025, Michael Gottlieb stated in a TMZ interview that Baldoni's "meritless sham claims designed to distract from Ms. Lively's claims," "designed to distract from retaliation claim that they launched" "they haven't just attacked Blake Lively and Ryan Reynolds, they have attacked the laws that are designed to protect victims of sexual harassment and sexual abuse. Victims of sexual abuse. They have attacked the laws that are designed to protect sexual abuse victims. It ends in trial . . . in open court on the record, under oath. And we are confident we

---

[15] Dominic Patten, *Cruel Subpoena Summer: Taylor Swift Dragged Directly Into Pal Blake Lively's Battle With Justin Baldoni*, Deadline (May 9, 2025), https://deadline.com/2025/05/taylor-swift-subpoena-blake-lively-justin-baldoni-battle-1236392212/.

[16] Dominic Patten, *More Than A Simple Favor: Judge Grants Blake Lively's Request To Have "Improper" Taylor Swift Bullying Claims Tossed Out*, Deadline (May 15, 2025), https://deadline.com/2025/05/blake-lively-taylor-swift-bullying-claims-dismissed-by-judge-1236399580/.

[17] Dominic Patten, *"Disingenuous Charade": Blake Lively Mocks Justin Baldoni's Long Delayed HR Probe Of Her Sexual Harassment Claims*, Deadline (May 19, 2025), https://deadline.com/2025/05/blake-lively-reacts-justin-baldoni-delayed-hr-probe-1236404582/.

[18] *Judge dismisses Justin Baldoni's $400 million defamation lawsuit against Blake Lively, Ryan Reynolds* [Video], YouTube, uploaded by CNN (Jun. 9, 2025), https://www.youtube.com/watch?v=J6_7VNiDDWA.

445075.1

will prevail."[19]

Ms. Lively and her counsel also made efforts through widely disseminated media statements to alienate and sway potential jurors who might be among Taylor Swift's millions of fans against Mr. Baldoni and the Wayfarer Parties:

- On May 22, 2025, a Lively "spokesperson" told Deadline: "We are pleased that Justin Baldoni and the Wayfarer Parties have withdrawn their harassing subpoenas to Taylor Swift and her law firm"; "We supported the efforts of Taylor's team to quash these inappropriate subpoenas directed to her counsel and we will continue to stand up for any third party who is unjustly harassed or threatened in the process"; "The Baldoni and Wayfarer team have tried to put Taylor Swift, a woman who has been an inspiration for tens of millions across the globe, at the center of this case since day one." Deadline reported that the Lively spokesperson said of their client's close pal who has popped up in more than one filing or two since this all started with the Another Simple Favor actress' CRD complaint in late 2024. "Exploiting Taylor Swift's celebrity was the original plan in Melissa Nathan's scenario planning document, and it continues to this day," the statement adds, with a swipe at Baldoni's crisis management PR chief.  "Faced with having to justify themselves in federal court, they folded. At some point they will run out of distractions from the actual claims of sexual harassment and retaliation they are facing."[20]

- And, on June 13, 2025, a Lively "spokesperson" told Deadline that "Justin Baldoni and the Wayfarer parties are still demanding access to Taylor Swift's private communications—despite having already subpoenaed and then withdrawn that subpoena after they 'got all they needed,'" "As reflected in today's filing, their intent to drag Taylor Swift into this was evident as far back as August 2024, when the crisis PR firm led by Melissa Nathan included her in their 'Scenario Planning' document (Lively Amended Complaint, Exhibit D) and flagged the "Taylor Swift fanbase" as something to take "extremely seriously" (Lively Amended Complaint, ¶ 214(b)). The ongoing attempts to once again try and use the world's biggest star as a PR tactic in this matter reflects a public unraveling of epic proportions—and serves only to distract from the fact that Justin Baldoni's

---

[19] *Blake Lively's Lawyer Michael Gottlieb Says Client Plans to Take the Case to Trial* [Video], TMZ (Jun. 9, 2025), https://www.tmz.com/watch/michael-gottlieb-lively-baldoni-freedman-06-11-2025/.

[20] Dominic Patten, *Shake That Subpoena Off: Taylor Swift Probe Dropped By Justin Baldoni In Blake Lively Battle's Latest Twist*, Deadline (May 22, 2025), https://deadline.com/2025/05/taylor-swift-subpoena-dropped-by-justin-baldoni-1236408443/.

445075.1

lawsuits against Ms. Lively, Ryan Reynolds, their publicist, and the New York Times have been entirely dismissed."[21]

Rule 3.6 does not require Mr. Freedman to stand idly by while Ms. Lively and her counsel conduct a transparent campaign to savage Mr. Baldoni, the Wayfarer defendants and their counsel. To the contrary, the express language makes it inapplicable to statements "that a reasonable lawyer would believe is required to protect a client from the substantial prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client," such as the prejudice created by the incessant press releases and interviews published by Ms. Lively and her counsel. N.Y. Rules of Prof. Conduct, Rule 3.6(d)

Ms. Lively conveniently fails to explain how these public statements differ from Mr. Freedman's. In fact, they are not. Like the statements Lively complains of, they challenge Defendants' truthfulness, attack Mr. Baldoni's character by repeatedly stating that his work to protect women was a fraud and, in fact, he is a typical serial sex abuser and Defendants are bullies. Unlike Mr. Freedman's statements, those from Ms. Lively's counsel barely conceal their intent to taint the jury pool, particularly the millions of fans who follow and support Taylor Swift. Succinctly put, if Mr. Freedman's statements are sanctionable, so are those of Lively's counsel.

