**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BLAKE LIVELY,

                    Plaintiff,

v.                                                    No. 24-cv-10049 (LJL) (lead case)

WAYFARER STUDIOS LLC, et al.,

                    Defendants.

## MEMORANDUM OF LAW IN OPPOSITION TO JED WALLACE AND STREET RELATIONS INC.'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Esra A. Hudson (admitted *pro hac vice*)
Stephanie A. Roeser (admitted *pro hac vice*)
Manatt, Phelps & Phillips LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
(310) 312-4000
ehudson@manatt.com
sroeser@manatt.com

Matthew F. Bruno
Manatt, Phelps & Phillips LLP
7 Times Square
New York, NY 10036
(212) 790-4525
mbruno@manatt.com

Meryl C. Governski (admitted *pro hac vice*)
Dunn Isaacson Rhee LLP
401 Ninth Street, NW
Washington, DC 20004
(202) 240-2900
mgovernski@dirllp.com

Michael J. Gottlieb
Kristin E. Bender
Willkie Farr & Gallagher LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1000
mgottlieb@willkie.com
kbender@willkie.com

Aaron E. Nathan
Michaela A. Connolly
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8904
anathan@willkie.com
mconnolly@willkie.com

*Attorneys for Blake Lively*

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................i

INTRODUCTION .........................................................................................................1

BACKGROUND ...........................................................................................................3

ARGUMENT ................................................................................................................7

I.    This Court Has Personal Jurisdiction Over the Wallace Defendants. ................7

      A.    The Co-Conspirators' CPLR 302(a)(1) Contacts Are Attributable to the
            Wallace Defendants. .............................................................................7

      B.    The Wallace Defendants Are Subject to Personal Jurisdiction Under
            CPLR 302(a)(2) and (a)(3)...................................................................12

            1.    The Defamation Exception Does Not Apply to Ms. Lively's False
                  Light Claim or the  FEHA Aiding-and-Abetting Claim. ...........12

            2.    The Co-Conspirators' CPLR 302(a)(2) Contacts Are Attributable
                  to the Wallace Defendants. ........................................................13

            3.    The Wallace Defendants Own CPLR 302(a)(3) Contacts Are
                  Enough to Subject them to Personal Jurisdiction. .....................14

      C.    Jurisdiction Over the Wallace Defendants Satisfies Due Process. ........16

      D.    An Evidentiary Hearing Is Unnecessary, But the Court Should Hold One
            After the Close of Fact Discovery Rather than Credit the Wallace
            Defendants' Reliance on Artfully Phrased Affidavits. ...........................18

II.   Venue Is Proper Under 28 U.S.C. § 1391(b). ...................................................19

III.  The Wallace Defendants' Motion to Dismiss Should Be Denied......................20

      A.    The SAC States a Claim Against the Wallace Defendants for False Light
            on a Conspiracy Theory. .......................................................................20

      B.    The SAC States a Claim Against the Wallace Defendants for FEHA
            Aiding-and-Abetting .............................................................................22

CONCLUSION.............................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Alch v. Superior Ct.*,
   122 Cal. App. 4th 339 (2004) ................................................................23

*Alch v. Superior Ct.*,
   122 Cal. App. 4th 389 (Cal. Ct. App. 2004) ........................................13

*Best Van Lines, Inc. v. Walker*,
   490 F.3d 239 (2d Cir. 2007) (Sack, J.).................................................12

*Campbell v. Arco Marine, Inc.*,
   42 Cal. App. 4th 1850 (1996) ..............................................................24

*Cantor Fitzgerald, L.P, v. Peaslee*,
   88 F.3d 152 (2d Cir. 1996).....................................................................12

*Charles Schwab Corp. v. Bank of Am. Corp.*,
   883 F.3d 68 (2d Cir. 2018)...............................................................16, 17

*Civello v. Equinix Inc.*,
   2025 WL 1898208 (D. Ariz. July 9, 2025) ...........................................25

*Creative Photographers, Inc. v. Grupo Televisa, S.A.B.*,
   2024 WL 1533189 (S.D.N.Y. Apr. 8, 2024)...........................................7

*Dixon v. Mack*,
   507 F. Supp. 345 (S.D.N.Y. 1980) .......................................................11

*Elzeftawy v. Pernix Group, Inc.*,
   2021 WL 4264276 (N.D. Ill. Sept. 20, 2021) .......................................25

*eShares, Inc. v. Talton*,
   2025 WL 936921 (S.D.N.Y. Mar. 27, 2025) ...................................23, 24

*FAT Brands Inc. v. Ramjeet*,
   75 F.4th 118 (2d Cir. 2023) ....................................................................8

*Fellows v. Nat'l Enquirer, Inc.*,
   721 P.2d 97 (Cal. 1986).........................................................................21

*Findlay v. Duthuit*,
   86 A.D.2d 789 (1st Dep't 1982) ...........................................................12

*G31000 N. Am., Inc. v. Paris*,
   No. 14-CV-3885 VEC, 2014 WL 6604790 (S.D.N.Y. Nov. 21, 2014)...................12

*Grand v. Schwarz*,
  No. 15-CV-8779 (KMW), 2016 WL 2733133 (S.D.N.Y. May 10, 2016) ............................14

*Hill v. Workday, Inc.*,
  773 F. Supp. 3d 779 (N.D. Cal. 2025) ...................................................................................25

*ICC Primex Plastics Corp. v. LA/ES Laminati Estrusi Termoplastici S.P.A.*,
  775 F. Supp. 650 (S.D.N.Y. 1991) .........................................................................................16

*Jackson v. Mayweather*,
  217 Cal. Rptr. 3d 234 (Cal. Ct. App. 2017) ..........................................................................21

*Lehigh Val. Indus., Inc. v. Birenbaum*,
  527 F.2d 87 (2d Cir. 1975) .....................................................................................................16

*Liner Freedman Taitelman Cooley, LLP v. Lively*,
  No. 25-MC-289 (LJL), 2025 WL 2205973 (S.D.N.Y. Aug. 4, 2025) ...................................22

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  2022 WL 15044626 (E.D.N.Y. Oct. 26, 2022) ......................................................................11

*In re Platinum & Palladium Antitrust Litig.*,
  61 F.4th 242 (2d Cir. 2023) .....................................................................................................9

*Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*,
  61 F.4th 299 (2d Cir. 2023) .....................................................................................................8

*Russo v. APL Marine Servs., Ltd.*,
  135 F. Supp. 3d 1089 (C.D. Cal. 2015) .................................................................................25

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
  22 F.4th 103 (2d Cir. 2021) ...............................................................................................17, 18

*Sims v. Worldpac Inc.*,
  2013 WL 663277 (N.D. Cal. Feb. 22, 2013) .........................................................................24

*Smith v. BP Lubricants USA Inc.*,
  278 Cal. Rptr. 3d 587 (2021) .................................................................................................22

*Stovall v. Align Tech., Inc.*,
  2020 WL 264402 (N.D. Cal. Jan. 17, 2020) ..........................................................................24

*Tannerite Sports, LLC v. NBCUniversal Media LLC*,
  135 F. Supp. 3d 219 (S.D.N.Y. 2015) ...................................................................................12

*Tetrault v. Cap. Grp. Companies Glob.*,
  2024 WL 3468903 (C.D. Cal. Jan. 17, 2024) ........................................................................24

*Yak v. Biggerpockets LLC,*
    2022 WL 67740 (2d Cir. Jan. 7, 2022) ..................................................................15

*Yanowitz v. L'Oreal USA, Inc.,*
    116 P.3d 1123 (Cal. 2005) ....................................................................................24

**Statutes**

28 U.S.C. § 1391(b) ........................................................................................................19

28 U.S.C. § 1404 .............................................................................................................20

28 U.S.C. § 1631 .............................................................................................................20

Cal. Gov't Code § 12940(h), (i) .....................................................................................24

