**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY, | No. 24-cv-10049 (LJL) (lead case) |
| Plaintiff, | |
| -v- | |
| WAYFARER STUDIOS LLC, et al., | |
| Defendants. | |
| WAYFARER STUDIOS LLC, et al., | No. 25-cv-00449 (LJL) (member case) |
| Plaintiffs, | |
| -v- | |
| BLAKE LIVELY, et al. | |
| Defendants. | |

**DEFENDANT BLAKE LIVELY'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR ATTORNEYS' FEES, TREBLE DAMAGES, AND PUNITIVE
DAMAGES UNDER CALIFORNIA CIVIL CODE SECTION 47.1**

# TABLE OF CONTENTS

**Page**

I.    Introduction and Summary of Argument .......................................................... 1

II.   Facts and Procedural History ........................................................................ 4

    A.    The Wayfarer Parties Openly Discuss Their Intent to Retaliate Against Ms. Lively. ......................................................................................... 4

    B.    The Wayfarer Parties Begin Seeding Their False Litigation Narrative the Day After Ms. Lively Files Her CRD Complaint and Then File Frivolous Claims. ....................................................................................... 5

    C.    Ms. Lively Moves to Dismiss the First Amended Complaint, and the Wayfarer Parties Repeatedly Refuse to Withdraw Their Deficient Claims. ......... 8

    D.    The Court Grants Ms. Lively's Motion to Dismiss the First Amended Complaint ....................................................................................... 9

    E.    The Wayfarer Parties and Their Counsel Repeatedly Attack Ms. Lively and Her Family in the Media, and Abuse the Litigation Process and this Court's Orders. ............................................................................... 12

III.  Ms. Lively's Allegedly Defamatory Statements Are Privileged Under Section 47.1, Which Mandates a Fees and Damages Award .......................................... 13

    A.    Ms. Lively's Allegedly Defamatory Statements are "Communications" Protected by Section 47.1. ................................................................. 15

    B.    Ms. Lively's Allegedly Defamatory Statements Were "Without Malice." ......... 16

    C.    Ms. Lively Had a "Reasonable Basis" To File Her "Complaints." ................... 18

IV.   The Court Should Award Ms. Lively Damages Under Section 47.1 ........................... 19

    A.    Ms. Lively Is Entitled to Her Attorneys' Fees and Costs in Defending Against the Wayfarer Parties' Claims ................................................... 19

    B.    Ms. Lively Is Entitled to Damages for Harm Caused By the Defamation Action ........................................................................................... 20

        a.    Ms. Lively is Entitled to Treble Damages for Harm Suffered ................ 20

        b.    Ms. Lively Is Entitled to Punitive Damages. ................................... 20

        c.    The Court Should Set a Schedule for Promptly Quantifying These Monetary Awards ................................................................... 24

V.    CONCLUSION ......................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Bertero v. Nat'l Gen. Corp.*,
  13 Cal. 3d 43 (1974) ..................................................................................22

*Clark Equip. Co. v. Wheat*,
  92 Cal. App. 3d 503 (1979) ........................................................................23

*Clark v. Celeb Pub., Inc.*,
  530 F. Supp. 979 (S.D.N.Y. 1981) ............................................................22

*In re Marriage of Falcone & Fyke*,
  203 Cal. App. 4th 964 (2012) ....................................................................21

*Kizer v. Cnty. of San Mateo*,
  53 Cal. 3d 139 (1991) ................................................................................21

*Liberty Transp., Inc. v. Harry W. Gorst Co.*,
  229 Cal. App. 3d 417 (1991) ......................................................................23

*Reader's Dig. Assn. v. Superior Ct.*,
  37 Cal. 3d 244 (1984) ................................................................................16

*Sanbourn v. Chronicle Pub. Co.*,
  18 Cal. 3d 406 (1976) ................................................................................16

*Taus v. Loftus*,
  40 Cal. 4th 683 (2007) ..............................................................................16

*Weeks v. Baker & McKenzie*,
  63 Cal. App. 4th 1128 (1998) ....................................................................21

*Zhadan v. Downtown Los Angeles Motor Distributors, Inc.*,
  100 Cal. App. 3d 821 (1979) ......................................................................21

*Zirpel v. Alki David Prods., Inc.*,
  93 Cal. App. 5th 563 (2023) ......................................................................21

### STATUTES

Cal. Civ. Code § 47.1 .......................................................................... passim

Cal. Civ. Code § 48(a) ................................................................................16

Cal. Civ. Code § 48a(d)(4) ..........................................................................16

Cal. Civ. Code § 3294(a) ............................................................................21

### RULES

Fed. R. Civ. P. 11 ................................................................................8, 9, 23

Fed. R. Civ. P 11(c) ......................................................................................8

Fed. R. Civ. P. 11(c)(2) ................................................................................8

Fed. R. Civ. P. 12(b)(6)..........................................................................................9

Fed. R. Civ. P. 43(c)............................................................................................25

Fed. R. Civ. P. 52(a)............................................................................................25

Fed. R. Civ. P. 54(d)............................................................................................24

Fed. R. Civ. P. 54(d)(2)(B)(iii)............................................................................20

Fed. R. Civ. P. 54(d)(1)(C)....................................................................................4

Fed. R. Civ. P. 54(d)(2)(C)......................................................................20, 24, 25

Fed. R. Civ. P. 78..............................................................................................24

N.Y. Rules of Pro. Conduct, Rule 3.6....................................................................12

I.    **Introduction and Summary of Argument**

The Wayfarer Parties'[1] defamation action against Blake Lively was baseless from the start. Despite repeated warnings about the impropriety of their legal claims, and the consequences of continuing to pursue them, the Wayfarer Parties refused to back down. Instead, they stoked the flames of public sentiment, posting their retaliatory lawsuit on a public website alongside dozens of heavily redacted and context-free exhibits masquerading as "receipts," to flood the zone with vicious character attacks on Ms. Lively designed to damage her credibility and to conceal their own unlawful acts. Indeed, the Wayfarer Parties tried their best to sue Ms. Lively "into oblivion," and made substantial progress towards fulfilling Steve Sarowitz's threat to spend $100 million to ruin the lives of Ms. Lively and her husband, leaving "two dead bodies" in his wake. (SAC ¶¶ 27).

This Court has already recognized the Wayfarer Parties' "pattern of using filings on the docket as an opportunity to litigate this case in the press rather than in court" and to exploit the litigation process to "invite public speculation and scandal." (*See* ECF No. 582, referencing also ECF Nos. 220, 226). Using a $400 million lawsuit against Ms. Lively as their vehicle, the Wayfarer Parties tried to manufacture an air of legitimacy to their conduct, a tactic about which this Court has warned them and has cautioned the public and the press. (ECF No. 220). And while Ms. Lively has used every tool available to her to try stop to this abuse, including moving to strike offensive filings, moving for sanctions under Rule 11 and Rule 3.6, and successfully moving to dismiss the Wayfarer Parties' lawsuit "in its entirety," their improper conduct continues unabated.

