**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY,<br><br>     Plaintiff,<br><br>  v.<br><br>WAYFARER STUDIOS LLC, et al.,<br><br>     Defendants. | Civ. Action No. 1:24-cv-10049-LJL<br>(Consolidated for pretrial purposes with<br>1:25-cv-00449-LJL)<br><br>rel. 1:25-cv-00449-LJL<br><br><br>**THIRD-PARTY DEFENDANT**<br>**JONESWORKS LLC'S**<br>**MEMORANDUM OF LAW IN**<br>**SUPPORT OF ITS MOTION FOR**<br>**SPOLIATION SANCTIONS** |
| JENNIFER ABEL,<br><br>     Third-Party Plaintiff,<br><br>  v.<br><br>JONESWORKS LLC,<br><br>     Third-Party Defendant. | |
| WAYFARER STUDIOS LLC, et al.,<br><br>     Plaintiffs,<br><br>  v.<br><br>BLAKE LIVELY, et al.,<br><br>     Defendants. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ ii

TABLE OF AUTHORITIES ....................................................................................................... iii

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ........................................................................................................................... 4

    I.    Abel Used Signal To Participate In A Retaliatory Smear Campaign Against Blake Lively Behind Jones's Back ........................................................................................................... 4

    II.    Abel Violates Her Agreement To Produce Signal Messages ............................................... 9

ARGUMENT ............................................................................................................................... 10

    I.    Abel Had A Duty To Preserve Signal Communications ................................................... 12

    II.    Abel Intentionally Destroyed Signal Communications ..................................................... 13

    III.    Jonesworks Is Severely Prejudiced By Abel's Destruction Of Relevant Signal Communications ............................................................................................................... 15

    IV.    Adverse Inference and Preclusion and Money Sanctions Are Warranted Here ............ 17

CONCLUSION ............................................................................................................................ 19

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Allied Property v. Zenith Aviation, Inc.*,
  2019 WL 10960568 (E.D. Va. Feb. 8, 2019) ........................................................................22

*Apple Inc. v. Samsung Electronics Co.*,
  881 F. Supp. 2d 1132 (N.D. Cal. 2012) ...............................................................................18

*Arista Records LLC v. Usenet.com*,
  608 F. Supp. 2d 409 (S.D.N.Y. 2009) ..................................................................................20

*Barbera v. Grailed, LLC*,
  2025 WL 2098635 (S.D.N.Y. July 25, 2025) .............................................................. 15, 16, 23

*ELG Utica Alloys, Inc. v. Niagara Mohawk Power Corp.*,
  144 F.4th 360 (2d Cir. 2025) ..........................................................................................15, 16

*F.T.C. v. Noland*,
  2021 WL 3857413 (D. Ariz. Aug. 30, 2021)........................................................................18, 19

*Fashion Exchange LLC v. Hybrid Promotions, LLC*,
  2021 WL 1172265 (S.D.N.Y. Mar. 29, 2021) ........................................................................21

*Glaukos Corp. v. Ivantis, Inc.*,
  2020 WL 5914552 (C.D. Cal. July 30, 2020) ........................................................................22

*In re Google Play Store Antitrust Litig.*,
  664 F. Supp. 3d 981 (N.D. Cal. 2023) .............................................................................21, 23

*Herzig v. Ark. Foundation for Med. Care, Inc.*,
  2019 WL 2870106 (W.D. Ark. July 3, 2019) .....................................................................18, 19

*Karsch v. Blink Health Ltd.*,
  2019 WL 2708125 (S.D.N.Y. June 20, 2019) ....................................................................17, 21

*Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*,
  880 F.3d 620 (2d Cir. 2018) .............................................................................................16

*Kronisch v. United States*,
  150 F.3d 112 (2d Cir. 1998) .............................................................................................16

*Leidig v. Buzzfeed, Inc.*,
  2017 WL 6512353 (S.D.N.Y. Dec. 19, 2017) ...................................................................17, 23

*Lokai Holdings LLC v. Twin Tiger USA LLC*,
    2018 WL 1512055 (S.D.N.Y. Mar. 12, 2018) ...........................................................................21

*Moody v. CSX Transp., Inc.*,
    271 F. Supp. 3d 410 (W.D.N.Y. 2017) ...................................................................................19

*Ottoson v. SMBC Leasing and Finance, Inc.*,
    268 F. Supp. 3d 570 (S.D.N.Y. 2017) ................................................................... 16, 19, 22

*R.F.M.A.S., Inc. v. So*,
    271 F.R.D. 13 (S.D.N.Y.) ..................................................................................................17, 22

*Sekisui Am. Corp. v. Hart*,
    945 F. Supp. 2d 494 (S.D.N.Y. 2013) .................................................................................19, 20

*Skyline Steel, LLC v. PilePro, LLC*,
    101 F. Supp. 3d 394 (S.D.N.Y. 2015) .................................................................................16, 17

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*,
    328 F.R.D. 100 (S.D.N.Y. 2018) .............................................................................................23

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
    269 F.R.D. 497 (D. Md. 2010) ................................................................................................21

*West v. Goodyear Tire & Rubber Co.*,
    167 F.3d 776 (2d Cir. 1999) ....................................................................................................15

## **Rules**

Fed. R. Civ. P. 37(e) .................................................................. 7, 15, 16, 19, 21, 22, 23

Third-Party Defendant Jonesworks LLC ("Jonesworks") respectfully submits this memorandum of law in support of its motion for spoliation sanctions pursuant to Federal Rule of Civil Procedure ("Rule") 37(e) against Third-Party Plaintiff Jennifer Abel ("Abel").

