# EXHIBIT 3

CONFIDENTIAL

Page 1

1                    UNITED STATES DISTRICT COURT
2            FOR THE SOUTHERN DISTRICT OF NEW YORK
3                         ---oOo---
4
5    BLAKE LIVELY,
6                     Plaintiff,
7       vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)
                                 25-CV-449 (LJL) (MEMBER CASE)
8
     WAYFARER STUDIOS LLC, ET AL.
9
                     Defendants.
10   _____
     JENNIFER ABEL,
11              Third-party Plaintiff,
        vs.
12   JONESWORKS, LLC,
                Third-party Defendant.
13   _____
     WAYFARER STUDIOS LLC, et al.
14              Consolidated Plaintiffs,
        vs.
15   BLAKE LIVELY, et al.
                Consolidated Defendants.
16   _____
17
18                    **CONFIDENTIAL**
19
20        VIDEO-RECORDED DEPOSITION OF JENNIFER ABEL
21                 Los Angeles, California
22                 Friday, September 26, 2025
23   Stenographically Reported by:  Ashley Soevyn,
     CALIFORNIA CSR No. 12019
24
25

CONFIDENTIAL

Page 2

```
 1                UNITED STATES DISTRICT COURT
 2            FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                         ---oOo---
 4
 5   BLAKE LIVELY,
 6                       Plaintiff,
 7      vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)
                             25-CV-449 (LJL) (MEMBER CASE)
 8
     WAYFARER STUDIOS LLC, ET AL.
 9
                      Defendants.
10   _____
     JENNIFER ABEL,
11              Third-party Plaintiff,
        vs.
12   JONESWORKS, LLC,
                Third-party Defendant.
13   _____
     WAYFARER STUDIOS LLC, et al.
14              Consolidated Plaintiffs,
        vs.
15   BLAKE LIVELY, et al.
                Consolidated Defendants.
16   _____
17                   **CONFIDENTIAL**
18           Video-recorded Deposition of
19   JENNIFER ABEL, taken on behalf of the Plaintiff
20   Blake Lively, Pursuant to Notice, at the offices of
21   Willkie Farr & Gallagher, 2029 Century Park East,
22   Los Angeles, California beginning at 9:12 a.m.  and
23   ending at 6:52 p.m. on Friday, September 26, 2025,
24   before me, ASHLEY SOEVYN, California Certified
25   Shorthand Reporter No. 12019.
```

CONFIDENTIAL

Page 208

1   BY MR. GOTTLIEB:

2        Q    Exhibit 57 is a document bearing the

3   Bates No. BALDONI_20412 through 20417.  This appears

4   to be a text chain between you, Ms. Jones, Mr. Heath

5   and Mr. Baldoni, on November 10th, 2023?

6        A    Yes.

7        Q    And it starts around 9:53 p.m. and

8   concludes around 10:12 p.m.; is that right?

9        A    Yes.

10        Q    And do you recall this conversation?

11        A    I do.

12        Q    And in this conversation, Mr. Baldoni

13   reaches out and he says he needs you and Ms. Jones

14   on a Zoom, right?

15        A    Yes.

16        Q    And Mr. Heath says, "It begins again"?

17        A    Yes.

18             MR. FREEDMAN:  Are we missing a page

19   here?  Goes from 2414 to 2416.

20             MS. TAUSTINE:  It's this.  It's the

21   picture of this bear.

22             MR. GOTTLIEB:  It's missing an image from

23   the production.  I will represent to you,

24   Mr. Freedman, it's a screenshot of this bear.

25             MR. FREEDMAN:  I have that one here.

CONFIDENTIAL

Page 209

1           MR. GOTTLIEB:  Yeah.

2           MR. FREEDMAN:  That's 24 -- that's 20413.

3           MR. GOTTLIEB:  It's an entire page with

4   this reproduced on it.

5   BY MR. GOTTLIEB:

6       Q    What did mister -- what did you

7   understand Mr. Heath to mean by saying, "It begins

8   again"?

9       A    I mean, at the time, I don't think I

10  really gave that much notice.  But now in this

11  context, I assume additional issues.

12      Q    Do you see at 10:11, at the bottom of

13  page 0414, Mr. Heath has forwarded to you a legal

14  letter, a screenshot of a legal letter, anyway, that

15  had been received from Ms. Lively's lawyer?

16      A    Yes.

17      Q    And in it, Ms. Lively's lawyer discusses

18  the complaints of our clients and others?

19      A    Uh-huh.

20      Q    And do you see there is an attachment

21  that Mr. Heath had sent at 10:12 p.m.?

