# EXHIBIT 9

CONFIDENTIAL

Page 1

```
               UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF NEW YORK
                         ---oOo---

 BLAKE LIVELY,

                  Plaintiff,

      vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)
                              25-CV-449 (LJL) (MEMBER CASE)


 WAYFARER STUDIOS LLC, ET AL.

                  Defendants.
 _____
 JENNIFER ABEL,
              Third-party Plaintiff,
      vs.
 JONESWORKS, LLC,
              Third-party Defendant.
 _____
 WAYFARER STUDIOS LLC, et al.
              Consolidated Plaintiffs,
      vs.
 BLAKE LIVELY, et al.
              Consolidated Defendants.
 _____


                    **CONFIDENTIAL**

      VIDEO-RECORDED DEPOSITION OF JUSTIN BALDONI
                Los Angeles, California
                Monday, October 6, 2025
 Stenographically Reported by:  Ashley Soevyn,
 CALIFORNIA CSR No. 12019
```

CONFIDENTIAL

Page 2

```
 1            UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                      ---oOo---
 4
 5   BLAKE LIVELY,
 6              Plaintiff,
 7     vs.       CASE NO. 24-CV-10049-LJL (LEAD CASE)
                          25-CV-449 (LJL) (MEMBER CASE)
 8
     WAYFARER STUDIOS LLC, ET AL.
 9
                Defendants.
10   _____
     JENNIFER ABEL,
11            Third-party Plaintiff,
       vs.
12   JONESWORKS, LLC,
              Third-party Defendant.
13   _____
     WAYFARER STUDIOS LLC, et al.
14            Consolidated Plaintiffs,
       vs.
15   BLAKE LIVELY, et al.
              Consolidated Defendants.
16   _____
17                  **CONFIDENTIAL**
18          Video-recorded Deposition of
19   JUSTIN BALDONI, taken on behalf of the Plaintiff
20   Jonesworks, et al., Pursuant to Notice, at the
21   offices of Willkie Farr & Gallagher, 2029 Century
22   Park East, Los Angeles, California beginning at
23   9:15 a.m.  and ending at 6:46 p.m. on Monday,
24   October 6, 2025, before me, ASHLEY SOEVYN,
25   California Certified Shorthand Reporter No. 12019.
```

Page 136

1  time.  But I believe he thought she was very good at
2  her job.
3      Q    Do you know what led him to believe that?
4      A    I don't.
5      Q    Did you have any personal role in making
6  the decision to hire Melissa Nathan over any of the
7  other crisis PRs that may have been recommended?
8      A    No.
9      Q    Are you aware of where Jamey got the
10 names for potential crisis communications
11 professionals that he was considering?
12     A    I imagine from --
13          MS. SHAPIRO:  Mr. Baldoni, don't
14 speculate.
15          THE WITNESS:  No.  I actually don't.
16 BY MS. SHAH:
17     Q    You don't know?
18     A    No.
19     Q    Do you know if he or anyone else at
20 Wayfarer asked Stephanie Jones for her views on
21 crisis communications professionals that you should
22 hire?
23     A    I don't.
24     Q    Do you know if she recommended
25 Melissa Nathan or not?

Page 137

1    A    If Stephanie Jones recommended?  I now
2    know that she didn't.
3    Q    How did you come to that understanding?
4         MS. SHAPIRO:  Mr. Baldoni, don't answer
5    --
6         THE WITNESS:  No --
7         MS. SHAPIRO:  -- if the information came
8    from your lawyers.
9         THE WITNESS:  Yes, I can answer this.
10   Stephanie had sent me a text about Melissa Nathan.
11   BY MS. SHAH:
12   Q    You knew at the time that Stephanie did
13   not recommend that you hire Melissa Nathan, correct?
14        MS. SHAPIRO:  Objection.
15        THE WITNESS:  I knew that Stephanie did
16   not like Melissa Nathan, yes.
17   BY MS. SHAH:
18   Q    And Stephanie warned you against hiring
19   Melissa Nathan; isn't that right?
20   A    You could -- I think you could put it
21   that way with my interaction with Stephanie.  Yeah.
22   Q    And were you aware that Stephanie also
23   warned Jamey Heath and Tera Hanks against hiring
24   Melissa Nathan?
25   A    I was only aware of what she texted me.

