# EXHIBIT 11

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                      ---oOo---
 4
 5   BLAKE LIVELY,
 6                 Plaintiff,
 7      vs.        CASE NO. 24-CV-10049-LJL (LEAD CASE)
                               25-CV-449 (LJL) (MEMBER CASE)
 8
     WAYFARER STUDIOS LLC, ET AL.,
 9
                   Defendants.
10   _____
     JENNIFER ABEL,
11             Third-party Plaintiff,
        vs.
12   JONESWORKS, LLC,
               Third-party Defendant.
13   _____
     WAYFARER STUDIOS LLC, et al.,
14             Consolidated Plaintiffs,
        vs.
15   BLAKE LIVELY, et al.,
               Consolidated Defendants.
16   _____
17                   **CONFIDENTIAL**
18
19      VIDEO-RECORDED DEPOSITION OF JAMEY HEATH
20               Los Angeles, California
21             Thursday, October 9, 2025
22
23   Stenographically Reported by:  Ashley Soevyn,
24   CALIFORNIA CSR No. 12019
25
```

CONFIDENTIAL

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                      ---oOo---
 4
 5   BLAKE LIVELY,
 6                Plaintiff,
 7      vs.        CASE NO. 24-CV-10049-LJL (LEAD CASE)
                              25-CV-449 (LJL) (MEMBER CASE)
 8
     WAYFARER STUDIOS LLC, ET AL.,
 9
                   Defendants.
10   _____
     JENNIFER ABEL,
11             Third-party Plaintiff,
        vs.
12   JONESWORKS, LLC,
               Third-party Defendant.
13   _____
     WAYFARER STUDIOS LLC, et al.,
14             Consolidated Plaintiffs,
        vs.
15   BLAKE LIVELY, et al.,
               Consolidated Defendants.
16   _____
17                   **CONFIDENTIAL**
18           Video-recorded Deposition of
19   JAMEY HEATH, taken on behalf of the Plaintiff
20   Stephanie Jones and Jonesworks, Pursuant to Notice,
21   at the offices of Manatt Phelps & Phillips, 2049
22   Century Park East, Los Angeles, California beginning
23   at 9:08 a.m.  and ending at 6:39 p.m. on Thursday,
24   October 9, 2025, before me, ASHLEY SOEVYN,
25   California Certified Shorthand Reporter No. 12019.
```

CONFIDENTIAL

```
                                                    Page 166
 1              (Lunch recess.)
 2
 3              THE VIDEOGRAPHER:  We're back on the
 4    record.  The time is 1:42 p.m.
 5    BY MS. SHAH:
 6         Q    Good afternoon, Mr. Heath.
 7         A    Good afternoon.
 8         Q    Before lunch we were discussing your
 9    decision to bring on TAG and Melissa Nathan to
10    handle crisis communications.  You had mentioned
11    that at some point, Jen had recommended to you that
12    you should consider bringing on crisis
13    communications professionals; is that right?
14         A    Correct.
15         Q    What do you recall about that
16    conversation?
17         A    I recall her saying that she doesn't do
18    crisis PR and this might be a conversation with a
19    crisis PR firm.
20         Q    Do you recall when that conversation
21    occurred?
22         A    I don't.
23         Q    Do you think it was like within several
24    days of when you first talked to Melissa Nathan?
25              MS. SHAPIRO:  Objection.
```

CONFIDENTIAL

Page 167

```
1              THE WITNESS:  I don't know if it was in
2     several days, but it wasn't weeks.
3     BY MS. SHAH:
4          Q    Okay.  Did she recommend Melissa Nathan
5     to you as a potential person that you could hire for
6     crisis comms?
7          A    I believe it was her.  Yes.
8          Q    Okay.  Meaning, it was Jen?
9          A    I believe so.
10         Q    Did she give you any other names of any
11    other people or firms other than Melissa Nathan that
12    you should consider for crisis communications?
13         A    I don't remember.  She may have.  I don't
14    remember.
15         Q    Okay.  You can't think of any as you sit
16    here today?
17         A    I can't.
18         Q    Did you personally speak with
19    Melissa Nathan or anyone from TAG before you decided
20    to hire them?
21         A    I did.
22         Q    Did you personally speak with or
23    interview any other crisis communications
24    professional?
25         A    I did not.
```

Page 168

1      Q    Did anyone at Wayfarer ever speak with or
2  interview any other crisis communications
3  professional than Melissa Nathan?
4      A    Not that I'm aware of.
5      Q    Okay.  Did you also ask or did anyone at
6  Wayfarer ask Stephanie Jones for recommendations for
7  crisis communications professionals?
8      A    I believe we did.
9      Q    Okay.
10     A    Or -- I don't know if we asked or if they
11 were just shared.  But I do know that we got some
12 recommendations from Stephanie Jones.  I don't
13 recall how that happened.
14     Q    Okay.  And Melissa Nathan was not on
15 Stephanie Jones' list of recommendations to you for
16 crisis communications, right?
17     A    She was not.
18     Q    You were aware that Stephanie Jones
19 expressly warned you that you should not hire
20 Melissa Nathan for this role, correct?
21     A    I was aware.
22     Q    What was your understanding of the
23 reasons that Stephanie thought you should not hire
24 Melissa Nathan in this role?
25     A    To start with, I had a phone conversation

1    remember getting -- answer [sic] me the question one
2    more time, if you don't mind.
3    BY MS. SHAH:
4         Q    Sure.
5              Do you have any basis to tell me as you
6    sit here today that Stephanie Jones didn't follow
7    your instruction for her to stand down after you
8    told her to do that?
9         A    I don't know.  I -- I can't recall
10   anything.
11        Q    Okay.  And after the point in time that
12   you told Stephanie she was not to contact any
13   reporters on behalf of Wayfarer or Justin, did you
14   have any substantive or strategy or other
15   conversations or communications with Stephanie about
16   Wayfarer's publicity after that?
17             MS. SHAPIRO:  Objection.
18             THE WITNESS:  After I asked her to stand
19   down?
20   BY MS. SHAH:
21        Q    Uh-huh.
22        A    Did I have any subsequent conversations
23   with her?
24        Q    Yes.
25        A    About the positioning of Jonesworks with

Page 229

1  Wayfarer?
2       Q    About -- no, about Wayfarer's publicity
3  plans.
4       A    Right.  Not immediately after, I don't.
5  When I say "immediately," I don't mean within days
6  because we were dealing with the current flames.
7  But that is something that became a little -- became
8  apparent to me that there seemed to be no discussion
9  on that at some point.  Once I had learned -- you
10 mean during this time or at anytime?
11      Q    What I'm essentially asking is, after you
12 told her to stand down, did you later, like, loop
13 her back onto the team and get her involved, or no?
14      A    As I said, she's never been involved.
15      Q    Okay.
16      A    As far as I'm concerned.
17      Q    Okay.  So you didn't invite her into the
18 team after that?
19           MS. SHAPIRO:  Objection.
20           THE WITNESS:  She was -- she was never a
21 part of it.
22 BY MS. SHAH:
23      Q    Okay.
24      A    No -- no offense to Stephanie.
25      Q    Understood.

```
                Federal Rules of Civil Procedure

                            Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the

deponent or a party before the deposition is

completed, the deponent must be allowed 30 days

after being notified by the officer that the

transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to

sign a statement listing the changes and the

reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.

The officer must note in the certificate prescribed

by Rule 30(f)(1) whether a review was requested

and, if so, must attach any changes the deponent

makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.
```

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.