# EXHIBIT 3

Filed Under Seal

CONFIDENTIAL

Page 1

```
 1           UNITED STATES DISTRICT COURT
 2       FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                    ---oOo---
 4
 5   BLAKE LIVELY,
 6              Plaintiff,
 7     vs.       CASE NO. 24-CV-10049-LJL (LEAD CASE)
                           25-CV-449 (LJL) (MEMBER CASE)
 8
     WAYFARER STUDIOS LLC, ET AL.
 9
                Defendants.
10   _____
     JENNIFER ABEL,
11              Third-party Plaintiff,
       vs.
12   JONESWORKS, LLC,
                Third-party Defendant.
13   _____
     WAYFARER STUDIOS LLC, et al.
14              Consolidated Plaintiffs,
       vs.
15   BLAKE LIVELY, et al.
                Consolidated Defendants.
16   _____
17
18                   **CONFIDENTIAL**
19
20     VIDEO-RECORDED DEPOSITION OF JENNIFER ABEL
21              Los Angeles, California
22             Friday, September 26, 2025
23   Stenographically Reported by:  Ashley Soevyn,
     CALIFORNIA CSR No. 12019
24
25
```

```
                                                     Page 209
 1             MR. GOTTLIEB:  Yeah.
 2             MR. FREEDMAN:  That's 24 -- that's 20413.
 3             MR. GOTTLIEB:  It's an entire page with
 4    this reproduced on it.
 5    BY MR. GOTTLIEB:
 6        Q    What did mister -- what did you
 7    understand Mr. Heath to mean by saying, "It begins
 8    again"?
 9        A    I mean, at the time, I don't think I
10    really gave that much notice.  But now in this
11    context, I assume additional issues.
12        Q    Do you see at 10:11, at the bottom of
13    page 0414, Mr. Heath has forwarded to you a legal
14    letter, a screenshot of a legal letter, anyway, that
15    had been received from Ms. Lively's lawyer?
16        A    Yes.
17        Q    And in it, Ms. Lively's lawyer discusses
18    the complaints of our clients and others?
19        A    Uh-huh.
20        Q    And do you see there is an attachment
21    that Mr. Heath had sent at 10:12 p.m.?
22        A    Yes.
23        Q    And that attachment is the protections
24    for return to production document, that is at
25    BALDONI_20416 and 20417?
```

1   A   Yes.
2   Q   Do you recall receiving these 17
3   protections for return to production?
4   A   Yes.  He texted it to us.
5   Q   Do you recall reviewing them at the time?
6   A   Yes.
7   Q   Did you review all of them?
8   A   We had a phone call, and we talked
9   through these.
10  Q   And, in fact, there came other points in
11  time later on in the timeline, when you talked about
12  these points with Mr. Heath and Mr. Baldoni, right?
13  A   You're going to have to be a little bit
14  more specific.
15  Q   This wasn't the last time --
16  November 10th, 2023 was not the last time you
17  looked at this 17-point list, right?
18      MR. FREEDMAN:  Objection.
19      THE WITNESS:  Correct.
20  BY MR. GOTTLIEB:
21  Q   Eventually, you all devised sort of
22  responses or points to address these, should they
23  ever become public, right?
24      MR. FREEDMAN:  Objection.
25      THE WITNESS:  I believe that we put

Page 250

1  today?
2       A    I'm not sure.
3       Q    Did you -- is it fair to say you didn't
4  use Signal very often?
5       A    Correct.
6       Q    You didn't open the app very much?  It
7  wasn't something you used on a regular daily basis;
8  is that your testimony?
9            MR. FREEDMAN:  Objection.
10           THE WITNESS:  I believe my testimony
11 yesterday was I had to re-download it because the
12 only time that I used it was when Stephanie
13 introduced me to the app for use on another client.
14 And I had deleted it.
15 BY MR. GOTTLIEB:
16      Q    You had deleted it.
17           And in August 20 -- August of 2024, at
18 some point, you reinstalled the app?
19      A    I recall doing so, yes.
20      Q    And you are on some chain that you don't
21 remember who was on it.  And you don't remember
22 really what was sent or not sent?
23      A    Correct.
24      Q    Did you ever send a message on Signal in
25 August of 2024, to the best of your recollection?

