# EXHIBIT 8

Filed Under Seal

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                      ---oOo---
 4
 5    BLAKE LIVELY,
 6                    Plaintiff,
 7      vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)
                               25-CV-449 (LJL) (MEMBER CASE)
 8
      WAYFARER STUDIOS LLC, ET AL.
 9
                      Defendants.
10    _____
      JENNIFER ABEL,
11               Third-party Plaintiff,
         vs.
12    JONESWORKS, LLC,
                 Third-party Defendant.
13    _____
      WAYFARER STUDIOS LLC, et al.
14               Consolidated Plaintiffs,
         vs.
15    BLAKE LIVELY, et al.
                 Consolidated Defendants.
16    _____
17                   **CONFIDENTIAL**
18
19        VIDEO-RECORDED DEPOSITION OF JAMEY HEATH
20              Los Angeles, California
21              Wednesday, October 8, 2025
22
23    Stenographically Reported by:  Ashley Soevyn,
      CALIFORNIA CSR No. 12019
24
25
```

CONFIDENTIAL

Page 313

1    the subject of testimony with your attorneys during

2    your break?

3              MS. SHAPIRO:  I direct you not to answer

4    any questions about your discussions with your

5    attorneys.

6    BY MS. HUDSON:

7         Q    Are you following that instruction?

8         A    Yes.

9         Q    Okay.

10             MS. HUDSON:  Hand you Exhibit 16.

11         (Exhibit 16 marked for identification.)

12             THE WITNESS:  Sure.

13   BY MS. HUDSON:

14        Q    Exhibit 64 is a --

15             MS. SHAPIRO:  Sixty-four or 16?

16             MS. HUDSON:  I'm sorry.

17   BY MS. HUDSON:

18        Q    Exhibit 16 is a text chain from --

19   between Jamey Heath and Mitz Toskovic, dated

20   June 17th, 2024, Bates-stamped TOSKOVIC_677.

21             Do you recognize this as a text chain

22   between you and Ms. Toskovic?

23        A    Yes.

24        Q    And you participated in this text

25   communication with Mitz Toskovic, correct?

CONFIDENTIAL

Page 314

```
 1          A     Yes.
 2          Q     And you ask her in this text chain, you
 3     say you have -- you've got a big job for you.
 4                Do you see that at 3:14 p.m. on page 1?
 5          A     I see it.
 6          Q     And then if you turn to the next page,
 7     you tell her:
 8                (As read):
 9                      "I need you to start putting a timeline
10                      doc.  Try to get as close to dates as
11                      possible.  We can fill in the links
12                      when I get back.  But when Justin and
13                      Blake met to write.  AJ maybe had in
14                      calendar.  Can you access?  When we
15                      shot the first karaoke scene, it's when
16                      I showed her the video of Tasha.  When
17                      Ange visited the first time and had
18                      the, quote, 'makeup trailer convo that
19                      apparently looked at her,' end quote.
20                      When we shot the graveyard scene.  When
21                      Justin met with trainer.  When Justin
22                      had convo with Blake and Ryan regarding
23                      asking about her weight.  When we had
24                      the convo when we went back in Blake's
25                      house with Ange and Todd.  Essentially,
```

CONFIDENTIAL

Page 315

1              anything we can get either the date and
2              alleged incident or the general time
3              frame and we can narrow in later.
4              Something chronological.  Best you can.
5              Consult with Reese where needed.  The
6              doc can be have gaps but at least let's
7              get something started."
8         And then you go on to say:
9         (As read):
10             "Whatever you can remember.  Whatever
11             Reese remembers.  Whatever AJ may
12             remember.  Anything at all.  Also, when
13             we got letter from Blake.  Just
14             anything that tells the story
15             chronologically, and then we will just
16             continue to build it."
17        Do you see that?
18    A    I do.
19    Q    Okay.
20        MS. HUDSON:  I'm going to give you
21    another document now.  What are we, Exhibit 17?  And
22    Exhibit 18.
23        (Exhibit 17 marked for identification.)
24        (Exhibit 18 marked for identification.)
25

CONFIDENTIAL

Page 316

1      BY MS. HUDSON:

2          Q    You asked Ms. Toskovic to put together a

3      timeline on June 17th, correct?

4          A    Are you referring to this document?

5          Q    Yes.

6          A    I see that.

7          Q    Okay.  And Exhibit 17 is an email

8      forwarding a timeline.

