UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__11/5/2025__
```

-----------------------------------------------------------------------X
                               :

BLAKE LIVELY,                       :

                            :

                  Plaintiff,         :            24-cv-10049

                            :

        -v-                     :    OPINION AND ORDER

                            :

WAYFARER STUDIOS LLC, JUSTIN BALDONI,  :
JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH :
US MOVIE LLC, MELISSA NATHAN, THE AGENCY :
GROUP PR LLC, JENNIFER ABEL, JED WALLACE,  :
STREET RELATIONS, INC.,            :

                            :

                  Defendants.     :

                            :

-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendants Jed Wallace ("Wallace") and Street Relations, Inc. ("Street," and with

Wallace, the "Wallace Defendants") move, pursuant to Federal Rule of Civil Procedure 12(b)(2),

to dismiss the Second Amended Complaint against them for lack of personal jurisdiction.  Dkt.

No. 642.  The Wallace Defendants also move for an order dismissing the claims against them

under Rule 12(b)(6) or, in the alternative, for an order severing the claims and transferring venue

to the United States District Court for the Western District of Texas.  *Id.*  The motion to dismiss

for lack of personal jurisdiction is granted.

**BACKGROUND**

      The Court has recounted the factual background of this case in prior opinions and orders.

*See, e.g.*, Dkt. No. 426 at 2–15.  The Court will not now repeat that background except to

supplement its previous discussion in light of the newly pleaded allegations in Plaintiff Blake

Lively's ("Lively") Second Amended Complaint.  As the Court has previously explained, the

allegations detailed below do not at this stage of the litigation "reflect the Court's own findings."

*Lively v. Wayfarer Studios LLC*, 786 F. Supp. 3d 695, 714 (S.D.N.Y. 2025) (quoting *Brown v. Maxwell*, 929 F.3d 41, 52 (2d Cir. 2019)).

Broadly, this case involves alleged sexual harassment and retaliation during and after the filming of the movie *It Ends With Us* (the "Film"). *See* Dkt. No. 520 ("Second Amended Complaint" or "SAC"). Lively, who stars in the Film, asserts that during production she was sexually harassed by Justin Baldoni ("Baldoni"), her co-star and director of the Film, and Jamey Heath ("Heath"), CEO of the Film's production company, Wayfarer Studios LLC ("Wayfarer"). *Id.* When she reported the harassment, Baldoni, Heath, Wayfarer, and others allegedly retaliated against her by launching a public-relations smear campaign to tarnish her reputation and credibility. *Id.* Among the individuals allegedly involved in assisting Baldoni, Heath, and Wayfarer with the smear campaign were: Steve Sarowitz ("Sarowitz"), co-chairman and co-founder of Wayfarer, *id.* ¶ 26; Melissa Nathan ("Nathan"), a crisis management and communications professional who launched The Agency Group PR LLC ("TAG") in January 2024, *id.* ¶¶ 62–63; non-parties Katherine Case ("Case") and Breanna Butler Koslow ("Koslow"), two employees of TAG, *id.* ¶ 293; Jennifer Abel ("Abel"), a public relations professional, *id.* ¶ 64; and Wallace, a Texas-based public-relations consultant offering "crisis mitigation services" who owns and runs the public-relations firm Street Relations, *id.* ¶¶ 65–66.[1]

In addition to those allegations detailed in the Court's prior opinion and order, the SAC alleges that at least some of the Wayfarer Parties were in New York for press appearances in anticipation of the Film's August 6, 2024 New York premiere when they initiated contact with Wallace about retaining him to conduct an "astroturfing" campaign wherein Wallace and Street

---

[1] Baldoni, Heath, Wayfarer, Sarowitz, Nathan, TAG, and Abel will be collectively referred to as the "Wayfarer Parties."

would "create, seed, promote, and engage with content that appeared to be authentic on social media platforms and internet chat forums" in order to "influence public opinion and thereby cause an organic pile-on [against Lively]." *Id.* ¶¶ 38, 293a–n.  While the Wayfarer Parties were in New York during the leadup to the premiere, they also shared relevant information with Wallace about the public-relations crisis, including Lively's allegations against Baldoni and Heath. *Id.* ¶¶ 293a–b.  Furthermore, they introduced Wallace to one another and formally retained him at a price of $30,000 per month for three months. *Id.* ¶¶ 293c–h.  Wallace almost immediately thereafter began completing work for the Wayfarer Parties. *Id.* ¶¶ 293i–k.

The SAC alleges that along with hiring Wallace, the Wayfarer Parties "have further pursued their public strategy through frivolous litigation designed to create press attention, intimidate others from coming forward, and pressure Ms. Lively to give up her claims." *Id.* ¶ 304.  "[A]lthough Mr. Wallace was not a plaintiff in the Wayfarer Parties' retaliatory lawsuit against Ms. Lively, he was actively supporting it in the background and attempting to manipulate public opinion relating to it—all while fully aware that the Wayfarer Parties' retaliatory countersuit would be filed, and was being maintained, in New York." *Id.* ¶ 293n.  Wallace's involvement allegedly entailed helping to construct a website, "thelawsuitinfo.com," which selectively published certain documents and filings in the Wayfarer Parties' lawsuit and thereby "promote[d] a public narrative about their New York-based retaliatory litigation." *Id.*

The SAC also contains allegations regarding Wallace's knowledge of the Wayfarer Parties' presence in New York at various points.  On August 4, 2024, Baldoni appeared in an Instagram story that included a photo of him in an airport bookstore with the caption, "Excited to be heading to New York for a full week of press for @itendswithusmovie!" *Id.* ¶ 293m.  The SAC asserts that "[a]nyone engaged in even 'passive observation and analysis of the social

media environment as it pertained to It Ends With Us' would have been aware of that post." *Id.*

Moreover, it alleges that Wallace's communications with the Wayfarer Parties revealed that they

were in a time zone one hour ahead of Wallace's location in Texas, "indicating that [they were]

in New York." *Id.* ¶ 293d.  One of these communications was from Abel, who was in New York

for the premiere and who told Wallace that she was in "morning press from 630am on" and then

"head[ed] straight to Chicago." *Id.*

Finally, the SAC contends that certain of Wallace's co-conspirators lived in New York

and that he was aware of this fact.  It states that given "that [he] remained involved in closely

coordinated work with the other Defendants from early August 2024 at least into early 2025, it is

implausible that he would not have learned during that time, and certainly prior to the filing of

the retaliatory lawsuit and the construction of the related website, that Case and Koslow were

New York residents actively transacting business in New York on behalf of TAG and otherwise

in order to perform numerous overt acts in furtherance of the conspiracy." *Id.* ¶ 293n.  The SAC

further states that "Mr. Wallace was also aware of his co-conspirators' residence in New York,

including because he participated in several text message or Signal chains with other phone

numbers having New York-based area codes." *Id.*  And it likewise alleges that Nathan resided in

Brooklyn, New York when she helped the Wayfarer Parties retain the Wallace Defendants. *Id.*

¶ 62.  In support of this allegation, the SAC cites a message Nathan sent to Abel wherein Nathan

stated that Abel "could've stayed at [her] apt" during the premiere in New York. *Id.*

In connection with their motion to dismiss for lack of personal jurisdiction, the Wallace

Defendants have included a declaration from Nathan in which she asserts, among other things,

that she did not live in Brooklyn or anywhere else in New York during the period when Street

was engaged by Wayfarer, Dkt. No. 649-6 ¶ 5; that she does not recall ever communicating with

Wallace, Street, or anyone working on their behalf while living in New York during the Wallace Defendants' engagement with Wayfarer, *id.* ¶¶ 6–7; and that she did not attend the Film's New York premiere, *id.* ¶ 8.

Lively, for her part, has included a declaration with her memorandum of law in opposition to the motion to dismiss purporting to demonstrate "extensive" phone communications between Wallace and Nathan on and after July 23, 2024.  Dkt. No. 714 ¶ 3.

## PROCEDURAL HISTORY

Lively initiated this action by filing a complaint against the Wayfarer Parties on December 31, 2024, alleging claims for sexual harassment, retaliation, breach of contract, and intentional and negligent infliction of emotional distress.  Dkt. No. 1.  Although Lively did not initially name Wallace or Street as defendants, she filed an amended complaint doing so on February 18, 2025.  Dkt. No. 84.  The Wallace Defendants then moved to dismiss the claims against them or, in the alternative, to sever the claims and transfer venue to the United States District Court for the Western District of Texas.  Dkt. No. 139.

On July 16, 2025, the Court issued an opinion and order granting the Wallace Defendants' motion to dismiss the First Amended Complaint against them for lack of personal jurisdiction.  *See Lively v. Wayfarer Studios LLC*, 2025 WL 1952027 (S.D.N.Y. July 16, 2025).  In its opinion and order, the Court held that Lively had alleged insufficient facts to support a basis for personal jurisdiction.

