# EXHIBIT 40

** C O N F I D E N T I A L **
* CONTAINS ATTORNEYS' EYES ONLY MATERIAL *
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 1:24-CV-10049-LJL
(Consolidated with 1:25-cv-00449-LJL)
-----------------------------------x
BLAKE LIVELY,
Plaintiff,
- against -
WAYFARER STUDIOS LLC, a Delaware Limited Liability Company, JUSTIN BALDONI, an individual, JAMEY HEATH, an individual, STEVE SAROWITZ, an individual, IT ENDS WITH US MOVIE LLC, a California Limited Liability Company, MELISSA NATHAN, an individual, THE AGENCY GROUP PR LLC, a Delaware Limited Liability Company, JENNIFER ABEL, an individual, JED WALLACE, an individual, and STREET RELATIONS INC., a California Corporation,
Defendants.
-----------------------------------x
(Caption continued)
September 5, 2025
9:10 a.m.

Videotaped Deposition of KATHERINE CASE, taken by Plaintiff, pursuant to Subpoena, held at the offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York, before Todd DeSimone, a Registered Professional Reporter and Notary Public of the State of New York.





[redacted]

Q. Have you ever met Mr. Wallace in person?
A. No.
Q. And you testified earlier that you had communicated directly with Mr. Wallace, correct?
MS. EMERY: Objection.
A. Across several instances, yes.
Q. What were your modes of communication with Mr. Wallace?
A. Primarily Signal.
Q. What other avenues of communication?
A. Limited e-mail.
Q. Any others?
A. No.





K. CASE - CONFIDENTIAL

(Case Exhibit 35 marked for identification.)

Q. Ms. Case, you are now reviewing a document that has been marked as Case 35. It is a printout of the website

K. CASE - CONFIDENTIAL

StephanieJonesLeaks.com.

Do you recognize this as the copy that you drafted?

A. I believe so, yes.

Q. Do you know how this went from the copy that you drafted to becoming a website?

A. I do not.

Q. Did Melissa communicate anything to you about how this became a website after you provided her with the copy?

MR. FREEDMAN: Objection.

A. No.

Q. Do you understand there came a time where this website was shut down?

MR. BREED: Objection.

A. No.

Q. Did you understand that there came a time where there was a second website?

A. At the time I wasn't aware that there was a second website, no.

Q. After you provided Ms. Nathan

K. CASE - CONFIDENTIAL

with the copy for Exhibit 35, did you have any other discussions with Ms. Nathan about websites regarding Ms. Jones?

MR. FREEDMAN: Objection.

A. Websites, plural, no. I was asked to help alongside her to draft a handful of tweets for the Twitter page, and I was asked, again, based on language that I was provided to extrapolate that into updates to the website.

Q. You referred to the Twitter page. What is the Twitter page?

A. I don't recall the specific handle. I was told that at the time the site went public there was a corresponding Twitter page.

Q. Was that Twitter handle @LyingStephJones?

MR. FREEDMAN: Objection.

A. I'm not sure. I don't recall what the Twitter page was.

Q. Melissa told you that there was a corresponding Twitter handle?

A. She asked if I could assist in

drafting tweets, so I inferred that the Twitter handle was related.

Q. Did she tell you that the tweets that you had drafted had in fact been posted?

A. She did not communicate that, no.

Q. Did you form an understanding that they had been posted?

MR. FREEDMAN: Objection.

A. Yes.

Q. Based on what?

A. Seeing them on the Twitter page.

Q. How many tweets did you prepare for the Twitter page?

A. Roughly five or six.

Q. How did you provide those to Ms. Nathan?

A. I believe maybe Signal. I don't really recall.

Q. Do you recall communicating with Ms. Nathan on Signal regarding Ms. Jones?

K. CASE - CONFIDENTIAL

A. In relation to the tweet drafts, yes.
Q. Do you still have those Signal messages today?
A. No.
Q. Why did you communicate with her on Signal?
A. I don't know.
Q. Did you frequently communicate with Ms. Nathan on Signal?
A. No.
Q. You communicated with Ms. Nathan to make sure that the messages would disappear, correct?
MR. BREED: Objection.
MR. FREEDMAN: Objection.
A. No.
Q. Was there any other reason to communicate on Signal?
A. To my knowledge, no.
(Case Exhibit 36 marked for identification.)
Q. You are reviewing what has been marked as Exhibit 36. It is a Twitter

K. CASE - CONFIDENTIAL

account.

