# Exhibit 4

CONFIDENTIAL

Page 1

1           UNITED STATES DISTRICT COURT

2         FOR THE SOUTHERN DISTRICT OF NEW YORK

3                   ---oOo---

4

5    BLAKE LIVELY,

6                   Plaintiff,

7       vs.        CASE NO. 24-CV-10049-LJL (LEAD CASE)
                            25-CV-449 (LJL) (MEMBER CASE)

8

     WAYFARER STUDIOS LLC, ET AL.

9

                    Defendants.

10   _____

     JENNIFER ABEL,

11             Third-party Plaintiff,

       vs.

12   JONESWORKS, LLC,

               Third-party Defendant.

13   _____

     WAYFARER STUDIOS LLC, et al.

14             Consolidated Plaintiffs,

       vs.

15   BLAKE LIVELY, et al.

               Consolidated Defendants.

16   _____

17                **CONFIDENTIAL**

18

19       VIDEO-RECORDED DEPOSITION OF JAMEY HEATH

20              Los Angeles, California

21             Wednesday, October 8, 2025

22

23   Stenographically Reported by:  Ashley Soevyn,
     CALIFORNIA CSR No. 12019

24

25

CONFIDENTIAL

                                              Page 32

1            Q     And when was Wayfarer founded to your

2      understanding?

3            A     Wayfarer Studios?

4            Q     Yes.

5            A     2019.

6            Q     And if I use the term "Wayfarer," I'm

7      referring to Wayfarer Studios LLC, unless I say

8      otherwise, okay?

9            A     You got it.

10           Q     So it was a fairly new company?

11           A     Yes.

12           Q     Were there any employees when you joined?

13           A     Yes.

14           Q     How many?

15           A     One, two, three, four, five, six,

16     seven -- around 10 maybe, somewhere in that realm.

17           Q     So when you were hired, what position

18     were you hired into?

19           A     As I stated, there wasn't a particular

20     position.  In the creative world, it's just more

21     come and bring your creativity, your observation,

22     your consultation, and -- and kind of like see where

23     that -- what that might look like.

24           Q     Well, at some point, you became

25     president, though, right?

CONFIDENTIAL

Page 34

1          Q     How long did you hold that position?

2          A     Until almost two years ago or -- or maybe

3     a year and eight months or so when we brought on

4     Tera Hanks.  We gave her the title of president and

5     I became COO -- CEO.  So to be clear, the -- at all

6     times, I was, with both titles, essentially, the

7     head of the company in that regard.  They are just

8     titles.  All of these titles are ridiculous to me

9     anyways.

10         Q     You see yourself as head of the company

11    with respect to the day -- day-to-day operations?

12              MS. SHAPIRO:  Objection.

13              THE WITNESS:  Day-to-day operations, we

14    have an operations manager.  So...

15    BY MS. HUDSON:

16         Q     Well, what do you mean by "head of the

17    company"?

18         A     I just mean the top -- the -- the person

19    that ultimately signs off on -- daily operations

20    would be one of them.  Our deals and most of our

21    creative.  Of course, not meaning to omit the

22    chairman, but their job is different or their role

23    is different.

24         Q     And in the president role, what is

25    distinct between the president and the CEO

CONFIDENTIAL

```
                                         Page 38
 1          A     Yes.  He -- he -- yes, yes, he has.

 2          Q     And then for VP of creative, is that

 3     Angela Cardon?

 4          A     Yes.

 5          Q     Has she held that position since 2023?

 6          A     She has.

 7          Q     For -- with respect to HR, is Cynthia

 8     Barnes Slater your head of HR?

 9          A     She is.

10          Q     You know she describes herself online as

11     retired.  Is that not accurate?

12          A     She retired from -- she was a head of HR

13     of -- I can't recall the company.  It's like GMC or,

14     you know, a big corporation.  She retired from that.

15     And then she does private working HR for smaller

16     companies.

17          Q     So in a consultant role, essentially?

18          A     Yes.

19          Q     And how long has she held that position?

20          A     With Wayfarer?

21          Q     Yes.

22          A     As long as I've been there so...

23          Q     Is she physically present in California?

24          A     She is.

25          Q     She doesn't live in Illinois?
```

