# Exhibit 6

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                      ---oOo---
 4
 5   BLAKE LIVELY,
 6                  Plaintiff,
 7     vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)
                                25-CV-449 (LJL) (MEMBER CASE)
 8
     WAYFARER STUDIOS LLC, ET AL.,
 9
                    Defendants.
10   _____
     JENNIFER ABEL,
11              Third-party Plaintiff,
        vs.
12   JONESWORKS, LLC,
                Third-party Defendant.
13   _____
     WAYFARER STUDIOS LLC, et al.,
14              Consolidated Plaintiffs,
        vs.
15   BLAKE LIVELY, et al.,
                Consolidated Defendants.
16   _____
17                  **CONFIDENTIAL**
18
19      VIDEO-RECORDED DEPOSITION OF STEVE SAROWITZ
20             Los Angeles, California
21             Friday, October 3, 2025
22
23   Stenographically Reported by:  Ashley Soevyn,
24   CALIFORNIA CSR No. 12019
25
```

CONFIDENTIAL

                                                Page 48

1          MS. GAROFALO:  Again, other than advice

2    you may have been provided by attorneys, you can

3    answer.

4    BY MR. GOTTLIEB:

5          Q    I am not asking for your conversations

6    with your lawyers.  As you sat in the boardroom as a

7    board member, I imagine a proposal was presented.

8    It's a serious proposal.  It meant shutting down an

9    organization that I imagine you'd given a lot of

10   time and money to.  And all I'm trying to ask is why

11   you decided to do that.

12         A    One of the deciding factors was death

13   threats against both me and my family as a result of

14   this litigation.

15         Q    And as a result of those threats --

16   sorry, what else did you want to say?

17         A    And arson at my house.

18         Q    And that informed the decision to shut

19   down the foundation in what way?

20         A    You were asking me about my personal

21   opinion, correct?

22         Q    I was asking you about why you made the

23   decision to support closing the foundation.

24         A    Well, as I said before, the board made

25   the decision, and then you asked me about my

CONFIDENTIAL

```
                                        Page 52
 1    is:  Have those threats been made to your knowledge
 2    against other employees, directors -- let's start
 3    with employees.
 4             Have -- are you aware of any threats that
 5    have been made to employees of the foundation?
 6        A    There was a threat made to the foundation
 7    itself.
 8        Q    And what was that threat?
 9        A    I don't recall the exact threat, but I
10    remember we had to get security and it was during
11    the course of this litigation, where -- I want to
12    say this very clearly -- antisemitism was weaponized
13    against me and anything I was associated with, even
14    though I'm a Baha'i.  And it was weaponized
15    violently and purposefully.  And as someone who lost
16    20 members of my family in the holocaust and was
17    beaten up for being Jewish when I was a child, lost
18    my great-grandfather who I'm named after, I don't
19    appreciate that.  And I want to go on record as
20    saying that religious prejudice has no place in
21    America.
22        Q    And I appreciate all that.  And I am
23    deeply sorry that that occurred.  I'm also a
24    descendant of holocaust survivors and so I don't
25    appreciate it either.
```

CONFIDENTIAL

                                                            Page 53

1              I'm trying to understand the link between

2     the threats that you received and your decision

3     respecting the foundation.  I think I understand you

4     to be saying that that link is this threat that the

5     foundation itself received.  Am I understanding you

6     correctly?

7         A    In addition to the personal death

8     threats, in addition to the death threats and

9     kidnapping threats and arson against my family, the

10    foundation also received a threat as a direct result

11    of this litigation because of the actions taken by

12    the people within this litigation, which were

13    purposefully leveled against me and my family.

14        Q    As a direct result, that antisemitic

15    threats against you and the Wayfarer Foundation, you

16    said -- I think you just testified are direct

17    results of actions taken by people in this

18    litigation?

19              MS. GAROFALO:  Objection.

20              THE WITNESS:  Yes.

21    BY MR. GOTTLIEB:

22        Q    By which people?

23        A    I don't know who authorized it, but I

24    know it was done by someone on -- on the other side.

25        Q    What was done by someone on the other

CONFIDENTIAL

Page 98

```
 1   BY MR. GOTTLIEB:
 2        Q    That doesn't surprise you?
 3        A    No, it does not.
 4        Q    You're the financier of Wayfair Studios?
 5        A    Yes.
 6        Q    You're co-founder?
 7        A    Yes.
 8        Q    Is Wayfarer Studios an LLC?
 9        A    I believe so.
10        Q    Who are the members?
11        A    I don't recall.
12        Q    Who are the shareholders?
13             MS. GAROFALO:  Objection.
14             THE WITNESS:  The major shareholders are
15   Justin and myself.
16   BY MR. GOTTLIEB:
17        Q    Do you know what the -- oh, sorry.  I
18   didn't mean to interrupt.  Did you have something
19   else you wanted to say?
20             Okay.
21             Do you know what the ownership
22   percentages are as of -- let's start with today --
23   between you and Mr. Baldoni?
24        A    Not exactly.
25        Q    Do you have a rough estimate?
```

CONFIDENTIAL

Page 103

1   my question first?

2       A    I don't recall.

3       Q    You don't recall saying that?  Do you

4   dispute saying that?

5            MS. GAROFALO:  Objection.

6            THE WITNESS:  No.

7   BY MR. GOTTLIEB:

8       Q    Do you recall giving an interview that is

9   on YouTube entitled, "Billionaire, Steve Sarowitz,

10  on wealth, philanthropy, and ethical success," in

11  August of 2024?

12      A    Yes.

13      Q    Do you recall saying about Mr. Heath that

14  you could pull rank on him because it's your money,

15  in October of 2024?

16      A    I don't recall the exact context.

17      Q    Is that true?

18      A    Is what true?

19      Q    That the money in Wayfarer Studios is

20  your money?

21      A    Yes.

22      Q    And is it true that that, in effect,

23  allows you to pull rank on Mr. Heath if you choose

24  to do so?

25      A    That's too broad.

CONFIDENTIAL

Page 120

