# Exhibit 263

ACTOR LOANOUT AGREEMENT
NO QUOTE/NON-PRECEDENTIAL

AS OF:                              May 5, 2023

PICTURE:                           "IT ENDS WITH US"

**ACTOR:**                         Blake Lively

LOANOUT:                           Blakel, Inc.
                                   c/o William Morris Endeavor

                                   Attn: Warren Zavala; Justin Grey-Stone

ROLE:                              "LILY BLOOM"

**LOCATION:**                      Jersey City, New Jersey and surrounding areas and limited
                                   services in and around Las Vegas, Nevada

PAYMENTS TO:                       Same as above

The following sets forth the agreement ("**Agreement**") between It Ends With Us Movie LLC ("**Company**"), a SAG-AFTRA signatory company in good standing, and Blakel, Inc. ("**Lender**") for the services of Blake Lively ("**Artist**") with respect to Artist's services in connection with the feature-length motion picture currently entitled "IT ENDS WITH US" ("**Picture**").

1. CONDITIONS PRECEDENT. Company's obligations under this Agreement are conditioned upon the following:

    1.1    Employment Eligibility. Lender and Artist's providing Company with all documents which may be required by any governmental agency or otherwise for Lender and Artist to render services hereunder, including, without limitation, copies of all necessary work visas, an INS Form I-9 (Employment Eligibility Verification Form) completed to Company's satisfaction, together with Lender and Artist's submission to Company of original documents establishing Lender and Artist's employment eligibility, which Company shall deem satisfied upon Lender's and Artist's signature of this Agreement provided Lender and Artist shall work in good faith with Company with respect hereto.

    1.2    Chain-of-Title. Company's timely receipt of chain-of-title documents (in form and substance satisfactory to Company) conveying to Company all right, title and interest in and to all materials upon which the Picture is based, which Company hereby deems satisfied.

    1.3    Execution of Agreement. Company's receipt of executed copies of this Agreement signed by Lender and Artist.

    1.4    Insurance. The satisfaction of any insurance carrier requirements for obtaining insurance for Artist if required for the financing of the Picture, which may mean Artist undergoing

CONFIDENTIAL                                          WAYFARER_000140957

a customary physical examination (e.g., treadmill, EKG, urine, and blood tests, but no X-rays) to the extent required by the applicable insurance company (at which Artist's personal doctor may be present) for the purposes of securing cast insurance (as and if applicable) and any other insurance (including essential element insurance) reasonably required by Company.

     1.5    <u>Loanout Documentation; Inducement</u>.  Company's receipt of (i) a copy of a valid certificate of formation for Artist's loan out company and all pertinent tax information (including EIN and tax identification number), and (ii) the inducement attached hereto and incorporated herein by this reference, fully executed by Lender and Artist.

     1.6    <u>Covid Regulations</u>: Company's receipt of Lender's and Artist's signature to Company's Covid Safety Protocols and Regulations Acknowledgement, which is attached hereto and incorporated herein by this reference as Exhibit "C" and shall form part of this Agreement.

2. <u>SERVICES; START DATE.</u>  Company hereby engages Lender for the services of Artist on a "pay-or play" basis (subject to paragraph 7 below) to render acting services in the Picture portraying the role designated above ("**Role**"). Artist shall render all services as are customarily rendered by actors in first-class, feature-length, theatrical motion pictures as, when and where reasonably required by Company as set forth herein. In connection therewith, Artist shall comply with all reasonable written directions, requests, rules and regulations of Company, whether or not the same involve matters of artistic taste or judgment. Without limiting the foregoing, Artist shall render the following services in connection with the Picture:

2.1  <u>Pre-Production/Production Services</u>. Lender shall cause Artist to render all acting services reasonably required by Company including, without limitation, those in connection with rehearsals, pre-production meetings, costume fittings, makeup, tests, and publicity stills. Artist shall render exclusive acting services during Artist's in-going scheduled period of principal photography of the Picture ("Scheduled Period") commencing on or about May 10, 2023 ("Start Date") and continuing for up to seven (7) consecutive weeks until the wrap of principal photography for Artist. Artist shall travel to Las Vegas, NV on or about May 9, 2013 for one (1) day of principal photography services and travel to New Jersey on or about May 11, 2023 for rehearsals, costume fittings and makeup tests as required by Company and start principal photography services in Jersey City, New Jersey on or about May 15, 2023. The Scheduled Period shall be subject to extension for any "Force Majeure" (subject to and as defined in the Standard Terms and Conditions) events, provided, however, in the event of any such extension after the Scheduled Period, Artist's services for the Picture shall be subject to Artist's approval and professional availability provided Lender and Artist shall use good faith efforts to be available when reasonably requested by Company. There shall be no more than one (1) forced call per week without Artist's written consent. Company acknowledges and agrees Artist work days shall be as follows: (i) 12-hour portal to portal (i.e., drop off at home until pick-up at home the following day) turnaround if Artist stays in Manhattan; (ii) 10.5-hour portal to portal (i.e., drop off at home until pick-up at home the following day) turnaround if Artist stays at upstate residence; (iii) 56 hour portal to portal (drop off at home at the end of the week until pick-up at home the following work day) weekend turnaround, provided that Artist will give good faith consideration to reducing the weekend turnaround to 52 hours portal to portal up to 2 times during principal photography; (iv) 12 hour cap on days (calculated from when the car drops Artist at base camp at the beginning of the day until Artist gets back in the car at base camp at the end of the day). Furthermore, Artist's work week shall be no more than five (5) days per week Monday-Friday. Artist's obligations to render post-production services or other services not consecutive to the Scheduled Period shall be subject to Artist's professional availability, and Lender and Artist will use all reasonably good faith efforts to be available to render such services.

2
IT ENDS WITH US -  Blake Lively Acting Agreement

    

2.2 <u>Post-Production Services</u>.  Lender shall cause Artist to render all post-production services reasonably required in connection with the Picture as are customarily rendered by actors in first-class, feature-length, theatrical motion pictures and as, when and where Company may reasonably require, such post-production services to include, without limitation, looping, dubbing, voice-overs, retakes, trick shots, opticals, foreign versions, cover shots, added scenes and re-shooting for the Picture.  Such post-production services, if non-consecutive to the Scheduled Period, shall be subject only to Artist's professional availability (provided that Lender and Artist shall use reasonable, good faith efforts to be available to render such services as, when and where reasonably required by Company, and upon Company's request therefor, Artist shall give Company prompt notice of such professional commitments).  The first five (5) days of Artist's post-production services shall be free, which may be consecutive or non-consecutive to each other (at Company's option) provided that all such days shall be subject to Artist's professional availability, shall be hereinafter referred to as the "**Free Days**" provided, however, services rendered by Artist on any Free Day for four (4) hours or less shall be counted only as one-half (1/2) day for purposes of determining the remaining Free Days.  Company shall not require Artist to render services for any Free Days more than fifty (50) miles from Artist's primary residence, unless Company provides any necessary travel, accommodations and expenses in connection therewith in accordance with Paragraph 5.2 below.

2.3 <u>Promotional and Publicity Services</u>.  Lender and Artist shall render promotional services (the "Promotional Services"), where and when reasonably required by Company in connection with the publicity and promotion of the initial release of the Picture, including without limitation attending premieres of the Picture, making appearances at press conferences or on television, making personal appearances, engaging in interviews, participating in photo sessions and participating in promotional tours and press junkets. Lender and Artist's obligation to render Promotional Services requested by Company, shall be subject to Lender and Artist's then prior professional availability; provided that in any event Lender and Artist shall use reasonable good faith efforts to be available to render the Promotional Services as reasonably requested by Company.  Company shall consult meaningfully in advance with Artist regarding the precise Promotional Services to be rendered by Artist.  Company acknowledges that Artist shall not be obligated to perform any particular Promotional Services which Lender and Artist finds personally offensive, provided that Lender and Artist performs other comparable Promotional Services (*e.g.*, Company will not require Artist to appear on a particular talk show if Artist has personally had a previous problem with the host of that talk show, provided that Artist appears on other talk shows as required by Company).  No additional compensation or other remuneration shall be payable to Lender with respect to the Promotional Services; however, Artist's Promotional Services are of the essence of this agreement and the compensation set forth in Section 3 hereof shall be deemed to be allocable to, and in consideration of, the Promotional Services as well as Artist's services in connection with the production of the Picture. If Artist is required to render any Promotional Services by Company more than fifty (50) miles from Artist's principal residence, Artist and a guest shall be provided first class roundtrip air travel (if available and if used), first class accommodations, exclusive ground transportation and Artist only a reasonable per diem.

2.4  <u>Covid Testing</u>: Artist agrees to get tested for Covid-19 prior to rendering services for the Picture and such test results shall not be more than seventy (72) hours earlier than Artist traveling to the "Location" (as defined below). Furthermore, Artist acknowledges and agrees to get tested for Covid-19 at any time as reasonably requested by Company while Artist is rendering any services in connection with the Picture. Company shall arrange and pay for all Covid-19 testing that Company requires hereunder.

3. <u>COMPENSATION</u>.  Upon the condition that Lender and Artist are not terminated for material "Default," and subject to Company's rights of suspension and/or termination on account of Lender and Artist's "Default" or "Disability" (as such terms are defined in the Standard Terms attached hereto) or

CONFIDENTIAL                                                                    WAYFARER_000140959

an event of Force Majeure and Company's rights of offset for damages caused by Lender's and/or Artist's Default, Company shall pay Lender, as full and complete consideration for Lender and Artist's services and all rights granted hereunder, the following

3.1 <u>Fixed Compensation</u>. For all of Lender and Artist's services during the Scheduled Period and services during the Free Days and for any Promotional Services, the sum of an amount equal to One Million Seven Hundred Fifty Thousand U.S. Dollars ($1,750,000USD) on a pay-or-play basis (subject to Paragraph 7. Below), payable on a weekly basis during the Scheduled Period of principal photography of the Picture ("**Fixed Compensation**"). The Fixed Compensation shall be placed into escrow in the WME Client Trust Account (the "**Escrow Account**") in the name of Lender in accordance with the escrow agreement issued by WME attached hereto as <u>Exhibit "B"</u> and incorporated by this reference. Company acknowledges and agrees that the Fixed Compensation shall be placed in the Escrow upon closing of the completion bond with the completion guarantor for the Picture but in any event no later than three (3) business days prior to Artist traveling to the Location for the Picture (the "Outside Escrow Date"). All payments hereunder shall be payable on Company's regular payday in the week following the week in which such payments shall have accrued. Except with respect to those mandatory provisions of the "SAG Agreement" (as defined below) that Artist is prohibited by the SAG Agreement from waiving, no increased or additional Fixed Compensation shall accrue or be payable to Lender for any of Artist's services rendered at night or on Saturdays (or sixth days), Sundays (or seventh days) or holidays, or after the expiration of any particular number of hours of service in any period, or by reason of time spent by Artist traveling to or from any location where Artist may be required to render services in connection with the Picture. In the event that Artist's services are required or Artist is exclusively 'held' on an additional day or days for production services after the Scheduled Period and Free Days (but not including Artist's travel, rehearsal and wardrobe days and any Promotional Services), Lender shall be paid a daily rate equal to $56,451.61 per day (the "Overage Rate"). Company agrees there shall be no crediting of the Fixed Compensation against residuals, penalties (if any) and forced calls (if any) or vice versa. Artist shall be considered Schedule F for purposes of this Agreement.

3.2 No additional or increased amounts shall be payable to Lender, including with respect to Artist's rendition of services at night, on weekends or holidays, or for time spent traveling to or from any location where Artist may be required to render services in connection with the Picture or in connection with the exercise of any rights granted under this Agreement, unless otherwise required by a SAG Agreement. If in connection with any of Artist's services or the exploitation of any rights granted under this Agreement any additional amounts are required by the SAG Agreement, Lender shall receive such amounts at the minimum rates required by the SAG Agreement.

3.3 Lender expressly acknowledges and agrees that all compensation payable to Lender pursuant to this Agreement includes full and proper equitable remuneration with respect to any right (including any rental, lending or other similar rights which Artist may have with respect to the Picture) to which Artist may now be or hereafter become entitled in connection with the production and/or exploitation of the Picture.

3.4 Company shall be entitled to withhold and/or deduct from the Fixed Compensation all amounts required to be withheld by applicable federal and/or state authorities, including, without limitation, all amounts required to qualify the Fixed Compensation for eligibility for any production tax incentives or credits at the Location. Lender hereby acknowledges that Lender shall register the company in the State of New Jersey and obtain a tax identification number and complete the necessary documentation required for the Fixed Compensation and the Overage Rate (if any) to

CONFIDENTIAL                                                                                WAYFARER_000140960

qualify for tax incentives in the State of New Jersey. If requested, Company shall assist Lender with the registration and pay for the actual, verifiable third-party costs with respect thereto.

