UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BLAKE LIVELY,

Plaintiff,

v.

WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, and JENNIFER ABEL,

Defendants.

Civ. Action No. 1:24-cv-10049-LJL

Related to:
Civ. Action No. 1:25-cv-00779-LJL

JENNIFER ABEL,

Third-Party Plaintiff,

v.

JONESWORKS LLC,

Third-Party Defendant.

**THIRD-PARTY PLAINTIFF JENNIFER ABEL'S OPPOSITION TO THIRD-PARTY DEFENDANT JONESWORKS LLC'S MOTION FOR SPOLIATION SANCTIONS**

# TABLE OF CONTENTS


I. INTRODUCTION ........ 6

II. FACTUAL BACKGROUND ........ 7

A. The Employment Relationship Between Jones and Abel. ........ 7

B. The Facts Giving Rise to Interlocking Lawsuits in Which Abel is a Party. ........ 9

1. The Film and Lively's Complaints About Misconduct on the Set. ........ 9

2. The "Protections and Resolution of Lively's Complaints. ........ 9

3. Lively's Assault on the Wayfarer Parties. ........ 10

4. The Surging Chatter Over Discord on the Film's Set and the Public Relations Response to Lively's Attacks. ........ 11

5. The Use of Signal by Some Defendants. ........ 14

6. The Interlocking Lawsuits. ........ 15

7. Abel's Third-Party Complaint Against Jones for Indemnification. ........ 15

8. Jones' Complaint Against Wayfarer and Abel for Breach of Contract and Defamation. ........ 15

III. JONES FAILS TO MEET HER BURDEN TO SHOW THAT SHE IS ENTITLED TO SANCTIONS UNDER RULE 37(e)(1) ........ 16

A. Jones Fails to Show that Abel Had a Duty to Preserve Evidence. ........ 18

B. Jones Fails to Establish that Abel Deleted Relevant Evidence to Jones' Prejudice. ........ 20

IV. JONES FAILS TO MEET HER BURDEN UNDER RULE 37(e)(2) FOR THE SEVERE SANCTIONS SHE SEEKS ........ 26

V. CONCLUSION ........ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adato v. Gala Tour, Inc.*,
2011 WL 4458852 (E.D.N.Y. Sept. 23, 2011) ....23

*American Lecithin Co. v. Rebmann*,
2023 WL 7160729 (S.D.N.Y. Oct. 31, 2023) ....16

*Anderson v. Amazon.com, Inc.*,
2025 WL 2780921 (S.D.N.Y. Sept. 30, 2025) ....20, 21

*Arista Recs. LLC v. Usenet.com, Inc.*,
608 F. Supp. 2d 409 (S.D.N.Y. 2009) ....24, 25, 26

*Barbera v. Grailed, LLC*,
2025 WL 2098635 (S.D.N.Y. July 25, 2025) ....16, 17, 27

*Bradshaw v. Welch*,
2024 WL 3495154 (N.D.N.Y. July 22, 2024) ....16

*CAT3, LLC v. Black Lineage, Inc.*,
164 F. Supp. 3d 488 (S.D.N.Y. 2016) ....16

*Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*,
337 F.R.D. 47 (S.D.N.Y. 2020) ....18, 28, 29

*Chin v. Port Auth. of N.Y. & N.J.*,
685 F.3d 135 (2d Cir. 2012) ....16, 18

*Cooper Foods International, LLC v. Yourd*,
2025 WL 2663977 (E.D.N.Y. Sept. 17, 2025) ....20, 22

*Cyntegra, Inc. v. Idexx Lab'ys, Inc.*,
2007 WL 5193736 (C.D. Cal. Sept. 21, 2007), *aff'd*, 322 F. App'x 569 (9th Cir. 2009) ....19

*Dilworth v. Goldberg*,
3 F. Supp. 3d 198 (S.D.N.Y. 2014) ....23

*ELG Utica Alloys, Inc. v. Niagara Mohawk Power Corp.*,
2025 WL 1962141 (2d Cir. July 17, 2025) ....16

*Grant v. Salius*,
2011 WL 5826041 (D. Conn. Nov. 18, 2011) ....21

*Hamling v. United States*,
418 U.S. 87 (1974) ..... 23

*Hoffer v. Tellone*,
128 F.4th 433 (2d Cir. 2025) ..... 25, 27

*Johnson v. L'Oreal USA*,
2020 WL 5530022 (S.D.N.Y. Sept. 15, 2020) ..... 27

*Jones et al v. Abel et al.*,
25-cv-00779-LJL, Dkt. 158 ..... 8

*Karsch v. Blink Health Ltd.*,
2019 WL 2708125 (S.D.N.Y. June 20, 2019) ..... 25, 27

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
341 F.R.D. 474 (S.D.N.Y. 2022) ..... 16, 26

*Khaldei v. Kaspiev*,
961 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 961 F. Supp. 2d 572 (S.D.N.Y. 2013) ..... 23

*Kosmidis v. Port Auth. of New York & New Jersey*,
2020 WL 5754605, at *4-9 (S.D.N.Y. Aug. 27, 2020), *report and recommendation adopted*, 2020 WL 7022479 (S.D.N.Y. Nov. 30, 2020) ..... 18

*Kronisch v. United States*,
150 F.3d 112 (2d Cir. 1998) ..... 18

*Marshall v. Port Auth. of New York & New Jersey*,
2022 WL 17491006 (S.D.N.Y. Dec. 5, 2022) ..... 18

*Oakley v. MSG Networks, Inc.*,
792 F. Supp. 3d 377 (S.D.N.Y. 2025) ..... 17, 18, 22, 27

*Ottoson v. SMBC Leasing & Fin., Inc.*,
268 F. Supp. 3d 570 (S.D.N.Y. 2017) ..... 24, 25, 26

*Pable v. Chicago Transit Auth.*,
2023 WL 2333414, at *19 (N.D. Ill. Mar. 2, 2023), *report and recommendation adopted*, 2024 WL 3688708 (N.D. Ill. Aug. 7, 2024), *aff'd*, 145 F.4th 712 (7th Cir. 2025) ..... 14

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*,
685 F. Supp. 2d 456 (S.D.N.Y. 2010), *abrogated on other grounds by Chin*, 685 F.3d 135 ..... 19

*Rhoda v. Rhoda*,
2017 WL 4712419 (S.D.N.Y. Oct. 3, 2017) ....................24

*Shaffer v. RWP Group, Inc*.,
169 F.R.D. 19 (E.D.N.Y.1996) ....................26

*Tranchina v. McGrath*,
2022 WL 17491727 (2d Cir. Dec. 8, 2022) ....................23

