**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY,<br><br>       Plaintiff,<br><br>  -against-<br><br>WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, JENNIFER ABEL, JED WALLACE, and STREET RELATIONS, INC.,<br>      Defendants.<br><br>JENNIFER ABEL,<br><br>     Third-Party Plaintiff,<br><br>  -against-<br><br>JONESWORKS LLC,<br><br>     Third-Party Defendant. | Civil Action No. 1:24-cv-10049 (consolidated with 1:25-cv-00449) |

### JONESWORKS LLC'S MEMORANDUM OF LAW OPPOSING JENNIFER ABEL'S CONDITIONAL MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................2

    A.    Jonesworks' Representation of Baldoni and Wayfarer.................................................2

    B.    Jonesworks Hires Jennifer Abel And Instructs Her To Conduct Her Duties Lawfully, Ethically And Consistent With Jonesworks' Positive Ethos .........................................4

    *C.*    Abel Advised Wayfarer Hire Nathan Over Jones's Objection, While She And Nathan Colluded To Steal Jonesworks' Clients ....................................................................5

    D.    Abel Conducts The Digital Campaign Behind Jones's Back While Working Against Jonesworks' Interests .......................................................................................8

    E.    Abel Continues The Digital Campaign After Her Termination From Jonesworks ..........12

    F.    Lively Sues Abel For Her Involvement In The Digital Campaign ....................................13

LEGAL STANDARD .........................................................................................................14

ARGUMENT .......................................................................................................................14

I.    SUMMARY JUDGMENT IS PRECLUDED BY EVIDENCE ESTABLISHING THAT ABEL IS RESPONSIBLE AND AT FAULT FOR THE CONDUCT THAT FORMS THE BASIS OF LIVELY'S COMPLAINT .......................................................................15

II.    RECORD EVIDENCE ESTABLISHES ABEL WAS RESPONSIBLE FOR AND AT FAULT FOR THE CONDUCT THAT FORMS THE BASIS FOR LIVELY's Complaint.........17

III.    DISPUTED FACTS ON WHETHER ABEL'S CONDUCT WAS WITHIN THE SCOPE OF HER EMPLOYMENT PRECLUDE SUMMARY JUDGMENT ...........................................19

    A.    Overwhelming Evidence Establishes That Abel Acted In Pursuit Of Her Own Interests.20

    B. Ample Evidence Establishes That Abel's Conduct Was Unforeseeable ..............................21

    C. The Evidence Further Establishes That Abel Deliberately Acted Outside Jonesworks' Goals ..................................................................................................................23

IV.    SUMMARY JUDGMENT IS UNDISPUTEDLY UNAVAILABLE FOR ABEL'S ALLEGED CONDUCT POST-DATING HER TERMINATION .................................................25

CONCLUSION....................................................................................................................25

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Cases**

*In re Adelphia Commc'ns Corp.*,
    323 B.R. 345 (Bankr. S.D.N.Y. 2005) ........................................................................ 15

*Amusement Indus. Inc. v. Stern*,
    693 F. Supp. 2d 319 (S.D.N.Y. 2010) ......................................................................... 17

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..................................................................................................... 14

*Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*,
    11 F.4th 55 (2d Cir. 2021) ........................................................................................... 14

*Danner-Cantalino v. City of New York*,
    85 A.D.3d 709 (N.Y. App. Div. 2011) ................................................................... 19, 20

*Doe 1 v. JPMorgan Chase Bank, N.A.*,
    687 F. Supp. 3d 405 (S.D.N.Y. 2023) ......................................................................... 18

*Doe v. Guthrie Clinic, Ltd.*,
    710 F.3d 492 (2d Cir. 2013) ............................................................................ 19, 20, 25

*Dole v. Dow Chem. Co.*,
    30 N.Y.2d 143 (1972) ................................................................................................... 18

*Empire Merchs., LLC v. Merinoff*,
    2018 WL 317848 (S.D.N.Y. Jan. 5, 2018) ................................................................. 15

*Hampshire Grp., Ltd. v. Kuttner*,
    2010 WL 2739995 (Del. Ch. July 12, 2010) .............................................................. 15

*Johnson v. Killian*,
    680 F.3d 234 (2d Cir. 2012) ........................................................................................ 14

*Judith M. v. Sisters of Charity Hosp.*,
    715 N.E.2d 95 (N.Y. 1999) ................................................................................... 21, 22

*McCarthy v. Turner Const., Inc.*,
    953 N.E.2d at 801 ......................................................................................................... 18

*Rivera v. State*,
    142 N.E.3d at 646 ............................................................................................. 21, 23, 25

*Rivera v. State,*
    34 N.Y.3d 383 (N.Y. 2019) ........................................................................................20

*Riviello v. Waldron,*
    391 N.E.2d 1278 (N.Y. 1979).....................................................................................21

*Rock v. Reed-Prentice Div. of Package Mach. Co.,*
    346 N.E.2d 520 (1976)................................................................................................18

*Trs. of Columbia Univ. in City of N.Y. v. Mitchell/Giurgola Assocs.,*
    109 A.D.2d 449 (1st Dep't 1985) ...............................................................................18

*Varga v. Flowcon, Inc.,*
    2025 WL 2774261 (S.D.N.Y. Sept. 29, 2025) .....................................................16, 17

*Webb v. United Health Servs., Inc.,*
    221 A.D.3d 1315 (N.Y. App. Div. 2023).....................................................................20

**Statutes**

Cal. Gov't Code §§ 12900–12996 (FEHA) ................................................................13

**Other Authorities**

Fed. R. Civ. P. 56(a) ......................................................................................................14

Third-party defendant Jonesworks LLC ("Jonesworks") respectfully submits this memorandum of law in opposition to defendant and third-party plaintiff Jennifer Abel's ("Abel") motion for conditional summary judgment, ECF No. 938.

## INTRODUCTION

Jennifer Abel is speaking out of both sides of her mouth. She denies engaging in any of the conduct that Lively alleges gives rise to Abel's liability for the retaliatory smear campaign described in Lively's complaint, but simultaneously argues that the actions she admits to entitle her to indemnification. But record evidence demonstrates that Abel's actions in July and August 2024 were self-serving and far outside the bounds of her employment at Jonesworks. Indeed, Abel's own expert in this matter acknowledges that ███████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████ Yet remarkably, Abel now claims ██████████████████ that she is entitled to summary judgment because she was engaged in only ordinary public relations at the instruction of her employer. Not so. Not only did Abel know the digital campaign was far outside the bounds of Jonesworks' ethos of positive publicity, she also knew that Jonesworks expressly objected to the "crisis PR" tactics employed by Melissa Nathan and her agency. Her motion thus fails.

