UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLAKE LIVELY,<br><br>                   Plaintiff,<br><br>     v.<br><br>WAYFARER STUDIOS LLC, et al.,<br><br>                   Defendants. | Civ. Action No. 1:24-cv-10049-LJL<br>(Consolidated for pretrial purposes with<br>1:25-cv-00449-LJL)<br><br>rel. 1:25-cv-00449-LJL |
| JENNIFER ABEL,<br><br>                   Third-Party Plaintiff,<br><br>     v.<br><br>JONESWORKS LLC,<br><br>                   Third-Party Defendant. | |
| WAYFARER STUDIOS LLC, et al.,<br><br>                   Plaintiffs,<br><br>     v.<br><br>BLAKE LIVELY, et al.,<br><br>                   Defendants. | |

**DECLARATION OF STEPHANIE JONES IN SUPPORT OF JONESWORKS LLC'S OPPOSITION TO JENNIFER ABEL'S CONDITIONAL MOTION FOR SUMMARY JUDGMENT**

I, Stephanie Jones, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am the founder, CEO, and president, of Jonesworks LLC ("Jonesworks"). Jonesworks is a third-party defendant in the above-captioned action.

2. I respectfully submit this declaration in support of Jonesworks' opposition to the motion for conditional summary judgment on the second cause of action in the amended third-party complaint of Jennifer Abel ("Abel") against Jonesworks, ECF No. 693.

I. **BACKGROUND**

   A. **Wayfarer Studios and Justin Baldoni**

3. Jonesworks is an award-winning public relations ("PR") agency.

4. Jonesworks provides positive, bespoke PR services rooted in strategy-driven brand communications, supporting the positioning, visibility, and projects of brands, executives, and talent through tailored press support, strategic communications plans, and purposeful social media strategy.

5. Starting in 2017, Jonesworks began representing Justin Baldoni ("Baldoni") for his personal publicity as an actor.

6. That work included promoting Baldoni and his projects through positive publicity, including by creating communications materials such as biographies and press releases, supporting Baldoni's promotional activities and philanthropy, and securing press coverage to promote his work as an actor and director.

7. Jonesworks' scope of work for Baldoni did not include seeding, planting, or promoting negative stories about his co-stars or manipulating social media.

8. After Wayfarer Studios ("Wayfarer") was formed, beginning on or about May 6, 2020, Jonesworks also began to represent Wayfarer.

2

9. Jonesworks continued to provide the same services to Baldoni, but with the addition of Wayfarer as a client, the scope of work expanded to cover Wayfarer's projects in addition to Baldoni's. This work included drafting press releases in support of Baldoni's and Wayfarer's upcoming projects, pitching stories to promote Baldoni and Wayfarer as well as their projects to earned media and providing talking points for use with the press.

10. Jonesworks also performed "media monitoring," by collecting and collating links to press coverage of Wayfarer and Baldoni and sharing those links with Wayfarer and Baldoni.

11. Like Jonesworks' previous work for Baldoni, the work Jonesworks did for Baldoni and Wayfarer under their agreement at no time included seeding, planting, or promoting negative stories about individuals in disputes with Baldoni or Wayfarer, or otherwise adverse or potentially adverse. Nor did Jonesworks influence conversations about Baldoni or Wayfarer occurring on social media through false or paid for accounts or comments, or otherwise engage in social media manipulation.

12. Under their agreement, Jonesworks occasionally assisted Baldoni with matters that he considered to be a "crisis," but Jonesworks—whose ethos centers on positive publicity—did not provide what is commonly referred to in the PR industry as "crisis PR" because Jonesworks is not a "crisis PR" firm.

13. Around May 2024, Jonesworks began providing additional social media services to Wayfarer and Baldoni on a three-month trial basis (the "Social Media Trial"). In connection with the Social Media Trial, Jonesworks helped Baldoni brainstorm positive ideas for social posts to be posted on his social media accounts and record videos in connection with those posts. Baldoni approved any content prior to posting. Jonesworks did not take any steps to manipulate social media conversations or coverage, nor was that within the scope of work of the Social Media Trial.

14. Wayfarer ended the Social Media Trial on July 31, 2024.

15. Jonesworks had email listservs to service the Baldoni and Wayfarer account— ███████████████████ and ███████████████ I was not on these listservs continuously or at all times, but was added in late July 2024 after Jennifer Abel resigned.

