# EXHIBIT 4

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                      ---oOo---
 4
 5   BLAKE LIVELY,
 6                 Plaintiff,
 7      vs.        CASE NO. 24-CV-10049-LJL (LEAD CASE)
                              25-CV-449 (LJL) (MEMBER CASE)
 8
     WAYFARER STUDIOS LLC, ET AL.,
 9
                   Defendants.
10   _____
     JENNIFER ABEL,
11              Third-party Plaintiff,
        vs.
12   JONESWORKS, LLC,
                Third-party Defendant.
13   _____
     WAYFARER STUDIOS LLC, et al.,
14              Consolidated Plaintiffs,
        vs.
15   BLAKE LIVELY, et al.,
                Consolidated Defendants.
16   _____
17                   **CONFIDENTIAL**
18
19       VIDEO-RECORDED DEPOSITION OF JAMEY HEATH
20              Los Angeles, California
21              Thursday, October 9, 2025
22
23   Stenographically Reported by:  Ashley Soevyn,
24   CALIFORNIA CSR No. 12019
25
```

CONFIDENTIAL

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                       ---oOo---
 4
 5   BLAKE LIVELY,
 6                Plaintiff,
 7      vs.         CASE NO. 24-CV-10049-LJL (LEAD CASE)
                                25-CV-449 (LJL) (MEMBER CASE)
 8
     WAYFARER STUDIOS LLC, ET AL.,
 9
                  Defendants.
10   _____
     JENNIFER ABEL,
11             Third-party Plaintiff,
        vs.
12   JONESWORKS, LLC,
               Third-party Defendant.
13   _____
     WAYFARER STUDIOS LLC, et al.,
14             Consolidated Plaintiffs,
        vs.
15   BLAKE LIVELY, et al.,
               Consolidated Defendants.
16   _____
17                    **CONFIDENTIAL**
18          Video-recorded Deposition of
19   JAMEY HEATH, taken on behalf of the Plaintiff
20   Stephanie Jones and Jonesworks, Pursuant to Notice,
21   at the offices of Manatt Phelps & Phillips, 2049
22   Century Park East, Los Angeles, California beginning
23   at 9:08 a.m.  and ending at 6:39 p.m. on Thursday,
24   October 9, 2025, before me, ASHLEY SOEVYN,
25   California Certified Shorthand Reporter No. 12019.
```

```
 1   have impact whether or not they make money.  Of
 2   course we have to make money, but that's not our
 3   primary goal.
 4       Q    Is Wayfarer profitable?
 5       A    No.
 6       Q    Has it ever been?
 7       A    No.
 8       Q    I believe Mr. Sarowitz testified that
 9   Wayfarer is paying for the litigation fees and
10   expenses of the various defendants in these two
11   related litigations; is that correct?
12       A    I don't know about -- well, the
13   defendants, yes, we are paying for those.
14       Q    And that includes litigation fees and
15   expenses for Mr. Baldoni's defense?
16       A    It does.
17       Q    And for Ms. Abel's defense?
18       A    It does.
19       Q    And for Ms. Nathan's defense?
20       A    It does.
21       Q    And for Wayfarer's defense?
22       A    Yes.
23       Q    For Mr. Wallace's defense?
24       A    Yes.  Sorry.  I just needed to -- there
25   is a lot of expenses, so I'm just making sure.
```

Page 52

1   very well aware of that, but to all capacities, I
2   don't know.
3        Q    Okay.  Okay.
4             And after the time of this agreement,
5   Wayfarer paid for the portion of Jonesworks' fee
6   attributable to its personal publicity services for
7   Mr. Baldoni; is that correct?
8             MS. SHAPIRO:  Objection.
9             THE WITNESS:  Correct.
10  BY MS. SHAH:
11       Q    And you're aware, are you not, that
12  Wayfarer had requested of Jonesworks around the time
13  that this agreement in Exhibit 23 was signed, that
14  Jonesworks issue a single invoice to Wayfarer for
15  payment that encompassed both the fee for Wayfarer
16  services and the fee for Mr. Baldoni's personal
17  publicity services, correct?
18            MS. SHAPIRO:  Objection.
19            THE WITNESS:  I believe that to be
20  accurate.
21  BY MS. SHAH:
22       Q    Okay.  And Wayfarer regularly paid those
23  joint or bundled invoices when they were issued by
24  Jonesworks on behalf of both Wayfarer's services and
25  Mr. Baldoni's personal publicity services, correct?

