# EXHIBIT 5

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                      ---oOo---
 4
 5   BLAKE LIVELY,
 6                   Plaintiff,
 7      vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)
                                25-CV-449 (LJL) (MEMBER CASE)
 8
     WAYFARER STUDIOS LLC, ET AL.
 9
                     Defendants.
10   _____
     JENNIFER ABEL,
11              Third-party Plaintiff,
        vs.
12   JONESWORKS, LLC,
                Third-party Defendant.
13   _____
     WAYFARER STUDIOS LLC, et al.
14              Consolidated Plaintiffs,
        vs.
15   BLAKE LIVELY, et al.
                Consolidated Defendants.
16   _____
17
18                   **CONFIDENTIAL**
19
20      VIDEO-RECORDED DEPOSITION OF JUSTIN BALDONI
21               Los Angeles, California
22               Monday, October 6, 2025
23   Stenographically Reported by:  Ashley Soevyn,
     CALIFORNIA CSR No. 12019
24
25
```

CONFIDENTIAL

```
                                              Page 2

 1              UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                      ---oOo---
 4
 5   BLAKE LIVELY,
 6                   Plaintiff,
 7     vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)
                              25-CV-449 (LJL) (MEMBER CASE)
 8
     WAYFARER STUDIOS LLC, ET AL.
 9
                     Defendants.
10   _____
     JENNIFER ABEL,
11              Third-party Plaintiff,
       vs.
12   JONESWORKS, LLC,
                Third-party Defendant.
13   _____
     WAYFARER STUDIOS LLC, et al.
14              Consolidated Plaintiffs,
       vs.
15   BLAKE LIVELY, et al.
                Consolidated Defendants.
16   _____
17                   **CONFIDENTIAL**
18           Video-recorded Deposition of
19   JUSTIN BALDONI, taken on behalf of the Plaintiff
20   Jonesworks, et al., Pursuant to Notice, at the
21   offices of Willkie Farr & Gallagher, 2029 Century
22   Park East, Los Angeles, California beginning at
23   9:15 a.m.  and ending at 6:46 p.m. on Monday,
24   October 6, 2025, before me, ASHLEY SOEVYN,
25   California Certified Shorthand Reporter No. 12019.
```

CONFIDENTIAL

Page 136

1    time.  But I believe he thought she was very good at

2    her job.

3         Q    Do you know what led him to believe that?

4         A    I don't.

5         Q    Did you have any personal role in making

6    the decision to hire Melissa Nathan over any of the

7    other crisis PRs that may have been recommended?

8         A    No.

9         Q    Are you aware of where Jamey got the

10   names for potential crisis communications

11   professionals that he was considering?

12        A    I imagine from --

13             MS. SHAPIRO:  Mr. Baldoni, don't

14   speculate.

15             THE WITNESS:  No.  I actually don't.

16   BY MS. SHAH:

17        Q    You don't know?

18        A    No.

19        Q    Do you know if he or anyone else at

20   Wayfarer asked Stephanie Jones for her views on

21   crisis communications professionals that you should

22   hire?

23        A    I don't.

24        Q    Do you know if she recommended

25   Melissa Nathan or not?

CONFIDENTIAL

                                          Page 137

1        A    If Stephanie Jones recommended?  I now

2   know that she didn't.

3        Q    How did you come to that understanding?

4             MS. SHAPIRO:  Mr. Baldoni, don't answer

5   --

6             THE WITNESS:  No --

7             MS. SHAPIRO:  -- if the information came

8   from your lawyers.

9             THE WITNESS:  Yes, I can answer this.

10  Stephanie had sent me a text about Melissa Nathan.

11  BY MS. SHAH:

12       Q    You knew at the time that Stephanie did

13  not recommend that you hire Melissa Nathan, correct?

14            MS. SHAPIRO:  Objection.

15            THE WITNESS:  I knew that Stephanie did

16  not like Melissa Nathan, yes.

17  BY MS. SHAH:

18       Q    And Stephanie warned you against hiring

19  Melissa Nathan; isn't that right?

20       A    You could -- I think you could put it

21  that way with my interaction with Stephanie.  Yeah.

22       Q    And were you aware that Stephanie also

23  warned Jamey Heath and Tera Hanks against hiring

24  Melissa Nathan?

25       A    I was only aware of what she texted me.

CONFIDENTIAL

Page 140

1          Q     Are you aware that Wayfarer and you

2     decided to hire Melissa Nathan over Stephanie Jones'

3     objections?

4          A     I would imagine so, yes.

5               MS. SHAH:  Okay.  I'm going to show you

6     what's marked as a document, Exhibit 5.

7          (Exhibit 5 marked for identification.)

8     BY MS. SHAH:

9          Q     It's a text message between you and

10    Stephanie Jones dated July 26, 2024, Bates stamped

11    Jonesworks_, several zeroes, 39735.

12              Is this the text message that you were

13    referring to that Stephanie Jones sent you where she

14    warned you against hiring Melissa Nathan?

15         A     It appears to be.

16         Q     And this was sent on July 26th, 2024.

17    So does this refresh your recollection that you were

18    considering bringing on crisis PR before

19    July 26th, 2024?

20         A     Yes.

21         Q     Okay.  And as you recall, Stephanie Jones

22    sent you a link at the top of the text thread,

23    right?

24         A     Yes.

25         Q     You said you never clicked on that; is

CONFIDENTIAL

Page 147

1   any of this.  So I trusted them to make the

2   decision.  I don't believe she told me anything.

