# EXHIBIT 18
# (Dkt. 871-16)

CONFIDENTIAL

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                     ---oOo---
 4
 5   BLAKE LIVELY,
 6              Plaintiff,
 7     vs.        CASE NO. 24-CV-10049-LJL (LEAD CASE)
                              25-CV-449 (LJL) (MEMBER CASE)
 8
     WAYFARER STUDIOS LLC, ET AL.
 9
                Defendants.
10   _____
     JENNIFER ABEL,
11              Third-party Plaintiff,
        vs.
12   JONESWORKS, LLC,
                Third-party Defendant.
13   _____
     WAYFARER STUDIOS LLC, et al.
14              Consolidated Plaintiffs,
        vs.
15   BLAKE LIVELY, et al.
                Consolidated Defendants.
16   _____
17                  **CONFIDENTIAL**
18
19       VIDEO-RECORDED DEPOSITION OF JENNIFER ABEL
20              Los Angeles, California
21            Thursday, September 25, 2025
22
23   Stenographically Reported by:  Ashley Soevyn,
     CALIFORNIA CSR No. 12019
24
25
```

CONFIDENTIAL

Page 2

1       UNITED STATES DISTRICT COURT
2     FOR THE SOUTHERN DISTRICT OF NEW YORK
3                   ---oOo---
4
5  BLAKE LIVELY,
6              Plaintiff,
7     vs.       CASE NO. 24-CV-10049-LJL (LEAD CASE)
                         25-CV-449 (LJL) (MEMBER CASE)
8
   WAYFARER STUDIOS LLC, ET AL.
9
              Defendants.
10 _____
   JENNIFER ABEL,
11           Third-party Plaintiff,
     vs.
12 JONESWORKS, LLC,
             Third-party Defendant.
13 _____
   WAYFARER STUDIOS LLC, et al.
14           Consolidated Plaintiffs,
     vs.
15 BLAKE LIVELY, et al.
             Consolidated Defendants.
16 _____
17               **CONFIDENTIAL**
18        Video-recorded Deposition of
19 JENNIFER ABEL, taken on behalf of the Plaintiff
20 Blake Lively, Pursuant to Notice, at the offices of
21 Willkie Farr & Gallagher, 2029 Century Park East,
22 Los Angeles, California beginning at 9:17 a.m.  and
23 ending at 7:23 p.m. on Thursday, September 25, 2025,
24 before me, ASHLEY SOEVYN, California Certified
25 Shorthand Reporter No. 12019.

CONFIDENTIAL

