# EXHIBIT 4

Filed Under Seal

# (Dkt. 874-4)

CONFIDENTIAL

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                  ---oOo---
 4
 5   BLAKE LIVELY,
 6              Plaintiff,
 7     vs.        CASE NO. 24-CV-10049-LJL (LEAD CASE)
                        25-CV-449 (LJL) (MEMBER CASE)
 8
 9   WAYFARER STUDIOS LLC, ET AL.
10              Defendants.
     _____
11   JENNIFER ABEL,
              Third-party Plaintiff,
12     vs.
     JONESWORKS, LLC,
              Third-party Defendant.
13   _____
14   WAYFARER STUDIOS LLC, et al.
              Consolidated Plaintiffs,
15     vs.
     BLAKE LIVELY, et al.
              Consolidated Defendants.
16   _____
17              **CONFIDENTIAL**
18
19     VIDEO-RECORDED DEPOSITION OF MELISSA NATHAN
20              Los Angeles, California
21             Monday, September 29, 2025
22
23   Stenographically Reported by:  Ashley Soevyn,
     CALIFORNIA CSR No. 12019
24
25
```

CONFIDENTIAL

Page 48

1    me strike that and try to be clear.

2            When you said you understood that you

3    were required to preserve everything related to this

4    matter, Ms. Lively had allegations other than sexual

5    harassment allegations, correct?

6        A    Whatever was in here, I knew I was meant

7    to preserve it, and I did that.

8        Q    Okay.  And you knew that those

9    preservation requirements extended to text messages

10   and social media accounts and emails, right?

11       A    From the 20th of December, I knew that,

12   yes.

13       Q    And including messages sent through

14   WhatsApp or Signal or other ephemeral messaging

15   platforms?

16       A    I did.

17       Q    Okay.  And did you preserve all of your

18   messages after this point in time?

19       A    I did.

20       Q    You -- you have a messaging app on your

21   phone.  Do you have any auto delete functions

22   enabled, so far as you know, on your text messages

23   on your phone?  Your regular messaging app, not

24   Signal or WhatsApp or any other?

25       A    During what time period?  In general?  Or

CONFIDENTIAL

Page 49

```
1    my text?
2           Q    In general.
3           A    No.
4           Q    And did you at any point during the time
5    period of July 1st, 2024 to the present, ever have
6    an auto delete function enabled on your regular
7    messaging app on your phone?
8               MR. FREEDMAN:  Objection.
9               THE WITNESS:  No.
10   BY MR. GOTTLIEB:
11          Q    You sometimes use Signal; is that right?
12          A    I do.
13          Q    And you were using Signal, at least for
14   some purposes, in July and August of 2024; is that
15   right?
16          A    It is.
17          Q    And Signal is not like the standard Apple
18   messaging product; is that right?
19          A    I can't speak to the Apple messaging
20   product, but I know what Signal is used for.
21          Q    And what is it used for?
22          A    It's used to -- it's been really popular
23   especially in all of our live business over the last
24   couple of years because there is an option that you
25   can -- it auto deletes messages for private
```

CONFIDENTIAL

Page 50

1   communications to deal with all clients.

2          Q     Okay.  That's been popular in your line

3   of work over the last couple of years?

4          A     It is.

5          Q     Do you use it for many clients that you

6   work for?

7          A     Not all, but I used -- it's become

8   popular over the last couple of years, yes.

9          Q     Okay.  Not all but --

10         A     Not all.

11         Q     -- but a significant number?

12         A     I would -- yeah.  And it's becoming more

13  so, yes.

14         Q     Okay.  And you used Signal for

15  communications relating to the Wayfarer parties; is

16  that right?

17         A     At what point?

18         Q     Well, when was the first time that you

19  can remember sending or receiving a Signal message

20  that concerned Justin Baldoni, the Wayfarer parties,

21  Blake Lively, any of the things connected to this

22  case?

23         A     I can't remember that.

24         Q     Was it in August of 2024?

25         A     I don't know.

CONFIDENTIAL

Page 51

1      Q    You don't know, as you sit here today,

2   whether you sent or received a single message on

3   Signal in August of 2024 relating to this -- this

4   matter?

5      A    I don't know.

6      Q    You used Signal when you communicate with

7   Jed Wallace; is that right?

8      A    Amongst other things, yes.

9      Q    What other things?

10     A    Telephone.

11     Q    What else?

12     A    Text.

13     Q    What else?

14     A    Email.

15     Q    What else?

16     A    To the best of my knowledge, that's it.

17     Q    Voice memos?

18     A    I don't send voice memos.

19     Q    Have you received voice memos from

20  Mr. Wallace?

21     A    Yes.

22     Q    Do any of those voice memos have an auto

23  delete function attached to them?

24     A    I'm not sure.

25     Q    Do you have any understanding of what the

CONFIDENTIAL

Page 91

