## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

BLAKE LIVELY,

                Plaintiff,

v.

WAYFARER STUDIOS LLC, et al.,

                Defendants.

No. 24-cv-10049 (LJL)

### PLAINTIFF BLAKE LIVELY'S MEMORANDUM OF LAW
### IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Esra A. Hudson (admitted *pro hac vice*)
Stephanie A. Roeser (admitted *pro hac vice*)
Sarah Moses (admitted *pro hac vice*)
Manatt, Phelps & Phillips LLP
2049 Century Park East, Suite 1700
Los Angeles, California 90067
(310) 312-4000
ehudson@manatt.com
sroeser@manatt.com

Matthew F. Bruno
Manatt, Phelps & Phillips LLP
7 Times Square
New York, NY 10036
(212) 790-4525
mbruno@manatt.com

Meryl C. Governski (admitted *pro hac vice*)
Dunn Isaacson Rhee LLP
401 9th Street NW
Washington, DC 20004
(202) 240-2927
mgovernski@dirllp.com

Michael J. Gottlieb
Willkie Farr & Gallagher LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 855-3111
mgottlieb@willkie.com

Kristin E. Bender
Willkie Farr & Gallagher LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1000
kbender@willkie.com

Aaron E. Nathan
Michaela A. Connolly
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8904
anathan@willkie.com
mconnolly@willkie.com

*Attorneys for Blake Lively*

<u>**TABLE OF CONTENTS**</u>

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ...............................................................................................ii

INTRODUCTION ...............................................................................................................1

BACKGROUND .................................................................................................................1

    A.    Baldoni And Wayfarer Curated A Misleading Feminist Brand..............................3

    B.    Wayfarer Policies "Strictly Prohibited" Harassment, But Its Leaders
        Disclaimed Responsibility For Creating A Safe Workplace On Set. ......................5

    C.    Wayfarer And Baldoni Fostered A Hostile Work Environment For
        Women.....................................................................................................................6

        1.    Baldoni and Heath marginalized and mistreated women based on
               gender............................................................................................................6

        2.    Heath insisted on a meeting while Lively was undressed and gawked
               at her body...................................................................................................7

        3.    Baldoni sexualized and objectified women on set...........................................8

        4.    Baldoni confessed a troubled history with sexual consent. ............................9

        5.    Baldoni added gratuitous sexual content and spoke about his sex life.............9

        6.    Baldoni was fixated with Lively's weight. ....................................................10

        7.    Baldoni and Heath pressured Lively to perform unscripted nudity................11

        8.    Heath showed Lively a video of his wife naked, without Lively's
               consent. ......................................................................................................11

        9.    Baldoni improvised physical intimacy without Lively's consent...................12

    D.    Lively And Other Women Repeatedly Reported Concerns About Baldoni
        And Heath, Which Wayfarer Failed To Investigate. .............................................12

    E.    Before Phase Two, Lively Negotiated Protections (That Wayfarer Agreed
        Were Reasonable) And Again Reported Her Concerns..........................................15

    F.    Sony Exercised Its Right To Edit Its Own Version Of The Film With
        Lively's Help. .......................................................................................................17

    G.    Sony And Wayfarer Develop A Plan To Market The Film As A Story Of
        Female Empowerment, Which Lively And The Cast Follow And Support...........3

    H.    The Wayfarer Defendants Responded By Disparaging And Discrediting
        Lively. ..................................................................................................................19

    I.    The Wayfarer Defendants Hired Crisis Experts To "Bury" Lively By
        Discrediting Her Claims And Assassinating Her Character................................20

        1.    The Wayfarer Defendants planned to go on the offensive from the
               outset............................................................................................................20

2.    Baldoni and Wayfarer hired a California-based crisis team to "bury" Lively. ...................................................................................22

3.    As the Film premiered with massive success, Defendants launched a "social combat plan" against Lively. ................................26

J.    In Response To Lively's CRD Complaint, Defendants Continued Their Retaliatory Campaign With A Baseless Lawsuit And Defamatory Statements. ...................................................................................................32

K.    Lively Suffered Damages As A Result Of The Conduct. ......................................35

ARGUMENT ...................................................................................................................36

I.    LIVELY'S SEXUAL HARASSMENT CLAIMS MUST PROCEED TO TRIAL. ...36

A.    Heath's Behavior, Alone, Warrants Denying The MSJ. ........................................37

B.    The Wayfarer Defendants Fostered An Environment Laden With Gender Bias. .................................................................................................................38

C.    Wayfarer And IEWUM Are Strictly Liable For Supervisory Conduct. ................40

II.    THE RETALIATION COUNTS MUST PROCEED TO TRIAL. ..............................37

A.    The Record Easily Establishes A Prima Facie Case Of Retaliation. .....................42

1.    The Wayfarer Defendants concede that Lively engaged in protected activities. ...................................................................................................42

2.    The Wayfarer Defendants subjected Lively to a continuous pattern of adverse actions. ...............................................................................43

3.    A causal link connects Lively's protected acts to Defendants' adverse conduct. ...................................................................................................47

B.    Defendants Failed To Produce Admissible Evidence Of Legitimate, Non-Retaliatory Reasons For Their Sustained Course Of Retaliatory Actions. ............48

C.    Defendants Wanted To "Bury" Lively For Speaking Out Against Them. ............49

III.    THE FAILURE-TO-PREVENT COUNT MUST PROCEED TO TRIAL. ................49

IV.    LIVELY WAS AN "EMPLOYEE" UNDER TITLE VII AND CALIFORNIA LAW. .................................................................................................................................50

V.    LIVELY'S CONTRACT CLAIMS MUST PROCEED TO TRIAL. .........................52

A.    The ALA And CRA Are Valid, Enforceable Agreements. ...................................52

1.    The ALA Is a Binding, Enforceable Agreement. .............................................52

2.    The CRA Is a Binding, Enforceable Agreement. .............................................54

B.    Defendants' Other Arguments As To The Breach Of Contract Claims Fail. ........55

VI.    THE FALSE LIGHT CLAIM SURVIVES BECAUSE CALIFORNIA LAW APPLIES. .............................................................................................................56

VII.    THE DEFAMATION CLAIM MUST PROCEED TO TRIAL. .................................57

ii

VIII.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE
         CONSPIRACY CLAIM. ............................................................................................58

IX.     SAROWITZ IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE FALSE
         LIGHT OR CONSPIRACY CLAIMS.........................................................................59

X.      THE WAYFARER PARTIES' DAMAGES ARGUMENTS FAIL ...........................60

CONCLUSION...............................................................................................................................60

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Achal v. Gate Gourmet, Inc.*,
    114 F. Supp. 3d 781 (N.D. Cal. 2015) ....................................................................50

*AHW Inv. P'ship v. Citigroup, Inc.*,
    806 F.3d 695 (2d Cir. 2015).....................................................................................60

*Aulicino v. New York City Dep't of Homeless Servs.*,
    580 F.3d 73 (2d Cir. 2009)........................................................................................37

*Bailey v. San Francisco Dist. Attorney's Off.*,
    16 Cal. 5th 611 (2024) ....................................................................................... *passim*

*Banks v. Gen. Motors, LLC*,
    81 F.4th 242 (2d Cir. 2023) .....................................................................................38

*Birschtein v. New United Motor Mfg., Inc.*,
    92 Cal. App. 4th 994 (2001) ...............................................................................40, 48

*Bradley v. Dep't of Corr.*,
    158 Cal. App. 4th 1612 (2008) ................................................................................50

*Burlington N. & Santa Fe Ry. Co. v. White*,
    548 U.S. 53 (2006).............................................................................................43, 44

*Byrnie v. Town of Cromwell, Bd. of Educ.*,
    243 F.3d 93 (2d Cir. 2001).......................................................................................44

*California Fair Emp. & Hous. Com. v. Gemini Aluminum* Corp.,
    122 Cal. App. 4th 1004 (2004) ................................................................................50

*Cantu v. Flanigan*,
    705 F. Supp. 2d 220 (E.D.N.Y. 2010) .....................................................................60

*Castro-Ramirez v. Dependable Highway Express, Inc.*,
    2 Cal. App. 5th 1028 .................................................................................................43

*Chukwueze v. NYCERS*,
    891 F. Supp. 2d 443 (S.D.N.Y. 2012).......................................................................47

*Cifone v. City of Poughkeepsie*,
    234 A.D.2d 331 (1996) .............................................................................................61

*Constantin v. N.Y.C. Fire Dep't*,
 2009 WL 3053851 (S.D.N.Y. Sept. 22, 2009) ........................................................................45

*Dhaliwal v. Saliz Pharms., Ltd.*,
 2019 WL 5067164 (S.D.N.Y. Oct. 9, 2019) ..........................................................................48

*Dixon v. Int'l Bhd. of Police Officers*,
 504 F.3d 73 (1st Cir. 2007) ...................................................................................................47

*Doe v. City & Cnty. of San Francisco*,
 835 F. Supp. 2d 762 (N.D. Cal. 2011) ..................................................................................45

*Doe v. Meta Platforms, Inc.*,
 690 F. Supp. 3d 1064 (N.D. Cal. 2023) ................................................................................57

*Duplan v. City of New York*,
 888 F.3d 612 (2d Cir. 2018) ..................................................................................................48

*Eaton v. Coca-Cola Co.*,
 2010 WL 2836737 (D. Conn. July 19, 2010) ........................................................................43

*Edwards v. Container Kraft Carton & Paper Supply Co.*,
 161 Cal. App. 2d 752 (1958) ................................................................................................60

*Eisenberg v. Advance Relocation & Storage, Inc.*,
 237 F.3d 111 (2d Cir. 2000) ..................................................................................................51

*Erlich v. Menezes*,
 21 Cal. 4th 543 (1999) ..........................................................................................................56

*GG Managers, Inc. v. Fidata Tr. Co. New York*,
 215 A.D.2d 241 (1995) ..........................................................................................................55

*Gonzalez v. Oplaai LLC*,
 2023 WL 11195911 (C.D. Cal. Dec. 19, 2023) .....................................................................53

*Grant v. Bethlehem Steel Corp.*,
 622 F.2d 43 (2d Cir. 1980) ....................................................................................................47

*Green v. Laibco, LLC*,
 192 Cal. App. 4th 441 (2011) ...............................................................................................47

*Gubitosi v. Kapica*,
 154 F.3d 30 (2d Cir. 1998) ....................................................................................................48

*Hahn v. Off. & Pro. Emps. Int'l Union, Loc. 153*,
 2016 WL 4120517 (S.D.N.Y. July 22, 2016) ........................................................................43

*Hardage v. CBS Broad., Inc.*,
　427 F.3d 1177 (9th Cir. 2005) ........................................................................50

*Hill v. Nat'l Collegiate Athletic Assn.*,
　7 Cal. 4th 1, 865 P.2d 633 (1994) ..................................................................57

*Hirst v. City of Oceanside*,
　236 Cal. App. 4th 774 (2015) .........................................................................49

*Hughes v. Twenty-First Century Fox, Inc.*,
　304 F. Supp. 3d 429 (S.D.N.Y. 2018)............................................................46

*Johnson v. J. Walter Thompson U.S.A., LLC*,
　224 F. Supp. 3d 296 (S.D.N.Y. 2016).............................................................47

*Kaytor v. Elec. Boat Corp.*,
　609 F.3d 537 (2d Cir. 2010)............................................................................38

*Kronisch v. United States*,
　150 F.3d 112 (2d Cir. 1998)............................................................................44

*Langson v. Lane*,
　967 F.2d 587 (9th Cir. 1992) ..........................................................................53

*Laurin v. Pokoik*,
　2005 WL 911429 (S.D.N.Y. Apr. 18, 2005)...................................................43

*Lawson v. PPG Architectural Finishes, Inc.*,
　12 Cal. 5th 703 (2022) ..............................................................................42, 49

*Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*,
　102 P.3d 257 (2004)........................................................................................56

*Lewis v. New York City Transit Auth.*,
　12 F. Supp. 3d 418 (E.D.N.Y. 2014) ..............................................................43

*Lively v. Wayfarer Studios*,
　2025 WL 1952027 (S.D.N.Y. July 16, 2025) .............................................14, 59

*Lockhart v. Gen. Motors Corp*,
　2001 WL 1262922 (C.D. Cal. Sept. 14, 2001) ...............................................55

*Luckett v. Kohl's Dep't Stores, Inc.*,
　2020 WL 4341779 (C.D. Cal. June 18, 2020) .................................................49

*Lyle v. Warner Bros. Television Prods.*,
　38 Cal. 4th 264 (2006) ..............................................................................39, 40

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000)................................................................51

*Malik v. Carrier Corp.*,
    202 F.3d 97 (2d Cir. 2000)..................................................................49

*Mamou v. Trendwest Resorts, Inc.*,
    165 Cal. App. 4th 686 (2008) ............................................................42

*Marshall v. Boeing Co.*,
    2019 WL 4391112 (C.D. Cal. June 10, 2019) .....................................50

*McSweeney v. Cohen*,
    776 F. Supp. 3d 200 (S.D.N.Y. 2025)...................................... *passim*

*Medvey v. Oxford Health Plans*,
    313 F. Supp. 2d 94 (D. Conn. 2004) ..................................................59

*Meeks v. Autozone, Inc.*,
    24 Cal. App. 5th 855 (2018) ..............................................................38

*Moll v. Telesector Res. Grp., Inc.*,
    94 F.4th 218 (2d Cir. 2024) ...............................................................38

*Muniz v. UPS*,
    731 F. Supp. 2d 961 (N.D. Cal. 2010) ...............................................37

*Myers v. Trendwest Resorts, Inc.*,
    148 Cal. App. 4th 1403 (2007) ..........................................................38

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*,
    118 A.3d 175 (Del. 2015) ...................................................................60

*Nazir v. United Airlines, Inc.*,
    178 Cal. App. 4th 243 (2009) ............................................................37

*Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.*,
    103 Cal. App. 4th 1021 (2002) ..........................................................49

*Oakland Raiders v. Oakland-Alameda Cnty. Coliseum, Inc.*,
    144 Cal. App. 4th 1175 (2006) ..........................................................54

*Ocheltree v. Scollon Prods., Inc.*,
    335 F.3d 325 (4th Cir. 2003) .............................................................39

*Palin v. New York Times Co.*,
    482 F. Supp. 3d 208 (S.D.N.Y.), *modified*,
    510 F. Supp. 3d 21 (S.D.N.Y. 2020)..................................................58

