# Exhibit 24

CONFIDENTIAL

Page 1

```
 1           UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                     ---oOo---
 4
 5  BLAKE LIVELY,
 6              Plaintiff,
 7    vs.        CASE NO. 24-CV-10049-LJL (LEAD CASE)
                           25-CV-449 (LJL) (MEMBER CASE)
 8
    WAYFARER STUDIOS LLC, ET AL.,
 9
                Defendants.
10  _____
    JENNIFER ABEL,
11           Third-party Plaintiff,
      vs.
12  JONESWORKS, LLC,
             Third-party Defendant.
13  _____
    WAYFARER STUDIOS LLC, et al.,
14           Consolidated Plaintiffs,
      vs.
15  BLAKE LIVELY, et al.,
             Consolidated Defendants.
16  _____
17                  **CONFIDENTIAL**
18
19     VIDEO-RECORDED DEPOSITION OF JAMEY HEATH
20              Los Angeles, California
21             Thursday, October 9, 2025
22
23  Stenographically Reported by:  Ashley Soevyn,
24  CALIFORNIA CSR No. 12019
25
```

Veritext Legal Solutions
212-267-6868         www.veritext.com         516-608-2400

CONFIDENTIAL

Page 27

1    A    I am.
2    Q    Did you discuss with them, yes or no,
3  what you were going to testify about with respect to
4  that answer this morning?
5         MS. SHAPIRO:  Same objection and same
6  instruction.
7  BY MS. SHAH:
8    Q    Are you going to follow that instruction?
9    A    I think it's best.
10   Q    Okay.  I don't have the words right in
11 front of me, but you did give me the correction that
12 you wanted to correct at the top of the testimony
13 today.  Would you just explain that to me again?
14 What it is about yesterday's testimony that you
15 wanted to correct in today's testimony.
16   A    I think simply, as I was testifying as it
17 pertains to 17-point list and my state of mind and
18 how I viewed it, in reflecting, while, of course, I
19 agreed that all of these things were reasonable
20 things that anyone asked for, I think I also
21 messaged that I may not have considered that some of
22 these things had some -- a nod to how -- what may
23 have been brought up in the past.  And that's what I
24 wanted to.
25   Q    I see.  So am I understanding correctly

Page 28

1  that what you're essentially saying is, you think
2  during the deposition yesterday, it may have
3  appeared from your testimony that you were not
4  leaving room for the possibility that some of the
5  things on the 17-point list related in some way to
6  past incidents, and -- and that's the aspect of it
7  that you want to expand on this morning?
8              MS. SHAPIRO:  Objection.
9              Go ahead.
10             THE WITNESS:  Not necessarily that it
11 related or not, but that I -- that I had considered
12 that could some of these things have some sort of
13 nod -- for lack of a better term -- to what we had
14 discussed in the past.
15 BY MS. SHAH:
16     Q    What you and Ms. Lively and others had
17 discussed in the past?
18     A    What -- yeah, some of the concerns that
19 she may have spoken about.
20     Q    Okay.  And when you say the word "nod,"
21 like it may have some nod to those things, do you
22 mean reference, or relatedness, or can you give me
23 another verb?
24     A    That it could have insinuated that
25 possibly, is this related to anything that's come up

```
                                                    Page 29
 1   before?  While I didn't necessarily land on that,
 2   but that it was a consideration.
 3          Q    It's something that went through your
 4   mind at the time?
 5          A    Sure.
 6          Q    Okay.  Why was it important to you to
 7   correct that aspect of your testimony this morning?
 8               MS. SHAPIRO:  Objection.
 9               THE WITNESS:  I want to really do my best
10   to reflect and to be truthful.  And if that was
11   sitting in me, that did I convey that correctly?
12   And so that was -- that was the purpose.
13   BY MS. SHAH:
14          Q    Is there anything else about your
15   testimony yesterday that you want to take the
16   opportunity now to correct?
17          A    No.
18          Q    Okay.  You were in the room, the breakout
19   room with your lawyers last night after the
20   deposition with some of the other defendants here,
21   and I believe your wife and Mr. Baldoni's wife for
22   quite a long time last night.  During that time, did
23   you discuss the substance of your deposition
24   testimony yesterday in any respect?
25          A    I don't believe so.
```

