# EXHIBIT 62

CONFIDENTIAL

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                      ---o0o---
 4
 5    BLAKE LIVELY,
 6               Plaintiff,
 7      vs.        CASE NO. 24-CV-10049-LJL (LEAD CASE)
                              25-CV-449 (LJL) (MEMBER CASE)
 8
      WAYFARER STUDIOS LLC, ET AL.
 9
                   Defendants.
10    _____
      JENNIFER ABEL,
11              Third-party Plaintiff,
        vs.
12    JONESWORKS, LLC,
                Third-party Defendant.
13    _____
      WAYFARER STUDIOS LLC, et al.
14              Consolidated Plaintiffs,
        vs.
15    BLAKE LIVELY, et al.
                Consolidated Defendants.
16    _____
17                  **CONFIDENTIAL**
18
19       VIDEO-RECORDED DEPOSITION OF JAMEY HEATH
20              Los Angeles, California
21             Wednesday, October 8, 2025
22
23    Stenographically Reported by:  Ashley Soevyn,
      CALIFORNIA CSR No. 12019
24
25
```

CONFIDENTIAL

Page 2

```
 1      UNITED STATES DISTRICT COURT
 2    FOR THE SOUTHERN DISTRICT OF NEW YORK
 3               ---0O0---
 4
 5   BLAKE LIVELY,
 6         Plaintiff,
 7     vs.    CASE NO. 24-CV-10049-LJL (LEAD CASE)
              25-CV-449 (LJL) (MEMBER CASE)
 8
     WAYFARER STUDIOS LLC, ET AL.
 9
            Defendants.
10   _____
     JENNIFER ABEL,
11         Third-party Plaintiff,
       vs.
12   JONESWORKS, LLC,
            Third-party Defendant.
13   _____
     WAYFARER STUDIOS LLC, et al.
14         Consolidated Plaintiffs,
       vs.
15   BLAKE LIVELY, et al.
            Consolidated Defendants.
16   _____
17            **CONFIDENTIAL**
18        Video-recorded Deposition of
19   JAMEY HEATH, taken on behalf of the Plaintiff Blake
20   Lively, Pursuant to Notice, at the offices of Manatt
21   Phelps & Phillips, 2049 Cenury Park East
22   Los Angeles, California beginning at
23   9:12 a.m.  and ending at 7:41 p.m. on Wednesday,
24   October 8, 2025, before me, ASHLEY SOEVYN,
25   California Certified Shorthand Reporter No. 12019.
```

Page 3

```
 1   A P P E A R A N C E S:
 2
 3    For the Plaintiffs Stephanie Jones and Jonesworks
 4   LLC:
 5        QUINN EMANUEL URQUHART & SULLIVAN
 6        BY:  KRISTIN TAHLER
 7        BY:  OLIVIA HOLMES
 8        Attorneys at Law
 9        865 S. Figueroa Street
10        8th Floor
11        Los Angeles, California 90017
12        kristintahler@quinnemanuel.com
13        oliviaholmes@quinnemanuel.com
14        (212) 849-7000
15    -AND-
16        QUINN EMANUEL URQUHART & SULLIVAN
17        BY:  MAAREN A. SHAH
18        Attorney at Law
19        51 Madison Avenue
20        22nd Floor
21        New York, New York 10010
22        maarenshah@quinnemanuel.com
23        (212) 849-7000
24
25
```

Page 4

```
 1   A P P E A R A N C E S:
 2
 3   For the Plaintiff Blake Lively:
 4        MANATT PHELPS & PHILLIPS LLP
 5        BY:  ESRA HUDSON
 6        BY:  STEPHANIE ROESER
 7        BY:  KATELYN CLIMACO
 8        Attorneys at Law
 9        2049 Century Park East
10        Suite 1700
11        Los Angeles, California 90067
12        ehudson@manatt.com
13        sroeser@manatt.com
14        ehudson@manatt.com
15        (310) 312-4207
```

Page 5

