# Jones Parties' Ex. 11

Page 1

** C O N F I D E N T I A L **

* CONTAINS ATTORNEYS' EYES ONLY MATERIAL *

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 1:24-CV-10049-LJL

(Consolidated with 1:25-cv-00449-LJL)

----------------------------------x

BLAKE LIVELY,

       Plaintiff,

   - against -

WAYFARER STUDIOS LLC, a Delaware
Limited Liability Company, JUSTIN
BALDONI, an individual, JAMEY HEATH, an
individual, STEVE SAROWITZ, an individual,
IT ENDS WITH US MOVIE LLC, a California
Limited Liability Company, MELISSA
NATHAN, an individual, THE AGENCY
GROUP PR LLC, a Delaware Limited Liability
Company, JENNIFER ABEL, an individual,
JED WALLACE, an individual, and STREET
RELATIONS INC., a California Corporation,

       Defendants.

----------------------------------x

      (Caption continued)

      September 5, 2025

      9:10 a.m.

    Videotaped Deposition of KATHERINE
CASE, taken by Plaintiff, pursuant to
Subpoena, held at the offices of Willkie
Farr & Gallagher LLP, 787 Seventh Avenue,
New York, New York, before Todd DeSimone, a
Registered Professional Reporter and Notary
Public of the State of New York.

Page 2

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Civ. Action No. 1:25-cv-779

5    ----------------------------------x
     STEPHANIE JONES and JONESWORKS LLC,

6
                      Plaintiffs,

7
            - against -

8

9
     JENNIFER ABEL, MELISSA NATHAN,

10   JUSTIN BALDONI, WAYFARER STUDIOS LLC,
     and JOHN DOES 1-10,

11
                      Defendants.

12
     ----------------------------------x

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                              Page 3

 1
 2    A P P E A R A N C E S :
 3    WILLKIE FARR & GALLAGHER LLP
      1875 K Street NW
 4    Washington D.C. 20006
              Attorneys for Blake Lively
 5    BY:    KRISTIN BENDER, ESQ.
              kbender@willkie.com
 6            MICHAEL GOTTLIEB, ESQ (Via Zoom)
              mgottlieb@willkie.com
 7
 8            - and -
 9
      WILLKIE FARR & GALLAGHER LLP
10    787 Seventh Avenue
      New York, New York 10019
11    BY:  MELISSA TAUSTINE, ESQ.
              mtaustine@willkie.com
12            AARON E. NATHAN, ESQ.
              anathan@willkie.com
13
14
15    MANATT, PHELPS & PHILLIPS LLP
      2049 Century Park East
16    Suite 1700
      Los Angeles, California 90067
17            Attorneys for Blake Lively
      BY:    STEPHANIE ROESER, ESQ. (Via Zoom)
18            sroeser@manatt.com
19
20
21
22
23
24
25
```

Page 4

```
 1
 2   A P P E A R A N C E S: (Continued)
 3   QUINN EMANUEL URQUHART & SULLIVAN LLP
     865 South Figueroa Street
 4   10th Floor
     Los Angeles, California 90017
 5       Attorneys for Stephanie Jones and
         Jonesworks, LLC
 6   BY:   KRISTIN N. TAHLER, ESQ.
            kristintahler@quinnemanuel.com
 7
 8            - and -
 9
     QUINN EMANUEL URQUHART & SULLIVAN LLP
10   295 Fifth Avenue
     9th Floor
11   New York, New York 10016
     BY:   MORGAN ANASTASIO, ESQ.
12         morgananastasio@quinnemanuel.com
13
14
     MEISTER SEELIG & FEIN PLLC
15   125 Park Avenue
     7th Floor
16   New York, New York 10017
           Attorneys for Wayfarer Studios
17         LLC, Justin Baldoni, Jamey
           Heath, Steve Sarowitz, It Ends With
18         Us Movie LLC, Melissa Nathan,
           Jennifer Abel, and The Agency Group
19         PR LLC
     BY:   MITCHELL SCHUSTER, ESQ.
20          ms@msf-law.com
           KEVIN A. FRITZ, ESQ. (Via Zoom)
21          kf@msf-law.com
22
23
24
25
```

Page 5

