# Exhibit 2

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                    ---oOo---
 4
 5  BLAKE LIVELY,
 6               Plaintiff,
 7     vs.        CASE NO. 24-CV-10049-LJL (LEAD CASE)
                          25-CV-449 (LJL) (MEMBER CASE)
 8
    WAYFARER STUDIOS LLC, ET AL.
 9
                 Defendants.
10  _____
    JENNIFER ABEL,
11            Third-party Plaintiff,
       vs.
12  JONESWORKS, LLC,
              Third-party Defendant.
13  _____
    WAYFARER STUDIOS LLC, et al.
14            Consolidated Plaintiffs,
       vs.
15  BLAKE LIVELY, et al.
              Consolidated Defendants.
16  _____
17                **CONFIDENTIAL**
18
19    VIDEO-RECORDED DEPOSITION OF ANDREA GIANNETTI
20              Culver City, California
21            Tuesday, September 23, 2025
22
23  Stenographically Reported by:  Ashley Soevyn,
    CALIFORNIA CSR No. 12019
24
25
```

CONFIDENTIAL

Page 24

```
 1    or "It Ends with Us," and those both refer to the
 2    film It Ends with Us.  Okay?
 3         A    Understood.
 4         Q    Where are you currently employed?
 5         A    Sony Pictures.
 6         Q    And what is your position?
 7         A    Executive Vice President Production and
 8    Senior Creative of Columbia Pictures.
 9         Q    Are Sony Pictures and Columbia Pictures
10    one and the same?
11         A    Columbia is a label owned by Sony
12    Pictures.
13         Q    And how long have you worked for Sony
14    Pictures?
15         A    Over 35 years.
16         Q    What positions have you held during that
17    time period?
18         A    I started as a switchboard operator, then
19    became an assistant, then became a reader, then
20    became a creative executive, then became a director
21    of development, then became a vice president, then
22    became a senior vice president, then became an
23    executive vice president, then became an executive
24    vice president and senior creative.
25         Q    Okay.  That is quite a journey from
```

CONFIDENTIAL

Page 25

```
 1    switchboard operator to executive vice president and
 2    senior creative.
 3              What are your duties as executive vice
 4    president and senior creative?
 5         A    I find ideas for movies.  I develop the
 6    screenplay with the producer and the writer, find a
 7    director, work with many different departments in
 8    terms of budgeting and packaging the film, oversee
 9    the prep of the film, the production of the film,
10    and the post of the film until the film is locked.
11         Q    Anything else?
12         A    No.
13         Q    And the films that you oversee in this
14    regard, are these films that are produced by Sony
15    Pictures or by other production companies?
16         A    The majority of them are produced by
17    Columbia Pictures.
18         Q    And how often do you work with outside
19    production companies?
20         A    I work with outside production companies
21    all the time in terms of producers -- in terms of
22    producers.
23         Q    How often have you worked with another
24    production company who is producing the entire film?
25         A    Overseeing the production of the film?
```

CONFIDENTIAL

Page 26

```
 1        Q    Yes.
 2        A    I've supervised over 70 films, so a
 3   handful, not very many.
 4        Q    And how long have you held the position
 5   of EVP and senior creative?
 6        A    About a month.  The senior creative is a
 7   new add.
 8        Q    And what is the -- what are the
 9   additional duties as the senior creative?
10        A    I'm still figuring that out.
11        Q    How long did you hold the position of
12   EVP?
13        A    I don't know exactly, but I -- 20 years?
14   I don't even remember, it's been that long.  It
15   could be 15 years.  I don't know.
16        Q    Does 2003 sound right?
17        A    Sure.  So it is over 20.
18        Q    That would be about 22 years.  Does that
19   sound right to you?
20        A    Yes.
21        Q    Who do you report to in your position?
22        A    Sanford Panitch.
23        Q    And what is his title?
24        A    I'm not even sure.  I think he is
25   president of Columbia Pictures or maybe co-chairman.
```

CONFIDENTIAL

Page 33

