Exhibit 3

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                     ---oOo---
 4
 5     BLAKE LIVELY,
 6                    Plaintiff,
 7       vs.        CASE NO. 24-CV-10049-LJL (LEAD CASE)
                            25-CV-449 (LJL) (MEMBER CASE)
 8
       WAYFARER STUDIOS LLC, ET AL.
 9
                    Defendants.
10     _____
       JENNIFER ABEL,
11               Third-party Plaintiff,
         vs.
12     JONESWORKS, LLC,
                 Third-party Defendant.
13     _____
       WAYFARER STUDIOS LLC, et al.
14               Consolidated Plaintiffs,
         vs.
15     BLAKE LIVELY, et al.
                 Consolidated Defendants.
16     _____
17                  **CONFIDENTIAL**
18
19        VIDEO-RECORDED DEPOSITION OF JAMEY HEATH
20              Los Angeles, California
21             Wednesday, October 8, 2025
22
23     Stenographically Reported by:  Ashley Soevyn,
       CALIFORNIA CSR No. 12019
24
25
```

CONFIDENTIAL

Page 18

```
 1          A    Jamey Heath -- or my legal name?

 2          Q    Yes.

 3          A    James Heath.

 4          Q    Have you ever been known by any other

 5     name?

 6          A    I have, Jamey, my whole life.  Also,

 7     professionally, for many years, I went by Jamey Jaz,

 8     J-A-Z.

 9          Q    And you spell Jamey, J-A-M-E-Y; is that

10     right?

11          A    Correct.
```

```
24          Q    Have you been deposed on any other

25     occasions?
```

CONFIDENTIAL

Page 19

1       A    I have not.

2       Q    But you've sat in on quite a few

3    depositions; is that right?

4       A    I have.

5       Q    Are there any depositions that have been

6    taken in this case that you did not sit in on?

7       A    Yes.  Several.

8       Q    Do you recall which ones you did sit in

9    on?

10      A    I can do my best.

11      Q    That's all I can ask.

12      A    Ms. Lively, Jennifer Abel.  And when I

13   say "the others," I was not present for all of them,

14   for the duration.

15      Q    You were -- you were present for the full

16   duration of Ms. Lively's?

17      A    I was.  Jennifer Abel, in and out, one of

18   the days.  Melissa Nathan, in and out.  I barely saw

19   much of hers.  Of course, Justin Baldoni's.

20      Q    And you -- you were present for all of

21   Justin Baldoni's deposition, correct?

22      A    Correct.

23           Present for Steve Sarowitz for the first

24   two hours, and then I was not here.  Portions of

25   Isabela Ferrer.  Most of -- well, not true, probably

CONFIDENTIAL

Page 20

```
 1    about half of Jenny Slate's.  A quarter or so of
 2    Colleen Hoover.  I was present for Ange Giannetti.
 3         Q    For the entire deposition?
 4         A    Correct.  Some of -- no, was I in person?
 5    I was in person for Danny Greenberg.
 6         Q    So you -- you participated in the -- you
 7    were present for the entire deposition for that one?
 8         A    Correct.  You might have to help me
 9    because there's a lot of people --
10         Q    Warren Zavala?
11         A    Warren, I did not see.
12         Q    Josh Greenstein?
13         A    I did not see Warren.  Josh, portions of
14    it, small portions.
15         Q    Katie Case?
16         A    I think maybe 10 minutes of that.
17         Q    Breanna Koslow?
18         A    Probably the same, a few minutes.
19         Q    Okay.
20              So having participated in all or part of
21    these many depositions, you have a pretty good
22    understanding of what the rules of the road are for
23    depositions, right?
24         A    I believe I do.
25         Q    I am not going to repeat those for you
```

CONFIDENTIAL

Page 21

```
 1        here today.  But I do want to ask you if you are
 2        taking any medication that will affect your
 3        testimony today?
 4             A    I have not.
 5             Q    Have you consumed alcohol in the last
 6        24 hours?
 7             A    I've never had a drink of alcohol.
 8             Q    You've never had alcohol?
 9             A    In my life.
10             Q    Are you under the influence of any
11        substance that would affect your testimony today?
12             A    Coffee.
13             Q    Do you think your coffee is going to
14        affect your testimony?
15             A    No.
16             Q    Is there any reason that you can't give
17        your best testimony here today?
18             A    There is not.
19             Q    When did you first meet Justin Baldoni?
20             A    Meet him?  Maybe 20 years ago.
21             Q    And in what context did you meet him?
22             A    He was friends with mutual friends.  I
23        think he had just moved to Los Angeles or somewhere
24        around that time and so we knew of each other.  I
25        actually knew of him before that as well because my
```

CONFIDENTIAL

Page 22

```
 1     family knew his family.  So I knew of him but hadn't
 2     met him.
 3          Q    When you say "your family knew his
 4     family," were you familiar with each other through
 5     your church?
 6          A    No.  Which is not a church, by the way,
 7     But just for clarification.  But no, my grandmother
 8     knew his mom.
 9          Q    Got it.  And when you say "it's not a
10     church," you mean, Baha'i, you don't refer to it as
11     a church?
12          A    Yeah.  There is no clergy in the Baha'i
13     faith.
14          Q    I understand.
15               And at some point, you and Mr. Baldoni
16     became close, correct?
17          A    Yes.
18          Q    When did that take place?
19          A    Fifteen years ago about.
20          Q    And what brought you from this
21     relationship where you knew each other through this
22     family relationship to becoming close friends?
23          A    Justin was hosting in his home, what
24     would you call it, a gathering of sorts of different
25     artists, people connected to the entertainment
```

CONFIDENTIAL

Page 23

```
 1      field.  Not only the entertainment, but primarily
 2      who were talking about elevated concepts, like how
 3      we can be better in the world.  And to talk about
 4      spiritual concepts no matter where you were from.
 5      What your spiritual background didn't matter, that
 6      wasn't the point.  It was more just to find out what
 7      we all agree upon, and how do we unify in that.
 8      He -- I saw him somewhere.  He invited me to it.
 9              Q    And you said that was about 15 years ago?
10              A    Correct.
11              Q    And then, how did you become friends more
12      closely from that experience?
13                  MS. SHAPIRO:  Objection.
14                  THE WITNESS:  Through that experience, we
15      started spending more time.  I admired him for his
16      unique ability to inspire others to care about
17      things they may have not thought about they cared
18      about.  And he's 15 years younger than I am, about
19      14.  And I was impressed with his ability to inspire
20      all age groups.
21      BY MS. HUDSON:
22              Q    And so over the course of time, he became
23      not just a close friend but your best friend, right?
24              A    One of my best friends for sure.
25              Q    You often describe him as your best
```

CONFIDENTIAL

Page 30

1    caliber because you had kids in an apartment on a

2    computer doing something.  Didn't maybe have the

3    same integrity.  And because of that, the landscape

4    changed.  And then as many -- as for many things,

5    you pivot.

6         Q    And you pivoted to Wayfarer?

7         A    I did.

8         Q    How did you -- well, when did you first

9    become employed by Wayfarer?

10        A    About five years ago.

11        Q    And how did you come to be employed

12   there?  I realized it's founded by your best friend,

13   but how did you become an employee at your best

14   friend's company?

15        A    As I said, Justin and I have been friends

16   and we worked together a lot before I was at

17   Entertainment.  I'm at Wayfarer Studios.  He had

18   Wayfarer Entertainment, and I worked a lot on a lot

19   of the projects that he did.

20        Q    What kind of work?

21        A    Did music, scored, and -- and adjacently,

22   consulted with him on things that he was doing.

23             He then was, about five years ago, was

24   working through something.  He asked for my

25   consultation, among some others.  The next day he

CONFIDENTIAL

Page 31

```
 1        called and said, I need you to be a part of my
 2        company.  And I said -- my words were, "fuck off, no
 3        thanks," jokingly, Ms. Esra, just so we're clear.
 4        Meaning, like, I'm not interested in tending to your
 5        garden.  I've got my own garden.
 6                 So at first I was like, yeah.  And I
 7        asked, "doing what?"  He's like, your whole life has
 8        been in the entertainment world.  You know what we
 9        do.  We work together.  The way that you lead and
10        operate and your understanding of things is -- I
11        feel is what we need in our company.  So...
12             Q    And what position did he offer you?
13             A    There was no particular position.  This
14        was the -- he says, I just need you in it.  I agreed
15        that I would, at some point, kind of take a look
16        inside.
17             Q    Within --
18             A    Again, this was at a time when I was
19        full-time spending on music and my own production
20        company, and I was at a crossroad.
21             Q    So you were looking for something new,
22        and he was offering something new?
23             A    Kind of lined up.
24             Q    This was in 2020?
25             A    Yes.
```

CONFIDENTIAL

Page 32

```
 1        Q     And when was Wayfarer founded to your
 2   understanding?
 3        A     Wayfarer Studios?
 4        Q     Yes.
 5        A     2019.
 6        Q     And if I use the term "Wayfarer," I'm
 7   referring to Wayfarer Studios LLC, unless I say
 8   otherwise, okay?
 9        A     You got it.
10        Q     So it was a fairly new company?
11        A     Yes.
12        Q     Were there any employees when you joined?
13        A     Yes.
14        Q     How many?
15        A     One, two, three, four, five, six,
16   seven -- around 10 maybe, somewhere in that realm.
17        Q     So when you were hired, what position
18   were you hired into?
19        A     As I stated, there wasn't a particular
20   position.  In the creative world, it's just more
21   come and bring your creativity, your observation,
22   your consultation, and -- and kind of like see where
23   that -- what that might look like.
24        Q     Well, at some point, you became
25   president, though, right?
```

CONFIDENTIAL

Page 33

```
 1          A    There was a few titles before that, but
 2     yes.
 3          Q    What was the first title?
 4          A    Interim COO.
 5          Q    And how long did you hold that position?
 6          A    Three months.
 7          Q    And then what did you do after that?
 8          A    Title?
 9          Q    Yes.
10          A    Co-COO.
11          Q    Co-COO?
12          A    Correct.
13          Q    Who was the other COO?
14          A    Manu.
15               THE STENOGRAPHIC REPORTER:  Can I have a
16     spelling, please?
17               THE WITNESS:  M-A-N-U.  And for some
18     reason, his last name is escaping me.  But I'm happy
19     to give it to you when I recall it.
20     BY MS. HUDSON:
21          Q    And how long were you then co-COO with
22     Manu?
23          A    Another three months.
24          Q    What was your next position?
25          A    President.
```

CONFIDENTIAL

Page 34

1      Q    How long did you hold that position?

2      A    Until almost two years ago or -- or maybe

3   a year and eight months or so when we brought on

4   Tera Hanks.  We gave her the title of president and

5   I became COO -- CEO.  So to be clear, the -- at all

6   times, I was, with both titles, essentially, the

7   head of the company in that regard.  They are just

8   titles.  All of these titles are ridiculous to me

9   anyways.

10     Q    You see yourself as head of the company

11  with respect to the day -- day-to-day operations?

12          MS. SHAPIRO:  Objection.

13          THE WITNESS:  Day-to-day operations, we

14  have an operations manager.  So...

15  BY MS. HUDSON:

16     Q    Well, what do you mean by "head of the

17  company"?

18     A    I just mean the top -- the -- the person

19  that ultimately signs off on -- daily operations

20  would be one of them.  Our deals and most of our

21  creative.  Of course, not meaning to omit the

22  chairman, but their job is different or their role

23  is different.

24     Q    And in the president role, what is

25  distinct between the president and the CEO

CONFIDENTIAL

Page 37

1          Q     I didn't hear human resources in there.

2          A     Human resources, thank you.

3          Q     So with respect to these positions, the

4     VP of marketing and communications, that's

5     Ashmi Dang?

6          A     Correct.

7          Q     The VP of operations is Mitz Toskovic?

8          A     Correct.

9          Q     And then, Brian Singer is the CFO?

10         A     Correct.

11         Q     And have these people, as I've described

12    them, held these positions since at least 2023?

13         A     Yes.

14         Q     You mentioned Tera Hanks as the

15    president.  Andrew Calof, is he the president of

16    production and development?

17         A     Correct.

18         Q     And he's also held that position since

19    2023?

20         A     Yes.

21         Q     John Logan Pierson, is he the head of

22    physical production?

23         A     He is.

24         Q     Okay.  And has he held that position

25    since at least 2023?

CONFIDENTIAL

Page 38

```
 1          A     Yes.  He -- he -- yes, yes, he has.
 2          Q     And then for VP of creative, is that
 3    Angela Cardon?
 4          A     Yes.
 5          Q     Has she held that position since 2023?
 6          A     She has.
 7          Q     For -- with respect to HR, is Cynthia
 8    Barnes Slater your head of HR?
 9          A     She is.
10          Q     You know she describes herself online as
11    retired.  Is that not accurate?
12          A     She retired from -- she was a head of HR
13    of -- I can't recall the company.  It's like GMC or,
14    you know, a big corporation.  She retired from that.
15    And then she does private working HR for smaller
16    companies.
17          Q     So in a consultant role, essentially?
18          A     Yes.
19          Q     And how long has she held that position?
20          A     With Wayfarer?
21          Q     Yes.
22          A     As long as I've been there so...
23          Q     Is she physically present in California?
24          A     She is.
25          Q     She doesn't live in Illinois?
```

CONFIDENTIAL

Page 39

