Exhibit 4

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                     ---oOo---
 4
 5   BLAKE LIVELY,
 6                  Plaintiff,
 7      vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)
                              25-CV-449 (LJL) (MEMBER CASE)
 8
     WAYFARER STUDIOS LLC, ET AL.
 9
                    Defendants.
10   _____
     JENNIFER ABEL,
11            Third-party Plaintiff,
        vs.
12   JONESWORKS, LLC,
              Third-party Defendant.
13   _____
     WAYFARER STUDIOS LLC, et al.
14            Consolidated Plaintiffs,
        vs.
15   BLAKE LIVELY, et al.
              Consolidated Defendants.
16   _____
17                  **CONFIDENTIAL**
18                     VOLUME II
19      VIDEO-RECORDED DEPOSITION OF JUSTIN BALDONI
20               Los Angeles, California
21               Tuesday, October 7, 2025
22
23   Stenographically Reported by:  Ashley Soevyn,
     CALIFORNIA CSR No. 12019
24
25
```

CONFIDENTIAL

```
                                          Page 33

 1         A    A set with all Baha'i's?  I don't know.
 2         Q    Well, so you're the director, and you're
 3    the co-founder of the studio.  And I'm here and I'm
 4    asking you, okay?
 5         A    Yeah.  Yeah.
 6         Q    Okay.  Someone has told me that your set
 7    is a Baha'i set.  Okay?
 8         A    Are you -- sorry.  Are you giving me a --
 9              MS. SHAPIRO:  Objection.
10    BY MR. GOTTLIEB:
11         Q    Just let me finish my question.
12         A    Okay.
13         Q    So let's establish some principles.
14    You're the cofounder of Wayfarer Studios, correct?
15         A    Correct.
16         Q    You were the director of It Ends with Us,
17    correct?
18         A    Correct.
19         Q    Producer?
20         A    No.
21         Q    Lead actor?
22         A    Second lead actor.
23         Q    Second lead actor.  And I come to you now
24    and I say, Mr. Baldoni, you're the director of this
25    film, you're the cofounder of this studio.  Someone
```

CONFIDENTIAL

                                                        Page 38

 1   we've become numb to it -- and I'm speaking
 2   generally as a "we", collective "we" -- in order to
 3   have more of a shock effect than I think that's
 4   where Hollywood has gone and made, like -- like sex
 5   has just become just something that you expect to
 6   see oftentimes, that doesn't actually have to do
 7   with the storyline or -- or I don't know if it
 8   necessarily moves the plot forward.
 9              So in that sense, I guess I would agree.
10   And I think that in general, Hollywood doesn't make
11   movies for the soul much anymore.  It does -- I
12   mean, there are certain people that do.  But I'm
13   just saying it's definitely become much more about
14   attention and money and just competing with other
15   places for people's attention in whatever can shock
16   them the most is what wins.
17   BY MR. GOTTLIEB:
18       Q    And you founded Wayfarer to be different
19   from what you just described; is that right?
20              MS. SHAPIRO:  Objection.
21              THE WITNESS:  I did.
22   BY MR. GOTTLIEB:
23       Q    You founded Wayfarer to be lights in the
24   darkness; is that correct?
25       A    That was a part of the mission.

CONFIDENTIAL

```
                                            Page 39
 1          Q    You, in founding Wayfarer, said that in
 2     Steve Sarowitz you had resources and a partner who
 3     shared values and beliefs; is that fair?
 4          A    Yeah.
 5          Q    Do you recall saying about Wayfarer
 6     Studios that you and Mr. Heath "were making a
 7     concerted effort to build a spiritual enterprise in
 8     every sense of the word, where everybody is free to
 9     have their own beliefs and express opinions that may
10     be different from the executives or the
11     shareholders, where there is true unity and equality
12     across the board, and where we're mindful of the
13     positions of power and how those power dynamics
14     work"?
15          A    Was the question do I remember saying
16     that?
17          Q    Do you remember saying that?
18          A    It sounds more like something I've
19     written.  I'm not sure if it --
20          Q    Does it sound like something you would
21     write or say?
22          A    I don't know if I'm that eloquent when I
23     speak.  But it sounds like it's definitely in line
24     with something that I believe or aspire to.
25          Q    If I told you that that quote appeared
```

CONFIDENTIAL

Page 40

```
1    out of a publication on Baha'iteachings.org entitled
2    "Wayfarer Studios Aims to be a Light in the
3    Darkness," would that refresh your recollection at
4    all?
5              MS. SHAPIRO:  Objection.
6              THE WITNESS:  That would confirm it was
7    probably something that I wrote versus I said.
8    BY MR. GOTTLIEB:
9         Q    Okay.  And do you believe that you have
10   created a spiritual enterprise where everyone is
11   free to have their own beliefs and express their own
12   opinions that may be different from the executives
13   or the shareholders?
14             MS. SHAPIRO:  Objection.
15             THE WITNESS:  Do I believe I've created
16   it?
17   BY MR. GOTTLIEB:
18        Q    Along with others.  Do you believe in
19   Wayfarer Studios, you've achieved that objective?
20        A    To be very frank, I don't know that it's
21   something that could ever be fully 100 percent
22   achieved.  I know we strive for it, but I wouldn't
23   be comfortable saying we've achieved it.
24        Q    Okay.  You've strived for it?
25        A    Strived, yeah.
```

CONFIDENTIAL

Page 41

1        Q    And in creating the culture at Wayfarer

2    Studios, do you believe that you have tried to be

3    mindful of the positions of power and how those

4    power dynamics work?

5              MS. SHAPIRO:  Objection.

6              THE WITNESS:  Again, it's something that

7    we strive for.  Not perfect at, but strived.

8    BY MR. GOTTLIEB:

9        Q    As the director of It Ends with Us, do

10   you believe you had more power than members of the

11   cast or crew that were not directors?

12             MS. SHAPIRO:  Objection.

13             THE WITNESS:  In thinking about power

14   dynamics, yes.

15   BY MR. GOTTLIEB:

16       Q    And you supervised essentially everyone

17   who was on the set, directly or indirectly; is that

18   right?

19             MS. SHAPIRO:  Objection.

20             THE WITNESS:  I'm not sure if I would

21   consider that my role as a director.

22   BY MR. GOTTLIEB:

23       Q    Were you ultimately responsible for what

24   happened on the set of It Ends with Us?

25             MS. SHAPIRO:  Objection.

CONFIDENTIAL

Page 42

```
1              THE WITNESS:  I wouldn't put that solely
2      on the director, no.  But I was partly --
3      BY MR. GOTTLIEB:
4          Q    I didn't ask if you --
5          A    -- responsible.
6          Q    I didn't ask if you were the only person.
7              MS. SHAPIRO:  Can you not interrupt his
8      answer?
9              MR. GOTTLIEB:  You're right.  You're
10     right.  Finish your answer.  I apologize.
11             THE WITNESS:  Oh, I just said I wasn't --
12     I don't think I was the only person responsible.
13     But I was a part of that responsibility, of course.
14     BY MR. GOTTLIEB:
15         Q    Okay.  So I'm not asking if you were the
16     only person who was responsible.  But as the
17     director, are you ultimately responsible for what
18     occurs on the set of your movies?
19             MS. SHAPIRO:  Objection.
20             THE WITNESS:  I'm not sure that I would
21     completely agree with that, the way that question is
22     framed.
23     BY MR. GOTTLIEB:
24         Q    Okay.  What is it about the question that
25     you disagree with, the framing of the question?
```

A I just think the premise is off.
Q What piece of the premise is off?
A One of the director's jobs is to bring on a great team and each of those team members have responsibilities. I think it would be impossible for a director to manage everybody. So there are department heads and producers and executive producers and all kinds of various jobs that each have people reporting under them and that each have their own responsibility.
So like if, you know, something happened to an extra, I don't know if that's ultimately the director's responsibility. If the catering was cold that day, I don't know if that's the director's responsibility.
If a stunt person was killed, I don't know if that's the director's responsibility. There is a stunt department. So that's what I mean by the premise. At least my understanding of what you were asking.
Q What about what the director does?
MS. SHAPIRO: Objection.
BY MR. GOTTLIEB:
Q Who is responsible for that?
A Could you be more specific?

CONFIDENTIAL

Page 44

1          Q     Well, the director is not responsible for
2     the caterers or the stunt doubles, but what about
3     the director?  Is the director responsible for what
4     the director does?
5          A     Yes, of course.  I was just answering
6     your question to the best that I could.
7          Q     Okay.  So we can at least agree that as
8     the director of It Ends with Us, you were
9     responsible for what you did on the set?
10         A     I was responsible for a lot, yeah.
11         Q     What you did, what some other people did,
12    that we'll have to define as we go through the day,
13    but not everything; is that fair?
14              MS. SHAPIRO:  Objection.
15              THE WITNESS:  Not solely responsible for
16    everything, but responsible, of course.  I'm the
17    director.
18    BY MR. GOTTLIEB:
19         Q     Okay.  Did Wayfarer Studios have policies
20    and procedures that were in place during the filming
21    of It Ends with Us?
22              MS. SHAPIRO:  Objection.
23              THE WITNESS:  Policies and procedures?
24    BY MR. GOTTLIEB:
25         Q     Any policies and procedures that were in

CONFIDENTIAL

Page 45

```
 1   place?
 2        A    I believe so.
 3        Q    And were those policies and procedures
 4   applicable to you as the director of the film, to
 5   the best of your knowledge?
 6             MS. SHAPIRO:  Objection.
 7             THE WITNESS:  You have to be more
 8   specific on what policies and procedures that you
 9   mean.
10             MR. GOTTLIEB:  Okay.
11             THE STENOGRAPHIC REPORTER:  Exhibit 20
12   for the record.
13        (Exhibit 20 marked for identification.)
14   BY MR. GOTTLIEB:
15        Q    Mr. Baldoni, you've been handed a
16   document marked as Exhibit 20.  It's a document
17   bearing the Bates Nos. WAYFARER_139046 through
18   139076.
19             And you can take a look.  It's a lengthy
20   document.
21        A    Am I on this document?
22        Q    Take a look through the first few pages,
23   and the first thing I'm going to ask you is if you
24   recognize it, and then I will ask you some more
25   questions.
```

CONFIDENTIAL

Page 46

```
 1              Mr. Baldoni, I think you've now had a
 2      chance to look at the cover letter --
 3          A    Yes.
 4          Q    -- and the Table of Contents.
 5          A    I haven't looked at all the Table of
 6      Contents of it.
 7          Q    You flipped through it?
 8          A    Would you like me to look at them?
 9          Q    There is not going to be a quiz on it, I
10      promise.
11          A    Sure.
12          Q    The main thing -- the first thing I
13      want -- the first thing I want to ask you is:  Have
14      you ever seen this?  Not the text chain that's on
15      the front, but the employee handbook that begins on
16      the page with the Bates No. 139049 on it?
17          A    I believe years ago, yes.
18          Q    Okay.  And you and Mr. Sarowitz sign off
19      on the introductory letter to this handbook; is that
20      correct?
21          A    Our names are on there.  So yes, we do.
22          Q    You are the co-chairman of the studio; is
23      that correct?
24          A    That is correct.
25          Q    There is no other chairman of the studio
```

CONFIDENTIAL

Page 47

```
 1   you're aware of?
 2             MS. SHAPIRO:  Objection.
 3             THE WITNESS:  Just Steve Sarowitz and
 4   myself.
 5   BY MR. GOTTLIEB:
 6        Q    What are the responsibilities that go
 7   along with being, to the best of your understanding,
 8   the co-chairman of Wayfarer Studios?
 9        A    My responsibilities?
10        Q    Any responsibilities that you believe
11   apply to you?
12        A    My responsibilities are to -- to help
13   select and pick who I believe, along with my
14   co-chairman, to be the best managers for the
15   company.  To help the company in its creative
16   direction.  More bird's-eye view of ideally
17   hopefully where we're going.  And then to consult
18   with -- with the CEO, and president, and upper
19   management.  And my specific responsibilities are
20   also to help with creative for the various projects
21   that we have.
22        Q    Okay.
23        A    Based on my time.
24        Q    You see in the cover letter that you and
25   Mr. Sarowitz have written for this handbook, a
```

CONFIDENTIAL

Page 48

1   reference to Wayfarer Studios being a

2   Baha'i-inspired organization?

3          A     I see that.  Yes.

4          Q     We were talking a little bit about that

5   before.  It's not a --

6          A     Yes.

7          Q     This is consistent with what you

8   previously testified to?

9              MS. SHAPIRO:  Objection.

10             THE WITNESS:  Yeah, I -- I did not

11  remember -- we had many conversations about actually

12  not calling it a Baha'i-inspired organization.  So I

13  think legally we did not.  And that was mostly

14  because we didn't ever want to make anybody feel

15  like they were working at a religious company.  So I

16  believe an early version of this did not have it on

17  there, which is where my memory was coming from.

18  But I do see it here, and I don't deny that.

19  BY MR. GOTTLIEB:

20         Q     Okay.  Are you aware of a later version

21  of this handbook in which that was removed?

22         A     I'm not aware of a later version.  I

23  imagine this is the most recent version.  I believe

24  there have been different versions of this various

25  letter over the years.

CONFIDENTIAL

Page 49

