Exhibit 11

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                      ---oOo---
 4
 5    BLAKE LIVELY,
 6                  Plaintiff,
 7      vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)
                               25-CV-449 (LJL) (MEMBER CASE)
 8
      WAYFARER STUDIOS LLC, ET AL.,
 9
                  Defendants.
10  _____
      JENNIFER ABEL,
11              Third-party Plaintiff,
        vs.
12    JONESWORKS, LLC,
                Third-party Defendant.
13  _____
      WAYFARER STUDIOS LLC, et al.,
14              Consolidated Plaintiffs,
        vs.
15    BLAKE LIVELY, et al.,
                Consolidated Defendants.
16  _____
17                  **CONFIDENTIAL**
18
19      VIDEO-RECORDED DEPOSITION OF STEVE SAROWITZ
20               Los Angeles, California
21               Friday, October 3, 2025
22
23    Stenographically Reported by:  Ashley Soevyn,
24    CALIFORNIA CSR No. 12019
25
```

CONFIDENTIAL

Page 46

```
 1   And if they changed during that time, it's fine,
 2   just give me the full list.
 3         A    In 2024, the three directors were the
 4   three of us that I mentioned already.  In 2025, we
 5   added on several more directors right before we shut
 6   the foundation down.  Andilib Khelghati, Daryn
 7   Dodson, Shabnam -- and I'm going to mess up her last
 8   name, it's a long Persian last name -- Nanabah,
 9   Native American, and Sean Hinton.
10         Q    Why were those -- when exactly were those
11   directors added?
12         A    February.
13         Q    And the -- I think the announcement that
14   the foundation was shutting down was in May; is that
15   right?
16         A    Yes.
17         Q    Did you know in February that you would
18   be shutting down the foundation?
19         A    No.
20         Q    When did you decide to shut down the
21   foundation?
22         A    Shortly before we shut it down; shortly
23   before the announcement.
24         Q    Why did you decide to shut down the
25   foundation?
```

CONFIDENTIAL

Page 47

```
 1        A    A variety of reasons.
 2        Q    Can you please list them or explain them?
 3             MS. GAROFALO:  To the extent the response
 4   includes any attorney-client communications or
 5   advice, you're instructed not to answer.  You may
 6   otherwise answer.
 7             THE WITNESS:  The decision was made in
 8   commune -- consultation with my attorneys.
 9   BY MR. GOTTLIEB:
10        Q    I understand that the decision may have
11   been made in consultation with your attorneys, and
12   I'm not going to ask you about any conversations
13   that you had with your attorneys about the
14   foundation or any other topic.  But certainly, you
15   had views on whether or not to shut down the
16   foundation; is that right?
17        A    Yes.
18        Q    And you made a decision to do so,
19   correct?
20        A    The board made the decision.
21        Q    And did you vote in favor of that, I
22   assume resolution or proposal, as a member of the
23   board?
24        A    Yes.
25        Q    What was your reason for doing so?
```

CONFIDENTIAL

```
 1            (As read):
 2                 "David, I spoke with Bryan.  We are
 3                 both on board with engaging your
 4                 services ASAP to do this"?
 5       A    Is that what you -- you're asking me to
 6  look at the document?
 7       Q    Yes.  In your email to Mr. Keyes and
 8  Mr. Freedman, you say:
 9            (As read):
10                 "David, I spoke with Bryan, and we are
11                 both on board with engaging your
12                 services ASAP to do this"?
13       A    So are you asking me if we engaged his
14  services?
15       Q    My question is, do you see where you've
16  said:
17            (As read):
18                 "David, I spoke with Bryan, and we are
19                 both on board with engaging your
20                 services ASAP to do this"?
21       A    Yes.
22       Q    And this is making Sage Steele's video go
23  viral.  That's what you were proposing to do?  We'll
24  get to whether it happened.  That's what you were
25  proposing to do at this point in time?
```

CONFIDENTIAL

Page 75

1         A     Yes.

2         Q     You and Mr. Freedman, at least as of

3    1:15:09 a.m. on January 2, were on board with the

4    notion of retaining David Keyes to make

5    Sage Steele's video go viral?

6              MS. GAROFALO:  Objection.

7              MR. GOTTLIEB:  You can answer the

8    question.

9              THE WITNESS:  Yes.

10   BY MR. GOTTLIEB:

11        Q     Okay.  Now, I gather you are trying to

12   tell me that you did not, in fact, engage Mr. Keyes?

13        A     Yes.

14        Q     Okay.  Why did you not engage Mr. Keyes?

15        A     I don't recall.

16        Q     Did you engage anyone else to help make

17   Sage Steele's video go viral?

18        A     I have no knowledge of that.

19        Q     You do not know?

20        A     I don't know.

21        Q     Okay.

22              Were you involved in conversations with

23   any other individuals -- sorry.  Strike that.

24              It looks like if you look through the

25   rest of this email, you did, in fact, at some point,

CONFIDENTIAL

                                                        Page 98

 1    BY MR. GOTTLIEB:

 2         Q    That doesn't surprise you?

 3         A    No, it does not.

 4         Q    You're the financier of Wayfair Studios?

 5         A    Yes.

 6         Q    You're co-founder?

 7         A    Yes.

 8         Q    Is Wayfarer Studios an LLC?

 9         A    I believe so.

10         Q    Who are the members?

11         A    I don't recall.

12         Q    Who are the shareholders?

13              MS. GAROFALO:  Objection.

14              THE WITNESS:  The major shareholders are

15    Justin and myself.

16    BY MR. GOTTLIEB:

17         Q    Do you know what the -- oh, sorry.  I

18    didn't mean to interrupt.  Did you have something

19    else you wanted to say?

20              Okay.

21              Do you know what the ownership

22    percentages are as of -- let's start with today --

23    between you and Mr. Baldoni?

24         A    Not exactly.

25         Q    Do you have a rough estimate?

1   that.

2        Q    That is the second sentence in that first

3   bullet after --

4        A    Oh, yes.  I see it now.

5        Q    Is that accurate?  Does that accurately

6   reflect your conversation with Ms. Hunter-Hart?

7        A    No.

8        Q    Do you remember your precise conversation

9   with Ms. Hunter-Hart?

10        A    No.

11        Q    So then how do you know that this doesn't

12   accurately reflect it?

13        A    That my general gist of what I would have

14   told her is the general gist of what I always say,

15   which is that I was protecting our studio.  And I

16   think that the general gist of what I said is closer

17   to me spending the money, that $100 million figure,

18   whatever the figure would be, in order to defend our

19   studio.  So I don't -- I don't believe that's

20   accurate.

21        Q    Do you believe that Ms. Hunter-Hart was

22   incorrect that you said to her that you might very

23   well have used that language?

24        A    I believe that I could have used the

25   figure language, but not the ruining part.  So that

CONFIDENTIAL

                                        Page 116

1    is where I think the issue is.

2        Q    A little bit ago I was asking you

3    questions about a call that you had with David Keyes

4    four days before this email was sent.  And you said

5    you couldn't recall virtually anything about that

6    conversation; is that right?

7        A    Yes.

8        Q    Are you saying now that you can recall

9    your specific conversation with Ms. Hunter-Hart?

10       A    No.

11       Q    Do you ever recall saying -- calling up

12   Ms. Hunter-Hart and saying, "I did not say to you

13   that I might very well have used this language.

14   You're wrong"?

15       A    No.

16       Q    Did you ever ask anyone, and I'm not

17   asking about conversations with your attorneys, but

18   Ms. Abel is copied on here.  Did you ask Ms. Abel or

19   Ms. Nathan to call up this reporter from Forbes and

20   say, "that's not right.  I didn't -- I didn't use

21   that language"?

22       A    I believe based on what is here, we

23   corrected this to say that I was prepared to spend

24   whatever is necessary to defend Baldoni, Wayfarer

25   Studios, and myself.  So that was corrected at that

CONFIDENTIAL

Page 122

1      Q     Never?

2      A     Correct.

3      Q     Even after litigation was commenced?

4      A     Correct.

5      Q     How do you define "negatively"?

6            MS. GAROFALO:  Objection.

7            THE WITNESS:  It's my testimony that the

8      sole intent was to use my money to promote the truth

9      about Baldoni and Wayfarer.

10     BY MR. GOTTLIEB:

11     Q     So if I were to take out the word

12     "negatively" from this sentence, and ask you, did

13     you ever provide input and ideas on ways to

14     influence the narrative, and then I modify

15     "against," and have it be "about" -- let me -- let

16     me -- let me read it the way I'm modifying it, and

17     then I will ask you the question.

18           Did you ever provide input and ideas on

19     ways to influence the narrative about Ms. Lively and

20     her family?

21           MS. GAROFALO:  Objection.

22           THE WITNESS:  No.

23     BY MR. GOTTLIEB:

24     Q     You never provided any ideas about ways

25     that the media narrative about Mr. Reynolds could be

CONFIDENTIAL

Page 123

1   influenced at any time?

2         A    I don't recall.

3         Q    Do you want to spend a minute and think

4   about it?

5         A    There was one time that I suggested that

6   we should point out, after Ms. Lively had said that

7   Ryan Reynolds rewrote a scene, that we should point

8   out that that was a scene written by a female

9   writer.  That was the sole time I remember.

10        Q    And why did you point that out?

11        A    I don't recall.

12        Q    What influence would it have in coverage

13  of the dispute to point out that it was a female

14  writer?

15             MS. GAROFALO:  Objection.

16             THE WITNESS:  I don't know.

17             MR. GOTTLIEB:  Really?

18             MS. GAROFALO:  Objection.

19  BY MR. GOTTLIEB:

20        Q    That's really your testimony as you sit

21  here today?  You can't -- you really don't know why

22  it would have mattered if there had been coverage

23  that followed the suggestion that you made?

24             MS. GAROFALO:  Objection.

25             THE WITNESS:  I don't know what the

CONFIDENTIAL

Page 131

