Exhibit 17

CONFIDENTIAL

1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF NEW YORK

3                    ---oOo---

4

5    BLAKE LIVELY,

6                    Plaintiff,

7       vs.        CASE NO. 24-CV-10049-LJL (LEAD CASE)

                            25-CV-449 (LJL) (MEMBER CASE)

8

     WAYFARER STUDIOS LLC, ET AL.

9

                    Defendants.

10   _____

     JENNIFER ABEL,

11              Third-party Plaintiff,

        vs.

12   JONESWORKS, LLC,

                Third-party Defendant.

13   _____

     WAYFARER STUDIOS LLC, et al.

14              Consolidated Plaintiffs,

        vs.

15   BLAKE LIVELY, et al.

                Consolidated Defendants.

16   _____

17

18                **CONFIDENTIAL**

19      VIDEO-RECORDED DEPOSITION OF MICHAEL ROBBINS

20             Los Angeles, California

21            Monday, November 24, 2025

22

23

24   Stenographically Reported by:  Ashley Soevyn,

     CALIFORNIA CSR No. 12019

25   Pages 1 - 270

                                        Page 1

1    time.  I wrote my report, and I shredded the notes.

2    BY MS. ZELDIN:

3         Q    Were you told to preserve those notes?

4         A    No.

5         Q    Did you understand that you had an

6    obligation to preserve those notes?

7         A    Nope.

8              MS. ROESER:  Belated objection.

9    BY MS. ZELDIN:

10        Q    Where in your report does it reflect

11   anything that Ms. Rikard told you?

12        A    It doesn't specifically refer to her.

13   But I can tell you, if you wish, what we discussed

14   and how that impacted my views.

15        Q    Go ahead.

16        A    So one thing that we discussed was the

17   birthing scene.  I had looked at the birthing scene

18   before that as well.  My view of the birthing scene

19   was that it involved intimacy such that there should

20   have been a nudity rider and a closed set.  She said

21   the same thing.  I don't remember exactly what words

22   she said, but her view was the same.

23             With respect to the dancing scene, I had

24   looked at the dancing scene several times.  My

25   thoughts were that Mr. Baldoni was trying to kiss

Page 47

1    Ms. Lively, that she was avoiding the kiss but

2    staying within character for the most part doing so.

3    And Ms. Rikard said the same thing.

4            More importantly, I knew about production

5    companies establishing definitions of intimacy so

6    that they could establish protocols which then would

7    inform them as to when to bring in an intimacy

8    coordinator, when to -- when to ensure that there

9    was a nudity rider, and when to have a closed set.

10           But I hadn't focused on that issue in

11   this case.  I just didn't see anything indicating

12   that they had or didn't have definitions.  She said

13   they didn't.  Assuming she's correct, that then

14   caused me to say, well, then, these other things

15   should have happened and didn't happen.

16           So that was primarily what she -- how she

17   impacted my opinion to cause me to focus on the lack

18   of definitions.

19       Q    Okay.  Let's go backwards.  Laura Rikard

20   is a director, actor, teacher, intimacy

21   choreographer, intimacy coordinator, and a founding

22   member and head faculty of Theater Intimacy

23   Education.  That's located in North Carolina, right?

24           MS. ROESER:  Objection.

25           THE WITNESS:  I don't remember all those

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

1          A    I am aware of those facts, yes.

2          Q    And you're also aware that filming

3    stopped on June 14th, 2023, due to the strikes by

4    the Writers Guild and by SAG-AFTRA?

5          A    Correct.  Above-the-line strikes.

6          Q    And then the filming -- there was a

7    hiatus in filming, and it did not start up again

8    until January 5th, 2024, and concluded on

9    February 9th, 2024, correct?

10          A    Yes.

11          Q    All right.  So there's two phases of the

12    film.  Phase one that occurred in 2023 and ended in

13    June of 2023.  And the other in 2024.  And that was

14    phase two?

15          A    That's my understanding.

16          Q    All right.  Do you agree that none of

17    the -- Lively's intimate scenes were rehearsed or

18    filmed during phase one of production?

