# Exhibit 20

CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT
2           FOR THE SOUTHERN DISTRICT OF NEW YORK
3                     ---oOo---
4
5    BLAKE LIVELY,
6                   Plaintiff,
7       vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)
                              25-CV-449 (LJL) (MEMBER CASE)
8
     WAYFARER STUDIOS LLC, ET AL.
9
                    Defendants.
10   _____
     JENNIFER ABEL,
11              Third-party Plaintiff,
        vs.
12   JONESWORKS, LLC,
                Third-party Defendant.
13   _____
     WAYFARER STUDIOS LLC, et al.
14              Consolidated Plaintiffs,
        vs.
15   BLAKE LIVELY, et al.
                Consolidated Defendants.
16   _____
17
18                   **CONFIDENTIAL**
19
20     VIDEO-RECORDED DEPOSITION OF JUSTIN BALDONI
21              Los Angeles, California
22              Monday, October 6, 2025
23   Stenographically Reported by:  Ashley Soevyn,
     CALIFORNIA CSR No. 12019
24
25

CONFIDENTIAL



Page 19

1        A        Four hours.   It might have been four

2   days, but for four hours or so each day, not -- I

3   mean, including, like, lunches and bathroom breaks.

4        Q        Were these in-person or Zoom sessions?

5        A        In person.

6        Q

CONFIDENTIAL

Page 20

1    ████████████████████████

██    █    ████

██    █    ████    ██████████████████████

██    ████████████████

██    █    ████

6         Q    Okay.  Did you review any documents to

7    help you prepare for this deposition?

8              MS. SHAPIRO:  Just yes or no.

9              THE WITNESS:  Yes.

10    BY MS. SHAH:

11         Q    Did any of those documents help refresh

12    your recollection or memory of the events that you'd

13    be testifying here today?

14         A    No.

15         Q    Okay.  Are you aware of whether all the

16    documents you reviewed in preparation for this

17    deposition were produced in this case?

18         A    I would assume so.

19         Q    Okay.  Did you go back through your phone

20    in preparation for this deposition and review

21    anything on your phone?

22         A    No.

23         Q    You've attended, either by Zoom or in

24    person, some of the other depositions that have

25    taken place in this case; is that right?

CONFIDENTIAL

Page 27

1    these days.

2         Q    So you do use Apple iMessage to

3    communicate, right, text message?

4         A    Yeah.

5         Q    Do you use email to communicate?

6         A    I get a lot of e-mails but I -- not good

7    at responding to them.  I do respond at times, but

8    it's generally pretty short.

9         Q    Do you use WhatsApp messaging to

10   communicate?

11        A    I'm on WhatsApp threads with various

12   people.

13        Q    Do you use Signal to communicate?

14        A    Since the lawsuit, I do.  Yeah.

15        Q    Before the lawsuit?

16        A    No.

17        Q    Since the lawsuit, who have you used

18   Signal to communicate with?

19        A    Mostly my attorneys, the people that are

20   the defendants, some friends.

21        Q    Do you use Telegram to communicate?

22        A    No.

23        Q    Do you ever send voice notes?

24        A    Yeah.

25        Q    Do you ever record phone calls that

CONFIDENTIAL

Page 28

1    you're a participant in?

2          A    I certainly have from time to time.

3          Q    Do you do that frequently?

4          A    No.

5          Q    Did you ever record any phone calls or

6    Zooms with the participants in this case?

7          A    In which case exactly?

8          Q    Either the Blake Lively case or the

9    Stephanie Jones case?

10         A    Yes.

11         Q    How many times would you estimate you

12   recorded the phone calls or Zooms?

13         A    Two to four.  Maybe four times, maybe.

14   Might be three.

15         Q    Am I correct to understand that's four

16   times ever that you recorded phone calls or Zooms

17   with any of the participants or witnesses or people

18   involved in the events that underlie either of these

19   litigations?

20         A    I don't do it often.  So I imagine it was

21   around four, two to four.  I'd have to take a lot of

22   pausing to really think about that which -- I think

23   it's between two and four.  Why don't we say four.

