# Exhibit 38

CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT
2              SOUTHERN DISTRICT OF NEW YORK
3
4    _____
                                     )
5    BLAKE LIVELY,                   )
                                     )
6              Plaintiff,            )
                                     )
7         vs.                        ) No. 1:24-CV-10049-LJL
                                     ) (Consolidated with
8    WAYFARER STUDIOS LLC, a         ) 1:25-CV-00449-LJL)
     Delaware Limited Liability      )
9    Company, JUSTIN BALDONI, an     )
     individual, JAMEY HEATH, an     )
10   individual, STEVE SAROWITZ, an)       CONFIDENTIAL
     individual, IT ENDS WITH US     )
11   MOVIE LLC, a California         )
     Limited Liability Company,      )
12   MELISSA NATHAN, an individual,)
     THE AGENCY GROUP PR LLC, a      )
13   Delaware Limited Liability      )
     Company, JENNIFER ABEL, an      )
14   individual, JED WALLACE, an     )
     individual, and STREET          )
15   RELATIONS INC., a California    )
     Corporation,                    )
16                                   )
               Defendants.           )
17   _____)
                                     )
18   (RELATED CONSOLIDATED CASE.     )
     _____)
19
20      VIDEOTAPED DEPOSITION OF JOSH GREENSTEIN
21             Los Angeles, California
22          Tuesday, September 30, 2025
23
     Reported by:
24   RENEE A. PACHECO, RPR, CLR
     CSR No. 11564
25

CONFIDENTIAL

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3
 4    _____
                                      )
 5    BLAKE LIVELY,                   )
                                      )
 6              Plaintiff,            )
                                      )
 7        vs.                         )   No. 1:24-CV-10049-LJL
                                      )   (Consolidated with
 8    WAYFARER STUDIOS LLC, a         )   1:25-CV-00449-LJL)
      Delaware Limited Liability      )
 9    Company, JUSTIN BALDONI, an     )
      individual, JAMEY HEATH, an     )
10    individual, STEVE SAROWITZ, an)      CONFIDENTIAL
      individual, IT ENDS WITH US     )
11    MOVIE LLC, a California         )
      Limited Liability Company,      )
12    MELISSA NATHAN, an individual,)
      THE AGENCY GROUP PR LLC, a      )
13    Delaware Limited Liability      )
      Company, JENNIFER ABEL, an      )
14    individual, JED WALLACE, an     )
      individual, and STREET          )
15    RELATIONS INC., a California    )
      Corporation,                    )
16                                    )
                                      )
17              Defendants.           )
      _____)
18
19         Videotaped deposition of JOSH GREENSTEIN,
20    taken on behalf of Plaintiff, taken at 5555 Melrose
21    Avenue, Los Angeles, California, beginning at
22    8:07 a.m. and ending at 3:52 p.m., on Tuesday,
23    September 30, 2025, before RENEE A. PACHECO,
24    Certified Shorthand Reporter No. 11564, RPR, CLR.
25
```

CONFIDENTIAL

Page 15

1        Q    And what is your role?

2        A    I'm cochairman of Paramount Pictures and

3   vice chairman of studio platforms.

4        Q    And when did you start at Paramount?

5        A    I think around six, seven weeks ago.

6        Q    Okay.  And before -- where were you working

7   before you were at Paramount?

8        A    Sony.

9        Q    And how long were you at Sony?

10       A    Around ten years.

11       Q    What roles did you hold during those ten

12  years?

13       A    I believe I was president of worldwide

14  marketing and distribution when I first got there,

15  for four or five years, and then in the last five

16  years, I was president of Motion Picture Group.

17       Q    And were you president of the Motion

18  Picture Group during the '22 -- 2022 to 2025 time

19  frame?

20       A    Yes.

21       Q    Can you explain what your duties were as

22  president of Sony Motion Picture Group?

23       A    Oversee all aspects of the studio, working

24  for the chairman, who was my boss, and oversaw the

25  whole -- you know, everything.

CONFIDENTIAL

Page 16

```
 1          But it included, on the label's front, all
 2   development and production, deal analysis, business
 3   affairs, all that -- all that stuff, and -- and then
 4   marketing and distribution reported up to me as
 5   well.
 6      Q   So you mentioned the chairman.  Is that Tom
 7   Rothman?
 8      A   Yes.
 9      Q   And marketing and distribution reported up
10   to you; is that right?
11      A   Yep.  Yes.
12      Q   Okay.
13      A   Yes.
14      Q   And did there come a time when Sony became
15   involved with the film "It Ends With Us"?
16      A   Yes.
17      Q   And what role, if any, did you fill with
18   respect to the film "It Ends With Us"?
19      A   My normal role as president of Motion
20   Picture Group, same as I do -- did with, you know,
21   many films.
22      Q   Did you have a role in casting the film?
23      A   No.
24      Q   Did you have a role in the filming of the
25   film?
```

CONFIDENTIAL

Page 23

```
 1   BY MS. GOVERNSKI:
 2        Q    Let me ask that question again.
 3             Can you please describe why you described
 4   Ms. Lively an incredible partner to Sony during the
 5   filming of "It Ends With Us"?
 6        A    Her work ethic and her drive.
 7        Q    You called Ms. Lively as (read):
 8                  "The best marketer of any
 9             producer I have worked with in my
10             25-year career, even way better
11             than her husband."
12             Could you explain why you included that in
13   your letter?
14        A    Because it was true.
15             THE DEPONENT:  Oh, thank you.  Thank you.
16             She had incredible ideas.  She pushed the
17   marketing team every day to be better.  She recut
18   the trailer.  She pushed to get this special song in
19   the trailer.  She was just relentless in a positive
20   way.
21   BY MS. GOVERNSKI:
22        Q    And you wrote that (as read):
23                  "She helped the trailer of 'It
24             Ends With Us' to one of the biggest
25             trailer debuts we have ever had";
```

CONFIDENTIAL

Page 24

```
 1            Is that right?
 2       A    Yes.
 3       Q    How big was the trailer debut?
 4       A    Big.  I do not recall the specifics.
 5       Q    Okay.  We'll get into that.
 6            In the last paragraph, you say you could
 7  "go on and on."
 8            What did you mean by that?
 9       A    I -- I don't really know.
10       Q    Did you mean that you would go on and on
11  about beneficial attributes of Ms. Lively or just --
12       A    I -- believe so.
13            MR. KALTGRAD:  Objection.
14  BY MS. GOVERNSKI:
15       Q    Would you describe the film "It Ends With
16  Us" as a success at the box office?
17       A    Tremendous success.
18       Q    Did it exceed your own expectations?
19       A    Wildly.
20       Q    And what about Sony's expectations?
21       A    Yes.
22       Q    Do you know how much on opening weekend the
23  film "It Ends With Us" made?
24       A    If -- I believe 50-something million
25  dollars, optimistically.
```

CONFIDENTIAL

Page 25

1      Q    And more internationally?

2      A    I believe so, yes.

3      Q    80 million?

4      A    Sounds right.  I don't know if we opened

5    all the -- I don't think we were day-and-date

6    globally, but that 80 global number sounds right.

7      Q    Earlier you referred to Ms. Lively being an

8    incredible partner to the marketing team.

9           What marketing team are you referring to?

10     A    The Sony marketing team.

11     Q    Okay.  Did Sony's marketing campaign on "It

12   Ends With Us" work?

13          MR. KALTGRAD:  Objection.

14          THE DEPONENT:  Yes.

15   BY MS. GOVERNSKI:

16     Q    In your opinion, would 50 to 80 million

17   people watch the film in opening weekend if it's

18   marketing campaign was not successful?

19          MR. KALTGRAD:  Objection.

20          MR. FLOYD:  Yeah.  Do you want to rephrase

21   that?  You said 50 to 80 million people, and I think

22   you're talking numbers, but.

23          MS. GOVERNSKI:  Okay.  If we can avoid

24   speaking objections.  I'm limited for time.

25          MR. FLOYD:  Trying to help, Ms. Governski.

CONFIDENTIAL

Page 29

1      Q    What was Sony's role with respect to "It

2   Ends With Us"?

3      A    Sorry, repeat the question.

4      Q    What was Sony's role with respect to "It

5   Ends With Us"?

6      A    Oh, can I just -- on the previous question,

7   I didn't know who Wayfarer was, but I might have

8   heard that they were an equity investor on one of

9   our films, I forget which one.  But I think that's

10  the extent of what I knew.

11     Q    But you didn't know anything about their

12  reputation?

13     A    No.

14     Q    Okay.  What was Sony's role with respect to

15  "It Ends With Us"?

16     A    We cofinanced it and distributed the film.

17     Q    And for those not in the movie business,

18  what is distributing a film mean?

19     A    It can mean many things.  But in this case,

20  it meant marketing and distributing the film

21  globally, theatrically and then running it through

22  the pay deals at the company.

23     Q    So how would describe the division of

24  responsibilities between Wayfarer and Sony with

25  respect to the film?

CONFIDENTIAL

```
                                              Page 30

 1            MR. KALTGRAD:  Objection.

 2            THE DEPONENT:  I don't know.

 3   BY MS. GOVERNSKI:

 4       Q   Do you understand that there was a

 5   contractual relationship between Sony and Wayfarer?

 6       A   Yes.

 7       Q   And are you familiar with the contract

 8   between Sony and Wayfarer?

 9       A   No.

10       Q   Have you ever seen the contract between

11   Sony and Wayfarer?

12       A   No.

13       Q   Are you familiar with the terms within the

14   contract between Sony and Wayfarer?

15       A   The contract for the film?

16       Q   Yes.

17       A   Not that I recall, no.

18       Q   Okay.  Let's mark Exhibit 2.  I'm hoping

19   you don't have to review this entire thing

20   currently.

21            (Plaintiff's Exhibit 2 was marked

22            for identification.)

23            THE DEPONENT:  Okay.

24   BY MS. GOVERNSKI:

25       Q   For the record, I've marked as Exhibit 2
```

CONFIDENTIAL

```
                                        Page 31

 1   what has been previously marked as SPE_BL1?

 2           Mr. Greenstein, do you have any familiarity

 3   with the document in front of you?

 4       A   No.

 5       Q   Do you understand what this is?

 6       A   Yes.

 7       Q   What is this?

 8       A   This is the cofinancing, coproduction,

 9   distribution agreement between Sony and Wayfarer.

10       Q   Do you have any reason to believe that this

11   is not an accurate copy of the contract between

12   Wayfarer and Sony?

13           MR. FLOYD:  Objection.

14           You can answer.

15           THE DEPONENT:  I have no idea, but it looks

16   official.

17   BY MS. GOVERNSKI:

18       Q   And you see the Bates number on the bottom.

19   Do you understand SPE refers to Sony Pictures

20   Entertainment?

21           MR. KALTGRAD:  Objection.

22           MS. GOVERNSKI:  Sony, SPE.

23           THE DEPONENT:  Where is that?

24   BY MS. GOVERNSKI:

25       Q   You see the Bates number on the bottom,
```

CONFIDENTIAL

```
                                        Page 32

 1   SPE?  Bates number on the bottom right, SPE?
 2        A    Yes.
 3        Q    Do you understand that that refers to Sony?
 4        A    Now I do.
 5        Q    Okay.  You understand that Sony produced
 6   this document as its first document, SPE_1?
 7             MR. KALTGRAD:  Objection.
 8             THE DEPONENT:  I don't know, but I -- seems
 9   reasonable.
10   BY MS. GOVERNSKI:
11        Q    Okay.  And if you look at that first
12   paragraph that you referred to, you see the
13   different definitions of the parties; correct?
14        A    Yes.
15        Q    And you see that it's -- Sony doesn't
16   actually appear in here but Columbia Pictures does;
17   is that right?
18        A    I'd have to read the whole --
19        Q    In the first paragraph where it refers to
20   Columbia.
21        A    Columbia, yes.
22        Q    Why does it refer to Columbia as opposed to
23   Sony?
24        A    Columbia is the label within Sony that
25   makes, produces and distributes films.
```

CONFIDENTIAL

Page 33

```
 1        Q   So when the contract says CPII, you would
 2    understand that to be referring to Sony?
 3        A   Yes.
 4        Q   Okay.  Is Ms. Lively one of the parties to
 5    this agreement in this first paragraph?
 6            MR. KALTGRAD:  Objection.
 7            THE DEPONENT:  No.
 8    BY MS. GOVERNSKI:
 9        Q   Do you have any awareness of whether
10    Ms. Lively has her own separate contract with
11    respect to "It Ends With Us"?
12            MR. KALTGRAD:  Objection.
13            THE DEPONENT:  Yes.  On all movies there
14    are -- if there's a acting or producing or directing
15    deal, there's agreements.
16    BY MS. GOVERNSKI:
17        Q   Are you familiar with any of the specific
18    terms of her contract?
19        A   No.
20        Q   Do you have any awareness of whether
21    Ms. Lively was, for instance, allowed to request
22    that any of her dailies that included scenes of
23    intimacy be destroyed?
24            MR. KALTGRAD:  Objection.
25            THE DEPONENT:  Repeat the question.
```

CONFIDENTIAL

Page 34

