Exhibit 52

CONFIDENTIAL

Page 1

1            UNITED STATES DISTRICT COURT
2         FOR THE SOUTHERN DISTRICT OF NEW YORK
3                    ---oOo---
4
5    BLAKE LIVELY,
6                  Plaintiff,
7      vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)
                              25-CV-449 (LJL) (MEMBER CASE)
8
     WAYFARER STUDIOS LLC, ET AL.
9
                   Defendants.
10   _____
     JENNIFER ABEL,
11              Third-party Plaintiff,
       vs.
12   JONESWORKS, LLC,
                Third-party Defendant.
13   _____
     WAYFARER STUDIOS LLC, et al.
14              Consolidated Plaintiffs,
       vs.
15   BLAKE LIVELY, et al.
                Consolidated Defendants.
16   _____
17
18                  **CONFIDENTIAL**
19
20      VIDEO-RECORDED DEPOSITION OF JENNIFER ABEL
21              Los Angeles, California
22            Friday, September 26, 2025
23   Stenographically Reported by:  Ashley Soevyn,
     CALIFORNIA CSR No. 12019
24
25

CONFIDENTIAL

Page 38

1    like the -- you know, you don't like the person's
2    past or their history or their reputation?
3              MR. FREEDMAN:  Objection.
4              THE WITNESS:  I think to better answer
5    your question, as a personal publicist, I'm able to
6    make decisions based on who I think I'm able to
7    represent based on my aligning values.
8    BY MR. GOTTLIEB:
9         Q    Okay.  Do you typically do like a
10   background investigation or look into your clients
11   when you have new opportunities presented to you?
12        A    I think the extent of my ability to do a
13   background investigation is to Google.  I'm sure
14   I've done that in the past.
15        Q    Okay.  When did you first meet
16   Justin Baldoni?
17        A    In 2020.
18        Q    What were the circumstances in which you
19   met him?
20        A    I became his publicist and started
21   running his account.
22        Q    How did that come about?
23        A    When I was employed at Jonesworks, I was
24   hired to oversee the entire talent and entertainment
25   department, and he was a talent client at that time.

CONFIDENTIAL

                                                    Page 39

1          Q    Okay.  Do you remember when in 2020 this

2    was?

3          A    I believe I was hired at the end of

4    July 2020.  So it would have been sometime around

5    that time period.

6          Q    And were -- were you introduced to

7    Mr. Baldoni through someone at Jonesworks or how --

8    how did that come about?

9          A    I'm trying to remember -- I apologize --

10   the first time that I met him.  I believe there was

11   a photo shoot and I came to set, and that was the

12   first time that we met.  But again, I'm -- it's a

13   long time ago so I'd have to think more about that,

14   and I can correct that later.

15         Q    Do you remember where that was?

16         A    I do not.  Sorry.

17         Q    Did you meet anybody else at Wayfarer

18   Studios when you were brought in, in 2020 to work

19   with Mr. Baldoni?

20              MR. FREEDMAN:  Objection.

21              THE WITNESS:  So I don't recall the exact

22   date of when I was introduced to the Wayfarer team.

23   Yeah, I apologize.  I don't recall the exact date.

24   BY MR. GOTTLIEB:

25         Q    At that time in 2020, were you

CONFIDENTIAL

```
                                            Page 41
 1   to oversee Justin and the Wayfarer account, I was
 2   aware that Steve Sarowitz was the founder.
 3         Q    Okay.  Did you have any understanding of
 4   who paid the bills for this account?
 5         A    No.
 6         Q    Who else worked with you -- and we'll
 7   have to take this in -- in chunks, so let's say 2020
 8   through -- well, just strike that.
 9              By the time we get to 2023, January of
10   2023, who else worked with you on the Baldoni
11   Wayfarer account at Jonesworks?
12         A    Sure.  So in 2023 -- would you like me to
13   name the employees?
14         Q    Please.
15         A    Matthew Mitchell, Matthew Gibson, Audrey
16   Hixon, Ande Bowser.  We had brought on a digital
17   team at that time to work with Justin, so that
18   included James Knobloch, Henry Hargitai, Nate Woldu,
19   was a videographer.  And as I mentioned before,
20   Raquel Harris was tapped into very briefly for about
21   a month or so of that time.
22         Q    Thank you.  That's very helpful.
23              Were any of those people --
24         A    Oh, and -- I'm so sorry.
25         Q    No, go ahead.
```

