# Exhibit 57

Page 1

```
 1
 2   ** C O N F I D E N T I A L **
 3   * CONTAINS ATTORNEYS' EYES ONLY MATERIAL *
 4   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 5   Case No. 1:24-CV-10049-LJL
     (Consolidated with 1:25-cv-00449-LJL)
 6   ------------------------------------x
     BLAKE LIVELY,
 7            Plaintiff,
 8         - against -
 9   WAYFARER STUDIOS LLC, a Delaware
     Limited Liability Company, JUSTIN
10   BALDONI, an individual, JAMEY HEATH, an
     individual, STEVE SAROWITZ, an individual,
11   IT ENDS WITH US MOVIE LLC, a California
     Limited Liability Company, MELISSA
12   NATHAN, an individual, THE AGENCY
     GROUP PR LLC, a Delaware Limited Liability
13   Company, JENNIFER ABEL, an individual,
     JED WALLACE, an individual, and STREET
14   RELATIONS INC., a California Corporation,
                 Defendants.
15   ------------------------------------x
                  (Caption continued)
16                September 5, 2025
                  9:10 a.m.
17
18        Videotaped Deposition of KATHERINE
19   CASE, taken by Plaintiff, pursuant to
20   Subpoena, held at the offices of Willkie
21   Farr & Gallagher LLP, 787 Seventh Avenue,
22   New York, New York, before Todd DeSimone, a
23   Registered Professional Reporter and Notary
24   Public of the State of New York.
25
```

```
                                              Page 31
 1           K. CASE - CONFIDENTIAL
 2       A.     I'm not entirely sure.
 3       Q.     What other employees worked at
 4   TAG when you joined?
 5       A.     Carolina was there, Breanna was
 6   there, Rylie was there, and Alyx was there.
 7       Q.     That is --
 8       A.     And Melissa as well, so six I
 9   suppose.
10       Q.     Is that Carolina Hurley,
11   Breanna Koslow, Alyx Sealy, and Rylie Long?
12       A.     That's correct.
13       Q.     And were you more senior than
14   those individuals?
15       A.     Carolina, Breanna and I would
16   have all been senior-level employees.
17       Q.     Did you all have the same job
18   title?
19       A.     At the time I don't believe so.
20       Q.     What was your job title?
21       A.     When I started I was a senior
22   director.  After a few months I became a
23   vice president.
24       Q.     And at the time what were
25   Breanna and Carolina's job titles?
```

