Exhibit 124



**EXPERT WITNESS REPORT**

**Blake Lively v. Wayfarer Studios LLC.,** *et al.*

**Case No. 1:24-cv-10049-LJL**

**October 16, 2025**

This constitutes my Expert Report in the above-referenced action. As a preliminary matter, please note that I understand discovery is on-going in this case, and to the extent such discovery produces information relevant to my opinions, I may supplement the opinions expressed herein.

## Opinions

Based on the information that I have reviewed, and on my background and experience, I anticipate expressing opinions concerning the Defendants' failures to follow standard practices (and their own policies and procedures) with respect to preventing harassment and retaliation from occurring relating to the movie *It Ends With Us* (hereinafter the "Movie" or the "Film.").

These failures to take reasonable steps to prevent harassment and retaliation from occurring included Defendants' repeated failures to investigate harassment and retaliation allegations raised by Plaintiff Blake Lively (and at times by others on the Film).

As to those allegations, standard practices (and the Defendants' own policies and procedures) provided for proper investigations of harassment, and retaliation allegations. Further, appropriate disciplinary/remedial actions would be taken as a result of such investigations.

Here, when harassment allegations were raised (on several occasions)[1] no investigations took place. (Baldoni deposition volume 2 at pages 50, 72, 296-298; Heath deposition volume 1 at pages 292-293).[2] Thus, the Defendants[3] violated standard practices and their own policies and procedures.

---

[1] And harassment and retaliation allegations about which they otherwise were aware.

[2] Mr. Baldoni also testified that he has never been disciplined for any conduct at Wayfarer Studios. (Baldoni deposition volume 2 at page 72).

[3] I understand that there are multiple Defendants here. I am not in a position to determine which Defendants are responsible for the multiple failures here. Further, I have not been asked to reach conclusions on that issue anyway. However, when I specifically refer to the "Studio" here, I am referring to Wayfarer Studios LLC, and/or any other entities involved with the production of the Movie.

Docusign Envelope ID: 7A906A42-EA76-478B-B40D-261C61555AF3
Case 1:24-cv-10049-LJL    Document 1230-124    Filed 01/20/26    Page 3 of 52

*Blake Lively v. Wayfarer Studios LLC.; et al.—Robbins' Expert Report*    2

Also, my opinion is that the Studio violated Entertainment Industry-specific intimacy protocols. In addition to the Company's policies (discussed above) these protocols are also designed to prevent harassment from occurring and to ensure a safe environment for all involved.

In addition, I intend to express opinions relating to ways in which the Entertainment Industry differs from most other industries/businesses with respect to issues concerning retaliation.[4] I also intend to describe the unique nature of the Entertainment Industry and how an actor's career in the Industry can be affected both before and even after the project on which she is working has been completed.

The basis for these opinions follows:

### Background

According to the Wayfarer Studio's Website, "Wayfarer Studios is an independent studio actively developing, producing, and fully financing a slate of highly original, genre-defining, and globally impactful feature Films, episodic television, documentaries, unscripted series, and podcasts. Co-founded by Justin Baldoni and Steve Sarowitz, and led by CEO Jamey Heath[5] and President Tera Hanks, the studio's work highlights the power of human connection—debunking the traditional studio model by championing inspirational stories that serve as true agents for social change. Wayfarer Studios' current slate includes IT ENDS WITH US."

The Studio's headquarters is in Los Angeles, California.

On its website, the Studio provides a brief synopsis of the Film:

"Lily Bloom thinks she's found the love of her life in Ryle Kincaid. However, after a troubling incident of abuse reminds her of her dark past, she must decide if love alone can carry her marriage through. Further complicating things is the return of her first love into her life: a man who she took in many years prior when he was homeless."

One of the Defendants here, Justin Baldoni, directed and starred in the Movie along with Ms. Lively.[6] Mr. Baldoni also was a part owner of the Studio. (Baldoni deposition volume 1 at pages 41-42). Another female star in the Film was Jenny Slate. Alexandra Saks was a Producer on the Film.

Sony Pictures Entertainment Inc. was the co-financier and distributor of the Film.[7] (Giannetti deposition at pages 24, 43-45). Sony Pictures' headquarters is in Los Angeles.[7]

---

[4] I have not been asked to determine whether retaliation occurred here – nor am I in a position to determine that anyway.

[5] At some point Mr. Heath came on as a full Producer on the Film as well. (Saks deposition at pages 97-98).

[6] Ms. Lively also received Executive Producer credit on the Film. (Giannetti deposition at page 77).

[7] Ms. Lively testified that Sony offered her a role in the Film via her Agent. (Lively deposition at pages 13 and 16; *See also*, Giannetti deposition at page 177).

Production on the Film started on May 15, 2023, but was suspended in mid-June 2023 due to a strike by the Writers Guild Of America (WGA).[8] Shortly thereafter, SAG-AFTRA began to strike. This was the first phase of production on the Film. The WGA strike ended on September 27, 2023, and the SAG-AFTRA strike ended on November 9, 2023. The second phase of production resumed thereafter. (Lively deposition at page 261, Talbot deposition at pages 72-73, Giannetti deposition at pages 70, 100-101).

The Film premiered on August 6, 2024. Then, its general release was on August 9, 2024. (Lively deposition pages 275-276).

### Policies and Procedures

Both Sony Entertainment (Sony) and the Studio maintained policies prohibiting harassment and retaliation. Both contained a complaint process resulting in an investigation. Further, both specified that appropriate actions would be taken as a result of such investigations.

For example, Sony's Policy Against Unlawful Harassment required that "Supervisors and managers must immediately refer all harassment complaints to the Human Resources Department, Production Administration, or to Employee Direct…. All incidents of harassment that are reported will be investigated."

Further, the policy stated that the investigation would be "effective, thorough, and impartial." And that it would be "promptly undertak[en]" and "concluded in a timely manner." Then, "If the company determines that a violation of this policy has occurred, it will take appropriate action to deter any future harassment. Where appropriate disciplinary action up to and including termination will also be taken."

In addition, the policy prohibited "retaliation against an individual for using the complaint procedure."

Sony's policy not only applied to Sony employees, but also to "individuals performing services" for Sony and that all such individuals "are expected… to cooperate with investigations into complaints of harassment."[9]

The Studio maintained a similar policy. The Studio's harassment provisions were contained in the Studio's Equal Employment Opportunities, Anti-Discrimination, and Anti-Harassment and Anti-Retaliation Policy.

---

[8] Additionally, there was a brief shut down due to Covid, from May 26 to June 1, 2023. (Giannetti deposition at pages 258-259).

[9] My understanding is that Ms. Lively was retained via her loan out company to perform services on the Film. Obviously, as an actor on the Film and as the Film's Director, Mr. Baldoni performed services on the Film as well.

Like the Sony policy, the Studio's policy prohibited harassment and retaliation. The policy also prohibited "unprofessional conduct by any employee of the company." Among other things, prohibited harassment included verbal or physical conduct of a sexual nature. And it included "harassment that is not necessarily sexual in nature (e.g. offensive remarks about one's sex or gender)."

The Studio's harassment policy included a complaint process and an investigation process. Specifically, "Any reported allegations of harassment, discrimination, or retaliation will be promptly and thoroughly investigated by qualified person in an impartial manner." Consistent with this, Mr. Heath testified he would rely on the Studio's employment policies to decide on initiating an investigation into harassment allegations (among others). (Heath deposition volume 1 at page 65 and 66). Further, in deposition, Mr. Heath testified that he understood and agreed that Wayfarer Studios' policy involved promptly and thoroughly investigating allegations of harassment (and other similar allegations). (Heath deposition volume 1 at pages 114-115).

The policy continued that "Wayfarer Studios will consider appropriate options for remedial actions and resolutions. If misconduct is found, Wayfarer Studios shall take prompt, corrective action as appropriate. Corrective action might include termination from employment." The policy also prohibited retaliation against an individual for reporting harassment.

In addition, like Sony's policy, the Studio's harassment policy applied to "all persons who interact with our Wayfarer Studios team, whether related to conduct engaged in by fellow employees or someone not directly connected to Wayfarer Studios (e.g., an outside vendor, consultant or production teams)."

However, Mr. Baldoni (a part owner of the Studio) testified that he was unsure if he had ever read the Studio's harassment and retaliation policy. (Baldoni deposition volume 2 at pages 37-38; Baldoni deposition volume 1 at page 41).

Similarly, as discussed below, Ms. Lively testified that she was never given any kind of Studio resources (for example, Human Resources or other) for filing a complaint. This failure was recognized by Ms. Saks, early on.

Ms. Saks testified that she was unaware whether the Studio even had a Human Resources Department.[10] Further, she understood that complaints on the set should be reported to Mr. Heath – even if the concerns related to Mr. Heath directly. (Saks

---

[10] This is despite the fact that the Studio's Anti-Harassment policy listed the individuals to whom complaints of harassment could be made, including to "Human Resources." Mr. Heath testified that he does not know if the Studio's policy was provided, or made accessible to, cast and crew in connection with the Movie. (Heath deposition at pages 395-396). Mr. Heath further testified that the Studio works with a human resources consultant, who works from home, and that the Studio did not have a separate human resources department for the Film. (Heath deposition volume 1 at pages 38-40, 116-117).

Docusign Envelope ID: 7A906A42-EA76-478B-B40D-261C61555AE3
Case 1:24-cv-10049-LJL    Document 1230-124    Filed 01/20/26    Page 6 of 52

*Blake Lively v. Wayfarer Studios LLC.; et al.—Robbins' Expert Report*                    5

deposition at pages 57-58).[11] Additionally, she did not know if the Studio had harassment protocols in place. (Saks deposition at pages 59-60).

So, on March 12, 2023, Ms. Saks wrote an email to Mr. Heath and Andrew Liebermann (at Sony) among others. In it, she suggested that the Studio's "workplace harassment protocols should come from Sony on this show. We should do their training/zoom before we start and their email/hotline should be [distributed] to crew upon hiring." (AS000062). As a result, the Studio was aware of the need to both conduct training and to distribute a hotline for harassment complaints.[12]

However, Sony declined to provide such training. (Saks at pages deposition 61-62, 201-202). And, while, according to Ms. Saks, a hotline number was set up, the complaints went to Mr. Heath and the Studio, not to Sony. (Saks deposition at page 202). By contrast, Ms. Slate did not recall receiving an email or hotline to raise concerns. And she was not aware of any HR Department at the Studio. (Slate deposition at page 38).

However, sexual harassment training was delivered to those involved on the Film.[13] The training was provided to the Studio by a law firm well-known for labor & employment work in the Entertainment Industry, Mitchell, Silberberg & Knupp LLP (MSK).[14] The MSK training, "Respect in the Workplace: Preventing Discriminatory Harassment & Retaliation," defined harassment, discrimination, and retaliation.

---

[11] It is not appropriate for an employer to require harassment complaints to be directed to the alleged harasser. As the EEOC says in its Guidance (below), "A complaint procedure should provide accessible points of contact for the initial complaint. A complaint process is not effective if employees are always required to complain first to their supervisors about alleged harassment, since the supervisor may be a harasser."

[12] In an apology which Mr. Baldoni distributed to a number of people (particularly apologizing to Ms. Saks) on February 19, 2023, he wrote, "For this film to work, every person involved has to feel safe to express their thoughts, feelings, opinions, and concerns to me on all levels. But with the pressure I've put on my shoulders, I have not created the energy for that environment to thrive. That is going to change. One of my main focuses going forward will be ensuring that my energy and spirit match my intention here." (AS004588-4589). Of course, it would not be appropriate to require harassment allegations raised against Mr. Baldoni to be raised to Mr. Baldoni. This aside, Ms. Lively and Ms. Slate testified that when concerns were raised to Mr. Baldoni, his response was to become "huffy" with them. (Discussed below).

[13] Mr. Baldoni and Mr. Heath testified that the harassment and retaliation training was provided in connection with the Movie. (Baldoni deposition volume 2 at pages 38-41, 44-47; (Heath deposition volume 1 at page 396). Similarly, Ms. Saks testified that the training was provided. However, Ms. Slate testified that she did not recall any such training. (Saks deposition at pages 201-202; Slate deposition at page 38). My understanding is that the Studio has not produced any record of who participated in the harassment and retaliation training, and Mr. Heath, the Studio's CEO, testified that he was unable to confirm whether such records exist or who could confirm their existence. (Heath deposition volume 1 at page 396). Conducting sexual harassment training is part of preventing harassment and retaliation from occurring. Ms. Giannetti testified that Sony would have expected the Studio to have done that. (Giannetti deposition at pages 79, 81-82).

[14] On a number of occasions, attorneys at MSK have hired me (and others at my company) to conduct workplace investigations for their clients in the Entertainment Industry. Also, I have served as an expert witness for MSK clients. As will be discussed below, I will be presenting on workplace investigation issues in the Entertainment Industry in a program that does not yet have a date but has been confirmed. The program is sponsored by the Association of Media and Entertainment Counsel (AMEC). One of my co-presenters is a partner at MSK.

Among other things, the training provided examples of inappropriate behaviors. For example, inappropriate verbal behaviors include sexual comments, stories or innuendos, asking about sexual fantasies/activities, making sexual comments about someone's clothing, and anatomy or appearance.

Inappropriate physical conduct included touching, kissing and hugging. Of course, given the Entertainment Industry, some such conduct would be appropriate, but only "if it is necessary to the performance of the job."

The training explained that "A person who is offended by your conduct is NOT obligated to tell you before raising a concern." It further explained that, "A person does not need to be the subject of the harassing conduct in order to have a legitimate concern." And that "it is the impact that matters, not the intent."

