Exhibit 189

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                    ---oOo---
 4
 5   BLAKE LIVELY,
 6                  Plaintiff,
 7     vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)
                              25-CV-449 (LJL) (MEMBER CASE)
 8
     WAYFARER STUDIOS LLC, ET AL.
 9
                    Defendants.
10   _____
     JENNIFER ABEL,
11              Third-party Plaintiff,
       vs.
12   JONESWORKS, LLC,
                    Third-party Defendant.
13   _____
     WAYFARER STUDIOS LLC, et al.
14              Consolidated Plaintiffs,
       vs.
15   BLAKE LIVELY, et al.
                    Consolidated Defendants.
16   _____
17                  **CONFIDENTIAL**
18
19      VIDEO-RECORDED DEPOSITION OF MELISSA NATHAN
20              Los Angeles, California
21              Monday, September 29, 2025
22
23   Stenographically Reported by:  Ashley Soevyn,
     CALIFORNIA CSR No. 12019
24
25
```

CONFIDENTIAL

Page 72

```
 1   minutes.
 2              MR. GOTTLIEB:  All right.  Why don't we
 3   take a quick break because I need to use the
 4   facilities.
 5              THE WITNESS:  Sure.
 6              THE VIDEOGRAPHER:  The time is 10:29 a.m.
 7   Off record.
 8              (Recess.)
 9              THE VIDEOGRAPHER:  The time is 10:46 a.m.
10    We're back on record.
11   BY MR. GOTTLIEB:
12        Q    All right.  Thank you, Ms. Nathan.  Back
13   on the record.  What is your position at TAG?
14        A    I'm the founder and CEO.
15        Q    Founder and CEO.  And so you oversee all
16   your employees?
17        A    I do.
18        Q    Is there anyone you answer to at TAG?
19        A    No.
20        Q    How many employees did TAG have, let's
21   focus, just for the time being, on July and August
22   of 2024?
23        A    Yes.
24        Q    How many people worked for you at TAG
25   during that period of time?
```

CONFIDENTIAL

Page 117

1    is "our team's digital experts"?

2         A    In this scenario?  Because we have a few.

3         Q    In this -- who are you referring to in

4    this document sent to your client?

5         A    Wayfarer hired Jed Wallace.

6         Q    Okay.  And is that who you had in mind

7    when this was written to -- to the client?

8         A    That would be fair, yes.

9         Q    Okay.  And if you recall previously, we

10   were looking at the TAG website.

11        A    Yes.

12        Q    And there is a reference there to digital

13   and social strategy?

14        A    Yeah.

15        Q    Is that -- when you're talking about

16   digital and social strategy, is Mr. Wallace one of

17   the people that you have in mind as the people

18   providing those services for TAG?

19        A    Yes.

20        Q    Is there anybody else that TAG uses for

21   digital or social strategy?

22        A    There is.

23        Q    Who is that?

24        A    Skyline.

25        Q    Okay.  And who is in charge of Skyline?

CONFIDENTIAL

Page 118

1        A    Two people.

2        Q    Who is that?

3        A    Roza and her partner, and I forget his

4    last name.  But yeah, Roza.

5        Q    What is Roza's full name?

6        A    Kalantari.

7        Q    Can you spell that, please?

8        A    K-A-L -- K-A-L-A-N-T-A-R-I.

9        Q    Okay.  Did Ms. Kalantari provide any work

10   in the -- on this -- on the Wayfarer account in

11   connection with TAG?

12       A    At what time?

13       Q    At any time.

14       A    After litigation, yes.

15       Q    Okay.  So in the July-August period of

16   time, Ms. Kalantari did not perform any services for

17   TAG?

18       A    She did not.

19       Q    In fact, at one point in time, did Ms.

20   Kalantari tell you that she would not be available

21   to work on this account in around July, August 2024?

22       A    I can't remember that.

23       Q    Okay.  Did Skyline perform any work in

24   connection with your work in July or August of 2024?

25       A    Define my work.

CONFIDENTIAL

                                              Page 128

1        Q    How is that different from off the

2   record?  How is it different to -- is there a

3   difference between talking on background as a source

4   familiar and talking to a journalist off the record?

5        A    It's a gray line, but yes.

6        Q    Okay.  So explain that to me.

7        A    Off the record is telling someone a piece

8   of information that you would like it to be off the

9   record.  I think it's, you know, important to note

10  that just because we tell a reporter something,

11  doesn't mean they're going to write it.  We can't --

12  we do not have oversight on them writing an article.

13  If they choose to use it, it's up to them.

14       Q    Sure.

15       A    Especially off the record.

16       Q    And by contrast, you don't know for sure

17  when you tell a journalist something off the record,

18  precisely what they'll do with that information,

19  right?

20       A    Correct.

21       Q    You have a general understanding and

22  agreement that they're not going to print it, right?

23       A    What do you mean?

24       Q    Like you tell a journalist something is

25  off the record, and you give them some -- whatever

CONFIDENTIAL

Page 129

1   the information is you give them --

2        A    Uh-huh.

3        Q    -- your general understanding -- and tell

4   me if I'm wrong -- is they are not going to print

5   that information in whatever article they're working

6   on, right?

7        A    That's not correct.  You mean -- you mean

8   interpretation?  That's what you mean?  They're not

9   going to print it to you; that's what you mean?

10       Q    I'm -- I only want to understand it from

11  your perspective.

12       A    No --

13       Q    So tell --

14       A    -- that's not true.

15       Q    -- me how you understand it.

16       A    Well, off the record, you're not

17  telling -- you can give someone information off the

18  record and it's their choice they're going to use

19  it.  Report -- you're not going to just phone up

20  someone and say, "off the record," and then they

21  don't use it.  You hope they do, but you can't tell

22  them they're going to use it.

23       Q    You hope they don't use it?

24       A    It depends on the situation.

25       Q    I'm just trying --

CONFIDENTIAL

Page 130

