Exhibit 203

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
    BLAKE LIVELY,              )
 3       PLAINTIFF,            )   CASE NO.
                               )   1:24-CV-10049-LJL
 4  VS.                        )   (CONSOLIDATED WITH
                               )   1:25-CV-00449-LJL
 5  WAYFARER STUDIOS LLC,      )
    JUSTIN BALDONI, JAMEY      )
 6  HEATH, STEVE SAROWITZ,     )
    IT ENDS WITH US MOVIE      )
 7  LLC, MELISSA NATHAN,       )
    THE AGENCY GROUP PR        )
 8  LLC, JENNIFER ABEL, JED    )
    WALLACE, AND STREET        )
 9  RELATIONS INC.,            )
         DEFENDANTS.           )
10  _____
    JENNIFER ABEL,             )
11       THIRD-PARTY           )
         PLAINTIFF,            )
12                             )
    VS.                        )
13                             )
    JONESWORKS LLC,            )
14       THIRD-PARTY           )
         DEFENDANT.            )
15  _____
    WAYFARER STUDIOS LLC,      )
16  JUSTIN BALDONI, JAMEY      )
    HEATH, IT ENDS WITH US     )
17  MOVIE LLC, MELISSA         )
    NATHAN, JENNIFER ABEL,     )
18  AND STEVE SAROWITZ,        )
         CONSOLIDATED          )
19       PLAINTIFFS,           )
                               )
20  VS.                        )
                               )
21  BLAKE LIVELY, RYAN         )
    REYNOLDS, LESLIE           )
22  SLOANE, VISION PR,         )
    INC., AND THE NEW YORK     )
23  TIMES COMPANY,             )
         CONSOLIDATED          )
24       DEFENDANTS.           )
25
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

1                ORAL AND VIDEOTAPED DEPOSITION OF JED WALLACE

                              OCTOBER 9, 2025

2                   CONFIDENTIAL - ATTORNEYS' EYES ONLY

3

4           ORAL AND VIDEOTAPED DEPOSITION OF JED WALLACE,

5      produced as a witness at the instance of the Blake

6      Lively and duly sworn, was taken in the above styled and

7      numbered cause on Thursday, October 9, 2025, from 9:14

8      a.m. to 7:36 p.m., before Janalyn Elkins, CSR, in and

9      for the State of Texas, reported by computerized

10     stenotype machine, at the offices of Jackson Walker, 100

11     Congress Avenue, Suite 1100, Austin, Texas, pursuant to

12     the Federal Rules of Civil Procedure and any provisions

13     stated on the record herein.

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 72

1    about services on email?

2        A.   Not that I recall.

3        Q.   How about on text message?

4        A.   Not -- could you be more specific?

5        Q.   On any form of electronic communication?  Let's

6    broaden it up.

7        A.   And the question did I have any communication

8    with her about any types of services?

9        Q.   That you might provide to Wayfarer Studios?

10       A.   Yeah, we discussed monitoring.

11       Q.   Okay.  In what -- on what platform did you have

12   that conversation with Ms. Nathan?

13       A.   I -- I -- I wouldn't know because I didn't know

14   the client or the details yet.

15       Q.   Were you in -- I'm not talk -- sorry.  Maybe my

16   question was unclear.  I wasn't talking about what

17   platform for monitoring.  I was talking about the

18   platform that you used to communicate with Ms. Nathan

19   about that.  Was it Signal?

20       A.   We've communicated through Signal and phone

21   calls.

