# Exhibit 272

```
 1                UNITED STATES DISTRICT COURT
 2                SOUTHERN DISTRICT OF NEW YORK
 3      BLAKE LIVELY,                         )
                                              )
 4         Plaintiff,                         ) Civil Action No.
                                              )
 5         vs.                                ) 1:24-cv-10049-LJL
                                              )
 6      WAYFARER STUDIOS LLC, a               ) (Consolidated for
        Delaware Limited Liability            ) pretrial purposes
 7      Company, JUSTIN BALDONI, an           ) with
        Individual, JAMEY HEATH, an           ) 1:25-cv-00449-LJL
 8      Individual, STEVE SAROWITZ, an        ) Rel:
        Individual, IT ENDS WITH US           ) 1:25-cv-00779-LJL
 9      MOVIE LLC, a California               )
        Limited Liability Company,            )
10      MELISSA NATHAN, an Individual,        )
        THE AGENCY GROUP PR LLC, a            )
11      Delaware Limited Liability            )
        Company, JENNIFER ABEL, an            )
12      Individual, JED WALLACE, an           )
        Individual, and STREET                )
13      RELATIONS INC., a California          )
        Corporation,                          )
14                                            )
           Defendants.                        )
15
16              VIDEOCONFERENCE DEPOSITION OF
17                  ASHLEE HUMPHREYS, Ph.D.
18                    November 25, 2025
19
20
21
22
23
24      Stenographically Reported by:
25      ANDREW R. PITTS, CSR, RPR


                                                       Page 1
```

```
 1                    (Whereupon, the following proceedings
 2                       were held via videoconference.)
 3               TECH ASSISTANT:  The time is now
 4    9:03 a.m. Central.  We are now going on the
 5    record.
 6                    (Whereupon, the witness was
 7                       administered an oath.)
 8               ASHLEE HUMPHREYS,
 9    called as a witness herein, having been first
10    administered an oath, was examined and testified
11    remotely via videoconference as follows:
12                         EXAMINATION
13    BY MR. SCHUSTER:
14         Q.   Good morning, everyone.  Good morning,
15    Dr. Humphreys.
16         A.   Good morning.
17         Q.   My name is Mitchell Schuster.  I am an
18    attorney at the law firm of Meister Seelig & Fein,
19    and I represent the Defendants in this action that
20    has brought us together this morning.  I am going to
21    ask you a series of questions throughout the day.
22    Hopefully it won't run into the end of the day, but
23    I will do my best to be as efficient as possible.
24               Have you ever been deposed before?
25         A.   Yes.
```

Page 5

1      Q.   Did you do that?
2      A.   Yes.
3      Q.   So you said "introducing new negative
4  associations," and you refer to Mr. Freedman's
5  statements about her lying in a government document,
6  and then you go on to say "and/or strengthen
7  existing negative associations."
8           Were there existing negative associations
9  with her in the public sphere?
10     A.   Yes.
11     Q.   What were the existing negative
12 associations about Blake Lively that were
13 strengthened by Mr. Freedman?
14     A.   I would need to go point you to the impact
15 analysis, but at a high level, I believe it's the
16 association that she was a bully and some of the
17 other associations that are congruent with the
18 alleged retaliation campaign.
19     Q.   Was Mr. Freedman -- do you recall
20 Mr. Freedman -- withdrawn.
21          Do you recall reading that Mr. Freedman
22 referred to Blake Lively as a bully?
23     A.   Yes, I believe that is in one of the
24 statements, although we could go check to confirm.
25     Q.   Okay.  Do you know if Blake Lively ever

