UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLAKE LIVELY,<br><br>    Plaintiff,<br><br>  v.<br><br>WAYFARER STUDIOS LLC, et al.,<br><br>    Defendants. | No. 24-cv-10049 (LJL) (lead case)<br>No. 25-cv-449 (LJL) (member case) |
| JENNIFER ABEL,<br><br>    Third-Party Plaintiff,<br><br>  v.<br><br>JONESWORKS LLC,<br><br>    Third-Party Defendant. | |

**DON SALADINO'S DECLARATION IN SUPPORT OF BLAKE LIVELY'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Don Saladino, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

  1.  I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. This declaration is based on my personal knowledge.

  2.  I am a globally recognized fitness coach, health entrepreneur, and business owner.

  3.  I have known Blake Lively for over 15 years and have worked as her fitness trainer throughout that time.

  4.  I agreed to provide training for Ms. Lively in connection with her role in the film *It Ends With Us*.

5. On or around January 22, 2023, with my agreement, Ms. Lively shared my contact information with her co-star Justin Baldoni. That same day, Mr. Baldoni reached out to me.

6. I communicated with Mr. Baldoni, both over text and by phone, on a handful of occasions, primarily in February 2023. He provided information on his nutrition and workout regimen. His existing workout program included regular back extensions.

7. I recommended Mr. Baldoni a workout program and provided information to him about my standard nutrition plan. I also recommended a specific individual who lived near Mr. Baldoni at the time and who could act as his trainer. I did not receive any payment from Mr. Baldoni and never met him in person. I did not consider myself to be Mr. Baldoni's trainer, and Mr. Baldoni did not give any indication that he understood me to be his trainer either.

8. I regularly advise clients to avoid arching their lower back while working out, as doing so creates a risk of injury and generally reflects bad form. I gave Mr. Baldoni this same advice, which was not specific to Mr. Baldoni or based on any suggestion he had a back injury. Indeed, consistent with my understanding of Mr. Baldoni's health, I recommended exercises to him that I would not recommend to someone with a back injury.

9. At some point during his training for the film, Mr. Baldoni called me on the phone. I recall that Mr. Baldoni asked me how much Ms. Lively would weigh by the start of filming. He said that he was asking about her weight in connection with a scripted lift scene, suggesting that he needed to know Ms. Lively's weight to determine whether he could perform the lift.

10. Mr. Baldoni's phone call made me very uncomfortable. I have never experienced someone reaching out to me about a client's weight. I felt that Mr. Baldoni's explanation for his question was dishonest, given that, based on my understanding of Mr. Baldoni's workout regimen, he would easily be able to perform a lift in a range that would include Ms. Lively.

11. I refused to answer Mr. Baldoni's question about Ms. Lively's weight and told Ms. Lively about Mr. Baldoni's inappropriate question. Ms. Lively seemed embarrassed and hurt that Mr. Baldoni had asked about her weight without her permission.

12. Given my relationship with Ms. Lively and her husband, Ryan Reynolds, my family and I suffered great personal and professional consequences after litigation between Ms. Lively and Mr. Baldoni began. Those have included harm to my online business and death and rape threats directed at my family. I had never before experienced anything close to the negative commentary and threats that I have experienced this year.

13. I declare under penalty of perjury that the foregoing is true and correct.

Dated: Cold Spring Harbor, New York
       December 3, 2025

_Don Saladino (Dec 3, 2025 18:47:49 EST)_

Don Saladino