## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

BLAKE LIVELY,

                    Plaintiff,

v.

WAYFARER STUDIOS LLC, et al.,

                    Defendants.

No. 24-cv-10049 (LJL)

### PLAINTIFF BLAKE LIVELY'S MEMORANDUM OF LAW
### IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Esra A. Hudson (admitted *pro hac vice*)
Stephanie A. Roeser (admitted *pro hac vice*)
Sarah Moses (admitted *pro hac vice*)
Manatt, Phelps & Phillips LLP
2049 Century Park East, Suite 1700
Los Angeles, California 90067
(310) 312-4000
ehudson@manatt.com
sroeser@manatt.com

Matthew F. Bruno
Manatt, Phelps & Phillips LLP
7 Times Square
New York, NY 10036
(212) 790-4525
mbruno@manatt.com

Meryl C. Governski (admitted *pro hac vice*)
Dunn Isaacson Rhee LLP
401 9th Street NW
Washington, DC 20004
(202) 240-2927
mgovernski@dirllp.com

Michael J. Gottlieb
Willkie Farr & Gallagher LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 855-3111
mgottlieb@willkie.com

Kristin E. Bender
Willkie Farr & Gallagher LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1000
kbender@willkie.com

Aaron E. Nathan
Michaela A. Connolly
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8904
anathan@willkie.com
mconnolly@willkie.com

*Attorneys for Blake Lively*

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ........................................................................................ii

INTRODUCTION ........................................................................................................1

BACKGROUND ..........................................................................................................1

A.     Baldoni And Wayfarer Curated A Misleading Feminist Brand..............................3

B.     Wayfarer Policies "Strictly Prohibited" Harassment, But Its Leaders Disclaimed Responsibility For Creating A Safe Workplace On Set. ....................5

C.     Wayfarer And Baldoni Fostered A Hostile Work Environment For Women.......................................................................................................................6

      1.     Baldoni and Heath marginalized and mistreated women based on gender.........................................................................................................6

      2.     Heath insisted on a meeting while Lively was undressed and gawked at her body...................................................................................7

      3.     Baldoni sexualized and objectified women on set. ...........................8

      4.     Baldoni confessed a troubled history with sexual consent. ..............9

      5.     Baldoni added gratuitous sexual content and spoke about his sex life............9

      6.     Baldoni was fixated with Lively's weight. ......................................10

      7.     Baldoni and Heath pressured Lively to perform unscripted nudity.................11

      8.     Heath showed Lively a video of his wife naked, without Lively's consent. .......................................................................................11

      9.     Baldoni improvised physical intimacy without Lively's consent....................12

D.     Lively And Other Women Repeatedly Reported Concerns About Baldoni And Heath, Which Wayfarer Failed To Investigate. ...........................................12

E.     Before Phase Two, Lively Negotiated Protections (That Wayfarer Agreed Were Reasonable) And Again Reported Her Concerns........................................15

F.     Sony Exercised Its Right To Edit Its Own Version Of The Film With Lively's Help. ....................................................................................................17

G.     Sony And Wayfarer Develop A Plan To Market The Film As A Story Of Female Empowerment, Which Lively And The Cast Follow And Support. ...........3

H.     The Wayfarer Defendants Responded By Disparaging And Discrediting Lively. ..................................................................................................................19

I.     The Wayfarer Defendants Hired Crisis Experts To "Bury" Lively By Discrediting Her Claims And Assassinating Her Character. ................................20

      1.     The Wayfarer Defendants planned to go on the offensive from the outset..........................................................................................20

i

2.    Baldoni and Wayfarer hired a California-based crisis team to "bury" Lively. ............................................................................22

3.    As the Film premiered with massive success, Defendants launched a "social combat plan" against Lively. ...............................26

J.    In Response To Lively's CRD Complaint, Defendants Continued Their Retaliatory Campaign With A Baseless Lawsuit And Defamatory Statements. .........................................................................32

K.    Lively Suffered Damages As A Result Of The Conduct. .....................................35

ARGUMENT ...........................................................................................................36

I.    LIVELY'S SEXUAL HARASSMENT CLAIMS MUST PROCEED TO TRIAL. ...36

A.    Heath's Behavior, Alone, Warrants Denying The MSJ.........................................37

B.    The Wayfarer Defendants Fostered An Environment Laden With Gender Bias. .......................................................................................38

C.    Wayfarer And IEWUM Are Strictly Liable For Supervisory Conduct. ...............40

II.    THE RETALIATION COUNTS MUST PROCEED TO TRIAL..............................37

A.    The Record Easily Establishes A Prima Facie Case Of Retaliation. ....................42

1.    The Wayfarer Defendants concede that Lively engaged in protected activities. .............................................................................42

2.    The Wayfarer Defendants subjected Lively to a continuous pattern of adverse actions. .........................................................................43

3.    A causal link connects Lively's protected acts to Defendants' adverse conduct. ...................................................................................47

B.    Defendants Failed To Produce Admissible Evidence Of Legitimate, Non-Retaliatory Reasons For Their Sustained Course Of Retaliatory Actions. ............48

C.    Defendants Wanted To "Bury" Lively For Speaking Out Against Them. ............49

III.    THE FAILURE-TO-PREVENT COUNT MUST PROCEED TO TRIAL................49

IV.    LIVELY WAS AN "EMPLOYEE" UNDER TITLE VII AND CALIFORNIA LAW. ....................................................................................................50

V.    LIVELY'S CONTRACT CLAIMS MUST PROCEED TO TRIAL. ........................52

A.    The ALA And CRA Are Valid, Enforceable Agreements. ...................................52

1.    The ALA Is a Binding, Enforceable Agreement. .............................................52

2.    The CRA Is a Binding, Enforceable Agreement. .............................................54

B.    Defendants' Other Arguments As To The Breach Of Contract Claims Fail. ........55

VI.    THE FALSE LIGHT CLAIM SURVIVES BECAUSE CALIFORNIA LAW APPLIES.......................................................................................................56

VII.    THE DEFAMATION CLAIM MUST PROCEED TO TRIAL. ...............................57

ii

VIII.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE
         CONSPIRACY CLAIM. ............................................................................................58

IX.      SAROWITZ IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE FALSE
         LIGHT OR CONSPIRACY CLAIMS........................................................................59

X.       THE WAYFARER PARTIES' DAMAGES ARGUMENTS FAIL ..........................60

CONCLUSION..............................................................................................................................60

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Achal v. Gate Gourmet, Inc.*,
   114 F. Supp. 3d 781 (N.D. Cal. 2015) ....................................................................50

*AHW Inv. P'ship v. Citigroup, Inc.*,
   806 F.3d 695 (2d Cir. 2015)....................................................................................60

*Aulicino v. New York City Dep't of Homeless Servs.*,
   580 F.3d 73 (2d Cir. 2009).....................................................................................37

*Bailey v. San Francisco Dist. Attorney's Off.*,
   16 Cal. 5th 611 (2024) ..................................................................................... *passim*

*Banks v. Gen. Motors, LLC*,
   81 F.4th 242 (2d Cir. 2023) ...................................................................................38

*Birschtein v. New United Motor Mfg., Inc.*,
   92 Cal. App. 4th 994 (2001) .............................................................................40, 48

*Bradley v. Dep't of Corr.*,
   158 Cal. App. 4th 1612 (2008) ..............................................................................50

*Burlington N. & Santa Fe Ry. Co. v. White*,
   548 U.S. 53 (2006)...........................................................................................43, 44

*Byrnie v. Town of Cromwell, Bd. of Educ.*,
   243 F.3d 93 (2d Cir. 2001).....................................................................................44

*California Fair Emp. & Hous. Com. v. Gemini Aluminum* Corp.,
   122 Cal. App. 4th 1004 (2004) ..............................................................................50

*Cantu v. Flanigan*,
   705 F. Supp. 2d 220 (E.D.N.Y. 2010) ...................................................................60

*Castro-Ramirez v. Dependable Highway Express, Inc.*,
   2 Cal. App. 5th 1028 ..............................................................................................43

*Chukwueze v. NYCERS*,
   891 F. Supp. 2d 443 (S.D.N.Y. 2012).....................................................................47

*Cifone v. City of Poughkeepsie*,
   234 A.D.2d 331 (1996) ...........................................................................................61

*Constantin v. N.Y.C. Fire Dep't*,
  2009 WL 3053851 (S.D.N.Y. Sept. 22, 2009)........................................................................45

*Dhaliwal v. Saliz Pharms., Ltd.*,
  2019 WL 5067164 (S.D.N.Y. Oct. 9, 2019)...........................................................................48

*Dixon v. Int'l Bhd. of Police Officers*,
  504 F.3d 73 (1st Cir. 2007)....................................................................................................47

*Doe v. City & Cnty. of San Francisco*,
  835 F. Supp. 2d 762 (N.D. Cal. 2011) ..................................................................................45

*Doe v. Meta Platforms, Inc.*,
  690 F. Supp. 3d 1064 (N.D. Cal. 2023) ................................................................................57

*Duplan v. City of New York*,
  888 F.3d 612 (2d Cir. 2018)...................................................................................................48

*Eaton v. Coca-Cola Co.*,
  2010 WL 2836737 (D. Conn. July 19, 2010) ........................................................................43

*Edwards v. Container Kraft Carton & Paper Supply Co.*,
  161 Cal. App. 2d 752 (1958) .................................................................................................60

*Eisenberg v. Advance Relocation & Storage, Inc.*,
  237 F.3d 111 (2d Cir. 2000)...................................................................................................51

*Erlich v. Menezes*,
  21 Cal. 4th 543 (1999) ...........................................................................................................56

*GG Managers, Inc. v. Fidata Tr. Co. New York*,
  215 A.D.2d 241 (1995) ..........................................................................................................55

*Gonzalez v. Oplaai LLC*,
  2023 WL 11195911 (C.D. Cal. Dec. 19, 2023) .....................................................................53

*Grant v. Bethlehem Steel Corp.*,
  622 F.2d 43 (2d Cir. 1980).....................................................................................................47

*Green v. Laibco, LLC*,
  192 Cal. App. 4th 441 (2011) ................................................................................................47

*Gubitosi v. Kapica*,
  154 F.3d 30 (2d Cir. 1998).....................................................................................................48

*Hahn v. Off. & Pro. Emps. Int'l Union, Loc. 153*,
  2016 WL 4120517 (S.D.N.Y. July 22, 2016) ........................................................................43

*Hardage v. CBS Broad., Inc.*,
   427 F.3d 1177 (9th Cir. 2005) .................................................................50

*Hill v. Nat'l Collegiate Athletic Assn.*,
   7 Cal. 4th 1, 865 P.2d 633 (1994) ..........................................................57

*Hirst v. City of Oceanside*,
   236 Cal. App. 4th 774 (2015) ...................................................................49

*Hughes v. Twenty-First Century Fox, Inc.*,
   304 F. Supp. 3d 429 (S.D.N.Y. 2018)......................................................46

*Johnson v. J. Walter Thompson U.S.A., LLC*,
   224 F. Supp. 3d 296 (S.D.N.Y. 2016).......................................................47

*Kaytor v. Elec. Boat Corp.*,
   609 F.3d 537 (2d Cir. 2010).......................................................................38

*Kronisch v. United States*,
   150 F.3d 112 (2d Cir. 1998).......................................................................44

*Langson v. Lane*,
   967 F.2d 587 (9th Cir. 1992) ....................................................................53

*Laurin v. Pokoik*,
   2005 WL 911429 (S.D.N.Y. Apr. 18, 2005)............................................43

*Lawson v. PPG Architectural Finishes, Inc.*,
   12 Cal. 5th 703 (2022) ........................................................................42, 49

*Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*,
   102 P.3d 257 (2004).....................................................................................56

*Lewis v. New York City Transit Auth.*,
   12 F. Supp. 3d 418 (E.D.N.Y. 2014) ......................................................43

*Lively v. Wayfarer Studios*,
   2025 WL 1952027 (S.D.N.Y. July 16, 2025) .....................................14, 59

*Lockhart v. Gen. Motors Corp*,
   2001 WL 1262922 (C.D. Cal. Sept. 14, 2001) ........................................55

*Luckett v. Kohl's Dep't Stores, Inc.*,
   2020 WL 4341779 (C.D. Cal. June 18, 2020) .........................................49

*Lyle v. Warner Bros. Television Prods.*,
   38 Cal. 4th 264 (2006) ........................................................................39, 40

*Makarova v. United States*,
   201 F.3d 110 (2d Cir. 2000)................................................................................51

*Malik v. Carrier Corp.*,
   202 F.3d 97 (2d Cir. 2000)..................................................................................49

*Mamou v. Trendwest Resorts, Inc.*,
   165 Cal. App. 4th 686 (2008) ..............................................................................42

*Marshall v. Boeing Co.*,
   2019 WL 4391112 (C.D. Cal. June 10, 2019) ......................................................50

*McSweeney v. Cohen*,
   776 F. Supp. 3d 200 (S.D.N.Y. 2025)......................................................... *passim*

*Medvey v. Oxford Health Plans*,
   313 F. Supp. 2d 94 (D. Conn. 2004)....................................................................59

*Meeks v. Autozone, Inc.*,
   24 Cal. App. 5th 855 (2018) ...............................................................................38

*Moll v. Telesector Res. Grp., Inc.*,
   94 F.4th 218 (2d Cir. 2024) ................................................................................38

*Muniz v. UPS*,
   731 F. Supp. 2d 961 (N.D. Cal. 2010) .................................................................37

*Myers v. Trendwest Resorts, Inc.*,
   148 Cal. App. 4th 1403 (2007) ............................................................................38

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*,
   118 A.3d 175 (Del. 2015) ....................................................................................60

*Nazir v. United Airlines, Inc.*,
   178 Cal. App. 4th 243 (2009) ..............................................................................37

*Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.*,
   103 Cal. App. 4th 1021 (2002) ............................................................................49

*Oakland Raiders v. Oakland-Alameda Cnty. Coliseum, Inc.*,
   144 Cal. App. 4th 1175 (2006) ............................................................................54

*Ocheltree v. Scollon Prods., Inc.*,
   335 F.3d 325 (4th Cir. 2003) ...............................................................................39

*Palin v. New York Times Co.*,
   482 F. Supp. 3d 208 (S.D.N.Y.), *modified*,
   510 F. Supp. 3d 21 (S.D.N.Y. 2020)....................................................................58

*Pantchenko v. C. B. Dolge Co.*,
  581 F.2d 1052 (2d Cir. 1978) ...............................................................45

*Pantoja v. Anton*,
  198 Cal. App. 4th 87 (2011) .................................................................38

*Parrish v. Sollecito*,
  249 F. Supp. 2d 342 (S.D.N.Y. 2003) ...................................................38

*Prozeralik v. Cap. Cities Commc'ns, Inc.*,
  188 A.D.2d 178 (1993) .........................................................................60

*Rangel v. Am. Med. Response W.*,
  2013 WL 1785907 (E.D. Cal. Apr. 25, 2013) .......................................50

*Rasmy v. Marriott Int'l, Inc.*,
  952 F.3d 379 (2d Cir. 2020) ............................................................37, 38

*Reynaga v. Roseburg Forest Products*,
  847 F. 3d 678 (9th Cir. 2017) .........................................................37, 38

*Rice v. FCA USA LLC*,
  2018 WL 345731 (Cal. Ct. App. Jan. 10, 2018) ...................................49

*Rickley v. Goodfriend*,
  212 Cal. App. 4th 1136 (2013) .............................................................59

*Robinson v. De Niro*,
  739 F. Supp. 3d 33 (S.D.N.Y. 2023) .....................................................47

*Roby v. McKesson Corp.*,
  47 Cal. 4th 686 (2009) ....................................................................36, 41

*S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*,
  769 P.2d 399 (Cal. 1989) ......................................................................52

*Salamon v. Our Lady of Victory Hosp.*,
  514 F.3d 217 (2d Cir. 2008) ..................................................................51

*San Francisco Milling Co. v. Mordecai*,
  134 Cal. App. 755 (1933) ......................................................................53

*Schoenadel v. YouGov Am. Inc.*,
  2025 WL 371089 (S.D.N.Y. Feb. 3, 2025) ...........................................43

*Sealy v. State Univ. of New York at Stony Brook*,
  834 F. App'x 611 (2d Cir. 2020) ...........................................................47

*Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc.*,
    531 F. Supp. 3d 522 (N.D.N.Y. 2021) ...................................................................41

*Sooroojballie v. Port Auth. of New York & New Jersey*,
    816 F. App'x 536 (2d Cir. 2020) ...................................................................41, 48

*Spencer-Smith v. Ehrlich*,
    347 F.R.D. 606 (S.D.N.Y. 2024) ..........................................................................56

*Stajic v. City of New York*,
    214 F. Supp. 3d 230 (S.D.N.Y. 2016)....................................................................48

*State Dep't of Health Servs. v. Superior Ct.*,
    31 Cal. 4th 1026 (2003) ...................................................................................41, 49

*Summa v. Hofstra Univ.*,
    708 F.3d 115 (2d Cir. 2013)....................................................................................47

*Tobias v. Notations, Inc.*,
    2015 WL 4654454 (S.D.N.Y. July 20, 2015) .........................................................53

*Troeger v. JetBlue Airways Corp.*,
    2024 WL 5146185 (S.D.N.Y. Dec. 17, 2024) ........................................................37

*Vega v. Broome Cnty.*,
    2023 WL 6318919 (N.D.N.Y. Sept. 28, 2023)........................................................44

*Villalobos v. Costco Wholesale Corp.*,
    2023 WL 5108499 (E.D. Cal. Aug. 9, 2023)...........................................................50

*Vincent Crisafulli Testamentary Tr. v. AAI Acquisition, LLC*,
    110 N.Y.S.3d 494 (N.Y. Sup. Ct. 2018) .................................................................53

*Wawrzenski v. United Airlines, Inc.*,
    106 Cal. App. 5th 663 (2024) .................................................................................49

*Wilson v. City of Fresno*,
    763 F. Supp. 3d 1073 (E.D. Cal. 2025)...................................................................42

*Wind Dancer Prod. Grp. v. Walt Disney Pictures*,
    10 Cal. App. 5th 56 (2017) .....................................................................................53

*Wyatt v. Union Mortg. Co.*,
    24 Cal. 3d 773 (1979) .............................................................................................59

*Wysinger v. Auto. Club of S. California*,
    157 Cal. App. 4th 413 (2007) .................................................................................47

*Yanowitz v. L'Oréal USA, Inc.*,
    36 Cal. 4th 1028 (2005) ....................................................................................43, 45

**Statutes**

Cal. Civil Code § 1614......................................................................................................55

Cal. Civil Code § 1615......................................................................................................55

Cal. Gov't Code § 12923..............................................................................................37, 39

Cal. Gov't Code § 12940......................................................................................41, 43, 49

Cal. Lab. Code § 98.6........................................................................................................49

Cal. Lab. Code § 1102.5..............................................................................................42, 49

Cal. Lab. Code § 2775.......................................................................................................52

Cal. Lab. Code § 2776(a)..................................................................................................52

**Other Authorities**

2 C.C.R. § 11008...............................................................................................................49

Fed. R. Civ. P. 56..............................................................................................................53

Restatement (Second) of Contracts § 73..........................................................................55

# I INTRODUCTION

In their latest effort to avoid accountability for the hostile environment they created during the production and marketing of It Ends With Us, Justin Baldoni, Jamey Heath, Steve Sarowitz, and their co-defendants ask this Court to shield them from trial, and deny Blake Lively her day in court, by throwing the kitchen sink at Lively's sexual harassment and retaliation claims.[1] But Defendants' scattershot theories collapse under the weight of the overwhelming evidence, in documents and testimony from witness after witness, that Baldoni and Heath "have a way of making women (and some men) feel like shit," which they got away with "[b]ecause they sign the checks." This is not, as Defendants claim, a story of minor annoyances fueled by creative differences, but instead one of a toxic environment in which "SO many things [were] stacking up [that] people are so upset or pissed off about," that Sony's representative remarked: "I cannot believe how they just keep on coming." Numerous women have written or testified about feeling "sexualized," "dismissed," and "marginalized," described Baldoni and Heath's behavior as "creepy" and "rageful," and wanted "nothing to do" with Baldoni and Heath by the time the Film's premiered. Betraying their "man enough" brand, Baldoni and Heath refused to listen to what numerous women told them; instead, their conduct and their *entire defense* has deployed a "textbook application" of Deny, Attack, Reverse Victim and Offender (DARVO) according to Dr. Jennifer Freyd, who coined the term and submitted an expert report supporting Lively in this case.

