**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY, | |
| Plaintiff, | |
| v. | No. 1:24-cv-10049-LJL |
| WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, JENNIFER ABEL, JED WALLACE, and STREET RELATIONS INC., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE WAYFARER PARTIES'**
**MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... iv

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

    A.  Lively Chose To Take A Lead Role In A Sexually Charged Film With Adult Themes ........................................................................................... 3

    B.  Lively Worked As An Independent Contractor, But No Contract Was Ever Formed ........................................................................................... 3

    C.  From The Outset, Lively Sought Increased Control Over The Film ........... 4

    D.  Lively Raised Concerns About Her Physical Appearance ......................... 5

    E.  Wayfarer, IEWUM, And Baldoni Took Steps To Create A Safe Set ........ 6

    F.  In The First Phase of Filming, Lively Did Not Film Any Intimate Scenes, But Voiced Objections To Certain Behavior ........................................... 7

    G.  Lively's Objections Were Addressed Before And During The Filming Hiatus .................................................................................................. 10

    H.  The Second Phase Of Filming Proceeded Without Incident .................... 11

    I.  Lively Used Her Famous Friends And Connections To Take Control Of The Film ................................................................................................ 11

    J.  Lively Stirred Up Negative Press About Baldoni And The Film .............. 13

    K.  Baldoni And Wayfarer Then Hired A Crisis Management Team .............. 14

    L.  Lively Suffered Backlash ...................................................................... 15

    M.  Lively And Reynolds Smeared Baldoni Once Again .............................. 17

    N.  Lively Initiated This Litigation .............................................................. 18

ARGUMENT .......................................................................................................... 18

I.    LIVELY CANNOT PROVE ANY ACTIONABLE SEXUAL HARASSMENT (COUNTS 1, 3, 6, 7, 8, 13) .............................................................................. 19

    A.  Lively Cannot Prove Severe And Pervasive Harassment ......................... 19

    B.  Lively Was Not Targeted On The Basis Of Her Gender ........................... 22

    C.  Defendants Completely Remediated Any Allegedly Offensive Behavior ............... 25

II.   LIVELY CANNOT PROVE ANY ACTIONABLE RETALIATION (COUNTS 2, 4, 5, 6, 7, 9, 12) .......................................................................................... 26

    A.  Lively Did Not Experience Any Actionable Adverse Action ................... 26

      1.  Lively Did Not Suffer Any Employment-Related Adverse Action ............... 27

      2.  The Only Proven Publicity Efforts Were Reasonable Defensive Measures ................................................................................................ 27

  B.  Lively Cannot Prove Any Protected Activity Was The But-For Cause Of The Alleged "Smear Campaign" ................................................................. 31

      1.  There Is No Temporal Proximity Between Any Claimed Protected Activity And Any Alleged Adverse Action .................................................... 31

      2.  Lively Cannot Prove Proximate Cause ........................................ 32

III.    LIVELY WAS AN INDEPENDENT CONTRACTOR, NOT AN EMPLOYEE (COUNTS 1, 2, 5) ............................................................................................. 32

IV.   LIVELY CANNOT PROVE A FAILURE TO INVESTIGATE CLAIM (COUNT 6) ........................................................................................................ 35

V.    LIVELY CANNOT PROVE AIDING AND ABETTING CLAIMS (COUNT 7) ........................................................................................................ 38

VI.   LIVELY'S CONTRACT CLAIMS (COUNTS 8 AND 9) FAIL .................... 39

  A.  Lively Cannot Enforce Either Alleged Agreement ..................................... 39

      1.  Lively Cannot Enforce the Actor Loanout "Agreement" .............. 39

      2.  Lively Cannot Enforce The Contract Rider "Agreement" ............. 41

  B.  Even If The ALA And CRA Were Enforceable Against The Entity Defendants, Lively's Breach Claims Would Fail As A Matter Of Law .................. 43

      1.  The Entity Defendants Did Not Engage In Conduct Rising To A Breach ........................................................................................... 43

      2.  The Entity Defendants' Alleged Conduct Cannot Constitute A Breach Because Lively Failed To Provide Notice And An Opportunity To Cure ............................................................................. 43

      3.  Even If "Notice" Were Provided Via Lively Counsel's November 2023 Email, The Entity Defendants Indisputably Cured Any Potential Breach Based On Alleged "Sexual Harassment" ......................... 45

      4.  Even If There Was A Breach By IEWUM, Wayfarer Would Not Be Liable Because Lively Cannot Establish Alter Ego Liability ..................... 46

  C.  Lively's Alleged Damages For Breach Are Barred By The "Limitations On Damages" Provision Of The ALA And Are Not Cognizable In Any Case ............................................................................................................... 47

  D.  Lively's Contract Claims Are Improperly Duplicative ............................. 49

VII.  THE DEFAMATION AND FALSE LIGHT CLAIMS (COUNTS 12 AND 14) FAIL ...................................................................................................................... 50

  A.  New York Law Applies To Lively's Defamation And False Light Claims ............... 50

B.  Lively's False Light Claim (Count 12) Fails ............................................................... 52

    1.  The False Light Claim Cannot Proceed ...................................................... 52

    2.  Lively Has No Standing To Bring A False Light Claim ................................ 52

C.  Lively's Defamation Claim (Count 14) Fails As A Matter Of Law ........................... 53

    1.  Lively Cannot Prove Falsity Or Malice ...................................................... 53

    2.  The Allegedly Defamatory Statements Were Absolutely Privileged ............. 55

VIII.  LIVELY'S CONSPIRACY CLAIM (COUNT 15) FAILS ............................................... 57

IX.  THERE IS NO BASIS FOR LIABILITY AGAINST DEFENDANT
SAROWITZ .................................................................................................................... 57

X.  SEVERAL ASPECTS OF LIVELY'S DAMAGES CLAIMS MUST BE
DISMISSED .................................................................................................................... 58

A.  Lively Lacks Standing To Assert Claims for Lost Profits Or Royalties .................... 58

B.  Lively Cannot Recover Speculative Lost Profits ....................................................... 59

CONCLUSION ............................................................................................................................... 60

## **TABLE OF AUTHORITIES**

**Cases**                                                                                           **Page(s)**

*Achal v. Gate Gourmet, Inc.*,
   114 F. Supp. 3d 781 (N.D. Cal. 2015) ............................................................... 37

*Aleman v. Airgas USA, LLC*,
   2024 WL 3937546 (C.D. Cal. Aug. 26, 2024) ..................................................... 20

*Alexander & Alexander of N.Y., Inc. v. Fritzen*,
   68 N.Y.2d 968 (1986) ......................................................................................... 57

*Alfano v. Costello*,
   294 F.3d 365 (2d Cir. 2002)................................................................................. 20

*Ali v. NYC Env't Control Bd.*,
   670 F. App'x 26 (2d Cir. 2016) ........................................................................... 59

*Am. Fed. Grp., Ltd. v. Rothenberg*,
   136 F.3d 897 (2d Cir. 1998)................................................................................. 59

*Areu v. Fox News Network, LLC*,
   2021 WL 4124226 (S.D.N.Y. Sept. 9, 2021)....................................................... 29

*Aymes v. Bonelli*,
   980 F.2d 857 (2d Cir. 1992)........................................................................... 34, 35

*Bailey v. San Francisco Dist. Attorney's Off.*,
   16 Cal. 5th 611 (2024) ........................................................................................ 27

*Bennett v. Rancho Cal. Water Dist.*,
   35 Cal. App. 5th 908 (Cal. Ct. App. 2019) ......................................................... 33

*Bliss v. MXK Rest. Corp.*,
   220 F. Supp. 3d 419 (S.D.N.Y. 2016) ................................................................ 25

*Branca v. Mayesh*,
   101 A.D.2d 872 (2d Dep't 1984) ........................................................................ 56

*Brennan v. Legal Aid Soc'y*,
   2020 WL 6875059 (S.D.N.Y. Nov. 23, 2020)..................................................... 32

*Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc.*,
   2007 WL 1040809 (S.D.N.Y. Apr. 4, 2007)........................................................ 57

*Brown v. Henderson*,
   115 F. Supp. 2d 445 (S.D.N.Y. 2000) ........................................................... 24, 25

*Burlington N. & Santa Fe Ry. Co. v. White*,
   548 U.S. 53 (2006)................................................................................... 19, 26, 27

*Buzayan v. City of Davis*,
   927 F. Supp. 2d 893 (E.D. Cal. 2013).................................................................. 53

*Celebrity Chefs Tour, LLC v. Macy's Inc.*,
   2014 WL 1660724 (S.D. Cal. Apr. 25, 2014)................................................ 46

*Choi v. Wolfgang*,
   2018 WL 7506173 (C.D. Cal. Sept. 26, 2018) ............................................ 27

*Chukwueze v. NYCERS*,
   891 F. Supp. 2d 443 (S.D.N.Y. 2012) ........................................................ 32

*Ciaramella v. Reader's Dig. Ass'n*,
   131 F.3d 320 (2d Cir. 1997).......................................................................... 41

*Clemens v. Am. Warranty Corp.*,
   193 Cal. App. 3d 444 (Cal. Ct. App. 1987) ................................................ 46

*Coleman v. Grand*,
   2025 WL 3058366 (2d Cir. Nov. 3, 2025)................................................... 54

*Collins v. Conifer Value-Based Care*,
   2025 WL 1140788 (C.D. Cal. Feb. 28, 2025) ............................................ 53

*Cozzi v. Cnty. of Marin*,
   787 F. Supp. 2d 1047 (N.D. Cal. 2011) ...................................................... 36

*Cristofaro v. Lake Shore Cent. Sch. Dist.*,
   473 F. App'x 28 (2d Cir. 2012) .................................................................... 21

*Davis v. Costa–Gavras*,
   580 F. Supp. 1082 (S.D.N.Y. 1984) ............................................................ 51

*DeIuliis v. Engel*,
   2021 WL 4443145 (S.D.N.Y. Sept. 27, 2021)............................................ 52

*Dhaliwal v. Salix Pharms., Ltd.*,
   2019 WL 5067164 (S.D.N.Y. Oct. 9, 2019) ............................................... 32

*Digital Broadcast Corp. v. Ladenburg, Thalmann & Co.*,
   63 A.D.3d 647 (1st Dep't 2009) .................................................................. 60

*Eisenberg v. Advance Relocation & Storage, Inc.*,
   237 F.3d 111 (2d Cir. 2000)................................................................... 32, 33

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*,
   194 F. Supp. 3d 263 (S.D.N.Y. 2016) ........................................................ 53

*Evemeta, LLC v. Siemens Convergence Creators Corp.*,
   2020 WL 6746630 (Sup. Ct. N.Y. Cty. Nov. 17, 2020) ............................. 60

*Faragher v. City of Boca Raton*,
   524 U.S. 775 (1998)...................................................................................... 38

*Ford v. Levinson*,
   90 A.D.2d 464 (1st Dep't 1982) .................................................................. 56

*Frangipani v. Boecker*,
    64 Cal. App. 4th 860 (Cal. Ct. App. 1998) .................................................................. 49

*Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*,
    136 F.3d 276 (2d Cir. 1998) ......................................................................................... 23

*Gibson v. Off. of Cal. Atty. Gen.*,
    561 F.3d 920 (9th Cir. 2009) ....................................................................................... 49

*Globecon Grp., LLC v. Hartford Fire Ins. Co.*,
    434 F.3d 165 (2d Cir. 2006) ......................................................................................... 40

*Goncalves v. Regent Int'l Hotels Ltd.*,
    58 N.Y.2d 206 (1983) ................................................................................................... 42

*Goodworth Holdings, Inc. v. Suh*,
    239 F. Supp. 2d 947 (N.D. Cal. 2002) ......................................................................... 40

*Gray Gables Corp. v. Arthur*,
    2022 WL 905393 (2d Cir. Mar. 29, 2022) ................................................................... 59

*Grove Press, Inc. v. Angleton*,
    649 F.2d 121 (2d Cir. 1981) ......................................................................................... 57

*Gubitosi v. Kapica*,
    154 F.3d 30 (2d Cir. 1998) ........................................................................................... 32

*Guifu Li v. A Perfect Day Franchise, Inc.*,
    281 F.R.D. 373 (N.D. Cal. 2012) ........................................................................... 46, 47

*Guz v. Bechtel Nat'l Inc.*,
    24 Cal. 4th 317 (2000) .................................................................................................. 50

*Hall v. Apartment Inv. & Mgmt. Co.*,
    2011 WL 940185 (N.D. Cal. Feb. 18, 2011) ................................................................ 38

*Hardage v. CBS Broad., Inc.*,
    427 F.3d 1177 (9th Cir. 2005) ..................................................................................... 37

*Hardage v. CBS Broad., Inc.*,
    436 F.3d 1050 (9th Cir. 2006) ..................................................................................... 37

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993) ........................................................................................................ 23

*Healthsmart Pac., Inc. v. Kabateck*,
    7 Cal. App. 5th 416 (Cal. Ct. App. 2016) .................................................................... 55

*Henderson v. Chicago Cubs Baseball Club, LLC*,
    2018 WL 3326682 (C.D. Cal. May 24, 2018) .............................................................. 53

*Hicks v. Baines*,
    593 F.3d 159 (2d Cir. 2010) ............................................................................... 19, 30

*Hughes v. Pair,*
   46 Cal. 4th 1035 (2009) ......................................................................................... 19

*Hughes v. Twenty-First Century Fox, Inc.,*
   304 F. Supp. 3d 429 (S.D.N.Y. 2018) ............................................................. 28, 29

*Int'l Gateway Exch., LLC v. W. Union Fin. Servs., Inc.,*
   333 F. Supp. 2d 131 (S.D.N.Y. 2004) .............................................................. 48, 49

*Jacobson v. Schwarzenegger,*
   357 F. Supp. 2d 1198 (C.D. Cal. 2004) .................................................................. 33

*JH Kelly, LLC v. AECOM Tech. Servs., Inc.,*
   660 F. Supp. 3d 840 (N.D. Cal. 2022) .................................................................... 49

*John's Insulation, Inc. v. Siska Const. Co.,*
   774 F. Supp. 156 (S.D.N.Y. 1991) .......................................................................... 57

*Jones v. Niagara Frontier Transp. Auth. (NFTA),*
   836 F.2d 731 (2d Cir. 1987) .................................................................................... 59

*Karkare ex rel. JN v. Int'l Ass'n of Bridge, Structural, Ornamental &*
   *Reinforcing Iron Workers Loc. 580,*
   140 F.4th 60 (2d Cir. 2025) ..................................................................................... 59

*Kaytor v. Elec. Boat Corp.,*
   609 F.3d 537 (2d Cir. 2010) .................................................................................... 20

*Kenford Co., Inc. v. Erie Cty.,*
   493 N.Y.2d 257 (1986) ............................................................................................ 60

*King v. Navy Fed. Credit Union,*
   699 F. Supp. 3d 864 (C.D. Cal. 2023) .................................................................... 44

*Kinsey v. New York Times Co.,*
   2020 WL 1435141 (S.D.N.Y. Mar. 23, 2020) ......................................................... 51

*Kinsey v. New York Times Co.,*
   991 F.3d 171 (2d Cir. 2021) ........................................................................ 50, 51, 52

*Klein v. Town & Country Fine Jewelry Grp., Inc.,*
   283 A.D.2d 368 (1st Dep't 2001) ............................................................................ 28

*Kohler v. Inter-Tel Techs.,*
   244 F.3d 1167 (9th Cir. 2001) ................................................................................. 19

*Kruitbosch v. Bakersfield Recovery Servs., Inc.,*
   114 Cal. App. 5th 200 (Cal. Ct. App. 2025) ........................................................... 38

*Lan Sang v. Ming Hai,*
   951 F. Supp. 2d 504 (S.D.N.Y. 2013) ..................................................................... 55

*Lawler v. Montblanc N. Am., LLC,*
   704 F.3d 1235 (9th Cir. 2013) ................................................................................. 20

*Lee v. Bankers Tr. Co.*,
  166 F.3d 540 (2d Cir. 1999) ............................................................................ 51

*Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*,
  34 Cal. 4th 960 (2004) .................................................................................... 48

*Lewis v. City of Norwalk*,
  562 F. App'x 25 (2d Cir. 2014) ..................................................................... 23

*Liberty Sackets Harbor LLC v. Vill. of Sackets Harbor*,
  776 F. App'x 1 (2d Cir. 2019) ....................................................................... 59

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  672 F.3d 155 (2d Cir. 2012) ........................................................................... 50

*Lively v. Wayfarer Studios LLC*,
  786 F. Supp. 3d 695 (S.D.N.Y. 2025) ..................................... 50, 52, 55, 56

*Lyle v. Warner Bros. Television Prods.*,
  38 Cal. 4th 264 (2006) ................................................................ 19, 22, 26

*McCaffrey v. Republic Servs., Inc.*,
  2025 WL 360745 (N.D. Cal. Jan. 31, 2025) ............................................... 36

*McNally v. Yarnall*,
  764 F. Supp. 853 (S.D.N.Y. 1991) ............................................................... 56

*McNamee v. Clemens*,
  2013 WL 3968740 (E.D.N.Y. July 31, 2013) ............................................. 54

*McSpedon v. Levine*,
  158 A.D.3d 618 (2d Dep't 2018) ................................................................. 57

*McSweeney v. Cohen*,
  776 F. Supp. 3d 200 (S.D.N.Y. 2025) ................................. 19, 22, 26, 28

*Medvey v. Oxford Health Plans*,
  313 F. Supp. 2d 94 (D. Conn. 2004) ........................................................... 57

*Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*,
  746 F. Supp. 2d 575 (S.D.N.Y. 2010) ......................................................... 30

*Morse v. Ted Cadillac, Inc.*,
  146 A.D.2d 756 (2d Dep't 1989) ................................................................. 39

*Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*,
  759 F.2d 219 (2d Cir. 1985) ........................................................................... 55

