**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY, | |
| Plaintiff, | |
| v. | No. 1:24-cv-10049-LJL |
| WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, JENNIFER ABEL, JED WALLACE, and STREET RELATIONS INC., | |
| Defendants. | |

**THE WAYFARER PARTIES' AMENDED RULE 56.1 STATEMENT**
**OF UNDISPUTED MATERIAL FACTS**

## <u>TABLE OF CONTENTS</u>

A.    Baldoni Conceived And Originated A Project To Develop "It Ends With Us" Into A Film To Broaden Awareness Of Domestic Violence ........................................ 1

B.    Lively Committed To A Role With Adult And Sexual Themes................................... 4

C.    Lively Exercised Substantial Control From The Outset ................................................ 7

D.    Lively Raised Concerns About Her Physical Appearance To Baldoni And Others Before Filming Begins ........................................................................................ 8

E.    Before Filming Began, Lively Used Famous Friends To Press Baldoni To Accept Her Revisions To The Script ........................................................................... 9

F.    Defendants Took Steps To Create A Safe Set Prior To Filming ............................... 10

G.    No Intimate Scenes Involving Lively Were Shot In The First Phase Of Filming ...................................................................................................................... 13

H.    All Of The Incidents Lively Raises Occurred During Or Before The First Phase Of Filming .................................................................................................... 15

      1. Baldoni's Comments At Initial Meeting........................................................... 16

      2. Baldoni's Private Inquiry About Lively's Weight For A Scene..................... 16

      3. The Addition of Sex Scenes to the script........................................................ 18

      4. Heath Briefly Enters Lively's Makeup Trailer ............................................... 19

      5. Filming of the Birthing Scene........................................................................ 20

      6. Comments that Lively And Another Actor Looked "Sexy".......................... 22

      7. Heath Shows Lively An Image Of His Wife's Home Birth .......................... 23

      8. Other Comments ............................................................................................ 24

      9. Lively Gets COVID ....................................................................................... 25

I.    Lively's And Another Actor's Concerns Are Promptly Addressed Before The First Phase Of Filming Concludes...................................................................... 25

J.    During the Filming Hiatus, Lively Announced A List Of "Protections" ................. 30

      1. Several of the requested "Protections" Were Already Substantially In Place............................................................................................................ 31

      2. Other Requested "Protections" Implicated Lively's Own Conduct. .............. 32

      3. Defendants Are Pressured To Accept Lively's Demands............................... 35

      4. Lively And Her Husband Make Additional Demands During A Meeting At Her Home ..................................................................................... 37

K.      After Making Her "Protections" Demands, Lively Revised Several
        Scenes To Be More Sexually Charged ......................................................... 39

L.      The Second Phase Of Filming, Including All Of Lively's Intimate
        Scenes, Proceeded Without Incident ........................................................... 40

M.      Lively Exercised Near Total Control Over The Second Half Of Production ............ 41

N.      Lively Used The Influence Of Her Famous Friends To Take Over
        The Film Entirely ...................................................................................... 41

O.      Lively And Her Husband Took Steps To Harm Baldoni's Reputation ..................... 44

P.      Lively Took Steps To Exclude Baldoni From The Premiere Of His
        Own Film .................................................................................................. 46

Q.      Baldoni, Heath, and Wayfarer Retained A Crisis PR Firm To Assist
        And Advise Them In The Face Of Growing Adverse Media Attention.................... 47

R.      In The Days After The Premiere, Negative Press Against Baldoni
        Intensified ................................................................................................ 48

S.      Wayfarer Hired Street Relations To Monitor Social Media ....................................... 50

T.      Lively Suffered Backlash.............................................................................. 51

U.      Lively and Her Husband Spread Negative Information About Baldoni
        And Work To Kill Negative Stories About Lively.............................................. 55

V.      Lively Failed To Uncover Proof That Defendants Spread False
        Information About Her ................................................................................ 58

W.      Sarowitz Played No Role In Marketing The Film Or Wayfarer's
        Publicity Strategy....................................................................................... 60

X.      Lively Obtained Documents Through A Sham Subpoena, Abusing
        Judicial Process To Serve Her Own Ends........................................................ 66

Y.      Lively Negotiated Every Aspect Of Her Work, But Never Reached
        Agreement ................................................................................................ 69

        1.  The Offer Letter ............................................................................. 69

        2.  The ALA Was Never Executed ......................................................... 73

Z.      Lively Sued Without Providing Notice And An Opportunity To Cure ..................... 77

AA.     Lively's Damages Are Barred ...................................................................... 77

Pursuant to Local Rule 56.1, Defendants Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, IEWUM, Jennifer Abel, Melissa Nathan, and TAG submit this Statement of Undisputed Material Facts in support of their Motion for Summary Judgment.

## A.    Baldoni Conceived And Originated A Project To Develop "It Ends With Us" Into A Film To Broaden Awareness Of Domestic Violence

1.      Wayfarer Studios is a production studio.  It aspires to create purpose-driven films intended to inspire connection and promote social change through authentic, impactful storytelling and fresh creative voices. Ex. 1, WAYFARER_00013949 at-052; Ex. 2, Heath Dep. (Oct. 9, 2025) at 38:16-23.

2.      Justin Baldoni and Steve Sarowitz co-founded Wayfarer Studios in or about 2019 or 2020 and serve as its co-chairs. Ex. 3, SAC ¶ 58, 60; Ex. 4, Heath Dep. (Oct. 8, 2025) at 32:1-5; Ex. 5, Baldoni Dep. (Oct. 6, 2025) at 42:21-43:5; Ex. 3, Dkt. 520 ¶¶ 58 ("SAC"), 60; Ex. 5, Baldoni Dep. (Oct. 6, 2025) at 46:22-24.

3.      Sarowitz is the majority investor in Wayfarer Studios.  Ex. 3 SAC ¶¶57, 60, 75; Dkt. 151, Sarowitz Answer ¶¶57, 60, 75; Ex. 6, Sarowitz Dep. Tr. 98:4-7, 103:17-21, 177:18-19, 231:3-5.  He resides in Illinois.  Ex. 3, SAC ¶60; Sarowitz Anwer ¶ 60.

4.      Jamey Heath is the CEO of Wayfarer.  Ex. 3, SAC ¶ 59; Ex. 4, Heath Dep. (Oct. 8, 2025) at 34:1-9; Ex. 2, Heath Dep. (Oct. 9, 2025) at 38:1-14.

5.      Baldoni is an acclaimed actor, director, and author.  Before the events giving rise to this dispute, he was the one of the stars of the acclaimed Golden-Globe nominated television show *Jane the Virgin*. He also produced and directed two prior feature films, *Five Feet Apart* and *Clouds*, together with CBS Films and Warner Brothers, respectively.  Ex. 7, WAYFARER_000041408-409.

6.      Baldoni has written two books on gender-related topics, focusing on the question of masculinity and addressing, among other issues, the importance of mutual consent, one of which was a *New York Times* bestseller.  Ex. 7, WAYFARER_000041408-409; Ex. 5, Baldoni Dep. (Oct. 6, 2025) at 302:09 – 307:9; Ex. 8, Baldoni Dep. (Oct. 7, 2025) at 77:2 – 77:9, 79:18-25.  Baldoni has also hosted a podcast, called "Man Enough," concerning the same and similar topics.  Ex. 7, WAYFARER_000041408-409.

7.      In February 2019, Baldoni met Colleen Hoover, author of the smash success *It Ends With Us,* a novel that addresses issues of domestic violence.  Ex. 9, WAYFARER_000141660; Ex. 10, Hoover Dep. at 21:22-22:13; Ex. 11, Saks Dep. at 231:5-18; Ex. 12, Giannetti Dep. at 188:13-189:2; Ex. 13, Slate Dep. at 122:2-6.

8.      Baldoni and Hoover discussed how the book could be adapted into a film, and, on May 8, 2019, Hoover agreed to sell Baldoni the rights for a film, in part due to Baldoni's ability and experience approaching sensitive topics in his prior films.  Ex. 14, WAYFARER_000141663 (Hoover, writing: "[Y]ou "get" the book…" and "based on the magnificent adaptation you did of Five Feet Apart, I'm confident you could do this book justice and that our visions will align").  Hoover also suggested that Baldoni play the lead role of Ryle.  Ex. 9, WAYFARER_000141660; Ex. 14, WAYFARER_000141663; Ex. 15, WAYFARER_000141666; Ex. 16, WAYFARER_000141667; Ex. 17, WAYFARER_000141669; Ex. 18, WAYFARER_000141671.

9.      In September 2022, Baldoni and Wayfarer sought to, and eventually did, partner with NO MORE, an organization dedicated to ending domestic and sexual violence, in connection with the film.  Ex. 19, WAYFARER_000141658.  Together, Wayfarer and NO

MORE planned to use the film as an opportunity to raise awareness about domestic violence, and to provide education, resources, and support for survivors.  *Id.*

10.    In September 2022, Wayfarer proposed a partnership with Sony for co-production and co-financing of the film.  Ex. 20, SPE_BL0000343.  Wayfarer's proposal included a requirement that 1% of the film's proceeds be donated to support survivors of domestic abuse. *Id*. at -345.  To date, NO MORE has received nearly $600,000 in connection with the film. Declaration of Jamey Heath ("Heath Decl.") ¶22.

11.    In early publicity planning for the film, Sony emphasized the need to center the "underlying messaging" of the story: "abusive relationships take many forms from all social classes … what does it take to leave and break the cycle of generational trauma and domestic violence?" Exs. 21-22, SPE_BL0005500-5503.  Sony cautioned:  "we need to be careful not to commercialize or handle lightly."  *Id.*  at -5501.

12.    Wayfarer Studios typically depends on separate LLCs for separate films or projects.  Heath Decl. ¶6.  In 2022, It Ends With Us Movie LLC ("IEWUM") was incorporated to develop and produce the film.  Heath Decl. ¶¶6, 9.

13.    Establishing a separate entity for each individual film production is common in the film industry to separate each production's liabilities, investment and ownership structure, rights assignments for distribution, and accounting. The SPE is often necessary for the purpose of obtaining production (or post-production) tax credits (which are often based on the specific jurisdiction in which individual films are shot, or edited, as well as the residency of members the crew), and for residual reporting with unions such as SAG-AFTRA, DGA, and WGA, which determine participation on a project-by-project basis). Heath Decl. ¶7.

14.     Utilizing a separate, project-specific entity is also necessary in order to, for example, calculate net proceeds and back-end profit participation for each film, for the purpose of calculating profit participation.  Heath Decl. ¶8.

15.     IEWUM maintained its own bank accounts and funds, separate from Wayfarer, and independently engaged the cast and crew of the film, only a handful of whom were also Wayfarer employees.  Heath Decl. ¶10.

16.     Although Wayfarer and its employees provided some administrative, legal, and operational support to IEWUM on the film, that is common in the film industry, and IEWUM paid Wayfarer ▮▮▮▮▮ for those services pursuant to the terms of the Wayfarer's co-financing agreement with Sony Pictures' subsidiary, Columbia.  Heath Decl. ¶11; Ex. 23, SPE_BL0000001 at -02.

17.     Beyond providing some financing, Sarowitz was not involved in the production of the film.  Ex. 6, Sarowitz Dep. Tr. 230:13-15, 120:21-24.  And he did not supervise or manage anyone at Wayfarer Studios during the filming of *It Ends With Us*.  Ex. 6, Sarowitz Dep. Tr. 204:20-23.

18.     Before Blake Lively joined the production, filming was set to begin in 2023, under Baldoni's direction. Ex. 24, Lively Dep. at 21:18-25; 261:3-12.

**B.      Lively Committed To A Role With Adult And Sexual Themes**

19.     The book *It Ends With Us* was well known for sexual content.  Ex. 12, Giannetti Dep. at 188:13-189:2

20.     Blake Lively never read the book, either before or during filming.  Ex. 24, Lively Dep. at 60:22-23.

21.     In or about December 2022, after having met with Baldoni, Lively accepted an offer to play the film's female lead, Lily Bloom.  Ex. 24, Lively Dep. at 12:17-20; *see also* Ex. 25, HEATH-000028774 at -75 (email from Warren Zavala to Jamey Heath expressing that "We're good on the financial terms for Blake. She's excited to do the film.").

22.     In mid-December 2022, Imene Meziane, Wayfarer's VP of Business and Legal Affairs, sent Lively's representatives a draft offer letter ("Offer Letter") setting out the basic parameters under which Lively would agree to perform in the role of Lily Bloom in the film. Exs. 26-27, HEATH_000046097-99.

23.     As is standard in the film industry, the proposed agreement for Lively's services was not between Lively herself, or Wayfarer.  The agreement's intended parties were IEWUM and Blakel, Inc., Lively's "loanout" entity.  Ex. 28, HEATH_000045678.  A loanout entity is a corporation formed around one individual, typically for tax purposes, which then "loans" the services of the individual for a fee.  Heath Decl. ¶13.

24.     On or about April 27, 2023, Lively signed an escrow agreement to facilitate payments from IEWUM to her loanout entity in connection with the film. Ex. 29, HEATH_000045645.

25.     Shortly before the Offer Letter was finalized, pursuant to the escrow agreement, IEWUM wired Lively's up-front fee of $1.75 million, less a 6.37% New Jersey withholding tax, to Lively's client trust account at WME.  IEWUM was not asked to and did not withhold federal income, Social Security, or Medicare taxes, or any other state or local taxes.  Exs. 30-31, WAYFARER_000030416-17; Ex. 29, HEATH_000045645.

26.     The Offer Letter was finalized in early May 2023.  As discussed below, the Offer Letter expressly provided that full execution of a long form agreement regarding the terms of

Lively's engagement was a condition precedent to IEWUM's obligations to Lively thereunder. Ex. 32; HEATH_000045662; Ex. 28, HEATH_000045678 at 80.

27.     No long form agreement, as described in the Offer Letter, was ever executed by the parties.  Heath Decl. ¶¶14-18.

28.     Before accepting the role, Lively had reviewed an early script, and thus knew the film would include sexual content and dark themes, including domestic violence.  Ex. 33, Zavala Dep. at 43:4-44:5, 47:18-23; Ex. 34, Stone Dep. at 65:3-66:13; Ex. 24, Lively Dep. at 60:8-21. The script Lively reviewed included scenes of sexual intimacy, intimate partner violence, and attempted sexual assault. *See, e.g.*, Ex. 35, WAYFARER_000129261, at -129275-77, -129308-311, -129328-331, -129338-340, -129347, -129348-351, -129354-359.

29.     Lively worked to revise the script before filming began.  Her written work product included frank sexual language and overtly sexual themes.  For instance, in April 2023, Lively sent Baldoni a revised draft for the scene in which Lively's character (Lily Bloom) and Baldoni's character (Ryle Kincaid) first meet—on the rooftop of a building (the "rooftop scene").  Lively explained she revised the scene to include "flirty and yummy…ball busting." She referred to her choice of dialogue as "my love language. Spicy and playfully bold, never with teeth."  Her draft called for "sexual tension" between the characters, kissing, and retained a line from the book in which Baldoni's character says directly to Lively's character: "I want to fuck you."  Ex. 36, BL-0000092 at -48; Ex. 37 , BL-000009253 at BL-000009262.

30.     On May 5, 2023, Baldoni sent Lively some notes on the script from Sony Executive Ange Giannetti, who wanted the scenes to involve more than just verbal interplay. Giannetti wrote: "other than language – this does not read like an R rated movie. Readers of the book … are expecting some HEAT … I'm hoping [the love scenes] are sexy and grown up …

6

please work to find the balance between sweet / funny / endearing with moments of real heat."

Ex. 38, BL-000013115.

## C.    Lively Exercised Substantial Control From The Outset

31.    Lively immediately exercised substantial influence over the development and

shooting of the film.  At Lively's request, Wayfarer agreed to abandon its intended filming

location—Boston, where Hoover's novel was set—and to accept Lively's choice of New Jersey

"to accommodate Blake."  Ex. 26, HEATH_000046097; *see also* Ex. 39, BL-000018396 (Lively

email to PGA, asserting "I lead[sic] the location shift from Boston to New Jersey").  Wayfarer

also agreed to adjust the filming schedule to accommodate Lively's other obligations.  Ex. 26,

HEATH_000046097.

32.    In a letter to the Producers Guild of America, Lively stated that she played a role

in numerous aspects of the film's pre-production, as follows:

> I lead the location shift from Boston to New Jersey and helped to solve all cost and
> schedule logistics associated
>
> I personally called and/or wrote emails to crew and put forth names for dept head roles.
> Including Hair, Makeup, Director of Photography, Costume Design, Transportation,
> Security, Camera Operators, etc ...
>
> I identified and onboarded freelance team members for the cast members (not just
> myself) to help achieve the goals for the screen including a fitness trainer, nutritionist,
> meal prep service, spray tanner, wig maker, hair colorist, etc ...
>
> I reviewed and reshaped the creative of the production design for all key locations for all
> characters, also made changes to use existing elements of locations to save cost
>
> I called in favors with home design contacts to get items loaned, discounted or gifted to
> save production design costs
>
> I reviewed and reshaped the creative of the costume design for all characters
>
> I called in favors with fashion contacts to get items loaned, discounted or gifted to save
> costume design costs
>
> I reviewed and reshaped the creative of the prop and floral design for the key film
> element of the film (the protagonist is a florist)
>
> I did outreach to florists all over instagram and beyond, helping with the marketing
> activation to feature a florist in the film, and connected the best names with production

7

> I went through hundreds of casting tapes to help find the rest of the cast, including our stars Atlas [Lively's character, Lily Bloom's other love interest], Young Lily, Young Atlas and Jenny Bloom [Lily Bloom's mother].
>
> I rewrote the script to improve the role of Jenny Bloom after 3 actresses turned it down.

Ex. 39, BL-000018396.

### D.    Lively Raised Concerns About Her Physical Appearance To Baldoni And Others Before Filming Begins

33.    In a February 8, 2023 voice memo, Lively asked if the start of shooting could be pushed back because she "want[ed] to be in my best shape." Ex. 40, BL-000008806.

