# Exhibit 277

*Execution Version*

## PROMOTIONAL SERVICES AND LICENSE AGREEMENT

**THIS PROMOTIONAL SERVICES AND LICENSE AGREEMENT** (this "Agreement") is made and entered into as of March 4, 2022 (the "Effective Date"), by and between Family Hive LLC, a Delaware limited liability company ("Company"), and LOL HATA LLC, a Delaware limited liability company entirely owned/controlled by Blake Lively ("Lender"), for the services of Blake Lively ("Talent"), with reference to the following facts:

      A.      Talent is recognized and widely known throughout the world as a movie star;

      B.      Talent's name and likeness, by virtue of her ability and experience, has a commercial value and meaning in the mind of the purchasing public which is important to the marketing, promotion, and sale of products;

      C.      Company owns or has the right to use the trademarks and other intellectual property associated with the Company Products (as defined below) and is engaged in the development, distribution, marketing and sale of the Company Products under the Brands (as defined below);

      D.      Company desires to (i) acquire the right and license to utilize the Talent Rights (as defined below), and (ii) engage Lender for the Services (as defined below) of Talent, in each case in connection with the marketing, promotion, distribution and sale of the Company Products under the Brands; and

      E.      Talent desires to so act and has provided Lender the right to license the Talent Rights to, and provide the Services for, Company, and Lender desires to grant to Company such rights to the Talent Rights, and to cause Talent to perform the Services for Company, all on the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants set forth herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree to the foregoing and as follows:

1.    **DEFINITIONS.**  When used in this Agreement, the following terms will have the meaning set forth below.

"Additional Categories Condition" means the timely satisfaction of the Haircare Threshold (as defined below) (i.e., the Haircare Threshold being satisfied by the end of Contract Year 1 (as defined below)).

"Affiliate" means, with respect to any specified Person (as defined below), any other Person who or which, directly or indirectly, controls, is controlled by, or is under common control with such specified Person or entity. As used in this definition, the term "control" means the direct or indirect ownership of more than 50% of the equity securities having the right to vote for the directors or other governing body thereof or the ability to otherwise control the management of an entity, whether through ownership of voting securities, by contract, resolution, regulation or otherwise. With respect to any Person specified who is a natural person, Affiliate also includes any trust established by or for the benefit of such individual(s).

"Brands" means all Company Products' brands that will be mutually approved by the Parties in writing (such approval by Lender in its sole and absolute discretion).

47037112

BL-000037820

"Company Intellectual Property" means all Intellectual Property Rights now or hereafter owned by or licensed by the Company or such other Intellectual Property Rights which the Company has the lawful right to use, including, without limitation, the Company Trademarks; provided, however, that, in no event shall Company Intellectual Property include the Talent Identification or any aspect thereof.

"Company Products" means Company's products in Product Category 1, and following the timely satisfaction of the Haircare Threshold (i.e., the Haircare Threshold being satisfied by the end of Contract Year 1), Product Category 2 and Product Category 3, and less any and all of Company's products in (a) the Removed Product Categories (as defined below) or (b) the Removed Key Markets (as defined below). Notwithstanding anything herein to the contrary, prior to the Haircare Threshold being satisfied, Company shall have the right to develop (but shall not produce (other than for development purposes) or exploit) Company products in Product Category 2 and/or Product Category 3, provided that if the Additional Categories Condition is not timely satisfied (i.e., the Haircare Threshold has not been satisfied by the end of Contract Year 1), Company shall have no further right to develop Company products in such Product Categories. Any Company Products may be sold individually and/or as part of a gift set assortment with other Company Products.

"Company Trademarks" means all brand names, logos, symbols, trademarks, trade names or other indicia of origin (collectively, "Trademarks") of the Company Products that will be mutually approved by the Parties in writing (such approval by Lender in its sole and absolute discretion), excluding Talent Trademarks (as defined below).

"Competitive Products" means (a) any product that is not a Company Product and that is in the same Product Category as a Company Product, and (b) during Contract Year 1, any product that is not a Company Product and that is in Product Category 2 or Product Category 3. Notwithstanding the foregoing, in the event the Haircare Threshold is not satisfied by the end of Contract Year 1, any product that is in Product Category 2 or Product Category 3 shall not be included in the definition of Competitive Products.

"Confidential Information" means the terms of this Agreement and any and all non-public information supplied or made available by one party (including its Affiliates, a "Disclosing Party") to the other party (including its Affiliates, a "Receiving Party") in connection with this Agreement or the services performed or activities contemplated hereunder, including, but not limited to, information relating to Intellectual Property Rights and to business plans, financial matters, products, services, manufacturing processes and methods, designs, trade secrets, costs, sources of supply, strategic marketing plans, customer lists, identities of investors, sales, profits, pricing methods, personnel, and personal and business relationships and any other non-public proprietary or confidential information of the Disclosing Party. Lender's "Confidential Information" shall also include, without limitation, all personal and business information (e.g. phone numbers, addressees, travel schedules and other personally identifiable information), documents and photographs (other than the Identification Materials (as defined below)), in each case relating in any way to Talent and her Immediate Family, relatives, associates, friends, and/or acquaintances and to Lender and Talent's Affiliates, which has not been made available or confirmed to the general public by Talent. Confidential Information does not include any information that: (a) becomes generally available to the public other than as a result of the Receiving Party's breach of this Agreement; (b) is furnished to the Receiving Party by a Third Party (as defined below) who, to the Receiving Party's knowledge, is lawfully in possession of, and who lawfully conveys, such information; or (c) is in the Receiving Party's possession prior to disclosure hereunder or is subsequently developed by the Receiving Party independently of, and without containing any of the Disclosing Party's Confidential Information, as established by the Receiving Party's written records.

"Contract Year" means each consecutive 12-month period commencing on the first day following the end of the preceding Contract Year, except that Contract Year 1 shall commence on the Effective Date

ATTORNEYS' EYES ONLY

BL-000037821

and terminate alternatively (a) on August 31st, 2023, if Launch (as defined below) occurs prior to or on December 31st, 2022 or (b) on December 31st, 2023, if Launch occurs later than December 31st, 2022.

"Endorsement Deal" means any endorsement, brand ambassador, promotional service and/or licensing deal.

"GBB" means Give Back Beauty LLC, a Delaware limited liability company.

"GBB Member" means Give Back Beauty International LLC, a Delaware limited liability company.

"Gross Sales" means, with respect to a particular measurement period, the gross amount of monies invoiced by Company for sales of the Company Products during such period including, without limitation, to (a)(i) GBB (or any of its Affiliates) on an ex-works or wholesale basis (to be sold by GBB to distributors and/or retailers in accordance with the Intercompany Services Agreement (as defined below)), or (ii) third party distributors on an ex-works or wholesale basis (as permitted under the Intercompany Services Agreement) ((a) collectively, "Wholesale Gross Sales"), and (b) end consumers via the internet, online distribution and any other form of direct-to-consumer sales ("Consumer Gross Sales"), less only the sum of the following deductions to the extent actually paid or allowed in connection with the sale of such products: (i) all taxes collected and otherwise included in Gross Sales in connection with such sales (e.g., sales tax or withholding taxes), and (ii) any credits, refunds, returns, charge backs, discounts, retroactive price reductions or promotional rebates and billing corrections, as applicable. For the avoidance of doubt, cost of goods sold and any selling, marketing, administrative, fulfilment or any other overhead and operating expenses, shall not be deducted from Gross Sales.

"Guaranty" means that certain Guaranty, of even date herewith, made by Brondi Holding S.r.l., an Italian limited liability company ("Brondi"), in favor of Lender.

"Haircare Threshold" means a performance threshold equal to $1,820,000 in Gross Sales of Company Products in Product Category 1.

"Identification Materials" means all marketing, sales, advertising, publicity and promotional materials which contain the Talent Identification produced by or on behalf of Company pursuant to the License (as defined below) set forth in Section 2.1, and all other forms of media, marketing and advertising pursuant to the License set forth in Section 2.1, in whatever medium whether now known or hereafter created which contain the Talent Identification, in each case so long as pre-approved by Lender in writing in accordance with Section 2.4 as to each form of marketing or advertising material to be used (which, in each case, includes the category of material, the specific creative execution and the channel through which the applicable material may be distributed or otherwise exploited). For the avoidance of doubt, Talent Trademarks shall not be included in the definition of Identification Materials.

"Immediate Family" means, with respect to any individual, such individual's spouse, parents, children and siblings, including adoptive relationships and relationships through marriage.

"Intellectual Property Rights" means all patents and patent applications, utility models, rights in industrial designs, trademarks (whether registered or unregistered and including any goodwill in such trade marks), service marks, trade names, business names, internet domain names, e-mail address names, rights in designs (whether registered or unregistered), copyrights, moral rights, database rights, rights in know-how, rights in confidential information, rights in trade secrets, rights in inventions (whether patentable or not), rights in discoveries, rights in improvements, rights in techniques, rights in processes, rights in tools, rights in models, rights in concepts, rights in systems and all other intellectual property rights, whether

ATTORNEYS' EYES ONLY                                                                          BL-000037822

registered or unregistered, including any form of application for any of the same and all similar or equivalent rights which may exist anywhere in the world.

"Intercompany Services Agreement" means that certain Intercompany Services Agreement, of even date herewith, by and between Company and GBB.

"Introduce" means that the applicable Product Category (as defined below) shall (a) be locally marketed and available for sale in the applicable Key Market (as defined below) within 12 months of the applicable Territory Introduction Date and (b) during the Contract Year commencing as of the applicable Territory Introduction Date shall achieve Gross Sales not less than 70% of the Key Market Business Plan Minimum Sales set forth in Exhibit A attached hereto ("Key Market Business Plan Minimum Sales") for such Key Market for such Contract Year.

"Key Markets" means, collectively, the United States of America, the United Kingdom, Germany, France, Italy, Canada, Australia, China, Mexico, Brazil, Russia and India.

"Launch" means the date when the first Company Products are first available for sale for consumer purchase.

"LLC Agreement" means the Company's Limited Liability Agreement, of even date herewith, as amended, restated or modified from time to time in accordance with the terms thereof.

"Non-Key Market Endorsement Deal" means a one-off Endorsement Deal in a non-Key Market entered into by Lender and/or Talent (or their respective Affiliates) with any established beauty brand in which Talent, Lender and/or any their respective Affiliates do not have any equity ownership interest(s) (excluding passive investments in investment funds (such as a venture capital or private equity fund) and up to 2% ownership of public companies). For the sake of clarity, any Non-Key Market Endorsement Deal may be publicized or promoted only in the relevant Non-Key Market.

"Person" means a natural person, limited liability company, corporation, partnership, firm or other entity.

"Product Categories" means, collectively, Product Category 1, Product Category 2, and Product Category 3.

"Product Category 1" means haircare (e.g., shampoo, conditioner, serum, mask and hair oil, nutri-cosmetics).

"Product Category 2" means color cosmetics (e.g., lipstick, lip gloss, lip liner, eyebrow liner, eye shadow, mascara, brow pencil, eyeliner, foundation, concealer, highlighter and blusher, primer, tinted cream, powder, balm, tinted moisturizers, oils, emulsions, lotions, powders, pencils, cosmetic preparations and cosmetic products which also have skin benefits).

"Product Category 3" means fragrance (e.g., perfume, shower gel, body cream and body lotion).

"Side Letter" means that certain Side Letter, of even date herewith, among Company, Brondi and Lender.

"Talent Identification" means Talent's approved professional name, approved voice, approved likeness, approved image, approved videos, and approved biographical information.

ATTORNEYS' EYES ONLY

BL-000037823

"Talent Rights" means, collectively, (a) the Talent Identification, and (b) any and all Talent Trademarks.

"Talent Trademark" means any Trademark of the Company Products consisting solely of the Talent Identification (e.g., "Blake", "Lively" or "Blake Lively").

"Territory" means worldwide less the Removed Key Markets (as defined below).

"Territory Introduction Date" means the date of the first day in the planned applicable introduction Contract Year for each Product Category in each Key Market as shown in Exhibit A. For the sake of clarity, the first Contract Year in which a Product Category is provided a Key Market Business Plan Minimum Sales target in Exhibit A for the applicable Key Market shall be considered the planned applicable introduction Contract Year for such Product Category in such Key Market.

"Third Party" means a Person other than Company and its Affiliates, Lender and its Affiliates, and Talent and her Affiliates.

