**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY,<br><br>                              Plaintiff,<br><br>v.<br><br>WAYFARER STUDIOS LLC, JUSTIN<br>BALDONI, JAMEY HEATH, STEVE<br>SAROWITZ, IT ENDS WITH US MOVIE LLC,<br>MELISSA NATHAN, THE AGENCY GROUP<br>PR LLC, JENNIFER ABEL, JED WALLACE,<br>and STREET RELATIONS INC.,<br><br>                              Defendants. | No. 1:24-cv-10049-LJL |

<br><br>

## REPLY MEMORANDUM IN FURTHER SUPPORT OF
## THE WAYFARER PARTIES' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

ARGUMENT ...................................................................................................................... 1

I.    LIVELY CANNOT PROVE ANY ACTIONABLE SEXUAL HARASSMENT ............ 1

II.   LIVELY CANNOT PROVE ANY ACTIONABLE RETALIATION ............................ 8

    A. Lively Did Not Experience Any Adverse Employment Action ................................. 8

    B. Defendants' Publicity Efforts Were Reasonable Defensive Measures That
Are Not Actionable As Retaliation .............................................................................. 10

    C. Lively Cannot Prove Causation ................................................................................. 11

        1. Lively Engaged In No Protected Activities After Her "Protections"
Demands ................................................................................................................. 11

        2. Lively Lacks Direct Evidence Of Retaliatory Animus .......................................... 12

        3. Undisputed Evidence Proves Defendants' Non-Retaliatory Motives .................... 12

    D. Post-Litigation Conduct Cannot Save Lively's Claims ............................................. 13

III.  LIVELY WAS AN INDEPENDENT CONTRACTOR, NOT AN EMPLOYEE .......... 13

IV.  LIVELY CANNOT PROVE A FAILURE TO PREVENT/INVESTIGATE
CLAIM .................................................................................................................... 15

V.   LIVELY'S CONTRACT CLAIMS FAIL ................................................................. 16

    A. Lively Has Abandoned Her Breach Claims Against Wayfarer ................................. 16

    B. The ALA Is Not Binding Or Enforceable Against The Entity Defendants ................ 17

        1. Judicial Estoppel Does Not Apply ........................................................................ 17

        2. The Condition Precedent Was Not Waived And No Agreement Was
Formed ................................................................................................................... 18

        3. Even If The ALA Was A Valid Agreement, The Execution Condition
Precedent Bars Lively From Enforcing It .............................................................. 20

    C. The CRA Is Not Binding Or Enforceable Against The Entity Defendants ................ 20

    D. Lively's Contract Claims Fail Even If The ALA And/Or CRA Are
Enforceable ................................................................................................................. 21

        1. Lively Did Not Provide Requisite Notice .............................................................. 21

        2. Lively's Damages Are Barred ............................................................................... 22

VI.  THE DEFAMATION AND FALSE LIGHT CLAIMS FAIL ..................................... 23

    A. Lively Cannot Salvage Her Defamation Claim ........................................................ 23

        1. Lively Cannot Establish Falsity Or Malice .......................................................... 23

        2.   Lively Fails To Rebut That The Allegedly Defamatory Statements
            Are Absolutely Privileged................................................................... 25

    B.  Lively's False Light Claim Fails........................................................... 27

        1.   New York Law Applies, Foreclosing The Claim ................................. 27

        2.   Lively Has No Standing Under California Law .................................. 28

VII.    LIVELY'S CONSPIRACY CLAIM FAILS ...................................................... 29

VIII.   DEFENDANT SAROWITZ MUST BE DISMISSED ...................................... 29

IX.    LIVELY FAILS TO OPPOSE DEFENDANTS' DAMAGES ARGUMENTS .............. 30

CONCLUSION.................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Alvarez v. Chevron Corp.*,
  656 F.3d 925 (9th Cir. 2011) .................................................................. 22

*Arcadia Biosciences, Inc. v. Vilmorin & Cie*,
  356 F. Supp. 3d 379 (S.D.N.Y. 2019) ..................................................... 28

*Atalla v. Ambartsumyan*,
  2020 WL 3444888 (Cal. Ct. App. June 24, 2020) .................................... 22

*Aulicino v. New York City Dep't of Homeless Servs.*,
  580 F.3d 73 (2d Cir. 2009) ........................................................................ 5

*Bailey v. San Francisco Dist. Attorney's Office*,
  16 Cal. 5th 611 (2024) ........................................................................... 5, 6

*Beltran v. Hard Rock Hotel Licensing, Inc.*,
  97 Cal. App. 5th 865 (Cal. Ct. App. 2023) ............................................... 6

*Brooks v. Simon*,
  783 F. App'x 13 (2d Cir. 2019) ............................................................... 20

*Cantu v. Flanigan*,
  705 F. Supp. 2d 220 (E.D.N.Y. 2010) ..................................................... 30

*Carroll v. Trump*,
  664 F. Supp. 3d 550 (S.D.N.Y. 2023) ..................................................... 25

*Castro-Ramirez v. Dependable Highway Express, Inc.*,
  2 Cal. App. 5th 1028 (Cal. Ct. App. 2016) .............................................. 11

*Christofaro v. Lake Shore Cent. Sch. Dist.*,
  473 F.App'x 28 (2d Cir. 2012) .................................................................. 5

*Citigroup Inc. v. AHW Inv. P'shp*,
  140 A.3d 1125 (Del. 2016) ...................................................................... 30

*Coleman v. Grand*,
  158 F.4th 132 (2d Cir. 2025) .................................................................. 24

*DeRosa v. Nat'l Envelope Corp.*,
  595 F.3d 99 (2d Cir. 2010) ...................................................................... 17

*Doe v. Meta Platforms*,
  690 F. Supp. 3d 1064 (N.D. Cal. 2023) ............................................. 28, 29

*Faragher v. City of Boca Raton*,
  524 U.S. 775 (1998) .................................................................................. 8

*Front, Inc. v. Khalil*,
   24 N.Y.3d 713 (2015) ................................................................................. 26

*Garnica v. Edwards*,
   72 F. Supp. 3d 411 (S.D.N.Y. 2014) ......................................................... 17

*Globecon Grp., LLC v. Hartford Fire Ins. Co.*,
   434 F.3d 165 (2d Cir. 2006).......................................................................... 19

*Hill v. Nat'l Collegiate Athletic Association*,
   7 Cal. 4th 1 (1994) ...................................................................................... 29

*Hill v. Walmart Inc.*,
   32 F.4th 811 (9th Cir. 2022) ...................................................................... 15

*Johnson v. YWCA Residence, LLC*,
   2014 WL 12782728 (S.D.N.Y. July 9, 2014) ............................................ 25

*Kaytor v. Elec. Boat Corp.*,
   609 F.3d 537 (2d Cir. 2010).......................................................................... 5

*King v. Navy Fed. Credit Union*,
   699 F. Supp. 3d 864 (C.D. Cal. 2023) ...................................................... 22

*Kinsey v. New York Times Co.*,
   991 F.3d 171 (2d Cir. 2021)................................................................... 26, 28

*Leibovitz v. New York City Transit Auth.*,
   252 F.3d 179 (2d Cir. 2001) ......................................................................... 7

*Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*,
   34 Cal. 4th 960 (2004) ................................................................................ 23

*Lipcon v. Underwriters at Lloyd's, London*,
   148 F.3d 1285 (11th Cir. 1998) ................................................................. 27

*Lively v. Wayfarer Studios LLC*,
   786 F. Supp. 3d 695 (S.D.N.Y. 2025) ...................................................... 26

*LoanCare, LLC v. Dimont & Assocs., LLC*,
   2025 WL 951585 (S.D.N.Y. Mar. 28, 2025) ........................................... 27

*Lyle v. Warner Bros. Television Prods.*,
   38 Cal. 4th 264 (2006) .................................................................................. 5

*Makarova v. United States*,
   201 F.3d 110 (2d Cir. 2000)................................................................... 13, 14

*McCaffrey v. Republic Servs., Inc.*,
   2025 WL 360745 (N.D. Cal. Jan. 31, 2025) .............................................. 6

*McNamee v. Clemens*,
    762 F. Supp. 2d 584 (E.D.N.Y. 2011) ................................................................... 26

*McSweeney v. Cohen*,
    776 F. Supp. 3d 200 (S.D.N.Y. 2025) ...................................................................... 5

*McSweeney v. Cohen*,
    776 F. Supp. 3d 200 (S.D.N.Y. 2025) ...................................................................... 6

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*,
    118 A.3d 175 (Del. 2015) ...................................................................................... 30

*Nieves v. Dist. Council 37*,
    2009 WL 4281454 (S.D.N.Y. Nov. 24, 2009) ........................................................... 5

*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75 (1998) .................................................................................................. 8

*Palin v. New York Times Co.*,
    482 F. Supp. 3d 208 (S.D.N.Y. 2020) .................................................................... 24

*R.G. Group, Inc. v. Horn & Hardart Co.*,
    751 F.2d 69 (2d Cir. 1984) .................................................................................... 20

