Exhibit 17

```
 1                UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                      ---oOo---
 4
 5    BLAKE LIVELY,
 6                    Plaintiff,
 7       vs.        CASE NO. 24-CV-10049-LJL (LEAD CASE)
                              25-CV-449 (LJL) (MEMBER CASE)
 8
      WAYFARER STUDIOS LLC, ET AL.
 9
                    Defendants.
10    _____
      JENNIFER ABEL,
11              Third-party Plaintiff,
         vs.
12    JONESWORKS, LLC,
                Third-party Defendant.
13    _____
      WAYFARER STUDIOS LLC, et al.
14              Consolidated Plaintiffs,
         vs.
15    BLAKE LIVELY, et al.
                Consolidated Defendants.
16    _____
17
18                  **CONFIDENTIAL**
19       VIDEO-RECORDED DEPOSITION OF MICHAEL ROBBINS
20               Los Angeles, California
21              Monday, November 24, 2025
22
23
24    Stenographically Reported by:  Ashley Soevyn,
      CALIFORNIA CSR No. 12019
25    Pages 1 - 270
```

Page 1

CONFIDENTIAL

```
 1    time.  I wrote my report, and I shredded the notes.
 2    BY MS. ZELDIN:
 3         Q    Were you told to preserve those notes?
 4         A    No.
 5         Q    Did you understand that you had an
 6    obligation to preserve those notes?
 7         A    Nope.
 8              MS. ROESER:  Belated objection.
 9    BY MS. ZELDIN:
10         Q    Where in your report does it reflect
11    anything that Ms. Rikard told you?
12         A    It doesn't specifically refer to her.
13    But I can tell you, if you wish, what we discussed
14    and how that impacted my views.
15         Q    Go ahead.
16         A    So one thing that we discussed was the
17    birthing scene.  I had looked at the birthing scene
18    before that as well.  My view of the birthing scene
19    was that it involved intimacy such that there should
20    have been a nudity rider and a closed set.  She said
21    the same thing.  I don't remember exactly what words
22    she said, but her view was the same.
23              With respect to the dancing scene, I had
24    looked at the dancing scene several times.  My
25    thoughts were that Mr. Baldoni was trying to kiss
```

Page 47

1    Ms. Lively, that she was avoiding the kiss but
2    staying within character for the most part doing so.
3    And Ms. Rikard said the same thing.
4            More importantly, I knew about production
5    companies establishing definitions of intimacy so
6    that they could establish protocols which then would
7    inform them as to when to bring in an intimacy
8    coordinator, when to -- when to ensure that there
9    was a nudity rider, and when to have a closed set.
10           But I hadn't focused on that issue in
11   this case.  I just didn't see anything indicating
12   that they had or didn't have definitions.  She said
13   they didn't.  Assuming she's correct, that then
14   caused me to say, well, then, these other things
15   should have happened and didn't happen.
16           So that was primarily what she -- how she
17   impacted my opinion to cause me to focus on the lack
18   of definitions.
19       Q    Okay.  Let's go backwards.  Laura Rikard
20   is a director, actor, teacher, intimacy
21   choreographer, intimacy coordinator, and a founding
22   member and head faculty of Theater Intimacy
23   Education.  That's located in North Carolina, right?
24           MS. ROESER:  Objection.
25           THE WITNESS:  I don't remember all those

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

1           A    I am aware of those facts, yes.

2           Q    And you're also aware that filming

3    stopped on June 14th, 2023, due to the strikes by

4    the Writers Guild and by SAG-AFTRA?

5           A    Correct.  Above-the-line strikes.

6           Q    And then the filming -- there was a

7    hiatus in filming, and it did not start up again

8    until January 5th, 2024, and concluded on

9    February 9th, 2024, correct?

10          A    Yes.

11          Q    All right.  So there's two phases of the

12   film.  Phase one that occurred in 2023 and ended in

13   June of 2023.  And the other in 2024.  And that was

14   phase two?

15          A    That's my understanding.

16          Q    All right.  Do you agree that none of

17   the -- Lively's intimate scenes were rehearsed or

18   filmed during phase one of production?

