# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

BLAKE LIVELY,

                Plaintiff,

    v.

WAYFARER STUDIOS LLC, et al,

                Defendants.

JENNIFER ABEL,

                Third-Party Plaintiff,

    v.

JONESWORKS LLC,

                Third-Party Defendant.

No. 24-cv-10049 (LJL) (lead case)
No. 25-cv-449 (LJL) (case)

**PLAINTIFF BLAKE LIVELY'S RESPONSE TO DEFENDANTS'
RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1, Plaintiff Blake Lively ("Lively") submits this response to the Statement of Undisputed Material Facts filed by Defendants Wayfarer Studios LLC ("Wayfarer"), Justin Baldoni ("Baldoni"), Jamey Heath ("Heath"), Steve Sarowitz ("Sarowitz"), It Ends With Us Movie LLC ("IEWUM"), Jennifer Abel ("Abel"), The Agency Group PR LLC ("TAG"), and Melissa Nathan ("Nathan," and together with Wayfarer, Baldoni, Heath, Sarowitz, IEWUM, Abel, and TAG, "Defendants") in support of their Motion for Summary Judgment (Dkt. No. 958).

1.      Wayfarer Studios is a production studio.  It aspires to create purpose-driven films intended to inspire connection and promote social change through authentic, impactful storytelling and fresh creative voices. Ex. 1, WAYFARER_00013949 at-052; Ex. 2, Heath Dep. (Oct. 9, 2025) at 38:16-23.

**Plaintiff's Response 1:**        Undisputed.

2.      Justin Baldoni and Steve Sarowitz co-founded Wayfarer Studios in or about 2019 or 2020 and serve as its co-chairs. Ex. 3, SAC ¶ 58, 60; Ex. 4, Heath Dep. (Oct. 8, 2025) at 32:1-5; Ex. 5, Baldoni Dep. (Oct. 6, 2025) at 42:21-43:5; Ex. 3, Dkt. 520 ¶¶ 58 ("SAC"), 60; Ex. 5, Baldoni Dep. (Oct. 6, 2025) at 46:22-24.

**Plaintiff's Response 2:**        Undisputed.

3.      Sarowitz is the majority investor in Wayfarer Studios.  Ex. 3 SAC ¶¶57, 60, 75; Dkt. 151, Sarowitz Answer ¶¶57, 60, 75; Ex. 6, Sarowitz Dep. Tr. 98:4-7, 103:17-21, 177:18-19, 231:3-5.  He resides in Illinois.  Ex. 3, SAC ¶60; Sarowitz Answer ¶ 60.

**Plaintiff's Response 3:**        Undisputed.

4.      Jamey Heath is the CEO of Wayfarer.  Ex. 3, SAC ¶ 59; Ex. 4, Heath Dep. (Oct. 8, 2025) at 34:1-9; Ex. 2, Heath Dep. (Oct. 9, 2025) at 38:1-14.

**Plaintiff's Response 4:**        Undisputed.

5.      Baldoni is an acclaimed actor, director, and author.  Before the events giving rise to this dispute, he was the one of the stars of the acclaimed Golden-Globe nominated television show *Jane the Virgin*. He also produced and directed two prior feature films, *Five Feet Apart* and *Clouds*, together with CBS Films and Warner Brothers, respectively.    Ex. 7, WAYFARER_000041408-409.

**Plaintiff's Response 5:**      Undisputed, except as to the characterization of Baldoni and Jane the Virgin being acclaimed, and, in the case of Jane the Virgin, Golden-Globe nominated, which the cited evidence does not support. Wayfarer Ex. 7 at WAYFARER_000041408–41409.

6.      Baldoni has written two books on gender-related topics, focusing on the question of masculinity and addressing, among other issues, the importance of mutual consent, one of which was a *New York Times* bestseller.  Ex. 7, WAYFARER_000041408-409; Ex. 5, Baldoni Dep. (Oct. 6, 2025) at 302:09 – 307:9; Ex. 8, Baldoni Dep. (Oct. 7, 2025) at 77:2 – 77:9, 79:18-25.  Baldoni has also hosted a podcast, called "Man Enough," concerning the same and similar topics.  Ex. 7, WAYFARER_000041408-409.

**Plaintiff's Response 6:**      Undisputed.

7.      In February 2019, Baldoni met Colleen Hoover, author of the smash success *It Ends With Us*, a novel that addresses issues of domestic violence.  Ex. 9, WAYFARER_000141660; Ex. 10, Hoover Dep. at 21:22-22:13; Ex. 11, Saks Dep. at 231:5-18; Ex. 12, Giannetti Dep. at 188:13-189:2; Ex. 13, Slate Dep. at 122:2-6.

**Plaintiff's Response 7:**      Undisputed that the book *It Ends With Us* addresses issues of domestic violence alongside a theme of female empowerment. Exs. 1, Hoover Tr. 33:15–17; 2, Giannetti Tr. 38:8–21.

8.     Baldoni and Hoover discussed how the book could be adapted into a film, and, on May 8, 2019, Hoover agreed to sell Baldoni the rights for a film, in part due to Baldoni's ability and experience approaching sensitive topics in his prior films.  Ex. 14, WAYFARER_000141663 (Hoover, writing: "[Y]ou "get" the book…" and "based on the magnificent adaptation you did of Five Feet Apart, I'm confident you could do this book justice and that our visions will align").  Hoover also suggested that Baldoni play the lead role of Ryle.  Ex. 9, WAYFARER_000141660; Ex. 14, WAYFARER_000141663; Ex. 15, WAYFARER_000141666; Ex. 16, WAYFARER_000141667; Ex. 17, WAYFARER_000141669; Ex. 18, WAYFARER_000141671.

**Plaintiff's Response 8:**     Undisputed, except as to the assertion that May 8, 2019 is the date on which Colleen Hoover ("Hoover") agreed to sell Baldoni the rights for a film, which the cited evidence does not support. Wayfarer Exs. 9, 14–18.

9.     In September 2022, Baldoni and Wayfarer sought to, and eventually did, partner with NO MORE, an organization dedicated to ending domestic and sexual violence, in connection with the film.  Ex. 19, WAYFARER_000141658.  Together, Wayfarer and NO MORE planned to use the film as an opportunity to raise awareness about domestic violence, and to provide education, resources, and support for survivors.  *Id*.

**Plaintiff's Response 9:**     Undisputed, except as to the assertion that Wayfarer planned to use *It Ends With Us* (the "Film") as an opportunity to raise awareness about domestic violence, which the cited evidence does not support. Wayfarer Ex. 19.

10.     In September 2022, Wayfarer proposed a partnership with Sony for co-production and co-financing of the film.  Ex. 20, SPE_BL0000343.  Wayfarer's proposal included a requirement that 1% of the film's proceeds be donated to support survivors of domestic abuse.  *Id*.

at -345.  To date, NO MORE has received nearly $600,000 in connection with the film. Declaration of Jamey Heath ("Heath Decl.") ¶22.

**Plaintiff's Response 10:**    Undisputed that ==Wayfarer proposed a partnership with Sony to co-produce the film in September 2022==, but disputed as to the remaining assertions regarding Wayfarer's proposal, which the cited evidence does not support. Wayfarer Ex. 20.

11.    In early publicity planning for the Film, Sony emphasized the need to center the =="underlying messaging"== of the story: =="abusive relationships take many forms from all social classes … what does it take to leave and break the cycle of generational trauma and domestic violence?"== Wayfarer Ex. 21-22 at SPE_BL0005500-5503. Sony cautioned: =="we need to be careful not to commercialize or handle lightly."== *Id.* at SPE_BL0005501.

**Plaintiff's Response 11:**    Undisputed that ==Sony's early publicity strategy aimed to provide "context for the underlying messaging" of abuse==, but disputed that =="breaking the cycle of abuse"== was the primary or sole theme that Sony sought to emphasize; the first theme listed was =="[w]omen empowerment" and others included "small businesses" and "[w]omen's friendship as a lifeline."== Wayfarer Ex. 22 at SPE_BL0005502. Also disputed that ==Sony's publicity planning for the film avoided commercializing its themes; the publicity plan included "[s]creenings on a rooftop," "[e]vents at a venue made to look like a floral shop with steampunk-style flowers," "[t]emporary heart tattoos," "[p]artner with Pinterest," and "[i]ncorporate onesies into the campaign."== *Id.*

12.    Wayfarer Studios typically depends on separate LLCs for separate films or projects. Heath Decl. ¶6.  In 2022, It Ends With Us Movie LLC ("IEWUM") was incorporated to develop and produce the film.  Heath Decl. ¶¶6, 9.

**Plaintiff's Response 12:**     Undisputed that the evidence cited supports Defendants' assertion, but otherwise disputed as inconsistent with Heath's October 8, 2025 deposition testimony in which he claimed to have little to no knowledge or recollection of the structure or operations of IEWUM. Ex. 3, Heath 10/8 Tr. 134:16–19 (stating that IEWUM "may be" a wholly owned subsidiary of Wayfarer but that he did not "have specific memory of it in the moment"), 134:24–135:1 (answering "I don't know" in response a question about whether Sony had an ownership interest in IEWUM), 154:14–22 (acknowledging that he was "apparently" the president of IEWUM).

13.     Establishing a separate entity for each individual film production is common in the film industry to separate each production's liabilities, investment and ownership structure, rights assignments for distribution, and accounting. The SPE is often necessary for the purpose of obtaining production (or post-production) tax credits (which are often based on the specific jurisdiction in which individual films are shot, or edited, as well as the residency of members the crew), and for residual reporting with unions such as SAG-AFTRA, DGA, and WGA (which determine participation on a project-by-project basis). Heath Decl. ¶7.

**Plaintiff's Response 13:**     Undisputed.

14.     Utilizing a separate, project-specific entity is also necessary in order to, for example, calculate net proceeds and back-end profit participation for each film, for the purpose of calculating profit participation.  Heath Decl. ¶8.

**Plaintiff's Response 14:**     Undisputed.

15.     IEWUM maintained its own bank accounts and funds, separate from Wayfarer, and independently engaged the cast and crew of the film, only a handful of whom were also Wayfarer employees.  Heath Decl. ¶10.

**Plaintiff's Response 15:**    Undisputed that the evidence cited supports Defendants' assertion, but otherwise disputed as inconsistent with Heath's October 8, 2025 deposition testimony in which he claimed to have little to no knowledge or recollection of the structure or operations of IEWUM, including with respect to financial management. Ex. 3, Heath 10/8 Tr. 134:16–19 (stating that IEWUM "may be" a wholly owned subsidiary of Wayfarer but that he did not "have specific memory of it in the moment"), 134:24–135:1 (answering "I don't know" in response a question about whether Sony had an ownership interest in IEWUM), 138:20–139:20 (acknowledging limited insight into the financial management of IEWUM), 154:14–22 (acknowledging that he was "apparently" the president of IEWUM).

16.    Although Wayfarer and its employees provided some administrative, legal, and operational support to IEWUM on the film, that is common in the film industry, and IEWUM paid Wayfarer $▇▇▇▇ for those services pursuant to the terms of the Wayfarer's co-financing agreement with Sony Pictures' subsidiary, Columbia. Heath Decl. ¶11; Ex. 23, SPE_BL0000001 at -02.

**Plaintiff's Response 16:**    Undisputed that the evidence cited supports Defendants' assertion, but otherwise disputed as Heath's declaration is inconsistent with his October 8, 2025 deposition testimony in which he claimed to have little to no knowledge or recollection of the operations of IEWUM. Ex. 3, Heath 10/8 Tr. 134:16–19 (stating that IEWUM "may be" a wholly owned subsidiary of Wayfarer but that he did not "have specific memory of it in the moment"), 134:24–135:1 (answering "I don't know" in response a question about whether Sony had an ownership interest in IEWUM), 154:14–22 (acknowledging that he was "apparently" the president of IEWUM).

17.    Beyond providing some financing, Sarowitz was not involved in the production of the film.  Ex. 6, Sarowitz Dep. Tr. 230:13-15, 120:21-24.  And he did not supervise or manage anyone at Wayfarer Studios during the filming of *It Ends With Us*.  Ex. 6, Sarowitz Dep. Tr. 204:20-23.

**Plaintiff's Response 17:**    Undisputed that Sarowitz was "barely involved with the film besides providing its funding," Wayfarer Ex. 6 at 120:21–24, but disputed that Sarowitz did not supervise or manage anyone at Wayfarer Studios because "the CEO and upper management answer to . . . Mr. Sarowitz."  Ex. 4, Baldoni 10/7 Tr. 46:22–47:21, 55:14–56:11.

18.    Before Blake Lively joined the production, filming was set to begin in 2023, under Baldoni's direction. Ex. 24, Lively Dep. at 21:18-25; 261:3-12.

**Plaintiff's Response 18:**    Undisputed.

19.    The book *It Ends With Us* was well known for sexual content.  Ex. 12, Giannetti Dep. at 188:13-189:2

**Plaintiff's Response 19:**    Disputed.  The evidence cited does not support the assertion that the book *It Ends With Us* was well known for sexual content, *see* Wayfarer Ex. 12 at 188:13–189:2, and Hoover challenged any suggestion that the book was "a hot romance" when discussing optioning the Film with Baldoni. Wayfarer Ex. 14 at WAYFARER_00014663.

20.    Blake Lively never read the book, either before or during filming.  Ex. 24, Lively Dep. at 60:22-23.

**Plaintiff's Response 20:**    Disputed.  Lively informed Baldoni that, when she is part of book-to-film adaptations, "what works better for [her] is to not read the book in advance" because it becomes harder "to see the blind spots in the film" and that she "like[s] to look at the film as its

own piece to make sure that it works on its own." Ex. 281, Lively Tr. 59:21–60:7.  Lively nevertheless read several portions of the book after April 2023.  *Id.* at 9:16–61:17.

21.    In or about December 2022, after having met with Baldoni, Lively accepted an offer to play the film's female lead, Lily Bloom. Ex. 24, Lively Dep. at 12:17-20; *see also* Ex. 25, HEATH-000028774 at -75 (email from Warren Zavala to Jamey Heath expressing that "We're good on the financial terms for Blake. She's excited to do the film.").

**Plaintiff's Response 21:**    Undisputed.

22.    In mid-December 2022, Imene Meziane, Wayfarer's VP of Business and Legal Affairs, sent Lively's representatives a draft offer letter ("Offer Letter") setting out the basic parameters under which Lively would agree to perform in the role of Lily Bloom in the film.  Exs. 26-27, HEATH_000046097-99.

**Plaintiff's Response 22:**    Undisputed.

23.    As is standard in the film industry, the proposed agreement for Lively's services was not between Lively herself, or Wayfarer.  The agreement's intended parties were IEWUM and Blakel, Inc., Lively's "loanout" entity.  Ex. 28, HEATH_000045678.  A loanout entity is a corporation formed around one individual, typically for tax purposes, which then "loans" the services of the individual for a fee.  Heath Decl. ¶13.

**Plaintiff's Response 23:**    Undisputed that IEWUM and Blakel, Inc. were parties to the agreements governing Lively's services but disputed that those agreements did not also impose obligations on Wayfarer and create enforceable rights for Lively. Wayfarer Exs. 117, 264.

24.    On or about April 27, 2023, Lively signed an escrow agreement to facilitate payments from IEWUM to her loanout entity in connection with the film. Ex. 29, HEATH_000045645.

**Plaintiff's Response 24:**        Undisputed.

25.        Shortly before the Offer Letter was finalized, pursuant to the escrow agreement, IEWUM wired Lively's up-front fee of $1.75 million, less a 6.37% New Jersey withholding tax, to Lively's client trust account at WME. IEWUM was not asked to and did not withhold federal income, Social Security, or Medicare taxes, or any other state or local taxes. Wayfarer Exs. 30–31, WAYFARER_000030416-17; Ex. 29, HEATH_000045645.

**Plaintiff's Response 25:**        Undisputed.

26.        The Offer Letter was finalized in early May 2023.  As discussed below, the Offer Letter expressly provided that full execution of a long form agreement regarding the terms of Lively's engagement was a condition precedent to IEWUM's obligations to Lively thereunder. Ex. 32; HEATH_000045662; Ex. 28, HEATH_000045678 at 80.

**Plaintiff's Response 26:**        Undisputed that the final version of the Offer Letter was circulated on May 4, 2023, but otherwise disputed that the Offer Letter expressly provided that full execution of a long form agreement regarding the terms of Lively's engagement was a condition precedent to IEWUM's obligations thereunder, which the cited evidence does not support. Wayfarer Exs. 28, 32. To the contrary, the cited evidence specifies as a condition precedent execution of "an Agreement in a form reasonably acceptable to all parties," Wayfarer Ex. 28 at HEATH_000045680, and Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith. Further, disputed that Paragraph 13 of the Offer Letter was an ongoing and operative part of the parties' agreement; the terms of the Offer Letter became binding through Lively's reliance letter to Wayfarer which expressly recognized the waiver of Paragraph 13 through the parties' mutual performance notwithstanding the absence of an executed long-form. Ex. 6 ("In the meantime, since

principal photography has commenced, until such time that the long form is fully-executed, our client will continue to proceed in reliance upon the terms of the negotiated deal memo with the understanding that Lender and Artist are now unconditionally pay-or-play for the acting fee of $1.75M and that the conditions in Paragraph 13 of the deal memo are now either satisfied or waived.").

27.    No long form agreement, as described in the Offer Letter, was ever executed by the parties.  Heath Decl. ¶¶14-18.

**Plaintiff's Response 27:**    Undisputed that the parties never executed a long form agreement, but otherwise disputed that the Offer Letter required or described a "long form agreement," which the cited evidence does not support. Heath Decl. ¶¶ 14–18. Disputed to the extent that this paragraph asserts that there was no agreement in substantially the form represented by the Actor Agreement and Standard Terms and Conditions ("Agreement"), and Side Letter (defined below). Wayfarer Exs. 117, 264; Dkt. No. 50, ¶ 341.

28.    Before accepting the role, Lively had reviewed an early script, and thus knew the film would include sexual content and dark themes, including domestic violence.  Ex. 33, Zavala Dep. at 43:4-44:5, 47:18-23; Ex. 34, Stone Dep. at 65:3-66:13; Ex. 24, Lively Dep. at 60:8-21. The script Lively reviewed included scenes of sexual intimacy, intimate partner violence, and attempted sexual assault. *See, e.g.*, Ex. 35, WAYFARER_000129261, at -129275-77, -129308-311, -129328-331, -129338-340, -129347, -129348-351, -129354-359.

**Plaintiff's Response 28:**    Undisputed that Lively had read a script of the film prior to accepting the role of Lily Bloom and understood the film to involve romance, drama, trauma, and levity. Ex. 281, Lively Tr. 15:24–16:17 ("But yeah, I knew that there was romance. I knew that there was drama. I knew that there was trauma. I knew that there was levity. I knew that there were

10

many facets in this story."). Disputed that the script Lively reviewed included scenes of "sexual intimacy, intimate partner violence, and attempted sexual assault," which the cited evidence does not support. Wayfarer Ex. 35.

29.     Lively worked to revise the script before filming began.  Her written work product included frank sexual language and overtly sexual themes.  For instance, in April 2023, Lively sent Baldoni a revised draft for the scene in which Lively's character (Lily Bloom) and Baldoni's character (Ryle Kincaid) first meet—on the rooftop of a building (the "rooftop scene").  Lively explained she revised the scene to include "flirty and yummy…ball busting."  She referred to her choice of dialogue as "my love language. Spicy and playfully bold, never with teeth."  Her draft called for "sexual tension" between the characters, kissing, and retained a line from the book in which Baldoni's character says directly to Lively's character: "I want to fuck you." Ex. 36, BL-0000092 at -48; Ex. 37, BL-000009253 at BL-000009262.

**Plaintiff's Response 29:**     Undisputed that Lively revised the script before filming began, including a portion of the script corresponding to the rooftop scene, and that the quoted language appears in the cited sources. Disputed to the extent this paragraph suggests that Lively was solely responsible for these revisions because Baldoni solicited, encouraged and approved of Lively's script revisions. Ex. 7 at BALDONI_000016476–16477.

30.     On May 5, 2023, Baldoni sent Lively some notes on the script from Sony Executive Ange Giannetti, who wanted the scenes to involve more than just verbal interplay. Giannetti wrote: "other than language – this does not read like an R rated movie. Readers of the book … are expecting some HEAT … I'm hoping [the love scenes] are sexy and grown up … please work to find the balance between sweet / funny / endearing with moments of real heat." Ex. 38, BL-000013115.

**Plaintiff's Response 30:**     Undisputed that the quoted language appears in the cited source, but otherwise disputed to the extent this paragraph suggests that the Film should have been an R-rated Film.  It was broadly acknowledged that "making th[e] film PG-13 ha[d] proven without a doubt to be what[] [was] best for the film and the audience."  Ex. 8 at AS000702.

31.     Lively immediately exercised substantial influence over the development and shooting of the film.  At Lively's request, Wayfarer agreed to abandon its intended filming location—Boston, where Hoover's novel was set—and to accept Lively's choice of New Jersey "to accommodate Blake."  Ex. 26, HEATH_000046097; *see also* Ex. 39, BL-000018396 (Lively email to PGA, asserting "I lead[sic] the location shift from Boston to New Jersey").  Wayfarer also agreed to adjust the filming schedule to accommodate Lively's other obligations.   Ex. 26, HEATH_000046097.

**Plaintiff's Response 31:**     Disputed that Lively "immediately exercised substantial influence" and to the extent that this paragraph suggests that Lively, rather than Wayfarer, was the decisionmaker for these changes, neither of which are supported by the cited evidence. Wayfarer Exs. 26, 39.  The decision to move the location to New Jersey was part of arms-length negotiations between Wayfarer and Lively's agent, Warren Zavala, who made clear that Wayfarer could say no and proceed with another actress.  Ex. 9.

32.     In a letter to the Producers Guild of America, Lively stated that she played a role in numerous aspects of the film's pre-production, as follows:

> I lead the location shift from Boston to New Jersey and helped to solve all cost and schedule logistics associated
>
> I personally called and/or wrote emails to crew and put forth names for dept head roles. Including Hair, Makeup, Director of Photography, Costume Design, Transportation, Security, Camera Operators, etc ...
>
> I identified and onboarded freelance team members for the cast members (not just myself) to help achieve the goals for the screen including a fitness trainer, nutritionist, meal prep service, spray tanner, wig maker, hair colorist, etc ...

I reviewed and reshaped the creative of the production design for all key locations for all characters, also made changes to use existing elements of locations to save cost

I called in favors with home design contacts to get items loaned, discounted or gifted to save production design costs

I reviewed and reshaped the creative of the costume design for all characters

I called in favors with fashion contacts to get items loaned, discounted or gifted to save costume design costs

I reviewed and reshaped the creative of the prop and floral design for the key film element of the film (the protagonist is a florist)

I did outreach to florists all over instagram and beyond, helping with the marketing activation to feature a florist in the film, and connected the best names with production

I went through hundreds of casting tapes to help find the rest of the cast, including our stars Atlas [Lively's character, Lily Bloom's other love interest], Young Lily, Young Atlas and Jenny Bloom [Lily Bloom's mother].

I rewrote the script to improve the role of Jenny Bloom after 3 actresses turned it down. Ex. 39, BL-000018396.

**Plaintiff's Response 32:** Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

33. In a February 8, 2023 voice memo, Lively asked if the start of shooting could be pushed back because she "want[ed] to be in my best shape." Ex. 40, BL-000008806.

**Plaintiff's Response 33:** Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

34. On February 9, 2023, in response to Baldoni's comment that Lively must feel "1000 lbs lighter" after resolving a personal dilemma, Lively responded "only 20 to go." Baldoni disliked Lively's self-deprecating joke. Ex. 41, BL-000008801 at -04.

**Plaintiff's Response 34:** Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

13

35.    On February 17, 2023, Lively asked Baldoni <mark>"What's the chance we can do the body scenes at the end of the schedule?"</mark> Baldoni responded: <mark>"I want you to know – you will look amazing. Anything you are insecure about we will talk through and get creative together and make you comfortable. I just don't want you to stress about your body. It's the last thing you need."</mark> Ex. 42, BL-0000008819 at -20.

**Plaintiff's Response 35:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

36.    The same day, February 17, Lively told Warren Zavala, her agent at WME: <mark>"Also I asked Justin Baldoni today, but I need their help in boarding the movie so that the body stuff last to shoot. I'm working my ass off. Literally working out twice a day, 4 hours a day. Which is insane. But I'm treating it like my full time job. … And no matter how hard I work it's a lot to accomplish in not a lot of time. And I want to set us all up for success.…This sexiness in this film and the marketing I'm sure, is critical to its success."</mark> Ex. 43, BL-000021371.

**Plaintiff's Response 36:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

37.    In a February 18, 2023 message to Baldoni, Lively wrote: <mark>"I know my job here…As woke as we both are and work to be, this movie requires a certain aesthetic. It's part of the job that we both excitedly signed up for. I don't shy away from it because its not problematic."</mark> Ex. 44, BL-000008821 at -22.

**Plaintiff's Response 37:**        Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

38.    On April 8, 2023, Lively sent Baldoni her proposed revisions to the "rooftop scene" in which the two main characters first meet. Ex. 36, BL-000009247 at -48.

**Plaintiff's Response 38:**        Undisputed.

39.    On April 12, 2023, Lively asked her friend, the world-famous musician Taylor Swift, for help. Referring to Baldoni as "this doofus director of my movie," she went on to describe him as "a clown" who "thinks he's a writer now." She asked Swift to endorse the revised script she was proposing—even without having read it. Ex. 45, BL-000018765 ("you don't have to read of course").

**Plaintiff's Response 39:**        Undisputed that the quoted language appears in the cited source, but disputed that Lively asked Taylor Swift to endorse the revised script without having read it. Ex. 281, Lively Tr. 241:3–242:23 ("And I sent Taylor the script on her way to my apartment because Justin was still there, and I asked her to read them. I told her she didn't have to, I didn't want her to feel pressured to do that, but I hoped that she would.").  Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

40.    Swift agreed to do Lively's bidding, texting Lively, "I'll do anything for you !!" Ex. 45, BL-000018765. Lively and Taylor Swift met with Baldoni at Lively's apartment, where Swift endorsed the revised draft. Afterward, Lively wrote to Swift: "You were so epically heroic today. I recapped every moment to Ryan. I kept remembering stuff- You making shit up about me

and lenses. And referring to yourself as my doll. This clown falling for all of it. But also resisting it. You are the worlds absolute greatest friend ever." Ex. 46, BL-000018767.

      **Plaintiff's Response 40:**    Disputed that Swift "agreed to do Lively's bidding," "met with Baldoni," or "endorsed the revised draft," which is not supported by the cited evidence. Wayfarer Ex. 46. Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents, and disputes any summary or interpretation inconsistent therewith.

      41.    On April 14, 2023, Baldoni told Lively he liked the revised scene. He added that he "would have felt that way without Ryan and Taylor." Ex. 47, BL-000009345 at -48. Lively explained that, to protect her like the princess in Game of Thrones, Reynolds and Swift serve as her "dragons." Ex. 48, BL-000009349 at -50.

      **Plaintiff's Response 41:**    Undisputed that the quoted language appears in the cited documents, but Lively respectfully refers the Court to the full documents for their complete contents, including that "we all benefit" from her relationship with Reynolds and Swift and "you will too, I can promise you." Wayfarer Ex. 48 at BL-000009350.

      42.    Lively has since disclosed that her husband, Ryan Reynolds, actually wrote the revisions to the "rooftop scene" that she proposed. Ex. 49, WAYFARER_000142463 at -64; Ex. 50, BL-000011703.

      **Plaintiff's Response 42:**    Undisputed.

      43.    Wayfarer has a set of industry-standard policies and procedures in place to prevent harassment, discrimination, and retaliation. Ex. 51, HEATH_000034943; Ex. 1, WAYFARER_000139049 (Wayfarer employee handbook). "All Wayfarer Studios employees, officers, principals, agents, workers, and representatives are prohibited from engaging in unlawful

discrimination, harassment, and/or retaliation." *Id.* at -53. "The Anti-Harassment Policy also applies to vendors, customers, independent contractors, unpaid interns, volunteers, persons providing services pursuant to a contract, and any other person's employees [sic] may come into contact with through the course of their work." *Id*.

**Plaintiff's Response 43:**    Undisputed that Wayfarer maintains written policies, but disputed to the extent the Wayfarer Parties imply these policies were distributed to, explained to, or available to cast or crew of the Film. Testimony from cast confirms that these policies were not provided on set, and Heath testified that he did know if cast and crew were provided with Wayfarer's policies. Additionally, Baldoni testified that he did not know if he had read the Equal Employment Opportunities, Anti-Discrimination, Anti-Harassment, and Anti-Retaliation Policy in Wayfarer Ex. 1. Ex. 4, Baldoni 10/7/25 Tr. 50:17-51:2. Sarowitz testified that he had not read any of the policies and procedures in Wayfarer. Ex. 51, 10, Ferrer Tr. 240:21–242:23; 3, Heath 10/8 Tr. 128:17–134:2, 395:7–396:2, 398:12–19; 4, Baldoni 10/7 Tr. 50:17–51:2; 11, Sarowitz Tr. 184:13–19. Lively Decl. ¶ 26.

44.    Wayfarer has a complaint process to address alleged instances of harassment, discrimination, and/or retaliation. "Individuals who believe they have been the victims of [prohibited conduct] should discuss their concerns with their immediate supervisor, any member of management, or Human Resources." Ex. 1, WAYFARER_000139049 (Wayfarer employee handbook) at -54. Wayfarer "encourages reporting of all perceived incidents of discrimination or harassment." *Id.* "Any reported allegations of harassment, discrimination, or retaliation will be promptly and thoroughly reported in an impartial manner." *Id.* at -55.

**Plaintiff's Response 44:**    Undisputed that Wayfarer Ex. 1 has a policy with the stated information, but disputed to the extent the Defendants imply the policy or information about the

complaint process therein was distributed to, explained to, or available to cast or crew of the Film. Testimony from cast members confirms that they were not provided with this information. Exs. 12, Slate Tr. 38:15–24; 10, Ferrer Tr. 240:21–242:23; Lively Decl. ¶ 26. When asked at his deposition whether "Wayfarer HR was responsible for this production," Heath testified "I'm not saying that . . . My understanding is I deferred to Alex Saks, ultimately, and Jill Sacco, who was our production supervisor, as well as Andrea [Ajemian], who was our line producer, that if there was – concerns would go to them if there were any brought up." Ex. 3, Heath 10/8 Tr. 129:24–130:24.

45.    Wayfarer has a human resources department headed by Cynthia Barnes-Slater. Ex. 4, Heath Dep. 10/8 Tr. 38:7-9. Mitz Toskovic assists Slater. *Id.* at 39:11-14.

**Plaintiff's Response 45:**    Undisputed that Slater is a human resources consultant for Wayfarer and that Toskovic assists Slater in the operations level, but disputed to the extent Defendants imply that Wayfarer made Slater or any other human resources representative available to cast and crew of the Film. Heath testified that Wayfarer "did not have an HR representative specifically for the movie," and he not recall whether he and Slater discussed her providing support to address cast or crew concerns in connection with the Film. Heath further testified that he deferred human resources issues "to Alex Saks, ultimately, and Jill Sacco, who was our production supervisor, as well as Andrea Ajemian], who was our line producer, that if there was – concerns would go to them if there were any brought up." Heath testified that he did not know if cast and crew were ever informed that human resources concerns should be raised with these individuals. Ex. 3, Heath 10/8 Tr. 128:17–133:6, 398:12–19.

46.     Wayfarer employees are required to participate in workplace harassment training. Ex. 4, Heath Dep. 10/8 Tr. 54:2-10. Baldoni participated in training approximately every two years. Ex. 8 Baldoni 10/7 Dep. Tr. 52:3-53:5.

**Plaintiff's Response 46:**     Undisputed that Wayfarer employees are required to participate in workplace harassment training, but disputed to the extent it suggests that all Wayfarer employees actually completed such training, which is not supported by the cited evidence. Cast testimony confirms they were not given any training or instruction regarding harassment policies. Exs. 12, Slate Tr. 38:7–24, 58:23-59:8; 10, Ferrer Tr. 240:21–242:23; 13, Baker Tr. 46:9–47:15, 205:22–25; 281, Lively Tr. 220:19–221:21; Lively Decl. ¶ 26.

47.     Sarowitz is not involved in the day-to-day operations of Wayfarer Studios. Ex. 6, Sarowitz Dep. Tr. at 126:8-9, 260:23-261:2, 266:22-267:7, 311:24-25. And he is not responsible for administering Wayfarer Studios' harassment policies. Ex. 6, Sarowitz Dep. Tr. at 183:6-12, 184:5-19, 195:17-196:13, 203:9-16.

**Plaintiff's Response 47:**     Undisputed that Sarowitz is not involved in day-to-day operations. Disputed to the extent it suggests that Sarowitz is not responsible for ensuring a safe workplace as co-chairman of Wayfarer, and signatory of its anti-harassment policies. Sarowitz's signature is on the Wayfarer Employee Handbook in Wayfarer Ex. 1 and Wayfarer Ex. 2. Exs. 11, Sarowitz Tr. 183:13–25; 4, Baldoni 10/7 Tr. 46:18–21. Baldoni further testified that upper management at Wayfarer reports to him and Sarowitz, and that he and Sarowitz could fire anyone, including the CEO. Ex. 4, Baldoni 10/7 Tr. 56:4–11; 282:13–283:1.

48.     Lively was under no obligation to engage in any nude or simulated sex scenes without her consent. The Offer Letter provided that Lively would not perform any

nudity/stimulated sex without her prior written consent and negotiation/execution of a formal nudity rider. Ex. 28, HEATH_000045678 at 80.

**Plaintiff's Response 48:** Undisputed that the offer letter stated that there would be "[n]udity/simulated sex without [Lively's] prior written consent and negotiation/execution of a nudity rider," Wayfarer Ex. 28 at HEATH_000045680, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith. Lively disputes any implication that this provision reflects the dynamics or conditions on set or that the Wayfarer Parties followed appropriate industry and/or nudity-rider procedures in practice, which is not supported by the cited evidence. Lively Decl. ¶¶ 12-14.

49.    In April 2023, before filming began, IEWUM hired Elizabeth Talbot to serve as the intimacy coordinator for the film. Ex. 52, 24-CV-10049_0002891 (payroll form signed by Elizabeth Talbot LLC on April 28, 2023).

**Plaintiff's Response 49:** Undisputed.

50.    On April 5, 2023, Baldoni wrote to Lively: "Just hired intimacy coordinator who I LOVE. Will set you up to meet / [FaceTime] with her next week for intro." Lively declined the introduction, responding: "I feel good. I can meet her when we start." Ex. 53, BL-000009220 at -22.

**Plaintiff's Response 50:** Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

51.    Baldoni reported to the production team: "Seems [Lively] doesn't want to meet with intimacy coordinator until we start which may mess up the workflow but I can still meet with her of course." Alex Saks, one of the film's producers, responded: "That's fine if [Lively] doesn't

want to meet [the intimacy coordinator] now. You'll just have to walk her through what you and [the intimacy coordinator] are thinking." Ex. 54, BALDONI_000018766.

**Plaintiff's Response 51:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

52.    On May 4, 2023, before any filming had begun and months before any shooting of the film's intimate scenes would take place, the intimacy coordinator considered the content of anticipated intimate scenes and suggested details and clarifications to both Baldoni and Heath. Ex. 55, BALDONI_00010363. While expressing concern that the scenes were becoming "too PG-13" as compared to the more explicit scenes in the book, Baldoni suggested that the intimacy coordinator discuss with Lively whether there were other ways of implying nudity that she would consider so as not to "disappoint readers," while also expressing sensitivity for Lively's boundaries. He wrote: "I am fine showing my butt (female gaze) …. I'm fine if Blake just wants to take [my clothing] off and we make it playful …. The goal is to choreograph in a way that keeps Blake's clothes on as much as possible." Ex. 56, BL-000013564 at -65. The intimacy coordinator agreed to have any necessary conversations to get clarity for the scenes "so both [Baldoni and Lively] are confident about level of contact during the scenes." Ex. 57, BALDONI_000010377.

**Plaintiff's Response 52:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

53.    The intimacy coordinator then met with Lively to review said vision and set boundaries for purposes of memorializing them in a nudity rider. On or around May 5, 2023, the intimacy coordinator had a phone call with Lively and her lawyer. The intimacy coordinator

21

explained that her role was to determine Lively's comfort level and boundaries to ensure scenes would be within her consent and boundaries, and to provide nudity rider language. Ex. 58, Talbot Dep. Tr. at 57:6-58:17. She told Lively to contact her if she wanted anything further. Lively did not meet with her again. Ex. 58, Talbot Dep. Tr. at 57:14-58:17.

**Plaintiff's Response 53:**    Undisputed except to the extent that it suggests Lively, her counsel, and Talbot discussed any scenes that were not scripted to include nudity or any form of intimacy, including the birth scene. Ex. 14, Talbot Tr. 57:6–60:5, 142:13–24, 143:9–25, 145:16–146:13.

54.    That same day, the intimacy coordinator provided draft language for the nudity rider to Lively. Lively responded: "This is great! Thank you!" Ex. 59, 24–CV–10049_0001869. Talbot sent Lively's notes to the film's production attorney for inclusion in Lively's nudity rider. Ex. 60, 24–CV–10049_0001816.

**Plaintiff's Response 54:**    Undisputed.

55.    On or about May 8, 2023, Lively and Baldoni were provided with nudity riders detailing their consent and boundaries concerning intimate scenes. Ex. 61, WAYFARER–000122708 (Lively Nudity Rider); Ex. 62, 24–cv–10049_0001822 (Baldoni Nudity Rider).

**Plaintiff's Response 55:**    Undisputed that Lively was provided with an initial draft nudity rider but respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

56.    On May 5, 2023, IEWUM held a "Respect in the Workplace: Preventing Discriminatory Harassment & Retaliation" meeting. Ex. 63, WAYFARER_000140131 (production schedule as of 5/4/2023); Ex. 64 BALDONI_000003760, attaching Ex. 65, BALDONI_000003760; Ex. 66, WAYFARER_000142434. The training was administered by the

law firm Mitchell Silberberg & Knupp LLP. Ex. 67, WAYFARER_000142796. Heath and Baldoni both attended and completed that training in advance of filming. Ex. 5, Baldoni 10/6 Dep. Tr. 51:22 – 52:1–10. Ex. 4, Heath 10/8 Dep. Tr. 399:25 – 400:12.

**Plaintiff's Response 56:**     Disputed to the extent that it suggests the training was offered to or intended for cast or crew, that the training deck in evidence was the one that was provided, or that any cast or crew member was invited or attended, which the cited evidence does not support. Multiple cast members testified that they were unaware of any such training and did not attend it. Exs. 12, Slate Tr. 38:7–24, 57:25–58:20; 10, Ferrer Tr. 240:21–242:23; 13, Baker Tr. 46:9–47:15, 205:22–25; 281, Lively Tr. 220:19–221:21; Lively Decl. ¶ 26.

57.     During the first phase of filming, Wayfarer distributed a Preliminary Crew List to the crew that listed Wayfarer's Human Resources contact, Cynthia Barnes Slater. Ex. 68, 24–CV–10049_0002324.

**Plaintiff's Response 57:**     Undisputed that a preliminary crew list existed and listed Wayfarer's HR representative, Cynthia Barnes-Slater, but disputed that such list, or Ms. Barnes–Slater's contact information, was distributed to cast and crew, which the cited evidence does not support. Heath testified that Wayfarer "did not have an HR representative specifically for the movie," and he not recall whether he and Slater discussed her providing support to address cast or crew concerns in connection with the Film. Heath further testified that he did not know if cast and crew were ever informed that human resources concerns should be raised with these individuals. Multiple cast members testified that they did not know who to contact about complaints and believed they were required to report concerns to Heath. Heath testified that Wayfarer deferred human resources issues on the Film to Alex Saks, Jill Sacco, and Andrea Ajemian. Exs. 3, Heath

10/8 Tr. 128:17–134:2; 398:12–19; 12, Slate Tr. 38:15–24; 10, Ferrer Tr. 240:21–23, 242:4–12; 15, Saks Tr. 58:6–20.

58.    All cast and crew were provided daily call sheets on the evening before each day of filming, which included a hotline number for workplace complaints, including sexual harassment, that directed them to a third–party organization to assist with any complaints. Ex. 69, 24–CV–10049_0001427. Ex. 70, Carroll Dep. Tr. 191:1–3. Ex. 4, Heath 10/8 Dep. Tr. 138:22 – 139:2; Ex. 150, BL–000021729; *see also* Ex. 151, BL–000021725 (showing Lively received such call sheets).

**Plaintiff's Response 58:**    Undisputed that daily call sheets were provided before filming days, but disputed that the "hotline number" was "for workplace complaints, including sexual harassment," and "directed" any person to an organization "to assist with any" such complaints. The call sheets in Wayfarer Ex. 69 and Wayfarer Ex. 150 list a "safety hotline" with a number for "Vigilant EHS" (Environmental Health & Safety Anonymous Hotline). The cited materials do not state that the hotline was intended for reporting sexual harassment, nor that cast or crew were informed it could be used for such complaints. Heath testified that he did not know whether the hotline could be used to report sexual harassment, as opposed to physical safety concerns. Multiple cast members also testified that they were not aware of any harassment hotline. Wayfarer Ex. 151 does not include a call sheet or any reference to a call sheet. Exs. 3, Heath 10/8 Tr. 140:1–141:23; 12, Slate Tr. 38:22–24; 10, Ferrer Tr. 242:19–23; Lively Decl. ¶ 26.

59.    Filming began on May 15, 2023, and then stopped of June 14, 2023, in deference to labor strikes by the Writers Guild of America and SAG–AFTRA. Ex. 3, SAC ¶ 15; Ex. 24, Lively Dep. at 261:15–18; Ex. 71, WAYFARER_000141293.

**Plaintiff's Response 59:**    Undisputed.

24

60.     All filming during the first phase of filming took place on a set in New Jersey. Ex. 12, Giannetti Dep. at 236:17–19; Ex. 24, Lively Dep. at 261:11–12.

**Plaintiff's Response 60:**     Undisputed.

61.     None of Lively's sexually explicit scenes or scenes involving simulated nudity were rehearsed or filmed during this initial period. Ex. 58, Talbot Dep. at 73:18–24; Ex. 72, SPE_WF0000312 (Aug. 29, 2023 Message from Ange Giannetti "All of the romantic / sex scenes and abuse still need to be shot"); Ex. 11, Saks Dep. at 203:18–204:14. Those scenes were rehearsed and filmed during a later phase of filming, without issue or incident. *See* Section L, *infra*.

**Plaintiff's Response 61:**     Disputed. A scene involving simulated nudity, in which Lively's character gave birth was filmed in May 2023 and, unexpectedly due to Baldoni's same–day decision making, involved profile nudity as Lively was unclothed from the waist down with only a small piece of fabric covering her genitals. Further disputed to the extent it suggests that all scenes during the later phase of production were filmed with SAG compliant nudity riders in place. Exs. 16; 13, Baker Tr. 209:20–210:14; 14, Talbot Tr. 69:13–21, 86:7–16, 143:13–25, 145:16–146:17; 17, Robbins Tr. 82:20–83:9; Lively Decl. ¶¶ 14–15.

62.     A scene in which Lively's character gives birth was filmed on May 22, 2023. Ex. 73, 24–CV–10049_0003314 – 3321.

**Plaintiff's Response 62:**     Undisputed.

63.     Lively claims the birthing scene constituted an "intimate" scene because there was implied nudity. Ex. 3, SAC ¶¶ 87–89.

**Plaintiff's Response 63:**     Undisputed.

64.     Footage of the birthing scene shows Lively covered with a hospital gown and a prosthetic pregnancy belly. Ex. 74, WAYFARER_000140494.

**Plaintiff's Response 64:**    Disputed as incomplete and misleading. While certain footage of the birthing scene shows Lively wearing a hospital gown and a prosthetic pregnancy belly, production blocked and filmed the scene over several hours using multiple framings and angles, including angles that depicted Lively's side profile fully nude from the chest down. To obtain those shots, the hospital gown was positioned only to cover her breasts, with an exposed prosthetic belly and a small, thin piece of flat black fabric covering her genital area. During filming, Lively lay on her back with her legs placed in stirrups while a male actor—whom she later learned was a personal friend of Baldoni—stood positioned between her legs for the scene. Accordingly, the cited footage does not fully or accurately reflect the partial nudity, nudity–simulating blocking, and filming that occurred. Exs. 16; 13, Baker Tr. 209:20–210:14; 14, Talbot Tr. 69:13–21, 86:7–16, 143:13–25, 145:16-146:17; Lively Decl. ¶¶ 14–15; *see also* Wayfarer Ex. 91, at Resp. 23.

65.    Elizabeth Talbot, the intimacy coordinator for the first phase of filming, testified that, pursuant to SAG industry standards, "nudity" of the type that requires a rider is defined as "anything that would be seen underneath a bikini." Ex. 58, Talbot Dep. Tr. 99:7–100:5. Nudity riders are not typical for "implied nudity" where the actor is not physically nude but is portrayed as such. *Id.* at 100:10–101:18.

**Plaintiff's Response 65:**    Undisputed that Talbot's testimony included the quoted language, but disputed to the extent this testimony is interpreted to suggest that the birthing scene involved only "implied nudity" or would not have required a nudity rider. While Talbot testified regarding SAG industry definitions of nudity, she also explained that the birthing scene involved a "high hip" exposure that constitutes profile nudity, which would typically require a nudity rider. Talbot further testified that she did not discuss the birthing scene with Lively in advance because

Baldoni did not inform her that the scene would include profile nudity and instead told her that Lively would be in a hospital gown. Talbot testified that had she understood the scene would involve profile nudity, she would have discussed it with Lively and would have been present on set that day. Ex. 14, Talbot Tr. 69:13–21, 86:7–16, 143:13–147:17.

66.    Talbot also testified that she did not recall any nudity in the birthing scene. Although the birthing scene showed a "high hip line," Lively did not require or request a nudity rider for that exposure. Ex. 58, Talbot Dep. Tr. 69:18–23.

**Plaintiff's Response 66:**    Undisputed that Talbot testified that the birthing scene showed a "high hip line" and that Lively did not request a nudity rider in advance of the birthing scene. Otherwise disputed. While Talbot testified that she did not recall nudity in the birthing scene, she also explained that the scene involved a "high hip" profile, which constitutes profile nudity. Talbot further testified that Baldoni did not inform her that he intended the birthing scene to include profile nudity and instead represented that Lively would be in a hospital gown. Because neither Lively nor Talbot was informed that the scene would involve profile nudity—and because it was not reflected in the script—Lively did not request a nudity rider. Talbot testified that had she known the scene would involve profile nudity, she would have discussed it with Lively and would have been present on set that day. Wayfarer did not call Talbot to set on the day in which the birth scene was filmed. Ex. 14, Talbot Tr. 152:16–25, 69:13–23, 86:7–16, 143:13–17; Lively Decl. ¶ 13.

67.    The only intimate scene shot in the first phase of production involved two actors other than Lively and Baldoni (the two actors playing the young versions of Baldoni and Lively's characters) (the "Young Lily and Young Atlas intimate scene"). Ex. 58, Talbot Dep. Tr. 73:18–24; Ex. 75, Ferrer Dep. Tr. 67:13–15.

**Plaintiff's Response 67:**    Undisputed that the only simulated sex scene shot in the first phase of production did not involve Lively. Disputed to the extent that "intimate scenes" may also include profile nudity, which the birth scene shot in May 2023 did include. Exs. 14, Talbot Tr. 69:13–21, 86:7–16, 143:13–25, 145:16-146:17; 17, Robbins Tr. 82:20–83:9.

68.    Lively was not involved in or present during the filming of the Young Lily and Young Atlas intimate scene. Ex. 58, Talbot Dep. at 78:14–20; Ex. 75, Ferrer Dep. Tr. 39:5–10.

**Plaintiff's Response 68:**    Undisputed.

69.    On June 11, 2023, before the Young Lily and Young Atlas intimate scene was filmed, Baldoni flagged to the production team that they would need to coordinate and work with the intimacy coordinator. Ex. 76, BALDONI_000016437.

**Plaintiff's Response 69:**    Undisputed.

70.    Thereafter, and before the Young Lily and Young Atlas intimate scene was filmed, both actors signed nudity riders. Ex. 75, Ferrer Dep. Tr. 32:13–17; Ex. 77, 24–CV–10049_0001089. They rehearsed the intimate scene with the intimacy coordinator, Baldoni, and the Director of Photography in advance of filming. Ex. 75, Ferrer Dep. Tr. 32:9–33:5.

**Plaintiff's Response 70:**    Undisputed that the two actors signed nudity riders and rehearsed the intimate scene before filming. Disputed, however, that the actors rehearsed all intimacy in advance of filming. During the rehearsal, intimacy coordinator Talbot was surprised by certain requests Baldoni introduced that were not in the script for what was supposed to be a sensitive depiction of two minors' first sexual experience. For example, Baldoni directed Young Lily to lick cookie dough off a spoon and look up at her love interest, which Ferrer felt had an inappropriate adult sexual undertone. Baldoni also raised unscripted content and additional positions, including having "Young Lily" perform the scene in her underwear. Talbot had to

intervene and make clear that any underwear must be full–coverage, consistent with the nudity riders—which confirmed there would be no nudity—and that the scene had to remain within the established boundaries. Exs. 14, Talbot Tr. 169:25–172:19, 175:13–177:23, 188:22–192:16; 18; 19; 10, Ferrer Tr. 20:19–24, 68:3–9, 244:3–245:17; 246:14-248:14. Accordingly, although a rehearsal occurred, the cited materials omit that the intimacy coordinator had to correct and limit Baldoni's proposed unscripted additions to ensure compliance with the riders and industry standards.

71.    Following the filming of the scene, Isabela Ferrer, the actor playing the young version of Lively's character, wrote to the film's intimacy coordinator: "Thank you so much for your help!! You were incredible and given I've never done that before I felt like it was the easiest thing ever! So thank you !!" Ex. 75, Ferrer Dep. Tr. 109:7–13.

**Plaintiff's Response 71:**    Undisputed that the quoted language appears in the cited source, but respectfully refers the Court to the cited source for its complete contents and disputed as to any summary or interpretation inconsistent therewith. When questioned about this text at her deposition, Ferrer testified that the message accurately reflected how she felt at the time about working specifically with intimacy coordinator Talbot, while also noting other issues related to filming the intimate scene. Ferrer described how she felt uncomfortable when Baldoni commented, "that was hot," immediately following the intimate scene. On the same day, Ferrer stated that Baldoni proposed adding an unscripted scene in which Young Lily would lick cookie dough off a spoon while looking at her co-star in a sexually suggestive manner, which she considered inappropriate. Additionally, Ferrer testified that while en route to rehearse the intimacy scene, Baldoni pulled co-star Alex Neustaedter aside and said, "I really want you to get to know Isabela well," and winked at him, which made her uncomfortable and feel sexualized because she "had

just met Alex and that was my director and to insinuate something of that kind of manner I found to be inappropriate." Exs. 10, Ferrer Tr. 20:19–24, 68:3–9, 244:3–245:17; 246:14–248:14, 252:21–254:3, 283:24–284:9; 14, Talbot Tr. 188:25–192:16.

72.    Ferrer also wrote to Baldoni to thank him for an "incredible" experience on the set. She continued: "you are such a wonderful smart sincere director and you created such a comfortable safe space for me to feel like I could fully step into this role I couldn't have asked for a more welcoming environment. It will stay with me for the rest of my life!!" Ex. 78, BALDONI_000031938.

**Plaintiff's Response 72:**    Undisputed that the quoted language appears in the cited source, but respectfully refers the Court to the cited source for its complete contents and disputed as to any summary or interpretation inconsistent therewith. When questioned about this text at her deposition, Ferrer testified that at the time she wrote it, the statement accurately reflected her general feeling about the workplace environment. She explained that two things can coexist: feeling welcomed and supported while also experiencing inappropriate conduct. Ferrer further clarified that her comments were about the overall environment and creative support, not about specific incidents that later made her uncomfortable. She added: "I think that the things that he said to me definitely made it less welcoming, but, again, at the time it was my first film and I think I was just really happy to be there, so it is hard to differentiate when that's your experience." Ex. 10, Ferrer Tr. 254:4–257:13.

73.    In her Second Amended Complaint and deposition testimony, Lively points to various alleged incidents prior to or during this first phase of filming, which she alleges amounted to sexual harassment and contributed to a hostile work environment. *See generally*, Ex. 3, SAC; Ex. 24, Lively Dep. Tr.

**Plaintiff's Response 73:**    Undisputed.

74.    <mark>In her deposition, Lively claimed she was uncomfortable with comments Baldoni made to her in their initial meeting in December 2022, before she had even agreed or begun to work on the film. Ex. 24, Lively Dep. Tr. 28:24–25, 51:07–52:19. Baldoni flew to New York City to meet Lively for the first time to discuss the possibility of casting her in the film. They met in her penthouse apartment, where her family, and various household employees were also present.</mark> Ex. 24, Lively Dep. Tr. 28:15–21, 29:15–21.

**Plaintiff's Response 74:**    Undisputed that the meeting took place at Lively's apartment, but disputed that <mark>it is a penthouse</mark>, which is not accurate and which the evidence does not support.

75.    <mark>Lively was pregnant at the time. She and Baldoni had been discussing "different medical decisions people make these days, including circumcision for male babies," a question Lively herself may have introduced. Ex. 24, Lively Dep. Tr. 51:21–52:05. Baldoni talked about "the decision that [he and his wife] made for their child…and then he offered that he was circumcised."</mark> *Id.* at 52:07–09.

**Plaintiff's Response 75:**    Undisputed.

76.    <mark>Lively did not complain to Baldoni or anyone else affiliated with Wayfarer at that time about these comments. Ex. 24, Lively Dep. Tr. 54:22–55:14. Lively also does not recall mentioning these comments to her agent before she accepted the role.</mark> *Id.* at 55:15–17.

**Plaintiff's Response 76:**    Disputed. Lively told her husband and her agent about the comment but does not recall when. Ex. 281, Lively Tr. 52:23–53:2, 56:10–57:7.

77.    On February 28, 2023, after that initial meeting, Lively's husband, Ryan Reynolds, wrote to Baldoni: "<mark>We're also big fans [of you] over here. Since before we met, and more–so</mark>

after… thank you again for all you're doing. I happen to adore you, Justin." Ex. 79, RR–SUBPOENA–000000049 at –50.

**Plaintiff's Response 77:**    Undisputed that the quoted language appears in the cited source, but respectfully refers the Court to the cited source for its complete contents and disputed as to any summary or interpretation inconsistent therewith.

78.    On or around April 23, 2023, outside the workplace, and outside the presence of any Wayfarer Studios or IEWUM employee, Baldoni privately asked a personal trainer he had consulted with (who was working separately with Lively) what Lively would weigh when filming began. Ex. 3, SAC ¶ 106; Ex. 5, Baldoni 10/6 Dep. Tr. 73:7–15.

**Plaintiff's Response 78:**    Undisputed that Baldoni asked Lively's longtime personal trainer how much Lively would weigh when filming began, but otherwise disputed as incomplete and misleading. The cited testimony does not establish where Baldoni was located when he asked Lively's longtime personal trainer about her weight, nor does it identify who was present at the time. The testimony also does not support the assertion that this occurred "outside the presence of any Wayfarer Studios or IEWUM employee." To the contrary, Baldoni testified that he shared screenshots of this conversation with Mitz Toskovic, who is employed by Wayfarer as the VP of Operations. Exs. 20, Baldoni 10/6 Tr. 72:24–73:25; 3, Heath 10/8 Tr. 37:7–8; Saladino Decl. ¶¶ 9–10; Lively Decl. ¶¶ 7–8.

79.    Baldoni, who suffers from chronic back issues, asked in anticipation of a scene in which he was expected to lift her. Ex. 5, Baldoni 10/6 Dep. Tr. 296:23–297:10; *see also* Ex. 80, BL–000018761 at –62 (April 24, 2023 text from Lively to a friend, stating that Baldoni asked about her weight "[b]ecause he's worried about his back and bone density and wants to be sure he's ok to lift me up for our sex scenes").

**Plaintiff's Response 79:**    Disputed. The cited testimony does not state that Baldoni "suffers from chronic back issues," and Defendants identify no evidence supporting that assertion. Wayfarer Exs. 5 Baldoni 10/6 Dep. Tr. 296:23–297:10; 80, at BL–000018762.

80.    Documentary evidence shows that Baldoni contemplated including such a scene in the film as late as December 28, 2023. Ex. 81, BALDONI_000031127 at –28.

**Plaintiff's Response 80:**    Undisputed that the cited document includes a reference to a scene in which Ryle carries Lily. Lively respectfully refers the Court to the full document for its complete contents.

81.    Baldoni never made the same comment in Lively's presence or in the presence of any cast or crew member. Ex. 5, Baldoni 10/6 Dep. Tr. 296:23–297:10.

**Plaintiff's Response 81:**    Disputed as incomplete and misleading. The cited testimony does not indicate whether Baldoni made the same comment in Lively's presence or in the presence of any cast or crew member.

82.    The trainer, acting on his own, decided to share the comment with Lively. Ex. 82, BALDONI_000015397.

**Plaintiff's Response 82:**    Disputed. The cited source does not indicate whether the trainer was acting on his own when he decided to share the comment with Lively, and the evidence that Baldoni initiated the inquiry about Lively's weight supports an inference that the trainer shared the question as a result of Baldoni's inquiry and/or at his behest. Saladino Decl. ¶¶ 9–11.

83.    On or about April 25, 2023, Baldoni met with Lively at her apartment. Ex. 83, BL–000021593. Lively's husband, Ryan Reynolds, and two other famous friends were there. Reynolds chastised Baldoni for commenting on a woman's weight. Ex. 5, Baldoni 10/6 Dep. Tr. 297:4–7.

**Plaintiff's Response 83:**    Undisputed that Baldoni and Lively met on or about April 25, 2023, during which time Lively confronted Baldoni about asking her trainer about her weight. Disputed that "two other famous friends were there" during this discussion. Lively Decl. ¶ 8.

84.    Lively subsequently described the meeting to a friend as follows: "I had a 3 hour meeting w him today … He had a bit of that melt down today when I told him … he audibly sobbed … This man is terrified of women." Ex. 84, BL–000021593.

**Plaintiff's Response 84:**    Undisputed that the quoted language appears in the cited source, but respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

85.    Lively also alleged that Baldoni "sham[ed Lively] for her body and weight" by offering to connect her with a specialist in probiotics after Lively caught strep throat, because, Lively alleges, the expert "was instead a weight–loss specialist." Ex. 3, SAC ¶ 108. Lively has not offered any admissible evidence supporting that claim. She did not discuss it during her deposition, and she has not produced any documentary evidence indicating that the expert was a "weight–loss specialist." Documentary evidence shows that Baldoni discussed Lively's illness with the specialist, and not her weight. *See* Ex. 257, BALDONI_000026173.

**Plaintiff's Response 85:**    Undisputed as to the allegation of Lively's Second Amended Complaint and that Lively was not asked about this incident during her deposition. Otherwise disputed. Baldoni introduced Lively to his personal health coach, who Lively later learned specialized in weight loss and was eager to recommend for how she could "work on fat loss." Exs. 21 at BENSON_0008; 22 at BL–000008819–20; Lively Decl., ¶¶ 5–6.

86.    In late April 2023, before filming began, Sony executive Ange Giannetti encouraged Baldoni to shoot an R–rated film to reflect the content of the book. In April 28, 2023,

she wrote: "I will [update] sony you are going to try and get as much tasteful hot sex as you can … You find out if we are pg–13 will colleen be ok and does she think her readers will be ok?" Ex. 84, BALDONI_000018544.

**Plaintiff's Response 86:**    Undisputed that Giannetti sent a text message to Baldoni on the specified date containing that language. Otherwise disputed. Wayfarer Ex. 84 does not show that Giannetti encouraged Baldoni to shoot an R–rated film. Instead, Wayfarer Ex. 84 reflects that Baldoni stated he would "do everything [he] can to shoot an R film." Nothing in Wayfarer Ex. 84 attributes this suggestion to Giannetti, Sony, or anyone else. Wayfarer Ex. 84 also does not support the proposition that an R–rated film would reflect the content of the book. In fact, Hoover stated she does not believe the book "is filled with sex," contradicting the Defendants' implication that an R–rating was required "to reflect the content of the book." Wayfarer Ex. 85; *see also* Exs. 15, Saks Tr. 173:3–175:3; 8 at AS000702 ("Making this film PG-13 has proven without a doubt to be what's best for the film and the audience.").

87.    Baldoni discussed Giannetti and Sony's suggestion about additional and more explicit sex scenes with Lively and Colleen Hoover. Ex. 85, BALDONI_00018780.

**Plaintiff's Response 87:**    Disputed. Wayfarer Ex. 85 reflects a discussion between Baldoni and Hoover regarding the character's emotional connection and sex scenes but also does not reflect a discussion of "explicit sex scenes" or any suggestion from Giannetti. Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

88.    On or about May 4, 2023, Baldoni worked with Elizabeth Talbot, the film's intimacy coordinator, to add specifics to the intimate scenes. Ex. 55, BALDONI_00010363. He suggested Talbot discuss the scenes with Lively to determine how to portray more sexual intimacy

in a manner consistent with Lively's personal boundaries and preferences. Ex. 57, BALDONI_000010377.

**Plaintiff's Response 88:**    Undisputed that Wayfarer Ex. 55 includes notes on intimate scenes but disputed to the extent Wayfarer Ex. 55 is construed as identifying all intimate scenes filmed. It is further disputed that Wayfarer Ex. 57 reflects any suggestion by Baldoni that Talbot "discuss the scenes with Lively to determine how to portray more sexual intimacy in a manner consistent with Lively's personal boundaries and preferences." Wayfarer Ex. 57 instead reflects Baldoni's "random thought" that "most sex scenes have some sort of breast touching and they can be used as a way to cover the breast as well," his concern about the film "becoming too PG–13," and his comment that "it may be just worth that conversation of what she's comfortable with versus it actually coming from me . . . so I wonder if that should be something that you discussed versus put in writing." Ex. 14, Talbot Tr. 141:2–142:12.

89.    On or about May 5, Lively and Talbot exchanged messages indicating that the scenes would be revised consistent with Lively's preferences. Ex. 56, BL–000013564.

**Plaintiff's Response 89:**    Disputed. Wayfarer Ex. 56 does not support the characterization that the scenes "would be revised consistent with Lively's preferences." The messages in Wayfarer Ex. 56 reflect only proposed revisions and do not indicate that any changes were agreed upon or implemented.

90.    Lively claims that Baldoni explained his proposed addition of a sex scene featuring a simulated simultaneous orgasm by stating that he and his wife experienced climax at the same time and asked if Lively and her husband did the same; that he mentioned a previous addiction to pornography; and that he commented that some of the most precious experiences with his wife

were bringing her to orgasm without reciprocation. Ex. 24, Lively Dep. Tr. 132:16–133:4, 137:6–10.

**Plaintiff's Response 90:**    Undisputed.

91.    Lively then told Baldoni she had never seen pornography. Ex. 24, Lively Dep. Tr. 137:11–24.

**Plaintiff's Response 91:**    Undisputed.

92.    Such discussion took place in the context of planning and choreographing a sex scene. Lively first volunteered her own personal experience before Baldoni shared his. Ex. 8, Baldoni 10/7 Dep. Tr. 174:25–177:20.

**Plaintiff's Response 92:**    Disputed. This discussion took place in the context of Lively expressing to Baldoni her "discomfort with the fact that . . . scenes had become more gratuitous" and that they felt "in some cases somewhat pornographic." Lively Tr. 131:16–136:17. In the context of that "creative discussion"—not choreography—Baldoni volunteered that "he and his wife orgasm at the same time and asked [Lively] if [her] husband and [she] do the same." *Id.* After Baldoni's "disturbing departure into personal conversations," Lively disclosed that she had never seen pornography "as a deflection." *Id.*

93.    Baldoni has publicly discussed his prior addiction to pornography on his podcast, which is aimed at male audiences, and in his published books. Ex. 8, Baldoni 10/7 Dep. Tr. 76:7–77:9.

**Plaintiff's Response 93:**    Undisputed.

94.    Lively claims that sometime in May 2023, Baldoni told other members of the cast and crew that she had never seen pornography. Ex. 24, Lively Dep. Tr. 139:2–140:9.

**Plaintiff's Response 94:**    Undisputed.

95.     On one occasion, on or about May 16, 2023, Heath entered Lively's make–up trailer while she was having her make–up removed. They had a brief conversation concerning a work–related issue. Ex. 24, Lively Dep. Tr. 126:12–129:16 (indicating the conversation was five minutes); Ex. 4, Heath 10/8 Dep. Tr. 212:06–07 (indicating that the conversation was between two and three minutes).

**Plaintiff's Response 95:**     Undisputed that Heath entered Lively's makeup trailer on May 16, 2023, and that Lively was "having her make–up removed" but otherwise disputed as incomplete and misleading. Lively was having her body makeup—not facial makeup—removed at the time. The conversation concerned issues that arose on the first day of filming, including Baldoni's comments about Lively's appearance. Exs. 281, Lively Tr. 123:2–124:24, 126:12–131:2; 23, Carroll Tr. 53:11–55:23, 56:6–57:18, 59:16–61:25; 13, Baker Tr. 71:25–72:24, 74:8–13, 77:10–78:2.

96.     Heath had been seeking to schedule a meeting with Lively, Baldoni, and Giannetti after several failed attempts. At the end of the shooting for the day, Heath suggested that they meet the following day. Lively said they could meet her at her makeup trailer to discuss the timing for the meeting. Ex. 4, Heath 10/8 Dep. Tr. 209:09–210:16.

**Plaintiff's Response 96:**     Disputed as incomplete and misleading. On the second day of filming, May 16, 2023, Lively requested a meeting with the production team. "[T]hat meeting was very important to [Lively] because it was to discuss other behavior [she] had experienced earlier that day that was concerning to [her]." Heath arrived unannounced at Lively's hair and makeup trailer while her team, Anne Carroll and Vivian Baker, was removing her body makeup. Lively was wearing only a thong, with her breasts exposed. Exs. 281, Lively Tr. 123:2–124:24,

126:12–131:2; 23, Carroll Tr. 53:11–55:23, 56:6–57:18, 59:16–61:25; 13, Baker Tr. 71:25–72:24, 74:8–13, 77:10–78:2.

97.　　Heath knocked on Lively's trailer door and Lively permitted him to come in. Ex. 4, Heath 10/8 Dep. Tr. 210:19–23; *see also* Ex. 24, Lively Dep. Tr.at 127:17–21 ("That meeting was very important to me…so I said 'Okay, fine, you can come in.'").

**Plaintiff's Response 97:**　　Disputed. When Heath knocked on the trailer door, Lively, Carroll, and Baker, screamed "whoa, whoa, whoa" and "no, no, no," and "don't come in." Heath entered anyway. Lively told Heath that she was undressed and would be out in a minute, but Heath said "if we don't meet now, we can't do that meeting." Lively "wasn't comfortable with [Heath coming in] in the first place" but said "okay, you can come in" on the condition that Heath not look at her. Exs. 281, Lively Tr. 123:2–124:24, 126:12–131:2;  23, Carroll Tr. 53:11–55:23, 56:6–57:18, 59:16–61:25; 13, Baker Tr. 71:25–72:24, 74:8–13, 77:10–78:2, 154:9–17 (". . .before the door was opened, we were screaming, 'Don't come in.'. . ."); 24, Heath 10/9 Tr. 145:16–147:7 ("She asked me to look away, so whatever she was doing, she didn't want me to. . . Sure. Q And what she was doing was something that had to do with her breasts being exposed or involved? A Okay.").

98.　　Lively asked Heath to turn around while he was speaking to her and he did. Ex. 24, Lively Dep. Tr.at 127:22–25 ("And he came in and I said, 'Okay, you can come in, but please don't look. Can you turn around?' So he turned around and faced the wall."); *see also* Ex. 4, Heath 10/8 Dep. Tr. 211:21–212:1 ("As I took a step up, I saw that she was leaned back. She looked what I though was either maybe breastfeeding or nursing. I said to her, oh, it looks like you're busy, I can come back. As I turned around she says, no, that's okay. You can come in, just look away. And I said sure.").

**Plaintiff's Response 98:**    Undisputed that Lively directed Heath to turn around and that he initially did so. Disputed that Heath faced away from Lively throughout the conversation, during which he stared "straight at [her]" and looked at her exposed breasts. Lively confronted Heath in the moment, and he admitted looking at her, saying "Oh, oh, sorry I like to make eye contact with people when I talk to them." Lively told Heath he had to leave, and at that point he did. Exs. 281, Lively Tr. 123:2–124:24, 126:12–131:2; 24, Heath 10/9 Tr. 145:16–147:7.

99.    Lively has testified that Heath subsequently glanced at Lively through a mirror despite agreeing to turn away while they spoke. Ex. 24, Lively Dep. Tr. 129:1–8.

**Plaintiff's Response 99:**    Disputed that Heath "subsequently glanced" at Lively through a mirror. Lively testified that she was sitting in front of a mirror when Heath insisted on entering her trailer. She told him "please don't look" and to turn around and face the wall. Lively turned to Heath and saw he was staring straight at her while her breasts were exposed and she was wearing only a thong and no longer facing the wall. Ex. 281, Lively Tr. 126:12–131:2.

100.    Two weeks after the incident occurred and months before this litigation arose, Lively raised the incident with Heath for the first time. She told Heath: "I asked you to look away and at some point you made eye contact with me….I'm not saying you were trying to cop a look. I'm just saying that I had asked you to turn away and you made eye contact with me." After expressing her displeasure, Lively moved on to other topics. Ex. 4, Heath 10/8 Dep. Tr. 223:12–25.

**Plaintiff's Response 100:**    Disputed. Lively raised her concerns with Heath looking at her exposed chest without consent immediately upon realizing he was doing so.  Lively Tr. 123:4–131:2.  Lively promptly instructed: "You need to leave." *Id.*  The next day, she confronted Heath to advise him that his conduct was inappropriate.

101.    A scene in which Lively's character gives birth was filmed on or around May 22, 2023. Ex. 73, 24–CV–10049_0003314 – 3321.

**Plaintiff's Response 101:**    Undisputed.

102.    While shooting the scene, Lively was wearing a hospital gown, a prosthetic belly, and fabric over her genitals. Ex. 74, video clip excerpt of WAYFARER_000140494; Ex. 91, Lively's Second Amended Responses to Wayfarer Studios LLC's Second Set Of Interrogatories, No. 23 (Oct. 9. 2025).

**Plaintiff's Response 102:**    Disputed. While Lively wore a hospital gown, prosthetic belly, and a piece of fabric over her genital area, the video clip in Wayfarer Ex. 74 does not accurately reflect the manner in which the scene was filmed. During the filming of the birth scene, production filmed multiple camera angles, including one depicting Lively's side profile fully nude from the chest down. A hospital gown was strategically placed only to cover Lively's breasts, with the prosthetic belly exposed, and she wore only a small, thin, flat piece of black fabric below her waist to cover her genitalia. *See* Exs. 16; 23, Carroll Tr. 89:6–19; 14, Talbot Tr. 69:13–21, 86:7–16, 143:13–25; 17, Robbins Tr. 82:20–83:9; Lively Decl. ¶¶ 14–16.

103.    Lively alleged that an actor Baldoni knew was cast as the doctor performing the delivery. SAC ¶ 89.

**Plaintiff's Response 103:**    Undisputed.

104.    The actor playing the doctor was a local union actor. Heath Decl. ¶23.

**Plaintiff's Response 104:**    Disputed that the cited evidence is admissible and sufficiently that the actor playing the OBGYN was a "local union actor."

105.    Lively has subsequently alleged that Steve Sarowitz was present on set during the birthing scene. Ex. 3, SAC ¶ 89; Ex. 24, Lively Dep. Tr. 50:2–8.

**Plaintiff's Response 105:**    Undisputed.

106.    Sarowitz testified that he was not on set during the filming of the birthing scene. Ex. 6, Sarowitz Dep. Tr. 169:24–25, 172:20–173:3, 211:16–18, 255:13–17; *see also* Ex. 86, SAROWITZ_000000 at –899–900. He arrived later, after the scene was filmed. Ex. 6, Sarowitz Dep. Tr. 173:10–12.; Ex. 11, Saks Dep. Tr.at 46:4–47:17; Ex. 4, Heath 10/8 Dep. Tr. 197:4–16. In fact, he only visited the set twice. Ex. 6, Sarowitz Dep. Tr. 120:25–121:2, 230:16–21. He visited briefly for part of one day and just a few minutes on another day, which happened to be the day the birthing scene was shot. Ex. 6, Sarowitz Dep. Tr. 319:25–320:3, Tr.at 173:4–12. Vivian Baker, Lively's makeup artist, for example, testified that she does not recall seeing Sarowitz on set and does not recall meeting him during production. Ex. 87, Baker Dep. Tr. 149:21–150:2.

**Plaintiff's Response 106:**    Undisputed as to Sarowitz and Baker's testimony. Disputed as to the remainder. Lively recalls Sarowitz being on set during the birthing scene. In response to whether he was "essential crew" to be on set that day, Sarowitz stated: "While I might have technically been non–essential, I did invest $30 million and paid for her salary, or at least my share of it, as well as the other actors, and I consider that to be essential. Lively considers that not to be essential, she can send me a check. I can give her an address or you could give it to her." Exs. 11, Sarowitz Tr. 168:24–171:5; Lively Decl. ¶ 12.

107.    Sarowitz later spoke to Adam Mondschein—who appeared in the birthing scene—regarding events on set. Mondschein did not raise anything negative about his experience on set and shared a positive experience. Ex. 6, Sarowitz Dep. Tr. 235:9–236:25. He confirmed that Sarowitz was not on set during the filming of the scene. Ex. 6, Sarowitz Dep. Tr.at 236:6–238:7.

**Plaintiff's Response 107:**    The Defendants' assertion is unsupported by any admissible evidence, as Sarowitz's testimony was based entirely on inadmissible hearsay. FRE 801(c), 802.

42

108.    Sarowitz did not know what scenes were being filmed at any given time. Ex. 6, Sarowitz Dep. Tr.at 172:21–22. And he made no conscious decision to see Lively in any particular scene while shooting. Ex. 6, Sarowitz Dep. Tr.at 172:22–173:3. Sarowitz did not know the birthing scene was being shot on the day it was shot. Ex. 6, Sarowitz Dep. Trat. 173:7–12.

**Plaintiff's Response 108:**    Disputed. Sarowitz was aware that the birthing scene would be filmed on May 22, 2023. On May 15, 2023, Sarowitz's Chief of Staff emailed Wayfarer that Sarowitz wanted to come to set on May 22, 2023, and on May 21, 2023, Sarowitz's Chief of Staff was sent the call sheet showing that the birthing scene would be filmed the next day. Ex. 25.

109.    During his first visit on set, Sarowitz spoke to Brandon Sklenar. Sklenar was effusive in his praise for Baldoni, his directing, Wayfarer, and how he had been treated in general. Ex. 6, Sarowitz Dep. Tr.at 232:16–24, 233:6–9.

**Plaintiff's Response 109:**    The Defendants' assertion is unsupported by any admissible evidence, as Sarowitz's testimony was based entirely on inadmissible hearsay. FRE 801(c), 802.

110.    During that first visit, Sarowitz also spoke to Lively for a minute or two. It was a very friendly meeting, and she did not voice any complaints. Ex. 6, Sarowitz Dep. Tr.at 234:10–235:7.

**Plaintiff's Response 110:**    Undisputed. Sarowitz testified as set forth above, but Lively respectfully refers the Court to the deposition transcript for its complete contents.

111.    Sarowitz has never said anything to Lively that she felt was inappropriate or made her uncomfortable. Ex. 24, Lively Dep. Tr.at 49:23–50:1.

**Plaintiff's Response 111:**    Undisputed.

112.    Lively has never discussed with Sarowitz her claims of sexual harassment. Ex. 24, Lively Dep. Tr.at 49:20–22.

**Plaintiff's Response 112:**    Undisputed.

113.    On or about May 18, 2023, Baldoni commented that actor Jenny Slate looked "sexy" in her character's wardrobe, which included black leather pants. Ex. 13, Slate Dep. Tr. 51:14–18; Ex. 11, Saks. Dep. Tr. 104:6–15; Ex. 8, Baldoni 10/7 Dep. Tr. 203:12–23. He made this comment in the presence of others, during the course of their work on the film. *Id.*

**Plaintiff's Response 113:**    Undisputed that Baldoni told Slate she "looked sexy." The remainder is disputed as incomplete and misleading. Baldoni told Slate, "I can say this because my wife is here, but you look sexy in what you're wearing." Exs. 12, Slate Tr. 51:16–54:7; 4, Baldoni 10/7 Tr. 202:8–203:17. Slate testified that she felt Baldoni was sexualizing her and explained that his comment "was about me, not my character. It wasn't useful for my work. It wasn't anything I wanted. It was unwanted and had no place, in my professional experience." Ex. 12, Slate Tr. 51:16–54:7.

114.    On or about May 23, 2023, Lively testified that she wore a low–cut dress under a coat to rehearsal, and when the coat fell open to expose the dress, Baldoni commented "I like your outfit" and gestured to his chest. Ex. 24, Lively Dep. Tr.at 83:16–85:09, 191:13–192:4.

**Plaintiff's Response 114:**    Undisputed that on May 23, 2023, Lively was on set for rehearsal and was wearing a jacket over a dress with a lower–cut neckline, which she wore to facilitate breastfeeding. The remainder is disputed as incomplete and misleading because the cited testimony is taken out of context. Baldoni's comment occurred before rehearsal began, after Lively bent down to pick something up and her jacket fell open, revealing her dress and cleavage. When the jacket opened, Baldoni said, "I like your outfit," while making a back–and–forth gesture across the chest area, which Lively interpreted as referring to her chest. Lively had worn the same outfit all day, but Baldoni's comment specifically occurred only after her jacket opened and exposed her

cleavage, not when he first saw her outfit earlier in the day. Ex. 281, Lively Tr. 83:16–91:11, 92:18–97:14.

115.    Also on May 23, 2023, Baldoni commented that her character's outfit was "sexy" or "hot." Ex. 24, Lively Dep. Tr. 100:18–102:25.

**Plaintiff's Response 115:**    Undisputed that Baldoni used the quoted words but otherwise disputed as incomplete and misleading because the cited testimony omits critical context. On May 23, 2023, while shooting a bar scene in the presence of crew and multiple actors, Baldoni pressured Lively to remove her jacket to expose the partially unzipped "onesie" she was wearing underneath that revealed her lace bra. Lively removed her coat and, looking at her, Baldoni said, "pretty hot," in a tone that made Lively feel "on display" and uncomfortable. Lively responded "that's not what I was going for." Baldoni responded stating, "sexy?," to which Lively responded "neither." Slate observed this interaction, perceiving Baldoni's comments as about Lively's body. She stated to Baldoni" that "comments about actors' bodies and their wardrobes…ranged from irrelevant or unnecessary to [] inappropriate and distracting" and "we're just not doing this anymore." Ex. 12, Slate Tr. 42:7–44:18 ("A. I felt that it was about her body"); 281:16–283:23. Baldoni responded by rolling his eyes and stating, "Sorry. I missed the sexual harassment training," before "walking away in a huff." Exs. 281, Lively Tr. 101:5–103:5, 113:1–11; 4, Baldoni 10/7 Tr. 230:2–232:16; 12, Slate Tr. 58:23–59:8, 89:16–20; *see also* Wayfarer Ex. 281 at 20230523–IEWU–PPD7 at 12:36:45–12:37:42.

116.    Video footage of the incident shows Lively was fully dressed in an oversized fleece "onesie" at the time, that numerous actors and crew were also present and engaged in ongoing work at time, that Baldoni's facial expression was neutral and not ogling or suggestive, and that,

after Baldoni apologized if his remark was inappropriate, Lively responded by saying "All good." Ex. 281, video clip excerpt of WAYFARER_000140494.

**Plaintiff's Response 116:** Disputed as incomplete and misleading because the footage in Wayfarer Ex. 281 omits critical context. On May 23, 2023, while shooting a bar scene in the presence of crew and multiple actors, Baldoni pressured Lively to remove her jacket to expose the partially unzipped "onesie" she was wearing underneath that revealed her lace bra. Lively removed her coat and, looking at her, Baldoni said, "pretty hot," in a tone that made Lively feel "on display" and uncomfortable. Lively responded "that's not what I was going for." Baldoni responded stating, "sexy?," to which Lively responded "neither." Slate observed this interaction, perceiving Baldoni's comments as about Lively's body. She stated to Baldoni" that "comments about actors' bodies and their wardrobes…ranged from irrelevant or unnecessary to [] inappropriate and distracting" and "we're just not doing this anymore." Ex. 12, Slate Tr. 42:7–44:18 ("A. I felt that it was about her body"); 281:16–283:23. Baldoni responded by rolling his eyes and stating, "Sorry. I missed the sexual harassment training," before "walking away in a huff." Exs. 281, Lively Tr. 101:5–103:5, 113:1–11; 4, Baldoni 10/7 Tr. 230:2–232:16; 12, Slate Tr. 58:23–59:8, 89:16–20; *see also* Wayfarer Ex. 281 at 20230523–IEWU–PPD7 at 12:36:45–12:37:42.

117.    Lively has testified that, sometime in late May 2023, Heath "very briefly" showed Lively an image of his wife giving birth. Ex. 24, Lively Dep.at 188:17–190:21. Lively said she stopped watching the video because there was "a naked woman" in it. *Id*.

**Plaintiff's Response 117:** Undisputed that the quoted language appears in Lively's deposition, but Lively respectfully refers the Court to the deposition transcript for its complete contents.

118.    Heath and his wife had a home birth for their younger daughter, using a birthing tub. Ex. 4, Heath 10/8 Dep. Tr. 179:23–180:7.

**Plaintiff's Response 118:**    Undisputed.

119.    Baldoni had asked Heath to show Lively a video of the experience—which Baldoni had previously seen—showing Heath and his wife in a birthing tub, surrounded by their family. Ex. 8, Baldoni 10/7 Dep. Tr. 300:15–301:18; Ex. 12, Giannetti Dep. Tr. 120:19–23. Baldoni wanted to share the video in connection with his discussions with Lively about a birthing scene in the film. Ex. 12, Giannetti Dep. Tr. 123:9–12; Ex. 70, Carroll Dep. Tr.at 109:1–2.

**Plaintiff's Response 119:**    Undisputed that Baldoni asked Heath to show Lively the birth video. Disputed that Heath showed Lively the portion of the video depicting Heath and his wife surrounded by their family. Also disputed that Heath sharing that video had any relation to the birth scene, filming of which had completed the day before, or was done in the context of related discussions. On May 23, 2023, the day after filming of the Birth Scene, Heath approached Lively while she was eating lunch and, without warning, started playing a video of a naked woman. Lively recalls seeing a woman "fully exposed." Lively initially believed that Heath was attempting to show her pornography, but he then explained it was a video of his wife giving birth. Lively asked Heath to stop playing the video and inquired if he had his wife's consent to share it, to which Heath replied, "she isn't weird about this stuff." Lively was disturbed and unsettled that Heath would show her the video at work. Exs. 281, Lively Tr. 188:17–190:21; 3, Heath 10/8 Tr. 191:23–192:4; 13, Baker Tr. 118:2–119:2; 26 at BL-000021685.

120.    Heath testified that he showed Lively a video depicting: "our midwife, my sister, my kids, my wife, myself, our newborn baby. I believe we were singing or praying." Heath and

his wife were in a birthing tub with the baby, who was covered in a towel. Ex. 4, Heath 10/8 Dep. Tr. 179:23–180:25.

**Plaintiff's Response 120:**     Undisputed that Heath testified that he showed Lively a video depicting "our midwife, my sister, my kids, my wife, myself, our newborn baby. I believe we were singing or praying." The remainder is disputed as incomplete and misleading. Multiple parts of the birth were filmed, including before, during, and after the baby was born, during which Heath's wife's nude body is visible. Lively recalls seeing a woman "fully exposed." 281, Lively Tr. 188:17–190:21; 3, Heath 10/8 Tr. 191:23–192:4; 13, Baker Tr. 118:2–119:2; 26 at BL-000021685.

121.     Ange Giannetti, a Sony executive associated with the production, testified that shortly after viewing the image, Lively briefly mentioned to Giannetti that she was "very unhappy" about being shown the video as she was walking by Giannetti at lunch. Ex. 12, Giannetti Dep. Tr. 121:05–10. Giannetti testified that Lively "said [her comment] to me and kept walking." *Id.*

**Plaintiff's Response 121:**     Undisputed that the quoted language appears in Giannetti's deposition, but Lively respectfully refers the Court to the deposition transcript for its complete contents.

122.     Lively did not ask Giannetti to take any action concerning the image. Ex. 12, Giannetti Dep. Tr. 122:03–04.

**Plaintiff's Response 122:**     Undisputed that in the immediate moments after Heath showed Lively the video on May 23, 2023, as Lively was walking away, Lively did not ask Giannetti to take any action. The remainder is disputed as incomplete and misleading because it omits critical subsequent events. On May 26, 2023, Lively had a 45–minute conversation with Sony's Giannetti, who was in Los Angeles at the time, about filing a complaint with Sony's HR

department about the on–set conduct. Lively shared with Giannetti her concerns about Baldoni's comments about her body and Heath's decision to show her a video of a naked woman. Lively told Giannetti that she "felt like the set was untenable and unruly and that there was no structure, and that there was no one in charge, and that the people who were in charge were misbehaving, and that [she] felt like [she] had nowhere to go." Giannetti told Lively that she had to report her grievances directly to Wayfarer. After Lively told Giannetti that she wanted to file an HR complaint, Giannetti reported Lively's complaints to Baldoni and Heath (without Lively's consent). Even though Sony's own policies and procedures mandated otherwise, Giannetti did not report Lively's harassment complaints to Sony's HR, and Sony did not conduct any investigation into Lively's harassment complaints. Exs. 281, Lively Tr. 76:3– 80:20; 2, Giannetti Tr. 108:24– 114:9, 116:1–117:25, 132:1–135:6; 27 at BL–000007954; 3, Baldoni 10/7 Tr. 180:2–185:22; 17, Robbins Tr. 93:13–94:8, 220:18–221:5; Wayfarer Ex. 92.

123.    Giannetti did not believe there was any reason to take any action. Ex. 12, Giannetti Dep. Tr. 122:06–07.

**Plaintiff's Response 123:**    Undisputed but Lively respectfully refers the Court to the deposition transcript for its complete contents. Even though Sony's own policies and procedures mandated otherwise, Giannetti did not report Lively's harassment complaints to Sony's HR, and Sony did not conduct any investigation into Lively's harassment complaints. Ex. 17, Robbins Tr. 93:13–94:8, 220:18–221:5.

124.    Giannetti testified that Heath showed her the image as well. She said that it depicted "a woman in a tub giving birth" with "someone[] behind her, holding her." She did not see "a baby crowning" or "any genitalia" in the image. Ex. 12, Giannetti Dep. Tr. 122:7–22.

**Plaintiff's Response 124:**    Disputed that Heath showed Giannetti "the image," to the extent that refers to the same material that Heath showed to Lively. Giannetti does not know if the video Heath showed her was the same video that Lively saw. Ex. 2, Giannetti Tr. 122:20–25.

125.    Giannetti believed the interaction was "a misunderstanding…a mistake" based on miscommunications between Baldoni, who told Heath to show the image, and Heath, who believed Lively was prepared to view it in the context of their work. Ex. 12, Giannetti Dep. Tr. 124:21–125:02.

**Plaintiff's Response 125:**    Undisputed that Giannetti believed the interaction described in paragraph 124 immediately above, as conveyed to her, represented a misunderstanding.

126.    Lively also alleges that, during the first phase of filming, while riding in a car with Lively, her assistant, and her driver, Baldoni stated that he had not always obtained consent before sex. Ex. 3, SAC ¶ 93.

**Plaintiff's Response 126:**    Undisputed.

127.    Baldoni was not questioned about this incident during two days of depositions.

**Plaintiff's Response 127:**    Undisputed.

128.    He recalls a conversation with Lively in which he told her about his own experience of having a romantic partner go beyond his personal boundaries of consent. Decl. of Justin Baldoni ("Baldoni Decl.) at ¶3.

**Plaintiff's Response 128:**    Undisputed.

129.    Baldoni has written about this experience in his published books and discussed in in public talks. Ex. 8, Baldoni 10/7 Dep. Tr. 20:2–18, 22:22–23:11, 27:16–22; Baldoni Decl. ¶4.

**Plaintiff's Response 129:**    Undisputed.

130.    Lively's subsequent conduct confirms Baldoni's account. In her "protections" demands, she objected to Baldoni referring to "personal times that physical consent was not given in sexual acts, as either the abuser *or the abused*." Ex. 88, BL–000026031 (emphasis added). In a subsequent text exchange with Taylor Swift, Lively linked Baldoni's comment about consent to an article in which Baldoni disclosed his experience as a victim of sexual abuse to the press. Ex. 89, BL–000021208.

**Plaintiff's Response 130:**    Undisputed that Lively objected to Baldoni referring to "personal times that physical consent was not given in sexual acts, as either the abuser *or the abused*" and that Lively shared an article with Swift about Baldoni. Disputed that "Lively's subsequent conduct confirms Baldoni's account" to the extent that it is inconsistent with the testimony of Lively's security detail that during an April 2023 car ride from New York to New Jersey with Lively, Baldoni divulged to Lively that "women had forced themselves on him" and he had "forced himself on women" and did so "even when they said no or did not consent." Exs. 28, Security Tr. 44:19–46:4; 46:12–47:9; 87:12–90:8; 92:23–93:10; 29.

131.    On or about May 26, 2023, Lively and her baby contracted COVID on set. Ex. 90, BL–000011538.

**Plaintiff's Response 131:**    Undisputed.

132.    Other cast and crew members also got COVID. Ex. 24, Lively Dep. Tr. 184:1–8.

**Plaintiff's Response 132:**    Undisputed.

133.    Lively included her COVID exposure in her list of incidents that required "protections," as discussed below, and also alleges it as part of her harassment claims. Ex. 88, BL–000026031; Ex. 3, SAC ¶109.

**Plaintiff's Response 133:**    Undisputed.

134.     On or about May 26, 2023, while out with COVID, Lively spoke with Ange Giannetti, the Sony executive assigned to the film, about various issues. Ex. 3 SAC ¶¶ 8, 120, 132; Ex. 12, Giannetti Dep. Tr. 109:4–112:16. These included the First Assistant Director on the set (a woman); an instance in which Heath showed Lively an image from a video taken of his wife at or around the time she had given birth; Baldoni's allegedly "inappropriate comments"; and scheduling issues. Ex.92, BL000033431.

**Plaintiff's Response 134:**     Undisputed that on May 26, 2023, while out with COVID, Lively spoke with Giannetti about concerns including the First Assistant Director, Heath showing her a video of his nude wife giving birth, and Baldoni's comments that she looked "sexy" and "hot." Disputed to the extent it suggests these were the only concerns raised by Lively during that call. Lively shared with Giannetti her concerns about Baldoni's comments about her body and Heath's decision to show her a video of a naked woman. Lively told Giannetti that she "felt like the set was untenable and unruly and that there was no structure, and that there was no one in charge, and that the people who were in charge were misbehaving, and that [she] felt like [she] had nowhere to go." Giannetti told Lively that she had to report her grievances directly to Wayfarer. Exs. 281, Lively Tr. 76:3–80:20; Wayfarer Ex. 92.

135.     In an email on the same date, Lively asked Giannetti to first "tackle the 1st [Assistant Director] issue" and then turn to other "leadership" issues on the set. Ex. 93, BL–000007955 at – 56. Lively's email did not mention "sexual harassment" or "discrimination" or make any accusation that any conduct rising to that level had occurred.

**Plaintiff's Response 135:**     Undisputed that the document reflects the quoted language in the first sentence. Disputed as to the second sentence to the extent it suggests that Lively was required to use specific buzz words like "sexual harassment" or "discrimination" or that Lively

had not made "any accusation that any conduct rising to that level had occurred." On May 26, 2023, Lively had a 45–minute conversation with Sony's Giannetti, who was in Los Angeles at the time, about filing a complaint with Sony's HR department about the on–set conduct. Lively shared with Giannetti her concerns about Baldoni's comments about her body and Heath's decision to show her a video of a naked woman. Lively told Giannetti that she "felt like the set was untenable and unruly and that there was no structure, and that there was no one in charge, and that the people who were in charge were misbehaving, and that [she] felt like [she] had nowhere to go." Giannetti told Lively that she had to report her grievances directly to Wayfarer. After Lively told Giannetti that she wanted to file an HR complaint, Giannetti reported Lively's complaints to Baldoni and Heath (without Lively's consent). Exs. 281, Lively Tr. 76:3–80:20; 2, Giannetti Tr. 108:24–114:9, 116:1–117:25, 132:1–135:6; 27, at BL–000007954; Wayfarer Ex. 92; 4, Baldoni 10/7 Tr. 180:2– 185:22.

136.    The female Assistant Director to whom Lively objected was terminated shortly thereafter and replaced with Lively's preferred Assistant Director, a man. Ex. 12, Giannetti Dep. Tr. 138:2–7, 143:1–6; *see also* Ex. 39, BL–000018396 at –97 (Lively PGA letter, stating "I unfortunately was responsible for the firing of our 1st AD, Julie"); Ex. 94, BL–000011615 at –16.

**Plaintiff's Response 136:**    Undisputed that a female assistant director was terminated during production. The remainder is disputed as incomplete and misleading. The cited materials do not support the implication that Lively unilaterally caused or directed the termination. To the contrary, the assistant director was inexperienced, had not previously worked on a film set, and was not meeting expectations. Saks recommended that the assistant director be terminated based on these performance deficiencies. Exs. 15, Saks Tr. 90:16–92:16; 2, Giannetti Tr. 143:1–6, 156:23–157:4, 159:14–160:14;  30, at SPE_BL0002030–2031.

137.    On May 28, 2023, Lively discussed the production with fellow cast member Jenny Slate. Ex. 95, BL–000020770 at –1–4. In this communication, Lively asked Slate not to mention her views about "inappropriate behavior" to Baldoni or Heath. She also indicated that she had had discussions with Giannetti "but I asked her not to mention so I could personally tackle." *Id*. at –1.

**Plaintiff's Response 137:**    Undisputed that the quoted language is included in Wayfarer Ex. 95, but Lively respectfully refers the Court to the full communication for its complete contents and disputes any summary or interpretation inconsistent therewith.

138.    Lively did not contact Wayfarer's HR department during the production, nor did she file a formal sexual harassment complaint with Sony or Wayfarer's HR departments at any time. Ex. 12, Giannetti Dep. Tr. 299:22–300:15; Ex. 96, WAYFARER_000149780 (email from Cynthia Barnes Slater confirming that Blake Lively did not make a complaint to Wayfarer's HR department).

**Plaintiff's Response 138:**    Undisputed that Lively did not contact Wayfarer's HR consultant or Sony's HR department. The remainder is disputed as incomplete and misleading because it omits critical context. Heath testified that Wayfarer had one HR consultant, Cynthia Barnes Slater, who worked from home, and that Wayfarer did not have a separate HR department dedicated to the Film.  Exs. 3, Heath 10/8 Tr. 38:7–39:14, 116:17–24. Wayfarer never provided Lively with HR resources or HR contact information. Exs. 281, Lively Tr. 187:11, 220:24–221:21; 17 Robbins Tr. 101:21–103:25. Lively made complaints to individuals with supervisory authority over her work on the production, including Baldoni, Heath, Saks, and Giannetti. Ex. 281, Lively Tr. 185:14–187:16. Lively told Giannetti that she wanted to file "HR claims" with Sony, but was advised by Giannetti that she could not do so. Ex.  281, Lively Tr. 186:16–21. Heath did not disclose Lively's complaints to Wayfarer's HR consultant and Wayfarer did not investigate

Lively's complaints. Exs. 3, Heath 10/8 Tr. 401:3–7; 17 Robbins Tr. 101:21–103:25. Even though Sony's own policies and procedures mandated otherwise, Giannetti did not report Lively's harassment complaints to Sony's HR, and Sony did not conduct any investigation into Lively's harassment complaints. Ex. 17, Robbins Tr. 93:13–94:8, 220:18–221:5. The Defendants' reference to a "formal sexual harassment complaint" is vague, undefined, and appears to be a legal conclusion. The cited materials do not support any implication that Lively failed to report her concerns.

139.    On June 1, 2023, Lively asked Baldoni, Heath, and producer Alex Saks into her trailer. Ex. 24, Lively Dep. Tr. 188:7–16; Ex. 4, Heath 10/8 Dep. Tr. 213:13–25. Lively discussed various topics, including: Baldoni's comment that the wardrobe for Lively's character looked "sexy" or "hot"; Heath showing Lively an image of his wife at around the time she gave birth; an instance in which Heath entered her makeup trailer while Lively was in a state of undress; an instance in which Baldoni had cried in her trailer over the negative public reaction to Lively's casting; and Heath and Baldoni's practice of hugging other cast and crew members. Ex. 97, NATHAN_00003767 attaching Ex. 219, NATHAN_00003768; *see also* Ex. 24, Lively Dep. Tr. 191:13–192:4.

**Plaintiff's Response 139:**    Undisputed that Lively raised concerns about each of these topics to Saks, Heath and Baldoni during the June 1, 2023 meeting. But disputed that such concerns were with respect to (a) comments about Lively's wardrobe, rather than her body or personal appearance; (b) Heath showing Lively an "image" "around the time" of his wife's birth, rather than a video of his naked wife during birth; and (c) only Heath entering her trailer, rather than also looking at her exposed breasts after she asked him to turn away. Exs. 30; 2 Giannetti Tr. 156:23–159:13; 15 Saks Tr. 134:17–139:16. Although Lively had not planned to log her

concerns in that meeting, she expressed her "real concerns" with the behavior on set, which she described as unprofessional and "too comfortable," and said that it is "not okay" and "has to stop." Ex. 281, Lively Tr. 186:14–187:16.

140.    Baldoni and Heath attempted to explain the innocent context and apologized for any discomfort Lively may have experienced. *See, e.g.*, Ex. 4, Heath 10/8 Dep. Tr. 219:6–25, 284:6–12, 290:11–24.

**Plaintiff's Response 140:**    Undisputed that Baldoni and Heath tried to justify their decision to show Lively a video of Heath's naked wife giving birth, claiming that they "thought she wanted to see it." Disputed as to the characterization of their explanation as providing "innocent context," which is argumentative and unsupported by the record. Lively testified that she found it inappropriate and expressed discomfort.  Lively was disturbed and unsettled that Heath would show her the video at work. The cited testimony does not establish that the context was "innocent," only that Baldoni and Heath offered their own justification after the fact. Ex. 281, Lively Tr. 186:5–187:16.

141.    Ange Giannetti, a female Sony executive, learned about the meeting from Saks. Ex. 12, Giannetti Dep. Tr. 157:1–23. After learning about Lively's objections and the subsequent meeting, Giannetti chose not to report any issues to Sony or Wayfarer's HR departments.  She testified: "I thought it was completely resolved, like grown–up people who sat down and talked about it, and she felt she said what she said, everyone was clear, and that was never going to happen again. And it seemed – it seems like it was addressed." *Id.* at 130:12–131:11.

**Plaintiff's Response 141:**    Undisputed that the quoted language appears in Giannetti's deposition, but Lively respectfully refers the Court to the deposition transcript for its complete contents. Even though Sony's own policies and procedures mandated otherwise, Giannetti did not

report Lively's harassment complaints to Sony's HR, and Sony did not conduct any investigation into Lively's harassment complaints. Ex. 17, Robbins Tr. 93:13–94:8, 220:18–221:5.

142.    On or around the same time, Jenny Slate discussed the production with Giannetti and producer Alex Saks. Ex. 12, Giannetti Dep. Tr. 147:15–148:10; Ex. 11, Saks Dep. Tr. 100:20–108:18; Ex. 95, BL–000020771; Ex. 98, SPE_BL00020 at –24. Her comments focused primarily on Lively's concerns about the set. Ex. 12, Giannetti Dep. Tr. 149:1–4. Slate also said that Baldoni told her she looked "sexy" in her character's wardrobe on one occasion. Ex. 11, Saks Dep. Tr. 104:6–10.

**Plaintiff's Response 142:**    Undisputed that Slate spoke with Giannetti and Saks about issues on the production. The remainder is disputed as incomplete and misleading. Slate raised multiple concerns about Baldoni and Heath, which were not "primarily focused on Lively's concerns about the set." On May 29, 2023, Slate raised concerns to Saks that Baldoni had commented about her physical appearance as "sexy," which made her uncomfortable; Baldoni had recorded an initial meeting with she and Lively without their consent; Heath made comments to her about how "generous" they had been with her housing allowance and that "it was important for them to take care of new mothers," which made her uncomfortable; and she felt overall uncomfortable in the presence of both Baldoni and Heath and would prefer to never see Heath again. Exs. 15, Saks Tr. 101:15–102:15; 12, Slate Tr. 51:16-54:7, 58:23-59:8. In a text to Giannetti that same day, Saks noted that Slate's concerns were "very bad" and stated "I think we need to replace our director. And [Heath] should not be on set." Saks went on to share that Slate "really would prefer to never see [Heath] again…" Exs. 15, Saks Tr. 99:10–20, 102:5–106:15;108:19–112:1; Wayfarer Ex. 98. Giannetti similarly testified that Slate complained to her about Baldoni's "hot" comment. Ex. 2, Giannetti Tr. 148:22–149:24.

143.    On May 30, 2023, Baldoni wrote messages to Lively and Slate separately, thanking them for their work and stating: "I was made fully aware of your concerns. I wanted you to know that they are fully received, I hear you, and adjustments will be made accordingly. I appreciate your feedback and really looking forward to working with you at the end of the week." Ex. 99, WAYFARER_000141469 at –71; *see also id.* (message to Lively, using similar language).

**Plaintiff's Response 143:**    Undisputed, but Lively respectfully refers the Court to the full document for its complete contents and disputes any summary or interpretation inconsistent therewith. Additionally, Slate testified that she did not see Baldoni's message to her as an apology, and instead viewed it as "not taking direct accountability," and "an acknowledgment that he received information from Ange and that, as he said, adjustments will be made accordingly," which was "enough for [her] to feel like [she] could focus up and do our work." Ex. 12, Slate Tr. 100:17–101:12.

144.    Giannetti testified that the "three incidents" she was aware of—namely, Lively being shown an image of Heath's wife's birth; Heath entering Lively's trailer; and Baldoni "call[ing] Slate hot in front of 300 people"—did not amount to "a reason to call HR." She explained: "we had a meeting in the trailer. It was resolved." Ex. 12, Giannetti Dep. Tr. 150:7–151:5.

**Plaintiff's Response 144:**    Undisputed that the quoted language appears in Giannetti's deposition, but Lively respectfully refers the Court to the deposition transcript for its complete contents. Even though Sony's own policies and procedures mandated otherwise, Giannetti did not report Lively's harassment complaints to Sony's HR, and Sony did not conduct any investigation into Lively's harassment complaints. Ex. 17, Robbins Tr. 93:13–94:8, 220:18–221:5.

145.    Neither Lively nor anyone else have identified any other incidents that they believe may have constituted sexual harassment or discrimination after June 1, 2023. *See, e.g.*, Ex. 11, Saks Dep. Tr. 198:22–199:2; *see generally* Ex. 3, SAC.

**Plaintiff's Response 145:**    Disputed. Ferrer experienced "sexually inappropriate" comments on the set of the Film after June 1, 2023. The first day that the two actors portraying "young Lily" and "young Atlas" met, Baldoni aside the male actor, Alex Neustaedter, and said: "I really want you to get to know [ Ferrer] well," winking at him. After filming a scene in which two underage characters have sex for the first time, Baldoni stated: "I'm not supposed to say this, but that was hot." The actors were in their underwear at the time and Ferrer felt it was directed at them personally. In another instance, Baldoni directed Ferrer to lick cookie dough off of a spoon and look up at her love interest, which Ferrer felt had an inappropriate adult sexual undertone. The scene was not in the script. Talbot insisted on being present for an intimate scene between young Lily and young Atlas, worried that Baldoni might add additional intimate content that had not been rehearsed. Further, the entire course of retaliatory conduct that began with Baldoni's "huffy" response when confronted about his behavior is part of the sexually harassing course of conduct, which was ongoing and continues to this day. In addition, Defendants have engaged in an ongoing course of retaliatory harassing conduct, including by disparaging Livley to peers and the media, among other things, ¶¶ 624-632. Exs. 10, Ferrer Tr. 68:3–9, 244:3–245:17; 246:14–248:14; 14, Talbot Tr. 188:25–192:16; Exs. 281, Lively Tr. 101:5–103:5, 104:2–106:20, 113:1–11, 118:19–120:4; 12, Slate Tr. 42:7–44:18, 58:23–59:8, 88:25–90:19; 15, Saks Tr. at 134:5–145:15; 30 at SPE_BL0002026–2029.

146.    Slate has testified in this litigation that she chose not to participate as a plaintiff in Lively's lawsuit because "I felt that I settled my issues on set and I wanted to move on." Ex. 13, Slate Dep. Tr. 296:3–8.

**Plaintiff's Response 146:**    Undisputed as to Slate's testimony. Disputed to the extent that it suggests Lively ever asked or suggested Slate participate as a plaintiff, which is not supported by the cited evidence, and which she did not do.

147.    Sarowitz has no firsthand knowledge of anyone on the set of *It Ends With Us* advising Baldoni that any behavior was unwelcome. Ex. 6, Sarowitz Dep. Tr. 198:2–16, 199:2–5.

**Plaintiff's Response 147:**    Undisputed that the paraphrased language appears in Wayfarer Ex. 6, but Lively respectfully refers the Court to the deposition transcript for its complete contents.

148.    Prior to this litigation, Sarowitz was not aware of any formal HR complaints that were filed in connection with the film. Ex. 6, Sarowitz Dep. Tr. 202:3–9, 275:11–12.

**Plaintiff's Response 148:**    Disputed. Sarowitz was made aware of several complaints regarding conduct on set, which were raised to Heath, Baldoni, Saks, and Giannetti. *See, e.g*, Exs. 281, Lively Tr. 76:3– 80:20; 2, Giannetti Tr. 108:24–114:9, 116:1–117:25, 132:1–135:6; 4, Baldoni 10/7 Tr. 180:2–185:22; 12, Slate Tr. 113:21-116:1. Heath and Baldoni notified Sarowitz of Lively and Slate's concerns that Baldoni had commented that they looked "hot" and "sexy," and responded that "he should come to set and remind Blake who's money this is." Exs. 11, Sarowitz Tr. 285:19–286:8; 3, Heath 10/8 Tr. 256:18–260:23; 31. Sarowitz also received the CRA. Ex. 11, Sarowitz Tr. 209:11–211:3.

149.    Sarowitz was not aware of any SAG complaints that were raised concerning Baldoni's behavior on the set of the film. Ex. 6, Sarowitz Dep. Tr. 202:3–9.

**Plaintiff's Response 149:**    Undisputed.

150.    Nor was he aware of any reported allegations of misconduct prompting an HR investigation at Wayfarer Studios. Ex. 6, Sarowitz Dep. Tr. 213:15–19, 221:19–24, 224:4–11, 256:17–20.

**Plaintiff's Response 150:**    Disputed. On May 28, 2023, Baldoni confirmed in a text to Heath that he had shared "the 'comments' the ladies had feelings about" with Sarowitz, who responded to Baldoni that "[Sarowitz] should come to sit and remind Blake who's money this is." Heath confirmed, "Yeah. He said that too to me." Ex. 31 at HEATH_000035493.

151.    Nor does Sarowitz have any knowledge of any actual behavior on set that could be described as sexual advances or requests for sexual favors, verbal abuse of a sexual nature, commentary about an individual's body, sexual prowess, or sexual deficiencies, sexual jokes and innuendo, leering, whistling, or touching, insulting or obscene comments or gestures, display in the workplace of sexually suggestive objects or pictures, or other physical, verbal, or visual conduct of a sexual nature, outside of the subject matter of the film itself. Ex. 6, Sarowitz Dep. Tr. 217:19–218:4.

**Plaintiff's Response 151:**    Disputed. Sarowitz was made aware of several complaints regarding conduct on set, which were raised to Heath, Baldoni, Saks, and Giannetti. *See, e.g*, Exs. 281, Lively Tr. 76:3– 80:20; 2, Giannetti Tr. 108:24–114:9, 116:1–117:25, 132:1–135:6; 4, Baldoni 10/7 Tr. 180:2–185:22; 12, Slate Tr. 113:21-115:9. Heath and Baldoni notified Sarowitz of Lively and Slate's concerns that Baldoni had commented that they looked "hot" and "sexy," and responded that "he should come to set and remind Blake who's money this is." Exs. 11, Sarowitz Tr. 285:19–286:8; 3, Heath 10/8 Tr. 256:18–260:23; 31. Sarowitz also received the CRA. Ex. 11, Sarowitz Tr. 209:11–211:3.

152.    Sarowitz is not aware of any complaints raised on set that were not resolved. Ex. 6, Sarowitz Dep. Tr. 221:4–18.

**Plaintiff's Response 152:**    Disputed. Sarowitz was made aware of several complaints regarding conduct on set, which were raised to Heath, Baldoni, Saks, and Giannetti. *See, e.g*, Exs. 281, Lively Tr. 76:3– 80:20; 2, Giannetti Tr. 108:24–114:9, 116:1–117:25, 132:1–135:6; 4, Baldoni 10/7 Tr. 180:2–185:22; 12, Slate Tr. 113:21-115:9. Heath and Baldoni notified Sarowitz of Lively and Slate's concerns that Baldoni had commented that they looked "hot" and "sexy," and responded that "he should come to set and remind Blake who's money this is." Exs. 11, Sarowitz Tr. 285:19–286:8; 3, Heath 10/8 Tr. 256:18–260:23; 31. Sarowitz also received the CRA. Ex. 11, Sarowitz Tr. 209:11–211:3. The cited evidence does not support that the foregoing were "resolved."

153.    Sarowitz was aware that Jenny Slate had a concern on set at one point, but he was not aware of the specifics of the issue and believed it was resolved. To his knowledge, there were no additional issues or concerns raised by Slate. Ex. 6, Sarowitz Dep. Tr. 266:5–14, 267:14–16, 268:24–25.

**Plaintiff's Response 153:**    Disputed. On May 28, 2023, Baldoni confirmed in a text to Heath that he had shared "the 'comments' the ladies had feelings about" with Sarowitz, who responded to Baldoni that "[Sarowitz] should come to sit and remind Blake who's money this is." Heath confirmed "Yeah. He said that too to me." Ex. 31 at HEATH_000035493.

154.    Sarowitz has never talked to Slate or met her. Ex. 6, Sarowitz Dep. Tr. 267:17–24.

**Plaintiff's Response 154:**    Undisputed.

155.    Sarowitz is unaware of any alleged complaint by Lively that Baldoni referred to her as sexy. Ex. 6, Sarowitz Dep. Tr. 265:16–19.

**Plaintiff's Response 155:**    Disputed. Sarowitz was made aware of several complaints regarding conduct on set, which were raised to Heath, Baldoni, Saks, and Giannetti. *See, e.g*, Exs. 281, Lively Tr. 76:3– 80:20; 2, Giannetti Tr. 108:24–114:9, 116:1–117:25, 132:1–135:6; 4, Baldoni 10/7 Tr. 180:2–185:22; 12, Slate Tr. 113:21-115:9. Heath and Baldoni notified Sarowitz of Lively and Slate's concerns that Baldoni had commented that they looked "hot" and "sexy," and responded that "he should come to set and remind Blake who's money this is." Exs. 11, Sarowitz Tr. 285:19–286:8; 3, Heath 10/8 Tr. 256:18–260:23; 31. Sarowitz also received the CRA. Ex. 11, Sarowitz Tr. 209:11–211:3.

156.    On June 1, 2023, Lively privately acknowledged to Slate that the set was "fine vibe wise." Ex. 100, BL–000020779 at –80.

**Plaintiff's Response 156:**    Undisputed that the quoted language appears in Wayfarer Ex. 100, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

157.    Filming halted on June 14, 2023 due to the Writers Guild of America and SAG–AFTRA strikes. Ex. 3, SAC ¶ 15; Ex. 24, Lively Dep.at 261:15–18; Ex. 71, WAYFARER_000141293.

**Plaintiff's Response 157:**    Undisputed.

158.    On July 19, 2023, approximately one month after filming had been interrupted due to the writers' strikes, Lively wrote to Baldoni asking to see the raw, unedited footage from the shoots, known as "dailies." She told Baldoni she was "so happy and energized" to see the select footage he had previously sent. She continued: "Such solid work from everyone on and off camera." Ex. 101, BL-000011555 at -56.

**Plaintiff's Response 158:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.  Lively Dec. ¶ 27.

159.    On August 29, 2023, Lively wrote to her agent, Zavala, to complain about not being provided with a full cut of the film or the dailies.  She wrote: "They're all clowns.  I have my Hr report ready also fyi."  Ex. 102, BL-000021967 at -71.

**Plaintiff's Response 159:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith. Undisputed that on August 29, 2023, Lively wrote to Zavala: "They should show me the movie. I'm an EP and they need me to be engaged in this thing during production and in press. His entire sales pitch is how collaborative he is and how much he values women. Yet they're not gonna allow me to see the movie? I've never not been invited into the edit room for my opinion, much less had to beg to see additional scenes of dailies. His promises of how he works so far have proven to be empty." Wayfarer Ex. 102 at BL-000021968.

160.    During the next two months, Lively did not file any HR complaint.

**Plaintiff's Response 160:**    Undisputed that Lively did not file an HR complaint between August 29, 2023 and October 29, 2023.

161.    On November 9, 2023, Lively's attorney sent Imene Meziane, Vice President of Business and Legal Affairs at Wayfarer, and Joseph Lanius, outside counsel to IEWUM, a list of "Protections for Return to Production."  Ex. 103, WAYFARER_000140991.

**Plaintiff's Response 161:**    Undisputed.

64

162.    In an email accompanying the list, Lively's attorney stated that the list was being provided "to remedy the misconduct that Ms. Lively and others had allegedly reported."  Lively's attorney further stated that items on the list would need to be "observed by the Film's producers" "in order for [Lively] to feel safe returning to the production."  The email also stated "While we reserve all legal rights, at this stage our client is willing to forego a more formal HR process in favor of everyone returning to work and finishing the Film as long as the set is safe moving forward."  It continued: "This letter is not intended to be, nor should it be construed as, a waiver, release or relinquishment of any of our client's rights or remedies, legal or equitable, all of which are hereby expressly reserved." Ex. 103, WAYFARER_000140991.

**Plaintiff's Response 162:**    Disputed that the language "to remedy the misconduct that Ms. Lively and others had allegedly reported," appears in the cited source. *See* Wayfarer Ex. 103. Undisputed that the remaining quoted language appears in the cited source, with the correction that it says "It is not intended to be," rather than "This letter is not intended to be." *Id.* Lively respectfully refers  the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

163.    Lively requested that an intimacy coordinator must be present at all times when she was on set.  SAC Ex. A, ¶ 1.

**Plaintiff's Response 163:**    Undisputed that Lively requested that an intimacy coordinator be present at all times when she returned to set after the hiatus.

164.    IEWUM had already retained an intimacy coordinator and made her available to meet with Lively.  *See* Ex. 53, BL-000009220.

**Plaintiff's Response 164:**    Undisputed that an intimacy coordinator was hired in April 2023 and made available to Lively for a meeting prior to the start of filming, but disputed to the

extent this fact is intended to imply that this is the same as the condition Lively requested, *i.e.*, that an intimacy coordinator be present at all times. Wayfarer Ex. 53 at BL-000009221–9221.

165.    Lively requested a closed set for any scene involving simulated sex or nudity, subject to a nudity rider and demanded that there be no rehearsal or filming of intimate scenes without such a rider in place. Ex. 3, SAC; SAC Ex. A, ¶¶ 2, 7, 15. Lively also sought an exception to the closed set requirement for an unspecified "representative of her choosing." *Id.* ¶ 8.

**Plaintiff's Response 165:**    Disputed as to the summary and characterization of Lively's requests at paragraphs 2, 7, and 15 of SAC Ex. A, which were as follows:

2. "There must be a closed set during the rehearsal or filming of any scene involving simulated sex or nudity and any observation via remote monitors shall be restricted to essential personnel as approved by BL (to be further described in a fully-negotiated, fully-executed, SAG-compliant nudity rider ("Nudity Rider");

7. "There shall be no rehearsal or filming of any nudity and/or simulated sex without the Nudity Rider in place. Any such footage previously shot without the Nudity Rider in place, and in direct violation of SAG requirements, may not be used without BL's and her legal representatives' prior, written consent";

15. "Any rehearsal or shooting involving Ms. Lively, or any other performer depicting the character of 'Lily,' that involves nudity (including partial nudity) or simulated sex must be conducted strictly in accordance with the Nudity Rider and must adhere to the approved script";

8. "BL may have a representative of her choosing present with her on set for the remainder of the rehearsal and shooting days, including while on a closed set." Ex. 32 at WAYFARER_000140992–140993.

166.    The film's intimacy coordinator had already sought Lively's input on all intimate scenes in advance, and the parties had negotiated a nudity rider that Lively had already been provided.  Ex. 60, 24-CV-10049_0001816.

**Plaintiff's Response 166:**    Disputed.    The cited document does not support the proposition that the film's intimacy coordinator had already sought Lively's input on all intimate scenes in advance. Wayfarer Ex. 60. The film's intimacy coordinator for the first phase of filming, Elizabeth Talbot, testified at length how Baldoni routinely improvised intimate scenes that were not in the script and had not been rehearsed or approved in advance. Exs. 19 at 24-CV-10049_0003612; 14, Talbot Tr. 160:6–162:17, 185:2–186:22, 194:8–195:5.

167.    Lively requested pre-approval of any scenes involving physical touching, simulated sex, or nudity.  Ex. 3, SAC; SAC Ex. A, ¶ 3.

**Plaintiff's Response 167:**    Disputed as to the summary and characterization of Lively's requests at paragraph 3 of SAC Ex. A, which were as follows:

3. "There is to be no spontaneous improvising of any scenes involving physical touching, simulated sex, or nudity. Scenes involving kissing, depictions of sexual intercourse, or any other physical touching must be contained in the screenplay (as approved by BL), choreographed in advance in the presence of the intimacy coordinator, and may only proceed as choreographed with the consent of all participants in advance." Ex. 32 at WAYFARER_000140992.

168.    The Offer Letter setting out the basic terms of Lively's participation already provided that there would be "no nudity / simulated sex without Artist's prior written consent and negotiation/execution of a nudity rider."  Ex. 28, HEATH_000045678 at 80.

**Plaintiff's Response 168:**    Undisputed that the Offer Letter provided that there would be "[n]o nudity/simulated sex without Artist's prior written consent and negotiation/execution of

a nudity rider," but disputed that this term "already provided" the protection sought in Lively's Protections for Return to Production. Ex. 32 at WAYFARER_000140992–140993.

169.    Lively requested that any footage involving "any nudity and/or simulated sex…previously shot without the Nudity Rider" in place could not be used.  Ex. 3, SAC; SAC Ex. A, ¶ 7.

**Plaintiff's Response 169:**    Disputed. Lively requested the following:

7. "There shall be no rehearsal of filming of any nudity and/or simulated sex without the Nudity Rider in place. Any such footage previously shot without the Nudity Rider in place, and in direct violation of SAG requirements, may not be used without BL's and her legal representatives' prior, written consent." Ex. 32 at WAYFARER_000140992.

170.    There were no such scenes.  At the time of Lively's requests, no intimate scenes involving her had been filmed.  Ex. 58, Talbot Dep., at 73:18-24.  The intimate scenes involving other actors, in which Lively had no involvement, had been filmed pursuant to nudity riders and with the assistance of an intimacy coordinator.  *See* Ex. 58, Talbot Dep., at 195:6-196:1.

**Plaintiff's Response 170:**    Disputed. A scene in which Lively's character gave birth was filmed in 2023 and, unexpectedly due to Baldoni's same-day decision making, involved profile nudity as Lively was unclothed from the waist down with only a small piece of fabric covering her genitals. Exs 16; 13, Baker Tr. 209:20–210:14; 14, Talbot Tr. 145:16-146:17; Lively Dec. ¶¶ 13–15.

171.    Lively requested that no one enter her trailer while she was in a state of undress. SAC Ex. A, ¶ 6.

**Plaintiff's Response 171:**     Undisputed that Lively requested that "No one will enter, attempt to enter, interrupt, pressure, or request entrance for BL's trailer while she is in a state of undress for any reason." Ex. 32 at WAYFARER_000140992.

172.     ==Lively had always had a lock on her trailer available to use to maintain her privacy.== Ex. 87, Baker Dep., at 82:5-21.

**Plaintiff's Response 172:**     Undisputed that ==Lively's trailer had a lock on it that hair and makeup professionals "wouldn't necessarily want to have [ ] locked because then you're going to have to open it,"== but that after Heath entered Lively's trailer without permission ==while she was in a state of undress, Lively's hair artist "began to lock it.==" Exs. 13, Baker Tr. 72:11–82:21; 23, Carroll Tr. 65:22–66:25.

173.     ==Lively also had personal security guard==s. Ex. 24, Lively Dep. Tr. at 125:10-24.

**Plaintiff's Response 173:**     Undisputed.

174.     Lively requested an "A-list stunt double, approved by [herself], to rehearse and perform any scenes" depicting rape or sexual violence.  SAC Ex. A, ¶ 14.

**Plaintiff's Response 174:**     Undisputed that Lively requested for Wayfarer to "engage an A-list stunt double, approved by Ms. Lively, to rehearse and perform any scenes involving the character 'Lily' that depicts rape or any act of sexual violence. Ms. Lively will only perform close-up work or other pre-approved shots for such scenes." Ex. 32 at WAYFARER_000140993.

175.     The Offer Letter setting out the basic terms of Lively's participation already provided that Lively had approval rights over any double.  Ex. 28, HEATH_000045678 at 80.

**Plaintiff's Response 175:**     Undisputed that the Offer Letter provided that there would be "[n]o digitizing or doubling in connection with nudity/simulated sex without Artist's prior

written consent," but disputed that this term "already provided" the protection sought in Lively's Protections for Return to Production. Wayfarer Ex. 28; Ex. 32 at WAYFARER_000140992.

176.    Lively requested that there was "to be no spontaneous improvising of any scenes involving physical touching, simulated sex or nudity." SAC Ex. A, ¶ 4.

**Plaintiff's Response 176:**    Disputed that the quoted language appears in the cited paragraph. Undisputed that Lively requested there "to be no spontaneous improvising of any scenes involving physical touching, simulated sex, or nudity." Ex. 32 at WAYFARER_000140992.

177.    On May 19, 2023, Lively oversaw a scene she herself added to the script, in which her character kissed Baldoni's character in every take, although there was no kiss in the script. Ex. 104, video clip excerpt from WAYFARER_000140494.

**Plaintiff's Response 177:**    Disputed. The source cited does not support the assertions that Ms. Lively "oversaw a scene [that] she herself added to the script." ==Further, Lively and Baldoni discussed and planned the addition of a kiss, to which Mr. Baldoni consented==. Lively Decl. ¶ 10.

178.    Lively requested that no comments be made concerning her personal, physical appearance. SAC Ex. A, ¶ 4.

**Plaintiff's Response 178:**    Disputed. Lively requested the following:

4. "Physical touching and/or comments on BL's physical appearance must only be done/made in connection with the character and scene work, not as to BL personally. Except as written into the screenplay or as strictly required in connection with make-up or costume preparation, there is to be no physical touching (including hugging) of BL, her on-set personnel and/or her employees." Ex. 32 at WAYFARER_000140992.

179.    Prior to shooting, Lively had repeatedly raised concerns about her own weight and physical appearance to Baldoni and her agent in connection with the shoot.    Ex. 41, BL-000008801; Ex. 42, BL-000008819-20; Ex. 44, BL-000008821-22; Ex. 43, BL-000021371.

**Plaintiff's Response 179:**    Disputed that the documents cited support that Lively raised any such concerns with her agent. Undisputed that Lively, weeks after giving birth to her fourth child, asked if there was any "chance" that "body scenes" could be filmed "at the end of the schedule," to ensure that she was able to get in "top shape" given that the "movie require[d] a certain aesthetic." Wayfarer Exs. 43, 44. Lively wrote to Baldoni that she understood he will "never personally know all the nuances of the challenges unless you lived this physical moment in time I'm in with this physical road ahead, so having your understanding and support to help me pull this off is critical." Wayfarer Ex. 44.

180.    On one occasion, Lively advocated to change her character's wardrobe because her preferred option was "much sexier."   Ex. 105, BL-000011518 at -19; *see also* Ex. 106, BL-000007943 at-44 (Lively, writing: "beanie is much sexier. It's the look … I think this is hot. But you look at me.").

**Plaintiff's Response 180:**    Undisputed that Lively texted a female Sony producer, Ange Giannetti, that she thought the "beanie [was] much sexier," and subsequently forwarded that text message along to Baldoni. Wayfarer Exs. 105 at BL-000011519; 106 at BL-000007944.

181.    Video footage also shows Lively explaining to a group of male crew members why her boots are "so sexy" because they are just "bone hitting wood." Ex. 107, video clip excerpt from WAYFARER_000140494.

**Plaintiff's Response 181:**    Undisputed.

182.    Lively also commented on the physical appearance of other actors in connection with the project, both before and after issuing these demands.

a.    When discussing one potential actor in the film with Baldoni on March 29, 2023, Lively said she was meeting "an actor…who Sony likes (he's pretty)." Ex. 108, BL-000009166 at -67.

b.    When discussing the marketing of the film in May 2024, Lively wrote to a younger male cast member: "I'm becoming pimp adjacent. Put on a short little skirt and get on that corner, Skelnar." Ex. 109, BL-000020058 at -59.

**Plaintiff's Response 182:**    Disputed. It was Baldoni, not Lively, who "commented on the physical appearance of other actors in connection with the project," when he wrote that he was meeting "an actor . . . who Sony likes (he's pretty)." Wayfarer Ex. 108 at BL-000009167. Undisputed that Lively made a joke to Sklenar—a friend and co-worker who was 33 years old at the time—regarding her helping to facilitate his participation in certain press events, which did not comment on his physical appearance. Wayfarer Ex. 109 at BL-000020059.

183.    Lively and Jenny Slate, another actor in the film, commented on the physical appearance of another female celebrity while on set. Ex. 95, BL-000020770 at -71.

**Plaintiff's Response 183:**    Undisputed that, in a text exchange with Slate, Lively recalled the following incident: "you said you used to stare at [a celebrity's] midsection for hours (before you finished and said what an athlete she was and how remarkable she seemed as a young girl) [Baldoni] jumped in and said 'same' and giggled but then eye rolled when we just looked at him." Wayfarer Ex. 95 at BL-000020771. Otherwise disputed.

184.    Lively requested there be "no physical touching (including hugging) of [herself], her on-set personnel and/or her employees. SAC Ex. A, ¶ 4.

**Plaintiff's Response 184:**     Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

185.     Lively herself had initiated hugs with Baldoni (Ex. 8, Baldoni 10/7 Dep. Tr. at 116:17-117:15) as had several members of her staff (*id.* at 117:20-118:14).

**Plaintiff's Response 185:**     Disputed. The testimony cited does not support Defendants' assertion that Lively "herself had initiated hugs with Baldoni," or that "several" members of her staff had initiated hugs with Baldoni. Further, Lively testified that "the difference with Justin and Jamey is that they would come for the hug every day. And if you didn't hug them, they would become prickly and standoffish and shut down. . . . I often tried to busy myself so that I didn't have to give hugs. Sometimes it was easier just to do it and get it over with so that the work wouldn't be affected . . . There were some days where it was easier just to hug him." Ex. 281, Lively Tr. 117:23–119:20.

186.     More broadly, all staff members had engaged in large "hugging circles."  Ex. 34, Justin Grey Stone Dep. at 177:16-178:6.  A producer on the film observed that "there was a lot of hugging and touching amidst the Wayfarer team. It's just seemingly sort of how they do business and interact with each other." Ex. 11, Saks Dep. Tr. at 139:6-9.

**Plaintiff's Response 186:**     Undisputed that when testifying about "a lot of unprofessionalism" that occurred on set, Stone described witnessing "people sort of in hugging circles and getting together." Ex. 33, Stone Tr. 177:16–178:6. Undisputed that Saks observed "a lot of hugging and touching amidst the Wayfarer team," and recalled Lively asking that the set be "more professional." Ex. 15, Saks Tr. 139:4–22.

187.    Video footage shows Baldoni hugging male members of the cast and crew as well. Ex. 110, video clip excerpt from WAYFARER_000140494; Ex. 280, video clip excerpt from WAYFARER_000140494.

**Plaintiff's Response 187:**    Undisputed.

188.    Lively requested there were to be "no discussions of personal experiences with sex or nudity."  SAC Ex. A, ¶ 5.

**Plaintiff's Response 188:**    Undisputed that Lively requested that there "be no discussions of personal experiences with sex or nudity, including as it relates to conduct with spouses or others." Ex. 32 at WAYFARER_000140992.

189.    Lively had previously volunteered to Baldoni details of her personal sex life.  Ex. 8, Baldoni 10/7 Dep. Tr. at 176:8-178: 21.

**Plaintiff's Response 189:**    Disputed. The cited testimony does not support the assertion that Lively volunteered details of her personal sex life; Baldoni's testimony, at most, claims Lively spoke about a hypothetical situation, not her personal experiences.  Wayfarer Ex. 8 at 176:8–178:21.

190.    Jenny Slate, another female actor, privately admitted that she, too, had made personal, sexual comments on set.  Ex. 95, BL-000020770 at -71.

**Plaintiff's Response 190:**    Disputed. The cited source does not support the assertion that Slate made "personal, sexual comments on set." Wayfarer Ex. 95 at BL-000020771.

191.    Lively's list also included several items that were wholly unrelated to her sex, gender or physical appearance, including demands that Baldoni not "speak" to her dead father, mention his own religious beliefs or ask for hers, or have "private, multi-hours meetings in Lively's

trailer with Mr. Baldoni crying," as well as a demand that Lively receive notice of COVID exposures on set.  Exs. 111-112, BL-000038461-62.

**Plaintiff's Response 191:**    Undisputed that Lively privately had a more fulsome list of protections on her phone that included additional items such as "No more mention by Mr. Baldoni of him 'speaking to' BL's dead father," "No more pressing by Mr. Baldoni for BL to disclose her religious beliefs, or unsolicited sharing of his," "No more private, multi-hour meetings in BL's trailer, with Mr. Baldoni crying, with no outside BL appointed representative to monitor," "No more pressing by Mr. Baldoni to sage any of BL's employees," and "No more asking or pressuring BL to cross physical picket lines." Wayfarer Exs. 111, 112. Disputed that these additional items were "wholly unrelated to her sex, gender or physical appearance," which is improper argument.

192.    On November 11, Meziane explained to Lively's representatives that certain of the seventeen "Protections" were not viable.  Ex. 113, HEATH_000046158.

**Plaintiff's Response 192:**    Disputed. On November 11, Ms. Meziane responded that Wayfarer found "most" of the requests "not only reasonable but also essential for the benefit of all parties involved." Wayfarer Ex. 113 at HEATH_000046158. Ms. Meziane only rejected a single request in its entirety--the request for Wayfarer to "engage an additional, experienced A-level producer, approved by Ms. Lively, to actively supervise the production, including monitoring the safety of the cast and crew, ensuring compliance with the schedule and overseeing logistics, problem solving and creative issues." *Id.*; Ex. 32 at WAYFARER_000140993.

193.    Lively and her counsel responded by threatening Wayfarer and Sony that Lively would not return to complete the film unless her "Protections" were accepted without negotiation. Ex. 33, Zavala Dep. Tr. at 117:8-118:19; Ex. 114, Zavala Dep. Ex. 5; Ex. 12, Giannetti Dep. at 296:10-12.

**Plaintiff's Response 193:**    Disputed. Lively "[n]ever threatened," but rather "put forward a list of protections for herself and for everybody else on the set that needed to be met in order to ensure a safe working environment that Wayfarer's negligence was not providing." Exs. 33, Stone Tr. 235:23–236: 14; 34, Zavala Tr. 117:8–118:19; Wayfarer Ex. 114.

194.    Sony pressured Wayfarer to accede to the "Protections" because if Lively did not return to the set, the film would not be finished or would be un-releasable, and Sony and Wayfarer had already invested and spent a "tremendous amount of money for the film." Ex. 12_, Giannetti Dep. Tr. at 295:18-296:8, 300:25-303; Ex. 115, Giannetti Dep. Ex. 19. As of November 2023, Sony had invested at least $20 million and Wayfarer had invested even more. Ex. 12, Giannetti Dep. Tr. at 296:21-297:5.

**Plaintiff's Response 194:**    Disputed. The cited sources do not support Defendants' assertions that Sony "pressured" Wayfarer to agree to the return to work protections or that Sony had invested at least $20 million in the Film as of November 2023. Wayfarer Ex. 12 at 295:18–297:5, 300:25–303; Wayfarer Ex. 115.

195.    On December 15, 2023, Lively's counsel sent Meziane a "draft side letter"—*i.e.*, a draft of what Lively's First Amended Complaint refers to as the "Contract Rider Agreement" ("CRA").  Ex. 116, BL-000038466-75; Ex. 3, SAC ¶426.

**Plaintiff's Response 195:**    Undisputed.

196.    In an accompanying email, Lively's counsel stated that the draft side letter "contains the list of [seventeen] protections originally forwarded in November." Ex. 116, BL-000038466.

**Plaintiff's Response 196:**    Undisputed that Lively's counsel stated that the "draft side letter [ ] contains the list of protections originally forwarded in November 2023, which we have

76

updated with a few details, pre-approvals and other minor modifications." Wayfarer Ex. 116 at BL-000038466.

197. Following further negotiations, and because of the above-mentioned pressure (Ex. 12, Giannetti Dep. Tr. at 295:18-296:8), on or about January 19, 2024, Heath, acting on behalf of IEWUM, signed the CRA as a rider to the long-form agreement that was contemplated in the Offer Letter. A true and correct copy of the executed CRA is at Ex. 117, HEATH_000045307.

**Plaintiff's Response 197:** Disputed. The CRA detailing Lively's 17 protections (the "Side Letter") is a side letter and not a "rider," and makes reference to the Agreement, including that in the Agreement Blakel, Inc. "has agreed" to cause Ms. Lively to "render acting services." *See* Wayfarer Ex. 117 at HEATH_000045307. Defendants cite no evidence to support their assertion that the CRA was signed due to "pressure," as stated *supra* ¶ 194. Undisputed that Heath signed the CRA on behalf of IEWUM on January 19, 2024. *Id*. at HEATH_000045309.

198. The parties to the draft CRA were IEWUM and Blakel, Inc. Ex. 117, HEATH_000045307.

**Plaintiff's Response 198:** Undisputed that the parties to the executed Side Letter (which Defendants cite) were IEWUM and Blakel, Inc. Wayfarer Ex. 117.

199. The CRA contained a provision stating:

There shall be no retaliation of any kind against Artist for raising concerns about the conduct described in this letter or for these requirements. Any changes in attitude, sarcasm, marginalization or other negative behavior, either on set or otherwise, including during publicity and promotional work, as a result of these requests is retaliatory and unacceptable, and will be met with immediate action.

Ex. 117, HEATH_000045307.

**Plaintiff's Response 199:** Undisputed.

200.    The CRA expressly stated that it reflected "*additional* terms and conditions …
which shall be deemed *incorporated into*" the ALA.  Ex. 117, HEATH_000045307 (emphasis
added).

**Plaintiff's Response 200:**    Undisputed.

201.    The first "Whereas" clause of the CRA states that "the parties wish to confirm the
conditions under which Lender has agreed to cause Artist to render acting services on the Picture
following the break in production of the Picture related to the 2023 WGA and SAG-AFTRA labor
strikes."  Ex. 117, HEATH_000045307.

**Plaintiff's Response 201:**    Undisputed.

202.    The CRA did not contain any provision embodying a promise that Lively would
forego or delay any claim against any party.  Ex. 117, HEATH_000045307.

**Plaintiff's Response 202:**    Undisputed that no such provision appears on the face of the
CRA.

203.    At the time the CRA was executed, no long-form agreement had been signed, nor
had the terms of any long-form agreement been finalized.  Heath Decl. ¶¶17-18.

**Plaintiff's Response 203:**    Undisputed that the ALA had not been signed, but disputed
that the terms were not substantially finalized, and disputed to the extent that this assertion suggests
that the ALA was not a binding enforceable agreement. The face of the CRA itself confirms that
the parties "had" reached agreement on at least the material terms. Wayfarer Ex. 117. Further, only
20% of the terms remained subject to discussion around the time the CRA was executed, and
meanwhile both parties had commenced performance of their obligations under the ALA.
Wayfarer Ex. 266; Exs. 293 (WAYFARER_000067020) (Daily Prep Schedule detailing "Lily"
rehearsals); 294 (HEATH_000045201) (invoice from Blakel to IEWUM LLC for meal allowances

78

and assistant payments from January and February 2024); 295 (HEATH_000045200) (email from IEWU staff stating, "Please note we paid for Meals/Training and the assistant previously"); (BL-000038477) at BL-000038479 ("[W]e're shooting in LA on February 7th. We have chartered a jet for Ms. Lively's travel on February 5th.").

204.    The CRA did not include any admission or acknowledgement of improper conduct or that any of the conduct prohibited by the rider had ever occurred.  Ex. 3, SAC ¶ 149; SAC Ex. B.

**Plaintiff's Response 204:**    Disputed. Ex. 24, 10/9 Heath Tr. 27:10-29:2.

205.    Wayfarer Studios was not a party to the CRA.  *See* Ex. 117, HEATH_000045307.

**Plaintiff's Response 205:**    Undisputed that Wayfarer was not listed as a party in the recitals to the CRA but disputed that Wayfarer was not bound by the CRA; the CRA expressly obligates Wayfarer by name (Paragraphs 9, 12, 13, 14) and was signed by Wayfarer's President Jamey Heath. Wayfarer Ex. 117 at HEATH_000045308. In response to the CRA, Wayfarer's Vice President of Business & Legal Affairs, Imene Meziane, indicated that "Wayfarer, Sony, and Production" acknowledged the CRA and Lively's "concerns regarding safety, professionalism and workplace culture," and, with narrow caveats, promptly agreed to 16 of the 17 protections outlined in the CRA. Ex. 35.

206.    Lively has not provided any evidence that the compensation she received for her work was reduced following her demand for "Protections."

**Plaintiff's Response 206:**    Undisputed that the compensation Lively received for her work on the Film was not reduced following her request for implementation of the return-to-work protections detailed in the CRA.

207.    Following Lively's insistence on a list of "Protections," and the execution of the CRA, her role in the production and involvement in the film was not constrained or diminished in

any way. Instead, Lively's control over the film continued to expand. On December 28, 2023, Baldoni wrote that although he was angry and upset about "letting Blake take over a film and re-write a movie we spent years developing, writing and funding … I am waving the white flag and submitting. I am going to give her 98% of what she wants." Ex. 118, BALDONI_000018926.

**Plaintiff's Response 207:** Disputed. During 2024, Baldoni and Heath diminished Lively and her role in production through post-production and promotion of the Film. For example, on May 6, 2024, Baldoni and Heath shared with Hoover at a dinner that Lively was taking over the Film, saying "[w]e're not saying she's a narcissist, but she's exhibiting narcissistic behavior, and that she was making their lives very stressful during the filming, and it was not a good experience." Ex. 1, Hoover Tr. 61:14–62:8, 74:3–75:17. In post-production, Wayfarer and Baldoni fought Lively's involvement at every turn, attempting to block her access to the footage, railing against her role in the edit, and throwing a temper tantrum over her feedback to the trailer. Exs. 36. Exs. 150; 36; 296, BL_000008107; 297, HEATH_000051764.

208.     On January 4, 2024, Lively, Baldoni, Heath, and others met at Lively's apartment, at Lively's request. Ex. 12, Giannetti Dep. at 304:21-307:4; Ex. 119, AS000101. The meeting was intended to review new pages and discuss other aspects of production before shooting. Ex. 12, Giannetti Dep. at 305:11-22. When the parties arrived, they were surprised to see that Lively had invited her husband, Ryan Reynolds. Ex. 120, SPE_BL0004526 at -27. Reynolds then berated the Wayfarer Parties for their alleged mistreatment of his wife. Ex. 12, Giannetti Dep. at 304:21-307:4; Ex. 3, SAC ¶ 20.

**Plaintiff's Response 208:**     Disputed that attendees were surprised by the nature of the meeting given that the CRA specifically indicated that "[a]t Artist's election, an all-hands, in-person meeting before production resumes which will include the director, the existing third party

producer, the Sony representative, the newly-engaged third party producer, Artist and Artist's designated representatives to confirm and approve a plan for implementation of the above will be adhered to for the physical and emotional safety of Artist, her employees and all the cast and crew moving forward." Wayfarer Ex. 116 at BL-000038475; Ex. 4, Baldoni 10/7 Tr. 253:2–24. Further disputed that Mr. Reynolds "berated the Wayfarer Parties," an asserted proposition of fact that did not occur and that no evidence cited by the Defendants supports. Lively Decl. ¶ 24.

209.    During the meeting, Lively read a longer list of demands off her phone. *See* Exs. 111-112, BL-000038461-62; *see also* Ex. 3, SAC ¶20.  In addition to the "Protections" discussed above, these demands appeared to refer to several incidents Lively had raised previously, including Baldoni's reference to circumcision in their first meeting; his discreet inquiry about her weight in April 2023; and the events she had discussed in June 2023, such as the birth video she was shown by Heath and Baldoni's references to his prior pornography addiction; as well as insinuations that Defendants needed to be told not to discuss "personal experiences with sex" or make "sexual comments" to female cast or crew.  Lively also demanded that Baldoni not "speak" to her dead father, mention his own religious beliefs, or have "private, multi-hours meetings in Lively's trailer with Mr. Baldoni crying." Lively also demanded notice of COVID exposures on set.

**Plaintiff's Response 209:**    Undisputed that Lively included additional protections on the list kept on her phone, but Lively respectfully refers  the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith. These additional protections were also discussed above. *See supra* ¶ 191. 15, Saks Tr. 175:11–176:10; 2, Giannetti Tr. 173:25–175:25.

210.    Although the attendees were stunned by the nature of the meeting, they made efforts to assuage Lively's anger though neither Heath nor Baldoni admitted any wrongdoing.  Ex. 12,

Giannetti Dep. at 304:21-307:4; Ex. 4, Heath 10/8 Dep. Tr. at 290:11-24; Ex. 121, BALDONI_000026204.

**Plaintiff's Response 210:**     Disputed. Heath <mark>apologized for his conduct</mark> during the January 4 meeting. Exs. 2, Giannetti Tr. 129:7–9; 4, Baldoni 10/7 Tr. 272:6–23. Also disputed that Lively was "angry." Also disputed that attendees were "stunned" by the nature of the meeting given that the Return to Work Protections specifically indicated that "[a]t Artist's election, an all-hands, in-person meeting before production resumes which will include the director, the existing third party producer, the Sony representative, the newly-engaged third party producer, Artist and Artist's designated representatives to ***confirm and approve a plan for implementation of the above will be adhered to for the physical and emotional safety of Artist, her employees and all the cast and crew moving forward.***" Wayfarer Ex. 116 at BL-000038475 (emphasis added); Ex. 4, Baldoni 10/7 Tr. 253:2–24.   Lively Decl. ¶ 24.

211.     Sarowitz was not present at the meeting that took place in New York on January 4, 2024.  Ex. 6, Sarowitz Dep. Tr. at 273:6-10.  He does not recall exactly when he learned about the meeting.  Ex. 6, Sarowitz Dep. Tr. at 304:21-25.  Sarowitz recalls speaking to Baldoni about the meeting at some point in time but does not know the exact date they spoke.  Ex. 6, , Sarowitz Dep. Tr. at 303:19-304:7.

**Plaintiff's Response 211:**     Undisputed.

212.     Sarowitz was never aware that anyone ever referred to the meeting as an "HR complaints meeting."  Ex. 6, Sarowitz Dep. Tr. at 274:25-275:5.

**Plaintiff's Response 212:**     Undisputed that Sarowitz was not aware of anyone using this specific phrase, but disputed to the extent that the substantially identical substance was conveyed to Sarowitz <mark>in a text chain dated January 5, 2024, in which Baldoni described that in the meeting</mark>

Lively "read from a phone all of the things that [he] did while many of them were based in actual situations. The events were wrong and things were taken completely out of context. The word creepy and abuse were used in reference to me in my behavior I was then given the words of what to say, and had to apologize which I was unable to do because my brain was trying to comprehend what was happening." Ex. 37.

213.    Sarowitz is aware that Lively sent a list of demands for her return to work, which were honored.  Ex. 6, Sarowitz Dep. Tr. at 210:11-211:3.

**Plaintiff's Response 213:**    Disputed to the extent Lively's demand that "[t]here shall be no retaliation of any kind against [Lively] for raising concerns about the conduct described in this letter or for these requirements" was not honored. Ex. 32 at WAYFARER_000140992; *see also infra* ¶¶ 274; 275; 279; 280; 289; 404.

214.    Sarowitz has no knowledge that anyone at Wayfarer Studios committed any of the acts implied in the list of demands.  Ex. 6, Sarowitz Dep. Tr. at 227:2-13, 291:7-14.

**Plaintiff's Response 214:**    Disputed. Sarowitz was on a text chain dated January 5, 2024 in which Baldoni acknowledged that "many of" the things Ms. Lively complained of "were based in actual situations" and that Mr. Heath "did a beautiful job apologizing." Ex. 37.

215.    Sarowitz understood that Wayfarer Studios acceded to Lively's list of demands under duress and with a caveat saying that the studio did not necessarily agree with the demands. Ex. 6, Sarowitz Dep. Tr. at 291:7-14.

**Plaintiff's Response 215:**    Undisputed that Sarowitz testified that was his understanding.

216.    Around the time Lively provided her list of demands, representatives from Wayfarer Studios spoke to counsel, who advised there were no events that they felt would require an investigation. Ex. 6, Sarowitz Dep. Tr. at 224:12-15.

**Plaintiff's Response 216:**    Disputed. Defendants' assertion is unsupported by any admissible evidence, as Mr. Sarowitz's testimony was based entirely on inadmissible hearsay, and not personal knowledge. Ex. 11, Sarowitz Tr. 224:12–225:25.

217.    Between December 6 and December 10, 2023, Lively insisted upon revising, and did revise, numerous scenes in the film. Ex. 122, SPE_WF0000021; Ex. 123, SPE_WF0000022; Ex. 124, SPE_WF0000024; Ex. 125, SPE_WF0000025; Ex. 127, SPE_WF0000026; Ex. 127, SPE_WF0000027.

**Plaintiff's Response 217:**    Undisputed that Lively revised certain scenes in December 2023. Disputed as to the characterization that Lively "insisted upon revising numerous scenes in the film," which is not supported by the cited evidence. Wayfarer Exs. 122127. The cited exhibits reflect that revisions occurred, but do not establish that Lively demanded or insisted upon them. .

218.    In a revision of a karaoke scene, Lively explained that she was trying to "solve the conceptual issue that we had with karaoke, in that karaoke is…not a sexy interaction." Ex. 125, SPE_WF0000025. In her revised scene, a female character ends up in her male partner's clothing, while the male partner is apparently naked. A direction when Lively's character observes Baldoni's character reads: "This guy has one gear. Sex." Ex. 128, 24–CV–10049_0000319, at –355. Later the characters are described as "white knuckling their sexual tension." *Id*. at –356. Baldoni's character says to Lively's character: "I can't imagine what it would be like. To have you. What I could do for you." *Id*. at –358.

**Plaintiff's Response 218:**    Undisputed that the quoted language appears in Wayfarer Ex. 125 and Wayfarer Ex. 128, but Lively respectfully refers the Court to the cited sources for their complete contents and disputes any summary or interpretation inconsistent therewith.

219.    In another December 2023 revision, Lively directed Baldoni's character to say: "I'm a ripped neurosurgeon for chrissake. Have you seen anyone who looks like me who *isn't* on a daytime soap." Ex. 126, SPE_WF0000026.

**Plaintiff's Response 219:**    Disputed because Wayfarer Ex. 126 does not include the quoted language "I'm a ripped neurosurgeon for chrissake. Have you seen anyone who looks like me who *isn't* on a daytime soap."

220.    Production resumed on January 5, 2024. Ex. 12, Giannetti Dep. at 173:7–8.

**Plaintiff's Response 220:**    Undisputed.

221.    The second phase of filming took place primarily on a New Jersey set and with a few additional days in California. Ex. 24, Lively Dep. at 261:24–25.

**Plaintiff's Response 221:**    Undisputed.

222.    That day, Lively told Slate: "You're coming into a different set … You will find it perfectly professional and sterile and lovely." Ex. 129, BL–000020898.

**Plaintiff's Response 222:**    Undisputed that the quoted language appears in Wayfarer Ex. 129, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

223.    One week into filming, on January 14, 2024, Lively told Slate that she felt "Solid. It's a professional set and we're getting good work." Ex. 130, BL–000020899 at –900.

**Plaintiff's Response 223:**    Undisputed that the quoted language appears in Wayfarer Ex. 130, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

224.    Warren Zavala, Lively's agent, visited the set during the second phase of production with Lively's counsel. Zavala discussed with two other executives involved with the film that Lively and Baldoni were successfully collaborating and the executives "were feeling great about everything." Zavala has testified that, during the second phase of production, "It seemed like we were in a much better place, and I think Blake was feeling very positive about the final phase of the movie." Ex. 33, Zavala Dep. Tr. at 124:3–15; 236:19–237:22.

**Plaintiff's Response 224:**    Undisputed that the quoted language appears in Zavala's deposition, but respectfully refers the Court to the deposition transcript for its complete contents, including that Zavala visited the set with Ms. Lively's counsel who negotiated the Protections to ensure a safe set in Phase 2. Ex. 32, WAYFARER_000140991.

225.    Lively "managed the politics and HR concerns" on set, "acting as an intermediary to keep crew and case engaged, safe, and on board." Ex. 39, BL–000018396 at –97. Lively also "led hiring of a new intimacy coordinator and intimacy doubles" and "helped to manage the logistics and protections of a closed set. And when there were oversights, I stopped production to make sure the set was safe and complying with all players nudity riders and contracts." *Id.*

**Plaintiff's Response 225:**    Undisputed that the quoted language appears in Wayfarer Ex. 39, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

226.    Filming concluded on February 9, 2024. Ex. 3, SAC ¶ 21.

**Plaintiff's Response 226:**    Undisputed.

227.    Lively's letter to the PGA asserts that she had extensive control over the production during the second phase of filming and thereafter. Ex. 39, BL–000018396 at –97–98. Among other things, Lively stated:

When we came back after the strikes, I was writing as we were shooting…

On round two of the film…I would speak to our 1st AD Chris Surgent every night for nearly an hour

I was the director's partner in all creative and logistical concerns

I called and led meetings with all department heads, the studio and the distributor when we had extenuating circumstances challenging our production plan

**Plaintiff's Response 227:**    Undisputed that the quoted language appears in Wayfarer Ex. 39, but disputed as to the characterization as "extensive control," which is described instead as "the director's partner." Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

228.    On or about February 22, 2024, Lively told Sony that she would not agree to promote the film unless she was permitted to participate in the edit. Ex. 131, BALDONI_000018831.

**Plaintiff's Response 228:**    Disputed. The cited evidence does not support the assertion that Lively threatened not to promote the film unless permitted to participate in the edit. Lively told Greenstein at Sony that "[i]t would be a big problem for [her]" if she was not involved in editing, which is "a very common occurrence in our business" because "if an artist isn't comfortable with what's on–screen, they have the right not to promote." Ex. 38, Greenstein Tr. 161:1–7, 303:18–19; Lively Decl. ¶ 25.

229.    During the ensuing weeks, Lively made extensive edits to the film, trailer, and poster. *See* Ex. 132, BL–000019015 at –16; Ex. 133, BL–0000188 at –09.

**Plaintiff's Response 229:**     Disputed. The assertion that Lively made "extensive edits to the film, trailer, and poster" is argumentative and unsupported by the cited evidence. Wayfarer Ex. 132 reflects a text from Lively to Greenstein discussing the edit, and Wayfarer Ex. 133 reflects a text from Lively to Swift asking Swift to watch the trailer. Neither exhibit shows that Lively performed or directed extensive edits to any of these materials. Lively Decl. ¶ 33.

230.     Lively told famous friends, including Matt Damon, Lucy Damon, and Ben Affleck that she "rewrote the script. I directed every actor." Ex. 134, BL–000027070. She also did not hesitate to disparage Baldoni among her Hollywood crowd, describing him to Ben Affleck, for example, as a "chaotic clown." *See* Ex. 135, BL–000027069 ("I ended up rewriting and restructuring the entire script, I also ended up having to direct the movie via the chaotic clown 'director'/actor/producer/ financier/studio head at the center.").

**Plaintiff's Response 230:**     Undisputed that the quoted language appears in Wayfarer Ex. 134 and Wayfarer Ex. 135, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

231.     Lively urged Hoover as well as her famous friends, including Matt Damon, Lucy Damon, Ben Affleck, Bradley Cooper, and Taylor Swift to support her version of the film over Baldoni's. Ex. 134, BL–000027070; Ex. 135, BL–000027069; Ex. 136, BL–000018825. For instance, in April 26, 2024 messages, Lively and Swift discussed a plan to use Swift's song in the film's trailer. Swift wrote: "If Justin was strategic He would be like no Taylor swift in the trailer Because that gives you more power over the film, that's your ally not his." Lively responded: "You are so right…He should've run from your music…How stupid. This was his only shot at having the appearance of an upper hand." Ex. 137, BL–000018810.

**Plaintiff's Response 231:**    Undisputed that the quoted language appears in Wayfarer Ex. 134, Wayfarer Ex. 135, Wayfarer Ex. 136, and Wayfarer Ex. 137, but Lively respectfully refers the Court to the cited sources for their complete contents and disputes any summary or interpretation inconsistent therewith.

232.    On May 30, 2024, Josh Greenstein, the President of Sony's Motion Picture Group, informed Lively that Baldoni's cut had scored higher than Lively's in audience testing. Lively responded: "Spoke with Colleen. She feels like I do, still full steam ahead w my cut. … Colleen and I are declaring now, this is the cut. … It's done from my perspective, from Colleen's, and from Taylor's. And from Sony's?" Ex. 138, BL–000019326.

**Plaintiff's Response 232:**    Undisputed that the quoted language appears in Wayfarer Ex. 138, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

233.    Lively also demanded changes to the film's credits, including moving up her name ahead of Heath's as a producer, changing the order of cast credits, contrary to existing contractual terms, and removing a credit stating that *It Ends With Us* was a "film by" Baldoni altogether. Ex. 139, BL–000019455; Ex. 140, SPE_WF0000641; Ex. 141, SPE_BL0022958; Ex. 8, Baldoni 10/7 Dep. Tr. 328:9–17 ("Lively had requested that my name be removed. So I had my "a film by" credit removed."); Ex. 142, Greenberg Dep. Tr. 138:2–19.

**Plaintiff's Response 233:**    Disputed that Lively demanded anything; Lively made requests and they were granted. *Infra* Pl.'s Response ¶ 387. Undisputed that Lively proposed Baldoni remove his "film by" credit but disputed to the extent this paragraph suggests that doing so was inappropriate or that Baldoni did not waive his credit of his own volition. Wayfarer Ex. 142 at Tr. 138:2–19.

234.   Lively further objected to Baldoni's name being included in the trailer and near her name on the film's promotional poster. Ex. 142 at, Greenstein Dep. Tr. 325:6–327:14 ("Blake didn't want his name by her name…She did not feel comfortable having his name by her name.").

**Plaintiff's Response 234:**    Undisputed that Lively did not wish to jointly promote the Film with Baldoni.  Lively had concerns that appearing alongside or promoting the Film with Baldoni would falsely indicate to others that I endorsed his work, any previous misbehavior or the way he treated women, and worried that others may view my public association with him as an implicit stamp of approval or trust.  Lively Decl. ¶ 25.

235.   Lively also insisted that Baldoni's image be removed from marketing materials and the film's poster, which ultimately just featured Lively herself. Ex. 8, Baldoni Dep. (Oct. 7, 2025) at 328:9–17; Ex. 143, BALDONI_000024619.

**Plaintiff's Response 235:**    Disputed.  The posters that Lively worked on, included Baldoni's image. The poster that Sony ultimately selected as the hero poster for the film was a book cover that Sony had created, which always featured Lively's image exclusively.  Sony used the book cover as a temporary poster for Book Bonanza, decorating the theater in hundreds of them without Lively's prior knowledge. Given the stellar success of the event and the ecstatic audience reaction all around, they sought to replicate everything about the success of that event, including by selecting that book cover to remain as the hero poster for the film. Lively both worked on and pushed for marketing materials that included the character of Ryle. Exs. 2, Giannetti Tr. 45:14–46:4; 86, SPE_BL0008705 at SPE_BL0008709; 163 at BL-000018399.

236.   On or about June 25, 2024, in connection with her work on the film, Lively sought official recognition of her work from the Producers Guild of America. Ex. 39, BL–000018396. Her letter details her extensive control over the film, including in post–production. Ex. 39, BL–

000018396 at –96–98. She wrote: I've produced every moment of this film, from pre–production, through production, into post, and now into marketing and worldwide release … So much has changed … The most significant being that the cut of the film that was selected to be released, is my cut." Among other things, Lively stated:

> After working with the film's original editor, "I worked with my own editors [from] May 2 onward"
>
> "I brought on a new composer" and "hand selected 90% of the songs in the film"
>
> "I've been working on the [visual effects], overseeing every shot that makes it into the film"
>
> "The cut of the film that I led was selected as the version of the film that will be released."

**Plaintiff's Response 236:**     Undisputed that the quoted language appears in Wayfarer Ex. 39, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

237.     The film's post–production supervisor wrote: "For the last three months of the post–process, Lively has been involved in reshaping every aspect of the film including the final locked edit, the sound, the VFX, the score and song choices … She hired a new editor who she has been working with around the clock to re–edit and lock the film. She made all the decisions on where and when the last few previews would take place. … She has been overseeing all approvals of [visual effects]." Ex. 144, BL–000018409.

**Plaintiff's Response 237:**     Undisputed that the quoted language appears in Wayfarer Ex. 144, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

238.     Lively asserted that she was heavily involved in developing the marketing strategy for the film. Ex. 39, BL–000018396 at –98–99.

**Plaintiff's Response 238:**    Undisputed that Lively was involved with the Film's marketing, but disputed as to the characterization that she was "heavily involved in developing the marketing strategy," which is argumentative and unsupported by the cited evidence. Wayfarer Ex. 39 indicates that Lively's involvement with marketing began with the Film's trailer, not with developing the overall strategy, which began in January 2023 and did not include Lively. Exs. 38, Greenstein Tr. 67:21–74:4, 170:7–171:21, 236:19–237:11; 39; 40; Wayfarer Ex. 254 at BALDONI_000030668–69 (Wayfarer Campaign Concepts).

239.    Josh Greenstein, the President of Sony's Motion Picture Group, wrote that Lively "has been involved in ever decision when it comes to dating the movies and determining the release pattern … She might be the best marketer of any producer I have worked with … we have marketing calls daily." Ex. 145, BL–000018415.

**Plaintiff's Response 239:**    Undisputed that the quoted language appears in Wayfarer Ex. 145, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

240.    On July 7, 2024, Lively told renowned playwright Sarah Ruhl: "I have been reediting the entire film, I brought on my composer, and whole team to redo everything." Ex. 146, BL–000028962.

**Plaintiff's Response 240:**    Undisputed that the quoted language appears in Wayfarer Ex. 146, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

241.    The film premiered in New York City on August 6, 2024 and it was released to the public on August 9, 2024. Ex. 24, Lively Dep. at 274:13–17, 275:1–18.

**Plaintiff's Response 241:**    Undisputed.

242.    On or about July 17, 2023, during the filming hiatus and before presenting her "protections" demands, Lively and her husband Ryan Reynolds "unfollowed" Baldoni on Instagram.  *See* Ex. 3, SAC at 186 n.26.

**Plaintiff's Response 242:**    Undisputed that Lively and Mr. Reynolds unfollowed Mr. Baldoni's social media accounts in or around July 2023.

243.    After the conclusion of filming and leading up to the premiere, Lively and her husband Ryan Reynolds openly attacked and disparaged Baldoni, seeking to tarnish his reputation in Hollywood, including among their famous and powerful friends, as well as with fellow cast members, and in the media.  For instance:

a.  On May 17, 2024, Lively and Reynolds pressed Matt and Lucy Damon to support Lively's cut of the film.  Reynolds told them that Baldoni was "a malignantly vein[sic], sociopathic FAUXminist with almost no sense of boundaries or shame. I cannot believe he hasn't gone to jail…".  Ex. 134, BL-000027070.

b.  The same day, Lively wrote Ben Affleck, asking seeking his support.  She described Baldoni as a "chaotic clown 'director'" and said there were "wild HR issues" on set.  Ex. 135, BL-000027069.

c.  On May 24, 2024, Lively wrote to fellow cast member Brandon Skelnar: "the word is out [about Baldoni and Heath]… they wreck [sic] havoc everywhere they go. And everyone sees it. Then they come to me."  Ex. 109, BL-000020058, at -20063.

d.  On June 19, 2024, Lively exchanged messages with Colleen Hoover and another prominent author, Tarryn Fisher, in which Lively openly criticized Baldoni and labelled him "a narcissist."  Ex. 147, BL-000019740.

e.  Seeking a broader audience, Lively conveyed her negative views of the production to Anna Wintour, Vogue's world-famous editor.  Ex. 148, BL-000032000 (message from Anna Wintour to Lively referring to "how hard a situation it was for you [to make this film]").

**Plaintiff's Response 243:**    Undisputed that the quoted language appears in private conversations with friends and co-workers, but disputed that Lively and Reynolds "openly attacked and disparaged Baldoni" with the purpose of "tarnish[ing] his reputation in Hollywood." The cited evidence demonstrates Lively was sharing her truthful story of harassment by Baldoni and Heath and seeking support from friends and colleagues, not "seeking to tarnish" Baldoni's reputation. Wayfarer Exs. 134 at BL-000027072–27072 (retelling friends incidents endured where "weeks before shooting, and right after Blake had given birth to our son," Baldoni asked her trainer about her weight, and Baldoni telling Lively that "he speak[s] to [her] (deceased) father often"); 135 (Lively seeking support on project that was "the most upsetting experience I've ever had on a movie"); 109 at BL-000020063 (despite her experiences, Lively told her colleague she had "been protecting it from getting out [because] all I want to do is focus on the work and not be pulled into the fucking mess they make"); 147 at BL-000019740 (Fisher, without prompting, reaching her own conclusion that Baldoni is "a sociopath"); 148 at BL-000032000 (a friend whom Lively confided in expressing support in light of "how hard a situation it was for you").

244.    During the relevant period, Baldoni, Reynolds, and Lively were all represented by WME, a famous and powerful talent agency.  Ex. 142, Greenberg Dep. at 12:16-18, 17:7-18:14, 35:25-36:2.

**Plaintiff's Response 244:**    Undisputed that WME represented Lively and Reynolds during the relevant time period, and that WME represented Mr. Baldoni from 2019 through on or

around December 22, 2024. Ex. 41, Greenberg Tr. 18:6–16. Disputed on the grounds that the relevant time period extends beyond December 22, 2024.

245.    On July 13, 2024, Reynolds wrote Patrick Whitesell, Executive Chairman of WME, describing Baldoni as "a thoroughbred, predatory fraudster" and requesting that Baldoni's WME agent Danny Greenberg be enlisted to "present options," including, among others, having Baldoni write "15 page apology letters to Blake and dozens of other folks from the film." Ex. 149, RR-SUBPOENA-000000082.

**Plaintiff's Response 245:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers  the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

246.    On or about June 20, 2024, a promotional event for the film was held at Book Bonanza, Hoover's annual romance-book convention.  Baldoni was not permitted to attend.  Ex. 11, Saks Dep. Tr. at 150:7-152:22. Ex. 75, Ferrer Dep. Tr. at 272:16-276:3.  At the event, Hoover and Lively pointedly avoided even referring to Baldoni by name.  Ex. 11, Saks. Dep. Tr. at 151:24-153:17.

**Plaintiff's Response 246:**    Undisputed that a promotional event for the Film was held at Book Bonanza that Baldoni did not attend, but otherwise disputed. Book Bonanza was an annual fundraising event to support the non-profit organization Bookworm Box, which was founded by Hoover. Ex. 1, Hoover Tr. 30:2–25. In 2024, Book Bonanza took place June 13-15, 2024. *Id.* 109:13–110:4; *see also* Ex. 42 (SPE_BL0019748). The reason for Baldoni's absence is a disputed fact: Ferrer testified that Hoover "didn't feel comfortable doing the festival with him anymore," leading to Hoover "disinvit[ing] him," Ex. 10, Ferrer Tr. 273:18–275:23, while Hoover testified

that "Sony or someone decided which of them would go," because "at this point, [Baldoni and Lively] wouldn't be together in the same location, Ex. 1, Hoover Tr. 111:11–20.

247.    In July, Lively excluded Baldoni from a marketing shoot for the film conducted by her husband's marketing company, Maximum Effort.  Ex. 152, ABEL_000018946; Ex. 142, Greenberg Dep. Tr. at 227:3-14.

**Plaintiff's Response 247:**    Disputed. The evidence cited does not support Defendants' assertion that Baldoni was "excluded" from a marketing shoot. Wayfarer Exs. 152 at ABEL_000018946. To the contrary, the evidence shows that Baldoni's representatives explicitly stated they were "not asking AT ALL for Justin to be flown to NY and in the room with Blake," but rather were "just asking for him to be incorporated into whatever content is produced so optically it isn't evident he isn't included." Wayfarer Ex. 152 at ABEL_000018947. Sony assured Baldoni's representatives that their "content team [was] putting together a few pieces for Justin," to which Baldoni's PR agent, Abel, responded "Wonderful thank you!" *Id.* at ABEL_000018946.

248.    Lively and others at Sony were aware that the media, including social media, was picking up on Lively's efforts to alienate Baldoni from the cast and film, while generating adverse publicity about Baldoni.  For instance:

a.    On July 11, 2024, the book's author, Colleen Hoover, sent Lively an image of a post from Deux Moi, a gossip blog with two million followers, noting that Baldoni had been excluded from all press for the film and that Lively had unfollowed him on social media.  Ex. 153, BL-000021232.

b.    On July 29, 2024, Sony executives discussed numerous comments on Lively's Instagram account observing that Baldoni had been absent from press for the film. Ex. 154, SPE_BL0008472.

**Plaintiff's Response 248:**    Undisputed that <mark>Hoover sent Lively a screenshot of a post from Deux Moi (although she sent it on July 12, 2024) that noted Baldoni was "missing from" the Film's press and that Lively "doesn't follow him on IG," Wayfarer Ex. 153, and that on July 29, 2024, Sony executives internally circulated comments posted on Lively's Instagram account observing that Baldoni had been absent from press for the film, Wayfarer Ex. 154.</mark> Otherwise disputed because the evidence Defendants cite does not support their assertions or characterizations that (1) Lively made "efforts to alienate" Baldoni, (2) there was "adverse publicity about Baldoni" at the time, (3) <mark>Deux Moi had or has two million followers, or</mark> (3) the <mark>Deux Moi post suggested that Baldoni was "excluded" from all press or that Lively had "unfollowed" Baldoni</mark>. *See* Wayfarer Exs. 153, 154.

249.    On or about July 22, 2024, <mark>Lively insisted to Sony that she would not attend the film's premiere if Baldoni was present as well, and she encouraged the book's author and other cast members to take the same position.</mark>  *See* Ex. 155, WME_00001254 (Danny Greenberg, writing: "[Lively's] been brilliantly choreographing this for a while."); Ex. 156, WME_00001266.

**Plaintiff's Response 249:**    Disputed. <mark>Lively told Sony that she "didn't want to be on the red carpet," "in photographs," or "seated near" Baldoni during the premiere—an obvious extension of her clear boundary to not appear in promotion with Mr. Baldoni due to how he treated women in connection with the Film.</mark> Exs. 38, Greenstein Tr. 287:7–288:22; 33, Stone Tr. 394:7–395:1 <mark>("she definitely had concerns about not wanting to appear as somebody endorsing as a filmmaker, that people, let alone other women, should be working with in the future");</mark> Lively Decl. ¶ 25. <mark>Lively did not encourage Ms. Hoover or any other cast member to take the same position,</mark> Ex. 33, Stone Tr. 395:2–14, <mark>although numerous women associated with the Film independently decided they would not appear in promotion with Baldoni.</mark> Exs. 12, Slate Tr. 114:5–115:9, 120:5–19.

JS0000284 (Slate deciding a year prior she did not want to promote the Film with Baldoni or Heath without having discussed with Lively); 15, Saks Tr. 154:3–155:5; 43 (noting that writer Christy Hall would not do press with Baldoni); 1, Hoover Tr. 253:10–254:5; 24, Heath 10/9 Tr. 134:11– 135:20 (acknowledging Saks "also would not go to the premiere").

250.    Ultimately, Baldoni and the Wayfarer team were not allowed to be on the red carpet during the premiere, except during specified times when Lively was not present.  Baldoni and his team were also required to wait in a basement while Lively conducted her red carpet pictures, and then view the film on a separate screen.  Ex. 2, Heath 10/9 Dep. Tr. at 96:18-21; Ex. 6, Sarowitz Dep. Tr. at 140:11-13; Ex. 157, WAYFARER_000141754; Ex. 158, WAYFARER_000141765.

**Plaintiff's Response 250:**    Disputed.  The evidence cited does not support Defendants' assertion that Baldoni and the Wayfarer team were "not allowed" to be on the red carpet unless Lively was not present.  It also does not support Defendants' assertion that Baldoni was required to wait in a basement or that Defendants viewed the Film on a separate screen.

251.    Following the premiere, Baldoni was excluded from a "sizzle" reel, promoting the film by showing attendees.  Ex. 159, SPE_BL0023136.

**Plaintiff's Response 251:**    Undisputed that Sony executive, Greenstein, instructed the Electronic Press Kit team to not include Baldoni in the premiere "sizzle" reel. Ex. 38, Greenstein Tr. 290:6–16.

252.    For years prior to the events at issue here, Jennifer Abel, a public relations professional, had worked with Wayfarer and Baldoni on PR matters.  Ex. 160, Abel Dep. Tr. at 38:15-40:17.

**Plaintiff's Response 252:**    Undisputed.

253.    Wayfarer and Baldoni were concerned that any adverse media would harm the reception and success of the film.    Ex. 161, Hanks Dep. Tr. at 275:8-15; Ex. 162, HEATH_000019467.

**Plaintiff's Response 253:**    Undisputed that Wayfarer and Baldoni were concerned that adverse media would harm the reception and success of the film, but the above is misleading because it omits that Baldoni also had "[s]o much fear of [Lively] coming out and going public about how [he is] a bad person and unsafe and not who [he] say[s] [he is]." Exs. 36; 4, Baldoni 10/7 289:10–291:20; 44; 45 at BALDONI_000018853 ("She had the nuclear bomb. If she doesn't promote the movie she can leak that I'm a bad person or that she felt unsafe with me and 'all the stuff' she has on me.").

254.    Even as the negative press intensified, Wayfarer gave Abel and her colleagues "explicit instructions…to not place any story that was negative about Blake [Lively] or otherwise. Our main focus was to mitigate the negative press that was breaking, organically, from the press tour."  Ex. 160, Abel Dep. Tr. at 340:15-22.

**Plaintiff's Response 254:**    Disputed. A plethora of evidence instead supports that Wayfarer, Baldoni, Abel, Nathan, and TAG strategized and executed on a plan to "bury" Lively, that included "get[ting] ahead of the narrative," pushing out "key messaging points" that were negative about Lively, and placing or amplifying negative stories about Lively in the press and on social media. Exs. 46 at NATHAN_000005504; 47; 48; 49; 50 at JONESWORKS_00016238; 51; 52, Abel 9/26 Tr. 173:5–16, 187:16–188:1; 53; 54; 55; 56; 57, Case Tr. 259: 2–15; 58 at Vituscka000016; 59; 60; 61; 62, Koslow Tr. 312:2–8; 63; 64; 65; Wayfarer Ex. 224.

255.    On July 24, 2024, Heath and Jen Abel agreed that "we should not be [doing] anything proactive" in response to the swirling press rumors.  Ex. 163, BL-000006379 at -6410.

**Plaintiff's Response 255:**    Disputed. The document Defendants cite does not contain the quoted language. Wayfarer Ex. 163, at BL-000006410. Also disputed for the reasons set forth in Plaintiff's Response ¶ 254.

256.    On or about July 25, 2024, Baldoni and Heath first met with TAG, Melissa Nathan's PR firm, to discuss the possibility of retaining the firm for crisis PR.  Ex. 164, KCASE-000005773. A TAG employee's notes from that meeting state that Wayfarer was "Not going to fire offensive bullets but [wanted] to have a strategy."  *Id*.

**Plaintiff's Response 256:**    Undisputed that Baldoni and Heath first met with TAG on or about July 25, 2024. Also undisputed that the quoted language appears in the cited source, but Lively respectfully refers  the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

257.    On July 26, 2024, TAG circulated a proposed "Scope of Work.".  Ex. 165, NATHAN_000003795.  It included providing "support" for Baldoni and others with "independent strategic counsel," "curat[ing] statements, background information, and talking points for the press reflecting [Wayfarer's] core values, key messaging, and the integral role they played to bring this film to life," developing a "scenario planning document," identifying "third party validators," working to "mitigate negative stories / correct inaccuracies," and monitoring coverage, as well as providing input on press strategies and media training.

**Plaintiff's Response 257:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers  the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

258.    On July 30, 2024, Wayfarer President Tera Hanks wrote to Stephanie Jones: "Melissa [Nathan] would not be having any comms outside of our internal teams. She would be

working through scenario planning with us to be armed if needed." Ex. 166, JONESWORKS_00030156.

**Plaintiff's Response 258:**    Undisputed that the quoted language appears in the cited source, but disputed that Nathan did not have communications outside of the internal Wayfarer team, as she reported speaking to her contacts at the Daily Mail and DeuxMoi as early as August 4, 2024. Ex. 50; Wayfarer Ex. 228.

259.    Wayfarer hired TAG and Nathan on August 2, 2024.    Ex. 167, JONESWORKS_WAYFARER_000003009.

**Plaintiff's Response 259:**    Undisputed.

260.    On August 2, 2024, TAG circulated a "Scenario Planning" document listing a series of possible options for responding to the public relations crisis facing Baldoni and Wayfarer.  Ex. 168, NATHAN_000005497.  Nathan has testified that document was not an approved action plan, but only a preliminary document for the purposes of "scenario planning," with each suggestion being only "a possibility.  This is not definitive."  Ex. 169, Nathan 9/29 Dep. Tr. at 111:18-112:4 ("[T]his is scenario planning. So this is a possibility. This is not definitive.").

**Plaintiff's Response 260:**    Undisputed, except that evidence suggests certain options set forth in the Scenario Planning Document were indeed acted upon, such as, for example, (1) "giving a friendly reporter who is covering the film a simple line hinting that [ ] you and Blake . . . 'had our differences,'" to "tee[] up reporters properly that there were issues with her," Exs. 54; 53, and (2) "planting stories about the weaponization of feminism and how people in BL's circle like Taylor Swift, have been accused of utilizing these tactics to 'bully' into getting what they want," Ex. 55. When discussing the contents of the Scenario Planning Document, Nathan told Abel: "when we send over documents we can't send over the work we will or could do because

that could get us in a lot of trouble. . . . Imagine if a document saying all the things that he wants

ends up in the wrong hands. The work is not the document." Ex. 47.

261.    On August 4, 2024, TAG employees exchanged messages discussing the "need to

explain to [Heath]/ Jen ahead of time not to get hyper focused on document" because they "can't

get stuck on something that might change." Ex. 170, KCASE-000002654.

**Plaintiff's Response 261:**    Undisputed that the quoted language appears in the cited

source, but Lively respectfully refers  the Court to the cited source for its complete contents and

disputes any summary or interpretation inconsistent therewith.

262.    On or about August 7, 2024, additional cast members unfollowed Baldoni on social

media, at Lively' prompting.  *See* Ex. 171, SPE_WF0000719 at -721 (Maggin: "The unfollowing

has really picked up today." Saks: "Why did everyone have to fucking do that? … It's Blake, I'm

sure.").

**Plaintiff's Response 262:**    Disputed. Lively did not cause or suggest that cast members

stop following Baldoni on social media. Ex. 281, Lively Tr. 177:2–178:1. Saks testified that she

does not have knowledge whether Lively engaged in efforts to "have the cast and crew de-friend

Mr. Baldoni on social media." Ex. 15, Saks Tr. 278:17–279.1.

263.    On August 8, 2024, *The Hollywood Reporter* published an article entitled: "Did

Blake Lively, Justin Baldoni Have A Rift Over It Ends With Us? Sleuthing TikTokers Think So."

Ex. 3, SAC ¶ 237 n.36. The article discussed Baldoni being excluded from press for the film and

unfollowed by Lively and other cast members.

**Plaintiff's Response 263:**    Undisputed the referenced article was published and

referenced "Baldoni's notable absence from joint press events; the lack of group photos of Lively

and Baldoni together at [the] premiere; and the fact that neither Lively, Hoover, nor the rest of the cast, follow Baldoni on Instagram." Wayfarer Ex. 3.

264.    On or about August 8, 2024, Lively's PR representative, Leslie Sloane, told Sara Nathan, a gossip reporter, that the "whole cast isn't speaking with [Baldoni]."  Ex. 172, LS-0000223 at -224.  Sloane testified that she provided this information to "soften up" and "balance out the story" that the reporter was working on, which she anticipated would be "negative about Justin and Blake."  Ex. 173, Sloane Dep. Tr. at 100:15-104:7.

**Plaintiff's Response 264:**    Undisputed.

265.    Sloane also told Sara Nathan that Lively and Baldoni "had [separate] screening rooms at the premiere. Everyone but him was with the cast. His cult had their own room."  Ex. 172, LS-0000223 at -224.  Sloane testified that she provided this information "to balance [the reporter's] story."  Ex. 173, Sloane Dep. Tr. at 103:8-18.

**Plaintiff's Response 265:**    Undisputed that Sloane told Nathan that Baldoni "had [separate] screening rooms at the premiere. Everyone but him was with the cast. His cult had their own room," Wayfarer Ex. 172 at LS_0000224, but disputed that the testimony Defendants cite supports the assertion that Sloane provided that information to balance Nathan's story. *See* Wayfarer Ex. 173, Sloane Dep. Tr. at 103:8–18.

266.    On August 8, 2024, Sloane communicated with James Vituscka, a gossip reporter at the *Daily Mail*.  Ex. 174, LS-0000243.  Sloane denied that there was any "power struggle" between Lively and others on set; that Lively and Reynolds "had insisted on rewriting the movie;" and that Lively "got very opinionated over directorial issues."  *Id*. at -244.  Sloane told Vituscka his sources were "lying," although she did not know whether her denials were accurate at the time. Ex. 173, Sloane Dep. Tr. at 148:4-152:12.

**Plaintiff's Response 266:**    Undisputed that the quoted language appears in the cited sources, but Lively respectfully refers  the Court to the cited sources for their complete contents and disputes any summary or interpretation inconsistent therewith.

267.    The same day, Sloane complained to Danni Maggin, a Sony marketing executive, that Stephanie Jones, then a member of Baldoni's press team, had been "calling around saying Blake stuff," which included "that Blake and Ryan insisted on rewriting the movie and …that she got very opinionated over directorial issues and that Justin found her difficult.  Blah blah blah." Ex. 175, LS0000314 at -315.

**Plaintiff's Response 267:**    Undisputed.

268.    Heath, Abel, and Nathan did not want to add fuel to the fire by prompting additional adverse media.  In particular, they told Jones not to contact the press about Lively.  Upon learning that Jones had done so, on August 9, 2024, Heath wrote to Jones: "I remind us all not to contact, respond, or reply to anyone under any circumstances."  Ex. 176, JONESWORKS_00030241.

**Plaintiff's Response 268:**    Undisputed that the quoted language appears in the cited source, otherwise disputed because the document cited does not support the remaining assertions, including because Abel and Nathan do not appear on the communication. *See* Wayfarer Ex. 176. Further disputed to the extent the fact suggests Jones did, in fact, contact press about Lively, which Jones denies. Ex. 191, Jones Tr. at 193:24-196:10.

269.    On August 9, 2024, *The Daily Mail* published an article entitled: "Disturbing TRUTH behind why Blake Lively and her It Ends With Us stars are feuding with Justin Baldoni." Ex 177, James Vituscka & Lillian Gissen, "Disturbing TRUTH behind why Blake Lively and her It Ends With Us stars are feuding with Justin Baldoni" (Aug. 15, 2024), https://www.dailymail.co.uk/tvshowbiz/article-13727789/it-ends-blake-lively-justin-baldoni-

feud.html.[1]   That article quoted sources asserting Baldoni was 'chauvinistic' and 'borderline abusive' on set.   It also noted that "rumors of a vicious feud" between Lively and Baldoni had "been swirling for weeks, with online sleuths highlighting how the on-screen love interests were not pictured together at the US premiere – while some cast members have blatantly swerved questions about the director."

**Plaintiff's Response 269:**     Undisputed.

270.     That day, Lively's agent wrote to Lively: "I just read the Daily Mail article. I feel it puts enough out there."  Ex. 178, BL-000020323 at -324.

**Plaintiff's Response 270:**     Undisputed that the quoted language appears in the cited source, but Lively respectfully refers  the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

271.     Sony executives believed the *Daily Mail* article was planted by Lively's PR representative, Leslie Sloane.  Ex. 179, SPE_WF0000740179.

**Plaintiff's Response 271:**     Undisputed that, on August 9, 2024, one Sony executive (Grant) expressed her opinion to other Sony executives that the source in the Daily Mail article was Sloane, *see* Wayfarer Ex. 179, SPE_WF0000740179, but otherwise disputed because Sloane has never seeded or planted a story. Ex. 68, Sloane Tr. 155:22–25.

272.     On August 7, 2024, Abel wrote to Nathan: "I think we really need to put the social combat plan…into motion."  Ex. 180, NATHAN_000003599 at -602.  She noted that she was waiting on a greenlight from Heath to do so.  *Id.* at -603.

---

[1] District courts have discretion to take judicial notice of online articles and websites, and the Court may properly notice such facts on summary judgment.  *See Fed. Election Comm'n v. Hall-Tyner Election Campaign Comm.*, 524 F. Supp. 955, 959 n.7 (S.D.N.Y. 1981), *aff'd*, 678 F.2d 416 (2d Cir. 1982) ("[A]ny facts subject to judicial notice may be properly considered in a motion for summary judgment."); *Baron A. Wolman Archives Tr. through Wareham v. Complex Media, Inc.*, No. 20 CIV. 152 (ER), 2022 WL 523597, at *1 n.3 (S.D.N.Y. Feb. 22, 2022) (taking judicial notice of *New York Times* and *Rolling Stones* articles); *Staley v. FSR Int'l Hotels Inc.*, 775 F. Supp. 3d 720, 725 n.3 (S.D.N.Y. 2025) (taking judicial notice of news articles and website).

**Plaintiff's Response 272:**    Undisputed that Abel wrote the quoted language to Nathan, and instructed Nathan to "call Jamey and get the [green] light." Wayfarer Ex. 180 at NATHAN_000003602-03.

273.    On August 8, 2024, Nathan proposed a quote for a new scope of work that included additional social media engagement.  Ex. 181, JONESWORKS_00006978; Exs. 182-183, SR 1.00000007-08.

**Plaintiff's Response 273:**    Disputed. It was on August 5, 2024 (not August 8) that Nathan sent Heath and Abel quotes for digital services, including for the "creation of social fan engagement to go back and forth with any negative accounts, helping to change narrative and stay on track." Ex. 66.

274.    On or about August 9, 2024, Wayfarer engaged Jed Wallace's firm, Street Relations, to monitor the social media discussion concerning Lively, Baldoni, and the film.  Ex. 184, SR 1.00000011.

**Plaintiff's Response 274:**    Disputed. The document Defendants cite shows that it was on August 8, 2024 (not August 9) that Nathan connected Heath and Jed Wallace over email, writing that "[Wallace] is aware we are going for their Quote two option for $30,000 PM for 3 months." Wayfarer Ex. 184. Quote two was "for creation of social fan engagement to go back and forth with any negative accounts, helping to change narrative and stay on track," as well as "a lot more" that would be "easier to discuss via phone in terms of capabilities." Ex. 66. That same day, Wallace told Wayfarer that "this is our wheelhouse and have it prioritized across all platform-specific specialists working for me." Ex. 67 at HEATH_000048498. By August 9, 2024, Wallace reported to Wayfarer that his "team *is/has been* in full throttle mode on [its] Wayfarer focus!" *Id.* at HEATH_0000048496 (emphasis added).

275.    Jed Wallace has testified that his firm did not surreptitiously spread negative information about Lively and has no ability to do so.  Ex. 185, Wallace 10/9 Dep. Tr. at 23:19–24:1 (describing Street Relations' capabilities in the digital space as "minimal" and limited to "monitoring").

**Plaintiff's Response 275:**    Undisputed that Wallace testified as such, but Plaintiff disputes the veracity of that testimony in light of extensive evidence indicating Wallace regularly offered and provided such services to clients, and that Wallace orchestrated a digital smear campaign against Lively beginning in August 2024. Exs. 207 (NATHAN_000003780) (Digital Scope of Work); 299 (STREET 3.000305) at STREET 3.000306 (Scope of Work); 209 (STREET 3.000492) at STREET 3.000493 (Scope of Work); 210 (STREET 3.000199) at STREET 3.000201 ("I have the forensic guys rewriting the ███████ image metadata . . ." "we are suppressing those posts/links/articles too"); 211 (STREET 3.000499) at STREET 3.000500-501 ("[I] have the various teams heavily clipping and algorithm boosting it for you and all the keywords I've got trending for you"); 212 (STREET 3.000204) at STREET 3.00205 ("I need to be able to throw a ton of upvotes at stuff that is rah rah rah for ███ . . . and need to downvote everything else"); 213 (STREET 3.000366) at STREET 3.000366 ("This is exactly the kind of content . . . that our team can elevate across all algorithmically driven platforms"); 214 (STREET 3.000486) at STREET 3.000487 ("We are undoing years of suppression related to your name and all related handles"); (STREET 3.000495199) at STREET 3.000497 ("[U]se our team of specialists to build all the digital (Reddit, site, X, 4 Chan, discord, etc) messaging to trend and dominate in client's favor"); 216 (STREET 3.000326) at STREET 3.000326 (Scope of Work prepared by TAG and Wallace for ████████████████); 217 (STREET 3.000360) at STREET 3.00361–362 (performing digital services for ██████); 215, (Wallace Ex. 14 (STREET 3.000495) at STREET 3.000497

(performing digital services for ███████████████); 218 (STREET 1.000005) at STREET 1.000005 (Katie Case informing Wallace that "Wayfarer would like to move forward ASAP with social / digital mitigation and remediation"); 67 (HEATH_000048496) at HEATH_000048498 (Wallace to Heath: "this is our wheelhouse and have it prioritized across all platform-specific specialists working for me"); (BBKOSLOW-000004011) at BBKOSLOW-000004013 (Case tells Abel they had "flagged [a creator posting negative Baldoni content] to Jed and his team for more serious action on the social side"); 224 (KCASE-000000728) at KCASE-000000732 ("Thank the lord for Jed"); 225 (BBKOSLOW-000003330) at BBKOSLOW-000003338, BBKOSLOW-000003341 ("Thank the lord for social and digital mitigation lol . . ." "That's us lol"); (KCASE-000001540) at KCASE-000001541 ("started to see a shift on social, due largely to Jed and his team's efforts to shift the narrative"); 70, Culotta Report ¶ 9, ¶¶ 54–60, 65, ¶ 67 (finding evidence of inauthentic activity TikTok); ¶¶ 72, 79–81, ¶ 87, (finding evidence of inauthentic activity Reddit); ¶ 95 (finding evidence of inauthentic activity YouTube); ¶ 96–97 (finding indicia of inauthenticity/manipulation).

276.    In August 2024, Baldoni himself repeatedly made positive comments about Lively in the press. For example, Baldoni told *Entertainment Tonight* that he thought Lively was "ready to direct." Ex. 186, BL-000003219.

**Plaintiff's Response 276:**    Undisputed that in response to a question about whether he would be directing the Film's sequel, Baldoni told *Entertainment Tonight*: "I think that there are better people for that one. I think Blake Lively's ready to direct, that's what I think." Wayfarer Ex. 186. Disputed that this comment can be characterized as a "positive comment" about Lively when the public connected this statement to "[r]umors [that] said Ryan Reynolds and Blake Lively wanted to take over the scripts or they made so many edits." *Id.*

277.    Melissa Nathan confirmed to Sloane that she was not "seed[ing] or plant[ing] negative press about Blake Lively on Justin's behalf," Ex. 173, Sloane Dep. Tr. at 205:15-19.

**Plaintiff's Response 277:**    Undisputed that Nathan told Sloane that she was not "going to seed or plant negative press about Blake Lively on Justin's behalf," but Sloane believed Nathan was doing so based on Nathan sharing with her that "[Baldoni is] somewhat of an idiot and did stupid things and that's why she's here to clean them up." Ex. 68, Sloane Tr. 203:5–207:12.

278.    On August 8, 2024, Nathan also told her own sister, gossip reporter Sara Nathan, that she had not contacted reporters on Baldoni's behalf and did not intend to do so.  Ex. 187, NATHAN_000002493.

**Plaintiff's Response 278:**    Undisputed that Nathan told her sister that she had not contacted reporters on Baldoni's behalf, however, evidence shows that she had spoken to reporters, including at the *Daily Mail*, regarding Baldoni prior to August 8, 2024. Exs. 50 at JONESWORKS_00016238; 69 at JONESWORKS_00016249; Wayfarer Ex. 228.

279.    A gossip reporter, James Vituska, separately told Sloane that Nathan had never planted anti-Lively stories with *the Daily Mail*. Ex. 173, Sloane Dep. Tr. at 287:21-288:3.

**Plaintiff's Response 279:**    Undisputed that Vituscka told Sloane that Nathan "had not done anything anti-Blake," Ex. 68, Sloane Tr. 287:21–288:7, however evidence shows that TAG placed at a minimum two negatives stories regarding Lively with the *Daily Mail*. Exs. 55 at JONESWORKS_00016354-16355; 56; 57, Case Tr. 259:2–15; 58 at Vituscka000016; 59 at KCASE-000002822; 60 at BBKOSLOW-000001025; 61 at KCASE-0000004758–4759; 62, Koslow Tr. 312:2–8.

280.     As of August 11, 2024, Baldoni believed there was a "truce" between his PR team and Lively's, which would inure to the benefit of the film.  Ex. 188, JONESWORKS00015018 at -18.

**Plaintiff's Response 280:**     Disputed. On August 10, 2024, Baldoni was informed that there had been "a shift on social, due largely to Jed and his team's efforts to shift the narrative toward shining a spotlight on Blake and Ryan," and in the days following Baldoni and Abel instructed TAG and the digital team to boost and amplify negative content regarding Ms. Lively, while simultaneously amplifying pro-Baldoni content. Ex. 63 at BALDONI_000015463; Wayfarer Ex. 224.

281.     On August 11, 2024, the *New York Times* published an article entitled "What 'It Ends With Us' Says About the Blake Lively Brand."  Ex 189, Esther Zuckerman "What 'It Ends With Us' Says About the Blake Lively Brand" (Aug. 11, 2024), https://www.nytimes.com/2024/08/11/movies/it-ends-with-us-blake-lively-brand.html.     The article discussed Lively's efforts to cross-promote the film and her personal haircare and alcohol brands as well as her husband's brand of gin.  For instance, it stated: "A promotional email explained how to make 'It Ends With Us'-inspired cocktails using Betty Buzz. One recipe called for Reynolds's gin. It's a cheery gimmick that seems awkwardly out of step with the context of the film itself, which tells the story of a woman dealing with domestic violence. … [Lively's] performance is almost beside the point. Lively has transformed the project into film-as-commerce." *Id.* There is no evidence that Defendants played any role in this article.

**Plaintiff's Response 281:**     Undisputed that this article was published, or that the quoted language appears in the cited source, but Lively respectfully refers  the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

282.     On August 13, 2024, in an analysis of the social media sentiment regarding the film, a Sony executive observed: "Some younger audiences felt Justin spoke to the DV [domestic violence] subject matter more seriously, while others criticized Blake's approach (including the focus on her outfits & hair care company, and co-promotion of the film with Ryan)."  Ex. 190, SPE_BL0003328.

**Plaintiff's Response 282:**     Undisputed that the quoted language appears in the cited source alongside Smalle's observation that "[n]egativity around Blake was most prominent on Twitter and TikTok . . . while Facebook and Instagram were much more supportive overall." Wayfarer Ex. 190, SPE_BL0003328..

283.     Also on August 13, Nathan privately observed to Abel that there was a "completely unsolicited story from tmz – Blake has a huge ego [Justin Baldoni] was liked by many cast and crew And this is her ego being bruised."  Abel responded: "Not from any of us obv."  Nathan agreed: "Totally not from us."  Abel concluded:  "These are clearly people on set coming out to defend [Baldoni] which is good and we just let them do their thing."   Ex. 191, NATHAN_000000547.

**Plaintiff's Response 283:**     Undisputed, except as to the characterization as "privately observed" because Heath was included on the text chain as well. Wayfarer Ex. 191, NATHAN_000000547.

284.     The same day, Lively wrote to another male cast member: "we are each looking to post resources for people experiencing DV (and should fill you in more first) if you wanna post also."  The cast member responded: "Great…definitely getting hit with comments."  Ex. 192, BL-000020228 at -229.

**Plaintiff's Response 284:**    Disputed. The message Lively wrote was: <mark>"Fyi we are each looking to post resources for people experiencing DV I can (and should fill you in more first) if you wanna post also."</mark> Wayfarer Ex. 192 at BL-000020228.

285.    On or about August 19, 2024, <mark>NBC reached out to Lively's team for comment about an article on survivors of domestic violence who had a negative reaction to her preferred promotion of the film as a "fun summer romance", as well as Reynolds's involvement and Lively's cross-promotion with his film.</mark> Ex. 193, WME_00001051.

**Plaintiff's Response 285:**    Disputed. On August 19, 2024, an NBC reporter reached out about "writing a story looking at how domestic violence survivors feel about the marketing around" the Film. Wayfarer Ex. 193. The Film's marketing strategy was developed by Sony and Wayfarer, and was not Lively's "preferred promotion." Ex. 38, Greenstein Tr. 61:12–63:1, 67:13–68:6; 70:15–73:22; 85:23–86:1, 171:9–172:11.

286.    Prior to these events, Lively had been criticized <mark>for getting married on a former slave plantation during the height of the 2020 Black Lives Matter protests.</mark> Ex. 24, Lively Dep. Tr. at 208:11-25. <mark>In August 2024, criticism of that decision resurfaced.</mark> *Id.* at 209:6-14; *see also* Ex. 194, A. Culotta Report (Oct. 17, 2025) at 47-49.

**Plaintiff's Response 286:**    Disputed that <mark>Lively was married "during the height of the 2020 Black Lives Matter protests."</mark> Ex. 281, Lively Tr. 208:11–17. Undisputed that <mark>Lively "dealt with negative press" regarding her wedding venue, and that criticism was resurfaced in August 2024 as a result of Defendants' smear campaign</mark>. *Id.* at 208:11–209:18; Ex. 70, Culotta Report at 46–49.

287.    Prior to these events, Lively had also been criticized for "problematic on-set behavior" while working on the TV show *Gossip Girl*. Ex. 195, Lively's Third Amended

Responses To Wayfarer Studios LLC's Second Set Of Interrogatories No. 21 (Oct. 17, 2025) at 15 (referring to January 7, 2024 video). These criticisms resurfaced in August 2024. *Id*.

**Plaintiff's Response 287:** Undisputed that on January 7, 2024 a TikTok user posted a clip of a May 2017 interview with commentary about Lively's alleged "problematic on-set behavior" without any supporting evidence or foundation, and that on August 10, 2024 Abel shared the post with TAG noting that she "like[d] that this is now getting some viral attention." Wayfarer Ex. 195 at 15; Ex. 71 at WAYFARER_000136137. Disputed to the extent that this fact suggests there were any prior independent criticisms of Lively's on-set behavior by anyone who worked with her, of which there is no competent evidence. Defendants were thrilled that Lively accepted the role for the film and cited to her "sterling reputation." Ex. 4, Baldoni 10/7 Tr. 278:18–279:2.

288. Sony executives privately observed that the negative publicity around Lively was driven by her own conduct. For instance:

a. On August 11, 2024, Tahra Grant, Executive VP and Chief Communications Officer at Sony wrote: "She orchestrated all this drama in a totally unsavvy and amateur way (and basically threatened…Sony) and now is mad it backfired on her." Ex. 196, SPE_BL0023201 at -202.

b. On August 15, 2024, Tom Rothman, Sony's CEO observed that although Lively didn't "deserve" the backlash, "she did bring it all on herself by refusing to listen to advice … and by selling her products." Ex. 197, SPE_WF0000762.

c. On August 21, 2024, Sony president Sanford Panitch wrote: "She did it to herself. If she just let him come to the premiere or didnt make all the cast unfollow him or kick him off the movie and did what everyone ever has done in show business for time and memorial which is protect 'the show' then none of the sleuthing would have happened.

The hair sell at the same time was epic level stupid. She wouldn't listen. She knows better." Ex. 198, SPE_WF0000793 at -794.

**Plaintiff's Response 288:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers  the Court to the cited sources for their complete contents and disputes any summary or interpretation inconsistent therewith.

289.    As negative sentiment toward Lively accelerated, Baldoni asked his PR team to confirm that it was not using "bots" or fake accounts to generate positive sentiment for him online. Abel and Nathan both confirmed that they were not using bots or fake accounts.  Ex. 199, BL-00000216 at -253; Ex. 190, BL-00000328; Ex. 200, JONESWORKS_0000001; Ex. 201, NATHAN_000000290.

**Plaintiff's Response 289:**    Undisputed that on August 18, 2024, after Baldoni noticed "[Instagram] comments on random posts defending me by people who are private with no followers and [ ] feel like bots," he asked Nathan and Abel for confirmation that they were not using bots because he doing so would "feed[] into [Lively's] potential narrative." Ex. 65 at BALDONI_000019423. Nathan responded that they were not using bots because "bots look fake to anyone," and that "[t]he other team is doing something very specific in terms of what they do. I know Jamey & Jed connected on this. Bots and fan accounts also run pretty organically by now with all the AI platforms and Google Analytics itself - there is no bot army that's a myth these days. Any digital team these days is far more intelligent to utilise something so obvious." *Id.* at NATHAN_000001006. Baldoni replied "Ok thank you" with praying hand and heart emojis. *Id.* Disputed that Nathan confirmed they were not using fake accounts. *See* Wayfarer Exs. 200 at JONESWORKS_00000003; 201 at NATHAN_000000290.

290.    On August 19, 2024, Baldoni asked Nathan about the negative sentiment toward Lively online.  He wrote:  "This is not us, correct?"  Nathan responded: "None of us would ever do this….there is this struggle where it's kind of maybe even unbelievable the way that people are turning against her … But they are. Organically. It's organic she's blown herself up by her own actions [Cites article describing Lively's past use of a transgender slur]…This just ran – obviously none of us knew about this either. But once media goes in, they go in … You did not do any of these[,] we did not do any of these. This is all organic." Ex. 202, NATHAN_000000278-279.

**Plaintiff's Response 290:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers  the Court to the cited sources for their complete contents and disputes any summary or interpretation inconsistent therewith.

291.    On August 27, 2024, Baldoni privately discussed with Nathan that he had "no intention…to make [Lively] or anyone an outcast" and told Nathan he was "Praying for [Lively and Reynolds]."  Ex. 203, NATHAN_000000292.

**Plaintiff's Response 291:**    Undisputed that on August 27, 2024 Nathan wrote to Baldoni that she "kn[ew] that [it's] not your intention either to make her or anyone an outcast," and that Baldoni responded that "Praying for them (Lively and Reynolds) has been helpful" for his own trauma. Wayfarer Ex. 203 at NATHAN_000000292.

292.    On August 27, 2024, Baldoni wrote to Heath, Nathan and Abel: "Definitely don't want to place stories – and yet just want to change the narrative." Heath subsequently responded: "Let's stay the course and not react."  Abel agreed: "we want to keep our participation with press to a min and keep steering the narrative into other things where we can."  Ex. 204, NATHAN_000001030 at -32.

**Plaintiff's Response 292:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers  the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

293.    On August 9, 2024, Ryan Renolds wrote to Warren Zavala, his agent at WME: "Leslie [Sloane, Lively's PR representative], should definitely engage the studio and fight back in any way necessary."  Ex. 205, RR-SUBPOENA-000000116 at -119.

**Plaintiff's Response 293:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers  the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

294.    On August 10, 2024, Ryan Reynolds wrote a message to author Colleen Hoover in which he stated that Baldoni is "obviously a predator and a sociopath." Ex. 206, RR-SUBPOENA-000000102 at -105.

**Plaintiff's Response 294:**    Undisputed that in the cited document Reynolds wrote a message to Hoover stating that "[i]t's amazing to me that you can have everybody involved with a production completely run away from a person who is obviously a predator and sociopath and the narrative must first land on why a woman is the problem," Wayfarer Ex. 206 at RR-SUBPOENA-000000105, but Lively respectfully refers  the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

295.    On August 13, 2024, Ryan Reynolds wrote a message to Patrick Whitesell, the Executive Chairman of WME, in which Reynolds described Baldoni and "his shitbag partner" as "predators and frauds."    Whitesell responded: "Ryan, I completely understand all of this….I hadn't been aware of all of this until you reached out to me a few weeks ago….Warren, Doug and I had a conversation tonight and will be deploying in the morning with the town.  As you said, the

most important thing here is that we don't let any of this have a negative effect on you two professionally and that all the studios, important buyers, etc know the truth about ALL of it. We won't rest until that is abundantly clear." Warren Zavala, who was also on the message, then wrote: "we've started our work in terms of analytics around the conversation and bringing our team together" and suggested a "strategy call" with Reynolds prior to his "call with Sony." Ex. 207, RR-SUBPOENA-000000113-115.

**Plaintiff's Response 295:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith. Specifically, Defendants' summary of Whitesell's message omits that he wrote: "I hadn't been aware of all of this until you reached out to me a few weeks ago, *but in these few weeks I have learned the full picture of what Blake, you and many others have endured*." Wayfarer Ex. 207 at RR-SUBPOENA-000000113–000000115 (emphasis added).

296.    On August 13, 2024, Sloane exchanged messages with gossip reporter Sara Nathan about her forthcoming article, which included some positive comments about Lively from Baldoni. Sloane wrote: "I hate this…This will hurt Blake. You're airing an animal." She pressed Nathan to remove Baldoni's quotes. Ex. 208, LS_0000219. At her deposition, Sloane testified that she was calling Baldoni an "animal" because "I felt like it." Ex. 173, Sloane Dep. Tr. at 192:07-21.

**Plaintiff's Response 296:**    Undisputed that the quoted language appears in the cited sources, but Lively respectfully refers  the Court to the cited sources for their complete contents and disputes any summary or interpretation inconsistent therewith. Specifically, Plaintiff disputes Defendants' characterization that Sloane "pressed Nathan to remove Baldoni's quotes," when it

was Nathan who first offered to amend the article, suggesting "We can take out some of the quotes?? From previous interviews that will help." Wayfarer Ex. 208 at LS_0000219.

297.    On August 15, 2024, Sloane wrote to another gossip reporter, asking him to change the wording of a headline about the "feud" between Lively and Baldoni. Sloane pitched the reporter a different story, which the reporter rejected. After reviewing the article, Sloane wrote: "You forgot to link the fat shaming and the inappropriate kissing allegations." Ex. 209, LS_0000253 at -256.

**Plaintiff's Response 297:**    Disputed. The document Defendants cite does not support that Sloane "pitched the reporter a different story, which the reporter rejected." Wayfarer Ex. 209 at LS_0000256.Undisputed that Sloane suggested removing an inflammatory adjective from the headline, which the reporter attempted to do but could not get approved because "digital writers always put in an adjective when talking about any type of feud, it's an SEO thing." *Id*. Undisputed that Sloane wrote "You forgot to link the fat shaming and the inappropriate kissing allegations," but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

298.    Sloane testified that she viewed providing this negative information about Baldoni as an appropriate part of her work as a PR professional:  "part of my job is to … try to balance out negative stories if they're negative and if they're untrue." Ex. 173, Sloane Dep. Tr. at 16:07-23. Sloane further testified that it is "okay to tell a reporter to include negative statements about someone if someone else in the press has already reported it." Ex. 173, Sloane Dep. Tr.at 244:8-14.

**Plaintiff's Response 298:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers  the Court to the cited source for its complete contents and

disputes any summary or interpretation inconsistent therewith, including the assertion that Sloane "viewed providing [ ] negative information about Mr. Baldoni as an appropriate part of her work as a PR professional."

299.     Also on August 15, 2024, Ryan Reynolds wrote to Warren Zavala, his agent at WME, discussing how to get producer Alex Saks to speak to the press "even on background….to advocate for Blake."   Zavala stated that "truly believes Blake and Jenny, but did not witness instances that they shared with her…so she can't corroborate what [Jami Kandel, another member of their PR team] would need."  Ex. 210, RR-SUBPOENA-000000025 at -26.

**Plaintiff's Response 299:**     Undisputed that the quoted language appears in the cited source, but Lively respectfully refers  the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

300.     On August 17, 2024, Warren Zavala directed Reynolds to provide an email contact to the *Daily Mail*.  He wrote:  "The reported had reached out via email to Leslie [Sloane, Lively's PR person.]. Now has connected with Sonys head of comms.  She has both the short statement and the longer version. I imagine killing the story is their focus…..the daily thing needs to be killed. …someone playing the game at the same level as them in terms of the internet is what we need."  Zavala subsequently told Reynolds: "They effectively got the daily mail not to print the [story about Lively having the first Assistant director fired].  Ex. 211, RR-SUBPOENA-000000120 at -122, 124.

**Plaintiff's Response 300:**     Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

301.    During this period, Defendants believed that Lively's press team was spreading negative information about Baldoni and using bots.

a.    Sara Nathan told Jennifer Abel that she texted Leslie Sloane and challenged her on sharing negative information on Baldoni to media outlets.  Ex. 212, BL-000003464.

b.    Jennifer Abel commented to Melissa Nathan that a Daily Mail story "look[ed] like a plant from Blake[ Lively]'s camp trying to steer the narrative."   Ex. 213, JONESWORKS_00016275 at -279.

c.    Melissa Nathan told Justin Baldoni, "[Lively's camp] are doing all of this themselves and it's really obvious. . . . This is bots."  Ex. 214, BL-000000009 at -10.

**Plaintiff's Response 301:**    Disputed that the cited source supports Defendants' assertion that "Defendants" generally "believed that Lively's press team was spreading negative information about Baldoni and using bots" or that "Sara Nathan told Jennifer Abel that she texted Leslie Sloane and challenged her on sharing negative information on Baldoni to media outlets." Wayfarer Ex. 212 at BL-000003464. Undisputed that the quoted language appears in the cited source, but Lively respectfully refers  the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

302.    During this litigation, Lively responded to interrogatories seeking identification of the ways in which Defendants supposedly "seeded social media content" to increase the "negative sentiment" toward Lively. Ex. 195, Lively's Third Amended Responses To Wayfarer Studios LLC's Second Set Of Interrogatories No. 21 (Oct. 17, 2025).[2]

**Plaintiff's Response 302:**    Undisputed.

---

[2] Wayfarer, Abel, Nathan, and TAG propounded substantially similar interrogatories to Lively on this topic, and Lively provided substantially similar responses.  *See* Ex. 215, Lively's Third Amended R&Os to Abel's Second Set of ROGs; Ex. 216, Lively's Third Amended R&Os to Nathan's Second Set of ROGs; Ex.-217, Lively's Third Amended R&Os to TAG's Second Set of ROGs.

303.    Nearly half the incidents Lively identifies are devoid of any negative content about Lively and merely claim that Defendants either "suppress[ed] content about Mr. Baldoni or enhanc[ed] positive content regarding Mr. Baldoni." Ex. 195, Lively's Third Amended Responses To Wayfarer Studios LLC's Second Set Of Interrogatories No. 21 (Oct. 17, 2025).  These include:

a.   Baldoni's effort to focus his press and promotion for the film on the issue of domestic violence and to "boost" videos by others showing him promoting his film. Ex. 220, BALDONI_000015675220; Ex. 221, JONESWORKS_00013830; Ex. 222, BALDONI_000019422.

b.   An August 9 statement by Baldoni to the press that "Every movie is a miracle. . . And then, of course, you're navigating complex personalities and trying to get everybody on the same page with the same vision. And mistakes are always made, and then you figure out how to move past them." Ex. 223, BBKOSLOW-000004011 at -4016.

c.   Abel's efforts on August 10 to "amplify" an interview with Baldoni suggesting that the film could "actually make a real difference" in the fight to end domestic violence. Ex. 224, BBKOSLOW-000004606.

d.   Abel's reference to another cast member's interview, saying that he had a positive experience working with Baldoni on the film. Ex. 225, BBKOSLOW-000002400.

e.   Efforts to "quiet/kill" stories claiming Baldoni behaved inappropriately on set, Ex. 226, KCASE-000003856; Ex. 227, BBKOSLOW-000001800; Ex. 228, NATHAN_000001924; Ex. 229, BBKOSLOW-000004049; Ex. 223, BBKOSLOW-000004011; Ex. 230, BBKOSLOW-000006156; Ex. 231, KCASE-000000728; Ex. 232, KCASE-000000763; Ex. 233, KCASE-000001093; Ex. 213,

JONESWORKS_00016275; Ex. 234, NATHAN_000002124; Ex. 235, KCASE-000003354.

f.  Efforts to track social media comments that were supportive of Baldoni's account or doubted Lively's.  Ex. 236, BBKOSLOW-000003330.

g.  Efforts to suppress an individual's false claim that Baldoni had invited her up to his hotel room,  Ex. 237, BBKOSLOW-000005085; Ex. 238, BBKOSLOW-000005127.

h.  Nathan's August 13 request to her sister, a gossip reporter, to write that when Baldoni commented that Lively was "ready to direct," he still wanted to be involved in any sequel of the film.  Ex. 239, JONESWORKS_00015395 at -396.

**Plaintiff's Response 303:**    Disputed that the incidents identified in Lively's Third Amended Responses to Wayfarer Studios LLC's Second Set Of Interrogatories make any "claim" regarding Defendants. Wayfarer Ex. 195. Disputed that nearly half the incidents Lively identifies in Lively's Third Amended Responses to Wayfarer Studios LLC's Second Set Of Interrogatories are devoid of any negative content about Lively, given that efforts to circulate negative content about Lively were inextricably tied to inorganic efforts suppressing content about Baldoni or enhancing positive content regarding Baldoni. *Id.* ("Such amplification, boosting, and similar efforts to affect the narrative to negatively affect Ms. Lively resulted where such efforts were taken in relation to suppressing content about Mr. Baldoni or enhancing positive content regarding Mr. Baldoni in relation to the Film or Ms. Lively.") (citing NATHAN_000005503 ("If the team is working on a longer lead, negative narrative, we would …mitigate false negatives, and point reporters toward third party advocates who can speak possibility on [Baldoni's] behalf"); *id.* ("Background briefing would include the numerous articles, interviews, and quotes of past

colleagues who openly love working with Justin, and pointing to BL's less than favorable reputation of her twenty-year career."); *id.* (encouraging "planting seeds of doubt and speculation" about Ms. Lively's "'experience' on set" by combining messaging as to "managing difference egos" and "being the subject to an imbalance of power" with "more positive press about the film")). Subject to the above:

- Undisputed that Baldoni undertook an effort to focus his press and promotion for the film on the issue of domestic violence and to "boost" videos by others showing him promoting the film. Disputed the cited sources supports Defendants' assertion that the cited context exclusively reflects Baldoni's effort to exclusively focus his press and promotion for the film on domestic violence. Wayfarer Exs. 220 (August 8, 2024 discussion of post regarding Baldoni making matcha); 222 (Baldoni texts link and request "To boost" TikTok video where the author of the video states: "I am flabbergasted that with the huge audience that Blake Lively has and all of the press interviews she's had she doesn't once talk about DV"). Disputed that Wayfarer Exhibit 221, a communication between Mitz Toskovic, Abel, and Heath, which does not include Baldoni as a participant, reflects Baldoni's effort to focus his press and promotion for the film on the issue of domestic violence or to "boost" videos by others showing him promoting his film. Wayfarer Ex. 221.

- Undisputed that on August 9, 2024, Baldoni made a statement to the press that "Every movie is a miracle. . . And then, of course, you're navigating complex personalities and trying to get everybody on the same page with the same vision. And mistakes are always made, and then you figure out how to move past them." Wayfarer Ex. 223 at BBKOSLOW-000004016.

- Undisputed that on August 10, 2024, Abel took efforts to "amplify" an interview with Baldoni suggesting that the film could "actually make a real difference" in the fight to end domestic violence. Wayfarer Ex. 224, BBKOSLOW-000004606. Disputed that Abel's requested

amplification was the only request for digital engagement including a request to "boost" negative content regarding Lively in the cited source.  Wayfarer Ex. 195 at 14.

- Undisputed that Abel referenced another case member's interview saying that he had a positive experience working with Baldoni on the film. Disputed that Abel's requested amplification was the only request for digital engagement to "amplify" or "boost" in the cited source.  Wayfarer Ex. 225.

- Undisputed that Defendants took efforts to "quiet/kill" stories claiming Baldoni behaved inappropriately on set, but disputed that any cited source other than Wayfarer Ex. 227, reflects the express quoted language. Wayfarer Exs. 213, 223, 226–35.

- Undisputed that Defendants took efforts to track social media comments that were supportive of Baldoni's account or doubted Lively's. Disputed that the cited source does not express conduct that would have a negative effect on Lively.  Wayfarer Ex. 236 ("[c]omments are all defending him" and "[t]hat's us lol[.]").

- Undisputed that Defendants took efforts to suppress an individual's claim that Baldoni had invited her up to his hotel room. Disputed that the cited sources support Defendants' assertion that claim was false. Wayfarer Exs. 237–38.

- Undisputed that on August 13, 2024, Nathan made a request to her sister, a gossip reporter, to write about when Baldoni commented that Lively was "ready to direct." Disputed that the cited source supports Defendants' assertion that Nathan indicated Baldoni still wanted to be involved in any sequel of the film, rather than simply clarifying that "his comment about Blake directing was not about him not returning for the sequel."  Wayfarer Ex. 239.

304.    Lively also points to incidents in which certain Defendants spoke to the press about Lively herself.  None of these incidents involved sharing any factual falsehoods about Lively;

instead, they involved pointing out true facts about Lively or her husband's conduct or sharing negative opinions of that conduct. Ex. 195, Lively's Third Amended Responses To Wayfarer Studios LLC's Second Set Of Interrogatories No. 21 (Oct. 17, 2025).

**Plaintiff's Response 304:**   Undisputed that in Lively's Third Amended Responses To Wayfarer Studios LLC's Second Set Of Interrogatories No. 21 (Oct. 17, 2025), Lively points to incidents in which certain Defendants spoke to the press about Lively herself.  Undisputed that some of these incidents involved point out facts about Lively or her husband's conduct or sharing negative opinions about Lively or her husband's conduct. Disputed that none of these incidents involved sharing any factual falsehoods about Lively given that multiple placed Lively in a false light. Wayfarer Ex. 195.

305.   Lively and her proffered expert on digital media also suggest that Defendants had some role in resurfacing a video in which Lively made an insensitive comment to a reporter, presuming—incorrectly—that the reporter was pregnant (the "little bump" video).  *See, e.g.,* Ex. 240, KCASE- 000001194; Ex. 194, A. Culotta Report (Oct. 17, 2025) at 52-57.

**Plaintiff's Response 305:**   Disputed that Professor Aron Culotta, PhD. concluded in his expert report that Defendants "had a role in resurfacing" the video; undisputed that he identified indicia of a campaign to manipulate online discussion of Lively, including evidence that in the hours after TAG suggested they should send the "little bump" interview to Jed, the comments on the video increased rapidly. Wayfarer Ex. 194 at 4, 52–57.

306.   Lively has not put forward any evidence to suggest the "little bump" video is not genuine, or that Defendants had any contact with the reporter in the video.

**Plaintiff's Response 306:**   Undisputed.

307.    Sarowitz was not involved in the marketing of the film, and did not review any of the marketing materials for the film created by Wayfarer Studios or Sony.  Ex. 6, Sarowitz Dep. Tr. 146:8-18, 121:3-5.

**Plaintiff's Response 307:**    Undisputed that Sarowitz testified that he did not review any of the marketing materials for the film created by Wayfarer Studios or Sony. Disputed that Sarowitz was not involved in the marketing of the film, as Sarowitz regularly received press updates from Jonesworks, which provided public relations services for Wayfarer and Baldoni in connection with the film, including communications reflecting social media coverage of an early fan and influencer event at which alcoholic beverages were served and Baldoni made flower bouquets. *See* Ex. 72. Sarowitz hosted a showing of the film at Wayfarer Theaters, which was styled as Lily Bloom's flower shop. "'It Ends With Us' Pop-Up & Non-Profit Partnership," https://wgntv.com/spotlight-chicago/it-ends-with-us-pop-up-non-profit-partnership/ (Aug. 14, 2024). Sarowitz personally gave an interview on the film on August 14, 2024. *Id.* Sarowitz actively monitored Baldoni's interviews in connection with the film and provided positive feedback in relation thereto. Ex. 73. Further, Sarowitz spoke with Greenberg on August 6, 2024, about press relating to the film, and provided input on influencing the public narrative relating to Ms. Lively and her family in mid-August 2024. Exs. 41, Greenberg Tr. 290:19–291:22; 11, Sarowitz Tr. 122:18–123:9; Wayfarer Ex. 241.

308.    Sarowitz did not participate in any respect in any of the preparation in advance of Baldoni's interviews regarding the release of *It Ends With Us*.  Ex. 6, Sarowitz Dep. Tr. 137:19-22.

**Plaintiff's Response 308:**    Undisputed that Sarowitz did not participate in the preparation in advance of Baldoni's interviews regarding the release of *It Ends With Us*.

309.    Sarowitz himself participated in certain interviews in August 2024, but did not do any media interviews in conjunction with the release of *It Ends with Us* in the first couple of weeks of August 2024.  Ex. 6, Sarowitz Dep. Tr. 138:3-10.

**Plaintiff's Response 309:**    Undisputed that Sarowitz participated in certain interviews in August 2024, but disputed that Sarowitz did not do any media interviews in conjunction with the release of *It Ends with Us* in the first couple of weeks of August 2024, as Sarowitz participated in an interview with Spotlight Chicago, WGN news on August 14, 2024 on a segment entitled "'It Ends With Us' Pop-Up & Non-Profit Partnership." *See* https://wgntv.com/spotlight-chicago/it-ends-with-us-pop-up-non-profit-partnership/ (Aug. 14, 2024).

310.    Sarowitz was not involved in hiring any PR team for Wayfarer.  Ex. 6, Sarowitz Dep. Tr. 152:4-9.

**Plaintiff's Response 310:**    Disputed that Sarowitz was not involved in hiring any PR or crisis team for Wayfarer, given that by August 14, 2024, after The Agency Group was engaged, Baldoni informed Sarowitz that he was "already helping by wayfarer paying for the pr teams." Wayfarer Exs. 167 at JONESWORKS_WAYFARER_000003012; 246 at 38:15–24 (stating on August 29, 2024 that "we have our press people, our PR people working"); Ex. 73.  Further disputed that Sarowitz was unaware of and did not approve of hiring a PR or crisis team for Wayfarer, Baldoni, and its executives, given that he in fact supplied at least one idea to influence the narrative on or around August 14, 2024. Exs. 11, Sarowitz Tr. 122:18–123:9; Wayfarer Ex. 241.

311.    Sarowitz was not asked his opinion on hiring The Agency Group before they were retained.  Nor did he vet The Agency Group before they were retained.  Ex. 6, Sarowitz Dep. Tr. 152:16-153:2.

**Plaintiff's Response 311:**    Undisputed that Sarowitz was not asked his opinion on hiring The Agency Group before they were retained, and did not vet The Agency Group before they were retained, except to the extent that opinion or vetting took place in connection with Sarowitz's "already helping by wayfarer paying for the pr teams" as of August 14, 2024. Ex. 73.

312.    Sarowitz also did not approve the hiring of Street Relations.  He was not consulted before they were hired and was not involved in that decision.  Ex. 6, Sarowitz Dep. Tr. 153:3-154:7.

**Plaintiff's Response 312:**    Undisputed that Sarowitz did not directly approve hiring Street Relations before they were hired and was not involved in that decision, except to the extent that opinion or vetting took place in connection with Sarowitz's "already helping by wayfarer paying for the pr teams" as of August 14, 2024. Ex. 73. Further disputed that Sarowitz was unaware of and did not approve of the hiring of Street Relations and/or Jed Wallace after the fact and during the retaliatory campaign against Lively. *See, e.g.*, Ex. 74 (certified transcript)).

313.    There is no evidence that Sarowitz received or reviewed the "Scenario Planning" document circulated by TAG prior to this litigation.

**Plaintiff's Response 313:**    Undisputed except to the extent that Baldoni was unable to disclaim that Sarowitz's suggestion regarding "flipping the script" regarding Lively and her family was part of Defendants' scenario planning. Ex. 20, Baldoni 10/6 Tr. 285:8–10.

314.    There is no evidence that Sarowitz ever spoke with Jed Wallace or any employee of Street Relations prior to this litigation. Ex. 4, Heath 10/8 Dep. Tr. 338:5-10.

**Plaintiff's Response 314:**    Undisputed that Sarowitz never spoke with Jed Wallace or any employee of Street Relations prior to this litigation, but disputed that Sarowitz never spoke

with Jed Wallace or any employee of Street Relations during the retaliation campaign. Ex. 74 (certified transcript)).

315.    In her interrogatory response, Lively has identified each instance in which the Defendants purportedly spread "negative" information about her.    Ex. 195, Lively's Third Amended Responses To Wayfarer Studios LLC's Second Set Of Interrogatories No. 21 (Oct. 17, 2025).    The interrogatory response does not identify any specific instance in which Sarowitz himself was involved in circulating any information about Lively whatsoever prior to this litigation, and only one instance in which he weighed in on press strategy concerning Lively.

**Plaintiff's Response 315:**    Disputed that Lively's Third Amended Responses To Wayfarer Studios LLC's Second Set Of Interrogatories No. 21 (Oct. 17, 2025) does not identify any specific instance in which Sarowitz himself was involved in circulating any information about Lively whatsoever prior to this litigation, as he "suggested" influencing the narrative with reference to Lively and her family, the substance of which was the direct cause of Baldoni circulating that information to Nathan. Wayfarer Ex. 241; Exs. 20, Baldoni 10/6 Tr. 278:10–279:6; 4, 10/7 Baldoni Tr. 339:10–340:6; 11, Sarowitz Tr. 122:18–123:9.

316.    On or about August 14, 2024, Sarowitz suggested that Wayfarer should point out, after Lively had said that Ryan Reynolds rewrote a scene, that the scene was initially written by a female writer.    Ex. 6, Sarowitz Dep. Tr. 122:24-123:9; Ex. 5, Baldoni Dep. (Oct. 6, 2025) at 278:3-279:6; *see also* Ex. 241 (BALDONI_000019234).    Sarowitz's statements were accurate:    Lively said publicly that her husband had rewritten a scene in the film, and that scene had initially been written by Christy Hall, a female screenwriter.    Ex. 242, WAYFARER_000142463; Ex. 50, BL-000011703.

**Plaintiff's Response 316:**    Undisputed that on or about August 14, 2024, Sarowitz suggested pointing out that the scene was initially written by a female writer, that the scene had initially been written by Christy Hall, and that Lively said that Reynolds had contributed to writing a scene in the film. Disputed that Sarowitz was suggesting factual corrections for accuracy rather than asking about "flipping the narrative" and "[u]sing their own words against them" to "lead" to the conclusion that Lively and Reynolds "were scabs" in attempt to influence the narrative against Lively and her family. Wayfarer Ex. 241; 11, Sarowitz Tr. 122:18–123:9.

317.    Lively alleged that Sarowitz "divulged to a witness at the Film's New York premiere on August 6, 2024, that he was prepared to spend $100 million to ruin the lives of Ms. Lively and her family."  SAC ¶26.  No witness has confirmed that conversation took place. Greenberg, the "witness" in question, testified that he spoke to Sarowitz at the premiere party about publicity related to the film.  Ex. 142, Greenberg Dep. Tr. 290:19-291:22.

**Plaintiff's Response 317:**    Undisputed that Lively alleged that Sarowitz "divulged to a witness at the Film's New York premiere on August 6, 2024, that he was prepared to spend $100 million to ruin the lives of Ms. Lively and her family."  Undisputed that Greenberg testified that he spoke to Sarowitz at the premiere party about publicity related to the film.  Wayfarer Ex. 142 at 290:19–291:22. Disputed that no witness confirmed that conversation took place, as Sarowitz confirmed that he may have used some or all of that exact language and did not deny that the conversation took place. *See* Exs. 75 ("Steve told me off the record that he doesn't remember what he said but that he very well might have used that language"); 11, Sarowitz Tr. 115:25–116:1 ("I believe that I could have used the figure language, but not the ruining part.").

318.    During the conversation, Greenberg perceived that Sarowitz was "seemingly a bit defensive and nervous about what could happen" but "seemed to be okay."  Ex. 142, Greenberg

Dep. Tr. 291:17-19.  Greenberg assured Sarowitz that he really had nothing to worry about.  Ex. 142, Greenberg Dep. Tr. 291:5-292:14.

**Plaintiff's Response 318:**    Undisputed, except that Greenberg additionally found his conversation with Sarowitz to be cause for "concern," as Greenberg perceived Sarowitz as "really aggressive" and needing to be "managed."  Wayfarer Ex. 243 at SPE_BL0009643; *see also* Wayfarer Ex. 244 at WME_00001319 ("I had to dial down the billionaire at the premiere who was ready for serious battle.").

319.    Greenberg confirmed that Sarowitz did not state during their conversation that "he was prepared to spend a hundred million dollars to ruin the lives of Ms. Lively."  Ex. 142, Greenberg Dep. Tr. 292:18-21.

**Plaintiff's Response 319:**    Undisputed as to the substance of Greenberg's testimony, but disputed as whether the testimony accurately reflects the complete substance of the conversation between Greenberg and Sarowitz on August 6, 2024, regarding spending $100 million to ruin the lives of Ms. Lively and her family. Ex. 75 ("Steve told me off the record that he doesn't remember what he said but that he very well might have used that language").

320.    Greenberg does not recall Sarowitz stating anything specific about Lively or her family.  Ex. 142, Greenberg Dep. Tr. 294:13-25.  He confirmed that Sarowitz did not state during their conversation that "he was prepared to ruin the lives of Ms. Lively and her family in any way." Ex. 142, Greenberg Dep. Tr. 294:9-11.

**Plaintiff's Response 320:**    Undisputed as to the substance of Greenberg's testimony, but disputed as whether the testimony accurately reflects the complete substance of the conversation between Greenberg and Sarowitz on August 6, 2024, regarding spending $100

million to ruin the lives of Ms. Lively and her family. Ex. 75 ("Steve told me off the record that he doesn't remember what he said but that he very well might have used that language").

321.     Greenberg has no memory of Sarowitz mentioning ruining anyone's life.  Ex. 142, Greenberg Dep. Tr. 300:12-13.

**Plaintiff's Response 321:**     Undisputed as to the substance of Greenberg's testimony, but disputed as whether the testimony accurately reflects the complete substance of the conversation between Greenberg and Sarowitz on August 6, 2024, regarding spending $100 million to ruin the lives of Ms. Lively and her family. Ex. 75 ("Steve told me off the record that he doesn't remember what he said but that he very well might have used that language").

322.     Greenberg recalls that Sarowitz stated: "I have lawyers and in the event I need to, and this becomes a legal situation, I'm prepared to spare no expense."  Ex. 142, Greenberg Dep. Tr. 292:22-293:10.

**Plaintiff's Response 322:**     Undisputed as to the substance of Greenberg's testimony, but disputed as whether the testimony accurately reflects the complete substance of the conversation between Greenberg and Sarowitz on August 6, 2024, regarding spending $100 million to ruin the lives of Ms. Lively and her family. Ex. 75  ("Steve told me off the record that he doesn't remember what he said but that he very well might have used that language").

323.     On August 9, 2024, Danny Greenberg sent a text message stating "Im a little concerned about Steve S.  He was really aggressive when I spoke with him.  I've been texting Jamey to make sure he is managed and to make sure he speaks with me before doing anything nuclear."  Ex. 243, SPE_BL0009643. When Greenberg wrote in his text message that Sarowitz was "aggressive," he was just describing Sarowitz's personality as a businessman feeling threatened and trying to prove himself in that moment.  Ex. 142, Greenberg Dep. Tr. 296:4-25.

When Greenberg referred in his text message to going "nuclear," he was referring to the possibility that Sarowitz could file a lawsuit because that is the only thing that Sarowitz mentioned to Greenberg.  Ex. 142, Greenberg Dep. Tr. 297:12-2984.

**Plaintiff's Response 323:**    Undisputed as to the content of the August 9, 2024 text message and the substance of Greenberg's testimony. Disputed as whether the testimony accurately reflects the complete substance of the conversation between Greenberg and Sarowitz on August 6, 2024, regarding spending $100 million to ruin the lives of Ms. Lively and her family. Ex. 75 ("Steve told me off the record that he doesn't remember what he said but that he very well might have used that language").

324.    On August 10, 2024, Danny Greenberg sent a text message stating "I had to dial down the billionaire at the premiere who was ready for serious battle."  Ex. 244, WME_00001319. The "billionaire" referred to Sarowitz.  Ex. 142, Greenberg Dep. Tr. 299:1-3.  When Greenberg referred in his text message to getting "ready for serious battle," he similarly just meant potentially having to get into a legal dispute.  Ex. 142, Greenberg Dep. Tr. 298:18-299:13.

**Plaintiff's Response 324:**    Undisputed as to the content of the August 10, 2024 text message and the substance of Greenberg's testimony. Disputed as whether the testimony accurately reflects the complete substance of the conversation between Greenberg and Sarowitz on August 6, 2024, regarding spending $100 million to ruin the lives of Ms. Lively and her family. Ex. 75 ("Steve told me off the record that he doesn't remember what he said but that he very well might have used that language").

325.    Greenberg has no memory of having a conversation with anyone about Sarowitz "ruining anyone's life."  Ex. 142, Greenberg Dep. Tr. 303:1-3.  Nor does Greenberg have any

memory of telling anyone that Sarowitz mentioned a particular $100 million figure. Ex. 142, Greenberg Dep. Tr. 302:16-17.

**Plaintiff's Response 325:**   Undisputed as to the substance of Greenberg's testimony, but disputed as whether the testimony accurately reflects the complete substance of the conversation between Greenberg and Sarowitz on August 6, 2024, regarding spending $100 million to ruin the lives of Ms. Lively and her family. Ex. 75 ("Steve told me off the record that he doesn't remember what he said but that he very well might have used that language").

326.   Sarowitz had a call with Claire Ayoub on August 29, 2024, which Ayoub recorded. Ex. 245, BL-000033428; Ex. 246, Oct. 3, 2025 transcript (Ex. 15 to Sarowitz Dep.); Ex. 6, Sarowitz Depo. Tr. 312:3-313:24.

**Plaintiff's Response 326:**   Undisputed.

327.   During the conversation, Sarowitz stated the following: "The *It Ends With Us* drama is simply that it is a drama, I'm done with it….It's going to happen when it's going to happen. You know, whatever is going to happen, whatever people want to think they are going to think. I was worried about it at one point and now I just -- now I'm just going to let the chips fall where they may…. If they like us, great, if they don't, they don't. We are who we are." Ex. 246, Oct. 3, 2025 transcript (Ex. 15 to Sarowitz Dep.) 5:1-16.

**Plaintiff's Response 327:**   Undisputed.

328.   He further stated: "They went after everything we had. Luckily I was out of it so like – [n]obody mentioned me….That's because I'm a nobody. I'm like I'm nobody, you know." Ex. 246, Oct. 3, 2025 transcript (Ex. 15 to Sarowitz Dep.) 19:24-20:8.

**Plaintiff's Response 328:**   Undisputed.

329.    He further stated: "Justin never has a bad set.  Yet, it was the worst set he has ever been on, but no, it wasn't bad.  I was there on set.  It was, you know, Justin is really kind and loving and he is like Rainn, actually Rainn is running a set…It is a Bahá'í set.  It is never going to be like that, no.  Everything was made up, it was manufactured, and it was – it was manufactured on purpose in order to take Justin down."  Ex. 246,  Oct. 3, 2025 transcript (Ex. 15 to Sarowitz Dep.) 31:7-13.

**Plaintiff's Response 329:**    Undisputed.

330.    He also stated: "I just know that for right now it seems like détente and then if they persist and they push to the limits then we will go to court and then it's all on me."  Ex. 246,  Oct. 3, 2025 transcript (Ex. 15 to Sarowitz Dep.) 36:16-20.

**Plaintiff's Response 330:**    Undisputed.

331.    In response to a question by Ayoub as to whether he meant "protecting the studio," Sarowitz replied "I will protect the studio like Israel protected itself from Hamas.  There were 39,000 dead bodies.  There will be two dead bodies when I'm done.  You know, and so not dead, but, you know…But you're dead to me…So that kind of -- that kind of dead, but dead to a lot of people.  If they ever get me to that point then I will make it worth their while because I'm going to spend a lot of money to make sure the studio is protected.  But I don't think we will go there."  Ex. 246,  Oct. 3, 2025 transcript (Ex. 15 to Sarowitz Dep.) 36:23-37:18.  Ayoub replied "Yeah, I hope not."  And Sarowitz stated "That's not the world I want to live in." Ex. 246,  Oct. 3, 2025 transcript (Ex. 15 to Sarowitz Dep.) 37:19-22.

**Plaintiff's Response 331:**    Undisputed.

332.    Sarowitz further stated "this is not going to go away, I don't think it is going to go away anytime soon….We will have to be defensive for years because there will be stuff coming

at us.  I will be defensive for years." Ex. 246,  Oct. 3, 2025 transcript (Ex. 15 to Sarowitz Dep.)

38:6-13.  When Sarowitz said this, he meant that he would defend Wayfarer Studios.  Ex. 6,

Sarowitz Dep. Tr. 334:2-10.

**Plaintiff's Response 332:**    Undisputed.

333.    Sarowitz further stated: "If they ever cross the line, ever, then I will go after them.

Jamey at one point called me up and said I think we're going to need you.  And we have lawyers

ready to go, we have our press people, our PR people working." Ex. 246,  Oct. 3, 2025 transcript

(Ex. 15 to Sarowitz Dep.) 38:15-24.

**Plaintiff's Response 333:**    Undisputed.

334.    Sarowitz further commented: "you work with so many people and almost

everybody is nice, and then there is Blake who she is totally different than everyone….Not to say

anything bad about her, but … [s]he is different.  She is different." Ex. 246, Oct. 3, 2025 transcript

(Ex. 15 to Sarowitz Dep.) . 55:9-14.

**Plaintiff's Response 334:**    Undisputed.

335.    As a result of Lively's conduct, Sarowitz has lost millions of dollars. Ex. 6,

Sarowitz Dep. Tr. 283:7-19.

**Plaintiff's Response 335:**    Disputed.  Sarowitz would fund the studio as needed,

providing approximately $30 million in affiliate transfers to Wayfarer, which Wayfarer then

allocated for purposes of It Ends With Us. Ex. 11, Sarowitz Tr. 134:10–13, 131:13–133:14.

Sarowitz's legal costs on behalf of himself and the other defendants, which he is funding, are not

attributable to Lively. *See* Ex. 1, Sarowitz Tr. 363:9–364:13. Disputed that other costs associated

with production are a result of Lively's conduct, because while Sarowitz estimates that Lively has

cost him personally over $10 million, he attributed such costs to "things like delays in production,"

"wardrobe," and "[h]aving to hire an extra producer," which are ordinary expenses and costs associated with a film production and were not as a result of Lively's conduct. Exs. 11, Sarowitz Tr. 229:13–230:6; 13, Baker Tr. 52:3–13, 53:4–7 (leading actress creative input on wardrobe is normal); 76 (meeting between Baldoni and Ms. Lively regarding wardrobe); 31 (Heath stating "we got shut down for covid"); 15, Saks Tr. 89:1–92:16 (terminating first assistant director was appropriate because of performance). The "cost" also ignores the massive, record-breaking nature of the success of the film, which Sony and others attributed to Lively. Exs. [ ], Giannetti Tr. 342:10–344:3; [ ], Greenstein Tr. 24:15–26:2; [ ], Saks Tr. 165:17–166:15.

336.    As a result of this litigation, the Wayfarer Foundation—the charitable arm of Wayfarer Studios—received threats, prompting the need for security.  Sarowitz and his family members have also personally received death threats.  An arson was even carried out at Sarowitz's home and someone threatened Sarowitz's daughter's life.  These events in part prompted Sarowitz and the Board of the Wayfarer Foundation to wind down the foundation.  Ex. 6, Sarowitz Dep. Tr. 48:5-17, 52:1-21, 53:1-20, 352:9-11.

**Plaintiff's Response 336:**    Undisputed as to the substance of Sarowitz's testimony, but disputed that this litigation foreseeably caused the threats and that Sarowitz shared all reasons for shutting down the Wayfarer Foundation. Ex. 11, Sarowitz Tr. 46:20–47:8.

337.    In or about August 2024, Baldoni's former publicist, Stephanie Jones, and Lively connected through a mutual acquaintance to share and discuss information that Jones had found on Abel's personal phone.  Ex. 24, Lively Dep. Tr. at 147:11-20; *see also* Ex. 247, BL-000021190 at -192 (Taylor Swift: "Can you believe she just called and was like this pr chick wants to get info to blake").

**Plaintiff's Response 337:** Undisputed that, in August 2024, Ms. Lively was approached by Ashley Avignon, who advised Ms. Lively that Jones "has a phone which contains the most disturbing messages she's ever read in her 20 to 30-plus-year career" that Ms. Lively "deserved to see what had been done to [her]" and that Jones wanted to share these messages with her. Ex. 281, Lively Tr. 147:11–148:15.

338.    Lively is the President and 50% owner, with her husband, of a company called Vanzan Inc., an entity with no external operations which she and her husband use to pay her personal employees.  Ex. 248, Harris Dep. Tr. 12:6–17–13:24.  Vanzan has no owners or officers other than Lively and Reynolds.  *Id.*

**Plaintiff's Response 338:**    Undisputed.

339.    On or about September 27, 2024, at Lively's direction, Vanzan filed a lawsuit in New York state court, alleging that in August 2024, ten unidentified "Doe" defendants had breached contracts with Vanzan "in a scheme to damage [Vanzan's] business and reputation."  Ex. 249, VANZAN_00001; *accord* Ex. 248, Harris Dep. Tr. 64:14–18.

**Plaintiff's Response 339:**    Undisputed that, on September 27, 2024, Vanzan filed a lawsuit in New York state court and Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

340.    "Doe" defendants were used even though Lively personally knew the identity of all parties involved in the film, and presumably, Vanzan knows the identity of all parties with which it has contracts.  Vanzan's 30(b)(6) witness, a lawyer with no prior relationship to the entity, implausibly claimed that any information Vanzan had concerning the identity of the contractors at issue in the complaint was privileged.  Ex. 248, Harris Dep. Tr. 224:15–225:15.

**Plaintiff's Response 340:**    Disputed. The evidence cited does not support Defendants' assertion.

341.    On or about October 1, 2024, taking advantage of New York rules that permit discovery even before issue has been joined, and of the fact that no defendants had been named who could thereby invoke the Court's process on their behalf, Vanzan served a subpoena on Jonesworks seeking documents related to "sexual harassment or retaliation in connection with …the Film" as well as information about "the marketing, publicity, or public relations of, for or related to the Film."  Ex. 250, VANZAN_000044.

**Plaintiff's Response 341:**    Undisputed that, on October 1, 2024, Vanzan served a document subpoena upon Jonesworks and Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

342.    Such requests were made even though the complaint did not refer to the film or Jonesworks at all, *see* Ex. 249, VANZAN_00001, nor did it have any contract with Jonesworks or any defendant, *see* Ex. 248, Harris Dep. Tr. 38:18–39:1 (Vanzan had no communications with Jonesworks whatsoever prior to service of the subpoena).

**Plaintiff's Response 342:**    Undisputed and Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

343.    The filing of the lawsuit and the issuance of the subpoena created a legal mechanism by which Lively, through Vanzan, could ostensibly claim to legitimately obtain the documents Jones had found on Abel's phone.  Absent a court's compulsory process, Jones could not simply turn over records she found on one of her employee's phones.  Ex. 251, JONESWORKS_00030306.

**Plaintiff's Response 343:**    Undisputed that the initiation of the Vanzan lawsuit and Vanzan's issuance of a document subpoena to Jones permitted Vanzan to request the categories of documents therein, but otherwise disputed that "[a]bsent a court's compulsory process, Jones could not simply turn over records she found on one of her employee's phones," which the cited evidence does not support, and which is a legal conclusion.

344.    At Lively's direction, Vanzan voluntarily dismissed the case on December 19, 2024, without any defendant ever appearing in the action.  *See Vanzan Inc. v. Does 1–10*, No. 655130/2024 (N.Y. Sup. Ct.), NYSCEF No. 2; *see also* Ex. 248, Harris Dep. Tr. 63:24–64:2.

**Plaintiff's Response 344:**    Undisputed.

345.    On December 21, 2024, *The New York Times* published a 4,000 word article entitled "We Can Bury Anyone: Inside a Hollywood Smear Machine."    Ex. 242, WAYFARER_000142613.   The article cited documents from Abel's phone that Vanzan had obtained by invoking the Court's process in a case against 10 anonymous Doe defendants.   It appears that Jones agreed to turn over the documents without any protective order or measure to prevent their disclosure.

**Plaintiff's Response 345:**    Undisputed that, on December 21, 2024, the New York Times published an article entitled "We Can Bury Anyone: Inside a Hollywood Smear Machine" and Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith. Disputed that "[t]he article cited documents from Abel's phone that Vanzan had obtained," which is not supported by any evidence.

346.    *The New York Times* article asserted that Baldoni and Heath had violated physical boundaries and made sexual and other inappropriate comments to and then instituted a retaliatory

"smear campaign" against Lively. *Id.* *The New York Times* article included a link to Lively's

California state administrative complaint, which had been filed the previous day. *Id.*

**Plaintiff's Response 346:**     Undisputed and Lively respectfully refers the Court to the

cited source for its complete contents and disputes any summary or interpretation inconsistent

therewith.

347.     On December 4 and 5, 2024, Lively and Taylor Swift privately discussed the

forthcoming *New York Times* article. Swift wrote: "I think this bitch knows something is coming

because he's gotten out his tiny violin." Ex. 89, BL–000021208 at –210.

**Plaintiff's Response 347:**     Disputed. The evidence cited does not support Defendants'

assertion that "[o]n December 4 and 5, 2024, Lively and Taylor Swift privately discussed the

forthcoming New York Times article." Undisputed that the quoted language appears in the cited

source, but Lively respectfully refers the Court to the cited source for its complete contents and

disputes any summary or interpretation inconsistent therewith. Wayfarer Ex. 89 at BL-000021210.

348.     Through the administrative complaint she provided, Lively and/or her agents told

*The New York Times* and other media that Baldoni had "abruptly pivoted away" from the agreed–

on marketing for the film to emphasize his support for survivors of domestic violence. Ex. 252,

CRD ¶ 7. That statement is false. *See* Ex. 253, BALDONI_000030667 (cover email to Sony); Ex.

254, BALDONI_000030668 (IEWU initial campaign concepts).

**Plaintiff's Response 348:**     Undisputed that Lively's CRD complaint alleges that "[i]n

the days leading up to the Film's release, Mr. Baldoni abruptly pivoted away from the Film's

Marketing Plan and the types of publicity activities in which he had previously participated . . . in

an effort to explain why many of the Film's cast and crew had unfollowed Mr. Baldoni on social

media and were not appearing with him in public," *see* Wayfarer Ex. 252 at ¶ 7, and Lively

respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith. Disputed as to the Defendants' assertion "[t]hat statement is false," which the cited evidence does not support. *See* Wayfarer Exs. 253, 254.

349.    Through the administrative complaint she provided, Lively and/or her agents told *The New York Times* and other media Baldoni and Wayfarer had not used nudity riders or intimacy coordinators on set until her intervention.  Ex. 252, CRD ¶ 30. That statement is false.  *See* Ex. 255, HEATH_000045527; Ex. 256, 24–CV–10049_0001819; Ex. 60, 24–CV–10049_0001816.

**Plaintiff's Response 349:**    Undisputed that Lively's CRD complaint alleges that "Wayfarer failed to adhere to guild rules, as well as Lively's contract, and standard industry safety protocols with respect to nudity and intimate scenes," *see* Wayfarer Ex. 252 at ¶ 30, and Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith. Disputed that Defendants' assertion "[t]hat statement is false," which the cited evidence does not support. To the contrary, the evidence cited by Defendants shows that, by May 8, 2023, nudity riders were still being drafted and not signed. *See* Wayfarer Ex. 60 at 24–CV–10049_0001816–18; Wayfarer Ex. 255 at HEATH_000045527–31. Lively's nudity rider was not signed until on or about January 18, 2024—after Defendants received the Protections to Return to Work Document and an "all hands" meeting was convened to address the hostile work environment that Lively and others experienced. *See* Exs. 77; 78.

350.    Through the administrative complaint she provided, Lively and/or her agents told *The New York Times* and other media Baldoni had suggestively told Lively her neck "smells so good" during a shot.  Ex. 252, CRD ¶ 32.  Video captured of the scene demonstrates that statement was false. Ex. 74, WAYFARER_000140494.

**Plaintiff's Response 350:**     Undisputed that Lively's CRD complaint alleges that during a slow dance scene for a montage with no sound recorded, Mr. Baldoni "leaned forward and slowly dragged his lips from [Lively's] ear and down [Lively's] neck as he said, 'it smells so good,'" which was not part of the script, *see* Wayfarer Ex. 252 at ¶ 32, and Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith. Disputed that "[v]ideo captured of the scene demonstrates that statement was false," which the cited evidence does not support. To the contrary, the evidence cited by Defendants is video footage from the scene in which Lively's character gives birth. *See* Wayfarer Ex. 74, at WAYFARER_000140494; *see also* Lively Decl. ¶ 19.

351.     Through the administrative complaint she provided, Lively and/or her agents told *The New York Times* and other media Baldoni had "routinely degraded Lively by finding back channel ways of criticizing her body and weight," including by pretending a scene in the script required him to lift Lively so he could ask her trainer about her weight and by referring Lively to a weight loss specialist.  Ex. 252, CRD ¶¶ 51–52.  Those statements were false. *See* Ex. 257, BALDONI_000026173; Ex. 258, BL–000011258 at –11329.

**Plaintiff's Response 351:**     Undisputed that Lively's CRD complaint alleges that Mr. Baldoni also routinely degraded Lively by finding back–channel ways of criticizing her body and weight" and that Mr. Baldoni "sham[ed] her for her body and weight," *see* Wayfarer Ex. 252, at ¶¶ 49–50, and Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith. Disputed that Defendants assertion "[t]hat statement is false," which the cited evidence does not support. To the contrary, the evidence demonstrates that during pre–production, Baldoni introduced Lively to his personal health coach, who Lively later learned specialized in weight loss. This was a particularly sensitive topic for

Lively given she had only recently given birth. Lively was disturbed and unsettled that Baldoni had asked about her weight, behind her back, especially given that she had recently given birth and was still breastfeeding, and she felt violated. Lively privately confronted Baldoni about his comment and conveyed that it was very invasive and inappropriate. Lively Decl., ¶¶ 5–8; Saladino Decl. ¶¶ 9-10; Exs. 21 at BENSON_0008; 22 at BL–000008819–20; 12, Slate Tr. 47:8–24.

352.    After *The New York Times* article was published, Nathan and other TAG employees gathered messages showing that "we never engaged because we were told not to." Ex. 259, BBKOSLOW–000005795 at –797.

**Plaintiff's Response 352:**    Undisputed that the quoted language appears in the cited source, but respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

353.    As discussed above, formal negotiations regarding the terms governing Lively's potential performance in *It Ends With Us* commenced in mid–December 2022, when Meziane sent Lively's representatives a draft Offer Letter under which Lively would agree to perform in the role of Lily Bloom in the film. Ex. 26, HEATH_000046097.

**Plaintiff's Response 353:**    Undisputed.

354.    The first draft of the Offer Letter defined "Producer" as "Wayfarer Studios (or their designated production service entity)." Ex. 27, HEATH_000046098.

**Plaintiff's Response 354:**    Undisputed.

355.    On April 25, 2023, Lively's lawyer revised the Offer Letter to define "Producer" as IEWUM, an entity that Lively's representatives understood was Wayfarer's "designated production service entity" for the film. Ex. 260, HEATH_000045731; Ex. 261, HEATH_000045741.

**Plaintiff's Response 355:**    Undisputed.

356.    The Offer Letter set forth basic parameters of the anticipated agreement, which endured throughout the drafting process:  Lively's loanout company Blakel, Inc. (defined as "Lender") would agree to furnish Lively (defined as "Artist") to perform in the role of Lily on specified dates. Ex. 28, HEATH_000045678.

**Plaintiff's Response 356:**    Undisputed that Ms. Lively's Loanout company, Blakel, Inc., contracted to provide the services of Ms. Lively to perform in the role of "Lily" pursuant to the Offer Letter, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

357.    Lively would also receive top billing and an "Executive Producer" credit.  Ex. 28, HEATH_000045678.

**Plaintiff's Response 357:**    Undisputed that the cited source reflects that Ms. Lively would receive "Executive Producer" credit, would be "1st position among EP's," and would take "First Position" in on screen credits, Wayfarer Ex. 28 at HEATH_000045679, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

358.    In exchange for this and other consideration to Lively, IEWUM (ultimately defined as "Producer") would pay Lively a substantial up-front fee, to be placed in an escrow account held by Lively's agent, WME, before filming would commence, plus compensation based on the performance of the film and other contingencies. Ex. 28, HEATH_000045678.

**Plaintiff's Response 358:**    Undisputed, except as to Lively's compensation based on the performance of the Film and other contingencies, which remained subject to negotiation. *Compare* Wayfarer Ex. 28 at HEATH_000045678 *with* Wayfarer Ex. 264 at BL-000038606–38608.

359.    Following several months of negotiations and exchanges of drafts, the Offer Letter was finalized in early May 2023, and dated March 17, 2023.  Ex. 32, HEATH_000045662.  Ex. 28, HEATH_000045678.

**Plaintiff's Response 359:**    Undisputed that the final version of the Offer Letter, dated March 17, 2023, was circulated on May 4, 2023.

360.    The Offer Letter did not contain any terms regarding sexual harassment. Ex. 28, HEATH_000045678.

**Plaintiff's Response 360:**    Undisputed.

361.    Wayfarer itself, as opposed to IEWUM, undertook no obligations under the Offer Letter.  Ex. 28, HEATH_000045678.

**Plaintiff's Response 361:**    Disputed. The evidence cited does not support Defendants' assertion that Wayfarer undertook no obligations under the Offer Letter. Wayfarer Ex. 28 at HEATH_000045678. To the contrary, the Offer Letter was signed by Ms. Meziane on behalf of "Wayfarer Studios," and IEWUM contracted with Blakel, Inc. in its capacity as an LLC "established by Wayfarer in 2022 in connection with the development and production of *It Ends With Us*." Wayfarer Ex. 28 at HEATH_000045678; Heath Decl. ¶ 6.

362.    The Offer Letter expressly and unambiguously provided that full execution of a long form agreement, to be subsequently negotiated, was a condition precedent to IEWUM's obligations thereunder, stating:

> 13. **Conditions Precedent**. Producer's obligations to Artist hereunder shall be subject to the satisfaction of the following: (a) Artist qualifying for cast and other insurance (which may include essential element insurance) and (b) full execution by Artist, Lender and Producer, of an Agreement in a form reasonably acceptable to all parties. Unless and until Lender/Artist are unconditionally pay or play and 100% of the fee is in escrow, Lender and Artist are not obligated hereunder, and Artist is free to take conflicting engagements.
>     …

Once we reach an agreement on the above terms, we will be happy to distribute a long form agreement, incorporating the terms herein and other standard terms and conditions to be negotiated in good faith.

Ex. 28, HEATH_000045678 at 80-81.

**Plaintiff's Response 362:**    Disputed. The evidence cited does not support Defendants' assertion that full execution of a long form agreement regarding the terms of Ms. Lively's engagement was expressly and unambiguously a condition precedent to IEWUM's obligations to Ms. Lively under the Offer Letter. To the contrary, the cited evidence specifies as a condition precedent execution of "an Agreement in a form reasonably acceptable to all parties," Wayfarer Ex. 28 at HEATH_000045680, and Ms. Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.  Further, disputed that Paragraph 13 of the Offer Letter was an ongoing and operative part of the parties' agreement; the terms of the Offer Letter became binding through Lively's reliance letter to Wayfarer which expressly recognized the waiver of Paragraph 13 through the parties' mutual performance notwithstanding the absence of an executed long-form. Ex. 6 ("In the meantime, since principal photography has commenced, until such time that the long form is fully-executed, our client will continue to proceed in reliance upon the terms of the negotiated deal memo with the understanding that Lender and Artist are now unconditionally pay-or-play for the acting fee of $1.75M and that the conditions in Paragraph 13 of the deal memo are now either satisfied or waived.").

363.    On May 8, 2023, outside counsel for IEWUM, Joseph Lanius, sent Lively's attorney a draft "Actor Loanout Agreement," ("ALA")—*i.e.*, the "long form agreement" referred to in the Offer Letter.  Ex. 262, WAYFARER_000140956; Ex. 263, WAYFARER_000140957.

**Plaintiff's Response 363:**    Undisputed that Joseph Lanius ("Lanius") sent Lively's attorney a draft Agreement on May 8, 2023 (although he did so "on accident"). Ex. 79.

364.    The parties to the draft ALA were IEWUM (defined as "Company") and Blakel, Inc. ("Lender"), with an inducement to be signed by Lively ("Artist").    Ex. 263, WAYFARER_000140957.

**Plaintiff's Response 364:**    Undisputed.

365.    The first section of the draft ALA referred expressly to "Conditions Precedent," stating that conditions precedent to "Company's obligations under this Agreement" included "Company's receipt of executed copies of this Agreement signed by Lender and Artist," (§1.3)[3] as well as receipt of "the inducement attached hereto and incorporated herein by this reference, fully executed by Lender and Artist" (§1.5).  Ex. 263, WAYFARER_000140957 at 57-58.

**Plaintiff's Response 365:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

366.    An inducement provision included at the end of the draft provided that Blake Lively would be personally bound by the terms of the ALA.  It further provided that "for the purposes of any and all Worker's Compensation statutes, laws, or regulations…an employment relationship exists between [IEWUM] and myself, [IEWUM] being my special employer under the agreement."  Ex. 263, WAYFARER_000140957 at 90.

---

[3] The section numbers did not remain consistent across drafts of the ALA.

**Plaintiff's Response 366:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

367.    The draft ALA contained an "Entire Agreement" provision (§18) which provided that a document setting forth "Standard Terms" would be included as part of the ALA and stated *inter alia*:

> This Agreement (including the Standard Terms) constitutes the entire understanding of the parties hereto and replaces any and all former agreements, understandings and representations relating in any way to the subject matter hereof.  No modification, alteration or amendment of this Agreement shall be valid or binding unless it is in writing and signed by both parties.

> Ex. 263, WAYFARER_000140957 at 71.

**Plaintiff's Response 367:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

368.    The "Standard Terms" attached as Exhibit A contained numerous provisions designed to protect IEWUM, including a notice and cure provision titled "Company's Breach," which ruled out any breach in the event of cure, as well as an express damages limitation, which ruled out any consequential damages:

> §4.3, titled "Company's Breach," stated, *inter alia*:

> No act or omission of Company hereunder shall constitute an event of Default or breach of this Agreement unless Artist shall first notify Company in writing setting forth such alleged breach or Default and Company shall not cure the same within thirty (30) days after receipt of such notice…. Ex. 263, WAYFARER_000140957 at 77.

> §15.7, titled "Limitations on Damages" stated:

> In no event will any party hereto (Company and/or Artist) be liable for or have any obligation to pay to the other consequential and/or incidental and/or special and/or punitive damages, all of which are expressly excluded, and Company and Lender and

Artist each hereby waive any right to recover any such damages from the other.  Ex. 263, WAYFARER_000140957 at 83.

**Plaintiff's Response 368:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

369.    The Standard Terms contained an additional merger provision (§15.3) which also included "non-waiver" language.  Ex. 263, WAYFARER_000140957 at 82.

**Plaintiff's Response 369:**    Undisputed.

370.    The Standard Terms also contained a "Lender's and Artist's Remedies" Provision (§15.6) stating, *inter alia*, that "The rights and remedies of Lender and Artist in the event of any breach by Company of this Agreement or any of Company's obligations hereunder shall be limited to Lender's and/or Artist's right to recover damages (subject to Paragraph 15.7 below), if any, in one or more arbitration proceedings."  Ex. 263, WAYFARER_000140957 at 83.

**Plaintiff's Response 370:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

371.    The Standard Terms required that any notices to IEWUM be "in writing" and addressed to IEWUM Attn: Jamey Heath.  Ex. 263, WAYFARER_000140957 at 77-78.

**Plaintiff's Response 371:**    Undisputed that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

372.    On April 18, 2024, Lively's counsel proposed additional edits to the loanout agreement.  Ex. 218, BL-000038554.

**Plaintiff's Response 372:**    Undisputed that, after several rounds of negotiations, Ms. Lively's counsel circulated revisions to the Agreement on April 18, 2024, which included provisions concerning sexual harassment and confidentiality that Ms. Lively's counsel had previously circulated on February 5, 2024, and that Lanius flatly rejected on March 7, 2024. Wayfarer Exs. 266 at BL-000038542, BL-000038548 (February 2024 draft); 267 at BL-000038504, BL-000038510 (March 2024 draft); 218 at BL-000038554.

373.    After additional communications, on or about April 29, 2024, Meziane asked Lively to sign the loanout agreement. Ex. 264, BL-000038599. Lively's representative responded: "We (Blake's reps) are all speaking this week about the open issues and will come back to you soon." *Id*.

**Plaintiff's Response 373:**    Undisputed.

374.    The first phase of filming *It Ends With Us* began on May 15, 2023, with the ALA still unsigned and no agreement reached on its final terms. Heath Decl. ¶¶17-18.

**Plaintiff's Response 374:**    Undisputed that the first phase of filming *It Ends With Us* began on May 15, 2023 and that the Agreement was not signed at the time, but disputed that the terms were not substantially finalized, and disputed to the extent that this assertion suggests that the Agreement was not a binding enforceable agreement. The face of the CRA itself confirms that the parties "ha[d]" reached agreement on at least the material terms. Wayfarer Ex. 117 at HEATH_000045307. Further, as of the date the CRA was executed, both parties had commenced performance of their obligations under the Agreement. Exs. 293 (WAYFARER_000067020) (Daily Prep Schedule detailing "Lily" rehearsals); 294 (HEATH_000045201) (invoice from Blakel to IEWUM LLC for meal allowances and assistant payments from January and February 2024);

295 (HEATH_000045200) (==email from IEWU staff stating, "Please note we paid for Meals/Training and the assistant previously"==).

375.    IEWUM was not asked to and did not pay for any medical insurance for Lively. Heath Decl. ¶21.

**Plaintiff's Response 375:**    Undisputed.

376.    Lively and her team negotiated every aspect of her work, dictating numerous terms and conditions, including minute details, such as the right to exercise pre-approval over the days when shoots would take place in locations other than New Jersey as well as her travel and accommodations in those locations; the financial bonuses she would receive if the film hit certain benchmarks; the credits she would receive for her work, including an executive producer credit; the identity of her make-up artist, wig maker, and body double; the ability to offer a "Meaningful consultation over the 'look' of the Role, ad campaign and release pattern; and the time she would spend on set and travelling to and from her home in New York each day; and even approval over the screenplay, the director, and her co-lead actor.  *E.g.*, Ex. 28, HEATH_000045678; Ex. 32, HEATH_000045662 at -663-75; Ex. 265, HEATH_000046122.

**Plaintiff's Response 376:**    Disputed that Lively and her team negotiated "every aspect of her work," which the cited evidence does not support. *See generally* Wayfarer Exs. 28, 32, 265. Lively and her representations negotiated for certain terms and conditions "beyond SAG minimum protections," and such negotiations were consistent with work condition negotiations for ==“most actors of [Ms. Lively's] stature," a reality Wayfarer did not dispute==. Wayfarer Ex. 32 at HEATH_000045664. ==At the time the parties began performance under the Agreement, only 20% of the provisions were subject to negotiation==. Wayfarer Ex. 266.

377.    Nonetheless, although the parties negotiated for more than a year, Lively never signed any long-form agreement setting out the complete terms of her engagement with the film. Ex. 264, BL-000038599; Heath Decl. ¶¶14-19.

**Plaintiff's Response 377:**    Undisputed that Lively did not sign the Agreement, but disputed that the parties did not reach agreement on the material terms of the Agreement and that the Agreement was not binding as to those terms. Further disputed as misleading because only 20% of the ALA's terms remained subject to discussion around the time the CRA was executed, and both parties had commenced performance of their obligations under the ALA. Wayfarer Ex. 266; Exs. 293 (WAYFARER_000067020) (Daily Prep Schedule detailing "Lily" rehearsals); [] (HEATH_000045201) (invoice from Blakel to IEWUM LLC for meal allowances and assistant payments from January and February 2024); 295 (HEATH_000045200) (email from IEWU staff stating, "Please note we paid for Meals/Training and the assistant previously"). And notwithstanding the parties' discussions as to 20% of the Agreement's terms, continued negotiations centered principally around four provisions out of over 110. *Compare* Wayfarer Ex. 266 (Lively's representative revises provisions governing execution of the Agreement, publicity limitations/still approvals, sexual harassment, and confidentiality in February 2024); *with* Wayfarer Ex. 267 at BL-000038482, BL-000038483, BL-000038492, BL-000038504, BL-000038510 (IEWUM rejects the same in March 2024); *and* Wayfarer Ex. 218 (Lively's representative re-introduces edits to provisions governing execution of the Agreement, publicity limitations/still approvals, sexual harassment, and confidentiality in April 2024); *and* Ex. 80 at HEATH_000041866, HEATH_000041888, HEATH_000041894 (IEWUM rejects revisions concerning execution of the Agreement, sexual harassment and confidentiality in April 2024).

378.  Negotiations over the terms of the ALA resumed and continued for months after the CRA was executed and filming recommenced, with numerous terms remaining subject to disagreement. *E.g.*, Ex. 266, BL-000038516; Ex. 267, BL-000038477.

**Plaintiff's Response 378:**    Undisputed that negotiations over the terms of the Agreement resumed and continued after the CRA was executed and filming recommenced, and that certain terms remained subject to disagreement, but otherwise disputed as misleading because the assertion that "numerous terms" remained subject to disagreement fails to account for the reality that continued negotiations centered principally around four isolated provisions out of over 110. *Compare* Wayfarer Ex. 266, BL-000038516 (Lively's representative revises provisions governing execution of the Agreement, publicity limitations/still approvals, sexual harassment, and confidentiality in February 2024); *with* Wayfarer Ex. 267, BL-000038477 (IEWUM rejects the same in March 2024); *and* Wayfarer Ex. 218 (Lively's representative re-introduces edits to provisions governing execution of the Agreement, publicity limitations/still approvals, sexual harassment, and confidentiality in April 2024); *and* Ex. 80 (IEWUM rejects revisions concerning execution of the Agreement, sexual harassment and confidentiality in April 2024).

379.  After the CRA (which the negotiators referred to as a "side-letter") was finalized, the parties renewed their efforts to finalize the ALA, and Lively's counsel continued to edit the Standard Terms to be included therein.  She edited the Standard Terms to state that such terms were to be incorporated into the "Underlying Agreement" "as amended."  Ex. 266, BL-000038516 at 37.

**Plaintiff's Response 379:**    Undisputed that negotiations over certain terms to be included in the parties' existing Agreement continued after the CRA was executed and that Lively's counsel edited Exhibit A to the Agreement to indicate that the Agreement *was amended*,

meaning there was an Agreement to be amended, and that the parties continued mutual negotiations over a select group of ancillary terms. *See e.g.*, Wayfarer Ex. 266 at BL-000038516 (Lively's counsel revises provisions governing execution of the Agreement, publicity limitations/still approvals, sexual harassment, and confidentiality in February 2024); Wayfarer Ex. 267 at BL-000038477 (IEWUM rejects the same in March 2024); Wayfarer Ex. 218 (BL-000038554) (Lively's counsel re-introduces edits to provisions governing execution of the Agreement, publicity limitations/still approvals, sexual harassment, and confidentiality in April 2024); Ex. 80 (IEWUM rejects revisions concerning execution of the Agreement, sexual harassment and confidentiality in April 2024).

380.    Lively's attorney sought, on multiple occasions, to strike the provisions stating that IEWUM's obligations were conditioned on full execution of the agreement and inducement, but IEWUM rejected those edits. Ex. 267, BL-000038477 at -482; Ex. 218, BL-000038554 at -565; Ex. 268, HEATH_000041864 at -866.

**Plaintiff's Response 380:**    Undisputed that Lively's counsel sought to revise the text of the "Execution of Agreement" provision to reflect that IEWUM had waived the requirement, *see* Wayfarer Ex. 218 at BL-000038565; Wayfarer Ex. 266 at BL-000038520; however, the assertion that IEWUM rejected those revisions is misleading because it fails to acknowledge that, in response to Lively's counsel's comment that IEWUM had "effectively waived" the Execution Condition "in practice," ***IEWUM did not contest, and therefore conceded, waiver.*** Wayfarer Ex. 267 at BL-000038482 (Lanius is silent on waiver and indicates that the Execution Condition should "still" remain because it "is always in a CP in every deal I have ever done.").

381.    At no point during the negotiations did either side suggest changes to the "Entire Agreement" provision, the "Company's Breach" provision, the "Non-Waiver" provision, or the

"Limitation on Damages" provision.  Nor did Lively ever seek to add Wayfarer as a party to the draft agreement.  Nor was Wayfarer ever made a party or signatory to the draft agreement.  Heath Decl. ¶¶19-20.

**Plaintiff's Response 381:**    Undisputed. Similarly, at no point during the negotiations did either side suggest changes to, *inter alia*, the "Governing Law" provision, the "Services; Start Date" provision, the "Company's Ownership Rights" provision, the "Sexual Harassment" provisions, save for the final sentence. *See, e.g.*, Wayfarer Exs. 264, 266; 267.

382.    As late as July 2024, Meziane continued to ask Lively's reps to review the draft and for Lively to sign.  Ex. 264, BL-000038599.  On July 2, 2024, Meziane wrote to Lively's representative: "Could we please have an expedited review and signature?  We sent the latest version in April.  Reserving rights[.]"  Ex. 264, BL-000038599.

**Plaintiff's Response 382:**    Undisputed that that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

383.    The last version of the draft ALA was dated May 5, 2023 and exchanged on July 2, 2024, after filming was complete.  That draft agreement provided that IEWUM's obligations under the draft agreement were conditioned on Lively's signature, which never occurred.  Ex. 264, BL-000038599 at 02-03.

**Plaintiff's Response 383:**    Undisputed, but the assertion that the version of the Agreement sent on July 2, 2024 provided that IEWUM's obligations thereunder were conditioned on Lively's signature is misleading because it fails to account for IEWUM's waiver of this condition both in writing and through its performance. In the course of negotiating the draft agreement, Ms. Strasberg advised, and IEWUM did not dispute, that IEWUM had "effectively

waived this condition in practice." Wayfarer Ex. 267 at BL-000038482. Lanius did not contest waiver, and instead responded: "It still needs to be left in as is always a CP in every deal I have ever done." Wayfarer Ex. 267 at BL-000038482. Heath separately and expressly advised Ms. Strasberg that Wayfarer had "withdraw [their] request for your client to sign her agreement in order to extend the time with the edit." HEATH_000046138. And Wayfarer also issued payment to Lively according to the terms of the Agreement, not the Offer Letter, and accorded Lively credit as a Producer, rather than an Executive Producer, consistent with the terms of the Agreement circulated on July 2, 2024. Wayfarer Ex. 264 at BL-000038611; Exs. 81; 82; 83; 84; 85; 86 at SPE_BL0008724.

384.    The final draft of the loanout agreement the parties exchanged was sent by Meziane, on July 2, 2024.  The cover email and draft are Exhibit 264. BL-000038599.

**Plaintiff's Response 384:**    Undisputed that the last version of the Agreement exchanged was sent on July 2, 2024.

385.    Lively refused to sign the ALA.  *See, e.g.*, Ex. 269, SPE_WF0000460 at -461 (April 30, 2024 text from Ange Giannetti, noting that Wayfarer had "been trying to get her to [sign] for over a year"); Ex. 270, BALDONI_000018702 (June 1, 2024 text from Baldoni, stating: "She won't sign her contract.").

**Plaintiff's Response 385:**    Undisputed that Lively did not sign the Agreement.

386.    The final version of the draft ALA granted Lively's loanout entity a $1.75 million guaranteed payment, with an additional weekly rate of $291,667.67 for any additional days required to render services beyond the dates agreed and bonuses should the film achieve certain benchmarks or should Lively be nominated or receive an award for her work. Ex. 264, BL-000038599 at -606-609.   In addition, the agreement specified that Lively's contingent

compensation package "shall be no less than the total contingent compensation payable to the director…or any other cast member…on the Picture." *Id.* at -608.

**Plaintiff's Response 386:**    Undisputed that the compensation terms and quoted language appear in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

387.    The final version of the draft ALA also granted Lively control over numerous aspects of her work.  It provided that Lively's workdays would be limited to a 12-hour period between the time she was picked up and dropped off at her home in New York, with adjustments if Lively chose to stay at other accommodations.  It specified that Lively would receive private, first-class transportation to and from set and retained "the right to approve the driver and car."  It gave Lively a $1000 weekly "training and meal allowance" and a $1500 weekly allowance for her exclusive, designated assistant.  Should Lively be required to film in Los Angeles, as the script anticipated, Lively would be flown round trip on a private jet, along with her four children, assistant, two nannies, and security personnel, and would receive an additional per diem for herself and her employees. Lively also retained control over the post-production schedule: the agreement provided that Lively would make herself available for post-production and promotional services on her own schedule.  Should Lively be required to travel more than 50 miles from her home for any promotional services, she would again be provided transportation and accommodations for herself, her immediate family, two nannies, an assistant, and security personnel.  Lively also retained control over all photographic stills or non-photographic likenesses of her image used in connection with the film. Ex. 264, BL-000038599 at 610-611.

**Plaintiff's Response 387:**    Undisputed that IEWUM willingly agreed to grant Lively the following contractual rights in the final draft of the Agreement: (i) 12-hour workdays when

Lively stayed in Manhattan and Los Angeles, with minor adjustments if Lively stayed elsewhere; (ii) first-class ground transportation to and from work each working day, and the right to approve the driver and car; (iii) a $1000 weekly training and meal allowance and a $1500 weekly allowance for a designated assistant; (iv) roundtrip travel on a private jet for Lively, her four children, assistant, two nannies, and security personnel should Lively be required to film in Los Angeles, and an additional per diem for Lively and her employees; (v) flexibility regarding post-production and promotional services; (vi) transportation and accommodations for Lively, her immediate family, assistant, two nannies and security in the event that promotional services required Lively to travel over 50 miles from her home; and (vii) approval rights over photographic stills or non-photographic likenesses of her image used in connection with the Film. Wayfarer Ex. 264 at BL-000038610–38611.

388.    The draft ALA contains a provision which prohibits "Sexual Harassment of any type." The terms of that provision were never finalized. Ex. 264, BL-000038599 at -625. As of July 2, 2024, this provision stated as follows (with blue font indicating edits by Lanius):

> Sexual Harassment of any type is strictly prohibited and cause for immediate termination of this Agreement by Company or by Artist. No employee shall be subjected to sexual harassment by another employee during the course of employment. For the purposes of this policy, sexual harassment is unwanted conduct of a sexual nature which adversely affects another person's conditions of employment and/or employment environment. Such harassment includes, but is not limited to: any unwelcome sexual advance, request for sexual favor, or other verbal, non-verbal, or physical conduct of a sexual nature, that interferes with work, is made a condition of employment, or creates an intimidating, hostile, or offensive environment in connection the workplace or the use of one's authority or power, either explicitly or implicitly, to coerce another into unwanted sexual relations or to punish another for his or her refusal. For the avoidance of doubt, Sexual Harassment may occur between or amongst persons of different sexes or genders or of the same sex or gender, and may be initiated by any gender or sex. In the event Company is aware of any Sexual Harassment conducted by Artist, Company shall have the right to immediately terminate this Agreement and available to all rights and remedies hereunder. ~~In the event Artist is aware of any Sexual Harassment conducted by Company, notwithstanding the terms of Paragraph 16.6 below,~~

Lender and/or Artist shall have the right to terminate this Agreement, shall remain entitled to full compensation and shall have the right to avail themselves of all rights and remedies hereunder and under applicable law.

Ex. 264, BL-000038599 at 625.

**Plaintiff's Response 388:**    Undisputed that the quoted language and edit appear in the cited source. Disputed that the terms of that provision, aside from the edited language, did not represent a binding agreement between the parties. *Supra* ¶ 381; Wayfarer Ex. 264 at BL-000038625. Lively respectfully refers the Court to the cited source for its complete contents and disputes any summary or interpretation inconsistent therewith.

389.    The draft ALA contained a California choice-of-law provision.  Ex. 264, BL-000038599 at -628.

**Plaintiff's Response 389:**    Undisputed.

390.    Lively never signed the ALA or the inducement.  Heath Decl. ¶¶17-18.

**Plaintiff's Response 390:**    Undisputed.

391.    Lively's representatives sent a cease and desist letter addressed to certain Defendants and others, on December 20, 2024.  The Letter was not addressed to IEWUM.  Ex. 271, HEATH_000041140 at -142.

**Plaintiff's Response 391:**    Undisputed.

392.    The cease and desist letter alleged, *inter alia*, that the addressees had breached the "Protections For Return to Production" and/or "Lively's contract rider."    Ex. 271, HEATH_000041140 at 42.  The cease and desist letter did not allege any independent breach of the ALA.

**Plaintiff's Response 392:**    Undisputed.

393.    Lively filed her initial Complaint in this Action on December 31, 2024.  (Dkt. 1).

**Plaintiff's Response 393:**    Undisputed.

394.    Lively seeks the following damages:

a.  "Lost earnings between approximately $41,550,956 and $87,793,592 subject to expert testimony."

b.  "Lost profits between approximately $39.6 million and $143.5 million subject to expert testimony."

c.  "Pain and suffering, physical pain, and humiliation in the range of $250,000 to $400,000."

d.  "Reputational harm attributable to defamation in an amount of approximately $24,375,267, subject to expert testimony."

e.  "Other reputational harm in an amount of approximately $36.5 million to $40.5 million, subject in part to expert testimony."

Ex. 272, Lively's Fourth Amended Initial Disclosures, dated October 29, 2025, at 41.

**Plaintiff's Response 394:**    Undisputed that Lively seeks the categories of damages identified in paragraph 394(a)-(e) and that the quoted language appears in the cited source, but Lively respectfully refers the Court to the cited source for its complete contents and disputes and summary or interpretation inconsistent therewith. Lively disclosed these "preliminary" damages pursuant to her obligations under Federal Rule of Civil Procedure 26(a)(1)(A)(iii), without prejudice to adjustment, and subject to proof, including but not limited to expert testimony that is presently underway. Wayfarer Ex. 272 at 40. Such damages categories also exclude Lively's claims for punitive damages in an amount "not less than three times the amount of Lively's damages," all attorneys' fees and costs incurred by Lively, and damages to which Lively is entitled pursuant to California Civil Code § 47.1. Wayfarer Ex. 272 at 41.

395.    As components of her damages, Lively seeks "lost wages" between for "lost acting and/or producing opportunities" and "lost endorsements, speaking engagements, and personal appearances. Ex. 272, Lively's Fourth Amended Initial Disclosures, dated October 29, 2025, at 41.

**Plaintiff's Response 395:**    Undisputed.

396.    As components of her damages, Lively seeks "lost profits" for "lost cash flows" to Blake Brown Beauty and Betty B Holdings, LLC, as well as "lost royalties" in relation to Blake Brown Beauty. Ex. 272, Lively's Fourth Amended Initial Disclosures, dated October 29, 2025, at 43.

**Plaintiff's Response 396:**    Undisputed.

397.    The Blake Brown Beauty brand was announced on July 31, 2024 and formally launched at Target on August 4, 2024—just months before Lively's complaint was filed. Ex. 273, Family Hive Dep. Tr. 50:24-50:25, 35:10-35:10.

**Plaintiff's Response 397:**    Undisputed.

398.    Lively understood that following the initial promotion of the brand through Target, that sales might decline organically. Ex. 273, Family Hive Depo Tr. 137:1-137:14, 138:4-138:7 (In October 2024, Lively received a sales deck noting that weekly retail sales might decline as the brand came off its national promotion at Target).

**Plaintiff's Response 398:**    Undisputed that Tedesco informed Lively that Blake Brown's weekly retail sales average might decrease as Blake Brown products came off of Target's national endcap, but otherwise disputed that Lively understood that sales might decline organically, which the cited evidence does not support. Wayfarer Ex. 273 at 137:1-137:14, 138:4-138:7. Defendants' asserted proposition as to Lively's understanding—and the possibility—of an

organic sales decline is misleading because it fails to account for Tedesco's experience "where sales stayed the same" and "where they actually go up because people tried the product," notwithstanding the removal of product from the display endcap. Ex. 87 Family Hive 9/29 Tr. at 136:19–138:13.

399.    Betty B Holdings LLC was formed in 2023 as a holding company to accommodate the introduction of a new alcoholic product line, Betty Booze.  Betty Buzz, LLC, which was formed as a non-alcoholic beverage company in 2021, became its subsidiary.  Ex. 274, Chrisomalis Dep. Tr. 25:16-28:7.

**Plaintiff's Response 399:**    Undisputed.

400.    The Betty Buzz mixer line consistently failed to gain market share throughout its three-year existence.  Ex. 274, Chrisomalis Dep. Tr. 121:18-121:21, 147:4-147:7.

**Plaintiff's Response 400:**    Undisputed.

401.    In 2023, Betty B Holdings began selling alcoholic products under the brand "Betty Booze."  Ex. 274, Chrisomalis Dep. Tr. 27:6-8.

**Plaintiff's Response 401:**    Undisputed.

402.    Lively wholly owns LOL HATA, which has a 40% membership interest in Family Hive LLC.  Ex. 273, Family Hive LLC Dep. Tr. 58:11-20; Ex. 275, Tedesco Dep. Tr. 226:10-227:3.  LOL HATA is also a member of Betty B Holdings, LLC. Ex. 276, BL-000022233.

**Plaintiff's Response 402:**    Undisputed that LOL HATA LLC owns a 40% membership interest in Family Hive LLC and that LOL HATA LLC is a member of Betty B Holdings, LLC, but otherwise disputed. Lively is the majority owner of LOL HATA LLC, holding a 99% ownership stake. Lively Decl. ¶35.

403.    ==Lively does not have any direct entitlement to royalties, which are paid to LOL HATA.  Ex. 275, Tedesco Dep. Tr. 246:20-24.== Ex. 277, BL-000037820; Ex. 278, BL-000034251; Ex. 279, BL-000034253.

**Plaintiff's Response 403:**    Undisputed that ==Family Hive LLC pays LOL HATA LLC royalties directly, and that Lively's entitlement to royalties is through her ownership interest in LOL HATA LLC==. Wayfarer Ex. 277 at BL-000037820.

404.    ==As components of her damages, Lively seeks damages for "Reputational Harm" based on "impressions" of the allegedly defamatory statements and "impressions of the terms 'bully,' 'mean girl,' and 'tone deaf'" attributable to the alleged retaliation.==  Ex. 272, Lively's Fourth Amended Initial Disclosures, dated October 29, 2025, at 43-44.

**Plaintiff's Response 404:**    Undisputed.

## PLAINTIFFS' ADDITIONAL RULE 56.1 STATEMENT OF
## UNDISPUTED MATERIAL FACTS

**A.    Baldoni Proclaims Himself As a Feminist and Uses His Feminist Brand to Promote Wayfarer**

405.    In 2017, Baldoni launched the "Man Enough" brand, which he describes as a content studio and "movement around healthy manhood and greater equity for all." Ex. 88.

406.    In 2017, Baldoni spoke about his own journey with masculinity in a viral TED Talk titled *Why I'm Done Trying to be 'Man Enough'* and, in 2021, Baldoni released his first book *Man Enough: Undefining My Masculinity*. Ex. 88; *see also* Wayfarer Ex. 7, WAYFARER_000041408–409.

407.    Baldoni has stated, "I have crossed boundaries and lines in my teens and 20s not even thinking about it, simply because of the porn I was consuming." He has also publicly commented that there is a "one million percent probability" that there "is a woman or two" that he has "in some way made uncomfortable by saying something or doing something that was chauvinistic or sexist" and that he did not "always ask for consent" or "always listen when they said no." Ex. 4, Baldoni 10/7 Tr. 78:4–16, 307:10–16.

408.    Baldoni publicly stated that he would "do better" and be "man enough" to "shut the hell up and listen" to women "so that one day we don't have to live in a world where a woman has to risk everything and come forward to say the words 'me too[.]'" SAC ¶¶ 314, 321; Dkt. No. 633 (Baldoni Answer to SAC) ("Baldoni Answer") ¶¶ 314, 321.

409.    In 2019, Baldoni launched the California–based production company Wayfarer Studios LLC ("Wayfarer") with Steve Sarowitz. Both hold the title of co–founder and co–chairman. Exs. 20, Baldoni 10/6 Tr. 19:13–20:5, 42:21–43:5, 46:3–5; 4, Baldoni 10/7 Tr. 284:9–11; 11, Sarowitz Tr. 98:4–7, 266:22–23; *see also* SAC ¶¶ 59, 60; Baldoni Answer ¶ 59; Dkt. No.

636 (Sarowitz Answer to SAC) ("Sarowitz Answer") ¶ 60. Wayfarer is based out of Los Angeles, California, and at all relevant times, Baldoni has resided in California. SAC ¶¶ 57, 58; Dkt. No. 632 (Wayfarer Answer to SAC) ("Wayfarer Answer") ¶ 57; Baldoni Answer ¶ 58.

410.    Sarowitz is a billionaire financier and co–founder of Wayfarer. He invested approximately thirty–million dollars to finance the Film. Ex. 11, Sarowitz Tr. 98:4–7, 132–134:2.

411.    In 2020, Baldoni hired his friend of nearly fifteen years, Jamey Heath, to serve as Wayfarer's interim Chief Operating Officer. Heath 10/8 Tr. 30:8–33:4. Heath later gained the title of Co–Chief Operating Officer, President, and then Chief Executive Officer. At all relevant times, Heath has resided in California. SAC ¶ 59; Dkt. No. 634 (Heath Answer to SAC) ("Heath Answer") ¶ 59; *see also* Exs. 3, Heath 10/8 Tr. 18:12–23; 33:7–34:9, 134:14–15; 89, Hanks Tr. 277:8–9; 4, Baldoni 10/7 Tr. 255:14–22; 11, Sarowitz Tr. 287:22–288:6; *see also* Dkt. No. 962 (Declaration of Jamey Heath in Support of Wayfarer Parties' Motion for Summary Judgment ("Heath Decl.") ¶ 3.

412.    Sarowitz, Heath, and Baldoni are close personal friends. Exs. 3, Heath 10/8 Tr. 121:22–122:9; 4, Baldoni 10/7 Tr. 255:14–22; 11, Sarowitz Tr. 287:22–288:6.

413.    Baldoni has stated that through Wayfarer, he aimed to create, and strives to maintain, an enterprise "where everybody is free to have their own beliefs and express opinions that maybe different from the executives or the shareholders, and where there is true unity and equality across the board, and where we're mindful of the positions of power and how those power dynamics work." Katia Arami, Wayfarer Studios Aims to Be a "Light in the Darkness," BahaiTeachings.org (June 24, 2022), https://bahaiteachings.org/wayfarer–studios/; Ex. 4, Baldoni 10/7 Tr. 38:23–41:7.

414.    Prior to the Film, Baldoni had directed two films: Five Feet Apart and Clouds. Ex. 88; *see also* Wayfarer Ex. 7, WAYFARER_000041408–409.

**B.    Baldoni Acquires Rights to Produce It Ends With Us To Capitalize on His Feminist Brand**

415.    In 2019, Wayfarer acquired the film rights to Colleen Hoover's novel, *It Ends With Us* (the "Film"). Ex. 4, Baldoni 10/7 Tr. 199:6–200:6.

416.    The novel centered on female triumph and empowerment in breaking the cycle of domestic violence. Exs. 1, Hoover Tr. 22:2–16, 33:15–17; 2, Giannetti Tr. 38:16–21; 3, Heath 10/8 Tr. 156:9–12.

417.    Hoover did not know that Baldoni would direct the Film when she sold Wayfarer the Film rights. Hoover wanted a woman to direct the Film and told Wayfarer and Baldoni that she wanted a woman to direct it. Ex. 1, Hoover Tr. 37:5–24.

418.    When Baldoni expressed interest in directing the Film, both Hoover and members of Baldoni's team at Wayfarer raised concerns, believing a women should direct due to the domestic violence themes. Hoover told Baldoni and Wayfarer that she "would prefer a female director, but if that wasn't possible and they couldn't find one, that I felt like, of all men, with him having a — the platform he did based on women, that he would be one of the few men I would be okay with directing it." Ex. 1, Hoover Tr. 37:20–38:25, 39:9–14.

419.    Although Hoover specifically requested that the Film be directed by a woman, Wayfarer and Baldoni decided that Baldoni would direct the Film himself. Exs. 4, Baldoni 10/7 Tr. 33:16–22, 199:3–201:4; 3, Heath 10/8 Tr. 121:22–122:1; 1, Hoover Tr. 39:9–21.

420.    As the Director and co–chairman, all cast and crew reported up to Baldoni, who had the power to hire, fire, remove, and discipline them as he saw fit. Exs. 4, Baldoni 10/7 Tr. 41:9–44:17, 61:3–18, 140:2–9; 15, Saks Tr. 61:2–13; 11, Sarowitz Tr. 204:20–205:2.

167

421.    Baldoni was also the lead male actor, playing the character of Ryle Kincaid. He was also an Executive Producer of the Film. Exs. 4, Baldoni 10/7 Tr. 33:16–22, 146:11–20, 199:3–201:4, 284:12–17; 3, Heath 10/8 Tr. 121:22–122:1; *see also* SAC ¶ 2; Baldoni Answer ¶ 2; Wayfarer Answer ¶ 2.

422.    It Ends With Us Movie LLC ("IEWUM") is wholly owned by Wayfarer. SAC ¶ 61; Wayfarer Answer ¶ 61; Heath Decl. ¶¶ 6, 9. IEWUM is a California limited liability company with its principal place of business in California. SAC ¶ 61; Dkt. 635 (IEWUM Answer) ¶ 61.

423.    All cast and crew were paid by Wayfarer Studios. Ex. 4, Baldoni 10/7 Tr. 140:2–9.

424.    Heath was President of IEWUM and a producer for the Film. All department heads reported to Heath, who was a supervisor. One of Heath's responsibilities was to ensure the set was safe. Heath Decl. ¶ 5; *see also* Exs. 3, Heath 10/8 Tr. 57:3–11, 135:14–137:24, 154:17–22; 11, Sarowitz Tr. 204:20–25; 15, Saks Tr. 61:2–13.

425.    When IEWUM hired Heath as President and producer for the Film, he also had limited experience working on films. Exs. 15, Saks Tr. 149:11–21; 3, Heath 10/8 Tr. 49:5–10, 50:8–25.

426.    At all times, Heath reported to both Sarowitz and Baldoni. Ex. 4, Baldoni 10/7 Tr. 56:4–11.

427.    Saks was a producer for the film, and in that capacity, reported to Baldoni and Heath, who were her bosses. Exs. 15, Saks Tr. 29:22–24, 52:15–25; 3, Heath 10/8 Tr. 118:5–7.

428.    Wayfarer and IEWUM, on the one hand, and Columbia Pictures Industries, Inc. ("CPII" or "Sony"), on the other hand, entered into a Co–Financing Distribution Agreement dated as of November 7, 2022 ("Distribution Agreement"), pursuant to which Sony agreed to co–finance, co–produce and distribute the Film. Sony spent more than twenty–eight million dollars to co–

finance the project. Exs. 2, Giannetti Tr. 24:9–12, 43:1–22, 296:21–25; 38, Greenstein Tr. 29:14–

33:3; *see also* Heath Decl., Ex. A (Dkt. No. 957–1).

429.    Andrea ("Ange") Giannetti was an Executive Vice President and Senior Creative

at Sony and served as Sony's day–to–day representative overseeing filming.  Exs. 2, Giannetti Tr.

25:3–26:3, 33:10–21; 15, Saks Tr. 53:1–15.

430.    Sony had the exclusive right to market and advertise the Film, and, subject to

certain conditions, authorize final cut of the Film in the event "█████████████████████████████

██████████████████████████████████." Heath Decl. Ex. A (Dkt.

No. 957–1) at SPE_BL0000013, SPE_BL0000017.

## C.    Wayfarer Approaches Lively for the Film and Lively Agrees to Sign on To a Film about Female Empowerment and Triumph

### i.    Lively's Positive Reputation in Hollywood Made Her a Top Contender for the Role of Lily Bloom

431.    In late 2022, Wayfarer worked to cast the role of Lily Bloom, for whom Baldoni,

Heath, and Sarowitz knew that to achieve the commercial success they desired, they needed an A–

list actress to headline the Film. Exs. 4, Baldoni 10/7 Tr. 145:10–145:8; 2, Giannetti Tr. 57:2–6;

90; 3, Heath 10/8 Tr. 156:14–17.

432.    After learning of Lively's potential interest in late 2022, Wayfarer attempted to cast

her. Exs. 90; 91; 33, Stone Tr. 378:8–379:6.

433.    In December 2022, Baldoni believed that Lively had a "sterling reputation," "was

well liked by fans," and was "the kind of person who could help drive box office success." Ex. 4,

Baldoni 10/7 Tr. 278:18–279:2.

434.    On December 9, 2022, Heath texted Baldoni: "If we get [B]lake on this

movie…holy shit. You would be directing and starring in a movie with one of the biggest female

stars. And one of the biggest film companies as a partner. [H]oly shit. With one of the biggest

169

books. Holy shit. This put[s] you in a different stratosphere." Baldoni responded: "Everyone loves her it's pretty [wild]." Exs. 92; 3, Heath 10/8 Tr. 160:11–161:19, 163:15–164:22. Hoover told Baldoni that "Blake is her dream Lily, and she couldn't believe" Lively was interested. Ex. 282.

ii.    Lively's First Meeting with Baldoni Contained Unwanted Sexual Discussion

435.    On December 14, 2022, Baldoni and Lively met for the first time at an initial meeting to discuss the possibility of Lively joining the Film. Exs. 281, Lively Tr. 28:24–25, 51:07–52:19; 4, Baldoni 10/7 Tr. 144:10–145:8. Baldoni later texted a friend that he had "[j]ust met with Blake. It was a love fest. I LOVE her." Ex. 93.

436.    Lively was pregnant with her first boy at the time of the meeting, they "were discussing different decisions that parents make and different factors, having boys versus girls," and "different medical decisions people make these days, including circumcision for male babies." Baldoni then told Lively "the decision that they (Baldoni and his wife) made for their child," and "then offered that he was circumcised." Exs. 281, Lively Tr. 50:22–52:12; 4, Baldoni 10/7 Tr. 147:11–148:6.

437.    Lively "found it disturbing" when Baldoni told her he was circumcised, "but . . . [she] wrote it off as him taking a benign conversation too far and hoped and assumed it would be an isolated incident." Ex. 281, Lively Tr. 54:6–13.

438.     Lively never asked Baldoni whether he was circumcised, or expressed any interest in the subject of Baldoni's genitalia. Ex. 4, Baldoni 10/7 Tr. 147:11–148:6.

439.    Prior to filming, Lively spoke with Baldoni's former *The Man Enough Podcast* co–host, Liz Plank, who "tried to warn [B]lake on the red flags" of working with Baldoni, and recalled that "working on his set was truly one of the worst days of [her] life." Exs. 94; 95; Lively Decl., ¶¶ 2–3.

440.    On December 23, 2024, Plank quit her role as co–host of *The Man Enough Podcast.* Ex. 4, Baldoni 10/7 Tr. 107:18–108:4.

441.    Lively had concerns about Baldoni's unsolicited disclosure about his penis and Plank's warning, but was gripped by Lily Bloom's story and was cautiously optimistic that he would be a collaborative creative partner based on Baldoni's own words and self–declaration as a feminist devoted to combatting toxic masculinity. Lively Decl., ¶ 4.

442.    Dr. Jennifer Freyd, who coined the term DARVO, which stands for Deny, Attack, and Reverse Victim and Offender, opined that Lively's "willingness to overlook [Baldoni's] inappropriate comment reflected both a maturity in understanding that sometimes good people say inappropriate things, but also planted the seeds for a kind of low–level betrayal blindness, whereby Lively continued to give Baldoni the benefit of the doubt as he continued to make inappropriate remarks and violate Lively's boundaries in a sexually inappropriate way." Ex. 96, Freyd Report at 10, 16.

iii.    <u>Wayfarer Hires Lively in an Actor Loan Out Agreement</u>

443.    Lively believed in the importance of the Film as a story about female empowerment and triumph. Lively Decl., ¶ 4.

444.    On December 16, 2022, Wayfarer offered Lively the role of Lily Bloom, which Lively accepted on December 31, 2022. Exs. 281, Lively Tr. 12:17–20; 97; 98; 99.

445.    Lively's representatives negotiated an initial offer letter with Wayfarer ("Offer Letter"). On May 19, 2023, Lively's attorney transmitted a reliance letter to Wayfarer based on the terms of the May 4, 2023 version of the Offer Letter, stating that because principal photography had commenced, Ms. Lively would "proceed in reliance upon the terms of the negotiated deal memo with the understanding that . . . the conditions in Paragraph 13 of the deal memo are now either satisfied or waived." Ex. 6. Through that communication, the Offer Letter's terms became

binding on Wayfarer and IEWUM aside from the "Conditions Precedent" set forth in Paragraph 13, which were not a part of the agreement.

446.    The Offer Letter entitled Lively to "a contingent participation from the exploitation of the Picture of an amount equal to 10% of 100% of Sony's A+ pool definition, with direct accounting, payment and audit rights from the studio. No one to get a greater percentage, a more favorable definition or cut in earlier. Guaranteed wide theatrical release. No crediting of overscale or contingent compensation against residuals or vice versa." Wayfarer Ex. 28.

447.    The final version of the Actor Agreement transmitted by Wayfarer to Lively's representatives on July 2, 2023, accepted changes to Lively's contingent compensation that Lively's representatives had requested, and added Lively's entitlement to a producer credit in place of an executive producer credit. Wayfarer Ex. 268 at HEATH_000041869–41871, HEATH_000041874. The Actor Agreement's contingent compensation terms were accordingly more generous than the Offer Letter's in the following ways: (1) Lively was entitled to home entertainment revenues accounted at 100% of amounts received less customary deductions; (2) there would be no advertising overhead charge; and (3) there would be no overbudget penalty. *Id.*

448.    Wayfarer performed these obligations under the Actor Agreement, ensuring that Lively was compensated according to the more generous terms of the Actor Agreement. Exs. 81; 82; 83; 84; 85.

449.    In addition, the final version of the Actor Agreement entitled Lively to a Producer credit, not the Executive Producer credit provided for in the Offer Letter. *Compare* Wayfarer Ex. 264 at BL-000038611 *with* Wayfarer Ex. 28 at HEATH_000045678.

450.    Wayfarer ensured that Ms. Lively was credited as a Producer as required by the Actor Agreement. Ex. 86 at SPE_BL0008724.

451.    During the negotiations over the Actor Agreement's terms, on February 5, 2024, Lively's attorney struck the conditions precedent requiring execution of the Actor Agreement and the Inducement, commenting that "Company has effectively waived this condition in practice," and that even though returning a signed Inducement "is part of signing a long form, . . . it is not a condition precedent to your obligations at this point." Wayfarer Ex. 266 at BL-000038520. Wayfarer's attorney responded *without disputing that the Execution Conditions had been waived*, stating instead that: "It still needs to be left in as it is always in a CP in every deal I have ever done." Wayfarer Ex. 267 at BL-000038482. At the same time, while as late as December 15, 2023, the operative draft of the CRA referred to the "*unexecuted* Actor Agreement," Wayfarer Ex. 116 at BL-000038466 (emphasis added), Wayfarer *struck* the word "unexecuted" from the draft they transmitted to Lively's representatives on January 3. Ex. 100 at HEATH_000045418.

452.    On May 3, 2024, Jamey Heath wrote to Lively's representative expressly waiving the Execution Conditions, writing *"We have withdrawn our request for your client to sign her agreement* in order to extend the time with the edit." Ex. 101.

453.    On December 18, 2022, Heath and Baldoni celebrated Lively's acceptance of the role, with Heath remarking that they were "birthing Blake into [the] role" of Lily Bloom. Heath was at home in Los Angeles at the time. Exs. 102 at WAYFARER_000138398; 3, Heath 10/8 Tr. 18:12–23.

454.    In January 2023, the announcement that Lively was cast to play the role of Lily Bloom caused the novel *It Ends With Us* to go "back to #1 on Amazon." Exs. 103; 2, Giannetti Tr. 65:13–66:9.

**D.    During Pre–Production, Baldoni Feigns Appreciation to Lively While Mistreating Women**

455.    On March 8, 2023, Baldoni texted Lively that he would "love [her] thoughts" regarding the casting of the characters Atlas and young Lily. Baldoni would request Lively's assistance with casting multiple times during pre–production. Exs. 104 at BL–000009295; 105; 106; 107; 108;  109; 110; 111.

456.    On April 3, 2023, Baldoni asked Lively to reach out to an actor reading for a role in the Film to tell him "how great he would be in this and that you/we love him" because Baldoni believed that if the actor "heard Blake Lively wanted [him] it would mean a lot." Ex. 112.

457.    Baldoni left Lively a voice note asking for her help from her "genius marketing brain" and her "EP brain" regarding the casting of young Lily. Ex. 104 at BL–000009295.

458.    When Baldoni was deciding between two directors of photography, he asked Ms. Lively to ask her husband, Ryan Reynolds, "what he thought" of one of the candidates. Ex. 113.

459.    When Lively offered recommendations for department heads for hair and makeup with whom Lively had prior relationships, Baldoni noted it was "so helpful to go through the agent and then have your relationship," and told Lively he "really appreciated the effort and time" she put into collaborating. Ex. 114.

460.    Baldoni asked Lively for her opinion about the design for her character's heart tattoo, and the correct color for young Lily's contact lenses. Exs. 115 at BL–000011246_A; 116.

461.    Baldoni and Heath described Lively's contributions to the Film to the Producers Guild of America as follows: "Her contributions have been impactful as she was consulted with

many of the casting options, she helped refine the script, she redesigned her own wardrobe as well as gave notes on others, she contributed to the production design and set decoration, and had influence on how many of the scenes were shot." Ex. 117.

462.    Baldoni asked for Lively's ideas on what type and color of cars the characters should drive, and what the logo for her character's flower shop should look like. Exs. 118; 119.

463.    On January 26, 2023, Baldoni told Lively that he "would welcome" any notes that she had on the script. Ex. 120 at BL–000008570.

464.    On April 9, 2023, Baldoni left a voice note for Lively about her notes on the script and said: "I am appreciative of your passion, and the process, and your ideas, and the spirit of collaboration. I know for a fact, I just feel it in my bones, how excited I am to work with you just as a creative because you give a shit and that's so fucking cool. And you're smart and you're funny and you're all of the things, and you're clearly a great writer. . . . I think that it's really good; I laughed. My gut tells me it's going to be a combination of this and we're gonna find it. . . . What I like about it is the banter and the wittiness . . . I was smiling while I was reading it . . . I can see you, and I know exactly what you want to do, and what you're trying to do, and I want that for Lily." Ex. 121 at BL–000009270.

465.    On April 16, 2023, when reviewing Lively's edits to the script, Baldoni wrote: "LOVE the first scene. . . . I love it. I love what you did. This is really fun to see you work. I have no notes." Ex. 122 at BL–000009643–9644.

466.    On May 14, 2023, Baldoni wrote to Lively: "Thank you for diving in head first, and caring so much about every little detail. Thank you for not settling for good at the expense of great. Thank you for the hard conversations and the fun ones. The long ass nights and the flights. . . . You are a once in a lifetime talent and you make everyone around you and everything you

touch better. As your collaborator, your director and your friend . . . I am so grateful and excited [to] take this journey with you and grateful for your trust in me. Let's tell the truth and enjoy ourselves while doing it." Ex. 123.

467.    During pre–production, Lively asked Baldoni if there was any "chance we can do body scenes at the end of the schedule," because she "still [had] a ton of work with not a ton of time." Baldoni responded by saying: "you will look amazing. Anything you are insecure about we will talk through and get creative together and make you comfortable. I just don't want you to stress about your body. It's the last thing you need. As soon as I have a rough schedule that's even remotely accurate I'[ll] share and I'[ll] make sure the team keeps this in mind as well." Ex. 22.

468.    During pre–production, Baldoni introduced Lively to his personal health coach, who Lively later learned specialized in weight loss. This was a particularly sensitive topic for Lively given she had only recently given birth. Lively Decl., ¶¶ 5–6; Exs. 21 at BENSON_0008; 22 at BL–000008819–20.

469.    On or about April 24, 2023, Baldoni asked Saladino, Lively's longtime personal trainer, how much Lively would weigh in two weeks. Saladino found Baldoni's inquiry intrusive and off–putting, especially given that Baldoni had been doing heavy lifting in training, which did not track with an alleged back problem. Saladino did not divulge that private information and, disturbed, notified Lively about the intrusion. Saladino Decl. ¶¶ 7–11; Lively Decl. ¶¶ 7–8.

470.    Lively was disturbed and unsettled that Baldoni had asked about her weight, behind her back, especially given that she had recently given birth and was still breastfeeding, and she felt violated. Lively privately confronted Baldoni about his comment and conveyed that it was very invasive and inappropriate. Lively Decl. ¶¶ 7–8.

471.    Baldoni told Saks and Giannetti that he had asked about Lively's weight, claiming he had back problems. Exs. 15, Saks Tr. 284:14–285:5; 2, Giannetti Tr. 135:15–24, 244:1–245:2.

472.    During rehearsals, Slate attended a rehearsal with Baldoni in the production offices while Lively attended via Zoom. After the rehearsal was over, Baldoni revealed that he had recorded the entire rehearsal without telling either Slate or Lively. Ex. 20, Baldoni 10/6 Tr. 27:25–29:18.

473.    Baldoni and Heath admitted that they secretly recorded multiple phone calls in connection with the Film without telling the participants they were being recorded. Exs. 20, Baldoni 10/6 Tr. 27:25–31:5, 35:8–37:4; 3, Heath 10/8 Tr. 67:4–21, 73:7–16, 82:16–84:8, 88:20–23, 92:9–93:2.

**E.    Wayfarer Policies "Strictly Prohibited" Harassment, But Its Leaders Disclaimed Responsibility For Creating A Safe Workplace On Set**

474.    At all relevant times, Wayfarer worked with one human resources consultant who worked remotely. Exs. 3, Heath 10/8 Tr. 38:7–40:1; 124, Robbins Report at 4 & n.10; 17, Robbins Tr. 101:21–104:18.

475.    Wayfarer had in place an Employee Handbook that applied to "all persons who interact with our Wayfarer Studios team" and "prohibited "harassment, disrespectful or unprofessional conduct by any employee of the Company, including supervisors, managers, and co–workers," including Heath, Baldoni, and Sarowitz. That handbook:

a.    "strictly prohibits" all forms of harassment, explaining that "harassment is not just sexual harassment" but extends to any behavior "that denigrates or shows hostility or aversion toward an individual based on any actual or perceived protected characteristic (including being perceived to have any of these protected characteristics or anyone who associates with a

person who has, or is perceived to have, any of these protected characteristics)." Wayfarer Ex. 1, at WAYFARER_000139053.

      b.    defines harassment to "may include a range of subtle and not–so–subtle behaviors" including: "sexual jokes and innuendo"; "commentary about an individual's body"; "leering, whistling or touching"; and "insulting or obscene comments or gestures[.]" Wayfarer Ex. 1 at WAYFARER_000139054.

      c.    encouraged the reporting of "all perceived incidents of discrimination or harassment" and promised that any "reported allegations of harassment, discrimination or retaliation will be promptly and thoroughly investigated by qualified personnel in an impartial manner" and using "evidence to reach reasonable conclusions." Wayfarer Ex. 1 at WAYFARER_000139054–55.

      d.    strictly prohibited retaliation "against an individual for reporting harassment or discrimination in good faith" and provided that any acts "of retaliation should be reported immediately and will be promptly investigated and addressed." Wayfarer Ex. 1 at WAYFARER_000139055.

      e.    required that if "any supervisor or manager becomes aware of a violation of this policy, they are obligated to report the violation to Human Resources/management so Wayfarer Studios can investigate and, if appropriate, take corrective action." Wayfarer Ex. 1 at WAYFARER_000139054; *see also* Exs. 3, Heath 10/8 Tr. 100:3–116:16, 135:2–12; 4, Baldoni 10/7 Tr. 45:15–50:24, 53:15–63:10, 66:19–68:3; 11, Sarowitz Tr. 182:23–184:19, 186:14–198:1, 202:23–208:6, 212:9–217:18, 219:21–220:16.

      476.    Baldoni does not know if he had read the Equal Employment Opportunities, Anti–Discrimination, Anti–Harassment, and Anti–Retaliation Policy in Wayfarer Ex. 1. Both he and

Heath understood the policy to prohibit harassment and retaliation and to require investigations. Sarowitz testified that he had not read any of Wayfarer's HR policies or procedures, even though he signed the handbook introduction in his capacity as Co-Chairman of Wayfarer, along with Baldoni. Exs. 3, Heath 10/8 Tr. 100:3–116:16, 135:2–12; 4, Baldoni 10/7 Tr. 45:15–50:24, 53:15–63:10, 66:19–68:3; 11, Sarowitz Tr. 182:23–184:19, 186:14–198:1, 202:23–208:6, 212:9–217:18, 219:21–220:16.

477.    Heath does not know if cast and crew were provided with Wayfarer's HR policies, did not talk to Wayfarer's HR consultant about supporting the Film, and confirmed that Wayfarer did not have an HR representative for the movie. Ex. 3, Heath 10/8 Tr. 128:17–134:2, 395:7–396:2, 398:12–19.

478.    Wayfarer does not have a record of who attended the "Respect in the Workplace" allegedly offered to cast and crew. Ex. 3, Heath 10/8 Tr. 396:4–20.

479.    Slate, Lively, Ferrer, and Baker did not attend any workplace harassment training in connection with the Film, receive Wayfarer's Employee Handbook, or know that Wayfarer had HR support. Exs. 12, Slate Tr. 38:7–24; 10, Ferrer Tr. 240:21–242:23; 13, Baker Tr. 46:9–47:15, 205:22–25; 281, Lively Tr. 220:19–221:21; Lively Decl. ¶ 26.

480.    The training slide deck titled "Respect in the Workplace: Preventing Discriminatory Harassment & Retaliation":

a.    listed additional specific examples of conduct as harassing, including conveying sexual "comments, stories or innuendos" or jokes "about sex," asking "about sexual fantasies/activities," making "sexual comments about someone's clothing, anatomy or appearance," using "facial expressions, winking, licking lips," or "hugging, touching, stroking or brushing." Wayfarer Ex. 67 at WAYFARER_000142810–15.

179

b.    did not include information about who cast and crew should report workplace concerns to. Wayfarer Ex. 67 at WAYFARER _000142812–16; *see also* Ex. 124, Robbins Report at 6 ("That training, however, did not provide information about where or to whom to complain.").

481.    Heath believed others, not himself, were responsible for <mark>addressing HR issues on set, including Saks, the production supervisor, and the line supervisor. Heath does not know if cast and crew were ever informed that HR concerns should be raised with these individuals.</mark> Ex. 3, Heath 10/8 Tr. 128:17–134:2.

482.    During production, Baldoni invited each of the film's production department heads to enjoy Russian baths with him. Alarmed, Saks reported the incident to Sony and to Heath. Sony confirmed that the invitation was inappropriate for the workplace. Exs. 15, Saks Tr. 152:23–153:5, 159:1–160:11; 125 at SPE_BL0002195–2196.

483.    Saks had concerns about Wayfarer overseeing HR/harassment protocols for the Film, and felt that cast and crew may not be comfortable raising concerns to Baldoni or Heath. She proposed that Sony provide the harassment protocols and training instead.  Exs. 15, Saks Tr. 59:7–61:18; 126. Which California-based Sony, did not do. Ex. 15, Saks Tr. 62:12-14.

484.    Saks believed that concerns or inappropriate behavior related to the Film should be raised to Heath as the "signer of checks and agreements." Ex. 15, Saks Tr. 57:25–58:20.

485.    In March 2023, Wayfarer received a complaint about <mark>age discrimination in connection with the Film, which it referred to its HR consultant for handling.</mark> Exs. 3, Heath 10/8 Tr. 125:24–127:4, 396:21–398:11; 127.

486.    Giannetti reflected in a text to Saks that "Everybody has something weird, uncomfortable and bad to say" about Baldoni, which was also Saks' experience. Ex. 15, Saks Tr. 160:6–24.

**F.    Wayfarer's and Baldoni's Self–Proclaimed Feminist Image Cracks As They Foster A Hostile Work Environment For Women.**

487.    On the very first day of filming, ==Baldoni brought to Lively's attention social media photos stating that she looked old and unattractive. He continued to talk about it for hours.== Lively Decl. ¶ 21.

i.    Baldoni and Heath Marginalize and Mistreat Women Based on Gender

488.    Saks recalled Baldoni "consistently" yelling at her and exhibiting "rageful yelling or interrupting reaction" when she spoke with him. Ex. 15, Saks Tr. 70:11–19, 74:11–19, 243:20–25 ("Q Okay. And do you think that those — that Mr. Baldoni's being curt with you had — that it was gender bias? Is that what you're telling us?. . . THE WITNESS: I don't know, honestly. But I also — I want to clarify, it actually wasn't him being curt. It was usually the opposite of that. It was usually that it provoked a sort of rageful yelling or interrupting reaction."); *id.* at 85:9–15 ("Q: Did you ever observe Mr. Baldoni become physically intimidating with a man on set or in connection with the film? A: Not that I can recall. Q: Did you ever observe Mr. Baldoni yell at a man in connection with the film? A: Not that I can remember.").

489.    In January 2023, Baldoni yelled at Saks during a Zoom with other Film leaders, raising his voice to her during a discussion about the script. Ex. 15, Saks Tr. 74:20–76:6. Baldoni did not go to New Jersey to begin production until March 2023, and was presumably in California at this time where he resided and where Wayfarer was headquartered. Exs. 128; 129; 130.

490.    On February 18, 2023, Baldoni yelled at Saks during another Zoom meeting. Baldoni sent Saks an email the next day, acknowledging that it was not "okay for me to interrupt

you and then mansplain" and that he had been trying "very hard not to interrupt the women" in his life. Baldoni promised to "make sure that [interrupting] doesn't happen again, ***to any of the women*** involved in this film." Exs. 15, Saks. Tr. 67:2–70:19; 131.

491.    On set in June of 2023, Baldoni "came up behind the monitor, where [Saks] was sitting," "yelled and then slammed his hands on the director's chair next to [her]," and stormed away. Saks felt physically intimidated by Baldoni. Ex. 15, Saks Tr. 76:16–81:14.

492.    Saks, who was seated in front of Heath and Giannetti and surrounded by several other crew at the time, told Mr. Heath and Ms. Giannetti that if Mr. Baldoni behaved that way again, she would "walk off the movie." Ex. 15, Saks Tr. 76:16–81:14.

493.    Saks felt sidelined by Baldoni and Heath. Ex. 15, Saks Tr. 171:20–23.

494.    On June 15, 2024, Saks texted Giannetti about the Film's screenwriter, Christy Hall, writing: "Justin was very dismissive of her when she wanted to direct and then used Jamey to try and manipulate her," "[a]nd then she felt like he tried to use her for cover with [Lively] and [Hoover] a bunch," and "she didn't feel respect as a female voice on the team and on a movie like this, that felt especially bad." Saks went on: "[Hall] just doesn't want to be associated with him/them." Exs. 15, Saks Tr. 152:23–157:2; 125.

495.    Hoover was not involved in the script as it was written and Wayfarer did not send her dailies, despite her Executive Producer title. Ex. 1, Hoover Tr. 46:25–47:15, 48:1–51:2, 66:2–68:20, 70:4–16.

496.    Clare Ayoub, who wrote and directed the film Empire Waist, which was produced by Wayfarer, declared under oath that Baldoni was verbally abusive to her and as a result she banned him from the set and, in August 2024, refused to appear in press and publicity with Baldoni. Ex. 132

ii.    Baldoni Objectifies Women on Set

497.    During a rehearsal on May 23, 2023, Lively was wearing her own jacket over one of her own dresses that had a lower cut neckline to facilitate breast feeding. When Lively's jacket briefly popped open and exposed her cleavage, Baldoni gestured towards her breasts and said "I like your outfit" in an inflected objectifying tone. Lively felt "uncomfortable," "exposed," "humiliated," and "ashamed" by the unwanted attention. Ex. 281, Lively Tr. 83:16–91:11, 92:18–97:14.

498.    On the same day, May 23, 2023, while shooting a bar scene in the presence of crew and multiple actors, Baldoni pressured Lively to remove her jacket to expose the partially unzipped "onesie" she was wearing underneath that revealed her lace bra. Ex. 281, Lively Tr. 101:5–103:5, 113:1–11.

499.    Lively removed her coat and, looking at her, Baldoni said, "pretty hot," in a tone that made Lively feel "on display" and uncomfortable. Exs. 281, Lively Tr. 101:5–103:5; 4, Baldoni 10/7 Tr. 230:4–232:16. Lively responded "that's not what I was going for." Baldoni responded stating, "sexy?," to which Lively responded "neither." Exs. 281, Lively Tr. 101:5–103:5; 12, Slate Tr. 42:7– 44:18; *see also* Wayfarer Ex. 281.

500.    Slate observed this interaction, perceiving Baldoni's comments as about Lively's body. She stated to Baldoni" that "comments about actors' bodies and their wardrobes…ranged from irrelevant or unnecessary to [] inappropriate and distracting" and "we're just not doing this anymore." Ex. 12, Slate Tr. 42:7–44:18 ("A. I felt that it was about her body"), 281:16–283:23.

501.    Baldoni responded by rolling his eyes and stating, "Sorry. I missed the sexual harassment training," before "walking away in a huff." Exs. 281, Lively Tr. 101:5–103:5; 4, Baldoni 10/7 Tr. 230:2–232:12; 12, Slate Tr. 58:23–59:8, 85:10-23, 86:21-87:16, 88:25-90:15; *see also* Wayfarer Ex. 281at 20230523–IEWU–PPD7 at 12:36:45–12:37:42.

502.    Baldoni later attempted to excuse and justify his comments, and Lively "felt like he was trying to get me on board with understanding why [it] was okay. . . . He never told me that that was inappropriate that he personalized those comments, and that it would never happen again, and that he understood the mistake that had been made and acknowledged that — what had happened." Ex. 281, Lively Tr. 103:15–106:20. Lively shared her feelings about the interaction with Slate. Ex. 12, Slate Tr. 85:10-23, 86:21-87:16, 88:25-90:15.

503.    On May 18, 2022, Baldoni commented to Slate: "I can say this because my wife is here, but you look sexy in what you're wearing." Exs. 12, Slate Tr. 51:16–54:7; 4, Baldoni 10/7 Tr. 202:8–203:17. Slate portrayed Ryle's sister in the Film and did not appear in any scene with sexual content. Exs. 12, Slate Tr. 17:2–10; 15, Saks Tr. 236:10–18.

504.    When he made that comment, Baldoni thought to himself "oh, maybe I shouldn't have said that." Ex. 4, Baldoni 10/7 Tr. 202:8–203:17.

505.    Slate felt that Baldoni's comment "was about me, not my character. It wasn't useful for my work. It wasn't anything I wanted. It was unwanted and had no place, in my professional experience." Ex. 12, Slate Tr. 51:16–54:7.

506.    On May 25, 2023, Baldoni texted friends, writing: "Lots of big big challenges that perfectly line up with my biggest insecurities. Right now balancing some very tricky personalities and some Potential poisoning of the well convos that could be putting me in a bad light." Ex. 133.

507.    The first day that the two actors portraying "young Lily" and "young Atlas" met, Baldoni pulled aside the male actor, Alex Neustaedter, and said: "I really want you to get to know [ Ferrer] well," winking at him. Ex. 10, Ferrer Tr. 252:21–254:3, 283:24–284:9.

508.    After filming a scene in which two underage characters have sex for the first time, Baldoni stated: "I'm not supposed to say this, but that was hot." The actors were in their underwear

at the time and Ferrer felt it was directed at them personally. Ex. 10, Ferrer Tr. 20:19–24, 68:3–9, 244:3–245:17; 246:14–247:3.

509.    In another instance, Baldoni directed Ferrer to lick cookie dough off a spoon and look up at her love interest, which Ferrer felt had an inappropriate adult sexual undertone. The scene was not in the script. Ex. 10, Ferrer Tr. 20:19–24, 68:3–9, 244:3–245:17; 246:14-248:14.

510.    Talbot insisted on being present for an intimate scene between young Lily and young Atlas, worried that Baldoni might add additional intimate content that had not been rehearsed. Ex. 14, Talbot Tr. 186:9–22, 194:8–195:5.

### iii.    Heath Gawks at Lively While She is Undressed

511.    On the first day of filming, Baldoni went to Lively's trailer and shared with her social media commentary that she looked old and unattractive in photos taken from set. Lively Decl. ¶ 21.

512.    On the second day of filming, May 16, 2023, Lively requested a meeting with the production team. "[T]hat meeting was very important to [Lively] because it was to discuss other behavior [she] had experienced . . . that was concerning to [her]." Heath arrived unannounced at Lively's hair and makeup trailer while her team, Anne Carroll and Vivian Baker, was removing her body makeup. Lively was wearing only a thong, with her breasts exposed. Exs. 281, Lively Tr. 123:2–124:24, 126:12–131:2; 23, Carroll Tr. 53:11–55:23, 56:6–57:18, 59:16–61:25; 13, Baker Tr. 71:25–72:24, 74:8–13, 77:10–78:2.

513.    In response to Heath's knock on the trailer door, Lively, Carroll, and Baker, screamed "whoa, whoa, whoa" and "no, no, no," and "don't come in." Heath entered anyway. Lively told Heath that she was undressed and would be out in a minute, but Heath said "if we don't meet now, we can't do that meeting." Lively "wasn't comfortable with [Heath coming in] in the first place" but said "okay, you can come in" on the condition that Heath not look at her. Exs. 281,

Lively Tr. 123:2–124:24, 126:12–131:2; 23, Carroll Tr. 53:11–55:23, 56:6–57:18, 59:16–61:25; 13, Baker Tr. 71:25–72:24, 74:8–13, 77:10–78:2,154:9–17 (". . .before the door was opened, we were screaming, 'Don't come in.'. . ."); 24, Heath 10/9 Tr. 145:16–147:7 ("She asked me to look away, so whatever she was doing, she didn't want me to. . . Sure. Q And what she was doing was something that had to do with her breasts being exposed or involved? A Okay.")

514.    During the approximate five-minute conversation Lively looked up and found Heath staring "straight at [her]." Lively was topless at the time and Heath understood that she did not want him looking at her. Exs. 281, Lively Tr. 123:2–124:24, 126:12–131:2; 24, Heath 10/9 Tr. 145:16–147:7.

515.    Lively confronted Heath in the moment, and he admitted looking at her, saying "Oh, oh, sorry I like to make eye contact with people when I talk to them." Lively told Heath he had to leave, and at that point he did. Ex. 281, Lively Tr. 123:2–124:24, 126:12–131:2.

516.    Lively, Baker and Carroll were in a state of shock when Heath finally exited the trailer. Lively immediately shared with Baker and Carroll that Heath had been staring at her during the conversation. Exs. 281, Lively Tr. 123:2–124:24, 126:12–131:2; 13, Baker Tr. 81:7–81:24; 23, Carroll Tr. 59:16–61:25, 63:23–64:21.

517.    Baker described Heath as having "cross[ed] a boundary that [she] had not observed on other film sets," explaining that she cannot imagine why Heath "would have come in" rather than wait until Lively was "in a more decent position." Ex. 13, Baker Tr. 78:21–79:3, 208:19–209:4. And Carroll began locking the door to the trailer to prevent similar intrusions going forward. Ex. 23, Carroll Tr. 65:22–66:8, 66:20–67:3.

   iv.  <u>Baldoni Adds Explicit and Gratuitous Sexual Content to the Film</u>

518.    Baldoni added several scenes to the script, which Lively perceived as "gratuitous." Ex. 281, Lively Tr. 63:2–64:12; 131:3–133:23.

186

a.    In one addition to the script, Lively was to "crawl" "[o]n all fours," "mounting" Baldoni, who would then "[k]iss his way down her torso as he slides off her panties. . . not stopping. . . until his mouth finds that precious place between her legs." *Compare* Exs. 134 at 24-CV-10049_0002522 *with* 135 at 24-CV-10049_0002682; 14, Talbot Tr. 106:23–107:10, 127:2–16.

b.    In another addition to the script, Lively would "moan[] in ecstasy." *Compare* Ex. 134 at 24-CV-10049_0002522 *with* 135 at 24-CV-10049_0002682; 14, Talbot Tr. 106:23–107:10, 127:2–16.

c.    In another scene added to the script, Lively and Baldoni would "CLIMAX ... AT THE SAME TIME." *Compare* Ex. 134 at 24-CV-10049_0002556 *with* 135 at 24-CV-10049_0002715; 14, Talbot Tr. 106:23–107:10, 127:2–16; 281, Lively Tr. 63:2–64:12; 131:3–133:23; 4, Baldoni 10/7 Tr. 172:25–176:16.

519.    Lively told Baldoni directly that she was uncomfortable with the additions, sharing that she "would be mortified to shoot something like that at this stage in [her] life and career and being the mother of four kids, and given that that was not in the understanding of the script that [she] I came into the film with." Ex. 281, Lively Tr. 66:12–67:16, 131:3–133:23.

520.    Baldoni told Lively that "he and his wife orgasm at the same time and asked [her] if [she and husband] do the same." He also shared that "some of his most precious memories. . . between him and his wife when he would bring her to orgasm. And she would ask to then, I guess, do what needed to happen for him, and he would say, no, that's enough." Ex. 281, Lively Tr. 131:3–133:23; Ex. 4, Baldoni 10/7 Tr. 172:25–176:16.

521.    Baldoni's comments to Lively were unwelcome and invasive. Baldoni offered no reason why an on–camera mutual orgasm was important from a creative perspective—it was not

featured in the novel or in the script Lively signed onto when she agreed to take the part. Lively Tr. 131:2-133:23.

522.    On April 30, 2023, Hoover had shared with Baldoni her view that "it's way more important we see those angsty looks and forbidden small touches, flirtation, than an extended sex scene. . . some of these movies that focus on romance think women want to watch sex, but they couldn't be more wrong." And that she "didn't want this film to be portrayed as, you know — with lots of sex scenes. I wanted the focus to remain on the heart of the book, which was Lily and her bravery and her leaving an abusive situation." Exs. 1, Hoover Tr. 33:4–17, 52:1–53:5; 136; 15, Saks Tr. 173:3–175:3; 8 at AS000702 ("Making this film PG-13 has proven without a doubt to be what's best for the film and the audience.").

v.    Baldoni Makes Disturbing Personal Disclosures About Forcing Himself on Women and His Pornography Addiction

523.    During an April 2023 car ride from New York to New Jersey with Lively, her long–time driver and security detail, and her assistant during Phase One—Baldoni divulged to Lively that "women had forced themselves on him" and he had "forced himself on women" and did so "even when they said no or did not consent." Exs. 28, Security Tr. 44:19–46:4; 46:12–47:9; 87:12–90:8; 92:23–93:10; 29, Security Errata.

524.    After making that disclosure, Baldoni warned this "stays in this car." Lively Decl. ¶ [].

525.    Lively's security detail overheard the conversation, was disturbed by it, and, as soon as Baldoni exited the car, advised Lively that he did not want her to be alone with Baldoni in the future. Exs. 28, Security Tr. 44:19–46:4; 46:12–47:9; 87:12–90:8; 92:23–93:10; 29, Security Errata.

526. Lively's security detail testified about this incident in detail, recounting where they were driving and where each passenger was seated in the car when Mr. Baldoni shared about forcing himself on women. Ex. 28, Security Tr. 37:19–38:22, 42:7–42:22, 43:8–45:10.

527. Baldoni also discussed his past addiction to pornography with Lively, a topic that had no connection to the Film's material. Ex. 281, Lively Tr. 136:12–137:24, 139:2–140:5. Lively attempted to shut down the pornography conversation by sharing that she had never seen it. Ex. 281, Lively Tr. 136:12–137:24, 139:2–140:5.

528. Baldoni said to multiple cast and crew that "Blake doesn't know anything about [pornography]; she's never seen it," which disturbed and upset Lively. Ex. 281, Lively Tr. 136:12–137:19, 139:2–140:5.

      vi.   <u>Baldoni Pressured Lively to Perform Unscripted Nudity</u>

529. Lively's ALA provided her with the right to approve any script changes. Wayfarer Ex. 263 at WAYFARER_000140970 § 13. And typically, actors must consent to material changes, including to additional sex scenes, after signing onto a film. Ex. 2, Giannetti Tr. 67:8–68:20.

530. The terms of the ALA provided Lively would, among other things:

      a.    Render services "as, when, and where reasonably required by [IEWUM]," Wayfarer Ex. 263 at WAYFARER_000140959 § 2, and "in such manner as [IEWUM] may direct, under instructions and in strict accordance with the controls and schedules established by" IEWUM," *id.* at WAYFARER_000140973 § 1;

      b.    "[C]omply with all reasonable written directions, requests, rules, and regulations of [IEWUM]," *id.* at WAYFARER_000140958 § 2;

      c.    Adhere to IEWUM's set work schedule, *id.* § 2.1; Ex. 98 ¶ 12;

      d.    Provide "exclusive" services during filming, *id.* at WAYFARER_000140958 § 2.1;

   e.  Render post–production and publicity services as required by IEWUM, *id.* at WAYFARER_000140959 §§ 2.2, 2.3.

   f.  The ALA authorized IEWUM to terminate at "any time . . . for any reason, with or without cause," *id.* at WAYFARER_000140965 § 7.1, prohibited Lively from materially changing her appearance, *id.* at WAYFARER_000140968 § 9, and provided that IEWUM is Lively's "special employer" and in that regard IEWUM "shall have the exclusive right to direct and control [Lively's] services hereunder," *id.* at WAYFARER_000140980 § 13.

  531.  SAG maintains certain guidelines for scenes involving nudity, simulated nudity, simulated sex, hyper exposure and other forms of intimacy, designed to prevent harassment on sets. Exs. 138; 139 at 3; 17, Robbins Tr. 81:22–82:15 ("Q Do you know how SAG–AFTRA defines intimate scenes? To the extent there is a definition, yes. Q What is the definition by SAG–AFTRA? A So nudity, simulated sex, hyper exposure, and other intimate scenes."). Those guidelines require actor consent for scenes involving intimacy or nudity, or depiction of nudity, in advance of filming. Ex. 14, Talbot Tr. 23:19–24:2, 102:17–104:11.

  532.  The Film's script included a scene in which Lively's character gives birth ("Birth Scene"). The script did not call for the simulation of nudity in that scene and Baldoni did not discuss it with the intimacy coordinator, who would have discussed the scene with Lively had she known. Lively Decl., ¶ 13; Ex. 14, Talbot Tr. 142:13–24, 143:9–25, 145:16–146:13 ("Q If you understood that the birth scene was going to include profile nudity, would you have discussed the scene with Ms. Lively? A Yes."), 152:4–153:10; 140.

  533.  The birth scene was filmed on May 22, 2023. That day, Baldoni informed Lively that it was "not normal" for a woman to remain in a hospital gown during delivery and that in fact, his wife "ripped her clothes off" during labor. He insisted that Lively simulate full nudity during

the shoot that day. Lively felt pressured into a compromise and agreed to simulate nudity from below the chest down. Wayfarer Ex. 73; Lively Decl. ¶ 14.

534.    The Birth Scene was filmed over several hours and shot using different framing and angles, including ones that showed Lively's side profile fully nude from the chest down (known as a "high hip profile"). Exs. 16; 14, Talbot Tr. 69:13–21 ("There was a high hip line that may have been called profile nudity to an extent, and that some actors would require or request a nudity rider for."), 86:7–16 ("The birthing scene could potentially have had a profile nudity rider below the waist for profile nudity below the waist."), 143:13–25; 17, Robbins Tr. 82:20–83:9; Lively Decl. ¶¶ 13–15.

535.    To obtain those shots, Lively wore a hospital gown strategically placed to cover her breasts, an exposed prosthetic belly, and only a small, thin, flat piece of black fabric to cover her genitalia. Lively Decl., ¶¶ 13–15; Ex. 23, Carroll Tr. 89:6–19.

536.    At other times, Lively may have added other garments and/or a blanket for additional coverage where her full pelvic area was unlikely to be visible and interrupt the implied nudity of her genitalia that Baldoni requested of her in the scene. Lively Decl., ¶¶ 13–15; *see also* Wayfarer Ex. 91, at Resp. 23.

537.    During filming, Lively laid on her back with her legs spread wide in stirrups, while a male actor, who she later learned was Baldoni's close friend, positioned himself between her legs. Lively found the experience to be invasive and humiliating. Lively Decl., ¶¶ 16–17; Exs. 23, Carroll Tr. 81:13–83:3; 88:7–23; 17, Robbins Tr. 82:20–83:9;

538.    Wayfarer did not implement "closed set" protocols during the scene, for example, by restricting set access and footage feeds to only personnel essential to the scene. And Wayfarer

191

did not call the Film's intimacy coordinator was not on set. Lively Decl., ¶ 12; Ex. 14, Talbot Tr. 152:4–158:6; 140; 141.

539.    Closed set protocols are standard protections are designed to ensure actors' comfort during particularly exposing scenes and to ensure safe harassment free work environments on productions. Exs. 124, Robbins Report, pp. 10–11; 14, Talbot Tr. 152:4–158:6; 141.

540.    Sarowitz was on set the day of the Birth Scene. Lively Decl. ¶ 12; Ex. 25.

541.    When asked whether he was "essential crew" to be on set that day, Sarowitz stated: "While I might have technically been non–essential, I did invest $30 million and paid for her salary, or at least my share of it, as well as the other actors, and I consider that to be essential. Lively considers that not to be essential, she can send me a check. I can give her an address or you could give it to her." Exs. 11, Sarowitz Tr. 168:24–171:5.

       vii.    After the Birth Scene is Shot, Heath Shows Lively a Video of His Nude Wife Without Explanation or Consent.

542.    On May 23, 2023, the day after filming of the Birth Scene, Heath approached Lively while she was eating lunch and, without warning, started playing a video of a naked woman. Lively recalls seeing a woman "fully exposed," giving birth. Exs. 281, Lively Tr. 188:17–190:21; 3, Heath 10/8 Tr. 191:23–192:4; 13, Baker Tr. 118:2–119:2; 26; Lively Decl. ¶ 18.

543.    Lively initially believed that Heath was attempting to show her pornography, but he then explained it was a video of his wife giving birth. Lively asked Heath to stop playing the video and inquired if he had his wife's consent to share it, to which Heath replied "she isn't weird about this stuff." Exs. 281, Lively Tr. 188:17–190:21; 3, Heath 10/8 Tr. 191:23–192:4; 13, Baker Tr. 118:2–119:2; 26; Lively Decl. ¶ 18.

544.    Lively was disturbed and unsettled that Heath would show her the video at work. Ex. 281, Lively Tr. 79:1–12; Lively Decl. ¶ 18.

545.    Heath insists he showed Lively only an "after birth" clip, in which he is cradling his wife from behind in an inflatable tub and throughout which his wife is fully nude. Ex. 3 Heath 10/8 Tr. 179:23–180:25. Lively insists that that is not the video Heath showed her. Lively Decl. ¶ 18. Heath has confirmed that his wife's birth experience was videoed in full, not just the "after birth" clip that he now claims to have shared with Lively. Ex. 3, Heath 10/8 Tr. 181:3–182:22.

viii.    Baldoni Improvised Physical Touching and Intimacy Scenes Without Lively's Consent

546.    On May 23, 2023, Lively and Baldoni shot a dance scene ("Dance Scene"). The script stated that their characters would be "in their own world" "falling in love," and did not call for any kissing or simulated intimacy. Lively Decl. ¶ 19; Ex. 142.

547.    Baldoni did not discuss including kissing or intimacy in that scene with Lively, or get her consent to do so. He also did not discuss the scene with the intimacy coordinator or call her to set the day of filming. Ex. 14, Talbot Tr. 161:10–163:3; Lively Decl. ¶ 19.

548.    Baldoni improvised during that scene by repeatedly leaning in toward Lively, attempting to kiss her, kissing her forehead, rubbing his face and mouth against her neck, putting his thumb to her mouth and flicking her lower lip, caressing her, and leaning into her neck and saying "it smells good." Lively Decl. ¶ 19; Exs. 143, 144, 145; 23, Carroll Tr. 69:2–20; 124, Robbins Report at 24 n.65–66 ("Mr. Baldoni testified that he did not try to kiss Ms. Lively during the scene . . . Reviewing the scene, it looks to me like that is exactly what he tried to do. Her reactions during shooting seem to show some discomfort."); 17, Robbins Tr. 47:15–48:3.

549.    Video footage shows Lively leaning away from Baldoni, and repeatedly suggesting that their characters should just talk. Exs. 143, 144, 145.

550.    Lively used levity and "creative" pleas to deflect Baldoni's unwelcome touching because she did not want to antagonize her director and co–lead actor. Lively Decl. ¶ 19. On

January 14, 2024, "Baldoni's long-time publicist, Jen Abel, described the Dance Scene 'so gross' and 'cringy,' speculating that it led Lively to file 'a cease and desist,' while also stating that she could not 'stand' Baldoni who was 'pompous' and 'unlikeable.' Ex. 283 at JONESWORKS_00041607.

551.    In another instance, Baldoni bit and sucked Lively's lip during a scene without consent, which Lively discussed with Slate, sharing her discomfort. Lively Decl. ¶ 20; Ex. 12, Slate Tr. 78:23–79:11.

**G.    During Phase One, Lively and Others Repeatedly Report Concerns about Baldoni and Heath, Which Wayfarer Failed to Investigate**

552.    Lively and others voiced their discomfort directly and privately to Baldoni, Heath, and others, often in real time or shortly thereafter. When confronted, Baldoni would "withdraw or pout" or otherwise change his behavior. Exs. 281, Lively Tr. 101:5–103:5, 104:2–106:20, 113:1–11, 118:19–120:4;  12, Slate Tr. 42:7–44:18, 58:23–59:8, 84:4–15, 88:25-90:1; 15, Saks Tr. 134:5–145:15; 30 at SPE_BL0002026–2029; 2, Giannetti Tr. 117:6–25, 148:11–151:5.

553.    On May 29, 2023, Lively texted Slate, describing Baldoni's reaction: "He keeps referencing it. Or disconnects entirely. Or gets snippy and impatient as a director. He was so huffy after the sexy thing I felt awful for saying something." Ex. 12, Slate Tr. 85:10-23, 86:21-87:16, 88:25-90:15.

554.    Lively described Baldoni's reaction as "unsettling," as she was "always very uncomfortable afterwards because [she] knew that I had to be in scenes and maintain some level of chemistry and camaraderie with" Baldoni. Ex. 281, Lively Tr. 101:5–103:5, 104:2–106:20. Slate and Lively discussed how Baldoni's conduct and his response when confronted was "leading to poor work." Exs. 12, Slate Tr. 68:9-73:24.

555.     On May 24, 2023, Lively texted Plank about an "sos set visit," writing "Whoa . . . It's like HR nuts today. The both of them. I wasn't expecting that turn. I mean it's been present but today I came home and cried." Lively continued: "Like keep your hormones to yourselves. This is not mine. I don't want it. I don't want you [sic] gaze or words or tongue or videos of your naked wife. Yeah. It's shocking. Clowns." Ex. 95 at BL–000021654–21656.

556.     That same day, Plank responded that that she "should have been more direct with the level of dysfunction, i thought maybe things had gotten better." Plank continued, "i also think they've never met their match. like i put up with a lot, most women do and you're not and i'm sure that's making them go even more nuts[.] you're confronting them to have to see who they really are and that's their worst nightmare." Plank observed "it's astounding they have gotten away with so much." Ex. 95 at BL–000021656–21657.

557.     On June 4, 2023, Slate shared with her team that she did not "want to do anything with Justin, I don't want to talk about him, like…nothing. . . . Justin is truly a false ally and I'm unwilling to do anything that promotes the image that he's crafting as a 'male feminist'…like…honestly I have no words to describe what a fraud he is." Slate made that decision independently.  Ex. 12, Slate Tr. 113:21-114:4 ("This was something that you did independently? A. Yes."); Ex. Ex. 284 at JS00000284.

558.     In that same message, Slate conveyed to her team: "this has been a really gross and disturbing shoot, and I'm one of many who feel thus [sic] way, and Blake and i have both complained directly to Ange at Sony, (and they agree w us btw)." Ex. 284 at JS00000284. Also on June 4, 2024, Slate shared with her team: "my concerns are only increasing about our director and producer [Heath]. I'd like to do the bare minimum here. . ." Ex. 12, Slate Tr. 113:21-115:9.

559.    Early during production, within the first week or two, Giannetti and Saks informed Baldoni that multiple people on set felt uncomfortable with the culture of hugging. Ex. 4, Baldoni 10/7 Tr. at 119:17–121:19, 181:3–182:2.

560.    On May 26, 2023, Lively had a 45–minute conversation with Sony's Giannetti, who was in Los Angeles at the time, about filing a complaint with Sony's HR department about the on–set conduct. Exs. 281, Lively Tr. 76:3– 80:20; 2, Giannetti Tr. 108:24–114:9, 116:1–117:25, 132:1–135:6; 27 at BL–000007954; Wayfarer Ex. 92.

561.    Lively shared with Giannetti her concerns about Baldoni's comments about her body and Heath's decision to show her a video of a naked woman. Lively told Giannetti that she "felt like the set was untenable and unruly and that there was no structure, and that there was no one in charge, and that the people who were in charge were misbehaving, and that [she] felt like [she] had nowhere to go." Giannetti told Lively that she had to report her grievances directly to Wayfarer. Exs. 281, Lively Tr. 76:3–80:20; Wayfarer Ex. 92.

562.    After Lively told Giannetti that she wanted to file an HR complaint, Giannetti reported Lively's complaints to Baldoni and Heath (without Lively's consent). Exs. 4, Baldoni 10/7 Tr. 180:2–185:22; 281, Lively Tr. 79:1–80:20. Lively took notes contemporaneous notes of her conversation with Giannetti.  Wayfarer Ex. 92.

563.    On May 27, 2023, Slate wrote to her agent in California that "Justin and Jamey are truly unfit," she felt "repulsed and deeply irritated, and I know Blake is experiencing that on a much more serious level." Ex. 12, Slate Tr. 68:9–73:24.

564.    Slate felt that "the unprofessional behavior" was "affecting the work, and that the "work environment was altered by the behavior of [] Baldoni and [] Heath." Ex. 12, Slate Tr. 85:10-23.

565.    Giannetti had a separate conversation with Baldoni in which she made him aware of Slate's concerns. Ex. 4 Baldoni 10/7 Tr. 180:2–185:22.

566.    Baldoni drafted notes to Slate and Lively saying: "I was made aware of your concerns. I wanted you to know they are fully received. I hear you and adjustments will be made accordingly." Exs. 4, Baldoni 10/7 Tr. 180:11–196:7; 146; 12, Slate Tr. 100:17-101:12

567.    On May 29, 2023, Slate shared her concerns with Saks. In a text to Giannetti that same day, Saks noted that Slate's concerns were "very bad" and stated "I think we need to replace our director. And [Heath] should not be on set." Saks went on to share that Slate "really would prefer to never see [ Heath] again…" Exs. 15, Saks Tr. 99:10–20, 102:5–106:15, 108:19–112:1; Wayfarer Ex. 98.

568.    That same day, Saks notified Baldoni and Heath of Slate's concerns and encouraged them to investigate because she "wanted the behavior to be taken seriously" and to help create "a more comfortable work environment for everyone going forward." Ex. 15, Saks. Tr. 115:1–119:13.

569.    Saks understood that Heath "didn't want the behavior written down, documented anywhere, in the event that someone wanted to talk about it again in the future" and that he "did not want Wayfarer to conduct an investigation into concerns about his and Baldoni's behavior because he didn't want a written record of it anywhere." Ex. 15, Saks. Tr. 115:1–119:13.

570.    Sarowitz confirmed that he did not think an investigation was necessary because he does not believe Baldoni is capable of sexually harassing anyone. Ex. 11, Sarowitz Tr. 220:21–222:11, 297:8–15.

571.    When Baldoni and Heath shared Lively and Slate's concerns with Sarowitz, Sarowitz replied, "he should come to sit and remind [Lively] whose money this is. . . ." Exs. 11, Sarowitz Tr. 285:19–286:8; 3, Heath 10/8 Tr. 256:18–260:23; 31.

572.     Michael Robbins, AWI–CH, an expert on harassment, discrimination and other employment matters, opined that both Wayfarer/IEWUM failed to follow standard practices and their own policies and failed to take reasonable steps to prevent harassment and retaliation from occurring, enabled by Ange Giannetti and Sony's lack of action. Exs. 124, Robbins Report at 1, 3–20; 17, Robbins Tr. 93:19–94:2, 98:25–100:5, 101:1–3, 101:21–102:1, 102:3–103:25, 140:17–142:24, 154:7–14, 155:9–156:2.

573.     On June 1, 2023, Lively attended an in–person meeting with Saks, Heath, and Baldoni. Baldoni began that meeting by saying it was "his fault" that Heath showed the video of his nude wife because Baldoni had thought Lively "wanted to see it." Ex. 281, Lively Tr. 186:14–187:16.

574.     Although Lively had not planned to log her concerns in that meeting, she expressed her "real concerns" with the behavior on set, which she described as unprofessional and "too comfortable," and said that it is "not okay" and "has to stop." Ex. 281, Lively Tr. 186:14–187:16.

575.     After the meeting, Saks texted Giannetti, recounting that Lively "was eloquent and on point" in "[c]alling [Heath] out in front of [Saks] and [Baldoni]," including about entering her trailer while she was undressed and "looking in her direction the entire conversation," showing her the birth video, and "mak[ing] jokes about how you can't make eye contact with people anymore, as if to undermine and lessen the importance of people not wanting to be comfy/cozy on set." Exs. 15, Saks Tr. 134:5–143:15; 30 at SPE_BL0002026–2029.

576.     Neither Baldoni nor Heath assured Lively that her concerns were taken seriously, offered her HR support, or ensured that the set would be safe going forward, which left Lively with the impression that they viewed her concerns as non–issues. Ex. 281, Lively Tr. 186:14–187:16.

577.    Baldoni saw "no reason" to investigate or otherwise try to understand what happened when Heath entered Lively's trailer, and that neither he nor Heath nor anyone at Wayfarer elevated the concerns to the Wayfarer HR department (or anyone else). No warning or disciplinary action was issued. Ex. 4, Baldoni 10/7 Tr. 240:13–241:7, 263:23–265:2.

578.    Baldoni testified that he is "not sure" that he would have wanted some kind of investigation to be done even if sexual harassment was being insinuated or suggested. Ex. 4, Baldoni 10/7 Tr. 214:8–13.

579.    On June 15, 2024, Giannetti texted Saks, observing that "Just SO many things stacking up people are so upset or pissed off about. I cannot believe how they just keep on coming. Did he think no one would notice or remember. . . ?" Exs. 15, Saks Tr. 153:2–5, 155:21–160:4; 125 at SPE_BL0002193–2195.

580.    Saks responded: "It's only when Jamey/this isn't fair nonsense and revisionist history comes up that I'm like, come on, guys," by which she referred to Heath and Baldoni's response that "we didn't do anything wrong, as opposed to remembering what happened." Exs. 15, Saks Tr. 153:2–158:10; 125 at SPE_BL0002193–2195. Saks further texted: "I think this is where the narcissism is dangerous," and further observed that "it's when Baldoni and Heath "have a way of making women (and some men) feel like shit[.] It is deep[.] Because they sign the checks." Exs. 15, Saks Tr. 153:2–158:10; 125 at SPE_BL0002193–2195.

581.    On October 13, 2023, Lively texted Slate that she was "dreading" going back to set and "getting hits of the experience in really upsetting ways." Ex. 285.

## H.    Before Phase Two, Lively Negotiates Protections (That Wayfarer Agrees Are Reasonable) and Again Reports Her Concerns.

582.    On November 9, 2023, Lively (through her attorneys, located in California) sent Wayfarer a document entitled, "Protections for Return to Production" (the "CRA"), Letter

requested Wayfarer agree to implement 17 protections ("17 Protections") to ensure a safe set going

forward. Exs. 32; 3, Heath 10/8 Tr. 261:12–262:8. The CRA, provided, among other things:

¶ 1: "An intimacy coordinator must be present at all times when BL is on set" (¶ 1);
¶ 2: "There must be a closed set during the rehearsal or filming of any scene involving simulated sex or nudity";
¶ 3: "Scenes involving kissing, depictions of sexual intercourse, or any other physical touching must be contained in the screenplay (as approved by BL), choreographed in advance in the presence of the intimacy coordinator, and may only proceed as choreographed with the consent of all participants in advance";
¶ 4: "Physical touching and/or comments on BL's physical appearance must only be one/made in connection with the character and scene work, not as to BL personally";
¶ 5: "There are to be no discussions of personal experiences with sex or nudity, including as it relates to conduct with spouses or others";
¶ 6: "No one will enter, attempt to enter, interrupt, pressure, or request entrance to BL's trailer while she is in a state of undress for any reason";
¶ 10: "There shall be no retaliation of any kind against [Lively] for raising concerns about the conduct described in this letter or for these requirements. Any changes in attitude, sarcasm, marginalization or other negative behavior, either on set or otherwise, including during publicity and promotional work, as a result of these requests is retaliatory and unacceptable, and will be met with immediate action"; and
¶ 17: "an all–hands, in–person meeting before production resumes which will include the director, all producers, the Sony representative, the newly–engaged third party producer, BL and BL's designated representatives to confirm and approve a plan for implementation of the above that will be adhered to for the physical and emotional safety of BL, her employees and all the cast and crew moving forward." *Id.*

583.     Wayfarer's in–house counsel, Imene Meziane, located in California, emailed Lively's counsel, stating that the 17 Protections were "not only reasonable but also essential for the benefit of all parties involved." Exs. 147; 3, Heath 10/8/ Tr. 278:25–279:4. Meziane confirmed that Wayfarer "Agreed" to all but one of the proposed conditions immediately, including the prohibition against retaliation. Wayfarer Ex. 28.

584.     Heath understood the CRA to reference many of the concerns Lively had previously reported. Ex. 24, Heath 10/9 Tr. 27:10–29:5. On November 10, 2023, Baldoni and Heath sent the CRA to their PR team (at that time Jones and Abel), writing "need you both for a zoom." Ex. 286.

585.    On November 12, 2023, Baldoni texted his "prayers and support" group, writing: "In an effort to gain power over me personally and the studio, we received a legal letter sighting How unsafe I and the workplace were for the Actor (s)." He went on, "Pretty tough stuff to digest . . . as of course we all know what this document insinuates – that i am/ unsafe /sexually harassing etc etc etc .. .. there's even silly things inferring Jamey was inappropriate which is silly. It's all manipulation." Wayfarer Ex.121; 4, Baldoni 10/7 Tr. 258:2–260:12, 261:10–20.

586.    On January 4, 2024, one day before filming resumed, Baldoni, Heath, Giannetti, Saks, and another producer, Todd Black, attended a meeting, during which Lively identified multiple behaviors reading from a list on her phone. Lively Decl. ¶ 24; Wayfarer Ex. 111; 15, Saks Tr. 175:11–176:10; 2, Giannetti Tr. 174:3–175:25; 3, Heath 10/8 Tr. 279:12–280:18, 281:21–285:4; 4, Baldoni 10/7 Tr. 265:10–268:21.

587.    That list reflects the following: discussions of "personal experiences with sex" and "times that physical consent was not given in sexual acts," "[n]o more showing nude videos or images of women, including producer's wife, to BL and/or her employees," "mention of 'pornography addiction,'" "improvising of kissing," "biting or sucking of lip," intimate conversations out of character Lively, "[n]o more personal, physical touching of, or sexual comments by, Mr Baldoni or Mr Heath," "jokes or disparaging comments. . . about HR complaints Wayfarer has already received on set, or about 'missing the HR meeting," and "[n]o more entering, attempting to enter, interrupting, pressuring or asking BL to enter her trailer or the makeup trailer by Mr Heath or Mr Baldoni while she is nude, tor any reason." Lively Decl. ¶ 24; Wayfarer Ex. 111.

588.    On January 4, 2024, before that meeting, Baldoni messaged his "prayers and support" group, asking for "any prayers for protection and strength / calm" because he and Heath

were heading to Lively's "for the big meeting." Ex. 301. Baldoni followed up the next, stating: "Last night was one of the hardest nights of my life. . . The only way to describe it was an ambush. . . . I was read from a phone all of the things that I did while many of them were based in actual situations. . . . The word creepy and abuse were used in reference to me in my behavior. . . it's hard to feel so much of what they believe about me is false because they are so convinced that it's real" Baldoni went on "We were told this was the worst experience of her life and others have witnessed this behavior, and the behavior on our set was creepy." Wayfarer Ex. 121.

589.    Wayfarer or IEWUM did not investigate Lively's concerns about Baldoni or Heath's conduct raised during the January 4 meeting. Exs. 3, Heath 10/8 Tr. 291:8–294:2 ("Did you actually have a conversation and make a decision not to do an investigation? A No. MS. SHAPIRO: Objection. BY MS. HUDSON: Q Did the topic of an investigation come up at any time prior to receiving Ms. Lively's CRD complaint? A No. . ."); 4, Baldoni 10/7 Tr. 309:2–310:11

590.    Heath believed Lively's concerns were "fabricated" and did not consider that other people on set might also be uncomfortable. Ex. 3, Heath 10/8 Tr. 291:8–294:2 ("So did Ms. Lively — did you consider that other people might be uncomfortable on set? A No . . .").

## I.    Sony Exercises Its Right To Edit Its Own Version Of The Film And Supports Lively's Help Doing So, Which Wayfarer Fought At Every Turn

591.    During contract negotiations, Sony rejected Baldoni's attempt to secure "final cut rights," which would have granted him sole discretion on what cut of the Film would be released. Exs. 2, Giannetti Tr. 46:8–55:23; Wayfarer Ex. 20 at SPE_BL0000345; Exs. 148 SPE_BL0001997; 149 SPE_BL0000369; 41, Greenberg Tr. 240:24–247:19.

592.    The Distribution Agreement provided Sony the right to prepare a cut of the Film and to control marketing. The Distribution Agreement provided that Sony and Wayfarer would

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████    Heath Decl., Ex. A (Dkt. No. 957–

1) at SPE_BL0000017 § 7.1, SPE_BL0000019 § 8.2; *see also* Ex. 38, Greenstein Tr. 30:25–37:2.

593.    In or around August 2023, Lively reviewed footage of an intimate scene involving young Lily and young Atlas that Baldoni had edited. As scripted, the scene featured the two characters kissing in the context of implied foreplay. The footage featured the same but then proceeded to show them undressing, falling into bed sheets, and a closeup of Young Lily gasping in pleasure when Young Atlas penetrated her and as she had sex for the first time. Lively Decl. ¶ 28.

594.    That editing concerned Lively, who grew worried about how Baldoni's felt exploitive and how they might marginalize female characters. Lively Decl. ¶ 30.

595.    With Sony's support, Lively led the editing of Sony's cut ("Sony's Cut"). Josh Greenstein (then President of Sony's Motion Picture Group), explained that Sony supported Lively editing because it "was clear she wanted to… make the movie great." Exs. 38, Greenstein Tr. 100:19–103:19, 110:8–13, 130:23–131:11; Lively Decl. ¶¶ 31–32.

596.    Lively did not receive extra pay or a promise of a producer credit for her work on the edit. Lively Decl. ¶ 32.

597.    Lively worked closely with Hoover in preparing Sony's Cut, sharing various versions of the Film with Hoover, discussing and incorporating Hoover's notes, and inviting

Hoover into the editing room to share her opinions. Exs. 1, Hoover Tr. 88:18–89:8, 90:11–21; 93:6–12; 120:1–14, 121:8–23; 38, Greenstein Tr. 126:2–12.

598.    Baldoni did not include Ms. Hoover in the editing process for his cut in the same way, or at all. Ex. 1, Hoover Tr. 126:17–127:1.

599.    After production, Baldoni and Heath returned to California where they reside. SAC ¶¶ 58, 59; Baldoni Answer ¶ 58; Heath Answer ¶ 59; *see also* Exs. 3, Heath 10/8 Tr. 18:12–23; 20, Baldoni 10/6 Tr. 19:13–20:5, 32:18–33:12.

600.    Wayfarer attempted to block Lively's access to the footage and complained about her role in the edit. Ex. 150.

601.    Baldoni tested his edit on three occasions between March 28, 2024 and May 18, 2024, and none of the three tests met the metrics that would have entitled him to final cut rights. Ex. 38, Greenstein Tr. 93:7–97:13, 106:9–107:21, 110:17–115:20.

602.    Mr. Greenstein thought the Sony Cut Lively prepared was the better one "no question." Exs. 38, Greenstein Tr. 129:2–134:22; 151 at RR–SUBPOENA–000000086.

603.    Hoover "really believe[d] in this adaption," i.e. Sony's Cut, and thought it would become "life–changing." She believed that Sony's Cut was "the stronger one to move forward with," and "ha[d] a list of like 57 things [she] loved about [Sony's] more." As the individual in the best position to determine if the Film would resonate with the book's "core fan base," Hoover's "effusive" praise of the cut Lively led carried "a lot of weight" with Sony. Exs. 1, Hoover Tr. 93:15–95:13, 99:15–105:9; 152 at BL–000039198–39199; 153; 154 at Hoover 0092–93; 38, Greenstein Tr. 65:17–66:9, 116:14–117:12, 122:7–16.

604.    In June 2024, an audience screened Sony's Cut at Book Bonanza, an annual charity event Hoover hosted for book fans. The "core fans went nuts" and gave the Film a standing

ovation, "jumped to their feet," and "screamed" that "you've got it right." Exs. 38, Greenstein Tr. 149:13–152:25, 241:17–242:5; 15, Saks Tr. 164:11–165:12; 10, Ferrer Tr. 276:15–277:12; 1, Hoover Tr. 147:18–150:23.

605.    After Sony's Cut was screened at Book Bonanza, both Sony and Wayfarer agreed that the cut Lively had worked on with Hoover would be released for distribution. Ex. 38, Greenstein Tr. 147:17–21; 2, Giannetti Tr. 343:24-344:3.

**J.    Sony and Wayfarer Develop a Plan To Market The Film As A Story of Female Empowerment, Which Lively And The Cast Follow And Support**

606.    In January 2023 (before the Film had even started shooting), Wayfarer sent Sony "It Ends With Us Initial Campaign Concepts." Wayfarer Exs. 253; 254 at BALDONI_000030668–30669. Among the "Pre-Premiere Campaign" concepts were "Nationwide Lily Bloom Pop-Up Shops" that included a "[f]un and sexy floral shop." *Id.*

607.    The three women reader focus groups that Sony conducted affirmed that marketing should "focus on Lily's story of self-empowerment as the main positive thread' and portray the character as "a survivor, not as a victim." Exs. 39 at SPE_BL0006379; 40. Sony's objective was therefore to "deal[] with a really difficult subject, but also mak[e] it hopeful and show[] that she's not just a victim, that she's so much more than that. Ex. 38, Greenstein Tr. 70:18–74:4.

608.    Sony "embraced" the floral-shop marketing concept, including to encourage viewers to "Grab their friends, wear their florals." Ex 38 Greenstein Tr. at 15:11–16:21, 60:2–14

609.    Wayfarer, in turn, embraced Sony' marketing campaign in the many "months and months" leading up to the premiere. Ex. 38, Greenstein Tr. 193:9–194:15.

610.    Sony provided talking points directing the promotion to focus on Lily's "strength and resilience as opposed to describing the film as a story about domestic violence" and warned that "[d]iscussing abuse, how abusers or the abusers are perceived outwardly, takes us down a path

that is not only dark but will detract from the primary messaging" Exs. 33, Stone Tr. 391:8–392:10; 155 at ABEL_000000181.

611.    In the lead up to the premiere of the Film, Baldoni, like Lively and other cast members, promoted the Film in accordance with the approved marketing plan, including appearing (without Lively) at a pop-up flower shop event targeting fans and social media influencers in Century City. Exs. 156; 52, Abel 9/26 Tr. 147:2–149:15; 157.

## K.    The Wayfarer Defendants Undertook A Pattern of Disparaging And Discrediting Lively.

612.    Baldoni told Nathan that Lively's feelings about what she experienced were genuine, stating, "I just know her personality and this is the kind of person that genuinely believes she's right and that all of this is unjust." Exs. 158 at NATHAN_000000294. Nathan agreed, writing: "She fully does. I know it." *Id.*

613.    On November 12, 2023, Baldoni described Lively as holding the power to destroy his career if she were to come forward publicly with her allegations against him. He stated, "[w]e don't believe she will leave or leak to press but this is her threat of a nuclear bomb as she knows this is the only way to get to me." Exs. 44 at BALDONI_000026194.

614.    On December 30, 2023, Baldoni told Greenberg that Lively was "setting [Baldoni] up for a trap" because she refused a body double. Ex. 159 at WME_00001169. Baldoni expressed his frustration over Lively's involvement, in particular, how it was "draining on [him] and time-consuming over this break to be dealing with an actress who is rewriting the writer and Director," and that Zavala "needs to know that [Lively] is destroying her reputation." *Id.* at WME_00001169–1170.

615.    On February 9, 2024, shooting of *It Ends With Us concluded*. Wayfarer Defendants' Amended Complaint Ex. A at 61.

616.    On February 23, 2024, Baldoni described Lively as holding the power to destroy his career if she were to come forward publicly with her allegations against him. Baldoni described Lively as having "the nuclear bomb" of being able to "leak that I'm a bad person or that she felt unsafe with me and 'all the stuff' she has on me. Then she's the victim." Exs. 45 at BALDONI_000018853; 4, Baldoni 10/7 Tr. 281:4–11.

617.    Sony was responsible for creating the trailers for the Film. Exs. 38, Greenstein Dep. 77:16–22; 2, Giannetti Tr. 45:14–21.

618.    On April 27, 2024, Baldoni sent a string of text messages to Heath describing his anger in response to a version of the trailer in which "[l]iterally nothing [Baldoni] asked for was done," including complaints that there was "[n]o abuse." And that "[s]he took out Ryles dialogue." Ex. 36 at BALDONI_000033560–33561.

619.    Baldoni wrote to Heath that "Josh needs to grow some balls" and "Sony needs to fucking stand up to Blake." Baldoni decided that if not, "[t]hen we threaten to walk away – and tell Sony to say No." Baldoni stated, "I'm going to be petty- I worked too hard. She's not taking me out of the trailer." Ex. 36 at BALDONI_000033561, BALDONI_000033563.

620.    Baldoni set out a plan to "little by little [] start taking away [Lively's] options[.]" Baldoni proposed, "[w]e call agents and manager. Tell them She's sabotaging herself. And ruining her reputation – people are talking." Exs. 36 at BALDONI_000033564; 4, Baldoni 10/7 Tr. 289:10–290:20.

621.    Later that day, Baldoni texted Heath about his "fear of Blake coming out and going public about how I'm a bad person and unsafe and not who I say I am." He described feeling "self hatred for the little boy who kept messing up friendships by saying the wrong thing. . . . I'm so

207

intertwined with this little Boy no one liked and I gotta figure out how to separate from him." Exs. 36 at BALDONI_000033565; 4, Baldoni 10/7 Tr. 291:14–20.

622.    Baldoni stated that the "little boy" in him has "been running the show when he feels scared and threatened and that's who you get so frustrated with. I'm sorry it makes your life harder - I'm doing my best to give him what he needs but this has been overwhelmingly triggering all my biggest fears." Exs. 36 at BALDONI_000033566; 4, Baldoni 10/7 Tr. 291:15–19.

623.    On May 6, 2024, Sony hosted a trailer launch event at its studio lot in Los Angeles in anticipation for the global launch of the Film's trailer on May 16. Exs. 160; 161. The trailer release was described by Sony as "hugely successful" and generated "108.4M views in the first 24 hours, easily outpacing all comps." Exs. 161 at SPE_BL0001762; 38, Greenstein Tr. at 81:8–82:19. Baldoni appeared at the event and passed out floral bouquets to fans. Ex. 1, Hoover Tr. 61:14–64:13.

624.    On May 6, 2024, Baldoni and Heath went to dinner with Hoover and her friend in Los Angeles. Exs. 1, Hoover Tr. 65:6–9; 162.

625.    During dinner, Baldoni and Heath told Hoover about their issues with Lively and the editing process, and in particular, told Hoover, "[w]e're not saying she's a narcissist, but she's exhibiting narcissistic behavior, and that she was making their lives very stressful during the filming, and it was not a good experience." Exs. 1, Hoover Tr. 75:8–17; 10, Ferrer Tr. 271:11–272:4.

626.    Baldoni told Hoover that "Blake was demanding her own edit and that Sony was allowing her the opportunity to edit the film because she was unhappy with his cut." Baldoni alleged that Lively "wanted to take over the film." Ex. 1, Hoover Tr. 74:17–75:3.

627.    Baldoni and Heath told Hoover about various incidents described in the Protections for Return to Set document, and how they "had a meeting that blindsided them about their behavior[.]" Ex. 1, Hoover Tr. 75:18–25.

628.    The behavior described included Heath entering Lively's trailer. Heath explained that "he feared [Lively] would file sexual harassment claims against him[.]" Ex. 1, Hoover Tr. 77:13–25.

629.    Hoover understood that Heath "was telling [her] this because it was all in this document that apparently was -- was going to come out, and so they were just trying to prepare me for what -- what was in the document." Ex. 1, Hoover Tr. 78:1–4.

630.    Hoover believed that Heath and Baldoni were afraid that the Protections for Return to Set would become public or escalate into a legal claim. They were "concerned that -- that the incident was going to turn into some sort of claim or be released publicly. They -- they were worried about this document" and "did not like that this document was -- existed." Ex. 1, Hoover Tr. 80:20–81:10.

631.    Hoover "did feel like for -- for a man who has a platform of building women up, that I left the dinner disappointed that it felt like I was made to not like her. Like -- like, I left the dinner feeling like the intention was to get me on their side or, you know, just explain their side before I heard it from her." Ex. 1, Hoover Tr. 82:12–23.

632.    Hoover was "blindsided by the dinner" and "the way they were kind of forewarning me about what kind of person [Lively] was." Exs. 1, Hoover Tr. 83:8–11, 134:7–16, 136:21–137:8; 10, Ferrer Tr. 271:11–272:4.

633.    As of May 6, Hoover "didn't know" Lively having only had a brief introduction to her prior to this date. Ex. 1, Hoover Tr. 57:3–24, 85:18–87:19.

634.    Alex Saks testified that she believed Lively deserved the PGA mark that she was awarded in connection with "It Ends With Us." Ex. 15, Saks Tr. 178:21–24; Wayfarer Defendants' Motion for Summary Judgment at 34–35.

635.    In June 2024, nineteen of the Film's department heads, producers, and creatives drafted letters detailing Lively's significant contributions to the film in support of Lively obtaining a PGA producer's mark, including:

    a.  Alex Saks, Ex. 163 at BL-000018401;
    b.  Josh Greenstein, Wayfarer Ex. 145;
    c.  Andrea Giannetti Ex. 164;
    d.  Colleen Hoover, Ex. 163 at BL-000018412;
    e.  Russell Barnes, the production designer, Ex. 165;
    f.  Barry Peterson, the director of photography, Ex. 163 at BL-000018404
    g.  Chris Surgent, the first assistant director, *id.* at BL-000018405;
    h.  Duncan Blickenstaff, composer, *id.* at BL-000018413;
    i.  Rob Simonsen, composer, *id.* at BL-000018413;
    j.  Eric Daman, costume designer, *id.* at BL-000018414;
    k.  Kami Asgar, supervising sound editor, *id.* at BL-000018410;
    l.  Alan Baumgarten, editor, *id.* at BL-000018408;
    m.  Robert Lugo, head of the hair department, *id.* at BL-000018417;
    n.  Season Kent, music Supervisor, *id.* at BL-000018418;
    o.  Todd Black, executive producer, *id.* at BL-000018419;
    p.  Andrea Ajemian, executive producer and unit production manager, Ex. 166
    q.  Lisa Rodgers, the post supervisor, Wayfarer Ex. 144;
    r.  Sarah Graalman, makeup department head, Ex. 167 at BL-000020004;
    s.  Tobias Schliessler, director of photography, Ex. 168.

636.    On June 18, 2024, Wayfarer agreed to give Lively a producer credit on the Film. But, Wayfarer remarked that Lively "would not be getting the PGA Mark as that is not applicable." Ex. 169; Wayfarer Defendants' Amended Complaint Ex. A at 86.

637.    On June 20, 2024, Baldoni and Heath were requested, through Sony, to write a letter in support of Lively receiving a PGA mark for her contributions to the Film. Wayfarer Defendants' Amended Complaint Ex. A at 87.

638.     On June 26, 2024, Baldoni and Heath wrote a letter in support of Lively receiving a PGA mark to the PGA. Ex. 117; Wayfarer Defendants' Amended Complaint Ex. A at 91–92.

639.     On June 27, 2024, Heath emailed Wayfarer personnel describing Lively's request for a letter in support of receiving the PGA mark as "unreasonable and cold hearted.  Essentially, the movie IEWU has been taken unjustly from Justin as a director and essentially from Wayfarer's control due to the extortion of Blake. . . . She continues to hold a threat over our heads and every time we try and hold a line she uses that threat either directly or indirectly to get us to fold." Ex. 170; Wayfarer Defendants' Amended Complaint Ex. A at 93.

## L.    The Wayfarer Defendants Hired Crisis Experts to "Bury" Ms. Lively by Discrediting Her Claims and Assassinating Her Character.

### i.    The Wayfarer Defendants Planned to Go On The Offensive Against Lively From the Outset

640.     On May 6, 2020, Wayfarer hired Jonesworks as its "exclusive public relations counsel to provide strategic communications services." Ex. 171 at JONESWORKS_00038539. Since around July 2020, Jennifer Abel has served as the PR representative overseeing the Baldoni and Wayfarer account. Ex. 52, Abel 9/26 Tr. 38:15–39:5. Matthew Mitchell also supported the Wayfarer account with Abel. *Id.* at 41:9–21. Both Abel and Mitchell are based in Los Angeles. Wayfarer Am. Compl. ¶ 232.

641.     On May 17, 2024, Baldoni texted Abel and Matthew Mitchell that he expected Lively "to plant seeds like that - give crumbs so the fans would go digging." Ex. 172 at JONESWORKS_00013486. Baldoni told Abel and Mitchell, "I need you guys to very much have a real plan so I can feel at ease." *Id.*

642.     On May 22, 2024, Baldoni texted Abel and Matthew Mitchell with continued concern: "I don't wanna focus at all on it, but I still wanna make sure you guys have a plan in case she does something crazy." Ex. 173 at JONESWORKS_00013489. He continued, "[w]hat would

make me feel better is for you guys to have a plan for what happens if and when she decides to unfollow me on IG or block like her husband. It would Just help me, knowing that you guys have a plan and feel fine because you know what happens after that happens with fans and all that stuff[.]" *Id.*

643.    On June 15, 2024, Lively, Hoover, and other cast appeared at Book Bonanza without Baldoni. Exs. 42; 1, Hoover Tr. 109:13–111:3.

644.    On June 17, 2024, Abel and Baldoni had an hour-long call, during which Baldoni asked for recommendations for attorneys. Ex. 174 at JONESWORKS_00037248. Abel relayed Baldoni's request to Jones, stating, "[t]hey want us to recommend a couple of great lawyers just to be armed with them if we need, Steve sarowitz will be paying for this lol. Wanted to check with you before I do… obviously Marty Singer, Bryan Freedman are people that come to mind. But lmk what you think!" *Id.*

645.    After Jones suggested that Wayfarer use "marty for sure not bryan as he's not well respected." *Id.* Abel noted her preference for Freedman, stating: "[b]ut he's a killer [a]nd would bury Blake[.]" *Id.*

646.    Mitz Toskovic is Wayfarer's Vice President of Operations. Ex. 24, Heath 10/9 Tr. 111:11–14.

647.    On June 17, 2024, Heath told Toskovic that he had "a big job for [her]," and asked Toskovic to "start putting a timeline doc" together that would include "[e]ssentially anything we can get either the date and alleged incident or the general time frame and we can narrow in later. Something chronological.  Best you can." Exs. 175 at TOSKOVIC_000000678; 3, Heath 10/8 Tr. 318:13–319:6, 321:7–322:1.

648.    Heath requested that Toskovic's timeline include, "When Justin and Blake met to write. AJ maybe had in calendsr [sic]," "[w]hen we shot the first karaoke scene (it's when I showed her the video of Tasha)," "[w]hen ange visited the first time and had the make up trailer convo that apparently looked at her[,] [w]hen we shot the graveyard scene[,] [w]hen Justin met with trainer[,] [w]hen Justin had convo with Blake and Ryan regarding asking about her weight[,] [w]hen we had the convo when we went back in Blake's house with ange and Todd . . . . [a]lso when we got letter from Blake." Ex. 175.

649.    On July 30, 2024, Toskovic sent the timeline to Nathan, Abel, Heath, and Hanks. Exs. 176; 177; 3, Heath 10/8 Tr. 316:11–23, 317:6–8. "The timeline had a tab entitled "Zingers," focused on themes for attacking Lively's reputation:

    ii.    <u>Baldoni and Wayfarer Coordinate To Conceal That Cast And Creatives Do Not Want To Appear With Baldoni Or Heath At Premiere</u>

650.    Around the time of the film's premiere, Greenstein was made aware of a "situation where Blake and several cast members, including the author, did not want to be photographed with [Baldoni] and did not want to be in the, I guess, same vicinity that he was in, whether that was the premiere or something else." Ex. 38, Greenstein Tr. 226:7–227:1.

651.    On June 15, 2024, Saks told Black and Giannetti that "Christy hall, the writer asked

    ZINGERS

| | |
|---|---|
| reputation | Blakes last movie RHYTHM SETION was reported to have also had difficulties on set similar to IEWU. there was specualtion that Blake took over teh movie and when the movie bombed she blamed Reed Morana (director). |
| reputation | Blake has had number of speculated feuds with cast on her projects including, Anna Kendrick, Leighton Meester, |

me for dinner a couple weeks ago . . . . She also won't do press w Justin, doesn't even want to be on the red carpet w him." Exs. 43 at SPE_BL0002184; 125 at SPE_BL0002194.

652.    On July 14, 2024, Hoover wrote to Giannetti and Greenstein, "[a]s for the premiere.
. . [a]m I going to be comfortable is Justin there? No, things are beyond uncomfortable at this
point." She continued, "[c]an I promise I'll go if he and his team are all there? I can't promise
that." Exs. 178; 38, Greenstein Tr. 156:10–159:5; 41, Greenberg Tr. 271:19–272:9; 43 at
SPE_BL0002184; 125 at SPE_BL0002194.

653.    On June 4, 2023, Slate shared with her team that she did not "want to do anything
with Justin, I don't want to talk about him, like…nothing. . . . Justin is truly a false ally and I'm
unwilling to do anything that promotes the image that he's crafting as a 'male
feminist'…like…honestly I have no words to describe what a fraud he is." Ex. 12, Slate Tr.
113:21-115:9; Ex. 284 at JS00000284.

654.    In that same message, Slate conveyed to her team: "this has been a really gross and
disturbing shoot, and I'm one of many who feel thus [sic] way, and Blake and i have both
complained directly to Ange at Sony, (and they agree w us btw)." Ex. 284 at JS00000284. Also on
June 4, 2024, Slate shared with her team: "my concerns are only increasing about our director and
producer [Heath]. I'd like to do the bare minimum here. . ." Ex. 12 Slate Tr. 113:21-115:9.

655.    Slate and Sklenar "weren't comfortable going [to the premiere] if Justin and the
Wayfarer team were there." Ex. 38, Greenstein Tr. 160:2–7.

656.    Slate ultimately attended the premiere because she did not "want to let [her] cast
mates down," and "want[ed] to support Blake's performance." Ex. 12, Slate Tr. 119:23–120:4,
121:15–21.

657.    Ferrer did "[n]ot particularly" want to appear in promotion with Baldoni. Ex. 10,
Ferrer Tr. 269:8–270:9.

658.    Saks did not want to attend the premiere. Ex. 24, Heath 10/9 Tr. 134:11–135:2.

659.    On June 20, 2024, Abel expressed concern to Sony that if a cast photo shoot was "going to be used in any official capacity for the film on socials or otherwise then we need to find a way for Justin to be included. . . we can't have fans starting to guess why Justin is left out of this stuff." Ex. 179 at JONESWORKS_00008075.

660.    Abel, Baldoni, Heath, and Baldoni's PR team strategized the "optics" for Baldoni's absence from promotional events. They discussed "using hospital and recovery [from an infection caused by a stem cell treatment in Mexico] as a way to stay out of content[.]" Exs. 180; 181.

661.    Another possible excuse floated for Baldoni's absence from promotional content was a family trip to Sweden. Exs. 182 at JONESWORKS_00013831; 52, Abel 9/26 Tr. 287:20–292:8; Wayfarer Ex. 180 at NATHAN_000003601.

662.    Another possible excuse floated for Baldoni's absence from promotional content and cast tension was Baldoni's neurodivergence. Baldoni wrote "With everything going on – I want to have an offensive move showing my neuro divergence and some of the attributes that come with it so that I can start talking about it. Most anything that I have been 'accused of' is social awkwardness and impulsive speech and I think me sitting down with him and just looking at my brain and talking about some of the these things will be helpful for me." Ex. 183 at JONESWORKS_00013503.

663.    On July 16, 2024, Sony reported that the Film's "fan-driven metrics look REALLY good." Exs. 38, Greenstein Tr. 166:5–167:2; 184 at SPE_BL0003130. In particular, the "cast, especially Blake Lively's portrayal of Lily, generated substantial praise from fans" while some "remained skeptical about Justin Baldoni." Exs. 38, Greenstein Tr. 167:21–169:7; 184 at SPE_BL0003131, SPE_BL0003134.

664.    Greenstein was responsible for marketing and distribution of the Film. Ex. 38, Greenstein Tr. 15:11–16:21.

665.    On June 17, 2024, Greenstein recalled no online negativity in response to the Film or Lively. Ex. 38, Greenstein Tr. at 153:24–154:6.

666.    Greenstein recalled that the atmosphere surrounding the Film and Lively remained positive through August 9, 2024. Exs. 38, Greenstein Tr. at 58:8–60:14, 150:1–7, 166:5–168:20, 233:6–234:2; 184 at SPE_BL0003130.

667.    On July 22, 2024, Baldoni texted Greenberg that they needed to "figure out the logistics of the premiere and get the real scoop on if they're really not gonna take a photo with me as I don't want to be thrown into a cast and producers picture and then have their faces all weird." Ex. 185 at WME_00001252.

668.    On or about July 22, 2024, Lively told Sony that she would not appear in press with Baldoni. Lively Decl. ¶ 25; *Infra* at ¶ 249.

669.    Lively did not want to appear alongside Baldoni due to her grave concerns about how he treated women in connection with the Film, how he had disparaged her to others as retaliation for her speaking up, and Heath and Baldoni's inappropriate and uncomfortable behavior in connection with the Film. Lively Decl.at ¶ 25; 15, Saks Tr. at 161:13–25.

## M.    Baldoni and Wayfarer hired a California-Based Crisis PR Team To "Bury" Lively.

670.    Jennifer Abel was the Vice President of Jonesworks at the time, until she created and started working at RWA Communications, a public relations firm, on September 1, 2024. Ex. 186, Abel 9/25 Tr. at 17:15–23, 18:9–22.

671.    On July 24, 2024, Abel emailed Heath and Greenberg requesting that they "please share with us the legal letter that was sent by BL and her team—per our conversation, we will go through point by point and draft context surrounding each situation. We can then flag what we are

missing that would be helpful to arm us in the case we need to refute any of the claims." Ex. 187 at WME_00001300.

672.    In that same email, Abel stated, "Jamey, understand that you are also compiling info on the various incidents which will be helpful to ensure we are in the know on everything— we will need potential witnesses, locations/context, people who could be in our corner to speak on background to refute any claims, and provide additional color surrounding the atmosphere on set.." *Id*.

673.    Also on or around July 24, 2024, Tera Hanks, the President of Wayfarer, Wayfarer 56.1 ¶ 258, asked Jones for recommendations for a crisis communications team. *See* Exs. 188 at JONESWORKS_00012592; 20, Baldoni 10/6 Tr. at 140:9–20, 255:22–257:19.

674.    Melissa Nathan is the founder and CEO of The Agency Group PR LLC ("TAG"). Ex. 189, Nathan 9/29 Tr. at 72:12–14.

675.    Jones strongly objected to hiring Nathan for crisis communications work due to concerns about Nathan's deeply unethical conduct. Exs. 190; 191, Jones Tr. at 50:2–50:10, 52:19– 54:9, 91:14–92:25.

676.    Abel recommended Nathan for the crisis communications role. Exs. 192 at KCASE-000005077; 52, Abel 9/26 Tr. at 228:15–19.

677.    Katherine Case was a vice president of TAG until late December 2024 or early January 2025. Ex. 57, Case Tr. 31:20–32:9, 286:20–25.

678.    On July 25, 2024, Nathan and Case met with Heath and Hanks for an introductory call, during which Wayfarer provided details regarding on-set "incidents" that were the subject of Lively's and others' complaints, as well as the Protections for Return to Production. *Infra* ¶ 256; Wayfarer Ex. 164 at KCASE-000005773–5775; 57, Case Tr. at 48:25–49:2.

679.   Case's notes from that meeting state the following:

a.   Baldoni commented to both Lively and Slate that they look "sexy," and he had "asked about" Lively's "weight." Wayfarer Ex. 164 at KCASE-000005774

b.   Heath "looked in the mirror and made eye contact" with Lively while in her hair and makeup trailer. *Id.*

c.   Heath "pulled up the video" of his wife giving birth to show Lively, which he admitted he "couldve [sic] done differently." *Id.*

d.   Wayfarer understood from Sony that "IF you guys go she [Lively] will not come to the premier [sic], nor will colleen, or any of the other actors." *Id.* at KCASE-000005777.

e.   "[T]hey're ***worried she [Lively]'s going to leak shit***," and Baldoni was "***worried about being cancelled.***" *Id.* at KCASE-000005777–5778 (emphasis added).

f.   They have "***enough friendly reporters and people who would create a story that we wanted to create***" and various narratives about Lively, including that "she took the movie over," committed "extortion," took Hoover under her "wing," and "weaponized feminism." *Id.* at KCASE-000005775– 5776, 5778 (emphasis added).

680.   After the call, Wayfarer engaged TAG to "ensure" that they "were protected against negative attacks." Exs. 57, Case Tr. 47:13–48:7; *see also* Ex. 193 at HEATH_000035539 ("I've hired a crisis management team. . . . Just have to manage every land mine so it doesn't go off."); Ex. 194 at KCASE-000000571; 62, Koslow Tr. at 27:10–25.

   i.   Abel And TAG Plan To Get Ahead Of The Narrative

681.   On July 31, 2024, Abel texted Heath and Toskovic, informing them that "[c]onfidentially," she was "out to dinner with a friend of 12+ years who writes for people magazine, Fox News, in touch, us weekly, and she is fully briefed of the situation and is armed and ready to take this story of Blake weaponizing feminism to any of her outlets the minute we give her the green light." Ex. 49 at JONESWORKS_00013780.

682.   Abel added that her friend "hates Blake, has heard this story before, and will do anything for us. Just fyi :) . . . She is armed and ready. I'm going to connect her to Melissa tomorrow just to have in our pocket." *Id.*

683.    When a publicist tells a journalist information, regardless of whether it is "off the record," it is the journalist's "choice [if] they're going to use it." Ex. 189, Nathan 9/29 Tr. 128:1–131:8. It is possible that the reporter "print[s]" the information, or "use[s] that information to go call other sources and try to get that information on the record." *Id.*; Ex. 52, Abel 9/26 Tr. 262:14–263:23.

684.    On August 1, 2024, TAG discussed a "scenario document in anticipation of [an] inevitable story from her [Lively's] team" in order to "desensationalize" Lively's story by "tee[ing] up a friendly to run the day of or right after the premiere, someone who is covering the overall film" of Baldoni "say[ing] something along the lines of 'me and Blake had our differences but I still respect her' so we at least set the stage and can then give the rest on background to reporters[.] So when the hit piece runs it's not as big of a shock." Exs. 51 at NATHAN_000002714–2715; 52, Abel 9/26 Tr. at 171:2–15, 173:5–16, 187:16–188:1; *see also* 53 at JONESWORKS_00014981.

685.    On August 2, 2024, Case, on behalf of TAG, sent Wayfarer and Baldoni a "Scenario Planning" document. Ex. 46 at NATHAN_000005497.

686.    The Scenario Planning document outlined "several potential scenarios at play here which we should be prepared for, should BL and her team make her grievances public," including a strategy of "planting a seed earlier on to position your truth / narrative around the ordeal in a subtle way." *Id.* at NATHAN_000005499–5550.

687.    In that document, TAG recommended that Wayfarer "get ahead of this narrative," *Id.* at NATHAN_000005503, and outlined a number of "[k]ey [m]essaging [p]oints," including:

   a.   "JB's stellar reputation among colleagues and industry peers - numerous quotes and interviews sharing positive experiences." *Id.* at NATHAN_000005504.

   b.   "JB has been a longtime activist and advocate of and for women in Hollywood, speaking out about challenges his colleagues faced before the Me Too movement even began (TED 2017)." *Id.*

    c.  "When BL wasn't able to get her way on set or behind the scenes, she involved her husband to create an imbalance of power between her and JB. RR went so far as to use his power to call agents and agencies, Sony, and other key players so that BL would get her way." *Id.*

    d.  "BL's less than favorable reputation in the industry spans decades and has been reported –there were issues on Gossip Girl, the Town, A Simple Favor, and more." *Id.*

    e.  "There is a clear, likely motive due to the film's value and fanbase, in which BL is attempting to bully her way into buying the rights for It Starts With Us." *Id.*

688.    The Scenario Planning document also suggested that the TAG "team can also explore planting stories about the weaponization of feminism and how people in BL's circle like Taylor Swift, have been accused of utilizing these tactics to 'bully' into getting what they want." *Id.* at NATHAN_000005506.

    ii.    <u>Abel And TAG Avoid Putting In Writing How They Will "Bury" Lively</u>

689.    After reviewing the Scenario Planning document, Baldoni told Abel: "Not in love with the document they sent — Not sure I'm feeling the protection I felt on the call." Ex. 195 at BALDONI_000016442.

690.    Abel then texted Nathan that Baldoni "wants to feel like she [Lively] can be buried..." Ex. 47 at NATHAN_000005552.

691.    Nathan sent the following messages in response:

    a.  "Of course- but you know when we send over documents ***we can't send over the work we will or could do because that could get us in a lot of trouble***." *Id.* (emphasis added).

    b.  "We can't write it down to him. ***We can't write we will destroy her***. We will go to this. We will do this. We will do this. We will do this." *Id.* at NATHAN_000005553 (emphasis added).

    c.  "Imagine if a document saying all the things that he wants ends up in the wrong hands." *Id.* at NATHAN_000005554.

d. *"you know we can bury anyone[.] But I can't write that to him[.]* I will, I'll be very tough." *Id.* (emphasis added).

692.    Nathan also sent Abel a "General Agenda" for the call with Baldoni, which included: the "[s]tory coming out" and "[d]iscuss a more aggressive way to get ahead of this." Ex. 47. at NATHAN_000005558.

693.    The next day, on August 3, 2024, Wayfarer executed TAG's engagement letter. Wayfarer Ex. 167 at JONESWORKS_WAYFARER_000003014.

694.    On August 4, 2024, Abel told Nathan that she was "having reckless thoughts of wanting to plant pieces this week of how horrible Blake is to work with." Ex. 50 at JONESWORKS_00016238. Nathan responded, "same" and told Abel that she "already off the records Spoke to the editor [of the] Daily Mail because she's my friend" and that "[s]he's ready when we are." *Id.* at JONESWORKS_00016238-16239.

695.    That same day, Case emailed Nathan the 17 Protections for Return to Production list, stating that "these are the items noted in her [Lively's] 'I won't come to work unless these are adhered to.'" Ex. 196. Nathan then emailed the same to Abel and Mitchell. Ex. 197.

696.    At this point, Baldoni's "crisis team [was] ready for a war with her" and had "all kinds of garbage on" Lively, according to Baldoni's talent agent, Danny Greenberg. Ex. 198; Wayfarer Ex. 142 at 17:11–15.

697.    The Sony publicity team provided Baldoni extensive feedback on how to better approach interview questions during his press tour. Ex. 199; Ex. 52, Abel 9/26 Tr. at 152:7–10, 153:16–154:3. Specifically, Sony advised Baldoni "focus on the positive elements in interviews [because] [d]iscussing abuse, how abusers or the abused are perceived outwardly, takes us down a path that is not only dark but will detract from the primary messaging." Ex. 199 at ABEL_000000666.

698.    On August 5, 2025, internal Sony emails discuss how, in a Dallas Morning News interview Baldoni "basically allud[ed] to 'raping' Atlas out of Lily when he said in an interview: "for me what that scene was more about was Ryle feeling like he had lost all power and feeling so insecure and jealous that the only way in his mind that he could show her how much he loved her was um and I won't say the word that we used in developing it, but what was essentially to force any love she had for [A]tlas out of her. . . . he was trying to, in his twisted mind, love . . . [A]tlas out of her. [T]here's another word we used and I'm sure in your imagination you can go there." Exs. 200; 52, Abel 9/26 Tr. at 190:11–19, 192:21–193:12; 38, Greenstein Tr. at 174:4–175:22. A Sony executive noted that they "cut the tape but [Baldoni] is a moron . . . [Baldoni] shouldn't do any more press[.]" Ex. 200.

## N.    Baldoni Plants the Seed that Lively's Personality Caused Friction On Set

699.    On August 4, 2024, Case provided press "[l]anguage for review" to the PR team, which included a statement that "[y]ou definitely navigate obstacles you don't expect, be it creative differences or ways of working." Exs. 201 at KCASE-000001080; 57, Case Tr. at 153:10–154:9 ("Given the situation, we were accounting for Ms. Lively.")).

700.    On August 5, 2024, Baldoni began the Film's press junket, through which he began planting a "seed earlier on to position [his] truth / narrative around the ordeal in a subtle way." Exs. 201 at KCASE-000001080; Ex. 46 at NATHAN_000005500; *see also* Ex. 155 at ABEL_00000156.

701.    Specifically, at 9:18 a.m., Abel reported to TAG that they had "[j]ust kicked off the junket— for Elle uk he said exactly like what we discussed about navigating complex character and as a director managing personalities and the natural friction on set." Ex. 201 at KCASE-000001080.

702.     Case replied "PERFECT," "love to hear it!!" and Mitchell added, in response to hearing that "Sony wasn't happy with" the word "friction," that "We love that word!" *Id.*

703.     A Sony representative texted Abel requesting that Baldoni not "mention friction on set so it doesn't open any doors." Ex. 202 at JONESWORKS_00015998.

704.     Just over an hour later, Mr. Baldoni repeated the "friction" narrative in his Cosmo UK interview, in which he "[t]alked about the challenges of being a director and getting everyone on board and how sometimes words get stuck and there are tough situations and *friction* creates beautiful art." Ex. 201 at KCASE-000001081 (emphasis added).

705.     Sony's representative then texted Abel again: "[l]et's take friction out of his vocabulary if we can 😊." Ex. 202 at JONESWORKS_00016000.

706.     Abel conveyed Sony's message to Baldoni: "Sony is having a hard time with the word 'friction.' They think it will be taken out as clickbait. ***They obviously don't know about our strategy*** but let's stick to the words of 'challenge.'" Exs. 53 at JONESWORKS_00014981 (emphasis added); 52 (Abel 9/26 Dep. Tr.) at 186:11–188:1.

707.     Within a week, dozens of news articles quoted Baldoni's statements identifying "friction" on set. *See, e.g.*, https://www.elle.com/uk/life-and-culture/culture/a61823800/justin-baldoni-interview/; https://www.usatoday.com/story/entertainment/celebrities/2024/08/10/it-ends-with-us-cast-drama-explained/74740951007/; https://www.instyle.com/it-ends-with-us-drama-8693842; https://www.usatoday.com/story/entertainment/celebrities/2024/08/10/it-ends-with-us-cast-drama-explained/74740951007/; https://people.com/it-ends-with-us-cast-drama-explained-everything-to-know-8693157.

708.     Baldoni also spoke in interviews about "the intimacy coordinator and bringing them on early and how important it was [for her] to be a woman," "bringing on a female stunt

coordinator and how important it was for everyone to feel safe and how involved Blake was," and "taking a step back and letting the women take over," as "[h]e didn't want them to feel like they were shot by a man." Ex. 201 at KCASE-000001081.

**O.    As The Film Premiered With Massive Success, Defendants Launched A "Social Combat Plan" Against Lively With The Help Of A Digital Fixer.**

    i.    <u>Wayfarer And Baldoni Hire Jed Wallace</u>

709.    In 2008, Wallace founded Street Relations, Inc. ("Street Relations"), for which is the sole director and officer. Ex. 203, Wallace 10/9 Tr. 21:6–23:13.

710.    Wallace specializes in "crisis communications." Ex. 203, Wallace 10/9 Tr. 263:7–264:8. Case described Wallace as a "contractor[]" with whom TAG would work "if a client required social or digital [re]mediation." Ex. 57, Case Tr. 160:16–21.

711.    On August 5, 2024, Nathan sent Heath and Abel a text message setting forth the "digital quotes [] from the two teams we use that get the best results." Ex. 66 at JONESWORKS_00012745. "Quote one" was for $175,000 "for a 3-4 month period and includes: website (to discuss) full reddit, full social account take downs, full social crisis team on hand for anything- engage with audiences in the right way, start threads of theories (to discuss) this is the way to be 100% protected.") *Id*.

712.    "Quote two" in Nathan's text message was for $25,000 per month, for a minimum of 3 months "as it needs to seed [the] same as [Quote one]," and would "be for creation of social fan engagement to go back and forth with any negative accounts, helping to change the narrative and stay on track." *Id*.

713.    Nathan wrote: "All of this will be most importantly untraceable." *Id*.

714.    Nathan wrote: "There is a lot more to both of these quotes, but easier to discuss via phone in terms of capabilities and what I have personally experienced in and out of crisis scenarios." *Id.*

715.    Also on August 5, 2024, Nathan emailed Wallace with Lively's Protections for Return to Production, explaining they were "the items noted in her 'I won't come to work unless these are adhered to.'" Ex. 204.

716.    On August 6, 2024, the U.S. premiere of the "It Ends With Us" film took place in New York. Ex. 1, Hoover Tr. at 152:18–19; *infra* ¶ 241.

717.    At the premiere, Sarowitz had a conversation with Baldoni and Wayfarer's agent, Danny Greenberg. Ex. 41, Greenberg Tr. 290:19–293:17.  On August 9, 2024, Greenberg texted Giannetti: "I'm a little concerned about Steve S. He was really aggressive when I spoke with him. I've been texting Jamey to make sure he is managed and to make sure he speaks with me before doing anything nuclear." *Id* at 295:5–297:11; Ex. 205 at SPE_BL0009643. On August 10, 2024, Greenberg texted Whitesell that he "had to dial down the billionaire at the premiere who was ready for serious battle." Ex. 41, Greenberg Tr. 298:5–299:13; Ex. 206 at WME_00001319.

718.    On August 6, a TAG intern flagged a social media comment that read "I think part of it is they didn't want to romanticize Lily and Ryle by having them do a ton of PR together," and noted that "[t]here are other comments saying he's traveling with family." Wayfarer Ex. 226. Case replied "Ok the comments are working excellent," and "[t]hats all us lol." *Id.*

719.    On August 7, 2024, Nathan and Abel agreed that Baldoni and Wayfarer "really need[ed] to put the social combat plan then into motion," and that Nathan would call Heath to "get the [green] light." Wayfarer Ex. 180 at NATHAN_000003602. When an article was

published that day speculating Lively and Baldoni were in a feud, Abel instructed TAG to "start having social kill asap." Ex. 278 at NATHAN_000000562.

720.    Later that day, Case sent Heath and Abel an email with the subject line "Social / Digital Mitigation / Remediation," which set out the scope of work for the digital team (the "Digital Scope of Work"). Ex. 207. The proposal outlined "[s]pecific efforts" that the digital team would "execute all without fingerprints," including (among other things):

    a.   "Leverage relationships with Discord, Reddit, X, IG, TikTok, YouTube, etc. to expose behavior of Blake and other parties, both current and past and engage directly with communities to adjust or influence the conversation taking place in real time;"

    b.   "Utilize CTR manipulation and contextual links to push up positive PR to change subject matter opinion on the first page of Google;"

    c.   "Work to remove links that are harmful to Wayfarer Studios, Justin, and the narrative alongside the appropriate teams,"

    d.   "Organically engaging with audiences in the right way, starting threads with theories the team approves of, and asking questions that no longer place Wayfarer and Justin on the back foot;" and

    e.   "Changing the overall narrative and helping keep it on track."

Id. Citing the concern of "Blake activating the Taylor Swift fan base," Case indicated that the fee for the digital services would be $30,000 per month. Ex. 207.

721.    Wallace and TAG have sent similar scopes of work to other prospective clients. For example, in a scope of work prepared by TAG and Wallace for ███████████, Wallace offers for "[t]he digital team [to] run a full assessment to determine a subsequent strategy that

deploys a 360-degree digital campaign to cover any and all conceivable issues." Exs. 208 at STREET 3.000306; Ex. 209 at STREET 3.000493. The scope of work further described that "efforts w[ould] include site optimizations, basic content creation and keyword monitoring to better rank within search engines," as well as "help[ing] amplify positive press as it occurs, and highlight news to communities, in forums and otherwise." Ex. 208 at STREET 3.000306. "For social media," Wallace offered to "claim, create, monitor, manage and optimize various online platforms including, social media pages, Wikipedia, Google Knowledge Panel, to include Instagram, X, TikTok, Facebook, YouTube, Snapchat, Tumbler, Reddit, Discord, etc. to enhance and expand digital footprint and online presence with the appropriate branding." *Id.*

722.    In emails and text messages with current or prospective clients, Wallace often describes his capabilities in the digital space, such as:

   a.   "I have the forensic guys rewriting the ▇▇▇▇▇ image metadata," Ex. 210 at STREET 3.000201;

   b.   "we are suppressing those posts/links/articles too," *Id.*;

   c.   "[I] have the various teams heavily clipping and algorithm boosting it for you and all the keywords I've got trending for you," Ex. 211 STREET 3.000500–501;

   d.   "I need to be able to throw a ton of upvotes at stuff that is rah rah rah for ▇▇ . . and need to downvote everything else," Ex. 212 at STREET 3.00205;

   e.   "This is exactly the kind of content . . . that our team can elevate across all algorithmically driven platforms," Ex. 213 at STREET 3.000366;

   f.   "We are undoing years of suppression related to your name and all related handles," Ex. 214 at STREET 3.000487;

227

g. "[U]se our team of specialists to build all the digital (Reddit, site, X, 4 Chan, discord, etc) messaging to trend and dominate in client's favor," Ex. 215 at STREET 3.000497.

723.    In the five or six years that Nathan and Wallace have known each other, they have worked together frequently, including "enhance and expand" ████████████'s "digital footprint and online presence," "shape, advance, and protect" ████████████'s reputation, "amplify positive" stories and "remove links that are hurting" ██████, and build digital "messaging to trend and dominate in" ██████████'s favor. Ex. 208 at STREET 3.000306; Ex. 216 at STREET 3.000326; Ex. 217 at STREET 3.00362; Ex. 215 at STREET 3.000497.

724.    On August 7, 2024, Case sent an email connecting Wallace with Ms. Abel, telling Wallace that "Wayfarer would like to move forward ASAP with social / digital mitigation and remediation." Ex. 218 at STREET 1.000005.

ii.    <u>Baldoni and Wayfarer, With Help From Wallace, Get To Work Manipulating Media Narratives And Causing An Onslaught Of Hate Toward Lively, Hoover, Slate, and Ferrer</u>

725.    On August 8, 2025, Nathan connected Heath and Wallace by email, to which Wallace responded that "this is our wheelhouse and have it prioritized across all platform-specific specialists working for me." Ex. 67 at HEATH_000048498.

726.    That same day, in response to a content creator posting that Baldoni had on previous projects "exploit[ed] the struggles of individuals facing terminal illnesses for his own gain," Case told Abel they had "flagged [the creator] to Jed and his team for more serious action on the social side." Wayfarer Ex. 223 at BBKOSLOW-000004013.

727.    Also that day, Baldoni flagged a post on X that read "Can I please get a primer on this Blake Lively Ryan Reynolds movie drama?" Wayfarer Ex. 230 at BBKOSLOW-000006156. Case assured Baldoni that they had "flagged to Jed and his team as well." *Id.* at BBKOSLOW-000006157.

728.    Meanwhile, also on August 8, 2024, Baldoni texted the publicity team responsible for managing his social media on the "Team JB Social Media" group chat directing them to "start posting me ONLY talking about domestic violence and clips and why the movie is so important," and to change his biography to a link to NO MORE. Exs. 219 at JONESWORKS_00014507; 52, Abel 9/26 Tr. 130:1–14, 194:5–19, 197:8–198:19.

729.    Toskovic wrote to Abel and Heath that day wondering if Baldoni should "consider holding off on any posts" because he was "the only one from the cast posting anything at the moment and fans are going ham on Blake Jenny and Colleen's comments section, Colleen went private from all the hate," and she "worr[ied] another post from Justin about DV and thanking 'women everywhere' might further fuel the fire." Exs. 182 at JONESWORKS_00013831; 52, Abel 9/26 Tr. 289:19–290:11, 291:12–292:8.

730.    Abel responded that, while it was a "valid thought, . . . if there's anymore pickup of those articles then a post like this would further combat the negative." Exs. 182 at JONESWORKS_00013831; 52, Abel 9/26 Tr. 289:19–290:11, 291:12–292:8.

731.    Heath replied: "Appreciate you thinking about this. And yet… I think we stay the course. Him doing exactly what he does is in great part what has combated the noise against him. . . . I do see what you mean, however the awareness to stay on point is more beneficial than the potential negative." Exs. 182 at JONESWORKS_00013831; 52, Abel 9/26 Tr. 291:12–292:8.

732.    Ferrer and Hoover continued to receive substantial public hate. Exs. 10, Ferrer Tr. 172:3–20, 175:10–25, 183:11–19, 189:9–190:9, 208:15–210:6, 278:17–281:18; 1, Hoover Tr. 153:2–157:8, 174:7–175:24.

733.    The film was released to the public in theaters on August 9, 2024. 56.1 ¶ 241; Ex. 281, Lively Tr. 274:13–17, 275:1–18.

734.    On August 9, 2024, Baldoni sent the Team JB Social Media group chat a text that read: "The next 36 hours are crucial and we need to be on it. Looking at everything. Finding the most emotional and touching content from survivors supporting this film and reposting. Need you to be finding survivors sharing their stories and amplifying them on my page and TikTok." Ex. 220 at JONESWORKS_00014513

735.    That same day, Wayfarer wired $30,000 to Street and Wallace confirmed that his "team is/has been in full throttle mode on our Wayfarer focus!" Ex. 67 at HEATH_000048496, HEATH_000048498.

736.    Also on August 9, when a Daily Mail article reporting on the gossip was published, Ms. Abel remarked to Ms. Nathan that she could "tell you've done a lot of work here" because the article failed to mention anything "about being unsafe[,] [f]at comments[,] sexual." Ex. 221 at JONESWORKS_00016279; *see also infra* ¶ 269.

737.    Days later, Abel would tell a friend how the Daily Mail "reduced down" referring to Baldoni as a "Sexual predator" to "chauvinistic" and "borderline abusive." Ex. 222 at JONESWORKS_00014817.

738.    When the New York Post's Page Six was prepared to run an article, Ms. Nathan was able to easily reach the reporter—who is also Ms. Nathan's sister—and convince her to remove the most inflammatory language in the draft. Ex. 223.

739.    On social media, one user posted a comment regarding the story: "Daily mail broke a story saying Blake calling Justin abusive. I don't buy it I think it's a way for her to get more control and attention of the movie." Ex. 224 at KCASE-000000731. Case circulated the comment to Koslow and Nathan remarking "Thank the lord for Jed." *Id.* Koslow echoed her "Thank god." *Id.* at KCASE-000000732.

740.    Similarly, just minutes later, in response to a comment shared by a TAG intern that read "It feels like a certain peoples PR team got ahead and leaked the story to the daily mail to justify them trying to take over the film," Case wrote "Thank the lord for social and digital mitigation lol." Exs. 225 at BBKOSLOW-000003393; *id.* at 000003338.

741.    Later that day, Case had to "wonder if they had Jed suppress the link" to the Daily Mail article because she "c[ould]n't even find that story." Ex. 226 at KCASE-000001096.

742.    Nathan texted Abel that they had "confused people" with "[s]o much mixed messaging," that it was "actually really funny if you think about it." Ex. 221 at JONESWORKS_00016284. Abel commented that while she had "very few" inquiries from reporters, it was "nothing about the [Daily Mail and New York Post] articles," which was "wild." *Id.* at JONESWORKS_00016285. Nathan agreed that "the worst is over," and that while "the next few months definitely will be a tiny bit bumpy," Baldoni would "not [be] cancelled." *Id.*

743.    On August 10, 2024, Case reported back to Heath that there was "extremely limited pick up on [the] Daily Mail or Page Six" articles, and that they had "also started to see a shift on social, due largely to Jed and his team's efforts to shift the narrative towards shining a spotlight on Blake and Ryan." Wayfarer Ex. 224 at BBKOSLOW-000004607.

    iii.   <u>Despite Extraordinary Box Office Success, Baldoni and Wayfarer Continue To Smear Lively In the Media</u>

744.    On opening weekend, the Film made more than $50 million, and around $80 million internationally. Ex. 38, Greenstein Tr. 24:22–25:6. Mr. Greenstein, a film marketing executive with 25 years of experience, called the Film's $50 million opening "one of the greatest marketing triumphs in the history of marketing." *Id.*, Greenstein Tr. 235:1–3, 236:4–9.

745.    Giannetti called the opening "gigantic," and agreed that it was "historically successful." Ex. 2, Giannetti Tr. 343:3–23. Sony was "thrilled" with the Film's performance. Ex. 38, Greenstein Tr. 247:1–13.

746.    On August 11, Giannetti texted Lively: "Blake, $50 million!! Your blood, sweat, tears, brilliant smarts, heart and soul in every single frame. My God, it's incredible. Thank you 50 million times. And it's only Saturday night." Ex. 227 at BL-000008025; Ex. 2, Giannetti Tr. 342:10–343:19.

747.    That same day, Heath emailed Sony about the Film's success, saying: "We are not saying it's been inappropriately marketed in any way. In fact, you all have been brilliant. Thank you. Extremely honored to be partners with you. It's been fantastic. The proof is in the pudding." Ex. 228 at HEATH_000019467.

748.    Greenstein described Lively as "[t]he best marketer of any producer I have worked with in my 25-year career, even way better than her husband," because "[s]he had incredible ideas," "pushed the marketing team every day to be better," and was "just relentless in a positive way." Exs. 38, Greenstein Tr. 23:7–20; 229. Greenstein described Lively as a "creative force and total badass" who "elevated" the marketing campaign and movie. Ex. 38, Greenstein Tr. 130:2–133:19.

749.    Saks had described Lively's cut as "EXCELLENT," and "the best thus far," calling Lively's work "[t]ruly beautiful." Exs. 230 at BL-000008043; 15 Saks Tr. 165:9–166:11.

She wrote: "I think this last leg of the journey is going to be really sweet for everyone and that's because of you. Colleen might be the mother, but you're the fucking fairy godmother for everyone." *Id.*

750.    On August 10, 2024, Abel reached out to the TAG team noting that it "would be great for the digital team to boost" a video featuring Lively patting Mr. Baldoni on the shoulder on set, which was collecting recent comments such as "I'm truly stuck on Blake being the problem," and "[t]his is one of the reasons why I don't believe the bullshit that is circling around." Ex. Wayfarer Ex. at BBKOSLOW-000004606. Ms. Case responded: "We'll flag to them!" *Id.*

751.    On August 13, 2024, Koslow orchestrated the placement of an article in the Daily Mail UK. Koslow first texted Case bullet points for a "[s]tory" "[f]or Alison – hands off think piece on the whole PR debacle behind the scenes," including: (i) "[y]ou have a film with serious subject matter, not only being promoted with focus on flowers/clothes, but a PR campaign distracting audiences away from important messaging to play out a high school fight between two stars"; (ii) "[w]hy would Blake allow this to happen? How could she? What is she thinking right now regarding her team?"; and (iii) "did Blake's inability to relate to regular people / what they want to see, just slight her big moment?" Ex. 59 at KCASE-000002822.

752.    Case responded: "Yes. To all. Also let's bring in the fact that she promoted a haircare line and her own drink brand as part of promo." *Id.* Later that day, Koslow texted Nathan, "Could Allison do think piece on the bad PR behind the film . . . And it wouldn't be so obvious if there's a part that scrutinizes his lack of response or whatever so it's not so obviously placed," to which Nathan responded, "Yes" "Let's go." Ex. 60 at BBKOSLOW-000001025. On August 20, 2024, the Daily Mail published an article that reported: "This should be the crowning

moment of Blake Lively's career . . . Lively's launch of her new film, *It Ends With Us*, has been

an unmitigated disaster."[4] The article also reported: "Lively has come under fire for aggressively

marketing her personal projects – not just her haircare, but her drinks company – seemingly on

the back of a film dealing with domestic violence."

753.    On August 13, 2024, Baldoni sent two links to TikTok videos to the group chat, to

which Abel confirmed "we have this and this is what the digital team is amplifying." Ex. 63 at

BALDONI_000015463. The links were to (1) a video posted by an individual who spoke about

her positive experience working with Baldoni on the set of the Film, and (2) a video where the

creator criticized  Lively's marketing of the Film as insensitive to domestic violence survivors.

*Id.*

754.    On August 14, Nathan circulated a screenshot of a Daily Mail article entitled

"HOLLYWOOD VILLIAN," which "branded" Lively "a mean girl" in light of a 2016 interview

with journalist Kjersti Flaa in which Flaa attempted to congratulate Lively on her recent

pregnancy news by referring to Lively's "little bump." Exs. 64 at KCASE-000003361, KCASE-

000003397. Ms. Koslow responded: "Omg this is amazing[.] We should send to Jed, right?" *Id.*

at KCASE-000003361.

755.    On August 15, 2024, Nathan told Abel that the Daily Mail was "hounding [her] re

HR complaints," so she told them to instead "look into how [Ms. Lively] is emulating her best

friend [T]aylor with the charm bracelets and shit" because "[i]t was the only thing [she] could

give of[f] the top of [her] head that looked organic and wouldn't seem like we placed about the

---

[4] Alison Boschoff, *How Blake Lively's Fairytale Turned Into a PR Nightmare*, Daily Mail (Aug. 20, 2024),
https://www.dailymail.co.uk/femail/article-13761985/How-Blake-Livelys-fairytaleturned-PR-nightmare-Amid-growing-backlash-ALISON-BOSHOFF-reveals-wentwrong-Hollywoods-golden-girl.html

film." Ex. 55 at JONESWORKS_00016354. That is, <mark>Baldoni would "win" as it wouldn't seem as if he was attacking Lively, but Lively still "will hate" the article.</mark> *Id.*

756.    That same day, Case emailed <mark>the Daily Mail reporter with "helpful" links comparing Lively to Taylor Swift</mark>. Ex. 56.

757.    On August 17, 2024, the Daily Mail published the article,[5] which incorporated the links Case had provided and reported that, according to an insider, "'Blake is trying to get Taylor to help pull her out of this mess by using their friendship for interviews and other promotional work directly related to the film amid the current backlash that she is getting'" and that Lively "laughed at the concept of making herself available to" domestic violence survivors. It further reported: "The source told DailyMail.com that 'Blake thinks she's getting set up by people around Justin so he doesn't have to come clean about his behavior' on set. . . . 'Instead of cementing her as a movie star it has served only to show out of touch she is.'"

758.    On August 15, 2024, Koslow <mark>spoke to Tatiana Siegel from Variety regarding publishing an article that focused on the union violations that allegedly occurred on the set of the Film by virtue of Reynolds working on the script during the WGA strike, and replacement editors being brought in to re-cut the Film</mark>. Ex. 231 at JONESWORKS_00013335. Again, Ms. Koslow focused on the fact that <mark>the placement would be "hands off" and was not akin to "some bigger takedown . . . which could backfire."</mark> *Id.*; Ex. 232 at BBKOSLOW-000006070. On August 27, Variety published the article, which claimed that "Reynolds' involvement [in It Ends With Us] raises . . .WGA issue[s]."[6]

---

[5] Lillian Gissen, *How Blake Lively COPIED Best Friend Taylor Swift to Promote It Ends With Us*, Daily Mail (Aug. 17, 2024) https://www.dailymail.co.uk/tvshowbiz/article-13750525/blake-lively-taylor-swiftcopied-friendship-justin-baldoni-drama.html.
[6] Rebecca Rubin, Tatiana Siegel, *"It Ends With Us" Sequel in Doubt Amid Blake Lively-Justin Baldoni Feud: "There's Probably No World Where They Work Together Again,"* Variety (Aug. 27, 2024), https://variety.com/2024/film/news/it-endswith-us-sequel-in-doubt-blake-lively-justin-baldoni-feud-1236114099.

759.    On August 18, 2024, Baldoni asked TAG "[t]o boost" three TikToks: (1) a video where the creator explains that she is "flabbergasted that with the huge audience Blake Lively has and all of the press interviews she's had she doesn't once talk about DV"; (2) a video of Baldoni introducing the Film to an unexpecting movie theater audience; and (3) a video of Baldoni appearing in an Instagram Live video with the creator's son. Ex. 65 at BALDONI_000019422–19423. Abel responded: "Yes definitely let's boost these vids," and Koslow replied that they "[w]ill let digital know!" *Id.* at BALDONI_000019423.

760.    Later that day, Baldoni noted "seeing some IG comments on random posts defending me by people who are private with no followers and they feel like bots." *Id.* Nathan responded: "I can fully fully confirm we do not have bots. This is not also what we do- bots look fake to anyone. The other team is doing something very specific in terms of what they do. I know Jamey & Jed connected on this. Bots and fan accounts also run pretty organically by now with all the AI platforms and Google analytics itself – there is no bot army that's a myth these days. Any digital team these days is far more intelligent to utilize something so obvious." *Id.* at BALDONI_000019424.

761.    Baldoni responded simply with "Ok thank you" and praying hands and heart emojis. *Id.*

762.    Between August and October 2024, Wayfarer would pay Street Relations a total of $90,000 for its services, and a minimum of $45,000 to TAG and $20,000 to Abel. Exs. 203, Wallace 10/9 Tr. 80:4–23; Exs. 233; 234 at STREET 1.000084; 235; 280; 279.

763.    While the TAG team would communicate with each other over ordinary text messaging applications, when communicating with Wallace they used Signal—a messaging

236

application that would automatically delete the messages after a set period of time. Exs. 57, Case Tr. 74:17–75:7; 203, Wallace 10/9 Tr. at 72:20–73:15.

764.    Indeed, in initial conversation with Heath, Wallace requested that Heath communicate with him over Signal, a request that Wallace makes with other clients for whom he is performing digital services. Exs. 236 at STREET 1.000055 (Mr. Heath writing that "[a]s for Signal, I'm not on it but will set that up this week for sure"); 215 at STREET 3.000498 (Wallace texting on chain with client "Signal please").

765.    In the weeks after the Film was released, however, public sentiment "swung very negative" against Lively and there was "a tidal wave of online hatred toward her." Wayfarer Ex. 190 at SPE_BL0003328; 38, Greenstein Tr. 191:9–192:17, 200:4–201:25, 203:2–7. In an August 13, 2024 analysis of the social and press response conducted by Sony revealed "much of the online response was more supportive of Justin (89%)," while only 4% were "pro-Blake. The analysis noted that "younger audiences felt Justin spoke to the DV subject matter more seriously, while others criticized Blake's approach (including the focus on her outfits & hair care company, and co-promotion of the film with Ryan)." Exs. 190 at SPE_BL0003328; 38, Greenstein Tr. 200:4–203:7.

iv.    <u>Sarowitz Decides To "Go After" And "Ruin The Lives" Of Lively And Reynolds</u>

766.    On August 29, Sarowitz had a Zoom conversation with Claire Ayoub, during which Sarowitz said:

a.   that he had been on set of the Film and that "it wasn't bad;"

b.   that if Lively and Reynolds "ever cross the line, ever then I will go after them," Wayfarer Ex. 245;

237

     c.   that he would protect Wayfarer "like Israel protected itself from Hamas. There were 39,000 dead bodies. There will be two dead bodies when I'm done."

       Wayfarer Ex. 245;

     d.   that Wayfarer "have lawyers ready to go, we have – our press people, our PR people working."

       Wayfarer Ex. 245; Ex. 11, Sarowitz Tr. 320:20–321:24, 322:10–14;

767.    Sarowitz considers his financial investment in the Film "to be essential." Ex. 11, Sarowitz Tr. 169:14–25.

768.    On May 28, 2023, Baldoni shared Lively's and Slate's complaints about comments made to them during production with Sarowitz, to which Sarowitz said "he should come to set and remind Blake who's money this is …." Exs. 31 at HEATH_000035493; 11, Sarowitz Tr. 285:19–286:8.

769.    Sarowitz was aware of a list of 17 conditions provided by Lively as of November 2023. Ex. 44; 11, Sarowitz Tr. 210:11–211:3.

770.    Sarowitz was aware that Lively complained of sexual harassment and inappropriate conduct on set. Ex. 11, Sarowitz Tr. 220:21–221–15

771.    Sarowitz was aware that Baldoni and Heath participated in the January 4, 2024 meeting and received a summary from Baldoni regarding that meeting the day after it occurred. Ex. 37 at SAROWITZ_000000080–81.

772.    On May 16, 2024, Sarowitz received a press update from Jonesworks, which reflected social media coverage of an early fan and influencer event at which alcoholic beverages were served and Baldoni made flower bouquets. Ex.72.

773.    Baldoni discussed going through "the most difficult and intense test" of his life "designed to be worst case scenarios from [his] unique fears and insecurities" with Sarowitz and others on May 26, 2024. Ex. 237 at SAROWITZ_000000747.

774.    By August 14, 2024, Sarowitz was aware of Baldoni's interviews in connection with the Film and Sarowitz was, according to Baldoni "already helping by [W]ayfarer paying for the pr teams." Ex. 238 at SAROWITZ_000000709.

775.    Sarowitz conducted one or more media interviews in August 2024. Ex. 11, Sarowitz Tr. 138:8–10, 138:21–24.[7]

776.    Sarowitz was in touch with Sage Steele in January 2025. Exs. 11, Sarowitz Tr. 347:22–349:16 349:23–25; 239 at SAROWITZ_000001241–1242.

777.    On January 2, 2025, Sarowitz emailed regarding engaging the services of David Keyes and proposing to "make Sage's video go viral." Exs. 240 at SAROWITZ_000000940; 11, Sarowitz Tr. 74:15–75:9.

778.    On January 5, 2025, Sarowitz provided suggestions on the content that Steele ultimately published publicly regarding Lively. Ex. 239 at SAROWITZ_000001241–1242.

779.    On January 6, 2025, subsequent to a conversation with Sarowitz, a reporter for Forbes wrote that "Steve told me off the record that he doesn't remember what he said but that he very well might have used that language," referencing Lively's allegations that Sarowitz "divulged at the Film's New York premiere on August 6, 2024 that he was prepared to spend $100 million to ruin the lives of Ms. Lively and her family." Ex. 75 at SAROWITZ_000000918.

780.    From May 1, 2024 through July 2025, TAG communicated with individuals who seed, generate, create, or influence Social Media content or provide related digital services,

---

[7] "'It Ends With Us' Pop-Up & Non-Profit Partnership," https://wgntv.com/spotlight-chicago/it-ends-with-us-pop-up-non-profit-partnership/ (Aug. 14, 2024).

including Billy Bush, Andy Signore of Popcorned Planet, Candace Owens, Perez Hilton, and Sage Steele. Exs. 207 (Defendant The Agency Group PR LLC's Second Supplemental Responses and Objections to Plaintiff Blake Lively's First Set of Interrogatories) at 12–13; 208 (Defendant The Agency Group PR LLC's Third Supplemental Responses and Objections to Plaintiff Blake Lively's First Set of Interrogatories) at 11–12; 289 (Plaintiff Blake Lively's First Set of Interrogatories to Defendant The Agency Group PR LLC) at 3. Nathan told Perez Hilton that he was in her "circle of BF trust." Ex. 300 at NATHAN_000020427.

781.    From May 1, 2024 through June or July 2025, Abel and TAG communicated with more than two dozen media outlets, including The Daily Mail, People, Us Weekly, and Deux Moi, regarding Ms. Lively or Mr. Reynolds. Exs. 208 (Defendant The Agency Group PR LLC's Second Supplemental Responses and Objections to Plaintiff Blake Lively's First Set of Interrogatories) at 12–13; (Defendant/Third-Party Plaintiff Jennifer Abel's Responses and Objections to Plaintiff Blake Lively's Third Set of Interrogatories) at 13–17. By August 2024, negative sentiment regarding Ms. Lively and positive sentiment about Mr. Baldoni had dramatically increased in online discourse. Exs. 267, Mayzlin Report ¶84; Ex. 70, Culotta Report ¶¶54–56.

782.    On January 17, 2025, Sarowitz texted Abel and Nathan stating "[t]hanks. We are making progress" in response to Nathan sharing several links of content regarding Ms. Lively in connection to Khaleesi, promotional efforts in connection with alcoholic beverages, and commentary regarding Mr. Baldoni's nose. Ex. 241.

**P.    In Response to Lively's CRD Complaint, Defendants Continued Their Retaliatory Campaign with a Baseless Lawsuit and Defamatory Statements.**

783.    On December 20, 2024, Lively filed an administrative complaint with the California Civil Rights Department naming as defendants Wayfarer Studios LLC, Justin Baldoni,

Jamey Heath, Steve Sarowitz, Melissa Nathan, The Agency Group PC LLC, Jennifer Abel and

her company RWA Communications, LLC, and Jed Wallace and his company Street Relations

Inc. *Lively v. Wayfarer Studios LLC et al*., CRD No.: 202412-27269003 (the "CRD

Complaint").

784.    The CRD Complaint alleged that Lively and others were subject to sexual

harassment and other misconduct by Baldoni and Heath on the set of the Film, that Lively's

complaints about sexual harassment and other misconduct were not investigated during

production of the Film, and that the defendants worked together to retaliate against her by

engaging in a "multi-tiered plan that Mr. Baldoni and his team described as '*social*

*manipulation*' designed to '*destroy*' Ms. Lively's reputation."  CRD Complaint ¶¶ 1-2, 8, 24-25.

785.    That day, the CRD issued an immediate right-to-sue letter pursuant to

Government Code § 12965(b). Ex. 242. Lively privately sent the CRD Complaint to Defendants

along with a cease and desist letter. Ex. 242

786.    Before the CRD Complaint had been published or reported, Defendants leaked it,

along with a statement from Defendants' counsel, Bryan Freedman, to a variety of news outlets.

*See* Blake Lively Sues Justin Baldoni for Sexual Harassment … Claims of Wild Behavior On

Set, TMZ (Dec. 21, 2024) https://www.tmz.com/2024/12/21/blake-lively-sues-justin-baldoni-

sexual-harassment-retaliation-on-it-ends-with-us-set/; Blake Lively Accuses 'It Ends With Us'

Co-Star Justin Baldoni of Sexual Harassment; His Lawyer Slams 'Shameful' Complaint Full of

'False Accusations,' Variety (Dec. 21, 2024) https://variety.com/2024/film/news/blake-lively-

accuses-justin-baldoni-sexual-harassment-it-ends-with-us-1236257048/; Justin Baldoni

Responds to Blake Lively's Sexual Harassment Legal Complaint, E! News (Dec. 21, 2024)

https://www.eonline.com/news/1411455/justin-baldoni-responds-to-blake-livelys-sexual-harassment-legal-complaint.

787.    On December 21, 2024, Freedman published a statement to the New York Times on behalf of Baldoni, Heath, Sarowitz, Abel, Nathan, and Wallace regarding the CRD Complaint which Ms. Abel had provided.  Ex. 243.[8]  It said: "It is shameful that Ms. Lively and her representatives would make such serious and categorically false accusations against Mr. Baldoni, Wayfarer Studios and its representatives, as yet another desperate attempt to 'fix' her negative reputation which was garnered from her own remarks and actions during the campaign for the film; interviews and press activities that were observed publicly, in real time and unedited, which allowed for the internet to generate their own views and opinions.  These claims are completely false, outrageous and intentionally salacious with an intent to publicly hurt and rehash a narrative in the media."  *Id.*  Freedman stated that "[t]hese claims are completely false, outrageous and intentionally salacious with an intent to publicly hurt and rehash a narrative in the media."  *Id.*  Further, he said "[t]he representatives of Wayfarer Studios still did nothing proactive nor retaliated, and only responded to incoming media inquiries to ensure balanced and factual reporting and monitored social activity.  What is pointedly missing from the cherry-picked correspondence is the evidence that there was no proactive measures taken with media or otherwise; just internal scenario planning and private correspondence to strategize which is standard operating procedure with public relations professionals."  *Id.*

788.    On December 23, 2024, counsel for Lively sent Freedman a letter reminding him of his ethical obligations, notifying him that he "defamed and engaged in further unlawful

---

[8] Statement to The New York Times from Bryan Freedman, attorney for Justin Baldoni, Wayfarer Studios and all its representatives, the New York Times (Dec. 21, 2024), https://www.nytimes.com/interactive/2024/12/21/us/statement-to-the-new-york-times.html/.

retaliation against Ms. Lively," and demanding that he "immediately cease and desist from making further defamatory, and retaliatory, statements relating to Ms. Lively." Exs. 244, 245. The letter further explained that his December 21 statement to the New York Times constituted defamation *per se* as it implied that "Ms. Lively has made knowingly false factual allegations in a verified pleading to a state administrative agency, which (if true) would be a crime under California state law." Ex. 245 at WAYFARER_000143714.

789. On December 30, 2024, Lively amended her CRD complaint to specially identify IEWUM as a respondent. The CRD issued a notice of amended complaint, which states: "The original Notice of Case Closure and Right to Sue issued in this case remains the only such notice provided by the CRD. (Cal. Code Regs., tit. 2, § 10022.)" (the "Notice of Amended CRD Complaint"). Ex. 274.

790. Lively received a dismissal and notice of right-to-sue from the EEOC as to Wayfarer and IEWUM from the EEOC on January 21, 2025 (the "EEOC Notices"). Exs. 275-276.

791. Lively served Defendants with the Notice of Amended CRD Complaint, the EEOC Notices, the CRD notice and right-to-sue on February 15, 2025 by certified mail. Ex. 277.

792. By December 30, 2024, Wayfarer Studios LLC, Baldoni, Heath, Sarowitz, Nathan, The Agency Group PC LLC, Abel and her company RWA Communications, LLC, and Jed Wallace and his company Street Relations Inc. all jointly retained the legal services of Liner Freedman Taitelman + Cooley, LLP. Ex. 246

793. Wayfarer Studios LLC arranged to pay the legal fees for all Defendants as well as third party witnesses Case, Koslow, and Hanks. Exs. 11, Sarowitz Tr. 363:24–364:15; 24, Heath

10/9 Tr. 39:8–40:9; 247, Wallace 10/10 Tr. 15:6–8; 62, Koslow Tr. 396:7–18; 89, Hanks Tr. 20:16–19; *see* 57, Case Tr. 265:21–266:7.

794.    On December 31, 2024, Lively filed her complaint in the present action in the District Court for the Southern District of New York. *Lively v. Wayfarer Studios LLC, et al.*, Case No. 1:24-cv-10049, ECF No. 1.  That same day, Freedman filed a lawsuit against the New York Times in California state court on behalf of certain of his clients alleging that an article published by the New York Times regarding the CRD Complaint defamed them under California law (the "California State Lawsuit"). *Wayfarer Studios LLC et al. v. New York Times Company*, No. 24STCV34662 (L.A. Superior Court).

795.    On January 2, 2025, Sarowitz texted his friend, Rainn Wilson, regarding news coverage of Lively's legal actions and the California State Lawsuit. Ex. 248.  Sarowitz told Wilson that "[r]ight now I am in the mindset of my name is Onigo Montoya. You killed my friends career prepare to. . ." and the California State Lawsuit is "[o]nly the beginning." *Id.*

i.    Defendants And Freedman Recruit Content Creators To Place Strategic Anti-Lively Content

796.    On January 3, 2025, Freedman started a group text with Sage Steele, an online content creator and his former client, and Sarowitz, Baldoni, Heath, Abel, Nathan, and other attorneys, explaining that "Sage is on copy.  In order to use her, we need to start with a video that can go viral.  That will get her in organically.  No news outlet sees or wants to explain the connection without it.  Who can work with her.  I'm buried so please help here." Ex. 249, 250 at SAROWITZ_000001255. Steele confirmed that she "was thinking a video would be the best, most organic, and genuine way for me to do this." Ex. 249

797.    On the same day, Abel shared "the top line talking points here" with Steele.  Ex. 251  The talking points advise that:

a.   the goal of the video is to establish that Ms. Lively's claims of sexual harassment on set are "blatantly false."

b.   there are text messages between Ms. Lively and Mr. Baldoni "where she clearly INVITES him into her trailer while pumping."

c.   the Wayfarer Parties "are NOT responsible for the backlash received by BL's OWN INTERVIEWS."

d.   "the PR team points out that internet users are resurfacing old interviews Lively did over the course of her career where she displays cruel, rude, and unflattering behavior towards reporters when promoting previous projects.  All of which is, also organic."

e.   "it was in fact BL who set the tone of describing her character's clothing as wanting it to be 'much sexier'.  Baldoni was providing creative input as director, to her character's wardrobe while on set, not objectifying her personally as it is alleged in BL's claims."

f.   "[w]hat is most heartbreaking is the pages of text messages between Baldoni and his editors proving that they were actively cut out of the film, and were even prevented from seeing BL's cut of the film, which was the cut that made it into theaters.  Yet, Baldoni remained positive and 'took the high road,' offering support to his editors who said they didn't want to see the final cut of the film for the first time at the premiere."

Ex. 251 at ABEL_000019515, ABEL_000019516, ABEL_000019518, ABEL_000019519, ABEL_000019520.

798.    On the same day, Nathan reached out to Roza Kalantari of the Skyline Agency,[9] including Wallace, Abel, and Freedman on the correspondence. Exs. 252; 189 Nathan 9/29 Tr. 117:20–118:8. Nathan instructed Kalantari: "Please do get started on a website build, something clean, great looking . . . We will release all texts exchanges & voice notes /voice messages." Ex. 252.

799.    On January 5, 2025, Steele provided Sarowitz, Baldoni, Heath, Abel, Nathan, Freedman, and other attorneys with a first take of her video. Ex. 253. Sarowitz replied that it was a "good start" and asked whether Steele should "point out that other women were hurt by [Blake] included the assistant director and editors and the wives of the men Blake falsely accused?" *Id.* Steele agreed to "add 'many women who are part of the production" but cautioned that she shouldn't go "too much deeper there" in order to "make it look organic / like I don't have too much insider info[.]" *Id.* at NATHAN_000019471.

800.    Heath, Abel, and their attorneys provided additional feedback on the contents of the draft video provided by Steele. *Id.* at NATHAN_000019472. For example, Heath advised her: "I think you change 'Blakes team has alleged there was an 'invasion of privacy' . . . suggesting that Justin & Jamey would barge into Blake's trailer while she was breastfeeding. Again, look at the texts – BL INVITED THEM into her trailer. . ." *Id.* Abel explained, "it would be good with you opening with more about your heart, being a mother, why this resonates with you and of course what you already say being a journalist and having your own experience being up against giants, etc right at the top." *Id.* at NATHAN_000019474.

---

[9] The Skyline Agency is a "full-service digital advertising and branding agency." https://theskylineagency.com/about.

801.    On January 7, 2025, Steele published a video titled, "Shame on Blake Lively,"[10]

in which she makes the following statements:

    a.  "I think what's happening between Blake Lively and Justin Baldoni is just wrong, and as a woman and as a journalist, I can't stay silent about it anymore."[11]

    b.  "The more you dig, the more you realize Blake has been creating her own bad pr issues on her own for years."[12]

    c.  "The bad press began after old interviews of Blake resurfaced; videos that were not a good look for Blake Lively. They were unflattering, to say the least. Did you see the interview with Kjersti Flaa?"[13]

    d.  "Blake invited Justin into her trailer so they could continue working while she was pumping and nursing."[14]

    e.  "Here's the truth, Blake is the one who initiated the conversation about the wardrobe needing to be 'much sexier.' That's what was in the text. Justin, he's not just the co-star; he's the director of this film so he provided creative input while on the set. . . . That's his job."[15]

    f.  "I tried to, like, take a step back and think about Justin and how he chose to handle this whole thing by taking the high road. I admit that I don't know that I could have done it the way that he's done it. In some ways, it was to his detriment during the production of the film, and he just kept taking the high road with her."[16]

    g.  "It's so disappointing because it ends up hurting other women. This discredits women who are actual victim of sexual harassment."[17]

    h.  "Other women are being hurt because of these claims."[18]

802.    That same day, Freedman appeared for an interview with former client Megyn

Kelly and said: "the concern really is that she used these allegations of sexual harassment, and

---

[10] Sage Steele, *Shame on Blake Lively*, Youtube (Jan. 7, 2025), https://www.youtube.com/watch?v=vWLURmkBL_k&t=6s.
[11] *Id.* at 0:05–0:12.
[12] *Id.* at 4:08–4:15.
[13] *Id.* at 3:13–3:25.
[14] *Id.* at 1:45–1:51.
[15] *Id.* at 2:30–2:52.
[16] *Id.* at 6:14–6:34.
[17] *Id.* at 0:48–0:55.
[18] *Id.* at 5:07–5:10.

she used these allegations of bullying to try and leverage her position so she could be the de facto director in the case."[19]

> ii.    Defendants File Their Retaliatory Lawsuit And Continue Defaming Lively In the Press

803.    On January 16, 2025, the Wayfarer Parties filed a complaint against Lively, Reynolds, Sloane and Vision PR.  Case No. 1:25-cv-00449 (the "Wayfarer Action"), ECF. No. 1.

804.    The Wayfarer Action complaint brought claims of civil extortion, defamation, false light invasion of privacy, breach of implied covenant of good faith and fair dealing, intentional interference with contractual relations, intentional interference with prospective economic advantage, and negligent interference with prospective economic advantage seeking at least $400,000,000 in damages.  *Id.*

805.    That same day, Ms. Nathan and Mr. Freedman worked with their <mark>"true loyal friend," Elizabeth Rosner</mark> of People Magazine, to place at least eight articles which were favorable to Mr. Baldoni.  Ex. 254.  The articles published that day, which were sent directly to Freedman and Nathan by Roeser, included ones which reported that:

a.    Lively had compared herself to the *Game of Thrones* character Khaleesi and referred to Reynolds and Swift as her "dragons,"[20]

b.    Lively attempted to use Swift and Reynolds to pressure Baldoni into accepting a rewrite of a key scene in the script,[21]

---

[19] Megyn Kelly, How the New York Times Colluded with Blake Lively, According to Justin Baldoni Lawyer Bryan Freedman (Jan. 7, 2005), https://www.youtube.com/watch?v=XIfFOdAk02U at 6:56.
[20] Benjamin VanHoose, *Justin Baldoni Claims Ryan Reynolds and Taylor Swift Pressured Him to Accept Blake Lively's It Ends With Us Rewrite: Complaint*, People (Jan. 16, 2025), https://people.com/justin-baldoni-claims-blake-lively-ryan-reynolds-taylor-swift-pressured-him-8775745; Jen Juneau, *Blake Lively Compared Self to Khaleesi in Alleged Texts to Justin Baldoni, Called Ryan Reynolds, Taylor Swift Her Dragons: Complaint*, People (Jan. 16, 2025), https://people.com/blake-lively-compared-herself-to-khaleesi-in-texts-to-justin-baldoni-lawsuit-8776041.
[21] *Id.*

c. Lively never read the book on which the Film is based prior to making the Film,[22]

d. Lively joked about Baldoni's nose and told him he should get plastic surgery,[23]

e. Lively named an after-party drink after the Film's abuser;[24] and

f. Lively pressured Ms. Ferrer to "shun" Baldoni.[25]

806. On January 18, 2025, Freedman made a statement to Deadline claiming: "After my clients filed a comprehensive lawsuit packed with almost 200 pages of undeniable facts and documentary evidence which crushed their false allegations of a smear campaign by providing doctored communications to the New York Times, Blake and her legal team have just one heinous pivot left, and that is to double down on the revoltingly false sexual allegations against Mr. Baldoni[.]"[26]  Freedman further stated that "[t]he mere fact that Ms. Lively feels that she can publicly destroy Mr. Baldoni's reputation in an attempt to devastate his future career and then deny him or his team their own ability to defend theirselves [*sic*] against her is preposterous. Mr. Baldoni never once publicly attempted to call Ms. Lively out for her own many wrongdoings during filming, he kindly addressed all her concerns during filming in the correct manner despite the fact that he wholly disagreed, he himself was committed to do things differently and to keep the peace as she specifically admitted to in her own lawsuit."  *Id.*

---

[22] Jen Juneau, *Justin Baldoni Alleges Blake Lively Never Read It Ends with Us Book Before Making Movie: It 'Worried' Her Colleagues*, People (Jan. 16, 2025), https://people.com/justin-baldoni-says-blake-lively-never-read-it-ends-with-us-book-before-making-film-lawsuit-8775743.

[23] Tommy McArdle, *Justin Baldoni Alleges Blake Lively Joked About His Nose on It Ends With Us Set, Told Him He 'Should Get Plastic Surgery'*, People (Jan. 16, 2025), https://people.com/justin-baldoni-alleges-blake-lively-joked-about-his-nose-it-ends-with-us-plastic-surgery-8775759.

[24] Lindsay Kimble, *Justin Baldoni Claims in Lawsuit That Blake Lively Named It Ends With Us Afterparty Drink After Film's Abuser*, People (Jan. 16, 2025), https://people.com/justin-baldoni-claims-blake-lively-named-it-ends-with-us-party-drink-after-film-abuser-8775762.

[25] Jack Smart, *Justin Baldoni Claims Blake Lively Urged Isabela Ferrer to 'Shun' Him Despite Her Allegedly Calling IEWU Set 'Safe': Complaint*, People (Jan. 16, 2025), https://people.com/justin-baldoni-lawsuit-blake-lively-urged-isabela-ferrer-shun-him-8776102.

[26] Dominic Patten, *Justin Baldoni's Lawyer Decries "Revoltingly False Sexual Allegations" From Blake Lively As Lawsuits Fly; Brands At Business Heart Of Dispute*, Deadline (Jan. 18, 2025, 5:44 pm), https://deadline.com/2025/01/blake-lively-justin-baldoni-lawyer-latest-1236260673/.

807.    On January 21, 2024, the Defendants provided raw video footage of the Dance Scene ("Dance Scene Footage") along with an approved statement to media outlets and content creators. Exs. 255, 256, 257.

808.    The Dance Scene Footage was shared by Defendants to The Daily Mail, TMZ, Entertainment Tonight, Popcorned Planet, and Perez Hilton. *Id.*; Ruth Styles, *Who's lying, Blake Lively or Justin Baldoni? Shocking It Ends With Us clip reveals the truth about abuse claims*, Daily Mail (Jan. 21, 2025), https://www.dailymail.co.uk/tvshowbiz/article-14308745/Blake-Lively-Justin-Baldoni-bombshell-clip-reveals-truth-abusee.htm ("The clip . . . was passed to DailyMail.com by the actor's production company Wayfarer and his lawyer Bryan Freedman."); *Justin Baldoni Claims No Signs of Sexual Harassment Here!!! Raw 'It Ends With Us' Scene*, TMZ (Jan. 21, 2025), https://www.tmz.com/2025/01/21/justin-baldoni-it-ends-with-us-raw-footage-dance-scene-no-sexual-harassment-blake-lively/ ("Baldoni's team dropped nearly 10 minutes of unedited footage -- including one scene where Justin and Blake are slow dancing."); Popcorned Planet, *See Blake Lively CAUGHT Lying About Justin Baldoni - Full Video Evidence From It Ends With Us REVEALED!*, YouTube (Jan. 21, 2025) https://www.youtube.com/watch?v=PIX7Clu_ZSU ("we got this from their legal counsel"); Entertainment Tonight, *It Ends With Us Legal Battle: Justin Baldoni Releases Raw Footage of Blake Lively on Set*, YouTube (Jan. 21, 2025), https://www.youtube.com/watch?v=Iz_aU4QJOOE&t=2s ("Justin Baldoni's lawyer, Bryan Freedman, shares new video of the director working with Blake Lively on set of the film at the center of the actors' he said, she said legal battle."); Andy Signore (@andysignore), X (Jan. 21, 2025), https://x.com/andysignore/status/1881768808861598176 ("EXCLUSIVE! We just got ahold of 10 MINUTES of 'It Ends With Us' On-Set Footage from Justin Baldoni's legal counsel

that PROVES Blake Lively was NOT being honest in her lawsuit... Read the accusation below,

then click the next tweet to watch what really happened."); Perez Hilton,

(@PerezHiltonOnReddit), Reddit,

https://www.reddit.com/r/teamjustinbaldoni/comments/1ll7har/exclusive_major_victory_for_just

in_baldoni/ ("The link is in my video. Team Baldoni confirmed to me.").[27]

809.    While discussing the Dance Scene Footage with Alison Boshoff of The Daily

Mail, Nathan exclaimed: "A huge lie! I mean that in itself being sexual harassment when there

are so many women and men who actually suffer with that is not right."  Ex. 256 at

NATHAN_000025354.

810.    Nathan celebrated with her sister—a reporter at Page Six—that the Dance Scene

Footage was "going everywhere."  Ex. 258 at NATHAN_00026628.

811.    On January 21, 2025, Lively asked the Court to enter a protective order pursuant

to Rule 3.6 in response to the near-daily character assassination of Lively. ECF No. 17.

812.    In response, Nathan provided People.com with a quote attributed to sources

"close to" Baldoni that it is "grossly unfair to impose a gag order" because all Baldoni wants to

do is "release videos and text messages to prove the allegations are false."  Ex. 259.

---

[27] *See also* Ryan Hudgins, *Justin Baldoni's Lawyer Releases Video of 'It Ends With Us' Scene to Try to Disprove Blake Lively*, US Magazine (Jan. 21, 2025), https://www.usmagazine.com/entertainment/news/wayfarer-studios-releases-justin-baldoni-blake-lively-slow-dance-scene/; Gabrielle Chung, *Blake Lively & Justin Baldoni's It Ends With Us Behind-the-Scenes Footage Revealed*, E! News (Jan. 21, 2025), https://www.eonline.com/news/1412416/blake-lively-justin-baldonis-behind-the-scenes-video-of-it-ends-with-us; Jack Smart & Elizabeth Rosner, *Newly Released Video Shows Blake Lively and Justin Baldoni Awkwardly Interacting on It Ends With Us Set*, People (Jan. 21, 2025), https://people.com/video-blake-lively-justin-baldoni-awkward-it-ends-with-us-set-8777517.
,

813.    On January 23, 2025, Mr. Freedman filed a motion for *pro hac vice* admission, with a Certificate of Good Standing which was signed and notarized in Los Angeles, California, stating that he practices law in California.  ECF Nos. 28, 28–1.

814.    On January 25, 2025, Freedman went to New York Post's Page Six to discuss the gag order: "The irony is not lost on anyone that Ms. Lively is so petrified of the truth that she has moved to gag it . . . Ms. Lively did this with the sole intent to ruin the lives of innocent individuals, and then went the extra mile to place blame on a fictitious smear campaign, all because she quite simply could not accept that the public had organically seen through her facade. . . . When you accuse innocent individuals of something so disturbing as sexual harassment without thinking of the destruction it would cause to not only them, but the entire domestic violence community, this is where accountability for such mean spirited actions must be taken. . . . All we want is for people to see the actual text messages that directly contradict her allegations, video footage that clearly shows there was no sexual harassment and all the other powerful evidence that directly contradicts any false allegations of sexual harassment and subsequent smear campaign."[28]

815.    On January 31, 2025, the Defendants filed the First Amended Complaint to include The New York Times as a party and to attach a 168-page "Timeline" detailing the Wayfarer Parties' version of events.  ECF Nos. 50, 50–1.

816.    On February 1, 2025, Defendants launched a website with the URL https://www.thelawsuitinfo.com/, containing a copy of the Wayfarer Parties' Amended Complaint and their Exhibit A, "Timeline of Relevant Events."  Kalantari asked for approval for

---

[28] BreAnna Bell, Justin Baldoni's lawyer says he won't be 'bullied' into silence by 'petrified' Blake Lively, Ryan Reynolds after gag order request, Page Six (Jan. 25, 2025, 4:45 pm), https://pagesix.com/2025/01/25/celebrity-news/justin-baldonis-lawyer-says-he-wont-be-bullied-into-silence-by-petrified-blake-lively-ryan-reynolds-after-gag-order-request/; see *also* Amended Humphreys Report ¶ 148, Appendix F at 171, Appendix G at 175.

the Defendants' website to go "live."  Ex. 260 at SKYLINE_000000249;

https://www.thelawsuitinfo.com/.

817.    On June 9, 2025, the Court dismissed Defendants' lawsuit in full. ECF No. 296 at

129–30.

**Q.    Mr. Freedman Killed Stories Unfavorable to His Clients & Continued to Defame Ms. Lively**

818.    On December 23, 2024, Freedman emailed an NBC reporter in response to a

possible connection between TAG and the Amber Heard smear campaign by stating: "Given

your close relationship with Stephanie Jones and your withholding the truth, I would tread lightly

if I were you since your [sic] the next one to be sued. I'm excited about that."  Ex. 261.

819.    On February 5, 2025, Freedman emailed another NBC reporter in connection with

an article that stated the Court "barred Justin Baldoni's attorney Bryan Freedman from deposing

Blake Lively" by stating:  "You're a liar and dishonest and we are drafting letters and a lawsuit

against you personally. You have had that transcript from the court hearing and have defamed

our client intentionally. I will never ever let up going after you for the rest of my career.

Someone better make this right immediately. Your hanging up the phone, your arrogance and

your incompetence will never be tolerated. I am coming after you in every legal way possible. To

my team start drafting."  Ex. 262.

820.    During a conversation between Freedman and Slate's counsel on February 6,

2025, that Nathan described in a text message, "BF went ballistic on her lawyer and manager

today" and "said that her career would be over if she backs this horse sort of thing."  Ex. 263 at

NATHAN_000022028–22029.

821.    On February 7, 2025, Gary Baum of the Hollywood Reporter emailed Freedman

to ask whether he and Wallace had previously worked together and if Wallace had been involved

253

in Freedman's work on another lawsuit where Freedman had been accused of participating in a "social media manipulation campaign." Ex. 264.

822.    On February 11, 2025, Freedman responded to Gary Baum stating: "Off the record-You're wrong and could not have anything credible to support these assertions. I know because of I never worked with him on these, I know you are relying on non credible sources. There is a conflict of interest when a media company/publisher, takes in tens of millions in dollars in advertising and fails to disclose it while attempting to write a story that favors those advertisers. I have shed [sic] The NY Times for defamation and there are 3 other defamation cases pending. I have authority to sue PMC, THR and you personally if you print untruths . . ." *Id.*

823.    Freedman continued, "print anything wrong and you will be sued and it will be devastating" and says his story "will not play well. Gary, be careful. I am coming hard. Off the record." *Id.*

**R.    Ms. Lively Suffered Damages As A Result Of The Conduct**

824.    Following the success of the Film, Lively was on track to command "not only a significant increase in her compensation moving forward, but just as importantly, if not even more, a significant rise in her opportunities to follow with great filmmakers, with studio films." Ex. 33, Stone Tr. 397:22–399:8.

825.    Since the Film's release, Lively suffered a "marked" decrease in interest in her acting services, and she has received "no meaningful or real offers." Exs. 34, Zavala Tr. 285:7–24); 281, Lively Tr. 225:16–228:5.

826.    The income Lively derived from her businesses, Blake Brown and Betty Booze, suffered as well. Exs. 265, Betty B Tr. 117:2–19; 87, Family Hive 9/29 Tr. 111:14–112:10; 266, Kinrich Report at 33–40, 53–56.

827.    Both brands are built around Lively, and their success depends on her acting as their "face," as the painstakingly prepared company financial projections reflect.  *Id.*

828.    After the retaliation, Lively could not publicly promote the businesses, and the onslaught of negative commentary forced the brands to suspend social media activities in the immediate aftermath of the Film's release.  Exs. 87, Family Hive 9/29 Tr. 30:14–31:5, 46:7–20, 50:5–10, 51:16–20; 265, Betty B. Tr. 32:14–33:1.

829.    Despite the prior success of Blake Brown and Betty Booze, sales of both brands declined significantly as a result of disruptions in marketing strategy, erosion of brand equity, and a sharp decline in sales performance in the aftermath of Defendants' retaliation.  Exs. 87, Family Hive 9/29 Tr. 177:16–178:4, 179:11–180:10, 181:1–12; 267, Mayzlin Report ¶¶ 92–113; 266, Kinrich Report ¶¶ 46–48, 53–56, 59–61; 268 at BL-000038029–38047;269 at BL-00008236, BL-00008237, BL-00008243, BL-00008244.

## S.    EXPERT OPINIONS

830.    Professor Aron Culotta, a Professor of Computer Science at Tulane University, reviewed the posts and platforms discussed in Defendants' text messages and found indicia of a campaign to manipulate the online discussion regarding Lively in August 2024 on TikTok and Reddit. Ex. 70, Culotta Report at 3–4.

831.    Indicia of a digital campaign to manipulate online discussion of Lively is reflected in the engagement with TikTok posts about Lively, upvote patterns on Reddit, and in the uptick in circulation of negative content about Lively on YouTube and an increased association with her as a "bully." *Id.* ¶¶ 9, 96–97; *id.* ¶¶ 54–60, 65, 67 (TikTok); *id.* ¶¶ 72, 79–81, 87, (Reddit); *id.* ¶ 95 (YouTube).

832.    TikTok video comments in August 2024 reflected a significant deviation from the average top-comment share for videos and anomalous behavior on the modality that serve as indicia of concerted inauthentic activity. Ex. 270, Culotta Tr. 50:6–51:10, 58:16–59:9, 60:20–24.

833.    During August 2024, the subreddit thread FauxMoi reflected comments that were extreme outliers in terms of their Reddit score, including on August 14, 2024, with sentiment that was anti-Lively and pro-Baldoni. *Id*. 76:10–18, 89:8–17, 90:3–8.

834.    Dr. Dina Mayzlin, the Robert E. Brooker Chair in Marketing at the Marshall School of Management and the University of Southern California, was asked to evaluate "whether there is evidence of manipulation of online conversations allegedly financed and/or executed by Defendants, and to assess the potential impact of the manipulation on Ms. Lively's brands." Ex. 267, Mayzlin Report ¶¶ 1, 7. In conducting her analysis, Dr. Mayzlin observed "reputational and commercial harm to Ms. Lively's businesses—Blake Brown Beauty, Betty Booze, and Betty Buzz—consistent with established findings in academic literature." *Id.* ¶ 11.

835.    Dr. Mayzlin also "observe[d] a marked shift in the volume, the content, and the sentiment of online conversations about Ms. Lively, consistent with the onset [of] the Defendants' orchestrated campaign" in May 2024 and was "unable to identify alternative external events that could plausibly explain this change." *Id.* ¶ 12. Her analysis confirmed that "[t]he online conversations pertaining to Ms. Lively starting in August 2024 is an example of online manipulation.'" *Id.* ¶ 53; *see also id.* ¶ 14 ("my analysis supports the inference that manipulated online conversations seeded and amplified negative conversations, substantially altering online discourse about Ms. Lively").

836.    More specifically, her assessment "reveal[ed] two patterns: (1) there was a complete absence of conversations echoing the manipulated Lively narratives in the 'Scenario

Planning' prior to August 2024; (2) there was a sharp increase after August 2024 in both the share of conversations endorsing the manipulated Lively narratives and the overall volume of negative conversations. These trends suggest that the manipulated Lively narratives seeded and fueled subsequent negativity, first in August 2024 and again in the period spanning December 2024 through February 2025. This pattern is consistent with academic research documenting how initial messaging can amplify and mutate over time, spawning related negative sentiments beyond the original claims." *Id.* ¶ 84.

837.    Professor Ashlee Humphreys, a Professor of Integrated Marketing Communications at Medill School of Journalism and Professor of Marketing at the Kellogg School of Management at Northwestern University analyzed the impact to Lively's reputation from the retaliation campaign by calculating the number of impressions of the alleged defamatory statements, evaluating the public response to them, and estimating the costs to repair Lively's reputation based on the impact of those impressions. Ex. 271, Humphreys Report ¶¶ 1, 8–9.

838.    Dr. Humphreys observed that there was a dramatic rise in negative sentiment and negative associations relating to Lively as "tone deaf," a "mean girl," and a "bully," congruent with the alleged retaliation campaign. Ex. 272, Humphreys Tr. 146:7–14; 168:14–23.

839.    The negative associations relating to Lively as a "mean girl," a "bully," and "tone deaf" were strengthened by the defamatory statements made by Freedman. *Id.*, 105:11–18.

840.    The negative associations relating to Lively as a "mean girl," a "bully," and "tone deaf" caused Lively reputational harm. *Id.*, 134:23–135:13.

841.    Prior to Freedman's defamatory statements, the association of Lively being a liar was not in the public discourse and was not attached to her reputation. *Id.*, 180:1–4; 183:2–13.