**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY,<br><br>    Plaintiff,<br><br>v.<br><br>WAYFARER STUDIOS LLC, et al,<br><br>    Defendants. | No. 24-cv-10049-LJL (lead case)<br>No. 25-cv-449 (LJL) (member case) |
| JENNIFER ABEL,<br><br>    Third-Party Plaintiff,<br><br>v.<br><br>JONESWORKS LLC,<br><br>    Third-Party Defendant. | |
| WAYFARER STUDIOS LLC, et al.,<br><br>    Consolidated Plaintiffs,<br><br>v.<br><br>BLAKE LIVELY, et al.<br><br>    Consolidated Defendants. | |

**PLAINTIFF BLAKE LIVELY'S MEMORANDUM OF LAW**
**IN SUPPORT OF SPOLIATION SANCTIONS**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND .............................................................................................. 4

    A.     Certain Wayfarer Defendants Acknowledged Receipt Of A Legal Letter On Or About November 9, 2023, Triggering An Obligation To Preserve Evidence.................................................................................................... 4

    B.     Defendants Decide To "Go to War" Against Ms. Lively In August 2024. ........... 5

    C.     Defendants Used Ephemeral Communications As Early As August 2024. .......... 9

    D.     Defendants Admit That They Anticipated Litigation By August 2024 And Took No Steps To Preserve Communications Before December 20, 2024........ 13

    E.     Defendants' Obstructive Conduct In This Litigation Confirms That Sanctions Are Appropriate.................................................................................. 15

III.   LEGAL STANDARD......................................................................................... 16

IV.    ARGUMENT ................................................................................................... 17

    A.     Defendants Intentionally Violated Their Duty To Preserve Ephemeral Communications. .................................................................................. 17

        1.     The duty to preserve ephemeral messages was triggered no later than August 2024, and as early as November 2023.............................. 17

        2.     Wayfarer, IEWU, their principals, and Ms. Abel had an obligation to preserve no later than November 2023. ............................. 18

        3.     The TAG Defendants and the Wallace Defendants had an obligation to preserve no later than August 2024. ................................... 19

    B.     Defendants Failed To Preserve Ephemeral Messages. ..................................... 19

    C.     The Ephemeral Messages Are Lost And Cannot Be Replaced........................... 20

    D.     Defendants Intentionally Used Ephemeral Communications To Execute Their Plans In An "Untraceable" Manner "Without Fingerprints." ................... 21

    E.     Ms. Lively Has Been Severely Prejudiced By Defendants' Failure To Preserve Relevant Communications. ................................................................. 22

    F.     The Willful Destruction Of Evidence Warrants Severe Sanctions..................... 23

V.     CONCLUSION................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allied Property v. Zenith Aviation, Inc.*,
    2019 WL 10960568 (E.D. Va. Feb. 8, 2019) .........................................................................20

*Barbera v. Grailed, LLC*,
    2025 WL 2098635 (S.D.N.Y. July 25, 2025) (Liman, J.) ............................................. passim

*CAT3, LLC v. Black Lineage, Inc.*,
    164 F.Supp.3d 488 (S.D.N.Y. 2016)....................................................................................23

*Charlestown Capital Advisors, LLC v. Acero Junction, Inc.*,
    337 F.R.D. 47 (S.D.N.Y. 2020) ..............................................................................................7

*DR Distributors, LLC v. 21 Century Smoking, Inc.*,
    513 F.Supp. 3d 839 (N.D. Ill. 2021) .....................................................................................20

*ELG Utica Alloys, Inc. v. Niagra Mohawk Power Corp.*,
    144 F.4th 360 (2d Cir. 2025) ...................................................................................................7

*F.T.C. v. Noland*,
    2021 WL 3857413 (D. Az. Aug. 30, 2021) ...............................................................19, 20, 21

*Fashion Exchange LLC v. Hybrid Promotions, LLC*,
    2021 WL 1172265 (S.D.N.Y. Mar. 29, 2021) .................................................................23, 25

*Fujitsu Ltd. v. Fed. Exp. Corp.*,
    247 F.3d 423 (2d Cir. 2001)...................................................................................................17

*Glaukos Corp. v. Ivantis, Inc.*,
    2020 WL 5914552 (C.D. Cal. July 30, 2020) .......................................................................19

*Hammond Packing Co. v. Arkansas*,
    212 U.S. 322 (1909).............................................................................................................25

*Herzig v. Ark. Foundation for Med. Care, Inc.*,
    2019 WL 2870106 (W.D. Ark. July 3, 2019) ..................................................................20, 21

*In re Google Play Store Antitrust Litig.*,
    664 F. Supp. 3d 981 (N.D. Cal. 2023) .............................................................................19, 23

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
    456 U.S. 694 (1982) .............................................................................................................25

*Karsch v. Blink Health Ltd.*,
    2019 WL 2708125 (S.D.N.Y. June 20, 2019) ......................................................17, 18, 23, 25

*Leidig v. Buzzfeed, Inc.*,
    2017 WL 6512353 (S.D.N.Y. Dec. 19, 2017) .......................................................................18

*Lokai Holdings LLC v. Twin Tiger USA LLC*,
    2018 WL 1512055 (S.D.N.Y. Mar. 12, 2018) .......................................................................23

*Moody v. CSX Transp., Inc.*,
  271 F. Supp. 3d 410 (W.D.N.Y. 2017) .......................................................................21

*Ottoson v. SMBC Leasing and Finance, Inc.*,
  268 F. Supp. 3d 570 (S.D.N.Y. 2017) .............................................17, 21, 22, 24

*R.F.M.A.S., Inc. v. So*,
  271 F.R.D. 13 (S.D.N.Y. 2010) ...............................................................................18

*Regulatory Fundamentals Grp. LLC v. Governance Risk Mgmt. Compliance, LLC*,
  2014 WL 3844796 (S.D.N.Y. Aug. 5, 2014) ..........................................................22

*Skyline Steel, LLC v. PilePro, LLC*,
  101 F. Supp. 3d 394 (S.D.N.Y. 2015) ...............................................................17, 18

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
  269 F.R.D. 497 (D. Md. 2010) .........................................................................23, 24

*WeRide Corp. v. Kun Huang*,
  2020 WL 1967209 (N.D. Cal. Apr. 24, 2020) .......................................................20

*West v. Goodyear Tire & Rubber Co.*,
  167 F.3d 776 (2d Cir. 1999) ...................................................................................24

## RULES

Fed. R. Civ. P. 37(e) ...............................................................16, 17, 20, 23

Fed. R. Civ. P. 37(e)(1) ..................................................................23, 25

Fed. R. Civ. P. 37(e)(2) ........................................................................ passim

## I.    <u>INTRODUCTION</u>

It is by now well-known that Defendants[1] texted and emailed each other about their ability to execute an "untraceable" retaliatory campaign against Blake Lively that would leave no "fingerprints." Their defense from the outset has been that they never moved beyond the "scenario planning" stage, which was a blueprint intended to "bury" Ms. Lively and her career. Along with their counsel, they have mocked Ms. Lively's use of the term "untraceable," even though it was first used by *Defendant Nathan* in stressing the importance of leaving no paper trail. And they have routinely taunted that Ms. Lively will not be able to prove that Defendants actually implemented the retaliatory campaign, insisting that the sudden onslaught of negative publicity against her beginning in August 2024 was "organic," coinciding perfectly with their plans by sheer luck.

