# EXHIBIT 3

Filed Under Seal

CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF NEW YORK

3                      ---oOo---

4

5   BLAKE LIVELY,

6                 Plaintiff,

7      vs.        CASE NO. 24-CV-10049-LJL (LEAD CASE)
                          25-CV-449 (LJL) (MEMBER CASE)

8

    WAYFARER STUDIOS LLC, ET AL.

9

                  Defendants.

10  _____

    JENNIFER ABEL,

11             Third-party Plaintiff,

       vs.

12  JONESWORKS, LLC,

               Third-party Defendant.

13  _____

    WAYFARER STUDIOS LLC, et al.

14             Consolidated Plaintiffs,

       vs.

15  BLAKE LIVELY, et al.

               Consolidated Defendants.

16  _____

17

18               **CONFIDENTIAL**

19

20     VIDEO-RECORDED DEPOSITION OF JENNIFER ABEL

21             Los Angeles, California

22           Friday, September 26, 2025

23  Stenographically Reported by:  Ashley Soevyn,
    CALIFORNIA CSR No. 12019

24

25

CONFIDENTIAL

Page 209

1              MR. GOTTLIEB:  Yeah.

2              MR. FREEDMAN:  That's 24 -- that's 20413.

3              MR. GOTTLIEB:  It's an entire page with

4     this reproduced on it.

5     BY MR. GOTTLIEB:

6          Q    What did mister -- what did you

7     understand Mr. Heath to mean by saying, "It begins

8     again"?

9          A    I mean, at the time, I don't think I

10    really gave that much notice.  But now in this

11    context, I assume additional issues.

12         Q    Do you see at 10:11, at the bottom of

13    page 0414, Mr. Heath has forwarded to you a legal

14    letter, a screenshot of a legal letter, anyway, that

15    had been received from Ms. Lively's lawyer?

16         A    Yes.

17         Q    And in it, Ms. Lively's lawyer discusses

18    the complaints of our clients and others?

19         A    Uh-huh.

20         Q    And do you see there is an attachment

21    that Mr. Heath had sent at 10:12 p.m.?

22         A    Yes.

23         Q    And that attachment is the protections

24    for return to production document, that is at

25    BALDONI_20416 and 20417?

CONFIDENTIAL

Page 210

1        A    Yes.

2        Q    Do you recall receiving these 17

3   protections for return to production?

4        A    Yes.  He texted it to us.

5        Q    Do you recall reviewing them at the time?

6        A    Yes.

7        Q    Did you review all of them?

8        A    We had a phone call, and we talked

9   through these.

10       Q    And, in fact, there came other points in

11  time later on in the timeline, when you talked about

12  these points with Mr. Heath and Mr. Baldoni, right?

13       A    You're going to have to be a little bit

14  more specific.

15       Q    This wasn't the last time --

16  November 10th, 2023 was not the last time you

17  looked at this 17-point list, right?

18            MR. FREEDMAN:  Objection.

19            THE WITNESS:  Correct.

20  BY MR. GOTTLIEB:

21       Q    Eventually, you all devised sort of

22  responses or points to address these, should they

23  ever become public, right?

24            MR. FREEDMAN:  Objection.

25            THE WITNESS:  I believe that we put

CONFIDENTIAL

Page 250

1    today?

2         A    I'm not sure.

3         Q    Did you -- is it fair to say you didn't

4    use Signal very often?

5         A    Correct.

6         Q    You didn't open the app very much?  It

7    wasn't something you used on a regular daily basis;

8    is that your testimony?

9              MR. FREEDMAN:  Objection.

10             THE WITNESS:  I believe my testimony

11   yesterday was I had to re-download it because the

12   only time that I used it was when Stephanie

13   introduced me to the app for use on another client.

14   And I had deleted it.

15   BY MR. GOTTLIEB:

16        Q    You had deleted it.

17             And in August 20 -- August of 2024, at

18   some point, you reinstalled the app?

19        A    I recall doing so, yes.

20        Q    And you are on some chain that you don't

21   remember who was on it.  And you don't remember

22   really what was sent or not sent?

