UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

BLAKE LIVELY,

                    Plaintiff,

           -v-

WAYFARER STUDIOS LLC, JUSTIN BALDONI,
JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH
US MOVIE LLC, MELISSA NATHAN, THE AGENCY
GROUP PR LLC, and JENNIFER ABEL,

               Defendants.

------------------------------------------------------------------------X

**USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__4/2/2026__**

24-cv-10049

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

This lawsuit grows out of events occurring during the production and promotion of the Hollywood film *It Ends With Us* (the "Film"), and the very public fallout between its two co-stars, Blake Lively ("Lively") and Justin Baldoni ("Baldoni").  Baldoni and his co-defendants, the Wayfarer Parties,[1] now move for judgment in their favor on all claims.  They bring two motions to do so: a motion for judgment on the pleadings and a motion for summary judgment.

For the following reasons, the motions are granted in part and denied in part.  In particular, the motions are granted except with respect to Lively's fourth cause of action for retaliation in violation of California law against It Ends With Us Movie LLC and Wayfarer Studios; her seventh cause of action against The Agency Group PR LLC for aiding and abetting retaliation in violation of California law; and her ninth cause of action for breach of an agreement called the Contract Rider Agreement against It Ends With Us Movie LLC.

---

[1] The Wayfarer Parties are Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, The Agency Group PR LLC, and Jennifer Abel.

**BACKGROUND**

The following facts are described in summary form at the outset with a more detailed description of the evidence recited in the section to which it is relevant.  The facts are undisputed for purposes of these motions except where otherwise noted and construed in Lively's favor as the non-moving party.

The Film at the heart of this lawsuit is based on a successful novel by Colleen Hoover ("Hoover") of the same title.  Dkt. No. 1074 ("R.56.1") ¶ 7.  Both the book and Film explore issues of domestic violence.  *Id.*  The Film was co-financed and co-produced by Defendant Wayfarer Studios ("Wayfarer") and Sony.  *Id.* ¶ 10.  It starred Lively and Baldoni.  Lively is a well-known actress.  Dkt. No. 520 ("SAC") ¶ 56.  Baldoni is an actor, director, and author. R.56.1 ¶ 5.  Wayfarer is a production studio.  *Id.* ¶ 1.  It aspires to create purpose-driven films intended to inspire connections and promote social change through authentic, impactful storytelling and fresh creative voices.  *Id.*  Baldoni co-founded Wayfarer in or about 2019 or 2020 with Defendant Steve Sarowitz ("Sarowitz").  *Id.* ¶ 2.  Sarowitz is also the majority investor in Wayfarer.  *Id.* ¶ 3.  Sarowitz and Baldoni serve as co-chairs of Wayfarer.  *Id.* ¶ 2. Defendant Jamey Heath ("Heath") is Wayfarer's CEO.  *Id.* ¶ 4.

Baldoni acquired the film rights to the novel from Hoover in or about May 2019.  *Id.* ¶ 8. In 2022, Wayfarer incorporated It Ends With Us Movie LLC ("IEWUM") to develop and produce the Film.  *Id.* ¶ 12.  Later that year, after meeting with Baldoni in New York, Lively agreed to play the Film's lead role, Lily Bloom, opposite of Baldoni as co-lead in the role of Ryle Kincaid.  *Id.* ¶¶ 21, 74.  Her agreement to perform that role is documented in an "Offer Letter" dated May 4, 2023.  *Id.* ¶¶ 26, 359.

Filming began on May 15, 2023.  *Id.* ¶ 59.  It stopped, however, on June 14, 2023, in

deference to labor strikes by the Writers Guild of America and SAG-AFTRA.  *Id.* ¶¶ 59, 157.

During the first phase of production, all filming took place on a set in New Jersey.  *Id.* ¶ 60.  As

described further below, *see infra* § IV, Lively contends that various incidents took place during

this first phase of filming that amounted to sexual harassment and contributed to a hostile work

environment.  R.56.1 ¶ 73.

Several months later, on November 9, 2023, in anticipation of the strikes ending and

filming resuming, Lively's attorney sent an email to Wayfarer and IEWUM listing a set of

seventeen items that they would have to address to remediate their alleged misconduct before

Lively would agree to return to production.  *Id.* ¶¶ 161–62.  The list was entitled "Protections for

Return to Production."  *Id.* ¶ 161.  It included, among other things, provisions related to the

presence of intimacy coordinators on set and the execution of nudity riders before rehearsing and

filming all intimate scenes.  *Id.* ¶ 165.

On January 4, 2024, Lively, Baldoni, Heath and others met at Lively's apartment at her

request to discuss her concerns regarding the first phase of production and to approve the

conditions for her return to production.  *Id.* ¶¶ 208, 586–88.  The protections were later

incorporated into a Contract Rider Agreement signed on or about January 19, 2024, by IEWUM

and Lively's loanout company, Blakel, Inc.  *Id.* ¶¶ 197–98.

Production resumed on January 5, 2024, *id.* ¶ 220, and took place primarily on the New

Jersey set with a few additional days in California, *id.* ¶ 221.  Filming concluded on February 9,

2024.  *Id.* ¶ 226.

During the following weeks, the parties worked on editing and promoting the Film.  *Id.*

¶¶ 228–29, 234, 246.  Lively indicated that she did not wish to jointly promote the Film with

Baldoni, concerned that her appearance with him would be viewed as an implicit stamp of trust

or approval of him. *Id.* ¶ 234; Lively Decl. ¶ 25.

The Film premiered in New York on August 6, 2024, and was released to the public on August 9, 2024. R.56.1 ¶ 241. In the run-up to the premiere, and after Lively and her husband Ryan Reynolds ("Reynolds") had "unfollowed" Baldoni on social media, Wayfarer and Baldoni worked with their public-relations consultant Jennifer Abel ("Abel") to engage "crisis communications" specialists, including Melissa Nathan ("Nathan") and Jed Wallace ("Wallace"), as well as their respective firms, The Agency Group PR LLC ("TAG") and Street Relations. *Id.* ¶¶ 248, 252–74, 674, 676. What happened next is hotly disputed and will be described below. *See infra* § IV. In short, Lively claims that Wayfarer, Baldoni, and their consultants engaged in a campaign to injure her reputation in retaliation for her claims of hostile work environment. SAC ¶¶ 367–74, 384–93.

## PROCEDURAL HISTORY

Lively initiated this case by complaint filed on December 31, 2024. Dkt. No. 1. She filed a First Amended Complaint on February 18, 2025, Dkt. No. 84, and the operative Second Amended Complaint on July 30, 2025, Dkt. No. 520.

On September 26, 2025, the Wayfarer Parties filed a motion for judgment on the pleadings supported by a memorandum of law and the declaration of Ellyn S. Garofalo. Dkt. Nos. 810, 811, 813, 814.

On November 12, 2025, the Wayfarer Parties filed a motion for summary judgment. Dkt. No. 952. The Wayfarer Parties also filed a Rule 56.1 statement, Dkt. No. 953, the declaration of Alexandra A.E. Shapiro attaching a large number of exhibits, Dkt. No. 954 ("Shapiro Decl."), a memorandum of law, Dkt. No. 955, and the declarations of Mitra Ahouraian, Justin Baldoni, and Jamey Heath, Dkt. Nos. 956, 957, 961.

4

On December 3, 2025, Lively filed memoranda of law in opposition to the motion for judgment on the pleadings, Dkt. Nos. 1053, 1055, and the motion for summary judgment, Dkt. Nos. 1064, 1070. Lively also filed a counterstatement to the Wayfarer Parties' Rule 56.1 statement, Dkt. No. 1074, the declaration of Michael J. Gottlieb attaching a large number of exhibits, Dkt. Nos. 1071, 1073 ("Gottlieb Decl."), the declaration of Blake Lively, Dkt. No. 1077 ("Lively Decl."), and the declaration of Don Saladino, Dkt. No. 1076.

On December 12, 2025, the Wayfarer Parties filed reply memoranda of law in further support of their motion for judgment on the pleadings, Dkt. No. 1122, and their motion for summary judgment, Dkt. Nos. 1119, 1120. The Wayfarer Parties also filed the declaration of Alexanda A.E. Shapiro in further support of the motion for summary judgment, Dkt. No. 1118, and an amended Rule 56.1 statement, Dkt. No. 1117.

The Court held oral argument on the motions on January 22, 2026. Jan. 22, 2026 Minute Entry.

## LEGAL STANDARD

Judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is appropriate if "the movant establishes that no material issue of fact remains to be resolved," such that a judgment on the merits of a case can be made "merely by considering the contents of the pleadings." *Guzman v. Astrue*, 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (citing *Juster Assocs. v. City of Rutland*, 901 F.2d 366, 369 (2d Cir. 1990)). "The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings." *Bank of N.Y. v. First Millenium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). "Thus, the Court must 'accept all factual allegations in the complaint as true and draw all reasonable inferences in Plaintiffs' favor.'" *Huer Huang v. Shanghai City Corp.*, 459 F. Supp. 3d 580, 585 (S.D.N.Y. 2020) (quoting *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010)).

5

"That being said, the Court need not accept allegations that are 'contradicted by other matters asserted or relied upon or incorporated by reference by plaintiff in drafting the complaint.'" *Samuels v. Barnard Coll.*, 2024 WL 5718124, at \*5 (S.D.N.Y. Oct. 3, 2024) (quoting *Fisk v. Letterman*, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005)).

A Rule 12(c) motion for judgment on the pleadings must be granted unless the complaint includes enough "factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action'" will not succeed against a Rule 12(c) motion, nor will a pleading that is only supported by "mere conclusory statements." *Id.* (quoting *Twombly*, 550 U.S. at 555). For a plaintiff's claim to be plausible, it must "raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The movant bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'" *Id.* at 114 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In deciding a motion for summary judgment, the Court must "construe the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor." *Gilman v. Marsh & McLennan Cos., Inc.*, 826 F.3d 69, 73 (2d Cir. 2016).

A party opposing summary judgment must present evidence "in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). "The principles governing admissibility of evidence do not change on a motion for summary judgment." *Id.* at 55–56. In particular, information that constitutes hearsay cannot create a genuine issue of material fact. "Hearsay is any out-of-court statement offered to prove the truth of the matter asserted in the statement." *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013). However, "[i]n general, even if evidence is not properly authenticated at the summary judgment stage, 'so long as evidence will be presented in admissible form at trial, it may be considered on summary judgment.'" *Hill v. County of Montgomery*, 2019 WL 5842822, at *10 (N.D.N.Y. Nov. 7, 2019) (quoting *Harleysville Worcester Ins. Co. v. Wesco Ins. Co.*, 752 F. App'x 90, 93–94 (2d Cir. 2019) (summary order)).

Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York prescribes the manner and method in which a party is to present undisputed issues of fact to the Court. The moving party must annex to its notice of motion "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." L. Civ. R. 56.1(a). The party opposing the motion for summary judgment is required to "include a correspondingly numbered paragraph admitting or denying, and otherwise responding to, each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs

containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." L. Civ. R. 56.1(b). The statements "must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." L. Civ. R. 56.1(d). The consequences of failure to follow these rules can be severe. "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." L. Civ. R. 56.1(c).

A Rule 56.1 statement "is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). If portions of a Rule 56.1 counterstatement cite to no admissible evidence in support of its denials, the Court is instructed to disregard those portions and deem the factual statements in the original Local Rule 56.1 statement admitted. *See Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013) (holding that denials that are not supported by citations to admissible record evidence are to be disregarded); *Colton v. N.Y. Div. of State Pol.*, 2017 WL 5508911, at *2 (N.D.N.Y. Feb. 8, 2017) ("The failure to properly controvert a supported statement of fact by pointing to admissible evidence contravening the movant's evidence results in the movant's statement being deemed admitted."); *Knight v. N.Y.C.H.A.*, 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007) ("Pursuant to Local Civil Rule 56.1 Defendant's statements are deemed to be admitted where Plaintiff has failed to specifically controvert them with citations to the record.").

8

## DISCUSSION

Lively brings thirteen claims[2] against the Wayfarer Parties: (1) sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) (against IEWUM and Wayfarer), SAC ¶¶ 353–66; (2) retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000c-3 (against IEWUM and Wayfarer), SAC ¶¶ 367–74; (3) sexual harassment in violation of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940 (against IEWUM, Wayfarer, Baldoni, and Heath), SAC ¶¶ 375–83; (4) retaliation in violation of FEHA, Cal. Gov't Code § 12940 (against IEWUM and Wayfarer), SAC ¶¶ 384–93; (5) retaliation in violation of California Labor Code Section 1102.5 (against IEWUM and Wayfarer), SAC ¶¶ 394–400; (6) failure to investigate, prevent, and/or remedy harassment in violation of FEHA, Cal. Gov't Code § 12940(j)–(k) (against IEWUM and Wayfarer), SAC ¶¶ 401–07; (7) aiding and abetting harassment and retaliation in violation of FEHA (against Nathan, TAG, Abel, Wallace, and Street Relations), Cal. Gov't Code § 12940(i), SAC ¶¶ 408–15; (8) breach of an agreement called the Actor's Loanout Agreement (against IEWUM and Wayfarer), *id.* ¶¶ 416–24; (9) breach of the Contract Rider Agreement (against IEWUM and Wayfarer), *id.* ¶¶ 425–33; (10) false light invasion of privacy in violation of Article I, Section 1 of the California Constitution (against Wayfarer, Baldoni, Heath, Sarowitz, Nathan, TAG, Abel, Wallace, and Street Relations), *id.* ¶¶ 434–40; (11) sexual harassment in violation of California Civil Code Section 51.9 (against Baldoni and Heath), *id.* ¶¶ 441–46; (12) defamation and defamation per se (against Wayfarer, Baldoni, and Heath), SAC ¶¶ 447–65; and (13) civil conspiracy (against all Defendants), *id.* ¶¶ 466–69.[3]

---

[2] The SAC improperly numbers claims ten through thirteen. *See* SAC ¶¶ 434–69.

[3] The Court previously dismissed all claims against Wallace and Street Relations for lack of personal jurisdiction. Dkt. No. 912.

Through their two pending motions, the Wayfarer Parties move for judgment on all claims. Their motions for judgment on the pleadings and summary judgment overlap in many respects. To the extent that they do not, however, the parties dispute whether the Court should, in considering the motion for judgment on the pleadings, also consider factual disputes presented in the motion for summary judgment. Lively contends that even if the Wayfarer Parties have identified some deficiency in her pleadings, the Court should conform the pleadings to the evidence in the summary judgment record and evaluate the Wayfarer Parties' arguments on that basis. Dkt. No. 1055 at 3–4. The Wayfarer Parties respond that the motion for judgment on the pleadings tests the sufficiency of the pleadings and that the Court therefore must not consider extraneous materials outside the pleadings in its analysis of that motion. Dkt. No. 1122 at 5–8.

A recent Second Circuit decision sheds light on this issue, and it suggests that Lively has the better of the argument. In *Miller v. Lamanna*, 169 F.4th 118 (2d Cir. 2026), the Circuit addressed a situation in which, "[f]ollowing extensive discovery," the defendants moved for summary judgment arguing both that the complaint failed to state a claim and that the summary judgment record did not create a genuine dispute of material fact. *Id.* at 120. In addressing the motion, the district court confined its analysis to the defendants' arguments regarding the sufficiency of the pleadings. *Id.* The Circuit explained that that decision was error: "[O]nce discovery has been completed, as here, 'we do not regard [the pleading standard] as requiring that defendants' Rule 12(c) motion be granted if evidence that had already been produced during discovery would fill the perceived gaps in the [c]omplaint.'" *Id.* at 130 (quoting *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 325 (2d Cir. 2011)). It added: "Even if the allegations in the complaint were insufficiently detailed to survive a motion to dismiss had such a motion been made before discovery, if the evidence collected in discovery raised triable issues of fact, it

10

would have been appropriate for [the plaintiff] to amend his complaint to conform to the evidence thus collected.  Dismissing the complaint at that stage, when the evidence adduced in discovery may have been sufficient to survive a summary judgment motion, would hardly serve the efficient or just resolution of disputes, which is the very foundation of the Federal Rules." *Id.*

Here, the parties have completed an extensive and fiercely contested discovery process. The Wayfarer Parties' motion for judgment on the pleadings came toward the end of that process, and only shortly before its motion for summary judgment.  In these circumstances, it "would hardly serve the efficient or just resolution" of this dispute for the Court to limit its analysis solely to the pleadings rather than the entire record on summary judgment.  *Id.*  In any event, this dispute ultimately matters very little, as the Wayfarer Parties have identified only a handful of allegations which they believe should be disregarded in consideration of the motion for judgment on the pleadings, *see* Tr. of Jan. 22, 2026 ("Tr.") at 107:6–17, and those allegations are immaterial to any determinations the Court reaches.

The Court starts with Lively's contract claims.  It then proceeds to discuss her federal claims, her California statutory claims, and her common law claims.

## I.    Contract Claims

Lively brings contract claims against IEWUM and Wayfarer for their purported breach of two agreements referred to as the Actor Loanout Agreement (the "ALA") and the Contract Rider Agreement ("CRA").  Her eighth cause of action alleges a breach of the ALA, and her ninth cause of action alleges a breach of the CRA.  SAC ¶¶ 416–33.  Lively grounds her claims in two provisions of the agreements: Paragraph 7 of the ALA, which prohibits sexual harassment and retaliation, and Paragraph 10 of the CRA, which prohibits retaliation against Lively for raising concerns about misconduct on the set of the Film.  *Id.*  IEWUM and Wayfarer respond principally that the agreements are non-binding and unenforceable.  Dkt. No. 955 at 39–43.

They argue in the alternative that even if the agreements are enforceable, there was neither a breach nor cognizable damages. *Id.* at 41–50.  The Court recounts the facts relevant to these claims before analyzing the merits of the parties' respective arguments.

### A.    Factual Background

Formal negotiations regarding Lively's appearance in the Film commenced in mid-December 2022 when Imene Meziane ("Meziane"), Wayfarer's Vice President of Business and Legal Affairs, sent Lively's representatives a draft offer letter (the "Offer Letter").  R.56.1 ¶¶ 22, 353.  Following additional negotiations and exchanges of drafts, the parties circulated a final version of the Offer Letter on May 4, 2023.  *Id.* ¶¶ 26, 359.  That letter sets forth an agreement between Lively's loanout entity, Blakel, Inc.[4] (defined as "Lender") and IEWUM, the special-purpose entity Wayfarer incorporated to develop and produce the Film (defined as "Producer").[5]  Blakel agreed to furnish Lively (defined as "Artist") to provide acting services to IEWUM in the role of Lily Bloom in the Film to be directed by Baldoni.  *Id.* ¶ 356.  Among other things, the Offer Letter specifies the timing and location of filming, Lively's compensation, her mutual approval rights over certain aspects of the production, and her credit as an executive producer.  Shapiro Decl., Ex. 28.  It states that Lively agrees to provide "exclusive principal photography

---

[4] A loanout entity "is a duly organized corporation, typically wholly owned by an artist, the sole function of which is to 'loan out' the services of the artist-owner to producers and other potential employers." *Bozzio v. EMI Grp. Ltd.*, 811 F.3d 1144, 1147 (9th Cir. 2016) (quoting Aaron J. Moss & Kenneth Basin, *Copyright Termination and Loan-Out Corporations: Reconciling Practice and Policy*, 3 Harv. J. Sports & Ent. L. 55, 72 (2012)); *accord Home Box Off., Inc. v. Dirs. Guild of Am., Inc.*, 531 F. Supp. 578, 597 (S.D.N.Y. 1982).

[5] It is common in the film industry for a separate entity to be established for each individual film product to separate each production's liabilities, investment, ownership structure, rights, assignments for distribution, and accounting.  R.56.1 ¶ 13.  The special-purpose entity is often necessary for the purpose of obtaining production (or post-production) tax credits (which are often based on the specific jurisdiction in which individual films are shot, or edited, as well as the residency of members the crew), and for residual reporting with unions such as SAG-AFTRA, DGA, and WGA (which determine participation on a project-by-project basis).  *Id.*

services for up to six (6) consecutive weeks during the run of production." *Id.* at 1. The Offer Letter contains no terms regarding sexual harassment. *See id.* at 1–4; R.56.1 ¶ 360.

Paragraph 13 of the agreement, titled "Conditions Precedent," provides that "Producer's obligations to Artist hereunder shall be subject to the satisfaction of . . . full execution by Artist, Lender and Producer, of an Agreement in a form reasonably acceptable to all parties." Shapiro Decl., Ex. 28 at 3. In contemplation of additional negotiations to follow, the Offer Letter also states that "[o]nce we reach an agreement on the above terms, we will be happy to distribute a long form agreement, incorporating the terms herein and other standard terms (including without limitation premieres, publicity travel/expenses, indemnity, insurance, etc.) and conditions to be negotiated in good faith." *Id.* at 4.

Four days later on May 8, 2023, Joseph Lanius ("Lanius"), outside counsel for IEWUM, sent Lively's counsel a draft of the ALA, which would serve as the long-form agreement mentioned in the Offer Letter. R.56.1 ¶ 363; Shapiro Decl., Exs. 262, 263. As with the Offer Letter, the draft ALA lists the parties to the agreement as IEWUM (defined as "Company") and Blakel, Inc. (defined as "Lender"), with an inducement to be signed by Lively (defined as "Artist"). R.56.1 ¶ 364. Wayfarer was not made a party or signatory to the draft agreement. *Id.* ¶ 381. The first section of the draft ALA is titled "Conditions Precedent" and provides that "Company's obligations under this Agreement are conditioned upon" certain circumstances, including, as relevant here: (1) "Company's receipt of executed copies of this Agreement signed by Lender and Artist"; and (2) "Company's receipt of . . . the inducement attached hereto and incorporated herein by this reference, fully executed by Lender and Artist." Shapiro Decl., Ex. 263 at 1–2. The draft ALA also contains an "Entire Agreement" provision incorporating certain Standard Terms (attached as Exhibit A to the agreement) and specifying that the ALA, including

13

the Standard Terms, "constitutes the entire understanding of the parties hereto and replaces any and all former agreements, understandings and representations relating in any way to the subject matter hereof." *Id.* at 15.  The ALA adds that "[n]o modification, alteration or amendment of this Agreement shall be valid or binding unless it is in writing and signed by both parties." *Id.*

The Standard Terms appended to the draft agreement include several provisions relevant for present purposes:

- Section 4.3, titled "Company's Breach," states: "No act or omission of Company hereunder shall constitute an event of Default or breach of this Agreement unless Artist shall first notify Company in writing setting forth such alleged breach or Default and Company shall not cure the same within thirty (30) days after receipt of such notice."

- Section 5, titled "Notices," states: "All notices required hereunder shall be in writing and shall be given either by personal delivery, telecopy/facsimile, email (provided that no subsequent delivery failure notification is issued by the sender's email server) or by United States mail (postage prepaid) . . . ."

- Section 15.1, titled "Governing Law," states: "The internal substantive laws (as distinguished from the choice of law rules) of the state of California and the United States of America applicable to contracts made and performed entirely in California shall govern (i) the validity and interpretation of this Agreement, (ii) the performance by the parties of their respective obligations hereunder, and (iii) all other causes of action (whether sounding in contract or in tort) arising out of or relating to this Agreement (or Lender's engagement and/or Artist's services hereunder) or the termination of this Agreement (or of Lender's engagement and/or Artist's services) or otherwise relating to the picture." (capitalization altered)

- Section 15.3, titled "Non-Waiver; Effect of Termination; Entire Agreement; Severability," states: "No waiver by Lender, Artist or Company of any failure by the other to keep or perform any covenant or condition of this Agreement shall constitute a waiver of any preceding or succeeding breach of the same or any other covenant or condition."

- Section 15.6, titled "Lender's and Artist's Remedies," states: "The rights and remedies of Lender and Artist in the event of any breach by Company of this Agreement or any of Company's obligations hereunder shall be limited to Lender's and/or Artist's right to recover damages (subject to Paragraph 15.7 below), if any, in one or more arbitration proceedings."

- Section 15.7, titled "Limitations on Damages," states: "In no event will any party hereto (Company and/or Artist) be liable for or have any obligation to pay to the other consequential and/or incidental and/or special and/or punitive damages, all of which are expressly excluded, and Company and Lender and Artist each hereby waive any right to recover any such damages from the other."

*Id.* at Ex. A, 5–11.

Paragraph 7 of the Standard Terms, titled "Sexual Harassment," further provides that:

Sexual Harassment of any type is strictly prohibited and cause for immediate termination of this Agreement by Company.  No employee shall be subjected to sexual harassment by another employee during the course of employment.  For the purposes of this policy, sexual harassment is unwanted conduct of a sexual nature which adversely affects another person's conditions of employment and/or employment environment.  Such harassment includes, but is not limited to: any unwelcome sexual advance, request for sexual favor, or other verbal, non-verbal, or physical conduct of a sexual nature, that interferes with work, is made a condition of employment, or creates an intimidating, hostile, or offensive environment in connection the workplace or the use of one's authority or power, either explicitly or implicitly, to coerce another into unwanted sexual relations or to punish another for his or her refusal.  For the avoidance of doubt, Sexual Harassment may occur between or amongst persons of different sexes or genders or of the same sex or gender, and may be initiated by any gender or sex.  In the event Company is aware of any Sexual Harassment conducted by Artist, Company shall have the right to immediately terminate this Agreement and available to all rights and remedies hereunder.

*Id.* at Ex. A, 6.

Th ALA was not signed when the first phase of filming began one week later on May 15, 2023.  R.56.1 ¶ 374.  In fact, although negotiations continued for more than a year, the parties agree that Lively never signed the ALA.  *Id.* ¶ 377.  On May 19, 2023, Lively's lawyer sent Lanius an email stating:

Thank you for sending the long form.  We will review and come back to you with our comments.  In the meantime, since principal photography has commenced, until such time that the long form is fully-executed, our client will continue to proceed in reliance upon the terms of the [Offer Letter] with the understanding that Lender and Artist are now unconditionally pay-or-play for the acting fee of $1.75M and that the conditions in Paragraph 13 of the deal memo [i.e., the "Conditions Precedent" section] are now either satisfied or waived.

Gottlieb Decl., Ex. 6.  There is no evidence of a response from counsel for IEWUM, and principal photography continued.

In February 2024, approximately nine months after IEWUM first shared a draft of the ALA with Lively and just days before filming wrapped, Lively's representatives finally sent IEWUM a marked-up version of the agreement.  Lively proposed revisions to approximately twenty percent of its provisions—including ones related to execution of the ALA, publicity limitations and still approvals, sexual harassment, and confidentiality.  R.56.1 ¶¶ 226, 372, 377; *see* Shapiro Decl., Ex. 266.  Among other things, Lively's counsel amended Paragraph 7 of the Standard Terms, the Sexual Harassment provision, to add that sexual harassment was not only "cause for immediate termination of this Agreement by Company," but also "by Artist."  Shapiro Decl., Ex. 266 at Ex. A, 6.  Counsel further added the following sentence to the conclusion of Paragraph 7: "In the event Artist is aware of any Sexual Harassment conducted by Company, notwithstanding the terms of Paragraph 16.6 below, Lender and/or Artist shall have the right to terminate this Agreement, shall remain entitled to full compensation and shall have the right to avail themselves of all rights and remedies hereunder and under applicable law."  *Id.*

Elsewhere in the ALA, Lively's counsel struck from the document the two conditions precedent specifying that IEWUM's obligations under the agreement were conditioned upon its receiving (1) executed copies of the ALA signed by Lender and Artist and (2) executed copies of the inducement attached to the agreement.  *Id.* at 2.  Counsel added comment bubbles to these provisions stating, "Company has effectively waived this condition in practice," and, "Of course this is part of signing a long form, but it [i]s not a condition precedent to your obligations at this point."  *Id.*  At this point in time, filming had nearly concluded, and the parties had already conferred certain benefits upon one another.  Lively had provided her acting services to IEWUM.

16

*See* Gottlieb Decl., Ex. 293.  IEWUM, meanwhile, had wired Lively's up-front fee of $1.75 million, less a 6.37% New Jersey withholding tax, to Lively's client trust account at WME. R.56.1 ¶ 25.  IEWUM did so even before the Offer Letter was finalized.  *Id.*  It had also paid for Lively's meal and training allowances and booked her travel.  *See* Gottlieb Decl., Ex. 295.

IEWUM's counsel "flatly rejected" these proposed revisions in correspondence on March 7, 2024.  R.56.1 ¶ 327.  With respect to the sentence added to the end of the Sexual Harassment provision, IEWUM wrote, "This is not acceptable.  There can be no instances where there is a right to terminate the agreement or have a right of injunctive relief."  Shapiro Decl., Ex. 267 at Ex. A, 6.  IEWUM also rejected Lively's attempts to remove the conditions precedent from the agreement.  In response to Lively's assertion that the requirement of an executed ALA had been "effectively waived . . . in practice," IEWUM's counsel stated: "It still needs to be left in as [it] is always in . . . every deal I have ever done."  *Id.* at 2.  IEWUM similarly responded to the comment bubble asserting that execution of the inducement was "not a condition precedent to your obligations at this point," stating, "Yes, having a signed agreement along with all Exhibits is always a [condition precedent]."  *Id.* at 2.

Disagreement over these terms continued, with Lively reintroducing the edits in a draft on April 18, 2024, *see* Shapiro Decl., Ex. 218, and IEWUM rejecting them once again in a subsequent draft, *see* Gottlieb Decl., Ex. 80.  Following these exchanges, Heath told Lively's representatives in a May 3, 2024 email that "[w]e have withdrawn our request for your client to sign her agreement in order to extend the time with the edit."  Gottlieb Decl., Ex. 101.  The end of that email notes: "As for the future resolution of the contract, we will standby in hopes that we come to a conclusion soon."  *Id.*

17

The parties exchanged a final draft of the ALA on July 2, 2024, with disputes regarding the contested provisions still unresolved and Lively's proposed additions once again struck from the document. R.56.1 ¶ 383; *see* Shapiro Decl., Ex. 264. In that correspondence, Meziane wrote to Lively's counsel seeking an expedited review and signature. *Id.* Meziane's request followed a similar one she made two months earlier, to which Lively's representatives had responded at the time, "We (Blake's reps) are all speaking this week about the open issues and will come back to you soon." *Id.* Notwithstanding these and other requests, Lively never signed the ALA. R.56.1 ¶ 385; Shapiro Decl., Ex. 269 (non-party Sony Executive Ange Giannetti stating that Wayfarer had "been trying to get [Lively to sign her deal] for over a year"); Shapiro Decl., Ex. 270 (Baldoni stating in a June 1, 2024 text that Lively "won't sign her contract").

That brings the Court to the CRA, the other agreement under which Lively seeks relief. As previously noted, filming paused on June 14, 2023, approximately one month after it began, due to the Writers Guild of America and SAG-AFTRA strikes. R.56.1 ¶ 157. In an email on November 9, 2023, Lively's attorney informed Meziane and Lanius that Lively's experience during the first phase of filming "ha[d] been deeply concerning on many levels" and that "a list of protections . . . w[ould] need to be guaranteed and observed by the Film's producers" in order for Lively "to feel safe returning to the production." Shapiro Decl., Ex. 103. The email states that "[w]hile we reserve all legal rights, at this stage our client is willing to forego a more formal HR process in favor of everyone returning to work and finishing the Film as long as the set is safe moving forward." *Id.* It continues that "[i]f the production is unwilling to accept or uphold these protections, our client is prepared to pursue her full legal rights and remedies." *Id.* Two days later, Meziane responded: "Wayfarer, Sony and Production respectfully acknowledge that your client has concerns regarding safety, professionalism and workplace culture. Although our

18

perspective differs in many aspects, ensuring a safe environment for all involved is paramount, irrespective of differing viewpoints.  Regarding your outlined requests, we find most of them not only reasonable but also essential for the benefit of all parties involved." *Id.*  Although Meziane agreed to many of the protections, she sought clarification regarding others and stated that one—Lively's request to engage an additional producer to supervise the production—was not viable. *See* Shapiro Decl., Ex. 113.  Lively's representative replied that the list provided "was not intended as a starting point for a negotiation" but rather was necessary for Lively to return to work.  *Id.*  The representative further requested that Meziane respond "as soon as possible whether Wayfarer will agree to accept all of the protections included in our original communication."  *Id.*

On December 15, 2023, Lively provided Meziane with a "side letter," which outlined the list of seventeen protections provided in the November email along with certain updates and "minor modifications."  R.56.1 ¶¶ 195–96; Shapiro Decl., Ex. 116.  Lanius confirmed receipt of this document—also known as the Contract Rider Agreement, or CRA—and in an email on January 3, 2024, proposed certain revisions.  Gottlieb Decl., Ex. 100.  On or about January 19, 2024, Heath, acting on behalf of IEWUM, signed the CRA.  Shapiro Decl., Ex. 117.  Lively also signed the agreement.  *Id.*  Sony Executive Ange Giannetti ("Giannetti") testified at her deposition that IEWUM executed the CRA "[b]ecause there was a tremendous amount of money that had been invested and spent, and we had to finish the movie or it was unreleasable." Shapiro Decl., Ex. 12 at 295:24–296:8.

The final CRA begins by stating that "REFERENCE IS MADE to [the ALA]" and that the parties—meaning IEWUM as Company, Blakel, Inc. as Lender, and Lively as Artist—"wish to confirm the conditions under which Lender has agreed to cause Artist to render acting services

on the Picture following the break in production of the Picture related to the 2023 WGA and

SAG-AFTRA labor strikes."  Shapiro Decl., Ex. 117 at 1.  A prior version of the CRA referred to

the ALA as "unexecuted," but Lanius deleted that word in a draft, among other edits.  *See*

Gottlieb Decl., Ex. 100.  The CRA further states that "for good and valuable consideration, the

receipt of which is hereby acknowledged," IEWUM agrees to certain additional terms and

conditions, including the following condition found at Paragraph 10:

> There shall be no retaliation of any kind against Artist for raising concerns about the conduct described in this letter or for these requirements.  Any changes in attitude, sarcasm, marginalization or other negative behavior, either on set or otherwise, including during publicity and promotional work, as a result of these requests is retaliatory and unacceptable, and will be met with immediate action.