In short, the persistent attacks on the Wayfarer Defendants place Mr. Freedman's statements squarely into Rule 3.6's exception for public statements "that a reasonable lawyer would believe is required to protect a client from the substantial prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client."

---

[21] Dominic Patten, *Taylor Swift Tête-A-Têtes "Irrelevant" To Blake Lively Vs. Justin Baldoni Fracas, Actress' Lawyer Says In Pitch For Protective Order*, Deadline (Jun. 13, 2025), https://deadline.com/2025/06/blake-lively-justin-baldoni-taylor-swift-protective-order-1236433866/.

### 2.    Other Exceptions to Rule 3.6 Apply to Shield Mr. Freedman From Sanctions.

.    Rule 3.6 does not apply to statements, asserted without elaboration, concerning "the claim, offense or defense … information contained in a public record; …[or] the scheduling or result of any step in the litigation."  Certain of the statements cited by Ms. Lively relate to the scheduling of Ms. Lively's deposition (scheduling (pp. 6, 8, above, numbers (1) (7), (8)); the amended complaint (concerning a claim or defense and public record, p. 7, numbers (3), (5)) and the media backlash against Ms. Lively (public record, p. 7, number (5).)

### C.    The Court Should Reject the Request to Effectively Disqualify Mr. Freedman by Revoking His *Pro Hac Vice* Admission.

Apparently, no punishment for a perceived slight would be too draconian for Ms. Lively. In her extended quest to permanently silence Mr. Freedman, in addition to monetary sanctions, attorney's fees and a reprimand, Ms. Lively seeks to have the Court revoke Mr. Freedman's *pro hac vice* status, effectively disqualifying him as the Wayfarer Defendants' counsel.  In *Niv v. Hilton Hotel Corp.*, 2007 WL 2077003, at *1 (S.D.N.Y. July 18, 2007), the court rejected a similar effort to enjoin opposing counsel from participating in the litigation as a sanction for posting a press release on the internet, finding that the plaintiffs had provided no explanation or authority for "such an extraordinary and harsh remedy."  The court noted the deleterious effect such a ruling would have on the plaintiffs.

The court explained that such a remedy "would deny the plaintiffs their right to the counsel of their choice.  Although this right is not absolute, it is 'a valued right and restriction be carefully scrutinized.'"  *Id.*, quoting *S&S Hotel Ventures*, *Ltd. Partnership v. 777 S.H. Corp.*, 69 N.Y. 2d 437, 443 (1987).  Further, enjoining counsel from participation in the litigation "can

22

have significant effects of the progress of the litigation and can create strategic advantages for the other party." *Id.*

## IV.    THE COURT SHOULD DECLINE TO EXERCISE ITS POWER TO SANCTION MR. FREEDMAN

Finally, implicitly recognizing shortcomings in its quest for Rule 3.6 sanctions, Ms. Lively alternatively asks the Court to exercise its inherent power to sanction opposing counsel. The Court should decline to do so.  Sanctions under the Court's inherent power require a showing of bad faith.  "Based on its 'inherent power to supervise and control its own proceedings,' a court may sanction counsel or a litigant for 'bad-faith conduct' provided they "receive an appropriate hearing."  *Unite Here v. Cintas Corp.*, 500 F. Supp. 2d 332, 334 (S.D.N.Y. 2007), *quoting Mickle v. Morin*, 297 F.3d 114, 125 (2d Cir. 2002).  Ms. Lively has not shown the "bad faith conduct" required for sanctions under the Court's inherent power.  As shown in Section III(B)(1), above, Mr. Freedman's statements were made to counter the deluge of negative publicity spawned by Ms. Lively and counsel as expressly permitted by Rule 3.6. Conduct which is permitted by Rule 3.6 or falls into one of its express exceptions, does not rise to the level of bad faith required for sanctions under the Court's inherent power.

## V.    CONCLUSION

For the foregoing reasons, Mr. Freedman and the Wayfarer Defendants respectfully request that the Court enter an order denying Ms. Lively's motion for sanctions.

445075.1

Respectfully submitted,

**MEISTER SEELIG & FEIN PLLC**

Dated:  August 18, 2025
New York, NY

By:   _/s/ Kevin Fritz_
Mitchell Schuster
Kevin Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
Email: ms@msf-law.com
kaf@msf-law.com

Dated:  August 18, 2025
Los Angeles, CA

**LINER FREEDMAN TAITELMAN
+ COOLEY**

By:   _/s/ Ellyn S. Garofalo_
Bryan J. Freedman (*pro hac vice*)
Ellyn S. Garofalo (*pro hac vice*)
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Tel: (310) 201-0005
Email: bfreedman@lftcllp.com
egarofalo@lftcllp.com