**Other Authorities**

CPLR 302(a)(1) ...........................................................................................................7, 8

CPLR 302(a) ...............................................................................................................7, 13

CPLR 302(a)(2), (a)(3) .............................................................................................12, 14

## INTRODUCTION

Jed Wallace and his company Street Relations Inc. ("Street Relations," and together with Mr. Wallace, the "Wallace Defendants") continue to deny they had anything to do with Defendants Justin Baldoni, Jamey Heath, and Steve Sarowitz's conspiracy to retaliate against Plaintiff Blake Lively for speaking out about Mr. Baldoni and Mr. Heath's misconduct on the set of *It Ends With Us* (the "Film"). According to the Wallace Defendants, any such conspiracy "did not involve Wallace," who they claim was merely monitoring social media in exchange for $30,000 per month. And while Mr. Wallace does not deny telling Co-Defendant Melissa Nathan that they were "crushing it on Reddit," he now claims it was only to support his recommendation that the Wayfarer Parties "do nothing on social media."  ECF No. 649 ("MTD") at 26.[1]

Mr. Wallace's current self-serving narrative is irreconcilable with what Mr. Wallace and the Wayfarer Parties confessed in private in August 2024. As detailed in the Second Amended Complaint (ECF No. 520, "SAC"), Mr. Wallace had "all the info" regarding the Wayfarer Parties' situation by August 5, 2024—including a copy (from Melissa Nathan) of the "Protections for Return to Production." Over the following days, Ms. Nathan's The Agency Group PR LLC ("TAG") colleagues, Katherine Case and Breanna Koslow, insisted that the Wayfarer Parties should "HIRE FUCKING JED," particularly because "all they care[d] about [was] social," and without Mr. Wallace the TAG parties "[couldn't] do anything about it." TAG pitched the Wayfarer Parties on a "Social attack" against Ms. Lively. Through TAG, the Wayfarer Parties received a quote from the Wallace Defendants for nearly $100,000 worth of the services that the Wallace Defendants proposed to "execute ... without fingerprints," which included "leverag[ing] relationships with Discord, Reddit, X, IG, TikTok, YouTube, etc., to expose behavior of Blake

---

[1] Unless otherwise indicated, ECF citations refer to the docket in No. 24-cv-10049, and pincites to documents filed on ECF refer to the ECF docket-stamp pagination, rather than the internal pagination of the PDF document.

and other parties, both current and past and engage directly with communities to adjust or influence the conversations taking place in real time" as well as "utiliz[ing] CTR manipulation and contextual links to push up positive PR to change subject matter opinion….", and "[t]aking down full Reddit and all social accounts as needed." Ms. Nathan connected Mr. Wallace and Mr. Heath on August 8, telling Mr. Heath that "Jed" would be "having his team assist on all social activity based off our own conversations as well as their digital plan you are in receipt of," adding that Mr. Wallace was "aware that we are going for their Quote two option for $30,000 PM for 3 months." Ms. Nathan boasted of Mr. Wallace's past successes, adding that "Jed and team has worked on some of the most monumental BTS [behind-the-scenes] projects globally." Mr. Wallace chimed in, confirming that "***this is our wheelhouse and have it prioritized across all platform-specific specialists working for me***." A day later, Mr. Wallace confirmed that "***my team is/has been in full throttle mode on our Wayfarer focus***!" Mr. Wallace added: "We will work in lockstep with TAG." Mr. Wallace later urged Mr. Heath to set up Signal, the encrypted messaging platform famous for its auto-delete functionality. *See* SAC ¶¶ 293a-c, e-h.

Meanwhile, the Wallace Defendants' co-conspirators praised how effective Mr. Wallace and Street Relations had been in a matter of days: "***Thank the lord for Jed***," who had done a "***wonderful job***." At minimum, the TAG parties understood one specific technique employed by the Wallace Defendants was the manipulation of "comments" accompanying social media posts. The other co-conspirators praised the Wallace Parties' "amazing work," including Defendants Melissa Nathan and Jennifer Abel's celebration of the conspiracy's "total success" in achieving a "shift on social, ***due largely to Jed and his team's efforts to shift the narrative towards shining a spotlight on Blake and Ryan.***" The Wallace Defendants were so successful that Ms. Nathan commented that the "majority of socials are so pro Justin and I don't even agree with half of them

[sic] lol," and added that *"[i]t's actually sad because it just shows you have people [sic] really want to hate on women."* When another woman came forward to describe similar misconduct she experienced at the hands of Mr. Baldoni, the co-conspirators turned to the Wallace Parties, with Ms. Abel reporting that *"we've flagged to Jed and his team for more serious action on the social side." See* SAC ¶¶ 48, 246-48, 260, 293i-k.

The SAC confirms that the Wallace Parties knowingly joined a conspiracy designed to harm Ms. Lively, knew what the conspiracy was trying to accomplish, and helped that happen. And, importantly, the SAC confirms that the Wallace Defendants knew of the New York-based contacts and overt acts of their co-conspirators. Most tellingly for the purposes of this motion, based on Mr. Wallace's sworn testimony and information obtained in discovery, it is clear that at least Mr. Baldoni, Mr. Heath, and Ms. Abel were all *physically present in New York* promoting the Film and responding to their perceived PR crisis that gave rise to the retaliation campaign *when they recruited, met, and retained the Wallace Defendants*. And the same testimony and allegations confirm that Mr. Wallace both knew and reasonably should have known of their location. In other words, not only did the co-conspirators take acts in furtherance of the conspiracy while physically present in New York, those acts included transacting business in New York *and specifically, hiring the Wallace Defendants to assist in their retaliatory campaign from New York*. The Wallace Defendants' motion to dismiss the SAC should be denied.

## BACKGROUND

The relevant background as it existed as of the filing of the First Amended Complaint, ECF No. 84, is well summarized in Ms. Lively's prior opposition to the Wallace Defendants' motion to dismiss, ECF No. 161, which Ms. Lively incorporates into this brief, and in the Court's July 16 Opinion, ECF No. 426 ("July 16 Op."). Here, Ms. Lively summarizes the additional allegations relevant to her claims against the Wallace Defendants.

As the Court summarized in its July 16, 2025 Opinion, in early August 2025, as the Film's August 6, 2024 New York premiere neared, Mr. Baldoni and Mr. Heath grew concerned that their misconduct would become public, and—in a blatant act of retaliation against Ms. Lively for privately reporting her concerns about that misconduct—engaged in a coordinated campaign to "destroy" her reputation, conceal their own behavior by distracting the public with false narratives about Ms. Lively, and discredit Ms. Lively in the event she spoke publicly about her concerns. SAC ¶¶ 26, 28-31, 33; *see* July 16 Op. at 7-11. To advance those unlawful objectives, Mr. Baldoni and Mr. Heath enlisted a number of co-conspirators, and shared with these co-conspirators the Protections for Return to Production, which they styled as Ms. Lively's "grievances." *Id.* ¶¶ 31, 203-04; *see* July 16 Op. at 7-11.

Since the Court issued its July 16 Opinion, Ms. Lively has obtained discovery shedding light on when the Wallace Defendants' joined the conspiracy, their knowledge of their co-conspirators' New York-based activities, and their overall awareness of the co-conspirators' unlawful retaliatory objectives and conduct—which, although present, were previously sparse, because the co-conspirators had done their best to make their activities "untraceable." Specifically, discovery has confirmed that the Wallace Defendants ███████████████████████████ ██████, *see* Connolly Decl. ¶ 2,[2] were aware of the conspiracy's objectives by at least August 5, 2025, and had joined the conspiracy no later than August 7, 2025, with knowledge that key co-conspirators were *at that very moment* in New York to promote the Film.

On August 2, 2024, Ms. Nathan delivered a proposal to Mr. Baldoni for an "untraceable" digital plan. SAC ¶ 203. As Ms. Abel described it, the plan was to engage in "social media mitigation and proactive fan posting to counter the negative" as well as "social manipulation." *Id.*

---

[2] References to "Connolly Decl." or "Connolly Declaration" refer to the Declaration of Michaela A. Connolly, dated August 27, 2025, submitted in support of Ms. Lively's opposition.