Now, Ms. Lively seeks the deterrent remedy provided in California Civil Code Section 47.1 ("Section 47.1"), which prohibits the precise tactics that the Wayfarer Parties have deployed

---

[1] The "Wayfarer Parties" collectively refers to Defendants and Cross-Complainants Wayfarer Studios LLC ("Wayfarer"), Justin Baldoni ("Baldoni"), Jamey Heath ("Heath"), It Ends With Us Movie LLC, Melissa Nathan ("Nathan"), Jennifer Abel ("Abel,"), and Steve Sarowitz ("Sarowitz").

here—imposing severe penalties for unsuccessfully filing retaliatory defamation actions against sexual harassment and retaliation complainants. Under Section 47.1, any "communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination [including retaliation] *is privileged*" so long as the speaker "has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not." Cal. Civ. Code § 47.1(a), (c), (d) (emphasis added). Section 47.1 ensures that individuals who experience sexual harassment or retaliation are able to share their experiences with courts, agencies, the press, and others, without fear of being sued for doing so. *Id.* The California Legislature enacted this privilege to provide a "clear, unambiguous pathway to justice" (*see* ECF No. 241-1, p. 14) "for victims of sexual assault, harassment, and discrimination." (ECF No. 146-1, Senate Judiciary Committee, July 13, 2023). Specifically, Section 47.1 is intended to deter frivolous claims that force survivors to "defend against a long and expensive retaliatory defamation lawsuit" by imposing "*significant remedies for successful defendants in defamation claims*" (*Id.* p. 25, March 21, 2023 Assembly Committee on Judiciary) (emphasis added). Cal. Civ. Code § 47.1(b). Moreover, because Section 47.1 is intended to protect victims *from the litigation itself*, "[t]hese remedies *must be available at the earliest stage*— typically through a motion to dismiss—to protect survivors from a punishing, protracted legal process." (*See* ECF No. 241-1, p. 17) (emphasis added).[2] Consistent with Section 47.1's stated purpose, the Court should act *promptly to remedy the substantial harm Ms. Lively has incurred*.

There can be no doubt that the Wayfarer Parties' suit is the "prototypical suit that the California Legislature intended to short circuit by enacting [Section 47.1]." (*See* ECF No. 242-1,

---

[2] *See also* ECF No. 242-1, p. 11 (Section 47.1 was drafted to "achieve two distinct goals: (1) to shield victims from the discovery process by ensuring they would prevail at the motion to dismiss stage in most circumstances; and (2) to remedy the financial and psychological costs of the litigation and deter abusers from pursuing unwarranted and retaliatory litigation in the first place.").

p. 17). The alleged defamatory statements that formed the basis of the Wayfarer Parties' lawsuit meet all the elements of privileged statements under that section for reasons this Court has already recognized.[3] Thus, as the "prevailing defendant," Ms. Lively is entitled to her attorneys' fees and costs, treble damages, and punitive damages. As for punitive damages, the record as it currently exists is sufficient for the Court to determine the Wayfarer Parties engaged in "oppression, fraud, or malice" by bringing and maintaining their claims against Ms. Lively, entitling her to punitive damages under Civil Code Sections 47.1 and 3294. As set forth in greater detail below, the Wayfarer Parties, and their lawyers, used the now-dismissed claims to peddle falsehoods in the media and they did not stop even **_after_** the Court granted Ms. Lively's motion to dismiss— mispresenting in a televised interview the nature of the Court's order[4] and feeding the media and online frenzy by thanking the "Internet sleuth community who continue to cover the case . . ."[5] (_See, e.g.,_ ECF Nos. 546, 702).[6] It is hard to imagine a more straightforward application of Section 47.1, including its provision for punitive damages.

Accordingly, Ms. Lively respectfully requests a ruling that she is a "prevailing defendant" under Section 47.1 and, as such, that she is entitled to: (1) her "reasonable attorney's fees and costs for successfully defending [herself] in the litigation," (2) treble damages for the harm caused by the Wayfarer Parties' retaliatory "defamation action" against her, and (3) punitive damages

---

[3] **_First,_** Ms. Lively's statements were "communication[s]" "related to an incident of sexual . . . harassment," retaliation, and aiding abetting the same. **_Second,_** Ms. Lively made the statements at issue "without malice," or as the Wayfarer Parties acknowledged, because she "genuinely believes she's right" (ECF No. 50-1 at 155) (emphasis added). **_Third,_** Ms. Lively plainly had a "reasonable basis" to file a complaint (as she, in fact, did in multiple ways to multiple people). (_See_ ECF No. 296 ("MTD Order"), p. 85).

[4] _Baldoni Lawyer Bryan Freedman Rips Blake Lively...She's on a False Victory Tour_, TMZ (Jun. 10, 2025), https://www.tmz.com/2025/06/10/justin-baldoni-lawyer-bryan-freedman-rips-blake-lively-false-victory-tour/.

[5] _Justin Baldoni's lawsuit against Blake Lively dismissed by federal judge_, ABC News (Jun. 10, 2025), https://abcnews.go.com/US/justin-baldonis-lawsuit-blake-lively-dismissed-federal-judge/story?id=122660022.

[6] Further, it has now become exceedingly clear from the additional evidence submitted by James Vituscka that their effort to try to hold Ms. Lively liable for alleged defamatory statements of her publicist under a bogus agency theory, was based entirely upon what appears to be a knowing lie that they, incredibly, continue to defend. (See, e.g., ECF No. 684; ECF No. 705).

sufficient to deter the Wayfarer Parties from engaging in such conduct in the future. Following those legal determinations, Ms. Lively respectfully requests that the Court set a schedule for the submission of affidavits and a decision, after an evidentiary hearing, if necessary, as to the quantification of those awards pursuant to Rule 54(d)(1)(C).

## II.    Facts and Procedural History

### A.    The Wayfarer Parties Openly Discuss Their Intent to Retaliate Against Ms. Lively.

Before and during this litigation, the Wayfarer Parties have repeatedly made clear their intent to retaliate against Ms. Lively, including by weaponizing the legal system. As Ms. Lively alleged in the SAC, "[t]hat plan was backed by virtually unlimited resources. Wayfarer's co-founder, co-chairman, and leading financier is multi-billionaire, Steve Sarowitz, who divulged to a witness at the Film's New York premiere on August 6, 2024, that "he was prepared **to spend $100 million to ruin the lives** of Ms. Lively and her family." (*See* SAC, ¶ 26; fn. 8)[7]. That was not the only time Mr. Sarowitz made such a threat. Later in August 2024, even though the Film had "turned out very well," and Wayfarer had "made a lot of money" on it, Mr. Sarowitz confessed to another witness, an individual who was working with Wayfarer on an unrelated project, that if Ms. Lively or Mr. Reynolds "ever cross the line, ever, then I will go after them." He declared: "***I will protect the studio like Israel protected itself from Hamas. There were 39,000 dead bodies. There will be two dead bodies when I'm done. Minimum***. Not dead, but 'you're dead to me.' So that kind of dead. But dead to a lot of people. If they ever get me to that point. Then I'll make it worth

---

[7] Footnote 8 of the SAC noted: When asked about this comment, Mr. Sarowitz's counsel "confirmed that his client is prepared to spend whatever necessary to defend Baldoni, Wayfarer Studios and himself." Monica Hunter-Hart, *Meet the Little-Known Billionaire Caught Up in the Baldoni-Lively Scandal*, Forbes (January 7, 2025), https://www.forbes.com/sites/monicahunterhart/2025/01/07/meet-the-little-known-blake-lively-steve-sarowitz-billionaire-caught-up-in-the-baldoni-livelyscandal/."

their while. Because I'm gonna spend a lot of money to make sure the studio is protected."[8] (Declaration ████████, ¶¶ 5-6, Ex. 1 at 3:10-3:16; 26:01-26:09; 25:04-25:32).[9] And, after Ms. Lively brought suit here, the Wayfarer Parties, through their attorney Bryan Freedman, reconfirmed their intent to sue Ms. Lively and others "into oblivion."[10] Thus, the Court need look no further than the Wayfarer Parties' own statements to confirm their intent to retaliate against Ms. Lively for reporting sexual harassment and retaliation, including by filing their now-dismissed claims.