## INTRODUCTION

This motion arises from Abel's deliberate use of an auto-deleting messaging platform to conceal her role in a retaliatory smear campaign and to destroy critical evidence after litigation was plainly foreseeable. In mid-2024, Abel, then a publicist at Jonesworks, joined forces with Wayfarer Studios LLC ("Wayfarer"), Justin Baldoni, Jamey Heath, Steve Sarowitz, Melissa Nathan, The Agency Group PR LLC ("TAG"), Jed Wallace, and Street Relations, Inc. (collectively, the "Defendants") to execute a covert digital campaign design to discredit Blake Lively in anticipation of legal claims arising from misconduct on the set of *It Ends With Us*. They coordinated that campaign primarily through Signal, an encrypted messaging application the very purpose of which is to ensure that messages disappear without a trace. They did so deliberately in order to cover their tracks, and indeed had a habit of turning to Signal—as opposed to regular text messaging—when embarking on a project they wanted to be "untraceable." Abel admits she knew that Signal messages auto-delete, and there is no evidence she took any steps to disable that function or preserve any of the Signal communications relevant to this action until more than four months after she anticipated litigation.

The record makes clear why the Defendants turned to Signal. In July 2024, Abel referred Nathan and TAG to Wayfarer in the face of anticipated allegations of a rift with Lively and the rest of the film cast. Within days, Nathan and Abel teamed with Wallace and his firm, Street Relations, to influence forums working against Baldoni and Wayfarer and to turn public sentiment against Lively. By early August 2024, litigation was not only foreseeable—it was actively

contemplated.  Notably, Abel chose both Nathan and TAG  for Wayfarer and Baldoni (who were then Jonesworks' clients) over the express objections of Jonesworks' founder and Abel's boss, Stephanie Jones.   And Wayfarer and Baldoni, in turn, hired Nathan and TAG over Jones's objections and against her advice.

From that point forward, the Defendants operated on Signal.  They used the application to coordinate the retaliatory digital campaign, communicate with journalists, and align with legal counsel on the narrative they would present to the press.  The deposition testimony and preserved documentary record are consistent that Jones was intentionally excluded from those discussions.  Yet when discovery arrived, the contemporaneous Signal messages that would have proven Abel's independent role in this clandestine campaign behind her employer's back had conveniently disappeared.

The reason is simple:  they were deleted.  Despite agreeing in August 2025 to search and produce her Signal communications, Abel's production contained none from the relevant period.  Her counsel later admitted they did not search Signal, as agreed.  Only after repeated conferrals and court intervention requiring the Wayfarer Parties[1] to produce Signals in this matter did she belatedly produce four trivial message threads from December 20 to 23, 2024—months after the retaliation campaign began and none containing substantive discussions of the smear effort.  And it is undisputed that Abel cannot recover any deleted Signal messages.  Abel herself acknowledges she knew Signal messages auto-deleted, and there is no evidence she did anything to preserve them.

This is precisely the misconduct Rule 37(e) was designed to address.  By at least August 2024, Abel was under a clear duty to preserve her communications: she admittedly contemplated

---

[1]  The Wayfarer Parties are Wayfarer, Baldoni, Heath, Sarowitz, Abel, and Nathan.

litigation ████████, wanted Baldoni to hire a litigator, was connected to litigation counsel on behalf of the Wayfarer Parties, and was helping direct a public campaign targeting Lively. Despite all this, however, rather than preserve evidence (as was her clear obligation), she used an ephemeral messaging platform to ensure the opposite—that communications would disappear. Her production of virtually no Signal messages in discovery confirms her flagrant disregard of her obligations. The destruction of those messages deprives Jonesworks of the very evidence that would have shown what every witness has already made plain—that Jones was never involved in the retaliatory campaign and that Abel conducted it with others behind Jones's back and without her approval, well outside the parameters of Abel's scope of employment.

Jonesworks therefore requests the Court impose sanctions under Rule 37(e), including at minimum: (1) an adverse inference that the destroyed Signal messages would have been favorable to Jonesworks and demonstrated that the Defendants, including Abel, conducted the smear campaign without Jones's or Jonesworks' knowledge, involvement, or approval, and that Abel's participation in that campaign for the few weeks that she remained a Jonesworks employee before her termination (a) was for her own personal benefit, (b) was not in furtherance of and was outside the course and scope of her employment, and not in discharge of her duties and (c) was not at Jones's or Jonesworks' direction; (2) preclusion of Abel from arguing otherwise; and (3) monetary sanctions for the costs and prejudice caused by her spoliation.