22      A    Yes.

23      Q    And that attachment is the protections

24  for return to production document, that is at

25  BALDONI_20416 and 20417?

CONFIDENTIAL

Page 210

1       A    Yes.

2       Q    Do you recall receiving these 17

3  protections for return to production?

4       A    Yes.  He texted it to us.

5       Q    Do you recall reviewing them at the time?

6       A    Yes.

7       Q    Did you review all of them?

8       A    We had a phone call, and we talked

9  through these.

10       Q    And, in fact, there came other points in

11  time later on in the timeline, when you talked about

12  these points with Mr. Heath and Mr. Baldoni, right?

13       A    You're going to have to be a little bit

14  more specific.

15       Q    This wasn't the last time --

16  November 10th, 2023 was not the last time you

17  looked at this 17-point list, right?

18            MR. FREEDMAN:  Objection.

19            THE WITNESS:  Correct.

20  BY MR. GOTTLIEB:

21       Q    Eventually, you all devised sort of

22  responses or points to address these, should they

23  ever become public, right?

24            MR. FREEDMAN:  Objection.

25            THE WITNESS:  I believe that we put

CONFIDENTIAL

Page 249

1    your belief that that person could bury Ms. Lively?

2              MR. FREEDMAN:  Objection.

3              THE WITNESS:  No.

4    BY MR. GOTTLIEB:

5         Q    You sure?

6         A    Yes.

7         Q    Ms. Abel, yesterday you testified that in

8    some point in August of 2017, you were added to a

9    Signal chain; is that right?

10        A    Sorry.  What was the date?

11        Q    At some point in -- did I say 2017?

12             THE STENOGRAPHIC REPORTER:  Yeah.

13   BY MR. GOTTLIEB:

14        Q    In August of 2024, you were added to a

15   Signal chain with a few people; is that right?

16        A    I believe I testified that I think I was,

17   around that time frame.  I don't think there was any

18   content in that text chain.

19        Q    Okay.  And who was -- hold on just a

20   second.

21             Who was -- who was on that text chain to

22   the best of your recollection?

23        A    I believe it was -- I would have to --

24   I'd have to go back and refresh my memory.

25        Q    Okay.  You're not sure as you sit here

CONFIDENTIAL

Page 250

```
 1   today?
 2         A    I'm not sure.
 3         Q    Did you -- is it fair to say you didn't
 4   use Signal very often?
 5         A    Correct.
 6         Q    You didn't open the app very much?  It
 7   wasn't something you used on a regular daily basis;
 8   is that your testimony?
 9              MR. FREEDMAN:  Objection.
10              THE WITNESS:  I believe my testimony
11   yesterday was I had to re-download it because the
12   only time that I used it was when Stephanie
13   introduced me to the app for use on another client.
14   And I had deleted it.
15   BY MR. GOTTLIEB:
16         Q    You had deleted it.
17              And in August 20 -- August of 2024, at
18   some point, you reinstalled the app?
19         A    I recall doing so, yes.
20         Q    And you are on some chain that you don't
21   remember who was on it.  And you don't remember
22   really what was sent or not sent?
23         A    Correct.
24         Q    Did you ever send a message on Signal in
25   August of 2024, to the best of your recollection?
```

CONFIDENTIAL

Page 251

```
 1        A    I don't recall.
 2        Q    And the thing about that is, we'll never
 3   know, right, because Signal is an ephemeral
 4   messaging platform?
 5             MR. FREEDMAN:  Objection.
 6   BY MR. GOTTLIEB:
 7        Q    Do you know what an ephemeral messaging
 8   platform is?
 9             MR. FREEDMAN:  Objection.
10             THE WITNESS:  I know the definition of
11   ephemeral messaging, yes.
12   BY MR. GOTTLIEB:
13        Q    The messages delete after a certain
14   period of time if you have the settings set a
15   certain way, right?
16        A    That is my understanding of how it works.
17        Q    Sorry.
18             That's why some people like to use
19   Signal, right?
20             MR. FREEDMAN:  Objection.
21             THE WITNESS:  Sure.
22   BY MR. GOTTLIEB:
23        Q    Because it -- messages delete and,
24   therefore, there's perceived privacy in those
25   communications?
```

CONFIDENTIAL

Page 252

1          MR. FREEDMAN:  Objection.

2          THE WITNESS:  Amongst other reasons, yes.

3   BY MR. GOTTLIEB:

4     Q    Security reasons?

5     A    Yes.

6     Q    Are you aware that Mr. Wallace was

7   communicating with your colleagues, or colleagues at

8   TAG or others at Wayfarer, using the Signal platform

9   in August of 2024?