1    Q    Jamey Heath and Tera Hanks never told you
2    that Stephanie Jones had also warned them against
3    hiring Melissa Nathan?
4    A    Not that I recall.
5    Q    Do you have an understanding as to why
6    Stephanie Jones was warning you against hiring
7    Melissa Nathan?
8    A    I vaguely remember -- I think there was a
9    text message that she sent that said she -- I'm
10   reading it in my mind.  There was something, there
11   was a word "shady" in there and it was like a link
12   to something that I never clicked on.
13   Q    Other than the text message you're
14   describing with Stephanie Jones, did you ever have a
15   conversation with her about this issue, whether in
16   person or on the phone?
17   A    I don't know.  I'm -- my memory of this
18   time was that there was a lot of messages and it,
19   like -- I might have spoken to Stephanie.  I don't
20   remember the conversation.  But there was like a --
21   there was like a -- felt like a frantic energy from
22   Stephanie.
23   Q    Did you give any credence to the
24   information that she was giving you in terms of why
25   you should not hire Melissa Nathan to be aligned

Page 139

```
 1  with you?
 2              MS. SHAPIRO:  Objection.
 3              THE WITNESS:  What do you mean by
 4  "credence" exactly?
 5  BY MS. SHAH:
 6       Q    Did you take her concerns seriously?
 7       A    I believe I did.
 8       Q    Did you do anything to investigate them
 9  further before you hired Melissa Nathan?
10       A    I didn't have any capacity at that time
11  to do personal investigation, no.
12       Q    Did you relay Stephanie's concerns to
13  Jamey Heath or Tera Hanks at the time?
14       A    I believe I did.  Yes.
15       Q    Tell me what you recall about the
16  substance of those conversations or communications.
17       A    I remember passing along that Stephanie
18  doesn't like -- I didn't know who Melissa Nathan
19  was -- one of the people.  That's what I remember.
20       Q    Do you remember Stephanie Jones telling
21  you in sum or substance that Melissa Nathan and the
22  tactics she uses as a crisis communications
23  professional are not the kinds of tactics that you
24  want to publicly associate yourself with?
25       A    That sounds very familiar.
```

CONFIDENTIAL

Page 140

1  Q    Are you aware that Wayfarer and you
2  decided to hire Melissa Nathan over Stephanie Jones'
3  objections?
4  A    I would imagine so, yes.
5       MS. SHAH:  Okay.  I'm going to show you
6  what's marked as a document, Exhibit 5.
7       (Exhibit 5 marked for identification.)
8  BY MS. SHAH:
9  Q    It's a text message between you and
10 Stephanie Jones dated July 26, 2024, Bates stamped
11 Jonesworks_, several zeroes, 39735.
12      Is this the text message that you were
13 referring to that Stephanie Jones sent you where she
14 warned you against hiring Melissa Nathan?
15 A    It appears to be.
16 Q    And this was sent on July 26th, 2024.
17 So does this refresh your recollection that you were
18 considering bringing on crisis PR before
19 July 26th, 2024?
20 A    Yes.
21 Q    Okay.  And as you recall, Stephanie Jones
22 sent you a link at the top of the text thread,
23 right?
24 A    Yes.
25 Q    You said you never clicked on that; is

Page 145

1      THE WITNESS: I don't know, no. I don't
2  know.
3  BY MS. SHAH:
4      Q    Because you never asked her what she
5  meant by that?
6           MS. SHAPIRO: Objection.
7           THE WITNESS: Unless you have a document
8  that says I did, I don't feel like I did.
9           MS. SHAH: Okay. I'm going to show you a
10 document that's been marked Exhibit 6.
11          (Exhibit 6 marked for identification.)
12          THE WITNESS: You got it.
13 BY MS. SHAH:
14     Q    It's a text message between
15 Stephanie Jones, Jamey Heath, Tera Hanks, and you --
16     A    Uh-huh.
17     Q    -- dated July 26th, Bates stamped
18 Jonesworks_JB_, several zeroes, 1142.
19          Do you see this?
20     A    Yes.
21     Q    Okay. Do you recall this text message
22 when you received it?
23     A    Vaguely, yes.
24     Q    Okay. And in this text message,
25 Stephanie Jones warns you, Tera Hanks, and

1   Jamey Heath that you should not work with
2   Melissa Nathan because "there's a lot of dirty work
3   she has done" and "it's not someone that you should
4   want in Justin's orb."
5           Do you see that?
6       A   Yes.
7       Q   Okay.  And she goes on to say:
8           (As read):
9               "Or for Blake's PR to use as a weapon
10              against him."
11          Do you see that?
12      A   I do.
13      Q   Did you ever have a conversation with her
14  about what she meant by that?
15      A   I did not have a conversation with
16  Stephanie at all around this.
17      Q   Okay.  Do you have any understanding,
18  whether from this text message or anything else that
19  you knew at the time, about what she meant when she
20  said, "I just downloaded Tera on some dark stuff"?
21      A   I don't.
22      Q   Did Tera ever relay the substance of that
23  conversation to you?
24      A   I think I had had a conversation with
25  Tera and Jamey that I didn't want to be a part of