Page 251

1       A    I don't recall.
2       Q    And the thing about that is, we'll never
3   know, right, because Signal is an ephemeral
4   messaging platform?
5            MR. FREEDMAN:  Objection.
6   BY MR. GOTTLIEB:
7       Q    Do you know what an ephemeral messaging
8   platform is?
9            MR. FREEDMAN:  Objection.
10           THE WITNESS:  I know the definition of
11  ephemeral messaging, yes.
12  BY MR. GOTTLIEB:
13      Q    The messages delete after a certain
14  period of time if you have the settings set a
15  certain way, right?
16      A    That is my understanding of how it works.
17      Q    Sorry.
18           That's why some people like to use
19  Signal, right?
20           MR. FREEDMAN:  Objection.
21           THE WITNESS:  Sure.
22  BY MR. GOTTLIEB:
23      Q    Because it -- messages delete and,
24  therefore, there's perceived privacy in those
25  communications?

1            MR. FREEDMAN:  Objection.
2            THE WITNESS:  Amongst other reasons, yes.
3    BY MR. GOTTLIEB:
4        Q    Security reasons?
5        A    Yes.
6        Q    Are you aware that Mr. Wallace was
7    communicating with your colleagues, or colleagues at
8    TAG or others at Wayfarer, using the Signal platform
9    in August of 2024?
10       A    I don't recall if I was aware at the
11   time, but I have become aware of that since then.
12       Q    Okay.  What did you become aware of?
13       A    The -- the usage of Signal amongst
14   Jed Wallace and other -- other people.
15           MR. GOTTLIEB:  Okay.  Let's look at
16   Exhibit 62.
17       (Exhibit 62 marked for identification.)
18           THE WITNESS:  Thank you.
19       Q    Ms. Abel, you've been handed a document
20   marked JONESWORKS 37247 through 37248, a text chain
21   between you and Stephanie Jones on June 17th,
22   2024.
23           Previously, I asked you if you had
24   recommended the retention of any other individuals
25   in this case because they could bury Ms. Lively.

Page 272

1           "So we can share with him tonight.  But
2           he feels good about the call and he
3           feels protected."
4      Do you see that?
5   A   Yes.
6   Q   A few days earlier, he had told you he
7   didn't feel protected, right?
8   A   Yes.
9   Q   And at this point, that's changed and he
10  does feel protected?
11  A   This is in reference to specific
12  messaging regarding why the cast had unfollowed him
13  and there were no images as he was doing the Today
14  Show the following day.
15          MR. GOTTLIEB:  Okay.  So this is on
16  August 7th?  I'm going to show you another
17  document.  This is Exhibit 65.
18          THE WITNESS:  Okay.
19      (Exhibit 65 marked for identification.)
20  BY MR. GOTTLIEB:
21  Q   This is a one-page document marked
22  HEATH 28187.  It has an email from Katie Case that
23  you then forward on August 7th, 2024.
24  A   Yes.
25  Q   Do you recognize this document?