9               Do you see that?

10         A    I do.

11         Q    And then Exhibit 18, I'll represent for

12     the record, is the document that was produced to us

13     that is reflected in the attachment to that email

14     that says "document produced in native format."

15         A    Can you repeat the -- the last thing?

16     Sorry, I was --

17         Q    Sure.

18         A    -- I was finishing 17.

19         Q    Sure.

20              So Exhibit 17 is an email forwarding a

21     timeline.

22              Do you see that?

23         A    I do.

24         Q    Okay.  And then it says, on the second

25     page of that email, "produced in native format"?

CONFIDENTIAL

Page 317

1           A     Uh-huh.  I do.  Yes.

2           Q     I'm representing to you that the native

3      format that we received in the production from your

4      lawyers is that document.

5           A     Okay.

6           Q     Okay?  Is this document, Exhibit 18, the

7      timeline that you asked Ms. Toskovic to create?

8           A     It looks to be so.

9           Q     Okay.  Why did you ask Ms. Toskovic to

10     create a timeline on June 17th?

11          A     Just to have a timeline of our whole

12     experience of the movie.

13          Q     Your whole experience of the movie, as it

14     relates to Ms. Lively?

15          A     Just our -- the timeline of what we

16     experienced throughout the movie, yes.

17          Q     For what purpose?

18          A     So we could have a record of our --

19     our -- the last year and a half of what we have

20     experienced.

21          Q     Why?

22          A     There was a lot that went on over the

23     year and a half on different levels, production and

24     all levels.  I just wanted to have a timeline of it.

25          Q     Well, your -- your text message to

CONFIDENTIAL

Page 318

1        Ms. Toskovic doesn't say anything about things that

2        happened during production in general, right?

3                    MS. SHAPIRO:  Objection.

4                    THE WITNESS:  Right.  Uh-huh.

5        BY MS. HUDSON:

6             Q    All of the things that are in your text

7        message to Mitz Toskovic relate to Ms. Lively,

8        correct?

9                    MS. SHAPIRO:  Objection.

10                    THE WITNESS:  Yeah, I see that's in the

11        -- in the text message.  Yeah.

12        BY MS. HUDSON:

13             Q    So why did you ask Ms. Toskovic to create

14        a timeline on June 17th, 2024 related to Ms. Lively?

15             A    That was one of the aspects of our whole

16        time on the movie, and I also wanted to include

17        that.

18             Q    Well, you didn't say reference anything

19        else, correct?  You only referenced issues related

20        to Ms. Lively in your text messages to Mitz

21        Toskovic, correct?

22                    MS. SHAPIRO:  Objection.

23                    THE WITNESS:  In this particular text

24        message, that's -- that's all it speaks to.

25

CONFIDENTIAL

Page 319

1    BY MS. HUDSON:

2        Q    Yeah, that's all you said when you asked

3    Ms. Toskovic to create a timeline, correct?

4            MS. SHAPIRO:  Objection.

5            THE WITNESS:  In this text message,

6    that's what it refers to.  Yes.

7    BY MS. HUDSON:

8        Q    Do you have another text message?

9            MS. SHAPIRO:  Objection.

10           THE WITNESS:  I don't know.

11   BY MS. HUDSON:

12       Q    Okay.  Well, why are -- my question to

13   you, Mr. Heath, is:  Why you were asking Ms.

14   Toskovic to create a timeline that references events

15   related to Ms. Lively on June 17th, 2024?

16       A    Our experience of the movie, and at this

17   point in June, we were unsure.  Justin had lost the

18   movie, I think, by this point.  We were dealing with

19   a lot of conversations with Sony about how to

20   navigate moving forward with him as the director.

21   We've got the release of the movie coming up -- and

22   in all of this and being confused of where we stood

23   with all of this, I just wanted to have documented

24   just our -- our whole experience with the movie.

25       Q    For what purpose?

CONFIDENTIAL

1           A    Just so I could have a good recollection
2      of it.  So that I knew what our last year and a half
3      was.
4           Q    Were you looking for a timeline of
5      incidents related to Ms. Lively's complaints?
6                MS. SHAPIRO:  Objection.
7                THE WITNESS:  No, not necessarily.  We
8      just -- I just wanted any experience that we had in
9      all capacities to be -- have a timeline.