First, Lively did not argue that the Wallace Defendants themselves had sufficient contacts with New York that would satisfy the long-arm statute.  *Id.* at *11.  And the Court rejected Lively's argument that personal jurisdiction could rest on a theory of conspiracy jurisdiction under CPLR 302(a)(1).  The Court noted that "New York courts have never recognized a conspiracy-based theory of jurisdiction under 302(a)(1)."  *Id.* at *15.  "Assuming, without

deciding, that a defendant can be haled into a New York court based on conduct by a co-conspirator outside the state that would give rise to 302(a)(1) personal jurisdiction, Lively ha[d] not alleged any such conduct by a co-conspirator of which the Wallace Defendants had knowledge." *Id.* at *16. In particular, she had not alleged that the Wallace Defendants were aware of any action by a co-conspirator targeted at New York. *Id.*

The Court also concluded that Lively had not pleaded CPLR 302(a)(2) conspiracy jurisdiction because she had not "alleged that any co-conspirator performed overt acts in furtherance of the conspiracy while that co-conspirator was physically present in New York." *Id.* at *14. While Lively alleged that "certain co-conspirators took actions within New York during the filming of *It Ends With Us* . . .[,] these actions were not within the scope of or in furtherance of the alleged conspiracy to retaliate against Lively, which did not begin until after filming ended." *Id.* It was further insufficient that the amended complaint alleged that Nathan lived in Brooklyn "during a portion of the relevant period," because it did not allege that "she took an action in furtherance of the conspiracy while in New York." *Id.* at *14. It also was not enough that Sarowitz stated to a witness that he was prepared to spend money to "ruin the lives of Ms. Lively and her family while attending the Film's New York premiere," because there was no allegation that such statement was made to carry out the object of the conspiracy. *Id.*

The Court held, as an alternative ground in further support of its decision, that the amended complaint's jurisdictional allegations were deficient because there were no factual allegations that the Wallace Defendants were *aware* of torts being committed by co-conspirators in New York. *Id.* And Lively also insufficiently pleaded personal jurisdiction under CPLR 302(a)(3) because she did not plead that the Wallace Defendants regularly did or solicited

business in New York State or "derive[d] substantial revenue from interstate or international commerce." *Id.* at *11.

Finally, the Court held that the exercise of personal jurisdiction would violate due process because "the Amended Complaint contain[ed] no factual allegations that the Wallace Defendants directed or controlled any conduct into New York or were aware of any actions taken in New York or directed at New York." *Id.* at *17.

The Court granted Lively leave to file a second amended complaint, *id.* at *18, which she did on July 30, 2025, *see* Dkt. No. 520.

The Wallace Defendants then filed this motion to dismiss or transfer venue on August 13, 2025. Dkt. Nos. 642, 649–50. On August 27, 2025, Lively filed a memorandum of law and supporting declaration in opposition to the motion to dismiss. Dkt. Nos. 713–14. On September 3, 2025, the Wallace Defendants filed a reply memorandum of law in further support of their motion to dismiss or transfer. Dkt. No. 729.

## LEGAL STANDARD

"When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). "[W]here the parties have conducted extensive discovery regarding the defendant's contacts with the forum state, but no evidentiary hearing has been held . . . the plaintiff's *prima facie* showing, necessary to defeat a

jurisdiction testing motion, must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Multi Access Ltd. v. Guangzhou Baiyunshan Pharm. Holdings Co.*, 2024 WL 3498180, at *4 (S.D.N.Y. July 22, 2024) (internal quotation marks omitted) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996)).  While the Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs," *Dorchester*, 722 F.3d at 85, the Court need not "accept as true a legal conclusion couched as a factual allegation," *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir.1998)).

## DISCUSSION

The Wallace Defendants' present motion seeks dismissal of the SAC on the basis of lack of personal jurisdiction and failure to state a claim for relief under Federal Rules of Civil Procedure 12(b)(2) and (b)(6).  In the alternative, the motion seeks transfer of venue.  The Court turns first to personal jurisdiction, which renders discussion of the other issues unnecessary.

## I.    Personal Jurisdiction

The Wallace Defendants argue that the SAC fails to cure the deficiencies identified by the Court in its first opinion and order.  Dkt. No. 649 at 5.  They contend that the Court therefore continues to lack personal jurisdiction over them.  *Id.* at 10–21.

Assessing personal jurisdiction over a non-domiciliary requires a two-part inquiry.  *See Multi Access Ltd.*, 2024 WL 3498180, at *5.  First, the Court considers whether there is a basis for personal jurisdiction under the laws of the forum state—here, New York.  *Id.*; *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010); *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006).  Second, the Court examines whether exercising

personal jurisdiction comports with constitutional due process.  *See Licci ex rel Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 168 (2d Cir. 2014); *Bank Brussels Lambert*, 305 F.3d at 124.

"In New York, there are two ways to establish personal jurisdiction over a defendant: (1) 'general jurisdiction' under N.Y. C.P.L.R. § 301; and (2) 'specific jurisdiction' under N.Y. C.P.L.R. § 302."  *Kreit v. Byblos Bank S.A.L.*, 2023 WL 6977448, at *4 (S.D.N.Y. Oct. 22, 2023), *aff'd*, 2025 WL 338194 (2d Cir. Jan. 30, 2025) (summary order).  General jurisdiction exists under CPLR 301 if the defendant is domiciled in New York or has "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction."  *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990) (quoting *McGowan v. Smith*, 419 N.E.2d 321, 323 (N.Y. 1981)).  CPLR 302 provides for specific jurisdiction in the following circumstances:

> [A] court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent*:*
>
>> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>>
>> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
>>
>> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
>>
>>> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>>>
>>> ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; . . .

N.Y. C.P.L.R. 302(a).

In the SAC, Lively identifies three separate bases for personal jurisdiction over the Wallace Defendants: (1) conspiracy jurisdiction under CPLR 302(a)(2) on the theory that the Wallace Defendants' co-conspirators committed tortious acts within New York in furtherance of the conspiracy and that those contacts can be imputed to the Wallace Defendants; (2) personal jurisdiction under CPLR 302(a)(3) on the theory that the Wallace Defendants committed a tortious act outside New York causing injury to person and property within the state, that they expected or reasonably should have expected the act to have consequences in New York, and that they derive substantial revenue from interstate commerce; and (3) conspiracy jurisdiction under CPLR 302(a)(1) on the theory that the Wallace Defendants' co-conspirators transacted business within New York and that those contacts can imputed to the Wallace Defendants.  SAC ¶ 72.

The Court agrees with the Wallace Defendants that Lively has failed to establish personal jurisdiction under any of these three theories.

## A.    CPLR 302(a)(2) and (a)(3)

Section 302(a)(2) of the CPLR provides for specific personal jurisdiction over a defendant who commits a tortious act within the state if the cause of action arises from that act. N.Y. C.P.L.R. 302(a)(2).  Section 302(a)(3), meanwhile, provides for personal jurisdiction where "(1) the defendant committed a tortious act outside New York; (2) the cause of action arose from that act; (3) the tortious act caused an injury to a person or property in New York; (4) the defendant expected or should reasonably have expected the act to have consequences in New York; and (5) the defendant derived substantial revenue from interstate or international commerce." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 946 N.E.2d 159, 162 (N.Y. 2011).

By their terms, both sections of the long-arm statute expressly exclude from their scope causes of action for "defamation of character."  N.Y. C.P.L.R. 302(a)(2), (a)(3).  Defamation

claims are singled out for "separate treatment to reflect the state's policy of preventing

disproportionate restrictions on freedom of expression." *SPCA of Upstate N. Y., Inc. v. Am.*

*Working Collie Ass'n*, 963 N.E.2d 1226, 1228 (N.Y. 2012); *see also Best Van Lines, Inc. v.*

*Walker*, 490 F.3d 239, 245 (2d Cir. 2007) (noting that the defamation exception is intended "to

avoid unnecessary inhibitions on freedom of speech or the press" (quoting *Legros v. Irving*, 327

N.Y.S.2d 371, 373 (1st Dep't 1971))).  The defamation exception protects against situations in

which, for example, "national publications based in distant states are haled into New York courts

on a libel or defamation claim simply because the publication (and accordingly the defamatory

statement) is available on a New York newsstand." *Vardinoyannis v. Encyc. Britannica, Inc.*,

1990 WL 124338, at *6 n.3 (S.D.N.Y. Aug. 20, 1990) (Leval, J.).  "Furthermore, by its plain

language . . . [the long-arm statute] would not cover a nondomiciliary who enters the state for the

sole purpose of making a defamatory statement." *Id.*

     Crucially, the exception applies not only to those claims labeled "defamation," but also to

those *sounding in defamation*.  Otherwise, parties would be permitted "to evade the statutory

exception" simply "by recasting their cause of action as something other than defamation."

*Cantor Fitzgerald, L.P., v. Peaslee*, 88 F.3d 152, 157 (2d Cir. 1996); *Tannerite Sports, LLC v.*

*NBCUniversal Media LLC*, 135 F. Supp. 3d 219, 231 (S.D.N.Y. 2015), *aff'd sub nom. Tannerite*

*Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236 (2d Cir. 2017) ("[A] plaintiff may not

escape the special rules applicable to allegations of defamation through artful pleading: when a

claim, however denominated, sounds in defamation, the CPLR's defamation rules apply."

(citation omitted)).  Courts thus look to "the substance, not merely the name, of a claim" to

determine whether it sounds in defamation.  *Fischer v. Stiglitz*, 2016 WL 3223627, at *4

(S.D.N.Y. June 8, 2016) (Nathan, J.) (quoting *Morsy v. Pal-Tech, Inc.*, 2008 WL 3200165, at *5

(S.D.N.Y. Aug. 7, 2008)); *see also Findlay v. Duthuit*, 446 N.Y.S.2d 951, 953 (1st Dep't 1982) (looking "for the reality and the essence of the action and not its mere name" when assessing personal jurisdiction); *79th Grp., Inc. v. Moore*, 2024 WL 36992, at *6 (S.D.N.Y. Jan. 3, 2024) (same); *Bah v. Apple Inc.*, 2020 WL 614932, at *7 (S.D.N.Y. Feb. 10, 2020), *adhered to on denial of reconsideration*, 2021 WL 4894677 (S.D.N.Y. July 26, 2021) (same).