Does this refresh your recollection that this is the Twitter account that you reviewed where your tweets were posted?

A. To my recollection, I was only aware of one of them. I believe it was Not a Stephanie Fan.

Q. You are aware of the Twitter account Not a Stephanie Fan?

A. To my recollection, that looks like the one that I was aware of.

Q. Your tweets were posted to Not a Stephanie Fan?

A. I don't know.

Q. But you weren't aware of any of the other Twitter accounts in Exhibit 36?

A. No.

MR. BREED: Objection.

Q. Did Melissa create Not a Stephanie Fan?

A. I don't know.

Q. Did she explain to you that a Twitter account was being created?

K. CASE - CONFIDENTIAL

A. There was never a formal explanation. I was simply asked to draft tweets.

Q. Do you know whether Melissa had any other assistance in this?

A. I don't know.

Q. Do you know whether she worked with Jed Wallace on this?

MR. FREEDMAN: Objection.

A. I spoke with Jed in conjunction to Melissa as it related to the tweets.

Q. And what did you and Jed discuss?

MR. FREEDMAN: Objection.

MS. EMERY: Objection.

A. The tweets.

Q. What about the tweets?

A. I provided them via Signal.

Q. Was it your understanding that Jed was going to post the tweets?

MR. FREEDMAN: Objection.

MR. BREED: Objection.

MS. EMERY: Objection.

A. I don't know.

K. CASE - CONFIDENTIAL

Q. Did you speak with him other than over Signal?

MR. FREEDMAN: Objection.

MS. EMERY: Objection.

A. No.

Q. Did you speak with him other than with regard to sending him these tweets?

MR. BREED: Objection.

MR. FREEDMAN: Objection.

MS. EMERY: Objection.

A. I don't recall.

Q. Did you speak to him at all in connection with the first website?

MR. FREEDMAN: Objection.

MS. EMERY: Objection.

A. I don't recall.

Q. Were all of your communications with Jed Wallace regarding Stephanie Jones done via Signal?

MR. FREEDMAN: Objection.

A. Yes.

Q. Did Jed Wallace communicate to you that he would like communications to be

done over Signal?

MR. BREED: Objection.

MS. EMERY: Objection.

A. No.

Q. How did you understand that you were to communicate over Signal?

A. It's where the thread was.

Q. Was the thread among you, Jed, and Melissa?

MR. FREEDMAN: Objection.

A. Yes.

Q. Was anyone else on this thread?

A. No.

Q. Was that your only thread with Jed?

A. I don't recall, no.

Q. Did you have any other threads related to this topic -- strike that.

Did you have any other Signal threads related to this topic of the Twitter accounts or the websites generally with Melissa Nathan and anyone else?

MR. FREEDMAN: Objection.

MS. EMERY: Objection.

K. CASE - CONFIDENTIAL

Q. After Ms. Abel brought you on to work with Wayfarer, correct?

A. Yes.

Q. Ms. Jones was not involved in Wayfarer hiring TAG, correct?

A. I'm not sure.

Q. To your knowledge, did Ms. Jones have any knowledge, or, I'm sorry, any involvement?

A. I don't know.

Q. Did you ever talk to Ms. Jones regarding Wayfarer?

A. I did not.

Q. When did Melissa Nathan tell you that Ms. Abel was leaving Jonesworks?

A. I don't recall specifically. I know it was around the time of her first conversation with Justin.

Q. Around Ms. Nathan's first conversation with Justin?

A. Yes.

Q. Do you recall approximately when that was?

A. Late July.

CERTIFICATION

I, TODD DeSIMONE, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of September, 2025.

TODD DESIMONE

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.