CONFIDENTIAL

Page 39

```
 1          A    No.  Let me rephrase that.  Not as far as
 2    I know.  But yes, she lives in California, unless
 3    something's changed.
 4          Q    And does Wayfarer have an office?
 5          A    Yes.
 6          Q    Does Ms. Barnes Slater work in Wayfarer's
 7    office?
 8          A    Not regularly.
 9          Q    Does she work from home?
10          A    Yes.
11          Q    Is there anyone in human resources other
12    than Ms. Barnes Slater?
13          A    I know Mitz assists her in the operations
14    level.  Outside of that, no.
15          Q    Has Ms. Barnes Slater always worked at
16    home?
17               MS. SHAPIRO:  Objection.
18               THE WITNESS:  Yes.
19    BY MS. HUDSON:
20          Q    Does she ever come into the office?
21          A    Yes.
22          Q    How often?
23          A    She does not have a schedule, so I would
24    not be able to put a number on it.
25          Q    Can you give me an estimate?
```

CONFIDENTIAL

Page 54

1    different many shapes.  It could be because you were

2    involved in the -- just developing the project but

3    not involved in producing.  It could be because you

4    brought some money to it.  There are distributors

5    that, if they distribute the movie, and they would

6    like an EP credit.  And then there are vanity

7    credits.  Those are pretty much the distinctions.

8         Q    So you got a producer credit on

9    It Ends with Us, correct?

10        A    I did.

11        Q    Why did you receive a producer credit on

12   that film?  Let -- let me ask you another question.

13             You -- you were provided a producer

14   credit at the outset of that film, correct; it was

15   not something that was provided at the end?

16             MS. SHAPIRO:  Objection.

17             THE WITNESS:  Correct.

18   BY MS. HUDSON:

19        Q    And what did you anticipate your role

20   would be on that film for you to receive a producer

21   credit from the outset?

22             MS. SHAPIRO:  Objection.

23             THE WITNESS:  As I had mentioned,

24   producers are in the sandbox doing the work,

25   creatively, business wise, and that was my

CONFIDENTIAL

                                                    Page 138

 1                THE WITNESS:  Absolutely.

 2      BY MS. HUDSON:

 3           Q     Okay.  All right.  But just to go back

 4      to -- I want to make sure I understand.  It's your

 5      understanding that Indie movies just have no HR; is

 6      that right?

 7                MS. SHAPIRO:  Objection.

 8                THE WITNESS:  That they don't have HR

 9      departments, that they don't have a representative

10      on set specifically that's HR.

11      BY MS. HUDSON:

12           Q     That they don't have any human resources

13      representatives?

14                MS. SHAPIRO:  Objection.

15                THE WITNESS:  That typically there are --

16      the understanding is that you would go to one of

17      your supervisors, production supervisor, or the line

18      producer, or the AD.  Also on call sheets, there are

19      numbers of hotlines, and also there are -- you have

20      your unions such as SAG and -- and so on.

21      BY MS. HUDSON:

22           Q     Do you know whether there was a hotline

23      provided to anybody who worked on It Ends with Us to

24      call regarding human resources matters?

25           A     I believe there was a hotline on all the

CONFIDENTIAL

Page 139

1    call sheets that went out regarding if there was

2    concerns of any matters that there was a line.

3         Q    If there was a hotline, who answered

4    that?

5         A    I don't know.

6         Q    You don't know who answered the hotline?

7         A    I do not.

8         Q    Did Wayfarer pay for someone to answer

9    the hotline?

10         A    Wayfarer didn't, but It Ends with Us

11    would have.

12         Q    It Ends with Us would have.  Were you

13    responsible at all for any of the financial

14    management of It Ends with Us?

15         A    On a top level.

16         Q    At a top level.  Okay.  Do you have any

17    recollection of ever authorizing or paying someone

18    to man a hotline for the movie It Ends with Us?