```
 1                    the truth about Baldoni and Wayfarer.
 2                    His lawyer says he was barely involved
 3                    with the film.  Besides providing the
 4                    funding, he only visited the set twice
 5                    and was not involved in the PR for the
 6                    film."
 7          Do you see that?
 8     A    Yes.
 9     Q    Is all of that accurate?
10     A    Yeah.  Oh, wait.  Could you ask me
11  specifically -- are you asking me specifically about
12  the statement that we provided, or are you asking me
13  about the previous thing?  Could you tell me if what
14  you're asking me is accurate?
15     Q    Fair clarification.
16          Is everything after, "Through his
17  lawyer," accurate?
18     A    Can I -- can you read specifically the
19  words, because I want to make sure.  This is a very
20  important point.
21     Q    Is it accurate that you were barely
22  involved with the film besides providing its
23  funding?
24     A    Yes.
25     Q    Is it accurate that you only visited the
```

CONFIDENTIAL

Page 121

1    set twice?

2          A     Yes.

3          Q     Is it accurate that you were not involved

4    in the PR for the film?

5          A     Yes.

6          Q     And that was all of the information that

7    was provided in response to this third allegation;

8    is that right?

9          A     I don't recall.

10         Q     In other words, you don't see here

11   anywhere that, It's actually false that I provided

12   input and ideas on ways to negatively influence the

13   narrative against Ms. Lively, that's not true.  You

14   don't see that anywhere in here; do you?

15         A     It's implied very strongly by this

16   answer, by saying I'm not involved with the PR, that

17   I would not -- since I wasn't involved with the PR,

18   which is correct, that I would not have provided

19   ideas.  Also, we never did a smear campaign.

20         Q     So it's implied strongly; that's your

21   testimony, right?

22         A     It's my testimony that I never gave any

23   input on ideas or ways to negatively influence the

24   narrative against Ms. Lively and her family.  It's

25   my testimony that I never did that, then or now.

CONFIDENTIAL

Page 122

1        Q      Never?

2        A      Correct.

3        Q      Even after litigation was commenced?

4        A      Correct.

5        Q      How do you define "negatively"?

6                MS. GAROFALO:  Objection.

7                THE WITNESS:  It's my testimony that the

8        sole intent was to use my money to promote the truth

9        about Baldoni and Wayfarer.

10       BY MR. GOTTLIEB:

11       Q      So if I were to take out the word

12       "negatively" from this sentence, and ask you, did

13       you ever provide input and ideas on ways to

14       influence the narrative, and then I modify

15       "against," and have it be "about" -- let me -- let

16       me -- let me read it the way I'm modifying it, and

17       then I will ask you the question.

18               Did you ever provide input and ideas on

19       ways to influence the narrative about Ms. Lively and

20       her family?

21               MS. GAROFALO:  Objection.

22               THE WITNESS:  No.

23       BY MR. GOTTLIEB:

24       Q      You never provided any ideas about ways

25       that the media narrative about Mr. Reynolds could be

CONFIDENTIAL

Page 123

1    influenced at any time?

2         A    I don't recall.

3         Q    Do you want to spend a minute and think

4    about it?

5         A    There was one time that I suggested that

6    we should point out, after Ms. Lively had said that

7    Ryan Reynolds rewrote a scene, that we should point

8    out that that was a scene written by a female

9    writer.  That was the sole time I remember.

10        Q    And why did you point that out?

11        A    I don't recall.

12        Q    What influence would it have in coverage

13   of the dispute to point out that it was a female

14   writer?

15             MS. GAROFALO:  Objection.

16             THE WITNESS:  I don't know.

17             MR. GOTTLIEB:  Really?

18             MS. GAROFALO:  Objection.

19   BY MR. GOTTLIEB:

20        Q    That's really your testimony as you sit

21   here today?  You can't -- you really don't know why

22   it would have mattered if there had been coverage

23   that followed the suggestion that you made?

24             MS. GAROFALO:  Objection.

25             THE WITNESS:  I don't know what the

CONFIDENTIAL

Page 126

1    had made on It Ends with Us by Q2 2025, how would I
2    figure that out?
3           A    I don't know.
4           Q    You really cannot think of a single piece
5    of paper or document or file I could look at that
6    would tell me that?
7                MS. GAROFALO:   Objection.
8                THE WITNESS:   I'm not involved in the
9    day-to-day running of Wayfarer.   I imagine you could
10   talk to Wayfarer management and ask them.
11   BY MR. GOTTLIEB:
12          Q    No one ever provided any kind of a report
13   to you in the ordinary course of your duties and
14   responsibilities as the co-chairman of the studio
15   that told you how much money this movie made?
16          A    I don't recall.
17          Q    Do you recall giving interviews in which
18   you talked about how much money the movie made
19   opening weekend?
20          A    Yes.
21          Q    Do you recall how much?
22          A    No.
23          Q    Do you recall it being more than you
24   anticipated?
25          A    Yes.

CONFIDENTIAL

Page 137

1        A    Yes.

2        Q    And that is a, I'm imagine, genuine

3    sentiment you were expressing to Mr. Baldoni?

4        A    Yes.

5        Q    And you recall being very proud of the

6    success of this movie in its opening days, right?

7        A    Yes.

8        Q    Okay.  And you say:

9             (As read):

10               "Your interviews have been sterling."

11            Do you see that?

12       A    Yes.

13       Q    Had you been watching some of

14   Mr. Baldoni's press interviews in connection with

15   the release of the film?

16       A    Yes.

17       Q    And you thought they were sterling?

18       A    Yes.

19       Q    Did you participate in any respect in any

20   of the preparation in advance of Mr. Baldoni's

21   interviews?

22       A    No.

23       Q    Did you -- you yourself did some

24   interviews in the first couple weeks that the film

25   was released; is that right?

CONFIDENTIAL

```
                                      Page 138

1          A     Can you be more specific?

2          Q     Sure.

3                Did you do any media interviews in

4     conjunction with the release of It Ends with Us?

5     So, you know, the -- either the, let's call it, the

6     first couple of weeks of August 2024?

7          A     Not specifically.

8          Q     Did you do any media interviews that

9     occurred around that time?

10         A     Yes.

11         Q     And did you prepare for those interviews

12    with the assistance of any people in advance of your

13    interviews?

14         A     Sorry.  I'm not trying to hesitate, I'm

15    just trying to remember.  Not -- not really.

16         Q     Did you ever receive any kind of talking

17    points or briefing materials in advance of the media

18    interviews you were doing in the first two weeks of

19    August 2024?

20         A     Not that I recall.

21         Q     Did you ever discuss with Mr. Baldoni in

22    advance of doing the interviews that you did, what

23    might be asked and what you might say?

24         A     Yes.

25         Q     Okay.  I will come back to that.
```

CONFIDENTIAL

Page 146

```
 1          Q     Who did you ask?
 2          A     Ask what?
 3          Q     Who did you ask the question to, did we
 4    have any idea that this would be promoted this way?
 5          A     I never asked.
 6          Q     You never asked anyone that question?
 7          A     Correct.
 8          Q     Okay.  Did you ever review any of the
 9    marketing materials for the film that were created
10    by Wayfarer Studios?
11          A     No.
12          Q     Did you ever review any of the marketing
13    materials for the film that were created by Sony?
14          A     No.
15          Q     Have you ever seen any marketing
16    materials of any kind about the film that were
17    created or influenced or edited by Ms. Lively?
18          A     I was not involved in the marketing.
19          Q     And so, therefore, you would have no way
20    of knowing whether Ms. Lively had any involvement at
21    all in how the film was marketed?
22          A     I was told that Ms. Lively and Sony took
23    over the marketing, by Jamey.
24          Q     Would it surprise you to learn that every
25    document that has been produced in this case that
```

CONFIDENTIAL

Page 152

1            paying for the PR teams.  That's you
2            loving me, and I appreciate you."
3       A    Yes.
4       Q    Was Wayfair paying for the PR teams?
5       A    I don't know the details.  I just
6   literally don't.
7       Q    Would you have to approve that before
8   Wayfarer hired a PR team?
9       A    No.
10      Q    And in this case, you're aware that The
11  Agency Group was retained to perform crisis
12  communication services; is that correct?
13      A    Yes, for the reasons I've already stated.
14  I can go through them again if you'd like.
15      Q    Well, that's not my question.
16           Did you approve the hiring of The Agency
17  Group?
18      A    No.
19      Q    Were you asked your opinion on it before
20  they were retained?
21      A    No.
22      Q    Did you vet The Agency Group before they
23  were retained?
24      A    No.
25      Q    Did you have any conversation with

CONFIDENTIAL

Page 153

1    Ms. Melissa Nathan before they were retained?
2         A    No.
3         Q    How about Street Relations?  Are you
4    familiar with Street Relations?
5         A    Yes.
6         Q    You are aware that Street Relations was
7    at one point retained by Wayfarer?
8         A    Yes.
9         Q    Did you -- were you asked for your view
10   on that retention?
11        A    I don't recall.
12        Q    Did you approve -- or sorry.  Strike
13   that.
14             Did you speak with Jed Wallace, the head
15   of Street Relations, before Street Relations was
16   retained?
17        A    I don't recall.
18        Q    Do you recall anything about the
19   retention of Street Relations?
20        A    They were retained in regards to --
21   actually, let me change my answer.  No, I was not
22   consulted before they were hired.  I just had to
23   remember.
24        Q    Okay.  What did you just remember?
25        A    I just remembered when they were hired.

CONFIDENTIAL

Page 154

1    Because at that point, I was not involved in the

2    day-to-day.

3         Q    Okay.  So when were they retained?

4         A    I believe, I'm not 100 percent sure,

5    sometime around August of 2024.

6         Q    And how --

7         A    I wasn't involved in that decision.

8         Q    How do you recall learning about that?

9         A    I don't recall.

10        Q    What do you recall learning about Street

11   Relations?

12        A    Not 100 percent sure because we've been

13   through this case for, you know, I guess it's been a

14   year and a half, a year now, that we've gone through

15   this.  And so there's been a lot that's been

16   reported.  So in my memory it may be a little bit

17   confused.  But to my knowledge now, I'm not sure if

18   I knew it then, Street Relations was monitoring the

19   negative press against us that was being put out by

20   the Lively camp.

21        Q    What does that mean, "monitoring"?

22        A    Helping with our crisis PR.

23        Q    So what does it mean to "monitor" social

24   media or PR or press?

25             MS. GAROFALO:  Hold on.  Objection.

CONFIDENTIAL

Page 169

1    made about you that you believe to be defamatory?

2         A    Again, sorry.  I'm just trying to get

3    clarification.  I'm not trying to be difficult.

4    During the course of the complaint or as part of the

5    complaint, would that be considered -- since that

6    was public in The New York Times and Ms. Lively was

7    the source of that statement, would that -- would

8    that count?

9         Q    That's for -- that's for you to tell me.

10        A    Would that --

11             MS. GAROFALO:  Why don't you answer the

12   question with what you believe she publicly said

13   through The New York Times.

14             THE WITNESS:  Okay.  Through The New York

15   Times in the course of the complaint, it was said

16   that I was on set for a scene where she was scantily

17   clad and that I was a non-essential person.  While I

18   might have technically been non-essential, I did

19   invest $30 million and paid for her salary, or at

20   least my share of it, as well as the other actors,

21   and I consider that to be essential.  Ms. Lively

22   considers that not to be essential, she can send me

23   a check.  I can give her an address or you could

24   give it to her.  But beyond that, I was not on set

25   for that scene.  And although I don't have direct

CONFIDENTIAL

                                              Page 172

1    BY MR. GOTTLIEB:

2         Q     That's all I'm interested in, is how your

3    understanding of how you, Steve Sarowitz, were

4    personally defamed.  And what she testified to in

5    her deposition, we're going to bracket that.

6         A     Okay.

7         Q     I think I understood you to say, you

8    believe that there were things in the CRD complaint

9    and The New York Times article that you found to be

10   defamatory about you?

11        A     Yes.

12        Q     Okay.  And the example that you gave of

13   that, I believe, was an allegation about a time when

14   it was alleged that you were on set for a scene

15   where Ms. Lively was acting out the scene of giving

16   birth; is that right?

17        A     Yes.  I want to add one other thing to

18   what I said.

19        Q     Okay.

20        A     It was insinuated that I went on set for

21   particularly that scene.  I didn't know what scenes

22   were being filmed.  Again, I wasn't on set for that

23   scene, but I did not -- it was insinuated that I

24   went on set for that particular scene.  Of course,

25   like I said, I wasn't on set for that particular

CONFIDENTIAL

Page 173

1    scene, and I also made no conscious decision to see

2    Ms. Lively in any particular thing because it wasn't

3    important to me.

4          Q    Were you on set that day, the day that

5    that scene was shot?

6          A    Yes.

7          Q    And how do you know that?

8          A    I didn't know it at the time, I was told

9    later in a conversation with someone who was there,

10   that, oh, yeah, that set was that scene.  Because I

11   said, what about that scene?  Oh, that was filmed

12   before you got on set.

13         Q    And there would be records, right, that

14   would show that you traveled to New Jersey; is that

15   right?

16         A    Yes.

17         Q    And those travel records would presumably

18   show us when you arrived and when you left?

19         A    I assume so.

20         Q    Would -- do you have a calendar or diary

21   that you keep?  By diary, I mean a calendar.  Do you

22   keep a calendar?

23         A    I do, but it wouldn't specifically say

24   which scenes I was there for.

25         Q    But wouldn't the calendar have, for

CONFIDENTIAL

Page 177

1      Q    Okay.  And then would the same be true

2  for intentional negligent interference with

3  prospective economic advantage?  Not about you

4  personally?

5      A    I'm not as certain on that one.  I'd have

6  to know more on that one.  Can -- I'd have to know

7  more on that one.  I'd need more detail.  The other

8  one, no.  That one, possibly.

9      Q    As you sit here today, what is your

10  understanding of the factual basis for intentional

11  and negligent interference with prospective economic

12  advantage against, for example, let's start with

13  Mr. Reynolds?

14      A    And the reason I'm hesitating is, I'm not

15  sure where Wayfarer ends and I start.  I don't know

16  how -- why the lawyers sued the way they did.  I'm

17  not a lawyer.  So I -- I'm not really an expert on

18  the law.  But I can talk about damages done to

19  Wayfarer, of which I'm the majority owner.  And that

20  would have a negative economic advantage to me as an

21  individual.  I don't know if that is what you're

22  asking me.

23      Q    I'm not ask- -- I'm not asking you

24  questions about damages to Wayfarer.  I'm talking

25  about the claims you personally raised.  But I

CONFIDENTIAL

Page 183