3.5     <u>Contingent Compensation</u>: Provided that the Picture is released, Lender shall be entitled to an amount equal to ten percent (10%) of 100% of the "Defined Gross Proceeds" of the Picture ("Lender's Contingent Compensation"). "Defined Gross Proceeds" shall be defined and computed in accordance with Exhibit "D", which is attached hereto and incorporated herein by this reference, provided that in any event the definition of Defined Gross Proceeds shall be no less favorable than the definition for all other defined gross proceeds participants, and the amount shall be no less favorable than that provided to all non-financing producers in connection with the Picture. Lender acknowledges that (i) Lender's Contingent Compensation, if any, shall not be a lien upon or claim against any of the rights granted herein; and (ii) Company has made no representation that the Picture, if produced, will actually achieve Lender's Contingent Compensation or any particular amount thereof.

3.6     <u>Box Office Bonuses</u>: Provided the Artist recognizably appears in the Role for the Picture, and the Picture is produced and released as a theatrical motion picture and neither Lender nor Artist are in material Default of this Agreement, Lender shall be entitled to the following worldwide box office bonuses ("BOB") in connection with the Picture:

(i)     At such time, if ever, that the aggregate worldwide gross theatrical box office receipts in connection with the initial theatrical release of the Picture as reported in Rentrak (or such other similarly reliable source as is generally accepted in the motion picture industry if Rentrak does not exist) ("WWBO") reaches an amount equal to 3x the "Direct Cost" (as defined in Exhibit "E", which is attached hereto and incorporated herein by this reference), Lender shall be entitled to a BOB of Two Hundred Fifty Thousand Dollars ($250,000);

(ii)    At such time, if ever, that WWBO reaches 3.5x the Direct Cost of the Picture, Lender shall be entitled to a BOB of Two Hundred Fifty Thousand Dollars ($250,000);

(iii)   At such time, if ever, that WWBO reaches 4x the Direct Cost of the Picture, Lender shall be entitled to a BOB of Two Hundred Fifty Thousand Dollars ($250,000);

(iv)    At such time, if ever, that WWBO reaches 4.5x the Direct Cost of the Picture, Lender shall be entitled to a BOB of Two Hundred Fifty Thousand Dollars ($250,000); and

(v)     At such time, if ever, that WWBO reaches 5x the Direct Cost of the Picture, Lender shall be entitled to a BOB of Two Hundred Fifty Thousand Dollars ($250,000).

(vi)    All bonuses will be payable within sixty (60) days of the applicable WWBO level being reached.

(vii)   Producer agrees that Artist's Box Office Bonuses hereunder shall be no less favorable than provided to all principal cast members of the Picture.

(viii)  Lender and Artist acknowledge and agree Artist's Box Office Bonuses shall be applicable against Lender's share of Defined Gross Proceeds as set forth in Paragraph 3.5. above.

3.7     <u>Award Bonuses</u>. Subject to assumption by the domestic distributor, provided that Artist appears recognizably in the Picture, and Artist is not in uncured, material default hereunder, Artist shall be entitled to the following award bonus(es) ("Award Bonuses") in connection with the Picture:

CONFIDENTIAL                                                                    WAYFARER_000140961

(i)     At such time, if ever, that Artist is nominated for an Academy Award for Best Actress, Artist shall be entitled to an award bonus of One Hundred Thousand Dollars ($100,000) for the nomination; or if Artist wins an Academy Award for Best Actress, Artist shall be entitled to an award bonus of Two Hundred Thousand Dollars ($200,000) for the win. For clarity, if Artist is nominated and wins an Academy Award for Best Actress, Artist shall only be entitled to the win bonus (i.e. $200,000).

(ii)     At such time, if ever, that Artist is nominated for a Golden Globe for Best Actress, Artist shall be entitled to an award bonus of Seventy-Five Thousand Dollars ($75,000) for the nomination; or if Artist wins a Golden Globe for Best Actress, Artist shall be entitled to an award bonus of One Hundred Thousand Dollars ($100,000) for the win. For clarity, if Artist is nominated and wins a Golden Globe for Best Actress, Artist shall only be entitled to the win bonus (i.e. $100,000).

(iii)     At such time, if ever, that Artist is nominated for a SAG Award for Best Actress, Artist shall be entitled to an award bonus of Fifty Thousand Dollars ($50,000) for the nomination; or if Artist wins a SAG Award for Best Actress, Artist shall be entitled to an award bonus of Seventy-Five Thousand Dollars ($75,000) for the win. For clarity, if Artist is nominated and wins a SAG Award for Best Actress, Artist shall only be entitled to the win bonus (i.e. $100,000).

(iv)     All Award Bonuses will be payable within thirty (30) days of the applicable event. All Award Bonuses are subject to assumption by the distributor of the Picture provided that, if a distributor assumes award bonuses for any other award bonus participant in connection with the Picture, Company shall cause such distributor to assume Artist's award bonuses as set forth herein. Lender and Artist acknowledge and agree Artist's Award Bonuses shall be applicable against Lender's share of Defined Gross Proceeds as set forth in Paragraph 3.5. above

4. Intentionally deleted.

5. TRAVEL AND EXPENSES.

5.1 For the services to be rendered in Las Vegas, NV, Company shall provide Artist with the following:

a.     Travel. Company shall provide roundtrip air transportation on one (1) private jet (Artist shall have the right to approve such jet) for the following: (i) Artist; (ii) Artist's four (4) children; (iii) Artist's assistant; (iv) Artist's two (2) nannies and (v) Artist's security personnel.

b.     Ground Transportation.  Company shall provide Lender and Artist with ground transportation on an exclusive basis to and from work each working day while at Las Vegas, NV. Furthermore, Company shall provide Lender and Artist ground transportation on an exclusive basis to and from the airport in Las Vegas, NV.

c.     Accommodations. While Artist is rendering services at Las Vegas, NV, Company shall furnish Artist with the following: (i) one mutually approved suite for Artist and Artist's children; and (ii) four (4) standard rooms for Artist's assistant, nannies and security personnel, with all of the foregoing being inclusive of any taxes, resort fees and wi-fi fees.

d.     Per Diem.  In lieu of providing Lender and Artist with meals and other living expenses, the non-accountable non-reducible sum of Sixty Dollars ($60) per day ("Per Diem"),

CONFIDENTIAL     WAYFARER_000140962

commencing on the date of Lender and Artist's travel to Las Vegas, NV and continuing until the last date that Company requires Lender and Artist's services at Las Vegas, NV.

5.2  For the services to be rendered in and around Jersey City, NJ, Company shall provide Artist with the following:

a.       <u>Ground Transportation</u>.  Company shall provide Lender and Artist with ground transportation on an exclusive basis to and from work each working day while in and around Jersey City, NJ. Company shall pick up and drop off Artist from either Artist's Manhattan residence or upstate New York residence, at Artist's election. Artist shall have the right to approve the driver and car.

b.       <u>Dressing Facilities</u>.  Subject to the limitations of any Location at which the Picture is being filmed, Company shall provide Artist with exclusive use of a single, pop out, star trailer (including customary amenities) for Artist's use each working day in and around Jersey City, NJ, which shall be mutually approved by Artist and no less favorable in any material respect than provided to any other cast member.

c.       <u>Training/Meals</u>.  While Artist is providing services in and around Jersey City, NJ, Company agrees to provide Artist a training and meal allowance of $1000 per week (subject to pro-ration based on 7 day work week) during Artist's principal photography services.

5.4     <u>Security.</u> While Artist is providing services in Las Vegas, NV and in and around Jersey City, NJ, Company shall provide Artist with exclusive, designated security personnel, which shall be in addition to Artist's regular security personnel.

5.5     <u>Assistant</u>. While Artist is providing services in Las Vegas, NV and in and around Jersey City, NJ, Company agrees to reimburse Lender at the rate of $1500/week (subject to pro-ration based on 7 day work week) for Artist's exclusive, designated assistant throughout any in person pre-production services,  principal photography and in connection with Artist's post-production services.

5.6     <u>Arrangements</u>.  All travel arrangements including, without limitation, the purchase or booking of airline tickets and accommodations and ground transportation, shall be made through Company's travel/location department, unless Company's prior written consent is obtained.

6.  <u>CREDIT</u>.

6.1  <u>Artist's Credit</u>.  Upon the condition that Artist appears recognizably in the Role in the Picture as released to the general public, and provided that neither Lender nor Artist are terminated for Default hereunder (including, without limitation, the morality clause as set forth in the Standard Terms), Company shall accord Lender and Artist the following credit, subject to any applicable Guild requirements:

6.1.1  <u>On Screen</u>.  On a single card in the main titles (*i.e.*, where the individual credits for the principal cast whether located at the beginning or end of the Picture), in first position among the single billed cast credits, above/before the title, of all positive prints of the Picture, in a size of 100% of the regular title and in a size, style, type, manner and duration no less favorable than any other cast members in the Picture.

CONFIDENTIAL                                                                        WAYFARER_000140963

6.1.2 <u>In Paid Advertising</u>. In the billing block portion of all paid advertising relating primarily to the Picture ("**Paid Ads**"), in first position among the cast credits, above/before the title, in a size of 100% of the regular title in the billing block and in the same size as all other cast credits, subject to customary distributor exceptions and exclusions and Section 6.4 below.

6.2 <u>Credit Tie-Ins</u>.

6.2.1 <u>Excluded Ad Tie-In</u>. Notwithstanding anything contained herein, if any member of the cast is accorded credit in any excluded ads (other than award, congratulatory or nomination advertising, in which only the person(s) so awarded, congratulated or nominated is (are) named, or group or institutional advertising, teaser and radio advertising and/or the audio portion of TV ads ["Special Ads"]), Artist shall also be accorded credit in the same, as applicable, in the same position and size/style ties and with same ties as non-excluded Paid Ads.

6.2.2 <u>Likeness Tie-In</u>. If the likeness of any principal member of the cast appears recognizably in a Paid Ad (other than award, congratulatory or nomination advertising in which only the honoree appears), then the likeness of Artist shall also appear in such Paid Ad, in substantially the same size and prominence as the likeness of such other cast member, giving effect to perspective and proportion.

6.2.3 <u>Audio Tie</u>. If the name of any member of the cast in connection with the Picture is mentioned in any audio ads (other than award, congratulatory, or nomination advertising in which the honoree(s) is/are the only person(s) mentioned), then the name of Artist shall also be mentioned in such audio ad in the same position among cast as set forth in Section 6.1.1.

6.2.4 <u>Above-the-Title Credit Tie-In</u>. If any cast member receives credit above or before the title on screen or in a Paid Ad, Company shall also accord Artist credit above or before the title of the Picture on screen or in such Paid Ad, as applicable in the size and position set forth in Sections 6.1.1 or 6.1.2, respectively.

6.2.5. <u>Artwork Title Use</u>. If the artwork title of the Picture appears in a Paid Ad or in an excluded ad (other than Special Ads), then the name of Artist shall also appear in conjunction with and above or before the artwork title in such Paid Ad or excluded ad, as applicable, in a size no less than 30% of the artwork title and the same position set forth in Section 6.1.2 above

6.3 <u>Executive Producer Credit</u>. In addition, Artist shall be accorded one (1) executive producer credit, in first position, in the main titles (*i.e.*, where the individual credits for the principal cast whether located at the beginning or end of the Picture), and in the billing block of all Paid Ads and excluded ads  (if other executive producers are accorded credit in such Paid Ads and excluded ads), in a size, style, type, manner and duration no less favorable than any other executive producer credits accorded credit in the Picture.

6.4 <u>General Terms</u>. All other matters with respect to Lender and Artist's credit shall be determined by Company in its sole reasonably good faith discretion. Any reference to the "title" of the Picture shall be deemed to mean the "regular" title unless such reference is specifically made to the "artwork" title.  If Company elects to accord Lender and Artist credit in conjunction with the "artwork" or "artwork" title portion of any Paid Ad, Company shall be deemed to have satisfied its obligation, if any, to accord Lender and Artist credit in the billing block portion of such Paid Ad.  Company shall have the right in its sole discretion to accord Lender and Artist more favorable credit(s) than provided for herein.  Company shall notify in writing third party distributors of the Picture with whom Company

CONFIDENTIAL                                                     WAYFARER_000140964

is in privity of contract of the credit provisions of this Section 6; provided, however, that no casual or inadvertent failure by Company to comply with the provisions of this Section 6 nor any failure by third parties to comply with their agreements with Company shall constitute a breach of this Agreement by Company. In the event of Company's failure to comply with any of its credit obligations hereunder, Company shall, upon receipt of written notice of such failure, use reasonable commercial efforts to correct such failure in Paid Ads on a prospective basis only, *i.e.*, those Paid Ads not yet placed or committed to and which are manufactured by Company or under Company's control after Company's receipt of such notice (allowing for adequate time after receipt of notice to implement such correction).

## 7. UTILIZATION OF SERVICES.

7.1    Company's Rights.   Notwithstanding any contrary provision of this Agreement, Company shall have no obligation to engage Lender to use Artist's services or to include the results and proceeds thereof in the Picture, or to develop, produce, release or otherwise exploit the Picture, and Company may at any time abandon development and/or production of the Picture and/or terminate Lender's engagement and Artist's services in connection with the Picture for any reason, with or without cause. Lender and Artist hereby release and discharge Company from all liability for any loss or damage Lender and Artist may suffer as a result of Company's abandonment of the Picture and/or failure to develop, produce, release, distribute, advertise or otherwise exploit the Picture and/or failure to utilize Artist's services in connection with the Picture or termination of Lender's engagement and Artist's services in connection with the Picture for any reason, with or without cause; provided, however, that if Company terminates Lender and Artist's services on the Picture "without cause" (for the purposes hereof, a "without cause" termination shall be a termination for any reason other than those set forth in the Standard Terms) after Artist has become "Pay or Play", as set forth below, Company shall remain obligated to pay Lender the full Fixed Compensation in accordance with the terms hereof (subject to Section 7.2 below) and the remaining portion of Fixed Compensation shall be released from the Escrow Account within five (5) business days for any termination without cause and, the credit (if Artist appears recognizably in the Picture), indemnity and insurance obligations shall survive such termination for without cause.