*United States v. Holmes*,
44 F.3d 1150 (2d Cir.1995) ....................23

*West v. Goodyear Tire & Rubber Co.*,
167 F.3d 776 (2d Cir. 1999) ....................16

**Other Authorities**

Fed. R. Civ. P. 37 .................... *passim*

Fed. R. Evid. 403 ....................23

# I. INTRODUCTION

Stephanie Jones and Jonesworks's (collectively, "Jones") sanctions motion is odd indeed, lacking any serious attempt to justify sanctions for spoliation of electronically stored information ("ESI") under Federal Rule of Civil Procedure 37(e). Jones falls short of meeting even the threshold requirement for application of Rule 37(e), namely, that at the time Signal messages were allegedly deleted and since November 2023, Jennifer Abel ("Abel") anticipated litigation concerning her August 2024 public relations activities on behalf of her clients, Wayfarer Studios LLC ("Wayfarer) and Justin Baldoni ("Baldoni") – the subject matter of the allegedly deleted Signal messages and chats – and thus had a duty to preserve the communications, assuming they ever existed. Jones merely cites evidence that Abel anticipated litigation against Justin Baldoni, Jamey Heath, Steve Sarowitz, Wayfarer Studios LLC and It Ends With Us Movie, LLC (collectively the "Wayfarer Defendants" or "Wayfarer Parties") relating to Blake Lively's allegations that she was uncomfortable on the set of the film "It Ends with Us" (the "Film"), which occurred over a year earlier, between May 15 and June 9, 2023. Simply put, evidence Jones contends was spoliated would have been relevant to the August 2024 public relations strategy, not the alleged harassment claims that were the subject of the only foreseeable litigation. Jones makes no effort to explain if or why Abel would contemplate litigation in November 2023 over a public relations campaign that allegedly launched in August 2024.

Jones' Motion similarly fails to pinpoint a particular message or chain relevant to Abel's indemnification claim which Abel deleted or even whether Abel was a participant in any pre-litigation Signal thread concerning Lively. Cognizant of the shortcomings in her Motion, Jones merely urges the Court to presume that Abel participated in Signal chats about Lively, the unspecified, indeed mythical, Signal messages were relevant to Abel's indemnification claim and

their deletion prejudiced Jones. However, Jones fails to show that Abel – who could not possibly foresee litigation involving her public relations work – acted in bad faith – the requisite showing for a presumption of relevance and prejudice.

Nevertheless, based on this very shaky house of cards which requires the Court to stack presumption on top of presumption, Jones seeks the most severe sanctions available under Rule 37(e)(2) including "at a minimum" a sweeping adverse inference that allegedly destroyed Signal messages would have been favorable to Jones; the broadly defined "Defendants" conducted a digital or 'smear' campaign against Lively without Jones's knowledge, involvement or approval; Abel participated in that campaign for her own personal benefit, outside the course and scope of her employment with Jones; and Abel acted with the intent to deprive Jones of relevant information. Jones also seeks to preclude Abel from refuting these allegations at trial. The exceedingly broad adverse inference and preclusion order sought by Jones would be the death knell for Abel's indemnification claim.

As elaborated below, Jones falls woefully short of meeting the "harsh" standard for sanctions under Rule 37(e)(2) or even the lesser sanctions available under Rule 37(e)(1), and thus her Motion should be denied.

## II. FACTUAL BACKGROUND

### A. The Employment Relationship Between Jones and Abel.

Until approximately August 2024, Jones was Wayfarer's public relations agent, and Abel was the Jonesworks employee primarily responsible for the Wayfarer account. Garofalo Decl. Ex. 1 (Heath Dep. 10/9/25 at 76:11-77:15; 230:3-231:9). On August 21, 2023, Abel was terminated. Garofalo Decl. Ex. 2 (Duren Dep. at 116:20-22). She then opened her own public relations business. Garofalo Decl. Ex. 3 (Abel Dep. 9/26/25 at 27:15-22). Prior to Abel's departure, Jones's chief of

staff accompanied by security and legal counsel, cornered Abel, seized her cell phone and subsequently downloaded her text messages and emails including her communications with Jones' client, Wayfarer. Garofalo Decl. Ex. 4 (Abel Dep. 9/25/25 at 264:9-265:25). Jones subsequently delivered Abel's communications to Lively for use by Lively in her contemplated dispute with the Wayfarer Parties. Garofalo Decl. Ex. 5 (Lively Dep. at 147:11-20); Garofalo Decl. Ex. 6 (BL000021190 at -192 [Taylor Swift: "Can you believe she just called and was like this pr chick wants to get info to blake"]).

Understanding that sharing the information purloined from Abel's phone carried risk, Jones and Lively created a ruse to give legal cover to Jones. On September 27, 2024, an entity known as Vanzan, a shell company controlled by Lively and her husband Ryan Reynolds, filed a sham breach of contract claim in New York Supreme Court. Garofalo Decl. Ex. 7 (Harris Dep. at 12:6-17-13:24) and Ex. 8 (VANZAN_00001). The complaint, brought by Doe plaintiffs against Doe defendants, did not describe or attach the allegedly breached contract and lacks any factual allegation. *Id.*; Garofalo Decl. Ex. 9 (Harris Dep. at 64:14-18). Vanzan (Lively) did not seek a judicial assignment as required in state court. Garofalo Decl. Ex. 10 (VANZAN_000031). The only activity in the case was the issuance of a subpoena directed to Jones for the material Jones downloaded from Abel's seized phone. Garofalo Decl. Ex. 11 (VANZAN_000044). Once Jones produced Abel's communications to Lively, Vanzan dismissed its state court complaint. Garofalo Decl. Ex. 12 (VANZAN_000029). These facts leave no doubt that the Vanzan complaint was filed for one reason only: to provide a mechanism for Jones to transfer the information stolen from Abel's phone to Lively. *See Jones et al v. Abel et al.*, 25-cv-00779-LJL, Dkt. 158 at 54-56.

### B. The Facts Giving Rise to Interlocking Lawsuits in Which Abel is a Party.

#### 1. The Film and Lively's Complaints About Misconduct on the Set.

The Film began shooting in New Jersey on May 15, 2023 ("Phase 1"). Garofalo Decl. Ex. 13 (Lively Dep. at 261:11-18). Phase 1 ended on June 14, 2023, due to the Writers Guild and SAG strikes. Garofalo Decl. Ex. 14 (WAYFARER_000141293). During Phase 1, Lively complained about purported mistreatment by Justin Baldoni and Jamey Heath on the set, including alleged conduct that made her uncomfortable. *See generally* Dkt. 520. Lively did not file a formal complaint, but voiced her concerns to Baldoni, Heath and others including the Film's distributor, Sony, no later than June 1, 2023. Garofalo Decl. Ex. 15 (Giannetti Dep. at 299:22-300:15), Ex. 16 (Heath Dep. 10/8/25 at 213:13-25). Abel, who was employed by Jones, was not involved in the production of the Film or Lively's complaints of mistreatment. Garofalo Decl. Ex. 17 (Abel Dep. 9/26/25 at 201:21-24).