If that alone were not fatal to Abel's motion, at the same time Abel was engaging in the conduct Lively alleges, she was also working against Jonesworks' interest and for her own. She was conspiring with Nathan to facilitate a *Business Insider* "kill story" against Jonesworks and its founder and CEO Stephanie Jones. She was working behind her employer's back, and over Jonesworks' objection, to recommend that Wayfarer Studios and Justin Baldoni retain Nathan for

the exact "crisis PR" that resulted in Lively's claims against Abel. And she was plotting her departure from Jonesworks, surreptitiously creating her own competing public relations company and pilfering Jonesworks' clients, employees, and confidential documents for her competitive gain. An employee in name only, Abel was a double agent, defying Jonesworks' instructions, ███████████████████████████████████████████████████████████████ ████████████████████████████████ and deliberately cutting Jonesworks' CEO out of the crisis strategy so she could steal them as clients and conceal her participation in the nefarious campaign she knew Jonesworks would never condone. Shielded from the view, supervision, and control of her employer, Abel embarked on the digital campaign over which Lively has now sued her and her co-conspirators.

Common law indemnification requires that an employee bear no responsibility for the actions engaged in; the employee must have acted strictly within the scope of her employment. The opposite is true here. Abel charted her own malicious and treacherous course for personal gain against the clear instruction and expectations of her workplace. She actively concealed her acts from Jonesworks, and she cannot now seek refuge behind that employer for her betrayal. At a minimum, the overwhelming evidence of Abel's deceit, concealment, and self-interest present issues of disputed material fact that preclude summary judgment. Her motion should be denied.

## BACKGROUND

### A.    Jonesworks' Representation of Baldoni and Wayfarer

Jonesworks is an award-winning PR agency that provides positive, bespoke PR services to its clients. Counter Statement of Material Facts ("CSMF") ¶ 1; Declaration of Stephanie Jones ("Jones Decl.") ¶¶ 3-4. In 2017, Jonesworks began representing Baldoni for his personal publicity. CSMF ¶ 2; Jones Decl. ¶ 5. That work included promoting Baldoni and his projects through

positive publicity, including by creating communications materials such as biographies and press releases, supporting Baldoni's promotional activities and philanthropy, and securing press coverage to promote his work as an actor and director. CSMF ¶ 6; Jones Decl. ¶ 6. Jonesworks' work for Baldoni did not include seeding, planting, or promoting negative stories for Baldoni or manipulating social media. CSMF ¶ 6; Jones Decl. ¶ 7.

After Wayfarer was formed, Jonesworks also began providing PR services for the studio. CSMF ¶ 3; Jones Decl. ¶ 8. On May 6, 2020, Jonesworks and Wayfarer entered into an agreement establishing Jonesworks "as its exclusive public relations counsel." CSMF ¶ 3. At Wayfarer's request, Jonesworks "bundled" Baldoni's personal publicity services into its agreement with Wayfarer's, such that the terms of the May 2020 agreement applied to both Baldoni's and Wayfarer's accounts. CSMF ¶ 4. Like Jonesworks' previous work for Baldoni, the work Jonesworks did under that agreement included promoting their projects through positive publicity—pitching stories to promote Baldoni and Wayfarer as well as their projects to earned media and providing talking points for use with the press. CSMF ¶ 6; Jones Decl. ¶¶ 9-10. Jonesworks also monitored and collated press coverage of Baldoni and Wayfarer to share with them. CSMF ¶ 6; Jones Decl. ¶ 10. The work Jonesworks did for Baldoni and Wayfarer under their agreement at no time included seeding, planting, or promoting negative stories about anyone, including individuals in disputes with Baldoni or Wayfarer. CSMF ¶¶ 7-8; Jones Decl. ¶ 11. Nor did Jonesworks influence social media conversations about Baldoni or Wayfarer through false or paid-for accounts or comments, or otherwise engage in social media manipulation. CSMF ¶¶ 7-8; Jones Decl. ¶ 11.

Around May 2025, Jonesworks began providing additional social media services to Wayfarer and Baldoni on a three-month trial basis. CSMF ¶ 11; Jones Decl. ¶ 13. Under that trial,

Jonesworks helped Baldoni brainstorm ideas for social posts, post approved content for him, and record video in connection with those social media posts. CSMF ¶ 11; Jones Decl. ¶ 13. Jonesworks did not take any steps to manipulate social media conversations or coverage, and such conduct was not within the scope of the trial. CSMF ¶ 11; Jones Decl. ¶ 13. Wayfarer ended the trial on July 31, 2024. CSMF ¶ 12; Jones Decl. ¶ 14.

### B.   Jonesworks Hires Jennifer Abel And Instructs Her To Conduct Her Duties Lawfully, Ethically And Consistent With Jonesworks' Positive Ethos

Jonesworks hired Abel in July 2020 to work as a publicist and help grow its Los Angeles office. Response to Abel's Statement of Undisputed Material Facts ("Response") ¶ 9; Jones Decl. ¶ 16. Abel's agreement with Jonesworks required her to acknowledge that all work product created in connection with her employment was the exclusive property of Jonesworks, and prohibited her from disparaging Jonesworks and from preparing or publishing any articles or materials involving Jonesworks without prior written authorization. CSMF ¶ 14; ECF No. 941 ("Abel Decl."), Ex. 2. Abel was subsequently promoted and executed a new agreement in 2021, which reaffirmed her obligations to protect Jonesworks' proprietary information and imposed certain non-solicitation obligations. CSMF ¶ 15; Abel Decl., Ex. 3.