**B.  Jennifer Abel**

16. In July 2020, Jonesworks hired Abel to work as a publicist with the title Vice President.

17. When Abel was hired at Jonesworks, she was instructed to carry out the duties of a competent PR professional, which include supporting the positioning of her clients in an ethical, lawful, and responsible manner. For example, Abel was expected to guide her clients as they interacted with the press, but Abel was not expected to, was never instructed to, and was prohibited from manipulating social media conversations to attack anyone and from pitching, seeding, or promoting negative or false stories about any person, including any non-client who had complained of wrongdoing or misconduct against her client. As a PR professional with over a decade of experience, Abel understood when she joined Jonesworks that she was employed to engage in proactive positive press to help build clients' brands and promote their projects and partnerships, and that her duties did not include instigating, promoting, or participating in negative coverage.

18. Abel was never instructed to, and was prohibited from, engaging or participating in conduct that could be considered harassment, discrimination, or retaliation in violation of state or federal laws or aiding and abetting harassment, discrimination, or retaliation in violation of state and federal laws.

19. Abel was never instructed to, and was prohibited from, engaging or participating in any conduct that would amount to "astroturfing," or the manufacturing of grassroots support of or opposition to a message or person orchestrated through fake or paid for social-media accounts or engagement and coordinated disinformation to manufacture what appears to be an organic consensus response.

20. Jonesworks, as a company, does not engage in these nefarious activities, and its employees understand that such activities are prohibited based on Jonesworks' ethics, course of conduct and expectations, as well as the industry standard expectations that garnering positive publicity to promote clients' projects and partnerships does not include promoting negative content. As a seasoned PR executive who worked at Jonesworks for more than four years, Abel knew that Jonesworks did not engage in the types of activities described in paragraphs 17 to 19 above. Abel also knew, through her work and interactions at Jonesworks, that Jonesworks and I did not engage in or approve of the kind of "crisis PR" activities I had observed and reflected upon from Melissa Nathan.

## II. THE DIGITAL CAMPAIGN

### A. Abel Recommended Wayfarer Hire Melissa Nathan Over My Objection

21. In late July and early August 2024, reports of tension between Baldoni and the cast of *It Ends With Us* began to appear online.

22. Abel told me that Wayfarer was interested in recommendations for crisis PR firms to potentially bring on in the event the situation escalated. Abel did not tell me that she recommended Wayfarer engage a crisis PR firm or that she specifically recommended Melissa Nathan.

5

23.  I provided recommendations to Wayfarer. The recommendations that I provided to Wayfarer did not include Melissa Nathan, because as Abel knew, I did not approve of or endorse certain of the "crisis PR" tactics and activities that I understood Melissa Nathan to engage in.

24.  On or around July 26, 2024, Wayfarer told me that they were considering hiring Melissa Nathan and her agency, The Agency Group PR ("TAG").

25.  Neither Abel nor anyone at Wayfarer told me that Abel had recommended Nathan. Abel, in particular, knew that I would have objected to hiring Nathan and lied to me by not telling me that it was Abel who had recommended Nathan in the first place, knowingly over my objections, instead indicating Wayfarer was acting independently of her. Wayfarer also lied to me and did not tell me that Abel had recommended Nathan, even when I explicitly asked if she did.

26.  I cautioned Wayfarer against hiring Nathan and warned Wayfarer and Baldoni that I thought Nathan used unethical tactics and that associating with her would be harmful to Baldoni and Wayfarer.

27.  I warned Wayfarer and Baldoni against hiring Nathan because, in 2023, I personally experienced Nathan engage in unethical behavior in support of a mutual client. I previously had a positive relationship with Nathan and referred clients to her. After the 2023 incident, I stopped referring clients to Nathan.

28.  I cautioned Baldoni, in particular, that I was worried not only about Nathan but the people Nathan works with.

29.  I also told Wayfarer, including its President Tera Hanks and CEO Jamey Heath, that I believed Nathan was behind negative attack websites, fake and negative employee reviews, and negative social media profiles about me that had appeared online beginning in May 2024. I now understand that I was correct in that speculation.

30. Wayfarer ultimately hired Nathan per Abel's recommendation and over my objection and against my advice.

31. Wayfarer's president, Tera Hanks, told me that Nathan would only be working through scenario planning and would not be having any external communications. I now know that was not true, and that the scenario planning document that TAG created and shared with Abel and Wayfarer anticipated from the beginning TAG working with the outside media.

### B. Abel And Nathan Concealed The Digital Campaign From Jonesworks And Me

32. Although I was typically involved in the Baldoni and Wayfarer account, after Wayfarer hired TAG, I was excluded from the crisis response.

33. I believe this was because Abel and Wayfarer knew I would not have approved of Nathan or TAG's tactics, which I had cautioned against and which contradicted Jonesworks' ethos and practices.