1          MS. SHAPIRO:  Objection.
2          THE WITNESS:  We did.
3   BY MS. SHAH:
4       Q    Okay.  And that total fee for Jonesworks
5   services that was paid by Wayfarer and that
6   encompassed both Jonesworks' services for Wayfarer
7   and Jonesworks' services for Mr. Baldoni, was
8   $25,000 a month; is that right?
9          MS. SHAPIRO:  Objection.
10         THE WITNESS:  Yes.
11  BY MS. SHAH:
12      Q    And you understand that Wayfarer had
13  requested, around the time that this agreement in
14  Exhibit 23 was signed -- well, let me ask it this
15  way.
16         Prior to the time when Jonesworks began
17  working for Wayfarer and before this agreement that
18  we looked at in Exhibit 23 was signed, Jonesworks
19  had already been working for Mr. Baldoni personally,
20  right?
21      A    I have knowledge that they worked
22  together, yes, that Stephanie was his publicist.  I
23  don't know to what capacity and what agreements
24  because it was before I was there.
25      Q    Sure.

CONFIDENTIAL

Page 54

1      A    But I know they worked together.
2      Q    Okay.  And once this agreement between
3   Wayfarer and Jonesworks was signed that we're
4   looking at in Exhibit 23, you're aware that Wayfarer
5   asked Jonesworks to bundle Mr. Baldoni's contract
6   together with this Wayfarer contract, right?
7           MS. SHAPIRO:  Objection.
8      A    I don't know if I understand the
9   mechanics that happened when they were bundled, but
10  I'm aware that they were bundled at some point.
11     Q    Okay.
12          MS. SHAH:  I am going to show you what's
13  been marked as tab 3 -- sorry.
14          THE STENOGRAPHIC REPORTER:  Twenty-four.
15          MS. SHAH:  Thank you.  What is going to
16  be marked as Exhibit 24.
17          THE WITNESS:  Thank you.
18       (Exhibit 24 marked for identification.)
19  BY MS. SHAH:
20     Q    For the record, this is a text thread
21  between Labid Aziz and Stephanie Jones dated
22  June 10th, 2020, and it's marked JONESWORKS_,
23  several zeroes, 41594.
24          Have you seen this text exchange before?
25     A    I have not.

Page 127

1  It Ends with Us?
2       A    I have no memory of it.
3       Q    Coming back to the subject of these
4  recorded calls that you -- the call recordings that
5  you made of the four calls, do you know, yes or no,
6  whether or not your attorneys ever shared any of
7  those recordings with any of the witnesses in this
8  case or those witnesses' counsel?
9       A    Say it one more time so I understand it
10 clearly.  I'm sorry.
11      Q    Sure.
12           With respect to the four call recordings
13 that you made that we've discussed earlier today, do
14 you have any knowledge, yes or no, whether your
15 attorneys ever shared any of those recordings with
16 any of the witnesses in this case or their counsel?
17      A    No, I have no knowledge.
18      Q    Okay.  Now, at some point in time,
19 Wayfarer made the decision to bring on TAG and
20 Melissa Nathan as crisis communications
21 professionals, right?
22      A    We did.
23      Q    And by "TAG" you understand I'm referring
24 to The Agency Group, which is Melissa Nathan's
25 company, right?

Page 131

1  having control of edits and all of her ideas being
2  embraced.  Justin did his best with that, but you
3  know, he had a line.  Her not getting them caused a
4  lot of feelings.  We had a year prior, if not more,
5  had some conversations that were of her expressing
6  that she wasn't happy with certain things.  And
7  there was this veiled, like, what does that mean?
8         What -- so we didn't know.  There was
9  this -- for me, there was this fear of an unknown,
10 but also things happening that we were witnessing.
11 What do we do?  Jen at some point recommended, I
12 think you should talk to crisis PR.  I think they
13 would be helpful.  So the purpose to originally meet
14 with them and to hire them was to have some
15 consultation.  What does someone do in this
16 particular time?  And that's what led us to hire
17 them.
18         Q    Okay.
19         A    Sorry for the long-winded explanation,
20 but there was probably more in there but I just --
21 just giving you -- you asked me specifically what
22 led us to do that.
23         Q    Sure.
24         A    Some of those things --
25         Q    Thank you.  I appreciate that.