3           Q     Okay.  Do you understand from this text

4   message that Stephanie is telling you and Jamey and

5   Tera that it might not be good for you to be

6   associated with someone like Melissa Nathan based on

7   the type of tactics that she has used in the past?

8           A     That seems to be an accurate summary.

9           Q     And that if people knew that you were

10  associated with Melissa Nathan or specifically if

11  Blake's PR came to find out that you had associated

12  yourself with Melissa Nathan, they could use that

13  against you because of who Melissa Nathan was,

14  right?

15                MS. SHAPIRO:  Objection.  Objection.

16                THE WITNESS:  I can't speculate to what

17  she meant by that.  But it seems to be she says

18  "Blake's PR to use as a weapon" so...

19  BY MS. SHAH:

20          Q     Okay.  Now, Wayfarer and you --

21          A      are you done with this one?

22          Q     I think so.

23          A     Here you go.

24          Q     Wayfarer and you went ahead and hired

25  Melissa Nathan after and despite Stephanie Jones's

CONFIDENTIAL

Page 148

1   warnings, right?

2            MS. SHAPIRO:  Objection.

3            THE WITNESS:  I believe so.

4   BY MS. SHAH:

5        Q    And there came a time in August, after

6   you had hired Melissa Nathan, that The Hollywood

7   Reporter published an article about the fact that

8   you had hired Melissa Nathan, right?

9        A    Yes.

10       Q    I'm going to show you that article.

11            MS. SHAH:  It's a document we're going to

12  mark as Exhibit 7.

13         (Exhibit 7 marked for identification.)

14            THE WITNESS:  Thank you.

15  BY MS. SHAH:

16       Q    It's an article from The Hollywood

17  Reporter, dated August 14th, 2024, that says

18  "Justin Baldoni Hires Crisis PR Veteran Amid

19  It Ends with Us Rift."

20            Do you see that?

21       A    Uh-huh.

22       Q    And it goes on to say:

23            (As read):

24                 "The director and star has retained the

25                 services of Melissa Nathan who

CONFIDENTIAL

Page 149

1              represented Johnny Depp during the

2              Amber Heard trial."

3         Do you see that?

4    A    Excuse me.  On the second page, yes.

5    Q    Okay.  You were pretty upset when this

6    article came out, right?

7    A    I don't remember what I was feeling.

8    Q    You were worried when this article came

9    out that being publicly associated with

10   Melissa Nathan might make it look like you had

11   something to be guilty for, right?

12            MS. SHAPIRO:  Objection.

13            THE WITNESS:  No, I think -- I think I

14   was just not happy that my crisis PR was being

15   publicized.  I don't think it had anything to do

16   with Nathan -- Melissa Nathan.

17   BY MS. SHAH:

18   Q    Why were you not happy that your crisis

19   PR was publicized?

20   A    Because it felt like more of the -- kind

21   of -- the kind of thing that felt like somebody

22   would plant to draw more attention and fan a flame

23   to something.

24   Q    Fan a flame to what?

25   A    To public speculation, the fan theories

CONFIDENTIAL

Page 150

1    of why I wasn't doing press with anybody and...

2         Q    What were the fan theories at the time

3    about why you weren't doing press with anyone?

4         A    I remember there being a lot of talk

5    about all of the cast unfollowing me, why I wasn't

6    doing press with any of the other cast members.  I

7    don't remember the date that this came out, but I

8    don't know if I had already done the premiere or not

9    at this point.  But I had also never read an article

10   or seen an article about somebody hiring crisis PR,

11   so I found it odd.

12        Q    And you thought it made you look bad,

13   right?

14        A    Yeah, I think I did.

15        Q    You thought it made you look like you had

16   something to hide?

17        A    I think I had never been involved in

18   anything like this, and I wasn't used to seeing my

19   name in the press in this way at all.  And I

20   certainly -- I certainly didn't want my -- my name

21   out there in a negative way.

22        Q    You thought it made it look like you had

23   something to hide that had to do with the

24   allegations of on-set abuse, right?

25             MS. SHAPIRO:  Objection.

CONFIDENTIAL

Page 151

1              THE WITNESS:  I'm unaware of any

2      allegations of on-set abuse.

3      BY MS. SHAH:

4          Q    To this day, you're unaware of any

5      allegations against you of on-set abuse?

6              MS. SHAPIRO:  Objection.

7              THE WITNESS:  Abuse?  I'm aware of

8      allegations as were written in the New York Times

9      article and in this lawsuit.  Yeah.

10     BY MS. SHAH:

11         Q    What do you understand those allegations

12     to be?

13         A    I understand that I have been alleged to

14     sexually harass Mrs. Lively.  And then that I have

15     alleged to have launched a retaliation smear

16     campaign.

17         Q    Do you recall articles coming out around

18     this time that called your on-set behavior abusive?

19             MS. SHAPIRO:  Objection.

20             THE WITNESS:  I believe I do.

21     BY MS. SHAH:

22         Q    Okay.  So you understand that that was

23     one of the fan theories that was floating around

24     about why you weren't involved in publicity and why

25     all the cast had unfollowed you, right?