```
                                              Page 77
 1        Q     And after the ▉▉▉▉▉▉▉, did your
 2   communications decrease in terms of frequency?
 3        A     No, because the ▉▉▉▉▉▉▉ was ongoing.
 4   There was multiple cities, so our communications
 5   continued.
 6        Q     And were these communications just
 7   between the two of you?
 8        A     Not always, no.  There were -- I had a
 9   team of -- of -- let's see -- on that account,
10   probably around four people, four to five people who
11   were privy to a majority of those conversations.
12        Q     Would you say you communicated with her
13   more frequently -- well, strike that.
14              How did you communicate with Ms. Nathan?
15        A     The -- the means in which we
16   communicated?  Phone, email, text message.
17        Q     Signal?
18        A     No.
19        Q     Have you ever communicated with
20   Ms. Nathan on Signal?
21        A     Following this -- for -- following this
22   litigation, yes.  For this litigation, yes.
23        Q     Prior to this litigation, had you ever
24   communicated with Ms. Nathan on Signal?
25        A     I -- I don't recall.  I know that there
```

Page 78

1  was conversations of starting Signal.  I wasn't
2  using it at the time.  I was being asked to download
3  it.  I -- I -- I'd have to go through either
4  documents, or maybe my memory can be recollected
5  later, when I actually downloaded Signal and we
6  started communicating.
7         Q    Who asked you to download Signal?
8         A    So I had --
9              MR. FREEDMAN:  If -- I would instruct you
10 not to answer --
11             THE WITNESS:  Sure.
12             MR. FREEDMAN:  -- to the extent this
13 invades the attorney-client privilege.
14             THE WITNESS:  Uh-huh.  Well, initially
15 Stephanie Jones asked me to download Signal.  She
16 used it frequently.  And we were working together
17 with a client to -- who primarily used Signal.  And
18 then after that client terminated us, I had
19 deactivated the app because I didn't use it for
20 anything else.
21 BY MS. TAHLER:
22        Q    And after that deactivation, up until the
23 time of this lawsuit, did you reactivate Signal?
24        A    Yes.
25        Q    And why was that?

Page 79

1  A   Again, it was -- I believe that this
2  would be attorney protected.
3  Q   When was this?
4  A   When?  August.  It would be August.  I
5  don't recall when in August.  I apologize.  But it
6  would be August 2024.
7  Q   An attorney instructed you to download
8  Signal?
9  A   I don't believe the attorney -- an
10 attorney instructed me to download it, initially,
11 but my communications in Signal are with attorneys.
12 Q   Which attorneys?
13 A   My attorneys, Bryan Freedman, et al.
14 Q   And you had Signal communications with
15 Mr. Freedman -- this is just a yes-or-no answer --
16 A   Uh-huh.
17 Q   -- in August of 2024?
18 A   I -- I believe a chain was started.  I
19 don't think there were communications on that chain.
20 Q   Was Mr. Freedman your personal attorney
21 in 2024?
22 A   No.
23 Q   Was he an attorney for Mr. Baldoni?
24 A   He --
25     MR. FREEDMAN:  Just to clarify, you're

Page 82

1  ever used it.
2       Q    Who is the "we" in that statement?
3       A    Oh, sorry.  Me and Bryan Freedman.
4            THE STENOGRAPHIC REPORTER:  Exhibit 5 for
5  the record.
6         (Exhibit 5 marked for identification.)
7  BY MS. TAHLER:
8       Q    And I apologize, I should have asked
9  another question before we get to this exhibit.
10      A    Okay.
11      Q    Did you communicate -- would you
12 communicate from time to time on WhatsApp?
13      A    I did use the app WhatsApp.  I'm unclear
14 if I used it for business purposes.  I don't believe
15 so, but I -- I'm -- I'd have to think more about
16 that, if I used it for business.
17      Q    Do you recall if you communicated with
18 Ms. Nathan on WhatsApp?
19      A    I don't recall communicating with her on
20 WhatsApp, no.
21      Q    Ms. Abel, you've been shown what has been
22 marked Abel 5.  It's a document Bates-stamped
23 Jonesworks_JA, several zeroes, ending in 789.
24           Do you recognize this document?
25      A    I'm just -- I'm just looking at it really

Page 146

1   referencing when there was a discussion about
2   bringing on crisis for Wayfarer and Mr. Baldoni?
3       A   Yes.
4       Q   And at the end, you tell Ms. Jones that
5   you've:
6           (As read:)
7               "Only ever worked with ▮▮▮▮▮ or
8                ▮▮▮▮▮▮▮ not familiar with ▮▮▮ but
9                trust your reccs."
10          Did you recommend those firms to
11  Wayfarer?
12      A   Yes.
13      Q   Who did you recommend them to?
14      A   Tera Hanks.
15      Q   Do you know whether or not Wayfarer
16  actually reached out to either of those firms?
17      A   I do not.
18          THE STENOGRAPHIC REPORTER:  Exhibit 15.
19          MS. TAHLER:  Sorry.  Hold on.
20  BY MS. TAHLER:
21      Q   You also recommended Melissa Nathan to
22  Wayfarer; isn't that right?
23      A   Yes.
24      Q   Who did you recommend her to?
25      A   I -- I recall Jamey Heath and I having

1                REPORTER'S CERTIFICATE

2           I, ASHLEY SOEVYN, a Certified Shorthand

3   Reporter of the State of California, do hereby

4   certify:

5           That the foregoing proceedings were taken

6   before me at the time and place herein set forth;

7   at which time the witness was put under oath by me;

8           That the testimony of the witness, the

9   questions propounded, and all objections and

10  statements made at the time of the examination were

11  recorded stenographically by me and were thereafter

12  transcribed;

13          That a review of the transcript by the

14  deponent was/ was not requested;

15          That the foregoing is a true and correct

16  transcript of my shorthand notes so taken.

17          I further certify that I am not a relative

18  or employee of any attorney of the parties, nor

19  financially interested in the action.

20          I declare under penalty of perjury under

21  the laws of California that the foregoing is true

22  and correct.  Dated this 26th day of September,

23  2025.

24                    [signature]

25                    ASHLEY SOEVYN

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.