```
 1        A    I can't remember.

 2        Q    Do you have a recollection of who was on

 3   the first call that you had with Wayfarer?

 4        A    I think it was just Jamey and Jen.  I

 5   think.

 6        Q    So just Mr. Heath and Ms. Abel?

 7        A    Yes.

 8        Q    And you don't have a recollection of

 9   Ms. Hanks being a part of that discussion?

10        A    No.

11        Q    Okay.

12             MR. GOTTLIEB:  Let's look at --

13   Ms. Nathan, I'm handing you what's been marked as

14   Exhibit 4.  This is a document bearing the Bates

15   numbers Nathan 3795 through Nathan 3798.

16         (Exhibit 4 marked for identification.)

17   BY MR. GOTTLIEB:

18        Q    This appears to be an email from Katie

19   Case to you and some other people on Friday,

20   July 26th, 2024, with some emails below it?

21        A    Yes.

22        Q    Do you recognize this document?

23        A    I do.

24        Q    What is it?

25        A    This is an email sent by Katie to the
```

CONFIDENTIAL

Page 92

1    Wayfarer team thanking for the call and attaching

2    the scope of work.

3        Q    Okay.  And if we work backwards from the

4    bottom of page 3795, the first page of this

5    document --

6        A    Uh-huh.

7        Q    -- you see a series of emails here.  The

8    first one is Thursday, July 25th, 2024 at

9    9:25 p.m.

10            Do you see that?

11       A    I do.

12       Q    And that's from Mr. Heath to Katie Case,

13   Tera Hanks.  And then I see your email, and is that

14   Ms. Koslow's email?

15       A    At the top, yes.

16       Q    Okay.  So Mr. Heath has sent a message to

17   you, Ms. Hanks, Ms. Case, and Ms. Koslow that simply

18   just says:

19            (As read):

20                "Thank you Katie."

21            At 9:25 p.m. on the 25th of July; is

22   that right?

23       A    That is correct.

24       Q    And Ms. Hanks replies, also on the 25th

25   of July, looks like around 6:30 p.m.:

CONFIDENTIAL

Page 93

1              (As read):

2                   "I would love to jump on a Zoom now, if

3                   possible.  If that works, can you

4                   please provide a link?"

5         Do you see that?

6    A    Yes.  I do.

7    Q    And then you respond at 12:42 a.m. on

8    Friday July 26th, saying:

9              (As read):

10                  "Thank you so much for taking the time

11                  to speak with us.  Jen and our team

12                  will connect tomorrow and go through

13                  everything.  We will aim to have a plan

14                  to you by the end of tomorrow."

15        Do you see that?

16   A    I do see that.

17   Q    Okay.  So does that mean that you had a

18   conversation with Mr. Heath and Ms. Hanks at some

19   point here in between the evening of July 25th and

20   early-early in the morning of the 26th?

21   A    I don't know if we spoke early in the

22   morning of the 26th because that was -- it says

23   "Thank you so much for the time last evening," but

24   that would mean the night before.  Yes.

25   Q    All I'm -- okay.  Fair enough.  So

CONFIDENTIAL

Page 94