*Pantchenko v. C. B. Dolge Co.*,
  581 F.2d 1052 (2d Cir. 1978) ........................................................................45

*Pantoja v. Anton*,
  198 Cal. App. 4th 87 (2011) .........................................................................38

*Parrish v. Sollecito*,
  249 F. Supp. 2d 342 (S.D.N.Y. 2003) ...........................................................38

*Prozeralik v. Cap. Cities Commc'ns, Inc.*,
  188 A.D.2d 178 (1993) .................................................................................60

*Rangel v. Am. Med. Response W.*,
  2013 WL 1785907 (E.D. Cal. Apr. 25, 2013) ...............................................50

*Rasmy v. Marriott Int'l, Inc.*,
  952 F.3d 379 (2d Cir. 2020) ...................................................................37, 38

*Reynaga v. Roseburg Forest Products*,
  847 F. 3d 678 (9th Cir. 2017) .................................................................37, 38

*Rice v. FCA USA LLC*,
  2018 WL 345731 (Cal. Ct. App. Jan. 10, 2018) ...........................................49

*Rickley v. Goodfriend*,
  212 Cal. App. 4th 1136 (2013) .....................................................................59

*Robinson v. De Niro*,
  739 F. Supp. 3d 33 (S.D.N.Y. 2023) .............................................................47

*Roby v. McKesson Corp.*,
  47 Cal. 4th 686 (2009) ...........................................................................36, 41

*S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*,
  769 P.2d 399 (Cal. 1989) ..............................................................................52

*Salamon v. Our Lady of Victory Hosp.*,
  514 F.3d 217 (2d Cir. 2008) ..........................................................................51

*San Francisco Milling Co. v. Mordecai*,
  134 Cal. App. 755 (1933) ..............................................................................53

*Schoenadel v. YouGov Am. Inc.*,
  2025 WL 371089 (S.D.N.Y. Feb. 3, 2025) ....................................................43

*Sealy v. State Univ. of New York at Stony Brook*,
  834 F. App'x 611 (2d Cir. 2020) ...................................................................47

*Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc.*,
   531 F. Supp. 3d 522 (N.D.N.Y. 2021) ................................................................41

*Sooroojballie v. Port Auth. of New York & New Jersey*,
   816 F. App'x 536 (2d Cir. 2020) ...............................................................41, 48

*Spencer-Smith v. Ehrlich*,
   347 F.R.D. 606 (S.D.N.Y. 2024) ........................................................................56

*Stajic v. City of New York*,
   214 F. Supp. 3d 230 (S.D.N.Y. 2016) .................................................................48

*State Dep't of Health Servs. v. Superior Ct.*,
   31 Cal. 4th 1026 (2003) ...............................................................................41, 49

*Summa v. Hofstra Univ.*,
   708 F.3d 115 (2d Cir. 2013) ...............................................................................47

*Tobias v. Notations, Inc.*,
   2015 WL 4654454 (S.D.N.Y. July 20, 2015) ....................................................53

*Troeger v. JetBlue Airways Corp.*,
   2024 WL 5146185 (S.D.N.Y. Dec. 17, 2024) ....................................................37

*Vega v. Broome Cnty.*,
   2023 WL 6318919 (N.D.N.Y. Sept. 28, 2023) ..................................................44

*Villalobos v. Costco Wholesale Corp.*,
   2023 WL 5108499 (E.D. Cal. Aug. 9, 2023) .....................................................50

*Vincent Crisafulli Testamentary Tr. v. AAI Acquisition, LLC*,
   110 N.Y.S.3d 494 (N.Y. Sup. Ct. 2018) ............................................................53

*Wawrzenski v. United Airlines, Inc.*,
   106 Cal. App. 5th 663 (2024) .............................................................................49

*Wilson v. City of Fresno*,
   763 F. Supp. 3d 1073 (E.D. Cal. 2025) ..............................................................42

*Wind Dancer Prod. Grp. v. Walt Disney Pictures*,
   10 Cal. App. 5th 56 (2017) .................................................................................53

*Wyatt v. Union Mortg. Co.*,
   24 Cal. 3d 773 (1979) ........................................................................................59

*Wysinger v. Auto. Club of S. California*,
   157 Cal. App. 4th 413 (2007) .............................................................................47

*Yanowitz v. L'Oréal USA, Inc.*,
  36 Cal. 4th 1028 (2005) ................................................................43, 45

**Statutes**

Cal. Civil Code § 1614..........................................................................55

Cal. Civil Code § 1615..........................................................................55

Cal. Gov't Code § 12923 ..................................................................37, 39

Cal. Gov't Code § 12940 ............................................................41, 43, 49

Cal. Lab. Code § 98.6 ...........................................................................49

Cal. Lab. Code § 1102.5 ..................................................................42, 49

Cal. Lab. Code § 2775 ..........................................................................52

Cal. Lab. Code § 2776(a) ......................................................................52

**Other Authorities**

2 C.C.R. § 11008..................................................................................49

Fed. R. Civ. P. 56.................................................................................53

Restatement (Second) of Contracts § 73................................................55

# I INTRODUCTION

In their latest effort to avoid accountability for the hostile environment they created during the production and marketing of It Ends With Us, Justin Baldoni, Jamey Heath, Steve Sarowitz, and their co-defendants ask this Court to shield them from trial, and deny Blake Lively her day in court, by throwing the kitchen sink at Lively's sexual harassment and retaliation claims.[1] But Defendants' scattershot theories collapse under the weight of the overwhelming evidence, in documents and testimony from witness after witness, that Baldoni and Heath "████████████ ████████████████████████ which they got away with ████████████ ████" This is not, as Defendants claim, a story of minor annoyances fueled by creative differences, but instead one of a toxic environment in which "████████████████████ ████████████████████" that Sony's representative remarked: "███████ ████████████████████" Numerous women have written or testified about feeling "████████," "████████," and "████████," described Baldoni and Heath's behavior as "████" and "████," and wanted "████████████" with Baldoni and Heath by the time the Film's premiered. Betraying their "████████" brand, Baldoni and Heath refused to listen to what numerous women told them; instead, their conduct and their ***entire defense*** has deployed a "████████████" of Deny, Attack, Reverse Victim and Offender (DARVO) according to Dr. Jennifer Freyd, who coined the term and submitted an expert report supporting Lively in this case.

Defendants created a hostile environment, and when confronted with complaints, they abandoned Wayfarer's policies by refusing to investigate the concerns because Heath thought it would be better "████████████████." Defendants buried these concerns even though— and in fact because—Baldoni fully understood by November of 2023 that Lively's written

---

[1] All names and capitalized terms are defined in Table of Abbreviations attached hereto.

complaints "███████████████████████████." Yet, rather than attempting to clear their names with an investigation, Defendants went on the *attack*, claiming that they are victims of a "bully" who "fabricated" complaints to "take over the movie" (ignoring the irony that this purportedly-hijacked Film enriched the Wayfarer Defendants by smashing all box office expectations).

The Wayfarer Defendants have peddled their victimization narrative since the Spring of 2023, including in response to Lively's concerns during production and then in reaction to her efforts to remediate her concerns. In August, 2024, they relied on background conversations and leaks to friendly journalists; a covert strategy that departed from the "██████" and "██████" (in Heath's words at the time) marketing plan being followed by the rest of the cast; and then seeding, amplifying and boosting negative content targeting Lively and her family. Defendants repeat their mantra that the instantaneous avalanche of online attacks against Lively *and the other women associated with the Film* was somehow an "organic" backlash to Lively, hoping to conceal the fact that their "untraceable" "social manipulation" campaign was designed to *appear* "organic." Defendants have never explained, nor could they, how Lively's ███████████████ (as Wayfarer initially described it in their own words) organically cratered from *the same marketing plan* that had delivered extraordinary box office success.

The Defendants' litigation strategy has parroted their inversion of victim and offender. Defendants filed a frivolous lawsuit, now dismissed, and their lawyer supercharged the Wayfarer Defendant's narratives through friendly journalists and content creators, and by laundering their DARVO strategy through this Court's docket. But Defendants' campaign to transform Lively—a mother of four with decades of experience in the industry who simply sought a safe and respectful workplace—into a "bully" who "took over" Baldoni's Film is not a defense to harassment,

retaliation, defamation, or any claim Lively has advanced. The record evidence is clear: Lively's claims survive summary judgment and must be sent to a jury. The Court should deny the MSJ in full.

## BACKGROUND

### A. Baldoni And Wayfarer Curated A Misleading Feminist Brand.

In 2017, Baldoni launched the "Man Enough" brand, which he describes as a "movement around healthy manhood and greater equity for all." ¶405.[2] In public commentary, Baldoni openly admitted to a history of mistreating women, estimating that there is a "*one million percent probability" that there "is a woman or two*" that he has "*in some way made uncomfortable by saying something or doing something that was chauvinistic or sexist*" and that he *did not "always ask for consent"* or "always listen when they said no." ¶¶406-08. Baldoni promised to "shut the hell up and listen" to women "so that one day we don't have to live in a world where a woman has to risk everything and come forward to say the words 'me too[.]'" *Id.*

Baldoni sought to monetize his feminist brand through Wayfarer, which he co-founded and co-chairs with billionaire Sarowitz, who is Wayfarer's financier and one of Baldoni's close friends (as is Heath, Wayfarer's CEO). ¶¶409-13. Shortly after its launch, Wayfarer acquired the film rights to Colleen Hoover's novel, *It Ends With Us*, the theme of which was female empowerment, including breaking the cycle of domestic violence. ¶¶415-16. Hoover was reluctant to option the Film to a man, but agreed to sell the rights to Wayfarer because she believed that Baldoni "████ ██████████████████████████████" ¶¶417-19. Hoover explicitly requested that a woman direct the Film. *Id.* Although Baldoni had directed only two small films, Wayfarer decided that he would direct, executive produce, and be the Film's lead male actor. ¶¶414, 419, 421. Wayfarer appointed

---

[2] All citations to ¶¶ refer to the 56.1 statement unless otherwise noted. All emphases are added unless otherwise noted, and this Opposition does not attempt to clean up nits or grammatical errors in contemporaneous communications.

Heath, with *even less* experience, as lead producer and as President of IEWUM, the wholly owned entity that produced the Film and, with Wayfarer, employed all cast and crew. ¶¶422-25. Heath oversaw Saks, an experienced independent producer. ¶427. Sony agreed to distribute and co-finance the Film, with Giannetti as its liaison, but Wayfarer would oversee and control all aspects of production. ¶¶428-29.[3] All departments reported to Heath and Baldoni, who had the power to hire, fire, and discipline cast and crew. ¶¶420, 424, 427. Heath and Baldoni reported to Sarowitz. ¶426.

Baldoni, Heath, and Sarowitz knew that they needed an A-list actress to headline the Film to achieve the commercial success they desired. When Wayfarer learned of Lively's potential interest in late 2022, they put on a full-court press to obtain her services. ¶¶431-32. Noting Lively's "███████████," Heath texted on December 9, 2022:



¶¶433-34. Hoover told Baldoni that "████████████████████████" Lively was interested. *Id.* :Baldoni and Lively met on December 14, 2022 in what Baldoni described as a "███████." ¶435. In that meeting, Baldoni volunteered that his penis was circumcised, without Lively expressing any interest in the subject of Baldoni's genitalia. ¶¶436-38. Lively later spoke with Plank, Baldoni's long time podcast host, who "████████ her "████████████" of working with Baldoni, but indicated that he had worked on himself so she was hopeful that Lively would not have issues. ¶¶439-40. Lively was disturbed but assuaged by Baldoni's purported commitment to being a feminist devoted to combatting toxic masculinity. ¶¶ 441-44. Lively agreed

---

[3] Wayfarer, IEWUM and Sony entered into the Distribution Agreement, which gave Sony the exclusive right to, *inter alia*, market and advertise the Film, and, subject to certain conditions, authorize final cut of the Film. ¶¶428-30.

to play Lily Bloom because she believed in the Film's messages of female empowerment, personally and professionally, and of the importance of ending the cycle of abuse. *Id.*.

Baldoni aggressively leveraged Lively's fame and her 20-plus years of experience in the entertainment industry, and regularly solicited her feedback on many aspects of pre-production work, including, but not limited to: casting and hiring; wardrobe and makeup; set design and decoration; and the script. ¶¶455-66. Baldoni gushed to Lively that she was a genuine collaborator and ███████████████████" who made "████████████" her and "████████████████████████." ¶466. Lively did not know that Baldoni privately resented collaborating with a prominent actress, arrogantly insisting behind her back in December 2022 that he had discovered Hoover's book ██████████," could "████████████████████," and intended to ████████████████ ██████████████████████."

**A. Wayfarer Policies ██████████████ Harassment, But Its Leaders Disclaimed Responsibility For Creating A Safe Workplace On Set.**

At relevant times, Wayfarer had HR policies in place that applied to "████████████ ████████████████████████" and "████████████████████████████, including "████████████████" but any behavior "████████████████████ ████████████████████████████████. ¶¶474-75. Those policies and Wayfarer's training deck provide that ████████████████████████████ ████████████████" including: conveying ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ██████████. ¶¶474-75, 480.[4] Wayfarer's policies encouraged reporting of "████████████████

_____

[4] Wayfarer claims to have presented this deck to cast and crew but has no record of who participated, and key cast and crew members dispute receiving it. The deck does not identify to whom concerns should be raised.

132272102.v8

██████████████████████" and promised that ██████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████." *Id.* ██████████████████████████

██████████████████████████. *Id.* Wayfarer's policies ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ *Id.* Baldoni and Heath

testified that they understood and received training on these policies. ¶¶474-76.

Before production, Saks expressed ████████████████████████████

████████████████████████████████████████████████████████████.

¶¶483-84. But Wayfarer kept HR for itself, and then failed to provide its policies to the cast and crew, make its HR consultant available, or provide guidance on reporting HR concerns. ¶477. Heath believed that ████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████. ¶481. For her part, Saks understood that HR concerns should be raised to Heath, as the "signer of checks and agreements," even if the complaints pertained to Wayfarer, Heath, Baldoni or Sarowitz. ¶484. In the end, the Film's cast and crew did not know ████████████████████████████████. ¶479.

**B.  Wayfarer And Baldoni Fostered A Hostile Work Environment For Women.**

Multiple women felt uncomfortable, marginalized, harassed, objectified, and disrespected by the environment Baldoni and Heath fostered in connection with the Film.