Page 39

```
 1   have impact whether or not they make money.  Of
 2   course we have to make money, but that's not our
 3   primary goal.
 4        Q    Is Wayfarer profitable?
 5        A    No.
 6        Q    Has it ever been?
 7        A    No.
 8        Q    I believe Mr. Sarowitz testified that
 9   Wayfarer is paying for the litigation fees and
10   expenses of the various defendants in these two
11   related litigations; is that correct?
12        A    I don't know about -- well, the
13   defendants, yes, we are paying for those.
14        Q    And that includes litigation fees and
15   expenses for Mr. Baldoni's defense?
16        A    It does.
17        Q    And for Ms. Abel's defense?
18        A    It does.
19        Q    And for Ms. Nathan's defense?
20        A    It does.
21        Q    And for Wayfarer's defense?
22        A    Yes.
23        Q    For Mr. Wallace's defense?
24        A    Yes.  Sorry.  I just needed to -- there
25   is a lot of expenses, so I'm just making sure.
```

```
                                                        Page 40
 1        Q    And for Street Relations' defense?
 2        A    I believe so.  I don't know if there is a
 3   distinction between the two.
 4        Q    And for The Agency Group's defense?
 5        A    I believe so.
 6        Q    For your defense?
 7        A    Yes.
 8        Q    For Mr. Sarowitz's defense?
 9        A    Yes.
10        Q    Am I missing any defendants that you are
11   paying for?
12        A    I don't think --
13             MS. SHAPIRO:  Objection.
14             THE WITNESS:  -- there's any other
15   defendants.
16   BY MS. SHAH:
17        Q    Okay.  How about attorneys' fees for
18   Ms. Case's legal fees related to this case?
19             MS. SHAPIRO:  Objection.  Objection.
20             THE WITNESS:  I don't know.
21   BY MS. SHAH:
22        Q    How about for the attorneys' fees related
23   to Ms. Koslow's involvement in this case?
24             MS. SHAPIRO:  Objection.
25             THE WITNESS:  Similarly, I don't know.
```

Page 111

1         MS. SHAH:  Can you pull tab 7?
2         I'm going to show you what's been marked
3    as Exhibit 27.  It's a document -- email with an
4    attachment, dated October 24th, 2024,
5    Bates-stamped JONESWORKS_WAYFARER_, several zeroes,
6    3754.
7         (Exhibit 27 marked for identification.)
8    BY MS. SHAH:
9         Q    Do you see that?
10        A    I do.
11        Q    Who is Mitz Toskovic at Wayfarer?  And
12   forgive my pronunciation.
13        A    Mitz Toskovic or Toskovic.  She's our
14   vice president of operations.
15        Q    Who is Laura Voglesong?
16        A    She's our controller.
17        Q    Who is brian@wayfarerstudios?
18        A    He's our CFO.
19        Q    What is his last name?
20        A    Singer.
21        Q    You're not on this email, it doesn't
22   appear to me.  Unless, are you part of the -- so
23   there is a --
24        A    I'm on it.
25        Q    You're on the accounting listserv?

Page 134

1   Isabela Ferrer's experiences on the set and what she
2   has testified to in this case, right?
3        A    I don't believe we talked about Isabela
4   yesterday.
5        Q    Okay.  Counsel talked to you yesterday
6   about Ms. Hoover's experiences on the set, and what
7   she has testified to about in this case, right?
8             MS. SHAPIRO:  Objection.
9             THE WITNESS:  I don't recall that.
10  BY MS. SHAH:
11       Q    Okay.  At least with respect to then
12  three women involved in the film; Ms. Lively,
13  Ms. Slate, and Alex Saks, coming into August of
14  2024, how do you think it's possible that by then
15  you did not recognize indications of their
16  discomfort and concerns about what had happened on
17  the set and people's on-set behavior?
18            MS. SHAPIRO:  Objection.
19            THE WITNESS:  In order to have this
20  conversation or for me to give testimony -- it's not
21  really a conversation.  I don't know how this is
22  working.  We're going to have to separate Alex Saks.
23  Because other than what I heard and some testimony
24  and until she then also would not go to the
25  premiere, up until that time, we were on fine