```
 1   A P P E A R A N C E S:
 2   For the Plaintiff Blake Lively:
 3        WILLKIE FARR & GALLAGHER
 4        BY:  MICHAEL GOTTLIEB
 5        Attorney at Law
 6        2029 Century Park East
 7        Los Angeles, California 90067
 8        mgottlieb@willkie.com
 9        (310) 855-3000
10
11   -AND-
12
13        WILLKIE FARR & GALLAGHER
14        BY:  KRISTIN BENDER  (Via Zoom)
15        Attorneys at Law
16        1875 K Street
17        Northwest
18        Washington, D.C. 20006
19        kbender@willkie.com
20        (202) 303-1245
```

CONFIDENTIAL

Page 330

1  Q  Yes.
2  A  I think at that point, it was a -- a
3  quick way to give them a glimpse of a timeline of
4  our experience.
5  Q  Your experience with Ms. Lively?
6  A  Our experience that was outlined in this
7  timeline.
8  Q  Your experience with Ms. Lively?
9  A  That is part of it.
10  Q  Okay.  It was a way to give TAG a quick
11  update -- or a summary of the alleged incidents, as
12  you described them, correct?
13      MS. SHAPIRO:  Objection.
14      THE WITNESS:  I wouldn't characterize it
15  as that.  I just think it was a quick way to get a
16  little bit of an update of some of the elements.
17  BY MS. HUDSON:
18  Q  Some of the elements of issues that had
19  arisen with Ms. Lively, correct?
20  A  Of our experience of the set, and some of
21  that included experiences with Ms. Lively for sure.
22  Q  And that's because you had retained TAG
23  at that point to help you with crisis management
24  related to your concerns about Ms. Lively
25  potentially going public, correct?

Page 331

1      MS. SHAPIRO:  Objection.
2      THE WITNESS:  No, it wasn't about
3  Ms. Lively going public.
4  BY MS. HUDSON:
5  Q  What was it about?
6  A  We didn't know what would become public.
7  We knew that there was a lot of contention.  We knew
8  that Justin was at a point where he had lost the
9  movie.  People had unfollowed him.  We heard
10  whisperings that she was saying some things about us
11  that were not kind.  We didn't know where we stood,
12  and some of this was like, what is this -- if any
13  sort of media or people start looking into why are
14  they unfollowing, what is going on there?  We just
15  wanted some guidance and some -- some consultation
16  of how we manage that.
17  Q  And this information that's in this
18  timeline is what you wanted TAG to know if people
19  were speculating about why Mr. Baldoni was being
20  unfollowed, correct?
21      MS. SHAPIRO:  Objection.
22      THE WITNESS:  This was part of it.
23  BY MS. HUDSON:
24  Q  Did you ever tell someone that you were
25  hiring a crisis management team that was costing you

Page 332

1  $9 million?
2  A  Yeah, I said that.  It was a hyperbole.
3  It was a joke.
4  Q  What does that mean?
5      MS. SHAPIRO:  Objection.
6      THE WITNESS:  I said to my wife yesterday
7  about a sandwich that cost $6,000.  It was a way to
8  say that we're spending money.  And it was an
9  exaggeration just to make a funny point.
10  BY MS. HUDSON:
11  Q  Meaning, it was, in your view, expensive?
12  A  I mean, that's relative.  It just was
13  we're having to spend money.  PR is expensive.
14  Lawyers are expensive, as you know, like right now.
15  Everything you do is expensive.  It's just a
16  reference to things cost money.  But it certainly
17  was not mine -- $9 million.  That's just a way to
18  have fun with a number.
19  Q  And in addition to TAG, you also hired
20  Jed Wallace and Street Relations, right?
21  A  We eventually did, yes.
22  Q  And you were involved in the decision to
23  hire Mr. Wallace and Street Relations, correct?
24  A  I was.
25  Q  Who else was involved in that decision?

Page 333

1  A  Part of the consultation was me, Jen.
2  Melissa was the one that suggested it to me.  But in
3  terms of the ultimate decision, I'm the one who
4  signed off on it.
5  Q  You authorized it?
6  A  I did.
7  Q  When did you first hear about Mr. Wallace
8  and Street Relations?
9  A  I don't recall when it was.
10  Q  You -- you said Melissa Nathan
11  recommended --
12  A  Correct.
13  Q  -- them?
14  A  Correct.
15  Q  Okay.  And what did Melissa Nathan tell
16  you about Mr. Wallace and Street Relations?
17  A  That he was someone that helps supported
18  crisis PR.  That they would need some additional
19  support in monitoring.  That was pretty much it.
20  Q  That was it, just additional support and
21  monitoring?
22  A  That was -- that was most -- mostly it.
23  Yeah.
24  Q  That was your understanding?
25  A  It was.

84 (Pages 330 - 333)