```
 1
 2   A P P E A R A N C E S: (Continued)
 3   LINER FREEDMAN TAITELMAN + COOLEY, LLP
     1801 Century Park West
 4   5th Floor
     Los Angeles, California 90067
 5         Attorneys for Wayfarer Studios
           LLC, Justin Baldoni, Jamey
 6         Heath, Steve Sarowitz, It Ends With
           Us Movie LLC, Melissa Nathan,
 7         Jennifer Abel, and The Agency Group
           PR LLC
 8   BY:   BRYAN FREEDMAN, ESQ.
            bfreedman@lftcllp.com
 9         KIM S. ZELDIN, ESQ. (Via Zoom)
            kzeldin@lftcllp.com
10         SUMMER BENSON, ESQ. (Via Zoom)
            sbenson@lftcllp.com
11
12
     AHOURAIAN LAW
13   9465 Wilshire Boulevard
     Suite 300
14   Beverly Hills, California 90210
           Attorneys for Wayfarer Studios
15         LLC, Justin Baldoni, Jamey
           Heath, Steve Sarowitz, It Ends With
16         Us Movie LLC, Melissa Nathan,
           Jennifer Abel, and The Agency Group
17         PR LLC
     BY:   MITRA AHOURAIAN, ESQ. (Via Zoom)
18
19
20   JACKSON WALKER LLP
     1401 McKinney Street
21   Suite 1900
     Houston, Texas 77010
22         Attorneys for Jed Wallace and
           Street Relations Inc.
23   BY:   TORY EMERY, ESQ.
            temery@jw.com
24
25
```

Page 6

```
 1
 2   A P P E A R A N C E S: (Continued)
 3   PRYOR CASHMAN LLP
     7 Times Square
 4   New York, New York 10036
            Attorneys for The Witness
 5   BY:  MAXWELL BREED, ESQ.
              mbreed@pryorcashman.com
 6          DANIEL POHLMAN, ESQ.
              dpohlman@pryorcashman.com
 7
 8
     ALSO PRESENT:
 9
         JUSTIN BALDONI (Via Zoom)
10
         JENNIFER ABEL (Via Zoom)
11
         JAMEY HEATH (Via Zoom)
12
         ZACH CZERENDA, Concierge Tech (Via Zoom)
13
         COREY WAINAINA, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

1          K. CASE - CONFIDENTIAL
2              THE VIDEOGRAPHER:  Good morning
3      everyone.  We are going on the record
4      at 9:10 a.m. on Friday, September 5th,
5      2025.  Please note that the microphones
6      are sensitive and may pick up
7      whispering and private conversations.
8              This is media unit one of the
9      video-recorded deposition of Katherine
10     Case in the matter of Blake Lively
11     versus Wayfarer Studios LLC, et al.
12     This is filed in the United States
13     District Court, Southern District of
14     New York, the case number is
15     1:24-CV-10049-LJL.
16             My name is Corey Wainaina
17     representing Veritext Legal Solutions
18     and I am the videographer.  The court
19     reporter is Todd DeSimone also from the
20     firm Veritext Legal Solutions.  I am
21     not authorized to administer an oath, I
22     am not related to any party in this
23     action, nor am I financially interested
24     in the outcome.
25             Please be aware that all

Page 8

```
 1          K. CASE - CONFIDENTIAL
 2       appearances and affiliations will be
 3       noted on the stenographic record, and
 4       will the court reporter please swear in
 5       the witness.
 6            *    *    *
 7  K A T H E R I N E   C A S E,
 8  called as a witness, having been first duly
 9  sworn, was examined and testified
10  as follows:
11  EXAMINATION BY MS. BENDER:
12       Q.     Good morning, Ms. Case.
13       A.     Good morning.
14       Q.     Can you please state your full
15  name and address for the record.
16       A.     Katherine Hastings Case, ██  ███
17  ██████ ██  ████████  ███  █████  █████.
18       Q.     And have you ever been deposed
19  before?
20       A.     No.
21       Q.     And do you understand that you
22  are under oath during this deposition?
23       A.     Yes.
24       Q.     Okay.  Do you understand that
25  your testimony today carries the same
```

1                K.  CASE  -  CONFIDENTIAL

2      KCASE-000003856.

3                    You  can  put  that  document

4      aside.   You  are  being  handed  what  has  been

5      marked  Case  Exhibit  8.