```
 1   your mind, would trigger your desire to get somebody
 2   neutral involved?
 3               MR. FLOYD:  Objection to form.
 4               THE WITNESS:  Something that was illegal.
 5   Something that was unethical.
 6   BY MS. HUDSON:
 7        Q    And would that include sexual harassment
 8   or retaliation?
 9        A    Yes.
10        Q    Were you part of the process by which
11   Sony became involved with the film It Ends with Us?
12               MR. FLOYD:  Objection.
13               THE WITNESS:  Can you say the question
14   again?
15   BY MS. HUDSON:
16        Q    Sure.  Were you part of the process by
17   which Sony became involved in the film
18   It Ends with Us.
19        A    Yes.
20        Q    What was your role?
21        A    I was the creative executive.
22        Q    Do you know how the film first came to
23   Sony?
24        A    Yes.
25        Q    How did it?
```

CONFIDENTIAL

Page 38

1   what the -- that was the beginning of -- of a longer

2   process.

3           Q    And how would you describe the synopsis

4   of It Ends with Us?

5               MR. FLOYD:  Objection.

6               THE WITNESS:  Seriously?

7   BY MS. HUDSON:

8           Q    I just would like to hear your view on --

9   if you had to give an elevator pitch on what the

10  book was about, what would it be?

11              MR. FLOYD:  Objection.

12              MR. FREEDMAN:  Objection.

13              THE WITNESS:  I really don't want to do

14  that.

15  BY MS. HUDSON:

16          Q    Would it be fair to say that it has

17  themes of romance and female empowerment centered on

18  the lead character, Lily Bloom, on a journey to end

19  the cycle of document violence?

20              MR. FLOYD:  Objection.

21              THE WITNESS:  Yes.

22  BY MS. HUDSON:

23          Q    Were you familiar with Wayfarer Studios

24  before Sony became involved?

25          A    No.

CONFIDENTIAL

Page 43

1        Q    Do you understand, for example, that Sony

2    was the co-financier and distributor of the film?

3        A    Yes.

4        Q    And did I describe that accurately to

5    your understanding?

6        A    Yes.

7        Q    And what is the basis of your

8    understanding, that Sony was the co-financier and

9    distributor of the film?

10        A    That Wayfarer would run the picture day

11    to day.  There was an agreed-upon budget going in,

12    with Sony being capped.  And the only -- as I

13    recall, the only legal controls we had were the

14    casting of Lily Bloom, an approved screenplay, so

15    any changes to the screenplay.  And I can't remember

16    if Atlas was a condition or not.

17        Q    And how did you learn these rights or

18    limits that you just described?

19        A    From my business affairs.

20        Q    Is that the legal unit that negotiates

21    the contracts?

22        A    Correct.

23        Q    Did you ever look at the contract

24    yourself?

25        A    No.  I don't think so.

CONFIDENTIAL

Page 45

1       Q    And that would be something that Sony

2    would typically retain the right to do as the

3    distributor?

4       A    You're asking a lot of legal questions

5    that I -- I -- I have to be honest, I don't know the

6    legal answer to this.  I know the process that I'm

7    familiar with.  But typically, when you make

8    trailers and posters and spots, there are other

9    people who have to approve it before it's put out.

10      Q    So just to be clear, I'm -- I'm only

11    asking you about your understanding.  I understand

12    that you're not a lawyer.  So...

13      A    Right.

14      Q    With respect to this film, was it your

15    understanding that Sony had the right to create and

16    release trailers?

17             MR. FREEDMAN:  Objection.

18             THE WITNESS:  It's my understanding that

19    Sony did create posters and trailers that they

20    shared with other people involved in the movie for

21    approval.

22    BY MS. HUDSON:

23      Q    And so you don't know, sitting here

24    today, who had approval rights?

25      A    I have an idea, but no, I don't know.

CONFIDENTIAL

Page 46

1    Q    What is your idea?

2    A    I'm sure Ms. Lively had approval over

3    certain things.  And I'm sure Wayfarer had approval

4    over certain things.

5    Q    Have you ever seen any contract of

6    Ms. Lively's with respect to the film?

7    A    No.

8    Q    Did you understand that Wayfarer

9    initially requested that Mr. Baldoni have final cut

10   rights over the film?

11          MR. FREEDMAN:  Objection.

12          THE WITNESS:  I think I did know that,

13   yeah.

14   BY MS. HUDSON:

15   Q    And how did you know that?

16   A    Because we had to -- because we said no,

17   and we had to come up with a mechanism in post for

18   what the final cut would be, which is common.

19   Q    And when you say a mechanism for what the

20   final cut would be is common, what do you mean by

21   that?

22   A    Since they were the rights holders and we

23   wanted to close a deal, there was a compromise that

24   if the movie tested a certain level at a preview and

25   Justin's cut hit those markers, he would have final

CONFIDENTIAL

Page 47

1   cut.

2          Q    And is that referred to as a bake-off?

3          A    No, that is not -- yeah, I guess that's a

4    "bake-off."

5              MS. HUDSON:  I'll hand the reporter a

6    document that we are marking as Exhibit 2.  I'm

7    sorry.  Exhibit 1.  Is that premarked?  Okay.

8    Sorry, I am not handing it to the reporter.  I'm

9    handing it directly to you.

10             That is Exhibit 1, Giannetti 1.  This

11   document is an email from Schuyler Moore to Michael

12   Marshall, dated September 27, 2022 to a variety of

13   people, including Ms. Giannetti.  The subject is

14   "IT ENDS WITH US/Proposed Sony Co-Production Term

15   Sheet," Bates stamp beginning SPE_BL343.

16   (Exhibit 1 marked for identification.)

17   BY MS. HUDSON:

18         Q    Ms. Giannetti, have you seen this

19   document before?

20         A    I don't remember, but it's in front of

21   me, so it's possible.

22         Q    And do you recognize this is an email

23   that you received, given your email address is on

24   here?

25         A    It's the correct email address.  I don't

CONFIDENTIAL

Page 48

1    remember getting it or reading it, but I'm not

2    saying I didn't.

3        Q    You have no reason to dispute that if

4    your email --

5        A    I have no reason to dispute.

6        Q    I'm sorry.  I'm just going to finish my

7    whole question so we have it clear on the record.

8            You have no reason to dispute that if

9    your email address is on here, that you received

10   this email?

11           MR. FREEDMAN:  Objection.

12           THE WITNESS:  Correct.

13   BY MS. HUDSON:

14       Q    And at the beginning of the email, it

15   says:

16           (As read):

17               "Michael, On behalf of Wayfarer

18               Studios, attached please find a

19               proposed term sheet for a co-production

20               for It Ends with Us, which has been

21               discussed with Sony."

22           Do you understand this as the proposal

23   that Wayfarer Studios gave for the co-production

24   agreement?

25       A    That's what it says, yes.

CONFIDENTIAL

Page 49

```
 1          Q    And you mentioned earlier that Wayfarer
 2    initially requested that Mr. Baldoni have final cut.
 3    Can you turn to the next page?  This appears to be
 4    the basic terms of the proposal from Wayfarer to
 5    Sony.
 6               Do you see that?
 7          A    Uh-huh.
 8          Q    Is that a yes?
 9          A    Yes.
10          Q    Okay.  And --
11          A    The approval section, is that what you're
12    asking me?
13          Q    Can you go to section 6.
14          A    I'm at section 6.
15          Q    It says:
16               (As read):
17                    "Director.  Justin Baldoni to direct
18                    and to have final cut rights.  Picture
19                    to be edited of location of his
20                    choosing."
21          A    That's what it says.
22          Q    And that's what you understand to have
23    been the original proposal from Wayfarer, correct?
24          A    Correct.
25                    MS. HUDSON:  I'm going to hand you -- you
```

CONFIDENTIAL

Page 50

```
 1   can put that one aside.  We're going to hand you

 2   another document to be marked as Exhibit 2,

 3   Giannetti 2.

 4   BY MS. HUDSON:

 5        Q    Before we get into that, Ms. Giannetti,

 6   what does final cut mean?

 7        A    It means the -- the finished film of the

 8   picture, of the -- of the images.

 9        Q    So what is a final cut right, that you --

10   to your understanding?

11        A    They are going to decide what is on

12   screen.  It's their decision.

13        Q    So if a director has final cut rights,

14   then it is up to the director's discretion what film

15   goes to the screen?

16             MR. FREEDMAN:  Objection.

17             THE WITNESS:  Correct.

18   (Exhibit 2 marked for identification.)

19   BY MS. HUDSON:

20        Q    Let's turn to Exhibit 2.  This is an

21   email from Michael Marshall to Schuyler Moore, dated

22   October 14th, 2022, to -- cc'ing a variety of

23   people, including Ms. Giannetti.  The subject is

24   "IT ENDS WITH US/Proposed Sony Co-Production Term

25   Sheet," beginning with Bates stamp SPE_BL1995.
```

```
 1            Who is Michael Marshall?
 2       A    The head of business affairs.
 3       Q    And when you mentioned business affairs
 4  before and they are the people that would negotiate
 5  the contracts, is that who you were talking about?
 6       A    Correct.
 7       Q    And in Mr. Marshall's email, he says:
 8            (As read):
 9                 "Sky - thanks again for forwarding the
10                 proposal and jumping on the phone
11                 earlier in the week.  And thanks for
12                 your patience as we've discussed
13                 internally.  Attached are Columbia
14                 responses."
15            And Columbia, this is Columbia Pictures?
16       A    Correct.
17       Q    If you turn to the second page, it says
18  at the top:
19            (As read):
20                 "Proposal to Columbia Pictures for
21                 'It Ends with Us.'"
22            And if you go to that same paragraph 6,
23  do you see where I'm pointing?
24       A    I do.
25       Q    It says:
```

CONFIDENTIAL

Page 52