```
 1          A     No.   Let me rephrase that.   Not as far as
 2     I know.   But yes, she lives in California, unless
 3     something's changed.
 4          Q     And does Wayfarer have an office?
 5          A     Yes.
 6          Q     Does Ms. Barnes Slater work in Wayfarer's
 7     office?
 8          A     Not regularly.
 9          Q     Does she work from home?
10          A     Yes.
11          Q     Is there anyone in human resources other
12     than Ms. Barnes Slater?
13          A     I know Mitz assists her in the operations
14     level.   Outside of that, no.
15          Q     Has Ms. Barnes Slater always worked at
16     home?
17                MS. SHAPIRO:   Objection.
18                THE WITNESS:   Yes.
19     BY MS. HUDSON:
20          Q     Does she ever come into the office?
21          A     Yes.
22          Q     How often?
23          A     She does not have a schedule, so I would
24     not be able to put a number on it.
25          Q     Can you give me an estimate?
```

CONFIDENTIAL

Page 40

```
 1          A    It would be a guess.  Once a month.
 2          Q    And who is Shekinah Reese?
 3          A    She's my assistant, previous assistant.
 4          Q    Okay.  And AJ Marbory?
 5          A    She was Justin's assistant.
 6          Q    And how long was Ms. Reese your
 7     assistant?
 8          A    There's a block of time that's gone, so I
 9     don't want to waste time thinking about it.  But a
10     year and a half, maybe two years.  Maybe '23, '24.
11          Q    '23, '24?  And who is your current
12     assistant?
13          A     I share now an assistant with Tera, who
14     is -- sorry, Isabelle, and I can't recall her last
15     name because it's a wonderful name that's hard to
16     pronounce.
17          Q    And Jarriesse Blackmon, was she your
18     assistant at some point?
19          A    No.
20          Q    Was she someone else's assistant?
21          A    Jarriesse is a male.
22          Q    Oh.
23          A    It's okay.  And he works assisting
24     Justin.
25          Q    Okay.  Now, during much of Mr. Baldoni's
```

CONFIDENTIAL

Page 49

 1    based on those sales, doesn't come to fruition.
 2    Like a market so to speak, right, you -- you can
 3    estimate, but you don't control a market.  So based
 4    on those.
 5         Q    Prior to joining Wayfarer as an employee,
 6    had you produced any films?
 7         A    As a on-the-ground producer, no.
 8    Prior -- I'm sorry.  You said prior to it?
 9         Q    Correct.
10         A    No.
11         Q    Had you been on a film set before?
12         A    Many.
13         Q    In what capacity?
14         A    As I mentioned, I was a composer for
15    projects throughout my life, so I would visit for
16    those.  Without giving you a whole back story, my
17    family was also involved in the entertainment
18    industry, so my childhood and life was only around
19    entertainment, music side and film side.  Movie sets
20    and television sets were a normal part.
21         Q    So you said that you had not been a
22    producer on a film, though, before Wayfarer.  And
23    what was the term that you used?
24         A    On-the-ground producer.
25         Q    On-the-ground producer?

CONFIDENTIAL

Page 50

```
 1        A     Yeah, but that -- that was --
 2        Q     What does that mean to you?  What's the
 3    difference between on-the-ground producer and
 4    whatever you did?
 5              MS. SHAPIRO:  Objection.
 6              THE WITNESS:  Before It Ends with Us?
 7    BY MS. HUDSON:
 8        Q     Prior to joining Wayfarer, you said you
 9    were not an on-the-ground producer.  What did you
10    mean by that?
11        A     I misunderstood your question.
12        Q     Okay.
13        A     Because you asked me prior.  I thought I
14    heard you -- what I interpreted your question to be
15    is at Wayfarer.  There are other films in Wayfarer
16    that I am -- have producer credit or executive
17    producer credit, and I was just being clear about
18    that.  But prior to Wayfarer, correct.
19        Q     So prior to Wayfarer, you were a producer
20    in -- with respect to your music work; is that
21    right?
22        A     Correct.
23        Q     So you had not been a film or TV producer
24    prior to Wayfarer, correct?
25        A     Correct.
```

CONFIDENTIAL

Page 57

```
 1              THE WITNESS:  No.
 2      BY MS. HUDSON:
 3          Q    Did you see yourself as having any
 4      employees who reported to you as producer?
 5              MS. SHAPIRO:  Objection.
 6              THE WITNESS:  Yeah.
 7      BY MS. HUDSON:
 8          Q    Who reported to you?
 9          A    Different department heads would report
10      to the producers, not necessarily Jamey.  But using
11      the term and title producer, department heads.
12          Q    And do you agree that it's important for
13      any film project to have a process in place for
14      reporting concerns about the workplace?
15              MS. SHAPIRO:  Objection.
16              THE WITNESS:  I do.
17      BY MS. HUDSON:
18          Q    And that there be protocols in place to
19      ensure a safe workplace?
20              MS. SHAPIRO:  Objection.
21              THE WITNESS:  I do.
22      BY MS. HUDSON:
23          Q    Do you think it's important for the cast
24      and crew to be trained in the appropriate workplace
25      behavior?
```

CONFIDENTIAL

Page 67

1             MS. SHAPIRO:  Objection.

2             THE WITNESS:  I do not.

3      BY MS. HUDSON:

4          Q    How often do you record phone calls?

5             MS. SHAPIRO:  Objection.

6             THE WITNESS:  In my entire life, I've

7      recorded three maybe, maybe four in the same period

8      of time.

9      BY MS. HUDSON:

10          Q    In your entire life, you've recorded

11      three or four phone calls?

12          A    Correct.

13          Q    And -- and in what -- when -- when were

14      those phone calls recorded?

15          A    Sometime at the -- I don't know the

16      months, but in 2024 of -- I believe around August, I

17      believe, maybe July, somewhere in there.

18          Q    And were all of those phone calls that

19      you recorded related in some way to It Ends with Us?

20             MS. SHAPIRO:  Objection.

21             THE WITNESS:  In some way, yes.

22      BY MS. HUDSON:

23          Q    Sunday we received a production of four

24      call recordings under your Bates-label starting with

25      Heath.  Are those the calls that you recorded?

CONFIDENTIAL

Page 73

1    represent and speak on our behalf.  And based on

2    some previous conversations with her, I was losing

3    confidence, and I knew this was a testy situation.

4    And I wanted to document anything she might say to

5    me.

6    BY MS. HUDSON:

7        Q    Did you tell Ms. Jones that you were

8    recording the call?

9        A    I did not.

10       Q    Why not?

11       A    Simply because I wanted to have

12   documented what she -- where she was or her state of

13   mind was, and I didn't allow her to know.

14       Q    You didn't want her to know?

15       A    I didn't deliberately think I didn't want

16   her to know.  I just didn't announce it.

17       Q    Were you planning to use it against her

18   in someway?

19       A    No.

20       Q    And you said you couldn't remember if

21   there was a third person listening in to the call?

22       A    I just don't recall, but if there was,

23   then I'm not saying there wasn't.  I just don't

24   recall it.

25       Q    So you don't remember, for example, if at

CONFIDENTIAL

Page 82

```
1     would be the call that you're mentioning.  You're
2     now identifying the names.  I'm just not sure if all
3     of that is accurate.
4          Q    Are there any of those three that you
5     recall with certainty were on that call?
6               MS. SHAPIRO:  Objection.
7               THE WITNESS:  I'm not certain -- I'm not
8     certain who was on that marketing call.
9     BY MS. HUDSON:
10         Q    But if they're calling themselves -- if
11    they're identifying themselves as Danni, Gloria, and
12    Josh on the call --
13         A    Yeah.  I would -- yeah, it would be that.
14         Q    Let me just finish my question.
15         A    Sure.
16         Q    If they're identifying themselves as
17    Danni, Gloria, and Josh on the call, then it would
18    be safe to say that those are the people that were
19    on that call; is that right?
20         A    Yes.
21              MS. SHAPIRO:  Objection.
22    BY MS. HUDSON:
23         Q    And where were you located when that call
24    was recorded?
25              MS. SHAPIRO:  Objection.
```

CONFIDENTIAL

Page 83

```
 1            THE WITNESS:  Do you mean state?
 2    BY MS. HUDSON:
 3        Q     City and state.
 4        A     Yeah.  I believe I would have been in
 5    Los Angeles.
 6        Q     And where in Los Angeles?  In your office
 7    or home?
 8        A     I don't remember.
 9        Q     Do you know where the participants -- the
10    other participants in the call were located?
11        A     I don't.  I don't know if they were
12    working remotely or out of their offices.  I don't.
13        Q     And is it your understanding that
14    Danni Maggin, Gloria Hann, and Josh Greenstein work
15    in Los Angeles also?
16            MS. SHAPIRO:  Objection.
17            THE WITNESS:  It is.
18    BY MS. HUDSON:
19        Q     And why did you record that call?
20        A     We were at a point where we were
21    discussing and being told that we were not allowed
22    to either go to the premiere, or if there was, what
23    that would look like separately.  We were trying to
24    navigate through all of that and all that led up to
25    that, and I did not know who to trust at this point.
```

CONFIDENTIAL

Page 84

```
 1      And I was concerned.
 2           Q    What was the point of recording the call?
 3           A    So I could listen, reflect back to it
 4      possibly.  A lot is said, and I wanted to have some
 5      sort of memory of it to document it.
 6           Q    Did you tell any of the participants in
 7      the call that you were recording them?
 8           A    I did not.
 9           Q    And why not?
10           A    I didn't consciously think of why not.  I
11      just didn't.
12           Q    Well, if you were just using it as a
13      record, couldn't you have said, I would like to
14      record this call to keep a record?
15                MS. SHAPIRO:  Objection.
16                THE WITNESS:  I could have.
17      BY MS. HUDSON:
18           Q    Were you intending to use the call
19      against the participants in some way?
20                MS. SHAPIRO:  Objection.
21                THE WITNESS:  No.
22      BY MS. HUDSON:
23           Q    Who, if anyone, did you share that call
24      with?
25           A    Other than my lawyers, I don't believe
```

CONFIDENTIAL

Page 88

1    Whose phone would you have borrowed for the

2    Stephanie Jones call?

3              MS. SHAPIRO:  Objection.

4              THE WITNESS:  I don't know.  I'm just --

5    I don't recall the actual mechanism of what I did at

6    that moment, but I could have borrowed someone's

7    phone so I can record it.

8    BY MS. HUDSON:

9         Q    I believe you said you listened to part

10   of the Stephanie Jones call.  Did you do that after

11   Ms. Lively filed her CRD complaint in California in

12   December of 2024?

13        A    I believe so.

14        Q    And did you send the call to your lawyers

15   before -- either this Jones call or any of the four

16   calls to your lawyers before you sued Ms. Lively?

17             MS. SHAPIRO:  Objection.

18             THE WITNESS:  I don't recall the time.

19   BY MS. HUDSON:

20        Q    Did you announce to any of the

21   participants in the call with Patrick Whitesell that

22   they were being recorded?

23        A    I did not.

24        Q    Why did you record that call?

25        A    I was incredibly worried of what I was

CONFIDENTIAL

Page 92

 1          A     Correct.
 2          Q     And you said Jen Abel and Dan Greenberg
 3     reside in Los Angeles.
 4                Do you have any reason to think they were
 5     anywhere other than Los Angeles for that call?
 6                MS. SHAPIRO:  Objection.
 7                THE WITNESS:  No.
 8     BY MS. HUDSON:
 9          Q     And with respect to the -- all of the
10     calls other than the one with Stephanie Jones, did
11     you -- did you -- what device did you use to record
12     those?
13                MS. SHAPIRO:  Objection.
14                THE WITNESS:  I was on the phone, so I
15     may have used my computer or iPad, whatever --
16     something of that nature that was there.  I don't
17     recall which.
18     BY MS. HUDSON:
19          Q     So you believe you used some device other
20     than your phone?
21          A     Yeah.  I was on my phone and I used, I
22     believe, my computer maybe.  But I don't know.  I
23     don't recall.
24          Q     Okay.  And did you -- did you tell any of
25     the participants in that call that you were

CONFIDENTIAL

Page 93

```
 1      recording them?
 2          A    I did not.
 3          Q    And Danny Greenberg is -- was Wayfarer's
 4      agent at the time?
 5          A    He's actually Justin's direct agent or
 6      was his agent.
 7          Q    So --
 8          A    He adjacently would help with Wayfarer
 9      and have calls, but he wasn't officially Wayfarer's
10      agent.
11          Q    So Danny Greenberg was Mr. Baldoni's
12      agent, and Jen Abel was Wayfarer's publicist,
13      correct?
14              MS. SHAPIRO:  Objection.
15              THE WITNESS:  Correct.  And she was --
16      and she's also Justin's publicist, was acting as
17      publicist on behalf of --
18      BY MS. HUDSON:
19          Q    And why did you recall -- why did you
20      record a call with them?
21          A    Danny was calling to read to us a letter
22      that we were told was written by Ryan Reynolds and
23      Blake Lively.  And they were going to articulate the
24      call to me, so I recorded it so I could have the
25      call the -- the letter documented.
```

CONFIDENTIAL

Page 100

1    just make sure this was, in fact --

2    BY MS. HUDSON:

3        Q    My question is:  Is this the employee

4    handbook?

5        A    It appears to be.

6        Q    Okay.  And you said previously that

7    you've reviewed the employee handbook, correct?

8            MS. SHAPIRO:  Objection.

9            THE WITNESS:  Yeah, I've reviewed this

10   before.

11   BY MS. HUDSON:

12       Q    Okay.  Let's take a look at -- I'm going

13   to direct your attention to the document

14   Bates-stamped 4947 at the bottom.

15       A    Okay.

16       Q    And this is -- at the top, it says:

17            (As read):

18                "Equal Employment Opportunity

19                Anti-Discrimination Anti-Harassment and

20                Anti-Retaliation Policy."

21            Do you see that?

22       A    I do.

23       Q    And it begins by saying that:

24            (As read):

25                "Wayfarer Studios provides equal

CONFIDENTIAL

Page 101