```
 1          Q    And when you say legally you were not a
 2     Baha'i-inspired organization, I'm not going to be
 3     asking you for your legal opinions during this
 4     deposition.
 5          A    No, no, no.
 6          Q    What are you saying?
 7          A    It was just in the starting of an
 8     organization as it relates to the Baha'i faith, we
 9     did not want our company to, in any way, be a part
10     of the Baha'i faith as an organization.
11          Q    I see.
12          A    So that's essentially what I mean, is
13     that because the Baha'i faith's internal government,
14     if you will, is different than maybe like the
15     Catholic church or other Christian organizations,
16     there is a Baha'i organization that actually is a
17     government in the Baha'i faith.  And we did not want
18     a company to legally be tied or associated with an
19     official Baha'i organization.
20          Q    I understand.
21          A    So that was the debate and the
22     conversation around like a Baha'i-inspired
23     organization and what that actually means.
24          Q    Okay.  Do you see where you've written,
25     with Mr. Sarowitz, "This handbook has been written
```

CONFIDENTIAL

Page 50

1    to serve as the guide for our relationship and the
2    various work rules"?
3         A    Yes.
4         Q    And then do you see, if you flip a page
5    over, in the Table of Contents, there is a series of
6    categories.  I'm looking, sir, at page 139050, there
7    is a list of categories of different types of -- of
8    rules that apply to employees of the company?
9         A    Are you looking at employment --
10   underneath "Employment"?
11        Q    I'm just seeing -- asking you if you see
12   in the Table of Contents a bunch of different
13   categories of policies, procedures and rules --
14        A    Yes, I do --
15        Q    -- that apply to the company?
16        A    -- I do see that.
17        Q    Okay.  If you flip ahead to page 5 of
18   this document, which is WAYFARER_139053.  Do you see
19   at the top of that page, "Equal Employment
20   Opportunities, Anti-Discrimination, Anti-Harassment,
21   and Anti-Retaliation Policy" at the top?
22        A    Yes, I do.
23        Q    And have you ever read this, this policy?
24        A    I don't know if I've read this one, no.
25        Q    You don't know or you think you haven't?

CONFIDENTIAL

Page 51

1          A     The policy that is directly in front of
2    me, I don't know if I have read this policy.
3          Q     Okay.  So do you know if you've ever had
4    any kind of training on this policy, this
5    anti-discrimination, anti-harassment, and
6    anti-retaliation policy?
7          A     Yes, I believe I have.
8          Q     When was that?
9          A     I think every couple years.
10          Q     When was the last time you attended one?
11          A     In person?
12          Q     At all.  Virtually or in person?
13          A     Virtually -- virtually, I completed mine
14    last week --
15          Q     Okay.
16          A     -- for this year.
17          Q     For the year 2025?
18          A     Yes.
19          Q     Prior to that, do you recall the last
20    time you had training on this policy?
21          A     I imagine it was two years before that.
22          Q     Do you recall there ever being a training
23    on anti-discrimination, anti-harassment and
24    anti-retaliation during the production of
25    It Ends with Us?

CONFIDENTIAL

Page 53

```
 1        A    It was a man -- yeah.  We were in person
 2   but the man was over Zoom --
 3        Q    Okay.
 4        A    -- from my memory.
 5        Q    Were there slides?
 6        A    I'm assuming there were, yes.
 7        Q    Okay.  So if I showed you some slides,
 8   you might be able to tell me if they were the ones
 9   you saw?
10        A    To be very honest, if you showed me
11   slides, I would not know if they were the exact ones
12   I saw.  It was years ago.
13        Q    I think I said might be able to tell me,
14   but okay.  Fair enough.
15             Do you see at the top of page 5, in the
16   second paragraph, second sentence, the sentence:
17             (As read):
18                  "Wayfarer Studios strictly prohibits
19                  discrimination, harassment or
20                  retaliation against employees,
21                  applicants or any other covered
22                  person"?
23        A    I see that.
24        Q    And that's the Wayfarer Studios policy,
25   right?
```

CONFIDENTIAL

Page 54

```
 1          A     Yes.

 2          Q     Do you agree with it?

 3          A     Yes.

 4          Q     You've done your best to follow it?

 5          A     I have done my best to follow it, yes.

 6          Q     Do you see a long list of characteristics

 7     that under the Wayfarer Studios policy are

 8     protected?

 9                MS. SHAPIRO:  Objection.

10                THE WITNESS:  May I read it?

11     BY MR. GOTTLIEB:

12          Q     Sure thing.

13          A     I've read this paragraph.

14          Q     Okay.  You've read the paragraph that

15     lists out the protected characteristics, correct?

16          A     Yes.

17          Q     So you see that gender is protected?

18          A     I do.

19          Q     You see that sex is protected?

20          A     Yes.

21          Q     And you see that further includes

22     pregnancy, breastfeeding, childbirth?

23          A     I do.

24          Q     Do you see that height and weight are

25     also protected characteristics?
```

CONFIDENTIAL

Page 55

```
 1        A    Height, weight and -- yes.
 2        Q    And do you see in the next line down
 3   after that paragraph, the sentence that says:
 4             (As read):
 5                  "All Wayfarer Studios employees,
 6                  officers, principals, agents, workers
 7                  and representatives are prohibited from
 8                  engaging in unlawful discrimination,
 9                  harassment and/or retaliation"?
10        A    Yes.
11        Q    And you were an officer of Wayfarer
12   Studios; is that correct?
13        A    As co-chairman, I believe I am.
14        Q    And you were also an agent or an employee
15   because you were hired to be the director of
16   It Ends with Us?
17             MS. SHAPIRO:  Objection.
18             THE WITNESS:  Yes.
19   BY MR. GOTTLIEB:
20        Q    And you certainly represented Wayfarer
21   Studios in your role as co-chairman, right?
22        A    I believe I am.
23        Q    And, in fact, you and Mr. Sarowitz are
24   the highest people in the hierarchy of Wayfarer; is
25   that right?
```

CONFIDENTIAL

Page 56

```
 1            MS. SHAPIRO:  Objection.

 2            THE WITNESS:  Yeah.

 3   BY MR. GOTTLIEB:

 4        Q    Ultimately, the CEO and upper management

 5   answer to you and Mr. Sarowitz; is that right?

 6        A    Ultimately, yes.

 7        Q    In other words, if you and Mr. Sarowitz

 8   decide that, you know, you had it with Mr. Heath,

 9   it's your decision whether to get rid of him, right?

10        A    Yes.  Do you want to tell him or should

11   I?

12        Q    I think you should.  It would go over

13   smoother.

14            So do you see that one paragraph down

15   from the sentence I just read, the anti-harassment

16   policy?

17        A    I see that.

18        Q    And do you see where it says --

19        A    I have not read this, so...

20        Q    Okay.

21        A    Can I read it?

22        Q    Why don't you read that -- I'm going to

23   ask you questions about the next three paragraphs,

24   so if you want to read the next three paragraphs,

25   then I will ask you questions about them.
```

CONFIDENTIAL

Page 57

```
 1        A     I think I've gotten through them now.
 2        Q     Okay.  So back on the previous page,
 3   page 5 of this document, in the start of the
 4   anti-harassment policy, do you see the sentence that
 5   reads:
 6             (As read):
 7                  "Wayfarer Studios prohibits harassment,
 8                  disrespectful or unprofessional conduct
 9                  by any employee of the company,
10                  including supervisors, managers and
11                  co-workers."
12             Do you see that?
13        A     I do.
14        Q     Do you understand what that means?
15        A     That we prohibit harassment by anybody at
16   the company.
17        Q     Okay.  Do you see then the sentence that
18   starts with "Harassment may be verbal, written, or
19   physical conduct"?
20        A     I do.
21        Q     Okay.  So if you carry that sentence over
22   to the next page:
23             (As read):
24                  "Harassment may be verbal, written, or
25                  physical conduct."
```

CONFIDENTIAL

Page 58

1              Go to the -- in front of the A, B and C:

2              (As read):

3                      "That, A, has the purpose or effect of

4                      creating an intimidating, hostile or

5                      offensive work environment; or, B, has

6                      the purpose or effect of unreasonably

7                      interfering with an individual's work

8                      performance; or, C, otherwise adversely

9                      affects an individual's employment

10                     opportunities."

11             Do you see that sentence?

12     A     I do.

13     Q     Do you recall ever receiving training

14  with respect to any of those concepts in the

15  sentence I just read to you?

16     A     I believe I do.

17     Q     Do you recall receiving training that

18  discussed that harassment can be conduct that has

19  either the purpose or the effect of creating a

20  hostile or offensive work environment?

21     A     I do.

22     Q     Okay.  And do you see the -- in the next

23  paragraph, the sentence that reads:

24             (As read):

25                     "Sexual harassment includes harassment

CONFIDENTIAL

Page 59

```
 1                 that is not necessarily sexual in
 2                 nature."
 3            Do you see that?
 4       A    Yes.
 5       Q    You've been trained on that concept?
 6       A    I believe I have.
 7       Q    And you see further down there is another
 8  A, B, and C here because, of course, we lawyers love
 9  to put A, Bs and Cs into our -- into our documents.
10  Do you see subsection C says:
11                 (As read):
12                 "Such conduct has the purpose or effect
13                 of substantially and unreasonably
14                 interfering with an individual's work
15                 performance by creating an
16                 intimidating, hostile, or offensive
17                 working environment."
18            Do you see that?
19       A    I do.
20       Q    Do you understand what that means?
21       A    I believe I do.
22       Q    And you've been trained on that as well?
23       A    I believe I have.
24       Q    Okay.  Do you see where it says:
25                 (As read):
```

CONFIDENTIAL

Page 60

```
 1                  "Sexual harassment may include a range
 2                  of subtle and not so subtle behaviors"?
 3          A     Yes.
 4          Q     And it can include:
 5                (As read):
 6                  "Sexual jokes or innuendo, commentary
 7                  about an individual's body, sexual
 8                  prowess or sexual deficiencies or
 9                  touching"?
10                MS. SHAPIRO:  Objection.
11     BY MR. GOTTLIEB:
12          Q     I know I left some words out.
13          A     Yeah, yeah, yeah.
14          Q     But do you see the words that I read
15     there --
16          A     Yes.
17          Q     -- in this policy?
18          A     Yes.
19          Q     And you've been trained on this as well?
20          A     I believe I have.
21          Q     And because of that training, you
22     understand that the policy prohibits behavior that
23     has these effects on employees regardless of whether
24     those effects were intended; is that right?
25                MS. SHAPIRO:  Objection.
```

CONFIDENTIAL

Page 61

```
 1          THE WITNESS:  I believe so, yes.
 2   BY MR. GOTTLIEB:
 3      Q    Okay.  If you turn -- sorry.  If you look
 4   then at "Supervisor and Manager Responsibilities."
 5   Do you see where it reads:
 6          (As read):
 7              "If any supervisor or manager becomes
 8              aware of a violation of this policy,
 9              they are obligated to report the
10              violation to human resource management
11              so Wayfarer Studios can investigate
12              and, if appropriate, take corrective
13              action"?
14      A    Yes.
15      Q    You understood that was your
16   responsibility as a supervisor or manager?
17          MS. SHAPIRO:  Objection.
18          THE WITNESS:  Yeah.
19   BY MR. GOTTLIEB:
20      Q    And that was Mr. Heath's responsibility
21   as a supervisor or manager?
22      A    Yes.
23      Q    On the next page, do you see the section
24   entitled "Investigation"?
25      A    Yes.
```

CONFIDENTIAL

Page 62

1      Q      Do you see where it reads:

2             (As read):

3                    "Any reported allegations of

4                    harassment, discrimination, or

5                    retaliation will be promptly and

6                    thoroughly investigated by qualified

7                    personnel in an impartial manner."

8             Do you see that?

9      A      I do.

10     Q      Do you see it says:

11            (As read):

12                   "Wayfarer Studios will ensure that

13                   these personnel will use the evidence

14                   to reach reasonable conclusions"?

15     A      Yes.

16     Q      And then one more sentence down after

17   that.

18            (As read):

19                   "Wayfarer Studios will maintain

20                   appropriate documentation and tracking

21                   to ensure reasonable progress is made."

22            Do you see all that?

23     A      Uh-huh.

24     Q      And then there is a discussion of what

25   happens at the close of investigation.

CONFIDENTIAL

Page 63