```
 1   BY MR. GOTTLIEB:
 2        Q    Is there any correlation -- in other
 3   words, there is a number that you see in green
 4   across from affiliate assets under dollar growth;
 5   it's in green.  And then the bottom text is also in
 6   green.  Are those two -- is that text related to
 7   that number?
 8        A    I don't know.
 9        Q    Okay.
10        A    I didn't produce this.  I mean, I didn't
11   create this.
12        Q    Okay.
13             Do you know if you, in fact, transferred
14   $18 million to Wayfarer Studios in 2024 for
15   operating costs?
16        A    That sounds reasonable.
17        Q    Do you know if you provided operating
18   costs in the form of a transfer to Wayfarer Studios
19   in 2023?
20        A    I don't recall.
21        Q    Do you know if you provided any in 2025?
22        A    I don't recall.
23        Q    Is that -- do you play that role
24   personally with respect to Wayfarer Studios?  In
25   other words, if Wayfarer Studios needs capital, are
```

CONFIDENTIAL

Page 132

```
 1   you the source of funding or financing that would
 2   provide that capital to Wayfarer Studios?
 3        A    Yes.
 4        Q    Okay.
 5             As you sit here today, do you have any
 6   idea of whether you have provided money in the form
 7   of affiliate transfers to Wayfarer Studios for the
 8   purpose of financing It Ends with Us?
 9        A    Yes.
10        Q    Do you know the amount that you've
11   provided?
12        A    Not the precise amount.
13        Q    Do you have an estimate?
14        A    Perhaps $30 million.
15        Q    Okay.  And do you know when you
16   provided -- any idea when you might have provided
17   that financing or that money?
18        A    Over the course of making the movie,
19   which spans several months.
20        Q    Okay.  Not all at one time; it happened
21   at different -- different points?
22        A    Yes.
23        Q    And do you know if it went to the
24   It Ends with Us LLC entity, or if it went -- by "it"
25   the money that you provided, it went to Wayfarer?
```

CONFIDENTIAL

Page 133

```
 1        A    I'm not involved with the details of that
 2   so I don't know exactly where the money would have
 3   flowed.
 4        Q    Okay.
 5             How would you become aware of the need to
 6   provide additional capital or financing for purposes
 7   of the movie?
 8        A    I didn't provide capital specifically for
 9   the movie.
10        Q    So the -- the 30 million estimate that
11   you were providing was money that was provided to
12   Wayfarer Studios that then Wayfarer Studios
13   allocated for purposes of the film?
14        A    Yes.
15        Q    Okay.
16             So how would you typically become aware
17   that there was a need for you to provide -- during
18   this period of time we're talking about, that there
19   was a need for you to provide capital to Wayfarer
20   Studios?
21        A    Through our CFO.
22        Q    Okay.  So you would have a conversation
23   with the CFO of Wayfarer Studios?
24        A    About?
25        Q    If you were -- if there was a need for
```

CONFIDENTIAL

Page 134

1    capital?

2         A    Yes.

3         Q    Okay.  Who was the CFO of Wayfarer

4    Studios during this period of time?

5         A    Brian Singer.

6         Q    Okay.  And so you would have a

7    conversation with Brian Singer who would tell you,

8    we have a need for some amount of additional money?

9         A    Yes.  He and/or Jamey Heath.

10        Q    Okay.  And then, I imagine that would be

11   memorialized in some kind of written request for

12   transfer.  How does that work?

13        A    I would fund the studio as needed.

14        Q    Would there be documentation of that

15   funding?

16        A    Yes.

17        Q    Would you get a request for a wire

18   transfer or an invoice or something like -- like a

19   piece of paper or digital document that would

20   reflect a request was made on this date for this

21   amount and it was provided at this later date?

22        A    Yes.

23        Q    Okay.

24             MR. GOTTLIEB:  You can put this one away

25   and we can go off AEO.

CONFIDENTIAL

Page 138

1        A    Can you be more specific?

2        Q    Sure.

3             Did you do any media interviews in

4   conjunction with the release of It Ends with Us?

5   So, you know, the -- either the, let's call it, the

6   first couple of weeks of August 2024?

7        A    Not specifically.

8        Q    Did you do any media interviews that

9   occurred around that time?

10       A    Yes.

11       Q    And did you prepare for those interviews

12  with the assistance of any people in advance of your

13  interviews?

14       A    Sorry.  I'm not trying to hesitate, I'm

15  just trying to remember.  Not -- not really.

16       Q    Did you ever receive any kind of talking

17  points or briefing materials in advance of the media

18  interviews you were doing in the first two weeks of

19  August 2024?

20       A    Not that I recall.

21       Q    Did you ever discuss with Mr. Baldoni in

22  advance of doing the interviews that you did, what

23  might be asked and what you might say?

24       A    Yes.

25       Q    Okay.  I will come back to that.

CONFIDENTIAL

Page 168

1   defamed you?

2            MS. GAROFALO:  Objection.

3            THE WITNESS:  Privately or publicly?

4   BY MR. GOTTLIEB:

5        Q    Are you aware of, as you sit here today,

6   of any way in which Ryan Reynolds has defamed you

7   personally, Steve Sarowitz?  Again, not Wayfarer

8   Studios or your other co-plaintiffs?

9        A    No.

10       Q    How about Ms. Lively?  Are you aware of

11   any occasion where Ms. Lively has defamed you

12   personally, as in Steve Sarowitz?

13       A    Yes.

14       Q    And what is that?

15       A    And I don't -- I'm just asking this.  I'm

16   not trying to cause any issues, but can I talk about

17   her deposition?  Is that -- or is that something I

18   should not address in this and -- as part of my

19   answer?

20       Q    If you believe that that -- so my

21   question is, if you're aware of when Ms. Lively has

22   defamed you?

23       A    Yes.

24       Q    So let me modify it to be, are you aware

25   of any public statement that Ms. Lively has ever

CONFIDENTIAL

Page 169

1    made about you that you believe to be defamatory?

2         A    Again, sorry.  I'm just trying to get

3    clarification.  I'm not trying to be difficult.

4    During the course of the complaint or as part of the

5    complaint, would that be considered -- since that

6    was public in The New York Times and Ms. Lively was

7    the source of that statement, would that -- would

8    that count?

9         Q    That's for -- that's for you to tell me.

10        A    Would that --

11             MS. GAROFALO:  Why don't you answer the

12   question with what you believe she publicly said

13   through The New York Times.

14             THE WITNESS:  Okay.  Through The New York

15   Times in the course of the complaint, it was said

16   that I was on set for a scene where she was scantily

17   clad and that I was a non-essential person.  While I

18   might have technically been non-essential, I did

19   invest $30 million and paid for her salary, or at

20   least my share of it, as well as the other actors,

21   and I consider that to be essential.  Ms. Lively

22   considers that not to be essential, she can send me

23   a check.  I can give her an address or you could

24   give it to her.  But beyond that, I was not on set

25   for that scene.  And although I don't have direct

CONFIDENTIAL

Page 170

1    knowledge of this since I was not on set for that

2    scene, I was told she was not scantily clad.  She

3    repeated that in her deposition.

4            Also in her deposition, she repeated --

5    she took a piece of what I was quoted from, in a

6    recording where I was recorded without my knowledge,

7    and definitely against my will, there was a small

8    piece, and she took a small piece out of context and

9    said that I threatened to kill her and Ryan, which I

10    did not.  I never have.  The full recording, which

11    you have kept sealed, which I would like to keep

12    open so people can hear it, that -- she said

13    incorrectly, which went against her own amended

14    complaint, that I threatened to kill them.  That's

15    what she said in her deposition.  I consider that

16    defamation since it's patently false.  I have never

17    made a threat against her and Ryan.  And for her to

18    say that publicly, especially a serious threat, and

19    especially in light of the threats that have been

20    made against myself and my family, I find that to be

21    extremely defamatory.

22            The other thing she said that I believe

23    to be defamatory, is that -- and, again, I'm just

24    saying that I'm not 100 percent sure of the exact

25    details.  You could look this up for yourself, and I

CONFIDENTIAL

Page 171

1  might not be 100 percent right, is that I wanted to
2  ruin her and Ryan.  It has never been my intention
3  to ruin anybody.  It has always been my intention to
4  protect my company with truth and in a just way, but
5  never to ruin anybody else.
6  BY MR. GOTTLIEB:
7       Q    Okay.  There's a lot packed in there.  So
8  I'm going to sideline the statements made during the
9  deposition because, of course, the deposition
10 occurred after you filed your amended complaint; is
11 that correct?
12      A    Yes.
13      Q    Okay.  So I'm interested in when you
14 filed your amended complaint, you sued Ms. Lively
15 for defamation.  I think I understand your testimony
16 to be that the basis for that was what was contained
17 in her CRD complaint and what was printed in The New
18 York times; is that correct?
19           MS. GAROFALO:  Objection.
20           THE WITNESS:  I would have to -- I would
21 have to get more details.  Are you -- so if you
22 could give me a little bit more specifically.  Are
23 you talking specifically how she defamed me
24 personally?
25

CONFIDENTIAL

Page 182

1    looking at 940 and 943?

2              MR. GOTTLIEB:  Yes.

3              MS. GAROFALO:  Okay.

4    BY MR. GOTTLIEB:

5         Q    So Mr. Sarowitz, you see on the first

6    page here, 34940, a text exchange between Mr. Heath

7    and Mitz Toskovic?

8         A    Yes.

9         Q    Did I pronounce Mitz Toskovic's name

10   correctly?

11        A    Yes.

12        Q    Thank you.

13             And this is a text exchange between the

14   two of them at -- starting at 1:17 p.m. on

15   February 26th, 2024.  In particular, we're focused

16   on the attachment that is referenced in the third

17   text here from Ms. Toskovic at 2:30 p.m.

18             Do you see a reference to the handbook

19   that says, "Baha'i Inspired Company" on page 1?

20             MS. GAROFALO:  He's looking at this one.

21             THE WITNESS:  Yes.

22   BY MR. GOTTLIEB:

23        Q    And then, do you see there's an

24   attachment there that references the Wayfarer

25   Studios Employee Handbook?

CONFIDENTIAL

Page 183