19              MS. ROESER:  Objection.

20              THE WITNESS:  I disagree.

21    BY MS. ZELDIN:

22          Q    Do you know how SAG-AFTRA defines

23    intimate scenes?

24          A    To the extent there is a definition, yes.

25          Q    What is the definition by SAG-AFTRA?

Page 81

CONFIDENTIAL

1        A     So nudity, simulated sex, hyper exposure,

2    and other intimate scenes.

3        Q     Isn't it just nudity or simulated sex?

4        A     No.

5        Q     What is the third thing you think that is

6    in there?

7        A     It is in there.  Hyper exposure.

8        Q     Hyper exposure.  What does that mean?

9        A     There is no specific definition, which is

10   why a studio or production company needs to be

11   specific, for the reasons I've described.  But it

12   means a situation where the actor is pulled into a

13   vulnerable situation, not necessarily involving

14   nudity.  Though, it could.  But involving something

15   sexual to some degree.

16       Q     Okay.  What were the intimate scenes that

17   were filmed in phase one of production?

18       A     I didn't say there were scenes.  But

19   there was one scene.

20       Q     One scene.  What was the scene that you

21   believe was intimate in phase one?

22       A     The birthing scene.

23       Q     And why do you believe it was intimate if

24   there was no definition of "intimate"?

25       A     Two reasons.  Reason number one is

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    because according to Ms. Talbot, the -- there was

2    profile nudity which she said an actor could

3    consider to be nudity.  So that was early part of

4    her deposition.

5            And in the later part of her deposition,

6    she said there was nudity in the scene, and that

7    would mean that an intimacy coordinator would get

8    involved.  So that is one reason.  Both comments

9    that Ms. Fromholz ignores.  And then, secondly --

10        Q    So I'm going to ask you, please, to not

11    comment on Ms. Fromholz's report until and unless I

12    ask you about it.  All right?

13        A    If I feel like I should do it, I will do

14    it.  And you shouldn't be stopping me in the middle

15    of a question.  But if you feel like you're going to

16    do it, do it.

17            MS. ROESER:  Agreed.  Objection.

18    BY MS. ZELDIN:

19        Q    If I ask a question, answer the question.

20        A    Can I continue with my answer?

21        Q    Yes.

22        A    And secondly, in my opinion, there was

23    hyper exposure.  And the reason I say that is

24    because if you look at the scene, which I have,

25    Ms. Lively is laying on an examination table or

Page 83

1    ever, ever testified that it was necessary to

2    conduct an investigation when a witness was --

3    strike that.

4              When a -- an actor and director called

5    his co-actress, the person that he was directing,

6    sexy in her costume?

7              MS. ROESER:  Objection.

8              THE WITNESS:  I have no idea.

9    BY MS. ZELDIN:

10        Q    Let's look at page 3 of your report, if

11   you would.

12        A    Sure.

13        Q    There is a section called "Policies and

14   Procedures."

15             Do you see that?

16        A    I do.

17        Q    And you begin talking about Sony.

18        A    Yes.

19        Q    Why are you discussing Sony in this

20   report?

21        A    Because my view was that Sony didn't do

22   what the policy said they would do, should do.

23        Q    So are you intending to opine that Sony

24   did not follow its practices and did not conduct an

25   investigation, which it should have conducted in

Page 93

1    this case?

2         A    Yes.  So says my report as well.

3         Q    Then go through Sony's policy language,

4    and first you state that:

5              (As read):

6                   "All harassment complaints must be

7                   reported to the HR department or other

8                   departments."

9         A    Show me where you are, please.

10        Q    For example, second paragraph under

11   "Policies and Procedures"?

12        A    Oh, so I'm just quoting the policy.

13        Q    Right.  Understood.  Okay.

14             And the question is:  Where in the policy

15   does it say what a harassment complaint is?

16             MS. ROESER:  Objection.

17             THE WITNESS:  I don't think it defines

18   harassment in the Sony -- what harassment complaint

19   is in the Sony policy.