24         Q    How about in-person meetings?

25              MS. SHAPIRO:  Objection.

CONFIDENTIAL

Page 29

```
 1              THE WITNESS:  One that I can think of.
 2   BY MS. SHAH:
 3        Q    What is that one?
 4        A    I recorded an improv acting session
 5   between Jenny Slate and Ms. Lively.
 6        Q    That you were also a participant in?
 7        A    I was.
 8        Q    Where were you located when you recorded
 9   that?
10        A    At our production offices in Hoboken, New
11   Jersey.
12        Q    Where was Ms. Slate located?
13        A    In New Jersey.
14        Q    She was with you?
15        A    Yeah.
16        Q    Where was Ms. Lively located?
17        A    I assume she was at her house, which is
18   in New York.
19        Q    Other than that one in-person meeting,
20   can you think of any other in-person meetings that
21   you recorded that have -- that involved any of the
22   participants in the events underlying these cases or
23   had anything to do with the events underlying these
24   cases?
25              MS. SHAPIRO:  Objection.
```

CONFIDENTIAL

Page 30

1              THE WITNESS:  At the moment, I can't.

2     BY MS. SHAH:

3          Q    Are you aware that your counsel produced

4     to us last night four recordings --

5              MS. SHAPIRO:  Objection to the extent it

6     calls for information provided by your attorneys.

7     BY MS. SHAH:

8          Q    -- that appear to be recordings by you or

9     phone calls or in-person meetings having to do with

10    this case?

11             MS. SHAPIRO:  Same objection.

12             THE WITNESS:  I would imagine that they

13    would.

14    BY MS. SHAH:

15         Q    Are you aware that they were produced

16    last night?

17             MS. SHAPIRO:  Objection.  Directing you

18    not to answer anything to the extent it calls for

19    information you only know from your attorneys.

20             THE WITNESS:  I can't answer.

21    BY MS. SHAH:

22         Q    Are you going to follow your counsel's

23    instruction?

24         A    Yes, ma'am.

25

CONFIDENTIAL

1      Q   Do you recall recording a phone call

2  between you and any of the following:

3  Ange Giannetti, Josh Greenstein or Todd Black?

4      A   Ange Giannetti.  I don't know if Todd

5  Black was on it, but I know Ange.  Yeah.

6      Q   Tell me what you recall about that phone

7  call with Ange.

8      A   I haven't listened to them.  What I

9  recall is feeling, almost feeling like -- feeling

10  scared and almost feeling like what was happening

11  was, like, I needed a witness.  Because what was

12  happening was just kind of -- it felt kind of crazy.

13  But I don't remember the content of the call.  I

14  assume it had to do with figuring out how to get

15  through a difficult shoot.

16      Q   What was it at the time that felt kind of

17  crazy to you?

18      A   I don't know exactly what call or when it

19  was recorded so I don't know if I can answer that

20  without more details.

21      Q   Do you remember why you recorded that

22  call?

23      A   Again, I just need to know what call

24  you're referring to.

25      Q   Do you have a memory of a call that you

CONFIDENTIAL

Page 32

```
 1   recorded with Ange Giannetti?
 2        A    I have a vague memory.  Yes.
 3        Q    With respect to that call that you have a
 4   vague memory of, do you have any recollection of why
 5   you recorded that call?
 6        A    I think I felt powerless and scared and
 7   kind of lonely, I think.
 8        Q    What did you intend to do with that
 9   recording?
10        A    Nothing.  I just -- I didn't know if I
11   would ever need it one day.
12        Q    Have you needed it?
13        A    I haven't looked at it or listened to it.
14    So apparently not.
15        Q    Did you tell her that you were recording
16   the call?
17        A    I didn't.
18        Q    Where were you located when you recorded
19   the call?
20        A    I don't know.  I would have to know the
21   date on the recording, and then I could try to
22   reverse engineer it.
23        Q    From your vague memory of doing this,
24   give me your best estimate of where you were
25   located.
```

CONFIDENTIAL

Page 33

1    A    I honestly have -- I don't know.
2    Q    Is it possible that you were in
3    California?
4         MS. SHAPIRO:  Objection.
5         THE WITNESS:  It's absolutely possible.
6    BY MS. SHAH:
7    Q    Where was Ange located when you recorded
8    that call?
9    A    I assume she was in California.
10    Q    Do you have a memory of recording any
11    calls with Josh Greenstein?
12    A    No.
13    Q    Do you have a memory of recording any
14    calls with Todd Black?
15    A    Only if Todd were on a call with Ange.
16    Q    Where is Todd Black located?
17         MS. SHAPIRO:  Objection.
18         THE WITNESS:  Like right now?
19    BY MS. SHAH:
20    Q    No.  In general.  Where does he live and
21    work?
22    A    He's often in New York.  I believe he
23    lives in LA, but he's often shooting movies.
24    Q    Does he maintain an office in LA?
25    A    I don't know.