```
 1   BY MS. GOVERNSKI:
 2        Q    Do you have any awareness, for instance,
 3   that -- whether Ms. Lively's contract allowed her to
 4   request that any dailies that included scenes of
 5   intimacy be destroyed?
 6              MR. KALTGRAD:   Objection.
 7              THE DEPONENT:   I might have heard that, but
 8   I don't recall specific.
 9   BY MS. GOVERNSKI:
10        Q    And you don't have personal knowledge of
11   the terms?
12        A    No.
13        Q    Okay.  If we can direct your attention in
14   this contract.  We're going the speed through it
15   really quickly, not all of it.
16              If you can please turn to Page 13.  On the
17   bottom you'll see pagination and then there's a
18   Paragraph 6.3.
19              Do you see that?
20        A    Uh-huh.
21        Q    And it says, "Grant of Distribution
22   Rights"?
23        A    Uh-huh.
24        Q    And the first sentence says (as read):
25              "Wayfarer hereby grants, sells
```

CONFIDENTIAL

Page 35

1          and assigns to CPII."
2          And then a lot of gobbledygook.  (As read):
3              "For the full distribution
4          term."
5          Do you see that?
6     A    Yes.
7     Q    You understand that this is the provision
8  that granted Sony distribution rights?
9          MR. KALTGRAD:  Objection.
10         THE DEPONENT:  Yes.
11 BY MS. GOVERNSKI:
12    Q    Then let's turn to the next page, please,
13 and you see that there's then Subparagraphs 6.3.1,
14 6.3.2?
15    A    Uh-huh.
16    Q    And you understand that these are
17 subparagraphs to Sony's distribution rights?
18    A    Uh-huh.
19         MR. KALTGRAD:  Objection.
20         MR. FLOYD:  It's "yes" or "no."
21         THE DEPONENT:  Yes.  Sorry.
22 BY MS. GOVERNSKI:
23    Q    And if I can direct your attention to
24 6.3.2, what is your understanding of what
25 distribution rights this provision referred to?

CONFIDENTIAL

Page 36

```
 1              MR. KALTGRAD:  Objection.
 2              THE DEPONENT:  I'm going to read it.
 3    BY MS. GOVERNSKI:
 4         Q    Of course.
 5         A    It states that Columbia has the right to
 6    cut/edit the picture, create foreign language
 7    versions, closed caption versions of the picture,
 8    excerpts, clips, trailers for advertising and
 9    promotional purposes.
10         Q    Okay.  So this provision relates to
11    granting Sony the right to cut and edit the film "It
12    Ends With Us"?
13              MR. KALTGRAD:  Objection.
14              THE DEPONENT:  I believe so.
15    BY MS. GOVERNSKI:
16         Q    Okay.  And if we can look at 6.3.8, what
17    right do you understand this provision to be
18    providing to Sony with respect to "It Ends With Us"?
19              MR. KALTGRAD:  Objection.
20              THE DEPONENT:  That Sony's -- or Columbia
21    has the right to create the advertising campaign.
22    BY MS. GOVERNSKI:
23         Q    And what about 6.3.9, what right do you
24    understand 6.3.9 provides Sony with respect to "It
25    Ends With Us"?
```

CONFIDENTIAL

Page 37

```
 1           MR. KALTGRAD:  Objection.
 2           THE DEPONENT:  Publicity and promotion.
 3   BY MS. GOVERNSKI:
 4      Q    Okay.  And do you understand that Wayfarer
 5   initially requested that Mr. Baldoni have final cut
 6   rights over the film?
 7           MR. KALTGRAD:  Objection.
 8           THE DEPONENT:  I don't recall that, no.
 9   BY MS. GOVERNSKI:
10      Q    Does Sony often -- or strike that.
11           Can you describe when Sony would provide a
12   director with final cut rights?
13           MR. KALTGRAD:  Objection.
14           MR. FLOYD:  Objection.
15           THE DEPONENT:  I don't know.  I would say
16   actually -- and, again, I do not recall any
17   specifics other than some grandfathered-in, all-tour
18   driven filmmakers like a Quentin Tarantino, who had
19   it for 25 years.  But it is not a normal course of
20   business.
21   BY MS. GOVERNSKI:
22      Q    Why not?
23      A    Don't know.
24      Q    Can you think of anybody else that Sony has
25   given final cut right approval to other than Quentin
```

CONFIDENTIAL

Page 60

1    BY MS. GOVERNSKI:

2        Q    Was "Grab their friends, wear their

3    florals" part of Sony's marketing campaign with

4    respect to "It Ends With Us"?

5            MR. KALTGRAD:   Objection.

6            THE DEPONENT:   Yes.

7    BY MS. GOVERNSKI:

8        Q    So you're not suggesting that someone other

9    than Sony came up with the concept of "Grab their

10   friends, wear their florals"?

11           MR. KALTGRAD:   Objection.

12           THE DEPONENT:   I don't know who came up

13   with that it, but it was certainly part of the Sony

14   campaign.   It was embraced.

15   BY MS. GOVERNSKI:

16       Q    Do you have any recollection of individuals

17   at Sony saying they wanted to create a campaign akin

18   to wearing pink to go see Barbie?

19           MR. KALTGRAD:   Objection.

20           THE DEPONENT:   I don't recall, but that

21   doesn't sound out of line with what a marketing

22   group would be trying to do.

23   BY MS. GOVERNSKI:

24       Q    What was Sony's goal with the "Grab their

25   friends, wear their florals" aspect of the marketing

CONFIDENTIAL

Page 61

```
 1   campaign?
 2            MR. KALTGRAD:  Objection.
 3            THE DEPONENT:  I assume it was to show
 4   support for the book and Lily's character, and turn
 5   it into a group -- a group outing.
 6   BY MS. GOVERNSKI:
 7       Q    Why did Sony want to turn the event into a
 8   group outing?
 9       A    Because how strong the movie played, and
10   the more people that saw it, the better reactions
11   you'd get in the world.
12       Q    If you can turn to the next -- it's
13   actually going to be the last page on this, with
14   Bates number 3312 -- it's all the way to the end --
15   you see a headline that says (as read):
16                "Friends and floral screening,
17            plus Lily Bloom's pop-up shop
18            experience."
19            Do you see that?
20       A    Yes.
21       Q    What do you -- what is your understanding
22   of what this paragraph describes?
23            MR. KALTGRAD:  Objection.
24            THE DEPONENT:  That we had a pop-up shop --
25   a Lily's pop-up shop in Century City, invited a
```

CONFIDENTIAL

Page 62

```
 1   bunch of influencers to come and take pictures and
 2   videos.
 3   BY MS. GOVERNSKI:
 4        Q    And when you say "we," who did you mean?
 5        A    Sony.
 6        Q    Okay.  Are these the fun and sexy pop-up
 7   shops that Wayfarer had earlier recommended?
 8             MR. KALTGRAD:  Objection.
 9             THE DEPONENT:  I assume so.
10   BY MS. GOVERNSKI:
11        Q    Do you see that in the middle it talks
12   about (as read):
13                 " -- influencers to check out
14             the space and partake in fun group
15             activities, such as ironing floral
16             patches to their denim, receive
17             temporary tattoos inspired by the
18             film, sip on Betty Booze/Buzz and
19             enjoy a gift bag with film-inspired
20             goodies, and screen the film in
21             advance of the release."
22             Do you see that?
23        A    Yes.
24        Q    Was this a part of Sony's marketing
25   campaign?
```

CONFIDENTIAL

Page 63

```
 1        A    Yes.
 2        Q    Okay.  And why did Sony offer visitors the
 3   ability to sip on Betty Booze/Buzz?
 4             MR. KALTGRAD:  Objection.
 5             THE DEPONENT:  I don't know.
 6   BY MS. GOVERNSKI:
 7        Q    Does that -- is it common for there to be
 8   sponsors on film events such as --
 9        A    Very much so.
10        Q    Can you explain that a little bit, please?
11        A    Brands like to align themselves with film
12   and sometimes to sponsor premieres or events, so
13   when that travels, their brand gets exposure.
14        Q    Do you have any idea of the origination of
15   the idea for Betty Booze and Buzz to be provided
16   at -- as a sponsor to the film?
17        A    I do not.
18        Q    Do you believe it was Sony's idea?
19             MR. KALTGRAD:  Objection.
20             THE DEPONENT:  I have no clue, but it
21   wouldn't be out of the realm of possibility.  I
22   don't know who specifically came up with it, but I
23   wouldn't be surprised.
24   BY MS. GOVERNSKI:
25        Q    Why not?
```

CONFIDENTIAL

Page 64

1        A    Because it's Sony's job to come up with
2    inventive ways to market the films.
3        Q    We talked about earlier -- actually, strike
4    that.
5             Mr. Greenstein, you can put this aside.
6        A    Okay.
7        Q    Do you know who Colleen Hoover is?
8        A    Yes.
9        Q    Who is she?
10       A    The author of "It Ends With Us."
11       Q    To what extent did Sony consider
12   Ms. Hoover's opinions when deciding how to market
13   the film?
14            MR. KALTGRAD:   Objection.
15            THE DEPONENT:   I believe we took them very
16   seriously.
17   BY MS. GOVERNSKI:
18       Q    Why?
19       A    Because she wrote it, it's her story.  It's
20   her fan base, and we wanted to make sure we got as
21   much right as we could, I believe.
22       Q    Do you recall Mr. Rothman, early on in the
23   process, telling you that Sony really needed to
24   understand Ms. Hoover's audience well to succeed?
25            MR. KALTGRAD:   Objection.

CONFIDENTIAL

Page 65

```
 1              THE DEPONENT:  Yes.
 2    BY MS. GOVERNSKI:
 3        Q    Did you agree with Mr. Rothman?
 4        A    Yes.
 5        Q    Why is that?
 6        A    Because if -- that -- that's the core fan
 7    base of the property.
 8        Q    We talked earlier about testing as one
 9    metric for deciding what film cut to choose.
10              To what extent would Ms. Hoover's opinion
11    provide an additional metric when deciding what cut
12    to choose?
13              MR. KALTGRAD:  Objection.
14              THE DEPONENT:  Can you repeat the question?
15    BY MS. GOVERNSKI:
16        Q    Yes?
17              We talked earlier about testing as one
18    metric for deciding what film cut to choose.
19              To what extent would Ms. Hoover's opinion
20    provide an additional metric for when deciding what
21    cut to choose?
22              MR. KALTGRAD:  Objection.
23              THE DEPONENT:  In this case, it would carry
24    a lot of weight.
25    ///
```

CONFIDENTIAL

Page 66

```
 1   BY MS. GOVERNSKI:
 2        Q   Can you explain that a little bit, please?
 3        A   Yes.  It's similar to how I assume Warner
 4   Bros. would treat J.K. Rowling on Harry Potter.  It
 5   was an -- it was a sensation in terms of book sales.
 6   And Colleen means a lot to the core fan base, and we
 7   wanted -- because of the sensitive nature of the --
 8   of what the film covered, we wanted to make sure it
 9   resonated and held true for the author.
10        Q   How would Sony go about understanding
11   Mrs. Hoover's audience?
12            MR. KALTGRAD:  Objection.
13            THE DEPONENT:  Talking with Colleen and
14   analyzing the book sales and analyzing social media
15   posts.
16   BY MS. GOVERNSKI:
17        Q   And did Sony conduct any of its own
18   research to better understand it's potential
19   audience?
20        A   I'm sure we did.
21        Q   All right.  Okay.  I'm going to mark
22   Exhibit 6, which will end in Bates number
23   SPE_BL6375.
24            (Plaintiff's Exhibit 6 was marked
25            for identification.)
```

CONFIDENTIAL

Page 67

```
 1          MS. GOVERNSKI:  And Exhibit 7 will be
 2    SPE_BL00 -- no, sorry, 0002044.
 3          (Plaintiff's Exhibit 7 was marked
 4          for identification.)
 5    BY MS. GOVERNSKI:
 6      Q   If you can just -- I'm not going to spend a
 7    ton of time on these.  But if you can just take a
 8    quick look and let me know what they are?
 9      A   Uh-huh.
10          MR. FLOYD:  6 and 7.
11          THE DEPONENT:  This looks like --
12    BY MS. GOVERNSKI:
13      Q   When you say "this," you're referring to
14    Exhibit 6?
15      A   Exhibit 6.  It looks like a marketing focus
16    group recap from Phoenix, Arizona.
17      Q   Okay.  And you can see in the opening
18    e-mail you received this; right?
19      A   Yes.
20      Q   Okay.  And then what's Exhibit 7?
21    Actually, let's start with Exhibit 6.  The e-mail is
22    from Shannon Kirk.  Who is Shannon Kirk?
23      A   Shannon Kirk, I don't know.
24      Q   Sorry, it's not a -- I didn't mean to test
25    you.  The global -- her signature line says she's
```

CONFIDENTIAL

```
                                            Page 68
 1   head of global creative strategy and research.
 2            Does that have any meaning to you?
 3        A    Yes.
 4        Q    So what does she do?
 5        A    She works in the research and strategy
 6   department.
 7        Q    Okay.  And what are focus groups?
 8        A    Focus groups are when you get a group of
 9   people together and ask them questions about either
10   what they have prior knowledge of in terms of a IP
11   or a -- or some kind of book.  And -- and sometimes
12   you show them materials, and you get their opinions
13   and it's supposed to help inform what the audience
14   wants to see.
15        Q    Does Sony do focus groups?
16        A    Yes.
17        Q    How often does Sony do focus groups when
18   it's working on a film project?
19        A    Usually every film.
20        Q    Okay.
21        A    Or most films.
22        Q    And why does Sony do focus groups?
23        A    Because it helps us understand what the
24   audience wants.
25        Q    And if you -- I can direct your attention
```

CONFIDENTIAL

Page 69

```
 1    to the page with Bates number 6376.  I think you're
 2    on it.
 3         A    Uh-huh.
 4         Q    Starts with, pas read):
 5              " This is a strategic marketing
 6              report."
 7              Are you familiar with this report?
 8         A    No.  But I get many of these or I used to
 9    get many of these.
10         Q    And what is your understanding of what the
11    purpose of this deck is?
12         A    To understand how we move forward in the
13    best way for the movie and the marketing.
14         Q    And why did Sony, as opposed to Wayfarer,
15    do this focus group?
16         A    Because we were distributing and releasing
17    and marketing the film.
18         Q    And what was Ms. Lively's involvement, if
19    any, in this focus group?
20         A    I don't know.
21         Q    Do you have any reason to believe
22    Ms. Lively had any involvement in the marketing
23    group?
24         A    What was the date of this?
25         Q    September 26, 2023?
```

CONFIDENTIAL

Page 70