CONFIDENTIAL

Page 130

1          Q     When do you recall -- was there a point
2     in time that you can recall, as you sit here today
3     without looking back through documents, Mr. Baldoni
4     deciding that he wanted his social media feed to
5     exclusively focus on issues of domestic violence?
6          A     Yes.
7          Q     When was that?
8          A     In that August time frame.
9          Q     Do you remember what day?
10         A     I don't recall.
11         Q     Okay.  If I told you it was around
12    August 8th, would that sound right to you?
13         A     I will take your word for it.  It was
14    around that time.
15         Q     Do you have a recollection of whether
16    that was after the premiere or before it?
17         A     That was after the premiere, before the
18    release.
19         Q     Okay.  And do you have that recollection
20    only because I said August 8th, or because you
21    actually remember it was after the premiere that he
22    decided that he wanted to start focusing on domestic
23    violence?
24               MR. FREEDMAN:  Objection.
25               THE WITNESS:  You said August 8.  The

CONFIDENTIAL

Page 147

1   BY MR. GOTTLIEB:

2        Q    Ms. Abel, you're being handed what's been

3   marked as Exhibit 47, which is a document bearing

4   the Bates No. 16763 through 16768.  And I'm only

5   asking you about the itinerary that you'll find on

6   the last page, not asking you anything about the

7   voluminous email traffic that gets to it.

8        A    Okay.

9        Q    Ms. Abel, one of the earliest press

10  events for this film was a trailer watch event on

11  May 6th, 2024; is that correct?

12       A    Yes.

13       Q    Did you attend that event?

14       A    I did.

15       Q    Do you recall it?

16       A    Vaguely.  But yes, I do.

17       Q    Do you see a reference at the top of the

18  page marked 16768, the last page of this document,

19  referencing that there would be 70 to 80 creators,

20  influencers or media members present?

21       A    Yes.

22       Q    Did Mr. Baldoni give an interview at this

23  event?

24       A    It was a roundtable discussion paired

25  with Colleen Hoover.

CONFIDENTIAL

Page 148

```
 1        Q    Was this referred to as a EPK interview
 2   or something like that?
 3        A    I can't recall if this was the same day
 4   that we did the interview with Entertainment Tonight
 5   prior to this when both -- when Justin and Colleen
 6   were together.  I don't see that that's noted on
 7   here.
 8        Q    Okay.  Do you have any recollection of
 9   the kinds of creators or influencers that were
10   invited to this event?
11        A    I don't know how they were selected, no.
12        Q    Do you have any idea whether some of them
13   were people who are familiar with the book or had
14   covered the book?  Was there any -- was there any
15   interest in getting people like that at this event?
16        A    I did not participate in getting people
17   to this event.
18        Q    Okay.  Was this -- who was this event
19   planned by?  Was it planned by Sony, Wayfarer, both
20   collaboratively?
21        A    Sony.
22        Q    Did Wayfarer or Mr. Baldoni object to
23   this event?
24        A    Object to it, no.
25        Q    Did Wayfarer or Mr. Baldoni express any
```

CONFIDENTIAL

Page 149

1    concerns prior to this event that you can recall?

2         A    No, not that I can recall.

3         Q    Did Mr. Baldoni ever tell you he didn't

4    want to attend this event?

5         A    Not that I can recall.

6         Q    This event involved, as you can see, a

7    teamed reception for influencers at 3:00 o'clock

8    p.m. and a floral arranging demonstration with a

9    floralist and Colleen Hoover and Justin Baldoni.

10             Do you see that?

11        A    Yes, following the roundtable discussion.

12        Q    And fans are welcome to bring their

13   bouquets for photos at 3:45 p.m.

14             Do you see that?

15        A    Yes.

16        Q    Was there a social media backlash to this

17   event?

18        A    I don't recall.

19        Q    You have any recollection of any kind of

20   negative reaction to selling It Ends with Us with

21   floral-themed events where bouquets of flowers were

22   made?