Page 32

```
 1         K. CASE - CONFIDENTIAL
 2      A.    I believe vice president.
 3      Q.    Did your job title change again
 4   during the time that you were at TAG?
 5      A.    No.
 6      Q.    And in August 2024, were you,
 7   Breanna and Carolina all vice presidents at
 8   TAG?
 9      A.    I believe so, yes.
10      Q.    What was Melissa Nathan's
11   reputation in the industry at the time you
12   joined TAG?
13      A.    Melissa is known to be a very
14   successful publicist.
15      Q.    Did she have any reputation
16   with respect to crisis work?
17      A.    She is quite renowned in the
18   area of crisis.
19      Q.    What do you think makes her so
20   effective?
21      A.    Melissa is incredibly
22   strategic, she is very calm in the face of
23   stress, and she is very good with client
24   management.
25      Q.    Does Melissa have significant
```

```
                                        Page 47
 1            K. CASE - CONFIDENTIAL
 2   colleagues' belief at the time that due to
 3   the conversation taking place majority on
 4   social, they would benefit from it.
 5   Oftentimes in today's landscape,
 6   conversations that start in social make
 7   their way into traditional media.
 8       Q.    Did TAG take into account the
 9   fact that online conversations make their
10   way in traditional media when it formulated
11   digital and social strategies?
12       A.    Yes.
13       Q.    Which of the services that
14   we've discussed did TAG provide to Wayfarer
15   and Baldoni?
16       A.    They would have been more of
17   what I refer to as a crisis-based project.
18   So we were brought in because it was -- it
19   is my understanding that there were
20   negative overtures being discussed with
21   different media outlets.  This was in
22   advance of the New York premiere.  And it
23   was important to ensure that the Wayfarer
24   parties were protected against negative
25   attacks.
```

```
                                              Page 48
  1            K. CASE - CONFIDENTIAL
  2       Q.     When you say negative attacks,
  3   what are you referring to?
  4       A.     It was my understanding at the
  5   time that certain false statements had been
  6   made to media in regards to the Wayfarer
  7   parties.
  8       Q.     How did you reach that
  9   understanding?
 10       A.     It was communicated to me that
 11   certain stories were being placed with
 12   outlets that would be potentially
 13   detrimental due to the false nature of the
 14   stories.
 15       Q.     Who communicated that to you?
 16       A.     Melissa.
 17       Q.     Anyone else?
 18       A.     It was a topic of discussion on
 19   many phone calls.
 20       Q.     Phone calls with clients who
 21   were part of the Wayfarer account?
 22       A.     That's correct.
 23       Q.     And who attended those phone
 24   calls?
 25       A.     It would depend.  The first
```

```
                                              Page 49
 1           K. CASE - CONFIDENTIAL
 2   conversation I had was with Jamey and Tera.
 3   From there it depended on, you know, Jen
 4   Abel would join, Melissa would be on,
 5   sometimes she wasn't able to, sometimes
 6   Justin would be on.  It depended on who was
 7   available.
 8        Q.    What false statements did you
 9   understand had been made to the media?
10        A.    I'm not sure specifically, but
11   it was my understanding at the time that
12   there were certain allegations made about
13   making Ms. Lively feel uncomfortable and a
14   separate story about Mr. Baldoni's faith.
15        Q.    And at that time those had, in
16   your view, already been placed?
17        A.    The conversations were ongoing
18   with media.
19        Q.    Where did you reach -- how did
20   you reach your understanding that these
21   were false?
22        A.    In many conversations had with
23   the Wayfarer parties.
24        Q.    You based your understanding of
25   their truth or falsity as to these stories
```

```
                                              Page 74
 1           K. CASE - CONFIDENTIAL
 2      A.     I had never been on a call with
 3   a psychic before.
 4      Q.     Was it unusual to you?
 5      A.     In my workday, it was unusual
 6   comparatively to most client calls.
 7      Q.     It was unusual to you, correct?
 8      A.     In the scope of most client
 9   calls, yes.
10      Q.     What about just generally, was
11   it unusual?
12      A.     I don't --
13      Q.     What was the psychic's name?
14      A.     I don't remember.
15      Q.     Was it a male?
16      A.     It was.
17      Q.     How would individuals at TAG
18   communicate with each other when working on
19   this account?
20      A.     Primarily text.
21      Q.     iMessage?
22      A.     Yes.
23      Q.     Signal?
24      A.     Not really, no.
25      Q.     Sometimes?
```

```
                                         Page 75
 1           K. CASE - CONFIDENTIAL
 2      A.     At times.
 3      Q.     When would TAG individuals use
 4   Signal in lieu of iMessage?
 5      A.     If we would -- if we would
 6   speak with Jed, it was primarily over
 7   Signal.
 8      Q.     And why was that?
 9      A.     I'm not sure.
10      Q.     Was that at Jed's request?
11      A.     No.
12      Q.     Who suggested that you use
13   Signal?
14      A.     It was just the form of
15   communication that was used.
16      Q.     Do you recall the first time
17   you communicated with Jed on Signal?
18      A.     Not by date specifically, no.
19      Q.     Did he text you on Signal?
20      A.     Not individually, but as it
21   related to communications.
22      Q.     Did you have a Signal account
23   prior to working at TAG?
24      A.     I believe so, yes.
25      Q.     And did you communicate on it
```

```
                                          Page 153
 1           K. CASE - CONFIDENTIAL
 2   not doing press with other cast members of
 3   the film?
 4         A.    And just in general, whenever
 5   there are certain conversations happening
 6   online and a client is going to do a full
 7   slate of interviews, it can be helpful to
 8   run through messaging, talking points,
 9   things of that nature.
10         Q.    And this references navigating
11   obstacles.  Do you see that?
12         A.    I do.
13         Q.    And it references creative
14   differences.  Do you see that?
15         A.    I do.
16         Q.    Were these intended to refer to
17   differences with Ms. Lively?
18         A.    It was just useful language.
19   He was the director and actor on the film.
20   You know, directing any movie there is
21   going to be obstacles that a director is
22   faced with.  Creative differences is a
23   pretty common phrase used in the
24   entertainment industry.
25         Q.    And here was that referring to
```

```
                                            Page 154
 1          K. CASE - CONFIDENTIAL
 2   Ms. Lively?
 3        A.    It could just be referring to
 4   his experience as a director navigating
 5   working with a lot of personalities on set.
 6        Q.    Did you have Ms. Lively in mind
 7   when you suggested this language?
 8        A.    Given the situation, we were
 9   accounting for Ms. Lively.
10        Q.    Do you see at 9:32 a.m.
11   Ms. Abel refers to statements made by
12   Mr. Baldoni in the junket and she says he
13   used the word "friction."  Do you see that?
14        A.    I do.
15        Q.    That's referring to Mr. Baldoni
16   using the word "friction"?
17        A.    I believe so.  I wasn't with
18   him at that interview.
19        Q.    And she says "I think it's
20   important to get ahead of it."
21              Do you see that?
22        A.    I do.
23        Q.    What did you understand that to
24   mean?
25        A.    Given the intentional
```