Finally, the training explained that the "Company Policy…Provides for Investigation and Corrective Action." That training, however, did not provide information about where or to whom to complain.

So, whether or not the training actually was conducted (which, in my opinion, would be standard practice), the Studio was at least aware of the type of conduct that was prohibited, that investigations needed to be done when complaints arose, and generally what appropriate practices were in the entertainment industry.

However, despite the policies and training (above), when allegations of harassment and retaliation were raised (both to Sony and to the Studio), no investigations took place. In other words, Sony and the Studio failed to follow their own policies and procedures.[15] Further, the Studio failed to follow the training that was delivered to those involved in the Film.

Interestingly, in his deposition, Mr. Sarowitz seemed to refute the clear statements contained in the Studio's policy with respect to when the Studio would conduct investigations into harassment complaints.

As mentioned above, the Studio's policy was clear: "Any reported allegations of harassment, discrimination, or retaliation will be promptly and thoroughly investigated by qualified person in an impartial manner." However, in deposition, Mr. Sarowitz's position seemed to be that investigations would only occur when a "formal" harassment complaint

---

[15] As mentioned above, Sony's policy not only applied to Sony employees, but also to "individuals performing services" for Sony and that all such individuals "are expected... to cooperate with investigations into complaints of harassment." Here, the Studio was performing services for Sony as the distributor and financier. Further, both Mr. Baldoni and Ms. Lively were performing services on the Film. Sony's policy was to conduct investigations when it became aware of harassment and retaliation allegations relating to those who were performing services for Sony. Yet Sony conducted no investigations here.

was raised. And his view was that "formal" meant a complaint made to Human Resources or through SAG- AFTRA. (Sarowitz deposition at pages 189-200). [16]

This explains one reason why the Studio failed to conduct any investigations into multiple harassment complaints – including those raised directly to Mr. Heath and to Mr. Baldoni. Specifically, since no complaints were raised to Human Resources or to SAG-AFTRA, no investigations were conducted. (Sarowitz deposition at pages 206-208).

Of course, Mr. Sarowitz's interpretation is contrary to the clear language in the Studio's employee handbook – a handbook with a cover page signed by him. It is contrary to standard practices as well. [17]

For example, in its Enforcement Guidance, Vicarious Employer Liability for Unlawful Harassment by Supervisors, [18] the EEOC writes that employers have an obligation to exercise due care to prevent harassment from occurring. Part of exercising due care is to conduct workplace investigations when complaints arise.

Additionally, it states that this applies "regardless of whether a complaint was framed in a way that conforms to the organization's particular complaint procedures. …. Furthermore, due care requires management to correct harassment regardless of whether an employee files an internal complaint…."

Similarly, in Conducting Effective Independent Workplace Investigations in a Post #MeToo Era, DISPUTE RESOLUTION JOURNAL, (2019, Volume 74 No. 1), the authors write that employers need to investigate when "employees submit a written complaint, but also when verbal allegations are made. Investigations are also commenced when complaints are made anonymously and when management and/or those in HR compliance roles directly observe problematic conduct."

Additional information about standard practices for responding to complaints of harassment follows.

---

[16] Mr. Baldoni was unsure whether an "official HR complaint" needed to be made in order for an investigation to result. (Baldoni deposition volume 2 at page 53). However, he agreed that the Studio's policies could be violated even without an official HR complaint and that supervisory responsibilities under the Studio's harassment and retaliation policy applied regardless of an official HR complaint being filed. (Baldoni deposition volume 2 pages 108-109).

[17] Beyond this, it appears that the Studio did not make its Human Resources Department available to cast or crew on set. Further, most employees working for the Studio and most working on the Film were not covered by a SAG-AFTRA contract either. For example, Ms. Saks raised complaints about inappropriate behavior on the Film (discussed below). As a Producer, she was not covered by the SAG-AFTRA contract.

[18] This is the 2010 Guidance. An updated version was promulgated on June 6, 2024. As to the establishment of an effective policy (discussed below), the elements delineated in the 2024 version basically are the same as in the 2010 version – though more extensive.

### Standard Practices

Standard practice is to take reasonable actions to prevent harassment and retaliation from occurring. In my opinion, there are four basic prevention steps: (1) promulgate, maintain, and enforce good[19] harassment and retaliation policies; (2) conduct harassment and retaliation prevention training; (3) when harassment and retaliation allegations arise, treat them seriously and conduct an adequate investigation; and (4) take prompt and appropriate disciplinary and/or remedial action based upon the investigation.[20]

Consistent with these four steps, the EEOC in its Enforcement Guidance, Vicarious Employer Liability for Unlawful Harassment by Supervisors, provides a harassment prevention guide for employers:

> "It generally is necessary for employers to establish, publicize, and enforce anti-harassment policies and complaint procedures. ….failure to do so will make it difficult for an employer to prove that it exercised reasonable care to prevent and correct harassment…..
>
> An employer should provide every employee with a copy of the policy and complaint procedure and redistribute it periodically. …. Other measures to ensure effective dissemination of the policy and complaint procedure include posting them in central locations and incorporating them into employee handbooks. If feasible, the employer should provide training to all employees to ensure that they understand their rights and responsibilities.
>
> An anti-harassment policy and complaint procedure should contain, at a minimum, the following elements:
>
> - A clear explanation of prohibited conduct;
>
> - Assurance that employees who make complaints of harassment or provide information related to such complaints will be protected against retaliation;
>
> - A clearly described complaint process that provides accessible avenues of complaint;
>
> - Assurance that the employer will protect the confidentiality of harassment complaints to the extent possible;
>
> - A complaint process that provides a prompt, thorough, and impartial investigation; and

---

[19] Good harassment policies mean policies that are consistent with standard practices.
[20] As discussed below, there are additional steps that exist in the Entertainment Industry when the relevant project involves intimacy scenes.

- Assurance that the employer will take immediate and appropriate corrective action when it determines that harassment has occurred."

Like both Sony's and the Studio's policies and procedures, standard practices are to conduct investigations into complaints of harassment, discrimination, and retaliation.

For example, the EEOC writes in its Guidance, "An employer should set up a mechanism for a prompt, thorough, and impartial investigation into alleged harassment."

Similarly in INVESTIGATING WORKPLACE CONDUCT, INVESTIGATOR'S GUIDEBOOK (Equal Employment Advisory Council 1999), the Equal Employment Advisory Council writes:

> "Whenever an agent of the company (i.e., officer, manager, or supervisor) receives a complaint or other information indicating a possible violation of law or company policy, the company has a responsibility to investigate. All complaints involving possible violations of law or company policy regarding discrimination, harassment, and/or other standards of conduct whether presented formally or informally, in writing or orally, should be taken seriously and investigated, …. Even if there has been no actual complaint, the company's responsibility to investigate is triggered if an agent of management observes, hears, or receives information about, possible harassment or other improper conduct affecting an employee's work environment."

In the Workplace Investigations chapter in ADVISING CALIFORNIA EMPLOYERS AND EMPLOYEES (CEB 2011), the authors write, "Once an employer receives an employee's complaint of harassment (and presumably a claim of any other type of unlawful employment practice), the employer has a duty to take prompt action to investigate and, if warranted, correct the behavior."

In the California Department of Fair Employment and Housing Workplace Harassment Guide for California Employers, the California Department of Fair Employment and Housing[21] (DFEH) writes, "if there are allegations of conduct that, if true, would violate your rules or expectations, you will need to investigate the matter to make a factual determination about what happened."

In one of my own articles I write, "By now, California employers are well aware that upon learning of an employee complaint of harassment, discrimination, or retaliation, whether formal or informal, it is incumbent on them to conduct a prompt, thorough, and impartial investigation." M. Robbins and J. Yanow, *Why, How and What Now? The Ramifications of the Duty to Investigate in California Discrimination Actions*, BENDER'S CALIFORNIA LABOR & EMPLOYMENT BULLETIN (April-May 2007).

As discussed below, multiple complaints were made both to Sony (then relayed to the Studio) and also to the Studio directly. But, despite the Studio's policies, the harassment training delivered on the Film, and standard practices, no investigations took place. The

---

[21] Recently renamed the California Civil Rights Department (CRD).

Studio failed to enforce its policies and its training materials. And the Studio failed to take reasonable steps to prevent harassment and retaliation from occurring.

Beyond all of this, Ms. Lively  was given no information about how to file complaints of harassment or retaliation. In this additional way, the Studio failed to take reasonable steps to prevent harassment and retaliation from occurring. (Lively deposition at pages 220-221).

In addition to the above, in the Entertainment Industry, there is another important step in preventing harassment and retaliation from occurring.[22] This step concerns productions that involve nudity and other intimacy scenes. This is part of creating a safe, harassment-free environment for those involved in such scenes.[23]

There are two aspects to this. First, in advance of any scene involving intimacy, the actors involved in intimacy scenes should be provided with (and then sign) a Nudity Rider.

A Nudity Rider should include specific and detailed descriptions of the exact nature of the nude, semi-nude, sexual or love scenes (including simulated sex, simulated nudity and other simulated intimacy scenes) involved in the project, along with a detailed explanation of the nature of the attire involved, if any.[24] The Nudity Rider also should include any other relevant information required to fully disclose the nature of the intimacy required. (*See* SAG-AFTRA Quick Guide for Scenes involving Nudity and Simulated Sex).

Additionally, the Nudity Rider should specify if, and then when, a body double will be utilized. Also, the studio or production company should make sure there will be a closed set when scenes involving nudity are Filmed and that the actors involved in the scene are informed about who will be on the set and who will be on the monitors. (Talbot deposition at pages 156-157).

All of this is to ensure that there can be no dispute or misunderstanding about what is contemplated. (*See* SAG-AFTRA Quick Guide for Scenes involving Nudity and Simulated Sex). The Nudity Rider should be presented to the performer in a way so that the actor in a position to make an informed decision as to whether to agree to perform in this scene[25] as requested and in the project.

Second, an Intimacy Coordinator should be on set for any scenes involving intimacy (including nudity) and such scenes should be shot on a closed set. Again, all of this is part of creating a safe harassment-free environment for those involved in the production.

---

[22] This is one of the unique aspects of the Entertainment Industry as few other industries involve nudity or visual/oral sexual content.
[23] As SAG-AFTRA says in its Quick Guide for Scenes involving Nudity and Simulated Sex, "producers are legally and contractually obligated to provide a workplace free from sexual harassment at all times, including providing training and mechanisms for reporting inappropriate conduct."
[24] For example, see-through clothing.
[25] SAG AFTRA says the Rider should be presented at least 48 hours prior to the filming of the scene. (SAG-AFTRA Quick Guide for Scenes involving Nudity and Simulated Sex; Talbot deposition at pages 65-66, 84-85).

However, significant problems existed with respect to both of these additional industry-specific standards–standards which are designed to provide a harassment free/safe workplace.

The specific failures to prevent harassment and retaliation from occurring, as well as the failures relating to the industry-specific standards, are discussed below.

### Complaints and Failures to Investigate

On May 23, 2023, Ms. Lively had a conversation on set with Mr. Baldoni. During that discussion, she spoke to Mr. Baldoni directly making it clear "that he had crossed the line" with her. This related to his inappropriate sexual comments directed toward her.[26] Ms. Slate was in this conversation as well. During the discussion, Ms. Slate chimed in – trying to explain to Mr. Baldoni how uncomfortable it can be when you are getting unwarranted comments.[27] But, instead of ceasing his inappropriate behaviors, Ms. Lively felt that instead, Mr. Baldoni was trying to justify and backpedal. (Lively deposition at pages 103-107, Slate deposition at pages 41-44).

Confirmation that Ms. Lively's complaints were raised that day can be seen from the Defendants' First Amended Complaint. Additional confirmation can be seen in a text exchange of May 28, 2023.

In that text exchange, Mr. Heath and Mr. Baldoni wrote about communications with Mr. Sarowitz. Mr. Heath wrote, "I talked to Steve [Sarowitz] last night also. I didn't share about the 'comments' the ladies had feelings about. Didn't want to share anything you hadn't yet." Mr. Baldoni responded, "I shared with him today."

Instead of responding that the Studio should enforce its policy and conduct a workplace investigation, Mr. Baldoni continued, "He [Sarowitz] said he should come to sit and remind Blake whose money this is and I [Baldoni] said that's not the best idea." (HEATH_ 000035492–35493; *See also* Lively deposition at pages 186-187 and Sarowitz deposition at pages 254-255, 262-263).

So, despite the Studio's policy standard practices, and the training – all of which called for investigating harassment allegations, no investigation took place.

A few days later, on May 26, 2023, Ms. Lively raised a harassment complaint to Andrea (Ange) Giannetti (the Film's representative for Sony Pictures Entertainment, the

---

[26] The timeline exhibit attached to the Sarowitz deposition seems to confirm Ms. Lively complaining that Mr. Baldoni made "'sexy' comments."

[27] Mr. Baldoni confirmed Ms. Slate talking to him about this comment. (Baldoni deposition volume 2 at pages 177-178). However, he did not believe that any of Ms. Slate's concerns were presented to human resources at the Studio. (Baldoni deposition volume 2 at page 178).