```
1         A    Me, too.  But it depends on the
2   situation.
3         Q    Yeah.  Okay.
4         A    There's a million different situations
5   and scenarios that you are --
6         Q    I just --
7         A    -- trying to whittle down to one.
8         Q    I just want to try to understand your
9   view of this.
10        A    Uh-huh.
11        Q    So am I right -- I think I'm
12  understanding what you're saying is, it's possible
13  if you call up a reporter and give them something
14  off the record --
15        A    Uh-huh.
16        Q    -- you hope they don't print it, but it's
17  possible that they could?
18        A    Possible.
19        Q    And it's possible they could use that
20  information to go call other sources and try to get
21  that information on the record that you provided to
22  them off the record, right?
23        A    Possible.
24        Q    Have you had that happen to you in your
25  career?
```

CONFIDENTIAL

Page 131

1          A    I couldn't pinpoint it.

2          Q    Do you think at some point in your

3    career, you've given a reporter information off the

4    record that they then were able to go do

5    investigative work, do some digging, and find that

6    information from a source they could attribute it

7    to?

8          A    Perhaps.

9          Q    And so the information you provided was

10   never published, but the actual information they got

11   from somebody else?

12         A    Perhaps.

13         Q    Okay.  So off the record information can

14   still be very useful to a journalist and going

15   around and doing other research and doing other

16   digging and trying to find stuff that might already

17   be in the public record?

18         A    I'm sure.

19         Q    Okay.  You write in this section:

20              (As read):

21                   "TAG will confirm outlets intending on

22                   covering the story, especially those

23                   impactful to Justin, Jamey, and

24                   Wayfarer's interest, are fully briefed

25                   on the situation, including and not

CONFIDENTIAL

Page 431

                    REPORTER'S CERTIFICATE

1          I, ASHLEY SOEVYN, a Certified Shorthand

2   Reporter of the State of California, do hereby

3   certify:

4          That the foregoing proceedings were taken

5   before me at the time and place herein set forth;

6   at which time the witness was put under oath by me;

7          That the testimony of the witness, the

8   questions propounded, and all objections and

9   statements made at the time of the examination were

10  recorded stenographically by me and were thereafter

11  transcribed;

12         That a review of the transcript by the

13  deponent was/ was not requested;

14         That the foregoing is a true and correct

15  transcript of my shorthand notes so taken.

16         I further certify that I am not a relative

17  or employee of any attorney of the parties, nor

18  financially interested in the action.

19         I declare under penalty of perjury under

20  the laws of California that the foregoing is true

21  and correct.  Dated this 1st day of October, 2025.

22

23

24

                    ASHLEY SOEVYN

25                  CSR No. 12019