22       Q.   By August 8th, 2024, had you communicated with

23   Melissa -- Melissa Nathan on Signal?

24       A.   Related to this?

25       Q.   On anything?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 73

```
 1        A.  Oh, yes.
 2        Q.  Okay.  Did you also communicate with Ms. Nathan
 3   on the -- do you -- do you have an Apple iPhone?
 4        A.  I do.
 5        Q.  Okay.  Did you also communicate with Ms. Nathan
 6   as of August 8th, 2024 on the Apple messaging app, the
 7   iMessaging app?
 8        A.  Ever before?
 9        Q.  Yes.
10        A.  I believe so.
11        Q.  Would you say as between those two messaging
12   applications as of August 8th, 2024, with respect to
13   your communications with Melissa Nathan, you used one of
14   those applications more than the other?
15        A.  I -- I would say yes, Signal.
16        Q.  You used Signal more?
17        A.  Uh-huh.
18        Q.  When do you recall -- do you -- do you recall a
19   point in time when you started to use Signal more than
20   regular text messaging with Melissa Nathan?
21        A.  No.
22        Q.  Okay.  At some point in time you did, though?
23        A.  No, I need a more specific question.
24        Q.  Okay.  Do you see, back to the email,
25   Ms. Nathan says, (Reading:)  He is aware we're going for
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 132

```
 1       Q.  Well, you say in the email, (Reading:)  This
 2   was forwarded without attachments.
 3            Right?
 4       A.  I do say that, but I don't recall.
 5       Q.  And -- okay.  And you say, (Reading:)  This is
 6   exactly the kind of content (in theory, until I read
 7   them) that our team can elevate.
 8            Right?
 9       A.  I do say that.
10       Q.  So you seem to be saying, and correct me if I'm
11   wrong, but you seem to be saying that whatever this
12   attachment or article was, you hadn't read it yet?
13       A.  I -- I can't speak to that.  I'm not sure.
14       Q.  You don't remember if that's what you're saying
15   here?
16       A.  I don't remember, no.
17       Q.  Well, nonetheless, whether you had read the
18   article or not, you say, (Reading:)  This is exactly the
19   kind of content that our team can elevate across all
20   algorithmically driven platforms.
21            Correct?
22       A.  Yes.
23       Q.  Was your team capable of elevating content
24   across algorithmically driven platforms?
25       A.  I don't have a team.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                          Page 133
 1        Q.   Is Street Relations capable of elevating
 2   content across all algorithmically driven platforms?
 3        A.   Absolutely not.
 4        Q.   So you were being untruthful to ███████
 5   when you said that "our team can elevate across all
 6   algorithmically driven platforms"?
 7                  MR. COOLEY:   Objection.
 8                  THE WITNESS:   Yeah, not at all.
 9        Q.   (BY MR. GOTTLIEB)   You were not at all being
10   untruthful?
11        A.   No.
12        Q.   Okay.   So Street Relations can't do that,
13   right?
14        A.   Correct.
15        Q.   Okay.   So who was your team capable of
16   elevating across all algorithmically driven platforms?
17        A.   If I'm referencing TAG, it would be whomever
18   works for TAG to post stories.
19        Q.   And you're saying you have no memory at all of
20   what team you were referencing here?
21        A.   No, I -- I think I said I'm referencing TAG as
22   the team.
23        Q.   Okay.   So you think that TAG is capable of
24   elevating content across all algorithmically driven
25   platforms?
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 134

1        A.   100 percent.

2        Q.   Okay.  Who at TAG can do that?

3             MR. COOLEY:  Objection.

4             THE WITNESS:  To be specific, when you post

5   a story or find a place for a story, you are elevating

6   it across algorithmically driven platforms.

7        Q.  (BY MR. GOTTLIEB)  And so who at TAG was

8   capable of posting or sharing stories creating content?

9             MR. COOLEY:  Same.

10             THE WITNESS:  I don't know specifically.

11   That's their job, to create stories.

12        Q.  (BY MR. GOTTLIEB)  TAG's job is to create

13   stories?

14        A.   Yes.  Or -- let me be specific with that.  Is

15   to help their clients get things posted as news stories,

16   which would 100 percent elevate it across all

17   algorithmically driven platforms.

18        Q.   Okay.  And -- and so you believe that when you

19   were writing, (Reading:)  So I can share with the teams

20   and get it into the system, what you're talking about is

21   sharing the content with TAG?

22        A.   I do.

23        Q.   And you believe the system is a reference to

24   something that TAG has?