Page 105

```
 1    part of a retaliatory campaign?
 2         A.   So what I can tell you based on
 3    Dr. Mayzlin's findings is that the phrase tone deaf
 4    experienced a dramatic uptick in the month of August
 5    and I believe again in December.  And that
 6    corresponded, again in Dr. Mayzlin's report, with the
 7    alleged dates of the retaliatory campaign.
 8    BY MR. SCHUSTER:
 9         Q.   Okay.  Do you have any opinion as to
10    whether a third party who uses the word tone deaf is
11    participating in a retaliation campaign?
12              MS. BENDER:  Objection.
13    BY THE WITNESS:
14         A.   I can tell you at the aggregate level, the
15    term tone deaf increased dramatically during that
16    period.
17    BY MR. SCHUSTER:
18         Q.   Do you know the person who used the term
19    tone deaf?
20         A.   Which person?
21         Q.   The one in the post we were just talking
22    about.
23         A.   So if someone used the term tone deaf -- and
24    they have, and I can't find the exact post right
25    now -- and that person -- what proof, if any, do you
```

Page 134

```
 1    have, not Dr. Mayzlin, what proof, if any, do you
 2    have that that poster was participating in the
 3    retaliation campaign allegedly initiated by the
 4    Defendants?
 5             MS. BENDER:  Objection.
 6    BY THE WITNESS:
 7        A.   So as I testified previously, I do not offer
 8    an opinion on the retaliatory campaign itself.  I can
 9    tell you that the dramatic increase in the term tone
10    deaf occurred in that period as cited in
11    Dr. Mayzlin's report, and I can tell you from my
12    impact analysis that that association caused
13    reputational harm.
14    BY MR. SCHUSTER:
15        Q.   Okay.  But if the tone deaf was caused by
16    Blake Lively, isn't the reputational harm her
17    problem?
18             MS. BENDER:  Objection.
19    BY THE WITNESS:
20        A.   I don't -- I don't offer an opinion on that
21    matter.
22    BY MR. SCHUSTER:
23        Q.   Are you aware that Ms. Lively was the
24    reason for an assistant director who worked on her
25    film A Simple Favor for quitting her job and that
```

Page 135

1   statements; one is my analysis of the alleged
2   retaliatory campaign.
3           The plantation association is not relevant
4   to my assessment of Mr. Freedman's statements because
5   I base the damages purely on his statements alone and
6   the damage to his statements alone.
7           Regarding part 1, as we spoke about earlier,
8   prior associations with Ms. Lively were kind of built
9   into that before time period in Dr. Mayzlin's
10  analysis, and so we're comparing that before period
11  where that is already known to the after period where
12  you see the dramatic rise in negative sentiment and
13  in association such as tone deaf, bully, and so
14  forth.
15      Q.  Well, wouldn't it be reasonable to assume
16  there would be a rise in negative sentiment if
17  someone had previously done some bad things or said
18  some bad things?  Wouldn't people be predisposed to
19  say, "Huh, so now she is doing XYZ, but I remember a
20  few years ago she did ABC.  Yeah, I'm not a fan
21  anymore"?
22          Wouldn't those things be completely
23  irrelevant to anything Bryan Freedman did or said?
24          MS. BENDER:  Objection.
25

```
 1              Are you aware that in August, from
 2   August 6th to the 9th of 2024 the film's premiere
 3   event, the theatrical release, triggered a surge in
 4   public engagement, including fan commentary,
 5   influencer reactions, red carpet coverage, and
 6   opening weekend box office reporting?
 7              Would you agree with that?
 8              MS. BENDER:  Objection.
 9   BY THE WITNESS:
10       A.   I would need to look at the underlying
11   sources, but I don't have a reason to disagree with
12   that.
13   BY MR. SCHUSTER:
14       Q.   Would those type of events increase
15   attention to the film, the actors, and/or the drama
16   that had been going on?
17       A.   So what I observed in Dr. Mayzlin's report
18   of this very issue -- analysis of this very issue was
19   that not only was there increased volume, but there
20   was also increased negative sentiment during the
21   August time period, and there was increased negative
22   associations congruent with the alleged retaliation
23   campaign.
24       Q.   Is it possible that the negative sentiment
25   related to Blake Lively's threats in connection with
```