Defendants created a hostile environment, and when confronted with complaints, they abandoned Wayfarer's policies by refusing to investigate the concerns because Heath thought it would be better "not to have a written record." Defendants buried these concerns even though—and in fact because—Baldoni fully understood by November of 2023 that Lively's written

---

[1] All names and capitalized terms are defined in Table of Abbreviations attached hereto.

132272102.v8

complaints "insinuate that I am unsafe / sexually harassing." Yet, rather than attempting to clear their names with an investigation, Defendants went on the ***attack***, claiming that they are victims of a "bully" who "fabricated" complaints to "take over the movie" (ignoring the irony that this purportedly-hijacked Film enriched the Wayfarer Defendants by smashing all box office expectations).

The Wayfarer Defendants have peddled their victimization narrative since the Spring of 2023, including in response to Lively's concerns during production and then in reaction to her efforts to remediate her concerns. In August, 2024, they relied on background conversations and leaks to friendly journalists; a covert strategy that departed from the "fantastic" and "brilliant" (in Heath's words at the time) marketing plan being followed by the rest of the cast; and then seeding, amplifying and boosting negative content targeting Lively and her family. Defendants repeat their mantra that the instantaneous avalanche of online attacks against Lively ***and the other women associated with the Film*** was somehow an "organic" backlash to Lively, hoping to conceal the fact that their "untraceable" "social manipulation" campaign was designed to *appear* "organic." Defendants have never explained, nor could they, how Lively's ***"sterling" reputation*** (as Wayfarer initially described it in their own words) organically cratered from ***the same marketing plan*** that had delivered extraordinary box office success.

The Defendants' litigation strategy has parroted their inversion of victim and offender. Defendants filed a frivolous lawsuit, now dismissed, and their lawyer supercharged the Wayfarer Defendant's narratives through friendly journalists and content creators, and by laundering their DARVO strategy through this Court's docket. But Defendants' campaign to transform Lively—a mother of four with decades of experience in the industry who simply sought a safe and respectful workplace—into a "bully" who "took over" Baldoni's Film is not a defense to harassment,

132272102.v8

retaliation, defamation, or any claim Lively has advanced. The record evidence is clear: Lively's claims survive summary judgment and must be sent to a jury. The Court should deny the MSJ in full.

## BACKGROUND

### A.  Baldoni And Wayfarer Curated A Misleading Feminist Brand.

In 2017, Baldoni launched the "Man Enough" brand, which he describes as a "movement around healthy manhood and greater equity for all." ¶405.[2] In public commentary, Baldoni openly admitted to a history of mistreating women, estimating that there is a "***one million percent probability" that there "is a woman or two*** that he has ***"in some way made uncomfortable by saying something or doing something that was chauvinistic or sexist"*** and that he ***did not "always ask for consent"*** or "always listen when they said no." ¶¶406-08. Baldoni promised to "shut the hell up and listen" to women "so that one day we don't have to live in a world where a woman has to risk everything and come forward to say the words 'me too[.]'" *Id.*

Baldoni sought to monetize his feminist brand through Wayfarer, which he co-founded and co-chairs with billionaire Sarowitz, who is Wayfarer's financier and one of Baldoni's close friends (as is Heath, Wayfarer's CEO). ¶¶409-13. Shortly after its launch, Wayfarer acquired the film rights to Colleen Hoover's novel, *It Ends With Us*, the theme of which was female empowerment, including breaking the cycle of domestic violence. ¶¶415-16. Hoover was reluctant to option the Film to a man, but agreed to sell the rights to Wayfarer because she believed that Baldoni "used his platform to empower women." ¶¶417-19. Hoover explicitly requested that a woman direct the Film. *Id.* Although Baldoni had directed only two small films, Wayfarer decided that he would direct, executive produce, and be the Film's lead male actor. ¶¶414, 419, 421. Wayfarer appointed

---

[2] All citations to ¶¶ refer to the 56.1 statement unless otherwise noted. All emphases are added unless otherwise noted, and this Opposition does not attempt to clean up nits or grammatical errors in contemporaneous communications.

Heath, with *even less* experience, as lead producer and as President of IEWUM, the wholly owned entity that produced the Film and, with Wayfarer, employed all cast and crew. ¶¶422-25. Heath oversaw Saks, an experienced independent producer. ¶427. Sony agreed to distribute and co-finance the Film, with Giannetti as its liaison, but Wayfarer would oversee and control all aspects of production. ¶¶428-29.[3] All departments reported to Heath and Baldoni, who had the power to hire, fire, and discipline cast and crew. ¶¶420, 424, 427. Heath and Baldoni reported to Sarowitz. ¶426.

Baldoni, Heath, and Sarowitz knew that they needed an A-list actress to headline the Film to achieve the commercial success they desired. When Wayfarer learned of Lively's potential interest in late 2022, they put on a full-court press to obtain her services. ¶¶431-32. Noting Lively's "***sterling reputation***," Heath texted on December 9, 2022:

> "If we get blake on this movie…holy shit. You would be directing and starring in a moving with one of the biggest female stars. And one of the biggest film companies as a partner. Holy shit. With one of the biggest books. Holy shit. This put you in a different stratosphere."

¶¶433-34. Hoover told Baldoni that "Blake is her dream Lily, and she couldn't believe" Lively was interested. *Id.* :Baldoni and Lively met on December 14, 2022 in what Baldoni described as a "love fest." ¶435. In that meeting, Baldoni volunteered that his penis was circumcised, without Lively expressing any interest in the subject of Baldoni's genitalia. ¶¶436-38. Lively later spoke with Plank, Baldoni's long time podcast host, who "tried to warn" her "about the red flags" of working with Baldoni, but indicated that he had worked on himself so she was hopeful that Lively would not have issues. ¶¶439-40. Lively was disturbed but assuaged by Baldoni's purported commitment to being a feminist devoted to combatting toxic masculinity. ¶¶ 441-44. Lively agreed

---

[3] Wayfarer, IEWUM and Sony entered into the Distribution Agreement, which gave Sony the exclusive right to, *inter alia*, market and advertise the Film, and, subject to certain conditions, authorize final cut of the Film. ¶¶428-30.

to play Lily Bloom because she believed in the Film's messages of female empowerment, personally and professionally, and of the importance of ending the cycle of abuse. *Id.*.

Baldoni aggressively leveraged Lively's fame and her 20-plus years of experience in the entertainment industry, and regularly solicited her feedback on many aspects of pre-production work, including, but not limited to: casting and hiring; wardrobe and makeup; set design and decoration; and the script. ¶¶455-66. Baldoni gushed to Lively that she was a genuine collaborator and "a once in a lifetime talent" who made "everyone around" her and "everything" she touches "better." ¶466. Lively did not know that Baldoni privately resented collaborating with a prominent actress, arrogantly insisting behind her back in December 2022 that he had discovered Hoover's book "before anyone," could "make this movie with anyone," and intended to "control every aspect of this film and how it gets made."

## A. Wayfarer Policies "Strictly Prohibited" Harassment, But Its Leaders Disclaimed Responsibility For Creating A Safe Workplace On Set.

At relevant times, Wayfarer had HR policies in place that applied to "all persons who interact with our Wayfarer Studios team" and "*strictly prohibited*" all forms of harassment, including "not just sexual harassment" but any behavior "that denigrates or shows hostility or aversion toward an individual" based on a protected characteristic. ¶¶474-75. Those policies and Wayfarer's training deck provide that sexual harassment "may include a range of subtle and not-so-subtle behaviors" including: conveying *sexual "comments, stories or innuendos*" or *jokes "about sex*," *asking "about sexual fantasies/activities*," *making "sexual comments about someone's clothing*, *anatomy or appearance,*" leering or staring, or *hugging*, *touching*, stroking or brushing. ¶¶474-75, 480.[4] Wayfarer's policies encouraged reporting of "all perceived incidents

---

[4] Wayfarer claims to have presented this deck to cast and crew but has no record of who participated, and key cast and crew members dispute receiving it. The deck does not identify to whom concerns should be raised.

132272102.v8

of discrimination or harassment" and promised that any reported allegations would be promptly and thoroughly investigated "by qualified personnel in an impartial manner," using "evidence to reach reasonable conclusions." *Id.* They also strictly prohibited retaliation for reporting concerns and required investigations into any allegations of the same. *Id.* Wayfarer's policies ***"obligated" "any supervisor" to report any violations that they "become aware of"*** to HR or Wayfarer management to "investigate and, if appropriate, take corrective action." *Id.* Baldoni and Heath testified that they understood and received training on these policies. ¶¶474-76.

Before production, Saks expressed concerns that Baldoni's consolidated power might deter the reporting and remediation of HR issues and recommended external HR support for the Film. ¶¶483-84. But Wayfarer kept HR for itself, and then failed to provide its policies to the cast and crew, make its HR consultant available, or provide guidance on reporting HR concerns. ¶477. Heath believed that Wayfarer bore ***no*** responsibility for addressing workplace concerns, incorrectly opining that independent films generally have no HR presence, and pinned responsibility on Saks for ensuring a safe workplace. ¶481. For her part, Saks understood that HR concerns should be raised to Heath, as the "signer of checks and agreements," even if the complaints pertained to Wayfarer, Heath, Baldoni or Sarowitz. ¶484. In the end, the Film's cast and crew did not know how to raise concerns about the employment environment. ¶479.

## B. Wayfarer And Baldoni Fostered A Hostile Work Environment For Women.

Multiple women felt uncomfortable, marginalized, harassed, objectified, and disrespected by the environment Baldoni and Heath fostered in connection with the Film.

### 1. Baldoni and Heath marginalized and mistreated women based on gender.

In February 2023, pre-production, Baldoni admitted in a lengthy note that he often interrupted Saks, and acknowledged that it was not "okay for me to interrupt you and then mansplain" and that he had been trying "very hard not to interrupt the women" in his life. ¶490.

6

But his misbehavior continued: ***Baldoni "consistently" yelled at Saks and exhibited "rageful yelling or interrupting reactions" when Saks spoke***. ¶¶488-92. Saks recounted one time when Baldoni, upset with Saks' input on the Film, "came up behind" where she was sitting and "yelled and then slammed his hands" on the chair next to her and stormed away. ¶¶491-92. Saks immediately warned Heath and Giannetti, seated behind her, that ***she would "walk off the movie" if Baldoni behaved that way again***. *Id.* As the only woman and non-Wayfarer producer on the set, Saks felt sidelined by Baldoni and Heath, and she also observed Baldoni being "very dismissive" of the Film's screenwriter, Hall, who he did not seem to respect "as a female voice on the team and on a movie like this, that felt especially bad." ¶¶493-94. Hoover expressed similar feelings, including that Baldoni had publicly claimed to be collaborating with her when he was not. ¶495.[5]

2. Heath insisted on a meeting while Lively was undressed and gawked at her body.

On the second day of filming, May 16, 2023, Lively asked for a meeting with the production team to discuss her concerns with Baldoni's disruptive emotional outburst that morning. ¶¶512-13; *infra* C.6. Heath arrived unannounced at Lively's hair and makeup trailer while her team, Carroll and Baker, were removing her body makeup. *Id*. Lively's nude breasts were exposed. *Id*. When Heath knocked, Lively, Carroll, and Baker screamed "whoa, whoa, whoa" and "no, no, no" and "don't come in." *Id*. Heath entered anyway. *Id*. Lively implored Heath that she was undressed and would be out in a minute, but Heath insisted that the meeting occur then or not at all. *Id*. Lively relented on the condition that Heath face the wall and, in Heath's words, "look away." *Id*. Despite his agreement, Lively looked up in the middle of their conversation to find Heath staring straight at her breasts in the mirror. ¶¶514.[6] Heath said "sorry" but defended his

[5] These women's experiences echo that of Ayoub, who worked on a separate Wayfarer film and described Baldoni as "verbally abusive," banned him from set, and refused to appear in press events with him. ¶496.
[6] Heath claims Lively invited him into the trailer, but admits Lively conditioned his entry on his agreeing not to look at her. ¶¶97-98. Defendants suggest Lively was comfortable with the intrusion because Lively once texted Baldoni

132272102.v8

inappropriate conduct by saying that he liked "to make eye contact with people when I talk to them." ¶515. Lively told Heath to leave. *Id.* All three women were in a state of shock when Heath finally exited the trailer. ¶516. Baker described Heath as having crossed a boundary that she had never seen crossed on a film set. ¶517. Carroll was so disturbed that she began locking the door to the trailer to prevent future intrusions. *Id.*

      3.   Baldoni sexualized and objectified women on set.

During a rehearsal on May 23, 2023, Lively was wearing her own jacket covering her own dress that had a lower cut neckline to facilitate breast feeding. ¶497. When Lively's jacket briefly popped open as she bent down to pick something up, exposing her cleavage, Baldoni gestured towards her breasts and said "I like your outfit" in an inflected and objectifying tone. *Id.*. Lively felt "uncomfortable," "exposed," and "humiliated" by the unwanted comment. *Id.* Later that day, before shooting a bar scene in a different outfit, Baldoni (who was wearing a unicorn-hooded rainbow "onesie" with no intended sexual connotation) pressured Lively to remove her jacket to expose the partially unzipped "onesie" she was wearing underneath, revealing her lace bra. ¶¶498-502. Looking at Lively, he said "***pretty hot***" in a tone that made Lively feel "on display." *Id.* When Lively responded, "that's not what I'm going for," Baldoni said, "***Sexy?***" *Id.* Slate, who played Baldoni's sister in the Film, jumped in to tell Baldoni that "comments about actors' bodies" range "from irrelevant or unnecessary" to inappropriate and distracting. *Id.* Video footage confirms Lively's recollection of the event, and also Baldoni's dismissive reaction, rolling his eyes in response to Slate and sarcastically stating: "***Sorry. I missed the sexual harassment training***," before "walking away in a huff." *Id.* A few days later, Baldoni blamed Lively for having "poisoned

---

about running lines when she was "pumping in her trailer." Dkt. 50, ¶58]. Lively did not say that she would pump *while* running lines, but regardless, Lively could conceal herself while pumping, which she could not do when Heath intruded.

132272102.v8

the well" against him with other cast members. ¶506.

On another occasion, Baldoni told Slate that "I can say this because my wife is here, but *you look sexy in what you're wearing*." ¶¶503-04. Slate testified that his comment "*was about me, not my character.* It wasn't useful for my work. . . and had no place, in my professional experience*." Baldoni also made Ferrer, the actor who played young Lily, feel sexualized. ¶505. At one point, Baldoni pulled aside Ferrer's on-screen love interest to encourage him to "get to know" Ferrer "well" with a wink, insinuating that he should pursue Ferrer sexually. ¶507. Later, when the two actors were in their underwear after filming the scene in which their characters had sex for the first time, Baldoni commented: "*I'm not supposed to say this, but that was hot*." ¶508, 510. The comment felt personal and untethered to the work.