*Nat'l R.R. Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002) .......................................................................................... 20

*New England Country Foods, LLC v. VanLaw Food Prods., Inc.*,
  17 Cal. 5th 703 (2025) .................................................................................... 48

*Nieves v. Dist. Council 37*,
  2009 WL 4281454 (S.D.N.Y. Nov. 24, 2009) .......................................................................... 21

*Off. Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  2002 WL 362794 (S.D.N.Y. Mar. 6, 2002) ............................................................................. 57

*Oncale v. Sundowner Offshore Servs., Inc.*,
  523 U.S. 75 (1998) ................................................................................................................... 19

*Passante v. McWilliam*,
  53 Cal. App. 4th 1240 (Cal. Ct. App. 1997) ......................................................................... 42

*Patterson-Ballagh Corp. v. Byron Jackson Co.*,
  145 F.2d 786 (9th Cir. 1944) ................................................................................................... 43

*Pease v. Tel. Pub. Co.*,
  121 N.H. 62 (1981) ................................................................................................................... 54

*Plazza v. Airbnb, Inc.*,
  289 F. Supp. 3d 537 (S.D.N.Y. 2018) ..................................................................................... 39

*Progeny Ventures, Inc. v. W. Union Fin. Servs., Inc.*,
  752 F. Supp. 2d 1127 (C.D. Cal. 2010) ................................................................................. 44

*Roche Freedman LLP v. Cyrulnik*,
  703 F. Supp. 3d 404 (S.D.N.Y. 2023) ..................................................................................... 57

*Safeway Inc. v. Abbott Labs.*,
  761 F. Supp. 2d 874 (N.D. Cal. 2011) ................................................................................... 49

*Salamon v. Our Lady of Victory Hosp.*,
  514 F.3d 217 (2d Cir. 2008) ................................................................................................... 33

*Schaldach v. Dignity Health*,
  2015 WL 5896023 (E.D. Cal. Oct. 6, 2015) .......................................................................... 38

*Schnabel v. Trilegiant Corp.*,
  697 F.3d 110 (2d Cir. 2012) ................................................................................................... 39

*Schonfeld v. Hilliard*,
  218 F.3d 164 (2d Cir. 2000) ................................................................................................... 59

*Sealy v. SUNY at Stony Brook*,
  834 F. App'x 611 (2d Cir. 2020) ........................................................................................... 31

*Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc.*,
  531 F. Supp. 3d 522 (N.D.N.Y. 2021) ................................................................................... 25

*Sellers v. Royal Bank of Canada*,
  2014 WL 104682 (S.D.N.Y. Jan. 8, 2014) ............................................................................. 35

*SG Blocks, Inc. v. Osang Healthcare Co. Ltd.*,
  2022 WL 16787936 (E.D.N.Y. Sept. 22, 2022) ..................................................................... 60

*Shipley Co. v. Rosemead Co.*,
  100 Cal. App. 706 (Cal. Ct. App. 1929) ............................................................ 42

*Silverado Modjeska Recreation & Park Dist. v. Cty. of Orange*,
  197 Cal. App. 4th 282 (Cal. Ct. App. 2011) ..................................................... 45

*Spina v. Our Lady of Mercy Med. Ctr.*,
  2003 WL 22434143 (S.D.N.Y. Oct. 23, 2003) ................................................. 21

*Springer v. Almontaser*,
  75 A.D.3d 539 (2d Dep't 2010) ........................................................................ 54

*Stack v. Karr-Barth Assocs., Inc.*,
  2021 WL 1063389 (S.D.N.Y. Mar. 18, 2021) .................................................. 34

*Tatung Co. v. Shu Tze Hsu*,
  217 F. Supp. 3d 1138 (C.D. Cal. 2016) ...................................................... 46, 47

*Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*,
  2007 WL 4820968 (S.D.N.Y. Sept. 18, 2007) ................................................. 51

*The Aspect Grp. v. Movietickets.com, Inc.*,
  2006 WL 5894608 (C.D. Cal. Jan. 24, 2006) ................................................... 41

*Thelen Reid Brown Raysman & Steiner LLP v. Marland*,
  2007 WL 9812750 (N.D. Cal. Aug. 1, 2007) ................................................... 39

*Thoma v. VXN Grp., LLC*,
  2025 WL 1766337 (C.D. Cal. Mar. 11, 2025) .................................................. 33

*Thompson v. City of Monrovia*,
  186 Cal. App. 4th 860 (Cal. Ct. App. 2010) ................................................... 36

*Troyk v. Farmers Grp., Inc.*,
  171 Cal. App. 4th 1305 (Cal. Ct. App. 2009) ................................................. 49

*United States v. N.Y.C. Transit Auth.*,
  97 F.3d 672 (2d Cir. 1996) ............................................................................... 28

*Vanzan Inc. v. Does 1-10*,
  No. 655130/2024 (N.Y. Sup. Ct.) .................................................................... 18

*Vega v. Hempstead Union Free Sch. Dist.*,
  801 F.3d 72 (2d Cir. 2015) ............................................................................... 31

*W. Pac. Elec. Co. Corp. v. Dragados/Flatiron*,
  534 F. Supp. 3d 1209 (E.D. Cal. 2021) ............................................................ 50

*WCA Holdings III, LLC v. Panasonic Avionics Corp.*,
  704 F. Supp. 3d 473 (S.D.N.Y. 2023) .............................................................. 43

*Wexler v. Allegion (UK) Ltd.*,
  374 F. Supp. 3d 302 (S.D.N.Y. 2019) .............................................................. 56

*Williams v. Superior Court*,
  3 Cal. 5th 531 (2017) ...................................................................................... 52

*Wind Dancer Prod. Grp. v. Walt Disney Pictures*,
  10 Cal. App. 5th 56 (Cal. Ct. App. 2017) ...................................................... 40

*Winston v. Mediafare Ent't Corp.*,
  777 F.2d 78 (2d Cir. 1985) ............................................................................. 40

*Yanowitz v. L'Oreal USA, Inc.*,
  36 Cal. 4th 1028 (2005) ............................................................................ 26, 27

*Young v. Cty. of Los Angeles*,
  2020 WL 6793362 (Cal. Ct. App. Nov. 19, 2020) .......................................... 27

*Yu v. New York City Hous. Dev. Corp.*,
  2011 WL 2326892 (S.D.N.Y. Mar. 16, 2011) ................................................ 35

**Other Authorities**

Cal. Civ. Code §47 ................................................................................................ 55

Cal. Code. Regs. tit. 2 §11023 ...................................................................... 36, 37

Cal. Const. Art. I ................................................................................................. 52

Cal. Labor Code §1102.5 ............................................................................... 27, 32

Cal. Labor Code § 2776 ....................................................................................... 33

California Fair Employment and Housing Act,
  Cal. Gov. Code §12940 ........................................................................... passim

Civil Rights Act of 1964, Title VII ............................................................... passim

N.Y. Civ. Rights Law §74 ................................................................................... 55

Unruh Act,
  Cal. Civ. Code §51.9 ................................................................................... 19

**Constitutional Provisions**

U.S. Const., Amend. I ......................................................................................... 28

## <u>INTRODUCTION</u>

Blake Lively, an immensely powerful A-list actor, agreed to act in a film adaptation of "It Ends With Us," a book with themes of sex and domestic violence. During the initial stages of filming, she voiced objections to certain on-the-set behavior she did not like. That behavior— involving no more than miscommunications and awkward comments—falls well below the threshold for any claim of sexual harassment or other legal wrong, especially in the context of collaborating to make a sensual and provocative, sexually-charged film. Regardless, Lively's concerns were heard and fully accommodated. It is undisputed that whatever she claimed to have experienced ceased. Filming continued during all future stages entirely without incident in an environment Lively touted as "perfectly professional" and "safe," including the filming of all intimate scenes involving Lively herself. Even Lively's then-lawyer said no formal HR process, let alone litigation, was necessary. Any issues had been successfully resolved.

Months then went by. But as the film was edited and moved towards its premiere, something else happened: Lively asserted control of the film and took aggressive steps to minimize Justin Baldoni's role. Even though Baldoni had conceived, directed, and co-starred in the film, and it had been produced and co-financed by his production company, Wayfarer Studios, Lively took all the credit. She wrote to the Producer's Guild of America: "I've produced every moment of this film, from pre-production, through production, into post, and now into marketing and worldwide release." She explained: "So much has changed…[t]he most significant being that the cut of the film that was selected to be released is, my cut." At the same time, Lively and her actor husband Ryan Reyolds disparaged Baldoni to their famous, high-powered friends in Hollywood, and to Baldoni's talent agency. As the film's premiere approached, Lively became increasingly hostile: she excluded Baldoni from marketing

materials, press, and promotions for the film, snubbed him on social media, urged Sony to eliminate his "a film by" credit, and even tried to exclude him from the premiere.

In light of these astounding developments—and not the minor concerns about on-the-set behavior raised and successfully resolved many months earlier—Baldoni sought the advice of a crisis-management public relations firm, as any responsible person in his position would do. He wanted to minimize fallout from media coverage of Lively's increasing attempts to alienate him from the film. He did so for the benefit of both his professional reputation and the newly-released film. He relied on media professionals to boost his image and assure that any coverage would be balanced and accurate. None of that is against the law.

Aided by two of the world's largest litigation firms, Lively now seeks to create causes of action where none exist. She cannot show the behavior she disliked was caused by her sex or gender, a basic prerequisite for her "sexual harassment" claims. She alleges Baldoni's resort to public relations professionals was "retaliation" for "complaints" she had raised. This ignores the large temporal gap, not to mention the many intervening events, between her raising of concerns and Baldoni's resort to crisis-management professionals. There can be no claim for retaliation based on purported complaints raised in the distant past. Nor did Baldoni and his co-defendants engage in a defamatory "smear campaign." It was not illegal for Baldoni to promote positive content about himself or truthful narratives about various events. That Lively's reputation may have suffered is a result of her own ill-advised public statements and actions. This is a dispute about Hollywood reputations, not genuine legal wrongs. It does not belong in court.

## STATEMENT OF FACTS

Justin Baldoni is an actor, director, producer, and author with significant experience in addressing gender issues, including in two published books and a podcast devoted to questions

about masculinity, all aimed at a predominantly male audience.  56.1 ¶5-6; *e.g.*, Ex. 7.  In 2019, he obtained the rights to produce a film based on Colleen Hoover's best-selling novel "It Ends With Us."  56.1 ¶8; Ex. 14.  Baldoni's production company, Wayfarer Studios, which specializes in films designed to promote social change, initiated work on the film alongside Sony, with Baldoni set to serve as the film's director and lead male actor.  56.1 ¶10; *e.g.*, Ex. 20.  Because the story focused on issues of domestic violence, Baldoni and Wayfarer partnered with NO MORE, an organization dedicated to ending domestic and sexual violence, and agreed to contribute a portion of the film's proceeds to support survivors of abuse.  56.1 ¶9; Ex. 19.  In early planning, the parties agreed the film's publicity needed to center upon and carefully handle these serious themes.  56.1 ¶11; Exs. 21-22, at -5501.

### A. Lively Chose To Take A Lead Role In A Sexually Charged Film With Adult Themes

In December 2022, years into the film's development, Blake Lively, a well-known, prominent actor, was cast as the female lead.  56.1 ¶21; Ex. 24 at 12.  Lively never read the book. 56.1 ¶21; Ex. 24 at 60.  She understood nevertheless, based on the script and before she accepted the role, that the film would include sexual content and address domestic violence.  56.1 ¶28; *e.g.*, Ex. 33 at 43-44, 47; Ex. 24 at 60.  Prior to filming, Lively reviewed notes from a female Sony executive stating that the audience was expecting something "grown up and sexy" with "real heat."  56.1 ¶30; Ex. 38.

### B. Lively Worked As An Independent Contractor, But No Contract Was Ever Formed

The parties never executed any contract concerning Lively's role.  *E.g.*, 56.1 ¶¶26-27, 374, 377; Heath Decl. ¶¶ 17-18.  Negotiations began in December 2022 between It Ends With Us Movie LLC ("IEWUM"), an entity Wayfarer Studios formed to produce the film, and Blakel, Inc., a loanout company "lending" Lively to perform in the film.  An Offer Letter dated March

17, 2023 set forth the basic financial terms, which promised Lively a $1.75 million fee plus various bonuses, but did not contain any terms regarding sexual harassment. 56.1 ¶¶22-26; Exs. 26-28. The parties also worked toward a separate long-form agreement to include other material terms. 56.1 ¶26, Exs. 32, 28. IEWUM's obligations under the Offer Letter were expressly subject to a "Condition Precedent," namely "full execution of an Agreement in a form reasonably acceptable to all parties." *Id.*

IEWUM's counsel circulated a draft of the anticipated long-form agreement between IEWUM and Blakel, Inc., the "Actor Loanout Agreement" ("ALA"), in May 2023. 56.1 ¶¶363-64; Exs. 262, 263. The draft stated conditions precedent, including full execution of the agreement and receipt of an executed document known as an "inducement." 56.1 ¶365; Ex. 263 at 57-58. It also had a merger clause specifying that it constituted the entire agreement between the parties, 56.1 ¶367; Ex. 263 at 71; a provision prohibiting special or consequential damages, 56.1 ¶368; Ex. 263 at 83; and certain other "Standard Terms," including one stating there would no actionable breach for any conduct unless notice was provided and cure not effected within 30 days, *id.*; Ex. 263 at 77. The same or similar terms endured throughout the drafting process. 56.1 ¶381; Heath Decl. ¶¶19-20. As work proceeded on the film, payments were made pursuant to the Offer Letter. The parties continued to negotiate the terms of the long-form ALA into July 2024, but Lively herself continued withholding her signature to avoid being bound. 56.1 ¶385, 390; *e.g.*, Ex. 269 at -461. No ALA was ever signed. 56.1 ¶390; Heath Decl. ¶¶17-18.

### C. From The Outset, Lively Sought Increased Control Over The Film

Although recruited to act in the film, Lively immediately assumed an active role in production and in developing the film's script, even before filming began. Among other things, she provided Baldoni with a re-write of the "roof-top" scene in which Baldoni's character and Lively's character first meet. 56.1 ¶38; Ex.36. She explained that her version of the scene

increased the "sexual tension."  It retained a line from the book, in which Baldoni's character

tells Lively's:  "I want to fuck you."  In messages to Baldoni, Lively referred to her revised draft

as featuring "flirty and yummy...ball busting."  56.1 ¶29; Ex. 36 at -48; Ex. 37 at -262.

Lively took special steps to convince Baldoni to accept her version of this scene.  She

asked her friend, the world-famous musician Taylor Swift, to stop by when Baldoni, "this doofus

director of my movie" and "a clown," would be meeting Lively at her apartment.  56.1 ¶39; Ex.

45.  Lively asked Swift to promote her version of the scene even without having read it.  *Id.*

After the meeting, Baldoni told Lively he would have gladly accepted her revisions, even

without urging from Swift or Lively's famous husband, the actor Ryan Reynolds.  56.1 ¶41; Ex.

47 at -48.  Lively has since disclosed that Reynolds, not she, re-wrote the scene.  56.1 ¶42; Ex.

49 at -464; Ex. 50.  This episode, which occurred even before filming began, was the first of a

series of events in which Lively relied on an array of Hollywood friends to increase her control

over the film, while denigrating Baldoni to them along the way.

Before filming began, Lively took additional steps to influence the direction of, and take

control of, the film.  At her request, Wayfarer abandoned plans to film the movie in Boston,

where the novel takes place, and relocated the set to New Jersey, near Lively's home.  56.1 ¶31;

Exs. 26, 39.  Wayfarer also agreed to change the start date and schedule to accommodate

Lively's other professional and personal commitments.  56.1 ¶31; Ex. 26.

### D.  Lively Raised Concerns About Her Physical Appearance

Having recently given birth, Lively expressed concerns to Baldoni and others that she

was not in top shape and wanted to look her best in the film.  56.1 ¶¶35-36; *e.g.*, Ex. 42 at -20.

When Lively asked Baldoni to push the "body scenes" to the end of the filming schedule,

Baldoni responded kindly:  "I want you to know – you will look amazing. Anything you are

insecure about we will talk through and get creative together and make you comfortable. I just

don't want you to stress about your body. It's the last thing you need." *Id.* Meanwhile, Lively raised the same concerns to her agent, noting that she was "working out twice a day, 4 hours a day" because "I want to set us all up for success." 56.1 ¶36; Ex. 43. Lively's communications reflect her frank awareness that the film was intended to achieve a certain sexualized imagery. She told her agent, "This sexiness in this film and the marketing I'm sure, is critical to its success." *Id.* Lively was equally frank with Baldoni: "I know my job here…As woke as we both are and work to be, this movie requires a certain aesthetic. It's part of the job that we both excitedly signed up for." She added: "I don't shy away from it because its not problematic." 56.1 ¶37; Ex. 43 at -22.

### E. Wayfarer, IEWUM, And Baldoni Took Steps To Create A Safe Set

Wayfarer had a set of industry-standard policies and procedures in place to prevent harassment, discrimination, and retaliation. Its employee handbook expressly prohibits such conduct and encourages employees to report violations. 56.1 ¶¶43-44; Ex. 1 at -54-55. To enforce these procedures, Wayfarer had an HR department with dedicated staff. 56.1 ¶45; Ex. 4 at 38:7-39:14. Prior to filming, IEWUM held an anti-discrimination training, administered by an outside law firm. 56.1 ¶56; *e.g.*, Ex. 67; Ex. 5 at 51:22-52:1-10. IEWUM also included a worker safety hotline on its daily call sheets. 56.1 ¶58; *e.g.*, Ex. 150.