34.    On February 9, 2023, in response to Baldoni's comment that Lively must feel "1000 lbs lighter" after resolving a personal dilemma, Lively responded "only 20 to go." Baldoni disliked Lively's self-deprecating joke. Ex. 41, BL-000008801 at -04.

35.    On February 17, 2023, Lively asked Baldoni "What's the chance we can do the body scenes at the end of the schedule?" Baldoni responded: "I want you to know – you will look amazing. Anything you are insecure about we will talk through and get creative together and make you comfortable. I just don't want you to stress about your body. It's the last thing you need." Ex. 42, BL-0000008819 at -20.

36.    The same day, February 17, Lively told Warren Zavala, her agent at WME: "Also I asked Justin Baldoni today, but I need their help in boarding the movie so that the body stuff last to shoot. I'm working my ass off.  Literally working out twice a day, 4 hours a day. Which is insane. But I'm treating it like my full time job. … And no matter how hard I work it's a lot to accomplish in not a lot of time. And I want to set us all up for success.…This sexiness in this film and the marketing I'm sure, is critical to its success." Ex. 43, BL-000021371.

37.    In a February 18, 2023 message to Baldoni, Lively wrote: "I know my job here…As woke as we both are and work to be, this movie requires a certain aesthetic. It's part of

the job that we both excitedly signed up for. I don't shy away from it because its not

problematic." Ex. 44, BL-000008821 at -22.

**E.     Before Filming Began, Lively Used Famous Friends To Press Baldoni To Accept Her Revisions To The Script**

38.     On April 8, 2023, Lively sent Baldoni her proposed revisions to the "rooftop

scene" in which the two main characters first meet.  Ex. 36, BL-000009247 at -48.

39.     On April 12, 2023, Lively asked her friend, the world-famous musician Taylor

Swift, for help.  Referring to Baldoni as "this doofus director of my movie," she went on to

describe him as "a clown" who "thinks he's a writer now."  She asked Swift to endorse the

revised script she was proposing—even without having read it.  Ex. 45, BL-000018765 ("you

don't have to read of course").

40.     Swift agreed to do Lively's bidding, texting Lively, "I'll do anything for you !!"

Ex. 45, BL-000018765.  Lively and Taylor Swift met with Baldoni at Lively's apartment, where

Swift endorsed the revised draft.  Afterward, Lively wrote to Swift:  "You were so epically

heroic today. I recapped every moment to Ryan. I kept remembering stuff- You making shit up

about me and lenses. And referring to yourself as my doll. This clown falling for all of it. But

also resisting it. You are the worlds absolute greatest friend ever."  Ex. 46, BL-000018767.

41.     On April 14, 2023, Baldoni told Lively he liked the revised scene.  He added that

he "would have felt that way without Ryan and Taylor."  Ex. 47, BL-000009345 at -48.  Lively

explained that, to protect her like the princess in Game of Thrones, Reynolds and Swift serve as

her "dragons."  Ex. 48, BL-000009349 at -50.

42.     Lively has since disclosed that her husband, Ryan Reynolds, actually wrote the

revisions to the "rooftop scene" that she proposed.  Ex. 49, WAYFARER_000142463 at -64; Ex.

50, BL-000011703.

**F.    Defendants Took Steps To Create A Safe Set Prior To Filming**

43.    Wayfarer has a set of industry-standard policies and procedures in place to prevent harassment, discrimination, and retaliation. Ex. 51, HEATH_000034943; Ex. 1, WAYFARER_000139049 (Wayfarer employee handbook). "All Wayfarer Studios employees, officers, principals, agents, workers, and representatives are prohibited from engaging in unlawful discrimination, harassment, and/or retaliation." *Id.* at -53. "The Anti-Harassment Policy also applies to vendors, customers, independent contractors, unpaid interns, volunteers, persons providing services pursuant to a contract, and any other person's employees [sic] may come into contact with through the course of their work." *Id.*

44.    Wayfarer has a complaint process to address alleged instances of harassment, discrimination, and/or retaliation. "Individuals who believe they have been the victims of [prohibited conduct] should discuss their concerns with their immediate supervisor, any member of management, or Human Resources." Ex. 1, WAYFARER_000139049 (Wayfarer employee handbook) at -54.  Wayfarer "encourages reporting of all perceived incidents of discrimination or harassment." *Id.* "Any reported allegations of harassment, discrimination, or retaliation will be promptly and thoroughly reported in an impartial manner." *Id.* at -55.

45.    Wayfarer has a human resources department headed by Cynthia Barnes-Slater. Ex. 4, Heath Dep. 10/8 Tr. 38:7-9. Mitz Toskovic assists Slater. *Id.* at 39:11-14.

46.    Wayfarer employees are required to participate in workplace harassment training. Ex. 4, Heath Dep. 10/8 Tr. 54:2-10. Baldoni participated in training approximately every two years. Ex. 8 Baldoni 10/7 Dep. Tr. 52:3-53:5.

47.    Sarowitz is not involved in the day-to-day operations of Wayfarer Studios.  Ex. 6, Sarowitz Dep. Tr. at 126:8-9, 260:23-261:2, 266:22-267:7, 311:24-25.  And he is not responsible

for administering Wayfarer Studios' harassment policies.  Ex. 6, Sarowitz Dep. Tr. at 183:6-12, 184:5-19, 195:17-196:13, 203:9-16.

48.    Lively was under no obligation to engage in any nude or simulated sex scenes without her consent.  The Offer Letter provided that Lively would not perform any nudity/stimulated sex without her prior written consent and negotiation/execution of a formal nudity rider.  Ex. 28, HEATH_000045678 at 80.

49.    In April 2023, before filming began, IEWUM hired Elizabeth Talbot to serve as the intimacy coordinator for the film.  Ex. 52, 24-CV-10049_0002891 (payroll form signed by Elizabeth Talbot LLC on April 28, 2023).

50.    On April 5, 2023, Baldoni wrote to Lively: "Just hired intimacy coordinator who I LOVE.  Will set you up to meet / [FaceTime] with her next week for intro."  Lively declined the introduction, responding: "I feel good. I can meet her when we start."  Ex. 53, BL-000009220 at -22.

51.    Baldoni reported to the production team: "Seems [Lively] doesn't want to meet with intimacy coordinator until we start which may mess up the workflow but I can still meet with her of course."  Alex Saks, one of the film's producers, responded: "That's fine if [Lively] doesn't want to meet [the intimacy coordinator] now. You'll just have to walk her through what you and [the intimacy coordinator] are thinking."  Ex. 54, BALDONI_000018766.

52.    On May 4, 2023, before any filming had begun and months before any shooting of the film's intimate scenes would take place, the intimacy coordinator considered the content of anticipated intimate scenes and suggested details and clarifications to both Baldoni and Heath.  Ex. 55, BALDONI_00010363.  While expressing concern that the scenes were becoming "too PG-13" as compared to the more explicit scenes in the book, Baldoni suggested that the intimacy

11

coordinator discuss with Lively whether there were other ways of implying nudity that she would consider so as not to "disappoint readers," while also expressing sensitivity for Lively's boundaries.  He wrote: "I am fine showing my butt (female gaze) …. I'm fine if Blake just wants to take [my clothing] off and we make it playful …. The goal is to choreograph in a way that keeps Blake's clothes on as much as possible."  Ex. 56, BL-000013564 at -65.  The intimacy coordinator agreed to have any necessary conversations to get clarity for the scenes "so both [Baldoni and Lively] are confident about level of contact during the scenes."  Ex. 57, BALDONI_000010377.

53.    The intimacy coordinator then met with Lively to review said vision and set boundaries for purposes of memorializing them in a nudity rider. On or around May 5, 2023, the intimacy coordinator had a phone call with Lively and her lawyer.  The intimacy coordinator explained that her role was to determine Lively's comfort level and boundaries to ensure scenes would be within her consent and boundaries, and to provide nudity rider language.  Ex. 58, Talbot Dep. Tr. at 57:6-58:17.  She told Lively to contact her if she wanted anything further. Lively did not meet with her again.  Ex. 58, Talbot Dep. Tr. at 57:14-58:17.

54.    That same day, the intimacy coordinator provided draft language for the nudity rider to Lively.  Lively responded: "This is great! Thank you!"  Ex. 59, 24-CV-10049_0001869. Talbot sent Lively's notes to the film's production attorney for inclusion in Lively's nudity rider. Ex. 60, 24-CV-10049_0001816.

55.    On or about May 8, 2023, Lively and Baldoni were provided with nudity riders detailing their consent and boundaries concerning intimate scenes.  Ex. 61, WAYFARER-000122708 (Lively Nudity Rider); Ex. 62, 24-cv-10049_0001822 (Baldoni Nudity Rider).

56.     On May 5, 2023, IEWUM held a "Respect in the Workplace: Preventing Discriminatory Harassment & Retaliation" meeting. Ex. 63, WAYFARER_000140131 (production schedule as of 5/4/2023); Ex. 64 BALDONI_000003760, attaching Ex. 65, BALDONI_000003760; Ex. 66, WAYFARER_000142434.  The training was administered by the law firm Mitchell Silberberg & Knupp LLP. Ex. 67, WAYFARER_000142796.  Heath and Baldoni both attended and completed that training in advance of filming. Ex. 5, Baldoni 10/6 Dep. Tr. at 51:22 – 52:1-10. Ex. 4, Heath 10/8 Dep. Tr. at 399:25 – 400:12.

57.     During the first phase of filming, Wayfarer distributed a Preliminary Crew List to the crew that listed Wayfarer's Human Resources contact, Cynthia Barnes Slater.  Ex. 68, 24-CV-10049_0002324.

58.     All cast and crew were provided daily call sheets on the evening before each day of filming, which included a hotline number for workplace complaints, including sexual harassment, that directed them to a third-party organization to assist with any complaints. Ex. 69, 24-CV-10049_0001427. Ex. 70, Carroll Dep. Tr. at 191:1-3. Ex. 4, Heath 10/8 Dep. Tr. at 138:22 – 139:2; Ex. 150, BL-000021729; *see also* Ex. 151, BL-000021725 (showing Lively received such call sheets).

**G.    No Intimate Scenes Involving Lively Were Shot In The First Phase Of Filming**

59.     Filming began on May 15, 2023, and then stopped of June 14, 2023, in deference to labor strikes by the Writers Guild of America and SAG-AFTRA.  Ex. 3, SAC ¶ 15; Ex. 24, Lively Dep. at 261:15-18; Ex. 71, WAYFARER_000141293.

60.     All filming during the first phase of filming took place on a set in New Jersey. Ex. 12, Giannetti Dep. at 236:17-19; Ex. 24, Lively Dep. at 261:11-12.

61.     None of Lively's sexually explicit scenes or scenes involving simulated nudity were rehearsed or filmed during this initial period.  Ex. 58, Talbot Dep. at 73:18-24; Ex. 72, SPE_WF0000312 (Aug. 29, 2023 Message from Ange Giannetti "All of the romantic / sex scenes and abuse still need to be shot"); Ex. 11, Saks Dep. at 203:18-204:14.  Those scenes were rehearsed and filmed during a later phase of filming, without issue or incident.  *See* Section L, *infra.*

62.     A scene in which Lively's character gives birth was filmed on May 22, 2023.  Ex. 73, 24-CV-10049_0003314 – 3321.

63.     Lively claims the birthing scene constituted an "intimate" scene because there was implied nudity.  Ex. 3, SAC ¶¶ 87-89.

64.     Footage of the birthing scene shows Lively covered with a hospital gown and a prosthetic pregnancy belly.  Ex. 74, WAYFARER_000140494.

65.     Elizabeth Talbot, the intimacy coordinator for the first phase of filming, testified that, pursuant to SAG industry standards, "nudity" of the type that requires a rider is defined as "anything that would be seen underneath a bikini."  Ex. 58, Talbot Dep. Tr. at 99:7-100:5. Nudity riders are not typical for "implied nudity" where the actor is not physically nude but is portrayed as such.  *Id.* at 100:10-101:18.

66.     Talbot also testified that she did not recall any nudity in the birthing scene. Although the birthing scene showed a "high hip line," Lively did not require or request a nudity rider for that exposure.  Ex. 58, Talbot Dep. Tr. at 69:18-23.

67.     The only intimate scene shot in the first phase of production involved two actors other than Lively and Baldoni (the two actors playing the young versions of Baldoni and

Lively's characters) (the "Young Lily and Young Atlas intimate scene"). Ex. 58, Talbot Dep. Tr. at 73:18-24; Ex. 75, Ferrer Dep. Tr. at 67:13-15.

68.    Lively was not involved in or present during the filming of the Young Lily and Young Atlas intimate scene. Ex. 58, Talbot Dep. at 78:14-20; Ex. 75, Ferrer Dep. Tr. at 39:5-10.

69.    On June 11, 2023, before the Young Lily and Young Atlas intimate scene was filmed, Baldoni flagged to the production team that they would need to coordinate and work with the intimacy coordinator. Ex. 76, BALDONI_000016437.

70.    Thereafter, and before the Young Lily and Young Atlas intimate scene was filmed, both actors signed nudity riders. Ex. 75, Ferrer Dep. Tr. at 32:13-17; Ex. 77, 24-CV-10049_0001089. They rehearsed the intimate scene with the intimacy coordinator, Baldoni, and the Director of Photography in advance of filming. Ex. 75, Ferrer Dep. Tr. at 32:9-33:5.

71.    Following the filming of the scene, Isabela Ferrer, the actor playing the young version of Lively's character, wrote to the film's intimacy coordinator: "Thank you so much for your help!! You were incredible and given I've never done that before I felt like it was the easiest thing ever! So thank you !!" Ex. 75, Ferrer Dep. Tr. at 109:7-13.

72.    Ferrer also wrote to Baldoni to thank him for an "incredible" experience on the set. She continued: "you are such a wonderful smart sincere director and you created such a comfortable safe space for me to feel like I could fully step into this role I couldn't have asked for a more welcoming environment. It will stay with me for the rest of my life!!" Ex. 78, BALDONI_000031938.

**H.    All Of The Incidents Lively Raises Occurred During Or Before The First Phase Of Filming**

73.    In her Second Amended Complaint and deposition testimony, Lively points to various alleged incidents prior to or during this first phase of filming, which she alleges

amounted to sexual harassment and contributed to a hostile work environment. *See generally*, Ex. 3, SAC; Ex. 24, Lively Dep. Tr.

### 1. Baldoni's Comments At Initial Meeting

74.     In her deposition, Lively claimed she was uncomfortable with comments Baldoni made to her in their initial meeting in December 2022, before she had even agreed or begun to work on the film. Ex. 24, Lively Dep. Tr. at 28:24-25, 51:07-52:19. Baldoni flew to New York City to meet Lively for the first time to discuss the possibility of casting her in the film. They met in her penthouse apartment, where her family, and various household employees were also present. Ex. 24, Lively Dep. Tr. at 28:15-21, 29:15-21.

75.     Lively was pregnant at the time. She and Baldoni had been discussing "different medical decisions people make these days, including circumcision for male babies," a question Lively herself may have introduced. Ex. 24, Lively Dep. Tr. at 51:21-52:05. Baldoni talked about "the decision that [he and his wife] made for their child…and then he offered that he was circumcised." *Id.* at 52:07-09.

76.     Lively did not complain to Baldoni or anyone else affiliated with Wayfarer at that time about these comments. Ex. 24, Lively Dep. Tr. at 54:22-55:14. Lively also does not recall mentioning these comments to her agent before she accepted the role. *Id.* at 55:15-17.

77.     On February 28, 2023, after that initial meeting, Lively's husband, Ryan Reynolds, wrote to Baldoni: "We're also big fans [of you] over here. Since before we met, and more-so after… thank you again for all you're doing. I happen to adore you, Justin." Ex. 79, RR-SUBPOENA-000000049 at -50.

### 2. Baldoni's Private Inquiry About Lively's Weight For A Scene

78.    On or around April 23, 2023, outside the workplace, and outside the presence of any Wayfarer Studios or IEWUM employee, Baldoni privately asked a personal trainer he had consulted with (who was working separately with Lively) what Lively would weigh when filming began.  Ex. 3, SAC ¶ 106; Ex. 5, Baldoni 10/6 Dep. Tr. at 73:7-15.

79.    Baldoni, who suffers from chronic back issues, asked in anticipation of a scene in which he was expected to lift her.  Ex. 5, Baldoni 10/6 Dep. Tr. at 296:23-297:10; *see also* Ex. 80, BL-000018761 at -62 (April 24, 2023 text from Lively to a friend, stating that Baldoni asked about her weight "[b]ecause he's worried about his back and bone density and wants to be sure he's ok to lift me up for our sex scenes").

80.    Documentary evidence shows that Baldoni contemplated including such a scene in the film as late as December 28, 2023.  Ex. 81, BALDONI_000031127 at -28.

81.    Baldoni never made the same comment in Lively's presence or in the presence of any cast or crew member.  Ex. 5, Baldoni 10/6 Dep. Tr. at 296:23-297:10.

82.    The trainer, acting on his own, decided to share the comment with Lively.  Ex. 82, BALDONI_000015397.

83.    On or about April 25, 2023, Baldoni met with Lively at her apartment.  Ex. 83, BL-000021593.  Lively's husband, Ryan Reynolds, and two other famous friends were there.  Reynolds chastised Baldoni for commenting on a woman's weight.  Ex. 5, Baldoni 10/6 Dep. Tr. at 297:4-7.

84.    Lively subsequently described the meeting to a friend as follows:  "I had a 3 hour meeting w him today … He had a bit of that melt down today when I told him … he audibly sobbed … This man is terrified of women."  Ex. 84, BL-000021593.

85.     Lively also alleged that Baldoni "sham[ed Lively] for her body and weight" by offering to connect her with a specialist in probiotics after Lively caught strep throat, because, Lively alleges, the expert "was instead a weight-loss specialist." Ex. 3, SAC ¶ 108.  Lively has not offered any admissible evidence supporting that claim.  She did not discuss it during her deposition, and she has not produced any documentary evidence indicating that the expert was a "weight-loss specialist."  Documentary evidence shows that Baldoni discussed Lively's illness with the specialist, and not her weight.  *See* Ex. 257, BALDONI_000026173.