**2.    LICENSE TO COMPANY.** Subject to and in accordance with the terms and conditions of this Agreement (including, without limitation, Lender's approval rights set forth in Section 2.4):

**2.1.    License.**

a.    Lender and Talent hereby grant to Company, during the License Term (as defined below), a limited, non-assignable (except as set forth in Section 9.8), sublicensable (subject to the same restrictions hereunder, and only to sublicensees approved by Lender in writing (except as set forth in Section 9.8)) right and license (collectively, the foregoing and the remainder of this sentence, the "License") to use and exploit the Talent Rights throughout the Territory solely in connection with the creation, manufacturing, marketing, promotion, distribution and sale of the Company Products in accordance with the terms of this Agreement. For purposes of this Agreement, GBB shall be considered a pre-approved sublicensee.

b.    Notwithstanding anything to the contrary herein, and without limiting the effect of Lender's approval rights, except if approved by Lender, Company acknowledges and agrees that it will not distribute, or authorize distribution of, the Talent Rights or any Identification Materials to, or publish, exhibit, or display the Talent Rights or any Identification Materials in connection with, (i) any media outlets (including without limitation publications, blogs, websites or other outlets) that promote weapons or that contain explicit violence, pornography, profanity, and hate speech, and/or any "tabloid" or gossip outlets (e.g., TMZ, National Enquirer, OK! Magazine, Star Magazine); and/or (ii) any ring-tones, wallpaper, screensavers, games, applications and the like. In addition, notwithstanding anything to the contrary herein, and without limiting the effect of Lender's approval rights, except if approved by the Lender, the Identification Materials may not include (A) standees, life-size POS, flyers, or mailers (including catalog) except those that are part of launch and promotional plans with retailers and approved by Lender hereunder, or (B) bus shelters, taxi tops, subway/train platforms, wild postings, trash cans, pop-ups or pop-unders, downloadable content/ads, interactive media that allows end users to manipulate or interact with Talent's likeness or image, DRTV (including program-length commercials), or in-cinema advertising. Company agrees that Identification Materials shall be created and exploited in good taste and shall not be incompatible with Talent's professional stature and persona.

c.    In addition, and notwithstanding anything to the contrary herein, Company acknowledges and agrees that the Talent Rights (i) may only be used as expressly set forth in this Agreement, and (ii) may not be associated with (A) any products or services other than the Company

ATTORNEYS' EYES ONLY                                        BL-000037824

Products, or (B) any brand, trademark(s) or logo(s) other than the Brands and Company Trademarks.

d.      Company understands and agrees that (i) Lender and Talent are not responsible for running trademark and other Intellectual Property Rights clearance searches in the Territory, and Company uses the Talent Rights in the Territory at its own risk and liability, irrespective of Lender's approval of such use as required under this Agreement, (ii) as between the parties, Company shall bear 100% of the costs of producing the Identification Materials, and (iii) Company shall be solely responsible for obtaining all necessary publicity waivers, releases, consents and other rights clearance necessary for the Identification Materials.

e.      Company shall ensure that any sublicensee approved by Lender in writing shall be bound to terms and conditions at least as restrictive as those contained in this Agreement with respect to the Talent Rights and the Identification Materials, in a form to be approved by Lender in writing.

### 2.2.   Exclusivity; Competitive Investments.

a.      Excluding the Excluded Endorsement Deals (as defined below) and the Non-Key Market Endorsement Deals, Lender agrees that neither Lender nor Talent will use, or grant any Third Party and/or Immediate Family Members (other than to an approved sublicensee under Section 2.1) the right to use the Talent Rights within the Territory to publicly promote or endorse or license any Competitive Products at any time during the Term. Notwithstanding the foregoing or anything herein to the contrary, neither Lender nor Talent shall be precluded from: (i) promoting or endorsing companies (in respect of non-Competitive Products) that do not sell Competitive Products as a primary part of their business; (ii) participating in any and all advertising, promotion or publicity activities and/or materials (including, without limitation, the merchandising, commercial tie-ins, product placement/integration, sponsorship or products or services used therein or related thereto) in connection with any motion picture, television program, stage production or other performance or audio-visual work or charity event (or rendering services in any motion picture, television program, digital production, stage production or other performance or audio-visual work) that contains or makes use of, or requires that Lender or Talent make use of, any Competitive Product, or is sponsored by or includes any advertisements for any such Competitive Product, or for any company that sells Competitive Products; or (iii) appearing at or in the entertainment, news or information portion of any radio, television, motion picture, media, stage production, charity event or other entertainment or philanthropic program or event. For the avoidance of doubt, Talent may appear as a guest at events, regardless of sponsorship (e.g., Talent may appear on a step and repeat or "red carpet" containing a backdrop with names of Competitive Products or companies that sell Competitive Products) and Talent may appear in purely editorial material (e.g., a magazine spread) which uses and/or credits Competitive Products or companies that sell Competitive Products.

b.      During the Term, Lender agrees that neither Lender nor Talent (nor any of their respective Affiliates nor any Immediate Family Members) shall directly or indirectly invest in any business, firm or entity which sells Competitive Products as its primary purpose or as a primary part of its business. Notwithstanding the foregoing or anything herein to the contrary, neither Lender nor Talent (nor any of their respective Affiliates) shall be precluded from: (i) holding equity interests in any entity representing not more than 2% of the outstanding equity interests issued by such entity; or (ii) making any passive investments in investment funds (such as a venture capital or private equity fund) that may invest in portfolio companies that sell Competitive Products. For the sake of clarity, in the events indicated sub (i) and (ii) above, the provisions of Section 2.2 (a) above shall apply.

### 2.3.   Non-Disparagement. During and after the Term, Company shall not, and Company shall cause its members, officers and managers and its Affiliates not to, make any public disparaging comments regarding Lender and/or Talent. During and after the Term, Lender shall not, and shall cause Talent not

- 6 -

BL-000037825

to, make any public disparaging statements regarding Company, GBB or GBB Member; provided that Lender or Talent shall not be in breach of this Section 2.3 if public statements are made by Lender or Talent in response to public customer services complaints against Company that associate or implicate Talent with such complaints. Nothing in this paragraph is intended or shall be construed to limit: (a) any Party's obligation to provide testimony, information or documents in response to a subpoena, deposition notice, other legal process or to inquiries from federal, state or local government officials; provided, that such Party shall provide, unless prohibited by law, prompt notice of any such court order or requirement to the other Party so as to enable such other Party to seek a protective order or otherwise prevent or restrict the scope of such disclosure; (b) any rights that cannot be legally waived; (c) either Party's private communications with counsel or other advisors; or (d) either Party's rights to enforce this Agreement.

## 2.4.    Approvals.

2.4.1.    Generally.  During the License Term, (a) no use of the Talent Rights may be made by or on behalf of Company without Lender's written approval, including, without limitation, in a particular form of Identification Materials or in a Talent Trademark, and (b) in each case Company must obtain Lender's written approval for all Services. All of Lender's approvals under this Agreement may be granted or withheld in Lender's sole and absolute discretion, provided that Lender shall use good faith efforts to respond in a timely manner. As soon as reasonably practicable following the Effective Date, Company shall develop, subject to Lender's right of meaningful input and Lender's written approval, a marketing plan (each, a "Marketing Plan") for the Company Products for Contract Year 1, including, without limitation, for use of Identification Materials in connection with the public announcement of Talent's association with the Company Products. Prior to the commencement of each such subsequent Contract Year, Company shall develop, subject to Lender's right of meaningful input and Lender's written approval, a Marketing Plan for such Contract Year, including, without limitation, for the use of the Identification Materials for each such Contract Year.  Subject to, and without limiting, Lender's right of meaningful input and Lender's approval rights, the Marketing Plan(s) will be orientated to market the Brands and Company Products in a subversive and unique manner, including, without limitation, through the use of digital media and "viral" marketing. Any changes to a Marketing Plan (including, without limitation, as may be necessary to align and react to market needs and opportunities) shall be subject Lender's written approval.

2.4.2.    Specific Approvals. Without limiting the generality of Section 2.4.1, Lender shall have the right to approve all of the following relating to the use of the Talent Identification:

a.    Overall creative concept(s);

b.    Identification Materials, including:

i.    Categories/types of materials; and

ii.    Each creative execution, including without limitation the concepts, development and all stages of execution (it being understood that final Identification Materials shall not materially deviate from approved concepts, scripts, storyboards and layouts);

c.    Media through which each item of Identification Materials may be distributed;

d.    Director(s), videographer(s) and photographer(s);

e.    Set-ups/poses for still photographs;

- 7 -

ATTORNEYS' EYES ONLY                                                                        BL-000037826

f.    All still photographs (i.e., unretouched proofs and final, retouched photographs; including any screen shots);

g.    Videos, commercials (if any) and/or other audio-visual materials elements (e.g., script, storyboard, rough cuts, final cut, dubbing and scoring, etc.);

h.    Layouts for any print materials;

i.    Layouts for any Company Products packaging;

j.    Quotations and statements attributed to Talent;

k.    Timing and content of all press releases/press statements which reference Talent or the Talent Identification;

l.    Timing and content of social media posts which reference Talent or the Talent Identification;

m.    Any media outlets invited to interview and/or photograph Talent (with any additional editorial shoots in conjunction with such interviews to be subject to Talent's written approval, it being understood that Talent shall not be required to do any cover shoots);

n.    Biographical material of Talent;

o.    The look of Talent's hair, make-up and wardrobe and the designation of Talent's hair, make-up and wardrobe stylists (or, if Talent elects, in her sole discretion, not to appoint such personnel, she will have the right to approve local personnel proposed by Company);

p.    The date, time and location of all Services which shall be subject to Talent's availability (including turnaround time between Service Days (as defined below));

q.    In connection with any personal appearances, press events, public relations or other in-person services: the nature of the event or activity, location, schedule, guest list, press outlets, journalists and/or bloggers, seating arrangements, and whether and when any photography or other recording of Talent will be permitted and by whom; and

r.    Any doubling of Talent's image or dubbing of Talent's voice.

2.4.3.    No Other Endorser.  The Talent Identification will not appear with the name or likeness of any other model, actor, personality, or other influencer in any Identification Materials without Talent's prior, written consent and approval of such person(s). Furthermore, Company shall not use the name, image or likeness or any other identifiable voiceovers of any other models, actors, talent or other person(s) in connection with the advertising, promotion and/or endorsement of the Company Products during the Term without Talent's prior, written consent and approval of such person(s).

2.4.4.    Timing of Requests.  Company will submit all matters or requests for approval under this Agreement at least 10 business days prior to any such use via email to such person(s) who are designated by Lender from time to time in writing (each, a "Designee", and collectively, the "Designees"). Lender shall use good faith efforts to provide Company with Lender's written approval or disapproval (and the reasons therefor) with respect to any matter or request by Company under this Section 2.4 within 10 business days of Lender's receipt thereof, with the understanding that in rare instances Company may

- 8 -

ATTORNEYS' EYES ONLY

BL-000037827

request a shorter response time when reasonably deemed necessary, in which case Lender shall use good faith efforts to provide a response within 24 hours, subject to Talent's professional availability. If Lender does not approve or disapprove within the required time period, Company shall send a written reminder to Lender and use reasonable efforts to contact Lender and Talent, and Talent's agents or representatives, through additional means (e.g., telephone) in order to ensure their receipt of the approval request. If Lender does not approve or disapprove the request within three business days of the receipt of such written reminder, such approval request shall be deemed disapproved. In case of non-approval, Lender shall communicate alternative proposals and/or arguments, so that Company can work on alternative proposals. Notwithstanding anything to the contrary herein, Company agrees that, in light of the very broad potential scope of Identification Materials, no failure by Lender or Talent to approve any such approval requests or to respond to the same shall constitute a breach of this Agreement by Lender or Talent under any circumstances, provided that Lender and Talent have customarily used good faith efforts to respond in a timely manner. Solely for purposes of the administration of the approval rights in this Section 2.4.4, (a) any reference to Lender shall also be deemed to include a reference to the Designee(s), (b) any Designee shall have the authority to grant approvals on behalf of Lender, (c) all approval requests by, and all approval request reminders from, Company, and any approvals granted or withheld by Lender (and the Designees), may be made only in writing or by email, and (d) Company shall provide any approval request under this Section 2.4 to all of the Designees and all of the Designees must be copied on all such email correspondence from Company. Lender hereby designates the following persons as its initial Designees: Blake Lively (email address: ), Sophia Travaglia (email address: and Justin Grey Stone (email address: with a courtesy copy to Todd Jacobs (email address: Lender shall have the right to remove and replace any and all Designees at any time for any reason upon written notice to Company. In the event of a lack of approval by Lender or its Designees resulting in a delay in the Company Product development, the marketing materials development or the distribution of the Company Products, the parties shall review the business plan to integrate such delay.