*Rasmy v. Marriott Int'l, Inc.*,
    952 F.3d 379 (2d Cir. 2020) .................................................................................... 6

*Redondo v. Cty. of Los Angeles*,
    2023 WL 9015197 (Cal. Ct. App. Dec. 29, 2023) ..................................................... 9

*Rennick v. O.P.T.I.O.N. Care, Inc.*,
    77 F.3d 309 (9th Cir. 1996) .................................................................................. 19

*S. California Edison Co. v. Pub. Utilities Comm'n*,
    85 Cal. App. 4th 1086 (Cal. Ct. App. 2000) .......................................................... 19

*Sheindlin v. Brady*,
    597 F. Supp. 3d 607 (S.D.N.Y. 2022) .............................................................. 25, 26

*Shulman v. Grp. W Prods., Inc.*,
    18 Cal. 4th 200 (1998) .......................................................................................... 29

*Specer-Smith v. Ehrlich*,
    347 F.R.D. 606 (S.D.N.Y. 2024) ............................................................................ 22

*Spina v. Our Lady of Mercy Med. Ctr.*,
    2003 WL 22434143 (S.D.N.Y. Oct. 23, 2003) .......................................................... 5

*Staley v. FSR Int'l Hotel Inc.*,
    2024 WL 1704931 (S.D.N.Y. Apr. 19, 2024) .......................................................... 27

*Sullivan v. Home Depot, U.S.A., Inc.*,
    2025 WL 3208306 (E.D. Cal. Nov. 17, 2025) ........................................................ 6

*Swearingen v. Santa Cruz Nat., Inc.*,
    2016 WL 4382544 (N.D. Cal. Aug. 17, 2016) ..................................................... 22

*Troeger v. JetBlue Airways Corp.*,
    2024 WL 5146185 (S.D.N.Y. Dec. 17, 2024) ........................................................ 5

*Uitz v. Lustigman Firm, P.C.*,
    2014 WL 3767056 (S.D.N.Y. July 28, 2014) ....................................................... 17

*United States v. Kaplan*,
    490 F.3d 110 (2d Cir. 2007) ............................................................................... 16

*VTX Commc'ns, LLC v. AT&T Inc.*,
    2020 WL 4465968 (S.D. Tex. Aug. 4, 2020) ...................................................... 27

*Wexler v. Allegion (UK) Ltd.*,
    374 F. Supp. 3d 302 (S.D.N.Y. 2019) ................................................................ 26

*Winston v. Mediafare Ent't Corp.*,
    777 F.2d 78 (2d Cir. 1985) ................................................................................. 19

*Yanowitz v. L'Oreal USA, Inc.*,
    36 Cal. 4th 1028 (2005) ........................................................................................ 9

**Other Authorities**

13 Williston on Contracts (4th ed.) ............................................................................. 20

Cal. Code. Regs. Tit. 2 §11023 ................................................................................... 16

Cal. Gov. Code §12923 ................................................................................................. 6

Cal. Gov. Code §12940 ............................................................................................... 16

Cal. Labor Code §2776 ............................................................................................... 14

**Rule**

Fed. R. Evid. 701 ........................................................................................................ 16

Lively spills lots of ink attempting to conjure up factual disputes, but the material facts are undisputed. Her opposition and 56.1 response confirm she has launched a massive legal campaign to address minor grievances, all of which were resolved during production of the film without the need for any litigation at all. She recites a litany of supposed harassment, ranging from "yelling" to "defensiveness" to a conversation Lively herself initiated about circumcision to an incident she assured at the time was a non-event, but cannot say any continued after she asked for them to stop. They did stop, and then the parties worked together to produce a successful film, bringing her not only riches, but an extraordinary set of professional accomplishments she touted to the Producers Guild of America as a rare achievement for a woman. Not satisfied, she now claims discrimination, arguing, among other things, that her bespoke, heavily-negotiated contract was violated, even though she never signed it, and that despite her near-total control over the production, she was merely an employee. She also claims Defendants unfairly resorted to professional PR firms for guidance, even while she and her husband openly badmouthed Baldoni and ginned up a flurry of negative press against him. She alleges a massive smear campaign but fails to point to a single falsehood any Defendant uttered against her. Lively's claims do not meet the requisite standards. Summary judgment should be granted.

## **ARGUMENT**

## I.     **LIVELY CANNOT PROVE ANY ACTIONABLE SEXUAL HARASSMENT**

Nothing in Lively's opposition overcomes the clear reality that she alleges low-level behavior, trivial grievances and petty slights. "Huffiness," "yelling," and the other assorted conduct she alleges may be bothersome, but they do not rise to the level of a discriminatory hostile work environment. Lively apparently recognizes Baldoni's conduct doesn't get her there—it boils down to a comment about circumcision after *she* raised the topic and before she

agreed to work on the movie, 56.1 Opp. ¶¶75, 437,[1] discussions about sex and "sexiness" while collaborating about how to depict an intimate relationship and sex scenes, *id.* ¶92, and a remark about her weight made off-set to a person uninvolved in the film, Saladino Decl. ¶9. She thus now attempts to make Heath the poster-boy of sexual harassment. Based on what? A brief glance, in an already awkward situation, after which, Lively undisputedly told Heath: "I'm not saying you were trying to cop a look." 56.1 Opp. ¶100. Heath showing her a video related to his child's birth shared in the context of producing a film with a prominent child-birth scene? When, it is undisputed, Heath showed the same or similar image to Baldoni, and to a female Sony executive who found it wholly inoffensive? 56.1 Opp. ¶¶119, 123-25. It is remarkable that, after months of discovery, Lively cannot muster anything more to justify the tremendous legal and judicial resources devoted to this case. It is even more remarkable, because whatever concerns she may have had were fully resolved once she raised them: Even Lively does not meaningfully dispute that the entire second phase of filming, including all intimate scenes involving Lively, occurred without incident.

    1.    Lively cannot establish the conduct at issue was aimed at her (or anyone else) *because of gender*—a basic prerequisite for a sexual discrimination claim. She concedes the alleged conduct affected women and "some men." Opp.1 (quoting Pl. Ex. 15 at 157:17-22). She abandons various allegations, such as improper "hugging," because she cannot dispute that both men and women were hugged. 56.1 Opp. ¶¶186-87.

    Lively's own evidence further undermines her claims. It confirms Baldoni's stated

---

[1] All legal citations are cleaned up. "56.1 ¶_" refers to the Wayfarer Parties' 56.1 Statement, and "56.1 Opp. ¶_" refers to Lively's response. "Br." and "Opp." refer to the summary judgment briefing. "Ex._" refers to Exhibits to Alexandra A.E. Shapiro's declarations. "Pl. Ex._" refers to Exhibits to Michael J. Gottlieb's declaration. Emphases are Defendants' unless noted.

motivation in privately inquiring about her weight was not to demean her as a woman, but to anticipate his own physical obligations "in connection with a scripted lift scene." Saladino Decl. ¶9; *see also* 56.1 Opp. ¶79; Ex. 80. Even Lively's sexual harassment expert admits it was not sexual harassment. Ex. 285 at 156-57. Lively's trainer's opinion of Baldoni's honesty, Saladino Decl. ¶10, is neither admissible nor competent evidence on summary judgment. Nor does Lively dispute that she herself repeatedly raised concerns about her own physique. 56.1 Opp. ¶¶33-37.

Lively continues to complain that Baldoni once complimented her personal outfit and, later the same day, referred to her wardrobe as "sexy." Opp.8. Lively strains to suggest her costume was revealing, but cannot dispute video footage showing it was, in fact, an oversized fleece "onesie." 56.1 Opp. ¶116; Ex. 281. Nor can she show this was a gendered attack. Lively notes Baldoni similarly referred to a male actor as "pretty," while Lively herself joked about "pimp[ing]" another male actor to market the film, 56.1 Opp. ¶182, proclaimed that "sexiness in this film…is critical to its success," and insisted upon the "sex[iness]" of her character's wardrobe on more than one occasion, *id.* ¶¶36, 180-81. Sexiness was indisputably used at times to describe a film devoted to adult themes, not invoked to pit one gender against another.

Lively also complains that Baldoni improvised "physical intimacy." Opp.12. Lively adduces no evidence to suggest he did this to offend her based on her gender. Baldoni was not targeting Lively as a woman. He was in character, filming a scene in which, as Lively puts it, his character and Lively's were "falling in love." 56.1 Opp. ¶546. Such conduct would not be acceptable in a typical office setting, but in the context of two professional actors making a romantic, sexually-charged movie, it cannot constitute discrimination. Lively's own declaration describes other kissing scenes in the film as vital to conveying the "love story." Lively Decl. ¶10. Her complaint that Baldoni added intimate scenes fails for the same reasons. Opp.9.