19               MS. ROESER:  Objection.

20               THE WITNESS:  I disagree.

21   BY MS. ZELDIN:

22          Q    Do you know how SAG-AFTRA defines

23   intimate scenes?

24          A    To the extent there is a definition, yes.

25          Q    What is the definition by SAG-AFTRA?

                                                Page 81

CONFIDENTIAL

1           A    So nudity, simulated sex, hyper exposure,

2      and other intimate scenes.

3           Q    Isn't it just nudity or simulated sex?

4           A    No.

5           Q    What is the third thing you think that is

6      in there?

7           A    It is in there.  Hyper exposure.

8           Q    Hyper exposure.  What does that mean?

9           A    There is no specific definition, which is

10     why a studio or production company needs to be

11     specific, for the reasons I've described.  But it

12     means a situation where the actor is pulled into a

13     vulnerable situation, not necessarily involving

14     nudity.  Though, it could.  But involving something

15     sexual to some degree.

16          Q    Okay.  What were the intimate scenes that

17     were filmed in phase one of production?

18          A    I didn't say there were scenes.  But

19     there was one scene.

20          Q    One scene.  What was the scene that you

21     believe was intimate in phase one?

22          A    The birthing scene.

23          Q    And why do you believe it was intimate if

24     there was no definition of "intimate"?

25          A    Two reasons.  Reason number one is

Page 82

CONFIDENTIAL

1    because according to Ms. Talbot, the -- there was

2    profile nudity which she said an actor could

3    consider to be nudity.  So that was early part of

4    her deposition.

5            And in the later part of her deposition,

6    she said there was nudity in the scene, and that

7    would mean that an intimacy coordinator would get

8    involved.  So that is one reason.  Both comments

9    that Ms. Fromholz ignores.  And then, secondly --

10       Q    So I'm going to ask you, please, to not

11   comment on Ms. Fromholz's report until and unless I

12   ask you about it.  All right?

13       A    If I feel like I should do it, I will do

14   it.  And you shouldn't be stopping me in the middle

15   of a question.  But if you feel like you're going to

16   do it, do it.

17            MS. ROESER:  Agreed.  Objection.

18   BY MS. ZELDIN:

19       Q    If I ask a question, answer the question.

20       A    Can I continue with my answer?

21       Q    Yes.

22       A    And secondly, in my opinion, there was

23   hyper exposure.  And the reason I say that is

24   because if you look at the scene, which I have,

25   Ms. Lively is laying on an examination table or

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

```
 1    ever, ever testified that it was necessary to
 2    conduct an investigation when a witness was --
 3    strike that.
 4              When a -- an actor and director called
 5    his co-actress, the person that he was directing,
 6    sexy in her costume?
 7              MS. ROESER:  Objection.
 8              THE WITNESS:  I have no idea.
 9    BY MS. ZELDIN:
10        Q    Let's look at page 3 of your report, if
11    you would.
12        A    Sure.
13        Q    There is a section called "Policies and
14    Procedures."
15              Do you see that?
16        A    I do.
17        Q    And you begin talking about Sony.
18        A    Yes.
19        Q    Why are you discussing Sony in this
20    report?
21        A    Because my view was that Sony didn't do
22    what the policy said they would do, should do.
23        Q    So are you intending to opine that Sony
24    did not follow its practices and did not conduct an
25    investigation, which it should have conducted in
```

Page 93

CONFIDENTIAL

```
 1     this case?
 2          A    Yes.  So says my report as well.
 3          Q    Then go through Sony's policy language,
 4     and first you state that:
 5               (As read):
 6                    "All harassment complaints must be
 7                    reported to the HR department or other
 8                    departments."
 9          A    Show me where you are, please.
10          Q    For example, second paragraph under
11     "Policies and Procedures"?
12          A    Oh, so I'm just quoting the policy.
13          Q    Right.  Understood.  Okay.
14               And the question is:  Where in the policy
15     does it say what a harassment complaint is?
16               MS. ROESER:  Objection.
17               THE WITNESS:  I don't think it defines
18     harassment in the Sony -- what harassment complaint
19     is in the Sony policy.
20     BY MS. ZELDIN:
21          Q    Okay.  Does Wayfarer policy define what a
22     harassment complaint is?
23          A    It defines "harassment".
24          Q    Does it define what a harassment
25     complaint is?
```

Page 94

CONFIDENTIAL

1   his or her findings, then that means the studio

2   knows what to do as a result of the investigation.