Meanwhile, Defendants have hid the ball at every turn in the discovery process, either failing to produce documents, or improperly cloaking them in the attorney-client privilege, forcing no less than twelve discovery-related motions to date against Defendants and their aligned third parties. Now that the dust has settled, and fact discovery and depositions have closed, two things are clear: (1) despite Defendants' clumsy efforts to cover their tracks, there is substantial evidence that the retaliatory campaign was, in fact, implemented as planned, and (2) Defendants flouted this Court's orders, and destroyed and/or failed to preserve or produce additional material and highly relevant evidence, the absence of which they intend to try to unjustly exploit in their favor. Ms. Lively brings this motion to stop Defendants from benefitting from their own misconduct, as described below:

---

[1] The "Defendants" are collectively Defendants Wayfarer Studios LLC ("Wayfarer"), It Ends With Us Movie LLC ("IEWUM"), Justin Baldoni, Jamey Heath, Steve Sarowitz, Jennifer Abel, Melissa Nathan, The Agency Group PR LLC ("TAG" and, with Ms. Nathan, the "TAG Defendants," and collectively the "Wayfarer Defendants"), and Defendants Jed Wallace and Street Relations, Inc. (together, the "Wallace Defendants"). Unless otherwise indicated, all exhibit references herein are to the exhibits appended to the Declaration of Esra A. Hudson, dated October 22, 2025.

<u>First</u>, Defendants used ephemeral methods of communication, thereby ***destroying and/or failing to preserve*** relevant communications in real time. In their depositions, most of the Defendants admitted communicating with each other via Signal, an ephemeral messaging platform that auto-deletes, prior to December 2024 (including as early as July). The evidence further shows that Mr. Wallace used disappearing "voice memos"[2] that self-destructed and were not otherwise preserved or produced by Defendants. In fact, contemporaneous texts on other messaging platforms establish that Defendants intentionally used voice memos or moved relevant and sensitive conversations to Signal during that time frame, at the height of their discussions of a retaliatory campaign. Indeed, this Court has already recognized that "[i]t is undisputed that the Wayfarer Parties used Signal to discuss topics relevant to this litigation." (Dkt. No. 711, at 12.) Accordingly, the Court previously ordered the Wayfarer Defendants to produce their Signal communications, including those of their counsel, by September 8, 2025. They not only failed to timely produce all responsive communications, ***but none of the Defendants ever produced any Signal communications pre-dating December 20, 2024.***[3] Not one. For the Wallace Defendants, the reason for this is clear: they admitted to the Court that they did not disable the *auto-delete* function on Signal, even though Signal was their ***preferred method of communication for work***. The remaining Defendants cannot explain their failure to preserve or produce relevant Signal communications or voice memos from Mr. Wallace prior to December 20, 2024, but it is clear that the messages are destroyed and cannot be replaced. This fact is all the more damning given that

---

[2] None of the Defendants produced a single voice memo from Mr. Wallace at any time prior to December 20, 2024, including Mr. Wallace. Notably, however, Katherine Case did produced one voice memo from Mr. Wallace dated August 5, 2024 in her third-party production, ███████ (*see* Ex. 47 (KCASE-000004957)), ███████.

[3] For his part, Mr. Baldoni claims that he did not download Signal to communicate regarding this matter until December 20, 2024, but admitted that he had previously installed it on his phone for other reasons and claimed not to have used it. (Ex. 6 (Deposition of Justin Baldoni, dated Oct. 6, 2025 ("Baldoni Dep. Tr. Vol. I")) at 54:5-55:6.)

the Wayfarer Defendants' lead attorney, Bryan Freedman, was a participant on at least some Signal communications with the Defendants by August 2024, and yet apparently did ***nothing*** to ensure these key communications were preserved.

Defendants further contemplated litigation as early as August 2024 (although the evidence shows that most of them were clearly aware of the possibility of legal action by November 2023), ***yet took no steps whatsoever to preserve their Signal or voice memo communications*** until December 20, 2024. Incredibly, Mr. Baldoni testified that he did not understand that he had an obligation to preserve documents until October ***2025***.

Second, Defendants produced no documents and provided minimal testimony about the work they claim the Wallace Defendants *actually performed* for their $90,000 fee in 2024, as to which Defendants either feigned ignorance or described with one word: "monitoring." ***No one, however, including Mr. Wallace, has been able to explain what "monitoring" actually involved***, and more importantly, not a single pre-December 20, 2024 document has been produced either (1) backing up the Defendants' claim that all the Wallace Defendants did was "monitor," or (2) reflecting the supposed "monitoring" work that was performed: in Defendants' entire document production, there are no reports, text messages, notes, or email summaries reflecting this alleged social media "monitoring" work from August 2024.

Having retained the Wallace Defendants to perform a detailed set of "untraceable" digital services, paid the Wallace Defendants $90,000 over a period of three months for those services, and communicated with the Wallace Defendants through ephemeral communications intended to eliminate any digital trail, Defendants now hope to blame Ms. Lively for being hindered in her ability to present the specific direct evidence they destroyed. But as described in more detail below, there is substantial evidence that Defendants indeed engaged in the conduct detailed in their

3

"scenario planning" documents, and did exactly what the Wallace Defendants and TAG proposed to do (the "***Digital Campaign***," as defined specifically below in Section II.B), which is entirely consistent with the work the Wallace Defendants perform for *other clients*.

Given the foregoing, severe sanctions are warranted to prevent Defendants from benefiting from their willful misconduct. To remedy the prejudice caused by the spoliated evidence, Ms. Lively respectfully seeks: (1) an adverse inference that Defendants intentionally deleted and failed to preserve relevant evidence when they had an obligation to do so, and that the destroyed evidence would have further shown Defendants' execution of the Digital Campaign; (2) preclusion sanctions to prevent Defendants from arguing that they did not execute their Digital Campaign as they openly planned to do, or that the Wallace Defendants did not actually engage in the Digital Campaign services they were hired and paid to perform, given the destruction of documentary evidence that would otherwise show what the Wallace Defendants actually did; and (3) monetary sanctions at least in the amount of Ms. Lively's reasonable attorneys' fees and costs for bringing this motion.

## II.    BACKGROUND

### A.    Certain Wayfarer Defendants Acknowledged Receipt Of A Legal Letter On Or About November 9, 2023, Triggering An Obligation To Preserve Evidence.

On November 9, 2023, prior to returning to production on the film *It Ends With Us* (the "Film"), which had been halted between June and October 2023 due to the WGA and SAG-AFTRA strikes, Ms. Lively's attorney sent Wayfarer's attorney a document, entitled "Protections for Return to Production." (Ex. 11 (WAYFARER_000140991) (the "Protections Document").) In the underlying transmittal email, Ms. Lively's attorney explained that the purpose of the Protections Document was to ensure that Ms. Lively and others "feel safe returning to the production" and further warned Wayfarer's attorney that "[i]f production is unwilling to accept or uphold these protections, our client is prepared to pursue her full legal rights and remedies." (*Id.*) Mr. Baldoni

4

and the Wayfarer Defendants who received the document understood the implications of this "legal letter"—namely, that Mr. Baldoni and Mr. Heath were being accused of sexual harassment.[4] Text messages, dated November 11, 2023, from Mr. Baldoni to Mr. Heath and Mr. Sarowitz remove any doubt as to their understanding: Mr. Baldoni acknowledged that they had received a "legal letter" that was "[p]retty tough stuff to digest ... as of course *we all know what this document insinuates - that i am / unsafe /sexually harassing etc etc etc*.... there's even silly things inferring *Jamey was inappropriate* which is silly." (Ex. 13 (BALDONI_000020294) (emphasis added).) Mr. Heath testified that he understood this document to refer to prior incidents that had taken place and that Ms. Lively had raised concerns about months before that date. (Ex. 9 (Deposition of Jamey Heath, dated Oct. 9, 2025, ("Heath Dep. Tr. Vol. II")) at 27:10-29:5.) Later, Mr. Heath took active steps to prepare for such litigation, directing his subordinate on June 17, 2024, to put together a detailed timeline of all of Ms. Lively's "alleged incidents," which he contributed to and then later shared with TAG after they were retained for crisis work. (Ex. 14 (TOSKOVIC_00000677); Ex. 17 (HEATH_000046882); Ex. 8 (Deposition of Jamey Heath, dated Oct.8, 2025, ("Heath Dep. Tr. Vol. I")) at 313:18-324:22, 329:23-330:4.) That same day, June 17, 2024, Mr. Baldoni asked for the recommendation of "a couple great lawyers just to be armed with them if [they] need," to which Ms. Abel suggested Bryan Freedman, since "he's a killer. . . [a]nd would bury Blake." (Ex. 15 (JONESWORKS_00039919).)