23        A    Correct.

24        Q    Did you ever send a message on Signal in

25   August of 2024, to the best of your recollection?

CONFIDENTIAL

Page 251

1        A    I don't recall.

2        Q    And the thing about that is, we'll never

3    know, right, because Signal is an ephemeral

4    messaging platform?

5            MR. FREEDMAN:  Objection.

6    BY MR. GOTTLIEB:

7        Q    Do you know what an ephemeral messaging

8    platform is?

9            MR. FREEDMAN:  Objection.

10            THE WITNESS:  I know the definition of

11    ephemeral messaging, yes.

12    BY MR. GOTTLIEB:

13        Q    The messages delete after a certain

14    period of time if you have the settings set a

15    certain way, right?

16        A    That is my understanding of how it works.

17        Q    Sorry.

18            That's why some people like to use

19    Signal, right?

20            MR. FREEDMAN:  Objection.

21            THE WITNESS:  Sure.

22    BY MR. GOTTLIEB:

23        Q    Because it -- messages delete and,

24    therefore, there's perceived privacy in those

25    communications?

CONFIDENTIAL

Page 252

```
 1              MR. FREEDMAN:  Objection.

 2              THE WITNESS:  Amongst other reasons, yes.

 3   BY MR. GOTTLIEB:

 4        Q    Security reasons?

 5        A    Yes.

 6        Q    Are you aware that Mr. Wallace was

 7   communicating with your colleagues, or colleagues at

 8   TAG or others at Wayfarer, using the Signal platform

 9   in August of 2024?

10        A    I don't recall if I was aware at the

11   time, but I have become aware of that since then.

12        Q    Okay.  What did you become aware of?

13        A    The -- the usage of Signal amongst

14   Jed Wallace and other -- other people.

15              MR. GOTTLIEB:  Okay.  Let's look at

16   Exhibit 62.

17        (Exhibit 62 marked for identification.)

18              THE WITNESS:  Thank you.

19        Q    Ms. Abel, you've been handed a document

20   marked JONESWORKS 37247 through 37248, a text chain

21   between you and Stephanie Jones on June 17th,

22   2024.

23              Previously, I asked you if you had

24   recommended the retention of any other individuals

25   in this case because they could bury Ms. Lively.
```

CONFIDENTIAL

Page 272

1           "So we can share with him tonight.  But

2              he feels good about the call and he

3              feels protected."

4        Do you see that?

5     A    Yes.

6     Q    A few days earlier, he had told you he

7  didn't feel protected, right?

8     A    Yes.

9     Q    And at this point, that's changed and he

10  does feel protected?

11     A    This is in reference to specific

12  messaging regarding why the cast had unfollowed him

13  and there were no images as he was doing the Today

14  Show the following day.

15           MR. GOTTLIEB:  Okay.  So this is on

16  August 7th?  I'm going to show you another

17  document.  This is Exhibit 65.

18           THE WITNESS:  Okay.

19      (Exhibit 65 marked for identification.)

20  BY MR. GOTTLIEB:

21     Q    This is a one-page document marked

22  HEATH 28187.  It has an email from Katie Case that

23  you then forward on August 7th, 2024.

24     A    Yes.

25     Q    Do you recognize this document?

CONFIDENTIAL

Page 273

1      A     I do.

2      Q     And this is -- the top email is an email

3    that you send in reply to Ms. Case; is that right?

4      A     Yes.

5      Q     And at 2:50 p.m. on the 7th, Ms. Case had

6    sent to Mr. Heath and yourself specifics regarding

7    social and digital mitigation or mediation, right?

8      A     Yes.

9      Q     And she's describing the work that the

10   digital team that Wayfarer was retaining would do,

11   right?

12           MR. FREEDMAN:  Objection.

13           THE WITNESS:  Yes, this looks like a list

14   of their capabilities.

15   BY MR. GOTTLIEB:

16      Q     You see at the top, you're discussing --

17   you have a question about the amount of the fee.