*Id.* at 2.  The CRA states that "[i]n the event of any conflict between the terms and conditions of

the Agreement and the terms and conditions of this side letter agreement, the terms and

conditions of this side letter agreement shall control."  *Id.*  Although the initial November email

with the Protections for Return to Production indicated that if the protections were acceded to

Lively was willing to forego a formal HR process, *see* Shapiro Decl., Ex. 103, the CRA contains

no such promise on its face, *see* Shapiro Decl., Ex. 117.  When the CRA was signed in January

2024, the parties were still actively negotiating at least certain portions of the ALA, including the

provision governing sexual harassment, and no long-form agreement had been signed.

### B.      The ALA Is Unenforceable.

IEWUM and Wayfarer contend principally that the ALA was never validly formed and is

unenforceable against them because the agreement contains conditions precedent—namely,

execution of the agreement and Lively's signing of the inducement—that did not occur.  Dkt.

No. 955 at 39–41.  Lively responds that they are estopped from raising such an argument by their

prior efforts to enforce the agreement and that, in any event, they have waived the conditions

through their conduct and in writing.  Dkt. No. 1064 at 52–54.

20

Before turning to the merits of these arguments, the Court addresses two preliminary issues. The first relates to choice of law. In discussing the contract claims, the parties both invoke California and New York law. *See* Dkt. No. 955 at 39–50; Dkt. No. 1064 at 52–56; Dkt. No. 1119 at 16–23. The Court will do the same, as courts have observed that "New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012)); *see also Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 547 (S.D.N.Y. 2018) (noting that New York and California apply "substantively similar law with respect to contract formation" (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014))). Furthermore, to the extent the two state's laws do conflict on such issues, any differences are immaterial, as detailed below. The Wayfarer Parties also make certain alternative arguments going beyond formation, which assume *arguendo* that the ALA is binding. Dkt. No. 955 at 39–40. Because these arguments take the ALA's validity as their premise, the Court analyzes them in accordance with the ALA's California choice-of-law provision.[6]

---

[6] The Wayfarer Parties do not similarly presume the applicability of the ALA's California choice-of-law provision with respect to issues of contract formation. *See* Dkt. No. 39 n.8. They instead argue (with some force) that contractual choice-of-law provisions have no bearing on questions of contract formation, as that "would presume the applicability of a provision before its adoption by the parties has been established." *See Schnabel*, 697 F.3d at 119. The Court need not accept that argument for present purposes, for as previously indicated, any differences between the states' laws are immaterial. The Court notes, however, that at least in the arbitration context, which involves distinct considerations and interests, the Second Circuit has rejected a similar proposition. *See Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802, 816–17 (2d Cir. 2022) (holding that where "the validity of the choice-of-law clause is [not] *specifically* challenged," the choice-of-law provision governs, even with respect to issues of contract formation); *see also Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996) (applying choice-of-law clause in arbitration context to an issue of contract formation).

The second preliminary issue is which Defendants are now subject to Lively's contract claims. The SAC pleads contract claims against both IEWUM and Wayfarer. *See* SAC ¶¶ 416–33. It is undisputed that only IEWUM, and not Wayfarer, is a party to the ALA and the CRA. R.56.1 ¶¶ 205, 381. Wayfarer therefore argues in its opening brief that it is not liable under the agreements. Dkt. No. 955 at 46–47. In her Rule 56.1 statement, Lively suggests that Wayfarer is bound by the agreements even if it was not listed as a party. *See* R.56.1 ¶ 205. Her brief in opposition to the motion for summary judgment, however, fails entirely to respond to the Wayfarer Parties' arguments as to why Wayfarer should not be held liable under the agreements. *See* Dkt. No. 1064 at 52–56. Given this failure to respond, and viewing "the papers and circumstances . . . as a whole," the Court deems her contract claims against Wayfarer abandoned. *Jackson v. Fed. Exp.*, 766 F.3d 189, 197 (2d Cir. 2014); *see also id.* at 198 ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to a motion for summary judgment] that relevant claims or defenses that are not defended have been abandoned.").[7]

### 1.    Estoppel

Lively asserts that the Wayfarer Parties' arguments regarding the validity and enforceability of the ALA are all beside the point because the Wayfarer Parties themselves previously sought to enforce the agreement against Lively and are therefore estopped from disputing its enforceability now. Dkt. No. 1064 at 52–53. Judicial estoppel applies where: "1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party

---

[7] Whether Wayfarer qualified as IEWUM's "alter ego" such that it can be held liable under contracts entered into by IEWUM is conceptually distinct from whether IEWUM and Wayfarer were Lively's joint employers—an issue which Lively has not waived. *See* Dkt. No. 41 at 26; Dkt. No. 1055 at 18–21.

asserting the two positions would derive an unfair advantage against the party seeking estoppel." *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001)). The Second Circuit has further limited estoppel "to situations where the risk of inconsistent results with its impact on judicial integrity is certain." *Id.* (quoting *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005)).

Those circumstances are inapplicable here. Lively's argument is predicated upon the Wayfarer Parties' assertion of a claim for breach of the implied covenant of good faith and fair dealing filed in this Court on January 16, 2025. *See Wayfarer Studios LLC v. Lively*, No. 25-cv-449 (the "Wayfarer Action"), Dkt. No. 1 (S.D.N.Y. Jan. 16, 2025). In an amended complaint filed on January 31, 2025, the Wayfarer Parties alleged a claim against Lively for breach of the implied covenant of good faith and fair dealing. Dkt. No. 50 ¶¶ 340–46. Lively moved to dismiss the amended complaint, arguing in relevant part that the implied-covenant claim had to be rejected because the Wayfarer Parties had failed to identify the relevant contract, any of its terms, who it was with, or how it was breached. Dkt. No. 145 at 4. The Wayfarer Parties opposed that motion without specifying a provision of a contract under which their claim arose but also while quoting a fragment of a sentence of language that appears in the ALA without citation. Wayfarer Action, Dkt. No. 83 at 32 (quoting language that Lively agreed not to "interfere with the complete enjoyment of the rights and privileges" granted to Wayfarer— language which appears in the ALA but not in the Offer Letter, *compare* Shapiro Decl., Ex. 28, *with* Shapiro Ex. Decl., Ex. 264). The Wayfarer Parties did not attach the ALA to the amended complaint, and the quoted fragment appeared nowhere in the complaint. *See* Dkt. No. 50. In its June 9, 2025 Opinion and Order granting the motion to dismiss the amended complaint, the Court dismissed the Wayfarer Parties' implied covenant claim on the grounds that the

23

complaint's allegations were conclusory and failed to identify the relevant contract, which individuals were parties to it, when it was made, or what the relevant terms were. *Lively v. Wayfarer Studios LLC*, 786 F. Supp. 3d 695, 782–83 (S.D.N.Y. 2025).

Lively's estoppel argument is without merit because the Wayfarer Parties did not previously assert that the ALA was enforceable, nor did the Court adopt any such position. In dismissing the Wayfarer Parties' amended complaint, the Court concluded that they had provided insufficient information regarding the specific contract under which they were suing. *See id.* It granted them leave to replead their contract claim with allegations identifying the relevant agreement and provisions, *id.* at 788, which they chose not to do. The Court's holding therefore necessarily did not address whether the ALA was validly formed or enforceable. The risk of any inconsistent results is therefore not only far from "certain," but non-existent. For similar reasons, there is no apparent possibility of an unfair advantage.[8]

To the extent Lively argues that the Wayfarer Parties should be prevented from disputing the ALA's validity not under the doctrine of judicial estoppel but under the different framework of waiver, the Court addresses, and rejects, that contention below.

---

[8] Furthermore, the Wayfarer Parties' current position is not "clearly inconsistent" with an earlier one. Again, the thrust of the Court's prior Opinion and Order was that it was unclear which agreement that Wayfarer Parties were suing under. It still is. The amended complaint refers to "a contract by which Lively agreed to perform as an actor in the Film *It Ends With Us*," Dkt. No. 50 ¶ 341, but that could be a reference the Offer Letter, which the Wayfarer Parties concede was a binding agreement, Dkt. No. 955 at 41. To be sure, in their brief in opposition to the motion to dismiss, the Wayfarer Parties quote part of a sentence that appears in the ALA and not in the Offer Letter. But that passing reference without citation in a brief in opposition does not clearly establish for estoppel purposes that the Wayfarer Parties were suing under the ALA. At the very least, it is not obvious that their current position is inconsistent with a prior one. Judicial estoppel is thus improper.

24

### 2.    Contract Formation

IEWUM raises two variants of the same core argument regarding why the ALA is unenforceable.  First, it contends that the ALA was never a validly formed and binding contract because IEWUM expressed an intent not to be bound until Lively executed and signed the contract, IEWUM never renounced that intent, and Lively never executed and signed the agreement.  Dkt. No. 955 at 40–41.  Second, IEWUM contends that even if the ALA was a binding contract, it specifically provided that IEWUM's *obligations* did not arise until the signing of the agreement.  *Id.* at 39–40.  Because that condition never occurred, its obligations never kicked in, and it cannot be held liable under the agreement.  *Id.* at 40.  These two arguments therefore end up in similar places through different doctrinal routes.  The Court will address both, turning first to the issue of formation.

"[M]utual intention to be bound by an agreement is the *sine qua non* of legally enforceable contracts[,] and recognition of this requirement is nearly universal."  *Casa del Caffe Vergnano S.P.A. v. ItalFlavors*, LLC, 816 F.3d 1208, 1212 (9th Cir. 2016) (citing Restatement (Second) of Contracts §§ 2, 17); *see also Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) ("Mutual assent is essential to the formation of a contract and a party cannot be held to have contracted if there was no assent or acceptance." (citation omitted)).  From this foundational principle it follows that "if either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract."  *Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985); *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 315 (9th Cir. 1996) ("If there 'is a manifest intention that the formal agreement is not to be complete until reduced to a formal writing to be executed, there is no binding contract until this is done.'" (citation omitted)).  Put another way, when the circumstances and evidence suggest "that both

25

parties contemplate that acceptance of a contract's terms would be signified in writing, the failure to sign the agreement means that no binding contract is created." *M.A. Mobile Ltd. v. Indian Inst. of Tech. Kharagpur*, 400 F. Supp. 3d 867, 889 (N.D. Cal. 2019) (quoting *Goodworth Holdings Inc. v. Suh*, 239 F. Supp. 2d 947, 958 (N.D. Cal. 2002), *aff'd*, 99 F. App'x 806 (9th Cir. 2004)); *StarVest Partners II, L.P. v. Emportal, Inc.*, 957 N.Y.S.2d 93, 95 (1st Dep't 2012) (noting that California and New York law are in accord on this point).  This "touchstone of contract" formation—intention to be bound—must be assessed based on the totality of the circumstances, including the parties' words and conduct.  *See Nguyen*, 763 F.3d at 1175 (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002)); *see also Martinez v. BaronHR, Inc.*, 265 Cal. Rptr. 3d 523, 527 (Cal. Ct. App. 2020) ("Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts . . . ." (citation omitted)).

Questions of intent to be bound often arise in situations involving preliminary agreements that call for the subsequent execution of more formal instruments.  The Second Circuit has identified two types of such agreements.  The first arises where parties agree on all points that require negotiation (including whether to be bound), and they contemplate memorializing those points in a more formal document.  *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998).  Such agreements are fully binding, as they are "preliminary only in form— only in the sense that the parties desire a more elaborate formalization of the agreement." *Id.* (quoting *Tchrs. Ins. & Annuity Ass'n of Am. v. Trib. Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987) (Leval, J.)).  The second situation arises where the parties agree to some major terms, but others remain to be negotiated.  *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989).  In this context, courts look to certain factors to determine whether the parties intend to be

26

bound, including: "(1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." *Id.*; *see also Winston*, 777 F.2d at 80; *CAC Grp., Inc. v. Maxim Grp., LLC*, 2012 WL 4857518, at *2 n.4, 3–4 (S.D.N.Y. Oct. 10, 2012) (applying these factors and noting the parties' agreement that New York and California law did not conflict), *aff'd*, 523 F. App'x 802 (2d Cir. 2013) (summary order). In considering these factors, the first "is frequently the most important," *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005), and there is "a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents," *Arcadian*, 884 F.2d at 73; *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir. 1984) ("[C]onsiderable weight is put on a party's explicit statement that it reserves the right to be bound only when a written agreement is signed."). That said, courts must "remain mindful that these factors help us identify categories of facts that are often useful in resolving disputes of this sort, but they do not provide us with a talismanic scorecard. The ultimate issue, as always, 'is the intent of the parties: whether the parties intended to be bound, and if so, to what extent.'" *Vacold LLC v. Cerami*, 545 F.3d 114, 125 (2d Cir. 2008) (quoting *Adjustrite*, 145 F.3d at 548–49).

Applying these standards to the facts of this case, it is clear that the ALA is not and has never been a validly formed and binding contract, as IEWUM unambiguously expressed an intent not to be bound absent a fully executed and signed agreement. Consider first the language of the agreements. In both the Offer Letter and the ALA, IEWUM "expressly reserved the right not to be bound prior to . . . execution." *See Winston*, 777 F.2d at 81. Paragraph 13 of the Offer Letter states: "Producer's obligations to Artist hereunder shall be subject to . . . full execution by

27

Artist, Lender and Producer, of an Agreement in a form reasonably acceptable to all parties." Shapiro Decl., Ex. 28 at 3.  The ALA contains similar language.  The first draft and all subsequent ones shared by IEWUM assert that IEWUM is not to be bound absent "receipt of executed copies of this Agreement signed by Lender and Artist."  Shapiro Decl., Ex. 263 at 1–2. The ALA also states that IEWUM is not to be bound unless it receives "the inducement attached hereto and incorporated herein by this reference, fully executed by Lender and Artist."  *Id.*  This express reservation of rights absent a signed writing—in not one or two but three different places—is compelling evidence that there was no mutual assent to the formation of a contract.

That inference finds support elsewhere in the ALA.  The agreement contains a "merger clause," which specifies that the parties' agreement is expressed entirely in the document and that it may not be modified, altered, or amended "unless . . . in writing and signed by both parties."  *Id.* at 17.  The Standard Terms also contain a provision requiring amendments to be in a "written instrument executed by Company and Artist."  *Id.* at Ex. A, 10.  The presence of such a merger clause "is persuasive evidence that the parties did not intend to be bound prior to the execution of a written agreement."  *Ciaramella v. Reader's Dig. Ass'n, Inc.*, 131 F.3d 320, 324 (2d Cir. 1997); *see also R.G. Grp.*, 751 F.2d at 76 (relying on a merger clause as evidence of the parties' intent not to be bound absent a signed agreement).

Where "a question of intention is determinable by written agreements, the question is one of the law, appropriately decided . . . on a motion for summary judgment."  *Arcadian*, 884 F.2d at 73 (quoting *Mallad Constr. Corp. v. Cnty. Fed. Sav. & Loan Ass'n*, 298 N.E.2d 96, 100 (N.Y. 1973)).  That is the case here.  The written agreements include open terms, call for future approvals, and expressly anticipate future preparation and execution of contract documents.  The message is clear: IEWUM did not intend to be bound prior to execution.  "Since in this case

28

intent can readily be determined by examining the [agreements], summary judgment [is] perfectly appropriate even [if] there was considerable partial performance." *See id.*

Additional factors including the context of the negotiations confirm what the agreements on their face suggest. IEWUM on multiple occasions sought Lively's signature on the ALA. Lively on multiple occasions withheld it. Those requests and that withholding were not meaningless. They evidenced the parties' shared understanding that execution of the ALA carried with it legal consequences. Lively argues that her withholding of her signature suggests at most that the parties continued to disagree over a limited subset of terms (in her estimation, about twenty percent), not that they disagreed over the formation of the contract in general. But twenty percent of an agreement's provisions is not an insubstantial amount, and the specific provisions at issue also are not insignificant or immaterial to issues of formation. One of the contested provisions is the very one under which Lively now sues: Paragraph 7, which prohibits sexual harassment and retaliation. Lively contends that the parties' disagreements over Paragraph 7 centered on her right to injunctive relief (which is not at issue here), and that there is no evidence the parties disagreed over the rest of the provision. That slices matters too finely. The Court cannot infer a party's agreement to parts of a provision from the fact that the party has expressly disagreed to other parts of the same provision. "[I]t is an elemental principle of contract law that '[a] written contract will be read as a whole, and every part will be interpreted with reference to the whole.'" *ChemImage Corp. v. Johnson & Johnson*, 2025 WL 1883908, at *12 (S.D.N.Y. July 8, 2025) (citation omitted). The question whether Lively would have the unilateral right to halt production of the Film if in her view sexual harassment occurred is hardly inconsequential. The fact that the parties were not able to come to terms on such provision provides powerful evidence that no contract had yet been formed.

Resisting this conclusion, Lively contends that the parties' partial performance of the ALA and their written statements about it reveal that they intended to be bound notwithstanding the agreement's clear language to the contrary and the parties' continued negotiations. The Court disagrees. Considering Lively's evidence both in isolation and as a whole, it fails to raise a genuine issue of material fact concerning formation of the ALA.

To start, Lively asserts that IEWUM's intent to proceed with the agreement can be inferred from the fact that it "performed the material terms of the ALA." Dkt. No. 1064 at 53. Had there been no contract, Lively argues, IEWUM would have had no reason to perform under it. *Id.* Partial performance is relevant, as "one party's partial performance of the alleged contract and the other party's acceptance of that performance shows that both parties understood a contract 'to be in effect.'" *Kosack v. Entergy Enters., Inc.*, 2016 WL 11700587, at *5 (S.D.N.Y. Sept. 27, 2016) (quoting *Zucker v. Katz*, 836 F. Supp. 137, 148 (S.D.N.Y. 1993)); *see also R.G. Grp.*, 751 F.2d at 75.

However, as the Wayfarer Parties argue, their performance took place under the Offer Letter, not the ALA. Dkt. No. 1119 at 19. After filing began and well before Lively responded to the Wayfarer Parties' draft of the ALA, Lively's counsel stated to IEWUM that because "principal photography ha[d] commenced, until such time that the long form is fully-executed, our client will continue to proceed in reliance upon the terms of the negotiated deal memo" (i.e., the Offer Letter). Gottlieb Decl., Ex. 6. IEWUM did not respond and thus tacitly accepted that position, treating the Offer Letter as a binding agreement.

Lively cites IEWUM's conduct after it circulated a draft of the ALA, but each act was consistent with the Offer Letter. Lively cites IEWUM's payment to Blakel of meal and training allowances as proof that IEWUM performed under the ALA, *see* R.56.1 ¶ 203, but the Offer

30

Letter also provides for such allowances, *see* Shapiro Decl., Ex. 28 at 3. Lively also observes that IEWUM chartered a private plane for her travel. R.56.1 ¶ 203. The Offer Letter requires IEWUM to provide "private round-trip air transportation" for Lively during shoots outside of New Jersey and New York. Shapiro Decl., Ex. at 2. The parties' conduct during filming therefore reinforces what Lively's counsel made explicit—that the parties would perform under the Offer Letter "until such time that the long form is fully-executed." Gottlieb Decl., Ex. 6 (emphasis added).

As for the parties' post-filming conduct, Lively argues that she was paid after the Film's release in accordance with the more generous contingent compensation arrangement outlined in the ALA rather than under the Offer Letter. R.56.1 ¶¶ 446–48; *see* Gottlieb Decl., Exs. 82, 83, 84, 85. But a party can provide a more generous benefit to a counterpart in anticipation that an agreement will be reached without at the same time committing itself to all of the terms in a written agreement before the agreement is reached. *See Winston*, 777 F.2d at 80; *see also Adjustrite*, 145 F.3d at 551 (holding that parties' partial performance under an agreement was "insufficient to raise a genuine issue for trial" regarding contract formation); *Missigman v. USI Ne., Inc.*, 131 F. Supp. 2d 495, 512 (S.D.N.Y. 2001) (same even where partial performance "strongly favor[ed]" finding existence of a contract). That is the case here. There is no evidence that IEWUM provided those benefits because it believed that it was bound by the ALA. By the time of post-production, Lively had repeatedly rebuffed IEWUM's entreaties for her to sign the ALA. IEWUM also had repeatedly and unequivocally rejected Lively's counsel's attempts to strike the execution language from the agreement. Even assuming that Lively is correct and that IEWUM paid her under the ALA, that partial performance cannot reasonably be understood to reflect what would be a conspicuously silent change of heart on IEWUM's part.

31

Lively also relies on certain statements made by the parties during negotiations as further evidence of their intent to be bound. These likewise fail to raise a triable issue, as they cannot fairly be read to carry the implications Lively assigns to them. First, Lively points out that when her counsel sought to strike the conditions precedent from the ALA on the grounds that they had been "effectively waived . . . in practice," IEWUM's counsel responded that the conditions should "still" remain because they are "always . . . in every deal I have ever done." Shapiro Decl., Ex. 267 at 2. Lively contends that because IEWUM's counsel did not expressly dispute waiver of the conditions precedent, IEWUM conceded the issue. A party need not use the magic words "I contest waiver" where its actions do just that. *See Mooney v. City of New York*, 219 F.3d 123, 131 (2d Cir. 2000) ("[T]he conduct said to constitute a waiver must be clear and unequivocal, as waivers are never to be lightly inferred." (citation omitted)); *Morningstar Films, LLC v. Nasso*, 554 F. Supp. 3d 525, 541 (E.D.N.Y. 2021) ("Waiver requires clear, unequivocal conduct and 'may not be inferred from mere silence or inaction.'" (citation omitted)). IEWUM refused to agree to remove the relevant language, continuing to insist that Lively deliver a final executed copy of the ALA before it would be bound.

Nor does Heath's email to Lively's representatives on May 3, 2024 provide evidence of an intent to enter into the ALA. At the time, the parties still had not reached agreement on the terms of an ALA. IEWUM had rejected Lively's proposed changes to the ALA. *See* Gottlieb Decl., Ex. 80. Lively states that Heath in the email "expressly confirmed in writing that Wayfarer was 'waiving' the Execution Conditions," Dkt. No. 1064 at 53, but that is misleading. In its entirety, the relevant sentence from the email reads: "We have withdrawn our request for your client to sign her agreement *in order to extend the time with the edit*." Gottlieb Decl., Ex. 101 (emphasis added). The email continues: "As for the future resolution of the contract, we will

standby in hopes that we come to a conclusion soon." *Id.* Clearly, Heath did not understand the contract to be "resolved" or "concluded." Nor did he agree that Lively did not need to deliver final executed copies of the ALA. He merely communicated that Lively could edit the Film while negotiations were ongoing. Indeed, after this email, IEWUM continued requesting Lively's "expedited review and signature" on the ALA, and Lively continued to refuse to do so. Shapiro Decl., Ex. 264; *see also* Shapiro Decl., Ex. 270 (Baldoni stating in a June 1, 2024 text that Lively "won't sign her contract").

Finally, Lively seizes on the fact that on January 3, 2024 during negotiations over the CRA, IEWUM struck the word "unexecuted" from the phrase "unexecuted Actor Agreement." Gottlieb Decl., Ex. 100. The fully-executed CRA states that "REFERENCE IS MADE to that certain actor agreement ("Agreement")," Shapiro Decl., Ex. 117, whereas the draft CRA previously stated, "REFERENCE IS MADE to that certain *unexecuted* actor agreement ("Agreement")," Gottlieb Decl., Ex. 100 (emphasis added). There are no discussions or other materials in the record shining any light on that edit. The edit cannot be read as evincing the parties' mutual intent to be bound by the then-extant copy of the ALA. At the time the edit was made and the CRA was executed, Lively's counsel had not yet gotten back to IEWUM with its promised comments on the draft longform. *See* Gottlieb Decl., Ex. 6. Lively had not even suggested the changes to the ALA that she now relies upon and that are at issue in this case (e.g., those over sexual harassment). At most, the edit reflects IEWUM's hope and expectation that there would be an actor agreement and that, once there was such an agreement, the CRA would survive the execution of that agreement. Thereafter, the parties continued to negotiate over the ALA's terms and to go back and forth over the issue of Lively's signature. IEWUM continued to demand that there be a final executed copy of the ALA before it was bound, and Lively

33

declined to provide such a copy.  There clearly was not an executed ALA at the time the CRA was signed.

Ultimately, Lively fails to confront what is the central dilemma in her claim.  She contends that the ALA became binding on IEWUM at some point while the parties were still negotiating it, but she cannot pinpoint a time when the parties began to be bound by it or which version of the ALA they were bound to.  The existence of a contract requires a "mutual assent and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (internal citations and quotations omitted).  Unless both parties are bound, neither party is bound.  Which draft of the ALA bound Lively?  Was it the version that lacked the sexual harassment provision?  At oral argument, Lively's counsel suggested that the ALA became binding once the parties began performing under the agreement, which counsel stated was the beginning of filming in May 2023.  But if that is so, it would mean that the ALA became binding before the sexual harassment provision was even proposed.  And, if it became binding at some later point, Lively cannot identify when exactly there was an agreement and what that agreement specified.  The only conclusion that the undisputed facts would support is that the parties performed services pursuant to the Offer Letter.  It is that document which Lively, through counsel, said that she would perform "until such time that the long form is fully-executed."  Gottlieb Decl., Ex. 6.  And it is only that document under which IEWUM accepted her performance.

In sum, "the contract drafts, combined with the parties' other written communications [and actions], conclusively establish [IEWUM's] intent not to be bound" to the ALA prior to its execution. *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir. 1984).  Absent such intent, the ALA was never validly formed.  Lively's contract claims under that agreement must therefore be rejected.

### 3.    Waiver of the Conditions Precedent

In the alternative, IEWUM argues that even if the ALA was validly formed, its terms provide that IEWUM's obligations did not arise until Lively signed the agreement.  Because that never happened, IEWUM contends that it cannot be held liable.  Lively responds that IEWUM "waived" the condition that there be a signed and executed ALA before IEWUM was bound by its terms.  Waiver is a cousin to contract formation.  Contract formation goes to whether there was an enforceable agreement between the parties at all.  Waiver goes to whether, assuming an enforceable agreement, IEWUM voluntarily and knowingly abandoned the term that it would not be bound until Lively delivered final executed copies of the ALA.  *See* 13 Williston on Contracts § 38:7 (4th ed. 2026) (distinguishing between conditions precedent to contract formation and those precedent to a party's obligations under an agreement).  IEWUM's arguments on this front succeed for largely the same reasons that its arguments above do.

California law defines "conditions precedent" as a contract term that "is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed."  Cal. Civ. Code § 1436.  Such a term may be waived by the party it is intended to benefit.  *See Sequoia Invest. Corp. v. Paillard*, 286 P.2d 857 (Cal. 1955).  "[A] party to a contract waives a contractual right by 'indicating an intent to relinquish the right.'"  *hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944, 962 (N.D. Cal. 2022) (citation omitted).  "The waiver may be either express, based on the words of the waiving party, or implied" based on conduct that is "so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished.'"  *Id.* (citation omitted).  In all instances, "the pivotal issue . . . is the intention of the party who allegedly relinquished the known legal right."  *Id.* at 962–63 (citation omitted); *see also Lynch v. Cal. Coastal Com.*, 396 P.3d 1085, 1088 (Cal. 2017) (the issue of waiver "rests upon intent").  Moreover, whether accomplished expressly or impliedly through either words or conduct, the

waiver must be demonstrated by clear and convincing evidence.  *Quach v. Cal. Com. Club, Inc.*, 551 P.3d 1123, 1137 (Cal. 2024); *accord Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 636 (Cal. 1995); *White Point Co. v. Herrington*, 73 Cal. Rptr. 885, 891 (Cal. Ct. App. 1968).  The party opposing enforcement of the contractual provision carries this burden, and "doubtful cases will be decided against a waiver."  *Waller*, 900 P.2d at 636 (citation omitted).

Lively has not identified evidence to support that IEWUM intentionally waived the conditions precedent under the ALA.

With respect to express waiver, Lively can only point to Heath's May 3, 2024 email in which he stated that "[w]e have withdrawn our request for your client to sign her agreement in order to extend the time with the edit."  Gottlieb Decl., Ex. 101.  But as previously explained, Lively takes this email out of context.  It does not demonstrate a complete and total waiver of the execution conditions but only a temporary acknowledgment of Lively's ability to continue with the edit while negotiations were ongoing.  It is undisputed that IEWUM continued asking for Lively to execute the contract after that point, and that she declined to do so.

As for implied wavier, neither IEWUM's conduct nor its words were so inconsistent with an intent to enforce the execution conditions as to raise the prospect of a purposeful abandonment of those rights.  When Lively's counsel attempted to strike the conditions precedent from the ALA on the grounds that they had been waived "in practice," and IEWUM responded that the conditions "still need[ed] to be left in," that response did not implicitly concede that IEWUM had abandoned its rights under the conditions.  IEWUM's insistence on keeping the provisions in the agreement establishes just the opposite.  Furthermore, insofar as Lively's counsel's suggested that the conditions had been waived by IEWUM's performance under the ALA, that contention failed to account for the fact that Lively herself indicated that she

36

would "proceed in reliance upon the terms of the negotiated deal memo"—that is, the Offer Letter—"until such time that the long form is fully-executed." Gottlieb Decl., Ex. 6. The only contract that IEWUM could be deemed to have accepted "in practice" was the Offer Letter.

Lively's suggestion that IEWUM's payment to her under the ALA proves IEWUM's waiver gets things backwards: Partial performance and acceptance of the benefits of performance typically effects waiver as to party who accepted benefits, not the other way around. *See Roseleaf Corp. v. Radis*, 264 P.2d 964, 969 (Cal. Dist. Ct. App. 1953) (noting that "where a contract has been performed in a substantial part and the other party has voluntarily accepted and received the benefit of the part performance," the party accepting performance "may thereby be precluded" from denying liability under the agreement (citation omitted)); *Priv. One of N.Y., LLC v. JMRL Sales & Serv., Inc.*, 873 N.Y.S.2d 236 (Kings Cnty. Sup. Ct. 2008) ("[A] party to a contract who accepts partial performance thereof waives the right to insist upon conditions whose fulfillment the party might have required prior thereto." (citing *Grant v. Pratt & Lambert*, 65 N.Y.S. 486, 493 (1st Dep't 1900))); *cf. Thomson v. Hodgson*, 2023 WL 6786774, at *9 (C.D. Cal. Aug. 25, 2023) ("[W]here a party to a contract accepts the benefit awarded to it by the contract, it necessarily waives any subsequent claim that the consideration was inadequate."). The only benefit that Lively cites as having conferred on IEWUM is her performance in the Film, *see* R.56.1 ¶ 203, but that performance was required by the Offer Letter. Lively therefore has not shown that IEWUM waived the conditions precedent by acceptance of any performance under the ALA.

At oral argument, Lively's counsel also suggested that IEWUM waived the conditions precedent by bringing suit against Lively under the agreement. But even accepting as true that IEWUM was suing under the ALA as opposed to the Offer Letter, the conditions precedent in

the agreement specify that *IEWUM's obligations*, not Lively's, were contingent upon Lively's signing of the contract. *See* Shapiro Decl., Ex. 264. Thus, IEWUM's lawsuit was in no way inconsistent with any intent on IEWUM's behalf to enforce the conditions precedent in the ALA. The provision went only one way.

Lively therefore fails to present evidence that would demonstrate intentional relinquishment of IEWUM's rights under the ALA. IEWUM cannot be held liable under the agreement, even if it was validly formed.

### 4.    Notice and Cure

IEWUM offers one last reason why Lively's ALA claim must be rejected: It argues that there was no actionable breach of the agreement because Lively did not satisfy the ALA's "notice and cure" provision. The Court agrees with IEWUM here too.

Section 4.3 of the ALA's Standard Terms is titled "Company's Breach." Shapiro Decl., Ex. 263 at Ex. A, 5. It provides that "[n]o act or omission of Company hereunder shall constitute an event of Default or breach of this Agreement unless Artist shall first notify Company in writing setting forth such alleged breach or Default and Company shall not cure the same within thirty (30) days after receipt of such notice." *Id.* The ALA further provides that "[a]ll notices required hereunder shall be in writing" and addressed to IEWUM under the attention of Jamey Heath. *Id.* at Ex. A, 5–6. IEWUM asserts that Lively never provided the requisite notice and opportunity to cure before asserting her breach of contract claims because the cease-and-desist letter she sent on December 20, 2024 was not addressed to IEWUM and did not mention any alleged breach of the ALA. Dkt. No. 955 at 44. IEWUM further argues that, even putting aside the fact that the letter was not sent to IEWUM and did not assert a breach of the ALA, Lively failed to comply with the contractual thirty-day cure period by filing suit only eleven days after sending the cease-and-desist letter. *Id.* Lively responds that IEWUM waived this defense by

38

failing to plead it as an affirmative defense in its answers. Dkt. No. 1064 at 55–56. She also contends that she complied with the provision because (1) IEWUM had notice of its breach at least by December 31, 2025, when she filed suit in this case, and (2) she filed her First and Second Amended Complaints on February 18, 2025, and July 30, 2025, outside the thirty-day window, thereby mooting any issue regarding IEWUM having an insufficient opportunity to cure. *Id.*

Lively's first argument lacks merit because her failure to comply with the notice-and-cure provision in this context is not an affirmative defense. Under the terms of the ALA, notice and cure goes to an element of a claim for breach of contract which the plaintiff, and not the defendant, must satisfy to prevail on her claim.

The elements for a breach of contract claim under California law are "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011). The plaintiff in a breach of contract action bears the burden on each element. *See Sonic Mfg. Techs., Inc. v. AAE Sys., Inc.*, 126 Cal. Rptr. 3d 301, 308 (Cal. Ct. App. 2011).