¶¶ 29, 224. To "get ahead of this narrative," Ms. Nathan's plan proposed strategies to ***advance misleading counternarratives***, including pushing Ms. Nathan's narrative that Ms. Lively had a "less than favorable reputation," proposing to "explore planting stories about the weaponization of feminism," and blaming Ms. Lively for production members' job losses. *Id.* ¶¶ 31, 205-06.

Wayfarer engaged Mr. Wallace and Street Relations in early August 2024, when the press and public were beginning to notice none of Mr. Baldoni's fellow cast members would be seen with him. SAC ¶¶ 216, 226. As revealed in discovery and as alleged in the SAC:

- Ms. Nathan and Mr. Wallace were in touch by email no later than August 5, 2024, at which time Ms. Nathan emailed Mr. Wallace the initial draft of the Protections for Return to Production that Ms. Lively negotiated to address the concerns that she had privately reported to Wayfarer about Mr. Baldoni and Mr. Heath's on-set harassment and misconduct. That was the same document Ms. Lively's counsel transmitted to Wayfarer counsel in November 2023 in the form of the attachment at Exhibit A to the SAC, ECF No. 520-1 at 3-4—indicating that Ms. Nathan (who had received the document from Mr. Baldoni) had already discussed those protections and the events that necessitated them with Mr. Wallace. *Id.* ¶ 293a.

- Over the next two days, the TAG team discussed among themselves their plans to bring Mr. Wallace on board and their expectations of what he would do: Katherine Case reported to her colleague Breanna Koslow that she had "***shared all the info***" with Mr. Wallace. *Id.* ¶ 293b.

- By August 6, the TAG team agreed that they needed to hire Mr. Wallace in order to address the Wayfarer Defendants' desire to address "social," and Ms. Koslow's "Next steps" for the team included a "Social attack." *Id.* The TAG team had already shared a quote for Mr. Wallace's services with the Wayfarer team: the services included "***leverag[ing] relationships with Discord, Reddit, X, IG, TikTok, YouTube, etc., to expose behavior of Blake and other parties, both current and past*** and engage directly with communities ***to adjust or influence the conversations taking place in real time.***" *Id.* ¶ 293e.

- On August 7, Mr. Wallace was in direct touch with Defendants Jennifer Abel, Ms. Nathan, and other members of the TAG team, who expressed to Mr. Wallace that "Wayfarer would like to move forward ASAP with social/digital mitigation and remediation." *Id.* ¶ 293c. Ms. Abel responded to that same email chain from New York, where she had traveled to assist the Wayfarer parties with their promotion of the Film at the New York premiere. *Id.* ¶ 293d. The time-stamp on Ms. Abel's email and her reference to doing "morning press" before traveling "straight to Chicago" would have made it clear to anyone with knowledge about the Film that Ms. Abel was physically present in New York at that time. *Id.*

- On August 8, Ms. Nathan introduced Mr. Wallace directly to Mr. Heath by email. *Id.* ¶ 293f. Ms. Nathan told Mr. Heath that Mr. Wallace was already aware that "we are going for their Quote two option," referring to the quoted services described above, and that "Jed" would be "having his team assist on all social activity based off our own conversations as well as their digital plan you are in receipt of." *Id.* Mr. Wallace responded that it was an "absolute pleasure," that the project was in "our wheelhouse" and that it was "***prioritized across all platform-specific specialists working for me.***" *Id.* ¶ 293g.

- Later that day Mr. Wallace confirmed that his "team is/has been in full throttle mode on our Wayfarer focus" and that they would "work in lockstep with TAG." *Id.* On August 10, Mr. Heath and Mr. Wallace spoke, which led Mr. Heath to report that he was "not on" Signal "but will set that up this week for sure." *Id.* ¶ 293h.

- On August 9, Ms. Abel, Mr. Baldoni, Mr. Heath, Ms. Nathan, and other members of the TAG team exchanged text messages to celebrate the "narrative" that was "shifting online to pointing finger at Ryan [being] overly involved." *Id.* ¶ 228. In response to Mr. Baldoni, a TAG employee noted that they had "flagged to Jed and his team as well" this shifting narrative. *Id.* That same day, Ms. Abel circulated a screenshot of a post by another woman accusing Mr. Baldoni of additional misconduct, stating: "I'm assuming this is not true in the slightest . . . ***Either way, we've flagged to Jed and his team for more serious action on the social side.***" *Id.* ¶ 260. That same day, Ms. Nathan reported to the group Mr. Wallace's sentiment that "we are crushing it on Reddit." *Id.* ¶ 235.

- On August 9, Ms. Case and Ms. Koslow corresponded about the success of the Wallace Defendants' efforts, sharing a photograph and commenting "***thank the lord for Jed,***" and "Thank god." *Id.* ¶ 293i. Ms. Koslow wondered about the instructions Mr. Wallace had received: "was he given the direction to backend this online as all part of marketing?" *Id.* In the same conversation, Ms. Koslow indicated that she and Ms. Case, at least, had received a "voice note" from Jed. *Id.*

- On August 10, Ms. Abel shared an article with Ms. Nathan, Mr. Heath, Ms. Case, Ms. Koslow, and others and asked if "digital has an idea of how to amplify." *Id.* ¶ 293j. Ms. Case replied that they would share the article with Jed and "***at the very least ask for engagement in the comments.***" *Id.* Evidently, in addition to "backend[ing]" information "online," the Wallace Defendants were also engaged in manipulating the "comments" under online posts as a form of boosting engagement with particular stories. *Id.* ¶ 293i-j. Ms. Case and Ms. Koslow confirmed as much when they wondered whether Mr. Wallace had been responsible for some TikToks critical of Ms. Lively—if the TikToks were attributable to "JUST comments," Ms. Case remarked, "***I'd be like oops.***" *Id.* ¶ 293k. All told, Ms. Case felt that Mr. Wallace had done a "wonderful job." *Id.*

- On August 10, TAG expressly acknowledged the success of the Wallace Parties' efforts to shift public attention from stories about Mr. Baldoni's misconduct into a manufactured and harmful narrative about Ms. Lively, stating they had "started to

6

see a shift on social, ***due largely to Jed and his team's efforts to shift the narrative towards shining a spotlight on Blake and Ryan***." SAC ¶ 245. Following this "shift," Ms. Nathan texted, "[t]he majority of socials are so pro Justin and I don't even agree with half of them lol." *Id.* ¶ 247. Ms. Nathan later bragged that "this went so well . . . It was genius." *Id.* ¶ 43.

- Over the days that followed, Mr. Wallace and Street Relations led a "digital team" that worked with Ms. Nathan, Ms. Abel, and TAG to further implement their social "manipulation" strategy. SAC ¶¶ 250-57. When an allegation surfaced regarding additional misconduct by Mr. Baldoni—as Ms. Abel stated, "this girl is claiming that Justin invited her up to his hotel room years ago"—Ms. Nathan advised Ms. Abel, "[l]et us chat to Jed as well on this." SAC ¶ 256. In response to Mr. Baldoni's concern that he did not want bots defending him online ("I really don't want bots defending me," SAC ¶ 257), Ms. Nathan reassured him that something much more sophisticated was in motion, stating that the "other team"—a reference to the Wallace Defendants—"is doing something very specific in terms of what they do," adding that "I know Jamey [Heath] &Jed [sic] connected on this." SAC ¶ 257.