**B.    The Wayfarer Parties Begin Seeding Their False Litigation Narrative the Day After Ms. Lively Files Her CRD Complaint and Then File Frivolous Claims.**

Ms. Lively filed her verified administrative complaint before the California Civil Rights Department ("CRD Complaint") on December 20, 2024. (*See* ECF No. 84, ¶ 294). The ***very next day,*** in the wee hours of the morning after the Wayfarer Parties had been served cease and desist letters along with a copy of the CRD Complaint (*id.*) Mr. Freedman, in his capacity as counsel for the Wayfarer Parties, provided an inflammatory statement to *TMZ*. The statement accused Ms. Lively of lying in the CRD Complaint, calling it "shameful," and declaring her allegations "completely false, outrageous and intentionally salacious with an intent to publicly hurt . . . " as part of "yet another attempt to 'fix' her negative reputation" that he claimed she brought on

---

[8] In unsealed portions of her deposition transcript filed with the Court, Ms. Lively testified that she not only felt that the lawsuit and Mr. Freedman's conduct was retaliatory, but that Mr. Sarowitz's "dead bodies" threat, on the heels of his pledge to spend $100 million to ruin her life, left her concerned for her physical safety and, as a mother, for that of her family. (ECF Nos. 596-1, pp. 3-4; 649-3, pp. 19-2; *See also* ECF No. 688).

[9] This person also had concerns with Mr. Baldoni, who they found to be verbally abusive, which resulted in him not being allowed on the set of the other project or involved in its marketing or publicity. (*Id.* at ¶¶2-5). ████████

[10] *Justin Baldoni's Lawyer Bryan Freedman Says He's Going to Sue Blake Lively "Into Oblivion" Soon*, Megyn Kelly (YouTube Jan. 7, 2025), https://www.youtube.com/watch?v=bZJFm-nl-V8.

herself.[11] On December 31, 2024, Ms. Lively initiated this action, filing her original complaint in this Court. (ECF No. 1). Later that same day, the Wayfarer Parties sued *The New York Times* in Los Angeles Superior Court, based wholly on its reporting regarding Ms. Lively's CRD complaint. (Compl., *Wayfarer, LLC et al. v. N.Y. Times Co.,* No. 24ST-cv-34662 (CA Super. Ct., Cnty. L.A.) (Dec. 31, 2024)). Then, on January 16, 2025, the Wayfarer Parties filed a retaliatory defamation lawsuit against Ms. Lively directly in this Court, claiming that Ms. Lively had defamed them by accusing them of engaging in sexual harassment and conducting a retaliatory digital manipulation campaign against her, also roping in her husband Ryan Reynolds and her publicist Leslie Sloane and Ms. Sloane's company Vision PR as defendants. (Case No. 1:25-cv-00449-LJL, ECF No. 1).

On January 31, 2025, barely two weeks after filing their initial complaint in this Court and eleven weeks before the deadline to file a motion to amend (ECF No. 58), the Wayfarer Parties filed a 391-page First Amended Complaint ("FAC"), including a 168-page narrative "Exhibit A," asserting nine causes of action against Ms. Lively and the other defendants, this time adding in *The New York Times* as a defendant.[12] (together with Ms. Lively, Mr. Reynolds, Ms. Sloane and Vision PR, "Defendants"). (*See* ECF No. 50, FAC at 211–22). Each Wayfarer Party asserted seven causes of action against Ms. Lively, including for (1) Civil Extortion (FAC ¶¶ 316-23 ("Extortion Claim")); (2) Intentional Interference with Contractual Relations (*id.* ¶¶ 347-55); (3) Intentional Interference with Prospective Economic Advantage (*id.* ¶¶ 356-65); (4) Negligent Interference with Prospective Economic Advantage (*id.* ¶¶ 366-74) (together with (2) and (3), the "Interference Claims")); (5) Breach of the Implied Covenant of Good Faith and Fair Dealing (*id.* ¶¶ 340-46

---

[11] *See Read the Statement: Statement to The New York Times from Bryan Freedman, attorney for Justin Baldoni, Wayfarer Studios and all its representatives*, N.Y. Times (December 21, 2024), https://www.nytimes.com/interactive/2024/12/21/us/statement-to-the-new-york-times.html.

[12] Shortly thereafter, the Wayfarer Parties dismissed their California state court action against *The New York Times* before it responded to that complaint, conveniently avoiding California's powerful anti-SLAPP statute contained in California Code of Civil Procedure Section 425.16. (*See* Req. for Dismissal, Case No. 24ST-cv-34662).

("Implied Covenant Claim")); and (6) Defamation (*id.* ¶¶ 324-31 ("Defamation Claim")). Mr. Baldoni, Mr. Heath, Ms. Nathan, Ms. Abel, and Mr. Sarowitz also brought a claim for False Light Invasion of Privacy (*id.* ¶¶ 332–39). With one exception—the False Light claim—each cause of action was asserted by *all* of the Wayfarer Parties against Ms. Lively. This lawsuit was accompanied by the creation of a website, entitled "thelawsuitinfo.com" on which the Wayfarer Parties placed only the FAC and its rambling Exhibit A, restyled as a "Timeline of Relevant Events," for easy public access. There was no legal purpose whatsoever for this website, which recently obtain discovery confirms was purely a blunt public relations tool against Ms. Lively. (*See, e.g., generally* ECF No. 31, Case No. 1:23-mc-00347-LJL). Indeed, in a contemporaneous Signal group chat in February 2025 ███████████████████████████████████████ ███████████████████████████████████ Later that day, after the website launched, the group[13] ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████ (*See* Declaration of Esra Hudson, ¶ 4, Exhibit A (SKYLINE_000000235, p. SKYLINE_000000276-77).

As this Court already found, the FAC was rooted in two buckets of allegedly injurious statements by Ms. Lively: (a) that the Wayfarer parties "engaged in, permitted, and/or failed to prevent sexually inappropriate conduct toward Lively"; and (b) that the Wayfarer parties retaliated against Ms. Lively and others for reporting the alleged misconduct by launching a "smear campaign." (*See* MTD Order, p. 46). These statements underlay all of the Wayfarer Parties' claims. (*See* MTD Order, p. 121) (with respect to the False Light Claim, concluding that certain "factual

---

[13] ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████

allegations simply allege in different words the same conduct that is alleged to constitute defamation" and "[t]he Wayfarer Parties cannot benefit by the expedient of simply relabeling their defamation claim as false light."); (MTD Order, p. 125) ("Regarding the claims of interference with prospective economic advantage, because the Wayfarer Parties do not allege that Reynolds' statements were defamatory, they do not allege that they were independently wrongful."). (*See also* FAC ¶ 317, 333, 334, 350, 359, 371).

### C. Ms. Lively Moves to Dismiss the First Amended Complaint, and the Wayfarer Parties Repeatedly Refuse to Withdraw Their Deficient Claims.

On March 20, 2025, Ms. Lively filed her successful Motion to Dismiss all claims asserted in the FAC on the grounds that, among other things, the FAC was based on statements protected by the fair report privilege, the litigation privilege, and Section 47.1. (ECF No. 145). As to Section 47.1, Ms. Lively argued that her allegedly defamatory statements were "communication[s] made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination." Cal. Civ. Code § 47.1(a); (Lively MTD, pp. 18-21).