## BACKGROUND

I.   **Abel Used Signal To Participate In A Retaliatory Smear Campaign Against Blake Lively Behind Jones's Back**

On November 9, 2023, before resuming production on the film *It Ends With Us*, counsel for Lively sent Wayfarer a document entitled "Protections for Return to Production" to ensure that Lively and other case members felt "safe" on set and warning that "[i]f the production is unwilling to accept or uphold these protections, [Lively] is prepared to pursue her full legal rights and remedies." Ex. 1.[2] Baldoni and Heath understood ███████████████████████████ ████████████████████████████████████████████████████. Ex. 2 at 2. They later informed ███████████████████████████████████████████ ██████████████████████████████████. Ex. 3, Sept. 26, 2025 Deposition of Jennifer Abel ("9/26/25 Abel Dep. Tr.") at 209:12–210:19 (Abel's confirming ████████ ████████████████████).

As the film's release date neared, the Wayfarer Parties began taking additional measures in anticipation of potential litigation stemming from Lively's experiences on set.  By at least ████ ████████████████████████████████████████████████████████████ (which he later provided to TAG for their crisis work), Ex. 4 at 2.  Within a matter of weeks, anticipating that their misconduct would become public, the Wayfarer Parties sought to engage crisis PR.  On July 25, 2024, Abel referred Melissa Nathan and her agency The Agency Group PR ("TAG") to the Wayfarer Parties.  Ex. 6 at 2 ("████████████████████████████████ ████████████████████████████████████"); Ex. 7 at 2–3 (Nathan's stating she ████████████████████████████████████████████).

---

[2]   All citations to "Ex." are to exhibits attached to the accompanying declaration of Kristin Tahler.

Abel recommended Melissa Nathan to work with Wayfarer over Jones's express directions, and convinced Wayfarer and Baldoni to hire Nathan over Jones's repeated objections and against her advice. Ex. 9, Oct. 6, 2025 Deposition of Justin Baldoni ("10/6/25 Baldoni Dep. Tr.") at 137:18–21, 140:1–4, 147:3–148:3 (admitting ███████████████████████████████████ ███████████████████████████████████). Indeed, Jones recommended Wayfarer hire other crisis PR firms, and cautioned Wayfarer repeatedly not to hire Nathan because ███████████████████████. Exs. 12, 13. Jones also tried to warn Wayfarer that Baldoni's image would suffer by association with a publicist like Nathan, and Abel was well aware of Jones's misgivings about Nathan but recommended her behind Jones's back nonetheless. Ex. 12 (Jones's warning ███████████████████████████████████ ███████████████████████████). Against Jones's warnings, Abel and Wayfarer onboarded Nathan and TAG to control the narrative around the film and "[p]rotect the reputation of Justin Baldoni, Jamey Heath, and Wayfarer Studios" against Lively's anticipated allegations. Ex 15 at 3; *see also* Exs. 16, 17; Ex. 11, Oct. 9, 2025 Deposition of Jamey Heath ("10/9/25 Heath Dep. Tr.") at 166:8–168:21; Ex. 18, September 25, 2025 Deposition of Jennifer Abel ("9/25/25 Abel Dep. Tr.") at 146:21–23.

The Wayfarer Parties understood from the outset that TAG would be working "alongside" Abel directly—not with Jones or Jonesworks—on this assignment. *E.g.*, Ex. 15 at 3–4, (August 2 scenario planning document specifying TAG would work "alongside Jen Abel and her team"). TAG knew and understood that Abel would soon be leaving Jonesworks to start a competing PR agency, RWA Communications LLC ("RWA"), and planned to continue working directly with Abel on the Baldoni-Wayfarer assignment after her departure. *E.g.*, Ex. 19 (Abel's instructing ██████████████████████████████); Ex. 6 at 6 ("████████████

5

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████"); Ex. 20 at

3 (Case and Koslow discussing ████████████████████████████████

████); Ex. 21 at 4 ("███████████████████████████████████");  Ex. 9,

10/6/25 Baldoni Dep. Tr. at 226:14–18 (confirming he ████████████████).

      Soon after, at TAG's recommendation and without Jones's knowledge, Wayfarer teamed

with Jed Wallace and his company Street Relations to, among other things, "directly influenc[e]

forums that are working against Justin Baldoni and Wayfarer Studios to adjust the narrative in real

time" and "expose behavior of Blake"—"all without fingerprints."  Ex. 22; *see also* Ex. 23, Ex. 35

Oct. 9, 2025 Deposition of Jed Wallace ("10/9/25 Wallace Dep. Tr.") at 197:20–198:1 (stating that

█████████████████████████████████████████).