10    A    I don't recall if I was aware at the

11  time, but I have become aware of that since then.

12    Q    Okay.  What did you become aware of?

13    A    The -- the usage of Signal amongst

14  Jed Wallace and other -- other people.

15         MR. GOTTLIEB:  Okay.  Let's look at

16  Exhibit 62.

17       (Exhibit 62 marked for identification.)

18         THE WITNESS:  Thank you.

19    Q    Ms. Abel, you've been handed a document

20  marked JONESWORKS 37247 through 37248, a text chain

21  between you and Stephanie Jones on June 17th,

22  2024.

23         Previously, I asked you if you had

24  recommended the retention of any other individuals

25  in this case because they could bury Ms. Lively.

CONFIDENTIAL

Page 300

1              THE WITNESS:  Yes.

2    BY MR. GOTTLIEB:

3         Q    All I'm asking, Ms. Abel, is you didn't

4    tell anyone, don't look at my Signal messages,

5    right?

6         A    No.

7         Q    Okay.  So if you had them, presumably --

8    and they were responsive, they would have been

9    produced to us, right?

10             MR. FREEDMAN:  Objection.

11             THE WITNESS:  I believe so, yes.

12    BY MR. GOTTLIEB:

13         Q    And, again, Signal is a messaging

14    platform where messages delete after a certain

15    period of time, right?

16             MR. FREEDMAN:  Objection.

17             THE WITNESS:  Yes.

18             MR. GOTTLIEB:  Handing you what's been

19    marked as Exhibit 70.

20         (Exhibit 70 marked for identification.)

21    BY MR. GOTTLIEB:

22         Q    This is a document bearing the Bates Nos.

23    JONESWORKS 14019 through 14029.

24             And, Ms. Abel, I'm only going to be

25    asking you about questions starting with messages on

CONFIDENTIAL

Page 322

1   your email accounts?

2         A    I -- I don't -- I don't know.

3         Q    Do you know, for example, whether your

4   RWA email account deletes information after a

5   certain period of time?

6         A    I do not know.

7         Q    Did you ever, at any point, go check

8   whether the RWA account has an auto delete feature

9   on it?

10        A    I don't believe it does, but I did not

11  specifically check.

12        Q    Did you ever receive an instruction to

13  discontinue any deletion, auto delete functions that

14  might exist on your accounts?

15             MR. FREEDMAN:  Objection.  I will

16  instruct you not to answer as to any communications

17  you had with counsel.  Other than counsel, did you

18  get an instruction from someone?

19             THE WITNESS:  No.

20  BY MR. GOTTLIEB:

21        Q    Did you come to understand at any time,

22  Ms. Abel, that you had an obligation to preserve

23  documents relating to the dispute between Ms. Lively

24  and Mr. Baldoni?

25             MR. FREEDMAN:  Same instruction as it

CONFIDENTIAL

Page 323

1   will invade the attorney-client privilege.  So even

2   if you're going to say yes to that, that's going to

3   invade the attorney-client privilege.  So you're not

4   going to -- I'm going to instruct her not to answer.

5           MR. GOTTLIEB:  About the simple fact of

6   whether she knew she was required to preserve

7   documents?

8           MR. FREEDMAN:  Yeah, because the simple

9   fact is revealing the actual privileged

10  communication.

11          MR. GOTTLIEB:  Okay.

12  BY MR. GOTTLIEB:

13      Q    So are you going to follow your counsel's

14  instruction?

15      A    Yes, I'm going to follow my counsel's

16  instruction.

17      Q    Okay.

18           Other than the Signal thread that you --

19  that we talked about earlier in August, between

20  August and December of 2024, can you think of any

21  other Signal thread or Signal communications that

22  you sent or received to anyone about anything?

23      A    Not that I can recall, no.

24      Q    Okay.  Have you had Signal communications

25  since December of 2024?

CONFIDENTIAL

Page 324

1       A    December 2024 until now?

2       Q    Yes.

3       A    Yes.

4       Q    And how many different Signal chains or

5  threads do you have going at any one time now?

6       A    I -- I don't recall.  I don't know.

7       Q    Have those Signal communications included

8  communications about the issues in this case?

9       A    To clarify, I have with my attorneys.

10      Q    Okay.  Have any of those communications

11  been about the press?

12      A    I don't recall.

13      Q    Have you communicated with Mr. Wallace on

14  Signal at any time from December of 2024 to the

15  present?