Page 147

1  any of this.  So I trusted them to make the
2  decision.  I don't believe she told me anything.
3      Q    Okay.  Do you understand from this text
4  message that Stephanie is telling you and Jamey and
5  Tera that it might not be good for you to be
6  associated with someone like Melissa Nathan based on
7  the type of tactics that she has used in the past?
8      A    That seems to be an accurate summary.
9      Q    And that if people knew that you were
10 associated with Melissa Nathan or specifically if
11 Blake's PR came to find out that you had associated
12 yourself with Melissa Nathan, they could use that
13 against you because of who Melissa Nathan was,
14 right?
15           MS. SHAPIRO:  Objection.  Objection.
16           THE WITNESS:  I can't speculate to what
17 she meant by that.  But it seems to be she says
18 "Blake's PR to use as a weapon" so...
19 BY MS. SHAH:
20     Q    Okay.  Now, Wayfarer and you --
21     A     are you done with this one?
22     Q    I think so.
23     A    Here you go.
24     Q    Wayfarer and you went ahead and hired
25 Melissa Nathan after and despite Stephanie Jones's

1  warnings, right?
2           MS. SHAPIRO:  Objection.
3           THE WITNESS:  I believe so.
4  BY MS. SHAH:
5       Q    And there came a time in August, after
6  you had hired Melissa Nathan, that The Hollywood
7  Reporter published an article about the fact that
8  you had hired Melissa Nathan, right?
9       A    Yes.
10      Q    I'm going to show you that article.
11          MS. SHAH:  It's a document we're going to
12  mark as Exhibit 7.
13          (Exhibit 7 marked for identification.)
14          THE WITNESS:  Thank you.
15 BY MS. SHAH:
16      Q    It's an article from The Hollywood
17 Reporter, dated August 14th, 2024, that says
18 "Justin Baldoni Hires Crisis PR Veteran Amid
19 It Ends with Us Rift."
20          Do you see that?
21      A    Uh-huh.
22      Q    And it goes on to say:
23          (As read):
24              "The director and star has retained the
25              services of Melissa Nathan who

1              represented Johnny Depp during the
2              Amber Heard trial."
3         Do you see that?
4     A    Excuse me.  On the second page, yes.
5     Q    Okay.  You were pretty upset when this
6  article came out, right?
7     A    I don't remember what I was feeling.
8     Q    You were worried when this article came
9  out that being publicly associated with
10 Melissa Nathan might make it look like you had
11 something to be guilty for, right?
12         MS. SHAPIRO:  Objection.
13         THE WITNESS:  No, I think -- I think I
14 was just not happy that my crisis PR was being
15 publicized.  I don't think it had anything to do
16 with Nathan -- Melissa Nathan.
17 BY MS. SHAH:
18    Q    Why were you not happy that your crisis
19 PR was publicized?
20    A    Because it felt like more of the -- kind
21 of -- the kind of thing that felt like somebody
22 would plant to draw more attention and fan a flame
23 to something.
24    Q    Fan a flame to what?
25    A    To public speculation, the fan theories

Page 150

1 of why I wasn't doing press with anybody and...
2        Q    What were the fan theories at the time
3 about why you weren't doing press with anyone?
4        A    I remember there being a lot of talk
5 about all of the cast unfollowing me, why I wasn't
6 doing press with any of the other cast members.  I
7 don't remember the date that this came out, but I
8 don't know if I had already done the premiere or not
9 at this point.  But I had also never read an article
10 or seen an article about somebody hiring crisis PR,
11 so I found it odd.
12       Q    And you thought it made you look bad,
13 right?
14       A    Yeah, I think I did.
15       Q    You thought it made you look like you had
16 something to hide?
17       A    I think I had never been involved in
18 anything like this, and I wasn't used to seeing my
19 name in the press in this way at all.  And I
20 certainly -- I certainly didn't want my -- my name
21 out there in a negative way.
22       Q    You thought it made it look like you had
23 something to hide that had to do with the
24 allegations of on-set abuse, right?
25            MS. SHAPIRO:  Objection.