CONFIDENTIAL

Page 273

1    A    I do.
2    Q    And this is -- the top email is an email
3    that you send in reply to Ms. Case; is that right?
4    A    Yes.
5    Q    And at 2:50 p.m. on the 7th, Ms. Case had
6    sent to Mr. Heath and yourself specifics regarding
7    social and digital mitigation or mediation, right?
8    A    Yes.
9    Q    And she's describing the work that the
10   digital team that Wayfarer was retaining would do,
11   right?
12              MR. FREEDMAN:  Objection.
13              THE WITNESS:  Yes, this looks like a list
14   of their capabilities.
15   BY MR. GOTTLIEB:
16   Q    You see at the top, you're discussing --
17   you have a question about the amount of the fee.
18   And then you have a reference to what we discussed
19   with MN earlier regarding social manipulation.
20              Do you see that?
21   A    Yes.
22   Q    MN is Ms. Nathan?
23   A    Yes.
24   Q    And then you say:
25              (As read):

```
 1              "From the separate team based in
 2              Hawaii."
 3         Do you see that?
 4    A    Yes.
 5    Q    What is the separate team based in
 6  Hawaii?
 7    A    I don't mean to laugh, but we've
 8  discussed this and it was either a misunderstanding
 9  on my side or I misheard, but I had a conversation
10  with Melissa regarding a digital team that she had
11  worked with, and it was my understanding that they
12  were based in Hawaii.
13    Q    Okay.  And did you later come to learn
14  that there was no team based in Hawaii?
15    A    Yes.
16    Q    Was there a separate team?
17    A    Yes.
18    Q    And that separate team, not in Hawaii,
19  was something that you had discussed regarding
20  social manipulation.
21         Do you see that?
22    A    Yes.
23    Q    Who was the separate team?
24    A    It's my understanding that this was Jed
25  and Streets Relations.
```

Page 275

1    Q    What was your understanding of who else
2    worked at Street Relations or with Street Relations
3    other than Jed Wallace?
4    A    I had no communications directly with Jed
5    or Street Relations, so I'm not sure.
6    Q    You were never on a call with
7    Mr. Wallace?
8    A    No, not that I can recall.
9    Q    Did you ever meet him?
10   A    No.
11   Q    You ever on a text chain with him?
12   A    I don't think so, no.
13   Q    Was it your impression that the specific
14   efforts that are described in the bullet points in
15   Ms. Case's email were services that Mr. Wallace's
16   team was capable of performing?
17            MR. FREEDMAN:  Objection.
18            MR. GLOVER:  Objection.  Form.
19            THE WITNESS:  Yes, as I said earlier, it
20   was my understanding this is a list of their
21   capabilities.
22   BY MR. GOTTLIEB:
23   Q    Did you think at the time that this was
24   all puffery?
25   A    Explain what you mean by "puffery."

1            THE WITNESS:  No, I believe that was a
2     continuation of the recommendation that was
3     requested earlier.  And I had clearly brought -- I
4     asked for Melissa's opinion.  I don't think that was
5     the --
6     BY MR. GOTTLIEB:
7          Q    Ms. Abel?
8          A    Yes.
9          Q    You say at 10:32 p.m., in response to
10    Ms. Nathan saying "can he please hire a lawyer," you
11    say:
12              (As read):
13                   "He needs to.  He has one but he needs
14                   a litigator."
15         A    Right.  But I don't think that was the
16    impetus.  I'm sorry.  I'm just trying to respond to
17    your question.
18         Q    Okay.  All I'm asking is:  Following your
19    learning about the request to put out a statement,
20    you and Ms. Nathan immediately say that your client,
21    Mr. Baldoni and Wayfarer, needs to hire a litigator.
22    You both agree on that, right?
23         A    Yeah.
24         Q    Okay.  And then at 11:42 p.m., Ms. Nathan
25    says:

Page 297

1             (As read):
2                 "Can I start a Signal thread with you,
3                 me, and Jed just in case you need him
4                 to connect you to Bryan because they
5                 are very close?"
6         Do you see that?
7     A   Yes.
8     Q   Does that refresh your recollection as to
9  who the Signal thread you were on was with in August
10 of 2024?
11    A   Yes.  But, again, I don't know if one was
12 actually started.  So I -- I would have to refresh
13 my memory on that.
14    Q   Okay.  And on the next page 2156,
15 Ms. Nathan says "Definitely contact him on" --
16 sorry, to have context for that.  At 11:43 p.m. on
17 the previous page, you say:
18            (As read):
19                 "I can reach out to Bryan too.  We've
20                 worked together."
21        Right?
22    A   Yes.
23    Q   And that's referring to Mr. Freedman?
24    A   Sorry.  I'm on the wrong page.
25        Yes.