10     BY MS. HUDSON:
11          Q    Well, but the timeline doesn't address
12     every experience that you had in all capacities,
13     does it?
14          A    I haven't gone through the whole thing,
15     but in all capacities, just with our experience.
16     Certainly with -- I mean, I can see that, you know,
17     a lot of this is with Blake, so that was a big part
18     of our experience.
19          Q    That was a big part of your experience.
20     And incidents where Ms. Blake -- or Ms. Lively
21     expressed concerns, correct?
22                MS. SHAPIRO:  Objection.
23                THE WITNESS:  I would say it's exactly
24     what I said it was.
25

CONFIDENTIAL

Page 321

1    BY MS. HUDSON:

2        Q    And the incidents that you identified to

3    Ms. Toskovic are incidents that you were aware that

4    Ms. Lively had raised concerns of prior to

5    June 17th, 2024, correct?

6        A    Can you repeat that, please?

7            MS. HUDSON:  The incidents that you

8    raised to Mitz Toskovic were incidents that you were

9    aware of prior to June 17th, 2024 that Ms. Lively

10   had raised concerns about, correct?

11           MS. SHAPIRO:  Objection.

12           THE WITNESS:  In this text message, it

13   references some of those.  Yes.

14   BY MS. HUDSON:

15       Q    Yes.  So the -- you -- you were aware of

16   the incidents that you told Ms. Toskovic about prior

17   to June 17th, 2024, correct?

18           MS. SHAPIRO:  Objection.

19           THE WITNESS:  Was I aware?  Yes, I was

20   aware that Justin met with the trainer.  I was aware

21   about -- he asked about the weight.  I was aware of

22   some of these things.  Yes.

23   BY MS. HUDSON:

24       Q    Well, you were aware of all of them

25   because you wrote them down, right?

CONFIDENTIAL

Page 322

```
 1          A     Yes.
 2          Q     And you wouldn't have been able to write
 3     them down if you weren't aware of all of them,
 4     correct?
 5          A     I was aware --
 6                MS. SHAPIRO:  Objection.
 7                THE WITNESS:  I was aware that these were
 8     included, yes.
 9     BY MS. HUDSON:
10          Q     That these were all things that
11     Ms. Lively had raised concerns about, correct?
12                MS. SHAPIRO:  Objection.
13                THE WITNESS:  Some of them; some of them
14     not.
15     BY MS. HUDSON:
16          Q     Okay.  Which one of these lists are not
17     things that Ms. Lively had raised concerns about
18     that you were aware of on June 17th?
19                MS. SHAPIRO:  Objection.
20                THE WITNESS:  Well, just as I go through
21     it, when we shot the graveyard scene.  When we had a
22     meeting at Blake's home.
23     BY MS. HUDSON:
24          Q     Why did you want to have a record of when
25     you had the meeting at Blake's home?
```

CONFIDENTIAL

Page 323

1          A    It was one of the things that we'd
2    experienced on the movie.
3          Q    Uh-huh.  And when you said "essentially
4    anything we can get either the date and alleged
5    incident," what did you mean by "alleged incident"?
6          A    I don't recall.  I don't know.
7          Q    Are -- are -- you don't know what you
8    meant by "alleged incident"?
9          A    I don't know exactly.
10         Q    Okay.  And did you have any further
11   follow-up with Mitz Toskovic about what you meant by
12   "alleged incident"?
13         A    I don't know.
14         Q    You don't know if you did?
15         A    I don't know.
16         Q    But somehow from -- did you give her any
17   direction beyond what you put in this Exhibit 16?
18         A    I don't know.
19         Q    Had you talked to Ms. Toskovic about the
20   alleged incidents before?
21              MS. SHAPIRO:  Objection.
22              THE WITNESS:  I don't recall.
23   BY MS. HUDSON:
24         Q    Do you -- did you assume she understood
25   what you meant by that?

CONFIDENTIAL

Page 324

1              MS. SHAPIRO:  Objection.

2              THE WITNESS:  I don't know what I meant

3      by that, but I see that there's a list of things

4      here that specifically asked her to.  So other than

5      that, I don't.

6      BY MS. HUDSON:

7          Q    What I'm asking you, Mr. Heath, is:  Did

8      you have a belief that Mitz Toskovic would

9      understand what you meant by "alleged incidents"?