"New York law considers claims sounding in tort to be defamation claims . . . where those causes of action seek damages only for injury to reputation, [or] where the entire injury complained of by plaintiff flows from the effect on his reputation." *Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (summary order) (quoting *Jain v. Sec. Indus. & Fin. Mkts. Ass'n*, 2009 WL 3166684, at *9 (S.D.N.Y. Sept. 28, 2009)); *accord Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 189–90 (S.D.N.Y. 2021). Courts also ask whether a claim arises from the same set of facts as a pleaded defamation claim. *See Giannetta v. Johnson*, 2021 WL 2593305, at *9 (S.D.N.Y. June 24, 2021). Because defamation, "unlike most torts, . . . is defined in terms of the injury, damage to reputation, and not in terms of the manner in which the injury is accomplished," courts have noted that the tort has a uniquely "broad reach." *Glob. Supplies NY, Inc. v. Electrolux Home Prods., Inc.*, 2022 WL 815795, at *2 (2d Cir. Mar. 18, 2022) (summary order) (quoting *Ganske v. Mensch*, 480 F. Supp. 3d 542, 556 (S.D.N.Y. Aug. 20, 2020)). Indeed, even where a plaintiff alleges business and other economic harms, so long as those harms all "flow[] from the effect on [one's] reputation," the claim sounds in defamation. *Katz v. Travelers*, 241 F. Supp. 3d 397, 407 (E.D.N.Y. 2017) (quoting *Chao*, 476 F. App'x at 895); *see id.* (noting that because "loss of contracts and business relationships" flowed from alleged reputational harms, the claims "are in truth defamation claims"); *Lesesne v. Brimecome*, 918 F. Supp. 2d 221, 225 (S.D.N.Y. 2013) (Nathan, J.) (collecting cases "in which courts have

found that claims brought under the guise of other causes of action actually sound in defamation, even if the plaintiff alleged economic harm").

The leading New York Court of Appeals decision analyzing whether and when a claim sounds in defamation is *Morrison v. National Broadcasting Co.*, 227 N.E.2d 572 (N.Y. 1967). There, the court considered whether the one-year statute of limitations for defamation claims applied to the plaintiff's cause of action arising out his participation in a gameshow that turned out to be rigged. *Id.* at 573. The plaintiff asserted that because he had been a contestant on the show, and because the "hoax caused the public to believe that all of the contestants were privy to the fraud," the plaintiff had "been brought into public scorn, contempt, and obloquy; ha[d] been held up as an object of scorn, shame, and contempt; and his professional standing and reputation had been seriously and pecuniarily damaged." *Id.* As in the personal jurisdiction context, the court looked for "the reality, and the essence of the action and not its mere name." *Id.* at 574 (citation omitted). In doing so, the court concluded that the claim sounded in defamation, as the "harm assertedly sustained by the plaintiff—injury to his reputation—is precisely the same as that caused by defamation." *Id.* It did not matter that the plaintiff alleged pecuniary damages in addition to loss of reputational standing, or that he did not identify any allegedly false statements made about himself. *Id.* Because the "plaintiff complain[ed], in effect, that the defendants' conduct 'brought an idea' that he was dishonest 'to the perception' of the general public . . . [it followed] that his cause of action must be deemed to fall within the ambit of tortious injury which sounds in defamation." *Id.*

The Second Circuit has applied *Morrison* outside of the statute-of-limitations context in analyzing whether a tort is duplicative of a defamation claim. *See Goldman v. Barrett*, 733 F. App'x 568, 570 (2d Cir. 2018) (summary order). And *Morrison*'s reasoning applies with equal

force in the personal jurisdiction context. *See Karageorgis v. Papachristos*, 226 N.Y.S.3d 532, at *1–2 (N.Y. Sup. Ct. Jan. 17, 2025) (table decision) (holding that where a plaintiff alleged injury to reputation and corresponding business harms, the claim sounded in defamation both for purposes of the long-arm statute and the statute of limitations); *Tannerite*, 135 F. Supp. 3d at 234 (holding that a complaint alleging reputational injury sounded in defamation for purposes of personal jurisdiction). After all, the question is in all instances the same: What is the "essence" of a defamation claim? The well-established answer to that question is, at least in New York, injury to reputation. *See Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 113 (2d Cir. 2005) (noting that under New York law, "[t]he gravamen of an action alleging defamation is an injury to reputation" (quoting *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 177 (2d Cir.2000))); *Santagada v. Lifedata Med. Servs., Inc.*, 1993 WL 378309, at *4 (S.D.N.Y. Sept. 22, 1993) (Leval, J.) (reading New York case law as establishing "a straightforward rule: if an action is one solely or primarily claiming injury to reputation, it is in the nature of a defamation").

In keeping with these principles, courts have applied the long-arm statute's defamation exception, and thereby declined to exercise personal jurisdiction, over claims for, among other things, injurious falsehood, *see 79th Grp.*, 2024 WL 36992, at *6; tortious interference with contractual relations, *see Cantor*, 88 F.3d at 157; *Common Cents Distribs., LLC v. CURLS Beauty Brands, LLC*, 2021 WL 4226182, at *5 (S.D.N.Y. Sept. 15, 2021); intentional and negligent infliction of emotional distress, *see Shamoun v. Mushlin*, 2014 WL 12776779, at *4 (S.D.N.Y. Mar. 26, 2014) (Nathan, J.); *Paige v. Digital Bus. Networks All., Inc.*, 2025 WL 753952, at *12 (S.D.N.Y. Mar. 10, 2025); and false advertising, trade libel, and unfair and deceptive trade practices, *see Mirza v. Dolce Vida Med. Spa, LLC*, 2024 WL 307969, at *1 (S.D.N.Y. Jan. 26, 2024); *Real Selling Grp. LLC v. ESN Grp., Inc.*, 2021 WL 535748, at *7

(S.D.N.Y. Feb. 12, 2021).  Because the analysis turns on the nature of the allegations and injury and not on the label given to the tort, courts must assess each claim on a case-by-case basis rather than as a categorical matter.  For example, a claim for tortious interference with contract or prospective business relations sounds in defamation where the plaintiff alleges "generalized harm to professional reputation"—even if that reputational harm results in "some economic loss"—but does not sound in defamation where a defendant is alleged to have specifically "interceded with prospective employers to dissuade them from hiring" an individual.  *See Lesesne*, 918 F. Supp. 2d at 226.  In the latter instance, the plaintiff suffers loss of employment as a direct result of the defendant's intervening conduct with the employer rather than as an indirect result of general reputational harm set in motion by the defendant.  *See id.*

Here, the Wallace Defendants argue that Lively's two causes of action against them—false light invasion of privacy and aiding and abetting harassment and retaliation—both sound in defamation and thus are exempted from CPLR 302(a)(2) and (a)(3).  Dkt. No. 649 at 2, 3–5.  The Court agrees that the essence of these claims is injury to reputation, that the claims therefore sound in defamation, and that personal jurisdiction accordingly may not be predicated under either section of the long-arm statute.

### 1.    False Light Invasion of Privacy

Turning to the first claim, false light invasion of privacy, the SAC alleges in relevant part that:

- [Defendants] publicly disclosed information or material regarding Plaintiff's marketing decisions, moral character, private life, and family, which showed Ms. Lively in a false light.

- The false light created by the disclosures of these Defendants would be highly offensive and objectionable to a reasonable person in Ms. Lively's position, in that it made Ms. Lively the object of scorn, pity, ridicule, humiliation, and other suffering.

- These Defendants knew the public disclosures would create a false impression about Ms. Lively or acted with reckless disregard for the truth.

- As a direct and proximate result of the said publicity and false and misleading disclosures, Ms. Lively sustained harm, including to her business and profession, as well as her reputation. Further, Ms. Lively has suffered, and continues to suffer, from grief and anxiety as a result of the near-overnight change in public sentiment regarding her reputation, work, and brands. As a further direct and proximate result of the said disclosures, Ms. Lively has suffered loss of income and interference with future income.

SAC ¶¶ 435–38.

These allegations make clear that Lively's false light claim centers entirely on reputational injuries and harms flowing from those injuries. As with the plaintiff in *Morrison*, Lively principally alleges "scorn" and loss of professional and reputational standing. 227 N.E.2d at 573; SAC ¶¶ 436, 438. Not only do the allegations specifically and repeatedly focus on Lively's reputation, but they also refer more generally to public perception and sentiment and publicity. *Id.* ¶ 438. Moreover, the complaint directly ties the alleged economic harms to Lively's reputational injuries. *Id.* ("As a further *direct and proximate result of the said disclosures*, Ms. Lively has suffered loss of income and interference with future income." (emphasis added)). Lively identifies no harms associated with this cause of action that are divorced from reputational injuries. The Court therefore has little difficulty concluding that this claim sounds in defamation.