19         A    No, I would have not seen that

20    specifically.

21         Q    You would not.  And sitting here today,

22    you don't know if that had actually happened, right?

23         A    No, I do know there was a hotline.

24         Q    There was a hotline?

25         A    There was.

CONFIDENTIAL

Page 179

1           Q    You produced a video in -- your lawyers
2      produced a video in this case.
3                Did you provide the video of -- a video
4      in which your wife is in a tub with a baby to your
5      lawyers to produce to us in this case?
6           A    I did.
7           Q    Okay.  Where was that video stored?
8           A    You mean when I -- at what point?
9           Q    At the point that you took it to give it
10     to your lawyers.  Where did you get it?  Where was
11     it?
12          A    I believe it was on my phone.
13          Q    It was on your phone?
14          A    I believe so.
15          Q    Okay.  Did you edit the video at all
16     before giving it to your lawyers?
17          A    I did not.
18          Q    So the video you gave was the complete
19     video as it existed on your phone?
20          A    Correct.
21          Q    What, in your memory, did the video
22     depict?
23          A    It's our midwife, my sister, my kids, my
24     wife, myself, our newborn baby.  I believe we were
25     singing or praying.  The baby was crying, and then

CONFIDENTIAL

Page 180

1    at some point we were whispering a prayer in the

2    baby's ear.

3            Q    That's what you recall?

4            A    Yeah.

5            Q    And your wife was in a tub?

6            A    A birthing tub, yeah.

7            Q    A birthing tub.

8                 And you said she wasn't clothed, but she

9    had a towel over her?

10               MS. SHAPIRO:  Objection.

11               THE WITNESS:  The towel was more over the

12   baby, I think, because, you know, when the baby came

13   out of the water and you bring it up, then it's wet.

14   So you put a dry towel to cover it.

15   BY MS. HUDSON:

16           Q    And in the video that you gave to your

17   lawyers to give to us, were you in the video?

18           A    I am.

19           Q    And are you nude in that video?

20           A    No.

21           Q    Were -- did your wife give birth in a

22   tub?

23           A    She did.

24           Q    Were you in the tub when she gave birth?

25           A    I was.

CONFIDENTIAL

Page 197

1    nothing.  It seemed in context of -- they were there

2    filming and a lot of conversations happening.  And

3    so I -- I did not think about that after that.

4          Q    And there's been some testimony about

5    Mr. Sarowitz being at the set the day of the

6    birthing video.  I'm sorry -- the day the birth

7    scene was filmed?

8          A    Yes.

9               MS. SHAPIRO:  Objection.

10   BY MS. HUDSON:

11         Q    And -- and you recall him being there

12   that day as well, correct?

13         A    He was there later that day.

14         Q    I understand.  But he was there on the

15   set at some point during that day, correct?

16         A    Correct.

17              MS. HUDSON:  I'm going to hand you what

18   we've marked as Exhibit 9.

19              MS. SHAPIRO:  There is already an

20   Exhibit 9.

21              MS. AHOURAIAN:  I have Exhibit 9.

22              THE WITNESS:  Do you need this back?

23              MS. HUDSON:  It's Exhibit 10.

24         (Exhibit 10 marked for identification.)

25              THE WITNESS:  Okay.

CONFIDENTIAL

Page 209

1          A    I don't know that she was in a state of

2     undress.

3          Q    Do you -- do you have a specific memory

4     of the incident that Ms. Carroll, Ms. Baker, and

5     Ms. Lively described?

6          A    I do.

7          Q    Okay.  And what is your memory of that

8     incident?

9          A    Well, this is day two of shooting.  We

10    had got a text that morning, maybe the night before,

11    but it could have been that morning, from Ms. Lively

12    that she wanted to meet with me and Ange and Justin

13    and Alex.  We tried to have the meeting that

14    morning.  It didn't work out.  We tried to have it

15    in the afternoon.  Several attempts and we were not

16    able to achieve.