```
 1        A    Yes.
 2        Q    And is the document that follows this
 3   that begins on page 34943, to the best of your
 4   knowledge, the Wayfarer Studios Employee Handbook?
 5        A    Yes.
 6        Q    And you're familiar with this document,
 7   right?  Your name is on the first cover page of this
 8   at 34943?
 9        A    I'm not familiar with every detail.  A
10   lot of times I will sign things as a high level.
11   I'm not involved in the day-to-day, but I'd be
12   familiar that there is the document.
13        Q    Okay.  You see on page 34943, the first
14   page of the document after the text, so the first
15   page of the attachment --
16        A    Yes.
17        Q    Do you see that on the page at the top it
18   says:
19             (As read):
20                  "So glad you've joined us."
21             And at the bottom, it's signed:
22             (As read):,
23                  "Steve Sarowitz and Justin Baldoni,
24                  co-chairmen"?
25        A    Yes.
```

CONFIDENTIAL

Page 184

1        Q    Okay.  And there is a -- there is
2    references here to this being the employee handbook,
3    right?
4        A    Yes.
5        Q    And do you have a recollection of signing
6    off on maybe not every word of this, but at some
7    point in time, signing off on an employee handbook
8    for Wayfarer Studios?
9        A    I don't recall.
10       Q    Do you have any recollection of ever
11   seeing this letter that your name is on here?
12       A    I don't recall.
13       Q    If you flip through the Table of Contents
14   on pages HEATH 34944 through HEATH 34945, have you
15   ever looked at this -- as you look through the Table
16   of Contents, have you ever looked through the
17   policies and procedures that are contained within
18   this handbook?
19       A    No.
20       Q    Okay.
21            Well, let's look through some of the
22   policies because I think they're quite commendable.
23   On page 4 of the document, which is HEATH 34946, do
24   you see a reference in the values to Wayfarer
25   Studios being a "Baha'i inspired organization"?

CONFIDENTIAL

Page 195

```
 1    what would -- it's not just anything that anyone
 2    says.  But things like, for example, unwelcome
 3    sexual advances, requests for sexual favors.  Some
 4    very specific things.
 5         Q    Sure.
 6         A    Not just anything anyone would term.  So
 7    I don't want to broadly say that anything that
 8    anyone perceives to be sexual harassment would
 9    actually be sexual harassment.  But, rather, things
10    as in here, a condition of an individual's
11    employment.
12              So in other words, that if someone were
13    to be asked for sexual favors or if someone were to
14    say, like -- like is very typical in Hollywood, that
15    would be definitely sexual harassment.
16         Q    Fair enough, Mr. Sarowitz.
17              If I worked for you, and I wanted to
18    understand what's our sexual harassment policy, I
19    imagine you would tell me, take a look at this
20    document, right?
21              MS. GAROFALO:  Objection.
22              THE WITNESS:  I wouldn't be -- I wouldn't
23    be the one answering that question.
24    BY MR. GOTTLIEB:
25         Q    If you were?
```

CONFIDENTIAL

Page 196