7.2 "Pay or Play". Provided that the conditions precedent have been satisfied and Company has received this Agreement, in form submitted by Company for signature, signed by Lender and Artist, Artist shall be deemed to be "Pay or Play" for purposes of the preceding section upon notice in writing to Lender of Company's election to make Artist "Pay or Play" or when all of the following have occurred:

7.2.1   Company has approved, in its sole discretion, the final shooting script, budget and production and post-production schedules for the Picture; and

7.2.2   All principal cast members, the director and the producer(s) of the Picture have been made unconditionally "Pay or Play" for their Fixed Compensation.

Notwithstanding the foregoing, for the avoidance of doubt, if Company terminates Lender and Artist's services as a result of an event of "Force Majeure" (as defined in the Standard Terms) or otherwise for cause as set forth in the Standard Terms, Company shall only be obligated to pay Lender such vested, accrued and/or earned Fixed Compensation set forth in Sections 3.1 above, on a pro rata basis for the days accrued during the Scheduled Period prior to such termination. Furthermore, if terminated for reasons of Force Majeure, the credit in accordance with Section 6, indemnity and insurance obligations shall survive such termination.

## 8. NAME AND LIKENESS; FILM CLIPS.

IT ENDS WITH US - Blake Lively Acting Agreement

CONFIDENTIAL                                                                                                    WAYFARER_000140965

8.1  <u>Name and Likeness</u>.  Subject to the restrictions and approvals set forth herein, Company shall have the right, in perpetuity and throughout the universe, to use, and to authorize others to use, Artist's name, still images taken from the Picture featuring Artist (i.e., "screen grabs"), image, voice, likeness and/or biography (such biography to be in a form pre-approved by Artist) in connection with the production, exhibition, advertising, promotion and/or other exploitation of the Picture and/or subsidiary and ancillary rights of any nature relating to the Picture or Artist's services hereunder, in any and all media, whether now or hereafter known or devised including without limitation, trailers and promotional films and/or videos (including so-called "music videos" [provided, that such music videos shall not use Artist's voice and/or likeness except as they appear in the final edited version of the Picture, or what Company in good faith believes will be the final edited version of the Picture]), "behind-the-scenes" or other footage, bloopers and/or outtakes (subject to Artist's approval of such "behind-the-scenes" [which Artist agrees to approve a reasonable amount of such behind-the-scenes footage] or other footage, bloopers and/or outtakes footage so used, such approval not to be unreasonably withheld or delayed provided that Artist shall not have any obligation to approve any bloopers), interviews, excerpts from the Picture, new footage shot in connection with trailers or promotional films, featurettes, one-sheets, souvenir programs, press books, novelizations and other commercial publications, soundtrack recordings embodied in any form now or hereafter known or devised, including the packaging therefor, and in sheet music and song books, "Co-Promotions" of any nature as defined and subject to Section 8.1.1 below.  Except for incidental dialogue, Company may not use Artist's voice (other than incidental use of Artist's spoken voice) on a soundtrack recording without Artist's prior written approval and a royalty to be negotiated in good faith. Notwithstanding the foregoing, it is understood and agreed that Company's use of (i) Artist's name in a billing block, or (ii) Artist's likeness in the key art and trailer shall constitute an acceptable use of Artist's name and/or likeness which shall not require Artist's consent.   Notwithstanding anything to the contrary contained herein, Company shall not use Artist's name, voice, image, biography, likeness, and/or any other indicia in connection with merchandise, endorsements, co-promotion and/or commercial tie-ins without Artist's prior written consent in each instance.

8.1.1   <u>Co-Promotions</u>. A "**Co-Promotion**" means any "in character" advertisement or other promotional item which is intended to promote both the Picture and a product or service of a party other than Company and/or its affiliates (the "**Tie-in-Item**"); provided that neither the exercise of any ancillary rights relating to the Picture (e.g., merchandising rights or soundtrack album rights), nor any reference(s) in any advertisement or promotional item to any service or facility which exhibits, reproduces, performs, transmits, or otherwise distributes the Picture or which provides information to consumers regarding, or otherwise facilitates, the purchase of tickets for, or copies of, the Picture, shall constitute a Co-Promotion.  Company shall not state or imply that Artist personally or directly endorses any Tie-in Item unless approved by Artist.  Company shall not use Artist in a Co-Promotion without Artist's prior written approval in each instance except that Company shall have the right to use in Co-Promotions, without any further compensation to Lender (i) Artist's name as it appears in the billing block and/or in conjunction with the artwork title of the Picture, (ii) Artist's name as it appears with a list of the principal cast and/or in a synopsis of the Picture  (iii) Artist's likeness as it appears in the key art one-sheet for the Picture, and/or (iv) solely during those periods when Company is advertising and/or promoting the Picture in conjunction with the theatrical and/or home video release of the Picture, Artist's voice and/or likeness as they appear in Company's trailers and/or TV spots for the Picture (it being understood that clips incorporating Artist's voice and/or likeness which appear in advertising for the Co-Promotion shall be used in the same general manner as such clips are used in Company's trailers and/or TV spots for the Picture and shall not be cut out of context as to imply an endorsement by Artist of any Tie-In Item).  Company, Lender and Artist agree that they have specifically negotiated for the right described in clause (iv) above; however, Company reserves its position that no separate negotiation is required regarding such matters.

CONFIDENTIAL                                                                          WAYFARER_000140966

8.2  <u>Film Clips</u>.  Lender and Artist hereby grant to Company the right to use and to authorize others to use film clips and excerpts from the Picture in which Artist appears recognizably (collectively, "**Clips**") and in promotional films and/or videos (including so-called "music videos" [provided, that such music videos shall not use Artist's voice and/or likeness except as they appear in the final edited version of the Picture, or what Company in good faith believes will be the final edited version of the Picture ]), featurettes, "behind-the-scene" footage (subject to Artist's approval rights as set forth above) and interviews relating to the Picture, without any additional consideration to Lender and Artist therefor unless required by the SAG Agreement.  Company acknowledges and agrees that Artist shall have the right to approve any Clips in which Artist appears.  Any use of Clips or excerpts of Artist in any other audiovisual productions, including, without limitation, prequels, sequels and/or remakes shall be subject to Article 22 of the SAG Agreement.

8.3  <u>Stills/Non-Photographic Likenesses</u>.

8.3.1  <u>Stills Approval Right</u>.  Artist shall have the right of approval, not to be unreasonably withheld or delayed, of all photographic stills of Artist ("**Stills**") issued by or under the direct control of Company (or any assignee, licensee, designee or successor or any distributors or subdistributors) in connection with the advertising, publicity, promotion and exploitation of the Picture or for any other purpose permitted hereunder; provided, however, that Artist shall be required to approve not less than (i) fifty percent (50%) of all Stills submitted to Artist in which Artist appears alone or with others not having approval rights over same still or, and (ii) 75% of a Stills submitted to Artist in which Artist appears with others who have approval rights over same still.  Stills shall be submitted in the form of so-called "contact sheets" and in reasonable quantity.  Artist shall have five (5) business days (reducible to two (2) business days in the event of exigencies and if notified at the time of submission) from receipt of each set of Stills ("**Approval Period**") in which to approve of same.  If Artist shall fail or refuse to approve, within said Approval Period, the requisite number of Stills so submitted, all Stills not previously disapproved by Artist in the set so submitted up to the relevant percentage shall be deemed approved.  Company's submission of Stills to the address specified on page one hereof shall satisfy Company's submission requirements hereunder, and no casual or inadvertent failure by Company (or its representatives) to comply with the provisions hereof shall constitute a breach of this Agreement by Company, provided that the timeline for the Approval Period shall not commence until Company properly submits Stills to the following email address: _____.  Once a Still is approved it shall be deemed approved for all uses of Artist's likeness permitted under this Agreement except that Company must resubmit for any magazine covers; provided that if Artist fails to timely notify Company of Artist's disapproval of any resubmitted Stills, then all such resubmitted Stills shall be deemed approved for use for magazine covers.  Artist shall exercise the foregoing approval rights in a reasonable manner and not so as to frustrate Company's ability to timely and fully exploit the Picture.  Company shall not submit any Stills to any tabloids or syndications without Artist's prior written approval.

8.3.2  <u>Non-Photographic Likenesses</u>.  Artist shall have a right of approval with respect to all recognizable non-photographic likenesses, of Artist (but not including the positioning of Artist's likeness) ("**Renditions**") used by Company (or any assignee, licensee, designee or successor or any distributors or subdistributors) in connection with the advertising, publicity, promotion and exploitation of the Picture or for any other purpose permitted hereunder.  Such approval right is to be exercised in a reasonable manner and not so as to intentionally frustrate Company's ability to timely and fully exploit the Picture.  Artist shall have five (5) business days (reducible to two (2) business days if notified at the time of submission) from receipt of any Rendition in which to approve said Rendition or to indicate to Company the precise nature of Artist's objection, if any.  Any disapprovals hereunder shall be given in a clear and unambiguous manner.  If exigent circumstances in connection

11

CONFIDENTIAL

with the production or distribution of the Picture require expedited approval of a Rendition, Artist shall approve the Rendition or indicate to Company the precise nature of Artist's objection, if any, within five (5) business days (reducible to two (2) business days if notified at the time of submission) after receipt of the Rendition. Company shall resubmit a revised Rendition for Artist's approval after changing the Rendition pursuant to Artist's request; provided, however, that for each such resubmission the foregoing five (5) business day approval period shall be reduced to two (2) business days; and provided further that Artist may not thereafter object to any portion of the Rendition to which Artist have not previously objected. Company shall not be required to resubmit any Rendition to Artist more than three (3) times. If either (a) Artist does not notify Company of Artist's objection to a Rendition within the applicable approval period set forth herein or (b) Artist has failed to approve a Rendition after three (3) resubmissions and Company has changed the Rendition in accordance with Artist's reasonable requests, Company shall have the right to deem such Rendition approved by Artist. Once a Rendition is approved, it shall be deemed approved for all uses of Artist's likeness permitted under this Agreement, except that Company must resubmit for use of Artist's image for any magazine covers. Company agrees not to submit any Stills or Renditions to any tabloids or for syndication.

8.3.3    Biography. Lender and Artist shall have a right of approval with respect to Artist's biography used by Company in connection with the advertising, publicity, promotion and exploitation of the Picture. Upon written request from Company, Artist shall submit to Company Artist's biography within five (5) business days (reducible to two (2) business days if notified at the time of submission). In the event Artist does not submit a biography within the foregoing time period, Company shall have the right to create a biography on behalf of Artist in its sole discretion to be used in connection with the advertising, publicity, promotion and exploitation of the Picture.

8.3.4    Key Art Still Submission. For the Stills Company plans to use for the key art in connection with the Picture (the "**Key Art Stills**"), Company shall submit such Key Art Stills to Artist for approval (not to be unreasonably withheld or delayed). Lender and Artist shall have five (5) business days (reducible to two (2) business days in the event of exigencies and if notified at the time of submission) from receipt of each set of Key Art Stills ("**Key Art Stills Approval Period**") in which to approve of same. If Lender and Artist shall fail or refuse to approve, within said Key Art Stills Approval Period, the requisite number of Key Art Stills so submitted shall be deemed approved.

8.3.5    One Picture License. The results and proceeds of Artist's services hereunder may only be used in the Picture, and not in any derivative productions or any other productions.

9. ARTIST'S APPEARANCE. Artist will not materially change Artist's appearance (*e.g.*, change hair style or hair color) at any time between completion of pre-production makeup and hairstyling work and completion of Artist's principal photography services. Notwithstanding Paragraph 13, below, In the event Company requires Artist to materially alter her hair in a manner that is not easily able to be restored prior to Artist's change of appearance for the Role, Artist shall have mutual approval over such alterations.

10. DUBBING AND DOUBLING. Company shall have the right to use the services of persons other than Artist (with or without the services of Artist) to "dub" or "double" Artist's acts, poses, appearance, voice or sound effects attributed to the character portrayed by Artist and to use the name, likeness, voice or other sound effects of Artist in connection therewith, to the same extent provided in Section 33 of Schedule C of the SAG Agreement; provided, however, that in the event neither Artist's voice nor likeness are recognizable, Company shall have the right to freely "dub" or "double" the same without regard to Section 33 of Schedule C of the SAG Agreement. Such "doubling" or dubbing" of Artist's voice may be in English or any other language; provided, however, that Company shall first give Artist the opportunity to dub in English provided that Artist is available as, when and where

CONFIDENTIAL                                                          WAYFARER_000140968

reasonably requested by Company (it being understood that Artist's unavailability on the date designated by Company for such services shall not render the designation of such date "unreasonable"; and in this regard, Company will use reasonable good faith efforts to accommodate Artist's then-existing professional commitments, with Company's decision being final) and that there is no additional cost to Company in connection with such dubbing services of Artist (except for incidental costs such as telephone or messenger charges and the like and the customary costs for the editing facility and editorial personnel, as well as for the transportation of Artist to/from the dubbing site [which shall be pursuant to Paragraph 2.2 above], or at Company's election such services may be performed at Artist's then-current location).