#### 2. The "Protections and Resolution of Lively's Complaints.

During the strike-related pause in filming, on November 9, 2023, the Wayfarer Parties received a letter from Lively's lawyer, Lindsey Strasberg, demanding that Wayfarer agree to a 17-point list of "Protections" as a condition for Lively's return to complete the Film. Dkt. 864-11. The letter stated that "[i]f the production is unwilling to accept or uphold these protections, our client is prepared to pursue her full legal rights and remedies." *Id*. On November 10, 2023, Wayfarer forwarded Strasberg's "demand letter" to Abel in her capacity as Wayfarer's public relations consultant. Wayfarer agreed to the Protections. Garofalo Decl. Ex. 18 (HEATH_000049558). Wayfarer understood that their agreement to the "Protections" resolved the issues that had arisen during Phase 1 and eliminated the threat of potential litigation. Garofalo Decl. Ex. 19 (Heath Dep. 10/9/25 at 163:5-165:14). Abel is not a party to the Protections (Dkt.

864-11), and there is no evidence that she was in any way involved in Wayfarer's negotiations or decision to sign the Protections.

Filming resumed on January 5, 2024, following an extremely tense "all hands" meeting on January 4, 2024, in which Lively's husband, Ryan Reynolds, spent hours berating the Wayfarer Defendants for their conduct in Phase 1. Garofalo Decl. Ex. 20 (Giannetti Dep. at 173:7-8, 304:21-307:4); Ex. 21 (Heath Dep. 10/8/25 at 290:2-291:7); Ex. 22 (BALDONI_000026204). After returning to the set, Lively did not assert any further complaints. Dkt. 520 ¶ 21. Filming, which began on January 5, wrapped up on February 9, 2024 ("Phase 2"). *Id*. Like Phase 1, Abel was not involved in Phase 2. There is no evidence (or even allegation) that the Wayfarer Parties failed to "uphold" the Protections during Phase 2. *See generally*, Dkt. 520. In fact, on January 14, 2024, Lively assured a cast member that the allegedly inappropriate behavior had ceased and that "It's a professional set and we're getting good work." Garofalo Decl. Ex. 51 (BL-000020899). Abel did not attend the January 4 "all-hands" meeting and did not have any contact with Lively about her complaints of misconduct in Phase 1. Dkt. 520 ¶ 19.

3. <u>Lively's Assault on the Wayfarer Parties.</u>

During Phase 2, Lively moved to seize control of the production. Among other things, she wrested control over editing, post-production and marketing from Baldoni and Wayfarer. Garofalo Decl. Ex. 24 (BL-000018396). Ultimately, Lively gained control over the entire post-production process, demanding that her cut of the Film be released even though Baldoni's Director's Cut tested better. Garofalo Decl. Ex. 25 (BL-000019326). Lively also demanded that Baldoni's "film by" credit be removed and that Baldoni's image be erased from the trailer and that Wayfarer recommend to the Producers Guild that Lively be given a producer's mark. Garofalo Decl. Ex. 26 (BL-000019455); Ex. 27 (SPE_WF0000641); Ex. 28 (SPE_BL0022958); Ex. 29 (Baldoni Dep.

10/7/25 at 328:9-17); Ex. 30 (Greenberg Dep. at 138:2-19). Lively's own submission to the Producers Guild leaves no doubt about Lively's successful efforts to hijack the Film. Garofalo Decl. Ex. 24 (BL-000018396). Lively accomplished her takeover through threats that if her demands were not met, she would not participate in marketing the Film, even though she was contractually obligated to do so. Garofalo Decl. Ex. 31 (BALDONI_000018831). A Sony executive aptly characterized Lively as a "terrorist." Garofalo Decl. Ex. 32 (SPE_WF0000415 at -416).

Not content with usurping Baldoni's role as director and excluding him from the marketing of the Film he developed, financed, directed and starred in, Lively then sidelined – indeed banished – Baldoni from the premiere, refusing to be photographed with him, and demanding that he and his guests be hidden from sight and shunning Baldoni and his guests into another screening room. Garofalo Decl. Ex. 33 (WME_00001254) (Danny Greenberg, writing: "[Lively's] been brilliantly choreographing this for a while."); Ex. 34 (WME_00001266); Ex. 35 (Heath Dep. 10/9/25 at 96:18-21); Ex. 36 (Sarowitz Dep. at 140:11-13); Ex. 37 (WAYFARER_000141754); Ex. 38 (WAYFARER_000141765). Baldoni was also barred from appearing with Lively in publicity photos or promotional appearances. Lively very publicly "unfollowed" Baldoni on social media and pushed other cast and crew members as well as Colleen Hoover, the book's author, to follow suit. Dkt. 520 at 186 n.26; Garofalo Decl. Ex. 39 (Hoover Dep. at 197:8-12); Ex. 40 (BL-000020979).

4. The Surging Chatter Over Discord on the Film's Set and the Public Relations Response to Lively's Attacks.

By the time of the Film's August 6, 2024 premiere, rumors of discord on the Film's set were already swirling on social media and in the press. Dkt. 520, ¶ 237 n.36. These rumors were fueled by Lively's very public exclusion of Baldoni from the Film's marketing (Garofalo Decl. Ex.

37 (SPE_BL0008472)), Lively's bullying of Sony to release her cut of the Film instead of Baldoni's Director's cut (Garofalo Decl. Ex. 25 (BL-000019326)), Lively's "unfollowing" of Baldoni on social media (Dkt. 520, p. 186 n.26) and Lively's insistence that Baldoni be stripped of the credit "film by Justin Baldoni" on the movie he developed, sold, directed and starred in. Garofalo Decl. Ex. 29 (Baldoni Dep. 10/7/25 at 328:9-17). Lively was also attracting negative media attention based on her marketing of the Film which seemed to trivialize the issue of domestic violence. Garofalo Decl. Ex. 42 (WME_00001051). Lively was further criticized for shamelessly using the Film to promote her alcohol business and other brands. Garofalo Decl. Ex. 43 (SPE_BL0003328). This decision was particularly tone deaf given the role of alcohol abuse in domestic violence cases. Nevertheless, Lively used alcoholic drinks using her Betty Booze alcohol product such as "Ryle You Wait" and "It Ends With Buzz" at promotional events. Garofalo Decl. Ex. 44 (WAYFARER_000142484). The public backlash was immediate and unforgiving. *See* Esther Zuckerman "What 'It Ends With Us' Says About the Blake Lively Brand" (Aug. 11, 2024), https://www.nytimes.com/2024/08/11/movies/it-ends-with-us-blake-lively-brand.html.