When Abel joined Jonesworks, she was instructed to carry out the duties of a competent PR professional, which include supporting the positioning of her clients in an ethical, lawful, and responsible manner through positive publicity. CSMF ¶ 16; Jones Decl. ¶ 17. For example, Abel was expected to guide her clients as they interacted with the press, but Abel was not expected to, was never instructed to, and was prohibited from manipulating social media conversations to attack anyone including a non-client and from pitching, seeding, or promoting negative false stories about anyone, including a non-client who had complained of misconduct against her client. CSMF ¶ 16; Jones Decl. ¶ 17. As a PR professional with over a decade of experience, Abel understood when

she joined Jonesworks that she was employed to engage in proactive positive press to help build her clients' brand and promote their projects and partnership, and that her duties did not include promoting negative coverage.  CSMF ¶ 16; Jones Decl. ¶ 17.

Accordingly, when Abel became the point person on Baldoni and Wayfarer's account after joining Jonesworks, she understood Jonesworks' work for Baldoni and Wayfarer did not include seeding, planting, or promoting negative stories about individuals in disputes with Baldoni or Wayfarer or manipulating social media, and that she was prohibited from engaging or participating in such nefarious conduct.  CSMF ¶¶ 8-10, 17-20; Jones Decl. ¶¶ 17-20.  Jonesworks, as a company, does not engage in these activities, and as a seasoned PR executive who worked at Jonesworks for more than four years, Abel knew that such activities are prohibited based on Jonesworks' ethics, course of conduct and expectations, as well as the industry standard expectations that garnering positive publicity to promote clients' projects and partnerships does not include promoting negative content.  CSMF ¶ 20; Jones Decl. ¶ 20.

### C.    Abel Advised Wayfarer Hire Nathan Over Jones's Objection, While She And Nathan Colluded To Steal Jonesworks' Clients

On July 19, 2024, while still employed by Jonesworks, Abel formed her soon-to-be competing business RWA Communications ("RWA").  CSMF ¶¶ 90, 91.  At that time, Abel had not told Jones of her intent to start a competing business.  CSMF ¶¶ 90, 91.

Also in late July, reports began to surface regarding tension between Baldoni and cast members of the film *It Ends With Us*.  CSMF ¶ 35.  On July 24, 2024, Abel told Jones that Wayfarer wanted recommendations for crisis PR firms to hire in the event the situation escalated.  CSMF ¶ 36; Abel Decl., Ex. 7; Jones Decl. ¶ 22.  Abel did not tell Jones that it was Abel herself who recommended Wayfarer bring on a crisis firm.  CSMF ¶ 36; Abel Decl., Ex. 7; Jones Decl. ¶ 22.

Jones gave Wayfarer recommendations for crisis PR firms.  CSMF ¶ 37; Jones Decl. ¶ 22.

Abel recommended Nathan and her company, The Agency Group PR LLC ("TAG"), despite knowing Jones would object to her doing so because Jones had previously witnessed Nathan engage in unethical tactics on behalf of a shared client. CSMF ¶¶ 38-39; Jones Decl. ¶¶ 23, 27, 33. Abel knew Jones no longer wanted Jonesworks to work with Nathan and that Jones believed Nathan's practices went against Jonesworks' ethos of positive publicity and were not in its clients' best interests. CSMF ¶¶ 38-39.

On July 25, 2024, Abel pitched Wayfarer to Nathan as something that they could work on together after Abel left Jonesworks. CSMF ¶¶ 51-52; Declaration of Kristin Tahler ("Tahler Decl."), Ex. 25 ███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████ ; Tahler Decl., Ex. 30 (████████

███████████████████████████████████████ . ███████████████

████████████████████████ CSMF ¶ 40. ████████████████████████████████

████████████████████████████████████ CSMF Response ¶¶ 41-42.

On July 26, 2024, TAG sent its proposed scope of work to Abel's RWA email address, not her Jonesworks email address, at Abel's instruction. CSMF ¶ 53. Abel did so because Jones still did not know that Abel was arranging for Wayfarer to hire TAG and because she was planning to take Baldoni and Wayfarer to her new agency and continue working with Nathan. CSMF ¶ 51-53, 55. Abel told a TAG employee that she would later have Wayfarer's president Tera Hanks "call Steph [Jones] and let her know [t]hen we can be above board." CSMF ¶ 53; Tahler Decl., Ex. 20. When Wayfarer did as Abel instructed, Jones asked if ███████████████████

████████████ CSMF ¶ 42; Jones Decl. ¶ 25. ████████████████████████████████████

████████████████████████████ CSMF ¶ 42; Jones Decl. ¶ 25.

Nevertheless, when Jones learned Wayfarer was considering hiring Nathan, she immediately cautioned Wayfarer that ███████████████████████████████████ ████████████████████████████████.  CSMF ¶¶ 43-48.  Jones warned Baldoni, in particular, that she was worried not only about Nathan but also the people Nathan works with.  CSMF ¶ 45. Jones further told Hanks and Heath that she believed Nathan was behind negative attack websites and social media profiles about Jones that had appeared online beginning in May 2024.  CSMF ¶ 47; Jones Decl. ¶ 29.  Yet Wayfarer spoke to only Nathan.  CSMF ¶ 49.  Wayfarer and Baldoni admit that they ultimately hired Nathan and TAG over Jones's objection and against her advice. CSMF ¶ 50; Tahler Decl., Ex. 5 (10/6/25 Baldoni Dep. Tr.) at 137:18–21, 140:1–4, 147:3–148:3 (admitting Baldoni and Wayfarer hired Nathan "despite Stephanie Jones's warnings" and "over Stephanie Jones'[s] objections"); Tahler Decl., Ex. 64 (10/9/25 Heath Dep. Tr.) at 168:18-21 ("Q You were aware that Stephanie Jones expressly warned you that you should not hire Melissa Nathan for this role, correct? A I was aware.").

Wayfarer and Abel also misled Jones about the scope of work Nathan and TAG would be providing.  CSMF ¶¶ 56-58; Jones Decl. ¶ 31.  ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████.  CSMF ¶¶ 56-57; Jones Decl. ¶ 31.  But that was not true.  CSMF ¶¶ 56-58.  TAG's scenario planning document created for Wayfarer included that TAG would "manage media inquiries on background as sources familiar" and "respond to media," which TAG did.  CSMF ¶ 58.