34. I also believe that Abel in particular wanted to isolate me from the Wayfarer and Baldoni accounts so that she could more easily poach them upon her departure, which she was implementing concurrently. Indeed, while Abel had informed me that Jonesworks had become too stressful and difficult for her to manage and she intended to pursue a lower profile path with less pressure, she had concealed the fact that she had registered a PR agency while still at Jonesworks and had actively commenced competing with Jonesworks, including by stealing proprietary and confidential documents.

35. I did not review or discuss the scenario planning document until this litigation.

36. I was not told, and did not know, that TAG recommended hiring Jed Wallace and his team Street Relations. I was entirely excluded from the "social and digital mitigation and

7

remediation" plan that Wallace and TAG implemented. I did not have knowledge of this plan until this litigation.

37. After Wayfarer came to incorrectly believe that I had spoken with a reporter from the *Daily Mail*, Heath told me to "stand down" and take no action on behalf of Baldoni or Wayfarer. After this, I was formally shut out of responding to the press on behalf of Wayfarer or Baldoni at this time.

38. In the days that followed, I reaffirmed my support of Wayfarer and Baldoni, including suggesting that Baldoni and Wayfarer "flood the zone with positives." This was exemplary of the approach to publicity that Jonesworks engaged in, which is promoting positive stories about clients and their projects. I understand that Wayfarer did not agree with my suggested approach, as I continued to be excluded from their strategy, and that Wayfarer instead wanted Abel and Nathan to drive its negative strategy (from which I was deliberately excluded).

### III. LIVELY SUES ABEL FOR HER INVOLVEMENT IN THE DIGITAL CAMPAIGN

39. On December 31, 2024, Lively commenced this action. ECF No. 1.

40. On July 30, 2025, Lively filed a second amended complaint that asserts claims against Abel for (a) aiding and abetting harassment and retaliation in violation of California's Fair Employment and Housing Act; (b) false light invasion of privacy; and (c) civil conspiracy.

41. Lively alleges that Abel participated in an astroturfing "retaliation scheme" against Lively by engaging in the "direct and constant media engagement, the seeding of content on traditional and social media platforms, the boosting of content (sometimes the very content that TAG and its affiliates had seeded), the suppressing of negative content about Mr. Baldoni, and the amplifying of negative content about Ms. Lively (including through engagement via comments on social media)." ECF No. 520, 230.

42. Lively also alleges that Abel knew Baldoni wanted Lively to be "buried," and that Nathan, TAG, and the digital team would "[f]ocus on reddit, TikTok, IG." *Id.* ¶ 36.

43. Lively alleges Abel participated in this astroturfing campaign by, among other things, planting negative, false stories of Lively to cover up Baldoni's bad acts, and participating in the amplification and boosting of content negative or critical of Lively to cover up Baldoni's bad acts and retaliate against Lively. *E.g., id.* ¶¶ 200, 211-15, 230, 250-51, 254, 260-66; Abel Decl., Ex. 6.

44. To the extent Abel participated in an "astroturfing" digital smear campaign, including in retaliation for Lively's reporting or otherwise refusing to tolerate mistreatment, she did not do so at my or Jonesworks' instruction, advice, or knowledge.

45. Neither Jonesworks nor I advised or instructed Abel to plant, seed, or promote any negative stories about Lively. To the extent Abel did so, it was without Jonesworks' or my knowledge or consent. To be clear, neither Jonesworks nor I advised or instructed Abel to plant, seed, or promote stories that Lively is a "bully," "mean girl," or "weaponiz[es] feminism," in traditional and social media, and Abel's participation in such conduct was without Jonesworks' or my knowledge or consent.

46. Neither Jonesworks nor I advised or instructed Abel to boost or amplify negative false content about Lively in traditional or social media to cover up any misconduct. Abel's involvement booting or amplifying negative content about Lively was done without Jonesworks' or my knowledge or consent.

47. None of this conduct alleged by Lively in any pleading was within the scope of services Jonesworks agreed to provide Baldoni and Wayfarer. Nor was it consistent with Jonesworks' ethos, policies, or practices or advised, instructed, or known by Jonesworks.

9

48. To the contrary, Jonesworks and I expected and instructed Abel to carry out her duties in an ethical and lawful manner, which did not include astroturfing, digital smear campaigns, retaliation, or any of the other nefarious behavior or actions that Lively alleges Abel did. I would have never advised or instructed Abel to engage in the conduct Lively alleges.

49. Abel's engagement in the retaliatory smear campaign as alleged by Lively was done outside the scope of her employment at Jonesworks.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: December 3, 2025
New York, NY

*Stephanie Jones* (signature)
Stephanie Jones