Page 166

1            (Lunch recess.)
2
3            THE VIDEOGRAPHER:  We're back on the
4    record.  The time is 1:42 p.m.
5    BY MS. SHAH:
6        Q    Good afternoon, Mr. Heath.
7        A    Good afternoon.
8        Q    Before lunch we were discussing your
9    decision to bring on TAG and Melissa Nathan to
10   handle crisis communications.  You had mentioned
11   that at some point, Jen had recommended to you that
12   you should consider bringing on crisis
13   communications professionals; is that right?
14       A    Correct.
15       Q    What do you recall about that
16   conversation?
17       A    I recall her saying that she doesn't do
18   crisis PR and this might be a conversation with a
19   crisis PR firm.
20       Q    Do you recall when that conversation
21   occurred?
22       A    I don't.
23       Q    Do you think it was like within several
24   days of when you first talked to Melissa Nathan?
25            MS. SHAPIRO:  Objection.

Page 167

1           THE WITNESS:  I don't know if it was in
2    several days, but it wasn't weeks.
3    BY MS. SHAH:
4         Q    Okay.  Did she recommend Melissa Nathan
5    to you as a potential person that you could hire for
6    crisis comms?
7         A    I believe it was her.  Yes.
8         Q    Okay.  Meaning, it was Jen?
9         A    I believe so.
10        Q    Did she give you any other names of any
11   other people or firms other than Melissa Nathan that
12   you should consider for crisis communications?
13        A    I don't remember.  She may have.  I don't
14   remember.
15        Q    Okay.  You can't think of any as you sit
16   here today?
17        A    I can't.
18        Q    Did you personally speak with
19   Melissa Nathan or anyone from TAG before you decided
20   to hire them?
21        A    I did.
22        Q    Did you personally speak with or
23   interview any other crisis communications
24   professional?
25        A    I did not.

```
 1        Q    Did anyone at Wayfarer ever speak with or
 2   interview any other crisis communications
 3   professional than Melissa Nathan?
 4        A    Not that I'm aware of.
 5        Q    Okay.  Did you also ask or did anyone at
 6   Wayfarer ask Stephanie Jones for recommendations for
 7   crisis communications professionals?
 8        A    I believe we did.
 9        Q    Okay.
10        A    Or -- I don't know if we asked or if they
11   were just shared.  But I do know that we got some
12   recommendations from Stephanie Jones.  I don't
13   recall how that happened.
14        Q    Okay.  And Melissa Nathan was not on
15   Stephanie Jones' list of recommendations to you for
16   crisis communications, right?
17        A    She was not.
18        Q    You were aware that Stephanie Jones
19   expressly warned you that you should not hire
20   Melissa Nathan for this role, correct?
21        A    I was aware.
22        Q    What was your understanding of the
23   reasons that Stephanie thought you should not hire
24   Melissa Nathan in this role?
25        A    To start with, I had a phone conversation
```

Page 169

1   with Stephanie also because she -- I believe she
2   called me about it.  And there was some either text
3   or email or something suggesting it.  I don't know
4   what happened when.  At some point, yes, she had
5   said that she didn't think she was the right fit
6   because she thought she was shady.
7        Q    What did you understand Stephanie to mean
8   when she said she thought Melissa Nathan was shady?
9        A    I didn't know exactly.  But she went on
10  to tell me, I believe on a phone call, and she was
11  very passionate, as Stephanie wonderfully can be,
12  about her feelings for her.
13       Q    And what did she tell -- what did
14  Stephanie tell you on that phone call about the
15  reasons that she thought Melissa Nathan was shady?
16       A    I don't think on that phone call that I
17  recall anything specific of what she said.  It's one
18  of the many phone calls that you have with people so
19  I don't remember exactly.  But the sentiment was,
20  she didn't like her.  I remember knowing that they
21  had some history.  She was pretty adamant about it.
22  Where by the end of the call, I had deduced that
23  they had personal history.
24            Maybe some of it was based on fact.
25  Maybe some of it was based on personal differences.

Page 204

1       A    I would almost 99 percent say I did not.
2       Q    Okay.
3       A    But -- because, yeah.
4       Q    Okay.  That's all I have on that.
5       A    Okay.
6       Q    Do you recall at some point in time also
7    bringing on Jed Wallace and Street Relations onto
8    the Wayfarer team?
9       A    Yeah.
10      Q    Whose suggestion was that?
11      A    I believe it would have been Melissa's.
12      Q    Did you ever discuss that with
13   Stephanie Jones?
14      A    No.
15      Q    Okay.  Did you ever discuss that with
16   Jen Abel?
17      A    I'm sure.
18      Q    Do you recall a point in time, we
19   discussed it a little bit earlier in part, when
20   there were some issues around like whether and who
21   had reached out to The Daily Mail?
22      A    Say that one more time.  You probably
23   said that perfectly fine, but I didn't follow.
24      Q    It's all right.
25           There was a Daily Mail article published