CONFIDENTIAL

Page 152

1          MS. SHAPIRO:  Objection.

2          THE WITNESS:  Not necessarily.

3     BY MS. SHAH:

4          Q     Well, yes or no?

5          MS. SHAPIRO:  Objection.

6          THE WITNESS:  No.

7     BY MS. SHAH:

8          Q     You're not aware of any fan theories at

9     the time that one of the reasons that the cast

10    unfollowed you and that you were not involved in a

11    lot of the marketing of the film or publicity around

12    the film was because you engaged in abusive or toxic

13    behavior on set?

14         MS. SHAPIRO:  Objection.

15         THE WITNESS:  I'm not aware those were

16    fan theories, no.

17    BY MS. SHAH:

18         Q     Any theories?

19         MS. SHAPIRO:  Objection.

20         THE WITNESS:  I'm aware that there were

21    leaks to press that accused me of that, but I'm not

22    aware of fan theories.

23         MS. SHAH:  Okay.  Thirty-nine, please.

24         (Exhibit 8 marked for identification.)

25

CONFIDENTIAL

Page 153

1   BY MS. SHAH:

2        Q    I'm going to hand you a document that's

3   marked as Exhibit 8.  It's a text thread between

4   Henny Grace, Melissa Nathan, you.  I think that's

5   it.

6        A    Uh-huh.

7        Q    On August 14th, Bates-stamped NATHAN_,

8   several zeros, 3972.

9             Do you see that?

10       A    I do.

11       Q    Who is Henny Grace?

12       A    That used to be my alias, but it's now

13   become public, so...

14       Q    No longer useful as an alias.  All right.

15            So this is a text thread between you and

16   Melissa Nathan; is that right?

17       A    It appears to be, yes.

18       Q    On August 14th, which is the day after

19   The Hollywood Reporter article that we just looked

20   at was published.

21            Do you see that?

22       A    Yes.

23       Q    Okay.  And halfway down the page, at

24   8:03 a.m., you write:

25            (As read):

CONFIDENTIAL

Page 154

1              "Talk to me about this - so I'm really
2              frustrated about this crisis PR leak -
3              and framing it as Johnny Depp's firm to
4              poise that I have something to hide and
5              also there was abuse."
6        Do you see that?
7    A    Uh-huh.
8    Q    And so you were concerned about The
9    Hollywood Reporter article framing it specifically
10   with relation to Melissa Nathan's prior association
11   with Johnny Depp that it might mean that you had
12   something to hide and that there was abuse on set,
13   right?
14             MS. SHAPIRO:  Objection.
15             THE WITNESS:  Yes, actually.  Yes.
16   BY MS. SHAH:
17   Q    Okay.  And then you say:
18        (As read):
19             "I don't understand how we are letting
20             her continue to leak stories and do
21             this to us."
22        Do you see that?
23   A    Yes.
24   Q    Who is "her"?
25   A    I presume I meant Ms. Lively's team.

CONFIDENTIAL

Page 155

1       Q    Okay.  And then you ask Melissa Nathan to

2   walk you through it.  And then I want you to read

3   Melissa Nathan's response on the next page.

4       A    Do you want me to keep reading past

5   page 2?

6       Q    No, you don't need to.

7       A    Okay.

8       Q    So she tells you at the top:

9            (As read):

10               "Sure-firstly I am also incredibly

11               frustrated."

12           Do you see that?

13      A    I do.

14      Q    Then she goes on to say:

15           (As read):

16               "A PR should never be part of a story

17               but- I also work with many people who

18               are in trouble and protect them."

19           Do you see that?

20      A    Uh-huh.

21      Q    Was it your understanding from this text

22   message or any other conversation you had with her

23   about this topic, that she was also frustrated by

24   the publication of The Hollywood Reporter article?

25      A    I'm reading that here now so it appears

CONFIDENTIAL

Page 156

```
 1    she was frustrated.
 2         Q    Do you remember conveying -- her
 3    conveying to you that she was frustrated by it?
 4         A    I -- just here.  I don't remember outside
 5    of this.  I -- I was on a plane at the time, so we
 6    didn't speak.
 7         Q    Okay.  Did you speak to her outside of
 8    this text message about The Hollywood Reporter
 9    article?
10         A    I don't know.
11         Q    Do you recall any phone or in-person
12    conversations with her about The Hollywood Reporter
13    article?
14         A    Definitely not in person.  I don't -- I
15    don't remember any phone calls about it.  I feel
16    like -- I feel like this was me venting.  So this
17    was probably the conversation that we had.
18         Q    Okay.  And you're essentially asking her,
19    like, tell me why this isn't a bad look for me,
20    right?
21              MS. SHAPIRO:  Objection.
22              THE WITNESS:  I think I'm trying to
23    understand all of this.  I oftentimes reach out to
24    my team to say, help me understand this, I have a
25    feeling about something.  I don't like this.  Make
```

CONFIDENTIAL

Page 157

1    me feel better about it.  What does this mean?

2    What -- what is this?  And I'm not -- I'm not a PR

3    expert.

4    BY MS. SHAH:

5         Q    And would you agree with me that she did

6    try to make you feel better about it?

7         A    It -- it appears that she did try.

8         Q    She's essentially saying, this is not a

9    huge deal, it doesn't look terrible for you, right?

10        A    Yeah.  She's saying it's very normal.

11   But that people have crisis PR, but it seems to me

12   that she also said that it's not normal for PR to be

13   part of a story.  So...

14        Q    And if you look down to the fourth

15   paragraph, starting "Jen knows."