1    we'll -- we'll stipulate to evening of the 25th.

2         A    Yes.

3         Q    You've got -- you have a meeting.

4              And then you see the top of the email is

5    Ms. Case responding, sending to you and that same

6    group with a scope of work.

7              Do you see that?

8         A    Yes.

9         Q    Is that -- is that the document that is

10   attached here with the pages 3797 and 3798 on it?

11        A    If this is what's been provided to you on

12   that exact -- from our emails that you have, then

13   yes.

14        Q    Okay.  And you see that the -- on the

15   first page if you go back, it says "Attachments:

16   Wayfarer Studios TAG PR Scope of Work July 26th,

17   2024"?

18        A    I do see that.

19        Q    Okay.  And then do you see the header at

20   the top of the attachment that says "Scope of Work

21   July 26, 2024"?

22        A    Yes.

23        Q    Okay.  Does this look like the document

24   you sent over to Wayfarer Studios on that day?

25        A    I'm going to trust my lawyers and say to

CONFIDENTIAL

Page 203

1                MR. FREEDMAN:  Objection.

2                THE WITNESS:  I can't speak to their

3      work.  I can only speak to my work.

4      BY MR. GOTTLIEB:

5           Q    Street Relations was, in fact, engaged on

6      a three-month term for $30,000 a month; is that

7      right?

8                MR. FREEDMAN:  Objection.

9                THE WITNESS:  I'm happy -- I know they

10     were engaged by Wayfarer, but if you have it, I can

11     look at the terms.

12     BY MR. GOTTLIEB:

13          Q    Okay.

14               MR. GOTTLIEB:  Let's look at another

15     document.

16               THE STENOGRAPHIC REPORTER:  Exhibit 14.

17          (Exhibit 14 marked for identification.)

18               THE WITNESS:  Thank you.

19     BY MR. GOTTLIEB:

20          Q    Ms. Nathan, you've been handed what's

21     been marked as Exhibit 14.

22          A    Thank you.

23          Q    Take a minute to look at it.  This is a

24     text message with the Bates Nos. KCASE 4802 through

25     4805.  The date is August 7th, 2024.

CONFIDENTIAL

Page 204

1          A     Thank you.

2                Thank you.

3          Q     Ms. Nathan, Exhibit 14 is a text exchange

4    between you and Katie Case on August 7th, 2024?

5          A     Yes.

6          Q     Do you see at 12:26 p.m., you write to

7    Ms. Case that you're on with Jamie and Jen about

8    social?

9          A     I do.

10         Q     12:26 p.m.?

11         A     Oh, yes, sorry.

12         Q     You were on a call with Mr. Heath and Ms.

13   Abel about the social -- however we describe this,

14   the social plan?

15         A     If I wrote that, yes, I was at that time.

16         Q     And it looks like Ms. Case was not on

17   that call with you.  She says "let me know how it

18   goes"?

19         A     Yes, I see that.

20         Q     You see then at 12:27 p.m., you send

21   through a draft of the text we looked at earlier

22   with the two quotes in it?

23         A     I do.

24         Q     And you said, "I think quote two" to

25   Ms. Case.

CONFIDENTIAL

Page 205