1.  <u>Baldoni and Heath marginalized and mistreated women based on gender.</u>

In February 2023, pre-production, Baldoni admitted in a lengthy note that ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████. ¶490.

But his misbehavior continued: ***Baldoni "consistently" yelled at Saks and exhibited "rageful yelling or interrupting reactions" when Saks spoke***. ¶¶488-92. Saks recounted one time when Baldoni, upset with Saks' input on the Film, "came up behind" where she was sitting and "yelled and then slammed his hands" on the chair next to her and stormed away. ¶¶491-92. Saks immediately warned Heath and Giannetti, seated behind her, that ***she would "walk off the movie" if Baldoni behaved that way again***. *Id.* As the only woman and non-Wayfarer producer on the set, Saks felt sidelined by Baldoni and Heath, and she also observed Baldoni being "very dismissive" of the Film's screenwriter, Hall, who he did not seem to respect "as a female voice on the team and on a movie like this, that felt especially bad." ¶¶493-94. Hoover expressed ███████████

████████████████████████████████████████. ¶495.[5]

    2.  <u>Heath insisted on a meeting while Lively was undressed and gawked at her body.</u>

On the second day of filming, May 16, 2023, █████████████████████████

████████████████████████████████████████████████████████

███████. ¶¶512-13; *infra* C.6. ███████████████████████████

███████████████████████████████████. *Id.* ███████████

█████████ *Id.* ███████████████████████████████

███████████████████ *Id.* ███████████████. *Id.*

████████████████████████████████████████████████

███████. *Id.*

███████ *Id.* Despite ████████████████████████████

████████████████████████████. ¶¶514.[6] Heath ███████████████

_____

[5] These women's experiences echo that of Ayoub, who worked on a separate Wayfarer film and described Baldoni as "verbally abusive," banned him from set, and refused to appear in press events with him. ¶496.
[6] Heath claims Lively invited him into the trailer, but admits Lively conditioned his entry on his agreeing not to look at her. ¶¶97-98. Defendants suggest Lively was comfortable with the intrusion because Lively once texted Baldoni

████████████████████████████████████████████████████

████ ¶515. Lively ████████████. *Id.* All three women █████████████

███████████████. ¶516. Baker described ████████████████████

███████████████████. ¶517. Carroll was so ████████████████████

███████████████████. *Id.*

3.  <u>Baldoni sexualized and objectified women on set.</u>

During a rehearsal on May 23, 2023, ████████████████████████████

████████████████████████████. ¶497. When ████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████. *Id..* Lively

███████████████████████████████████████████. *Id.* Later that day,

before shooting a bar scene in a different outfit, Baldoni ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████. *Id.* When

Lively ███████████████████████████████████. *Id.* Slate, who played

Baldoni's sister in the Film<mark>.</mark>████████████████████████████

███████████████████████████████████████. *Id.* Video footage confirms

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████. *Id.* A few days later, Baldoni ████████████████

---

about running lines when she was "pumping in her trailer." Dkt. 50, ¶58]. Lively did not say that she would pump *while* running lines, but regardless, Lively could conceal herself while pumping, which she could not do when Heath intruded.

132272102.v8

███████████████████████████. ¶506.

On another occasion, Baldoni told Slate that ████████████████████████

████████████████████" ¶¶503-04. Slate testified that ████████████████

███████████████████████████████████████████████████

███████" Baldoni also ████████████████████████████. ¶505. At

one point, Baldoni ██████████████████████████████████████

███████████████████████████████. ¶507. Later, ████████

███████████████████████████████████████████████

███████████████████████████████████████," ¶508, 510. The

████████████████████████████.

    4. <u>Baldoni confessed a troubled history with sexual consent.</u>

During a car ride with Lively, her security detail, and her assistant in April 2023, Baldoni

███████████████████████████████████████████████████

███████████████████████████," echoing ██████████████████.

¶¶523-26. Baldoni ████████████████████████." *Id.* As soon as ████████████

███████████████████████████████████████. *Id.*

    5. <u>Baldoni added gratuitous sexual content and spoke about his sex life.</u>

The ALA ████████████████████████████. ¶529. Yet, Baldoni added

gratuitous sexual content without her knowledge or consent, such as ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████ ¶518. Baldoni also ████████████████████████

█████████████████████████████████ *Id.*[7] Baldoni did not explain why ███████████████████

█████████████████████████. ¶¶519-21. ████████████████████████

████████████████████████████████ ¶522. Baldoni's motives for adding these

scenes, including whether to create additional opportunities for intimacy with Lively, are disputed.

When Lively challenged the additions, Baldoni ███████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████ ¶¶519-21. ██████████

████████████████████████████. *Id.* Baldoni █████████

█████████████████████████████████████████████

█████████████████████████████. ¶¶527-28. Baldoni ██████████

█████████████████████████████████████████████

███████████████████████"[8] *Id.*

      6. <u>Baldoni was fixated with Lively's weight.</u>

Having given birth to her fourth child shortly before accepting the role, ███████████

█████████████████████████████. ¶467. While █████████

█████████████ (*id.*), Baldoni undermined her confidence behind her back in invasive and

humiliating ways. On or about April 24, 2023, and without Lively's consent, █████████████

█████████████████████████. ¶¶469-71.

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████ ¶468. On the first day of filming, ████████████████

---

[7] Defendants blame Giannetti for suggesting a more sexualized script, ¶30, but (even if true) that did not grant Baldoni the right to bypass Lively's approval rights or to use his personal sexual life as justification. ¶529.
[8] Baldoni similarly attempted to add gratuitous hypersexual content for Ferrer to perform, despite the fact that Ferrer portrayed an underage teenage girl. ¶¶508-10.

132272102.v8

████████████████████████████████████████████████████. ¶487.

### 7. Baldoni and Heath pressured Lively to perform unscripted nudity.

The Birth Scene did not call for the simulation of nudity but on the day of filming, May 22, 2023, Baldoni ███████████████████████████████████████████ ███████████████████████████████████████████████. ¶¶532-33. Notwithstanding SAG guidelines requiring actor consent to nudity prior to filming, ███████ ███████████████████████████████████████. ¶¶531-533. ███████████████ ██████████████████████████████. *Id.* ████████████████████ ███████████████████████████████████████████████████████ ████████████████████. ¶¶534-36. To obtain those shots, ████████████████ ███████████████████████████████████████████████████████ █████████████████████████. *Id.* During filming, ████████████████████████ ███████████████████████████████████████████████████. ¶537. ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████ ¶¶532-33, 538-39.[9] █████ ████████████. ¶537.

### 8. Heath showed Lively a video of his wife naked, without Lively's consent.

On May 23, 2023, the day after filming of the Birth Scene wrapped, Heath ███████ ███████████████████████████████████████████████████████ █████████████████████████████████. ¶542.[10] ████████████████████

---

[9] Sarowitz, who was on set the day of the Birth Scene, testified: "While I might have technically been non-essential, I did invest $30 million and paid for her salary, or at least my share of it, as well as the other actors, and I consider that to be essential. Lively considers that not to be essential, ***she can send me a check***. . . ." ¶¶540-541.

[10] Lively and Heath dispute what video he showed her. Heath insists the video was "after birth." Even if that were true, that video still shows Heath seemingly nude, cradling his visibly nude wife from behind in a tub. ¶545.

132272102.v8

██████████████████████████████████████████████████████████

██████████████████. ¶¶534-44. ████████████████████████████████

██████████████████████████████████████████████████ *Id.*.

    9.  <u>Baldoni improvised physical intimacy without Lively's consent.</u>

Also on May 23, 2023, Lively and Baldoni shot the Dance Scene, ████████████

██████████████████. ¶546. As such, ████████████████████████

██████████████████████████████. ¶547. ████████████████████

██████████████████████████████████████████████████████████

██████████████████████. ¶¶548. Behind-the-scenes footage, which the Defendants

released to the press, captures Lively's visible discomfort, including her leaning and pulling away

from Baldoni, and repeatedly suggesting that their characters should just talk. ¶549.[11] Lively used

██████████████████████████████████████████████████████████

██████████████████████████████. ¶550. Another time, ██████████████████

██████████████████████████████████████. ¶551.

**C.  Lively And Other Women Repeatedly Reported Concerns About Baldoni And Heath, Which Wayfarer Failed To Investigate.**

Lively and others voiced ████████████████████████████████████

██████████████████████. ¶552. When ████████████████████████████

██████████████████████████████████. ¶¶552-54. In a contemporaneous

text, Lively ██████████████████████████████████████████

██████████████████████████████████████████████████████████

---

[11] Abel, Baldoni's long-time publicist, described the Dance Scene as "so gross" and "cringy," and speculated that it would prompt Lively to file "a cease and desist" against the "pompous" and "unlikeable" Baldoni. ¶¶550.

██████████████████████████████████████████████████████████

████████." ¶554. ██████████████████████████████████████

████████████████████████████████████████ *Id.*.

The same day that Heath showed Lively the naked video of his wife, among other unsettling

incidents, ██████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████ ¶555. Lively continued: ████████████████████████

██████████████████████████████████████████████████████████

████████ *Id.* ████████████████████████████████████████

████████████████████ ¶556.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ *Id.*

On May 26, 2023, Lively ████████████████████████████████████

██████████████████ ¶¶560-62. Lively ████████████████████████

██████████████████████████████████████████████████████████

████████████████████████. *Id.* Lively told ████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████ ¶¶ *Id.* ████████████████████████████████████

████████. *Id.* ████████████████████████████████████████

████████████████████████████████████████. *Id.*

Slate ██████████████████████████████ around the same time. ¶¶563-67.

On May 27, 2023, Slate ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████ *Id.* Slate separately ████████████████████████████████

██████████████████████████████ . *Id.* Saks immediately texted Giannetti that "[w]e

have real issues," and ***need "to replace our director" and restrict Heath's access to the set***. *Id.*

Saks escalated Slate's concerns directly to Baldoni and Heath, repeatedly encouraging them to

investigate because she wanted it "to be taken seriously" and to create "a more comfortable work

environment for everyone going forward." ¶¶568.

       Wayfarer did not investigate the complaints. Instead, Heath decided ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████" ¶569. Baldoni ████████████████████████████████ . ¶585. And

Sarowitz ████████████████████████████████████████████████████

████████████████████████████████ ¶570. Instead, Sarowitz suggested that "█

████████████████████████████████████████████ ¶571.

       To Lively's surprise, ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ . ¶573.

Although Lively ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ ¶¶574-75. ████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████. ¶¶576.[12] Baldoni testified that ████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████ ¶¶577-

78. Wayfarer's refusal to investigate the complaints ███████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████ ¶¶485, 572.

████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ ¶¶ 579-80. Saks responded that ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ *Id.*

### D. Before Phase Two, Lively Negotiated Protections (That Wayfarer Agreed Were Reasonable) And Again Reported Her Concerns.

In October 2023, Lively ██████████████████████████████████

████████████████████████████████████████████." ¶581. Slate responded that ████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████" *Id.* Lively decided that she could not, nor expect

others to, return to a hostile environment. Thus, on November 9, 2023, Lively (through her

attorneys) sent Wayfarer a document entitled, "Protections for Return to Production" (the "CRA")

which requested Wayfarer agree to implement 17 Protections to ensure a safe set going forward.

¶582. The CRA required, *inter alia*, the presence of an intimacy coordinator when Lively was on

---

[12] Saks was present for this meeting, and described it in detail to Gianetti, expressing admiration for Livelys' professionalism and frustration at Baldoni and Heath's failure to take responsibility for their behavior.

set; restricted set access during intimacy and other exposing scenes; prohibited spontaneous improvisation of intimacy, touching, or nudity, comments about Lively's body or appearance, discussion of personal sexual experiences, or intrusion into Lively's trailer while she is undressed. *Id.* It also expressly addressed retaliation:

> "There **shall be no retaliation of any kind** against [Lively] for raising concerns about the conduct described in this letter or for these requirements. ***Any changes in attitude, sarcasm, marginalization or other negative behavior, either on set or otherwise, including during publicity and promotional work, as a result of these requests is retaliatory and unacceptable***, and will be met with immediate action."

*Id.* (emphases added). Further, it mandated an all-hands meeting before filming resumed. *Id.*



Baldoni and Heath ███████████████████████████████████████████ ████████████████ ¶¶584-85. Notwithstanding the private nature of the communication, Baldoni and Heath ██████████████████████████████████████████ ████████████████████████████. *Id.* On November 12, 2023, Baldoni ████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████" *Id.* (emphasis added). But Baldoni ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████ *Id.* Despite ████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████████████████ and executed a contractual rider adopting them, the CRA. ¶583.

On January 4, 2024, Baldoni ████████████████████████████████████████ ███████████████████████████████████████████████████████

███████  ¶588. That same day, Baldoni, Heath, Giannetti, Saks, and others attended the "all hands" meeting referred to in the 17 Protections, during which Lively identified multiple behaviors reading from her 30-point list on her phone, including: discussions of "***personal experiences with sex***" and "times that ***physical consent was not given in sexual acts***," "***improvising of kissing***," "***biting or sucking of lip***," and intimate conversations out of character. ¶¶586-87. The next day, Baldoni █████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████  ¶588. Baldoni ███████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████  *Id.* (emphasis added).

### E.  Sony Exercised Its Right To Edit Its Own Version Of The Film With Lively's Help.

Production of the Film resumed from January 5, 2024 until February 9, 2024, when post-production work began. ¶¶218, 224. The Distribution Agreement provided Sony the right █

██████████████████████████████. ¶592. During negotiations, Sony █████

████████████████████████████████████████████████████████████

¶591. During the strikes, Lively received a ███████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████. ¶593.

Lively worried that ████████████████████████████████. ¶594. Accordingly, and with Sony's support, encouragement, and facilitation, Lively ████████████████.

¶595. Greenstein (then President of Sony's Motion Picture Group), explained that ████████

███████████████████████████████████████████████████  *Id.* Lively

132272102.v8

██████████████████████████████████████████████████████.

¶596. Unlike Baldoni, Lively ███████████████████████████████

███████████████████████████████████████. ¶597. Wayfarer and

Baldoni ██████████████████████████████████████████████████

█████████████████████████████ ¶¶599-600.