1   speaking terms.  She and I were -- everything was
2   good.
3            So other than, which I acknowledge there
4   was a moment that they bumped heads on set, there
5   was no indication that there was anything more than
6   that with Alex Saks, nor have I heard any
7   accusations that there was more other than they
8   bumped heads a few times.
9            I don't want to belittle what someone may
10  feel, but I want to be clear that in intense
11  situations, people bump heads all the time.  I'm
12  sure you've bumped heads with an attorney once or
13  twice.  I saw you guys going at it a few times.  It
14  happens, but then do you go and think that there is
15  a problem with this person because you bumped heads?
16  That's what the experience was with Alex.  So I
17  think it's important to separate that from anything
18  else.  Because there was no indication for me at
19  that point to think when you say "other women" to
20  include Alex, if that's fair.
21  BY MS. SHAH:
22       Q   I don't know whether it's fair or not,
23  but I accept your answer.
24           And I guess my question is, respectfully,
25  your perspective of these various incidents seems

Page 145

1   to discuss or clear the air about.  One of them was
2   the incident with you and she in her trailer, right,
3   when she was getting her body makeup removed.  And
4   you mentioned that she had said something to you
5   like, I asked you to look away and I turned around
6   and we made eye contact or something like that,
7   right?
8        A     In the June 1st meeting?
9        Q     Okay.
10       A     Is that what you mean?
11       Q     Sure.  At any point in time.
12       A     Okay.  I didn't know if you talked about
13  --
14       Q     Fair.
15       A     -- other things.
16       Q     I guess my question is, you understood,
17  though, from your discussions with her that the
18  issue about you entering her trailer was because she
19  was nude from the waist up, right?
20       A     No.
21            MS. SHAPIRO:  Objection.
22  BY MS. SHAH:
23       Q     You didn't think she asked you to turn
24  around because she was nude from the waist up?
25            MS. SHAPIRO:  Objection.

Page 146

1    THE WITNESS:  I did not think that.
2    BY MS. SHAH:
3         Q    Does she typically ask you to turn around
4    when she's having conversations with you when she
5    has her clothes on?
6              MS. SHAPIRO:  Objection.
7              THE WITNESS:  Fair.
8    BY MS. SHAH:
9         Q    Okay.
10        A    I didn't see her, what she was wearing or
11   not wearing.  I saw that she was leaning back, and
12   it looked like she was either feeding or maybe
13   nursing -- or pumping.  That's what it appeared she
14   was doing.  When she asked me to look away, I
15   thought it was in that regard.
16        Q    I understand --
17        A    So I never saw it, so I didn't question
18   that.  So I moved over and looked away based on
19   that.
20        Q    Okay.  But even nursing or pumping
21   involves activity with a woman's breasts, right?
22        A    Sure.
23        Q    And you understood that it was in that
24   context that she was asking you not to look, right?
25        A    Fair.  She asked me to look away, so

```
                                              Page 147
 1   whatever she was doing, she didn't want me to --
 2        Q    Right.
 3        A    Sure.
 4        Q    And what she was doing was something that
 5   had to do with her breasts being exposed or
 6   involved?
 7        A    Okay.
 8        Q    Okay.  The video that you mentioned that
 9   she -- that you showed her of your wife was one of
10   the things that she raised for discussion with you,
11   right?
12             MS. SHAPIRO:  Objection.
13             THE WITNESS:  Correct.
14   BY MS. SHAH:
15        Q    Okay.  However you want to characterize
16   that video, that is a video -- I don't mean that in
17   any way other than I'm trying not to say "birthing
18   video," because I understand there's been some
19   discrepancy around what exactly is in the video.
20        A    Okay.
21        Q    That is a video of some portion of your
22   wife in an intimate scene with you during the
23   process of birthing your child, right?
24        A    The word "intimate" throws me when you
25   say that.
```

1             REPORTER'S CERTIFICATE
2             I, ASHLEY SOEVYN, a Certified Shorthand
3    Reporter of the State of California, do hereby
4    certify:
5             That the foregoing proceedings were taken
6    before me at the time and place herein set forth;
7    at which time the witness was put under oath by me;
8             That the testimony of the witness, the
9    questions propounded, and all objections and
10   statements made at the time of the examination were
11   recorded stenographically by me and were thereafter
12   transcribed;
13            That a review of the transcript by the
14   deponent was/ was not requested;
15            That the foregoing is a true and correct
16   transcript of my shorthand notes so taken.
17            I further certify that I am not a relative
18   or employee of any attorney of the parties, nor
19   financially interested in the action.
20            I declare under penalty of perjury under
21   the laws of California that the foregoing is true
22   and correct.  Dated this 10th day of October 2025.
23   *[signature]*
24   _____
     ASHLEY SOEVYN
25   CSR No. 12019