6                    (Case  Exhibit  8  marked  for

7      identification.)

8                    MR.  FREEDMAN:   Did  you  mark

9           this  as  7?

10                   MS.  BENDER:   It  was  marked  as

11          7,  but  we  are  going  to  discuss  Case

12          Exhibit  8.

13          Q.      Okay.   This  is  Bates  stamped

14     KCASE-000004949,  a  text  ranging  from  August

15     5th  to  August  6th,  2024.

16                   Ms.  Case,  do  you  recognize  this

17     document?

18          A.      I  do.

19          Q.      What  is  it?

20          A.      It  seems  to  be  a  text  thread

21     between  myself  and  Melissa.

22          Q.      Do  you  have  any  reason  to  think

23     this  document  is  not  as  it  was  when  it  was

24     created?

25          A.      No.

```
 1              K. CASE - CONFIDENTIAL
 2        Q.      If you turn a few pages to
 3   where the Bates stamp ends in 53.  At 1:58
 4   Melissa says to you "I have to drive to
 5   this fucking meeting.  Do you think you'll
 6   have that copy for Jed today?"
 7                 Do you see that?
 8        A.      I do.
 9        Q.      Is that referring to Jed
10   Wallace?
11        A.      Yes.
12        Q.      What copy were you drafting for
13   Jed Wallace?
14        A.      I believe this is in regards to
15   a client.
16        Q.      Which client?
17                MR. BREED:  W█ will designate
18        it as attorneys' eyes only, please.
19                THE VIDEOGRAPHER:  Okay.
20        Q.      Which client?
21        A.      I believe this was for ████████
     ██   ███████████
23        Q.      Okay.  On the next page, at
24   4:46 p.m., Melissa says "Jed and Bryan
25   asking me for copy lol kill me."
```

1             K. CASE - CONFIDENTIAL

2                 Do you see that?

3       A.      I do.

4       Q.      Who is Bryan?

5       A.      I believe Bryan Freedman.

6       Q.      Bryan and Jed were working in

7    collaboration with TAG on the ███████  ███████

8    account?

9       A.      I didn't work on that account,

10   so I'm not sure.

11      Q.      You worked on the copy that

12   Melissa was requesting for that account,

13   correct?

14      A.      This was a one-off request.

15      Q.      So you did some work on that

16   account, correct?

17      A.      Specifically I assisted with

18   this copy.

19      Q.      And you knew that Jed and Bryan

20   were working together asking for the copy

21   that you were preparing for that account,

22   correct?

23              MR. BREED:  Objection.

24              MR. FREEDMAN:  Objection.

25      A.      Melissa alerted me at that

Page 159

```
 1            K.  CASE - CONFIDENTIAL
 2    time.
 3         Q.      You knew that both Jed and
 4    Bryan were to receive the copy, correct?
 5                 MR. BREED:  Objection.
 6                 MS. EMERY:  Objection.
 7         A.      I knew that Melissa needed the
 8    copy.
 9         Q.      For whom?
10         A.      In her text message she said
11    Jed and Bryan were looking for it.
12         Q.      Did Mr. Freedman work with TAG
13    and Jed on the Wayfarer account?
14         A.      Not during the summer of 2024.
15         Q.      When is your understanding that
16    Mr. Freedman started that work?
17         A.      It is my understanding that it
18    was following Blake's CRD complaint, Civil
19    Rights Department complaint in December.
20         Q.      When TAG was looking to
21    identify a subcontractor for digital
22    services in connection with the Wayfarer
23    account, did TAG receive multiple quotes
24    for those services?
25         A.      That was communicated to me by
```

```
 1           K. CASE - CONFIDENTIAL
 2    prep that they had spoken to anyone
 3    representing the Wayfarer parties prior to
 4    your preparation?
 5        A.      I can't say.
 6        Q.      Ms. Case, are you aware of
 7    various websites and social media accounts
 8    that are disparaging of Ms. Jones?
 9               MR. BREED:  Objection.
10        A.      I am aware of websites about
11    Ms. Jones.
12        Q.      Did you create any of the
13    websites that are disparaging of Ms. Jones?
14        A.      No.
15        Q.      Who did?
16        A.      I don't know.
17        Q.      How did you become aware of the
18    websites that are disparaging of Ms. Jones?
19               MR. BREED:  Objection.
20               MR. FREEDMAN:  Objection.
21        Q.      How did you become aware of the
22    websites disparaging Ms. Jones?
23        A.      I received a call from Melissa
24    in early May.  It was communicated to me
25    that a website had been requested.
```