```
 1              (As read):
 2                   "Director.  Justin Baldoni to direct
 3                   and [to have final cut rights].
 4                   Picture to be edited at location of his
 5                   choosing.  Columbia customarily doesn't
 6                   give director's final cut."
 7          Is that your understanding that Columbia
 8   didn't typically give director's final cut?
 9       A    Correct.
10       Q    And why not?
11       A    It's a very expensive proposition
12   releasing a film.  And so that's a big leap of faith
13   with a big financial investment, so we do not
14   give -- it's very hard to get final cut.
15       Q    Are there certain directors to whom you
16   would give final cut?
17       A    Yes.
18       Q    Like whom?
19       A    Quentin Tarantino has final cut.
20       Q    And why would a director like Quentin
21   Tarantino get final cut?
22            MR. FREEDMAN:  Objection.
23            THE WITNESS:  He's made a lot of
24   successful, highly acclaimed films.  And also, he
25   controls them.
```

CONFIDENTIAL

Page 53

1    BY MS. HUDSON:

2         Q    What do you mean by that?

3         A    It means he writes and he owns them, so

4    if you want to distribute them, he has all the

5    leverage in the deal.

6         Q    Got it.

7              So Mr. Baldoni also owned the script and

8    could make the film.  Are you saying that he did not

9    have the same track record of filmmaking as someone

10   like Quentin Tarantino had?

11             MR. FREEDMAN:  Objection.

12             THE WITNESS:  No, he did not have the

13   same track record.

14             MS. HUDSON:  We are going to next mark

15   Exhibit 3.

16        (Exhibit 3 marked for identification.)

17   BY MS. HUDSON:

18        Q    Exhibit 3 is an email from Schuyler Moore

19   to Michael Marshall, dated October it 27, 2022,

20   to -- cc'ing a variety of people, including

21   Ms. Giannetti.  The -- starting with Bates stamp

22   SPE-BL367.

23             This email from Mr. Moore, says:

24             (As read):

25                 "Attached please find a clean and

CONFIDENTIAL

Page 54

```
 1              redlined proposal with our remaining
 2              minor requested changes."
 3         Do you see that?
 4    A    I do.
 5    Q    And then if you turn to the next page,
 6  we're going to look again at that paragraph 6,
 7  regarding the director?
 8    A    Uh-huh.
 9    Q    Do you see that?
10    A    I do.
11    Q    And in this one, it says:
12         (As read):
13              "Final cut to be determined by
14              bake-off."
15         Do you see that?
16    A    I do.
17    Q    And then it says:
18         (As read):
19              "Bake-off ok provided that (a) it's a
20              blind recruit test screening and (b)
21              Justin's cut scores above 90-85 in the
22              top two boxes and above 70 in definite
23              recommends.  Alternatively, if Justin's
24              cut scores at least 7 points higher in
25              definite recommends than a cut
```

CONFIDENTIAL

```
                                            Page 55

 1              incorporating Columbia's changes, then
 2              Justin's cut will also prevail."
 3         MR. FREEDMAN:  Objection.
 4    BY MS. HUDSON:
 5         Q    Did I read that accurately?
 6         A    You did.
 7         Q    What did you understand this to mean?
 8         A    That if Justin and Sony had a
 9    disagreement over the cut -- if -- there would be a
10    mechanism to determine what would be released.
11    If -- if he met these metrics.
12         Q    And if he didn't meet these -- these
13    metrics, what is your understanding of what would
14    happen?
15         A    Sony would be able to release the cut.
16    Our cut.
17         Q    And the testing and the metrics, is that
18    what a bake-off is?
19         A    Yeah.  Yes.
20         Q    And is it your understanding that if Sony
21    had a cut, there would be testing for Sony's cut as
22    well?
23         A    Yes.
24         Q    Earlier we discussed the fact that there
25    was a theme of female empowerment in the film, do
```

CONFIDENTIAL

Page 57

```
 1        A     Previous success.
 2        Q     Once it became clear that Sony and
 3   Wayfarer were going to get a deal done, did you
 4   begin reaching out to talent agents regarding
 5   casting Lily Bloom?
 6        A     Yes.
 7        Q     Did one of those talent agents include
 8   Warren Zavala?
 9        A     Yes.
10        Q     Who is Warren Zavala?
11        A     He's a talent agent at WME.
12        Q     And how long have you known Mr. Zavala?
13        A     A long time.  Many years.
14        Q     Did you know who Mr. Zavala represented?
15        A     Some of them.
16        Q     Did you know that he represented
17   Blake Lively?
18        A     I did.
19        Q     Were you thinking about Blake Lively when
20   you reached out to Mr. Zavala?
21        A     Not the first time.
22        Q     Who -- is there someone else you were
23   thinking of?
24        A     Yes.
25        Q     Who were you thinking of?
```

CONFIDENTIAL

Page 65

```
 1        Q    Did you feel that she overall had a
 2   positive reputation?
 3        A    I thought so, yeah.
 4        Q    And after Ms. Lively -- Ms. Lively's
 5   casting was announced, was there a big jump in book
 6   sales of It Ends with Us?
 7        A    I wouldn't doubt it, but I don't know.
 8             MS. HUDSON:  I'm going to hand you the
 9   next exhibit, which will be 5.
10        (Exhibit 5 marked for identification.)
11             THE WITNESS:  Yes, thank you.
12   BY MS. HUDSON:
13        Q    Exhibit 5 is an email from Ms. Giannetti
14   to Tom Rothman, Sanford Panitch, and Josh Greenstein
15   dated January 30, 2023.  The subject:  "Colleen
16   Hoover's Publisher."  Bates-stamped SPE_WF2010
17   [sic].
18             Do you recognize this email,
19   Ms. Giannetti?
20        A    Sure.
21        Q    This is an email you sent?
22        A    Yeah, yeah.  I mean, I clearly sent it.
23   Yeah.
24        Q    And in the text of the email, it says:
25             (As read):
```

CONFIDENTIAL

Page 66

```
 1              "Head of Atria - publisher of
 2              It Ends with Us - emailed the book is
 3              back to #1 on Amazon given Blake/movie
 4              announcement."
 5          Does this refresh your recollection that
 6    there was a jump in book sales --
 7          A    Yes.
 8          Q    -- once Ms. Lively was cast?
 9          A    Yes.
10              MS. HUDSON:  You can set that aside.
11              We've been going for about an hour,
12    should we take a quick break?
13              THE WITNESS:  Sure.
14              THE VIDEOGRAPHER:  The time is 11:08 a.m.
15    Off record.
16                      (Recess.)
17              THE VIDEOGRAPHER:  The time is 11:26 a.m.
18    We're back on record.
19              MS. HUDSON:  And I would just like to
20    note for the record that we have a new participant
21    on Zoom, Justin Baldoni.
22    BY MS. HUDSON:
23          Q    Ms. Giannetti, is it your understanding
24    that when actors are cast for a film, they're
25    provided with a script?
```

CONFIDENTIAL

Page 67