```
 1              employment opportunities to all
 2              employees."
 3         Do you see that?
 4    A    I do.
 5    Q    And it also provides that:
 6         (As read):
 7              "Wayfarer is committed to providing a
 8              workplace that is free of
 9              discrimination."
10         And then it provides a number of
11    different categories that are protected from
12    discrimination.
13         Do you see that?
14    A    I do.
15    Q    And those categories include sex.
16         Do you see that?
17    A    I do.
18    Q    And gender?
19    A    Yes.
20    Q    And also pregnancy and marital status?
21    A    I do.
22    Q    Okay.  And you understand those are
23    categories of characteristics that are protected
24    under Wayfarer's policy?
25    A    I see that.
```

CONFIDENTIAL

Page 102

1     Q    And you understand that, also?  That was
2     my question to you.
3          A    I you understand that as best as I can
4     not being a lawyer or an HR expert.
5          Q    Fair enough.  And if you go down a little
6     bit further on this page, there is an
7     anti-harassment policy.
8               Do you see that?
9          A    I do.
10         Q    And this policy says that:
11              (As read):
12                   "Sexual harassment and any form of
13                   harassment based on any protected
14                   category is prohibited."
15              Do you -- do you understand that?
16         A    I do.
17         Q    And you understand, also, that the policy
18    applies to all individuals involved in the operation
19    of the company?
20         A    I do.
21         Q    And anyone who comes in contact with the
22    company?
23              MS. SHAPIRO:  Objection.
24    BY MS. HUDSON:
25         Q    You understand that as well?

CONFIDENTIAL

Page 103

```
 1          A    Do you have a particular line that I can
 2     read --
 3          Q    Sure?
 4          A    -- that can refresh my understanding of
 5     it?
 6          Q    Sure.  The next line says that:
 7               (As read):
 8                    "Wayfarer Studios prohibits harassment,
 9                    disrespectful or unprofessional conduct
10                    by any employee of the company,
11                    including supervisors, managers, and
12                    coworkers."
13               And then it goes on to say that:
14               (As read):
15                    "The policy also applies to vendors,
16                    customers, independent contractors,
17                    unpaid interns, volunteers, persons
18                    providing services pursuant to
19                    contract, and any other persons who
20                    employees may come in contact with"?
21          A    I see that.
22          Q    Okay.  And you understood that as well?
23          A    To the best of my ability, yes.
24          Q    All right.  If you could -- I will direct
25     your attention to the next page that ends in 34948.
```

CONFIDENTIAL

Page 104

1          A     Uh-huh.

2          Q     The second paragraph discusses sexual

3     harassment specifically.

4                Do you see that?

5          A     I do.

6          Q     And it says:

7                (As read):

8                    "Sexual harassment is strictly

9                    prohibited."

10               Did you understand that to be Wayfarer's

11    policy?

12         A     Yes.

13         Q     And did you also understand that under

14    Wayfarers policy, sexual harassment includes

15    harassment that is not necessarily sexual in nature?

16         A     It gives examples, offensive remarks

17    about one's sex or gender.

18         Q     Right.  But you understood that sexual

19    harassment doesn't necessarily have to be sexual in

20    nature?

21         A     I understand that as long as we continue

22    the sentence, because where you're not pausing at a

23    comma or a period, so I believe that the whole

24    sentence needs to be included in order for me to

25    respond.

CONFIDENTIAL

Page 105

```
 1          Q    So you believe that the part of the
 2     sentence that says "sexual harassment does not
 3     necessarily have to be sexual in nature" is not a
 4     standalone sentence that you --
 5          A    No, No --
 6          Q    Yeah.
 7          A    -- I'm not trying to argue that.  I just
 8     don't want to make commen- -- give commentary on a
 9     portion rather than the whole thing.  That's all.
10          Q    Well, setting aside what -- do you -- do
11     you understand generally that sexual harassment does
12     not have to be sexual in nature?
13               MS. SHAPIRO:  Objection.
14               THE WITNESS:  To the best of my
15     understanding, I think that generalization is
16     probably correct, but I am no expert in this.
17     BY MS. HUDSON:
18          Q    Okay.  And it includes, like you said,
19     offensive remarks about one's sex or gender, right,
20     according to this policy?
21          A    It does.
22          Q    And it also includes:
23               (As read):
24                   "Verbal or physical conduct of a sexual
25                   nature when the submission of such
```

CONFIDENTIAL

Page 106

```
1                    conduct is either implicitly or
2                    explicitly a term or condition of
3                    employment, or the conduct has the
4                    purpose or the effect of substantially
5                    or unreasonably interfering with an
6                    individual's work performance by
7                    creating an intimidating, hostile or
8                    offensive work environment."
9          Do you see that part?
10    A     I see it.
11    Q     And you understand that the behavior is
12  not -- the conduct is prohibited even if it has the
13  effect of substantially or unreasonably interfering
14  with an individual's work performance?
15              MS. SHAPIRO:  Objection.
16              THE WITNESS:  I see what it says there.
17  BY MS. HUDSON:
18    Q     Okay.  And I just want to make sure you
19  understand, not just see, that conduct that has an
20  effect is prohibited under your policy as well, not
21  just conduct that has purpose?
22              MS. SHAPIRO:  Objection.
23              THE WITNESS:  I see what it says there.
24  BY MS. HUDSON:
25    Q     And you understand that?
```

CONFIDENTIAL

Page 107

```
 1          A    I understand the general understanding of
 2     it, yes.
 3          Q    And -- okay.  You -- and what -- what is
 4     it that you understand that to mean?
 5          A    I understand that -- yes, any sort -- any
 6     things in this nature are prohibited.
 7          Q    And do you understand that it's
 8     prohibited even if it has the effect of causing
 9     these things?  That creating an -- an -- interfering
10     with an individual's work performance, creating an
11     intimidating, hostile or offensive work environment,
12     even if that's not the purpose of the conduct?
13               MS. SHAPIRO:  Objection.
14               THE WITNESS:  I understand what that
15     states there, yes.
16     BY MS. HUDSON:
17          Q    And you -- okay.  And then if you go on
18     to the next paragraph --
19          A    Yes.
20          Q    -- it says that:
21               (As read):
22                    "Sexual harassment may include a range
23                    of subtle and not-so-subtle behaviors."
24               Do you understand that?
25          A    I understand it.
```

CONFIDENTIAL

Page 108

1          Q     And that these -- that the:

2                (As read):

3                     "Depending on the circumstances, the

4                     behaviors can include sexual jokes and

5                     innuendo."

6                Right?

7          A     I can see that there.

8          Q     You can see that and do you -- do you

9     understand that?  That sexual harassment can include

10    sexual jokes and innuendo?

11         A     I understand that it's there, yes.

12         Q     Well, I under- -- I'm not asking you if

13    you can read it.  I'm asking if you understand it?

14         A     Sure.  I understand that it's there.  I

15    do.

16         Q     I -- I'm not asking you if you understand

17    it's there.

18                MS. SHAPIRO:  Objection.

19    BY MS. HUDSON:

20         Q     I'm understanding [sic] --

21         A     I'm sorry.

22         Q     -- if you understand the language that's

23    being used here?

24                MS. SHAPIRO:  Objection.

25                THE WITNESS:  My answer is, I understand

CONFIDENTIAL

Page 109

```
 1     that it's there.  That's all I can give you.
 2     BY MS. HUDSON:
 3          Q    That's all you can do?  So you can't say
 4     whether you understand that sexual jokes and
 5     innuendo can be sexual harassment?
 6               MS. SHAPIRO:  Objection.
 7     BY MS. HUDSON:
 8          Q    According to your policy?
 9               MS. SHAPIRO:  Objection.
10               THE WITNESS:  I understand that it says
11     that there, yes.
12     BY MS. HUDSON:
13          Q    Do you understand what those words mean?
14          A    I do.
15          Q    Okay.  And it also says that sexual
16     harassment may include "verbal abuse of a sexual
17     nature."
18               Do you understand that?
19          A    I do.
20          Q    And that it also may include "commentary
21     about an individual's body or sexual prowess."
22               Do you understand that those things can
23     also be sexual harassment?
24               MS. SHAPIRO:  Objection.
25               THE WITNESS:  I understand that that is
```

CONFIDENTIAL

Page 110

1    written here and says that.  Yes, I do.
2    BY MS. HUDSON:
3        Q    And you understand that's Wayfarer's
4    policy, that those things constitute sexual
5    harassment?
6            MS. SHAPIRO:  Objection.
7            THE WITNESS:  No, I don't agree with --
8    I'm not going to agree with the last statement, that
9    those things constitute sexual harassment.  I'm not
10   an expert on this.
11   BY MS. HUDSON:
12       Q    Well, you agree that Wayfarer's policy
13   says that those are among the range of behaviors
14   that may -- may be sexually harassing?
15       A    Yeah.  That's a different
16   characterization.  "May" versus "are" are very
17   different for me.  So that's a distinction that was
18   important.
19       Q    And you understand, though, that things
20   like commenting on an individual's body may be
21   sexual harassment under your policy?
22       A    I'm going to -- I'm going to say that I
23   understand what it says here and I can follow.  Do I
24   understand it to the level that my attorney or my HR
25   person does, I don't.

CONFIDENTIAL

Page 111

```
 1          Q    Well, I didn't ask you that.
 2               MS. SHAPIRO:  Objection.
 3     BY MS. HUDSON:
 4          Q    I'm just asking you for your
 5     understanding.
 6          A    I think I've testified to it.
 7          Q    Okay.  Well, do you also understand that
 8     your policy provides that touching in certain
 9     circumstances may also constitute sexual harassment?
10          A    "May," I think, again, this is -- I'm not
11     trying to be combative with you.  You are a lawyer
12     and you are really brilliant, and I've seen your
13     work.  And I'm not.  So I want to be careful that
14     what I'm testifying to is accurate and not -- so I
15     see that, but I also think the context when you say
16     "touching," I think that depends on what kind of
17     touching, certainly.
18          Q    Well, this -- I'm not going to argue with
19     you.  I'm just trying to understand if you
20     understand what Wayfarer's policy says?
21          A    I understand what Wayfarer's policy says,
22     yes.
23          Q    And you understand that it identifies
24     certain types of behavior that can be sexually
25     harassing, right?
```

CONFIDENTIAL

Page 112

```
 1          A    I see that.
 2          Q    And the behaviors that I'm reading to you
 3     are the ones that are included in Wayfarer's policy.
 4          Do you understand that?
 5          A    I see it.  I see that.
 6          Q    You see it, but do you understand it?
 7          A    I understand that.
 8          Q    Okay.  And it also includes:
 9          (As read):
10              "Physical, verbal or visual conduct of
11               a sexual nature."
12          That can include -- that can be sexually
13     harassing as well under Wayfarer's policy, right?
14              MS. SHAPIRO:  Objection.
15              THE WITNESS:  Sure.
16     BY MS. HUDSON:
17          Q    Okay.  And then I would like you to move
18     down a little -- on the page a little bit to the
19     section that focuses on supervisor and manager
20     responsibilities.
21          Do you see that?
22          A    I do.  I see it.
23          Q    It says:
24          (As read):
25              "If any supervisor or manager becomes
```

CONFIDENTIAL

Page 113

1           aware of a violation of this policy,
2           they are obligated to report the
3           violation to human resources or
4           management so Wayfarer Studios can
5           investigate and, if appropriate, take
6           corrective action."
7      Do you see that?
8      A    I do.
9      Q    And did you understand in your management
10  role, you had an obligation to report to human
11  resources any time you became aware of conduct that
12  fell within this policy?
13          MS. SHAPIRO:  Objection.
14          THE WITNESS:  If I became aware of
15  conduct that fell within this policy, I see that I
16  am obligated to report that.
17  BY MS. HUDSON:
18      Q    Okay.
19      A    If I became aware of it.
20      Q    And you understand that before this
21  moment?
22      A    Yes.
23      Q    Okay.  And have you always understood
24  that's your obligation?
25          MS. SHAPIRO:  Objection.

CONFIDENTIAL

Page 114