```
 1             Do you see that?
 2      A     Yes.
 3      Q     And you see that depending on what's
 4  found in an investigation, "Wayfarer Studios will
 5  consider appropriate options for remedial actions
 6  and resolution and if misconduct is found, Wayfarer
 7  Studios shall take prompt, corrective action as
 8  appropriate."
 9             Do you see that?
10      A     Yes.
11      Q     Was any investigation of the type
12  described here in this paragraph conducted for the
13  conduct that is at issue in this litigation?
14             MS. SHAPIRO:  Objection.
15             THE WITNESS:  Not until this lawsuit was
16  filed and we were made aware of the conduct.
17  BY MR. GOTTLIEB:
18      Q     So I think your testimony is, this
19  lawsuit was filed --
20      A     Uh-huh.
21      Q     -- you were made aware of conduct?
22      A     We were made aware of allegations of
23  misconduct.
24      Q     Okay.  And then you launched an
25  investigation?
```

CONFIDENTIAL

Page 66

```
1   unaware of the incidents that were described in the
2   complaint?  Or is it your testimony that you were
3   unaware that Ms. Lively thought that those incidents
4   constituted sexual harassment and retaliation?
5            MS. SHAPIRO:  Objection.
6            THE WITNESS:  My testimony is that this
7   lawsuit and The New York Times article and the CRD
8   complaint was the first that I had heard of many of
9   these allegations that evidently I was at or a part
10  of, which I completely disagree with whether or not
11  they happened.
12           That said, the reason we launched an
13  investigation was because this was the first
14  official complaint, lawsuit against us.  So that
15  investigation happened because it was past the HR
16  complaint situation.  It was now an official, very
17  public situation.
18  BY MR. GOTTLIEB:
19       Q    Is it your understanding of the Wayfarer
20  policy that in order to investigate allegations of
21  sexual harassment and retaliation, that an official
22  HR complaint needs to be filed by the complainant?
23       A    I'm not sure.
24       Q    In fact, didn't we just look at on page 6
25  of the policy in the section entitled "Supervisor
```

CONFIDENTIAL

Page 67

```
 1   and Manager Responsibilities," there's a line that
 2   says:
 3                  (As read):
 4                      "If any supervisor or manager becomes
 5                      aware of a violation of this policy,
 6                      they are obligated to report the
 7                      violation to human resources/management
 8                      so Wayfarer Studios can investigate
 9                      and, if appropriate, take corrective
10                      action"?
11              MS. SHAPIRO:  Objection.
12              THE WITNESS:  I see that, yes.
13   BY MR. GOTTLIEB:
14       Q    So it is actually under your -- Wayfarer
15   Studios' policy, it's not incumbent upon the person
16   who feels that they have been harassed to come
17   forward with a formal HR complaint; is that right?
18              MS. SHAPIRO:  Objection.
19              THE WITNESS:  I don't know if there is
20   another part of this that says there needs to be a
21   formal HR complaint or not, so I don't know.
22   BY MR. GOTTLIEB:
23       Q    Okay.  You don't see one as you're
24   sitting here looking at this page, do you?  Under
25   the box that says "Supervisor and Manager
```

CONFIDENTIAL

Page 68

1    Responsibilities"?

2              MS. SHAPIRO:  Objection.

3              THE WITNESS:  No, I don't see one.

4    BY MR. GOTTLIEB:

5        Q    Okay.  You testified yesterday, I

6    believe, that you've never read The New York Times

7    article; is that correct?

8        A    Never personally read it, no.

9        Q    You've never sat down to read the article

10   published by The New York Times written by Megan

11   Twohey about the incidents in this case?

12       A    I did not personally sit down to read it.

13       Q    So as you sit here today, you do not know

14   personally anything that that article says?

15             MS. SHAPIRO:  Objection.

16             THE WITNESS:  No, I would not say that

17   that's true.

18   BY MR. GOTTLIEB:

19       Q    You have no personal knowledge from your

20   own experience of what that article says; is that

21   right?

22       A    I have personal firsthand knowledge from

23   my attorneys giving me point by point all that was

24   in the article.

25       Q    Okay.  So let me try it this way because

CONFIDENTIAL

Page 78

```
 1    consent.  But what I'm essentially saying is,
 2    there's even a possibility that in my teens and 20s,
 3    I wasn't aware.
 4         Q    Well, literally what you said is:
 5              (As read):
 6                   "I'm sure I have crossed boundaries and
 7                   lines in my teens and 20s not even
 8                   thinking about it simply because of the
 9                   porn I was consuming."
10              So that's what you said.  And my question
11    to you is:  Do I understand your testimony to be
12    that you were essentially making that up in order to
13    make other men feel that you were relatable to them?
14              MS. SHAPIRO:  Objection.
15              THE WITNESS:  No.  I'm sure I had crossed
16    boundaries in my teens and 20s.  I'm sure I have.
17    BY MR. GOTTLIEB:
18         Q    And do you think that was because of the
19    exposure that you had to this kind of toxic
20    pornography?
21         A    I'm sure that that was a part of it.  It
22    was also a different time and part of why I wrote
23    the book, was that consent wasn't taught to boys.
24    And I wanted to make sure that we taught consent to
25    boys and men.
```

CONFIDENTIAL

Page 107

1    they were women, I said women.  I hope that answers

2    your question.

3    BY MR. GOTTLIEB:

4         Q    It does.

5              Did you support Mr. Sarowitz's decision

6    about the employment action to take with respect to

7    Mr. Norman?

8         A    I did.

9         Q    And you know that that employment action

10   meant that he remained on with Man Enough in a

11   consulting or part-time position for a number of

12   months?

13        A    Yes.

14        Q    And he continued to be paid?

15        A    Yes.

16        Q    And you supported that?

17        A    I did.

18        Q    Who is Liz Plank?

19        A    Liz Plank is my former co-host of the Man

20   Enough podcast.

21        Q    How long was she your co-host?

22        A    Maybe three years.

23        Q    What changed?

24        A    What changed?

25        Q    What changed that caused her to not be

CONFIDENTIAL

Page 108