```
 1        A    Yes.
 2        Q    And is the document that follows this
 3   that begins on page 34943, to the best of your
 4   knowledge, the Wayfarer Studios Employee Handbook?
 5        A    Yes.
 6        Q    And you're familiar with this document,
 7   right?  Your name is on the first cover page of this
 8   at 34943?
 9        A    I'm not familiar with every detail.  A
10   lot of times I will sign things as a high level.
11   I'm not involved in the day-to-day, but I'd be
12   familiar that there is the document.
13        Q    Okay.  You see on page 34943, the first
14   page of the document after the text, so the first
15   page of the attachment --
16        A    Yes.
17        Q    Do you see that on the page at the top it
18   says:
19             (As read):
20                  "So glad you've joined us."
21             And at the bottom, it's signed:
22             (As read):,
23                  "Steve Sarowitz and Justin Baldoni,
24                  co-chairmen"?
25        A    Yes.
```

CONFIDENTIAL

Page 184

1        Q     Okay.  And there is a -- there is
2   references here to this being the employee handbook,
3   right?
4        A     Yes.
5        Q     And do you have a recollection of signing
6   off on maybe not every word of this, but at some
7   point in time, signing off on an employee handbook
8   for Wayfarer Studios?
9        A     I don't recall.
10       Q     Do you have any recollection of ever
11  seeing this letter that your name is on here?
12       A     I don't recall.
13       Q     If you flip through the Table of Contents
14  on pages HEATH 34944 through HEATH 34945, have you
15  ever looked at this -- as you look through the Table
16  of Contents, have you ever looked through the
17  policies and procedures that are contained within
18  this handbook?
19       A     No.
20       Q     Okay.
21             Well, let's look through some of the
22  policies because I think they're quite commendable.
23  On page 4 of the document, which is HEATH 34946, do
24  you see a reference in the values to Wayfarer
25  Studios being a "Baha'i inspired organization"?

CONFIDENTIAL

Page 186

1   anti-retaliation policies and procedures?

2       A    I don't know.

3       Q    No idea one way or the other?

4       A    I don't -- yeah, I'm not -- I'm not aware

5   of the details.  I'm a board member.  I don't get

6   into the day-to-day operations.

7       Q    All right.  But at any time during

8   Paylocity's existence, are you aware of whether the

9   company provided any services with respects to

10  compliance in anti-discrimination, anti-harassment,

11  and anti-discrimination policy?

12      A    I am not aware of that.

13      Q    Okay.

14           Do you see here in this policy, a -- the

15  second paragraph begins with:

16           (As read):

17               "Wayfarer Studios is committed to

18               providing a workplace that is free from

19               discrimination, harassment, and

20               retaliation.  Wayfarer Studios strictly

21               prohibits discrimination, harassment,

22               or retaliation against employees,

23               applicants, or any other covered

24               person."

25           And then, there's a long paragraph after

CONFIDENTIAL

Page 187

```
 1   that.
 2           Do you see where I am?
 3       A   Yes.
 4       Q   Have you ever looked at this policy
 5   before?
 6       A   No.
 7       Q   Have you ever received any training on
 8   this policy?
 9       A   No.
10       Q   Have you ever seen a policy like this in
11   any of your work settings?
12       A   Yes.
13       Q   Does this appear to be a fairly standard
14   or common anti-discrimination, anti-harassment, and
15   anti-retaliation policy?
16           MS. GAROFALO:  Objection.
17           THE WITNESS:  I'm not an expert on that,
18   but yes.
19   BY MR. GOTTLIEB:
20       Q   Do you see in the middle of that
21   paragraph, there is a reference to:
22           (As read):
23               "Prohibiting discrimination relating to
24               marital status, sex, including
25               pregnancy, childbirth, breastfeeding,
```

CONFIDENTIAL

Page 188

1              or other medical conditions related to
2              breastfeeding, and medical conditions
3              related to pregnancy or childbirth"?
4      A    Yes.
5      Q    Do you agree that's part of the policy
6  for Wayfarer Studios?
7      A    Yes.
8      Q    Any more or less important than any other
9  part of the paragraph that you see here?
10     A    I don't really know how to answer that,
11 but it's part of the policy.
12     Q    Okay.
13          Do you see a reference to height and
14 weight in this paragraph, under "covered person"?
15     A    Yes.
16     Q    Do you see a reference to gender?
17     A    Thank God we don't discriminate on
18 height.  I would have a problem.
19     Q    Fair enough, sir.
20          Do you see a reference -- I kind of
21 skipped ahead of it a little bit.  But after the
22 marital status, sex sentence, do you see the
23 reference to gender and gender expression?
24     A    Yes.
25     Q    Another one relating to gender identity?

CONFIDENTIAL

Page 189

1      A    Yes.

2      Q    Okay.  And there is a number of other

3    protected characteristics within this paragraph,

4    right?

5      A    Yes.

6      Q    And you see:

7           (As read):

8               "Wayfarer Studios also prohibits and

9               does not tolerate unlawful

10              discrimination, harassment, or

11              retaliation against employees and

12              covered persons who are perceived to

13              have any of these protected

14              characteristics."

15          Do you see that?

16     A    Yes.

17     Q    Do you understand what that means?

18     A    Yes.

19     Q    Do you see the next sentence says:

20          (As read):

21              "All, underlined, Wayfarer Studio

22              employees, officers, principals,

23              agents, workers, and representatives

24              are prohibited from engaging in

25              unlawful discrimination, harassment,

CONFIDENTIAL

Page 190

1              and/or retaliation."

2         Do you see that?

3    A    Yes.

4    Q    That applies to you?

5    A    Yes.

6    Q    That applies to Mr. Baldoni?

7    A    Yes.

8    Q    That applies to Mr. Heath?

9    A    Yes.

10   Q    Do you see the anti-harassment section,

11   sir?

12   A    Yes.

13   Q    Do you see the first sentence says:

14        (As read):

15            "Prohibited harassment is not just

16            sexual harassment, but harassment based

17            on any protected characteristic."

18        Do you see that?

19   A    Yes.

20   Q    Do you understand what that means?

21   A    That's a -- can you rephrase that,

22   please?

23   Q    Do you understand what that sentence

24   means?

25   A    Yes.

CONFIDENTIAL

Page 191

1          Q     Do you see the last sentence in that
2    paragraph before we carry over to the next page
3    says:
4                (As read):
5                     "Harassment may be verbal, written, or
6                     physical conduct that denigrates or
7                     shows hostility or aversion towards an
8                     individual based on any protected
9                     characteristic, including being
10                    perceived to have any of these
11                    protected characteristics."
12               And then, it goes on:
13               (As read):
14                    "That has the purpose or effect of
15                    creating an intimidating, hostile, or
16                    offensive work environment, has the
17                    purpose or effect of unreasonably
18                    interfering with an individual's work
19                    performance, or otherwise adversely
20                    affects an individual's employment
21                    opportunities."
22               Do you see that?
23          A     Yes.
24          Q     This is Wayfarer Studios' official policy
25    of what constitutes and what can constitute sexual

CONFIDENTIAL

Page 192

1  harassment, correct?

2      A    No.  This is harassment.  I don't see

3  sexual harassment.

4      Q    "Of any kind of harassment."

5      A    Yeah, there's two different things.  So I

6  think my answer would have to be no unless you want

7  to rephrase the question.

8      Q    This is Wayfarer Studios' official

9  definition of conduct that can constitute

10  harassment?

11      A    Yes.

12      Q    Okay.

13          So harassment can be something that has

14  the purpose or effect of creating an intimidating,

15  hostile, or offensive work environment, right?

16          MS. GAROFALO:  Objection.

17          THE WITNESS:  To the best of my

18  knowledge.

19  BY MR. GOTTLIEB:

20      Q    And it can be something that has the

21  purpose or effect of unreasonably interfering with

22  an individual's work performance, right?

23          MS. GAROFALO:  Objection.

24          MR. GOTTLIEB:  To the best of my

25  knowledge.

CONFIDENTIAL

Page 193

1   BY MR. GOTTLIEB:

2        Q    And someone can be harassed by having

3   their employment opportunities adversely affected?

4             MS. GAROFALO:  Objection.

5             THE WITNESS:  To the best of my

6   knowledge.

7   BY MR. GOTTLIEB:

8        Q    Do you agree that sexual harassment

9   includes harassment that is not necessarily sexual

10  in nature?

11            MS. GAROFALO:  Objection.

12            THE WITNESS:  No.

13  BY MR. GOTTLIEB:

14       Q    Do you understand your policy says that?

15       A    Can you show me where?

16       Q    On HEATH 34948.  It's in the first full

17  paragraph:

18            (As read):

19                 "Like other forms of harassment, sexual

20                 harassment is strictly prohibited.

21                 Sexual harassment includes harassment

22                 that is not necessarily sexual in

23                 nature."

24       A    Hang on, let's -- okay.  Can you give me

25  a second to read through it?

CONFIDENTIAL

Page 194