20   BY MS. ZELDIN:

21        Q    Okay.  Does Wayfarer policy define what a

22   harassment complaint is?

23        A    It defines "harassment".

24        Q    Does it define what a harassment

25   complaint is?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    his or her findings, then that means the studio

2    knows what to do as a result of the investigation.

3    So then they have to take disciplinary or remedial

4    action, which is what their policy says as well.

5    And that varies according to what the investigator

6    finds.  So you don't know what is appropriate until

7    you conduct the investigation.

8         Q    And I've asked you to assume that the

9    investigation found that the director was saying

10   that about her personally.  And there was,

11   therefore, a violation of the policy.  What would be

12   appropriate remedial action under those

13   circumstances?

14              MS. ROESER:  Objection.

15              THE WITNESS:  So I have two things to say

16   about that.  Thing number one is that is not what

17   you had asked me.  And thing number two is I haven't

18   been asked to give an opinion as to what is or isn't

19   appropriate remedial action.  I have been asked to

20   give an opinion as to what kinds of remedial action

21   exist but not specifically what appropriate action

22   was in a particular circumstance.

23   BY MS. ZELDIN:

24        Q    What remedial actions exist?

25        A    So one thing is to take actions to stop

Page 98

1    the harassment from occurring, assuming that the
2    investigator determines that harassment did occur.
3    If the investigator determines that harassment
4    occurred, then disciplinary action with respect to
5    the people who violated the policy either by
6    conducting the harassment themselves, committing the
7    harassment themselves, or, alternatively, by
8    otherwise not following the policy -- for example,
9    Wayfarer's policy said that reported incidents had
10   to be -- I'm sorry -- that incidents about which a
11   supervisor was made aware had to be reported so that
12   it could be investigated.
13            So if supervisors knew about possible
14   harassment violations and didn't report it, that's
15   also a violation.  There should be some kind of
16   discipline.  The company's own policy talks about
17   termination as a type of discipline.  That aside
18   from that, you want to take other remedial actions,
19   especially if the investigator determined that
20   harassment had occurred.
21            So, for example, you would say, do our
22   employees understand what harassment is and isn't,
23   and do the supervisors understand their obligation
24   under the policy to report the allegations?  Have we
25   sufficiently distributed the policy to our employees

Page 99

1   so that they know about that?  And if it's unclear,

2   which it was, then we should redistribute the

3   policy.  And also, we should write the policy in a

4   way that's consistent with what our own procedures

5   are, which their policy wasn't.

6            Additionally, maybe do training again if

7   the investigator concluded that people didn't

8   understand their obligations or didn't understand

9   what harassment is.

10           So there are a variety of things you can

11  do.

12      Q    Under the circumstances that I outlined,

13  the director calling the actress sexy while she was

14  in her costume, what would be the appropriate

15  remedial actions?  You're not going to fire him for

16  that, right?

17           MS. ROESER:  Objection.  Form and scope.

18           THE WITNESS:  Yeah, I wasn't asked to

19  form an opinion about what remedial action should be

20  taken in a particular situation.

21  BY MS. ZELDIN:

22      Q    If --

23      A    But there are a variety that are

24  available.  And if you find someone harassed, then

25  you normally would discipline in some way.

Page 100

CONFIDENTIAL

1          Q    Do you intend to offer an opinion that
2     Sony failed to follow its own policies?
3          A    Yes.  Same answer as before.
4          Q    Are you offering an opinion on the
5     adequacy of Sony's policies?
6          A    No.
7          Q    Do you intend to offer an opinion that
8     Wayfarer failed to follow Sony's policies?
9          A    No.
10         Q    You agree that Wayfarer had a set of
11    industry-standard policies and procedures in place
12    to prevent harassment, discrimination and
13    retaliation --
14              MS. ROESER:  Objection.
15    BY MS. ZELDIN:
16         Q    Correct?
17              MS. ROESER:  Sorry.
18              THE WITNESS:  I'm sorry.  I missed one
19    word, and so if you wouldn't mind repeating.
20    BY MS. ZELDIN:
21         Q    Would you agree that Wayfarer had a set
22    of industry-standard policies and procedures in
23    place to prevent harassment, discrimination, and
24    retaliation?
25              MS. ROESER:  Objection.