CONFIDENTIAL

Page 35

```
 1        A    Is it -- do you want to finish your
 2   question?
 3        Q    No.  It's all right.
 4        A    I didn't mean to interrupt you.
 5        Q    I know.  It's all right.  I was trying to
 6   ask a better question but I think I --
 7        A    Do you mind re-asking the question?
 8        Q    Other than the one call we've spoken
 9   about with Ange Giannetti, do you recall recording
10   any other calls?
11        A    Yes.
12        Q    Okay.  Please tell me about those.
13        A    I recorded a -- part of a call with Shawn
14   Levy.
15        Q    Who is Shawn Levy?
16        A    Shawn Levy is a director and a --
17   apparently a very close friend of Ms. Lively and
18   Mr. Reynolds.
19        Q    What do you recall about that call?
20        A    I recall he wanted to speak to me.  And
21   as we began talking, I got the feeling that he was
22   calling to kind of adjust or course correct, which
23   made me feel a little uncomfortable.
24        Q    Adjust or course correct from what?
25        A    I didn't know.
```

CONFIDENTIAL

Page 36

1         Q    What do you mean when you say "adjust or
2    course correct"?  Just explain that to me a little
3    bit more, please.
4         A    It felt like he was being asked to call
5    me.  Like he wasn't just calling to talk or check
6    in.
7         Q    And what was he calling you about?
8         A    The movie, It Ends with Us, and
9    Ms. Lively.
10        Q    Was he calling you about the tensions
11   that were arising in relation to that movie?
12        A    No.
13        Q    So what about the movie, It Ends with Us,
14   was he calling you about?
15        A    He was calling to give me advice, it
16   appeared, on how to handle or navigate making a
17   movie with Ms. Lively.
18        Q    When in time was this?
19        A    I could be wrong.  I believe it was April
20   of '23.
21        Q    Where were you located when you recorded
22   the call?
23        A    At my office in New Jersey.
24        Q    Where was he located when he was speaking
25   to you on the call?

CONFIDENTIAL

Page 37

1          A     I don't know.
2          Q     Did you inform him that you were
3     recording the call?
4          A     I did not.
5          Q     Other than these two calls we've now
6     spoken about, one with Ange Giannetti and one with
7     Shawn Levy, can you remember any other phone calls
8     that you recorded?
9          A     It's not something I do often.  So no, to
10    be precise.  I can't.
11         Q     Does Jamey Heath often record phone calls
12    to your understanding?
13         A     I'm unaware of what Jamey does on his own
14    time.
15         Q     Does Jamey Heath ever record phone calls
16    in the course of his work for Wayfarer to your
17    understanding?
18         A     I don't know.  I know he has.  But I
19    don't know if it's a regular practice.
20         Q     How do you know he has?
21         A     Because I'm aware of at least a
22    recording.
23         Q     Which recording is that?
24         A     I'm aware of a recording of a WME, WME
25    agent or conversation that happened.

CONFIDENTIAL

Page 42

 1    an understanding of why they've been promised ghost

 2    equity or some sort of promise of equity in

 3    Wayfarer?

 4         A    I believe so.

 5         Q    Can you tell me?

 6         A    I will start with Ahmed.  Ahmed was my

 7    former partner at Wayfarer Entertainment, which was

 8    a small production company that I had started years

 9    ago, and he's an independent producer now.  But I

10    didn't feel like I could have started Wayfarer

11    without his help with Wayfarer Entertainment so I

12    gave him a small piece of my own equity.

13              Jamey Heath took a low salary compared,

14    probably, to a lot of other folks and has lived and

15    breathed the company.  And Steve and I felt he

16    deserved a small piece of equity.