```
 1      A    So basically a year -- a little less than a
 2  year before release, no.  I would assume she'd have
 3  none.
 4      Q    Do you have any understanding of whether
 5  Wayfarer did its own focus groups?
 6      A    I have no -- no idea.
 7      Q    Do you believe you would know if Wayfarer
 8  had done its own focus groups?
 9          MR. KALTGRAD:  Objection.
10          THE DEPONENT:  Not sure.
11  BY MS. GOVERNSKI:
12      Q    Had you ever seen any results from any
13  Wayfarer focus groups?
14      A    I don't believe so.
15      Q    If you can -- I can turn your attention to
16  Page 6379.
17      A    Yep.
18      Q    Is there any reason for you to doubt the
19  accuracy of what is described in this deck?
20      A    No.
21      Q    Okay.  It says (as read):
22              "Findings from these groups
23          suggests that the most emotionally
24          resonant for readers is Lily's
25          journey of self-empowerment.  Her
```

CONFIDENTIAL

Page 71

```
 1          breaking a generational cycle of
 2          domestic abuse and discovering her
 3          passion and starting a successful
 4          business."
 5          Is that consistent with your understanding
 6    of the initial reaction from audiences that Sony was
 7    receiving?
 8       A    Yes.
 9       Q    And the -- if I can direct your attention
10    to the end of that paragraph where it says (as
11    read):
12          " The book left them feeling
13          optimistic for Lily's future and
14          they wanted the movie to do the
15          same."
16          Do you see that?
17       A    Yes.
18       Q    To what extent does that describe Sony's
19    objective with respect to its marketing of the film?
20          MR. KALTGRAD:  Objection.
21          THE DEPONENT:  Broadly accurate.
22    BY MS. GOVERNSKI:
23       Q    What do you mean?
24       A    I mean, the description of dealing with a
25    really difficult subject, but also making it hopeful
```

CONFIDENTIAL

Page 72

1   and showing that she's not just a victim, that she's
2   so much more than that, I think is what the audience
3   wanted to hear.
4        Q   And how early did Sony realize that that
5   was the balance to strike?
6        A   September 29th, 2023.
7        Q   And if I direct your attention to the next
8   page of 6380 where it says that (as read):
9                "Women in the focus group found
10           that Lily was, quote, 'not defined
11           by abuse' and that her, quote,
12           'becoming a business woman and
13           opening a flower shop was
14           especially important.'"
15           Do you see that?
16       A   Yes.
17       Q   How is this sentence to the extent --
18   strike that.
19           How did Sony's ultimate marketing campaign
20   reflect the beliefs expressed in this sentence?
21           MR. KALTGRAD:   Objection.
22           THE DEPONENT:   I believe it tried to
23   encapsulate this idea in everything.
24   BY MS. GOVERNSKI:
25       Q   What idea did Sony's marketing campaign try

CONFIDENTIAL

Page 73

```
 1   to encapsulate?
 2        A    Not to hide the abuse, but to also show
 3   there was so much more to her and there was hope and
 4   she could make it through and she was a multifaceted
 5   person that was not just defined by someone doing
 6   something to her.  She was not a pure victim.
 7        Q    On the next page on 6385, it says (as
 8   read):
 9                "Domestic abuse is the
10             essential part of Lily's story, but
11             it is not her whole story."
12        A    Yes.
13        Q    Can you describe what, to any extent,
14   Sony's ultimate marketing campaign reflected that
15   idea?
16        A    I think what you just said accurately
17   describes it.
18        Q    And this was not just some idea that Sony
19   came up with on a whim; right?
20        A    No.  This was researched and put forth as
21   the best way to get as many people to see this
22   important film as possible.
23        Q    And so was there a strategic decision on
24   Sony's part not to make it a domestic abuse film?
25        A    Well, I wouldn't --
```

CONFIDENTIAL

Page 74

```
 1          MR. KALTGRAD:  Objection.
 2          THE DEPONENT:  I wouldn't say that, because
 3    it was very important not to hide that fact.  But it
 4    was part of, not the only thing.
 5    BY MS. GOVERNSKI:
 6      Q    Understood.
 7          I see your counsel looking at you for a
 8    break.  I just have a couple more questions on this
 9    and then we can take a real quick break, if that's
10    okay?
11          Okay.  If we can turn to next document in
12    Bates 2044.  You received an e-mail from Laura
13    Potter who, at that time, was the vice president of
14    strategic market and research.  Did Ms. Potter
15    report to you?
16      A    No.
17      Q    Okay.  Ms. Potter refers to three focus
18    groups and has a header called, "Guardrails for the
19    creative campaign."  What are "guardrails"?
20      A    I don't know.  But I assume she's talking
21    about kind of pillars to -- to stay on.
22      Q    You received this e-mail; right?
23      A    Looks that way, yes.
24      Q    And why would you receive this e-mail?
25      A    Because she is part of my organization.
```

CONFIDENTIAL

Page 75

```
 1        Q    And who, in your understanding, would
 2   develop these guardrails?
 3        A    The research and strategy team.
 4        Q    Sony's research and strategy team?
 5        A    Yes.  Yes.
 6        Q    Anyone outside of Sony -- strike that.
 7             Would anyone outside of Sony be responsible
 8   for helping come up with these guardrails?
 9        A    Well, the vendor that Sony uses, right.
10   The research company that goes out and helps us
11   recruit and analyze the data.
12        Q    Who is that research company?
13        A    On this particular film, there's a couple
14   different ones we used.  I don't know who's -- I
15   don't know who we used on this.
16        Q    Is MarketCast one of the vendors that you
17   use?
18        A    Yeah.
19        Q    Do you believe you used MarketCast -- Sony
20   used MarketCast with respect to "It Ends With Us"?
21        A    If you say we did, I'm sure we did.
22        Q    What is MarketCast?
23        A    They're a independent agency that conducts
24   research in terms of films and marketing materials
25   that we work with that helps us analyze and put
```

CONFIDENTIAL

Page 76

```
 1    together these kind of plans.
 2         Q    So Sony hires MarketCast to collect data
 3    which Sony then relies on?
 4         A    Yes.
 5         Q    And how does Sony rely on them?
 6         A    Rely on MarketCast?
 7         Q    Yeah.
 8         A    Because they're talking to the audience and
 9    we're relying on that data.
10         Q    Do you have any understanding if MarketCast
11    data is reliable?
12         A    Like all data --
13              MR. KALTGRAD:  Objection.
14              THE DEPONENT:  -- data on films, it can be.
15    And usually is pretty reliable, but sometimes
16    they're wrong.
17    BY MS. GOVERNSKI:
18         Q    But there's -- but do you have any concerns
19    that MarketCast methodology is unreliable?
20         A    No.
21         Q    And does Sony rely on the data from
22    MarketCast as if it is reliable?
23         A    Yes.
24         Q    Okay.  If you can just very quickly look at
25    the "Dos and Don'ts."  I don't need you to read
```

CONFIDENTIAL

Page 77

```
 1   them, but generally, the headers, do you agree
 2   generally with these "Dos and Don'ts"?
 3        A    Uh-huh.
 4             MR. FLOYD:  "Yes" or "no."
 5             THE DEPONENT:  Oh, yes.  Sorry.
 6             MS. GOVERNSKI:  Okay.  I'm moving on to a
 7   different module unless the witness would like a
 8   break.  Do you want to keep going.
 9             THE DEPONENT:  Yeah, I'll take a break.
10             THE VIDEOGRAPHER:  We're going off the
11   record.  The time is 9:13 a.m.
12             (Recess.)
13             THE VIDEOGRAPHER:  We're back on the
14   record.  The time is 9:23 p.m.
15   BY MS. GOVERNSKI:
16        Q    Mr. Greenstein, did there come a time when
17   Sony began to work on trailers for "It Ends With
18   Us"?
19        A    Sure.
20        Q    And who is responsible for creating the
21   trailers for "It Ends With Us"?
22        A    Sony.
23        Q    Did there come a time when Sony tested
24   trailers?
25        A    I assume so.
```

CONFIDENTIAL

Page 81

```
 1   limiting some of the abuse scenes in the trailer?
 2       A   I don't.
 3       Q   Okay.  I'm going to hand you what I'll mark
 4   as Exhibit 9.
 5           (Plaintiff's Exhibit 9 was marked
 6           for identification.)
 7   BY MS. GOVERNSKI:
 8       Q   Okay.  I'm definitely not going into the
 9   bulk of this e-mail.  This is an e-mail that you
10   received from someone name David Smalle.  Who is
11   David Smalle?
12       A   He worked in analytics.
13       Q   What does analytics do?
14       A   Social listening, understanding how people
15   online feel about subjects.
16       Q   And he works for Sony?
17       A   Yes.
18       Q   Okay.  And do you trust Mr. Smalle's
19   opinions?
20       A   Yes.
21       Q   For the record, I should note that this
22   exhibit ends in Bates number SPE_BL1762.
23           Do you see where Mr. Smalle talks about the
24   "hugely successful trailer launch"?
25       A   Yes.
```

CONFIDENTIAL

```
                                        Page 82
 1       Q    Is that consistent with your recollection
 2   about the trailer launch?
 3       A    Yes.
 4       Q    And he says (as read):
 5              "The social response is bigger
 6            than we could have imagined."
 7            Do you see that?
 8       A    Yes.
 9       Q    And how many million viewers does he refer
10   to?
11       A    108 million.
12       Q    Do you believe that that number is
13   accurate?
14       A    Yes.
15       Q    Do you recall your reaction to 108 million
16   views on the "It Ends With Us" trailer?
17       A    I don't recall.  But with those kind of
18   numbers and the kind of sentiment, I'm sure I was
19   thrilled.
20       Q    And Mr. Smalle's e-mail refers to (as
21   read):
22              "90 percent positive on
23            FanCentric platforms."
24            Do you see that?
25       A    Yes.
```

CONFIDENTIAL

Page 85

1       A    Smalle?

2       Q    No.  Kaminow?

3       A    Oh, Kaminow.

4       Q    Kaminow.

5            -- Kaminow's e-mail about a romantic

6  thriller.  How did Sony end up describing the film

7  in those terms?

8       A    I don't recall, but I'm sure there is a

9  document -- that there's a positioning document that

10 I'm sure you guys have or exist that would

11 accurately say what that was.

12           I don't believe we ended up positioning it

13 as a thriller.  Again, in the early stages of

14 marketing campaigns, there's a million ideas thrown

15 out and you're trying to see what's the most

16 effective.

17           And so, at that early stage, any and all

18 ideas are welcomed.

19      Q    What about romantic drama, do you believe

20 that that was the genre that Sony used to describe

21 the film?

22      A    That sounds more accurate.

23      Q    To what extent are you aware that Sony

24 marketing explicitly decided not to label "It Ends

25 With Us" a domestic abuse film?

CONFIDENTIAL

Page 86

```
 1        A   I think that was from the very beginning.
 2        Q   Okay.  I'm going to hand you what I'll mark
 3   as Exhibit 10, which has Bates number BL_18992.
 4            (Plaintiff's Exhibit 10 was marked
 5            for identification.)
 6   BY MS. GOVERNSKI:
 7        Q   Do you see this e-mail?
 8        A   Yep.
 9        Q   Or -- I'm sorry, not an e-mail.
10            Do you see this text exchange between you
11   and Ms. Lively; is that right?
12        A   Yes.
13        Q   Is this a true and accurate copy of a text
14   exchange between you and Ms. Lively dated March 4,
15   2024?
16        A   Yes.
17        Q   Okay.  If I can direct your attention to
18   where Ms. Lively wrote that Justin just texted her
19   to invite her into the edit starting next week,
20   March 11th.
21            Do you see that?
22        A   Yes.
23        Q   Did you understand Justin to mean
24   Mr. Baldoni?
25        A   Yes.
```

CONFIDENTIAL

Page 93

```
 1   BY MS. GOVERNSKI:
 2        Q    -- as 12, which ends in Bates number
 3   SPE_BL1027.
 4           (Plaintiff's Exhibit 12 was marked
 5            for identification.)
 6   BY MS. GOVERNSKI:
 7        Q    The title of the e-mail is, "IEWU 3.28
 8   screening, Denver."
 9           Do you see that?
10        A    Uh-huh.
11        Q    Does this refresh your recollection about
12   when Mr. Baldoni's first official test of his cut
13   was filmed -- was screened?
14        A    Yeah.  Yes.  Yes.
15        Q    Okay.  So when was -- when did that first
16   official test occur?
17        A    Some -- sometime in that week, the March
18   29th week.
19        Q    Okay.  It says, "3-28 Screening" in the
20   title; right?
21        A    Yeah.
22        Q    So March 28th, 2024?
23        A    Yep.  Yep.  There is it, yep.
24        Q    Okay.  And where did the March 28th
25   screening of Mr. Baldoni's cut occur?
```

CONFIDENTIAL

Page 94

```
 1        A    It looks like it was Denver.

 2        Q    Did you occur -- did you attend?

 3        A    Don't recall.

 4        Q    Did Ms. Lively attend?

 5             MR. KALTGRAD:  Objection.

 6             THE DEPONENT:  I don't know.

 7   BY MS. GOVERNSKI:

 8        Q    Okay.  The first e-mail in Exhibit 12 is

 9   from Naveena Samuel.  Mr. Samuel [sic] is a Sony

10   vice president of global strategic market and

11   research; is that accurate?

12        A    Yes.  Ms.

13        Q    Oh, thank you very much.

14        A    No problem.

15        Q    Oh, I had Ms. in my outline.  Thank you.

16             And Ms. Samuel says the ratings were, quote

17   (as read):

18                  "Positive but short of the

19             theatrical targets."