23        A    Not that I can recall.

24        Q    You were never asked to respond to or

25   address anyone that you can remember, as you sit

CONFIDENTIAL

Page 152

1          (As read):

2              "She doesn't like how much we lean into

3              the domestic abuse storylines, but you

4              know that and it's about finding a

5              balance"?

6     A    Yes.

7     Q    You had previously communicated to

8  Mr. Baldoni that Sony did not like how much he had

9  leaned into the domestic abuse storylines?

10    A    Yes.

11    Q    Mr. Baldoni responds at 8:54:

12         (As read):

13             "Yeah, maybe some slack can be given

14             considering the terrorist attack

15             concurrently happening lol."

16         Do you see that?

17    A    Yes.

18    Q    Did you understand what he was referring

19  to when he referenced a "terrorist attack"?

20    A    I'd have to recall world events happening

21  on or around the state.  I apologize.  Not in this

22  moment.

23    Q    As you sit here today, you have no

24  recollection at all of whether he was referencing a

25  literal terrorist attack or a figurative one?

CONFIDENTIAL

Page 153

```
 1              MR. FREEDMAN:  Objection.
 2              THE WITNESS:  Terrorist -- I -- I don't
 3   recall.
 4   BY MR. GOTTLIEB:
 5        Q    Do you have any understanding at all why
 6   he was asking for some slack?
 7              MR. FREEDMAN:  Objection.
 8              THE WITNESS:  I don't recall.
 9   BY MR. GOTTLIEB:
10        Q    Did you ever receive written feedback
11   from Sony on the EPK interview?
12        A    Yes.
13        Q    And did you share that feedback with
14   Mr. Baldoni?
15        A    Yes.
16        Q    Do you have a recollection -- we'll start
17   at a high level and then see how much you remember.
18   Do you have a level -- a recollection at a high
19   level of what the gist of Sony's messaging to
20   Mr. Baldoni was?
21        A    The gist "high level" was that he spoke
22   too much about the domestic abuse survivor community
23   and as that was why he wanted to make the film.
24        Q    And they wanted a lighter focus in the
25   marketing?
```

```
                                        Page 154
```

 1        A    I believe that was part of the feedback
 2   they were given.  It was a lengthy email, if I can
 3   recall.  I don't recall the full email.
 4        Q    They gave lengthy feedback on what to
 5   emphasize and what to avoid in marketing the film?
 6        A    Are you referring to that specific email
 7   or just in general?
 8        Q    Around this time, did -- did Sony give
 9   lengthy feedback in writing that you reviewed about
10   how to market the film?
11             MR. FREEDMAN:  Objection.
12             THE WITNESS:  Feedback in context to how
13   Justin was answering his EPK interviews.
14   BY MR. GOTTLIEB:
15        Q    Okay.  Do you recall -- do you recall
16   Sony saying that the main point they wanted
17   Mr. Baldoni to hit was that this is an entertaining
18   blockbuster film, movie of the summer that everyone
19   will enjoy regardless of their own experiences, or
20   lack thereof, with abuse?
21        A    I would have to review the specific
22   language that they used.  It's been a while.
23        Q    Okay.  Do you have any recollection of
24   saying that you agreed with Sony's point of view?
25        A    Yes, and about finding a balance.

CONFIDENTIAL

1  Mr. Baldoni on social media; is that right?

2        A    In reference to that communication on

3  August 5th that we're discussing specifically,

4  yes, that's what I recall.

5        Q    And the idea was that this language --

6        A    Uh-huh.

7        Q    -- which we'll get to.  This language was

8  something Mr. Baldoni could say in the press that

9  would -- I think the word used was "normalize" --

10       A    Uh-huh.

11       Q    -- the unfollowing of him on social

12 media; is that right?

13       A    Not normalizing the act, but normalizing

14 and de-sensationalizing any social media commentary

15 surrounding fans picking up on that fact.

16       Q    Okay.  So that was a deliberate strategy

17 of how to place this language or concept into one of

18 Mr. Baldoni's statements in order to defend against

19 or alter a narrative that you all saw emerging in

20 social media; is that what you just said?