Page 160

1  K. CASE - CONFIDENTIAL
2  Melissa at the time.
3      Q.    And do you know whether TAG
4  received multiple quotes?
5      A.    Melissa told me that there were
6  two quotes.
7      Q.    Do you know what the quotes
8  were?
9      A.    Offhand, I can't remember the
10 specific amount, but my assumption is one
11 was from Roza and one was from Jed, but I
12 can't confirm that.
13     Q.    What is Street Relations?
14     A.    It's my understanding that
15 that's Jed's company.
16     Q.    And did you and TAG regularly
17 work with Street Relations?
18     A.    When appropriate, if a client
19 required social or digital mediation, or
20 remediation, rather, we would work with Jed
21 as one of the contractors.
22     Q.    And in this case, specifically
23 with respect to the Wayfarer account?
24     A.    We did work with Jed.
25     Q.    Who else did TAG work with at

```
                                          Page 259
 1            K. CASE - CONFIDENTIAL
 2        Q.     And did you communicate with
 3   Mr. Vituscka about Ms. Lively at all?
 4        A.     Yes.
 5        Q.     What about?
 6        A.     I was connected with him via
 7   Melissa Nathan.  I was told he was writing
 8   a piece for the Daily Mail about how her
 9   promotion matched that of Taylor Swift's
10   during her Eras tour.
11        Q.     And did you provide him content
12   in connection with his writing that
13   article?
14        A.     I provided links that were
15   readily available online.
16        Q.     And did you read the ultimate
17   article when it came out?
18        A.     I did.
19        Q.     And was that article entitled
20   "How Blake Lively copied best friend Taylor
21   Swift to promote It Ends With Us before
22   turning to singer to help crisis manage
23   backlash and Justin Baldoni drama"?
24        A.     If that was the story that had
25   James' name on it, then I assume that is
```

```
                                       Page 265
 1         K. CASE - CONFIDENTIAL
 2      A.    Again, I'm not entirely sure if
 3   this is the same timeline, but to my
 4   recollection, nothing would have caused me
 5   to feel anything was a misrepresentation.
 6      Q.    Ms. Case, who is paying your
 7   legal expenses?
 8            MR. BREED:  Objection.
 9      A.    I'm not entirely sure.
10      Q.    You don't know?
11      A.    No.
12      Q.    Who do you think is paying your
13   legal expenses?
14            MR. BREED:  Objection.
15      A.    I'm not sure.
16      Q.    Are you paying them?
17      A.    I personally am not.
18      Q.    Are the Wayfarer parties?
19            MR. BREED:  Objection.
20      A.    I'm not sure.
21      Q.    Have you had a conversation
22   with anyone regarding who is paying your
23   legal expenses?
24            MR. BREED:  Objection.
25      A.    I was given indemnification
```

Page 266

1      K. CASE - CONFIDENTIAL
2  based on these things happening during my
3  employment at TAG.
4       Q.     Indemnification by TAG?
5       A.     It's my -- it's my
6  understanding, but, again, I'm not entirely
7  sure.
8       Q.     You are being provided a
9  document that is being marked Case Exhibit
10 26.
11             (Case Exhibit 26 marked for
12 identification.)
13      Q.     Bates stamped KCASE-000003477.
14             Do you recognize this document?
15      A.     Yes.
16      Q.     What is it?
17      A.     A text thread between Breanna
18 and myself.
19      Q.     Any reason to believe that this
20 document has been altered since when it was
21 originally made?
22      A.     I don't believe so.
23      Q.     If you flip two pages to the
24 document numbered 3479, at 10:56 a.m. do
25 you see that you sent a screen shot to

```
                                              Page 286
 1         K. CASE - CONFIDENTIAL
 2      Q.    How is your relationship with
 3   Melissa now?
 4      A.    I have a great deal of respect
 5   for Melissa.  She has been my mentor for
 6   almost a decade.
 7      Q.    How is your relationship?
 8      A.    Conversations have been
 9   limited, but, again, I hold nothing but
10   respect for Melissa.
11      Q.    Has your relationship been
12   strained by this whole case?
13      A.    I don't believe so, no.
14      Q.    Has Melissa indicated that
15   that's the case?
16      A.    No.
17      Q.    Did you leave TAG because you
18   were unhappy at TAG?
19      A.    No.
20      Q.    Why did you leave TAG?
21      A.    I was offered a more fortuitous
22   opportunity.
23      Q.    When was that?
24      A.    That would have been late
25   December/early January.
```

## CERTIFICATION

I, TODD DeSIMONE, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of September, 2025.

*Todd DeSimone*

TODD DESIMONE