Distributor).[28] The complaint related to harassment both by Mr. Baldoni and Mr. Heath. (See, text exchange between Slate and Josh Pearl[29] of May 27, 2023, JS0000507 and text exchange between Lively and Giannetti, BL–000007953).[30]

According to Ms. Lively, when she spoke to Ms. Giannetti, she shared some of the harassing incidents with Ms. Giannetti which she had endured on the set. For example, she explained that Mr. Heath had approached her asking if she had a minute for him to show her something. He did so without explaining what he wanted to show her. Then Mr. Heath showed Ms. Lively a video[31] of a naked woman (apparently of Mr. Heath's wife, nude, giving birth).[32]

Ms. Lively also explained to Ms. Giannetti that the people who were in charge of the Film were misbehaving and that she felt she had nowhere to go. But Ms. Giannetti told Ms. Lively that she could not file a complaint through Sony because Sony did not run the physical production of the Film. Instead, Ms. Giannetti told Ms. Lively she had to file her complaint with the Studio. (Lively deposition at pages 76-80, 139-140).[33]

In deposition, Ms. Giannetti confirmed that Ms. Lively raised complaints to her on May 26. This was via a phone call that may have lasted 45 minutes. Specifically, Ms. Lively complained about Mr. Heath showing Ms. Lively the video of his wife, nude, giving birth. Also, Ms. Lively conveyed her discomfort about Mr. Heath entering her trailer when she was in a "vulnerable state of undress."

In addition, Ms. Giannetti testified that Ms. Lively might have raised issues about unscripted physical interactions she had with Mr. Baldoni. (Giannetti deposition at pages 119-133, 141-142, 241-242; Exhibit 13 to Giannetti deposition).

Ms. Lively's notes of the May 26 conversation not only show the complaint about Mr. Heath entering Ms. Lively's trailer, but also Ms. Lively relaying that Mr. Baldoni was inappropriate towards her and to others. (Giannetti deposition Exhibit 13).[34]

---

[28] At the time of her 2025 deposition, Ms. Giannetti was the Executive Vice President Production and Senior Creative of Columbia Pictures and Sony Pictures. She testified the Columbia is a label owned by Sony Pictures. (Giannetti deposition at page 24).

[29] At the time, Mr. Pearl was a Talent Agent at CAA.

[30] See the timeline exhibit attached to Sarowitz deposition. However, according to the timeline, this meeting with Ms. Giannetti took place on May 29, 2023. The timeline refers to Mr. Baldoni making "sexy" comments" and Mr. Heath showing "birth video."

[31] According to the timeline exhibit attached to Sarowitz deposition, the video was shown on May 23, 2023.

[32] In deposition, Mr. Baldoni admitted asking Mr. Heath to show Ms. Lively the video of Mr. Heath's wife giving birth. (Baldoni deposition volume 2 page 287). In deposition, Mr. Heath admitted that, in the video, his wife was nude from the waist up. (Heath deposition volume 2 pages 123-138).

[33] Ms. Giannetti testified that the Studio was responsible for handling human resource complaints related to the Film – though she did not know if anyone from the Studio was assigned to human resources for that purpose. (Giannetti deposition at page 82).

[34] Further, via Mr. Baldoni, Ms. Giannetti understood that Ms. Lively was upset about a comment Mr. Baldoni made about Ms. Lively's weight. (Giannetti deposition at pages 133-136).

As mentioned above, Sony's harassment policies applied to individuals performing services for Sony. The policy included conducting an investigation when Sony became aware of harassment allegations. Yet Sony conducted no investigation as a result of the complaint.[35]

Around the same time, another cast member, Ms. Slate also complained about harassment to Ms. Giannetti. (*See* Slate text exchange with Lively of May 29, 2023, JS0000380; Slate deposition at pages 96-90).[36]

In deposition, Ms. Giannetti confirmed this phone conversation with Ms. Slate in which Ms. Slate expressed unease on the set – mentioning Ms. Lively's concerns and her own experiences with Mr. Baldoni making a "hot" comment to her. Also, these contributed to a tense atmosphere on the set.[37] (Giannetti deposition at pages 148-149, 260-261).

Again, Sony conducted no investigation.[38]

In the meantime, Ms. Slate raised a complaint with Ms. Saks, a Producer on the Film. (See Slate text exchange with Lively of May 29, 2023, JS 0000383; Slate deposition at pages 86, 90-91).

Ms. Saks testified that, on that date, she had brunch with Ms. Slate. Initially she believed that it would just be a friendly brunch. Instead, Ms. Slate complained about Mr. Baldoni – expressing discomfort about his making comments about her physical appearance. For example, saying that she was hot or sexy.[39] Also, Ms. Slate relayed that she was uncomfortable with Mr. Baldoni recording a creative Zoom meeting without prior consent. And, in addition, Ms. Slate expressed some discomfort relating to Mr. Heath. Her own concerns aside, Ms. Slate suggested that Ms. Lively also had concerns. (Saks deposition at pages 100-109, 120-121).

Ms. Slate testified that she spoke to Ms. Saks about Mr. Heath's inappropriate comments.[40] Also that she was offended by Mr. Baldoni's inappropriate recording, his comments about women, and his fussy attitude. (Slate deposition at pages 90-92). Further that she told Ms. Saks about impact on all of this on the work environment and that her work was suffering. (Slate deposition at pages 88-90).

---

[35] Ms. Giannetti confirmed telling Ms. Lively that Sony did not run the production. But this was in the context of a COVID issue which Ms. Lively had raised. (Giannetti deposition pages 142-143).

[36] Another female actor in the Film, Isabela Ferrer, also testified that Ms. Slate expressed "frustrations or upsetness" with Mr. Baldoni. (Ferrer deposition at pages 44-45, 50-51).

[37] In other words, it impacted her ability to perform her job. Ms. Lively testified to how Mr. Baldoni's actions affected her job as well. (E.g., Lively deposition at pages 117-118).

[38] Sony's failure to investigate meant that it fell to the Studio to investigate. But the Studio failed to do so.

[39] Ms. Slate played the sister of Mr. Baldoni's character in the Film. It seems unlikely that Mr. Baldoni's character would refer to his "sister's" physical appearance as hot or sexy. In other words, it does not seem like the comment was related to Ms. Slate's character in the Film. Instead, it appears to be a personal comment about Ms. Slate's appearance.

[40] The timeline exhibit attached to Sarowitz deposition indicates that Mr. Baldoni's comment to Ms. Slate about being "sexy" occurred on May 18, 2023.

As a result of the complaints Ms. Slate had raised with Ms. Saks, Ms. Saks sent a text to Ms. Giannetti suggesting that Mr. Baldoni be replaced as Director. Also, that Mr. Heath be kept off the set. (Saks deposition at pages 109-112; Exhibit 62 Saks deposition).

Additionally, believing that Ms. Slate was genuinely uncomfortable with Mr. Baldoni and with Mr. Heath, Ms. Saks relayed Ms. Slate's concerns to Mr. Baldoni and Mr. Heath and spoke to them about conducting an investigation into Ms. Slate's concerns. (Saks deposition at pages 100-112, 121-122, 202-203).

Mr. Baldoni testified that Ms. Saks did talk to him about Ms. Slate's discomfort with some of his actions. This included that Ms. Slate had not appreciated a comment that he had made on-set, using the word "sexy" in reference to something she was wearing.  (Baldoni deposition volume 2, pages 182-191; *See also* Heath deposition volume 1 at pages 242-247).

Despite these complaints (and Ms. Saks's investigation recommendation), the Studio did not conduct an investigation. Ms. Saks explained why. Specifically, that Mr. Heath told her that they had decided not to conduct an investigation into concerns about Mr. Baldoni's and his own behaviors because they didn't want a written record of it anywhere. (Saks deposition at pages 118-119).

By contrast, Mr. Heath denied telling Ms. Saks that they did not want a written record and so, as a result, that they were declining to conduct an investigation. (Heath deposition volume 1 at pages 238-242).

I am not in a position to know whether Ms. Saks or Mr. Heath are telling the truth about this alleged explanation. Of course, if true, the explanation and failure are completely inappropriate – contrary to standard practices and the Studio's own policies and procedures. But, in any event, no investigation was conducted.

In the meantime, according to Ms. Saks, the "guys" on the set then started making comments about not being able to make eye contact anymore. She saw this as them making light of behaviors that made other employees uncomfortable. (Saks deposition at pages 139-141).

On May 30, Mr. Baldoni texted Ms. Lively writing, "I want you to know that I've been made aware of your concerns and I hear you. They are fully received, and adjustments will be made imminently." (WAYFARER_000141471; Baldoni deposition volume 2 at pages 178-175).[41] However, no investigation was conducted and the only adjustments which were made were not imminent.[42] Instead, 17 protections were implemented in January 2024 at Ms. Lively's insistence. (Discussed below).

---

[41] See the timeline exhibit attached to Sarowitz deposition. However, according to the timeline, this text was sent on May 31, 2023.
[42] However, Mr. Baldoni testified that he did cease hugging others on the set. (Baldoni deposition volume 2 at pages 106-107).

By this time Ms. Lively had spoken to Mr. Heath as well. Specifically, on the second day of filming, Mr. Heath had attempted to enter Ms. Lively's trailer uninvited. She told him to wait a minute – that she was getting undressed. But he insisted that he needed to meet with her right away. So, she allowed him to come into the trailer so long as he faced the wall. Initially he did.

However, Mr. Heath stopped facing the wall because he wanted to make eye contact with Ms. Lively while they were talking. At that moment, Ms. Lively was removing body makeup and a wig. Ms. Lively was nude from the waist up (i.e., with her breasts showing). She expressed discomfort – telling Mr. Heath that it was not okay for him to do this. Nevertheless, later, both Mr. Heath and Mr. Baldoni continued to enter her trailer uninvited (Lively deposition at pages 123-135).

In deposition, Mr. Baldoni admitted Ms. Lively talking about Mr. Heath entering her trailer. From his point of view, as she was sharing the story, she did not seem upset. However, he understood she did not want it to happen again. And nothing was reported to human resources. (Baldoni deposition volume 2 at pages 226-227).

Also, according to Ms. Lively, Mr. Heath had shown her a video of his wife, naked, giving birth. The video was completely out of context. She had asked Mr. Heath to stop showing it. (Lively deposition at pages 186-191).

And, by this time, Mr. Baldoni had called her "hot" and told her she "looked sexy" (unrelated to her character). (Lively deposition at pages 99-101; Slate deposition at pages 41-44).[43]

By this point, according to Mr. Baldoni, Ms. Giannetti had told him about Ms. Lively's discomfort with him – including his use of the word "sexy" to her. (Baldoni deposition volume 2 at pages 172-173, 180-182).

On June 1, 2023, Ms. Lively had a meeting with Ms. Saks, Mr. Baldoni, and Mr. Heath. As mentioned above, Ms. Lively tried to bring these issues to Sony, but to no avail. So, she intended to discuss with her team other avenues to address the issues and to ensure a safer set. Before she could do so, the June 1 meeting with Mr. Baldoni and Mr. Heath took place.

Mr. Baldoni started the meeting by saying that Mr. Heath, showing the naked video of his wife, was not Mr. Heath's fault, it was Mr. Baldoni's fault as he had asked Mr. Heath to show her the video.

---

[43] Ms. Slate testified that when Mr. Baldoni called Ms. Lively "hot" and then "sexy" (or vice versa) she told him that such comments were inappropriate and distracting and "we're just not doing this anymore." (Slate deposition at pages 41-44). Mr. Baldoni admitted Ms. Slate talking to him about this. (Baldoni deposition volume 2 at pages 177-178). And he admitted making the "hot" comment to Ms. Lively – though his version is somewhat different than hers. Instead, he testified that he commented to Ms. Lively that her outfit "looked hot," to which "she replied that was 'not what she was going for,'" and "then [Mr. Baldoni] made a joke, [he] said, sexy?" (Baldoni deposition volume 2 at pages 216-218, 230-232).

However, rather than promising that nothing like that would ever happen again and rather than ensuring that she would have a safe set going forward, Mr. Baldoni and Mr. Heath did not find their actions to be an issue.

During the meeting, Ms. Lively raised HR "claims" with them.[44] She expressed concerns about the improper sexual things that had occurred to her so far and delineated some of the improper actions as examples. She told them that their behavior had to stop. (Lively deposition at pages 189-194).

In response, Mr. Heath and Mr. Baldoni did not offer any HR people for her to call. They didn't say who was responsible for handling such HR issues. And there was no acknowledgment, apology or reparations. (Lively deposition at pages 186-192).

Mr. Baldoni admitted the behavior but tried to justify it – explaining why it was okay. And he tried to explain why she should not feel how she did about that which had occurred. Ms. Lively felt that Mr. Baldoni and Mr. Heath did not take her concerns seriously. (Lively deposition at pages 185-199). According to Ms. Lively, she was never given any HR resources by the Studio. (Lively deposition at pages 220-221).[45]

That Ms. Lively complained on June 1 is confirmed by texts between Ms. Saks and Ms. Giannetti. In it, Ms. Saks discussed the "very good (tough) chat [with] Blake." This included "the wife photo" and "other comments" by Ms. Lively. Also, that Mr. Heath "went to Ms. Lively's trailer and when she agreed that he could come in if he did not look at her, "apparently he was looking in her direction the entire conversation when she turned around." (SPE_BL0002027-0002028; Saks deposition at pages 133-137).

Additionally, according to the timeline exhibit attached to the Sarowitz deposition, on June 1, "Blake took Alex [Saks], Justin [Baldoni] and Jamie [Heath] to her trailer to discuss the complaints she had about them." These included the following: "Sexy comment," "[Heath] showing the birth scene," "Told [Heath] that he looked at her in the trailer."

In deposition, Mr. Heath also talked about the June 1 meeting with Ms. Lively. He explained that she complained about the "sexy" comment, the situation with him in her trailer (during which she had asked him not to look in her direction and that she was nursing or feeding at the time) and about his showing her the video of his wife (nude from at least the waist up). Heath deposition volume 2 at pages 123-138; *See also* Heath deposition volume 1 at pages 247-241).