25        A.   It's the system of posting or at least getting

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 135

```
 1   content covered for their clients.
 2        Q.  Okay.  And you recall the previous exhibit we
 3   looked at was on the 19th?
 4        A.  Uh-huh.
 5        Q.  At 7:29 p.m., and you said, (Reading:)  Got
 6   that one in the system/on it?
 7        A.  Correct.
 8        Q.  So does it look like you followed through on
 9   what you said you would do here in Exhibit 10?
10        A.  I don't recall what that is.
11        Q.  Was this further help for ██████████?
12        A.  No.  I didn't -- again, not engaged by ████
13   ██████
14        Q.  Well, sir, that was not my question.  My
15   question was, was this further help for █████████  that
16   you provided?
17                   MR. COOLEY:  Objection.
18                   THE WITNESS:  I can't answer that.  I don't
19   know.
20        Q.  (BY MR. GOTTLIEB)  Why?  Why can't you answer
21   that?
22                   MR. COOLEY:  Objection.
23                   MR. BABCOCK:  Same -- same objection.
24                   THE WITNESS:  I don't know if it helped
25   him.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 136

1     Q.   (BY MR. GOTTLIEB)  Did you believe you were
2   providing him with help?
3     A.   No.
4     Q.   It's a very simple question -- no?
5     A.   I believe that I was helping to share
6   information.
7     Q.   Is that not providing help?
8     A.   It is.
9     Q.   Okay.  So if I want to ask you about whether
10  you were formally engaged by someone from this point
11  forward, I will be sure to ask formally engaged and
12  specify my question.  But can we agree if I ask you if
13  you have helped someone, we're using the broad
14  definition of help in any respect?
15              MR. BABCOCK:  Objection.
16              MR. COOLEY:  Join.
17              MR. BABCOCK:  You don't need to make an
18  agreement about that.
19    Q.   (BY MR. GOTTLIEB)  This is 11.
20              (Exhibit No. 11 was marked.)
21    Q.   (BY MR. GOTTLIEB)  Exhibit 11, sir, is a
22  document bearing the Bates Nos. 3.0486 through .0488.
23  This is a text chain.  The date range is November 11th
24  through November 14th, 2024.  Appears to be between
25  yourself, Ms. Nathan, Ms. Koslow, ██████████, and

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 148

```
 1              VIDEOGRAPHER:  Going off the record.  The
 2    time is 12:29.
 3                   (Brief recess.)
 4              VIDEOGRAPHER:  Back on the record.  The
 5    time is 1:34.
 6         Q.  (BY MR. GOTTLIEB)  Hi, Mr. Wallace, back on the
 7    record.  Hope you had a good lunch.
 8              We were talking before about a period of
 9    time in October through November of 2024.  We were
10    looking at a bunch of messages.  I think I asked you
11    before about sort of, like, the recordkeeping that you
12    have or that Street has for your work.  If we wanted to
13    recreate one of your days in that period of time after
14    the fact, say, you know, mid-October, end of
15    October 2024, would you have anything in terms of
16    records other than, you know, your text messages,
17    emails, and phone records?
18         A.  Would I have anything other as records?  Is
19    that what you're asking?  I'm sorry.
20         Q.  Any information that you would have stored
21    somewhere that would help us to recreate one of your
22    days going back in time other than your -- what -- what
23    is -- you have preserved in the form of text messages,
24    whether Signal or Apple, emails, and phone records that
25    show outgoing and incoming calls?
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 149

1      A.   No.

2      Q.   Do you keep --

3      A.   Not that I'm aware of.

4      Q.   I'm sorry.

5      A.   Not that I'm aware of.

6      Q.   Okay.  Do you keep a calendar?

7      A.   Yeah.  There's -- there's a calendar of events.

8      Q.   You -- you have a calendar personally?

9      A.   Yeah.  I mean, everyone has I on an iPhone.

10      Q.   Okay.  Do you ever put work calls or work

11   meetings into your calendar on your iPhone?

12      A.   Yes.

13      Q.   Okay.  And if you get invited to a Zoom or a

14   Microsoft Teams meeting or something like that, that

15   from time to time show up in your calendar on your

16   iPhone?