Page 168

```
 1        Q.   Were they asked whether they considered her
 2   a liar?
 3        A.   It was not in the public discourse, meaning
 4   it was not attached to her reputation.
 5        Q.   But it doesn't mean people were not aware
 6   of it, doesn't mean people didn't have underlying
 7   feelings, it doesn't mean that people didn't have
 8   underlying experiences about viewing her, reading
 9   about her, observing her.
10             So it could have been something dormant
11   that her initiation of this very public lawsuit
12   brought to the forefront of the conversation; isn't
13   that a possibility?
14             MS. BENDER:  Objection.
15   BY THE WITNESS:
16        A.   I have no evidence to support that.
17   BY MR. SCHUSTER:
18        Q.   Do you have evidence to support that
19   Ms. Lively engaged in prior conduct that would
20   alienate members of the public?
21             MS. BENDER:  Objection.
22   BY THE WITNESS:
23        A.   Not exactly, no.
24   BY MR. SCHUSTER:
25        Q.   Do you think getting married on a slave
```

Page 180

```
 1    BY MR. SCHUSTER:
 2         Q.   Well, but he doesn't make his statements
 3    until she initiated a very public lawsuit.  So there
 4    would have been no reason for it to be in the public
 5    discourse?
 6              MS. BENDER:  Objection.
 7    BY THE WITNESS:
 8         A.   So reputation exists in the public
 9    discourse.  It's the associations that are connected
10    with one's name in the public sphere.  As my analysis
11    shows on page 92 and 93, for example, the association
12    between Ms. Lively and being a liar was virtually
13    zero until after Mr. Freedman's statement.
14    BY MR. SCHUSTER:
15         Q.   Did you ever research Blake Lively's
16    company that she started with her brother?
17         A.   I did not.
18         Q.   Where the lawsuits that were commenced
19    against Blake Lively and her brother for creating a
20    toxic work environment?
21         A.   I did not.
22              MS. BENDER:  Objection.
23    BY MR. SCHUSTER:
24         Q.   Well, because that was not at the forefront
25    of a Google search, does that mean it's not true?
```

Page 183

1          REPORTER CERTIFICATE

2

3          I, ANDREW R. PITTS, C.S.R. within and
4    for the County of Cook and State of Illinois, do
5    hereby certify that heretofore, to wit, on Tuesday
6    the 25th day of November, 2025, personally appeared
7    before me via videoconference, ASHLEE HUMPHREYS,
8    Ph.D., in a cause now pending and undetermined in
9    the United States District Court of the Southern
10   District of New York, wherein BLAKE LIVELY is the
11   Plaintiff, and WAYFARER STUDIOS LLC, a Delaware
12   Limited Liability Company, JUSTIN BALDONI, an
13   Individual, et al., are the Defendants.
14          I further certify that the said witness
15   was first duly sworn to testify to the truth, the
16   whole truth and nothing but the truth in the cause
17   aforesaid; that the sworn testimony then given by
18   said witness was reported stenographically by me in
19   the presence of the said witness remotely via
20   videoconference, and afterwards reduced to
21   typewriting by Computer-Aided Transcription, and
22   the foregoing is a true and correct transcript of
23   the videoconference testimony so given by said
24   witness as aforesaid.
25          I further certify that the signature to

Page 191

```
 1    the foregoing videoconference deposition was
 2    reserved by counsel for the Defendants.  I further
 3    certify that the taking of this deposition was
 4    pursuant to Notice, and that there were present in
 5    person and via videoconference at the deposition
 6    the attorneys hereinbefore mentioned.
 7              I further certify that I am not counsel
 8    for nor in any way related to the parties to this
 9    suit, nor am I in any way interested in the outcome
10    thereof.
11              IN TESTIMONY WHEREOF:  I have hereunto
12    set my hand and affixed my seal this 26th day of
13    November, 2025.
14
15
16
                ANDREW R. PITTS, CSR, RPR
17              CSR, COOK COUNTY, ILLINOIS
18
19
20
21
22
23
24
25
```

Page 192