### 4. Baldoni confessed a troubled history with sexual consent.

During a car ride with Lively, her security detail, and her assistant in April 2023, Baldoni volunteered that "women had forced themselves on him" and *he had "forced himself on women" and did so "even when they said no or did not consent,*" echoing his previous public comments. ¶¶523-26. Baldoni warned that his admission "stays in this car." *Id.* As soon as Baldoni exited the car, Lively's security detail told her that he did not want her to be alone with Baldoni. *Id.*

### 5. Baldoni added gratuitous sexual content and spoke about his sex life.

The ALA gave Lively the right to approve any script changes. ¶529. Yet, Baldoni added gratuitous sexual content without her knowledge or consent, such as having Lively moan "in ecstasy" and "crawl" on "all fours" before "mounting" Baldoni, who would then kiss "his way down her torso as he slides off her panties. . . not stopping. . . until his mouth finds that precious place between her legs." ¶518. Baldoni also added a scene where Lively and Baldoni would

"CLIMAX ... AT THE SAME TIME." *Id.*[7] Baldoni did not explain why adding mutual orgasm to the approved script was creatively important. ¶¶519-21. Hoover had told Baldoni that she thought sex in the Film should be subtle and implied, not graphic. ¶522. Baldoni's motives for adding these scenes, including whether to create additional opportunities for intimacy with Lively, are disputed. When Lively challenged the additions, Baldoni volunteered details about his own sex life to Lively, specifically that he and his wife orgasm in tandem and, sometimes, he brings his wife to orgasm through cunnilingus without climaxing himself. ¶¶519-21. Baldoni asked Lively if she and her husband, Reynolds, climaxed at the same time during sex. *Id.* Baldoni also discussed his past addiction to pornography, a topic that had no connection to the Film's material, which Lively attempted to shut down by sharing that she had never seen it. ¶¶527-28. Baldoni later humiliated Lively by sharing her private disclosure in front of cast and crew, saying: "Blake doesn't know anything about [pornography]; she's never seen it."[8] *Id.*

    6.  <u>Baldoni was fixated with Lively's weight.</u>

Having given birth to her fourth child shortly before accepting the role, Lively was transparent with Baldoni about how hard she was training for the Film. ¶467. While responding with professed empathy (*id.*), Baldoni undermined her confidence behind her back in invasive and humiliating ways. On or about April 24, 2023, and without Lively's consent, Baldoni asked her longtime personal trainer how much she would weigh in two weeks. ¶¶469-71. Under the guise of helping Lively recover from strep throat, Baldoni introduced her to his personal health advisor, who Lively later learned specialized in weight loss, and was eager to recommended how Lively could "work on fat loss." ¶468. On the first day of filming, Baldoni emotionally complained to

---

[7] Defendants blame Giannetti for suggesting a more sexualized script, ¶30, but (even if true) that did not grant Baldoni the right to bypass Lively's approval rights or to use his personal sexual life as justification. ¶529.
[8] Baldoni similarly attempted to add gratuitous hypersexual content for Ferrer to perform, despite the fact that Ferrer portrayed an underage teenage girl. ¶¶508-10.

132272102.v8

Lively about online commentary that she looked old and unattractive in paparazzi photos. ¶487.

7. <u>Baldoni and Heath pressured Lively to perform unscripted nudity.</u>

The Birth Scene did not call for the simulation of nudity but on the day of filming, May 22, 2023, Baldoni told Lively that it was "not normal" for women to remain in hospital gowns during delivery and that his wife "ripped her clothes off" during her labor. ¶¶532-33. Notwithstanding SAG guidelines requiring actor consent to nudity prior to filming, Baldoni and Heath insisted during the shoot that Lively simulate full nudity. ¶¶531-533. Lively felt forced to agree to simulate nudity from below the chest down. *Id.* Production blocked and filmed the scene over several hours and shot it using different angles, including a side profile that implied nudity from below the chest. ¶¶534-36. To obtain those shots, Lively wore a hospital gown strategically placed to cover her breasts, an exposed prosthetic belly, and a small, thin, flat piece of black fabric below her waist to cover her genitalia. *Id.* During filming, Lively laid on her back with her legs spread wide in stirrups while a male actor (Baldoni's friend) positioned between her legs. ¶537. The intimacy coordinator was not on set for the Birth Scene—Wayfarer did not ask her to attend or discuss the scene with her in advance—and Wayfarer did not implement "closed set" protocols, including restricting access to personnel essential to filming the scene. ¶¶532-33, 538-39.[9] Lively felt humiliated. ¶537.

8. <u>Heath showed Lively a video of his wife naked, without Lively's consent.</u>

On May 23, 2023, the day after filming of the Birth Scene wrapped, Heath approached Lively while she was eating and, without consent, context, or forewarning, started playing a video of a nude woman "fully exposed" with her legs spread apart. ¶542.[10] Lively was confused, and

---

[9] Sarowitz, who was on set the day of the Birth Scene, testified: "While I might have technically been non-essential, I did invest $30 million and paid for her salary, or at least my share of it, as well as the other actors, and I consider that to be essential. Lively considers that not to be essential, ***she can send me a check*** . . . ." ¶¶540-541.

[10] Lively and Heath dispute what video he showed her. Heath insists the video was "after birth." Even if that were true, that video still shows Heath seemingly nude, cradling his visibly nude wife from behind in a tub. ¶545.

132272102.v8

initially thought Heath was showing her pornography, but Heath then explained it was a video of his wife giving birth. ¶¶534-44. Lively asked Heath to stop playing the video and inquired if he had his wife's consent to share it, to which Heath replied "she isn't weird about this stuff." *Id.*.

9.  Baldoni improvised physical intimacy without Lively's consent.

Also on May 23, 2023, Lively and Baldoni shot the Dance Scene, which was not written to include intimacy of any kind. ¶546. As such, the intimacy coordinator had not been involved in choreographing it and was not on set for filming. ¶547. With cameras rolling, Baldoni spontaneously improvised intimacy by repeatedly leaning in toward Lively, attempting to kiss her, kissing her forehead, rubbing his face and mouth against her neck, putting his thumb to her mouth and flicking her lower lip, and more. ¶¶548. Behind-the-scenes footage, which the Defendants released to the press, captures Lively's visible discomfort, including her leaning and pulling away from Baldoni, and repeatedly suggesting that their characters should just talk. ¶549.[11] Lively used levity and "creative" pleas to deflect Baldoni's unwelcome touching to avoid antagonizing him and appear happy while being filmed in character. ¶550. Another time, Baldoni bit and sucked Lively's lip during a scene without consent, about which she later confided in Slate. ¶551.

**C. Lively And Other Women Repeatedly Reported Concerns About Baldoni And Heath, Which Wayfarer Failed To Investigate.**

Lively and others voiced their discomfort directly and privately to Baldoni, Heath, and others, often in real time. ¶552. When confronted, Baldoni would "withdraw or pout" or otherwise change his behavior towards the women raising their concerns. ¶¶552-54. In a contemporaneous text, Lively described Baldoni's reaction to hearing her concerns as unsettling and disruptive of her ability to maintain chemistry with him: "He keeps referencing it. Or disconnects entirely. Or

---

[11] Abel, Baldoni's long-time publicist, described the Dance Scene as "so gross" and "cringy," and speculated that it would prompt Lively to file "a cease and desist" against the "pompous" and "unlikeable" Baldoni. ¶¶550.

132272102.v8

gets snippy and impatient as a director. He was so huffy after the sexy thing I felt awful for saying something." ¶554. Slate agreed that Baldoni's conduct and his response when confronted was "*leading to poor work*" and the two discussed the environment feeling "so funky." *Id.*.

The same day that Heath showed Lively the naked video of his wife, among other unsettling incidents, Lively pleaded with Plank to make an "sos set visit" because "Whoa . . . *It's like HR nuts toda*y. The both of them. I wasn't expecting that turn. I mean it's been present but *today I came home and cried*." ¶555. Lively continued: "like keep your hormones to yourselves. . . . *I don't want you [sic] gaze or words or tongue or videos of your naked wife. Yeah. It's shocking.* Clowns." *Id.* Plank expressed that she "should have been more direct with the level of dysfunction, i thought maybe things had gotten better." ¶556. Plank continued, "*i put up with a lot, most women do and you're not and i'm sure that's making them go even more nuts*[.] *you're confronting them to have to see who they really are and that's their worst nightmare*." *Id.* Plank observed "it's astounding they have gotten away with so much." *Id.*

On May 26, 2023, Lively had a 45-minute conversation with Giannetti, who was in Los Angeles at the time. ¶¶560-62. Lively asked if she could file a complaint with Sony's HR department to report, among other things, Baldoni's comments about women's bodies and Heath's decision to show her the nude video. *Id.* Lively told Giannetti that she "felt like *the set was untenable and unruly and that there was no structure, and that there was no one in charge, and that the people who were in charge were misbehaving, and that [she] felt like [she] had nowhere to go*." ¶¶ *Id.* Giannetti advised Lively that only Wayfarer, and not Sony, could address her concerns. *Id.* She then reported Lively's complaints to Baldoni and Heath, disregarding Lively's request to keep her concerns confidential until she found an appropriate reporting channel. *Id.*

Slate raised her own concerns about Baldoni and Heath around the same time. ¶¶563-67.

On May 27, 2023, Slate ==wrote to her agent in California that "Justin and Jamey are truly unfit,"== ==she felt "unsettled and deeply, deeply disappointed and irritated" by Baldoni having called her== =="sexy" and "repulsed and deeply irritated, and I know Blake is experiencing that on a much more== ==serious level."== *Id.* Slate separately ==spoke with Saks and Giannetti about her discomfort with== ==Baldoni, including his comment about her body==. *Id.* Saks immediately texted Giannetti that "[w]e have real issues," and ***need "to replace our director" and restrict Heath's access to the set***. *Id.* Saks escalated Slate's concerns directly to Baldoni and Heath, repeatedly encouraging them to investigate because she wanted it "to be taken seriously" and to create "a more comfortable work environment for everyone going forward." ¶¶568.

Wayfarer did not investigate the complaints. Instead, Heath decided ==that "==***it would be*** ***better for all of this not to be on an official record***" because they "***didn't want the behavior*** ***written down, documented anywhere***, in the event that someone wanted to talk about it again in the future." ¶569. Baldoni ==thought it was "silly" to think Heath could be inappropriate==. ¶585. And Sarowitz ==confirmed that he did not ever think about investigating, in part because he did not believe== ==Baldoni to be capable of sexually harassing anyone==. ¶570. Instead, Sarowitz suggested that "***he*** ***should come to set and remind [Lively] whose money this is***. . . ." ¶571.

To Lively's surprise, ==Baldoni opened a June 1, 2023 production meeting with Heath, Saks,== ==and her by saying it was "his fault" that Heath showed the video of his nude wife because Baldoni== ==had thought Lively "wanted to see it,"== notwithstanding that she had *never* expressed that. ¶573. Although Lively ==was surprised that Baldoni knew about her complaint to Giannetti, she expressed== =="real concerns" with the behavior on set, which she described as unprofessional and "too== ==comfortable," saying it is "not okay" and "has to stop." ¶¶574-75.== ==Neither Baldoni nor Heath== ==assured Lively that her concerns were taken seriously, offered her HR support, or ensured that the==

set would be safe going forward, which confirmed Lively's fear that they viewed her concerns as non-issues. ¶¶576.[12] Baldoni testified that he saw "no reason" to investigate or otherwise try to understand what happened when Heath entered Lively's trailer, and neither he nor Heath nor anyone at Wayfarer elevated the concerns to the Wayfarer HR department (or anyone else). ¶¶577-78. Wayfarer's refusal to investigate the complaints departed radically from how it handled a male-initiated complaint of age discrimination during the Film, which Heath promptly sent to Wayfarer's HR consultant and ordered an investigation. ¶¶485, 572.

Reflecting on production, Gianetti observed that there were "Just SO many things stacking up people are so upset or pissed off about. I cannot believe how they just keep on coming. Did he think no one would notice or remember. . . ?" ¶¶ 579-80. Saks responded that "I think this is where the narcissism is dangerous," and further observed that Baldoni and Heath "*have a way of making women (and some men) feel like shit*[.] It is deep[.] Because they sign the checks." *Id*.

**D. Before Phase Two, Lively Negotiated Protections (That Wayfarer Agreed Were Reasonable) And Again Reported Her Concerns.**

In October 2023, Lively texted Slate that she was "dreading" going back to set and "getting hits of the experience in really upsetting ways." ¶581. Slate responded that she was "so angry at myself for ignoring signs in Justin that I should have taken seriously in terms of 'wait…is this ACTUALLY in line w a feminist perspective?'" *Id*. Lively decided that she could not, nor expect others to, return to a hostile environment. Thus, on November 9, 2023, Lively (through her attorneys) sent Wayfarer a document entitled, "Protections for Return to Production" (the "CRA") which requested Wayfarer agree to implement 17 Protections to ensure a safe set going forward. ¶582. The CRA required, *inter alia*, the presence of an intimacy coordinator when Lively was on

---

[12] Saks was present for this meeting, and described it in detail to Gianetti, expressing admiration for Livelys' professionalism and frustration at Baldoni and Heath's failure to take responsibility for their behavior.

set; restricted set access during intimacy and other exposing scenes; prohibited spontaneous improvisation of intimacy, touching, or nudity, comments about Lively's body or appearance, discussion of personal sexual experiences, or intrusion into Lively's trailer while she is undressed. *Id.* It also expressly addressed retaliation:

> "There **shall be no retaliation of any kind** against [Lively] for raising concerns about the conduct described in this letter or for these requirements. ***Any changes in attitude, sarcasm, marginalization or other negative behavior, either on set or otherwise, including during publicity and promotional work, as a result of these requests is retaliatory and unacceptable***, and will be met with immediate action."

*Id*. (emphases added). Further, it mandated an all-hands meeting before filming resumed. *Id.*

Baldoni and Heath understood the CRA to reference many of the concerns Lively had previously reported. ¶¶584-85. Notwithstanding the private nature of the communication, Baldoni and Heath immediately sent the CRA to their PR team (at that time Jones and Abel at Jonesworks) and convened an emergency call. *Id.* On November 12, 2023, Baldoni sent a message about the CRA to his "prayers and support" text group, writing: "*of course we all know what this document insinuates - that i am [] unsafe /sexually harassing etc etc etc .... there's even silly things inferring Jamey was inappropriate which is silly.*" *Id.* (emphasis added). But Baldoni immediately dismissed the accusations as being "all manipulation" and accused Lively of using her allegations about how "unsafe I and the workplace were" as part of "an effort to gain power over [him] personally and the studio." *Id*. Despite alleged concerns with this "manipulation," Baldoni and Heath did not initiate an investigation to clear their names or clarify what they claimed were misunderstandings—instead, Wayfarer conceded that the 17 Protections were "***not only reasonable but also essential for the benefit of all parties involved***," and executed a contractual rider adopting them, the CRA. ¶583.

On January 4, 2024, Baldoni messaged his "prayers and support" group asking for "any prayers for protection and strength / calm" because he and Heath were heading to Lively's "for the

16

132272102.v8

big meeting." ¶588. That same day, Baldoni, Heath, Giannetti, Saks, and others attended the "all hands" meeting referred to in the 17 Protections, during which Lively identified multiple behaviors reading from her 30-point list on her phone, including: discussions of "***personal experiences with sex***" and "times that ***physical consent was not given in sexual acts***," "***improvising of kissing***," "***biting or sucking of lip***," and intimate conversations out of character. ¶¶586-87. The next day, Baldoni texted friends that the meeting was an "ambush" and "so unjust" and that Lively had shared all the ways he "made her feel unsafe," used the words "creepy and abuse" in reference to his behavior, and said "this was the worst experience of her life and the behavior on our set was creepy." ¶588. Baldoni rejected the notion that his conduct could have been inappropriate, but conceded that "it's hard to feel so much of what they believe about me is false because ***they are so convinced that it's real***." *Id.* (emphasis added).

### E. Sony Exercised Its Right To Edit Its Own Version Of The Film With Lively's Help.

Production of the Film resumed from January 5, 2024 until February 9, 2024, when post-production work began. ¶¶218, 224. The Distribution Agreement provided Sony the right to prepare a cut of the Film and to control marketing. ¶592. During negotiations, Sony rejected Baldoni's attempt to secure "final cut rights" to decide what cut of the Film would be released. ¶591. During the strikes, Lively received a glimpse into Baldoni's planned edit when she received a small portion of his cut, which included, in a disturbing departure from the novel and approved script, a sex scene depicting Ferrer's underage character being penetrated and gasping. ¶593. Lively worried that Baldoni's concerning behavior would endanger the Film. ¶594. Accordingly, and with Sony's support, encouragement, and facilitation, Lively led the editing of Sony's cut. ¶595. Greenstein (then President of Sony's Motion Picture Group), explained that Sony supported Lively editing its cut because ***she was exclusively motivated to "make the movie great."*** *Id.* Lively

dove into the edit, working all hours, for no extra pay and with no promise of credit for the work.

¶596. Unlike Baldoni, Lively worked closely with Hoover, sharing various versions of the Film, discussing and incorporating her notes, and bringing her into the editing room. ¶597. Wayfarer and Baldoni (who had returned to California) attempted to block Lively's access to the footage and railed against her role in the edit (behind her back). ¶¶599-600.

Baldoni tested his edit on at least three occasions between March and May 2024, but none of the tests met the metrics that would have entitled him to final cut rights. ¶601. Sony thought the cut Lively prepared was the better one "no question" and so did Hoover, who "really believe[d] in this adaption." ¶602. As the individual in the best position to determine if the Film would resonate with the book's "core fan base," Hoover's "effusive" praise carried "a lot of weight" with Sony. ¶603. In June 2024, an audience screened Sony's Lively-led cut at Book Bonanza, and the fan reaction confirmed Hoover's instinct. ¶604. The "core fans went nuts," gave the Film a standing ovation, and "screamed" that "you've got it right." *Id.* Thereafter, both Sony and Wayfarer agreed that the Sony cut that Lively created with Hoover would be released for distribution. ¶605.

### F. Sony And Wayfarer Develop A Plan To Market The Film As A Story Of Female Empowerment, Which Lively And The Cast Follow And Support.