Lively benefitted from other protections as well. The Offer Letter provided that she would not perform any nudity/stimulated sex without her prior written consent and without negotiation and execution of a formal nudity rider. 56.1 ¶168; Ex. 28 at 80. In April 2023, before filming began, IEWUM hired Elizabeth Talbot to serve as the intimacy coordinator for the film. 56.1 ¶49; Ex. 52. Lively was given the opportunity to meet with Talbot a month before filming began, but declined. 56.1 ¶50; Ex. 53 at -22. Before shooting began, Talbot considered the content of anticipated intimate scenes and suggested details and clarifications. 56.1 ¶52; Exs.

55-57.  She also spoke with Lively about Lively's boundaries.  56.1 ¶53; Ex. 58 at 57:6-58:17.

When Lively expressed reservations about intimate scenes, Baldoni volunteered to keep the

focus on his own body so that scenes could be "choreograph[ed] in a way that keeps Blake's

clothes on as much as possible."  56.1 ¶52; Ex. 56 at -65.  Prior to shooting, Lively and Baldoni

were both provided with nudity riders detailing their consent and boundaries concerning intimate

scenes.  56.1 ¶55; Exs. 61, 62.

### F.  In The First Phase of Filming, Lively Did Not Film Any Intimate Scenes, But Voiced Objections To Certain Behavior

Filming began on the set in New Jersey on May 15, 2023.  It stopped on June 14, 2023,

due to strikes by the Writers Guild of America and SAG-AFTRA.  56.1 ¶59; Ex. 3, SAC ¶ 15;

Ex. 24 at 261:15-18.  None of Lively's intimate scenes were rehearsed or filmed during this

period.  56.1 ¶61; *e.g.*, Ex. 58 at 73:18-24.  However, all the incidents Lively now characterizes

as comprising a "hostile work environment" occurred prior to or during this first phase of

filming.  56.1 ¶145; *see generally* SAC.

Lively's stated concerns, even if accepted as true, all involve incidents of relatively low-

level or innocuous behavior that, considered separately or together, fall far short of actionable

discrimination or sexual harassment.  For instance, Lively claims Baldoni "described his

genitalia" in their first meeting, before she had agreed to join the film.  SAC ¶7.  This is a

hyperbolic lawyer's spin on what really happened.  During the meeting, Lively raised the topic

of circumcision.  She was pregnant and noted that she and her husband were considering the

issue because they were expecting a son.  Baldoni responded by noting that he appreciated the

issue and that he and his wife had grappled with the same question for their children, because his

parents had chosen to circumcise him.  56.1 ¶¶74-75; Ex. 24 at 51:21-52:9.  Such a statement is

obviously not justification to bring any claim in court.  Indeed, Lively herself seemed unphased.

She had raised the subject, did not complain to anyone at the time, and after the meeting her husband sent Baldoni an effusive message saying both he and Lively were "big fans" of his. 56.1 ¶¶76-77; Ex. 24 at 54:22-55:14; Ex. 79 at -50.

Lively also accuses Baldoni of "fat-shaming."  This allegation is based on a single instance in which Baldoni, who had chronic back problems and anticipated a scene in which he would have to lift Lively up, privately asked a physical trainer he had consulted with, who also trained Lively, about her weight.  He did so discreetly, outside the workplace and outside Lively's hearing.  56.1 ¶¶78-79; *e.g.*, Ex. 5 at 73:7-15, 296:23-297:10.  But even if this inquiry was, as Lively now portrays it, a sly criticism, any petty slight that might have arisen when the trainer, on his own initiative, repeated the comment to Lively, is simply too trivial to constitute sexual harassment.

Lively further accuses Baldoni of adding gratuitous sexual content to the script before filming began.  The evidence shows, however, that the scenes were added with the encouragement of a female Sony executive to align with the explicit female-authored book on which the film was based.  56.1 ¶¶86-87; *e.g.*, Ex. 84.  Baldoni asked a female intimacy coordinator to review them with Lively.  56.1 ¶88; Ex. 57.  To the extent Lively objected, scenes were revised or removed.  56.1 ¶89; Ex. 56.  Moreover, Lively herself rewrote other scenes to boost their sexual vibe.  56.1 ¶29; Ex. 36 at -48; Ex. 37 at -262; 56.1 ¶218; Ex. 128 at -355-58.

Lively claims Baldoni improperly used the word "sexy" to refer to her wardrobe on one occasion and to that of another actor on another occasion, and that at one point he complimented Lively's own personal, low-cut outfit.  SAC ¶¶99, 101.  Such passing, sporadic comments, while perhaps ill-advised, are not outrageously offensive in an environment where professionals are working closely together to make a deliberately sexually-charged film.  *E.g.*, 56.1 ¶¶28-30; *e.g.*,

Exs. 35, 36, 38.  Lively also asserts that Baldoni at times alluded to his own sexual and marital experiences.  SAC ¶¶ 86, 88, 95, 96.  Again, such exchanges are hardly surprising given that Lively and Baldoni were collaborating and communicating daily about how best to portray various adult and marital themes.

Lively also claims Jamey Heath, Wayfarer's CEO and one of the film's producers, momentarily glanced at her naked upper body after she permitted him to come into her trailer while she was having body makeup removed.  SAC ¶104.  Lively says she instructed Heath not to look at her, but at some point during their brief conversation, he glanced at her through a mirror.  56.1 ¶¶98-99; Ex. 24 at 129:1-8.  Whatever fleeting mishap may or may not have occurred, it is being characterized as sinister only in retrospect.  At the time, Lively said, "I know you weren't trying to cop a look."  56.1 ¶100; Ex. 4 at 223:12-25.

Lively also objected to being shown a video image relating to Heath's wife's homebirth, incorrectly believing it was pornography.  SAC ¶90.  A female Sony executive testified that Lively expressed displeasure to her.  The executive reviewed the same image and concluded there was no need to take further action because Lively's reaction was the result of a "misunderstanding" or "mistake."  56.1 ¶¶121-125, 144; Ex. 12 at 121:5-122:22, 124:21-125:02. The film includes an important scene between Lively and Baldoni's characters surrounding the birth of their child, and Baldoni and Lively had discussed the scene before Heath shared the video image.  56.1 ¶119; Ex. 8 at 300:15-301:18; Ex. 12 at 120:19-23, 123:9-12.

Lively includes an assortment of other objections in her complaint, including that she contracted COVID on set, SAC ¶109; that after Lively told Baldoni she had never seen pornography, he shared that fact with others, SAC ¶96; that at one point Baldoni shared a personal story about being pushed past his own consent boundaries, an experience he has

discussed publicly, including in his published books, SAC ¶92; 56.1 ¶129; Baldoni Decl. ¶¶3-4; and that there was too much hugging on set, SAC ¶98.

### G.  Lively's Objections Were Addressed Before And During The Filming Hiatus

Although Lively's description of events is disputed, what is undisputed is that Lively's objections were resolved as soon as they were raised.  Lively chose not to file any formal complaint.  56.1 ¶138; Ex. 12 at 299:22-300:15; Ex. 96.  Instead, as she told another cast member at the time, she preferred to "personally tackle" them.  56.1 ¶137; Ex. 95 at -1. Consistent with that approach, after Lively and her husband chastised Baldoni for inquiring about her weight, the issue did not recur.  56.1 ¶83; Ex. 5 at 297:4-7.  Lively objected to certain sex scenes, and Baldoni revised or eliminated them accordingly.  56.1 ¶89; Ex. 56.  On June 1, 2023, a few weeks into shooting, Lively met with Baldoni and Heath and reviewed various matters she was unhappy about.  56.1 ¶139; Ex. 24 at 188:7-16, 191:13-192:2; Ex. 4 at 213:13-25.  Baldoni and Heath apologized for Lively's discomfort.  56.1 ¶140; Ex. 4 at 219:6-25, 284:6-12, 290:11-24.  Evidently, that was enough to resolve the issue:  Lively has not identified any incident after that meeting that she claims constitutes sexual harassment.  56.1 ¶145; Ex. 11 at 198:22-199:2; *see generally* SAC.

On November 9, 2023, five months after filming had stopped due to the strikes, Lively, through her entertainment lawyer, sent a list of "protections" she wanted observed in connection with any future filming.  56.1 ¶161; Ex. 103.  Lively's lawyer said a signed agreement to abide by the protections would suffice in lieu of a "more formal HR process."  56.1 ¶162; Ex. 103. Lively did not commence any litigation or file any formal complaint, though her lawyer noted she "reserve[d] all legal rights."  *Id.*  The requested "protections" largely replicated protections that were already in place, such as the use of nudity riders and an intimacy coordinator.  56.1 ¶¶163-170; *e.g.*, Ex. 60; Ex. 58 at 195:6-196:1.  Other "protections" implicated conduct Lively

herself had engaged in during the earlier phase of filming, such as improvising kissing in scenes, commenting on her own physical appearance and that of others, and hugging other cast members.  56.1 ¶¶176-190; SAC Ex. A, ¶ 4; *e.g.*, Ex. 105 at -19; Ex. 106 at -44.

On January 4, Lively held a production meeting at her apartment.  56.1 ¶208; Ex. 12 at 304:21-307:4.  Lively and her husband hijacked the proceeding to berate Baldoni and Heath for their purported behavior months before.  *Id.*; *see also* Ex. 120 at -7.  Lively read a list of grievances from her phone that included, in addition to incidents discussed above, a demand that Baldoni not "speak" to her dead father, mention his own religious beliefs, or have "private, multi-hours meetings in Lively's trailer with Mr. Baldoni crying."  56.1 ¶209; Exs. 111-12.  Lively also demanded notice of COVID exposures on set.  *Id.*

On or about January 19, 2024, Heath, acting on behalf of IEWUM, signed the "protections," as incorporated into a rider to the unsigned ALA between IEWUM and Blakel Inc.  56.1 ¶197; Ex. 117.  Lively refers to this document as the "Contract Rider Agreement" ("CRA").  The CRA does not include any admission of improper conduct.  It is a forward-looking document concerning behavior once filming resumes.  *Id*.

### H.  The Second Phase Of Filming Proceeded Without Incident

Filming resumed on January 5, 2024 and concluded February 9.  Lively raised no further objections and told another female cast member the set was "professional."  56.1 ¶222; Ex. 129; Ex. 130 at -900.  Whatever issues had been raised months before had been fully resolved.

### I.  Lively Used Her Famous Friends And Connections To Take Control Of The Film

Shortly after filming wrapped, Lively told Sony she would not agree to promote the film unless she was permitted to participate in the edit.  56.1 ¶228; Ex. 131.  Thereafter, she amassed an enormous level of control over the film.  When Lively received pushback, she recruited

famous friends, including Matt and Lucy Damon, Ben Affleck, and Taylor Swift, to support her, while disparaging Baldoni to them as a "chaotic clown." 56.1 ¶230; Ex. 135. Lively connived with Swift to use the rights to Swift's music to gain leverage over the trailer. Swift told Lively using her music "gives you more power over the film, that's your ally, not [Baldoni's]." Lively agreed it was "stupid" for Baldoni to use the song, because it cost him "his only shot at having the appearance of an upper hand." 56.1 ¶231; Ex. 137. When Baldoni—the film's director—produced a cut of the film that scored higher with test audiences than Lively's, she still pushed the studio to reject it, writing: "Colleen [Hoover] and I are declaring now, this is the cut…It's done from my perspective, from Colleen's and from Taylor [Swift's]. And from Sony's?" 56.1 ¶232; Ex. 138. Lively also insisted on changes to the film's credits, including moving her own name up in the list of producers and removing Baldoni's "film by" credit altogether. 56.1 ¶233; *e.g.*, Ex. 139; Ex. 8 at 328:9-17.

In a June 25, 2024 letter to the Producers Guild of America, Lively described what she claims was her extraordinary role in bringing about almost every aspect of the film, from start to finish. 56.1 ¶236; Ex. 39 at -96-98. "I've produced every moment of this film, from pre-production, through production, into post, and now into marketing and worldwide release." *Id.* She explains "[s]o much has changed…[t]he most significant being that the cut of the film that was selected to be released is, my cut." *Id.* Her long letter is not shy about listing numerous claimed accomplishments. It is a remarkable document. She takes credit for, among other things, determining the location of the film, putting forth the name of department heads, reshaping "the creative of the production design for all key locations and characters," reshaping "the creative of the costume design for all characters," "significant rewrites of the script," "firing the first Assistant Director," helping to "block the staging of every scene," "call[ing] and

l[eading] meetings with all department heads, the studio and the distributor," and "re-edit[ing] the film." 56.1 ¶32; Ex. 39. Lively also asserted she was heavily involved in developing the film's marketing strategy, a claim backed by a Sony executive. 56.1 ¶¶238-39; Ex. 39 at -98-99; Ex. 145.

### J. Lively Stirred Up Negative Press About Baldoni And The Film

Apparently not content to have wrested directorial and editorial control from Baldoni, Lively set out to destroy his reputation and alienate him from his own film. Lively and her famous husband unfollowed Baldoni on social media, encouraging the press and fans to suspect a "feud." 56.1 ¶¶242, 262; SAC ¶186 n.26; Ex. 171 at -721. Reynolds told their famous Hollywood friends that Baldoni belonged in "jail." 56.1 ¶243; Ex. 134. He told the Executive Chairman of WME, the powerful talent agency, that Baldoni was a "thoroughbred predatory fraudster." 56.1 ¶245; Ex. 149. Lively told Hoover and another prominent author that Baldoni was a "narcissist." 56.1 ¶243; Ex. 147. Even Anna Wintour of *Vogue* magazine heard about how "hard" the production had been for Lively. 56.1 ¶243; Ex. 148.

Lively also took steps to exclude Baldoni from all press associated with the film, including a high-profile event at Hoover's romance-book convention. 56.1 ¶246; Ex. 11 at 150:7-152:22; Ex. 75 at 272:16-276:3. Unsurprisingly, the press took notice. 56.1 ¶248; *e.g.,* Ex. 153. Lively and Hoover discussed a post from a prominent gossip blog observing Baldoni's outcast status. *Id.* But Lively wanted more: on July 22, she told Sony she would not attend the film's upcoming premiere if Baldoni—the film's creator, director, and male lead—was also there. 56.1 ¶249; Exs. 155-56. Ultimately, Baldoni was allowed to attend, so long as he left the red carpet before Lively arrived, waited in a basement while she and her famous friends were photographed, and then watched the film in a separate theater. 56.1 ¶250; Ex. 2 at 96:18-21; Exs. 157-58.

### K. Baldoni And Wayfarer Then Hired A Crisis Management Team

It was in this context, in late July 2024—over a year after Lively's concerns about on-the-set-behavior had been fully resolved, and faced with a new set of concerns relating to media coverage surrounding and following the film's premiere—that Baldoni and Wayfarer first entertained the concept of hiring a crisis PR team. 56.1 ¶¶253-254; Ex. 160 at 340:15-22. Even as the negative press intensified, Baldoni's team, led by Heath and his long-time publicist Jen Abel of Jonesworks, agreed that it would be a mistake to fan the flames and that "we should not be doing anything proactive," 56.1 ¶255; Ex. 163 at -6410. On July 25, Baldoni and Heath met with The Agency Group ("TAG"), Melissa Nathan's PR firm, to discuss retaining the firm for crisis management. 56.1 ¶256; Ex. 164. In subsequent messages, Wayfarer reiterated that it did not want to take any "offensive" steps and that Nathan would not be "having any comms outside of our internal teams." 56.1 ¶¶256-258; Ex. 167. On August 2, 2024, TAG circulated the "Scenario Planning" document that has been the subject of much of Lively's ire. 56.1 ¶260; Ex. 168. As the title suggests, that document simply laid out a menu of possible options. *Id.*; Ex. 169 at 111:18-112:4. It was not an agreed-upon plan of action.

Immediately after the premiere, numerous outlets published stories about the "feud" between Lively and Baldoni. 56.1 ¶269. This was, in part, prompted by Lively's PR representative, who told press contacts the "whole cast isn't speaking with [Baldoni]" and that Lively and Baldoni watched the premiere from separate screening rooms. 56.1 ¶264; Ex. 172 at -224. Baldoni's PR team, led by Abel, Nathan, and TAG, distributed positive information and stories about Baldoni and worked to mitigate or minimize negative ones—standard operating procedure for PR professionals. 56.1 ¶303; *e.g.,* Ex. 195. Baldoni himself made numerous positive public statements about Lively. 56.1 ¶276; Ex. 186.

On August 7, Abel told Nathan she was still waiting on a "greenlight" from Heath to "put

the social combat plan into motion."  56.1 ¶272; Ex. 180 at -603.  On August 9, Wayfarer

engaged Street Relations, Jed Wallace's firm, to monitor social media concerning Lively,

Baldoni, and the film.  56.1 ¶274; Ex. 184.  Contrary to Lively's claims, Wallace testified his

firm did not surreptitiously spread negative information about Lively and had no ability to do so.

56.1 ¶275; Ex. 185 at 23:19-24:1.  At the same time, Baldoni's team negotiated what they

believed was a "truce" with Lively's PR team, in which neither party would engage with any

media, hoping to avoid any adverse publicity that could interfere with the reception of the newly

released film.  56.1 ¶¶ 253, 280; Ex. 161 at 275:8-15; Ex. 188 at -18.

### L.  Lively Suffered Backlash

The attention commanded by Lively's star power and by news of the purported "feud"

was a double-edged sword.  By virtue of all the coverage, she was put under a very public

microscope.  In August 2024, she experienced a massive outpouring of negative sentiment.  But

the undisputed evidence shows Lively's own missteps were a significant driver of that response.

Several press outlets picked up, for example, on Lively's decision to cross-promote a serious

film about domestic violence with, among other things, her husband's summer superhero

blockbuster, as well as her own haircare and beverage products.  56.1 ¶281.  Lively privately

acknowledged the marketing misstep—days after the premiere, she reached out to another cast

member and advised: "we are looking to post resources for people experiencing DV."  56.1

¶284; Ex. 192 at -229.  Sony executives observed the negative publicity had been driven by

Livley's own ill-advised promotional strategies.  56.1 ¶288; *e.g.,* Ex. 197.