### 3.  The Addition of Sex Scenes to the script

86.     In late April 2023, before filming began, Sony executive Ange Giannetti encouraged Baldoni to shoot an R-rated film to reflect the content of the book.  In April 28, 2023, she wrote: "I will [update] sony you are going to try and get as much tasteful hot sex as you can … You find out if we are pg-13 will colleen be ok and does she think her readers will be ok?" Ex. 84, BALDONI_000018544.

87.     Baldoni discussed Giannetti and Sony's suggestion about additional and more explicit sex scenes with Lively and Colleen Hoover.  Ex. 85, BALDONI_00018780.

88.     On or about May 4, 2023, Baldoni worked with Elizabeth Talbot, the film's intimacy coordinator, to add specifics to the intimate scenes.  Ex. 55, BALDONI_00010363.  He suggested Talbot discuss the scenes with Lively to determine how to portray more sexual intimacy in a manner consistent with Lively's personal boundaries and preferences.  Ex. 57, BALDONI_000010377.

89.     On or about May 5, Lively and Talbot exchanged messages indicating that the scenes would be revised consistent with Lively's preferences.  Ex. 56, BL-000013564.

90.     Lively claims that Baldoni explained his proposed addition of a sex scene featuring a simulated simultaneous orgasm by stating that he and his wife experienced climax at the same time and asked if Lively and her husband did the same; that he mentioned a previous addiction to pornography; and that he commented that some of the most precious experiences with his wife were bringing her to orgasm without reciprocation.  Ex. 24, Lively Dep. Tr. at 132:16-133:4, 137:6-10.

91.     Lively then told Baldoni she had never seen pornography.  Ex. 24, Lively Dep. Tr. at 137:11-24.

92.     Such discussion took place in the context of planning and choreographing a sex scene.  Lively first volunteered her own personal experience before Baldoni shared his.  Ex. 8, Baldoni 10/7 Dep. Tr. at 174:25-177:20.

93.     Baldoni has publicly discussed his prior addiction to pornography on his podcast, which is aimed at male audiences, and in his published books.  Ex. 8, Baldoni 10/7 Dep. Tr. at 76:7 – 77:9.

94.     Lively claims that sometime in May 2023, Baldoni told other members of the cast and crew that she had never seen pornography.  Ex. 24, Lively Dep. Tr. at 139:2-140:9.

                    4.  Heath Briefly Enters Lively's Makeup Trailer

95.     On one occasion, on or about May 16, 2023, Heath entered Lively's make-up trailer while she was having her make-up removed.  They had a brief conversation concerning a work-related issue.  Ex. 24, Lively Dep. Tr. at 126:12-129:16 (indicating the conversation was five minutes); Ex. 4, Heath 10/8 Dep. Tr. at 212:06-07 (indicating that the conversation was between two and three minutes).

96.     Heath had been seeking to schedule a meeting with Lively, Baldoni, and Giannetti after several failed attempts.  At the end of the shooting for the day, Heath suggested that they meet the following day.  Lively said they could meet her at her makeup trailer to discuss the timing for the meeting.  Ex. 4, Heath 10/8 Dep. Tr. at 209:09-210:16.

97.     Heath knocked on Lively's trailer door and Lively permitted him to come in.  Ex. 4, Heath 10/8 Dep. Tr. at 210:19-23; *see also* Ex. 24, Lively Dep. Tr.at 127:17-21 ("That meeting was very important to me…so I said 'Okay, fine, you can come in.'").

98.     Lively asked Heath to turn around while he was speaking to her and he did.  Ex. 24, Lively Dep. Tr.at 127:22-25 ("And he came in and I said, 'Okay, you can come in, but please don't look. Can you turn you turn around?' So he turned around and faced the wall."); *see also* Ex. 4, Heath 10/8 Dep. Tr. at 211:21-212:1 ("As I took a step up, I saw that she was leaned back. She looked what I though was either maybe breastfeeding or nursing.  I said to her, oh, it looks like you're busy, I can come back. As I turned around she says, no, that's okay. You can come in, just look away. And I said sure.").

99.     Lively has testified that Heath subsequently glanced at Lively through a mirror despite agreeing to turn away while they spoke.  Ex. 24, Lively Dep. Tr. at 129:1-8.

100.    Two weeks after the incident occurred and months before this litigation arose, Lively raised the incident with Heath for the first time.  She told Heath: "I asked you to look away and at some point you made eye contact with me….I'm not saying you were trying to cop a look. I'm just saying that I had asked you to turn away and you made eye contact with me." After expressing her displeasure, Lively moved on to other topics. Ex. 4, Heath 10/8 Dep. Tr. at 223:12-25.

### 5.  Filming of the Birthing Scene

101.    A scene in which Lively's character gives birth was filmed on or around May 22, 2023.  Ex. 73, 24-CV-10049_0003314 – 3321.

102.    While shooting the scene, Lively was wearing a hospital gown, a prosthetic belly, and fabric over her genitals.  Ex. 74, video clip excerpt of WAYFARER_000140494; Ex. 91, Lively's Second Amended Responses to Wayfarer Studios LLC's Second Set Of Interrogatories, No. 23 (Oct. 9. 2025).

103.    Lively alleged that an actor Baldoni knew was cast as the doctor performing the delivery.  SAC ¶ 89.

104.    The actor playing the doctor was a local union actor.  Heath Decl. ¶23.

105.    Lively has subsequently alleged that Steve Sarowitz was present on set during the birthing scene.  Ex. 3, SAC ¶ 89; Ex. 24, Lively Dep. Tr. at 50:2-8.

106.    Sarowitz testified that he was not on set during the filming of the birthing scene.  Ex. 6, Sarowitz Dep. Tr. at 169:24-25, 172:20-173:3, 211:16-18, 255:13-17; *see also* Ex. 86, SAROWITZ_000000 at -899-900.  He arrived later, after the scene was filmed.  Ex. 6, Sarowitz Dep. Tr. at 173:10-12.; Ex. 11, Saks Dep. Tr.at 46:4-47:17; Ex. 4, Heath 10/8 Dep. Tr. at 197:4-16.  In fact, he only visited the set twice.  Ex. 6, Sarowitz Dep. Tr. at 120:25-121:2, 230:16-21.  He visited briefly for part of one day and just a few minutes on another day, which happened to be the day the birthing scene was shot.  Ex. 6, Sarowitz Dep. Tr. 319:25-320:3, Tr.at 173:4-12.  Vivian Baker, Lively's makeup artist, for example, testified that she does not recall seeing Sarowitz on set and does not recall meeting him during production.  Ex. 87, Baker Dep. Tr. at 149:21-150:2.

107.    Sarowitz later spoke to Adam Mondschein—who appeared in the birthing scene—regarding events on set.  Mondschein did not raise anything negative about his

21

experience on set and shared a positive experience. Ex. 6, Sarowitz Dep. Tr.at 235:9-236:25. He

confirmed that Sarowitz was not on set during the filming of the scene. Ex. 6, Sarowitz Dep.

Tr.at 236:6-238:7.

108.    Sarowitz did not know what scenes were being filmed at any given time. Ex. 6,

Sarowitz Dep. Tr.at 172:21-22. And he made no conscious decision to see Lively in any

particular scene while shooting. Ex. 6, Sarowitz Dep. Tr.at 172:22-173:3. Sarowitz did not

know the birthing scene was being shot on the day it was shot. Ex. 6, Sarowitz Dep. Trat. 173:7-

12.

109.    During his first visit on set, Sarowitz spoke to Brandon Sklenar. Skelnar was

effusive in his praise for Baldoni, his directing, Wayfarer, and how he had been treated in

general. Ex. 6, Sarowitz Dep. Tr.at 232:16-24, 233:6-9.

110.    During that first visit, Sarowitz also spoke to Lively for a minute or two. It was a

very friendly meeting, and she did not voice any complaints. Ex. 6, Sarowitz Dep. Tr.at 234:10-

235:7.

111.    Sarowitz has never said anything to Lively that she felt was inappropriate or made

her uncomfortable. Ex. 24, Lively Dep. Tr.at 49:23-50:1.

112.    Lively has never discussed with Sarowitz her claims of sexual harassment. Ex.

24, Lively Dep. Tr.at 49:20-22.

### 6. Comments that Lively And Another Actor Looked "Sexy"

113.    On or about May 18, 2023, Baldoni commented that actor Jenny Slate looked

"sexy" in her character's wardrobe, which included black leather pants. Ex. 13, Slate Dep. Tr. at

51:14-18; Ex. 11, Saks. Dep. Tr. at 104:6-15; Ex. 8, Baldoni 10/7 Dep. Tr. at 203:12-23. He

made this comment in the presence of others, during the course of their work on the film. *Id.*

114.    On or about May 23, 2023, Lively testified that she wore a low-cut dress under a coat to rehearsal, and when the coat fell open to expose the dress, Baldoni commented "I like your outfit" and gestured to his chest.  Ex. 24, Lively Dep. Tr.at 83:16-85:09, 191:13-192:4.

115.    Also on May 23, 2023, Baldoni commented that her character's outfit was "sexy" or "hot."  Ex. 24, Lively Dep. Tr. at 100:18-102:25.

116.    Video footage of the incident shows Lively was fully dressed in an oversized fleece "onesie" at the time, that numerous actors and crew were also present and engaged in ongoing work at time, that Baldoni's facial expression was neutral and not ogling or suggestive, and that, after Baldoni apologized if his remark was inappropriate, Lively responded by saying "All good."  Ex. 281, video clip excerpt of WAYFARER_000140494.

### 7.  Heath Shows Lively An Image Of His Wife's Home Birth

117.    Lively has testified that, sometime in late May 2023, Heath "very briefly" showed Lively an image of his wife giving birth.  Ex. 24, Lively Dep.at 188:17-190:21.  Lively said she stopped watching the video because there was "a naked woman" in it.  *Id.*

118.    Heath and his wife had a home birth for their younger daughter, using a birthing tub.  Ex. 4, Heath 10/8 Dep. Tr. at 179:23-180:7.

119.    Baldoni had asked Heath to show Lively a video of the experience—which Baldoni had previously seen—showing Heath and his wife in a birthing tub, surrounded by their family.  Ex. 8, Baldoni 10/7 Dep. Tr. at 300:15-301:18; Ex. 12, Giannetti Dep. Tr. at 120:19-23.  Baldoni wanted to share the video in connection with his discussions with Lively about a birthing scene in the film.  Ex. 12, Giannetti Dep. Tr. at 123:9-12; Ex. 70, Carroll Dep. Tr.at 109:1-2.

120.    Heath testified that he showed Lively a video depicting: "our midwife, my sister, my kids, my wife, myself, our newborn baby. I believe we were singing or praying."  Heath and his wife were in a birthing tub with the baby, who was covered in a towel.  Ex. 4, Heath 10/8 Dep. Tr. at 179:23-180:25.

121.    Ange Giannetti, a Sony executive associated with the production, testified that shortly after viewing the image, Lively briefly mentioned to Giannetti that she was "very unhappy" about being shown the video as she was walking by Giannetti at lunch.  Ex. 12, Giannetti Dep. Tr. at 121:05-10.  Giannetti testified that Lively "said [her comment] to me and kept walking." *Id.*

122.    Lively did not ask Giannetti to take any action concerning the image.  Ex. 12, Giannetti Dep. Tr. at 122:03-04.

123.    Giannetti did not believe there was any reason to take any action.  Ex. 12, Giannetti Dep. Tr. at 122:06-07.

124.    Giannetti testified that Heath showed her the image as well.  She said that it depicted "a woman in a tub giving birth" with "someone[] behind her, holding her."  She did not see "a baby crowning" or "any genitalia" in the image.  Ex. 12, Giannetti Dep. Tr. at 122:7-22.

125.    Giannetti believed the interaction was "a misunderstanding…a mistake" based on miscommunications between Baldoni, who told Heath to show the image, and Heath, who believed Lively was prepared to view it in the context of their work.  Ex. 12, Giannetti Dep. Tr. at 124:21-125:02.

### 8.  Other Comments

126.    Lively also alleges that, during the first phase of filming, while riding in a car with Lively, her assistant, and her driver, Baldoni stated that he had not always obtained consent before sex.  Ex. 3, SAC ¶ 93.

24

127.    Baldoni was not questioned about this incident during two days of depositions.

128.    He recalls a conversation with Lively in which he told her about his own experience of having a romantic partner go beyond his personal boundaries of consent.  Decl. of Justin Baldoni ("Baldoni Decl.) at ¶3.

129.    Baldoni has written about this experience in his published books and discussed in in public talks. Ex. 8, Baldoni 10/7 Dep. Tr. at 20:2-18, 22:22-23:11, 27:16-22; Baldoni Decl. ¶4.

130.    Lively's subsequent conduct confirms Baldoni's account. In her "protections" demands, she objected to Baldoni referring to "personal times that physical consent was not given in sexual acts, as either the abuser *or the abused*."  Ex. 88, BL-000026031 (emphasis added).  In a subsequent text exchange with Taylor Swift, Lively linked Baldoni's comment about consent to an article in which Baldoni disclosed his experience as a victim of sexual abuse to the press. Ex. 89, BL-000021208.

### 9.  Lively Gets COVID

131.    On or about May 26, 2023, Lively and her baby contracted COVID on set.  Ex. 90, BL-000011538.

132.    Other cast and crew members also got COVID.  Ex. 24, Lively Dep. Tr. at 184:1-8.

133.    Lively included her COVID exposure in her list of incidents that required "protections," as discussed below, and also alleges it as part of her harassment claims.  Ex. 88, BL-000026031; Ex. 3, SAC ¶109.

**I.    Lively's And Another Actor's Concerns Are Promptly Addressed Before The First Phase Of Filming Concludes**

134.    On or about May 26, 2023, while out with COVID, Lively spoke with Ange Giannetti, the Sony executive assigned to the film, about various issues.  Ex. 3 SAC ¶¶ 8, 120,

132; Ex. 12, Giannetti Dep. Tr. at 109:4-112:16.  These included the First Assistant Director on the set (a woman); an instance in which Heath showed Lively an image from a video taken of his wife at or around the time she had given birth; Baldoni's allegedly "inappropriate comments"; and scheduling issues.  Ex.92, BL000033431.

135.    In an email on the same date, Lively asked Giannetti to first "tackle the 1st [Assistant Director] issue" and then turn to other "leadership" issues on the set.  Ex. 93, BL-000007955 at -56.  Lively's email did not mention "sexual harassment" or "discrimination" or make any accusation that any conduct rising to that level had occurred.

136.    The female Assistant Director to whom Lively objected was terminated shortly thereafter and replaced with Lively's preferred Assistant Director, a man.  Ex. 12, Giannetti Dep. Tr. at 138:2-7, 143:1-6; *see also* Ex. 39, BL-000018396 at -97 (Lively PGA letter, stating "I unfortunately was responsible for the firing of our 1st AD, Julie"); Ex. 94, BL-000011615 at -16.

137.    On May 28, 2023, Lively discussed the production with fellow cast member Jenny Slate.  Ex. 95, BL-000020770 at -1-4.  In this communication, Lively asked Slate not to mention her views about "inappropriate behavior" to Baldoni or Heath.  She also indicated that she had had discussions with Giannetti "but I asked her not to mention so I could personally tackle."  *Id.* at -1.

138.    Lively did not contact Wayfarer's HR department during the production, nor did she file a formal sexual harassment complaint with Sony or Wayfarer's HR departments at any time.  Ex. 12, Giannetti Dep. Tr. at 299:22-300:15; Ex. 96, WAYFARER_000149780 (email from Cynthia Barnes Slater confirming that Blake Lively did not make a complaint to Wayfarer's HR department).

139.     On June 1, 2023, Lively asked Baldoni, Heath, and producer Alex Saks into her trailer. Ex. 24, Lively Dep. Tr. at 188:7-16; Ex. 4, Heath 10/8 Dep. Tr. at 213:13-25.   Lively discussed various topics, including: Baldoni's comment that the wardrobe for Lively's character looked "sexy" or "hot"; Heath showing Lively an image of his wife at around the time she gave birth; an instance in which Heath entered her makeup trailer while Lively was in a state of undress; an instance in which Baldoni had cried in her trailer over the negative public reaction to Lively's casting; and Heath and Baldoni's practice of hugging other cast and crew members.  Ex. 97, NATHAN_00003767 attaching Ex. 219, NATHAN_00003768; *see also* Ex. 24, Lively Dep. Tr. at 191:13-192:4.

140.     Baldoni and Heath attempted to explain the innocent context and apologized for any discomfort Lively may have experienced. *See, e.g.*, Ex. 4, Heath 10/8 Dep. Tr. at 219:6-25, 284:6-12, 290:11-24.

141.     Ange Giannetti, a female Sony executive, learned about the meeting from Saks. Ex. 12, Giannetti Dep. Tr. at 157:1-23.  After learning about Lively's objections and the subsequent meeting, Giannetti chose not to report any issues to Sony or Wayfarer's HR departments.   She testified:  "I thought it was completely resolved, like grown-up people who sat down and talked about it, and she felt she said what she said, everyone was clear, and that was never going to happen again.  And it seemed – it seems like it was addressed."  *Id.* at 130:12-131:11.

142.     On or around the same time, Jenny Slate discussed the production with Giannetti and producer Alex Saks.  Ex. 12, Giannetti Dep. Tr. at 147:15-148:10; Ex. 11, Saks Dep. Tr. at 100:20-108:18; Ex. 95, BL-000020771; Ex. 98, SPE_BL00020 at -24.  Her comments focused primarily on Lively's concerns about the set.  Ex. 12, Giannetti Dep. Tr. at 149:1-4.  Slate also

said that Baldoni told her she looked "sexy" in her character's wardrobe on one occasion.  Ex. 11, Saks Dep. Tr. at 104:6-10.