2.4.5.     Other Commitments. Lender shall use reasonable efforts to advise in advance Company of any other relevant commitments and/or licensing agreements that Lender or Talent enters into during the Term which may affect Talent's ability to provide any approved scheduled Services hereunder with enough notice to permit Company to reschedule the appointment of such Services and to prevent any material Third Party out-of-pocket costs associated with such rescheduling.

**3.     TALENT SERVICES.** During the Services Term (as defined below), subject to Lender's approval pursuant to Section 2.4 above, Lender shall cause Talent to provide to Company the required Services as further set forth in Exhibit B attached hereto (the "Services"). Provided that Lender has so approved the Services in each instance, Lender shall cause Talent to perform all of such Services competently in a timely and professional manner, exercising all the diligence and due care normally exercised in the performance of comparable tasks by comparable celebrity endorsers and promoters, in accordance with such practices and procedures appropriate to the activities undertaken, subject to Talent's bona fide professional and personal commitments, such as, but not limited to, film or television productions and birthday and other life cycle events for Talent's Immediate Family members, in which cases Lender shall use reasonable efforts to advise in advance Company with enough notice to permit it to reschedule the appointment of any approved scheduled Services and to prevent any material Third-Party out-of-pocket costs associated with such rescheduling. In the event that Talent is unavailable to provide Services on a particular date requested by Company, Lender shall promptly provide Company with alternative dates, as close in time to the date requested by Company as reasonably practicable given Talent's professional and personal commitments, on which she will be available to provide Services. For the avoidance of doubt and in addition to Talent's undertakings under Annex I, if and to the extent that Talent has any specific obligations under this Agreement, Lender shall cause Talent to perform such obligations in accordance with the terms and conditions of this Agreement.

- 9 -

ATTORNEYS' EYES ONLY
BL-000037828

**3.1.    Travel, Expenses and Personnel.**  The travel, accommodations, expenses, personnel and perquisites to be provided by Company in connection with Talent's Services are set forth in Exhibit C attached hereto.

**3.2.    B-Roll.**  If and to the extent Talent agrees to allow Company to hire Company-controlled, mutually-approved photographer(s) and/or videographer(s) to shoot B-roll/behind-the-scenes photographs and/or footage ("BTS Materials") during the Services, the following conditions shall apply thereto: (a) Company will provide Talent with reasonable prior notice of its desire to shoot any BTS Materials; (b) all BTS Materials and any use, exhibition or distribution thereof are subject to mutual, written approval; (c) shooting of BTS Materials will at all times be designed to protect Talent's dignity, image and "private moments;" (d) BTS Materials will only be shot after Talent is fully groomed and in full wardrobe; and (e) all BTS Materials shooting will be conducted in a manner that will not interfere with Talent's provision of services hereunder.

## 4.    COMPENSATION.

**4.1.    Royalties.**  In consideration for the rights granted and Services to be performed by Lender and Talent under this Agreement, Company shall pay Lender as follows:

**4.1.1.    Product Royalties.**  During the License Term and any Wind-Down Period (as defined below), Company shall pay to Lender (a) a royalty equal to 5% of Wholesale Gross Sales ("Wholesale Royalties"), and (b) a royalty equal to 10% of Consumer Gross Sales ("Consumer Royalties" and together with Wholesale Royalties, "Product Royalties").

**4.1.2.    Additional Royalties.**  During the Renewal Service Term (as defined below) and any Wind-Down Period, in addition to the payment of Product Royalties, Company shall pay to Lender a royalty equal to 3% of Gross Sales as consideration for the Services ("Additional Royalties" and together with Product Royalties, "Royalties").

**4.2.    Payment Schedule; Payment Statements.**  Wholesale Royalties and Additional Royalties shall be paid in quarterly installments within 10 days after the end of each applicable calendar quarter during the Term and any Wind-Down Period. Consumer Royalties shall be paid in monthly installments within 10 days after the end of each applicable calendar month during the Term and any Wind-Down Period.  Each Royalty payment shall be accompanied by a written statement that shows in reasonable detail, for the applicable calendar quarter or calendar month, the following: (a) the Gross Sales, Wholesale Gross Sales and/or Consumer Gross Sales, as applicable, and the calculation thereof, and (b) the Wholesale Royalties, Consumer Royalties, and/or Additional Royalties, as applicable, and the calculation thereof.

**4.3.    Expense Reimbursements.**  During the Services Term, in addition to any other expenses that are reimbursable under this Agreement, Company shall pay directly for or reimburse Lender and Talent for (a) all of the travel, accommodations, expenses, personnel and perquisites listed on Exhibit C, and (b) any other reasonable expenses incurred in connection with the performance of Services under this Agreement, in each case within 30 days after Lender provides an invoice for the same which substantiates such expenditures.

**4.4.    Records and Audit Rights.**  Company shall at all times maintain complete and accurate books and records relating to its activities and performance under this Agreement, including, without limitation, the sales of the Company Products, and all Gross Sales (including on a Product Category-by-Product Category and territory-by-territory basis) and computations of Royalties ("Records"), in a manner that sufficiently demonstrates Company's compliance with its obligations under this Agreement. During the Term and for a period of three years thereafter, Lender shall have the right to audit the Records

ATTORNEYS' EYES ONLY

BL-000037829

maintained pursuant to this <u>Section 4.4</u> for the purposes of verifying Company's compliance with this <u>Section 4</u> by providing at least 10 business days' prior written notice to Company. All such audits shall be conducted during normal business hours and without disruption to Company's business. Lender shall be responsible for all costs and expenses it may incur to perform such an audit, unless the audit reveals a variance of more than 3% from the reported amounts, in which case Company shall bear the cost of the audit. If such audit concludes that additional payments were owed or that excess payments were made during such period, Company shall pay to Lender an amount equal to the underpayment, or Company shall apply as a credit to its next payment to Lender hereunder an amount equal to the overpayment, in either case, within 30 days after the date on which such audit is completed and the conclusions thereof are notified to the parties.

4.5. <u>**Reporting.**</u>  At any time during the Term and any Wind-Down Period upon Lender's reasonable request, and in any event within 15 days after the end of each Contract Year, Company will deliver to Lender a report detailing (a) Company's advertising and promotional activities in connection with the Company Products for such Contract Year, including detailed expenditures on marketing and advertising campaigns; (b) sales performance data for the Company Products for such Contract Year, including detailed sales performance date segregated by type of Company Products, Territory (including, without limitation, as to Key Markets), and type of sale (e.g., wholesale vs. direct to end consumer); and (c) data for distribution channels for the Company Products for such Contract Year.

4.6. <u>**US Dollars.**</u>  All payments and other compensation made by Company hereunder shall be in United States Dollars. With respect to sales of Company Products in a currency other than United States Dollars, Gross Sales shall be computed on the basis of the average of the conversion rates of such currency into United States Dollars quoted in The Wall Street Journal as of the close of business on the last business day of each month during each applicable accounting and payment period.

5. <u>**INTELLECTUAL PROPERTY.**</u>

5.1. <u>**Company Intellectual Property Rights.**</u> Lender and Talent acknowledge and agree that neither Lender nor Talent now has, and in the future neither Lender nor Talent will have or assert, any right, title or interest of any kind or nature whatsoever in or to any Company Intellectual Property (other than any aspects of the Talent Rights used therein). Lender hereby acknowledges, understands and agrees that all right, title, interest and Intellectual Property Rights in and to (a) any and all Identification Materials, and (b) all the results and proceeds of Lender's and Talent's Services during the Services Term hereunder, including, without limitation, any contributions Talent makes in connection with the Company Products, but excluding (i) the Talent Rights, including, without limitation, any derivative works of the Talent Identification, and (ii) any of Lender or Talent's pre-existing materials or proprietary materials originally created independent of the Services (collectively, after taking into account the foregoing exclusions, the "<u>Results and Proceeds</u>"), are and shall be for the sole and exclusive ownership and benefit of Company in accordance with the copyright laws of the United States and foreign laws including, but not limited to, Sections 101 and 201 of Title 17 of the U.S. Code. To the extent the Results and Proceeds are not for the sole and exclusive ownership and benefit of Company in accordance with the applicable copyright laws, then Lender hereby irrevocably assigns, and shall cause Talent to irrevocably assign, any and all right, title and interest in and to such Results and Proceeds to Company. At Company's reasonable request, and at Company's sole cost and expense at any time during and after the Term, Lender and Talent will execute all documents and instruments consistent herewith and perform all acts which may reasonably be necessary to give effect to Company's ownership of Results and Proceeds, including, without limitation, by giving good faith testimony by affidavit and/or in person in connection with any legal proceedings during the Term, subject to Talent's professional and personal availability. Notwithstanding anything to the contrary herein, Company acknowledges and agrees that Company is entitled to use and exploit the Identification Materials and Talent Rights solely during the License Term (and, subject to <u>Section 8.5</u>, during any Wind-Down

ATTORNEYS' EYES ONLY                                                                 BL-000037830

Period), and solely in accordance with the terms and conditions of this Agreement.

**5.2.** **Infringement of Talent Rights by Third Parties.** During the License Term, Company will use commercially reasonable efforts to promptly inform Lender if Company learns of any Third Party infringement of the Talent Rights (or any part thereof). In the event that Lender elects in its sole and absolute discretion to take action to stop any such infringement (it being recognized that Lender is under no obligation to do so), Lender shall bear all expenses in connection with such action and to the extent reasonably practicable, Company shall cooperate with Lender or Talent as may be reasonably requested by Lender and at Lender's cost. Any and all recovery resulting from any action taken hereunder by Lender or Talent shall be for the sole benefit of Lender. In the event Lender does not choose to take action to stop any infringement described above, then Company will have the right, but not the obligation, with Lender's written approval (which cannot be unreasonably denied), to take any action with respect to the alleged infringement on Lender's and Talent's behalf and Company shall bear all expenses in connection with such action. In connection with any approved action taken by Company, to the extent reasonably practicable, Lender and Talent will cooperate with Company, at Company's cost, to stop such infringement and, if so requested by Company, will join with Company as a party to any action brought by Company for such purpose. Company will have full control over any action or position taken by Company, including the right to select counsel, to settle on any terms it deems advisable in its discretion following meaningful consultation with Lender, to appeal any adverse decision rendered in any court, and otherwise to make any decision in respect thereto as Company in its discretion deems advisable and will bear all expenses connected with such Company's action or position, except that if Lender and/or Talent desire to retain their own counsel in connection with such Company action or position, Lender and Talent will do so at Lender's own expense. Neither Lender nor Talent will be liable to Company for any Third Party infringement of the Talent Rights except if such infringement was at Lender or Talent's express direction. Any and all recovery resulting from any action taken hereunder solely by Company shall be for the sole benefit of the Company, <u>provided that</u> each of Lender's, Talent's, and Company's costs shall first be reimbursed on a pro rata basis in proportion to each of their respective expenditures.

**5.3.** **Ownership of Talent Identification.** Company acknowledges that Lender and/or Talent have sole and exclusive ownership of all right, title and interest in and to the Talent Identification. Company further acknowledges that Company has not acquired, and Company will not acquire (whether by operation of law, by this Agreement or otherwise), any right, title or interest in or to the Talent Identification or any mark or brand other than Company Intellectual Property. If Company acquires any rights in the Talent Identification, by operation of law, or otherwise, such rights shall be deemed and are hereby irrevocably automatically assigned to Talent without further action by any of the parties. Company agrees that it will not, without Lender's prior written approval (in Lender's sole and absolute discretion), file during the Term or thereafter, any application for trademark, trade dress, trade name, copyright or otherwise obtain or attempt to obtain a trademark or copyright registration anywhere in the world, which consists in whole or in part, of any constituent element of the Talent Identification, including, without limitation, any mark, design or logo intended to make reference to the Talent Identification or Talent.