Lively does not dispute that she, too, revised the script to increase the "sexual tension."  56.1 Opp. ¶¶29, 218, 219.[2]  Any gendered animus is further undermined by undisputed facts that Lively was invited to discuss her views about the intimate scenes with a female intimacy coordinator before filming, and proposed revisions.  56.1 Opp. ¶¶50, 52-54, 87-89; Ex. 56.  Lively's effort to evade this conclusion by characterizing the film's birth scene as "unscripted nudity" is absurd—she claims she was "unexpectedly" required to imply nudity "from the waist down" under a hospital gown and prosthetic belly.  56.1 Opp. ¶¶61, 64, 535-36.  But Lively, a mother of four, must have known people generally don't wear pants to give birth.

Nor were comments Baldoni supposedly made to Lively about his personal experiences gendered.  It is undisputed any such comments were substantially similar to statements Baldoni has made in talks and books aimed primarily at male audiences.  56.1 Opp. ¶¶93, 129.  Lively also notably does not dispute that she shared her own views about intimacy with Baldoni, during "creative discussions" about the film.  56.1 Opp. ¶¶92, 189; Ex. 8 at 176-78, Ex. 24 at 132-33.

2.  Nor do the two alleged incidents involving Heath provide any evidence of gender-discriminatory animus.  Lively cannot dispute that three witnesses testified Baldoni asked Heath to show Lively the birth video for non-gender-based reasons—following discussions about the birth scene in the film.  56.1 Opp. ¶119.  Indeed, she admits Baldoni contemporaneously told her the same thing.  *Id.* ¶573.  After Lively objected, no one persisted in showing her the video.  It is undisputed that Heath also showed the video to Baldoni, a male participant in the film.  *Id.* ¶119.

Similarly, Lively admits Heath entered her trailer once not for any gender-related purpose, but to discuss "issues that arose on the first day of filming," *id.* ¶95, with her permission, *id.* ¶97.  Lively asked Heath to turn away from her, and he indisputably did.  *Id.* ¶98.

---

[2] Defendants' 56.1 Paragraph 219 erroneously cites Exhibit 126.  A corrected Exhibit 283, showing the relevant language, is being submitted to the Court concurrently with this memorandum of law.

She claims that, at some point, he glanced at her anyway, *id.,* but doesn't dispute later assuring him: "I'm not saying you were trying to cop a look," *id.* ¶100.  She cites no evidence supporting her claim that she raised the incident with Heath "the next day," *id.*, nor is there any evidence she raised it during the call with the Sony executive a few days later, when she "shared…her concerns" about the production, *see id.* ¶¶561-62; Ex. 92.  And while "harassing conduct need not be motivated by sexual desire," Opp.37-38, Lively omits that the very sentence she cites for that proposition underscores that the conduct must be "motivated by gender," *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010).  She cannot make that showing here.

Lively defends her reliance on limited, sporadic, one-off instances of alleged misconduct by citing one case in which a single incident sufficed, *Bailey v. San Francisco Dist. Attorney's Office*.[3]  In reaching that conclusion, the court was clear that "isolated incidents" must be "extremely serious" to give rise to an actionable claim.  16 Cal. 5th 611, 628 (2024).  Unlike here, the incident in *Bailey* "involve[d] an unambiguous racial epithet," the "[N-word]," a slur so universally recognized that its discriminatory intent cannot be denied.  *Id.* at 634.

3.  Beyond Heath's conduct, Lively does not even claim anything she personally experienced was sufficiently "severe or pervasive" to prove harassment.  She largely ignores significant authority confirming her allegations are too mild.  *See* Br.20-21 (citing, *inter alia*, *Christofaro*, *Nieves*, *Spina*, *McSweeney*, *Lyle*).  She dodges the undisputed, critical fact that any alleged harassment ceased once she raised concerns; no issue arose, and no incident recurred, throughout the remainder of filming.  56.1 Opp. ¶¶145, 222-25.  And that was not just

---

[3] The other cases Lively cites for this proposition (Opp.37) do not actually involve a single incident.  *Aulicino v. New York City Dep't of Homeless Servs.* involved several derogatory, racial comments, and "physical threats."  580 F.3d 73, 83-85 (2d Cir. 2009).  *Troeger v. JetBlue Airways Corp.* involved "two years" of false accusations and misconduct.  2024 WL 5146185, at *12 (S.D.N.Y. Dec. 17, 2024).

Defendants' view:  It is undisputed that the female Sony executive to whom Lively complained and Lively's own agent both viewed the issues as fully resolved, as did the only other person who complained.  56.1 Opp. ¶¶144, 146, 221-24; *accord* Pl. Ex. 15 at 158:20-25 (Saks, testifying the set was "much better on the second round").  How could the conduct be "severe or pervasive" if it vanished once the issue was raised, so much so that Lively, advised by counsel, concluded no "formal HR process" was warranted?  Br.25-26; Ex. 103.

Even the authorities Lively claims support a relaxed standard require proof of "severe or pervasive" conduct for a hostile work environment claim.  Opp.36 (citing *Bailey*, 16 Cal. 5th at 627); *accord Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 387 (2d Cir. 2020); *McSweeney v. Cohen*, 776 F. Supp. 3d 200, 261 (S.D.N.Y. 2025).  For example, *Bailey* confirms that "[s]imple teasing [or] offhand comments, and isolated incidents (unless extremely serious) are not sufficient to create an actionable claim of harassment."  16 Cal. 5th at 627.

Lively relies repeatedly on Cal. Gov. Code §12923, a 2019 proclamation from the California state legislature declaring its "intent" that summary judgment is "rarely appropriate" in harassment cases.  Opp.36-37, 39.  That proclamation has no bearing on Lively's Title VII claims, and by its terms, merely states a legislative view.  California courts have also confirmed that it does not mark a "substantive change" in California law.  *Beltran v. Hard Rock Hotel Licensing, Inc.*, 97 Cal. App. 5th 865, 879 (Cal. Ct. App. 2023).  Indeed, federal courts in California continue to grant summary judgment in FEHA cases where severity is not shown. *See, e.g.*, *Sullivan v. Home Depot, U.S.A., Inc.*, 2025 WL 3208306, at *8 (E.D. Cal. Nov. 17, 2025) (citing *Lyle*); *McCaffrey v. Republic Servs., Inc.*, 2025 WL 360745, at *7 (N.D. Cal. Jan. 31, 2025) (two comments about plaintiff's age not sufficient).

4.  Lively tries to bolster her claim by invoking the alleged experience of other women.

Opp.38; 56.1 Opp. ¶¶488-96, 503-05, 507-10, 556.  There is no evidence Lively knew about most of these alleged events prior to litigation, if they even occurred.  Several of these alleged events are supported only by rank hearsay or otherwise inadmissible evidence.  *See, e.g.*, 56.1 Opp. ¶¶494, 507, 510, 556.  Such unsupported claims must not be considered.  *Cf. Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 182 (2d Cir. 2001) ("Title VII's prohibition against…discrimination affords no claim to a person who experiences it by hearsay.").

Moreover, the conduct she discusses adds little weight to her claims.  Like Lively, co-star Jenny Slate refers to a single instance in which Baldoni referred to her wardrobe, which included black leather pants, as "sexy," a term, which, as noted, was widely used on set, including by Lively herself.  A one-off remark may be unwelcome, but it is not so severe or pervasive as to give rise to a claim.  It is undisputed that Baldoni acknowledged Slate's concerns, and Slate felt the issue had been resolved.  56.1 Opp. ¶¶143, 146.  Lively also claims Baldoni yelled at female producer Alex Saks.  *Id.* ¶488.  Yelling, without more, is not evidence of gender bias.  Even Saks resists such an interpretation, noting that Baldoni treated men similarly.  *Id.* ¶580 (Defendants "have a way of making women (and some men) feel like shit.").

Lively's references to "verbal abuse" supposedly experienced by another director, on another set, of a different film, have nothing to do with the work environment at issue in this case.  In any event, the alleged "verbal abuse" is only vaguely described, with no suggestion it was either sexual or gender-based.  56.1 Opp. ¶496; Pl. Ex. 132.  Likewise, the claim that author Colleen Hoover "was not involved in the script" and did not receive "dailies" has no evident connection to Hoover's gender or to the on-set environment.  56.1 Opp. ¶495.  Finally, Lively criticizes Baldoni for complimenting two actors, one male, one female, based on their work in an intimate scene.  *Id.* ¶508.  The female actor testified that the comment was aimed at both actors.

*Id.* There is no evidence it was gender-based.

5. Because, as is now undisputed, all the issues Lively raised were resolved, she cannot show that the conditions of her employment changed. This is yet another reason to dismiss her claims. Lively argues that even though she voiced no objections during the second phase of filming or thereafter, Defendants' "'huffy' and defensive reactions" to Lively's behavior were themselves harassment. Opp.40. But the two occasions in which Lively claims that occurred were both during the first phase of filming. 56.1 Opp. ¶¶552-54, 576; Pl. Exs. 12, 30, 31. Regardless, the law is clear that such minimally unfriendly conduct does not amount to the "change in the terms and conditions of employment" required to prove a hostile work environment. On the contrary, the Supreme Court has repeatedly stated that the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

## II.    LIVELY CANNOT PROVE ANY ACTIONABLE RETALIATION

Perhaps aware of the shortcomings of her argument, Lively insists "very little evidence" is required. Opp.37 n.18, 42. What she has is not enough to save her retaliation or aiding and abetting claims. Lively's claim that she has made out a *prima facie* case fails on multiple grounds, and even if she has, Defendants have presented a clear, non-pretextual justification for their publicity efforts, which were a reaction to a media firestorm and not to any complaint by Lively months before.