3   So then they have to take disciplinary or remedial

4   action, which is what their policy says as well.

5   And that varies according to what the investigator

6   finds.  So you don't know what is appropriate until

7   you conduct the investigation.

8        Q    And I've asked you to assume that the

9   investigation found that the director was saying

10  that about her personally.  And there was,

11  therefore, a violation of the policy.  What would be

12  appropriate remedial action under those

13  circumstances?

14            MS. ROESER:  Objection.

15            THE WITNESS:  So I have two things to say

16  about that.  Thing number one is that is not what

17  you had asked me.  And thing number two is I haven't

18  been asked to give an opinion as to what is or isn't

19  appropriate remedial action.  I have been asked to

20  give an opinion as to what kinds of remedial action

21  exist but not specifically what appropriate action

22  was in a particular circumstance.

23  BY MS. ZELDIN:

24       Q    What remedial actions exist?

25       A    So one thing is to take actions to stop

Page 98

CONFIDENTIAL

1    the harassment from occurring, assuming that the

2    investigator determines that harassment did occur.

3    If the investigator determines that harassment

4    occurred, then disciplinary action with respect to

5    the people who violated the policy either by

6    conducting the harassment themselves, committing the

7    harassment themselves, or, alternatively, by

8    otherwise not following the policy -- for example,

9    Wayfarer's policy said that reported incidents had

10   to be -- I'm sorry -- that incidents about which a

11   supervisor was made aware had to be reported so that

12   it could be investigated.

13        So if supervisors knew about possible

14   harassment violations and didn't report it, that's

15   also a violation.  There should be some kind of

16   discipline.  The company's own policy talks about

17   termination as a type of discipline.  That aside

18   from that, you want to take other remedial actions,

19   especially if the investigator determined that

20   harassment had occurred.

21        So, for example, you would say, do our

22   employees understand what harassment is and isn't,

23   and do the supervisors understand their obligation

24   under the policy to report the allegations?  Have we

25   sufficiently distributed the policy to our employees

Page 99

CONFIDENTIAL

1     so that they know about that?  And if it's unclear,

2     which it was, then we should redistribute the

3     policy.  And also, we should write the policy in a

4     way that's consistent with what our own procedures

5     are, which their policy wasn't.

6              Additionally, maybe do training again if

7     the investigator concluded that people didn't

8     understand their obligations or didn't understand

9     what harassment is.

10             So there are a variety of things you can

11    do.

12        Q    Under the circumstances that I outlined,

13    the director calling the actress sexy while she was

14    in her costume, what would be the appropriate

15    remedial actions?  You're not going to fire him for

16    that, right?

17             MS. ROESER:  Objection.  Form and scope.

18             THE WITNESS:  Yeah, I wasn't asked to

19    form an opinion about what remedial action should be

20    taken in a particular situation.

21    BY MS. ZELDIN:

22        Q    If --

23        A    But there are a variety that are

24    available.  And if you find someone harassed, then

25    you normally would discipline in some way.

                                              Page 100

CONFIDENTIAL

```
 1          Q    Do you intend to offer an opinion that
 2     Sony failed to follow its own policies?
 3          A    Yes.  Same answer as before.
 4          Q    Are you offering an opinion on the
 5     adequacy of Sony's policies?
 6          A    No.
 7          Q    Do you intend to offer an opinion that
 8     Wayfarer failed to follow Sony's policies?
 9          A    No.
10          Q    You agree that Wayfarer had a set of
11     industry-standard policies and procedures in place
12     to prevent harassment, discrimination and
13     retaliation --
14               MS. ROESER:  Objection.
15     BY MS. ZELDIN:
16          Q    Correct?
17               MS. ROESER:  Sorry.
18               THE WITNESS:  I'm sorry.  I missed one
19     word, and so if you wouldn't mind repeating.
20     BY MS. ZELDIN:
21          Q    Would you agree that Wayfarer had a set
22     of industry-standard policies and procedures in
23     place to prevent harassment, discrimination, and
24     retaliation?
25               MS. ROESER:  Objection.
```