### B.     Defendants Decide To "Go to War" Against Ms. Lively In August 2024.

Since at least early August 2024, Defendants have engaged in a retaliatory campaign against Ms. Lively, designed to "bury" and "destroy" her career. (Ex. 18 (NATHAN_000005552);

---

[4] Immediately upon receiving the Protections Document, Mr. Baldoni and Mr. Heath wrote to Ms. Abel on November 10 sharing with her the underlying transmittal email and legal letter. (Ex. 12 (BALDONI_000020412.); *see also* Ex. 3 (Deposition of Jennifer Abel, dated September 26, 2025 ("Abel Dep. Tr. Vol. II") at 209:12-210:210:19 (confirming receipt of the Protection Documents on November 10, 2023.).)

*see also* Ex. 55.) Among other things, Defendants' planned digital efforts have included "amplifying" or "boosting" trends or narratives that are favorable to Mr. Baldoni or to manufacture and perpetuate negative narratives about Ms. Lively. (Ex. 24 (HEATH_000028186).)

Fearing that Mr. Baldoni and Mr. Heath's misconduct on the set of the Film would become public as the Film's August 9, 2024 release date neared, on or about August 3, 2024, Wayfarer retained TAG as a crisis PR firm to prepare to discredit Ms. Lively in the court of public opinion should she dare to tell the truth about what happened. (Ex. 19 (CHURLEY_00000020); Ex. 16 (WAYFARER_000135368).) To that end, on August 2, 2024, TAG developed a document, entitled "SCENARIO PLANNING – IT ENDS WITH US," plainly already anticipating litigation. (Ex. 20 (WAYFARER_000141577).) As part of this initiative, TAG anticipated "[w]orking with legal" to "provide information to ensure [Wayfarer and Mr. Baldoni's] narrative is properly represented in any and all coverage." (*Id.*) In terms of messaging, TAG took aim at Ms. Lively directly. One of the "Key Messaging Points" included highlighting: "[Ms. Lively's] less than favorable reputation in the industry spans decades and has been reported." (*Id.*) When Mr. Baldoni expressed concern that this document seemed less aggressive than what TAG had conveyed to him over the phone, Ms. Nathan admitted to Ms. Abel that the Scenario Planning document was deliberately written that way because of the danger of recording their true intentions in writing. (Ex. 18 (NATHAN_000005552); *see also* Dkt. No. 521 ¶¶ 33-34.)

Shortly after her first conversation with Wayfarer, Ms. Nathan reached out to the Wallace Defendants, TAG's regular collaborators, in late July phone calls, and shared details of Ms. Lively's Protections Document on August 5. (Ex. 48 (WAYFARER_000142867; *see also* Ex. 21 (STREET 1.000001).) Realizing they needed an experienced social media manipulator, on or about August 7, "due to the uptick in social chatter," TAG recommended retaining, and Wayfarer did

retain, the Wallace Defendants for a rate of $30,000/month.[5] (Ex. 27 (SR 1.00000044); Ex. 24

(HEATH_000028186).) TAG employee Katie Case detailed the Wallace Defendants' services with

bullet points in the August 7 proposal (which Ms. Lively refers to throughout this Motion as the

"***Digital Campaign***"):

The team will focus on the social and digital elements – boosting SEO efforts and updating with new content to enforce SEO efforts, monitoring and directly influencing forums that are working against Justin and Wayfarer to adjust the narrative in real time, and collate assets and background to work in conjunction with Jen and her team, as well as TAG PR.

The integral part here is to execute all without fingerprints.

*Specific efforts include:*

- Monitor and report forums, threads, sites, links, and more that are working against Wayfarer Studios
- Justin, and the overall narrative, as well as derogatory comments.
- Leverage relationships with Discord, Reddit, X, IG, TikTok, YouTube, etc. to expose behavior of Blake and other parties, both current and past and engage directly with communities to adjust or influence the conversations taking place in real time.
- Utilize CTR manipulation and contextual links to push up positive PR to change subject matter opinion on the first page of Google.
- Work to remove links that are harmful to Wayfarer Studios, Justin, and the narrative alongside the appropriate teams.
- Disavow and report outdated or cached non-relevant links, and cleanup spam and/or negative links that are ranked within the SERPs as needed.
- Properly and strategically monitor damaging Reddit/Subreddits, X, Discord, etc. – including threads related to concerning opposition and manage the narrative. This can be done with legacy admin for each platform. As part of this, expert admins will also monitor and protect peripheral elements like Wikipedia, fan pages, and more to ensure threads and narratives are handled appropriately.
- Actively sway the algorithm with one SEO charged holistic, created and overseen by the team.
- Taking down full Reddit and all social accounts as needed.
- Organically engaging with audiences in the right way, starting threads with theories the team approves of, and asking questions that no longer place Wayfarer and Justin on the back foot.
- Changing the overall narrative and helping keep it on track.

The social team are now worried about Blake activating the Taylor Swift fan base, which is a major concern. With this in mind and to ensure Justin and the studio are 100% protected moving forward, they have now changed the fee to $30,000 per month due to the uptick in social chatter.

(Ex. 24 (HEATH_000028186); Dkt. No. 698-3; *see also* Abel Dep. Tr. Vol. II at 272:15-275:21

(confirming that the "specific efforts" listed "==were services that Mr. Wallace's team was capable==

==of performing==.").)[6]

 In this proposal, Ms. Case took care to note that "[t]he integral part here is to execute all

***without fingerprints***," demonstrating that ***the decision to conduct business with no paper trail,***

***including via the use of ephemeral messaging capabilities for digital services, was not an***

***accident, but rather the plan all along***. (*Id.* (emphasis added).) That plan has enabled Defendants

to hide, in part, how they implemented the Digital Campaign against Ms. Lively. Documents

---

[5] *See also* Ex. 21 (STREET 1.000001) (==August 5, 2024 email providing Wallace with Ms. Lively's November 9, 2023== ="legal letter"==); *see also* Ex. 10, Deposition of Jed Wallace ("Wallace Dep. Tr.") at 197:20-198:1 (==Street Relations was== ==formally retained on August 9==.)