18   And then you have a reference to what we discussed

19   with MN earlier regarding social manipulation.

20           Do you see that?

21      A     Yes.

22      Q     MN is Ms. Nathan?

23      A     Yes.

24      Q     And then you say:

25           (As read):

CONFIDENTIAL

Page 274

1              "From the separate team based in

2              Hawaii."

3         Do you see that?

4    A    Yes.

5    Q    What is the separate team based in

6  Hawaii?

7    A    I don't mean to laugh, but we've

8  discussed this and it was either a misunderstanding

9  on my side or I misheard, but I had a conversation

10  with Melissa regarding a digital team that she had

11  worked with, and it was my understanding that they

12  were based in Hawaii.

13    Q    Okay.  And did you later come to learn

14  that there was no team based in Hawaii?

15    A    Yes.

16    Q    Was there a separate team?

17    A    Yes.

18    Q    And that separate team, not in Hawaii,

19  was something that you had discussed regarding

20  social manipulation.

21         Do you see that?

22    A    Yes.

23    Q    Who was the separate team?

24    A    It's my understanding that this was Jed

25  and Streets Relations.

CONFIDENTIAL

Page 275

1       Q    What was your understanding of who else

2    worked at Street Relations or with Street Relations

3    other than Jed Wallace?

4       A    I had no communications directly with Jed

5    or Street Relations, so I'm not sure.

6       Q    You were never on a call with

7    Mr. Wallace?

8       A    No, not that I can recall.

9       Q    Did you ever meet him?

10      A    No.

11      Q    You ever on a text chain with him?

12      A    I don't think so, no.

13      Q    Was it your impression that the specific

14   efforts that are described in the bullet points in

15   Ms. Case's email were services that Mr. Wallace's

16   team was capable of performing?

17              MR. FREEDMAN:  Objection.

18              MR. GLOVER:  Objection.  Form.

19              THE WITNESS:  Yes, as I said earlier, it

20   was my understanding this is a list of their

21   capabilities.

22   BY MR. GOTTLIEB:

23      Q    Did you think at the time that this was

24   all puffery?

25      A    Explain what you mean by "puffery."

CONFIDENTIAL

Page 296

1           THE WITNESS:  No, I believe that was a

2     continuation of the recommendation that was

3     requested earlier.  And I had clearly brought -- I

4     asked for Melissa's opinion.  I don't think that was

5     the --

6     BY MR. GOTTLIEB:

7           Q     Ms. Abel?

8           A     Yes.

9           Q     You say at 10:32 p.m., in response to

10    Ms. Nathan saying "can he please hire a lawyer," you

11    say:

12              (As read):

13                   "He needs to.  He has one but he needs

14                   a litigator."

15          A     Right.  But I don't think that was the

16    impetus.  I'm sorry.  I'm just trying to respond to

17    your question.

18          Q     Okay.  All I'm asking is:  Following your

19    learning about the request to put out a statement,

20    you and Ms. Nathan immediately say that your client,

21    Mr. Baldoni and Wayfarer, needs to hire a litigator.

22    You both agree on that, right?

23          A     Yeah.

24          Q     Okay.  And then at 11:42 p.m., Ms. Nathan

25    says:

Page 297

1          (As read):

2                "Can I start a Signal thread with you,

3                me, and Jed just in case you need him

4                to connect you to Bryan because they

5                are very close?"

6          Do you see that?

7      A    Yes.

8      Q    Does that refresh your recollection as to

9  who the Signal thread you were on was with in August

10  of 2024?

11     A    Yes.  But, again, I don't know if one was

12  actually started.  So I -- I would have to refresh

13  my memory on that.

14     Q    Okay.  And on the next page 2156,

15  Ms. Nathan says "Definitely contact him on" --

16  sorry, to have context for that.  At 11:43 p.m. on

17  the previous page, you say:

18          (As read):

19                "I can reach out to Bryan too.  We've

20                worked together."