As a general matter, a notice-and-cure provision can implicate both the second and third prongs. With respect to the second element, courts have held that notice and an opportunity to cure is an element of performance that the plaintiff must satisfy before bringing a claim for breach of contract. *See Daniels v. Specialized Loan Servicing, LLC*, 2025 WL 576588, at *6 (C.D. Cal. Feb. 10, 2025) (holding that a plaintiff's failure to provide notice and opportunity to cure meant that the plaintiff could not "prove an essential element of these breach claims, Plaintiff's performance," and granting summary judgment to the defendant on that basis); *see*

39

*also Consol. World Invs., Inc. v. Lido Preferred Ltd.*, 11 Cal. Rptr. 2d 524, 527 (Cal. Ct. App. 1992) ("It is elementary a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance."); *cf. M & I Bank, FSB v. Coughlin*, 2012 WL 602365, at *6 (D. Ariz. Feb. 24, 2012) ("[Plaintiff's] failure to provide prompt written notice was a failure to perform, thus negating an essential element of its breach of contract and warranty causes of action.").

With respect to the third prong, where the contract expressly provides that no act or omission shall constitute a breach absent compliance with the notice-and-cure provision, a breach cannot be shown without demonstrating that notice and an opportunity to cure have been provided. *See King v. Navy Fed. Credit Union*, 699 F. Supp. 3d 864, 869 (C.D. Cal. 2023) ("Failure to plead compliance with a notice-and-cure provision of a contract will serve as a bar to a claim for breach of contract, where the provision was clearly stated in the contract that was allegedly breached."); *Wilde v. Flagstar Bank FSB*, 2019 WL 1099841, at *3 (S.D. Cal. Mar. 8, 2019) (explaining that an "action for breach of contract necessarily falls within the scope of the notice-and-cure provision because it directly relates to [the defendant's] performance under the contract").

The California Court of Appeal's decision in *Silverado Modjeska Recreation & Park District v. County of Orange*, 128 Cal. Rptr. 3d 772 (Cal. Ct. App. 2011), is instructive. That case is complicated in many respects but involves a relatively straightforward contract claim. In short, the developer of a ranch entered into a contract with the county whereby the developer agreed to dedicate certain land as a permanent open space and contribute funds for cleanup, restoration, and enhancement of the space on the condition that the county agreed "not to appeal and/or litigate" the developer's plans for a project site. *Id.* at 793. The agreement further

provided that the county would indemnify the developer from any and all liabilities or expenses, including attorneys' fees, caused by the county's breach of the agreement. *Id.* The county subsequently initiated suit, and the developer thereafter argued breach and sought fees under the agreement. *Id.* at 794. The district court granted the developer's motion after finding that the county breached the agreement by filing suit. *Id.*

The Court of Appeal reversed, concluding that "the trial court's ruling that the [county] breached the agreement was erroneous because the agreement expressly *defines* a breach as the failure to cure an alleged breach after receipt of proper notice of the alleged breach, and [the developer] failed to give the [the county] proper notice of breach." *Id.* at 797. Much like the agreement here, the contract in *Silverado* stated that "[a] Party shall be deemed in breach of this Agreement *only* upon the failure to perform any obligation under this Agreement after receipt of written notice of breach and failure to cure such breach within thirty (30) days thereafter." *Id.* The court noted that the agreement "d[id] not simply require that a party give notice of breach as a prerequisite to bringing an action for breach" but rather it "define[d] breach as the failure to perform any obligation *after* receipt of written notice of breach *and* failure to cure within 30 days after receipt of the notice." *Id.* The agreement also specified, as here, that "all notices required herein shall be in writing and sent by prepaid certified mail or by courier." *Id.* at 797 n.22. Because the developer had provided neither the notice nor opportunity to cure "expressly required under the agreement," it could not demonstrate breach. *Id.*

In reaching this conclusion, the court also considered and rejected the developer's argument that it had provided the requisite notice through its conduct in litigation. *Id.* The developer contended that its efforts to estop the county in the litigation on the basis of the agreement "manifestly provided notice of the [county's] breach of the [a]greement." *Id.* The

court disagreed, finding that the developer had failed to comply with the strict terms of the notice provision, as the term "breach" appeared nowhere in the developer's opposition papers. *Id.* at 789. Ultimately, the court summarized: "Because the agreement unambiguously provides the [county] shall be deemed in breach of the agreement *only* upon its failure to perform any obligation under the agreement *after receipt of written notice of breach and failure to cure the breach within thirty days,* the trial court erred in ruling the [county] breached the agreement, and [the developer] was therefore entitled to recover attorney fees under the agreement." *Id.* (emphasis in original).

The same conclusion applies here. The ALA expressly defines "Company's Breach" as arising only where Lively first notifies IEWUM of the alleged breach and provides thirty days from receipt of that notice to cure. Shapiro Decl., Ex. 263 at Ex. A, 5. This unambiguous language means that there can be no finding of breach—a necessary element of Lively's case— unless she first establishes compliance with the notice-and-cure provision. Because it is Lively who bears the burden of demonstrating IEWUM's breach, IEWUM did not need to specifically identify the notice-and-cure provision as an affirmative defense in its answer. It therefore did not waive reliance on the provision by failing to do so.

To be sure, the plaintiff need not always plead and prove compliance with a notice and cure provision. It depends on the terms of the relevant agreement. If the agreement were to provide only that the plaintiff could not initiate suit until it provided notice and an opportunity to cure, notice and cure would be a condition to bringing suit but not a prerequisite to showing breach. *See Silverado*, 128 Cal. Rptr. 3d at 797 (noting that the agreement did "not simply require that a party give notice of breach as a prerequisite to bringing an action for breach"). Some provisions are drafted to require notice of "a breach" and to give the breaching party an

42

opportunity "to cure the breach." *See RLED, LLC v. Dan Good Distrib. Co., Inc.*, 2008 WL 11389039, at *4 (E.D. Cal. Aug. 29, 2008) (distinguishing between different types of notice-and-cure provisions based on the various consequences of failing to comply with the conditions). But to reiterate, such an agreement is not at issue here, as the ALA requires notice of an "alleged breach" and expressly states that no act "shall constitute an event of Default or breach" absent compliance with the notice-and-cure provision. *See* Shapiro Decl., Ex. 263 at Ex. A, 5. Accordingly, the provision of notice and cure does go directly to whether Lively can establish breach as an element of her prima facie case.

The relevant state's laws also matter. This Court has previously explained that under the Federal Rules of Civil Procedure, whether a plaintiff or a defendant bears the burden of pleading satisfaction of a notice-and-cure provision "is determined by the elements of state law." *See Spencer-Smith v. Ehrlich*, 347 F.R.D. 606, 619 (S.D.N.Y. 2024). As elucidated in *Silverado*, California law requires plaintiffs to establish compliance with clear and unambiguous notice-and-cure provisions where the provisions define "breach" around notice-and-cure principles. Other states might allocate the burdens differently.

The Court therefore turns to whether Lively satisfied the notice-and-cure provision in the ALA. She did not. In her summary judgment papers, she points to no notice that she sent and addressed to IEWUM which specifically raised the specter of breach of the ALA. The November 9, 2023, email sharing the Protections for Return to Production made no mention of breach of any agreement (which makes sense given that the ALA had not been executed, and the Offer Letter contained no terms regarding sexual harassment or retaliation). The December 20, 2024, cease and desist letter was not addressed to IEWUM and therefore plainly failed to comply with the ALA's specified notice procedures, which required a writing addressed to IEWUM

under the attention of Jamey Heath setting forth the specific alleged breach.  Lively did amend her CRD complaint on December 30, 2024, to name IEWUM, but simply amending her complaint again failed to comply strictly with the ALA's notice procedures.[9]

Lively also initiated this suit the very next day, depriving IEWUM of its thirty-day opportunity to cure.  Lively suggests that any issues regarding the cure window are now moot because her First and Second Amended Complaints were filed more than thirty days after the suit was initially filed (and therefore thirty days after IEWUM had notice).  But Lively's amended complaints simply alleged the same breach of contract claim alleged in her initial complaint.  *See* Dkt. No. 1 ¶¶ 284–92.  Courts have repeatedly explained that the purpose of notice-and-cure provisions "is to provide the breaching party an opportunity to cure the breach *before litigation or termination of the contract*."  *IP Glob. Invs. Am., Inc. v. Body Glove IP Holdings, LP*, 2018 WL 5983550, at *5 (C.D. Cal. Nov. 14, 2018) (emphasis added); *see also Alvarez v. Chevron Corp.*, 656 F.3d 925, 932 (9th Cir. 2011) ("The purpose of giving notice of breach is to allow the breaching party to cure the breach and thereby avoid the necessity of litigating the matter in court."); *Keysight Techs., Inc. v. Mentor Graphics Corp.*, 2017 WL 7310781, at *6 (N.D. Cal. Sept. 28, 2017) ("The purpose of a notice and cure provision is to facilitate the parties' ability to 'cure problems and prevent the need for litigation.'" (quoting *Kim v. Shellpoint Partners, LLC*, 2016 WL 1241541, at *6 (S.D. Cal. Mar. 30, 2016))); *cf. U.S. Bank Nat. Ass'n v. GreenPoint Mortg. Funding, Inc.*, 45 N.Y.S.3d 11, 18 (1st Dep't 2016) (noting that under New York law, "[t]he contractual requirement of a breach notice . . . triggers the defendant's right/obligation to cure a claimed default and *avoid a lawsuit*" (emphasis added)).  As the Ninth Circuit has

---

[9] The CRD also made no mention of the ALA, instead focusing extensively on the CRA.  *See* Shapiro Decl., Ex. 252.

44

explained, "[t]his purpose would be completely undermined if it could be satisfied with the giving of post-suit notice." *Alvarez v. Chevron Corp.*, 656 F.3d at 932; *see also Eckler v. Wal-Mart Stores, Inc.*, 2012 WL 5382218, at *8 (S.D. Cal. Nov. 1, 2012) ("[W]ere it adequate to provide notice post-suit, it would completely defeat the purpose of the notice requirement, which is to 'allow the breaching party to cure the breach and thereby avoid the necessity of litigating the matter in court.'" (quoting *Alvarez*, 656 F.3d at 932)).

In sum, Lively has failed to raise a triable issue regarding IEWUM's breach under the relevant contractual language given her non-compliance with the ALA's notice and cure provision. Summary judgment is therefore warranted on this claim for an additional reason.

## C.    The CRA Is Enforceable.

Lively's attempts to enforce the CRA—and in particular, its provision specifying that "[t]here shall be no retaliation of any kind against Artist for raising concerns about the conduct described in this letter," *see* Shapiro Decl., Ex. 117 at 2—stand on firmer ground. IEWUM makes two primary arguments why Lively cannot enforce the CRA. It argues that the CRA was not binding because it made reference to the ALA and thus had no force prior to the ALA's adoption. Dkt. No. 955 at 41–42. Second, IEWUM argues that the CRA was not supported by consideration. *Id.* at 42–43. Neither argument has merit. The Court starts with IEWUM's argument regarding consideration.

One of the bedrock elements of contract formation, in addition the manifestation of mutual assent, is the exchange of bargained-for consideration. *See Mahram v. The Kroger Co.*, 324 Cal. Rptr. 3d 575, 579 (Cal. Ct. App. 2024) (citing Restatement (Second) of Contracts § 17(1)); *Lebedev v. Blavatnik*, 142 N.Y.S.3d 511, 517 (1st Dep't 2021). Consideration is often defined as "some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other." *Alpha Cap.*

45

*Anstalt v. Real Goods Solar, Inc.*, 311 F. Supp. 3d 623, 630 (S.D.N.Y. 2018) (quoting *Hamer v. Sidway*, 27 N.E. 256, 257 (N.Y. 1892)); *see also San Luis Obispo Loc. Agency Formation Com. v. City of Pismo Beach*, 275 Cal. Rptr. 3d 837, 840 (Cal. Ct. App. 2021) (noting that consideration can take the form either of a benefit to the promisor or a detriment to the promisee).

"It is well established that the 'slightest consideration is sufficient to support the most onerous obligation' and that the courts are not to inquire into the adequacy of consideration." *Caisse Nationale de Credit Agricole-CNCA, N.Y. Branch v. Valcorp, Inc.*, 28 F.3d 259, 265 (2d Cir. 1994) (quoting *Mencher v. Weiss*, 114 N.E.2d 177 (N.Y. 1953)). Although courts will not second-guess the fairness of an agreement or require "equivalence in the values exchanged," *Harris v. Time, Inc.*, 237 Cal. Rptr. 584, 587 (Cal. Ct. App. 1987), there must still be "something of real value in the eye of the law" that both parties agree to give up, *Grimaldi v. Sangi*, 113 N.Y.S.3d 771, 775 (3d Dep't 2019); *accord Drummond v. Akselrad*, 2023 WL 3173780, at *4 (S.D.N.Y. May 1, 2023) (citing *Apfel v. Prudential-Bache Sec. Inc.*, 616 N.E.2d 1095, 1097 (N.Y. 1993)). "If a promise is so insubstantial as to impose no obligation at all on the promisor—who says, in effect, 'I will if I want to'—then that promise may be characterized as an illusory promise, i.e., a promise in form but not in substance," and it will not constitute consideration. *O'Mahoney v. Susser*, 2012 WL 12883586, at *3 (E.D.N.Y. July 23, 2012) (citation and internal quotation marks omitted), *aff'd*, 531 F. App'x 39 (2d Cir. 2013) (summary order).

A written instrument is presumptive evidence of consideration under California law, but boilerplate recitals regarding the exchange of good and valuable consideration are not conclusive and may be "overcome" based on "the facts and surrounding circumstances." *Kott v. Hilton*, 114

46

P.2d 666, 668 (Cal. Dist. Ct. App. 1941) (citing Cal. Civ. Code §§ 1614, 1615); *accord Ballagh Corp. v. Byron Jackson Co.*, 145 F.2d 786, 790 (9th Cir. 1944). Under California law, the presumption of consideration means that the burden of proof is on the party seeking to invalidate the agreement for lack of consideration, which may be accomplished through extrinsic evidence. *Star Pac. Invs., Inc. v. Oro Hills Ranch, Inc.*, 176 Cal. Rptr. 546, 550 (Cal. Ct. App. 1981); *see also Ballagh*, 145 F.2d at 790 ("[T]he recital of consideration in a written instrument is not conclusive."). New York contains no such codified presumption regarding written agreements. It is instead "black letter law that the burden of proving the existence, terms and validity of a contract rests on the party seeking to enforce it." *Paz v. Singer Co.*, 542 N.Y.S.2d 10, 11 (1st Dep't 1989). But, as under California law, "the words ['good and valuable consideration'] cannot serve as consideration where the facts show that nothing good or valuable was actually given at the time the contract was made." *In re Greene*, 45 F.2d 428, 429 (S.D.N.Y. 1930).

A promise to perform a preexisting legal obligation cannot constitute new consideration, as such a promise is not in any sense bargained for or given in exchange for a new counter-promise. *Id.*; *see also Bailey v. Breetwor*, 23 Cal. Rptr. 740, 743 (Cal. Ct. App. 1962); *Murray v. Northrop Grumman Info. Tech., Inc.*, 444 F.3d 169, 178 (2d Cir. 2006) (citing *Goncalves v. Regent Int'l Hotels, Ltd.*, 447 N.E.2d 693, 700 (N.Y. 1983)); *Pennolino v. Cent. Prods. LLC*, 2023 WL 3383934, at *15 (S.D.N.Y. May 11, 2023) ("It is axiomatic that past consideration cannot support the formation of a new contract"). However, a party's promise to perform a legal duty that is doubtful or the subject of an honest dispute can constitute consideration. *See* Restatement (Second) of Contracts § 73.

Regardless of where the burdens in this case fall, there is sufficient evidence in the record to conclude that the CRA was supported by valid consideration. In particular, when the parties

47

entered into the CRA, Lively's legal duty to return to set for the second half of production was at least doubtful or subject to an honest dispute. *See* Restatement (Second) of Contracts § 73. The Offer Letter, the only agreement by which she was bound to perform, required her to provide "exclusive principal photography services for up to six (6) *consecutive weeks* during the run of production," Shapiro Decl., Ex. 28 at 1 (emphasis added), and filming paused one month into production due to the Writers Guild of America and SAG-AFTRA strikes, R.56.1 ¶ 157. By its terms, the Offer Letter did not oblige Lively to commit to more than six consecutive weeks of principal photography. Her duty to continue with filming at that point—on a different schedule than the one previously agreed to—was therefore subject to at least some uncertainty. Her agreement to resolve that uncertainty by returning to set constituted valid consideration. That is what the CRA in fact recites. It states that the parties wish to "confirm the conditions upon which [Blakel] has agreed to cause [Lively] to render acting services on the [Film] following the break in production of the [Film] related to the 2023 WGA and SAG-AFTRA labor strikes." Shapiro Decl., Ex. 117. The clear implication is that absent agreement to the conditions, Blakel would not cause Lively to return to set. And because it was unclear whether Blakel had an obligation to cause Lively to return to set and whether Lively herself had such an obligation, the CRA was supported by valid consideration and is binding.[10]

IEWUM also argues that the CRA is not enforceable because it makes reference to the ALA, and the ALA was not executed. That argument has no greater merit. The CRA states that it "shall be deemed incorporated into the [ALA]." *Id.* The CRA also states that, in the event of a conflict between the CRA and the ALA, the terms of the CRA govern. *Id.* "The interpretation

---

[10] Because the CRA is enforceable based on Lively's agreement to return to set for the second phase of production, the Court need not address the extent to which Lively's agreement "to forego a more formal HR process," *see* Shapiro Decl., Ex. 103, constituted valid consideration.

48

of an unambiguous contract is a matter for the court." *Complete Packaging & Shipping Supplies, Inc. v. Arch Ins. Co.*, 2024 WL 1679330, at \*2 (E.D.N.Y. Apr. 18, 2024) (quoting *Zahler v. Twin City Fire Ins. Co.*, 2006 WL 846352, at \*4 (S.D.N.Y. Mar. 31, 2006)).  It is clear that the CRA does not make entry into the ALA a condition precedent to the execution of the CRA or to the parties' obligations under it.  As previously explained, "a condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'" *Comerica Leasing Corp. v. Bombardier Inc.*, 2019 WL 11027701, at \*5 (S.D.N.Y. Sept. 30, 2019) (quoting *Bank of N.Y. Mellon Trust Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 305 (2d Cir. 2016)); *see also* Cal. Civ. Code § 1436.  The CRA sets forth a series of promises by IEWUM, none of which is conditional upon there being an ALA, and each of which is stated to "confirm" the conditions upon which Lively would return to work.  In context, the reference to the ALA means nothing more than that were the ALA to be executed, the CRA would be deemed incorporated into it and not superseded by it.  In other words, the CRA contemplated the possibility that the parties would enter into the ALA, and it set forth how the CRA would apply in the event of that contingency.  It was not itself contingent upon the signing of the ALA.  The parties' conduct confirms that understanding, as they both performed under the CRA notwithstanding continued negotiations over the ALA.  The Wayfarer Parties took steps to implement the CRA's requirements, including by hiring a new producer.  R.56.1 ¶ 586.  Lively, for her part, returned to set for the second phase of production.  The CRA thus carried independent and binding force.

IEWUM argues that even if the CRA is enforceable, Lively's claim for breach of that agreement must be rejected.  Dkt. No. 955 at 43–50.  IEWUM again relies on the notice-and-cure provision in the ALA.  *Id.* at 43–45.  But no such provision appears in the CRA.  Of course,

where there are multiple integrated agreements, those agreements are to be read as a unified whole. 11 Williston on Contracts § 30:25 (4th ed. 2025) ("Generally, all writings which are part of the same transaction are interpreted together."). But here, there is only one agreement—the CRA. Because Lively never agreed to the ALA, she cannot be deemed to be bound by its terms. Indeed, as explained above, the intent of the parties in making reference to the ALA was not to incorporate all of its terms—including the conditions precedent and the notice-and-cure provision—but to ensure that if the ALA were ever adopted, it would not supplant or supersede the CRA. "[I]n order to uphold the validity of terms incorporated by reference, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." *Id.*; *see also id.* § 30:26 (explaining that the doctrine of incorporation by reference "does not mean that the provisions of one instrument are imported bodily into another, contrary to the intent of the parties"). The parties did not assent to the "incorporated terms" and did not effect a wholesale adoption of the ALA through the backdoor of the CRA. Nor did they evince an intent to carry over any of the ALA's specific provisions. "[I]ncorporation by reference is ineffective to accomplish its intended purpose when the provisions to which reference is made do not have a reasonably clear and ascertainable meaning." *Id.* § 30:25. Even if one of the parties did secretly intend for some of the draft ALA's terms to be carried over into the CRA—a proposition for which there is no evidence to support—it is entirely unclear which provisions that would include from which draft of the ALA. The parties referred to the ALA; they did not refer to a draft unexecuted ALA of a particular date.[11]

---

[11] To the extent parol evidence is relevant, an earlier draft of the CRA made reference to the "unexecuted ALA" and thus arguably could be deemed to have incorporated the then-extant draft of the ALA. But the fact that the language "unexecuted" was subsequently dropped tends to reflect an intent by the parties that the ALA would not be incorporated until there was an effective executed ALA.

50

IEWUM also argues that Lively's claim under the CRA fails because she cannot prove damages. Dkt. No. 955 at 47–49. IEWUM makes four arguments in this respect: (1) Lively cannot recover consequential damages, or what California law calls "special damages," under the "Limitation on Damages" clause in the ALA, *id.* at 47–49; (2) Lively cannot recover emotional distress damages for breach of contract, *id.* at 49; (3) Lively's alleged contract damages are improperly duplicative of her alleged statutory damages, *id.* at 49–50; and (4) Lively cannot recover damages for the lost profits or royalties of two entities she controls, Blake Brown Beauty and Betty B Holdings LLC, for lack of standing and because such damages are speculative, *id.* at 58–60. None of these provides a basis for granting judgment on Lively's CRA claim.

To begin, the Wayfarer Parties argue that "nearly all of Lively's asserted damages" are consequential or special damages, Dkt. No. 955 at 48, and that such damages are barred by a provision in the ALA stating that "[i]n no event will any party hereto . . . be liable for or have any obligation to pay the other consequential and/or incidental and/or special and/or punitive damages." Shapiro Decl., Ex. 263 at Ex. A, 5–11. This argument fails for the same reason that the notice-and-cure argument above fails: No analogous provision appears in the CRA. The parties never agreed to the ALA. They are not bound by it.

Second, IEWUM argues that under California law, a party cannot recover damages for emotional distress, including distress from loss of reputation, as a result of a breach of contract. Dkt. No. 955 at 49; *see Frangipani v. Boecker*, 75 Cal. Rptr. 2d 407, 410 (Cal. Ct. App 1998) (collecting cases). There may be some question with respect to the reach of that doctrine and its applicability here. *See Erlich v. Menezes*, 981 P.2d 978, 988 (Cal. 1999) ("[W]hen the express object of the contract is the mental and emotional well-being of one of the contracting parties, the breach of the contract may give rise to damages for mental suffering or emotional distress.").

The Court need not reach that issue, however, as Lively does not ground her opposition to summary judgment on the basis that she is solely entitled to damages for emotional distress and loss of reputation.

Third, IEWUM argues that Lively's contract claim is improperly duplicative because she seeks recovery for the same damages under her statutory causes of action. Dkt. No. 955 at 49–50. The cases that IEWUM cites, however, stand for the proposition that if a plaintiff proceeds on two claims, each of which seek damages for the same injury, the plaintiff will not be entitled to double recovery. *See W. Pac. Elec. Co. Corp. v. Dragados/Flatiron*, 534 F. Supp. 3d 1209, 1254 (E.D. Cal. 2021) (stating that a plaintiff will have to "elect to receive either tort or contract damages, but not both for the same injury"). Lively's statutory and contractual retaliation claims will present their separate challenges at trial. Lively need not forego one theory of recovery at this stage in order to pursue the other.

Finally, IEWUM argues that Lively cannot recover for lost profits to Blake Brown Beauty and Betty B Holdings. Dkt. No. 955 at 58–60. Lively responds that she is not seeking relief in her capacity as a shareholder but rather direct damages to her own business reputation in connection with her own legal claims. Dkt. No. 1064 at 60. The Court has the authority under Rule 56(g) to determine a fact that is not genuinely in dispute, including an item of damages. Fed. R. Civ. P. 56(g). However, the exercise of that power is discretionary. *See* 11 Moore's Federal Practice 56.123[3] (3d ed. 2026). The Court can decide that it is better to leave the matter for trial. *Id.* In this case, the parties devote only a few pages to Lively's theory of damages. The issue is better addressed at trial or prior to trial through motions in limine directed to the admissibility of evidence and argument. *Cf. Town & Country Linen Corp. v. Ingenious Designs LLC*, 2022 WL 2757643, at *1 (S.D.N.Y. July 14, 2022) (addressing damages

arguments through motion in limine directed at expert reports).

IEWUM's motion for summary judgment with respect to Lively's contract claim under the CRA is denied.

## II.    Lively's Employment Status

Lively's first and second causes of action allege harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964.  SAC ¶¶ 353–74.  Her fifth cause of action alleges retaliation in violation of California Labor Code Section 1102.5.  *Id.* ¶¶ 394–400.  The Wayfarer Parties raise the threshold issue of whether the laws cover Lively in the first place.

"Under both California and federal law, the question whether an individual worker should properly be classified as an employee or, instead, as an independent contractor has considerable significance for workers, businesses, and the public generally."  *Dynamex Operations W. v. Superior Ct.*, 416 P.3d 1, 4 (Cal. 2018).  Title VII "cover[s] 'employees,' not independent contractors."  *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 113 (2d Cir. 2000).  California Labor Code Section 1102.5 similarly requires the plaintiff to prove employment status.  *See Bennett v. Rancho Cal. Water Dist.*, 248 Cal. Rptr. 3d 21, 24 (Cal. Ct. App. 2019); *Soukup v. L. Offs. of Herbert Hafif*, 139 P.3d 30, 48 (Cal. 2006) ("[I]t appears that a prerequisite to asserting a violation of Labor Code section 1102.5 is the existence of an employer-employee relationship at the time the allegedly retaliatory action occurred.").  Lively's sexual harassment and retaliation claims under these provisions can therefore proceed only if she was an employee rather than an independent contractor.[12]

---

[12] "Although the FEHA generally protects only 'employees' and 'applicants,' the provisions prohibiting [sexual] harassment . . . are intentionally broader" and include not only employees but also persons "providing services pursuant to a contract."  *Hirst v. City of Oceanside*, 187 Cal. Rptr. 3d 119, 124–25 (Cal. Ct. App. 2015) (quoting Cal. Gov't Code § 12940(j)).  Section 51.9 of the California Civil Code similarly sweeps more broadly than Title VII and prohibits sexual harassment where there is a "business, service, or professional relationship between the plaintiff

The Court will assess Lively's employment status under Title VII and California Labor Code Section 1102.5 in turn.

### A.     Title VII

#### 1.        Legal Background

Title VII covers "employees," but the statute's definition of that term is circular: "the Act states only that an 'employee' is an 'individual employed by an employer.'" *O'Connor v. Davis*, 126 F.3d 112, 115 (2d Cir. 1997) (quoting 42 U.S.C. § 2000e(f)).  In determining whether a person is an employee for purposes of Title VII, courts have applied the analysis derived from the Supreme Court's decisions in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989), a case involving the Copyright Act, and *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318, 322 (1992), a case involving the Employee Retirement Income Security Act.  *See O'Connor*, 126 F.3d at 115; *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226–27 (2d Cir. 2008).  The relevant factors are drawn from the general common law of agency rather than from any particular state's laws given that "federal statutes are generally intended to have uniform nationwide application." *Reid*, 490 U.S. at 740 (quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989)).  In particular, the Supreme Court has outlined thirteen factors drawn from the Restatement of Agency and from caselaw that courts are to consider in determining whether a person is an employee:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished.  Among the other factors relevant to this inquiry

and defendant." This includes a plaintiff's relationship with a "[d]irector or producer." Cal. Civ. Code § 51.9(a)(1)(H).  Perhaps recognizing as much, the Wayfarer Parties have not moved for judgment on Lively's FEHA or Section 51.9 claims on the grounds that she is an independent contractor, so the Court will not discuss those provisions in analyzing this issue. *See* Dkt. No. 955 at 32–35 (moving to dismiss Counts 1, 2, and 5—i.e., the Title VII and Section 1102.5 claims—on the basis of employment status, and not similarly moving to dismiss Counts 3, 4, or 13, the FEHA cand Section 51.9 claims, on that same basis).

are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*O'Connor*, 126 F.3d at 115 (quoting *Reid*, 490 U.S. at 751–52).

Balancing the *Reid* factors is "a highly fact-specific task," *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 516 (D. Conn. 2016), that should not be performed "in a mechanistic fashion," *Aymes v. Bonelli*, 980 F.2d 857, 862 (2d Cir. 1992). No one factor is dispositive, *Reid*, 490 U.S. at 752, and additional circumstances may be considered if they are drawn from the common law of agency that *Reid* seeks to synthesize, *see Eisenberg*, 237 F.3d at 114 n.1. Courts "must disregard those factors that, in light of the facts of a particular case, are (1) irrelevant or (2) of 'indeterminate' weight—that is, those factors that are essentially in equipoise and thus do not meaningfully cut in favor of either the conclusion that the worker is an employee or the conclusion that he or she is an independent contractor." *Id.* at 114; *see also Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 110–111 (2d Cir. 1998) ("Not all the *Reid* factors will be significant in every case, and we must weigh in the balance only those factors that are actually indicative of agency in the particular circumstances before us."). A court may determine that a plaintiff is an independent contractor even if one or more of the *Reid* factors, analyzed in isolation, would suggest to the contrary. *See Reid*, 490 U.S. at 752–53 (holding that the plaintiff was an independent contractor even though the hiring party provided specifications for, and exerted a degree of control over, the plaintiff's work product).

The analysis is not indifferent to congressional intent. A person who may be deemed an independent contractor for purposes of the work-for-hire provisions of the Copyright Act, where "the rights to intellectual property can depend on contractual terms," may nonetheless be an

55

employee for purposes of Title VII, where Congress intended to create "'public law' rights [that] were vested in workers as a class . . . [and] not subject to waiver or sale by individuals." *Eisenberg*, 237 F.3d at 116. Thus, while factors such as employment benefits and tax treatment might deserve special consideration in the copyright work-for-hire context, where "workers and employers are free to allocate intellectual property rights by contract," those factors are entitled to less weight in the employment discrimination context, as firms could "use individual employment contracts to opt out of the anti-discrimination statutes." *Id.* (citing *Aymes*, 980 F.2d at 862–83). As the Second Circuit explained in *Eisenberg*, "the core, substantive protections of the anti-discrimination laws were not intended to be skirted by the terms of individual employment contracts." *Id.* at 117. "The most important factor in determining the existence of an employment relationship [under Title VII] is 'that control or right of control by the employer which characterizes the relation of employer and employee and differentiates the employee or servant from the independent contractor.'" *Salamon*, 514 F.3d at 228 (quoting *Metcalf & Eddy v. Mitchell*, 269 U.S. 514, 521 (1926)). "The degree of employer control is . . . the foundation for Title VII's limits: Independent contractors are thought not to need Title VII protection because such contractors already have a degree of control over their employment." *Id.* at 228 n.11 (2d Cir. 2008).[13]

The presence or absence of each *Reid* factor raises a question of fact, but the "'ultimate determination' as to whether a worker is an employee or an independent contractor—that is, the . . . balancing of the *Reid* factors—is a question of law." *Eisenberg*, 237 F.3d at 115. If,

---

[13] Although that proposition may be a questionable one, it is settled in the law. *See Salamon*, 514 F.3d at 228 n.11 (citing scholarship "challenging the claim that 'independent contractors, unlike employees, have equal bargaining power with those who hire them, and thus do not require government intervention'" (citation omitted)).

based on the undisputed facts, no reasonable jury could determine that the plaintiff was an employee, the Court may not shirk from stating that conclusion. *See* Restatement (Second) of Agency § 220, cmt. c ("If the inference is clear that there is, or is not, a master and servant relation, [the determination] is made by the court; otherwise the jury determines the question after instruction by the court as to the matters of fact to be considered."); *cf. Salamon*, 514 F.3d at 231 (reversing grant of summary judgment where there was a material factual issue regarding whether the methods that a hospital required a physician to comply with merely reflected professional standards or demonstrated a greater degree of control sufficient to establish an employee-employer relationship). *But see Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 170 (2d Cir. 1998) (expressing uncertainty as to whether an individual's employment status is a question for the jury or the court, but holding that regardless, the court committed no prejudicial error in sending the issue to the jury); *Knight v. State Univ. of N.Y. at Stony Brook*, 880 F.3d 636, 641 (2d Cir. 2018) (same).

### 2.    Factual Background

The parties dispute the existence of certain *Reid* factors and the extent to which they either weigh in favor or against a finding of employment status. *Compare* Dkt. No. 955 at 32–35, *and* Dkt. No. 1119 at 13–15, *with* Dkt. No. 1064 at 50–52. However, they do not dispute the underlying material facts.

Lively agreed with IEWUM, a company formed to produce a single film, that she would perform a specified role in the Film based upon a pre-agreed script with a pre-agreed director and a pre-agreed co-lead. The Offer Letter between IEWUM and Lively's loanout entity, pursuant to which Lively performed and was bound, *see supra* § I, gave Lively important rights both with

57

respect to the Film and her participation in it.[14]  No change could be made to the script, the

director, the co-lead, or the double (if any) for Lively without her permission.  Lively had rights

with respect to her hair and make-up.  Section 8 of the agreement is titled "Approvals" and

states:

> Artist will have mutual approval rights over the following: a) hair (Anne Carroll pre-approved), make-up (Vivienne Baker pre-approved) and wardrobe personnel; stand-in, stunt double (if any) b) the screenplay c) director (with Justin Baldoni pre-approved) and any replacement, and d) the co-lead for the Picture (with Justin Baldoni pre-approved) and any replacement thereof.  Meaningful consultation over the "look" of the Role, ad campaign and release pattern.  Hair and Make-up personnel are exclusive to Artist.  Peter Owen is pre-approved as wig maker.