## ARGUMENT

**I.    This Court Has Personal Jurisdiction Over the Wallace Defendants.**

### A.    The Conspirators' 302(a)(1) Contacts Are Attributable to the Wallace Defendants.

The Wallace Defendants are subject to personal jurisdiction under CPLR 302(a)(1) because their co-conspirators' (a)(1) contacts are attributable to them under a conspiracy theory. Section 302(a)(1) authorizes personal jurisdiction "over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." CPLR 302(a)(1). "Section 302(a)(1) is a single act statute, meaning that, proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful." *Creative Photographers, Inc. v. Grupo Televisa, S.A.B.*, 2024 WL 1533189, at *6 (S.D.N.Y. Apr. 8, 2024) (cleaned up); *see id.* (equating "transacted business" under (a)(1) with purposeful availment).

As the Court has recognized, "[c]onspiracy jurisdiction is based on an interpretation of the statutory language 'through an agent,' which applies to all prongs of C.P.L.R. 302(a)," a theory that "fundamentally concerns when contacts can be imputed to a co-conspirator, not what the

contacts are in the first instance." July 16 Op. at 33 n.11. New York's "broad approach to agency" attributes long-arm statute contacts to co-conspirators when "(a) the defendant had an awareness of the effects in New York of [the conspiracy's] activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control, or at the request of or on behalf of the out-of-state defendant." *FAT Brands Inc. v. Ramjeet*, 75 F.4th 118, 126, 128 (2d Cir. 2023) (cleaned up). "The third requirement—that the New York-based co-conspirators acted at the direction or under the control of the out-of-state defendant—may be satisfied by an allegation that the out-of-state defendant was aware of the torts being committed by co-conspirators in New York." *Id.* at 127 (cleaned up). July 16 Op. at 26-28.[3]

As before, *see* ECF No. 142; ECF No. 383 at 2, the Wallace Defendants do not dispute that their co-conspirators engaged in extensive conduct within New York such that they satisfy Section 302(a)(1)'s "single act" requirement many times over. *See generally* MTD. That silence alone can be treated as a concession that sufficient contacts exist. *Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 61 F.4th 299, 305 (2d Cir. 2023) (attributing contacts to an out-of-state co-conspirator where "[n]o party disputes" the sufficiency of the in-state co-conspirator's contacts). But regardless, the SAC alleges numerous Section 302(a)(1) contacts of which the Wallace Defendants were aware, and which must be attributed to them under a conspiracy theory. In

---

[3] In its July 16 Opinion, the Court characterized the 302(a)(1) theory as one by which "a defendant can be haled into a New York court based on conduct by a co-conspirator *outside the state* that would give rise to 302(a)(1) personal jurisdiction." July 16 Op. at 33 (emphasis added). But the text of Section 302(a)(1) authorizes jurisdiction based on acts by non-domiciliaries "within" New York, which can sometimes consist of out-of-state conduct having effects in New York. CPLR 302(a)(1). To be clear, Ms. Lively seeks to establish jurisdiction not only based upon the co-conspirators projection of statements into New York from outside of New York, but also upon their *in-state activities* in furtherance of the conspiracy, which may be attributed to the Wallace Defendants under *FAT Brands. Infra* at 8. Both the Court's and the Wallace Defendants' concerns about applying Section 302(a)(1) to a defendant's out-of-state projection of defamatory statements into New York are, therefore, not implicated by this case. July 16 Op. at 34 n.12; MTD 21 n.11.

particular, *at the time the Wallace Defendants were invited to join the conspiracy*—on August 5, 6, and 7—at least Mr. Baldoni, Mr. Heath, and Ms. Abel, were in New York conducting the very communications strategy of which the Wallace Defendants would became an integral part. SAC ¶¶ 293a-293c SAC ¶¶ 26, 62, 73, 169, 293a-293d, 293m; Ex. A.[4]

That New York-based activity was conducted in furtherance of the conspiracy's objective to "bury" Ms. Lively in retaliation for reporting Mr. Baldoni and Mr. Heath's harassment and to conceal the same. *See In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 271 (2d Cir. 2023) ("an overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy.") (cleaned up).

The SAC also alleges sufficient facts to permit the inference that the Wallace Defendants—who were indisputably aware of these activities—were also aware that these activities were taking place in New York. As alleged in the SAC (and as Wallace has himself sworn under penalty of perjury), after being "contacted by Melissa Nathan about Justin Baldoni" in "early August, 2024," Mr. Wallace engaged (at minimum) in "passive observation and analysis of the social media environment as it pertained to *It Ends With Us*." ECF No. 142-1 at ¶¶ 24, 30; SAC ¶ 293*l*. By then, Mr. Baldoni had already posted on Instagram (and the *It Ends With Us* Instagram had re-posted) that he was "heading to New York for a full week of press for @itendswithusmovie," adding a tag that would have made the post searchable by anyone monitoring Instagram for content about the Film. SAC ¶ 293m. By August 5, at least Mr. Baldoni and Ms. Abel were in New York for the August 6 premiere, where Mr. Baldoni was making press appearances. *Id.* ¶¶ 62, 293a, 293d; Ex. A. On August 6, the same day that Mr. Baldoni alleges to have learned that Ms. Lively and other cast members refused to appear alongside him at the New York premiere of the Film (ECF 50 ¶

---

[4] References to "Ex." refer to exhibits attached to the Connolly Declaration.

166), Ms. Case—a New York resident then in New York—told Ms. Koslow that she had "shared all the info with" Mr. Wallace, SAC ¶ 293b. And on August 7, Ms. Case introduced Mr. Wallace and Ms. Abel directly, informing Mr. Wallace that "Wayfarer would like to move forward ASAP with social / digital mitigation and remediation." *Id.* ¶ 293c. Ms. Abel replied from an East Coast time zone, informing the others (including Mr. Wallace) that the next day she would be "in morning press" before "head[ing] straight to Chicago." *Id.* ¶ 293d.

A reasonable inference from these allegations, taken as true, is that Mr. Wallace (with whom Ms. Case had "shared all the info") knew that Ms. Abel and the Wayfarer Parties were in New York for the New York premiere of the Film (and associated press appearances). Indeed, given Mr. Wallace's sworn statement that he was personally monitoring social media relating to the Film—social media that *confirmed* that Mr. Baldoni and his associates were in New York for "press" relating to the film at the time they retained Mr. Wallace—it would strain credulity to infer that Mr. Wallace was *un*aware that his new clients were gathered in New York for press activities relating to the same issues that he was being hired to address. This is especially true given that one of the very reasons that Wayfarer hired the Wallace Defendants was to distract from the fact that Mr. Baldoni's co-stars refused to appear in photos with Mr. Baldoni ***at the New York premiere***. ECF 50 ¶¶ 158-71. Indeed, in Wayfarer's own words, Mr. Baldoni engaged "crisis PR" and obtained the social manipulation proposal "as the [New York] premiere of the Film approached" to "be ready," after Ms. Lively and other cast members "unfollowed Baldoni" and after learning on August 6 that Ms. Lively and the cast would not appear alongside him at the premiere, which according to Wayfarer would "give fans the impression that Baldoni had committed an egregious sin, something so egregious that no one wanted to even take photos with him or have him around." ECF 50 ¶ 162, 159. Thus, not only did Mr. Heath, Mr. Baldoni, Ms. Abel, and Wayfarer transact

10

business "within New York," including the promoting the Film, *a key element of the business they transacted was hiring the Wallace Parties to launch a "social attack" against Ms. Lively*, and a primary purpose of doing so was to "be ready" for their New York-based activity.