Thereafter, on April 23, 2025, Ms. Lively served Mr. Sarowitz, Mr. Heath, Ms. Nathan, Ms. Abel, and It Ends With Us Movie, LLC (the "Rule 11 Plaintiffs") with letters under Federal Rule of Civil Procedure 11(c) (the "Safe Harbor Letters") demanding that, among other things: (i) Mr. Sarowitz, Ms. Nathan, Ms. Abel, and IEWU LLC withdraw their Civil Extortion Claims; (ii) all Rule 11 Plaintiffs withdraw their Interference Claims; and (iii) Mr. Sarowitz, Ms. Nathan, Ms. Abel, and Mr. Heath withdraw their Implied Covenant Claim. The Safe Harbor Letters indicated that if the Rule 11 Plaintiffs, through their counsel, failed to withdraw these claims within the 21-day safe-harbor period prescribed by Rule 11, Ms. Lively would seek sanctions from the Court. (*See* ECF No. 224, 224-1. 224-2, 224-3, 224-4, 224-5; Fed. R. Civ. P. 11(c)(2)). The Rule 11 Parties steadfastly refused to take any action to address the many flaws and deficiencies identified

in the Safe Harbor Letters. Instead, in a May 13, 2025, response, they advised that they were standing by every word of their frivolous pleadings. (*See* ECF No. 224-6).

On May 19, 2025, Ms. Lively filed a motion for sanctions under Federal Rule of Civil Procedure 11 (the "Rule 11 Motion") (ECF No. 223). In that motion, Ms. Lively set out in detail why all the Rule 11 Plaintiffs' claims against her failed as a matter of law.[14] In response to Ms. Lively's Rule 11 Motion, the Rule 11 Plaintiffs *did not even attempt to stand behind their claims on the merits*. Instead, they argued, in essence, that the Court should ignore the requirements imposed by Rule 11 that parties and counsel submit pleadings that are brought in good faith, and instead merely dismiss any deficient claims under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 263 ("Rule 11 Opp"), p. 6-10).

### D. The Court Grants Ms. Lively's Motion to Dismiss the First Amended Complaint.

On June 9, 2025, the Court granted Ms. Lively's Motion to Dismiss "in its entirety," along with the motions to dismiss filed by Mr. Reynolds, Ms. Sloane, Vision PR, and The New York Times. (MTD Order, p. 38). As to Ms. Lively, the Court dismissed (1) with prejudice the Wayfarer Parties' claims for defamation, civil extortion, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, and false light invasion

---

[14] Specifically, Ms. Lively explained that the Rule 11 Plaintiffs' claims set forth no extortionate threats or demands as to Mr. Sarowitz, Ms. Nathan, Ms. Abel, or IEWU LLC to support their Extortion Claim. (Rule 11 Motion pp. 7-8; citing FAC ¶¶ 250-54; FAC ¶¶ 16, 250–256.) The Rule 11 Plaintiffs' three Interference Claims against Ms. Lively were based exclusively on purported relationships *between other parties—Wayfarer and WME* and *between Mr. Baldoni and WME*. (Rule 11 Motion p. 11; citing FAC ¶¶ 348, 357, 367; Opp. at 36). And, like the Interference Claims, the Implied Covenant Claims advanced by Mr. Sarowitz, Ms. Nathan, Ms. Abel and Mr. Heath were based on an actor agreement between *Ms. Lively and Wayfarer*, pursuant to which Ms. Lively would take the lead role as Lily Bloom in the Film. (Rule 11 Motion p. 14, citing Opp. at 41; *see also* FAC ¶ 27.) As Ms. Lively's Rule 11 Motion made clear, there was *no* conceivable contractual relationship between any of Mr. Sarowitz, Ms. Nathan, Ms. Abel, or Mr. Heath, on the one hand, and Ms. Lively, on the other. (*Id.*)

of privacy; and (2) without prejudice the Wayfarer Parties' claims for intentional interference with contractual relations and breach of the implied covenant of good faith and fair dealing. (*Id*. p. 132).

In dismissing the Wayfarer Parties' defamation action against Ms. Lively, the Court concluded that her statements were privileged under the fair report and litigation privilege. (*Id*. p. 106). The Court did not rule on whether Ms. Lively's alleged statements were privileged under Section 47.1 or whether Ms. Lively acted with actual malice, but permitted Ms. Lively to "renew" her motion for attorneys' fees, treble damages, and punitive damages under Section 47.1. (*Id*. p. 131). In granting the parallel motions to dismiss, the Court did, however, rule, that the Wayfarer Parties failed to plead actual malice on the part of Mr. Reynolds, Ms. Sloane, and The New York Times, finding that the Wayfarer Parties failed to allege facts that would have caused the Defendants to doubt Ms. Lively's account:

- In concluding that the Wayfarer Parties failed to allege actual malice as to Ms. Sloane, the Court held that the Wayfarer Parties failed to make any allegations "suggesting Lively's account was inaccurate or that Sloane would have reason to believe Lively was being duplicitous," and thus Ms. Sloane had no duty to investigate Ms. Lively's statements. (MTD Order, p. 94).

- In holding that the Wayfarer Parties failed to allege actual malice as to Mr. Reynolds, the Court held that "the Amended Complaint does not provide any reason [Reynolds] would have doubted Lively's version of events." (*Id*. p. 97).

- In rejecting the Wayfarer Parties' conspiracy arguments, the Court stated, "[t]he Wayfarer Parties' conclusory allegations that Lively, Reynolds, and Sloane engaged in a conspiracy to defame the Wayfarer Parties by disseminating knowingly false statements cannot substitute for factual allegations supporting a plausible inference that this occurred." (*Id*. p. 106).

The Court also found there to be sufficient evidence of a "smear campaign" to defeat the Wayfarer Parties' defamation claim against The New York Times. In concluding that the Wayfarer Parties failed to allege actual malice on the part of The New York Times, the Court held:

- "The CRD complaint and Article contain numerous messages and documents ***strongly suggesting the Wayfarer Parties did spread negative stories about Lively***." (*Id*. p. 115) (emphasis added).

- "The Wayfarer Parties' statements regarding sending negative content to 'digital' and Wallace's attempts to 'shin[e] a spotlight on Blake and Ryan' are inexplicable unless the Wayfarer Parties were spreading negative content about Lively, and this impression is reinforced by messages from Baldoni, Abel, and Nathan suggesting this strategy. *It is fair to presume that the Wayfarer Parties did what they said that they planned to do* . . . Those messages are what is contained in the Article and referenced in the Video. A reader of those messages would have little doubt that the Wayfarer Parties engaged in a smear campaign." (*Id*. p. 116) (emphasis added).

- "Some messages relied on by the Wayfarer Parties for the claim that they were not engaging in negative messaging regarding Lively and Reynolds can in fact be read to imply the opposite. A message from Baldoni to Nathan about 'protecting myself' asks '[s]o do we say / Blake and ryan hire Harvey Weinstein publicist' to which Nathan responds '[t]hat's a conversation I'm going to have with Jen/Jamey today.' Dkt. No. 50 ¶ 233. *This implies that Baldoni and Nathan at least considered spreading a negative story regarding Lively's choice of Sloane as her publicist.* In addition, the Wayfarer Parties emphasize texts between TAG team members stating '[w]e didn't tell Jed to go after the idea that her promo was inappropriate / That happened organically.' *Id*. ¶ 280. *But these texts can be read to imply that TAG did tell Wallace to go after Lively on other issues*. If Wallace never spread anything negative about Lively, it is unclear why TAG team members would feel the need to note that Wallace did not spread this particular piece of negative publicity about Lively." (*Id*. p. 117 n.62) (emphasis added).

- "The Times may have otherwise parroted the breathless 'smear campaign' narrative of Lively's complaint, *but it had evidence to support that narrative*." (*Id*. p. 118) (emphasis added).