      That is exactly what they did—all without Jones's knowledge or involvement.  There is no

dispute (and the Defendants have admitted) that Jones had no knowledge about, and indeed was

excluded from, Defendants' digital campaign against Lively.[3]  Ex. 11, 10/9/25 Heath Dep. Tr.

229:11–14 ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████); Ex. 24, October 10, 2025 Deposition of Jed Wallace ("10/10/25 Wallace Dep. Tr.")

---

[3]  Instead, Abel, who planned to leave Jonesworks to start a competing agency, and Nathan, who had previous deep animosity toward Jones and had recently started a competing agency of her own, worked to ice Jones out of the Baldoni and Wayfarer account.  Ex. 26 at 6 (Nathan telling Abel "to take this f[***]ing client and never talk to [Jones] again"); Ex. 27 at 4 ("once you are gone – we will be on accounts together and make really good money and be happy").  They succeeded.  After Wayfarer was told—falsely and without any due diligence—that Jones had spoken to reporters about *It Ends With Us* on August 8, Heath told Jones to ████████████ and indicated his intent to rely solely on Abel, making Jones's exclusion on the account official.  *See* Ex. 28 (Heath's confirming ████████████████████████████).

at 118:3–119:8 (testifying ████████████████████████████████████████

███████████████).

      The Wayfarer Parties knew litigation was imminent when they retained TAG and Wallace. Indeed, TAG's initial scenario planning document dated August 2, 2024, contemplated "[w]orking with legal" to "to ensure our narrative is properly represented in any and all coverage."  Ex. 15. And by August 12, 2024, Nathan and Abel were discussing ████████████████████

██████ with Abel stating he ██████████████ Ex. 29 at 4–5.  Attorney Bryan Freedman was

████████████ *id.* at 5, and Nathan arranged for ████████████████████ Ex. 30 at

7–8.  Abel, and the other Defendants, admit they "█████████████████████████████████

████████████████████████████." Ex. 31 at No. 23.

      Meanwhile, Abel and the other Defendants began orchestrating their campaign against Lively on Signal, an ephemeral messaging application with an auto-deletion function.  As early as August 7, 2024, Nathan and her employees were ██████████████████████████████████

██████████████████████████████████ Ex. 32 at 7 ("██████████████████████████████

████████████████████████████████████").  On August 12, 2024,  Nathan

started ████████████████████████████████████████████████████████████████

██████████████████████████████████████████ and  instructed  Abel  to

██████████████████████████████████ Ex. 29 at 5–6.  While Abel now claims ████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

█████████████████████. Ex. 3, 9/26/25 Abel Dep. Tr. at 250:17–252:2.

It is undisputed that the Defendants used Signal during this period to discuss the work TAG and Wallace were performing for Wayfarer.[4]  ECF No. 711 at 12 ("It is undisputed that the Wayfarer Parties used Signal to discuss topics relevant to this litigation."); *see also* Ex. 33, Oct. 8, 2025 Deposition of Jamey Heath ("10/8/25 Heath Dep. Tr.") at 359:15–24, 364:2–7 (confirming ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████); Ex. 34, Sept. 29, 2025 Deposition of Melissa Nathan ("9/29/25 Nathan Dep. Tr.") at 49:11–16 (confirming █████████████████ ████████████).

Abel and the other Defendants continued to use Signal in support of their smear campaign. Ex. 18, 9/25/25 Abel Dep. Tr. at 77:19–22 (Abel's admitting she ████████████████████ ███████████████████████).  Evidence only recently produced reveals that, soon after Lively initiated this action, Abel, along with Freedman and others, were actively directing social-media messaging intended to promote Baldoni and disparage Lively.  By January 3, 2025, for example, Abel ███████████████████████████████████████████████████████████████ █████████████████████████████.  Ex. 36.  Abel then ███████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ on Tik Tok

---

[4]    The Defendants did not just use Signal, they moved discussions to Signal to conceal them.  *Compare* Ex. 38 (███████████████████████████████████), *with* Ex. 32 at 7 (████████ ██████████████████).  Indeed, discovery has revealed that TAG and Wallace typically communicate using Signal and voice notes to keep information private, including for their practice of █████████████████████████████.  *E.g.*, Ex. 39 at 4 (Wallace's requesting ███████████████ ████████████; Ex. 40, Sept. 5, 2025 Deposition of Katie Case ("Case Dep. Tr.") at 163:18–20 (testifying she ████████████████████████████████████████); *id.* at 383:6–387:19 (testifying she drafted tweets related to the Stephanie Jones Leaks website and ███████████████ ████████████████████████████); Ex. 41 at 1–2; Ex. 42 (Wallace's ███████████████████ ████████████ for ██████████████).

[5]    Abel did not produce ████████████████████.

that has been viewed more than 1.5 million times.  Ex. 37; @officialsagesteele, TikTok (Jan. 7,

2025), https://www.tiktok.com/@officialsagesteele/video/7457284296856866091.