16      A    With inclusion of my attorneys.

17      Q    So the answer is yes?

18      A    Yes.  With inclusion of my attorneys.

19      Q    Okay.  Have you communicated with

20  Mr. Wallace outside of any threads including your

21  attorneys?

22      A    Not that I can recall.

23      Q    Have -- since the lawsuit was filed, have

24  you taken any steps -- not talking about any

25  conversations or advice you have received -- but

CONFIDENTIAL

Page 325

1    have you taken any steps personally to ensure that

2    your communications are preserved?

3              MR. FREEDMAN:  Other than what you've

4    learned from counsel, you can answer, if you've

5    taken steps outside of what we discussed.

6              THE WITNESS:  I've produced documents as

7    requested.

8              MR. GOTTLIEB:  Mr. Freedman, she can

9    testify about what she's done, even if she's

10   discussed what she's done with you.  That's clearly

11   not privileged.

12   BY MR. GOTTLIEB:

13        Q    And so my question is:  Can you think of

14   anything that you have done -- I don't want to know

15   about what you talked to your lawyers about.  But

16   can you think of anything you have done, any steps

17   you have taken outside of conversations you've had

18   with counsel, but actual things you've done to

19   preserve your documents, your electronic

20   communications in this case?

21        A    Yes.  And I apologize, I thought I

22   answered.  I've produced everything as requested.

23        Q    Okay.  So my question is a little bit

24   different.  So --

25        A    Okay.

CONFIDENTIAL

Page 326

1        Q    -- I understand you're saying you
2    produced what you found.  My question is:  At any
3    point in time, do you have a recollection of taking
4    steps to ensure that nothing would be deleted, no
5    auto delete functions would be on, no messages would
6    expire from a set period of time or the like,
7    anything like that?
8               MR. FREEDMAN:  Same instruction as to
9    attorney-client privilege.  If you can answer it
10   outside of that, you can answer it.
11              THE WITNESS:  Yeah, I don't think I can
12   answer it.
13   BY MR. GOTTLIEB:
14       Q    Are you aware that you have produced four
15   Signal communications to us in this case?
16              MR. FREEDMAN:  Again, if you're aware of
17   it based on something you learned from counsel, I
18   would like you not to provide that information.  If
19   you're aware of it some other way, you can answer.
20              THE WITNESS:  I'm not aware of it any
21   other way.
22   BY MR. GOTTLIEB:
23       Q    Do you know that there are Signal
24   communications that you have been copied on that
25   have been produced to us in this case that you have

CONFIDENTIAL

Page 327

1    not produced to us in this case?

2              MR. FREEDMAN:  Objection.

3              THE WITNESS:  No.

4    BY MR. GOTTLIEB:

5         Q    Did you have Signal communications with

6    Sage Steele in early January of 2025?

7         A    I don't recall by Signal.

8         Q    But you had some communications that you

9    recall with Sage Steele in early January 2025?

10        A    Yes, I -- I recall Sage had reached out

11   to us.  She -- this case personally resonated with

12   her.  I believe she had a brother who was falsely

13   accused, and she expressed interest in wanting to

14   support in our defense.

15        Q    And do you know that you had Signal

16   communications with Ms. Koslow and Ms. Nathan in

17   January of 2025 that did not include your attorneys?

18             MR. FREEDMAN:  Objection.

19             THE WITNESS:  In -- in January?  I don't

20   recall.

21   BY MR. GOTTLIEB:

22        Q    Okay.  But your testimony is you've

23   produced to us everything that could be found in

24   your phone that was responsive to our request,

25   right?

CONFIDENTIAL

Page 380

1              REPORTER'S CERTIFICATE

2              I, ASHLEY SOEVYN, a Certified Shorthand

3      Reporter of the State of California, do hereby

4      certify:

5              That the foregoing proceedings were taken

6      before me at the time and place herein set forth;

7      at which time the witness was put under oath by me;

8              That the testimony of the witness, the

9      questions propounded, and all objections and

10     statements made at the time of the examination were

11     recorded stenographically by me and were thereafter

12     transcribed;

13             That a review of the transcript by the

14     deponent was/ was not requested;

15             That the foregoing is a true and correct

16     transcript of my shorthand notes so taken.

17             I further certify that I am not a relative

18     or employee of any attorney of the parties, nor

19     financially interested in the action.

20             I declare under penalty of perjury under

21     the laws of California that the foregoing is true

22     and correct.  Dated this 27th day of September,

23     2025.

24

               ASHLEY SOEVYN

25             CSR No. 12019

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.