1  BY MS. SHAH:
2      Q    Which part do you not agree with?
3      A    Can you ask me again?
4      Q    You left Jonesworks to go with
5  Jennifer Abel as a publicist after Jennifer Abel was
6  fired from Jonesworks, right?
7           MS. SHAPIRO:  Objection.
8           THE WITNESS:  I don't know the -- the
9  sequence.  I -- I know that Jennifer had put in her
10 notice, so I'm -- I'm confused by the way the
11 question is asked.
12 BY MS. SHAH:
13     Q    Let me ask it a different way.
14          You left Jonesworks to go with
15 Jennifer Abel as a publicist after she left
16 Jonesworks, right?
17          MS. SHAPIRO:  Objection.
18          THE WITNESS:  Yeah.  Yes.
19 BY MS. SHAH:
20     Q    Why?
21     A    Because she was my publicist for years
22 before, and I -- I trusted her.
23     Q    Do you still trust her?
24          MS. SHAPIRO:  Objection.
25          THE WITNESS:  I do.

1  BY MS. SHAH:
2      Q   Okay.  Have you seen any documents or
3  text messages in this case, or otherwise, where
4  Stephanie Jones is talking shit about you the way
5  Jen Abel was?
6      A   I haven't seen any documents about
7  Stephanie Jones in general to my knowledge.
8      Q   Okay.
9      A   Are we done with this one?
10     Q   Yes.
11     A   Okay.
12     Q   Are you aware that after Wayfarer
13 onboarded TAG as its crisis publicist, Katie Case
14 and Melissa Nathan were joking about whether your
15 faith was a cult?
16         MS. SHAPIRO:  Objection.
17         THE WITNESS:  I was not aware.
18 BY MS. SHAH:
19     Q   What do you think about that?
20         MS. SHAPIRO:  Objection.
21         THE WITNESS:  Well, I think anytime
22 somebody makes a religious joke, I think that's not
23 okay.  It seems to have happened a lot in this case.
24 BY MS. SHAH:
25     Q   Including from your own publicist, it

```
                                                     Page 228
 1   seems.
 2             MS. SHAPIRO:  Objection.
 3             THE WITNESS:  If you want to show it to
 4   me, I'd be happy to see it.  I haven't heard
 5   anything.  This is the first I'm hearing about it.
 6   BY MS. SHAH:
 7       Q    Sure.
 8             MS. SHAH:  Tab 139, please.
 9             I will show you a document that's marked
10   as exhibit?
11             THE STENOGRAPHIC REPORTER:  Thirteen.
12             MS. SHAH:  Thirteen.
13         (Exhibit 13 marked for identification.)
14   BY MS. SHAH:
15       Q    It's a text thread between Katie Case and
16   Melissa Nathan from August 4th, 2024 with the Bates
17   stamp NATHAN, several zeroes, 2938.
18       A    Okay.  Sorry, there is one more page.
19       Q    Have you seen this before?
20       A    I have not.
21       Q    Were you aware that Katie Case and
22   Melissa Nathan were texting things like this about
23   you while they were on a call with you?
24             MS. SHAPIRO:  Objection.
25             THE WITNESS:  I was not.
```

1  CERTIFICATE OF DEPONENT
2
3        I have read the foregoing transcript of
4  my deposition and except for any corrections or
5  changes noted on the errata sheet, I hereby
6  subscribe to the transcript as an accurate record
7  of the statements made by me.
8
9
                        _____
10                              JUSTIN BALDONI
11
12        SUBSCRIBED AND SWORN before and to me
13  this ____ day of _____, 20___.
14
15
16                      _____
17                              NOTARY PUBLIC
18
19
20  My Commission expires:
21
22
23
24
25

CONFIDENTIAL

Page 318

1                REPORTER'S CERTIFICATE

2           I, ASHLEY SOEVYN, a Certified Shorthand

3    Reporter of the State of California, do hereby

4    certify:

5           That the foregoing proceedings were taken

6    before me at the time and place herein set forth;

7    at which time the witness was put under oath by me;

8           That the testimony of the witness, the

9    questions propounded, and all objections and

10   statements made at the time of the examination were

11   recorded stenographically by me and were thereafter

12   transcribed;

13          That a review of the transcript by the

14   deponent was/ was not requested;

15          That the foregoing is a true and correct

16   transcript of my shorthand notes so taken.

17          I further certify that I am not a relative

18   or employee of any attorney of the parties, nor

19   financially interested in the action.

20          I declare under penalty of perjury under

21   the laws of California that the foregoing is true

22   and correct.  Dated this 7th day of October 2025.

23

24

             ASHLEY SOEVYN

25           CSR No. 12019