CONFIDENTIAL

Page 298

```
 1      Q    Okay.  And then at 11:44 p.m., Ms. Nathan
 2   says:
 3           (As read):
 4               "Definitely contact him on Signal
 5               though."
 6           Do you see that?
 7      A    Yes.
 8      Q    She says:
 9           (As read)
10               "Feel free to add me obviously because
11               of the crisis."
12           So Ms. Nathan is telling you definitely
13   connect with Mr. Freedman on Signal.
14           Do you see that?
15      A    Yes.
16      Q    And, again, Mr. Freedman is not your
17   lawyer at this point in time; is that right?
18      A    That is correct.
19      Q    Did you think it was strange that you
20   were being directed to contact an attorney on
21   Signal?
22      A    No.
23      Q    Is that something you've been asked to do
24   before?  Contact an attorney on Signal?
25      A    I don't recall, no.
```

Page 322

1  your email accounts?
2       A    I -- I don't -- I don't know.
3       Q    Do you know, for example, whether your
4  RWA email account deletes information after a
5  certain period of time?
6       A    I do not know.
7       Q    Did you ever, at any point, go check
8  whether the RWA account has an auto delete feature
9  on it?
10      A    I don't believe it does, but I did not
11 specifically check.
12      Q    Did you ever receive an instruction to
13 discontinue any deletion, auto delete functions that
14 might exist on your accounts?
15           MR. FREEDMAN:  Objection.  I will
16 instruct you not to answer as to any communications
17 you had with counsel.  Other than counsel, did you
18 get an instruction from someone?
19           THE WITNESS:  No.
20 BY MR. GOTTLIEB:
21      Q    Did you come to understand at any time,
22 Ms. Abel, that you had an obligation to preserve
23 documents relating to the dispute between Ms. Lively
24 and Mr. Baldoni?
25           MR. FREEDMAN:  Same instruction as it

Page 323

1  will invade the attorney-client privilege.  So even
2  if you're going to say yes to that, that's going to
3  invade the attorney-client privilege.  So you're not
4  going to -- I'm going to instruct her not to answer.
5           MR. GOTTLIEB:  About the simple fact of
6  whether she knew she was required to preserve
7  documents?
8           MR. FREEDMAN:  Yeah, because the simple
9  fact is revealing the actual privileged
10 communication.
11          MR. GOTTLIEB:  Okay.
12 BY MR. GOTTLIEB:
13     Q    So are you going to follow your counsel's
14 instruction?
15     A    Yes, I'm going to follow my counsel's
16 instruction.
17     Q    Okay.
18          Other than the Signal thread that you --
19 that we talked about earlier in August, between
20 August and December of 2024, can you think of any
21 other Signal thread or Signal communications that
22 you sent or received to anyone about anything?
23     A    Not that I can recall, no.
24     Q    Okay.  Have you had Signal communications
25 since December of 2024?

1    Q    -- I understand you're saying you
2    produced what you found.  My question is:  At any
3    point in time, do you have a recollection of taking
4    steps to ensure that nothing would be deleted, no
5    auto delete functions would be on, no messages would
6    expire from a set period of time or the like,
7    anything like that?
8              MR. FREEDMAN:  Same instruction as to
9    attorney-client privilege.  If you can answer it
10   outside of that, you can answer it.
11             THE WITNESS:  Yeah, I don't think I can
12   answer it.
13   BY MR. GOTTLIEB:
14   Q    Are you aware that you have produced four
15   Signal communications to us in this case?
16             MR. FREEDMAN:  Again, if you're aware of
17   it based on something you learned from counsel, I
18   would like you not to provide that information.  If
19   you're aware of it some other way, you can answer.
20             THE WITNESS:  I'm not aware of it any
21   other way.
22   BY MR. GOTTLIEB:
23   Q    Do you know that there are Signal
24   communications that you have been copied on that
25   have been produced to us in this case that you have