10         A    I don't know.

11         Q    You don't know?

12         A    I don't know.  I don't know what I meant

13     by that.

14         Q    Do you -- is it Ms. Toskovic that created

15     the timeline in Exhibit 18?

16         A    She was -- she assisted, yes.

17         Q    Who else was involved in creating this

18     timeline?

19         A    Myself.

20         Q    What did you do to create this timeline?

21         A    Just gave -- gave more info to -- what

22     this is here, added to this timeline.

23         Q    How much of the information in this

24     timeline did you put in the timeline?

25         A    I don't know.

CONFIDENTIAL

Page 329

1      any way after, at minimum, August 6th, 2024,
2      correct?
3                  MS. SHAPIRO:  Objection.
4                  THE WITNESS:  I don't know.
5      BY MS. HUDSON:
6            Q     You don't know?
7            A     I don't.
8            Q     Okay.  You have no recollection of making
9      any changes to this timeline after August 6th, 2024,
10     correct?
11           A     To this timeline --
12                 MS. SHAPIRO:  Objection.
13                 THE WITNESS:  -- I don't have a
14     recollection.
15     BY MS. HUDSON:
16           Q     Okay.  And you don't know -- you didn't
17     direct Ms. Toskovic to make changes to this timeline
18     after August 6th, 2024, correct?
19           A     I don't recall.  I don't know.
20           Q     Okay.  Why did you send the timeline --
21     or why did you have the timeline sent to -- well,
22     strike that.
23                 Do you know why the timeline was sent to
24     The Agency Group?
25           A     To TAG?

CONFIDENTIAL

Page 330

1          Q     Yes.

2          A     I think at that point, it was a -- a

3     quick way to give them a glimpse of a timeline of

4     our experience.

5          Q     Your experience with Ms. Lively?

6          A     Our experience that was outlined in this

7     timeline.

8          Q     Your experience with Ms. Lively?

9          A     That is part of it.

10         Q     Okay.  It was a way to give TAG a quick

11    update -- or a summary of the alleged incidents, as

12    you described them, correct?

13              MS. SHAPIRO:  Objection.

14              THE WITNESS:  I wouldn't characterize it

15    as that.  I just think it was a quick way to get a

16    little bit of an update of some of the elements.

17    BY MS. HUDSON:

18         Q     Some of the elements of issues that had

19    arisen with Ms. Lively, correct?

20         A     Of our experience of the set, and some of

21    that included experiences with Ms. Lively for sure.

22         Q     And that's because you had retained TAG

23    at that point to help you with crisis management

24    related to your concerns about Ms. Lively

25    potentially going public, correct?

CONFIDENTIAL

Page 356

1          A     A handful.  I don't know exactly.

2          Q     And do you recall any of the -- those

3     conversations with any specificity?

4          A     From our first conversation, he seemed

5     like a really nice guy.  We talked about -- I

6     remember we talked about our kids, and he would just

7     check in, how are you doing.  He knew that there was

8     a lot of social noise going on, and he was just

9     oftentimes calling to express his -- for lack of a

10    better word, his love.

11         Q     So Mr. -- your conversations with

12    Mr. Wallace after meeting him in August of 2024 were

13    about his love for you?

14              MS. SHAPIRO:  Objection.

15              MR. GLOVER:  Objection.  Form.

16              THE WITNESS:  No.

17    BY MS. HUDSON:

18         Q     When you say "his love," what do you mean

19    by that?

20         A     That's a term I would use just to express

21    some -- some nice words of encouragement.  You know,

22    we see what's going on.  We're monitoring.  I hope

23    you're well.  Things of that nature.

24         Q     Did he tell you what he saw going on?

25         A     We did not really get into that much,

CONFIDENTIAL

Page 357

1      other than him saying things like, things are

2      looking okay out there.  So sorry for what's going

3      on.  He would give some general acknowledgments of

4      that nature, but we didn't get into the weeds.

5           Q    He didn't tell you what it was he saw?

6           A    I don't recall exactly what was said, but

7      we did not get into weeds of stuff.

8           Q    So your -- your testimony is that in the

9      conversations that you had with Mr. Wallace, they

10     were just check-ins essentially about your

11     well-being?

12               MS. SHAPIRO:  Objection.

13               THE WITNESS:  I mean, I'm looking at our

14     text threads here.  "I appreciate this message.