Other courts have found the same with respect to false light claims in the context of CPLR 302(a)(2) and (a)(3)'s defamation exception. *See, e.g.*, *Shamoun*, 2014 WL 12776779, at *4. And it is worth noting that both New York and Texas courts reject the false light tort entirely because it largely duplicates the defamation cause of action. *See Cain v. Hearst Corp.*, 878 S.W.2d 577, 579 (Tex. 1994) ("Today, we join those jurisdictions that do not recognize the false light invasion of privacy action" because "it largely duplicates other rights of recovery, particularly defamation." (citing *Arrington v. N.Y. Times*, 55 N.Y.2d 433, 434 (N.Y. 1982))); *see*

*also Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 573 (1977) ("'The interest protected' in permitting recovery for placing the plaintiff in a false light 'is clearly that of reputation, with the same overtones of mental distress as in defamation.'" (quoting W. Prosser, Privacy, 48 Cal. L. Rev. 383, 400 (1960))).[2]

Lively's arguments to the contrary are unpersuasive.  For one, the cases she cites in support of her position all applied the defamation exception.  *See* Dkt. No. 713 at 12–13; *G31000 N. Am., Inc. v. Paris*, 2014 WL 6604790, at *5 (S.D.N.Y. Nov. 21, 2014) (holding that the defamation exception applied to claims that defendants had engaged in "a smear campaign," even though the claims were not denominated defamation); *Tannerite*, 135 F. Supp. 3d at 233–34 (rejecting argument that claim for product disparagement did not sound in defamation); *Cantor*, 88 F.3d at 157 (affirming district court's determination that it lacked personal jurisdiction over claims of injurious falsehood and tortious interference with prospective economic because the entire complaint sounded in defamation); *Findlay*, 446 N.Y.S.2d at 953 (concluding from a "fair reading of the complaint" that a claim involving the defendant's assertion that an artwork was not authentic sounded in defamation).  Moreover, Lively asserts that because she "has not sought to premise her false light claims on any allegedly defamatory statements," her claim is "genuinely *not* duplicative of an unpled defamation claim."  *See* Dkt. No. 713 at 12.  But, as previously explained, a plaintiff cannot avoid the defamation bar by the contrivance of not identifying any specific statements alleged to be defamatory (or by not challenging the truth of the injurious statement).  Whether a claim sounds in defamation turns on the nature of the

---

[2] The parties dispute which state's laws govern the false light claim.  *Compare* Dkt. No. 649 at 22–23 (Wallace Defendants arguing that either New York or Texas law applies), *with* Dkt. No. 713 at 20 (Lively arguing that California's law controls).  That issue is not relevant to the personal jurisdiction analysis.

alleged injury, not on the form in which a message is sent or whether the plaintiff has identified

any specific defamatory assertions.  In *Morrison* itself, the plaintiff did not identify any

defamatory statements made about himself and instead premised his claim on general

reputational harms stemming from his association with the fraudulent gameshow.  227 N.E.2d at

573; *see also Morrison v. Nat'l Broad. Co.*, 266 N.Y.S.2d 406, 418 (1st Dep't 1965) (Steuer, J.,

dissenting), *rev'd*, 227 N.E.2d 572 (N.Y. 1967) (noting that "[n]either libel nor slander can be

claimed because no statement derogatory or otherwise concerning plaintiff is charged," and

explaining that "what plaintiff apparently relies on is that the public is prone to accept guilt by

association").  In concluding that the plaintiff's claim sounded in defamation, the New York

Court of Appeals explained that what mattered was that the "harm assertedly sustained by the

plaintiff—injury to his reputation—[was] precisely the same as that caused by defamation."  227

N.E.2d at 574.  So too here.

### 2.    Aiding and Abetting Harassment and Retaliation

A similar conclusion holds with respect to Lively's claim for aiding and abetting

harassment and retaliation in violation of California's Fair Employment and Housing Act

("FEHA").  Although FEHA retaliation claims undoubtedly often have little to do with

defamation, this is the unusual case in which the retaliatory acts identified relate exclusively to

efforts to damage an individual's reputation and credibility.  Indeed, the only alleged adverse

employment action that the complaint specifically identifies is the launching of a "coordinated

campaign to cast Ms. Lively in a false light during the publicity and promotion of the Film and

thereafter."  SAC ¶¶ 372, 391; *see also id.* ¶ 398.  Lively's FEHA retaliation claim thus falls

back on allegations regarding efforts to cast her "in a false light"—allegations which the Court

has already explained sound in defamation.

The aiding-and-abetting section of the complaint further provides that Defendants engaged in an "'astroturfing' campaign to discredit and 'bury' Ms. Lively." *Id.* ¶ 411. These allegations likewise implicate exclusively reputational injuries (and economic and emotional harms downstream from those injuries). In opposing the Wallace Defendants' motions to dismiss, Lively has herself framed the aiding-and-abetting allegations as centered around efforts to damage her reputation. In her response in opposition to the Wallace Defendants' first motion to dismiss, she asserted: "Indeed, *the whole point* of retaining the Wallace Parties was so that they could help the Wayfarer Parties 'shift the narrative' from 'HR complaints on set' to 'shining a spotlight on' Ms. Lively instead, *in an effort to destroy her reputation*." Dkt. No. 161 at 21 (second emphasis added). And in her response in opposition to the current motion, Lively similarly contends that "in a blatant act of retaliation against Ms. Lively for privately reporting her concerns about that misconduct . . . [Defendants] engaged in a coordinated campaign *to 'destroy' her reputation*, conceal their own behavior by *distracting the public with false narratives* about Ms. Lively, and *discredit Ms. Lively* in the event she spoke publicly about her concerns." Dkt. No. 713 at 4 (emphasis added). These harms all sound in defamation.

Along similar lines, the SAC explicitly defines the retaliation scheme as the execution of a "social manipulation" plan. SAC ¶ 230; *see also id.* ¶ 297 (asserting that a "relentless media influence and 'digital manipulation' strategy remains at the heart of Defendants' campaign"). The goal of this plan is to "'destroy' Ms. Lively's reputation" and to "to drive negative sentiment against" her. *Id.* ¶¶ 26, 297; *see also id.* ¶ 295 (identifying the "intent" of the retaliatory campaign as perpetrating "a smear campaign, including negative press and a social combat plan"). Defendants have accomplished these ends by allegedly "relying on direct and constant media engagement, [including] the seeding of content on traditional and social media platforms

. . . and the amplifying of negative content about Ms. Lively." *Id.* ¶ 230.  Defendants have also allegedly pushed narratives that Lively has an unfavorable reputation, has weaponized feminism, and caused the loss of production members' jobs. *Id.* ¶¶ 31, 205.  Furthermore, Defendants have allegedly conferred with "reporters to release stories that would cast Ms. Lively and/or Mr. Reynolds in a negative light." *Id.* ¶ 279; *see also id.* ¶¶ 38, 223, 250 (alleging that Defendants fed "manufactured content to unwitting reporters, helping to make content go viral in order to influence public opinion and thereby cause an organic pile-on").  At bottom, these allegations relating to media influence, social manipulation, negative press, and public opinion all raise the specter of reputational injuries—and therefore reinforce the conclusion that the claim sounds in defamation.[3]

The SAC confirms, moreover, that those are the harms that have allegedly resulted.  It catalogues "various negative comments" and "online vitriol" directed toward Lively, her husband, and her businesses, *id.* ¶¶ 273–74, 335–37, and it asserts that Lively and other cast

---

[3] *See also* SAC ¶ 44 (explaining that "the purpose of this 'social manipulation' plan was two-fold: it aimed to both (a) conceal the pattern of harassment and other misconduct by Mr. Baldoni, Mr. Heath, and Wayfarer, and (b) retaliate against Ms. Lively by battering her image, harming her businesses, and causing her and her family severe emotional harm"); *id.* ¶ 218 (noting that Wallace's role in the retaliatory campaign was "to shape public perception of his clients and their adversaries and to perpetuate those perceptions"); *id.* ¶ 296 ("Defendants, and their agents acting at their direction, have pursued a highly public, media blitz and litigation strategy to attempt to discredit Ms. Lively and Mr. Reynolds . . . ."); *id.* ¶ 297 ("As before, Defendants have directly engaged with media platforms to overwhelm and confuse the public's understanding of Ms. Lively's allegations, and to drive negative sentiment against Ms. Lively and anyone who supports her or speaks out against Mr. Baldoni."); *id.* ¶ 303 ("Additionally, as before, Defendants have continued to pursue their 'untraceable' digital social media manipulation campaign designed to impact social media algorithms against Ms. Lively."); *id.* ¶ 304 ("Defendants have further pursued their public strategy through frivolous litigation designed to create press attention, intimidate others from coming forward, and pressure Ms. Lively to give up her claims"); *id.* ¶ 310 (stating that "Defendants have weaponized the litigation to further their campaign narrative in other ways as well"); *id.* ¶ 311 (alleging that "Defendants have continued to push negative and derogatory content about Ms. Lively and her family to content creators, journalists, and others").

members have "experienced a sudden tidal wave of increasingly negative public attention building around them" after declining to appear in the press with Baldoni, *id.* ¶ 282. Additionally, the SAC details the prevalence of negative sentiment toward Lively and her businesses by using graphs to chart the net volume of positive and negative mentions of them online. *See id.* ¶¶ 326, 332, 334.  And the FEHA retaliation claims allege losses including "severe emotional distress and pain, humiliation, embarrassment, belittlement, frustration, and mental anguish." *Id.* ¶ 406.  In the end, the SAC concludes that Defendants have poured "money, time, and human resources . . . into creating an environment of hatred against Ms. Lively and her family," and that these efforts have largely succeeded. *Id.* ¶ 338.