17              At the end of shooting, we were at the

18    cemetery.  I approached her and said, I know you

19    wanted to meet today, but it's getting late, and

20    suggested that maybe we do it the next day or

21    something.  She had said that she was going back to

22    her makeup trailer, could we meet her there, and we

23    could have the conversation then.

24              Not the conversation that she wanted to

25    have in the morning, the conversation about whether

CONFIDENTIAL

Page 210

1  or not we were going to do it that night or the next
2  day.
3       Q    So the conversation, just so I understand
4  it, was just about when the meeting was going to
5  take place?
6       A    She was hoping to have it that day, that
7  night, and now that it was at the end of the day, I
8  was concerned about her turnaround time.
9       Q    So just to be clear, though, the
10  conversation that you were going to have with
11  Ms. Lively in her makeup trailer, in your
12  understanding, was about when this meeting was going
13  to take place?
14            MS. SHAPIRO:  Objection.
15            THE WITNESS:  Whether we were going to do
16  it that night or the next day.
17  BY MS. HUDSON:
18       Q    Okay.
19       A    So the four of us, Justin, myself,
20  Ange Giannetti, and Alex Saks, all went to her
21  makeup trailer, the four of us.  I knocked.  Heard
22  some sort of "come in" or "yes" or some indication
23  that led me to believe it was okay to open the door.
24       Q    So the opposite of what the three
25  witnesses said?

CONFIDENTIAL

Page 211

1          A     You asked me what.

2          Q     I just want to make sure I understand.

3     You -- they said -- they all said they said no, and

4     you heard yes; is that right?

5                MS. SHAPIRO:  Objection.

6                THE WITNESS:  Can -- I don't --

7                MS. SHAPIRO:  Will you let him finish his

8     answer?  You asked him to describe his memory of the

9     event, and you keep interrupting him.

10               MS. HUDSON:  Well, I'm asking questions

11    as he is providing the answer.

12               THE WITNESS:  Would it be okay if I just

13    give you my answer?

14    BY MS. HUDSON:

15         Q     Go ahead.

16         A     Is that all right?

17         Q     Go ahead.

18         A     So I then knocked, to be clear, with

19    Justin and Ange and Alex with me at the bottom of

20    her steps.  I knocked on the door, heard some

21    indication to come in.  As I took a step up, I saw

22    that she was leaned back.  She looked what I thought

23    was either maybe breastfeeding or nursing.  I said

24    to her, oh, it looks like you're busy, I can come

25    back.  As I turned around she says, no, that's okay.

CONFIDENTIAL

Page 212

 1      You can come in, just look away.  And I said, sure.
 2              Now, I never saw the front of her.  I
 3      just saw this which appeared to me a familiar --
 4      familiar position of her feeding or nursing or
 5      pumping.  So then I walked over to the side, looked
 6      away.  We had a two-minute conversation, could have
 7      been three minutes, about whether or not we were
 8      going to have the meeting that night or the next
 9      day.  I was trying to negotiate with her, could we
10      do it tomorrow because I was worried about the
11      turnaround time, and we would lose money, which is
12      an implication -- we would lose hours in the next
13      day, which is an implication of money.
14              We had a conversation back and forth.
15      She eventually said no, she had to have it tonight
16      and she would not waive any sort of turnaround time
17      and do it off record.  So I then left, walked down
18      the stairs out of the makeup trailer where Ange,
19      Justin, and Alex were.  Reported to them, she wants
20      to do it tonight.  I tried to convince her to do it
21      tomorrow, but she wants to do it tonight.
22              She walked out four or five minutes
23      later, greeted us, said, hello.  We went into her
24      then trailer, and we had a discussion about what she
25      wanted to meet with us.