```
 1              MS. GAROFALO:  Objection.
 2              THE WITNESS:  But I wouldn't be, so it's
 3    conjecture.
 4    BY MR. GOTTLIEB:
 5         Q    Is it fair to say that if I wanted to
 6    understand what Wayfarer Studios' sexual harassment
 7    policy was, that this is the place I would look?
 8    This document is the place I would look to
 9    understand that policy?
10              MS. GAROFALO:  Objection.
11              THE WITNESS:  I'm not 100 percent sure
12    how it would be handled since I don't handle the
13    day-to-day operations.
14    BY MR. GOTTLIEB:
15         Q    Do you understand that Wayfarer Studios'
16    policy, explains that:
17              (As read):
18                   "Sexual harassment may include a range
19                   of subtle and not so subtle behaviors
20                   and may involve individuals of the same
21                   or different gender"?
22              MS. GAROFALO:  Objection.
23              THE WITNESS:  That's from our policy,
24    correct?  That's a piece of our policy?
25
```

CONFIDENTIAL

Page 198

1      A    Yes.

2      Q    Are you aware of whether anyone on the

3   set of It Ends with Us advised Mr. Baldoni that his

4   behavior was unwelcome?

5      A    That's too broad a topic.  Can you -- can

6   you say specifically, more specifically what?

7      Q    Do you know if at any time during the

8   filming of It Ends with Us, anyone advised

9   Mr. Baldoni that he had engaged in behavior that was

10  unwelcome?

11     A    I just can't.  It's too broad.

12     Q    You don't know?

13     A    I wasn't there.  I don't -- I don't have

14  any firsthand -- as you said before about the other

15  things, I don't have first knowledge -- firsthand

16  knowledge.  I wasn't there.

17     Q    Do you have any information at all, were

18  you ever told, that anyone told Mr. Baldoni that he

19  had engaged in conduct that was unwelcome and a

20  request that it be discontinued?

21          MS. GAROFALO:  Objection.  To the extent

22  it calls for information you learned from lawyers,

23  in which case you are instructed not to answer.

24          You may otherwise answer.

25          THE WITNESS:  Attorney privilege.

CONFIDENTIAL

Page 199

1    BY MR. GOTTLIEB:

2        Q    So you're saying, other than what you've

3    learned from your attorneys, you're unaware of

4    anything?

5        A    Correct.

6        Q    Other than what you've heard from your

7    attorneys, for example, you never had a conversation

8    with Mr. Baldoni where he told you that someone on

9    the set had told him that his behavior was

10   unwelcome?

11       A    I don't recall.

12       Q    Do you -- are you aware, other than what

13   you've learned from your attorneys, whether any

14   member of the cast or crew ever asked Mr. Baldoni to

15   discontinue a behavior or type of conduct on the

16   set?

17       A    Other than what I learned from my

18   attorneys, I'm not aware of anything.

19       Q    Okay.  You've never seen anything from

20   Wayfarer's own documents or your own text messages?

21       A    I don't recall --

22       Q    That's --

23       A    -- outside of what I talked to my

24   attorneys about.

25       Q    Okay.  So you don't know one way or the

CONFIDENTIAL

Page 202

1    It Ends with Us?

2        A    I don't recall.

3        Q    Was there ever a time, again, prior to

4    this litigation, where you learned that someone on

5    the set raised concerns that Mr. Baldoni's behavior

6    was inappropriate during filming?

7        A    I am not aware of any HR complaints that

8    were raised or any SAG complaints that were raised

9    by his behavior.

10       Q    Well, that's an interesting way of

11   distinguishing the question, because that's

12   precisely how your PR people talked about it to the

13   press.  So my question to you, sir, was not about HR

14   complaints or SAG complaints.

15       A    Okay.  So --

16       Q    My question to you was whether -- and I

17   will reread it, if I can find it.

18            My question was whether you ever became

19   aware prior to this litigation of anyone on the set

20   raising concerns that Mr. Baldoni's behavior during

21   filming was inappropriate?

22       A    I don't recall.

23       Q    Do you see if -- is it fair to say that

24   under the Wayfarer Studios' policy, the thing you

25   want your employees to do when they feel like they

CONFIDENTIAL

Page 203

1    have experienced this type of prohibited behavior,

2    is promptly advise the offender that his or her

3    behavior is unwelcome, and request that it be

4    discontinued?

5                MS. GAROFALO:  Objection.

6                You can answer.

7                THE WITNESS:  Yes.

8    BY MR. GOTTLIEB:

9         Q    And what is supposed to happen when an

10   individual follows that policy to the letter?

11               MS. GAROFALO:  Objection.

12               THE WITNESS:  Although I am not

13   responsible for this because I'm not the one

14   actually implementing this, the behavior should

15   stop.  That would not be my individual

16   responsibility as an individual.

17   BY MR. GOTTLIEB:

18        Q    But the reason the policy is written this

19   way is because the hope is by promptly reporting it

20   and asking for that behavior to be discontinued,

21   whoever's doing it will stop, right?

22               MS. GAROFALO:  Objection.

23               THE WITNESS:  I would not be personally

24   involved, but that would be the hope.

25

CONFIDENTIAL

Page 204

1    BY MR. GOTTLIEB:

2        Q    That's your understanding of the purpose

3    of this policy, right?

4        A    Yes.

5        Q    And the next section under "Supervisor

6    and Manager Responsibility" states:

7            (As read):

8                "If any supervisor or manager becomes

9                aware of a violation of this policy,

10               they are obligated to report the

11               violation to human resources/management

12               so Wayfarer Studios can investigate,

13               and if appropriate, take corrective

14               action."

15           Do you see that?

16       A    Where's that at?

17       Q    In the section entitled "Supervisor and

18   Manager Responsibilities."

19       A    Okay.  Yes.

20       Q    Did you supervise or manage any people at

21   Wayfarer Studios during the filming of

22   It Ends with Us?

23       A    No.

24       Q    Did Mr. Heath?

25       A    Yes.

CONFIDENTIAL

Page 210

1   before Ms. Garofalo was your lawyer, right?

2          A     Yes.

3          Q     You learned about that completely

4   independently of anything that could fall within an

5   attorney-client privilege because you learned about

6   it in 2023, right?

7                MS. GAROFALO:   Objection.

8                THE WITNESS:   Not completely

9   independently.

10  BY MR. GOTTLIEB:

11         Q     You knew in 2023 that Ms. Lively's legal

12  team had sent a list of protections for return to

13  production, and you talked about it with

14  Mr. Baldoni, didn't you?

15         A     I'm trying to answer this honestly, so

16  give me a second to describe what I think of that

17  list.  I believe that in -- Ms. Lively sent a list

18  of things that she insinuated we did, which we never

19  did.  And that forced us basically, after millions

20  of dollars were invested to the movie, to sign a

21  list of things that we would do no more, that were

22  never done as a ploy to take over the movie, which

23  she eventually did.

24               So yes, I believe that Ms. Lively did

25  send a list of demands for her to return to work,

CONFIDENTIAL

Page 211

1    and we did sign the list, but when we signed it, we

2    signed it with the understanding that we did not

3    agree that we had actually done those things.

4        Q    What did you do, since you're stating

5    with some amount of conviction that the actions

6    described in that list did not occur and were, as

7    you just said, a ploy, what did you do to satisfy

8    yourself that what you just said is factual?

9            MS. GAROFALO:  Objection.

10   BY MR. GOTTLIEB:

11       Q    How did you satisfy yourself that those

12   behaviors or activities or compliance, or whatever

13   you would like to call them, did not occur?

14       A    As I have stated previously, the two main

15   things that she said about me are complete or

16   partial lies.  That's is my direct experience.  She

17   accused me of being in a scene -- at a scene, which

18   I was not at.  She said she was scantily clad.  An

19   actor who was on the set with her, testified she was

20   not -- publically testified she was not scantily

21   clad.  And then, throughout the course of this case,

22   the evidence has come out that much of what she said

23   was not true, or partially true, or twisted, to make

24   it seem worse.

25            For example, she said that Justin said

CONFIDENTIAL

Page 213

1              "Wayfarer Studios will maintain

2              appropriate documentation and tracking

3              to ensure that reasonable progress is

4              made"?

5      A    Yes.

6      Q    Did that happen with respect to what

7  occurred on set in It Ends with Us?

8              MS. GAROFALO:  Objection.

9              THE WITNESS:  The two ways that a formal

10  complaint would -- I'm not aware of -- of any formal

11  complaints of any -- any formal reports of any

12  allegations being made either to, as I mentioned

13  before, either to SAG or to HR.

14  BY MR. GOTTLIEB:

15      Q    So your answer is, you're not aware of

16  any investigation of this type referenced on the

17  document with the Bates No. 34949 taking place?

18      A    I am not aware of any reported

19  allegations.

20      Q    What's a "formal report"?

21      A    Typically in -- again, I'm not an expert

22  on this.  I don't manage sets.  But what I've been

23  told and what I've learned through the course of

24  this case, is that the two options, if there was a

25  --

CONFIDENTIAL

Page 217