11.  PUBLICITY LIMITATION.  Lender and Artist shall not issue, release, authorize or in any way participate in any publicity, press releases, interviews, advertisements or promotional activities relating to Company, the Picture or Artist's services hereunder without the prior written consent of Company, except personal publicity in which the Picture is only incidentally mentioned ("**Personal Publicity**") provided Lender and Artist may not engage in personal publicity until such time, if ever, as Company has first publicly disclosed Artist's involvement with the Picture.  No publicity issued by Lender and Artist, whether Personal Publicity or otherwise, shall contain derogatory mention of Company, the Picture, or the services of Artist or others in connection with the Picture.  Lender and Artist may not disclose any confidential information not otherwise available to the public with respect to Company or the Picture (including, without limitation, the budget thereof or the terms of any contracts for services of persons engaged in connection with the Picture) without Company's prior consent, except for information disclosed to Lender's and Artist's agents, attorneys and business representatives (provided that the applicable party is restricted from any further disclosure) and as required by law or court order or in order to enforce this Agreement.  Company agrees Artist shall have mutual approval over the first press release of the Picture in which Artist is referenced as an actor and in any additional press releases/statements that discuss Artist beyond being mentioned as an actor in the Picture.  Company shall provide 24-hour notice to Artist of press on set and/or any behind-the-scenes or "b-roll" filming; provided that Company's inadvertent failure to provide such notice to Artist shall not be deemed a breach of this Agreement.  Company shall not submit to tabloids.  Artist acknowledges that Company cannot make any guarantees regarding the unauthorized use of Stills, renditions or EPK or press-junket footage by publications or media outlets which were legitimately serviced by Company's Publicity Department during the normal course of publicizing and promoting the Picture.  Any publicity and promotional services during principal photography shall be at times to be coordinated with Artist and Artist's representation so as to minimize interference with production, provided Artist shall be available for a reasonable number of on-set interviews, and other BTS interviews for use in promotion, subject to Artist's approval provided that Artist agrees to approve a reasonable amount for purposes of an EPK.

12.  DVD/BluRay/One-Sheet/Soundtrack.  Provided that Lender and Artist are not terminated for Default, upon written request, Company shall provide Artist with one (1) DVD (or one (1) BluRay), the one-sheet and one (1) soundtrack album of the Picture at such time, if ever, as DVDs (or BluRays) and/or soundtrack ablum and/or one-sheet of the Picture become generally commercially available.

13.  EXERCISE OF CONSULTATION AND/OR APPROVAL RIGHTS.  All consultation and/or approval rights, if any, granted to Lender and Artist hereunder shall be subject to the following:  (i) Lender and Artist being available as, when and where reasonably required for the exercise of such rights; (ii) such rights being exercised in a reasonable manner and not so as to frustrate Company's full and timely development, production and/or exploitation of the Picture; (iii) such rights are personal to Lender and Artist and may not be exercised by any other person or entity; (iv) are subject to Artist full performance of all material services hereunder and Artist not being terminated for Default hereunder; (v) Company's determination shall be final with respect to any matter with respect to which Lender

CONFIDENTIAL                                                                    WAYFARER_000140969

and Artist have consultation rights hereunder; and (vi) Company shall not be obligated to incur any additional costs with respect to such consultation or approval rights. Company agrees that Artist shall have mutual approval with respect to the following: a) hair (Anne Carroll pre-approved), make-up (Vivienne Baker pre-approved) and wardrobe personnel; b) wig maker (Peter Owen pre-approved); c) stand-in and stunt double (if any); d) the final screenplay, which Artist hereby pre-approves the screenplay dated _____, 2023; e) director (with Justin Baldoni pre-approved) including any replacement, and f) the co-lead for the Picture (with Justin Baldoni pre-approved) and any replacement thereof. In addition, Artist shall have meaningful consultiaotn over the "look" for the Role, ad campaign in which Aritst appears and the release pattern of the Picture, provided that Company's final decisions shall control in each instance and the distributor's final decisions shall control in each instance with respect to the ad campaign in which Aritst appears and the release pattern of the Picture. Any inadvertent failure by Company or the distributor to meainingfully consult with Artist with respect to the foregoing shall not be deemed a breach hereof.

14.  <u>PREMIERE</u>.  Provided that Artist appears recognizably in the Picture and that Lender and Artist are not in material Default, Company shall invite Artist and one (1) guest to the first U.S. celebrity premiere (if any) of the Picture.

15.  <u>MISCELLANEOUS</u>.  Company shall pay for any immunizations, visas, or work permits reasonably required to enable Artist to perform services in connection with the Picture.  Company agrees and acknowledges that safety officers and/or paramedics shall be present on the set during hazardous scenes which may occur during principal photography and Company shall use a stunt double for such hazardous scenes, if any.

16.  <u>MEDICAL</u>.  Artist hereby agrees to submit to one customary medical examination upon Company's request by a physician of Company's selection, at any time commencing upon the execution of this Agreement and continuing throughout the duration of principal photography of the Picture, to verify Artist's fitness and ability to render the services set forth hereunder in connection with the Role, such fitness and ability being a material condition of Company's obligations hereunder. At Artist's sole expense, Artist shall have the right to have Artist's own physician present during such examination(s).

Artist acknowledges the contagious and potentially dangerous nature of the Coronavirus/COVID-19 (COVID-19), that there is an element of risk of exposure to COVID-19 associated with any form of participation in an activity involving other individuals working at relatively close proximity and that there remains a possibility, notwithstanding Company's adherence to its Covid Safety Protocols and Regulations, that the Artist may come into direct or indirect contact with COVID-19. Accordingly, the Artist confirms that Artist both freely and willingly agrees to participate in the Picture. In the event that the Artist is unable to work due to sickness, injury or owing to self-isolation or shielding as a result of COVID-19 then the Artist agrees to inform Company/relevant line manager as soon as possible on the first day of absence confirming the reason for absence and its expected duration. It is acknowledged that it is the Artist's responsibility to inform Company if the Artist develops symptoms or lives with someone who develops symptoms consistent with COVID-19 as soon as possible.

17.  <u>NO NUDITY / NO SIMULATED SEX SCENES</u>.  Artist shall not appear nude or be required to film any scenes in the nude to appear in any simulated sex scenes without obtaining Artist's prior written consent.  Company agrees not to use any body double to simulate Artist's appearance in the nude or in any simulated sex scenes without obtaining Artist's prior written consent. Furthermore, Company shall not digitize Artist in any manner to simulate Artist's appearance in the nude or in any simulated sex scenes without obtaining Artist's prior written consent.

CONFIDENTIAL    WAYFARER_000140970

18.  <u>ENTIRE AGREEMENT/STANDARD TERMS</u>.  All other terms and conditions of Lender's and Artist's services hereunder (including, without limitation, injunctive relief and Company's rights of suspension and/or termination in the event of Default, Disability or Force Majeure) are set forth in Company's Standard Terms and Conditions applicable to the services of actors (the "**Standard Terms**") attached hereto as <u>Exhibit A</u> and incorporated herein by this reference, subject to only those changes as may be mutually agreed upon in writing after good faith negotiations within Company's customary parameters for an actor of Artist's stature.  This Agreement (including the Standard Terms) constitutes the entire understanding of the parties hereto and replaces any and all former agreements, understandings and representations relating in any way to the subject matter hereof.  No modification, alteration or amendment of this Agreement shall be valid or binding unless it is in writing and signed by both parties.

*Signatures on the following page*

IT ENDS WITH US -  Blake Lively Acting Agreement

CONFIDENTIAL

WAYFARER_000140971

*SIGNATURE PAGE*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

IT ENDS WITH US MOVIE LLC

By:_____

Its:_____

ACCEPTED & AGREED BY:

BLAKEL, INC.

By:_____

Its:_____

CONFIDENTIAL                                                    WAYFARER_000140972

## EXHIBIT A

## STANDARD TERMS AND CONDITIONS

These Standard Terms and Conditions ("**Standard Terms**") are part of, and are incorporated into, that certain agreement ("**Underlying Agreement**"), dated as of May 5, 2023, between It Ends With Us Movie LLC ("**Company**"), and Blakel, Inc. ("Lender") for the services of Blake Lively ("**Artist**") relating to Artist's acting services in connection with the motion picture tentatively entitled "IT ENDS WITH US" ("**Picture**"). These Standard Terms and the Underlying Agreement shall hereinafter be collectively referred to as the "**Agreement**." Unless expressly provided to the contrary herein, (i) all terms used herein shall have the same meaning as set forth in the Underlying Agreement and (ii) to the extent that any provision of these Standard Terms conflicts with any provision of the Underlying Agreement, the Underlying Agreement shall control. The term "**Section(s)**" refers to the numbered provisions of the Underlying Agreement and the term "**Paragraph(s)**" refers to the numbered provisions of the Standard Terms. All references to Artist hereunder shall be deemed to include Lender where appropriate.

1.    ARTIST'S SERVICES. Lender acknowledges and agrees that Artist's services on the Picture will be rendered either alone or in cooperation with other persons in such manner as Company may direct, under the instructions and in strict accordance with the controls and schedules established by Company's authorized representatives and at the times, places and in the manner reasonably required by said representatives. Such services shall be rendered in an artistic, conscientious, efficient and punctual manner to Artist's best ability and with full regard to the careful, efficient, economical and expeditious production of the Picture within the budget, shooting schedule and policies reasonably established by Company, it being understood that Company's production of motion pictures involves matters of discretion to be exercised by Company in respect to art and taste and Artist's services and the manner of rendition thereof are to be governed by Company (it being further understood that Company's instructions regarding matters of artistic taste and judgment are *per se* reasonable).

2.    COMPANY'S OWNERSHIP RIGHTS; DROIT MORAL. Company hereby is and shall be the sole and exclusive owner and is the sole author for all purposes (including under the Copyright laws of the United States), in perpetuity (but in any event for not less than the period of copyright and any renewals and extensions thereof) and throughout the universe, of all of the following from the moment of their creation, at every stage of their development, production, or completion: (i) all right, title and interest in and to the Results and Proceeds (as defined below) of Lender's and Artist's services hereunder, all of which shall be a "work made for hire" for Company prepared within the scope of Artist's employment and/or as a work specially ordered or commissioned for use as a part of a motion picture or other audio-visual work; (ii) all right, title and interest in and to the Picture and the material upon which it is based, including, but not limited to, the copyright in and to the Picture and any renewals and extensions of such copyright and all moral rights of authors with respect thereto; (iii) all distribution, exhibition, exploitation, publication, communication, broadcast, transmission, sale, licensing, allied, ancillary and/or subsidiary rights with respect to the Picture and/or the Results and Proceeds in any and all media, whether now or hereafter known, including, without limitation, all of the following: theatrical; non-theatrical (including airlines, ships and other carriers, military, educational, industrial and the like); pay-per-view; home video (including videocassettes, digital videodiscs, laserdiscs, CD-ROMs and all other formats); all forms of television (including pay, free, network, syndication, cable, satellite, high definition and digital); video-on-demand, near video-on-demand and subscription on demand; all forms of digital or on-line exploitation, distribution and/or transmission (including, without limitation, the internet), CD-ROMs, and similar disc systems, interactive cable, digital video discs, satellite, fiber optic or other exhibition, broadcast and/or delivery systems and/or computerized or computer-assisted media; all rights of communication to the public, rights of distribution to the public or other forms of public or private communication and/or distribution; and all forms of dissemination, communication or distribution to one or more locations or parties whether embodied or transmitted using analog, digital or other format; and (iv) all other tangible and intangible rights of any nature relating to, and all proceeds and benefits of any nature derived from, the Picture and/or the Results and Proceeds, including merchandising, Co-Promotion and commercial tie-in rights with respect to all commodities, services and/or products of any kind now known or hereafter devised. Without limiting the foregoing, in the event that any of the Results and Proceeds are not deemed to be a "work made for hire" for Company, Lender and Artist each