Given the circumstances and Lively's affirmatively hostile conduct, the Wayfarer Parties were understandably concerned about a potential onslaught of negative publicity from Lively. On July 25, 2024, the Wayfarer Parties contacted crisis communications specialist, Melissa Nathan, and her company TAG, to defuse and defend against Lively's anticipated assault and protect the Film and Baldoni's professional reputation as a producer and director. Garofalo Decl. Ex. 45 (KCASE000005773); Ex. 46 (NATHAN_000003795). The Wayfarer Defendants also retained Jed Wallace to provide digital monitoring services. Garofalo Decl. Ex. 47 (SR 1.00000011).

On August 2, 2024, the crisis management/public relations team circulated a "SCENARIO PLANNING" document with a proposed strategy to counter against negative press and Lively's

efforts to disparage Baldoni and Heath as the Film's director and producer, respectively, tamp down the growing chatter on the internet's rumor mill, and handle the response "should [Lively] and her team make her grievances public." Garofalo Decl. Ex. 48 (NATHAN_000005497). Lively defines this defensive measure as the launch of a retaliatory "smear campaign" and contends that in the weeks and months that followed, the Wayfarer Parties "engaged in a sophisticated, coordinated, and well-financed retaliation plan." Dkt. 520, ¶ 5. In fact, the Wayfarer Defendants did nothing other than exercise their right to defend against Lively's attacks and the tidal wave of negative publicity triggered by Lively's conduct. Lively implicitly concedes that the goal of the Wayfarer Parties' public relations effort was not retaliation for some protected activity, but to defend Baldoni and his reputation.

The strategy described in the Scenario Planning document was never implemented because anti-Lively, pro-Baldoni sentiment went viral organically, obviating any need to take measures to control the narrative. Garofalo Decl. Ex. 49 (NATHAN_000000278). The negative publicity spiked on the eve of the August 6 premiere and August 9, 2024 release date. Dkt. 520, ¶ 237 n.36. Lively's own timeline indicates that Defendants could not have been the masterminds behind the spike in negative publicity. Lively points to spikes in negative internet traffic on August 8 and 14, 2024. Dkt. 520, ¶ 326. Wallace was recommended to Defendants on August 7 and engaged on August 9, 2024. Garofalo Decl. Ex. 50 (NATHAN_000003599 at -602); Ex. 59 (J. Wallace Dep. 10/9/25 at 197:20-198:1. The first spike in negative digital coverage began on August 8 – before Wallace, the alleged digital wizard, was retained and only one day after he was referred by Nathan. Dkt. 520, ¶ 326. Even looking at the August 14 spike, Lively does not offer any explanation about how the TAG, Nathan, Abel and Wallace were able to turn the entire internet against Lively in less

than two days. *Id.* These facts undermine Lively's presumption that Defendants manipulated the spike in the already burgeoning negative sentiment targeted at Lively.

5. The Use of Signal by Some Defendants.

After the crisis management team was brought on board in August 2024 and prior to Lively filing of her claim on December 20, 2024, certain Defendants used Signal chats to communicate. Signal is a commonly used app which provides "enhanced security features." *Pable v. Chicago Transit Auth.*, 2023 WL 2333414, at *19 (N.D. Ill. Mar. 2, 2023), *report and recommendation adopted*, 2024 WL 3688708 (N.D. Ill. Aug. 7, 2024), *aff'd*, 145 F.4th 712 (7th Cir. 2025). The security protections Signal provides made Signal the preferred and primary means of communication between Nathan, the crisis manager, and Wallace, who operate in a highly charged media environment. Garofalo Decl. Ex 60 (Nathan Dep. 9/29/25 at 51:6-18). Other Defendants used Signal on limited occasions. Jamey Heath communicated at least twice on Signal during this period. Garofalo Decl. Ex. 61 (Heath Dep. 10/8/25 at 359:5-360:20). Sarowitz, Baldoni and Abel did not use Signal at all during the pre-litigation period to communicate about Lively. Garofalo Decl. Ex. 51 (Sarowitz Dep. at 91:14-93:6); Ex. 62 (Baldoni Dep. 10/6/25 at 54:5-55:6); Ex. 52 (Abel Dep. 9/26/25 at 249:7-18; 323:17-23). However, to the extent Signal was used, the participants had Signal set on its auto-delete feature. Garofalo Decl. Ex. 63 (Heath Dep. 10/8/25 at 362:17-363:12); Garofalo Decl. 53 (Nathan Dep. 9/29/25 at 51:25-53:7). Defendants therefore have no Signal communications from the pre-litigation period. However, Defendants also used traditional platforms, such as text messages, to communicate. Garofalo Decl. Ex. 54 (Case Dep. at 74:17-75:2). Abel has produced these communications. As noted, Jones already had possession of all Abel's text and emails prior to August 23, 2024, which had been downloaded from Abel's confiscated phone.

6. The Interlocking Lawsuits.

Lively filed her CRD complaint on December 20, 2024 and, on the same day, sent a cease and desist letter advising the parties of a litigation hold. Dkt. 520, ¶ 294. Bryan Freedman, although he had been introduced to Defendants in August 2024, was not retained until December 24, 2024. Garofalo Decl. Ex. 55 (ABEL_000021588). An engagement letter cautioned Defendants to preserve documents. *Id*. Shortly thereafter, Defendants switched off the auto delete feature. Garofalo Decl. Ex. 64 (Nathan Dep. 9/29/25 at 48:2-19), Ex. 65 (Heath Dep. 10/8/25 at 370:11-373:8). Non-privileged Signal communications after December 20, 2024 have been produced.

7. Abel's Third-Party Complaint Against Jones for Indemnification.

In this Action (the "Abel Action"), Abel is seeking statutory and common law indemnification and contribution from her former employer, Jones, for liability arising from the Lively's Action. Dkt. 639. Jones's defense is that in planning a public relations strategy for Wayfarer, Jones's client, between August 2, 2024 and her departure from Jonesworks on August 23, 2023, Abel was a rogue employee, acting outside the scope of her employment, without Jones's knowledge or consent. Dkt. 877.