At the same time Abel was onboarding Nathan behind Jones's back, she was colluding with Nathan to take Jonesworks clients.  CSMF ¶¶ 52, 55, 89, 92-94.  On July 29, 2024, for example, Nathan gloated to Abel "once you are gone [from Jonesworks], we will be on accounts

together and make really good money and be happy." CSMF ¶¶ 52, 55; Tahler Decl., Ex. 45. In those same messages, Abel and Nathan discussed a forthcoming negative *Business Insider* article about Jones, with Abel asking Nathan if she had yet spoken with "Katie [Warren] … [t]he journo" writing the story, which Nathan later joked to Abel would be a "KILL STORY" of Jones. CSMF ¶¶ 33, 95; Tahler Decl., Exs. 13, 45. On July 30, 2024, Abel ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

CSMF ¶ 97; Tahler Decl., Ex. 46.

>    **D.    Abel Conducts The Digital Campaign Behind Jones's Back While Working Against Jonesworks' Interests**

Wayfarer and TAG anticipated and understood that TAG would be working with Abel, and not Jonesworks, to plant and promote negative stories about Lively, and they intentionally excluded Jones from that effort. CSMF ¶¶ 61-88 Indeed, before Jones was even told Wayfarer hired TAG, Abel admits that she sent Wayfarer executives a message (without Jones in copy) that she spoke to a journalist "friend of 12+ years" who was "armed and ready to take this story of Blake weaponizing feminism to any of her outlets," and that she would "connect her [friend] to Melissa [Nathan] tomorrow." CSMF ¶ 63. Moreover, the August 2 scenario planning document TAG created for Wayfarer noted that TAG would work "[a]longside Jen Abel and her team," to "plant[] a seed earlier on to position [Baldoni's] truth / narrative . . . hinting that . . . [Baldoni] and Blake didn't always agree at times" and plant stories about the "weaponization of feminism and how people in BL's circle like Taylor Swift, have been accused of utilizing these tactics to 'bully' into getting what they want." CSMF ¶ 64; Abel Decl., Ex. 10. Jones, on the other hand, had never reviewed or discussed the scenario planning document until this litigation. CSMF ¶ 54; Jones Decl. ¶ 35. ████████████████████████████████████████

████████████████████████████  CSMF ¶¶ 65-66.  Abel promptly shared that feedback with Nathan, but not Jones, telling Nathan that Baldoni wanted to feel like Lively could be "buried." CSMF ¶ 66.

On August 5, 2024, Baldoni sent Abel social media content about "hailey bieber's history of bullying many women (not just selena gomez) throughout the years," and told Abel "[t]his is what we would need."  CSMF ¶ 68.  Abel responded that she "literally just spoke to Melissa [Nathan] about this … about what we discussed last night for social and digital."  CSMF ¶ 68; Abel Decl., Ex. 11.  That same day, ███████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████  CSMF ¶ 69.  Wayfarer has admitted that Nathan recommended it hire Wallace, and that Abel agreed with that recommendation. CSMF ¶ 70. Jones (nor anyone else from Jonesworks) did not know of or participate in Wayfarer's decision to hire Wallace  CSMF ¶ 71; Jones Decl. ¶ 36.

On August 7, 2024, Abel expressed her frustration that Wayfarer had not taken digital action, telling Nathan, but not Jones or anyone else from Jonesworks, █████████████████ ██████████████████████████████  CSMF ¶ 72.  Nathan responded ██████████ *Id.*  Also on August 7, TAG sent Heath and Abel—but not Jones or anyone else from Jonesworks—the "specifics" on the "social and digital mitigation and remediation" plan they would pursue with Wallace.  CSMF ¶ 73; Abel Decl., Ex. 13.  That plan anticipated "work[ing] in conjunction with Jen [Abel] and her team, as well as TAG PR," not Jonesworks, to "directly influenc[e] forums that are working against Justin [Baldoni] and Wayfarer to adjust the narrative in real time … execut[ing] all without fingerprints."  CSMF ¶ 73; Abel Decl., Ex. 13.  TAG shortly thereafter

introduced Wallace to Abel—not Jones or anyone else from Jonesworks— ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████  CSMF ¶ 75.

      After Wallace came on board, Abel worked with him and TAG to boost and amplify media critical of Lively and suppress negative coverage of Baldoni, including to cover up allegations of his misconduct. CSMF ¶¶ 76-81. For example, on August 8, 2024, Abel flagged social media posts about Baldoni ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████  CSMF ¶ 76; Abel Decl., Ex. 14. On August 9, Nathan told Abel alone that Wallace said "we are crushing it on Reddit," and gloated "[w]eve [sic] confused people[.] So much mixed messaging[.] It's actually really funny if you think about it." CSMF ¶ 77; Abel Decl., Ex. 15.

      On August 10, 2024, TAG reported to Abel that "[w]e've also started to see a shift on social, due largely to Jed and his team's efforts to shift the narrative towards shining a spotlight on Blake and Ryan." CSMF ¶ 78; Abel Decl., Ex. 16. On August 13, Baldoni shared with Abel TikTok videos, including a video negative to Lively, to which Abel responded, "Yes we have this and this is what the digital team is amplifying." CSMF ¶ 79; Abel Decl., Ex. 18. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████  Abel Decl., Ex. 6; CSMF ¶ 81. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████ Abel Decl., Ex. 6; CSMF ¶ 81.

Jonesworks was deliberately excluded from the crisis effort that Nathan and Abel were orchestrating. CSMF ¶¶ 82-86. Heath confirmed in sworn testimony on Wayfarer's behalf that Jones had "never been involved" in the crisis response. CSMF ¶ 83. TAG employees and Wallace similarly confirmed they never spoke with Jones about their work for Wayfarer. CSMF ¶ 84. Indeed, after Wayfarer was told falsely that Jones had spoken to the press about Baldoni, on or about August 8, 2024, ████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████ CSMF ¶ 85. Abel ██████████████████████████

████████████████████████ CSMF ¶ 87. A few days later when Jones reaffirmed her support for Baldoni and Wayfarer and suggested Wayfarer "Flood the Zone with Positives," Abel

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████ CSMF ¶ 88.

At the same time, Abel and Nathan were working against Jonesworks' interests. CSMF ¶¶ 89-101. On August 9, 2024, Nathan encouraged Abel to "take this fucking client [Wayfarer] and never talk to [Jones] against I swear to God." CSMF ¶ 77; Abel Decl., Ex. 15. That same day, Abel suggested ████████████████████████████████████

████████████████████████████████████ CSMF ¶ 98 Abel specifically ████████████████████████████████████████

████████████████████████████████ CSMF ¶ 98; Tahler Decl., Ex. 48.