Page 218

1  text from you at 11:35 a.m. that says:
2             (As read):
3                  "Hold on, guys.  Please, no one call
4                  Daily Mail right now.  Melissa is in
5                  the middle of it."
6        What did you mean by, "Melissa is in the
7  middle of it"?
8        A    It looked like that she was fielding --
9  we brought in, at this point, crisis to navigate
10 through this.  And she was discussing it, and I
11 didn't want multiple people calling.  Stephanie, as
12 I had mentioned, was not in the daily loop in
13 conversations.  So what she might know the marching
14 orders are and the intricacies of it, she's not
15 involved or I don't know how much she knows.  So
16 I've asked Michelle to take care of it.  Please,
17 it's okay.  She's taking care of it.
18       Q    Okay.  So at this point in time, you were
19 having Melissa Nathan handle any inquiries from The
20 Daily Mail and otherwise manage the press around
21 this, and you did not want Stephanie Jones to do it;
22 is that fair?
23            MS. SHAPIRO:  Objection.
24            THE WITNESS:  I didn't want anyone doing
25 it that wasn't in our inner circle talking about it

1  all the time.  Because there were daily, hourly,
2  possibly, whatever, decisions and conversations of
3  navigating it.  And unless you were in that loop
4  every day, I didn't want anyone doing something.
5  BY MS. SHAH:
6       Q    I understand that.  But Stephanie Jones
7  in your mind was not in that loop and so you did not
8  want her interfacing with The Daily Mail on this; is
9  that correct?
10      A    Correct.  I did not want her to.
11      Q    Okay.  And that was at least in part
12 because Melissa Nathan was already doing it and --
13 and you wanted Melissa Nathan as the crisis person
14 to be doing that, right?
15      A    I don't know if I would -- I can say
16 that.  I think it was, there's a team of people that
17 are meeting.  We've consulted.  That's how I wanted
18 to handle it.  Now, whether it was Melissa or
19 whether it was another person at TAG or maybe it
20 would have been Jen, I don't know, necessarily,
21 again this wasn't my world.  But I just knew it was
22 all people that were hearing from me, and Stephanie
23 was not one.
24      Q    Okay.  Who were the people that were
25 hearing from you on this that were in the circle?

Page 229

1  Wayfarer?
2       Q    About -- no, about Wayfarer's publicity
3  plans.
4       A    Right.  Not immediately after, I don't.
5  When I say "immediately," I don't mean within days
6  because we were dealing with the current flames.
7  But that is something that became a little -- became
8  apparent to me that there seemed to be no discussion
9  on that at some point.  Once I had learned -- you
10 mean during this time or at anytime?
11      Q    What I'm essentially asking is, after you
12 told her to stand down, did you later, like, loop
13 her back onto the team and get her involved, or no?
14      A    As I said, she's never been involved.
15      Q    Okay.
16      A    As far as I'm concerned.
17      Q    Okay.  So you didn't invite her into the
18 team after that?
19           MS. SHAPIRO:  Objection.
20           THE WITNESS:  She was -- she was never a
21 part of it.
22 BY MS. SHAH:
23      Q    Okay.
24      A    No -- no offense to Stephanie.
25      Q    Understood.

CONFIDENTIAL

Page 348

```
 1              REPORTER'S CERTIFICATE
 2          I, ASHLEY SOEVYN, a Certified Shorthand
 3   Reporter of the State of California, do hereby
 4   certify:
 5          That the foregoing proceedings were taken
 6   before me at the time and place herein set forth;
 7   at which time the witness was put under oath by me;
 8          That the testimony of the witness, the
 9   questions propounded, and all objections and
10   statements made at the time of the examination were
11   recorded stenographically by me and were thereafter
12   transcribed;
13          That a review of the transcript by the
14   deponent was/ was not requested;
15          That the foregoing is a true and correct
16   transcript of my shorthand notes so taken.
17          I further certify that I am not a relative
18   or employee of any attorney of the parties, nor
19   financially interested in the action.
20          I declare under penalty of perjury under
21   the laws of California that the foregoing is true
22   and correct.  Dated this 10th day of October 2025.
23   [signature]
24   _____
     ASHLEY SOEVYN
25   CSR No. 12019
```