16             Do you see that?

17        A    "Jen knows," yes.

18        Q    She said:

19             (As read):

20                  "Jen knows - I spoke for an hour on the

21                  phone from 12-1 a.m. my time she swears

22                  she had nothing to do with it but I

23                  know someone placed this."

24             Do you see that?

25        A    I do.

CONFIDENTIAL

Page 158

1        Q    Did you have a suspicion that Jen Abel
2   had placed this?
3        A    No.
4        Q    Did you have a suspicion that
5   Stephanie Jones had placed this?
6        A    I had a suspicion that this was Blake's
7   team placing this.
8        Q    Did you have a suspicion that
9   Melissa Nathan had placed this?
10       A    No.
11       Q    And here, she's essentially communicating
12   to you, I'm frustrated by this, someone placed this,
13   it wasn't me, right?
14       A    I think maybe when I first reached out to
15   her, I may have -- I may have been confused and
16   wondered why my team might place this or if it was a
17   leak.  I don't really remember.  I just remember it
18   being such a weird headline.  But no, I never
19   suspected that Jen placed it.
20       Q    Did you ever suspect that Melissa placed
21   it?
22       A    Not in a negative way.  I think if I
23   reached out, I was confirming that no one from my
24   team would brag about me having crisis PR.  I didn't
25   think that was something worth bragging or making an

CONFIDENTIAL

Page 159

1    announcement about.

2         Q    Did you get confirmation from your team

3    or comfort from your team that no one from your team

4    had leaked this information?

5         A    I believe I did.  I believe this is part

6    of that.

7         Q    This message that Melissa is writing to

8    you is part of the confirmation that you were

9    getting that your team didn't have any part in

10   leaking this information, right?

11        A    I believe so.

12        Q    Okay.  And then she goes on to say:

13             (As read):

14                  "It doesn't make you look bad."

15             Do you see that?

16        A    Yes.

17        Q    You understood from this that she was

18   trying to reassure you that this wasn't a bad look

19   for you, right?

20        A    I imagine that's what she was doing.

21        Q    Okay.  And then she said:

22             (As read):

23                  "All the reporters like and trust me,

24                  which is why when they called me, they

25                  took out all the social media stuff and

CONFIDENTIAL

Page 160

1              did a straight story as they wouldn't

2              kill it."

3          Do you see that?

4      A    I do.

5      Q    Do you have any understanding of what she

6   meant by "they took out all the social media stuff"?

7      A    No, because even just reading it a second

8   ago, I think I missed that too.  Sometimes my

9   reading comprehension isn't great.  No, I have "all

10  the reporters like and trust me, which is why they

11  called me."  I have no idea what she's talking

12  about.

13     Q    Did you have an understanding, as of this

14  time, that she had spoken to reporters at THR or

15  about this article?

16     A    No.

17     Q    Did you have any understanding about, at

18  the time, that she had tried to influence the

19  article or kill it?

20     A    No, I think I missed that completely.

21     Q    Okay.  Is this the type of negative

22  association with Melissa Nathan and her past clients

23  and tactics that you think Steph was warning you

24  about before she hired you -- before you hired

25  Melissa?

CONFIDENTIAL

Page 161

1              MS. SHAPIRO:  Objection.

2              THE WITNESS:  I can't speculate to what

3      she was worried or warning me about.

4      BY MS. SHAH:

5          Q    Because you never spoke to her about it

6      yourself?

7          A    Yeah, I never did.

8          Q    Okay.  Did Melissa Nathan ever tell you

9      that she, in fact, was responsible for the leak that

10     culminated in this story?

11         A    She never did.

12         Q    Did she ever tell you that she was lying

13     to you when she thought -- when she told you that

14     she was incredibly frustrated by this?

15             MS. SHAPIRO:  Objection.

16             THE WITNESS:  She did not.

17     BY MS. SHAH:

18         Q    Did she ever tell you when she said "I

19     know someone placed this," that she actually knew

20     who had placed it?

21         A    She, obviously, did not.

22         Q    Did she ever tell you that it was one of

23     her friends?

24         A    Like before, she didn't tell me anything

25     except what I see here.

CONFIDENTIAL

Page 162

1          Q     Okay.  If those things were true, are
2     those things you would have wanted her to tell you
3     at the time when you reached out to ask about it?
4               MS. SHAPIRO:  Objection.
5               THE WITNESS:  I would imagine so, yes.
6     BY MS. SHAH:
7          Q     Okay.
8               MS. SHAH:  I'm going to show you -- pull
9     tab 40, please.
10              THE WITNESS:  Do you want me to hold onto
11    this?
12              MS. SHAH:  You don't have to.
13              I'm going to mark this as Exhibit 9.
14         (Exhibit 9 marked for identification.)
15              THE WITNESS:  Thanks.
16    BY MS. SHAH:
17         Q     It's a text thread between you,
18    Melissa Nathan, and Jen Abel, also dated
19    August 14th, 2024, Bates-stamped NATHAN_,several
20    zeroes, 4552.
21         A     Uh-huh.
22         Q     Turn for me to page that's stamped at the
23    bottom 4554, please.
24         A     Can I just read before then, too?
25         Q     Sure.

CONFIDENTIAL

Page 163

1          A     What was the page you wanted me to look

2     at?