```
 1              Do you see that?
 2         A    I see that.
 3         Q    And then at 12:36 p.m., you type out:
 4              (As read):
 5                   "30K monthly for three month minimum,
 6                   properly and strategically monitor
 7                   damaging Reddit/subreddit, X, Discord,
 8                   X or et cetera threads relating to
 9                   concerning opposition and manage the
10                   narrative.  This can only be done with
11                   legacy admin for each platform.  They
12                   work for us."
13         A    I see that.
14         Q    Do you see that?
15              You wrote that?
16         A    I did.
17         Q    Where did you get that language?
18         A    I'm not sure where -- who sent it to me.
19         Q    Is there any person other than
20    Jed Wallace who could have sent that to you?
21              MR. GLOVER:  Objection.
22              THE WITNESS:  I wasn't speaking to anyone
23    else on -- at this point for this case.
24    BY MR. GOTTLIEB:
25         Q    And these -- these services are a
```

CONFIDENTIAL

Page 206

1    description of services that you believe

2    Jed Wallace -- Jed Wallace could provide, right?

3                    MR. GLOVER:  Objection.  Form.

4                    THE WITNESS:  I do not understand what

5    these services are, so -- half of them, I don't

6    understand what they are.

7    BY MR. GOTTLIEB:

8        Q    Okay.  What half do you understand?

9        A    I understand monitoring.

10       Q    Okay.

11       A    I do understand the Wiki situation

12   because I've had different issues with that from my

13   other clients.  That's why you need admin editors,

14   which is very aboveboard.

15       Q    Okay.

16       A    I don't --

17       Q    That's a reference to the second sentence

18   here:

19               (As read):

20                   "With seasoned admin editors on

21                   peripheral elements like Wikipedia and

22                   fan pages"?

23       A    Yes, you need to have editors to be able

24   to overlook Wikipedia these days.  It's different to

25   what it used to be.

CONFIDENTIAL

Page 207

1          Q       When you say "overlook," to watch changes

2     to --

3          A       To make sure the changes don't happen.

4     Because even when people add changes into your

5     pages, as I've had, it's difficult to change them

6     afterwards.  It used to be easy.

7          Q       What does this mean in the parenthetical

8     here:

9                  (As read):

10                      "This can only be done with legacy

11                      admin for each platform.  They work for

12                      us"?

13         A       I don't know.  I know what legacy admin

14     is.

15         Q       What's that?

16         A       Legacy admin is people that have been

17     there for a long time; hence, the Wikipedia stuff.

18         Q       People who have been where for a long

19     time?

20         A       Editors that can change Wiki.  That's

21     what I think.

22         Q       Administrators at Wikipedia?

23         A       I think so.

24         Q       And you notice here it says, "each

25     platform," right?

CONFIDENTIAL

Page 208

1          A     Yes.

2          Q     And above in the sentence, there's a

3     reference to "Reddit"?

4          A     Uh-huh.

5          Q     And X?

6          A     Uh-huh.

7          Q     And Discord?

8          A     Uh-huh.

9          Q     Those are platforms that have online

10    content, right?

11         A     Yup.

12         Q     Presumably, they have admins?

13         A     I have no idea.

14         Q     Have you ever had a conversation with

15    Mr. Wallace in the entire time you've known him

16    about admins at Reddit?

17         A     Not to my knowledge.

18         Q     X?

19         A     Not to my knowledge.

20         Q     Discord?

21         A     I don't even know what Discord is.

22         Q     Then you write:

23               (As read):

24                    "Again, the real value is when you can

25                    actively sway the algorithm with one

CONFIDENTIAL

Page 209

1              SEO-charged hub/site."

2         Do you see that?

3    A    I see that.

4    Q    What does that mean?

5    A    I don't know.

6    Q    Why did you send this to Ms. Case to be

7    written up into a document if you didn't know what

8    it meant?

9    A    This was -- this is -- this was exactly

10   this, which was the social/digital or the other one

11   with the price for hiring digital.

12   Q    Okay.  But you didn't -- you didn't know

13   what it meant at all?

14   A    Like I said, half, some.  But that's why

15   I choose to work with external vendors that know