Baldoni █████████████████████████████████████████

████████████████████████████████████████. ¶601. Sony ██████

█████████████████████████████████████████████████████████

████████████" ¶602. As the individual ███████████████████

██████████████████████████████████████████████████████████.

¶603. In June 2024, an audience screened █████████████████████

██████████████████████████. ¶604. ████████████████████████

██████████████████████████ *Id.* Thereafter, both Sony and Wayfarer ████

██████████████████████████████████████. ¶605.

## F. Sony And Wayfarer Develop A Plan To Market The Film As A Story Of Female Empowerment, Which Lively And The Cast Follow And Support.

Sony and Wayfarer collaboratively developed the Film's marketing, publicity, and

promotion strategy. In January 2023 (before shooting had begun), Wayfarer █████████████

███████████████████████████████████████████████████████████

████████████████████ ¶606. Sony's ████████████████████████

███████████████████████████████████████ ¶607. Sony "████████

█████████████████████████████████████████████████████████

██████████████████████████ ¶608. Wayfarer, in turn, ██████████

████████████████████████████. ¶¶609. Baldoni was ████████████

132272102.v8



¶610. Leading up to the premiere of the Film, Baldoni ▮▮▮ . ¶¶611, 747, 772.

### G. The Wayfarer Defendants Responded By Disparaging And Discrediting Lively.

Despite admitting that Lively's feelings about her experiences were genuine (¶612), Baldoni's fear that his on-set behavior may be exposed led him immediately to retaliate. He recast the complaints as misunderstandings, portrayed himself as the victim, and began an unyielding campaign to assassinate Lively's character. *See supra*; ¶¶613-39. For example, on December 30, 2023, Baldoni

.” ¶613-16. On April 27, 2024, Baldoni

. ¶¶617-23. Baldoni's

.” *Id.*

Baldoni said

*Id.* Baldoni's behavior .

*Id.* Baldoni

¶621-22. He

██████████████████████████████████████████ *Id.*

In truth, the "█████" who were talking about and disparaging Lively were Heath and Baldoni. During a dinner with Hoover and her friend in Los Angeles on May 6, 2024 following the successful trailer launch event, (¶¶623-24), Baldoni and Heath ███████████████████

████████████████████████████████████████████████████

███████████████████████████. ¶625. They ██████████████████

█████████████████████████ ¶¶628-30. █████████████████

████████████████████████████████████████████████████

████████████████████████████████████." ¶631. Heath and Baldoni

████████████████████████████████████████████████████

█████████. ¶¶634-39. Rather than dispute Lively's qualification, █████████████

████████████████████████████████████████████████████

█████████████████████████████. ¶639.

## H.  The Wayfarer Defendants Hired Crisis Experts To "Bury" Lively By Discrediting Her Claims And Assassinating Her Character.

> 10. <u>The Wayfarer Defendants planned to go on the offensive from the outset.</u>

On May 17, 2024, months before the Film's scheduled premiere, Baldoni █████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ ¶240, 641. Five days later, Baldoni again asked "████████████████

████████████████████" ¶642. On June 17, 2024, two days after Lively, Hoover, and other cast appeared at Book Bonanza without Baldoni, he and Abel ███████████

████████████████████████████████████████████████████

¶¶643-45. Abel ███████████████████████████████

███████████████ *Id*. The same day, Wayfarer ███████████████████████

███████████████████████████████ ¶647.

    Around the same time, Sony learned that "███████████████████████

███████████████████████████████ " as Baldoni. ¶¶650-58. In mid-June

2024, Saks, who herself did not want to be pictured with Baldoni or Heath (¶658), conveyed to

Sony that Hall (the screenwriter, who Lively has never met) "won't do press w Justin, doesn't even

want to be on the red-carpet w him." ¶651. Hoover ████████████████████

███████████. ¶652. Slate ███████████████

███████████. ¶653-55. Ferrer ████████████████████. ¶657.

    By June 20, 2024, Abel learned ████████████████████████████

████████████████████████████████████████████████

███████████████████████████████ ." ¶659. Rather than truthfully

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████ (¶661), and ████████████████ :



¶662.

    As the Defendants were planning an offensive move for Baldoni, the Film's marketing plan

was eliciting an overwhelmingly positive public response. Sony, which was systematically

tracking response to the Film, ██████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████." ¶663.

Greenstein, who bore ultimate responsibility for the Film's marketing, ████████████

████████████████████████████████████████████████████

████████████████████████████████████, which had begun months before and

included wearing florals at promotional events and encouraging viewers to do the same. ¶663-66.

By July 22, 2025, Baldoni knew that ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████ ¶667. That same day, Lively told Sony that ████████

██████████████████████. ¶668. By this time, Lively ████████████████████████

████████████████████████████████. ¶669. ██████████████

██████████████████████████████████████████████████████

████████████████████████████████. *Id.*

11. <u>Baldoni and Wayfarer hired a California-based crisis team to "bury" Lively.</u>

Approximately two weeks before the Film's premiere, ██████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████" ¶671-72. Abel ████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████ *Id.* The same day, ██████████████████████████████████

██████████████████. ¶¶673.



. ¶¶673-76. On July 25, 2024,

. ¶¶678-79. Case's

_Id._ According to Cases'

_Id._ There was discussion

" _Id._ After the call,

¶680.

Abel did not wait for negative attacks. On July 31, 2024, she texted Wayfarer about having seeded the "***weaponized feminism***" narrative with a writer for People, Fox News, In Touch, and US Weekly, explaining "she is fully briefed of the situation and is armed and ready to take this story of Blake weaponizing feminism to any of her outlets the minute we give her the green light." ¶¶681-82. Abel did this notwithstanding

. ¶683. The next day, TAG

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ ¶684.

A similar strategy of "***planting a seed earlier on to position your truth/narrative*** around the ordeal in a subtle way" appeared in a "Scenario Planning" document TAG sent to Wayfarer, which set forth scenarios that "we should be prepared for, should BL and her team make her grievances public[.]" ¶¶685-88 ("Scenario Planning Document"). TAG recommended that Wayfarer "get ahead of this narrative" with "key messaging points" including:

- "When BL wasn't able to get her way on set or behind the scenes, she involved her husband to create an ***imbalance of power*** between her and JB."

- "BL's ***less than favorable reputation*** in the industry spans decades and has been reported."

- "There is a clear, likely motive due to the film's value and fanbase, in which BL is attempting to ***bully her way*** into buying the rights for It Starts With Us."

*Id.* The Scenario Planning Document also suggested that the TAG "team can explore ***planting stories about the weaponization of feminism*** and a how people in BL's circle like Taylor Swift, have been accused of utilizing these tactics to '***bully***' into getting what they want." *Id.*

Baldoni found the Scenario Planning Document to be insufficiently aggressive—he told Abel that he ████████████████████████████████████████████ ██████████████████. ¶689-92. Abel conveyed that Baldoni "wants to feel like" Lively "can be buried..." *Id*. Nathan explained: when we send over documents ***we can't send over the work we will or could do because that could get us in a lot of trouble*.**" She explained: "***We can't write we will destroy her*. . . . *Imagine if a document saying all the things that he wants ends up in the wrong hands*.**" She observed that "***you know we can bury anyone***[.] But I can't write that to him." *Id*. Nathan and Abel planned to ████████████████████████████████████"

██████████████████████████████████████. *Id*.

Wayfarer engaged TAG on August 3, 2024. ¶693. Nathan immediately got to work,

████████████████████████████████████████████████." ¶694. On

August 4, 2024, TAG, Nathan, and Abel ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████. ¶696.

As the Film's August 5, 2024 press junket approached, ███████████████

████████████████████████████████████████████████████████████

█████████████████████████████████ ¶¶697-98. ████████████████████

██████████████████████████████████████." ¶698. ████████████████

███████████████████████████████████████. *Id*.

Baldoni's abrupt departure from the approved marketing strategy was not accidental—it

was a strategy devised by TAG to get ahead of Lively's claims before they became public. Early

on August 5, 2024, Abel reported that during his first interview of the junket, Baldoni "█████████

████████████████████████████████████████████████████████████

██████████████████████████████████" ¶¶700-01. The PR team ███████████████

████████████████████████████████████████ ¶702. Sony █████████████████

████████████████████████████████████████████████████████████

████████████████ ¶703-05.

████████████████████████████████████████████████████████████

████████████████████████████ ¶706. Sony was right. Within a week, dozens of articles

had regurgitated ████████████████████ using the word "friction" in speculating about on-set

tensions. ¶707. Baldoni also ████████████████████████████████████████████

████████████████████████████. ¶708.

    12. <u>As the Film premiered with massive success, Defendants launched a "social combat plan" against Lively.</u>

    On August 5, 2024, the day before the premiere, Nathan provided Heath with ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ ¶¶709-15. The same

day, Nathan ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████. *Id.*

    The Film premiered in New York on August 6, 2024. ¶716. At an after party, Sarowitz ███

████████████████████████████████████████████████████████████

████████████████████████████████████ ¶717. At this point,

Nathan and Abel were ██████████████████████████████." ¶719. ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████ ¶718. The day after the premiere, Nathan ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████." ¶719.

On August 7, 2025, TAG ████████████████████████████

████████████████████    The proposal outlined ████████████████████

████████████████████████████████



¶720.[13] TAG ████████████████████████████████████

████████████████████████████." ¶724. By the time Wayfarer engaged Street on

August 8, 2024, Wallace ████████████████████████████████

████████████████████████████ ¶725. That day, ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ ¶727.

Also on August 8, 2024, upon arriving in Chicago following the New York press junket

and premiere, Baldoni decided to depart entirely from the Film's agreed-upon marketing plan.

Texting the "Team JB Social Media" group chat, ████████████████████████████████

---

[13] These proposed services reflect TAG's understanding of Wallace's capabilities, as reflected in similar scopes of work sent by TAG to other prospective clients. ¶¶720-23. For example, Wallace has explained that he can improve an individual's image and reputation by: "rewriting" an image's metadata"; "suppressing" posts, links, and articles; "heavily clipping and algorithm boosting"; throwing "a ton of upvotes at stuff that is rah rah" and "downvote everything that's acting as a draft"; elevating content "across all algorithmically driven platforms"; and "undoing years of suppression" relating to a person's name. *Id.* Street Relations and TAG work together frequently, including to "enhance and expand" ████████████████ s "digital footprint and online presence," "shape, advance, and protect" ████████████ reputation, "amplify positive" stories and "remove links that are hurting" ████████████ and build digital "messaging to trend and dominate in" ████████████ favor. *Id.*

27

██████████████████████████████████████████████████████

█████████████████████████████████.” ¶728. The next day, Baldoni

wrote that the "██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████ ¶¶

734. ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████" ¶¶729-31. Abel and

Heath, nonetheless, ███████████████████████████████████. *Id.*

    The Film was released into theatres on August 9, 2024. ¶733. The same day, Wayfarer

██████████████████████████████████████████████████████

████████████████████████ ¶735. TAG, Nathan, and Abel were also █████████████. For

example, ██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████ ¶736-38. ████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████. *Id.*

    Later on August 9, TAG employees █████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

[REDACTED].” ¶¶739-40. Later that day, TAG [REDACTED]

¶741. By that evening, Nathan and Abel celebrated that they [REDACTED]

[REDACTED]” ¶742. The next afternoon, TAG reported [REDACTED]

[REDACTED] ¶743.

During its first week, the Film [REDACTED]

[REDACTED]. ¶¶744-45. According to Sony, the Film performed " [REDACTED]

[REDACTED] *Id*. There was consensus [REDACTED]

[REDACTED] ¶¶746–49.

[REDACTED].” ¶¶ 747.

Notwithstanding the Film's success, TAG, Nathan, Abel, Wallace, and Street spent much of August 2024 working to disparage Lively's character, and discredit any allegations that might arise about Baldoni's on-set behavior, by boosting derogatory content about Lively alongside glowing content about Baldoni. Just a few examples include:

- On August 10, [REDACTED]

  [REDACTED]” ¶750.

- On August 13, [REDACTED]

  



- On August 13, Baldoni ██████████████████████████████████████████ ¶753.

- On August 14, TAG ████████████████████████████████████████████ ¶754.

- On August 15, 2024, ████████████████████████████████████████ ¶756-57.

- On August 15, ████████████████████████████████████████████████ *Id.*

- On August 18, TAG confirmed ███████████████████████████████████ ¶759.

By August 18, 2024, Baldoni ██████████████████████████████████████

██████████████ ¶¶760-61. Nathan ████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████ *Id.* Tellingly, ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ *Id.*

In the weeks after the Film's release, ████████████████████████████

███████████████████████████████████ ¶765. On August 13, 2024, ███

████████████████████████████████████████████ — as compared

to only four percent pro-Lively—including because ████████████████████

████████████████████████████████████████████████████████.

*Id.* Professor Aron Culotta, who teaches Computer Science at Tulane University, ████████

████████████████████████████████████████████████████

████████████████████████ ¶¶830-33. Likewise, Dina Mayzlin, the Robert

E. Brooker Chair in Marketing at the Marshall School of Management and the University of

Southern California, concluded that the ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ ¶¶834-36. These

trends suggest that the seeded, manipulated narratives fueled subsequent negativity, first in August

2024 and again in the period spanning December 2024 through February 2025. *Id.*

During a phone conversation on August 29, 2024, Sarowitz admitted that the Film had

achieved massive financial success, yet his fear that Lively might speak out publicly prompted him

to warn that he would protect Wayfarer "like Israel protected itself from Hamas. There were 39,000

dead bodies. There will be two dead bodies when I'm done." ¶766. The very next day, Baldoni

admitted in a text that he knew Lively ███████████████████████████████████

████████████████████████████████████████ ¶612. Notwithstanding that

admission, ████████████████████████████████████████████████████

██████████████████████████████████████████████. ¶762. ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████



## I.   In Response To Lively's CRD Complaint, Defendants Continued Their Retaliatory Campaign With A Baseless Lawsuit And Defamatory Statements.

On December 20, 2024, Lively filed an administrative complaint with the California Civil

Rights Department ("CRD Complaint") alleging *inter alia* harassment and retaliation. ¶¶ 783-84.

The same day, Lively ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████. ¶¶786.