Page 375

1              K. CASE - CONFIDENTIAL

2       Q.      A website had been requested?

3       A.      The creation of a website had

4   been requested.

5       Q.      By whom?

6               MR. FREEDMAN:  Objection.

7               MR. BREED:  Let's designate

8       this AEO, please.

9               MS. TAHLER:  We can go off.

10              THE VIDEOGRAPHER:  Yeah.

11      A.      Melissa represented to me that

12  a potential new client had requested the

13  formulation of a website.

14      Q.      Who was that new client?

15              MR. FREEDMAN:  Objection.

16      A.      At the time it was represented

17  to me that it was ███████  ████████.

18      Q.      Melissa Nathan told you that

19  ███  ████████  had requested preparation of a

20  website about Ms. Jones?

21              MR. FREEDMAN:  Objection.

22      A.      She represented to me that he

23  had requested the creation of a website of

24  this nature.

25      Q.      Did she tell you anything else

Page 376

1           K. CASE - CONFIDENTIAL
2    about what ███   ████████   had requested?
3         A.      Not what he had requested
4    specifically.
5         Q.      Generally what he had
6    requested?
7         A.      Not necessarily what he had
8    requested, but specific language was
9    communicated.
10        Q.      What was that specific
11   language?
12        A.      That Stephanie holds clients
13   hostage, that she leaks clients' secrets,
14   and that she treats her employees poorly,
15   amongst others.
16        Q.      Ms. Nathan told you that
17   ████   ████████   had said the things that you
18   just said to her?
19        A.      No.
20        Q.      Who did Ms. Nathan say said
21   that Stephanie holds clients hostage?
22               MR. BREED:   Objection.
23        A.      I don't know who might have
24   said that.  This language was communicated
25   to me.

Page 377

```
 1              K. CASE - CONFIDENTIAL
 2       Q.       By Ms. Nathan?
 3       A.       The conversation was with her,
 4  yes.
 5       Q.       It was a conversation?
 6       A.       Yes.
 7       Q.       Did Ms. Nathan send you any
 8  written communications about this?
 9       A.       Not about the language to be
10  used, no.
11       Q.       Generally about the websites?
12       A.       At that time, no.
13       Q.       At any time?
14       A.       There was conversation about
15  the copy that I had written based on the
16  information provided, I redrafted and sent
17  back to her.
18       Q.       Did you draft the copy for the
19  website about Ms. Jones?
20       A.       Based on the conversation and
21  the language provided to me, I provided
22  copy.
23       Q.       So yes, you provided -- you
24  wrote the copy that was -- that became the
25  website of Ms. Jones?
```

```
 1            K.  CASE - CONFIDENTIAL
 2                 MR.  FREEDMAN:   Objection.
 3       A.      Based on the language that I
 4   was instructed to use.
 5       Q.      Did anyone else provide you
 6   with that language besides Ms. Nathan?
 7                 MR.  BREED:   Objection.
 8       A.      No.
 9       Q.      And Ms. Nathan provided all of
10   this language to you orally?
11                 MR.  FREEDMAN:   Objection.
12                 MR.  BREED:   Objection.
13       A.      She provided language to
14   reference over the phone, yes.
15       Q.      Did she put anything in writing
16   about the language to be used in the
17   website?
18       A.      No.
19       Q.      What happened -- did she send
20   an audio message?
21                 MR.  BREED:   Objection.
22       A.      No.
23       Q.      What happened after you
24   provided Ms. Nathan with the copy?
25       A.      I don't know.
```

Page 379

1          K. CASE - CONFIDENTIAL

2      Q.      Did you come to understand that

3  the copy that you had drafted became a

4  website about Ms. Jones?