```
 1        A    Yes.
 2        Q    And is it important for actors to have a
 3   script to understand the nature of the film and
 4   their role?
 5             MR. FREEDMAN:  Objection.
 6             THE WITNESS:  What is the question again?
 7   BY MS. HUDSON:
 8        Q    Is it important for actors to have a
 9   script to understand the nature of the film and
10   their role?
11        A    Yes, they have to have a script.
12        Q    And typically, if the script is changed
13   after the actor signs on to the film, does the actor
14   have to give consent?
15             MR. FREEDMAN:  Objection.
16             THE WITNESS:  Yes, if the approved
17   screenplay for shooting changes, yes.  Materially,
18   has to have material changes.
19   BY MS. HUDSON:
20        Q    And in your view, what -- what kind of
21   things constitute material changes?
22             MR. FREEDMAN:  Objection.
23             THE WITNESS:  They have a broken leg.
24   They're -- a material change to the character or a
25   material change to the movie would be a pretty -- it
```

CONFIDENTIAL

Page 68

1    would have to be significant.

2    BY MS. HUDSON:

3        Q    And do actors typically, to your

4    understanding, have a script approval rights

5    negotiated as part of their contract?

6            MR. FREEDMAN:  Objection.

7            THE WITNESS:  My understanding is once a

8    screenplay is approved, that is the document moving

9    forward.  And if there are material changes to the

10   character or to the story, they have to be consulted

11   and agree to material changes.  But there's a lot of

12   changes that can happen that are not material.

13   BY MS. HUDSON:

14       Q    And what kind of changes would you

15   consider not material?

16       A    Location changes, an added supporting

17   character, an added scene but it's still in the

18   spirit of the movie.

19       Q    What about adding additional sex scenes?

20       A    Yes, that would be material.

21       Q    Do you recall when filming began on

22   It Ends with Us?

23       A    Yeah.

24       Q    When was it?

25       A    January.

CONFIDENTIAL

Page 108

1   related to issues raised by Ms. Lively, correct?

2         A    Those two -- well, just that Ms. Lively

3   and I disagreed about wardrobe.

4         Q    Okay.

5         A    But subjective, creative disagreements.

6   We just disagreed.

7         Q    Any issues with the production related to

8   Mr. Baldoni or Mr. Heath during this time period?

9         A    Not that I can recall.

10             MS. HUDSON:  All right.  So I think we've

11  been going for about an hour, and this probably is

12  going to be a good time to break for lunch before I

13  get into the next section, if that's okay for

14  everyone.

15             THE VIDEOGRAPHER:  The time is 12:17 p.m.

16   Off record.

17                   (Lunch recess.)

18             THE VIDEOGRAPHER:  The time is 1:33 p.m.

19  We're back on record.

20  BY MS. HUDSON:

21        Q    Hello, Ms. Giannetti.  Any reason you

22  can't continue to give your best testimony here?

23        A    No.

24             MS. HUDSON:  I will hand you what will be

25  Exhibit 12.

CONFIDENTIAL

Page 109

1          (Exhibit 12 marked for identification.)

2               THE WITNESS:   Thank you.

3     BY MS. HUDSON:

4          Q    Exhibit 12 is a text chain between

5     Ms. Lively and Ms. Giannetti dated May 25th

6     through May 26th, 2023, BL7953.

7               Ms. Giannetti, do you recognize this text

8     chain?

9          A    Yes.

10         Q    And you recognize this as a text chain

11    between you and Ms. Lively?

12         A    Correct.

13         Q    In the second entry here from Ms. Lively

14    at the end of the sentence, she says:

15              (As read):

16                   "But let's attach up in general"?

17         A    Uh-huh.

18         Q    And then you say:

19              (As read):

20                   "I can make any time tomorrow work."

21              Do you see that?

22         A    I do.

23         Q    And it looks like you play a little phone

24    tag with her for a document; is that right?

25         A    It looks like it.

CONFIDENTIAL

Page 110

```
 1        Q    And then at the end, you say:
 2             (As read):
 3                  "I will say what I did want to
 4                  review/discuss feels very, very small
 5                  in light of today's news.  I'm so
 6                  sorry.  Calling you in moments."
 7             Do you see that?
 8        A    I do.
 9        Q    Did you call Ms. Lively on this day?
10        A    I can't recall but most likely.
11        Q    And the day is May 26th, right?
12   Correct?
13        A    I see -- I see that on the -- I see that
14   on the -- on the printout, yeah.
15        Q    And do you recall what it was that you
16   wanted to review and discuss with Ms. Lively?
17        A    I think it was wardrobe.
18        Q    And you say that:
19             (As read):
20                  "In light of today's news, that seems
21                  very, very small."
22             Right?
23        A    That's what I wrote, yes.
24        Q    What was "today's news"; do you recall?
25        A    I believe it was that she had been
```

CONFIDENTIAL

Page 111

1    exposed to COVID and was worried that the baby might

2    have COVID.

3        Q    And how did you learn that?

4        A    I don't remember where I learned it

5    first.

6        Q    Did you talk with Ms. -- did Ms. Lively

7    tell you that herself?

8        A    Yes.  We definitely talked about it.

9        Q    Did you talk about it before this call?

10        A    I don't remember.

11        Q    And you said you think you probably did

12    have a call with her on May 26th, then?

13        A    If I said "I'm calling you in moments," I

14    would have called her in moments.

15        Q    Sitting here today, do you have a

16    recollection of that phone call?

17        A    Exactly, no.

18        Q    Do you have a general recollection of it?

19        A    I have a general recollection.

20        Q    And generally, what do you recall?

21        A    I remember -- I mostly remember her being

22    very concerned about the COVID.  And if I'm correct,

23    I -- I don't know if it was before or after.  I'm

24    not great with the timing.  But I recall that she

25    had been in the hospital, and the baby had been in

CONFIDENTIAL

Page 112

```
 1   the hospital with RSV.  And so this -- you know,
 2   this -- that potentially the baby would have COVID.
 3   As a mother, that was concern- -- you know, very
 4   concerning.
 5          Q    The phone call, do you recall whether it
 6   was just you and Ms. Lively on that phone call?
 7          A    I think it was just the two of us on the
 8   phone call.
 9          Q    Do you recall how long it lasted?
10          A    No.
11          Q    Do you recall anything else about the
12   phone call, other than what you described?
13          A    Specifically, on this call, I can't -- I
14   know there were many things we were talking about at
15   this time, but I couldn't say for sure exactly.
16   Yeah, I don't -- you know.
17          Q    And where were you on May 26th?  Were
18   you in Los Angeles?
19          A    Yeah, I was in Los Angeles.
20          Q    And was it your understanding that
21   Ms. Lively was in New York, New Jersey?
22          A    New York.  I mean if it was at night, she
23   was probably in New York.  Or maybe she was on set
24   if it was a night shoot -- I mean in New Jersey, if
25   it was a night shoot.
```

CONFIDENTIAL

Page 113

1          Q    But not in Los Angeles with you?

2          A    No.  No.

3          Q    And you said that there were many things

4    you were talking about at the time.  What are you

5    referring to?

6          A    We were constantly talking about the

7    script.  I believe this is -- this is around the

8    time she started to have criticisms of the first AD,

9    how the set and schedule was laid out.  We were

10   having ward- -- still going back on forth on

11   wardrobe.  Those are what I remember being the --

12   some of the things we talked about.

13         Q    When you said "some of the things we

14   talked about," you mean at this time period, but you

15   may not mean specifically on this call?

16         A    I'm pretty sure the first AD came up on

17   this call.

18         Q    Is there anything else you are pretty

19   sure came up on that call?

20         A    I can't say for sure either way, to be

21   honest.  I can't remember.

22         Q    Do you recall, during this time period,

23   Ms. Lively raising any concerns about Mr. Baldoni

24   specifically?

25         A    Oh, I'm sure she did.

CONFIDENTIAL

1     Q    Do you recall her doing so to you?

2     A    I recall her doing that frequently.  So

3  it would be -- I don't recall this exact phone call.

4  But it is safe for me to assume she brought it up on

5  this call, too.

6     Q    Okay.  So you -- she was raising issues

7  about Mr. Baldoni to you frequently prior to

8  May 26th?

9     A    Yes.

10     Q    Okay.  Do you recall her raising issues

11  about Mr. Heath?

12     A    Less so.

13     Q    Do you recall whether she raised issues

14  to you regarding Mr. Baldoni or Mr. Heath on this

15  May 26th call?

16     A    I can't remember May 26th as a date in

17  my mind, so I can't -- I can't answer that, that I

18  can remember that specifically.

19     Q    So generally during this time period,

20  what do you recall -- what concerns do you recall

21  Ms. Lively raising with you about Mr. Baldoni?

22     A    She did not think he was experienced.  Or

23  prepared.

24     Q    Anything else?

25     A    No.

CONFIDENTIAL

Page 116