```
 1              THE WITNESS:  Yes.
 2     BY MS. HUDSON:
 3          Q    Let's take a look at the next page ending
 4     in 3949.
 5          A    Okay.
 6          Q    There's a section on Investigation.  Do
 7     you see that?
 8          A    I do.
 9          Q    And it says:
10              (As read):
11                   "Any reported allegations of
12                   harassment, discrimination or
13                   retaliation will be promptly and
14                   thoroughly investigated by qualified
15                   personnel in an impartial manner.
16                   Wayfarer Studios will ensure that these
17                   personnel will use the evidence to
18                   reach reasonable conclusions.  The
19                   investigation may include individual
20                   interviews of parties involved, and
21                   Wayfarer Studios will maintain
22                   appropriate documentation and tracking
23                   to ensure reasonable progress is made."
24              Did you understand that that was
25     Wayfarer's policies -- policy regarding
```

CONFIDENTIAL

Page 115

1    investigations?

2          A    I do.

3          Q    Okay.  And it also says at the end:

4               (As read):

5                    "If misconduct is found, Wayfarer

6                    Studios shall take prompt, corrective

7                    action, as appropriate.  Corrective

8                    action might include termination from

9                    employment."

10              Did you understand that to be Wayfarer's

11   policy with respect to investigation?

12         A    I do.

13         Q    Okay.  You understand it now, and you've

14   always understood that, right?

15              MS. SHAPIRO:  Objection.

16   BY MS. HUDSON:

17         Q    Is that right?

18         A    Correct.

19         Q    And you've actually been involved with

20   investigations of workplace matters in your role at

21   Wayfarer, correct?

22              MS. SHAPIRO:  Objection.

23              THE WITNESS:  I believe so.

24   BY MS. HUDSON:

25         Q    Yes.  Wayfarer also has an

CONFIDENTIAL

Page 116

```
 1        anti-retaliation policy, correct?
 2             A     It does.
 3             Q     And it says if there are:
 4                   (As read):
 5                        "Retaliation against an individual for
 6                        reporting harassment or discrimination
 7                        in good faith or for participating in
 8                        an investigation of a claim of
 9                        harassment or discrimination is a
10                        serious violation of the policy and can
11                        also subject one to disciplinary action
12                        including termination."
13                   Right?
14             A     Uh-huh.
15             Q     Yes?
16             A     Yes, I see that.
17             Q     Okay.  All right.
18                   Did Wayfarer -- was there a separate
19        human resources department on the movie
20        It Ends with Us?
21             A     A separate human resources?
22             Q     Yes.
23             A     No.  Typically, movies don't have a
24        separate human resources department.
25             Q     That's your understanding?
```

CONFIDENTIAL

Page 118

```
 1                with Sony taking the lead on all
 2                workplace hotline/email type things if
 3                Sony is allowed to.  He gets it all and
 4                agrees.  Andrea is also aware."
 5                Who is Alex Saks?
 6        A    She was our lead producer on
 7   It Ends with Us.
 8        Q    Okay.  And do you know what conversation
 9   she's referencing here?
10        A    I don't -- I don't know this
11   conversation, no.  I mean --
12        Q    Did you have a conversation with Ms. Saks
13   about Sony taking the lead on workplace hotlines and
14   emails for the production of It Ends with Us?
15        A    We may have.  I don't recall it.
16        Q    You don't recall it?
17        A    No.
18        Q    Okay.  And do you understand why Ms. Saks
19   thought it might be a good idea for Sony to take the
20   lead?
21                MS. SHAPIRO:  Objection.
22                THE WITNESS:  I don't remember this
23   conversation.  This looks like this was in March.
24   So before production, so I think she's just -- as we
25   are setting up production on the ground, this looks
```

CONFIDENTIAL

Page 121

1          Q      Okay.  And you think it's reasonable for

2      her to have made that suggestion?

3          A      Sure.

4          Q      And do you understand her concern about

5      Justin -- making -- strike that.

6               Do you understand that she was making the

7      suggestion that Sony handle the training and have a

8      workplace email and hotline because of Justin's role

9      at Wayfarer?

10         A      Do I understand that that is what she was

11     articulating?

12         Q      Yes.

13         A      I can see that's articulated here, yes.

14         Q      And do you understand why Justin's role

15     at Wayfarer would have an impact on her view?

16               MS. SHAPIRO:  Objection.

17               THE WITNESS:  I can't speak to if it

18     impacted her view or not other than she's making a

19     suggestion, she's bringing it to be aware -- for us

20     to be made aware of, and that's what I see.

21     BY MS. HUDSON:

22         Q      So Mr. Baldoni on this production, he was

23     the director, correct?

24         A      He was.

25         Q      He was the lead actor?

CONFIDENTIAL

Page 122

```
 1          A    He was.
 2          Q    He was the chair?
 3               MS. SHAPIRO:  Objection.
 4     BY MS. HUDSON:
 5          Q    Correct?  Of Wayfarer?
 6          A    He was.
 7          Q    He was also your best friend, right?
 8     Correct?
 9          A    One of my dear, best friends, yes.
10          Q    Yes.  So you can -- do you think it's the
11     case that Ms. Saks was suggesting this because
12     Mr. Baldoni held a number of senior positions within
13     this production and it may be difficult for Wayfarer
14     to not be conflicted in its handling of HR matters?
15               MS. SHAPIRO:  Objection.
16               THE WITNESS:  Okay.  You just -- I'm so
17     sorry.  You just articulated a whole narrative that
18     I don't read in here, so I don't -- I don't read
19     that.
20     BY MS. HUDSON:
21          Q    What do you read?  What do you think
22     she -- she means here?
23          A    She's bringing up something for us to
24     consider, Justin's role at Wayfarer.
25          Q    Well, what do you think she means by
```

CONFIDENTIAL

Page 125

```
 1              THE VIDEOGRAPHER:  We're back on the
 2      record.  The time is 11:57 a.m.
 3      BY MS. HUDSON:
 4          Q    Mr. Heath, you said that you had been
 5      involved in some employee investigations before,
 6      correct?
 7              MS. SHAPIRO:  Objection.
 8              THE WITNESS:  I said I believe I have.
 9      BY MS. HUDSON:
10          Q    And you were involved on investigations
11      on the set that had to do with --
12          A    Oh, on the set?
13          Q    Let me finish my question.
14              You were also -- you were involved
15      specifically in investigations having to do with
16      It Ends with Us, correct?
17          A    There was one.
18          Q    There was one.
19              MS. HUDSON:  I'm going to hand you what
20      we've marked as Exhibit 4.
21          (Exhibit 4 marked for identification.)
22              MS. CLIMACO:  Did you get one, Alexandra?
23      BY MS. HUDSON:
24          Q    Exhibit 4 is a -- an email from --
25      between Jamey Heath and several other participants,
```

CONFIDENTIAL

Page 126

1      dated April, 27, 2023, Bates-stamped HEATH_48499.
2              At the bottom part of this email,
3      Mr. Heath, there's a discussion about a complaint by
4      someone at Local 52.
5              Do you see that?
6          A    I do.
7          Q    Do you recognize this email?
8          A    I don't recall the specific email, but I
9      remember the -- the subject.
10         Q    But you received this, correct, this
11     email, and participated in this email chain?
12         A    I did.
13         Q    And it said that there was a call from
14     someone at Local 52 that needs the HR department
15     information immediately regarding a complaint,
16     correct?
17         A    Correct.
18         Q    And then you respond, in response to a
19     question, who handles HR at Wayfarer, you respond,
20     correct?
21         A    I see that.
22         Q    And your response is:
23              (As read):
24              "We do have HR at Wayfarer.  However,
25              we may want to have an outside agency

CONFIDENTIAL

Page 127

```
 1              for the show."
 2         Why did you say that?
 3    A    I don't have a recollection of why I said
 4    this at that time.
 5         Q    Looking at this now, do you have any
 6    understanding of why you might want to have an
 7    outside agency for that show?
 8              MS. SHAPIRO:  Objection.
 9              THE WITNESS:  I would only be guessing.
10    BY MS. HUDSON:
11         Q    And what -- if you were guessing, what
12    would you say?
13              MS. SHAPIRO:  Objection.
14              THE WITNESS:  That I would only be
15    guessing.
16    BY MS. HUDSON:
17         Q    So you don't know why Ms. Saks suggested
18    having an outside entity provide HR services, and
19    you don't know why you suggested that either; is
20    that right?
21              MS. SHAPIRO:  Objection.
22              THE WITNESS:  At this time, there was a
23    constant flow of suggestions, as we were still
24    building the foundation for many things, so I don't
25    know -- I don't know what my exact thought was at
```

CONFIDENTIAL

Page 128

```
1     this time other than responding to the email.
2     BY MS. HUDSON:
3          Q    And you didn't -- you didn't think that,
4     like, Ms. Saks thought that the fact that Justin was
5     having so many roles in leadership might create a
6     problem for dealing with HR issues?
7               MS. SHAPIRO:  Objection.
8               THE WITNESS:  No, I did not think that.
9     BY MS. HUDSON:
10         Q    You didn't think that.  And you have no
11    idea why you might have suggested an outside agency;
12    is that right?
13              MS. SHAPIRO:  Objection.
14              THE WITNESS:  This is over two years ago.
15    I do not recall my feeling at the time.
16    BY MS. HUDSON:
17         Q    And you never did have any outside HR
18    agency provide support for It Ends with Us, correct?
19         A    We did not have an HR representative
20    specifically for the movie, as what was determined
21    was specifically Indies and most other shows don't
22    have an HR outside of the production company that
23    provides it.
24         Q    Just to make sure I understand what
25    you're referring to the bottom
```

CONFIDENTIAL

Page 129

```
 1      of this email where Andrea Ajemian says:
 2                  (As read):
 3                      "Normally on Indies there are no HR
 4                      departments, so who should I send?"
 5              MS. SHAPIRO:  Objection.
 6              THE WITNESS:  I see that she says that
 7      here.  But I'm also saying that any movie that I've
 8      been involved in, and anyone that I know that -- any
 9      other producers have told me they've been involved
10      in or our studio, there is not an HR presence.
11      BY MS. HUDSON:
12          Q    There's no HR presence on movies?
13          A    Outside of the production company.
14          Q    So you -- when you say "outside the
15      production company," you mean outside of Wayfarer?
16              MS. SHAPIRO:  Objection.
17              THE WITNESS:  Outside of whatever
18      production company or the studio that is running the
19      movie.
20      BY MS. HUDSON:
21          Q    So the studio that was running the movie
22      here is Wayfarer, right?
23          A    Correct.
24          Q    Okay.  And are you saying that it's your
25      view that Wayfarer HR was responsible for this
```

CONFIDENTIAL

Page 130

1    production?

2              MS. SHAPIRO:  Objection.

3              THE WITNESS:  I'm not saying that.  I'm

4    saying that Wayfarer has HR, and movies don't

5    typically have an HR person on set.

6    BY MS. HUDSON:

7         Q    So what is your understanding of who was

8    responsible for human resources matters for the

9    movie It Ends with Us?

10        A    My understanding is I deferred to Alex

11   Saks, ultimately, and Jill Sacco, who was our

12   production supervisor, as well as Andrea, who was

13   our line producer, that if there was -- concerns

14   would go to them if there were any brought up.  They

15   would then learn what the next step was should it

16   need to go to another step.  And in this case, they

17   had asked for Wayfarer's HR or they wanted to know

18   who, and that's -- we just followed what their

19   suggestions were at that time.

20        Q    So you deferred the notion of human

21   resources issues to Alex Saks, Jill Sacco, and

22   Andrea Ajemian?

23        A    For the movie itself?

24        Q    Uh-huh.

25        A    They were ones that were more experienced

CONFIDENTIAL

Page 131

```
 1     with how policies or -- or what the procedure would
 2     be -- excuse me -- not policies, but the procedure
 3     would be for anything as it pertains to the movie.
 4          Q     And were Alex Saks, Jill Sacco, or Andrea
 5     Ajemian employees of Wayfarer Studios?
 6          A     They were employees of It Ends With Us.
 7          Q     They were not Wayfarer employees, right?
 8          A     They were not.
 9          Q     But you were?
10          A     Yes.
11          Q     And was there any other information given
12     to anybody who worked on It Ends with Us that if
13     they had a human resources concern, they should go
14     to Alex Saks, Jill Sacco or Andrea Ajemian?
15               MS. SHAPIRO:  Objection.
16               THE WITNESS:  From my understanding, the
17     normal protocol that happens at all movies, happened
18     on It Ends with Us.
19               MS. HUDSON:  We'll move to strike as
20     nonresponsive.
21               THE WITNESS:  Okay.
22     BY MS. HUDSON:
23          Q     Can you answer the question I asked?
24          A     I'm happy to.  I thought I did.
25          Q     You did not.
```

CONFIDENTIAL

Page 132