```
 1   your co-host anymore?
 2        A    The -- I imagine The New York Times
 3   article and the entire world thinking I was a bad
 4   man.
 5        Q    Did she tell you that?
 6        A    No.
 7        Q    Did you talk to her when she quit?
 8        A    No.
 9        Q    Did you read anything that she wrote
10   about why she didn't want to be a co-host anymore?
11        A    I believe it was shown to me, yes.
12        Q    Do you recall what it said?
13        A    I can't recall exactly what it said, no.
14        Q    Was it not important to you to understand
15   why Ms. Plank wanted to discontinue a
16   three-year-long professional relationship at that
17   point in time?
18             MS. SHAPIRO:  Objection.
19             THE WITNESS:  Can you ask the question a
20   different way?
21   BY MR. GOTTLIEB:
22        Q    I can try.  You said you didn't talk to
23   her after she quit?
24        A    No.
25        Q    And you didn't reach out to her to talk
```

CONFIDENTIAL

Page 119

1    uncomfortable because of the culture of hugging on

2    the set of It Ends with Us?

3             MS. SHAPIRO:  Objection.

4             THE WITNESS:  I'm not sure how my

5    assumption of Ms. Baker's testimony would lead to

6    perjury.

7    BY MR. GOTTLIEB:

8        Q    Do you or do you not think she was being

9    truthful when she said that multiple people felt

10   uncomfortable about a culture of hugging on the set

11   of It Ends with Us?

12            MS. SHAPIRO:  Objection.

13            THE WITNESS:  I think she was being

14   truthful.  That's not why I said I thought it was

15   odd.

16   BY MR. GOTTLIEB:

17       Q    Okay.  Did you ever hear from anyone on

18   the set of It Ends with Us that hugging, daily

19   hugging, was making them uncomfortable?

20       A    There was a point in time that I heard

21   that, yes.

22       Q    And when was that?

23       A    That was from Ange Giannetti and, I

24   believe, Alex Saks.

25       Q    Do you recall when that was?

CONFIDENTIAL

                                              Page 120

1          A    It was early on in production.  Maybe

2    first week or two.

3          Q    Okay.  So that's in May of 2023?

4               MS. SHAPIRO:  Objection.

5               THE WITNESS:  I have a feeling you know

6    the date better than me.  So, yes.

7    BY MR. GOTTLIEB:

8          Q    And what did you do when Ms. Saks and

9    Ms. Giannetti told you that certain people felt

10   uncomfortable with the hugging on the set of

11   It Ends with Us?

12              MS. SHAPIRO:  Objection.

13              THE WITNESS:  I stopped hugging.

14   BY MR. GOTTLIEB:

15         Q    Did you perform an investigation?

16         A    Because people didn't want there to be as

17   much hugging?

18         Q    That's my question.

19         A    No.

20         Q    Did you inform anybody in HR?

21         A    I did not.

22         Q    Even though hugging is one of the items

23   that appears in your sexual harassment policy?

24              MS. SHAPIRO:  Objection.

25              THE WITNESS:  I was unaware of any

CONFIDENTIAL

Page 121

1    official complaint of the hugging.  In fact, quite
2    the opposite.
3    BY MR. GOTTLIEB:
4         Q    Again, and we did this before, you
5    understand, because we had this exchange before,
6    that an official complaint does not need to be filed
7    in order for something to violate the Wayfarer
8    Studios sexual harassment policy, right?
9              MS. SHAPIRO:  Objection.
10             THE WITNESS:  Correct.
11   BY MR. GOTTLIEB:
12        Q    And you understand that there are
13   supervisor responsibilities that apply --
14             MS. SHAPIRO:  Objection.
15   BY MR. GOTTLIEB:
16        Q    -- that do not depend upon the filing of
17   an official HR complaint, right?
18             MS. SHAPIRO:  Objection.
19             THE WITNESS:  Correct.
20   BY MR. GOTTLIEB:
21        Q    Okay.
22        A    But just to point you back to 9054,
23   page 6, paragraph 1, 2, 3, 4, 5, 6.  It says:
24             (As read):
25                  "If any supervisor or manager becomes

CONFIDENTIAL

Page 140

1        A    Not myself.

2        Q    Did Wayfarer Studios pay for people's

3   salaries, compensation, on the film It Ends with Us?

4        A    I would imagine so.

5        Q    And you as the director and co-studio

6   head had the authority to hire, fire, remove, and

7   discipline people on the set if you chose to do so?

8             MS. SHAPIRO:  Objection.

9             THE WITNESS:  Yes.

10  BY MR. GOTTLIEB:

11       Q    And then you see a reference at 3:05 p.m.

12  by Ms. Saks saying:

13            (As read):

14                 "Do you remember when I called

15                 Andy Davis a few weeks in and was like,

16                 'Andy, he's inviting the department

17                 heads to go to Russian baths with

18                 him.'"

19            Do you see that?

20       A    Yes.

21       Q    Who is Andy Davis?

22       A    I believe Andy Davis is the -- he might

23  be the head of production at Sony Studios.

24       Q    Okay.  And on the next --

25       A    The person in charge of production at

CONFIDENTIAL

Page 144

1                "Russell said when he wrapped, he felt
2                like he left a cult"?
3       A    I do see that.
4       Q    Do you find that offensive?
5            MS. SHAPIRO:  Objection.
6            THE WITNESS:  It wouldn't be the first
7    time people around this case have said I was in a
8    cult.
9    BY MR. GOTTLIEB:
10       Q    I think you testified earlier about
11    meetings with Ms. Lively that occurred in her
12    apartment; is that right?
13       A    Yes.
14       Q    Is that the first place that you met with
15    Ms. Lively?
16       A    The first place -- it was in the same
17    building, yes.
18       Q    In the same apartment building?
19       A    In the building.
20       Q    Different room but same building?
21       A    Different apartment.
22       Q    Different apartment, same building?
23       A    Yes.
24       Q    Okay.
25       A    Am I done with this?

CONFIDENTIAL

Page 145

1       Q     Sure.

2             When was that meeting, the first meeting?

3       A     Sometime in December before Christmas.

4    Sorry.  I think it was December 22.

5       Q     And when you first met with Ms. Lively,

6    she had not yet agreed to play the role of Lily in

7    the film; is that right?

8       A     Yes.

9       Q     And you had not yet decided whether you

10   were sure if you wanted her to play the role of Lily

11   in the film, right?

12      A     Correct.

13      Q     You thought you did, though, right?

14            MS. SHAPIRO:  Objection.

15            THE WITNESS:  I thought I did what?

16   BY MR. GOTTLIEB:

17      Q     When you went to that meeting, traveled

18   to the meeting --

19      A     Yes.

20      Q     -- you prepared for the meeting?

21      A     Yes.

22      Q     And you discussed the meeting in advance

23   with certain people?

24      A     Yes.

25      Q     Like Mr. Heath?

CONFIDENTIAL

Page 146

1        A    Yes.

2        Q    And others?

3        A    (Witness nods head.)

4        Q    And is it fair to say that you were

5   hopeful that you and Ms. Lively would reach an

6   understanding and she would agree to play the role

7   of Lily in the film?

8             MS. SHAPIRO:  Objection.

9             THE WITNESS:  Yes.

10   BY MR. GOTTLIEB:

11        Q    And at that point in time, you had made

12   the decision that along with directing the film, you

13   would play the co-lead role in the film?

14        A    Yes.

15        Q    Is that the role of Ryle?

16        A    Yes.

17        Q    And before, I asked you if you were a

18   producer and you said no, you're an executive

19   producer; is that correct?

20        A    Yes.

21        Q    Okay.

22        A    I was, but eventually I -- I wasn't.

23        Q    You were for some period of time?

24        A    Yes.

25        Q    Okay.  In the first meeting, along with

CONFIDENTIAL

Page 147

1    other topics, you and Ms. Lively discussed your

2    families; is that right?

3          A     Yes.

4          Q     And at the time, Ms. Lively was pregnant?

5          A     Very pregnant, yes.

6          Q     She was soon to give birth?

7          A     Yes.

8          Q     And that would not be the first time.

9    Ms. Lively had children already, right?

10         A     Yes.  They were all over the apartment.

11         Q     And Ms. Lively was pregnant with a boy;

12   is that right?

13         A     Yes.

14         Q     And the two of you discussed certain

15   things about Ms. Lively's baby?

16               MS. SHAPIRO:  Objection.

17               THE WITNESS:  Unborn baby, yes.

18   BY MR. GOTTLIEB:

19         Q     Among other things, you discussed whether

20   Ms. Lively's baby would be circumcised, right?

21               MS. SHAPIRO:  Objection.

22               THE WITNESS:  That was a conversation,

23   yes.

24   BY MR. GOTTLIEB:

25         Q     And in the context of that conversation,

CONFIDENTIAL

Page 148

1   did you at any point share with Ms. Lively whether
2   you were circumcised?
3         A    Yes.
4         Q    Did Ms. Lively ask you whether you were
5   circumcised?
6         A    Directly, no.
7         Q    Who was present at the moment when you
8   relayed to Ms. Lively that you were circumcised?
9         A    There were people going all around.
10  Mr. Reynolds was in and out of the conversation.
11  She had, I think, two nannies.  I felt like there
12  was a housekeeper there.  Her assistant was walking
13  around.  I think she had two assistants there.  Her
14  and I were sitting on the couch, but there was
15  people all around.
16        Q    Have you ever told any other work
17  colleague at any point in time about your genitalia?
18              MS. SHAPIRO:  Objection.
19              THE WITNESS:  I don't talk about my
20  genitalia, so no.
21  BY MR. GOTTLIEB:
22        Q    Prior to Ms. Lively accepting the role of
23  Lily Bloom, she received a copy of the script; is
24  that right?
25        A    Yes.

CONFIDENTIAL

Page 172

1           MS. SHAPIRO:  Objection.

2           THE WITNESS:  I don't believe that was my

3    testimony.

4    BY MR. GOTTLIEB:

5       Q    Would adding a sex scene not in the book

6    be considered gratuitous?

7           MS. SHAPIRO:  Objection.

8           THE WITNESS:  No.  Because none of the

9    sex scenes that were in the movie as they currently

10   exist were ever in the book in the way that they

11   are.

12   BY MR. GOTTLIEB:

13      Q    If you flip to page 81 of the script,

14   which is BALDONI 3724.

15           Are you there with me, sir?

16      A    Yes.

17      Q    Do you see A69?

18      A    Yes.

19      Q    And that is a reference to "ARIA HOTEL,

20   PENTHOUSE SUITE NIGHT"?

21      A    Yes.

22      Q    And this is wedding night for Ryle and

23   Lily?

24      A    Yes.

25      Q    And you see towards the end of that, it's

CONFIDENTIAL

Page 173

1    written:

2              (As read):

3                   "As the two climax at the same time,

4                   they lock eyes and cannot help but

5                   smile, baffled that they found each

6                   other"?

7         A    Yes.

8         Q    Whose idea was it to add "the two climax

9    at the same time"?

10        A    Christy Hall.

11        Q    When did she communicate that to you?

12        A    We did it -- we were writing together.

13   We were in a room in my office.  We were

14   specifically working on a lot of the sex scenes and

15   --

16        Q    What did -- sorry.  Go ahead.

17        A    And we -- yeah.  This was -- we were

18   writing a movie that was filled with romance and

19   lust and intimacy and sex.  And, again, these are

20   all outlines, right, so a script has far less

21   description than a book.  So you have

22   It Ends with Us, which has a ton of pages and very

23   detailed descriptions of various scenes so that you

24   can paint the picture in your mind.  And all writers

25   do.  Which I learned a lot on this process, is you

CONFIDENTIAL

Page 174

1    have to give some sort of outline so that as you're

2    reading the script, you have an idea of what's

3    happening.  And then you work out all the details

4    once you start production, both with the actress in

5    accordance with what is standard for approval.  And

6    then after the actress, with the intimacy

7    coordinators to figure out what each of these things

8    really mean.

9         Q    Did you ever have a conversation with

10   anyone else, cast, crew, production on

11   It Ends with Us about Lily and Ryle climaxing

12   together, other than Christy Hall?

13        A    I think I spoke about every single

14   intimate sex scene with our intimacy coordinator.

15        Q    Okay.  So Ms. Hall, your intimacy

16   coordinator --

17        A    And then eventually, Ms. Lively.

18        Q    Okay.  And then Ms. Lively?

19        A    Yes.

20        Q    Do you ever recall having a conver -- so

21   do you recall having a conversation with Ms. Lively

22   about this specific line here?

23        A    I don't recall it being about this

24   specific line.

25        Q    Do you have any recollection of having a

CONFIDENTIAL

Page 175

1    conversation with Ms. Lively about the scene in

2    which you discussed you and your wife?

3              MS. SHAPIRO:  Objection.

4              THE WITNESS:  I remember a conversation,

5    not discussing a scene, where I brought up my wife,

6    yes.

7    BY MR. GOTTLIEB:

8         Q    And what do you recall bringing up?

9         A    The day before I had a meeting with the

10   intimacy coordinator, to go over ideas for all of

11   these scenes, I wrote down a bunch of notes from

12   that meeting.  The following day, I had a meeting

13   set with Ms. Lively to specifically talk about the

14   sex scenes.  That was the actual point of the

15   meeting.  In that meeting, I read through and walked

16   through the notes that I had discussed with the

17   intimacy coordinator.

18             One of them was an idea that had come up

19   where Ryle and Lily were making love.  Lily had

20   climaxed or had an orgasm, to speak frankly here,

21   and Ryle did not.  And the idea, as the intimacy

22   coordinator and I were talking about things that

23   women have not seen on camera yet, things that would

24   be unique, that would be attractive to the female

25   gaze, which was the purpose of that meeting, the

CONFIDENTIAL

Page 176

1    idea was that Ryle would then stop and say "just
2    watching you was enough" or "I'm good" or something
3    like that.
4            When I shared that with Ms. Lively, she
5    then made it personal and said ,"Oh, God, that would
6    mortify me if that happened to me."  To which I then
7    responded, as one does because when you're two grown
8    adults with children who are married in the context
9    of talking about sex scenes, with a movie that
10   you're making with a person who is understanding
11   that there are going to be sex scenes in a book
12   based with a lot of sex in it, the only thing you
13   really have to share are personal experiences.  So I
14   said, "Oh, well, some of the most beautiful moments
15   have been when that's happened with me and my wife."
16    And that was it.
17       Q    So you were interested in shooting the
18   scene from the female gaze?
19       A    I was interested in shooting all the sex
20   scenes from the female gaze.
21       Q    Did Ms. Lively have a female gaze?
22       A    I would imagine so if she's a female.
23       Q    Did you believe she had one?
24       A    Of course.
25       Q    Did you believe that that gaze was

CONFIDENTIAL

                                            Page 180

1              THE VIDEOGRAPHER:  We are going off the

2      record.  The time is 1:05 p.m.

3              (Lunch recess.)

4      (continuing)

5                      AFTERNOON SESSION

6                  TUESDAY, OCTOBER 7, 2025

7                      ---oOo---

8              THE VIDEOGRAPHER:  We're back on the

9      record.  The time is 2:02 p.m.

10     BY MR. GOTTLIEB:

11         Q    Did there come a time in May of 2023

12     where you learned that Jenny Slate and Ms. Lively

13     had made concerns known regarding comments that you

14     had made on the set?

15         A    In May of 2023?  I believe, yes.  Yes.

16         Q    Who told you about Ms. Slate and

17     Ms. Lively's concerns?

18         A    Ange Giannetti.  Alex Saks.

19         Q    Separately or together?

20         A    Separate conversations.

21         Q    With Ms. Giannetti, was that a

22     conversation in person?

23         A    No.

24         Q    On the phone?

25         A    Yes.

CONFIDENTIAL

Page 181

1         Q     How about Ms. Saks?

2         A     Phone.

3         Q     Okay.  What do you recall Ms. Saks

4    telling you about Ms. Slate's concerns?

5         A     I recall her having lunch with Ms. Slate

6    and saying that Ms. Slate -- she listed a few

7    things.  She said Ms. Slate had not appreciated the

8    recording that I had made during pre-production with

9    her and Ms. Lively.  She had not appreciated a

10   comment that I had made on-set regarding her

11   wardrobe, something she was wearing.  I believe she

12   also said that Ms. Slate didn't like that I was

13   interacting with the fans outside.  There was a lot

14   of fans when we were shooting.  And then, on certain

15   breaks I would go and just say hi to them because

16   they were out there all day.

17              And if I recall correctly, she was saying

18   to Ms. Saks that she didn't want to be asked to go

19   out and do that as well because she was a private

20   person.  So she was asking to not interact with --

21   to be asked to interact with the fans.  I don't know

22   if it was Alex or Ange who told me that she had felt

23   the set was too huggie or comfortable or whatever.

24   I know huggie was a word that was used because I

25   remember the word.

CONFIDENTIAL

Page 182

1              That's the best of my recollection at the

2      moment.

3          Q    So between Ms. Saks and Ms. Giannetti,

4      you were told that Ms. Slate thought the set was too

5      huggie, yes?

6          A    You asked me about just Ms. Saks, so I

7      was just answering for Ms. Saks.

8          Q    I thought you just said you weren't sure

9      if it was Ms. Saks or Ms. Giannetti that said that?

10         A    Oh, no.  I thought your original question

11     was to recount what Ms. Saks told me.  If I misheard

12     that --

13         Q    That's fine.

14         A    -- I thought you were breaking the two

15     up.

16         Q    Did Ms. Giannetti's description of

17     Ms. Slate's concerns differ in any material respect

18     to you?

19              MS. SHAPIRO:  Objection.

20              THE WITNESS:  Slightly.

21     BY MR. GOTTLIEB:

22         Q    In what way?

23         A    I specifically recall -- to further

24     answer your question, it was a FaceTime.

25         Q    With?

CONFIDENTIAL

Page 183

1          A     Ms. Giannetti.

2          Q     Okay.

3          A     It was not a phone call.

4          Q     So a FaceTime with Ms. Giannetti.  What

5     do you recall that's different?

6          A     What's different is that Ms. Giannetti

7     had told me that she had asked Ms. Slate if she

8     wanted to file a report, if she wanted her to do

9     something with it.  That was not something that

10    was -- that Alex had said anything about.  To which

11    Ms. Slate said, no.  Ms. Giannetti had also said on

12    that call that when Ms. Slate had said that I had

13    commented on her wardrobe and used the word "sexy,"

14    that Ms. Giannetti asked if she felt it was sexual

15    or if I was hitting on her, and she said, no, it

16    wasn't sexual.  She just didn't appreciate it.

17               That's how in my recollection -- oh, and

18    I believe it was from Ms. Giannetti that I had heard

19    that Ms. Slate didn't appreciate the way that Jamey

20    or Mr. Heath had offered to pay for her additional

21    housing, as he was talking about the sanctity of

22    motherhood.  And I wasn't there, so I don't know.

23    But she didn't like that, I guess.

24         Q     And so before when you were testifying

25    about what Ms. Saks told you, you had mentioned a

CONFIDENTIAL

Page 184

1    comment about a wardrobe.  That comment about a

2    wardrobe included the use of the word "sexy"?

3         A     Correct.

4         Q     And your testimony is that that comment

5    was about the wardrobe choice?

6         A     I don't think that's what I said.

7         Q     Okay.  We'll get back to your description

8    of that in just a moment.

9              Am I correct that in response to

10   receiving this information from Ms. Saks and

11   Ms. Giannetti, you sent a message to Ms. Slate?

12        A     Well, this was the first I had heard

13   about it.  Ms. Slate had not come to me directly,

14   and I felt -- I felt terrible, and I wanted to

15   apologize.  But I also didn't want to burden her

16   with that or make her uncomfortable.  And so I

17   thought it would be best, based on the kind of the

18   power dynamic and the awkwardness of it, to actually

19   send it to Alex so that I didn't have to, like,

20   force her to accept my apology or something.  So I

21   was just trying to be respectful.  And so, yes, I

22   sent Alex a message to send to Ms. Slate.

23        Q     You didn't want to make Ms. Slate

24   uncomfortable by sending her a message directly?

25        A     Yes.

CONFIDENTIAL

Page 185

1          Q    And that's because you understood that
2    Ms. Slate was already uncomfortable in certain
3    respects?
4               MS. SHAPIRO:  Objection.
5               THE WITNESS:  Well, I understood that
6    since she had shared that she had not appreciated
7    some of my behavior.  As soon as I was aware of it,
8    I didn't want to add to that in any way.  So I
9    wanted to send it to her so I didn't, like, create
10   anymore discomfort.
11   BY MR. GOTTLIEB:
12          Q    Anymore discomfort?
13              MS. SHAPIRO:  Objection.
14              THE WITNESS:  Yes.  Correct.
15   BY MR. GOTTLIEB:
16          Q    Okay.  And you were also informed about
17   Ms. Lively's discomfort as well, correct?
18              MS. SHAPIRO:  Objection.
19              THE WITNESS:  Not from Alex Saks.
20   BY MR. GOTTLIEB:
21          Q    From whom?
22          A    Ange Giannetti.
23          Q    Let's bracket that and come back to it.
24   Let's continue on Ms. Slate for a moment.
25          A    Okay.

CONFIDENTIAL

                                            Page 186

1              MR. GOTTLIEB:  I want to show you a

2    document.  This will be Exhibit 26.

3          (Exhibit 26 marked for identification.)

4    BY MR. GOTTLIEB:

5          Q    Mr. Baldoni you've been handed what's

6    been marked as Exhibit 26.  This is a document

7    bearing the Bates Nos. BALDONI 31947 through 31950.

8          A    Uh-huh.

9          Q    And this is a text exchange between you

10   and Alex Saks; is that correct?

11         A    It appears to be.

12         Q    The date is May 30th, 2023; is that

13   correct?

14         A    May 30th, 2023, yes.

15         Q    Okay.  And do you see at the bottom of

16   page 31948 at 9:46 p.m., you ask Ms. Saks if you can

17   send your notes to Jenny and Blake?

18         A    I do.

19         Q    And then, do you see on page 31949, you

20   send two draft notes to Ms. Slate and Ms. Lively?

21         A    I do.

22         Q    You send them to Ms. Saks, draft notes to

23   --

24         A    Yes --

25              (Cross talk.)

CONFIDENTIAL

Page 187

1          Q      -- to Ms. Slate and Ms. Lively?

2          A      -- I send them to Ms. Saks, yes.

3          Q      Okay.  And in the note to Ms. Slate, that

4     you're asking Ms. Saks to send, you say:

5                 (As read):

6                       "I recognize the last few days of

7                       filming have been difficult, but I

8                       wanted you to know that the work is

9                       really great and I'm excited for what

10                      we're creating."

11                Were you being straightforward and

12     truthful when you said that the last few days of

13     filming have been difficult?

14         A      Yes.  I said:

15                (As read):

16                      "First off, thank you for putting in --

17                      putting your all into the film."

18                And then I said:

19                (As read):

20                      "I recognize that the last few days of

21                      filming have been difficult."

22                So that was -- well, it was -- they

23     were -- yeah, they were difficult, so I was being

24     truthful, of course.

25         Q      Those few days had been challenging on

CONFIDENTIAL

Page 188

1    the set?

2         A    Every day on a movie set is honestly

3    challenging, but those few days, yeah, there were a

4    lot of big challenges those few days, production

5    wise.

6         Q    Then you say:

7              (As read):

8                   "Equally important is that I was made

9                   aware of your concerns.  I wanted you

10                  to know they are fully received.  I

11                  hear you and adjustments will be made

12                  accordingly."

13             And your reference there to your

14   concerns, are those the concerns that you had just

15   listed out to me that you had been relayed from

16   Ms. Saks and Ms. Giannetti?

17        A    Correct.  The ones involving myself, yes.

18        Q    Are there any other concerns that as you

19   sit here today, you can think of that you could have

20   been referring to other than the ones you just

21   testified about?

22        A    Specifically, I -- I was answering your

23   question as it related to Jenny Slate, so if you're

24   talking about concerns in general...

25        Q    What I'm talking about is your reference

CONFIDENTIAL

Page 189