```
 1        Q    Sure.
 2        A    Okay.  Can you reask the question?
 3        Q    Do you understand that sexual harassment
 4   includes harassment that is not necessarily sexual
 5   in nature?
 6             MS. GAROFALO:  Objection.
 7             THE WITNESS:  I'm not an expert on that,
 8   but that's what the policy says.
 9   BY MR. GOTTLIEB:
10        Q    That is the Wayfarer Studios' policy that
11   applies to you, Mr. Baldoni, and Mr. Heath, right?
12             MS. GAROFALO:  Objection.
13             THE WITNESS:  That is in our -- our
14   handbook.  And then, it goes on to say --
15   BY MR. GOTTLIEB:
16        Q    A lot more, right?
17        A    Yeah.  Unwelcome sexual advantages,
18   requests for sexual favors, and other.  So verbal or
19   physical contact of a sexual nature.
20        Q    Okay.
21        A    So those kinds of things.
22        Q    Do you see the second paragraph --
23        A    Sorry.  So if I can read through?
24        Q    Yeah, go ahead.  I apologize.
25        A    There's some specificity in here about
```

CONFIDENTIAL

Page 195

1   what would -- it's not just anything that anyone
2   says.  But things like, for example, unwelcome
3   sexual advances, requests for sexual favors.  Some
4   very specific things.
5        Q     Sure.
6        A     Not just anything anyone would term.  So
7   I don't want to broadly say that anything that
8   anyone perceives to be sexual harassment would
9   actually be sexual harassment.  But, rather, things
10  as in here, a condition of an individual's
11  employment.
12            So in other words, that if someone were
13  to be asked for sexual favors or if someone were to
14  say, like -- like is very typical in Hollywood, that
15  would be definitely sexual harassment.
16       Q    Fair enough, Mr. Sarowitz.
17            If I worked for you, and I wanted to
18  understand what's our sexual harassment policy, I
19  imagine you would tell me, take a look at this
20  document, right?
21            MS. GAROFALO:  Objection.
22            THE WITNESS:  I wouldn't be -- I wouldn't
23  be the one answering that question.
24  BY MR. GOTTLIEB:
25       Q    If you were?

CONFIDENTIAL

Page 196

1           MS. GAROFALO:  Objection.

2           THE WITNESS:  But I wouldn't be, so it's

3   conjecture.

4   BY MR. GOTTLIEB:

5       Q    Is it fair to say that if I wanted to

6   understand what Wayfarer Studios' sexual harassment

7   policy was, that this is the place I would look?

8   This document is the place I would look to

9   understand that policy?

10          MS. GAROFALO:  Objection.

11          THE WITNESS:  I'm not 100 percent sure

12  how it would be handled since I don't handle the

13  day-to-day operations.

14  BY MR. GOTTLIEB:

15      Q    Do you understand that Wayfarer Studios'

16  policy, explains that:

17              (As read):

18                  "Sexual harassment may include a range

19                  of subtle and not so subtle behaviors

20                  and may involve individuals of the same

21                  or different gender"?

22          MS. GAROFALO:  Objection.

23          THE WITNESS:  That's from our policy,

24  correct?  That's a piece of our policy?

25

CONFIDENTIAL

Page 197

1   BY MR. GOTTLIEB:

2        Q    And you see there's, in that same

3   paragraph, a discussion of different circumstances

4   and behaviors that could be considered sexual

5   harassment depending on the context?

6        A    Right.  Such as unwelcome sexual

7   advances, requests for sexual favors, or making

8   sexual favors a condition of -- the things that are

9   here.

10       Q    Okay.

11       A    I would definitely agree that would be

12  part of our policy.

13       Q    You see the paragraphs -- there is two

14  paragraphs under the heading, "Individual and

15  Conduct Covered"?

16       A    Okay.  That's in the middle, correct?

17       Q    Yes, sir.

18       A    Yes.

19       Q    Okay.  Do you see how that policy

20  encourages individuals who believe they are being

21  subjected to improper conduct, or such conduct:

22            (As read):

23                 "Promptly advise the offender that his

24                 or her behavior is unwelcome and

25                 request that it be discontinued"?

Page 198

```
 1        A    Yes.
 2        Q    Are you aware of whether anyone on the
 3   set of It Ends with Us advised Mr. Baldoni that his
 4   behavior was unwelcome?
 5        A    That's too broad a topic.  Can you -- can
 6   you say specifically, more specifically what?
 7        Q    Do you know if at any time during the
 8   filming of It Ends with Us, anyone advised
 9   Mr. Baldoni that he had engaged in behavior that was
10   unwelcome?
11        A    I just can't.  It's too broad.
12        Q    You don't know?
13        A    I wasn't there.  I don't -- I don't have
14   any firsthand -- as you said before about the other
15   things, I don't have first knowledge -- firsthand
16   knowledge.  I wasn't there.
17        Q    Do you have any information at all, were
18   you ever told, that anyone told Mr. Baldoni that he
19   had engaged in conduct that was unwelcome and a
20   request that it be discontinued?
21             MS. GAROFALO:  Objection.  To the extent
22   it calls for information you learned from lawyers,
23   in which case you are instructed not to answer.
24             You may otherwise answer.
25             THE WITNESS:  Attorney privilege.
```

CONFIDENTIAL

Page 202

1    It Ends with Us?

2         A    I don't recall.

3         Q    Was there ever a time, again, prior to

4    this litigation, where you learned that someone on

5    the set raised concerns that Mr. Baldoni's behavior

6    was inappropriate during filming?

7         A    I am not aware of any HR complaints that

8    were raised or any SAG complaints that were raised

9    by his behavior.

10        Q    Well, that's an interesting way of

11   distinguishing the question, because that's

12   precisely how your PR people talked about it to the

13   press.  So my question to you, sir, was not about HR

14   complaints or SAG complaints.

15        A    Okay.  So --

16        Q    My question to you was whether -- and I

17   will reread it, if I can find it.

18             My question was whether you ever became

19   aware prior to this litigation of anyone on the set

20   raising concerns that Mr. Baldoni's behavior during

21   filming was inappropriate?

22        A    I don't recall.

23        Q    Do you see if -- is it fair to say that

24   under the Wayfarer Studios' policy, the thing you

25   want your employees to do when they feel like they

CONFIDENTIAL

Page 203

1   have experienced this type of prohibited behavior,

2   is promptly advise the offender that his or her

3   behavior is unwelcome, and request that it be

4   discontinued?

5               MS. GAROFALO:  Objection.

6               You can answer.

7               THE WITNESS:  Yes.

8   BY MR. GOTTLIEB:

9       Q    And what is supposed to happen when an

10  individual follows that policy to the letter?

11              MS. GAROFALO:  Objection.

12              THE WITNESS:  Although I am not

13  responsible for this because I'm not the one

14  actually implementing this, the behavior should

15  stop.  That would not be my individual

16  responsibility as an individual.

17  BY MR. GOTTLIEB:

18      Q    But the reason the policy is written this

19  way is because the hope is by promptly reporting it

20  and asking for that behavior to be discontinued,

21  whoever's doing it will stop, right?

22              MS. GAROFALO:  Objection.

23              THE WITNESS:  I would not be personally

24  involved, but that would be the hope.

25

CONFIDENTIAL

Page 204