                                        Page 101

CONFIDENTIAL

```
 1            THE WITNESS:  I do not agree with that.
 2    BY MS. ZELDIN:
 3        Q    Okay.  Did -- what don't you agree with?
 4        A    So many things.  First, one of the things
 5    that the policy said was that if supervisors or
 6    managers became aware of a possible violation of the
 7    policy, that they had to report it to human
 8    resources and that an investigation would be
 9    conducted.  So focusing on the report to human
10    resources, Mr. Heath testified that he never asked
11    the person who did human resources for the studio to
12    be involved with the film, and that there was no
13    human resources department or anybody who was
14    handling the film other than the AD.  I assume he
15    meant first AD, but I'm not sure.  And Ms. Saks, who
16    was a producer.  So having a policy that says
17    supervisors should report to HR when HR doesn't
18    exist is not consistent with standard practices in
19    the industry.
20            Similarly, the policy said that employees
21    who felt that the policy had been violated should
22    either report to their supervisor or any member of
23    management or to HR, a department that not did not
24    exist.  It's not consistent with standard practices.
25    You tell people to report to people or departments
```

Page 102

1     that exist, not ones that don't exist.

2              Also, having a policy is just having

3     words.  You need to do more than just have the

4     words.  You need to distribute the policy.  Standard

5     practice in the industry and otherwise is to

6     distribute harassment policies and retaliation

7     policies.

8              Mr. Heath said, "I don't know if the cast

9     and crew were given a copy of the policy."

10    Ms. Lively said she never got any resources in terms

11    of how to raise a complaint.  The question should

12    have been asked but wasn't:  Well, did you get the

13    policy?  But if you didn't get the resources, then

14    presumably, she didn't get the policy.

15             Mr. Baldoni, who is one of the people

16    being accused of harassment, said, "I don't think I

17    ever saw that policy before."  Well, standard

18    practice is to distribute the policy.  So that's

19    also not consistent with standard practices.

20             And more than anything else, standard

21    practice is not just to have a policy sitting there,

22    much less one that wasn't distributed or at least

23    may not have been, but actually do what the policy

24    says.  The policy says all reported allegations will

25    be investigated, and they didn't.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

```
 1          Q    There was a policy, a written policy,
 2    correct?
 3          A    Sorry.  Yes, there was a written policy.
 4          Q    All right.  And Wayfarer had an HR
 5    department with dedicated staff, yes or no?
 6               MS. ROESER:  Objection.
 7               THE WITNESS:  Wayfarer had an HR
 8    department, but I've already explained what the
 9    problem was.  And dedicated staff, Mr. Heath only
10    talked about one person, but maybe there was more
11    than one.
12    BY MS. ZELDIN:
13          Q    All right.  But there was one -- at least
14    one person with an HR department at Wayfarer,
15    correct?  It's a yes or no.
16               MS. ROESER:  Objection.
17               THE WITNESS:  I don't know if there was a
18    department.  There was a person who did HR services.
19    BY MS. ZELDIN:
20          Q    Prior to filming It Ends with Us movie --
21    prior to filming that, the movie itself held
22    anti-discrimination training administrated --
23    administrated by a law firm that you respect,
24    correct?
25               MS. ROESER:  Objection.
```

Page 104

CONFIDENTIAL

```
 1    BY MS. ZELDIN:
 2         Q    So your opinions are summarized on the
 3    first and second pages of your report; is that
 4    right?
 5         A    Not my opinions about Ms. Fromholz's
 6    opinions because, obviously, they didn't exist
 7    before I wrote the report.
 8         Q    Okay.  But your opinion -- let's just
 9    stick with the report, and we'll talk about
10    Ms. Fromholz at the end.  Okay?
11         A    Sure.  Yeah.
12         Q    With respect to your report, there you
13    basically offer three opinions; is that right?
14              MS. ROESER:  Objection.
15              THE WITNESS:  Yes.
16    BY MS. ZELDIN:
17         Q    Okay.  And your first opinion is that:
18              (As read):
19                   "Defendants violated standard practices
20                   in their own policies by failing to
21                   investigate harassment and retaliation
22                   allegations."
23              Correct?
24         A    Yes.
25         Q    And what were the harassment and
```

Page 140

1    retaliation allegations that they failed to

2    investigate?