17              And I'm still unsure if Tera Hanks

18    officially has any or that any was promised.  But

19    when she joined, I think it was discussed.  But I

20    don't have a full memory of it.

21         Q    Would you say it's accurate that you and

22    Steve Sarowitz co-founded Wayfarer Studios?

23         A    Yeah, I think so.

24         Q    When did that happen?

25         A    I believe officially, it was around the

CONFIDENTIAL

Page 43

1   time of the pandemic, so early 2020.  But I know it
2   was starting to happen, like there were
3   conversations in 2019.  I just don't know the exact,
4   like, date the papers were signed or things like
5   that.
6          Q     And how did that come about?
7          A     The starting of Wayfarer Studios?
8          Q     Uh-huh.
9          A     I had always wanted to have the means to
10  create movies that I thought could make a difference
11  and help people.  And Steve had a very similar world
12  view, and he wanted to make movies that could help
13  people too.  So we started Wayfarer.
14         Q     How did you come to know Steve Sarowitz?
15         A     I first met Steve when he was making a
16  film called The Gate.  It was a story of the Bab,
17  who was a central figure in the Baha'i faith.  And
18  we were introduced because he said he didn't know
19  what he was doing and he needed some guidance.  And
20  so I helped him out and we became friends.  And we
21  have a shared faith.
22         Q     Do you know approximately when this was
23  that you were introduced to him?
24         A     I don't.  I feel like maybe 2016 or 2017.
25         Q     Would you say there's a common thesis or

CONFIDENTIAL

Page 46

```
 1        A    I don't know.  And I don't know how I --
 2   we would quantify that.  I don't believe so.
 3        Q    Are you the co-chairman of Wayfarer
 4   Studios?
 5        A    I am.
 6        Q    Do you hold any other titles with respect
 7   to Wayfarer Studios?
 8        A    I do not.
 9        Q    And what are your responsibilities as
10   co-chairman of Wayfarer Studios?
11        A    Mostly thinking of the future direction
12   of where I would like to see the company going.  I
13   assist with creative.  That's -- that's pretty much
14   it.
15        Q    Do you have any responsibilities with
16   respect to the financials of Wayfarer Studios?
17        A    No.
18        Q    Do you have any responsibilities with
19   respect to the day-to-day operation of Wayfarer
20   Studios?
21        A    No.
22        Q    Would you say that Sarowitz is the money
23   guy and you're the creative force behind Wayfarer
24   Studios?
25        A    Sarowitz is quite creative, but I think
```

CONFIDENTIAL

Page 51

```
 1          A     I can't think of any right now.
 2          Q     In any other role than an attendee?
 3          A     I started speaking in my 30s, and I don't
 4    know if I ever spoke at one or not.
 5          Q     Do you know a gentleman by the name of
 6    Labid Aziz?
 7          A     Yes.
 8          Q     Who is he?
 9          A     Labid?
10          Q     Yes.
11          A      was the original COO of Wayfarer
12    Studios.
13          Q     And when did he cease operating in that
14    role?
15          A     I think about a year into his role.
16          Q     Was he a good COO?
17          A     I'm not sure I'm qualified to judge what
18    a good COO is.
19          Q     Did you ever have any concerns personally
20    with him in his role as COO?
21          A     I did.
22          Q     What were those concerns?
23          A     I felt he would often promise things in
24    dealmaking that weren't possible.  He was a bit of a
25    wheeler and a dealer, and there were certain
```

CONFIDENTIAL

Page 52

1    instances where I did not feel he was telling the

2    truth.

3        Q    Can you identify any of those incidents

4    for me?

5        A    I just remember getting phone calls

6    saying, like, Labid said this or Labid promised this

7    and being very confused because that wasn't

8    something that he could be promising.  It was

9    important to me that we were always honest and that

10   we didn't enter into deals with people and make

11   promises that we couldn't keep.  And I didn't always

12   feel that that integrity was -- was -- didn't always

13   feel he operated with that -- that integrity.