20             Do you see that?

21        A    Where is that, I'm sorry?  It's over on the

22   next page?  Oh, that's on 1060.

23        Q    Yes, that's on 1060.  Sorry.  That's the

24   first e-mail.

25        A    No worries.  Okay.
```

CONFIDENTIAL

Page 95

```
 1        Q    Is that consistent with your
 2   understanding -- with your recollection regarding
 3   the first cut of --
 4        A    Uh-huh.
 5        Q    -- Mr. Baldoni's screening that the
 6   reaction was "positive but short of theatrical
 7   targets"?
 8        A    Yes.
 9        Q    Ms. Samuel continues that (as read):
10             "The screening fell behind
11             among other audiences, but
12             particularly women under 35."
13             Do you see that?
14        A    Yes.
15        Q    And if we can go to the top of the next
16   page where it says "Top 2 Box."
17        A    Uh-huh.
18        Q    Remind me what Top 2 Box is?
19        A    Excellent and very good.
20        Q    Okay.  And we earlier talked about the
21   contractual requirements for Sony to choose
22   Mr. Baldoni's cut.
23             Do you recall that?
24        A    Yes.
25        Q    And do you recall that the Top 2 Boxes had
```

CONFIDENTIAL

Page 96

```
 1   to be 90 percent; right?
 2           MR. KALTGRAD:  Objection.
 3           THE DEPONENT:  Yes.
 4   BY MS. GOVERNSKI:
 5       Q   Well, what is your recollection of what
 6   Mr. Baldoni's cut had to score in the Top 2 Boxes in
 7   order for his cut to be the one released?
 8           MR. KALTGRAD:  Objection.
 9           THE DEPONENT:  I have no recollection, but
10   based on what the document you showed me, it was 90.
11   BY MS. GOVERNSKI:
12       Q   Okay.  And looking at this, can you help us
13   understand what the score was for Mr. Baldoni's cut
14   at the March 28 screening in the Top 2 Box?
15       A   76.
16       Q   76 percent?
17       A   Uh-huh.
18       Q   If I can direct your attention to the "yes,
19   definitely," what does this box describe?
20       A   Would you definitely recommend this film to
21   somebody?
22       Q   And we talked about the "yes, definitely"
23   category with respect to the contract between Sony
24   and Mr. Baldoni.
25           Do you recall that?
```

CONFIDENTIAL

Page 97

1        A    Yes, I recall that.

2        Q    Do you recall what percentage Mr. Baldoni

3    needed to hit in order for his cut to be the one

4    released?

5             MR. KALTGRAD:   Objection.

6             THE DEPONENT:   70, was that -- I can look

7    at those documents again, but, I believe, 70.

8    BY MS. GOVERNSKI:

9        Q    Okay.  And what was Mr. Baldoni's -- strike

10   that.

11            What was the "definitely recommend"

12   percentage for Mr. Baldoni's cut?

13       A    62.

14       Q    And what about for -- okay.  After the

15   March 28th test, do you recall having any

16   conversations with Ms. Lively relating to editing

17   the film?

18            THE DEPONENT:   After this?

19   BY MS. GOVERNSKI:

20       Q    Uh-huh.

21       A    I do not.

22       Q    Do you recall having a meeting with

23   Ms. Lively at her apartment after the March 28th

24   test?

25       A    I recall a meeting at her apartment, but I

CONFIDENTIAL

Page 100

1    Ms. Lively during that meeting?

2         A    I do not.

3         Q    Do you recall asking Ms. Lively that you

4    wanted her -- strike that.

5              Do you recall asking Ms. Lively to make

6    Sony's cut of the film?

7         A    I do not.

8         Q    Do you recall Ms. Lively telling you that

9    she did not want to be involved in editing the film?

10        A    No, I -- I don't know either way.  I don't

11   remember.

12        Q    Do you recall Ms. Lively telling you that

13   Sony should hire its own editor to make its own cut?

14        A    I don't remember.

15        Q    Do you recall approving Ms. Lively to work

16   with her own editor?

17        A    I don't -- I know there was conversations I

18   had with Ange, but I don't recall the specifics.

19        Q    Do you recall who Ms. Lively's -- who the

20   editor was that Ms. Lively ended up working with on

21   Sony's cut?

22        A    I forget his name.

23        Q    Shane Reid?

24        A    Sounds right.

25        Q    Do you recall helping coordinate Mr. Reid's

CONFIDENTIAL

Page 101

1    schedule to work with Ms. Lively?

2        A    I don't.

3        Q    Do you recall helping clear Mr. Reid's

4    calendar so that Mr. Reid could work with

5    Ms. Lively?

6        A    I don't.  If there was conversations, it

7    would probably be with Ange in terms of facilitating

8    any of that.

9        Q    You don't recall calling the director of

10   another film, Mr. Reitman, and asking to release

11   Shane to work with Ms. Lively?

12       A    Oh, yes, I do recall that.

13            Yes, I believe that they wanted Shane to

14   help in the edit, and he was on I think

15   "Ghostbusters" at the time.  And I called Jason and

16   said, "Hey, can you help us for, you know, a week or

17   two," I believe, but I do remember that.

18       Q    And when do you believe that that

19   conversation was?

20       A    I have no idea.

21       Q    So you were facilitating Ms. Lively using

22   Mr. Reid for an edit?

23       A    I guess you could call it that.  I was just

24   helping, I think, him with Jason Reitman.  But,

25   yeah, I would say Sony helped facilitate that.

CONFIDENTIAL

Page 102

```
 1        Q    And why did Sony help facilitate that?
 2        A    To see if we could get a better cut.
 3        Q    Did Ms. Lively ever express any other
 4   motivation other than hoping to get a better cut?
 5        A    No.  She was clear she wanted to do a cut
 6   to make the movie great.
 7        Q    And you discussed that she had mentioned
 8   some of the difficulties on the set.
 9             Did she ever threaten to publicly disclose
10   what happened on the set unless you allowed her to
11   be involved in the edit?
12        A    No.
13        Q    Did Ms. Lively ever threaten you in any way
14   in connection with her involvement in the edit?
15             MR. KALTGRAD:  Objection.
16             THE DEPONENT:  No.
17   BY MS. GOVERNSKI:
18        Q    I handed you a document that I'll mark as
19   Exhibit 12, which is Bates number BL_19036, which is
20   a text between you and Ms. Lively?
21             Do you see that?
22             DEPOSITION REPORTER:  I believe it's 13.
23             THE DEPONENT:  Uh-huh.
24             MS. GOVERNSKI:  Thank you very much.
25             Exhibit 13 --
```

CONFIDENTIAL

Page 103

```
 1            (Plaintiff's Exhibit 13 was marked
 2            for identification.)
 3   BY MS. GOVERNSKI:
 4       Q   -- which is a text between you and
 5   Ms. Lively?
 6            Do you see the document?
 7       A   Uh-huh.
 8       Q   Do you recognize it?
 9       A   I don't recognize it, but I have no reason
10   not to believe it.
11       Q   Okay.  It's a May 4th document.  And you
12   write (as read):
13                "So glad you are with Shane!!!"
14            and three exclamation points.
15            Do you see that?
16       A   Uh-huh.
17       Q   And who were you referring to when you said
18   "Shane"?
19       A   It must be the editor.
20       Q   Okay.  And so were you being truthful when
21   you said that you were so glad that Ms. Lively was
22   working with Shane?
23       A   Yeah, I think I was happy because she was
24   happy and -- yeah.
25       Q   Was that the only reason that you were
```

CONFIDENTIAL

Page 106

```
 1   contractual thresholds"?
 2        A    It must mean far from -- this was -- this
 3   was based on a screening.  I don't -- I don't know
 4   if this was in response to a -- one of Justin's cuts
 5   of the film.  I don't -- I don't know.
 6        Q    So do you recall that there were two
 7   screenings in Edwards Aliso Viejo?
 8        A    Okay.  I don't, but I believe you.
 9        Q    Well, do you recall that there was a second
10   screening for Mr. Baldoni's cut?
11        A    Sounds right.
12        Q    Okay.  I can represent to you that the May
13   13th testing at Edwards Aliso Viejo was the second
14   screening of Mr. Baldoni's cut.
15        A    Okay.
16             MR. KALTGRAD:  Objection.
17   BY MS. GOVERNSKI:
18        Q    Okay.  So -- I'm sorry, did you answer the
19   question -- when you referred to these "contractual
20   thresholds," are those the ones we discussed
21   earlier, the 90 percent for the Top 2?
22             MR. KALTGRAD:  Objection.
23             THE DEPONENT:  I assume.
24   BY MS. GOVERNSKI:
25        Q    Okay.  And Mr. Baldoni's cut at the second
```

CONFIDENTIAL

Page 107

1   test did not reach that 90 percent threshold; is

2   that right?

3           MR. KALTGRAD:  Objection.

4           THE DEPONENT:  I don't know based on this.

5   But if you've got the data, then, yes.

6   BY MS. GOVERNSKI:

7       Q   So when you wrote "86 percent Top 2," what

8   did you mean?

9       A   That's the Top 2.  That's definite and

10  excellent -- I mean, that's very good and excellent.

11      Q   Okay.  And so this -- is this your

12  understanding of the result from the May 13th

13  testing?

14      A   It must have been, yeah.

15      Q   Okay.  And what about "def recommend," what

16  did you mean there?

17      A   That's definitely recommend.

18      Q   And what did you understand that the

19  "definite recommend" score was at the second

20  screening?

21      A   It looks like 66.

22      Q   Okay.  And you wrote (as read):

23              "The ending is most likely

24          doing the heavy lifting and

25          improving scenes.  She's" left --

CONFIDENTIAL

Page 110

```
 1        Q    Okay.  And to what extent was your shocker
 2   in reaction to Ms. Lively saying that Mr. Baldoni
 3   had resisted the Atlas scene at the end?
 4        A    Oh, I -- I don't think it was directed
 5   towards that.  I think it was directed at, of
 6   course, that's what the audience wanted, from what I
 7   recall.
 8        Q    And Ms. Lively continued to work on Sony's
 9   cut after the May 13th testing; right?
10        A    Yes.
11        Q    Did Sony continue to support her use of an
12   editor?
13        A    I believe so, yes.
14        Q    And do you recall the first time that the
15   Sony cut was screened?
16        A    I do not.
17        Q    Okay.  I'm going to hand you what I'll mark
18   as Exhibit 15.
19             (Plaintiff's Exhibit 15 was marked
20              for identification.)
21   BY MS. GOVERNSKI:
22        Q    Which is SPE_BL7874.
23        A    Thanks.
24        Q    And this is an e-mail from Mr. Pan to you
25   about the results of a May 18th screening.
```

CONFIDENTIAL

Page 111

```
 1            Do you see that?
 2       A    Yep.
 3       Q    What is this document?
 4       A    Looks like how -- a document about how the
 5   movie tested versus the previous cuts.
 6       Q    Okay.  And who's Jack Pan?
 7       A    He runs research for Sony.
 8       Q    Okay.  And he writes (as read):
 9            "Tonight's scores" --
10            "Tonight" presumably referring to -- well,
11   let's see.  This is e-mail is at 4:24 a.m., so
12   tonight scores could refer to May 18th; right?
13       A    Uh-huh.
14       Q    Okay.  (As read):
15            "Hi, Josh.  Tonight's scores
16            attached with comparisons to the
17            two previous screenings."
18            Do you see that?
19       A    Uh-huh.
20       Q    Okay.  And let's just look at the first --
21   I see you rushed to the second page.  But can we --
22       A    I'm just trying to jog my memory, sorry.
23       Q    No, that's fine.  Can we look under "Pros,"
24   the first bullet that says (as read):
25            "This cut pushes the emotional
```

CONFIDENTIAL

Page 112

```
 1          grounds to greater extents.
 2          Specifically, the romance is
 3          steamier and the abuse is heavier
 4          and the emotional arc is more
 5          varied and intense."
 6          Do you see that?
 7     A    Uh-huh.
 8     Q    Please make sure you're saying "yes."
 9     A    Yes.  Sorry.  I'm really sorry.
10     Q    I keep reminding you.  We have to keep
11   reminding each other.
12     A    Yeah.  Yes.
13     Q    Okay.  So help me understand, in all these
14   various cuts, is part of the purpose
15   experimentation?
16     A    Yes.
17     Q    And why is that?
18     A    Because it's a creative process and you're
19   trying things out.  There's a million different
20   variables and ways you can do it, and you're just
21   trying to get to the beck's -- best mix of all those
22   variables.
23     Q    Okay.  Let's go to the attachment, which is
24   on Bates number BL -- SPE_BL7876.
25          Do you see that?
```

CONFIDENTIAL

Page 113

1          Actually, let's go to the next page the
2    SPE_BL7877?
3          Do you see that?
4      A   Yes.
5      Q   Okay.  Let's just orient ourselves.  Under
6    the dates, you see there's three dates:  May 18, May
7    13th and March 28th.
8      A   Uh-huh.
9      Q   Do you see that?
10     A   Uh-huh.
11     Q   Okay.  So we established earlier that the
12   March 28th was Mr. -- the first test of
13   Mr. Baldoni's cut in Denver.
14     A   Okay.
15     Q   You can see that here, right, Denver,
16   Colorado?
17     A   Uh-huh.
18     Q   Is that consistent with your understanding
19   that March 28th reflects the first test of
20   Mr. Baldoni's cut?
21     A   Uh-huh.
22     Q   Okay.  And then May 13th, 2024, you see
23   Aliso Viejo-- oh, please say "yes" or "no."
24     A   Yes.  Sorry.
25     Q   Okay.  In response to May 13th -- sorry.

CONFIDENTIAL

Page 114

1   When we look at May 13, 2024, Aliso Viejo,

2   California.  We talked about that as the second test

3   of Mr. Baldoni's cut.  Is that consistent with your

4   understanding?

5        A    Yes.

6        Q    Okay.  And then the top one is in New York,

7   May 18, 2024.  We talked about that -- you testified

8   that that was the first test of Sony's cut; is that

9   right?

10       A    Yes.

11       Q    Okay.  So let's go down to "total

12  positive."  Is total positive the same as the Top 2?

13       A    Yes.

14       Q    Okay.  And if we look under "Totals," can

15  you please compare the results of the three tests

16  that we see in that box under "totals"?

17       A    The last test was an 84.  The second test

18  was an 85.  And the original test was a 76.

19       Q    None of those tests met the 90 percent

20  contractual threshold; right?

21            MR. KALTGRAD:  Objection.

22            THE DEPONENT:  Correct.

23  BY MS. GOVERNSKI:

24       Q    Okay.  And if you compare Mr. Baldoni's

25  cut -- strike that.

CONFIDENTIAL

Page 115