21       A    No, I don't agree with that

22 characterization.

23       Q    What don't you agree about with it?

24       A    That language was provided as guidance.

25 It was not with the intention, in your words, to

CONFIDENTIAL

Page 173

```
 1    provide guidance to my client of how he can still be
 2    authentic in his messaging, and yet, again, kind of
 3    be desensationalized, should that narrative take
 4    hold and cross over into traditional media.
 5         Q    And so if I'm understanding you, one of
 6    the benefits of getting ahead of the narrative by
 7    making some kind of a statement, is that if the
 8    narrative later comes out, you can point back to
 9    whatever the thing is that the client has said, and
10    said, we already said that, see?
11         A    It desensationalizes it.
12         Q    It's not new?
13         A    It's not new; it's not exciting.
14         Q    We talked about that already.  You don't
15    need to cover it.
16         A    Exactly.  It desensationalizes it.
17         Q    Okay.  You're aware, though, that Sony
18    disagreed that using the word "fiction"[sic] would
19    desensationalize what was happening, right?
20         A    Friction.  Kimberly Wire, who was in the
21    interviews with me, I believe had messaged me and
22    said that she didn't -- she kind of caught that word
23    and flagged it for me.
24         Q    And she, in fact, said:
25              (As read):
```

CONFIDENTIAL

Page 186

1    this way.  Actually, keep that one.  Keep these two

2    handy.

3                THE WITNESS:  Okay.

4                MR. GOTTLIEB:  The last two.

5                This is Exhibit 54.

6                Am I right on my numbering here?

7         (Exhibit 54 marked for identification.)

8                THE STENOGRAPHIC REPORTER:  Yes, you are.

9                MR. GOTTLIEB:  It's a miracle.  Okay.

10   BY MR. GOTTLIEB:

11        Q    So Exhibit 54 is a document bearing the

12   Bates range 14980 to 14982.  And this one, I

13   believe, is a text exchange between you and

14   Mr. Baldoni; is that right?

15        A    Oh, I'm sorry, which -- no, this one is

16   between -- yes, it is between me and Justin.  Yes,

17   thank you.

18        Q    And this is on August 5th; is that right?

19        A    Yes.

20        Q    And the first message there is 10:42 a.m.

21             Do you see that?

22        A    Yes.

23        Q    So this is when you were communicating to

24   Mr. Baldoni the feedback that Ms. Wire had given to

25   you about trying to not use the word "friction"?

CONFIDENTIAL

Page 187

```
 1          A     Yes.
 2          Q     Are so does this refresh your
 3     recollection that you gave that advice to him by
 4     text message rather than in person?
 5          A     I did both.
 6          Q     Okay.  So you say to him here:
 7                (As read):
 8                     "Sony is having a hard time with the
 9                     word 'friction.' They think it will be
10                     taken out as clickbait.  They obviously
11                     don't know about our strategy, but
12                     let's stick to the words of
13                     'challenge.'"
14                And then you continue.
15          A     Correct.
16          Q     Did he shift to the word "challenge"
17     after this?
18          A     He did.
19          Q     What was your strategy that you were
20     referring to that Sony did not know about?
21          A     About providing guidance to
22     desensationalize what we anticipated at that time.
23     The social media commentary picking up on the fact
24     that the cast had unfollowed him, and he was not
25     present in any of the marketing materials with the
```

CONFIDENTIAL

Page 188

1  cast.

2      Q    Okay.

3           It looks like about 90 minutes later, he

4  sends you an image, a screenshot, that says, "This

5  is what we would need."

6      A    Uh-huh.

7      Q    We're going to -- I'm going to come back

8  to a few questions about this later, but what

9  happened between 10:42 and 12:06 that prompted

10 Mr. Baldoni to send this image to you on August 6th?

11          MR. FREEDMAN:  Objection.

12          THE WITNESS:  I have to look at the

13 timing of the other documents.  I'm not sure if we

14 were still in press at that time or what.

15 BY MR. GOTTLIEB:

16     Q    Okay.  And then you make a comment right

17 after he sends the screenshot to you that says --

18 and he says:

19          (As read):

20              "This is what we would need."