---

[44] The timeline exhibit attached to Sarowitz deposition indicates that she raised "HR concerns." Mr. Heath testified that the timeline was prepared at his direction beginning on June 17, 2024, and was prepared with input from him and another Studio employee, at minimum. (Heath deposition volume 1 at pages 313-328).
[45] As mentioned above, if true, it is a failure to follow standard practices for preventing harassment and retaliation from occurring.

Docusign Envelope ID: 7A906A42-EA76-4785-B40D-361C61655AF3
Case 1:24-cv-10049-LJL    Document 1230-124    Filed 01/20/26    Page 18 of 52

*Blake Lively v. Wayfarer Studios LLC.; et al.—Robbins' Expert Report*                    17

Despite Ms. Lively raising these harassment claims, no investigation took place.[46]

Also, on June 1, Mr. Baldoni responded in writing to Ms. Slate's earlier complaint stating, "I was made aware of your concerns. I wanted you to know that they are fully received, I hear you, and adjustments will be made accordingly."[47] (JS0000334; Baldoni deposition volume 2 at pages 173-175). And no investigation took place regarding the concerns raised by Ms. Slate.

On June 2, 2023, in a text exchange with her Publicist, Alex Crotin, Ms. Slate wrote, "this movie is really full of huge issues, like Blake and I both made complaints to Sony regarding behavior, I think we should talk asap." (JS00000298).

As a result of all the above, it is clear that the Studio knew that many of the harassment issues had been raised – including by Ms. Slate, by Ms. Saks, and by Ms. Lively.

As another example of this, in an August 14, 2024, text exchange with a number of individuals, Katie Case[48] wrote, hey guys re the tmz[49] thing re the HR complaints – our understanding is that 2 were [from] Blake and Jenny…." (*See also, the* text exchange between Mr. Baldoni and Mr. Heath of May 28, 2023, above).

In the meantime, the production on the Film temporarily halted in June 2023. This was as the result of the WGA strike – followed by the SAG-AFTRA strike. The WGA strike ended on September 27, 2023, and the SAG-AFTRA strike ended on November 9, 2023. Thereafter, the Film resumed production. (Lively deposition at page 261).[50]

Also, on November 9, 2023, Ms. Lively's counsel sent a set of 17 proposed protections to Sony's counsel and the Studio's counsel. As the Film was set to resume production, these protections were designed to stop the harassment that had been taking place on the set.  Also designed to create a safe environment.

As Ms. Lively's counsel wrote, "It is no surprise to the Film's producers the experience of shooting the Film has been deeply concerning on many levels. The complaints of our client and others have been repeatedly conveyed and well-documented throughout pre-production and photography."

---

[46] Ms. Lively testified that she did not specifically request that an investigation take place. (Lively deposition at page 193). However, in my opinion, is not the responsibility of the Complaining Party to ensure that the company follows its own policies and procedures (as well as standard practices). Instead, it is up to the company (here the Studio) to follow its own policies and procedures. So, the company should conduct an investigation, and then to take appropriate remedial and/or disciplinary action.

[47] That is, of course, until after resumption of filming after the strikes when the 17 protocols were submitted and ultimately agreed upon.

[48] Ms. Case was with a public relations firm, The Agency Group PR LLC (TAG) as Senior Director for Entertainment and Strategy, later Vice President.

[49] TMZ is an entertainment news channel.

[50] Production resumed around January 5, 2024. (Lively deposition at page 261).

The proposals prohibited certain specific inappropriate behaviors. As just a few examples, no touching and/or comments on Ms. Lively's physical appearance, except in connection with the character and scene work, not as to [Ms. Lively] personally." Similarly, "no discussions of personal experiences with sex and nudity." Also, not entering or attempting to enter Ms. Lively's trailer "while she is in a state of undress for any reason." Many other similar prohibitions were included.

As a result of these proposals (as well as at least some of the complaints made above), there can be no doubt that the Studio knew of Ms. Lively's objections to inappropriate sexual conduct that had been occurring on the set. Indeed, Mr. Sarowitz testified that Mr. Baldoni communicated to him that the document containing the 17 proposals insinuated that Mr. Baldoni was unsafe and sexually harassing. (Sarowitz deposition at pages 270-271; SAROWITZ-000000069-000000073).

On November 10, 2023, Michael Marshall (at Sony) commented on the proposals. Among other things, he wrote, "Further, as discussed, overall, the tone of the response has to be part denying the underlying insinuations/allegations but doing so in a way that doesn't inflame or escalate further since most of what's on the list Wayfarer is acknowledging/addressing."

However, Sony did not suggest that an investigation into the "insinuations/allegations" take place. And neither Sony nor the Studio conducted an investigation.

On November 19, 2023, the Studio's counsel wrote "Wayfarer, Sony and Production respectfully acknowledge that your client has concerns regarding safety, professionalism, and workplace culture. Although our perspective differs in many respects, ensuring a safe environment for all involved is paramount, irrespective of differing viewpoints. Regarding your outlined requests, we find most of them not only reasonable but also essential to the benefit of all parties involved."

As result, an agreement was reached via a contractual rider which was executed on January 19, 2024. The agreement included 17 provisions. Most addressed Ms. Lively's harassment concerns. One prohibited retaliation for her raising such concerns.[51] The 17th provision required, at Ms. Lively's election, an all-hands in-person meeting before production resumed. Clearly, through these agreed-upon provisions, the Studio was well aware of Ms. Lively's harassment concerns. Yet still no investigation took place.

On January 4, 2024, the all-hands meeting took place at Ms. Lively's house. Among others, Mr. Heath, Mr. Baldoni, Ms. Saks, and Ms. Giannetti were there during the meeting, and many examples of inappropriate conduct were discussed. (Giannetti deposition at pages 174-176 (confirming that all of the 30 examples on the list were discussed in some fashion); Saks deposition at pages 288-290).[52]

As just a few examples:

---

[51] As well as the concerns raised by others.
[52] See the timeline exhibit attached to Sarowitz deposition.

- "No more showing nude videos or images of women, including producer's [i.e. Heath's] wife, to BL [Blake Lively] and/or her employees."

- "No more mention to BL or her employees of personal times that physical consent was not given in sexual acts, as either the abuser or the abused."

- "No more descriptions of their own genitalia to BL."

- "No more jokes or disparaging comments to be made to BL and/or her employees about HR complaints Wayfarer has already received on set, or about 'missing the HR meeting.'"

- "No more personal, physical touching of, or sexual comments by Mr. Baldoni or Mr. Heath to be tolerated by BL and/or any of her employees as well as any female cast or crew without their express consent."

- "No more improvising of kissing."

- "No more entering, attempting to enter, interrupting, pressuring, or asking BL to enter her trailer or the makeup trailer by Mr. Heath or Mr. Baldoni while she is nude, for any reason."

- "No more adding of sex scenes, oral sex, or on camera climaxing by BL outside the scope of the script BL approved when signing onto the project.[53]"

In deposition, Mr. Baldoni admitted that, at the all-hands meeting, Ms. Lively relayed that he had made her feel unsafe. And Mr. Baldoni admitted that during the all-hands meeting, Ms. Lively read a list from her phone. However, he disputed that some (but not all) of the items that are alleged to have been raised at that meeting, actually were relayed. (Baldoni deposition volume 2 at pages 251- 257, 267). Similarly, Mr. Heath testified that Ms. Lively read at least a few items from her phone, possibly nine or ten items. (Heath deposition volume at 1 pages 274-278).

However, based on what occurred during the all-hands meeting, it is clear that the Studio was aware of at least some of the harassment allegations. Further, the Studio was aware that Ms. Lively contended that Mr. Baldoni had made her feel unsafe. But again, no investigation took place. Further, no disciplinary or remedial action took place as a result of any investigation. (Baldoni deposition volume 2 at page 72).

Mr. Heath explained why no investigation was conducted. He testified, "We did not determine it was necessary. We never came to the point to think that it was necessary because in it, while she was expressing it, it was very confusing because she (i.e., Ms. Lively) was not -- it was almost like he was a child."  Further, he explained that there was

---

[53] SAC ¶ 20; BL-000038461.

no conversation or decision made to not conduct an investigation. (Heath deposition volume 1 at pages 292-293). In other words, that the Studio never even considered whether or not to conduct an investigation. In addition, Mr. Heath confirmed that he did not speak to the Studio's human resources consultant about the incidents that Ms. Lively raised. (Heath deposition volume 1 at page 401.)

The trailer screening for the Film took place on May 6, 2024. Margaret Colleen Hoover (the author of the book on which the Film was based) had dinner that evening with Mr. Baldoni, Mr. Heath, and Ms. Hoover's best friend. During the dinner, Mr. Baldoni made negative comments about Ms. Lively. This included that she was a narcissist and that she wanted to take over the Film. Mr. Baldoni related that Ms. Lively was "making their lives very stressful during the filming."[54]

Mr. Baldoni further explained that Ms. Lively had a meeting "that blindsided them about their behavior." Further, that the result of the meeting was that "she forced them to sign a document stating they wouldn't exhibit that behavior anymore or she wouldn't resume filming."

During the dinner, several incidents were described – including Mr. Heath going into Ms. Lively's trailer while she was breast-feeding. Mr. Heath said that he "feared she would file sexual harassment claims against him." (Hoover deposition at pages 62-81).

Assuming Ms. Hoover is telling the truth, there can be no doubt that both Mr. Baldoni and Mr. Heath understood that Ms. Lively had raised sexual harassment claims. Yet, no investigation took place.

As result of all of this, the Studio failed to enforce its own policies requiring investigations of harassment allegations. The Studio failed to follow the training that was provided to those involved with the Film. And the Studio failed to follow standard practices as well.

Despite the agreed-upon prohibition on retaliation, Ms. Lively alleges that, thereafter,[55] the Defendants engaged in an extensive retaliation campaign designed to affect her reputation and career, including, among other things, by manipulating online narratives about her, including with respect to Ms. Lively allegedly having a "less than favorable reputation in the industry" and "a clear, likely motive . . . to bully her way into buying the rights for *It Starts With Us,*" the sequel to the Movie.[56] (Lively deposition at pages 145-

---

[54] Mr. Heath could not quite recall that dinner.  (Heath deposition volume 1 at pages 295-296).

[55] Ms. Lively also claims that when issues were raised with Mr. Baldoni during production, he would retaliate against her (and others) by responding in a "huffy" manner. (Lively deposition at pages 101-103). Similarly, Ms. Slate testified that that her experience with Mr. Baldoni was consistent with Ms. Lively's description of his behavior, including being "huffy" and creating a negative atmosphere on set. (Slate deposition at pages 88-90).

[56] *E.g., see*, Scenario Planning It Ends with Us, Dkt. 521-3; Social/Digital Mitigation/Remediation document of August 7, 2024 (ABLE_000005094); text exchange by Melissa Nathan (Crisis Communication Specialist, The Agency Group PR LLC) of August 2, 2024, writing about Mr. Baldoni, "we can't write we will destroy her [i.e. Ms. Lively]. We will go to this. We will do this. We will do this. We will do this." Also, "you know we

156, 171-177, 199-203, 226, 265-268).[57] Ms. Lively testified that she first became aware of this campaign on August 9, 2024 – the same day that the Film was released, and that has she since experienced a ground swell of negativity. (Lively deposition at pages 152-153, 206-207).

On December 20, 2024, Ms. Lively filed a Complaint with the California Civil Rights Department (CRD) alleging harassment and retaliation. Ms. Lively alleged, among other things, that she suffered reputational damage as a result of the retaliation against her. This kind of alleged reputational damage is particularly problematic in the Entertainment Industry, which is unique in many ways. One of those ways relates to the ability of people in power (including, for example, directors, studio executives, and/or others with access to large amounts of money) to negatively impact the future careers of actors (and other "above the line" individuals such as directors, writers, etc.). This can apply not only when the actor is performing services on a particular project but also can impact the actor's future career (including future work opportunities and advancement) – a career not involved in any way with the individual trying to destroy their career. And this can be true even for those actors that have experienced prior successes, are considered "A-list," or have well-established networks in the industry.

I wrote about this unique phenomenon in both of my published articles relating to conducting investigations in the Entertainment Industry. Quoting one of my articles:

> "Another unique aspect of entertainment investigations is that other industries do not have powerbrokers like those in the Entertainment Industry. For example, if an employee raises harassment allegations at an insurance company and then decides to leave for another company, outside individuals would likely not have any power to affect that employee's ability to obtain a job at another insurance firm.
>
> In contrast, powerbrokers like Harvey Weinstein had the ability to affect people's careers—even beyond the reach of their own projects. For example, an actor who refused to engage in sexual activity with a powerbroker might find their career destroyed—including on projects completely unrelated to the powerbroker. Although the Entertainment Industry appears to be changing for the better, fear of powerbrokers having a deleterious effect on careers remains a prominent concern even now, five years after the start of the #MeToo movement and the public reckoning faced by many high-profile individuals and companies. These levels of influence and fear simply do not exist in any other industry." Robbins and Wagener,

---

can bury anyone." (JONESWORKS_00016227); and text exchange by Jennifer Abel (Mr. Baldoni's then-publicist) writing that "He [Mr. Baldoni] wants to feel like she [Ms. Lively] can be buried." (TAG_000000151).
[57] Mr. Baldoni views what occurred at that time was hiring Melissa Nathan at TAG "to combat untrue negative stories with the truth." (Baldoni deposition volume 1 at page 134). He testified that creating defamatory smear websites and social media posts about people is not a tactic he would ever employ. (Baldoni deposition at page 208) However, despite being warned not to hire Ms. Nathan because "there's a lot of dirty work she has done," Ms. Nathan and TAG were retained for "crisis PR." (Baldoni deposition volume 1 at pages 145-147; 256-256). He testified that he could not confirm with certainty whether Ms. Nathan employed such dirty tactics against Ms. Lively. (Baldoni deposition volume 1 at pages 214-218).