17            MR. BABCOCK:  Objection.

18            THE WITNESS:  Yeah.  If -- if someone sent

19   me a link to that, you know, it just populates

20   sometimes.  You accept or deny.

21      Q.   (BY MR. GOTTLIEB)  All right.  So sometimes you

22   will have a -- depending on whether somebody sent you

23   the invite to your -- your email or your -- otherwise

24   sent you an invite that populates into your calendar?

25      A.   I need to know more details.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 169

1   a conversation in advance of her sending this message at

2   8:57 a.m.?

3                    MR. BABCOCK:  Objection.

4                    MR. COOLEY:  Join.

5                    THE WITNESS:  I don't recall.

6       Q.  (BY MR. GOTTLIEB)  Is it possible that before

7   Ms. Nathan sent this statement of work at 8:57 a.m. that

8   you and she discussed this statement of work?

9                    MR. BABCOCK:  Objection.

10                   THE WITNESS:  Yeah, I don't recall.

11      Q.  (BY MR. GOTTLIEB)  My question is just is it

12  possible?

13                   MR. BABCOCK:  Objection.  Sorry.

14      Q.  (BY MR. GOTTLIEB)  So -- that's a -- that's a

15  yes or no --

16                   MR. COOLEY:  Join.

17      Q.  (BY MR. GOTTLIEB)  -- question?

18      A.  Yeah, I don't think so.

19      Q.  You don't think so.  But do you know for

20  certain that you and Melissa Nathan did not discuss the

21  statement of work before she sent it at 8:57 a.m.?

22                   MR. BABCOCK:  Objection.

23                   MR. COOLEY:  Join.

24                   THE WITNESS:  We did not discuss the

25  statement of work before she sent that.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 170

1      Q.  (BY MR. GOTTLIEB)  You're certain of that as
2   you sit here today?
3      A.  As I recall.
4      Q.  Okay.  That's a different answer.  So saying to
5   the best of my recollection I don't recall discussing
6   this is one answer.  Saying that you're certain is
7   another.  So I'm just trying to discern the difference
8   to understand your testimony?
9      A.  We didn't have a discussion about the scope of
10  work.
11     Q.  Okay.  And you're sure about that?
12     A.  I'm sure about that.
13     Q.  All right.  Did you discuss it with her after
14  she sent it?
15     A.  I don't recall.
16     Q.  Okay.  So you might have discussed it with her
17  after, but you're sure you didn't discuss it with her
18  before?
19     A.  Yeah, I don't recall.
20     Q.  Do you see the next bullet down says,
21  (Reading:)  Use our team of specialists to build all the
22  digital (Reddit, site, X, 4 Chan, discord, et cetera)
23  messaging to trend and dominate in client's favor?
24     A.  I do.
25     Q.  Are you aware of any team of specialists that

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 171

1  exists that can do that?

2      A.  I'm not.

3      Q.  Is Melissa Nathan a technically sophisticated

4  person?

5              MR. COOLEY:  Objection.

6              MR. BABCOCK:  Objection.

7              THE WITNESS:  Yeah, I'd -- I'd need a more

8  specific question.

9      Q.  (BY MR. GOTTLIEB)  Do you think Melissa Nathan

10  understands, for example, the -- the concept of

11  something being algorithmically weaponized?

12             MR. BABCOCK:  Objection.

13             MR. COOLEY:  Join.

14             THE WITNESS:  I don't know.

15     Q.  (BY MR. GOTTLIEB)  Do you think she understands

16  how to influence content on 4chan?

17             MR. BABCOCK:  Objection.

18             MR. COOLEY:  Objection.

19             THE WITNESS:  I don't know.

20     Q.  (BY MR. GOTTLIEB)  Would it surprise you to

21  learn in her testimony under oath in this case she

22  testified that she doesn't even have social media?