Sony and Wayfarer collaboratively developed the Film's marketing, publicity, and promotion strategy. In January 2023 (before shooting had begun), Wayfarer sent Sony an "IEWU Campaign Concept," which included a proposal for a "Fun and sexy floral shop" and "Nationwide Lily Bloom Pop-Up Shops." ¶606. Sony's research affirmed that marketing should focus on the Film's "hopeful" elements and avoid depicting Lily as "just a victim." ¶607. Sony "embraced" the floral marketing concept, and created taglines for influencers and the cast, encouraging viewers to "Grab their friends, wear their florals." ¶608. Wayfarer, in turn, adopted Sony's campaign in the "months and months" leading up to the premiere. ¶¶609. Baldoni was instructed to focus on Lily's

"strength and resilience as opposed to describing the film as a story about domestic violence" and warned that "discussing abuse. . . takes us down a path that is not only dark but will detract from the primary messaging." ¶610. Leading up to the premiere of the Film, Baldoni followed the approved marketing plan, appearing at joyful floral-themed events targeting fans and social media influencers. ¶¶611, 747, 772.

### G.  The Wayfarer Defendants Responded By Disparaging And Discrediting Lively.

Despite admitting that Lively's feelings about her experiences were genuine (¶612), Baldoni's fear that his on-set behavior may be exposed led him immediately to retaliate.  He recast the complaints as misunderstandings, portrayed himself as the victim, and began an unyielding campaign to assassinate Lively's character. *See supra*; ¶¶613-39. For example, on December 30, 2023, Baldoni complained to WME that he was "dealing with an actress who is rewriting the writer and Director," "destroying her reputation," and setting him "up for a trap." ¶614. In correspondence, Baldoni described feeling like Lively was holding a "***nuclear bomb***" because "she can leak that I'm a bad person or that she felt unsafe with me and 'all the stuff' she has on me." ¶613-16. On April 27, 2024, Baldoni lashed out to Heath when he saw the Film trailer that Sony had prepared—which received more than 100 million views, an unexpected success that Sony credits to Lively—upset that he was not featured enough. ¶¶617-23. Baldoni's rage focused on Lively, venting that Greenstein needed "to grow some balls" and "Sony needs to fucking stand up to Blake." *Id.* Baldoni said he planned "to be petty" and "start taking away" Lively's "options" by calling her agents, manager, and Greenstein to "tell them She's sabotaging herself" and "ruining her reputation – people are talking." *Id*. Baldoni's behavior was so unhinged that it alienated Heath. *Id.* Baldoni later confessed that his anger stemmed from his "***fear of Blake coming out and going public about how I'm a bad person and unsafe and not who I say I am.***" ¶621-22. He confessed that "***this has been overwhelmingly triggering all my biggest fears***", causing him to act like a

132272102.v8

"little Boy" who "kept messing up friendships by saying the wrong thing." *Id*.

In truth, the "people" who were talking about and disparaging Lively were Heath and Baldoni. During a dinner with Hoover and her friend in Los Angeles on May 6, 2024 following the successful trailer launch event, (¶¶623-24), Baldoni and Heath actively worked to align Hoover against Lively (whom Hoover had not yet met), accusing Lively of having "narcissistic behavior," manufacturing sexual harassment concerns, and taking over the Film. ¶625. They shared their fears that Lively would sue them for sexual harassment. ¶¶628-30. Hoover left that dinner uninterested in interacting with Baldoni or Heath and feeling "disappointed" because "for a man who has a platform of building women up," it "felt like I was made to not like her." ¶631. Heath and Baldoni also attempted to prevent Lively from obtaining a PGA producer's mark despite her considerable contributions. ¶¶634-39. Rather than dispute Lively's qualification, Heath centered their refusal to support Lively's application on her being "cold hearted," "taking" the movie "unjustly" through "threats," i.e. Lively's repeatedly expressed HR concerns. ¶639.

**H. The Wayfarer Defendants Hired Crisis Experts To "Bury" Lively By Discrediting Her Claims And Assassinating Her Character.**

10. The Wayfarer Defendants planned to go on the offensive from the outset.

On May 17, 2024, months before the Film's scheduled premiere, Baldoni tasked Abel and another TAG employee (both based in Los Angeles) to come up with a "real plan so I can feel at ease" if Lively blocked him on social media—even though Defendants admit Lively had unfollowed Baldoni on social media nearly a year earlier, around July 2023—and fans went "digging." ¶240, 641. Five days later, Baldoni again asked "for a plan for what happens if and when she decides to unfollow me." ¶642. On June 17, 2024, two days after Lively, Hoover, and other cast appeared at Book Bonanza without Baldoni, he and Abel had an hour-long call during which he asked Abel "to recommend a couple of great lawyers just to be armed with" who would

20

be paid by Sarowitz. ¶¶643-45. Abel recommended Freedman, describing him as "a killer" who "would bury Blake." *Id*. The same day, Wayfarer began to assemble a "timeline doc" of each "alleged incident" relating to Lively to "tell the story chronologically." ¶647.

Around the same time, Sony learned that "several cast members, including the author, did not want to be photographed with" or in the "same vicinity" as Baldoni. ¶¶650-58. In mid-June 2024, Saks, who herself did not want to be pictured with Baldoni or Heath (¶658), conveyed to Sony that Hall (the screenwriter, who Lively has never met) "won't do press w Justin, doesn't even want to be on the red-carpet w him." ¶651. Hoover had her own misgivings about appearing with Baldoni and Heath. ¶652. Slate had decided a year earlier that she wanted "nothing" to do with Baldoni or Wayfarer. ¶653-55. Ferrer had similar feelings of discomfort. ¶657.

By June 20, 2024, Abel learned that planning was underway for a shoot with some members of the cast, and told Sony that "if it's going to be used in any official capacity for the film on socials or otherwise then we need to find a way for Justin to be included. . . we can't have fans starting to guess why Justin is left out of this stuff." ¶659. Rather than truthfully acknowledging why the entire cast refused to promote the Film with the director, or launching an investigation, Abel, Baldoni, and Heath brainstormed possible cover stories, including a recent hospitalization to treat an infection from spinal stem cell treatment in Mexico (¶660), a family visit to Sweden (¶661), and even neurodivergence:

> "With everything going on- *I want to have an offensive move* showing my neuro divergence and some of the attributes that come with it so that I can start talking about it. *Most anything that I have been 'accused of' is social awkwardness* and impulsive speech and I think me sitting down with him and just looking at my brain and talking about some of the these things will be helpful for me."

¶662.

As the Defendants were planning an offensive move for Baldoni, the Film's marketing plan was eliciting an overwhelmingly positive public response. Sony, which was systematically

tracking response to the Film, reported that the metrics looked "REALLY good" with "sentiment" overwhelmingly positive and that the "cast, especially Blake Lively's portrayal of Lily, generated substantial praise from fans" while some "remained skeptical about Justin Baldoni." ¶663. Greenstein, who bore ultimate responsibility for the Film's marketing, recalled "virtually zero" negative response to the Film up to its August 6 premiere, and "zero" negative response to anything that Lively had done in connection with marketing the Film, which had begun months before and included wearing florals at promotional events and encouraging viewers to do the same. ¶663-66.

By July 22, 2025, Baldoni knew that members of the cast would not be photographed with him at the premiere, writing that he would "rather just get there early and then go inside" if "*they're really not gonna take a photo with me as I don't want to be thrown into a cast and producers picture and then have their faces all weird*." ¶667. That same day, Lively told Sony that she would not appear alongside Baldoni. ¶668. By this time, Lively had grave concerns about how Baldoni treated her and others during production, including his retaliation. ¶669. She also did not want to be in pictures seeming to support Baldoni, given the Film's subject matter and Baldoni's confessions regarding engaging in sex acts without consent. *Id.*

11. Baldoni and Wayfarer hired a California-based crisis team to "bury" Lively.

Approximately two weeks before the Film's premiere, Abel spoke with Heath about the CRA and that she planned to "go through point by point and draft context surrounding each situation" and "flag what we are missing that would be helpful to arm us in the case we need to refute any of the claims." ¶671-72. Abel understood that Heath was "compiling info on the various incidents which will be helpful to ensure we are in the know on everything-we will need potential witnesses, locations/context, people who could be in our corner to speak on background to refute any claims." *Id*. The same day, Wayfarer and Baldoni asked Abel to recommend a crisis communications team. ¶¶673.

22

132272102.v8

Against the vociferous objections of her boss (Jones), Abel recommended Nathan, TAG's founder and CEO. ¶¶673-76. On July 25, 2024, Heath, Hanks (Wayfarer's President), Nathan, and another TAG employee, Case, had an introductory call. ¶¶678-79. Case's notes reflect that the Wayfarer participants confirmed the occurrence of many of the on-set "incidents" on the call, including that Baldoni told both Lively and Slate that they were "sexy" to describe their physical appearance and "asked about" Lively's "weight" and that Heath "looked in the mirror and made eye contact" with Lively while in her hair and makeup trailer and "pulled up the video" of his wife (which Heath admitted he "could've done differently"). *Id.* According to Cases' notes, Sony had told Wayfarer that "IF you guys go [Lively] will not come to the premiere, nor will colleen, or any of the other actors." *Id*. Heath or Hanks explained that Baldoni was ***"worried about being cancelled" and that Lively was "going to leak shit."*** *Id.* There was discussion during the call about going on the offense, including that there were "***enough friendly reporters and people who would create a story that we wanted to create***" and various narratives they could cultivate about Lively, including that "she ***took the movie over***," committed "***extortion***," took Hoover under her "wing," and "***weaponized feminism***." *Id.* After the call, Wayfarer engaged TAG to "ensure" that they "were protected against negative attacks." ¶680.

Abel did not wait for negative attacks. On July 31, 2024, she texted Wayfarer about having seeded the "***weaponized feminism***" narrative with a writer for People, Fox News, In Touch, and US Weekly, explaining "she is fully briefed of the situation and is armed and ready to take this story of Blake weaponizing feminism to any of her outlets the minute we give her the green light." ¶¶681-82. Abel did this notwithstanding the reality that publicists cannot control how a reporter uses information once that information is shared. ¶683. The next day, TAG discussed a plan to "desensationalize" an inevitable story about Lively's harassment claims by "tee[ing] up a friendly

to run the day of or right after the premiere" that "says something along the line of 'me and Blake had our differences but I still respect her' *so we at least set the stage* and can give the rest on background to reporters[.] So when the hit piece runs it's not as big of a shock." ¶684.

A similar strategy of "*planting a seed earlier on to position your truth/narrative* around the ordeal in a subtle way" appeared in a "Scenario Planning" document TAG sent to Wayfarer, which set forth scenarios that "we should be prepared for, should BL and her team make her grievances public[.]" ¶¶685-88 ("Scenario Planning Document"). TAG recommended that Wayfarer "get ahead of this narrative" with "key messaging points" including:

- "When BL wasn't able to get her way on set or behind the scenes, she involved her husband to create an *imbalance of power* between her and JB."

- "BL's *less than favorable reputation* in the industry spans decades and has been reported."

- "There is a clear, likely motive due to the film's value and fanbase, in which BL is attempting to *bully her way* into buying the rights for It Starts With Us."

*Id.* The Scenario Planning Document also suggested that the TAG "team can explore *planting stories about the weaponization of feminism* and a how people in BL's circle like Taylor Swift, have been accused of utilizing these tactics to '*bully*' into getting what they want." *Id.*

Baldoni found the Scenario Planning Document to be insufficiently aggressive—he told Abel that he was not "in love with the document" and was not "feeling the protection" he had felt during an earlier call with TAG. ¶689-92. Abel conveyed that Baldoni "wants to feel like" Lively "can be buried..." *Id*. Nathan explained: when we send over documents *we can't send over the work we will or could do because that could get us in a lot of trouble*." She explained: "*We can't write we will destroy her*. . . . *Imagine if a document saying all the things that he wants ends up in the wrong hands*." She observed that "*you know we can bury anyone*[.] But I can't write that to him." *Id*. Nathan and Abel planned to speak about "a more aggressive way to get ahead of this"

during a subsequent call with Baldoni later that day. *Id.*

Wayfarer engaged TAG on August 3, 2024. ¶693. Nathan immediately got to work, speaking with the editor of the Daily Mail to make sure she is "ready when we are." ¶694. On August 4, 2024, TAG, Nathan, and Abel circulated the 17 Protections, with Nathan commenting that they were "the items noted in her 'I won't come to work unless these are adhered to.'" ¶695. At this point, Greenberg, Baldoni's agent, reported that Baldoni's "crisis team was *ready for a war*" and had "*all kinds of garbage* on" Lively. ¶696.

As the Film's August 5, 2024 press junket approached, Sony provided Baldoni with extensive feedback about what to say, and not say, fearing that the way he spoke about domestic violence would harm the Film's success. ¶¶697-98. Sony's fears materialized when Baldoni mused about "'raping' Atlas out of Lily to the Dallas Morning News." ¶698. Sony called Baldoni a "moron" and contemplated barring him from further press events. *Id.*

Baldoni's abrupt departure from the approved marketing strategy was not accidental—it was a strategy devised by TAG to get ahead of Lively's claims before they became public. Early on August 5, 2024, Abel reported that during his first interview of the junket, Baldoni "said *exactly like what we discussed* about navigating complex character and as a director managing personalities and the natural friction on set." ¶¶700-01. The PR team was thrilled, texting each other "PERFECT" and "love" the word "friction." ¶702. Sony was unhappy, texting Abel to insist that Baldoni not "mention friction on set so it doesn't open any doors" and "take friction out of his vocabulary." ¶¶703-05. Abel texted Baldoni: "*Sony is having a hard time with the word 'friction.' They think it will be taken out as clickbait. They obviously don't know about our strategy* but let's stick to the words of 'challenge.'" ¶706. Sony was right. Within a week, dozens of articles had regurgitated Baldoni's "clickbait," using the word "friction" in speculating about on-set

tensions. ¶707. Baldoni also successfully seeded other narratives to get ahead of future stories he feared would arise about his on-set behavior. ¶708.

12. As the Film premiered with massive success, Defendants launched a "social combat plan" against Lively.

On August 5, 2024, the day before the premiere, Nathan provided Heath with "digital quotes" for services that could support TAGs media strategy in the "digital" and social media arena—these services would "*be most importantly untraceable*" and include "full reddit, full social account take downs, full social crisis team on hand for anything – engage with audiences the right way, start threads of theories" and the "creation of social fan engagement to go back and forth with any negative accounts, helping change narrative and stay on track." ¶¶709-15. The same day, Nathan emailed the list of 17 Protections to Wallace, founder of Street Relations, a crisis communications firm that specializes in social and digital mitigation and remediation, including the suppression or amplification of online content, and manipulating user comments on certain social media platforms to help shift public narratives. *Id*.

The Film premiered in New York on August 6, 2024. ¶716. At an after party, Sarowitz was "really aggressive" about Lively in a conversation with Greenberg, who was "concerned" that Sarowitz would go "nuclear" because he was "*ready for serious battle*." ¶717. At this point, Nathan and Abel were desperate to "put the *social combat plan* into motion." ¶719. In response to online speculation about why Baldoni was not photographed with the cast—including because "they didn't want to romanticize Lily and Ryle by having them do a ton of PR together" or that he was "traveling with family"—TAG said the comments were "working excellent" and that they were "all us lol." ¶718. The day after the premiere, Nathan had a lengthy "background" conversation with Deux Moi about the "crisis," while Abel responded to an article speculating that Baldoni was "feuding" with the cast by instructing TAG to "*start having social kill asap*." ¶719.

132272102.v8

On August 7, 2025, TAG emailed Heath a proposed scope of work for the digital team with a $30,000 per month price tag. The proposal outlined "specific efforts" that the digital team would "*execute all without fingerprints*," including (among other things):

- "Leverage relationship with Discord, Reddit, X, IG, TikTok, YouTube, etc. to *expose behavior of Blake and other parties, both current and past and engage directly with communities to adjust or influence the conversation taking place in real time*;"

- "Organically engaging with audiences in the right way, *starting threads with theories the team approves of*, and asking questions that no longer place Wayfarer and Justin on the back foot;" and

- "*Changing the overall narrative* and helping keep it on track."

¶720.[13] TAG notified Wallace later that day that "Wayfarer would like to move forward ASAP with social / digital mitigation and remediation." ¶724. By the time Wayfarer engaged Street on August 8, 2024, Wallace assured Wayfarer that he already had their work "prioritized across all platform-specific specialists working for me." ¶725. That day, Abel and TAG "flagged" to "Jed and his team for more serious action on the social side" a derogatory online post about Baldoni, ¶726, and likewise "flagged to Jed and his team as well" a post on X that asked for "a primer on this Blake Lively Ryan Reynolds movie drama?" ¶727.