Lively also came under fire for past missteps, including her decision to get married on a

former slave plantation, 56.1 ¶286; Ex. 24 at 208:11-25, 209:6-14; old allegations that she was

difficult to work with, 56.1 ¶287; Ex. 195, and an interview in which she mockingly referred to

her infertile interviewer as pregnant (the "little bump" interview), 56.1 ¶305; Ex. 240.  Lively

does not dispute that any of these events actually occurred; she merely insinuates that Defendants had a role in bringing them to light.

The evidence does not support her headline claims. After months of scorched earth discovery, backed up by a pounding drumbeat of almost daily motions to compel, Lively has been unable to identify any instance in which any Defendant distributed or promoted any false story about her, even after subpoenaing dozens of content creators. Her interrogatory response summarizing the evidence of what she described as a highly orchestrated "smear campaign" reveals a surprising truth: what Lively primarily objects to is Baldoni's effort to defend *himself*, whether by promoting positive stories or trying to suppress negative ones. 56.1 ¶¶302-304; Ex. 195. But that is not retaliation. Indeed, Lively's own PR representatives took steps to kill negative stories about Lively—including stories she knew were true—during the same period. 56.1 ¶300; Ex. 211 at -122, -124.

Even when certain Defendants contacted the press about Lively in August 2024, their efforts were far from the sophisticated internet take-down Lively touted in the press. The few instances in which the evidence suggests any Defendant spoke to the press about Lively all involved truthful references to her actual conduct, or to that of her husband, or the sharing of opinions about that conduct. 56.1 ¶304; Ex. 195. Lively's own PR representative confirmed that such communications are standard fare: in defending her own efforts to share negative information about Baldoni, Lively's representative testified that it is "okay to tell a reporter to include negative statements about someone if someone else in the press has already reported it." 56.1 ¶298; Ex. 173 at 244:8-14.

Lively has also long claimed Defendants used a network of "bots" to bring her down. Contemporaneous documentary evidence shows that Baldoni himself repeatedly confirmed with

both Abel and Nathan that they were *not* using bots or fake accounts. 56.1 ¶289; Ex. 199 at -253; Exs. 190, 200, 201. Nathan in particular assured Baldoni the backlash was "organic[,] she's blown herself up by her own actions….once media goes in, they go in…You did not do any of these[,] we did not do any of these. This is all organic." 56.1 ¶290; Ex. 202. Baldoni later discussed with Nathan that he had no intention to make Lively an "outcast" and was praying for her and her family. 56.1 ¶291; Ex. 203.

### M. Lively And Reynolds Smeared Baldoni Once Again

Ironically, Lively's cry that Baldoni tried to "bury" her more accurately describes her own efforts to tar him. Beginning on August 9, 2024, just one day after Lively alleges the "smear campaign" began, SAC ¶326, Reynolds told his agent Lively's PR representative should "fight back in any way necessary." 56.1 ¶293; Ex. 205 at -119. Four days later, Reynolds himself described Baldoni and "his shitbag partner"—presumably Heath—as "predators and frauds" to WME's Executive Chairman, Patrick Whitesell. 56.1 ¶295; Ex. 207. Whitesell reassured Reynolds that WME "won't rest" until "all the studios, important buyers, etc know the truth about ALL of it." *Id.* Lively's PR rep, in turn, told one reporter Baldoni was an "animal," and told another, "You forgot to link the fat shaming and the inappropriate kissing allegations." 56.1 ¶¶296-297; Ex. 208; Ex. 209 at -256.

Lively then used a sham litigation to obtain the private messages of Baldoni's publicist Jen Abel, using a shell company as a bogus plaintiff. This company filed claims against 10 anonymous "Doe" defendants and, working behind the scenes with Abel's former employer Stephanie Jones, invoked a New York State court's subpoena power to obtain Wayfarer's confidential records from Abel's personal phone that Lively would not have otherwise been legally permitted to obtain. 56.1 ¶¶337-344; Exs. 249, 250. On December 21, 2024, *The New York Times* published a 4,000-word article entitled "We Can Bury Anyone: Inside a Hollywood

17

Smear Machine," that relied on the documents Lively had obtained through the sham lawsuit, as well as an administrative complaint she filed the day prior.  56.1 ¶345; Ex. 242.  The article asserted Baldoni and Heath had violated Lively's physical boundaries and made sexual and other inappropriate comments to her and then instituted a retaliatory "smear campaign."  56.1 ¶346; Ex. 242.  Weeks before the article came out, Taylor Swift gloated to Lively, "I think this bitch [Baldoni] knows something is coming because he's gotten out his tiny violin."  56.1 ¶347; Ex. 89 at -210.  Around the same time, Lively conveniently dropped her New York State Court lawsuit, confirming it was not filed in good faith and had only been used as a ploy.  56.1 ¶344; s*ee* *Vanzan Inc. v. Does 1-10*, No. 655130/2024 (N.Y. Sup. Ct.), NYSCEF No. 2; *see also* Ex. 248 at 63:24-64:2.

### N.  Lively Initiated This Litigation

In December 2024, 18 months after the minor issues she raised about on-the-set behavior were fully and successfully resolved, Lively launched this dispute with an administrative complaint and the fanfare of her *New York Times* headline.  The behavior she previously regarded as not requiring any formal HR process was now presented by two large, sophisticated, global law firms as sexual harassment of the gravest kind.  And Baldoni's natural defensive effort, after being sidelined from his own premiere, to manage his own and his film's reputation by employing experienced PR professionals was now recast as "retaliation" against Lively for raising purported sexual harassment concerns.  Lively's numerous claims against numerous defendants cannot withstand scrutiny.  Judgment should be entered for defendants on all claims.

## ARGUMENT

For the reasons set forth below, Lively's claims all fail.  This motion also incorporates the arguments in Defendants' Motion for Judgment on the Pleadings (Dkt.810), including that extraterritorial application of California statutes is improper because, as the undisputed facts

show, no alleged instance of harassment took place there (*see* 56.1 ¶60; Ex. 12 at 236).[1]

## I.     LIVELY CANNOT PROVE ANY ACTIONABLE SEXUAL HARASSMENT (COUNTS 1, 3, 6, 7, 8, 13)

This Court, as well as many others, have pointedly observed that, in evaluating what

constitutes actionable harassment or a hostile work environment, "[c]ontext matters."

*McSweeney v. Cohen*, 776 F. Supp. 3d 200, 268 (S.D.N.Y. 2025) (Liman, J.); *accord Burlington*

*N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006).[2]  Comments made on the set of filming

a movie about adult themes may have a different "material effect" from similar comments made

in a routine office setting.  *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).  Lively knowingly

took on a lead role in a provocative, sexually-charged film, based on a book famous for its

intense intimate scenes.  When viewed in context, no reasonable juror could find that the handful

of comments and miscommunications Lively has mustered amounts to sexual harassment.

### A.  Lively Cannot Prove Severe And Pervasive Harassment

Title VII, FEHA, and the Unruh Act do not address trivial sleights nor prescribe a

"general civility code" for the workplace.  *White*, 548 U.S. at 68 (2006); *accord Lyle v. Warner*

*Bros. Television Prods.*, 38 Cal. 4th 264, 295 (2006) ("like Title VII, the FEHA is not a 'civility

code'").  The litany of minor grievances Lively cobbles together falls far short of the requisite

level of being "severe or pervasive enough to create an objectively hostile or abusive work

environment."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81 (1998); *Lawler v.*

---

[1] All legal citations are cleaned up.  "56.1 ¶_" refers to the Wayfarer Parties' 56.1 Statement and Ex. refers to Exhibits to Alexandra A.E. Shapiro's declaration in support of this motion.

[2] Decisions interpreting and applying Title VII are relevant to Lively's claims under both federal and California law because "California courts consistently look to Title VII for guidance in interpreting FEHA." *Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1172 (9th Cir. 2001) (collecting cases).  The standard for proving a hostile work environment is the same under Title VII, FEHA, and the Unruh Act, Cal. Civ. Code §51.9.  *Hughes v. Pair*, 46 Cal. 4th 1035, 1045-46 (2009).

*Montblanc N. Am., LLC*, 704 F.3d 1235, 1245 (9th Cir. 2013) (same, for FEHA).

"Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). "The sporadic use of abusive language, gender-related jokes, and occasional teasing are not actionable harassment" under federal or California law. *Aleman v. Airgas USA, LLC*, 2024 WL 3937546, at *3 (C.D. Cal. Aug. 26, 2024). In separating low-level objections from legally cognizable wrongs, courts consider the totality of circumstances: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). It is not enough for Lively to say that she personally found something Baldoni or Heath did objectionable. "[B]oth an objective and a subjective standard must be met" to sustain a claim. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010).

Lively's claims, premised on a few purportedly "offensive utterance[s]" and on-set mishaps, do not satisfy these standards. That Baldoni, in directing particular scenes, twice used the adjective "sexy" to refer to how female actors appeared in their assigned wardrobe is hardly surprising given the sexually-charged nature of scenes in the film. The banality of such conduct, and its general low-level offensiveness, is underscored by Lively's own use of the term "sexy" during her work on the film, and Sony's directives to turn up the "heat." 56.1 ¶¶180, 181, 182, 218; *see also* 56.1 ¶30; Ex. 38. Video footage confirms that Baldoni's use of the word "sexy" in reference to Lively's wardrobe was entirely unremarkable: Lively was not scantily clad, but dressed in an oversized fleece "onesie." 56.1 ¶116; Ex. 281. Nor was this anything that might remotely approach flirtation—rather, both she and Baldoni were working at the time, surrounded by actors and crew. Baldoni's expression was neutral and not ogling or suggestive. On top of

that, Baldoni apologized if his remark was inappropriate, and Lively responded by saying "All good." *Id*.

Even in routine office settings, such conduct is not actionable. For example, the Second Circuit held a high school teacher's claims that her male supervisor "occasionally commented on [her] physical appearance" and "participated in a bet with three other male employees as to when [he] would be able to engage [her] in sexually explicit conversation" were insufficient. *Cristofaro v. Lake Shore Cent. Sch. Dist.*, 473 F. App'x 28, 30 (2d Cir. 2012). Similarly, claims that a senior employee "(1) [] told Plaintiff that her clothes were sexy and that her hair was beautiful, (2) [] sometimes blew kisses at Plaintiff, as he did to all his employees, (3) [] once sent Plaintiff an inappropriate e-mail" and made sexual jokes were insufficient. *Nieves v. Dist. Council 37*, 2009 WL 4281454, at *6 (S.D.N.Y. Nov. 24, 2009), *aff'd sub nom. Nieves v. Roberts*, 420 F. App'x 118 (2d Cir. 2011). Likewise, a file clerk's claims that her supervisor "compliment[ed] …her hair and eyes," commented "that she looked good in tight pants," and "referred to her as a 'bitch'" twice were insufficient. *Spina v. Our Lady of Mercy Med. Ctr.*, 2003 WL 22434143, at *3 (S.D.N.Y. Oct. 23, 2003), *aff'd*, 120 F. App'x 408 (2d Cir. 2005).

Lively's other complaints are equally deficient when viewed in context. It would be one thing if Lively and Baldoni were two insurance executives reviewing actuarial figures on a spreadsheet, and, out of nowhere, Baldoni alluded to his marital or sexual experiences or to a prior pornography addiction. It is quite another thing here, because Lively and Baldoni were discussing these issues in the context of creating intimate scenes and adult themes in the film they were making together. Lively always had complete control in approving any additions to the script concerning intimacy, as well as access to a female intimacy coordinator, 56.1 ¶¶49-53,

88-89; Ex. 56, and she raised no concerns throughout the entire period in which the movie's most intimate scenes were filmed, 56.1 ¶145; Ex. 11 at 198:22-199:2.

Lively's complaint that Baldoni inquired about her weight similarly falls short. He didn't make the comment in the workplace or in the presence of any cast or crew member or even Lively herself. It had no effect on the workplace environment. Someone else communicated it to Lively—not at Baldoni's request and independent of any activity related to the film. 56.1 ¶82; Ex. 82; *see Lyle*, 38 Cal. 4th at 289 (sexual comments did not "amount to verbal abuse or harassment, inasmuch as the [subjects] were not even present to hear the [speakers'] offensive remarks and, apparently, had no awareness of what had been said").

In *McSweeney*, this Court rejected Title VII claims. It observed that calling someone a "Housewife" or commenting on a co-worker's breast implants would be highly offensive in a run-of-the-mill office. 776 F. Supp. 3d at 268. At the same time, however, in connection with the reality TV show "Real Housewives of New York City," those comments had a different ring. *Id.* This Court held that even such "obnoxious and insensitive" comments did not rise above the level of a 'petty slight.'" *Id.* The California Supreme Court has similarly observed: "The circumstance that this was a creative workplace focused on generating scripts for an adult-oriented comedy show featuring sexual themes is significant in assessing" whether the plaintiff had viable harassment claims. *Lyle*, 38 Cal. 4th at 287. The plaintiff's claims that male writers made "graphic comments [about having sex with an actress on the show]…only once or at least twice" in four months was not sufficient to support her claim that hostility toward women "permeated" the workplace. *Id.* at 280-90. Lively's claims suffer from the same fatal defect.

### B. Lively Was Not Targeted On The Basis Of Her Gender

To sustain a sexual harassment claim, Lively must show that the offending conduct was motivated by her gender—that she was treated a certain way *because* "she was a woman."

*Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998). "The

critical issue, Title VII's text indicates, is whether members of one sex are exposed to

disadvantageous terms or conditions of employment to which members of the other sex are not

exposed." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J. concurring).

Lively cannot show that here. The basis of many of her claims has nothing to do with her

sex. For instance, Lively contends there was too much "hugging" on the set. She does not

claim, let alone prove, that hugging was gender specific. The undisputed evidence, including

video footage, shows both men and women being hugged. 56.1 ¶¶186-87; Ex. 11 at 139:6-9;

Exs. 110, 280. Perhaps there was a general overgenerosity of spirit among people on the set, but

such "facially sex-neutral incidents…even if they made [Lively] subjectively uncomfortable, do

not…create an environment that a reasonable person would find hostile or abusive." *Lewis v.

City of Norwalk*, 562 F. App'x 25, 28-29 (2d Cir. 2014).

Baldoni spoke with Lively about topics like sexuality, consent, and pornography, not

motivated by her gender, but because she was his co-lead and collaborator in a film exploring

adult themes. It is undisputed that Baldoni has spoken openly about such topics to large

audiences of men as well as women, including in two published books and a frequently broadcast

podcast. No evidence suggests he singled out anyone for differential treatment on the basis of

gender. Moreover, it is undisputed that female cast and crew members, including Lively herself,

commented on the appearance of both male and female actors and celebrities, 56.1 ¶¶182-183;

*e.g.,* Ex. 95 at -71, while the female executive Sony assigned to the film encouraged Baldoni to

include "as much tasteful hot sex as you can," 56.1 ¶86; Ex. 84. Meanwhile, Lively advocated

making her own wardrobe "sexier." 56.1 ¶180; Ex. 105 at -19; *see also* Ex. 106 at -44. She

explained to male crew members why her boots were so "sexy." 56.1 ¶181; Ex. 107. She

oversaw a scene in which there was unscripted kissing (including her character kissing Baldoni's).  56.1 ¶177; Ex. 104.  Against the backdrop of a film devoted to achieving a certain sexy aesthetic, a project Lively embraced and advanced, it is impossible to see occasional sporadic references to sexuality as specifically directed toward either gender.

Nor do the two alleged instances involving Heath reflect any gender motivation or animus.  Lively was shown a fragment of a video depicting family members (male and female) and a newborn child not because she was a woman, but because she had acted in an important birth-related scene in the film, the details of which she had been discussing with Baldoni.  56.1 ¶119; Ex. 8 at 300:15-301:18; Ex. 12 at 120:19-23, 123:9-12.  Heath had shown the same video to Baldoni, a man.  56.1 ¶119; Ex. 8 at 300:15-301:18.  Similarly, Lively asserts Heath inappropriately glanced at her after being invited into her makeup trailer while she was in a state of undress.  Even crediting her account, there is no evidence Heath entered her trailer, or did anything else, for some untoward sexual reason.  Before this dispute arose, Lively herself dismissed that idea, telling Heath: "I know you weren't trying to cop a look."  56.1 ¶100; Ex. 4 at 223:12-25.

Lively relies on the fallacious assumption that any unwelcome reference to sex or sexuality is gender discrimination.  That is not the law.  Exposure to overtly sexual conduct far more egregious than that alleged here is not actionable if not specifically motivated by gender.  In *Brown v. Henderson*, 115 F. Supp. 2d 445 (S.D.N.Y. 2000), *aff'd,* 257 F.3d 246 (2d Cir. 2001), the court granted summary judgment, and the Second Circuit affirmed, even where plaintiff alleged she was the butt of jokes about an affair with a male employee, her co-employees threatened to "sodomize one another," and "someone posted a pornographic picture of a naked, obese, spread-eagled woman masturbating."  *Id.* at 447. It was "undisputed

24

that…[Plaintiff] was subject to unwelcome verbal conduct of a sexual nature," but the court rightly found that "failure to adduce evidence that the conduct at issue…was based on her sex…is fatal to her claim." *Id.* at 450; *accord Bliss v. MXK Rest. Corp.*, 220 F. Supp. 3d 419, 422, 424 (S.D.N.Y. 2016) (dismissing claims by plaintiff-bartender exposed to "private sex parties" and "nudity, prostitution, and people performing sexual acts in her presence" because plaintiff "does not claim that she was subjected to these sights because she is a woman").