143.    On May 30, 2023, Baldoni wrote messages to Lively and Slate separately, thanking them for their work and stating: "I was made fully aware of your concerns.  I wanted you to know that they are fully received, I hear you, and adjustments will be made accordingly. I appreciate your feedback and really looking forward to working with you at the end of the week." Ex. 99, WAYFARER_000141469 at -71; *see also id.* (message to Lively, using similar language).

144.    Giannetti testified that the "three incidents" she was aware of—namely, Lively being shown an image of Heath's wife's birth; Heath entering Lively's trailer; and Baldoni "call[ing] Slate hot in front of 300 people"—did not amount to "a reason to call HR."  She explained: "we had a meeting in the trailer.  It was resolved."  Ex. 12, Giannetti Dep. Tr. at 150:7-151:5.

145.    Neither Lively nor anyone else have identified any other incidents that they believe may have constituted sexual harassment or discrimination after June 1, 2023.  *See, e.g.*, Ex. 11, Saks Dep. Tr. at 198:22-199:2; *see generally* Ex. 3, SAC.

146.    Slate has testified in this litigation that she chose not to participate as a plaintiff in Lively's lawsuit because "I felt that I settled my issues on set and I wanted to move on."  Ex. 13, Slate Dep. Tr. at 296:3-8.

147.    Sarowitz has no firsthand knowledge of anyone on the set of *It Ends With Us* advising Baldoni that any behavior was unwelcome.  Ex. 6, Sarowitz Dep. Tr. at 198:2-16, 199:2-5.

148.    Prior to this litigation, Sarowitz was not aware of any formal HR complaints that were filed in connection with the film.  Ex. 6, Sarowitz Dep. Tr..at 202:3-9, 275:11-12.

149.    Sarowitz was not aware of any SAG complaints that were raised concerning Baldoni's behavior on the set of the film.  Ex. 6, Sarowitz Dep. Tr. at 202:3-9.

150.    Nor was he aware of any reported allegations of misconduct prompting an HR investigation at Wayfarer Studios.  Ex. 6, Sarowitz Dep. Tr. at 213:15-19, 221:19-24, 224:4-11, 256:17-20.

151.    Nor does Sarowitz have any knowledge of any actual behavior on set that could be described as sexual advances or requests for sexual favors, verbal abuse of a sexual nature, commentary about an individual's body, sexual prowess, or sexual deficiencies, sexual jokes and innuendo, leering, whistling, or touching, insulting or obscene comments or gestures, display in the workplace of sexually suggestive objects or pictures, or other physical, verbal, or visual conduct of a sexual nature, outside of the subject matter of the film itself.  Ex. 6, Sarowitz Dep. Tr. at 217:19-218:4.

152.    Sarowitz is not aware of any complaints raised on set that were not resolved.  Ex. 6, Sarowitz Dep. Tr. at 221:4-18.

153.    Sarowitz was aware that Jenny Slate had a concern on set at one point, but he was not aware of the specifics of the issue and believed it was resolved.  To his knowledge, there were no additional issues or concerns raised by Slate.  Ex. 6, Sarowitz Dep. Tr. at 266:5-14, 267:14-16, 268:24-25.

154.    Sarowitz has never talked to Slate or met her.  Ex. 6, Sarowitz Dep. Tr. at 267:17-24.

29

155.    Sarowitz is unaware of any alleged complaint by Lively that Baldoni referred to her as sexy.  Ex. 6, Sarowitz Dep. Tr. at 265:16-19.

156.    On June 1, 2023, Lively privately acknowledged to Slate that the set was "fine vibe wise."  Ex. 100, BL-000020779 at -80.

157.    Filming halted on June 14, 2023 due to the Writers Guild of America and SAG-AFTRA strikes.  Ex. 3, SAC ¶ 15; Ex. 24, Lively Dep.at 261:15-18; Ex. 71, WAYFARER_000141293.

**J.    During the Filming Hiatus, Lively Announced A List Of "Protections"**

158.    On July 19, 2023, approximately one month after filming had been interrupted due to the writers' strikes, Lively wrote to Baldoni asking to see the raw, unedited footage from the shoots, known as "dailies."  She told Baldoni she was "so happy and energized" to see the select footage he had previously sent.  She continued: "Such solid work from everyone on and off camera."  Ex. 101, BL-000011555 at -56.

159.    On August 29, 2023, Lively wrote to her agent, Zavala, to complain about not being provided with a full cut of the film or the dailies.  She wrote: "They're all clowns.  I have my Hr report ready also fyi."  Ex. 102, BL-000021967 at -71.

160.    During the next two months, Lively did not file any HR complaint.

161.    On November 9, 2023, Lively's attorney sent Imene Meziane, Vice President of Business and Legal Affairs at Wayfarer, and Joseph Lanius, outside counsel to IEWUM, a list of "Protections for Return to Production."  Ex. 103, WAYFARER_000140991.

162.     In an email accompanying the list, Lively's attorney stated that the list was being provided "to remedy the misconduct that Ms. Lively and others had allegedly reported."  Lively's attorney further stated that items on the list would need to be "observed by the Film's

producers" "in order for [Lively] to feel safe returning to the production."  The email also stated "While we reserve all legal rights, at this stage our client is willing to forego a more formal HR process in favor of everyone returning to work and finishing the Film as long as the set is safe moving forward."  It continued: "This letter is not intended to be, nor should it be construed as, a waiver, release or relinquishment of any of our client's rights or remedies, legal or equitable, all of which are hereby expressly reserved."  Ex. 103, WAYFARER_000140991.

<u>1.  Several of the Requested "Protections" Were Already Substantially in Place.</u>

163.    Lively requested that an intimacy coordinator must be present at all times when she was on set.  SAC Ex. A, ¶ 1.

164.    IEWUM had already retained an intimacy coordinator and made her available to meet with Lively.  *See* Ex. 53, BL-000009220.

165.    Lively requested a closed set for any scene involving simulated sex or nudity, subject to a nudity rider and demanded that there be no rehearsal or filming of intimate scenes without such a rider in place.  Ex. 3, SAC; SAC Ex. A, ¶¶ 2, 7, 15.  Lively also sought an exception to the closed set requirement for an unspecified "representative of her choosing."  *Id.* ¶ 8.

166.    The film's intimacy coordinator had already sought Lively's input on all intimate scenes in advance, and the parties had negotiated a nudity rider that Lively had already been provided.  Ex. 60, 24-CV-10049_0001816.

167.    Lively requested pre-approval of any scenes involving physical touching, simulated sex, or nudity.  Ex. 3, SAC; SAC Ex. A, ¶ 3.

168.    The Offer Letter setting out the basic terms of Lively's participation already provided that there would be "no nudity / simulated sex without Artist's prior written consent and negotiation/execution of a nudity rider."  Ex. 28, HEATH_000045678 at 80.

169.    Lively requested that any footage involving "any nudity and/or simulated sex…previously shot without the Nudity Rider" in place could not be used.  Ex. 3, SAC; SAC Ex. A, ¶ 7.

170.    There were no such scenes.  At the time of Lively's requests, no intimate scenes involving her had been filmed.  Ex. 58, Talbot Dep., at 73:18-24.  The intimate scenes involving other actors, in which Lively had no involvement, had been filmed pursuant to nudity riders and with the assistance of an intimacy coordinator.  *See* Ex. 58, Talbot Dep., at 195:6-196:1.

171.    Lively requested that no one enter her trailer while she was in a state of undress. SAC Ex. A, ¶ 6.

172.    Lively had always had a lock on her trailer available to use to maintain her privacy. Ex. 87, Baker Dep., at 82:5-21.

173.    Lively also had personal security guards.  Ex. 24, Lively Dep. Tr. at 125:10-24.

174.    Lively requested an "A-list stunt double, approved by [herself], to rehearse and perform any scenes" depicting rape or sexual violence.  SAC Ex. A, ¶ 14.

175.    The Offer Letter setting out the basic terms of Lively's participation already provided that Lively had approval rights over any double.  Ex. 28, HEATH_000045678 at 80.

### 2.  Other requested "Protections" implicated Lively's Own Conduct.

176.    Lively requested that there was "to be no spontaneous improvising of any scenes involving physical touching, simulated sex, or nudity."  SAC Ex. A, ¶ 3.

177.    On May 19, 2023, Lively oversaw a scene she herself added to the script, in which her character kissed Baldoni's character in every take, although there was no kiss in the script.  Ex. 104, video clip excerpt from WAYFARER_000140494.

178.    Lively requested that no comments be made concerning her personal, physical appearance.  SAC Ex. A, ¶ 4.

179.    Prior to shooting, Lively had repeatedly raised concerns about her own weight and physical appearance to Baldoni and her agent in connection with the shoot.  Ex. 41, BL-000008801; Ex. 42, BL-000008819-20; Ex. 44, BL-000008821-22; Ex. 43, BL-000021371.

180.    On one occasion, Lively advocated to change her character's wardrobe because her preferred option was "much sexier."  Ex. 105, BL-000011518 at -19; *see also* Ex. 106, BL-000007943 at-44 (Lively, writing: "beanie is much sexier. It's the look … I think this is hot. But you look at me.").

181.    Video footage also shows Lively explaining to a group of male crew members why her boots are "so sexy" because they are just "bone hitting wood." Ex. 107, video clip excerpt from WAYFARER_000140494.

182.    Lively also commented on the physical appearance of other actors in connection with the project, both before and after issuing these demands.

a.    When discussing one potential actor in the film with Baldoni on March 29, 2023, Lively said she was meeting "an actor…who Sony likes (he's pretty)."  Ex. 108, BL-000009166 at -67.

b.    When discussing the marketing of the film in May 2024, Lively wrote to a younger male cast member: "I'm becoming pimp adjacent. Put on a short little skirt and get on that corner, Skelnar."  Ex. 109, BL-000020058 at -59.

33

183.    Lively and Jenny Slate, another actor in the film, commented on the physical appearance of another female celebrity while on set.  Ex. 95, BL-000020770 at -71.

184.    Lively requested there be "no physical touching (including hugging) of [herself], her on-set personnel and/or her employees.  SAC Ex. A, ¶ 4.

185.    Lively herself had initiated hugs with Baldoni (Ex. 8, Baldoni 10/7 Dep. Tr. at 116:17-117:15) as had several members of her staff (*id.* at 117:20-118:14).

186.    More broadly, all staff members had engaged in large "hugging circles."  Ex. 34, Justin Grey Stone Dep. at 177:16-178:6.  A producer on the film observed that "there was a lot of hugging and touching amidst the Wayfarer team. It's just seemingly sort of how they do business and interact with each other."  Ex. 11, Saks Dep. Tr. at 139:6-9.

187.    Video footage shows Baldoni hugging male members of the cast and crew as well. Ex. 110, video clip excerpt from WAYFARER_000140494; Ex. 280, video clip excerpt from WAYFARER_000140494.

188.    Lively requested there were to be "no discussions of personal experiences with sex or nudity."  SAC Ex. A, ¶ 5.

189.    Lively had previously volunteered to Baldoni details of her personal sex life.  Ex. 8, Baldoni 10/7 Dep. Tr. at 176:8-178: 21.

190.    Jenny Slate, another female actor, privately admitted that she, too, had made personal, sexual comments on set.  Ex. 95, BL-000020770 at -73.

191.    Lively's list also included several items that were wholly unrelated to her sex, gender or physical appearance, including demands that Baldoni not "speak" to her dead father, mention his own religious beliefs or ask for hers, or have "private, multi-hours meetings in

34

Lively's trailer with Mr. Baldoni crying," as well as a demand that Lively receive notice of COVID exposures on set.  Exs. 111-112, BL-000038461-62.

### 3.  Defendants Are Pressured To Accept Lively's Demands

192.    On November 11, Meziane explained to Lively's representatives that certain of the seventeen "Protections" were not viable.  Ex. 113, HEATH_000046158.

193.    Lively and her counsel responded by threatening Wayfarer and Sony that Lively would not return to complete the film unless her "Protections" were accepted without negotiation.  Ex. 33, Zavala Dep. Tr. at 117:8-118:19; Ex. 114, Zavala Dep. Ex. 5; Ex. 12, Giannetti Dep. at 296:10-12.

194.    Sony pressured Wayfarer to accede to the "Protections" because if Lively did not return to the set, the film would not be finished or would be un-releasable, and Sony and Wayfarer had already invested and spent a "tremendous amount of money for the film."  Ex. 12_, Giannetti Dep. Tr. at 295:18-296:8, 300:25-303; Ex. 115, Giannetti Dep. Ex. 19.  As of November 2023, Sony had invested at least $20 million and Wayfarer had invested even more. Ex. 12, Giannetti Dep. Tr. at 296:21-297:5.

### 4. The Contract Rider "Agreement"

195.    On December 15, 2023, Lively's counsel sent Meziane a "draft side letter"—*i.e.*, a draft of what Lively's First Amended Complaint refers to as the "Contract Rider Agreement" ("CRA").  Ex. 116, BL-000038466-75; Ex. 3, SAC ¶426.

196.    In an accompanying email, Lively's counsel stated that the draft side letter "contains the list of [seventeen] protections originally forwarded in November."  Ex. 116, BL-000038466.

197.     Following further negotiations, and because of the above-mentioned pressure (Ex.

12, Giannetti Dep. Tr. at 295:18-296:8), on or about January 19, 2024, Heath, acting on behalf of

IEWUM, signed the CRA as a rider to the long-form agreement that was contemplated in the

Offer Letter.  A true and correct copy of the executed CRA is at Ex. 117, HEATH_000045307.

198.     The parties to the draft CRA were IEWUM and Blakel, Inc.  Ex. 117,

HEATH_000045307.

199.     The CRA contained a provision stating:

> There shall be no retaliation of any kind against Artist for raising concerns about the
> conduct described in this letter or for these requirements. Any changes in attitude,
> sarcasm, marginalization or other negative behavior, either on set or otherwise, including
> during publicity and promotional work, as a result of these requests is retaliatory and
> unacceptable, and will be met with immediate action.

Ex. 117, HEATH_000045307.

200.     The CRA expressly stated that it reflected "*additional* terms and conditions …

which shall be deemed *incorporated into*" the ALA.  Ex. 117, HEATH_000045307 (emphasis

added).

201.     The first "Whereas" clause of the CRA states that "the parties wish to confirm the

conditions under which Lender has agreed to cause Artist to render acting services on the Picture

following the break in production of the Picture related to the 2023 WGA and SAG-AFTRA

labor strikes."  Ex. 117, HEATH_000045307.

202.     The CRA did not contain any provision embodying a promise that Lively would

forego or delay any claim against any party.  Ex. 117, HEATH_000045307.

203.     At the time the CRA was executed, no long-form agreement had been signed, nor

had the terms of any long-form agreement been finalized.  Heath Decl. ¶¶17-18.

204.    The CRA did not include any admission or acknowledgement of improper conduct or that any of the conduct prohibited by the rider had ever occurred.  Ex. 3, SAC ¶ 149; SAC Ex. B.

205.    Wayfarer Studios was not a party to the CRA.  *See* Ex. 117, HEATH_000045307.

206.    Lively has not provided any evidence that the compensation she received for her work was reduced following her demand for "Protections."

207.    Following Lively's insistence on a list of "Protections," and the execution of the CRA, her role in the production and involvement in the film was not constrained or diminished in any way.  Instead, Lively's control over the film continued to expand.  On December 28, 2023, Baldoni wrote that although he was angry and upset about "letting Blake take over a film and re-write a movie we spent years developing, writing and funding … I am waving the white flag and submitting. I am going to give her 98% of what she wants."  Ex. 118, BALDONI_000018926.

### 4.  Lively And Her Husband Make Additional Demands During A Meeting At Her Home

208.    On January 4, 2024, Lively, Baldoni, Heath, and others met at Lively's apartment, at Lively's request.  Ex. 12, Giannetti Dep. at 304:21-307:4; Ex. 119, AS000101.  The meeting was intended to review new pages and discuss other aspects of production before shooting.  Ex. 12, Giannetti Dep. at 305:11-22.  When the parties arrived, they were surprised to see that Lively had invited her husband, Ryan Reynolds.  Ex. 120, SPE_BL0004526 at -27.  Reynolds then berated the Wayfarer Parties for their alleged mistreatment of his wife.  Ex. 12, Giannetti Dep. at 304:21-307:4; Ex. 3, SAC ¶ 20.

209.    During the meeting, Lively read a longer list of demands off her phone.  *See* Exs. 111-112, BL-000038461-62; *see also* Ex. 3, SAC ¶20.  In addition to the "Protections" discussed

37

above, these demands appeared to refer to several incidents Lively had raised previously, including Baldoni's reference to circumcision in their first meeting; his discreet inquiry about her weight in April 2023; and the events she had discussed in June 2023, such as the birth video she was shown by Heath and Baldoni's references to his prior pornography addiction; as well as insinuations that Defendants needed to be told not to discuss "personal experiences with sex" or make "sexual comments" to female cast or crew.  Lively also demanded that Baldoni not "speak" to her dead father, mention his own religious beliefs, or have "private, multi-hours meetings in Lively's trailer with Mr. Baldoni crying." Lively also demanded notice of COVID exposures on set.

210.    Although the attendees were stunned by the nature of the meeting, they made efforts to assuage Lively's anger though neither Heath nor Baldoni admitted any wrongdoing. Ex. 12, Giannetti Dep. at 304:21-307:4; Ex. 4, Heath 10/8 Dep. Tr. at 290:11-24; Ex. 121, BALDONI_000026204.

211.    Sarowitz was not present at the meeting that took place in New York on January 4, 2024.  Ex. 6, Sarowitz Dep. Tr. at 273:6-10.  He does not recall exactly when he learned about the meeting.  Ex. 6, Sarowitz Dep. Tr. at 304:21-25.  Sarowitz recalls speaking to Baldoni about the meeting at some point in time but does not know the exact date they spoke.  Ex. 6, , Sarowitz Dep. Tr. at 303:19-304:7.

212.    Sarowitz was never aware that anyone ever referred to the meeting as an "HR complaints meeting."  Ex. 6, Sarowitz Dep. Tr. at 274:25-275:5.