**5.4.** **Talent Trademarks.** Upon request of Company, Lender shall use good faith efforts to obtain the registration of Talent Trademarks in any Key Market, <u>provided that</u> (a) such request is supported by commercial reasons, (b) all such applications and/or registrations will be in the name of, and are owned by, Lender (or its designee and (c) any such filings for such applications and/or registrations do not violate, and are consistent with, all applicable laws, rules, regulations and ordinances in such Key Market. For the avoidance of doubt, the foregoing does not create, nor shall be construed to create, any obligation for Lender and/or Talent to pursue nor defend litigation (nor any other public claims, suits, oppositions, cancellations and/or proceedings) in the efforts to obtain any such registration. During the License Term, Company shall (i) cooperate reasonably with Lender in connection with the registration, prosecution and maintenance of Talent Trademarks and (ii) bear all related reasonable Third Party out-of-pocket expenses in connection

ATTORNEYS' EYES ONLY

BL-000037831

with such registration, prosecution and maintenance. In case of infringement of any applications and/or registrations of Talent Trademarks, <u>Section 5.2</u> shall apply; <u>provided, however</u>, that, during the License Term, Company shall bear all related reasonable Third Party out-of-pocket expenses in connection with such infringement of any such application and/or registrations (whether Lender or Company asserts the applicable action). Lender (or its designee) expressly reserves all rights in and to the Talent Trademarks not expressly granted to Company under this Agreement. As between the parties, Company acknowledges and agrees that Lender (or its designee) is the sole and exclusive owner of the Talent Trademarks and of the goodwill associated therewith, including all goodwill that arises during or from the use thereof, and that Company hereby acquires no right, title, interest or claim of ownership in or to the Talent Trademarks or the goodwill associated therewith, except as to the rights expressly granted to Company as specified herein.

     **5.5.**   **License to Company Intellectual Property.** Subject to the terms and conditions of this Agreement, Company hereby grants to Lender and Talent, during the Services Term, a royalty-free right and license to use Company Intellectual Property as necessary to perform Services or as otherwise necessary to fulfill Lender's or Talent's obligations under this Agreement.

     **5.6.**   **Recordal of the Agreement.** Company shall have the right to record, at Company's cost, this Agreement in the relevant trademark registries (subject to the deletion of highly sensitive information, such as financial information and Talent's obligations set forth in this Agreement, such deletion subject to the parties' mutual approval). Lender shall provide reasonable assistance, at Company's request and at Company's cost, to enable Company to carry out the necessary acts and measures to file a request for recordal of, and record, the license granted to it in <u>Section 2.1</u>, in the relevant trademark registries, including but not limited to the execution of all forms, applications and any other documents or deeds required by the competent authorities (subject to Lender's reasonable opportunity to review and comment on such forms, applications, documents and deeds), whose preparation is the full responsibility of Company. Lender shall not request the cancellation of any recording made pursuant to this Section during the License Term.

**6.**    **REPRESENTATIONS, WARRANTIES AND INDEMNITIES.**

     **6.1.**   **Lender's Representations, Warranties and Covenants.** Lender represents, warrants and covenants to Company as follows:

        **6.1.1.**   **Enforceability.** This Agreement constitutes the valid and binding obligation of Lender enforceable against Lender in accordance with its terms.

        **6.1.2.**   **Rights.** Lender has, and throughout the Term of this Agreement will have, the right to grant Company all of the rights granted to Company in this Agreement on the terms provided in this Agreement, including but not limited to the right to license the Talent Identification, as provided herein, for commercial purposes throughout the Territory.

        **6.1.3.**   **As-Is License.** Notwithstanding anything in this Agreement to the contrary, the License granted in <u>Section 2.1</u>, and any rights to use the Talent Rights hereunder, are on an "as-is" basis without any representation or warranty of any kind or nature, whether express or implied.

        **6.1.4.**   **Agreement.** There is in existence between Lender and Talent a valid and enforceable agreement, which permits Lender to grant to Company on Talent's behalf all of the services and rights being granted to Company under this Agreement. Lender will waive none of Lender's rights thereunder and shall take all steps necessary or desirable to keep the same in full force and effect so that Company shall have the benefit of Talent's Services and all rights granted to Company hereunder.

        **6.1.5.**   **No Conflict.** Neither this Agreement nor Lender's or Talent's duties, obligations

ATTORNEYS' EYES ONLY

BL-000037832

or performance hereunder conflict with any agreement or obligation of Lender or Talent. Neither Lender nor Talent are parties to any agreement or subject to any obligation that would prevent or materially restrict their ability to perform their duties and obligations under this Agreement. There is no claim, action, suit or proceeding pending or, to Lender or Talent's knowledge, threatened, which if adversely determined would affect the ability of Lender or Talent to enter into this Agreement or to perform their duties and obligations hereunder.

      6.1.6.   **Taxes.** Lender and Talent have reviewed with their own tax advisors the federal, state, local and foreign tax consequences of the transactions contemplated by this Agreement. Lender and Talent are relying solely on such advisors and not on any statements or representations of the Company or any of its agents with respect thereto. Lender and Talent understand that they (and not the Company) shall be responsible for Lender's and Talent's respective tax liabilities that may arise as a result of the transactions contemplated by this Agreement.

    **6.2.**   **Company's Representations, Warranties and Covenants.** Company represents, warrants and covenants to Lender as follows:

      6.2.1.   **Organization and Standing.** Company is a Delaware limited liability company and is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of Delaware. Company has all requisite corporate power and authority and all necessary licenses, permits and authorizations to own and operate its properties and assets and to carry on its business as now being conducted.

      6.2.2.   **Authorization; Enforceability.** Company has the power and authority to enter into this Agreement, to perform its obligations under this Agreement, and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action (corporate, limited liability company or otherwise) on the part of Company and constitutes the valid and binding obligation of Company enforceable against Company in accordance with their respective terms.

      6.2.3.   **Compliance with Law.** Company shall operate its business (including but not limited to the production, distribution, marketing, promotion and sale of Company Products and the use of Identification Materials) in compliance with all applicable laws, rules, regulations, ordinances and labor standards. In addition, Company shall cause its Affiliate suppliers to (and shall require, and use commercially reasonable efforts to enforce such requirements, its other suppliers in its relevant agreements with them to) operate their businesses with respect to the production, distribution, marketing, promotion and sale of Company Products and the use of Identification Materials, in compliance with all applicable laws, rules, regulations, ordinances and labor standards. Without limiting the generality of the foregoing sentences, Company is responsible for any advertising claims or content provided or approved by Company. For the avoidance of doubt, and by way of example, Company shall be responsible for ensuring that any disclosure of Talent's affiliation with Company that is provided or approved by Company complies with the FTC Endorsement Guides, and that any content of the Social Media Posts (as defined below) provided or approved by Company relating to the Company Products or Company contain true and accurate statements and, to the extent applicable, fully substantiated marketing claims.

      6.2.4.   **No Infringement.** Company Intellectual Property, and use thereof by Lender or Talent in accordance with this Agreement, does not and will not infringe (directly or indirectly), misappropriate or violate the Intellectual Property Rights or other rights of any Third Party.

      6.2.5.   **No Conflict.** Neither this Agreement nor Company's duties, obligations or performance hereunder conflict with any agreement or obligation of Company. Company is not a party to

- 14 -

BL-000037833

any agreement or subject to any obligation that would prevent or materially restrict its ability to perform its duties and obligations under this Agreement. There is no claim, action, suit or proceeding pending or, to Company's knowledge, threatened, which if adversely determined would affect the ability of Company to enter into this Agreement or to perform its duties and obligations hereunder.

6.2.6.   **BL Core Values.** Company shall operate its business in compliance with the BL Core Values (as defined in the LLC Agreement).

**6.3.**   **Indemnity; Insurance.**

6.3.1.   **Indemnification of Lender.** Company will indemnify and hold each of Lender, Talent and their respective Affiliates, Immediate Family (in the case of Talent), officers, directors, employees and agents ("Lender Parties") harmless from and against any and all liabilities, damages, losses, obligations, judgments, costs and expenses (including, without limitation, reasonable attorneys' fees and charges) ("Damages") resulting from any and all claims, actions, suits, and proceedings, made or brought against any Lender Party by a Third Party arising out of or relating to: (a) any material breach by Company of any term or condition of this Agreement, including, but not limited to, any of its representations, warranties, covenants or other obligations set forth in this Agreement, (b) the performance of the Services under this Agreement, and any instructions and directions given by Company in connection with the Services, (c) the operation and management of Company's business, including, without limitation, the development, production, marketing, distribution, promotion, labeling, packaging, advertising, sale or use of any Company Products, (d) the distribution, exploitation and/or use of any Identification Materials, or of any advertising, marketing and/or promotional materials used by Company, and any content or materials provided by Company, including, without limitation, substantive claims made by or content generated by Company related to the price, terms and conditions of the Company Products or the quality and/or reliability of the Company Products, or used by Lender and/or Talent and approved by Company, (e) any product liability or personal injury claims or any similar or other claim based on strict liability, negligence or warranty (whether express or implied) related to the Company Products, (f) any investigation, audit or proceeding initiated by a federal, state, local or other governmental agency or authority against Lender and/or Talent as a result of the Brands, the Company Products, or any claims or related materials in connection therewith, (g) any gross negligence, willful misconduct or reckless actions or omissions of Company, and (h) the use of the Talent Rights in a manner not authorized by this Agreement; provided, however, that Company shall not be obligated to indemnify the Lender Parties from and against any such Damages to the extent resulting from the gross negligence or willful misconduct of Lender and/or Talent.

6.3.2.   **Process of Indemnification of the Lender.** Company will conduct the defense or settlement of each Third Party claim subject to the indemnity provisions of Section 6.3.1 with counsel of its choice, which counsel must be reasonably acceptable to Lender. If Lender becomes aware of any circumstances of any Third Party claim that might or does give rise to a claim for indemnification, then Lender shall promptly notify Company in writing; provided that, no delay in notification will relieve Company from any obligation unless (and solely to the extent that) Company is prejudiced by such delay. Company will not settle any matter without the consent of Lender, which consent will not be unreasonably withheld or delayed; it being understood that if Lender refuses a settlement that Company is willing to make, Company's overall future monetary liability with respect thereto shall be limited to the amount of such settlement provided that such settlement does not (a) impose any liability on, nor require any personal obligations of, Talent (nor her Affiliates or Immediate Family), and (b) have, nor is reasonably likely to have, an adverse effect on Talent's name, brand and/or public image. Lender will have the right but not the obligation to employ separate counsel and participate in the defense of any such claim at its sole cost. If Company does not conduct the defense on behalf of Lender following Lender's request therefor, Lender may defend against and consent to the entry of any judgment or enter into any settlement with respect to any claim in any manner it reasonably deems appropriate, and Company will remain responsible for any

- 15 -

                                                          BL-000037834

Damages Lender may suffer resulting from the Third Party claim. The indemnification obligations of this Section 6.3.2 shall survive the termination or expiration of this Agreement.

   6.3.3. **Insurance.** Company shall, throughout the Term and the Wind-Down Period (if any) and for at least 24 months following the expiration of the later thereof, obtain and maintain at its own cost and expense, from an insurance company having at minimum an AM Best Rating of A-VIII a Standard ISO or equivalent, Comprehensive General liability insurance policy including coverage for products liability, personal injury, and directors and officers liability, as well as Errors and Omissions coverage provided by a standard Media Liability policy naming each of Lender and Talent as additional named insureds in each of such policies. Such Comprehensive General liability policy shall provide a limit of liability (in addition to costs of defense) of not less than $3,000,000 per occurrence and a $5,000,000 aggregate for products. These limits may be achieved by using Primary and excess liability policies. The Media liability policy shall be for $3,000,000 per occurrence with a $5,000,000 aggregate cap and shall be written on a claims-made basis having an option for a 24-month tail coverage. A certificate of insurance evidencing such coverage shall be furnished to Lender within 10 days of the full execution of this Agreement. The insurance described in this Section is understood to be primary and is not subject to contribution by any other insurance which may be available to Lender. Company shall use its best efforts to obtain that such insurance policies provide that the insurer cannot terminate or non-renew or materially modify such policies or remove either of Lender or Talent as additional insureds.