### A.  Lively Did Not Experience Any Adverse Employment Action

It is now beyond dispute that no material aspect of Lively's employment changed for the worse. Her compensation did not decrease. 56.1 Opp. ¶206. Her role was not diminished. *Id.* ¶207. That alone is enough to defeat her FEHA claims. Br.26-27.

Lively tries to evade the point by expanding her supposed employment to include post-filming activity as well as her campaign to get a PGA mark. 56.1 Opp. ¶207; *see also* Opp.20. But Lively was not hired as an editor, director, or Producer. Ex. 28.[4] That she had any role in post-filming activity is proof that her responsibilities expanded, not contracted. In any event, it is undisputed that Lively *did* get the opportunities and references she sought, including Defendants' endorsement of her PGA mark. *See* 56.1 Opp. ¶¶236, 638; Pl. Ex. 117. She described her accomplishments as a victory for women in film, and not as any setback. Ex. 39.

Lively's complaints that she was made to "feel[] guilty" and was criticized to Hoover and others (Opp.44-45) are "[m]inor or relatively trivial adverse actions...that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee…[and] are not actionable." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1054 (2005); *accord Redondo v. Cty. of Los Angeles*, 2023 WL 9015197, at *7 (Cal. Ct. App. Dec. 29, 2023) (actions that "do no more than subjectively 'upset' … the employee, or are not to her liking are not adverse employment actions"). Any such conduct had no material effect. The record is replete with evidence that after the May 6, 2024 dinner about which Lively complains, 56.1 Opp. ¶¶624-33, Hoover worked "closely" with Lively and endorsed her cut (while gossiping with her about Defendants), *id.* ¶¶232, 243(d), 248(a), 597, 603. In lieu of any material harm, Lively relies on the CRA to argue that mere "changes in attitude" or "sarcasm" could be enough. Opp.44. Yet precisely because there is no material harm, no damages can arise from any alleged contractual breach, even assuming the CRA was a binding agreement, which it was not. *See infra* Point V.C.

---

[4] Lively distorts the record by suggesting she was entitled to a "Producer" credit, rather than the ceremonial "Executive Producer" title in the Offer Letter. 56.1 Opp. ¶449. Lively admits she first undertook to edit the film without "a promise of a producer credit." *Id.* ¶596; *see also* Lively Decl. ¶31. Indeed, she was not granted a "Producer" title until June 2024. *See* Ex. 39 (Lively, stating she was "officially granted" that title "just a few days before" her June 18, 2024 PGA letter); Ex. 169.

### B. Defendants' Publicity Efforts Were Reasonable Defensive Measures That Are Not Actionable As Retaliation

Lively cannot meaningfully dispute that Defendants' publicity efforts took place outside the workplace, in the arena of public opinion. Undisputed facts show Lively chose that arena and exercised immense power within it. It was Lively who unfollowed Baldoni, tantalizing social media sleuths. 56.1 Opp. ¶242. It was Lively who disparaged Baldoni to her famous friends. *Id.* ¶¶230-32, 243, 245. Documentary evidence shows Lively's husband badmouthed Defendants to the Chair of WME "weeks" before the premiere, *id.* ¶295, while Lively refused to promote the film with Baldoni, causing a media furor, *id.* ¶¶234, 249. Just days after the premiere, Lively's representative killed accurate stories about Lively and spread negative ones about Baldoni, even telling one reporter Baldoni was an "animal." *Id.* ¶¶264-66, 293, 296, 300.

Lively's opposition fails to identify *a single factually false statement* Defendants shared or promoted in response to this onslaught. *Id.* ¶304. She claims "multiple" incidents "placed Lively in a false light," *id.*, but fails to say which ones, or how. She complains Defendants exposed her to criticism for past conduct but does not dispute those criticisms were already in the public domain before any publicity by Defendants. *Id.* ¶¶286-87, 306, 754. Lively faults Defendants for supposedly contending she "weaponized feminism" and "took the movie over," Opp.23, but it is undisputed that Lively claimed to have "produced every moment of" and remade the film, 56.1 Opp. ¶¶236, 240. She also claimed that rewarding her with a PGA mark would be a victory for "all the women who are told they can't be given credit because 'there are already too many female producers'"—clearly invoking a feminist theme. Ex. 39 at -18400.

Lively asserts she was unfairly criticized for shifting the film's marketing strategy away from domestic violence. Opp.2, 45. Yet it is undisputed that the film was always intended to raise awareness about domestic violence, *see* Pl. Exs. 39, 40, and that Lively played a significant

role in post-production efforts to shape the film's marketing strategy, 56.1 Opp. ¶¶238-39, 748.
In claiming Heath admitted her marketing was "brilliant," Lively misrepresents.  Opp.2, 29.  In
the very document she cites, Heath expressed concern to Sony about "how many people are
pointing out that the DV is being glossed over" and encouraged everyone to be "more deliberate
in embracing the DV aspect."  Pl. Ex. 228.  Regardless, it is undisputed that Lively was criticized
not simply for deemphasizing domestic violence but for simultaneously promoting her other
projects and those of her husband as well. 56.1 Opp. ¶281-82.  The record is clear such criticisms
appeared in the press independent of any effort by Defendants.  *Id.*

### C. Lively Cannot Prove Causation

#### 1.  Lively Engaged In No Protected Activities After Her "Protections" Demands

Lively tries to shrink the temporal gap by stretching out her claimed "protected
activities."  Opp.42.  That doesn't work, because Lively has never before claimed any of the
additional events she now relies upon—such as negotiating the ALA or refusing to promote the
film with Baldoni—as activity intended to oppose "discrimination," and there is no evidence any
Defendant understood them as such.  Elsewhere, Lively describes the ALA negotiations as
"immaterial," Opp.54, and her cited evidence doesn't refer to the provision she now relies upon
at all.  *Id.* at 42 (citing 56.1 Opp. ¶¶582-90).  An action cannot constitute "protected activity"
"where there is no evidence the employer knew that the employee's opposition was based upon a
reasonable belief that the employer was engaging in discrimination."  *Castro-Ramirez v.
Dependable Highway Express, Inc.*, 2 Cal. App. 5th 1028, 1046 (Cal. Ct. App. 2016).  And even
assuming such conduct could constitute "protected activity," it is undisputed Defendants
respected Lively's requests:  Baldoni did not insist on promoting the film with her, 56.1 Opp.
¶¶233, 247, Ex. 152, and the last draft ALA exchanged between the parties provides that "Sexual
Harassment of any type…is cause for immediate termination of this Agreement by…Artist," *id.*

¶388, a provision Lively never invoked.[5]

### 2. Lively Lacks Direct Evidence Of Retaliatory Animus

Lively next asserts the temporal gap between her objections and the publicity campaign doesn't matter because she can show a direct causal link.  Opp.47.  But conspicuously lacking from the record is a single piece of evidence in which Defendants say they are initiating a publicity campaign to get back at her for raising objections on set.  Instead, she relies on messages in which Defendants express concerns about her possible prospective activity and seek to prepare for the fallout.  Opp.19-20.  Those cannot prove a retaliatory motive, and it is undisputed that Defendants' conduct consistently resulted in Lively's gaining *more* power over the production, not less.  *E.g.*, 56.1 Opp. ¶233; Exs. 39, 118; Pl. Ex. 45.

### 3. Undisputed Evidence Proves Defendants' Non-Retaliatory Motives

Lively argues no "admissible evidence" shows Defendants had a legitimate, non-discriminatory motivation.  Opp.48.  She is wrong.  Undisputed facts show that when Defendants decided to engage a crisis PR team, they did so to protect their own reputations, and that of the film, against an anticipated onslaught of negative publicity—not to retaliate against her.  *E.g.*, 56.1 Opp. ¶253.  Indeed, Lively admits Defendants first met with TAG only on July 25, after negative publicity had already begun.  *Compare* 56.1 Opp. ¶248, *with* ¶256.  Lively lacks evidence to show, as she must, that her purportedly protected activity was the "but for" cause of Defendants' conduct.  Br.31.  She cannot possibly meet that burden on this record.  Nor can Lively credibly argue that Defendants welcomed the media fracas as a "pretext" to attack her for her objections.  Opp. 49.  Rather, undisputed evidence, including materials Lively cites, shows

---

[5]  Lively's caselaw about "legal buzzwords" is inapposite.  Opp.43 n.29 (citing *Castro-Ramirez*; *Eaton*).  Her cases concern circumstances in which a lay person used the wrong words to make a complaint, whereas Lively was well-resourced, assisted by counsel, and knew how to make her concerns known.

that Defendants were terrified and doing everything they could to *avoid* a confrontation.  *E.g.*, 56.1 Opp. ¶¶254, 255-56, 260, 268, 613-22, 642; Ex. 164; Pl. Ex. 36.