Page 101

CONFIDENTIAL

```
 1              THE WITNESS:  I do not agree with that.
 2    BY MS. ZELDIN:
 3         Q    Okay.  Did -- what don't you agree with?
 4         A    So many things.  First, one of the things
 5    that the policy said was that if supervisors or
 6    managers became aware of a possible violation of the
 7    policy, that they had to report it to human
 8    resources and that an investigation would be
 9    conducted.  So focusing on the report to human
10    resources, Mr. Heath testified that he never asked
11    the person who did human resources for the studio to
12    be involved with the film, and that there was no
13    human resources department or anybody who was
14    handling the film other than the AD.  I assume he
15    meant first AD, but I'm not sure.  And Ms. Saks, who
16    was a producer.  So having a policy that says
17    supervisors should report to HR when HR doesn't
18    exist is not consistent with standard practices in
19    the industry.
20              Similarly, the policy said that employees
21    who felt that the policy had been violated should
22    either report to their supervisor or any member of
23    management or to HR, a department that not did not
24    exist.  It's not consistent with standard practices.
25    You tell people to report to people or departments
```

Page 102

CONFIDENTIAL

1      that exist, not ones that don't exist.

2              Also, having a policy is just having

3      words.  You need to do more than just have the

4      words.  You need to distribute the policy.  Standard

5      practice in the industry and otherwise is to

6      distribute harassment policies and retaliation

7      policies.

8              Mr. Heath said, "I don't know if the cast

9      and crew were given a copy of the policy."

10     Ms. Lively said she never got any resources in terms

11     of how to raise a complaint.  The question should

12     have been asked but wasn't:  Well, did you get the

13     policy?  But if you didn't get the resources, then

14     presumably, she didn't get the policy.

15             Mr. Baldoni, who is one of the people

16     being accused of harassment, said, "I don't think I

17     ever saw that policy before."  Well, standard

18     practice is to distribute the policy.  So that's

19     also not consistent with standard practices.

20             And more than anything else, standard

21     practice is not just to have a policy sitting there,

22     much less one that wasn't distributed or at least

23     may not have been, but actually do what the policy

24     says.  The policy says all reported allegations will

25     be investigated, and they didn't.

Page 103

CONFIDENTIAL

```
 1        Q    There was a policy, a written policy,
 2    correct?
 3        A    Sorry.  Yes, there was a written policy.
 4        Q    All right.  And Wayfarer had an HR
 5    department with dedicated staff, yes or no?
 6             MS. ROESER:  Objection.
 7             THE WITNESS:  Wayfarer had an HR
 8    department, but I've already explained what the
 9    problem was.  And dedicated staff, Mr. Heath only
10    talked about one person, but maybe there was more
11    than one.
12    BY MS. ZELDIN:
13        Q    All right.  But there was one -- at least
14    one person with an HR department at Wayfarer,
15    correct?  It's a yes or no.
16             MS. ROESER:  Objection.
17             THE WITNESS:  I don't know if there was a
18    department.  There was a person who did HR services.
19    BY MS. ZELDIN:
20        Q    Prior to filming It Ends with Us movie --
21    prior to filming that, the movie itself held
22    anti-discrimination training administrated --
23    administrated by a law firm that you respect,
24    correct?
25             MS. ROESER:  Objection.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