[6] Despite being a list created and prepared by TAG, Ms. Nathan incredibly claimed that ==she did not understand what== ="half" of these services were==. (*See* Ex. 4 (Deposition of Melissa Nathan, dated Sept. 29, 2025 ("Nathan Dep. Tr.")) at 203:20-209:16.)

produced during discovery pursuant to Court orders (*see* Dkt. Nos. 390, 727 (ordering the Wallace Defendants to disclose the identities of their clients)), however, show that the TAG and Wallace Defendants are not only capable of implementing the above social manipulation tactics but that they have done so for *other clients,* in some instances, leaving a paper trail. Those documents include, for example, discussions of "rewriting" metadata, "building protective infrastructures," "throw[ing] a ton of upvotes" and "downvotes" at Reddit posts, and "elevat[ing]" content "across all algorithmically driven platforms. . . ." (Ex. 35 (STREET 3.000199) ("I have the forensic guys rewriting the . . . metadata . . . it has been weaponized (algorithmically) . . . – we are suppressing those articles too."); Ex. 34 (STREET 3.000486) (Mr. Wallace requesting client call to "discuss building protective infrastructure to make certain we have the digital strategy in full effect in perpetuity."); Ex. 36 (STREET 3.000204) (Mr. Wallace expressing the need to "throw a ton of upvotes" and "downvotes" at Reddit posts "as part of our mandate from you and yours"); Ex. 33 (STREET 3.000499) (Mr. Wallace stating that he is "most excited about [manipulating the SEO] and later addressing the client's ask to "suppress this story"); Ex. 37 (STREET 3.000366) (Mr. Wallace saying to client, "this is exactly the kind of content (in theory, until I read them) that our team can elevate across all algorithmically driven platforms," and asking the client "to resend with the articles attached so I can share with the team(s) and get into the system," so "we can do our thing."). When confronted with these documents at his deposition, Mr. Wallace did not distinguish between the "help" he provided for other clients and the services that he provided Wayfarer as part of the Digital Campaign against Ms. Lively—creating the strong inference that absent Defendants' use of ephemeral messaging, the very same evidence would exist here.[7]

---

[7] Wallace's testimony studiously avoided disclosing the substance of any work he has ever performed for any client, or even the identity of his clients notwithstanding this Court's express orders to the contrary. He incredibly, repeatedly claimed not to know, understand, or recall what his own words meant, said he would not understand how to perform work he admitted to performing in writing, and dismissed repeated representations to his clients of the work he could

By no later than August 12, 2024, Defendants took to the offensive—using their own words, it was time to "lawyer up," get "ready to fight," and "go to war." (Ex. 29 (NATHAN_000002151); Ex. 32 (TOSKOVIC_000000707); Ex. 30 (NATHAN_000002237); Ex. 31 (KCASE-000003354) ("And now we go to war." . . . "MN please call us. We need Jed too").)

Even though Defendants touted their use of clandestine tactics to avoid leaving any "fingerprints," they were not entirely successful and still managed to leave a significant paper trail that evidences their extensive efforts to engage in a retaliatory campaign. (*See* Ex. 55, at 6-29 (Ms. Lively's 23+ page interrogatory response summarizing and consolidating the evidence demonstrating some of Defendants' conduct directed at Ms. Lively).) For example, consistent with the Scenario Planning Document's "key messaging points," Defendants were strategic and deliberate in ***successfully*** "planting seeds of doubt and speculation" about Ms. Lively's "experience on set," amplifying positive narratives about Mr. Baldoni "designed to provide a contrast with negative messaging regarding Ms. Lively," and amplifying negative stories and content focusing on Ms. Lively. (*Id.* at 6-25; *see also* Ex. 20 (WAYFARER_000141577).)

Following the early August scenario planning, Defendants began communicating through Signal and (as for Mr. Wallace) voice memos, which are the focal point of this motion. (Ex. 8, Heath Dep. Tr. Vol. I at 359:1-365:12; Ex. 29 (NATHAN_000002151).)

### C. Defendants Used Ephemeral Communications As Early As August 2024.

Consistent with their efforts to run an "untraceable" campaign with "no fingerprints," Defendants communicated frequently through Signal—an encrypted messaging platform that

---

perform as mere "puffery." (Ex. 10, Wallace Dep. Tr. at 132:1-136:8, 169:19-174:21, 199:2-202:5.) Similarly, despite having known Mr. Wallace for "five to six years," Ms. Nathan was unable to describe any work Mr. Wallace actually performs—only that he does "work in the digital space." (Nathan Dep. Tr. at 292:13-15, 304:15-306:3.) And, although Wayfarer contracted with Mr. Wallace for almost $100,000, Mr. Heath claims he did not speak with Mr. Wallace about the services he was performing and, like Ms. Nathan, only generally described his work as including "digital monitoring." (Heath Dep. Tr. Vol. I at 356:19-358:25.)

features auto-deletion capabilities—and voice memos that delete automatically (unless saved by the recipient). As early as August 7, 2024, the TAG and Wallace Defendants were using Signal to discuss the various services that the Wallace Defendants would be providing on behalf of the Wayfarer Defendants. (Ex. 23 (BBKOSLOW-000004099) ("[Melissa Nathan] asked if you can screenshot for 30k and share with Jed on signal").) Just days later, on August 10, Mr. Heath emailed Mr. Wallace to express his appreciation for Mr. Wallace's "approach" and "spirit" and advised Wallace that he would be setting up a Signal account "this week" to speak with him moving forward. (Ex. 28 (SR 1.00000054) ("As for Signal, I'm not on it but will set that up this week for sure. I'll let you know once I've done that.") Two days later, the TAG Defendants started a new Signal thread with Wallace, "[j]ust in case" they needed Wallace to connect them with "Bryan [Freedman] *because they're very close*." (Ex. 29 (NATHAN_000002151 (emphasis added); *see also* Dkt. No. 658-9.)[8]; Ex. 1 (Deposition of Katherine Case ("Case Dep. Tr.") 75:3-7, 163:18-20 (Acknowledging that TAG employees would use Signal "primarily" to speak with Mr. Wallace).) Later in this text thread, Ms. Nathan instructed Ms. Abel to "[d]efinitely contact [Mr. Freedman] on Signal." (Ex. 29 (NATHAN_000002151).) Documents from this same period (August 2024) also confirm that Mr. Wallace communicated with other Defendants through voice memos that automatically delete (unless saved within two minutes of listening). (Ex. 26 (BBKOSLOW-000001988) (referencing "Jedd's voice note"); Ex. 10, Wallace Dep. Tr. at 234:23-235:19 (confirming use of voice memos).); *see also* Iphone User Guide, *Send and receive audio messages in Messages on Iphone*, APPLE, https://support.apple.com/en-ie/guide/iphone/iph2e42d3117/ios ("Tap Keep to save an incoming or outgoing audio message. . . . Otherwise, *the recording is deleted from the conversation*." (emphasis added).)

---

[8] At his deposition, Mr. Wallace testified that Mr. Freedman has been his lawyer since 2020. (Wallace Dep. Tr. 226:10-17.)

At his deposition, Mr. Heath confirmed that he began using Signal to speak with Wallace in or around August 2024, and "may have" started using Signal to speak with Ms. Abel and Ms. Nathan by September 2024. (Heath Dep. Tr. Vol. I at 359:1-365:12.) Both Ms. Nathan and Ms. Abel admitted to using Signal for this matter by late July or August 2024. (Ex. 4 (Deposition of Melissa Nathan, dated Sept. 29, 2025 ("Nathan Dep. Tr.")) at 49:11-16 (confirming use of Signal in July and August 2024); Ex. 2 (Deposition of Jennifer Abel, dated Sept. 25, 2025 ("Abel Dep. Tr. Vol. I") at 78:22-79:6); Abel Dep. Tr. Vol. II at 296:24-298:18 (confirming use of Signal in August 2024 to join Signal thread with Attorney Freedman).) The same is true for Mr. Wallace, who confirmed that he communicated with Ms. Nathan on Signal well before August 2024, and thereafter with other TAG employees. (Ex. 10, Wallace Dep. Tr. at 72:15-73:17, 315:7-22.) Third party productions confirm that by at least August 8, 2024, the TAG and Wallace Defendants discussed their work for Mr. Baldoni and Wayfarer via Signal. (Ex. 25 (BBKOSLOW-000006742); *see also* Dkt. No. 658-5.)