21          Right?

22     A    Yes.

23     Q    And that's referring to Mr. Freedman?

24     A    Sorry.  I'm on the wrong page.

25          Yes.

CONFIDENTIAL

Page 298

1      Q    Okay.  And then at 11:44 p.m., Ms. Nathan

2  says:

3           (As read):

4               "Definitely contact him on Signal

5               though."

6           Do you see that?

7      A    Yes.

8      Q    She says:

9           (As read)

10              "Feel free to add me obviously because

11              of the crisis."

12          So Ms. Nathan is telling you definitely

13  connect with Mr. Freedman on Signal.

14          Do you see that?

15     A    Yes.

16     Q    And, again, Mr. Freedman is not your

17  lawyer at this point in time; is that right?

18     A    That is correct.

19     Q    Did you think it was strange that you

20  were being directed to contact an attorney on

21  Signal?

22     A    No.

23     Q    Is that something you've been asked to do

24  before?  Contact an attorney on Signal?

25     A    I don't recall, no.

CONFIDENTIAL

Page 322

1    your email accounts?

2          A    I -- I don't -- I don't know.

3          Q    Do you know, for example, whether your

4    RWA email account deletes information after a

5    certain period of time?

6          A    I do not know.

7          Q    Did you ever, at any point, go check

8    whether the RWA account has an auto delete feature

9    on it?

10         A    I don't believe it does, but I did not

11   specifically check.

12         Q    Did you ever receive an instruction to

13   discontinue any deletion, auto delete functions that

14   might exist on your accounts?

15              MR. FREEDMAN:  Objection.  I will

16   instruct you not to answer as to any communications

17   you had with counsel.  Other than counsel, did you

18   get an instruction from someone?

19              THE WITNESS:  No.

20   BY MR. GOTTLIEB:

21         Q    Did you come to understand at any time,

22   Ms. Abel, that you had an obligation to preserve

23   documents relating to the dispute between Ms. Lively

24   and Mr. Baldoni?

25              MR. FREEDMAN:  Same instruction as it

CONFIDENTIAL

Page 323

1    will invade the attorney-client privilege.  So even

2    if you're going to say yes to that, that's going to

3    invade the attorney-client privilege.  So you're not

4    going to -- I'm going to instruct her not to answer.

5              MR. GOTTLIEB:  About the simple fact of

6    whether she knew she was required to preserve

7    documents?

8              MR. FREEDMAN:  Yeah, because the simple

9    fact is revealing the actual privileged

10   communication.

11             MR. GOTTLIEB:  Okay.

12   BY MR. GOTTLIEB:

13        Q    So are you going to follow your counsel's

14   instruction?

15        A    Yes, I'm going to follow my counsel's

16   instruction.

17        Q    Okay.

18             Other than the Signal thread that you --

19   that we talked about earlier in August, between

20   August and December of 2024, can you think of any

21   other Signal thread or Signal communications that

22   you sent or received to anyone about anything?

23        A    Not that I can recall, no.

24        Q    Okay.  Have you had Signal communications

25   since December of 2024?

CONFIDENTIAL

Page 326

1       Q    -- I understand you're saying you

2   produced what you found.  My question is:  At any

3   point in time, do you have a recollection of taking

4   steps to ensure that nothing would be deleted, no

5   auto delete functions would be on, no messages would

6   expire from a set period of time or the like,

7   anything like that?

8            MR. FREEDMAN:  Same instruction as to

9   attorney-client privilege.  If you can answer it

10   outside of that, you can answer it.

11            THE WITNESS:  Yeah, I don't think I can

12   answer it.

13   BY MR. GOTTLIEB:

14       Q    Are you aware that you have produced four

15   Signal communications to us in this case?

16            MR. FREEDMAN:  Again, if you're aware of

17   it based on something you learned from counsel, I

18   would like you not to provide that information.  If

19   you're aware of it some other way, you can answer.

20            THE WITNESS:  I'm not aware of it any

21   other way.

22   BY MR. GOTTLIEB:

23       Q    Do you know that there are Signal

24   communications that you have been copied on that

25   have been produced to us in this case that you have