Shapiro Decl., Ex. 28 at 2.

The Offer Letter contains additional approval provisions, including Lively's right to sign

off on: the filming start date in May 2023; any shoot days outside of New Jersey or New York;

her transportation for such shoots; the trailer provided for her on set; use of her name, voice, or

likeness in merchandise, commercial tie-ins, co-promotions, and the like; outtakes and behind-

the-scenes shooting and the use of any such footage; press and "EPK crew on set"; interviews;

press releases and statements; use of nudity and/or simulated sex in the Film and digitizing or

doubling of Lively in any such scenes; doubling of Lively in the Film more generally; and use of

clips from the Film.  *Id.* at 1–4.

There is no genuine dispute that Lively's approval rights were honored in practice.

Lively's counsel acknowledged at oral argument that there was nothing in the record indicating

that the Wayfarer Parties ever ignored, refused, or rejected Lively's exercise of her approval

rights under the Offer Letter.  Tr. at 104:18–105:12.

---

[14] The Court has found that the ALA was never an executed or binding agreement.  It has also found that the parties performed under the Offer Letter.  The Court will accordingly look to the Offer Letter in ascertaining the nature of the parties' working relationship.

There also is no genuine dispute that Lively had extensive involvement in, and control over, many of the decisions related to the Film and her role. She does not dispute the underlying facts relayed in her letter to the Producers Guild of America (the "PGA Letter"). *See* R.56.1 ¶ 227; Shapiro Decl., Ex. 39. As reflected in that letter, Lively:

- "lead the location shift from Boston to New Jersey and helped to solve all cost and schedule logistics associated," Shapiro Decl., Ex. 39 at 1;

- "personally called and/or wrote emails to crew and put forth names for dept head roles" and "identified and onboarded freelance team members for the cast members," *id.*;

- "reviewed and reshaped the creative of the production design for all key locations for all characters," *id.*;

- "reviewed and reshaped the creative of the costume design for all characters," *id.*;

- "went through hundreds of casting tapes to help find the rest of the cast, including our stars Atlas, Young Lily, Young Atlas and Jenny Bloom," *id.*;

- "zoomed with every cast member to get their notes and ideas" and "did significant rewrites of the script to incorporate all the notes of the cast, studio, distributor, author, director," all while "address[ing] scheduling, financial, location, weather and/or other logistical constraints in that rewrite," *id.*;

- "unfortunately was responsible for the firing of our 1st AD, Julie, as we were not making our days for the first many weeks," *id.*;[15]

- "helped to block the staging of every scene for shooting efficiency," *id.*;

- "reviewed and instated covid protocols," *id.*;

- "managed the politics and HR concerns on a daily basis, acting as an intermediary to keep crew and cast engaged, safe, and on board," *id.*;

- "was the director's partner in all creative and logistical concerns," *id.*;

---

[15] Lively does dispute the suggestion that she unilaterally caused the assistant director to be terminated, stating that it was instead done on producer Alex Saks' recommendation due to performance deficiencies. R.56.1 ¶ 136. The difference is immaterial to the disposition of these motions.

- "watched the monitor between every take, to be sure everything that ended up on screen, from every department, was best servicing the film, and lead the changes needed to get there when applicable," *id.*;

- "led the hiring of a freelance producer to help balance the set" and the "hiring [of] a new intimacy coordinator and intimacy doubles to help block out the sensitive scenes for both safety and shooting efficiency," *id.*;

- "called and led meetings with all department heads, the studio and the distributor when we had extenuating circumstances challenging our production plan" and "acted as a liaison between cast and their reps in finding solutions to finishing the film," *id.*;

- "worked with the film's original editor . . . to be sure the director's goals and preferences for the film were understood and honored before starting with my own editors to expand the audience and commerciality of this film," *id.* at 3;

- worked with her "own editors May 2, onward[, r]unning a room of sometimes 3 editors at once as we pushed to meet the tight timing for 3 test screenings and eventually picture lock," *id.*;

- "brought on a new composer" after "personally reaching out to [him] and convincing him to join us with very limited time, trouble shooting financial and logistical hurdles to get him on board," *id.*;

- "hand selected 90% of the songs in the film," *id.*;

- worked "on the VFX, overseeing every shot that makes it into the film," *id.*;

- solicited and implemented feedback based on test screenings, *id.*;

- worked "closely with the international teams on everything from posters, commercials, book covers, and beyond by territory" and "with the digital team on everything from the Social media pages, down to the color palette, graphics, language, copy, cadence, and even what font is used and when and how," *id.* at 4;

- worked "with cast's representatives, producers, show runners, tour managers, spouses, travel agents, and beyond to coordinate their schedules for press, going as far as successfully begging their bosses to release them for press for our film," *id.* at 4.

There also is no dispute that, in addition to a flat sum guaranteed as payment for her work on the Film, Lively was entitled to contingent compensation based on the Film's performance, as well as compensation in the form of credit and bonuses for awards. *See* Shapiro Decl., Ex. 28.

The Offer Letter committed Lively to providing six weeks of exclusive principal photography services plus "standard prep services" subject to her approval and availability and "up to 3 free post days." *Id.* at 1. At any other point, Lively was free to accept other work and to perform in other films, which she did. The PGA Letter indicates that she was "shooting another film" while simultaneously working a minimum of ten hours a day on post production for the Film. Shapiro Decl., Ex. 39 at 3. As for her working hours during principal photography, the Offer Letter cabined them as follows:

> a. 12-hour portal to portal (i.e., drop off at home until pick-up at home the following day) turnaround if Artist stays in Manhattan.
>
> b. 10.5-hour portal to portal (i.e., drop off at home until pick-up at home the following day) turnaround if Artist stays at upstate residence.
>
> c. 56 hour portal to portal (drop off at home at the end of the week until pick-up at home the following work day) weekend turnaround, provided that Artist will give good faith consideration to reducing the weekend turnaround to 52 hours portal to portal up to 2 times during principal photography.
>
> d. 12 hour cap on days (calculated from when the car drops Artist at base camp at the beginning of the day until Artist gets back in the car at base camp at the end of the day)).
>
> e. 5 day weeks, Monday - Friday.
>
> f. No more than one forced call without Artist's prior consent.

Shapiro Decl., Ex. 28 at 3.

### 3.    Analysis

The undisputed facts reveal that Lively enjoyed a degree of economic independence sufficient to make her an independent contractor. Although not every factor weighs equally in favor of that conclusion when viewed in isolation, analyzing the factors collectively eliminates any genuine dispute. That means that Lively cannot bring a claim under Title VII.

The Court first analyzes each *Reid* factor separately, recognizing that they overlap and that certain undisputed facts that are relevant to one factor may also be relevant to others.

*Right to Control*.  This factor favors independent-contractor status.  Lively enjoyed extensive control over the means and manner by which the product was produced, both as a matter of contract and in practice.  "The type of comprehensive control that characterizes a traditional employer-employee relationship" was absent here.  *See Horror Inc. v. Miller*, 15 F.4th 232, 250–51 (2d Cir. 2021).

By contract, IEWUM could produce only one product with Lively's participation—the Film—for which her approval of the script, director, and co-lead was required before she was bound.  Moreover, IEWUM could not make any changes to those aspects of the production without her approval.  She had the right to "meaningful consultation" not just over the "look" of her role, but also over the ad campaign and release pattern.  Shapiro Decl., Ex. 28 at 2.  Her "name, voice or likeness" could not be used "in merchandise[,] . . . commercial tie-ins, co-promotions, soundtrack, novelizations, publications, and/or in connection with advertising or promotion of a theme park or a theme park attraction" without her "prior, written consent."  *Id.* at 3.  She had the right to approve any "behind-the scenes shooting and any use of footage," any "outtakes," the press and crew on set, and any interviews.  *Id.*  IEWUM could not issue a first press release mentioning her as an actor without her approval and could not issue any additional press releases mentioning her (other than as an actor in the Film) without her approval.  *Id.*  She had control over her hair and makeup.  *Id* at 2.  And the Wayfarer Parties did not have the right to cast an actor as her "double" without her prior written consent.  *Id.*

Lively also had power as a matter of the "day-to-day reality" of the parties' working relationship.  *See Eisenberg*, 237 F.3d at 119.  Lively described Baldoni in the PGA letter not as

an employer, boss, or superior, but as a "partner in all creative and logistical concerns." Shapiro Decl., Ex. 39. It is undisputed that, among other things, she reviewed and reshaped the production and costume design for all key locations and characters; performed significant rewrites of the script to incorporate feedback from the cast, studio, distributor, author, director; reviewed and instated COVID-19 protocols; led meetings with all department heads, the studio and the distributor; oversaw a team of editors; and coordinated and managed cast and crew's various schedules for the Film's press and release. *See id.*

Lively emphasizes that the Wayfarer Parties had the right to control her performance because she had to render her acting services when and where they directed. Dkt. No. 1064 at 51. Specifically, she states that she had to adhere to a set work schedule and provide exclusive services during filming. *Id.* But these factors weigh only marginally, if at all, in favor of her being an employee. The duration of her work on the Film and the start date on which that work began were heavily negotiated. Just as she was required to start in May 2023 and to continue for up to six consecutive weeks during the run of production, so too, if IEWUM wanted to make the Film with her, was IEWUM required to adhere to that schedule. Moreover, that Lively's time commitment was defined by the task at hand, the "run of production," with a maximum number of weeks during which she could be required to work, further suggests that she was not an employee. Lively was "hired" only for a "particular project[]." *Aymes*, 980 F.2d at 863. IEWUM could not assign Lively "other projects." *Id.* at 864. It had no right to any of her time beyond what was necessary to accomplish that project and what was outlined in the Offer Letter. Lively, not IUEWM, would have the choice of whether to contribute the additional hours.[16]

---

[16] In *Eisenberg*, the Second Circuit disregarded the issue of whether the plaintiff had control over her schedule as "ambivalent," as the plaintiff had "some" but not full control over her schedule. 237 F.3d at 118. The facts here are likewise ambivalent, but this aspect of the relationship is

It appears to be true (and must be taken as true for purposes of this motion) that once the parties agreed that shooting would start in May, Lively had no discretion but to devote up to six consecutive weeks to the Film until production was complete, and that during that period, she could not offer principal photography services to anyone else. However, that cannot be enough to make her an employee. A movie cannot be produced without the simultaneous participation of a number of persons, including the director, cast, and crew. "Thus, even assuming that plaintiff was expected to work a particular schedule, '[i]t is in the very nature of [plaintiff's] work . . . that obliged [her] to work on certain days and at certain times.'" *Sellers v. Royal Bank of Can.*, 2014 WL 104682, at *6 (S.D.N.Y. Jan. 8, 2014) (quoting *Johnson v. FedEx Home Delivery*, 2011 WL 6153425, at *14 (E.D.N.Y. Dec. 12, 2011)), *aff'd*, 592 F. App'x 45 (2d Cir. 2015) (summary order). "The fact that an independent contractor is required to be at a job . . . at a certain time does not eliminate [her] status as an independent contractor." *Id.* (quoting *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 602 (E.D.N.Y. 2012)); *Powell-Ross v. All Star Radio, Inc. - WPGR-AM*, 1995 WL 491291, at *8 (E.D. Pa. Aug. 16, 1995) (holding that a radio DJ was an independent contractor under Title VII even though she was required "to appear at the station during the hours of her show (otherwise there would be nothing but dead air)").

An opera performer may have limited dates on which she can perform and must make sure the dates she chooses are ones on which the conductor and other performers will be available. But that does not mean that because her performance is dependent on the participation of others, she is by necessity an employee. *Cf. Lerohl v. Friends of Minn. Sinfonia*, 322 F.3d 486, 490 (8th Cir. 2003) (holding that musicians in an orchestra were independent contractors

---

further entitled to limited weight given the nature of the work as discussed further below.

even though they were, "by necessity, subject to the control and scheduling of the conductor because such control allows the symphony to perform as a single unit").

For similar reasons, the fact that Lively could not during those six weeks participate in principal photography for anyone else also does not make her an employee. Depending on the circumstances, an inability to take on other work can support a finding of an employer-employee relationship. *See, e.g.*, *Legeno v. Douglas Elliman, LLC*, 311 F. App'x 403, 405 (2d Cir. 2009) (summary order); *Sellers*, 2014 WL 104682, at *6; *Browning*, 885 F. Supp. 2d at 602. That is because the freedom to accept other work from other sources lies at the very heart of the "independence" inherent to independent contractors. In context here, however, the requirement that while principal photography took place Lively's acting services would be exclusive to IEWUM does not reflect that she lacked the "economic independence" to be an independent contractor. *See Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 148 (2d Cir. 2017). The contract reflected nothing more than Lively's commitment of the time necessary to film her scenes alongside other actors and the Film's crew. At any other point, she was free to accept additional work and to perform in other films. And she did so. The PGA Letter indicates that she was "shooting another film" while working on post production for the Film. Shapiro Decl., Ex. 39 at 3.

The "where" factor also tends to suggest that Lively was not an employee. That factor frequently is of "negligible weight" where the hired individual is "by necessity" required to work where the defendant has offices. *Aymes*, 980 F.2d at 864. But here it has weight, and that weight favors the Wayfarer Parties. IEWUM did not have a fixed location for shooting where Lively had to appear; it was a special-purpose entity created only to produce the Film. Lively herself "le[d] the location shift from Boston to New Jersey" for principal photography. Shapiro Decl.,

65

Ex. 39 at 1.  Once she led that shift, by contract, she could only be required to appear "in and around Jersey City, NJ and New York City, NY."  Shapiro Decl., Ex. 28 at 2.  As counsel for IEWUM and Wayfarer stated at the time: "We are willing to move the shoot from Boston to New Jersey to accommodate Blake.  We understand how important that is for her.  Although the film itself is set in Boston and we were planning to shoot there, we will make the adjustment."  *See* Gottlieb Decl., Ex. 9 at 1.  If the Wayfarer Parties wanted to shoot anywhere else, including in Las Vegas, they had to obtain Lively's prior approval.  Shapiro Decl., Ex. 28 at 2.  And that change of location, even if agreed to, would not be cost-free.  IEWUM was required to provide her transportation, accommodation, and perquisites subject to her approval, which would include private round-trip transportation for her, her four children, an assistant, two nannies and security, as well as approved first class accommodations and first class ground transportation.  *Id.*

The remaining fact implicating the issue of "control" is that Lively in her role as actor was subject to direction by Baldoni as director.  When combined with other evidence of control, that fact might in certain circumstances make a person an employee.  *Cf. Makarova v. United States*, 201 F.3d 110, 115 (2d Cir. 2000).  But it is not alone sufficient to confer on Lively the status of employee.  A person need not be in control over all of the means and manner of production to be an independent contractor.  Any complex product will require the involvement of persons with different specialties—in the case of a movie, in addition to a director, it will involve actors, cameramen, lighting experts, sound experts, and the like.  That each of them may to some extent be subject to the direction and coordination of the director does not *ipso facto* make each of them an employee.  *See Reid*, 490 U.S. at 752–53 (holding that a sculptor was an independent contractor even though the hiring party determined the scene to be sculpted, the materials to be used, and specific details about the sculpture's appearance and scale); *see also*

*Alberty-Velez v. Corporacion de Puerto Rico Para La Difusion Publica*, 361 F.3d 1, 9 (1st Cir. 2004); *Lerohl*, 322 F.3d at 490; *Axakowsky v. NFL Productions, LLC*, 2018 WL 5961923, at \*4 (D.N.J. Nov. 14, 2018); *McDaniel v. Pres. Prop. Mgmt. Co., LLC*, 781 F. Supp. 3d 9, 18 (D.R.I. 2025). "To hold that this sort of control determines [Lively's] status would defy 'common sense' as it would result in classifying all actors as employees, regardless of the other aspects of the relationship." *Alberty-Velez*, 361 F.3d at 10.

Lively may have been subject to some extent to Baldoni's direction; in the end, he was the one to call for lights, to direct the camera to start shooting, and to tell the actors when to act. But his discretion was also not unlimited. Baldoni too was subject to constraints on his creative freedom. He was required to direct according to the script and did not have control over the script. For him to depart from the script, he needed Lively's assent. If, for example, Lively did not want a scene to deviate from the screenplay in a particular manner, he could not direct her to do so. Lively admits that she helped to block the staging of every scene for shooting efficiency; that after the labor strikes, she was writing as the Film was shooting; and that she "watched the monitor between every take, to be sure everything that ended upon on screen from every department, was best servicing the film, and lead the changed need to get there when applicable." Shapiro Decl., Ex. 39 at 2. Lively accordingly participated with Baldoni in the "creative collaboration and exchange of ideas" on similar, albeit not identical, footing. *See Horror Inc.*, 15 F.4th at 250–51.

*Skill*. Lively's skill level tips heavily in favor of finding independent-contractor status. The Second Circuit has stated that "those in professions akin to that of 'architects, photographers, graphic artists, drafters' are often found by courts 'to be highly-skilled independent contractors.'" *Horror Inc.*, 15 F.4th at 251 (quoting *Aymes*, 980 F.2d at 862). It has

67

found that screenwriting is such a skilled position. *Id.* Skill level, of course, is not determinative of employee status. A physician with years of training and specialized skills can still be an employee. *See Salamon*, 514 F.3d at 228–29. "[S]hip captains and managers of great corporations" can also be employees under certain circumstances. *Id.* at 229 (quoting Restatement (Second) of Agency § 220(1) cmt. A (1958)). However, skill can connote a "degree of control" by the hired person over her employment. *Id.* at 228 n.11. "[An] actress is a skilled position requiring talent and training not available on-the-job." *Alberty-Velez*, 361 F.3d at 7; *accord Axakowsky*, 2018 WL 5961923, at *4.

The Offer Letter reflects Lively's skill as an actor and her level of economic independence. In addition to her compensation, she was accorded "first position" in on-screen credit and paid ads with her name "in no event in a size of type smaller than the average size of letters of any other cast member in such paid ads/ excluded ads," in recognition of her "stature" as an artist. Shapiro Decl., Ex. 28 at 2; *see also* Shapiro Decl., Ex. 32. These provisions reflect the parties' acknowledgment that Lively had name recognition and stature independent of whatever the Film itself would bring.

*The Source of the Instrumentalities and Tools, and the Hired Party's Role In Hiring and Paying Assistants*. The source of the instrumentalities and tools is also consistent with Lively's status as an independent contractor. Where the plaintiff is dependent for her livelihood upon instrumentalities and tools provided by another, the plaintiff is more likely to be an employee. It is also "normally understood," especially where the tools "are of substantial value," that the person who has been provided them "will follow the directions of the owner in their use." Restatement (Second) of Agency § 220, cmt. k. A person who has no control or ownership over the tools of her trade has greater need of Title VII's protection. *See Salamon*, 514 F.3d at 228.

68

The undisputed facts here reflect that IEWUM contributed "the set, camera, sound, costume, and crew." Dkt. No. 1064 at 51 n.44. Lively could not appear in the Film without a camera and sound technician to record her and a costume to wear. But that fact alone does not suggest that IEWUM was in control of the instrumentalities and tools or make this factor weigh in favor of Lively. The instrumentalities and tools also included Lively's celebrity and acting skills, for which IEWUM paid a large sum. Shapiro Decl., Ex. 28. Lively also "called in favors" with home design and fashion contacts "to get items loaned, discounted, or gifted to save" costs associated with both production design and costumes, and during post-production, she provided her "own editors" to participate in the editing of the Film. Shapiro Decl., Ex. 39 at 1; *see also Alberty-Velez*, 361 F.3d at 7 (noting that the actor there provided some of the tools and instrumentalities of her work).

Moreover, while IEWUM owned the screenplay and enjoyed the authority to hire members of the cast and crew, there is evidence that it shared the practical ability to exercise that authority with Lively. The Offer Letter gave Lively approval rights over hair, make-up, and wardrobe personnel. Shapiro Decl., Ex. 28 at 2. Lively "led the hiring of a freelance producer to help balance the set" and the hiring of "a new intimacy coordinator and intimacy doubles to help block out the sensitive scenes for both safety and shooting efficiency." Shapiro Decl., Ex. 39 at 2. She "personally called and/or wrote emails to crew and put forth names for dept head roles . . . [i]ncluding Hair, Makeup, Director of Photography, Costume Design, Transportation, Security, Camera Operators, etc." *Id.* at 1. She also "went through hundreds of casting tapes to help find the rest of the cast" and "personally identified" the actor to play Jenny Bloom. *Id.* at 1– 2. She was involved in the firing of the first assistant director. Shapiro Decl., Ex. 39 at 2. These facts also point toward independent-contractor status. *See Stack v. Karr-Barth Assocs., Inc.*,

2021 WL 1063389, at *6 (S.D.N.Y. Mar. 18, 2021) ("A worker's freedom to hire and pay assistants supports a finding of independent contractor status."); *accord Johnson*, 2011 WL 6153425, at *12; *see also Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x 74, 77 (2d Cir. 2020) (summary order) ("[T]he ability to hire others to run the business is evidence of the type of 'considerable independence and discretion' that supports a finding of independent contractor status." (quoting *Saleem*, 854 F.3d at 143)); *Preacely v. AAA Typing & Resume, Inc.*, 2015 WL 1266852, at *7 (S.D.N.Y. Mar. 18, 2015) (noting that ability to fire also supports a finding of independent contractor status).

*Duration of the Relationship and Whether the Hiring Party Has the Right to Assign Additional Projects to the Hired Party.*  The duration and nature of employment are consistent with independent contractor status.  "A traditional employee . . . will typically be hired to create not just a single artistic project, but will instead be subject to the employer's right to assign additional and distinct projects during the term of the engagement."  *Horror Inc.*, 15 F.4th at 254; *see also Jones v. Pawar Bros. Corp.*, 434 F. Supp. 3d 14, 26 (E.D.N.Y. 2020) ("[T]he fact that Plaintiff could refuse work creates an inference of independence.").  By contrast, "an independent contractor's engagement is more likely to be 'project-by-project' . . . with the relationship terminating upon completion of the contractually assigned project."  *Horror Inc.*, 15 F.4th at 254 (quoting *Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1998)); *see also Aymes*, 980 F.2d at 863 ("[I]ndependent contractors are typically hired only for particular projects."); *Kasseris v. ZA & D Serv. Station, Inc.*, 2026 WL 84037, at *6 (E.D.N.Y. Jan. 12, 2026) ("Generally speaking, independent contractors often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas employees usually work for only one employer and such relationship is continuous and of indefinite duration." (quoting

70

*Saleem*, 52 F. Supp. 3d at 543)).  A relationship in which "a contractor is hired for a single project with well-defined limits, and the employer has no discretion to assign additional work without negotiating additional payment," indicates independent-contractor status.  *Yu v. N.Y.C. Hous. Dev. Corp. (HDC)*, 2011 WL 2326892, at \*29 (S.D.N.Y. Mar. 16, 2011), *report and recommendation adopted*, 2011 WL 2183181 (S.D.N.Y. June 3, 2011), *aff'd*, 494 F. App'x 122 (2d Cir. 2012) (summary order).

In addition, the Second Circuit has stated that "a relatively short tenure [of four to five weeks] ordinarily implies that a worker is an independent contractor."  *Eisenberg*, 237 F.3d at 117; *see also  Horror Inc.*, 15 F.4th at 255 (a period of approximately two months is "so brief" as to suggest such a hired party is not an employee); *Sellers*, 2014 WL 104682, at \*8 (noting that five "discrete, short-term contracts, none of which lasted more than three months . . . weigh[ed] in favor of an independent contractor status").

Lively committed to a period of six consecutive weeks for principal photography, "plus standard prep services" subject to her availability and approval and up to three free post-production days.  Shapiro Decl., Ex. 28.  She had no obligation to participate in any other projects for IEWUM or for Wayfarer, and there is no evidence of any contemplation that she would work on any other projects or have any continued relationship with the Wayfarer Parties after completion of the Film.  These undisputed facts suggest independent contractor status.

*The Method of Payment*.  Lively's pay, employee benefits (or lack thereof), and tax treatment are also all consistent with her status as an independent contractor rather than an employee.  These factors ordinarily are not given decisive weight in the Title VII context for fear that a wily employer might by contract force its worker to give up her statutory rights and thereby "opt out of the anti-discrimination laws."  *Eisenberg*, 237 F.3d at 117.  In this case,

however, the particular circumstances do weigh at least somewhat in favor of independent-contractor status.

When a person is paid on the basis of projects completed rather than hours worked, that is suggestive of independent-contractor status. *See Horror Inc. v. Miller*, 335 F. Supp. 3d 273, 309 (D. Conn. 2018) ("Miller's compensation was based exclusively on his completion of the individual project—he was never paid based on time worked. Accordingly, the method-of-payment factor suggests independent contractor status."), *aff'd*, 15 F.4th 232 (2d Cir. 2021); *Smith v. Calypso Charter Cruises Inc.*, 2021 WL 4084182, at *10 (S.D.N.Y. Sept. 8, 2021) (noting that "[i]ndependent contractors are commonly paid upon completion of a specific job, with the pay keyed to the scale and nature of work as opposed to on a salaried or fixed basis," and holding that payment by check for services rendered during cruises "strongly" favored independent-contractor status). In addition, "commission-based compensation cuts in favor of independent-contractor status." *Stack*, 2021 WL 1063389, at *5; *Tremalio v. Demand Shoes, LLC*, 2013 WL 5445258, at *15 (D. Conn. Sept. 30, 2013) (same). Further, a plaintiff's receipt of payment from a defendant "'under the name of his business' weighs in favor of independent contractor status." *Sellers*, 2014 WL 104682, at *9 (quoting *Thompson v. DDB Needham Chi., Inc.*, 1996 WL 392165, at *6 (N.D. Ill. July 11, 1996)); *cf. Cox v. German Kitchen Ctr. LLC*, 2023 WL 8648839, at *8 (S.D.N.Y. Dec. 14, 2023) ("Plaintiff created a system to receive payments in the manner of a sophisticated independent contractor.").

Lively was paid by the project, rather than hourly, and through her loanout entity Blakel, rather than directly. R.56.1 ¶ 24; *see also* Shapiro Decl., Ex. 28 at 1 ("*Lender* shall receive the sum of US$1,750,000 on a guaranteed, pay or play basis . . . ." (emphasis added)). She also received substantial equity in the project. In her words, she "own[ed] a huge piece of the

72

movie." Shapiro Decl., Ex. 83. IEWUM guaranteed her a wide theatrical release and she (through her loanout entity) was entitled to receive contingent compensation based on the success and exploitation of the Film, with "[n]o one to get a greater percentage, a more favorable definition or cut." Shapiro Decl., Ex. 28 at 1. The provisions for award bonuses and credit suggest she had a stake in the project independent of what her work would generate for the common enterprise. The Offer Letter entitled her to bonuses for an Academy Award, for a Golden Globe award, or for a SAG award, and, as noted, to on-screed credit, credit in paid advertisements, and to Executive Producer credit, first among all other Executive Producers. *Id.* at 2. Lively did not receive employee benefits such as medical insurance. *See* R.56.1 ¶ 375. And the Wayfarer Parties were not asked to and did not withhold federal income, Social Security, or Medicare taxes, or any other state or local taxes. *Id.* ¶ 25.[17]

*Whether the Work Is Part of the Regular Business of the Hiring Party.* Finally, there is no dispute that the Wayfarer Parties were in the business of producing films and that Lively's work related to that business objective. The Second Circuit has cautioned, however, that whether a hiring party is in business "indicates nothing about whether [the hired party] was an employee in that business," and that "[t]his factor will generally be of little help in this analysis." *Aymes*, 980 F.2d at 863; *accord Yu*, 2011 WL 2326892, at *28; *Kreinik v. Showbran Photo, Inc.*, 400 F. Supp. 2d 554, 570 (S.D.N.Y. 2005).

---

[17] Lively contends that she was covered under IEWUM's workers' compensation policy, but that provision appeared only in the unexecuted ALA. R.56.1 ¶ 366. Lively also briefly suggests that the method-of-payment factor favors her because IEWUM paid her fee on its "regular payday in the week following the week in which such payments have accrued," but she does not cite to any evidence to substantiate this assertion, and the Rule 56.1 statement makes no mention of it. *See* Dkt. No. 1064 at 51 n.44. In any event, what matters more is what payment is based upon rather than when it is processed.

*The Balance of the Reid Factors*.  Analyzing the factors and the relationship as a whole, the relevant considerations overwhelmingly point in the direction of Lively being properly classified an independent contractor.  Lively is a highly skilled artist who agreed to contribute her acting skills and name recognition to a single purpose entity for a single term-limited project for equity in the project with heavily negotiated approval rights over her own performance and key aspects of the project, and with the ability to accept and perform other work outside of a short six-week window (during which her presence on set was necessary for purposes of creative collaboration).  Not only did she reserve substantial contractual control over her participation in the Film, but she exercised that control.  The Court need not rely on her statement in the PGA Letter that she "produced every moment of this film" to see that her role far exceeded that of a traditional employee.  She played a part in hiring and firing assistants, negotiated for the relocation of filming to be closer to her home, rewrote the script, conducted meetings with all department heads and the studio, oversaw a team of editors, and played a central part in shaping the Film's "look," marketing, and release.  She enjoyed the economic independence to walk at any moment with the only consequence being that she would potentially be in breach of contract. And she exercised that independence in negotiating the terms under which she would return to work.  She also enjoyed equity in the Film, ensuring that her compensation would be based not just on her own work but on the Film's success as a whole.

There is limited caselaw bearing directly on the status of an actor as an independent contractor under the federal anti-discrimination laws.  But the Court's conclusion is consistent with the caselaw that does exist.  In *Alberty-Velez*, the plaintiff was a host of a Puerto Rican television show, who signed a new contract for each episode and was required "to work a certain number of days (usually two) filming the show in a specific town," during which time she was

74

on-call for the entire day and subject to direction by the show's producer, who "set the location and hours of filming" and "established the basic content of the program." 361 F.3d at 4. The production company provided the equipment for filming but the plaintiff provided her own clothing and hair stylist. *Id.* The plaintiff was paid a lump sum amount for each episode with no withholding or benefits. *Id.* The First Circuit held that her claim for pregnancy and gender discrimination was properly dismissed on summary judgment because no reasonable factfinder could conclude that she was an employee. *Id.* at 11. Central to the court's holding was its rejection of an argument strikingly similar to the one that Lively makes here—namely, that actors are employees whenever they receive directions during filming, are told where filming will occur, and are required to be on-call for certain hours during filming days. *Id.* at 9. The court explained that "[w]hile 'control' over the manner, location, and hours of work is often critical to the independent contractor/employee analysis," context matters, and considering the industry at issue and "the tasks than an actor performs," the types of control identified by the plaintiff were not indicative of employee status. *Id.* The control that came from the direction given to an actor by a director was inherent to the two roles and not indicative of the extent of their general independence from one another. *Id.* The court stated in relevant part:

> Alberty's work on "Desde Mi Pueblo" required her to film at the featured sites at the required times and to follow the instructions of the director. WIPR could only achieve its goal of producing its program by having Alberty follow these directions. . . To hold that this sort of control determines Alberty's status would defy "common sense" as it would result in classifying all actors as employees, regardless of the other aspects of the relationship.

*Id.* at 10.

Likewise in *Lerohl v. Friends of Minnesota Sinfonia*, a Title VII retaliation case upon which *Alberty-Velez* relied, the Eighth Circuit held that musicians in a symphony were independent contractors even though the conductor of the symphony had "undisputed control in

75

selecting the music to be played, scheduling [] rehearsals and concerts, and determining the manner in which the concert music was collectively played."  322 F.3d at 490.  The court reasoned that in this context, the issue of control most sensibly turned not on whether the conductor could tell the musicians "where to sit and when to play during a concern or rehearsal," but on whether the musicians retained the discretion to decline to play in particular concerts and to accept jobs elsewhere.  *Id.* at 491–92.  Because they did, the court found that they were independent contractors as a matter of law.  *Id.* at 492.

Other courts addressing workers in creative contexts have analyzed the issue similarly. *See, e.g.*, *Axakowsky*, 2018 WL 5961923, at *1–4 (holding in a Title VII hostile work environment suit that "a reasonable factfinder could only conclude" that an actor who provided voiceover services for NFL Productions was an independent contractor even though she almost always used NFL Productions' recording studio and equipment and did so mainly on NFL Productions' schedule and at its studios, as these facts were "less weighty" in the analysis given "the nature of the work at issue"); *see also McDaniel*, 781 F. Supp. 3d at 18 (holding in a Title VII sex discrimination case that a model, actress, and spokesperson was an independent contractor despite her contention that there were "hotly contested" issues regarding the level of control over aspects of her work, as those issues did "little to show the required level of control because they were largely creative in nature").

Lively relies primarily on a single case to argue the contrary, but upon close analysis, it does not support her claims.  The plaintiff in *Makarova v. United States*, was "widely regarded as the world's best prima ballerina" and performed in productions at the Kennedy Center for the Performing Arts in Washington, D.C.  201 F.3d at 112.  She sued the Kennedy Center under the Federal Tort Claims Act after a piece of scenery fell on her during a performance.  *Id.*  The

76

Second Circuit affirmed that she was properly classified as an employee under both New York and District of Columbia law because her contract with the Kennedy Center required her to: "(1) play a specific part in the musical; (2) maintain a contractually specified rehearsal and performance schedule; (3) have her hair styled in accord with the time period of the show; (4) wear shoes and make-up provided by the Kennedy Center; and (5) provide her exclusive services to the Kennedy Center during the term of the contract." *Id.* at 114.

*Makarova* is distinguishable in several respects. First, the Circuit applied New York and District of Columbia law and not the common law of agency that governs Title VII. 201 F.3d at 114–16. District of Columbia law—in notable contrast to Title VII—defines "employee" as "every person . . . in service of another under any contract of hire," D.C. Code Ann. § 36–301(9) (1981). As to New York law, the Circuit noted in a relatively short discussion that "New York courts have repeatedly found performance artists to be 'employees.'" *Id.* at 114. Without mentioning or applying the *Reid* factors or citing to any cases that did, the Second Circuit stated that "[a]s long as the employer exercises control over such aspects of the workers' employment as the dates and times of performances and the work to be performed, *New York law* would appear to treat him or her as an employee." *Id.* (emphasis added). Lively has not cited, nor has the Court found, any decision applying *Makarova* in the context of Title VII claim.