Finally—relevant both to this (a)(1) theory and the (a)(2) and (a)(3) theories discussed below—the Wallace Defendants ignore that a conspiracy theory of jurisdiction sweeps in not only co-conspirator contacts that pre-date their joining of the conspiracy, but also those contacts that occurred before they removed themselves from the conspiracy, something Wallace Defendants do not argue they have ever done. It "is black letter conspiracy law that a conspirator . . . remains a member of the conspiracy until he affirmatively acts to repudiate it and remove himself." *Dixon v. Mack*, 507 F. Supp. 345, 352 n.8 (S.D.N.Y. 1980); *see In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 15044626, at *53 (E.D.N.Y. Oct. 26, 2022) (collecting cases). As alleged in the SAC, the co-conspirators persisted in their retaliatory campaign against Ms. Lively well into 2025, and committed numerous New York-based overt acts, including filing a retaliatory lawsuit in this Court and coordinating (with Mr. Wallace involved) to post their cherry-picked "receipts," as filed in that lawsuit, on a website for public view. SAC ¶ 293n; *see generally Lively v. The Skyline Agency*, No. 25-mc-347 (S.D.N.Y.), ECF No. 2. And by January 2025—a date by which the Wallace Defendants had not withdrawn from the conspiracy—they undoubtedly knew and should have known that the co-conspirators engaged in substantial overt acts in New York in furtherance of the conspiracy, including retaining the Wallace Defendants themselves, filing the retaliatory lawsuit, and collaborating to spread a narrative about that lawsuit through their website. SAC ¶¶ 293a–n.

**B.  The Wallace Defendants Are Subject to Jurisdiction Under 302(a)(2) and (a)(3).**

1.  The Defamation Exception Does Not Apply to Ms. Lively's False Light Claim or the FEHA Aiding-and-Abetting Claim.

The Wallace Defendants assert that the "defamation exception" of CPLR 302(a)(2) and (a)(3) rules out Ms. Lively's reliance on those subsections with respect to both her false light and FEHA aiding-and-abetting claims. But neither the false light claim nor the FEHA aiding-and-abetting claim fall under the defamation exception. "'Defamation' includes the torts of libel (usually written) and slander (usually oral)." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 245 n.7 (2d Cir. 2007) (Sack, J.). As alleged, Ms. Lively's claims against the Wallace Defendants do not seek to "evade the statutory exception by recasting [her] cause of action as something other than defamation." *Cantor Fitzgerald, L.P, v. Peaslee*, 88 F.3d 152, 157 (2d Cir. 1996). As the Wallace Defendants recognize, Ms. Lively has not sought to premise her false light claims on any allegedly defamatory statements, or alleged facts in support of her false-light or FEHA aiding-and-abetting claims that are really defamation. This is accordingly not a situation where Ms. Lively's "claims— regardless of how they are denominated—rest on Defendants' allegedly defamatory statements," *G31000 N. Am., Inc. v. Paris*, No. 14-CV-3885 VEC, 2014 WL 6604790, at *3 (S.D.N.Y. Nov. 21, 2014), or where she is "disguising defamation claims as claims for other torts," *Tannerite Sports, LLC v. NBCUniversal Media LLC*, 135 F. Supp. 3d 219, 233 (S.D.N.Y. 2015), because this is a case in which Ms. Lively's false-light and FEHA aiding-and-abetting claims are genuinely *not* duplicative of an unpled defamation claim.

Meanwhile, Ms. Lively's FEHA aiding-and-abetting claim is not a "cause of action for defamation of character," CPLR 302(a)(2), (a)(3), nor does it "sound in defamation," *Findlay v. Duthuit*, 86 A.D.2d 789, 790 (1st Dep't 1982). FEHA makes it unlawful for "any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under" the Act, "or to attempt

to do so." *Alch v. Superior Ct.*, 122 Cal. App. 4th 389, 389 (Cal. Ct. App. 2004) (quoting Cal. Gov't Code § 12940(i)). The SAC alleges that the Wallace Defendants aided and abetted the other Defendants' campaign of retaliation against Ms. Lively for raising concerns about misconduct on the set of the Film, all in violation of FEHA. But that aiding-and-abetting involved more than boosting negative narratives about Ms. Lively on social media; it also involved providing advice and counsel to the Wayfarer Parties, and strategizing with them on the conduct of their retaliation campaign—activities that do not even arguably "sound in defamation" but are core aiding-and-abetting conduct irrespective of the form that the retaliation took. ECF No. 649-2 at ¶¶ 24-25; SAC ¶¶ 293a-n.

2. The Co-Conspirators' CPLR 302(a)(2) Contacts Are Attributable to the Wallace Defendants.

As this Court has recognized, jurisdiction under CPLR 302(a)(2) depends on "overt acts taken physically within New York which are then imputed to co-conspirators outside New York." July 16 Op. at 25–26. The new allegations in the SAC make clear that the co-conspirators took such acts while physically present in New York. Indeed, at the time Ms. Abel and Ms. Heath first met Mr. Wallace, and decided to sign him on, they were physically present in New York. SAC ¶¶ 239a-c. The purpose of signing Mr. Wallace on was to execute a "social attack" plan pursuant to the quote that Ms. Nathan had previously shared, and thus to further the other co-conspirators' objective of executing a retaliatory "social attack" plan. *Id.* ¶ 239b. And Mr. Wallace was aware that the Wayfarer Parties, including Mr. Heath, were in New York to promote the Film—or, indisputably, he later became aware through his participation in the conspiracy and his admitted "monitoring" of social media relating to the Film.[5]

---

[5] Indeed, because of the Wallace Defendants' continued membership in the conspiracy, the co-conspirators' January 2025 contacts with New York are also attributable to the Wallace Defendants for (a)(2) purposes, just as with subsection (a)(1). *Supra* at I(A).

3.   The Wallace Defendants Own 302(a)(3) Contacts Are Sufficient.

The Wallace Defendants dispute CPLR 302(a)(3) jurisdiction on three grounds: that the Wallace Defendants did not derive "substantial revenue" from interstate commerce because $90,000 is not enough money to be "substantial," that Mr. Wallace should not have reasonably expected that his actions would have consequences in New York, and that CPLR 302(a)(3) cannot apply here under cases holding that a plaintiff's mere residence in New York is not enough. None of these arguments has merit.

First, the fact that the Wallace Defendants derived (at least) $90,000 in revenue from this engagement alone certainly qualifies as "substantial" for purposes of CPLR 302(a)(3). The Wallace Defendants cite no authority to the contrary, or anything suggesting that many tens of thousands of dollars would not qualify as "substantial" revenue. It does. *See Grand v. Schwarz*, No. 15-CV-8779 (KMW), 2016 WL 2733133, at *3 n.4 (S.D.N.Y. May 10, 2016) ("thousands of dollars" sufficient under (a)(3)).

The Wallace Defendants next dispute that Mr. Wallace was aware that Ms. Lively lives in New York and promoted the Film there. MTD 14-15. But of all the allegations supporting that conclusion, the Wallace Defendants have a substantive argument against only one: that the SAC does not allege facts that would have guaranteed that Mr. Wallace knew that Live with Kelly and Mark taped in New York. *Id.* at 15. The Wallace Defendants simply deride the SAC's other allegations supporting the Wallace Defendants' knowledge that their actions would have consequences in New York as "speculation and conclusory." *Id.* at 15. But labeling an allegation "conclusory" does not make it so, and there is nothing conclusory about alleging that Mr. Wallace knew that Ms. Lively lived and was promoting the Film in New York, and therefore reasonably should have expected his actions to have consequences in New York, based on (1) *his own sworn testimony* that he was monitoring social media relating to the Film and (2) the existence of social

14

media posts, including one in which Ms. Lively referred to herself as an "N.Y. lady," and other articles reporting Ms. Lively's connections to New York. And Wallace (who had received "all the info" in advance from Ms. Case and Ms. Nathan) was brought on board precisely because the Wayfarer Parties were concerned about their upcoming appearances in New York. *Supra* at 10-11. That Mr. Wallace was therefore aware of Ms. Lively's connections to New York (and the likely consequences of his actions there) is not an "argumentative conclusion," MTD 14, but a reasonable inference from each of those facts laid side by side. Because a jury *could* draw such an inference from those allegations, the Court *must* draw it at this stage. Furthermore, even with respect to the Wallace Defendants' commentary on the Live Kelly and Mark allegation, all the SAC must allege is that it would have been objectively reasonable for the Wallace Defendants to expect their actions to have consequences in New York. Whether or not Mr. Wallace subjectively did have such an expectation is not the issue, because a reasonable person in his position would have. [6]