- "*Given the strength of the evidence in favor of a smear campaign,* it is not plausible that the Times 'entertained serious doubts as to the truth' of the smear campaign narrative as a whole, even if, for whatever reason, it misrepresented one particular set of messages in aid of that narrative. *Harte-Hanks*, 491 U.S. at 667." (*Id*. p. 119) (emphasis added).

Finally, in denying leave to amend the Wayfarer Parties' defamation claim, the Court held that "[t]he Wayfarer Parties do not identify any particular factual allegations that could be added to support the defamation or civil extortion claims, nor is it plausible that any allegations not yet mentioned would change the basic substance of Lively's threats, the conclusion that the CRD complaint was privileged, *or the conclusion that relevant statements were made without actual malice*." (*Id*. p. 129) (emphasis added).[15]

---

[15] While the bolded language appears to refer to statements made by Mr. Reynolds, Ms. Sloane, and the New York Times, their statements were alleged to arise out of the same underlying statements that formed the basis of the

**E.**    **The Wayfarer Parties and Their Counsel Repeatedly Attack Ms. Lively and Her Family in the Media, and Abuse the Litigation Process and this Court's Orders.**

Despite repeated warnings regarding the grave deficiencies in their claims, the Wayfarer Parties continued to hide behind them to push falsehoods in the press and before this Court. From December 2024 through the date of this filing, the Wayfarer Parties, with Mr. Freedman as their mouthpiece, have made incessant statements in the press misrepresenting the nature of their claims, and attacking Ms. Lively personally. As set forth in greater detail in Ms. Lively's Rule 11 Motion (ECF No. 223), Mr. Freedman accused Ms. Lively and Mr. Reynolds of being "cowardly," claimed that Ms. Lively is "abusing our legal system," called Ms. Lively's conduct "shameful" and "bullying," and, even more unthinkable, accused her of "devastating the entirety of the domestic violence community by lodging the allegations." (*See* Rule 11 Motion, pp. 14-15). Mr. Freedman's persistent character attacks on Ms. Lively also resulted in a separate motion seeking sanctions under Rule 3.6 for exposing the public (and the jury pool) to his prejudicial and inflammatory pre-trial indictments of Ms. Lively's character, credibility, and reputation. (ECF No. 543, 544).

On May 8, 2025, as this Court knows, Mr. Freedman went so far as to ***suggest that he would take Ms. Lively's deposition at Madison Square Garden, charge tickets for admission to attend, and livestream the testimony for the world to watch***.[16] He then filed two letters and an affidavit with the Court making allegations against Ms. Lively and her counsel that were so improper that they were stricken from the record. (*See* ECF No. 220). Following the Court's Order

---

Wayfarer Parties' defamation allegation against Ms. Lively. (See Wayfarer Parties' Opposition to Lively MTD, ECF 162). The Court's finding that Mr. Reynolds, Ms. Sloane, and the New York Times acted without actual malice, by extension, suggests a lack of malice on the part of Ms. Lively as well. And the Wayfarer Parties certainly did not allege any facts that would support a malice finding as to Ms. Lively.

[16] Elizabeth Rosner, *Justin Baldoni's Lawyer Wants to Sell Tickets to Blake Lively's Deposition for This Reason (Exclusive)*, People (May 8, 2025) ("Since Ms. Lively is open to testifying, let's make it count," Baldoni's attorney Bryan Freedman tells PEOPLE. "Hold the deposition at MSG, sell tickets or stream it, and donate every dollar to organizations helping victims of domestic abuse."), available at https://people.com/justin-baldoni-lawyer-wants-sell-tickets-blake-lively-deposition-exclusive-11731182.

dismissing all of the Wayfarer Parties' claims, Mr. Freedman thanked the "Internet sleuth community who continue to cover the case," effectively pouring gasoline on the already-blazing media frenzy and encouraging the same type of online trolling that got the Wayfarer Parties sued in the first place. And just last month, on August 1, 2025, the Wayfarer Parties and Mr. Freedman's firm filed under seal the entire uncertified draft rough 292-page transcript from Ms. Lively's deposition, which had occurred the day before, on July 31. (ECF No. 538.) The Court granted Ms. Lively's motion to strike the filing, finding that it had the "responsibility to step in" because it was "inescapable that the Wayfarer Parties filed gratuitous amounts of irrelevant pages so that, if Lively moved for continued sealing of the irrelevant pages, the Wayfarer Parties could then use Lively's response for their own public-relations purposes." (*Id*.).[17]

Mr. Freedman's statements on behalf of the Wayfarer Parties, while no doubt shocking, are not surprising given his clients' litigation strategy. The sentiments of Mr. Sarowitz, which are reprehensible in any sense of the word, are especially troublesome in a case involving allegations as sensitive as the ones at issue here, but certainly confirm that for the Wayfarer Parties, the merits of their allegations were secondary to their goal of leaving Ms. Lively and her husband "dead."

## III.    <u>Ms. Lively's Allegedly Defamatory Statements Are Privileged Under Section 47.1, Which Mandates a Fees and Damages Award.</u>

Section 47.1 protects Ms. Lively's statements about sexual harassment and retaliation by the Wayfarer Parties and, in fact, was created to deter the filing of exactly the kind of complaint

---

[17] And as if on cue, and true to plan, the media and the "internet sleuth" community immediately began speculating that the deposition testimony must not have gone well for Ms. Lively if her attorneys sought to keep the transcript sealed. *See* Dominic Patten, *Blake Lively Slams and Shames Justin Baldoni's Lawyers over Making Her Deposition Public, Leaking Details of Last Week's Sit-Down for "Media Campaign."*, Deadline, August 4, 2025 ("a letter from the *Another Simple Favor* star's own attorneys filed today in federal court makes it pretty clear in hindsight the July 31 sit-down did not go well.") <u>https://deadline.com/2025/08/blake-lively-justin-baldoni-deposition-public-1236478234/</u>; https://www.tiktok.com/t/ZP8kxuWNx/.

filed by the Wayfarer Parties here. A "communication" is privileged under Section 47.1 when it is (1) "regarding an incident of sexual assault, harassment, or discrimination"; (2) made "without malice"; and (3) made by "an individual that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination" whether the complaint is filed or not. Cal. Civ. Code § 47.1(a), (c). A "prevailing defendant in any defamation action brought against that defendant for making a communication that is privileged" under Section 47.1 is entitled to "their reasonable attorney's fees and costs for successfully defending themselves in the litigation, plus treble damages for any harm caused to them by the defamation action against them, in addition to punitive damages available under Section 3294 or any other relief otherwise permitted by law." *Id*. § 47.1(b).

California enacted Section 47.1 to clarify and codify existing law, in direct response to repeated attacks upon individuals who report sexual harassment, and to provide a strong remedy to disincentivize retaliatory litigation, "curb a pervasive culture of sexual assault and harassment," and "provide significant remedies for successful defendants in defamation claims." (ECF No. 146-1, pp. 27, 62, 83); (*See also* ECF No. 242-1 pp. 4-6 (noting the prevalence of retaliatory litigation tactics in the post #MeToo era)). Members of the California Legislature explained that Section 47.1 was necessary because the #MeToo movement had "unveiled a predatory culture that persists across all sectors of employment and society" in which many victims have been "served with defamation lawsuits." (*Id*. at 87). One legislator went on to describe these retaliatory suits as "a weapon to threaten, silence, intimidate, and dissuade" their accusers. (*Id*. at 87, 91-92). Section 47.1 was thus drafted to "achieve two distinct goals: (1) to shield victims from the discovery process by ensuring they would prevail at the motion to dismiss stage in most circumstances; and (2) to remedy the financial and psychological costs of the litigation and deter abusers from

pursuing unwarranted and retaliatory litigation in the first place." (*See* ECF No. 242-1 p. 11; *see also* ECF No. 242-1 p. 10) ("The Legislature intended for AB 933 to protect individuals who reported sexual harassment without malice from retaliatory litigation, particularly abusive discovery.").