## II.    Abel Violates Her Agreement To Produce Signal Messages

Abel filed a third-party complaint for indemnification against Jonesworks on March 20,

2025.  ECF No. 154.  On July 16, 2025, Jonesworks served requests for the production of

documents on Abel in this action.  On August 11, and August 15, 2025, following conferrals and

in advance of this Court's motion to compel deadlines, Abel and the other Jones Defendants[6]

agreed to run specific search terms across specified custodians and repositories, including Signal.

Exs. 10, 14.  The ESI Protocol governing discovery in this action separately requires a manual

review of Signal messages.  ECF No. 212 at 7.

Abel subsequently agreed she would produce documents responsive to the August 11 and

August 15 agreements by August 27. Ex. 5.  The resulting production, however, violated the

parties' agreement and was facially deficient in several respects, such as lacking specific

documents Abel agreed to search for and produce and including *zero* Signal messages.[7]  Exs. 8,

25.

During a subsequent conferral, Abel's counsel admitted they had not searched Signal

messages in advance of their production, claiming they were unable to run the agreed-upon search

terms on Signal.  Ex. 8.  Counsel refused to disclose when they learned they could not satisfy that

aspect of the parties' agreement, including whether they knew about this issue at the time the

agreements were made.  *Id.*  Abel did not produce any Signal messages in response to Jonesworks'

---

[6]  The Jones Defendants are Abel, Nathan, Baldoni, and Wayfarer.

[7]  The productions of the Jones Defendants in the related *Jones v. Abel* action, Case No.
25-cv-00779, are equally deficient and gravely prejudicing the Jones Parties' ability to properly
litigate that matter.  The Jones Parties will seek appropriate relief separately in that matter.

requests until September 12—after multiple depositions had already occurred—and even then produced only *four* messaging threads, ***none*** of which were dated earlier than December 20, 2024. Each produced Signal message contained only conversations with Nathan between December 20 and December 23 concerning the *New York Times* article and related press coverage.

Abel and the Defendants similarly violated their discovery obligations with respect to Lively's document requests. This Court ordered that Abel and the Wayfarer Parties produce all Signal communications by September 8, 2025. ECF No. 711 at 16. They did not. The Wayfarer Parties' resulting delinquent production similarly failed to include any Signal messages dated prior to December 20, 2024. And none of those messages contained any substantive discussion of the allegations or the retaliatory campaign. Even worse, Abel's Signal productions fail to include Signal communications Jonesworks knows exist because of third-party productions from Skyline Agency, LLC, or any ███████████████████████████████████████. At her deposition, Abel was instructed not to answer ███████████████████████████ ████████ and was unable to say whether █████████████████████████████████████ ██████. Ex. 3, 9/26/25 Abel Dep. Tr. at 322:21–323:16, 326:1–12.

## ARGUMENT

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *ELG Utica Alloys, Inc. v. Niagara Mohawk Power Corp.*, 144 F.4th 360, 374 (2d Cir. 2025) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). Rule 37(e) governs the spoliation of electronically stored information ("ESI"), in particular, and allows a District Court to issue sanctions "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. Pro. 37(e); *Barbera v.*

*Grailed, LLC*, 2025 WL 2098635, at *7–8, *11 (S.D.N.Y. July 25, 2025) (Liman, J.) (granting spoliation sanctions under Rule 37(e).  In particular, where a spoliating "party acted with the intent to deprive another party of the information's use in litigation," the District Court may "presume that the lost information was unfavorable to the party" or "instruct the jury that it may or must presume the information was unfavorable to the party." Fed. R. Civ. P. 37(e)(2).

"A party seeking sanctions based on spoliation must establish by a preponderance of evidence: '(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *ELG Utica Alloys*, 144 F.4th at 374 (quoting *Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018)); *accord Ottoson v. SMBC Leasing and Finance, Inc.*, 268 F. Supp. 3d 570, 580 (S.D.N.Y. 2017).

Rule 37(e) sanctions are "entrusted to the court's discretion," *Barbera, LLC*, 2025 WL 2098635, at *8, and "should be designed to deter parties from engaging in spoliation, place the risk of an erroneous judgment on a party who wrongfully created the risk, and restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party," *Ottoson*, 268 F. Supp. 3d at 580.

I.     **Abel Had A Duty To Preserve Signal Communications**

The "obligation to preserve evidence arises when [a] party has notice that the evidence is relevant to litigation" or "when a party should have known that the evidence may be relevant to future litigation." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998); *see also Skyline Steel, LLC v. PilePro, LLC*, 101 F. Supp. 3d 394, 407–08, 412 (S.D.N.Y. 2015) (issuing spoliation sanctions).   This "preservation obligation requires a litigant to do more than refrain from intentionally destroying relevant evidence; the litigant must also 'take affirmative steps to prevent inadvertent spoliation.'" *Skyline Steel*, 101 F. Supp. 3d at 408 (quoting *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 24 (S.D.N.Y.), *opinion adopted*, 271 F.R.D. 55 (S.D.N.Y. 2010)).