15     Congrats on a big weekend.  Appreciate you.  Looking

16     forward to meeting you.  Just checking in."  That

17     was typically, you know -- we connected.

18     BY MS. HUDSON:

19          Q    You didn't have conversations about the

20     work, though, is that what you're saying, that you

21     had contracted with Mr. Wallace to do for nearly

22     $100,000?

23               MS. SHAPIRO:  Objection.

24               MR. GLOVER:  Objection.  Form.

25               THE WITNESS:  It would be like me having

CONFIDENTIAL

Page 358

1    a conversation with somebody about a world in a

2    language I just don't understand.  That wasn't our

3    conversation.  It was just more -- we connected and

4    that was what our conversations were.

5    BY MS. HUDSON:

6         Q     I'm trying to understand why you feel the

7    world that Mr. Wallace occupied was something that

8    you couldn't understand.  Why is that?

9              MS. SHAPIRO:  Objection.

10             THE WITNESS:  I am not a digital

11   monitoring person that understands social media and

12   all of that.  So...

13   BY MS. HUDSON:

14        Q     What did you understand digital

15   monitoring to mean?

16        A     Monitoring what was going on in the

17   digital realm.

18        Q     And you weren't curious about how

19   Mr. Wallace did that?

20        A     It wasn't one of my -- I didn't have any

21   reason to be concerned about it or think about it

22   beyond that.  It just was he was here to help, and

23   that's all that -- that's all that mattered.  He was

24   doing it in a way that I understood was aligned with

25   us.

CONFIDENTIAL

Page 359

1          Q    On August 11th, Mr. Wallace said --
2      you -- you refer to Signal.
3               Do you see that?
4          A    Which one is this?
5          Q    August 11th at 12:02 a.m.
6          A    Hey, man, I appreciate your message.  I
7      could tell after speaking with you --
8          Q    In the middle, you say:
9               (As read):
10                  "As for Signal, I'm not on it, but
11                  we'll set that up this week for sure.
12                  I'll let you know once I've done that."
13              Do you see that?
14         A    I do.
15         Q    Did you set up Signal at this time?
16         A    I must have.  I think I might -- I think
17     I did.
18         Q    And did you let Mr. Wallace know that you
19     had set it up?
20         A    I don't know.
21         Q    Did you communicate with Mr. Wallace on
22     Signal at this -- after August 11th, 2024?
23         A    I think there was a few -- a few messages
24     sent.
25              Q    And when did you first send a Signal

CONFIDENTIAL

Page 360

1      message to Mr. Wallace?

2          A    I don't recall.

3          Q    When did you first receive a Signal

4      message from Mr. Wallace, if at all?

5          A    I don't recall.  I guess it would have

6      been around this time.  That's my guess.

7          Q    Okay.  And did you communicate on Signal

8      with anyone else after you obtained Signal?

9          A    I don't think so.

10         Q    The only person --

11         A    There could have been somebody, but I

12     don't think so.

13         Q    The only one you recall communicating

14     with on Signal was Mr. Wallace?

15              MS. SHAPIRO:  Objection.

16              THE WITNESS:  The time, I don't remember.

17     It could have been.  I -- I would have to refresh my

18     memory.  Maybe there was something with Jen and

19     Melissa on there, but I don't have a specific memory

20     of it.

21     BY MS. HUDSON:

22         Q    Did you have a group chain with

23     Mr. Wallace, Ms. Abel, and Ms. Nathan at this time?

24         A    I don't know if that was on Signal or a

25     text message, but I think that we did.

CONFIDENTIAL

Page 361

1          Q     You think you did on Signal?

2          A     I don't know which one.

3                MS. SHAPIRO:  Objection.

4     BY MS. HUDSON:

5          Q     You might have on Signal?

6                MS. SHAPIRO:  Objection.

7                THE WITNESS:  We may have.

8     BY MS. HUDSON:

9          Q     You believe that there was at minimum a

10    text chain with you, Ms. Nathan, and Mr. Wallace?

11               MR. GLOVER:  Objection.  Form.

12    BY MS. HUDSON:

13         Q     Regardless of platform?

14               MS. SHAPIRO:  Objection.

15               THE WITNESS:  I think there may have

16    been.  I don't -- I'm happy to be refreshed.