The fairest reading of these allegations and the SAC more generally is that "the entire injury complained of by plaintiff flows from the effect on [her] reputation." *Chao*, 476 F. App'x at 895.  Indeed, to the extent Lively identifies harms other than purely reputational ones, she effectively concedes that those injuries flow from the effects on her reputation.  Take, for instance, her alleged business and professional harms.  She asserts that "*given the ongoing nature of the campaign and the associated negative public sentiment*, [she] did not believe she could proceed with public appearances or events . . . [and] cancelled a critical Target corporate event for her haircare company . . . [as well as] an invitation to host the premier episode of the 50th anniversary season of Saturday Night Live in September 2024."  SAC ¶ 341 (emphasis added). She has also canceled appearances on behalf of her other businesses for the same reasons. *Id.* ¶¶ 339, 341, 346.  Furthermore, the SAC expressly identifies "the sudden and unexpected negative media campaign launched against Ms. Lively" as the cause of depressed retail sales of her haircare-line products. *Id.* ¶ 342; *see also id.* ¶¶ 342–43 (noting that Lively's haircare line "was caught up in the crossfires of the negative environment against [her]" and that depressed

sales of her products "appear[] to have been caused overwhelmingly, if not entirely, by the retaliatory campaign initiated by Defendants").  It is well-established that lost business or professional opportunities flowing from generalized reputational harms "give[] rise to a suit for defamation."  *See Lesesne*, 918 F. Supp. 2d at 225 (citing cases).

Lively similarly ties her emotional injuries to the smear campaign, negative publicity, and corresponding online attacks.  *See* SAC ¶¶ 346–48 (detailing the "emotional consequence of feeling targeted and shamed").  Her case therefore resembles those in which courts have found that claims for intentional and negligent infliction of emotional distress sound in defamation.[4] *See, e.g.*, *Shamoun*, 2014 WL 12776779, at *4 (applying defamation exception under CPLR 302(a)(2) and (a)(3) to claim for intentional infliction of emotional distress); *Paige*, 2025 WL 753952, at *12 (same); *Bah*, 2020 WL 614932, at *7 (same); *Fischer*, 2016 WL 3223627, at *5 (same); *cf. Baiqiao Tang v. Wengui Guo*, 2019 WL 6169940, at *6 (S.D.N.Y. Nov. 20, 2019) (dismissing as duplicative of defamation a claim for intentional infliction of emotional distress where the "injuries arising from the defamation claim are the same as the IIED claim").

To the extent Lively identifies harms stemming from Defendants' lawsuit against her, which she asserts was retaliatory and frivolous, SAC ¶ 304, the harms she has pleaded are also ultimately reputational.  The complaint alleges that "Defendants have further pursued their *public strategy through frivolous litigation* designed to create press attention, intimidate others from coming forward, and pressure Ms. Lively to give up her claims."  *Id.* (emphasis added). Lively further alleges that Defendants "post[ed] their cherry-picked 'receipts,' as filed in that lawsuit, on a website *for public view*."  Dkt. No. 713 at 11 (emphasis added); *see also* SAC

---

[4] Lively initially brought claims for intentional and negligent infliction of emotional distress, *see* Dkt. No. 1, but later voluntarily dismissed them, *see* Dkt. No. 337.

¶ 293n ("In other words, although Mr. Wallace was not a plaintiff in the Wayfarer Parties'

retaliatory lawsuit against Ms. Lively, he was actively supporting it in the background and

*attempting to manipulate public opinion relating to it*—all while fully aware that the Wayfarer

Parties' retaliatory countersuit would be filed, and was being maintained, in New York."

(emphasis added)).  The unmistakable import of these allegations is that the lawsuit was intended

to further the smear campaign, which in turn was designed to harm Lively reputationally.  Lively

has not identified or specifically pleaded any additional harms associated with the lawsuit.

     Courts have found that claims sound in defamation in similar circumstances.  In *Sparrow*

*Fund Management, LP v. Mimedx Group, Inc.*, the plaintiff brought a malicious prosecution

claim alleging that the defendants had filed a retaliatory lawsuit against it.  2019 WL 8955307, at

*17 (S.D.N.Y. Nov. 7, 2019), *report and recommendation adopted*, 2020 WL 1330283

(S.D.N.Y. Mar. 22, 2020).  The court explained that it did not need to consider whether the

defendant who filed the lawsuit had been acting as the agent of a different defendant, because in

any event, the claim was premised on allegedly false accusations advanced in the lawsuit and

therefore sounded in defamation.  *Id.*  The court accordingly concluded that it lacked jurisdiction

under CPLR 302(a)(2) and (a)(3).  *Id.*; *cf. McNamee v. Clemens*, 762 F. Supp. 2d 584, 608

(E.D.N.Y. 2011) (dismissing a claim based on the filing of an "allegedly malicious lawsuit" as

duplicative of the plaintiff's defamation cause of action).

     These cases stand in contrast to those where plaintiffs have identified some harm

unconnected to reputation.  In *Hanly v. Powell Goldstein, LLP*, the court held that the plaintiffs'

malicious prosecution and intentional infliction of emotional distress claims did not sound in

defamation under the long-arm statute because although they were rooted in the same conduct as

the defamation claim—the sending of a letter—the claims were "premised upon injuries distinct

from the defamation claim."  2007 WL 747806, at *3 n.5 (S.D.N.Y. Mar. 9, 2007), *aff'd*, 290 F.

App'x 435 (2d Cir. 2008) (summary order).  Specifically, the defamation claim sought to recover

for injuries related to the impugning of the plaintiffs' character, while the malicious prosecution

and emotional distress claims were premised on harms related to a criminal investigation that

resulted from the letter.  *Id.* at *3 n.5, *6 n.9.  Here, as previously explained, Lively has not

specifically identified or alleged any non-reputational injuries related to the two claims pleaded

against the Wallace Defendants.

Lively's responses regarding her aiding-and-abetting claim, like those made in

connection with her false light claim, miss the mark.  She contends that "aiding-and-abetting

involved more than boosting negative narratives about Ms. Lively on social media; it also

involved providing advice and counsel to the Wayfarer Parties, and strategizing with them on the

conduct of their retaliation campaign—activities that do not even arguably 'sound in defamation'

but are core aiding-and-abetting conduct irrespective of the form that the retaliation took."  Dkt.

No. 713 at 12–13.  Even if the Wallace Defendants did provide advice, counsel, and strategic

assistance to the Wayfarer Parties rather than simply boosting negative content online, the

question remains: advice, counsel, and strategic assistance regarding what?  The only answer to

that question that Lively's filings and complaint reasonably suggest is advice regarding publicity,

public relations, and the shaping of public perception.  *See* Dkt. No. 161 at 21 ("Indeed, *the*

*whole point* of retaining the Wallace Parties was so that they could help the Wayfarer Parties

'shift the narrative' from 'HR complaints on set' to 'shining a spotlight on' Ms. Lively instead,

in an effort to destroy her reputation.").  Lively's response also falters by focusing exclusively on

the "activities" in question rather than the nature of the injury.  As the Court has already

indicated, "[u]nlike most torts, defamation is defined in terms of the injury, damage to

reputation, and not in terms of the manner in which the injury is accomplished." *See Morrison*, 227 N.E.2d at 574.

Lively has accordingly failed to carry her burden of establishing personal jurisdiction over the Wallace Defendants under CPLR 302(a)(2) or (a)(3). That conclusion is especially appropriate given that, unlike many other cases at the motion to dismiss stage, there has been extensive discovery in this case to date. *See* Dkt. No. 713 at 4 (Lively's memorandum of law asserting that "[s]ince the Court issued its July 16 Opinion, Ms. Lively has obtained discovery shedding light on when the Wallace Defendants' joined the conspiracy, their knowledge of their co-conspirators' New York-based activities, and their overall awareness of the co-conspirators' unlawful retaliatory objectives and conduct—which, although present, were previously sparse, because the co-conspirators had done their best to make their activities 'untraceable'").

### B.    CPLR 302(a)(1)

Lively next turns to CPLR 302(a)(1), which permits a court to "'exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state,' so long as the cause of action arises from such business." *Creative Photographers, Inc. v. Grupo Televisa, S.A.B.*, 763 F. Supp. 3d 618, 631 (S.D.N.Y. 2025) (citation omitted). This subsection contains two elements. Under the first, the plaintiff must show that the defendant "transacted business" within the state. A defendant who is not domiciled in New York need not be physically present in the state to "transact business" there. This requirement is satisfied "so long as the defendant has engaged in 'purposeful activity,' for example, 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Spin Master Ltd.*, 463 F. Supp. 3d at 362 (quoting *Best Van Lines*, 490 F.3d at 246–47). Under the second prong, the plaintiff must

show that its causes of action "arise from" the defendants' transactions in New York.  *See Dicks v. Cooks Junction, Inc.*, 2023 WL 2775830, at *4 (S.D.N.Y. Apr. 4, 2023).  "A suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Best Van Lines*, 490 F.3d at 246 (citation omitted).

In notable contrast to CPLR 302(a)(2) and (a)(3), subsection (a)(1) *does not* specifically exempt from its scope causes of action sounding in defamation.  *See* N.Y. C.P.L.R. 302(a)(1) (omitting any mention of "defamation of character").  As the Second Circuit has explained, personal jurisdiction over claims sounding in defamation "may be acquired under section 302(a)(1)" even where it may not be acquired under the other prongs of the long-arm statute.  *See Best Van Lines*, 490 F.3d at 246; *accord Donner v. Der Spiegel Gmbh & Co. KG*, 747 F. Supp. 3d 681, 689 (S.D.N.Y. 2024).  That said, and consistent with the "state's policy of preventing disproportionate restrictions on freedom of expression," *SPCA of Upstate N. Y.*, 963 N.E.2d at 1228, courts "construe 'transacts any business within the state' more narrowly in defamation cases than they do in the context of other sorts of litigation," *Best Van Lines*, 490 F.3d at 248. For example, while proof of one transaction, or a "single act," in New York is typically sufficient to invoke jurisdiction under 302(a)(1), "[i]n defamation cases, by contrast, the 'single act' of uttering a defamat[ory] [statement], no matter how loudly, is not a 'transaction of business' that may provide the foundation for personal jurisdiction." *Giannetta*, 2021 WL 2593305, at *8 (quoting *Best Van Lines*, 490 F.3d at 248).