CONFIDENTIAL

Page 213

1          Q     And when she came to the trailer for the
2     meeting, did she say anything about what had just
3     occurred in her makeup trailer?
4          A     She did not.  This is on day two.  This
5     is May.
6          Q     May 16th?
7          A     May 16.
8          Q     Did you ever learn that Ms. Lively had a
9     different view of the incident in the trailer prior
10    to her testimony?
11         A     I learned that her different view is when
12    I read the CRD complaint.
13         Q     So you didn't hear any concerns raised by
14    Ms. Lively regarding this incident in the trailer on
15    the second day of shooting until the CRD complaint?
16         A     We had a conversation about it on
17    June 1st, two weeks later, but not that there was
18    a concern.
19         Q     Okay.  And when you say, "we had a
20    conversation about it two weeks later," who are you
21    talking about?
22         A     There was a conversation with Blake,
23    Justin, myself, and Alex Saks, about she had got
24    COVID and we returned to set.  And we had a morning
25    conversation before we started working.

CONFIDENTIAL

Page 219

```
 1    BY MS. HUDSON:
 2         Q    Okay.  So if Ms. Lively wasn't saying she
 3    was uncomfortable, what was your understanding of
 4    the reason she brought up the video?
 5              MS. SHAPIRO:  Objection.
 6              THE WITNESS:  I can tell you what the
 7    interaction was and what I inferred from it.
 8    BY MS. HUDSON:
 9         Q    Sure.
10         A    As she came back from having COVID and as
11    her text said she wanted to get off to a -- to a:
12              (As read):
13                   "Back to work on a solid track."
14              She said to me that, "Jamey, you know
15    when you walked up to me to show me the video with
16    your wife, I thought you were showing me porn."  I
17    said, Oh my God.  I'm so sorry.  Really?  Oh my
18    gosh.  She was like, I know that it wasn't, but it
19    startled me.  I thought that's what you were showing
20    me.  I was like, Oh my gosh, I'm so sorry.  And then
21    we moved on.  She didn't say anything that it was
22    uncomfortable.  She was just telling me that's what
23    she thought.  She recognized that what she thought
24    it was, that it was, in fact, what I showed her.
25    And then she moved on to the next subject.
```

CONFIDENTIAL

Page 223

1        this is what Ms. Lively said.  So you're disputing

2        Ms. Saks' memory?

3                    MS. SHAPIRO:  Objection.

4                    THE WITNESS:  I don't mean to dispute

5        anybody's memory.  Okay?  I can just only tell you

6        what had happened.  That's not -- that's not --

7        BY MS. HUDSON:

8            Q    Did Ms. Lively discuss the trailer

9        incident?

10           A    She did bring it up, yeah.

11           Q    What did she say about it in your memory?

12           A    After she had said something about, as I

13       said, that she thought the video at first was porn,

14       recognized that it wasn't, because it was not.  She

15       then said, also, you know, when you came into the

16       trailer a couple of weeks, I asked you to look away

17       and at some point you made eye contact with me.  And

18       I was like, oh, I didn't even know that.  She says,

19       I'm not saying you were trying to cop a look.  I'm

20       just saying that I had asked you to turn away, and

21       you made eye contact with me.  I was like, oh I'm so

22       sorry.  I didn't even realize that.  Maybe I

23       happened to glance through conversation.  I have no

24       memory of it.  But -- and then she moved onto the

25       next.

CONFIDENTIAL

Page 284

1    that there were other ones.  "To BL and her or her
2    employees."  So, yeah, we -- we talked about that
3    video again where she had brought it up.
4        Q    So you talked about the video but --
5             MS. SHAPIRO:  Can you let him finish?
6             THE WITNESS:  So we talked about the
7    video.  We didn't talk about the details of it.  We
8    just talked to -- brought up again that that video
9    was shown.  Again, I apologized to her recognizing
10   that she was surprised by it.  And -- but this
11   wasn't written.  But that topic was.
12            So no more mention of Baldoni or Heath's
13   previous pornography addiction.  I don't have a
14   pornography addiction.  So certainly, she wouldn't
15   have never read that, and I don't know what that
16   refers to.  So no, that was not discussed.
17       Q    Did she talk about Mr. Baldoni's
18   referencing pornography addiction during this
19   meeting?
20       A    I believe she mentioned something about
21   it.
22       Q    Okay.  Did she talk about wanting to --
23   neither her nor her employees to hear personal
24   experiences of -- of other people's sex lives,
25   including as it relates to spouses or others?