```
 1              favors, verbal abuse of a sexual
 2              nature, commentary about an
 3              individual's body, sexual prowess, or
 4              sexual deficiencies."
 5         Yes.
 6    Q    Also:
 7         (As read):
 8              "Sexual jokes and innuendo, leering,
 9              whistling, or touching, insulting or
10              obscene comments or gestures, display
11              in the workplace of sexually suggestive
12              objects or pictures, and other
13              physical, verbal, or visual conduct of
14              a sexual nature."
15         Is that a good description of what can
16    constitute sexual harassment under Wayfarer's
17    policy?
18    A    That's what the policy says.
19    Q    Do you have any knowledge of whether any
20    conduct of that type occurred on the set of
21    It Ends with Us?
22    A    I have no knowledge of any of that.
23    Q    Okay.  You don't know one way or the
24    other?
25    A    I have no knowledge of any of that ever
```

CONFIDENTIAL

Page 218

1    occurring.  It's my belief that none of that ever

2    occurred on set.

3         Q    Okay.

4         A    I have no direct knowledge.

5         Q    So if an investigation is not conducted

6    and if an employee believes their complaint is not

7    resolved, what does the policy say the employee or

8    covered person should do?

9              MS. GAROFALO:  Objection.

10             Do you need time to read the policy?

11             THE WITNESS:  Can you point me to that?

12   BY MR. GOTTLIEB:

13        Q    Take a look at the section that says,

14   "Violations of this policy."

15        A    Okay.  Got it.

16        Q    Do you see the paragraph that begins with

17   employees -- "If employees believe their complaint

18   is not resolved"?

19             Do you see that?

20        A    So if the -- so what you're saying is, if

21   anything actually occurred?

22             MS. GAROFALO:  Take a minute --

23             THE WITNESS:  Yeah, so I should --

24             MS. GAROFALO:  -- and read it, and then

25   you can respond.

CONFIDENTIAL

Page 221

1   Mr. Baldoni?

2        A    I am not aware of any complaints that

3   were not resolved.

4        Q    Complaints describing unwelcome behavior?

5        A    I am not aware of any complaints that

6   were not resolved.

7        Q    Okay.

8        A    And can I answer a little bit more?

9        Q    Sure.

10       A    I believe that after there were -- there

11  are no further complaints after the 17 points, so

12  even after very early on in filming I was not aware

13  of any complaints, and I'm not aware of any written

14  complaints, any HR complaints.  I'm not aware of any

15  unresolved complaints.

16       Q    Okay.  Are you --

17       A    I know that there was insinuated, but I

18  am not aware of any unresolved complaints.

19       Q    Are you aware of any investigation that

20  took place into any conduct that took place on the

21  set of It Ends with Us prior to this litigation?

22       A    I am not aware of any complaints that

23  necessitated an investigation prior to this

24  investigation.

25       Q    So the answer to my question is, no,

CONFIDENTIAL

1              investigated and addressed."

2         Do you see that?

3    A    Yes.

4    Q    And we've already established that there

5  was no investigation of any kind prior to the

6  initiation of litigation in this case; is that

7  correct?

8    A    I'm not aware of any -- any event that

9  would facilitate or require an investigation.  So as

10  I said before, I'm not aware of any -- any event

11  that would have required an investigation.

12         And one thing I forgot to mention before

13  is that we had talked to counsel and -- and there

14  was no event that they felt would require an

15  investigation.

16    Q    Who is "we"?

17    A    Jamey and Justin.

18    Q    And --

19    A    I don't really know.  I wasn't involved

20  in that conversation.

21    Q    Well, how did you just remember this?

22    A    I -- I knew about it before.  I had

23  forgotten to say it before.  The counsel that also

24  verified along with our own -- you know, just there

25  was -- there was no need for an investigation at

CONFIDENTIAL

Page 230

1    these expensive things occurred throughout the
2    production.
3              So when these things occurred, I can't
4    tell you exactly when they occurred, but throughout
5    the production.  In addition to a lot of stress.  In
6    addition to the people being fired.
7         Q    Why do you -- sorry.  Go ahead.
8         A    And this 17-point list essentially served
9    very effectively, in my opinion.  And I will give
10   her a lot of credit for this, as essentially a knife
11   to our throat throughout all of this, so she could
12   get away with the crime she got away with.
13        Q    I thought you weren't involved in the
14   production of the film?
15        A    Correct.
16        Q    You only visited the set twice, right?
17   Isn't that what your lawyer told Forbes?
18        A    That's what I told Forbes, and that's
19   what I'm telling you.  I only visited the set twice.
20        Q    That's the truth?
21        A    That is the truth.
22        Q    Well, you used the word "we" a lot in
23   that speech you just gave.  And so what I'm
24   wondering is, were you involved in the production of
25   the film?  Or are you, in using the word "we,"

CONFIDENTIAL

Page 231

1   describing Wayfarer Studios?

2            MS. GAROFALO:  Objection.

3            THE WITNESS:  I'm using the word "we," as

4   in the entity, Wayfarer Studios, of which I'm the

5   majority investor.  Not that I was individually

6   involved in any of the actions.  Not that I have

7   personal knowledge of any of this.  Not that I was

8   involved in any of this personally or have any

9   individual knowledge.  However, the effects have

10  hurt me as -- have hurt the company and myself as --

11  as an owner of the company in that respect.

12  BY MR. GOTTLIEB:

13       Q    What I'm trying to get at, Mr. Sarowitz,

14  is, did you -- about with respect to Ms. Lively's

15  allegations, and whatever label you want to give to

16  the sort of content of the 17-point list, okay.  I

17  don't want to fight over whether they're allegations

18  or claims or whatever they are.  But the substance

19  of what was in the 17-point list, did you know

20  anything about the events described from firsthand

21  knowledge?

22            MS. GAROFALO:  Objection.

23            THE WITNESS:  No.

24  BY MR. GOTTLIEB:

25       Q    Did you know anything about what was

CONFIDENTIAL

Page 232

1    described in that document, other than what you had
2    learned from Mr. Baldoni?
3              MS. GAROFALO:  Objection.
4              THE WITNESS:  Is it possible we could
5    review the 17-point list?
6    BY MR. GOTTLIEB:
7         Q    We are going to get to a document in a
8    minute.  But as you sit here today, your
9    understanding of what was happening on the set,
10   which you have testified you weren't there every
11   day, you visited twice, you weren't involved in the
12   production, do you ever recall learning anything
13   about what was going on, on the set, other than from
14   Mr. Baldoni?
15        A    Yes.
16        Q    Okay.  What else do you recall, as you
17   sit here today?
18        A    I talked to Brandon Sklenar when I was on
19   set.  And he was infuse -- he was effusive in his
20   praise for Justin, his directing, Wayfarer, how he
21   had been treated in general.  So I met with him
22   personally on the day I was in set -- on set.
23        Q    Which of the two days?
24        A    The first day I was on set.
25        Q    Okay.

CONFIDENTIAL

Page 233

1          A     My own experience from those -- from that
2     day on set was that I did not witness anything
3     untoward, but I would not have.  Again, I was only
4     on set twice.  So that's what I would know
5     firsthand.
6          Q     Okay.  And so you had a conversation that
7     you can recall from Mr. Sklenar, which was very
8     positive about his experience?
9          A     Effusive, yes.
10         Q     Effusive, your word.  And you, obviously,
11    had conversations along the way with Mr. Baldoni.
12    Is there anything else you can think of as you're
13    sitting here today that -- any other person from
14    whom you might have learned information about what
15    was happening on set?
16         A     Yes.
17         Q     Who was that?
18         A     Jamey Heath.
19         Q     Okay.  So you had conversations with
20    Mr. Heath during production?
21         A     Yes.
22         Q     And did you talk to Mr. Heath and
23    Mr. Baldoni by phone from time to time during
24    production?
25         A     I don't recall, but I assume so.

CONFIDENTIAL

Page 235

1          A     Correct.

2          Q     Which was the first of the two days that

3    you visited the set?

4          A     Yes.

5          Q     Okay.  And how long would you say that

6    interaction with Ms. Lively took?

7          A     A minute or two.

8          Q     Okay.

9                Anything else?  I know this can be

10   tedious, but anything else that you can think of in

11   your head, as you sit here today, that informed your

12   understanding of what had happened on set?

13         A     I'm friends with one of the actors.

14         Q     Which one?

15         A     Adam Mondschein.

16         Q     And did you have conversations with

17   Mr. Mondschein about what was happening on set?

18         A     Nothing negative.

19         Q     My question was, did you have any

20   conversations with Mr. Mancini about what was

21   happening on the set?

22         A     Just his experience.

23         Q     And when did you talk to Mr. Mancini?

24         A     I don't recall.

25         Q     Do you recall how many scenes in the

CONFIDENTIAL