Exhibit A

CONFIDENTIAL

WAYFARER_000140973

hereby irrevocably and exclusively assigns to Company (or if any applicable law prohibits or limits such assignment, Lender and Artist hereby irrevocably licenses to Company) all right, title and interest in and to such Results and Proceeds (including all copyrights therein and thereto and all renewals and extensions thereof), and all rights to exploit the same throughout the universe, in perpetuity (but in any event for not less than the period of copyright and any renewals and extensions thereof), in any and all media, whether now or hereafter known or devised. Lender and Artist, on their own behalf and on behalf of their heirs, successors and assigns, hereby waives any so-called "moral rights of authors" and "*droit moral*" rights and any similar or analogous rights under the applicable laws of any country of the world (including, without limitation, the so-called right of paternity [*droit a la paternite*], right of integrity [*droit au respect de l'oeuvre*], right of withdrawal [*droit de retrait* or *droit de repentir*] and/or right of publication [*droit divulgation*]) which Lender and Artist may have in connection with the Picture or the Results and Proceeds, and to the extent such waiver is unenforceable, Lender and Artist hereby covenant and agree on their own behalf, and on behalf of their heirs, successors and assigns, not to bring any claim, suit or other legal proceeding against Company, its successors, assigns or licensees claiming that any of Lender's and Artist's "moral rights" or "droit moral" rights have been violated. Lender and Artist further hereby irrevocably assign to Company (or if any applicable law prohibits or limits such assignment, Lender and Artist hereby irrevocably license to Company), in perpetuity (but in any event for not less than the period of copyright and any renewals and extensions thereof) throughout the universe, all of Lender's and Artist's rights, if any, to authorize, prohibit and/or control the renting, lending, fixation, reproduction, importation and/or other exploitation of the Picture by any media and/or means now or hereafter known or devised as may be conferred upon Lender and Artist under applicable laws, regulations or directives, including, without limitation, any so-called "Rental and Lending Rights" pursuant to any treaty, European Union ("**EU**") directives and/or enabling or implementing legislation, or any law or regulation enacted by the member nations of the EU or any other jurisdiction. The parties agree that the United States of America is the country of origin of the Picture. As used herein, "**Results and Proceeds**" shall mean all results and proceeds of Lender's engagement and Artist's services under this Agreement or otherwise relating to the Picture, including all themes, plots, characters, formats, ideas and stories contained therein and all other materials of any kind created or developed by Lender and/or Artist during the period of Artist's exclusive services hereunder and all so-called "moral rights of authors" or "*droit moral*" rights (including, without limitation, the so-called right of paternity [*droit a la paternite*], right of integrity [*droit au respect de l'oeuvre*], right of withdrawal [*droit de retrait* or *droit de repentir*] and/or right of publication [*droit divulgation*]) with respect to any of the foregoing, and the right to make such changes therein and/or uses thereof as Company shall from time to time determine in its sole discretion. Lender and Artist acknowledge that Lender and Artist have no ownership interest or other rights of any kind in and to any character portrayed by Artist in the Picture and that Company shall have the exclusive and unfettered right to portray, merchandise, promote or otherwise exploit such characters (including the right to use other performers to portray such characters) in any manner and at any time, free and clear of any obligation to Lender and Artist.

3.       INJUNCTIVE RELIEF. Lender and Artist acknowledge and agree that the services to be rendered by Artist hereunder are of a special, unique, unusual, extraordinary and intellectual character, making them difficult to replace and giving them a peculiar value, the loss of which may not be reasonably compensated in damages in an action at law; that if Lender and/or Artist breaches any provision of this Agreement, Company may be caused irreparable damage; and that, therefore, Company shall be entitled, as a matter of right, at its election, to seek to enforce this Agreement and all of the provisions hereof by injunction or other equitable relief.

4.       SUSPENSION AND TERMINATION.

    4.1  Suspension.

        4.1.1 Company's Suspension Rights. Lender's engagement Artist's services and the accrual of compensation hereunder shall be suspended upon written notice by Company during all periods when:

            A. Disability. Artist is unable to perform Artist's material obligations hereunder by reason of mental or physical disability (including the death of Artist) ("**Disability**"). If Company has reason to believe Artist is disabled or if any claim of Disability is made by or on behalf of Artist, Company shall have the right to have Artist examined by such physician(s) as Company may designate, with Artist's physician present (at Artist's sole cost) if Artist so request, provided that such physician does not interfere with the examination conducted by Company's physician;

Exhibit A

CONFIDENTIAL

WAYFARER_000140974

B. <u>Default</u>.  Lender or Artist fails, refuses or neglects to comply with Lender and Artist's material obligations hereunder, including without limitation in connection with any of Artist's in-person services, complying with any then-applicable health protocols in connection with the Picture (as required by Company and in accordance with applicable motion picture industry and governmental mandates) or (directly or through any representative) states an intention to do so ("**Default**"); and/or

C. <u>Force Majeure</u>.  As a result of any Act of God; war; epidemic; pandemic; accident; fire; strike; lock-out or other labor controversy; riot; civil disturbance; act of public enemy; law, enactment, rule, restraint, order or act of any governmental instrumentality or military authority; failure or inability to obtain any necessary permit or license; failure of technical facilities; inability to obtain sufficient labor, technical or other personnel (including, without limitation, cast or crew members); failure, delay or reduction in transportation facilities or water, electricity or other public utilities; death, disability, disfigurement (with respect to principal cast only), or unavailability of, or inability to obtain life, accident, or health insurance (<u>i.e.</u>, so-called "cast insurance") for, at customary rates and subject only to customary exclusions and deductible amounts, a principal member of the cast, the director, any producer or key crew member or inability to obtain visas, labor permits or other governmental licenses for any such persons (other than Lender and Artist); any breach by any third party of its obligations to Company; or any other cause not reasonably within Company's control or which Company could not by reasonable diligence have avoided (including for the avoidance of doubt, delays by reason of COVID-19 or other pandemics), or Company is hampered in the development or production of the Picture or Company's normal business operations become commercially impracticable (for purposes hereof, Company shall be deemed to be hampered by a labor controversy during that period commencing three (3) months prior to the expiration of any applicable collective bargaining agreement [*i.e.* DGA, SAG, WGA, IATSE] and continuing until a new agreement is ratified and signed) ("**Force Majeure**"). The parties acknowledge and agree that a Force Majeure event involving Covid-19 is in progress at the time of executing this Agreement and that Company reserves its right to invoke force majeure in accordance with this Paragraph 4 as related to Covid-19 or any evolution or derivative of its effects.  Notwithstanding anything to the contrary contained herein, any force majeure suspension related to Covid-19 shall not give Artist the right to terminate this Agreement provided that rescheduling Artist's services after the Stop Date and after removal of a suspension related to Covid-19 shall be subject to Artist's then existing professional availability (provided that Lender and Artist shall use reasonable, good faith efforts to be available to render such services as, when reasonably required by Company) and Artist shall not be entitled to any additional compensation with respect thereto.

4.1.2  <u>Effect of Suspension</u>.  If any such Force Majeure, Disability or Default should occur prior to the Start Date, the Start Date may be postponed by Company from the date then (tentatively) scheduled for a period equal to the duration of such Force Majeure, Disability or Default plus such additional reasonable period of time as Company may deem necessary under the circumstances to commence or recommence development or production of the Picture, and (unless Company gives Artist notice to the contrary) such postponement shall not be deemed a suspension of this Agreement for purposes of Paragraph 4.2.1 A. below, and Lender shall not have any termination right by reason of any such postponement.  Company may reduce the period of any such postponement in its own discretion upon notice thereof to Artist.  Any suspension shall be for the duration of any such Force Majeure, Disability or Default plus such reasonable period of time as may be deemed necessary by Company to commence or recommence development or production of the Picture and, unless Company notifies Artist in writing to the contrary, Lender's engagement and Artist's services hereunder shall be automatically extended by such number of days as equal the total number of days of such suspension. A suspension hereunder shall not relieve Artist of any of Artist's obligations to perform hereunder.  During any suspension, Artist shall not render any services for Lender, for others or for him/her/itself in the field of entertainment, except that during a suspension predicated on Force Majeure, Artist may render such other services, provided that any and all commitments for such services are subordinate to the obligations of Lender's engagement and Artist's services hereunder, including Artist's obligation to resume rendering services to Company promptly (not earlier than 48 hours after recall) upon termination of the suspension.  Payment of any compensation accrued and unpaid prior to the suspension shall be subject to all of Company's rights and remedies  (including the right of offset) for Artist's Default.  Notwithstanding the foregoing, Company shall not suspend or terminate Artist's services due to an event of Force Majeure unless the services of substantially all similarly situated principal cast members (other than cast members who have completed their services [except promotional services] on the Picture, or who are not scheduled to work at the same time as Artist, or who are

Exhibit A

CONFIDENTIAL

WAYFARER_000140975

engaged on so-called "flat" deals) have also been suspended or terminated (provided that the foregoing limitation shall not apply if the event of Force Majeure is a strike by a guild or union of which Artist is a member) and shall only suspend one time per Force Majeure event. A recurring illness or injury shall not be considered the same event of Force Majeure.  Any Force Majeure suspension related to Covid-19 shall not give Artist the right to terminate this Agreement provided that rescheduling Artist's services outside the Scheduled Period after removal of a suspension related to Covid-19 shall be subject to Artist's then existing professional availability (provided that Artist shall use reasonable efforts to be available to render such services as, when reasonably required by Company) and Artist shall not be entitled to any additional compensation with respect thereto except as set forth in the Agreement. In the event Artist tests positive for Covid-19 at any time during the Scheduled Period, Artist acknowledges and agrees Company shall have the right to suspend the Picture in its sole discretion, provided Artist shall be tied with all other cast as to payment during any suspension for Force Majeure, and reinstatement after any suspension, and any hiatus, if any, required by Company. Furthermore, without respect to rescheduling any of Artist's services due to Artist testing positive for Covid-19, Artist acknowledges and agrees that the Picture shall be first priority provided that rescheduling of Artist's services after the Scheduled Period shall be subject to Artist's then existing professional availability (provided that Artist shall use reasonable efforts to be available to render such services as, when reasonably required by Company) and Artist shall not be entitled to any additional compensation with respect thereto except as set forth in the Agreement.

    4.2  <u>Termination</u>.

        4.2.1  <u>Termination Rights of the Parties</u>.

            A.  <u>Artist's Termination Right</u>.  If a suspension predicated on Force Majeure (excluding (i) a strike by a guild or union of which Lender and Artist is a member ["Own-Union Strike"] and/or (ii) any Force Majeure event that affects the major motion picture studios (iii) a suspension by reason of COVID-19 or other pandemics and/or (iv) government order) continues for six (6) or more consecutive weeks or for an aggregate of eight (8) or more weeks, Lender and Artist may give Company written notice of Lender and Artist's desire to terminate this Agreement, and unless Company terminates such suspension within seven (7) business days after its receipt of such notice and resumes payment of compensation hereunder as and when due, this Agreement shall terminate. Notwithstanding anything to the contrary contained in this Agreement, in the event Artist has been deemed "Pay or Play" as set forth in the Agreement, Lender and Artist acknowledge and agree they shall not have the right to terminate this Agreement for any Force Majeure event provided that any services not consecutive to the Scheduled Period shall be subject to Artist's professional availability, which Artist shall make good faith efforts to be available when requested by Company.

            B.  <u>Company's Termination Rights</u>.  Company shall have the right to terminate Lender's engagement and Artist's services upon the occurrence of any of the following by delivering written notice to Lender:

            (i)  Lender and Artist's Disability continuing for either (x) 48 hours during principal photography or (y) five (5) days during Lender and Artist's rendition of pre-production services in connection with the Picture at any other time, or (z) seven (7) or more consecutive days or an aggregate of fourteen (14) or more days when providing services outside the Scheduled Period;

            (ii)  Lender and Artist intentionally and materially adversely changes Artist's appearance at any time between the date of this Agreement and the completion of all in going, scheduled principal photography services required by Company hereunder during the Term.

            (iii)  Default; provided, however, that if such Default is inadvertent (i.e., not intentional or repeated) and is by its nature reasonably curable and allowing Lender and Artist to cure such Default will not result in additional material expense to Company, then on a one-time-only basis Lender and Artist shall have a period of forty eight (48) hours (reducible to 24 hours during principal photography) from the date of notice from Company of such Default within which to cure the first such Default only;

Exhibit A

CONFIDENTIAL                                                                                  WAYFARER_000140976

(iv)  If an event of Force Majeure: (aa) occurs prior to or on the Start Date; or (bb) occurs after the Start Date and continues for six (6) or more consecutive weeks or for an aggregate of eight (8) or more weeks (such period to be reduced to one (1) week during Artist's rendition of Pre-Production Services and services in connection with the principal photography of the Picture); or (cc) arises from an Own-Union Strike; or (dd) affects development and/or production in a manner incapable of being corrected within the foregoing time periods; or (ee) has an impact that, at the time of onset, can reasonably be expected to continue for not less than two weeks;

(v)  In case of Artist's death; or

(vi)  Any event or contingency expressly provided for in this Agreement.

4.2.3  Effect of Termination.  If Artist or Company terminates this Agreement in accordance with the provisions of this Paragraph 4, Company shall be released and discharged from any liability or obligation whatsoever to Lender and Artist hereunder; provided, however, that (i) if Company terminates this Agreement pursuant to this Paragraph 4 for any reason other than Lender's or Artist's Default, Artist shall be entitled to receive the full Fixed Compensation and any vested contingent compensation including bonuses, and (ii) the representations and warranties (including Company's credit and insurance obligations) and indemnification obligations of the parties hereunder shall survive such termination and (iii) neither Company's ownership of the Picture nor any grant of rights to Company hereunder shall be affected, limited or terminated in any way by any termination or cancellation of this Agreement for any reason.  Notwithstanding the foregoing, Company shall not terminate Artist's services due to an event of Force Majeure unless the services of substantially all similarly situated principal cast members (other than cast members who have completed their services [except promotional services] on the Picture, or who are not scheduled to work at the same time as Artist, or who are engaged in so-called "flat" deals) have also been terminated (provided that the foregoing limitation shall not apply if the event of Force Majeure is a strike by a guild or union of which Lender and Artist is a member).