8. Jones' Complaint Against Wayfarer and Abel for Breach of Contract and Defamation.

In a complaint captioned *Stephanie Jones v. Jennifer Abel, et al*. (the "Jones Action"), Jones asserts claims against Abel for breach of Abel's employment contract and breach of fiduciary duty by allegedly using and disclosing confidential information and "poaching" Jones' clients and employees for her own business. *See* 25-cv-00779-LJL, Dkt. 1-1. Jones also alleges that Abel tortiously interfered with Jones' contract with Wayfarer and Abel defamed Jones with statements that placed Jones in a false light. *Id.* Although this Motion is brought in Abel's indemnification

action only, Abel anticipates that Jones will argue that the adverse inference and preclusion order apply equally in the Jones Action.

## III. JONES FAILS TO MEET HER BURDEN TO SHOW THAT SHE IS ENTITLED TO SANCTIONS UNDER RULE 37(e)(1)[1]

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *ELG Utica Alloys, Inc. v. Niagara Mohawk Power Corp.*, 2025 WL 1962141, at *8 (2d Cir. July 17, 2025)). Federal Rule of Civil Procedure 37(e) governs spoliation of electronically stored information ("ESI"). *Barbera v. Grailed, LLC*, 2025 WL 2098635, *7 (S.D.N.Y. July 25, 2025). Rule 37(e) sanctions are "entrusted to the court's discretion." Fed. R. Civ. P. 37(e). A party seeking sanctions for spoliation has the burden to establish "'(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the [evidence was] destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp*., 306 F.3d 99, 107 (2d Cir. 2002)).

---

[1] The Second Circuit has not decided whether a preponderance of evidence or clear and convincing standard of proof on spoliation claims or on what issues. *Bradshaw v. Welch*, 2024 WL 3495154, at * 6 (N.D.N.Y. July 22, 2024) ("It is the movant's burden to establish by clear and convincing evidence that the non-moving party acted with intent to deprive him of the spoliated evidence"); *American Lecithin Co. v. Rebmann*, 2023 WL 7160729, at *3 (S.D.N.Y. Oct. 31, 2023) ("The party requesting an adverse inference, 'bears the burden to show by clear and convincing evidence that the alleged spoliator acted with intent to deprive the movant of the information for use in the litigation.'" (citation omitted)); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig*., 341 F.R.D. 474, 496 (S.D.N.Y. 2022) (moving party on spoliation motion must prove bad faith and intent to deprive by clear and convincing evidence); *CAT3, LLC v. Black Lineage, Inc*., 164 F. Supp. 3d 488, 498 (S.D.N.Y. 2016) (same). As shown below, Plaintiff's motion fails to meet even the lesser preponderance standard.

There are two levels of sanctions under Rule 37(e). Sanctions under Rule 37(e)(1) are available upon a showing of prejudice and are limited to "measures no greater than necessary to cure the prejudice." *Barbera*, 2025 WL 2098635, at *8, *11 (citing Fed. R. Civ. P. Rule 37(e)(1) advisory committee's note to 2015 amendment, which states "it may be appropriate to exclude a specific item of evidence to offset prejudice caused by failure to preserve other evidence that might contradict the excluded item of evidence."). The Court is not "require[d] … to adopt measures to cure every possible prejudicial effect." *Id*. Under Rule 37(e)(1), a court may permit the prejudiced party "to present evidence to the jury concerning the loss and likely relevance of information and instruct[] the jury that it may consider that evidence, along with all the other evidence in the case, in making its decision." Fed. R. Civ. P. 37(e)(1) Advisory Committee Note to 2015 Amendments; *Oakley v. MSG Networks, Inc.*, 792 F. Supp. 3d 377, 389 (S.D.N.Y. 2025) (denying request to preclude evidence showing that plaintiff was assaulted where after the filing of his complaint, plaintiff deleted a spike of over 800 text messages from immediately after the alleged assault finding no authority "that would permit such a sweeping preclusion of evidence under Rule 37(e)(1)").

More severe sanctions, including an adverse inference, presumption and terminating sanctions, are available only under Rule 37(e)(2), which requires an additional showing that the spoliating party deleted or destroyed evidence with the intent to deprive the non-spoliating party of its use in the litigation. *Barbera*, 2025 WL 2098635, at *8. As noted, Jones is seeking draconian sanctions available only under Rule 37(e)(2) including an adverse inference that the destroyed Signal messages would have been favorable to Jonesworks and unfavorable to Abel and demonstrated that the Defendants, including Abel, conducted the smear campaign without Jones's or Jonesworks' knowledge, involvement, or approval, and that Abel's participation in that

campaign while a Jonesworks employee (a) was for her own personal benefit, (b) was not in furtherance of and was outside the course and scope of her employment, and not in discharge of her duties and (c) was not at Jones's or Jonesworks' direction; (2) preclusion of Abel from arguing otherwise." Dkt. 869, p. 19. Imposition of such sanctions would be tantamount to a dispositive ruling on Plaintiff's retaliation and defamation claims.

**A. Jones Fails to Show that Abel Had a Duty to Preserve Evidence.**

To even establish that Rule 37(e) even applies, a party seeking spoliation sanctions must show that the destroying party "had an obligation to preserve [the evidence] at the time it was destroyed." *Chin*, 685 F.3d at 162 (citation and quotations omitted); *Oakley*, 792 F. Supp. 3d at 384; *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 60-61 (S.D.N.Y. 2020). The duty to preserve evidence "most commonly [arises] when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (defendants did not have reasonably anticipated a claim prior to service of the summons and complaint.); *Kosmidis v. Port Auth. of New York & New Jersey*, 2020 WL 5754605, at *4-9 (S.D.N.Y. Aug. 27, 2020), *report and recommendation adopted*, 2020 WL 7022479 (S.D.N.Y. Nov. 30, 2020) (sanctions not warranted where defendants denied that they had engaged in misconduct and thus they had no reason to expect litigation); *Marshall v. Port Auth. of New York & New Jersey*, 2022 WL 17491006, at *7 (S.D.N.Y. Dec. 5, 2022) ("Defendants would not have reasonably anticipated that they would be sued prior to the date that they were served following Plaintiff issuing his first summons and complaint"). "A plaintiff's duty is more often triggered before litigation commences, in large part because plaintiffs control the timing of litigation."

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 466 (S.D.N.Y. 2010), *abrogated on other grounds by Chin*, 685 F.3d 135. "Unlike defendants, plaintiffs may be imputed notice of the duty to preserve potentially relevant evidence prior to the filing of the complaint. Plaintiffs are 'in control of when the litigation is to be commenced' and must necessarily anticipate litigation before the complaint is filed." *Cyntegra, Inc. v. Idexx Lab'ys, Inc.*, 2007 WL 5193736, at *3 (C.D. Cal. Sept. 21, 2007), *aff'd*, 322 F. App'x 569 (9th Cir. 2009).