Abel and Nathan concurrently were attempting to arrange for Jonesworks employee Matthew Mitchell—the only other Jonesworks employee Abel claims to have worked with on the digital campaign—to leave Jonesworks to work with TAG, so he could continue working on the Wayfarer campaign. CSMF ¶¶ 59-60. On August 13, 2024, for example, Abel ███████████ ███████████████████████████████████████████████████████████████████████ ██████████ CSMF ¶ 60.

On August 19, 2024, Nathan told Abel that she encouraged Baldoni to leave Jonesworks and go with Abel to RWA, to which Abel responded "Hahahaha omg love you." CSMF ¶ 94. That same day, Abel told a friend that she was taking all of her clients and joked that ████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████ CSMF ¶ 101.

### E. Abel Continues The Digital Campaign After Her Termination From Jonesworks

Jonesworks terminated Abel on August 21, 2024, after it discovered her stealing proprietary and confidential information to support her new competing business. CSMF ¶ 99-102. Wayfarer purported to terminate its agreement with Jonesworks on ██████████████████████ Fritz Decl., Ex. C at 76:20-77:7. Wayfarer continued its work with Abel (and TAG) through and immediately following Abel's termination, without pause, and then after its purported termination of its contract with Jonesworks. Response ¶ 113. Indeed on August 22, the day after Abel's termination, ██████████████████████████████████████████████ Response ¶ 113; Tahler Decl., Ex. 30.

Abel's efforts to manipulate social media in Baldoni and Wayfarer's favor have continued through this litigation. Response ¶ 83. For example, on January 3, 2025, ██████████████████ ██████████████████████████████████████████████████████████████████████████



*Id.*

### F.    Lively Sues Abel For Her Involvement In The Digital Campaign

On December 31, 2024, Lively commenced this action. ECF No. 1. On July 30, 2025, Lively filed the operative complaint that asserts claims against Abel for (a) aiding and abetting harassment and retaliation in violation of California's Fair Employment and Housing Act; (b) false light invasion of privacy; and (c) civil conspiracy. ECF No. 520. Lively alleges that Abel participated in an ongoing astroturfing "retaliation scheme" against Lively by, among other things, participating in the planting of negative, false stories about Lively to cover up Baldoni's bad acts, and amplifying or boosting negative content critical of Lively to cover up Baldoni's bad acts and retaliate against Lively. ECF No. 520 ¶¶ 55, 200, 211-15, 230, 250-51, 254, 260-66; Abel Decl., Ex. 6.

Abel's expert report acknowledges that ███████████████████████████████ ██████████████████████████ CSMF ¶ 119; Ex. 12. Indeed, the report states that:



CSMF ¶ 119; Ex. 12 at 9.

On August 13, 2025, Abel filed the operative amended answer to Lively's complaint and an amended third-party complaint seeking indemnification against Jonesworks.   ECF No. 639. But ███████████████████████████████████████████████████████ CSMF ¶¶ 110-112.  Rather, ███████████████████████████████ CSMF ¶ 112.

## LEGAL STANDARD

Summary judgment is appropriate only when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.,* 11 F.4th 55, 61 (2d Cir. 2021) (quoting *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012)).

## ARGUMENT

Genuine disputes of material fact exist as to each essential element of Abel's common law indemnification claim and preclude summary judgment.  Whether Abel's conduct falls within the scope of her employment, the threshold requirement for common law indemnification, depends on what she actually did, and the parties fundamentally dispute this question.  The parties also dispute whether Abel bears responsibility for the actions underlying Lively's claims, whether she acted in furtherance of her own competing self-interests, whether her conduct was foreseeable to Jonesworks, and whether Jonesworks knew of and authorized her specific actions.  Each of these material disputes precludes summary judgment.

I.    **SUMMARY JUDGMENT IS PRECLUDED BY EVIDENCE ESTABLISHING THAT ABEL IS RESPONSIBLE AND AT FAULT FOR THE CONDUCT THAT FORMS THE BASIS OF LIVELY'S COMPLAINT**

As a threshold matter, Abel's motion for summary judgment is fatally premature.  That is, the Court cannot assess whether specific acts by Abel were within the scope of her employment, because no determination has been made as to what those acts are, let alone her intent and responsibility for them.  The Court should deny summary judgment on this ground alone.

"[I]t is black letter law that 'indemnification claims do not typically ripen until after the merits of an action have been decided, and all appeals have been resolved." *Empire Merchs., LLC v. Merinoff*, 2018 WL 317848, at *3 (S.D.N.Y. Jan. 5, 2018) (quoting *Hampshire Grp., Ltd. v. Kuttner*, 2010 WL 2739995, at *53 (Del. Ch. July 12, 2010)).  Specifically in the context of employee indemnification, a court ought not either anticipate what factual determinations might be made in the future regarding an employee's conduct or try to make such a determination at the summary judgment stage when such a determination requires the resolution of disputed factual issues. *See In re Adelphia Commc'ns Corp.*, 323 B.R. 345, 380 (Bankr. S.D.N.Y. 2005) (where jury acquitted on some counts and hung on others, court declined to rule on indemnification because there had been no determination of whether employee's actions constituted wrongful conduct and "[t]his Court is not in a position now to anticipate that any such determination would be made in the future, or to try to make such a determination at this time itself").

Such outstanding factual disputes and determinations regarding the underlying conduct bar the granting of summary judgment here.  Lively and Abel present competing factual narratives embedded with a multitude of factual disputes regarding Abel's conduct, which must be resolved by a jury.  Determination by the fact finder of the precise activities that Abel undertook, as well as how and why, is a necessary precondition to the Court determining whether Abel's actions were within the scope of her employment at Jonesworks.