3          Q     4554.  It's the page you're on.

4          A     Uh-huh.

5                Okay.

6          Q     Okay.  So you're sending a screenshot to

7     Jen and Melissa of a text that your old assistant,

8     Will, sent to you, right?

9          A     Yes.

10         Q     Did you read the text?

11         A     I did.

12         Q     And in that text, he's essentially

13    expressing to you that it's a bad look for you what

14    came out in The Hollywood Reporter story, right?

15               MS. SHAPIRO:  Objection.

16               THE WITNESS:  Yes.

17    BY MS. SHAH:

18         Q     Okay.  And you were passing that along to

19    Jen and Melissa to, what, seek their feedback on

20    that text?

21         A     I don't remember why I sent it.  I just

22    remember it didn't feel good.

23         Q     Why didn't it feel good?

24         A     Who's on this text, by the way?  Oh, it's

25    Melissa.

CONFIDENTIAL

Page 164

1          I mean, I'm being talked about in public
2    and that sucks.  And he's telling me that he thinks
3    that it looks like I'm trying to cover something up.
4    And he wants to just share with me because he knows
5    my heart and I -- you know, and I didn't want people
6    to think that because it wasn't true.
7          Q    And isn't this kind of association
8    exactly what Stephanie Jones was warning you about
9    when she advised you not to hire Melissa Nathan?
10               MS. SHAPIRO:  Objection.
11               THE WITNESS:  Again, I don't know what
12   Stephanie Jones was exactly referring to so I can't
13   answer that.
14   BY MS. SHAH:
15         Q    You understood that she had said to you
16   that being associated with a crisis communications
17   professional like Melissa Nathan could be used
18   against you because of that association, right?
19         A    I remember it at one of the texts you
20   showed me.
21         Q    And here -- here is at least one
22   independent source expressing that same view to you
23   now, right?
24         A    Yes.
25         Q    Okay.  Were you bothered by this?

CONFIDENTIAL

Page 165

1           MS. SHAPIRO:  Objection.

2           THE WITNESS:  I think I was.

3    BY MS. SHAH:

4        Q    Okay.  Can you think of another example

5    of a director of a film hiring crisis PR during the

6    promotion and release of the film related to the

7    promotion and release of the film?

8        A    I don't -- I can't think of an article

9    where anyone who hires crisis PR publicizes it.

10       Q    My question was:  Can you think of a

11   single example of a director who hired crisis PR

12   during the promotion and release of a film?

13          MS. SHAPIRO:  Objection.

14   BY MS. SHAH:

15       Q    In your industry?

16       A    Do you mean that I know of a director who

17   hired crisis PR, or that I read an article of a

18   director who hired crises PR?

19       Q    Either one.  Can you think of any other

20   example that you can think of where a director of a

21   film hired crisis PR during the promotion and

22   release of that film?

23       A    A director of a film hired crisis PR.  As

24   I sit here right now, I can't think of a director

25   that I would know that hired crisis PR.

CONFIDENTIAL

Page 166

```
 1        Q    Okay.  Pretty unique situation in the
 2   industry as far as you're aware?
 3             MS. SHAPIRO:  Objection.
 4             THE WITNESS:  I'm sorry.  What was the
 5   question?
 6   BY MS. SHAH:
 7        Q    Is that a pretty unique situation in your
 8   industry as far as you're aware?
 9        A    For what?
10        Q    That a director would hire a crisis PR in
11   connection with the promotion and release of a film
12   he was directing or she was directing?
13        A    I don't know.  Because I don't think
14   normally people find out when people hire crisis PR.
15        Q    But you can't think of a single other
16   example?
17        A    I can't right now.  No.
18        Q    Okay.
19             MS. SHAH:  Tab 83, please.
20             THE WITNESS:  Done with this one?
21   BY MS. SHAH:
22        Q    Actually, let's look at it for a second
23   more.  Just flip forward to the pages ahead of what
24   we were just talking about, from the beginning of
25   the text thread.  The pages ahead.  Sorry.
```

CONFIDENTIAL

Page 167

```
 1              MS. SHAPIRO:  What is the Bates number?
 2              MS. SHAH:  Start at the beginning of the
 3    document 4552.
 4              THE WITNESS:  Okay.
 5    BY MS. SHAH:
 6         Q    And through 4553.
 7              Am I correct that you and Jen and Melissa
 8    are talking about, generally speaking, what is going
 9    on with publicity around you and the film and this
10    issue and how to handle it?
11              MS. SHAPIRO:  Objection.
12              THE WITNESS:  I think there were more
13    articles coming out that she was sharing and giving
14    me context about.  And here, we're talking about the
15    trainer and my back.  That's from what I see.
16    BY MS. SHAH:
17         Q    Okay.  At the -- on the first page, the
18    first text, you wrote:
19              (As read):
20                   "Just woke up, texting Jennifer.  With
21                   all the texts I'm getting worried about
22                   me.  I imagine this truce didn't last?"
23              Do you see that?
24         A    Uh-huh.
25         Q    Do you recall getting texts that morning
```

CONFIDENTIAL

Page 168

1    or the day before that were concerned about you?

2         A    I remember going to sleep.  I don't know

3    if I was on a plane or where -- I don't remember

4    where I was.  But there were a lot of people asking

5    if I was okay.

6         Q    And they were asking if you were okay

7    because they had read The Hollywood Reporter article

8    about you hiring Johnny Depp's crisis publicist,

9    right?

10        A    I don't know what they were -- what they

11   had read.  I don't know how many articles there

12   were.  But I know that people were worried about me.