16   about these things that I don't know about.

17   Q    Do you know what it means to actively

18   sway the algorithm?

19   A    I have an idea.

20   Q    What is your idea?

21   A    To change an algorithm.  To change

22   something online.

23   Q    What does it mean to do that with one

24   SEO-charged hub or site?

25   A    I don't know.

CONFIDENTIAL

Page 292

1         A    Sure.

2         Q    How long have you known Jed Wallace?

3              THE WITNESS:  I'm so sorry.  Before we do

4    this, can I use the bathroom?

5              MR. GOTTLIEB:  Sure.

6              THE VIDEOGRAPHER:  Off record.  The time

7    is 3:48 p.m.  Please disconnect your microphones

8    before you leave the table.

9              (Recess.)

10             THE VIDEOGRAPHER:  The time is 4:10 p.m.

11   We're back on record.

12   BY MR. GOTTLIEB:

13        Q    How long have you known Jed Wallace?

14        A    I've known Jed for around between five to

15   six years.

16        Q    How did you meet Mr. Wallace?

17        A    Through a client.

18        Q    Which client?  And if you want to go AEO

19   for any of this, you're welcome to.

20        A    Sure, yes.  I would like to.

21             MR. FREEDMAN:  Yup.  We're going to go

22   AEO.

23             THE VIDEOGRAPHER:  If any of the

24   participants in the Zoom room need to be removed due

25   to that, we do not have Mr. Heath present at the

CONFIDENTIAL

Page 304

1          A     I don't recall.
2          Q     How about on the ███████████ matter?
3     What did Jed Wallace do in that matter?
4                MR. GLOVER:  Objection, form.
5                THE WITNESS:  I'm not too sure.
6     BY MR. GOTTLIEB:
7          Q     Do you have any idea?
8          A     No.
9                MR. GLOVER:  Objection.  Form.
10    BY MR. GOTTLIEB:
11         Q     Is that by design, Ms. Nathan?
12         A     Is what by design?
13               MR. FREEDMAN:  Objection.  Form.
14    BY MR. GOTTLIEB:
15         Q     The fact that you are testifying that you
16    do not know anything about what Jed Wallace does?
17         A     I didn't testify that.  I said I do know
18    what -- I know what he does in my opinion, which is
19    work in the digital space.  I know that he works
20    with people that are in active addiction and also
21    getting them into addiction-type facilities.  That's
22    what I personally know.
23         Q     What does "work in the digital space"
24    mean?
25         A     If I knew about digital, I would be the

CONFIDENTIAL

Page 305

1   one doing it because you can make really good money

2   doing it.

3          Q    I certainly understand there's a

4   distinction between being an expert in the digital

5   space and an expert in searching and optimization

6   and experts in the various things Mr. Wallace does

7   and having a general knowledge or understanding of

8   what some of that work entails.

9          A    Yes.

10         Q    So is it really your testimony that apart

11  from that he works in the digital space, that you

12  don't know anything more about what that means?

13         A    That's why I hire someone else to do it.

14  I do not work in the digital space.  I don't even

15  barely have social media myself.

16         Q    How do you --

17         A    But I know it's important.

18         Q    Sorry.

19         A    No.  I know it's important.  As I

20  testified earlier, it's come to the situation right

21  now that all legal firms, including your own, hire a

22  digital service because we do not understand

23  digital.  I'm finding out more every day.  Maybe

24  next year, my answer might be different.

25         Q    How do you know that it's not just all a

CONFIDENTIAL

Page 306

```
 1    fraud or a Ponzi scheme?
 2                 MR. GLOVER:  Objection.  Form.
 3                 THE WITNESS:  I don't know.
 4    BY MR. GOTTLIEB:
 5          Q     You don't know?
 6          A     How do I know?  Yours -- how do I know?
 7    I know it's digital space that I do not understand.
 8          Q     Do you have a view one way or the other
 9    about whether Mr. Wallace is good at what he does?
10                 MR. FREEDMAN:  Objection.
11                 THE WITNESS:  Well, all the clients that
12    I have worked with him on really like Jed.  They
13    really like the rapport they have with Jed and are
14    happy with the work.  That's why he's used so often
15    in all the biggest legal firms, including quite a
16    few here in Los Angeles today and probably
17    elsewhere.
18    BY MR. GOTTLIEB:
19          Q     You like him, right?
20          A     I do like him.
21          Q     He's a nice guy?
22          A     He is a nice guy.
23          Q     So -- okay.  There's nothing else that
24    you think you can tell me -- my original question on
25    this line was about ▮▮▮▮▮▮▮▮.
```