Freedman also published the December 21 Statement to *The New York Times* on behalf of his

clients, calling Lively's claims "completely false, outrageous and intentional salacious" and a

"desperate attempt to 'fix' her negative reputation which was garnered from her own remarks and

---

[14] Notwithstanding all of the evidence summarized above, there is a dearth of real-time communications between Wallace and the Defendants between August to October 2024, because the TAG team communicated with Wallace using Signal, a messaging application that Wallace, TAG, and others utilized precisely because it is designed to automatically delete messages after a short period of time. ¶¶763-64

actions during the campaign for the film." ¶787. Freedman stated that the "representatives of Wayfarer Studios still did nothing proactive nor retaliated, and only responded to incoming media inquiries" and "that there were no proactive measures taken with media or otherwise." *Id.*

On December 23, 2024, 

." ¶788. On December 31, 2024, Freedman filed the California State Lawsuit against *The New York Times* in state court in Los Angeles, California on behalf of certain of his clients, alleging that an article on the CRD Complaint defamed them under California law. ¶794. Lively initiated this litigation earlier that same day. *Id.*

On January 2, 2025, 

¶795. The next day,

¶796.

*Id.*

. *Id.* Sarowitz

. ¶¶ 799-800.

132272102.v8

█████████████ *Id.* After Defendants' approval, ████████████████████████████████

████. ¶ 801. On January 7, 2025, Freedman was interviewed from his Los Angeles office by another former client, Megyn Kelly, during which he made the January 7 Statement, which falsely accused Lively of "making threats" in order to "be in control of marketing of the movie," and of using "these allegations of sexual harassment, and she used these allegations of bullying to try and leverage her position so she could be the de facto director." ¶¶ *Id.*

Wayfarer, Baldoni, Heath, IEWUM, Abel, and Nathan filed a separate lawsuit in this Court on January 16, 2025 against *inter alia* Lively and Reynolds, seeking at least $400,000,000 in damages. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████. ¶¶803-05. In the January 18 Statement to Deadline, Freedman described Lively's sexual harassment allegations as "heinous" and "revoltingly false," accusing her of attempting to "publicly destroy Baldoni's reputation in an attempt to devastate his future career," and claiming that "Baldoni never once publicly attempted to call Lively out for her own many wrongdoings during filming, he kindly addressed all her concerns during filming in the correct manner. . ." ¶806.

On January 21, 2024, the Defendants provided raw video footage of the Dance Scene along with an approved statement to friendly media outlets and content creators, including to TMZ, The Daily Mail, and Popcorned Planet, which rewarded Defendants with headlines falsely asserting that the video proved Lively had lied about being sexually harassed. ¶¶ 806. That same day, Lively moved for a protective order pursuant to Rule 3.6 in response to Freedman's incessant character assassination. ¶811.[15] Despite that ask, which is *not* a "gag order," Nathan provided a quote to

---

[15] On January 23, 2025, Freedman filed a motion for *pro hac vice* admission, which was signed and notarized in Los Angeles, California—indicating that he was located in California at that time—and stated that he primarily practices law in California. ¶813.

People.com (attributed to sources "close to" Baldoni) that it is "grossly unfair to impose a gag order" because all Baldoni wants to do is "release videos and text messages to prove the allegations are false." ¶814. In the January 25 Statement, Freeman falsely alleged (to Page Six) that "Lively is so petrified of the truth that she has moved to gag it" and that Lively had filed her litigation "with the sole intent to ruin the lives of innocent individuals, and then went the extra mile to place blame on a fictious smear campaign, all because she quite simply could not accept that the public had organically seen through her façade." ¶814.

On January 31, 2025, the Defendants filed the FAC, alongside a rambling 168-page "Timeline" detailing the Wayfarer Parties' version of events. ¶815. On February 1, 2025, the Defendants launched a website, with the URL www.thelawsuitinfo.com/, which contained the FAC and the Timeline. ¶816. On June 9, 2025, the Court dismissed Defendants' lawsuit. ¶817.[16]

### J. Lively Suffered Damages As A Result Of The Conduct.

Following the success of the Film, Lively was on track to command 

¶824. Instead, Lively suffered

. ¶825. The income Lively

," ¶¶826-27, but the

. ¶828. Despite their prior successes, sales of both

---

[16] At this point, Freedman also was personally involved in attempting to kill stories that were unfavorable to his clients, including by

*Id.*

132272102.v8

████████████████████████████████

████████████████████. ¶¶828-29.

## **ARGUMENT**

Between the MSJ and MJP, Defendants present a kitchen-sink of meritless arguments to attack Lively's claims. To avoid duplication, Lively addresses the threshold issues of administrative exhaustion, extraterritoriality, joint-employer liability, the opinion and privilege defamation defenses, and the challenged sufficiency of the pleadings in the MJP Opposition, which is incorporated herein by reference. This Opposition addresses the substantive evidentiary disputes and governing legal principles that preclude summary judgment on Lively's sexual harassment, retaliation, failure-to-prevent, aiding-and-abetting, employee-status, contract, defamation, false light, conspiracy, and damages claims, as set forth in Sections I–X below, and are likewise incorporated by reference into the MJP Opposition.[17]

## I.    LIVELY'S SEXUAL HARASSMENT CLAIMS MUST PROCEED TO TRIAL.

Sexual harassment can be verbal, physical, or visual, and includes, without limitation, inappropriate comments, touching, and other conduct that communicates a demeaning message. *Bailey v. San Francisco Dist. Attorney's Off.*, 16 Cal. 5th 611, 627 (2024); *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 708 (2009). Conduct creates a hostile or offensive work environment when it "sufficiently offends, humiliates, distresses, or intrudes upon" the employee, "so as to disrupt [her] emotional tranquility in the workplace," "make it more difficult to do the job," or otherwise "interfere[s] with and undermine[s] [her] personal sense of well-being." Cal. Gov't Code § 12923 (a), (e); *Reynaga v. Roseburg Forest Products*, 847 F. 3d 678, 687 (9th Cir. 2017); *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 390 n.52 (2d Cir. 2020). A "single incident of harassing conduct

---

[17] By defining Lively's claims and arguing against summary judgment on a claim-by-claim basis, this Opposition does not limit the application of any arguments that are applicable to multiple claims.

132272102.v8

is sufficient to create a triable issue" and may be sufficiently severe to create an offensive environment. MSJ at 20; Cal. Gov't Code § 12923(b); *accord Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 83 (2d Cir. 2009); *Troeger v. JetBlue Airways Corp.*, 2024 WL 5146185 (S.D.N.Y. Dec. 17, 2024). Hostile environment claims are "***rarely appropriate for disposition on summary judgment"*** because they require consideration of the totality of the circumstances and often "involve issues 'not determinable on paper.'" *Nazir v. United Airlines, Inc.,* 178 Cal. App. 4th 243, 288 (2009) (emphasis added); Cal. Gov't Code § 12923 (e).[18] The totality of the circumstances here necessitate denying the MSJ as to the Harassment Claims because the Wayfarer Defendants have failed to meet their burden, and the evidence demonstrates that they subjected Lively to (1) unwelcome conduct (2) because of gender that was (3) sufficiently severe or pervasive to alter the conditions of her employment. *Bailey*, *supra*, at 627.

### K.  Heath's Behavior, Alone, Warrants Denying The MSJ.

Heath's intrusion into Lively's hair and makeup trailer and choice to show her a nude video at work (after filming of the Birth Scene already had concluded) each alone give rise to a triable issue on harassment that precludes summary judgment. Any reasonable woman in Lively's position would be offended by having a supervisor look at her exposed breasts or play a video of his admittedly naked wife in the workplace. These experiences were "degrading and humiliating in the extreme." *Bailey*, 16 Cal. 5th at 634. ██████████████████████████ ███████████████████████████████████████ and ignores that Heath was Lively's boss. *See* ¶¶511-517. Heath's claim that ████████████████████████ ████████████ MSJ at 24, not only is irrelevant, but also betrays ignorance about ███████████ ██████████████ *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010) ("harassing

---

[18] *See Muniz v. UPS*, 731 F. Supp. 2d 961, 971 (N.D. Cal. 2010) ("very little evidence" required to "survive summary judgment").

conduct need not be motivated by sexual desire" (citation omitted)).

**L.  The Wayfarer Defendants Fostered An Environment Laden With Gender Bias.**

The totality of the circumstances, subjective and objective assessed, demonstrate that the Wayfarer Defendants fostered a hostile environment based on sex.[19] It well established that "hostility need not be directly targeted at the plaintiff to be relevant to [] her hostile work environment claim." *Reynaga*, 847 F.3d at 687; *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 229 (2d Cir. 2024); *see also Banks v. Gen. Motors, LLC*, 81 F.4th 242, 267 (2d Cir. 2023); *Meeks v. Autozone, Inc.*, 24 Cal. App. 5th 855, 871 (2018) ("'Me too' evidence … may be admissible to prove a defendant's motive or intent."); *Pantoja v. Anton*, 198 Cal. App. 4th 87, 109 (2011).[20] Instead, the challenged conduct need only have made it more difficult for plaintiff to perform her job. *Reynaga*, 847 F.3d at 687; *Rasmy*, 952 F.3d at 390 n.52.[21]

Multiple women—Lively, Slate, Saks, Ferrer, Hoover, and Hall—



. ¶¶487-575. The Wayfarer Defendants do not deny that the majority of the harassing incidents occurred, but

---

[19] The objective severe or pervasive analysis considers the nature, frequency, and severity of the conduct, the role of the harasser(s), as well as the particulars of a plaintiff's position, among other factors. *McSweeney v. Cohen*, 776 F. Supp. 3d 200, 250-251 (S.D.N.Y. 2025); *Bailey*, 16 Cal. 5th 628, 632.

[20] It is indisputable that the behavior was unwelcome and that Lively genuinely perceived the workplace to be infected by gender-based bias and hostility. Defendants' own texts support that finding. ¶¶585, 588, 612, 616. As do Lively's contemporaneous texts and notes, testimony, and repeated reporting. ¶¶ 515, 519, 527, 543, 552-56, 559-62, 574-75, 581-87, 667. That Lively described her own character's boots or beanie as "sexy," or dialogue as "flirty and yummy," does not indicate either comfort with, or consent to, Baldoni using those words to describe *her body*. Nor does agreeing to act in a romantic drama indicate her consent to discuss personal sexual fantasies, her sex life, or pornography. An unsupported and disputed allegation that Lively improvised kissing (she did not) does not establish that she consented to Baldoni's improvisation or found it appropriate.

[21] Harassing conduct can occur outside the workplace, which makes it irrelevant, for example, that Baldoni asked Lively's trainer, rather than Lively herself, about her weight and that he did so outside the presence of cast and crew. *Compare* MSJ at 22, *with Myers v. Trendwest Resorts, Inc.*, 148 Cal. App. 4th 1403, 1424 (2007), *and Parrish v. Sollecito*, 249 F. Supp. 2d 342, 351 (S.D.N.Y. 2003) (proper focus "is not on any particular point in time or coordinate location that rigidly affixes the employment relationship, but on the manifest conduct associated with it. . . .").

██████ MSJ at 19. These characterizations do not excuse the Wayfarer Defendants' fostering of a hostile work environment. The "legal standard for sexual harassment should not vary by type of workplace" and women who choose to work in creative environments, like movie sets, remain entitled to a workplace free from harassing conduct aimed at them. *See* Cal. Gov't Code § 12923 (d); *compare Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 332 (4th Cir. 2003) (finding harassment), *with Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 275 (2006) (declining to find harassment based on comments in writers' room that "did not involve and were not aimed at plaintiff").[22]  Baldoni directed his personal sexual comments ***at Lively directly***, including by:

████████████████████████████████████████████████ (¶497-501);

████████████████████████████████████████████████████

██████████████████████ (¶520); ██████████████████████████

█████████████████████████ (¶¶523-26); and ████████████████

████████████████████████████████ (¶ 527-28). Wayfarer's own policies recognize that █████████████████████████████████

██████████████. ¶¶474-75, 480.

The nature of the Film's material is no excuse. Baldoni's ████████████████████

████████████████████████████████████████████████████

████████████ cannot reasonably attributed solely to advancing any plotline. ¶¶518-22, 546-51. The nature of the Film also could not possibly explain ████████████████████

████████████████████████████████████████████████████

████████████████████ ¶¶511-517, 542-45. Nor does it explain the Wayfarer Defendants' ████████████████████████████████████, including those who

---

[22] Courts "should only consider the nature of the workplace when engaging in or witnessing prurient conduct and commentary is integral to the performance of the job duties." Cal. Gov't Code § 12923 (d).

shared no intimate scenes with Baldoni in the Film. ¶¶488-95. Baldoni and Heath's behavior would

be offensive and marginalizing to any reasonable woman, and was to many other women on the

set—███████████████████████████████████████████. ¶¶487-575.

Lively may be a movie star, but on the set of the Film, Heath and Baldoni were her bosses

with a total consolidation of power as lead actor, producer, director, co-chairman, president, and

CEO. ¶¶409-12, 420-27. They set her schedule and her salary, appeared on and managed the set

every day, were responsible for receiving and addressing HR concerns, and had the power to exert

influence over Lively's working conditions. *Id.* Heath and Baldoni also leveraged their close

friendship to "act with a certain degree of impunity" and cover the other's misdeeds, such as

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ *Id.* ¶585, 588,

613-16; *Bailey*, 16 Cal. 5th at 632. Their close friend, Sarowitz, responded by suggesting ████

███████████████████████████ ¶571. Their collective power and conduct threatened

Lively's (and others') ability to do her job, including by risking her chemistry with her costar,

forcing her to spend significant time reporting and attempting to remedy their behaviors, and

███████████████████████████. ¶¶554, 582-87. On that score, the retaliatory ████████

█████████████████████, and continual disparagement of Lively to others, among the other

retaliatory behaviors, were part and parcel of the sexual harassment, extending it well beyond

January 4, 2024, contrary to Defendants' position that all was well and resolved by that time.

¶¶552-53; *Birschtein v. New United Motor Mfg., Inc.*, 92 Cal. App. 4th 994, 1002 (2001)

(retaliatory acts can exacerbate hostile work environment); *Sooroojballie v. Port Auth. of New*

*York & New Jersey*, 816 F. App'x 536, 543 (2d Cir. 2020) (summary order) (accord).