5      A.      I was made aware of that, yes.

6      Q.      Who made you aware of that?

7      A.      Melissa.

8      Q.      And what did Melissa tell you?

9      A.      She sent me the link.

10      Q.      The link to which website?

11      A.      It might have been the leaks.

12  I don't remember which came first.

13      Q.      She sent it to you how?

14      A.      In a text message.

15      Q.      And that text message sending

16  Stephanie Jones Leaks you recognized as the

17  copy that you had drafted, correct?

18      A.      That's correct.

19      Q.      Did ████ ███████ pay TAG to

20  create this website?

21          MR. BREED:  Objection.

22      A.      I don't know.

23      Q.      Did ████ ███████ become a client

24  of TAG?

25      A.      He did not.

Page 380

1          K. CASE - CONFIDENTIAL

2          Q.      Do you know if Ms. Nathan had

3    any other conversations with ████  ███████

4    other than the one you have already

5    discussed?

6               MR. BREED:  Objection.

7               MR. FREEDMAN:  Objection.

8          A.      I don't know.

9          Q.      Did Ms. Nathan report to you

10   any other conversations with ████  ███████

11   other than the one you have already

12   discussed?

13              MR. FREEDMAN:  Objection.

14              MR. BREED:  Objection.

15         A.      No.

16         Q.      Do you recall anything else

17   about that initial conversation with

18   ████  ████████ other than what you have

19   already testified to?

20              MR. BREED:  Objection.  That

21        wasn't the testimony.

22         A.      It wasn't a conversation with

23   ████  ████████.

24         Q.      What was it with ████  ███████

25         A.      I never spoke to ████  ███████

1    K. CASE - CONFIDENTIAL

2    Q.    I had understood that

3    Ms. Nathan had spoken with ████ ██████ and

4    then Ms. Nathan reported that to you.

5    MR. BREED:  Objection, that

6    wasn't the testimony either.

7    MR. FREEDMAN:  Objection.

8    MS. TAHLER:  I'm asking for

9    clarification.

10    A.    I am not aware of whether or

11    not Melissa spoke with ████ ██████  It was

12    communicated to me that the site was at

13    either his or someone affiliated with him's

14    request.

15    Q.    Did she tell you if she ever

16    spoke to him directly?

17    A.    No.

18    Q.    Did she tell you who she spoke

19    to about this?

20    A.    No.

21    (Case Exhibit 35 marked for

22    identification.)

23    Q.    Ms. Case, you are now reviewing

24    a document that has been marked as Case 35.

25    It is a printout of the website

```
 1            K.  CASE - CONFIDENTIAL
 2    StephanieJonesLeaks.com.
 3                 Do you recognize this as the
 4    copy that you drafted?
 5         A.      I believe so, yes.
 6         Q.      Do you know how this went from
 7    the copy that you drafted to becoming a
 8    website?
 9         A.      I do not.
10         Q.      Did Melissa communicate
11    anything to you about how this became a
12    website after you provided her with the
13    copy?
14                 MR. FREEDMAN:  Objection.
15         A.      No.
16         Q.      Do you understand there came a
17    time where this website was shut down?
18                 MR. BREED:  Objection.
19         A.      No.
20         Q.      Did you understand that there
21    came a time where there was a second
22    website?
23         A.      At the time I wasn't aware that
24    there was a second website, no.
25         Q.      After you provided Ms. Nathan
```

```
                                          Page 383
 1           K. CASE - CONFIDENTIAL
 2   with the copy for Exhibit 35, did you have
 3   any other discussions with Ms. Nathan about
 4   websites regarding Ms. Jones?
 5                MR. FREEDMAN:  Objection.
 6        A.      Websites, plural, no.  I was
 7   asked to help alongside her to draft a
 8   handful of tweets for the Twitter page, and
 9   I was asked, again, based on language that
10   I was provided to extrapolate that into
11   updates to the website.
12        Q.      You referred to the Twitter
13   page.  What is the Twitter page?
14        A.      I don't recall the specific
15   handle.  I was told that at the time the
16   site went public there was a corresponding
17   Twitter page.
18        Q.      Was that Twitter handle
19   @LyingStephJones?
20                MR. FREEDMAN:  Objection.
21        A.      I'm not sure.  I don't recall
22   what the Twitter page was.
23        Q.      Melissa told you that there was
24   a corresponding Twitter handle?
25        A.      She asked if I could assist in
```