```
 1              Are there other issues that Ms. Lively
 2   raised to you about Mr. Baldoni at some other time,
 3   that you recall?
 4        A    Could you be more specific?
 5        Q    Well, I can't because if there were
 6   issues she raised to you, you would know that.  So
 7   I'm asking you --
 8        A    It always fell --
 9        Q    -- if you were --
10        A    It fell into the category of unprepared,
11   indecisive, and inexperienced.
12        Q    Those are the only issues that you recall
13   her raising to you at any time regarding
14   Mr. Baldoni?
15        A    She had other criticisms.
16        Q    What were they?
17        A    It was too loose on the set.
18        Q    What else?
19        A    He was too sensitive.
20        Q    Too sensitive?
21        A    Yes.
22        Q    Anything else?
23        A    I'm sure, but I can't recall the
24   specificity of that.
25        Q    And do you recall when Ms. Lively raised
```

CONFIDENTIAL

Page 117

1    those specific issues with you, that Mr. Baldoni was

2    too loose, too sensitive?

3         A    By "loose," I mean casual, too casual.

4    Early on, she was sharing about the too casual.  The

5    sensitive thing was later.

6         Q    Did she tell you what she meant by either

7    of these two things, too loose and too sensitive?

8         A    I will take sensitive first.  She felt as

9    though when she would make a complaint to him, that

10   he would be hurt by it.  And then she would have to,

11   like, buck him up and make him feel better so that

12   they could go on with the scene or get on with the

13   work.

14        Q    Did she say anything else to you on

15   that -- in that regard?

16        A    No.  That was what she meant.  That's --

17   "sensitive," I don't know if that's the right word.

18   But that -- that's what she complained about.

19        Q    Did she ever raise any specific incidents

20   with respect to Mr. Baldoni in his behavior towards

21   her to you?

22        A    It was a lot on that theme.  She would

23   have a criticism, and he wouldn't take it well.

24   He'd be hurt by it, and then she felt like she had

25   to, like, go in and buck him up.

CONFIDENTIAL

Page 122

1    his wife was nude in the video?

2         A     She could have said that, yeah.

3         Q     Did she ask you to do anything about it?

4         A     She did not.

5         Q     Did you think you should do anything

6    about it?

7         A     No.  I saw the video.

8         Q     What did you see?

9         A     I saw a woman in a tub giving birth.

10        Q     What exactly did you see?  Was it -- was

11   she naked?

12        A     I knew she was naked.  There was water.

13   I don't remember seeing any genitalia.

14        Q     Did you -- when you say "giving birth,"

15   did you see a baby crowning?

16        A     No.  I don't remember that.

17        Q     You remember a woman alone in the tub?

18        A     No.  I think someone's behind her,

19   holding her.

20        Q     Do you know whether -- well, let me ask

21   you this:  How did -- how did you see the video?

22        A     Jamey showed it to me.

23        Q     And how do you know that the video you

24   saw was the same video that Ms. Lively saw?

25        A     I don't.

CONFIDENTIAL

Page 129

```
 1        A     In her trailer.
 2        Q     Okay.  And how -- who -- who else was in
 3   that meeting?
 4        A     Okay.  It was me, Alex Saks, Jamey,
 5   Blake, and I don't know if Justin was there or not.
 6   I can't remember.
 7        Q     Okay.  Do you recall anything else that
 8   was said by anyone in that room at that meeting?
 9        A     I recall Jamey apologizing.  And I recall
10   Blake being very clear about entering the trailer
11   and not entering the trailer and her privacy.  And
12   she was -- she was very clear.
13        Q     Was she very upset?
14        A     She seemed upset, yeah.
15        Q     And did Ms. Lively tell you that not only
16   did she not give Mr. Heath permission to enter the
17   trailer, that she actively told him not to come in?
18        A     She may have.
19        Q     Did she also tell you that he insisted on
20   coming in, notwithstanding her request for him not
21   to, and said that if they were going to have a
22   meeting, it had to happen then or not at all?
23             MR. FREEDMAN:  Objection.
24             THE WITNESS:  I don't recall.  She may
25   have.
```

CONFIDENTIAL

Page 132

1          Q    Do you know whether this May 26th phone
2     call, Ms. Lively took any notes of it?
3          A    I don't know that she did.
4              MS. HUDSON:   I am going to hand you what
5     will be Exhibit 13.   Exhibit 13 is a photograph of
6     handwritten notes dated May 26th, 2023,
7     Bates-stamped BL33431.   Okay.
8          (Exhibit 13 marked for identification.)
9          Q    Have you seen this document before,
10    Ms. Giannetti?
11         A    I have not.
12         Q    I'm going to represent to you for the
13    record that these are notes of Ms. Lively's call
14    with you on May 26th.
15         A    Okay.
16         Q    So I'm just going to ask you some
17    questions about some of the things that are on here
18    and ask you if you recall her discussing this during
19    this call.   Okay?
20         A    Okay.
21         Q    So the third dash down, it says "Jamey
22    naked wife."   Do you see that?
23         A    I do.   Well, I -- I couldn't read that,
24    but I believe that's what it says.
25         Q    Okay.   All right.   So do you -- do you

CONFIDENTIAL

Page 133

1  recall whether on this call, you spoke -- Ms. Lively
2  spoke to you again about the issue of the birth
3  video?
4      A    I don't recall it, but I don't deny it.
5      Q    Were there any other incidents involving
6  Mr. Heath's naked wife other than that, that you're
7  aware of?
8      A    Not that I'm aware of.
9      Q    And then, underneath that, it says -- the
10  next dash -- "JB inappropriate comments to me and
11  others."  Do you see that?
12     A    I do.
13     Q    Do you know what inappropriate comments
14  Ms. Lively was referring to?
15     A    I believe -- but I don't know the timing,
16  so I would have to look back -- but I believe he
17  called Jenny Slate "sexy" when she was dressed in
18  character on set and -- I think that's what that
19  refers to.
20     Q    Did he -- do you know what
21  inappropriate -- did Ms. Lively talk to you about
22  any inappropriate comments Mr. Baldoni made to her?
23     A    Not that I can recall.
24     Q    Did she talk to you, during this call,
25  about Mr. Baldoni improvising physical intimacy that

CONFIDENTIAL

Page 134

1   was not scripted?

2        A    Had we shot any intimacy scenes?  I

3   didn't think we had shot any sex scenes until we

4   came back, so --

5        Q    Well, I didn't say sex.

6        A    Oh.

7        Q    I said "physical intimacy."  So let me

8   ask you the question again.

9             Well, let's do this.  When I say

10  "physical intimacy," you're think- -- that that's

11  referring to sex?

12       A    Yes.  The movie's a romance movie, so

13  that was -- yeah, that's immediately what I go to.

14       Q    Do you -- could physical intimacy also

15  mean kissing or other touching?

16       A    Sure.

17       Q    Okay.  Did Ms. Lively, during this call,

18  raise any issues with you about Mr. Baldoni

19  touching, kissing, or otherwise interacting with her

20  physically in ways that were not scripted?

21       A    She might have.

22       Q    She might have?

23       A    She might have.

24       Q    Okay.  Is that a topic that you recall

25  her raising with you at some point?

CONFIDENTIAL

Page 135