```
 1            MS. SHAPIRO:  Objection.
 2            THE WITNESS:  Okay.  Give it to me again.
 3     BY MS. HUDSON:
 4        Q    My question was -- I'm going to read it
 5     exactly how I asked it.
 6        A    All right.
 7        Q    Was there any information given to
 8     anybody who worked on It Ends with Us that if they
 9     had a human resources concern, they should go to
10     Alex Saks, Jill Sacco, or Andrea Ajemian?
11            MS. SHAPIRO:  Objection.
12            THE WITNESS:  I don't know if there was a
13     specific email that said that.
14     BY MS. HUDSON:
15        Q    Or a -- not -- any information?
16            MS. SHAPIRO:  Objection.
17     BY MS. HUDSON:
18        Q    Verbal, email, text message?
19        A    I don't know.
20            MS. SHAPIRO:  Objection.
21     BY MS. HUDSON:
22        Q    You've never seen anything like that,
23     correct?
24            MS. SHAPIRO:  Objection.
25            THE WITNESS:  I don't recall.
```

CONFIDENTIAL

Page 133

1      BY MS. HUDSON:

2          Q    You can't recall ever seeing something

3      like that, correct?

4              MS. SHAPIRO:   Objection.

5              THE WITNESS:   I don't have a memory of

6      it.

7      BY MS. HUDSON:

8          Q    As the CEO of Wayfarer, did you do

9      anything to ensure that cast and crew on

10     It Ends with Us knew who to raise concerns to if

11     they had any?

12         A    That would not fall under the job

13     description of the CEO.

14         Q    I thought you said it was the CEO's job

15     to make sure that it was a safe workplace?

16         A    Correct, for Wayfarer.

17         Q    You didn't -- you didn't consider your

18     job to make sure that the set was a safe workplace?

19         A    No, that's not what I said.

20         Q    Okay.

21         A    Wayfarer Studios, in our operations, but

22     It Ends with Us is its own small business.  And the

23     people that were running that business, essentially,

24     me included for sure, were responsible for how the

25     procedures went about on there.  I deferred to those

CONFIDENTIAL

Page 134

 1     who were used to running those small businesses on
 2     the ground.
 3          Q     Who ran It Ends with Us Movie LLC?
 4          A     That would have been a combination of
 5     Wayfarer and Sony.
 6          Q     Wayfarer and Sony?
 7          A     I believe so.
 8          Q     Sony had a leadership role in
 9     It Ends with Us LLC?
10          A     Your question was who ran it.  I believe
11     the LLC was run -- and I could be wrong on this so I
12     can confirm this -- but was the both parties in
13     that.
14          Q     Well, you're the CEO of Wayfarer?
15          A     Correct.
16          Q     Do you understand that It Ends with Us
17     LLC is a wholly owned subsidiary of Wayfarer?
18          A     It may be.  I don't have specific memory
19     of it at the moment.
20          Q     So you don't know who owns
21     It Ends with Us LLC -- It Ends with Us Movie LLC?
22          A     I know that Wayfarer is party to it.  I
23     don't know if Sony is as well.
24          Q     So you think Sony might have an ownership
25     interest in It Ends With Us Movie LLC?

CONFIDENTIAL

Page 135

```
 1          A     They may.  I don't know.
 2          Q     Okay.  You remember when we looked at the
 3     employee handbook, it says that those policies apply
 4     to everyone who interacts with employees of
 5     Wayfarer, right?
 6          A     Understood.
 7                MS. SHAPIRO:  Objection.
 8     BY MS. HUDSON:
 9          Q     Okay.  So you understood the policies
10     also applied to people on the set, right?
11                MS. SHAPIRO:  Objection.
12                THE WITNESS:  Sure.
13     BY MS. HUDSON:
14          Q     So going back to who ran the set -- or
15     who ran It Ends with Us Movie LLC, you're saying
16     you, as CEO of Wayfarer, you did not consider it
17     your role as you might -- strike that.
18                I believe you said you had a leadership
19     role with It Ends with Us LLC also?
20                MS. SHAPIRO:  Objection.
21                THE WITNESS:  No.  I mean, I have a
22     leadership role in the movie --
23     BY MS. HUDSON:
24          Q     In the movie?
25          A     -- the actual production.
```

CONFIDENTIAL

Page 136

1          Q     Okay.  And would you -- you would

2     consider yourself a supervisor or management for

3     the -- for the purposes of the production --

4               MS. SHAPIRO:  Objection.

5     BY MS. HUDSON:

6          Q     -- correct?

7               MS. SHAPIRO:  Objection.

8               THE WITNESS:  For particular roles.

9     BY MS. HUDSON:

10         Q     For particular roles.  Which roles are

11    that?

12         A     Financial.  Some creative.  And assisting

13    with department heads when they might need

14    something.

15         Q     And it sounds similar to your duties as

16    CEO, except you left out making sure that there is a

17    safe workplace.  Is that not part of what your --

18    you saw your role as a producer of It Ends with Us

19    and the CEO of Wayfarer?

20              MS. SHAPIRO:  Objection.

21              THE WITNESS:  As a producer on the set,

22    there were different hats that we all wore at

23    different times.  So sure.  I'm making the

24    distinction for CEO.  Because practically speaking,

25    I will just give you an example.  Let's take a Tom

CONFIDENTIAL

Page 137

1    Rothman, who's the CEO of Sony, who's got 50 movies

2    happening maybe at one time.  Each movie has its own

3    production and they are the ones implementing and

4    determining who is running what.  He's not

5    necessarily aware of every production and who is

6    doing what.

7    BY MS. HUDSON:

8        Q    But Tom Rothman isn't a producer on all

9    of those movies.

10        A    Fair enough.  That's why --

11        Q    You were.

12        A    -- I'm saying as a producer, but you're

13    referring to me as a CEO so I'm just making a

14    distinction between the CEO of Wayfarer and me as

15    producer.  That's all.

16        Q    I think my question referred to you as

17    the producer and the CEO of Wayfarer.

18        A    Okay.

19        Q    And in those capacities, you saw -- are

20    you saying you did not see part of your job duties

21    as ensuring the safe was set --

22        A    Sure.

23        Q    -- the set was safe?

24        A    Sure.

25        MS. SHAPIRO:  Objection.

CONFIDENTIAL

Page 138

```
 1              THE WITNESS:  Absolutely.
 2    BY MS. HUDSON:
 3         Q    Okay.  All right.  But just to go back
 4    to -- I want to make sure I understand.  It's your
 5    understanding that Indie movies just have no HR; is
 6    that right?
 7              MS. SHAPIRO:  Objection.
 8              THE WITNESS:  That they don't have HR
 9    departments, that they don't have a representative
10    on set specifically that's HR.
11    BY MS. HUDSON:
12         Q    That they don't have any human resources
13    representatives?
14              MS. SHAPIRO:  Objection.
15              THE WITNESS:  That typically there are --
16    the understanding is that you would go to one of
17    your supervisors, production supervisor, or the line
18    producer, or the AD.  Also on call sheets, there are
19    numbers of hotlines, and also there are -- you have
20    your unions such as SAG and -- and so on.
21    BY MS. HUDSON:
22         Q    Do you know whether there was a hotline
23    provided to anybody who worked on It Ends with Us to
24    call regarding human resources matters?
25         A    I believe there was a hotline on all the
```

CONFIDENTIAL

Page 139

```
 1     call sheets that went out regarding if there was
 2     concerns of any matters that there was a line.
 3          Q    If there was a hotline, who answered
 4     that?
 5          A    I don't know.
 6          Q    You don't know who answered the hotline?
 7          A    I do not.
 8          Q    Did Wayfarer pay for someone to answer
 9     the hotline?
10          A    Wayfarer didn't, but It Ends with Us
11     would have.
12          Q    It Ends with Us would have.  Were you
13     responsible at all for any of the financial
14     management of It Ends with Us?
15          A    On a top level.
16          Q    At a top level.  Okay.  Do you have any
17     recollection of ever authorizing or paying someone
18     to man a hotline for the movie It Ends with Us?
19          A    No, I would have not seen that
20     specifically.
21          Q    You would not.  And sitting here today,
22     you don't know if that had actually happened, right?
23          A    No, I do know there was a hotline.
24          Q    There was a hotline?
25          A    There was.
```

CONFIDENTIAL

Page 140

```
 1          Q     So was there a contract with an outside
 2     agency to provide a hotline for It Ends with Us?
 3          A     I do not know.
 4          Q     You don't know?
 5          A     I was not in charge of that.
 6          Q     So we haven't seen any evidence of a
 7     hotline in this case.  If you have a hotline, would
 8     you provide that to your lawyer so they can produce
 9     it to us?
10               MS. SHAPIRO:  Objection.
11               THE WITNESS:  There -- there was some
12     number.  I'm not sure if it's called a hotline.  But
13     there is some number that was afforded to people to
14     call in case there was safety concerns.
15     BY MS. HUDSON:
16          Q     Okay.  Safety concerns or human resources
17     concerns?
18          A     I don't have the language in front of me.
19     I don't know.
20          Q     Okay.  All right.  And, again, do you
21     recall ever seeing anything in which employees were
22     told there is a human resources hotline that you can
23     call if you have any concerns about the types of
24     things we talked about earlier, harassment,
25     discrimination or retaliation?
```

CONFIDENTIAL

Page 141

```
 1              MS. SHAPIRO:  Objection.
 2              THE WITNESS:  I don't know if there was
 3     that particular language or not.
 4     BY MS. HUDSON:
 5         Q    You understand there might be a
 6     distinction between physical workplace safety and
 7     human resources --
 8              MS. SHAPIRO:  Objection.
 9     BY MS. HUDSON:
10         Q    -- issues?
11              MS. SHAPIRO:  Objection.
12              THE WITNESS:  I understand that.
13     BY MS. HUDSON:
14         Q    Okay.  And you wouldn't expect employees,
15     if they were given a hotline to call for physical
16     safety issues like someone being injured on the set,
17     that that would -- that they would automatically
18     understand that that's the number they should call
19     for harassment, discrimination or retaliation
20     issues, right?
21              MS. SHAPIRO:  Objection.
22              THE WITNESS:  Understand that basic
23     premise, yes.
24     BY MS. HUDSON:
25         Q    Okay.
```

CONFIDENTIAL

Page 148

```
 1      '24, after there was chatter online about
 2      It Ends with Us, and she was concerned that that
 3      chatter might have an impact on her movie, and she
 4      didn't want to associate with it.
 5      BY MS. HUDSON:
 6           Q     Did she also ask that Mr. Baldoni not
 7      come to the set of Empire Waist?
 8           A     Never once.
 9           Q     So that is not true?  That's just a lie
10      that Ms. Ayoub was telling us?
11           A     That is something the first time we ever
12      heard --
13           Q     Uh-huh.
14           A     -- expressed.  I don't know the date, but
15      years later.
16           Q     When you say years later?
17                 MS. SHAPIRO:  Objection.
18                 THE WITNESS:  Within the last six months,
19      year, something.  She -- she said something to Ashmi
20      in the marketing -- no, this would have been in
21      September of '24.  She said something that she
22      didn't want Justin to -- to post something, I
23      believe it was.
24      BY MS. HUDSON:
25           Q     Are you referencing the text message that
```

CONFIDENTIAL

Page 149

1    Mr. Baldoni testified about yesterday?

2         A    I don't know what text message that was.

3         Q    Okay.

4         A    So she had conveyed to Ashmi that she

5    didn't want him to promote the movie based on what

6    was going on.  And in that, she also expressed,

7    which I heard for the first time or anyone had heard

8    for the first time, where she said something, he was

9    banned from set.  But I'm sure if you do more

10   investigation, you will see that there is nothing

11   that leads for you to believe that.  I'm helping you

12   with that one.

13        Q    Okay.  There was also some testimony by

14   Mr. Baldoni about -- and also Mr. Sarowitz about

15   Shane Norman.

16             Do you recall that?

17        A    I do.

18        Q    Mr. Baldoni and Mr. Sarowitz claimed that

19   Mr. Norman -- there were multiple complaints from

20   multiple women about his behavior towards them.

21             Do you recall that?

22        A    I do.

23        Q    And that there was an investigation

24   conducted; is that right?

25        A    There was.

CONFIDENTIAL

Page 154

1          A      Okay.

2          Q      -- is this the agreement between Sony and

3      Wayfarer for It Ends with Us LLC?

4          A      Well, I don't see a signature on it,

5      so...

6          Q      So if you turn to the page that's

7      Bates-stamped SPE_BL0000049.

8          A      Ending in 49?

9          Q      Ending in 49, you will see signatures.

10         A      Okay.  Okay.  I see it now.

11         Q      And do you recognize what the signature

12     under Wayfarer Studios LLC as yours?

13         A      I do.

14         Q      And do you also see the signature under

15     It Ends with Us Movie LLC as yours?

16         A      I do.

17         Q      And you see this document identifies you

18     as the president of both of these entities?

19         A      I see it.

20         Q      And were you, in fact, the president of

21     It Ends with Us Movie LLC?

22         A      Apparently so.

23         Q      Okay.  And do you recognize that -- can

24     you -- is this the agreement between Wayfarer and

25     Sony for It Ends with Us LLC?

CONFIDENTIAL

Page 156

1        A    Okay.

2        Q    And we can come back to that later.

3        A    Sure.

4        Q    Okay?

5        A    Are we done with -- here you go.

6        Q    Now, at some point, you all began casting

7    for It Ends with Us, correct?

8        A    Yes.

9        Q    And a key theme for the movie

10   It Ends with Us is female empowerment, right?

11            MS. SHAPIRO:  Objection.

12            THE WITNESS:  Yes.

13   BY MS. HUDSON:

14       Q    And did you think that you would need a

15   strong actress to play the role of Lily Bloom?

16            MS. SHAPIRO:  Objection.

17            THE WITNESS:  Yes.

18   BY MS. HUDSON:

19       Q    And were Sony and Wayfarer hoping to land

20   an A-list actress?

21            MS. SHAPIRO:  Objection.

22            THE WITNESS:  I think it's more nuanced

23   than that, but eventually, we came to the

24   understanding that that was what we were seeking.

25

CONFIDENTIAL

Page 160