```
 1   here to your concerns.  And all I'm trying to
 2   understand, sir, is if other than what you just
 3   testified to, there's anything else you can think
 4   about that you were referring to when you wrote
 5   "your concerns"?
 6              MS. SHAPIRO:  Objection.
 7              THE WITNESS:  I would go back to a
 8   previous question, and then I would -- I would
 9   include a concern that wasn't, I don't think,
10   mentioned to me from Alex.  But if you're asking if
11   I was inferring anything, there was a instance that
12   happened with Ms. Lively on set as well, where I
13   also used the word "sexy" in relation to wardrobe
14   that Ms. Slate was there for.  So I would lump that
15   into the overall concerns.
16   BY MR. GOTTLIEB:
17        Q    And you knew that Ms. Slate was concerned
18   about that comment as well to Ms. Lively?
19        A    Ms. Slate and I had a conversation with
20   Ms. Lively about that comment.
21        Q    Okay.  And Ms. Slate told you she did not
22   appreciate or feel comfortable with that comment?
23        A    Those -- I don't believe those were the
24   words she used.
25        Q    What were the words she used?
```

CONFIDENTIAL

Page 190

1         A    I believe she -- I don't have the exact
2    words, but it had to do with, in general, we are --
3    it's like, we are -- the collective, we are staying
4    away from using those words to describe, you know,
5    women's bodies.  It was like a -- in kind of like
6    a -- Ms. Slate is a very funny woman, kind of a
7    disarming, joking kind of way.  But it wasn't your
8    words.  So I just...
9         Q    Do you think that was Ms. Slate's female
10    gaze?
11              MS. SHAPIRO:  Objection.
12              THE WITNESS:  Do I think her words --
13    BY MR. GOTTLIEB:
14         Q    Objection to describing her wardrobe as
15    sexy would constitute her female gaze on that
16    particular situation?
17              MS. SHAPIRO:  Objection.
18              THE WITNESS:  Yes.
19    BY MR. GOTTLIEB:
20         Q    Did you have a different gaze from your
21    male perspective?
22         A    I don't know if it's possible that I can
23    have a different gaze as a male.  So I'm sorry, I
24    don't know what you're asking.
25         Q    So Ms. Slate, not you, would know from

CONFIDENTIAL

Page 191

1    the female gaze, the impact of having somebody say

2    that you're -- you look sexy in a piece of clothing?

3              MS. SHAPIRO:  Objection.

4              THE WITNESS:  That's not what I said to

5    Ms. Lively.  But absolutely, Ms. Slate would have a

6    female gaze and I would not.

7    BY MR. GOTTLIEB:

8         Q    Would Ms. Lively have one?

9         A    As I said earlier, so long as Ms. Lively

10   identifies as a female, she would have a female

11   gaze.

12        Q    Okay.  Do you see -- were any of the

13   concerns that were reported to you by Ms. Slate

14   provided to anyone in HR at Wayfarer Studios?

15        A    To my knowledge, no.

16        Q    You did not report any of the concerns

17   that Ms. Slate had raised with you to anyone in the

18   HR department at Wayfarer Studios?

19        A    I did not.

20        Q    Do you see that you've also written a

21   note to Ms. Lively here?

22        A    I have.

23        Q    And you essentially use similar language

24   here with respect to Ms. Lively's concerns; is that

25   right?

CONFIDENTIAL

Page 192

```
 1        A    Yes.
 2        Q    You say:
 3             (As read):
 4                 "I want you to know that I've been made
 5                  aware of your concerns and I hear you.
 6                  They are fully received and adjustments
 7                  will be made imminently."
 8             Do you see that?
 9        A    Yes.
10        Q    And you say:
11             (As read):
12                 "The dailies are looking wonderful and
13                  while the last two days were tough, I
14                  assure you that your work was
15                  fantastic."
16             Do you see that?
17        A    Yes.
18        Q    And you say:
19             (As read):
20                 "I truly believe you're creating one of
21                  your most honest performances that will
22                  have a long lasting and powerful
23                  impact."
24             Do you see that also?
25        A    I do.
```

CONFIDENTIAL

Page 193

1          Q    Were you being dishonest when you wrote
2     this to Ms. Lively?
3          A    No.
4          Q    You believed all of that?
5          A    Yes.
6          Q    You did not believe as of
7     May 30th, 2023, that Ms. Lively's concerns had
8     been fabricated?
9               MS. SHAPIRO:  Objection.
10              THE WITNESS:  The concerns -- well, I
11    don't think we've talked about her concerns yet,
12    but...
13    BY MR. GOTTLIEB:
14         Q    The concerns to which you are responding
15    here when you say:
16              (As read):
17                   "I've been made aware of your concerns
18                   and I hear you.  They are fully
19                   received and adjustments will be made
20                   imminently."
21              With respect to those concerns that
22    you're saying that you've been made aware of and
23    they are fully received and adjustments will be made
24    imminently, those concerns were not fabricated,
25    right?

CONFIDENTIAL

Page 194

1              MS. SHAPIRO:  Objection.

2              THE WITNESS:  No.

3    BY MR. GOTTLIEB:

4        Q    You believe Ms. Lively made those --

5    communicated those concerns to you -- had -- let me

6    strike that.

7              You believed that Ms. Lively communicated

8    those concerns in good faith?

9              MS. SHAPIRO:  Objection.

10             THE WITNESS:  I believe that the primary

11   concern, also being COVID, the reason that I was

12   told she called Ange Giannetti, is a very valid

13   concern.  I was made aware of the -- that she also

14   didn't appreciate the use of the word "sexy," but

15   also that I apologized in the moment, and in her own

16   words, we were good because we had actually

17   discussed this in person afterwards.  The majority

18   of the concerns that I took seriously had to do with

19   the way the set was being run.  She was very adamant

20   when she spoke to Sony about the firing of the first

21   AD, she wanted a change.

22             So it was my understanding that the

23   majority of the phone call with Ms. Giannetti had to

24   do with COVID, and the firing of the first AD.  And

25   those were the concerns that I can recall being

CONFIDENTIAL

Page 195

1    aware of, which I do not believe were fabricated and
2    she had every right to feel the way that she felt.
3    BY MR. GOTTLIEB:
4         Q    Including her concern with respect to
5    your use of the word "sexy"?
6         A    She has every right to feel that way
7    about that word, but I also -- that was something
8    that we worked through immediately on the spot.
9         Q    And I appreciate that, but to underscore
10   the point, it's your testimony as you sit here today
11   that Ms. Lively's concern with respect to your use
12   of the word "sexy," that wasn't something she made
13   up to take control of the film, right?
14             MS. SHAPIRO:  Objection.
15             THE WITNESS:  I do not believe she made
16   up the instance where I used the word "sexy" to
17   describe specifically her wardrobe, no, I don't.
18   BY MR. GOTTLIEB:
19        Q    And Ms. Slate's concerns were not made up
20   so that Ms. Lively could take control of the film,
21   right?
22        A    No.  I also can't speak to what
23   Ms. Lively's intentions were at the time.
24        Q    I want to show you -- did you ever talk
25   to Ms. Slate after sending this message?  Did you

CONFIDENTIAL

Page 196

1    ever talk to her about this situation or her

2    concerns directly?

3            A    I didn't feel it was appropriate to put

4    her in that situation.  So from that point on, I

5    gave her high-fives and complimented her on her work

6    and didn't hug her and never used the word "sexy"

7    again.

8                 MR. GOTTLIEB:  I want to show you a

9    document.  I will mark it as Exhibit 27.  And

10   Exhibit 27 is a document bearing the Bates Nos.

11   JS 224 through 225, which is a text message dated

12   May 27th between Jenny Slate and Josh Pearl.

13                 Take a minute to read that.

14           (Exhibit 27 marked for identification.)

15   BY MR. GOTTLIEB:

16           Q    And Mr. Baldoni, I appreciate that

17   looking at some of this may be difficult.  This --

18   who is Josh Pearl, first of all?

19           A    I don't know.

20           Q    The text that we were looking at in the

21   prior exhibit, which is Exhibit 26, and the messages

22   that you had sent to Ms. Slate and Ms. Lively was

23   from May 30th.  This is an exchange on May 27th;

24   is that right?

25           A    It appears to be.

CONFIDENTIAL

Page 199

1              THE WITNESS:  Sad.

2    BY MR. GOTTLIEB:

3         Q     You talk before about your desire to tell

4    the story through the female gaze; is that correct?

5         A     It was a desire, yes.

6         Q     Why did you choose a male director?

7         A     Well, for some time I was actually

8    looking for a female director.  I went back and

9    forth from the very beginning of if I should direct

10   or not.  Originally, I had optioned the book to

11   direct it, and that was the original plan.  And that

12   was back in 2019 or so.  And culturally, the

13   conversation changed very fast, and so I thought

14   maybe I shouldn't direct it.  So there was a period

15   of time where I wasn't going to direct it.

16              And then, in the developing of it with

17   Christy Hall, and in speaking to many of the women

18   in my life and women who do specific work as it

19   relates to gender, I sought advice.  I started

20   feeling like I was seeing the movie and what was

21   possible.  And I thought if I could surround myself

22   with the right team, that there was actually

23   something that I could do justice to because it

24   wasn't solely a female story.  There also were

25   elements that I believe could be really helpful to

CONFIDENTIAL

Page 200

1   men.
2              So ultimately, because I had the rights
3   to the film and it was ultimately my decision and in
4   consultation with friends and my wife and team,
5   ultimately I believed in myself enough to take on
6   the role.
7        Q    You thought you would be the best person
8   to direct this film?
9        A    At the time I did.
10       Q    Did Colleen Hoover ever tell you that she
11  wanted the director of It Ends with Us to be a
12  female?
13       A    My recollection from the very beginning
14  was that Colleen Hoover knew I was going to be
15  directing this film.  That was why she gave me the
16  rights.
17       Q    So my question is, at any point in time,
18  did Colleen Hoover ever tell you that she wanted the
19  director of the film to be female?
20       A    I don't remember a conversation like
21  that.  It may have happened, but I feel like I would
22  remember.
23       Q    Okay.  Do you recall ever having a
24  conversation with anyone where they told you maybe
25  the director of this movie should be a female?

CONFIDENTIAL

Page 201

1        A    I think during the time that I was just
2    discussing where there was big shifts culturally,
3    yes, which is why we were looking for a female
4    director for quite some time.
5        Q    Okay.  But ultimately, you decided you
6    were better positioned to tell the story?
7            MS. SHAPIRO:  Objection.
8            THE WITNESS:  I wouldn't characterize it
9    that way at all.
10   BY MR. GOTTLIEB:
11       Q    Do you recall ever saying to
12   Brandon Sklenar on the film set, something to the
13   effect of, I have to tell you something but I don't
14   want to get canceled or lose my job.  You can't say
15   anything on this set anymore?
16       A    I have heard that in someone else's
17   testimony, and that is not something I said.  That's
18   also not the way that I speak.
19       Q    Whose testimony did you hear that in?
20       A    I believe Jenny Slate's.
21       Q    Did you come to ever feel like you
22   couldn't be open or candid or unfiltered on your
23   set?
24       A    Yes.  But not for any reason that it's
25   inferred in that text, nor would I ever say anything

CONFIDENTIAL

Page 202

1   to Brandon Sklenar like that.
2        Q    So if somebody said they heard you say
3   that, your under-oath testimony would be they are
4   mistaken?
5        A    My under-oath testimony is that I don't
6   believe I ever said anything to that -- to that
7   effect to Brandon Sklenar.
8        Q    Did you say to Ms. Slate when you made
9   the "sexy" comment, that you could say that because
10  your wife was there?
11           MS. SHAPIRO:  Objection.
12           THE WITNESS:  My recollection of the
13  "sexy" comment was that it was all kind of said in
14  one sentence.
15  BY MR. GOTTLIEB:
16       Q    And what was the one sentence?
17       A    Ms. Slate walked in.  As a director, I
18  was doing whatever I was doing, getting the set
19  ready.  I looked over to her.  She was wearing a --
20  I believe black leather pants, which were designed
21  to, I'm sure, look sexy.  And without thinking, I
22  said something to the effect of, oh, wow, those
23  pants look sexy on you.  And my memory, if it serves
24  me correctly, I then -- my wife was in the room
25  nearby.  And I think in my head I was like, oh,

CONFIDENTIAL

Page 203

1    maybe I shouldn't have said that.  And I said, and I

2    say that as a married man with my wife in the other

3    room.  Because I did not want it to come off in any

4    way like it apparently did.  So I was just -- in

5    that moment it was just an instance where I said

6    something that I was like, ah, I probably shouldn't

7    have said that.  And just tried to not make it super

8    awkward and made a bad joke at the end of it.

9         Q    What you just described to me, I probably

10   shouldn't have said that, my wife's in the other

11   room, is that something you said outloud or is that

12   in your head what you were thinking?

13        A    Well, I was -- it was like an internal

14   dialogue --

15        Q    Internal dialogue?

16        A    -- like a -- it just came out.  It was an

17   instance where I said something without thinking.

18        Q    Okay.  Have you ever discussed, in the

19   context of the events of this film, and what

20   happened on set, have you ever discussed trying to

21   describe them as a component of neurodivergence?

22             MS. SHAPIRO:  Objection.

23             THE WITNESS:  That being an instance,

24   yes.

25

CONFIDENTIAL

Page 214