```
 1   BY MR. GOTTLIEB:
 2        Q     That's your understanding of the purpose
 3   of this policy, right?
 4        A     Yes.
 5        Q     And the next section under "Supervisor
 6   and Manager Responsibility" states:
 7             (As read):
 8                  "If any supervisor or manager becomes
 9                  aware of a violation of this policy,
10                  they are obligated to report the
11                  violation to human resources/management
12                  so Wayfarer Studios can investigate,
13                  and if appropriate, take corrective
14                  action."
15             Do you see that?
16        A     Where's that at?
17        Q     In the section entitled "Supervisor and
18   Manager Responsibilities."
19        A     Okay.  Yes.
20        Q     Did you supervise or manage any people at
21   Wayfarer Studios during the filming of
22   It Ends with Us?
23        A     No.
24        Q     Did Mr. Heath?
25        A     Yes.
```

CONFIDENTIAL

Page 205

1          Q     Did Mr. Baldoni?

2          A     Yes.

3          Q     So if Mr. Heath or Mr. Baldoni became

4     aware of a violation of policy, they were obligated

5     to report the violation under the terms of it; is

6     that correct?

7          A     I am not aware of what was or wasn't

8     done, so I would say, I don't know what they did.

9          Q     I'm just asking you about what the policy

10    requires.  I mean, you understand that the

11    obligation to report a violation that arises for

12    supervisors and managers is triggered any time a

13    supervisor or manager becomes aware of a violation.

14    That's what this policy says, right?

15               MS. GAROFALO:  Objection.

16               THE WITNESS:  Yes.

17    BY MR. GOTTLIEB:

18          Q     And that's a good policy to have, right?

19               MS. GAROFALO:  Objection.

20               THE WITNESS:  I think so.

21    BY MR. GOTTLIEB:

22          Q     You don't want to force a low-level

23    employee in an organization to have to invoke a

24    formal process if a number of supervisors and

25    managers already know what is going on, right?

CONFIDENTIAL

```
 1            MS. GAROFALO:  Objection.
 2            THE WITNESS:  So you're talking about a
 3   power imbalance, like --
 4            (Cross talk.)
 5   BY MR. GOTTLIEB:
 6       Q    I'm just talking about the reason you
 7   have a policy like this.
 8       A    I know.  Can I -- can I --
 9       Q    Sure.
10       A    -- finish the question to you?  So I just
11   want to make sure I understand.
12            So you're saying like a low-level
13   employee, someone without any power who would not be
14   able to get their way, being victimized by
15   harassment or something similar; is that what you're
16   saying --
17       Q    That's one example.
18       A    -- of a low level employee?  Just so I
19   can understand what you mean by low-level employee.
20       Q    Let's strike my reference to a low-level
21   employee.
22       A    Okay.
23       Q    Do you agree that it's a good policy to
24   have that if a supervisor or manager becomes aware
25   of a violation of the policy, they're obligated to
```

CONFIDENTIAL

Page 207

```
 1   report it?
 2              MS. GAROFALO:  Objection.
 3              THE WITNESS:  To the best of my
 4   knowledge, yes.
 5   BY MR. GOTTLIEB:
 6        Q    Okay.  That promotes accountability,
 7   right?
 8              MS. GAROFALO:  Objection.
 9              THE WITNESS:  To the best of my
10   knowledge, yes.
11   BY MR. GOTTLIEB:
12        Q    Do you see on the next page there's a
13   section called "Investigation"?
14        A    Uh-huh.
15        Q    Do you see how it states:
16              (As read):
17                   "Any reported allegations of
18                   harassment, discrimination, or
19                   retaliation, will be promptly and
20                   thoroughly investigated by qualified
21                   personnel in an impartial manner"?
22        A    Uh-huh.
23        Q    Do you see how it then includes --
24              Sorry, is that a yes?
25        A    Yes.
```

CONFIDENTIAL

Page 208

1        Q    Do you see how it says:

2             (As read):

3                  "Wayfarer Studios will ensure that

4                  these personnel will use the evidence

5                  to reach reasonable conclusions"?

6        A    Yes.

7        Q    You are now aware as you sit here today,

8   that complaints were raised about Mr. Baldoni's

9   conduct on the set of It Ends with Us, correct?

10            MS. GAROFALO:  Objection, to the --

11   objection, to the extent it calls for

12   attorney-client communications.  You are not -- you

13   are instructed not to respond with anything you

14   learned strictly through attorney-client

15   communications.  If you have any independent

16   knowledge, you may respond.

17            THE WITNESS:  Sorry.  I'm going through

18   this in my head.  I'm not trying to delay.  I'm --

19   because this case has been going on, this has mainly

20   been discussed with my attorneys, so I really

21   couldn't tell you where my independent knowledge

22   begins, and my -- I think it's safer that I don't

23   say anything.

24   BY MR. GOTTLIEB:

25        Q    Well, Mr. Sarowitz, notwithstanding the

CONFIDENTIAL

Page 209

1    best efforts of your attorney here, you sat through
2    Ms. Lively's deposition, correct?
3           A     Yes.
4           Q     You sat through all of it, from start to
5    finish, right?
6           A     Yes.
7           Q     And you heard Ms. Lively testify that she
8    had made complaints to Mr. Baldoni during the
9    filming of It Ends with Us; is that right?
10          A     I don't recall.
11          Q     And you know, I assume from reading the
12   complaint in this case and from listening to that
13   testimony and others, that at one point in time, Ms.
14   Lively's legal team sent a list of 17 protections
15   that were demanded for the return to production in
16   November of 2023; you know that, right?
17                MS. GAROFALO:  Again, objection to the
18   extent you having information gleaned from
19   communications with attorneys.  If you knew that
20   contemporaneously or other independent knowledge,
21   you may answer.
22                THE WITNESS:  Yes.  I'm aware of the
23   list.
24   BY MR. GOTTLIEB:
25          Q     In fact, you learned about that long

CONFIDENTIAL

Page 210