3         A    So on May 23rd, we had the incident we

4    talked about earlier relating to Mr. Baldoni making

5    the "sexy" and "hot" comments and Ms. Slate's

6    response to that, and then his joke in response to

7    that.  So that's the first one.  And they had a

8    conversation, they say, with him, Ms. Slate and

9    Ms. Lively about the impropriety of making

10   statements like that.  So that's first one.

11        Q    Okay.

12        A    Should I keep going?

13        Q    Yes, please.  Just I want you to list

14   them, please.

15        A    Sure.  So then on May 26th, Ms. Lively

16   went to Ms. Giannetti and talked to her about her

17   concerns.  There is a slight disagreement about what

18   was discussed, but it appears that she discussed the

19   trailer incident, the birthing incident.

20   Ms. Giannetti did not recall whether she talked

21   about any comments made by Mr. Baldoni.  But the

22   timeline that was produced by the company shows that

23   Ms. Giannetti told Mr. Baldoni about the "sexy"

24   comments.  So it appears that she did say that to

25   Ms. Giannetti; otherwise, Ms. Giannetti wouldn't

Page 141

1    know to say that to Mr. Baldoni.

2            So then on -- late -- in late May,

3    Ms. Slate went to Ms. Giannetti, talked to her about

4    her concerns.  Said there was a problem with the

5    atmosphere on the set as a result of the concerns;

6    and Ms. Lively had concerns as well.  And

7    Ms. Giannetti then spoke to Mr. Baldoni about that.

8    Ms. Slate also went to Ms. Saks.  Ms. Saks -- and

9    about the same thing she had told Ms. Giannetti.

10           Ms. Saks then says she went to

11   Mr. Baldoni and to Mr. Heath.  Mr. Baldoni says,

12   yes, she came to me.  But -- and basically, she

13   talked -- she mentioned her own -- Ms. Slate's own

14   discomfort about the "sexy" comment that he had made

15   to her.

16           Ms. Saks said she went to Mr. Heath, but

17   there is a dispute about what was said.  Ms. Saks

18   says she told Mr. Heath basically the same thing she

19   told Mr. Baldoni and also that she told Mr. Heath on

20   several occasions that an investigation needed to be

21   conducted.  Mr. Heath said, well, maybe she came to

22   talk to me, but she didn't talk to me about an

23   investigation.  And I didn't say what she said I

24   said.

25           Q    Okay.  I'm sorry.  My question, then,

                                          Page 142

CONFIDENTIAL

```
 1                      ---oOo---

 2                AFTERNOON SESSION

 3              MONDAY, NOVEMBER 24, 2025

 4              THE VIDEOGRAPHER:  We're back on the

 5     record.  The time is 1:23 p.m.

 6     BY MS. ZELDIN:

 7         Q    Mr. Robbins, we were trying to summarize

 8     on a high level, what your big opinions are, not

 9     your sub-opinions.  And the first one we said was

10     that it -- Defendants violated standard practices

11     and their own policies by failing to investigate

12     harassment and retaliation allegations; is that

13     correct?

14         A    Yes.

15         Q    And then the second one is that the

16     investigation would have resulted in disciplinary

17     remedial actions.  Is that another big opinion?

18         A    No, I don't have an opinion like that.

19         Q    You don't have an opinion like that?

20         A    No.

21         Q    Okay.  So I'm looking at the first page

22     again, the penultimate paragraph, the last sentence.

23              (As read):

24                   "Further appropriate disciplinary

25                   remedial actions would be taken as a
```

Page 154

CONFIDENTIAL

1             result of such investigations."