14       Q    Can you give me any specific examples?

15       A    The one I can think of right now is my

16   dad is also in the entertainment business.  He was

17   one of the founding fathers of what is called

18   product placement.  And I always wanted to work with

19   my dad, and it's a sweet relationship.  But I

20   remember my dad told me that he had promised Labid

21   -- or Labid had promised him that he could build out

22   an entire product placement division of Wayfarer

23   Studios and that he would put him on a salary.

24   And -- and I think he got my dad's hopes up, which

25   my dad, you know, was 70, and that wasn't ever part

CONFIDENTIAL

Page 72

```
 1        Q     Text messages with Blake?
 2        A     No.
 3        Q     Text messages with Stephanie Jones?
 4        A     I don't believe I shared any of those
 5   with Mitz.  No.
 6        Q     Text messages with Jen Abel?
 7        A     No.
 8        Q     Text messages with Melissa Nathan?
 9        A     I didn't have any text messages with
10   Melissa Nathan.
11        Q     Text messages with whom then?
12        A     My memory -- text messages with my -- my
13   health coach.  Text messages with Don Saladino.
14        Q     Who is your health coach?
15        A     Jennifer Benson.
16        Q     What does she generally do for you?
17        A     She's not my current health coach.
18        Q     What should she generally do for you when
19   she was your health coach?
20        A     She tried to keep me healthy.
21        Q     How?
22        A     Supplements, peptides, helping my immune
23   system.
24        Q     What about your text messages with your
25   health coach did you believe at that time would help
```

CONFIDENTIAL

Page 73

1   you explain the truth of what happened?

2        A    If my memory is correct, I was being

3   accused of many things.  But one of them was, like,

4   putting Ms. Lively on a phone call with a dietitian,

5   which was a lie and an extreme distortion of the

6   truth.

7        Q    Who is Dan [sic] Saladino?

8        A    He's a personal trainer.

9        Q    Is he Ms. Lively's personal trainer?

10       A    I would assume so.

11       Q    And what about your text messages with

12   him did you believe at the time would help you

13   demonstrate the truth of what had happened?

14       A    The communication between him and myself

15   that showed that he was also working with me.

16       Q    How many screenshots do you recall

17   sending to Mitz?

18       A    I wish I could tell you.  I don't know.

19       Q    More than two?

20       A    Yeah.

21       Q    More than five?

22       A    Probably.

23       Q    More than ten?

24       A    That was a very hard time.  I will say

25   yes.

CONFIDENTIAL

Page 140

1        Q    Are you aware that Wayfarer and you
2    decided to hire Melissa Nathan over Stephanie Jones'
3    objections?
4        A    I would imagine so, yes.
5             MS. SHAH:  Okay.  I'm going to show you
6    what's marked as a document, Exhibit 5.
7         (Exhibit 5 marked for identification.)
8    BY MS. SHAH:
9        Q    It's a text message between you and
10   Stephanie Jones dated July 26, 2024, Bates stamped
11   Jonesworks_, several zeroes, 39735.
12            Is this the text message that you were
13   referring to that Stephanie Jones sent you where she
14   warned you against hiring Melissa Nathan?
15       A    It appears to be.
16       Q    And this was sent on July 26th, 2024.
17   So does this refresh your recollection that you were
18   considering bringing on crisis PR before
19   July 26th, 2024?
20       A    Yes.
21       Q    Okay.  And as you recall, Stephanie Jones
22   sent you a link at the top of the text thread,
23   right?
24       A    Yes.
25       Q    You said you never clicked on that; is

CONFIDENTIAL

                                    Page 255

1   revised at any point in time?

2         A    I don't.

3         Q    Okay.  To your best recollection, you

4   only recall seeing one version of a scenario

5   planning document; is that correct?

6         A    I -- yes.  Yes.

7         Q    Do you remember that you didn't see any

8   other versions or you just don't remember one way or

9   another?

10             MS. SHAPIRO:  Objection.

11             THE WITNESS:  I don't believe I saw a

12  second version.

13  BY MS. SHAH:

14        Q    Okay.  After you were provided with the

15  scenario planning document, describe for me the

16  series of events, to your recollection, in terms of

17  how you came to hire TAG?

18             MS. SHAPIRO:  Objection.

19             THE WITNESS:  Forgive me.

20             Can you ask one more time?

21  BY MS. SHAH:

22        Q    Sure.  At some point after you received

23  the scenario planning document for TAG, you

24  ultimately hired TAG, right?