```
 1          If you compare the second test of
 2   Mr. Baldoni's cut with the first test of Sony's cut,
 3   what do you see comparing those two percentages?
 4       A    In "total positive"?
 5       Q    Uh-huh.
 6       A    It went down a point.
 7       Q    Essentially a tie?
 8            MR. KALTGRAD:  Objection.
 9            THE DEPONENT:  Yeah, 84 to 85.
10   BY MS. GOVERNSKI:
11       Q    Okay.  And what about "yes, definitely,"
12   can you take a look and tell us what you see?
13       A    Yeah.  Clear 69 versus a 66 and a 62.
14       Q    So which cut had the 69?
15       A    The third cut, the -- I guess you'd call
16   that the Sony cut.
17       Q    Okay.  And Mr. -- what percentages did
18   Mr. Baldoni's cuts previously achieve in "yes,
19   definitely"?
20       A    66 and 62.
21       Q    Okay.  I'm going to hand you what I will
22   mark as Exhibit 16.
23            (Plaintiff's Exhibit 16 was marked
24             for identification.)
25   ///
```

CONFIDENTIAL

Page 116

1   BY MS. GOVERNSKI:

2       Q    SPE_BL19158.  Let me know what this is?

3       A    Yep.

4       Q    Okay.  What is this?

5       A    Message -- text between me and Blake and --

6   where she informed me -- where she sent me Colleen's

7   reaction to her cut.

8       Q    Okay.  So let me break that up.  By

9   "Colleen," you mean Ms. Hoover?

10      A    Yes.

11      Q    And when you say "her cut," you mean, what

12  we've been referring to as "Sony's cut"?

13      A    Yes.

14      Q    And what was Ms. Hoover's reaction to

15  viewing Sony's cut?

16          MR. KALTGRAD:  Objection.

17          THE DEPONENT:  Well, based on this text, it

18  was effusive.  And it says (as read):

19              "I have a list of 57 things I

20          love about yours more.  You killed

21          it."

22          And then she put some of her specific

23  thoughts.  And I wrote (as read):

24              "Amazing and good news."

25  ///

CONFIDENTIAL

Page 117

1    BY MS. GOVERNSKI:

2        Q    Why was it good news?

3        A    Because it's important, no matter what cut

4    of the movie you go with, in terms of the film and

5    in terms of the marketing that the cut -- the

6    author, someone as much influence and understanding

7    of the audience, Colleen Hoover, supports it and

8    thinks it -- champions it.

9        Q    You said, "according to this text."  Is

10   there any reason to think that this is not an

11   accurate reflection of the text that --

12       A    No, not at all.

13           MR. KALTGRAD:  Objection.

14           THE DEPONENT:  I'm just saying that because

15   I have zero memory in general.  And I just wanted --

16   you know, I've never done a deposition.  So I'm just

17   trying be accurate, you know.

18   BY MS. GOVERNSKI:

19       Q    So if you look up at your text message from

20   11:11 p.m. before Ms. Lively sends you

21   Ms. Colleen -- Ms. Hoover's text, you say, "Spoke to

22   Colleen."

23           Do you see that?

24       A    Uh-huh.

25       Q    Do you recall having a conversation with

CONFIDENTIAL

Page 122

1   all -- you know, it's very different fan bases, very

2   different reasons.  But that's all the same for all

3   of it, is you need to have the tip of the spear

4   exited about what you're doing and believing in what

5   you're doing.

6   BY MS. GOVERNSKI:

7        Q    So what weight would you place on

8   Ms. Hoover's opinion?

9            MR. KALTGRAD:  Objection.

10           THE DEPONENT:  A lot.

11   BY MS. GOVERNSKI:

12       Q    And how did you consider Ms. Hoover's

13   opinion in deciding what cut of the film to release?

14           MR. KALTGRAD:  Objection.

15           THE DEPONENT:  It -- I would say it had a

16   big -- a big sway.

17   BY MS. GOVERNSKI:

18       Q    Even more than testing metrics?

19           MR. FLOYD:  Objection.

20           THE DEPONENT:  I don't know if I'd say

21   more, but on par.  If she had a real problem with

22   something that was in the film, we would have a

23   major problem.

24   BY MS. GOVERNSKI:

25       Q    I'm not going to ask you to read all of her

CONFIDENTIAL

Page 126

```
 1   BY MS. GOVERNSKI:
 2        Q    How -- to what extent did Ms. Lively
 3   include Ms. Hoover in the editing process?
 4             MR. KALTGRAD:   Objection.
 5             THE DEPONENT:   I believe substantially.
 6   BY MS. GOVERNSKI:
 7        Q    Can you explain what you mean by
 8   "substantially"?
 9        A    Well, I believe she showed her the film
10   several times, got several rounds of notes and
11   addressed all of Colleen's notes.  I don't have the
12   specifics, but that's what I recall.
13        Q    Okay.  And to what extent did Mr. Baldoni
14   including -- include Ms. Hoover in the editing
15   process?
16             MR. KALTGRAD:   Objection.
17             THE DEPONENT:   I don't know.  I do recall
18   it felt like Colleen felt that she was brought into
19   the Blake cut in a more substantive way, but I don't
20   recall the specifics.
21   BY MS. GOVERNSKI:
22        Q    And do you recall that -- do you recall
23   hearing that from Ms. Hoover herself?
24        A    Yes.
25        Q    Do you know one way or the other whether
```

CONFIDENTIAL

Page 129

```
 1   BY MS. GOVERNSKI:
 2       Q   Mr. Greenstein, I'm handing you Exhibit 19,
 3   which is Bates number RR/subpoena/85.
 4           (Plaintiff's Exhibit 19 was marked
 5           for identification.)
 6   BY MS. GOVERNSKI:
 7       Q   What is this document?
 8       A   This look like a text from Ryan
 9   congratulating me on Sony's "Garfield" opening.
10       Q   Those are texts you received from
11   Mr. Reynolds?
12       A   Yes.
13       Q   And that's Ms. Lively's husband; right?
14       A   Uh-huh.  Yes.
15       Q   And if you go to the second paragraph,
16   Mr. Reynolds writes (as read):
17               "More importantly, Josh.  I
18           can't thank you enough for your
19           level of integrity and leadership
20           with the IEWU drama.  You're not
21           only backstopping a vastly better
22           version of the film, but you're
23           making fans and allies left, right
24           and center."
25           And you respond (as read):
```

CONFIDENTIAL

Page 130

```
 1             "I really" --
 2         And he writes other things.  And then you
 3   write (as read):
 4             "I really appreciate your kind
 5             words.  I'm so impressed with how
 6             Blake has handled the situation."
 7         What did you mean when you wrote, "I'm so
 8   impressed with how Blake has handled the situation"?
 9     A   I believe I meant how impressed I was with
10   what all -- you know, what she was doing in terms of
11   the movie and the marketing campaign under these
12   circumstances.
13     Q   And what impressed you about how Blake was
14   handling the marketing campaign under these
15   circumstances?
16     A   Well, at the time -- let me -- I'm just
17   going to read my response.  It was -- it was
18   about -- oh, thanks.  Thank you.
19             Yeah.  I believe it was about -- about how
20   creative she was, how she wouldn't settle for
21   anything but greatness in the film and in the
22   marketing campaign.
23     Q   And then you say that her North Star is the
24   movie.
25     A   Yes.
```

CONFIDENTIAL

Page 131

1        Q    What did you mean by that?

2        A    Well, it's kind of something I always said

3    whenever I worked in places where it was like --

4    even though I was employed by a studio, like I

5    always felt like I never worked for the studio.  I

6    never worked for the filmmakers.

7             I worked for the movie, and that's the only

8    thing that mattered.  The best version and the

9    biggest audience to come see a movie.  And I believe

10   that's how I felt she was in regards to this

11   process.  All she cared about was greatness.

12       Q    You say (as read):

13              "I tell my wife and daughters

14              all the time you need to advocate

15              for yourself, especially in this

16              world as a woman."

17             I'm wondering why you included that

18   sentence.

19       A    Well, it's -- I -- probably because I've

20   been on so many movies where, you know, similar

21   disagreements have happened between star and

22   director or studio and star or studio and director.

23   You know, there's all kind -- or producers or

24   financiers.

25             And it's quite common for, in my

CONFIDENTIAL

Page 132

1    experience, male stars to have real opinions and use
2    their weight to say this is what's got to be.  And I
3    just didn't think there should be a double standard.
4         Q   Did you think that there was a double
5    standard?
6         A   Well, I think that the pushback I think I
7    was responding to from what was going on -- I'm not
8    sure I felt there was an double standard.  I was
9    just saying I liked the fact that Blake was really
10   speaking up for herself and trying to do what was
11   best for the movie.
12        Q   Did you think that Ms. Lively was acting as
13   a terrorist?
14        A   No.
15        Q   Did you ever tell anyone that Ms. Lively
16   was acting as a terrorist?
17        A   I don't believe so, no.
18        Q   Your next sentence, you say -- it says
19   "no."  I'm assuming you meant to say "not" for "not
20   only" instead of "no only"; is that right?
21        A   Probably.
22        Q   (As read):
23             "Not only does Blake do that
24             for herself, but she is a creative
25             force and a total badass."

CONFIDENTIAL

Page 133

1          Do you see that?

2      A    Yes.

3      Q    Why did you include that line?

4      A    Because I was incredibly impressed that --

5  especially seeing everything she was doing in terms

6  of the cut of the film and the marketing of the

7  film, that she -- her creativity, she took a -- like

8  an okay campaign and elevated it.

9          And that whole Lily's flower shop special

10 shoot with her and the cast was all kind of her --

11 her design, right.  And it really helped the movie.

12         Her pushing us to go screen the movie in

13 full at Colleen's book event thing and having

14 courage to do that and where we wanted to just show

15 a little snippet of the movie.

16         And, you know, that's what I remember.  And

17 I was really, really impressed.  Because you don't

18 always get -- you rarely get that from partners much

19 less producers or actors.

20     Q    Okay.  Can you read the next sentence

21 beginning with her cut?  You can read it out loud,

22 please?

23     A    Where do you want?

24     Q    After total badass.

25     A    (As read):

CONFIDENTIAL

Page 134

```
 1            "Her cut is better, no
 2       question.  I have her back all the
 3       way.  It would be agreement both
 4       you making movies at Sony, both of
 5       you -- to both of you" --
 6       Man, I'm --
 7   Q   You can stop.  It's okay.
 8   A   I'm a terrible speller and grammar --
 9   Q   I'm sorry.  I should have told you where to
10 stop.  I'm interested in your sentence where you
11 said "her cut is better, no question."  By "her
12 cut," you meant Sony's cut?
13   A   Yeah.
14   Q   And you said (as read):
15            "Her cut is better, no
16       question.  I have her back all the
17       way."
18       Why did you communicate this in the text
19 message?
20   A   Because there was a lot of back-and-forth
21 between Wayfarer and them and us.  And I believe
22 that that cut was a stronger cut.
23   Q   As of May 26, you believed that the Sony
24 cut was the stronger cut?
25   A   I assume or I saw a path that it would
```

CONFIDENTIAL

Page 147

1        A    I don't believe so.

2        Q    Okay.  Let's scroll down to

3    where Ms. Lively says she spoke with Colleen.

4            (As read):

5                "She feels like I do, still

6            full steam ahead with my cut."

7            Do you see that?

8        A    Yes.

9        Q    Is that consistent with your view of what

10    the next steps were with respect to the cut that

11    Sony would release?

12        A    Yes, but I assume it was us working on that

13    cut, because I think there are a lot of things just

14    in terms of music and editing, not just the pure

15    scores but the vibe, certain scenes that both Blake

16    and Colleen liked much more in this cut.

17        Q    Was it your decision to decide what cut to

18    move forward with?

19        A    Ultimately?  No.

20        Q    Whose decision was it?

21        A    Tom Rothman.

22        Q    Do you recall a time when Mr. Rothman made

23    the decision which cut to move forward with?

24        A    I don't.

25        Q    And so at this point, that decision had not

CONFIDENTIAL

Page 149