21          And you respond:

22          (As read):

23              "Yes.  I literally just spoke to

24              Melissa about this on the break about

25              what we discussed last night for social

CONFIDENTIAL

Page 190

1    email from Danni Maggin to Jacob Johnson, copying

2    Gloria Hann and Danielle Misher.

3              Who is Danni Maggin?

4        A    Sony publicity.

5        Q    And were you in contact with Danni Maggin

6    around this time, around August 5th?

7        A    Yes.

8        Q    Talking about press about -- around the

9    release of the film?

10       A    Yes.

11       Q    Does Ms. Maggin here reference the Dallas

12   Morning News interview that we were just discussing?

13       A    Yes.  I haven't seen this document

14   before, so I'm just going to read it.

15             Okay.

16       Q    Do you see that Ms. Maggin is saying that

17   Josh said Mr. Baldoni shouldn't do any more press

18   after this?

19       A    Yes.

20             MR. FREEDMAN:  Object.

21   BY MR. GOTTLIEB:

22       Q    Who is Josh a reference to?

23       A    Josh Greenstein.

24       Q    And who is that?

25       A    I don't know his exact title, but I

CONFIDENTIAL

Page 192

```
 1              MR. FREEDMAN:  Objection.
 2              THE WITNESS:  Not that I can recall.
 3    BY MR. GOTTLIEB:
 4        Q    Did Mr. Baldoni ever tell you that
 5    because of his neurodivergence, he sometimes says
 6    awkward things or impulsive things that he later
 7    regrets saying?
 8              MR. FREEDMAN:  Objection.
 9              THE WITNESS:  He e-mailed or texted or
10    emailed, I don't remember the method, in relation to
11    a podcast interview that he was asking if he should
12    do.
13    BY MR. GOTTLIEB:
14        Q    Did you have any concerns about that when
15    he was approaching press for this film?
16        A    Concerns about what?  Sorry.
17        Q    Impulsive speech or an inability to stay
18    on message?
19        A    No.
20        Q    Okay.
21              Jonesworks had -- we talked about before,
22    its contract -- oh, sorry.  Just one more thing
23    about the Dallas Morning News interview.  That never
24    ran, right?
25        A    No, not to my knowledge, no.
```

CONFIDENTIAL

Page 193

1        Q     Sony was basically able to kill it?

2        A     We pulled the tape.

3        Q     And how did you do that?

4              MR. FREEDMAN:   Objection.

5              THE WITNESS:   In that setting, in a press

6        junket, it is typically -- you have one camera

7        operator.  They are rolling tape for all of the

8        interviews, and then you hand the tape of the

9        segment to the reporter.  I wasn't part of that

10       facilitation, but it was my understanding that it

11       was in our control, and we had the ability to pull

12       the tape.

13       BY MR. GOTTLIEB:

14       Q     Okay.  Let's shift to social media.  We

15       talked before about Jonesworks.  I think you

16       described it as "a significant amount of work."  At

17       this time, it was going into Mr. Baldoni's social

18       immediate profile; is that right?

19       A     Yes.

20       Q     And is it fair to say there were times

21       when you would go through multiple drafts and text

22       with particular message that Mr. Baldoni would post

23       on his Instagram feed?

24       A     Yes.

25       Q     And I'll ask you this because I think

CONFIDENTIAL

Page 194

1  you'll otherwise say it, but that's typical for

2  clients that you had advised in the social media

3  space; is that right?

4        A    That is typical, yes.

5        Q    So the social media post -- now back to

6  Mr. Baldoni, the social media post that he was

7  putting out on his Instagram page are during this

8  period of time, particular ones that are being

9  vetted through and edited by the social media team,

10  right?

11        A    Yes, the Jonesworks social media team,

12  yes.

13        Q    Okay.  Were there times that this -- that

14  you found this tedious?

15        A    Yes.

16        Q    Were there times that you felt like the

17  social media posts were overly curated?

18        A    I'm sure I provided that feedback.

19        Q    Maybe there was a bit more debate and

20  discussion on the precise wording of social posts

21  than you thought necessary?