> *Investigations in Hollywood: It's the Same, but Different* (AWI JOURNAL, December 2022).[58]

I intend to discuss my views about the unique nature of the Entertainment Industry during the trial.

The same day that Ms. Lively submitted her CRD Complaint, her counsel sent a cease-and-desist letter to the Defendants describing the harassment and retaliation experienced by Ms. Lively and demanding that their retaliatory actions cease. The CRD Complaint also was included.

Despite Studio policies to investigate harassment and retaliation allegations, despite the training provided to those involved in the Film and despite standard practice to do so, once again, no investigation took place. To the contrary, instead of conducting a workplace investigation, Ms. Lively contends that the retaliation campaign against her escalated. (*See,* the Civil Complaint).

As result, once again, the Studio failed to follow standard practices and its own policies and procedures. And once again, the Studio failed to follow the training that was given to those involved in the Film. Once again, the Studio did not take reasonable steps to prevent harassment and retaliation from occurring.

### Nudity Rider and Intimacy Coordinator Failures

As to Nudity Rider issues, in April 2023, a Nudity Rider was sent to Ms. Lively. In May 2023, some exchanges took place with respect to the Rider. (Exhibit 12 to the Talbot deposition). However, Ms. Lively did not sign the Rider until January 2024.[59] In my opinion, it is the Studio's and/or production Company's responsibility to ensure that Nudity Riders are signed prior to any intimacy (including nudity or simulated nudity) scenes being shot. However, that did not occur here.[60]

As Elizabeth Talbot (Intimacy Coordinator) testified, nudity riders need to be signed any time before an intimacy scene is shot. (Talbot deposition at pages 65-66).

Also, the Studio did establish Closed Set Protocols. However, those protocols were not distributed until June 21, 2023. (24-CV-10049_000-1097). In my opinion, those protocols should have been established and distributed in advance of any potential intimacy scenes. However, the protocols were not established or distributed in advance of birthing scene, which in my view involved simulated nudity. (Scene 106, discussed below). That

---

[58] I described the same thing in my even more recent article, "Investigations in Hollywood - There's No Business Like Show Business," THE DAILY JOURNAL (January 19, 2024). (Republished in the AMEC Weekly, August 2024). Then during my 2023 presentation, "Investigations in the Entertainment Industry" for The Beverly Hills Bar Association.

[59] See the timeline exhibit attached to Sarowitz deposition. According to the timeline, the Rider was signed on January 10, 2024.

[60] For example, the birthing scene (described in more detail below) was shot on May 22, 2023.

scene was Filmed on May 22, 2023. So, the Studio did not follow standard practices for creating closed set protocols.

Further, while the Studio did establish (belatedly) Closed Set Protocols, it did not create its own definitions of "intimacy."[61]

Beyond all of this, my understanding is that at times, Mr. Baldoni would "improvise" by adding additional sexual contact to some of the scenes after Ms. Lively signed onto the Movie. (Lively deposition at pages 61-74).[62] These improvised changes could have impacted both the content of the Nudity Rider as well as proper utilization of the Intimacy Coordinator.[63] My understanding is that while the Studio retained an Intimacy Coordinator, problems exist with respect to how the Studio actually utilized the services of that Intimacy Coordinator – at least prior to the adoption of the 17 protections discussed above.

In this regard, in the first phase of production (i.e., before the union strikes and then adoption of 17 protections) Elizabeth Talbot served as the Intimacy Coordinator on the Film. As is normal practice, the Studio controlled when the Intimacy Coordinator would be brought onto the set. (Talbot deposition at pages 121-122). The Studio also controlled when the set would be closed. However, because the Studio did not establish clear definitions of "intimacy," no clear procedure was established as to when any particular scene involved "intimacy." That then impacted when the Intimacy Coordinator was brought onto the set and when the set would be closed.

The birthing scene involved simulated nudity. Having watched the scene, my opinion is that it involved intimacy issues.[64] But Ms. Talbot was not brought onto the set when that scene was Filmed. (Talbot deposition at pages 86, 150-153). Additionally, so far as I can tell, Ms. Lively was not asked whether she would have been more comfortable with an Intimacy Coordinator present during the filming of the scene. And in addition, despite the

---

[61] Problems caused by the failure to establish such definitions are discussed below.

[62] As mentioned above, Ms. Giannetti testified that Ms. Lively may have complained to her about this as well. Ms. Giannetti also testified that adding additional sex scenes to a script would constitute a material change that would require an actor's consent. (Giannetti deposition at pages 67-68).

[63] Similarly, Ms. Ferrer described Mr. Baldoni changing a scene at the time of filming in a way that she felt was inappropriate. (Ferrer deposition at pages 73-74). Also, that she heard Mr. Baldoni made a comment to another person about getting to know Ms. Ferrer better, then winking as he made the comment. (Ferrer deposition at pages 287-288). Ms. Ferrer also mentioned others to whom Ms. Lively spoke at or about the time of the harassing incidents. (Ferrer deposition at pages 50, 55-56, 60). These individuals (along with Ms. Ferrer and others) could have been interviewed as part of a proper workplace investigation into the allegations raised by Ms. Slate and by Ms. Lively. But no investigations took place.

[64] In part this was because Ms. Lively was put in a vulnerable position with legs spread and a male actor leaning in between her legs. It was an intimate, hyper-exposed scene. Also, because it involved simulated nudity. (*See*, SAG-AFTRA Quick Guide for Scenes involving Nudity and Simulated Sex. *See also*, SAG-AFTRA Standards and Protocols for the Use of Intimacy Coordinators). Beyond this, the Intimacy Coordinator, Ms. Talbot, testified that she did not discuss the birthing scene with Ms. Lively. This, despite the fact that this scene seemed to include "a high hip line" that, according to Ms. Talbot, might be considered nudity by some actors. (Talbot deposition at pages 69-70, 86). Further, as discussed above, Ms. Talbot was not brought onto the set during the filming of that scene.

scene being an intimacy scene, the set was not closed. In my opinion, all of this was a failure to properly use the services of the Intimacy Coordinator.

Even before that scene, it is also my understanding that Ms. Lively was asked whether she wanted to meet with the Intimacy Coordinator in advance of production. This was in April 2023. She responded that a meeting in advance of production was "not standard," (Lively deposition at pages 61-65).

I agree that generally it would not be standard at that point in time. However, my understanding is that what Ms. Lively did not recognize when she was asked whether she wanted to meet in advance, was that sexual content had been added in – beyond that which was contained in the script.  For example, Mr. Baldoni testified that, after Ms. Lively reviewed the script and then agreed to perform on the Film, intimate scenes were worked on – without his working with Ms. Lively on those scenes. This was in order to make the Film "more sexual." (Baldoni deposition volume 2 at pages 151-153, 158-159).

In my opinion, the Studio should have explained these changes, delineated the increases in intimacy scenes, then asked Ms. Lively whether she wished to meet with the Intimacy Coordinator. Mr. Baldoni testified that he did discuss some of the changes with the Intimacy Coordinator and ultimately with Ms. Lively. (Baldoni deposition volume 2 at page 161).

And as to the improvised changes (i.e., those made at the time of the filming) so far as I can tell, those improvised changes were not discussed with the Intimacy Coordinator and not discussed with, or consented to by, Ms. Lively before being effectuated. That is because they were made by Mr. Baldoni instantly at the time the scenes were being filmed. Assuming all of this is true, once again my opinion is that the Studio did not properly utilize the services of the Intimacy Coordinator.

The dancing scene (Scene 040) seems to be an example of Mr. Baldoni improvising during the shooting of the scene. Specifically, it appears that, during filming, he decided to add a level of intimacy to the scene that was not written in the script.[65] I can see how Ms. Lively might have been uncomfortable with the changes.[66] In my opinion, the way to have created a safe environment would have been to offer Ms. Lively an Intimacy Coordinator during the scene to ensure that she was comfortable/safe with the changes. So far as I can see, with no definition of "intimacy," that did not occur here. The same should have applied with any other changes which increased the intimacy of a scene. Again, assuming all this is true, my opinion is that the Studio did not properly utilize the services of the Intimacy Coordinator.

For the above reasons, my opinion is that the Studio did not follow standard practices both with respect to the Nudity Rider and with respect to utilization of an Intimacy

---

[65] Mr. Baldoni testified that he did not try to kiss Ms. Lively during the scene. (Baldoni deposition at pages 235-237). Reviewing the scene, it looks to me like that is exactly what he tried to do.
[66] Her reactions during shooting seem to show some discomfort.

Docusign Envelope ID: 7A906A42-EA76-478B-B40D-361C61EF5AF3

Coordinator. Both of these are designed to prevent harassment from occurring and to help establish a safe set for all those involved.

## Data Considered

I have attached hereto as Exhibit C a listing of facts or data I have considered or relied upon.  Based on additional discovery that occurs, I may add to some of this data.

## Exhibits

I intend to use portions of the above data as a summary of or in support of my opinions. In addition, I may utilize graphs, charts or other demonstrative evidence, including, but not limited to evidence presented on PowerPoint.

## Qualifications

Please see my C.V., attached hereto as Exhibit A.

I have been retained as an Expert on over 750 occasions.  Most of the time, my retention has been on issues relating to the employer's efforts to prevent and investigate discrimination, harassment, retaliation and other misconduct.  I have been retained as an Expert Witness/Consultant on this same issue by both Defendants and Plaintiffs.

I have testified as an expert witness in a bit over 100 trials, over 27 years.  The last time I testified in court was in late May 2025 – in Los Angeles County Superior Court.

My analysis and opinions have been found by multiple courts to be a proper subject matter for expert testimony.

For example, in Federal Court in *EEOC v. Scolari Warehouse Markets*, 488 F. Supp. 2d 1117 (D. N.V. 2007), the Federal District Court held, "Notably, Mr. Robbins 'has worked as an expert witness on more than 250 occasions, and he has extensive experience conducting discrimination, retaliation and employee misconduct investigations -- having conducted over 200 workplace investigations.'. . . Many of his other accomplishments, such as his background in employment law, his publications in employment law journals and reports, his teaching and lecturing experience at various employment law centers and law schools, and his membership on the Executive Board of the Los Angeles County Bar Association's Labor & Employment Law Section, as well as others, leads this Court to view Mr. Robbins as a reputable source of expert testimony."  *Id.* at 1134.

This is the only published opinion relating to my testimony on workplace investigation issues.

Currently, I am employed by EXTTI, Incorporated where I hold the position of President. I founded EXTTI in early 1998.  EXTTI provides Expert Testimony, Training and Investigation services in the employment area.  Thus, at EXTTI, my work as an Expert

Witness is only one of the services which I perform.   In addition, I conduct harassment/discrimination awareness training.  Also, I conduct training on how to conduct proper workplace investigations.

I have extensive experience conducting harassment, discrimination, retaliation and employee misconduct investigations.  I estimate that I have conducted and/or supervised well over 600 workplace investigations over a period of 48 years.

I have twice performed work as a Consent Decree Monitor in Federal District Court.  Among other things, my job as the Consent Decree Monitor was to ensure that the defendant employers implemented proper policies and training relating to preventing harassment, discrimination and retaliation from occurring and also training relating to how and when to conduct proper workplace investigations.

Further, when the need for workplace allegations arose, my job was to ensure that the employers conducted proper workplace investigations. Then, that they took proper actions as a result of what they had learned in their investigations.

In addition to my practical experience in this area, I have taught many programs on how to conduct proper workplace investigations. In these programs, I have taught Human Resource Professionals, compliance personnel, other management personnel, and attorneys how to conduct workplace investigations. I have taught investigation programs not only all over California, but also in Pennsylvania and Puerto Rico (at ABA conferences) and in New Hampshire, Georgia, Connecticut, Hawaii, and Australia.

Examples of the seminars I've provided over the past several years are listed in my CV, attached hereto as Exhibit A.  Listing a few of my most recent presentations:

In June 2023, I presented a program on workplace investigations in the Entertainment Industry. The program was sponsored by the Beverly Hills Bar Association.

Then in July 2023, I presented at an Association of Workplace Investigators (AWI) Basics Program. AWI is an organization of thousands of internal and external workplace investigators.

Also in July 2023, I spoke at the Los Angeles District Office of the EEOC.

In July 2024, I presented at an EEOC webinar, "Empowering Employers to Confront Harassment." Close to 200 individuals (overwhelmingly in-house Human Resource Professionals) attended the program.

On May 22, 2025, I presented a program on workplace investigations for the Los Angeles County Bar Association, Labor & Employment Section.

On October 24, 2025, I will be speaking about investigation issues at the California Employment Lawyers Association (CELA) Annual Conference in San Francisco.

Then, either on November 18 or 20, 2025, I will be speaking at a program sponsored by the California Lawyers Association (CLA). Entitled "Bulletproof Investigations: Conducting, Defending, and Protecting HR Investigations," I will be joined by a defense attorney (from Littler) and in-house counsel. In the presentation, among other things, we will present a mock investigation. Then I will be asked to explain how the investigation could have been improved – consistent with standard practices.

Two other presentations have been confirmed for very early next year. One will be sponsored by the California Lawyers Association (CLA). It is entitled, "Child Porn, Cocaine and Guns, Oh My (Workplace Investigators' Possession of Materials, Possession of Which Is Illegal)."