23             MR. BABCOCK:  Objection.

24             THE WITNESS:  I -- I -- I don't -- I

25  don't -- have no idea if that would surprise me or not.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 172

```
 1    It would be news.
 2         Q.  (BY MR. GOTTLIEB)  Okay.  But your testimony is
 3    you don't know anyone who could build all of the digital
 4    messaging from these platforms to trend and dominate in
 5    the client's favor; is that right?
 6                   MR. COOLEY:  Objection.
 7                   THE WITNESS:  Correct.
 8         Q.  (BY MR. GOTTLIEB)  And you can't do that
 9    personally?
10         A.  I cannot.
11         Q.  Okay.  So assuming that Melissa Nathan is also
12    not capable of doing this personally, given your
13    testimony that you can't do it personally and you don't
14    know anybody who can do this personally, is this a
15    truthful representation of the statement of work that
16    you, TAG, and Bryan Freedman could provide?
17                   MR. BABCOCK:  Objection.
18                   MR. COOLEY:  Objection.
19                   THE WITNESS:  I -- I have no idea what some
20    of these things are.
21         Q.  (BY MR. GOTTLIEB)  So -- so no, this would not
22    be a truthful and accurate representation of a service
23    that collectively, you, Melissa Nathan, and Bryan
24    Freedman could provide?
25                   MR. BABCOCK:  Objection.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 173

1           MR. COOLEY:  Objection.

2           THE WITNESS:  Not from my perspective.

3      Q.  (BY MR. GOTTLIEB)  Why do you think Melissa

4  Nathan repeatedly sends out statements of work that

5  represent digital services that you can't provide?

6           MR. BABCOCK:  Objection.

7           MR. COOLEY:  Objection.

8           THE WITNESS:  Can you repeat that question?

9      Q.  (BY MR. GOTTLIEB)  Why do you think Melissa

10  Nathan repeatedly sends out statements of work to

11  clients referencing digital services that you are not

12  capable of providing?

13           MR. BABCOCK:  Objection.

14           MR. COOLEY:  Same.

15           THE WITNESS:  I have no idea.

16      Q.  (BY MR. GOTTLIEB)  Does it concern you?

17           MR. BABCOCK:  Objection.

18           THE WITNESS:  I -- I don't know enough

19  about it --

20      Q.  (BY MR. GOTTLIEB)  As you sit here today --

21      A.  -- that it concerns me.

22      Q.  Sorry.  I didn't mean to interrupt.

23           As you sit here today, we've now looked at

24  a few of these, right?

25      A.  Uh-huh.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 174

```
 1        Q.   Okay.  And I'm just asking you as a businessman
 2   who runs his own business, who has a representation,
 3   does it bother you at all that you are being held out to
 4   provide services that you are sitting here telling me
 5   under oath not only can you not provide them you don't
 6   even know what they are?
 7                  MR. BABCOCK:  Objection.
 8                  MR. COOLEY:  Objection.
 9        Q.   (BY MR. GOTTLIEB)  Does that bother you?
10                  MR. BABCOCK:  Same objection.
11                  MR. COOLEY:  Objection.
12                  THE WITNESS:  I don't know that she's
13   talking about me.
14        Q.   (BY MR. GOTTLIEB)  Okay.  If she's talking
15   about you, if her testimony is in providing description
16   of digital services she was talking about you and Street
17   Relations, then would it bother you?
18                  MR. BABCOCK:  Objection.
19                  MR. COOLEY:  Objection.
20                  THE WITNESS:  I don't have enough details
21   there.
22        Q.   (BY MR. GOTTLIEB)  Would you want to keep
23   working with somebody who's making misrepresentations to
24   clients about what you can do?
25                  MR. COOLEY:  Objection.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 197

1              (Exhibit No. 18 was marked.)

2         Q.   (BY MR. GOTTLIEB)   This is Exhibit 18.   And

3    Mr. Wallace, you've been handed a document marked as

4    Exhibit 18 bearing the Bates Nos. Street 3.0348 through

5    0355.  And let me know once you've had a chance to look

6    through it.

7         A.   Okay.

8         Q.   You've had a chance to look through Exhibit 18?

9         A.   I have.

10        Q.   And Exhibit 18 is an email exchange be an

11   attachment that involves you, a number of people from

12   TAG, and someone from ███████████████; is that right?

13        A.   Yes.

14        Q.   Is ███████████ a client that you did any work

15   for around this time?