Also on August 8, 2024, upon arriving in Chicago following the New York press junket and premiere, Baldoni decided to depart entirely from the Film's agreed-upon marketing plan. Texting the "Team JB Social Media" group chat, he directed those responsible for his social media

---

[13] These proposed services reflect TAG's understanding of Wallace's capabilities, as reflected in similar scopes of work sent by TAG to other prospective clients. ¶¶720-23. For example, Wallace has explained that he can improve an individual's image and reputation by: "rewriting" an image's metadata"; "suppressing" posts, links, and articles; "heavily clipping and algorithm boosting"; throwing "a ton of upvotes at stuff that is rah rah" and "downvote everything that's acting as a draft"; elevating content "across all algorithmically driven platforms"; and "undoing years of suppression" relating to a person's name. *Id.* Street Relations and TAG work together frequently, including to "enhance and expand" ███████████████ s "digital footprint and online presence," "shape, advance, and protect" ██████████████ 's reputation, "amplify positive" stories and "remove links that are hurting" ██████████, and build digital "messaging to trend and dominate in" ███████████ favor. *Id.*

132272102.v8

accounts to "start posting me ONLY talking about domestic violence and clips and why this movie is so important" and to change his biography and link to "NO MORE." ¶728. The next day, Baldoni wrote that the "next 36 hours are crucial and we need to be on it. Looking at everything. Finding the most emotional and touching content from survivors supporting this film and reposting. Need you to be finding survivors sharing their stories and amplifying them on my page and TikTok." ¶¶ 734. Wayfarer, Abel, and Heath knew that Baldoni's rogue marketing strategy was causing a backlash against Lively, Slate, and Hoover—all of whom (unlike Baldoni) were faithfully following the Wayfarer-approved marketing plan—acknowledging in one text message that Hoover had to turn her social media "private from all the hate" and that "another post from Justin about DV and thanking 'women everywhere' might further fuel the fire." ¶¶729-31. Abel and Heath, nonetheless, decided to "stay the course" to "combat[] the noise against" Baldoni. *Id.*

The Film was released into theatres on August 9, 2024. ¶733. The same day, Wayfarer wired $30,000 to Street, and Wallace told Wayfarer that his "***team is/has been in full throttle mode on our Wayfarer focus!***" ¶735. TAG, Nathan, and Abel were also in full throttle mode. For example, Abel told Nathan she could "tell you've done a lot of work here" about a Daily Mail article that (thanks to Nathan's lobbying) did not mention anything about Lively feeling "unsafe" on the set. ¶736-38. Nathan also successfully persuaded her sister (a reporter for the New York Post) to remove language she did not like from a Page Six article, while Abel pressured People Magazine to water down language about Baldoni's on-set behavior as well. *Id.*

Later on August 9, TAG employees celebrated the positive online reaction to a Daily Mail article about an alleged feud between Baldoni and Lively by praising Wallace—"***Thank the lord for Jed***" and "***Thank the lord for social and digital mitigation lol***"—specifically, they praised online comments echoing themes from the TAG Scenario Planning Document, including blaming

Lively for trying "to get more control and attention of the movie." ¶¶739-40. Later that day, TAG could not locate the Daily Mail story, which make them wonder "if they had Jed suppress the link." ¶741. By that evening, Nathan and Abel celebrated that they had "confused people" with "so "much mixed messaging" and praised the press coverage as "great comparatively to what we know." ¶742. The next afternoon, TAG reported "extremely limited pick up" on the Page Six and Daily Mail articles, and that they had "*started to see a shift on social, due largely to Jed and his team's efforts to shift the narrative towards shining a spotlight on Blake and Ryan*." ¶743.

During its first week, the Film made more than $50 million, and around $80 million internationally. ¶¶744-45. According to Sony, the Film performed "wildly" beyond expectations and reflected "more business than anyone in the entire world ever thought it would do." *Id*. There was consensus among those involved with the Film that Lively was largely responsible for the film's success. ¶¶746–49. Heath lauded the approved marketing plan as "brilliant" and "fantastic," noting that the "proof" of the marketing plan's success "was in the pudding." ¶¶ 747.

Notwithstanding the Film's success, TAG, Nathan, Abel, Wallace, and Street spent much of August 2024 working to disparage Lively's character, and discredit any allegations that might arise about Baldoni's on-set behavior, by boosting derogatory content about Lively alongside glowing content about Baldoni. Just a few examples include:

- On August 10, asked the "digital team to boost" a video featuring Lively interacting with Baldoni on the set, with comments like "I'm truly stuck on Blake being the problem." ¶750.

- On August 13, TAG drafted talking points for "Alison" at the Daily Mail "on the whole PR debacle behind the scenes," including that: you "have a film with serious subject matter, not only being promoted with focus on flowers/clothes, but a PR campaign distracting audiences"; why "would Blake allow this to happen? How could she?"; and "did Blake's inability to relate to regular people / what they want to see, just slight her big moment?" ¶751. The reporter "came through for" TAG in an August 20, 2024 article by Alison Boshoff titled "*How Blake Lively's Fairytale Turned into a PR Nightmare*" that counterintuitively

called the Film's blockbuster launch "an unmitigated disaster" because "Lively has come under fire for aggressively marketing her personal projects – not just her haircare, but her drinks company – seemingly on the back of a film dealing with domestic violence." ¶752.

- On August 13, Baldoni texted his PR team links to two TikTok videos—one of which criticized Lively as insensitive to domestic violence survivors—that Abel confirmed "the digital team is amplifying." ¶753.

- On August 14, TAG discussed sending Wallace an "amazing" Daily Mail article entitled "HOLLYWOOD VILLIAN," which "branded" Lively "a mean girl" based upon a 2016 interview with journalist Kjersti Flaa. ¶754.

- On August 15, 2024, to stop the Daily Mail from writing about HR complaints, TAG provided a Daily Mail reporter with "helpful" links comparing Lively to Taylor Swift and urged the reporter to cover how Lively "is emulating her best friend taylor with the charm bracelets and shit[,]" which Nathan said was "the only thing" she could think of "that looked organic and wouldn't seem like she placed." ¶754-55. The Daily Mail published a few days later, incorporating the provided links and quoting an insider that Lively: "'laughed at the concept of making herself available to'" domestic violence survivors; "'is trying to get Taylor to help pull her out of this mess by using their friendship for interviews and other promotional work directly related to the film amid the current backlash that she is getting'"; and that the "entire situation" showed how "out of touch she is.'" ¶756-57.

- On August 15, TAG encouraged Variety to publish a "hands off" and subtle "takedown" piece that falsely claimed that Lively's husband had violated union rules by working on the Film during the strikes (cynically, Baldoni himself had pressured others to work through the strike). ¶758. On August 27, Variety published the article, which questioned "whether Reynolds' work is a guild violation." *Id.*

- On August 18, TAG confirmed it would "let digital know" to "definitely boost" three TikToks Baldoni asked them "boost" including one video where the creator explains that she is "flabbergasted that with the huge audience Blake Lively has and all of the press interviews she's had she doesn't once talk about DV." ¶759.

By August 18, 2024, Baldoni asked whether the digital team was using "bots" as part of their campaign. ¶¶760-61. Nathan responded that "bots look fake to anyone" but confirmed that the "***other team is doing something very specific in terms of what they do***" (as she said Heath and Wallace had discussed), and that any "digital team these days is far more intelligent to utilise

something so obvious." *Id*. Tellingly, Baldoni did *not* express concern, surprise, or even curiosity about the "very specific thing" being done by the "other team," but instead responded by writing "***Ok*** thank you" with prayer hands and heart emojis. *Id*.

In the weeks after the Film's release, public sentiment "swung very negative" against Lively and there was "a tidal wave of online hatred toward her." ¶765. On August 13, 2024, Sony reported that "much of the online response was more supportive of Justin (89%)"— as compared to only four percent pro-Lively—including because "they felt he took the DV subject matter more seriously" and due to rumors about the supposedly untoward contributions of Lively and Reynolds. *Id*. Professor Aron Culotta, who teaches Computer Science at Tulane University, reviewed the online content discussed in Defendants' text messages and found indicia of a manipulation campaign in August 2024 on TikTok and Reddit. ¶¶830-33. Likewise, Dina Mayzlin, the Robert E. Brooker Chair in Marketing at the Marshall School of Management and the University of Southern California, concluded that the "online conversations pertaining to Lively starting in August 2024 is an example of online manipulation" based on *inter alia* a "complete absence of conversations echoing the manipulated Lively narratives in the 'Scenario Planning' prior to August 2024 and a sharp increase after August 2024 . . . in both the share of conversations endorsing the manipulated Lively narratives and the overall volume of negative conversations." ¶¶834-36. These trends suggest that the seeded, manipulated narratives fueled subsequent negativity, first in August 2024 and again in the period spanning December 2024 through February 2025. *Id*.

During a phone conversation on August 29, 2024, Sarowitz admitted that the Film had achieved massive financial success, yet his fear that Lively might speak out publicly prompted him to warn that he would protect Wayfarer "like Israel protected itself from Hamas. There were 39,000 dead bodies. There will be two dead bodies when I'm done." ¶766. The very next day, Baldoni

31

admitted in a text that he knew Lively *"genuinely believes she's right and that all of this is unjust."* [] Nathan agreed, writing: *"She fully does. I know it."* ¶612. Notwithstanding that admission, over the next three months, Wayfarer at a minimum paid Street $90,000, TAG ▆▆▆▆ and Abel ▆▆▆▆—totaling at least ▆▆▆▆ in that short period of time alone. ¶762. TAG has admitted that between August 2024 and March 2025 they worked with Andy Signore (Popcorned Planet), Perez Hilton (who Nathan said was in her "circle of BF trust"), Candace Owens, and Billy Bush to seed, generate, or influence social media content or to provide "related digital or social media services directly or indirectly" to or for Defendants. ¶¶ *Id.*. They also admitted to working with more than two dozen media outlets, including The Daily Mail, People, Us Weekly and Deux Moi. Around that time, an overwhelming amount of pro-Baldoni, and anti-Lively, articles and content was placed online. ¶¶ *Id.*[14]

## I. In Response To Lively's CRD Complaint, Defendants Continued Their Retaliatory Campaign With A Baseless Lawsuit And Defamatory Statements.

On December 20, 2024, Lively filed an administrative complaint with the California Civil Rights Department ("CRD Complaint") alleging *inter alia* harassment and retaliation. ¶¶ 783-84. The same day, Lively sent that complaint privately to Defendants along with a Cease and Desist letter. Before the CRD Complaint had been reported upon by any news outlet, Defendants leaked it, along with a statement from their counsel, Freedman, to a variety of news outlets. ¶¶786. Freedman also published the December 21 Statement to *The New York Times* on behalf of his clients, calling Lively's claims "completely false, outrageous and intentional salacious" and a "desperate attempt to 'fix' her negative reputation which was garnered from her own remarks and

---

[14] Notwithstanding all of the evidence summarized above, there is a dearth of real-time communications between Wallace and the Defendants between August to October 2024, because the TAG team communicated with Wallace using Signal, a messaging application that Wallace, TAG, and others utilized precisely because it is designed to automatically delete messages after a short period of time. ¶¶763-64.

actions during the campaign for the film." ¶787. Freedman stated that the "representatives of Wayfarer Studios still did nothing proactive nor retaliated, and only responded to incoming media inquiries" and "that there were no proactive measures taken with media or otherwise." *Id*.

On December 23, 2024, Lively's counsel mailed a cease-and-desist letter to Defendants via Freedman advising them that Freedman's December 21 Statement was *per se* defamatory, including because the gist of the statement was that Lively, with the goal of advancing a public-relations strategy, "made knowingly false factual allegations in a verified pleading to a state administrative agency, which (if true) would be a crime under California state law." ¶788. On December 31, 2024, Freedman filed the California State Lawsuit against *The New York Times* in state court in Los Angeles, California on behalf of certain of his clients, alleging that an article on the CRD Complaint defamed them under California law. ¶794. Lively initiated this litigation earlier that same day. *Id*.

On January 2, 2025, Sarowitz texted his friend, Rainn Wilson, about his state of mind, writing "***I am in the mindset of my name is Onigo Montoya. You killed my friends career prepare to***…" and that the positive press responding to Freedman's press campaign and California State Lawsuit was "***only the beginning***." ¶795. The next day, Freedman started a group text with Sage Steele, an online content creator and his former client, and Sarowitz, Baldoni, Heath, Abel, Nathan, and other attorneys, writing: "***Sage is on copy. In order to use her, we need to start with a video that can go viral. That will get her in organically***." ¶796. Steele agreed that "a video would be the best, most organic, and genuine way for me to do this." *Id*. Baldoni and Abel both provided content to Steele, who sent a first cut of the video. *Id*. Sarowitz said it was a "good start" but suggested that Steele point "out that other women were hurt" by Lively's "false" accusations. ¶¶ 799-800. Steele agreed but advised against going "too much deeper there based on ***trying to make***

***it look organic***[.]" *Id.* After Defendants' approval, Steele posted the video on her YouTube channel. ¶ 801. On January 7, 2025, Freedman was interviewed from his Los Angeles office by another former client, Megyn Kelly, during which he made the January 7 Statement, which falsely accused Lively of "making threats" in order to "be in control of marketing of the movie," and of using "these allegations of sexual harassment, and she used these allegations of bullying to try and leverage her position so she could be the de facto director." ¶¶ *Id*.

Wayfarer, Baldoni, Heath, IEWUM, Abel, and Nathan filed a separate lawsuit in this Court on January 16, 2025 against *inter alia* Lively and Reynolds, seeking at least $400,000,000 in damages. Nathan successfully placed press stories about the filing, such as with a "true loyal friend" at People.com who published at least *eight articles that day* disparaging Lively. ¶¶803-05. In the January 18 Statement to Deadline, Freedman described Lively's sexual harassment allegations as "heinous" and "revoltingly false," accusing her of attempting to "publicly destroy Baldoni's reputation in an attempt to devastate his future career," and claiming that "Baldoni never once publicly attempted to call Lively out for her own many wrongdoings during filming, he kindly addressed all her concerns during filming in the correct manner. . ." ¶806.

On January 21, 2024, the Defendants provided raw video footage of the Dance Scene along with an approved statement to friendly media outlets and content creators, including to TMZ, The Daily Mail, and Popcorned Planet, which rewarded Defendants with headlines falsely asserting that the video proved Lively had lied about being sexually harassed. ¶¶ 806. That same day, Lively moved for a protective order pursuant to Rule 3.6 in response to Freedman's incessant character assassination. ¶811.[15] Despite that ask, which is *not* a "gag order," Nathan provided a quote to

---

[15] On January 23, 2025, Freedman filed a motion for *pro hac vice* admission, which was signed and notarized in Los Angeles, California—indicating that he was located in California at that time—and stated that he primarily practices law in California. ¶813.

People.com (attributed to sources "close to" Baldoni) that it is "grossly unfair to impose a gag order" because all Baldoni wants to do is "release videos and text messages to prove the allegations are false." ¶814. In the January 25 Statement, Freeman falsely alleged (to Page Six) that "Lively is so petrified of the truth that she has moved to gag it" and that Lively had filed her litigation "with the sole intent to ruin the lives of innocent individuals, and then went the extra mile to place blame on a fictious smear campaign, all because she quite simply could not accept that the public had organically seen through her façade." ¶814.

On January 31, 2025, the Defendants filed the FAC, alongside a rambling 168-page "Timeline" detailing the Wayfarer Parties' version of events. ¶815. On February 1, 2025, the Defendants launched a website, with the URL www.thelawsuitinfo.com/, which contained the FAC and the Timeline. ¶816. On June 9, 2025, the Court dismissed Defendants' lawsuit. ¶817.[16]

### J.   Lively Suffered Damages As A Result Of The Conduct.

Following the success of the Film, Lively was on track to command "not only a significant increase in her compensation moving forward, but just as importantly, if not even more, a significant rise in her opportunities to follow with great filmmakers, with studio films." ¶824. Instead, Lively suffered a "marked" decrease in interest in her acting services since the Film's release. ¶825. The income Lively derived from her businesses, Blake Brown and Betty Booze, suffered as well. The success of each brand depends on Lively acting as their "face," ¶¶826-27, but the onslaught of negative commentary in the immediate aftermath of the Film's release forced the brands to suspend social media activities. ¶828. Despite their prior successes, sales of both

---

[16] At this point, Freedman also was personally involved in attempting to kill stories that were unfavorable to his clients, including by threatening one reporter that he would "never ever let up going after you for the rest of my career." ¶¶ 818-23. Freedman also threatened at least one witness. In a text message on February 6, 2025, Nathan expressed confidence that Slate would not join Lively as a plaintiff, because Freedman had gone "ballistic on her lawyer and manager today" and "said that her career would be over if she backs this horse sort of thing." Confronted at deposition, Nathan first lied and claimed it never happened, but after being confronted by the text, she explained that she had thought it was privileged (and thus, perhaps, acceptable to lie about under oath). *Id.*

==brands declined significantly following disruptions in marketing strategy, erosion of brand equity,==

==and a sharp decline in sales performance==. ¶¶828-29.

## ARGUMENT

Between the MSJ and MJP, Defendants present a kitchen-sink of meritless arguments to attack Lively's claims. To avoid duplication, Lively addresses the threshold issues of administrative exhaustion, extraterritoriality, joint-employer liability, the opinion and privilege defamation defenses, and the challenged sufficiency of the pleadings in the MJP Opposition, which is incorporated herein by reference. This Opposition addresses the substantive evidentiary disputes and governing legal principles that preclude summary judgment on Lively's sexual harassment, retaliation, failure-to-prevent, aiding-and-abetting, employee-status, contract, defamation, false light, conspiracy, and damages claims, as set forth in Sections I–X below, and are likewise incorporated by reference into the MJP Opposition.[17]

## I.     LIVELY'S SEXUAL HARASSMENT CLAIMS MUST PROCEED TO TRIAL.

Sexual harassment can be verbal, physical, or visual, and includes, without limitation, inappropriate comments, touching, and other conduct that communicates a demeaning message. *Bailey v. San Francisco Dist. Attorney's Off.*, 16 Cal. 5th 611, 627 (2024); *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 708 (2009). Conduct creates a hostile or offensive work environment when it "sufficiently offends, humiliates, distresses, or intrudes upon" the employee, "so as to disrupt [her] emotional tranquility in the workplace," "make it more difficult to do the job," or otherwise "interfere[s] with and undermine[s] [her] personal sense of well-being." Cal. Gov't Code § 12923 (a), (e); *Reynaga v. Roseburg Forest Products*, 847 F. 3d 678, 687 (9th Cir. 2017); *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 390 n.52 (2d Cir. 2020). A "single incident of harassing conduct

---

[17] By defining Lively's claims and arguing against summary judgment on a claim-by-claim basis, this Opposition does not limit the application of any arguments that are applicable to multiple claims.

is sufficient to create a triable issue" and may be sufficiently severe to create an offensive environment. MSJ at 20; Cal. Gov't Code § 12923(b); *accord Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 83 (2d Cir. 2009); *Troeger v. JetBlue Airways Corp.*, 2024 WL 5146185 (S.D.N.Y. Dec. 17, 2024). Hostile environment claims are "***rarely appropriate for disposition on summary judgment***" because they require consideration of the totality of the circumstances and often "involve issues 'not determinable on paper.'" *Nazir v. United Airlines, Inc.,* 178 Cal. App. 4th 243, 288 (2009) (emphasis added); Cal. Gov't Code § 12923 (e).[18] The totality of the circumstances here necessitate denying the MSJ as to the Harassment Claims because the Wayfarer Defendants have failed to meet their burden, and the evidence demonstrates that they subjected Lively to (1) unwelcome conduct (2) because of gender that was (3) sufficiently severe or pervasive to alter the conditions of her employment. *Bailey*, *supra*, at 627.