*Lyle* is particularly on point. There, the California Supreme Court reinstated a grant of summary judgment dismissing FEHA hostile work environment claims where a female writer for the TV show *Friends* presented evidence that male writers for the show had engaged in "sexual antics, including their pantomiming of masturbation…graphic discussions about their personal sexual experiences, sexual preferences, and preferences in women…bragging about their personal sexual exploits." 38 Cal. 4th at 286. Considering the context in which the conduct occurred, the writers' room for an adult comedic show, the court concluded there was no triable issue that "the writers engaged in harassment 'because of…sex.'" *Id.* It found that both men and women engaged in sexual jokes and commentary, with no indication such conducted was undertaken "to make plaintiff uncomfortable or self-conscious" *because* she was a woman. *Id.* at 288.

### C. Defendants Completely Remediated Any Allegedly Offensive Behavior

Lively is also unable to show pervasive harassment because any concern she raised, whether justified or not, was promptly addressed and rectified. Indeed, when filming resumed after Lively had raised a set of requests or "protections," it proceeded without issue or incident. "[A] reasonable employee would hardly be able to find their workplace to be pervasively discriminatory if their employer actively took successful steps to protect them from abuse." *Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc.*, 531 F. Supp. 522, 539 (N.D.N.Y. 2021); *cf.*

*Lyle*, 38 Cal. 4th at 291 (no harassment where "plaintiff offered no facts showing…any complaint she made was ignored").

Lively does not claim there was any misstep or misdeed by anyone on set after her June 1, 2023 meeting with Heath and Baldoni. *See generally* SAC.[3]  Indeed, before Lively unleashed her battery of high-powered law firms, she herself repeatedly took credit for creating a "perfectly professional and sterile and lovely" set.  56.1 ¶222; Ex. 129.  Her agent visited the set and observed that Lively "was feeling very positive about the final phase of the movie," a sentiment echoed by other executives involved in the film who had been privy to Lively's earlier concerns. 56.1 ¶224; Ex. 33 at 124:3-15; 236:19-237:22.  It is difficult to see how such relatively minor alleged transgressions, all indisputably nipped in the bud while production continued, can support the massive litigation Lively has brought here.  Indeed, that is precisely why one of Lively's co-stars, Jenny Slate, declined Lively's invitation to join the suit.  As Slate testified:  "I felt that I settled my issues on set and I wanted to move on."  56.1 ¶146; Ex. 13 at 296:3-8.

## II.    LIVELY CANNOT PROVE ANY ACTIONABLE RETALIATION (COUNTS 2, 4, 5, 6, 7, 9, 12)

### A.  Lively Did Not Experience Any Actionable Adverse Action

To sustain a retaliation claim, Lively must prove, among other things, that she suffered an adverse action.  *McSweeney*, 776 F. Supp. 3d at 269; *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1049 (2005).  Under Title VII, an adverse action must include conduct that would

---

[3] To create the appearance of ongoing misconduct, Lively alleges the harassment has continued in the form of "a coordinated campaign to cast Ms. Lively in a false light."  SAC ¶363.  That is (at best) a retaliation claim, not a sexual harassment claim.  Lively fails to show that the so-called smear campaign was based on her *gender*.  *See* Point I.B.  Nor would such a campaign constitute an "adverse *employment* action," a term that is defined more narrowly under substantive Title VII law than for retaliation claims.  *See White*, 548 U.S. at 64 (observing Title VII's substantive provision is "limited to discriminatory actions that affect the terms and conditions of employment").

"dissuade[] a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 67. California's FEHA statute and §1102.5 of the California whistleblower statute upon which Lively relies define a qualifying adverse action even more narrowly. *Young v. Cty. of Los Angeles*, 2020 WL 6793362, at *16 (Cal. Ct. App. Nov. 19, 2020) (noting those statutes rely on "the same definition of 'adverse employment action'"). They require that the adverse action be *employment related*—that is, it must "materially affect the terms, conditions, or privileges of employment." *Yanowitz*, 36 Cal. 4th at 1051; *accord Bailey v. San Francisco Dist. Attorney's Off.*, 16 Cal. 5th 611, 637 & n.8 (2024); *Choi v. Wolfgang*, 2018 WL 7506173, at *3 (C.D. Cal. Sept. 26, 2018) (discussing differences between Title VII and FEHA retaliation).

### 1. Lively Did Not Suffer Any Employment-Related Adverse Action

No aspect of Lively's employment changed for the worse after she presented her list of requested "protections." She was not demoted, sidelined, or paid less. To the contrary, her power in the workplace and control over the production both expanded dramatically. By her own account, also conveyed in self-congratulatory detail to the PGA, she "rewrote the script [and] directed every actor," and edited and secured the release of her own cut of the film, 56.1 ¶¶32, 232; Ex. 138; Ex. 39, among many other things. No reasonable juror could find that Lively suffered an adverse *employment* action in any traditional sense. Rather than retaliate against her, Defendants acceded to her every demand, providing her with a career boon that she presented as grounds for prestigious PGA recognition, a first in her career.

### 2. The Only Proven Publicity Efforts Were Reasonable Defensive Measures

In lieu of a traditional adverse action, Lively claims that the retaliation against her took the form of a barrage of negative publicity—outside the workplace and after all of her on-set work was done. Nothing Defendants did can fairly be described as retaliation for Lively's engagement in any protected activity. Instead, Baldoni and Wayfarer were reasonably

attempting to protect themselves in response to an onslaught of vicious negative publicity launched by Lively and her famous husband.  Defendants were exercising First Amendment and due process rights, not stepping on Lively's earlier exercised right to voice concerns in the workplace, which they had honored in full.

Even if Defendants' conduct in late 2024 somehow could stretch back to workplace concerns raised over a year before, there would still be no actionable harassment.  This Court knows well that parties accused of harassment are permitted to defend themselves.  *See McSweeney*, 776 F. Supp. 3d at 254 ("[N]o reasonable employee should expect that the employer-defendant would simply surrender in the face of litigation."); *Hughes v. Twenty-First Century Fox, Inc*., 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018) ("an employer is entitled to undertake reasonable defensive measures against an employee's charge of discrimination").  The Second Circuit has recognized that such "[r]easonable defensive measures do not violate the anti-retaliation provision of Title VII."  *United States v. N.Y.C. Transit Auth.*, 97 F.3d 672, 677 (2d Cir. 1996).  Defendants' publicity efforts, even if construed in their worst possible light, are precisely the type of reasonable defensive measures outside the scope of actionable retaliation.[4]

It neither against the law nor retaliatory for Baldoni to put out positive press about himself or to attempt to mitigate or suppress any negative stories that may arise.  That is classic PR activity.  Nor is pointing journalists to preexisting negative coverage of Lively actionable.  In

---

[4] For the same reasons, Defendants' lawsuit against Lively cannot support her retaliation claims. As this Court recently held, to protect an employer's due process and First Amendment rights, an employer's counterclaim cannot be deemed an adverse action "if it is filed without a retaliatory motive and with a reasonable basis in fact or law."  *McSweeney*, 776 F. Supp. 3d at 253–54; *Klein v. Town & Country Fine Jewelry Grp., Inc.*, 283 A.D.2d 368, 369 (1st Dep't 2001) (noting that it is "rare...that the filing of a counterclaim can serve as the basis for a retaliation claim."). That Defendants' claims were dismissed based on various privileges or other pleading issues is not tantamount to a finding that they were filed in bad faith.

*Hughes v. Twenty-First Century Fox, Inc.*, the defendant-employer was accused of leaking a false narrative to the *National Enquirer* about the plaintiff's affair with her boss "to preempt any actions [plaintiff] would have taken to expose [her claims that the boss raped her], as well as the discrimination and blacklisting that she suffered." 304 F. Supp. 3d at 441. Even in that ugly context, the court dismissed the retaliation claims, holding that any contact with the *National Enquirer* was not an adverse action under the anti-discrimination laws, but rather "a colorable defense to protect [defendants'] business" in the face of plaintiff's "inflammatory" allegations. *Id.* at 449. Similarly, in *Areu v. Fox News Network, LLC*, the defendant-employer allegedly "leak[ed] cherry-picked emails to the media" to portray the plaintiff-complainant in a negative light. 2021 WL 4124226, at *16 (S.D.N.Y. Sept. 9, 2021). The court held such actions were "reasonable defensive measures" that "cannot support a claim for retaliation" because "[n]one of the emails released are alleged to have been doctored or fabricated. Indeed, it is likely that these emails would become public if this action proceeded to trial." *Id.*

Here, Lively has been unable to identify any instance in which any Defendant provided false information about Lively to any member of the press or to any social media influencer. 56.1 ¶304; Ex. 195. Lively has never asserted defamation claims against Abel, Nathan, TAG, or any other member of Wayfarer's PR team. Her defamation claims against Wayfarer, Heath, and Baldoni conspicuously fail to identify any statements made in August 2024, when the alleged smear campaign was supposedly in full swing. *See* SAC at ¶¶447-465.[5] Lively's digital expert on "inauthentic online activity," Aron Culotta, similarly fails to identify any false statement

---

[5] Lively has also claimed Defendants engaged in sophisticated digital warfare against her. Although Lively will no doubt assert the facts are contested, discovery establishes that "digital warfare" never happened. In August 2024, long before this dispute, Baldoni repeatedly asked his PR team if they were using bots or "fake accounts" to foment negative sentiment against Lively, and they assured him they were not. 56.1 ¶289; Ex. 199 at -253; Exs. 190, 200-01.

about Lively that was supposedly "inauthentically" amplified.  Ex. 194.  Instead, he focuses on comments where posters criticize Lively on the basis of her own irrefutable conduct:  her acting, her demeanor in interviews, her decision to have her husband revise the script, her decision to cross-promote a film about domestic violence with her husband's action-adventure movie or her alcoholic beverage company, and her to decision to unfollow Baldoni on social media.  Such posts are not "false" by any measure.  *Id.* at 29, 32-34.  Culotta also observes a resurgence of attention to the "little bump" interview.  *Id.* at 52-57.  No one has disputed, however, that the interview actually occurred.  56.1 ¶306.

The Second Circuit emphasizes that "context matters" when assessing retaliation claims, just as it does for substantive harassment claims.  *Hicks*, 593 F.3d at 165.  And a "plaintiff's own behavior in the face of purported retaliation has to be considered." *Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*, 746 F. Supp. 2d 575, 598 (S.D.N.Y. 2010).  Lively indisputably started the publicity fight, and her reaction to even the hint of any defensive response showed she remained an eager participant on that battlefield.  As early as August 9, 2024, virtually the same day Lively claims the purported smear campaign began, Lively and her husband told their PR professional to "engage the studio and fight back in any way necessary."  56.1 ¶293; Ex. 205 at -119.  Four days later, on August 13, Reynolds pressed the Executive Chairman of WME, the talent agency representing Reynolds, Lively, and Baldoni, to advocate for Lively.  56.1 ¶299; Ex. 210 at -26.  Lively and her team filed a bogus lawsuit in New York state court and then subsequently worked with the *New York Times* to publish a 4,000-word article about Baldoni's purported misconduct, based on numerous private and cherry-picked texts improperly seized from Jen Abel's phone.  56.1 ¶¶339-345; *e.g.,* Ex. 242.  This aggressive response itself shows the

media activity transcended not only the workplace but the bounds of workplace anti-discrimination laws.

### B. Lively Cannot Prove Any Protected Activity Was The But-For Cause Of The Alleged "Smear Campaign"

Lively's retaliation claims also fail for the separate and independent reason that she cannot prove any temporal or causal proximity between Defendants' alleged publicity efforts and the list of "protections" she presented many months before. To establish a causal link between her protected activity and Defendants' allegedly adverse action, Lively must prove "the retaliation was a 'but-for' cause of the employer's adverse action." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015). "It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision"—rather, Lively must prove that the negative publicity campaign *would not have happened* absent a desire to retaliate against her for her complaints. *Id.* at 90-91. She cannot do so here.

### 1. There Is No Temporal Proximity Between Any Claimed Protected Activity And Any Alleged Adverse Action

It is undisputed that Lively faced no real consequences for at least eight months after presenting her "protections" demands.[6] On the contrary, filming resumed—including filming of all of Lively's intimate scenes—without incident, and she alleges no act of retaliation during the subsequent months of editing. The long temporal gap between her protected activity and an alleged instance of retaliation alone defeats her claims. *See Sealy v. SUNY at Stony Brook*, 834 F. App'x 611, 614 (2d Cir. 2020) ("actions occurring approximately three months after protected

---

[6] Lively claimed during her deposition that Baldoni retaliated against her by privately criticizing her to Hoover and Fisher (Ex. 24 at 199:9-200:5) and complaining about her to a film editor (Ex. 24 at 200:23-201:10). Neither of these events resulted in any material harm to Lively or the conditions of her employment. Moreover, around the same time, Lively told Hoover Baldoni was a "narcissist." 56.1 ¶243; Ex. 147. In any event, Lively didn't raise those incidents in her administrative complaint and has thus failed to exhaust her administrative remedies. Ex. 252.

activity are too attenuated to give rise to an inference of retaliation"); *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 457 (S.D.N.Y. 2012) (collecting cases holding a gap of "between three and six months…is insufficient, standing alone, to establish a causal connection").

### 2. Lively Cannot Prove Proximate Cause

"[S]ignificant intervening events" between Lively's claimed protected activity and the alleged smear campaign also destroy any inference of causation, especially the "but for" causation required here. *Gubitosi v. Kapica*, 154 F.3d 30, 33 (2d Cir. 1998). It is ridiculous to suggest that, but for Lively's airing of "protections" some eight months earlier, Defendants would not have hired PR professionals to help manage their reputations. Defendants would have reacted to Lively's onslaught of negative press against them even if no concerns about their on-set behavior had ever been raised. They had a legitimate interest in protecting their reputations and the reception of their film after Lively isolated Baldoni from the rest of the cast and snubbed him at the film's premiere. 56.1 ¶¶249-250; Ex. 2 at 96:18-21. These developments eviscerate any inference of "but for" causation relating to events in the distant past. *See Gubitosi*, 154 F.3d at 33 (affirming summary judgment due to "significant intervening events between [the claimed protected activity and adverse action]"); *Dhaliwal v. Salix Pharms., Ltd.*, 2019 WL 5067164, at *6 (S.D.N.Y. Oct. 9, 2019) (granting summary judgment where, after six-month delay, "a number of intervening events make it even less plausible to conclude" there was causal link to adverse action); *Brennan v. Legal Aid Soc'y*, 2020 WL 6875059, at *5 (S.D.N.Y. Nov. 23, 2020) ("intervening events defeat the inference of causation," collecting cases holding same).

## III.   LIVELY WAS AN INDEPENDENT CONTRACTOR, NOT AN EMPLOYEE (COUNTS 1, 2, 5)

Title VII "cover[s] 'employees,' not independent contractors." *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 113 (2d Cir. 2000). California Labor Code §1102.5 is

no broader.  By its plain terms, it does not protect independent contractors.  *See Jacobson v. Schwarzenegger*, 357 F. Supp. 2d 1198, 1214 (C.D. Cal. 2004) (dismissing §1102.5 claim brought by independent contractor); *accord Bennett v. Rancho Cal. Water Dist.*, 35 Cal. App. 5th 908, 921 (Cal. Ct. App. 2019), *as modified on denial of reh'g* (June 13, 2019) "employer-employee relationship" is a "prerequisite to asserting [an §1102.5 claim]").  Lively, a world-famous actor who ran her own business empire and relied on lawyers to negotiate a detailed contract on behalf of a specialized LLC for her work, plainly wasn't a standard employee.

Lively was not beholden to any employer.  She controlled the terms and conditions of the work she performed—to an extraordinary degree.  *See Eisenberg*, 237 F.3d at 114-15 (right to control is touchstone of employer-employee relationship).  She moved the location of the film, changed the filming schedule, led meetings at her own personal residence, and demanded numerous terms and conditions, without which she refused to go forward.  If sexual harassment law is designed to address a power differential, her star power gave her the upper hand.  She came to exercise such immense control that—put in her own words— she "produced every moment of this film."  56.1 ¶236; Ex. 39, Lively PGA Letter.

In determining whether an individual qualifies as an employee under Title VII, courts look to thirteen non-exhaustive factors drawn from common law.  *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 227 (2d Cir. 2008). California law ordinarily presumes individuals are employees, but Cal. Labor Code § 2776(a) provides a different standard where, as here, there is a "bona fide business-to-business contracting relationship[]."  *See Thoma v. VXN Grp., LLC*, 2025 WL 1766337, at *18 (C.D. Cal. Mar. 11, 2025) ("the issue of control is central").  The existence of a business-to-business relationship depends on factors that substantially overlap with the factors articulated below. Cal. Labor Code § 2776; *see also Thoma*, 2025 WL 1766337,

at *17.  Since the terms of Blakel's payment were negotiated and set out in written agreements

(Exs. 28, 29), that common law test applies.  Common law factors strongly weigh against

treating Lively as an employee:

- **Did any Defendant "have the right to control the manner and means by which the product is accomplished"?**  No.  Lively exercised control at every turn.  The final cut of the film was her own.  She reserved the right not to perform in any intimate scene to which she did not consent.  She determined the filming location and schedule, took over significant aspects of the script and editing process as well as aspects of the musical score and costume design.  She led meetings with all relevant department heads.  She refused to move forward, including when presenting her list of "protections," unless others acceded to the terms and conditions she imposed.  56.1 ¶¶32, 227, 236; Ex. 39, Lively PGA Letter.

- **Was a high level of "skill required" for Lively's work?**  Yes.  Lively was an A-list actor.  She touts many skills and accomplishments in her letter to the PGA.  She bargained for a $1.75 million guaranteed payment, as well as additional bonuses, including a "Box Office bonus" that was required to be "no less favorable than Justin Baldoni's."  56.1 ¶358; Ex. 28 at -678.

- **Who was the "source of the instrumentalities and tools"?**  Lively herself was the primary instrumentality of the acting work she performed.  While Wayfarer and IEWUM arranged for the set and paid for ancillary materials associated with the production, Lively made decisions and exercised creative control.  She claimed credit for, among other things, "the costume design for all characters" and "the prop and floral design for the key film element of the film (the protagonist is a florist)."  56.1 ¶32; Ex. 39, Lively PGA Letter.