213.    Sarowitz is aware that Lively sent a list of demands for her return to work, which were honored.  Ex. 6, Sarowitz Dep. Tr. at 210:11-211:3.

214.    Sarowitz has no knowledge that anyone at Wayfarer Studios committed any of the acts implied in the list of demands.  Ex. 6, Sarowitz Dep. Tr. at 227:2-13, 291:7-14.

215.    Sarowitz understood that Wayfarer Studios acceded to Lively's list of demands under duress and with a caveat saying that the studio did not necessarily agree with the demands. Ex. 6, Sarowitz Dep. Tr. at 291:7-14.

216.    Around the time Lively provided her list of demands, representatives from Wayfarer Studios spoke to counsel, who advised there were no events that they felt would require an investigation.  Ex. 6, Sarowitz Dep. Tr. at 224:12-15.

## K.    After Making Her "Protections" Demands, Lively Revised Several Scenes To Be More Sexually Charged

217.    Between December 6 and December 10, 2023, Lively insisted upon revising, and did revise, numerous scenes in the film.  Ex. 122, SPE_WF0000021; Ex. 123, SPE_WF0000022; Ex. 124, SPE_WF0000024; Ex. 125, SPE_WF0000025; Ex. 127, SPE_WF0000026; Ex. 127, SPE_WF0000027.

218.    In a revision of a karaoke scene, Lively explained that she was trying to "solve the conceptual issue that we had with karaoke, in that karaoke is…not a sexy interaction."  Ex. 125, SPE_WF0000025.  In her revised scene, a female character ends up in her male partner's clothing, while the male partner is apparently naked.  A direction when Lively's character observes Baldoni's character reads: "This guy has one gear.  Sex."  Ex. 128, 24-CV-10049_0000319, at -355.  Later the characters are described as "white knuckling their sexual tension."  *Id.* at -356.  Baldoni's character says to Lively's character: "I can't imagine what it would be like. To have you. What I could do for you."  *Id.* at -358.

219.    In another December 2023 revision, Lively directed Baldoni's character to say: "I'm a ripped neurosurgeon for chrissake. Have you seen anyone who looks like me who *isn't* on a daytime soap." Ex. 283, AS000244 at -248 (attached to AS000215).

**L.    The Second Phase Of Filming, Including All Of Lively's Intimate Scenes, Proceeded Without Incident**

220.    Production resumed on January 5, 2024. Ex. 12, Giannetti Dep. at 173:7-8.

221.    The second phase of filming took place primarily on a New Jersey set and with a few additional days in California. Ex. 24, Lively Dep. at 261:24-25.

222.    That day, Lively told Slate: "You're coming into a different set … You will find it perfectly professional and sterile and lovely." Ex. 129, BL-000020898.

223.    One week into filming, on January 14, 2024, Lively told Slate that she felt "Solid. It's a professional set and we're getting good work." Ex. 130, BL-000020899 at -900.

224.    Warren Zavala, Lively's agent, visited the set during the second phase of production with Lively's counsel. Zavala discussed with two other executives involved with the film that Lively and Baldoni were successfully collaborating and the executives "were feeling great about everything." Zavala has testified that, during the second phase of production, "It seemed like we were in a much better place, and I think Blake was feeling very positive about the final phase of the movie." Ex. 33, Zavala Dep. Tr.at 124:3-15; 236:19-237:22.

225.    Lively "managed the politics and HR concerns" on set, "acting as an intermediary to keep crew and case engaged, safe, and on board." Ex. 39, BL-000018396 at -97. Lively also "led hiring of a new intimacy coordinator and intimacy doubles" and "helped to manage the logistics and protections of a closed set. And when there were oversights, I stopped production to make sure the set was safe and complying with all players nudity riders and contracts." *Id.*

226.    Filming concluded on February 9, 2024. Ex. 3, SAC ¶ 21.

**M.    Lively Exercised Near Total Control Over The Second Half Of Production**

227.    Lively's letter to the PGA asserts that she had extensive control over the

production during the second phase of filming and thereafter.  Ex. 39, BL-000018396 at -97-98.

Among other things, Lively stated:

> When we came back after the strikes, I was writing as we were shooting…
>
> On round two of the film…I would speak to our 1st AD Chris Surgent every night for nearly an hour
>
> I was the director's partner in all creative and logistical concerns
>
> I called and led meetings with all department heads, the studio and the distributor when we had extenuating circumstances challenging our production plan

**N.    Lively Used The Influence Of Her Famous Friends To Take Over The Film Entirely**

228.    On or about February 22, 2024, Lively told Sony that she would not agree to

promote the film unless she was permitted to participate in the edit.  Ex. 131,

BALDONI_000018831.

229.    During the ensuing weeks, Lively made extensive edits to the film, trailer, and

poster.  *See* Ex. 132, BL-000019015 at -16; Ex. 133, BL-0000188 at -09.

230.    Lively told famous friends, including Matt Damon, Lucy Damon, and Ben

Affleck that she "rewrote the script. I directed every actor."  Ex. 134, BL-000027070.  She also

did not hesitate to disparage Baldoni among her Hollywood crowd, describing him to Ben

Affleck, for example, as a "chaotic clown."  *See* Ex. 135, BL-000027069 ("I ended up rewriting

and restructuring the entire script, I also ended up having to direct the movie via the chaotic

clown 'director'/actor/producer/ financier/studio head at the center.").

231.    Lively urged Hoover as well as her famous friends, including Matt Damon, Lucy

Damon, Ben Affleck, Bradley Cooper, and Taylor Swift to support her version of the film over

Baldoni's. Ex. 134, BL-000027070; Ex. 135, BL-000027069; Ex. 136, BL-000018825.  For

instance, in April 26, 2024 messages, Lively and Swift discussed a plan to use Swift's song in the film's trailer. Swift wrote: "If Justin was strategic He would be like no Taylor swift in the trailer Because that gives you more power over the film, that's your ally not his." Lively responded: "You are so right…He should've run from your music…How stupid. This was his only shot at having the appearance of an upper hand." Ex. 137, BL-000018810.

232.    On May 30, 2024, Josh Greenstein, the President of Sony's Motion Picture Group, informed Lively that Baldoni's cut had scored higher than Lively's in audience testing. Lively responded: "Spoke with Colleen. She feels like I do, still full steam ahead w my cut. … Colleen and I are declaring now, this is the cut. … It's done from my perspective, from Colleen's, and from Taylor's. And from Sony's?" Ex. 138, BL-000019326.

233.    Lively also demanded changes to the film's credits, including moving up her name ahead of Heath's as a producer, changing the order of cast credits, contrary to existing contractual terms, and removing a credit stating that *It Ends With Us* was a "film by" Baldoni altogether. Ex. 139, BL-000019455; Ex. 140, SPE_WF0000641; Ex. 141, SPE_BL0022958; Ex. 8, Baldoni 10/7 Dep. Tr. at 328:9-17 ("Ms. Lively had requested that my name be removed. So I had my "a film by" credit removed."); Ex. 142, Greenberg Dep. Tr. at 138:2-19.

234.    Lively further objected to Baldoni's name being included in the trailer and near her name on the film's promotional poster. Ex. 142 at, Greenstein Dep. Tr. 325:6-327:14 ("Blake didn't want his name by her name…She did not feel comfortable having his name by her name.").

235.    Lively also insisted that Baldoni's image be removed from marketing materials and the film's poster, which ultimately just featured Lively herself. Ex. 8, Baldoni Dep. (Oct. 7, 2025) at 328:9-17; Ex. 143, BALDONI_000024619.

236.    On or about June 25, 2024, in connection with her work on the film, Lively

sought official recognition of her work from the Producers Guild of America.  Ex. 39, BL-

000018396.  Her letter details her extensive control over the film, including in post-production.

Ex. 39, BL-000018396 at -96-98. She wrote: I've produced every moment of this film, from pre-

production, through production, into post, and now into marketing and worldwide release … So

much has changed … The most significant being that the cut of the film that was selected to be

released, is my cut." Among other things, Lively stated:

> After working with the film's original editor, "I worked with my own editors [from] May
> 2 onward"
> "I brought on a new composer" and "hand selected 90% of the songs in the film"
> "I've been working on the [visual effects], overseeing every shot that makes it into the
> film"
> "The cut of the film that I led was selected as the version of the film that will be
> released."

237.    The film's post-production supervisor wrote: "For the last three months of the

post-process, Ms. Lively has been involved in reshaping every aspect of the film including the

final locked edit, the sound, the VFX, the score and song choices … She hired a new editor who

she has been working with around the clock to re-edit and lock the film. She made all the

decisions on where and when the last few previews would take place. … She has been

overseeing all approvals of [visual effects]."  Ex. 144, BL-000018409.

238.    Lively asserted that she was heavily involved in developing the marketing

strategy for the film.  Ex. 39, BL-000018396 at -98-99.

239.    Josh Greenstein, the President of Sony's Motion Picture Group, wrote that Lively

"has been involved in ever decision when it comes to dating the movies and determining the

release pattern … She might be the best marketer of any producer I have worked with … we

have marketing calls daily."  Ex. 145, BL-000018415.

240.    On July 7, 2024, Lively told renowned playwright Sarah Ruhl: "I have been reediting the entire film, I brought on my composer, and whole team to redo everything."  Ex. 146, BL-000028962.

241.    The film premiered in New York City on August 6, 2024 and it was released to the public on August 9, 2024.  Ex. 24, Lively Dep. at 274:13-17, 275:1-18.

**O.    Lively And Her Husband Took Steps To Harm Baldoni's Reputation**

242.    On or about July 17, 2023, during the filming hiatus and before presenting her "protections" demands, Lively and her husband Ryan Reynolds "unfollowed" Baldoni on Instagram.  *See* Ex. 3, SAC at 186 n.26.

243.    After the conclusion of filming and leading up to the premiere, Lively and her husband Ryan Reynolds openly attacked and disparaged Baldoni, seeking to tarnish his reputation in Hollywood, including among their famous and powerful friends, as well as with fellow cast members, and in the media.  For instance:

   a.    On May 17, 2024, Lively and Reynolds pressed Matt and Lucy Damon to support Lively's cut of the film.  Reynolds told them that Baldoni was "a malignantly vein[sic], sociopathic FAUXminist with almost no sense of boundaries or shame. I cannot believe he hasn't gone to jail…".  Ex. 134, BL-000027070.

   b.    The same day, Lively wrote Ben Affleck, asking seeking his support.  She described Baldoni as a "chaotic clown 'director'" and said there were "wild HR issues" on set. Ex. 135, BL-000027069.

   c.    On May 24, 2024, Lively wrote to fellow cast member Brandon Skelnar: "the word is out [about Baldoni and Heath]… they wreck [sic] havoc everywhere they go. And everyone sees it. Then they come to me."  Ex. 109, BL-000020058, at -20063.

44

d.  On June 19, 2024, Lively exchanged messages with Colleen Hoover and another prominent author, Tarryn Fisher, in which Lively openly criticized Baldoni and labelled him "a narcissist."  Ex. 147, BL-000019740.

e.  Seeking a broader audience, Lively conveyed her negative views of the production to Anna Wintour, Vogue's world-famous editor.  Ex. 148, BL-000032000 (message from Anna Wintour to Lively referring to "how hard a situation it was for you [to make this film]").

244.    During the relevant period, Baldoni, Reynolds, and Lively were all represented by WME, a famous and powerful talent agency.  Ex. 142, Greenberg Dep. at 12:16-18, 17:7-18:14, 35:25-36:2.

245.    On July 13, 2024, Reynolds wrote Patrick Whitesell, Executive Chairman of WME, describing Baldoni as "a thoroughbred, predatory fraudster" and requesting that Baldoni's WME agent Danny Greenberg be enlisted to "present options," including, among others, having Baldoni write "15 page apology letters to Blake and dozens of other folks from the film."  Ex. 149, RR-SUBPOENA-000000082.

246.    On or about June 20, 2024, a promotional event for the film was held at Book Bonanza, Hoover's annual romance-book convention.  Baldoni was not permitted to attend.  Ex. 11, Saks Dep. Tr. at 150:7-152:22. Ex. 75, Ferrer Dep. Tr. at 272:16-276:3.  At the event, Hoover and Lively pointedly avoided even referring to Baldoni by name.  Ex. 11, Saks. Dep. Tr. at 151:24-153:17.

247.    In July, Lively excluded Baldoni from a marketing shoot for the film conducted by her husband's marketing company, Maximum Effort.  Ex. 152, ABEL_000018946; Ex. 142, Greenberg Dep. Tr. at 227:3-14.

248.    Lively and others at Sony were aware that the media, including social media, was picking up on Lively's efforts to alienate Baldoni from the cast and film, while generating adverse publicity about Baldoni.  For instance:

>    a.    On July 11, 2024, the book's author, Colleen Hoover, sent Lively an image of a post from Deuxmoi, a gossip blog with two million followers, noting that Baldoni had been excluded from all press for the film and that Lively had unfollowed him on social media.  Ex. 153, BL-000021232.

>    b.    On July 29, 2024, Sony executives discussed numerous comments on Lively's Instagram account observing that Baldoni had been absent from press for the film.  Ex. 154, SPE_BL0008472.

**P.    Lively Took Steps To Exclude Baldoni From The Premiere Of His Own Film**

249.    On or about July 22, 2024, Lively insisted to Sony that she would not attend the film's premiere if Baldoni was present as well, and she encouraged the book's author and other cast members to take the same position.  *See* Ex. 155, WME_00001254 (Danny Greenberg, writing: "[Lively's] been brilliantly choreographing this for a while."); Ex. 156, WME_00001266.

250.    Ultimately, Baldoni and the Wayfarer team were not allowed to be on the red carpet during the premiere, except during specified times when Lively was not present.  Baldoni and his team were also required to wait in a basement while Lively conducted her red carpet pictures, and then view the film on a separate screen.  Ex. 2, Heath 10/9 Dep. Tr. at 96:18-21; Ex. 6, Sarowitz Dep. Tr. at 140:11-13; Ex. 157, WAYFARER_000141754; Ex. 158, WAYFARER_000141765.

251.    Following the premiere, Baldoni was excluded from a "sizzle" reel, promoting the film by showing attendees.  Ex. 159, SPE_BL0023136.

**Q.    Baldoni, Heath, and Wayfarer Retained A Crisis PR Firm To Assist And Advise Them In The Face Of Growing Adverse Media Attention**

252.    For years prior to the events at issue here, Jennifer Abel, a public relations professional, had worked with Wayfarer and Baldoni on PR matters.  Ex. 160, Abel Dep. Tr. at 38:15-40:17.

253.    Wayfarer and Baldoni were concerned that any adverse media would harm the reception and success of the film.  Ex. 161, Hanks Dep. Tr. at 275:8-15; Ex. 162, HEATH_000019467.

254.    Even as the negative press intensified, Wayfarer gave Abel and her colleagues "explicit instructions…to not place any story that was negative about Blake [Lively] or otherwise.  Our main focus was to mitigate the negative press that was breaking, organically, from the press tour."  Ex. 160, Abel Dep. Tr. at 340:15-22.

255.    On July 24, 2024, Heath and Jen Abel agreed that "we should not be [doing] anything proactive" in response to the swirling press rumors.  Ex. 282, JONESWORKS_00017397.

256.    On or about July 25, 2024, Baldoni and Heath first met with TAG, Melissa Nathan's PR firm, to discuss the possibility of retaining the firm for crisis PR.  Ex. 164, KCASE-000005773.  A TAG employee's notes from that meeting state that Wayfarer was "Not going to fire offensive bullets but [wanted] to have a strategy."  *Id.*

257.    On July 26, 2024, TAG circulated a proposed "Scope of Work.".  Ex. 165, NATHAN_000003795.  It included providing "support" for Baldoni and others with "independent strategic counsel," "curat[ing] statements, background information, and talking

47

points for the press reflecting [Wayfarer's] core values, key messaging, and the integral role they played to bring this film to life," developing a "scenario planning document," identifying "third party validators," working to "mitigate negative stories / correct inaccuracies," and monitoring coverage, as well as providing input on press strategies and media training.

258.    On July 30, 2024, Wayfarer President Tera Hanks wrote to Stephanie Jones: "Melissa [Nathan] would not be having any comms outside of our internal teams. She would be working through scenario planning with us to be armed if needed."  Ex. 166, JONESWORKS_00030156.

259.    Wayfarer hired TAG and Nathan on August 2, 2024.  Ex. 167, JONESWORKS_WAYFARER_000003009.

260.    On August 2, 2024, TAG circulated a "Scenario Planning" document listing a series of possible options for responding to the public relations crisis facing Baldoni and Wayfarer.  Ex. 168, NATHAN_000005497.   Nathan has testified that document was not an approved action plan, but only a preliminary document for the purposes of "scenario planning," with each suggestion being only "a possibility.  This is not definitive."  Ex. 169, Nathan 9/29 Dep. Tr. at 111:18-112:4 ("[T]his is scenario planning. So this is a possibility. This is not definitive.").

261.    On August 4, 2024, TAG employees exchanged messages discussing the "need to explain to [Heath]/ Jen ahead of time not to get hyper focused on document" because they "can't get stuck on something that might change."  Ex. 170, KCASE-000002654.

**R.    In The Days After The Premiere, Negative Press Against Baldoni Intensified**

262.    On or about August 7, 2024, additional cast members unfollowed Baldoni on social media, at Lively' prompting.  *See* Ex. 171, SPE_WF0000719 at -721 (Maggin: "The

unfollowing has really picked up today." Saks: "Why did everyone have to fucking do that? … It's Blake, I'm sure.").

263.    On August 8, 2024, *The Hollywood Reporter* published an article entitled: "Did Blake Lively, Justin Baldoni Have A Rift Over It Ends With Us? Sleuthing TikTokers Think So." Ex. 3, SAC ¶ 237 n.36. The article discussed Baldoni being excluded from press for the film and unfollowed by Lively and other cast members.