**7.**  **CONFIDENTIAL INFORMATION.** The parties acknowledge that during the course of their performance under this Agreement, the Receiving Party may learn Confidential Information of the Disclosing Party. Each party agrees to take reasonable steps to protect such Confidential Information and further agrees that it will not, directly or indirectly, without the prior written consent of the Disclosing Party: (a) use such Confidential Information other than in the normal and proper course of performing Services and in the performance of the other covenants and obligations subject to and pursuant to the terms of this Agreement and the LLC Agreement; (b) disclose such Confidential Information to any party other than (i) to such party's investors, members, managers, directors, partners, officers, and employees and (ii) to such party's lawyers, accountants and business representatives who owe a duty of confidentiality to such party. In the event the Receiving Party is required to disclose the Disclosing Party's Confidential Information pursuant to any law, regulation or court or other governmental order, request or requirement, the Receiving Party will, if permitted by law, promptly notify the Disclosing Party in writing and take reasonable steps (at the sole cost of the Disclosing Party) to assist the Disclosing Party in requesting confidential treatment, contesting the order or otherwise protecting the Disclosing Party's Confidential Information. The foregoing restrictions will continue to apply after the expiration or termination of this Agreement, regardless of the reason for such expiration or termination, and will continue to apply for so long as the confidential nature of such information is maintained. All Confidential Information is, and will remain, the property of the Disclosing Party.

**8.**  **TERM AND TERMINATION.**

  **8.1.**  **Term.** The initial term of Services under this Agreement shall commence upon the Effective Date of this Agreement and shall continue for a period of five consecutive Contract Years thereafter, unless terminated sooner pursuant to the terms and conditions of this Agreement ("Initial Services Term"). Following the Initial Services Term, the term of Services under this Agreement shall automatically renew for an additional, successive period of five Contract Years, unless terminated sooner pursuant to the terms and conditions of this Agreement ("Renewal Services Term"). The Initial Services Term and the Renewal Services Term (if any) shall be referred to herein collectively as the "Services Term". The term of the License set forth in Section 2.1 shall commence upon the Effective Date of this Agreement and shall continue for a period of 10 consecutive Contract Years thereafter, unless terminated sooner pursuant to the terms and conditions of this Agreement ("License Term"). The Services Term and License

ATTORNEYS' EYES ONLY
BL-000037835

Term shall be referred to herein collectively as the "Term".

    **8.2.**    **Termination by Company.** Upon the occurrence of only the following events during the Term, in addition to all other remedies available to it at law or in equity (except as limited in this Agreement), Company will have the right to terminate this Agreement, upon providing written notice to Lender, subject to any cure rights, as set forth below:

    8.2.1.    **Material Breach.** Except as to events covered under Sections 8.2.2, Lender or Talent materially breaches any material representation, warranty, covenant or obligation under this Agreement (including the performance of the Services by Talent), but only if (a) Lender or Talent fails to cure such breach – to the extent reasonably capable of being cured - within 30 days, after receipt of Company's written notice of such breach and a detailed description of the conduct in need of cure and (b) Company exercises its termination right under this Section 8.2.1 within 60 days of learning the circumstances giving rise to such termination right.

    8.2.2.    **Death or Disability.** If Talent dies during the Term, then within 30 days of the date of Talent's death, Company will have the right to terminate this Agreement. In the event Talent is substantially unable (with or without reasonable accommodation) to perform the essential services for Service Days required hereunder as a result of physical or mental disability, as determined by Company on the basis of medical evidence (including meaningful consultation with Talent's physician, which Talent shall facilitate), and such disability shall continue for 120 consecutive days or for more than 180 days in any 12-consecutive month period (each, a "Disability"), then within 30 days, Company shall have the right, at its option (but subject to any limitations imposed by applicable law), on written notice to terminate this Agreement hereunder, so long as the Disability is continuing at the time of such notice. Any termination under this Section 8.2.2 due to death or Disability of Talent shall not constitute a material breach for which Company has the right to seek damages.

    8.2.3.    **Misalignment.** In the event that, by the end of Contract Year 1, GBB and Lender, despite meaningful and good faith negotiation, cannot agree on a fundamental Company Product or commercial strategy that is reasonably viewed as essential to Company's success, and a compromise between GBB and Lender is not achievable after at least 30 days of good faith negotiations between GBB and Lender, provided that Company must exercise its termination right under this Section 8.2.3, within 30 days after the end of such good faith negotiation period, and provided, however, that Company shall not be permitted to exercise its termination right under this Section 8.2.3 if as of such date Lender has not approved any action outside of, or contrary to, the BL Core Values.

    8.2.4.    **Morals.** In the event that (a) Talent is convicted of (or pleads guilty or no contest to) a felony (or foreign jurisdiction equivalent, but excluding vehicular-related felonies) or another crime involving moral turpitude, or (b) Talent commits an act or has committed an act that, after the Effective Date is reported in at least two news publications (including on-line publications) of stature and reputation similar to that of the New York Times (one of which may be the New York Times); which in either case (i) justifiably shocks, insults or offends a significant portion of the community in the metropolitan area of New York City or the Greater Los Angeles area, and (ii) causes a material and lasting adverse effect on Talent's public image or Company's public image; provided that Company must exercise its termination right under this Section 8.2.4, within 60 days of learning of the circumstances giving rise to such termination. For purposes of clarity, Talent's political activism, Talent's appearance in movies (including, without limitation, R rated movies) and reportage of Talent as a victim of a crime or as a party to a civil action to protect or defend Talent's rights of privacy or publicity shall not be deemed a violation of the morals provisions set forth in this Section 8.2.4, and Company shall have no right to terminate this Agreement as a result thereof.

ATTORNEYS' EYES ONLY

BL-000037836

Notwithstanding anything herein to the contrary, in no event shall Company have the right to terminate this Agreement for any reason other than those reasons expressly set forth in this <u>Section 8.2</u>. Without limiting the foregoing, Company may not terminate this Agreement for convenience.

**8.3.** <u>**Termination by Lender.**</u> Upon the occurrence of any of the following events during the Term, in addition to all other remedies available to it at law or in equity, Lender will have the right to terminate this Agreement upon providing written notice to Company, subject to any cure rights, as set forth below:

8.3.1. <u>**Material Breach.**</u> In the event (a) Company, GBB, GBB Member or any Affiliate of the foregoing (each, a "<u>GBB Party</u>") materially breaches any representation, warranty, or covenant or obligation in this Agreement or the LLC Agreement; (b) Company materially breaches any of the BL Core Values or produces and/or sells any products in contravention of any BL Core Value, or (c) Company or any GBB Party (or any purchaser in a Change of Control of GBB (as defined in the Side Letter)) materially breaches any payment obligation to Company, Lender or Talent (as applicable), including, without limitation, under the Guaranty or the Side Letter; <u>provided that</u>, in the case of any of the foregoing breaches, (i) to the extent reasonably capable of being cured, the applicable GBB Party fails to cure such breach within 30 days after receipt of Lender's notice of such breach, and (ii) Lender must exercise its termination right under this <u>Section 8.3.1</u> within 60 days of learning the circumstances giving rise to such termination right. Without limiting the foregoing, any breach by the Company of its obligations under <u>Section 6.3</u> above shall be deemed a material breach of this Agreement.

8.3.2. <u>**Insolvency.**</u> In the event (a) Company commences as debtor any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, dissolution, moratorium, delinquency, bulk transfer, or similar law, in any state, federal, or foreign proceedings, or Company seeks the appointment of a receiver, conservator, trustee, custodian, or similar official for Company or any substantial part of its property, or Company convenes any meeting of creditors for purposes of (i) commencing any such case or proceeding or (ii) seeking such an appointment or election, or (iii) entering into any composition agreement or similar arrangement; (b) any such case or proceeding is commenced against Company, or another seeking such an appointment or election; (c) an involuntary bankruptcy or insolvency proceeding is commenced against Company, which proceeding is not dismissed within 45 days; (d) Company makes a general assignment for the benefit of creditors; or (e) Company admits its inability to, or its intention not to, pay its debts as they become due, <u>provided that</u> Lender must exercise its termination right under this <u>Section 8.3.2</u> within 60 days of learning the circumstances giving rise to such termination right.

8.3.3. <u>**Investigation.**</u> Company or GBB (including any of their respective management, members or executive officers, in each case, other than Lender and Talent) or the Company Products become the subject of an official governmental investigation or defendant to a lawsuit, including, but not limited to, an investigation by the Federal Trade Commission, the Federal Communications Commission or any other state, federal or local governmental entity or agency, and such investigation or lawsuit (a) results in a consent order or adverse decision that is materially harmful or detrimental to, Company's reputation or goodwill, or (b) materially harms or materially adversely affects, Talent's reputation or goodwill, <u>provided that</u> Lender must exercise its termination right under this <u>Section 8.3.3</u> within 60 days of learning of the circumstances giving rise to such termination.

8.3.4. <u>**Membership Interests.**</u> Upon the termination or expiration of the LLC Agreement or, if sooner, the date on which Lender, Talent (or any of their Permitted Transferees (as defined in the LLC Agreement) no longer hold any membership interests of Company for any reason.

8.3.5. <u>**Misalignment.**</u> In the event that, by the end of Contract Year 1, GBB and Lender,

- 18 -

BL-000037837

despite meaningful and good faith negotiation, cannot agree on a fundamental Company Product or commercial strategy that is reasonably viewed as essential to Company's success, and a compromise between GBB and Lender is not achievable after at least 30 days of good faith negotiations between GBB and Lender, provided that Lender must exercise its termination right under this Section 8.3.5 within 30 days after the end of such good faith negotiation period.

8.3.6. **Performance.** In the event that, by the end of Contract Year 3, the aggregate sum of Royalties that Company has paid to Lender is less than $1,500,000, provided that Lender must exercise its termination right under this Section 8.3.6 within 60 days after the end of Contract Year 3, and provided further that Company may negate any such termination by Lender pursuant to this Section 8.3.6 if (a) the aggregate sum of Royalties that Company has paid to Lender by the end of Contract Year 3 is equal to or greater than $1,250,000, and (b) Company pays to Lender an amount equal to the difference between (i) $1,500,000 and (ii) the aggregate sum of Royalties that Company has paid to Lender by the end of Contract Year 3, within 30 days after receipt of Lender's termination notice pursuant to this Section 8.3.6.

8.3.7. **Morals.** In the event that (a) Company or GBB (or any of their respective executive officers, other than Blake Lively and/or the BL Manager (as defined in the LLC Agreement)) is convicted of (or pleads guilty or no contest to) a felony (or foreign jurisdiction equivalent, but excluding vehicular-related felonies) or another crime involving moral turpitude, or (b) Company or GBB (or any of their respective executive officers, other than Blake Lively and/or the BL Manager) commits an act or has committed an act that, after the Effective Date is reported in at least two news publications of stature and reputation similar to that of the New York Times (one of which may be the New York Times); which in either case (i) justifiably shocks, insults or offends a significant portion of the community in the metropolitan area of New York City or the Greater Los Angeles area, and (ii) causes a material and lasting adverse effect on Talent's public image or Company's public image; provided that Lender must exercise its termination right under this Section 8.3.7, within 60 days after of learning of the circumstances giving rise to such termination.

**8.4.    Additional Lender Termination Options and Rights.**

8.4.1. **Territory Exit Options and Rights.** Without limiting the Additional Categories Condition, in the event that any Product Category has not been Introduced in any Key Market by the end of the applicable Contract Year commencing as of the applicable Territory Introduction Date, then Lender and Talent shall have the right (in their sole and absolute discretion) to: (a) enter into an exclusive or non-exclusive Endorsement Deal with any beauty brand in such Product Category in such Key Market (each such Endorsement Deal entered into in accordance with this Section 8.4.1, an "Excluded Endorsement Deal"), and/or (b) remove such Product Category in such Key Market from this Agreement (each such Key Market Removed by Lender with reference to the relevant Product Category in accordance with this Section 8.4.1, a "Removed Key Market"). In the event that there are at least two Key Markets in the European Union in which all Product Categories have been removed in accordance with this Section 8.4.1, then Lender shall have the right (in its sole and absolute discretion) to remove from this Agreement: (i) all countries in the European Union, including, without limitation, all Key Markets in the European Union, and (ii) the United Kingdom. In addition, in the event that at least 50% of the Key Markets in value of Gross Sales (for the avoidance of doubt, not in the number of Key Markets) have been terminated in accordance with this Section 8.4.1 for all Product Categories, then Lender shall have the right (in its sole and absolute discretion) to terminate this Agreement in its entirety. It is expressly agreed that Lender must exercise any of its rights of removal or termination under this Section 8.4.1 within 90 days after the occurrence of any event which entitles it to exercise the relevant rights provided that Company shall promptly provide written notice to Lender upon the occurrence of any such event. For each Removed Key Market, Company will be provided a six-month period after the effective date of the applicable removal to, and to cause its sublicensees to, (A) remove all Talent Identification, and references to Talent, from such

- 19 -

BL-000037838

Removed Key Market, including, without, limitation, from then-existing Company Products and Company brands (including, without limitation, the Brands) sold in such Removed Key Market, (B) phase out all Talent Trademarks from such Removed Key Market, including, without, limitation, from then-existing Company Products and Company brands (including, without limitation, the Brands) sold in such Removed Key Market, and (C) sell-off in such Removed Key Market its then-existing inventory of Company Products that incorporate any of the Talent Rights, in each of the foregoing cases unless otherwise agreed to by Lender in writing (such agreement, in Lender's sole and absolute discretion) on a case-by-case basis.