### D.  Post-Litigation Conduct Cannot Save Lively's Claims

Lively leans heavily on actions Defendants and their counsel supposedly took after she filed her CRD complaint.  Opp.32-35, 47.  But if Lively did not suffer any actionable retaliation before commencing litigation, she should not be able to create a claim based on post-litigation conduct.  Any such conduct by Defendants would be a response to the litigation she commenced, not a response to any workplace complaint about harassment from many months before.

## III.    LIVELY WAS AN INDEPENDENT CONTRACTOR, NOT AN EMPLOYEE

Lively attempts to paint herself as a mere employee.  In doing so, she ignores her own extensive admissions, including her description of her own powerful role in her letter to the PGA, in which she takes credit for having "produced every moment of this film," including its final cut, *i.e.*, "my cut."  56.1 ¶236; Ex. 39.  She also ignores the highly bespoke contracts she negotiated, including an agreement that the production's location be moved closer to her own home, 56.1 Opp. ¶31, rights over many aspects of production, *id.* ¶376, and a rider (the "CRA") insisting on her own unilaterally imposed terms as a condition for going forward, *id.* ¶162.  If, as she argues, "control" is the determinative factor in determining whether a traditional employer-employee relationship exists, Opp.50, it is difficult to imagine anyone having more control.

The circumstances bear no resemblance to those in *Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000), the only authority upon which Lively relies.  There, the Second Circuit emphasized that the Kennedy Center "consistently maintained full artistic control over" not only a ballerina's performance but also the entire "show."  *Id.* at 112, 114-15.  Lively, by contrast, exercised tremendous control over the entire production—as evidenced by her letter to the PGA—and not simply over her own performance.  While the ballerina signed a contract rider

that bound her to standard terms, *id.* at 112, Lively dictated and demanded the unique terms of the CRA.  While it remained "unclear whether [the ballerina] was paid as an independent contractor," 201 F.3d at 115, it is undisputed that Lively received no standard employee benefits, nor was she paid or subject to taxes in the manner of a standard employee.  56.1 Opp. ¶¶25, 375.

Lively's opposition also points to the ALA, Opp.51, but the terms of that agreement were never fully negotiated, and the agreement was never signed.  56.1 Opp. ¶¶384, 390.  In any event, Lively is relying solely on the language of a *pro forma* worker's compensation provision, *see* 56.1 Opp. ¶530 (citing Ex. 263 §13) while ignoring the broader circumstances, a particularly myopic approach in an area where courts require a comprehensive multi-factor analysis.

The application of California's business-to-business exception similarly cannot be denied where, as here, the work was performed pursuant to a business-to-business transaction between IEWUM, on the one hand, and Lively's loanout entity, Blakel Inc., on the other.  56.1 Opp. ¶356.  The relevant factors, set out in Cal. Labor Code §2776(a), overlap with those of the *Reid* test or are self-evident from the record, and they uniformly confirm this was a bona fide business-to-business transaction:  (1) Blakel was "free from the control of" Defendants, "both under the contract…and in fact;" (2) Blakel was "providing services directly to" Defendants, not to Defendants' customers; (3) the putative contract between the parties was "in writing and specifies the payment amount," Exs. 28, 29; (4) Blakel had a "business tax registration," as Defendants withheld applicable New Jersey business taxes, Exs. 29, 32; (5) Blakel's "business location" was separate from Defendants', *e.g.*, Ex. 263; (6) Blakel's customary role was to lend out Lively's acting services, the same services "involved in the work performed;" (7 & 8) Blakel "provide[d] the same…services" to others, advertised itself as available to do so, *e.g.*, Ex. 210 (discussing Lively's work on other films) and even insisted upon an alteration of Defendants'

production schedule to accommodate Blakel's ability to provide Lively's services on another film, *e.g.*, Ex. 41 at -03; (9) Blakel provided the relevant instrumentality for the work—Lively herself; (10) Blakel could and did "negotiate its own rates," 56.1 Opp. ¶¶358, 376; (11) Blakel could and did demand changes to the location and hours of work; and (12) Blakel was obviously not a member of the construction industry, for which a special contractors' license is needed.

Because this was a business-to-business relationship, the *Borello* test, which is materially indistinguishable from the *Reid* test, determines Lively's independent contractor status under California law, Opp.52 n.45, and thus yields the same outcome. Like *Reid*, *Borrello* examines circumstances holistically, considering, among other things, the right to control, and secondary indicia like the skill required, who provides the instrumentalities, the duration of the work, and the method of payment. *Hill v. Walmart Inc.*, 32 F.4th 811, 818 (9th Cir. 2022).

Far from a typical employee, Lively independently contracted through her own private business entity and exercised tremendous control, while maintaining the right to work on other projects and for other businesses. If she is not an independent contractor, then there is no such thing as an independent contractor.

## IV.    LIVELY CANNOT PROVE A FAILURE TO PREVENT/INVESTIGATE CLAIM

Lively knew how to raise concerns, and she did. Heath and Baldoni may have disputed her version of events, but they still acceded to her demands. And although Lively's brief asserts Defendants "failed to…implement *any* corrective measures," Opp.49, her 56.1 response admits IEWUM agreed to a set of requested "protections"—through which a "perfectly professional" set was achieved during all subsequent filming, including all intimate scenes featuring Lively herself, 56.1 Opp. ¶¶197, 220-25.

Lively also cannot dispute that, through legal counsel, she declined to pursue formal HR process. 56.1 Opp. ¶162; Ex. 103. Lively tries to re-write history, claiming an investigation

didn't happen because Heath did not want "a written record." Opp.1, 14. That claim misleads the Court by twisting Alex Saks' deposition testimony, 56.1 Opp. ¶569, and is not supported by competent evidence. Saks actually testified that when she first suggested an investigation, "[Heath] was very open to it." Pl. Ex. 15 at 115:1-116:22. Saks further testified that she surmised Heath's desire not to have "the behavior written down" based on her own interpretation, not on anything Heath ever said. *Id.* at 118:13-119:13. Saks's private speculation about Heath's motives is not admissible evidence. *See* Fed. R. Evid. 701; *see also United States v. Kaplan*, 490 F.3d 110, 117-19 (2d Cir. 2007) (reversing conviction based on improperly admitted lay opinion testimony about another's knowledge and state of mind).

Also fatal to Lively's claim is the lack of evidence suggesting any failure to prevent or investigate harassment was a "substantial factor" in causing her purported harm. Br.38. It is undisputed that Wayfarer had appropriate policies and Baldoni and Heath participated in workplace harassment training. 56.1 Opp. ¶¶43, 44, 46, 56. Because any allegedly harassing conduct ceased once Lively voiced concerns, any subsequent failure to investigate cannot have contributed to any harm either. Contrary to Lively's argument, Opp.49-50, there is no causal relationship between the adequacy of Defendants' on-set policies or their decision not to conduct a formal investigation and the gravamen of Lively's complaint, a so-called retaliation campaign consisting of social media activity months later.[6]

## V.    LIVELY'S CONTRACT CLAIMS FAIL

### A.  Lively Has Abandoned Her Breach Claims Against Wayfarer

Lively makes no effort to defend her alter ego theory breach of contract claims against

---

[6] Because she is not an employee, Lively cannot bring a claim under §12940(k) at all. Her argument to the contrary, Opp.49 n.38, cites a different provision of FEHA and ignores the plain language of §12940(k) itself, which expressly discusses "employers," as well as the regulation articulating that provision which is similarly limited, Cal. Code. Regs. tit. 2 §11023.

*Wayfarer* which (unlike IEWUM) was not a party to the ALA and CRA. *See* Br.46-47. The

claims against Wayfarer must therefore be dismissed. *Garnica v. Edwards*, 72 F. Supp. 3d 411,

417 (S.D.N.Y. 2014) (dismissing claims not defended on summary judgment as abandoned).

### B. The ALA Is Not Binding Or Enforceable Against The Entity Defendants

Lively does not dispute that (1) negotiations of the draft ALA continued long after

filming was complete, *e.g.*, 56.1 Opp. ¶¶379, 383; (2) open terms remained when the last draft

was exchanged, *id.* ¶¶383-84; (3) IEWUM *rejected* Lively's attempts to strike the condition

precedent requiring full execution, *id.* ¶380; and (4) Lively refused to sign the draft ALA, despite

repeated requests from IEWUM's counsel, *id.* ¶382, 385, 390. Lively's arguments to salvage her

breach claims in the face of those undisputed facts all fail.