```
 1    BY MS. ZELDIN:
 2         Q    So your opinions are summarized on the
 3    first and second pages of your report; is that
 4    right?
 5         A    Not my opinions about Ms. Fromholz's
 6    opinions because, obviously, they didn't exist
 7    before I wrote the report.
 8         Q    Okay.  But your opinion -- let's just
 9    stick with the report, and we'll talk about
10    Ms. Fromholz at the end.  Okay?
11         A    Sure.  Yeah.
12         Q    With respect to your report, there you
13    basically offer three opinions; is that right?
14              MS. ROESER:  Objection.
15              THE WITNESS:  Yes.
16    BY MS. ZELDIN:
17         Q    Okay.  And your first opinion is that:
18              (As read):
19                  "Defendants violated standard practices
20                   in their own policies by failing to
21                   investigate harassment and retaliation
22                   allegations."
23              Correct?
24         A    Yes.
25         Q    And what were the harassment and
```

Page 140

1    retaliation allegations that they failed to

2    investigate?

3        A    So on May 23rd, we had the incident we

4    talked about earlier relating to Mr. Baldoni making

5    the "sexy" and "hot" comments and Ms. Slate's

6    response to that, and then his joke in response to

7    that.  So that's the first one.  And they had a

8    conversation, they say, with him, Ms. Slate and

9    Ms. Lively about the impropriety of making

10   statements like that.  So that's first one.

11       Q    Okay.

12       A    Should I keep going?

13       Q    Yes, please.  Just I want you to list

14   them, please.

15       A    Sure.  So then on May 26th, Ms. Lively

16   went to Ms. Giannetti and talked to her about her

17   concerns.  There is a slight disagreement about what

18   was discussed, but it appears that she discussed the

19   trailer incident, the birthing incident.

20   Ms. Giannetti did not recall whether she talked

21   about any comments made by Mr. Baldoni.  But the

22   timeline that was produced by the company shows that

23   Ms. Giannetti told Mr. Baldoni about the "sexy"

24   comments.  So it appears that she did say that to

25   Ms. Giannetti; otherwise, Ms. Giannetti wouldn't

Page 141

1     know to say that to Mr. Baldoni.

2              So then on    late -- in late May,

3     Ms. Slate went to Ms. Giannetti, talked to her about

4     her concerns.  Said there was a problem with the

5     atmosphere on the set as a result of the concerns;

6     and Ms. Lively had concerns as well.  And

7     Ms. Giannetti then spoke to Mr. Baldoni about that.

8     Ms. Slate also went to Ms. Saks.  Ms. Saks -- and

9     about the same thing she had told Ms. Giannetti.

10             Ms. Saks then says she went to

11    Mr. Baldoni and to Mr. Heath.  Mr. Baldoni says,

12    yes, she came to me.  But -- and basically, she

13    talked -- she mentioned her own -- Ms. Slate's own

14    discomfort about the "sexy" comment that he had made

15    to her.

16             Ms. Saks said she went to Mr. Heath, but

17    there is a dispute about what was said.  Ms. Saks

18    says she told Mr. Heath basically the same thing she

19    told Mr. Baldoni and also that she told Mr. Heath on

20    several occasions that an investigation needed to be

21    conducted.  Mr. Heath said, well, maybe she came to

22    talk to me, but she didn't talk to me about an

23    investigation.  And I didn't say what she said I

24    said.

25         Q    Okay.  I'm sorry.  My question, then,

                                        Page 142

CONFIDENTIAL

```
 1                        ---oOo---

 2                   AFTERNOON SESSION

 3                 MONDAY, NOVEMBER 24, 2025

 4              THE VIDEOGRAPHER:  We're back on the

 5     record.  The time is 1:23 p.m.

 6     BY MS. ZELDIN:

 7          Q    Mr. Robbins, we were trying to summarize

 8     on a high level, what your big opinions are, not

 9     your sub-opinions.  And the first one we said was

10     that it -- Defendants violated standard practices

11     and their own policies by failing to investigate

12     harassment and retaliation allegations; is that

13     correct?

14          A    Yes.

15          Q    And then the second one is that the

16     investigation would have resulted in disciplinary

17     remedial actions.  Is that another big opinion?

18          A    No, I don't have an opinion like that.

19          Q    You don't have an opinion like that?

20          A    No.

21          Q    Okay.  So I'm looking at the first page

22     again, the penultimate paragraph, the last sentence.