In addition, after Ms. Lively filed her complaint with the California Civil Rights Department (the "CRD Complaint") and served Defendants with cease-and-desist letters on December 20, 2024, TAG created a new Signal chat. (Ex. 38 (BBKOSLOW-000005795) ("me/AS/KC/CH started a chat on Signal to be safe").) The very next day, TAG started a new Signal thread with an Executive Editor at Variety magazine to "share more emails and texts." (Ex. 39 (BBKOSLOW-000001753).) In a separate text chain that same day, TAG employees continued to discuss media relating to Ms. Lively's CRD Complaint, during which a TAG employee is instructed to provide Ms. Nathan with a "roundup" of the articles "on signal only." (Ex. 40 (BBKOSLOW-000007083).)

Even since the filing of this action, Defendants have continued to use Signal and (as for Mr. Wallace) voice memos to communicate covertly about their ongoing retaliation against Ms. Lively. For example, recently-produced Signal communications show that days after Ms. Lively commenced this action, Defendants and Mr. Freedman were working with content creators to further their pro-Baldoni and anti-Lively campaign. On January 3, 2025—after sharing a copy of Ms. Lively's initial Complaint—Ms. Abel (copying attorneys Mr. Freedman and Summer Benson) provided Sage Steele (a content creator) with "talking points" for her reference in preparing a social media post on Ms. Lively's lawsuit. (Ex. 41 (NATHAN_000018774).) Two days later, on January 5, Ms. Steele provided the TAG Defendants, Mr. Freedman, and Ms. Benson with a "first take" of her social media recording for feedback—a recording that was not produced. (Ex. 42 (ABEL_000019523).) To avoid "get[ting] lost in the [Golden] Globes/weekend stuff, etc.," Ms. Steele and Ms. Abel agreed that Ms. Steele would post her video the following day, to maximize views. (*Id.*) On January 7, Ms. Steele posted her carefully-curated video from her official TikTok Account (@officialsagesteele) that covered the "talking points" provided by Ms. Abel and has garnered over 1.5 million views. In her video post, Ms. Steele slams Ms. Lively, accusing her of "abusing her power" and "hurting other women" and claiming that Ms. Lively's actions "discredit[] other women that are true victims of sexual harassment." *See* @officialsagesteele, TikTok, at 0:43-1:00 (Jan. 7, 2025), https://www.tiktok.com/@officialsagesteele/video/7457284296856866091.

Signal communications from February 1, 2025, which were produced by third party The Skyline Agency, LLC ("Skyline"), also show Defendants working with Mr. Freedman, his law firm, and Skyline to launch a website that would post communications between Ms. Lively and Mr. Baldoni, in relation to the ongoing litigation. (Ex. 44 (SKYLINE_000000235); Ex. 45

(SKYLINE_000000312).) In one Signal thread, dated February 1, Mr. Freedman presses for the website to be launched. (Ex. 44 (SKYLINE_000000235).)

The handful of Signal communications and voice memos that were produced by Skyline during this period demonstrate Mr. Wallace's active participation not only in the development of the website, but also in directing TAG and Skyline employees to use encrypted links to transfer information to third parties, to ensure that the links automatically "extinguish":

> If we're sending them a link to something, we're sending them a link to where this video lives. Right? That could be in its own separate space. . . . Ideally . . . we are sending people or whomever the recipient is an entire file, right, that they can then have and that the file is something that they are going to embed into their website, right. . . . So, what Roza is saying is like, okay she has access to this file, she can send a wetransfer link which . . . *the link itself would be extinguished after a while*. . . . Logistically, if Jen [Abel] says, 'hey we need to get the file to this person,' then we could send a wetransfer link to the actual file itself and *then the link will destroy itself*. . . . Roza, connect with Jason [Sunshine], just so we can *figure out what the best way* to do that is, *so this is not something that is connected to anything that has any other legs* or access to any other files.

(Ex. 43, at 0:15-1:45 (emphasis added) (SKYLINE_000000214).) Skyline's production not only demonstrates Mr. Wallace's active participation in Signal threads, but his frequent use of voice memos. (*See id.*) Despite this, not one Defendant (including the Wallace Defendants) has produced a single voice memo from Mr. Wallace prior to December 20, 2024, during their implementation of the Digital Campaign. (Hudson Decl., ¶ 8.)

**D.      Defendants Admit That They Anticipated Litigation By August 2024 And Took No Steps To Preserve Communications Before December 20, 2024.**

In their verified interrogatory responses, Mr. Baldoni, Mr. Heath, Mr. Sarowitz, Ms. Nathan, Ms. Abel, and TAG, each admit that they the anticipated the "possibility of litigation relating to the shooting of the Film in or around mid-August 2024." (Exs. 49-54.) It is clear, however, that they anticipated litigation even before then. Indeed, Wayfarer compiled a timeline of Ms. Lively's "alleged incidents" in June, interviewed TAG as early as July 25 (after which time

TAG created its August 2 Scenario Planning Document, contemplating "[w]orking with legal"), and shortly thereafter retained Street Relations. (Ex. 14 (TOSKOVIC_000000677); Ex. 17 (HEATH_000046882); (Ex. 19 (CHURLEY_00000020); Nathan Dep. Tr. at 91:2-94:2; Ex. 10, Wallace Dep. Tr. at 197:20-198:1.) And, by August and carrying through December 2024, Mr. Heath, the TAG Defendants, and the Wallace Defendants were all using Signal to communicate. *See supra* Section II.C.[9]

Still, ***not one Defendant has produced a single Signal communication or (for Mr. Wallace) any voices memo that pre-date December 20, 2024.*** (Ex. 46 (Email from Wayfarer Defendant's counsel dated Sept. 22, 2025).) That is because Defendants took no steps to preserve their data prior to that date. (Nathan Dep. Tr. at 48:2-19 (Ms. Nathan claims that she began preserving "everything related to this matter" beginning on December 20, 2024);[10] Heath Dep. Tr. Vol. I at 370:11-373:8 (Mr. Heath admitted he began preserving communications after receiving the CRD Complaint)[11]; Ex. 5 (Deposition of Steve Sarowitz ("Sarowitz Dep. Tr.")) at 94:14-17, 95:20-96:14 (Mr. Sarowitz confirmed he never deactivated Signal's auto-deletion functions); Ex. 7 (Deposition of Justin Baldoni, dated Oct. 7, 2025 ("Baldoni Dep. Tr. Vol II")) at 347:17-348:7 (Mr. Baldoni testified that he was informed of his duty to preserve in early October ***2025***); Wallace Dep. Tr. at 148:8-149:5, 232:6-235:19 (discussing failure to preserve records and failing to "recall" any efforts to preserve Signal communications after receiving the CRD Complaint); Abel Dep. Tr. Vol. II at 322:21-323:16, 326:1-12 (declining to answer, on the advice of counsel, whether she

---

[9] Because Signal communications were not preserved, it is unclear whether Mr. Baldoni and Mr. Sarowitz were separately using Signal prior to December 20, 2024.

[10] These representations are difficult to accept at face value when third parties produced documents dated *after* the CRD Complaint that were not included in party productions.

[11] Mr. Heath testified that, after receiving the cease and desist letter, he checked Signal to confirm that his communications between August and December 2024 had not been deleted, which he "believed" were still preserved. (Heath Dep. Tr. Vol I at 372:25-373:14.) Despite this admission, no such Signal communications have been produced.

==knew she was required to preserve documents and claiming not to know whether she took any steps to ensure messages would not be deleted==).)