*Makarova* is also distinguishable on its facts. The case does support the propositions, which the Court has accepted, that a movie star is not by virtue of being a star categorically excluded from the protections of Title VII, and that the receipt of direction is relevant to the analysis. But in concluding that Makarova was an employee under New York and District of Columbia law, the court relied on the equitable consideration (not present here) that the plaintiff had previously accepted workers' compensation benefits available only to Kennedy Center

77

employees.  *Id.*  The court stated that, having accepted these benefits, "Makarova cannot now argue that she should be free of the strictures of that same workers' compensation regime."  *Id.*  And there was no evidence presented there, as is presented here, of the ballerina's control over the means and methods of production of the ballet as a whole, or that she had a financial interest in its success.

Because Lively was an independent contractor, the Wayfarer Parties are entitled to summary judgment on her Title VII claims.

### B.  California Law

The Wayfarer Parties also argue that Lively was an independent contractor and not an employee under California's "business-to-business exception" such that her Section 1102.5 retaliation claim must also be rejected.  Dkt. No. 1119 at 14-15.  Under California law, as under federal law, "[w]hether an individual is an employee or independent contractor is a question of law unless the determination depends upon a dispute of material fact."  *Irish v. Magnussen Home Furnishings, Inc.*, 786 F. App'x 687 (9th Cir. 2019) (citing *S.G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 769 P.2d 399, 403 (Cal. 1989)).  Similar factors to those that compel the conclusion that Lively was an independent contractor for purposes of Title VII also require rejecting her claim under California labor law.

California labor law creates a presumption that "a person providing labor or services for remuneration is considered an employee rather than an independent contractor."  Cal. Lab. Code § 2775(b)(1); *Dynamex*, 416 P.3d at 35.  Such presumption can be defeated only if the hiring entity satisfies all three parts of the so-called ABC test: (A) the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; (B) the worker performs work that is outside the usual course of the hiring entity's business; and (C) the worker is customarily

78

engaged in an independently established trade, occupation, or business of the same nature as the work performed. Cal. Lab. Code § 2775(a). As of 2020, the "ABC" test applies to determine employment status in all cases under the California Labor Code, as well as in cases involving wage orders and Unemployment Insurance Code violations. *See Thoma v. VXN Grp., LLC*, 2025 WL 1766337, at *17 (C.D. Cal. Mar. 11, 2025); *Barajas v. Ortiz-Nance*, 2021 WL 4469636, at *9 (Cal. Ct. App. Sept. 30, 2021).

The presumption established in Section 2775(b)(1) and the California Supreme Court's decision in *Dynamex*, however, is subject to an important exception. Section 2775(b)(1) and *Dynamex* "do not apply to a bona fide business contracting relationship." Cal. Lab. Code § 2776. In order to avail itself of the test for bona-fide business-to-business relationships, the contracting business must satisfy each of the following twelve conditions:

(1) The business service provider is free from the control and direction of the contracting business entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.

(2) The business service provider is providing services directly to the contracting business rather than to customers of the contracting business. This subparagraph does not apply if the business service provider's employees are solely performing the services under the contract under the name of the business service provider and the business service provider regularly contracts with other businesses.

(3) The contract with the business service provider is in writing and specifies the payment amount, including any applicable rate of pay, for services to be performed, as well as the due date of payment for such services.

(4) If the work is performed in a jurisdiction that requires the business service provider to have a business license or business tax registration, the business service provider has the required business license or business tax registration.

(5) The business service provider maintains a business location, which may include the business service provider's residence, that is separate from the business or work location of the contracting business.

(6) The business service provider is customarily engaged in an independently established business of the same nature as that involved in the work performed.

(7) The business service provider can contract with other businesses to provide the same or similar services and maintain a clientele without restrictions from the hiring entity.

(8) The business service provider advertises and holds itself out to the public as available to provide the same or similar services.

(9) Consistent with the nature of the work, the business service provider provides its own tools, vehicles, and equipment to perform the services, not including any proprietary materials that may be necessary to perform the services under the contract.

(10) The business service provider can negotiate its own rates.

(11) Consistent with the nature of the work, the business service provider can set its own hours and location of work.

(12) The business service provider is not performing the type of work for which a license from the Contractors' State License Board is required, pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code.

*Id.* § 2776(a). If the contracting business is unable "to establish any one of the criteria, the inquiry ends." *Thoma*, 2025 WL 1766337, at *17.

If those twelve conditions are satisfied, the determination of whether a person is an employee or independent contractor is governed by the test set forth by the California Supreme Court in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 769 P.2d 399 (Cal. 1989). "[T]he Borello standard . . . calls for consideration of all potentially relevant factual distinctions in different employment arrangements on a case-by-case, totality-of-the-circumstances basis." *Dynamex*, 416 P.3d at 33. "The principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *Borello*, 769 P.2d at 404 (quoting *Tieberg v. Unemployment Ins. Appeals Bd.*, 471 P.2d 975, 977 (Cal. 1970)). The California Supreme Court has also identified a number of "secondary indicia of the nature of a service relationship," including "the right to discharge at will, without cause," and:

80

(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Id.* (internal quotations omitted). The factors "are intertwined and their weight depends often on particular combinations." *Id.* (citation omitted). "The importance due to each individual factor is case-specific." *Hill v. Walmart Inc.*, 32 F.4th 811, 818 (9th Cir. 2022).

The Wayfarer Parties have checked the box as to each of the 2776(a) factors. Lively provided services for the Film pursuant to a contract between IEWUM and her loanout company, Blakel. Shapiro Decl., Ex. 28. Her company, Blakel, was free from the control and direction of IEWUM under the contract and in fact for many of the same reasons the Court has concluded that Lively is an independent contractor under Title VII. IEWUM was a special-purpose entity created only for the Film. Lively had a circumscribed but important role with respect to the Film. IEWUM could exercise no control or direction over Blakel without Lively's consent. In loaning Lively for purposes of the Film, Blakel was providing services directly to IEWUM and not to IEWUM's customers, and the contract between Blakel and IEWUM was in writing and specified the payment amount and rates of pay, services to be performed, and due dates for payment. It is not disputed that Blakel had a business tax registration and that it maintained a business location separate from IEWUM's business location. Nor is it disputed that Blakel is customarily engaged in an independently established business of the same nature as that involved in the work performed, that Lively could contract with other production companies to offer her services, or that she held herself out to the public as available to provide similar services. For

81

reasons previously stated, it is apparent that Blakel was able to negotiate its own rates for Lively and also to set its own hours and locations of work.

The same undisputed facts that establish Lively was not an employee under Title VII also satisfy the test for an independent contractor under *Borello*.  Lively and Blakel had control over the manner and means of production.  Unlike in *Tieberg*, where the putative employer had "the right to direct [] writers in making modifications or revisions in their teleplays," IEWUM could not dictate changes in the script or other important aspects of the product.  *See Tieberg*, 471 P.2d at 981–82.  If IEWUM wanted to make any change to the screenplay or to the director or co-lead for that matter, it needed Lively's approval.  Lively was paid on a guaranteed, pay or play basis; even if IEWUM decided not to make the Film or decided to make it without her, she was still owed her fee.  Lively was "engaged in a distinct occupation, [her] work involves skill, [she did ] not work on [IEWUM's] premises, [she was] employed only to [act] in a particular [Film], and [she was] paid by the job rather than by the hour," all of which suggest independent-contractor status.  *Tieberg*, 471 P.2d at 982.  There is no evidence that IEWUM's control over the costumes and set was of such "substantial value" as to indicate that they alone gave IEWUM control over Lively.  *Id.*  And there is no evidence that IEWUM considered itself an employer or that Lively considered herself an employee.  Regardless whether the facts are analyzed through the lens of Title VII or through the lens of *Borello*, Lively was not an employee.

Summary judgment must therefore also be granted on Lively's Section 1102.5 claim.

## III.    Extraterritoriality

The Wayfarer Parties present one last hurdle to Lively's California statutory claims: They assert that these laws apply only to conduct with a sufficient nexus to California, and that such a connection is lacking here.  Dkt. No. 813 at 5–9.  Lively responds that the California statutes apply because the parties included a California choice-of-law provision in the ALA, and that

82

even without that provision, her claims possess a sufficient nexus to California.  Dkt. No. 1055 at

18.  The Court concludes that the California statutes do not apply to Lively's sexual harassment

claims but that they might to her retaliation claims.

### A.    The Presumption Against Extraterritoriality

California presumes that its statutes do not have extraterritorial application.  *Diamond*

*Multimedia Sys., Inc. v. Superior Ct.*, 968 P.2d 539, 553 (Cal. 1999); *accord People ex rel.*

*DuFauchard v. U.S. Fin. Mgmt., Inc.*, 87 Cal. Rptr. 3d 615, 625 (Cal. Ct. App. 2009).[18]  As the

California Supreme Court has repeatedly explained, no matter how "far the Legislature's power

may theoretically extend, [courts] presume the Legislature did not intend a statute to be operative

with respect to occurrences outside the state unless such intention is clearly expressed or

reasonably to be inferred from the language of the act or from its purpose, subject matter or

history."  *Sullivan v. Oracle Corp.*, 254 P.3d 237, 248 (Cal. 2011) (cleaned up) (quoting *N.*

*Alaska Salmon Co. v. Pillsbury*, 162 P. 93, 94 (Cal. 1916)).

Applying this presumption, courts have found that FEHA and California Labor Code

Section 1102.5 do not apply to claims arising out of conduct occurring outside the state.  First,

although "[i]t does not appear that the Ninth Circuit or California Supreme Court has addressed

whether FEHA may apply extraterritorially," the highest California court to address the issue, the

California Court of Appeal, has determined that FEHA was "not intended to apply to non-

residents where the tortious conduct took place outside of California's territorial boundaries."

*Tetrault v. Cap. Grp. Cos. Glob.*, 2024 WL 3468903, at \*5 (C.D. Cal. Jan. 17, 2024) (citing

*Campbell v. Arco Marine, Inc.*, 50 Cal. Rptr. 2d 626 (Cal. Ct. App. 1996)).  The California Court

of Appeal based this conclusion on its review of the statute and relevant legislative history,

---

[18] A similar presumption applies with respect to federal law.  *See Yegiazaryan v. Smagin*, 599
U.S. 533, 541 (2023).

including the legislature's "repeated statements that the law was enacted for the benefit of the *citizenry* of [California]." *Campbell*, 50 Cal. Rptr at 633 (emphasis added). Many courts have followed suit. *See Gonzalez v. Apttus Corp.*, 2023 WL 4827996, at *3–4 (N.D. Cal. July 26, 2023) (collecting cases). And courts have reached a similar conclusion for similar reasons with respect to California Labor Code Section 1102.5. *See, e.g.*, *Wilson v. Wavestream Corp.*, 2024 WL 3914475, at *3 (C.D. Cal. May 13, 2024) (collecting cases); *Garcia v. ROC Nation LLC*, 2025 WL 1865965, at *17 (S.D.N.Y. July 2, 2025); *Tetrault*, 2024 WL 3468903, at *5. Lively offers no reason for the Court to depart from this consensus, and the Court sees none.

It does not appear that any court has addressed the extraterritorial reach of California Civil Code Section 51.9, which was adopted to "plug a hole" in FEHA by prohibiting sexual harassment not only in the employer-employee context but also in contexts involving other types of "professional relationships." *See Rohm v. Homer*, 367 F. Supp. 2d 1278, 1287 (N.D. Cal. 2005) (alterations omitted) (quoting *Brown v. Smith*, 64 Cal. Rptr. 2d 301, 313 (Cal. Ct. App. 1997)). As with FEHA and California Labor Code Section 1102.5, the statute on its face contains no indication that it was intended to apply extraterritorially. *See* Cal. Civ. Code § 51.9. The fact that it was adopted as a companion to FEHA, which does not apply extraterritorially, also suggests that it covers only intra-state claims. Ultimately, the Court need not make a definitive holding with respect to the territorial reach of this law, as Lively has not contested the Wayfarer Parties' assertion that the presumption against extraterritoriality applies to Section 51.9 as well. The Court will therefore proceed on the assumption that similar standards govern Section 51.9.

Lively's principal contention is that the territorial reach of these statutes is beside the point because "[t]he parties expressly agreed that California's substantive law would govern all

disputes arising out of or relating to Ms. Lively's services under the [ALA]." Dkt. No. 1055 at 7. The ALA, she argues, is conclusive with respect to the statutes' application here. The Wayfarer Parties disagree, responding primarily that "a contractual choice of law provision that incorporates California law presumably incorporates all of California law—including California's presumption against extraterritorial application of its law." Dkt. No. 1122 at 11 (citing *O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 1005 (N.D. Cal. 2014)); *see also Wavestream*, 2024 WL 3914475, at *2 n.2 (C.D. Cal. May 13, 2024) (collecting cases holding that "a California choice-of-law clause incorporates California's presumption against extraterritoriality and its geographical limitation unless there is an indication otherwise"). This dispute poses an interesting and important question regarding parties' ability to contract around extraterritorial limitations in state statutes. It is not one, however, that the Court need address, as the ALA was never executed and is not binding. *See supra* § I. The premise underlying Lively's argument—that the parties "expressly agreed" to apply California law to all disputes—is therefore incorrect. For Lively to obtain relief under the California statutes, she must demonstrate that her claims would not violate principles of extraterritoriality.

### B.     Lively's Claims

Lively asserts that her California sexual harassment and retaliation causes of action are sufficiently related to California such that they do not implicate extraterritoriality concerns. Dkt. No. 1055 at 13–18. Courts addressing the question whether a case falls within the territorial limits of FEHA and California Labor Code Section 1102.5 apply the framework that the California Court of Appeal outlined in *Campbell*. *See Tetrault*, 2024 WL 3468903, at *5–6 (collecting cases); *see also* Dkt. No. 1055 at 13 n.12 (Lively acknowledging that courts evaluate Section 1102.5 allegations in the same manner as FEHA claims). *Campbell* involved sexual harassment claims brought by a Washington resident who was employed by a California-based

85

crude oil shipping company.  50 Cal. Rptr. 2d at 627–28.  The plaintiff performed most of her duties outside of California, and her claims arose from harassing behavior which occurred either at sea or in Washington.  *Id.* at 627, 631.  No one in the company's California headquarters "participated in or ratified the conduct."  *Id.*  Noting that the case's connection with California was only "slight," the Court of Appeals held that "FEHA was not intended to apply to non-residents where, as here, the tortious conduct took place out of this state's territorial boundaries." *Id.* at 628; *see also id.* at 632.  The relevant inquiry, then, is not where the employer is based, but where the wrongful conduct occurred.

Courts applying *Campbell* have held that even where "the majority of the allegedly discriminatory conduct" occurred outside of the state, a case possesses a sufficient nexus to California when "the ultimate discriminatory action"—often a plaintiff's termination—"was 'directed, overs[een], and ratified'" by individuals within the state.  *See Stovall v. Align Tech., Inc.*, 2020 WL 264402, at *3 (N.D. Cal. Jan. 17, 2020); *see also Ruffulo v. Farmers Ins. Exch.*, 2025 WL 2994717, at *2 (C.D. Cal. Mar. 17, 2025) (holding that there was a sufficient nexus to California even where employees were informed of their termination while outside the state, as the terminations were directed from the employer's nerve center in California); *Sims v. Worldpac Inc.*, 2013 WL 663277, at *3 (N.D. Cal. Feb. 22, 2013) (similar); *cf. eShares, Inc. v. Talton*, 2025 WL 936921, at *15 (S.D.N.Y. Mar. 27, 2025) (similar where the "decision to take [retaliatory] actions" was made in California).

This emphasis on the "ultimate" discriminatory acts aligns with other courts' focus on whether a "crucial element" of the claim occurred in California.  *See Eng. v. Gen. Dynamics Mission Sys., Inc.*, 2019 WL 2619658, at *8 (C.D. Cal. May 8, 2019) (holding that FEHA did not apply to a California resident who received her pay in California, paid California income taxes,

86

and performed a significant amount of her work in California, as she experienced harassment and a hostile work environment in Colorado, and the decision to terminate her was made in Georgia and North Carolina), *aff'd*, 808 F. App'x 529, 530 (9th Cir. 2020) (confirming that no "crucial element" of the claim occurred in California (citing *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 931 (Cal. 2006))).  Thus, it is not enough for a plaintiff to simply point to some event or activity that occurred in California.  There must instead be a "substantial connection" between California and "the core of the alleged wrongful conduct" going to "the material elements of the cause of action." *Sexton v. Spirit Airlines, Inc.*, 2023 WL 1823487, at *4 (E.D. Cal. Feb. 8, 2023); *accord Hill v. Workday, Inc.*, 773 F. Supp. 3d 779, 794 (N.D. Cal. 2025); *see also Diamond Multimedia Sys.*, 968 P.2d at 554 (asking whether "the conduct which gives rise to liability" occurred in California); *Eng.*, 2019 WL 2619658, at *7 (holding that the location of the decision to fire the plaintiff was far more important than the plaintiff's location when she learned about the termination, as courts must focus "on the location of the violative conduct").

### 1.    The Sexual Harassment Claims

Lively brings sexual harassment claims against IEWUM, Wayfarer, Baldoni, and Heath under FEHA, and against Baldoni and Heath under California Civil Code Section 51.9.  SAC ¶¶ 375–83, 441–46.  The crux of these claims is that the Defendants harassed Lively and subjected her to a hostile work environment on the basis of her sex and/or gender.  Lively's allegations center largely around conduct which occurred on the set of the Film during the first phrase of production in New Jersey.  *See id.* ¶¶ 75–109; R.56.1 ¶ 60.  This on-set conduct occurred outside California and cannot support applying the statutes extraterritorially.

Recognizing as much, Lively asserts that the "key decisions that enabled, escalated, and perpetuated the hostile work environment were made in California by executives supervising Ms. Lively's employment from Wayfarer's California headquarters."  Dkt. No. 1055 at 14.

87

Specifically, she alleges that Baldoni and Heath made "critical pre-production decisions from California that enabled harassment to occur and left cast and crew without protections once filming moved to New Jersey." *Id.* For that proposition, Lively asserts that Heath, acting from California, failed to hire a separate HR presence for production even though Baldoni had a potential conflict of interest as the Film's director and Wayfarer's chairman. R.56.1 ¶ 483; Gottlieb Decl., Ex. 3 at 116:18–24; SAC ¶ 113. Lively also points to Wayfarer's failure to provide sexual harassment training to cast and crew after Sony informed it that Sony would not be responsible for the training. R.56.1 ¶¶ 477–79, 481, 483; SAC ¶ 111. Lively asserts that these "California-based management decisions" effectively "guaranteed that once filming began, there would be no meaningful mechanism for Ms. Lively or any other cast member to report inappropriate behavior." Dkt. No. 1055 at 15.

Lively alleges that additional conduct in California "set the tone for harassment." *Id.* Shortly after Lively accepted the role of Lily Bloom, Heath sent the following text message to Baldoni while Heath was in California: "Btw. I'm at home with my daughter, husband, and wife with a visit from her midwife (that delivered Justin's kids, and my kids) going through the process for her home birth at my house. It's very magical. This all to say, the energy of bringing life into the world is surrounding us. We are birthing Blake into this roll." Gottlieb Decl., Ex. 102. Lively states that this comment "sexualized her and invoked female reproductive imagery to describe her professional contributions," signaling that her "value was tied to her gender rather than her talent." Dkt. No. 1055 at 15. Lively points also to the fact that during a pre-production Zoom meeting, Baldoni, "presumably" joining from California where he resided, "lashed out at a female producer" for disagreeing with him and subsequently sent an apology to that producer, also presumably from California. R.56.1 ¶¶ 489–90. Lively further states that when she and

88

Slate complained to Giannetti about Baldoni and Heath's behavior, Giannetti, who was in California, failed to act because she did not believe Sony was responsible. R.56.1 ¶¶ 483–84. When "efforts were finally made to address Ms. Lively's [complaints] and complaints by other female personnel, they were done via negotiation between Sony, Wayfarer, and Ms. Lively's personal counsel in California." Dkt. No. 1055 at 16; R.56.1 ¶¶ 582–83.

Lively contends that the harassment also continued after filming. In particular, she claims that the Wayfarer Parties "planned, coordinated, and implemented" a smear campaign from California which was intended to cast her in a false light, discredit her claims, and damage her career. Dkt. No. 1055 at 16; SAC ¶¶ 193–312. "In addition, after Ms. Lively filed her CRD complaint in December 2024—another California-based act—Defendants launched a second wave of retaliation, executed in part through their California-based attorney, Bryan Freedman, who made defamatory public statements and filed Defendants' retaliatory counter-lawsuit from California." Dkt. No. 1055 at 17; SAC ¶¶ 50–51, 303–12. Finally, Lively contends that her "employment relationship was established through a contracting relationship between Wayfarer, IEWUM, Blakel, Inc.—all California entities, negotiated in California, through California-based representatives." Dkt. No. 1055 at 14 n.14; R.56.1 ¶¶ 422, 582–83. In sum, she concludes that "[t]hese facts show that the harassment on set was the foreseeable extension of a hostile environment conceived in California, directed by California executives, and perpetuated through California-based decisions, policies, and omissions." Dkt. No. 1055 at 16.

None of these acts or occurrences provides the "substantial connection" to California needed to sustain Lively's sexual harassment claims under FEHA and Section 51.9. Most notably, the acts do not implicate issues of "core" or "ultimate" wrongdoing having any bearing on "the material elements of the cause of action." *Sexton*, 2023 WL 1823487, at *4. To start,

89

many of the acts were not even taken by the Wayfarer Parties and therefore do not involve "conduct which gives rise to liability." *See Diamond Multimedia Sys.*, 968 P.2d at 554. The fact that non-party Giannetti of Sony may have failed to act on complaints from Slate and Lively while in California cannot support a claim for harassment against the Wayfarer Parties under California law; there is no evidence that Giannetti was acting on behalf of the Wayfarer Parties or that she directed or ratified any discriminatory behavior. Furthermore, the fact that Lively's counsel and representatives negotiated her employment relationship while they were in California, or that Lively filed her CRD complaint in California, cannot support the application of California law. A plaintiff cannot transform an otherwise extraterritorial claim into a territorial claim by the unilateral decision to challenge the defendants' conduct in California.

Nor do the Wayfarer Parties' own California-based acts establish that the core of her claim arose from California. The vague assertion that Heath's private text message to Baldoni about the birth of his child "set the tone" for harassment implicitly concedes that the conduct Lively has identified does not itself go to the core of her complaints. No reasonable jury could conclude that Heath's text message about being at home with his family bore a sufficient relation to the sexual harassment Lively claims to have later occurred on set, or that Baldoni "lash[ing] out" at a female producer in a pre-production Zoom meeting while in California has a substantial bearing on a material element of her claims.

Lively's efforts to invoke retaliatory acts taken in California as a basis for sustaining her sexual harassment claims are without merit. Lively asserts that "[u]nder California law, retaliatory acts can constitute continuing harassment of an employee," and that because the retaliatory smear campaign was "implemented from California," this means that her sexual harassment claims also involve California-based conduct. Dkt. No. 1055 at 16 (citing *Birschtein*

90

*v. New United Motor Mfg., Inc.*, 112 Cal. Rptr. 2d 347, 353 (Cal. Ct. App. 2001)).  The Court will separately address issues of extraterritoriality as they relate to Lively's retaliation claims.  However, even if there might be some circumstances in which retaliatory acts exacerbate a hostile work environment and therefore qualify as a kind of continuing harassment, that is not the case here.  The retaliatory smear campaign is alleged to have begun after Lively's working relationship with the Wayfarer Parties concluded.  The alleged acts of retaliation therefore plainly cannot support a hostile work environment claim.  *See Alatraqchi v. Uber Techs., Inc.*, 2013 WL 4517756, at *7 (N.D. Cal. Aug. 22, 2013) ("[T]o the extent the complained-of conduct occurred after Plaintiff's termination, the Court fails to see how such conduct could create a hostile work environment for Plaintiff since he was no longer working for Uber."); *Cardenas v. F.D. Thomas, Inc.*, 2025 WL 418753, at *7 (E.D. Cal. Feb. 6, 2025) ("[A] claim for FEHA sexual harassment hostile work environment subject to the continuing violations doctrine does not accrue until 'the last discriminatory act *in furtherance of the hostile work environment*.'" (emphasis added and citation omitted)); *cf. Valenzuela v. Cochise County*, 2013 WL 85350, at *7 (D. Ariz. Jan. 8, 2013) ("Plaintiff cannot allege any acts constituting a hostile work environment occurring after the date of her termination, when she was no longer in that work environment.").[19]

Finally, failing to hire additional HR personnel or to share HR policies with cast and crew was not "the core of the alleged wrongful conduct" underlying Lively's sexual harassment claims.  *See Sexton*, 2023 WL 1823487, at *4.  To the extent Lively suggests that there might have been other "California-based decisions, policies, and omissions" responsible for her

---

[19] The character of the alleged retaliatory acts was also sufficiently different from the alleged acts of sexual harassment so as not to constitute a "continuing course" of harassment.  *See Brennan v. Townsend & O'Leary Enters., Inc.*, 132 Cal. Rptr. 3d 292, 311 (Cal. Ct. App. 2011).

harassment, Dkt. No. 1055 at 16, courts are clear that "formulaic" recitations regarding California decisionmakers who "instituted, approved, ratified, affirmed and/or implemented the discriminatory policies" cannot provide a sufficient factual nexus, *see Gonsalves v. Infosys Techs., LTD.*, 2010 WL 1854146, at *6 (N.D. Cal. May 6, 2010).

This case is therefore readily distinguishable from the ones upon which Lively relies. Lively cites *Doe v. Maxim, Inc.*, 2023 WL 11979557, at *11 (C.D. Cal. May 19, 2023), for the proposition that "[h]iring someone in California with knowledge that they will suffer discriminatory conduct out of state creates a nexus between the in-state conduct and the discriminatory conduct, and FEHA therefore applies." Dkt. No. 1055 at 13–14. But that case is far afield from this one. In *Doe*, the two individual defendants concocted a plan in California to entice the plaintiff—a model residing in California and who worked in California—out of the state for a supposed "photoshoot" so that they could sexually assault her. *Id.* at *1–2. The photoshoot was a pretext. That case is plainly inapplicable here, as there is neither allegation nor evidence that Heath or Baldoni concocted a plan from California to sexually harass Lively outside of the state, nor is there any allegation or evidence that Lively was hired "with knowledge" that she would be sexually harassed by someone else outside of the state.

The remainder of the cases are further afield. In each, some ultimate act of discrimination central to the elements of the claim occurred in California. *See eShares*, 2025 WL 936921, at *4–5, *15 (decisions to terminate plaintiff, publish a retaliatory article, and file a retaliatory lawsuit all made in California); *Stovall*, 2020 WL 264402, at *3 ("ultimate discriminatory action" of terminating plaintiff was directed, overseen, and ratified by individual in California); *Roger-Vasselin v. Marriott Int'l*, Inc., 2006 WL 2038291, at *8 (N.D. Cal. July 19, 2006) (denying summary judgment where decision to deny promotion may have involved

California-based manager); *Thompson v. Nat'l R.R. Passenger Corp.*, 2008 WL 11398932, at *3–4 (N.D. Cal. Dec. 17, 2008) (California management "was directly involved in the alleged objectionable conduct," including decision to terminate plaintiff); *Kisman v. United Parcel Serv., Inc.*, 2023 WL 11822264, at *5, *9 (C.D. Cal. Nov. 14, 2023) (California-based management "played a substantial role" in disciplining plaintiff).

The Court therefore grants judgment on Counts Three and Thirteen of the SAC because those claims lack a sufficient nexus to California. That means that both Lively's federal and state claims alleging sexual harassment fail to survive the Wayfarer Parties' motions for summary judgment and judgment on the pleadings.

### 2.      The Retaliation Claims

Lively's retaliation claims against IEWUM and Wayfarer under California Labor Code Section 1102.5 and against IEWUM, Wayfarer, Nathan, TAG, and Abel under FEHA do not suffer from similar deficiencies. These claims involve Lively's allegation that the Defendants subjected her to an adverse employment action "by launching a coordinated campaign to cast [her] in a false light during the publicity and promotion of the Film, to discredit her in the event that she publicly disclosed her concerns about harassment and other unlawful conduct, and to irreparably damage [her] career and future earning capabilities in direct retaliation for [her] participation in protected activity." SAC ¶¶ 391, 398. Whether these acts occurred, and whether they amount to "retaliation," are not issues that the Court must consider in connection with the issue of extraterritoriality. The only issue now is whether the core of the alleged wrongdoing possessed a sufficient nexus to California. It did.

Lively alleges that in August 2024, Wayfarer retained California residents TAG and Nathan to "get ahead of" Lively's "grievances" by planting false narratives portraying her as a "bully" and "mean girl." SAC ¶¶ 62–63, 190, 194, 199, 245. Baldoni and Heath—California

93

residents—then "directed" the execution of this alleged retaliatory smear campaign over the weeks and months that followed on behalf of themselves and IEWUM and Wayfarer, also California residents. *Id.* ¶¶ 36, 37, 57–61. Lively further alleges that the Wayfarer Parties launched a second wave of retaliation executed through their California-based attorney, Freedman, who made allegedly defamatory public statements and filed an allegedly retaliatory counter-suit from California. *Id.* ¶¶ 50–51, 303–12.

The acts forming the basis of Lively's retaliation claims largely occurred in and were directed from California. The rule against extraterritoriality thus does not pose an obstacle to the claims. *See eShares*, 2025 WL 936921, at *15 (applying FEHA where the "decision to take [retaliatory] actions were made in California"). Indeed, the Wayfarer Parties offer no real fight here. They focus almost exclusively on the sexual harassment claims and state only with respect to the retaliation claims that Nathan and Abel "cannot be liable for retaliation, wherever it occurred." Dkt. No. 1122 at 13. The Court will address that argument at a later point. For now, Lively's fourth, fifth, and seventh causes of action survive.[20]

## IV.    Retaliation

Lively brings retaliation claims against IEWUM and Wayfarer under Title VII, FEHA, and California Labor Code Section 1102.5. SAC ¶¶ 367–74, 384–400. She also brings aiding and abetting retaliation claims under FEHA against Nathan, TAG, and Abel. *Id.* ¶¶ 408–15; *see also* Dkt. No. 1064 at 41 n.25 (clarifying that Count Seven of the SAC involves only aiding and abetting retaliation, not harassment). The Court has granted judgment on the Title VII and Section 1102.5 claims on the grounds that Lively was an independent contractor. *See supra* § II.

---

[20] There may exist a question regarding the application of the FEHA retaliation statute where (1) the allegedly retaliatory conduct has a sufficient territorial nexus to California but (2) the underlying harassment about which the plaintiff has complained does not. No party has raised that issue on these motions, so the Court has no occasion to address it.

94

However, a person does not need to be an employee to bring a retaliation claim under FEHA. *See Fitzsimons v. Cal. Emergency Physicians Med. Grp.*, 141 Cal. Rptr. 3d 265, 269 (Cal. Ct. App. 2012); Cal. Gov't Code § 12940(h) (prohibiting retaliation against "any person" who engages in protected activity).  Indeed, as previously explained, the Wayfarer Parties have not moved for judgment on Lively's FEHA claims on the basis of her employment status.  *See* Dkt. No. 955 at 32–35.

The Court thus turns to Lively's retaliation claims under FEHA.  In doing so, the Court finds that there exist genuine issues of material fact requiring trial as to the claims against IEWUM and Wayfarer.  Nathan and Abel, however, are entitled to summary judgment with respect to the aiding and abetting claims pleaded against them.  The Court withholds judgment with respect to TAG's liability for aiding and abetting retaliation.[21]

Before proceeding further, the Court notes that the discussion below treats IEWUM and Wayfarer both as Lively's "employer"—not to suggest that there was an employer-employee relationship (there was not), but to conform to the language of the statute and caselaw, which use the term "employer" even in cases involving independent contractors.  *See, e.g.*, *Hirst v. City of Oceanside*, 187 Cal. Rptr. 3d 119, 131 (Cal. Ct. App. 2015).  Lively has argued that IEWUM and Wayfarer were her "joint employers" under FEHA.  Dkt. No. 1055 at 18–21.  The Wayfarer Parties have responded that they never made any argument to the contrary, but that if they had, there would be reason to reject Lively's position.  Dkt. No. 1122 at 14.  The Court will not at this stage grant judgment in Wayfarer's favor based on a "mythical argument" that it expressly says

---

[21] Lively has separately moved for spoliation sanctions against the Wayfarer Parties based on their use of the ephemeral messaging platform Signal.  *See* Dkt. No. 862.  She asserts that the Wayfarer Parties' destruction of relevant evidence makes summary judgement here especially unwarranted.  Dkt. No. 1064 at 44 n.31.  The Court need not address the issue of spoliation sanctions at this juncture, as there are triable issues with respect to retaliation regardless.

it never made in its opening briefing.  *Id.*  The Court will therefore treat Wayfarer and IEWUM

as joint employers under FEHA for present purposes.[22]

### A.    Legal Background

FEHA provides in broad terms that it is an unlawful employment practice for "any

employer . . . or person to discharge, expel, or otherwise discriminate against any person because

the person has opposed any practices forbidden under this part or because the person has filed a

complaint, testified, or assisted in any proceeding under this part."  Cal. Gov't Code § 12940(h).

Although this subsection mentions "discriminat[ion]," it has long been understood to prohibit

retaliation.  *See Husman v. Toyota Motor Credit Corp.*, 220 Cal. Rptr. 3d 42, 63 (Cal. Ct. App.