Finally, the Wallace Defendants dispute (a)(3) jurisdiction under a line of cases holding that, in certain circumstances, the mere fact of the plaintiff's presence in New York is insufficient to support an (a)(3) theory. MTD 16. But those cases have no application here. As the Second Circuit put it in *Yak*, New York cases "have consistently rejected as insufficient to support personal jurisdiction allegations of 'remote or consequential injuries such as lost commercial profits which occur in New York only because the plaintiff is domiciled or doing business here.'" *Yak v. Biggerpockets LLC*, 2022 WL 67740, at *2 (2d Cir. Jan. 7, 2022). As the Wallace Defendants' other cases confirm, this line of precedent deals with allegations of "indirect financial loss resulting

---

[6] The Wallace Defendants argue that this fact, which was evident to them based on their own sworn testimony as of August 2024, is "belied" by Ms. Lively's sworn declaration in the Texas 202 proceeding that her "business address is c/o Manatt Phelps & Phillips LLP, 2049 Century Park East, Suite 1700, Los Angeles." ECF No. 142-2. MTD 13. How that statement dated January 21, 2025—quite obviously *not* a statement about where Ms. Lively resides—could cast doubt on Ms. Lively's allegation that Mr. Wallace *was* aware that Ms. Lively lived in New York as of August 2024, the Wallace Defendants do not explain.

from the fact that the injured person resides or is domiciled in New York," particularly in cases involving business torts. *ICC Primex Plastics Corp. v. LA/ES Laminati Estrusi Termoplastici S.P.A.*, 775 F. Supp. 650, 656 (S.D.N.Y. 1991) (tortious interference with business). As the Second Circuit explained in *Lehigh Valley Industries*, (a)(3) requires that "the injury in New York must be direct and not remote or consequential," and the courts have accordingly rejected theories premised on "remote or consequential injuries such as lost commercial profits which occur in New York only because the plaintiff is domiciled or doing business here"—in *Lehigh*, a claim by a New York resident alleging indirect financial loss arising from direct injury to a *Massachusetts-based* corporation in which he held shares. *Lehigh Val. Indus., Inc. v. Birenbaum*, 527 F.2d 87, 94 (2d Cir. 1975). But that line of cases is inapplicable because the SAC alleges *direct* injuries to Ms. Lively in New York, including financial harm, reputational harm, emotional distress, lost wages, and other damages brought about directly by the Wallace Defendants and their co-conspirators' actions. Stated differently, the New York-based effects on Ms. Lively were not downstream ramifications of the Wallace Defendants' actions, whose "consequences" were more directly felt elsewhere—they were the primary, proximate, and most direct effects of the Wallace Defendants' conduct.[7]

### C.  Jurisdiction Over the Wallace Defendants Satisfies Due Process.

Unlike their prior motion to dismiss, the Wallace Defendants spend little time contesting that personal jurisdiction over them satisfies due process under *Charles Schwab Corp. v. Bank of Am. Corp.* ("*Schwab I*"), 883 F.3d 68, 87–88 (2d Cir. 2018). The Wallace Defendants principally

---

[7] Indeed, if the Wallace Defendants' expansive theory of *Lehigh Valley Industries* were correct—essentially, that (a)(3) jurisdiction cannot be premised on the fact that the plaintiff resides in New York—then it is hard to see what function (a)(3) could still perform. Generally speaking, the best reason for an out-of-state tortfeasor to reasonably expect his actions to have consequences in New York would be that his victim resides there. Under a proper reading of *Lehigh Valley Industries* and its progeny, so long as the New York-based consequences are "direct" and not "remote or consequential," the fact that the plaintiff resides in New York is not a barrier to (a)(3) jurisdiction.

attack a straw man—that Ms. Lively's allegations against them do not satisfy *Calder*'s "effects test." MTD 17–19. But Ms. Lively does not seek to establish personal jurisdiction under *Calder*, which deals with only one among several ways that a defendant may purposefully avail himself of a forum under the Fourteenth Amendment. Here, Ms. Lively's theory of personal jurisdiction is (1) that "a conspiracy existed," (2) that the Wallace Defendants "participated in the conspiracy," and (3) that "a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with" New York "to subject that co-conspirator to jurisdiction in that state." *Schwab I*, 883 F.3d at 87. As the Second Circuit has more recently confirmed, *Schwab I* "provides the appropriate test for alleging a conspiracy theory of jurisdiction," and "neither [Second Circuit precedent] nor due process principles require more than that a defendant purposefully availed itself of the forum through the overt acts of its co-conspirator." S*chwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC* ("*Schwab II*"), 22 F.4th 103, 124–25 (2d Cir. 2021) (cleaned up). *Schwab I*'s three-prong test thus "serves the purposeful availment requirement, rather than supplants it," in the sense that "the conspiracy theory could not get off the ground if a defendant were altogether blindsided by its co-conspirator's contacts with the forum." *Schwab II*, 22 F.4th at 125. But there is no extra, fourth prong beyond the test announced in *Schwab I*, including that the defendant's conduct also satisfy *Calder v. Jones*. *Id.*

As before, the Wallace Defendants do not contest that their co-conspirators had jurisdictionally sufficient contacts with New York. In their earlier motion to dismiss, the Wallace Defendants contested the second element of *Schwab I*'s three-pronged test (that they joined the conspiracy) by relying on a self-serving affidavit of Mr. Wallace denying that he joined any conspiracy. The Second Amended Complaint's new allegations, drawn from material unearthed in discovery, have put that issue to rest. *Supra* at 5-7. The Wallace Defendants have not meaningfully

raised that issue again. Instead. The Wallace Defendants' remaining objection on due process grounds is, again, to attack a straw man – that "mere foreseeability" of Ms. Lively's injuries in New York would not be enough under *Schwab I*. MTD 17. But that language comes from a separate section of *Schwab I* addressing the *Calder* theory, not from the section approving a conspiracy theory. All that must be "foreseeable" under a conspiracy theory, the Second Circuit clarified in *Schwab II*, are the "overt acts taken by co-conspirators in the [forum]." 22 F.4th at 125. That test is easily satisfied here given that Mr. Wallace *joined* the conspiracy knowing that at least some of the co-conspirators were in New York for the Film's premiere.

### D. An Evidentiary Hearing Is Unnecessary, But the Court Should Hold One After the Close of Fact Discovery Rather than Credit Artfully Phrased Affidavits.

The Wallace Defendants ask that the Court hold an evidentiary hearing to the extent Ms. Lively has made out a *prima facie* case of personal jurisdiction against them. MTD 26-27. In truth, there is a simpler option: if the Court concludes, as it should, that the SAC establishes personal jurisdiction over the Wallace Defendants, then the Wallace Defendants would remain free to renew their personal jurisdiction arguments at the summary judgment stage or at trial, on a more fully developed evidentiary record. Creating yet another independent factual record on which to evaluate the personal jurisdiction issues (in addition to the motion-to-dismiss record, the record at summary judgment, and the trial record) may be an appropriate procedure in some cases, but it seems hardly efficient here, when the deadline for summary judgment motions is just over two months away. *See* ECF No. 58.

However, in the event that the Court would otherwise give dispositive effect to Mr. Wallace and Ms. Nathan's affidavits, Ms. Lively agrees that an evidentiary hearing would be appropriate as a means of resolving any factual disputes at this stage. Neither Ms. Nathan nor Mr. Wallace has been deposed yet in this case, nor has Wallace produced phone records that would show his

location at the time of relevant communications. This discovery, which will be provided in the coming weeks, may obviate the need for any evidentiary hearing, if they result in admissions to jurisdictionally relevant facts in response to questions that the Wallace Defendants have not yet answered. And materials obtained in discovery only last Friday indicate that, at a minimum, Mr. Wallace and Ms. Nathan's untested affidavits may not tell the whole story of their communications during the relevant period. For example, Ms. Nathan avers that she does "not recall ever communicating" with Mr. Wallace "while [she] was living or working in New York regarding Street's engagement with Wayfarer." ECF No. 649-6 at 3 ¶ 6. But a document produced by Ms. Nathan only last Friday—which has been in her possession all along—shows ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████. Ex. B at 3. That raises significant questions about the accuracy of Ms. Nathan's recollection about her location during the period that she was communicating with Mr. Wallace in furtherance of their work on the Wayfarer engagement, something that she could have easily confirmed through phone records and other documents in her possession.