To curb this weaponization of the legal system, Section 47.1 provides immunity against claims that seek to hold individuals liable for speaking out about their experiences with sexual harassment and related claims, including retaliation and aiding and abetting—whether in a legal proceeding, to the press, or otherwise. *See* Cal. Civ. Code § 47.1. Under Section 47.1, a covered communication is defined as any "factual information related to an incident of sexual assault, harassment, or discrimination experienced by the individual making the communication," including: (1) an act of sexual harassment by a director or producer, under Civil Code Section 51.9, and (2) "[a]n act of workplace harassment or discrimination, failure to prevent an act of workplace harassment or discrimination, aiding, abetting, inciting, compelling, or coercing an act of workplace harassment or discrimination, or an act of retaliation against a person for reporting or opposing workplace harassment or discrimination. . . . " *Id*. §§ 47.1(d)(2)-(3).

A.    **Ms. Lively's Allegedly Defamatory Statements are "Communications" Protected by Section 47.1.**

The FAC's allegations establish that all the Wayfarer Parties' claims against Ms. Lively rested on "communications" she made "regarding an incident of sexual . . . harassment," retaliation, or aiding and abetting the same. Cal. Civ. Code § 47.1(a), (d)(2)-(3) (emphasis added). In fact, the Wayfarer Parties conceded as much in their oppositions to Ms. Lively's Motion to Dismiss: they confirmed that their claims arose from statements that Ms. Lively made in legal filings about Mr. Baldoni and Mr. Heath's sexually harassing behavior as the Wayfarer Parties' retaliatory campaign against her in retaliation for reporting the same. (*See* ECF No. 121, p. 22;

ECF No. 127, p. 16). Indeed, each and every factual statement that the FAC identified as false or defamatory relates to "an incident of sexual assault, harassment, or discrimination experienced by" Ms. Lively at the hands of her director, producer, or employers under Cal Civ. Code § 47.1(d). (*See* ECF No. 50, FAC, ¶¶ 36, 38, 46, 83-90, 94- 95, 100-01, 104-05, 120, 124, 135, 144, 155, 190, 192-93, 260, 267, 273, 275, 276, 284, 287, 292-93).

**B.    Ms. Lively's Allegedly Defamatory Statements Were "Without Malice."**

The Wayfarer Parties' own allegations also confirm that Ms. Lively's allegedly defamatory statements were made "without malice." Although neither Section 47 nor Section 47.1 define "malice," courts applying Section 47 have relied upon California Civil Code section 48a's definition of "actual malice" as the governing standard. *See Taus v. Loftus*, 40 Cal. 4th 683, 721 (2007) (citing Cal. Civ. Code § 48a(d)(4)); *accord Sanbourn v. Chronicle Pub. Co.,* 18 Cal. 3d 406, 412-14 (1976). Section 48a defines "actual malice" as a "state of mind arising from hatred or ill will toward the plaintiff" and clarifies that "a good faith belief on the part of the defendant in the truth of the libelous publication . . . at the time it is published . . . shall not constitute actual malice." Cal. Civ. Code § 48a(d)(4) (emphasis added). Courts applying the "actual malice" standard outside the context of Civil Code section 48 are in accord. *See Reader's Dig. Assn. v. Superior Ct.,* 37 Cal. 3d 244, 258-59 (1984) (explaining that the "actual malice" standard is focused on the "subjective attitude of the publisher" and, therefore, requires the plaintiff to allege that the defamatory statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not.").

Here, the FAC is replete with admissions confirming the truth of Ms. Lively's allegations. The FAC admits that misconduct on set did occur and that the Wayfarer Parties even apologized for their misconduct. (*See* FAC, ¶¶ 49, 94, 104; ECF No. 50-1 at 25, 29, 33-34). The FAC admits that Ms. Lively repeatedly raised concerns during production about the exact misconduct described

in the CRD Complaint and publications in The New York Times. (FAC, ¶¶ 49, 75, 88, 94, 100, 104, 128; ECF No. 50-1 at 25-26, 32). Most damning of all, the FAC references a text between Mr. Baldoni and Ms. Nathan, in which both agree that Mr. Lively "***genuinely believes she's right*** and that all of this is unjust." (ECF No. 50-1 at 155) (emphasis added).

While generally alleging that Ms. Lively's allegations are false (ECF No. 50, FAC, ¶¶ 1, 3-4, 8, 14-17, 36, 46, 81, 83-85, 88-90, 96, 100-01, 104-05, 120, 124, 135, 144, 155, 162, 187, 190, 192-93, 260, 267, 273, 275, 276, 284, 287, 292-930), the FAC's identified "falsehoods" center on hair-splitting Ms. Lively's recounting of specific incidents within her legal complaints or, worse, attempt to justify the Wayfarer Parties' behavior—essentially asserting that Ms. Lively "asked for it." Consequently, the FAC does nothing more than describe the exact same factual conduct, but from the Wayfarer Parties' points of view rather than Ms. Lively's. This "both sides" approach geared toward the court of public opinion only highlights the FAC's total failure to allege that Ms. Lively ever doubted the truth of her own allegations.

At best, the FAC asserts that Ms. Lively published the alleged statements either to save her own reputation or as part of a power grab: (i) they allege that "she needed a scapegoat" to blame for her "missteps" in promoting the Film, (*id.*, ¶¶ 3, 12, 271); (ii) they claim she was "driven by overweening ambition and a need for control," (*id.*, ¶ 9); (iii) they assert she wanted to "match her star husband" or "boost[] her own brand and business ventures," (*id.*, ¶¶ 176-78); and (iv) they state she was determined to "extract…creative control" and to "steal" the Film, (*id.*, ¶¶ 130, 161), or "take over the production of the sequel, It Starts With Us" (*id.*, ¶ 175). But, as described above, none of these theories contain allegations that Ms. Lively fabricated the sexual harassment allegations or "insinuations" in the Protections for Return to Production, particularly given that so many of those "insinuations" directly tracked actual incidents that the FAC concedes occurred.

*See supra,* at pp. 7-9. Even taking the above as true, the FAC does not plausibly allege that Ms. Lively actively disbelieved any of the allegations set forth in her verified CRD Complaint.

Moreover, the FAC offers no plausible basis to infer that Ms. Lively would—over a period of years— (i) knowingly fabricate sexual harassment claims; (ii) repeatedly report her concerns to her superiors (including, Baldoni, Heath, Wayfarer, and Sony); (iii) negotiate contractual protections to address her concerns, (*id.*, ¶ 75); (iv) file complaints with state and federal government agencies, (*id.*, ¶ 4); and, finally, (v) initiate this litigation—further exposing herself to the precise public backlash the Wayfarer Parties promised to unleash—all to have the kind of creative control she presumably could have obtained simply by being "[one] of the most powerful stars in the world," as the FAC asserts she is (FAC, ¶ 18).