When Abel downloaded Signal for this matter in August 2024 she was on notice of potential litigation relating to the film and to Baldoni's and Heath's harassment of Lively on set. Indeed, ███████████████████████████████████████████, which warned Baldoni and Heath that "[i]f the production is unwilling to accept or uphold these protections, **our client is prepared to pursue her full legal rights and remedies**."   Ex. 1 (emphasis added); *see Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *18 (S.D.N.Y. June 20, 2019) ("duty to preserve the ESI … was triggered 'no later than June 16, 2015,' when … a demand letter [was sent] ... threatening legal action") (collecting cases); *see also Leidig v. Buzzfeed, Inc.*, 2017 WL 6512353, at *8 (S.D.N.Y. Dec. 19, 2017) (demand letter triggered duty to preserve).

If that were not enough, by July 25, 2024, Abel had recommended Wayfarer hire TAG, which Abel knew no later than August 2, 2024, planned to "[w]ork[] with legal" to "provide information to ensure [their] narrative is properly represented in any and all coverage."  Ex. 15 at 3.  And by August 12, 2024, Nathan and Abel were discussing ██████████████████ ██████████  with Abel stating he ████████████  Ex. 29 at 4–5. Nathan ██████████

███████████████████████. Ex. 30 at 7–8.  And Abel now admits she "████████████████████

███████████████████████████████████████████████████████." Ex. 31 at No. 23

(emphasis added).

Thus, once Abel started to use Signal for this matter in August 2024, there can be no serious

doubt she was on actual notice that litigation was reasonably foreseeable and was therefore under

a clear and continuing duty to preserve all relevant communications in her possession.  *See Skyline*

*Steel*, 101 F. Supp. 3d at 409 (S.D.N.Y. 2015) (finding it was clear evidence "would be relevant

as early as November 20, 2013, when Skyline sent PilePro a letter referencing the instant lawsuit"

and "there can be no question that PilePro 'should have known that the evidence may [have been]

relevant to future litigation' at that time."); *see also, e.g.*, *Apple Inc. v. Samsung Electronics Co.*,

881 F. Supp. 2d 1132, 1144–47 (N.D. Cal. 2012) (preservation obligations arose when plaintiff

informed the defendant of infringement, not when the plaintiff filed suit; defendant failed to

comply with those obligations when it failed to suspend auto-delete policy).

## II.    Abel Intentionally Destroyed Signal Communications

There can be equally little dispute that Abel failed to take reasonable measures to preserve

her Signal communications.  To the contrary, in August 2024, Abel and the other Defendants chose

to communicate about the digital campaign through Signal ***because*** they were automatically

deleting.  Ex. 34, 9/29/25 Nathan Dep. Tr. at 49:17–50:1 (testifying ████████████████████

████████████████████████████████████████████████████); Ex. 3, 9/26/25 Abel Dep. Tr. at

300:13–17 ("████████████████████████████████████████████████████████████████

████████████████████████████").  Abel has admitted that ████████████████████████

██████████████████████████████████████████████████████████ *F.T.C. v.*

*Noland*, 2021 WL 3857413, at *2–3, 10–15 (D. Ariz. Aug. 30, 2021) (awarding adverse inference

where defendants began using Signal for "anything sensitive" or "important things," after learning of FTC investigation); *Herzig v. Ark. Foundation for Med. Care, Inc.*, 2019 WL 2870106, at *4–5 (W.D. Ark. July 3, 2019) (adverse inference based on defendants' installation of Signal app during pendency of litigation). Ex. 3, 9/26/25 Abel Dep. Tr. at 251:2–16. And there is no evidence Abel took any measures to disable the auto-deletion function or otherwise preserve her messages until December 20, 2024. Abel's failure is even worse here because she, with knowledge litigation was foreseeable, "had full knowledge of the possibility of future litigation" for indemnification given she is the plaintiff for those claims. *Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 507 (S.D.N.Y. 2013) (finding failure to preserve relevant evidence "inexcusable given that Sekisui is the plaintiff in this action and, as such, had full knowledge of the possibility of future litigation.").

Abel's intentional use of Signal and failure to disable auto-delete suffices to infer intent to spoliate. *See Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 431 (W.D.N.Y. 2017) (inferring intent where defendants knew "they had a duty to preserve" and "allowed the original data on the event recorder to be overwritten, and destroyed or recycled ... without ever confirming that the data had been preserved in another repository"); *Ottoson*, 268 F. Supp. 3d at 582 (collecting cases) (intent for Rule 37(e) "satisfie[d]" where "(1) Plaintiff communicated with Mr. Berger via email … ; (2) Plaintiff failed to take any reasonable steps to preserve these communications … ; and/or (3) Plaintiff failed to produce these communications in violation of her discovery obligations."). Indeed, at least other two district courts have found that a defendant's use of Signal as a means to avoid discoverable information to demonstrate intent under Rule 37(e)(2). *See Herzig*, 2019 WL 2870106, at *5 (Defendants' "manually configuring Signal to delete text communications … was intentional and done in bad faith"); *Noland*, 2021 WL 3857413, at *12–13 (intent to deprive met

where defendants downloaded Signal upon discovering FTC investigation and deleted the application before imaging their devices). The same result should follow here.