17    BY MS. HUDSON:

18         Q     Other than Mr. Wallace and possibly

19    Ms. Nathan and Ms. Abel, is there anyone else that

20    you recall communicating with on Signal and in

21    August of 2024?

22               MS. SHAPIRO:  Objection.

23               THE WITNESS:  I don't know the month.

24    There was so many ways of communicating, email,

25    phone -- excuse me -- text messages.  Signal could

CONFIDENTIAL

Page 362

1    have been one of them.  I just don't know.

2    BY MS. HUDSON:

3         Q    So you may have communicated with other

4    people on Signal in August of 2024 other than the

5    ones you identify?

6         A    I don't have a particular recollection of

7    it because I think that was the only people that I

8    communicated with at that time, but I don't know.

9         Q    Did you communicate with Mr. Freedman on

10   Signal in August of 2024?

11        A    I don't know.

12        Q    You may have?

13        A    I don't know.

14        Q    Did you communicate with Mr. Baldoni on

15   Signal in August of 2024?

16        A    I don't know.

17        Q    When you downloaded Signal, did you make

18   any effort to change any of the settings for the

19   handling of preservation of messages?

20        A    In August?

21        Q    When you downloaded Signal?

22        A    No.

23        Q    Did the messages that you exchanged on

24   Signal in August of 2024 automatically disappear as

25   far as you know?

CONFIDENTIAL

Page 363

```
 1              MS. SHAPIRO:  Objection.
 2              THE WITNESS:  I think that depends on
 3      whatever thread I was on, whoever initiated it may
 4      have set the settings.  I don't have any particular
 5      memory of myself setting something to disappear.
 6      BY MS. HUDSON:
 7          Q    And did you set up your Signal messages
 8      so that they would not disappear?
 9          A    In August?
10          Q    Yes.
11          A    I don't believe I was thinking about
12      that.
13          Q    Did you communicate by Signal in
14      September of 2024?
15          A    I may have.
16          Q    And who do you believe you may have
17      communicated with on Signal in September of 2024?
18              MS. SHAPIRO:  Objection.
19              THE WITNESS:  It would be a guess.  I
20      just don't know.
21      BY MS. HUDSON:
22          Q    Did you communicate with Mr. Wallace on
23      Signal in September of 2024?
24              MR. GLOVER:  Objection.  Form.
25              THE WITNESS:  I may have.
```

CONFIDENTIAL

Page 364

1    BY MS. HUDSON:

2        Q    Did you communicate with Ms. Abel on

3    Signal in September of 2024?

4        A    I may have.

5        Q    Did you communicate with Ms. Nathan on

6    Signal in 2024?

7        A    I may have.

8        Q    Is -- did you communicate with

9    Mr. Freedman on Signal in 2024 -- in September of

10   2024?

11       A    I know for sure not.

12       Q    And why do you know that one for sure?

13       A    Well, because I only had one conversation

14   with Mr. Freedman.

15       Q    On Signal?

16       A    No.  I had one conversation with him

17   in -- I don't remember what month it was.  Maybe it

18   was in August.

19       Q    Did you communicate with anyone on Signal

20   in October of 2024?

21       A    I may have.

22       Q    And did you speak with -- did you

23   communicate with Mr. Wallace on Signal in October of

24   2024?

25       A    It's the same.  I may have.  I'm -- I

CONFIDENTIAL

Page 365

1    don't have a particular recollection of it.  I'm

2    certainly not disputing that I would or would.  I

3    just don't have a memory.  I mean, I don't know.

4         Q    Did you communicate -- do you have any

5    memory of communicating with Mr. Wallace in November

6    of 2024 on Signal?

7         A    I may have.

8         Q    And I asked you about Mr. Wallace in

9    October and November.  In those months, did you

10   communicate with Ms. Nathan or Ms. Abel on Signal?

11             MS. SHAPIRO:  Objection.

12             THE WITNESS:  I may have.

13   BY MS. HUDSON:

14        Q    Did you communicate with anyone -- any

15   Wayfarer employees on Signal between August and

16   December 2024?

17        A    I don't know during that -- during that

18   period of time.

19        Q    You don't know but you may have?

20        A    I don't have a memory of it during that

21   time, no.