As in her opposition to the Wallace Defendants' first motion to dismiss, Lively contends that personal jurisdiction over the Wallace Defendants exists under CPLR 302(a)(1) on a conspiracy theory of jurisdiction.  Dkt. No. 713 at 7.  In other words, Lively asserts that the

Wallace Defendants participated in a conspiracy, that their co-conspirators transacted business within New York, and that those contacts can imputed to the Wallace Defendants. *Id.* As the Court explained in its prior opinion and order granting the Wallace Defendants' motion to dismiss, New York courts have never applied such a theory of jurisdiction under CPLR 302(a)(1). *See Lively*, 2025 WL 1952027, at *15 (citing *United States v. Besneli*, 2018 WL 443747, at *5 (S.D.N.Y. Jan. 16, 2018); *Przewozman v. Charity*, 2023 WL 2562537, at *16 (E.D.N.Y. Mar. 17, 2023)). Noting that such a theory was not necessarily inconsistent with the text of the long-arm statute, the Court nonetheless declined to so hold, for even assuming that conspiracy jurisdiction *might* exist under 302(a)(1) in certain circumstances, Lively had alleged insufficient facts to establish personal jurisdiction on a conspiracy theory. *Id.* at *16 & n.11. The Court once again reaches that conclusion here.

At least in the context of CPLR 302(a)(2), establishing personal jurisdiction over a co-conspirator under an agency theory of jurisdiction requires alleging "first, that 'the defendant was a part of a conspiracy involving . . . overt . . . acts in New York,' and, second, that: '(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control, or at the request of or on behalf of the out-of-state defendant.'" *FAT Brands Inc. v. Ramjeet*, 75 F.4th 118, 126 (2d Cir. 2023) (first quoting *Lawati v. Montague Morgan Slade Ltd.*, 961 N.Y.S.2d 5, 7 (1st Dep't 2013); and then quoting *Berkshire Bank v. Lloyds Banking Grp. PLC*, 2022 WL 569819, at *3 (2d Cir. Feb. 25, 2022) (summary order)).

The first step of this test—establishing the existence of a conspiracy involving overt acts in New York—requires "defin[ing] the scope of the conspiracy, because only acts taken pursuant

to that conspiracy are jurisdictionally relevant." *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 591 (S.D.N.Y. 2017) (citation omitted). The second step, which concerns whether those overt acts can be imputed to a co-conspirator, requires, among other things, demonstrating that the in-state activity was to the benefit of the out-of-state co-conspirator and done "at the direction or under the control[] or at the request of or on behalf of the out-of-state defendant." *FAT Brands*, 75 F.4th at 126 (quoting *Berkshire Bank*, 2022 WL 569819, at *3). Notwithstanding this language of "direction" and "control," the Second Circuit, interpreting New York caselaw, has held that New York contacts in furtherance of a conspiracy may imputed to an out-of-state co-conspirator based only on "an allegation that the out-of-state defendant was 'aware of the torts being committed by' co-conspirators in New York." *Id.* at 127 (quoting *Berkshire Bank*, 2022 WL 569819, at *3).

Lively cites several potential overt acts that she believes constitute "transacting business" within New York and which she argues can be imputed to the Wallace Defendants. *See* Dkt. No. 713 at 7–11. But these acts all fail to establish personal jurisdiction under CPLR 302(a)(1), as they variously were not completed in furtherance of the conspiracy, do not constitute "transacting business" under the long-arm statute, were not done with the Wallace Defendants' awareness that the conduct was being committed in New York, and rely on an improperly broad conception of conspiracy.

First, Lively cites the fact that at least Baldoni, Heath, and Abel were physically present in New York when the "Wallace Defendants were invited to join the conspiracy." *Id.* at 9 (emphasis omitted). As Lively puts it, a "a key element of the business [that the co-conspirators] transacted [in New York] was hiring the Wallace Parties to launch a 'social attack' against Ms. Lively." *Id.* at 11 (emphasis omitted); *see also id.* at 2 ("Most tellingly for the purposes of this

motion, based on Mr. Wallace's sworn testimony and information obtained in discovery, it is clear that at least Mr. Baldoni, Mr. Heath, and Ms. Abel were *all physically present in New York* promoting the Film and responding to their perceived PR crisis that gave rise to the retaliation campaign *when they recruited, met, and retained the Wallace Defendants*."); *id.* ("In other words, not only did the co-conspirators take acts in furtherance of the conspiracy while physically present in New York, those acts included transacting business in New York and *specifically, hiring the Wallace Defendants to assist in their retaliatory campaign from New York*.").

As an initial matter, it is unclear whether Lively has sufficiently alleged that the Wallace Defendants were aware of their alleged co-conspirators' presence in New York at the time. Lively relies primarily on allegations that Wallace was retained to engage in observation and analysis of social media related to the Film, and that certain social media posts, including one from Baldoni himself, indicated that he was "heading to New York for a full week of press for @itendswithusmovie." *Id.* at 9 (citing SAC ¶ 293m). Lively also observes that certain co-conspirators replied to messages "from an East Coast time zone." *Id.* at 10 (citing SAC ¶ 293d). Even assuming, however, that Wallace was monitoring social media, and assuming he was doing so methodically, that still provides a weak basis for concluding that he was personally aware of the entire range of posts related to the Film, including all those from Baldoni. Moreover, as the Wallace Defendants point out, that certain messages came from the eastern time zone hardly evinces that co-conspirators were in New York as opposed to one of the other twenty-two states in that time zone. Dkt. No. 649 at 7.

But regardless of the Wallace Defendants' ultimate knowledge, the fact that they were hired while their alleged co-conspirators were in New York for the Film's premiere does not

constitute "transacting business" within the state. "Under New York law, the transacts-business standard can be satisfied where both the negotiations and execution of a contract took place within New York." *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166–67 (2d Cir. 2005). However, the New York Court of Appeals has clarified that "physical presence alone cannot talismanically transform any and all business dealings into business transactions under CPLR 302." *Presidential Realty Corp. v. Michael Square W., Ltd.*, 376 N.E.2d 198, 199 (N.Y. 1978). "[T]he place where a contract is performed is more important for purposes of jurisdiction than the place where a contract is executed, and place of contracting alone is an insufficient basis on which to rest jurisdiction." *Metro. Air Serv., Inc. v. Penberthy Aircraft Leasing Co.*, 648 F. Supp. 1153, 1157 (S.D.N.Y. 1986) (citing *Aero-Bocker Knitting Mills, Inc. v. Allied Fabrics Corp.*, 387 N.Y.S.2d 635, 637 (1st Dep't 1976)); *see also Smit v. Isiklar Holding A.S.*, 354 F. Supp. 2d 260, 265 (S.D.N.Y. 2005) ("The execution of an agreement in New York, without more, does not constitute 'transacting business' in New York for purposes of § 302."). This makes sense considering that "transacting business" requires "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, 477 F. Supp. 3d 241, 252 (S.D.N.Y. 2020) (quoting *Best Van Lines*, 490 F.3d at 246). Mere "coincidental or fortuitous" presence in New York when an agreement is entered into does not constitute purposeful availment of the benefits and protections of the state's laws. *Chalfin v. Go Big Solar, LLC*, 2025 WL 2022012, at *8 (S.D.N.Y. July 17, 2025) (quoting *Palmer v. Globalive Commc'ns Corp.*, 2008 WL 2971469, at *8 (S.D.N.Y. Aug. 1, 2008)).

The Second Circuit's decision in *Pincione v. D'Alfonso*, 506 F. App'x 22 (2d Cir. 2012) (summary order), is instructive. There, as here, the plaintiff tried to establish personal

jurisdiction over the defendants under 302(a)(1) based on a conspiracy theory of jurisdiction. *Id.*
at 25. Assuming that conspiracy jurisdiction could attach under 302(a)(1), and that the plaintiff
had "adequately pleaded an agent/principal or co-conspirator relationship," the Second Circuit
nonetheless found personal jurisdiction lacking because even though certain co-conspirators had
been physically present in New York for business meetings related to the underlying cause of
action, their presence could not transform what was "fundamentally [an] Italian deal into a New
York business transaction." *Id.* The court explained that "determining whether a defendant
transacts business in New York . . . [turns on] the totality of a defendant's conduct and activities
in New York," and the circumstances revealed that the co-conspirators did not intend to project
themselves into New York or to avail themselves of its laws. *Id.* at 24–25.

Likewise, the fact that the Wayfarer Parties were temporarily in New York when they
engaged the Wallace Defendants to join the conspiracy does not demonstrate purposeful
availment of the benefits and protections of New York's laws. Baldoni, Heath, and Abel—all
California residents, SAC ¶¶ 58–59, 64—were in New York for a period of a few days to attend
the premiere, not to establish any business relationship with Wallace. Moreover, at least Abel
left the state the day after the premiere. *Id.* ¶ 293. It was therefore "merely coincidental or
fortuitous" that the agreement was executed while they were still physically present in the state
as opposed to elsewhere shortly thereafter. *See Chalfin*, 2025 WL 2022012, at *8 (citation
omitted). Importantly, there are also no allegations that the contract contemplated performance
in New York. *See Metro. Air Serv.*, 648 F. Supp. at 1157 (noting this as a central factor in the
jurisdictional analysis); *Trabucco v. Intesa Sanpaolo, S.p.A.*, 695 F. Supp. 2d 98, 103 (S.D.N.Y.