CONFIDENTIAL

Page 290

1    there.

2         Q    And you've given me a full scope of your

3    memory about what was discussed in that five or six

4    hours?

5              MS. SHAPIRO:  Objection.

6              THE WITNESS:  No, a lot of it was Ryan

7    belittling Justin.

8    BY MS. HUDSON:

9         Q    For five or six hours?

10        A    A lot of it was.

11        Q    And when you say "belittling," what do

12   you mean by that?

13        A    When this first -- when she first started

14   reading a couple of her things and Justin was

15   hearing this, taking this in, and trying to make

16   sense of it, he was frozen by hearing this stuff.

17   And instead of -- well, let me not say instead of --

18   and his reaction was -- was that he was being a

19   coward.  That what you do when a woman says this to

20   you and points out these things, you just stand up

21   and you just apologize and apologize.  And Justin

22   was just like, but I didn't do this.  And then he

23   raised his voice and used some language and

24   insinuated that he was not a good guy.

25        Q    That Mr. Baldoni was not a good guy?

CONFIDENTIAL

Page 338

1    I had.

2         Q    Did you discuss with Mr. Baldoni hiring

3    Jed Wallace of Street Relations?

4         A    I don't recall.  I don't remember.

5         Q    Did you discuss with anyone else at

6    Wayfarer what Mr. Wallace was being hired to do?

7         A    I may have.

8         Q    Did you discuss it with Mr. Sarowitz?

9         A    I don't have a particular memory of it

10   but I -- but I may have.  I don't know.

11        Q    Did you receive an email outlining the

12   work that Mr. Wallace would be doing for Wayfarer?

13             MR. GLOVER:  Objection.  Form.

14             THE WITNESS:  I believe there was an

15   email that came in that I only know about more

16   recently, but I never looked at it.

17   BY MS. HUDSON:

18        Q    You didn't look at it?

19        A    I did not.

20        Q    Did it come to you?

21        A    I believe my email was on it, yes.

22        Q    You believe it did come to you?

23        A    I believe so.

24        Q    But you're saying --

25        A    Only because I've learned more recently

CONFIDENTIAL

Page 399

1    BY MS. HUDSON:

2         Q    By whom?

3         A    By the production supervisor, I believe

4    Alex Saks.

5         Q    Alex Saks told you that employee

6    complaints should be brought to the line AD and

7    production supervisor?

8         A    I don't know specifically.  I just know

9    that they were saying if there's anything that

10   needed to be -- any concerns, that they would report

11   to them.  That was standard protocol.

12        Q    That's what Ms. Saks told you?

13        A    At some point, yes.

14        Q    And did she say that that was her

15   understanding of the protocol with respect to human

16   resources concerns on an independent film?

17             MS. SHAPIRO:  Objection.

18             THE WITNESS:  I don't recall beyond that.

19   BY MS. HUDSON:

20        Q    You don't recall beyond that.  So you

21   don't recall her specifically saying human resources

22   concerns of employees should be brought to the line

23   AD and production supervisor?

24        A    I don't recall that.

25        Q    The training that you referenced, did you

CONFIDENTIAL

Page 400

1    attend in person?

2         A    It was a Zoom that I -- that I attended.

3         Q    Did you attend in person?

4              MS. SHAPIRO:  Objection.

5              THE WITNESS:  The individual giving it

6    was on Zoom so I was in person on the computer, but

7    he was on Zoom.

8    BY MS. HUDSON:

9         Q    You were in person on a computer?

10        A    The training was remote.  The individual

11   giving the training was remote so I was in front of

12   my computer on the training.

13        Q    So were you -- you were not in a room

14   with the other cast and crew; is that right?

15        A    No.

16        Q    Was the other cast and crew assembled in

17   a room for the training; do you know?

18        A    I don't know.

19        Q    And where -- where were you physically

20   located when you took it?

21        A    I was at the production offices in New

22   Jersey.

23        Q    In an office?

24        A    Correct.

25        Q    And do you have any record of having