```
                                           Page 236
 1    movie Mr. Mancini was in?
 2          A    I don't know.
 3          Q    Would it refresh your recollection if I
 4    told you one?
 5          A    Yeah, that sounds right to me.
 6          Q    Do you know what scene he was in?
 7          A    Yes, he was in the birthing scene.
 8          Q    Do you know what character he played?
 9          A    He played the doctor.
10          Q    The doctor that sat in between
11    Ms. Lively's legs while she was giving birth?
12          A    I wasn't there.
13          Q    Have you seen the movie?
14          A    I have seen the movie.
15          Q    Is that what happens in the scene?
16          A    I don't recall.
17          Q    Did you talk to Mr. Mancini before he
18    went to act for that scene?
19          A    No.
20          Q    Did you talk to him after that?
21          A    Yes.
22          Q    What was the nature of your conversation?
23          A    Just his experience.
24          Q    And what did he talk about it?
25          A    Sounded like it was positive.
```

CONFIDENTIAL

Page 237

1        Q    Anything specific you can recall?

2        A    No, I don't recall.

3             Also, he confirmed my memory, which is

4    that I wasn't there at that scene.

5        Q    When did that happen?

6        A    After -- during the course of

7    litigation -- after litigation, I just

8    double-checked and said, "I wasn't there for that

9    scene."  He said, "I know.  I was there."

10       Q    When did that conversation take place?

11       A    I don't recall.

12       Q    Do you know roughly, like, month that

13   would have occurred in?

14       A    I don't recall the exact month.

15       Q    Do you talk to him on the phone?

16       A    Yes.

17       Q    Do you recall about how long the

18   conversation was?

19       A    No.

20       Q    Did you talk to him about anything else?

21       A    I don't recall.

22       Q    And so the nature of that call, to the

23   best of your recollection, is you asked him if he

24   had a recollection of you being present for the

25   birth scene, and he said he did not?

CONFIDENTIAL

Page 238

```
1         A    I told -- my recollection -- and, again,
2    this is going back to the call.  That I told him I
3    wasn't there for the birth scene and am I wrong
4    about that.  And he -- he confirmed that.
5         Q    He said, yeah, you're right, you weren't
6    there?
7         A    Correct.
8         Q    Okay.
9              MR. GOTTLIEB:  Let's take a look at
10   Exhibit 8.
11         (Exhibit 8 marked for identification.)
12   BY MR. GOTTLIEB:
13         Q    Mr. Sarowitz, you've been handed a
14   document marked as Exhibit 8, which is a document
15   bearing the Bates No. NATHAN 3767, and then an
16   attachment that is produced in native format to this
17   document.
18         A    It's a little small for my old eyes.  I
19   think I --
20         Q    I also need these to read this document.
21              MS. GAROFALO:  He needs a microscope.
22              MR. GOTTLIEB:  This document is -- the
23   first page of Nathan -- of Exhibit 7.  Eight?
24              THE STENOGRAPHIC REPORTER:  Eight.
25
```

CONFIDENTIAL

Page 255

1          MS. GAROFALO:  Hold on.

2          Objection.

3          THE WITNESS:  I have seen a lot of

4     evidence personally involving me and others that

5     Ms. Lively's perspective is false, and I think the

6     word -- I think "misleading," false and misleading

7     often, as I have mentioned with my own personal

8     things in the deposition.  I don't like to speak to

9     others, but I can speak to the facts -- the fact --

10    the supposed facts she said about me were either

11    misleading or completely wrong, and I believe on

12    purpose.

13          For example, Ms. Lively -- Ms. Lively

14    said I was going to -- or I was at a scene I was not

15    at, insinuating for the entire world that I wanted

16    to go and see a birthing scene because she was

17    scantily clad, which I -- again, I wasn't there but

18    I've heard she was also not scantily clad.  Given my

19    experience with Ms. Lively, my personal experience

20    with Ms. Lively, that and during her deposition, she

21    insinuated I threatened to kill her and her husband,

22    which I have never done.  And even in the evidence

23    that they proffered in their own complaint, it very

24    specifically says I did not threaten to kill them,

25    and I was very clear about that.  But she repeated

CONFIDENTIAL

Page 256

1    it as such.

2              Given the misleading things she said

3    about me, I have every reason -- and given my

4    long-term friendship with Justin, where he has been

5    sweet and kind to many, many people for many years

6    and his 19-year experience in the film industry with

7    excellent relations with many people who I have met.

8              Given my experience with both of them, I

9    have reason to mistrust Ms. Lively, direct reason to

10   distrust Ms. Lively and reason to trust

11   Justin Baldoni.

12   BY MR. GOTTLIEB:

13       Q    Understood.  Isn't everything you and I

14   just talked about the reason why corporations do

15   investigations when allegations arise?

16              MS. GAROFALO:  Objection.

17              THE WITNESS:  As I have stated before,

18   I'm unaware of any complaints that were lodged that

19   would require an investigation prior to the actual

20   CRD complaint.

21   BY MR. GOTTLIEB:

22       Q    Do you see a reference on the next page

23   of this chart to May 16th, 2023, there's a

24   description of a meeting in BL trailer regarding

25   wardrobe concern?  And then there's another

                                            Page 260

1    questions in your testimony.

2              Were you aware that -- well, have you

3    seen what Ms. Baker or Ms. Carroll testified about

4    this meeting on the 16th?

5         A    No.

6         Q    Have you talked to any percipient

7    witnesses to that event to come to an understanding

8    of what occurred?

9         A    No.

10        Q    So for all you know, Ms. Lively's

11   description of this event could be completely

12   accurate?

13        A    Given the lack of accuracy that I've

14   scene by almost everything else that Blake Lively

15   has said, I've come to doubt her veracity as a

16   witness on almost everything she says.  Given the

17   things that I know, given all the evidence I have

18   seen over and over again.  However, it is possible

19   that she could be accurate on something as well.

20        Q    And to figure out whether she was

21   accurate, you'd probably want to know what the

22   eyewitnesses to the events thought, right?

23        A    There -- you know, we have -- we have a

24   whole legal team.  And again, I -- as I mentioned,

25   I'm an investor in many companies.  I don't get

CONFIDENTIAL

Page 261

1    involved in the details, but the legal team is
2    involved.
3              MR. GOTTLIEB:  Okay.  We're going to go
4    AEO for a second.
5              THE WITNESS:  We are not AEO.  Now we
6    are.  Okay.
7    BY MR. GOTTLIEB:
8         Q    In her deposition, Ms. Carroll testified
9    about this event with Mr. Heath.  She said the
10   following:
11             (As read):
12                  "Blake was having body makeup done in
13                  the trailer by Vivian.  We heard the
14                  door open and looked at went, 'Whoa,
15                  whoa, whoa.' And it was Jamey at the
16                  door.  I grabbed a cutting cape, which
17                  was over my chair and held it up to try
18                  and cover her.  And she said -- Blake
19                  said, 'whoa, whoa, I'm, you know, don't
20                  come in.'  And he said, 'it will only
21                  take a second.'  And that's when all of
22                  this action was happening.  He stayed
23                  in the trailer, they had a discussion
24                  and he left."
25             And it continues:

CONFIDENTIAL

Page 265

1        Q    Are you with me?

2        A    Yes.  I'm with you.  No, that's okay,

3    that's short enough.  Go ahead.

4        Q    Okay.  Are you aware that Ms. Slate had

5    complained to Mr. Baldoni about him calling her or

6    referring to her as sexy around May 18th, 2023?

7        A    I am not aware of that.

8        Q    At any time prior to this litigation, did

9    you become aware of that?

10       A    No.

11       Q    Did you ever become aware that Ms. Slate

12   had gone to Mr. Baldoni and said, "I don't like that

13   comment, please stop"?

14       A    I don't know the details of that

15   incident.

16       Q    Did you know that Ms. Lively also around

17   the same time complained to Mr. Baldoni about him

18   referring to her as sexy?

19       A    I am not aware of that.

20       Q    Would you be interested in what

21   Ms. Slate -- I recognize you've said you don't

22   believe anything Ms. Lively says or something to

23   that effect or you find her incredible.  What about

24   Ms. Slate?

25       A    I would not use the word "incredible."

CONFIDENTIAL

Page 266

1          Q      Lacking in credibility when I say
2      "incredible," is that a fair description of your
3      views?

4          A      Much better.

5          Q      Okay.  What about Ms. Slate?

6          A      I'm aware that in the course of any
7      production, that there's issues.  I am aware that
8      Ms. Slate had an issue.  I am not aware of the
9      specifics.  I'm aware that it was resolved.  And to
10     my knowledge, there was nothing else brought up.  So
11     I'm aware that -- you know, I'm aware that in the
12     course of production, there can be issues.  And I
13     was aware there was an issue with Ms. Slate and that
14     it was resolved.

15         Q      In determining whether there were
16     problems on the set, would it be of interest to you
17     to know Jenny Slate's perspective on what happened
18     that day?

19             MS. GAROFALO:  Objection.

20             THE WITNESS:  I believe that that will be
21     up to a jury during the trial.  In other words, I
22     don't have time to get into every detail.  I'm the
23     chairman.  I don't have time to get into every
24     detail.  I think at some point in time, you know,
25     I'll have time -- we've had kind of a whirlwind, you

CONFIDENTIAL

Page 267

1    know, 16-hour day thing with this case in addition
2    to the other work I do, which is quite expansive.
3    And so I haven't had time to -- to look in detail.
4    At some point in time as we get further into the
5    trial, I may get more into the details.  But most
6    likely, I'm -- I'm -- I'm not involved with the
7    day-to-day operations.
8    BY MR. GOTTLIEB:
9        Q    Would you have wanted to know if
10   Ms. Toskovic had showed you this back in August of
11   2024 and said, hey, just so you know, Jenny Slate
12   had a concern that she expressed to Justin on the
13   set; would you have wanted to know that?
14       A    I was aware that -- that Ms. Slate had a
15   concern and that that concern was taken care of, and
16   I was not aware that there were further concerns.
17       Q    Okay.  But you never talked to Ms. Slate
18   about that, I assume?
19       A    I have never talked to Ms. Slate at all.
20       Q    Okay.
21       A    I didn't see her at the premiere along
22   with the other actors.  I have never talked to her
23   before or during the premiere.  I've never seen her.
24   I've never met her.  Never spoken to her or met her.
25       Q    Have you read Ms. Slate's testimony in

CONFIDENTIAL

Page 268

1    her deposition in this case?

2         A    I have not.

3         Q    Would it -- would you expect that Ms.

4    Slate's testimony about the "sexy" comment that had

5    been made to Ms. Lively would be similar or

6    dissimilar from Ms. Lively's description?

7              MS. GAROFALO:  Objection.

8              THE WITNESS:  I wasn't there.  I don't

9    know.

10   BY MR. GOTTLIEB:

11        Q    Would it matter to you?

12             MS. GAROFALO:  Objection.

13             THE WITNESS:  What would matter to me is

14   that any -- any problems which -- or issues which

15   occurred, as you mentioned, and I will repeat your

16   words, nobody's perfect.  Justin included.  And if

17   Justin said something that was inappropriate, or

18   anybody says something because in the course of

19   filming a film largely about sex, about a novel that

20   has a ton of sex in it, if the word "sexy" was used

21   inappropriately in that context, I would hope that

22   that would be rectified.  And I understand that

23   nobody's perfect.  And I would expect that that

24   would be dealt with.  And I was under the impression

25   that it was dealt with and handled.

CONFIDENTIAL

Page 273

1    problems.  So I don't have enough information based

2    on what you've told me as to how bad the problems

3    were on set and what was done to resolve it based on

4    the comments that you gave me.

5    BY MR. GOTTLIEB:

6         Q    Are you aware of a meeting that took

7    place in New York on January 4th, 2024 that

8    Mr. Baldoni and Mr. Heath attended?

9         A    I believe I've become aware of that

10   through my attorneys.

11        Q    Have you ever heard that meeting

12   described as an ambush?

13             MS. GAROFALO:  Objection to the extent

14   that the question calls for attorney-client

15   communications.  He just testified he heard it from

16   his attorneys.  You are instructed not to answer.

17   BY MR. GOTTLIEB:

18        Q    I'm not interested in what you may have

19   learned from your attorneys.

20             Did Mr. Baldoni or Mr. Heath ever

21   describe that meeting to you as an ambush?

22        A    I don't recall.

23        Q    Have you ever heard that meeting

24   described as an HR complaints meeting?

25        A    Not to my knowledge.  Not to my

CONFIDENTIAL

Page 274

 1    recollection.

 2         Q     Well, why don't you turn to page 12 of

 3    the document we're in.  And look five lines down, it

 4    says page 12 at the bottom.

 5         A     I got it.  Just getting there.

 6         Q     Sorry, the Bates numbers are not on this

 7    because it was produced in its native format.

 8         A     I've got this one.

 9         Q     It looks like we're on the same page.

10    That one you can read without my glasses.

11         A     I can.

12         Q     And if you look five lines down, where it

13    says, "Chris Surgent 1AD during phase two."

14         A     Yup.

15         Q     Note says:

16               (As read):

17                    "He was in the production planning

18                    meeting turned HR complaints meeting on

19                    January 4, 2024."

20               Do you see that?

21         A     Who is Chris Surgent?

22         Q     All I know is what is written here.

23         A     Yeah, I'm not -- I'm not familiar with

24    this.

25         Q     Did you know that there was somebody at

CONFIDENTIAL

Page 275

1   Wayfarer Studios who referred to the meeting that

2   took place on January 4th, 2025 as the HR complaints

3   meeting?

4        A    I was never aware until this very moment

5   that it was ever referred to as that.

6             MR. GOTTLIEB:  Let's mark another

7   document.

8             THE STENOGRAPHIC REPORTER:  Exhibit 9 for

9   the record.

10        (Exhibit 9 marked for identification.)

11             THE WITNESS:  And I'm unaware of any HR

12   complaints that were filed.

13   BY MR. GOTTLIEB:

14        Q    Mr. Sarowitz, you've been handed what's

15   been marked as Exhibit 9.  Exhibit 9 is a document

16   bearing the Bates Nos. HEATH 35492 through HEATH

17   35493.  This is a text message exchange on

18   May 28th, 2023 between Mr. Heath and Mr. Baldoni.

19             You can take a minute to take a look.

20        A    I got it.

21        Q    Okay.  And Mr. Sarowitz, we just looked

22   at that chart that had references to Ms. Slate and

23   Ms. Lively and the sexy comments occurring

24   between -- the first date we looked at was around

25   May 11th and then the last date was around

CONFIDENTIAL

Page 283