4.3  Company's Breach.  No act or omission of Company hereunder shall constitute an event of Default or breach of this Agreement unless Artist shall first notify Company in writing setting forth such alleged breach or Default and Company shall not cure the same within thirty (30) days after receipt of such notice or, in the case of Company's failure to pay Artist compensation pursuant to this Agreement, ten (10) business days after such receipt.

4.4  Other Agreements.  Any breach or Default by Lender or Artist of any other agreement between Company and Lender or Artist for Lender's and Artist's services in connection with the Picture ("Other Services Agreements") shall constitute a breach or a Default by Lender and Artist under this Agreement.  Any breach or Default by Lender or Artist under this Agreement shall constitute a breach or Default by Lender and Artist under the Other Services Agreements.  No breach or Default by Lender or Artist under this Agreement, the Other Services Agreement (or any other agreement between Company and Lender or Artist, whether or not related to the Picture), or any failure to consummate any of the agreements between Company and Lender or Artist (whether or not related to the Picture), shall affect Company's acquisition of rights in connection with the Picture (or any material upon which the Picture is based or which is incorporated therein) pursuant to any rights agreement with Lender or Artist or any other third parties.

5.  NOTICES.  All notices required hereunder shall be in writing and shall be given either by personal delivery, telecopy/facsimile, email (provided that no subsequent delivery failure notification is issued by the sender's email server) or by United States mail (postage prepaid), and shall be deemed given hereunder on the date personally delivered, emailed, or telecopied, or the date three (3) business days after the date mailed if mailed in the United States, and five (5) business days after the date mailed if mailed outside of the United States.  Until further notice, the addresses of the parties shall be as follows:

5.1  For Artist, as indicated in the Underlying Agreement.

5.2  For Company:        It Ends With Us Movie, LLC
                         417 South Beverly Drive
                         Beverly Hills, CA 90212

Exhibit A

CONFIDENTIAL    WAYFARER_000140977

Attn: Jamey Heath

6.    <u>REPRESENTATIONS AND WARRANTIES</u>. Artist represents and warrants that:

    6.1 <u>Authority and Non-Interference</u>. Artist is free to enter into this Agreement; Artist has the right to render services in accordance with the terms and conditions hereof; Artist is not subject to any obligation or known disability which would materially interfere with or prevent the full performance by Artist of Artist's services hereunder; Lender is obligated to pay Artist at least the applicable annual guarantee required under Section 3423 of the California Civil Code; and Artist has not done, nor will Artist do, any act, and Artist have not made, nor will Artist make, any grant or assignment, which will interfere with the complete enjoyment of the rights and privileges herein granted to Company.

    6.2 <u>Created Material</u>. All material, works, writings, ideas, "gags" or dialogue written, composed, prepared, submitted or interpolated by Artist in connection with the Picture or its preparation or production, shall be wholly original with Artist and shall not be copied in whole or in part from any other work, except for material submitted to Artist by Company for inclusion in and included in the Picture or material in the public domain.

Each of Artist and Company makes no warranties, express or implied, other than as specifically set forth in this Agreement.

7.    <u>SEXUAL HARASSMENT</u>. Sexual Harassment of any type is strictly prohibited and cause for immediate termination of this Agreement by Company. No employee shall be subjected to sexual harassment by another employee during the course of employment. For the purposes of this policy, sexual harassment is unwanted conduct of a sexual nature which adversely affects another person's conditions of employment and/or employment environment. Such harassment includes, but is not limited to: any unwelcome sexual advance, request for sexual favor, or other verbal, non-verbal, or physical conduct of a sexual nature, that interferes with work, is made a condition of employment, or creates an intimidating, hostile, or offensive environment in connection the workplace or the use of one's authority or power, either explicitly or implicitly, to coerce another into unwanted sexual relations or to punish another for his or her refusal. For the avoidance of doubt, Sexual Harassment may occur between or amongst persons of different sexes or genders or of the same sex or gender, and may be initiated by any gender or sex. In the event Company is aware of any Sexual Harassment conducted by Artist, Company shall have the right to immediately terminate this Agreement and available to all rights and remedies hereunder.

8.    <u>MORALITY</u>. Artist warrants and represents that, prior to the date of this Agreement, Artist has not been convicted of any act or acts of moral turpitude which might violate community standards of viewers and advertisers in the United States and, if publicly revealed, would result in widespread public disrepute for Artist, Company and/or its assignees, designees, distributors, programming services' sponsors or subject them to scandal or ridicule. Artist acknowledges that, in entering into this Agreement, Company is acting in reliance upon Artist's warranty herein. Artist further acknowledges that (a) if Artist is convicted of any acts of moral turpitude or violating Federal, state or local law(s), or (b) if Company becomes aware that Artist has previously been convicted of any such acts, then Company shall be entitled to terminate this Agreement forthwith by giving Artist notice of termination in writing at any time after Company acquires knowledge of such conviction and in such event, Company shall have no further obligations to Artist hereunder, including, without limitation, any payment, credit, indemnity or insurance obligations as set forth in this Agreement.

9.    <u>INDEMNITY</u>. Lender shall indemnify and hold Company, its parents, affiliates, subsidiaries, employees, directors, officers, agents, successors, assigns and licensees, and each of them, harmless from and against any and all third-party liabilities, judgments, losses, claims, demands, damages, penalties, interest, costs and expenses of every kind whatsoever (including, without limitation, reasonable outside attorney's and accountants' fees and disbursements) (collectively, "**Expenses**") suffered or incurred by Company, the aforementioned parties and/or any of them, arising out of or resulting from a Default by Lender or Artist, or any breach by Lender and/or Artist of their representations and warranties hereunder and/or resulting from Lender's and/or Artist's intentionally tortious or reckless or grossly negligent conduct in connection with services hereunder. Company shall defend (selecting its own counsel), indemnify and hold Lender and Artist harmless

Exhibit A

CONFIDENTIAL

from and against any and all Expenses suffered or incurred by Artist, arising out of or by reason of or resulting from any material submitted by Company to Artist for inclusion in and included in the Picture and/or by reason of any third party claim arising out of Company's production, distribution and/or exploitation of the Picture; provided, however, that the foregoing indemnification shall not apply to any Expenses or third party claims arising out of or resulting from Lender's or Artist's intentionallyt tortious or reckless or grossly negligent conduct (or other conduct by Lender or Artist which is not authorized by Company and is outside of the scope of Lender's engagement and/or Artist's employment by Company) or from any breach of Lender's or Artist's covenants, representations or warranties hereunder. Without limiting the foregoing, in connection with any claim arising out of the production, distribution, or exploitation of the Picture which alleges that material contained in the Picture constitutes a breach by Artist and/or Lender of Artist's and/or Lender's representations and warranties hereunder (hereinafter, "**Claim**"), Company shall defend Artist against any such Claim, unless Company at any time determines in good faith, based upon such information as may then be available to Company, that there has been an actual breach of Lender's and/or Artist's representations and warranties hereunder, in which event Company shall have no further obligation to defend Lender and/or Artist with respect to such Claim. If Company undertakes Artist's defense in connection with any such Claim: (i) Artist shall give Company prompt written notice of the Claim and shall cooperate fully with Company and comply with Company's instructions in connection with the defense thereof; (ii) Company shall control the defense of any such Claim and shall have the right to dispose of and/or settle such Claim as Company deems appropriate; and (iii) Artist shall not compromise or settle any such Claim without Company's prior written consent. Notwithstanding Company's defense or settlement of any Claim on behalf of itself and/or Artist, Company reserves all rights, both in equity and at law, against Artist (including the right to recover any Expenses incurred by Company in connection with the defense, settlement or other disposition of any such Claim) to the extent such Claim arises out of a breach by Artist of Artist's representations and warranties hereunder. With respect to any action brought by Company against Artist pursuant to the preceding sentence, such action will be deemed to accrue on the date on which Company requests Artist to reimburse Company for Company's Expenses, it being agreed that Company shall not be required to make any such request in connection with any Claim until after the final disposition or settlement thereof. All Expenses incurred in connection with any defense or indemnity of Lender and/or Artist under this Paragraph may be charged by Company as distribution expenses or Direct Costs of the Picture.

10.    <u>COMMITMENTS TO OTHERS</u>. Artist shall not have the right or authority to, and shall not, (i) employ any person in any capacity, (ii) contract for the purchase or rental of any article or material, or (iii) make any commitment, agreement or obligation whereby Company shall be required to pay any monies or other consideration, without Company's prior written consent in each instance.

11.    <u>RIGHT TO WITHHOLD</u>. Company shall have the right to deduct and withhold from any sums payable to Artist hereunder (i) any amounts required to be deducted and withheld by Company pursuant to any present or future tax law, ordinance or regulation of the United States or of any state thereof or any subdivision of any state thereof, or of any other country, including, without limitation, any country wherein Artist performs any services hereunder, or pursuant to any present or future rule or regulation of any union or guild (if any) having jurisdiction over the services to be performed by Artist hereunder; (ii) any expenses, including union or guild dues or other fees paid by Company on Artist's behalf; and (iii) all amounts required to qualify any payments for eligibility for any production tax incentives or credits.

12.    <u>INSURANCE</u>. Company shall have the right to apply for and take out, at Company's expense, life, health, accident, cast or other insurance covering Artist, in any amount Company deems necessary to protect Company's interest hereunder. Artist shall not have any right, title or interest in or to such insurance. Artist shall assist Company in obtaining such insurance by submitting to usual and customary medical and other examinations, and by signing such applications, statements and other instruments as may be reasonably required by any insurance company; provided, however, that Artist may have Artist's own physician present (at Artist's sole cost) if Artist so request, provided that such physician does not interfere with the examination conducted by Company's physician. In the event Artist fail or are unable to qualify for such insurance at customary rates and subject only to customary exclusions and deductible amounts (if any), Company shall have the right to terminate this Agreement; provided, however, that if termination of this Agreement is only a matter of a higher premium or increased deductible, Artist shall have the right to avoid such termination by paying such additional premium or any increased deductible, as applicable. Notwithstanding the foregoing, if Artist have cooperated

Exhibit A

CONFIDENTIAL                                                                                              WAYFARER_000140979

fully in Company's efforts to obtain such insurance, Company shall not have the right to terminate this Agreement for inability or failure to obtain cast insurance after the Start Date or after Artist has traveled to render services for the Picture, whichever is earlier. During the term of this Agreement, Artist shall not travel on any chartered or unscheduled private airline or plane, unless requested to do so by Company, or engage in any ultra-hazardous conduct that Artist is aware or reasonably should be aware is prohibited by any policy of insurance obtained by Company in accordance with this Agreement. Additionally, the services that Artist shall render pursuant to this Agreement are of the type covered under Company's errors and omissions insurance policy, and Lender and Artist shall be covered as additional insureds thereunder and under the general liability insurance policy applicable to the Picture, subject to each such policy's terms, conditions and limitations.

13.    WORKER'S COMPENSATION/SPECIAL LENDER. Notwithstanding that Lender is furnishing Artist's services to Company hereunder, for the purposes of any applicable workers' compensation statute, an employment relationship exists between Company and Artist, Company being Artist's "special employer" hereunder and Lender being Artist's "general employer" (as the terms "special employer" and "general employer" are understood for purposes of workers' compensation statutes). As between Lender and Company, Company shall have the exclusive right to direct and control the performance of Artist's services hereunder. The rights and remedies, if any, of Artist and/or Artist's heirs, executors, administrators, successors and assigns against Company and/or Company's agents and/or employees by reason of injury, illness, disability or death arising out of and occurring in the course of this employment shall be governed by and limited to those provided under such workers' compensation statutes and neither Company nor Company's agents or employees shall have any other obligation or liability by reason of any such injury, illness, disability or death. If the applicability of any workers' compensation statutes to the engagement of Artist's services hereunder is dependent upon (or may be affected by) an election on the part of Lender, Artist and/or Company, such election is hereby made in favor of such application. Nothing contained in this section shall be deemed to waive the provisions of California Labor Code Section 3601, and where reference is made in the section to Workers' Compensation statutes, it shall be deemed to include Section 3601. Except as otherwise provided by law or herein, Artist shall receive no less or more favorable benefits under the Workers' Compensation statute than Artist would have received had Artist been employed directly by Company.