Here, although Abel is nominally a plaintiff, her indemnification claims accrued only after Lively filed suit against her. In other words, in contrast to a typical plaintiff, Abel did not control the timing of the litigation in which she seek indemnity. Nevertheless, Jones asserts that "[b]y early August 2024, litigation was not only foreseeable—it was actively contemplated." Dkt. 869, pp. 1-2. Lively, however, has two categories of claims: (1) claims arising from alleged sexual harassment or other mistreatment on the set during Phase 1 shooting between May and June 2023; and (2) claims of alleged reputational and other harm stemming from the alleged manipulation of the internet beginning in August 2024. Jones states that "[w]hen Abel downloaded Signal for this matter in August 2024 she was on notice of potential litigation ***relating to the film and to Baldoni's and Heath's harassment of Lively on set.***" Dkt. 869, p. 12. As evidence that Abel contemplated litigation in August 2024, Jones points to (1) the November 9, 2023 letter from Lively's lawyer, Leslie Strasberg, demanding certain protections on the set as a condition for Lively's completion of the Film, which Heath sent to Abel as Wayfarer's public relations agent on November 10, 2023; and (2) Abel's admission that "she 'suspected ***the possibility of litigation relating to the shooting of the Film in or around mid-August 2024.***'" *Id.*, p. 13, citing Ex. 31 at No. 23 (emphasis added.)

Jones explicitly states Defendant used Signal "to coordinate the retaliatory digital campaign, communicate with journalists, and align with legal counsel on the narrative they would

present to the press" (Dkt. 869, p. 2), conversations focused on a response to the August 2024 explosion of media coverage triggered by Lively's hijacking of the production, exclusion of Baldoni from the Film's marketing and premiere and very public unfollowing on social media. Thus, while Abel may have anticipated litigation relating to Lively's allegations of harassment during "shooting" of the Film in May and June 2023, Jones presents no evidence – indeed, does not even argue – that Abel (or any other Defendant) anticipated litigation over their August 2024 public relations activities. Naturally, Jones would have a very difficult time explaining how Abel could have reasonably foreseen litigation in November 2023 over a retaliatory 'smear campaign' that did not happen until August 2024. Hence, Jones fails to make the critical showing that Abel (or any Defendant) could reasonably foresee litigation over a public relations strategy, or that their August 2024 messages were relevant to anticipated litigation, that might give rise to a duty to preserve such evidence prior to the filing of Lively's December 20, 2024 Complaint. Absent a showing that Abel could have reasonably foreseen litigation arising from her August 2024 public relations work, Jones fails to show that Abel deleted Signal messages with a culpable state of mind (assuming she deleted anything at all). Moreover, Signal's auto-delete feature was disabled after litigation commenced and Defendants have produced post-filing Signal messages – facts that weigh against the notion Abel acted with culpable intent to delete relevant evidence

### B. Jones Fails to Establish that Abel Deleted Relevant Evidence to Jones' Prejudice.

Rule 37(e) requires a showing that evidence existed and was destroyed. *Cooper Foods International, LLC v. Yourd*, 2025 WL 2663977, at *2 (E.D.N.Y. Sept. 17, 2025); *Anderson v. Amazon.com, Inc.*, 2025 WL 2780921, at *15 (S.D.N.Y. Sept. 30, 2025) (moving party failed to show that allegedly destroyed documents even existed). Jones does not show that Abel used Signal prior to December 20, 2024, to communicate about Lively. Deposition testimony establishes only

that prior to Lively's filing of her Complaint, Abel used Signal to communicate with or about another very high-profile client unrelated to this action and that although Abel activated Signal in August 2024, she does not recall using it to communicate about Lively. Garofalo Decl. Ex. 56 (Abel Dep. 9/25/25 at 80:12-19; Abel Dep. 9/26/25 at 249:7-18; 323:17-23).

As noted, Jones fails to identify a single item or even type of relevant evidence that was destroyed by Abel or any Defendant. Jones similarly fails to establish even that Abel "operated on Signal" in connection with Lively. Jones does not cite any evidence stablishing that Abel used Signal to communicate about Lively between August 2024 and the disabling of the auto-delete feature on Defendants' phones after the filing of Lively's complaint. Although Abel activated Signal in August 2024, she does not believe that there were any communications on that Signal thread until December of 2024, when Lively filed her Complaint. Garofalo Decl. Ex. 57 (Abel Dep. 9/25/25 at 78:22-79:19; Abel Dep. 9/26/25 at 249:7-18; 323:17-12). Abel does not recall whether she sent any Signal message at all in August of 2024, when the Digital Campaign was allegedly conceived and executed. *Id*. at 81:4-7; Garofalo Decl. Ex. 58 (Abel Dep. 9/25/25 at 81:4-7).

Jones merely avers that "From [August 2024], the Defendants operated on Signal." Dkt. 869, p. 2. Jones defines "Defendants" to include not only Abel but Wayfarer, Baldoni, Heath, Sarowitz, Nathan, TAG, Wallace and Street Relations Inc. As noted above, Rule 37(e) sanctions are personal and the destruction of documents by one party cannot give rise to a spoliation sanction against another party. *See, e.g.*, *Grant v. Salius*, 2011 WL 5826041, at *3 (D. Conn. Nov. 18, 2011). Therefore, Jones cannot and does not cite information relating to the alleged digital campaign that Abel could have deleted. Jones acknowledges these shortcomings by asking the Court to simply

presume that Abel had and deleted relevant messages that might have shown Jones's lack of involvement.

Non-existent messages cannot be either relevant or prejudicial – showings crucial to a Rule 37(e) spoliation analysis. *Oakley v. MSG Networks, Inc.***,** 792 F. Supp. 3d 377, 387 (S.D.N.Y. 2025) (citing *Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 178 (S.D.N.Y. 2022). Nevertheless, and without any evidentiary or factual support, Jones contends that assuming they existed, Abel's alleged deleted Signal messages "would confirm Jones's exclusion and that Abel's participation in the retaliation campaign was without Jones's knowledge and against her recommendations" and "[t]here is no question that Abel's Signal messages with the other Defendants during this period would have shown that Abel's participation in the digital campaign was not at Jones's direction and that Jones was not involved." Dkt. 869, pp. 16. This can be "inferred from Abel's recommendation … of Nathan to spearhead this covert campaign over Jones's express objections, and exclusion of Jones from that process from the subsequent work that followed. And Abel's destruction of that evidence 'has limited the universe of documents available for [Jonesworks] to use in this litigation' to Jonesworks's detriment." *Id.*