15

Lively alleges that Abel participated in a sophisticated press and digital campaign designed to retaliate against her, including by planting and seeding negative stories about Lively with journalists, coordinating with TAG and Wallace to manipulate social media platforms including Reddit, Discord, TikTok, and Instagram, amplifying and boosting negative content about Lively, suppressing positive content about Lively, utilizing algorithm manipulation, and executing all of this without fingerprints. *E.g.*, ECF No. 520 ¶¶ 230, 411. Lively alleges this campaign constituted intentional torts. ECF No. 520, Counts II, III, IV, V, VII, XII, XIV, XV. Abel, for her part, denies engaging in any of the actions Lively alleges. *See* ECF No. 639; Abel Decl. ¶¶ 45-46. She instead characterizes her conduct as routine public relations activities for Wayfarer and Baldoni as part of the services Jonesworks was providing them as its clients, even though her expert says ███

███ ECF No. 945 ("Abel Mem.") at 2. This factual dispute cannot be resolved at summary judgment. Until a jury determines what Abel actually did, the question of whether her conduct fell within the scope of employment remains a genuine issue of material fact that must be resolved.

Indeed, a court in this District recently denied a motion for summary judgment on an indemnification claim in similar circumstances where, as here, no liability determination had yet been made. *Varga v. Flowcon, Inc.*, 2025 WL 2774261, at *24 (S.D.N.Y. Sept. 29, 2025). In *Varga*, a property owner sought common law indemnification from a general contractor for a claim brought by an employee injured on the worksite. *Id.* Even though the general contractor did not respond to the owner's motion for summary judgment on the indemnification claim, the Court denied that motion as not ripe because a liability determination had not yet been made. *Id.* The same result should follow here.

Abel acknowledges this authority and concedes that her motion may be premature. She attempts to avoid the necessary consequence of this—that is, denial of her motion—by relying on

cases in which courts granted summary judgment on indemnification claims. Abel Mem. at 11-13. But those cases are inapposite and readily distinguishable: In each, there was no dispute about what the employee in question actually did or whether the employee acted within the scope of employment. For example, in *Wallace v. National R.R. Passenger Corp.*, an employee performing construction work indisputably fell from a defective platform owned and maintained by his employer while performing assigned work duties. 5 F. Supp.3d 452, 460-61 (S.D.N.Y. 2014). Similarly, in *McCabe v. Queensboro Farm Prods., Inc.*, a construction worker was indisputably injured on the job. 22 N.Y.2d 204, 207-08 (1968). Here, by contrast, there are fundamental disputes about what conduct Abel engaged in that must be resolved before any analysis of whether that conduct was within the scope of her employment can even be undertaken. The Court should deny Abel's motion for this reason alone.

## II.    RECORD EVIDENCE ESTABLISHES ABEL WAS RESPONSIBLE FOR AND AT FAULT FOR THE CONDUCT THAT FORMS THE BASIS FOR LIVELY'S COMPLAINT

As this Court explained in resolving Jonesworks' motion to dismiss, Abel bears the ultimate burden to show that she bears no fault or responsibility for the tort claims against her by Lively before she can establish her entitlement to common law indemnification. ECF No. 852 at 27; *see also Amusement Indus. Inc.v. Stern*, 693 F. Supp. 2d 319, 326 (S.D.N.Y. 2010) ("[I]ndemnity is no longer available under New York law where the proposed indemnitee bears fault for the injury for which it seeks indemnity."). Abel can only recover if she "was not negligent and acted merely at the direction of Jonesworks." *Id.* at 25. Thus, Abel must establish that she was not at fault and bore no responsibility for the acts that led to Lively's claims or harm. *Trs. of Columbia Univ. in City of N.Y. v. Mitchell/Giurgola Assocs.*, 109 A.D.2d 449, 451 (1st Dep't 1985); *see also* Abel Mem. at 13-14 (discussing common law indemnification standard). If Abel participated to ***any*** degree in the wrongdoing, she cannot receive the benefit of common law

indemnification. *Trs. of Columbia Univ.*, 109 A.D.2d at 453 ("Since the predicate of common-law indemnity is vicarious liability without actual fault on the part of the proposed indemnitee, it follows that a party who has itself actually participated to some degree in the wrongdoing cannot receive the benefit of the doctrine."); *see also Rock v. Reed-Prentice Div. of Package Mach. Co.*, 346 N.E.2d 520 (1976) ("But when, as here, the party seeking indemnification was himself partially at fault, the courts of this State, and throughout the Nation generally, refused to imply a right to partial indemnification against 'another who played an effective role in causing the damage.'") (quoting *Dole v. Dow Chem. Co.*, 30 N.Y.2d 143, 148 (1972)).

Here, Abel offers no argument or evidence in support of her lack of fault or responsibility, a required element of her claim. This alone is sufficient to defeat Abel's motion. *See Doe 1 v. JPMorgan Chase Bank, N.A.*, 687 F. Supp. 3d 405, 418 (S.D.N.Y. 2023) ("[A]s a general matter, 'a party cannot obtain common-law indemnification unless it has been held to be vicariously liable without proof of any negligence or actual supervision on its own part.'" (quoting *McCarthy v. Turner Const., Inc.*, 953 N.E.2d at 801)). But Abel not only does not make this showing, she cannot: as detailed throughout, far from acting merely in rote obedience of Jonesworks' orders, Abel embarked on her own course of conduct, for her own purposes, in service of her own interests, all the while hiding that conduct from Jonesworks. *See, e.g.*, CSMF ¶¶ 40-41

; CSMF ¶ 53 (Abel instructing TAG to send proposed scope of work to her RWA, not Jonesworks, email address); CSMF ¶¶ 56-58

CSMF ¶ 66

(Abel and Nathan communicating about need to "bury" Lively on behalf of Baldoni); Abel Decl., Ex. 11 (Abel and Baldoni discussing need for negative coverage of Lively); CSMF ¶ 72

; CSMF ¶¶ 76-

81; Abel Decl., Ex. 14 (Abel flagging social media posts for Wallace); CSMF ¶ 60 (Abel attempting to have TAG hire Jonesworks employee); CSMF ¶¶ 92-94 (Abel planning with Nathan to poach Wayfarer and Baldoni as clients from Jonesworks). Abel's self-serving and conclusory claim that all of these actions were merely in obedience to Jonesworks' instructions and not her own, independent conduct is implausible, inconsistent, and incredible. The facts speak for themselves on Abel's degree of responsibility and bar summary judgment.