13        Q    Was it your understanding that that was,

14   at least in part, generated from The Hollywood

15   Reporter article or you think it was just a

16   coincidence and out of the blue?

17             MS. SHAPIRO:  Objection.

18             THE WITNESS:  I had no idea what it was

19   about.  That's why I think that's why I was texting

20   Jennifer.  And I make reference to a truce between

21   the two PR teams.

22   BY MS. SHAH:

23        Q    And what did you understand about that

24   truce?

25        A    That they would not be planting any

CONFIDENTIAL

Page 169

1   negative or untrue stories and that we would not be
2   talking to any media.
3         Q    Okay.  And you understood that that's a
4   truce that had been made between Melissa Nathan and
5   Leslie Sloane; is that right?
6         A    That's what was told to me.
7         Q    Okay.  And you understood as of this time
8   that both Melissa Nathan and the TAG team and
9   Jennifer Abel and the Jonesworks team were
10  interfacing with reporters about the incoming or
11  published stories that were happening around the
12  film and you; is that right?
13        A    I'm sorry.  Can you repeat that one more
14  time?
15        Q    Sure.  I'm trying to get a sense of what
16  you understood the TAG team and Melissa Nathan and
17  Jennifer Abel to be doing around this time vis-a-vis
18  publicity.  You understood that Melissa Nathan had
19  reached out to Leslie Sloane and formed some sort of
20  truce; is that right?
21        A    Yes.
22        Q    Okay.  You understood that Melissa Nathan
23  was monitoring and handling any incoming PR
24  inquiries; is that right?
25        A    I think I had believed that both her and

CONFIDENTIAL

Page 170

1    Jen were doing that.

2        Q    Okay.  You understood that Melissa Nathan

3    was interfacing with reporters as necessary on any

4    of these stories, right?

5        A    Interfacing, like -- communicating with?

6    (Cross talk.)

7        Q    Communicating with?  Sure.

8        A    Yeah.  Yeah.  My understanding was that

9    if someone reached out to her, then she would

10   obviously answer that or communicate with them in

11   whatever way a PR person communicates.

12       Q    And by "someone," you meant a reporter?

13       A    I would imagine.

14       Q    And by "she", you meant Melissa Nathan?

15       A    Or Jennifer Abel.

16       Q    Okay.  Did you understand that

17   Melissa Nathan and/or Jennifer Abel were actually

18   speaking to reporters whether on background or

19   otherwise around this time?

20       A    In what capacity?

21       Q    On your behalf.

22       A    Well, I imagine so.  There was a -- we

23   were still promoting the movie so...

24       Q    And you understood that both

25   Melissa Nathan and Jennifer Abel were speaking to

CONFIDENTIAL

Page 171

1    reporters on your behalf at this time?

2        A    I'm not sure if I ever thought about who

3    was speaking to who.

4        Q    Okay.

5        A    Did you want me to finish -- was there

6    something I didn't answer?

7        Q    No.

8        A    Okay.

9        Q    Were you finished with your answer?

10       A    I believe so.

11           MS. SHAH:  Okay.  Eighty-three, please.

12           THE WITNESS:  Now we're done with this?

13   BY MS. SHAH:

14       Q    Fair to say that you did not view The

15   Hollywood Reporter article as a positive for you

16   when it came out?

17       A    I think that's fair to say.

18       Q    Fair to say you would have been pretty

19   pissed if you had learned that Melissa Nathan had,

20   in fact, leaked the information that resulted in

21   that article, right?

22           MS. SHAPIRO:  Objection.

23           THE WITNESS:  I can't imagine I would

24   have been happy about that.

25

CONFIDENTIAL

```
 1              MS. SHAH:  All right.  I'm going to show
 2    you what's been marked as Exhibit 10.  It's a text
 3    thread between Melissa Nathan, Ashlea, and Amy
 4    Chozick dated August 13th, 2024, Bates stamped
 5    Nathan_, several zeroes, 1221.  Flip through this
 6    for me and tell me if you've ever seen this before.
 7          (Exhibit 10 marked for identification.)
 8              THE WITNESS:  No, I have never seen this.
 9    I don't have to flip through it.
10    BY MS. SHAH:
11        Q    Sorry.  I gave you the wrong one.
12             Do you know who Amy Chozick is?
13        A    I do not.
14        Q    Do you know if she's a reporter?
15        A    I do not.
16        Q    Okay.  Do you know who Ashlea is?
17        A    I do not.
18        Q    Do you know if she's one of
19    Melissa Nathan's good friends?
20        A    I do not.
21        Q    Okay.  On the first page of this, there's
22    a text from Amy Chozick and then a text from
23    Melissa Nathan that says:
24             (As read):
25                 "I am on Zoom but we need to pin Amy
```

CONFIDENTIAL

Page 173

```
 1              threw me to the wolves."
 2         Do you see that?
 3    A    Uh-huh.
 4    Q    And then Amy says:
 5         (As read):
 6              "I didn't know that Josh would put it
 7              on the wires."
 8         Do you see that?
 9    A    I do.
10    Q    And then Amy says:
11         (As read):
12              "My money is on Melissa against the
13              wolves anyway."
14         Do you see that?
15    A    I do.
16    Q    Then Melissa says:
17              "Stop sucking up."
18         And then Amy says:
19              "I should be your publicist.  Hire me."
20         Do you see that?
21    A    I do.
22    Q    And Melissa says:
23              "Done.  0.00 per year."