### M. Wayfarer And IEWUM Are Strictly Liable For Supervisory Conduct.

Because Baldoni and Heath served as Lively's supervisors, Wayfarer and IWEUM are

strictly liable for their misconduct. *See Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc.*, 531 F. Supp. 3d 522, 537 (N.D.N.Y. 2021); *Roby*, 47 Cal. 4th at 707. The Wayfarer Defendants' remediation argument fails because such a defense does not apply when, as here, the conduct involves *supervisory* conduct. *Sears*, 531 F. Supp. 3d at 538. Nor can they avail themselves of the *Faragher* defense because doing so requires an employer not only have but also ***enforce*** anti-harassment policies and complaint procedures, including by effecting corrective action. *Id.* at 537 ("Remedial action beings with the investigation.").[23] Wayfarer failed to enforce its own policies , refused to investigate concerns when raised, and did not take *any* disciplinary action (not even admonishing Heath or Baldoni).[24] ¶¶474-86, 569-72, 576-78, 589-90. Instead, they enabled the hostility to continue, including through the subsequent retaliation inflicted on Lively. *Lively's* persistent efforts to remediate the behavior does not absolve Wayfarer and IEWUM of their obligations.

## II.    THE RETALIATION COUNTS MUST PROCEED TO TRIAL.[25]

This Court's previous finding that "the strength of the evidence in favor of a smear campaign" because the evidence in the CRD Complaint sufficiently demonstrated that the "Wayfarer Parties did spread negative stories about Lively" and "did what they said they planned to do" alone warrants denying the MSJ. Dkt. 296 at 115-119.[26] The same result follows at this stage because the Wayfarer Defendants have failed to adduce *admissible* evidence to demonstrate

---

[23] The *Faragher* defense requires: "(1) the employer exercised reasonable care to prevent and correct any harassing behavior"; and (2) the plaintiff unreasonably failed to take advantage of corrective opportunities. *Sears*, 531 F. Supp. 3d at 538. California does not recognize the *Faragher* defense because "under the FEHA, an employer is strictly liable for all acts of sexual harassment by a supervisor." *State Dep't of Health Servs. v. Superior Ct.*, 31 Cal. 4th 1026, 1042 (2003); Cal. Gov't Code § 12940.

[24] *Cf. Sears*, 531 F. Supp. 3d at 536-537 (finding appropriate remedial steps where defendant conducted an investigation consistent with its policies and also disciplined the harasser with more than "an empty slap on the wrist").

[25] ███████████████████████████████████████████████████████████

[26] Wayfarer and IEWUM are liable as joint employers.

they had a legitimate reason for their conduct, which they must to "dispel the presumption" of retaliation under Title VII and FEHA once Lively makes a prima facie case that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) a causal link exists between the two. *Mamou v. Trendwest Resorts, Inc.*, 165 Cal. App. 4th 686, 714-15 (2008); *McSweeney*, 776 F. Supp. 3d at 250-251.[27] Even if *arguendo* the Wayfarer Defendants are able to proffer evidence as to legitimacy, denial of MSJ still is necessary because the evidence shows those reasons are untrue or pretextual. *McSweeney*, 776 F. Supp. 3d at 250-251. "Very little" evidence is required at this stage because the "ultimate question" is "most appropriately conducted before a factfinder on the full record." *Wilson v. City of Fresno*, 763 F. Supp. 3d 1073, 1106–07 (E.D. Cal. 2025)*.*

**A.      The Record Easily Establishes A Prima Facie Case Of Retaliation.**

        1.      <u>The Wayfarer Defendants concede that Lively engaged in protected activities.</u>

While conceding that Lively has met the protected activity element of her *prima facie* case,[28] the Wayfarer Defendants attempt to undermine the causal link element by pointing to "temporal proximity" and "intervening events" that ignores the full scope of Lively's ***protected conduct***, which includes: ██████████████████████████████████████ (April 2023, ¶¶470-71, 519, 561); ████████████████ (May-June 2023), ¶¶ 561-81; ███████████████████████████████ (January-June 2024, ¶¶ 582-90); █████████ ███████████████████████████████████████ (June to August 2024, ¶¶249, 668-69); and filing her CRD complaint and this action (December 2024, ¶¶

---

[27] An even higher "clear and convincing" standard applies to California Labor Code section 1102.5, which Defendants do not meet. *See Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703, 718 (2022).

[28] Defendants identify at least three protected acts, which they do not dispute occurred or constitute actionable protected activities: Lively raising concerns in May 2023 (MJP at 14, 16; ¶¶ 561-81) and January 2024 (¶¶586-89), and negotiating the CRA (MSJ at 31; ¶¶582-,83).

783-84).[29] The Wayfarer Defendants cannot challenge these additional protected activities on reply,[30] but, even if they could, each event constitutes legally protected conduct that destroys the causal argument.

2.  <u>The Wayfarer Defendants subjected Lively to a continuous pattern of adverse actions</u>.

Courts liberally interpret anti-retaliation provisions to include "the entire spectrum of employment actions" and consider the totality of the circumstances and an employer's acts collectively, rather than in isolation, because retaliation can manifest in "a series of subtle, yet damaging, injuries." *Yanowitz v. L'Oréal USA, Inc.*, 36 Cal. 4th 1028, 1052–53 (2005); *Bailey*, 16 Cal. 5th at 638 (task is to "appreciate the nature of *this* conduct by *this* particular actor in the context of *this* workplace"); *accord Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63-64 (2006); *Schoenadel v. YouGov Am. Inc.*, 2025 WL 371089, at *9 (S.D.N.Y. Feb. 3, 2025). California law defines an adverse action as "treatment that is ***reasonably likely*** to impair an employee's job performance or ***prospects for advancement in their career***." *Bailey*, 16 Cal. 5th at 638 (emphasis added). Title VII is even broader, reaching "any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination." *McSweeney*, 776 F. Supp. 3d at 251 (citing *Burlington*, 548 U.S. at 57). Such injuries need not directly relate to a plaintiff's employment or workplace nor affect her compensation or job level. *Burlington*, 548 at 63-64. The MSJ does not confront the Wayfarer Defendants' continuous pattern of adverse actions, focusing instead on recharacterizing certain publicity efforts as "reasonable defensive measures" and relying on self-serving and disputed facts to assert that the "digital smear campaign" "never

---

[29] "Protected conduct can take many forms," including formal or informal reporting or opposing conduct that employee reasonably believes is unlawful. Cal. Gov't Code § 12940(h); *Castro-Ramirez v. Dependable Highway Express, Inc.*, 2 Cal. App. 5th 1028, 1046 (need not use "legal buzzwords"); *see also Eaton v. Coca-Cola Co.*, 2010 WL 2836737, at *17 (D. Conn. July 19, 2010); *Lewis v. New York City Transit Auth.*, 12 F. Supp. 3d 418, 449 (E.D.N.Y. 2014); *Laurin v. Pokoik*, No. 02 CIV. 1938 (LMM), 2005 WL 911429, at *4 (S.D.N.Y. Apr. 18, 2005).
[30] *See Hahn v. Off. & Pro. Emps. Int'l Union, Loc. 153*, 2016 WL 4120517, at *4 (S.D.N.Y. July 22, 2016).

happened." MSJ at 27, 29 fn. 5. The argument is legally erroneous, and ignores contrary evidence, the pending spoilation motion, and expert testimony.[31]

> i. *The Wayfarer Defendants obstructed Lively's attempts to report and remediate workplace harassment.*

The Wayfarer Defendants impeded Lively's ability to report unlawful conduct and to secure a safe and harassment-free work relationship by dismissing her concerns, attempting to justify their behavior, becoming "huffy" or "short" and "withdrawing," or making comments that undermined the importance of people feeling safe on set,. ¶¶552-54. *Bailey,* 16 Cal. 5th at 638 (obstructing a complaint could be "quintessentially retaliatory"). Baldoni and Heath knew that others found their behavior inappropriate, but ████████████████████████████████ ████████████████████████████████ ¶¶565-72, 584,. Their ████████████ ████████████████████████████████████████████████ ████████████████████████████████ ¶¶552-54. The Wayfarer Defendants' effort to ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████." ¶¶582-83.

> ii. *The Wayfarer Defendants impugned Lively's reputation.*

Courts have long recognized that making "disparaging or untrue statements" or otherwise "[b]emirching" an employee's reputation can constitute adverse treatment, especially when future

---

[31] The Court must deny the MSJ on the Retaliation Claims because Lively not only has presented substantial evidence demonstrating that the existence of a retaliatory digital campaign (*see* ¶¶709-62, 830-33) but also has sought relief for the Defendants' destruction of relevant ephemeral communications (*see* Dkt. 874). *See Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998) ("where the innocent party has produced some (not insubstantial) evidence in support of his claim, the intentional destruction of relevant evidence by the opposing party may push a claim that might not otherwise survive summary judgment over the line"); *accord Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001); *see also Vega v. Broome Cnty.*, 2023 WL 6318919, at *14-15 (N.D.N.Y. Sept. 28, 2023).

employment requires a "wholesome reputation." *McSweeney*, 776 F. Supp. 3d at 268 (collecting cases confirming that negative references, refusals to provide recommendation letters, blacklisting, and about an employee to others or in the media can be adverse); *Yanowitz*, 36 Cal. 4th at 1055 (communicating, fabricating, and soliciting negative information about employee contributes to adverse course of conduct); *see Doe v. City & Cnty. of San Francisco*, 835 F. Supp. 2d 762, 772 (N.D. Cal. 2011). The Wayfarer Defendants ████████████████████████████████████ ████████████████████████, which directly undermined Lively's ability to perform her job, including by jeopardizing her ability to promote the Film alongside Hoover. ¶¶623-639.[32] They furthered the pattern of adverse acts against Lively ██████████████████████████, despite her well-documented contributions to the Film. *See Constantin v. N.Y.C. Fire Dep't*, 2009 WL 3053851, at *14 (S.D.N.Y) (denial of recommendation letter sufficient to support adverse action); *accord Pantchenko v. C. B. Dolge Co.*, 581 F.2d 1052, 1055 (2d Cir. 1978). Defendants ████████████████████████████████████████████████. (¶¶636-37).

Defendants publicly maligned Lively by planning and implementing a press and social media campaign to "bury" her. ¶¶640-782. Baldoni departed from the Film's agreed-upon marketing plan, despite knowing in real-time that it would harm Lively and the other female cast and crew, ████████████████████████████████████████ ███████████████. ¶¶728-34. The Defendants simultaneously placed and promoted negative media and social media narratives that falsely blamed Lively for the Film's marketing plan (¶¶744-65), and cast aspirations at her character (¶¶681-88). Defendants' attempt to cast their campaign as a "defensive measure" or "classic PR," ignores the law and the facts, including their prior

---

[32] That ██████████████████████ is irrelevant—it says nothing about whether Heath and Baldoni disparaged *her because of* her having engaged in protected activities.

agreement that "negative behavior, ***including during publicity and promotional work***" could be retaliatory. ¶582. Defendants cite no evidence demonstrating that Lively "indisputably started the publicity fight," or that she launched an "onslaught of vicious negative" press against Baldoni. MSJ at 30. Instead, they rely on disputed events occurring *after* they set their plan in motion: two texts from Reynolds to WME, the Vanzan lawsuit, and *The New York Times'* reporting on Lively's CRD Complaint. MSJ at 30. None of this can possibly explain the campaign Defendants began to hatch, and then started executing, *before the Film premiered.* ¶¶640-715.

The evidence that exists demonstrates that Defendants have exceeded the bounds of "reasonable defensive measures." They did not simply *defend* Wayfarer by, for example, having Baldoni or Heath give interviews to explain what they experienced on set, or offer witnesses to speak to Baldoni and Heath's character. *Cf. McSweeney*, 776 F.Supp.3d at 258-25; *Hughes*, 304 F.Supp.3d at 449. Instead, they purposely, repeatedly, surreptitiously, and directly, attacked Lively's character and reputation, including in ways that directly contradicted their own perception of Lively's ███████████████ ¶¶640-782. An employer's right to defend itself does not authorize threats, intimidation, or efforts to publicly discredit employees who have raised harassment claims. *Cf. McSweeney*, 776 F.Supp.3d at 258-259 (published letter not adverse where "cast[] doubts on Plaintiff's allegations [about ancillary issue] and not on Plaintiff's performance as an actor or reputation as an employee in the entertainment industry").[33] The Wayfarer Defendants' employer-coordinated and funded smear campaign, directed by the same executives Lively accused of harassment, constitutes quintessential adverse conduct and DARVO. ¶442; *see*

---

[33] *See also Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018) ("There is an important difference between defending oneself, on the one hand, and threatening, intimidating, or otherwise interfering with someone's right to pursue a discrimination claim on the other."); *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 84 (1st Cir. 2007) (affirming verdict based on union president's comments on TV that plaintiff was unfit for her job and implying she would "pay a price").

*generally* Ex. 96, Freyd Report; *Johnson v. J. Walter Thompson U.S.A., LLC*, 224 F. Supp. 3d 296, 314 (S.D.N.Y. 2016).

> iii.    *Defendants Filed a Baseless and Retaliatory Lawsuit.*

Defendants' frivolous and dismissed $400M lawsuit—launched with the purpose of suing Lively, her family, and anyone on her side "into oblivion"—constitutes adverse action. *See* Dkt. 223, 296, 743 at 5-13, 23-24; *Robinson v. De Niro*, 739 F. Supp. 3d 33, 89 (S.D.N.Y. 2023) (suits that are designed to deter employees from seeking legal redress may constitute adverse actions when filed "with a retaliatory motive" and "without a reasonable basis in fact or law").[34]

> 3.  <u>A causal link connects Lively's protected acts to Defendants' adverse conduct.</u>

Defendants have failed to undermine the causal link connecting Lively's repeated protected acts, between April 2023 and December 2024, to their pattern of adverse treatment. Defendants' sole challenge to causation is a purported lack of "temporal proximity," but temporal proximity is not the only way to infer retaliatory animus. MSJ 31-32; *see, e.g., Sealy v. State Univ. of New York at Stony Brook*, 834 F. App'x 611, 614 (2d Cir. 2020) (addressing a situation "where a plaintiff relies on temporal proximity alone," "without some other evidence of retaliatory animus*); Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 457 (S.D.N.Y. 2012).[35] Temporal proximity is unnecessary here because the record shows that Lively's protected acts are *precisely what caused* Defendants to retaliate. *See Stajic v. City of New York*, 214 F. Supp. 3d 230, 236 (S.D.N.Y. 2016). Defendants' argument separately fails because it assumes that nothing happened after January 4,

---

[34] In *Robinson*, 739 F. Supp. 3d at 90, this Court declined to find a retaliatory suit where defendants planned to initiate litigation based on plaintiff's misconduct regardless of her suit. But Defendants had no plans to sue Lively (let alone her husband or publicist) until she sent Defendants her already-filed CRD Complaint. Dkt. 296 at 46.