Page 386

```
 1           K. CASE - CONFIDENTIAL
 2    account.
 3              Does this refresh your
 4    recollection that this is the Twitter
 5    account that you reviewed where your tweets
 6    were posted?
 7       A.     To my recollection, I was only
 8    aware of one of them.  I believe it was Not
 9    a Stephanie Fan.
10       Q.     You are aware of the Twitter
11    account Not a Stephanie Fan?
12       A.     To my recollection, that looks
13    like the one that I was aware of.
14       Q.     Your tweets were posted to Not
15    a Stephanie Fan?
16       A.     I don't know.
17       Q.     But you weren't aware of any of
18    the other Twitter accounts in Exhibit 36?
19       A.     No.
20              MR. BREED:  Objection.
21       Q.     Did Melissa create Not a
22    Stephanie Fan?
23       A.     I don't know.
24       Q.     Did she explain to you that a
25    Twitter account was being created?
```

```
 1          K. CASE - CONFIDENTIAL
 2      A.      There was never a formal
 3  explanation.  I was simply asked to draft
 4  tweets.
 5      Q.      Do you know whether Melissa had
 6  any other assistance in this?
 7      A.      I don't know.
 8      Q.      Do you know whether she worked
 9  with Jed Wallace on this?
10          MR. FREEDMAN:  Objection.
11      A.      I spoke with Jed in conjunction
12  to Melissa as it related to the tweets.
13      Q.      And what did you and Jed
14  discuss?
15          MR. FREEDMAN:  Objection.
16          MS. EMERY:  Objection.
17      A.      The tweets.
18      Q.      What about the tweets?
19      A.      I provided them via Signal.
20      Q.      Was it your understanding that
21  Jed was going to post the tweets?
22          MR. FREEDMAN:  Objection.
23          MR. BREED:  Objection.
24          MS. EMERY:  Objection.
25      A.      I don't know.
```

Page 505

```
                    K. CASE - CONFIDENTIAL
 1
 2    not exactly sure what she did; is that
 3    correct?
 4         A.     That's correct.
 5         Q.     Do you have any ill will of
 6    Melissa Nathan?
 7         A.     No.
 8         Q.     Earlier you testified that the
 9    Alexander brothers were turned down by TAG
10    as clients?
11         A.     That's my understanding.
12         Q.     Isn't it true that you yourself
13    personally worked for them on the side?
14         A.     I wouldn't qualify it as
15    working with them.
16         Q.     Are you saying you didn't
17    perform any services whatsoever for the
18    Alexander brothers?
19         A.     It was requested that I connect
20    with them to create a website in
21    conjunction with their ongoing litigation.
22         Q.     And that was not for TAG, it
23    was outside of TAG, right?
24         A.     I'm not sure.
25         Q.     Well, Melissa Nathan turned
```

Page 519

1

2         CERTIFICATION

3

4      I,  TODD DeSIMONE, a Notary Public for

5    and within the State of New York, do hereby

6    certify:

7      That the witness whose testimony as

8    herein set forth, was duly sworn by me; and

9    that the within transcript is a true record

10   of the testimony given by said witness.

11     I further certify that I am not related

12   to any of the parties to this action by

13   blood or marriage, and that I am in no way

14   interested in the outcome of this matter.

15     IN WITNESS WHEREOF, I have hereunto set

16   my hand this 6th day of September, 2025.

17

18

19         TODD DESIMONE

20

21

22

23

24

25