```
 1        A    Yeah, I think so, yeah.  I'm trying to
 2   figure out -- anyway...
 3             THE VIDEOGRAPHER:  I apologize, Counsel.
 4   If you don't mind raising your microphone a little
 5   bit higher, that would be appreciated.
 6             Thank you, ma'am.
 7   BY MS. HUDSON:
 8        Q    During this phone call, did Ms. Lively
 9   raise anything to you about Mr. Baldoni telling her
10   he had a pornography addiction?
11        A    I did not know -- no.
12        Q    Okay.  Did she raise that with you at any
13   time, to your recollection?
14        A    I don't recall.
15        Q    Did Ms. Lively raise to you, during this
16   phone call, any issue related to Mr. Baldoni calling
17   her trainer and asking her about -- and asking her
18   trainer about her weight?
19        A    I remember hearing about that from
20   Justin.
21        Q    So Justin came to you first before you --
22   Ms. Lively did?
23             MR. FREEDMAN:  Objection.
24             THE WITNESS:  I believe so.
25
```

CONFIDENTIAL

Page 143

```
 1        Q     Did you help replace the first AD?
 2        A     Yes, I did.
 3        Q     And do you know whether anyone else
 4   thought that there was a problem with the first AD?
 5        A     I think Alex Saks thought there was a
 6   problem with the first AD.
 7        Q     Did anyone else speak with you about
 8   concerns they had with Mr. Baldoni or Mr. Heath?
 9        A     Define "concern."  There is a lot of
10   complaining on a set.  There is a lot of
11   personalities.  Yeah, I think Alex -- probably Alex
12   Saks.
13        Q     Did Jenny Slate?
14        A     Yes, Jenny Slate.  Yes, the "sexy"
15   comment.
16        Q     Did Jenny Slate's manager?
17        A     I will tell you about the conversation
18   with Jenny Slate's manager.  Jenny Slate's manager
19   called me and, in a very general way, asked me,
20   like, "What's going on, on that set?"  She didn't
21   get into anything specific.  She just said, "What's
22   going on?"  And -- and she intimated Jenny and --
23   and Blake had concern.  She didn't know really what
24   it was.  And I -- and I just said to the manager,
25   "Have Jenny call me.  She can call me directly.
```

CONFIDENTIAL

Page 148

1          A    I got a quote that said.

2          Q    And did you end up speaking with

3     Ms. Slate?

4          A    Yeah, she called.

5          Q    And what did -- when did that

6     conversation take place?

7          A    I think it was the same night I spoke to

8     the manager.  I think.

9          Q    Was that May 27th?

10         A    Maybe.

11         Q    And do you know whether Ms. Slate spoke

12    with Alex Saks as well?

13         A    I think she did.

14         Q    Going back to your conversation with

15    Ms. Slate, what did she tell you?  Before you -- was

16    this a phone call, or was this in person?

17         A    It was a phone call.

18         Q    It was just the two of you?

19         A    Yes.

20         Q    And how long did that phone call last?

21         A    Not long.

22         Q    Okay.  And what did Ms. Slate tell you?

23         A    In -- in -- in -- what I remember

24    generally, I remember some things generally and some

25    things specifically.

CONFIDENTIAL

Page 149

1          Generally, I remember her having unease
2     on the set, talking about how Blake had great --
3     had -- Blake had a lot of concerns.  She shared them
4     with Jenny.  Jenny had the experience of the "hot"
5     comment.  And it just -- the -- it felt tense.  You
6     know, things felt tense on set.  She was very --
7     honestly, she was very all over the place and
8     wishy-washy about it a little bit.  And I -- the
9     part I really specifically remember is asking her at
10    the end, "Are you asking me to do something?"  And
11    she said, "No.  My manager said I should call you."
12         Q    And you didn't feel, after hearing that
13    both Ms. Slate and Ms. Lively were uncomfortable,
14    that there was something you should do, whether
15    asked or not?
16         A    To date, Jenny Slate told me the director
17    told her she looked "hot" in costume.  No, I did not
18    think anything from that needed to go to HR.  And
19    the majority of Blake's concern -- the majority of
20    them were the running of the set, his inexperience,
21    the first AD, the COVID.  And there were these
22    other -- the incident of the video and the trailer.
23    But, no, I did not think there was -- I thought it
24    was a shit show, but I did not think it was...
25         Q    Also, Alex Saks felt sidelined as well,

CONFIDENTIAL

Page 150

1  right?

2          MR. FREEDMAN:  Objection.  Could you let

3  her finish her answer?

4  BY MS. HUDSON:

5      Q    I'm sorry.  Were you still -- was there

6  more you were saying?

7      A    I thought it was a shit show, and there

8  was -- those incidents alone were not reason to call

9  HR for a movie that we were cofinancing and

10  distributing.

11     Q    How many women on a set have to be

12  uncomfortable before you think it rises to the level

13  of calling HR?

14         MR. FREEDMAN:  Objection.

15         THE WITNESS:  They didn't like him.

16  BY MS. HUDSON:

17     Q    What do you mean by that?

18     A    They didn't like him.

19     Q    So you discounted their views on him?

20         MR. FREEDMAN:  Objection.

21         THE WITNESS:  I heard of three incidents.

22  You can ask me this a hundred times, I'm going to

23  tell you the three incidents I know over and over

24  again.

25         The video, I saw the video.  The trailer,

CONFIDENTIAL

Page 151

```
1    we had a meeting in the trailer.  It was resolved.
2    And the director called Jenny Slate "hot" in front
3    of 300 people on set.  Those were the three
4    incidents.  No, I did not think there was reason to
5    call HR.
6              MS. HUDSON:  Okay.  Let's take a look at
7    Exhibit 16.  This is a text chain between Alex Saks
8    and Ange Giannetti dated May 29th, 2023,
9    Bates-stamped SPEBL2023.
10        (Exhibit 16 marked for identification.)
11   BY MS. HUDSON:
12        Q    Do you recognize this as a text chain
13   between you and Ms. Saks?
14        A    I do.
15        Q    Okay.  If you go to the beginning, Ms. --
16   you say to Ms. Saks:
17             (As read):
18                  "Call you when" -- "call when you can,
19                  xx."
20             Do you see that?
21        A    I do.
22        Q    And Ms. Saks says:
23             (As read):
24                  "Finishing up brunch with Jenny."
25             Do you see that?
```

CONFIDENTIAL

Page 156

1          Q    Did you learn, at some point, that there
2     was a meeting with Alex Saks, Justin Baldoni,
3     Mr. Heath, and Blake Lively?
4          A    You'd have to be more specific.
5          Q    Was there a meeting following all of
6     these phone calls and discussions with Mr. Heath,
7     Mr. Baldoni, Alex Saks, and Blake Lively?
8              MR. FREEDMAN:  Objection.
9     BY MS. HUDSON:
10         Q    That you're aware of?
11         A    About the Jenny Slate?
12         Q    About the various incidents we've
13    discussed?
14         A    The first AD?
15         Q    Well, we've discussed more than that.  Do
16    you recall Ms. Saks reporting to you about a meeting
17    that she had with --
18         A    There were so many.  You'd have to be
19    more specific.
20             MS. HUDSON:  Okay.  Let's take a look at
21    Exhibit 17?
22             THE STENOGRAPHIC REPORTER:  Yes.
23         (Exhibit 17 marked for identification.)
24    BY MS. HUDSON:
25         Q    This is a text chain between you and

CONFIDENTIAL

Page 157