```
 1      been high maintenance at that time?
 2              MS. SHAPIRO:  Objection.
 3              THE WITNESS:  No, because the truth is,
 4      many people are high maintenance.  Many people say
 5      things about other people.  And so it wasn't a cause
 6      for concern.  But being that you asked me had I
 7      heard anything else, that's what I had heard.  That
 8      was the extent of it at that time.
 9      BY MS. HUDSON:
10          Q    Okay.
11              MS. HUDSON:  I'll hand you what's been
12      marked as Exhibit 6.
13          (Exhibit 6 marked for identification.)
14              THE WITNESS:  Sure.
15      BY MS. HUDSON:
16          Q    It's a text chain between Jamey Heath,
17      Justin Baldoni, dated December 9th, 2022,
18      Bates-stamped BALDONI_18877.
19              Do you recognize this as a text chain
20      that you and Mr. Baldoni participated in?
21          A    If you allow me to read it, I can confirm
22      that.
23          Q    I'm going to direct you to, you know,
24      specific areas for questions.  I'm just asking --
25          A    I understand.
```

CONFIDENTIAL

Page 161

```
 1         Q    Yeah.
 2         A    I can give you an advance.  I'm not able
 3    to comment on something unless I understand full
 4    context.  So I have to read it from -- I have to.
 5    Just for anything that you give me, I'm going to
 6    certainly read it.
 7         Q    Are you telling me that every document
 8    that I give you, you need to read the entire thing
 9    before I can ask you any questions about it?
10         A    No --
11              MS. SHAPIRO:  Objection.
12              THE WITNESS:  No, but if you're giving me
13    something of this nature, my intention is I need to
14    understand the context.  That's all.
15    BY MS. HUDSON:
16         Q    I don't -- right now, I'm only asking you
17    if you recognize it as a text chain between you and
18    Mr. Baldoni?
19         A    It appears to be, yes.
20         Q    Okay.  So --
21         A    Can I read it?
22         Q    You -- you can take a moment to read it,
23    but I don't think you need to read the whole thing
24    for the questions I'm going to ask.
25         A    Okay.  How about -- how about we do this.
```

CONFIDENTIAL

Page 163

```
 1            MS. SHAPIRO:  Objection.
 2      BY MS. HUDSON:
 3            Q    Okay.  You want to read the whole
 4      document before you --
 5            A    I want to read --
 6            Q    -- hear my question?
 7            A    -- what -- yes.  Because you're now
 8      ask -- you're reading things to me.  I can read for
 9      myself at this point, if that's okay.
10            Q    Go ahead.
11            A    Thank you.
12                 Okay.  Thank you.
13            Q    You done?
14            A    I am.
15            Q    So I'm going to go back to what I just
16      read to you.
17            A    Okay.
18            Q    Which was:
19                 (As read):
20                     "If we get Blake on this movie, holy
21                     shit.  You would be directing and
22                     starring in a movie with one of the
23                     biggest female stars."
24                 Is that an accurate reflection of how you
25      felt at the time you sent this text message?
```

CONFIDENTIAL

Page 164

1          A    Absolutely.

2          Q    All right.  And then if you go down to

3     the next thing you write here, you say:

4               (As read):

5                    "My son's girlfriend was over last

6                    night and she heard me talking about

7                    Blake and she said, 'OMG, I love her so

8                    much."  She's a black 20 year old."

9               Was this an accurate statement when you

10    wrote it?

11         A    It was.

12         Q    Okay.  And then Mr. Baldoni responded:

13              (As read):

14                   "Everyone loves her.  It's pretty

15                   wild."

16              Do you see that?

17              MS. SHAPIRO:  Objection.

18    BY MS. HUDSON:

19         Q    Well, he says "it's pretty wind."

20         A    Yeah.

21         Q    And then corrects it, and says "wild."

22         A    I see that.

23         Q    So and -- and you understood that it was

24    his view at the time that everyone loves Blake,

25    right?

CONFIDENTIAL

Page 179

1          Q     You produced a video in -- your lawyers
2     produced a video in this case.
3                Did you provide the video of -- a video
4     in which your wife is in a tub with a baby to your
5     lawyers to produce to us in this case?
6          A     I did.
7          Q     Okay.  Where was that video stored?
8          A     You mean when I -- at what point?
9          Q     At the point that you took it to give it
10    to your lawyers.  Where did you get it?  Where was
11    it?
12         A     I believe it was on my phone.
13         Q     It was on your phone?
14         A     I believe so.
15         Q     Okay.  Did you edit the video at all
16    before giving it to your lawyers?
17         A     I did not.
18         Q     So the video you gave was the complete
19    video as it existed on your phone?
20         A     Correct.
21         Q     What, in your memory, did the video
22    depict?
23         A     It's our midwife, my sister, my kids, my
24    wife, myself, our newborn baby.  I believe we were
25    singing or praying.  The baby was crying, and then

CONFIDENTIAL

Page 180

```
 1       at some point we were whispering a prayer in the
 2       baby's ear.
 3            Q     That's what you recall?
 4            A     Yeah.
 5            Q     And your wife was in a tub?
 6            A     A birthing tub, yeah.
 7            Q     A birthing tub.
 8                  And you said she wasn't clothed, but she
 9       had a towel over her?
10            MS. SHAPIRO:  Objection.
11            THE WITNESS:  The towel was more over the
12       baby, I think, because, you know, when the baby came
13       out of the water and you bring it up, then it's wet.
14       So you put a dry towel to cover it.
15       BY MS. HUDSON:
16            Q     And in the video that you gave to your
17       lawyers to give to us, were you in the video?
18            A     I am.
19            Q     And are you nude in that video?
20            A     No.
21            Q     Were -- did your wife give birth in a
22       tub?
23            A     She did.
24            Q     Were you in the tub when she gave birth?
25            A     I was.
```

CONFIDENTIAL

Page 181

1       Q    The entire time?

2       A    I believe so.

3       Q    You were there the whole time she was

4  giving birth?

5       A    I was.

6       Q    Who filmed the video?

7       A    That particular one, I believe, was my

8  daughter.

9       Q    Your daughter?

10      A    My older daughter.

11      Q    Your older daughter.

12        Did you give your daughter instructions

13  for filming?

14      A    I'm not sure.  What do you mean?

15      Q    Did you ask her to film any particular

16  part of the birth?

17      A    No.  She just was -- her and my sister

18  both, actually, were filming different stages of the

19  labor and the birth and afterwards.

20      Q    So did someone else film a different

21  stage other than the stage that is depicted in the

22  video that you gave to your lawyers to produce to

23  us?

24        MS. SHAPIRO:  Objection.

25        THE WITNESS:  I think I'm a little

CONFIDENTIAL

Page 182

```
 1      confused, but I think your question is, are there
 2      other -- is there other video of the duration of my
 3      child being born and after and beforehand?
 4      BY MS. HUDSON:
 5           Q     Sure.
 6           A     Yes.
 7           Q     What other stages of the delivery are
 8      depicted in the video?
 9           A     Her entire birth.
10           Q     How long was the birth?
11           A     Oh, gosh.  I don't remember.  The whole
12      birthing?  Couple of hours.
13           Q     And it's all on film?
14           A     No, no, no.  I just mean the birth took a
15      couple of hours at different times.  But if you're
16      wondering if the birth is filmed, it is.
17           Q     The delivery itself?
18           A     It is.
19           Q     So the baby crowning and coming out is
20      all filmed?
21           A     Yes.  The baby being delivered, yes, for
22      sure.
23           Q     Were you in the tub with your wife when
24      the baby was actually delivered?
25           A     I was.
```

CONFIDENTIAL

Page 191

1      time over -- over weeks.  And then, eventually, they

2      decided not to shoot it that way.

3                  So Justin -- I believe it was at the

4      Route, the bar we filmed The Route at.  I was

5      sitting over on a chair, doing some work on my

6      phone.  Justin comes over and says, Hey, I was

7      talking to Blake.  I was talking about your

8      beautiful video with your wife.  Would you mind

9      showing it to her?  I said, yeah, sure.  I didn't

10     think twice about it.  I went over, walked over to

11     her, and then the rest, as I explained already,

12     happened.

13         Q    It's your -- you didn't say anything to

14     Ms. Lively before you showed her the video because

15     it was your understanding that Mr. Bal -- that she

16     had specifically asked for it?

17                  MS. SHAPIRO:  Objection.

18                  THE WITNESS:  My understanding at the

19     time was that they had just had a conversation or

20     just at some point had a conversation, and that she

21     was expecting or -- or that she was aware.

22     BY MS. HUDSON:

23         Q    So you didn't say anything prefatory,

24     like, This is the video that Justin said you wanted

25     to look at?

CONFIDENTIAL

Page 192

1          A    I did say something when I walked up.  I

2     was like, Hey, Blake.  Justin had mentioned you

3     wanted to see this.  And then I immediately showed

4     her the screen.

5          Q    You mean -- and was it playing at the

6     time?

7          A    I don't recall if it was playing or

8     paused.

9          Q    Do you know what scene was specifically

10    showing, what was visible to Ms. Lively when you hit

11    play?

12         A    Well, the first portion of the video --

13    which, again, she had only seen maybe a half a

14    second of it -- is only my wife sitting here, the

15    baby on top.  And that's what she would have seen.

16         Q    So your testimony is, what you showed her

17    was the very beginning of the video?

18         A    Yeah, for sure.

19              MS. SHAPIRO:  Objection.

20              MS. HUDSON:  Okay.

21              THE WITNESS:  Either it was paused or

22    playing.  I don't recall that, but for sure.

23    BY MS. HUDSON:

24         Q    Do you remember what date this was?

25         A    I have come to believe and know that the

CONFIDENTIAL

Page 256

```
 1              MS. SHAPIRO:  I'm just pointing it out.
 2              MS. HUDSON:  We're taking an excessive
 3      amount of time to read documents, respectfully.
 4      So --
 5              MS. SHAPIRO:  This is a two-page
 6      document.
 7              THE WITNESS:  You've given me four.  I'm
 8      trying to do my best --
 9      BY MS. HUDSON:
10         Q    I understand, but I just want to ask you
11      questions.  So if you don't mind, if I could just
12      bring you to the -- to the questions I want to ask
13      you, and then if you need to look, that's fine.
14              That was a suggestion you made.  Let's
15      try and do that.  How about it?
16         A    Accepted.
17         Q    Okay.  Thank you.
18              If you would look at the second page,
19      35493.  At the top of the page, it says, from
20      Mr. Baldoni:
21                   (As read):
22                   "I told Steve more today."
23              Do you see that?
24         A    I see it.
25         Q    And then you respond:
```

CONFIDENTIAL

Page 257

```
 1              (As read):
 2              "I talked to Steve last night also.  I
 3              didn't share about the comments the
 4              ladies had feelings about.  Didn't want
 5              to share anything you hadn't yet."
 6         Do you see that?
 7    A    I do.
 8    Q    Then Mr. Baldoni responds:
 9              (As read):
10              "I shared with him today."
11         Do you see that?
12    A    I do.
13    Q    My question for you is, the comments the
14    ladies had feelings about, what does that refer to?
15    A    Okay.  So, respectfully, you asked me
16    about this and there's context beforehand, so I
17    would like to read it.
18    Q    All right.  Go ahead.
19    A    Okay.  Thank you.
20    Q    Which ladies' comments were you referring
21    to there?
22    A    I don't really recall exactly what was
23    happening at this moment, but -- I don't.
24    Q    Do you know who the ladies were that you
25    were referring to there?
```

CONFIDENTIAL

Page 258

```
 1         A    I don't recall sending this.
 2         Q    Well, I am not asking if you recall
 3    sending it.  I'm just asking if you recall which
 4    comments you were talking about there -- or which
 5    ladies you were talking about?
 6         A    I don't recall sending it, so I don't
 7    recall what I was thinking.  So looking at it now, I
 8    would only be guessing.  And I might be able to make
 9    a good guess, but I don't want to guess it
10    incorrectly.
11         Q    Well, you read the whole thing for
12    context, right?
13         A    I did.
14         Q    Maybe Mr. Baldoni's response will help
15    provide you some additional context.
16              He said:
17                   (As read):
18                   "I shared with him today.  He said he
19                   should come to sit and remind Blake
20                   whose money this is.  And I said,
21                   'that's not the best idea.'"
22         A    Right.
23         Q    Does this refresh your recollection that
24    one of the ladies was Ms. Lively?
25         A    It may have been.
```

CONFIDENTIAL

Page 259

1          Q    It may have been.  And any other lady
2     might have been Ms. Slate, right?
3          A    It may have been, but I just don't know
4     for sure.
5          Q    It may have been that the comments that
6     you are referring to were the ones that Ms. Slate
7     and Ms. Lively had raised to Ms. Giannetti, correct?
8          A    I don't recall sending it.  I don't
9     recall this conversation, so I really don't -- I'm
10    not -- I just don't want to be wrong about something
11    so...
12         Q    Did you ever talk to Mr. Baldoni what it
13    is that he shared with Steve?
14         A    I did not.
15         Q    Did you understand Steve to be Steve
16    Sarowitz?
17         A    I did.
18         Q    Do you know what you talked to Steve
19    Sarowitz about?
20         A    Did I know what?
21         Q    What you talked to Steve Sarowitz about
22    the night before?
23         A    I don't recall what we talked about, but
24    I know this was during COVID and a shutdown.  So
25    maybe it was an update.

CONFIDENTIAL

Page 260