```
 1    anyone that you thought sexual harassment was being
 2    insinuated or suggested about you or your conduct?
 3              MS. SHAPIRO:  Objection.
 4              THE WITNESS:  I'm not sure, but I know
 5    that I certainly didn't agree with -- or the
 6    insinuations.
 7    BY MR. GOTTLIEB:
 8         Q    If you had thought that sexual harassment
 9    was being insinuated, suggested, would you have
10    wanted some kind of an investigation to be done or
11    to exonerate yourself?
12              MS. SHAPIRO:  Objection.
13              THE WITNESS:  I'm not sure.
14    BY MR. GOTTLIEB:
15         Q    I'm going to mark a document.  Before I
16    do, Mr. Baldoni, I see you have a drink in front of
17    you.
18         A    Yes.
19         Q    That's a drink called "Update," right?
20         A    Yes.
21         Q    Are you a sponsor or a promoter of
22    Update?
23         A    A sponsor?
24         Q    Yeah.
25         A    What do you mean by a "sponsor"?
```

CONFIDENTIAL

Page 230

1    appears from the transcript, I did.

2              How would you characterize your comment

3    using the word "sexy"?

4         A    In a conversation where I was speaking to

5    Ms. Lively about her wardrobe, as the director, I

6    wanted to see the onesie because all the characters

7    were wearing onesie's.  She had a large jacket on,

8    and we were having a bit of a negotiation, as I was

9    trying to gently ask her to remove it.

10             And like many conversations with

11   Ms. Lively, there's a back-and-forth that can go on

12   for quite some time.  And it got to the point where

13   I believe I said to her that it looked hot, to which

14   she replied -- earlier, she had said she thought it

15   was cute, and that's why she wanted to wear it.  And

16   then I had said it -- down the line, I had said it

17   looked hot.  And she said, That's not what I was

18   going for.

19             And then I made a joke.  I said, sexy?

20   She goes, Not that either.  And then immediately, I

21   paused, and I said, I'm sorry, did I just cross a

22   boundary?  And Mrs. Slate shared what we talked

23   about earlier, to which case I thanked them both.  I

24   apologized to Ms. Lively again.

25             And I was in the middle of, you know,

CONFIDENTIAL

Page 231

1   getting everything ready.  I think at one point I

2   let Ms. Lively know that she had something in her

3   teeth before filming, because we were getting ready

4   to go shoot.  And then I came back later, five

5   minutes later, before we started filming, and I

6   thanked Mrs. Slate for what she said.

7              I said that was -- I said something along

8   the lines of, That can't be easy.  I wish you didn't

9   need to say what you said, and I really appreciate

10  you sharing that with me.  And I apologized again to

11  Ms. Lively for using the word "sexy" as it related

12  specifically to her character's wardrobe.

13       Q    Were the cameras recording when that

14  exchange happened?

15       A    The cameras for the movie?

16       Q    Any cameras.

17       A    I believe there was some

18  behind-the-scenes cameras filming, yes.

19       Q    Have you watched the video from that

20  exchange?

21       A    I have.

22       Q    Have you produced the video from that

23  exchange in this case to Ms. Lively?

24       A    I believe every single piece of video as

25  it relates to the movie was produced from my

CONFIDENTIAL

Page 232

1    attorneys.

2          Q     When did you last watch that scene, that

3    recording?

4          A     January maybe.

5          Q     You didn't mention anything about missing

6    the HR meeting.  Did you say anything about missing

7    the HR meeting?

8          A     Yes, I did.  In response to Jenny Slate's

9    kind of -- as I mentioned earlier, joke, as she was

10   saying, We don't say that anymore, I immediately

11   responded and said, I guess I missed the sexual

12   harassment meeting.

13         Q     Did you miss the sexual harassment

14   meeting?

15         A     That's why I made the joke, because I did

16   not miss the sexual harassment meeting.

17              MR. GOTTLIEB:  All right.  Let's look at

18   a document.

19         (Exhibit 30 marked for identification.)

20   BY MR. GOTTLIEB:

21         Q     This is a document that's been marked as

22   Exhibit 30, another text exchange between Ms. Saks

23   and Ms. Giannetti on June 1st, 2023.  And it bears

24   the Bates No. SPE_BL 2026 through 2035.  And I'm

25   really only going to be asking you, Mr. Baldoni,

CONFIDENTIAL

Page 240

1    thought Ms. Lively was upset, and that's why she was

2    sharing the story.  I can't, one, speculate to what

3    Ms. Lively was feeling.  All I was saying was that

4    she did not seem upset as she was sharing the story.

5    It felt like this was something that she wanted to

6    share to ensure it didn't happen again.  But I can't

7    speculate as to what she was feeling or not feeling.

8    BY MR. GOTTLIEB:

9        Q    She didn't want it to happen again; you

10   understood that?

11       A    Yes.

12       Q    Okay.

13            Did anyone talk to HR about that

14   incident, the incident in the trailer?

15       A    To my knowledge, no.

16       Q    Do you know one way or another whether

17   Ms. Lively started locking her trailer door after

18   that event?

19       A    I do not.

20       Q    Did Sony ever issue any kind of warning

21   to you or to Mr. Heath so far as you know?

22       A    A warning?

23       Q    A warning.

24       A    No, not that I'm aware of.

25       Q    A caution?

CONFIDENTIAL

Page 241

1          A    You're welcome to refresh my memory, but
2    not that I can think of.
3          Q    That's fine.  I'm just interested if you
4    recall any time that they cautioned, warned, or
5    otherwise issued any -- anything that sounded like
6    that to you?
7          A    I don't recall a warning or a caution.
8               MR. GOTTLIEB:  Let's do Exhibit 31.
9          (Exhibit 31 marked for identification.)
10   BY MR. GOTTLIEB:
11         Q    Mr. Baldoni, you've been handed what's
12   been marked as Exhibit 31, which is a document
13   bearing the Bates Nos. BALDONI 16447 through 16452,
14   and this is a text chain, I believe, between
15   yourself, Mr. Heath, Ms. Abel, and Stephanie Jones
16   on November 10th, 2023.
17              Let me know once you've had a chance to
18   look at it.
19         A    Okay.
20         Q    Had a chance to review Exhibit 31,
21   Mr. Baldoni?
22         A    I have.
23         Q    Do you recognize this document?
24         A    I do.
25         Q    You've seen this before?

CONFIDENTIAL

Page 253

```
 1        A     Yes.
 2        Q     Do you see that that meeting was supposed
 3   to include:
 4              (As read):
 5                    "The director, all producers, the Sony
 6                    representative, the newly-engaged
 7                    third-party producer, BL and BL's
 8                    designated representatives to confirm
 9                    and approve a plan for the
10                    implementation of the above that will
11                    be adhered to for the physical and
12                    emotional safety of BL, her employees,
13                    and all the cast and crew moving
14                    forward"?
15        A     I do.
16        Q     Did that meeting occur?
17        A     I believe that meeting did occur.
18        Q     When did that meeting occur?
19        A     The evening before day one of production.
20   I don't have the exact date offhand.
21        Q     January 4th, 2024?
22        A     That sounds -- that sounds correct.
23        Q     And where was that meeting held?
24        A     Ms. Lively and Mr. Reynolds' residence.
25        Q     And did all those people that you see
```

CONFIDENTIAL

Page 255

1              (Recess.)

2              THE VIDEOGRAPHER:  We're back on the

3     record.  The time is 4:20 p.m.

4     BY MR. GOTTLIEB:

5         Q    Mr. Baldoni, before the break, I had

6     handed you Exhibit 32.  I'm going to ask you about

7     your message that appears on the first page, first

8     full page of Exhibit 32.  Exhibit 32 is a text chain

9     between yourself and a number of individuals on

10    November 12th, 2023; is that right?

11         (Exhibit 32 marked for identification.)

12              THE WITNESS:  Yes.

13    BY MR. GOTTLIEB:

14         Q    And how would you describe -- it looks

15    like there's a title to this group.  It says:

16    "Prayers and support."

17              What is that?

18         A    This is just a group of some of my best

19    male friends.

20         Q    And Mr. Heath is on there.  He's a friend

21    and also a co-worker, right?

22         A    Yes.

23         Q    And what about Mr. Musiol?

24         A    My best friend and not technically a

25    co-worker.  Former partner.

CONFIDENTIAL

Page 258

1    BY MR. GOTTLIEB:

2         Q    Okay.  Here you are saying:

3              (As read):

4                   "We all know what this document

5                   insinuates," right?

6         A    I see that.

7         Q    You say:

8              (As read):

9                   "This is all a manipulation," right?

10        A    I see that I said that too.

11        Q    You say:

12             (As read):

13                  "There's even silly things, inferring

14                  Jamey was inappropriate, which is

15                  silly," right?

16        A    I read that, yes.

17        Q    Is the reference to Mr. Heath that's in

18   the 17-point list a reference to entering trailers?

19             MS. SHAPIRO:  Objection.

20             THE WITNESS:  I have no idea what I was

21   referring to here.

22   BY MR. GOTTLIEB:

23        Q    Okay.  But what you knew was you thought

24   that there was something inferring that Mr. Heath

25   had been inappropriate, which you thought was silly?

CONFIDENTIAL

Page 259