```
 1   before Ms. Garofalo was your lawyer, right?
 2        A    Yes.
 3        Q    You learned about that completely
 4   independently of anything that could fall within an
 5   attorney-client privilege because you learned about
 6   it in 2023, right?
 7             MS. GAROFALO:  Objection.
 8             THE WITNESS:  Not completely
 9   independently.
10   BY MR. GOTTLIEB:
11        Q    You knew in 2023 that Ms. Lively's legal
12   team had sent a list of protections for return to
13   production, and you talked about it with
14   Mr. Baldoni, didn't you?
15        A    I'm trying to answer this honestly, so
16   give me a second to describe what I think of that
17   list.  I believe that in -- Ms. Lively sent a list
18   of things that she insinuated we did, which we never
19   did.  And that forced us basically, after millions
20   of dollars were invested to the movie, to sign a
21   list of things that we would do no more, that were
22   never done as a ploy to take over the movie, which
23   she eventually did.
24             So yes, I believe that Ms. Lively did
25   send a list of demands for her to return to work,
```

CONFIDENTIAL

Page 211

1    and we did sign the list, but when we signed it, we

2    signed it with the understanding that we did not

3    agree that we had actually done those things.

4         Q    What did you do, since you're stating

5    with some amount of conviction that the actions

6    described in that list did not occur and were, as

7    you just said, a ploy, what did you do to satisfy

8    yourself that what you just said is factual?

9              MS. GAROFALO:  Objection.

10   BY MR. GOTTLIEB:

11        Q    How did you satisfy yourself that those

12   behaviors or activities or compliance, or whatever

13   you would like to call them, did not occur?

14        A    As I have stated previously, the two main

15   things that she said about me are complete or

16   partial lies.  That's is my direct experience.  She

17   accused me of being in a scene -- at a scene, which

18   I was not at.  She said she was scantily clad.  An

19   actor who was on the set with her, testified she was

20   not -- publically testified she was not scantily

21   clad.  And then, throughout the course of this case,

22   the evidence has come out that much of what she said

23   was not true, or partially true, or twisted, to make

24   it seem worse.

25              For example, she said that Justin said

CONFIDENTIAL

Page 212

1    she smelled good.  And the evidence was very clear,

2    because we had it on tape, she asked Justin, "does

3    my spray tan" -- she said, "my spray tan smells

4    bad," and Justin says, "No, it smells good."  So

5    very different than how she portrayed it.  There

6    were several other instances like that where the

7    actual evidence from text messages, et cetera,

8    debunked her claims.

9         Q    You were describing your understanding of

10   evidence as this case has developed.  You see in the

11   paragraph labeled "Investigation," in the bottom of,

12   or the top of page 34949, that:

13             (As read):

14                  "Any reported allegations of

15                  harassment, discrimination, or

16                  retaliation will be promptly and

17                  thoroughly investigated by qualified

18                  personnel in an impartial manner.

19                  Wayfarer Studios will ensure that these

20                  personnel will use the evidence to

21                  reach reasonable conclusions."

22             Do you see that?

23        A    Yes.

24        Q    And do you see the policy also states:

25             (As read):

CONFIDENTIAL

Page 213

1              "Wayfarer Studios will maintain
2              appropriate documentation and tracking
3              to ensure that reasonable progress is
4              made"?
5      A     Yes.
6      Q     Did that happen with respect to what
7  occurred on set in It Ends with Us?
8              MS. GAROFALO:  Objection.
9              THE WITNESS:  The two ways that a formal
10  complaint would -- I'm not aware of -- of any formal
11  complaints of any -- any formal reports of any
12  allegations being made either to, as I mentioned
13  before, either to SAG or to HR.
14  BY MR. GOTTLIEB:
15      Q     So your answer is, you're not aware of
16  any investigation of this type referenced on the
17  document with the Bates No. 34949 taking place?
18      A     I am not aware of any reported
19  allegations.
20      Q     What's a "formal report"?
21      A     Typically in -- again, I'm not an expert
22  on this.  I don't manage sets.  But what I've been
23  told and what I've learned through the course of
24  this case, is that the two options, if there was a
25  --

CONFIDENTIAL

Page 214

1              MS. GAROFALO:  Okay.  Objection, to the

2     extent that you learned anything from

3     attorney-client communications --

4              THE WITNESS:  Okay.  Sorry.

5              MS. GAROFALO:  -- and you are instructed

6     not to answer --

7              THE WITNESS:  Okay.  Sorry.  I will not

8     answer.

9              MS. GAROFALO:  -- and move to strike.

10    BY MR. GOTTLIEB:

11         Q    So you don't know anything other than

12    what you've learned from your attorneys in this

13    case?

14         A    Correct.

15         Q    Do you see anywhere in the paragraph

16    labeled "Investigation," a requirement that for an

17    investigation to take place, a formal HR complaint

18    must be filed with a particular person or in a

19    particular form?

20         A    Can I get a little time to read through

21    it?

22         Q    It's just one paragraph, but sure.

23         A    It still takes some time.

24              Okay.  Can you repeat the question?

25         Q    Do you see anywhere in the paragraph

CONFIDENTIAL

Page 215

1  labeled "Investigation," any requirement that for an
2  investigation to take place, a formal HR complaint
3  must be filed?
4       A    I see the first three words, "any
5  reported allegations."
6       Q    "Any" meaning, any, right?
7       A    Reported.
8       Q    Okay.
9            And do you also see the prior page in the
10 section we were just looking at, the "Supervisor and
11 Manager Responsibilities"?  Do you see:
12            (As read):
13              "In a circumstance where a supervisor
14              or manager is aware of a violation of
15              the policy, they're obligated to report
16              it to HR," right?
17       A    Yes.
18       Q    And so the responsibility to report is
19 not on the individual who has been the subject of
20 the conduct, right, under this policy?
21            MS. GAROFALO:  Objection.
22            THE WITNESS:  Well, it doesn't mean it's
23 not their responsibility, but it would also be on
24 their manager.
25

CONFIDENTIAL

Page 216

1    BY MR. GOTTLIEB:

2         Q    It would also be on the management?

3         A    Yeah.

4         Q    Okay.

5         A    It would be -- I would -- typically, from

6    my experience, the individual would be more likely

7    to report it.

8         Q    And do you agree, sticking on that same

9    page, 34948, that if you wanted to understand what

10   types of conduct sexual harassment could include,

11   you could read this paragraph that says:

12              (As read):

13                   "Sexual harassment may include a range

14                   of subtle and not so subtle behaviors

15                   that may involve individuals of the

16                   same or different gender."

17              And then, a second sentence that begins

18   with:

19              (As read):

20                   "Depending on the circumstances."

21              And then, there is a long list of

22   behaviors.

23              Do you see that?

24         A    (As read):

25                   "Sexual advances or requests for sexual

CONFIDENTIAL

Page 217

1              favors, verbal abuse of a sexual
2              nature, commentary about an
3              individual's body, sexual prowess, or
4              sexual deficiencies."
5       Yes.
6    Q    Also:
7         (As read):
8              "Sexual jokes and innuendo, leering,
9              whistling, or touching, insulting or
10             obscene comments or gestures, display
11             in the workplace of sexually suggestive
12             objects or pictures, and other
13             physical, verbal, or visual conduct of
14             a sexual nature."
15       Is that a good description of what can
16    constitute sexual harassment under Wayfarer's
17    policy?
18    A    That's what the policy says.
19    Q    Do you have any knowledge of whether any
20    conduct of that type occurred on the set of
21    It Ends with Us?
22    A    I have no knowledge of any of that.
23    Q    Okay.  You don't know one way or the
24    other?
25    A    I have no knowledge of any of that ever

CONFIDENTIAL

1          THE WITNESS:  Okay.  Yeah.  So I want him

2      to clarify.

3      BY MR. GOTTLIEB:

4          Q    That's fair.  Let me ask the question

5      this way.

6              Is it the Wayfarer Studios' policy, that

7      if an employee believes they have been subject to

8      misconduct under this policy, they may file a

9      complaint with the appropriate agency?  The

10     appropriate agencies being, the California

11     Department of Fair Employment and Housing or the

12     Federal Equal Employment Opportunity Commission?

13             MS. GAROFALO:  Is there a question?

14     BY MR. GOTTLIEB:

15         Q    Is that Wayfarer Studios' policy?

16         A    Can you --

17             MS. GAROFALO:  Objection.

18             THE WITNESS:  And could you repeat it

19     again, please?

20     BY MR. GOTTLIEB:

21         Q    Is it the Wayfarer Studios' policy that

22     if an employee believes they have been subject to

23     misconduct under this policy, they may file a

24     complaint with the appropriate agency?  And then the

25     two agencies listed are, the California Department

CONFIDENTIAL

Page 220