2        A    Right.  That's not saying that I have an

3   opinion as to what actions should be taken, if any,

4   because I can't -- I don't know what an investigator

5   would determine, and I'm just saying that normally

6   you take disciplinary and/or remedial action, and so

7   that was something that's available depending on

8   what an investigator determined.

9        Q    And then the second opinion is that the

10  studio violated -- we're going to say that's not a

11  major opinion.  The first opinion is the major

12  opinion, which is the Defendants violated standard

13  practices in their own policies by failing to

14  investigate; is that right?

15       A    Yeah.

16       Q    The second one is that the studio

17  violated the entertainment industry specific

18  protocols?

19       A    I look at the first and second as you

20  describe them to be part of the same thing.

21       Q    Okay.

22       A    That it's taking steps to prevent

23  harassment and retaliation from occurring, and I

24  list the four steps, which you pointed out earlier,

25  including investigating.  And the intimacy protocols

Page 155

1    are part of preventing harassment and not

2    retaliation so much, but harassment.

3           Q    And your third opinion or maybe your

4    second opinion, then, is that entertainment -- the

5    entertainment industry differs from most other

6    industries and businesses with respect to issues

7    concerning retaliation?

8           MS. ROESER:  Objection.

9    BY MS. ZELDIN:

10          Q    Is that correct?

11          A    Yes.  And then I have an opinion about

12   Ms. Fromholz's opinion as well.

13          Q    Okay.  And then so, and finally, you have

14   an opinion about Ms. Fromholz.  We will do that

15   last, okay?

16          A    Whatever order you like.

17          Q    Thank you.  In your report, you mentioned

18   various incidents.  We talked about some of those

19   earlier.  Your report also refers to a fat shaming

20   incident.  Do you recall that?

21          MS. ROESER:  Objection.

22          THE WITNESS:  Is that in the report?

23   BY MS. ZELDIN:

24          Q    I believe you discuss that.

25          A    I don't remember.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1    BY MS. ZELDIN:

 2         Q    Correct?

 3         A    It's not what he wrote.

 4         Q    She.

 5         A    Sorry.  Oh, that was sexist.  But I would

 6    say it's reasonable to assume that it included no

 7    investigation.

 8         Q    Was on the list of the 17 things, was

 9    there a requirement to hire a new producer?

10         A    I don't remember the things that really

11    aren't relevant to my opinion very much.  But, so I

12    don't remember one way or the other.  Since you're

13    asking me, the answer is probably yes, but I don't

14    remember it.

15         Q    Did the 17-point list include a

16    requirement that Ange Giannetti be on the set?

17         A    Yes.

18         Q    This was the same Ange Giannetti that you

19    criticized for not having conducted any

20    investigation, correct?

21         A    No.

22         Q    Is it a different Ange Giannetti?

23         A    No.  I never criticized her for not

24    conducting an investigation.  I criticized Sony for

25    not conducting an investigation.
```

Page 220

```
 1          Q    I see.  And do you know whether she told
 2     anybody at Sony about the allegations that
 3     Ms. Lively made?
 4          A    I don't know.  But if she didn't, she
 5     should have.  And I would criticize her for that.
 6          Q    Okay.  One of the requirements was to
 7     give Alex Saks more power.  How does that have
 8     something to do with sexual harassment?
 9               MS. ROESER:  Objection.
10               THE WITNESS:  I don't think it
11     necessarily does.  I don't think every -- each one
12     of the 17 protections had to do with sexual
13     harassment.  Some did; some didn't.
14     BY MS. ZELDIN:
15          Q    How about the protection with regard to
16     COVID, did that have anything to do with sexual
17     harassment?
18          A    No.
19          Q    Did Lively and her team threaten Wayfarer
20     and Sony that she would not return to complete the
21     film unless they accepted the protections?
22               MS. ROESER:  Objection.
23               THE WITNESS:  Whether it was Lively or
24     her team, I don't know.  But that was what was
25     communicated.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127