25        A    The company did, yes.

CONFIDENTIAL

Page 256

1      Q    Yes.  Is it your testimony that Wayfarer
2   hired TAG?
3      A    Yes, I believe so.
4      Q    Okay.  Do you have an understanding of
5   whether you personally also hired TAG?
6      A    I don't think I personally hired anyone.
7      Q    Okay.  And when Wayfarer hired TAG, what
8   was your understanding of what TAG was being brought
9   on to do?
10     A    My understanding was that TAG was being
11  brought on to be crisis public relations
12  representatives.
13     Q    Was -- to your understanding, was TAG
14  given any instructions by you or by Wayfarer in
15  terms of how to proceed once you had hired them?
16     A    I believe so.  I believe that Jamey was
17  in communication with them.
18     Q    And do you know what those instructions
19  were?
20     A    I can only speak to the instructions that
21  I gave Jamey or at any time spoke to Jen or on the
22  calls, which was to plan and to just try to get good
23  press out there for the movie.
24     Q    How involved were you personally in
25  discussing with anyone at TAG the type of PR

CONFIDENTIAL

Page 257

1    strategy you all should be employing?

2        A    I don't know.  I think I had ideas.  I'm

3    not -- I'm not sure how many conversations were

4    happening versus what ideas I was sharing.  I was

5    kind of in and out.

6        Q    Do you have any recollection of any ideas

7    you had that you shared with TAG?

8        A    I mean I really wanted to focus, not just

9    TAG, but also Jennifer Abel, I really wanted to

10   focus on amplifying the voices of survivors.  I

11   wanted to focus on the DV.  I wanted to focus on the

12   movie and not all of this speculation and drama.

13       Q    Did you personally ever have any

14   conversations with Stephanie Jones about the

15   instructions that Wayfarer was giving TAG in terms

16   of how to proceed?

17       A    I don't think I had any real

18   conversations with Stephanie Jones outside of

19   texting through July and August.

20       Q    Do you recall ever communicating with

21   Stephanie Jones, whether on text or in conversation,

22   about the instructions that Wayfarer had given TAG

23   about how to proceed?

24       A    I don't believe so.  My memory of texts

25   with Stephanie Jones were focused on letting her

CONFIDENTIAL

Page 278

1          (Exhibit 18 marked for identification.)
2    BY MS. SHAH:
3          Q    Is this the idea from your partner,
4    Steve Sarowitz, about flipping the narrative that
5    you were just testifying discussing flipping the
6    narrative about?
7          A    Can I have a second to read it, please.
8          Q    Of course.
9          A    Okay.
10         Q    So is this the substance of the idea that
11   you were just talking about that came from your
12   partner, Steve Sarowitz, about flipping the script?
13         A    Yes.
14         Q    And that included flipping the script
15   from Ryan saying:
16              (As read):
17                   "Script was a disaster and he saved the
18                   movie, to something about Ryan claiming
19                   the female hired was a feminist writer,
20                   didn't know how to tackle a female film
21                   etc."
22              Do you see that?
23         A    Yes.
24         Q    This idea that this was a female writer
25   and a female film and that what Ryan Reynolds was

CONFIDENTIAL

Page 279

```
 1    saying was essentially misogynistic, did that come
 2    from Steve Sarowitz?
 3              MS. SHAPIRO:  Objection.
 4              THE WITNESS:  I think I said here that my
 5    partner, Steve, has asked about this.  So I was
 6    passing that along.
 7    BY MS. SHAH:
 8         Q    So this idea, something about Ryan
 9    claiming the female hired was a feminist writer,
10    didn't know how to tackle a female film, etc., came
11    from Steve?
12         A    That was what was passed on to me.
13         Q    Did you use any judgment about whether or
14    not that was a good idea before you passed it along?
15              MS. SHAPIRO:  Objection.
16              THE WITNESS:  I think it's implied in him
17    saying the script was a disaster, so I just pass it
18    along.  I didn't disagree with him.
19    BY MS. SHAH:
20         Q    You didn't disagree with Mr. Sarowitz's
21    idea?  Is that what you mean?
22         A    I didn't disagree with what Mr. Sarowitz
23    was -- was saying in terms of what Ryan was
24    inferring when he called the script a disaster.
25         Q    Meaning, that Ryan was essentially acting
```

CONFIDENTIAL

Page 285

1          A     I don't know.

2          Q     Okay.  Other than the reporting that was

3    going on at the time about what Mr. Reynolds or

4    Ms. Lively had said about this, do you have any

5    other basis to understand what they had actually

6    said?