```
 1   BY MS. GOVERNSKI:
 2        Q    And how would you describe Ms. Lively's
 3   receptivity to receiving notes from Sony?
 4             MR. KALTGRAD:  Objection.
 5             THE DEPONENT:  Open-minded.
 6   BY MS. GOVERNSKI:
 7        Q    Are you aware of an event called "Book
 8   Bonanza"?
 9        A    I believe so.
10        Q    Did Ms. Lively go to Book Bonanza?
11        A    Is that the Colleen Hoover book event in
12   Texas?
13        Q    Are you aware of a book event in Texas that
14   occurred in June 2024?
15        A    Yes, that's probably it.
16        Q    Okay.  Any idea whose idea it was for
17   Ms. Lively to attend Book Bonanza?
18             MR. KALTGRAD:  Objection.
19             THE DEPONENT:  I don't.  It was either
20   Colleen or Sony or one of the two.
21   BY MS. GOVERNSKI:
22        Q    One of the two, Colleen or Sony?
23        A    Uh-huh.
24        Q    Colleen being Ms. Hoover?
25        A    Yes.
```

CONFIDENTIAL

1      Q   What was the reaction from the audience of
2   Book Bonanza to the film?
3      A   I believe it was incredibly well received.
4      Q   What cut aired at Book Bonanza?
5      A   I think an earlier cut of the Sony/Blake
6   version, I believe.  I don't think it was the final
7   film cut.
8      Q   But it was the Sony cut as it existed at
9   that date?
10      A   Yes.  But when you say the Sony or Blake
11   cut, I do believe there was a -- there was still
12   stuff from Justin's cut.  I forget the -- it was
13   kind of a mix of things.
14      Q   So as Ms. Lively was editing, there could
15   be certain components of Mr. Baldoni's cut?
16      A   Yes.
17      Q   Is that right?
18      A   Yeah.
19      Q   Based on the feedback that she was
20   receiving --
21      A   I think so.
22      Q   -- from Sony?
23      A   Yes.  Or from the audience.
24      Q   Or from the audience.
25          Okay.  So I've handed you what I've marked

CONFIDENTIAL

Page 151

1    as Exhibit 22, which is SPE_BL8046.

2         A    Uh-huh.

3              (The following portion of this transcript

4              was designated as confidential:)

5    ///

6    ///

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 152

1          (Plaintiff's Exhibit 22 was marked for

2          identification.)

3

4                      EXAMINATION

5    BY MS. GOVERNSKI:

6        Q    Do you recall receiving this e-mail?

7        A    Uh-huh.  Yes.

8        Q    Yeah.  What is this e-mail?

9        A    A reaction to Book Bonanza.

10       Q    What was the reaction?

11       A    Audiences loved it.  They jumped to their

12   feet in Blake's theater and screamed, like, You've

13   got it right.  Colleen was moved.  Great night.  And

14   that's kind of what you -- that's the dream when

15   you're dealing with a very avid fan base.

16       Q    Do you recall --

17       A    If that didn't go well, you're in big

18   trouble.

19       Q    Do you recall describing it as "lightening

20   in a bottle"?

21       A    I don't recall, but I -- sounds like

22   something I'd say.

23       Q    Why is that?

24       A    I think -- I've just used that old-timey

25   expression before.

CONFIDENTIAL

Page 153

1      Q    I'm handing you what's marked as
2    Exhibit 23, SPE_BL30 --
3           MS. GOVERNSKI:  Oh, we're off AEO now.  I'm
4    so sorry.  We can let Mr. Heath back in.
5    BY MS. GOVERNSKI:
6      Q    This is SPE_BL3031.
7      A    Uh-huh.
8           (Plaintiff's Exhibit 23 was marked
9           for identification.)
10   BY MS. GOVERNSKI:
11     Q    What is this e-mail?
12     A    Social reactions to "It Ends With Us" Book
13   Bonanza panel and screening.
14     Q    Okay.  And who's Michael Severson?
15     A    I believe he worked in strategy and
16   analytics for the marketing group.
17     Q    And he wrote that the response from the
18   online fan base has been outstanding; right?
19     A    Yes.
20     Q    Overwhelmingly positive?
21     A    Yes.
22     Q    And just a small amount of negativity?
23     A    Yeah.
24     Q    So as of this date on June 17, 2024, what
25   was your recollection of the amount of negativity,

CONFIDENTIAL

                                              Page 154

1    if any, that you were seeing online about the film?

2         A    At this point, virtually zero.

3         Q    And at this point, what do you recall about

4    whether you were seeing negativity online regarding

5    Ms. Lively?

6         A    Zero.  None.

7         Q    Okay.  I want to hand you what I'll mark as

8    24, which is SPE_BL8206.

9              (Plaintiff's Exhibit 24 was marked

10             for identification.)

11   BY MS. GOVERNSKI:

12        Q    What is this e-mail?

13        A    An e-mail it looks like to me and Ange from

14   Colleen Hoover.

15        Q    Do you recall receiving this?

16        A    No.

17        Q    Okay.  Any reason to doubt that you

18   received this from Ms. Hoover?

19        A    No.

20        Q    Okay.  If you look in the first paragraph,

21   she says, (as read):

22                  "In no way do I want to deny

23             support for this film, especially

24             after being invited by Blake to

25             have a small hand in seeing it

CONFIDENTIAL

Page 155

```
 1          through.  I will say that I'm
 2          concerned about everything
 3          happening behind the screens and
 4          the positions I've been put in,
 5          which I feel is" -- "which is why I
 6          feel much more comfortable having
 7          this conversation over e-mail."
 8          And then if you go down to the end of the
 9  second question -- the -- sorry, the fourth
10  paragraph.  She says (as read):
11               "As for the premiere, I'm
12          honestly not comfortable with it
13          anymore."
14          What was your reaction to receiving an
15  e-mail from Ms. Hoover telling you she was not
16  comfortable with the premiere anymore?
17      A    The premiere or --
18      Q    Look, it says, "as for the premiere."
19      A    Oh.  I assume it was her talking about
20  being in the middle of Justin and Blake's
21  disagreements.
22      Q    When you say "Justin and Blake's
23  disagreements," what do you mean?
24      A    Whether it be the cut of the movie or, you
25  know, doing promotion or the press or the premiere,
```

CONFIDENTIAL

Page 156

1   you know, that stuff.

2        Q    Did you understand that the only

3   disagreements were between Ms. Lively and

4   Mr. Baldoni?

5        A    No.  I know Colleen had voiced disagreement

6   with certain things.

7        Q    And did you have any understanding of

8   whether Ms. Hoover was uncomfortable going to the

9   premiere -- actually, strike that.

10            Let's go to the next sentence.  (As read):

11               "Am I comfortable" -- "am I

12               going to be comfortable if Justin

13               is there?  No.  Things are beyond

14               uncomfortable at this point."

15            Do you see that?

16       A    Yes.

17       Q    Okay.  So what was your understanding of

18   what Ms. Hoover was communicating there?

19       A    That she didn't want to be at the premiere

20   with Justin.

21       Q    So she would go to the premiere, just not

22   if Justin was there; right?

23            MR. KALTGRAD:  Objection.

24            THE DEPONENT:  I don't know that she

25   wouldn't go, but her e-mail said she'd be

CONFIDENTIAL

Page 157

```
 1   uncomfortable.
 2   BY MS. GOVERNSKI:
 3        Q    Did you have any idea why Ms. Hoover would
 4   be uncomfortable?
 5        A    I just assumed with whatever stuff that was
 6   going on between all of them that -- you know, I
 7   wasn't on those calls or conversations, so.
 8        Q    So you didn't have any understanding of why
 9   Ms. Hoover would be uncomfortable being around
10   Mr. Baldoni?
11        A    I understood that they had some -- she
12   would've felt very put off in terms of involvement
13   in the film.  And that she had some real issues.  So
14   I didn't really talk to her that much about those
15   specifically.  I didn't have that much communication
16   with her.
17        Q    She writes (as read):
18              "Can I promise I'll go if he,
19              meaning, Mr. Baldoni and his team
20              are all there?  I can't promise
21              that.  I go back and forth every
22              day between continuing to show up
23              for this movie or going into
24              hiding.  Because it's all causing
25              me anxiety and bringing attention
```

CONFIDENTIAL

Page 158

```
 1              that I'm not prepared for or used
 2              to."
 3              Do you see that?
 4         A    Uh-huh.
 5         Q    Did you have any idea about the anxiety
 6    that Ms. Hoover was experiencing in connection with
 7    "It Ends With Us"?
 8         A    Yeah.  I don't know if at that point there
 9    was -- they started to be very close to open.
10    Some -- a lot of online chatter about the campaign
11    and about how it wasn't reflective enough of the
12    book or the abuse or -- which kind of I think made
13    her uncomfortable.
14         Q    Did you have any understanding of why that
15    was directed towards Mr. Baldoni and his team as
16    opposed to Ms. Lively?
17         A    I assume she had issues with them, with --
18    with Mr. Baldoni and his team.
19         Q    And Ms. Hoover says (as read):
20              "In a perfect world, we'd set
21              it all aside and everyone could
22              smile for the cameras.  But
23              feelings have been hurt and
24              boundaries have been crossed."
25              Do you have any understanding of what
```

CONFIDENTIAL

Page 159

```
 1   Ms. Hoover meant when she wrote "boundaries have
 2   been crossed"?
 3        A   I can only assume that she felt that in her
 4   interactions, some boundaries have been crossed.  I
 5   can't really expound on that.
 6        Q   Do you have any understanding of why
 7   Ms. Hoover didn't want to be smiling for the cameras
 8   with Mr. Baldoni?
 9        A   She obviously had issue with him.
10        Q   Did you have any understandings of why any
11   other members of the cast -- strike that.
12            Do you have any understanding of whether
13   any other members of the cast did not want to be
14   smiling in pictures for the cameras with Mr. Baldoni
15   at the premiere?
16            MR. KALTGRAD:  Objection.
17            THE DEPONENT:  I was told Jenny Slate and
18   Brandon didn't want to be in the picture with him.
19   BY MS. GOVERNSKI:
20        Q   Can you describe what you understood with
21   respect to Ms. Slate and Mr. Sklenar -- Ms. -- with
22   respect -- sorry -- strike that.
23            Can you please describe what you
24   understood, any hesitations, with respect to Ms. --
25   from -- oh, my gosh.  Why can't I get this question
```

CONFIDENTIAL

Page 160

 1   out?  Strike that.

 2           Tell me about what you were told about

 3   Ms. Slate and Mr. Sklenar attending the premiere?

 4      A   I believe someone in my publicity team said

 5   they weren't comfortable going if Justin and the

 6   Wayfarer team were there.  And that's kind of the

 7   broad strokes of what I remember.

 8      Q   Did you ask why?

 9      A   Yeah.  And it was stuff that happened on

10   set and I didn't -- I didn't know the specifics.

11   And at that point, I think I was just trying to get

12   the movie launched without having some kind of

13   publicity problem around it.

14      Q   So at that point, Ms. Lively still had not

15   told you any details what about occurred on the set?

16      A   No.  No.  I think she said at one point,

17   I'm specifically -- will not tell you details.

18      Q   She said she specifically would not tell

19   you details?

20      A   Yeah.  And I think it was as much for me as

21   it was for her that she didn't want to involve me in

22   that specificity.

23      Q   Did Ms. Lively ever tell you that she would

24   not promote the movie at all if you did not release

25   the Sony cut?

CONFIDENTIAL

Page 161

1       A    She said she'd be uncomfortable promoting

2    the movie.  I don't recall her ever threatening

3    not -- to absolutely not, but I think I was

4    definitely worried about that possibility.

5           And, again, very common occurrence in our

6    business, if an artist isn't comfortable with what's

7    on-screen, they have the right not to promote.

8       Q    Can you discuss a little bit about that,

9    the right not to promote if you're not comfortable

10   with what's on the screen?

11      A    I mean, if -- you know, there are some

12   contracts that have contractual language where stars

13   give two weeks' promotion, right.

14          But if someone doesn't -- you know, most of

15   the time there's not that provision.  But if someone

16   doesn't want to promote something, it would be

17   really impossible to make them.  You wouldn't want

18   to do that and -- for many reasons: one, you can't

19   force someone to do what they don't want to do, and,

20   two, if they're not excited about it, that's going

21   to come across in the promotion of the film.

22      Q    So it's common for stars to want to embrace

23   a film before they agree to promote it?

24          MR. KALTGRAD:  Objection.

25          THE DEPONENT:  I would say it helps a great

CONFIDENTIAL

Page 167

1    the reaction to "It Ends With Us"?

2        A    Campaign?  Strong.  Very strong.

3        Q    And as of January 16, 2024, how would you

4    describe --

5        A    I would say.

6        Q    Let me just finish.

7            How would you describe the reaction to

8    Ms. Lively in particular?

9            MR. KALTGRAD:  Objection.

10           THE DEPONENT:  Well --

11           MR. FLOYD:  I think he said --

12   BY MS. GOVERNSKI:

13       Q    Let me ask that question again.

14           As of July 16, 2024 --

15           MS. GAROFALO:  I'm sorry.  I heard

16   whispering.  Is there an objection on the record?

17           MS. GOVERNSKI:  They were telling us that I

18   got the wrong date.

19           MS. GAROFALO:  Thank you.

20   BY MS. GOVERNSKI:

21       Q    So as of July 16, 2024, how would you

22   describe the response that you were seeing with

23   respect to Ms. Lively?

24       A    Well, it says in Thematic Insights (as

25   read):

CONFIDENTIAL

Page 170

```
 1        Q    I guess everyone indirectly reports to you?
 2        A    Uh-huh.
 3             MR. FLOYD:  Did.  Did.
 4             THE DEPONENT:  Did.  Did.
 5             MS. GOVERNSKI:  Did.
 6   BY MS. GOVERNSKI:
 7        Q    You see in the first sentence, he says (as
 8   read):
 9                 "Spoke to Wayfarer this
10             morning."
11        A    Uh-huh.  Yes.
12        Q    Do you have an understanding of who at
13   Wayfarer Mr. Whitmore may have spoken with?
14        A    No.
15        Q    Okay.  He says, in the second paragraph,
16   Mr. Whitmore writes (as read):
17                 "We were very clear.  We don't
18             want to create/post nomore.org- or
19             domestic violence-related content."
20             Did you have any understanding of who the
21   "we" is that Mr. Whitmore referred to in this
22   sentence?
23        A    Sony.
24        Q    Okay.  So Mr. Whitmore explained that Sony
25   was very clear that Sony did not want to create/post
```

CONFIDENTIAL

Page 171

1   nomore.org- or domestic violence-related content.

2          He goes on that -- he explains (as read):

3              "That its virtue signaling

4          could feel self-serving and also

5          could easily not hit right coming

6          from two men."

7          Do you see that?

8      A   Yes.

9      Q   To what extent does Mr. Whitmore's

10  description of why Sony did not want to create this

11  type of content consistent with your own views?

12     A   Yes.  The only thing I would say it's

13  missing, from your question, is that also everything

14  we learned in the research said making it too

15  focused on domestic violence would hurt the opening

16  weekend of the film.

17          We always -- we always believed that we

18  would support those organizations post-release.  And

19  that the most important thing was to get as many

20  eyeballs seeing a movie about domestic violence and

21  so much more was the North Star for us.

22     Q   So not necessarily speaking about domestic

23  violence, but designing a campaign that gets people

24  excited about seeing a film about domestic violence

25  or that includes domestic violence?

CONFIDENTIAL

Page 172