22        A    I'm sure, yes.

23        Q    But what Mr. Baldoni's followers saw was

24  not any of that, or the debate, or the multiple

25  drafts, but instead the final product that went out

CONFIDENTIAL

Page 197

1    at least according to Mr. Baldoni, from your flight

2    to Chicago, right?

3         A    Yes.

4         Q    And this is at the same time that you get

5    a text chain going about who was responsible for the

6    leak to the Daily Mail, right?

7         A    Yes.

8         Q    And as soon as Mr. Baldoni lands, he

9    sends this message and says:

10              (As read):

11                   "What is the TikTok strategy?  I would

12                   like you guys to start posting me ONLY

13                   talking about domestic violence and

14                   clips and why this movie is so

15                   important."

16              Do you see that?

17         A    Yes.

18         Q    And then there's a discussion after that.

19    So to level set this instruction that came from

20    Mr. Baldoni to the social team, is it something that

21    the social team worked to implement?

22         A    In -- in terms of cutting and providing

23    content of him talking about DV and clips and why

24    the movie is so important to him?

25         Q    Yes.

CONFIDENTIAL

Page 198

1        A    Yes.

2        Q    And he changed his profile and handle on

3    Instagram at some point in time?

4        A    He put his bio to No More, with a link to

5    for resources.

6        Q    And at first, you actually advise, don't

7    do that, it's too soon, right.  "Too drastic too

8    soon," at 4:16 p.m.?

9        A    Oh, I think that it's because I didn't

10   want to lose his link tree.

11       Q    I see.  So this is after the interview

12   with the word "friction," right?

13       A    Yes.

14       Q    And we're now on the 8th, and so there

15   are now stories that are starting to be in the works

16   using the word, or the concept, of a "feud," right;

17   that's what the Daily Mail story was about?

18       A    Yes.  To the best of my recollection,

19   that was.

20       Q    And this was around the time that you all

21   were starting to see the commentary on social media

22   spill over into media-media, right?

23            MR. FREEDMAN:  Objection.

24            THE WITNESS:  Just for clarity, if I

25   recall correctly, it was starting to spill over

CONFIDENTIAL

Page 228

```
 1                 "Agreed.  It's horrible.  We'll dig in
 2                 for details on her indiscretions."
 3            And then there's some emojis there,
 4     right?
 5         A    Yes.
 6         Q    And you don't respond to that in words,
 7     but you "heart" that or "love" that, right?
 8         A    Yes.
 9         Q    Did Mr. Mitchell prepare such a whatever,
10     this arsenal of stuff on Ms. Lively's indiscretions?
11                 MR. FREEDMAN:  Objection.
12                 THE WITNESS:  Not -- not that I'm aware
13     of.
14     BY MR. GOTTLIEB:
15         Q    Who first suggested the hiring of
16     Melissa Nathan and TAG on the Wayfarer -- Baldoni
17     account?
18         A    Melissa was one of my crisis
19     recommendations.
20         Q    Okay.  And I think you testified
21     yesterday that you had given a few names?
22         A    Multiple.
23         Q    And you -- did you recommend Ms. Nathan?
24     Not in the sense of, you must hire this person, but,
25     this would be a good person to work with, to
```

CONFIDENTIAL

Page 262

1          Q    Are you aware of whether she had phone
2     calls with her around this period of time?
3          A    I do not know.
4          Q    Would you be upset if you learned that
5     Ms. Nathan had been having phone conversations with
6     the editor of the Daily Mail arming them with
7     information about a piece that could be written
8     about Ms. Lively around this time?
9          A    No.  She's telling me that she's in
10    conversations:
11              (As read):
12                   "Off record spoke to the editor at
13                   Daily Mail because she's my friend."
14         Q    When a reporter gets something off the
15    record, are there different rules that reporter --
16    certain reporters follow for what off the record
17    means or is it uniform across all media?
18         A    Off the record is generally uniform.
19         Q    Off the record means can't be quoted,
20    right?
21         A    Correct.
22         Q    Can't be used as a background?
23         A    Correct.
24         Q    Are there some reporters that take a
25    different view as to whether they can use

CONFIDENTIAL

Page 263

1   off-the-record information to chase leads on

2   stories?