The other is another program on workplace investigations in the Entertainment Industry. This time sponsored by AMEC (the Association of Media And Entertainment Counsel).

The training that I have given in the area of workplace investigations is only part of the teaching that I have conducted for Human Resource (and other) professionals. Indeed, I have provided training in a variety of areas. In addition, for three years, I taught Human Resources at Loyola Marymount University in Los Angeles, California.

I am a member of a number of relevant professional organizations. I am a Past President of the Association of Workplace Investigators and also am a Past President of the Society of Independent Workplace Investigators (SIWI) – an organization devoted to outside workplace investigators. Further, I was a member of the ASIS International Technical Committee tasked with creating ANSI standards for Managing the Investigative Process.[67]

In addition, for many years I have been a member of the Executive Board of the Los Angeles County Bar Association's Labor & Employment Section and am a Past Chair of the Section. Also, up until September 30, 2022, I was on the Executive Committee of the California Lawyers Association, Section of Labor & Employment Law. In 2013, I was elected a Fellow of the College of Labor and Employment Lawyers.

Also, I am a member of the Association of Media and Entertainment Counsel (AMEC) – an organization of 14,000 attorneys working in the Entertainment Industry. Recognizing that when I perform services as a workplace investigator, I am performing limited legal services,[68] AMEC named me Labor and Counsel of the year for 2023. This was in recognition of the workplace investigation work I do in the Entertainment Industry.

In addition to all the above, I earned a performance-based certificate from AWI on conducting workplace investigations and so am permitted to use the designation AWI-CH (AWI Certificate Holder). Also, I earned a certification in conducting Title IX investigations from the Association of Title IX Administrators (ATIXA).

---

[67] This was separate from the ANSI accreditation for AWI.
[68] California Business & Professions Code, §7520, *et seq.*

My experience prior to forming EXTTI is as follows:

From 1991 to 1998, I was a Partner in the Beverly Hills law firm of Rosenfeld, Meyer & Susman, LLP. With 60 attorneys, RM&S was (at the time) the largest firm in Beverly Hills. From 1991 to 1997, I was head of RM&S's Labor and Employment Law Department. In 1996, I was elected to the firm's Executive Committee.

In 1997, I was elected C.E.O. and Managing Partner of RM&S. During several of my years at RM&S, I was responsible for the Human Resources function at the firm (*i.e.,* for the firm's employees).

Because RM&S was an Entertainment Firm, much of my work at the Firm involved labor & employment work in the Entertainment Industry. This included work for major studios (e.g., Warner Bros., Universal, MGM, Lionsgate) as well as production companies (both for television and Film) and, occasional representation of actors, directors and producers.

From 1982 through 1990, I was first a Senior Associate, and later a Partner, in the International law firm of Pepper, Hamilton, LLP, now Troutman, Pepper, Locke LLP. In addition, I twice headed that firm's West Coast Labor Law Department. During my tenure at these two firms (*i.e.* from 1982 to 1998), I spent much of my time providing day-to-day advice to management -- mostly on Human Resource (and related) issues. In addition, at both firms, I wrote and/or reviewed hundreds of employment policies. Also, I conducted workplace investigations at both firms. Some of my work at Pepper was in the Entertainment Industry – mostly based on my four years of in-house experience in that industry (below).

In 1981 and 1982, I worked as Director of Labor Relations and Labor Counsel for Golden West Broadcasters/Golden West Television (which then owned KTLA-TV, KMPC, KSFO, eight soundstages and the Angels baseball franchise, among other companies).

In part, this was a Human Resource position. Here too, I spent much of my time providing day-to-day advice to management -- mostly on Human Resource (and related) issues. In addition, I wrote and reviewed employment policies for the Company's various divisions. Also, I conducted workplace investigations.

In 1980 and 1981, I was a Senior Attorney at CBS, Inc., working in the Labor Law Department. Again, I spent much of my time providing day-to-day advice to management -- mostly on Human Resource (and related) issues including workplace investigations. In addition, I wrote and reviewed employment policies for the Company's various divisions.

I began my career at the National Labor Relations Board (NLRB) in 1977 where I worked first, as a Summer Clerk, and then, in 1978 and 1979, as a Field Attorney. I was trained by that federal agency in conducting workplace investigations and most of what I did at that Federal Agency was to conduct workplace investigations. Because I worked for Region 31 of the NLRB and because Region 31 included jurisdiction over most of the Los

Angeles based studios, I conducted a number of investigations in the Entertainment Industry.

In addition to the above, I have been involved with a number of non-profit organizations over the years and twice held the position of Vice-President of Personnel for a one such non-profit organization. I was on that organization's Personnel Practices Committee for over 15 years.

Although I do not practice law any longer in the traditional sense, I am an attorney by training. In 1978, I received my J.D. Degree from the UCLA School of Law. While at UCLA I worked for the UCLA Institute of Industrial Relations and was a Judicial Extern for the California Court of Appeal.

I received my Bachelor's Degree in 1975 from San Diego State University, was a member of the Phi Beta Kappa Honor Society and was Valedictorian -- first in a graduating class of over 5000 people. I received my degree in History, with minors in Political Science and Spanish.

## Publications

My list of publications is included on my CV, Exhibit A. In 2024, I had two articles published concerning conducting workplace investigation issues in *The Daily Journal*.

## Case List

My list of cases is attached as Exhibit B.

## Compensation

My rate is $750 per hour for all work -- with a four-hour minimum for any type of testimony.

Thank you for allowing me the opportunity for me to express an opinion in this matter.

Respectfully Submitted,

*Michael Robbins*

Michael A. Robbins,
President, EXTTI, Incorporated

Docusign Envelope ID: 7A906A42-EA76-4798-B40D-261C61EF5AE3

# Exhibit A



**EXHIBIT A**

**MICHAEL A. ROBBINS, AWI-CH[1]**
**President**
**EXTTI, Incorporated**

**www.extti.com**

| | |
|---|---|
| **Practice Areas:** | **Expert Testimony, Training, Investigations—** *in the Employment Area.* |
| **Professional History:** | Michael A. Robbins founded EXTTI, Incorporated in 1998.  EXTTI provides **Ex**pert **T**estimony, **T**raining and **I**nvestigations on employment issues.  Mr. Robbins frequently appears as an Expert Witness in harassment, discrimination and other employment matters--both for Plaintiffs and Defendants.  He has worked as an expert witness on close to 750 occasions. In addition, he conducts harassment/ discrimination awareness training, as well as training on conducting workplace investigations.  He has extensive experience conducting harassment, discrimination, retaliation and employee misconduct investigations--having conducted and /or supervised well over 600 workplace investigations.  In addition, he has served as a Consent Decree Monitor in Federal District Courts. |

From 1991 to 1998 Mr. Robbins was a Partner in the Beverly Hills law firm of Rosenfeld, Meyer & Susman, LLP.  With 60 attorneys, RM&S was the largest firm in Beverly Hills.  From 1991 to 1997 he was Chair of that firm's Labor and Employment Law Department.  In 1997, Mr. Robbins was elected C.E.O. and Managing Partner of the firm.

From 1982 through 1990, Mr. Robbins was first, a Senior Associate, and later a Partner in the International law firm of Pepper, Hamilton, LLP (now, Troutman Pepper Locke).   During that time, he twice headed that firm's West Coast Labor Law Department.

In 1981 and 1982, Mr. Robbins worked as Director of Labor Relations and Labor Counsel for Golden West Broadcasters/Golden West Television (which then owned KTLA-TV, KMPC, KSFO and the Angels baseball franchise, among other companies).

In 1980 and 1981, Mr. Robbins was a Senior Attorney at CBS, Inc. working in the Labor Law Department.

Mr. Robbins began his career in 1977 at the National Labor Relations Board (NLRB).

---

[1] Association of Workplace Investigators, Certificate Holder

**Professional Affiliations/ Activities:**

Mr. Robbins is a Charter Member and a Past President of the Association of Workplace Investigators (AWI) and was a Founding Member and Past President of the Society of Independent Workplace Investigators (SIWI). He is a member the American Bar Association (Section of Labor and Employment Law) and is a long time member of the Executive Board of the Los Angeles County Bar Association's Labor & Employment Law Section and is a Past Chair of the Section. And, for three years, he was a member of California Lawyers Association Labor & Employment Executive Committee.

In 2013, he was elected a Fellow of the College of Labor and Employment Lawyers. In 2015 he was invited to and testified before the EEOC's Select Task Force on the Study of Harassment in the Workplace.

In recognition of his work conducting investigations in the Entertainment Industry, Mr. Robbins was named Labor & Employment Counsel of the Year for 2023 by the Association of Media & Entertainment Counsel. One of the few neutrals chosen for this honor since the organization was founded.

Mr. Robbins was a member of the Technical Committee tasked with creating ANSI (American National Standards Institute) standards for Managing the Investigative Process. Those standards went into effect July 2015. Also, he chaired the Association of Workplace Investigators' committee which obtained ANSI accreditation for AWI's National Training Institute.

In 1995, The Los Angeles Business Journal selected Mr. Robbins for inclusion in their "Who's Who in Law". Starting in 2006, Mr. Robbins has been selected for inclusion in "Best Lawyers in America, Preferred Experts". He has been extensively involved with non-profit entities—including twice serving as Vice President of Personnel and later President for one such organization.

**Teaching/ Lectures:**

Mr. Robbins has widely written and lectured in the area of Employment Law and Human Resources. For more than a decade, he was a speaker for the Continuing Education of the Bar (CEB) at its Employment Law Practice: Annual Recent Developments Program—moderating and presenting at the program for most of that time. He has spoken at numerous seminars for Bar Associations and Human Resource conferences. For three years, he was an Adjunct Professor at the Loyola Marymount University Center for Industrial Relations. He has been a guest lecturer at Stanford Law School, Loyola Law School, USC and

UCLA's Anderson School of Management and has conducted harassment, discrimination and retaliation training seminars and workshops throughout the U.S.

**Publications/
Appearances:**

Mr. Robbins was twice a Contributing Editor for <u>The Developing Labor Law</u> (BNA) and was a Contributing Author of a chapter on sexual harassment, in <u>Workers' Compensation Abuse</u> (Griffin).  His articles have been published in the *Civil Litigation Reporter, Employee Relations Law Journal, Forum Magazine, The AWI Journal* and Matthew Benders' *California Labor & Employment Bulletin.*  Periodically, he has been quoted or mentioned in *The New York Times*, *USA Today*, *Variety*, *The Los Angeles Times, The Chicago Tribune, The Los Angeles Business Journal, The Los Angeles Daily Journal, The San Jose Mercury News, The Sacramento Bee, The Fresno Bee, The Daily Mail* (in the U.K.), and in other publications regarding labor, employment and investigation issues. Also, he has been interviewed by PBS, Univision, NBC, on several local television stations and on National Public Radio (NPR).

**Selected Speaking
engagements and
presentations:**

"Confidentiality in Workplace Investigations: What's New, Changing, & Necessary to know under the current state of the law." Los Angeles County Bar Association.

"Empowering Employers to Confront Harassment." EEOC.

"Investigations in the Entertainment Industry."  The Beverly Hills Bar Association.

"Investigation Under Fire: Defending Your Investigation In a Contentious Deposition." 2022 AWI Annual Conference.

"Conducting Effective Workplace Investigations, Advanced." Stradling Yocca Carlson & Rauth.

"Investigating the Cuomo Investigation." The Association of Workplace Investigators.

"Workplace Investigation Testimony: The Tightrope of Admissibility." Labor & Employment Section of the California Lawyers Association.

"Being Deposed on Your Investigation: Strategies for Success." The Association of Workplace Investigators.

Twice, The AWI Virtual Basics Program, "Planning the Investigation." The Association of Workplace Investigators.

"Conducting Investigations in Uncertain Times." The Association of Workplace Investigators.

"Banner is Toast (*Apogee* and Other NLRB Developments Affecting Workplace Investigations)." Labor & Employment Section of the California Lawyers Association.

"Workplace Investigations, Particularly Amidst The 'Me Too' Movement." National Public radio (NPR).

"How to be an Expert Witness on Workplace Investigations." The Association of Workplace Investigators.

"Investigations in Hollywood, It's the Same, But Different." Australasian Association of Workplace Investigators, Melbourne, Australia.

"Looking Forward/Looking Back—2019 Employment Legislation." California Lawyers Association, Labor & Employment Section Annual Meeting.

"California's New Sexual Harassment Training Law and the Mechanics of Workplace Investigations." California Lawyers Association 2019 Solo and Small Firm Summit.

"If Joe Biden Were An Employee: Investigating Not-Quite-Harassment Allegations Against a Celebrity Respondent." Association of Workplace Investigators'

"It's a Crime (Maybe). Dealing With Concurrent Criminal And Workplace Investigations." The Los Angeles County Bar Association.

"It's a Crime (Maybe). Dealing With Concurrent Criminal And Workplace Investigations." Association of Workplace Investigators' Annual Conference.

The Association of Workplace Investigators "Basics Seminar."

"New Tools To Combat Harassment." EEOC.

"Conducting Lawful Investigations." LERA 69th Annual Meeting.

"A Banner Year for the NLRB: How Recent NLRB Decisions Impact Workplace Investigations." UCLA Institute for Research on Labor and Employment and the Los Angeles County Bar Association.

"A Banner Year for the NLRB: How Recent NLRB Decisions Impact Workplace Investigations." Orange County Chapter of the Labor and Employment Relations Association (OCLERA).

"Do We Really Need Experts in this Case and When Should We Hire Them?" American Bar Association.