16        A.   They were a client of TAG's.

17        Q.   Okay.  A client of TAG's.  Did you or Street do

18   any work for them in connection with TAG's services?

19        A.   I had a few consulting calls with them.

20        Q.   Okay.  And this August -- this is August 3rd,

21   2024.  Is that around the same time that you began

22   working for -- performing the work that you did on

23   behalf of Wayfarer Studios?

24        A.   No.  It was later for Wayfarer.

25        Q.   A few days later?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 198

```
 1        A.   August 9th.

 2        Q.   This was around the same time that you began

 3   talking to Ms. Nathan about Mr. Baldoni and Wayfarer; is

 4   that right?

 5        A.   I don't recall.

 6        Q.   Okay.  At most, then, I think what you're

 7   saying it was six days apart from when you were engaged?

 8        A.   According to this date, yes.

 9        Q.   Okay.  And there is a scope of work for

10   █████████   that is attached to the end of this email

11   chain; is that right?

12        A.   Yes.

13        Q.   And █████████████████████████████████████

██   ██████████████████████████████████████ -- oh,

15   lost your microphone.

16        A.   My bad.

17        Q.   No worries.

18             Am I right that █████████████████████████

██   ████████████████████████████████████████

██   █████████████████████████████████████████████

██   ████████████████

22        A.   Yes.

23        Q.   Okay.  And at 8:28 p.m. on Friday, August 2nd,

24   you reply to the introduction that █████████ has sent;

25   is that right?
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 199

```
 1      A.  Yes.
 2      Q.  ████████████████████████████████████
        ████████████████████████████████████
        ██████████████████████████  I'm sorry for
 5   the circumstances but happy to connect and help build a
 6   solution.
 7              Do you see that?
 8      A.  I do.
 9      Q.  And you say, (Reading:)  I see the date of the
10   article and have my forensic team building a quick
11   report on the sentiment and how it engages so we can
12   discuss all the paths to solve.
13              Do you see that?
14      A.  I do see.
15      Q.  Who is your forensic team you were referring to
16   here?
17      A.  I don't have one.
18      Q.  Who were you referring to when you wrote "my
19   forensic team"?
20      A.  I don't recall.
21      Q.  Do you think you had someone out there that was
22   building a quick report on the sentiment?
23      A.  No, not at this point.
24      Q.  Do you think you asked anyone whether human,
25   AI, or otherwise to build a sentiment report at this
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 200

```
 1   point in time?
 2        A.  I did not.
 3        Q.  So this was a misrepresentation that you made
 4   to ███████████
 5        A.  It was forward thinking before I looked into
 6   the case.
 7        Q.  I'm not sure I understand what you're saying?
 8        A.  I hadn't had a chance to review.  I was going
 9   to review myself first.
10        Q.  Okay.  So you didn't yet have anyone building a
11   quick report.  But what you're telling me, I think, is
12   that your intention was to prepare some kind of a
13   sentiment report?
14        A.  I don't know enough details.  I don't recall.
15        Q.  Okay.  But you certainly recall that it was not
16   correct that you had a forensic team at that time
17   building a quick report on the sentiment?
18        A.  Correct.
19        Q.  Then you ask if you can connect on Monday,
20   right?
21        A.  Yes.
22        Q.  Then you say, (Reading:)  I'd like to introduce
23   you to my crisis comms specialist that focuses on
24   diversity and culture, Melissa Nathan.
25             Do you see that?
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 201