### K.  Heath's Behavior, Alone, Warrants Denying The MSJ.

Heath's intrusion into Lively's hair and makeup trailer and choice to show her a nude video at work (after filming of the Birth Scene already had concluded) each alone give rise to a triable issue on harassment that precludes summary judgment. Any reasonable woman in Lively's position would be offended by having a supervisor look at her exposed breasts or play a video of his admittedly naked wife in the workplace. These experiences were "degrading and humiliating in the extreme." *Bailey*, 16 Cal. 5th at 634. Characterizing the encounter in the trailer as Heath "just glancing" at Lively after she "invited him" in misstates the evidence and ignores that Heath was Lively's boss. *See* ¶¶511-517. Heath's claim that he was not motivated by "some untoward sexual reason," MSJ at 24, not only is irrelevant, but also betrays ignorance about the nature of sexual harassment. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010) ("harassing

---

[18] *See Muniz v. UPS*, 731 F. Supp. 2d 961, 971 (N.D. Cal. 2010) ("very little evidence" required to "survive summary judgment").

conduct need not be motivated by sexual desire" (citation omitted)).

### L. The Wayfarer Defendants Fostered An Environment Laden With Gender Bias.

The totality of the circumstances, subjective and objective assessed, demonstrate that the Wayfarer Defendants fostered a hostile environment based on sex.[19] It well established that "hostility need not be directly targeted at the plaintiff to be relevant to [] her hostile work environment claim." *Reynaga*, 847 F.3d at 687; *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 229 (2d Cir. 2024); *see also Banks v. Gen. Motors, LLC*, 81 F.4th 242, 267 (2d Cir. 2023); *Meeks v. Autozone, Inc.*, 24 Cal. App. 5th 855, 871 (2018) ("'Me too' evidence … may be admissible to prove a defendant's motive or intent."); *Pantoja v. Anton*, 198 Cal. App. 4th 87, 109 (2011).[20] Instead, the challenged conduct need only have made it more difficult for plaintiff to perform her job. *Reynaga*, 847 F.3d at 687; *Rasmy*, 952 F.3d at 390 n.52.[21]

Multiple women—Lively, Slate, Saks, Ferrer, Hoover, and Hall—felt marginalized, disrespected, threatened and/or objectified by the Wayfarer Defendants in connection with the Film. ¶¶487-575. The Wayfarer Defendants do not deny that the majority of the harassing incidents occurred, but ignore the women's testimony about the impact, attempt to downplay the conduct as a "litany of minor grievances," and justify their behavior by the Film's "sexually charged" subject

---

[19] The objective severe or pervasive analysis considers the nature, frequency, and severity of the conduct, the role of the harasser(s), as well as the particulars of a plaintiff's position, among other factors. *McSweeney v. Cohen*, 776 F. Supp. 3d 200, 250-251 (S.D.N.Y. 2025); *Bailey*, 16 Cal. 5th 628, 632.

[20] It is indisputable that the behavior was unwelcome and that Lively genuinely perceived the workplace to be infected by gender-based bias and hostility. Defendants' own texts support that finding. ¶¶585, 588, 612, 616. As do Lively's contemporaneous texts and notes, testimony, and repeated reporting. ¶¶ 515, 519, 527, 543, 552-56, 559-62, 574-75, 581-87, 667. That Lively described her own character's boots or beanie as "sexy," or dialogue as "flirty and yummy," does not indicate either comfort with, or consent to, Baldoni using those words to describe ***her body***. Nor does agreeing to act in a romantic drama indicate her consent to discuss personal sexual fantasies, her sex life, or pornography. An unsupported and disputed allegation that Lively improvised kissing (she did not) does not establish that she consented to Baldoni's improvisation or found it appropriate.

[21] Harassing conduct can occur outside the workplace, which makes it irrelevant, for example, that Baldoni asked Lively's trainer, rather than Lively herself, about her weight and that he did so outside the presence of cast and crew. *Compare* MSJ at 22, *with Myers v. Trendwest Resorts, Inc.*, 148 Cal. App. 4th 1403, 1424 (2007), *and Parrish v. Sollecito*, 249 F. Supp. 2d 342, 351 (S.D.N.Y. 2003) (proper focus "is not on any particular point in time or coordinate location that rigidly affixes the employment relationship, but on the manifest conduct associated with it. . . .").

matter. MSJ at 19. These characterizations do not excuse the Wayfarer Defendants' fostering of a hostile work environment. The "legal standard for sexual harassment should not vary by type of workplace" and women who choose to work in creative environments, like movie sets, remain entitled to a workplace free from harassing conduct aimed at them. *See* Cal. Gov't Code § 12923 (d); *compare Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 332 (4th Cir. 2003) (finding harassment), *with Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 275 (2006) (declining to find harassment based on comments in writers' room that "did not involve and were not aimed at plaintiff").[22]  Baldoni directed his personal sexual comments ***at Lively directly***, including by: commenting on her "sexy" body and gesturing at her breasts while not in wardrobe (¶497-501); disclosing his martial preference for simultaneous orgasm and inquiring whether she and her husband experienced the same (¶520); divulging (without any connection to a scene) that he had previously "forced himself on women" without consent (¶¶523-26); and discussing pornography with her even though the Film neither discusses nor depicts such content (¶ 527-28). Wayfarer's own policies recognize that forcing such personal intrusions on employees at work can create a hostile work environment. ¶¶474-75, 480.

The nature of the Film's material is no excuse. Baldoni's improvised ***physical touch*** and added gratuitous sexual content and nudity that would involve further physical touch of Lively, without consent, cannot reasonably attributed solely to advancing any plotline. ¶¶518-22, 546-51. The nature of the Film also could not possibly explain Heath looking at Lively's exposed breasts in her private trailer or showing her a nude video of his wife *after* the birth scene was filmed and, unlike the Film, depicting a waterbirth. ¶¶511-517, 542-45. Nor does it explain the Wayfarer Defendants' marginalizing and dismissive behavior towards *other* women, including those who

---

[22] Courts "should only consider the nature of the workplace when engaging in or witnessing prurient conduct and commentary is integral to the performance of the job duties." Cal. Gov't Code § 12923 (d).

shared no intimate scenes with Baldoni in the Film. ¶¶488-95. Baldoni and Heath's behavior would be offensive and marginalizing to any reasonable woman, and was to many other women on the set—so much so that they refused to even appear with Baldoni in public. ¶¶487-575.

Lively may be a movie star, but on the set of the Film, Heath and Baldoni were her bosses with a total consolidation of power as lead actor, producer, director, co-chairman, president, and CEO. ¶¶409-12, 420-27. They set her schedule and her salary, appeared on and managed the set every day, were responsible for receiving and addressing HR concerns, and had the power to exert influence over Lively's working conditions. *Id.* Heath and Baldoni also leveraged their close friendship to "act with a certain degree of impunity" and cover the other's misdeeds, such as brushing off complaints as misunderstandings and "silly" while simultaneously acknowledging that Lively's complaints "insinuated" that they were "unsafe/sexually harassing." *Id.* ¶585, 588, 613-16; *Bailey*, 16 Cal. 5th at 632. Their close friend, Sarowitz, responded by suggesting they "remind" Lively "whose money it was." ¶571. Their collective power and conduct threatened Lively's (and others') ability to do her job, including by risking her chemistry with her costar, forcing her to spend significant time reporting and attempting to remedy their behaviors, and "making it okay" to save the work. ¶¶554, 582-87. On that score, the retaliatory "huffy" and defensive reactions to concerns, and continual disparagement of Lively to others, among the other retaliatory behaviors, were part and parcel of the sexual harassment, extending it well beyond January 4, 2024, contrary to Defendants' position that all was well and resolved by that time. ¶¶552-53; *Birschtein v. New United Motor Mfg., Inc.*, 92 Cal. App. 4th 994, 1002 (2001) (retaliatory acts can exacerbate hostile work environment); *Sooroojballie v. Port Auth. of New York & New Jersey*, 816 F. App'x 536, 543 (2d Cir. 2020) (summary order) (accord).

**M. Wayfarer And IEWUM Are Strictly Liable For Supervisory Conduct.**

Because Baldoni and Heath served as Lively's supervisors, Wayfarer and IWEUM are

strictly liable for their misconduct. *See Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc.*, 531 F. Supp. 3d 522, 537 (N.D.N.Y. 2021); *Roby*, 47 Cal. 4th at 707. The Wayfarer Defendants' remediation argument fails because such a defense does not apply when, as here, the conduct involves *supervisory* conduct. *Sears*, 531 F. Supp. 3d at 538. Nor can they avail themselves of the *Faragher* defense because doing so requires an employer not only have but also ***enforce*** anti-harassment policies and complaint procedures, including by effecting corrective action. *Id.* at 537 ("Remedial action beings with the investigation.").[23] Wayfarer failed to enforce its own policies , refused to investigate concerns when raised, and did not take *any* disciplinary action (not even admonishing Heath or Baldoni).[24] ¶¶474-86, 569-72, 576-78, 589-90. Instead, they enabled the hostility to continue, including through the subsequent retaliation inflicted on Lively. *Lively's* persistent efforts to remediate the behavior does not absolve Wayfarer and IEWUM of their obligations.

## II.    THE RETALIATION COUNTS MUST PROCEED TO TRIAL.[25]

This Court's previous finding that "the strength of the evidence in favor of a smear campaign" because the evidence in the CRD Complaint sufficiently demonstrated that the "Wayfarer Parties did spread negative stories about Lively" and "did what they said they planned to do" alone warrants denying the MSJ. Dkt. 296 at 115-119.[26] The same result follows at this stage because the Wayfarer Defendants have failed to adduce *admissible* evidence to demonstrate

---

[23] The *Faragher* defense requires: "(1) the employer exercised reasonable care to prevent and correct any harassing behavior"; and (2) the plaintiff unreasonably failed to take advantage of corrective opportunities. *Sears*, 531 F. Supp. 3d at 538. California does not recognize the *Faragher* defense because "under the FEHA, an employer is strictly liable for all acts of sexual harassment by a supervisor." *State Dep't of Health Servs. v. Superior Ct.*, 31 Cal. 4th 1026, 1042 (2003); Cal. Gov't Code § 12940.

[24] *Cf. Sears*, 531 F. Supp. 3d at 536-537 (finding appropriate remedial steps where defendant conducted an investigation consistent with its policies and also disciplined the harasser with more than "an empty slap on the wrist").

[25] Because Lively's retaliation counts raise triable issues, Defendants' challenge to the aiding and abetting claim as derivative must also fail. Defendants' sole other challenge confuses the basis of this count, which asserts only aiding and abetting retaliation (not harassment).

[26] Wayfarer and IEWUM are liable as joint employers.

they had a legitimate reason for their conduct, which they must to "dispel the presumption" of retaliation under Title VII and FEHA once Lively makes a prima facie case that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) a causal link exists between the two. *Mamou v. Trendwest Resorts, Inc.*, 165 Cal. App. 4th 686, 714-15 (2008); *McSweeney*, 776 F. Supp. 3d at 250-251.[27] Even if *arguendo* the Wayfarer Defendants are able to proffer evidence as to legitimacy, denial of MSJ still is necessary because the evidence shows those reasons are untrue or pretextual. *McSweeney*, 776 F. Supp. 3d at 250-251. "Very little" evidence is required at this stage because the "ultimate question" is "most appropriately conducted before a factfinder on the full record." *Wilson v. City of Fresno*, 763 F. Supp. 3d 1073, 1106–07 (E.D. Cal. 2025)*.*

**A.    The Record Easily Establishes A Prima Facie Case Of Retaliation.**

    1.    The Wayfarer Defendants concede that Lively engaged in protected activities.

While conceding that Lively has met the protected activity element of her *prima facie* case,[28] the Wayfarer Defendants attempt to undermine the causal link element by pointing to "temporal proximity" and "intervening events" that ignores the full scope of Lively's ***protected conduct***, which includes: confronting Baldoni about his gratuitous sex scenes and fat shaming (April 2023, ¶¶470-71, 519, 561); reporting Heath's behavior (May-June 2023), ¶¶ 561-81); negotiating contract terms prohibiting sexual harassment (January-June 2024, ¶¶ 582-90); refusing to appear in promotion with Baldoni and Heath, thereby opposing their harassing conduct (June to August 2024, ¶¶249, 668-69); and filing her CRD complaint and this action (December 2024, ¶¶

---

[27] An even higher "clear and convincing" standard applies to California Labor Code section 1102.5, which Defendants do not meet. *See Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703, 718 (2022).

[28] Defendants identify at least three protected acts, which they do not dispute occurred or constitute actionable protected activities: Lively raising concerns in May 2023 (MJP at 14, 16; ¶¶ 561-81) and January 2024 (¶¶586-89), and negotiating the CRA (MSJ at 31; ¶¶582-,83).

783-84).[29] The Wayfarer Defendants cannot challenge these additional protected activities on reply,[30] but, even if they could, each event constitutes legally protected conduct that destroys the causal argument.

2.  The Wayfarer Defendants subjected Lively to a continuous pattern of adverse actions.

Courts liberally interpret anti-retaliation provisions to include "the entire spectrum of employment actions" and consider the totality of the circumstances and an employer's acts collectively, rather than in isolation, because retaliation can manifest in "a series of subtle, yet damaging, injuries." *Yanowitz v. L'Oréal USA, Inc.*, 36 Cal. 4th 1028, 1052–53 (2005); *Bailey*, 16 Cal. 5th at 638 (task is to "appreciate the nature of *this* conduct by *this* particular actor in the context of *this* workplace"); *accord Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63-64 (2006); *Schoenadel v. YouGov Am. Inc.*, 2025 WL 371089, at *9 (S.D.N.Y. Feb. 3, 2025). California law defines an adverse action as "treatment that is ***reasonably likely*** to impair an employee's job performance or ***prospects for advancement in their career***." *Bailey*, 16 Cal. 5th at 638 (emphasis added). Title VII is even broader, reaching "any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination." *McSweeney*, 776 F. Supp. 3d at 251 (citing *Burlington*, 548 U.S. at 57). Such injuries need not directly relate to a plaintiff's employment or workplace nor affect her compensation or job level. *Burlington*, 548 at 63-64. The MSJ does not confront the Wayfarer Defendants' continuous pattern of adverse actions, focusing instead on recharacterizing certain publicity efforts as "reasonable defensive measures" and relying on self-serving and disputed facts to assert that the "digital smear campaign" "never

---

[29] "Protected conduct can take many forms," including formal or informal reporting or opposing conduct that employee reasonably believes is unlawful. Cal. Gov't Code § 12940(h); *Castro-Ramirez v. Dependable Highway Express, Inc.*, 2 Cal. App. 5th 1028, 1046 (need not use "legal buzzwords"); *see also Eaton v. Coca-Cola Co.*, 2010 WL 2836737, at *17 (D. Conn. July 19, 2010); *Lewis v. New York City Transit Auth.*, 12 F. Supp. 3d 418, 449 (E.D.N.Y. 2014); *Laurin v. Pokoik*, No. 02 CIV. 1938 (LMM), 2005 WL 911429, at *4 (S.D.N.Y. Apr. 18, 2005).
[30] *See Hahn v. Off. & Pro. Emps. Int'l Union, Loc. 153*, 2016 WL 4120517, at *4 (S.D.N.Y. July 22, 2016).

132272102.v8

happened." MSJ at 27, 29 fn. 5. The argument is legally erroneous, and ignores contrary evidence, the pending spoilation motion, and expert testimony.[31]

> i. *The Wayfarer Defendants obstructed Lively's attempts to report and remediate workplace harassment.*

The Wayfarer Defendants impeded Lively's ability to report unlawful conduct and to secure a safe and harassment-free work relationship by dismissing her concerns, attempting to justify their behavior, becoming "huffy" or "short" and "withdrawing," or making comments that undermined the importance of people feeling safe on set,. ¶¶552-54. *Bailey,* 16 Cal. 5th at 638 (obstructing a complaint could be "quintessentially retaliatory"). Baldoni and Heath knew that others found their behavior inappropriate, but rejected any investigation by subjectively concluding that they had been "misunderstood." ¶¶565-72, 584,. Their reactions negatively impacted the work, left Lively feeling guilty for speaking up, and shifted onto Lively the responsibility to "make it okay so the scene would be good." ¶¶552-54. The Wayfarer Defendants' effort to characterize Lively's claims as "petty slights" cannot be squared with their ***express agreement*** in January 2024 that ***any*** "changes in attitude, sarcasm, marginalization or other negative behavior . . . as a result of these requests is retaliatory and unacceptable." ¶¶582-83.