- **Who chose "the location of the work"?**  Lively told the PGA she led the film's shift in location.  She insisted shooting switch from Boston, where the film was set, to New Jersey, a location more convenient to her home. 56.1 ¶31; Ex. 39, Lively PGA Letter at -96.  She retained "pre-approval" rights as to any shoots in other locations.  56.1 ¶376; Ex. 265.

- **What was the "duration of the relationship between the parties"** and **Could any Defendant "assign additional projects" to Lively?**  The relationship was limited to the duration of a single project, the film.  *See Aymes v. Bonelli*, 980 F.2d 857, 863 (2d Cir. 1992) ("independent contractors are typically hired only for particular projects"); *accord Stack v. Karr-Barth Assocs., Inc.*, 2021 WL 1063389, at *5 (S.D.N.Y. Mar. 18, 2021) (that a party is paid "based on projects completed indicates contractor status").

- **Did Lively have "discretion over when and how long to work"?**  Yes.  That was an extensively negotiated aspect of the Offer Letter and the (never executed) ALA.  56.1 ¶376; Ex. 28; Ex. 32 at -663-75; Ex. 265. Under the financial terms in the unexecuted ALA, Lively was also entitled to receive payment for any day she worked beyond the agreed-on schedule, at a weekly rate of $291,667.67.  56.1 ¶386; Ex. 264 at -606-609.

- **What "method of payment" was used?**  Lively's loanout entity was paid her minimum guaranteed payment in six installments pursuant to an escrow agreement, with additional bonuses contingent on the film's success.  56.1 ¶25; Ex. 29.  *See Sellers v. Royal Bank of Canada*, 2014 WL 104682, at *9 (S.D.N.Y. Jan. 8, 2014) ("that plaintiff invoiced payment from Defendant under the name of his business weighs in favor of independent contractor status") *aff'd,*592 F. App'x 45 (2d Cir. 2015).

- **What was Lively's role in "hiring and paying assistants"?**  It was extensive.  Lively claimed she personally identified the heads of several departments as well as "freelance team members."  56.1 ¶ 32; Ex. 39, Lively PGA Letter at -96-98.  Lively brought in a new composer and new editors for the film.  *Id.*  She was also "responsible for the firing of the [First Assistant Director]" on the film.  56.1 ¶136; Ex. 39, Lively PGA Letter at -97.  Under the unexecuted ALA, Lively would also have had the right to select her personal assistants, nannies, and security.  56.1 ¶387; Ex. 264 at 610-611; *see also* 56.1 ¶376; Ex. 28 at -679.

- **Were Defendants in business** and **Was the work part of their regular business?**  Yes.  Defendants were in the business of producing films.  But it was not as if Lively walked into a preexisting business and simply followed their rules.  By her own account, she transformed the entire production process.  "The fact that a party was in business...indicates nothing about whether [plaintiff] was an employee in that business."  *Yu v. New York City Hous. Dev. Corp.*, 2011 WL 2326892, at *28 (S.D.N.Y. Mar. 16, 2011), *R&R adopted*, 2011 WL 2183181 (S.D.N.Y. June 3, 2011), *aff'd,* 494 F. App'x 122 (2d Cir. 2012); *accord Aymes*, 980 F.2d at 863 (such factors get "little weight" in work-for-hire context).

- **Did Lively receive "employee benefits" like health insurance?**  No.  56.1 ¶375; Heath Decl. ¶21.

- **How was Lively treated for tax purposes?**  Not like a standard W-2 employee.  As required by New Jersey law for all films shot in the state, IEWUM withheld a 6.37% tax from its payments to Lively's loanout entity, but it did not withhold federal, state, or local income tax, or Social Security or Medicare taxes.  56.1 ¶25; Exs. 29-31.

Moreover, the very fact that Lively now claims tens of millions in "lost profits" for her various companies demonstrates that she was in business for herself, not for any Defendant.  56.1 ¶394; Ex.272 at 41.  *See Sellers*, 2014 WL 104682, at *6 ("The fact that plaintiff was free to engage in other employment indicates that his position was that of an independent contractor.").

## IV.    LIVELY CANNOT PROVE A FAILURE TO INVESTIGATE CLAIM (COUNT 6)

Lively asserts that IEWUM and Wayfarer, as employer entities, violated two provisions of FEHA, Cal. Gov. Code §12940(j)(1) and §12940(k), by allegedly failing to take reasonable steps to prevent or investigate harassment regarding their employees.  SAC ¶¶401-407.  As a

preliminary matter, Lively cannot assert claims under §12940(k), which by its terms, as relevant here, is strictly limited to the employer-employee context.[7]  *See id.* (it shall be unlawful "for an *employer*…to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring" (emphasis added)); *see also* Cal. Code. Regs. tit. 2 §11023 (regulation articulating the duties of "employers" under §12940(k)).  In any event, Lively's claim that Defendants failed to prevent or investigate harassment would fail on the merits under either provision because she cannot establish the elements of such a claim—namely, that there was, in fact, a substantive FEHA violation; Defendants failed to take reasonable steps to prevent it; or that any such failure by Defendants caused Lively any harm.  *McCaffrey v. Republic Servs., Inc.*, 2025 WL 360745, at *8 (N.D. Cal. Jan. 31, 2025).

*First*, insofar as nothing Lively experienced rose to the level of actionable harassment or retaliation, Defendants had no corresponding obligation to prevent or investigate.  Per regulations promulgated under §12940(k), there can be no standalone employer liability for failure to take reasonable steps unless the plaintiff also "plead[s] and prevail[s] on the underlying claim of discrimination, harassment, or retaliation."  Cal. Code Regs. tit. 2, §11023.  Because §(j)(1) also "does not create a stand-alone tort, the employee has no cause of action for a failure to investigate [under FEHA]…unless actionable misconduct occurred."  *Thompson v. City of Monrovia*, 186 Cal. App. 4th 860, 880 (Cal. Ct. App. 2010); *Cozzi v. Cnty. of Marin*, 787 F. Supp. 2d 1047, 1073 (N.D. Cal. 2011).

*Second*, undisputed facts show Defendants took "all reasonable steps to prevent harassment from occurring," thereby fulfilling their statutory obligations.  The reasonableness of

---

[7] §12940(k) also applies to labor organizations, employment agencies, apprenticeship training programs, and other employment training programs.  Defendants are none of those.

any employer's measures depends on the context.  The regulations under §12940(k) call for "an individualized assessment, depending upon numerous factors sometimes unique to the particular employer…as well as upon the facts of a particular case."  Cal. Code Regs. tit. 2, §11023(a)(1).  "Reasonable steps" to prevent discrimination can include "the establishment and promulgation of antidiscrimination policies and the implementation of effective procedures to handle discrimination-related complaints and grievances."  *Achal v. Gate Gourmet, Inc.*, 114 F. Supp. 3d 781, 804 (N.D. Cal. 2015); *accord Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1185 (9th Cir. 2005), *amended on denial of reh'g*, 433 F.3d 672 *and* 436 F.3d 1050 (9th Cir. 2006) (under Title VII, "adoption of an anti-harassment policy and []efforts to disseminate the policy to its employees establish that the employer exercised reasonable care to prevent sexual harassment").

Wayfarer took each of those measures.  It had a separate HR department, as well as an employee handbook with clear anti-discrimination, harassment, or retaliation policies.  56.1 ¶¶43-45; Ex. 51; Ex. 1 at 38-39.  Pursuant to those policies, individuals who believed they had experienced harassment were invited to discuss their concerns with "their immediate supervisor, any member or management, or Human Resources."  56.1 ¶44; Ex. 1 at -54.  IEWUM also held an anti-harassment training administered by an outside law firm during pre-production, 56.1 ¶56; Exs.63-65, and provided call sheets with a hotline for workplace complaints, 56.1 ¶57; Ex. 150.

Lively may argue Defendants failed to act reasonably because no formal investigation into issues she raised took place.  Yet Lively herself conceded it was reasonable for Defendants to forego any investigation.  Her lawyer offered a proposed list of "protections" in lieu of "a more formal HR process."  56.1 ¶162; Ex. 103.  The "legal significance of [her] specific request not to investigate" is that it shows Defendants' alleged decision not to do so was perfectly reasonable.  *Hardage v. CBS Broad., Inc.*, 436 F.3d 1050, 1051 (9th Cir. 2006); *cf. Faragher v.*

*City of Boca Raton*, 524 U.S. 775, 807 (1998) (in the Title VII context, an employer may avoid liability for co-worker harassment where "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer").

*Third*, Lively cannot prove—as she must—that any technical failure to investigate or remediate was a "substantial factor" in causing her purported harm. *Kruitbosch v. Bakersfield Recovery Servs., Inc.*, 114 Cal. App. 5th 200 (Cal. Ct. App. 2025). No formal "investigation" would have made any difference because Defendants simply acceded to Lively's requested "protections" and demands. Filming continued thereafter without issue or incident in what Lively described as a completely safe and professional environment. No deficiency in the remedial apparatus of Wayfarer or of IEWUM contributed to Lively's alleged harm. She claims she was injured primarily by an alleged smear campaign that took place well after Wayfarer and IEWUM were no longer responsible for supervising on-set behavior relating to the film.

## V.    LIVELY CANNOT PROVE AIDING AND ABETTING CLAIMS (COUNT 7)

Lively claims Abel, Nathan and TAG aided and abetted harassment and retaliation in violation of FEHA. SAC ¶¶408-415. This claim for secondary liability cannot stand because there is no primary liability: for reasons stated above, no actionable harassment or retaliation occurred. *See Schaldach v. Dignity Health*, 2015 WL 5896023, at *8 (E.D. Cal. Oct. 6, 2015) (summary judgment dismissing aiding and abetting claim where primary claim dismissed); *Hall v. Apartment Inv. & Mgmt. Co.*, 2011 WL 940185, at *8 n.8 (N.D. Cal. Feb. 18, 2011) (aiding and abetting claim requires proof of a "substantive violation of the FEHA"). The record is especially deficient as to any claim that Abel, Nathan, or TAG aided and abetted any harassment. That alleged conduct occurred during or before June 2023. 56.1 ¶145; Ex. 11 at 198-99; *see generally* SAC. Nathan's company TAG was not retained until August 2024, more than a year

later.  56.1 ¶259; Ex. 167.  And there is no evidence that Abel substantially assisted or

encouraged anyone to sexually harass Lively at any point in time, either.

## VI.    LIVELY'S CONTRACT CLAIMS (COUNTS 8 AND 9) FAIL

Lively's contract claims against IEWUM and Wayfarer (the "Entity Defendants") are

based on two putative "agreements"—what she calls the Actor Loanout Agreement ("ALA") and

the Contract Rider Agreement ("CRA")—but neither is enforceable by Lively.  The ALA was

expressly subject to multiple conditions precedent that were never fulfilled, and no final

agreement was ever reached or signed with respect to its material terms.  The CRA was, by its

terms, to be *incorporated into* the unexecuted ALA as an amendment.  56.1 ¶200; Ex. 117.  It

was therefore subject to the same unsatisfied conditions precedent and incomplete formation and

also was not independently supported by valid consideration.  And even if the ALA and CRA

were enforceable, Lively's claims would still fail for multiple reasons.

### A.  Lively Cannot Enforce Either Alleged Agreement

#### 1.   Lively Cannot Enforce the Actor Loanout "Agreement"

a.    "Any condition precedent in a contract must be performed before the promisor's

duty of performance arises."  *Thelen Reid Brown Raysman & Steiner LLP v. Marland*, 2007 WL

9812750, at *7 (N.D. Cal. Aug. 1, 2007) (citing Cal. Civ. Code §1436).  "[B]efore liability can

arise on a promise qualified by conditions expressed or implied in fact, such conditions must be

fulfilled."  *Morse v. Ted Cadillac, Inc.*, 146 A.D.2d 756, 756 (2d Dep't 1989).[8]

---

[8] The draft ALA contains a California choice-of-law provision, 56.1 ¶389; Ex. 264 at -628, but
such contractual provisions do not apply to the question of whether a valid contract was formed.
*Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012).  The choice-of-law question is
largely irrelevant here because Lively cannot show the ALA is valid or enforceable under either
New York or California law.  *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 547 (S.D.N.Y. 2018)
(New York and California apply "substantively similar law with respect to contract formation").

It is undisputed that the parties *never* executed the ALA (nor agreed on its final terms), and Lively *never* signed the inducement, each of which was a condition precedent to IEWUM's obligations. Nor were these express conditions waived. Indeed, IEWUM's representatives flatly *refused* to remove these conditions precedent when Lively's counsel suggested compliance had been waived. 56.1 ¶¶380, 382; Ex. 267 at -482; Ex. 218 at -565; Ex. 268 at -866. "[W]aiver of rights under a contract should not be lightly presumed." *Globecon Grp., LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 176 (2d Cir. 2006). IEWUM's behavior was a far cry from conduct "so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished," as is required to find a waiver of a contractual right. *Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 78 (Cal. Ct. App. 2017). If anything, Lively's counsel's repeated attempts to remove the conditions precedent from the draft ALA is compelling evidence Lively knew IEWUM had *not* waived compliance with the conditions precedent.

      b.     For substantially the same reasons, the draft ALA was never a binding agreement. "[W]hen it is clear that both parties contemplate that acceptance of a contract's terms would be signified in writing, the failure to sign the agreement means that no binding contract is created." *Goodworth Holdings, Inc. v. Suh*, 239 F. Supp. 2d 947, 958 (N.D. Cal. 2002), *aff'd* 99 F. App'x 806 (9th Cir. 2004); *Winston v. Mediafare Ent't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985) (same).

Here, the undisputed facts show the parties communicated an intent not to be bound absent full execution via (1) the clear condition precedent language in the draft ALA, which IEWUM refused to remove; (2) IEWUM's continued efforts to obtain Lively's signature through July 2024 and her continuing refusal to provide it as a manifestation of her acceptance; and (3) the "Entire Agreement" provision of the draft ALA (as well as the similar provision in the

Standard Terms).  56.1 ¶¶365, 367, 369, 380-82; *e.g.*, Ex. 263 at 57-58, 71, 82; Ex. 268 at -866; Ex. 264; *see, e.g.*, *Ciaramella v. Reader's Dig. Ass'n*, 131 F.3d 320 (2d Cir. 1997) ("The presence of such a merger clause is persuasive evidence that the parties did not intend to be bound prior to the execution of a written agreement.").

Nor do the facts establish that the draft ALA remained unexecuted simply as a matter of neglect or convenience after final terms were definitively agreed to by the parties.  To the contrary, the undisputed facts establish that the parties continued to negotiate material terms until July 2024, and no final agreement was ever reached.  56.1 ¶¶388, 390; Ex. 264 at -625; Heath Decl. ¶17-18.  "There is no meeting of the minds of the parties while they are still negotiating terms."  *The Aspect Grp. v. Movietickets.com, Inc.*, 2006 WL 5894608, at *8 (C.D. Cal. Jan. 24, 2006).  Even the "Sexual Harassment" provision, *i.e.*, the provision Lively claims was breached, remained subject to revisions when the last draft was exchanged.  56.1 ¶388; Ex. 264 at -625.

c.      To the extent any binding agreement enforceable by Lively was arguably formed, its terms were those set forth *in the Offer Letter*, Ex. 28, which was fully negotiated and agreed upon in May 2023, *not in the ALA*, the terms of which were never finalized.  IEWUM does not dispute that, consistent with the Offer Letter, it placed Lively's up-front fee into escrow and accepted Lively's services on the first phase of filming.  Critically, however, the Offer Letter does not contain the provisions that Lively says were breached.  56.1 ¶360; Ex. 28. Thus, whatever the validity of the Offer Letter and Lively's right to enforce it, that letter cannot salvage Lively's fatally defective breach claims, which stand outside the letter's plain text.

2.      <u>Lively Cannot Enforce The Contract Rider "Agreement"</u>

a.      Lively cannot enforce the CRA even though it was fully executed, because it was expressly made part of the ALA, and Lively's right to enforce the CRA was subject to the *same* unsatisfied execution conditions precedent and incomplete formation of that agreement.  The

CRA was not intended as a standalone agreement independent of the ALA. Rather, by its terms, it provided "*additional* terms and conditions in connection with Artist's services" and was "deemed *incorporated into* the [ALA]." 56.1 ¶200; Ex. 117 (emphasis added).

Nothing in the CRA suggests its provisions could be enforced independently of the unexecuted ALA. Moreover, the very existence of the CRA demonstrates that the parties were still negotiating the ALA and seeking to amend and supplement its terms. The CRA's plain text shows it was intended to be integrated as part of any final ALA, but there is more. The conduct of Lively's counsel confirms the parties' understanding that, even though the CRA was finalized first, the CRA was to be an ancillary *amendment* to the unfinalized, unexecuted ALA: after the CRA (which the negotiators referred to as a "side-letter") was finalized, the parties renewed their efforts to finalize the ALA, and Lively's counsel continued to edit the Standard Terms to be included therein, stating such terms were to be incorporated into the "Underlying Agreement" "*as amended*." 56.1 ¶379; Ex. 266 at 37 (emphasis added).

b.    The CRA is also unenforceable as an independent agreement because it is not supported by any valid consideration from Lively. The CRA is silent with respect to any further obligation or forbearance on her behalf. The only arguable consideration supporting the CRA was Lively's promise to fulfill her preexisting obligation, under the terms of the Offer Letter, to perform as Lily in the film, for which IEWUM had *already* paid Lively's full up-front fee into escrow. "A promise to perform a legal obligation is not a sufficient consideration for a contract based thereon." *Shipley Co. v. Rosemead Co.*, 100 Cal. App. 706, 714 (Cal. Ct. App. 1929); *Goncalves v. Regent Int'l Hotels Ltd.*, 58 N.Y.2d 206, 220 (1983) (same). Nor can past consideration support a new contractual obligation. *Passante v. McWilliam*, 53 Cal. App. 4th 1240, 1247 (Cal. Ct. App. 1997). The plain language of the CRA confirms that the purported

42

consideration for the deal was "to cause Artist to render acting services on the Picture." 56.1 ¶201; Ex. 117. But that was the exact same obligation IEWUM had *already* paid Lively to perform months earlier (by placing her fee into her WME trust account), and to the extent Lively reneged on her obligations without returning her fee, she would have been liable for breach of the Offer Letter or, at minimum, for unjust enrichment.