264.    On or about August 8, 2024, Lively's PR representative, Leslie Sloane, told Sara Nathan, a gossip reporter, that the "whole cast isn't speaking with [Baldoni]." Ex. 172, LS-0000223 at -224. Sloane testified that she provided this information to "soften up" and "balance out the story" that the reporter was working on, which she anticipated would be "negative about Justin and Blake." Ex. 173, Sloane Dep. Tr. at 100:15-104:7.

265.    Sloane also told Sara Nathan that Lively and Baldoni "had [separate] screening rooms at the premiere. Everyone but him was with the cast. His cult had their own room." Ex. 172, LS-0000223 at -224. Sloane testified that she provided this information "to balance [the reporter's] story." Ex. 173, Sloane Dep. Tr. at 103:8-18.

266.    On August 8, 2024, Sloane communicated with James Vituscka, a gossip reporter at the *Daily Mail*. Ex. 174, LS-0000243. Sloane denied that there was any "power struggle" between Lively and others on set; that Lively and Reynolds "had insisted on rewriting the movie;" and that Lively "got very opinionated over directorial issues." *Id*. at -244. Sloane told Vituscka his sources were "lying," although she did not know whether her denials were accurate at the time. Ex. 173, Sloane Dep. Tr. at 148:4-152:12.

267.    The same day, Sloane complained to Danni Maggin, a Sony marketing executive, that Stephanie Jones, then a member of Baldoni's press team, had been "calling around saying

Blake stuff," which included "that Blake and Ryan insisted on rewriting the movie and …that she got very opinionated over directorial issues and that Justin found her difficult.  Blah blah blah."  Ex. 175, LS0000314 at -315.

268.    Heath, Abel, and Nathan did not want to add fuel to the fire by prompting additional adverse media.  In particular, they told Jones not to contact the press about Lively.  Upon learning that Jones had done so, on August 9, 2024, Heath wrote to Jones: "I remind us all not to contact, respond, or reply to anyone under any circumstances."  Ex. 176, JONESWORKS_00030241.

269.    On August 9, 2024, *The Daily Mail* published an article entitled: "Disturbing TRUTH behind why Blake Lively and her It Ends With Us stars are feuding with Justin Baldoni."  Ex 177, James Vituscka & Lillian Gissen, "Disturbing TRUTH behind why Blake Lively and her It Ends With Us stars are feuding with Justin Baldoni" (Aug. 15, 2024), https://www.dailymail.co.uk/tvshowbiz/article-13727789/it-ends-blake-lively-justin-baldoni-feud.html.  That article quoted sources asserting Baldoni was 'chauvinistic' and 'borderline abusive' on set.  It also noted that "rumors of a vicious feud" between Lively and Baldoni had "been swirling for weeks, with online sleuths highlighting how the on-screen love interests were not pictured together at the US premiere – while some cast members have blatantly swerved questions about the director."

270.    That day, Lively's agent wrote to Lively: "I just read the Daily Mail article. I feel it puts enough out there."  Ex. 178, BL-000020323 at -324.

271.    Sony executives believed the *Daily Mail* article was planted by Lively's PR representative, Leslie Sloane.  Ex. 179, SPE_WF0000740179.

**S.    Wayfarer Hired Street Relations To Monitor Social Media**

272.    On August 7, 2024, Abel wrote to Nathan: "I think we really need to put the social combat plan…into motion."  Ex. 180, NATHAN_000003599 at -602.  She noted that she was waiting on a greenlight from Heath to do so.  *Id.* at -603.

273.    On August 8, 2024, Nathan proposed a quote for a new scope of work that included additional social media engagement.  Ex. 181, JONESWORKS_00006978; Exs. 182-183, SR 1.00000007-08.

274.    On or about August 9, 2024, Wayfarer engaged Jed Wallace's firm, Street Relations, to monitor the social media discussion concerning Lively, Baldoni, and the film.  Ex. 184, SR 1.00000011.

275.    Jed Wallace has testified that his firm did not surreptitiously spread negative information about Lively and has no ability to do so.  Ex. 185, Wallace 10/9 Dep. Tr. at 23:19-24:1 (describing Street Relations' capabilities in the digital space as "minimal" and limited to "monitoring").

**T.    Lively Suffered Backlash**

276.    In August 2024, Baldoni himself repeatedly made positive comments about Lively in the press. For example, Baldoni told *Entertainment Tonight* that he thought Lively was "ready to direct." Ex. 186, BL-000003219.

277.    Melissa Nathan confirmed to Sloane that she was not "seed[ing] or plant[ing] negative press about Blake Lively on Justin's behalf," Ex. 173, Sloane Dep. Tr. at 205:15-19.

278.    On August 8, 2024, Nathan also told her own sister, gossip reporter Sara Nathan, that she had not contacted reporters on Baldoni's behalf and did not intend to do so.  Ex. 187, NATHAN_000002493.

279.    A gossip reporter, James Vituska, separately told Sloane that Nathan had never planted anti-Lively stories with *the Daily Mail*. Ex. 173, Sloane Dep. Tr. at 287:21-288:3.

280.    As of August 11, 2024, Baldoni believed there was a "truce" between his PR team and Lively's, which would inure to the benefit of the film.  Ex. 188, JONESWORKS00015018 at -18.

281.    On August 11, 2024, the *New York Times* published an article entitled "What 'It Ends With Us' Says About the Blake Lively Brand."  Ex 189, Esther Zuckerman "What 'It Ends With Us' Says About the Blake Lively Brand" (Aug. 11, 2024), https://www.nytimes.com/2024/08/11/movies/it-ends-with-us-blake-lively-brand.html.  The article discussed Lively's efforts to cross-promote the film and her personal haircare and alcohol brands as well as her husband's brand of gin.  For instance, it stated: "A promotional email explained how to make 'It Ends With Us'-inspired cocktails using Betty Buzz. One recipe called for Reynolds's gin. It's a cheery gimmick that seems awkwardly out of step with the context of the film itself, which tells the story of a woman dealing with domestic violence. … [Lively's] performance is almost beside the point. Lively has transformed the project into film-as-commerce."  *Id.* There is no evidence that Defendants played any role in this article.

282.    On August 13, 2024, in an analysis of the social media sentiment regarding the film, a Sony executive observed: "Some younger audiences felt Justin spoke to the DV [domestic violence] subject matter more seriously, while others criticized Blake's approach (including the focus on her outfits & hair care company, and co-promotion of the film with Ryan)."  Ex. 190, SPE_BL0003328.

283.    Also on August 13, Nathan privately observed to Abel that there was a "completely unsolicited story from tmz – Blake has a huge ego [Justin Baldoni] was liked by

many cast and crew And this is her ego being bruised."  Abel responded: "Not from any of us

obv."  Nathan agreed: "Totally not from us."  Abel concluded:  "These are clearly people on set

coming out to defend [Baldoni] which is good and we just let them do their thing."  Ex. 191,

NATHAN_000000547.

284.    The same day, Lively wrote to another male cast member: "we are each looking

to post resources for people experiencing DV (and should fill you in more first) if you wanna

post also."  The cast member responded: "Great…definitely getting hit with comments."  Ex.

192, BL-000020228 at -229.

285.    On or about August 19, 2024, NBC reached out to Lively's team for comment

about an article on survivors of domestic violence who had a negative reaction to her preferred

promotion of the film as a "fun summer romance", as well as Reynolds's involvement and

Lively's cross-promotion with his film.  Ex. 193, WME_00001051.

286.    Prior to these events, Lively had been criticized for getting married on a former

slave plantation during the height of the 2020 Black Lives Matter protests.  Ex. 24, Lively Dep.

Tr. at 208:11-25.  In August 2024, criticism of that decision resurfaced.  *Id.* at 209:6-14; *see also*

Ex. 194, A. Culotta Report (Oct. 17, 2025) at 47-49.

287.    Prior to these events, Lively had also been criticized for "problematic on-set

behavior" while working on the TV show *Gossip Girl*.  Ex. 195, Lively's Third Amended

Responses To Wayfarer Studios LLC's Second Set Of Interrogatories No. 21 (Oct. 17, 2025) at

15 (referring to January 7, 2024 video).  These criticisms resurfaced in August 2024.  *Id.*

288.    Sony executives privately observed that the negative publicity around Lively was

driven by her own conduct.  For instance:

a. On August 11, 2024, Tahra Grant, Executive VP and Chief Communications Officer at Sony wrote: "She orchestrated all this drama in a totally unsavvy and amateur way (and basically threatened…Sony) and now is mad it backfired on her." Ex. 196, SPE_BL0023201 at -202.

b. On August 15, 2024, Tom Rothman, Sony's CEO observed that although Lively didn't "deserve" the backlash, "she did bring it all on herself by refusing to listen to advice … and by selling her products." Ex. 197, SPE_WF0000762.

c. On August 21, 2024, Sony president Sanford Pantitch wrote: "She did it to herself. If she just let him come to the premiere or didnt make all the cast unfollow him or kick him off the movie and did what everyone ever has done in show business for time and memorial which is protect 'the show' then none of the sleuthing would have happened. The hair sell at the same time was epic level stupid. She wouldn't listen. She knows better." Ex. 198, SPE_WF0000793 at -794.

289.    As negative sentiment toward Lively accelerated, Baldoni asked his PR team to confirm that it was not using "bots" or fake accounts to generate positive sentiment for him online.  Abel and Nathan both confirmed that they were not using bots or fake accounts.  Ex. 199, BL-00000216 at -253; Ex. 190, BL-00000328; Ex. 200, JONESWORKS_0000001; Ex. 201, NATHAN_000000290.

290.    On August 19, 2024, Baldoni asked Nathan about the negative sentiment toward Lively online.  He wrote:  "This is not us, correct?"  Nathan responded: "None of us would ever do this….there is this struggle where it's kind of maybe even unbelievable the way that people

are turning against her … But they are. Organically. It's organic she's blown herself up by her

own actions [Cites article describing Lively's past use of a transgender slur]…This just ran –

obviously none of us knew about this either. But once media goes in, they go in … You did not

do any of these[,] we did not do any of these. This is all organic."  Ex. 202,

NATHAN_000000278-279.

291.    On August 27, 2024, Baldoni privately discussed with Nathan that he had "no

intention…to make [Lively] or anyone an outcast" and told Nathan he was "Praying for [Lively

and Reynolds]."  Ex. 203, NATHAN_000000292.

292.    On August 27, 2024, Baldoni wrote to Heath, Nathan and Abel: "Definitely don't

want to place stories – and yet just want to change the narrative." Heath subsequently responded:

"Let's stay the course and not react."  Abel agreed: "we want to keep our participation with press

to a min and keep steering the narrative into other things where we can."  Ex. 204,

NATHAN_000001030 at -32.

**U.    Lively and Her Husband Spread Negative Information About Baldoni And Work
To Kill Negative Stories About Lively**

293.    On August 9, 2024, Ryan Renolds wrote to Warren Zavala, his agent at WME:

"Leslie [Sloane, Lively's PR representative], should definitely engage the studio and fight back

in any way necessary."  Ex. 205, RR-SUBPOENA-000000116 at -119.

294.    On August 10, 2024, Ryan Reynolds wrote a message to author Colleen Hoover

in which he stated that Baldoni is "obviously a predator and a sociopath."  Ex. 206, RR-

SUBPOENA-000000102 at -105.

295.    On August 13, 2024, Ryan Reynolds wrote a message to Patrick Whitesell, the

Executive Chairman of WME, in which Reynolds described Baldoni and "his shitbag partner" as

"predators and frauds."   Whitesell responded: "Ryan, I completely understand all of this….I

hadn't been aware of all of this until you reached out to me a few weeks ago….Warren, Doug and I had a conversation tonight and will be deploying in the morning with the town.  As you said, the most important thing here is that we don't let any of this have a negative effect on you two professionally and that all the studios, important buyers, etc know the truth about ALL of it. We won't rest until that is abundantly clear."   Warren Zavala, who was also on the message, then wrote: "we've started our work in terms of analytics around the conversation and bringing our team together" and suggested a "strategy call" with Reynolds prior to his "call with Sony." Ex. 207, RR-SUBPOENA-000000113-115.

296.    On August 13, 2024, Sloane exchanged messages with gossip reporter Sara Nathan about her forthcoming article, which included some positive comments about Lively from Baldoni.  Sloane wrote: "I hate this…This will hurt Blake. You're airing an animal." She pressed Nathan to remove Baldoni's quotes.  Ex. 208, LS_0000219.  At her deposition, Sloane testified that she was calling Baldoni an "animal" because "I felt like it."  Ex. 173, Sloane Dep. Tr. at 192:07-21.

297.    On August 15, 2024, Sloane wrote to another gossip reporter, asking him to change the wording of a headline about the "feud" between Lively and Baldoni.  Sloane pitched the reporter a different story, which the reporter rejected.  After reviewing the article, Sloane wrote: "You forgot to link the fat shaming and the inappropriate kissing allegations." Ex. 209, LS_0000253 at -256.

298.    Sloane testified that she viewed providing this negative information about Baldoni as an appropriate part of her work as a PR professional:  "part of my job is to … try to balance out negative stories if they're negative and if they're untrue."  Ex. 173, Sloane Dep. Tr. at 16:07-23.  Sloane further testified that it is "okay to tell a reporter to include negative statements about

someone if someone else in the press has already reported it."  Ex. 173, Sloane Dep. Tr.at 244:8-14.

299.    Also on August 15, 2024, Ryan Reynolds wrote to Warren Zavala, his agent at WME, discussing how to get producer Alex Saks to speak to the press "even on background….to advocate for Blake."  Zavala stated that "truly believes Blake and Jenny, but did not witness instances that they shared with her…so she can't corroborate what [Jami Kandel, another member of their PR team] would need."  Ex. 210, RR-SUBPOENA-000000025 at -26.

300.    On August 17, 2024, Warren Zavala directed Reynolds to provide an email contact to the *Daily Mail*.  He wrote:  "The reported had reached out via email to Leslie [Sloane, Lively's PR person.]. Now has connected with Sonys head of comms.  She has both the short statement and the longer version. I imagine killing the story is their focus…..the daily thing needs to be killed. …someone playing the game at the same level as them in terms of the internet is what we need."  Zavala subsequently told Reynolds: "They effectively got the daily mail not to print the [story about Lively having the first Assistant director fired].  Ex. 211, RR-SUBPOENA-000000120 at -122, 124.

301.    During this period, Defendants believed that Lively's press team was spreading negative information about Baldoni and using bots.

      a.    Sara Nathan told Jennifer Abel that she texted Leslie Sloane and challenged her on sharing negative information on Baldoni to media outlets.  Ex. 212, BL-000003464.

      b.    Jennifer Abel commented to Melissa Nathan that a Daily Mail story "look[ed] like a plant from Blake[ Lively]'s camp trying to steer the narrative."  Ex. 213, JONESWORKS_00016275 at -279.

     c.   Melissa Nathan told Justin Baldoni, "[Lively's camp] are doing all of this themselves and it's really obvious. . . . It's bots."  Ex. 214, BL-000000009 at -10.

## V.  Lively Failed To Uncover Proof That Defendants Spread False Information About Her

302.    During this litigation, Lively responded to interrogatories seeking identification of the ways in which Defendants supposedly "seeded social media content" to increase the "negative sentiment" toward Lively.   Ex. 195, Lively's Third Amended Responses To Wayfarer Studios LLC's Second Set Of Interrogatories No. 21 (Oct. 17, 2025).[1]

303.    Nearly half the incidents Lively identifies are devoid of any negative content about Lively and merely claim that Defendants either "suppress[ed] content about Mr. Baldoni or enhanc[ed] positive content regarding Mr. Baldoni."  Ex. 195, Lively's Third Amended Responses To Wayfarer Studios LLC's Second Set Of Interrogatories No. 21 (Oct. 17, 2025). These include:

     a.   Baldoni's effort to focus his press and promotion for the film on the issue of domestic violence and to "boost" videos by others showing him promoting his film.  Ex. 220, BALDONI_000015675220; Ex. 221, JONESWORKS_00013830; Ex. 222, BALDONI_000019422.

     b.   An August 9 statement by Baldoni to the press that "Every movie is a miracle. . . And then, of course, you're navigating complex personalities and trying to get everybody

---

[1] Wayfarer, Abel, Nathan, and TAG propounded substantially similar interrogatories to Lively on this topic, and Lively provided substantially similar responses.  *See* Ex. 215, Lively's Third Amended R&Os to Abel's Second Set of ROGs; Ex. 216, Lively's Third Amended R&Os to Nathan's Second Set of ROGs; Ex.-217, Lively's Third Amended R&Os to TAG's Second Set of ROGs.

on the same page with the same vision. And mistakes are always made, and then you

figure out how to move past them." Ex. 223, BBKOSLOW-000004011 at -4016.

c.  Abel's efforts on August 10 to "amplify" an interview with Baldoni suggesting that

the film could "actually make a real difference" in the fight to end domestic violence.

Ex. 224, BBKOSLOW-000004606.

d.  Abel's reference to another cast member's interview, saying that he had a positive

experience working with Baldoni on the film, Ex. 225, BBKOSLOW-000002400.

e.  Efforts to "quiet/kill" stories claiming Baldoni behaved inappropriately on set, Ex.

226, KCASE-000003856; Ex. 227, BBKOSLOW-000001800; Ex. 228,

NATHAN_000001924; Ex. 229, BBKOSLOW-000004049; Ex. 223, BBKOSLOW-

000004011; Ex. 230, BBKOSLOW-000006156; Ex. 231, KCASE-000000728; Ex.

232, KCASE- 000000763; Ex. 233, KCASE-000001093; Ex. 213,

JONESWORKS_00016275; Ex. 234, NATHAN_000002124; Ex. 235, KCASE-

000003354.

f.  Efforts to track social media comments that were supportive of Baldoni's account or

doubted Lively's.  Ex. 236, BBKOSLOW-000003330.

g.  Efforts to suppress an individual's false claim that Baldoni had invited her up to his

hotel room, Ex. 237, BBKOSLOW-000005085; Ex. 238, BBKOSLOW-000005127.

h.  Nathan's August 13 request to her sister, a gossip reporter, to write that when Baldoni

commented that Lively was "ready to direct," he still wanted to be involved in any

sequel of the film.  Ex. 239, JONESWORKS_00015395 at -396.