8.4.2.     **Category Exit Options and Rights.** Without limiting the Additional Categories Condition, in the event that Gross Sales in any Product Category are not at least 70% of the Total Business Plan Minimum Sales as set forth in Exhibit D attached hereto ("Total Business Plan Minimum Sales") for such Product Category for two consecutive Contract Years, then Lender shall have the right (in its sole and absolute discretion) to remove such Product Category from this Agreement (each such Product Category removed by Lender in accordance with this Section 8.4.2, a "Removed Product Category"). In addition, in the event that any Product Category has not been Introduced in the United States of America and Canada by the end of the applicable Contract Year commencing as of the applicable Territory Introduction Date in the relevant Territory, then Lender shall have the right (in its sole and absolute discretion) to treat it as a Removed Product Category. In the event that there are at least two Removed Product Categories, then Lender shall have the right, but not the obligation, to remove all Product Categories and terminate this Agreement in its entirety, unless, and only unless, Gross Sales in the remaining Product Category are at least 100% of the Total Business Plan Minimum Sales of that Product Category in the prior two consecutive Contract Years (in which case, Lender will not have the right to terminate this Agreement in its entirety based on such failure). It is expressly agreed that Lender must exercise any of their rights of removal or termination under this Section 8.4.2 within 90 days after the occurrence of any event which entitles it to exercise the relevant rights provided that Company shall promptly provide written notice to Lender upon the occurrence of any such event. For each Removed Product Category, Company will be provided a six-month period after the effective date of the applicable removal to, and to cause its sublicensees to, (a) remove all Talent Identification, and references to Talent, from such Removed Product Category, including, without, limitation, from then-existing Company Products and Company brands (including, without limitation, the Brands) sold in such Removed Product Category, (b) phase out all Talent Trademarks from such Removed Product Category, including, without, limitation, from then-existing Company Products and Company brands (including, without limitation, the Brands) sold in such Removed Product Category, and (c) sell-off its then-existing inventory of Company Products sold in such Removed Product Category that incorporate any of the Talent Rights, in each of the foregoing cases unless otherwise agreed to by Lender in writing (such agreement, in Lender's sole and absolute discretion) on a case-by-case basis.

**8.5.     Effect of Termination.** Upon termination of this Agreement for any reason or expiration of the Term, Company shall be required to pay Lender (a) any unreimbursed expenses that are due hereunder as of the termination date, and (b) any compensation due and payable under Section 4.1 as of the termination date and through any Wind-Down Period, as such compensation becomes due in accordance with Section 4.2. In addition, notwithstanding the foregoing, if Company has terminated this Agreement pursuant to Section 8.2.1 or Lender has terminated this Agreement pursuant to Section 8.3.1 or 8.3.3, any such termination shall be in addition to and not in lieu of any other rights or remedies available to the terminating party hereunder, at law or in equity (except as otherwise limited in this Agreement). Upon termination (for any reason) or expiration of the License Term or termination (for any reason) or expiration of this Agreement, (i) all rights granted by Lender and Talent hereunder shall immediately revert to Lender and/or Talent and Company shall immediately cease, and shall cause its sublicensees to cease, any use of the Talent Rights, and any Identification Materials in any form, and (ii) Company shall have no further right to manufacture, distribute or sell any Company Products incorporating any of the Talent Rights. Notwithstanding the foregoing, subject to the terms and conditions of this Agreement, unless this Agreement is terminated by Lender pursuant to Section 8.3.1, 8.3.3 or 8.3.7, Company will be provided a

- 20 -

BL-000037839

six-month period ("Wind-Down Period") after the effective date of the termination to, and to cause its sublicensees to, (A) remove all Talent Identification, and references to Talent, from Company's business, including, without limitation, then-existing Company Products and Company brands (including, without limitation, the Brands), (B) phase out all Talent Trademarks from Company's business, including, without limitation, then-existing Company Products and Company brands (including, without limitation, the Brands), and (C) sell-off its then-existing inventory of Company Products that incorporate any of the Talent Rights, in each of the foregoing cases unless otherwise agreed to by Lender in writing (such agreement, in Lender's sole and absolute discretion) on a case-by-case basis. For the avoidance of doubt, by way of example, by the end of the Wind-Down Period, any Company brand or Company Product utilizing a Company Trademark in combination with a Talent Trademark would phase to "[Company Trademark]" as opposed to "[Company Trademark] by [Talent Trademark]" (e.g., "Nakeup" as opposed to "Nakeup by Blake Lively"). The parties agree that any such wind-down will be done in a responsible manner that protects the reputation of Company and the Company Intellectual Property, Talent Rights and equity holders of Company.

**8.6.** **Survival.** All rights and obligations of the parties which, by their express terms or nature, including, but not limited to, Sections 2.3, 4.1, 4.4, 5.1, 5.3, 5.4, 6, 7, 8.5, 8.6, and 9 (but excluding Section 9.14), survive the expiration or termination of this Agreement will continue until fully performed.

## 9. MISCELLANEOUS.

**9.1.** **Notices.** All notices under this Agreement must be in writing and mailed by certified or registered mail, return receipt requested, postage prepaid, or dispatched by expedited overnight delivery service, always anticipated by email, at the respective addresses set forth in the LLC Agreement (and reported below for sake of clarity) or such other addresses as either party may designate in writing. Any notice mailed will be deemed to have been received three business days after it is mailed; any notice dispatched by expedited overnight delivery service will be deemed to have been received one day after it is dispatched. All approvals under this Agreement and all notices related to the reporting as per Section 4.5 may be requested and given through email. With respect to any such email notice, such notice shall be deemed to have been received 48 hours after it is sent or upon a notice by the receiving party that it has received the email, whichever occurs earlier.

a) To Company:

> Family Hive LLC
> 2701 Ponce de Leon Blvd., Suite 202
> Coral Gables, FL 33134

With a copy to:

> Deloitte Legal
> Via Tortona 25
> 20144 Milan - Italy
> Attention: Carlotta Robbiano
> Email: 

b) To Lender:

> c/o: ML Management Associates, Inc.
> 888 Seventh Avenue, 4th Floor
> New York, NY 10106

- 21 -

ATTORNEYS' EYES ONLY                                                          BL-000037840

Attn: Mark Landesman
Email:

With copies to:

Management 360
10100 Santa Monica Boulevard, Suite 2300
Los Angeles, CA 90067
Attn: Justin Grey Stone
Email:

and

William Morris Endeavor
9601 Wilshire Boulevard
Beverly Hills, CA 90210
Attn: Todd Jacobs and Warren Zavala
Email:                                  and

and

Willkie Farr & Gallagher LLP
2029 Century Park East, 34th Floor
Los Angeles, CA 90067
Attn: Alan J. Epstein, Esq.
Email:

**9.2.     Governing Law; Dispute Resolution.** This Agreement is made pursuant to and shall be governed by and construed in accordance with the laws of the State of New York, without references to the principles of conflicts of laws. Any dispute arising out of or relating to this Agreement shall be treated as a "Dispute" (as defined in the LLC Agreement) and, accordingly, shall be settled pursuant to Section 9.12 of the LLC Agreement, with any logically necessary changes; provided, however, that the foregoing shall in no way limit or restrict a party's right to seek injunctive relief or to enforce an arbitration award in any court of competent jurisdiction.

**9.3.     SAG-AFTRA.** Talent's services and the production and use of any videos, commercials and other on-camera or audio-visual materials produced hereunder shall be subject to the applicable union agreements of the Screen Actors Guild ("SAG") and/or the American Federation of Radio and Television Artists ("Union Codes"), and all compensation required under the Union Codes shall be paid to Lender in accordance with the applicable Union Code. Company acknowledges and agrees that any allocation of compensation between "covered" and "non-covered" services shall be determined in accordance with the SAG Commercials Contract, including without limitation the Multi-Service Commercial Allocation Guidelines. Company shall either be a signatory or shall cause an advertising agency or payroll service, which shall be a signatory to the Screen Actors Guild Commercials Contract or other applicable SAG or AFTRA collective bargaining agreement, to fulfill all signatory obligations, including without limitation paying required compensation for services and/or usage, making all Union Code Pension and Health Fund payments (in addition to any compensation payable hereunder) directly to SAG or AFTRA Plans, as applicable, and complying with all other applicable rules and regulations with respect to Talent' services hereunder. Company will indemnify Lender and Talent for any fines, penalties, assessments or other liabilities in connection with Company's (or the applicable third party signatory's) failure to comply with Union Code requirements in connection with Talent's services hereunder.

- 22 -

**9.4.** **Waiver.** The failure of any party to exercise the rights granted to such party in this Agreement upon the occurrence of any of the contingencies set forth in this Agreement will not in any event constitute a waiver of any such rights upon the occurrence of any additional such contingencies.

**9.5.** **Entire Understanding; No Oral Amendments.** This Agreement (including Annex I and the Exhibits attached hereto, each of which is incorporated herein by reference), and the LLC Agreement constitute the entire understanding between the parties hereto with respect to the subject matter of this Agreement and supersedes all prior agreements whether written or oral. No waiver, modification or addition to this Agreement will be valid unless made in writing and signed by the parties hereto. In the event of a conflict between the terms of this Agreement and the terms of the LLC Agreement, this Agreement shall control.

**9.6.** **Severability.** If any provision of this Agreement is determined to be invalid by a court of competent jurisdiction, then such determination will in no way affect the validity or enforceability of any other provision in this Agreement.

**9.7.** **Independent Status.** This Agreement does not constitute and will not be construed as constituting a partnership or joint venture, or an employee employer relationship or one of principal and agent, it being understood that the parties hereto are and will remain independent contractors in all respects.

**9.8.** **Assignment.** Company may only assign, sublicense or transfer, in whole or in part, the rights and obligations provided in this Agreement with the prior written consent of Lender, provided that Company may assign, sublicense or transfer, in whole or in part, the rights and obligations provided in this Agreement without the written consent of Lender to an Affiliate of Company, provided Company shall remain primarily liable in such instance. In addition, Company may exercise the rights granted to it pursuant to this Agreement with respect to distribution, sales and marketing through any Affiliate of the Company. This Agreement is personal to Lender and other than to an Affiliate of Lender or Talent (in which instance Lender shall remain primarily liable), Lender shall not have the right to assign or otherwise transfer, in whole or in part, the rights and obligations provided in this Agreement to any Third Party; any such attempt shall be deemed void ab initio. This Agreement will be binding upon, and will inure to the benefit of, the parties' respective successors and permitted assignees. For the sake of clarity, in the event Lender or Talent assigns or transfers at any time the Talent Rights to an Affiliate of Lender or Talent, such assignment or transfer shall be effective provided that all the rights and obligations related to the Talent Rights as provided pursuant to this Agreement shall also be assigned or transferred to such Affiliate of Lender or Talent. In any case of any such assignment or transfer, Talent shall keep on fulfilling all of the Talent's obligations under this Agreement and Annex I herself. For any such subsequent assignment or transfer to an Affiliate of Lender or Talent, the rules provided in the foregoing two sentences in this Section 9.8 shall continue to apply.