#### 1.  Judicial Estoppel Does Not Apply

Contrary to Lively's argument, the Entity Defendants are not judicially estopped from

arguing that the ALA is not binding. Opp.52-53. Judicial estoppel applies only when a "clearly

inconsistent" factual position has been "adopted in some way by the court in the earlier

proceeding," such that a party would derive an "unfair advantage" by changing tack. *DeRosa v.*

*Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010).

*First*, the Court has never previously "adopted" any position advanced by Defendants

with respect to the ALA. In an order of dismissal, it rejected Defendants' only arguably related

claim. Dkt.296 at 122; *see, e.g.*, *Uitz v. Lustigman Firm, P.C.*, 2014 WL 3767056, at *2

(S.D.N.Y. July 28, 2014) (suit for breach could proceed because prior position "was never

adopted"). *Second*, Defendants' prior pleading was not inconsistent with their current position.

It too pointed out the ALA had never been signed. It asserted a claim for breach of the covenant

of good faith and fair dealing that was never specifically alleged to rest on the ALA. As noted in

Defendants' opening brief (at 41) and below, the parties performed pursuant to a separate Offer

Letter.  *Third*, the Entity Defendants gained no "unfair advantage" based on the alleged

inconsistency.  In dismissing the prior claim, this Court noted allegations that the ALA had never

been signed, and Defendants chose not to replead the claim though leave was granted.  Dkt.123

at 123 ("The Amended Complaint contains vague references to contract negotiations or

entitlements, but it also indicates several times that Lively did not sign her employment contract

for the Film.").

> 2.   The Condition Precedent Was Not Waived And No Agreement Was Formed

a.   Lively falsely claims defendants "confirmed in writing that Wayfarer was 'waiving'"

execution.  Opp.53.  That did not happen.  The cited evidence (56.1 Opp. ¶101 & Pl. Ex. 101)

shows Heath told Lively's reps "we have withdrawn our request for your client to sign her

agreement *in order to extend the time with the edit*"—*i.e.*, Heath gave Lively more time to edit

the film without making signing the draft ALA a condition of the concession.  Heath was clear

the contract negotiations remained open—he wrote: "As for the future resolution of the contract,

we will standby in hopes that we come to a conclusion soon."  Pl. Ex. 101.

Lively also falsely claims IEWUM did not dispute the execution condition had been

waived.  *See* Opp.53 n.46.  The opposite is true.  When Lively tried to strike the execution

condition and claim it had been "waived in practice," IEWUM rejected that edit.  Lively doesn't

dispute that fact, though she labels it "misleading," claiming IEWUM could have more explicitly

rejected her assertion of waiver.  56.1 Opp. ¶380.  But IEWUM was unequivocal that it was not

waiving the condition.  When Lively later tried to insert the phrase "(which condition is hereby

waived)" into the draft, IEWUM again rejected the edit.  Ex. 268 at -66.

b.   Nor did IEWUM waive via its conduct.  Opp.53.  Indeed, Lively's own evidence

confirms that, because the ALA was not finalized when principal photography commenced, her

lawyer insisted that "until such time that the long form is fully-executed, our client will continue

18

to proceed in reliance upon the terms of the negotiated deal memo"—in other words, the parties

would rely upon the Offer Letter. 56.1 Opp. ¶¶362, 445.

Moreover, both New York and California law require *unequivocal* expression of intent to

waive, especially where, as here, the contract expressly bars modifications not signed and in

writing. *See Globecon Grp., LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 176 (2d Cir. 2006); *S.*

*California Edison Co. v. Pub. Utilities Comm'n*, 85 Cal. App. 4th 1086, 1107 (Cal. Ct. App.

2000). Lively can't show unequivocal intent to waive here given her pre-dispute assertion that

pending execution of the ALA the parties would perform under the Offer Letter, her repeated

unsuccessful attempts to remove the condition from the ALA, and IEWUM's continual request

that she sign the agreement.

c.  For similar reasons, the ALA was never binding. As noted above, Lively does not

meaningfully grapple with undisputed evidence showing the parties did not intend to be bound

absent a fully executed writing. Instead, Lively merely claims that by July 2, 2024, *most* of the

draft ALA's terms were final, and the remainder, she says, were "immaterial in practice."

Opp.54. It is irrelevant, however, whether many key terms of the ALA were, apparently, no

longer subject to negotiation, because it is black letter law that "if *either* party communicates an

intent not to be bound until he achieves a fully executed document, no amount of negotiation or

oral agreement to specific terms will result in the formation of a binding contract." *Winston v.*

*Mediafare Ent't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985); *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77

F.3d 309, 315 (9th Cir. 1996) (same). Lively's argument that the ALA was performed (Opp.53)

also fails, because Lively cannot meaningfully dispute that performance occurred under the Offer

Letter, which set forth the key terms between the parties. In any case, performance is only one

factor for determining whether an agreement is formed and is "not decisive." *Brooks v. Simon*,

783 F. App'x 13, 19 (2d Cir. 2019) (citing *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir. 1984)).

Lively's argument that execution of the CRA suggests the parties understood the ALA was already a binding agreement, Opp.54, is flatly contradicted by the record. It is undisputed that negotiations over numerous provisions of the ALA, including the provision making execution a condition precedent, continued *after* the CRA was signed, with neither side manifesting an understanding that terms of the ALA were finalized. 56.1 Opp. ¶203 (admitting 20% of ALA's terms were still being negotiated when CRA was executed). If the CRA manifested the parties' understanding that the ALA was a done deal, there would have been no need for roughly *six more months* of negotiations, nor any reason for Lively to decline to sign.

3. Even If The ALA Was A Valid Agreement, The Execution Condition Precedent Bars Lively From Enforcing It

Lively also ignores that even *if* the ALA were a valid agreement (or Defendants are estopped from arguing otherwise), the execution condition precedent would still prevent her from enforcing the ALA (as well as the CRA, which was incorporated into the ALA). The draft ALA made execution a non-mutual "condition precedent to *IEWUM's obligations*" (Br.40), *not* a condition precedent to contract formation. *See, e.g.*, 56.1 Opp. ¶365 (conceding execution was a condition precedent to "*Company's* obligations under this Agreement"); *see also* 13 Williston on Contracts (4th ed.) (distinguishing between conditions precedent to formation and performance; noting "the failure of a condition to occur excuses *performance by the party whose performance is dependent on its occurrence*."). Thus, even if a valid agreement were formed, Lively cannot enforce that agreement, because IEWUM's obligations were never triggered.

**C. The CRA Is Not Binding Or Enforceable Against The Entity Defendants**

1. Lively's defense of the CRA's enforceability rests almost entirely on her contention

that the ALA was binding and enforceable, Opp.54, and therefore fails for the same reasons. Lively suggests the parties would not have bothered "to execute the CRA at all" unless they intended it to function as an independent agreement. But no such intent is expressly set forth in any writing. Instead, the CRA says the opposite. Indeed, there is an obvious reason why the parties intended to have the CRA incorporated into the ALA: The draft ALA contained an "Entire Agreement" provision that refused recognition of any other agreements. 56.1 Opp. ¶367. If the CRA had *not* contained words "incorporating" it into the draft ALA, and had not been separately signed, it would have been a nullity, had the ALA ever been finalized.

2. Lively's observation that contract modifications do not require new consideration (Opp.55) is beside the point, because Defendants' consideration argument only goes to whether the CRA is "[]enforceable as an *independent* agreement." Br.42.

Lively says the CRA was supported by consideration because her obligation to continue filming was "doubtful" insofar as "she possessed a right under the ALA (in a provision never subject to dispute) to terminate the Agreement in the event that sexual harassment took place." Opp.55. That claim is another blatant distortion, however. The Sexual Harassment provision was edited to permit Lively to terminate only *after* the CRA was signed. *See* Ex. 266 at 42. At the time the CRA was signed, Lively had no such right to terminate—her obligation to perform was required under the Offer Letter, as she concedes. 56.1 Opp. ¶362. Lively's claim that there was consideration because she agreed to "forbear" a claim is also wrong. As she admits, the CRA contained no such promise, *id.* ¶202, and Lively's attorney had, in fact, "reserved all legal rights" to bring a claim, *id.* ¶162.

### D. Lively's Contract Claims Fail Even If The ALA And/Or CRA Are Enforceable

1. <u>Lively Did Not Provide Requisite Notice</u>

Lively does not dispute that she did not satisfy the notice-and-cure provision in the ALA

before suing.  *See* Br.43-45.  She claims Defendants waived the notice-and-cure by failing to include it as an affirmative defense.  Opp.56.  But courts applying California law have held compliance with contractual notice-and-cure provisions must be pleaded by the *Plaintiff* and need not be asserted as an affirmative defense.  *See King v. Navy Fed. Credit Union*, 699 F. Supp. 3d 864, 869 (C.D. Cal. 2023); *Atalla v. Ambartsumyan*, 2020 WL 3444888, at *10 (Cal. Ct. App. June 24, 2020) (unpublished).  The sole case Lively cites for the proposition that failure to comply with a notice provision is an affirmative defense applied New York law.  *Specer-Smith v. Ehrlich*, 347 F.R.D. 606, 619-20 (S.D.N.Y. 2024).  That decision also turned on the specific language of the provision at issue, which made notice "a condition precedent to suit," unlike the notice provision in the ALA, which states that no "act or omission of [IEWUM] shall constitute an event of Default or breach" absent notice and an opportunity to cure.  56.1 Opp. ¶368; *Specer-Smith*, 347 F.R.D. at 621.