23              (As read):

24                   "Further appropriate disciplinary

25                   remedial actions would be taken as a
```

                                                    Page 154

CONFIDENTIAL

```
 1                    result of such investigations."
 2        A    Right.  That's not saying that I have an
 3   opinion as to what actions should be taken, if any,
 4   because I can't -- I don't know what an investigator
 5   would determine, and I'm just saying that normally
 6   you take disciplinary and/or remedial action, and so
 7   that was something that's available depending on
 8   what an investigator determined.
 9        Q    And then the second opinion is that the
10   studio violated -- we're going to say that's not a
11   major opinion.  The first opinion is the major
12   opinion, which is the Defendants violated standard
13   practices in their own policies by failing to
14   investigate; is that right?
15        A    Yeah.
16        Q    The second one is that the studio
17   violated the entertainment industry specific
18   protocols?
19        A    I look at the first and second as you
20   describe them to be part of the same thing.
21        Q    Okay.
22        A    That it's taking steps to prevent
23   harassment and retaliation from occurring, and I
24   list the four steps, which you pointed out earlier,
25   including investigating.  And the intimacy protocols
```

Page 155

CONFIDENTIAL

```
1    are part of preventing harassment and not
2    retaliation so much, but harassment.
3          Q    And your third opinion or maybe your
4    second opinion, then, is that entertainment -- the
5    entertainment industry differs from most other
6    industries and businesses with respect to issues
7    concerning retaliation?
8               MS. ROESER:  Objection.
9    BY MS. ZELDIN:
10         Q    Is that correct?
11         A    Yes.  And then I have an opinion about
12   Ms. Fromholz's opinion as well.
13         Q    Okay.  And then so, and finally, you have
14   an opinion about Ms. Fromholz.  We will do that
15   last, okay?
16         A    Whatever order you like.
17         Q    Thank you.  In your report, you mentioned
18   various incidents.  We talked about some of those
19   earlier.  Your report also refers to a fat shaming
20   incident.  Do you recall that?
21              MS. ROESER:  Objection.
22              THE WITNESS:  Is that in the report?
23   BY MS. ZELDIN:
24         Q    I believe you discuss that.
25         A    I don't remember.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

```
 1    BY MS. ZELDIN:
 2         Q    Correct?
 3         A    It's not what he wrote.
 4         Q    She.
 5         A    Sorry.  Oh, that was sexist.  But I would
 6    say it's reasonable to assume that it included no
 7    investigation.
 8         Q    Was on the list of the 17 things, was
 9    there a requirement to hire a new producer?
10         A    I don't remember the things that really
11    aren't relevant to my opinion very much.  But, so I
12    don't remember one way or the other.  Since you're
13    asking me, the answer is probably yes, but I don't
14    remember it.
15         Q    Did the 17-point list include a
16    requirement that Ange Giannetti be on the set?
17         A    Yes.
18         Q    This was the same Ange Giannetti that you
19    criticized for not having conducted any
20    investigation, correct?
21         A    No.
22         Q    Is it a different Ange Giannetti?
23         A    No.  I never criticized her for not
24    conducting an investigation.  I criticized Sony for
25    not conducting an investigation.
```

Page 220

CONFIDENTIAL

```
1         Q    I see.  And do you know whether she told
2    anybody at Sony about the allegations that
3    Ms. Lively made?
4         A    I don't know.  But if she didn't, she
5    should have.  And I would criticize her for that.
6         Q    Okay.  One of the requirements was to
7    give Alex Saks more power.  How does that have
8    something to do with sexual harassment?
9              MS. ROESER:  Objection.
10             THE WITNESS:  I don't think it
11   necessarily does.  I don't think every -- each one
12   of the 17 protections had to do with sexual
13   harassment.  Some did; some didn't.
14   BY MS. ZELDIN:
15        Q    How about the protection with regard to
16   COVID, did that have anything to do with sexual
17   harassment?
18        A    No.
19        Q    Did Lively and her team threaten Wayfarer
20   and Sony that she would not return to complete the
21   film unless they accepted the protections?
22             MS. ROESER:  Objection.
23             THE WITNESS:  Whether it was Lively or
24   her team, I don't know.  But that was what was
25   communicated.
```

Page 221