**E.**    **Defendants' Obstructive Conduct In This Litigation Confirms That Sanctions Are Appropriate.**

The facts discussed immediately above were only recently obtained by Ms. Lively after overcoming substantial discovery hurdles created by Defendants.[12] There is no dispute that each of the Defendants used Signal as an ephemeral messaging platform to discuss issues related to this litigation—this Court has already acknowledged as much. (Dkt. No. 711, at 12.) Ms. Lively first requested these Signal communications on February 20, 2025, and the Parties thereafter explicitly agreed in the ESI Protocol governing discovery to *manually review* Signal communications among any party to the action. (Dkt. No. 212 at 7.) Yet for almost six months, Defendants refused to produce any of them and forced Ms. Lively to file repeated motions to compel. (*See* Dkt. No. 553, at 5-6; Dkt. No. 695, at 9-11.) In response, the Wallace Defendants admitted that, because they did not disable Signal's auto-deletion feature, no responsive communications remained in their possession, custody, or control. (Dkt. No. 707, at 6-9.) The Court accepted this representation in denying Ms. Lively's motion on this score. (Dkt. No. 727, at 5-6.) The Court ordered the Wayfarer Defendants to produce Signal communications no later than September 8, 2025. Instead of complying, the Wayfarer Defendants made an eleventh-hour request for a one-week extension to complete this production, which this Court denied for failure to demonstrate good cause. (Dkt. No. 752.)  Ignoring the Court's order, the Wayfarer Defendants engaged in self-help and produced just a handful of Signal communications late,[13] and then unilaterally continued to produce more at

---

[12] In addition to five discovery-related motions with third parties, Ms. Lively had to file ***seven*** separate motions to compel Defendants' compliance with various discovery obligations. (*See* Dkt. Nos. 203, 228, 295, 344, 552, 694, 803.)

[13] On September 8, at 11:56 p.m. EST, certain Wayfarer Defendants produced some Signal communications—totaling only seven unique messages—which were buried in an 80,000 page document dump and were not even accessible until days later. (Hudson Decl., ¶ 5).

random intervals with no explanation for another month until October 9. Critically, however, *none of the Signal communications pre-date December 20*. (Hudson Decl., ¶¶ 7, 9.) The Wayfarer Defendants have established a clear pattern of failing to comply with their discovery obligations and this Court's orders. (Dkt. No. 770, at 3 (explaining that "Lively did not know at that time . . . that the Wayfarer Parties would fail to honor the Court's orders regarding the timing of discovery.").) The Wayfarer Defendants also have not produced a compliant privilege log for all withheld Signal communications, which will (again) require further motion practice. (*See* Dkt. No. 806; *see also* Dkt. No. 832 (reserving judgment).)

Furthermore, inexplicably, Mr. Heath, Mr. Wallace, and Ms. Abel have not produced any of the Signal communications that were produced by Skyline—documents that were improperly withheld for privilege by Skyline and produced only after an order from this Court. *See* Case No. 25-mc-347, Dkt. No. 31 (S.D.N.Y. Sept. 3, 2025) (Hudson Decl., ¶ 8). Nor have Defendants produced any other Signal communications or (for Mr. Wallace) any voice memo that pre-date December 20, 2024, including in the August through December timeframe, when they were actively discussing, among other things, an offensive strategy to protect Mr. Baldoni and Wayfarer's reputations and to "bury" Ms. Lively—communications that strike at the very heart of this case. (Hudson Decl., ¶¶ 8-10.)

## III.    <u>LEGAL STANDARD</u>

Under Rule 37(e), a party may be sanctioned "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). "Where a party seeks a jury instruction for the spoliation of ESI, it must establish that (1) the spoliating party had control over the evidence and an obligation to preserve it at the time of destruction or loss; (2) the spoliating party acted with a culpable state of

mind upon destroying or losing the evidence; and (3) the missing evidence is relevant to the moving party's claim." *Ottoson v. SMBC Leasing and Finance, Inc.*, 268 F.Supp.3d 570, 580 (S.D.N.Y. 2017) (issuing adverse inference under Rule 37(e)(2); *Charlestown Capital Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 59 (S.D.N.Y. 2020); *ELG Utica Alloys, Inc. v. Niagra Mohawk Power Corp.*, 144 F.4th 360, 374 (2d Cir. 2025). "Determining the appropriate sanction under Rule 37(e) is left to the Court's sound discretion." *Barbera v. Grailed, LLC*, 2025 WL 2098635, at *8 (S.D.N.Y. July 25, 2025) (Liman, J.) (granting spoliation sanctions).

## IV.    ARGUMENT

### A.    Defendants Intentionally Violated Their Duty To Preserve Ephemeral Communications.

In evaluating this first prong under Rule 37(e), courts consider the following predicate elements: (i) whether there is ESI "that should have been preserved in the anticipation or conduct of litigation"; (ii) whether the ESI "is lost because a party failed to take reasonable steps to preserve it"; and (iii) whether the ESI "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e); *see also Barbera*, 2025 WL 2098635, at *7-8 (discussing each element); *see also Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *17-18 (S.D.N.Y. June 20, 2019) (same). Here, each of these elements is clearly established.

#### 1.    The duty to preserve ephemeral messages was triggered no later than August 2024, and as early as November 2023.

"The obligation to preserve evidence arises when [a] party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). This obligation "arises when the party has notice that the evidence is relevant to litigation . . . for example when a party should have known that the evidence may be relevant to future litigation." *Skyline Steel, LLC v. PilePro, LLC*, 101 F.Supp.3d 394, 407-08 (S.D.N.Y. 2015) (citations omitted) (granting motion

17

for spoliation sanctions). When triggered, the litigant must do "more than refrain from intentionally destroying relevant evidence; *the litigant must also 'take affirmative steps to prevent inadvertent spoliation*.'" *Id.* at 408 (emphasis added and quoting *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 24 (S.D.N.Y. 2010)). Ms. Lively addresses each Defendant's preservation obligation in turn.

> 2.    *Wayfarer, IEWU, their principals, and Ms. Abel had an obligation to preserve no later than November 2023.*

It is well-settled that a duty to preserve is triggered when a party receives a demand letter. *See Karsch*, 2019 WL 2708125, at *18 (collecting cases); *Leidig v. Buzzfeed, Inc.*, 2017 WL 6512353, at *8 (S.D.N.Y. Dec. 19, 2017) (demand letter triggered duty to preserve). Here, based on the service of the Protections Document, Wayfarer, IEWU, and their principals had a duty to preserve beginning on November 9, 2023. The same is true for Ms. Abel, who received the Protections Document the following day. (*See supra* n.4.) As explained in the transmittal email issued by Ms. Lively's counsel, the Protections Document outlined "a list of protections that will need to be guaranteed and observed by the Film's producers." (Ex. 11.) One such protection included prohibiting retaliation of any kind "including during publicity and promotional work." (*Id.*) Further, Ms. Lively's counsel included a customary warning that "[i]f the production is unwilling to accept or uphold these protections, *our client is prepared to pursue her full legal rights and remedies*." (*Id.*) (emphasis added). There can be no dispute that this letter put Wayfarer, IEWU, their principals, and Ms. Abel on notice of Ms. Lively's forthcoming suit—Mr. Baldoni admitted as much in a text to Mr. Sarowitz and Mr. Heath. (*See* Ex. 13.)

At the latest, each Wayfarer Defendant acknowledges in verified interrogatories that they anticipated litigation by August 2024. (*See* Exs. 49-54.) Indeed, it was at this point that Wayfarer made the strategic decision to "go to war" with Ms. Lively. (*See* Exs. 30-31.)