2017).  The statute defines "person" as including "one or more individuals, partnerships,

associations, corporations, limited liability companies, legal representatives, trustees, trustees in

bankruptcy, and receivers or other fiduciaries," Cal. Gov't Code § 12925(d), and "employer" as

including "any person regularly employing five or more persons, or any person acting as an

agent of an employer, directly or indirectly," *id.* § 12926(d).

FEHA's anti-retaliation provision is intended to "aid[] enforcement of the FEHA and

promote[] communication and informal dispute resolution in the workplace."  *Miller v. Dep't of*

*Corr.*, 115 P.3d 77, 94 (Cal. 2005).  As with retaliation claims brought under Title VII, FEHA

retaliation claims contain three elements.  A plaintiff must establish that (1) she engaged in

protected activity; (2) the defendant subjected her to an adverse employment action; and (3) a

---

[22] The Wayfarer Parties' arguments regarding administrative exhaustion are deemed abandoned, *see* Dkt. No. 813 at 9–11, as Lively argued in her opposition to the motion for judgment on the pleadings that, among other things, such an argument is an affirmative defense that they failed to plead, and they made no attempt to respond in their reply brief, *see Kocourek v. Shrader*, 391 F. Supp. 3d 308, 321 n.101 (S.D.N.Y. 2019); *Romeo v. Aid to the Developmentally Disabled, Inc.*, 2013 WL 1209098, at *12 (E.D.N.Y. Mar. 22, 2013).

causal link exists between the protected activity and the defendant's action.  *See Yanowitz v. L'Oreal USA, Inc.*, 116 P.3d 1123, 1130 (Cal. 2005).

The first part of the plaintiff's prima facie test, establishing "protected activity," requires demonstrating that the plaintiff took steps to oppose practices forbidden by FEHA.  *Nealy v. City of Santa Monica*, 184 Cal. Rptr. 3d 9, 25 (Cal. Ct. App. 2015).  "Of course, '[a plaintiff's] conduct may constitute protected activity . . . not only when the [plaintiff] opposes conduct that ultimately is determined to be unlawfully discriminatory under the FEHA, but also when the [plaintiff] opposes conduct that [she] reasonably and in good faith believes to be discriminatory, whether or not the challenged conduct is ultimately found to violate the FEHA.'"  *Dinslage v. City & County of San Francisco*, 209 Cal. Rptr. 3d 809, 819 (Cal. Ct. App. 2016) (quoting *Yanowitz*, 116 P.3d at 1131–32); *cf. Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("To prevail on a [Title VII] retaliation claim, 'the plaintiff need not prove that her underlying complaint of discrimination had merit . . . .'" (citation omitted)).  Put another way, a plaintiff may bring a retaliation claim where she has opposed conduct she reasonably believed to be discriminatory under FEHA, "even when a court later determines the conduct was not actually prohibited by the FEHA."  *Yanowitz*, 116 P.3d at 1131.

In a case where a court has not found an underlying FEHA violation, "the question is the reasonableness of the [plaintiff's] belief that [she] was opposing a practice prohibited by the FEHA."  *Dinslage*, 209 Cal. Rptr. 2d at 819.  This reasonableness inquiry contains both a subjective and objective component.  *Id.* at 819–20.  "A plaintiff must not only show that [she] subjectively (that is, in good faith) believed that [her] employer was engaged in unlawful employment practices, but also that [her] belief was objectively reasonable in light of the facts and record presented."  *Id.* at 820 (quoting *Little v. United Techs.*, 103 F.3d 956, 960 (11th Cir.

97

1997)).  "The objective reasonableness of an employee's belief that [her] employer has engaged in a prohibited employment practice 'must be measured against existing substantive law.'"  *Id.* (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999)).

A plaintiff's "unarticulated belief that [the defendant] is engaging in discrimination will not suffice to establish protected conduct for the purposes of establishing a prima facie case of retaliation, where there is no evidence the [defendant] knew that the [plaintiff's] opposition was based upon a reasonable belief that the [defendant] was engaging in discrimination."  *Husman*, 220 Cal. Rptr. 3d at 63 (cleaned up) (quoting *Yanowitz*, 116 P.3d at 1137, 1046).  A plaintiff need not expressly inform the defendant that she believes the defendant's conduct was discriminatory and in violation of FEHA.  *Id.*  However, "[c]omplaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct."  *Id.* (quoting *Yanowitz*, 116 P.3d at 1047).  "The relevant question . . . is not whether a formal accusation of discrimination is made but whether the [plaintiff's] communications to the [defendant] sufficiently convey the [plaintiff's] reasonable concerns that the [defendant] has acted or is acting in an unlawful discriminatory manner."  *Yanowitz*, 116 P.3d at 1047 (citation omitted); *see also Mayfield v. Sara Lee Corp.*, 2005 WL 88965, at *8 (N.D. Cal. Jan. 13, 2005) ("Though [the plaintiff] need not have invoked 'magic words' in order for his complaints to constitute protected activity, he must have alerted his employer to his belief that discrimination, not merely unfair personnel treatment, had occurred.").

The second part of the plaintiff's prima facie test, the adverse-employment-action prong, requires that the plaintiff's "terms, conditions, or privileges of employment" be materially altered

for the worse.  *Bailey v. S.F. Dist. Att'ys Off.*, 552 P.3d 433, 450 (Cal. 2024).[23]  "Minor or

relatively trivial adverse actions or conduct by employers or fellow employees that, from an

objective perspective, are reasonably likely to do no more than anger or upset an employee

cannot properly be viewed as materially affecting the terms, conditions, or privileges of

employment and are not actionable."  *Id.* (quoting *Yanowitz*, 116 P.3d at 1139).  On the other

hand, "treatment that is reasonably likely to impair [the plaintiff's] job performance or prospects

for advancement in [her] career" can make out a claim.  *Id.*; *see also Yanowitz*, 116 P.3d at 1143

("Actions that threaten to derail an employee's career are objectively adverse . . . .").  The

California Supreme Court has noted that "[r]etaliation claims are inherently fact specific, and the

impact of an employer's action in a particular case must be evaluated in context," considering

"the unique circumstances of the affected employee as well as the workplace context of the

claim."  *Yanowitz*, 116 P.3d at 1137.  "Additionally, the alleged retaliatory acts are to be

considered 'collectively,' rather than individually," and "may take the form of 'a series of subtle,

yet damaging, injuries.'"  *Bailey*, 552 P.3d at 433, 451 (quoting *Yanowitz*, 116 P.3d at 1139).

In the Title VII context, which California courts have drawn guidance from, *see*

*Yanowitz*, 116 P.3d at 1138, the Second Circuit has observed that "[a]t some level of generality,

any action taken by an employer for the purpose of defending against the employee's charge can

be characterized as adverse to the employee," but that does not mean that these actions qualify as

"adverse" under the statute, *see United States v. N.Y.C. Transit Auth.*, 97 F.3d 672, 677 (2d Cir.

1996); *accord Richardson v. Comm'n on Hum. Rts. & Opportunities*, 532 F.3d 114, 124 (2d Cir.

---

[23] Title VII, by contrast, requires only that there be some act which "well might have 'dissuaded
a reasonable worker from making or supporting a charge of discrimination.'"  *Burlington N. &
Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation omitted); *see also Bailey*, 552 P.3d at
450 n.8 (noting the distinction between California and federal law in this respect).

2008).  "Reasonable defensive measures do not violate the anti-retaliation provision of Title VII, even though such steps are adverse to the charging employee and result in differential treatment."  *N.Y.C. Transit Auth.*, 97 F.3d at 677.  That is because defendants must have "latitude in deciding how to handle and respond to discrimination claims, notwithstanding the fact that different strategies and approaches in different cases and classes of cases will result in differences in treatment."  *Id.*

California courts have likewise held with respect to FEHA that "the significance of particular types of adverse actions must be evaluated by taking into account the legitimate interests of both the employer and the employee."  *Yanowitz*, 116 P.3d at 1139.  An employer has a legitimate interest in taking reasonably defensive measures in the face of a charge of discrimination.  *See McSweeney v. Cohen*, 776 F. Supp. 3d 200, 254 (S.D.N.Y. 2025) ("[N]o reasonable employee should expect that the employer-defendant would simply surrender in the face of litigation.  Although the threat of a vigorous defense . . . might well cause an employee to think carefully about whether to start litigation at all, that threat is not the 'retaliation' that Congress had in mind in crafting the retaliation provisions of [federal antidiscrimination law]." (quoting *Sherman*, 2020 WL 2136227, at *6)); *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018) (holding that the defendants' release of a preemptive statement to the National Enquirer in an attempt to blunt the inflammatory force of sexual harassment allegations was a reasonable defensive measure that could not support a retaliation claim, especially considering that the statement was made without threats or menacing language impugning the plaintiff's character); *cf. Eckhart v. Fox News Network, LLC*, 2021 WL 4124616, at *22 (S.D.N.Y. Sept. 9, 2021), *on reconsideration in part*, 2022 WL 4579121 (S.D.N.Y. Sept.

29, 2022) (holding that the defendant's decision to file partially nude photos of the plaintiff on the public docket was not a reasonable defensive measure and could support retaliation liability).

With respect to the final element, causation, FEHA eschews Title VII's "but for" causation standard for retaliation claims, *see Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013), and instead requires "only that [discriminatory animus] was a 'substantial motivating factor'" in bringing about the adverse action, *see Wawrzenski v. United Airlines, Inc.*, 327 Cal. Rptr. 3d 245, 267, 283 (Cal. Ct. App. 2024); *accord Wu v. Shopify (USA) Inc.*, 2025 WL 3515027, at *3 (N.D. Cal. Dec. 8, 2025); *Loggins v. Leland Stanford Junior Univ.*, 2024 WL 3955470, at *5 (N.D. Cal. Aug. 26, 2024). This means that the discrimination must have "actually contributed to the [adverse employment action]" in a way that was more than "remote or trivial"—but the discrimination need not have been "the only reason motivating the [adverse employment action]." *King v. U.S. Bank Nat'l Ass'n*, 266 Cal. Rptr. 3d 520, 550 (Cal. Ct. App. 2020) (quoting *Alamo v. Prac. Mgmt. Info. Corp.*, 161 Cal. Rptr. 3d 758, 769 n.2 (Cal. Ct. App. 2013)). One way of demonstrating causation is "indirectly by timing: protected activity followed closely in time by adverse employment action." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015); *accord Hawkins v. City of Los Angeles*, 252 Cal. Rptr. 3d 849, 856 (Cal. Ct. App. 2019); *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001). But temporal proximity is not a necessary component of establishing causation, and other circumstances might give rise to an inference of discrimination. *See Hawkins*, 252 Cal. Rptr. 3d at 856 ("Even if we found that a long period elapsed between the protected activity and the terminations, a causal connection between them would still be established so long as the City engaged in a pattern of conduct consistent with a retaliatory intent.").

Where there is a triable issue of fact regarding whether retaliation played a substantial

101

motivating role in the adverse employment action, a FEHA claim is not properly resolved on summary judgment. *See Husman*, 220 Cal. Rptr. 3d at 57. That is true even if the defendant professes that the same action would have happened for legitimate, non-retaliatory reasons, and the plaintiff has not disputed that contention. *See id.* FEHA's causation test therefore stands in contrast to that under Title VII, which permits a defendant to defeat a retaliation claim by offering unrebutted evidence that the same adverse employment action would have happened regardless for non-retaliatory reasons. *See Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70–73 (2d Cir. 2015). This is another way of stating that but-for causation is required for retaliation claims under Title VII but not FEHA.

Under FEHA, if the plaintiff has raised a triable issue regarding whether retaliation was a substantial motivating factor in the adverse action, the defendant is still "entitled to demonstrate that legitimate, nondiscriminatory reasons would have led it to make the same decision at the time" (i.e., to negate but-for causation), but such a showing goes to damages rather than to liability. *See Harris v. City of Santa Monica*, 294 P.3d 49, 61, 72 (Cal. 2013); *see also Kell v. AutoZone, Inc.*, 2014 WL 509143, at *11–17 (Cal. Ct. App. Feb. 10, 2014) (unpublished) (explaining that *Harris*, a FEHA discrimination case, also applies to FEHA retaliation claims)[24]; *McCray v. Westrock Servs., LLC*, 2024 WL 4579108, at *4 (C.D. Cal. Sept. 10, 2024) (noting that the "*Harris* causation standard also applies to FEHA retaliation claims" and citing for

---

[24] "Even though unpublished California Courts of Appeal decisions have no precedential value under California law, [federal courts are] 'not precluded' from considering such decisions 'as a possible reflection of California law.'" *See Goodson v. County of Plumas*, 2023 WL 4678990, at *20 n.2 (E.D. Cal. July 21, 2023) (quoting *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1167 n.6 (9th Cir. 2011)). The California Court of Appeal's decision in *Kell* provides by far the most thorough discussion of whether the California Supreme Court's decision in *Harris* applies to FEHA retaliation claims, and the Court adopts its reasoning not because it is authoritative or binding but because it is persuasive.

support the California Court of Appeal's decision in *Alamo*, 161 Cal. Rptr. 3d at 760–61); *Balladarez v. Vitro Flat Glass LLC*, 2024 WL 3226729, at *14 (E.D. Cal. June 28, 2024) (same); *Schlitt v. Abercrombie & Fitch Stores, Inc.*, 2016 WL 2902233, at *12 (N.D. Cal. May 13, 2016) (same).

### B.    Analysis

"The complex issue of retaliation . . . involves a factual inquiry into the employer's motivation and intent." *Loiseau v. Dep't of Hum. Res. of State of Or.*, 113 F.3d 1241 (9th Cir. 1997) (citation omitted). Such inquiries are typically reserved for the factfinder and not to be resolved on summary judgment. *See Begnal v. Canfield & Assocs., Inc.*, 92 Cal. Rptr. 2d 611, 618 (Cal. Ct. App. 2000) ("[D]eterminations regarding motivation and intent depend on complicated inferences from the evidence and are therefore peculiarly within the province of the factfinder."). Here, the Court finds triable issues of fact with respect to all three elements of Lively's FEHA retaliation claim.

### 1.    Protected Activity

The parties appear to agree that Lively engaged in at least some protected activity. *See* Dkt. No. 955 at 31–32 (Wayfarer Parties arguing not that Lively failed to engage in protected activity, but that it was too attenuated from an adverse employment action); Dkt. No. 1119 at 11 (same). Most notably, on November 9, 2023, in anticipation of returning to set after the conclusion of the Writers Guild of America and SAG-AFTRA strikes, Lively's attorneys sent Meziane, Wayfarer's in-house counsel, an email with the Protections for Return to Production (the "Protections Letter"). R.56.1 ¶ 582. Lively's counsel stated that "at this stage our client is willing to forego a more formal HR process in favor of everyone returning to work and finishing the Film" if Wayfarer was willing to "guarantee[] and observe[]" seventeen enumerated protections. Shapiro Decl., Ex. 103. The Protections Letter alluded to specific incidents during

103

the first phase of production, which the Court will describe in more detail below.  *See* Gottlieb Decl., Ex. 32; Gottlieb Decl., Ex. 24 at 27:10–29:5 (Heath testifying that he understood the CRA to "nod" to some of the concerns Lively had previously raised).  For example, the letter stated, among other things: that an intimacy coordinator had to be on set whenever Lively was present; that there would be no spontaneous improvising of any scenes involving physical touching, simulated sex, or nudity; that physical touching and/or comments about Lively's appearance had to be made only in connection with her character and scene work and not about her personally; that there would be no discussions of personal experiences with sex or nudity; and that no one would enter her trailer while she was in a state of undress.  Gottlieb Decl., Ex. 32.[25]

The Protections Letter further provided that "[t]here shall be no retaliation of any kind against BL for raising concerns about the conduct described in this letter or for these requirements.  Any changes in attitude, sarcasm, marginalization or other negative behavior, either on set or otherwise, including during publicity and promotional work, as a result of these requests is retaliatory and unacceptable, and will be met with immediate action."  *Id.*  And it required an "all-hands" meeting before returning to production "to confirm and approve a plan for implementation of the above that will be adhered to for the physical and emotional safety of [Lively], her employees and all the cast and crew moving forward."  *Id.*

On January 4, 2024, the day before filming resumed, the parties held the all-hands meeting at Lively's home.  R.56.1 ¶¶ 208, 586; *see* Gottlieb Decl., Ex. 4.  Baldoni, Heath, Giannetti, and producers Todd Black and Alex Saks attended.  R.56.1 ¶ 586.  Lively's husband Reynolds was also present.  Lively Decl. ¶ 24.  During the meeting, Lively read from her phone a

---

[25] The document also contained provisions entirely unrelated to issues of sexual harassment, such as requiring COVID-19 exposure notifications.  Gottlieb Decl., Ex. 32.

list of behaviors that she had found inappropriate and that needed to change, including ones that could be considered related to sexual harassment: no more discussions of "personal experiences with sex" and "times that physical consent was not given in sexual acts"; "[n]o more showing nude videos or images of women, including producer's wife, to BL and/or her employees"; no more "mention of 'pornography addiction'"; no more "improvising of kissing" or "biting or sucking of lip"; no more intimate conversations out of character; "[n]o more personal, physical touching of, or sexual comments by, Mr Baldoni or Mr Heath"; no more "jokes or disparaging comments . . . about HR complaints Wayfarer has already received on set, or about 'missing the HR meeting'"; and "[n]o more entering, attempting to enter, interrupting, pressuring or asking BL to enter her trailer or the makeup trailer by Mr Heath or Mr Baldoni while she is nude, for any reason."  R.56.1 ¶¶ 586–87; Shapiro Decl., Ex. 111.

Lively asserts that she engaged in additional instances of protected activity, including her counsel's negotiation of contractual terms prohibiting sexual harassment from January through June 2024; her refusal to appear in promotion with Baldoni and Heath in August 2024; and the filing of her CRD complaint in this action in December 2024.  Dkt. No. 1064 at 42.  The Wayfarer Parties dispute that these actions constitute protected activity under FEHA.  Dkt. No. 1119 at 11–12.  The date of Lively's last instance of protected activity is relevant insofar as a short amount of time between such activity and an adverse employment action can raise an inference of causation.  The Court need not resolve this dispute.  Lively's complaints made via the Protections Letter and during the all-hands meeting satisfy the elements of protected activity, and, as further explained below, there is enough evidence that this activity was a "substantial motivating factor" in any adverse employment actions to survive summary judgment.

a.      **Good-Faith Basis**

A reasonable jury could conclude that Lively opposed practices that she subjectively believed constituted sexual harassment by complaining about inappropriate behavior in the Protections Letter and during the all-hands meeting. The Wayfarer Parties have not specifically contested Lively's subjective belief that she was discriminated against. And there is sufficient evidence suggesting that she felt she had been.

During the first week of filming, she complained privately to a friend that "[i]t's like HR nuts today. The both of them. I wasn't expecting that turn. I mean it's been present but today I came home and cried. . . They're just being creeps . . . . Like keep your hormones to yourselves. This is not mine. I don't want it. I don't want you [sic] gaze or words or tongue or videos of your naked wife. Yeah. It's shocking." Gottlieb Decl., Ex. 95. Lively also privately indicated that she was "dreading" returning to production because of her experience during the first phase of filming. R.56.1 ¶ 581. Baldoni himself made statements suggesting he understood Lively made her complaints in good faith. He stated: "I just know her personality and this is the kind of person that genuinely believes she's right and that all of this is unjust," to which Nathan responded, "She fully does. I know it." Gottlieb Decl., Ex. 158. Along similar lines, Baldoni told friends: "[I]t's hard to feel so much of what they believe about me is false because they are so convinced that it's real . . . . We were told this was the worst experience of her life . . . ." Shapiro Decl., Ex. 121.

To be sure, the Wayfarer Parties *have* suggested that Lively used her experience on set as a cudgel for control over the Film. *See, e.g.*, Gottlieb Decl., Ex. 170 (Heath stating that "[s]he continues to hold a threat over our heads and every time we try and hold a line she uses that threat either directly or indirectly to get us to fold"); Shapiro Decl., Ex. 121 (Baldoni stating that the Protections were "sent in an effort to gain power over [him] personally and the studio"). But

106

a reasonable jury could find that Lively also genuinely experienced what happened on set as discriminatory. The two are not mutually exclusive. There is at least a triable issue with respect to whether Lively sincerely experienced what happened on set as sexually harassing.

### b.    Objective Basis

Viewed in the light most favorable to Lively, there is also sufficient evidence that it was reasonable for her to believe that the Wayfarer Parties sexually harassed her by creating a hostile work environment. In analyzing this issue, the Court need not, and does not, determine whether the relevant conduct rose to the level of sexual harassment. *See Yanowitz*, 116 P.3d at 1131–32. The question is instead whether Lively's belief was, as some courts have put it, "utterly baseless." *Munson v. Splice Commc'ns, Inc.*, 2013 WL 6659454, at *15 (N.D. Cal. Dec. 16, 2013) (quoting *Yanowitz*, 116 P.3d at 1043); *see also Yanowitz*, 116 P.3d at 1043 ("Employees often are legally unsophisticated and will not be in a position to make an informed judgment as to whether a particular practice or conduct *actually* violates the governing antidiscrimination statute."). There is enough evidence in the record to conclude that it was far from baseless.

Hostile work environment claims under FEHA "operate under the same guiding principles" as those under Title VII. *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000); *see also Lyle v. Warner Bros. Television Prods.*, 132 P.3d 211, 220 (Cal. 2006) ("California courts have adopted the same standard for hostile work environment sexual harassment claims under the FEHA."). Courts accordingly "often analyze Title VII and FEHA hostile work environment claims together." *Kelly v. S.F. City & Cnty. Dep't of Pub. Health Laguna Honda Hosp.*, 2025 WL 2782586, at *15 n.21 (N.D. Cal. Sept. 30, 2025). A "hostile work environment" arises when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S.

107

17, 21 (1993) (cleaned up); *accord Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 240 (2d Cir. 2007); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (Sotomayor, J). Whether an environment is sufficiently "hostile" or "abusive" "can be determined only by looking at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Courts must also consider that "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998).

The relevant conduct must be *discriminatory*. "A hostile work environment is not one that is bad for all living things in a manner that happens to involve characteristics of the protected class; rather it is one that is *discriminatorily* hostile to an employee based on *his or her* membership in the protected class." *McSweeney*, 776 F. Supp. 3d at 262 (cleaned up) (quoting *Bernstein v. N.Y.C. Dep't of Educ.*, 2020 WL 6564809, at *7 (S.D.N.Y. Nov. 9, 2020)); *accord Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 514 (S.D.N.Y. 2010) (Lynch, J.). In other words, the hostile work environment must have occurred "because of the plaintiff's protected characteristic." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007).

Lively has identified a series of acts that she claims created a hostile work environment based on her gender, beginning with her work on the Film and continuing through the conclusion of the first phase of filming. Several of the incidents either would not support a hostile work environment claim or would do so, at most, only minimally or in context. Other incidents come closer to stating a claim. The Court begins with the former before turning to the latter. When

108

viewed together, the incidents are sufficient to support a reasonable basis for Lively's complaints (and therefore her assertion of a retaliation claim).

When Lively first met with Baldoni in December 2022 to discuss possibly participating in the Film, R.56.1 ¶¶ 74, 436, Baldoni told Lively—who was pregnant with her first boy at the time—that he was circumcised, Shapiro Decl., Ex. 24 at 51:21–52:05; R.56.1 ¶ 75. Lively found the disclosure uncomfortable and unnecessary, but it occurred in the context of a discussion about the "different medical decisions people make these days, including circumcision for male babies," a topic that Lively herself may have introduced. Shapiro Decl., Ex. 24 at 51:21–52:05; R.56.1 ¶ 75. More importantly, it occurred before she began working on the Film. It therefore could not have created a hostile *work* environment. *See Velez v. N.Y.C. Police Pension Fund Article II*, 2019 WL 1382884, at *9 (S.D.N.Y. Mar. 27, 2019) ("[A]ny incidents giving rise to the hostile work environment claim must have occurred during the plaintiff's employment.").

Other conduct, particularly viewed in isolation, also would not give rise to a claim for hostile work environment. Prior to principal filming, Baldoni proposed certain edits to the screenplay, including ones related to sex, that Lively believed were "gratuitous." R.56.1 ¶ 92. That Baldoni suggested scenes involving sexual acts in the context of developing a motion picture involving such adult themes did not create a "sexually objectionable environment" or an environment hostile to women (or to men) because of sex. It would be "neither surprising nor unreasonable from a creative standpoint" for both Baldoni and Lively to have drafted sexually explicit material, even if some of it was not to the taste of the other. *See Lyle*, 132 P.3d at 225 (Cal. 2006). Indeed, Giannetti had written to Baldoni that Sony was "going to try and get as much tasteful hot sex as you can." Shapiro Decl., Ex. 84.[26] As the Court observed in

---

[26] It is irrelevant whether material ended up in the final Film or even in the screenplay. That

*McSweeney*:

> In context, actors in a play containing sexist dialog would reasonably understand that dialog to be part of a performance, i.e., part of the constellation of surrounding circumstances, expectations, and relationships surrounding the play, rather than an expression of hostility or animus towards their gender. An individual actor in that play might find the experience of performance subjectively painful, but without more, she would not have a claim for a hostile work environment because even if the use of sexist dialog happens to involve sex, it is not discriminatorily hostile to an employee based on his or her sex.

776 F. Supp. 3d at 266 (internal quotation marks and citations omitted). A similar principle applies here with respect to the creation of the screenplay.

Lively's complaints of "fat-shaming" also could not reasonably support a claim. Shortly before work on the Film began, Lively gave birth to a child. *See* R.56.1 ¶ 75. She expressed to Baldoni that she "want[ed] to be in [her] best shape" for filming. R.56.1 ¶ 33; Shapiro Decl., Ex. 40. On or around April 23, 2023, before principal photography began, Baldoni asked a personal trainer he had consulted with, and who was working separately with Lively, if the trainer knew what Lively would weigh when filming began. R.56.1 ¶ 78. Baldoni's question then found its way back to Lively, who felt "disturbed and unsettled that Baldoni was soliciting information about [her] weight." Lively Decl. ¶ 7. On another occasion, Baldoni introduced Lively to a specialist in probiotics, who Lively subsequently discovered also specialized in weight loss. SAC ¶ 108; Lively Decl. ¶¶ 5–6.

Evidence that an employer made weight-related comments to persons of one only gender could in certain circumstances help demonstrate a hostile work environment based on sex. *See King v. Aramark Servs. Inc.*, 96 F.4th 546, 564 (2d Cir. 2024). Although the record here does not indicate whether any similar conduct was directed toward men, regardless, the conduct

---

some scenes ended up in the proverbial cutting room floor would "merely reflect[] the creative process at work" and would not result in "harassment because of sex." *Lyle*, 132 P.3d at 226.

110

cannot reasonably be viewed as expressing hostility to Lively as a woman or to women in general. The physical appearance of the protagonists was part of the product that the producers were intending to offer the audience. Lively herself recognized that achieving a "certain aesthetic" was "part of the job that we both excitedly signed up for." Shapiro Decl., Ex. 44. She asked Baldoni if they could do "the body scenes at the end of the schedule" so that she would have sufficient time to work out, R.56.1 ¶ 35; Shapiro Decl., Ex. 42; she wrote to her agent privately that she was "working out twice a day, 4 hours a day" in order to lose weight and set the movie up for success, as the "sexiness in this film and the marketing I'm sure, is critical to its success," R.56.1 ¶ 36; Shapiro Decl., Ex. 36; and she told Baldoni, "My husband and I both look at certain roles as athletic events. And this is one of them. . . . And that's great," R.56.1 ¶ 37; Shapiro Decl., Ex. 44. Given these statements, Baldoni's actions—even if they could be viewed as gently pushing Lively to lose weight, which is not necessarily supported by the evidence—could not fairly be described as discrimination "because of" Lively's gender.

Lively also points to certain conduct that occurred during filming. Early in the production phase, Lively and Baldoni filmed a scene in which their characters dance together. Lively Decl. ¶ 19. The script stated that their characters would be slow dancing "[c]ompletely in their own world," but did not otherwise include details about how the scene would be shot or how the characters would be interacting. R.56.1 ¶ 546; Gottlieb Decl., Ex. 142. The script did not specifically call for any kissing or simulated intimacy. R.56.1 ¶ 546. Yet, Lively claims that during filming, Baldoni leaned in and gestured as if he was intending to kiss her, and that he kissed her forehead, rubbed his face and mouth against her neck, put his thumb to her mouth and flicked her lower lip, caressed her, and leaned into her neck, saying "it smells good." Lively Decl. ¶ 19. The record includes videos of the scene. Gottlieb Decl., Exs. 143, 144, 145. The

111

scene was shot in front of a large group of people.  Baldoni can be heard giving blocking instructions.  Both actors can be shown improvising.  Other actors are in the background.

There is no question that this conduct might support a hostile work environment claim "if it occurred on the factory floor or in the executive suite." *McSweeney*, 776 F. Supp. 3d at 265.  But in all sexual harassment cases, the court must "careful[ly] consider[] the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81.  And the question is whether in this context, Baldoni's conduct could reasonably be understood to reflect a view about Lively as a woman rather than "the role [she was] asked to play." *McSweeney*, 776 F. Supp. 3d  at 267.  Under this framing, it would be difficult to view Baldoni's conduct as reflecting hostility or bias based on gender.  He was acting in the scene.  Assuming he was improvising, the conduct was not so far beyond what might reasonably be expected to take place between two characters during a slow dancing scene such that an inference of hostile treatment on the basis of sex would arise.  At least in isolation, the conduct was directed to Lively's character rather than to Lively herself.  Creative artists, no less than comedy room writers, must have some amount of space to experiment within the bounds of an agreed script without fear of being held liable for sexual harassment.  *See Lyle*, 132 P.3d at 225.

Although these incidents could not, on their own, sustain a hostile work environment claim, sexual harassment claims must be viewed based on the totality of the circumstances.  *See Harris*, 510 U.S. at 23. And there is other conduct by Defendants that presents a closer question.

A reasonable jury could conclude that Baldoni commented on Lively's and Slate's personal physical appearances (rather than their appearances as actors or characters) in ways that made them uncomfortable.  Comments of these types can help contribute to a hostile work environment. *See Ibrahim v. Fid. Brokerage Servs. LLC*, 2020 WL 107104, at *5 (S.D.N.Y. Jan.

112

9, 2020) ("Similar to physical acts of harassment, unwanted comments about an employee's attractiveness and appearance have an exclusionary effect in the workplace and constitute unequal treatment.").

During the first phase of shooting, Baldoni asked Lively to remove her jacket and when she did so, revealing a partially unzipped "onesie" at the time and a lace bra underneath, Baldoni stated "pretty hot" in a tone that made Lively feel "on display" and uncomfortable. R.56.1 ¶¶ 498–99. Lively responded that that was "not what [she] was going for," and Baldoni replied, "Sexy?" to which she stated, "Neither." *Id.* ¶ 499. The comment was understood contemporaneously to be inappropriate. Slate told Baldoni that "comments about actors' bodies and their wardrobes . . . ranged from irrelevant or unnecessary to [] inappropriate and distracting" and "we're just not doing this anymore." *Id.* ¶ 500. Baldoni rolled his eyes and stated, "Sorry, I missed the sexual harassment training," before walking away. *Id.* ¶ 501. Also that day, Lively was wearing a jacket over a dress with a lower-cut neckline (not in wardrobe), and when she bent down to pick something up, her jacket fell open, revealing her dress and cleavage, and Baldoni said, "I like your outfit," while making a back-and-forth gesture across his chest area, which Lively interpreted as referring to her chest. *Id.* ¶ 497. Although Lively had referred to her own wardrobe as sexy on certain occasions, *id.* ¶ 181, that did not open the door to all manner of comments on her appearance. Baldoni also told Slate—who played his character's sister, was not involved in any sexual content in the Film, and was wearing black leather pants at the time—"I can say this because my wife is here, but you look sexy in what you're wearing." *Id.* ¶ 503.

Then there is the intrusion into Lively's physical privacy. On the second day of filming, Heath arrived at Lively's trailer while she was almost entirely undressed and having her body

113

makeup removed.  Gottlieb Decl., Ex. 281 at 127:1–2; R.56.1 ¶ 512.  Lively agreed to meet with him because she had concerns that she wanted to share with him, but she made him promise to turn away from her and face the wall, which he agreed to do.  R.56.1 ¶¶ 513–14; Gottlieb Decl., Ex. 281 at 127:17–24.  At some point during the discussion, Lively realized that Heath had turned away from the wall to face her and was staring at her exposed body through a mirror. R.56.1 ¶¶ 513–14; Gottlieb Decl., Ex. 281 at 129:1–4.  Lively confronted Heath in the moment, and he admitted looking at her, saying "Oh, oh, sorry I like to make eye contact with people when I talk to them."  R.56.1 ¶ 515.[27]  The Second Circuit has recognized that "stares" at a women's body can provide evidence of a hostile work environment, *see King*, 96 F.4th at 564, and here, Lively was in a state of undress and specifically asked Heath not to look at her.

In another incident, Baldoni and Heath pushed for Lively to perform a birth scene naked, even though her character was in a hospital, they had not previously discussed blocking the scene in this way, she had not anticipated or agreed to be so exposed in the scene, and the Offer Letter provided that there would be "[n]o nudity/simulated sex without Artist's prior written consent and negotiation/execution of a nudity rider."  Shapiro Decl., Ex. 28 at 3; Lively Decl. ¶ 14. Lively felt forced to compromise by performing simulated nudity from below the chest down with her uncovered legs spread apart wide in stirrups and only a small, thin piece of black fabric covering her genitalia.  Lively Decl. ¶ 14; R.56.1 ¶¶ 533–537.  For the entirety of filming the scene, which took several hours, the set was not closed to nonessential personnel.  Lively Decl. ¶¶ 12, 15.  Lively has submitted some evidence that industry standards would call for an

---

[27] Although Lively subsequently told Heath that she knew he was not "trying to cop a look," one could reasonably understand that comment as an attempt to defuse tensions with a producer on the Film rather than as a true reflection of Lively's understanding of the encounter.  Shapiro Decl., Ex. 4 at 223:12–25.

intimacy coordinator to be present because there was implied nudity and a "high hip exposure" that constitutes "profile nudity," *id.* ¶¶ 63, 65, but no such person was present.