## II.     Venue Is Proper Under 28 U.S.C. § 1391(b).

The Wallace Defendants re-assert and re-incorporate their objections to venue, and their motions to sever and transfer, as set forth in their initial motion to dismiss. MTD 27-28. Ms. Lively similarly incorporates and adopts her responses to those arguments from her initial opposition brief. ECF No. 161 at 17-19. Taking things one step further, the Second Amended Complaint alleges that the Wallace Defendants' co-conspirators *were present in this District* when they made initial contact with Mr. Wallace, negotiated terms of his and Street Relations' engagement, and made his membership in the conspiracy official. SAC ¶¶ 293a-293g. That more than establishes this District as one among several eligible venues under 28 U.S.C. § 1391(b).

Similarly, the Wallace Defendants advance no new arguments in favor of their motion to sever and transfer Ms. Lively's claims against them to the Western District of Texas, MTD 27, and their prior arguments fail for the same reasons as before, ECF No. 161 at 19-22. However, should the Court again conclude that Ms. Lively's allegations are insufficient to establish jurisdiction over the Wallace Defendants in New York, Ms. Lively agrees that the proper course of action would be to sever and transfer, rather than dismiss, those claims—not under 28 U.S.C. § 1404 or 1407, but under 28 U.S.C. § 1631, and not to the Western District of Texas but to the Central District of California, where Street was incorporated at the time of the conduct in question, where Mr. Wallace claims to have understood his activities to target, and where the majority of witnesses to Mr. Wallace's conduct all reside, including Nathan, Abel, Baldoni, and Heath.

## III.    The Wallace Defendants' Motion to Dismiss Should Be Denied.

### A. The SAC States a Claim Against the Wallace Defendants for False Light on a Conspiracy Theory.

As before, the Wallace Defendants' main objection to Ms. Lively's false light claim is that the claim is governed by the laws of New York or Texas (which do not recognize false light) rather than the law of California (which does). MTD 28-31; *see* ECF No. 142 at 22-23. Ms. Lively incorporates her prior responses to this argument: as this very case illustrates, it is routine for personal jurisdiction and venue to be proper in one jurisdiction while the choice-of-law inquiry dictates application of another's law. *See* ECF No. 161 at 23-25.

Apart from this choice-of-law argument, the Wallace Defendants' only objection to the false-light claim is that it does not satisfy the *elements* of defamation, a separate tort. MTD 30. The Wallace Defendants argue that these elements must be satisfied based on a misreading of California law holding that, because "[a] 'false light' cause of action is in substance equivalent to a libel claim, [it] should meet the same requirements of the libel claim, including proof of malice."

*Jackson v. Mayweather*, 217 Cal. Rptr. 3d 234, 256 (Cal. Ct. App. 2017); *see* MTD 30 (quoting *Jackson*). But as *Jackson* demonstrates, including in the language just quoted, those "same requirements" refer not to the *elements* of defamation, but to the statutory and constitutional restrictions on the two torts—as relevant here, "proof of malice"—and then, only where the false light claim is based on "language" that could also be attacked as defamatory. *See Jackson*, 217 Cal. Rptr. 3d at 256 (citing cases); *see also Fellows v. Nat'l Enquirer, Inc.*, 721 P.2d 97, 109 (Cal. 1986) (holding that statutory restrictions applicable to defamation apply "whenever a claim for false light invasion of privacy is based on *language that is defamatory*") (emphasis added).

The interpretation advanced by the Wallace Defendants—that every false light claim must also satisfy the *elements* of defamation—would make little sense because, after all, false light is a distinct tort from defamation under California law. Instead, a false light claim depends on allegations of "publicity that places a plaintiff before the public in a false light that would be highly offensive to a reasonable person." *Jackson*, 217 Cal. Rptr. 3d at 256. Only where a false light claim is "based on the same statements" of an accompanying defamation claim is the false light claim "superfluous" and subject to the same elements. *Id.* Thus, the fact that the SAC may not allege a "publication attributable to Wallace or Street" is not a problem with Ms. Lively's false light claim; instead, the fact that Ms. Lively has not simultaneously sought to impose *defamation* liability arising from the same "publicity" that is the subject of her false light claim helps explain why her false light claim is *not* duplicative of a defamation claim.

The Wallace Defendants' only remaining challenge to the false light claim is that Ms. Lively has not alleged that the Wallace Defendants acted with actual malice when they participated in the conspiracy to commit the false light tort (which the Wallace Defendants continue to assume, wrongly, would have had to involve them personally publishing defamatory statements about Ms.

Lively). MTD 30-31. In the first place, the Wallace Defendants are wrong about *whose* state of mind is relevant to the necessary element of actual malice: as the Court has recognized in another context, it is not the Wallace Defendants' malice, but their co-conspirators on whose behalf they engaged in their retaliatory conduct, who possessed the necessary state of mind. *See Liner Freedman Taitelman Cooley, LLP v. Lively*, No. 25-MC-289 (LJL), 2025 WL 2205973, at *8 (S.D.N.Y. Aug. 4, 2025). Neither the Wallace Defendants nor any other party has challenged the allegations of actual malice with respect to the Wayfarer Parties, and the Court accordingly need not address that issue in the context of this motion. But suffice it to say that actual malice is more than sufficiently alleged. *See*, *e.g.*, ECF No. 161 at 29.

## B. The SAC States a Claim Against the Wallace Defendants for FEHA Aiding-and-Abetting

The Wallace Defendants' renewed motion to dismiss repeats only one of their prior arguments, namely that Ms. Lively has not alleged that the Wallace Defendants "knew" of the statutory tort being committed. *Compare* ECF No. 142, *with* MTD 33-34. That was not true before, and it is even less true now. As Ms. Lively previously explained (and as the Wallace Defendants appear to have accepted this time around), this "knowledge" element does not require Ms. Lively to allege or prove that the Wallace Defendants "knew that the FEHA existed" or otherwise held a correct interpretation of applicable law. ECF No. 161 at 25-27. All that is necessary is that the defendant subjectively know of facts that, properly (and objectively) understood, constitute a violation. Nor does the Wallace Defendants' reliance on *Smith v. BP Lubricants USA Inc.* change matters; indeed, as *Smith* recognizes, it is knowledge of the "alleged harassment and discrimination," and not a lawyer's understanding of the legal implications of such "harassment," that makes out a FEHA aiding-and-abetting claim. 278 Cal. Rptr. 3d 587, 594 (2021). Notably, *Smith* itself cites *Alch* for this proposition, stating that *Alch* upheld liability because those plaintiffs

22

"alleged talent agencies knowingly gave substantial assistance to employers' FEHA violations"; *id.*—and in *Alch* the plaintiffs alleged that the defendants "knew the employers were engaged in systemic discrimination on the basis of age," not that the defendants knew the employers' conduct had violated state law. *Alch v. Superior Ct.*, 122 Cal. App. 4th 339, 390 (2004).