The Court's Order on Ms. Lively's Motion to Dismiss lends further support to the inescapable conclusion that Ms. Lively's statements were made without actual malice. As set forth above, the Court concluded that Ms. Lively did not give Mr. Reynolds, Ms. Sloane or *The New York Times* any reason to doubt her account of the events with regard to the alleged harassment and retaliation against her. (*See, supra*, pp. 9-11, citing MTD Order pp. 97, 106, 115, 117, 118, 119). Moreover, as to the retaliation statements specifically, the Court concluded that the Wayfarer Parties own judicial admissions and text communications support the existence of a retaliation campaign. (*See, supra*, pp. 10-11, citing MTD Order p. 117, n.62). The Wayfarer Parties have thus been hoisted by their own petard: their own allegations confirm that Ms. Lively's "communications" about the sexual harassment and retaliation she experienced at the hands of the Wayfarer Parties were made "without malice," thereby supporting application of Section 47.1.

### C.    Ms. Lively Had a "Reasonable Basis" To File Her "Complaints."

Finally, to be protected by Section 47.1, the speaker need only have "or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, ***whether the***

*complaint is, or was, filed or not.*" Cal. Civ. Code § 47.1(c) (emphasis added). In other words, the privilege under Section 47.1 attaches regardless of whether a complaint is ever filed and no matter to whom the communication is published. As the California Legislature explained: "The protections . . . would apply to individuals who, after relaying any factual statement, whether in the form of a formal complaint or a statement outside a formal proceeding such as to a media outlet, [are] sued for defamation." (*See* ECF No. 146, Ex. 1 at 28, 63, 84) (emphasis added). Indeed, the statute was enacted in large part to address defamation claims filed against harassment victims based upon statements made to the press. (*Id*. at 72, 83-84).

It is self-evident that Ms. Lively had a more than "reasonable basis" to report her workplace concerns during production and to file her complaints both with the CRD and this Court, and the FAC provide no plausible basis to conclude otherwise. As set forth above, the Wayfarer Parties admit much of the misconduct that occurred on set. ( *See, supra,* pp 7-9.) The Court need look no further than its own docket to further confirm such finding. The Wayfarer Parties' attempt to recast Ms. Lively's claims as false and defamatory entirely failed: all the Wayfarer Parties' claims against Ms. Lively have now been dismissed with prejudice or abandoned.

Ms. Lively is therefore a "prevailing defendant" under Section 47.1, and as such, she is entitled to her attorneys' fees and costs, treble damages, and punitive damages.

## IV.    The Court Should Award Ms. Lively Damages Under Section 47.1

### A.    Ms. Lively Is Entitled to Her Attorneys' Fees and Costs in Defending Against the Wayfarer Parties' Claims.

As the "prevailing defendant" in the Wayfarer Parties' "defamation action," Ms. Lively is entitled to her "reasonable attorney's fees and costs for successfully defending [herself] in the litigation." Cal. Civ. Code § 47.1(b). Accordingly, Ms. Lively respectfully requests that the Court award her attorneys' fees and costs and set a deadline following that ruling for Ms. Lively to submit

appropriate documentation as to the amount thereof. *See* Fed. R. Civ. P. 54(d)(2)(C) ("The court may decide issues of liability for fees before receiving submissions on the value of services."). Pursuant to Rule 54(d)(2)(B)(iii), Ms. Lively estimates that she will seek a multi-million-dollar award to recover her attorneys' fees and costs in defending against the Wayfarer Parties' claims (including, this briefing,  expert witness fees, and any further proceedings on this request).

### B.    Ms. Lively Is Entitled to Damages for Harm Caused By the Defamation Action.

#### a.    Ms. Lively is Entitled to Treble Damages for Harm Suffered.

Ms. Lively is also entitled to compensation for all harm caused to her by the Wayfarer Parties' retaliatory defamation action, including her "economic, emotional, and psychological harms."[18] (*See* ECF No. 242-1, p. 14 (explaining that Section 47.1's damages provision "authorize[s] treble damages for the economic, emotional, and psychological harms survivors suffer when defending themselves in retaliatory suits brought by their abusers.")). The full measure of this harm will be established during expert discovery in this case.. (ECF No. 425). Ms. Lively thus asks the Court to set a schedule for the submission of evidence, including a prompt evidentiary hearing if the Court deems it appropriate, quantifying her harm, which must then be trebled under Section 47.1. Cal. Civ. Code § 47.1(b).

#### b.    Ms. Lively Is Entitled to Punitive Damages.

Finally, Ms. Lively is entitled to punitive damages under Section 47.1 and Civil Code section 3294. Unlike other claims that apply punitive damages based on the underlying allegations of wrongdoing, under Section 47.1, such damages are based on ***bringing the lawsuit itself***. Civ. Code § 47.1(b). Thus, the conduct to be assessed in imposing punitive damages here is the

---

[18] As to emotional distress, Ms. Lively will seek only "garden variety" damages under Section 47.1.

Wayfarer Parties' actions in bringing and maintaining their claims against Ms. Lively—conduct that was (and continues to be) unquestionably oppressive, fraudulent, and malicious.

To obtain punitive damages under Civil Code section 3294, Ms. Lively must establish "by clear and convincing evidence" that the Wayfarer Parties have "been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a) (emphasis added). Malice is either conduct that is intended to cause injury or "despicable conduct" carried out "with a willful and conscious disregard of the rights or safety of others." *Id.* § 3294(c) (emphasis added). "Oppression" is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." *Id.* (emphasis added). "Fraud" is "an intentional misrepresentation, deceit, or concealment of a material fact" intended to cause injury. *Id.* (emphasis added).

"The purpose for awarding punitive damages is to punish wrongdoing and thereby protect the public from future misconduct, either by the same defendant or other potential wrongdoers." *Weeks v. Baker & McKenzie*, 63 Cal. App. 4th 1128, 1155 (1998); *see also Zirpel v. Alki David Prods., Inc.*, 93 Cal. App. 5th 563, 579 (2023) ("California law permits awards of punitive damages 'for the sake of example and by way of punishing the defendant.'"); *Kizer v. Cnty. of San Mateo*, 53 Cal. 3d 139, 147 (1991), *overruled on other grounds by Los Angeles Unified Sch. Dist. v. Superior Ct.*, 14 Cal. 5th 758 (2023) (accord).[19] Moreover, court must give "due consideration" to the importance of the public policy embodied statutory provisions like Section 47.1 as well as "the magnitude of defendant's violation of such policy." *Zhadan v. Downtown Los Angeles Motor Distrib., Inc.*, 100 Cal. App. 3d 821, 835 (1979).

---

[19] For this, the fact that Ms. Lively has the financial wherewithal to defend herself against the Wayfarer Parties' claims does not diminish the policy rationale for imposing punitive damages here. *Cf. In re Marriage of Falcone & Fyke*, 203 Cal. App. 4th 964, 975, 138 Cal. Rptr. 3d 44, 57 (2012) (party's ability to pay costs and fees does not bar an award of such).

California state courts, and New York federal courts applying California law, consistently award punitive damages against parties who maintain baseless litigation positions, including through their attorneys. In *Clark v. Celeb Pub., Inc*., 530 F. Supp. 979, 984 (S.D.N.Y. 1981), the Court entered default judgment in favor of plaintiff, a model and actress, in an action against a pornographic magazine for publishing sexually explicit photographs of plaintiff without her consent. The court awarded plaintiff punitive damages under California Civil Code section 3294, finding that defendant had acted in conscious disregard of plaintiff's rights by (1) refusing to withdraw, and then releasing subsequent, issues of the magazine containing plaintiff's photograph after receiving notice that the photographs were unauthorized; and (2) its attorney refusing to sign a consent order formally enjoining the use of the photographs and requiring their return. *Id*.