## III. Jonesworks Is Severely Prejudiced By Abel's Destruction Of Relevant Signal Communications

"Relevance and prejudice may be presumed when" as here, "the spoliating party acted in bad faith or in a grossly negligent manner." *Ottoson*, 268 F. Supp. 3d at 581 (quoting *Pension Comm.*, 685 F. Supp. 2d at 467); *see also Sekisui*, 945 F. Supp. 2d at 508 ("When evidence is destroyed intentionally, such destruction is sufficient evidence from which to conclude that the missing evidence was unfavorable to that party."); *Arista Records LLC v. Usenet.com*, 608 F. Supp. 2d 409, 439 (S.D.N.Y. 2009) ("When evidence is destroyed in bad faith, that alone is sufficient to support an inference that the missing evidence would have been favorable to the party seeking sanctions, and thus relevant."). That is so because "once willfulness is established, no burden is imposed on the innocent party to point to now-destroyed evidence which is no longer available *because the other party destroyed it.* Rather, the 'risk that the evidence would have been detrimental rather than favorable [to the spoliator] should fall on the party responsible for its loss.'" *Sekisui*, 945 F. Supp. 2d at 508–09 (emphasis in original).

Even if that were not so, relevance and prejudice are easily satisfied here. As this Court has recognized, Abel's indemnification claims turn on whether she "conducted the actions at issue in the Lively Complaint in the course of her employment at Jonesworks and at the direction of Jonesworks," "was not negligent or responsible in any part," and acted with "wholly personal motives nor in a way unforeseeable to Jonesworks." ECF No. 852 at 24, 27. Abel alleges that, to the extent she participated in any campaign against Lively, it was at "Jonesworks' direction." *Id.* at 26–27. Abel's Signal messages at that time—which would confirm Jones's exclusion and that Abel's participation in the retaliation campaign was without Jones's knowledge and against her

15

recommendations—bear directly on the factual questions this Court identified as dispositive: whether Abel's conduct was performed at Jonesworks' direction or instead for her own purposes.

Indeed, the deposition testimony and preserved documentary record are uniform that Jones had no involvement in the digital campaign and, in fact, was deliberately excluded from it. Ex. 11, 10/9/25 Heath Dep. Tr. at 229:11–14 (" ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████ "); Ex. 40, Case Dep. Tr. at 408:12–14 (████████████ ████████████████████████████); Ex. 24, 10/10/25 Wallace Dep. Tr. at 118:3–119:8 (testifying ██████████████████████████████████████).

There is no question that Abel's Signal messages with the other Defendants during this period would have shown that Abel's participation in the digital campaign was not at Jones's direction and that Jones was not involved. This, too, can be inferred from Abel's recommendation (and Wayfarer's hiring) of Nathan to spearhead this covert campaign over Jones's express objections, and exclusion of Jones from that process and from the subsequent work that followed. And Abel's destruction of that evidence "has limited the universe of documents available for [Jonesworks] to use in this litigation" to Jonesworks' detriment. *Lokai Holdings LLC v. Twin Tiger USA LLC*, 2018 WL 1512055, at *12 (S.D.N.Y. Mar. 12, 2018); *see also In re Google Play Store Antitrust Litig.*, 664 F. Supp. 3d 981, 994 (N.D. Cal. 2023) (prejudice where "substantive business communications were made on Chat that plaintiffs will never see, to the potential detriment of their case"); *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 532 (D. Md. 2010) ("Generally, courts find prejudice where a party's ability to present its case or to defend is compromised.").

16

Jonesworks is further prejudiced by the time and expense required to address Abel's discovery deficiencies, including the unnecessary hours spent identifying her deficiencies, attempting to resolve them, and ultimately filing this motion. *See Karsch*, 2019 WL 2708125, at *25 (party suffered 'economic prejudice' in the form of attorneys' fees and other expenses they have incurred in discovering and proving the disappearance of" evidence); *Fashion Exchange LLC v. Hybrid Promotions, LLC*, 2021 WL 1172265, at *5 (S.D.N.Y. Mar. 29, 2021) ("Courts have recognized that discovery misconduct that causes a party to incur additional expenses is a form of prejudice that supports an award of sanctions pursuant to Rule 37(e).").