22        Q    For any of the communications that you

23   had on Signal between August and December 2024, do

24   you have any of them still?

25             MR. GLOVER:  Objection.  Form.

CONFIDENTIAL

Page 370

1           Q    Have you taken any steps to learn if

2     Wayfarer has any policies, practices, or procedures

3     regarding document retention or deletion?

4               MS. SHAPIRO:  Objection.  Just to be

5     clear again, he's not here as a 30(b)(6) witness.

6               THE WITNESS:  I have not taken any

7     particular steps as a company to make sure that

8     our -- there is some sort of policy.  But Wayfarer

9     is -- is aware to not delete anything.

10    BY MS. HUDSON:

11          Q    And how would you know?  How is Wayfarer

12    aware not to delete anything?

13              MS. SHAPIRO:  Objection.

14              THE WITNESS:  Once we received the CRD

15    complaint, sometime at that point we were made

16    aware, and that was communicated.

17    BY MS. HUDSON:

18          Q    So you -- you weren't aware of any

19    obligations to preserve or not delete documents

20    until you received the CRD complaint?

21              MS. SHAPIRO:  Objection.

22              THE WITNESS:  Was not aware.

23    BY MS. HUDSON:

24          Q    So did you make any effort to preserve or

25    not delete documents prior to receiving the CRD

CONFIDENTIAL

Page 371

1    complaint?

2              MS. SHAPIRO:  Objection.

3              THE WITNESS:  Other than what I said,

4    that there was no reason or auto delete happening,

5    there was no particular effort to go outside the

6    normal scope.

7    BY MS. HUDSON:

8         Q    And you said that you received

9    instructions to preserve documents after Ms. Lively

10   filed her CRD complaint?

11             MS. SHAPIRO:  Objection.

12             THE WITNESS:  I don't know if it was the

13   CRD complaint or the lawsuit.  I don't recall, but

14   during that period we learned that there was -- or

15   maybe it was a -- maybe it was a notice from

16   Mr. Gottlieb.  Sometime in that frame we were made

17   aware.  I don't recall where it came from.

18   BY MS. HUDSON:

19        Q    Are you talking about the cease and

20   desist letter that we sent?

21        A    It may have been that.  I don't recall

22   exactly.  It was just in that time frame.

23        Q    And did you take some steps to preserve

24   documents once you received the cease and desist

25   letter?

CONFIDENTIAL

Page 372

```
 1          A    Yes.
 2          Q    What steps did you take?
 3          A    Made sure that personally, if there was
 4     anything that was said to disappear or delete, that
 5     they were not.  Told Wayfarer parties to not delete
 6     anything, that in case they otherwise might.  I
 7     can't recall at the moment, but I think those were
 8     the general steps.
 9          Q    Okay.  And did you have any personal
10     devices that were set for automatic deletion at that
11     time?
12               MS. SHAPIRO:  Objection.
13               THE WITNESS:  There may have been some
14     threads that were on Signal.  So I just reviewed
15     them and made sure that they were not on
16     disappearing mode.
17     BY MS. HUDSON:
18          Q    So what was -- what was there between
19     August and December 2024, you ensured it was not on
20     auto disappearing mode?
21               MS. SHAPIRO:  Objection.
22               THE WITNESS:  I don't understand the
23     question.
24     BY MS. HUDSON:
25          Q    Well, you said that you had some
```

CONFIDENTIAL

Page 373

1    communications between August and December of 2024,

2    correct?

3         A    Yes.

4         Q    And when you got the cease and desist

5    letter, you looked at the threads to make sure that

6    they were not on automatic disappearing mode,

7    correct?

8         A    Correct.

9         Q    So at the time that you did that, those

10   threads existed, correct?

11        A    Correct.  I imagine so.

12        Q    And they should still be there then,

13   right?

14        A    I believe they would be.

15        Q    And were any of those threads related in

16   any way to Ms. Lively, Mr. Reynolds, or any of the

17   issues in this litigation?

18             MS. SHAPIRO:  Objection.  Form.

19             THE WITNESS:  I didn't pay attention to

20   the content.  I just made sure that whatever thread

21   there was, was -- was not -- there is no nothing in

22   there that would auto delete or auto disappear.

23   BY MS. HUDSON:

24        Q    And that's for all your Signal

25   communications?