2010) (same).  The complaint instead alleges that Wallace and Street are based in Texas and

California, and that certain people working for them are based in Hawaii.  SAC ¶¶ 65–66, 224.[5]

    To be sure, the fact that the Wallace Defendants were hired while the Wayfarer Parties

were in New York was not *wholly* unrelated to New York: the premiere was in New York,

Baldoni was in the state when he learned that his co-stars refused to appear alongside him at the

premiere, and that knowledge at least partially prompted Wallace's hiring.  Dkt. No. 713 at 9–10.

But simply some connection to New York is insufficient.  *See Pincione*, 506 F. App'x at 25;

*Chalfin*, 2025 WL 2022012, at *8.  And, considering the circumstances, this was not

"fundamentally . . . a New York business transaction."  *Pincione*, 506 F. App'x at 25.  Rather, it

was an agreement between out-of-state parties (some of whom happened to be temporarily in the

state) concerning out-of-state work.

    In her opposition papers, Lively states that as part of engaging the Wallace Defendants,

Case, "a New York resident then in New York[,] . . . 'shared all the info with' Mr. Wallace."

Dkt. No. 713 at 9–10.  The SAC, however, does not allege that Case was then in New York.  *See*

SAC ¶ 239b.  And even if it did, there are no allegations indicating that Wallace *knew* she was a

New York resident then in New York such that her contacts could be imputed to him under a

conspiracy theory of jurisdiction.[6]  The same goes for the SAC's allegations that Nathan

---

[5] The SAC does state in passing that Wallace "weaponized a digital army around the country from New York to Los Angeles and beyond," but the assertion that members of Wallace's "army" were in New York is conclusory and undeveloped.  SAC ¶¶ 38, 223.  As indicated above, the SAC principally alleges that Wallace was located in Texas and California and that members of his "team" were based in Hawaii.  *Id.* ¶¶ 65–65, 224.

[6] The SAC states that Wallace communicated with "phone numbers having New York-based area codes."  SAC ¶ 293m.  It does not specifically allege that Case was one of these individuals.  But such an allegation would make little difference, as having a phone number with a New York area code would tend at most to suggest that the owner at some point lived in New York.  The Court takes judicial notice that people regularly keep their phone numbers when moving to different states.  *Cf. Jones v. Abel*, 2025 WL 2821370, at *14 n.8 (S.D.N.Y. Oct. 3, 2025) (noting

maintained a residence in New York "[d]uring a portion of the relevant period" when she helped

Wayfarer retain the Wallace Defendants. *Id.* ¶ 62.  Even if Nathan did maintain a residence in

New York around the time of the premiere—and she has denied that she lived in the state at the

time, *see* Dkt. No. 649-6 ¶¶ 5–8—the SAC alleges neither that she was physically present in

New York when the Wallace Defendants were retained, nor that Wallace had reason to believe

she was.  In fact, the SAC suggests the opposite, as Nathan apparently messaged Abel that

"[Abel] could've stayed at [Nathan's] apt" during the premiere.  SAC ¶ 62.  Nathan confirms in

her declaration that she was not in New York for the premiere.  Dkt. No. 649-6 ¶ 8.

Separate and apart from the issue of retaining the Wallace Defendants and whether that

satisfies 302(a)(1), the SAC states that because "Wallace remained involved in closely

coordinated work with the other Defendants from early August 2024 at least into early 2025, it is

implausible that he would not have learned during that time, and certainly prior to the filing of

the retaliatory lawsuit and the construction of the related website, that Ms. Case [and] Ms.

Koslow were New York residents actively transacting business in New York on behalf of TAG

and otherwise in order to perform numerous overt acts in furtherance of the conspiracy." *Id.*

¶ 293n.  This reference to Wallace's awareness of Case and Koslow "actively transacting

business in New York . . . in order to perform numerous overt acts in furtherance of the

conspiracy" is wholly conclusory and simply parrots the statutory requirements.  Without

providing any facts regarding what this "transacting business" entailed, there is no way to

determine whether Wallace was plausibly aware of the acts such that they can be imputed to him.

---

that federal law provides that wireless consumers may switch between carriers while retaining
the same phone number).  Perhaps recognizing the weakness of this argument, Lively's
opposition papers do not mention area codes as a basis for inferring the Wallace Defendants'
knowledge of their co-conspirators' presence in New York.  *See* Dkt. No. 713.

Lively next relies on the fact that while the Wayfarer Parties were in New York for the Film's premiere, they promoted the Film and made associated press appearances. *See* Dkt. No. 713 at 9–10; SAC ¶¶ 293a, 293d. These contacts also fail to satisfy 302(a)(1) under a conspiracy theory of jurisdiction. Assuming *arguendo* that they might constitute "transacting business" under 302(a)(1), they can hardly be said to have been done in furtherance of the conspiracy given that they no doubt would have occurred in the normal course of the Film's release regardless of the conspiracy's existence. Furthermore, Lively asserts that these appearances were part of "conducting the very communications strategy of which the Wallace Defendants would become an integral part," Dkt. No. 713 at 9, but she does not identify *how* they were used or would be used to harm her reputationally (the goal of the conspiracy); they thus were not acts in furtherance of the conspiracy. For example, the SAC references an appearance on the Today Show, which films in New York, but says nothing about who made that appearance, what was said, or how that appearance might have furthered the objectives of the conspiracy. SAC ¶ 293b. The complaint further alleges that Baldoni has "engaged in stunning duplicity, praising Ms. Lively to her face *and in public*, while secretly disparaging her in private and plotting to 'bury' her alongside the truth of his own behavior," which suggests that the Wayfarer Parties did not in fact use public press appearances—at least not initially while in New York—to tarnish Lively's reputation. *Id.* ¶ 168 (emphasis added). Because Lively has not alleged facts to support the inference that the Wayfarer Parties' promotion of the Film in New York was conducted in furtherance of the conspiracy, she has also failed to demonstrate that her claims "arise from" those contacts, which 302(a)(1) separately requires.

Shifting gears, Lively asserts that the Wallace Defendants and others were involved in the creation of a website for public view designed to "manipulate public opinion relating" to the

Wayfarer Parties' allegedly retaliatory New York-based litigation. *Id.* ¶ 293n; Dkt. No. 713 at 11. There is no allegation that this work was performed in New York. The argument instead seems to be that creating a website with information or statements about a New York-related subject matter and which is accessible in New York is enough to establish personal jurisdiction under 302(a)(1). It is not. "'New York case law establishes that making defamatory statements outside of New York about New York residents does not, without more, provide a basis for jurisdiction, even when those statements are published in media accessible to New York readers,' such as a website." *Giannetta*, 2021 WL 2593305, at *9 (quoting *Best Van Lines*, 490 F.3d at 253); *see Starmedia Network, Inc. v. Star Media, Inc.*, 2001 WL 417118, at *3 (S.D.N.Y. Apr. 23, 2001) ("It is now well established that one does not subject himself to the jurisdiction of the courts in another state simply because he maintains a web site which residents of that state visit."); *see also Donner*, 747 F. Supp. 3d at 692–93 (S.D.N.Y. 2024). That is because "the 'single act' of uttering a defamation, no matter how loudly, is not a 'transact[ion of] business' that may provide the foundation for personal jurisdiction." *Best Van Lines*, 490 F.3d at 248. In determining whether personal jurisdiction exists under 302(a)(1) over out-of-state defendants who project defamatory statements into New York, courts ask whether there was "something more" than just the utterance. *Donner*, 747 F. Supp. 3d at 692. This standard "is satisfied when at least part of the defamatory content was created, researched, written, developed, or produced in New York." *Id.* (quoting *Prince v. Intercept*, 634 F. Supp. 3d 114, 129 (S.D.N.Y. 2022)). In the context of statements published on websites, moreover, courts consider the level of interactivity of the site, although this inquiry does not amount to its own separate framework for analyzing internet-based jurisdiction. *See Best Van Lines*, 490 F.3d at 252.

Lively has not sufficiently alleged "something more" than the publishing of the website. She has not alleged, for instance, that the website was prepared, researched, or developed in New York, or that it was specifically designed to target New York residents. *See Giannetta*, 2021 WL 2593305, at *8 (collecting cases in which courts have found the "something more" standard satisfied). To the contrary, the SAC suggests that the website was intended for a national audience and designed to "spread a narrative" about the lawsuit as broadly as possible. Dkt. No. 713 at 11; *see Best Van Lines*, 490 F.3d at 253 (noting that the relevant comments were not "purposefully directed to New Yorkers rather than a nationwide audience"). The website's low level of interactivity also counsels against finding the transaction of business. The site merely posts online for public consumption certain documents filed in connection with the Wayfarer Parties' lawsuit—including "annotated text messages and a winding, self-serving chronology from prior to the Film's production through the filing of Ms. Lively's complaint"—in order to "advance Defendants' narrative." SAC ¶ 310. It does not seek to exchange information with users or to initiate commercial activity. *See Best Van Lines*, 490 F.3d at 251 (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)). The Second Circuit has found that even certain interactive websites that do actively solicit contributions from visitors are insufficient to satisfy the requirements of 302(a)(1). *See id.* at 251–52. The SAC's allegations regarding the website therefore fail to establish personal jurisdiction.