```
 1   record.   The time is 5:03 p.m.
 2            MS. GAROFALO:   Okay.   I'm going to
 3   withdraw my objections.   We've clarified the issue
 4   and you can proceed with your questions on
 5   Exhibit 10.
 6   BY MR. GOTTLIEB:
 7        Q    All right.   So Mr. Sarowitz, you
 8   testified earlier today, I think, but you'll correct
 9   me if I get this wrong, that you had lost a
10   significant amount of money on the film as a result
11   of what you believe to be Ms. Lively's conduct; is
12   that correct?
13        A    Yes.
14        Q    And you put a dollar amount on that, what
15   you thought you had lost?
16        A    Millions.   I couldn't put an exact
17   dollar -- I haven't -- to be honest, I haven't done
18   it because I just -- I just looked at it as
19   something I was not ever going to go after her for.
20        Q    And you said you were going to go after
21   her for other things?
22        A    We had -- you had asked me a question as
23   to the things I was upset about.   I'd listed them
24   before.   I don't know if you need me to list them
25   out again, or can we go back to my previous answer?
```

1    return to production letter that we were discussing
2    earlier?
3         A    Yes.
4         Q    This is right around the time that letter
5    was circulated; is that right?
6         A    I don't recall, but perhaps.
7         Q    Did Wayfarer agree to meet these 17
8    conditions?
9         A    Ultimately, we signed the letter under
10   duress with a caveat saying that we didn't
11   necessarily agree with it, but we signed the letter
12   in order to get her back to work.  But we had not
13   done the things in the first place, and continued
14   not to do the things that were in the letter.
15              MR. GOTTLIEB:  I will move to strike as
16   nonresponsive.
17   BY MR. GOTTLIEB:
18        Q    My question was just whether Wayfair
19   agreed to meet the 17 conditions; yes or no?
20        A    We agreed to continue not to do the
21   things we weren't doing.
22        Q    Was that letter of conditions something
23   you considered to be sensitive?
24              MS. GAROFALO:  Objection.
25              THE WITNESS:  Can you be more specific?

CONFIDENTIAL

Page 303