14.    SAG-AFTRA AGREEMENT AND MEMBERSHIP. Company hereby represents and warrants that Company shall become a signatory to the SAG Agreement prior to Artist rendering any services in connection with the Picutre. To the extent that any provision of this Agreement conflicts with the mandatory provisions of the applicable SAG Agreement, the provisions of the SAG Agreement shall prevail; provided, however, that in such event the Agreement shall be limited only to the extent necessary to permit compliance with the minimum mandatory terms and conditions of the SAG Agreement, and Company shall be entitled to the maximum benefits and shall be deemed to have the maximum rights provided in the SAG Agreement and any other applicable collective bargaining agreement. To the extent and during such periods as it may be lawful for Company to require Artist to do so hereunder, Artist is or shall become and remain a member in good standing of SAG Agreement or otherwise eligible to perform services pursuant to the SAG Agreement and/or applicable laws. If Artist fails, neglects or refuses to become and remain a member in good standing of SAG Agreement (or otherwise eligible to perform services pursuant to the SAG Agreement), Company shall have the right, at Company's sole election (in addition to the exercise of Company's other rights and remedies hereunder), to terminate this Agreement, or to pay on Artist's behalf any required dues, fees or other payments to SAG-AFTRA to qualify Artist as a member in good standing (or to qualify Artist to be eligible to perform services pursuant to the SAG Agreement) and to deduct the amounts so paid by Company from any compensation otherwise payable to Artist hereunder. Company or Company's agents shall pay directly to SAG-AFTRA any applicable pension, health and welfare contributions required in connection with Artist's services on the Picture. If the SAG Agreement requires the payment of compensation to Artist in addition to that provided for in this Agreement (including, without limitation, residuals), such additional compensation shall be paid at the minimum applicable rates specified in the SAG Agreement, and shall be based, where permitted by the SAG Agreement, upon the minimum applicable compensation (including, without limitation, contingent compensation), payable thereunder. Artist shall cooperate with Company in requesting any waiver of the provisions of the SAG Agreement in connection with the Agreement. Except as may otherwise be expressly herein provided, all provisions of Schedule "F" of the SAG Agreement applicable to deal players shall apply to Artist's services hereunder. Without limiting the foregoing, the Fixed Compensation payable to Artist

Exhibit A

CONFIDENTIAL                                                                                    WAYFARER_000140980

hereunder shall include compensation for rehearsal time, travel time and intervening time.

15.    GENERAL CREDIT TERMS.  All references in this Agreement to the title of the Picture shall be deemed to mean the "regular" title unless reference is specifically made to the "artwork" title.  With respect to any obligation to accord credit in Paid Ads, if the title of the Picture or the name(s) of one or more other person(s) engaged in connection with the Picture is used more than once in such Paid Ads, *e.g.*, a so-called "regular" use and a so-called "artwork" use (such as, for example, the weaving of the title and/or name(s) as part of the background of the advertisement, or a display use or a fanciful use), the references herein to the title of the Picture and/or the name(s) of any person shall be to the so-called "regular" use of the title or the name(s) as distinguished from the "artwork" use of the title or the name(s). All references to "size" however stated, whether as a percentage or otherwise, shall mean height and width of the lettering used in the credit.  Subject to Artist's right under the applicable collective bargaining agreement (if any), Artist shall be entitled to the credit provided in the Underlying Agreement only if Artist appears recognizably in the Picture.

15.    MISCELLANEOUS.

15.1  Governing Law.  THE INTERNAL SUBSTANTIVE LAWS (AS DISTINGUISHED FROM THE CHOICE OF LAW RULES) OF THE STATE OF CALIFORNIA AND THE UNITED STATES OF AMERICA APPLICABLE TO CONTRACTS MADE AND PERFORMED ENTIRELY IN CALIFORNIA SHALL GOVERN (i) THE VALIDITY AND INTERPRETATION OF THIS AGREEMENT, (ii) THE PERFORMANCE BY THE PARTIES OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER, AND (iii) ALL OTHER CAUSES OF ACTION (WHETHER SOUNDING IN CONTRACT OR IN TORT) ARISING OUT OF OR RELATING TO THIS AGREEMENT (OR LENDER'S ENGAGEMENT AND/OR ARTIST'S SERVICES HEREUNDER) OR THE TERMINATION OF THIS AGREEMENT (OR OF LENDER'S ENGAGEMENT AND/OR ARTIST'S SERVICES) OR OTHERWISE RELATING TO THE PICTURE.

15.2  LEGAL PROCEEDINGS – ARBITRATION.  The parties agree that, except as otherwise required by any applicable guild collective bargaining agreement, any and all disputes or controversies of any nature between them arising at any time (whether or not relating to the Picture), shall be determined by binding arbitration in accordance with the rules of JAMS (or, with the agreement of the parties, ADR Services), held in Los Angeles, California before a single neutral arbitrator ("Arbitrator").  The Arbitrator shall be an attorney with at least ten (10) years' experience in the motion picture industry or a retired judge and shall be mutually agreed upon by Company and Lender.  If Company and Lender are unable to agree on an Arbitrator, the Arbitrator shall be appointed by the arbitration service.  The fees of the Arbitrator shall be borne equally by Company and Lender, provided that the Arbitrator may require that such fees be borne in such other manner as the Arbitrator determines is required in order for this arbitration clause to be enforceable under applicable law.  The parties shall be entitled to conduct discovery in accordance with Section 1283.05 of the California Code of Civil Procedure provided that  (a) the Arbitrator must authorize all such discovery in advance based on findings that the material sought is relevant to the issues in dispute and that the nature and scope of such discovery is reasonable under the circumstances, and (b) discovery shall be limited to depositions and production of documents unless the Arbitrator finds that another method of discovery (*e.g.*, interrogatories) is the most reasonable and cost efficient method of obtaining the information sought.  There shall be a record of the proceedings at the arbitration hearing and the Arbitrator shall issue a Statement of Decision setting forth the factual and legal basis for the Arbitrator's decision.  If neither party gives written notice requesting an appeal within ten (10) business days after the issuance of the Statement of Decision, the Arbitrator's decision shall be final and binding as to all matters of substance and procedure, and in such event, if the decision is not fully complied with within fifteen (15) business days after the end of the appeal period (or the parties do not mutually agree to a different resolution prior to the expiration of such 15-business day period), the Arbitrator's decision may be enforced by a petition to the Superior Court for confirmation and enforcement of the award.  If either party gives written notice requesting an appeal within ten (10) business days after the issuance of the Statement of Decision, the award of the Arbitrator shall be appealed to three (3) neutral arbitrators (the "Appellate Arbitrators"), each of whom shall have the same qualifications and be selected through the same procedure as the Arbitrator.  The appealing party shall file its appellate brief within

Exhibit A

CONFIDENTIAL                    WAYFARER_000140981

thirty (30) days after its written notice requesting the appeal and the other party shall file its brief within thirty (30) days thereafter. The Appellate Arbitrators shall thereupon review the decision of the Arbitrator applying the same standards of review (and all of the same presumptions) as if the Appellate Arbitrators were a California Court of Appeals reviewing a judgment of the California Superior Court, except that the Appellate Arbitrators shall in all cases issue a final award and shall not remand the matter to the Arbitrator. The decision of the Appellate Arbitrators shall be final and binding as to all matters of substance and procedure, and in such event, if the decision is not fully complied with within fifteen (15) business days after the decision of the Appellate Arbitrators (or the parties do not mutually agree to a different resolution prior to the expiration of such 15-business day period), the Appellate Arbitrators' decision may be enforced by a petition to the Superior Court for confirmation and enforcement of the award. The party appealing the decision of the Arbitrator shall pay all costs and expenses of the appeal, including the fees of the Appellate Arbitrators and the reasonable outside attorneys' fees of the opposing party, unless the decision of the Arbitrator is reversed, in which event the expenses of the appeal shall be borne as determined by the Appellate Arbitrators. The Arbitrator shall have the power to enter temporary restraining orders, preliminary and permanent injunctions, subject to the provisions of the Agreement waiving or limiting that remedy. Prior to the appointment of the Arbitrator or for remedies beyond the jurisdiction of an arbitrator, at any time, Company may seek temporary or preliminary relief in a court of competent jurisdiction *pendente lite* without thereby waiving its right to arbitration of the dispute or controversy under this Paragraph. All arbitration proceedings (including proceedings before the Appellate Arbitrators) shall be closed to the public and confidential and all records relating thereto shall be permanently sealed, except as necessary to obtain court confirmation of the arbitration award in accordance with the provisions set forth hereinabove. The fact that there is a dispute between the parties that is the subject of an arbitration shall also be confidential and neither party shall disclose, report, reveal, gossip or speculate about any arbitration, by any means including without limitation by e-mail, blogging or tweeting. The provisions of this Paragraph 15.2 shall supersede any inconsistent provisions of any prior agreement between the parties.

15.3  Non-Waiver; Effect of Termination; Entire Agreement; Severability.  No waiver by Lender, Artist or Company of any failure by the other to keep or perform any covenant or condition of this Agreement shall constitute a waiver of any preceding or succeeding breach of the same or any other covenant or condition. The expiration, termination and/or cancellation of this Agreement for any reason whatsoever shall not affect the rights granted hereunder by Artist or Company's ownership thereof, and the representations and warranties of Artist hereunder shall survive any such expiration, termination or cancellation. This Agreement (together with all of its exhibits and schedules) constitutes the entire agreement between Company and Artist with respect to the subject matter hereof and may only be amended by a written instrument executed by Company and Artist. If one or more provisions of this Agreement are held to be illegal or unenforceable under applicable California law, such illegal or unenforceable portion(s) shall be limited or excluded from this Agreement to the minimum extent required and the remaining portions of this Agreement shall be interpreted as if such portion(s) were so limited or excluded and shall be enforceable in accordance with its terms.

15.4  Visas and Labor Permits.  Artist agrees to cooperate with Company and assist Company in securing such visas and labor permits as may be required by any governmental agency in connection with Artist's rendition of services hereunder. If, in spite of such cooperation and assistance, Company is unable to secure such visas and labor permits within a reasonable time period prior to the Start Date, Company shall have the right to suspend Lender's engagement and Artist's services hereunder until a final determination concerning such visa or labor permit is made by the applicable authority, and Company shall have the right to terminate this Agreement, Lender's engagement and Artist's employment hereunder if such visas and labor permits cannot be secured. All such visas and labor permits provided for under this paragraph shall be at Company's expense.

15.5  Company's Remedies.  All remedies accorded herein or otherwise available to Company shall be cumulative and no one such remedy shall be exclusive of any other. Without waiving any rights or remedies under this Agreement or otherwise, Company may from time to time recover, by arbitrations, any damages (subject to Paragraph 15.7 below) arising out of any breach of this Agreement by Artist and may institute and maintain subsequent actions for additional damages (subject to Paragraph 15.7 below) which may arise from the same or other breaches. The commencement or maintaining of any such action or actions by Company shall not constitute an election on Company's part to terminate this Agreement nor constitute or result in the termination of Lender's engagement and Artist's services hereunder unless Company shall expressly so elect

Exhibit A

CONFIDENTIAL

WAYFARER_000140982

by written notice to Lender. The pursuit by Company of any remedy under this Agreement or otherwise shall not be deemed a waiver of any other or different remedy which may be available under this Agreement or otherwise, either at law or in equity.

15.6  <u>Lender's and Artist's Remedies</u>.  The rights and remedies of Lender and Artist in the event of any breach by Company of this Agreement or any of Company's obligations hereunder shall be limited to Lender's and/or Artist's right to recover damages (subject to Paragraph 15.7 below) , if any, in one or more arbitration proceedings, and Lender and Artist hereby waives any right or remedy in equity, including without limitation any right to terminate, rescind or cancel this Agreement or Company's ownership of the Picture or the Results and Proceeds or any other right granted to Company hereunder and/or to seek injunctive or other equitable relief with respect to any breach of Company's obligations hereunder and/or to enjoin or restrain or otherwise impair in any manner the production, distribution, exhibition or other exploitation of the Picture, or any parts or elements thereof, or the use, publication or dissemination of any advertising in connection therewith.

15.7  <u>Limitations on Damages</u>.  In no event will any party hereto (Company and/or Artist) be liable for or have any obligation to pay to the other consequential and/or incidental and/or special and/or punitive damages, all of which are expressly excluded, and Company and Lender and Artist each hereby waive any right to recover any such damages from the other.

15.8  <u>Captions</u>.  The captions used in connection with the Sections and subsections of this Agreement are inserted only for the purpose of reference. Such captions shall not be deemed to govern, limit, modify, or in any other manner affect the scope, meaning, or intent of the provisions of this Agreement or any part thereof; nor shall such captions otherwise be given any legal effect.

15.9  <u>Governmental Limitation</u>.  If the compensation provided for by this Agreement shall exceed the amount permitted by any present or future law or governmental order or regulation, such compensation shall be reduced, while such limitation is in effect, to the amount which is so permitted, and the payment of such reduced compensation shall be deemed to constitute full performance by Company of its obligations respecting the payment of compensation hereunder until such limitation is amended.

15.10  <u>Assignment</u>.  Company shall be free to assign this Agreement and its rights hereunder, and to delegate its duties, obligations and liabilities hereunder, at any time and from time to time, in whole or in part, to any person or entity and upon such assignment Company shall be released and discharged of and from any and all of its duties, obligations and liabilities hereunder only if such assignment is to: (i) a person or entity into which Company merges or is consolidated or (ii) a person or entity which acquires all or substantially all of Company's business and assets or (iii) a person or entity which is controlled by, under common control with, or controls Company or (iv) any major or "mini-major" motion picture company, United States television network or (v) other similarly financially responsible party, or (vi) any assignee assumes in writing all of Company's obligations hereunder. Artist may not assign this Agreement or Artist's rights hereunder, or delegate Artist's duties under this Agreement in whole or in part.