This is pure conjecture and speculation. An assumption or speculation that allegedly deleted relevant evidence existed, is not sufficient. For instance, in *Cooper Foods International, LLC* the plaintiff failed to meet his burden under Rule 37(e) where he argued that because defendants usually communicated over WhatsApp during the relevant time period, and one of the defendants had enabled Disappearing Messages, "relevant messages must have been deleted." 2025 WL 2663977, at *2. The *Cooper* court rejected the moving party's claim that he could not prove spoliation because plaintiff deleted the evidence, concluding that such speculation failed to show that the allegedly missing evidence ever existed to be destroyed. *Id.* ("This speculative

assertion fails to establish that there were indeed any messages – much less, messages relevant to the claims in this action – sent during that time period."), *see also, Dilworth v. Goldberg*, 3 F. Supp. 3d 198, 202 (S.D.N.Y. 2014) (denying spoliation sanction based on "pure speculation about the existence of the [sought-after documents]"); *Adato v. Gala Tour, Inc*., 2011 WL 4458852, at *10-11 (E.D.N.Y. Sept. 23, 2011) (denying spoliation sanctions where plaintiff failed to show documents existed); *Khaldei v. Kaspiev*, 961 F. Supp. 2d 564, 570 (S.D.N.Y. 2013), *aff'd*, 961 F. Supp. 2d 572 (S.D.N.Y. 2013) ("[B]ecause plaintiff's argument that there has been any actual loss of evidence relevant to the claims or defenses in this case amounts to pure speculation, it is insufficient to sustain a motion for spoliation sanctions.").

Jones contends that Abel may have deleted messages that may have shown that Jones was excluded from and did not direct the public relations strategy developed by Abel and others in August 2024 and thus that Abel was acting outside the scope of her employment. However, Jones does not dispute that at the time Wayfarer was a Jones client or that Abel was the Jonesworks employee responsible for the account. Jones also fails to mention that other text and email messages that were produced, plainly show Jones's involvement in the Lively-Baldoni brawl and that, as she alleges, Jones recommended against hiring crisis management specialist Melissa Nathan. In fact, district courts routinely exclude relevant evidence that is needlessly cumulative. Fed. R. Evid. 403; *Hamling v. United States*, 418 U.S. 87, 127 (1974) (district courts retain "considerable latitude" in rejecting admittedly relevant evidence in which is cumulative); *United States v. Holmes,* 44 F.3d 1150, 1157 (2d Cir.1995) ("Absent a clear abuse of discretion, a trial judge retains a wide latitude to exclude irrelevant, repetitive, or cumulative evidence."); *Tranchina v. McGrath*, 2022 WL 17491727, at *3 (2d Cir. Dec. 8, 2022).

Finally, even assuming Wayfarer engaged Nathan despite Jones's recommendation, Jones does not explain how this is evidence relevant to Jones' claim that Abel is not entitled to indemnification because she, rather than Jones, took the lead in working with their client. Nor does Jones describe additional evidence that might add to the evidence she already has. There is none. Hence, nothing that Abel could have deleted would affect or prejudice Jones' ability to prove that Jones recommended against hiring Nathan from which Jones claims her non-involvement can't be "inferred."

Implicitly recognizing the fatal shortcomings in her argument, Jones urges that relevance and prejudice may be presumed and the Court may infer that deleted evidence was unfavorable where "the spoliating party acted in bad faith or in a grossly negligent manner." As noted, Jones fails to show that Abel anticipated litigation in which communications relating to a public relations strategy might be relevant and thus fails to show that Abel acted with a culpable state of mind. The failure to make this showing precludes Jones from making the higher showing of bad faith.

The authority cited by Jones does not advance her cause. To start, Jones cites authority for the proposition that relevance and prejudice can be presumed for "grossly negligent" conduct, has been abrogated. Dkt. 869, p. 15 (citing *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 580-82 (S.D.N.Y. 2017) and *Arista Recs. LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 438-39 (S.D.N.Y. 2009)). But after *Ottoson* and *Arista* were decided, "a new Rule 37 went into effect impacting the obligations of parties to preserve electronically stored information." *Rhoda v. Rhoda*, 2017 WL 4712419, at *2 (S.D.N.Y. Oct. 3, 2017). Parties seeking an "adverse inference now have the burden of proving an 'intent to deprive,' rather than ordinary or gross negligence." *Id.* Indeed, the Second Circuit recently made clear that "imposition of a sanction under Rule 37(e)(2) requires a specific finding of 'intent to deprive another party of the information's use in the

litigation.'" *Hoffer v. Tellone*, 128 F.4th 433, 438 (2d Cir. 2025) (quoting Fed. R. Civ. P. 37(e)); *see Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *25 (S.D.N.Y. June 20, 2019) (finding Rule 37(e)(2) sanctions not warranted where spoliation "appear[ed] to be the result of gross negligence rather than a specific intent to deprive defendants in this action of relevant evidence," and despite spoliating party falling "far short of its professional and ethical obligations"). Jones does not establish the intent to deprive required for the Court to presume relevant evidence, unfavorable to Abel, was deliberately deleted by Abel in bad faith after she had was on notice of potential litigation relating to her August 2024 public relations work for a Jonesworks client.

In any event, the cases Jones relies upon are inapposite. For instance, in *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 580-82 (S.D.N.Y. 2017), a plaintiff failed to produce emails after she was on notice of litigation and throughout the litigation. The plaintiff had control of the evidence and an obligation to preserve it from the date that her counsel sent a demand letter to defendants threatening litigation or, at the latest, from the date the plaintiff filed her claim with the EEOC. *Id.* (citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("[T]he duty to preserve evidence arose, at the latest, on August 16, 2001, when Zubulake filed her EEOC charge."). The plaintiff failed to preserve her communications with individuals from whom she had obtained statements to support her claims. This evidence established that the plaintiff acted in bad faith. *Ottoson*, 268 F. Supp. 3d at 580-82.

In *Arista Recs. LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 438-39 (S.D.N.Y. 2009), another cited by Jones, a defendant in a music infringement action admitted that he removed a webpage with a digital music file and reconfigured his server "after the commencement of the litigation." The evidence destroyed after the commencement of litigation was directly relevant to

the plaintiff's legal claims for direct and secondary copyright infringement. The court found this conduct amounted to bad faith, warranting spoliation sanctions.

In contrast to *Ottoson* and *Arista*, Abel was not a plaintiff who alerted Jones to the possibility of litigation and is not alleged to have to deleted relevant information after the commencement of litigation. Nor, as explained in Section III.A, above, could Abel have foreseen litigation over her public relations work in August 2024. Moreover, unlike *Ottoson* and *Arista*, Jones does not identify specific evidence that Abel may have deleted. *See also*, *Shaffer v. RWP Group, Inc*., 169 F.R.D. 19, 26 (E.D.N.Y.1996) (finding a conscious disregard for discovery obligations where defendants were involved in litigation, served with document requests encompassing most, if not all, of the documents destroyed, and after commencement of the instant action ordered numerous relevant documents destroyed in order to "make room" for new files).