## III.  DISPUTED FACTS ON WHETHER ABEL'S CONDUCT WAS WITHIN THE SCOPE OF HER EMPLOYMENT PRECLUDE SUMMARY JUDGMENT

Even if the Court does consider the substance of Abel's motion, it should still deny it. Abel cannot establish as a matter of undisputed fact that her conduct was within the scope of her employment, an essential element of her common law indemnification claim. Indeed, there exist disputed facts on each prong of the scope of employment analysis, any one of which acts to independently preclude summary judgment.

Under New York law, common law indemnification requires that Abel establish she conducted the actions alleged by Lively in the course of her employment at Jonesworks and at the direction of Jonesworks, and that this conduct was neither done with wholly personal motives nor unforeseeable to Jonesworks. ECF No. 852 at 27 (citing *Doe v. Guthrie Clinic, Ltd.*, 710 F.3d 492, 495 (2d Cir. 2013)). Conduct falls within the scope of employment only when performed in furtherance of the employer's business and for the employer's benefit, not the employee's own interests. *Danner-Cantalino v. City of New York*, 85 A.D.3d 709, 710 (N.Y. App. Div. 2011); *see also* Abel Mem. at 14. The conduct must be foreseeable and not constitute a significant departure from the normal methods of performance of the employee's duties. *Rivera v. State*, 34 N.Y.3d 383, 388-89 (N.Y. 2019). "Whether an employee acted within the scope of employment is a fact-based inquiry." *Id.* at 390.

19

There are genuine disputes of material fact as to whether Abel meets any of these requirements: whether she acted in furtherance of Jonesworks' business or her own interests, whether her conduct was foreseeable or constituted a significant departure from her normal duties, and whether she defied Jonesworks' instructions. Indeed, the record overwhelming supports the opposite conclusion than Abel seeks, but at the very least each of these disputes independently precludes summary judgment.

## A.    Overwhelming Evidence Establishes That Abel Acted In Pursuit Of Her Own Interests

Courts consistently hold that where an employee's actions are taken for wholly personal reasons (including pursuing personal interests), her conduct cannot be said to fall within the scope of employment. *E.g.*, *Danner-Cantalino*, 85 A.D.3d at 710 ("[W]here an employee's actions are taken for wholly personal reasons, which are not job related, his or her conduct cannot be said to fall within the scope of employment."); *Guthrie Clinic, Ltd.*, 710 F.3d at 495-96 (nurse acting for purely personal reasons outside scope of employment); *Webb v. United Health Servs., Inc.*, 221 A.D.3d 1315, 1319-20 (N.Y. App. Div. 2023) (employee accessing patient records out of spite outside scope of employment).

Here, there is substantial evidence that throughout July and August 2024, Abel was acting in her own, personal interest and not in the interests of Jonesworks—and indeed, was acting deliberately and directly adverse to Jonesworks' interests. For example, Abel recommended that Wayfarer hire Nathan, whose PR practices Abel knew went against Jonesworks' positive ethos, so Abel and Nathan could take that account from Jonesworks upon Abel's departure. CSMF ¶¶ 38-39, 51-55, 89-94. At the same time Abel participated in the digital campaign for which Lively sued, she helped facilitate a *Business Insider* "kill story" about Jonesworks' founder and CEO, including by speaking to the reporter responsible for the story multiple times throughout this

period, ███████████████████████████████████████████████████  *See*
CSMF ¶ 96-98; Response ¶ 91; Tahler Decl., Ex. 14.  Abel also conspired with Nathan to ensure
that Wayfarer and Baldoni breached their contract with Jonesworks and retained Abel's new,
competing PR firm in violation of both Wayfarer's and Abel's contracts with Jonesworks.  CSMF
¶¶ 92-94.  And as her departure from Jonesworks neared, Abel was usin ██████████████████
to circumvent Jonesworks' computer security systems in order to steal confidential documents in
violation of her agreements.  CSMF ¶ 13-15, 99-101.  All of this was in service of Abel's scheme
with Nathan to "take this fucking client and never talk to [Jones] again I swear to God."  CSMF
¶¶ 52, 55.

       In the face of these facts, Abel falls well short of meeting her burden to show that there is
no material disputed fact and that she was working in Jonesworks' interest.  Her motion must be
denied.

       **B.    Ample Evidence Establishes That Abel's Conduct Was Unforeseeable**

       Even if Abel acted in Jonesworks' interests (she did not), Jonesworks would still be liable
only if Abel's tortious conduct also was generally foreseeable and a natural incident of the
employment.  *Judith M. v. Sisters of Charity Hosp.*, 715 N.E.2d 95, 96 (N.Y. 1999); *see also*
*Riviello v. Waldron*, 391 N.E.2d 1278, 1281 (N.Y. 1979) (factors include whether the specific act
was one that the employer could reasonably have anticipated).  Actions that are a significant
departure from the normal methods of performance of the duties of the employee are not
foreseeable.  *See Rivera v. State*, 142 N.E.3d at 646  ("[T]he employer may be liable when the
employee acts negligently or intentionally, so long as the tortious conduct is generally foreseeable
and a natural incident of the employment."); *Judith M.*, 715 N.E.2d at 96 (same).

       Abel's expert report alone dooms her summary judgment motion on this point.  That report
recognizes that ████████████████████████████████████████████████████████████████

21

██████████████████████████████████████████████████

████████████████    CSMF ¶ 119.  Abel cannot win summary judgment in the face of this admission.

Regardless, the record evidence also belies Abel's arguments. Abel relies on her unsubstantiated assertion that she engaged in only standard public relations activities such as responding to press inquiries, monitoring media coverage, and coordinating messaging, all of which she claims fell within the scope of Jonesworks' services for Wayfarer. Abel Mem. at 3-4, 14-15. But Abel's say-so does not make it true—especially in light on her own expert report—and is insufficient to carry her summary judgment burden, especially where, as detailed throughout, Abel's self-serving assertion flies in the face of the overwhelming evidence.