24         Do you see that?
25    A    I do.
```

CONFIDENTIAL

Page 174

```
 1        Q    Now, this text thread is on the same day
 2   as The Hollywood Reporter article was published.
 3             MS. SHAPIRO:  Is that a question?
 4             MS. SHAH:  No.
 5   BY MS. SHAH:
 6        Q    Are you aware of whether or not they're
 7   talking about The Hollywood Reporter article that
 8   named Melissa as your crisis PR?
 9             MS. SHAPIRO:  Objection.  He just said
10   that he's never seen this before.
11             THE WITNESS:  I've never --
12             MS. SHAPIRO:  Can you move to something
13   that he actually has knowledge of?
14             MS. SHAH:  No.  I'm going to ask him the
15   questions I'm going to ask him.
16             THE WITNESS:  Is it okay if I read the
17   document?
18             MS. SHAH:  Of course.
19             THE WITNESS:  Okay.  I've read it.
20   BY MS. SHAH:
21        Q    Do you now understand that they were
22   joking about The Hollywood Reporter article that
23   identified Melissa as your crisis PR?
24             MS. SHAPIRO:  Objection.
25             THE WITNESS:  It appears to be the case.
```

CONFIDENTIAL

Page 175

1    BY MS. SHAH:

2         Q    Okay.  Flip with me to the page marked

3    1222 at the bottom.

4         A    Okay.

5         Q    Do you see where Amy Chozick at around

6    7:40 says:

7              (As read):

8                   "I told our friend Josh that Melissa is

9                   a boss and has a cool client.  Josh

10                  told his wife who is a very prominent

11                  publicist.  Sarah somehow told The

12                  Hollywood Reporter and now they are

13                  doing a story on Mel."

14             Do you see that?

15        A    I do.

16        Q    You understand this is how The Hollywood

17   Reporter got that story?

18        A    It appears that is what Amy is saying.

19        Q    Flip the page to 1223.  You see a

20   screenshot texted by Melissa of a conversation

21   between her and Pam.  Do you see that?

22        A    I do.

23        Q    You don't need to flip back to the

24   article.  But I'll represent to you that Pam is Pam

25   McClintock who wrote The Hollywood Reporter story on

CONFIDENTIAL

```
 1   Melissa.
 2        A     Okay.
 3        Q     Okay.  And you see they're texting.
 4              (As read):
 5                   "Good to chat."
 6              Melissa says:
 7                   "Just checking in to see if I need to
 8                   look out for this article and if so,
 9                   when."
10              And then Pam says:
11                   "Was just texting you.  Story is very
12                   fair and going soon."
13              Melissa says:
14                   "Thank you."
15              Do you see that?
16        A     Yes.
17        Q     Were you aware that Melissa had spoken on
18   background with The Hollywood Reporter ahead of the
19   story being published?
20        A     I was not.
21        Q     Were you aware that she was managing
22   coverage in The Hollywood Reporter story about her
23   before the story was being published?
24        A     I was not.
25        Q     Amy Chozick writes:
```

CONFIDENTIAL

Page 177

1              "Perfect."

2         Do you see that?

3    A    Oh, sorry, down here.  Yes.

4    Q    And if you flip the page, they are

5    talking about:

6              (As read):

7                   "What publication?"

8                   "THR."

9                   "Ooh exciting."

10                   "I think so!"

11         Do you see that?

12    A    Yes.

13    Q    Were you aware that Melissa and her

14    friends were boasting and joking about how good this

15    article was going to be for Melissa at the time?

16              MS. SHAPIRO:  Objection.

17              THE WITNESS:  I wasn't aware of this, so

18    no.

19    BY MS. SHAH:

20    Q    Because Melissa never told you any of

21    this, did she?

22              MS. SHAPIRO:  Objection.

23              THE WITNESS:  I think I testified to what

24    Melissa told me earlier.  Which was not this.  So...

25

CONFIDENTIAL

Page 178

1    BY MS. SHAH:

2        Q    Okay.  If you flip the page to 1225,

3    you'll see that Melissa texts The Hollywood Reporter

4    story to this group thread when it goes up.

5            Do you see that?

6        A    Uh-huh.

7        Q    Okay.  And then Ashlea says:

8            (As read):

9                "Oh, that's really good, Mel.  Like

10               really good."

11           Do you see that?

12       A    I see it.

13       Q    And then Amy says:

14               "Boom!  This is good."

15           Right?

16       A    I -- yes, I see it.

17       Q    And then Amy, lower below, says:

18           (As read):

19               "You are going to hear from all the

20               problematic men!  Dick pic-a-palooza."

21           Ashlea says:

22               "Men are always the problem.  You're in

23               the right game."

24           Do you see that?

25       A    I do.

CONFIDENTIAL

Page 179

1          Q    What do you think of this seeing it now?
2               MS. SHAPIRO:   Objection.
3               THE WITNESS:   I think it sounds like a
4    group of female friends talking to each other about
5    an article.
6    BY MS. SHAH:
7          Q    Are you pleased to see that Melissa was
8    joking with her friends about the article that was
9    causing you consternation at the time?
10              MS. SHAPIRO:   Objection.
11              THE WITNESS:   I'm not pleased.  I don't
12   think that's the word but...
13   BY MS. SHAH:
14         Q    Are you pleased by the fact that when you
15   asked her to explain this article for you and what
16   it meant, she didn't tell you any of this?