[35] *See Wysinger v. Auto. Club of S. California*, 157 Cal. App. 4th 413, 421 (2007) ("A long period between an employer's adverse employment action and the employee's earlier protected activity" may support inference of causal connection); *see also Green v. Laibco, LLC*, 192 Cal. App. 4th 441, 456 (2011) (one-year gap); *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) (seven-month gap); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980) (eight-month gap).

2024, which ignores Lively's intervening protected acts and their ongoing pattern of public and private antagonism against her. *See* MSJ (Lively "faced no real consequences for at least eight months" after negotiating the Protections Rider); *see, e.g.*, *Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018); *Birschtein v. New United Motor Mfg., Inc.*, 92 Cal. App. 4th 994, 1002 (2001) (retaliatory acts can exacerbate hostile work environment); *Sooroojballie v. Port Auth. of New York & New Jersey*, 816 F. App'x 536, 543 (2d Cir. 2020) (summary order) (accord) (citations omitted).[36]

### B. Defendants Failed To Produce Admissible Evidence Of Legitimate, Non-Retaliatory Reasons For Their Sustained Course Of Retaliatory Actions.

Because Lively has shown a *prima facie* case, Defendants must but cannot point to *admissible evidence* to support a legitimate reason for their sustained adverse treatment of Lively. *O'Halpin*, 670 F. Supp. at 79. Defendants' argument that they "would have reacted to Lively's onslaught of negative press against them even if no concerns about their on-set behavior had ever been raised" fails on multiple levels. MSJ at 31. The argument relies on Heath's disputed, foundation-less, and self-serving testimony, which is contradicted by admissible evidence that

████████████████████████████████████████████████████████

██████████████████████████████ (¶¶249, 262). The Defendants' insistence that they needed to defend themselves against Lively's concerns overlooks that she made no public accusations until she filed the CRD complaint. The argument also fails by focusing on the publicity-related aspects of the retaliation campaign, while ignoring the other adverse actions against Lively. *See supra*. Finally, the Wayfarer Defendants' claim that they had legitimate reasons

---

[36] The Wayfarer Defendants' cited cases are distinguishable. *Gubitosi v. Kapica*, 154 F.3d 30 (2d Cir. 1998), concerns a police officer's § 1983 claims, and *Dhaliwal v. Saliz Pharms., Ltd.*, 2019 WL 5067164 (S.D.N.Y. Oct. 9, 2019), addresses the False Claims Act. The sole Title VII case, *Brennan*, 2020 WL 6875059, found an intervening act when, during a 16-month temporal gap, the plaintiff made "***terrorist threats.***" *Id.* at *5.

to act as they did ignores the volume and severity of conduct, and the fact that such conduct *far exceeds* any reasonable "defense," and was and is an unleashed fury of offense. *See supra*.

### C.  Defendants Wanted To "Bury" Lively For Speaking Out Against Them.

Even if Defendants have met their second-stage burden, the record contains evidence that Defendants' articulated business reason (to defend themselves) was false, pretextual, or motivated "at least in part" by the plaintiff's protected activity. *Bart*, 96 F.4th at 576; ¶¶263-645, 649.[37]

## III.    THE FAILURE-TO-PREVENT COUNT MUST PROCEED TO TRIAL.

The Wayfarer Defendants had an "affirmative and mandatory" duty to prevent harassment and retaliation and to "take all reasonable steps necessary" to do so (including a prompt, thorough, and impartial investigation), but failed to do so. Gov't Code § 12940(j), (k); *State Dep't of Health Servs. v. Superior Ct.*, 31 Cal. 4th 1026, 1040 (2003).*Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.*, 103 Cal. App. 4th 1021, 1035 (2002); *Malik v. Carrier Corp.*, 202 F.3d 97, 105 (2d Cir. 2000).[38] Wayfarer and IEWUM failed to: ██████████████████████ ██ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. ¶¶589- 590. *Bradley v. Dep't of Corr.*, 158 Cal. App. 4th 1612, 1630 (2008) ("adequate remedial measures" include "immediate corrective action" calculated to end, and prevent future,

---

[37] Lively's California counts set a significantly lower bar. FEHA and Section 1102.5 impose "substantial motivating reason" and "contributing factor" standards, respectively, and for 1102.5 a presumption of retaliation within 90 days of a protected act. *See Wawrzenski v. United Airlines, Inc*., 106 Cal. App. 5th 663, 685 (2024); *Lawson*, 12 Cal. 5th at 712; Cal. Lab. Code § 98.6. Having met the higher but for test, Lively easily meets California's tests.

[38] These provisions apply whether Lively was an employee or contractor as FEHA expressly protects employees and any "person providing services pursuant to a contract." Gov't Code § 12940(j)(1), (j)(5); *Hirst v. City of Oceanside*, 236 Cal. App. 4th 774, 791 (2015); 2 C.C.R. § 11008.

[39] Undistributed or unenforced policies are not reasonable preventative measures. *See Rice v. FCA USA LLC*, 2018 WL 345731, at *15 (Cal. Ct. App. Jan. 10, 2018) (policies "are mere lip service" if not followed by "conducting a reasonably thorough investigation to root out harassment."); *Luckett v. Kohl's Dep't Stores, Inc*., 2020 WL 4341779, at *4 (C.D. Cal. June 18, 2020) (same); *see also*, Robbins Tr., 101:21-103:25 ("having a policy is just having words. . . You need to distribute the policy.")

harassment).

Wayfarer and IEWUM insist that an investigation would not "have made any difference" because they executed the CRA, but *Lively's* insistence on a safe workplace does not absolve *them* of liability. MSJ at 38*; see Villalobos v. Costco Wholesale Corp.*, 2023 WL 5108499, at *8 (E.D. Cal. Aug. 9, 2023) ("obligation to take prompt corrective action" requires temporary and permanent remedial steps).[40] Nor can they claim futility because an investigation could have substantiated Lively's allegations, resulted in remedial actions including discipline for Baldoni and Heath, or ***prevented Defendants from launching their subsequent retaliation campaign***. *See California Fair Emp. & Hous. Com. v. Gemini Aluminum* Corp., 122 Cal. App. 4th 1004, 1024 (2004) ("employer's claim that its procedures are effective in addressing discrimination is negated by proof of retaliation."). Based on these failures, summary judgment is inappropriate. *See Marshall v. Boeing Co.*, 2019 WL 4391112, at *5 (C.D. Cal. June 10, 2019); *Rangel v. Am. Med. Response W.*, 2013 WL 1785907, at *8 (E.D. Cal. Apr. 25, 2013).

## IV.    LIVELY WAS AN "EMPLOYEE" UNDER TITLE VII AND CALIFORNIA LAW.

Defendants wrongly argue that Lively was an independent contractor rather than an employee for the purposes of Counts 1, 2, and 5. MSJ 32-35. Whether an individual is an "employee" entitled to Title VII's protections depends on a fact-specific analysis of thirteen factors (known as the "*Reid* factors"). *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 227 (2d Cir. 2008). "Control" is the "most important factor," and is alone reason to deny summary judgment.

---

[40] *Achal v. Gate Gourmet, Inc.*, 114 F. Supp. 3d 781 (N.D. Cal. 2015), and *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177 (9th Cir. 2005) both involve the federal *Faragher* defense under Title VII, and do not apply here. Even if they did, they do establish that existence of a policy, alone, satisfies FEHA. (Dkt. 955 at 36–37); *Achal*, 114 F. Supp. 3d at 804 (policy is one reasonable step an employer might take"); *Hardage*, 427 F.3d at 1185 (unlike here, employer fulfilled its preventative duties by maintaining and distributing a policy).

*Salomon*, 514 F.3d at 228.[41] Lively's Offer Letter and the ALA are replete with terms that show Defendants' "right to control the manner and means" of Lively's performance, requiring Lively to:



.[42] The ALA gave IEWUM

¶530.[43] Defendants complain that Lively's A-list status precludes a finding of "control" but being a "star" does make Lively "something less of an employee." *See Makarova*, 201 F.3d at 116. Defendants argument that they had no control because of Lively's various contributions to the Film also fails because IEWUM had ultimate say. MSJ at 34.[44] Defendants' failure to meet the "control" test is dispositive, as failure to establish even one factor renders the exception inapplicable. Cal. Lab. Code § 2776(a).

Defendants concede California's employee presumption, but claim that Lively is an

---

[41] Courts "*should not* ordinarily place extra weight on the benefits and tax treatment factors. . . and *should* instead place special weight on" the hiring party's control of the 'manner and means.' *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 117 (2d Cir. 2000) (emphasis in the original).

[42] Defendants dispute that the ALA is binding but ***themselves*** cite it as evidence that multiple *Reid* factors supposedly point their way, conceding the ALA's relevance to the issue. *See* Mot. at 34-35.

[43] *Makarova* addresses under New York law, but the Title VII test is the same. *Makarova*, 201 F.3d at 114.

[44] The Wayfarer Defendants ignore *Reid* factors 4, 7, and 8. Virtually all the other factors show that Lively was an employee, because Defendants: were "the source of the instrumentalities and tools" (factor 3), provided the set, camera, sound, costume, and crew; chose "the location of the work" (factor 4); prescribed a filming schedule (factor 7); paid Lively her fee "on [IEWUM's] regular payday in the week following the week in which such payments have accrued," (factor 6); hired and paid film staff (factor 9); considered Lively's work part of their "regular business" as a movie studio (factors 10 and 11); and covered Lively under IEWUM's workers' compensation policy (factors 12 and 13). While Lively is highly skilled (factor 2), even highly skilled individuals can be "employees" under Title VII. *See Salamon*, 514 F.3d at 228 (highly skilled surgeon could be an employee, noting that even "ship captains and managers of great corporations" can be as well).

independent contractor under the narrow "business-to-business" exception. MSJ 33; Cal. Lab. Code § 2776(a). That exception applies only if the Wayfarer Defendants meet ***all*** twelve statutory criteria, which they do not cite, let alone discuss.[45] To avoid a finding of employment status, Defendants thus must meet California's more-stringent "ABC" test, which requires establishing that Lively (A) was free from their control, (B) performs work outside their usual business, and (C) is "customarily engaged in an independently established" occupation or business. *Id*. §2775(b). *See* Cal. Lab. Code § 2775. Defendants cannot meet their burden because they fail even to mention this test, but even if they did, they could meet it because Lively is an employee for the above reasons.

## V.    LIVELY'S CONTRACT CLAIMS MUST PROCEED TO TRIAL.

### D.  The ALA And CRA Are Valid, Enforceable Agreements.

#### 1.  The ALA Is a Binding, Enforceable Agreement.

The Court should reject the Wayfarer Defendants' argument that the ALA was never validly formed and is unenforceable because *Defendants* previously sought to enforce the ALA against Lively in their now-dismissed lawsuit, which asserted a claim for breach of the covenant of good faith and fair dealing predicated on the ALA. MSJ 39-42; Dkt. 50, ¶¶34-46; *see also id*. ¶50 (contending ALA was an enforceable contract notwithstanding simultaneous allegation that Lively "never even signed her employment agreement") & ¶341 (alleging  "Lively and the Wayfarer Parties entered into a contract by which Lively agreed to perform as an actor in the Film *It Ends With Us*"). Defendants relied expressly on the ALA, quoting verbatim from its terms, to oppose Lively's motion to dismiss to FAC. Dkt. 83 at 32. It is elementary that a "party cannot sue

---

[45] Even if the business-to-business exception applies, a finding of contractor status does not follow, because Defendants still must show that Lively is an independent contractor under the multi-factor *Borrello* test. *See* Cal. Lab. Code §§ 2776(a); *S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 769 P.2d 399, 404 (Cal. 1989). Defendants make no attempt to show employment status under the *Borello* test.

on a contract and at the same time repudiate his obligations under it." *San Francisco Milling Co. v. Mordecai*, 134 Cal. App. 755, 759 (1933); *Tobias v. Notations, Inc.*, 2015 WL 4654454, at *5 (S.D.N.Y. July 20, 2015) (rejecting challenge to existence of a contract based on "repeated acknowledgement" of it in complaint). Defendants' prior insistence that the ALA *was* a binding agreement estops them from argument otherwise now, and is a judicially noticeable admission that warrants granting Lively summary judgment on the ALA's enforceability. *See* Fed. R. Civ. P. 56(f)(1), 56(g).

The Wayfarer Defendants also cannot maintain their argument that execution was a condition precedent (the "Execution Conditions") (MSJ at 40) because, under California law, "a party to an agreement waives a condition precedent by expressing a desire and intent to go forward with a contract notwithstanding the failure of the condition precedent." *Langson v. Lane*, 967 F.2d 587 (9th Cir. 1992); *Gonzalez v. Oplaai LLC*, 2023 WL 11195911, at *4 (C.D. Cal. Dec. 19, 2023); *Vincent Crisafulli Testamentary Tr. v. AAI Acquisition, LLC*, 110 N.Y.S.3d 494 (N.Y. Sup. Ct. 2018). Setting aside the provisions they later breached, Wayfarer and IEWUM performed the material terms of the ALA, including by paying the contingent compensation that it contemplated (rather than the amount specified in the Offer Letter). MSJ 41; 56.1 ¶¶446-47. Had the Wayfarer Defendants believed a condition precedent was unmet, they could have (but chose not to) withhold payment. *Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 78 (2017). They did not do that and, in fact, on May 3, 2024, ███████████████████████████████████ ███████████████████████ ¶452. (emphasis added).[46] Plus, the plain language of the

---

[46] Evidence of the parties' negotiations is admissible to prove the validity of the ALA (and the waiver of the Execution Conditions) even though an integration clause is part of the parties' final written agreement. *See* Cal. Civ. Code. § 1856(f). That evidence includes Lively's attorney expressly stating that the Execution Conditions had been waived, which Wayfarer's counsel did not dispute. ¶383. And, while as late as December 15, 2023, the operative draft of the CRA referred to the "unexecuted Actor Agreement," Wayfarer *struck* the word "unexecuted" from the draft they transmitted to Lively's representatives on January 3, 2024. ¶423.