```
 1   Alex Saks dated June 1st, 2023, SPEBL2026.
 2             Is this a -- do you recognize this as a
 3   text chain between you and Ms. Saks?
 4        A    I do.
 5        Q    And in this text chain, is Ms. --
 6   Ms. Saks reporting to you about a meeting that she
 7   had with Ms. Lively, Mr. Heath, and Mr. Baldoni?
 8        A    I need a minute to read it.
 9        Q    Sure.
10             I'm going to go to this and ask you
11   specific questions.
12        A    Okay.
13        Q    Okay?  The -- at 9:35 a.m., Ms. Saks says
14   "We had a very good tough chat with Blake.  She was
15   eloquent and on point.  Called Jamey out in front of
16   me and Justin kindly but was very direct.  It was
17   impressive to watch."
18             Do you see that?
19        A    I do.
20        Q    Okay.  So does this refresh your
21   recollection that Ms. Lively -- that Ms. Saks told
22   you about a meeting with her, Ms. Lively,
23   Mr. Baldoni, and Mr. Heath?
24        A    It doesn't refresh it, but I -- I see
25   that it happened.
```

CONFIDENTIAL

Page 159

```
 1    don't look.  And apparently, he was looking in her
 2    direction the entire conversation when she turned
 3    around.
 4            Do you see that?
 5        A    I do.
 6        Q    And your response was, "not good," and
 7    you capitalized each letter of "not," right?
 8        A    Uh-huh.
 9        Q    What did you mean by that?
10        A    I mean, if that happened, that would not
11    be good.
12        Q    Okay.  Why would that not be good?
13        A    She was in a state of undress.
14        Q    And then if you go to the next page, the
15    one Bates stamped 2030, there is a text chain at the
16    top it says from Ms. Saks,
17            (As read):
18            "I'm ready to bring a new AD team in."
19            Do you see that?
20        A    I'm sorry, what page is this?
21        Q    2030.
22        A    Oh, yeah.  Yes, I see that at the top.
23        Q    Ms. Saks says, "I'm ready to bring a new
24    AD team in."  You mentioned that she also wasn't
25    happy with the AD team?
```

CONFIDENTIAL

Page 160

1       A    Correct.

2       Q    And she describes to you some issues with

3  the AD team and you respond, "How is that possible?

4  Two people in the scene.  Exactly."

5            Did you also think that the AD team had

6  some issues?

7       A    I'm going to be honest, I don't know -- I

8  didn't know if it was an AD team issue, if it was a

9  Justin planning issue, if it was a DP issue.  I knew

10  that there was an issue, you know, that it would

11  take that -- I mean, it's not crazy that it takes

12  two hours before you get a shot off on a set, but

13  that does seem like a -- it's an interior location

14  and you're not dealing with weather.

15       Q    At the bottom, Ms. Saks -- you ask

16  Ms. Saks at 10:14 a.m.

17            "What does Justin say?  And Ms. Saks

18  response:

19            Nothing."

20            Do you see that?

21       A    At what time?  I'm sorry.

22       Q    10:14.

23       A    Oh, yeah.  Okay.

24            He says "nothing."

25       Q    And Ms. Saks says, Just looks blankly,

CONFIDENTIAL

Page 173

1            MR. FREEDMAN:  Objection.

2            THE WITNESS:  Yeah, I mean -- yeah, it

3    says here there will be one, but I did not -- I

4    didn't remember that we had to have it, and I didn't

5    know that it was scheduled at the end --

6    BY MS. HUDSON:

7        Q    When did production start?

8        A    January 5th.

9        Q    Okay.  And when was the meeting?

10       A    January 4th.

11       Q    Okay.  And at the January 4th

12   meeting...

13           MS. HUDSON:  I'm going to hand you

14   another document.

15           THE WITNESS:  Okay.

16           THE STENOGRAPHIC REPORTER:  Exhibit 20

17   for the record.

18       (Exhibit 20 marked for identification.)

19           MS. HUDSON:  Okay.

20           MR. FREEDMAN:  Time check?

21           THE VIDEOGRAPHER:  Three hours, thirteen

22   minutes.

23           THE WITNESS:  Thank you.

24   BY MS. HUDSON:

25       Q    Ms. Giannetti, this is Ms. Lively's

CONFIDENTIAL

Page 174

1    complaint in this lawsuit, her current complaint.

2           A     Uh-huh.

3           Q     I'm going to have you turn to page 7,

4    paragraph 20.

5                 It says --

6           A     I see it.  Yup.

7           Q     (As read):

8                       "During the January 4th meeting, the

9                       parties discussed in detail the

10                      inappropriate conduct that Ms. Lively,

11                      her employees, and other cast and crew

12                      experienced at the hands of Mr. Baldoni

13                      and Mr. Heath.  Ms. Lively read the

14                      list below in its entirety.  And after

15                      a discussion, all parties present

16                      agreed that the outlined conduct would

17                      cease."

18                Take a look at this list, which continues

19    onto page 2.  Do you recall Ms. Lively raising these

20    issues at -- at the January 4th meeting?

21                MR. FREEDMAN:  Objection.

22                Go ahead.

23                MS. HALLINAN:  You can take your time to

24    read through this.

25

CONFIDENTIAL