```
 1        Q    Are there any other two ladies who had --
 2    I'm sorry.
 3              Are there any other ladies who had
 4    feelings about comments other than Ms. Lively and
 5    Ms. Slate?
 6              MS. SHAPIRO:  Objection.
 7              THE WITNESS:  This is why -- I can guess.
 8    This is a tricky one for me here.  You're asking me
 9    to deduce, and I can't.
10    BY MS. HUDSON:
11        Q    I'm not asking you to deduce.  I'm asking
12    you, are there other ladies who may -- who had
13    concerns about comments on set?
14              MS. SHAPIRO:  Objection.
15              THE WITNESS:  No.  But I don't see that
16    I'm saying "on set" here.
17    BY MS. HUDSON:
18        Q    Okay.  Are there other ladies that you
19    knew about on May 28th, 2023 who had feelings
20    about comments?
21        A    I could guess that possibly it is about
22    Blake and Jenny, since that's what you're asking.  I
23    could guess, but I don't know for sure.
24        Q    It's an educated guess, right, that
25    that's probably what you're talking about here?
```

CONFIDENTIAL

Page 261

```
 1            MS. SHAPIRO:  Objection.
 2            THE WITNESS:  I'm doing my best to not
 3     just hit a wall here.  And I can't.  I can't say.
 4     BY MS. HUDSON:
 5         Q    Okay.
 6         A    This is two years ago, and I don't know.
 7            MS. HUDSON:  Okay.  I'm going to hand you
 8     a document that we're marking as Exhibit 13.
 9            THE WITNESS:  Sure.  Do you want this
10     one?
11            THE STENOGRAPHIC REPORTER:  Thank you.
12         (Exhibit 13 marked for identification.)
13     BY MS. HUDSON:
14         Q    Exhibit 13 email from Lindsey Strasberg
15     to Imene Meziane and Joseph Lanius, dated
16     November 9th, 2023, and it has an attachment
17     entitled "Protections for Return to Production,"
18     Bates-stamped WAYFARER 140991 through 140993.
19         A    I see it.
20         Q    Have you seen this email before,
21     Mr. Heath?
22         A    Yes.  Just -- quickly just briefing it,
23     but yes.
24         Q    You understand this to be the cover email
25     that sends to your -- Wayfarer's lawyers,
```

CONFIDENTIAL

Page 262

1    Ms. Lively's Protections for Return to Production,
2    right?
3          A    Yes, I see that.
4          Q    With the protections attached, right?
5          A    I see that.
6          Q    Yes.  And you understand that's what this
7    is?
8          A    I do.
9          Q    Okay.  Who is Imene Meziane?
10         A    Imene, by the way, is how to pronounce
11   it.  And she's our legal counsel at Wayfarer.
12         Q    Is she in-house counsel?
13         A    She is.
14         Q    And what is her title?
15         A    VP of legal affairs.
16         Q    And Mr. Lanius is outside counsel?
17         A    Correct.
18         Q    Okay.  All right.  And when did you first
19   see this email and the Protections for Return to
20   Production?
21         A    November 9th, I believe, the day it was
22   sent.
23         Q    Okay.  And when you received it, did you
24   read it?
25         A    I did.

CONFIDENTIAL

Page 278

```
 1    words --
 2         A    Yes.
 3         Q    -- you understand that that -- that this
 4    is -- that he was saying how he viewed this
 5    document?
 6              MS. SHAPIRO:  Objection.
 7              THE WITNESS:  I see that this -- this
 8    suggests that he was considering this to be
 9    something that could be possible.
10    BY MS. HUDSON:
11         Q    I see.  Okay.
12              And do you know how your in-house
13    counsel, Imene, I think you said her name was?
14         A    Imene.
15         Q    How she responded to Ms. Strasberg's
16    email?
17              MS. SHAPIRO:  Objection.
18              THE WITNESS:  I don't see that.
19    BY MS. HUDSON:
20         Q    Do you recall her saying that the
21    protections were not -- were not only reasonable but
22    essential?
23         A    I don't recall the -- the language.  You
24    can show it to me.
25         Q    Okay.  Did you think the 17 protections
```

CONFIDENTIAL

Page 279

```
 1      that were in that document were reasonable?
 2           A    I think taking them -- take -- taking
 3      them as they are written, yes, I think they are
 4      ultimately reasonable.
 5           Q    Okay.  At some point, did Ms. Lively come
 6      back to the production?
 7           A    She did.
 8           Q    And did filming resume?
 9           A    It did.
10           Q    What date did it resume; do you recall?
11           A    January 5th, 2024, I believe.
12           Q    Prior to returning to filming, was there
13      a meeting at Ms. Lively's apartment?
14           A    There was.
15           Q    And were you at that meeting?
16           A    I was.
17           Q    And if you go back to the protections
18      document --
19           A    Okay.
20           Q    -- you will see --
21           A    Can I pull this one up?  I think it's
22      this one.  Maybe it's this one.  Okay.  I see it.
23           Q    Number 17 was:
24                (As read):
25                     "An all-hands, in-person meeting before
```

CONFIDENTIAL

Page 280

```
 1              production resumes which will include
 2              the director, all producers, the Sony
 3              representative, the newly-engaged
 4              third-party producer, Ms. -- BL and
 5              BL's designated representative to
 6              confirm and approve a plan for
 7              implementation of all the above that
 8              will be adhered to for the physical and
 9              emotional safety of BL, her employees
10              and all the cast and crew moving
11              forward."
12         Do you see that?
13    A    I do.
14    Q    Okay.  And there was a meeting that
15    included all of those participants in her apartment
16    on January 4th, the day before production began,
17    right?
18    A    Yes.
19    Q    Okay.  And have you read Ms. Lively's
20    second amended complaint?
21    A    I have.
22         MS. HUDSON:  Okay.  I'm going to hand you
23    that document, the second amended complaint, which
24    we have marked as Exhibit 15.
25         (Exhibit 15 marked for identification.)
```

CONFIDENTIAL

Page 281

```
 1            THE WITNESS:  Do you want me to read the
 2    whole thing?
 3    BY MS. HUDSON:
 4        Q    I definitely don't want you to read the
 5    whole thing.  I am going to point you to something
 6    very specific in this document.
 7            If you turn to page 7.
 8        A    Okay.
 9        Q    You will see paragraphs 19 and 20 refer
10    to the January 4th meeting and the participants.
11            Do you see that?
12        A    I do.
13        Q    And the participants that are listed in
14    paragraph 19, is that an accurate list of who was
15    present?
16        A    Chris Surgent was also present for the
17    beginning portion of it.
18        Q    Okay.  Other than that, is it an accurate
19    list?
20        A    Yes.
21        Q    And then in paragraph 20, the complaint
22    says that during the meeting, that Ms. Lively read
23    the list below in its entirety.  And then below is a
24    list of 30 points.
25            Do you see that?
```

CONFIDENTIAL

Page 282

1          A     I see the 30-point list that's included

2     in this document.

3          Q     Okay.  And you see in the complaint where

4     it says Ms. Lively said she read the list below in

5     its entirety, right?

6          A     I see that.

7          Q     Okay.  And did you attend the entire

8     meeting?

9          A     I did.

10          Q     Okay.  And you said you've read the

11     second amended complaint before, right?

12          A     I have, but I don't recall every single

13     detail of it.  There's been many legal motions

14     moving on around.  So I did at the time, yes.

15          Q     Well, I would like you to take a moment

16     and look at this 30-point list, and tell me if you

17     recall Ms. Lively discussing each of these things

18     during the January 4th meeting.

19          A     You mean did she -- I just want to be

20     clear -- discuss any of the things inferred in these

21     things?  Because she did not read this list.

22          Q     Your position is she did not read from a

23     list?

24          A     She did read a few things from her phone.

25     She did not read this list.  So I just want to know

CONFIDENTIAL

Page 283

```
 1      what you want me to do because...
 2           Q    Are you saying Ms. Lively read a
 3      different list?
 4           A    I'm saying Ms. Lively read a few things
 5      from her phone, maybe nine or ten things, that were
 6      not phrased in this way at all.
 7           Q    When you say they "were not phrased in
 8      this way," what do you mean by that?
 9           A    Well, nothing ever said "no more."  And
10      the way that it's written was not -- she read
11      more -- it wasn't firsthand, but it was -- it was
12      less -- it was not phrased like this.
13           Q    So each one of these 30 points addresses
14      a topic.  Are -- are there any topics that are
15      addressed in these 30 points that Ms. Lively did not
16      cover during the meeting?
17                MS. SHAPIRO:  Objection.
18                THE WITNESS:  Yeah.
19      BY MS. HUDSON:
20           Q    Which ones?
21           A    Okay.  Well, we can take our time going
22      through them.  I -- I don't know how you want to do
23      this.  But, like, starting with number 1, "no more
24      showing nude videos or images of women."  Then it
25      says "including producer's wife," which insinuates
```

CONFIDENTIAL

Page 284

1    that there were other ones.  "To BL and her or her
2    employees."  So, yeah, we -- we talked about that
3    video again where she had brought it up.
4         Q    So you talked about the video but --
5              MS. SHAPIRO:  Can you let him finish?
6              THE WITNESS:  So we talked about the
7    video.  We didn't talk about the details of it.  We
8    just talked to -- brought up again that that video
9    was shown.  Again, I apologized to her recognizing
10   that she was surprised by it.  And -- but this
11   wasn't written.  But that topic was.
12             So no more mention of Baldoni or Heath's
13   previous pornography addiction.  I don't have a
14   pornography addiction.  So certainly, she wouldn't
15   have never read that, and I don't know what that
16   refers to.  So no, that was not discussed.
17        Q    Did she talk about Mr. Baldoni's
18   referencing pornography addiction during this
19   meeting?
20        A    I believe she mentioned something about
21   it.
22        Q    Okay.  Did she talk about wanting to --
23   neither her nor her employees to hear personal
24   experiences of -- of other people's sex lives,
25   including as it relates to spouses or others?

CONFIDENTIAL

Page 285

1        A      Where -- what number are you reading,
2    please?
3        Q      Three.
4        A      I think she said something about that.
5        Q      Did she say -- did she talk about
6    number -- in number 4, did she want to -- did she
7    say that she wanted no discussion about -- with her
8    or her employees of personal times that physical
9    consent was not given in sexual acts either -- as
10   either the abuser or the abused?
11       A      I do not recall that.
12       Q      You don't recall that?
13       A      I do not.
14       Q      Okay.  Did she recount a story in which
15   Mr. Baldoni talked about times that he had engaged
16   in actions with women without consent?
17       A      No.
18       Q      She didn't talk about that.  Okay.
19              Did she talk about the description --
20   anyone describing their own genitalia to her and
21   asking that that not happen?
22       A      No.
23       Q      She didn't talk about Mr. --
24       A      Let me rephrase it.  No, not that I
25   remember in any sense.

CONFIDENTIAL

Page 291

1          A     Yeah.

2          Q     Yeah.

3          A     And he -- and he did it very

4     aggressively.  He did it to me as well.  More at

5     him.  It was -- it may have been the hardest thing I

6     have ever witnessed someone talking to another

7     person with such belittlement.

8          Q     So after that meeting, did you have an

9     understanding that there were things that were

10    happening in connection with filming this movie that

11    Ms. Lively was uncomfortable with?

12               MS. SHAPIRO:  Objection.

13               THE WITNESS:  I understood that she had

14    shared some things that did not make sense, and I

15    believe were fabricated.

16    BY MS. HUDSON:

17         Q     You believe were fabricated?

18         A     Not all of them.

19         Q     Uh-huh.

20         A     Either distorted --

21         Q     Uh-huh.

22         A     -- or fabricated.

23         Q     Now, did you think it would be a good

24    idea to conduct an investigation at that point?

25               MS. SHAPIRO:  Objection.

CONFIDENTIAL

Page 292

```
 1              THE WITNESS:  Her letter started with --
 2     as we went back to it after this meeting, with in
 3     lieu of an HR report, we would sign these things.
 4     And if any -- at this point, if any of these things
 5     were referencing that, there was nothing to
 6     investigate.
 7     BY MS. HUDSON:
 8         Q    In lieu of a formal HR process, I think
 9     it said.
10         A    Yes.
11         Q    So you decided that since Ms. Lively said
12     in November, in lieu of an HR process, there was no
13     need for an investigation?
14              MS. SHAPIRO:  Objection.
15              THE WITNESS:  We did not determine that
16     that was necessary.
17     BY MS. HUDSON:
18         Q    You -- you did not determine.  You -- so
19     you determined it was not necessary; is that right?
20         A    We did not determine it was necessary.
21     We never came to the point to think that it was
22     necessary because in it, while she was expressing
23     it, it was very confusing because she was not -- it
24     was almost like he was a child.  Not that she felt
25     threatened or that she felt -- it just felt like he
```

CONFIDENTIAL

Page 293

1   was a child and it was talking that.  It wasn't --
2   so our perspective from that point was, once we left
3   and had some conversations with Ange, and Justin was
4   a little frozen because of -- of the aggressive
5   nature of it, she couldn't wait to -- appeared to
6   could not wait to get back to work tomorrow, and we
7   moved forward.
8        Q    So did Ms. Lively -- did you consider
9   that other people might be uncomfortable on set?
10       A    No, we hadn't heard anything else about
11  anybody being uncomfortable.  There was a lot of
12  insinuations about -- I think she brought up also --
13  she brought up saging, talking to her dead father.
14  There was a lot of stuff that was mixed in here that
15  was just -- she didn't like Justin.  She didn't like
16  me.  She didn't like that he cried.  She mentioned
17  that.  There was a lot in there, so it was -- there
18  was a lot going on.
19       Q    Did you actually have a conversation and
20  make a decision not to do an investigation?
21       A    No.
22            MS. SHAPIRO:  Objection.
23  BY MS. HUDSON:
24       Q    Did the topic of an investigation come up
25  at any time prior to receiving Ms. Lively's CRD

CONFIDENTIAL

Page 294

1      complaint?

2             A     No.  Not that I recall.

3             Q     At some point, did you have a dinner with

4      Colleen Hoover in connection with the trailer

5      launch?

6             A     We did.

7             Q     And when was that?

8             A     You're going to have to refresh my

9      memory.

10             Q     I will do that.

11             A     I think it was, you know, two or three

12      months before.  Two months before release, I think.

13      Three months maybe.  But I don't know.

14                  MS. SHAPIRO:  Jonathan, how much more

15      time?

16                  THE VIDEOGRAPHER:  We've been on the

17      record for five hours and 14 minutes.

18                  MS. SHAPIRO:  Thank you.

19                  THE WITNESS:  Ms. Hudson, I won't need

20      this anymore, will I?

21      BY MS. HUDSON:

22             Q     No, thank you.  Do you recall what day

23      the trailer launch event took place?  Was that

24      May 6th?

25             A     I don't recall.

CONFIDENTIAL

Page 316