```
 1              MS. SHAPIRO:  Objection.
 2              THE WITNESS:  I don't know what I was
 3    saying was silly.  That's what I can tell you.
 4    BY MR. GOTTLIEB:
 5         Q    You said that:
 6              (As read):
 7                   "This letter was sent in an effort to
 8                   gain power over you personally and the
 9                   studio," right?
10         A    I think that's what I believed.
11         Q    That's what you believed at the time?
12         A    Very clearly, yes.
13         Q    Yet, you thought all or nearly all of the
14    requests or the conditions in the letter were
15    reasonable, right?
16              MS. SHAPIRO:  Objection.
17              THE WITNESS:  I did.
18    BY MR. GOTTLIEB:
19         Q    So what kind of a plan is that?
20              MS. SHAPIRO:  Objection.
21    BY MR. GOTTLIEB:
22         Q    If you're trying to come up with a plan
23    to assert power and domination over somebody, why
24    would you send them a list of 17 very reasonable
25    things to do?
```

CONFIDENTIAL

Page 260

```
1            MS. SHAPIRO:  Objection.
2            THE WITNESS:  I can't speculate as to why
3    someone would do that.
4    BY MR. GOTTLIEB:
5        Q    In the list of 17 conditions or the text
6    that was accompanying it that was screenshot in the
7    document we just looked at, was there any demand to
8    send Ms. Lively the unfinished director's cut of the
9    movie?
10       A    In what -- in what we read together?
11       Q    In what we read together.
12       A    No.
13       Q    Was there any demand that Ms. Lively be
14   allowed to take control of the edit of the film?
15       A    In the 17-point list?
16       Q    In the 17-point list.
17       A    No.
18       Q    Was there any demand about ultimate
19   control over the content of the film?
20            MS. SHAPIRO:  Objection.
21            THE WITNESS:  I believe there was in the
22   17-point list.
23   BY MR. GOTTLIEB:
24       Q    And what is your recollection of that?
25       A    I believe there was a paragraph that --
```

CONFIDENTIAL

Page 261

1   where she asked for ultimate control over some of

2   the content of the film, just like what you said.

3        Q    What content was that?

4        A    I believe any intimate scene depicting

5   her character.

6        Q    Over intimate scenes, correct?

7        A    Yes, but --

8        Q    Okay.

9        A    -- I consider that content.

10       Q    You say to your friend group:

11            (As read):

12                 "We don't believe she will leave or

13                 leak to press, but this is her threat

14                 of a nuclear bomb, as she knows this is

15                 the only way to get to me."

16            Do you see that?

17       A    I do.

18       Q    What did you mean, "this is the only way

19   to get to me"?

20       A    I'm not sure what I meant.

21       Q    Do you believe that as you sit here

22   today, that the 17-point list was a nuclear bomb and

23   the only way to get to you?

24       A    Again, I -- I don't know what I meant.

25   This was a text sent in a very confusing, dark

CONFIDENTIAL

Page 263

1    that came to our attorneys, so yes.

2    BY MR. GOTTLIEB:

3         Q    And it involved issues relating to

4    personnel and employment with respect to the film,

5    right?

6              MS. SHAPIRO:  Objection.

7              THE WITNESS:  Yes.

8    BY MR. GOTTLIEB:

9         Q    So why did you feel like it was

10   appropriate to send details about that to a friend

11   group that included lots of people that didn't work

12   at Wayfarer Studios?

13             MS. SHAPIRO:  Objection.

14             THE WITNESS:  I don't believe I sent the

15   document itself or any attachments.

16   BY MR. GOTTLIEB:

17        Q    You just described it?

18             MS. SHAPIRO:  Objection.

19             THE WITNESS:  I wasn't aware that there

20   was anything in that document saying that I couldn't

21   describe it.

22   BY MR. GOTTLIEB:

23        Q    Before when I was asking you about the

24   incident in Ms. Lively's trailer involving

25   Mr. Heath, did you ever take any steps to confirm or

CONFIDENTIAL

Page 264

1    learn what had actually happened in that meeting?

2              MS. SHAPIRO:  Objection.

3              THE WITNESS:  My understanding is

4    anything that happened during that meeting

5    interaction was discussed in person and worked out,

6    and my recollection is Mr. Heath apologized to her

7    for even looking in her direction.  That's what he

8    was apologizing for, and it never happened again.

9    BY MR. GOTTLIEB:

10        Q    Did you ever take any steps to decide for

11   yourself what you thought had happened?

12             MS. SHAPIRO:  Objection.

13             THE WITNESS:  I'm not sure what further

14   steps I could have taken, as Ms. Lively herself

15   spoke to Jamey, and she was -- and they were the two

16   people involved.

17   BY MR. GOTTLIEB:

18        Q    You later came to learn that Mr. Heath

19   had a different view of what happened in the trailer

20   with Ms. Lively, right?

21        A    Slightly different at the time.

22        Q    And so did you take any steps to try to

23   ascertain whose version of events was correct or

24   accurate?

25        A    No.  Because at the time, the stories

CONFIDENTIAL

Page 265

1  seemed to be pretty similar and there was no --
2  there was no reason to.  It was worked out.
3      Q    Eventually, you believed Mr. Heath's
4  version of what happened in the trailer?
5          MS. SHAPIRO:  Objection.
6          THE WITNESS:  Again, at that time, which
7  was 2023, the versions were very close.  They seemed
8  to be very different now.
9  BY MR. GOTTLIEB:
10     Q    Earlier, we talked a little bit about the
11  January 4th meeting in Ms. Lively's apartment.
12          Do you recall that?
13     A    Yes.
14     Q    You said -- well, withdrawn.
15          You attended that meeting?
16     A    I did.
17     Q    It was memorable?
18          MS. SHAPIRO:  Objection.
19          THE WITNESS:  That's one way to put it.
20  BY MR. GOTTLIEB:
21     Q    Would you characterize it as traumatic?
22     A    I, for me, would.  I'm not sure if anyone
23  else would.
24     Q    I'm only asking about you, sir.
25          MS. SHAPIRO:  Objection.

CONFIDENTIAL

```
 1              THE WITNESS:  Yeah.
 2    BY MR. GOTTLIEB:
 3         Q    During that meeting, did Ms. Lively read
 4    a list from her phone?
 5         A    She did.
 6         Q    Do you have a distinct memory of her
 7    reading a list of incidents or items from her phone
 8    to the group during that meeting?
 9         A    I do.
10         Q    Okay.
11              MR. GOTTLIEB:  I'm going to mark the next
12    exhibit, Exhibit 33.  Mr. Baldoni, you've been
13    handed what's been marked as Exhibit 33.  This is a
14    document bearing the Bates Nos. BL 38461 through
15    BL 38462.
16         (Exhibit 33 marked for identification.)
17    BY MR. GOTTLIEB:
18         Q    Have you had a chance to review this
19    exhibit, Exhibit 33?
20         A    I have.
21         Q    Do you know one way or the other as you
22    sit here today, whether this is the list that
23    Ms. Lively read from her phone during that meeting
24    on January 4th?
25         A    This was not the list that Ms. Lively
```

CONFIDENTIAL

Page 267

1   read from her phone.

2        Q    How do you know that this is not the list

3   that Ms. Lively read from, from her phone, in that

4   meeting on January 4th, 2024?

5        A    For one, she never used the wording "no

6   more."  So that's how I know, first off.

7        Q    Okay.  And you know that based on your

8   specific recollection of how she spoke to you during

9   that meeting?

10       A    I know that because I was present and in

11  shock of what I was hearing, and paid very close

12  attention to the words, and "no more" was never

13  used.  It also says an updated list, so I'm not sure

14  when it was updated.

15       Q    Okay.  Well, apart from your

16  identification of "no more," do you have any other

17  reason to believe that this list is not what

18  Ms. Lively read from during the meeting on

19  January 4th, 2024?

20            MS. SHAPIRO:  Objection.

21            THE WITNESS:  I think that's a big one.

22  I mean, the fact that she never said "no more" shows

23  it's not the same list.

24  BY MR. GOTTLIEB:

25       Q    I'm asking if there's any other reason?

CONFIDENTIAL

Page 268

```
 1        A    Yes, there are certain -- I would say
 2   there's quite a few things in here that were not
 3   read or discussed that day.
 4        Q    Do you recall Ms. Lively saying during
 5   the meeting that this was the worst experience of
 6   her life?
 7        A    I do.
 8        Q    Do you recall her saying during the
 9   meeting that others had witnessed this behavior?
10             MS. SHAPIRO:  Objection.
11             THE WITNESS:  I don't remember those
12   exact words, no.
13   BY MR. GOTTLIEB:
14        Q    Do you recall the words "creepy" or
15   "abuse" being used in reference to your behavior?
16        A    I definitely don't remember the word
17   "abuse."  I think I remember the word "creepy."
18        Q    Do you recall feeling embarrassed while
19   Ms. Lively was reading out these items?
20        A    I think that could be accurate for one of
21   the things I was feeling, yeah.
22        Q    I want to mark another exhibit.  Before I
23   go on, Mr. Baldoni, I can't remember if
24   Ange Giannetti is one of the people whose
25   depositions you listened to.
```

CONFIDENTIAL

Page 272

```
 1              THE WITNESS:   Yes, completely.
 2      BY MR. GOTTLIEB:
 3          Q     You see here "the word creepy and abused
 4      were used in reference to me and my behavior"?
 5          A     I do see that, yes.
 6          Q     And you see a little bit later, you say
 7      that you were:
 8                (As read):
 9                    "Unable to respond.  Mr. Heath did a
10                    beautiful job apologizing.  You were
11                    embarrassed that you were unable to
12                    formulate the correct words to
13                    apologize and honestly feel like a bad
14                    person."
15                Do you see that?
16          A     I would beat myself up a lot, clearly.
17          Q     You said:
18                (As read):
19                    "It's hard to feel so much of what they
20                    believe about me is false because they
21                    are so convinced that it's real."
22                Do you see that?
23          A     I do.
24          Q     Did it occur to you that they might be
25      right?
```

CONFIDENTIAL

Page 278

1        A    Yes.  Along with her husband and her best
2    friend.
3        Q    And the kind of person who could help get
4    the message, the important message, of your movie
5    out, right?
6                MS. SHAPIRO:  Objection.
7                THE WITNESS:  Yes.  I hoped that that
8    would be a big part of it.
9    BY MR. GOTTLIEB:
10       Q    So would you have disagreed in December
11   of 2022 if somebody had said to you, Ms. Lively has
12   got a terrible well-known reputation in the
13   industry; nobody likes her?
14               MS. SHAPIRO:  Objection.
15               THE WITNESS:  Nobody told me that.
16   BY MR. GOTTLIEB:
17       Q    If Katie Case or Breanna Koslow had told
18   you that in December of 2022, would you have found
19   that very surprising?
20               MS. SHAPIRO:  Objection.
21               THE WITNESS:  I don't think I can
22   speculate on that.
23   BY MR. GOTTLIEB:
24       Q    Okay.  On the previous page 18853, at
25   11:01 a.m., you say of Ms. Lively:

CONFIDENTIAL

Page 279