```
 1    of Fair Housing and Employment -- Fair Employment
 2    and Housing, and the Federal Equal Employment
 3    Opportunity Commission.
 4         A    I would not agree with it as stated.
 5         Q    How would you state it?
 6         A    If the complaint -- if the employee had
 7    an actual complaint and that complaint was not
 8    resolved.  You didn't put that part in.  If you
 9    would add that part in, that the complaint was not
10    resolved, then I would agree with it.
11         Q    Okay.  So if an employee or covered
12    person believes their complaint is not resolved, and
13    they believe they have been subject to misconduct
14    under the policy, then they may file a complaint
15    with the appropriate agency?
16         A    Yes.
17         Q    Are you aware that Ms. Lively believed
18    her complaints were not resolved?
19         A    I -- I am not aware of what Ms. Lively
20    did or did not believe.
21         Q    Okay.  Are you aware that Ms. Lively's
22    complaint filed with the CRD described complaints
23    that were not resolved?
24         A    Yes.
25         Q    Complaints that had been made to
```

CONFIDENTIAL

Page 221

1    Mr. Baldoni?

2         A    I am not aware of any complaints that

3    were not resolved.

4         Q    Complaints describing unwelcome behavior?

5         A    I am not aware of any complaints that

6    were not resolved.

7         Q    Okay.

8         A    And can I answer a little bit more?

9         Q    Sure.

10        A    I believe that after there were -- there

11   are no further complaints after the 17 points, so

12   even after very early on in filming I was not aware

13   of any complaints, and I'm not aware of any written

14   complaints, any HR complaints.  I'm not aware of any

15   unresolved complaints.

16        Q    Okay.  Are you --

17        A    I know that there was insinuated, but I

18   am not aware of any unresolved complaints.

19        Q    Are you aware of any investigation that

20   took place into any conduct that took place on the

21   set of It Ends with Us prior to this litigation?

22        A    I am not aware of any complaints that

23   necessitated an investigation prior to this

24   investigation.

25        Q    So the answer to my question is, no,

CONFIDENTIAL

Page 222

1    you're not aware of any investigations that took

2    place with respect to any conduct that occurred or

3    was alleged to have occurred on the set of

4    It Ends with Us prior to this litigation?

5         A    I am not aware of any complaints that

6    would necessitate a -- an investigation.

7         Q    You're going to have to answer my

8    question.

9         A    I did.  I said I'm not aware of any

10   complaints that necessitated an investigation;

11   therefore, I'm not aware of any investigation.

12        Q    The second part was the first time you

13   answered that in three tries.  Let's move on.

14             MR. GOTTLIEB:  What was the tab 4?  Do we

15   need a break?  The tape is out.

16             THE VIDEOGRAPHER:  We are going off the

17   record.  The time is 3:14 p.m.

18             (Recess.)

19             THE VIDEOGRAPHER:  We're back on the

20   record.  The time is 3:36 p.m.

21   BY MR. GOTTLIEB:

22        Q    Mr. Sarowitz, before the break we were

23   looking at the document marked as Exhibit 7, which

24   is the handbook.  And the last thing I wanted to

25   look at before we leave this document is on the same

CONFIDENTIAL

Page 229

1   did end up taking over the editing, the marketing.

2   She ended up getting a producer credit.  She ended

3   up taking Justin out of the premiere.

4               All of these things occurred with -- as a

5   partial result of us signing this.  So it was a way

6   to essentially extort our own production.

7        Q    Did any of those things occur in November

8   of 2023?

9               MS. GAROFALO:  Objection.

10              THE WITNESS:  Again, that's a very vague

11  question.  Could you be more specific?

12  BY MR. GOTTLIEB:

13       Q    Did any of the long list of items that

14  you just listed that Ms. Lively was trying to

15  accomplish with this list, did any of them occur

16  contemporaneously with the discussion around the

17  17-point list?

18       A    I was not there to see exactly what she

19  did and when, but Ms. Lively's behavior began almost

20  immediately from the time she was on set.  Her

21  demands were unreasonable.  It cost me personally, I

22  would estimate over $10 million.  And I'm not

23  talking about our legal costs.  Things like the

24  wardrobe, things like delays in production, et

25  cetera.  Having to hire an extra producer.  All of

CONFIDENTIAL

Page 230

1    these expensive things occurred throughout the
2    production.
3              So when these things occurred, I can't
4    tell you exactly when they occurred, but throughout
5    the production.  In addition to a lot of stress.  In
6    addition to the people being fired.
7        Q    Why do you -- sorry.  Go ahead.
8        A    And this 17-point list essentially served
9    very effectively, in my opinion.  And I will give
10   her a lot of credit for this, as essentially a knife
11   to our throat throughout all of this, so she could
12   get away with the crime she got away with.
13       Q    I thought you weren't involved in the
14   production of the film?
15       A    Correct.
16       Q    You only visited the set twice, right?
17   Isn't that what your lawyer told Forbes?
18       A    That's what I told Forbes, and that's
19   what I'm telling you.  I only visited the set twice.
20       Q    That's the truth?
21       A    That is the truth.
22       Q    Well, you used the word "we" a lot in
23   that speech you just gave.  And so what I'm
24   wondering is, were you involved in the production of
25   the film?  Or are you, in using the word "we,"

CONFIDENTIAL

Page 266

1        Q    Lacking in credibility when I say
2   "incredible," is that a fair description of your
3   views?

4        A    Much better.

5        Q    Okay.  What about Ms. Slate?

6        A    I'm aware that in the course of any
7   production, that there's issues.  I am aware that
8   Ms. Slate had an issue.  I am not aware of the
9   specifics.  I'm aware that it was resolved.  And to
10  my knowledge, there was nothing else brought up.  So
11  I'm aware that -- you know, I'm aware that in the
12  course of production, there can be issues.  And I
13  was aware there was an issue with Ms. Slate and that
14  it was resolved.

15       Q    In determining whether there were
16  problems on the set, would it be of interest to you
17  to know Jenny Slate's perspective on what happened
18  that day?

19            MS. GAROFALO:  Objection.

20            THE WITNESS:  I believe that that will be
21  up to a jury during the trial.  In other words, I
22  don't have time to get into every detail.  I'm the
23  chairman.  I don't have time to get into every
24  detail.  I think at some point in time, you know,
25  I'll have time -- we've had kind of a whirlwind, you

CONFIDENTIAL

Page 285

1        A     No.

2        Q     Did it make you angry?

3        A     No.

4        Q     But they weren't financing the film,

5   right?

6        A     Correct.

7        Q     You were?

8        A     Correct.

9        Q     And you wanted people to know that,

10   right?

11        A     No.

12        Q     You didn't?

13        A     That's why I wasn't upset.

14        Q     Okay.

15              So back on Exhibit 9, which is the last

16   exhibit before this one we were looking at.  It's

17   right here in front of you, I think.

18        A     Got it.

19        Q     When Mr. Baldoni, at 7:00 p.m. on

20   May 28th, says -- referring to you, says:

21              (As read):

22                  "He said he should come to sit and

23                  remind Blake whose money this is."

24              Do you have any reason to dispute that

25   you said that to Mr. Baldoni?

CONFIDENTIAL

Page 286

1           A    No.

2           Q    And do you believe Mr. Baldoni to be

3     honest and accurate in his communications with

4     Mr. Heath?

5           A    Yes.

6           Q    And he would have tried to represent

7     accurately what you had said to him?

8           A    Yes.

9           Q    Let's look at -- one more question.

10               Do you know why that would have been your

11    reaction --

12          A    I don't recall.

13          Q    -- to learning about comments made by

14    Ms. Slate and Ms. Lively?

15               MS. GAROFALO:  Objection.

16               THE WITNESS:  I don't -- I don't believe

17    that was my reaction to that.

18    BY MR. GOTTLIEB:

19          Q    You believe that was your reaction to

20    something else Mr. Baldoni said?

21          A    Yes.

22          Q    But you're not sure because you don't

23    recall the specific conversation?

24          A    This is going back -- this is going back

25    to over a year ago, so I don't recall the specific.

CONFIDENTIAL

Page 287

1    But I can tell you that I would not -- it would have

2    been more than that to get me that upset.

3            MR. GOTTLIEB:  Okay.  Let's look at

4    another exhibit.  This has been marked as

5    Exhibit 11.

6        (Exhibit 11 marked for identification.)

7    BY MR. GOTTLIEB:

8        Q    Mr. Sarowitz, you've been handed a

9    document marked as Exhibit 11, which is a document

10   bearing Bates Nos. SAROWITZ 69 through SAROWITZ 74,

11   and this is a text chain with a number of

12   individuals dated November 12th, 2023 --

13       A    This is different than this one.

14       Q    Yes, sir.

15       A    Can I have some time to read through it?

16       Q    Sure thing.  Once you've had a chance to

17   look through, let me know.

18       A    Okay.

19       Q    You've had a chance to flip through this,

20   Mr. Sarowitz?

21       A    Yes.

22       Q    This is a text message dated

23   November, 12th 2023 -- a series of text messages

24   with a large group.  How would you describe the

25   group that is on this text thread?

CONFIDENTIAL

Page 288

```
 1        A    A group of good friends.
 2        Q    A group of good friends, and Mr. Baldoni
 3   is on here?
 4        A    Yes.
 5        Q    Mr. Heath is on here?
 6        A    Yes.
 7        Q    Mr. Mondschein is --
 8        A    Hang on.  Just want to make sure.
 9             Yes.
10        Q    Mr. Mondschein is on here?
11        A    Yes.
12        Q    Mr. Musiol is on here, right?
13        A    Yes.
14        Q    Mr. Musiol is one of the co-founders --
15   original co-founders of Wayfarer Studios; is that
16   right?
17        A    Yes.
18        Q    To your knowledge, did he have --
19        A    Wait, Way- -- yes.
20        Q    To your knowledge, did he have any
21   involvement in the -- in any respect to the
22   production of It Ends with Us?
23        A    Yes.
24        Q    And what was he involved with?
25        A    I don't recall exactly, but I think he
```

CONFIDENTIAL

 1        A    We are very good friends.

 2        Q    Has he ever, to your knowledge, told you

 3   a lie?

 4        A    No.

 5        Q    Do you believe he's capable of telling a

 6   lie to you?

 7        A    Everybody is capable of lying.

 8        Q    Do you believe Mr. Baldoni is capable of

 9   sexually harassing someone?

10        A    No.

11        Q    Do you understand that having -- let me

12   put it -- let me withdraw and rephrase.

13             Do you believe that Mr. Baldoni is

14   capable, at any point in his life, has been capable

15   of taking advantage of a woman?

16             MS. GAROFALO:  Objection.

17             THE WITNESS:  That's a very broad

18   question.  Can you narrow it at all?

19   BY MR. GOTTLIEB:

20        Q    Do you think Mr. Baldoni at any point in

21   his life has engaged in what you would consider to

22   be inappropriate conduct vis-a-vis women?

23             MS. GAROFALO:  Objection.

24             THE WITNESS:  I have no knowledge of him

25   ever doing this.

CONFIDENTIAL

Page 320