7          A     I'm not sure.

8          Q     Okay.  Was this also part of this

9    scenario planning that you were discussing?

10         A     I am unsure.

11         Q     How does flipping the narrative in the

12   way that is suggested here reconcile with the view

13   that you should be putting out only positive

14   stories?

15         A     Because it has to do with a defensive

16   measure.  So if we're talking about something that

17   was an offensive measure, then flipping an existing

18   narrative would not be us doing anything

19   offensively.  It would be us defending.  And again,

20   this was me passing something on.

21         Q     Do you recall testifying earlier about

22   whether Melissa Nathan ever encouraged you to leave

23   Jonesworks with Jen Abel when Jen Abel left?

24         A     At this point, I remember some of that,

25   and I would love for you to refresh my memory more.

CONFIDENTIAL

Page 296

1    think she represented The Rock.  And she had said on

2    that call that Mr. Reynolds had, like, terrorized

3    The Rock or something to that extent.  Something

4    about a -- something about a letter.  I don't

5    remember the details but something about, like, he

6    had written a letter and it was, like, they wouldn't

7    do press together.  I don't know.  She was -- it was

8    a lot of gossip.  But that's why I remember laughing

9    because I was just like, oh.

10        Q    Did you feel supported by her on that

11   call?

12        A    Yeah, as I said earlier, it kind of felt

13   like, oh, don't worry.  She's this and that.  It

14   will be fine.  The movie's going to come out, and it

15   will be awesome.  And everybody's had a bad

16   experience with her.  It was like that kind of call.

17        Q    And did you feel like she believed what

18   you were relaying to her about your experiences on

19   set?

20        A    Yes.  I don't remember sharing much, but

21   what I did share, I just shared the truth.  And

22   she -- yeah.  Yeah.

23        Q    What do you remember sharing with her

24   about your experiences on set?

25        A    I specifically remember sharing the

CONFIDENTIAL

Page 297

```
 1   situation with our trainer and -- and asking him
 2   about what he thought Ms. Lively might weigh when we
 3   shot the scene where I had to pick her up, because
 4   of my back.  And how then they confronted me the
 5   next day and how this trainer evidently then went
 6   and told her that I was asking about her weight or
 7   something.  And then how that became this big thing.
 8    And they sat me down, and I just remember her kind
 9   of not being able to believe that that was even a
10   thing.
11            I -- I believe I shared with her that
12   I -- I had made a comment about the way Jenny Slate
13   looked in her wardrobe.  And then I used the word
14   "sexy," and I think she started responding by joking
15   about how -- again, I'm not going to -- I don't want
16   to, if it's okay, repeat the words that she said --
17   but describing, generalizing the women and their
18   fragility.  And then I shared -- I think I talked
19   about the wardrobe, how hard it was with the
20   wardrobe.  And just that it felt like it was just a
21   very hard experience.  Like, that's kind of what I
22   remember.
23       Q    Do you remember sharing with her any --
24   anything else regarding your experiences on set in
25   that call?
```

CONFIDENTIAL

Page 318

1          REPORTER'S CERTIFICATE

2              I, ASHLEY SOEVYN, a Certified Shorthand

3     Reporter of the State of California, do hereby

4     certify:

5              That the foregoing proceedings were taken

6     before me at the time and place herein set forth;

7     at which time the witness was put under oath by me;

8              That the testimony of the witness, the

9     questions propounded, and all objections and

10    statements made at the time of the examination were

11    recorded stenographically by me and were thereafter

12    transcribed;

13             That a review of the transcript by the

14    deponent was/ was not requested;

15             That the foregoing is a true and correct

16    transcript of my shorthand notes so taken.

17             I further certify that I am not a relative

18    or employee of any attorney of the parties, nor

19    financially interested in the action.

20             I declare under penalty of perjury under

21    the laws of California that the foregoing is true

22    and correct.  Dated this 7th day of October 2025.

23

24

              **ASHLEY SOEVYN**

25            CSR No. 12019