```
 1       A    That includes domestic violence.  Again,
 2   not hiding -- you know, if you look at all the
 3   materials, not hiding the domestic violence.
 4   Actually, not only is -- would that be the wrong
 5   thing to do morally, but as you can see from which I
 6   didn't remember until your documents, the earlier
 7   research said you must address that.
 8            That's what -- you know, people didn't want
 9   a run-of-the-mill romantic drama.  It had some real
10   subject matter and some hard-hitting stuff, but it
11   can't be focused only on that.
12       Q    It wasn't a documentary on domestic abuse?
13       A    The movie, no, it was not.
14       Q    Okay.  We talked about that the -- I think
15   we've oriented that the release was August 9th?
16       A    Uh-huh.  Yes.
17       Q    Are you aware of press junkets that
18   occurred in advance of the premiere on August 9th?
19       A    I am certain there was such junkets, but I
20   don't remember.
21       Q    And they -- do junkets typically occur
22   before a film is released?
23       A    Yes.
24       Q    Okay.  Do you have any recollection of
25   whether Mr. Baldoni participated in any press
```

CONFIDENTIAL

Page 174

1   BY MS. GOVERNSKI:

2        Q   Do you see this e-mail?

3        A   Yes.  Uh-huh.

4        Q   What is this document?

5        A   This document is Danni informing us of an

6   interview that Justin did in Dallas where he was

7   trying to talk about the scene where Ryles [sic] was

8   raping Lily.

9        Q   And, specifically, Ms. Maggin writes (as

10  read):

11              "I just alerted Josh about

12              this.  But Justin is basically

13              alluding to raping Atlas out of

14              Lily when talking to the Dallas

15              Morning News.  We cut the tape.

16              But he is a moron.  Josh said he

17              couldn't do any more press, but he

18              has a lot left.  So maybe we can

19              talk ASAP."

20              Do you see that?

21       A   Yes.

22       Q   To what extent is this an accurate

23  description of your reaction to the Dallas Morning

24  News interview?

25              MR. KALTGRAD:  Objection.

CONFIDENTIAL

Page 175

1              THE DEPONENT:  I think I must have been

2    upset, and I was very deployable trying to protect

3    the movie.

4    BY MS. GOVERNSKI:

5         Q    Why were you upset about what Mr. Baldoni

6    said to the Dallas Morning News?

7         A    Because my staff and I felt that that was

8    not a topic to discuss in the promotion of the

9    movie, getting that detailed and somewhat graphic

10   and worried about that male perspective on the

11   issue.

12        Q    When you say "that male perspective on the

13   issue," what do you mean?

14        A    Means Ryle's character's point of view.  I

15   don't think there's a lot of sympathy for that --

16   rightly so that -- that -- it -- whatever that

17   character's point of view was.  And that's certainly

18   not something that would help in promoting the

19   movie.

20        Q    Did you tell that to Mr. Baldoni?

21        A    I am sure I made that clear to my people

22   who were communicating with him.

23        Q    Okay.  I want to hand you Exhibit 28, which

24   is LS_325.

25   ///

CONFIDENTIAL

Page 191

1    could possibly.

2            You know, I didn't -- I didn't have it as a

3    fact.  But the fact I was hearing it from multiple

4    people that I worked with was concerning, so I

5    forwarded it to them.

6        Q    And you said Ms. Sloane is Ms. Lively's

7    publicist; right?

8        A    Yes.

9        Q    Do you understand that Ms. Sloane had been

10   working to prevent any stories about what happened

11   on the set from being made public?

12           MR. KALTGRAD:   Objection.

13           THE DEPONENT:   Yes.

14   BY MS. GOVERNSKI:

15       Q    How did you understand that?

16       A    She told me.

17       Q    What did she tell you?

18       A    Just that she -- there was -- she was

19   getting a lot of incoming calls about stories of

20   problems on the set and she was trying to kill them.

21       Q    And what was your reaction to Ms. Sloane

22   telling you she was trying to kill stories about

23   happened on the set?

24       A    I don't remember what my reaction was, but

25   I'm sure it was gratitude.

CONFIDENTIAL

Page 192

1      Q    Why gratitude?

2      A    Because those stories would damage -- could

3   damage the -- the performance of the film.

4      Q    Could they damage Ms. Lively as well?

5      A    Yes.

6      Q    Did they?

7           MR. KALTGRAD:  Objection.

8           THE DEPONENT:  Did those specific or

9   eventually the whole thing?

10  BY MS. GOVERNSKI:

11     Q    The whole thing?

12          MR. KALTGRAD:  Objection.

13          THE DEPONENT:  It -- yes, I assume.  I know

14  how upset she was and how she felt that her

15  reputation was hurt.  And there was a tidal wave of

16  online hatred towards her that I don't think I ever

17  seen to such a degree.

18  BY MS. GOVERNSKI:

19     Q    Can you describe the wave of online hatred

20  towards her that you saw?

21     A    Just -- there's a lot of stories about --

22  negative stories of all types and kinds and shades

23  about her for many months.

24     Q    From when did those begin?

25          MR. KALTGRAD:  Objection.

CONFIDENTIAL

Page 193

1          THE DEPONENT:  I don't know, but it was

2     pretty close to the opening of the film.

3          Q    Okay.  I want to hand you Exhibit 31, which

4     is SPE_BL9980.  Do you have that in front of you?

5          A    Yes.

6               (Plaintiff's Exhibit 31 was marked

7               for identification.)

8     BY MS. GOVERNSKI:

9          Q    If you turn the page, it's an e-mail from

10    Mr. Heath.

11         A    Uh-huh.

12         Q    You're on this e-mail; right?

13         A    Uh-huh.

14         Q    Do you recognize it?

15         A    Yes.

16         Q    What is this?

17         A    Response to the article I sent Jamey.

18         Q    Okay.  And he writes (as read):

19               "I'd like us to take a look at

20               that.  Even in the midst of feuding

21               how many people are pointing out

22               that the DV is being glossed over,

23               and that Justin is essentially the

24               only one appreciating the subject

25               matter whilst others may be not

1          giving it the proper respect it

2          deserves."

3          Do you see that?

4     A    Yes.

5     Q    Do you recall your reaction to this e-mail?

6     A    Yes.

7     Q    What was your reaction to this e-mail?

8     A    My reaction was I didn't recall them having

9     those concerns earlier for months and months during

10    the campaign.  And it seemed like at opening, those

11    concerns started happening.  And there were stories

12    started breaking.  I don't know the order.

13         But I thought that, one, that it was

14    incredibly unfair to the campaign.  And two, it

15    would materially hurt the film.

16    Q    So did Mr. Heath come out and -- strike

17    that.

18         If we can turn to the first page.  You

19    respond by saying "ignore" in all capital letters;

20    right?

21    A    The first page of this?

22    Q    Well, we can state Ms. Hann writes -- who

23    is Ms. Hann?

24    A    She ran publicity for Sony.

25    Q    Okay.  And she writes (as read):

CONFIDENTIAL

Page 200

```
 1        Q    Was Sony tracking the online reaction to
 2    stories about Ms. Lively?
 3        A    Yes.
 4        Q    Okay.  I've handed you Exhibit 33 which has
 5    the Bates stamp SPE_BL3328.
 6             Do you see that?
 7        A    Yep.  Yes.
 8             (Plaintiff's Exhibit 33 was marked
 9             for identification.)
10    BY MS. GOVERNSKI:
11        Q    What is this e-mail?
12        A    It's social and press response to the cast
13    controversy with "It Ends With Us."
14        Q    Okay.  And is this a type of document that
15    you would receive in the ordinary course of your
16    business at Sony?
17        A    Yes.
18        Q    And can you describe the contents, like
19    what does this type of e-mail track?
20        A    Social sentiment.
21        Q    And who is doing the tracking?
22        A    We have monitoring services and it scours
23    social media to look at individual posts.
24        Q    So do you -- would you rely on the data in
25    this --
```

CONFIDENTIAL

Page 201

```
 1        A    Yes.

 2        Q    -- e-mail?

 3        A    Yes.

 4        Q    Okay.  And if you can look to the first

 5   sentence where -- I'm sorry, the second -- okay.

 6   The -- in the second paragraph, it says (as read):

 7                "Very little of this seemed to

 8             impact people's interest in seeing

 9             the movie; however, much of the

10             online response was more supportive

11             of Justin, 89 percent."

12             Do you see that?

13        A    Yes.

14        Q    Did that surprise you?

15        A    I don't recall, but it -- at that point,

16   that was, what, six days after release, four days

17   after release?  We released on the 9th?

18        Q    Uh-huh.

19        A    Yep.  Yeah, with -- where all the stories

20   were breaking, I -- I wasn't that surprised.