3       A    I'm not a reporter.  I don't know.

4       Q    What is your understanding of when you

5   give something off the record to a reporter?  What

6   are they -- what are they allowed to do with that

7   information?

8           MR. FREEDMAN:  Objection.

9   BY MR. GOTTLIEB:

10      Q    In your understanding.

11      A    Sure.  I can just speak to my experience.

12  When I give something off the record to a reporter,

13  it is so they have a better understanding of the

14  context.  However, they cannot use anything related

15  to that context.  It's for comprehension purposes.

16      Q    Are they allowed to, for example, if you

17  gave information -- if you gave a link to a reporter

18  off the record, a link to an article or a social

19  media post or whatever, would they be allowed to go

20  read that article or go read the social media post?

21          MR. FREEDMAN:  Objection.

22          THE WITNESS:  Absolutely.  Off the record

23  is for publication purposes.

24  BY MR. GOTTLIEB:

25      Q    Okay.  I think we understand each other.

CONFIDENTIAL

Page 287

```
 1              MR. FREEDMAN:  Objection.
 2    BY MR. GOTTLIEB:
 3         Q    Per this email chain?
 4         A    Or at any time.  It just says "we'll
 5    connect with you directly on this."
 6         Q    Okay.  How did you understand Jed and his
 7    team to be absolute magicians, if at all?
 8              MR. GLOVER:  Objection to form.
 9              MR. FREEDMAN:  Objection.
10              THE WITNESS:  It sounds like Katie is
11    hyping them up.  I just -- yeah.  Make them feel
12    good.
13    BY MR. GOTTLIEB:
14         Q    Getting excited about their services?
15         A    Sounds like it's just puffery, making
16    them feel good.
17         Q    Okay.
18              MR. GOTTLIEB:  Ms. Abel, you're being
19    handed --
20              THE STENOGRAPHIC REPORTER:  Exhibit 68.
21         (Exhibit 68 marked for identification.)
22              MR. GOTTLIEB:  A document that's been
23    marked as Exhibit 68.  It's a text chain with the
24    Bates Nos. JONESWORKS 13830 through 13831.  This is
25    an August 11th, 2024 text chain involving
```

CONFIDENTIAL

Page 288

1    yourself, Mr. Heath, and Mitz Toskovic.

2    BY MR. GOTTLIEB:

3         Q    Let me know when you've had a chance to

4    look at that.

5         A    Yes.  Okay.

6         Q    Ms. Toskovic is telling you at 6:45 p.m.

7    that Mr. Baldoni is the only one from the cast

8    posting anything at the moment; is that right?

9         A    Yes.

10        Q    And that:

11             (As read):

12                  "Fans are going ham on Blake, Jenny and

13                  Colleen's comment sections."

14             Do you see that?

15        A    Yes.

16        Q    Do you see where he says "Colleen went

17   private from all the hate"?

18        A    Yes.

19        Q    And -- and she writes that she's worried

20   that:

21             (As read):

22                  "Another post from Justin about DV and

23                  thanking women everywhere might further

24                  fuel the fire."

25             Do you see that?

CONFIDENTIAL

Page 289

1       A    Yes.

2       Q    And you reply a few minutes later that:

3            (As read):

4                "That's valid thought.  But I'm also

5                thinking of the next wave of press for

6                Monday and news cycle and if there is

7                anymore pickup of those articles in a

8                post like this would further combat the

9                negative.  Plus, since they're

10               releasing the podcast tomorrow, it

11               further instates that he's in Sweden

12               even though it says in the episode, but

13               people are dumb."  Emoji.

14           Do you see that?

15      A    Yes, I do.

16      Q    And Mr. Heath, after listening or reading

17  this, says "stay the course," right?

18      A    Yes.

19      Q    So did you understand that Ms. Toskovic

20  was concerned that further posts from Mr. Baldoni

21  could just fuel more hateful messages towards the

22  women in the cast?

23      A    I believe she was concerned at the

24  discrepancy, the fact that no one else from the cast

25  was posting and supporting the film, and fans were

CONFIDENTIAL

                                                    Page 290

1    viewing that as negative.  And Justin was.  Justin

2    was incredibly supportive of this film and everyone

3    in it.