"Employment Investigations Basics." California State Bar Association.

"A Banner Year for the NLRB: How Recent NLRB Decisions Impact Workplace Investigations." The Association of Workplace Investigators.

"Workplace Investigations; Avoiding the Traps." HR.com.

"Trends in Workplace Investigations." The Association of Workplace Investigators Fifth Annual Conference.

"Ethical Issues Involving Internal Investigations." 2014 UFCW Attorneys Conference.

"This Is Not Your Father's (or Mother's) Investigation: How Workplace Investigations Have Changed Over the Past 10 Years." Los Angeles County Bar Association.

"Workplace Investigations as a Defense," The Defense Research Institute (DRI).

"Workplace Investigations as a Defense," The Association of Southern California Defense Counsel (ASCDC).

"Workplace Investigations, Conducting, Managing, Attacking and Defending." The Rutter Group

"The Standard of Care for a Workplace Investigation." The State Bar of California, Labor & Employment Section.

"Conducting Effective Workplace Investigations."  Hawaii State Bar, Labor & Employment Section.

"Investigating Complaints of Disability Discrimination."  The Association of Workplace Investigators.

"Liability Experts in Employment Litigation."  The State Bar of California, Labor & Employment Section.

Docusign Envelope ID: 7A906A42-EA76-47BB-B40D-361C61FF5AF3

Fourteen times Faculty member at the Association of Workplace Investigators' week-long National Training Institute.

"Hey Boss, It's the Fed! Federal Laws You Should Know as an Employer."   (Presenting on workplace investigations.  Also, on reasonable accommodation of disabled employees through use of the interactive process). International Association of Insurance Receivers.

"The Year in Review." The Los Angeles County Bar Association's 32nd Annual Labor and Employment Law Symposium.

"Conducting   Effective   Investigations."   New   Hampshire   Bar Association.

"Examining the Investigation." Also, "Expert Testimony on Trial, By the Experts."   Association of Workplace Investigators (AWI), 2nd Annual Conference.

"Use of Liability Experts in Harassment Litigation." The 29th Annual Meeting, California State Bar Association, Labor & Employment Section.

"Finding Buried Workplace Treasure—Then Using It at Trial." (Presenting on workplace investigations). 2011 Midwinter Meeting of the   American   Bar   Association's   Employment   Rights   and Responsibilities Committee.

"Mastering the Art of Workplace Investigations." California State Bar Association, Labor & Employment Section and the California Association of Workplace Investigator's (CAOWI).

"Dispelling Misconceptions Pertaining to the Employment of Individuals with Disabilities." HR Conference sponsored by EMPOWERTECH.

"The Year in Review." The Los Angeles County Bar Association's 30th Annual Labor and Employment Law Symposium.

"Workplace Investigations on Trial:  How Defendants Conduct Bulletproof Investigations and How Plaintiffs Shoot Them Down." The Los Angeles County Bar Association's Labor & Employment Section.

"Workplace Investigations on Trial:  How Defendants Conduct Bulletproof Investigations and How Plaintiffs Shoot Them Down." The California Association of Workplace Investigator's (CAOWI).

"Hot Topics in Disability Discrimination." The 28th Annual Los Angeles County Bar Association's Labor and Employment Law Symposium.

"Sexual Harassment Investigations; Protecting Your Clients, Protecting Your Law Firm." The Wilshire Bar Association.

"Internal Investigations on Trial: Plaintiff and Defense Perspectives." California State Bar Labor & Employment Section.

"Harassment and Discrimination Investigations: Protecting Your Clients, Protecting Your Law Firm." The Labor & Employment Section of the Orange County Bar Association.

"Disability Discrimination Cases; From Intake Through Trial". The California Employment Lawyers Association.

"Working on the Chain Gang, Accommodating the Disabled Worker". The Consumer Attorneys of California.

"Employee Discharge and Documentation in California." (Presenting on workplace investigations). Lorman Educational Services.

Moderator of the Los Angeles County Bar Association's program on *Lyle v. Warner Bros.* (the "Friends lawsuit)".

"Conducting Workplace Investigations." The Sixteenth Annual Convention of the National Employment Lawyers Association (NELA).

"Investigation Advice - Workplace Investigations by the Experts." The Beverly Hills Bar Association.

"Conducting Workplace Investigations In The Public Sector." The annual meeting of the County Counsels' Association of California.

State Wrongful Discharge Law: Are Unionized Employees Covered?" *Employee Relations Law Journal* (1986).

Portions of two chapters in the first and second editions of The Developing Labor Law (BNA).

**Publications:**    An article in the *Civil Litigation Reporter* relating to *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal. Rptr. 211 (1988).

A chapter entitled "Sexual Harassment and the Law" which was contained in a book entitled Preventing Worker's Compensation Abuse (Griffin, 1992).

"Why, How and What Now? The Ramifications of the Duty to Investigate In California Discrimination Actions," *Bender's California Labor & Employment Bulletin* (April-May 2007).

"Why How and What Now? Deriving Maximum Value from Your Neutral Investigation," *Bender's California Labor & Employment Bulletin* (November-December 2007).

"Effective Use of Experts in Disability Cases," FORUM Magazine (January-February 2008).

"Why, How and What Now? Getting Your Expert Testimony Admitted." *Bender's California Labor & Employment Bulletin.* (November-December 2008).

"Workplace Investigations: Understanding Standard Practice." *Bender's California Labor & Employment Bulletin.* (June 2010). (Peer reviewed and Republished in *The CAOWI Quarterly*, April 2011).

"Expert Testimony on Investigations." *The AWI Quarterly* (April 2012).

"Workplace Investigations as a Defense" *In-House Defense Quarterly* (DRI, Spring 2014).

"This Is Not Your Father's (or Mother's) Investigation: How Workplace Investigations Have Changed Over the Past 10 Years." 28 *California Labor & Employment Law Review* No. 6 (November 2014). (Peer reviewed and Republished in *The AWI Journal*, April 2015).

"California Legal Update," *The AWI Journal* (January 2015).

"Oops, I Stepped Into Your Privilege – Now How Do I Get Out?" *The AWI Journal* (Summer 2017).

"Union Not Entitled to Detailed Information Prior to Pre-Disciplinary Interview," *The AWI Journal* (September 2021).

"Being Deposed on Your Investigation: Strategies for Success," *The AWI Journal* (December 2021 and March 2022).

Docusign Envelope ID: 7A906A42-EA76-4795-B40D-361C61EF5AE3

"Clear and Convincing or Preponderance of the Evidence: What's a Workplace Investigator to Do? *36 California Labor & Employment Law Review* No. 3 (May 2022).

Investigations in Hollywood: It's the Same, But Different," *The AWI Journal* (December 2022). (Republished in the *AMEC Weekly*, August, 2024).

"Investigations in Hollywood – There's No Business Like Show Business," *The Daily Journal* (January 19, 2024). (Republished in the *AMEC Weekly*, August, 2024).

"Conflicting Views on Confidentiality in Workplace Investigations Create a Legal Dilemma," The Daily Journal (July 19, 2024). (Republished in the *AMEC Weekly*, August, 2024).

Docusign Envelope ID: 7A906A42-EA76-4788-B40D-261C616F5AF3

# Exhibit B

**Michael A. Robbins
Expert Testimony List[1]
Exhibit B**

| Case Name: | Deposition or Trial: | |
|---|---|---|
| Shelly v. CRST International | Deposition and Trial | No case number found |
| Wallace v. Countrywide | Deposition | 04CC11425 |
| Crable v. HSBC Card Services, Inc. | Deposition | M77614 |
| Morales v. R Ranch Markets, Inc. | Trial | BC350124 |
| Distelrath v. CHP, State of Calif. | Deposition | BC315085 |
| Otis v. Irvine USD | Deposition | 05CC0851 |
| O'Leary v. DR Horton | Deposition | 06-00639 |
| EEOC v. Scolari Warehouse Stores | Deposition | CV-N-040229LRH-RAM |
| McCall v. Safety Consultant Services, Inc., School Ten, Inc, Alfred Escobar | Deposition and Trial | VC046814 |
| La Pham v. Santa Ana USD | Deposition | 06CC01937 |
| Jimenez v. Rowland USD | Deposition | BL358662 |
| Bain v. Countrywide | Deposition and Trial | 12200347733 |
| EEOC v. Leo Palace | Deposition | 1:06CV00028 |
| Lang v. PSF | Deposition | 06CC13276 |
| Ashworth v. Foot Locker, Inc. | Deposition | CV066121DPP(FFMx) |
| Acosta v. Bijan, Fashion World | Deposition | BC363777 |
| Kinkaid v. Tribune Co. | Deposition | BC367308 |
| Gillette v. ANTC | Trial | 05-ARB-142 |
| Roe v. Wal*Mart | Deposition | CV2005-009394 |
| Asperi & Asperi v. Hyundai Motor American | Deposition | 06CC09820 |
| Connelly v. Toll Brothers | Deposition and Trial | 73160023907JOGU |
| Isman v. Beverly Hospital | Deposition and Trial | BC366198 |
| Richardson v. Selective Insurance Group, Inc. and Selective Insurance Company of America | Deposition | RDB06-CV-2594 |
| Morales v. MTA | Deposition and Trial | BC739557 |

---

[1] 2008+

| Nguyen v. Computer Services Corp. | Deposition | BC358617 |
|---|---|---|
| DFEH (Caruddo) v. Lucent Technologies | Deposition | C07-3747 Pjh |
| Abdel v. Citigroup | Trial | 72 160 000944 DECR |
| Sharbono v. Chicago Title | Deposition | 07CC05199 |
| Belshe v. Ojai Valley School | Deposition | 56-2007-00286520-CU-WT-VTA |
| Vara v. Countrywide | Deposition | 1120037370 |
| Burgess v. The Grand Del Mar | Deposition and Trial | NO. 37-2008-00079210-CU-WE-CTL |
| Ewing v. Fidelity National Title | Deposition | BC386339 |
| EEOC v. Bill Heard | Deposition | NO.: 2:07-CV-1195-RLH-PAL |
| Hampton v. Spectrum Security Services, Inc. | Deposition and Trial | BC 387130 |
| Vrastil v. Madison Marquette | Trial | YC052811 |
| Martinez v. County of Los Angeles | Deposition and Trial | BC 377968 |
| Espinosa v. County of Orange | Deposition and Trial | 30-2008 00110643 |
| Curry v. Schlumberger | Deposition | BC398542 |
| Lopez v. Stanislaus County | Deposition and Trial | No. 628471 |
| Klein v. Raytheon | Deposition | CV08-6461 CAS |
| Martinez v. Rite Aid Corporation | Deposition | BC401746 |
| Dsouza v. Los Angeles World Airports | Deposition and Trial | YC057846 |
| Babakitis v. Henry's Farmers Market | Deposition | 30-2009 00124459 |
| Shank v. CRST | Deposition and Trial | SCVSS 140516 |
| Dickinson v. Allstate Insurance Company | Deposition and Trial | 30-2009-310856 |
| Scharlach v. Coastal Radiation Oncology Medical Group | Deposition and arbitration hearing | Arbitration |
| Devgan v. Loma Linda University Medical Center, | Deposition and Trial | CIVSS 807479 |
| Saldana v. LA County | Deposition | BC 345048 |
| Miles v. Las Cal Corp. | Deposition | X575002 (Nevada) |

| Galindo v. LA County | Deposition | CV 07-07911GW (Ex) |
|---|---|---|
| Tookhli v. Avis Budget Group Inc. | Deposition | CGC-10-497120 |
| Gaede v. Loma Linda University | Deposition and Trial | CIVDS 1005806 |
| Meyle v. Dynamex, Inc. | Deposition | 34-2009-00055774 |
| Haley v. Cohen & Steers | Deposition | C10-03856 |
| Dang v. Sutter's Place, Inc. dba Bay 101; Unite Here! Local 19 | Deposition | 10-CV-02818 (RMW) |
| Daniel v. Tesoro | Deposition and Trial | BC 383 531 |
| Olivo v. Corovan Moving & Storage | Deposition | Arbitration |
| Abdullah v. SDG&E | Deposition | 37-2011-00086007 CU-WT-CTL |
| Mailhoit v. Home Depot | Deposition | CV11-03892-AHM (SSx) |
| Zwarg v. Union Bank; Best Best & Trust (BB&T) et al | Deposition and Trial | RG09477291 |
| Rhodes v. Dyson, Inc. | Deposition and Trial | SACV 12-616 JVC (JPRx) |
| Arenas v. Pediatric Management Group | Deposition | BC492104 |
| Fitzgerald v. CSAA | Deposition | C 10-03173 |
| Le v. Orange County Transportation Authority | Trial | 30-2010-00381599 |
| Felix v. Union Pacific | Deposition | BC497357 |
| Segal v. TCW Group | Deposition and Arbitration | JAMS 1220045625 |
| Acosta v. Costco | Deposition and Trial | RIC 1109224 |
| Rivera v. Costco | Deposition and Trial | RIC 1218368 |
| Bradford v. City of Compton | Deposition and Trial | TC026769 |
| Pao v. Kleiner Perkins | Deposition and Trial | CGC-12-520719 |
| Furutsuki v. Cisco Systems | Deposition and Arbitration | JAMS NO. 1110016574 |
| Luck v. USD | Deposition | 13CV3088 JLS BGS |