```
 1        A.  I do.
 2        Q.  Does Melissa Nathan focus on diversity and
 3   culture?
 4        A.  Among other things.  She's very good with that.
 5        Q.  Does she focus on diversity and culture more
 6   than she focuses on entertainment?
 7             MR. COOLEY:  Objection.
 8             THE WITNESS:  I don't know that those are
 9   different.
10        Q.  (BY MR. GOTTLIEB)  Are they the same in your
11   view?
12        A.  Could be.
13        Q.  You say, (Reading:)  Melissa and/or her team
14   can connect with you today so we can get their
15   perspective.  Let me know if you're open to that; I can
16   get their feedback team, my forensic team's results, and
17   then we can connect on Monday.
18             Do you see that?
19        A.  I do.
20        Q.  But you had no intention of getting your
21   forensic team's results by Monday.  Is that what I
22   understand you to be saying?
23        A.  I need more details.
24        Q.  Why do you need more details than what you
25   wrote?
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 202

1        A.   I -- I don't recall exactly.

2        Q.   Well, I mean, how often do you tell people that

3   you have some team working on something, when it's not

4   true?

5        A.   It's puffery.

6        Q.   This is puffery?  Okay.

7             You say, (Reading:)  Either way this is our

8   wheelhouse and I'm happy to discuss.

9             Do you see that?

10       A.   I do.

11       Q.   What are you trying to convey when you tell

12   somebody "this is our wheelhouse"?

13       A.   It's crisis management.

14       Q.   And you're trying to convey to ████████  that

15   the problem she's facing is in the wheelhouse of you and

16   Ms. Nathan, right?

17       A.   I don't know specifically.  Crisis management

18   is the wheelhouse.

19       Q.   But you're not talking about crisis management

20   generally to ██████ , right?  You're talking about

21   the problems she's facing?

22       A.   We don't know the details yet.

23       Q.   So you were saying then that all crisis

24   management is in your wheelhouse?

25       A.   I don't know exactly what there -- what's being

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 226

```
 1   the Texas case.  In fact, Ms. Lively has prevented us
 2   from taking discovery in the Texas case.  So if -- if
 3   your questions are limited to the New York case where
 4   the accusations are clear about what she's alleging,
 5   I'll let him answer.  But I don't want him answering
 6   questions about the Texas case.
 7               MR. GOTTLIEB:  Well, as you recall in
 8   Ms. Lively's deposition, you, in your limited time, and
 9   it was limited, asked her questions about the Texas 202
10   position, correct?
11               MR. BABCOCK:  Well, I asked her what I
12   asked her.
13               MR. GOTTLIEB:  Okay.
14               MR. BABCOCK:  But I wasn't asking her about
15   the Texas case.
16       Q.  (BY MR. GOTTLIEB)  I'm not asking you
17   specifically about allegations in your Texas complaint.
18   Okay?
19       A.  Okay.
20       Q.  But at any point in time, perhaps other than
21   your allegations in your Texas complaint, have you ever
22   claimed or alleged that Ms. Lively fabricated her
23   allegations of sexual harassment?
24       A.  Not that I recall.
25       Q.  Has -- have you ever had, to your knowledge, a
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                      Page 232

1        Q.   Okay.   At any point in time, did you gain that
2    understanding?
3        A.   As I said, he's my lawyer since 2020.   That was
4    my first phone call.   We were trying to process what it
5    meant.
6        Q.   All right.   Did you understand when you
7    received this email and the attached cease and desist
8    letter that you were required to preserve all documents
9    concerning Ms. Lively's sexual harassment allegations
10   against Mr. Baldoni and other Wayfarer parties?
11              MR. BABCOCK:   I don't need to say this, but
12   exclude conversations with a -- your lawyer.   Lawyers.
13              THE WITNESS:   Yes.
14              Ask the question again, I'm sorry.
15       Q.   (BY MR. GOTTLIEB)   Did you understand that this
16   letter required you to preserve all documents concerning
17   Ms. Lively's sexual harassment allegations against
18   Mr. Baldoni and other Wayfarer parties?
19       A.   I did.
20       Q.   And did you understand that the document or
21   the -- sorry.   Did you understand that you were required
22   to preserve all documents concerning Ms. Lively's
23   retaliation allegation against the Wayfarer parties?
24       A.   I did.
25       Q.   Did you understand that preservation

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 233

1    requirement to extend to electronically stored

2    information?

3          A.  Yes.

4          Q.  And you saw the long description of

5    electronically stored information in this letter as you

6    were reviewing it?

7          A.  I did.

8          Q.  You saw that that included things like WhatsApp

9    and Signal?

10         A.  I did.

11         Q.  And emails and text messages?

12         A.  Yes.

13         Q.  Okay.  What steps did you take, and I don't

14   want to know about conversations that you had with your

15   counsel.  But what steps, if any, did you personally

16   take to preserve documents after receiving this letter?

17         A.  I called my lawyer.

18         Q.  Okay.  Apart from talking to your attorneys,

19   which I will not ask you about, did you take any steps

20   personally to engage in document preservation for your

21   devices?

22         A.  I did what they suggested.

23         Q.  Okay.  Did you -- did you personally go into

24   your phone and change any settings, retention settings

25   on your Signal app after receiving this letter?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 234