> ii. *The Wayfarer Defendants impugned Lively's reputation.*

Courts have long recognized that making "disparaging or untrue statements" or otherwise "[b]emirching" an employee's reputation can constitute adverse treatment, especially when future

---

[31] The Court must deny the MSJ on the Retaliation Claims because Lively not only has presented substantial evidence demonstrating that the existence of a retaliatory digital campaign (*see* ¶¶709-62, 830-33) but also has sought relief for the Defendants' destruction of relevant ephemeral communications (*see* Dkt. 874). *See Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998) ("where the innocent party has produced some (not insubstantial) evidence in support of his claim, the intentional destruction of relevant evidence by the opposing party may push a claim that might not otherwise survive summary judgment over the line"); *accord Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001); *see also Vega v. Broome Cnty.*, 2023 WL 6318919, at *14-15 (N.D.N.Y. Sept. 28, 2023).

employment requires a "wholesome reputation." *McSweeney*, 776 F. Supp. 3d at 268 (collecting cases confirming that negative references, refusals to provide recommendation letters, blacklisting, and about an employee to others or in the media can be adverse); *Yanowitz*, 36 Cal. 4th at 1055 (communicating, fabricating, and soliciting negative information about employee contributes to adverse course of conduct); *see Doe v. City & Cnty. of San Francisco*, 835 F. Supp. 2d 762, 772 (N.D. Cal. 2011). The Wayfarer Defendants disparaged Lively to her peers, including to Hoover and one of the Film's producers, which directly undermined Lively's ability to perform her job, including by jeopardizing her ability to promote the Film alongside Hoover. ¶¶623-639.[32] They furthered the pattern of adverse acts against Lively by refusing to support her PGA application, despite her well-documented contributions to the Film. *See Constantin v. N.Y.C. Fire Dep't*, 2009 WL 3053851, at *14 (S.D.N.Y) (denial of recommendation letter sufficient to support adverse action); *accord Pantchenko v. C. B. Dolge Co.*, 581 F.2d 1052, 1055 (2d Cir. 1978). Defendants ultimately submitted a letter to the PGA, but only after further disparaging Lively to Sony. (¶¶636-37).

Defendants publicly maligned Lively by planning and implementing a press and social media campaign to "bury" her. ¶¶640-782. Baldoni departed from the Film's agreed-upon marketing plan, despite knowing in real-time that it would harm Lively and the other female cast and crew, to position himself as *the* champion of survivors and proactively "combat[]" stories about on-set friction. ¶¶728-34. The Defendants simultaneously placed and promoted negative media and social media narratives that falsely blamed Lively for the Film's marketing plan (¶¶744-65), and cast aspirations at her character (¶¶681-88). Defendants' attempt to cast their campaign as a "defensive measure" or "classic PR," ignores the law and the facts, including their prior

---

[32] That Lively described Baldoni a "narcissist" is irrelevant—it says nothing about whether Heath and Baldoni disparaged *her because of* her having engaged in protected activities.

agreement that "negative behavior, ***including during publicity and promotional work***" could be retaliatory. ¶582. Defendants cite no evidence demonstrating that Lively "indisputably started the publicity fight," or that she launched an "onslaught of vicious negative" press against Baldoni. MSJ at 30. Instead, they rely on disputed events occurring *after* they set their plan in motion: two texts from Reynolds to WME, the Vanzan lawsuit, and *The New York Times'* reporting on Lively's CRD Complaint. MSJ at 30. None of this can possibly explain the campaign Defendants began to hatch, and then started executing, *before the Film premiered.* ¶¶640-715.

The evidence that exists demonstrates that Defendants have exceeded the bounds of "reasonable defensive measures." They did not simply *defend* Wayfarer by, for example, having Baldoni or Heath give interviews to explain what they experienced on set, or offer witnesses to speak to Baldoni and Heath's character. *Cf. McSweeney*, 776 F.Supp.3d at 258-25; *Hughes*, 304 F.Supp.3d at 449. Instead, they purposely, repeatedly, surreptitiously, and directly, attacked Lively's character and reputation, including in ways that directly contradicted their own perception of Lively's "sterling" reputation. ¶¶640-782. An employer's right to defend itself does not authorize threats, intimidation, or efforts to publicly discredit employees who have raised harassment claims. *Cf. McSweeney*, 776 F.Supp.3d at 258-259 (published letter not adverse where "cast[] doubts on Plaintiff's allegations [about ancillary issue] and not on Plaintiff's performance as an actor or reputation as an employee in the entertainment industry").[33] The Wayfarer Defendants' employer-coordinated and funded smear campaign, directed by the same executives Lively accused of harassment, constitutes quintessential adverse conduct and DARVO. ¶442; *see*

---

[33] *See also Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018) ("There is an important difference between defending oneself, on the one hand, and threatening, intimidating, or otherwise interfering with someone's right to pursue a discrimination claim on the other."); *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 84 (1st Cir. 2007) (affirming verdict based on union president's comments on TV that plaintiff was unfit for her job and implying she would "pay a price").

132272102.v8

*generally* Ex. 96, Freyd Report; *Johnson v. J. Walter Thompson U.S.A., LLC*, 224 F. Supp. 3d 296, 314 (S.D.N.Y. 2016).

> iii.    *Defendants Filed a Baseless and Retaliatory Lawsuit.*

Defendants' frivolous and dismissed $400M lawsuit—launched with the purpose of suing Lively, her family, and anyone on her side "into oblivion"—constitutes adverse action. *See* Dkt. 223, 296, 743 at 5-13, 23-24; *Robinson v. De Niro*, 739 F. Supp. 3d 33, 89 (S.D.N.Y. 2023) (suits that are designed to deter employees from seeking legal redress may constitute adverse actions when filed "with a retaliatory motive" and "without a reasonable basis in fact or law").[34]

> 3.    A causal link connects Lively's protected acts to Defendants' adverse conduct.

Defendants have failed to undermine the causal link connecting Lively's repeated protected acts, between April 2023 and December 2024, to their pattern of adverse treatment. Defendants' sole challenge to causation is a purported lack of "temporal proximity," but temporal proximity is not the only way to infer retaliatory animus. MSJ 31-32; *see, e.g., Sealy v. State Univ. of New York at Stony Brook*, 834 F. App'x 611, 614 (2d Cir. 2020) (addressing a situation "where a plaintiff relies on temporal proximity alone," "without some other evidence of retaliatory animus*); Chukweze v. NYCERS*, 891 F. Supp. 2d 443, 457 (S.D.N.Y. 2012).[35] Temporal proximity is unnecessary here because the record shows that Lively's protected acts are *precisely what caused* Defendants to retaliate. *See Stajic v. City of New York*, 214 F. Supp. 3d 230, 236 (S.D.N.Y. 2016). Defendants' argument separately fails because it assumes that nothing happened after January 4,

---

[34] In *Robinson*, 739 F. Supp. 3d at 90, this Court declined to find a retaliatory suit where defendants planned to initiate litigation based on plaintiff's misconduct regardless of her suit. But Defendants had no plans to sue Lively (let alone her husband or publicist) until she sent Defendants her already-filed CRD Complaint. Dkt. 296 at 46.
[35] *See Wysinger v. Auto. Club of S. California*, 157 Cal. App. 4th 413, 421 (2007) ("A long period between an employer's adverse employment action and the employee's earlier protected activity" may support inference of causal connection); *see also Green v. Laibco, LL*C, 192 Cal. App. 4th 441, 456 (2011) (one-year gap); *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) (seven-month gap); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980) (eight-month gap).

47

132272102.v8

2024, which ignores Lively's intervening protected acts and their ongoing pattern of public and private antagonism against her. *See* MSJ (Lively "faced no real consequences for at least eight months" after negotiating the Protections Rider); *see, e.g.*, *Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018); *Birschtein v. New United Motor Mfg., Inc.*, 92 Cal. App. 4th 994, 1002 (2001) (retaliatory acts can exacerbate hostile work environment); *Sooroojballie v. Port Auth. of New York & New Jersey*, 816 F. App'x 536, 543 (2d Cir. 2020) (summary order) (accord) (citations omitted).[36]

## B. Defendants Failed To Produce Admissible Evidence Of Legitimate, Non-Retaliatory Reasons For Their Sustained Course Of Retaliatory Actions.

Because Lively has shown a *prima facie* case, Defendants must but cannot point to *admissible evidence* to support a legitimate reason for their sustained adverse treatment of Lively. *O'Halpin*, 670 F. Supp. at 79. Defendants' argument that they "would have reacted to Lively's onslaught of negative press against them even if no concerns about their on-set behavior had ever been raised" fails on multiple levels. MSJ at 31. The argument relies on Heath's disputed, foundation-less, and self-serving testimony, which is contradicted by admissible evidence that Lively neither sought out negative press about Baldoni, nor isolated him from the cast, who independently distanced themselves from him (¶¶249, 262). The Defendants' insistence that they needed to defend themselves against Lively's concerns overlooks that she made no public accusations until she filed the CRD complaint. The argument also fails by focusing on the publicity-related aspects of the retaliation campaign, while ignoring the other adverse actions against Lively. *See supra*. Finally, the Wayfarer Defendants' claim that they had legitimate reasons

---

[36] The Wayfarer Defendants' cited cases are distinguishable. *Gubitosi v. Kapica*, 154 F.3d 30 (2d Cir. 1998), concerns a police officer's § 1983 claims, and *Dhaliwal v. Saliz Pharms., Ltd.*, 2019 WL 5067164 (S.D.N.Y. Oct. 9, 2019), addresses the False Claims Act. The sole Title VII case, *Brennan*, 2020 WL 6875059, found an intervening act when, during a 16-month temporal gap, the plaintiff made "***terrorist threats.***" *Id.* at *5.

to act as they did ignores the volume and severity of conduct, and the fact that such conduct *far exceeds* any reasonable "defense," and was and is an unleashed fury of offense. *See supra*.

### C. Defendants Wanted To "Bury" Lively For Speaking Out Against Them.

Even if Defendants have met their second-stage burden, the record contains evidence that Defendants' articulated business reason (to defend themselves) was false, pretextual, or motivated "at least in part" by the plaintiff's protected activity. *Bart*, 96 F.4th at 576; ¶¶263-645, 649.[37]

### III.    THE FAILURE-TO-PREVENT COUNT MUST PROCEED TO TRIAL.

The Wayfarer Defendants had an "affirmative and mandatory" duty to prevent harassment and retaliation and to "take all reasonable steps necessary" to do so (including a prompt, thorough, and impartial investigation), but failed to do so. Gov't Code § 12940(j), (k); *State Dep't of Health Servs. v. Superior Ct.*, 31 Cal. 4th 1026, 1040 (2003).*Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.*, 103 Cal. App. 4th 1021, 1035 (2002); *Malik v. Carrier Corp.*, 202 F.3d 97, 105 (2d Cir. 2000).[38] Wayfarer and IEWUM failed to: distribute and enforce their HR policies;[39] inform cast and crew that they could raise concerns to the "safety hotline;" maintain any records of their alleged training; introduce their sole HR consultant to cast and crew or alert her to concerns; take any investigative steps (interviewing no witnesses); or implement *any* corrective measures. ¶¶589-590. *Bradley v. Dep't of Corr.*, 158 Cal. App. 4th 1612, 1630 (2008) ("adequate remedial measures" include "immediate corrective action" calculated to end, and prevent future,

---

[37] Lively's California counts set a significantly lower bar. FEHA and Section 1102.5 impose "substantial motivating reason" and "contributing factor" standards, respectively, and for 1102.5 a presumption of retaliation within 90 days of a protected act. *See Wawrzenski v. United Airlines, Inc*., 106 Cal. App. 5th 663, 685 (2024); *Lawson*, 12 Cal. 5th at 712; Cal. Lab. Code § 98.6. Having met the higher but for test, Lively easily meets California's tests.

[38] These provisions apply whether Lively was an employee or contractor as FEHA expressly protects employees and any "person providing services pursuant to a contract." Gov't Code § 12940(j)(1), (j)(5); *Hirst v. City of Oceanside*, 236 Cal. App. 4th 774, 791 (2015); 2 C.C.R. § 11008.

[39] Undistributed or unenforced policies are not reasonable preventative measures. *See Rice v. FCA USA LLC*, 2018 WL 345731, at *15 (Cal. Ct. App. Jan. 10, 2018) (policies "are mere lip service" if not followed by "conducting a reasonably thorough investigation to root out harassment."); *Luckett v. Kohl's Dep't Stores, Inc.*, 2020 WL 4341779, at *4 (C.D. Cal. June 18, 2020) (same); *see also*, Robbins Tr., 101:21-103:25 ("having a policy is just having words. . . You need to distribute the policy.")

harassment).

Wayfarer and IEWUM insist that an investigation would not "have made any difference" because they executed the CRA, but *Lively's* insistence on a safe workplace does not absolve *them* of liability. MSJ at 38*; see Villalobos v. Costco Wholesale Corp.*, 2023 WL 5108499, at *8 (E.D. Cal. Aug. 9, 2023) ("obligation to take prompt corrective action" requires temporary and permanent remedial steps).[40] Nor can they claim futility because an investigation could have substantiated Lively's allegations, resulted in remedial actions including discipline for Baldoni and Heath, or ***prevented Defendants from launching their subsequent retaliation campaign***. *See California Fair Emp. & Hous. Com. v. Gemini Aluminum* Corp., 122 Cal. App. 4th 1004, 1024 (2004) ("employer's claim that its procedures are effective in addressing discrimination is negated by proof of retaliation."). Based on these failures, summary judgment is inappropriate. *See Marshall v. Boeing Co.*, 2019 WL 4391112, at *5 (C.D. Cal. June 10, 2019); *Rangel v. Am. Med. Response W.*, 2013 WL 1785907, at *8 (E.D. Cal. Apr. 25, 2013).

## IV.    LIVELY WAS AN "EMPLOYEE" UNDER TITLE VII AND CALIFORNIA LAW.

Defendants wrongly argue that Lively was an independent contractor rather than an employee for the purposes of Counts 1, 2, and 5. MSJ 32-35. Whether an individual is an "employee" entitled to Title VII's protections depends on a fact-specific analysis of thirteen factors (known as the "*Reid* factors"). *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 227 (2d Cir. 2008). "Control" is the "most important factor," and is alone reason to deny summary judgment.

---

[40] *Achal v. Gate Gourmet, Inc.*, 114 F. Supp. 3d 781 (N.D. Cal. 2015), and *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177 (9th Cir. 2005) both involve the federal *Faragher* defense under Title VII, and do not apply here. Even if they did, they do establish that existence of a policy, alone, satisfies FEHA. (Dkt. 955 at 36–37); *Achal*, 114 F. Supp. 3d at 804 (policy is one reasonable step an employer might take"); *Hardage*, 427 F.3d at 1185 (unlike here, employer fulfilled its preventative duties by maintaining and distributing a policy).

*Salomon*, 514 F.3d at 228.[41] Lively's Offer Letter and the ALA are replete with terms that show Defendants' "right to control the manner and means" of Lively's performance, requiring Lively to: render services when, where, and in a manner directed by IEWUM (including post-production and publicity), comply with all IEWUM directions and adhere to IEWUM's set work schedule, and provide "exclusive" services during filming; *see Makarova v. United States*, 201 F.3d 110, 114 (2d Cir. 2000) (finding actress engaged via loan-out employee where required to play specific part, meet rehearsal and performance schedules; have specific hair style and wear provided shoes/makeup, and provide exclusive services during term).[42] The ALA gave IEWUM the right to terminate Lively, prohibited her from changing her appearance, and defined IEWUM as Lively's "special employer" with "***the exclusive right to direct and control***." ¶530.[43] Defendants complain that Lively's A-list status precludes a finding of "control" but being a "star" does make Lively "something less of an employee." *See Makarova*, 201 F.3d at 116. Defendants argument that they had no control because of Lively's various contributions to the Film also fails because IEWUM had ultimate say. MSJ at 34.[44] Defendants' failure to meet the "control" test is dispositive, as failure to establish even one factor renders the exception inapplicable. Cal. Lab. Code § 2776(a).

Defendants concede California's employee presumption, but claim that Lively is an

---

[41] Courts "*should not* ordinarily place extra weight on the benefits and tax treatment factors. . . and *should* instead place special weight on" the hiring party's control of the 'manner and means. *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 117 (2d Cir. 2000) (emphasis in the original).
[42] Defendants dispute that the ALA is binding but ***themselves*** cite it as evidence that multiple *Reid* factors supposedly point their way, conceding the ALA's relevance to the issue. *See* Mot. at 34-35.
[43] *Makarova* addresses under New York law, but the Title VII test is the same. *Makarova*, 201 F.3d at 114.
[44] The Wayfarer Defendants ignore *Reid* factors 4, 7, and 8. Virtually all the other factors show that Lively was an employee, because Defendants: were "the source of the instrumentalities and tools" (factor 3), provided the set, camera, sound, costume, and crew; chose "the location of the work" (factor 4); prescribed a filming schedule (factor 7); paid Lively her fee "on [IEWUM's] regular payday in the week following the week in which such payments have accrued," (factor 6); hired and paid film staff (factor 9); considered Lively's work part of their "regular business" as a movie studio (factors 10 and 11); and covered Lively under IEWUM's workers' compensation policy (factors 12 and 13). While Lively is highly skilled (factor 2), even highly skilled individuals can be "employees" under Title VII. *See Salamon*, 514 F.3d at 228 (highly skilled surgeon could be an employee, noting that even "ship captains and managers of great corporations" can be as well).

51

independent contractor under the narrow "business-to-business" exception. MSJ 33; Cal. Lab. Code § 2776(a). That exception applies only if the Wayfarer Defendants meet *all* twelve statutory criteria, which they do not cite, let alone discuss.[45] To avoid a finding of employment status, Defendants thus must meet California's more-stringent "ABC" test, which requires establishing that Lively (A) was free from their control, (B) performs work outside their usual business, and (C) is "customarily engaged in an independently established" occupation or business. *Id*. §2775(b). *See* Cal. Lab. Code § 2775. Defendants cannot meet their burden because they fail even to mention this test, but even if they did, they could meet it because Lively is an employee for the above reasons.