The CRA's boilerplate recitation that "good and valuable consideration" was exchanged is beside the point, as such recitals cannot overcome an absence of real-world consideration. *See, e.g.*, *Patterson-Ballagh Corp. v. Byron Jackson Co.*, 145 F.2d 786, 790 (9th Cir. 1944). Although Lively's counsel vaguely alluded in email correspondence to the possibility of "forego[ing] a more formal HR process" when she initially proposed the seventeen "Protections for Return to Production," she was explicit that Lively was not, in fact, agreeing to forgo—or even delay—any claim, and instead "reserve[d] all legal rights." 56.1 ¶162; Ex. 103. Moreover, the CRA itself included no term embodying a promise that Lively would forgo or delay any claim. Ex. 117. This sort of illusory promise, which is "so insubstantial as to impose no obligation," is not valid consideration. *WCA Holdings III, LLC v. Panasonic Avionics Corp.*, 704 F. Supp. 3d 473, 495 (S.D.N.Y. 2023).

### B. Even If The ALA And CRA Were Enforceable Against The Entity Defendants, Lively's Breach Claims Would Fail As A Matter Of Law

#### 1. The Entity Defendants Did Not Engage In Conduct Rising To A Breach

Both of Lively's breach claims turn on the contention that IEWUM, through its agents, sexually harassed Lively and then retaliated against her for raising concerns. As discussed above, Lively does not come close to establishing a genuine issue of fact as to any such claim.

#### 2. The Entity Defendants' Alleged Conduct Cannot Constitute A Breach Because Lively Failed To Provide Notice And An Opportunity To Cure

Lively's breach claims also fail because she failed to provide thirty days' notice and an

opportunity to cure, as required by the ALA's "Company's Breach" provision, which also governs the incorporated CRA.  That provision states that "no act or omission of Company [IEWUM] hereunder shall constitute an event of Default or breach of this Agreement unless Artist [Lively] shall first notify Company in writing setting forth such alleged breach or Default and Company shall not cure the same within thirty (30) days after receipt of such notice."[9]  56.1 ¶368; Ex. 263 at 77.  A "notice-and-cure provision of a contract will serve as a bar to a claim for breach of contract, where the provision was clearly stated in the contract that was allegedly breached."  *King v. Navy Fed. Credit Union*, 699 F. Supp. 3d 864, 869 (C.D. Cal. 2023).

Lively never provided the requisite notice and opportunity to cure before asserting her breach of contract claims.  To be sure, Lively's attorneys sent a cease-and-desist letter on December 20, 2024 claiming that Wayfarer and others breached the CRA.  But that letter was not addressed to IEWUM (as required by the contractual notice provision) and did not mention any alleged breach of the ALA.  56.1 ¶391; Ex. 271 at -142.  In any case, Lively filed her breach claims on December 31, 2024, only *eleven* days after sending the cease-and-desist letter, *see* Dkt.1—far less than the contractually mandated thirty-day period.  *Cf. Progeny Ventures, Inc. v. W. Union Fin. Servs., Inc.*, 752 F. Supp. 2d 1127, 1132 (C.D. Cal. 2010) ("If the contractual language is clear and explicit, such language governs.").  The only *arguably* relevant "notice" Lively delivered with respect to the ALA was the November 2023 email in which her counsel presented IEWUM's counsel with the "Protections for Return to Production."  But that email did not "set[] forth" any "alleged breach," as required under the ALA's notice-and-cure provision.  It

---

[9] As discussed, *supra* Point VI.A.2, the ALA's notice and cure provision also covers the CRA, which was incorporated into the ALA.

was therefore insufficient under the language of the putative contract. And as discussed below, any arguable breach alleged in that email was cured.

By its terms, the ALA and incorporated CRA provide that no breach can arise absent notice and an opportunity to cure. 56.1 ¶368; Ex. 263 at 77. As such, "[t]he provision of the agreement that defines a breach is not ambiguous. The clear and explicit meaning of the provision is that a party may be held in breach of the agreement *only* after receiving written notice of breach from the other party…and failing to cure the breach within 30 days of receiving that notice." *Silverado Modjeska Recreation & Park Dist. v. Cty. of Orange*, 197 Cal. App. 4th 282, 313 (Cal. Ct. App. 2011). Because "[t]here is nothing in the record showing [Lively] provided [IEWUM] with such notice of breach, or that [she] accorded [IEWUM] 30 days to cure the alleged breach as expressly required under the agreement," there was no cognizable breach by the Entity Defendants. *Id.*

### 3. Even If "Notice" Were Provided Via Lively Counsel's November 2023 Email, The Entity Defendants Indisputably Cured Any Potential Breach Based On Alleged "Sexual Harassment"

It is undisputed that when work resumed after the writers' strike and following receipt of Lively's list of "protections," there was no recurrence of any alleged impropriety: work on the set proceeded without issue or incident, without a single concern raised about even a single item that might give rise to a potentially hostile work environment. *See supra* Point I.C. As a result, any source of discomfort that could arguably give rise to a claim for sexual harassment had been completely cured. Per the notice-and-cure provision underlying both the ALA and CRA, any noticed sexually-harassing conduct, having been cured, cannot constitute a breach. While Lively claims, separately, that the ALA and CRA were breached based on acts of "retaliation," there was no actionable retaliation, let alone any temporal or causal nexus between

the alleged retaliation and any concerns Lively had raised, in an altogether different context and

at an altogether different stage, many months before.  *See supra* Point II.

4.  Even If There Was A Breach By IEWUM, Wayfarer Would Not Be Liable
Because Lively Cannot Establish Alter Ego Liability

Lively's breach claims against Wayfarer suffer from an even more obvious defect:

Wayfarer was not a party to the putative agreements and therefore cannot be liable for any

breach thereof.  "Under California law, only a signatory to a contract may be liable for any

breach."  *Clemens v. Am. Warranty Corp.*, 193 Cal. App. 3d 444, 452 (Cal. Ct. App. 1987).

Lively's implicit contention that Wayfarer is liable for breach as IEWUM's alter ego (*see*

SAC ¶¶419, 428) is unavailing, because "a member or manager of an LLC … cannot be held

liable for the 'debts, obligations, or other liabilities' of the LLC, 'whether arising in contract,

tort, or otherwise,' solely by reason of his status as a member or manager."  *Celebrity Chefs*

*Tour, LLC v. Macy's Inc.*, 2014 WL 1660724, at *4 (S.D. Cal. Apr. 25, 2014) (quoting Cal.

Corp. Code §17703.04(a)).  Rather, "the party seeking to have the corporate entity disregarded

bears the burden of proving that the alter ego theory should be applied."  *Guifu Li v. A Perfect*

*Day Franchise, Inc.*, 281 F.R.D. 373, 403 (N.D. Cal. 2012).

"Alter ego is an extreme remedy and is sparingly used.  Courts apply the doctrine when

the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other

wrongful or inequitable purpose."  *Tatung Co. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1175 (C.D.

Cal. 2016).  Lively cannot prove that Wayfarer should be liable as IEWUM's alter ego.

*First*, no "inequitable" result would follow from recognizing the corporate form.

Establishing inequity requires "direct evidence of specific manipulative conduct" which must

include "some conduct amounting to bad faith."  *Tatung Co.*, 217 F. Supp. 3d at 1176.  "Without

something more, simply availing oneself of the protections provided by corporate charters is not

misconduct sufficient to justify a court in finding a corporation to be an alter ego." *Id.*  There

was no manipulative conduct by Wayfarer or IEWUM here.  Lively was represented by

sophisticated entertainment counsel during her negotiations with IEWUM, and her counsel knew

that the contractual counterparty would be a "designated production service entity" (ultimately,

IEWUM), not Wayfarer itself—as is customary in the film industry.  56.1 ¶¶13-14; Heath Decl.

¶¶7-8.  Indeed, it was Lively's counsel who redlined the Offer Letter to substitute IEWUM as

"Producer," whereas the initial draft had defined "Producer" as "Wayfarer Studios or its

designated production service entity."  56.1 ¶355; Exs. 260-61.  Any suggestion that it was

manipulative or "bad faith" for IEWUM to be the counterparty is also belied by *Lively's* own use

of a loanout company—Blakel, Inc.—as counterparty to the alleged agreements.

 *Second*, Lively cannot establish IEWUM and Wayfarer had "such unity of interest and

ownership that the separate personalities of the corporation and the [member] no longer exist."

*Guifu Li*, 281 F.R.D. at 403.  IEWUM maintained its own separate bank accounts and funds, had

its own counsel and independently engaged the cast and crew of the film, only a few of whom

were Wayfarer employees.  56.1 ¶15; Heath Decl. ¶10.  Although Wayfarer and its employees

provided some support to IEWUM on the film, that is common in the film industry, and IEWUM

paid Wayfarer ███████ for those services ███████████████████████████████████

███████████.  56.1 ¶16; Heath Decl. ¶11; Ex. 23 at -02.

### C.  Lively's Alleged Damages For Breach Are Barred By The "Limitations On Damages" Provision Of The ALA And Are Not Cognizable In Any Case

 Even if Lively could establish a triable fact on her breach of contract claims, most, if not

all her asserted damages would be barred by the ALA's "Limitations on Damages" clause, which

excludes "consequential and/or incidental and/or special and/or punitive damages."  Although

California law prohibits pre-dispute "limitations on damages for willful injury to the person or

property of another," *New England Country Foods, LLC v. VanLaw Food Prods., Inc.*, 17 Cal.

5th 703, 712 (2025), that principle "does not preclude parties from limiting their liability for pure

breaches of contract," like those at issue here, *id.* at 717.[10]

Here, little, if any, of Lively's asserted injury consists of "general damages"—*i.e.*,

damages that flow "directly and necessarily from a breach of contract, or that are a natural result

of a breach." *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960,

968 (2004) (citing Cal. Civ. Code §3300). Rather, nearly all of Lively's asserted damages are

paradigmatic consequential, incidental, or special damages—*i.e.*, "secondary or derivative losses

arising from circumstances that are particular to the contract or to the parties." *Id.*

Lively claims, for instance, that Defendants' conduct caused associated businesses to

suffer millions of dollars in "lost profits." She also claims tens of millions more in lost profits

(which Lively refers to as "lost earnings") from the speculative loss of entertainment deals with

third parties. *See Int'l Gateway Exch., LLC v. W. Union Fin. Servs., Inc.*, 333 F. Supp. 2d 131,

149 (S.D.N.Y. 2004) ("Lost earnings are, of course, a component of lost profits."). Lively also

claims tens of millions from "reputational harm," which appears to be simply double counting of

her alleged future lost profits. 56.1 ¶394; Ex. 272 at 41.

None of these damages flow directly or necessarily from the Entity Defendants' alleged

breaches. They are instead "secondary or derivative losses" based on Lively's particular

circumstances—namely, her expectation of obtaining income from her affiliated business and

subsequent entertainment-related contracts with third parties. *Lewis Jorge*, 34 Cal. 4th at 968.

Under California law, lost profits can constitute direct damages *only* where the profits

---

[10] Moreover, the limitation on liability in the ALA should not be treated as "pre-dispute" because
it remained in the draft agreement *after* Lively raised the concerns resulting in the execution of
the CRA, and the parties subsequently continued to negotiate terms.

lost were due under the breached contract itself, not "future or unidentified contracts." *JH Kelly,*

*LLC v. AECOM Tech. Servs., Inc.*, 660 F. Supp. 3d 840, 848 (N.D. Cal. 2022). "[Lively] does

not contend that any of [her] lost profits are monies owed by [Defendants] under the contract.

Thus, the lost profits [Lively] seeks are best characterized as consequential, not general

damages" and are expressly barred by the ALA. *Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d

874, 900 (N.D. Cal. 2011); *see also Int'l Gateway Exch.*, 333 F. Supp. 2d at 149 ("[L]ost profits

from a business venture are a prime example of consequential or special damages."). Thus,

Lively's "lost profits," "lost wages," and "reputational harm" are all consequential, incidental, or

special damages and barred under the "Limitations on Damages" provision.

Lively's only alleged damages that do not fall into the bucket of consequential/special/

incidental/punitive damages are her alleged "[p]ain and suffering, physical pain, and

humiliation." 56.1 ¶394; Ex. 272 at 41. It is unclear whether Lively contends these are proper

damages for her breach claims (as opposed to her tort claims). To the extent she does, her

contention is barred because such damages are not available for breach of contract. *See Gibson

v. Off. of Cal. Atty. Gen.*, 561 F.3d 920, 929 (9th Cir. 2009). "The invariable rule is pronounced

by a legion of cases that damages are not recoverable for mental suffering or injury to reputation

resulting from breach of contract." *Frangipani v. Boecker*, 64 Cal. App. 4th 860, 865 (Cal. Ct.

App. 1998) (collecting cases). Thus, Lively has failed to satisfy damages, which is a necessary

element for breach of contract. *See, e.g.*, *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305,

1352 (Cal. Ct. App. 2009).

### D. Lively's Contract Claims Are Improperly Duplicative

Even if Lively's contract claims had merit, they would be subject to dismissal because

they merely duplicate her harassment and retaliation claims. Tort claims generally are not

duplicative of contract claims *because tort claims offer a separate measure of recovery*. *Guz v.*

*Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 352 (2000).  However, a claim is duplicative if it seeks the same damages or relief already sought by another claim.  Here, however, Lively's theory of damages for her contract claims and her statutory/tort claims are entirely overlapping.  Lively "is not entitled to double recovery (*i.e.*, tort damages plus contract damages) for the same injury by pleading both tort and breach-of-contract contract claims."  *W. Pac. Elec. Co. Corp. v. Dragados/Flatiron*, 534 F. Supp. 3d 1209, 1254 (E.D. Cal. 2021).  Because she cannot establish any independent damages for the alleged breach, her contract claims should be dismissed.

## VII.    THE DEFAMATION AND FALSE LIGHT CLAIMS (COUNTS 12 AND 14) FAIL

### A.  New York Law Applies To Lively's Defamation And False Light Claims

"A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012).  "Under New York choice-of-law rules, 'the first step … is to determine whether there is an "actual conflict"' between the rules of the relevant jurisdictions."  *Kinsey v. New York Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021).  Here, there are conflicts.  New York does not recognize a cause of action for false light invasion of privacy.  New York and California defamation law, while similar, also conflict in certain respects.  *See Lively v. Wayfarer Studios LLC*, 786 F. Supp. 3d 695, 734 (S.D.N.Y. 2025).

In tort cases, New York "applies the law of the state with the most significant interest in the litigation."  *Kinsey*, 991 F.3d at 176.  In a multistate defamation case, "the plaintiff's domicile will usually have the most significant relationship to the case, and its law will therefore govern."  *Id.* at 177.  This is the presumptive rule, which is overcome only if "some other state has a more significant relationship" after taking into account "where [the] plaintiff suffered the greatest injury; where the statements emanated and were broadcast; where the activities to which the allegedly defamatory statements refer took place; and the policy interests of the states whose

law might apply." *Id.* at 177.  All factors support application of New York law.

*First*, Lively resides in New York, SAC ¶56, and "as New York law recognizes, a "plaintiff's home state is where a plaintiff's reputation is most likely damaged."  *Id.* at 178; *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 545 (2d Cir. 1999); *Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, 2007 WL 4820968, at *4 (S.D.N.Y. Sept. 18, 2007) (New York's choice of law rules "presume[ ] [a] relationship between domicile and injury").  This is true even where the complained of statements are published multistate.  *Davis v. Costa–Gavras*, 580 F. Supp. 1082, 1091 (S.D.N.Y. 1984) (quoting Restatement (Second) of Conflict of Laws §150(2) (1977)).  While Lively complains about statements "heard, viewed, or read millions of times around the world," SAC ¶461, the harm she complains of is personal harm in New York, including to her reputation in the community as well as "grief and anxiety."  SAC ¶¶438-39, 461-63.  Lively also "filed suit in New York," *Kinsey v. New York Times Co.*, 2020 WL 1435141, at *5 (S.D.N.Y. Mar. 23, 2020), *aff'd,* 991 F.3d 171 (2d Cir. 2021), based on allegations that "all Defendants transact and solicit business within the State, have committed the tortious acts described in this Complaint within the State, and/or have committed such acts outside of the State *causing injury to Plaintiff within the State*."  SAC ¶72 (emphasis added).

*Second*, the complained of statements largely emanated from New York.  Lively's allegations are largely based on statements disseminated through publications and other media outlets headquartered or based in New York, including the *New York Post*, SAC ¶270, *The New York Times*, *USA Today*, *People* magazine, *Page Six*, and The Megyn Kelly Show, SAC ¶299. "New York has a strong interest in establishing defamation standards for media outlets domiciled in the state[.]"  *Kinsey*, 2020 WL 1435141, at *5 (collecting cases).

*Third*, the allegedly defamatory statements refer to activities in New York and its

environs.  Lively alleges Defendants launched a coordinated campaign to cast her in a false light during the publicity and promotion of the film and thereafter, and points to statements related to conduct on set.  The film was primarily shot in New Jersey, and the premiere and some pre-production took place in New York.  56.1 ¶¶60, 208, 221, 241; *e.g.*, Ex. 24 at 261, 274-75; Ex. 119.  Many of the statements concern responses to the *New York Times* article about the dispute or the allegations filed in this Court.  The only relation to California is the general involvement of Hollywood's entertainment industry and the fact that two uneventful days of shooting took place there after Lively's concerns were resolved; that certain—but not all—Defendants' residence there; and that Lively filed an administrative complaint there after the fact.  This fact pattern "favors New York … to a greater degree here than in *Kinsey*, where the underlying events had no connection to New York whatsoever."  *Lively*, 786 F. Supp. 3d at 737 n.22.