304.  Lively also points to incidents in which certain Defendants spoke to the press

about Lively herself.  None of these incidents involved sharing any factual falsehoods about

Lively; instead, they involved pointing out true facts about Lively or her husband's conduct or sharing negative opinions of that conduct. Ex. 195, Lively's Third Amended Responses To Wayfarer Studios LLC's Second Set Of Interrogatories No. 21 (Oct. 17, 2025).

305.    Lively and her proffered expert on digital media also suggest that Defendants had some role in resurfacing a video in which Lively made an insensitive comment to a reporter, presuming—incorrectly—that the reporter was pregnant (the "little bump" video). *See, e.g.,* Ex. 240, KCASE- 000001194; Ex. 194, A. Culotta Report (Oct. 17, 2025) at 52-57.

306.    Lively has not put forward any evidence to suggest the "little bump" video is not genuine, or that Defendants had any contact with the reporter in the video.

**W.    Sarowitz Played No Role In Marketing The Film Or Wayfarer's Publicity Strategy**

307.    Sarowitz was not involved in the marketing of the film, and did not review any of the marketing materials for the film created by Wayfarer Studios or Sony.  Ex. 6, Sarowitz Dep. Tr. 146:8-18, 121:3-5.

308.    Sarowitz did not participate in any respect in any of the preparation in advance of Baldoni's interviews regarding the release of *It Ends With Us*.  Ex. 6, Sarowitz Dep. Tr. 137:19-22.

309.    Sarowitz himself participated in certain interviews in August 2024, but did not do any media interviews in conjunction with the release of *It Ends with Us* in the first couple of weeks of August 2024.  Ex. 6, Sarowitz Dep. Tr. 138:3-10.

310.    Sarowitz was not involved in hiring any PR team for Wayfarer.  Ex. 6, Sarowitz Dep. Tr. 152:4-9.

311.    Sarowitz was not asked his opinion on hiring The Agency Group before they were retained.  Nor did he vet The Agency Group before they were retained.  Ex. 6, Sarowitz Dep. Tr. 152:16-153:2.

312.    Sarowitz also did not approve the hiring of Street Relations.  He was not consulted before they were hired and was not involved in that decision.  Ex. 6, Sarowitz Dep. Tr. 153:3-154:7.

313.    There is no evidence that Sarowitz received or reviewed the "Scenario Planning" document circulated by TAG prior to this litigation.

314.    There is no evidence that Sarowitz ever spoke with Jed Wallace or any employee of Street Relations prior to this litigation.  Ex. 4, Heath 10/8 Dep. Tr. 338:5-10.

315.    In her interrogatory response, Lively has identified each instance in which the Defendants purportedly spread "negative" information about her.  Ex. 195, Lively's Third Amended Responses To Wayfarer Studios LLC's Second Set Of Interrogatories No. 21 (Oct. 17, 2025).  The interrogatory response does not identify any specific instance in which Sarowitz himself was involved in circulating any information about Lively whatsoever prior to this litigation, and only one instance in which he weighed in on press strategy concerning Lively.

316.    On or about August 14, 2024, Sarowitz suggested that Wayfarer should point out, after Lively had said that Ryan Reynolds rewrote a scene, that the scene was initially written by a female writer.  Ex. 6, Sarowitz Dep. Tr. 122:24-123:9; Ex. 5, Baldoni Dep. (Oct. 6, 2025) at 278:3-279:6; *see also* Ex. 241 (BALDONI_000019234).  Sarowitz's statements were accurate: Lively said publicly that her husband had rewritten a scene in the film, and that scene had initially been written by Christy Hall, a female screenwriter.  Ex. 242, WAYFARER_000142463; Ex. 50, BL-000011703.

317.     Lively alleged that Sarowitz "divulged to a witness at the Film's New York premiere on August 6, 2024, that he was prepared to spend $100 million to ruin the lives of Ms. Lively and her family." SAC ¶26.  No witness has confirmed that conversation took place. Greenberg, the "witness" in question, testified that he spoke to Sarowitz at the premiere party about publicity related to the film.  Ex. 142, Greenberg Dep. Tr. 290:19-291:22.

318.     During the conversation, Greenberg perceived that Sarowitz was "seemingly a bit defensive and nervous about what could happen" but "seemed to be okay."  Ex. 142, Greenberg Dep. Tr. 291:17-19.  Greenberg assured Sarowitz that he really had nothing to worry about.  Ex. 142, Greenberg Dep. Tr. 291:5-292:14.

319.     Greenberg confirmed that Sarowitz did not state during their conversation that "he was prepared to spend a hundred million dollars to ruin the lives of Ms. Lively."  Ex. 142, Greenberg Dep. Tr. 292:18-21.

320.     Greenberg does not recall Sarowitz stating anything specific about Lively or her family.  Ex. 142, Greenberg Dep. Tr. 294:13-25.  He confirmed that Sarowitz did not state during their conversation that "he was prepared to ruin the lives of Ms. Lively and her family in any way."  Ex. 142, Greenberg Dep. Tr. 294:9-11.

321.     Greenberg has no memory of Sarowitz mentioning ruining anyone's life.  Ex. 142, Greenberg Dep. Tr. 300:12-13.

322.     Greenberg recalls that Sarowitz stated: "I have lawyers and in the event I need to, and this becomes a legal situation, I'm prepared to spare no expense."  Ex. 142, Greenberg Dep. Tr. 292:22-293:10.

323.     On August 9, 2024, Danny Greenberg sent a text message stating "Im a little concerned about Steve S.  He was really aggressive when I spoke with him.  I've been texting

Jamey to make sure he is managed and to make sure he speaks with me before doing anything nuclear." Ex. 243, SPE_BL0009643. When Greenberg wrote in his text message that Sarowitz was "aggressive," he was just describing Sarowitz's personality as a businessman feeling threatened and trying to prove himself in that moment. Ex. 142, Greenberg Dep. Tr. 296:4-25. When Greenberg referred in his text message to going "nuclear," he was referring to the possibility that Sarowitz could file a lawsuit because that is the only thing that Sarowitz mentioned to Greenberg. Ex. 142, Greenberg Dep. Tr. 297:12-2984.

324.    On August 10, 2024, Danny Greenberg sent a text message stating "I had to dial down the billionaire at the premiere who was ready for serious battle." Ex. 244, WME_00001319. The "billionaire" referred to Sarowitz. Ex. 142, Greenberg Dep. Tr. 299:1-3. When Greenberg referred in his text message to getting "ready for serious battle," he similarly just meant potentially having to get into a legal dispute. Ex. 142, Greenberg Dep. Tr. 298:18-299:13.

325.    Greenberg has no memory of having a conversation with anyone about Sarowitz "ruining anyone's life." Ex. 142, Greenberg Dep. Tr. 303:1-3. Nor does Greenberg have any memory of telling anyone that Sarowitz mentioned a particular $100 million figure. Ex. 142, Greenberg Dep. Tr. 302:16-17.

326.    Sarowitz had a call with Claire Ayoub on August 29, 2024, which Ayoub recorded. Ex. 245, BL-000033428; Ex. 246, Oct. 3, 2025 transcript (Ex. 15 to Sarowitz Dep.); Ex. 6, Sarowitz Depo. Tr. 312:3-313:24.

327.    During the conversation, Sarowitz stated the following: "The *It Ends With Us* drama is simply that it is a drama, I'm done with it….It's going to happen when it's going to happen.  You know, whatever is going to happen, whatever people want to think they are going

to think.  I was worried about it at one point and now I just -- now I'm just going to let the chips

fall where they may.… If they like us, great, if they don't, they don't.  We are who we are."  Ex.

246, Oct. 3, 2025 transcript (Ex. 15 to Sarowitz Dep.) 5:1-16.

  328. He further stated: "They went after everything we had.  Luckily I was out of it so

like – [n]obody mentioned me.…That's because I'm a nobody.  I'm like I'm nobody, you

know."  Ex. 246, Oct. 3, 2025 transcript (Ex. 15 to Sarowitz Dep.) 19:24-20:8.

  329. He further stated: "Justin never has a bad set.  Yet, it was the worst set he has ever

been on, but no, it wasn't bad.  I was there on set.  It was, you know, Justin is really kind and

loving and he is like Rainn, actually Rainn is running a set…It is a Bahá'í set.  It is never going

to be like that, no.  Everything was made up, it was manufactured, and it was – it was

manufactured on purpose in order to take Justin down."  Ex. 246,  Oct. 3, 2025 transcript (Ex. 15

to Sarowitz Dep.) 31:7-13.

  330. He also stated: "I just know that for right now it seems like détente and then if

they persist and they push to the limits then we will go to court and then it's all on me."  Ex. 246,

Oct. 3, 2025 transcript (Ex. 15 to Sarowitz Dep.) 36:16-20.

  331. In response to a question by Ayoub as to whether he meant "protecting the

studio," Sarowitz replied "I will protect the studio like Israel protected itself from Hamas.  There

were 39,000 dead bodies.  There will be two dead bodies when I'm done.  You know, and so not

dead, but, you know…But you're dead to me…So that kind of -- that kind of dead, but dead to a

lot of people.  If they ever get me to that point then I will make it worth their while because I'm

going to spend a lot of money to make sure the studio is protected.  But I don't think we will go

there."  Ex. 246,  Oct. 3, 2025 transcript (Ex. 15 to Sarowitz Dep.) 36:23-37:18.  Ayoub replied

"Yeah, I hope not." And Sarowitz stated "That's not the world I want to live in." Ex. 246, Oct. 3, 2025 transcript (Ex. 15 to Sarowitz Dep.) 37:19-22.

332.    Sarowitz further stated "this is not going to go away, I don't think it is going to go away anytime soon….We will have to be defensive for years because there will be stuff coming at us.  I will be defensive for years." Ex. 246,  Oct. 3, 2025 transcript (Ex. 15 to Sarowitz Dep.) 38:6-13.  When Sarowitz said this, he meant that he would defend Wayfarer Studios.  Ex. 6, Sarowitz Dep. Tr. 334:2-10.

333.    Sarowitz further stated: "If they ever cross the line, ever, then I will go after them. Jamey at one point called me up and said I think we're going to need you.  And we have lawyers ready to go, we have our press people, our PR people working."  Ex. 246,  Oct. 3, 2025 transcript (Ex. 15 to Sarowitz Dep.) 38:15-24.

334.    Sarowitz further commented: "you work with so many people and almost everybody is nice, and then there is Blake who she is totally different than everyone….Not to say anything bad about her, but … [s]he is different.  She is different."  Ex. 246, Oct. 3, 2025 transcript (Ex. 15 to Sarowitz Dep.) . 55:9-14.

335.    As a result of Lively's conduct, Sarowitz has lost millions of dollars. Ex. 6, Sarowitz Dep. Tr. 283:7-19.

336.    As a result of this litigation, the Wayfarer Foundation—the charitable arm of Wayfarer Studios—received threats, prompting the need for security.  Sarowitz and his family members have also personally received death threats.  An arson was even carried out at Sarowitz's home and someone threatened Sarowitz's daughter's life.  These events in part prompted Sarowitz and the Board of the Wayfarer Foundation to wind down the foundation.  Ex. 6, Sarowitz Dep. Tr. 48:5-17, 52:1-21, 53:1-20, 352:9-11.

**X.    Lively Obtained Documents Through A Sham Subpoena, Abusing Judicial Process To Serve Her Own Ends**

337.    In or about August 2024, Baldoni's former publicist, Stephanie Jones, and Lively connected through a mutual acquaintance to share and discuss information that Jones had found on Abel's personal phone.  Ex. 24, Lively Dep. Tr. at 147:11-20; *see also* Ex. 247, BL-000021190 at -192 (Taylor Swift: "Can you believe she just called and was like this pr chick wants to get info to blake").

338.    Lively is the President and 50% owner, with her husband, of a company called Vanzan Inc., an entity with no external operations which she and her husband use to pay her personal employees.   Ex. 248, Harris Dep. Tr. at 12:6-17-13:24.  Vanzan has no owners or officers other than Lively and Reynolds.  *Id.*

339.    On or about September 27, 2024, at Lively's direction, Vanzan filed a lawsuit in New York state court, alleging that in August 2024, ten unidentified "Doe" defendants had breached contracts with Vanzan "in a scheme to damage [Vanzan's] business and reputation." Ex. 249, VANZAN_00001; *accord* Ex. 248, Harris Dep. Tr. 64:14-18.

340.    "Doe" defendants were used even though Lively personally knew the identity of all parties involved in the film, and presumably, Vanzan knows the identity of all parties with which it has contracts.  Vanzan's 30(b)(6) witness, a lawyer with no prior relationship to the entity, implausibly claimed that any information Vanzan had concerning the identity of the contractors at issue in the complaint was privileged.  Ex. 248, Harris Dep. Tr. at 224:15-225:15.

341.    On or about October 1, 2024, taking advantage of New York rules that permit discovery even before issue has been joined, and of the fact that no defendants had been named who could thereby invoke the Court's process on their behalf, Vanzan served a subpoena on Jonesworks seeking documents related to "sexual harassment or retaliation in connection with

66

…the Film" as well as information about "the marketing, publicity, or public relations of, for or related to the Film."  Ex. 250, VANZAN_000044.

342.    Such requests were made even though the complaint did not refer to the film or Jonesworks at all, *see* Ex. 249, VANZAN_00001, nor did it have any contract with Jonesworks or any defendant, *see* Ex. 248, Harris Dep. Tr. 38:18-39:1 (Vanzan had no communications with Jonesworks whatsoever prior to service of the subpoena).

343.    The filing of the lawsuit and the issuance of the subpoena created a legal mechanism by which Lively, through Vanzan, could ostensibly claim to legitimately obtain the documents Jones had found on Abel's phone.  Absent a court's compulsory process, Jones could not simply turn over records she found on one of her employee's phones.  Ex. 251, JONESWORKS_00030306.

344.    At Lively's direction, Vanzan voluntarily dismissed the case on December 19, 2024, without any defendant ever appearing in the action.  *See Vanzan Inc. v. Does 1-10*, No. 655130/2024 (N.Y. Sup. Ct.), NYSCEF No. 2; *see also* Ex. 248, Harris Dep. Tr. 63:24-64:2.

345.    On December 21, 2024, *The New York Times* published a 4,000 word article entitled "We Can Bury Anyone: Inside a Hollywood Smear Machine."  Ex. 242, WAYFARER_000142613.  The article cited documents from Abel's phone that Vanzan had obtained by invoking the Court's process in a case against 10 anonymous Doe defendants.  It appears that Jones agreed to turn over the documents without any protective order or measure to prevent their disclosure.

346.    *The New York Times* article asserted that Baldoni and Heath had violated physical boundaries and made sexual and other inappropriate comments to and then instituted a retaliatory

"smear campaign" against Lively.  *Id.  The New York Times* article included a link to Lively's

California state administrative complaint, which had been filed the previous day.  *Id.*

347.    On December 4 and 5, 2024, Lively and Taylor Swift privately discussed the

forthcoming *New York Times* article.  Swift wrote: "I think this bitch knows something is coming

because he's gotten out his tiny violin."  Ex. 89, BL-000021208 at -210.

348.    Through the administrative complaint she provided, Lively and/or her agents told

*The New York Times* and other media that Baldoni had "abruptly pivoted away" from the agreed-

on marketing for the film to emphasize his support for survivors of domestic violence.  Ex. 252,

CRD ¶ 7.  That statement is false.  *See* Ex. 253, BALDONI_000030667 (cover email to Sony);

Ex. 254, BALDONI_000030668 (IEWU initial campaign concepts).

349.    Through the administrative complaint she provided, Lively and/or her agents told

*The New York Times* and other media Baldoni and Wayfarer had not used nudity riders or

intimacy coordinators on set until her intervention.  Ex. 252, CRD ¶ 30. That statement is false.

*See* Ex. 255, HEATH_000045527; Ex. 256, 24-CV-10049_0001819; Ex. 60, 24-CV-

10049_0001816.

350.    Through the administrative complaint she provided, Lively and/or her agents told

*The New York Times* and other media Baldoni had suggestively told Lively her neck "smells so

good" during a shot.  Ex. 252, CRD ¶ 32.  Video captured of the scene demonstrates that

statement was false. Ex. 284, Scene 40_2_B at 1:38.

351.    Through the administrative complaint she provided, Lively and/or her agents told

*The New York Times* and other media Baldoni had "routinely degraded Ms. Lively by finding

back channel ways of criticizing her body and weight," including by pretending a scene in the

script required him to lift Lively so he could ask her trainer about her weight and by referring

Lively to a weight loss specialist.  Ex. 252, CRD ¶¶ 51-52.  Those statements were false. *See* Ex. 257, BALDONI_000026173; Ex. 258, BL-000011258 at -11329.

352.    After *The New York Times* article was published, Nathan and other TAG employees gathered messages showing that "we never engaged because we were told not to." Ex. 259, BBKOSLOW-000005795 at -797.

**Y.    Lively Negotiated Every Aspect Of Her Work, But Never Reached Agreement**

                    1.  The Offer Letter

353.    As discussed above, formal negotiations regarding the terms governing Lively's potential performance in *It Ends With Us* commenced in mid-December 2022, when Meziane sent Lively's representatives a draft Offer Letter under which Lively would agree to perform in the role of Lily Bloom in the film.  Ex. 26, HEATH_000046097.

354.    The first draft of the Offer Letter defined "Producer" as "Wayfarer Studios (or their designated production service entity)."  Ex. 27, HEATH_000046098.

355.    On April 25, 2023, Lively's lawyer revised the Offer Letter to define "Producer" as IEWUM, an entity that Lively's representatives understood was Wayfarer's "designated production service entity" for the film.  Ex. 260, HEATH_000045731; Ex. 261, HEATH_000045741.

356.    The Offer Letter set forth basic parameters of the anticipated agreement, which endured throughout the drafting process:  Lively's loanout company Blakel, Inc. (defined as "Lender") would agree to furnish Lively (defined as "Artist") to perform in the role of Lily on specified dates.  Ex. 28, HEATH_000045678.