**9.9.** **Insolvency.** In the event of Lender's dissolution or the liquidation of Lender's assets, or the filing of a petition in bankruptcy or insolvency or for any arrangement or reorganization by, for or against Lender, or in the event of the appointment of a receiver or a trustee for all or a portion of Lender's property, or in the event that Lender shall make an assignment for the benefit of creditors or commit any act for, or in, bankruptcy or become insolvent, or in the event Lender shall fail to fulfill any of Lender's material obligations under this Agreement for any other reason, then, at any time after the occurrence of any such event, in addition to any other remedies which may be available, Company shall have the option by written notice to require that Talent render her personal services directly to Company upon all the same terms and conditions as are herein contained, and in such event, Talent shall be deemed substituted for Lender as party to this Agreement, effective from and after the date of Company's exercise of such option and without the need of any consent by the Talent, whose consent is already granted hereby.

- 23 -

 BL-000037842

**9.10.** **Counterparts.** This Agreement may be executed concurrently in two or more counterparts, each of which will be deemed to be an original for all purposes (including for admission in any legal proceeding), but all of which together will constitute one and the same instrument. Executed counterparts via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**9.11.** **Limit of Liability.** Notwithstanding anything to the contrary contained herein, in the event any party incurs any expenses, damages or other liabilities (including, without limitation, reasonable attorneys' fees) in connection herewith, a party's liability to the other party for direct damages hereunder (excluding indemnification obligations hereunder) shall be limited to proven actual direct damages. Without limiting the generality of the foregoing, except as to each party's willful misconduct and Company's indemnification obligations under this Agreement with respect to Third Party indemnification claims, in no event shall any party hereto be liable for, or be obligated to pay or indemnify any other party hereto, for (a) any consequential, punitive, special or exemplary damages of any kind (unless paid by a party hereto to a Third Party in connection with a Third Party claim) and/or (b) lost profits, future revenue, or loss of business reputation or opportunity, or diminution in value.

**9.12.** **DAMAGES CAP.** EXCEPT FOR LENDER'S AND/OR TALENT'S WILLFUL MISCONDUCT, COMPANY AGREES THAT IN NO EVENT SHALL THE AGGREGATE AMOUNT OF ANY AND ALL MONETARY DAMAGES TO WHICH IT IS ENTITLED (IF ANY) AS A RESULT OF A BREACH OF THIS AGREEMENT BY LENDER OR TALENT EXCEED THE AMOUNT EQUAL TO THE SUM OF (A) ANY DISTRIBUTIONS AND ALL OTHER COMPENSATIONS PAID TO LENDER UNDER THE LLC AGREEMENT, AND (B) ANY AMOUNTS PAID BY COMPANY TO LENDER UNDER SECTION 4.1 OF THIS AGREEMENT, IN EACH CASE DURING THE 12-MONTH PERIOD PRECEDING THE EVENT WHICH GAVE RISE TO THE BREACH AND (C) 50% OF THE SALE PROCEEDS RECEIVED BY THE BL PARTIES (AS DEFINED IN THE SIDE LETTER) IN RESPECT OF THE PUT UNITS (AS DEFINED IN THE SIDE LETTER) AS A RESULT OF EXERCISING THE GBB SALE PUT RIGHT (AS DEFINED IN THE SIDE LETTER).

**9.13.** **Pay or Play.** Company agrees that Lender is being engaged on a "pay or play" basis, and that none of the consideration payable under this Agreement to Lender or Talent is contingent on Company's use of Identification Materials, the Talent Identification or any other services of Lender or Talent.

**9.14.** **Marketing Commitment.** During Contract Year 1, Company shall fund a minimum marketing commitment (each, a "Minimum Marketing Commitment") equal to 25% of the Total Business Plan Minimum Sales for Contract Year 1. During Contract Years 2 through 5, Company shall fund a Minimum Marketing Commitment equal to 25% of the budgeted Gross Sales in each such Contract Year, provided, that, if the actual Gross Sales exceed the budgeted Gross Sales during any such Contract Year (such excess, the "Excess Sales"), then an amount equal to 25% of the Excess Sales shall be added to Minimum Marketing Commitment for the following Contract Year. Company agrees that during each Contract Year it shall budget and spend on the advertising of Company Products, also through its distributors, an amount which is no less than the Minimum Marketing Commitment in respect of such Contract Year. In the event in any Contract Year, Company spends less than the required Minimum Marketing Commitment, Lender agrees that for the relevant Contract Year, Company shall be permitted to carry forward to the subsequent Contract Year an amount not higher than 10% of the Minimum Marketing Commitment of the relevant Contract Year (the "Marketing Underspend Carry Forward"). Such amount shall be spent by Company in addition to the Minimum Marketing Commitment of the following Contract Year, provided that the Marketing Underspend Carry Forward must be spent within the first six months of

ATTORNEYS' EYES ONLY

BL-000037843

the following Contract Year. Notwithstanding the foregoing, it remains agreed that in the event the Company does not carry forward the required Minimum Marketing Commitment to the subsequent relevant Contract Year, the Lender shall have the right to treat Company's failure to spend the applicable Minimum Marketing Commitment in two consecutive Contract Years as a material breach of this Agreement.

*[signature pages follow]*

- 25 -

ATTORNEYS' EYES ONLY                                                      BL-000037844

**IN WITNESS THEREOF**, each party has duly executed this Agreement as of the Effective Date.

**LENDER:**

**LOL HATA  LLC**

By: _____

Name: Blake  Ellender  Reynolds

        p/k/a Blake Lively

Title:   Manager

**COMPANY**:

**FAMILY HIVE LLC**

By: _____

Name: _____

Title: _____

[SIGNATURE PAGE TO PROMOTIONAL SERVICES AND LICENSE AGREEMENT]

ATTORNEYS' EYES ONLY

     **IN WITNESS THEREOF**, each party has duly executed this Agreement as of the Effective Date.

**LENDER:**

**LOL HATA LLC**

By: _____
Name: Blake Lively
Title: Manager

**COMPANY**:

**FAMILY HIVE LLC**

By: _____
Name: Ruben de Pra
Title: Manager

[SIGNATURE PAGE TO PROMOTIONAL SERVICES AND LICENSE AGREEMENT]

ATTORNEYS' EYES ONLY

## ANNEX I

**Talent Inducement**

In order to induce Family Hive LLC ("Company") to enter into the foregoing Promotional Services and License Agreement (the "Agreement") with LOL HATA LLC ("Lender"), for the services of Blake Lively, the undersigned hereby:

(a)    acknowledges that she has read and is familiar with all the terms and conditions of the Agreement;

(b)    assents to the execution of the Agreement and agrees to be bound by the terms and conditions thereof that relate to the services to be rendered thereunder by the undersigned and restrictions imposed upon the undersigned in accordance with the provisions of the Agreement, and hereby guarantees to Company that she will perform the Services as and when required under the Agreement;

(c)    confirms and joins in the grant of all of the rights granted by Lender under the Agreement and confirms the authority and right of Lender to enter into the Agreement; and

(d)    acknowledges and agrees that Company shall not be under any obligation to make any payments to the undersigned for or in connection with this inducement and for or in connection with the Services rendered by the undersigned or in connection with the rights granted to Company thereunder and the fulfillment of the undersigned's obligations pursuant to the Agreement except as contemplated otherwise by Section 4 of the Agreement.

DocuSigned by:

Blake Lively

Date:    March 4, 2022

BL-000037847

## EXHIBIT A

### Key Market Business Plan Minimum Sales*

| TOTAL Business Minimum Sales | Contract Year 1 | | Contract Year 2 | | Contract Year 3 | | Contract Year 4 | | Contract Year 5 | |
|---|---|---|---|---|---|---|---|---|---|---|
| USA | $ | 800.000 | $ | 2.900.000 | $ | 4.500.000 | $ | 5.800.000 | $ | 6.000.000 |
| UK | $ | 300.000 | $ | 1.200.000 | $ | 2.300.000 | $ | 2.800.000 | $ | 3.400.000 |
| Australia | $ | 200.000 | $ | 800.000 | $ | 1.500.000 | $ | 2.100.000 | $ | 2.400.000 |
| Germany | $ | - | $ | 500.000 | $ | 900.000 | $ | 1.000.000 | $ | 1.200.000 |
| Italy | $ | - | $ | 100.000 | $ | 600.000 | $ | 800.000 | $ | 900.000 |
| Canada | $ | 100.000 | $ | 400.000 | $ | 600.000 | $ | 800.000 | $ | 800.000 |
| Brazil | $ | 100.000 | $ | 500.000 | $ | 800.000 | $ | 1.100.000 | $ | 1.700.000 |
| France | $ | - | $ | 100.000 | $ | 300.000 | $ | 700.000 | $ | 700.000 |
| India | $ | - | $ | 100.000 | $ | 300.000 | $ | 700.000 | $ | 1.000.000 |
| Mexico | $ | - | $ | 300.000 | $ | 600.000 | $ | 1.100.000 | $ | 1.600.000 |
| Russia | $ | - | $ | - | $ | 400.000 | $ | 500.000 | $ | 700.000 |
| China | $ | - | $ | - | $ | 300.000 | $ | 500.000 | $ | 800.000 |

* The achievement of the applicable Key Market Business Plan Minimum Sales will be based on Gross Sales actually collected by Company with respect to the applicable Contract Year, by the end of the fourth month of the following Contract Year. Prior to the beginning of each Contract Year after Contract Year 5, the parties shall mutually agree in good faith as to the Key Market Business Plan Minimum Sales for each applicable Territory (including the Key Territories) for such Contract Year.

ATTORNEYS' EYES ONLY

**TOTAL Business**

| Minimum Sales | Contract Year 1 | Contract Year 2 | Contract Year 3 | Contract Year 4 | Contract Year 5 |
|---|---|---|---|---|---|
| USA | $ 800,000 | $ 2,900,000 | $ 4,500,000 | $ 5,800,000 | $ 6,000,000 |
| UK | $ 300,000 | $ 1,200,000 | $ 2,300,000 | $ 2,800,000 | $ 3,400,000 |
| Australia | $ 200,000 | $ 800,000 | $ 1,500,000 | $ 2,100,000 | $ 2,400,000 |
| Germany | $ - | $ 500,000 | $ 900,000 | $ 1,000,000 | $ 1,200,000 |
| Italy | $ - | $ 100,000 | $ 600,000 | $ 800,000 | $ 900,000 |
| Canada | $ 100,000 | $ 400,000 | $ 600,000 | $ 800,000 | $ 800,000 |
| Brazil | $ 100,000 | $ 500,000 | $ 800,000 | $ 1,100,000 | $ 1,700,000 |
| France | $ - | $ 100,000 | $ 300,000 | $ 700,000 | $ 700,000 |
| India | $ - | $ 100,000 | $ 300,000 | $ 700,000 | $ 1,000,000 |
| Mexico | $ - | $ 300,000 | $ 600,000 | $ 1,100,000 | $ 1,600,000 |
| Russia | $ - | $ - | $ 400,000 | $ 500,000 | $ 700,000 |
| China | $ - | $ - | $ 300,000 | $ 500,000 | $ 800,000 |

**Haircare**

| Minimum Sales | Contract Year 1 | Contract Year 2 | Contract Year 3 | Contract Year 4 | Contract Year 5 |
|---|---|---|---|---|---|
| USA | $ 800,000 | $ 900,000 | $ 1,400,000 | $ 2,000,000 | $ 1,800,000 |
| UK | $ 300,000 | $ 300,000 | $ 500,000 | $ 600,000 | $ 800,000 |
| Australia | $ 200,000 | $ 300,000 | $ 500,000 | $ 700,000 | $ 800,000 |
| Germany | $ - | $ 100,000 | $ 200,000 | $ 200,000 | $ 300,000 |
| Italy | $ - | $ 100,000 | $ 100,000 | $ 200,000 | $ 200,000 |
| Canada | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 |
| Brazil | $ 100,000 | $ 200,000 | $ 300,000 | $ 500,000 | $ 600,000 |
| France | $ - | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 |
| India | $ - | $ 100,000 | $ 100,000 | $ 200,000 | $ 300,000 |
| Mexico | $ - | $ 100,000 | $ 200,000 | $ 400,000 | $ 500,000 |
| Russia | $ - | $ - | $ 100,000 | $ 100,000 | $ 100,000 |
| China | $ - | $ - | $ 100,000 | $ 200,000 | $ 300,000 |