Lively's contention that she satisfied the provision by amending outside the cure period after her initial complaint provided "written notice," Opp.56, is absurd.  A party cannot evade clear notice-and-cure requirements by simply filing a lawsuit and then amending once the cure period has run.  "The purpose of giving notice of breach…would be completely undermined if it could be satisfied with the giving of post-suit notice."  *Alvarez v. Chevron Corp.*, 656 F.3d 925, 932 (9th Cir. 2011); *see also, e.g.*, *Swearingen v. Santa Cruz Nat., Inc.*, 2016 WL 4382544, at *11 (N.D. Cal. Aug. 17, 2016).

## 2.  Lively's Damages Are Barred

Lively does not dispute that she can't seek duplicative recovery for the same injury by asserting overlapping tort and contract claims.  Opp.56.  Since her claimed contract damages entirely mirror her alleged tort damages, her contract claims fail.

Lively also offers no real response to Defendants' showing that, if the ALA is binding, its

"Limitations On Damages" provision bars most if not all her contract damages, and that all her other alleged damages, such as her "suffering" and "humiliation," are unavailable for breach of contract.  Br.47-49.  Lively does not even *attempt* to defend, and therefore abandons, all her contractual damage claims other than those "for the breach of the CRA's anti-retaliation provision."  Opp.56.  As to the alleged breach of the CRA, Lively argues, in conclusory fashion, that her alleged injury "constitute[s] general damages."  But the case she cites for that proposition, *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960 (2004), hurts rather than helps her.  There, the California Supreme Court held that profits the plaintiff might have earned from unrelated future contracts "are not general damages" and were too remote to be available "as special damages" even though—unlike here—there was no specific contractual special damages waiver, and the industry at issue—construction—was far more predictable than the film industry.  *Id.* at 977.  *Lewis Jorge* dooms Lively's damages claim.

## VI.    THE DEFAMATION AND FALSE LIGHT CLAIMS FAIL

### A.  Lively Cannot Salvage Her Defamation Claim

Lively concedes, as she must, that her defamation claim is based entirely on defense counsel's denials of Lively's allegations, asserted after litigation commenced, in the context of discussion of the litigation.  *See* MJOP.Opp.23 n.17; Pl. Ex. 271 at 170-71 (identifying the "At-Issue Statements").  That concession is fatal to her claim.

#### 1.  Lively Cannot Establish Falsity Or Malice

a.   Contrary to Lively's assertions (Opp.57), Defendants have a made a strong showing that no actionable harassment or retaliation occurred, as discussed.  Accordingly, statements denying Lively's claims are true, or at least "substantially true," which is all that is required to defeat a defamation claim.  Br.53.

Lively does not meaningfully dispute that what constitutes retaliation, harassment, or a

"smear campaign" is imprecise and subjective, such that a denial of such conduct constitutes unactionable opinion.  Br.53-54.  Lively attempts to distinguish *Coleman v. Grand*, 158 F.4th 132 (2d Cir. 2025), on the ground that here, the alleged defamatory statements imply "undisclosed facts," and, as such, are "mixed" rather than "pure" opinions.  MJOP.Opp.21-23.  But one can scour the alleged defamatory statements for any suggestion of undisclosed facts.  *See* Pl. Ex. 271 at 170-71 & n.493-97.  The statements—viewed in their entirety, rather than via Lively's cherry-picked excerpts—repeatedly disclose the basis for the opinions expressed.  *E.g.*, 56.1 Opp. ¶806 n.26 (referring to "200 pages of undeniable facts and documentary evidence"); *id.* ¶814 n.28 (referring to publicly released video footage and text messages, including a video *linked to* in the allegedly defamatory article itself); *id.* ¶787 n.8 (setting forth bases for contention that Lively's allegations are "categorically false.").

b.    Lively also fails to muster evidence sufficient to prove actual malice with "convincing clarity," as she concedes is her burden.  Opp.57-58 (quoting *Palin v. New York Times Co.*, 482 F. Supp. 3d 208, 214 (S.D.N.Y. 2020)).  Lively reiterates her argument that Defendants must have acted with malice because they "knew that Lively complained" of supposed harassment on set.  Opp.58.  Lively does not respond, however, to the obvious point that knowledge of a complaint is *not* knowledge that harassment had, in fact, occurred.  *See* Br.55.  Lively distorts the record by claiming "Baldoni, Heath, and Sarowitz" admitted, Lively "'genuinely believes' her claims."  Opp.58.  But the cited text message shows Baldoni agreed with Nathan's comment "*We also know there was no truth to anything*," while merely noting that, nonetheless, Lively "is the kind of person that genuinely believes she's right and that all of this is unjust."  56.1 Opp. ¶612 & Ex. 158.  That evidence hurts rather than helps Lively's claim.

c.    Lively argues for the first time that the statements were false, and published with

malice, because they assert Lively lied about harassment to "gain control of the Film's *marketing*." Opp.58; MJOP.Opp.21. This novel theory appears nowhere in Lively's SAC (*see* SAC ¶¶447-65), and "[a] Plaintiff may not, in opposing a motion for summary judgment, rely on theories not set forth in the Complaint." *Johnson v. YWCA Residence, LLC*, 2014 WL 12782728, at *5 (S.D.N.Y. July 9, 2014). In any event, none of the statements specifically says Lively fabricated claims to take over the film's marketing.

> 2.  Lively Fails To Rebut That The Allegedly Defamatory Statements Are Absolutely Privileged

a. Lively first suggests the fair report privilege does not apply because an "ordinary reader or viewer" would not perceive defense counsel's statements as "reporting on the proceeding." MJOP.Opp.23 (quoting *Carroll v. Trump*, 664 F. Supp. 3d 550, 558 (S.D.N.Y. 2023)). But "a fair reading in the context of the *publication as a whole*" shows the statements were clearly comments on the litigation, and mirrored Defendants' positions throughout the litigation. *Sheindlin v. Brady*, 597 F. Supp. 3d 607, 625 (S.D.N.Y. 2022) (emphasis in original).

For example, the article that includes the "January 18 Statement" makes clear the statement was discussing and describing "Baldoni's long-expected lawsuit," filed days earlier. 56.1 Opp. ¶806 n.26; *see also id.* ¶814 n.28. Similarly, the "January 7 Statement" is part of a video embedded in an article about the ongoing litigation, and the specific statement was commentary on Defendants' complaint against NYT, plus discussion of documents that, only ten days later, would be attached to Defendants' complaint against Lively. Pl. Ex. 271 at 172 n.497 (at 2:00-7:31). Lively's argument that the "December 21 Statement" to NYT did not give readers any way to understand that it referenced Lively's CRD Complaint (as opposed to the NYT article itself)" (MJOP.Opp.24) is even more absurd, because the subject matter of the NYT article and the CRD complaint were essentially the same.

In any event, it is not necessary "that the court filing, the court, or the jurisdiction be specifically identified in the article" for the fair report privilege to apply. *Kinsey v. New York Times Co.*, 991 F.3d 171, 180 (2d Cir. 2021). And a statement need not reproduce a court filing or proceed verbatim for the privilege to apply. "Comments that *essentially* summarize or restate the allegations of a pleading filed in an action are the type of statements that fall within [the] privilege." *Sheindlin* 597 F. Supp. 3d at 630; *see also Wexler v. Allegion (UK) Ltd.*, 374 F. Supp. 3d 302, 311-12 (S.D.N.Y. 2019). Moreover, it is beside the point that certain statements were made shortly before Defendants filed their claims against Lively, because privilege can apply even before a complaint is formally filed, so long as litigation is anticipated. *See Lively v. Wayfarer Studios LLC*, 786 F. Supp. 3d 695 (S.D.N.Y. 2025); *Front, Inc. v. Khalil*, 24 N.Y.3d 713, 720 (2015) (describing privilege at "pre-litigation stage."). And Lively's contention that the privilege should not apply because Defendants' claims "were frivolous," MJOP.Opp.24, fails for reasons described in Defendants' opposition to Lively's Rule 11 sanctions motion, *see* Dkt.263.

    b. Lively has no answer to the First Amendment concerns raised by recognizing a defamation claim based on a lawyer's vigorous denial of allegations against his clients. Br.56. Her only response is that the allegedly defamatory statements were not "general denials" and instead suggested Lively "would be proven a liar." MJOP.Opp.22 (quoting *McNamee v. Clemens*, 762 F. Supp. 2d 584, 601 (E.D.N.Y. 2011)). But it is difficult to imagine any denial that would not at least implicitly convey Lively's claims were false—*i.e.*, that she had lied. Lively also *has* specifically alleged that the statement that her accusations were "categorically false" was defamatory. It is difficult to imagine a clearer "general denial." SAC ¶451, first bullet. Permitting Lively's defamation claim to proceed risks chilling attorneys' ability to deny accusations against their clients.