> 3. *The TAG Defendants and the Wallace Defendants had an obligation to preserve no later than August 2024.*

The TAG Defendants similarly do not dispute that litigation relating to the Film was anticipated by August 2024, although, as noted above, Ms. Abel recommended Bryan Freedman to Wayfarer as early as June 17, 2024. (*See* Exs. 15, 52, 54.) This is consistent with the TAG Defendants' plan to "lawyer up" and to get ready for "war" with Ms. Lively. (*See* Exs. 29-31.) For their part, the Wallace Defendants were aware of the Protections Document, and thereby Ms. Lively's underlying allegations as well as the provision explicitly prohibiting retaliation, when they were onboarded in early August 2024 to support TAG's offensive. (*See supra* n.5.)

## B.  Defendants Failed To Preserve Ephemeral Messages.

Defendants took no affirmative steps to preserve their ephemeral messages. They did just the opposite: at a critical moment, they elected to communicate primarily through Signal, which they knew full-well would automatically delete their messages and took no steps to ensure that their messages would be preserved. *See Herzig v. Ark. Foundation for Med. Care, Inc.*, 2019 WL 2870106, at *4 (W.D. Ark. July 3, 2019) ("Signal allows users to send and receive encrypted text messages accessible only to sender and recipient, and to change settings to automatically delete these messages after a short period of time."); *see also F.T.C. v. Noland*, 2021 WL 3857413, at *2 n.1 (D. Az. Aug. 30, 2021) ("The key security features of Signal are its end-to-end encryption and its assurance that all messaging data, including the content of the communications, cannot be tracked or observed by Signal itself or any party that does not have access to the user's device."). In fact, the Wallace Defendants admitted as much in response to Ms. Lively's motion to compel— acknowledging that their "Signal messages were automatically deleted." (Dkt. No. 707, at 7.)

It is no answer that the TAG and Wallace Defendants appear to have used ephemeral messaging as a part of their regular business practice, because settled law requires a party to

suspend auto-deletion or ephemeral features upon anticipating litigation. *See In re Google Play Store Antitrust Litig.*, 664 F.Supp.3d 981, 991-95 (N.D. Cal. 2023) (monetary sanctions for failure to suspend its auto-deletion function for chat messages); *Glaukos Corp. v. Ivantis, Inc.*, 2020 WL 5914552, at *4 (C.D. Cal. July 30, 2020) (adverse inference under Rule 37(e)(2) based upon the defendant's failure to "suspend its automatic email deletion policy even when litigation was reasonably foreseeable."); *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F.Supp. 3d 839, 977-80 (N.D. Ill. 2021) (sanctions based upon the defendant's failure to disable email autodeletion setting); *Allied Property v. Zenith Aviation, Inc.*, 2019 WL 10960568, at *3-4 (E.D. Va. Feb. 8, 2019) (adverse inference instruction, based upon the plaintiff's failure to suspend email autodeletion policy); *WeRide Corp. v. Kun Huang*, 2020 WL 1967209, at *10 (N.D. Cal. Apr. 24, 2020) (sanctions issued where the defendant "left in place the autodelete setting on its email server"). Indeed, courts have issued spoliation sanctions where, as here, the parties (upon anticipating litigation) began communicating through Signal, to avoid preserving responsive communications. *Noland*, 2021 WL 3857413, at *2-3, 10-15; *Herzig*, 2019 WL 2870106, at *4-5. Because Defendants have done the same here, spoliation sanctions are warranted.

### C.    The Ephemeral Messages Are Lost And Cannot Be Replaced.

It is beyond dispute that the ephemeral messages (*i.e.*, the Signal communications and voice memos) at issue here are lost and incapable of being retrieved. The Court previously acknowledged as much in denying Ms. Lively's prior motion to compel the Wallace Parties to produce all Signal communications. (*See* Dkt. No. 727, at 5 (emphasis added).) Accordingly, because there is no cognizable way to obtain these ephemeral communications, this final element for ESI spoliation is met. *See Barbera*, 2025 WL 2098635, at *8 (defendant "established the elements of ESI spoliation under Rule 37(e)," where, among other things, there was "no alternative method[] for obtaining the lost information.).

20

**D.**    **Defendants Intentionally Used Ephemeral Communications To Execute Their Plans In An "Untraceable" Manner "Without Fingerprints."**

The decision to use ephemeral communications was deliberate and intentional: to prevent documentary evidence of their "social manipulation" plan from falling into the "wrong hands," whether those hands belonged to Ms. Lively, anyone sympathetic to her, or the Court. Courts in this Circuit have held that intent under Rule 37(e)(2) can be demonstrated where, as here, the defendants knew "they had a duty to preserve" and "allowed the original data on the event recorder to be overwritten, and destroyed or recycled ... without ever confirming that the data had been preserved in another repository." *Moody v. CSX Transp., Inc.*, 271 F.Supp.3d 410, 431 (W.D.N.Y. 2017) (awarding sanctions under Rule 37(e)(2)); *see also Ottoson*, 2017 WL 2992726, at *9 (failure to take steps to preserve relevant evidence "satisfies the requisite level of intent"). In fact, at least two district courts have held that the defendants' use of Signal as a means to avoid discovery obligations met the requisite intent under Rule 37(e)(2). *Herzig*, 2019 WL 2870106, at *5 (Defendants' "manually configuring Signal to delete text communications . . . was intentional and done in bad faith"); *Noland*, 2021 WL 3857413, at *12-13 (intent established where defendants downloaded Signal upon discovering FTC investigation, then deleted it before imaging devices).

A similar outcome is warranted here. By November 2023 (and no later than August 2024), Wayfarer, IEWUM, their principals, and Ms. Abel anticipated litigation, ==based upon the service and receipt of the Protections Document== and Mr. Heath, Mr. Baldoni, Ms. Abel and Mr. Sarowitz's verified interrogatory responses, ==in which they confirm that litigation was anticipated by August 2024==. (Exs. 11-12, 49-53.) The same is true for the TAG Defendants, ==who similarly confirmed the anticipation of litigation by August 2024.== (Ex. 54.) And while the Wallace Defendants did not provide similar interrogatory responses, they were onboarded in August 2024 and retained as part of Mr. Baldoni and Wayfarer's offensive efforts to discredit Ms. Lively in the event her allegations

became public. (*See supra* n.5.) Despite being admittedly aware that litigation was on the horizon, Defendants elected to communicate through Signal and voice memos, and possibly other ephemeral means. That is because an "[i]ntegral part" of their plan was to execute their mission without leaving "fingerprints" or a trace. (Ex. 24 (HEATH_000028186).) In fact, deposition testimony confirms that preservation efforts only began after December 20, 2024—when Ms. Lively filed her CRD Complaint. (*See supra* Section II.D.)

Worst of all, as early as August 2024, Mr. Freedman was aware of Defendants' use of Signal (as evidenced by the fact that he was included on Signal threads)[14] **and did _nothing_ to ensure the ongoing preservation of these communications**. *See Regulatory Fundamentals Grp. LLC v. Governance Risk Mgmt. Compliance, LLC*, 2014 WL 3844796, at *14 (S.D.N.Y. Aug. 5, 2014) ("licensed attorney who undoubtedly was aware of the basic document retention requirements" had "culpable state of mind" in deleting emails). Instead, recently produced communications confirm that Mr. Freedman was not only a participant on Signal at relevant times, but even *after* the lawsuit was brought, he was *directly involved* in soliciting content creators to use their platform to post pro-Baldoni and anti-Lively content. (*See supra* Exs. 41-42.) Taken together, these actions more than meet the "requisite level of intent." *Ottoson*, 268 F.Supp.3d at 582 (collecting cases).