At another point, during work on the screenplay and in discussing a sex scene in the Film, Baldoni offered that he and his wife orgasm at the same time, and he asked if Lively and her husband do the same. R.56.1 ¶ 520. Also during the writing process, after Lively commented that she believed some scenes had become "somewhat pornographic," Gottlieb Decl., Ex. 281 at 132:7–8, Baldoni volunteered (in the course of claiming that the scenes were not pornographic) that he had been previously addicted to pornography. *Id.* at 132:9–13; R.56.1 ¶ 92. Lively stated that she had never seen pornography, and Baldoni later announced to individuals on set that Lively had never seen pornography. R.56.1 ¶¶ 527–28. It may be fair grounds for an author or a director to discuss personal experiences, including those related to sex, as part of the creative process. *See Lyle*, 132 P.3d at 225. And the mere mention of sexual content or topics in the workplace does not necessarily support a hostile work environment claim. *See Oncale*, 523 U.S. at 12. But Baldoni's on-set comment to crew members regarding whether Lively watched pornography bore no apparent connection to the creative process and singled Lively out in front of others in a way that could be interpreted as relating to sex and based on gender. *Cf. Garrett v. City Univ. of N.Y.*, 2025 WL 3096550, at *15 (S.D.N.Y. Oct. 10, 2025) (explaining that discussions "about a woman's sexual affairs" can contribute to a hostile work environment), *report and recommendation adopted*, 2026 WL 709987 (S.D.N.Y. Mar. 13, 2026); *Patane*, 508 F.3d at 114 ("[T]he mere presence of pornography in a workplace can alter the 'status' of women therein and is relevant to assessing the objective hostility of the environment.").

There are other instances of alleged inappropriate behavior, including one in which Heath showed Lively a video of his wife giving birth. But it suffices for present purposes to conclude

115

that, drawing all inferences in Lively's favor, a person in her position could have understood the workplace to at times reflect a gendered and sexualized view of women and a disregard for their privacy sufficient to make it reasonable to complain about a hostile work environment based on sex or gender. That conclusion finds additional support in the fact that Lively alluded to many of these incidents in the Protections Letter, and the Wayfarer Parties wrote that "[a]lthough [their] perspective differ[ed] in many aspects," they found most of her requests "not only reasonable but also essential for the benefit of all parties involved." Shapiro Decl., Ex. 103.

The Court need not consider whether the acts as alleged would support a jury verdict that the Wayfarer Parties created a hostile work environment under FEHA. It is sufficient that it was reasonable for Lively to believe that they did. *See Miller*, 115 P.3d at 96 (noting that even if a plaintiff's beliefs regarding sexual harassment are legally mistaken under FEHA, a retaliation claim might be sustained where "the nature of [the] complaint" reasonably falls within the statute's "general purview").

### c.    Notice

Finally, a jury could also find that the Wayfarer Parties understood that Lively thought they had behaved in a discriminatory manner. Baldoni stated with respect to the Protections Letter, "[O]f course we all know what this document insinuates – that i am/ unsafe /sexually harassing etc etc etc . . . ." R.56.1 ¶ 585. After the all-hands meeting, he shared with friends: "They essentially said that Jamey and I are not who we claimed to be and that for us to have a podcast is unsafe because it makes people feel like we are safe. . . . The word creepy and abuse were used in reference to me [and] my behavior." Shapiro Decl., Ex. 121. When Slate called Baldoni out on set for remarking on Lively's appearance, he stated, "Sorry I missed the sexual harassment training." R.56.1 ¶ 501. And Heath feared that Lively would file sexual harassment claims against him. Gottlieb Decl., Ex. 1 at 77:23–25. The Wayfarer Parties accordingly knew

116

that at least some of Lively's complaints went to instances of alleged gender discrimination rather than "merely unfair personnel treatment." *Mayfield*, 2005 WL 88965, at *8.

There is enough evidence to bring the issue of Lively's protected activity before a jury.

### 2.    Adverse Employment Action

There are also triable issues with respect to whether the Wayfarer Parties took any adverse employment action against Lively. The main way in which Lively believes the Wayfarer Parties retaliated against her is by concocting and executing a "multi-tiered" "social manipulation" plan to destroy her reputation. R.56.1 ¶ 784. That allegation represents the crux of her case, so the Court outlines it here in some detail.[28]

### a.    Factual Background

In May 2024 after Reynolds blocked Baldoni on social media, Baldoni worried that Lively might do the same to "plant seeds" and "give crumbs" so that "fans would go 'digging.'" Gottlieb Decl., Ex. 172. He therefore asked his publicist, Jennifer Abel, to formulate a "real plan" in case that happened so that he could "feel at ease." *Id.* Baldoni's concerns continued to escalate after other cast members appeared at a June 15, 2024 "book bonanza" without him. R.56.1 ¶ 643. Two days later, Baldoni and Abel had an hour-long call in which he asked for recommendations for attorneys. *Id.* ¶ 644. Heath also asked Mitz Toskovic ("Toskovic"), Wayfarer's Vice President of Operations, to start compiling a timeline document regarding all of the alleged incidents. *Id.* ¶ 647.

---

[28] Several of the other alleged adverse employment actions are too "minor" or "trivial" to qualify under FEHA. *See Bailey*, 552 P.3d at 450. These include Baldoni's allegedly "huffy" and dismissive response to being called out on set, and Baldoni and Heath's remark to Hoover that Lively was exhibiting "narcissistic behavior." Gottlieb Decl., Ex. 1 at 75:6–17. There is no indication that these actions were reasonably likely to adversely and materially affect Lively's job performance or her opportunities for advancement in her career.

In July 2024, Lively informed Sony that she would not appear in press with Baldoni. *Id.* ¶ 668. Tera Hanks ("Hanks"), the President of Wayfarer, asked Wayfarer's publicist, Stephanie Jones, for recommendations for a crisis communications team. *Id.* ¶ 673. Abel also asked Heath to share with her "the legal letter that was sent by [Lively] and her team—per our conversation, we will go through point by point and draft context surrounding each situation. We can then flag what we are missing that would be helpful to arm us in the case we need to refute any of the claims." *Id.* ¶ 671. Abel recommended Melissa Nathan and her firm TAG for the crisis communications role. *Id.* ¶ 676. On July 25, 2024, Nathan and TAG vice president Katherine Case ("Case") met with Heath and Hanks for an introductory call, during which Wayfarer provided details regarding the Protections Letter and the incidents alluded to in it. R.56.1 ¶¶ 677–78. Case's notes from that meeting state that Wayfarer was "[n]ot going to fire offensive bullets but [wanted] to have a strategy." Shapiro Decl., Ex. 164. After the call, Wayfarer engaged TAG to ensure that they "were protected against negative attacks." *Id.* ¶ 680.

On July 31, 2024, Abel texted Heath and Toskovic that "[c]onfidentially" she was "out to dinner with a friend of 12+ years who writes for people magazine, Fox News, in touch, us weekly, and she is fully briefed of the situation and is armed and ready to take this story of Blake weaponizing feminism to any of her outlets the minute we give her the green light. She hates Blake, has heard this story before, and will do anything for us. Just fyi :)." R.56.1 ¶¶ 681–82. On August 1, 2024, TAG discussed drafting a "scenario document in anticipation of [an] inevitable story from [Lively's] team" in order to "desensationalize" Lively's story by "tee[ing] up a friendly to run the day of or right after the premiere, someone who is covering the overall film" of Baldoni "say[ing] something along the lines of 'me and Blake had our differences but I still respect her' so we at least set the stage and can then give the rest on background to

118

reporters[.]  So when the hit piece runs it's not as big of a shock."  *Id.* ¶ 684.  Case sent Wayfarer and Baldoni a scenario planning document the next day.  *Id.* ¶ 685.  In it, TAG recommended certain messaging points emphasizing both Baldoni's "stellar reputation," including his history of "activis[m] and advoca[cy] of and for women in Hollywood," and Lively's "less than favorable reputation in the industry."  *Id.* ¶ 687.  The document also suggested that TAG "explore planting stories about the weaponization of feminism and how people in [Lively's] circle like Taylor Swift, have been accused of utilizing these tactics to 'bully' into getting what they want."  *Id.* ¶ 688.  Nathan has testified that the document was not an approved action plan but only a preliminary document for purposes of "scenario planning," with each suggestion being only a "possibility."  *Id.* ¶ 260.

Minutes after receiving the document, Baldoni texted Abel that he was "[n]ot in love with [it]," adding, "Not sure I'm feeling the protection I felt on the call."  Gottlieb Decl., Exs. 46, 195.  Abel immediately shared this with Nathan, stating, "I'm going to confidentially send you something he's texting me and Jamey on the side just to arm you before this call.  I think you guys need to be tough and show the strength of what you guys can do in these scenarios.  He wants to feel like she can be buried . . ."  Gottlieb Decl., Ex. 47.  Nathan responded: "Of course– but you know when we send over documents we can't send over the work we will or could do because that could get us in a lot of trouble."  *Id.*  She added: "We can't write it down to him[.] We can't write we will destroy her."  *Id.*  To which Abel replied, "Of course not.  But I told him that's the point of talking through."  *Id.*  Nathan then observed, "He has to look at it as an information document for us to be armed with.  That's all.  Imagine if a document saying all the things that he wants ends up in the wrong hands. . . .  you know we can bury anyone[.]  But I can't write that to him[.]  I will, I'll be very tough."  *Id.*  Nathan also sent an agenda to Abel for

119

an upcoming call with Baldoni, which included "[d]iscuss[ing] a more aggressive way to get ahead of this." *Id.*

On August 4, 2024, Abel messaged Nathan that she was "having reckless thoughts of wanting to plant pieces this week of how horrible Blake is to work with." Gottlieb Decl., Ex. 50. Nathan responded "same," and shared that she had "already off the records Spoke [sic] to the editor [of the] Daily Mail because she's my friend" and that "[s]he's ready when we are." *Id.* Baldoni's talent agent wrote in a message that same day that "Justin's crisis team [was] ready for a war with [Lively]" and that they had "all kinds of garbage on her." Gottlieb Decl., Ex. 198.

The next day, Nathan shared with Heath and Abel two "quotes" from "digital" teams that TAG "use[s] to get the best results":

> Quote one: $175k - this will be for a 3-4 month period and includes: website (to discuss) full reddit, full social account take downs, full social crisis team on hand for anything - engage with audiences in the right way, start threads of theories (to discuss) this is the way to be fully 100% protected.

> Quote two $25k per month - min 3 months as it needs to seed same as above - this will be for creation of social fan engagement to go back and forth with any negative accounts, helping to change narrative and stay on track.

Gottlieb Decl., Ex. 66. Nathan added that "most importantly," the work would be "untraceable." *Id.* And she explained that there was "a lot more to both of these quotes" but that it would be "easier to discuss via phone in terms of capabilities and what [she had] personally experienced in and out of crisis scenarios." *Id.* Nathan was at this point in touch with Jed Wallace and his company Street Relations, which had previously worked for TAG as a contractor in cases in which clients "required social or digital [re]mediation." R.56.1 ¶¶ 709–10, 715.

On August 6, 2024, the Film premiered in New York. *Id.* ¶¶ 241, 716. Baldoni and Lively did not appear on the red carpet together. *See id.* ¶¶ 249–50. A TAG intern flagged a social media comment suggesting that Lively and Baldoni had not appeared in PR together

120

because "part of it is they didn't want to romanticize Lily and Ryle by having them do a ton of PR together," and another comment saying that Baldoni was "traveling with family." Shapiro Decl., Ex. 226. Case replied, "Ok the comments are working excellent . . . [t]hats all us lol." *Id.* At the premiere after-party, Sarowitz had a conversation with Baldoni and Wayfarer's agent, Danny Greenberg ("Greenberg"), which Greenberg subsequently reported to Giannetti: "I'm a little concerned about Steve S. He was really aggressive when I spoke with him. I've been texting Jamey to make sure he is managed and to make sure he speaks with me before doing anything nuclear." R.56.1 ¶ 717. Greenberg sent a separate text stating that he "had to dial down the billionaire at the premiere who was ready for serious battle." *Id.*

The day after the premiere, Nathan and Abel agreed that Wayfarer "really need[ed] to put the social combat plan [] into motion" and that Nathan would call Heath to "get the [green] light." Shapiro Decl., Ex. 180. Case then sent Heath and Abel an email with the subject line "Social / Digital Mitigation / Remediation," in which she provided "specifics" regarding the work that the digital "team" could focus on, including "boosting [search engine optimization] efforts and updating with new content to enforce SEO efforts, monitoring and directly influencing forums that are working against Justin and Wayfarer to adjust the narrative in real time, and collate assets and background to work in conjunction with Jen and her team, as well as TAG PR." Gottlieb Decl., Ex. 207. Echoing Nathan's earlier statements, Case added that the "integral part here is to execute all without fingerprints." *Id.* Among the specific services the digital team could provide were:

- "Leverag[ing] relationships with Discord, Reddit, X, IG, TikTok, YouTube, etc. to expose behavior of Blake and other parties, both current and past and engage directly with communities to adjust or influence the conversations taking place in real time."

- "Utiliz[ing] CTR manipulation and contextual links to push up positive PR to change subject matter opinion on the first page of Google."

121

- "Work[ing] to remove links that are harmful to Wayfarer Studios, Justin, and the narrative alongside the appropriate teams."

- "Properly and strategically monitor damaging Reddit/Subreddits, X, Discord, etc.— including threads related to concerning opposition and manage the narrative.  This can be done with legacy admin for each platform. As part of this, expert admins will also monitor and protect peripheral elements like Wikipedia, fan pages, and more to ensure threads and narratives are handled appropriately."

- "Actively sway the algorithm with one SEO charged hub/site, created and overseen by the team."

- "Taking down full Reddit and all social accounts as needed."

- "Organically engaging with audiences in the right way, starting threads with theories the team approves of, and asking questions that no longer place Wayfarer and Justin on the back foot."

*Id.*  Noting the "uptick in social chatter," Case noted that the quote for these services had been raised to $30,000.  *Id.*

That same day, Case introduced Abel and Wallace via email: "Jen—Jed and his team are absolute magicians.  Jed—Wayfarer would like to move forward ASAP with social / digital mitigation and remediation."  Gottlieb Decl., Ex. 218.  And Nathan connected Heath and Wallace the next day, writing, "Hi Jamey, Please meet Jed who will be having his team assist on all social activity based off our own conversations as well as their digital plan you are in receipt of. . . .  Jed and team has worked on some of the most monumental [behind the scenes] projects globally and I'm extremely happy to make this intro between you both."  Gottlieb Decl., Ex. 67.  Wallace responded assuring Heath that "this is our wheelhouse and have it prioritized across all platform-specific specialists working for me. . . .  [M]y team is/has been in full throttle mode on our Wayfarer focus!"  *Id.*

Thereafter, the Wayfarer Parties made multiple references to Wallace and the work he was doing on their behalf.  For example, in response to a content creator posting that Baldoni had on previous projects "exploit[ed] the struggles of individuals facing terminal illnesses for his

122

own gain," Case told Abel they had "flagged [the creator] to Jed and his team for more *serious action* on the social side." Shapiro Decl., Ex. 223 (emphasis added). On another occasion, Case circulated a social media comment which stated, "Daily mail broke a story saying Blake calling Justin abusive. I don't buy it I think it's a way for her to get more control and attention of the movie," and Case remarked, "Thank the lord for Jed." Gottlieb Decl., Ex. 224. Case likewise stated "[t]hank the lord for social and digital mitigation lol" with respect to a social media comment that "[i]t feels like a certain peoples PR team got ahead and leaked the story to the daily mail to justify them trying to take over the film." Gottlieb Decl., Ex. 225. Shortly thereafter, Case "wonder[ed] if they had Jed suppress the link" to the Daily Mail article because she could not "even find that story." Gottlieb Decl., Ex. 226. She also remarked that there was "extremely limited pick up on Daily Mail or Page Six" articles and that they had "also started to see a shift on social, *due largely to Jed and his team's efforts to shift the narrative towards shining a spotlight on Blake and Ryan*." Shapiro Decl., Ex. 224 (emphasis added).

The record reveals other similar incidents and comments. On August 10, 2024, Abel reached out to the TAG team noting that it "would be great for the digital team to boost [a particular video] in any way possible." Shapiro Decl., Ex. 224. Case responded, "We'll flag to them!" and Abel added that she "like[d] that [a video regarding Lively's "problematic on-set behavior"] is now getting some viral attention." *Id.* In that same message thread, Abel shared another link "in case digital has an idea of how to amplify," and Case replied, "We'll share this as well—at the very least ask for engagement in the comments." *Id.* On August 13, 2024, Baldoni sent two links to TikTok videos—one by an individual who spoke positively about her experience of working with Baldoni on the Film, and another which criticized Lively's marketing of the Film as insensitive to domestic violence survivors—and Abel confirmed, "[W]e

123

have this and this is what the digital team is amplifying." Gottlieb Decl., Ex. 63. On August 14, 2024, Nathan circulated a screenshot of a Daily Mail article entitled "HOLLYWOOD VILLIAN," which "branded" Lively "a mean girl" in light of a 2016 interview with journalist Kjersti Flaa in which Flaa attempted to congratulate Lively on her recent pregnancy news by referring to Lively's "little bump." Gottlieb Decl., Ex. 64. A TAG employee responded: "Omg this is amazing[.] We should send to Jed, right?" *Id.* On August 18, 2024, Baldoni asked TAG to "boost" two TikToks depicting Baldoni positively and one in which the creator explains that she is "flabbergasted that with the huge audience Blake Lively has and all of the press interviews she's had she doesn't once talk about DV." Gottlieb Decl., Ex. 65. Abel responded, "Yes definitely let's boost these vids," to which someone else replied, "Will let digital know!" *Id.* That same day, Baldoni noted "seeing some IG comments on random posts defending me by people who are private with no followers and they feel like bots," and Nathan responded: "I can fully fully confirm we do not have bots. This is not also what we do—bots look fake to anyone. The other team is doing something very specific in terms of what they do. I know Jamey & Jed connected on this. Bots and fan accounts also run pretty organically by now with all the AI platforms and Google analytics itself—there is no bot army that's a myth these days. Any digital team these days is far more intelligent to utilize something so obvious." *Id.*

Lively has also submitted expert reports that tend to support her allegations that there was an online campaign to manipulate public opinion and discussion against her. Professor Aron Culotta, a Professor of Computer Science at Tulane University, reviewed the posts and platforms discussed in the Wayfarer Parties' text messages and found indicia of artificial content manipulation on both TikTok and Reddit. Gottlieb Decl., Ex. 70 at 3–4. Among other things, Professor Culotta calculated the proportion of "likes" on the top comment of a social media post

versus the number of total likes on the post as a whole (the "Top-Comment Share"), which researchers have found can act as a reliable signal of potentially manipulated activity. *Id.* ¶ 52. Professor Culotta found statistically significant and practically significant deviations from expected values for Top Comments on TikToks expressing both negative sentiment toward Lively and positive sentiment toward Baldoni. *Id.* ¶¶ 53–55. Nearly all of the Top Comments with the highest Top-Comment Share in the period starting August 2024 either disparage Lively or praise Baldoni. *Id.* ¶ 58. Moreover, among the most unusual Top Comments were ones on posts that the Wayfarer Parties internally discussed in text messages. *Id.* ¶ 60. Professor Culotta also found multiple extreme statistical outliers in "comment score patterns" on Reddit which pointed strongly toward a coordinated campaign. *Id.* ¶¶ 72–87. Professor Culotta concluded that although the Wayfarer Parties stated that their campaign would be "untraceable," there were clear online makers of inauthenticity suggesting a manipulation campaign. *Id.* ¶ 97.

Dr. Dina Mayzlin, the Robert E. Brooker Chair in Marketing at the Marshall School of Management and the University of Southern California, reached a similar conclusion. *See* Gottlieb Decl., Ex. 267 ¶ 12. She "observe[d] a marked shift in the volume, the content, and the sentiment of online conversations about Ms. Lively, consistent with the onset the Defendants' orchestrated campaign, as alleged by Ms. Lively." *Id.*; *see also id.* ¶ 14 ("[M]y analysis supports the inference that manipulated online conversations seeded and amplified negative conversations, substantially altering online discourse about Ms. Lively."). Her assessment revealed that "(1) there was a complete absence of conversations echoing the manipulated Lively narratives in the 'Scenario Planning' prior to August 2024; (2) there was a sharp increase after August 2024 in both the share of conversations endorsing the manipulated Lively narratives and the overall volume of negative conversations." *Id.* ¶ 84.

Lively argues that the Wayfarer Parties have taken steps to harm her reputation in ways going beyond the "digital campaign" allegedly executed by Wallace. From May 1, 2024 through July 2025, TAG communicated directly with certain individuals who seed, generate, create, or influence social media content or provide related digital services, including Billy Bush, Andy Signore, Candace Owens, Perez Hilton, and Sage Steele. R.56.1 ¶ 780; Gottlieb Decl., Exs. 287, 288, 289. For example, Nathan messaged Hilton that he was "in [her] circle of BF trust" and that she would be "HAPPY for [him] to say this . . ." and, "You can say . . ." with Hilton responding, "Will get on these later!" Gottlieb Decl., Ex. 290. On another occasion, Freedman started a group chat with Steele, a former client of his, explaining that Steele "is on copy. In order to use her, we need to start with a video that can go viral. That will get her in organically. No news outlet sees or wants to explain the connection without it." Gottlieb Decl., Ex. 249. Steele responded that she "was thinking a video would be the best, most organic, and genuine way for [her] to do this." *Id.* Abel then shared certain "top line talking points" with her. Gottlieb Decl., Ex. 251. Two days later, Steele shared her first draft of the video, to which Sarowitz replied that it was a "good start" and asked whether she should "point out that other women were hurt by [Blake] including the assistant director and editors and the wives of the men Blake falsely accused?" Gottlieb Decl., Ex. 253. Steele responded that she could "add 'many women who are part of the production . . .'" but that she was "not sure [she] should go too much deeper there based on trying to make it look organic / like [she doesn't] have too much insider info." *Id.* Heath, Abel, and their attorneys provided additional feedback on the draft video. *Id.* Steele subsequently posted a video titled "Shame on Blake Lively." R.56.1 ¶ 801.

TAG also indicates that it has communicated about Lively and Reynolds with approximately twenty media outlets, including The Daily Mail, People, Us Weekly, and Deux

126

Moi. *Id.* ¶ 781; Gottlieb Decl., Exs. 287, 288, 289.  For instance, on August 13, 2024, Case, Nathan, and other TAG employees discussed working with a Daily Mail reporter about a story detailing "the whole PR debacle behind the scenes," including the following talking points: "You have a film with serious subject matter, not only being promoted with focus on flowers/clothes, but a PR campaign distracting audiences away from important messaging to play out a high school fight between two stars"; "[w]hy would Blake allow this to happen? How could she? What is she thinking right now regarding her team?"; and "did Blake's inability to relate to regular people / what they want to see, just slight her big moment?"  Gottlieb Decl., Ex. 59. Case responded "Yes.  To all.  Also let's bring in the fact that she promoted a haircare line and her own drink brand as part of promo."  *Id.*  A TAG employee stated that the article could be framed such that "it's not so obviously placed," and when asked whether the story could run, Nathan responded, "Yes[.]  Let's go."  Gottlieb Decl., Ex. 60.  A story by that reporter ran one week later highlighting that "Lively has come under fire for aggressively marketing her personal projects—not just her haircare, but her drinks company—seemingly on the back of a film dealing with domestic violence."  R.56.1 ¶ 752.

Lively contends that the effects of the smear campaign have been devasting for her reputation and career.  Professor Ashlee Humphreys, a Professor of Integrated Marketing Communications at Medill School of Journalism and Professor of Marketing at the Kellogg School of Management at Northwestern University, calculates a "conservative" estimate of over 176 million online "impressions" calling Lively a "bully," "mean girl," and "tone deaf" in the wake of the digital campaign.  Gottlieb Decl., Ex. 271 ¶¶ 67–69.  Polling from between June and September 2024 indicates a 30% increase in negative attitudes toward Lively.  *Id.* ¶ 108. Professor Humphreys determined that "the retaliation campaign promoted specific, identifiable

127

frames associated with Ms. Lively, and these became widely circulated during and after the period of the campaign.  They became the lens through which the general public integrated new information and had a lasting negative impact on Ms. Lively's reputation."  *Id.* ¶ 119.

The reputational effects have been particularly severe given the nature of Lively's profession, which places a heavy emphasis on personal and professional marketability.  *Id.* ¶¶ 111–13.  When it was first announced that Lively was cast in the role of Lily Bloom, the novel *It Ends With Us* went "back to #1 on Amazon."  R.56.1 ¶ 454.  At the time, Baldoni believed that Lively had a "sterling reputation," "was well liked by fans," and was "the kind of person who could help drive box office success."  *Id.* ¶ 433.  Baldoni stated, "Everyone loves her it's pretty wild."  Gottlieb Decl., Ex. 92.  Hoover told Baldoni that "Blake is her dream Lily, and she couldn't believe" Lively was interested.  Gottlieb Decl., Ex. 282.  Following the success of the Film, Lively was on track to command "not only a significant increase in her compensation moving forward, but just as importantly, if not even more, a significant rise in her opportunities to follow with great filmmakers, with studio films."  Gottlieb Decl., Ex. 33 at 398:9–16. "[G]enerally in the business, when you have a movie that opens No. 1 . . . the phones are ringing off the hook with incoming opportunities and offers and meetings and etc. and so forth."  *Id.* at 398:21–399:2.  That did not happen here.  *Id.* at 399:10–12.  Since the Film's release, Lively has instead suffered a "marked" decrease in interest in her acting services, and she has received "no meaningful or real offers."  R.56.1 ¶ 825.

### b.     Analysis

The Wayfarer Parties argue that they took no adverse employment action against Lively and that their actions were instead reasonably intended to protect themselves and their reputations from unfair and false attacks.  Dkt. No. 955 at 27–31.  Lively responds that they

128

engaged in a coordinated attempt to attack her character and destroy her reputation in ways extending beyond mere "reasonable defensive measures."  Dkt. No. 1064 at 45–57.

At this stage, the Court need not, and may not, pass on whose account is more credible. *See Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020).  The question is whether Lively has provided more than a mere "scintilla" of evidence to support her claim such that a reasonable jury viewing the evidence in her favor could find that the Wayfarer Parties took adverse employment action against her because of her protected activities.  *See Havey v. Homebound Mortg., Inc.*, 547 F.3d 158, 163 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 252). The evidence here, viewed favorably to Lively, passes this test.

"Retaliation claims are inherently fact specific, and the impact of an employer's action in a particular case must be evaluated in context," considering "the unique circumstances of the affected employee as well as the workplace context of the claim." *Yanowitz*, 116 P.3d at 1137. "[T]he phrase 'terms, conditions, or privileges' of employment must be interpreted liberally and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination that the FEHA was intended to provide." *Id.* at 1138–39.  FEHA covers not only "employment actions that are reasonably likely to adversely and materially affect an employee's job performance" but also the employee's "opportunity for advancement in his or her career." *Id.* at 1138.  There are triable issues here with respect to whether the Wayfarer Parties took action that impermissibly and materially altered Lively's opportunity for advancement in her career.  The dissemination of a "negative employment reference" can constitute an adverse employment action, *see Salgado v. Iqvia, Inc.*, 459 F. Supp. 3d 1318, 1332–33 (S.D. Cal. 2020), and Lively alleges here not just that the Wayfarer Parties interfered with her ability to get a job, but that they effectively prevented

her from getting *any* future work. *See Yanowitz*, 116 P.3d at 1138; *see also Akers v. County of San Diego*, 116 Cal. Rptr. 2d 602, 612 (Cal. Ct. App. 2002) (holding that there was sufficient evidence of an adverse employment action where the plaintiff, a prosecutor, received a negative performance review accusing her of incompetence, dishonesty, and insubordination, as it was "undisputed that 'an accusation of dishonesty' against a prosecutor 'can be a career ender' and that a deputy district attorney's reputation for honesty is an essential quality of a successful prosecutor"); *cf. Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) (stating in the ADEA context that "plaintiffs may be able to state a claim for retaliation, even though they are no longer employed by the defendant company, if, for example, the company . . . sullies the plaintiff's reputation" (citation omitted)).

To be sure, much of what Lively complains about is not actionable. The Wayfarer Parties were entitled to engage public relations and crisis management specialists to protect their reputations. *See Hughes*, 304 F. Supp. 3d at 436–39, 449 (explaining that an employer was entitled to release a statement to the National Enquirer in an attempt to "blunt the inflammatory force of [the plaintiff's] allegations," as doing so "was a colorable defense to protect their business"); *see also Areu v. Fox News Network, LLC*, 2021 WL 4124226, at *16 (S.D.N.Y. Sept. 9, 2021) (holding that leaking of "cherry-picked emails to the media to portray [the plaintiff] as someone who invited sexual harassment" was a "reasonable defensive measure"); *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 84 (1st Cir. 2007) ("[T]he person or entity accused of discrimination must be allowed to defend himself or itself."). Just as "no reasonable employee should expect that the employer-defendant would simply surrender in the face of litigation," *McSweeney*, 776 F. Supp. 3d at 254, a reasonable employee in a public-facing

130

industry would not expect an employer to refrain from hiring crisis-communications professionals to be "protected against negative attacks," R.56.1 ¶ 680.

The Wayfarer Parties were also entitled to prepare responses to the Protections Letter and the accusations that it implied. That included the right to assert that the claims against them were untrue or misconstrued, and that Lively could not be credited. It also included the right to convey to the viewing public reasons why Lively's account could not be trusted, including pointing to evidence that Lively had ulterior motives for making claims of harassment and that she did not believe the claims she was making.

Furthermore, Lively has cited no support for the proposition that a person publicly accused of serious misconduct cannot use proxies—both disclosed and undisclosed—to defend him or herself. For example, it was permissible for Baldoni to request that the digital team "boost" certain videos which he believed were favorable to his image, Gottlieb Decl., Ex. 65, and for TAG to work behind the scenes to emphasize his "stellar reputation among colleagues and industry peers," including the fact that he was "a longtime activist and advocate for women in Hollywood," Gottlieb Decl., Ex. 46 at 3, and to tone down inflammatory allegations against him, R.56.1 ¶¶ 736–38. The Wayfarer Parties similarly would have been within their rights in elevating stories that would cast doubt on whether Lively was a credible reporter of the events that occurred on the set.

However, certain conduct at least arguably crossed the line and is sufficient to preclude summary judgment. There are limits to the response that the accused can make in response to claims of harassment. There comes a point where the accused stops simply defending him or herself and starts taking action that a reasonable jury could view as retaliation for the fact that the accuser had the temerity to make the accusations. "There is an important difference between

131

defending oneself, on the one hand, and threatening, intimidating, or otherwise interfering with someone's right to pursue a discrimination claim on the other." *Dixon*, 504 F.3d at 84; *see also Eckhart*, 2021 WL 4124616, at \*22–23 (holding that a defendant's decision to file partially nude photos of the plaintiff on the public docket was not a reasonably defensive measure and therefore could support retaliation liability, as the materials had no relevance to the defendant's arguments at the motion to dismiss stage). In *McSweeney*, this Court explained that one reason why the publishing of a letter did not qualify as an adverse employment action was because the letter "cast[] doubt on Plaintiff's allegations and not on Plaintiff's performance as an actor or reputation as an employee in the entertainment industry." 776 F. Supp. 3d at 258.

Here, certain conduct could be construed as directed not at Lively's allegations and at undermining their credibility, but as an attack on her professional reputation and livelihood.

The Wayfarer Parties planned a public relations campaign that included as a "key messaging point" the fact that Lively had a "less than favorable reputation in the industry span[ning] decades," and that "[p]roduction members lost their jobs due to BL's takeover." Gottlieb Decl., Ex. 46 at 2. There is evidence from which a jury could find that the Wayfarer Parties planned more aggressive action, not only to "destroy" Lively's accusations but to destroy her and her career. Nathan told Abel, among other things, "[Y]ou know when we send over documents we can't send over the work we will or could do because that could get us in a lot of trouble. . . . We can't write we will destroy her. . . . Imagine if a document saying all the things that he wants ends up in the wrong hands. . . . you know we can bury anyone[.] But I can't write that to him." Gottlieb Decl., Ex. 47. Sarowitz similarly stated: "There will be two dead bodies when I'm done. You know, and so not dead, but, you know . . . But you're dead to me . . . So that kind of—that kind of dead, but dead to a lot of people." R.56.1 ¶ 331. The Wayfarer Parties

132

assert that even if they contemplated taking offensive action against Lively, they never ended up doing so. But a jury is permitted to infer that when a party plans, after deliberation, to take certain action, the party has engaged in that action. "It is fair to presume that the Wayfarer Parties did what they said that they planned to do." *Lively*, 786 F. Supp. 3d at 779; *cf. Mut. Life Ins. Co. of N.Y. v. Hillmon*, 145 U.S. 285, 296 (1892); Fed. R. Evid. 803 advisory committee note (1973) ("The rule of *Mutual Life Ins. Co. v. Hillmon*, allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed.").

There also is some direct evidence that the plan to destroy Lively and her career was put into action. In addition to boosting videos of himself, Baldoni requested that the digital team amplify a video criticizing Lively as insensitive to domestic violence survivors. R.56.1 ¶ 753. There is also evidence suggesting that TAG "sen[t] to Jed" the "little bump" video and a Daily Mail article entitled "HOLLYWOOD VILLIAN," which "branded" Lively "a mean girl." *Id.* ¶ 754. These are two examples of what Case described as "Jed and his team's efforts to shift the narrative towards shining a spotlight on Blake and Ryan." *Id.* ¶ 743. The record further supports the Wayfarer Parties working to place "all kinds of garbage" on Lively in traditional media outlets. *See id.* ¶ 696. Case and others pitched a story to a Daily Mail reporter focusing on Lively's supposed marketing missteps and posing questions such as, "Why would Blake allow this to happen?" and, "How could she?" *Id.* ¶¶ 751–53. A jury could find that these efforts were proactive and in line with Baldoni's desire "to feel like [Lively] can be buried." *Id.* ¶ 690.