The SAC's new allegations place this knowledge element beyond any doubt. On August 5, 2025, before the Wallace Defendants began work on behalf of the Wayfarer Parties, Melissa Nathan spoke to Mr. Wallace by phone. She then emailed him a copy of the "Protections for Return to Production," a document that laid out Ms. Lively's *own requests* that the Wayfarer Parties cease the misconduct they had committed against her on set, including an *explicit request* that they refrain from any retaliation for Ms. Lively's having raised these concerns. *Supra* at 1, 4, 5; SAC ¶ 293a. Katie Case also spoke to Mr. Wallace and "shared all the info." SAC ¶ 293b. In other words, the Wallace Defendants joined the conspiracy with full knowledge not only of what had transpired on set, but *Ms. Lively's own perspective* on those events, in the form of her express, written requests that the Wayfarer Parties stop harassing her and refrain from any retaliation. It is hard to imagine stronger allegations of advance "knowledge" that unlawful retaliation was about to take place. Mr. Wallace's practice of using Signal, famous for its encrypted and ephemeral messaging—and his encouragement of other co-conspirators to do so—further supports the inference that Mr. Wallace knew that improper behavior was taking place. SAC ¶¶ 221, 293h.

The Wallace Defendants also challenge Ms. Lively's FEHA aiding-and-abetting claim against them on extraterritoriality grounds. MTD 31-33. But their arguments are misplaced. Courts have repeatedly recognized that FEHA does not explicitly impose a residency requirement or limit its reach to employees who physically perform their work in the state of California. Instead, the relevant inquiry is whether "the conduct which gives rise to liability occurs in California." *eShares,*

*Inc. v. Talton*, 2025 WL 936921, at *15 (S.D.N.Y. Mar. 27, 2025) (cleaned up). FEHA does not apply to "non-residents employed outside the state *when the tortious conduct did not occur in California.*" *Campbell v. Arco Marine, Inc.*, 42 Cal. App. 4th 1850, 1860 (1996) (emphasis added). But, when the tortious conduct *did* occur in California, the FEHA applies even if the plaintiff resides in another state. *See, e.g.*, *eShares, Inc.*, 2025 WL 936921, at *15 ("Although Talton was residing in New York or in Illinois at the time of the allegedly retaliatory actions, Talton has specified that the decision to take those actions were made in California.").[8] Here, by focusing on the location where the Film was shot, the Wallace Defendants misconceive the FEHA aiding-and-abetting claim against them. Regardless of the locus of Ms. Lively's harassment claim,[9] Ms. Lively's retaliation (and aiding-and-abetting) claim is premised on California-based conduct:[10]

Here, the SAC alleges a coordinated scheme carried out by the Wayfarer Parties—California residents who have relied upon and not only consented to the application of California law, but demanded it. SAC ¶¶ 151 n. 21, 57-59, 61; ECF No. 83, at 12. During a *break* in production due to the SAG-AFTRA strike, Ms. Lively transmitted the "Protections" through her

---

[8] Similarly, in *Stovall v. Align Tech., Inc.*, 2020 WL 264402, at *3 (N.D. Cal. Jan. 17, 2020), the court held that a non-California resident employee sufficiently pleaded a FEHA claim even though the majority of the discriminatory conduct occurred outside of California because "the ultimate discriminatory action—Plaintiff's termination—was 'directed, overs[een], and ratified' by [defendant's HR employee] from California." *See also Tetrault v. Cap. Grp. Companies Glob.*, 2024 WL 3468903, at *7 (C.D. Cal. Jan. 17, 2024) (finding that Swiss plaintiff sufficiently pleaded claims for violation of FEHA where employer and supervisors were located in California, decision to terminate was made in California, and terminating employees appeared on Zoom from California to terminate Plaintiff); *Sims v. Worldpac Inc.*, 2013 WL 663277, at *1-4 (N.D. Cal. Feb. 22, 2013) (declining to dismiss complaint on extraterritoriality grounds where non-resident plaintiff's complaint alleged that discriminatory and retaliatory conduct occurred in California).

[9] Because "a retaliation claim may be brought by an employee who has complained of or opposed conduct that the employee reasonably believes to be discriminatory, even when a court later determines the conduct was not actually prohibited by the FEHA," *Yanowitz v. L'Oreal USA, Inc.*, 116 P.3d 1123, 1131 (Cal. 2005), Ms. Lively's retaliation claim (and aiding and abetting claim) are valid regardless of whether the underlying harassment allegations state a claim under the FEHA, which is not at issue here.

[10] FEHA's anti-retaliation provision makes it unlawful for "any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part," and FEHA's aiding-and-abetting provision makes it unlawful for "any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this part, or to attempt to do so." Cal. Gov't Code § 12940(h), (i).

California-based attorneys to Wayfarer's California-based attorneys. SAC ¶ 146; *id.* Ex. A. Defendants retaliated against Ms. Lively for raising precisely those concerns, which the California-based Wayfarer Parties shared with Ms. Nathan—who swears she was based in and working from California during this time, ECF No. 649-6—who, in turn, shared that very document with the Wallace Defendants when recruiting them to join the retaliatory scheme, SAC ¶ 293a. And, when executing the retaliatory scheme, Mr. Wallace himself has sworn that he was working directly with Ms. Nathan, whom he understood to be in California, and that all of his activities were targeted at California. *Supra* at 1-3, 5-6. Ms. Lively also filed her CRD complaint in California, which triggered a second wave of continued retaliatory activity. *See* SAC ¶ 50. The SAC further alleges retaliatory conduct directed by California residents, including an ongoing smear campaign carried out with the assistance of their California-based attorney. *See, e.g.*, *id.* ¶¶ 221, 298, 454. It also alleges that Ms. Lively's California-based employer, Wayfarer, paid the Wallace Defendants' invoices for their work on the retaliatory campaign, further tying her retaliation claim to California. *See id.* ¶¶ 293f, 293g. In other words, this is a situation in which the underlying protected activity, the decisions to retaliate against Ms. Lively, and the execution of a significant part of that retaliatory scheme, were all carried out by California-based persons in California.[11]

## CONCLUSION

The motion to dismiss or to transfer should be denied.

---

[11] The cases cited by the Wallace Defendants are all distinguishable because in each, the alleged FEHA-violating conduct occurred *entirely* outside of California. *See Russo v. APL Marine Servs., Ltd.*, 135 F. Supp. 3d 1089, 1094 (C.D. Cal. 2015), (alleged harassment occurred in international waters); *Civello v. Equinix Inc.*, 2025 WL 1898208, at *2 (D. Ariz. July 9, 2025) ("The complaint does not in actuality describe where any of the allegedly discriminatory acts took place and Equinix has provided a declaration stating none of the actors Civello names worked in California."); *Hill v. Workday, Inc.*, 773 F. Supp. 3d 779 (N.D. Cal. 2025) ("The FAC only alleges transitory or minor connections to California for the material elements of the causes of action."); *Elzeftawy v. Pernix Group, Inc.*, 2021 WL 4264276 (N.D. Ill. Sept. 20, 2021) ("[Plaintiff] alleges that [Defendant] made its FEHA-violating decisions and sent its FEHA-violating communications from Illinois and North Carolina."). By contrast, the alleged retaliatory acts set forth in the SAC were directed and carried out by California residents in the State of California, with some acts occurring in New York.

Respectfully submitted,

Dated:  August 27, 2025

/s/ Michael J. Gottlieb

Esra A. Hudson (admitted *pro hac vice*)
Stephanie A. Roeser (admitted *pro hac vice*)
Manatt, Phelps & Phillips LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
(310) 312-4000
ehudson@manatt.com
sroeser@manatt.com

Michael J. Gottlieb
Kristin E. Bender
Willkie Farr & Gallagher LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1000
mgottlieb@willkie.com
kbender@willkie.com

Matthew F. Bruno
Manatt, Phelps & Phillips LLP
7 Times Square
New York, NY 10036
(212) 790-4525
mbruno@manatt.com

Aaron E. Nathan
Michaela A. Connolly
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8904
anathan@willkie.com
mconnolly@willkie.com

Meryl C. Governski (admitted *pro hac vice*)
Dunn Isaacson Rhee LLP
401 Ninth Street, NW
Washington, DC 20004
(202) 240-2900
mgovernski@dirllp.com

*Attorneys for Blake Lively*