Similarly, in *Bertero v. Nat'l Gen. Corp*., 13 Cal. 3d 43, 65–66 (1974), a malicious prosecution case, the Supreme Court of California held that "filing fabricated [cross] claims in order to coerce [the plaintiff] to settle or abandon a legitimate claim" is a "flagrant abuse of the judicial process [and] precisely the type of tortious conduct that an award of exemplary damages is designed to deter." *Id*. In affirming the jury's punitive damages award, the court pointed to evidence that one of the individual defendants (Klein) told the plaintiff he would go "all the way" in disposing of the executive's claims and that counsel for defendants in the prior action "harbored deep feelings against" the executive, which permitted the inference that he, too, failed to act in good faith," including by admitting to "arguing a weak point in his brief '…not because of any high hopes of now winning it, but because I wanted to show the Appellate Court what a bastard [plaintiff] is.'" *Id.* at 54. The court explained that this "want of probable cause was sufficient proof of punitive damages," and those damages were properly awarded against all defendants, regardless of which defendant "controlled the litigation." *Id*. at 67.

Moreover, it is proper to award punitive damages against a litigant for their attorney's conduct when the litigant continues to retain the attorney despite knowledge of their malicious, fraudulent or oppressive conduct. *See Clark Equip. Co. v. Wheat*, 92 Cal. App. 3d 503, 523–24 (1979) (explaining that an attorney's appearance on behalf of a litigant "created a *presumption* that [the attorney] had the authority to do all acts necessary or incidental to the conduct of the case") (emphasis in original); *Liberty Transp., Inc. v. Harry W. Gorst Co.,* 229 Cal. App. 3d 417, 440 (1991) *disapproved on other grounds by Adams v. Murakami*, 54 Cal. 3d 105 (1991) (punitive damages appropriate where defendants ratified their attorney's conduct).

As set forth above, the Wayfarer Parties—with and through their lead attorney, Mr. Freedman—brought and maintained claims that were not based on factual or legal merit, but instead a deliberate plan to discredit Ms. Lively and to harm her and her husband by suing them into "oblivion." They did so despite ample warning of their obligations *not* to retaliate against Ms. Lively, as well as the frivolity of their claims. As if that were not enough, as is already before the Court, the Wayfarer Parties affirmatively elected to maintained their claims despite repeated warnings about the potential consequences of doing so, including through Safe Habor Letters, a Rule 11 Motion, and Ms. Lively's Motion to Dismiss.

Counsel for Ms. Lively has also already presented to the Court the extensive efforts by Mr. Freedman, on behalf of the Wayfarer Parties, to assail Ms. Lively in the press—even after Ms. Lively amended her complaint to add claims related to Mr. Freedman's defamatory statements (ECF No. 84), and as recently as just a few weeks ago— using tactics designed to make his clients appear to be the true victims. (*See* ECF 242-1, pp. 7-8, *Brief* Amicus Curiea *by Equal Rights Advocates, California Employment Lawyers Association, and California Women's Law Center in Support of Defendant Blake Livley's Motion to Dismiss Based on California Assembly Bill 933*

(explaining that "retaliatory lawsuits have become a core part of abusers' playbook to deny the abuse, attack their victims' credibility, and cast themselves as the real 'victim'—a tactic psychologists term 'DARVO' or 'Deny, Attack, Reverse Victim and Offender' and concluding that "[a]ccording to Ms. Lively's description in her amended complaint and motion to dismiss, Mr. Baldoni has used DARVO here: he denied her allegations, attacked her directly, and engaged in an extensive social media and public relations campaign to reverse victim and offender, ***including by filing the present suit together with the other plaintiffs***.") (emphasis added). Once the majority of their claims were dismissed with prejudice, the Wayfarer Parties simply abandoned the rest— all but conceding that the claims were never intended to survive in court. In short, the Wayfarer Parties attempted to sue Ms. Lively "into oblivion," merits be damned, and will not cease their retaliatory conduct unless and until they are called to account for their actions.

This case, in sum, presents a straightforward application of Section 47.1, including its punitive damages provision. Indeed, it is hard to imagine more "despicable conduct" in "conscious disregard" of Ms. Lively's rights than that in which the Wayfarer Parties engaged here.

### c.      The Court Should Set a Schedule for Promptly Quantifying These Monetary Awards.

The Wayfarer Parties' case, which was independently filed and not a cross-complaint, has been dismissed, making Ms. Lively a "prevailing defendant" for purposes of this motion, and rendering her Section 47.1 claims ripe. As such, the Court should set a schedule for promptly quantifying the monetary award to which Ms. Lively is entitled ***well in advance of*** the March 2026 trial on her case, pursuant to Federal Rule of Civil Procedure 54(d)(2)(C). In these circumstances, Rule 54(d) provides the appropriate procedure for deciding questions of liability for harms, including fees, inflicted by the litigation itself. *See* Fed. R. Civ. P. 54(d)(2)(C) (the Court may adjudicate issues of "liability for fees" on the briefs pursuant to Rule 78 or "in accordance with

Rule 43(c)," which in turn provides that "[w]hen a motion relies on facts outside the record, the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions," Fed. R. Civ. P. 43(c)). The Court must then "find the facts and state its conclusions of law as provided in Rule 52(a)." Fed. R. Civ. P. 54(d)(2)(C). Adjudicating these issues separate from, and in advance of, trial on Ms. Lively's case would also further the policy rationales underlying Section 47.1 by making the statute's remedies available to Ms. Lively "***at the earliest stage***" in the litigation. (*See* ECF 241-1, p. 17). (emphasis added). Ms. Lively should not be delayed or required to prevail on the claims in her own case to obtain damages to which she is entitled under Section 47.1 *today*.[20] Moreover, quantifying the Section 47.1 damages now will further serve the statutory purpose and underlying public policy by deter retaliatory litigation conduct that the Wayfarer Parties continue to engage in despite their claims being dismissed with prejudice. Thus, to the extent the Court deems an evidentiary hearing appropriate, it should be prior to, and separate from, the jury trial in Ms. Lively's affirmative case.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Ms. Lively renewed motion for attorneys' fees and costs, treble damages, and punitive damages under Section 47.1 and set schedule for determining any disputed factual issues relating to these damages awards pursuant to Rule 54(d)(2)(C), including the measure of Ms. Lively's harm and the amount of punitive damages that should be imposed against the Wayfarer Parties.

Respectfully submitted,

Dated: September 8, 2025                    /s/ Esra Hudson

---

[20] Further, it would not be appropriate to require Ms. Lively's entitlement to remedies to be tried in conjunction with both liability and damages on her affirmative case, which would substantially risk confusing any jury in her case because Ms. Lively may be forced to present evidence of two different types of retaliation with different available damages at the same time. *See* Fed. R. Evid. 403

Michael J. Gottlieb
Kristin E. Bender
Willkie Farr & Gallagher LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1000
mgottlieb@willkie.com
kbender@willkie.com
mgovernski@willkie.com

Aaron Nathan
Willkie Farr & Gallagher LLP
787 7th Avenue
New York, NY 10019
(212) 728-8000
anathan@willkie.com

Meryl C. Governski (admitted *pro hac vice*)
Dunn Isaacson Rhee LLP
401 Ninth Street, NW
Washington, DC 20004
(202) 240-2900
mgovernski@dirllp.com

Esra A. Hudson (admitted *pro hac vice*)
Stephanie A. Roeser (admitted *pro hac vice*)
Sarah E. Moses (admitted *pro hac vice*)
Manatt, Phelps & Phillips, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
(310) 312-4000
ehudson@manatt.com
sroeser@manatt.com
smoses@manatt.com

Matthew F. Bruno
Manatt, Phelps & Phillips, LLP
7 Times Sq.
New York, NY 10036
(212) 790-4500
mbruno@manatt.com

*Attorneys for Blake Lively*