## IV.    Adverse Inference and Preclusion and Money Sanctions Are Warranted Here

"[H]ow severe a sanction is warranted will depend on the extent of the discovered party's non-compliance with discovery obligations, the degree of that party's culpability, and the extent to which the non-compliance prejudiced the other parties." *R.F.M.A.S.*, 271 F.R.D. at 24–25. Abel's willful use of an ephemeral messaging platform to avoid the production of relevant communications, and the prejudice caused to Jonesworks as a result, warrants adverse inference, preclusion, and money sanctions.

"When, as here, a spoliating party has acted willfully or in bad faith, a jury can be instructed that 'certain facts are deemed admitted and must be accepted as true.'" *Ottoson*, 268 F. Supp. 3d at 584 (citation omitted). Accordingly, to remedy the prejudice caused by the spoliated evidence, the Court should instruct any factfinder to infer that Abel intentionally deleted and failed to preserve relevant evidence for this litigation and that this deleted evidence would have been favorable to Jonesworks—specifically, that these deleted messages would have shown that Abel's participation in the retaliatory smear campaign for the few weeks that she remained a Jonesworks' employee before her termination was not in furtherance of and was outside the scope of her

17

employment, was not at Jones's or Jonesworks' direction, and was for Abel's own benefit. *E.g.*, *Glaukos Corp. v. Ivantis, Inc.*, 2020 WL 5914552, at *1 (C.D. Cal. July 30, 2020) (adverse inference under Rule 37(e)(2) based upon the defendant's failure to "suspend its automatic email deletion policy even when litigation was reasonably foreseeable."); *Allied Property v. Zenith Aviation, Inc.*, 2019 WL 10960568, at *3-4 (E.D. Va. Feb. 8, 2019) (adverse inference based on plaintiff's failure to suspend email autodeletion policy).[8]  Additionally, the Court should preclude Abel from arguing that she did not engage in a retaliatory smear campaign, that she did so for anything other than her own benefit and that she did so at Jones's or Jonesworks' direction or with their knowledge or involvement, and that Abel's involvement was in furtherance of her scope of employment or within the scope of her employment.  *See Barbera*, 2025 WL 2098635, at *11 (issuing preclusion sanctions).

Finally, money sanctions, including cost spent to litigate discovery deficiencies and this motion, should issue.  *See In re Google*, 664 F.Supp.3d at 991–95 (issuing monetary sanctions for failure to suspend its auto-deletion function for chat messages); *see also Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, 328 F.R.D. 100, 123–25 (S.D.N.Y. 2018).

---

[8]  In the alternative, the Court should permit Jonesworks to present evidence and argument to the jury regarding the deleted Signal messages and allow a jury instruction to assist the jury's evaluation of that evidence.  *See Barbera*, 2025 WL 2098635, at *11; *see also Leidig*, 2017 WL 6512353, at *14 (permitting evidence to the jury of plaintiffs' spoliation).

18

## **CONCLUSION**

For all these reasons, the Court should impose spoliation sanctions under Rule 37(e), including at minimum (1) an adverse inference that the destroyed Signal messages would have been favorable to Jonesworks and unfavorable to Abel and demonstrated that the Defendants, including Abel, conducted the smear campaign without Jones's or Jonesworks' knowledge, involvement, or approval, and that Abel's participation in that campaign while a Jonesworks employee (a) was for her own personal benefit, (b) was not in furtherance of and was outside the course and scope of her employment, and not in discharge of her duties and (c) was not at Jones's or Jonesworks' direction; (2) preclusion of Abel from arguing otherwise; (3) monetary sanctions for the costs and prejudice caused by her spoliation; and (4) any other relief the Court deems proper.

Dated: October 22, 2025                            Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By :  */s/ Kristin Tahler*
　　　Kristin Tahler
　　　865 S. Figueroa Street, 10th Floor
　　　Los Angeles, California 90017
　　　(213) 443-3000
　　　kristintahler@quinnemanuel.com

　　　Maaren A. Shah
　　　Morgan L. Anastasio
　　　295 5th Avenue
　　　New York, New York 10016
　　　(212) 849-7000
　　　maarenshah@quinnemanuel.com
　　　morgananastasio@quinnemanuel.com

　　　Nicholas Inns (*pro hac vice*)
　　　1300 I Street NW
　　　Suite 900
　　　Washington, D.C. 20005
　　　(202) 538-8000
　　　nicholasinns@quinnemanuel.com

　　　*Attorneys for Third-Party Defendant Jonesworks, LLC*

## CERTIFICATE OF WORD COUNT COMPLIANCE

I, Kristin Tahler, an attorney duly admitted to practice before this Court, hereby certifies pursuant to Local Civil Rule 7.1(c) that this Memorandum of Law was prepared using Microsoft Word, and the document contains 5,913 words as calculated by the application's word-counting function, excluding the parts of the Memorandum exempted by Local Civil Rule 7.1(c).

I certify under the penalty of perjury the forgoing statements are true and correct. Executed on this 22nd day of October, 2025 in Los Angeles, California.

*/s/ Kristin Tahler*
Kristin Tahler