Finally, Lively invokes the Wayfarer Parties' allegedly retaliatory lawsuit filed in this Court as a basis for establishing jurisdiction under CPLR 302(a)(1). *See* Dkt. No. 713 at 11; SAC ¶ 293n. She argues that although the Wallace Defendants were not parties to that suit, the filing of the case was an overt act in New York in furtherance of the conspiracy and which occurred with the Wallace Defendants' awareness and support. SAC ¶ 293n. This asserted basis

for personal jurisdiction presents the closest call.  The SAC sufficiently alleges that the Wallace

Defendants were aware of the suit and that it would be filed in New York.  *Id.*  Furthermore,

taking as true Lively's allegations that the lawsuit was retaliatory and intended to advance the

smear campaign by further harming her reputation, the filing of the suit would appear to fall

within the scope of the conspiracy, and her claim at least partly arises from that conduct.  *See id.*

¶¶ 51, 293n, 304–05.  Additionally, although Lively has not cited any authority to this effect,

courts have held that litigating a case in New York can under certain circumstances constitute

purposeful availment of the benefits and protections of the state's laws sufficient to establish

personal jurisdiction under 302(a)(1).  *See, e.g.*, *S.E.C. v. Softpoint, Inc.*, 2012 WL 1681167, at

*3 (S.D.N.Y. May 9, 2012).

On the other hand, courts "construe 'transacts any business within the state' more

narrowly" where the claims sound in defamation.  *Best Van Lines*, 490 F.3d at 248.  This

"heightened standard" stems from New York's "policy of preventing disproportionate

restrictions on freedom of expression."  *SPCA of Upstate N. Y.*, 963 N.E.2d at 1228; *Senese v.*

*Hindle*, 2011 WL 4536955, at *14 (E.D.N.Y. Sept. 9, 2011), *report and recommendation*

*adopted*, 2011 WL 4529359 (E.D.N.Y. Sept. 28, 2011); *see also Shamoun*, 2014 WL 12776779,

at *5 (noting that "transacts business" is construed more narrowly in defamation cases "due to

free speech concerns").  "Through CPLR 302, the Legislature has manifested its intention to treat

the tort of defamation differently from other causes of action and . . ., as a result, particular care

must be taken to make certain that non-domiciliaries are not haled into court in a manner that

potentially chills free speech without an appropriate showing that they purposefully transacted

business here and that the proper nexus exists between the transaction and the defamatory

statements at issue."  *SPCA of Upstate N.Y.*, 963 N.E.2d at 1230.

Ultimately, although certain defamation claims may be brought under 302(a)(1) even when they may not under (a)(2) or (a)(3), finding jurisdiction in this case would be inconsistent with the legislature's goal of preventing disproportionate restrictions on freedom of expression. That is because Lively's position requires an expansive interpretation not only of transacting business, but also of conspiracy jurisdiction under CPLR 302(a)(1). New York courts have held in the context of CPLR 302(a)(2) that conspiracy jurisdiction requires that the in-state co-conspirators "acted at the *direction or under the control*, or at the request of or on behalf of the out-of-state defendant." *FAT Brands*, 75 F.4th at 126 (citation omitted). As the Court explained in its prior opinion and order, the New York Court of Appeals has never addressed whether this requirement of "direction or control" may be satisfied by a co-conspirator's mere awareness of the relevant in-state act. *Lively*, 2025 WL 1952027, at *13. The Second Circuit has predicted, however, that if the New York Court of Appeals were to address that issue, it would hold that mere awareness *is* sufficient. *Id.* (citing *FAT Brands*, 75 F.4th at 127). Although that prediction stands in some tension with more recent New York cases requiring the out-of-state defendant to have "some extent of control over the in-state actor," the Court continues to believe itself bound by the Second Circuit's decision in *FAT Brands*. *Id.* (quoting *Bangladesh Bank v. Rizal Com. Banking Corp*, 208 N.Y.S.3d 2, 22 (1st Dep't 2024)).

Nonetheless, the Second Circuit has never held, or even suggested, that this prediction likewise applies in the CPLR 302(a)(1) context. Nor have any other courts for that matter (given that no case has ever even applied conspiracy jurisdiction under CPLR 302(a)(1)). The Second Circuit's decision in *FAT Brands* is premised exclusively on cases interpreting and applying CPLR 302(a)(2). 75 F.4th at 125–28. It does not once mention CPLR 302(a)(1). *Id.* And, as other courts have thoughtfully observed, concepts of conspiracy jurisdiction do not neatly map

onto the various long-arm subsections in precisely the same ways. *See Doe 1 v. Gov't of U.S.V.I.*, 771 F. Supp. 3d 379, 391 (S.D.N.Y. 2025). Finding personal jurisdiction in these circumstances would therefore require not one but two significant extensions of New York law without direction or guidance from New York courts or the Second Circuit; Lively is asking not only for this Court to apply conspiracy jurisdiction under 302(a)(1), but for the Court to transplant wholesale a contested and developing area of law involving the requirements of control and direction in agency relationships to a new context involving distinct considerations.

Indeed, whether and to what extent an agency relationship must be demonstrated under CPLR 302(a)(1) makes a difference in this case. The Wallace Defendants are not alleged to have directed, controlled, or requested that their alleged co-conspirators file the lawsuit. Nor are the Wayfarer Parties alleged to have filed the suit on the Wallace Defendants' behalf. "If anything, it's the other way around—the complaint alleges that [Wayfarer Parties] utilized the [Wallace Defendants] as [their] agents" for purposes of the retaliatory scheme. *See id.* Accordingly, the Court cannot apply conspiracy jurisdiction under 301(a)(1) without addressing the issue of direction and control.

Exercising personal jurisdiction over the Wallace Defendants based on such a broad conception of agency and conspiracy would be inconsistent with free-speech considerations and New York courts' instruction to apply 302(a)(1) narrowly in defamation cases. Consider a hypothetical scenario in which several individuals loosely organize themselves online for the purpose of promoting an issue of public importance—say, to bring public and government attention to an alleged defect in a popular consumer product. The individuals are scattered across the country save for one located in New York, and they research, write, and publish posts in their respective states that are accessible online in New York. It is clear that (1) the individual

located in New York may be subject to suit in New York on claims of defamation or product

disparagement, *see Legros*, 327 N.Y.S.2d at 374; and (2) that the out-of-state individuals are

protected under CPLR 302(a)(2) and (a)(3) from being haled into a New York court based on

their out-of-state utterances, even if those utterances are accessible online in New York and

concern a New York resident, *see Best Van Lines*, 490 F.3d at 248.  On Lively's expansive

theory of 302(a)(1) conspiracy jurisdiction, however, those same out-of-state individuals could

be sued in New York so long as a plaintiff plausibly alleged that they were aware of the New

York-based member's purposeful activity in New York in furtherance of their shared end—even

if they had no direction or control over that activity, and even if it was not necessary to their own

out-of-state activities.  Applying 302(a)(1) in those circumstances would effectively permit an

end-run around the statutory defamation exception, opening New York courts up to a vast array

of out-of-state defendants.  *See id.* at 248 n.11 (explaining that "transacting business" must be

interpreted in line with the defamation exceptions in (a)(2) and (a)(3) and "consistent with the

'cardinal rule' of statutory construction 'that a statute is to be read as a whole, since the meaning

of statutory language, plain or not, depends on context'" (quoting *King v. St. Vincents Hosp.*, 502

U.S. 215, 221 (1991))).

So too here.  The Wallace Defendants' own contacts with New York are insufficient to

constitute transacting business under 302(a)(1).  There is no allegation that they had any role in

the Wayfarer Parties' decision to file a lawsuit in New York, let alone direction or control over

that decision.  The fact that the lawsuit was filed in New York was only incidentally related to

their involvement in the conspiracy; their alleged conduct would have been no different had the

lawsuit been filed elsewhere, or had the allegedly defamatory statements been made through a

vehicle other than a lawsuit.  Yet because the Wallace Defendants were aware of the lawsuit, and

because the lawsuit was one of the means of the conspiracy (even though not one in which they were directly involved), they would be subjected to personal jurisdiction in this state.  Such an approach would "unjustifiably extend the intendment of the Legislature to allow, in limited circumstances, the reach of this State's jurisdiction beyond its border" in defamation cases.  *Kim v. Dvorak*, 658 N.Y.S.2d 502, 505 (3d Dep't 1997).  Lively has therefore also failed to establish personal jurisdiction over the Wallace Defendants under CPLR 302(a)(1).

Because the Second Amended Complaint fails to establish personal jurisdiction over the Wallace Defendants under New York's long-arm statute, the Court need not address the parties' due process arguments.  *See Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 209–10 (2d Cir. 2001); *Schentag v. Nebgen*, 2018 WL 3104092, at *20 (S.D.N.Y. June 21, 2018); *Nanovibronix, Inc. v. Weiss*, 333 F. Supp. 2d 76, 78 (E.D.N.Y. 2004).  Furthermore, in light of the Court's disposition of the motion to dismiss for lack of personal jurisdiction, the Court does not address the Wallace Defendants' arguments that the SAC fails to state a claim for relief or that venue should be transferred.

## CONCLUSION

The Wallace Defendants' motion to dismiss the Second Amended Complaint for lack of personal jurisdiction is GRANTED.  The Second Amended Complaint is DISMISSED as to the Wallace Defendants without prejudice to refiling in a court that has personal jurisdiction.

The Clerk of Court is respectfully directed to close Dkt. No. 650.

SO ORDERED.

Dated: November 5, 2025
     New York, New York
                                     LEWIS J. LIMAN
                              United States District Judge