```
 1              MS. GAROFALO:  I'm sure it is.
 2     BY MR. GOTTLIEB:
 3         Q    Let's look at the exhibit that you have
 4     in front of you, sir.  Exhibit 12.
 5              Exhibit 12 is a document bearing the
 6     Bates Nos. SAROWITZ 80 through 82.  It's a text
 7     exchange on January 5th, 2024.  And this is a text
 8     chain that appears to involve some of the same
 9     individuals as the exhibit we just looked at, I
10     believe.  But if you notice a difference, please
11     tell me.
12         A    I don't.
13         Q    Okay.  So this is a text chain with some
14     of the -- the title at the top here, you see
15     "Prayers and Support."  Is that the same title of
16     the sort of text thread that we looked at at
17     Exhibit 11?
18         A    Yes.
19         Q    On January 5th, 2024, did Mr. Baldoni
20     reach out to you to discuss the meeting that had
21     happened the day before on January 4th?
22         A    Can I have time to familiarize myself
23     with this document?
24         Q    Sure.
25         A    Thank you.
```

CONFIDENTIAL

Page 304

1           I don't recall.

2       Q    So you don't recall talking to

3   Mr. Baldoni on or around January 5th about the

4   meeting that happened in the apartment building with

5   Ms. Lively and Mr. Reynolds on January 4th?

6       A    I know we talked at some point in time.

7   I don't know the exact date we talked.

8       Q    Okay.  You see at 6:35 p.m. on

9   January 5th, Mr. Baldoni sends a somewhat lengthy

10  text message, which is on the page SAROWITZ 80, and

11  then follows that up at 6:45 p.m. on the page

12  SAROWITZ 81?

13      A    Uh-huh.

14      Q    Is the description that you see here

15  generally consistent with any conversation you ever

16  had with Mr. Baldoni where he described the meeting

17  to you like this?

18          MS. GAROFALO:  Objection.

19          THE WITNESS:  I don't recall.

20  BY MR. GOTTLIEB:

21      Q    You don't have -- do you have any

22  recollection of when the first time you learned

23  about the January 4th, 2024 meeting?

24      A    I don't remember exactly when I learned

25  about it.

CONFIDENTIAL

Page 311

1    you had with Ms. Ayoub was before this occurred on

2    September 27th, this conversation, or after?

3        A    I don't recall.

4        Q    Did you -- were you asked to have a call

5    with Claire Ayoub?

6        A    I don't -- I know I did.  I don't recall

7    how it came up.

8        Q    Does it seem like the kind of thing that

9    you would have affirmatively reached out on your own

10   to request?

11       A    She was coming to show her film at the

12   theater.  I don't recall how the call came about.

13       Q    If we had your calendar from September or

14   August of 2024, do you think we might find a Zoom

15   meeting or meeting indication?  Might we possibly

16   find one with Ms. Ayoub?

17       A    Yes.

18       Q    Do you recall knowing when you spoke to

19   Ms. Ayoub that there had been any problems on the

20   set of Empire Waist?

21       A    I visited the set of Empire Waist and was

22   not aware of any problems.

23       Q    Okay.

24       A    But, again, I don't -- I don't run the

25   day-to-day.

CONFIDENTIAL

Page 312

1          MR. GOTTLIEB:  Okay.  We're going to go

2    AEO now.

3          And we are going to mark as an exhibit

4    the audio file that has the Bates No. BL 33428.

5          THE STENOGRAPHIC REPORTER:  As

6    Exhibit 14.

7          MR. GOTTLIEB:  So we will mark as

8    Exhibit 14 the document produced in its native

9    format, has the Bates No. BL 33428.  We're going to

10   mark that.  This is all you'll see with it.

11       (Exhibit 14 marked for identification.)

12   BY MR. GOTTLIEB:

13       Q    And before we start playing that,

14   Mr. Sarowitz, we have produced in this litigation a

15   recording of this call.  Have you received that

16   production, the call you had with Claire Ayoub?

17       A    Yes.

18       Q    Have you listened to it?

19       A    Yes.

20       Q    Have you listened to all of it?

21       A    Yes.

22       Q    And I assume -- I assumed you have

23   listened to all of it because you earlier mentioned

24   you were seeking to have it de-designated; is that

25   right?

CONFIDENTIAL

Page 313

1          A    It was not my decision to designate it,
2    but I am okay with that decision.
3          Q    Okay.  How many times have you listened
4    to the call at this point in time?
5          A    Once.
6          Q    All right.  We're going to play just a
7    little of it to ask you if this is the call.  And
8    then we'll stop, and I will ask you some more
9    questions.
10              MR. GOTTLIEB:  So why don't we start.
11              (Audio recording played during the
12    deposition.)
13              MR. GOTTLIEB:  All right.  Let's stop.
14    BY MR. GOTTLIEB:
15          Q    Is that your voice that you just heard
16    saying, "It's been a long few weeks"?
17          A    Yes.
18          Q    And was the woman's voice speaking to you
19    right before that Ms. Ayoub's voice?
20          A    Yes.
21          Q    And is that the recording of the call
22    that we've been talking about here that I just
23    played for you a small clip of?
24          A    Yes.
25          Q    Do you know who Elise that was referred

CONFIDENTIAL

Page 319

```
 1              And then later in the page:
 2              (As read):
 3                   "They went after everything we had.
 4                   Luckily, I was out of it.  So like --
 5                   nobody mentioned me.  That's because
 6                   I'm a nobody."
 7              In other words, referring to myself.  I
 8       wasn't very important.
 9         Q    Okay.  Thank you for that.
10              How was Mr. Heath stopping what you
11       viewed as "the worst of the worst" from coming out?
12              MS. GAROFALO:  Objection.
13              THE WITNESS:  This is what our crisis
14       PR -- PR people were working on, is stopping the
15       public attacks on us, the ongoing, everyday public
16       attacks on us.
17       BY MR. GOTTLIEB:
18         Q    Okay.  Do you recall later in the
19       conversation discussing with Ms. Ayoub what had
20       happened on the set of It Ends with Us?
21         A    I don't think I could have because I
22       wasn't on the set of It Ends with Us.  But is there
23       anything in the document which would talk about
24       that?
25         Q    You weren't there?
```

```
 1        A    I was only there, as I mentioned, briefly
 2   for part of one day and just a few minutes on
 3   another, so I really wasn't on the set.
 4        Q    Would it surprise you to learn that when
 5   Ms. Ayoub said:
 6             (As read):
 7                  "I wasn't there, so I don't know what
 8                  it's like."
 9             Your response was, "I was"?
10        A    Can you refer me to the page?
11        Q    You don't have any recollection of saying
12   to Ms. Ayoub, "I was there on set"?
13        A    Again, can you refer me to the page?
14        Q    Pages 30 to 31.
15        A    Okay.  Just give me a second or two to
16   read it, and I will go through as quickly as I can
17   because I realize we're running short on time.
18        Q    Thank you, sir.
19        A    Okay.
20        Q    And you see that you make a reference to
21   there being two different sets.  And Ms. Ayoub says:
22             (As read):
23                  "I don't know.  I wasn't there, so I
24                  don't know what it was like."
25             And you say, "I was," right?
```

CONFIDENTIAL

Page 334

1              (As read):

2                   "We will have to be defensive for

3                   years."

4         It talks about:

5              (As read):

6                   "There will be stuff coming at us."

7              So I believe based on the context, that

8    this is very consistent with what I said before,

9    that I would defend the studio.  That's what I meant

10   by that.

11        Q    Do you understand the difference between

12   defense and offense?

13             MS. GAROFALO:  Objection.

14             THE WITNESS:  Yes.

15   BY MR. GOTTLIEB:

16        Q    Aren't there -- I mean, isn't this --

17   doesn't this go back to an earlier conversation we

18   had about some of the tenets of your faith?

19             MS. GAROFALO:  Objection.

20   BY MR. GOTTLIEB:

21        Q    The distinction between self-defense and

22   retaliation?

23             MS. GAROFALO:  Objection.

24   BY MR. GOTTLIEB:

25        Q    Let me try that a different way, sir.

CONFIDENTIAL

Page 352

1   BY MR. GOTTLIEB:

2        Q    Is saying, "I will never ever let up

3   going after you for the rest of my career" something

4   that you want your attorneys to say to reporters at

5   news organizations?

6              MS. GAROFALO:  Objection.

7              THE WITNESS:  I don't know the context,

8   so I can't comment on something I don't have the

9   context.  I don't know what was done.  For example,

10  in the course of this case, someone threatened my

11  daughter's life.  If I knew who did that, I would

12  say something similar to that, even as a Baha'i,

13  because we're not perfect human beings.

14             There are things that are beyond the pale

15  and people get angry.  I'm sure you, like me, have a

16  temper, and occasionally we say things we might even

17  regret.  So I would like to know what the whole

18  context is before I can comment on it.

19             Do you have anymore context on this you

20  can give me?

21  BY MR. GOTTLIEB:

22       Q    I do not.  Your attorneys do.

23             Did you ever learn of anything horrific

24  or terrible that Mr. Reiss had done or said in

25  public?  Did you ever see anything that he said in