15.11  <u>New Media</u>.  Lender and Artist grant to Company and its licensees, successors and assigns forever and throughout the universe the right to use, sell, license or otherwise exploit any portion of the photography and/or soundtrack ("excerpts") of Artist's services in the Picture on or by means of "new media" platforms including but not limited to internet and mobile devices without payment of additional compensation unless required by the SAG Agreement and, if required, such payments shall be applicable guild minimum for such use or reuse.

15.12  <u>FCPA</u>.  Lender and Artist acknowledge that they are familiar with the requirements of the Foreign Corrupt Practices Act ("FCPA") and understand that a violation of any of the provisions of the FCPA constitutes a criminal offense. Lender and Artist represent and warrant that they have not and will not take any action which would be in violation of the FCPA and/or would cause Company, its subsidiaries, assignees and/or affiliates to be in violation of the FCPA and that they will fully comply with the terms of Company's Anti-Bribery Policy. Without limiting the generality of the foregoing, Lender and Artist represent and warrant that in connection with the Picture, or any activity related thereto, neither they nor any person or entity acting on their behalf or under their control or direction, have made or will make any promise, offer, payment(s) or give or

Exhibit A

CONFIDENTIAL                                                                    WAYFARER_000140983

authorize the giving of anything of value, directly or indirectly, to any person with the knowledge that all or a portion of it will be offered, given or promised, directly or indirectly to any government agency or officials, political party, leader or candidate for government or political office, in order to obtain or retain business or secure any improper business advantage for the Company.

15.13    Privacy.    Lender and Artist hereby acknowledge that for purposes connected with this Agreement, including compliance with Company's legal and regulatory obligations, Company will collect, use, and otherwise process certain individually identifiable information about Lender and Artist, including without limitation "personal data" such as name, address, email address, government ID, banking and insurance information and "sensitive personal data" such as race or ethnic origin, health conditions and health insurance, criminal history, trade union information (collectively "Personal Data"). Any Personal Data furnished by Lender or Artist to Company will be disclosed in compliance with applicable data protection laws. Lender and Artist further acknowledge that the processing of Personal Data may involve transfer or disclosure to Company's parent or other affiliated companies, Company's employees and agents, and to third parties, including without limitation, third party service providers, external advisors, government agencies, regulators and authorities, courts and other tribunals, potential purchasers of Company or any of its assets or business, and Company's suppliers, promoters and advertisers and other persons connected with Company and/or the Picture and that such transfer may be to countries that may not provide a level of protection to Personal Data equivalent to that provided by Lender's or Artist's home country. Lender and Artist hereby consent to such holding, processing and/or transfer of Personal Data and, to ensure that the Personal Data remains as accurate as possible, Lender and Artist hereby agree to inform Company as soon as reasonably practicable of any changes thereto.

15.14    Counterparts/Originals.    This Agreement may be executed in counterparts and by electronic signature (*e.g.* via DocuSign, accompanied by the confirming e-signature certificate) and may be transmitted by facsimile copy or e-mailed PDF file, each of which when so executed and delivered shall be deemed to be an original and all of which, when taken together, shall constitute one and the same instrument. Upon request by any party receiving an executed counterpart by facsimile or PDF (by e-mail) to also receive an ink-signed original, the other party shall provide original ink-signed signature pages as soon as practicable, but failure to do so shall not affect the validity, enforceability, or binding effect of this Agreement.

16.    FURTHER INSTRUMENTS.    After a reasonable opportunity for Lender's counsel to review and comment, which shall not exceed five (5) business days, Lender and Artist shall duly execute, acknowledge and deliver to Company or cause to be executed, acknowledged and delivered to Company, any and all assignments or instruments consistent herewith which Company may reasonably deem necessary to carry out and effectuate the purposes and intent of this Agreement, including, without limitation, separate assignments of any rights granted by Lender and/or Artist in this Agreement. In the event Lender or Artist fails to execute, acknowledge and deliver any such instrument within five (5) business days after Company's request therefor (or within three (3) days if exigent circumstances may require), Lender and Artist hereby irrevocably appoint Company as Lender's and Artist's attorney-in-fact, which appointment shall be deemed a power coupled with an interest, with full rights of substitution and delegation, solely to execute any such instruments in Lender's and Artist's name and on Lender's and Artist's behalf. Upon Lender's request, Company shall provide Lender with copies of any such instruments so executed; provided, however, that any failure by Company to provide Lender and Artist with such copies shall not constitute a breach of this Agreement or otherwise affect the validity of any such instruments.

17.    CONFIDENTIALITY.    Lender and Artist understand that it is an essential term of this engagement that the Production Information (as defined below) be maintained in the strictest confidence and that neither Lender nor Artist duplicate, disclose, report, reveal, gossip or speculate about, assign, sell or transfer, either directly or indirectly, factually or by means of fictionalization, by any means including without limitation by e-mail, blogging or tweeting, any Production Information without Company's prior consent. Lender and Artist will use best efforts to prohibit observation of Artist's services or the completed Results and Proceeds thereof by any individuals not rendering services in connection with the Picture. Lender and Artist acknowledge and agree that Company shall have the exclusive right to release Production Information and to determine under what circumstances to release Production Information and that Artist shall not in any way participate in any publicity, press releases, interviews, advertisements or promotional activities relating to Company, the Picture, or Artist's services hereunder without the prior written consent of Company, except personal publicity in which the Picture is only incidentally mentioned in a non-derogatory manner. If Artist

Exhibit A

CONFIDENTIAL    WAYFARER_000140984

makes or compiles correspondence, memoranda, notes, records and other documents relating to Artist's services hereunder, such material will be deemed to be part of the Results and Proceeds of Artist's services and a "work made for hire" for Company and Company shall be deemed to be the sole author and owner of all copyrights in and to any such material.  If any tangible Production Information is delivered to Lender or Artist, Artist shall return the same to Company upon completion of services for Company, or at any other time upon Company's request.  Notwithstanding the foregoing, Lender and Artist shall not be deemed to be in breach of this Agreement if (i) Artist discloses information relating to the terms of Artist's services to Artist's agents, attorneys, and business representatives solely as required for such representative to properly provide services to Artist (provided that the applicable party is restricted from any further disclosure) and/or (ii) Artist or Artist's agents, attorneys, and business representatives disclose information to third parties about Artist's compensation and credit and other deal terms for so-called "quote" purposes and/or (iii) Artist discloses any Production Information (a) as required by law (including, without limitation, as required pursuant to court order or to enforce such party's rights hereunder) and/or (b) to employees of Company or other persons performing services on the Picture only if and to the minimum extent necessary in order for them to perform their services in connection with the Picture.  "Production Information" shall mean any information or material which has not theretofore been released or authorized to be released generally to the public by Company which Lender or Artist may obtain knowledge of or access to, including without limitation any and all information relating to Artist's services hereunder, the Picture and its production and exploitation, the screenplay and the story lines, characters and/or locations contained therein, the budget, schedule, production plans (including any information regarding cast members engaged or being considered for engagement), drawings, designs, specifications, ideas, concepts, models, costumes, techniques or special effects for the Picture or other creative, business and/or physical production elements relating to the Picture and/or Company and/or Company's business, executives and/or financial information.

18.  <u>PERSONAL PHOTOGRAPHY PROHIBITED</u>.  Lender and Artist understand, acknowledge and agree that personal photography of any nature at, of or on any location in connection with the Picture is strictly prohibited and any breach of this provision will be a Default of this Agreement. Notwithstanding any contrary provision in the Agreement, any photography taken by Artist relating to the Picture or taken at, of or on any location where the Picture is being produced will be deemed to be part of the Results and Proceeds of Artist's services and a "work made for hire" for Company and Company shall be deemed to be the sole author and owner of all copyrights in and to any such photography.

END OF STANDARD TERMS

Exhibit A

CONFIDENTIAL

WAYFARER_000140985

**<u>EXHIBIT B</u>**

**<u>ESCROW AGREEMENT</u>**
**(attached)**

Exhibit B

CONFIDENTIAL

WAYFARER_000140986

## EXHIBIT C

## COVID SAFETY PROTOCOLS & REGULATIONS ACKNOWLEDGEMENT

I, Blake Lively, acknowledge and agree that It Ends With Us Movie LLC has provided the Covid safety protocols and regulations ("Covid Safety Regulations") that should be followed while I am providing services in connection with the motion picture currently entitled "IT ENDS WITH US" (the "Picture"). Furthermore, I acknowledge and agree that (i) I will use reasonable good faith efforts to follow the guidelines in the Covid Safety Regulations (ad may be amended from time to time); (ii) I will follow any reasonable written instructions provided by Company with respect thereto including, if required, the completion of a daily health declaration before commencing work; and (iii) repeated failure to follow the Covid Safety Regulations may be deemed a breach of my agreement in connection with the Picture. Company acknowledges and agrees that the Covid Safety Regulations (i) are in line with government regulations and guidelines; (ii) have been approved by SAG-AFTRA; and (iii) will be followed and enforced by Company.

_____

Printed Name: Blake Lively

Exhibit B

WAYFARER_000140987

**EXHIBIT D**

**DEFINED GROSS PROCEEDS**

Exhibit B

CONFIDENTIAL

WAYFARER_000140988

## EXHIBIT E

## DIRECT COSTS DEFINITION

All costs, charges, and expenses (collectively, "Direct Costs") incurred in connection with the development, preparation, production, completion, and delivery of the Picture to Columbia Pictures Industries, Inc. ("Columbia") (regardless of whether the items to which such costs relate were included in any version of the Picture released to consumers), computed and determined in all respects in the same manner as Columbia customarily determines the direct cost of other motion pictures produced, distributed, and/or financed by it, including but not limited to the following: costs of acquisition of underlying rights, music rights, distribution rights or other rights of any nature (including without limitation costs of copyright and title searches, clearances and registrations and royalties and license fees); development and pre-production expenses; all fees, expenses and costs incurred in connection with the engagement of any producers, directors, writers, actors, special effects vendors or personnel, cameramen, set designers, makeup artists, film editors, and other creative, artistic, and technical vendors or personnel in connection with the Picture; an allocation of all accrued overhead and/or general production account charges incurred by Columbia and/or Wayfarer Studios, LLC ("Wayfarer"); costs of materials and equipment; charges for studio space, stages, and facilities, reproduction and processing equipment; costs of film, tape or other recording media; costs of laboratory and sound services and facilities and all other services and facilities; locations, and construction expenses; travel and living expenses incurred in connection with the development, preparation, production, post-production or delivery of the Picture; insurance costs, including premiums and deductibles, (it being understood that Columbia shall have the right to allocate to the Picture a reasonable share of all costs of Columbia's insurance programs which relate in any way to the production of the Picture and that Columbia shall not be obligated to take out or maintain any such insurance and may elect to self-insure as to any or all risks of loss, and, if Columbia so elects, Columbia may charge as a Direct Cost an amount equivalent to the premium that would be charged by a third party insurer; but if Columbia charges as a Direct Cost a self-insurance premium with respect to any category of risk, Columbia shall not deduct as a Direct Cost any losses suffered by Columbia within the category of such self-insured risk, except for an amount equal to customary deductibles charged by third party insurers); and reasonable outside legal and accounting charges. In computing the Direct Costs, discounts from list price from the laboratory (but not discounts, rebates, or credits received as a result of the overall volume or quantity of film stock, prints, negatives, or other materials ordered by Columbia and/or its affiliates over a specified calendar period, or the manner or time of payment) shall be taken into account. The net receipts of any policy of insurance maintained by Columbia or Wayfarer in respect of the production of the Picture actually received by Columbia or Wayfarer as reimbursement for any cost or expense previously charged as a Direct Cost shall be applied in reduction of such item of cost or expense.

Exhibit B

WAYFARER_000140989

## INDUCEMENT

I, BLAKE LIVELY, have read and am familiar with all the terms of the foregoing agreement between It Ends With Us Movie LLC ("Company") and Blakel, Inc. ("Lender") and, in order to induce Company to enter into said agreement, I consent to the execution thereof, ratify and confirm in my individual capacity all representations, warranties and agreements of Lender contained herein, agree to be bound by the terms and conditions thereof and agree that I shall render all services and grant all rights as are necessary to enable Lender to comply with its obligations under said agreement. Provided Company pays Lender all amounts payable to Lender under the agreement, and unless I am deemed substituted for Lender, I agree to look solely to Lender for full payment of any amounts due for all rights granted and services performed thereunder. In the event of any breach or default by Lender, I agree that without prior notice to me or Lender, Company may proceed against me as if I were a party thereto and I shall be primarily, jointly and severally liable with Lender thereunder. For purposes of any and all Worker's Compensation statutes, laws, or regulations ("Worker's Compensation"), I acknowledge that an employment relationship exists between Company and myself, Company being my special employer under the agreement. Accordingly, I acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Worker's Compensation, my rights and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Company or Company's affiliated companies and their respective officers, agents, and employees (including, without limitation, any other special employee and any corporation or other entity furnishing to Company or an affiliate company the services of any other special employee) shall be governed by and limited to those provided and/or permitted by Worker's Compensation.


Signature: _____

Print Name: Blake Lively

WAYFARER_000140990