Jones thus fails to establish her right to sanctions under Rule 37(e)(1), which are limited to those sufficient to cure the prejudice she has not shown. But Jones does not seek sanctions under subsection (1); she seeks the more severe sanctions of an adverse inference and preclusion available only under Rule 37(e)(2). Jones, however, fails to establish that any Defendant acted with the intent to deprive her of specific evidence for use in this litigation – a predicate for the onerous sanctions available under subsection (2) only.

## IV. JONES FAILS TO MEET HER BURDEN UNDER RULE 37(e)(2) FOR THE SEVERE SANCTIONS SHE SEEKS

The more severe sanctions available only under Rule 37(e)(2), require a showing that the spoliating party intended to deprive the moving party of information for use in the litigation. The intent standard for sanctions under Rule 37(e)(2), is "particularly harsh," and "stringent and specific." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig*., 341 F.R.D. at 496. The moving party must show "not merely the intent to perform an act that destroys ESI but rather

the intent to actually deprive another party of evidence." *Hoffer v. Tellone*, 128 F.4th 433, 438 (2d Cir. 2025) (quoting *Karsch*, 2019 WL 2708125, at *21 (quoting *Leidig v. Buzzfeed, Inc*., 2017 WL 6512353, at 11 (S.D.N.Y. Dec. 19, 2017)). "A party's acting negligently or knowingly will not suffice to justify [such] sanctions." *Oakley*, 792 F. Supp. 3d at 389 (citation and quotations marks omitted).

Even a showing of prejudice from the destruction of highly relevant or even dispositive evidence may be insufficient for Rule 37(e)(2) sanctions absent a show that the evidence was destroyed with the intent to deprive the moving party of its use in the litigation. *Oakley*, 792 F. Supp. 3d at 389; *Barbera,* 2025 WL 2098635, at *8. "An intent to deprive can be found either from a conscious act of destruction or a 'conscious dereliction of a known duty to preserve electronic data.'" *Oakley,* 792 F. Supp. 3d at 390 (quoting *Fashion Exch. LLC v. Hybrid Promotions, LLC*, 2019 WL 6838672, at *5 (S.D.N.Y. Dec. 16, 2019)); *see also*, *Johnson v. L'Oreal USA*, 2020 WL 5530022, at *4 (S.D.N.Y. Sept. 15, 2020) (denying request for adverse inference in absence of "evidentiary basis for Plaintiff's allegations that [the defendant] acted with an intent to deprive Plaintiff of relevant ESI in this litigation"); *Karsch*, 2019 WL 2708125, at *22 ("[T]he intent contemplated by Rule 37[(e)(2)] is not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence." (citation and quotation marks omitted)).

The Second Circuit applies four factors to determine whether a party acted with the intent to deprive: "(1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be

credibly explained as not involving bad faith by the reason proffered by the spoliator." *Charlestown Cap. Advisors*., 337 F.R.D. at 67 (quoting *Moody v. CSX Transportation, Inc.*, 271 F. Supp. 3d 410, 431 (W.D.N.Y. 2017) (quotation marks and citation omitted)).

Jones fails to meet any prong of the "intent to deprive" test. In fact, Jones does not acknowledge the "intent to deprive" requirement for the sanctions she seeks. Jones merely asserts, in the most conclusory fashion, that "Abel's intentional use of Signal and failure to disable auto-delete suffices to infer intent to spoliate." "Intent to spoliate" is not the standard for an adverse inference or preclusion. Rather, a party seeking sanctions must show "an intent to deprive [Jones] of evidence for use in this litigation." Nor does Jones describe facts that would meet any prong of the "intent to deprive" test. First, as shown in Section III.B, above, Jones fails to show that relevant evidence once existed that could fairly be supposed to have been material to her defense of Abel's indemnification claim. At issue are Signal chats between the public relations/crisis management team and/or Wayfarer Defendants in the pre-litigation period, August 2024 to December 20, 2024. Plaintiff only speculates that the deleted chats may reflect that Abel excluded Jones from the communications and work being performed on behalf of a Jones client.

Second, Plaintiff does not show that Defendants acted affirmatively to cause relevant evidence to be lost. Third, addressed in Section III.A, above, Jones fails to show that Abel deleted any relevant Signal messages after litigation commenced or she was on notice of potential litigation over her August 2024 public relations activities which are the subject of allegedly deleted messages, and the only topic relevant to Abel's indemnification claim against Jones. Finally, the use of Signal by the public relations/crisis management team, can "be credibly explained.

At the time the crisis management strategy was developed, the internet was already ablaze with stories about the Lively-Baldoni dispute, triggered primarily by Lively's conduct in excluding

Baldoni from the marketing of the Film and the premiere, Lively's "unfollowing" of Baldoni on social media and Lively's own missteps in marketing the Film. Surely even Jones would admit that keeping crisis management communications confidential, and safe from hackers and aggressive media players, can "be credibly explained as not involving bad faith by the reason proffered by the spoliator." *Charlestown Cap. Advisors, LLC*, 337 F.R.D. at 67 (quotation marks and citations omitted).

## V. CONCLUSION

For the foregoing reasons, Abel respectfully requests that the Court enter an order denying Jones's motion for Rule 37(e) sanctions in its entirety.

Dated: November 20, 2025
Los Angeles, CA

**LINER FREEDMAN TAITELMAN + COOLEY**

By: *_/s/ Ellyn S. Garofalo_*
Bryan J. Freedman (*pro hac vice*)
Ellyn S. Garofalo (*pro hac vice*)
Kim S. Zeldin (*pro hac vice*)
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Tel: (310) 201-0005
Email: bfreedman@lftcllp.com
egarofalo@lftcllp.com
kzeldin@lftcllp.com

**MEISTER SEELIG & FEIN PLLC**
Mitchell Schuster
Kevin Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
Email: ms@msf-law.com
kaf@msf-law.com

**AHOURAIAN LAW**
Mitra Ahouraian (*pro hac vice*)
2029 Century Park East, 4th Floor
Los Angeles, CA 90067
Tel. (310) 376-7878
Email: mitra@ahouraianlaw.com

**SHAPIRO ARATO BACH LLP**
Alexandra A. E. Shapiro
Jonathan Bach
Alice Buttrick
1140 Avenue of the Americas, 17th Floor
New York, NY 10036
Tel: 212-257-4881
Email: ashapiro@shapiroarato.com
jbach@shapiroarato.com
abuttrick@shapiroarato.com