What is more, even if Abel's claimed engagement in "standard public relations activities" may have been foreseeable to Jonesworks, this does not end the inquiry because such "standard activities" do not comprise or reflect what Lively alleges (and the evidence demonstrates) Abel did here.  Indeed, Abel herself admits to doing substantially more and different work that fell outside the scope of Jonesworks' contract with Wayfarer, including planting a negative story with a reporter to cover up Baldoni's misdeeds, CSMF ¶ 63, identifying social media content that was hostile to Lively for amplification, CSMF ¶¶ 76, 79-80, ██████████████████████████

██████████████████    CSMF ¶ 81, working with TAG and Wallace to manipulate, suppress or boost social media content against Lively, CSMF ¶¶ 79-80, and boasting with Nathan about their ability to "bury" Lively.  CSMF ¶ 65.  None of these actions were foreseeable to Jonesworks, which as a matter of company practice and policy does not engage in such underhanded manipulative tactics but instead insists that all of its employees engage only in ethical and routine positive public relations work.  CSMF ¶ 20; Jones Decl. ¶¶ 17-20.  Because Abel's liability hinges

on her violation of this Jonesworks' culture and ethos, as well as her participation in unforeseeable and unlawful conduct, her indemnification claim fails and her motion should be denied.

### C. The Evidence Further Establishes That Abel Deliberately Acted Outside Jonesworks' Goals

When an employee's conduct is not "in furtherance of any employer-related goal whatsoever," she is not acting within the scope of employment. *See Rivera*, 142 N.E.3d at 645-46. Here, ample record evidence demonstrates Abel acting inconsistently with employer-related goals on multiple fronts, including the following, each of which defeat her motion for summary judgment:

*First*, Abel recommended that Wayfarer hire Nathan despite knowing Jones and Jonesworks objected to that recommendation and to Nathan's hiring because Nathan's PR practices went against Jonesworks' ethos. CSMF ¶¶ 20, 38-39. Abel's actions confirm that she knew that she was defying Jonesworks' instructions, as she contrived to have Nathan's company, TAG, send their scope of work for the Wayfarer account to Abel's non-Jonesworks email, CSMF ¶ 53, and to ████████████████████████████████████████████████████ ████████████████████████ CSMF ¶¶ 42, 49. Multiple Wayfarer executives, including Wayfarer's corporate representative, confirmed that Wayfarer hired Nathan at Abel's recommendation and over Jones's objections. CSMF ¶ 50. And Wayfarer's president, ████████████████████████ ████████████████████████████████████████████████████ CSMF ¶ 42. Abel's efforts to conceal her defiance of Jonesworks' instructions from her boss and her departure from the goals of the company.

*Second*, Abel excluded Jones from the crisis response and digital campaign that Lively complains of. From the outset, Abel, Nathan, TAG, Baldoni, and Wayfarer deliberately excluded

Jonesworks from the strategy and execution of the crisis response and actively misled Jonesworks about their actions:

- Abel ████████████████████████████████████████████████
  ██████████████████████████████████████████ CSMF
  ¶¶ 40-41.

- Abel and Hanks misled Jonesworks about TAG's scope of work, telling Jones that Nathan and TAG woul █████████████████████████████████████
  ███████████████████████████████████ CSMF ¶¶ 56-58. But TAG's scenario planning document for the Wayfarer account (which was sent to Wayfarer and Abel, but not Jones) from the outset envisioned that TAG would "manage media inquiries on background as sources familiar" and "respond to media," which TAG in fact did behind Jonesworks' back. *Id.* ¶ 58.

- The August 2, 2024 "Scenario Planning" document specified that TAG would work "[a]longside Jen Abel and her team" with no mention of Jonesworks, the ostensible employer of "Abel and her team." CSMF ¶¶ 51, 54.

- Jones was left off the August 7, 2024 email describing the "social and digital mitigation and remediation" plan for Wayfarer and Baldoni. Response ¶ 73.

- TAG employees never spoke with Jones about Wayfarer during the entire tenure of TAG's engagement for Wayfarer. CSMF ¶ 84.

- Wallace had no recollection of speaking with Jones regarding Wayfarer. CSMF ¶ 84.

Abel's exclusion of Jones was intentional and systematic. Far from aligning her work with the goals of Jonesworks, Abel deliberately and repeatedly departed from these goals and hid her defiance and actions from her employer as part of her strategy to position herself as the point

person for Wayfarer, exclude Jones and Jonesworks from the account, drive a wedge between her employer and client, and continue her misconduct unchecked and undiscovered. At a minimum, there are significant and material evidentiary disputes regarding Abel's deliberate defiance of and deviation from Jonesworks' goals, requiring denial of her motion.

## IV.    SUMMARY JUDGMENT IS UNDISPUTEDLY UNAVAILABLE FOR ABEL'S ALLEGED CONDUCT POST-DATING HER TERMINATION

Common law indemnification applies only to actions an employee undertook ***during the course and tenure*** of their employment by the claimed indemnitor. *Rivera*, 142 N.E. 3d at 645 ("Liability attaches 'for the tortious acts of ... employees only if those acts were committed in furtherance of the employer's business and within the scope of employment.'" (quoting *Guthrie Clinic, Ltd.*, 710 F.3d at 484)). Thus, Abel cannot seek indemnification for conduct she engaged in after her employment with Jonesworks ended. Abel concedes, and it is undisputed, that she was terminated from Jonesworks on August 21, 2024, and after that date no longer worked at Jonesworks. Response ¶ 79. Here, however, Lively alleges that Abel has continued to engage in tortious conduct after her termination from Jonesworks on August 21, 2024, and through the filing of the complaint and the presence. ECF No. 520 ¶ 55 (describing the retaliation as ongoing). Because Lively's complaint includes allegations that post-date Abel's employment at Jonesworks, Abel's motion must, at a minimum, as a matter of law and undisputed fact, be denied with respect to any conduct that occurred after August 21, 2024.

## CONCLUSION

For the foregoing reasons, Jonesworks respectfully requests that this Court deny Abel's motion for conditional summary judgment on her second cause of action for common law indemnification.

DATED: December 3, 2025

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:  /s/ Kristin Tahler

Kristin Tahler
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
kristintahler@quinnemanuel.com

Maaren A. Shah
Morgan L. Anastasio
295 5th Avenue
New York, New York 10016
(212) 849-7000
maarenshah@quinnemanuel.com
morgananastasio@quinnemanuel.com

Nicholas Inns (*pro hac vice*)
1300 I Street NW
Suite 900
Washington, D.C. 20005
(202) 538-8000
nicholasinns@quinnemanuel.com

*Attorneys for Third-Party Defendant
Jonesworks LLC*