17              MS. SHAPIRO:   Objection.
18              THE WITNESS:   I'm sorry, can you?
19   BY MS. SHAH:
20         Q    Are you pleased by the fact that when you
21   asked Melissa, explain this article to me and what
22   it means, she didn't tell you any of this?
23              MS. SHAPIRO:   Objection.
24              THE WITNESS:   Again, I wouldn't say I'm
25   pleased.  No.

CONFIDENTIAL

                                                    Page 180

1    BY MS. SHAH:

2         Q    Are you pleased to be lumped in, among

3    Melissa's friends, with a group of all the

4    problematic men that need Melissa's help?

5              MS. SHAPIRO:  Objection.

6              THE WITNESS:  I would hope that they

7    weren't thinking I was one of the problematic men,

8    but that she was going to hear from all of the

9    problematic men.  Then it says:

10             (As read):

11                  "Dick pic-a-palooza."

12             So, whatever that means.

13   BY MS. SHAH:

14        Q    Do you understand from this that

15   essentially what they're saying is, this is an

16   article about how Melissa has helped Johnny Depp in

17   his abuse trial against Amber Heard and is now

18   helping you in relation to the allegations by

19   Blake Lively against you, and so now she's going to

20   be hearing from all of the problematic men?

21             MS. SHAPIRO:  Objection.

22             THE WITNESS:  I believe one could infer

23   that that was what they were talking about.

24   BY MS. SHAH:

25        Q    Do you see Melissa anywhere in this text

CONFIDENTIAL

Page 181

1    thread saying, what are you talking about, Justin is

2    not a problematic man?

3                MS. SHAPIRO:  Objection.

4                THE WITNESS:  Not in the pages that you

5    gave me.

6    BY MS. SHAH:

7        Q    Instead, if you look at 1226, you will

8    see that Ashlea says:

9                (As read):

10                    "Blake Lively noting Melissa's name.

11                    Haha."

12              Then Amy says:

13              (As read):

14                    "Joaquin Phoenix is calling."

15              And then Melissa says:

16              (As read):

17                    "I fucking wish."

18              Right?

19        A    I see that.

20        Q    Do you have a view from this text thread

21    about whether or not Melissa thought the publication

22    of this article was going to be good for her

23    business?

24                MS. SHAPIRO:  Objection.

25                THE WITNESS:  I can't guess on what

CONFIDENTIAL

Page 182

1   Melissa was thinking or feeling at that time.

2   BY MS. SHAH:

3        Q    Do you think it would have been fair for

4   people to infer from the fact that you chose to hire

5   Melissa Nathan, that you were now one of a group of

6   problematic men that she tended to work with?

7              MS. SHAPIRO:  Objection.

8              THE WITNESS:  Do I think it would be fair

9   for people to infer?  I think people's opinions are

10  fair.  I mean, I -- I can't control people's

11  opinions.

12  BY MS. SHAH:

13       Q    Do you think that would be a fair

14  inference for people to draw from the fact that you

15  had hired Melissa Nathan who had also worked with

16  other problematic men?

17             MS. SHAPIRO:  Objection.

18             THE WITNESS:  I think -- yeah.  I think

19  that would be fair.  I think in this case, yeah.

20  BY MS. SHAH:

21       Q    Do you think you're a problematic man?

22             MS. SHAPIRO:  Objection.

23             THE WITNESS:  I don't.

24  BY MS. SHAH:

25       Q    Not in any respect?

CONFIDENTIAL

Page 183

1           MS. SHAPIRO:  Objection.

2           THE WITNESS:  I'm not sure how to answer

3    that.

4    BY MS. SHAH:

5        Q    With a yes or no.

6        A    I don't.

7        Q    Okay.

8           Do you think that this is the type of

9    association, looking back with hindsight, that

10   Steph Jones was trying to warn you about when she

11   warned you not to hire Melissa Nathan?

12          MS. SHAPIRO:  Objection.

13          THE WITNESS:  Again, I -- I don't know

14   everything that was in Stephanie Jones's head, but I

15   think that could be a fair thing to think.

16   BY MS. SHAH:

17       Q    You said you felt at the time that

18   Stephanie Jones had an agenda in warning you against

19   Melissa Nathan.  Do you remember that?

20       A    I do.

21       Q    Seeing this and in hindsight, do you

22   still think she had an agenda or do you think she

23   was trying to protect your interests?

24       A    I don't -- I can't know what she was

25   truly doing.  I just know that the feeling that I

CONFIDENTIAL

Page 318

1                REPORTER'S CERTIFICATE

2              I, ASHLEY SOEVYN, a Certified Shorthand

3       Reporter of the State of California, do hereby

4       certify:

5              That the foregoing proceedings were taken

6       before me at the time and place herein set forth;

7       at which time the witness was put under oath by me;

8              That the testimony of the witness, the

9       questions propounded, and all objections and

10      statements made at the time of the examination were

11      recorded stenographically by me and were thereafter

12      transcribed;

13             That a review of the transcript by the

14      deponent was/ was not requested;

15             That the foregoing is a true and correct

16      transcript of my shorthand notes so taken.

17             I further certify that I am not a relative

18      or employee of any attorney of the parties, nor

19      financially interested in the action.

20             I declare under penalty of perjury under

21      the laws of California that the foregoing is true

22      and correct.  Dated this 7th day of October 2025.

23

24

        ASHLEY SOEVYN

25      CSR No. 12019