CRA, which Heath and Lively executed, contemplated ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

¶201. Where, as here, "a party's conduct is so inconsistent with the intent to enforce a legal right, the intention to give up that right will be *presumed,* notwithstanding evidence that the party did not subjectively 'intend' to relinquish it." *Oakland Raiders v. Oakland-Alameda Cnty. Coliseum, Inc.*, 144 Cal. App. 4th 1175, 1194 (2006).

Defendants claim there was no meeting of the minds on the ALA based on the conclusory assertion that "no final agreement was ever reached" because there remained "material" terms that the parties were discussing in July 2024. MSJ at 41. Only *four* terms remained subject to discussion at that time: ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████ ¶¶380-81. Those terms were immaterial in practice because both parties performed the remainder of the ALA's terms even while continuing to discuss those terms.

> 2.  <u>The CRA Is a Binding, Enforceable Agreement.</u>

Defendants' argument that the CRA is unenforceable because its validity depended on the ALA fails because the ALA is an enforceable agreement. *Supra*. Separately, the CRA was an independent, fully executed agreement, and nothing on its face conditions its validity on the execution of the ALA, including the reference to "additional" terms that would be "incorporated" into the ALA. Defendants cannot explain why, if the CRA's enforceability depended upon the execution of the ALA, it was necessary to execute the CRA at all, much less in January 2024. The

CRA by its own terms refers to an independent exchange of consideration and Lively's suggestion to refer to the ALA was not a unilateral "statement," but a change that Wayfarer *accepted*, which demonstrates a contemporary, mutual understanding that the ALA was in effect and had been amended.

While Defendants contend that the CRA lacked consideration, neither California nor New York law would require new consideration since it modified an existing agreement (the ALA). MSJ at 42-43; Cal. Civ. Code. § 1698(a); *GG Managers, Inc. v. Fidata Tr. Co. New York*, 215 A.D.2d 241, 242 (1995).[47] Regardless, there *was* consideration for the Letter because a "written instrument" is "presumptive evidence" of valid consideration, which Defendants do not rebut. Cal. Civil Code §§ 1614-15. The rule Defendants cite—that a promise to perform an existing legal duty cannot constitute consideration—only applies where the duty is "neither doubtful nor the subject of honest dispute." Restatement (Second) of Contracts § 73. Lively's duty to continue was *at least* doubtful, because she possessed a right under the ALA (in a provision never subject to dispute) to terminate the Agreement in the event that sexual harassment took place. ¶388. Further, it is undisputed that Lively executed the Protection Rider as an alternative to pursuing a "more formal HR process," 56.1 ¶162, and "forbearance to assert" a claim is valid consideration. Restatement (Second) of Contracts § 73 cmt. d; *id.* § 74.

### E. Defendants' Other Arguments As To The Breach Of Contract Claims Fail.

Defendants wrongly claim they are entitled to summary judgment on Lively's breach of contract claims because she purportedly did not comply with the notice-and-cure provision, they cured any such breach, and Lively is not entitled to the damages she seeks. Defendants have waived

---

[47] Even if the ALA was not in effect at the time the CRA was executed, the mutual exchange of promises embodied in the CRA was sufficient consideration to support the agreement. *See, e.g.*, *Lockhart v. Gen. Motors Corp*, 2001 WL 1262922, at *2 (C.D. Cal. Sept. 14, 2001).

132272102.v8

the right to claim Lively's noncompliance because they failed to assert it as an affirmative defense, which "must be pleaded and proved by the party in breach" on pain of "waiver." *Spencer-Smith v. Ehrlich*, 347 F.R.D. 606, 621 (S.D.N.Y. 2024); Dkt. 148, 149. Even without waiver, Lively satisfied the notice-and-cure provision because the Wayfarer Defendants had written notice of their breach by December 31, 2025, and Lively filed the first and second amended complaints outside the cure period, mooting the issue. Dkt. 84, 521. As to the claim that Defendants cured any breach after November 2023, they do not because they cannot contend that they ever cured the breach of the *anti-retaliation* provision, much less before Lively's amendments were filed. MSJ 45-46. Finally, Defendants contend that Lively's contract damages are duplicative and exceed the ALA's limitation on consequential and special damages. MSJ 47-49. But "the same wrongful act may constitute both a breach of contract and an invasion of an interest protected by the law of torts," and Lively is entitled to seek damages on alternative and independent theories. *Erlich v. Menezes*, 21 Cal. 4th 543, 551–53 (1999). For similar reasons, Lively's claimed damages for the breach of the CRA's anti-retaliation provision constitute general damages, not special damages. *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 102 P.3d 257, 263 (2004).

## VI.    THE FALSE LIGHT CLAIM SURVIVES BECAUSE CALIFORNIA LAW APPLIES.

Defendants' contention that New York law applies to Lively's false light claim ignores that the ALA contains a choice-of-law provision that mandates application of California law to that claim. Even if it did not, California law would apply to the false light claim, because it turns on Defendants' conduct in California, including but not limited to the execution of a communications strategy from California that included blaming Lively for marketing for which Sony and Wayfarer (not Lively) was responsible and distributing the Dance Scene footage to friendly outlets. ¶¶807-08; Dkt. 142-1, ¶28. Defendants claim that Lively lacks "standing" to bring a false light claim

because she is not a California resident, but the authorities on which Defendants rely are unpersuasive because they cannot be reconciled with Article I, Section 1 of the California Constitution, which by its terms applies to "all people." Cal. Const. art. I, § 1. In any event, false light claims do not depend on the California Constitution because it is a common-law tort, which makes cases limiting the reach of California's Constitution to residents inapplicable. *See Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 23–27, 865 P.2d 633, 646–49 (1994). And even where constitutional privacy claims are squarely at issue, other cases have rejected the argument that such claims are unavailable to nonresidents, instead applying ordinary choice of law analyses. *See, e.g.*, *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1080–81 (N.D. Cal. 2023) (constitutional privacy claims adequately alleged where the "conduct causing [nonresident plaintiffs] harm occurred in and emanated from California").[48]

## VII.   THE DEFAMATION CLAIM MUST PROCEED TO TRIAL.

The MSJ recycles a number of the arguments advanced in the MJP, including that the Defamatory Statements are opinions[49] and privileged. Those arguments fail for the reasons discussed in the MJP Opposition.[50] Defendants in the MSJ argue that the Defamatory Statements are true because the Wayfarer Defendants did not harass or retaliate against Lively. MSJ 53. But as detailed above, that argument depends entirely on factual disputes precluding summary judgment. So too with their argument as to actual malice. This court must determine "whether the evidence presented is such that a reasonable jury might find that actual malice had been shown

---

[48] The MSJ argues that the false light and defamation claim warrants dismissal based on the fair report privilege, which fails for the reasons discussed in the MJP Opp and *infra*.

[49] Defendants do not dispute that they asserted verifiably false facts in connection with the Defamatory Statements, including by asserting that Lively fabricated harassment claims as part of a ploy to take over the ***marketing*** of the Film, an assertion which falsely pinned responsibility on Lively for a marketing plan that was approved by Wayfarer from the start. The only opinion defense that Defendants assert is that "whether conduct amounted to sexual harassment or retaliation" reflects unactionable opinion. MSJ 54.

[50] The Court need not engage in a choice-of-law analysis for Lively's defamation claim, because there is no conflict between New York and California law as to the specific arguments Defendants advance. *See* Opp. at 55 n.11.

with convincing clarity.'" *Palin v. New York Times Co.*, 482 F. Supp. 3d 208, 214 (S.D.N.Y.), *modified,* 510 F. Supp. 3d 21 (S.D.N.Y. 2020) (quoting *Anderson v. Liberty Lobby*, 477 U.S. (1986)). Here, a reasonable jury could find that the Defendants caused their agent, Freedman, to publish the Defamatory Statements with subjective disregard for the truth. As explained in detail above, Baldoni, Heath, and Sarowitz knew specific types of conduct that amounted to sexual harassment based on Wayfarer's own policy, knew that Lively complained about such conduct long before the Film was edited or marketed, and admitted not just that *many* of the incidents occurred as Lively had described them, but that that Lively "genuinely believes" her claims. ¶612. Thus, there is ample evidence from which a reasonable jury could find that Defendants *knew* Lively did not fabricate her claims of sexual harassment. This is even more true as to the claim that Lively fabricated her claims in order to gain control of the Film's *marketing*, which Defendants knew was untrue at all times given their acknowledgment that Sony had been responsible for the Film's marketing plan. As to the assertion that TAG, Abel, and Street did nothing proactive, but only responded to inbound media inquiries (thereby proving Lively's retaliation claims to be fabricated), a reasonable jury would likely find that Defendants were *knowingly participants* in a proactive media campaign designed to discredit Lively. Accusing Lively of having fabricated claims that Defendants knew to be contemporaneously documented and genuinely held is the definition of actual malice.

## VIII.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE CONSPIRACY CLAIM.

Lively's conspiracy claim functions "as an alternative theory of liability on her non-conspiracy claims." *Lively v. Wayfarer Studios*, 2025 WL 1952027, at *10 n.8 (S.D.N.Y. July 16, 2025). As evident from the underlying claims, Lively has alleged: (1) civil conspiracy to retaliate under Title VII, FEHA, and the California Labor Code against IEWUM and Wayfarer; (2)

conspiracy to commit false light as to Wayfarer, Baldoni, Heath, Sarowitz, Nathan, TAG, and Abel; and (3) conspiracy to commit defamation/defamation per se against Wayfarer, Baldoni, and Heath. Compl. ¶¶353-469. The record evidence establishes that the Wayfarer Defendants agreed to a common scheme to retaliate against Lively that included placing her in a false light and defaming her, one or more of the Wayfarer Defendants acted intentionally and overtly in furtherance of that scheme, and harm resulted. That is all that is required for a jury to conclude that the Defendants conspired to commit the civil wrongs. *Wyatt v. Union Mortg. Co.*, 24 Cal. 3d 773, 784 (1979). ("As long as two or more persons agree to perform a wrongful act, the law places civil liability for the resulting damages on all of them" and the "requisite concurrence and knowledge may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances," including a co-conspirator's "tacit consent as well as express approval" (cleaned up)).[51]

## IX.    SAROWITZ IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE FALSE LIGHT OR CONSPIRACY CLAIMS.

The MSJ's attempt to cast Sarowitz as an aloof financier cannot be squared with the record. Sarowitz is a close confidant and friend of Baldoni and Heath and is Wayfarer's co-chairman and ████████████████████████████████████████████████. ¶476. He was intimately aware of the complaints of sexual harassment at the time they occurred, visited the set, participated in the promotion of the film, knowingly paid for Wayfarer Studios' public relations and crisis services used to carry out the retaliatory campaign, and personally drafted negative narratives about Lively ████████████████████████████████████████████████████

---

[51] Defendants argue that Lively's conspiracy claim does not "extend to" her statutory claims, but the case they cite turned on the elements of the underlying *Connecticut-law* tort, not any aspect of civil conspiracy doctrine. *Medvey v. Oxford Health Plans*, 313 F. Supp. 2d 94, 99 (D. Conn. 2004). To the contrary, it "is sufficient that a conspiracy is based on an agreement to engage in unlawful conduct regardless of whether the conspiracy violates a duty imposed by *tort law or a statute*." *Rickley v. Goodfriend*, 212 Cal. App. 4th 1136, 1158 (2013) (emphasis added).

132272102.v8

███████████████ ¶316. Sarowitz' attempt to minimize his involvement is controverted by his own documents, notwithstanding their limited nature due to a failure to preserve.

## X.    THE WAYFARER PARTIES' DAMAGES ARGUMENTS FAIL

The Wayfarer Parties wrongly argue that Lively lacks "standing" to seek damages for "lost profits" and "royalties" from her businesses because she is an "indirect shareholder" and "lost profits" are too speculative. MSJ at 58-60. Lively does not purport to bring "derivative" shareholder claims on behalf of the companies, but rather is seeking damages to her *own* business reputation in connection with her own legal claims.[52] *See Cantu v. Flanigan*, 705 F. Supp. 2d 220, 229 (E.D.N.Y. 2010) (upholding $150 million defamation damages award based, in part, on inability of plaintiff's company to secure contracts); *accord Prozeralik v. Cap. Cities Commc'ns, Inc.*, 188 A.D.2d 178, 184–85 (1993). For this same reason, the Defendants' authority addressing speculative "lost profits" is inapposite but, even if they were not, Lively's losses associated with Blake Brown and Betty Booze are rooted in detailed financial projections prepared by experienced business leaders based on industry experience and actual sales figures. *See Edwards v. Container Kraft Carton & Paper Supply Co.*, 161 Cal. App. 2d 752, 758 (1958); *Cifone v. City of Poughkeepsie*, 234 A.D.2d 331 (1996).

## **CONCLUSION**

Defendants' motion for summary judgment should be denied.

---

[52] Even if *arguendo* "standing" is the correct issue, Delaware law permits a plaintiff to pursue a "direct" claim to enforce her individual rights, even if damages are based on "indirect" loss to a third-party company in which the plaintiff has an ownership interest. *See NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 179–80 (Del. 2015); *AHW Inv. P'ship v. Citigroup, Inc.*, 806 F.3d 695, 699 (2d Cir. 2015), *certified question answered*, 140 A.3d 1125 (Del. 2016) ("we look to the law of the state of incorporation when adjudicating whether a claim is direct or derivative").

132272102.v8

Respectfully submitted,

Dated: December 3, 2025

/s/        *Esra A. Hudson*

Esra A. Hudson (admitted *pro hac vice*)
Stephanie A. Roeser (admitted *pro hac vice*)
Manatt, Phelps & Phillips LLP
2049 Century Park East, Suite 1700
Los Angeles, California 90067
(310) 312-4000
ehudson@manatt.com
sroeser@manatt.com

Matthew F. Bruno
Manatt, Phelps & Phillips LLP
7 Times Square
New York, NY 10036
(212) 790-4525
mbruno@manatt.com

Meryl C. Governski
Dunn Isaacson Rhee LLP
401 9th Street NW
Washington, DC 20004
(202) 240-2927
mgovernski@dirllp.com

Michael J. Gottlieb
Willkie Farr & Gallagher LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 855-3111
mgottlieb@willkie.com

Kristin E. Bender
Willkie Farr & Gallagher LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1000
kbender@willkie.com

Aaron E. Nathan
Michaela A. Connolly
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8904
anathan@willkie.com
mconnolly@willkie.com

*Attorneys for Blake Lively*

61