```
                                            Page 175
```

 1   BY MS. HUDSON:

 2        Q    Having looked at that, do you recall

 3   Ms. Lively reading from a list like that during the

 4   meeting?

 5              MR. FREEDMAN:  Sorry.  Can I get that

 6   read back?  I just didn't hear it.

 7              MS. HUDSON:  Okay.

 8   BY MS. HUDSON:

 9        Q    Having looked at the list, do you recall

10   Ms. Lively reading a list like this during the

11   meeting?

12              MR. FREEDMAN:  Objection.

13              THE WITNESS:  I'm up to number 23, and up

14   to 23, yes.

15   BY MS. HUDSON:

16        Q    Okay.  And go ahead and finish the

17   remaining --

18        A    Okay.

19        Q    -- four.

20        A    I will do it quickly.

21              Okay.

22        Q    Yes.  And she mentioned the -- the

23   remainder of the list during the meeting?

24        A    I don't remember it exactly, but it's --

25   it seems quite accurate.

CONFIDENTIAL

Page 244

1        Q    Did she -- did she tell you that she felt
2    uncomfortable about Justin speaking with her -- her
3    and, I think, his trainer?
4             MS. HUDSON:   Objection.
5             THE WITNESS:   I can't recall if she told
6    me specifically that herself or someone told me that
7    she did.
8    BY MR. FREEDMAN:
9        Q    Was that someone Justin?
10       A    I think it was everyone.  I think it was
11   Justin, Jamey, and Alex.
12       Q    Did Justin explain to you why he was
13   asking about what her weight might be?
14       A    Yes.
15       Q    What did he say to you?
16       A    In one of the scenes, he had to lift her.
17   And he had a bad back, and he wanted to know how
18   much she weighed so that he could lift her.  And
19   what he did say is, I think, not be embarrassed.
20   Like, he wanted to be able to do the scene.
21       Q    And did he explain to you that he was
22   concerned about a back injury that he had suffered?
23       A    Yeah, he -- well, he had mentioned that,
24   yeah, he -- he was worried about his back.
25       Q    Did you know that he had suffered a back

CONFIDENTIAL

                                              Page 245

1    injury previously?

2         A    I didn't.

3              MS. HUDSON:  Objection.

4              MR. FREEDMAN:  Thirty-three.

5         (Exhibit 33 marked for identification.)

6    BY MR. FREEDMAN:

7         Q    Exhibit 33 is a text exchange -- is a

8    text exchange -- it's a text exchange between

9    yourself and Blake Lively on May 15th and 16th.

10   It's Bates-stamped BL7941 and BL7942.

11             Do you know what this text was about?

12             MS. HUDSON:  Objection.

13             THE WITNESS:  No.

14   BY MR. FREEDMAN:

15        Q    Did --

16        A    Maybe.

17        Q    Sure.  What is it about?

18        A    I think this is for the end of the movie,

19   and we're supposed to show time passing.  Is that --

20   I'm -- I'm not actually sure, actually.

21        Q    Did Blake Lively tell you that Justin or

22   Jamey had done anything that made her feel

23   uncomfortable on the set on May 15 or May 16?

24        A    I don't recall.

25        Q    Did you learn that Blake Lively believed

CONFIDENTIAL

Page 296

1  17-point list?

2       A    No.  I knew why.

3       Q    Why?

4            MS. HUDSON:  Objection.

5            THE WITNESS:  Because there was a

6  tremendous amount of money that had been invested

7  and spent, and we had to finish the movie or it was

8  unreleasable.

9  BY MR. FREEDMAN:

10      Q    Did Blake Lively threaten to leave the

11 movie if the 17-point list wasn't signed without

12 alteration or revision?

13           MS. HUDSON:  Objection.

14           THE WITNESS:  That's my understanding.

15 BY MR. FREEDMAN:

16      Q    Do you recall telling Jamey Heath that

17 you thought Blake was a fucking terrorist?

18           MS. HUDSON:  Objection.

19           THE WITNESS:  Yes.

20 BY MR. FREEDMAN:

21      Q    At that point in time, how much money had

22 Sony invested in the movie?

23      A    Well, I believe the ingoing budget was 28

24 and change, 28 million and change.  We had

25 three weeks left -- I -- I -- I'm -- at least

CONFIDENTIAL

Page 342

```
 1              THE WITNESS:  In regards to nudity in
 2   the -- in the nudity rider and daillies had nudity?
 3   BY MS. HUDSON:
 4       Q    If her nudity rider had a provision that
 5   required the daillies to be destroyed in certain
 6   circumstances, would it be appropriate for the
 7   daillies to have been destroyed consistent with the
 8   circumstances laid out in the nudity rider?
 9       A    Yes.
10       Q    Let's look at Exhibit 41.
11            This is a text message between
12   Ms. Giannetti and Ms. Lively, dated August 11th,
13   2024, Bates-stamped BL_8024.
14            Ms. Giannetti, I'm going to draw your
15   attention to your text to Blake Lively on
16   August 11th.
17            Can you read it out loud?
18       A    Sure.
19            (As read):
20                 "Blake, $50 million!!  Your blood,
21                 sweat, tears, brilliant smarts, heart
22                 and soul in every single frame.  My
23                 God, it's incredible.  Thank you
24                 50 million times.  And it's only
25                 Saturday night."
```

CONFIDENTIAL

1      Q    What were you referring to here?

2      A    The success of the opening of the film.

3      Q    Was the opening of the film successful?

4      A    Very.

5      Q    And -- and how did it compare to other

6  movies of the genre?

7           MR. FREEDMAN:  Objection.

8           THE WITNESS:  It was gigantic.

9  BY MS. HUDSON:

10     Q    Was it a historically successful movie?

11          MR. FREEDMAN:  Objection.

12          THE WITNESS:  Oh, you could say that.  I

13 think that's fair.

14 BY MS. HUDSON:

15     Q    And how much money has It Ends with Us

16 made to date?

17     A    I can't tell you to date.  I can tell you

18 to date theatrically.  I think it's close to

19 $350 million.

20     Q    And is that a historically large success

21 rate?

22     A    For this size budget and this genre,

23 incredible.

24     Q    And the cut of the film that went to

25 theaters was the one that Ms. Lively worked on for

CONFIDENTIAL

Page 344

1    Sony, correct?

2              MR. FREEDMAN:  Objection.

3              THE WITNESS:  Yes.

4              MS. HUDSON:  Okay.  No further questions.

5              MR. FREEDMAN:  I just have a little bit.

6    I will ask them from here, if that's okay.

7              THE WITNESS:  It's okay.

8              MR. FREEDMAN:  Sorry about that.

9              THE WITNESS:  That's all right.

10             MR. FREEDMAN:  You're close, though.

11             THE WITNESS:  I know.  I can feel it.

12                    EXAMINATION

13   BY MR. FREEDMAN:

14        Q    Let me start by giving you a document I

15   will ask the court reporter to mark as Exhibit 42

16   for identification.

17             THE STENOGRAPHIC REPORTER:  Here you go.

18   Exhibit 42 for the record.

19        (Exhibit 42 marked for identification.)

20   BY MR. FREEDMAN:

21        Q    Exhibit 42 is an exchange between, it

22   looks like Josh Greenstein and yourself, and it's

23   dated September 3, 2024.

24        A    Uh-huh.

25        Q    Do you recognize the document?

CONFIDENTIAL

Page 353

1            REPORTER'S CERTIFICATE

2            I, ASHLEY SOEVYN, a Certified Shorthand

3    Reporter of the State of California, do hereby

4    certify:

5            That the foregoing proceedings were taken

6    before me at the time and place herein set forth;

7    at which time the witness was put under oath by me;

8            That the testimony of the witness, the

9    questions propounded, and all objections and

10   statements made at the time of the examination were

11   recorded stenographically by me and were thereafter

12   transcribed;

13           That a review of the transcript by the

14   deponent was/ was not requested;

15           That the foregoing is a true and correct

16   transcript of my shorthand notes so taken.

17           I further certify that I am not a relative

18   or employee of any attorney of the parties, nor

19   financially interested in the action.

20           I declare under penalty of perjury under

21   the laws of California that the foregoing is true

22   and correct.  Dated this 25th day of September,

23   2025.

24

         ASHLEY SOEVYN

25       CSR No. 12019