```
 1      BY MS. HUDSON:
 2           Q    You asked Ms. Toskovic to put together a
 3      timeline on June 17th, correct?
 4           A    Are you referring to this document?
 5           Q    Yes.
 6           A    I see that.
 7           Q    Okay.  And Exhibit 17 is an email
 8      forwarding a timeline.
 9                Do you see that?
10           A    I do.
11           Q    And then Exhibit 18, I'll represent for
12      the record, is the document that was produced to us
13      that is reflected in the attachment to that email
14      that says "document produced in native format."
15           A    Can you repeat the -- the last thing?
16      Sorry, I was --
17           Q    Sure.
18           A    -- I was finishing 17.
19           Q    Sure.
20                So Exhibit 17 is an email forwarding a
21      timeline.
22                Do you see that?
23           A    I do.
24           Q    Okay.  And then it says, on the second
25      page of that email, "produced in native format"?
```

CONFIDENTIAL

Page 317

1          A     Uh-huh.  I do.  Yes.

2          Q     I'm representing to you that the native

3    format that we received in the production from your

4    lawyers is that document.

5          A     Okay.

6          Q     Okay?  Is this document, Exhibit 18, the

7    timeline that you asked Ms. Toskovic to create?

8          A     It looks to be so.

9          Q     Okay.  Why did you ask Ms. Toskovic to

10   create a timeline on June 17th?

11         A     Just to have a timeline of our whole

12   experience of the movie.

13         Q     Your whole experience of the movie, as it

14   relates to Ms. Lively?

15         A     Just our -- the timeline of what we

16   experienced throughout the movie, yes.

17         Q     For what purpose?

18         A     So we could have a record of our --

19   our -- the last year and a half of what we have

20   experienced.

21         Q     Why?

22         A     There was a lot that went on over the

23   year and a half on different levels, production and

24   all levels.  I just wanted to have a timeline of it.

25         Q     Well, your -- your text message to

CONFIDENTIAL

Page 318

```
1       Ms. Toskovic doesn't say anything about things that
2       happened during production in general, right?
3               MS. SHAPIRO:  Objection.
4               THE WITNESS:  Right.  Uh-huh.
5       BY MS. HUDSON:
6           Q    All of the things that are in your text
7       message to Mitz Toskovic relate to Ms. Lively,
8       correct?
9               MS. SHAPIRO:  Objection.
10              THE WITNESS:  Yeah, I see that's in the
11      -- in the text message.  Yeah.
12      BY MS. HUDSON:
13          Q    So why did you ask Ms. Toskovic to create
14      a timeline on June 17th, 2024 related to Ms. Lively?
15          A    That was one of the aspects of our whole
16      time on the movie, and I also wanted to include
17      that.
18          Q    Well, you didn't say reference anything
19      else, correct?  You only referenced issues related
20      to Ms. Lively in your text messages to Mitz
21      Toskovic, correct?
22              MS. SHAPIRO:  Objection.
23              THE WITNESS:  In this particular text
24      message, that's -- that's all it speaks to.
25
```

CONFIDENTIAL

Page 319

1    BY MS. HUDSON:

2        Q    Yeah, that's all you said when you asked

3    Ms. Toskovic to create a timeline, correct?

4            MS. SHAPIRO:  Objection.

5            THE WITNESS:  In this text message,

6    that's what it refers to.  Yes.

7    BY MS. HUDSON:

8        Q    Do you have another text message?

9            MS. SHAPIRO:  Objection.

10           THE WITNESS:  I don't know.

11   BY MS. HUDSON:

12       Q    Okay.  Well, why are -- my question to

13   you, Mr. Heath, is:  Why you were asking Ms.

14   Toskovic to create a timeline that references events

15   related to Ms. Lively on June 17th, 2024?

16       A    Our experience of the movie, and at this

17   point in June, we were unsure.  Justin had lost the

18   movie, I think, by this point.  We were dealing with

19   a lot of conversations with Sony about how to

20   navigate moving forward with him as the director.

21   We've got the release of the movie coming up -- and

22   in all of this and being confused of where we stood

23   with all of this, I just wanted to have documented

24   just our -- our whole experience with the movie.

25       Q    For what purpose?

CONFIDENTIAL

Page 321

1    BY MS. HUDSON:

2        Q    And the incidents that you identified to

3    Ms. Toskovic are incidents that you were aware that

4    Ms. Lively had raised concerns of prior to

5    June 17th, 2024, correct?

6        A    Can you repeat that, please?

7            MS. HUDSON:  The incidents that you

8    raised to Mitz Toskovic were incidents that you were

9    aware of prior to June 17th, 2024 that Ms. Lively

10   had raised concerns about, correct?

11           MS. SHAPIRO:  Objection.

12           THE WITNESS:  In this text message, it

13   references some of those.  Yes.

14   BY MS. HUDSON:

15       Q    Yes.  So the -- you -- you were aware of

16   the incidents that you told Ms. Toskovic about prior

17   to June 17th, 2024, correct?

18           MS. SHAPIRO:  Objection.

19           THE WITNESS:  Was I aware?  Yes, I was

20   aware that Justin met with the trainer.  I was aware

21   about -- he asked about the weight.  I was aware of

22   some of these things.  Yes.

23   BY MS. HUDSON:

24       Q    Well, you were aware of all of them

25   because you wrote them down, right?

CONFIDENTIAL

Page 322

```
1          A    Yes.
2          Q    And you wouldn't have been able to write
3     them down if you weren't aware of all of them,
4     correct?
5          A    I was aware --
6               MS. SHAPIRO:  Objection.
7               THE WITNESS:  I was aware that these were
8     included, yes.
9     BY MS. HUDSON:
10         Q    That these were all things that
11    Ms. Lively had raised concerns about, correct?
12              MS. SHAPIRO:  Objection.
13              THE WITNESS:  Some of them; some of them
14    not.
15    BY MS. HUDSON:
16         Q    Okay.  Which one of these lists are not
17    things that Ms. Lively had raised concerns about
18    that you were aware of on June 17th?
19              MS. SHAPIRO:  Objection.
20              THE WITNESS:  Well, just as I go through
21    it, when we shot the graveyard scene.  When we had a
22    meeting at Blake's home.
23    BY MS. HUDSON:
24         Q    Why did you want to have a record of when
25    you had the meeting at Blake's home?
```

CONFIDENTIAL

Page 395

```
 1              THE VIDEOGRAPHER:  We are going off the
 2    record.  The time is 7:24 p.m.
 3                  (Recess.)
 4              THE VIDEOGRAPHER:  We're back on the
 5    record.  The time is 7:34 p.m.
 6    BY MS. HUDSON:
 7         Q    Mr. Heath, as Wayfarer's sole human
 8    resources representative, has Ms. Barnes Slater, to
 9    your knowledge, provided human resources support to
10    any Wayfarer production?
11              MS. SHAPIRO:  Objection.
12              THE WITNESS:  I don't know.
13    BY MS. HUDSON:
14         Q    You're not aware of Ms. Barnes Slater
15    providing human resources support to any Wayfarer
16    production?
17              MS. SHAPIRO:  Objection.
18              THE WITNESS:  I don't know.
19    BY MS. HUDSON:
20         Q    Did Wayfarer provide copies of its
21    handbook to the cast and crew on It Ends with Us?
22         A    I don't know.
23         Q    Did Wayfarer provide access to its
24    employee -- employee handbook to the cast and crew
25    of It Ends with Us?
```

CONFIDENTIAL

Page 396

```
 1              MS. SHAPIRO:  Objection.
 2              THE WITNESS:  I don't know.
 3      BY MS. HUDSON:
 4          Q    Do you know whether a training was
 5      provided to cast and crew regarding respectful
 6      workplace on It Ends with Us?
 7              MS. SHAPIRO:  Objection.
 8              THE WITNESS:  Yes.
 9      BY MS. HUDSON:
10          Q    Are there -- do you know who attended
11      that training?
12          A    I believe all the crew.
13          Q    Are there any records reflecting who
14      attended the training?
15          A    I don't know.
16          Q    Who would know?
17          A    I don't know.
18          Q    You don't know who would know about the
19      records?
20          A    I don't.
21          Q    Did you have any discussions with
22      Ms. Barnes Slater regarding providing human resource
23      support to It Ends with Us?
24          A    I don't recall.
25          Q    You have no specific recollection of
```

CONFIDENTIAL

```
1    talking to Ms. Barnes Slater about providing human
2    resources support for the film?
3              MS. SHAPIRO:  Objection.
4              THE WITNESS:  The one complaint that came
5    in, she provided support.  That's all I know.
6    BY MS. HUDSON:
7         Q    Which complaint is that?
8         A    When the sound mixer was not hired.
9         Q    You're talking about the complaint that
10   came through Local 52 that we looked at earlier?
11        A    Correct.
12        Q    You said Ms. Barnes Slater provided
13   support for that?
14             MS. SHAPIRO:  Objection.
15             THE WITNESS:  I believe so.
16   BY MS. HUDSON:
17        Q    And what support did she provide for that
18   complaint?
19        A    I don't know.
20        Q    Why do you believe Ms. Barnes Slater
21   provided support for that complaint?
22        A    That's what I can recall.  That's all I
23   recall.
24        Q    And in what manner did she provide
25   support?
```

CONFIDENTIAL

Page 398

```
 1        A    I don't recall at the moment.  I don't
 2   recall.
 3        Q    Did you speak with Ms. Barnes Slater
 4   about the complaint from Local 52?
 5        A    I have a vague recollection of speaking
 6   to her.  That's...
 7        Q    Did she give you any advice on how to
 8   proceed with respect to that complaint?
 9        A    I don't recall.  I know specifically they
10   had asked to speak to HR at Wayfarer, so I put them
11   in contact with them.  That's what I remember.
12        Q    Did you discuss with Ms. Barnes Slater
13   providing support to address any cast or crew
14   concerns on It Ends with Us?
15             MS. SHAPIRO:  Objection.
16             THE WITNESS:  I don't recall.
17   BY MS. HUDSON:
18        Q    You don't recall having done that?
19        A    I don't.
20        Q    What is the basis for your understanding
21   that concerns of employees on an independent film
22   should be raised to the line AD or the production
23   supervisor?
24             MS. SHAPIRO:  Objection.
25             THE WITNESS:  That's what I was told.
```

CONFIDENTIAL

Page 401

```
 1      attended the training?
 2           A    I don't know.
 3           Q    Did you disclose any of the alleged
 4      incidents related to Ms. Lively to Ms. Barnes
 5      Slater?
 6                MS. SHAPIRO:  Objection.
 7                THE WITNESS:  No.
 8      BY MS. HUDSON:
 9           Q    Did you ever speak with Ms. Barnes Slater
10      about Ms. Lively?
11           A    I don't recall.
12           Q    Did you ever speak with Ms. Barnes Slater
13      about Ms. Slate?
14           A    I don't recall.
15           Q    Did you ever speak with Ms. Barnes Slater
16      about any concerns on the production of
17      It Ends with Us?
18           A    I don't recall.
19           Q    You have no recollection of having done
20      so, correct?
21                MS. SHAPIRO:  Objection.
22                THE WITNESS:  I don't recall.  I do not.
23      BY MS. HUDSON:
24           Q    Earlier we talked about call recording.
25           A    Uh-huh.
```

CONFIDENTIAL

Page 404

1                     REPORTER'S CERTIFICATE

2              I, ASHLEY SOEVYN, a Certified Shorthand

3       Reporter of the State of California, do hereby

4       certify:

5              That the foregoing proceedings were taken

6       before me at the time and place herein set forth;

7       at which time the witness was put under oath by me;

8              That the testimony of the witness, the

9       questions propounded, and all objections and

10      statements made at the time of the examination were

11      recorded stenographically by me and were thereafter

12      transcribed;

13             That a review of the transcript by the

14      deponent was/ was not requested;

15             That the foregoing is a true and correct

16      transcript of my shorthand notes so taken.

17             I further certify that I am not a relative

18      or employee of any attorney of the parties, nor

19      financially interested in the action.

20             I declare under penalty of perjury under

21      the laws of California that the foregoing is true

22      and correct.  Dated this 10th day of October 2025.

23

24

        ASHLEY SOEVYN

25      CSR No. 12019