```
 1              (As read):
 2                   "She had the nuclear bomb.  If she
 3                   doesn't promote the movie, she can leak
 4                   that I'm a bad person or that she felt
 5                   unsafe with me and all the stuff she
 6                   has on me.  Then she's the victim.
 7                   It's the Taylor Swift playbook.  So she
 8                   can ask for whatever she wants because
 9                   she knows I know."
10              Do you see that?
11      A    I do.
12      Q    Did you mean that?
13           MS. SHAPIRO:  Objection.
14           THE WITNESS:  What part of it?
15  BY MR. GOTTLIEB:
16      Q    All of it.
17      A    I don't know.
18      Q    You had agreed to the conditions that
19  Ms. Lively asked for to return to set, right?
20      A    Yes.
21      Q    And upon the return to production, so far
22  as production on the set went, things went pretty
23  well, right?
24      A    According to your own complaint, it
25  went -- everything went great.
```

CONFIDENTIAL

Page 281

1    refer to her -- Ms. Lively leaking, "I'm a bad
2    person or that she felt unsafe with me"?
3              MS. SHAPIRO:  Objection.
4              THE WITNESS:  I think when you are
5    somebody small in the industry like myself, and
6    you're dealing with a titan like Ms. Lively and some
7    of the most powerful people in the world, which are
8    her best friends, and you're in the situation that I
9    was in, I think it's very reasonable, especially at
10   this point, to be concerned about what's possible
11   and what's not.  I -- I was spinning at this point.
12   BY MR. GOTTLIEB:
13       Q    Is there anything else you can think of
14   other than the material contained within the
15   17-point list or the list that Ms. Lively read from
16   on January 4th, 2024, that as you sit here today,
17   you might have been referring to when you referred
18   to a nuclear bomb that could be leaked?
19              MS. SHAPIRO:  Objection.
20              THE WITNESS:  Nothing about the 17-point
21   list.  But I assure you that that list that was read
22   to me contained complete fabrications of the truth.
23   So I very well could have -- could have had that be
24   a part of what I felt scared of, lies.  But I didn't
25   know.  I didn't know anything.  I knew that at this

CONFIDENTIAL

Page 282

1    point, my gut feeling was that she was going to take
2    over the film.
3    BY MR. GOTTLIEB:
4         Q    Lies.  When you say "lies," you mean,
5    lies insinuating that you had made Ms. Lively feel
6    unsafe?
7         A    No.  That's not what I mean.
8         Q    Lies insinuating that you had sexually
9    harassed Ms. Lively?
10              MS. SHAPIRO:  Objection.
11              THE WITNESS:  No.  I'm speaking about
12    lies in general.
13   BY MR. GOTTLIEB:
14        Q    You're the co-head of Wayfarer Studios;
15   are you not?
16        A    I am the co-chairman.
17        Q    The co-chairman of Wayfarer Studios.  But
18   the executives answer to you and Mr. Sarowitz?
19              MS. SHAPIRO:  Objection.  Objection.
20              THE WITNESS:  The executives answer to
21   our CEO, and our CEO reports to me and Sarowitz.
22   BY MR. GOTTLIEB:
23        Q    And you testified earlier that you could
24   fire the CEO if you wanted to?
25        A    I imagine I could do -- yeah, I imagine I

CONFIDENTIAL

Page 283

```
 1   could.
 2        Q    And it's Mr. Sarowitz's money that
 3   financed this particular project; is that right?
 4        A    Co-financed.
 5        Q    Co-financed?
 6        A    Yes.
 7        Q    If you had wanted to, you could have just
 8   decided not to go forward with the movie, right?
 9             MS. SHAPIRO:  Objection.
10             THE WITNESS:  At what point?
11   BY MR. GOTTLIEB:
12        Q    At any point.
13        A    Not necessarily.
14        Q    As of February 23, 2024, could you have
15   pulled the plug on the movie?
16        A    I don't believe so.
17        Q    Even -- you don't believe you could have
18   done so without inviting litigation; is that what
19   you're saying?
20             MS. SHAPIRO:  Objection.
21             THE WITNESS:  I believe this was the
22   biggest project that we'd ever invested in, ever
23   had, and we had a tremendous amount of money
24   invested in it, and so did Sony who were our
25   partners, so we had an obligation, a fiduciary
```

CONFIDENTIAL

Page 284

1   obligation to Sony, and to Steve's family to not
2   pull out of the film.
3   BY MR. GOTTLIEB:
4       Q    To not lose that money?
5           MS. SHAPIRO:  Objection.
6           THE WITNESS:  It wasn't just about money.
7   It was one of the major factors, yes.
8   BY MR. GOTTLIEB:
9       Q    Okay.  But nonetheless, you're the
10  co-founder of the studio, right?
11      A    Yes.
12      Q    You're the director of the film, right?
13      A    Yes.
14      Q    You are the co-lead actor, right?
15      A    Yes.
16      Q    You are an executive producer, right?
17      A    At that time, I was.
18      Q    That is a lot of accumulated power on one
19  movie; is it not?
20          MS. SHAPIRO:  Objection.
21          THE WITNESS:  It is, and also I don't
22  think it's unusual.
23  BY MR. GOTTLIEB:
24      Q    Is that the typical arrangement that
25  you're familiar with?

CONFIDENTIAL

Page 289

1    to Mr. Heath for what you were saying the night

2    before, right?  At 2:23 p.m. on the 27th, on

3    page 33565?

4         A    Yeah.  I believe we could sum it up that

5    way.

6         Q    And what you say is, you've just come out

7    of therapy, and you're purging shit out and

8    exhausted.  And then you say:

9              (As read):

10                  "So much fear of Blake coming out and

11                  going public about how I'm a bad person

12                  and unsafe and not who I say I am."

13             Do you see that?

14         A    I do.

15         Q    And that's similar language to the fear

16    that you describe to Mr. Van Winkle in the document

17    we just looked at a few minutes ago from February,

18    right?

19             MS. SHAPIRO:  Objection.

20             THE WITNESS:  I believe so.

21    BY MR. GOTTLIEB:

22         Q    You were very concerned that Ms. Lively

23    would go public with some of the materials or

24    allegations that had been contained in the 17-point

25    list and in the list you read on January 4th,

CONFIDENTIAL

                                            Page 290

1    right?

2            MS. SHAPIRO:  Objection.

3            THE WITNESS:  Again, I disagree with

4    anything to do with the 17-point list.

5    BY MR. GOTTLIEB:

6        Q    But you think it might have referred to

7    items that were in the January 4th list?

8            MS. SHAPIRO:  Objection.

9            THE WITNESS:  I'm sure I had feelings

10   about the lies that I felt were in the January 4th

11   meeting, but I think it's a very reasonable feeling

12   that I'm expressing here.

13   BY MR. GOTTLIEB:

14       Q    Mr. Baldoni, was the thought of someone

15   saying publicly that you were not who you say you

16   are, one of your biggest fears?

17       A    I think based on where I was emotionally

18   in my healing journey therapy at the time in going

19   through this film, I would imagine that was a fear,

20   yes.

21       Q    And that's what you're referencing here

22   to Mr. Heath, isn't it, with your reference to the

23   little boy that you're so intertwined with?

24           MS. SHAPIRO:  Objection.

25           THE WITNESS:  I'm just out of therapy and

CONFIDENTIAL

Page 291

```
 1   clearly not very sober in terms of my emotional
 2   state.  So I was extremely sensitive and vulnerable
 3   and clearly in a very dark place at that moment.
 4   BY MR. GOTTLIEB:
 5        Q    I understand, and I'm sorry to press on
 6   it, but you're saying to Mr. Heath, I think,
 7   particularly in this carryover message at 2:33 p.m.
 8   on 27th, that your personality is being overrun by
 9   this little boy who feels scared and threatened; is
10   that what you're conveying to Mr. Heath in this
11   message?
12             MS. SHAPIRO:  Objection.
13             THE WITNESS:  No.
14   BY MR. GOTTLIEB:
15        Q    That's not what you meant by:
16             (As read):
17                  "He's been running the show when he
18                  feels scared and threatened and that's
19                  who you get so frustrated with"?
20             MS. SHAPIRO:  Objection.
21             THE WITNESS:  What I meant by that is, in
22   moments of intense emotion, in moments where I'm
23   short or can get angry very quickly, in those
24   moments, I believe that is the little boy in me that
25   doesn't feel safe.  And it's in those moments, like
```

CONFIDENTIAL

Page 307

1    with me.  I had no idea.

2    BY MR. GOTTLIEB:

3        Q    Did you ask her why?

4             MS. SHAPIRO:  Objection.

5             THE WITNESS:  I think it was very clear

6    that when a person publicly unfollows you, and also

7    through channels tells you they don't want you at

8    the premiere or they won't attend, I think I took

9    the hint that I shouldn't reach out to anybody and

10    ask.

11    BY MR. GOTTLIEB:

12        Q    But you didn't reach out and ask, right?

13        A    I did not believe that anything that I

14    had to say could compete with any influence that

15    Ms. Lively had.

16        Q    Even though in your view, all of this was

17    based on lies?

18             MS. SHAPIRO:  Objection.

19             THE WITNESS:  When you're dealing with,

20    arguably, the most powerful couple in Hollywood with

21    the most powerful friends in the world, mixed with

22    someone who's extremely charming and personable and

23    has so much to offer someone as young as her, by

24    that point, there was nothing I believe I could have

25    said to her that would -- that could affect any

CONFIDENTIAL

Page 309

1    BY MR. GOTTLIEB:

2         Q    Do you think your conduct on the set of

3    It Ends with Us had anything to do with the

4    decisions made by cast members, other than

5    Ms. Lively, to not want to follow you and not appear

6    alongside you at the premiere?

7              MS. SHAPIRO:    Objection.

8              THE WITNESS:    I am unsure if --

9              MR. GOTTLIEB:    Can you repeat the

10   question?    This is not working for me.

11             THE STENOGRAPHIC REPORTER:

12             (Record read as follows):

13                  "Do you think your conduct on the set

14                  of It Ends With Us had anything to do

15                  with the decisions made by cast

16                  members, other than Ms. Lively, not

17                  wanting to follow you and not appearing

18                  alongside you at the premiere?"

19             THE WITNESS:    I can't speculate and

20   answer that question.

21   BY MR. GOTTLIEB:

22        Q    You don't know what their motivations

23   were?

24        A    I think it's impossible to know what

25   anybody's motivation is.

CONFIDENTIAL

Page 310

```
 1        Q    And you didn't ask what their motivations
 2   were?
 3        A    I did not ask what anyone's motivations
 4   were.
 5        Q    And notwithstanding that you were very
 6   concerned and very afraid, you did not initiate an
 7   investigation at this point in time to clear your
 8   name?
 9             MS. SHAPIRO:  Objection.
10             THE WITNESS:  I did not initiate an
11   investigation at that time.
12   BY MR. GOTTLIEB:
13        Q    Instead, you retained The Agency Group,
14   right?
15             MS. SHAPIRO:  Objection.
16             THE WITNESS:  I would not classify it as
17   that.
18   BY MR. GOTTLIEB:
19        Q    And you commissioned the scenario
20   planning document to get ahead of what you thought
21   might be coming?
22             MS. SHAPIRO:  Objection.
23             THE WITNESS:  I just want to go back.  I
24   did not use the word instead of investigating.  I
25   just want to say that's not it.  I disagree.
```

CONFIDENTIAL

Page 339

1          A     Like every other production, correct.

2          Q     Did you want reporters to know that?

3          A     I was not hiding that.

4          Q     Is being called a scab a positive or a

5    negative implication in your view?

6          A     I'm not sure I can answer that.

7          Q     But you wanted reporters to go in that

8    direction, right?

9                MS. SHAPIRO:  Objection.

10               THE WITNESS:  What I believe I was doing

11   was passing on a message from my partner, Steve, who

12   relayed to me after reading a story that appeared to

13   be in response from something Ms. Lively said on her

14   own.  She was not even asked about whether or not

15   her husband wrote a scene.  And then, because of

16   that, received a lot of negative backlash, as did

17   Mr. Reynolds, because why would Mr. Reynolds be a

18   WGA writer writing a scene in someone's movie that

19   he's not credited for.  And so Steve, seeing

20   Mr. Reynolds' apparent leak that the script was a

21   disaster, which seemed like he was trying to save

22   his own image in that moment, asked me to pass on to

23   Melissa and Jen that an idea could be presented,

24   which would be flipping this narrative that our

25   movie was a disaster to begin with.

CONFIDENTIAL

Page 340

1              And this, again, was a purely defensive

2      conversation.  There was an offensive move done to

3      say that our script was originally a disaster, and

4      we were implying that this could happen.  We did not

5      say, go do it.  I don't -- unless you have something

6      where I did.

7      BY MR. GOTTLIEB:

8         Q    Do you have -- you characterize these as

9      offensive and defensive; yet, you have admitted that

10     you have absolutely no idea whether Mr. Reynolds

11     ever said that the movie was a disaster that he

12     saved?

13              MS. SHAPIRO:  Objection.

14              THE WITNESS:  Untrue.  I do know he said

15     it.

16     BY MR. GOTTLIEB:

17        Q    You know that he said that the movie was

18     a disaster that he saved?

19        A    Yes.

20        Q    Okay.  And you know that how?

21        A    He said it at the January 4th meeting, in

22     person, to my face.

23        Q    And did he say that in public any time

24     that you ever heard him say that?

25        A    I found it odd that something he said to

CONFIDENTIAL

Page 357

1                    REPORTER'S CERTIFICATE

2              I, ASHLEY SOEVYN, a Certified Shorthand

3    Reporter of the State of California, do hereby

4    certify:

5              That the foregoing proceedings were taken

6    before me at the time and place herein set forth;

7    at which time the witness was put under oath by me;

8              That the testimony of the witness, the

9    questions propounded, and all objections and

10   statements made at the time of the examination were

11   recorded stenographically by me and were thereafter

12   transcribed;

13             That a review of the transcript by the

14   deponent was/ was not requested;

15             That the foregoing is a true and correct

16   transcript of my shorthand notes so taken.

17             I further certify that I am not a relative

18   or employee of any attorney of the parties, nor

19   financially interested in the action.

20             I declare under penalty of perjury under

21   the laws of California that the foregoing is true

22   and correct.  Dated this 8th day of October, 2025.

23

24

                  ASHLEY SOEVYN

25                CSR No. 12019