```
 1        A    I was only there, as I mentioned, briefly
 2   for part of one day and just a few minutes on
 3   another, so I really wasn't on the set.
 4        Q    Would it surprise you to learn that when
 5   Ms. Ayoub said:
 6             (As read):
 7                  "I wasn't there, so I don't know what
 8                  it's like."
 9             Your response was, "I was"?
10        A    Can you refer me to the page?
11        Q    You don't have any recollection of saying
12   to Ms. Ayoub, "I was there on set"?
13        A    Again, can you refer me to the page?
14        Q    Pages 30 to 31.
15        A    Okay.  Just give me a second or two to
16   read it, and I will go through as quickly as I can
17   because I realize we're running short on time.
18        Q    Thank you, sir.
19        A    Okay.
20        Q    And you see that you make a reference to
21   there being two different sets.  And Ms. Ayoub says:
22             (As read):
23                  "I don't know.  I wasn't there, so I
24                  don't know what it was like."
25             And you say, "I was," right?
```

CONFIDENTIAL

Page 321

1      A     Yes.

2      Q     And she says:

3            (As read):

4                 "You were there?  Was it bad?"

5            And your response is, "No," correct?

6      A     Correct.

7      Q     And she says, "Oh, God."  And your

8   response to that is:

9            (As read):

10                "Justin never has bad set.  Yes, it was

11                the worst set he has ever been on, but

12                no, it wasn't bad.  I was there on set.

13                It was, you know, Justin is really kind

14                and loving and he's like Rainn,

15                actually Rainn is running a set."

16           Ms. Ayoub says, "Yeah."  And you say:

17           (As read):

18                "It's a Baha'i set.  It's never going

19                to be like that, no.  Everything was

20                made up.  It was manufactured, and it

21                was manufactured on purpose in order to

22                take Justin down."

23           That's what you said, right?

24     A     Yes.

25     Q     Do you recall saying that?

CONFIDENTIAL

Page 322

```
 1          A      With the help of this document, yes.
 2          Q      Does that sound like something you would
 3     say?
 4          A      Yes.
 5          Q      Would you be surprised if you said
 6     similar things to other people around the time of
 7     this conversation?
 8          A      I'm not aware of me saying anything like
 9     this to anybody else.
10          Q      And your representation to Ms. Ayoub is
11     that everything, referring to what happened on set,
12     was manufactured on purpose in order to take Justin
13     down; is that right?
14          A      That appears to be what I said.
15          Q      You said that having never even looked at
16     the chronology that your own team had put together
17     about what happened on set, right?
18          A      I don't recall what I looked at and what
19     I hadn't looked at.
20          Q      And you said that even though you never
21     talked to any of the relevant, factual witnesses,
22     with the exception of Mr. Baldoni and Mr. Heath, and
23     one conversation with Brandon Sklenar, to know what
24     had happened on set; is that right?
25          A      And a short conversation with Ms. Lively.
```

CONFIDENTIAL

Page 347

1          Q    Yes.   Mr. Sarowitz, just to cut to the
2    chase, I'm going to represent to you that the
3    custodian -- do you see the custodian in the top on
4    the first page -- see where it says "Custodian:
5    Steven Sarowitz"?
6          A    Yes.
7          Q    I will represent to you that the format
8    of these messages is such that the blue box here on
9    the right-hand side represents whoever the custodian
10   of the messages is.  So we'll just proceed on that
11   understanding; is that all right?
12         A    Yes.
13         Q    We'll proceed on you accepting that
14   representation from me, which is that good?
15         A    Yes.
16         Q    Okay.  So you understand here that you're
17   having a conversation with this group about what
18   Sage Steele should point out and address in a video
19   that Sage Steele ultimately posted online; is that
20   correct?
21         A    Could you repeat the question, please?
22         Q    Do you understand that this text
23   exchange, you and your colleagues are discussing --
24   or you and this group of participants are discussing
25   the content of a post, a video post, that

CONFIDENTIAL

Page 348

1    Sage Steele is going to release?

2         A    Okay.

3         Q    And do you see you're saying:

4              (As read):

5              "It's a good start.  Should she also

6              point out that the other women who were

7              hurt by" -- and it looks like Blake,

8              but there's an N -- "included the

9              assistant director and editors and the

10             wives of the men Blake falsely

11             accused?"

12        Do you see that?

13        A    Yes.

14        Q    And there's a couple of responses from

15   Ms. Steele -- three responses from Ms. Steele.  You

16   respond.  And then on the top of page 1242, you

17   write:

18             (As read):

19             "Looking good.  A few minor suggestions

20             Instead of Team Blake, change to

21             Blake's team.  Also, do you want to add

22             the wives of the men who were falsely

23             accused as well?"

24        Do you see that?

25        A    Yes.

CONFIDENTIAL

Page 349

1      Q    Mr. Heath responds:

2           (As read):

3                "I think leave the wives out.  It feels

4                too manipulative."

5           Do you see that?

6      A    Sorry.  I wanted to read this whole

7  comment.

8           (Witness reviews document.)

9           Yes.

10     Q    Were there any other content creators

11  that you were in touch with around this time, around

12  January 5th, 2025, early January?

13     A    Not to my knowledge.

14     Q    Sage Steele is the only one you can think

15  of as you sit here today?

16     A    Correct.

17     Q    Sorry?

18     A    Correct.

19     Q    Could there have been others?

20          MS. GAROFALO:  Objection.

21          THE WITNESS:  I don't recall any others.

22  BY MR. GOTTLIEB:

23     Q    Okay.  Did Sage Steele eventually post a

24  video?

25     A    I believe so.

CONFIDENTIAL

Page 363

1              MS. GAROFALO:  It's a yes-or-no answer.

2              THE WITNESS:  Could you repeat the

3     question, please?

4     BY MR. GOTTLIEB:

5         Q    Do you review retention agreements with

6     service providers in this -- related to this case

7     before they are agreed to?

8         A    Not typically.

9         Q    Who amongst your group of defendants is

10    responsible for approving or not approving the

11    retention of vendors or service providers in this

12    case?

13             MS. GAROFALO:  Objection.

14             THE WITNESS:  That would be the Wayfarer

15    management team.

16    BY MR. GOTTLIEB:

17        Q    The Wayfarer management team is in charge

18    of making those selections and decisions?

19        A    Yes.

20        Q    And is the -- does that mean that

21    Wayfarer Studios is responsible for paying their

22    invoices?

23        A    Yes.

24        Q    So then if I understand you, the answer

25    to my previous question was that Wayfarer Studios is

CONFIDENTIAL

Page 364

1    paying for the services being provided relating to

2    the litigation of this case; is that right?

3         A     For who?

4         Q     Let's start for you.

5         A     Yes.

6         Q     Okay.  Mr. Heath?

7         A     Yes.

8         Q     Mr. Baldoni?

9         A     Yes.

10        Q     Ms. Nathan?

11        A     I think so.

12        Q     Ms. Abel?

13        A     I believe so.

14        Q     Mr. Wallace?

15        A     I'm not sure.  I'm not certain.

16              MR. GOTTLIEB:  I believe my time is up,

17    Mr. Sarowitz.  Thank you for your time.  I hope you

18    make your flight.

19              THE WITNESS:  We've got plenty of time.

20              THE VIDEOGRAPHER:  This marks the

21    conclusion of today's deposition.  We're going off

22    the record.  The time is 7:16 p.m.

23

24    (WHEREUPON THE DEPOSITION CONCLUDED AT 7:16 p.m.)

25

CONFIDENTIAL

Page 365

1                    REPORTER'S CERTIFICATE

2            I, ASHLEY SOEVYN, a Certified Shorthand

3    Reporter of the State of California, do hereby

4    certify:

5            That the foregoing proceedings were taken

6    before me at the time and place herein set forth;

7    at which time the witness was put under oath by me;

8            That the testimony of the witness, the

9    questions propounded, and all objections and

10   statements made at the time of the examination were

11   recorded stenographically by me and were thereafter

12   transcribed;

13           That a review of the transcript by the

14   deponent was/ was not requested;

15           That the foregoing is a true and correct

16   transcript of my shorthand notes so taken.

17           I further certify that I am not a relative

18   or employee of any attorney of the parties, nor

19   financially interested in the action.

20           I declare under penalty of perjury under

21   the laws of California that the foregoing is true

22   and correct.  Dated this 4TH day of October, 2025.

23

24   _____

     ASHLEY SOEVYN

25   CSR No. 12019