21        Q    You were not that surprised?

22        A    Huh-uh.

23        Q    Why not?

24        A    Because I believe at this point there was a

25   deluge of negative stories about Blake.
```

CONFIDENTIAL

Page 202

```
 1        Q    And if you go down to the social response,
 2    it says (as read):
 3                  "Neutral, 7 percent; pro Blake,
 4             4 percent; pro Justin, 89 percent."
 5             Do you see that?
 6        A    Yes.
 7        Q    How did these numbers compare to the
 8    numbers that you were seeing in July that we
 9    discussed?
10             MR. KALTGRAD:  Objection.
11             THE DEPONENT:  The numbers that we
12    discussed in July were I believe about the movie,
13    not the -- but there was -- there was not -- I
14    believe that this wasn't in the conversation, so it
15    didn't exist.
16    BY MS. GOVERNSKI:
17        Q    Okay.  Well, it says 4 percent pro Blake;
18    right?
19        A    Uh-huh.
20        Q    Do you recall your testimony earlier that
21    the -- that you had not been seeing any negative
22    reaction regarding Blake in July of 2024?
23        A    Correct.
24             MR. KALTGRAD:  Objection.
25    ///
```

CONFIDENTIAL

Page 203

1    BY MS. GOVERNSKI:

2        Q    So I am asking you if you can compare what

3    you were seeing online in July with the numbers as

4    reflected here regarding Ms. Lively?

5            MR. KALTGRAD:  Objection.

6            THE DEPONENT:  I would say public sentiment

7    swung very negative.

8    BY MS. GOVERNSKI:

9        Q    In the span of a week?

10       A    Seemed to be.

11       Q    In your experience, was that unusual?

12           MR. KALTGRAD:  Objection.

13           THE DEPONENT:  Yes.

14   BY MS. GOVERNSKI:

15       Q    What is your reaction to the swing in the

16   anti-Blake sentiment between July and August?

17       A    My reaction with this would eventually hurt

18   the playability of the movie, and I believe it did.

19       Q    And what do you think is responsible for

20   causing this drastic swing?

21           MR. KALTGRAD:  Objection.

22           THE DEPONENT:  All the negative press.

23   BY MS. GOVERNSKI:

24       Q    Okay.  I'm handing an exhibit, 34, which is

25   AEO, so -- this is marked AEO by Sony so we have to

CONFIDENTIAL

Page 226

1    world, what they were telling me, and that certain

2    things were being -- I was reading in the press were

3    being echoed, like that e-mail that I was shown by

4    Mr. Heath to me about the negativity on the

5    marketing campaign.

6    BY MS. GAROFALO:

7        Q    Okay.  Now, did you -- strike that.

8             Did you know at or about the time this

9    publicity began to appear that Ms. Lively had

10   effectively excluded Mr. Baldoni from the marketing

11   campaign for "It Ends With Us"?

12            MS. GOVERNSKI:  Objection.

13            THE DEPONENT:  Yes.

14   BY MS. GAROFALO:

15       Q    And would that have meant that in any

16   photographs, publicity, anything -- any vehicle that

17   was used to market the campaign, Mr. Baldoni was

18   absent; isn't that correct?

19            MS. GOVERNSKI:  Objection.

20            THE DEPONENT:  For the most part.  I do

21   believe Justin did some things, but we had a

22   situation where Blake and several cast members,

23   including the author, did not want to be

24   photographed with him and did not want to be in the,

25   I guess, same vicinity that he was in, whether that

CONFIDENTIAL

Page 227

1    was the premiere or something else.

2    BY MS. GAROFALO:

3        Q    Okay.  And you anticipated my next

4    question.  Did you know that there were photographs

5    relating to marketing and the premiere where

6    Mr. Baldoni was absent?

7        A    Yes.

8        Q    And that was at Ms. Lively's request; isn't

9    that correct?

10           MS. GOVERNSKI:  Objection.

11           THE DEPONENT:  It was at the request of

12   Ms. Lively, Brandon Sklenar -- was that his name,

13   the other actor -- Jenny Slate, I believe that's her

14   name, and Colleen.

15   BY MS. GAROFALO:

16       Q    Did you ever discuss Mr. Baldoni being

17   erased from photographs with Ms. Slate?

18           MS. GOVERNSKI:  Objection.

19           THE DEPONENT:  I don't recall.  I don't --

20   I'll just leave it there.  I don't believe so, but I

21   don't truthfully -- but, I don't recall.

22   BY MS. GAROFALO:

23       Q    Same question for Mr. Sklenar, did you ever

24   discuss it with him directly?

25       A    No.

CONFIDENTIAL

Page 233

1          THE DEPONENT:  I was made aware that there

2     was chatter about the marketing -- that piece of the

3     marketing I believe close to the premiere is when it

4     popped up.

5     BY MS. GAROFALO:

6          Q    Do you remember what some of the public

7     criticisms of Ms. Lively's marketing efforts were?

8          MS. GOVERNSKI:  Objection.

9          THE DEPONENT:  Yes.  That it wasn't dealing

10    hard enough with the direct idea of the abuse in the

11    film.  And that it was very flowery, I think.  But

12    I -- you know, the whole way through the campaign,

13    we didn't hear that.  Actually, we heard the

14    opposite.  This campaign is working so well because

15    of everything we're doing.

16          And Blake had always said, which I thought

17    was smart, it's actually what we learned in the

18    research.  It's what Colleen said.  It's what the

19    fans want, which is "Lily isn't defined by being

20    abused."

21          That she is -- that she was abused, yes.

22    But she's also a strong woman.  She's -- she's

23    self-sufficient.  She's started -- she has her own

24    business.  She has friends.  She has other

25    relationships.  You know, it was like not let that

CONFIDENTIAL

Page 234

1   define her completely.  And that was kind of what we

2   -- with the campaign was trying do.

3   BY MS. GAROFALO:

4       Q    Your marketing people made a decision that

5   it was better to promote the movie, market the movie

6   by downplaying the sexual abuse and playing up Lily

7   Bloom's character strengths.  Is that the correct

8   statement?

9       A    No.

10      Q    Okay.

11      A    I don't think that's correct.

12      Q    Tell me what the marketing team at Sony

13  conceived, or was recommending as a marketing

14  strategy?

15      A    It was showing all aspects.  That -- and I

16  want to be very clear.  Not hiding or shying away

17  from the abuse as I said in all materials that was

18  front and center.

19          But if you made everything just about that,

20  it would not have opened as big as it did and got

21  enough excitement for people to see other aspects of

22  this woman's life.

23      Q    And you told us you relied on your

24  marketing people; correct?

25      A    Yes.

CONFIDENTIAL

Page 235

1        Q    Now, how long have you been involved in
2    marketing of motion pictures?
3        A    25 years.
4        Q    Have you ever known the marketing to go
5    astray and effectively tank a release?
6        A    My marketing department?
7        Q    In general.
8        A    A studio's marketing department that's
9    actually marketing the movie?
10        Q    Yeah.  Make bad decisions, make a bad
11    strategy call, it happens, doesn't it?
12        A    Well, you said "intentionally tank."
13        Q    Oh, I did not.  If I did, I didn't mean to.
14        A    Oh, okay.  Sorry, can you rephrase?
15        Q    Yeah.  Sometimes the decisions by marketing
16    departments are wrong and have a negative effect on
17    the product; is that your experience?
18            MS. GOVERNSKI:  Objection.
19            THE DEPONENT:  It could happen.
20    BY MS. GAROFALO:
21        Q    It does happen, doesn't it?
22        A    Yeah, it's happened.
23        Q    I can name a few.
24        A    Let's hear.  What do you got?
25        Q    I'm not going to criticize.

CONFIDENTIAL

Page 236

1          Okay.  So were you aware --
2      A   But can I say one thing to add to that?
3      Q   You may.
4      A   I would just say that in terms of marketing
5  on this film and I don't want to come off as
6  proprietary or defensive, but I would say this movie
7  opening at $50 million is one of the greatest
8  marketing triumphs in the history of marketing.  So
9  it certainly was effective.
10     Q   And that's your opinion?
11     A   I think it's a fact.
12     Q   Someone could have done it differently and
13 opened at 60 million.
14     A   Really?
15     Q   Isn't that possible?
16     A   No.
17     Q   Not possible?
18     A   Not possible.
19     Q   Okay.  At or about the time of the release,
20 were you aware that there was a public criticism of
21 Ms. Lively promoting her personal brands, personal
22 products in the course of her marketing of "It Ends
23 With Us"?
24         MS. GOVERNSKI:  Objection.
25         THE DEPONENT:  I was made aware when she

CONFIDENTIAL

Page 237

1    launched her -- forgot what it was.  It was some

2    kind of company, maybe a beauty line, something like

3    that.  At a certain point when that was launched, I

4    think it was maybe a few weeks out from release, or

5    six weeks, I don't remember the exact time.  But I

6    do remember there was negative chatter.

7    BY MS. GAROFALO:

8        Q    Because it was incorporated into the

9    marketing of the film "It Ends With Us"; correct?

10       A    It wasn't incorporated into it.  It was

11   launched in the same timeline.

12       Q    Okay.  What about -- are you aware that

13   Ms. Lively had some kind of alcohol business called

14   Betty Buzz?

15       A    Is that the thing?  I don't -- maybe.  I

16   don't know.

17       Q    Were you aware of criticism that

18   Ms. Lively, public criticism that Ms. Lively was

19   attempting to market her brand Betty Buzz in

20   connection with "It Ends With Us," which has a

21   domestic violence theme?

22           MS. GOVERNSKI:  Objection.

23           THE DEPONENT:  No, I'm not aware.

24   BY MS. GAROFALO:

25       Q    But you don't know that it didn't happen?

CONFIDENTIAL

```
                                         Page 241
 1   released?
 2            MS. GOVERNSKI:  Objection.
 3            THE DEPONENT:  Yes.
 4   BY MS. GAROFALO:
 5       Q   What film was that?
 6       A   I've got to really think about that.  I
 7   know that I've been involved in situations like
 8   that.  It's happened over the years.  It's not
 9   incredibly frequent, but it's -- it has been known
10   to happen, yes.
11       Q   It is rare, is it not?
12            MS. GOVERNSKI:  Objection.
13            THE DEPONENT:  Yes, I'd categorize that as
14   rare, but there are movies that come out that don't
15   even get tested.
16   BY MS. GAROFALO:
17       Q   And in those movies that you've referred to
18   where the lesser -- the lesser cut, the cut with the
19   lower scores has been released, can you remember the
20   circumstances with any of those projects?
21            MS. GOVERNSKI:  Objection.
22            THE DEPONENT:  I can't, but I don't recall
23   what the final scores were that -- the final test
24   score.
25            I think one of the big things that
```

CONFIDENTIAL

Page 242

1   solidified our belief in it is when we showed a cut,

2   and I don't remember which cut exactly, at the

3   Colleen Hoover Book Bonanza, and the core fans went

4   nuts for it, that, I believe, also had a lot of

5   influence on that decision.

6   BY MS. GAROFALO:

7       Q    And was that before or after the Bake-Off?

8       A    I don't know.

9       Q    You talked a few minutes ago about

10  Mr. Baldoni bringing this project --

11      A    Uh-huh.

12      Q    -- to Sony.  Do you recall that?

13          MS. GOVERNSKI:  Objection.

14          THE DEPONENT:  I wasn't there for that, but

15  that's what I heard happened.  I think Wayfarer

16  brought it to Ange, maybe.

17  BY MS. GAROFALO:

18      Q    Okay.  And if you know -- well, did you

19  ever come to learn that this was a project that

20  Mr. Baldoni had been working on for quite a while?

21      A    I don't know.

22      Q    How much money did Wayfarer invest in the

23  film?

24          MS. GOVERNSKI:  Objection.

25          THE DEPONENT:  I believe they invested

CONFIDENTIAL

Page 247

1        Q    Ms. Lively was very happy with the way you
2    performed your role on an "It Ends With Us" in
3    connection with the marketing of the film; is that a
4    correct statement, to your understanding?
5             MS. GOVERNSKI:  Objection.
6             THE DEPONENT:  I would assume that is the
7    case, because if you look up the gross openings on
8    romantic dramas historically, this is probably the
9    biggest, and it also dealt with tough subject
10   matter.
11            So I think not only was she thrilled with
12   the results in terms of the box office, but everyone
13   at Sony and, you know, all of my constituents were.
14   BY MS. GAROFALO:
15       Q    Okay.  You received a number of
16   communications from Ms. Lively --
17       A    Uh-huh.
18       Q    -- telling you how happy she was for the
19   positions that you were taking in connection with
20   marketing of the film; isn't that correct?
21            MS. GOVERNSKI:  Objection.
22            THE DEPONENT:  I believe so.
23   BY MS. GAROFALO:
24       Q    Okay.  And same for Mr. Reynolds:  You
25   received a number of communications from

CONFIDENTIAL

Page 287

1  how the premiere would be handled with respect to

2  Mr. Baldoni.

3          Do you recall that?

4          MS. GOVERNSKI:  Objection.

5          THE DEPONENT:  Yes.

6  BY MS. GAROFALO:

7      Q   And what do you recall of those demands by

8  Ms. Lively?

9      A   She didn't want to be on the red carpet

10  with him.  She didn't want to be in photographs with

11  him.  She didn't want to be seated near him.

12     Q   It went further than that, didn't it?

13         MS. GOVERNSKI:  Objection.

14         THE DEPONENT:  That's what I remember.

15  BY MS. GAROFALO:

16     Q   And who made the decision to cave in to

17  those demands?

18         MS. GOVERNSKI:  Objection.

19         THE DEPONENT:  We all talked as a company,

20  Tom, me, publicity.  There was a group of us.

21  BY MS. GAROFALO:

22     Q   And the decision to give Ms. Lively what

23  she wanted in connection with the premiere was made

24  for the benefit of the film; would that be a correct

25  statement?

CONFIDENTIAL

Page 288

```
 1          MS. GOVERNSKI:  Objection.
 2          THE DEPONENT:  It was made for the -- for
 3   the benefit of us needing the lead actress to show
 4   and promote the movie at the premiere.  I believe
 5   Wayfarer was also involved in this discussion and I
 6   guess had agreed to the demands as well.
 7   BY MS. GAROFALO:
 8      Q   Because Ms. Lively was threatening not to
 9   attend the premiere unless her demands were met;
10   isn't that correct?
11          MS. GOVERNSKI:  Objection.
12          THE DEPONENT:  I don't know how it was
13   communicated with Wayfarer.
14   BY MS. GAROFALO:
15      Q   Do you know how it was communicated to
16   Sony?
17      A   Yes.
18      Q   And is it correct that Ms. Lively was
19   indicating to Sony that she might not show up at the
20   premiere if her demands were not met with respect to
21   Mr. Baldoni?
22      A   Yes.
23          MS. GOVERNSKI:  Objection.
24   BY MS. GAROFALO:
25      Q   And what kind of effect in your -- based on
```

CONFIDENTIAL

Page 290

```
 1   very briefly.
 2            (Plaintiff's Exhibit 40 was marked
 3            for identification.)
 4            MS. GAROFALO:  I'm sorry.
 5   BY MS. GAROFALO:
 6       Q    Appear to be text messages between you and
 7   Jason Groff on August 7, 2024.
 8       A    Uh-huh.
 9       Q    Who's Mr. Groff?
10       A    Runs the EPK.
11       Q    What is that?
12       A    Electronic press kit.  Sorry.  It's the
13   people in charge of filming everything that goes on
14   at the premiere and packaging it and putting it out
15   to try to get eyeballs.
16       Q    Thank you.
17            And so on the second page of the document,
18   Mr. Groff says (as read):
19                "Hey, Josh, at the premiere you
20            told the team not to include Justin
21            in the premiere sizzle.  Danielle
22            wanted me to double-check since the
23            conversation about him not being
24            involved was getting louder and
25            louder."
```

CONFIDENTIAL

Page 303

1      A    Uh-huh.

2      Q    And does that text from Ms. Giannetti

3    refresh your recollection?

4      A    A little bit.  So, yeah, so is the mix --

5      Q    Can I finish?

6      A    Oh, sorry.

7      Q    Thank you.

8           Does that refresh your recollection that at

9    least at some point in time Ms. Lively was

10   threatening not to promote the film if she didn't

11   get her way with respect to editing?

12           MS. GOVERNSKI:  Objection.

13           THE DEPONENT:  I believe that I was worried

14   about there was a possibility of that.

15   BY MS. GAROFALO:

16     Q    Because she had told you that, hadn't she?

17           MS. GOVERNSKI:  Objection.

18           THE DEPONENT:  She had not threatened that.

19   She had said, "It would be a big problem for me."

20   BY MS. GAROFALO:

21     Q    And you didn't consider that a threat?

22     A    No.

23     Q    Ms. Giannetti considered it a threat,

24   didn't she?

25           MS. GOVERNSKI:  Objection.

CONFIDENTIAL

Page 370

1          I, the undersigned, a Certified Shorthand

2      Reporter of the State of California, Registered

3      Professional Reporter, Certified Live Note Reporter,

4      do hereby certify:

5          That the foregoing proceedings were taken

6      before me at the time and place herein set forth;

7      that any witnesses in the foregoing proceedings,

8      prior to testifying, were duly sworn; that a record

9      of the proceedings was made by me using machine

10     shorthand which was thereafter transcribed under my

11     direction; that the foregoing transcript is a true

12     record of the testimony given.

13         Further, that if the foregoing pertains to

14     the original transcript of a deposition in a Federal

15     Case, before completion of the proceedings, review

16     of the transcript [  ] was [  ] was not requested.

17     I further certify I am neither financially

18     interested in the action nor a relative or employee

19     of any attorney or party to this action.

20         IN WITNESS WHEREOF, I have this date

21     subscribed my name.

22     Dated: October 1, 2025

23

24                      RENEE A. PACHECO

                        CSR No. 11564 RPR, CLR

25