4         Q    And the result of that negative view that

5    you described is that fans were attacking

6    Ms. Lively, Ms. Slate, and Ms. Hoover on social

7    media, right?

8              MR. FREEDMAN:  Objection.

9              THE WITNESS:  Social media was attacking

10   everyone, specifically resulting from people's

11   actions during the promotion of this tour.

12   BY MR. GOTTLIEB:

13        Q    My question was just about --

14        A    Sure.

15        Q    -- what you understood Ms. Toskovic to be

16   communicating to you.  And what she says is that

17   "fans are going ham on Blake, Jenny and Colleen's

18   comment section."  Right?

19        A    Yes.

20             MR. FREEDMAN:  Objection.

21   BY MR. GOTTLIEB:

22        Q    So you understood at this point in time,

23   that the hate or the negative reaction -- or

24   Ms. Toskovic describes it as hate -- is being

25   directed not just at Ms. Lively, but also at

CONFIDENTIAL

Page 291

1    Ms. Slate and Ms. Hoover, right?

2         A    Yes.  And the hate was resulting from

3    their participation in the promotion of the -- of

4    the film.

5              MR. GOTTLIEB:  Move to strike as

6    nonresponsive.

7    BY MR. GOTTLIEB:

8         Q    Ms. Abel, I didn't ask you for why you

9    thought -- or how you thought the hate arose.

10        A    Oh, sorry.  I was clarifying what the

11   hate was.  Sorry.

12        Q    You understood that there was hate online

13   directed at Ms. Lively, Ms. Slate, and Ms. Hoover,

14   right?

15             MR. FREEDMAN:  Objection.

16             THE WITNESS:  Yes.

17   BY MR. GOTTLIEB:

18        Q    And what Ms. Toskovic is saying here is:

19             (As read):

20                  "Maybe we should hold off further posts

21                  about domestic violence for Justin

22                  because I'm concerned that that might

23                  fuel the fire that we're already

24                  seeing."

25        A    Yes, because --

CONFIDENTIAL

Page 292

1        Q    And you --
2        A    Let me finish, please.  Because Blake,
3   Jenny and Colleen were not posting anything or
4   communicating anything regarding the domestic
5   violence community.
6        Q    And you and Mr. Heath say "stay the
7   course," right?
8        A    Yes.
9             MR. GOTTLIEB:  Ms. Abel, I'm handing you
10  what has been marked as Exhibit 69.  This is a text
11  chain between you and Ms. Nathan on August 12th,
12  2024, starting at 2:14 p.m., ending at 11:56 p.m.
13  Bears the Bates No. NATHAN 2151 through NATHAN 2156.
14       (Exhibit 69 marked for identification.)
15            THE WITNESS:  Okay.
16  BY MR. GOTTLIEB:
17       Q    So Ms. Abel, this is a text exchange
18  between you and Ms. Nathan on August 12th, 2024?
19       A    Yes.
20       Q    And in it, you discuss information that
21  you received on a call with Mr. Heath; is that
22  right?  A meeting or Zoom or some type of
23  interaction with Mr. Heath?
24       A    I'm on with Jamey.  Yes, I must have
25  been.  Yes.

CONFIDENTIAL

Page 380

1                    REPORTER'S CERTIFICATE

2              I, ASHLEY SOEVYN, a Certified Shorthand

3    Reporter of the State of California, do hereby

4    certify:

5              That the foregoing proceedings were taken

6    before me at the time and place herein set forth;

7    at which time the witness was put under oath by me;

8              That the testimony of the witness, the

9    questions propounded, and all objections and

10   statements made at the time of the examination were

11   recorded stenographically by me and were thereafter

12   transcribed;

13             That a review of the transcript by the

14   deponent was/ was not requested;

15             That the foregoing is a true and correct

16   transcript of my shorthand notes so taken.

17             I further certify that I am not a relative

18   or employee of any attorney of the parties, nor

19   financially interested in the action.

20             I declare under penalty of perjury under

21   the laws of California that the foregoing is true

22   and correct.  Dated this 27th day of September,

23   2025.

24

                    ASHLEY SOEVYN

25                  CSR No. 12019