| Abarca v. Citizens of Humanity | Deposition and trial | BC 521 900 |
|---|---|---|
| Gonzalez and Valenzuela v. Urology Associates of Central California Medical Group | Deposition | 14CECG02860 |
| Bohnert v. Archdiocese of San Francisco | Deposition | 3:14-cv-02854-WHO |
| Lenard v. OCTA [Orange County Transportation Authority] | Deposition and trial | 30-2013-00690455-CU-OE-CJC |
| Parsons v. Office Depot | Deposition | BC513972 |
| Aboulhosn v. Merrill Lynch | Deposition | CV 2-00891-MMM-SPX |
| Smith v. City of Redlands | Deposition and trial | CIVDS 1311213 |
| Gutierrez v. Kenneth Cole Productions | Deposition | 3:15-cv-00129-SC |
| Vasquez v. Hazy | Deposition | SC123280 |
| Losorelli v. State of CA Department of Corrections | Deposition and trial | CIVDS 1418794 |
| Burns v. SDSU | Deposition | 37-2014-00003408-CU-CO-CTL |
| Perona v. Time Warner Cable | Trial | 5:14- cv- 02501-MWF(SPx) |
| Motakef v. Grubb & Ellis | Deposition and trial | 30-2011-00524087-CU-OE-CC |
| Teasley v. SpaceX | Deposition and trial | BC568896 |
| Monge v. Interspace Battery, Inc.; Concord Battery Corporation | Deposition | BC551981 |
| Abrams v.SkyOne Credit Union | Deposition | BC605650 |
| Stinson v. Pepperdine University | Deposition and trial | BC591794 |
| Zuniga v. City of Commerce | Deposition | BC 560902 |
| Harris v. The Zoological Society of San Diego | Deposition | 37-2016-00003260 CU-WT-CTL |
| Blasdell v. SpaceX | Deposition | BC 615 112 |
| Moland v. McWane | Trial | BC 559796 |
| Avetisyan v. Drinker Biddle & Reath LLP | Deposition | BC551859 |
| Wergechik v. Anaheim Arena | Deposition and trial | 30-2015-00786670- |

| | | |
|---|---|---|
| Management (Honda Center) | | CU-WT-CJC |
| Herrera v. Power Distribution, Inc | Deposition | 30-2016-00866182-CU-WT-CJC |
| Carranza v. State of California, Department of Corrections | Deposition | CIVRS1201373 |
| Carbajal v. Orange County | Deposition | No. 30-2013-00688237-CU-CR-CJC |
| Delgado v. Commerce Casino | Deposition | BC586727 |
| Monsef v. Cedars-Sinai Medical Center | Deposition | 01-15-0005-4331 |
| Gill v. CR Laurence Co., Inc | Deposition and trial | BC611501 |
| Bland v. J. Paul Getty Trust | Deposition | BC 604926 |
| Sarkisian v. USC | Deposition and arbitration | 01-16-0001-0212 |
| Sepah v. County of Los Angeles | Deposition and trial | BC622387 |
| Do v. Raytheon | Deposition | BC603539 |
| Horton v. Trident Society; Neptune Society of America | Deposition and trial | 37-2016-00039356-CU-OE-CTL |
| Pineda v. Abbott Laboratories | Deposition | 1240023036 |
| Gokhale v. Dolby Laboratories | Deposition | 3:17-cv-03845-IST |
| Bracken v. Equinox | Deposition and trial | BC 673140 |
| Mulder v. Children's Hospital | Deposition and trial | RG-17868998 |
| Narayan v. Compass Group | Deposition | 2:17-cv-00999-MCE-CKD |
| Goldstine v. NBCUniversal | Deposition | JAMS DT TT |
| Allen V. KRM, INC., KRM, Inc., d/b/a Thomas Keller Restaurant Group | Deposition and trial | 16-CV-000854 |
| Van de Motter & Tillotson v. The Irvine Company | Deposition and trial | JAMS NO., 1220059645 |
| Harrison v. Long Beach USD | Deposition | BC658086 |
| Ribaudo v. GE | Trial | JAMS No.1220058648 |
| Gardner v. Southern California Edison | Deposition and trial | BC669840 |
| Doe v. CRST | Deposition | RIC 1808034 |
| McConn v. UPS | Deposition and trial | BC7I7923 |
| Waring v. GEODIS | Deposition | 2:19-cv-04415-GW-KS |

| LOGISTICS | | |
|---|---|---|
| Romo v. COSTCO | Deposition | 19CV1120 JAH MSB |
| Pasinosky v. Pay Pal | Deposition | JAMS 1220062987 |
| Taylor v. UNUM | Deposition | 2:19-cv-07712-FMO-SS |
| Zeppos v. Brandman University | Deposition | 30-2019-01044513-CU-WT-CJC |
| Aguiar v. O'Reilly | Deposition | BC708634 |
| Wentworth v. University of California (Berkeley) | Deposition and trial | RG16833068 |
| De La Garza v. Perfect Promotional Products | Deposition | 56w201Bw00-11-0-CUWT-VTA |
| DFEH v. Pathways Community Services | Deposition | 30-2018-01039657-CU-CR-CJC |
| Sprengel v. Advanced Ambulatory Surgery Center, LP | Deposition | CIVDS 1516318 |
| Zucchella v. Olympusat, Inc | Deposition | 2:19-CV-7335 DSF (PLAx) |
| George v. Ingraham Micro | Deposition | RIC1903685 |
| Zareh v. LA County and USC | Deposition and trial | BC644274 |
| Alnadawi v. Flemings | Deposition and trial | CIVDS1611613 |
| Nunez v. Aspen Skilled Health Care aka Kei-Ai Los Angeles aka ALAL | Deposition | 18STCV00445 |
| Martignetti v. Southern California Healthcare System | Trial | 1220066760 |
| West v. County of Los Angeles | Deposition and trial | BC716104 |
| Fisker v. Albano | Trial | 1-20-0015-1304 |
| Cazares v. Anaheim Terrace Care Center | Deposition | 30-2019-01062296 |
| Assaad v. Caltrans | Deposition and trial | BC698405 |
| Lange v. Monster Energy | Deposition | BC697115 |
| Bridges v. United States Veterans Initiative | Trial | 1200057644 |
| Yphantides v. County of San Diego | Deposition and trial | 21-CV-1575-GPC (BLM) |
| Alexiadis v. Cambridge Systematics | Deposition | 2:21-CV-08564-JAK(pvc) |
| Demetriades v. USC., Keck | Deposition and Arbitration | AAA 1-22-000-6912 |

| | | |
|---|---|---|
| Kim v. USC | Deposition | 21STCV14870 |
| Doe v. AutoZoners | Deposition and Arbitration | NMMZE |
| Milner v. TBWA | Deposition | 19 STCV29137 |
| Pinter-Brown v. UCLA | Deposition and trial | BC 624 838 |
| Abrahamian v. Cedars Sinai | Deposition | 22STCV21788 |
| EEOC v. Fresh Venture Farms; Gold Coast Packing; Babe Farms | Deposition | 2:21-cv-07679-CBM-DFMx |
| John Doe v. DYE Precision, Inc. | Deposition | 37-2022-00047300-CU-OE-CTL |
| Cushman and Wakefield | Deposition | 37-2023-00006734 ·CU-WT-CTL |
| Cheung v. Grail Inc. | Deposition | 23CV038119 |
| Aylward v. Brinker (Chili's) | Trial | 22STCV34846 |
| Sanchez and Acevedo v. Walt Disney Parks & Resorts US, Inc. | Deposition | 20STCV03170 |
| | | |

# Exhibit C

## FACTS OR DATA CONSIDERED OR RELIED UPON

**Documents**

1.    24-CV-10049_0001097
2.    ABEL_000005094
3.    AS000008
4.    AS000010-11
5.    AS000062
6.    AS004588-89
7.    BALDONI_000016432-33
8.    BALDONI_000019296-98
9.    BALDONI_000019422-24
10.   BALDONI_000033615-16
11.   BBKOSLOW-000005085-89
12.   BL-000005595
13.   BL-000007953-54
14.   BL-000007966-67
15.   BL-000007990-91
16.   BL-000008024-25
17.   BL-000016442-43
18.   BL-000018761-62
19.   BL-000020756-58
20.   BL-000020760-62
21.   BL-000021653-57
22.   BL-000033428
23.   BL-000033431
24.   BL-000038461
25.   BL-000038463-65
26.   HEATH 000035492-93
27.   HEATH_000052026
28.   HEATH_000007969-73
29.   HEATH_000008993-9133
30.   JONESWORKS_00000182-200
31.   JONESWORKS_00000762-882
32.   JONESWORKS_00001639-1895
33.   JONESWORKS_00006011-20
34.   JONESWORKS_00006978-88
35.   JONESWORKS_00007063-201
36.   JONESWORKS_00007863-80
37.   JONESWORKS_00009099-189
38.   JONESWORKS_00009300-514
39.   JONESWORKS_00011289-695
40.   JONESWORKS_00013832-34
41.   JONESWORKS_00014980-82
42.   JONESWORKS_00015018-22
43.   JONESWORKS_00016225-32

44. JONESWORKS_00016351-59
45. JONESWORKS_00041606-608
46. JS0000283-84
47. JS0000289-91
48. JS0000297-98
49. JS0000333-35
50. JS0000368-70
51. JS0000374-76
52. JS0000379-83
53. JS0000506-07
54. KCASE-000000578-80
55. LS_0000277-78
56. NATHAN_000003767
57. SAROWITZ_000000069-74
58. SPE_BL0002023-25
59. SPE_BL0002026-35
60. SPE_BL0002193-97
61. SPE_BL0003512-16
62. SPE_BL0003351-54
63. SPE_BL0004512-13
64. SPE_BL0011099-102
65. SPE_BL0015756-60
66. TAG_000000151
67. WAYFARER_000139049-76
68. WAYFARER_000140115-16
69. WAYFARER_000140131-32
70. WAYFARER_000142434-35
71. WAYFARER_000142796-863
72. Baker Deposition, Exhibit 1
73. WAYFARER_000140494 at 040_1_A, 40_1_B, 40_2_A, 40_2B, 40A_1_A, 40A_1_B, 106_1_A, 106_1_B, 106_2_A, 106_2_B, 106A_1_A, 106A_1_B, 106A_2_A, 106A_2_B, 106B_1_A, 106B_1_B

## Depositions (and Related Exhibits)

1. 2025-07-31 Deposition of Blake Lively
2. 2025-08-21 Deposition of Elizabeth Talbot
3. 2025-09-12 Deposition of Vivian Baker
4. 2025-09-23 Deposition of Andrea Giannetti
5. 2025-09-24 Deposition of Alexandra Saks
6. 2025-09-26 Deposition of Jenny Slate
7. 2025-09-29 Deposition of Margaret Colleen Hoover
8. 2025-09-30 Deposition of Isabela Ferrer
9. 2025-10-03 Deposition of Steve Sarowitz
10. 2025-10-06 Deposition of Justin Baldoni
11. 2025-10-07 Deposition of Justin Baldoni
12. 2025-10-08 Deposition of Jamey Heath

13.     2025-10-09 Deposition of Jamey Heath

## Pleadings and Filings

1.    2025-01-31 Wayfarer Parties' Amended Complaint, Dkt. 50
2.    2025-01-31 Wayfarer Parties' Amended Complaint, Ex. A, Dkt. 50-1
3.    2025-07-30 B. Lively Second Amended Complaint, Dkt. 520
4.    2025-07-30 Exhibit to Filing, Dkt. 521-3

## Other

1.    Conversation with Laura Rikard, Owner of Theatrical Intimacy Education.
2.    SAG-AFTRA Quick Guide for Scenes involving Nudity and Simulated Sex.
3.    SAG-AFTRA Standards and Protocols for the Use of Intimacy Coordinators.
4.    PREVENTING WORKPLACE HARASSMENT, DISCRIMINATION, AND RETALIATION (Liebert, Cassidy, Whitmore 2008).
5.    L. Guerin, ESSENTIAL GUIDE TO WORKPLACE INVESTIGATIONS (2nd ed., Nolo 2010).
6.    *California Department of Fair Employment and Housing Workplace Harassment Guide for California Employers* (DFEH).
7.    M. Robbins and J. Yanow, *Why, How and What Now? The Ramifications of the Duty to Investigate in California Discrimination Actions*, BENDER'S CALIFORNIA LABOR & EMPLOYMENT BULLETIN (April-May 2007).
8.    *Guiding Principles for Conducting Workplace Investigations*, (AWI);  EEOC, *Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors* (June 1999).
9.    INVESTIGATING WORKPLACE CONDUCT, INVESTIGATOR'S GUIDEBOOK (Equal Employment Advisory Council 1999).
10.    ADVISING CALIFORNIA EMPLOYERS AND EMPLOYEES (CEB 2011), M. Robbins and S. Wooley,  28 CALIFORNIA LABOR & EMPLOYMENT LAW REVIEW No. 6 (November, 2014), (Peer reviewed and Republished in THE AWI JOURNAL, April 2015).
11.    Workplace Investigations: Understanding Standard Practice, BENDER'S CALIFORNIA LABOR & EMPLOYMENT BULLETIN (June 2010) (Republished in THE CAOWI QUARTERLY, April 2011).
12.    Conducting Effective Independent Workplace Investigations in a Post #MeToo Era, DISPUTE RESOLUTION JOURNAL, (2019, volume 74 No. 1).
13.    Nancy Bornn and Debra L. Reilly, Practice Pointers for Workplace Investigations, (AWI JOURNAL); California Department Of Fair Employment And Housing Workplace Harassment Guide For California Employers; Robbins and Wagener, *Investigations in Hollywood: It's the Same, but Different* (AWI Journal, December 2022).
14.    Wagener and Robbins, *Investigations in Hollywood – there's no business like show business* (Daily Journal, January 19, 2024).