```
 1        A.  I don't recall doing that.
 2        Q.  Okay.  Do -- do you recall examining the
 3   retention settings on the Street Relations email
 4   accounts?
 5        A.  I don't recall.
 6        Q.  Do you -- do you know one way or the other
 7   whether the Street Relations email account have
 8   retention settings on them?
 9        A.  Yeah, they retain everything --
10        Q.  For how long?
11        A.  -- from my understanding.  I don't recall.
12        Q.  Okay.  So you don't know if that's indefinite
13   or for some period of time?
14        A.  I don't as we sit here.
15        Q.  Okay.  Do you recall going into your WhatsApp
16   account and changing any settings in that?
17        A.  I don't recall.
18        Q.  And how about in iMessage, do you recall
19   looking at any settings that you might have had with
20   respect to data retention on the cloud for -- for Apple
21   or for your device with Apple?
22        A.  I don't recall.
23        Q.  You, from time to time, use the -- the voice
24   note feature; is that right?
25        A.  Yes.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 235

```
 1        Q.  And am I right that the voice note feature is
 2   configured in a way on Apple devices where voice notes
 3   will not automatically be saved to devices?
 4        A.  I -- I don't know the specifics.
 5        Q.  Okay.
 6        A.  What's the question again, what you're asking?
 7        Q.  Do you know if on your device, the -- the voice
 8   notes that you send or receive are automatically saved
 9   to your device or whether you have to save them
10   yourself?
11        A.  I -- I don't know offhand.
12        Q.  Okay.  So you don't know one way or the other
13   whether, for example, if you send a voice note to
14   someone in the context of a text thread whether that is
15   saved, that being the voice note, along with the text
16   thread?
17        A.  I'd need to know more specifics.
18        Q.  Okay.  But you don't know, right?
19        A.  I -- not offhand.
20        Q.  Okay.  Apart from your Street Relations email,
21   do you use any other email account?
22        A.  There's a Mac address.
23        Q.  Okay.
24        A.  Nothing for business.
25        Q.  Have you ever received or sent, whether
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                          Page 315

1                    THE WITNESS:  Yeah, I -- I -- I don't -- I

2    don't recall.

3         Q.  (BY MR. GOTTLIEB)  So you can't rule it out?

4                    MR. COOLEY:  Objection.

5                    THE WITNESS:  I -- I need to know more

6    details.

7         Q.  (BY MR. GOTTLIEB)  You've got to answer my

8    question, sir.  It's a yes or no question.  Can you rule

9    out the possibility that you were on a Signal chain with

10   Katie Case and Melissa Nathan as this -- on the date of

11   this message here, August 8th, 2024?

12                    MR. COOLEY:  Same objection.

13                    MR. BABCOCK:  Me too.

14                    THE WITNESS:  Yeah, I -- I don't know what

15   indicates this is a Signal message, so I'd need to know

16   more information.

17        Q.  (BY MR. GOTTLIEB)  Okay.  You were

18   communicating with people at TAG by this time in August

19   of 2024, right, on Signal?

20        A.  Sure, yes.

21        Q.  Including Melissa Nathan?

22        A.  Correct.

23        Q.  Okay.  And you just don't recall whether this

24   is among the Signal messages that -- or Signal chains

25   that you were on?