## V.    LIVELY'S CONTRACT CLAIMS MUST PROCEED TO TRIAL.

### D.  The ALA And CRA Are Valid, Enforceable Agreements.

#### 1.  The ALA Is a Binding, Enforceable Agreement.

The Court should reject the Wayfarer Defendants' argument that the ALA was never validly formed and is unenforceable because *Defendants* previously sought to enforce the ALA against Lively in their now-dismissed lawsuit, which asserted a claim for breach of the covenant of good faith and fair dealing predicated on the ALA. MSJ 39-42; Dkt. 50, ¶¶34-46; *see also id*. ¶50 (contending ALA was an enforceable contract notwithstanding simultaneous allegation that Lively "never even signed her employment agreement") & ¶341 (alleging "Lively and the Wayfarer Parties entered into a contract by which Lively agreed to perform as an actor in the Film *It Ends With Us*"). Defendants relied expressly on the ALA, quoting verbatim from its terms, to oppose Lively's motion to dismiss to FAC. Dkt. 83 at 32. It is elementary that a "party cannot sue

---

[45] Even if the business-to-business exception applies, a finding of contractor status does not follow, because Defendants still must show that Lively is an independent contractor under the multi-factor *Borrello* test. *See* Cal. Lab. Code §§ 2776(a); *S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 769 P.2d 399, 404 (Cal. 1989). Defendants make no attempt to show employment status under the *Borello* test.

on a contract and at the same time repudiate his obligations under it." *San Francisco Milling Co. v. Mordecai*, 134 Cal. App. 755, 759 (1933); *Tobias v. Notations, Inc.*, 2015 WL 4654454, at *5 (S.D.N.Y. July 20, 2015) (rejecting challenge to existence of a contract based on "repeated acknowledgement" of it in complaint). Defendants' prior insistence that the ALA *was* a binding agreement estops them from argument otherwise now, and is a judicially noticeable admission that warrants granting Lively summary judgment on the ALA's enforceability. *See* Fed. R. Civ. P. 56(f)(1), 56(g).

The Wayfarer Defendants also cannot maintain their argument that execution was a condition precedent (the "Execution Conditions") (MSJ at 40) because, under California law, "a party to an agreement waives a condition precedent by expressing a desire and intent to go forward with a contract notwithstanding the failure of the condition precedent." *Langson v. Lane*, 967 F.2d 587 (9th Cir. 1992); *Gonzalez v. Oplaai LLC*, 2023 WL 11195911, at *4 (C.D. Cal. Dec. 19, 2023); *Vincent Crisafulli Testamentary Tr. v. AAI Acquisition, LLC*, 110 N.Y.S.3d 494 (N.Y. Sup. Ct. 2018). Setting aside the provisions they later breached, Wayfarer and IEWUM performed the material terms of the ALA, including by paying the contingent compensation that it contemplated (rather than the amount specified in the Offer Letter). MSJ 41; 56.1 ¶¶446-47. Had the Wayfarer Defendants believed a condition precedent was unmet, they could have (but chose not to) withhold payment. *Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 78 (2017). They did not do that and, in fact, on May 3, 2024, expressly confirmed in writing that Wayfarer was "***waiving***" the Execution Conditions. ¶452. (emphasis added).[46] Plus, the plain language of the

---

[46] Evidence of the parties' negotiations is admissible to prove the validity of the ALA (and the waiver of the Execution Conditions) even though an integration clause is part of the parties' final written agreement. *See* Cal. Civ. Code. § 1856(f). That evidence includes Lively's attorney expressly stating that the Execution Conditions had been waived, which Wayfarer's counsel did not dispute. ¶383. And, while as late as December 15, 2023, the operative draft of the CRA referred to the "unexecuted Actor Agreement," Wayfarer *struck* the word "unexecuted" from the draft they transmitted to Lively's representatives on January 3, 2024. ¶423.

CRA, which Heath and Lively executed, contemplated the validity of the ALA, referring expressly to "that certain actor agreement . . . dated as of May 5, 2023," and reciting that the "parties wish to confirm the conditions under which Lender *has agreed* to cause Artist to render acting services." ¶201. Where, as here, "a party's conduct is so inconsistent with the intent to enforce a legal right, the intention to give up that right will be *presumed,* notwithstanding evidence that the party did not subjectively 'intend' to relinquish it." *Oakland Raiders v. Oakland-Alameda Cnty. Coliseum, Inc.*, 144 Cal. App. 4th 1175, 1194 (2006).

Defendants claim there was no meeting of the minds on the ALA based on the conclusory assertion that "no final agreement was ever reached" because there remained "material" terms that the parties were discussing in July 2024. MSJ at 41. Only *four* terms remained subject to discussion at that time: (1) the (waived) Execution Conditions; (2) details of Lively's wardrobe and travel expenses during promotion of the Film; (3) the conditions under which Lively would be able to exercise the termination right in the event of sexual harassment; and (4) a modification to the confidentiality provision that would have permitted Lively to make "truthful statements" about the production, which Wayfarer rejected. ¶¶380-81. Those terms were immaterial in practice because both parties performed the remainder of the ALA's terms even while continuing to discuss those terms.

    2.  The CRA Is a Binding, Enforceable Agreement.

Defendants' argument that the CRA is unenforceable because its validity depended on the ALA fails because the ALA is an enforceable agreement. *Supra*. Separately, the CRA was an independent, fully executed agreement, and nothing on its face conditions its validity on the execution of the ALA, including the reference to "additional" terms that would be "incorporated" into the ALA. Defendants cannot explain why, if the CRA's enforceability depended upon the execution of the ALA, it was necessary to execute the CRA at all, much less in January 2024. The

132272102.v8

CRA by its own terms refers to an independent exchange of consideration and Lively's suggestion to refer to the ALA was not a unilateral "statement," but a change that Wayfarer *accepted*, which demonstrates a contemporary, mutual understanding that the ALA was in effect and had been amended.

While Defendants contend that the CRA lacked consideration, neither California nor New York law would require new consideration since it modified an existing agreement (the ALA). MSJ at 42-43; Cal. Civ. Code. § 1698(a); *GG Managers, Inc. v. Fidata Tr. Co. New York*, 215 A.D.2d 241, 242 (1995).[47] Regardless, there *was* consideration for the Letter because a "written instrument" is "presumptive evidence" of valid consideration, which Defendants do not rebut. Cal. Civil Code §§ 1614-15. The rule Defendants cite—that a promise to perform an existing legal duty cannot constitute consideration—only applies where the duty is "neither doubtful nor the subject of honest dispute." Restatement (Second) of Contracts § 73. Lively's duty to continue was *at least* doubtful, because she possessed a right under the ALA (in a provision never subject to dispute) to terminate the Agreement in the event that sexual harassment took place. ¶388. Further, it is undisputed that Lively executed the Protection Rider as an alternative to pursuing a "more formal HR process," 56.1 ¶162, and "forbearance to assert" a claim is valid consideration. Restatement (Second) of Contracts § 73 cmt. d; *id.* § 74.

### E.  Defendants' Other Arguments As To The Breach Of Contract Claims Fail.

Defendants wrongly claim they are entitled to summary judgment on Lively's breach of contract claims because she purportedly did not comply with the notice-and-cure provision, they cured any such breach, and Lively is not entitled to the damages she seeks. Defendants have waived

---

[47] Even if the ALA was not in effect at the time the CRA was executed, the mutual exchange of promises embodied in the CRA was sufficient consideration to support the agreement. *See, e.g.*, *Lockhart v. Gen. Motors Corp*, 2001 WL 1262922, at *2 (C.D. Cal. Sept. 14, 2001).

the right to claim Lively's noncompliance because they failed to assert it as an affirmative defense, which "must be pleaded and proved by the party in breach" on pain of "waiver." *Spencer-Smith v. Ehrlich*, 347 F.R.D. 606, 621 (S.D.N.Y. 2024); Dkt. 148, 149. Even without waiver, Lively satisfied the notice-and-cure provision because the Wayfarer Defendants had written notice of their breach by December 31, 2025, and Lively filed the first and second amended complaints outside the cure period, mooting the issue. Dkt. 84, 521. As to the claim that Defendants cured any breach after November 2023, they do not because they cannot contend that they ever cured the breach of the *anti-retaliation* provision, much less before Lively's amendments were filed. MSJ 45-46. Finally, Defendants contend that Lively's contract damages are duplicative and exceed the ALA's limitation on consequential and special damages. MSJ 47-49. But "the same wrongful act may constitute both a breach of contract and an invasion of an interest protected by the law of torts," and Lively is entitled to seek damages on alternative and independent theories. *Erlich v. Menezes*, 21 Cal. 4th 543, 551–53 (1999). For similar reasons, Lively's claimed damages for the breach of the CRA's anti-retaliation provision constitute general damages, not special damages. *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 102 P.3d 257, 263 (2004).

## VI.   THE FALSE LIGHT CLAIM SURVIVES BECAUSE CALIFORNIA LAW APPLIES.

Defendants' contention that New York law applies to Lively's false light claim ignores that the ALA contains a choice-of-law provision that mandates application of California law to that claim. Even if it did not, California law would apply to the false light claim, because it turns on Defendants' conduct in California, including but not limited to the execution of a communications strategy from California that included blaming Lively for marketing for which Sony and Wayfarer (not Lively) was responsible and distributing the Dance Scene footage to friendly outlets. ¶¶807-08; Dkt. 142-1, ¶28. Defendants claim that Lively lacks "standing" to bring a false light claim

because she is not a California resident, but the authorities on which Defendants rely are unpersuasive because they cannot be reconciled with Article I, Section 1 of the California Constitution, which by its terms applies to "all people." Cal. Const. art. I, § 1. In any event, false light claims do not depend on the California Constitution because it is a common-law tort, which makes cases limiting the reach of California's Constitution to residents inapplicable. *See Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 23–27, 865 P.2d 633, 646–49 (1994). And even where constitutional privacy claims are squarely at issue, other cases have rejected the argument that such claims are unavailable to nonresidents, instead applying ordinary choice of law analyses. *See, e.g.*, *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1080–81 (N.D. Cal. 2023) (constitutional privacy claims adequately alleged where the "conduct causing [nonresident plaintiffs] harm occurred in and emanated from California"). [48]

## VII.    THE DEFAMATION CLAIM MUST PROCEED TO TRIAL.

The MSJ recycles a number of the arguments advanced in the MJP, including that the Defamatory Statements are opinions[49] and privileged. Those arguments fail for the reasons discussed in the MJP Opposition.[50] Defendants in the MSJ argue that the Defamatory Statements are true because the Wayfarer Defendants did not harass or retaliate against Lively. MSJ 53. But as detailed above, that argument depends entirely on factual disputes precluding summary judgment. So too with their argument as to actual malice. This court must determine "whether the evidence presented is such that a reasonable jury might find that actual malice had been shown

---

[48] The MSJ argues that the false light and defamation claim warrants dismissal based on the fair report privilege, which fails for the reasons discussed in the MJP Opp and *infra*.

[49] Defendants do not dispute that they asserted verifiably false facts in connection with the Defamatory Statements, including by asserting that Lively fabricated harassment claims as part of a ploy to take over the ***marketing*** of the Film, an assertion which falsely pinned responsibility on Lively for a marketing plan that was approved by Wayfarer from the start, The only opinion defense that Defendants assert is that "whether conduct amounted to sexual harassment or retaliation" reflects unactionable opinion. MSJ 54.

[50] The Court need not engage in a choice-of-law analysis for Lively's defamation claim, because there is no conflict between New York and California law as to the specific arguments Defendants advance. *See* Opp. at 55 n.11.

with convincing clarity.'" *Palin v. New York Times Co.*, 482 F. Supp. 3d 208, 214 (S.D.N.Y.), *modified,* 510 F. Supp. 3d 21 (S.D.N.Y. 2020) (quoting *Anderson v. Liberty Lobby*, 477 U.S. (1986)). Here, a reasonable jury could find that the Defendants caused their agent, Freedman, to publish the Defamatory Statements with subjective disregard for the truth. As explained in detail above, Baldoni, Heath, and Sarowitz knew specific types of conduct that amounted to sexual harassment based on Wayfarer's own policy, knew that Lively complained about such conduct long before the Film was edited or marketed, and admitted not just that *many* of the incidents occurred as Lively had described them, but that that Lively "genuinely believes" her claims. ¶612. Thus, there is ample evidence from which a reasonable jury could find that Defendants *knew* Lively did not fabricate her claims of sexual harassment. This is even more true as to the claim that Lively fabricated her claims in order to gain control of the Film's *marketing*, which Defendants knew was untrue at all times given their acknowledgment that Sony had been responsible for the Film's marketing plan. As to the assertion that TAG, Abel, and Street did nothing proactive, but only responded to inbound media inquiries (thereby proving Lively's retaliation claims to be fabricated), a reasonable jury would likely find that Defendants were *knowingly participants* in a proactive media campaign designed to discredit Lively. Accusing Lively of having fabricated claims that Defendants knew to be contemporaneously documented and genuinely held is the definition of actual malice.

## VIII.  DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE CONSPIRACY CLAIM.

Lively's conspiracy claim functions "as an alternative theory of liability on her non-conspiracy claims." *Lively v. Wayfarer Studios*, 2025 WL 1952027, at *10 n.8 (S.D.N.Y. July 16, 2025). As evident from the underlying claims, Lively has alleged: (1) civil conspiracy to retaliate under Title VII, FEHA, and the California Labor Code against IEWUM and Wayfarer; (2)

conspiracy to commit false light as to Wayfarer, Baldoni, Heath, Sarowitz, Nathan, TAG, and Abel; and (3) conspiracy to commit defamation/defamation per se against Wayfarer, Baldoni, and Heath. Compl. ¶¶353-469. The record evidence establishes that the Wayfarer Defendants agreed to a common scheme to retaliate against Lively that included placing her in a false light and defaming her, one or more of the Wayfarer Defendants acted intentionally and overtly in furtherance of that scheme, and harm resulted. That is all that is required for a jury to conclude that the Defendants conspired to commit the civil wrongs. *Wyatt v. Union Mortg. Co.*, 24 Cal. 3d 773, 784 (1979). ("As long as two or more persons agree to perform a wrongful act, the law places civil liability for the resulting damages on all of them" and the "requisite concurrence and knowledge may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances," including a co-conspirator's "tacit consent as well as express approval" (cleaned up)).[51]

## IX.    SAROWITZ IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE FALSE LIGHT OR CONSPIRACY CLAIMS.

The MSJ's attempt to cast Sarowitz as an aloof financier cannot be squared with the record. Sarowitz is a close confidant and friend of Baldoni and Heath and is Wayfarer's co-chairman and a signatory on the company's sexual harassment and retaliation policy. ¶476. He was intimately aware of the complaints of sexual harassment at the time they occurred, visited the set, participated in the promotion of the film, knowingly paid for Wayfarer Studios' public relations and crisis services used to carry out the retaliatory campaign, and personally drafted negative narratives about Lively (such as suggesting to "flip[] the narrative" and to make a content creator's video

---

[51] Defendants argue that Lively's conspiracy claim does not "extend to" her statutory claims, but the case they cite turned on the elements of the underlying *Connecticut-law* tort, not any aspect of civil conspiracy doctrine. *Medvey v. Oxford Health Plans*, 313 F. Supp. 2d 94, 99 (D. Conn. 2004). To the contrary, it "is sufficient that a conspiracy is based on an agreement to engage in unlawful conduct regardless of whether the conspiracy violates a duty imposed by *tort law or a statute*." *Rickley v. Goodfriend*, 212 Cal. App. 4th 1136, 1158 (2013) (emphasis added).

132272102.v8

about Lively "go viral"). ¶316. Sarowitz' attempt to minimize his involvement is controverted by

his own documents, notwithstanding their limited nature due to a failure to preserve.

## X.    THE WAYFARER PARTIES' DAMAGES ARGUMENTS FAIL

The Wayfarer Parties wrongly argue that Lively lacks "standing" to seek damages for "lost

profits" and "royalties" from her businesses because she is an "indirect shareholder" and "lost

profits" are too speculative. MSJ at 58-60. Lively does not purport to bring "derivative"

shareholder claims on behalf of the companies, but rather is seeking damages to her *own* business

reputation in connection with her own legal claims.[52] *See Cantu v. Flanigan*, 705 F. Supp. 2d 220,

229 (E.D.N.Y. 2010) (upholding $150 million defamation damages award based, in part, on

inability of plaintiff's company to secure contracts); *accord Prozeralik v. Cap. Cities Commc'ns,

Inc.*, 188 A.D.2d 178, 184–85 (1993). For this same reason, the Defendants' authority addressing

speculative "lost profits" is inapposite but, even if they were not, Lively's losses associated with

Blake Brown and Betty Booze are rooted in detailed financial projections prepared by experienced

business leaders based on industry experience and actual sales figures. *See Edwards v. Container

Kraft Carton & Paper Supply Co.*, 161 Cal. App. 2d 752, 758 (1958); *Cifone v. City of

Poughkeepsie*, 234 A.D.2d 331 (1996).

## <u>CONCLUSION</u>

Defendants' motion for summary judgment should be denied.

---

[52] Even if *arguendo* "standing" is the correct issue, Delaware law permits a plaintiff to pursue a "direct" claim to enforce her individual rights, even if damages are based on "indirect" loss to a third-party company in which the plaintiff has an ownership interest. *See NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 179–80 (Del. 2015); *AHW Inv. P'ship v. Citigroup, Inc.*, 806 F.3d 695, 699 (2d Cir. 2015), *certified question answered*, 140 A.3d 1125 (Del. 2016) ("we look to the law of the state of incorporation when adjudicating whether a claim is direct or derivative").

132272102.v8

Respectfully submitted,

Dated: December 3, 2025

/s/       *Esra A. Hudson*

Esra A. Hudson (admitted *pro hac vice*)
Stephanie A. Roeser (admitted *pro hac vice*)
Manatt, Phelps & Phillips LLP
2049 Century Park East, Suite 1700
Los Angeles, California 90067
(310) 312-4000
ehudson@manatt.com
sroeser@manatt.com

Matthew F. Bruno
Manatt, Phelps & Phillips LLP
7 Times Square
New York, NY 10036
(212) 790-4525
mbruno@manatt.com

Meryl C. Governski
Dunn Isaacson Rhee LLP
401 9th Street NW
Washington, DC 20004
(202) 240-2927
mgovernski@dirllp.com

Michael J. Gottlieb
Willkie Farr & Gallagher LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 855-3111
mgottlieb@willkie.com

Kristin E. Bender
Willkie Farr & Gallagher LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1000
kbender@willkie.com

Aaron E. Nathan
Michaela A. Connolly
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8904
anathan@willkie.com
mconnolly@willkie.com

*Attorneys for Blake Lively*

132272102.v8