*Finally*, New York clearly "has an interest in protecting its citizens"—like Lively—"from defamatory conduct," an interest not outweighed by any other state's.  *Kinsey*, 991 F.3d at 178.

## B.  Lively's False Light Claim (Count 12) Fails

### 1.  The False Light Claim Cannot Proceed

Because New York law applies and "New York does not recognize the tort of false light invasion of privacy," summary judgment on that claim must be entered for defendants.  *DeIuliis v. Engel*, 2021 WL 4443145, at *11 (S.D.N.Y. Sept. 27, 2021).

### 2.  Lively Has No Standing To Bring A False Light Claim

Even if California Law applies, Lively lacks standing.  The false light claim arises from Article I, §1 of the California Constitution.  SAC ¶¶434-40.  But the California "Constitution expressly grants *Californians* a right of privacy," and thus does not apply to Lively, who resides in New York.  *Williams v. Superior Court*, 3 Cal. 5th 531, 552 (2017) (emphasis added); *Henderson v. Chicago Cubs Baseball Club, LLC*, 2018 WL 3326682, at *1 (C.D. Cal. May 24,

2018) (California Constitution's right of privacy does not apply to non-residents); *Buzayan v. City of Davis*, 927 F. Supp. 2d 893, 902-03 (E.D. Cal. 2013) (the right applies to "residents"). Because Lively is not a "California resident," SAC ¶ 56, she "may not bring an invasion of privacy claim under the California Constitution." *Collins v. Conifer Value-Based Care*, 2025 WL 1140788, at *7 (C.D. Cal. Feb. 28, 2025).

**C. Lively's Defamation Claim (Count 14) Fails As A Matter Of Law**

Nor can Lively establish a triable issue for her defamation claim. Lively generally contends that Wayfarer, Baldoni, and Heath (the "Defamation Defendants"), through their agents, published false statements asserting that Lively's allegations of harassment filed with the California CRD and this Court were "false" and "fabricated." SAC ¶141. That is, Lively's defamation claim is, by definition, based entirely on statements *about the litigation* published *after* litigation commenced. This claim fails for multiple reasons.

1. Lively Cannot Prove Falsity Or Malice

Lively's defamation claim fails because it is premised on the conceit that her harassment and retaliation allegations are true and any contrary statements false. But as explained above, *supra* Points I and II, Lively's claims and allegations do not rise to the level of harassment, and no retaliation for complaints of harassment occurred. "It is axiomatic that truth is an absolute, unqualified defense to a civil defamation action…and that substantial truth is all that is required." *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 281 (S.D.N.Y. 2016). The Defamation Defendants' statements denying the truth of Lively's allegations and asserting, for example, that the claims "are completely false," SAC ¶451, were true, or at minimum, substantially true. Lively's claim therefore fails as a matter of law.

Just as significantly, Defendants' alleged statements denying the truth and validity of Lively's claims and allegations were not statements of objective fact and therefore cannot

constitute defamation as a matter of law.  The Second Circuit confirmed just last week that "[w]hether conduct rises to the level of harassment—and what is meant by the term—is often a subjective inquiry that permits differing opinions among those involved in, or aware of, the alleged conduct."  *Coleman v. Grand*, 2025 WL 3058366, at *5 (2d Cir. Nov. 3, 2025).

Any ultimate conclusion about whether conduct amounted to sexual harassment or retaliation "is a subjective one – or a legal one," *id.* at *6, and statements expressing such conclusions therefore cannot, without more, constitute actionable defamation under New York law, *Springer v. Almontaser*, 75 A.D.3d 539, 541 (2d Dep't 2010) (dismissing defamation claim because statement that defendant "was stalked and harassed was not an actionable statement of objective fact because it did not have a precise, readily understood meaning"); *see also McNamee v. Clemens,* 2013 WL 3968740, at *3 (E.D.N.Y. July 31, 2013) ("General denials of accusations are not actionable as defamation.  Only statements of facts, or 'mixed opinions' that give the impression that the speaker has information, known only to him, which support his opinion can serve as the basis of a defamation claim.").

Statements about whether or not there was any "smear campaign" are, for the same reason, not actionable: "smear campaign" lacks any precise, definitive meaning, such that statements denying the existence of such a campaign reflect constitutionally protected opinion. *See, e.g.*, *Pease v. Tel. Pub. Co.*, 121 N.H. 62, 66 (1981) (letter asserting article was "journalistic smear" was protected opinion).  Likewise, assertions that, for example, Lively was pushing "her own self-serving and selfish vendetta," and her claims were "outrageous and intentionally salacious," SAC ¶451, are, likewise, "precisely the sort of opinion statement that cannot be objectively proven and is therefore not an actionable basis for a defamation claim," *Coleman*, 2025 WL 3058366, at *5.

For substantially the same reasons, Lively cannot prove the requisite malice.  "[A]s a public figure for purposes of First Amendment analysis," Lively must "demonstrate with clear and convincing evidence that the defendant[s] realized that [their] statement was false or that [they] subjectively entertained serious doubt as to the truth of [their] statement."  *Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 230 (2d Cir. 1985).  Lively contends that the Defamation Defendants knew her allegations were accurate because "they signed the [CRA]" and "knew that Ms. Lively was not alone."  SAC ¶454.  The CRA was not, by its terms, an acknowledgement of any past conduct; it was expressly forward-looking.  56.1 ¶204; SAC Ex. B.  But even accepting Lively's spin on the document, it shows, at most, that Defendants knew "complaints" were *raised*, not that the "complaints" were *true.*

### 2.  The Allegedly Defamatory Statements Were Absolutely Privileged

Lively's defamation claim also fails because it is based on statements that are absolutely privileged under New York law.[11]  New York's fair report privilege protects any "fair and true report of any judicial proceeding, legislative proceeding or other official proceeding." N.Y. Civ. Rights Law §74; *see also Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 520 (S.D.N.Y. 2013) (the fair report privilege is "absolute.").  "New York courts adopt a liberal interpretation of the fair and true report standard…so as to provide broad protection to news accounts of judicial proceedings."  *Lively*, 786 F. Supp. 3d at 774.

Here, the post-litigation statements Lively claims were defamatory *all* merely repeat allegations Defendants had already asserted or would soon assert in this action, namely that

---

[11] These statements would also be privileged in California.  *See* Cal. Civ. Code §47(d); *see also Healthsmart Pac., Inc. v. Kabateck*, 7 Cal. App. 5th 416, 431 (Cal. Ct. App. 2016), *as modified* (Jan. 10, 2017) ("The fair report privilege confers an absolute privilege on any fair and true report in, or a communication to, a public journal of a judicial proceeding, or anything said in the course thereof.").

Lively's allegations of harassment and retaliation were false and self-serving and could not constitute actionable claims. *Compare, e.g.*, SAC ¶451 ("It is shameful that Ms. Lively and her representatives would make such serious and categorically false accusations….") *with* Defendants' FAC, Dkt.50 ¶38 (describing "Lively's troubling pattern of manipulation and lies"); *cf. Lively*, 786 F. Supp. 3d at 761 ("[T]he fair report privilege applies to a party who communicates a complaint to the press before that complaint is publicly filed.").[12]

Moreover, permitting a defamation claim to proceed to trial based on an attorney's blanket denial of serious accusations against his clients would raise serious First Amendment concerns. For that reason and others, "New York courts have extended the [fair report] privilege to comments made by attorneys to the press in connection with the representation of their clients." *McNally v. Yarnall*, 764 F. Supp. 853, 856 (S.D.N.Y. 1991) (collecting cases); *see also Wexler v. Allegion (UK) Ltd.*, 374 F. Supp. 3d 302, 312 (S.D.N.Y. 2019) (applying privilege to lawyer's press release that "essentially summarizes or restates the allegations of the complaint" even though press release used "rhetorical hyperbole"); *Branca v. Mayesh*, 101 A.D.2d 872, 873 (2d Dep't 1984) ("While statutory predecessors to § 74 limited the privilege to members of the media who acted without malice, the privilege now extends to 'any person', whether or not he acts with malice") *aff'd*, 63 N.Y.2d 994 (1984); *Ford v. Levinson*, 90 A.D.2d 464, 465 (1st Dep't 1982) (attorney's remarks to newspaper that were similar to allegations set forth in earlier pleading were privileged as a matter of law). Here, the allegedly defamatory publications all "essentially summarize[] or restate[]" the Defendants' litigation position, as expressed in their filings, and are thus privileged.

---

[12] One the statements Lively claims is defamatory appears verbatim in Defendants' Complaint. *Compare, e.g.*, SAC ¶451 *with* Defendants' FAC ¶294 (alleging exact same statement).

## VIII.   LIVELY'S CONSPIRACY CLAIM (COUNT 15) FAILS

Lively's conspiracy claim fails for several independent reasons.  *First*, there can be no claim of conspiracy where, as here, there is no actionable underlying tort.  *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (1986); *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 123 (2d Cir. 1981); *McSpedon v. Levine*, 158 A.D.3d 618, 621 (2d Dep't 2018).[13] *Second*, even if Lively had a viable tort claim, her conspiracy claim would be entirely duplicative of it and should be dismissed on that ground as well.  *Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc.*, 2007 WL 1040809, at *26 (S.D.N.Y. Apr. 4, 2007), *aff'd*, 312 F. App'x 433 (2d Cir. 2009). *Third*, outside of tort liability, no claim for conspiracy will lie.  "[A] breach of contract may not serve as [the] basis for a civil conspiracy claim."  *Roche Freedman LLP v. Cyrulnik*, 703 F. Supp. 3d 404, 425 n.15 (S.D.N.Y. 2023) (citing *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1317 (S.D. Fla. 2014)); *John's Insulation, Inc. v. Siska Const. Co.*, 774 F. Supp. 156, 162 (S.D.N.Y. 1991).  Nor does New York civil conspiracy law extend to Lively's federal and state statutory claims.  *See, e.g.*, *Medvey v. Oxford Health Plans*, 313 F. Supp. 2d 94, 99 (D. Conn. 2004) ("Because…plaintiff has asserted other statutory mechanisms by which she may obtain a remedy, her common law claim of conspiracy…is preempted by such acts.").

## IX.   THERE IS NO BASIS FOR LIABILITY AGAINST DEFENDANT SAROWITZ

Lively alleges only two claims against Sarowitz: false light and conspiracy.  SAC ¶¶434-40, 466-69.  For the reasons discussed, these claims fail.  Even if these claims could proceed against any defendant, no reasonable jury could find Sarowitz liable.  His exceptionally limited involvement confirms why, and the record is devoid of any facts implicating him in either claim.

---

[13] There is no conflict between California and New York civil conspiracy law.  *See Off. Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 2002 WL 362794, at *13 (S.D.N.Y. Mar. 6, 2002) (concluding "California law is consistent in all material respects").

Sarowitz is the majority investor in Wayfarer Studios and provides the studio with financing. 56.1 ¶3; Ex. 6 at 98, 103, 177. He played no role in the production or marketing strategy of the film, visited the set only twice, and played no role overseeing press concerning the film or this dispute. 56.1 ¶¶17, 106, 307; Ex. 6 at 120-21, 230, 146. Lively's claims against him are predicated on overblown comments that are taken out of context. For example, Lively alleges Sarowitz stated he would "spend $100 million to ruin" Lively and her family, but the discovery record confirmed Sarowitz did not make any such comment and at all times was focused only on defending himself and the studio. 56.1 ¶¶317-22; Ex. 142 at 290-300. Lively also quotes a surreptitious recording of Sarowitz in which he states, "there will be two dead bodies when I'm done." But as that recording makes clear, Sarowitz was speaking only in metaphorical terms. Left out of Lively's allegations is Sarowitz's immediate clarification that he meant "not dead, but … you're dead to me." 56.1 ¶331; Ex. 246 at 36-37. Sarowitz was focused solely on "mak[ing] sure the studio [was] protected" from Lively's attacks and not attacking Lively, and he disclaimed any intent to harm Lively as "not the world I want to live in." *Id.* Such comments, without any evidence of any specific follow-up conduct, are insufficient to support any of the claims in which Sarowitz is named.

## X.    SEVERAL ASPECTS OF LIVELY'S DAMAGES CLAIMS MUST BE DISMISSED

### A. Lively Lacks Standing To Assert Claims for Lost Profits Or Royalties

Lively claims tens of millions of lost profits associated with two non-parties, "Blake Brown Beauty" and Betty B Holdings LLC, as well as royalties flowing from those entities. 56.1 ¶394; Ex. 272 at 41. Lively is merely an indirect shareholder of these entities and not the direct beneficiary of any royalties flowing therefrom. As such, she has no basis to claim any such damages and or to recover losses allegedly suffered by these entities.

A shareholder "cannot sue in h[er] individual capacity to redress wrongs inflicted upon a corporation in which [s]he holds stock." *Gray Gables Corp. v. Arthur*, 2022 WL 905393, at *1 (2d Cir. Mar. 29, 2022). Courts routinely reject claims like Lively's in which individuals seek redress for corporate damages, including lost profits. *See Jones v. Niagara Frontier Transp. Auth. (NFTA)*, 836 F.2d 731, 736 (2d Cir. 1987); *Karkare ex rel. JN v. Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers Loc. 580*, 140 F.4th 60, 65 (2d Cir. 2025); *Liberty Sackets Harbor LLC v. Vill. of Sackets Harbor*, 776 F. App'x 1, 3 (2d Cir. 2019).

Lively and the businesses she works with are not interchangeable. "An individual lacks standing to sue when the alleged injury is based on an injury to a corporate entity." *Ali v. NYC Env't Control Bd.*, 670 F. App'x 26, 27 (2d Cir. 2016). Lively does not even have a direct ownership interest in either "Blake Brown Beauty"—which is just a brand, and not a standalone entity—or in that brand's parent company, Family Hive LLC, or in Betty B Holdings, LLC. Her purported interest in those entities exists through her interest in another non-party, LOL HATA LLC. *See* 56.1 ¶402; *e.g.*, Ex. 273 at 58; Ex. 276. Any royalty payments similarly go to non-party LOL HATA LLC, not to Lively. 56.1 ¶403; Exs. 275 at 246; Ex. 277-79.

### B. Lively Cannot Recover Speculative Lost Profits

Even if Lively had standing to seek damages on behalf of these distinct corporate entities (she does not), the Court should still reject her demand for lost profits. Lost profit damages are too speculative where, as here, they arise from entirely new business ventures, without any proven record of financial performance.

Damages for lost profits must be proved with "reasonable certainty." *Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 907-08 (2d Cir. 1998). They may "not be merely speculative, possible or imaginary." *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000). In the case of new business ventures, evidence of lost profits "receives greater scrutiny because there is no

track record upon which to base an estimate." *Id.* at 172.  Not surprisingly, "courts routinely have rejected lost profit claims asserted with respect to unproven businesses."  *Evemeta, LLC v. Siemens Convergence Creators Corp.*, 2020 WL 6746630, at *9 (Sup. Ct. N.Y. Cty. Nov. 17, 2020).  That is because with any new business "there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty." *Kenford Co., Inc. v. Erie Cty.*, 493 N.Y.2d 257, 261 (1986).

Blake Brown Beauty launched just days before the film's premiere.  56.1 ¶397; Ex. 273 at 35, 50.  As such, there is no basis upon which its lost profits can be calculated with reasonable certainty.  *See Digital Broadcast Corp. v. Ladenburg, Thalmann & Co.*, 63 A.D.3d 647, 648 (1st Dep't 2009); *SG Blocks, Inc. v. Osang Healthcare Co. Ltd.*, 2022 WL 16787936, at *4 (E.D.N.Y. Sept. 22, 2022) ("[B]oth New York courts and courts in the Second Circuit have 'dismissed claims for lost profits where the pleadings suggest that an award of lost profits would require an unreasonable level of speculation.'").  And although Betty B Holdings was formed in 2021, Lively claims losses only in connection with that entity's "Betty Booze" brand, which launched in 2023.  56.1 ¶401; Ex. 274 at 27.

## CONCLUSION

For the foregoing reasons and those stated in Defendants' Motion For Judgment on the Pleadings, the Court should grant summary judgment in the Wayfarer parties' favor on Lively's claims.

60

Dated:  November 12, 2025
       New York, New York

/s/Alexandra A.E. Shapiro
SHAPIRO ARATO BACH LLP
Alexandra A. E. Shapiro
Jonathan Bach
Alice Buttrick
Jason A. Driscoll
1140 Avenue of the Americas, 17th Floor
New York, NY 10036
Tel: 212-257-4881
ashapiro@shapiroarato.com
jbach@shapiroarato.com
abuttrick@shapiroarato.com
jdriscoll@shapiroarato.com

LINER FREEDMAN TAITELMAN +
COOLEY, LLP
Bryan J. Freedman (pro hac vice)
Ellyn S. Garofalo (pro hac vice)
Theresa M Troupson (pro hac vice)
Summer Benson (pro hac vice)
Jason Sunshine
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Tel: (310) 201-0005
bfreedman@lftcllp.com
egarofalo@lftcllp.com
ttroupson@lftcllp.com
sbenson@lftcllp.com
jsunshine@lftcllp.com

MEISTER SEELIG & FEIN PLLC
Mitchell Schuster
Kevin Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
ms@msf-law.com
kaf@msf-law.com

AHOURAIAN LAW
Mitra Ahouraian (pro hac vice)
2029 Century Park East, 4th Floor
Los Angeles, CA 90067
Tel. (310) 376-7878
mitra@ahouraianlaw.com

*Counsel for the Wayfarer Parties*