357.    Lively would also receive top billing and an "Executive Producer" credit.  Ex. 28, HEATH_000045678.

358.    In exchange for this and other consideration to Lively, IEWUM (ultimately defined as "Producer") would pay Lively a substantial up-front fee, to be placed in an escrow account held by Lively's agent, WME, before filming would commence, plus compensation based on the performance of the film and other contingencies. Ex. 28, HEATH_000045678.

359.    Following several months of negotiations and exchanges of drafts, the Offer Letter was finalized in early May 2023, and dated March 17, 2023. Ex. 32, HEATH_000045662. Ex. 28, HEATH_000045678.

360.    The Offer Letter did not contain any terms regarding sexual harassment. Ex. 28, HEATH_000045678.

361.    Wayfarer itself, as opposed to IEWUM, undertook no obligations under the Offer Letter. Ex. 28, HEATH_000045678.

362.    The Offer Letter expressly and unambiguously provided that full execution of a long form agreement, to be subsequently negotiated, was a condition precedent to IEWUM's obligations thereunder, stating:

> 13. **Conditions Precedent**. Producer's obligations to Artist hereunder shall be subject to the satisfaction of the following: (a) Artist qualifying for cast and other insurance (which may include essential element insurance) and (b) full execution by Artist, Lender and Producer, of an Agreement in a form reasonably acceptable to all parties. Unless and until Lender/Artist are unconditionally pay or play and 100% of the fee is in escrow, Lender and Artist are not obligated hereunder, and Artist is free to take conflicting engagements.
> …
>
> Once we reach an agreement on the above terms, we will be happy to distribute a long form agreement, incorporating the terms herein and other standard terms and conditions to be negotiated in good faith.

Ex. 28, HEATH_000045678 at 80-81.

1.    The Unexecuted Actor Loanout "Agreement"

363.    On May 8, 2023, outside counsel for IEWUM, Joseph Lanius, sent Lively's attorney a draft "Actor Loanout Agreement," ("ALA")—*i.e.*, the "long form agreement" referred to in the Offer Letter.  Ex. 262, WAYFARER_000140956; Ex. 263, WAYFARER_000140957.

364.    The parties to the draft ALA were IEWUM (defined as "Company") and Blakel, Inc. ("Lender"), with an inducement to be signed by Lively ("Artist").  Ex. 263, WAYFARER_000140957.

365.    The first section of the draft ALA referred expressly to "Conditions Precedent," stating that conditions precedent to "Company's obligations under this Agreement" included "Company's receipt of executed copies of this Agreement signed by Lender and Artist," (§1.3)[2] as well as receipt of "the inducement attached hereto and incorporated herein by this reference, fully executed by Lender and Artist" (§1.5).  Ex. 263, WAYFARER_000140957 at 57-58.

366.    An inducement provision included at the end of the draft provided that Blake Lively would be personally bound by the terms of the ALA.  It further provided that "for the purposes of any and all Worker's Compensation statutes, laws, or regulations…an employment relationship exists between [IEWUM] and myself, [IEWUM] being my special employer under the agreement."  Ex. 263, WAYFARER_000140957 at 90.

367.    The draft ALA contained an "Entire Agreement" provision (§18) which provided that a document setting forth "Standard Terms" would be included as part of the ALA and stated *inter alia*:

> This Agreement (including the Standard Terms) constitutes the entire understanding of the parties hereto and replaces any and all former agreements, understandings and representations relating in any way to the subject matter hereof.  No modification, alteration or amendment of this Agreement shall be valid or binding unless it is in writing and signed by both parties.

---

[2] The section numbers did not remain consistent across drafts of the ALA.

Ex. 263, WAYFARER_000140957 at 71.

368.   The "Standard Terms" attached as Exhibit A contained numerous provisions designed to protect IEWUM, including a notice and cure provision titled "Company's Breach," which ruled out any breach in the event of cure, as well as an express damages limitation, which ruled out any consequential damages:

§4.3, titled "Company's Breach," stated, *inter alia*:

No act or omission of Company hereunder shall constitute an event of Default or breach of this Agreement unless Artist shall first notify Company in writing setting forth such alleged breach or Default and Company shall not cure the same within thirty (30) days after receipt of such notice…. Ex. 263, WAYFARER_000140957 at 77.

§15.7, titled "Limitations on Damages" stated:

In no event will any party hereto (Company and/or Artist) be liable for or have any obligation to pay to the other consequential and/or incidental and/or special and/or punitive damages, all of which are expressly excluded, and Company and Lender and Artist each hereby waive any right to recover any such damages from the other.  Ex. 263, WAYFARER_000140957 at 83.

369.   The Standard Terms contained an additional merger provision (§15.3) which also included "non-waiver" language.  Ex. 263, WAYFARER_000140957 at 82.

370.   The Standard Terms also contained a "Lender's and Artist's Remedies" Provision (§15.6) stating, *inter alia*, that "The rights and remedies of Lender and Artist in the event of any breach by Company of this Agreement or any of Company's obligations hereunder shall be limited to Lender's and/or Artist's right to recover damages (subject to Paragraph 15.7 below), if any, in one or more arbitration proceedings."  Ex. 263, WAYFARER_000140957 at 83.

371.   The Standard Terms required that any notices to IEWUM be "in writing" and addressed to IEWUM Attn: Jamey Heath.  Ex. 263, WAYFARER_000140957 at 77-78.

372.   On April 18, 2024, Lively's counsel proposed additional edits to the loanout agreement.  Ex. 218, BL-000038554.

373.    After additional communications, on or about April 29, 2024, Meziane asked Lively to sign the loanout agreement.  Ex. 264, BL-000038599.  Lively's representative responded: "We (Blake's reps) are all speaking this week about the open issues and will come back to you soon."  *Id.*

374.    The first phase of filming *It Ends With Us* began on May 15, 2023, with the ALA still unsigned and no agreement reached on its final terms.  Heath Decl. ¶¶17-18.

375.    IEWUM was not asked to and did not pay for any medical insurance for Lively. Heath Decl. ¶21.

### 2.  The ALA Was Never Executed

376.    Lively and her team negotiated every aspect of her work, dictating numerous terms and conditions, including minute details, such as the right to exercise pre-approval over the days when shoots would take place in locations other than New Jersey as well as her travel and accommodations in those locations; the financial bonuses she would receive if the film hit certain benchmarks; the credits she would receive for her work, including an executive producer credit; the identity of her make-up artist, wig maker, and body double; the ability to offer a "Meaningful consultation over the 'look' of the Role, ad campaign and release pattern; and the time she would spend on set and travelling to and from her home in New York each day; and even approval over the screenplay, the director, and her co-lead actor.  *E.g.*, Ex. 28, HEATH_000045678; Ex. 32, HEATH_000045662 at -663-75; Ex. 265, HEATH_000046122.

377.    Nonetheless, although the parties negotiated for more than a year, Lively never signed any long-form agreement setting out the complete terms of her engagement with the film. Ex. 264, BL-000038599; Heath Decl. ¶¶14-19.

378.    Negotiations over the terms of the ALA resumed and continued for months after the CRA was executed and filming recommenced, with numerous terms remaining subject to disagreement.  *E.g.*, Ex. 266, BL-000038516; Ex. 267, BL-000038477.

379.    After the CRA (which the negotiators referred to as a "side-letter") was finalized, the parties renewed their efforts to finalize the ALA, and Lively's counsel continued to edit the Standard Terms to be included therein.  She edited the Standard Terms to state that such terms were to be incorporated into the "Underlying Agreement" "as amended."  Ex. 266, BL-000038516 at 37.

380.    Lively's attorney sought, on multiple occasions, to strike the provisions stating that IEWUM's obligations were conditioned on full execution of the agreement and inducement, but IEWUM rejected those edits.  Ex. 267, BL-000038477 at -482; Ex. 218, BL-000038554 at -565; Ex. 268, HEATH_000041864 at -866.

381.    At no point during the negotiations did either side suggest changes to the "Entire Agreement" provision, the "Company's Breach" provision, the "Non-Waiver" provision, or the "Limitation on Damages" provision.  Nor did Lively ever seek to add Wayfarer as a party to the draft agreement.  Nor was Wayfarer ever made a party or signatory to the draft agreement. Heath Decl. ¶¶19-20.

382.    As late as July 2024, Meziane continued to ask Lively's reps to review the draft and for Lively to sign.  Ex. 264, BL-000038599.  On July 2, 2024, Meziane wrote to Lively's representative: "Could we please have an expedited review and signature?  We sent the latest version in April.  Reserving rights[.]"  Ex. 264, BL-000038599.

383.    The last version of the draft ALA was dated May 5, 2023 and exchanged on July 2, 2024, after filming was complete.  That draft agreement provided that IEWUM's obligations

under the draft agreement were conditioned on Lively's signature, which never occurred.  Ex. 264, BL-000038599 at 02-03.

384.    The final draft of the loanout agreement the parties exchanged was sent by Meziane, on July 2, 2024.  The cover email and draft are Exhibit 264, BL-000038599.

385.    Lively refused to sign the ALA.  *See, e.g.*, Ex. 269, SPE_WF0000460 at -461 (April 30, 2024 text from Ange Giannetti, noting that Wayfarer had "been trying to get her to [sign] for over a year"); Ex. 270, BALDONI_000018702 (June 1, 2024 text from Baldoni, stating: "She won't sign her contract.").

386.    The final version of the draft ALA granted Lively's loanout entity a $1.75 million guaranteed payment, with an additional weekly rate of $291,667.67 for any additional days required to render services beyond the dates agreed and bonuses should the film achieve certain benchmarks or should Lively be nominated or receive an award for her work.  Ex. 264, BL-000038599 at -606-609.  In addition, the agreement specified that Lively's contingent compensation package "shall be no less than the total contingent compensation payable to the director…or any other cast member…on the Picture."  *Id.* at -608.

387.    The final version of the draft ALA also granted Lively control over numerous aspects of her work.  It provided that Lively's workdays would be limited to a 12-hour period between the time she was picked up and dropped off at her home in New York, with adjustments if Lively chose to stay at other accommodations.  It specified that Lively would receive private, first-class transportation to and from set and retained "the right to approve the driver and car."  It gave Lively a $1000 weekly "training and meal allowance" and a $1500 weekly allowance for her exclusive, designated assistant.  Should Lively be required to film in Los Angeles, as the script anticipated, Lively would be flown round trip on a private jet, along with her four children,

75

assistant, two nannies, and security personnel, and would receive an additional per diem for herself and her employees. Lively also retained control over the post-production schedule: the agreement provided that Lively would make herself available for post-production and promotional services on her own schedule. Should Lively be required to travel more than 50 miles from her home for any promotional services, she would again be provided transportation and accommodations for herself, her immediate family, two nannies, an assistant, and security personnel. Lively also retained control over all photographic stills or non-photographic likenesses of her image used in connection with the film. Ex. 264, BL-000038599 at 610-611.

388. The draft ALA contains a provision which prohibits "Sexual Harassment of any type." The terms of that provision were never finalized. Ex. 264, BL-000038599 at -625. As of July 2, 2024, this provision stated as follows (with blue font indicating edits by Lanius):

> Sexual Harassment of any type is strictly prohibited and cause for immediate termination of this Agreement by Company or by Artist. No employee shall be subjected to sexual harassment by another employee during the course of employment. For the purposes of this policy, sexual harassment is unwanted conduct of a sexual nature which adversely affects another person's conditions of employment and/or employment environment. Such harassment includes, but is not limited to: any unwelcome sexual advance, request for sexual favor, or other verbal, non-verbal, or physical conduct of a sexual nature, that interferes with work, is made a condition of employment, or creates an intimidating, hostile, or offensive environment in connection the workplace or the use of one's authority or power, either explicitly or implicitly, to coerce another into unwanted sexual relations or to punish another for his or her refusal. For the avoidance of doubt, Sexual Harassment may occur between or amongst persons of different sexes or genders or of the same sex or gender, and may be initiated by any gender or sex. In the event Company is aware of any Sexual Harassment conducted by Artist, Company shall have the right to immediately terminate this Agreement and available to all rights and remedies hereunder. In the event Artist is aware of any Sexual Harassment conducted by Company, notwithstanding the terms of Paragraph 16.6 below, Lender and/or Artist shall have the right to terminate this Agreement, shall remain entitled to full compensation and shall have the right to avail themselves of all rights and remedies hereunder and under applicable law.

Ex. 264, BL-000038599 at 625.

389. The draft ALA contained a California choice-of-law provision. Ex. 264, BL-000038599 at -628.

390.    Lively never signed the ALA or the inducement.  Heath Decl. ¶¶17-18.

## Z.    Lively Sued Without Providing Notice And An Opportunity To Cure

391.    Lively's representatives sent a cease and desist letter addressed to certain Defendants and others, on December 20, 2024.  The Letter was not addressed to IEWUM.  Ex. 271, HEATH_000041140 at -142.

392.    The cease and desist letter alleged, *inter alia*, that the addressees had breached the "Protections For Return to Production" and/or "Lively's contract rider."  Ex. 271, HEATH_000041140 at 42.  The cease and desist letter did not allege any independent breach of the ALA.

393.    Lively filed her initial Complaint in this Action on December 31, 2024.  (Dkt. 1).

## AA.    Lively's Damages Are Barred

394.    Lively seeks the following damages:

a.    "Lost earnings between approximately $41,550,956 and $87,793,592 subject to expert testimony."

b.    "Lost profits between approximately $39.6 million and $143.5 million subject to expert testimony."

c.    "Pain and suffering, physical pain, and humiliation in the range of $250,000 to $400,000."

d.    "Reputational harm attributable to defamation in an amount of approximately $24,375,267, subject to expert testimony."

e.    "Other reputational harm in an amount of approximately $36.5 million to $40.5 million, subject in part to expert testimony."

Ex. 272, Lively's Fourth Amended Initial Disclosures, dated October 29, 2025, at 41.

395.    As components of her damages, Lively seeks "lost wages" between for "lost acting and/or producing opportunities" and "lost endorsements, speaking engagements, and personal appearances.  Ex. 272, Lively's Fourth Amended Initial Disclosures, dated October 29, 2025, at 41.

396.    As components of her damages, Lively seeks "lost profits" for "lost cash flows" to Blake Brown Beauty and Betty B Holdings, LLC, as well as "lost royalties" in relation to Blake Brown Beauty.  Ex. 272, Lively's Fourth Amended Initial Disclosures, dated October 29, 2025, at 43.

397.    The Blake Brown Beauty brand was announced on July 31, 2024 and formally launched at Target on August 4, 2024—just months before Lively's complaint was filed.  Ex. 273, Family Hive Dep. Tr. 50:24-50:25, 35:10-35:10.

398.    Lively understood that following the initial promotion of the brand through Target, that sales might decline organically.  Ex. 273, Family Hive Depo Tr. 137:1-137:14, 138:4-138:7 (In October 2024, Lively received a sales deck noting that weekly retail sales might decline as the brand came off its national promotion at Target).

399.    Betty B Holdings LLC was formed in 2023 as a holding company to accommodate the introduction of a new alcoholic product line, Betty Booze.  Betty Buzz, LLC, which was formed as a non-alcoholic beverage company in 2021, became its subsidiary.  Ex. 274, Chrisomalis Dep. Tr. 25:16-28:7.

400.    The Betty Buzz mixer line consistently failed to gain market share throughout its three-year existence.  Ex. 274, Chrisomalis Dep. Tr. 121:18-121:21, 147:4-147:7.

401.    In 2023, Betty B Holdings began selling alcoholic products under the brand "Betty Booze."  Ex. 274, Chrisomalis Dep. Tr. 27:6-8.

402.    Lively wholly owns LOL HATA, which has a 40% membership interest in Family Hive LLC.  Ex. 273, Family Hive LLC Dep. Tr. 58:11-20; Ex. 275, Tedesco Dep. Tr. 226:10-227:3.  LOL HATA is also a member of Betty B Holdings, LLC. Ex. 276, BL-000022233.

403.    Lively does not have any direct entitlement to royalties, which are paid to LOL HATA.  Ex. 275, Tedesco Dep. Tr. 246:20-24. Ex. 277, BL-000037820; Ex. 278, BL-000034251; Ex. 279, BL-000034253

404.    As components of her damages, Lively seeks damages for "Reputational Harm" based on "impressions" of the allegedly defamatory statements and "impressions of the terms 'bully,' 'mean girl,' and 'tone deaf'" attributable to the alleged retaliation.  Ex. 272, Lively's Fourth Amended Initial Disclosures, dated October 29, 2025, at 43-44.


Dated:  December 12, 2025
        New York, New York


                                    /s/ *Alexandra A.E. Shapiro*
                                    SHAPIRO ARATO BACH LLP
                                    Alexandra A. E. Shapiro
                                    Jonathan Bach
                                    Alice Buttrick
                                    Jason A. Driscoll
                                    1140 Avenue of the Americas, 17th Floor
                                    New York, NY 10036
                                    Tel: 212-257-4881
                                    ashapiro@shapiroarato.com
                                    jbach@shapiroarato.com
                                    abuttrick@shapiroarato.com
                                    jdriscoll@shapiroarato.com


                                    LINER FREEDMAN TAITELMAN +
                                    COOLEY, LLP
                                    Bryan J. Freedman (pro hac vice)

Ellyn S. Garofalo (pro hac vice)
Theresa M Troupson (pro hac vice)
Summer Benson (pro hac vice)
Jason Sunshine
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Tel: (310) 201-0005
bfreedman@lftcllp.com
egarofalo@lftcllp.com
ttroupson@lftcllp.com
sbenson@lftcllp.com
jsunshine@lftcllp.com


MEISTER SEELIG & FEIN PLLC
Mitchell Schuster
Kevin Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
ms@msf-law.com
kaf@msf-law.com


AHOURAIAN LAW
Mitra Ahouraian (pro hac vice)
2029 Century Park East, 4th Floor
Los Angeles, CA 90067
Tel. (310) 376-7878
mitra@ahouraianlaw.com

*Counsel for the Wayfarer Parties*