**Makeup**

| Minimum Sales | Contract Year 1 | Contract Year 2 | Contract Year 3 | Contract Year 4 | Contract Year 5 |
|---|---|---|---|---|---|
| USA | $ - | $ 2,000,000 | $ 2,100,000 | $ 2,500,000 | $ 2,600,000 |
| UK | $ - | $ 900,000 | $ 1,200,000 | $ 1,500,000 | $ 1,800,000 |
| Australia | $ - | $ 500,000 | $ 700,000 | $ 1,000,000 | $ 1,100,000 |
| Germany | $ - | $ 400,000 | $ 500,000 | $ 500,000 | $ 600,000 |
| Italy | $ - | $ - | $ 300,000 | $ 300,000 | $ 400,000 |
| Canada | $ - | $ 300,000 | $ 300,000 | $ 400,000 | $ 400,000 |
| Brazil | $ - | $ 300,000 | $ 400,000 | $ 500,000 | $ 800,000 |
| France | $ - | $ - | $ 200,000 | $ 300,000 | $ 300,000 |
| India | $ - | $ - | $ 200,000 | $ 400,000 | $ 500,000 |
| Mexico | $ - | $ 200,000 | $ 200,000 | $ 400,000 | $ 600,000 |
| Russia | $ - | $ - | $ 200,000 | $ 300,000 | $ 400,000 |
| China | $ - | $ - | $ 100,000 | $ 200,000 | $ 300,000 |

**Fragrances**

| Minimum Sales | Contract Year 1 | Contract Year 2 | Contract Year 3 | Contract Year 4 | Contract Year 5 |
|---|---|---|---|---|---|
| USA | $ - | $ - | $ 1,000,000 | $ 1,300,000 | $ 1,600,000 |
| UK | $ - | $ - | $ 600,000 | $ 700,000 | $ 800,000 |
| Australia | $ - | $ - | $ 300,000 | $ 400,000 | $ 500,000 |
| Germany | $ - | $ - | $ 200,000 | $ 300,000 | $ 300,000 |
| Italy | $ - | $ - | $ 200,000 | $ 300,000 | $ 300,000 |
| Canada | $ - | $ - | $ 200,000 | $ 300,000 | $ 300,000 |
| Brazil | $ - | $ - | $ 100,000 | $ 100,000 | $ 300,000 |
| France | $ - | $ - | $ - | $ 300,000 | $ 300,000 |
| India | $ - | $ - | $ - | $ 100,000 | $ 200,000 |
| Mexico | $ - | $ - | $ 200,000 | $ 300,000 | $ 500,000 |
| Russia | $ - | $ - | $ 100,000 | $ 100,000 | $ 200,000 |
| China | $ - | $ - | $ 100,000 | $ 100,000 | $ 200,000 |

ATTORNEYS' EYES ONLY

BL-000037849

**EXHIBIT B**

**Services**

1. **Service Days.** In each case subject to Lender's approval as set forth in Section 2.4 of the Agreement, and as further described below, Lender shall furnish the Services of Talent for a minimum number of Service Days per each Contract Year during the Services Term (all minimums pro-rated for any period less than a full Contract Year) as follows: (a) during Contract Year 1, a minimum of seven Service Days, (b) during Contract Years 2 through 5, a minimum of five Service Days per each such Contract Year, and (c) during Contract Years 6 through 10, there shall be no minimum number of Service Days required. "Service Days" may consist of Production Days, PA Days, Travel Days, Other Service Days, and Additional Service Days (each, as defined below). Company shall make reasonable efforts to coordinate the date, time and location of Service Days with Talent's bona fide professional and personal commitments and with Talent's existing travel schedule. Any unused Service Days in a Contract Year shall not carry forward or be usable in a subsequent Contract Year, except as provided for in the following sentence. Company shall have the right to treat Talent's failure to render the applicable minimum of Service Days in a Contract Year during the Services Term as a material breach of this Agreement or as the right to carry forward to the subsequent Contract Year (if any) the unused Service Day(s) for such Contract Year, provided that Company has requested at minimum a number of Service Days in such Contract Year greater or equal to the applicable minimum of Service Days for such Contract Year on dates, times, and locations compatible with Talent's bona fide professional and personal commitments and with Talent's existing travel schedule, and provided that the maximum number of unused Service Days to be carried forward to the subsequent Contract Year is not greater than 20% of the Service Days for the relevant Contract Year.

        a.      Production Days. Talent may participate in photo and video shoots for audio-visual, digital, and print Identification Materials ("Production Days"). Each Production Day shall consist of no more than up to six consecutive hours of Talent's time, including time spent on hair, makeup, wardrobe, meals and other customary breaks, and excluding local travel time; provided, however, that any shoot location shall be within 30 minutes of Talent's pick up or drop off location.

        b.      Personal Appearance Days. Talent may make a personal appearance at certain high end, high impact events with senior executives/owners of Company and/or key retail accounts and certain other high impact personal appearance events ("PA Days"). Each PA Day shall consist of no more than up to six consecutive hours of Talent's time, including time spent on hair, makeup, wardrobe, meals and other customary breaks, and excluding local travel time; provided, however, that any PA Day location shall be within 30 minutes of Talent's pick up or drop off location.

        c.      Travel Days. Any day(s) Talent spends on traveling to and from locations for Production Days, PR Days or other Service Days excluding "local" ground transportation of up to 90 minutes each way, shall be considered a "Travel Day" shall count as half a Service Day, provided, however, that, if the total flight time of any such travel is greater than four hours, such Travel Day shall count as a full Service Day.

        d.      Other Service Days. Talent may participate in other types of Service Days such as a media interview, or attending a Company business meeting for the purpose of Company Product development (each, an "Other Service Day"). Each Other Service Day shall consist of no more than up to six consecutive hours of Talent's time.

BL-000037850

e.    <u>Additional Service Days</u>. In the event Company requests additional Service Days (each, an "<u>Additional Service Day</u>") in excess of the applicable minimum Service Days required per each Contract Year, Lender shall have the right to approve or reject such request in its sole and absolute discretion. Each Additional Service Day is subject to all of the limitations, restrictions and obligations of Company for Services Days as described in this Agreement.

2.    **Social Media Posts.** As mutually agreed by the parties, Lender shall cause Talent to provide postings (which for the avoidance of doubt, includes stories) on Talent's social media channel(s) (all such postings under this Section, collectively, "<u>Social Media Posts</u>") including Social Media Posts to feature Company Products and/or to drive socially engaged customers from Talent's social media channel(s) to Company's official page or profile and/or to the point of purchase whether physical or digital and whether owned by Company or by third parties (e.g. retailers). By way of example, Social Media Posts may consist of (a) content (e.g., Instagram stories or YouTube tutorials), (b) spreading the news (e.g., posts, events, interviews, friends), and (c) driving traffic to Company's store (e.g., link to Company official page and/or to retailer partner stores). Lender and Company will mutually determine the topic or content as well as the posting schedule for the Social Media Posts. Company will provide Talent with a creative brief containing information about the Company Products, Company Product launches, and any guidelines and other instructions for creating content for the Social Media Posts, including without limitation guidelines for FTC compliance (the "<u>Brief</u>"). Talent may elect to create the Social Media Posts based on the Brief, all of which will be in Talent's own voice, and submit them to Company for review and approval. Alternatively, at Talent's election, Company will draft and provide the Social Media Posts and will submit them to Talent for review and approval. After providing Company an opportunity to review the Social Media Posts, Talent will publish such Social Media Posts approved by Company on Talent's then-active social media channel(s) in accordance with the publication schedule mutually determined by the parties. It is acknowledged that per each of Contract Years 1 through 5 the Social Media Posts shall consist of a minimum of 6 Social Media Posts. For the avoidance of doubt, the parties agree that during Contract Years 6 through 10, there shall be no minimum number of Social Media Posts required.  Talent shall publish the Social Media Posts in support of the Company Products on one or more of her relevant personal social media accounts, and will discuss in good faith with Company which personal social media account(s) should be utilized for specific posts, further provided that (unless otherwise agreed by the parties) at least 50% of such Social Media Posts will be at least on the highest trafficked platform of Talent (e.g., @ blakelively  on Instagram or a future social media channel with similar fan engagement). During Contract Years 1 through 5, Talent shall place the reference to Company website on the home page of the highest trafficked platform of Talent (currently @ blakelively  on Instagram). Lender hereby pre-approves Company to re-post any Social Media Post one time on Company's official, branded account(s) on the corresponding social media platform(s) (it being acknowledged that any further re-posts are subject to Lender's written approval), <u>provided, that</u>, (i) any text/captions in connection with such re-post are subject to Lender's written approval, (ii) any linking or tagging on such re-post is subject to Lender's written approval, and (iii) any boosting, amplification or other paid promotion with respect to such re-post is subject to Lender's written approval.   Subject to the foregoing sentence, any posts by Company in connection with Talent or the Talent Identification are subject to Lender's approval as set forth in <u>Section 2.4</u> of the Agreement.

3.    **General Promotion.** Lender shall use good faith efforts to cause Talent to, when appropriate for the applicable context, promote or discuss the Company Products during any media interviews and or other professional or public appearances that are unrelated to Talent's Services. Notwithstanding anything to the contrary, Talent's failure to promote or discuss the Company Products during any such media interview or other professional or public appearance shall not constitute a breach of this Agreement.

ATTORNEYS' EYES ONLY

**EXHIBIT C**

**Travel, Accommodations, Expenses, Personnel and Perquisites**

1. On each occasion that Talent is required to travel in connection with any Services hereunder, Company shall pay for the following travel and accommodation arrangements, costs and expenses:

   (i) First-class air travel for Talent and up to four of Talent's guests, subject to Talent's reasonable approval;

   (ii) exclusive first-class ground transportation for Talent and up to four of Talent's guests (car service and driver designated by Talent) to and from all airports;

   (iii) exclusive first-class ground transportation for Talent and up to four of Talent's guests (car service and driver designated by Talent) to and from all Services locations and as otherwise needed while on location;

   (iv) per diem of $400 for Talent and $200 for up to four of Talent's guests per day (including travel days);

   (v) for travel reasonably requiring overnight stays, a two-bedroom suite for Talent and one standard room for each of up to four of Talent's guests at a five-star hotel of Talent's choice, including taxes, fees and reasonable incidentals;

   (vi) all wardrobe and related shipping expenses in connection with Services; and

   (vii) meet and greet at all airports (service designated by Talent, e.g., Windsor suite at Heathrow).

2. For Services that take place locally (i.e., within the same city that Talent is then located), Company agrees to provide first-class exclusive ground transportation (i.e., car(s) and driver(s) with a car service and driver designated by Talent) for Talent and up to four of Talent's guests to/from the Service locations.

3. Company will hire, pay directly, and provide travel, accommodations and expenses for, Talent's designated hair, make-up and wardrobe stylists in connection with all in-person Services or Production Days.

4. Company shall provide a private, first class single trailer or first-class dressing room for Talent's exclusive use with customary first-class amenities (including private bathroom) for all shooting/on-camera Services hereunder.

5. At the request of Talent, Company will engage and pay directly Talent's designated security personnel in connection with all in-person Services. If travel is required in connection with such Services, Company will provide the security personnel with transportation (same type and class of travel as Talent), accommodations (same hotel as Talent) and expenses (which may include a rental car, if requested).

BL-000037852

## EXHIBIT D

### Total Business Plan Minimum Sales*

| Minimum Sales | | Category 1 | | Category 2 | | Category 3 | | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Contract Year 1 | $ | 2,600,000 | $ | - | $ | - | $ | 2,600,000 |
| Contract Year 2 | $ | 4,300,000 | $ | 8,100,000 | $ | - | $ | 12,400,000 |
| Contract Year 3 | $ | 6,900,000 | $ | 12,200,000 | $ | 4,400,000 | $ | 23,500,000 |
| Contract Year 4 | $ | 10,800,000 | $ | 16,700,000 | $ | 6,400,000 | $ | 33,900,000 |
| Contract Year 5 | $ | 12,400,000 | $ | 20,800,000 | $ | 8,800,000 | $ | 42,000,000 |

\* The achievement of the applicable Total Business Plan Minimum Sales will be based on Gross Sales actually collected by Company with respect to the applicable Contract Year, by the end of the fourth month of the following Contract Year. Prior to the beginning of each Contract Year after Contract Year 5, the parties shall mutually agree in good faith as to the Total Business Plan Minimum Sales for each Product Category for such Contract Year.

ATTORNEYS' EYES ONLY