**B. Lively's False Light Claim Fails**

    1.  <u>New York Law Applies, Foreclosing The Claim</u>

Lively's choice-of-law argument assumes the California choice-of-law provision in the unexecuted ALA applies, but for the reasons explained *supra*, the ALA is not binding or enforceable.  Lively's argument fails in any case, because the ALA does not bind the Defendants who were never parties to any ALA draft.  "The general rule is that a contract cannot bind a nonparty."  *Staley v. FSR Int'l Hotel Inc.*, 2024 WL 1704931, at *3 (S.D.N.Y. Apr. 19, 2024).  Lively attempts to end run this rule by calling these defendants "closely related" parties of IEWUM, but her own cases undermine the argument.  MJOP.Opp.7.

*LoanCare, LLC v. Dimont & Assocs., LLC*, concerned a party that purchased the contracting party's assets and continued its operations after "expressly agree[ing] to perform under the [contract]," essentially inheriting the contract and its choice-of-law provision.  2025 WL 951585, at *12 (S.D.N.Y. Mar. 28, 2025).  The facts of this case are not comparable.  *VTX Commc'ns, LLC v. AT&T Inc.*, observed that a non-signatory can "embrace" a contract's choice-of-law provision by "knowingly seeking and obtaining '*direct* benefits' from that contract," and held non-signatories bound in part based on allegations of "self-dealing conduct" through which the contracts directly benefited the non-signatories.  2020 WL 4465968, at *4-5 (S.D. Tex. Aug. 4, 2020).  Here, there is no allegation of self-dealing[7]—the only benefits the non-signatories received from the contract were entirely *indirect*.  And in *Lipcon v. Underwriters at Lloyd's, London*, the non-signatories at issue were spouses of signatories to the relevant agreements and sued to enforce rights arising out of the agreements, such that the court concluded their interests were "completely derivative."  148 F.3d 1285, 1299 (11th Cir. 1998).  These cases do not

---

[7] Indeed, Lively has abandoned her alter ego-based contract claims against Wayfarer.

support the conclusion that Wayfarer, Baldoni, Heath, and Sarowitz must defend a False Light claim under California law, and the argument is even weaker still as to Nathan, TAG, and Abel. Lively has not even demonstrated, for example, that any defendant "was <u>aware</u> of the…clause." *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 395 (S.D.N.Y. 2019) (underline in original).

Lively separately argues for application of California law pointing to what she describes as California "conduct."  Opp.56.  This argument is blind to choice of law principles that favor application of New York law.  The overwhelming balance of conduct indisputably occurred in New York or New Jersey, including Lively's pre-filming conversations with Baldoni, 56.1 Opp. ¶74 (NY), Lively's mid-production conversations with Defendants about their conduct, *id.* ¶208 (NY), Defendants' alleged on-the-set behavior, *id.* ¶¶31, 60, 221 (NJ), and the premiere of the film, attended by Lively and Baldoni, *id.* ¶241 (NY).  She claims Defendants executed a "communications strategy from California," but overlooks detailed allegations in her own pleading that place Defendants and herself in New York when that alleged strategy was purportedly hatched.  *See* Dkt.912 at 2-3 (detailing SAC's allegations).  She further ignores that the defamatory statements and media of which she complains emanated primarily from New York—where she resided at all relevant times.  In short, the "most significant relationship" factors clearly support application of New York law.  *Kinsey*, 991 F.3d at 176; *see* Br.50-52.

### 2. Lively Has No Standing Under California Law

Lively would fare no better even if California law applied.  Indisputably a New York resident, she asks the Court to ignore the impressive body of authority that limits standing to California residents.  Br.52-53.  Relying on no contrary authority, she cites only *Doe v. Meta Platforms*, 690 F. Supp. 3d 1064 (N.D. Cal. 2023).  Opp.57.  That case does not confer standing upon a New York plaintiff to bring a false light claim.  Far from it—the court noted it was "not

determining or foreclosing" the standing argument and ultimately dismissed the constitutional invasion of privacy claims as then pled. *Id.* at 1079, 1081.

Lively argues her claim does "not depend on the California Constitution" and can proceed under the common law, citing *Hill v. Nat'l Collegiate Athletic Association*, 7 Cal. 4th 1, 27 (1994). Opp.57. Lively's SAC, however, pleads a claim only under "California Const., Art. I, § 1" and not under common law. SAC at 139. Moreover, a common law claim would not be "actionable" based on the mere "dissemination of truthful, newsworthy" material. *Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 215 (1998). And as noted above, Lively fails to identify any dissemination of false information. 56.1 Opp. ¶304.

## VII.    LIVELY'S CONSPIRACY CLAIM FAILS

Lively concedes conspiracy liability cannot arise from contract claims, and she fails to meaningfully oppose Defendants' arguments that New York conspiracy liability cannot attach to California FEHA and Federal Title VII claims. Her conspiracy claims are entirely duplicative of her underlying tort claims and must be dismissed for that reason alone, Br.57, let alone that none of her alleged torts can survive summary judgment.

## VIII.   DEFENDANT SAROWITZ MUST BE DISMISSED

Lively strains to implicate Sarowitz, despite his undisputedly peripheral role 56.1 Opp. ¶¶17, 47. She claims, but without evidence, that he was "on set during the birthing scene." *Id.* ¶106. Lively's Declaration states only that Sarowitz was "present at on the set that day" [*sic*], without specifying any scene or shoot he attended. *Id.* (citing Lively Decl. ¶12). Multiple scenes were shot the same day. Pl. Ex. 25. While not disputing that Sarowitz had no contact with the PR firms allegedly responsible for the alleged smear campaign, at least not before this litigation began, *id.* ¶¶311-14, Lively claims Sarowitz is nonetheless liable because he made a suggestion about "flipping the narrative," Opp.59. She admits, however, that that

suggestion merely brought to light the truthful fact that her husband, a male, rewrote portions of the originally female script. 56.1 Opp. ¶¶315-16, 42 (Lively, admitting same facts). Lively also fails to identify any evidence to support her claim that Sarowitz threatened to ruin her family. Undisputed evidence shows Sarowitz never made such a threat. *See id.* ¶¶317-25; Br.59.

## IX.    LIVELY FAILS TO OPPOSE DEFENDANTS' DAMAGES ARGUMENTS

Lively's damages arguments confuse the issues. She claims standing to pursue damages to her own "reputation," Opp.60, but falsely equates personal reputational harm with the speculative lost profits purportedly sustained by separate businesses. She has no standing to seek such damages, which are in any case too speculative. Br.58-60. *Cantu v. Flanigan* only underscores the point. Cantu was personally awarded non-economic damages not for speculative lost profits but because the harm to his reputation directly resulted in his inability to secure oil and gas contracts with an identified value. 705 F. Supp. 2d 220, 231 (E.D.N.Y. 2010). Lively's other cited cases are inapposite and concern entirely distinct issues, such as standing to sue on a contract, *see NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 176 (Del. 2015), or standing to sue corporations based on the corporation's misrepresentations to the plaintiff, *Citigroup Inc. v. AHW Inv. P'shp*, 140 A.3d 1125, 1126 (Del. 2016).

Lively cannot dispute that the business entities she identifies had no track record, consistently failed to gain market share prior to any alleged misconduct, and ran the risk of sales declines for multiple reasons unrelated to this case. 56.1 Opp. ¶¶397, 399-401.

## CONCLUSION

For the foregoing reasons and those stated in the prior briefing, the Court should grant summary judgment in the Wayfarer parties' favor on Lively's claims.

Dated:  December 12, 2025
        New York, New York

/s/ Alexandra A.E. Shapiro
SHAPIRO ARATO BACH LLP
Alexandra A.E. Shapiro
Jonathan Bach
Alice Buttrick
Jason A. Driscoll
1140 Avenue of the Americas, 17th Floor
New York, NY 10036
Tel: 212-257-4881
ashapiro@shapiroarato.com
jbach@shapiroarato.com
abuttrick@shapiroarato.com
jdriscoll@shapiroarato.com

LINER FREEDMAN TAITELMAN +
COOLEY, LLP
Bryan J. Freedman (pro hac vice)
Ellyn S. Garofalo (pro hac vice)
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Tel: (310) 201-0005
bfreedman@lftcllp.com
egarofalo@lftcllp.com

MEISTER SEELIG & FEIN PLLC
Mitchell Schuster
Kevin Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
ms@msf-law.com
kaf@msf-law.com

AHOURAIAN LAW
Mitra Ahouraian (pro hac vice)
2029 Century Park East, 4th Floor
Los Angeles, CA 90067
Tel. (310) 376-7878
mitra@ahouraianlaw.com

*Counsel for the Wayfarer Parties*