### E.    Ms. Lively Has Been Severely Prejudiced By Defendants' Failure To Preserve Relevant Communications.

The prejudice to Ms. Lively is obvious. Among other things, Defendants failed to preserve more than ***four months' worth of communications from a platform that "[i]t is undisputed that the Wayfarer [Defendants] used . . . to discuss topics relevant to this litigation.***" (Dkt. No. 711, at 12 (emphasis added).) This, in turn, has impaired Ms. Lively's ability to fully prosecute her

---

[14] (Ex. 29 (NATHAN_000002151) (discussing the creation of a Signal thread between the TAG Defendants, Wallace Defendants, and Attorney Freedman); *see also* Ex. 2, Abel Dep. Tr. Vol. I at 78:22-79:19 (describing the activation of a Signal thread between the TAG Defendants and Attorney Freedman in August 2024).)

claims and to rebut Defendants' defenses, particularly Defendants' widely publicized claim that the Wallace Defendants decided, after being retained, that no proactive Digital Campaign work was required given "organic" online sentiment and therefore chose (despite being paid in full) to engage only in "monitoring." *See CAT3, LLC v. Black Lineage, Inc.*, 164 F.Supp.3d 488, 497 (S.D.N.Y. 2016) (reasoning that "Plaintiff's case against Defendants is weaker when it cannot present the overwhelming quantity of evidence it otherwise would have to support its case."); *Lokai Holdings LLC v. Twin Tiger USA LLC*, 2018 WL 1512055, at *12 (S.D.N.Y. Mar. 12, 2018) (same); *see also In re Google*, 664 F.Supp.3d at 994 (finding prejudice where "substantive business communications were made on Chat that plaintiffs will never see, to the potential detriment of their case"); *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 532 (D. Md. 2010) (accord). In addition, Ms. Lively has suffered "economic prejudice" based on the time and expense incurred to prove the use and disappearance of Defendants' Signal messages and voice memos—as evidenced by the many motions to compel that Ms. Lively was forced to file (*see supra* n.12.) *See Karsch*, 2019 WL 2708125, at *25 (recognizing "economic prejudice" where the defendants incurred fees and expenses to prove the loss of ESI); *Fashion Exchange LLC v. Hybrid Promotions, LLC*, 2021 WL 1172265, at *5 (S.D.N.Y. Mar. 29, 2021) (same).

### F.    The Willful Destruction Of Evidence Warrants Severe Sanctions.

Based upon Defendants' willful misconduct—intentionally utilizing ephemeral messaging and (as to Mr. Wallace) self-deleting voice memos to avoid the production of relevant communications—and the prejudice caused to Ms. Lively as a result, relief under Rule 37(e)(2) is warranted. An appropriate sanction under Rule 37(e) should, "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" *West v. Goodyear Tire & Rubber Co.*,

167 F.3d 776, 779 (2d Cir. 1999)); *Victor Stanley*, 269 F.R.D. at 533-34. A court should also consider "whether the sanctions it imposes will 'prevent abuses of the judicial system' and 'promote the efficient administration of justice.'" *Victor Stanley*, 269 F.R.D. at 539 (citation omitted). Under Rule 37(e)(2), where a court finds that "the party acted with the intent to deprive another of the information's use in the litigation," it may: "(A) presume that the lot information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter default judgment." *Barbera*, 2025 WL 2098635, at *8 (discussing available relief).

Because Defendants acted culpably in failing to preserve relevant communications, an adverse inference instruction is warranted to remedy the prejudice to Ms. Lively in pursuing her claims. "When, as here, a spoliating party has acted willfully or in bad faith, a jury can be instructed that 'certain facts are deemed admitted and must be accepted as true.'" *Ottoson*, 268 F.Supp.3d at 584 (citation omitted). Accordingly, to remedy the prejudice caused by the spoliated evidence, Ms. Lively respectfully seeks the following adverse inference:

> Defendants intentionally deleted and failed to preserve relevant evidence for this litigation. Defendants anticipated litigation with Ms. Lively by at least August 2024, but nonetheless elected to use methods of communication that automatically delete, such as Signal and (as to the Wallace Defendants) voice memos, to discuss the execution of the Digital Campaign against Ms. Lively, and Defendants failed to take affirmative steps to preserve such communications prior to December 20, 2024. You may presume from Defendants' failure to preserve these Signal communications and voice memos that Defendants did, in fact, execute the plan that TAG recommended and for which the Wayfarer Parties retained the Wallace Defendants and that Defendants intentionally failed to preserve their communications in order to hide this fact.

In addition, the Court should issue sanctions precluding Defendants from asserting that they did not execute the Digital Campaign to develop a negative narrative about Ms. Lively. *See Barbera*, 2025 WL 2098635, at *11 (issuing preclusion sanctions). Alternatively, Ms. Lively

should "be permitted to present evidence and argument to the jury regarding the lost documents" and seek a curative instruction under Rule 37(e)(1), based upon the instruction proposed above, with the exception of the adverse instruction. *See Barbara*, 2025 WL 2098635, at *11.

With respect to the Wallace Defendants, the Court should further order an adverse inference that the Wallace Defendants possessed the requisite knowledge of their co-conspirators in-forum actions to support a finding of personal jurisdiction under CPLR 302(a)(1) and (a)(2), and that the Wallace Defendants independently understood that their actions would have the requisite consequences in New York under CPLR 302(a)(3). As is well-established, evidentiary sanctions may supply the basis for a finding of personal jurisdiction where, as here, the sanctions are consistent with the *Hammond Packing* presumption, namely "the presumption that the refusal to produce evidence . . . was but an admission of the want of merit in the asserted defense." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 709 (1982) (quoting *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 351 (1909)). "[T]he requirement of personal jurisdiction may be intentionally waived, or for various reasons a defendant may be estopped from raising the issue," including for discovery misconduct, and the Wallace Defendants' intentional efforts to cover their tracks in and after August 2024 amply supports such a result here. *Ins. Corp. of Ireland*, 456 U.S. at 704. At a minimum, the Court should order a permissive adverse inference and leave the issue for trial.

Finally, Defendants should be penalized with monetary sanctions and ordered to repay Ms. Lively for the reasonable attorneys' fees and costs for bringing this motion. *See Karsch*, 2019 WL 2708125, at *26; *Fashion Exchange*, 2021 WL 1172265, at *5.

## V.    <u>CONCLUSION</u>

For the above reasons, Ms. Lively respectfully requests that her motion for spoliation sanctions be granted in its entirety.

Dated: October 22, 2025

/s/ *Esra A. Hudson*

WILLKIE FARR & GALLAGHER LLP
Michael J. Gottlieb
2049 Century Park East
Los Angeles, California 90067
(310) 855-3000
mgottlieb@willkie.com

Kristin E. Bender
1875 K Street NW
Washington, DC 20006
(202) 303-1000
kbender@willkie.com

Aaron Nathan
Michaela A. Connolly
787 7th Avenue
New York, NY 10019
(212) 728-8000
anathan@willkie.com
mconnolly@willkie.com

DUNN ISAACSON RHEE LLP
Meryl C. Governski (admitted *pro hac vice*)
401 9th Street NW
Washington, DC 20004
(202) 240-2927
mgovernski@dirllp.com

MANATT, PHELPS & PHILLIPS, LLP
Esra A. Hudson (admitted *pro hac vice*)
Stephanie A. Roeser (admitted *pro hac vice*)
Sarah E. Moses (admitted *pro hac vice*)
2049 Century Park East, Suite 1700
Los Angeles, California 90067
(310) 312-4000
ehudson@manatt.com
sroeser@manatt.com
smoses@manatt.com

Matthew F. Bruno
7 Times Sq
New York, NY 10036
(212) 790-4500
mbruno@manatt.com

*Attorneys for Plaintiff Blake Lively*