Wallace and TAG deny that they took proactive measures. Wallace has testified that Street Relations has only "minimal" digital capabilities related to "observant monitoring," and that it does not "do anything as far as action in the digital space." Shapiro Decl., Ex. 185 at 23:19–24:1. A jury could disbelieve that testimony. As detailed above, in pitching Wallace's

133

services to Heath and Wayfarer, Case indicated that Wallace could offer "specific services" related to "[a]ctively sway[ing] the algorithm" and "starting threads with theories the team approves of, and asking questions that no longer place Wayfarer and Justin on the back foot." Gottlieb Decl., Ex. 207. Wallace has sent similar scopes of work to other prospective clients. *See* Gottlieb Decl., Ex. 208 (informing a prospective client that his "digital team" can "help amplify positive press as it occurs"); Gottlieb Decl., Ex. 215 (discussing ability to create, monitory, manage, and optimize social media platforms); *see also* Gottlieb Decl., Exs. 210, 211, 212, 213, 214, 217. Wayfarer also retained Street at a rate of $30,000 per month (a rate double that charged by TAG itself). Gottlieb Decl., Exs. 67, 167, 207, 218.

A plaintiff cannot carry her burden at trial simply by calling into question the credibility of witnesses who have testified against her. *See Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952). However, Lively has come forward with affirmative evidence supporting her claim—both with respect to the Wayfarer Parties following through on their intent to spread negative content about her, and with respect to Wallace's technological capabilities in doing so.

In sum, the parties fiercely dispute the extent to which the backlash against Lively was "organic" or "artificial," and which steps the Wayfarer Parties may have taken to protect themselves (versus which ones they may have taken to destroy Lively personally and her career). A jury can and should decide those questions.

### 3.      Causation

The final element of Lively's case—establishing that her protected activity was a "substantial motivating factor" in an adverse employment action—presents yet more issues of fact for the jury. "[T]he question of what motivated an employer's desire" to engage in the alleged retaliatory conduct is "a quintessential jury function." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 392 (2d Cir. 2020).

The Wayfarer Parties argue that Lively has failed to demonstrate "the requisite temporal proximity between [her] complaints and the allegedly retaliatory smear campaign." Dkt. No. 813 at 14; *see also* Dkt. No. 955 at 31 (arguing that the "long temporal gap between her protected activity and an alleged instance of retaliation alone defeats her claims"). But California law imposes no "requisite temporal proximity" between protected activity and an adverse employment action. *See Hawkins*, 252 Cal. Rptr. 3d at 856. Instead, what is required is "conduct consistent with a retaliatory intent." *Id.* (noting that the circumstances might establish a causal connection even if "a long period elapsed between the protected activity and the terminations").[29]

Lively has identified evidence that, if credited, could support an inference that the Wayfarer Parties took adverse employment action against her at least in part because of her protected activity. After Lively raised her complaints in the Protections Letter, Baldoni felt "angry," "furious," and "sad," *see* Shapiro Decl., Ex. 118, and he felt "embarrassed" after the all-hands meeting, *see* Shapiro Decl., Ex. 121. A jury could draw the inference that at that moment, he had a motive to retaliate but an incentive not to do so. The Wayfarer Parties needed Lively to finish the Film, and Baldoni expressed concern about his behavior becoming public. But once the Film was released, that reason for not acting would have dissipated. Thus, a jury could find that the Wayfarer Parties "waited to exact their retaliation at an opportune time." *McConkey v.*

---

[29] The cases the Wayfarer Parties cite for their temporal-proximity rule hold that a plaintiff *might* be able to establish a causal connection by demonstrating a close temporal connection between protected activity and adverse employment actions. *See* Dkt. No. 813 at 14–16. In other words, the Wayfarer Parties have taken a sufficient condition and turned it into a necessary one. And even if this were a necessary condition, California courts have sustained jury verdicts where the gap between protected activity and adverse act was far longer than the seven months here between the all-hands meeting and the alleged smear campaign. *See, e.g., Green v. Laibco, LLC*, 121 Cal. Rptr. 3d 415, 426 (Cal. Ct. App. 2011) (one-year gap).

*Churchill Sch. & Ctr.*, 2025 WL 2062195, at \*14 (S.D.N.Y. July 23, 2025) (quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)).

To be sure, a jury could also find that something other than retaliation explains the actions of the Wayfarer Parties. As they argue, they "had a legitimate interest in protecting their reputations and the reception of their film" against negative press and would have taken steps to do so regardless of Lively's protected activity. *See* Dkt. No. 955 at 32. But retaliatory intent is not an all or nothing matter. Even under the higher but-for causation standard, a plaintiff need not demonstrate that "retaliation was the only cause of the employer's action." *Radice v. Eastport S. Manor Cent. Sch. Dist.*, 437 F. Supp. 3d 198, 210 (E.D.N.Y. 2020) (citation omitted). And, given the nature of the response, a jury could find that the Wayfarer Parties were motivated not just by fear of what would be disclosed but by the protected actions Lively had taken in the past.

Lively has accordingly demonstrated genuine issues of material fact with respect to all three elements of her FEHA retaliation claim. The motion for summary judgment as to this claim is denied.

### C. Aiding and Abetting Liability

Count Seven charges Abel, Nathan, and TAG with aiding and abetting retaliation. SAC ¶¶ 408–15. The Wayfarer Parties argue principally that Count Seven must be dismissed because there is no primary FEHA retaliation liability. *See* Dkt. No. 955 at 38. The Court has now rejected that argument. However, Abel and Nathan are nonetheless entitled to summary judgment on a different basis.

FEHA makes it an unlawful employment practice "[f]or any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this part, or to attempt to do so." Cal. Gov't Code § 12940(i). California courts have imported the common law definition of

136

aiding and abetting into FEHA: "a person aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." *Hall v. Hamilton Fam. Ctr.*, 2014 WL 1410555, at *4 (N.D. Cal. Apr. 11, 2014) (cleaned up) (quoting *Fiol v. Doellstedt*, 58 Cal. Rptr. 2d 308, 312 (Cal. Ct. App. 1996)).

In *Reno v. Baird*, 957 P.2d 1333 (Cal. 1998), the California Supreme Court held that individual non-employer individuals such as supervisors cannot be held directly liable for discrimination under FEHA. *Id.* at 1335–42. The court reasoned that the legislature did not intend to place individual employees charged with making personnel decisions on behalf of their employer at risk of personal liability for those decisions—especially given that FEHA only covers employers with five or more employees, and it would be "inconceivable" that small employers were shielded from FEHA claims while individual supervisors were not. *Id.* at 1339–40. For largely the same reasons, and more importantly for present purposes, the court also held that even though FEHA's aiding and abetting provision covers "any person," individual nonemployers such as supervisors cannot be held liable for aiding and abetting discrimination. *Id.* at 1342–43. The court explained that because individual supervisors are not directly liable for discrimination under FEHA, it was implausible that the legislature nonetheless intended for them to be personally liable "by the roundabout method of 'aiding and abetting' language." *Id.* at 1343 (quoting *Janken v. GM Hughes Elecs.*, 53 Cal. Rptr. 2d 741, 756 (Cal. Ct. App. 1996)). In *Jones v. Lodge at Torrey Pines Partnership*, 42 Cal. 4th 1158, 1173 (2008), the California Supreme Court extended *Reno*'s holding regarding personal liability for individual nonemployers

137

from the FEHA discrimination context to FEHA retaliation claims.[30]  Accordingly, there can be no aiding and abetting liability for individual nonemployers—on a theory of either discrimination or retaliation—where the individual is acting as an agent for the employer. Aiding and abetting liability instead applies to third parties such as customers or suppliers who "induce or coerce" conduct prohibited under FEHA.  *Reno*, 957 P.2d at 655.

For example, in *Alch v. Superior Ct.*, 19 Cal. Rptr. 3d 29 (Cal. Ct. App. 2004), the court held that talent agencies could be liable for age discrimination inflicted on television writers by the television networks and studios that employed the writers.  *Id.* at 35–36.  The agencies knew the studios were engaged in a course of systematic age discrimination and gave substantial assistance or encouragement to that course by virtue of their own referral practices, which allegedly screened out older writers in favor of younger ones.  *Id.* at 67–68.  Accordingly, the court held that the talent agencies acted as a sort of outside, third-party "supplier" for the studios rather than as their agents.  *Cf. Smith v. BP Lubricants USA Inc.*, 278 Cal. Rptr. 3d 587 (Cal. Ct. App. 2021) (analyzing whether an outside vendor was liable as an aider and abettor).

Here, Nathan and Abel were hired by Wayfarer and IEWUM to perform services on their behalf and as their agents.  Unlike the talent agencies in *Alch*, Nathan and Abel were not outside third parties who coerced, induced, or substantially assisted an employer's discrimination or retaliation.  Instead, they were for all intents and purposes individual employees carrying out

---

[30] The holding of *Jones*—that nonemployer individuals cannot be personally liable for retaliation—applies even where the underlying FEHA violation which prompted the protected activity was harassment rather than discrimination.  *See Greenwald v. Bohemian Club, Inc.*, 2008 WL 2331947, at *5 (N.D. Cal. June 4, 2008); *Agosto v. Altec, Inc.*, 2015 WL 13908080, at *5 (C.D. Cal. July 23, 2015).  Although individual employees *can* be personally liable for harassment, *see* Cal. Gov't Code § 12940(j), that does not mean they can also be personally liable for retaliation in connection with harassment, as retaliation in those circumstances still requires adverse employment activity such as personnel decisions for which only employers may be held liable.  *See Greenwald*, 2008 WL 2331947, at *5.

alleged adverse employment actions at the direction of the employer.  In such circumstances, liability attaches against the employer.  *See Reno*, 957 P.2d at 1342–43.

A different conclusion might be warranted with respect to TAG.  In *Raines v. U.S. Healthworks Medical Group*, 534 P.3d 40 (Cal. 2023), the California Supreme Court held that unlike individual nonemployers such as supervisors, an "employer's business-entity agents can be held directly liable under the FEHA for employment discrimination in appropriate circumstances when the business-entity agent has at least five employees and carries out FEHA-regulated activities on behalf of an employer." *Id.* at 41.  The court based this holding on its determination that "the considerations that motivated [its] decisions in *Reno* and *Jones* are either absent or much diminished in a case" where a business-entity agent acts as an independent contractor for an employer.  *Id.* at 44–45.  For one, such entities are more likely to be able to negotiate over issues of indemnification and therefore less likely to be burdened by concerns about liability in carrying out their responsibilities on behalf of the employer.  *Id.* at 45.  In reaching this conclusion, the California Supreme Court expressly did not address whether aiding and abetting liability might apply to business-entity agents.  *Id.* at 54.  But there is at least some reason to believe that it does given that (1) business-entity agents can be directly liable for substantive FEHA violations and (2) the California Supreme Court treated issues of direct liability and aiding-and-abetting liability similarly in *Reno*.  *See* 957 P.2d at 1342–43; *cf. Mobley v. Workday, Inc.*, 740 F. Supp. 3d 796, 813 n.6 (N.D. Cal. 2024) (assuming without deciding that a business-entity agent may be subject to liability under FEHA's aider and abettor provision).

The parties have not addressed this issue at any length.  They have instead treated the aiding and abetting Defendants without differentiation.  The Court therefore withholds judgment with respect to whether TAG might be liable for aiding and abetting FEHA retaliation.  Because

Nathan and Abel cannot be held personally liable for aiding and abetting retaliation, judgment must be granted in their favor.  The motion for summary judgment with respect to TAG is denied without prejudice.

## V.      Failure to Prevent Sexual Harassment

Count Six of the SAC charges IEWUM and Wayfarer with failing to investigate, prevent, and remedy harassment in violation of FEHA.  SAC ¶¶ 401–07.  Two provisions under FEHA are relevant to this claim.  First is Section 12940(j)(1), which states that "[a]n entity shall take all reasonable steps to prevent harassment from occurring."  Cal. Gov't Code § 12940(j)(1).  This language appears in the same provision which prohibits harassment, including the maintenance of a hostile work environment.  *See id.*  Courts have therefore read the "failure to prevent" language in subsection (j)(1) as informing harassment claims rather than as "creat[ing] a stand-alone tort."  *See Thompson v. City of Monrovia*, 112 Cal. Rptr. 3d 377, 393 (Cal. Ct. App. 2010).

Section 12940(k) separately provides that it is unlawful for "an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."  Cal. Gov't Code § 12940(k).  The California Supreme Court has described this provision as establishing a "separate unlawful employment practice."  *State Dep't of Health Servs. v. Superior Ct.*, 79 P.3d 556, 562 (Cal. 2003).  Nonetheless, regulations promulgated under Section 12940(k) provide that there is "no stand-alone, private cause of action" under the provision unless the plaintiff also "plead[s] and prevail[s] on the underlying claim of discrimination, harassment, or retaliation."  Cal. Code Regs. tit. 2, § 11023(a)(2); *see also Dickson v. Burke Williams, Inc.*, 184 Cal. Rptr. 3d 774, 780–83 (Cal. Ct. App. 2015) (holding that there can be no liability under subsection (k) without a finding of "actionable harassment," and collecting cases holding the same); *Oliver v. Microsoft Corp.*, 966 F. Supp. 2d

140

889, 898 (N.D. Cal. 2013) (explaining that a failure to prevent or remedy discrimination or harassment claim "fails in the absence of a viable underlying claim"); *Kohli v. City & County of San Francisco*, 2025 WL 1883724, at *3 (N.D. Cal. July 8, 2025) ("Because the Court dismisses the harassment claim as untimely, it also dismisses his failure to prevent harassment claim.").

The Court has granted summary judgment on Lively's FEHA harassment claim. *See supra* § III.1. Judgment must therefore also be granted on her failure to prevent harassment claim.

## VI.    False Light Invasion of Privacy

Lively's tenth cause of action asserts a claim against the Wayfarer Parties for false light invasion of privacy in violation of Article I, Section 1 of the California Constitution. SAC ¶¶ 434–40. Generally, this tort occurs when a defendant invades the plaintiff's privacy "by publicity that places the plaintiff in a false light in the public eye." *Fellows v. Nat'l Enquirer, Inc.*, 721 P.2d 97, 99 (Cal. 1986). Lively's claim fails because it is governed by New York law, and New York recognizes no such tort.

Lively argues she can bring a common law claim for false light invasion of privacy under California law because (1) the parties included a California choice-of-law provision in the ALA and (2) her claim turns on conduct which occurred in California, especially the execution of the communications strategy from the state. Dkt. No. 1064 at 56–57. As for the first contention, the ALA is an unexecuted agreement and does not create binding obligations between the parties. *See supra* § I. Its choice-of-law provision therefore cannot provide a basis for the application of California law to Lively's false light invasion of privacy claim.

As for the second assertion, the facts alleged in the SAC and proffered by Lively in opposition to the Wayfarer Parties' motion for summary judgment do not support the application of California law. That is because the relevant choice of law principles in this context focus

141

primarily on where the injury occurred rather than where the liability-creating conduct arose.[31]

"[A] federal court sitting in diversity borrows the forum State's choice-of-law rule." *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 115 (2022). "Interest analysis [is] the relevant analytical approach to choice of law in tort actions in New York." *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 684 (N.Y. 1985). "In determining which jurisdiction has the most significant interest in the dispute, courts 'look chiefly to the parties' domiciles and the locus of the tort.'" *eShares*, 2025 WL 936921, at *7 (quoting *Condit v. Dunne*, 317 F. Supp. 2d 344, 352 (S.D.N.Y. 2004)). "The locus of a tort is generally determined by the place where the plaintiff suffered injury." *Id.* (quoting *Condit*, 317 F. Supp. 2d at 353). This factor is particularly determinative where the law at issue is "conduct-regulating," meaning it is used as a guide to govern individuals' primary conduct and acts as a "prophylactic . . . to prevent injuries from occurring," rather than as a way to "prohibit, assign, or limit liability after [a] tort occurs." *Padula v. Lilarn Props. Corp.*, 644 N.E.2d 1001, 1002–03 (N.Y. 1994) (citing *Cooney v. Osgood Mach.*, 612 N.E.2d 277, 280 (N.Y. 1993)). False light invasion of privacy is a conduct-regulating tort. *See Winter v. Pinkins*, 2016 WL 1023319, at *4 (S.D.N.Y. Mar. 8, 2016) (citing *Catalanello v. Kramer*, 18 F. Supp. 3d 504, 511–13, 518–19 (S.D.N.Y. 2014)). Thus, Lively's place of domicile determines the laws to be applied unless some other state "has a more significant relationship to the issue or the parties." *Adelson v. Harris*, 973 F. Supp. 2d 467, 477 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017).

New York has the most significant interest in this claim. While there is evidence of conduct occurring in California, Lively resides in New York, SAC ¶ 56, and would have suffered

---

[31] As explained previously, this stands in contrast to the extraterritoriality analysis in Section III. *See Forcellati v. Hyland's, Inc.*, 876 F. Supp. 2d 1155, 1160 (C.D. Cal. 2012) (discussing the conceptually distinct issues of extraterritoriality and choice-of-law analysis).

her injury in New York, *id.* ¶¶ 438–39, 461–63.  She does not explain why California has a more significant relationship to the issue or parties other than by relying on the unadopted choice-of-law provision and the Wayfarer Parties' location when they committed the alleged tortious conduct.  Without more, that is "[in]sufficient to overcome the presumption that the law of Plaintiff's domicile should apply in this type of case."  *See Adelson*, 973 F. Supp. 2d at 477.

New York law does not recognize a claim for false light invasion of privacy.  *See Lively*, 786 F. Supp. 3d at 734 (citing *DeIuliis v. Engel*, 2021 WL 4443145, at *9 (S.D.N.Y. Sept. 27, 2021)); *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 703 (N.Y. 1993).  The claim must therefore be denied.

## VII.    Defamation

Lively brings a claim for defamation against the Wayfarer Parties based on allegedly false and defamatory statements made about her through their lawyer, Bryan Freedman ("Freedman"), after she filed the CRD complaint and during the course of this litigation.  SAC ¶¶ 447–65.  The alleged defamatory statements are as follows:

On December 21, 2024, the day after Lively filed her complaint with the California Civil Rights Division, Freedman made the following statement to the New York Times:

> It is shameful that Ms. Lively and her representatives would make such serious and categorically false accusations against Mr. Baldoni, Wayfarer Studios and its representatives, as yet another desperate attempt to "fix" her negative reputation which was garnered from her own remarks and actions during the campaign for the film; interviews and press activities that were observed publicly, in real time and unedited, which allowed for the internet to generate their own views and opinions. These claims are completely false, outrageous and intentionally salacious with an intent to publicly hurt and rehash a narrative in the media.

SAC ¶ 451; R.56.1 ¶ 787; Gottlieb Decl., Ex. 271 at 170.

On January 7, 2025, after Lively filed her complaint in this Court, Freedman stated in an interview for the Megyn Kelly Show:

> And for an executive producer to have a competing cut of a film is, is incredibly bizarre. But when she starts threatening people and saying I'm not going to promote the film, I'm not going to do anything unless you use my cut, that's when it starts to be awfully, you know, awfully incendiary. And you know, the concern really is that she used these allegations of sexual harassment and she used these allegations of bullying to try and leverage her position so she could be the de facto director in the case.

SAC ¶ 451; R.56.1 ¶ 802; Gottlieb Decl., Ex. 271 at 172.

On January 18, 2025, two days after the Wayfarer Parties filed their complaint against Lively in the related litigation, *see* Wayfarer Action, Dkt. No. 1, Freeman stated to Deadline as follows:

> After my clients filed a comprehensive lawsuit packed with almost 200 pages of undeniable facts and documentary evidence which crushed their false allegations of a smear campaign by providing doctored communications to the New York Times Blake and her legal team have just one heinous pivot left, and that is to double down on the revoltingly false sexual allegations against Mr. Baldoni. . . . The mere fact that Ms. Lively feels that she can publicly destroy Mr. Baldoni's reputation in an attempt to devastate his future career and then deny him or his team their own ability to defend theirselves [sic] against her is preposterous. Mr. Baldoni never once publicly attempted to call Ms. Lively out for her own many wrongdoings during filming, he kindly addressed all her concerns during filming in the correct manner despite the fact that he wholly disagreed, he himself was committed to do things differently and to keep the peace as she specifically admitted to in her own lawsuit. We will not only continue to defend our clients against Blake's power, privilege and all out lies, but we will now fight even harder for the voiceless in the DV community who are unfairly suffering while she continues to push on her own self-serving and selfish vendetta in the media.

SAC ¶ 451; R.56.1 ¶ 806; Gottlieb Decl., Ex. 170–71.

On January 25, 2025, Freedman stated to the New York Post's Page Six:

> We will always respect the court; however, we will never be bullied by those suggesting we cannot defend our clients with pure, unedited facts. All we want is for people to see the actual text messages that directly contradict her allegations, video footage that clearly shows there was no sexual harassment and all the other powerful evidence that directly contradicts any false allegations of sexual harassment and subsequent smear campaign. It seems that in a time of universal deceit, telling the truth is a revolutionary act.

SAC ¶ 451; R.56.1 ¶ 814; Gottlieb Decl., Ex. 271 at 171.

144

The Wayfarer Parties argue that Lively cannot prove falsity or malice; that the statements are ones of opinion; that they are shielded by the First Amendment; and that they are absolutely privileged under California's litigation privilege, Cal. Civil Code § 47(b), and New York's fair report privilege, N.Y. Civ. Rights Law § 74. Dkt. No. 813 at 19–22; Dkt. No. 955 at 53–56. The Court need not engage in a choice-of-law analysis, as the parties agree that there is no conflict between New York and California law with respect to the specific arguments raised. Dkt. No. 1064 at 57 n.50.

New York and California both extend protection for reports of judicial proceedings. New York's statute, Section 74, provides: "A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published." N.Y. Civ. Rights Law § 74. "The fair and true report privilege has been described as an absolute privilege that is not defeated by the presence of malice or bad faith." *Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 520 (S.D.N.Y. 2013) (quoting *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 477 (S.D.N.Y. 2012)). "Cases finding § 74 protection have held that a 'report' of a judicial or other official proceeding can take many forms." *Gonzalez v. Gray*, 69 F. Supp. 2d 561, 569 (S.D.N.Y. 1999), *aff'd*, 216 F.3d 1072 (2d Cir. 2000). The privilege has been extended to "comments made by attorneys to the press in connection with representation of their clients." *McNally v. Yarnall*, 764 F. Supp. 853, 856 (S.D.N.Y. 1991); *accord Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation*, 2009 WL 4547792, at *16 (E.D.N.Y. Dec. 1, 2009); *Silver v. Kuehbeck*, 2005 WL 2990642, at *16 (S.D.N.Y. Nov. 7, 2005), *aff'd*, 217 F. App'x 18 (2d Cir. 2007) (summary order); *Lacher v. Engel*, 817 N.Y.S.2d 37, 43 (1st Dep't 2006), *abrogated on other grounds by Gottwald v. Sebert*,

220 N.E.3d 621 (N.Y. 2023). A report need not be balanced to be "fair and true." *See Silver*, 2005 WL 2990642, at *16 (summary of client's position is fair and accurate). It is sufficient that the account given is "substantially accurate." *Holy Spirit Assn. for Unification of World Christianity v. N.Y. Times Co.*, 399 N.E.2d 1185, 1187 (N.Y. 1979). "A fair and true report admits of some liberality; the exact words of every proceeding need not be given if the substance be substantially stated." *Id.* (citation omitted).

"Section 74 does not afford protection if the specific statements at issue, considered in their context, 'suggest[] more serious conduct than that actually suggested in the official proceeding.'" *Calvin Klein Trademark Trust v. Wachner*, 129 F. Supp. 2d 248, 253 (S.D.N.Y. 2001) (quoting *Daniel Goldreyer, Ltd. v. Van de Wetering*, 630 N.Y.S.2d 18, 22 (1st Dep't 1995)). Moreover, "[i]f context indicates that a challenged portion of a publication focuses exclusively on underlying events, rather than an official proceeding relating to those events, that portion is insufficiently connected to the proceeding to constitute a report of that proceeding." *Wexler v. Allegion (UK) Ltd.*, 374 F. Supp. 3d 302, 313 (S.D.N.Y. 2019). "A key test courts have adopted to resolve whether a report qualifies for the fair report privilege is whether the ordinary viewer or reader can determine from the publication itself that the publication is reporting on a judicial proceeding." *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 178–79 (2d Cir. 2021) (cleaned up and citation omitted). This is not to say that "the court filing, the court, or the jurisdiction be specifically identified in the article," but "[t]he key question is whether the reader is able to determine that the report is of a proceeding." *Id.* at 180. "In other words, if the context in which the statement is made makes it impossible for the ordinary viewer or reader to determine whether the publication was reporting on a judicial proceeding, the absolute privilege does not apply." *Id.* at 179 (cleaned up and citation omitted). In assessing the relevant context,

146

courts "must give the entire disputed language a fair reading in the context of the *publication as a whole*." *Sheindlin v. Brady*, 597 F. Supp. 3d 607, 634 (S.D.N.Y. 2022) (emphasis in original) (quoting *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000)).

It is evident from the context here that each of the statements alleged to be defamatory constituted a report with respect to a judicial proceeding.

The December 21 statement was made immediately after Lively filed the CRD complaint. It referred explicitly to the "accusations against" the Wayfarer Parties and the "claims" made by Lively. It was made by Lively's attorney to a New York Times reporter in connection with a report on the CRD complaint. It would have been obvious from context that Freedman was referring to the accusations made by Lively and to the expected response, i.e., that the claims were "false, outrageous and intentionally salacious with an intent to publicly hurt and rehash a narrative in the media." SAC ¶ 451. "[T]he fair report privilege applies to a party who communicates a complaint to the press before that complaint is publicly filed." *Lively*, 786 F. Supp. 3d at 761. A similar principle must apply with respect to a party who communicates a *response* to a complaint before that response is publicly filed.

The January 7, 18, and 25 comments all likewise refer to the "allegations" made by Lively and to the Wayfarer Parties' response. Given their timing, content, and context— especially the person who made them—the comments could only have been understood as a reflection of the Wayfarer Parties' view of what the evidence would show in the judicial proceeding rather than as a testimonial by Freedman with respect to the underlying facts. The January 7 statement was made in the immediate aftermath of Lively's complaint in this Court. While it does not explicitly reference the complaint, it is plain from the context that it refers to the complaint. It is undisputed that, as Freedman stated on January 7, Lively was the executive

147

producer and that she generated "a competing cut" of the Film and refused to promote it with Baldoni. What the statement adds is the claim that Lively made her complaints about sexual harassment as leverage to become the de facto director of the Film. But Freedman's statements mirrored those he made in court on behalf of the Wayfarer Parties little more than one week later to undercut Lively's allegations in her complaint. *See* Wayfarer Action, Dkt. No. 1 ¶¶ 2–3. Freedman's January 18 statement to Deadline directly referred to the "comprehensive lawsuit" that the Wayfarer Parties had filed, his efforts to "continue to defend [his] clients," and assertions that Lively had purportedly "specifically admitted to in her own lawsuit." SAC ¶ 451; R.56.1 ¶ 806; Gottlieb Decl., Ex. 170–71. The article in which these statements appeared framed Freedman's statements as a response "to the January 16 response from Lively's Manatt, Phelps & Phillips attorneys and Willkie Farr & Gallagher lawyers to Baldoni's *long expected lawsuit*."[32] (emphasis added). Similarly, the January 25 statement was made shortly after Lively asked the Court to enter a protective order, *see* R.56.1 ¶ 811, and in it, Freedman referred to "respect[ing] the court" and the "evidence" that would undermine Lively's "allegations of sexual harassment," SAC ¶ 451.

Moreover, none of the statements suggests conduct more serious than that suggested in the Wayfarer Parties' in-court responses to Lively's allegations. *Compare* SAC ¶ 451, *with* Wayfarer FAC ¶ 3 ("[R]ather than admit and take accountability for her own mishaps, she chose to blame the Wayfarer Parties, in a malicious and unforgivably public manner. When she and Reynolds could not force Baldoni and Wayfarer to read a statement she and her representatives

---

[32] *See* Dominic Patten, *Justin Baldoni's Lawyer Decries "Revoltingly False Sexual Allegations" from Blake Lively as Lawsuits Fly; Brands at Business Heart of Dispute*, Deadline (Jan. 18, 2025, at 17:44 ET), https://deadline.com/2025/01/blake-lively-justin-baldoni-lawyer-latest-1236260673/.

prepared, extorting them to 'take accountability' in defense of Lively's actions, she lay in wait for months, preparing to publicly attack Baldoni by falsely claiming that he had sexually harassed her. The same falsified stories she had calculatingly devised and used throughout the production of this film in order to take control were now being used publicly to destroy Baldoni and the Wayfarer Parties."); *id.* ¶ 296 ("Lively orchestrated a malicious attack on the reputations, careers, and personal lives of the Wayfarer Parties, subjecting them to public humiliation, threats, and vitriol.").

Lively relies on Judge Kaplan's opinion in *Carroll v. Trump*, 664 F. Supp.3d 550 (S.D.N.Y. 2023), but that case bears little resemblance to this one. While the statement at issue in that case was made during the pendency of a legal proceeding and its subject matter overlapped with the proceeding, nothing about the "content or context" of the statement "made it a 'report' of a judicial proceeding." *Id.* at 558. The statement instead constituted "an amalgamation of Mr. Trump's personal views and comments on a wide range of subjects, including the legal system of the United States and of New York, this Court, Ms. Carroll and her rape accusation against him, CNN and its journalist Anderson Cooper, and Ms. Carroll's counsel." *Id.* Indeed, the way in which it was stylized belied any notion that the defendant "was even attempting to provide a fair and true report of a judicial proceeding." *Id.* (citation omitted). In this case, by contrast, the statements at issue were made by counsel, not a percipient witness. And they were both framed in terms of the issues raised in court and consistent with the Wayfarer Parties' in-court positions. Any ordinary viewer or reader would therefore understand that Freedman was commenting on a judicial proceeding.

The Wayfarer Parties are entitled to summary judgment on the defamation claim.

149

## VIII.    Conspiracy

Lively's final cause of action alleges civil conspiracy against each of the Wayfarer Parties.  SAC ¶¶ 466–69.  In her memorandum of law in opposition to the motion for summary judgment, Lively clarifies that her conspiracy claim is limited to: "(1) civil conspiracy to retaliate under Title VII, FEHA, and the California Labor Code against IEWUM and Wayfarer; (2) conspiracy to commit false light as to Wayfarer, Baldoni, Heath, Sarowitz, Nathan, TAG, and Abel; and (3) conspiracy to commit defamation/defamation per se against Wayfarer, Baldoni, and Heath."  Dkt. No. 1064 at 58–59.

Civil conspiracy is not an independent cause of action under either California or New York law but rather "a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration."  *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal. 1994); *accord Alexander & Alexander of N.Y., Inc. v. Fritzen*, 503 N.E.2d 102, 102–03 (N.Y. 1986).  There is no conspiracy claim "unless the underlying tort is committed and damage results therefrom."  *Julian v. Mission Cmty. Hosp.*, 218 Cal. Rptr. 3d 38, 65 (Cal. Ct. App. 2017) (citation omitted); *see also Alexander*, 503 N.E.2d at 103.

The Court has granted judgment on the Title VII, California Labor Code, false light, and defamation claims.  Accordingly, there can be no conspiracy liability for these claims, and the Wayfarer Parties are entitled to summary judgment on the claim of civil conspiracy to violate those laws or commit those torts.

The Wayfarer Parties are also entitled to summary judgment on the claim of conspiracy to commit retaliation under FEHA.  Regardless of whether New York or California's law of conspiracy governs, Lively cannot accomplish by way of civil conspiracy what she is unable to under FEHA itself.  As detailed above, *see supra* § IV.C, FEHA permits aiding and abetting

150

claims under certain circumstances, but it also places specific limitations on that form of liability. Lively cites no authority, and the Court has found none, permitting a party to evade the carefully drawn limitations on aiding and abetting liability under FEHA by the artifice of pleading the claim in conspiracy. In fact, courts have recognized just the opposite. As one court has explained, the California legislature "carefully delineated the scope of liability for another's conduct" under FEHA, "limiting it to those who 'aid, abet, incite, compel or coerce the doing' of a prohibited act." *Wynn v. Nat'l Broad. Co.*, 234 F. Supp. 2d 1067, 1116 (C.D. Cal. 2002). Accordingly, a civil conspiracy claim which exceeds the scope of FEHA's aiding and abetting provision cannot be brought. *See id.* at 1115–16; *Thomsen v. Sacramento Metro. Fire Dist.*, 2009 WL 8741960, at *15 n.16 (E.D. Cal. Oct. 20, 2009) (stating that there is "no cognizable claim for conspiracy under FEHA"); *cf. Doctors' Co. v. Superior Ct.*, 775 P.2d 508, 514 (Cal. 1989) (suggesting in dicta that conspiracy liability under FEHA turns on application of the statute's aiding and abetting provision).

## CONCLUSION

The motions for judgment on the pleadings and summary judgment are GRANTED IN PART and DENIED IN PART. Judgment is granted in the Wayfarer Parties' favor with respect to all counts in the Second Amended Complaint except for: (1) Lively's fourth cause of action for retaliation in violation of FEHA against IEWUM and Wayfarer; (2) Lively's seventh cause of action against TAG for aiding and abetting retaliation in violation of FEHA; and (3) Lively's ninth cause of action for breach of the CRA against IEWUM.

The Clerk of Court is respectfully directed to close Dkt. Nos. 810, 813, and 952.


SO ORDERED.

Dated: April 2, 2026
   New York, New York

            LEWIS J. LIMAN
          United States District Judge