# EXHIBIT 2

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---

BLAKE LIVELY,

Plaintiff,

vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)

25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.,

Defendants.

_____

JENNIFER ABEL,

Third-party Plaintiff,

vs.

JONESWORKS, LLC,

Third-party Defendant.

_____

WAYFARER STUDIOS LLC, et al.,

Consolidated Plaintiffs,

vs.

BLAKE LIVELY, et al.,

Consolidated Defendants.

_____

**CONFIDENTIAL**


VIDEO-RECORDED DEPOSITION OF NICOLE ALEXANDER

APPEARING REMOTELY FROM

New York, New York

Monday, December 15, 2025


Stenographically Reported by:  Ashley Soevyn,

CALIFORNIA CSR No. 12019

CONFIDENTIAL

Page 2

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---0O0---

BLAKE LIVELY,
        Plaintiff,
vs.     CASE NO. 24-CV-10049-LJL (LEAD CASE)
        25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.,

        Defendants.
_____
JENNIFER ABEL,
        Third-party Plaintiff,
    vs.
JONESWORKS, LLC,
        Third-party Defendant.
_____
WAYFARER STUDIOS LLC, et al.,
        Consolidated Plaintiffs,
    vs.
BLAKE LIVELY, et al.,
        Consolidated Defendants.
_____
        **CONFIDENTIAL**
    Video-recorded Deposition of
NICOLE ALEXANDER, taken on behalf of the Plaintiff
Blake Lively, Pursuant to Notice, with all parties
appearing via video conferencing beginning at
8:04 a.m. PST; 11:04 a.m. EST and ending at 5:06
p.m. PST; 8:06 p.m. EST on Monday, December 15,
2025, before me, ASHLEY SOEVYN, California Certified
Shorthand Reporter No. 12019.

Page 3

A P P E A R A N C E S:

For the Plaintiffs Stephanie Jones and Jonesworks
LLC:  (NOT PRESENT FOR THIS DEPOSITION)
    QUINN EMANUEL URQUHART & SULLIVAN
    BY:  KRISTIN TAHLER
    BY:  OLIVIA HOLMES
    BY:  LAURENNE M. BABAYAN
    Attorneys at Law
    865 S. Figueroa Street
    8th Floor
    Los Angeles, California 90017
    kristintahler@quinnemanuel.com
    oliviaholmes@quinnemanuel.com
    laurennebabayan@quinnemanuel.com
    (212) 849-7000

Page 4

A P P E A R A N C E S:

For the Plaintiff Blake Lively:
    MANATT PHELPS & PHILLIPS LLP
    BY:  ESRA HUDSON
    BY:  SARAH MOSES
    Attorneys at Law
    2049 Century Park East
    Suite 1700
    Los Angeles, California 90067
    ehudson@manatt.com
    smoses@manatt.com
    (310) 312-4207

Page 5

A P P E A R A N C E S:

For the Plaintiff Blake Lively:
    WILLKIE FARR & GALLAGHER
    BY:  KRISTIN BENDER
    BY:  AUTUMN ADAMS-JACK
    Attorneys at Law
    1875 K Street
    Northwest
    Washington, D.C. 20006
    kbender@willkie.com
    aadams-jack@willkie.com
    (202) 303-1245

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

A P P E A R A N C E S:

For the Plaintiff Blake Lively:

DUNN ISAACSON RHEE
BY: MERYL GOVERNSKI
Attorney at Law
401 9th Street, NW
Washington, D.C. 20004
mgovernski@dirllp.com
(202) 240-2927

-AND-

SLOANE OFFER WEBER AND DERN
BY: LINDSEY STRASBERG
Attorney at Law
10100 Santa Monica Blvd., Ste. 750
Los Angeles, California 90067
(310) 248-5100

Page 7

A P P E A R A N C E S:

For the Defendants Wayfarer Studios LLC, Jennifer Abel, Melissa Nathan and Justin Baldoni, Jamey Heath and Steve Sarowitz:

LINER FREEDMAN TAITELMAN+COOLEY
BY: BRYAN FREEDMAN
BY: AMIR KALTGRAD
Attorneys at Law
1801 Century Park West, 5th Floor
Los Angeles, California 90067
bfreedman@lftcllp.com
akaltgrad@lftcllp.com
(310) 201-0005

Page 8

A P P E A R A N C E S:

For the Defendants Wayfarer Studios LLC, Jennifer Abel, Melissa Nathan and Justin Baldoni, Jamey Heath and Steve Sarowitz:

AHOURAIAN LAW
BY: MITRA AHOURAIAN
Attorney at Law
2029 Century Park East
Suite 400
Los Angeles, California 90067
mitra@ahouraianlaw.com
(310) 376-7878

Page 9

A P P E A R A N C E S:

For the Defendants Wayfarer Studios LLC, Jennifer Abel, Melissa Nathan and Justin Baldoni, Jamey Heath and Steve Sarowitz:

MEISTER SEELIG & FEIN
BY: MITCHELL SCHUSTER
Attorney at Law
125 Park Avenue, 7th Floor
New York, New York 10017
ms@msf-law.com
(212) 655-3549

Also Present:

Maggie Kane, Veritext Legal Solutions Concierge
Dina Mayzlin, Plaintiff's Expert
John MacDonnell, Videographer

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

INDEX TO EXAMINATION

WITNESS:  NICOLE ALEXANDER

EXAMINATION BY:                              PAGE
MS. GOVERNSKI                                  15

WITNESS INSTRUCTION NOT TO ANSWER

| PAGE | LINE |
|------|------|
| 20 | 10 |
| 21 | 6 |
| 24 | 1 |
| 24 | 9 |
| 27 | 12 |
| 27 | 21 |
| 28 | 2 |
| 28 | 7 |
| 28 | 12 |

Page 11

INDEX TO EXHIBITS
NICOLE ALEXANDER
BLAKE LIVELY V. WAYFARER STUDIOS LLC, ET AL.
Monday, December 15, 2025
Ashley Soevyn, CSR No. 12019

| EXHIBIT NO. | DESCRIPTION | PAGE |
|-------------|-------------|------|
| Exhibit 1 | Expert Report of Nicole M. Alexander, November 3, 2025 | 16 |
| Exhibit 2 | Amended Expert Report of Nicole M. Alexander, November 3, 2025 | 62 |
| Exhibit 3 | Document titled Inauthentic Behavior | 91 |
| Exhibit 4 | Book titled Ethical AI in Marketing Aligning growth, responsibility, and customer trust by Nicole Alexander | 112 |
| Exhibit 4-A | Excerpt from Ms. Alexander's book page 15 | 113 |
| Exhibit 4-B | Excerpt from Ms. Alexander's book page 22 Future Regulations on AI Ethics | 118 |
| Exhibit 5 | Article by Timothy Graham, Sam Hames and Elizabeth Alpert titled The Coordination Network Toolkit: a framework for detecting and analysing coordinated behaviour on social media | 131 |
| Exhibit 6 | Document titled GPTZero AI Generated | 147 |
| Exhibit 7 | Document titled Sage Research Methods Encyclopedia of Research Design Meta Analysis | 219 |

Page 12

INDEX TO EXHIBITS
NICOLE ALEXANDER
BLAKE LIVELY V. WAYFARER STUDIOS LLC, ET AL.
Monday, December 15, 2025
Ashley Soevyn, CSR No. 12019

| EXHIBIT NO. | DESCRIPTION | PAGE |
|-------------|-------------|------|
| Exhibit 8 | Social media post Do U on X @Patrick webb | 269 |
| Exhibit 9 | Social Media Post 12/22/24 Richard Sempertegui on X | 272 |
| Exhibit 10 | 3/23/24 Social Media Post Sabrina Carpenter on Reddit | 276 |
| Exhibit 11 | 4/5/25 Social Media Post Francis Bean Cobain on Reddit | 278 |
| Exhibit 12 | 10/18/25 Social Media Post Oh and this show on Instagram | 279 |
| Exhibit 13 | 10/18/25 Social Media Post Oh and this show on Instagram | 281 |
| Exhibit 14 | 10/25/25 Social Media Post Love Island Finale on TikTok | 281 |
| Exhibit 15 | 10/27/25 Social Media Post Massage is a path to a healthier life on TikTok | 282 |
| Exhibit 16 | 11/18/25 Reddit Analysis Reproducible Code | 285 |
| Exhibit 17 | 12/4/25 Reddit Post Scraper | 300 |
| Exhibit 18 | Reddit Scraper $9 month | 307 |
| Exhibit 19 | 11/18/25 Excel Reddit INPUT.xlsx | 308 |
| Exhibit 20 | 11/18/25 TikTok README | 315 |

Page 13

INDEX TO EXHIBITS
NICOLE ALEXANDER
BLAKE LIVELY V. WAYFARER STUDIOS LLC, ET AL.
Monday, December 15, 2025
Ashley Soevyn, CSR No. 12019

| EXHIBIT NO. | DESCRIPTION | PAGE |
|-------------|-------------|------|
| Exhibit 21 | 12/4/25 TikTok Hashtag Scraper Apify | 321 |
| Exhibit 22 | 11/18/25 Excel TikTok INPUTxlsx | 323 |
| Exhibit 23 | 11/18/25 YouTube README | 325 |
| Exhibit 24 | 11/18/25 Excel YouTube INPUT.CSV | 329 |
| Exhibit 25 | 5/16/2024 It Ends With Us Official Trailer on YouTube | 332 |

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

---0O0---

CONFIDENTIAL DEPOSITION PROCEEDINGS

MONDAY, DECEMBER 15, 2025

---0O0---

THE VIDEOGRAPHER:  We're on the record. It's 11:04 a.m. Eastern Time on December 15th, 2025. This is the deposition of Nicole Alexander.  We're here in the matter of Blake Lively v. Wayfarer Studios LLC, et al.

I'm John MacDonnell, the videographer with Veritext.  Before the witness is sworn, would counsel please identify themselves beginning with noticing party, please.

MS. GOVERNSKI:  Good morning.  Meryl Governski from Dunn Isaacson Rhee on behalf of Ms. Lively.  Joining me today are Autumn Adams-Jack, co-counsel at Willkie Farr & Gallagher, and Dr. Dina Mayzlin, Ms. Lively's -- one of Ms. Lively's designated experts.

MR. FRITZ:  Good morning.  Kevin Fritz from Meister Seelig & Fein on behalf of the defendants and the witness.

MR. SCHUSTER:  And Mitch Schuster, also from Meister Seelig & Fein, on behalf of the defendants and witness.

Page 15

MS. GOVERNSKI:  I'm sorry.  One more thing.  Lindsey Strasberg, also co-counsel for Ms. Lively is on as well.

THE STENOGRAPHIC REPORTER:  Good morning, everyone, Ashley Soevyn, California.  Steno reporter, license 12019.

Ma'am, can I please have you raise your right hand?

Do you solemnly state that the testimony you're about to give in this deposition will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes, I do.

THE STENOGRAPHIC REPORTER:  Great.  Thank you.

EXAMINATION

BY MS. GOVERNSKI:

Q   Good morning, Ms. Alexander.  Can you please state your full name for the record?

A   Nicole Marie Alexander.

Q   Is there any reason today, Ms. Alexander, that you won't be able to give truthful and complete testimony?

A   None.

Q   You understand we originally were supposed to meet last week, and I understand that

Page 16

you came down with ██████.  Has your ████ resolved at this point?

A   It was ██████████, but yes, it has.

Q   Is there any reason that the ██████████ would prevent you from giving truthful and complete testimony today?

A   None.

MS. GOVERNSKI:  I'm going to go ahead and we've marked as Exhibit 1, which is your report in this matter.

(Exhibit 1 marked for identification.)

BY MS. GOVERNSKI:

Q   The first page of your report says it was prepared for Liner Freedman Taitelman & Cooley LLP. Did Liner Freedman retain you in this case?

A   Yes.

Q   And when did Liner Freedman retain you?

A   September possibly.  September, October.

Q   September of 2025?

A   '25, yes.

Q   In the course of putting together your report, did you interact with any of the attorneys at Liner Freedman?

A   Yes, I interacted with Amir -- I'm sorry, his last name is...

Page 17

Q   Kaltgrad?

A   Yes, thank you.

Q   Did you interact with any other attorneys at Liner Freedman?

A   Not while I was preparing my report, no.

Q   Well, when did you interact with any other attorneys at Liner Freedman?

A   I met Kevin Fritz, who is on currently, afterwards.  Probably three weeks ago.

Q   Okay.  And how often, during the course of putting together your report, did you speak with Mr. Kaltgrad?

A   Maybe I touched base once a week via email.  Email or call.

Q   Since you were retained in September or October 2025?

A   Correct.

Q   And what is your understanding of which clients, on behalf of Liner Freedman, retained you?

A   I believe it is Wayfarer and maybe partially Baldoni as well.  I'm not quite sure.  I know there are several different counsels.  I'm not sure the inter- -- the operations.

Q   Okay.  So the defendants in this case include Mr. Baldoni, Wayfarer, Jamey Heath,

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

Steve Sarowitz, Melissa Nathan, Jennifer Abel, It Ends with Us and TAG PR?

A   Uh-huh.

Q   Do you understand that you are testifying on behalf of all of those defendants today?

A   I believe I am, because I thought it was part of the collective.  So...

Q   Okay.  So if I refer to the Wayfarer defendants throughout the day, you will understand that I'm referring to that big group of defendants?

A   Yes.

Q   Prior to this litigation, have you had any interactions with any of the Wayfarer defendants?

A   No.

Q   During the course of this litigation, have you had any interaction with any of the Wayfarer defendants?

A   No.

Q   And you refer to "other counsel."  You understand that the Wayfarer defendants have counsel other than Liner Freedman, right?

A   I believe so, yes.

Q   To what extent have you interacted with any attorneys other than those at Liner Freedman and

Page 19

Mr. Fritz, as you just mentioned?

A   Prior to coming on board with the engagement with Amir, I had a conversation with separate counsel, which I believe is part of a separate law firm.

Q   And who is that?

A   I could not tell you.  It was two -- two attorneys.  It was part of a vetting process.  They were looking to -- for someone with my background to come on as an expert witness.

Q   And that was, you said, prior to you coming on with the engagement, right?

A   With -- yes, correct.

Q   So that conversation preceded your engagement?

A   Correct.

Q   Were those two attorneys with Shapiro Arato Bach?

A   Honestly, I'm not sure.

Q   Were they female or male attorneys?

A   Both female.

Q   Is it possible that they were at Liner Freedman?

MR. FRITZ:  Objection.

THE WITNESS:  I -- I don't want to guess.

Page 20

BY MS. GOVERNSKI:

Q   Do you remember their names --

A   I don't --

Q   -- their first names?

A   I don't.

Q   Kim?

A   Honestly, it was about a 30-minute call and I -- back in August maybe.  I'm not sure of their name.

Q   Okay.  What do you recall about that call?

A   It was a --

MR. FRITZ:  Hold on.  I would just instruct you not to disclose the substance of the conversation.

MS. GOVERNSKI:  She wasn't engaged at that time.

MR. FRITZ:  Attorney-client privilege.  I understand your position.

BY MS. GOVERNSKI:

Q   Are you following your counsel's advise not to answer questions?

MR. FRITZ:  She is.

THE WITNESS:  Yes.

Page 21

BY MS. GOVERNSKI:

Q   Ms. Alexander, at the time you had this conversation, had you ever spoken with any of these individuals before?

A   No.

Q   Did you understand that they were speaking with a number of individuals; you called it part of a vetting process?

MR. FRITZ:  Same instruction.  To the extent that your answer would require you to disclose the substance of your conversation, I would instruct you not to answer that.

BY MS. GOVERNSKI:

Q   Are you following your counsel's instruction not to answer?

A   Yes.

Q   Well, you mentioned --

MR. FRITZ:  Just going forward, she's always going to follow my instruction not to answer, so...

MS. GOVERNSKI:  Can you articulate your basis for instructing her not to answer?

MR. FREEDMAN:  Can we stop with the speaking objections?

MR. FRITZ:  Sorry, I don't know who that

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

is.

MR. FREEDMAN: That's Bryan Freedman.

MS. GOVERNSKI: Mr. Freedman, you're not entered in this -- in this, so you're --

MR. FREEDMAN: You know what, you will need to stop with the -- you'll need to stop with the speaking objections.

MS. GOVERNSKI: It's my deposition.

MR. FREEDMAN: Yeah, that's right, and you're improperly handling it, and you don't know what you're doing or how to practice law. So stop with your speaking objections.

MS. GOVERNSKI: Counsel, please mute Mr. Freedman who has not entered an appearance in this deposition. And I am not giving speaking objections. You're instructing your own counsel not to give speaking objections. It's my deposition.

MR. FREEDMAN: No, you're the one giving speaking objections, as your mouth is moving right now.

MS. GOVERNSKI: Can we please -- Mr. Fritz, can you please control your co-counsel or I'm going to have to seek relief from the Court.

MR. FRITZ: I mean, he's not incorrect. You're, like, trying to engage --

Page 23

(Cross talk.)

MS. GOVERNSKI: I'm asking to understand -- I'm asking, Mr. Fritz, you to explain the basis for your objection so I can understand what your perception is on the line on privilege.

MR. FRITZ: You have it.

MS. GOVERNSKI: No, I would like you to explain to me -- I am asking you to explain to me your line on privilege when Ms. Alexander said she was not engaged at that time.

MR. FRITZ: I'm not going to engage in the debate during the deposition.

BY MS. GOVERNSKI:

Q    Ms. Alexander, how did you come to be on that phone call in August?

A    I was engaged via GLG, and GLG put me in contact with the two women I referenced earlier.

Q    And what was your understanding of the purpose of that call?

MR. FRITZ: Objection.

BY MS. GOVERNSKI:

Q    You can answer.

A    I was asked to come on to meet them to talk about my background in social media and data analysis.

Page 24

Q    And what about your background did you understand prompted that call?

MR. FRITZ: Instruct the witness not to answer to the extent it would require the disclosure of a privileged communication.

THE WITNESS: I will follow his instructions.

BY MS. GOVERNSKI:

Q    Ms. Alexander, what is your understanding of what in your background prompted GLG to reach out to you?

MR. FRITZ: Same instruction not to answer.

BY MS. GOVERNSKI:

Q    Ms. Alexander, did you have any understanding before you got on that call of why you were getting on it?

A    Yes, I did.

Q    And what was that understanding?

A    As part of GLG, which is an expert network of individuals with different backgrounds, I had been asked to come on the call to discuss how I would approach -- as an expert witness, how I would approach the opportunity to do data science and analytics as part of a case.

Page 25

Q    Are you part of GLG?

A    I am.

Q    And when did you become part of GLG?

A    Twelve years ago.

Q    And how did you describe your expertise within the GLG Network?

A    So my background is -- my CV is published as part of the network. And a basic summary is 25 years of experience across data analytics, marketing, and some more of my credentials, just being in academia, my book, et cetera.

Q    And so you've been part of GLG Network for 12 years. Have you ever been part of what you described as the vetting process before?

A    For litigation work, is that the question?

Q    Yes. Yes.

A    No, this is the first time.

Q    So in 12 years as being part of GLG, this was the first time you've received that call?

A    For litigation work, yes.

Q    And what did GLG say to you when they called you?

A    I'm sorry. It was not a call. I shouldn't say that. It was outreach via electronic

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

correspondence. So it was a survey that I filled out, and I answered the question.

Q   What were the questions in the survey?

A   Honestly, I couldn't remember.

Q   Do you have any recollection of the type of questions the survey was asking you?

MR. FRITZ:  Objection.

You can answer.

THE WITNESS:  I don't.  I fill out many, many surveys.

BY MS. GOVERNSKI:

Q   And this was the first survey you filled out that you've received a callback in a litigation matter; is that right?

A   Correct.

Q   How soon after that survey did you receive a callback?

A   I would say within three weeks.

Q   And after you filled out that survey, did you -- you receive a callback from GLG or was it directly from the counsel that you spoke with?

A   No, it was GLG.

Q   And what did GLG tell you when they called you back?

A   They asked to set up a 30-minute Zoom

Page 27

call with the attorneys.

Q   Okay.  And you used the term "vetting process."  Why did you use that term?

A   That would be what I call any -- any conversation like that.  I -- I made the assumption that they were looking to understand my background to see if I was an appropriate fit.  Specifically, also around like things like availability, is usually a part of any conversation that I've had with GLG, if I'm available for the work, things of that nature.

Q   And did those individuals on the call tell you that they were looking for you to testify that there was no smear campaign?

MR. FRITZ:  I would -- let me instruct the witness not to answer.  And similarly, for any other question that seeks to obtain information that is protected by the attorney-client privilege, I would give you the same instruction.

BY MS. GOVERNSKI:

Q   Ms. Alexander, when you had that call, did you understand that it would be protected by attorney-client privilege?

MR. FRITZ:  Instruction not to answer.

Page 28

BY MS. GOVERNSKI:

Q   Did they tell you that anything you said on that call would be protected by attorney-client privilege?

MR. FRITZ:  Same instruction.

BY MS. GOVERNSKI:

Q   On that call, Ms. Alexander, did they tell you that -- what they want your opinions on this matter to be?

MR. FRITZ:  Same instruction.

BY MS. GOVERNSKI:

Q   Ms. Alexander, did they tell you how the drafting of the report would be handled during that call?

MR. FRITZ:  Same instruction.

BY MS. GOVERNSKI:

Q   Did you discuss your report with anyone other than Wayfarer defendants' counsel?

A   No, no one else.

Q   Your report refers to an assistant...

A   I was going to say, I apologize.  Let me rephrase.  No one outside of my team, which is the assistant referenced, other than Wayfarer's counsel.

Q   Who is the assistant?

A   Taylor Hunter, T-A-Y-L-O-R.

Page 29

Q   Okay.  Who is Taylor Hunter?

A   She's a data scientist.

Q   Does she work with you?

A   She worked with me on this particular piece of work.

Q   Had you met Ms. Hunter before?

A   She was referred to me by someone else within my network.  She's not the normal per- -- the normal data scientist I work with.

Q   Why didn't you use the normal data scientist that you work with?

A   She is -- she was unavailable and offline taking care of personal matters.

Q   And why were you looking for an assistant?

A   Because of the scope of the work that I do is just too much for one person.

Q   So tell me the process of you soliciting the assistance of Ms. Hunter.

A   I reached out to someone else in my network to see if they were available, someone who I had worked with previously.  They were unavailable, and referred -- and gave a reference to Taylor Hunter.  I contacted Taylor Hunter and asked some -- again, I'm going to use the word "vetting" -- some

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

vetting questions, just around her background, the projects she had done previously, to see some of those projects. And then I subsequently engaged her.

Q    And who was the individual in your network who was unavailable?

A    So I can't pronounce her full name. It's Annu and Praavi. Her last name is Praavi (ph).

Q    And when you say "in your network," what do you mean?

A    She's someone that I've known for I think the last year. We've spoken at the same conference together. I've seen the work that she does, and yes, it's someone that I know, I guess, cordially.

Q    And what were those vetting questions that you asked Ms. Hunter?

A    I don't know them offhand.

Q    Well, what kind of questions would you ask while you were vetting someone to assist you as your assistant?

MR. FRITZ:  Objection.

You can answer.

THE WITNESS:  So I would ask what projects specifically they've done around social media, whether it was analytical, computational

Page 31

science or like forensics work. I would like to see the project specifically if it's available and it's not private. Asking them to also share the dataset with me. Also, I would ask for data visualization project, whether it was in conjunction with the first project that they are sending me, or a separate one, just to show their use of tools, how they visualize data, how they story tell. And those are the core questions for this kind of work.

BY MS. GOVERNSKI:

Q    And what is your understanding of Ms. Hunter's academic background?

A    Her academic background, I think she has an advanced degree.

Q    In what?

A    It's not comp sci. I'm not sure.

Q    Okay. And what is your understanding of her current career?

A    She handles -- she's a data scientist for a company. I can't remember the company offhand.

Q    Had you heard of that company before?

A    I'm assuming not if I can't remember it easily, so I will say no.

Q    And what is a data scientist?

A    It's someone that looks at data and a

Page 32

myriad of different variables in order to -- sorry, I've never had someone ask me that before. It's someone that looks at data in order to interpret that data into understanding outcomes, patterns -- yes.

Q    And what about Ms. Hunter's background made you feel comfortable that she was experienced sufficiently to handle that task?

A    She currently works in data analysis within the role that she currently has, and she's done so for several years.

Q    But for a company that you had never heard of; is that right?

A    Yes, there is a lot of companies that I'm unaware of.

Q    Understood. And did you retain Ms. Hunter?

A    Yes.

Q    And so you pay Ms. Hunter?

A    Correct.

Q    And how much is Ms. Hunter paid?

A    280 an hour.

Q    And when did you retain Ms. Hunter?

A    At the beginning of the project, so sometime in September. I'm not sure.

Page 33

Q    September or October, after you had the conversation -- or after you were retained by Liner Freedman?

A    Correct, after I was retained.

Q    Okay. Where does Ms. Hunter live?

A    She's in Texas.

Q    Have you ever met Ms. Hunter in person?

A    Not in person, no.

Q    So how do you communicate?

A    Via conference call, via telephone, email.

Q    And you mentioned in your answer that you would have her share a dataset. What did you mean when you said that?

A    As part of the vetting process, I asked her to share something that she was allowed to share so that I could see exactly how she extrapolated, you know, whatever insights she shared with me from the project from the dataset itself.

Q    Understood.

Have you ever served as an expert witness before?

A    I have not.

Q    So how did you go about putting together a report having never done it before?

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

A   Putting together my expert report? I, fortunately, was able to see other expert reports as part of this litigation, and I use similar formatting.

Q   And what other expert reports did you see?

A   Aside from the ones shared with me from the experts on the plaintiff's side, none.

Q   So when you said you were able to put your report together based on looking at other expert reports, you were referring to the expert reports that you reviewed in this matter?

A   Correct.

Q   Did you receive any samples of any other expert reports?

A   No.

Q   How many hours did you spend on putting together the report?

A   The report itself?

Q   Yes.

A   I don't have a breakout of just the report.

Q   As opposed to what? Preparing for the deposition too?

A   Exactly, based on also doing the data

Page 35

analysis, doing the report, like, the entire piece of work, I don't have a breakout offhand of just the report.

Q   Okay. So let's talk about all of those things. How much -- how many hours all in have you spent doing all of -- everything for this matter?

A   I would have to calculate it. I know how much I've billed. I can't tell you the hours.

Q   Okay. How much --

A   I'd just have to back it out.

Q   Let's do that. How much have you billed?

A   I have billed to date $110,000.

Q   Have you been paid $110,000?

A   No, I have not.

Q   How much have you been paid?

A   89,101.

Q   Okay. If we -- I'm going to pull out my calculator because I am not a mathematician. So if you've billed $110,000 and you make 650 an hour; is that right?

A   Correct.

Q   Okay. So that's about 169 hours; does that sound right?

A   Yes, between myself and Taylor.

Q   Oh, I'm just talking about for yourself.

Page 36

A   I don't -- I don't break it out because I bill GLG altogether. So I would have to go in and dissect the difference between the assistant and myself.

Q   And could you do that?

A   If I went into the Excel file, yes.

Q   How would you do that?

A   I have a column that says how much work I've done when it comes to total minutes versus how much work she's done in total minutes.

Q   Do you have any recollection of how much you've done?

A   I would say of that, I would guess it's probably about 75 percent or 80 percent.

Q   Is done by you?

A   Correct.

Q   And 20 to 25 by Ms. Hunter?

A   Correct.

Q   Okay. How did you break down who did what?

A   So usually, if I have a research assistant, I would ask them to do a lot of the preparation. So things like the data scraping, the Python analysis, and then I would go and check their work and then take it from there for the so-what,

Page 37

now-what. So analyzing some of the -- analyzing what -- if it matters, where it's statistically significant, what the implications are, things of that nature.

Q   Okay. So you said "usually," but what about in this case, what did Ms. Hunter do?

A   So, I'm sorry, I shouldn't have said "usually." So in this case, that's what she did.

Q   So Ms. Hunter performed the data scraping?

A   Correct.

Q   Did you perform any of the data scraping?

A   Data scraping, no.

Q   Who decided, you or Ms. Hunter, what data scraping tools to use?

A   I did.

Q   How did you go about deciding what tools to use?

A   It's a tool I've used previously.

Q   What is "it"?

A   Apify. And I reference it in my report.

Q   Is Apify a tool or a network of tools?

A   It's a software as a service. And they are one of the leaders in social media tracking. So they are similar to a Sprout Social or a myriad of

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

other tools or -- yeah, tools that you're able to go online and scrape from.

Q   But there are different social media tools for each -- I'm sorry, strike that.

There are different actors for various social media tools on Apify, aren't there?

MR. FRITZ:  Objection.

You can answer.

THE WITNESS:  Yes.

BY MS. GOVERNSKI:

Q   So how did you pick what actors in Apify to use for each of the social media?

A   I selected the ones that I have used previously.  And also, I think one was new and one was just relevant for this particular case.

Q   And who determined that it was relevant for this case?

A   I did.

Q   Okay.  And you said you checked work. Please explain how you checked Ms. Hunter's work.

A   So once she was done doing the data scraping, we had a shared folder, so I would go into that shared folder.  I would look at the data that she scraped for, let's say, that day or in total for that particular social media.  I would go through,

Page 39

look at the data, make sure that it was complete. When she ran Python code, I would go in and just drop it in to make sure that the Python code ran correctly.  Then -- and that it was looking at the correct components.

Q   And did you ever go back to her and say, I would like you to rerun this or run it a different way?

A   If there was an error, then yes.

Q   What kind of an error?

A   If -- if the -- if the code itself didn't make sense, or if there was anything missing.  So maybe she hadn't selected the entire dataset or something to that effect, I would ask her to go back and do a rerun.

Q   So did you ever ask her to rerun based on the content of the -- of the dataset?

A   No, not on the content.

Q   And what were your instructions to Ms. Hunter about what to scrape?

A   I asked her to look across five different social media channels.  I asked her to use both positive, as well as negative, and neutral sentiment.  So a three classifier.  And that was predominantly it.  I didn't give her any specific

Page 40

instruction on how to approach it, how to run the data, or how to scrape the data, anything to that effect.

Q   So the clarifier, though, that came after the data was scraped, right?

A   That's correct.

Q   So I'm just talking specifically about data scraping.  How did Ms. Hunter know what data she should be looking for?

A   I gave her keywords.

Q   What keywords did you give her?

A   I believe I have them in the report.

Q   Okay.  And that's all that you gave her; you said scrape these keywords?

A   I said scrape those keywords.  And then I asked her to let me know if any other keywords came up that had -- had -- that she saw significantly in the data outside of that.

Q   Did any other keywords come up?

A   Nothing that she made note of for a high percentage, no.

Q   Did you give her any other parameters with respect to the data scraping?

A   Just the time frame.

Q   What time frame did you give her?

Page 41

MR. FRITZ:  Objection --

THE WITNESS:  I asked her --

MR. FRITZ:  -- just let the witness finish, Meryl.  Thanks.

THE WITNESS:  So for the last question, I asked her to look at a one-year time period, ideally, depending on the restrictions that some of the social media -- social media network set.

BY MS. GOVERNSKI:

Q   What do you mean by the restrictions social media sets?

A   Sometimes there is date limitations for how far they can go back.

Q   Which networks here had such date limitations?

A   All of the networks that we ended up looking at were available from January 2024 through October 2025.

Q   And so was that the time frame that you provided her?

A   Yes.

Q   So is it your understanding that Ms. Hunter scraped for all content that hit on the search terms between January 2022 and 2025?

A   January 2024.

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

Q   I'm sorry.  January 2024.  Let me ask that question again.

So is it your understanding that Ms. Hunter scraped for all data that hit on any of the keywords between January 2024 through October 2025?

A   Everything that was available via Apify, yes.

Q   What does that mean, "available via Apify"?

A   So all data is a little bit of a misnomer.  So -- because all data across the social media sites is different than what is available via Apify.  So you can only scrape public accounts, so -- which is a -- well, which is a feature of any social media scraping tool.  So yes, it should be -- the keywords based on public data from that time frame.

Q   So it's your understanding that the dataset that Ms. Hunter provided you includes the universe of all data that was publicly available and hit on search terms between January 2024 and October 2025?

MR. FRITZ:  Objection.

THE WITNESS:  Yes.

Page 43

BY MS. GOVERNSKI:

Q   Okay.  So I know you said that you were having difficulty remembering the exact breakdown in terms of the hours that you spent on the research versus the writing versus preparing for testimony.  Can you give any sort of a proportional breakdown, like 50 percent of your time was doing the analytics, 20 percent was writing?  Like, can you do any breakdown like that?

A   I would say the bulk of the work was the data analysis.

Q   Uh-huh.

A   Secondarily, was developing the report.  And tertiary, it's been preparing for the deposition.

Q   And 169 hours, that included all of the preparation to date for the depo, right?

A   Yes, that would be altogether.

Q   Okay.  And in terms of the breakdown between you and Ms. Hunter, you said she did about 20 to 25; you did about 75 to 80.  Are those percentages the same when we look at different categories; meaning, the analytics work, the report writing, and then the preparing for deposition, or did those proportions change?

Page 44

MR. FRITZ:  Objection.

You can answer.

THE WITNESS:  I'm sorry.  Do they change -- does she have the same buckets as I do; is that the question?

BY MS. GOVERNSKI:

Q   Let me ask it a better way.

So how would you divide up, from a percentage perspective, the work done on just the data analytics point?

A   For Taylor, it's 100 percent data analysis.

Q   Got it.  So she -- Ms. Hunter did not help you at all with the report itself?

A   No, she didn't help me with the writing of the report.

Q   Okay.  Did anyone help you with the writing of the report?

A   No.

Q   So you drafted every word of the report?

A   Yes.

Q   Were there multiple drafts of the report?

A   Yes, different versions.

Q   How many different versions were there?

A   Arguably, a different version every time

Page 45

I open and close the report.  So...

Q   When did you start drafting the report?

A   I would say eight to ten days before November 3rd.

Q   Eight to ten days before November 3rd.  Let's see, November 3rd is a Friday -- no, a Monday --

A   It's a Monday.

Q   -- so like October 20th, something like that?

A   Around there.  Yes.

Q   And so was the data analytics completed by October 20th then?

A   No, there was still some analytics going on, but I began drafting the report.

Q   Okay.  So do you stand by every word in the report?

A   Yes.

Q   Did anyone edit your report?

A   No.

Q   Did Wayfarer defendants' counsel edit your report in any way?

A   No.

MR. FRITZ:  Objection.

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

BY MS. GOVERNSKI:

Q   Did you use artificial intelligence to assist in the drafting of the report in any way?

A   So yes, because everything technically has AI in it.  So I use Google Docs in order to develop the report.  So Gemini is attached to that, and I have Gemini on for my Google Docs --

Q   Can you explain --

A   -- but I did not use generative AI, if that's the question.

Q   Can you explain the difference?

A   So AI is the higher level.  It is an algorithm.  Most things that you use, including Zoom right now, has AI running in the background in some way, shape or form.

Generative AI is specifically developing net new content in creative versus reshaping, copy editing, copy writing, things of that nature.

Q   So when you say you did not use generative AI, did -- you mean that you did not use AI to write the report?

A   I did not use generative AI in any way, so...

Q   Even to edit the report?

MR. FRITZ:  Objection.

Page 47

THE WITNESS:  Correct.

BY MS. GOVERNSKI:

Q   Your report refers to the concept of hallucination and it defines it as "generating plausible but factually incorrect information"; is that right?

A   Correct.

Q   What does that mean?

MR. FRITZ:  Objection.

You can answer.

THE WITNESS:  So it means to develop something that would come next, based on a high propensity that that would be rational and make sense with the context that the rest of the sentence structure has developed.  So it's a -- it's looking at statistically does this make sense as the next element within that -- within that string of words.

BY MS. GOVERNSKI:

Q   So what would that look like, you know, if you're looking at a paper or something, what would a hallucinated content look like?

A   It can look like a myriad of different things.

Q   Sometimes are citations hallucinated?

A   Citations can be hallucinated.  Yes.

Page 48

Q   And what does a citation that is hallucinated look like?

A   I'm not sure exactly how to answer that.  What does it look like?

Q   Well, is it like the title might be wrong, or the authors might be wrong, or the page numbers?  Like what would it look like?

MR. FRITZ:  Objection.

You can answer.

THE WITNESS:  So that could just be human error.  So hallucinations are usually something that does not actually exist in real life.

BY MS. GOVERNSKI:

Q   Okay.  So if it, like, adds authors, for example, that were not responsible for the publication, that could be a hallucination?

MR. FRITZ:  Objection.

THE WITNESS:  It could be, but that's not -- it could be a hallucination.  However, that doesn't mean that it is a hallucination.  So I have students get footnotes, citations, bibliographies incorrect all the time.  There's a myriad of different reasons.  One of those reasons could be a hallucination.

Q   And how do you check what the reason is,

Page 49

as a professor?

A   I mean, I don't normally grade on the accuracy of the way that they use references and bibliographies.  I make sure that they exist, but aside from that, I don't necessarily debate if it's APA, MLA, or if they've completely gotten it accurate.

Q   How do you make sure that they exist?

MR. FRITZ:  Objection.

THE WITNESS:  Normally, one of my CAs or TAs will go in and check.  It's just part of the process I have with them.

BY MS. GOVERNSKI:

Q   To run it through, like, Google Scholar or something like that?

MR. FRITZ:  Objection.

THE WITNESS:  There is different ways of checking, so...

BY MS. GOVERNSKI:

Q   What are the different ways of checking?

A   It depends on how they submitted it.  It could be a check system that the university uses.  It could be through asking for a link, specifically if it's an online article or Googling or using Google Scholar.

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

Q    When you said a check system that the institution uses, what do you mean?  What kind of check system?

A    Most universities, when you submit something as a student, they have different software solution packages that will check to see if there are irregularities.

Q    Are you aware of any software packages that check for irregularities?

A    One is turn it -- Turnitin.  That's the only one I can think of offhand.

Q    Have you heard of Grammarly?

A    Yes, I don't know any universities that use that, though, as a check.  But yes, I know Grammarly.

Q    What about GPTZero?

A    I don't know that one.

Q    So other than Turnitin, you don't know of any other system checks that universities use to check student papers?

A    No.

Q    Why -- strike that.

You mentioned the system that you have with your TAs.  What system do your TAs use?

A    Depending on how I've set up the -- the

Page 51

submission, it would either be Turnitin or via checking through Google --

Q    Do you have --

A    -- I don't specify.

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q    I'm sorry.  I thought you finished.  Go on.

A    I don't specify usually.

Q    So you let the TA choose whatever checking system they would want to use?

MR. FRITZ:  Objection.

THE WITNESS:  The TA or the course associate, yes.

BY MS. GOVERNSKI:

Q    Okay.  And how do you know that you can rely on the outcomes of whatever checking system they've used?

A    I -- I've hired them so I have faith in their ability to -- to make the right checks.

Q    So if they run a student paper through an AI checker and it says there is a high percentage chance likelihood that this is AI, do you believe the checker?

A    No, I don't allow them to run it through

Page 52

AI checkers because AI checkers are not -- they are not accurate at the end of the day.  So I don't allow them to use AI checker, just to be clear.  I said Turnitin for things like citation that uses probability or Google to actually look up.  So they are not AI -- they're not using a AI checker.  They are looking up the citation itself.

Q    Okay.  Well, what about the content of your students -- well, let me back up for a second.

Do you -- you're a professor at NYU and Columbia, right?

A    Correct.

Q    Okay.  Do you create your own syllabi for those classes?

A    For the classes that I've created, yes, I create my own syllabi.

Q    Okay.  And are those available online at all?

A    The one for Columbia for this semester is definitely.

Q    Okay.  And what is the class that you're teaching at Columbia this semester?

A    It is AI and the knowledge organization.

Q    So does your syllabi in that course discuss any academic policies for the class?

Page 53

A    Yes.

Q    Like what?

MR. FRITZ:  Objection.

Go ahead.

THE WITNESS:  The academic policies are, quite frankly, a cut and paste, so all of the syllabi have the exact same academic policy.

BY MS. GOVERNSKI:

Q    When you say "all of the syllabi," it's all of the Columbia syllabi or all of your syllabi?

A    All of the syllabi within the college I teach in has the exact same academic policy.

Q    And how does that syllabi discuss the use of AI, generative AI?

A    So we are allowed to make distinctions on AI specifically.  That's the one you want because it's not technically a -- it's not a Columbia-wide policy.  So that one, I wouldn't call a policy.  That's up to the discretion of each professor.

Q    Okay.  So what is your policy?

A    It has to be disclosed.

Q    What has to be disclosed?

A    The use of AI and how the AI was used.

Q    Okay.  So how do you enforce that policy?

A    Well, the students usually -- well,

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

actually, the students for semester have always disclosed. I've asked -- I've given them examples of how to disclose, and that is enforced based on things like if they -- if it appears that someone has used it and hasn't disclosed, I address it with them. If they have submitted something, which didn't happen -- if they have submitted something that appears not to be their work in general -- and, again, there's other reasons for that outside of AI -- then I address that with them as well.

Q    So you said if it appears like it was created by AI. What are some of the telltale signs of AI usage?

A    If it appears that they have used -- used frameworks incorrectly, for instance. If they have -- especially ones that maybe show up in -- like an AI overview, if there is any -- if there is any language that they use that just simply is not normally used by them, again, after working with the student for a semester, you know the way that they, number one, communicate, and usually how they write.

Q    So how do you check whether their material includes generative AI?

MR. FRITZ:  Objection.

You can answer.

Page 55

THE WITNESS:  Frankly, there is no way to definitively check.

BY MS. GOVERNSKI:

Q    Okay. Not definitively, but do you just take their word for it when they say, "no, I wrote this?" And you don't do any sort of additional checking?

MR. FRITZ:  Objection.

You can answer.

THE WITNESS:  As I mentioned, it would depend on the case, so what specifically it looked like they did. And then I would understand how to address it appropriately.

BY MS. GOVERNSKI:

Q    So it's all subjective; is that your testimony?

MR. FRITZ:  Objection.

THE WITNESS:  Yes.

BY MS. GOVERNSKI:

Q    Okay. So you mentioned that you find AI checkers unreliable. What did you mean by that?

A    There's actually third-party research that shows that they are not reliable. Depending on -- they take into account things like colloquialisms, the way that you write. There is

Page 56

different signatures that are attributed to AI, which simply don't make sense in real life. So I'm sure you've heard things like using an ampersand. People use ampersands to write, particularly depending on the individual's age, how they were educated, things of that nature.

Q    You talked about universities checking for AI. Do you know whether the universities for which -- for which you work use AI checkers?

A    The colleges that I work for within the universities do not use AI checkers for any of the classes I'm aware of.

Q    So how do colleges discipline individuals if they suspect that a student is using generative AI?

MR. FRITZ:  Objection.

You can answer.

THE WITNESS:  This is a conversation for the ages across education. So there is no answer to that currently.

BY MS. GOVERNSKI:

Q    So it's your testimony that there are no AI checkers that provide any indicia of the use of generative AIs?

MR. FRITZ:  Objection.

Page 57

THE WITNESS:  I'm sorry. Could you repeat that?

BY MS. GOVERNSKI:

Q    So it's your testimony that there is no AI checker that can reliably predict the use of generative AI?

A    Yes, that's my opinion. Yes.

Q    And what if a student's paper is entered into multiple AI checkers and they all come back with a high percentage of likely to be AI; is that also, in your opinion, not reliable?

MR. FRITZ:  Objection.

THE WITNESS:  So to my understanding and the research that I've seen, most AI checkers are all using the same -- the same way of codifying what the assumption of AI is. And, again, this is simply third-party research that I've read. So no, I don't have a trust that AI checkers do an adequate job of definitively, or even statistically significantly proving, that something is AI versus not AI.

BY MS. GOVERNSKI:

Q    Your report includes a number of charts. Who made the charts?

A    The charts were made by Taylor.

Q    So earlier when you testified that a

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

hundred percent of her time was dedicated to the data analytics, would that include the work on the charts?

A   Yes.  So the charts are data analysis.

Q   So how did you -- to what extent did you QC the charts?

A   So looking at the charts, I looked at the datasets and the code for which she provided that generated the visuals to make sure that they were accurate.

Q   And when you say "the datasets," those are the datasets that Ms. Hunter created using the scrapers we talked about?

A   Correct.

MS. GOVERNSKI:  Okay.  Let's look at your CV.  If we pull up your report, we can go to page 93.  And I'm going to ask my colleague, Autumn, to share the report on the screen so we can all speak the same language.

Is it -- Autumn, are you able to share?

Autumn, are you able to share?

THE A/V TECHNICIAN:  It actually looks like Autumn is not on the call.  Oh, here she is.  She's rejoining right now.

MS. GOVERNSKI:  I think I can share.

Page 59

BY MS. GOVERNSKI:

Q   Do you see my screen?

A   Yes.

Q   And this is the expert report that you submitted in this case, right?

MR. FRITZ:  Do you want the witness to access the document herself so she can scroll through it?

MS. GOVERNSKI:  If she wants to.

MR. FRITZ:  Okay.

Are you able to do that, Ms. Alexander?

THE WITNESS:  I'm downloading it right now, yes.

MS. GOVERNSKI:  Do we need to go off record for you to review it, or are you able to take a look and let me know if this is your expert report?

MR. FRITZ:  She'll -- we'll stay on record and she will review it to ensure that it is what you say that it is.

THE WITNESS:  I just want to confirm that this is the amended report.

BY MS. GOVERNSKI:

Q   Is it your testimony that you've provided an amended report?

Page 60

MR. FRITZ:  Objection.

THE WITNESS:  I do not think this is the -- sorry, I don't think this is the amended one.

BY MS. GOVERNSKI:

Q   When did you produce an amended report?

A   I sent the amended report November -- the week of November 3rd or the week after.

MS. GOVERNSKI:  Counsel, we have not received an amended report.  This is the only report we've received from Ms. Alexander.

MR. FRITZ:  I will check with my team whether that's accurate.  You want to take a --

MS. GOVERNSKI:  Yeah, we're going to have to, yeah, take a break, because if she's amended her report, then we're going to need to consider other options.

MR. FRITZ:  Okay.  Do you want to take a break now?

MS. GOVERNSKI:  Yeah, we're going to go off record until you reach a resolution on this.

MR. FRITZ:  Well, why don't we just take five minutes?

MS. GOVERNSKI:  We'll take as much time until you figure out if there is an amended report because I'm not going to continue a deposition if

Page 61

she -- if this report is not her current report, so let's go off the record.

MR. FRITZ:  How would you like me to get back to you, on the Zoom?

MS. GOVERNSKI:  Sure.

MR. FRITZ:  All right.

THE VIDEOGRAPHER:  We're off the record.  It's 12:00 p.m.

(Recess.)

THE VIDEOGRAPHER:  We're back on the record.  It's 12:09 p.m.

BY MS. GOVERNSKI:

Q   Okay, Ms. Alexander, the report that I previously entered as 001 was the original report that you produced in this matter, right?

A   I can't confirm that.  I -- I just looked for the amended report.  So...

Q   Okay.  Can you please open the report that I marked as 001 and confirm that was the original report that you provided?

A   Yes, it is.

MS. GOVERNSKI:  And I've introduced Exhibit 2, which you should see in the folder, which is the amended report.

(Exhibit 2 marked for identification.)

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

BY MS. GOVERNSKI:

Q   Do you see that?

A   Can I -- I didn't receive the link originally, so someone shared it at the top of this hour.  Can -- since he closed out the Zoom, I don't have the link anymore.

Q   You don't have the link to the Exhibit Share?

A   No.  When I exited Zoom, the chat functionality went away.

MS. GOVERNSKI:  Okay.  Let's go off the record.

THE VIDEOGRAPHER:  Off the record.  It's 12:11 p.m.

(Recess.)

THE VIDEOGRAPHER:  We're back on the record.  It's 12:12 p.m.  Thank you.

BY MS. GOVERNSKI:

Q   Ms. Alexander, is the second item, what I've marked as Exhibit 002, the amended report in this matter?

A   It is.

Q   Why did you amend your report?

A   I found two -- two elements in the original report that were a problem with the

Page 63

visualization and a reference to one of the standard deviations.

Q   Okay.  We will get to that in a moment, but I would like to get -- direct your attention in 002 to your CV, which is Appendix A.  Did you make changes to Appendix A between the first and second report?

A   No, I don't believe so.

Q   Okay.  And if I refer to the "first report," you understand that's the Exhibit 001, and if I refer to the "amended report," you will understand that's 002?

A   Yes.

Q   Did you draft this CV?

A   Yes.

Q   When did you draft this?

A   It's an adaptation of my normal CV, so I adapted it for this report.

Q   Why did you adapt it?

A   Just because my regular CV is -- is more practitioner-focused --

Q   Sorry, you were saying more practitioner-focused?

A   Yes.

Q   What is the difference between a

Page 64

practitioner and an expert focus?

A   So I would say this would be more academic-focused, what you're seeing in Exhibit 2.  So it's giving additional information around my speaking engagements, my book.  I think those are the key differences.  And then chronologically, just where you place -- where I placed information.

Q   So what are some of the differences in this CV versus your regular one?

A   Let's see.  It is -- sorry, I just have to get down to that page.  It would be, as I mentioned, the detail of my speaking engagements.  That's not in my practitioner CV.  I don't have my book in my practitioner CV.

Q   Why don't you have your book in your practitioner CV?

A   Well, I haven't added it because I haven't needed to.  But usually, you wouldn't necessarily put that in a practitioner CV.

Q   Why not?

MR. FRITZ:  Objection.

You can answer.

THE WITNESS:  It's not the norm.

BY MS. GOVERNSKI:

Q   Did you modify your short bio in any way?

Page 65

A   Probably, yes.

Q   Who -- how did you decide to modify your CV?

A   My overall CV; is that the question, or the short bio?

Q   Oh, sorry.  The overall CV.

A   I did it the way I would do it for academia.  So this is more similar to my academic CV.

Q   Why didn't you use your academic CV?

A   Because it's outdated.  I haven't updated it.

Q   I see.  You were just updating your academic CV?

A   Yes.  So I would normally take this and I would copy it to my academic CV moving forward.

Q   Did anyone at Liner Freedman assist you in editing this CV in any way?

A   No.

MR. FRITZ:  Instruct the witness not to answer questions designed to disclose attorney-client privilege.

MS. GOVERNSKI:  Is --

MR. FRITZ:  Sorry.  I wasn't finished with my objection.  Attorney-client privilege.

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

MS. GOVERNSKI: It was a speaking objection.

MR. FRITZ: Sorry. I wasn't finished. I would just caution the witness not to disclose any information that would be protected from disclosure by the attorney-client privilege.

BY MS. GOVERNSKI:

Q   Is all of the information in this CV accurate?

A   So let me just go back to the CV. I apologize. I had my local one open and not this one.

Yes. Everything is accurate.

Q   I should have asked. Do you have anything else open on your computer right now?

A   No, no. Just my -- my original report, the one I didn't download. So I closed that.

Q   Okay. So when you were looking at your local CV, you were looking at a copy other than what is in either of the reports?

A   No. I had the amended report that was not downloaded, that's sitting on my desktop. I had that open in order to answer the earlier question of is this different, is this amended or not amended. So I've subsequently closed that. So I just want to

Page 67

make sure I was looking at the correct document. I'm now looking at the document, Exhibit 2, that I downloaded.

Q   Okay. You've testified there is no difference between the CV in the original report and the CV in the amended report, right?

A   I don't believe there is. I'm just looking at Exhibit 2 right now.

Q   Okay. So what in the short bio, speaking just about the short bio -- I'm going to go ahead and share my screen for 002 just to speed this up and make sure we're talking from the same document.

Do you see what is on my screen?

A   Yes. Can you just zoom in a little bit? Yes.

Q   So what in this short bio is different here as compared to what you've called your regular CV?

A   All the content is identical. I may verbalize it slightly differently, but it's pretty much the same.

Q   Okay. Your CV says that you -- oh, sorry.

Everything in this short bio is accurate -- is accurate?

Page 68

A   Yeah. So it says "Current NYU Professor." That actually is probably the outdated. It should say "Current Columbia Professor," excuse me.

Q   You no longer teach at NYU?

A   I am not currently teaching there, no. I finished teaching the semester at Columbia.

Q   When did you stop teaching at NYU?

A   My last -- the last time I taught was 2022. I'm sorry. The last time I taught a full semester course was 2022.

Q   Okay. Well, what have you taught since then at NYU?

A   I teach, like, seminars depending on if they need me.

Q   Like one-off seminars or courses?

A   No. One-off seminars.

Q   And that's considered being a professor there?

MR. FRITZ: Objection.

THE WITNESS: Yes.

BY MS. GOVERNSKI:

Q   Okay. How many seminars have you taught since 2022?

A   For NYU, I don't know. I would say

Page 69

three, both -- maybe three.

Q   Okay. And how many courses -- how many times did you teach a full semester course at NYU?

A   How many times? Like over the years?

Q   Yeah. A full semester course.

A   I don't know. I would have to check.

Q   Okay. At least 15, you think?

A   Not sure. I would rather just check to make sure I'm accurate.

Q   Why did you stop teaching full-semester courses at NYU?

A   No particular reason. Mostly because I was working full-time as well. So...

Q   Okay. So when you say -- when the short bio says "Current NYU Professor", that is not accurate?

MR. FRITZ: Objection. You can answer.

THE WITNESS: I'm not actively teaching, correct.

BY MS. GOVERNSKI:

Q   Okay. And when your academic appointments right below says:

(As read):

"Adjunct Professor of Marketing Technology, NYU, 2013 to present," is

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

that accurate?

A   So as an adjunct, you can come in and teach one semester, skip three years, come back, teach another semester.  That's the whole point of being an adjunct.

Q   Got it.  So when it says "2013 to present," it's just in case you come back to teach a full-semester course in the future?

MR. FRITZ:  Objection.

THE WITNESS:  Correct.

BY MS. GOVERNSKI:

Q   So you would consider yourself a current Adjunct Professor of Marketing and Technology at NYU?

A   Yes.

Q   Okay.  And what about at Columbia University?  Are you a current professor at Columbia University?

A   Yes.

Q   How many courses do you currently teach at Columbia?

A   The semester just ended.  But one, normally.

Q   And how many credits is that course for?

A   I'm not sure.  I would guess three.

Page 71

Q   Okay.  How many times a week does that course meet?

A   Once a week.

Q   Is this the right title of that course? "Teaching AI for the Knowledge Driven Organization"?

A   Yes.  Correct.

Q   What does that course teach?

A   It teaches practitioners or future practitioners about how to look at AI from a strategic perspective, from an executionary perspective; how to think about the technology side as well as the business implications.

Q   Okay.  I'm going to go off of this -- I'm just going to stop the share for a second.

Your CV lists a Bachelor's of Science from NYU with a degree in Leadership Management; is that right?

A   Correct.

Q   When did you graduate from NYU?

A   With my Bachelor's degree?

Q   Yes.

A   2012.

Q   What is a degree in Leadership and Management?

MR. FRITZ:  Objection.  You can answer.

Page 72

THE WITNESS:  It is looking at leadership skills, understanding how to manage.  I had a focus in marketing.  So quite frankly, I remember more of the marketing courses than the other courses for a Bachelor's degree.

BY MS. GOVERNSKI:

Q   Okay.  I'm going to share my screen again, actually.  So when you say here:  "B.S. Leadership in Management, NYU", it doesn't mention marketing, right?

A   I didn't list my concentration.  No.

Q   Okay.  What does a concentration mean at NYU?

MR. FRITZ:  Objection.  You can answer.

THE WITNESS:  I believe for any undergraduate degree, it's what your focus is that you decide to focus in.

BY MS. GOVERNSKI:

Q   Does your degree show a concentration in marketing?

A   On the paperwork, I'm not sure.

Q   And is Leadership and Management the major?  Is that what it's called?

A   Leadership and Management is the degree.

Q   That's the degree.  Okay.  How is a

Page 73

degree in Leadership and Management relevant to your assignment in this case?

A   I'm not sure.

Q   Is it relevant to your assignment in this case?

MR. FRITZ:  Objection.

THE WITNESS:  I look at it like my life skills, my education, all culminates to who I am now.  So I would say yes.

BY MS. GOVERNSKI:

Q   But your particular degree in Leadership and Management, how is that specific degree relevant to your assignment in this case?

MR. FRITZ:  Objection.  You can answer again.

THE WITNESS:  I think that the focus that I had around marketing is relevant to the jobs that I've taken, as well as my role as an expert in this case.

BY MS. GOVERNSKI:

Q   Okay.  So it's relevant to the extent that it afforded you access to jobs in marketing, which then informed your opinion in this case; is that right?

MR. FRITZ:  Objection.  You can answer

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

again.

THE WITNESS:  Yes.

BY MS. GOVERNSKI:

Q   Okay.  And then your CV also lists an MST in Artificial Intelligence Ethics and Society.

What kind of a degree is that?

A   It's a graduate degree at the University of Cambridge.

Q   Okay.  MST, that's a Master of -- what does ST stand for?

A   Studies.

Q   And did you -- it doesn't list a date.  When did you attend Cambridge?

A   2023 to 2025.

Q   So you just received that degree?

A   I did.

Q   When did you receive it?

A   We were -- my class was conferred over the summer sometime.

Q   Okay.  Did you move to Cambridge for this program?

A   I did not.

Q   So how did you receive this degree from Cambridge?

MR. FRITZ:  Objection.

Page 75

THE WITNESS:  How did I study?  Is that the question?

BY MS. GOVERNSKI:

Q   Yeah.  Was it a remote virtual program?  I'm just trying to understand how you took courses.

A   It was part-time.  So it was hybrid.  That's why it's a Master's of Studies and not a Master's of Philosophy.  So M-Phil is for full-time students.  Master's of Studies is for part-time hybrid students.

Q   Okay.  So that's why you were -- it took you from 2023 to 2025.  That was the two years because it was a part-time program?

A   Correct.

Q   Okay.  And so what is a Master's in Artificial Intelligence Ethics in Society?

A   So we study the roots of AI from a power philosophy perspective.  We also talk about -- we look at insights around how AI has developed; the uses of AI particularly across, you know, public society, organizations, government.

Q   So do you as part of this program study AI technology itself?

A   Yes.

Q   So tell me about those aspects of the

Page 76

degree.

MR. FRITZ:  Objection.  You can answer.

THE WITNESS:  We looked at things such as how LLMs are created, some of the biases that go into LLM, based on the datasets; how LLMs are developed and built.  Everything from the natural language processing, through fine tuning the LLM.  We also look at things like small language models as well.  There is a lot.  I'm not sure specifically what to highlight.

BY MS. GOVERNSKI:

Q   How many courses did you take in those aspects specifically, what you just described?

A   So they are not individual courses the same way you would think of in an undergraduate degree.  They are interwoven into each of the different semesters.

Q   So there are no courses.  It's just a general kind of programming; is that right?

A   It's programming.  Yes.

Q   So how many classes were specifically on what we just discussed in terms of LLMs and how they are created, et cetera?

A   It came up in each program that we walk through.

Page 77

Q   What does the program look like?  How many times a week were you in school for this degree?

A   In school?  I'm sorry.

Q   In classes?

MR. FRITZ:  Objection.  You can answer.

THE WITNESS:  So there is a specific amount of classroom hours that any degree granting has to have.  I don't know what that is offhand.  I was physically in Cambridge around two weeks.  Every quarter -- or every term, excuse me, they use a different verbiage.  Every term.  And then there was remote work where we had to log on.  So long story short, I'm not sure offhand.

BY MS. GOVERNSKI:

Q   So you're not sure how many total hours you needed to participate in order to receive that degree?

MR. FRITZ:  Objection.  You can answer again.

MS. GOVERNSKI:  Sorry.  I didn't hear your answer.

THE WITNESS:  I'm not sure offhand.

BY MS. GOVERNSKI:

Q   Any ballpark?

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

A   I wouldn't venture to guess.  Over two years.  I'm not sure.

Q   Was it sporadic or something you did every week?

A   No.  It was done every week.

Q   And to what extent is your Master's of Studies degree in Artificial Intelligence Ethics and Society relevant to your assignment in this case?

A   It gives me a deeper understanding of specifically how LLMs operate.  Understanding how looking at the -- the ethics or the elements around AI, particularly around things like manipulation across social media, which was specifically one of my areas of study.  How that all culminates.  How to think about identifiers.  And how AI is leveraged, pro or con, in marketing.

Q   And all of the other experience in your CV predated the receipt of this degree, right?

A   I'm sorry.  Could you repeat that?

MR. FRITZ:  Objection.

MS. GOVERNSKI:  I will withdraw the question.

BY MS. GOVERNSKI:

Q   Your CV also lists an executive MBA.  What is an executive MBA?

Page 79

A   It's a MBA but for executives.  It doesn't really answer the question.

It is a part-time MBA that is targeted specifically to usually executives with a certain amount of years of experience to help them get additional knowledge for business.

Q   When did you receive this degree?

A   2014.

Q   It talks about it being a joint degree.  Where were you physically located when you obtained this degree?

A   During the 18 months of study, I was in Paris, Chennai, India, Shanghai, China, New York, and -- did I say London and Paris?

Q   Okay.  And you said over 18 months.  About how many weeks would you say that you spent on this program before you obtained the degree?

A   Weeks of working towards the degree or weeks of travel?

Q   Weeks of working towards the degree.

A   It was aggressive.  I would say probably 20 hours a week.

Q   For how many weeks?

A   Over the course of the degree.

Q   But it's a ten-week program, isn't it?

Page 80

A   No.

MR. FRITZ:  Objection.

THE WITNESS:  No, it's not a ten-week program.

BY MS. GOVERNSKI:

Q   Okay.  So online, when they describe it as a ten-week program, that's not accurate?

MR. FRITZ:  Objection.

THE WITNESS:  I don't believe they describe it as a ten-week program.  It may be stated as ten weeks in-person, but it's not a ten-week program.

BY MS. GOVERNSKI:

Q   Understood.  So how many weeks is the full program, do you think?

A   I believe it's 18 months.

Q   A full-time program over 18 months?

MR. FRITZ:  Objection.

THE WITNESS:  It's not full-time because it's targeted to executives.  So it is literally formatted for individuals who are usually executives within their organization.  So it's 18 months, I believe, start to finish.

BY MS. GOVERNSKI:

Q   And to what extent is your executive MBA

Page 81

relevant to your assignment in this case?

A   It has allowed me to understand -- again, my focus was on data analytics as part of that degree.  So it gave me both a finance perspective, it's given me depth in strategy in particular, as well as marketing.

Q   When you refer to data analytics, that's not listed as part of this degree on your CV, right?

A   Data analytics is part of the executive MBA.  It's actually part of the NYU module.

Q   Okay.  So how did -- how was it part of your executive MBA?

A   It's a class.

Q   How long was the class?

A   It's for the term.  So 14 weeks.

Q   Okay.  So a 14-week class in data analytics.  Was there anything else part of this executive MBA during which you learned about data analytics?

A   Data analytics was integrated within other parts as well that weren't actually called data analytics as a class.  So we had finance analytics, which looks at a myriad of different data.  We also had strategy classes that also incorporated data analysis.

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

Q   What is data analytics?

A   Looking at data, and it depends on how big you want to -- cleaning, sorting, aggregating data in order to provide an informed decision on what that data tells you.

Q   Okay.  None of these three degrees you list here reflect that you have a degree in data analytics, right?

MR. FRITZ:  Objection.  You can answer.

THE WITNESS:  None of the degrees are called data analytics.

BY MS. GOVERNSKI:

Q   Are these three entries the extent of the degrees that you possess?

A   Degrees, yes.

Q   Are you familiar with the term, "computational social sciences"?

A   Yes.

Q   Computational social sciences also is not mentioned here; is that right?

A   Correct.  I don't have a degree in it.

Q   What are computational social sciences?

A   I don't know how I would define that.

Q   Can you try?

A   I'm not sure.

Page 83

Q   Can you try?

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q   Do you know what computational social science means?

MR. FRITZ:  Objection.  You can answer.

THE WITNESS:  It's an interdisciplinary field.  It looks at analyzing large scale datasets.  That's how I would describe it.

BY MS. GOVERNSKI:

Q   An interdisciplinary of what disciplines?

A   Computer science, data science, and I'm sure there is another science in there.  Those are the two I can think of.

Q   Do you have a degree in computer science?

A   I don't have a degree in comp-sci.

Q   Do you have a degree in data science?

A   I don't have a degree in data science.

Q   What about mathematics?  Do you have a degree in mathematics?

A   I don't have a degree in mathematics.

Q   What about statistics?

A   I do not.

Q   What about economics?

A   No.

Page 84

Q   Do you have a degree in digital marketing?

A   The degree is not listed as digital marketing.  No.

Q   Your CV talks about you being at Meta.  You were at Meta for two years?

A   Two years, six months.

Q   It talks about Global Head of Marketing, Business and Product Marketing.  Were you -- that's of all of Meta?

A   That's of the Business and Product Marketing division.  So I was on the side of what most people would refer to as B2B.

Q   Can you explain what B2B means, other than the literal definition?  What is that?

A   Business to business.  So Meta works -- Meta has goods and services that they promote to consumers, such as you, Kevin, et cetera.  So people that use Facebook, WhatsApp, a myriad of different solutions.  That's what we call the B2B side.

B2B is about working with the advertisers, small to medium businesses.  Things of that nature.

Q   And what did you do from a day-to-day perspective as a Global Head of Marketing Business

Page 85

and Product Marketing?

A   I ran a couple of different teams that include data analytics, engineering, owned -- the owned services team.  So that is all the things like e-mail, social media, website.  And my goal was to, number one, maintain our site on the business side; ensure that clients or potential customers were able to find what they needed.  I also had revenue stream goals.  So making sure that we were converting potential customers into active customers.  And then a myriad of promotional activities.  Yeah.  That's the gist.

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q   Why did you --

Why did you leave in 2023?

A   There were changes in the organization so I decided it was a good time for me to depart.

Q   So it was a voluntary departure?

A   Yes, correct.

Q   Who did you report to while you were there?

A   I reported to the SV -- I'm sorry.  I reported to the VP, her role then was VP of -- I'm going to say Skilled Solutions.  But I'm not sure if

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

that's the overarching name.

Q   You've referenced having direct reports. How many direct reports did you have?

A   Direct reports, I had 15 at the highest.

Q   And you mentioned data analytics, but this description doesn't mention data analytics. Why doesn't it include that?

A   I didn't put it in there. But most of my job was around data analysis, data analytics.

Q   Why have you mentioned that describing this role when it wasn't in your CV?

MR. FRITZ:  Objection.

THE WITNESS:  I'm sorry. Can you repeat that?

BY MS. GOVERNSKI:

Q   Yeah, I'm just saying you've volunteered data analytics as part of this position, but it's not mentioned in your CV. I'm just wondering why you mentioned it when it's not listed in your CV.

A   I volunteered it as one of the teams that I oversaw.

Q   How did you oversee that team?

MR. FRITZ:  Objection.

THE WITNESS:  It was one of the teams that sat under my purview. So it's actually one of

Page 87

the teams I developed while I was there.

BY MS. GOVERNSKI:

Q   Tell me about that.

MR. FRITZ:  Objection.

THE WITNESS:  So in order to lead our owned properties we specifically had to have insights on how data was captured; how data was cleaned; how we were aggregating data; how we were using data. And then ensuring that it was not only responsible, but also in line with Meta's overall policies. So I had a team of data analysts that did all of that work.

BY MS. GOVERNSKI:

Q   How much of that work did you perform yourself?

A   On an ongoing basis for what they did to what I performed, marginal.

Q   Okay. There is a data analytics team separate from one under the marketing department at Meta, isn't there?

A   There are a lot of data analytics teams at Meta.

Q   Got it. So when you talk about running a data analytics team, that's a specific team that you created in the marketing department?

Page 88

A   Yes.

Q   What type of specific data was the data analytics team that you supervised performing?

A   They would run -- we would look at things like social graph, click stream data. We would look at potential threats across our network.

Q   What does potential threats mean?

A   It could mean anything from bots to DDS. Someone trying to access our network. To -- it was predominantly around things like bots, click flow traffic, reporting to see if these were -- if we were on target to hit revenue goals, usage behavior. Things of that nature.

Q   Describe your experience with bots while you were at Meta.

A   Part of the work that we did was to look at bot activities specifically across when it came to clients. So specifically if there were accounts that were -- accounts that looked like there were -- that bots were used in order to spike traffic, whereas clients had to then pay for said traffic, we would do forensics work around if that traffic was realized, if it was associated with users, or if it was non-organic.

Q   Okay. You use the term "non-organic."

Page 89

What does non-organic mean?

A   Non-organic means that it doesn't have qualifiers. That would mean that users actually were the ones that generated the traffic.

Q   So when you use the term "non-organic", you're referring to automated conduct like the use of bots?

A   It could be bots or it could be other things as well.

Q   What other things?

A   It could be users of -- coordinated actual users attempting to spike traffic or to, in a negative or positive way, manipulate the traffic somehow.

Q   So users coordinating to spike traffic would be non-organic?

A   That would be non-organic. We wouldn't classify it as that. Internally, we would classify it as sort of -- we use words like maleficent, but that makes no sense in the real world. So it would be something that would be a coordinated manipulation pretty much.

Q   So you didn't use the term "organic" while at Meta?

A   We used organic but not in the sense that

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

we're discussing here.

Q   So how are we discussing organic in the sense here?

A   So I believe that when you brought up how we used it, it was in regards to data analytics for -- around bot traffic.  We used organic more from where the origin of traffic came from.  So for instance, organic versus paid in an advertising perspective.

Q   I see.  So you use the term non-organic to describe the use of bots so how were you using that term?

MR. FRITZ:  Objection.

THE WITNESS:  Sorry.  So non-organic, I'm using it that it is a coordinated sort of manipulation in some way, shape or form, whether through technology or through humans.

BY MS. GOVERNSKI:

Q   But that is not how you would use the term when you were at Meta?

A   Every company has their own verbiage.  I would use Meta's verbiage internally.

MS. GOVERNSKI:  Okay.  Let's look at Meta's verbiage.  I'm going to put into the Exhibit Share what I will mark as Exhibit 3.  Autumn, are

Page 91

you here?

(Exhibit 3 marked for identification.)

MS. ADAMS-JACK:  I'm back.  I can handle it.

MS. GOVERNSKI:  Okay.  You know the one I'm asking for?

MS. ADAMS-JACK:  Yes.  Yes, got it.

BY MS. GOVERNSKI:

Q   As my colleague is putting up Meta's policy, are you familiar with a term called "inauthentic behavior"?

A   Yes.

Q   What does inauthentic behavior mean?

A   It is activity that is not based on the usual way that users interact with content across Meta's platforms.

Q   What are the usual ways that users interact with content on Meta?

A   The usual ways would be taking a baseline based on data that we have internally.

Q   What does that mean?

MR. FRITZ:  Objection.  You can answer.

THE WITNESS:  So within Meta, we have baselines that we can see how users have historically interacted with our content.  Based on

Page 92

that, we would form a baseline.  So things outside of that baseline would be things that were -- that we would check to see why the traffic or whatever the activity was, was skewed.

BY MS. GOVERNSKI:

Q   Okay.  So when you used the term earlier "non-organic" how, if at all, does that relate to inauthentic behavior?

A   From the way that we use that at Meta, it could be a synonym.

Q   What about the way that you use the term organic in your report, to what extent does the way that you use the term organic in your report coincide with inauthentic behavior?

A   I didn't associate the use of inorganic in my report with anything, any verbiage related to Meta, for instance.

Q   What did you associate the use of organic in your report to?

A   In my report, I specifically look at organic behavior, being things within the norm that didn't have classifiers of inorganic manipulation.

Q   What are classifiers of inorganic manipulation?

A   It could be anything like temporal

Page 93

oddities.  It could be user activity that would be outside of a normal timeframe.  It would be things like amplification ratios.  Looking at those kind of fingerprints.

Q   Let's go down in Exhibit 3 to the first paragraph on the next page.  Oh, sorry.  Let me share.

MS. GOVERNSKI:  Autumn, can you share your screen on this so we're all looking at the same thing?

MS. ADAMS-JACK:  I think you have to stop sharing and then I can switch.

MR. FRITZ:  Nicole, I would just download the document so you can look at it as you see fit.

MS. GOVERNSKI:  Well, I won't share it if that's not helpful.  I was doing it more as a helpful.

THE WITNESS:  It's easier for me to look at it on my screen.

MS. GOVERNSKI:  Okay.  So if you look at the second page, it says --

MR. FRITZ:  Just take a -- excuse me, sorry.  Take a moment to look at the entire document and then let Meryl know when you're ready.

MS. GOVERNSKI:  I'm not going to ask

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

about the entire document, though.

MR. FRITZ:  I understand.

THE WITNESS:  Okay.

BY MS. GOVERNSKI:

Q   Okay.  If you can look at the first paragraph, and it says:

(As read):

"In line with our commitment to authenticity, we don't allow people to misrepresent themselves on our service, use fake accounts, artificially boost the popularity of content or engage in behaviors designed to enable other violations under our community standards."

Do you see that?

A   Yes.

Q   Did you engage in any of these type of behaviors while you were at Meta?

MR. FRITZ:  Objection.

THE WITNESS:  I'm sorry?  Could you repeat that?

BY MS. GOVERNSKI:

Q   When you were --

MR. FRITZ:  Note my objection.

Page 95

BY MS. GOVERNSKI:

Q   When you were doing marketing at Meta, did you engage in any of these type of behaviors?

A   Let me just read this again.  So I -- so I want to clarify first.  So you have me looking at a document from Meta that is about user standards.  So this is community-based standards on what consumers or users that sign up on Meta's platforms agree to.

So to answer your question, as a user at Meta, someone with a Facebook account, someone with an Instagram account, I did not do any of these activities while at Meta as a user.

Q   And why not?

MR. FRITZ:  Objection.

THE WITNESS:  I don't know how to answer that.

BY MS. GOVERNSKI:

Q   What is your understanding of "artificially boost"?  What does that mean?

A   So in this context for Meta, as part of their user agreement, it would mean using things like different programs or bots or coordinated activities to increase traffic in some way, shape, or form.

Page 96

Q   And coordinated activities could be manual, right, not automated?

A   They can be, yes.  It would have to be very, very synchronized for it to work at scale, but yes, it is possible.

Q   When you say "to work at scale," what do you mean?

A   To -- to make a difference.  So you, as an individual, clicking on things across the site is not going to make an impact when it comes to traffic.

Q   But -- but it's possible that you could synchronate in order to artificially boost without using automated tools, right?

MR. FRITZ:  Objection.

You can answer.

THE WITNESS:  So as I stated before, it's possible, but it's extremely difficult to do so.

BY MS. GOVERNSKI:

Q   Right.  You would have to be an expert in order to do that?

MR. FRITZ:  Objection.

THE WITNESS:  I wouldn't say that.  That's -- I'm not sure what that means particularly.  But you would need to have a vast network of humans

Page 97

in order to pull that off.

BY MS. GOVERNSKI:

Q   Okay.  And would, under the way that you use the term "organic" in your report, would that type of artificial boosting that uses a manual network be considered organic or not organic?

A   That would be considered inorganic, the way that I'm using it.

Q   Okay.  And if we look at the next sentence, it says:

(As read):

"Inauthentic behavior refers to a variety of complex forms of deception performed by a network of inauthentic assets controlled by the same individual or individuals with the goal of deceiving Meta or a community."

Do you see that?

A   Sorry, what page are you on for that one?

Q   The same paragraph.

A   Oh.

Q   Just the next sentence.

A   Oh, yes, sorry.

Q   And do you agree with that sentence?

A   I don't disagree with it.  It's -- it's

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

Meta's terms. I'm not sure...

Q   But do you agree that inauthentic behavior includes complex forms of deception performed by a network of inauthentic assets controlled by the same individuals -- individual or individuals?

MR. FRITZ: Objection.

You can answer again.

THE WITNESS: I would say yes, that's accurate.

BY MS. GOVERNSKI:

Q   What does that mean to you when it says "a network of inauthentic assets controlled by the same individual or individuals"?

A   The way that I would -- okay. Do you want me to put my Meta hat on, or do you want me to speak from the perspective of an expert outside of Meta? Because there's two different answers.

Q   Give me both.

A   So within Meta, that means if you own a link farm, if you are coordinating with bots, particularly around -- to deceive around advertising or politics, those are usually the two forms.

Outside of Meta, I would say it's more about am I orchestrating something that I have

Page 99

access to a myriad of different -- most likely, computers and algorithmic programs. Because, again, as I mentioned, human beings is extremely difficult to coordinate that. And am I trying to do it in order to impact something in either a negative or positive way.

Q   And when it says "a network of inauthentic assets," what is your understanding of "inauthentic assets"?

A   So the way that Meta is looking at this --

Q   I'm asking how you are looking at it. Sorry.

MR. FRITZ: Sorry.

Objection.

MS. GOVERNSKI: I wanted to clarify my question.

MR. FRITZ: Why doesn't -- do you want to withdraw it? Are you withdrawing the first one or you're going to ask another one?

MS. GOVERNSKI: I specifically asked, how do you define the term "inauthentic assets"?

MR. FRITZ: Okay.

Go ahead, Nicole.

THE WITNESS: Outside of this context, I

Page 100

would say inauthentic assets would mean any asset that is attempting to either negatively or positively impact something, defraud or cause harm or specific benefit.

BY MS. GOVERNSKI:

Q   And that could be automated or it could be manual, right?

A   As I said before, it's normally automated. And in rare cases, with a lot of coordination at scale, it could also be manual.

Q   What is your basis for saying that it's ordinarily automated?

A   So, again, in the context of social media, for it to be impactful, make a dent at scale, it is extremely difficult to do that in a coordinated way with a network of humans.

Q   How could you do it?

MR. FRITZ: Objection.

THE WITNESS: I mean, there is probably several different ways. The one way I could think of would be to rally a massive amount of, again, individuals, human beings in a coordinated attempt that would either cause benefit or cause harm. But there would have to be -- it would have to have signatures -- I'm trying to think how -- it would

Page 101

have to have signatures of authenticity, though, for it not to be identifiable.

Q   What does that mean, "signatures of authenticity"?

A   I'm sorry. I should flip that. I should have said signatures of inauthenticity. Apologies.

Q   Can you explain what you mean by "signatures of inauthenticity"?

A   Signatures of inauthenticity?

Q   Uh-huh.

A   So as I mentioned before, things like, you know, like temporal analysis, content, homogeneous content. It would be things like coordination clusters. But, again, that would all be based on actually doing the analysis to figure out if that -- if that was there.

Q   So if someone was really good at doing this, couldn't it avoid those signs of inauthenticity?

MR. FRITZ: Objection.

You can answer.

THE WITNESS: Sorry. There's -- I'm not going to say always, but there is usually identifiers, which is why you don't just look at one element of inauthenticity. You look at several

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

different ones. So, for instance, you know, posting times, that would just be one. So if someone got around posting times, there is still six or seven other fingerprinting techniques that you can use. So you don't just check one factor; you check a myriad of different factors.

BY MS. GOVERNSKI:

Q    But if someone understood what all those factors are, couldn't they devise a campaign at scale to avoid those signs of inauthenticity?

MR. FRITZ:  Objection.

THE WITNESS:  I have not seen that to actually be possible, where it's -- that it's not identifiable in any of the different ways that you would analyze it.

BY MS. GOVERNSKI:

Q    Isn't it possible that you just wouldn't be able to identify it because it was untraceable?

MR. FRITZ:  Objection.

THE WITNESS:  So untraceable sounds good from a marketing perspective. Untraceable is still traceable. So there are usually signatures that fall outside of what the norm would look like or outside of a baseline. And that would, then, get you to dig deeper into understanding why that

Page 103

happened, if it was authentically an anomaly or if it was a coordinated act.

BY MS. GOVERNSKI:

Q    So you say "usually," but that doesn't mean that there is always signatures, right?

MR. FRITZ:  Objection.

You can answer again.

THE WITNESS:  In all of the ways that I have seen and been privy to, there are usually -- there have been ways of determining inauthentic behavior.

BY MS. GOVERNSKI:

Q    How have you seen that? Can you explain?

A    Sure. So I've seen it based on -- again, going back to, like, content, homogeneous content. So things where you have -- this is just one example -- things where you have identical verbiage, like literally identical, or even things around social media as consistent as the flow of hashtags. So the -- you know, how hashtags actually show up. And I'm seeing that from an original piece of content dropping, not a re-tweet, not a repost.

Q    But I'm trying to ask, like, specific case studies that you have performed or been involved in where you have seen inauthentic

Page 104

behavior.

A    Oh --

MR. FRITZ:  Objection.

Go ahead.

THE WITNESS:  -- so that actually is one. That is one that we saw specifically in my work at Meta. So that's one that I'm -- one example. We've also seen actual use case at Meta. We've seen issues where there were like temporal -- where coordination across different regions. So they were outside of, like, normal posting times, based on the baseline of when users authentically post, re-tweet -- sorry, for -- repost in this case.

I've also seen specifically in previous work with Ipsos, through Synthesio, which is a social media tool that we had. We've seen things like coordinated signatures around, like, age activity. So where accounts were, like, newly created and they were all the ones -- they were the ones that were posting problematic content.

BY MS. GOVERNSKI:

Q    But I'm trying to understand a specific incident. Like not just talking generally, but what was the specific content that you saw to be inauthentic? You gave two examples at Meta. What

Page 105

were the specific content that you determined that was inauthentic?

MR. FRITZ:  Objection.

You can answer again.

THE WITNESS:  So at Meta, in one specific case, it was seeing duplicative identical content showing up at a higher propensity than normal.

BY MS. GOVERNSKI:

Q    What was the specific content?

A    So I cannot tell you the specific content for anything I did within Meta. Are you asking --

Q    You can designate it as confidential, but I'm entitled to understand the basis of your knowledge.

What was the specific type of content that, in that case, you determined was inauthentic?

MR. FRITZ:  Well, if there is some contract that she's bound by or regulations that said this is proprietary information, then I'm not sure the protective order would cover that.

THE WITNESS:  I can tell you that it was political.

BY MS. GOVERNSKI:

Q    And what was your role in sussing out that content?

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

A    So my role was to look at the vast amount of data over a certain period of time in order to look at anomalies that this content was being -- that this content was inflated or the activity around the content was inflated.

Q    How was it inflated?

A    Trying to think of how I can -- how I can share. There were actors that were pushing this content across Meta's platforms, and we saw bot behavior in that circumstance, or in that particular use case.

Q    And so that case included bot behavior. Did the other specific Meta case that you were referring to include bot behavior?

A    The other one did. It was different bot behavior. So -- I mean, because bot is a very general term, just to be specific, right? Programmatic advertising is bots. So this was manipulative bot behavior in the political case that was foreign actors.

The second case was bot activity specific to inflating advertising numbers in order to harm a business.

Q    And have you ever identified, in any of your positions, any campaigns that did not include

Page 107

bot behavior?

A    Yes.

Q    Tell me about those.

MR. FRITZ: Objection.

THE WITNESS: We've had -- so some were with Ipsos. We were looking through Synthesio, which was our social media solution, for when a CPG company felt that sales and the subsequent return of -- yeah, return -- return of goods was around bot activity. We saw that that was not the case. So we were able to identify that it had the signatures of authentic activity where people were just purchasing, were unhappy, and were returning goods.

BY MS. GOVERNSKI:

Q    And how did you rule out that it was this type of manual network that did not rely on bots?

A    So we looked at sort of -- in that case, we looked at tracking. So we looked at where the purchases were taking place, where the order was taking place, where the purchases were sent to. And we looked to see if there were any signifiers that skewed outside of what their normal base of customers looked like. So we were able to see that their authentic customers, which they agreed with were authentic customers, had the same signatures as

Page 108

what they thought were inauthentic customers.

Q    And if someone wanted to appear to be an authentic customer, that would be possible, wouldn't it?

MR. FRITZ: Objection.

THE WITNESS: In this case, it would not have been.

BY MS. GOVERNSKI:

Q    What about in any case?

MR. FRITZ: Objection.

THE WITNESS: That's a lot of different assumptions I would have to make. I couldn't answer that.

BY MS. GOVERNSKI:

Q    Well, what would it take for someone to make a coordinated campaign look authentic?

MR. FRITZ: Objection.

THE WITNESS: I don't know all the factors to be able to answer that.

MR. FRITZ: We've been going for about two hours. Why don't we take a break now?

MS. GOVERNSKI: When I'm done with this line of questioning.

MR. FRITZ: Well, no, actually, we're going to --

Page 109

MS. GOVERNSKI: When I'm done with this question -- I was in the middle of a question.

MR. FRITZ: You weren't in the middle of a question.

MS. GOVERNSKI: I was.

MR. FRITZ: You weren't.

MS. GOVERNSKI: The court reporter -- can you read --

(Cross talk.)

MR. FRITZ: -- we've been going for two hours and now you're trying to pose a question.

MS. GOVERNSKI: I will take a break after this.

So the court reporter, can you read back the question?

(Cross talk.)

MR. FRITZ: We're going to --

MS. GOVERNSKI: Kevin, there's a question pending.

(Cross talk.)

MR. FRITZ: There wasn't.

(Cross talk.)

MS. GOVERNSKI: Let's ask the court reporter.

MR. FRITZ: Frankly, with all due respect

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

to the court reporter, I don't care what this court reporter said. I suggest that we take a break and then you start to ask another question.

MS. GOVERNSKI: That's not true.

MR. FRITZ: I've never seen anyone do that before.

MS. GOVERNSKI: Ash -- there's a question pending. If she says no --

(Cross talk.)

MR. FRITZ: Nicole, we're going to come back at 11:25. You can put yourself --

(Cross talk.)

MS. GOVERNSKI: Kevin, if the court reporter says there is a question pending, I will -- we should believe her. If not, then I'll step -- Ash, please speak.

(Cross talk)

MS. GOVERNSKI: Please respect Ash.

MR. FRITZ: I know the sequence. I know the sequence.

MS. GOVERNSKI: Ash, what was the sequence?

MR. FRITZ: With all due respect to the court reporter, it doesn't matter.

(Cross talk.)

Page 111

MS. GOVERNSKI: Ash --

(Cross talk.)

MR. FRITZ: You started asked the question, which you didn't finish, after I asked for a break. It's inappropriate. So we're going to take a break now. We'll come back at 1:25.

MS. GOVERNSKI: Kevin, I'm allowed to ask --

(Cross talk.)

MR. FRITZ: Nicole --

MS. GOVERNSKI: Stop talking, Kevin. Ash, please, was a question pending?

THE STENOGRAPHIC REPORTER: I would have to check.

MS. GOVERNSKI: Please check.

THE STENOGRAPHIC REPORTER: Here it is.

(The record read.)

MS. GOVERNSKI: Okay. Let's go on break. Ten minutes?

She answered that question. Right, Ash?

THE STENOGRAPHIC REPORTER: I don't know. I'll have to look at the --

MR. FRITZ: What happened after that? What happened after that?

(Cross talk.)

Page 112

MR. FRITZ: So the record should reflect there was no question pending.

MS. GOVERNSKI: Well, I asked a question, but the record was not --

(Cross talk.)

MR. FRITZ: See you in ten minutes.

THE VIDEOGRAPHER: We are off the record. It's 1:16 p.m.

(Recess.)

THE VIDEOGRAPHER: We're back on the record. It is 1:26 p.m.

BY MS. GOVERNSKI:

Q   Ms. Alexander, we moved into Exhibit Share -- actually, I should ask, Ms. Alexander, did you have any substantive conversations with your counsel during the break?

A   No.

MS. GOVERNSKI: We've moved into Exhibit Share what will be marked as Exhibit 4. Can you look at that?

(Exhibit 4 marked for identification.)

BY MS. GOVERNSKI:

Q   Can you look at that?

A   Yes, I have it.

Q   What is it?

Page 113

A   My book cover.

MS. GOVERNSKI: Okay. I'm going to admit as Exhibit 4 your book. We're going to send to Veritext a copy of your actual physical book. And then for purposes of the exhibit -- of the discussion today, I have an excerpt from your book, which I will mark as Exhibit 4A, which should also be in your Exhibit Share.

(Exhibit 4-A marked for identification.)

BY MS. GOVERNSKI:

Q   If you can pull that up.

A   Just a sec. I'm downloading it.

Q   Sure.

A   4A. Got it.

MR. FRITZ: Are you going to send me a copy of the book too, Meryl?

MS. GOVERNSKI: Sure.

MR. FRITZ: Thanks.

BY MS. GOVERNSKI:

Q   Ms. Alexander, do you see the excerpt that is marked as Exhibit 4A is page 15 of your book?

A   Yes.

Q   Okay. And you write:

(As read):

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

"AI-driven content curation on social media platforms influences not just purchasing decisions but also opinions and beliefs. Algorithms prioritize content that is likely to engage users, often amplifying sensational or polarizing material."

When you use the terms "sensational or polarizing material," what did you mean?

A   I can't think in my mindset at that particular time, but I think I was probably referencing things like specifically, you know, coordinated attempts around politics, around -- I'm not sure. Just major -- major events where we've seen harm come to companies, governments, individuals, based on coordinated attacks.

Q   Okay. And when it says:

(As read):

"This can skew perceptions and contribute to the spread of misinformation, as seen in various instances where fake news has gone viral."

Do you see that?

A   Yes.

Page 115

Q   What did you mean by the term "misinformation"?

A   So misinformation, specifically I was talking about where information is presented as either slightly skewed versus what the original information actually is or completely false.

Q   Uh-huh. And how has --

A   I'm so sorry to cut you off. I should have added "for deceptive purposes," was the last.

Q   Okay. And how -- how is the spread of misinformation related to fake news going viral?

A   So a couple of different ways. So this information is usually meant to feed on emotions. And when you have emotions either to the left or the right, extremely happy or extremely negative, those are the times when human beings usually promote content more so from a human perspective.

From an algorithmic perspective, we've seen studies that have shown that misinformation also has been able to radicalize individuals and algorithms show more and more intense information depending on how users engage with that content.

Q   So the engagement that you've just described, that would be organic engagement, right?

A   Misinformation is organic, yes. The

Page 116

escalation of it to get to sensationalism is usually coordinated.

Q   I see. So something can be both inorganic and organic?

MR. FRITZ: Objection.

THE WITNESS: So I would tease those two out. Something can start off as organic and it can be manipulated into being inorganic.

BY MS. GOVERNSKI:

Q   What about vice versa? Can start off inorganic and be manipulated to seem organic?

A   That's more difficult to do. It's not impossible, but it's extremely difficult to do.

Q   How would you do it?

MR. FRITZ: Objection.

THE WITNESS: I mean, that -- I'm not quite sure of the ways you would go about escalating it. I'm sure there's a myriad of different ways.

BY MS. GOVERNSKI:

Q   But as you sit here today, you don't know any ways that would be used to do that, other than that that it's possible?

A   To go from something that is inorganic to make it -- I'm sorry.

Q   Appear organic.

Page 117

A   No. Because you would need -- you would need -- no. I can't think of anything. I can't think of how you would go about that.

Q   Let's just do in your hypothetical. You said that if something is sensational or polarizing, it can motivate people to on their own post, right?

A   Correct.

Q   What if the sensational or polarizing material is something that is planted and not truthful? Couldn't that have the exact same effect you just described?

A   For it to be sensationalized, yes.

Q   For then users to pick it up and organically spread it?

A   Yes, that is possible.

Q   Let's go back to the excerpt on page 22. It says:

(As read):

"Reputational harm can be even more devastating than legal penalties. In today's digital landscape, news, especially bad news, travels fast. A single incident can tarnish a brand's impact overnight and rebuilding trust can take years."

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

Do you see that?

A   I do.

Q   Do you stand behind that sentence?

MR. FRITZ:  Sorry.  You said page 22, Meryl?  I thought we were looking at page 15.

MS. GOVERNSKI:  Oh, I'm sorry.  Let's go to page 22.

MR. FRITZ:  Is this a new exhibit?

MS. GOVERNSKI:  Well, I did say 22. Amber, is this the same exhibit?  Autumn.  Sorry. Oh, let's go to 4B.

(Exhibit 4-B marked for identification.)

THE STENOGRAPHIC REPORTER:  Meryl, we're going to 4B.  We need to announce it.  Thank you.

MS. GOVERNSKI:  Yup, 4B.  While my colleague is getting it pulled out.

BY MS. GOVERNSKI:

Q   Do you recall writing that reputational harm can be even more devastating than legal penalties and that a single incident can tarnish a brand's impact overnight and rebuilding trust can take years?

A   Yes.  I know that statement.  I remember writing that.

Q   Do you agree with that statement?

Page 119

A   Yes.

Q   Okay.  And you continued:

(As read):

"Recovering from reputational damage requires substantial investment in public relations, marketing, and operational changes."

Do you recall writing that as well?

A   I do.

Q   Do you agree with that statement?

A   I do.

Q   By the way, you talk about brands.  When you talk about brands in your book, is that corporate brands?

A   That's any brands.  It can be small, medium business.  It can be enterprise.  Obviously, in regards to the statement that you just mentioned, obviously the amount of investment is vastly different for an enterprise brand versus a small and medium business brand.

Q   Right.  But the principle is the same?

A   There is always -- yes, there is elements of recovery.  But brands are also -- and I think it's a subsequent statement on either the previous or the following page.  I also talk about how brands

Page 120

also have to mitigate their own risk as well.

Q   Okay.  So other than the book, your CV doesn't list any other publications that you've authored.  Have you authored any other publications?

A   Do you mean like academic papers, I'm assuming you mean?

Q   Anything.

MR. FRITZ:  Objection.

THE WITNESS:  I've authored other papers, yes.

BY MS. GOVERNSKI:

Q   What papers?

A   I've authored papers at all of my companies.  So at Meta --

Q   Okay --

MR. FRITZ:  Objection.

THE WITNESS:  Ipsos, Nielsen --

MR. FRITZ:  Go ahead and finish your answer, Ms. Alexander.

THE WITNESS:  That was it.

BY MS. GOVERNSKI:

Q   Have you -- have any of your other publications that you've authored been published?

A   No.

Q   So the book is the only piece of

Page 121

literature that you've published?

A   Correct.

Q   What sort of journals exist in your discipline?

A   Sorry, in marketing?

Q   How would you define your discipline?

MR. FRITZ:  Objection.

THE WITNESS:  I'm sorry, I'm not sure how to answer that.

BY MS. GOVERNSKI:

Q   How would you define your expertise?

A   We've just got done talking about Meta. If you're asking in my discipline at Meta, I was in marketing.  Full-staff marketing.  So that's everything from data analysis to engineering to -- I mean, PR, branding, et cetera.

Q   Well, what is your understanding of why you're being offered as an expert in this case?

A   So as an expert in this case, it's for my experience in data analysis, marketing, and specifically social networks.

Q   So in data analysis, marketing, or what was the last thing you said?  Social?

A   Social networks.

Q   Social networks.  In your experience in

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

either of those, are there journals that exist in any of those three disciplines?

A    There are several. You want me to just name them?

Q    That would be great.

A    Journal of Marketing, God, they all have long names. Nature Human Behavior and something. I don't actually subscribe to the journals so...

Q    Any --

A    I don't have to. We get them free as faculty.

Q    Which ones do you receive as a member of the faculty?

A    I read -- because receiving and reading are different. I read American Marketing Association and their journal. I read ANA's Journal. I'm sorry. Stands for American National Advertisers, I think the acronym is.

Q    Okay.

A    Those are the ones I usually read.

Q    So American Marketing Association and the American National Association's Journal; is that right?

A    Of Advertisers.

Q    American National Association of

Page 123

Advertisers?

A    Yes.

Q    Any other journals that you read on a regular basis?

A    Journals themselves, no. I usually read individual articles when they interest me.

Q    How do you decide what articles to read?

A    Depending on topic. It could be something that is shared with me, something that is in my queue based on different tags or hashtags.

Q    But it's just like an ad hoc basis what you decide to read?

MR. FRITZ:  Objection.

THE WITNESS:  Yes.

BY MS. GOVERNSKI:

Q    Have you ever edited any of the journals that you just discussed?

A    I'm not an editor for any journal. No.

Q    But none of the work that you've done has been published in any of the specific journals that you've just discussed?

A    No. That's usually for more full-blown academics.

Q    Can you explain that distinction?

A    As a practitioner, I don't have the

Page 124

obligation of having to publish. Whereas, academics usually do.

Q    You mentioned that you wrote a number of papers for Meta in the course of your career. Have any of the papers you've written been peer-reviewed?

A    None that -- well, actually, no, that's not true. Yes. A paper that I wrote in conjunction with another author at Ipsos was peer-reviewed and we presented that at an academic -- jointly at an academic forum. And that was peer-reviewed. I think that's it. A peer review process like in academia is a little bit different than peer-reviewed for a practitioner.

Q    When you were referring to peer-reviewed in this context, was it for a practitioner or was it academic?

A    That was academia.

Q    Okay. And what was the topic of that paper?

A    We looked at -- we looked at marketing effectiveness and behavior across -- across a global dataset.

Q    And why did you not list that paper in your CV?

A    Because it wasn't published.

Page 125

Q    Do you have a copy of it?

A    Honestly, I don't know. I may have a copy of it somewhere.

Q    What was the methodology that was tested in that paper?

A    So we looked at marketing effectiveness. So we looked at regression analysis of a myriad of different campaigns across different disciplines. In order to talk about things like concepts, how concepts actually worked well if they went live, if they didn't go live. We appended sales data to that, for the ones that did go live, obviously. And just looking at the overall trend of how to bring a product concept to fruition.

Q    Did you rely on that analysis for purposes of this report?

A    No.

Q    Let's go -- if you can pull up your report, please. Let's do the latest one, Exhibit 002. Let's go to Appendix C. What is your understanding of what Appendix C is?

A    Those are materials I considered when drafting my report.

Q    Did you draft Appendix C?

A    Yes.

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

Q   Did you consider any materials that are not listed in Appendix C?

A   For the end report, no.

Q   What does that mean, "for the end report"?

A   For the report that you're looking at, no.

Q   But did you consider any other materials for -- in the course of preparing your report?

A   In the course of preparing it, no.

Q   So Appendix C lists everything you considered in the course of preparing your report?

MR. FRITZ:  Objection.  You can answer again.

THE WITNESS:  Just doing a read-through.  Yes.

MS. GOVERNSKI:  Okay.  Autumn, go ahead and let's share this on the screen so at least I can look at it on the screen, please.

BY MS. GOVERNSKI:

Q   What quality control steps did you ensure that Appendix C contained all of your sources?

A   I used Zotero, which is a software for citation and reference clipping and storing.

Page 127

Q   Okay.  Is Terow -- does it include an AI feature?

A   It's Zotero.  And I do not believe it does.  It's Z-O-T-E-R-O.

Q   I appreciate that.  Thank you.

And where you include citations in your report -- strike that.

You include certain footnotes with citations in your report, but a lot of paragraphs have no citations.  What is -- how are we supposed to know the basis for the paragraphs where you don't include a citation?

MR. FRITZ:  Objection.  You can answer.

THE WITNESS:  If I'm not using a citation, then it comes from personal knowledge.

BY MS. GOVERNSKI:

Q   Rather than academia?

A   Rather than having to reference -- me going to reference something.

Q   Understood.  Let's look at 108.

A   Okay.

Q   Okay.  You see it lists academic materials?

A   Yes.

Q   Are these all the academic papers that

Page 128

you used -- that you relied on for purposes of your report?

A   Yes, I believe so.

Q   Okay.  And if you look at page 109, there is a report by -- you cite an article by Bellutta, right?

A   Yes.

Q   Okay.  You see there's an article by Bellutta, right?

MR. FRITZ:  Are you looking at page 108, Meryl?

MS. GOVERNSKI:  Nope.  I'm looking at -- oh, you know what, it might be the new report.  Sorry.  I'm working off the old report.  Yup.

BY MS. GOVERNSKI:

Q   108, you see Bellutta?

A   I do.

Q   And it's called "Investigating coordinated account creation using burst detection and network analysis."

Do you see that?

A   Yes.

Q   Okay.  That's in the article -- it's in The Journal of Big Data.  That wasn't one of the journals that you read regularly?

Page 129

A   It's not one of the ones I listed earlier, no.

Q   Is it one of the ones you read regularly?

A   No.

Q   Let's go to your report, paragraph 20.

A   Okay.

Q   Let me just make sure it's still 20.  You see that there is a footnote there at the end of paragraph 20, to footnote 2?

A   Yes.

Q   You see that it's unlike the other title, which was "Investigating coordinated account creation using burst detection and network analysis", this has a different title.  Why is that?

A   I do not know.  I would have to check to see the copy of the article that I provided, on what the actual name is.

Q   Well, it can't be both, right?

MR. FRITZ:  Objection.

THE WITNESS:  I would say not.

BY MS. GOVERNSKI:

Q   Is this what a hallucinated cite looks like?  It has plausible but factually incorrect information?

MR. FRITZ:  Objection.  You can answer.

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

THE WITNESS: I'm sorry. Hallucinated cite or citation?

BY MS. GOVERNSKI:

Q   Hallucinated cite. Is there a difference?

A   I'm not sure what a hallucinated cite is. That's why I wanted to clarify.

Q   Okay. Well, is this a hallucination?

MR. FRITZ: Objection.

THE WITNESS: I wouldn't say that. No. I would say that it's probably wrong if the two don't match. But I wouldn't say it's a hallucination.

BY MS. GOVERNSKI:

Q   Well, what is the explanation for the two not matching?

MR. FRITZ: Objection. You can answer again.

THE WITNESS: Possible error.

BY MS. GOVERNSKI:

Q   Okay. Well, let's look at one of the articles that your counsel provided us. I'm going to move and mark as Exhibit -- where are we, 5?

THE STENOGRAPHIC REPORTER: Yes. We're on Exhibit 5.

Page 131

(Exhibit 5 marked for identification.)

BY MS. GOVERNSKI:

Q   Okay. I'm going to introduce Exhibit 5, and it should be in marked exhibits, if you can open that.

A   Yes, I have it.

Q   And what is this?

A   It appears to be from the Journal of Computational Science. It's an article, "The coordination network toolkit."

Q   "The coordination network toolkit: A framework for detecting and analyzing coordinated behavior", right?

A   On social media. Yes.

Q   This is from -- this is from the Journal of Computational Social Science. If you look at the top. That's right, right?

A   That's what is listed. Yes.

Q   This is also not one of the journals you regularly read?

A   No.

Q   And if you look at the top, it says 7.1139 to 1160.

Do you see that?

A   Yes.

Page 132

Q   What do those numbers, 1139 to 1160, indicate?

A   It should be the journal, the page, the -- I'm not sure.

Q   The page number where the journal starts, where the article starts?

MR. FRITZ: Objection.

THE WITNESS: Honestly, I can't remember how that is usually signified. But something to that effect. Yes.

BY MS. GOVERNSKI:

Q   Let's go to the next page and you will see 1140. Does that help explain what those numbers indicated?

A   Yes. So I'm assuming it's the page, yes.

Q   So the pages of this particular article is 1139 to 1160 in the Journal of Computational Social Science?

A   Yes.

Q   Who are the authors of this paper?

A   Timothy Graham, Sam Hames, and Elizabeth Alpert.

Q   Okay. And those are the only three authors listed here, right?

A   Yes. On this publication, yes.

Page 133

Q   Are you familiar with who those individuals are?

A   No.

Q   Do you know anything about them?

A   No.

Q   Do you know anything about the quality of their research?

A   No.

Q   How did you identify this article?

MR. FRITZ: Objection. You can answer.

THE WITNESS: I don't know how I identified it.

BY MS. GOVERNSKI:

Q   How did you know about it?

A   It could have been one of the ones that have it -- I have a myriad of references to different articles.

Q   I understand. But how did you decide to review this article for purposes of your report?

MR. FRITZ: Objection. You can answer again.

THE WITNESS: I'm not sure how I selected this particular article.

BY MS. GOVERNSKI:

Q   Well, who would have selected it for you?

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

MR. FRITZ:  Objection.

THE WITNESS:  I would have selected it for myself.

BY MS. GOVERNSKI:

Q  How would you have -- how did you find it?

A  I have, as I mentioned, I have a lot of articles that I either have read, I've clipped.  I have numerous articles that I've read previously and I store, and then I usually sort through them.

Q  I understand.  But you don't have a recollection of doing that with respect to this article?

A  I don't have a recollection of how I chose the specific article.

Q  Okay.  Did you read the entirety of this paper?

A  Probably not recently.  But yes, at some point.

Q  Well, recently, like at some point, what do you mean?

A  I didn't review this for the deposition. I would have read this probably months ago.  But yes.

Q  You said you were retained in September,

Page 135

October.  Did you read it since then?

A  Yes.

Q  So can you summarize the contents of this paper for me, please?

MR. FRITZ:  Objection.

THE WITNESS:  I cannot.  Offhand?

MR. FRITZ:  You want her to read the entire article now?

BY MS. GOVERNSKI:

Q  No.  Ms. Alexander, you cite this article multiple times in your report.  I'm asking for you to summarize it.

MR. FRITZ:  Do you want her to read it first?

MS. GOVERNSKI:  No.  She's supposedly read it as she was preparing her report, Kevin.

Ms. Alexander, I'm asking you to please summarize the article that you cited multiple times.

MR. FRITZ:  Objection.

THE WITNESS:  I understand that.  So the article in and of itself is about coordinated networks and the toolkit that the authors used to identify them.  I believe that would be a succinct summary.

Page 136

BY MS. GOVERNSKI:

Q  Okay.  And what are some of the specific tools that they identify?

MR. FRITZ:  Objection.

THE WITNESS:  I don't know this particular one just offhand.

BY MS. GOVERNSKI:

Q  Okay.  Can you name one of the tools that this article identifies?

A  One from the toolkit?  No.

Q  Okay.  Does this paper provide any formal definition of coordinated behavior in social media?

A  I would have to go through and read it again.

Q  Okay.  Well, as you reviewed it for purposes of your report, did you rely on any definition in this article for coordinated behavior in social media?

A  For this one, I'm not sure.

Q  As you sit here today, can you explain how this paper defines coordinated behavior in social media?

MR. FRITZ:  You want her to review the article?

MS. GOVERNSKI:  Kevin, stop with the

Page 137

speaking objections.

MR. FRITZ:  I just want to make sure the question is clear --

MS. GOVERNSKI:  No, she's --

MR. FRITZ:  Sorry --

MS. GOVERNSKI:  She cited this.  I'm entitled to her information that she has in her recollection today, about this article.

MR. FRITZ:  Please try not to interrupt me.  I just want to make sure that the witness and I both understood what you're asking her.  If you're asking her from memory, then we understood --

MS. GOVERNSKI:  Ash, please repeat back my question which said, "as you sit here today."

MR. FRITZ:  Sorry, I don't know why you interrupted me again.  I excused it the first time because I thought it was a mistake, and now I'm learning it might not be.  So you should just make clear whether you want her to go from memory or you want her to read the article.  That's all I'm asking.

MS. GOVERNSKI:  Mr. Fritz, you should stop with your speaking objections.  Ash, please read back the question I asked.

THE REPORTER:  All right.  Last question.

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

(Record read as follows:

"QUESTION:  As you sit here today, can you explain how this paper defines coordinated behavior in social media?")

MR. FRITZ:  So sitting here today, do you want her to scroll through the entire thing?

MS. GOVERNSKI:  Mr. Fritz, stop with the speaking objections.  No, I am going to have to call the Court.  It's my deposition.  Stop with the speaking objections.  Ms. Alexander, as you --

MR. FRITZ:  We can call the Court if you'd like, because you keep interrupting me.

BY MS. GOVERNSKI:

Q   Ms. Alexander, as you sit here today --

MR. FRITZ:  I just want to understand your question.

MS. GOVERNSKI:  As she sits here today, I'm entitled to her recollection as she sits here today.

MR. FRITZ:  Just so the record is clear, you do not want her to read the article now?

MS. GOVERNSKI:  No.  She relied on it in her report.  As you sit here today -- can you please repeat the question back, Ash, because Mr. Fritz's one minute long speaking objection has distracted me

Page 139

from what the actual question was.

MR. FRITZ:  I just wanted to make sure we're all understanding what your question was.

MS. GOVERNSKI:  Mr. Fritz, stop with the speaking objections.  Ash, please repeat back the question.

THE REPORTER:  (Record read as follows:

"QUESTION:  As you sit here today, can you explain how this paper defines coordinated behavior in social media?")

MR. FRITZ:  Objection.  You can answer.

THE WITNESS:  I cannot offhand without going through and referencing the paper.

BY MS. GOVERNSKI:

Q   Okay.  You cite to this article in page 87 as the only source for your claim that, quote:

(As read):

"Coordinated influence operations exhibit distinctive network fingerprints, tight temporal synchronization, limited participant dispersion, high clustering coefficients, and centralized network structures with identifiable command

Page 140

and control hubs."

Please identify what parts of this article you used to support that statement.

MR. FRITZ:  Objection.  You can answer.

THE WITNESS:  Specifically, I would have to go through to reference the page and the location of -- I would have to look to see how I used it within the report and then go through the paper to see how I cited it.

MS. GOVERNSKI:  Okay.  So let's do that.  Let's go to 109 in your report.

MR. FRITZ:  Are you saying you want her to read the article now?

BY MS. GOVERNSKI:

Q   No.  Go to 109 of your report, is what I said.  Paragraph 109.  I'm sorry.  Let's go to paragraph 87.

A   Okay.

Q   Are you at paragraph 87 of your report?

A   Yes.

Q   You refer to Graham, et al.

Do you see that?

A   Yes.

Q   You have a footnote, footnote 11.

Do you see that?

Page 141

A   Yes.

Q   If you can look at this footnote, it says "Graham, et al." and you see the title here, right?

"Detecting coordination networks in social media."

Do you see that?

A   Yes.

Q   So that's a different title than what we just discussed which was "The coordination network toolkit:  A framework for detecting and analyzing coordinated behavior on social media", right?

You can go back and look at Exhibit 5.

A   Okay.

Q   And you can see the two titles don't match again, right?

MR. FRITZ:  Objection.

THE WITNESS:  To what I have listed in the references?

BY MS. GOVERNSKI:

Q   No.  The actual article.

A   Okay.

Q   The actual article, you've read the title as being "The coordination network toolkit:  A framework for directing and analyzing coordinated behavior on social media."

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

That's not the same title as "Detecting coordination networks in social media", right?

MR. FRITZ: Objection. You can answer.

THE WITNESS: That is not.

BY MS. GOVERNSKI:

Q So why is there different titles here?

A I am not sure.

Q Okay. And then we talked about the page numbers and we talked about the page numbers 1139 to 1160 represent the number of pages that reflect this article, right?

A Yes.

Q Okay. Let's look at this footnote. You cite pages 23 to 47.

Do you see that?

A I do.

Q And this is the -- those are the page numbers that you say supports this statement:

(As read):

"These findings align closely with recent computational social science research."

Which is the sentence I just read. So please direct me to pages 23 to 47 in Exhibit 5.

A So I'm assuming this is an error. But I

Page 143

don't -- that's not part of your exhibit.

Q Those page numbers don't match the exhibit that your counsel provided to us, right?

A It doesn't match the paper that I submitted. No.

Q Is this a hallucinated cite -- citation?

MR. FRITZ: Objection.

THE WITNESS: No, I wouldn't call it hallucinated because it's an actual paper. It's incorrect on the way that it was picked up for the title and the year.

BY MS. GOVERNSKI:

Q So it says Graham, et al., but if you listed authors who were not the authors who appeared, would that be an indication of a hallucination?

A I'm sorry. If I listed authors that did not appear?

Q On the publication.

A So I think that you're using the word "hallucination." That is not hallucination to me. That is incorrect. But hallucination is different.

Q Well, if a citation includes authors who were not the authors of the paper, wouldn't that be a hallucination?

Page 144

MR. FRITZ: Objection.

THE WITNESS: By definition, no.

BY MS. GOVERNSKI:

Q If it made up authors who were not the authors, that would not be a hallucination?

MR. FRITZ: Objection.

THE WITNESS: If a generative AI solution made up authors, then yes, that would be a hallucination.

BY MS. GOVERNSKI:

Q Okay. So let's look at Exhibit 55, which we already talked about. And we talked about the three authors. You recall that, Graham, Hames and Alpert. Do you recall that those were the only three authors identified in this article?

A In one that we're looking at, yes.

Q Okay. So let's go back to your report, which is Exhibit 002, and let's go to page 108. I'm going to share my screen so it's a little easier. Oh, I am showing my screen, I guess.

And you see right here, Graham -- this is the article we're talking about, right?

"Detecting coordination networks in social media. 'Journal of Computational Social Science.'"

Page 145

Do you see that?

A Yes.

Q Okay. And you see that it lists additional authors here: Bruns, Zhu, and Campbell.

Do you see that?

A Yes.

Q Those authors were not in the article, right?

A On the article we looked at, no, they were not.

Q Well, do you have any reason to believe that the other article that your counsel provided to us as this article is not the article that you intended to reference here?

A No, I believe it is the article I intended to reference.

Q So how can you explain a citation that makes up authors who are not the authors identified in the article?

MR. FRITZ: Objection. You can answer again.

THE WITNESS: I'm sorry, Kevin?

MR. FRITZ: You can answer.

THE WITNESS: Oh. So there are a couple of things wrong. So it's -- in general, it's just

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

incorrect. I mean, outside of the author, the date is also incorrect, so...

BY MS. GOVERNSKI:

Q   Right. So how did -- you just said earlier that if a cite -- citation were to include authors who did not appear on the article, it would be a sign of a hallucination.

MR. FRITZ: Objection.

BY MS. GOVERNSKI:

Q   How is that not the case here?

A   So I believe I said if something was developed through a generative AI solution that added authors, it would be an example of hallucination.

Q   And how do you know that's not the case here?

A   Because I know this wasn't generated by generative AI.

Q   Okay. Well, let's look at that. Let's look at the paragraph that you cite this for, paragraph 86.

MR. FRITZ: Objection.

BY MS. GOVERNSKI:

Q   Sorry. 87. This is the same paragraph we've been looking at, right, where you cite Graham?

Page 147

Oh, by the way, have you ever applied the concepts that you cite Graham for in your professional life?

A   I'm sorry, which concepts are we specifically talking about?

Q   The concepts that you reference here in this paragraph 87.

A   So temporal synchronization, yes. Participant dispersion, yes. And command and control hubs, yes.

Q   Okay. But when you applied those concepts, were you relying on Graham?

A   As a practitioner, no.

MS. GOVERNSKI: So my colleague is going to be moving into a document, which I will mark as Exhibit 6. Let me know when you have it.

Autumn, are you here?

MS. ADAMS-JACK: I'm here. I just entered it in. It says it's being introduced.

(Exhibit 6 marked for identification.)

BY MS. GOVERNSKI:

Q   Okay. Do you have that document, Exhibit 6, up?

A   It's downloading right now.

Q   Okay. I'm also sharing my screen. Let

Page 148

me know when you have it.

A   I can look at your screen. It's taking -- it's taking a while to download.

Q   Okay. This is a GPTZero report. And you will see it has the exact verbatim of paragraph 87. Do you see that?

A   Can you zoom in?

Q   Uh-huh. Right here.

(As read):

"These findings align closely with recent computational social science research."

And you will see it's that same citation to Graham that we just looked at in paragraph 87?

A   Okay.

Q   Okay. And at the top, it states that:

(As read):

"We are highly confident this text is AI generated."

And lists AI probability at 100 percent. Do you see that?

A   I see that.

Q   Do you have any explanation for GPTZero's finding that it's 100 percent probability that paragraph 87 is AI generated?

Page 149

MR. FRITZ: Objection.

THE WITNESS: No.

BY MS. GOVERNSKI:

Q   You have no explanation for that?

MR. FRITZ: Objection. You can answer again.

THE WITNESS: I do not. As I mentioned earlier, I don't believe in AI analysis for the use of identifying if something is generative AI. I think we talked about that earlier.

BY MS. GOVERNSKI:

Q   So if another -- if Grammarly found the same paragraph had a 70 percent chance of being generated by AI, would that change your perception at all?

A   So Grammarly has a feature that is also an AI checker --

Q   Uh-huh.

A   -- which, again, is -- is similar to what I mentioned earlier with the accuracy of overall AI checkers.

Q   Okay. So what about the fact that GPTZero predicted this paragraph was 100 percent likely to be AI, and Grammarly predicted this paragraph to be 70 percent, your response is that

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

both GPTZero and Grammarly must be inaccurate?

MR. FRITZ: Objection.

You can answer again.

THE WITNESS: So I don't think it's about the inaccuracy. I think it's about AI generator checks not simply being accurate. And research, outside of my statement, has also seen this to be true.

BY MS. GOVERNSKI:

Q   Okay. And then a third AI checker, TextGuard, found this one paragraph to be 86 percent likely to be AI. So I'm just trying to understand, is it your testimony that that is just a coincidence?

MR. FRITZ: Objection.

You can answer again.

THE WITNESS: My testimony is that AI generator checkers are -- are inadequate and not accurate.

BY MS. GOVERNSKI:

Q   How come the paragraphs in your report that describe your background all came back as human generated?

MR. FRITZ: Objection.

THE WITNESS: I do not know why.

Page 151

BY MS. GOVERNSKI:

Q   And why did the paragraphs in Dr. Mayzlin's report come back as zero percent AI generated?

MR. FRITZ: Objection.

THE WITNESS: I couldn't answer that.

BY MS. GOVERNSKI:

Q   Do you have any explanation for why GPTZero would predict that 101 paragraphs of your report have a 100 percent probability of being AI?

MR. FRITZ: Objection.

THE WITNESS: I couldn't answer that.

BY MS. GOVERNSKI:

Q   Do you have any explanation for why GPTZero predicted that an additional 28 paragraphs of your report had a 90 percent probability of being AI?

MR. FRITZ: Objection.

THE WITNESS: I still can't answer that.

BY MS. GOVERNSKI:

Q   And do you have any explanation for why GPTZero predicted that another 35 paragraphs of your report had a 80 percent probability of being AI?

MR. FRITZ: Objection.

THE WITNESS: I can't answer that.

Page 152

BY MS. GOVERNSKI:

Q   So do you have any explanation for why 164 paragraphs out of 200 in your report had an 80 percent likelihood of being AI?

MR. FRITZ: Objection.

THE WITNESS: I don't know.

BY MS. GOVERNSKI:

Q   Okay. Let's go back to your report where you cite Graham again. And I'm sharing it on my screen for ease of use.

Do you see paragraph 97?

MR. FRITZ: I would use the Exhibit Share, Ms. Alexander.

THE WITNESS: I'm there.

BY MS. GOVERNSKI:

Q   Okay. And you see that in the first paragraph, you -- you cite Graham, Howard and Woolley and Ferrara.

Do you see that?

A   I do.

Q   Okay. What is the Howard and Woolley article?

A   I would have to go back to reference the documents or the articles that I submitted.

Q   As you sit here today, based on your

Page 153

recollection, what is this article about?

A   I can't tell you offhand. I would have -- I'd have to reference the article itself.

Q   Okay. As you sit here today, can you explain why the Howard and Woolley article support the statements in this paragraph?

MR. FRITZ: Objection.

THE WITNESS: I cannot.

BY MS. GOVERNSKI:

Q   What about Ferrara, et al., what do you recall about that article?

A   I'd have to look at the article.

Q   As you sit here today, do you have any recollection about what that article was about?

MR. FRITZ: Objection.

THE WITNESS: I don't know offhand.

BY MS. GOVERNSKI:

Q   And as you sit today, do you have any recollection for how the article by Ferrara supports any of the statements in paragraph 97?

MR. FRITZ: Objection.

THE WITNESS: Without referencing the article, no.

BY MS. GOVERNSKI:

Q   And did you write this paragraph?

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

A   Yes.

Q   Every word?

A   So the citations themselves, I get from Zotero, but yes, the copy itself, yes.

Q   Any idea how GPTZero would predict the likelihood of this paragraph?

MR. FRITZ:  Objection.

THE WITNESS:  I don't know.

BY MS. GOVERNSKI:

Q   Would you be surprised to learn that GPTZero projected that this paragraph was 100 percent likely to be AI generated?

MR. FRITZ:  Objection.

You can answer.

THE WITNESS:  I'm sorry.  What was the question there?  I apologize.

BY MS. GOVERNSKI:

Q   Would you be surprised to learn that GPTZero predicted that there was 100 percent likelihood that this paragraph was AI generated?

MR. FRITZ:  Objection.

THE WITNESS:  It wouldn't surprise or not surprise me.

BY MS. GOVERNSKI:

Q   Okay.  And then TextGuard also found that

Page 155

this paragraph was 92 percent most likely to be AI generated.  Would that surprise you?

MR. FRITZ:  Objection.

THE WITNESS:  Same answer.  I wouldn't be surprised or not surprised.

BY MS. GOVERNSKI:

Q   Okay.  And so these bullets here:

(As read):

"Centralized amplification hubs, Temporal synchronization, Sentiment homogeneity."

You wrote -- it's your testimony that you wrote these bullets?

A   Yes.

Q   Okay.  And there's no citation for these bullets.  So is this one of those examples where the basis for these are just your own experience?

A   Yes.  Those are also some of the same verbiage I used earlier when we talked about the work that I did at Meta as well as at Ipsos.

Q   Right.  So that verbiage, and when you talked about it earlier, that's not based on academia; that's just based on your own experience?

A   That's based on my expert experience, yes.

Page 156

Q   And not academia, right?

A   I believe this is also associated in academia, yes, correct.

Q   What academia?

A   I'm sorry, what do you mean by "what academia"?

Q   What academia supports these specific bullets that we've been discussing?

A   There is research around account clustering, sentiment homogeneity, across data analysis and computational science.

Q   Okay.  And what is that academia?

A   I believe you're asking if I can cite the authors and/or a paper.  I can't do that offhand.

Q   I'm asking for the basis of the bullets that don't include a citation.

MR. FRITZ:  Objection.

You can answer again.

THE WITNESS:  It's from my lived experience, as well as, I believe, norms across social analysis of social media in academia as well.

BY MS. GOVERNSKI:

Q   Okay.  But you can't, as you sit here today, cite any academia that supports these specific bullets?

Page 157

MR. FRITZ:  Objection.

THE WITNESS:  I can't provide an author and a paper offhand.

BY MS. GOVERNSKI:

Q   I'm not asking for the paper and the author, but just what academia supports these specific bullets?

MR. FRITZ:  Same objection.

THE WITNESS:  Maybe I don't understand the question when you say which academia.  So looking at marketing and social analysis in academia, right, which is a discipline, so there's been research done to show coordinated fingerprinting in academia, as well as on the practitioner side.

BY MS. GOVERNSKI:

Q   I'm trying to identify and understand what academia you relied on when you came up with this bulleted list.

A   The bulleted list is based on my lived experience, as I mentioned.  But it's also supported, in addition, in academic research.

Q   And I'm entitled to know what academic research you relied on for coming up with these bullets.

40 (Pages 154 - 157)

CONFIDENTIAL

Page 158

MR. FRITZ:  Objection.

THE WITNESS:  So I think we're saying -- I'm saying the same thing over and over again.  So it's based on the research that I've done, myself, as a practitioner.  And in addition to that, I also believe that there is research on these particular elements across marketing science and social analysis.  I do not have -- before you ask -- I do not have a citation to offer you offhand.

BY MS. GOVERNSKI:

Q   So your report does not disclose the academia on which you relied for these paragraphs in paragraph 97?

MR. FRITZ:  Objection.

THE WITNESS:  That's incorrect --

BY MS. GOVERNSKI:

Q   So --

A   -- as I stated.

Q   -- what is the academia?  Yeah, go on.  Sorry.

A   It's based on my experience as a practitioner, period.  I'm saying I also believe, in addition to that being the basis of the bullets, I also believe that there is academic research that supports it as well.

Page 159

Q   But that's a belief based on your intuition and not what is cited in your report?

MR. FRITZ:  Objection.

THE WITNESS:  It's based on my understanding of articles I've read across academia of different conferences, a myriad of other things.

BY MS. GOVERNSKI:

Q   And do you understand that you're required to identify all of the academia that supports the opinions that you're offering in this case?

MR. FRITZ:  Objection.

THE WITNESS:  I understand that if I'm using academic sources.  As I mentioned in my last answer, these bullets, first and foremost, are based on my practitioner experience.

BY MS. GOVERNSKI:

Q   And you cannot, as you sit here today, think of any of the articles that inform these bullets?

MR. FRITZ:  Objection.

THE WITNESS:  Of the citations, no, I cannot.  Of referencing a title of a paper and the authors, no, I cannot.

Page 160

BY MS. GOVERNSKI:

Q   And how would you go about finding that out?

A   I would do a scholar search based on keywords.

Q   And you can do that?

A   Yes.

Q   So why didn't you do that when you were putting together Appendix C?

A   So as I mentioned, for this particular content, again, it's based on practitioner work, which would not be needed for an academic citation.

Q   Okay.  Let's go to your Appendix C, where you, again, are expected to list all of the materials that form the basis of your opinion.  And on page 108, you cite a legal case called Daubert.  Do you see that?

A   Yes.

Q   Why did you list Daubert?

A   Daubert is something I read early on when I -- when I was -- when this -- when the litigation first was presented to me.

Q   Why did you read Daubert?

A   For just research and knowledge.

Q   Did you just decide on your own to read

Page 161

Daubert?

MR. FRITZ:  I would instruct the witness to the extent your answer requires you to disclose substantive communications with counsel, you not reveal that.  But independent of that, go ahead.

THE WITNESS:  So it was nothing to do with any conversation with counsel.  It was something that I did just proactively.

BY MS. GOVERNSKI:

Q   Okay.  How did you learn about Daubert?

A   Honestly, I think I Googled it.

Q   Okay.  What prompted you to Google Daubert?

A   The engagement with GLG.

Q   The engagement with GLG or -- like 12 years ago or in this case?

A   When GLG reached out to me regarding a potential litigation case, I Googled it.

Q   Okay.  And what is your understanding of Daubert?

A   So this was -- I read it a while ago.  I can't quote the case but it talks about methodology -- methodology rigor and being able to -- sorry, I'm paraphrasing -- source and have a chain of custody, I believe.  Something to that

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

effect on how you represent information.

Q   And is your entire understanding of what Daubert stands for based on your own Google search?

A   Yes, based on my own reading, correct.

Q   Okay.  You're not a lawyer?

A   No, I'm not.

Q   Do you hold yourself out as an expert on the Daubert standards?

A   Not at all.

Q   So when your ninth opinion states that the methodologies employed in this analysis meet established standards, you have no expertise in determining what meets Daubert standards, right?

A   Outside of what I read, no.

Q   Outside of what you read on Google?

A   Well, actually, outside of what I read on the U.S. Justice website.

Q   Okay.  You have no independent experience other than having read the case?

A   Correct.

Q   And you talk about Daubert in paragraphs 100 to 106 of your report.  And you write:

(As read):

"Under the Daubert standard and its progeny, Courts evaluate expert

Page 163

methodology based on several criteria."

What is your understanding of Daubert progeny?

A   So it is the case -- the components, based on what I downloaded and read from the U.S. -- U.S. Justice's website.

Q   Okay.  And you wrote that sentence, "under the Daubert standard and its progeny"?

MR. FRITZ:  Objection.

THE WITNESS:  Yes.

BY MS. GOVERNSKI:

Q   Okay.  And would it surprise you that GPTZero predicted this paragraph also to be 100 percent likely to be AI?

MR. FRITZ:  Objection.

THE WITNESS:  Okay.  Is it the word "progeny" that's -- I'm sorry.  I'm confused about that.  It's a case and then it's the word "progeny" added onto it.  So I'm not sure what would be generative AI about that.

BY MS. GOVERNSKI:

Q   I'm just trying to understand how you came up with the sentence:

(As read):

"Under the Daubert standard and its

Page 164

progeny, Courts evaluate expert methodology based on several key criteria."

A   I mean, it's --

MR. FRITZ:  Objection.

THE WITNESS:  Again, I probably read it on the Justice's website.

BY MS. GOVERNSKI:

Q   Okay.  And I don't understand why you were offering an opinion on whether your methodology meets Daubert's standard if you're not an expert in Daubert.  Can you please explain?

MR. FRITZ:  Objection.

THE WITNESS:  So I added that in specifically to ensure that I, my work, would meet the criteria that would be relevant for the report itself.

BY MS. GOVERNSKI:

Q   Even though you have no expertise in the Daubert standards?

A   Outside of what I read, no.

Q   Okay.  What is your understanding of what your assignment was in this case?

MR. FRITZ:  Objection.

You can answer again.

Page 165

THE WITNESS:  So -- excuse me.  So my assignment was to -- as a rebuttal expert, was to review the plaintiff's experts -- well, select expert reports and offer my perspective on if the inferences made on the reports were accurate.  If there were areas that I would say made sense, didn't make sense, answering questions around specifically is a campaign inorganic or organic, and offering any additional context in regards to Dr. Mayzlin's report or Dr. Humphrey's report.

BY MS. GOVERNSKI:

Q   Were those terms, "organic" and "inorganic" specifically used when discussing your assignment with you?

A   That term --

MR. FRITZ:  Hold on.  Hold on.

To the extent your -- extent the question and your response is calling for the disclosure of information that would be protected by the attorney-client privilege, I would instruct you not to answer.  And that is how I understood the question.

BY MS. GOVERNSKI:

Q   What is your -- you used the terms "organic" and "inorganic" to describe your

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

assignment, right?

A   I did, yes.

Q   Okay.  And you understood that your assignment was to make the determination between organic and inorganic, those specific words?

A   So that was not the charge.  I used that based on the way that I looked at the analysis.

Q   Okay.  What was the charge?

A   Excuse me.  The charge was to --

MR. FRITZ:  Objection.

You can answer again.

THE WITNESS:  The charge was to read through Dr. Mayzlin's and Dr. Humphrey's reports and offer any perspective as a rebuttal witness to see if the outcomes, the inferences that they made or the way that they analyzed the data was accurate or inaccurate.

BY MS. GOVERNSKI:

Q   And that was the entire scope of your assignment?

A   Yes, that was the charge I was given.

Q   Okay.  So when did you receive the expert reports that you were assigned to rebut?

A   I'm not sure of the exact date.  I know there was only about two-and-a-half-weeks turnaround

Page 167

time for November 3rd.  So I would say November 3rd, backing that out by two and a half weeks.

Q   Yeah, like October 17th is, I believe, the date that the experts were served, so that sounds about right.

So did you start -- so did you and Ms. Hunter start your data analysis before that time or only after you received the reports?

A   After we received the reports.

Q   What is your experience with Dr. Mayzlin?

A   I don't know Dr. Mayzlin.

Q   Have you ever met Dr. Mayzlin?

A   No.

Q   You cite in your report an article by Dr. Mayzlin.  Do you recall reading an article that she wrote?

A   I do.

Q   Okay.  Tell me about it.

Page 168

MR. FRITZ:  Objection.

THE WITNESS:  I can't recall the name of the article.  It's in my report as a footnote.  I originally read through the article and was going to use it within the context of my report.  I decided not to, and I removed the -- the commentary but left the footnote.

BY MS. GOVERNSKI:

Q   And you didn't list that, actually, in your Appendix C C.  Why is that?

A   Because I didn't end up using the -- her article.

Q   But you read her article --

A   I did.

Q   -- in THE context of preparing your report?

A   Yes, I read the article.

Q   And who told -- sorry.  Strike that.

How did you decide that you didn't need to list it in Appendix C C?

A   To my understanding, the materials relied upon was the materials that I relied upon for the final report.  So based on the content that was in that report.

Q   So it's your testimony that your

Page 169

Appendix C C does not include everything that you've reviewed in the course of preparing your report but only the things that you determined you would rely upon?

MR. FRITZ:  Objection.

THE WITNESS:  Correct.  I believe, yes.

BY MS. GOVERNSKI:

Q   So why did you cite the Mayzlin study and then keep the citation in your report, but then not list it in your materials considered?

MR. FRITZ:  Objection.

You can answer again.

THE WITNESS:  I'm sorry.  Could you just repeat the question?

BY MS. GOVERNSKI:

Q   Yeah.  It's your testimony that you didn't list it in Appendix C Appendix C because you didn't rely on it, but you still cite it as support in your report.  So I'm trying to understand why you included it as a citation.

MR. FRITZ:  Objection.

THE WITNESS:  Because I don't cite it in my report, I should have removed the footnote when I removed the copy from the report.

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

BY MS. GOVERNSKI:

Q   Okay.  So the footnote that says you relied on Mayzlin is inaccurate?

MR. FRITZ:  Objection.

THE WITNESS:  Exactly.  It's an echo.

BY MS. GOVERNSKI:

Q   How many footnotes in your report did you not actually rely on?

A   So having gone through it, Dr. Mayzlin's specific paper was the only footnote that was left that was inaccurate.

Q   Okay.  So there were other footnotes that were not included in Appendix C C but are still included as footnotes.  Why is that?

MR. FRITZ:  Objection.

THE WITNESS:  I'm not sure I understand what you're asking.

BY MS. GOVERNSKI:

Q   There are six other footnote citations that reflect publications that are not otherwise listed in Appendix C C.  Why is that?

MR. FRITZ:  Objection.

THE WITNESS:  I do not know.

BY MS. GOVERNSKI:

Q   So how are we supposed to know what you

Page 171

relied on based on certain materials cited and certain materials not being included in your Appendix C?

MR. FRITZ:  Objection.

THE WITNESS:  Should be from my Appendix C and from my footnotes.

BY MS. GOVERNSKI:

Q   Okay.  But in some cases, what is in footnotes actually is not something you've relied on?

A   The only example of that is Dr. Mayzlin's report -- article.

Q   Why didn't you remove that footnote?

MR. FRITZ:  Objection.

You can answer again.

THE WITNESS:  It was -- again, it was a bit of an echo from versioning, so it should have been removed.

BY MS. GOVERNSKI:

Q   What does an "echo" mean?

A   It means that it wasn't taken out when the content itself was removed.

Q   What content did you remove?

A   I don't remember the specific way that I positioned it, but it was in one of the draft

Page 172

versions.

Q   Okay.  And when you cite the four expert reports, Dr. Mayzlin, Dr. Humphreys, Mr. Culotta, and Mr. Kinrich, did you review only the expert reports or did you also review their underlying data?

A   I reviewed -- I reviewed some of the data packages, yes.

Q   Okay.  So what data packages did you review?

A   I'm sorry -- so the ones that were given to me as part of their expert submission, I reviewed.

Q   Okay.  So you reviewed all of the backup?

A   That was provided to me, yes.

Q   Okay.  And did you review all of the backup data?

A   I personally read through it, yes.

Q   All of -- well, read through it, but I'm talking about the actual data.  Did you -- did you personally review all of the data in their backup materials?

A   Dr. Mayzlin's, yes.  Dr. Humphreys', yes.  For Culotta and Kinrich, I don't remember the data packages.

Page 173

Q   Okay.  And did you review all of the materials that any of these experts cited in their reports?

A   Did I review each of the articles that were cited, no.

Q   Did you review any of the articles that they cited?

A   Yes, some.

Q   So if there were articles that they cited that you reviewed, did you list them in Appendix C?

A   No, because they were part of the experts' submissions.  So for instance, with Dr. Mayzlin, she provided a myriad of different academic articles.  I may have reviewed some of them, for instance, as -- as part of my job of reviewing the experts' submissions.

Q   How are we supposed to understand which ones you reviewed and which ones you didn't?

MR. FRITZ:  Objection.

THE WITNESS:  So to my knowledge, it was my job to review all of the experts' submissions, but relying on them for my report is different.

BY MS. GOVERNSKI:

Q   So if you didn't list it in Appendix C, then it's your testimony that they are irrelevant to

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

your report?

MR. FRITZ:  Objection.

THE WITNESS:  It means I did not rely on them for my report.

BY MS. GOVERNSKI:

Q   What does that mean to you, "not rely on them"?

A   I did not take the content or context into regard into my report.

Q   Okay.  So you said that you reviewed Dr. Mayzlin's dataset.  How many pieces of social media items do you understand that Dr. Mayzlin reviewed for purposes of her report?

A   She listed 1.1 million, approximately.

Q   Okay.  And you testified that you've reviewed all of them?

MR. FRITZ:  Objection.

THE WITNESS:  I'm not sure what you mean by that, so could you clarify?

BY MS. GOVERNSKI:

Q   Well, you testified that you reviewed all of the data that Dr. Mayzlin provided.

A   Yes, I looked through the dataset.

Q   Okay.  So did the dataset include all of the social media items that comprised her report?

Page 175

A   I did not go into each individual line of data -- like, row of data and read them verbatim.

Q   Okay.  Your dataset is 96 percent smaller than Dr. Mayzlin's, right?

MR. FRITZ:  Objection.

THE WITNESS:  My dataset is 44,000.

BY MS. GOVERNSKI:

Q   And that's 96 percent smaller than 1.1 million, right?

MR. FRITZ:  Objection.

THE WITNESS:  44,000, is my dataset. Yeah.

BY MS. GOVERNSKI:

Q   Okay.  Well, can you explain how you can be confident that your dataset is representative when Dr. Mayzlin's is 96 percent larger?

A   Size is not a signifier of accuracy or -- of accuracy, I would say.

Q   Right.  So I'm asking how could you ensure that your 43,992 posts were a representative sample?

MR. FRITZ:  Objection.

You can answer again.

THE WITNESS:  Yeah, so I would say representative is extremely difficult.  I would

Page 176

actually argue that neither my dataset nor Dr. Mayzlin's set is representative of the overall universe that encompasses Blake Lively during the given periods of time that we looked at because it's physically impossible, based on the data that is available to either of us.

BY MS. GOVERNSKI:

Q   Understood.  So you cannot, as you sit here today, represent that your dataset is representative of the full dataset that would be reflective of the Blake Lively-related content during this time period?

MR. FRITZ:  Objection.

You can answer again.

THE WITNESS:  So "representative" would first have to be defined.  Representative of the entire mass of data for any given time period, no one's dataset is representative unless you're looking at a social media platform looking at their own data.  So anybody with access to second-party or third-party data, which would be any of the experts involved in this trial, would not have access to representative data based on the entire universe.

BY MS. GOVERNSKI:

Q   I'm asking you specifically about your

Page 177

report, so if you can stay focused on yourself and your own dataset.

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q   How would you define "representative" in the context of your report?

A   So I wouldn't define representative in my report because "representative" isn't necessary for the data analysis.

Q   Okay.  So what does your dataset -- what is your dataset comprised of?  What does it show?

MR. FRITZ:  Objection.

THE WITNESS:  It shows five different social media networks.  So I was representative from the diversity of the social media platforms that I looked at, which was higher than Dr. Mayzlin's, for instance.  I looked at X, Reddit, Instagram, YouTube, and -- sorry.  I'm missing one.  Sorry, I'm blanking on the fifth one.

BY MS. GOVERNSKI:

Q   But what is -- it's just representative of what posts hit on the search terms; is that what it's representative of?

A   So I'm going to not use the word "representative" because I think we need to define

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

what representative means.

My data is based on the keywords that were accessible for public -- public posts, similar to, again, anybody not using first-party data.

Q   Okay.  Well, how would you use the term "representative" generally in your everyday life?

MR. FRITZ:  Objection.

THE WITNESS:  Representative in my everyday life?

MR. FRITZ:  Hold on.  Do you mean as a verb or a noun?

BY MS. GOVERNSKI:

Q   Answer the question as you understand it.

MR. FRITZ:  Go ahead.

THE WITNESS:  So having a research background, I would use representative in the context of does this represent the majority of individuals within a class, a segment, a majority, a minority, or the majority of information available.

BY MS. GOVERNSKI:

Q   Okay.  Is it your testimony that your dataset meets your definition of "representative"?

MR. FRITZ:  Objection.

You can answer again.

THE WITNESS:  My dataset and no one

Page 179

else's dataset, unless it's a first-party, would be representative of the keywords around Blake Lively.

BY MS. GOVERNSKI:

Q   Okay.  So just speaking about your dataset, I just want to make sure I understand.  Adopting your definition of "representative," it's your testimony that your dataset is not representative of the majority of the individual statements about Blake Lively during this time period?

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q   Is that right?  I just want to understand what your testimony is.

MR. FRITZ:  Same objection.

THE WITNESS:  It's not possible for a dataset to be, quote, unquote, representative of all of the social media discussion around Blake Lively, unless you are a first-party that is -- has access to that data, such as Twitter, Instagram, Facebook, et cetera.

BY MS. GOVERNSKI:

Q   Okay.  So if you are a scientist and you're conducting an experiment, don't you need to create a representative sample?  Otherwise, what is

Page 180

it that you're trying to conclude?

MR. FRITZ:  Objection.

THE WITNESS:  So when looking at social media data, it's not about a representative sample; it's about a statistically significant sample.  Because keywords, in and of themselves, means that you're not looking at a representative sample because you are only using a specific amount of keywords.  There are a myriad of different combinations that represent Blake Lively globally across social media.  There's also accounts that are inaccessible by any second-party individual trying to look and analyze data.

BY MS. GOVERNSKI:

Q   So if you were to identify an entirely separate set of 43,992 social media items, like entirely separate, there's no overlap between the two, how do you know the results would be the same?

A   Again, the question would be what is the second set of data about.

Q   Well, you said that you can't possibly identify everything, even if it hits on search terms, right?

MR. FRITZ:  Objection.

THE WITNESS:  No one -- no one can,

Page 181

that's not first-party.

BY MS. GOVERNSKI:

Q   Right.  So what if someone else searches for 43,992 using search terms and that came up with a different dataset than the 43,992 that were part of your dataset, how could you guarantee that the results would be the same?

MR. FRITZ:  Objection.

THE WITNESS:  So by replicating the subscription that I referenced, so Apify in this case, by representing the prompts that I -- or the keywords that I used when inputting them into Apify for the same time period, they are replicable based on, again, that criteria.

BY MS. GOVERNSKI:

Q   Okay.  So but -- so it's your testimony that the 43,992 represents the entire universe of all social media items that hit on your keywords?

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q   Is that -- is that your testimony?

A   I'm sorry.  Can you repeat that?

Q   Yeah.  Is it your testimony that the 43,992 items represents the universe of all social media items that hit on your search terms?

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

A   The dataset that I reference, as part of my expert report, is the complete dataset that I was able to receive from Apify, based on doing the analysis.

Q   Okay.  So what if someone else was able to use a different Apify tool and come up with 43,992 items that are not duplicative of your dataset?

MR. FRITZ:  Objection.

You can answer again.

MS. GOVERNSKI:  I didn't finish the question.

MR. FRITZ:  Okay.

BY MS. GOVERNSKI:

Q   How do you know that the outcome would be the same?

MR. FRITZ:  Same objection.  And also, compound.

Go ahead.  You can answer again.

THE WITNESS:  So couple of things.  The first part of the question is, in order to use the same tool, they would have to use the same inputs, and they would have access to the same underlying dataset through Apify.  So if that is done then --

MS. GOVERNSKI:  That's not what my

Page 183

question is.  I'm sorry to interrupt, but I just want to make sure you're answering what my question is --

(Cross talk.)

MR. FRITZ:  Excuse me.  Then don't interrupt her.  Let her finish, and if you have a follow-up, then ask.

Finish your answer, Ms. Alexander.

THE WITNESS:  If someone were to replicate the process that I went through, through the tool that I went through, using the exact same methods that I did, they should receive -- during the same time period, they should receive the same outputs from Apify that I received.

BY MS. GOVERNSKI:

Q   That's not my question, though.

If someone used a different tool on Apify that identified an entirely different dataset than the one that you identified, but also which hit on your search terms, how can you guarantee that the results of your study would be the same as the study of that other dataset?

MR. FRITZ:  Objection.

You can answer again.

THE WITNESS:  That's a lot of

Page 184

hypotheticals that I am not able to answer.

BY MS. GOVERNSKI:

Q   Okay.  Let's make it not a hypothetical.

You know Dr. Mayzlin's set includes more than a million social media items, right?

MR. FRITZ:  Objection.

THE WITNESS:  Her dataset includes 1.1 million, yes.

BY MS. GOVERNSKI:

Q   How do you know that applying your methodology to her dataset would result in the same outcome?

A   I'm sorry.  Could you repeat the second part of that question?

Q   If you were to run Dr. Mayzlin's --

MR. FRITZ:  Could I make a suggestion?

MS. GOVERNSKI:  No, you can't.  I'm in the middle of a question.

MR. FRITZ:  I'm sorry.  If she's telling you she doesn't understand the question --

MS. GOVERNSKI:  I'm rephrasing it.

MR. FRITZ:  Excuse me.  And she's explaining to you why she doesn't understand it, I'd suggest you wait until she's finished so you completely and fully understand why she's confused.

Page 185

MS. GOVERNSKI:  We're going to go off the record.  Off the record.  I'm going to call the Court about speaking objections.  So let's go off the record, please.

MR. FRITZ:  Go ahead.

THE VIDEOGRAPHER:  We're off the record.  It's 2:53 p.m.

(Recess.)

(Whereupon, a conference call was had with the Court which has been transcribed and bounded in a separate transcript.)

---0o0---

THE VIDEOGRAPHER:  We are back on the record.  It's 3:58 p.m.

MS. GOVERNSKI:  Ms. -- Ashley, do you mind repeating back the last question I asked?

THE STENOGRAPHIC REPORTER:  Okay.  If you give me a few minutes, I have to go all the way back --

MS. GOVERNSKI:  Oh, no.  That's okay.  That's okay.  I'm good.

BY MS. GOVERNSKI:

Q   Ms. Alexander, I was asking you if applying the methodology from your report to the dataset in Dr. Mayzlin's analysis would lead to the

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

same conclusions?

A That is -- that is not something that I would be able to say.

Q Why is that?

A So Dr. Mayzlin used an LLM in order to get to her outputs. I cannot replicate, based on what she's given me, the outcome -- of how she's been able to get to those outcomes because it's an LLM. If I were to use my dataset -- I'm sorry. If I were to use my prompts or queries in an LLM, specifically the one that she used, I'm not sure how it would come out.

Q Okay. But I'm asking if you were to apply whatever methodology you applied to draw conclusions about your dataset, if you applied your methodology to her dataset, would the outcome be the same?

MR. FRITZ: Objection.

THE WITNESS: I would assume not because they are different raw datasets.

BY MS. GOVERNSKI:

Q Right. So the outcome of your methodology depends upon what your dataset was comprised off?

A Outcomes of any analysis comes from the

Page 187

underlying raw data.

Q And if we were to take 43,000 of the social media items from Dr. Mayzlin's dataset that was not part of the 43,000 data items in her -- in your dataset, you would not be able to determine, with any certainty, what the outcome would be; is that right?

A So because Dr. Mayzlin used an LLM, even if she were to use the same prompts, again, for instance, the outputs would be different because it is an LLM that she used. So it's hard for me to say if my data was applied within that LLM, what the output would be.

Q But I'm asking about your methodology that you applied. If you were to apply your methodology to another 43,000 media items that were not part of your dataset, would your opinions be the same?

MR. FRITZ: Objection.

THE WITNESS: I wouldn't be able to say that until I do the actual analysis.

BY MS. GOVERNSKI:

Q Okay. So your opinions are solely based on these 43,000 social media items?

MR. FRITZ: Objection.

Page 188

THE WITNESS: So my outputs are based on the analysis that I did, based on the APIs that pulled raw data from each of those five platforms. So I'm taking the data, based on the time frame, the queries I provided, and I'm doing analysis of that raw dataset.

BY MS. GOVERNSKI:

Q Right. Analysis of the 43,992 items that comprised your dataset?

A Correct.

Q In your report, you list -- you list eleven opinions. Are those all the opinions you intend to offer in this matter?

A Yes, that's everything I included in the report.

Q You don't intend to offer any other opinions that are not listed in your report at page -- at the section on your opinions, right?

A Not based on any of the data that I've already looked at. If new information comes into play, then I can assert additional opinions. But based on everything, all the research I've done, the analysis, those are my opinions.

Q So today as you sit here, the opinion section in your report reflects all of your opinions

Page 189

that you are offering in this case?

A Yes, based on everything that is in the report, those are my opinions.

Q Okay. Are there any opinions that are not offered in your report that you are offering in this case?

MR. FRITZ: Objection.

THE WITNESS: If new information were to come to light or additional information were to come to light after the report, then I may have additional opinions. But everything that I've offered is based on the research that I've done.

BY MS. GOVERNSKI:

Q I understand, in the future, you may supplement. But I'm trying to just get at a very basic question.

Are there any opinions, as you sit here today, that you are offering that you did not articulate in your current amended report?

A No, there are not.

Q Okay. Thank you. You use the term "organic" nearly 90 times in your report. Does it mean the same thing every time you use the term?

A I try to stay consistent with my use of "organic," so I would have to confirm each of the

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

times I've used it.  But in general, yes, there should be consistency with the underlying definition of the term.

Q   Okay.  What is the underlying definition of the term "organic"?

A   So I look at organic as being a -- signatures of non-manipulative traffic usage, et cetera.

Q   And what does "non-manipulative" mean?

A   Basic users talking, commenting, liking, upping content across social media platforms.

Q   Okay.  And you use the term -- actually, does the term "organic," is that definition rooted in any academia?

A   I don't know how it's rooted in academia.  It's rooted in practice as a term that is used daily.

Q   Okay.  So as you just defined, organic is based on your own definition of the term?

MR. FRITZ:  Objection.

THE WITNESS:  The way that I defined it was based on industry definition of the term.

BY MS. GOVERNSKI:

Q   What industry?

A   Social media technology.

Page 191

Q   Okay.  So what is your basis for stating that social media technology as an industry uses the term "organic" the way that you just described it?

A   Having worked in technology and social media --

Q   Okay.  So it's based on --

A   -- going to conferences -- sorry.

Q   No, no.  You go.  I'm sorry.

A   Having spoken at industry conferences on the topic, having written a book using that verbiage, yes.

Q   And your report uses the term "legitimate news cycles."  What did -- what did you mean when you use the term "legitimate"?

A   When I say "legitimate news cycles," I meant news that does not contain misinformation.  So there are legitimate news cycles on the -- not the book, excuse me -- the movie launching, that is a legitimate news cycle.  The movie exists, the movie launched, and there was news around that movie launch.

Q   So what about news about how the film was marketed; would that be considered legitimate?

MR. FRITZ:  Objection.

THE WITNESS:  So marketing activity would

Page 192

be considered legitimate when it comes to PR, press coverage, because, again, it's things that are taken from interviews with actors, actresses, producers, whomever is involved in the film.  There is news coverage by a slew of different media sources, things of that nature.

BY MS. GOVERNSKI:

Q   Okay.  And so does it matter what the content of the communication is?  If it's solely about marketing, it's legitimate irrespective of what the contents is?

A   I'm not sure I understand.  Are you saying if the content is paid marketing or organic marketing?

Q   No, let's say -- let's do a hypothetical.  Someone says something about the marketing of the film that turned out not to be true.  Would that, in your opinion, be considered legitimate because it had to do with marketing even though it was not a truthful statement?

A   So based on what I understood the question, I wouldn't call that marketing, number one, because that's not the marketing of the film.  That would be commentary around it.  So it could be -- I don't know -- something happened in the news

Page 193

that had nothing to do with the film or the actors, actresses, et cetera.  So that, in and of itself, could have legitimate properties or it could have illegitimate properties, depending on where it came from.

Q   What if an actor was talking about the marketing of the film; would that be legitimate or not legitimate?

A   If they were talking about the marketing of the film and they were being honest, then I would say yes, that would be legitimate.  Alternatively, if they were saying something that was untrue knowingly, it could be misinformation.

Q   So how do you tell what is legitimate or illegitimate?  It sounds a little bit subjective.

MR. FRITZ:  Objection.

THE WITNESS:  Well, one way is by simply looking at is this true or is this not true.

BY MS. GOVERNSKI:

Q   And so you would have to do that at a post-by-post analysis?

A   To look at if something was legitimate as part of a news cycle?

Q   Uh-huh.

A   So there would be additional patterns.

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

Because, again, just because you say something, doesn't mean that it's going to get scale. So if it got scale and it was true, right, there would be other ways to identify, number one, if it's true, and if the origins was an individual saying it, a press release, whatever the case may be, and vice versa.

Q   Okay. So is there like a scientific way to determine if something is part of a legitimate news cycle or an illegitimate news cycle?

A   So there is a way to identify misinformation. If you want to identify if something is true regarding a news cycle, usually you look at things of credibility of who disseminated it, you look at confirmation of that dissemination or the story. So in other words, did the New York Times publish it, and then, subsequently, did AP News publish it. So there is a collective mentality of, the assumption is that not every major news outlet would knowingly publish incorrect information.

Q   Well, what you just described seems like a pretty subjective process.

MR. FRITZ: Objection.

THE WITNESS: I'm sorry.

Page 195

(Audio interruption.)

THE WITNESS: Sorry. Was that a question?

BY MS. GOVERNSKI:

Q   What was that?

A   You just -- you just -- for some reason you knocked my Google Home. Sorry.

Q   Okay. Is your Google Home turned on?

A   My Google Home is always turned on. Everything -- yes, it's turned on.

Q   Is it providing you feedback on the deposition?

A   No, it's -- no, it's not. Like, usually, you should have to say -- I won't say it, but usually you have to say the prompt.

Q   Say the prompt?

A   Yes.

Q   Okay. So I'm specifically focused on the words "legitimate" versus "not legitimate." Is there a scientific definition of legitimacy?

MR. FRITZ: Objection.

THE WITNESS: There may be. I don't know what the scientific definition would be.

BY MS. GOVERNSKI:

Q   Okay. And you don't know -- I'm sorry.

Page 196

Strike that.

Are you an expert on what is legitimate or not legitimate in terms of news cycles?

MR. FRITZ: Objection.

THE WITNESS: So I have done work on legitimate and illegitimate around social media in conjunction with news cycles and politics.

BY MS. GOVERNSKI:

Q   Okay. So can you explain how you are an expert in determining whether a news cycle is legitimate or illegitimate?

A   So I have looked at Discourse across different news cycles. Specifically the one I'm referencing right now is in conjunction with politics. And looking at stories -- or coverage stories that were seeded versus not seeded for different political gains and dissecting if those news stories were true or false and if they were -- how do you say -- if they were manipulative within the context of how they were planted across Meta's network.

Q   It sounds like a lot of the determination between whether something is legitimate or illegitimate depends on whether the content is true or false; is that right?

Page 197

MR. FRITZ: Objection.

THE WITNESS: It's one factor, but it wouldn't be the only factor.

BY MS. GOVERNSKI:

Q   Well, what are some other factors?

A   If something is true or false. If something -- sorry. If something had been boosted, for instance. Sorry, I can't think of how else to say that. Increased in its popularity based on manipulation. Also if something is true, but it's contextually positioned. So it's not wrong, but it's contextually positioned as inaccurately.

Q   And those are all examples of things that are -- news cycles that would be illegitimate, right?

A   Correct.

Q   Your first opinion in this case refers to a time frame of August 2024 through February 2025. And that's a six-month period. Is your first opinion limited to that specific time frame? I'm happy to share.

A   Can you just --

Q   Of course. Let me go up to the top so you can see what I'm in. I'm in -- wait, what did we look at? B1? I just want to make sure that

50 (Pages 194 - 197)

CONFIDENTIAL

Page 198

we're oriented that this is your latest report. Here, right? B2, this is your latest report, right?

A   Yes, number 2, Exhibit 2.

Q   Yup.  Exhibit 2, exactly.  So if we can go to paragraph 22.  Oh, actually, I want to go to the opinions.

Opinion 1 is right here:

(As read):

"The social media activity surrounding Ms. Lively during August 2024 through February 2025 exhibited patterns consistent with organic public discord driven by legitimate news cycles, film publicity, and entertainment media coverage."

Do you see that?

A   Yes.

Q   Oh, and you use the term "coordinated manipulation" and "astroturfing."  So I would like you to explain those one by one.

A   So coordinated manipulation is similar to what we talked about before.  It can either be through technology or, less frequently, through coordinated human ways of manipulating data.  So from a bot perspective, specifically manipulative

Page 199

bots, because there are bots that are not manipulative that are used every single day, to also, you know, having a coordinated group of individuals or humans, you know, make something either more positive or more negative based on -- based on coordinated activity.

Q   Okay.  It sounds like that is similar to how you define illegitimate news cycles, film publicity, and entertainment; is that right?  That's kind of the opposite of legitimate news cycles, film publicity, and entertainment media coverage?

A   I believe so.

Q   Okay.  What is "astroturfing"?

A   Astroturfing, to my understanding, is similar to manipulative behavior.  Astroturfing isn't a term that I use normally.

Q   So why did you use it in your report?

A   So specifically, I used it because it was used in Dr. Mayzlin's report, so I wanted to use similar terminology.

Q   Okay.  But do you have any independent expertise in astroturfing?

A   Yes.  Astroturfing is a different word, but it's the same underlying behavior of manipulative, legitimate or illegitimate work that

Page 200

is done in a coordinated effort either through bots or through human activity.  It's a different coined term.

Q   Okay.  And how do you know that the way you define astroturfing is the way that Dr. Mayzlin defines astroturfing?

A   I believe it's an inference from reading through her report and the contextualization in that report.  Also, I understand the general term of astroturfing outside of both of our reports.

Q   Okay.  So opinion 1 says that you looked at social media activity between August 2024 through February 2025.  So is this opinion limited to that time period?

A   This opinion, yes.  I looked at larger datasets, but this particular opinion is based on that time frame.

Q   So that was my next question.  Why did you collect from a broader time period but limit this opinion solely to the more narrow time period?

A   Because I didn't have enough volume of data in order to offer that opinion through the larger frame of time that I was hoping to look at.

Q   So why didn't you just use Dr. Mayzlin's data?

Page 201

A   So I couldn't replicate Dr. Mayzlin's data, first of all.

And secondly, using someone else's data just point blank without ensuring that, number one, I could reproduce it.  Number two, that the data is, you know, accurate of that time period, doesn't really make sense.  So I specifically wanted to pull raw data from the social media platforms themselves to analyze.

Q   So you have no idea -- well, you use the term -- what did you just say?  Accurate -- you just used the term "accurate of the time period," is that the term you used?

MR. FRITZ:  Objection.

THE WITNESS:  I'm not sure what I just said.  I'm not sure if it was accurate or -- number one, her data, it wasn't reproducible based on what I was given.  Secondly, it was -- to ensure that the data was -- I'm going to use it in a different way than we used it earlier -- representative of the actual raw data during the time frame.

BY MS. GOVERNSKI:

Q   Okay.  So how -- based on the way you just used it, how did you ensure that your data was representative of the actual raw data from the time

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

period?

A   It was pulled directly from the social media platforms, from their raw datasets.

Q   Okay.  So you don't know one way or the other whether Dr. Mayzlin's data was representative of the actual raw data from the time period?

A   There is no way to tell because she used an LLM.

Q   Right.  So you can't tell one way or the other whether her data was representative of the time period?

MR. FRITZ:  Objection.

THE WITNESS:  I cannot tell if her raw data is accurate of the time period that she has, no.

BY MS. GOVERNSKI:

Q   Okay.  So when you said there was not enough, not sufficient social media activity after February 2025, what was that based on?

A   So what I said was, for this particular opinion, there wasn't enough volume of data in order to derive an insight outside of this time period.

Q   What volume of data would you have needed?

A   It would have to be consistent across all

Page 203

five of the networks.  So there should be an even sample across all networks in order to make an opinion after this time frame.

Q   Why do you need an even sample across all the networks?

A   So it doesn't have to be exactly the same, but there has -- it has to be proportional.  So ideally, I would have had more of two of the networks, which I did not just based on availability, I guess, through Apify.  So I used the data that I felt was the most -- the most substantive and without making any assumptions on smaller datasets.

Q   Okay.  But you said there wasn't enough volume, so do you have a ballpark of how much volume you would need for the period after February 2025?

A   I don't know offhand.  It would -- I would have to go back and crunch the numbers.

Q   So what I'm confused about is why didn't you just accept Dr. Mayzlin's dataset for whatever value it has and run your analysis on that?

MR. FRITZ:  Objection.

THE WITNESS:  So I didn't accept it at face value, and nor should anyone just accept data at face value.  What I did was, I first tried to

Page 204

replicate the dataset, based on the prompts that she gave.  I was not able to do that.

BY MS. GOVERNSKI:

Q   But my question is:  Why didn't you just run your methodology, your sentiment analysis on her dataset to see if you had a valid methodology?

MR. FRITZ:  Objection.

THE WITNESS:  Well, the methodology itself is valid, it's peer-reviewed, it's all methodology that you would run in academia, as well as in practitioner spheres of doing regression analysis, doing sentiment analysis, so my methodology is not something that is new form by any means.

BY MS. GOVERNSKI:

Q   But my question is -- if you could please just answer my question -- why didn't you run that methodology on Dr. Mayzlin's dataset?

MR. FRITZ:  Objection.

THE WITNESS:  Because I did not -- in order to run the methodology on anyone's dataset, you'd first have to ensure that the dataset itself was, I'm going to say, accurate, or -- or representative based on the time frame, which is why you try and repeat to make sure that you're able to

Page 205

pull the same data.  And then if I was able to pull the same data, I would have then run the methodology on that dataset.

BY MS. GOVERNSKI:

Q   Okay.  So how did you ensure that your dataset was representative based on the time frame, as you just used those words?

A   I pulled it through Apify, and I made sure it was -- all of the keywords that were available -- that I plugged in that were available during the time frame that I stated in the report, and that there was enough data, based on total volume, in order to analyze it.

Q   What was the total volume?

A   I would have to -- I would have to look at the report, but it was 44,000 unique records.

Q   So how did you know that 44,000 represented the universe of what you've called accurate information from the time period?

MR. FRITZ:  Objection.

THE WITNESS:  Because it's pulled from the raw data across all five of those platforms.

BY MS. GOVERNSKI:

Q   So it's your testimony that there were only 44,000 social media items between January 2024

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

and October 2025?

MR. FRITZ: Objection.

THE WITNESS: The dataset that I provided is what came back from the data scrapes, and there is a myriad of different reasons for why the datasets could be different if you pulled it with additional keywords. For the keywords I used, so for the parameters, the query I put in and the time frame I put in, those were the ones that were available through Apify across the time frame.

BY MS. GOVERNSKI:

Q   Okay. Let's talk about what you did with Apify. Give me one second. Let me stop sharing my screen.

How did you come up with the search terms that you used?

A   I used terms that were relevant for Blake Lively and It Ends with Us and the movie title.

Q   How did you determine what terms were relevant?

A   I used terms that were general enough, but that I saw had a good amount of volume across Apify.

Q   Have you -- so okay. So for Reddit -- actually, one second. So tell me how you selected

Page 207

which specific scrapers to use. If we go -- actually, let's do it this way.

If you go to page 110 of your report, you list five specific data sources and tools. My question is whether what you list here reflects the universe of the scrapers that you used?

A   So sorry. Let me go to page 110, you said?

Q   Uh-huh.

A   There is -- Exhibit 2, there's only 109 pages.

Q   Oh, 109. Sorry. That changed. See where it says "Data Sources and Tools"?

A   Yes.

Q   Okay. So is this the universe of the scrapers that you used?

A   Yes.

Q   And how did you decide which scrapers to use?

A   So those were the scrapers for the particular social media platforms. So first, I decided which social media platforms I wanted to scrape. And after that, I selected the scrapers that were available through the API on Apify.

Q   So is it your testimony that this is the

Page 208

only, say, Instagram scraper that Apify provides?

A   It's the only one that was available to select, yes.

Q   Did you personally go to Apify to see if this was the only Instagram scraper?

A   I logged into Apify, yes. So I didn't validate Instagram specifically, but I logged in in order to see the options.

Q   Well, I'm asking specifically with Instagram. Did you personally verify that this is the only scraper for Instagram?

MR. FRITZ: Objection.

THE WITNESS: I verified the interface of Apify, and that, for Instagram, this is the scraper that was available to use. However, the scraper itself is scraping the API, which is the raw dataset on Instagram. So even if there are two scrapers, which there wasn't available, you're still scraping the raw dataset.

BY MS. GOVERNSKI:

Q   Okay. You separated your -- your opinion into different time periods. I want to focus on your baseline time period. Your baseline time period was May to July 2024, right?

A   Yes.

Page 209

Q   And so if I refer to "baseline," you'll understand I'm talking about that baseline?

A   Yes.

Q   Okay. And then when I refer to -- actually, let's go -- let's look at your report, Exhibit 2, and let's go to paragraph 32, which is on page 17, I think.

A   I'm sorry, could you repeat the number?

Q   Yeah, 42. I'm looking at 42 right here -- oh, no, I want to go to 32.

You see paragraph 32 --

A   Yes.

Q   -- that says:

(As read):

"The meta-analysis combined data from all 43,992 social media items."

You use the term "August 2024 spike." What did you mean by that?

A   That's the spike that you see in one of the charts, for instance. It means that we saw total volume of sentiment for that particular month increase with a statistical significance.

Q   Okay. So you mentioned statistical significance, and there is a 1,096 standard deviation. What does that mean?

53 (Pages 206 - 209)

CONFIDENTIAL

Page 210

A    So it is outside of the -- outside of the normal baseline amount.

Q    What does specifically the 1,096 standard deviation mean?

A    So I'm looking at the 1,191 items per month, and that means it's extraordinary -- extraordinarily statistically significant.

Q    So what specific data points did you use to determine that?

A    I'm sorry?

Q    What specific data points did you use to determine the standard deviation?

A    So I looked at the baseline period, which we already talked about, and the overall activity across all of the platforms combined.

Q    Okay. And did you use monthly or daily data for those three months?

A    That's monthly data.

Q    So why did you use monthly data?

A    Monthly data looks at things like the de-dupes. It looks at smoothing out. It removes usually oddities that come in on a daily basis. It's -- it normally is smoother and cleaner data than looking at a daily.

Q    What if, though, you -- the daily

Page 211

aberrations were important?

A    So daily wouldn't make a statistical significance looking at it daily or monthly because the monthly is still just looking at an average of the dailies. So you're not going to get massive skews one way or the other going from daily or monthly.

Q    Did you try it?

A    I didn't need to because I -- I know that looking at daily and looking at monthly, the same argument could be made why didn't I look at it yearly or quarterly. There is smoothing of the overall data by looking at it on a monthly -- a monthly basis versus the daily.

Q    So if you were only looking at three months, May, June and July, you had three data points that went into this analysis?

A    I had three months that went into it.

Q    Right. So that's three data points that you entered in order to reach your conclusion, right? A data point from each month, an average from each month?

A    It's an aggregate that rolls up into a monthly data point.

Q    And so isn't a standard deviation so

Page 212

close to the number indicative that the underlying data is variable?

A    I'm sorry. Can you repeat that?

Q    Isn't a standard deviation this high and this close to the total number of items indicative of variable data?

MR. FRITZ:  Objection.

THE WITNESS:  No would be my answer. It's indicative that there is a very high -- a very high -- I'm trying not to use word "deviation." There's a very high variance between the baseline and the output of the data.

BY MS. GOVERNSKI:

Q    So what does that mean because we're trying to look at the baseline?

A    Right. In this case, it's showing that the baseline is -- it's showing that the baseline is higher for these particular terms than, for instance, some other celebrity terms that you may identify. So in general, Lively starts at a higher baseline when compared to, arguably, other celebrities, actors, actresses.

Q    But you didn't disclose baselines for other actors or actresses?

A    No, I didn't --

Page 213

MR. FRITZ:  Objection.

THE WITNESS:  -- because I didn't need to -- oh, sorry. Oh, I thought Kevin said something.

MR. FRITZ:  I did. I just noted my objection.

You can answer.

THE WITNESS:  Because I didn't need to. That's, again, based on my knowledge of actually working with celebrities across social media and tracking individuals, whether they are brands or people.

BY MS. GOVERNSKI:

Q    How many times have you run a standard deviation before?

A    How many times have I done the calculation? Numerous.

Q    In the course of your career, how many times?

A    Over 25 years, I can't give you a number.

Q    Is it part of your day-to-day work?

A    It was part of my prior day-to-day work, yes.

Q    Prior, meaning at Meta?

A    At Meta, Ipsos, at Nielsen, which are all market research companies. And, again, market

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

research, standard deviation is a key element of doing massive research initiatives.

Q   And when you analyzed August 2024, you described that as "a spike." Why did you use those words -- or that word, sorry, "spike"?

A   I used that word because you have to look at a larger set of data across multiples months. And if something goes up dramatically, I would call that a spike.

Q   In fact, you've used the word "extraordinary" to describe the August 2024 spike, right?

A   I'm not sure if that's the actual word I used, but I will say yes, this was a significant spike.

Q   Okay. Well, let's go to opinion 2 of your report, which is in paragraph 169.

A   Yes.

Q   Okay. And if you can look at opinion 2, you say:

(As read):

    "The 4.9 statistical deviation, while
    extraordinarily, reflects organic
    news-driven interest rather than
    manipulated [sic] manipulation."

Page 215

    Do you see that?

A   I do see that.

Q   Okay. So what were you describing as extraordinary there?

A   The fact that it is an extreme spike.

Q   Okay. So you would describe the spike as extraordinary?

MR. FRITZ:  Objection.

THE WITNESS:  Yes, that's how I used the term there.

BY MS. GOVERNSKI:

Q   Okay. And what are "temporal patterns"?

A   So temporal patterns could be a myriad of different things. But basically, it's looking at the overall volume of something in order to understand if there is an observable irregularity.

Q   Okay. Are timing signatures the same thing as temporal patterns?

A   Timing signatures offer inputs into temporal -- sorry, that offers inputs into temporal patterns. If something occurs, like, over time as part of a norm, then something that would be an irregularity around timing would be everyone else, let's say, in a city posts around this time. So we see spikes outside of this time frame, which is an

Page 216

irregularity.

Q   Okay. And we talked about the five platforms that you looked at:  Twitter, YouTube, Instagram, Reddit, and TikTok. How did you pick those five platforms?

A   They are the five major social media platforms across the U.S.

Q   Did you do any research to determine whether there are any allegations that the defendants specifically used those five platforms?

A   No.

Q   So if it turns out that the defendants only used, say, one of these platforms, how would your analysis change?

A   I'm sorry. Just repeat that once more.

Q   If it turns out that the defendants only used one of these platforms, how would your analysis change?

A   My analysis wouldn't change based on that assumption.

Q   Why not?

A   So what I did was analyze real-life data. So I looked at five different sites specifically to detect any patterns because in order to have something be manipulative, there needs to be scale

Page 217

as one form factor, especially for social media. So looking at five different platforms instead of two or three, gives additional contextualization to understand if there is any oddities that we see in one network, two networks, three networks. Looking across five allows us just better analysis.

Q   Okay. You reviewed 2,039 items on Twitter, 16,000 items on YouTube, 6,000 on Instagram, 879 on Reddit, and 688 on TikTok; is that right?

A   I believe those numbers are correct, yes.

Q   Okay. So what if the only smear campaign were on Reddit and TikTok?

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q   How would your analysis be the same when you are including so many more items from the other platforms?

A   So sorry. I had to think about what you were asking. So if I'm looking at several different platforms, I analyze those platforms first individually and then part of the collective. So that's why I provide a meta-analysis as well as an individual analysis across each of the platforms. So if something was an oddity across one or two

55 (Pages 214 - 217)

CONFIDENTIAL

Page 218

platforms, then that would come up in the data itself that was analyzed.

Q   Okay.  So you use the term "meta-analysis."  What does that term mean?

A   It's an aggregate across all the platforms.

Q   Okay.  And who -- is that a term of art in your industry?

A   Is it a term of -- I'm sorry?

Q   A term of art.  Does it mean something specific in your industry?

A   Meta-analysis usually just means it's a high-level analysis across whatever you're looking at, examining.

Q   So across what in particular?

A   In this case, it's across five platforms.

Q   Okay.  And when you described earlier that your methodology was sound and rooted in academia, is that a meta-analysis that you were talking about?

A   So yes, looking at an aggregate is done in academia as well as in practitioner -- in practice.  So you look at different social media networks individually.  And then in order to do a larger analysis at the aggregate scale, you would

Page 219

then -- and maybe folks would call it different things, but it's called meta-analysis most of the time that I've interacted with it, whether, again, in academia or as a practitioner.

Q   Are you -- do you know who Professor Gene Glass is?

A   I don't think so.

Q   Have you ever heard of Professor Gene Glass?

MR. FRITZ:  Objection.

THE WITNESS:  The name sounds familiar, but I don't know.  It's not something that comes to mind, no.

MS. GOVERNSKI:  Okay.  My colleague will mark what will be Exhibit 7?  Am I up to 7?

THE STENOGRAPHIC REPORTER:  Yes, you are.  Exhibit 7.

(Exhibit 7 marked for identification.)

MS. GOVERNSKI:  Let me know when it's in there, and then we'll share it on the screen.

THE WITNESS:  I downloaded it.

BY MS. GOVERNSKI:

Q   Okay.  Great.  Oh, my gosh, my computer just turned off.  Okay.  If you can look at -- I'm sorry.  I'm having some technical issues.  I'm

Page 220

sorry.  I'm back.

If you look at the screen, in the -- it discusses the definition of "meta-analysis."

Do you see that?

A   I do.  From Karl Pearson, yes.

Q   Yup, and it says Gene Glass coined the term in 1976.

Do you see that?

A   Yes.

Q   So when you use the term "meta-analysis," is this the meta-analysis that you're talking about?

MR. FRITZ:  Objection.

THE WITNESS:  So let me see how they're describing it here, but several independent studies considered to be combinable -- yes.  At a high level, this would be the definition.  So looking at doing different analysis and having them be able to be aggregated.

BY MS. GOVERNSKI:

Q   Okay.  But what you just read said, "a meta-analysis is a statistical method that integrates the results of several independent studies considered to be combinable."

So what independent studies analyzing whether there was a coordinated campaign did you

Page 221

integrate?

A   So that specific definition I'm assuming in 1976 when it was coined probably meant a very specific thing.  The way that Meta analysis are used currently, literally from I would say 2022 up until the present, is looking at individual analysis of social media sites such as Instagram as a silo; Facebook as a silo; Reddit as a silo.

And then using the same time period, the exact same parameters or queries that you use would be classified as the individual studies.  And being able to roll that up would be the meta-analysis in aggregate.

Q   Okay.  Well, but this is from the Encyclopedia of Research Design, and you can see I pulled it on December 9th.  It's not purporting to define the term then.

Are you saying that this is not the way that meta-analysis is defined in the research world?

MR. FRITZ:  Objection.

THE WITNESS:  In the research world, we use it in the way that I just defined it.  Or the way that --

BY MS. GOVERNSKI:

Q   Okay.

56 (Pages 218 - 221)

CONFIDENTIAL

Page 222

A    Yeah.

Q    What authorities do you have for the way that you define meta-analysis?

A    We've used it at Ipsos.  We've used it at Nielson.  And this is not just in the U.S. but global studies in the U.S., China, parts of Asia for doing individual analysis across social media sites.  And then looking at making sure that certain variables hold true.  Which are things like the keywords or the parameters or the queries.  Looking at the exact same time frame, and aggregating and doing an overall -- a roll-up analysis.

Q    I see.  So as you used the term "meta-analysis,' it's based on what you've done in your career?

MR. FRITZ:  Objection.

THE WITNESS:  Yes.

BY MS. GOVERNSKI:

Q    But it's a different definition than in this encyclopedia that I showed you?

A    I would argue that it's not different.  Some of the individual verbiage may be different, because it says "study."

So I would argue that a study of Instagram, a study of Facebook, a study of Reddit

Page 223

would be exactly similar to what they're talking about here.

Q    But the study was just data from each of those, right?

A    That is a quantitative study.

Q    Okay.  So it's your testimony that a meta-analysis also -- strike that.

It's your testimony that when the definition of meta-analysis here refers to studies, it also means the combination of different datasets?

A    I agree with the fact that it says individual studies and those could be qualitative or quantitative.  And then it talks about the combining, or being combinable.

Q    Okay.  And when you talk about your definition of meta-analysis, can you provide me with any academic citation that supports that definition?

A    Offhand, no.  Not readily available.

Q    Okay.  Let's go to opinion 5 in your report.  My colleague will share that again.  Where you have opinion 5.  And you say:

(As read):

"Cross-platform meta-analysis confirmed synchronous timing across all five platforms (peak activity within 48 to

Page 224

72 hours), proportional distribution stability, and identical decay patterns."

This is paragraph 169.

When opinion 5 refers to a meta-analysis, that's describing the analysis you just described which looks at your dataset, right?

A    I'm sorry.  I found it.  Can you just repeat the question again?

Q    Sure.  When opinion number 5 refers to a meta-analysis, you're describing the analysis we just discussed which was your analysis of your dataset, right?

A    That is correct.

Q    Okay.  And when I refer to your dataset, that's the 42,992 items, right?

A    Yes.  The complete dataset that I submitted.  Yes.

Q    When I refer to your dataset, you'll understand that I'm referring to that universe, that 42,995 so I don't have to keep repeating that?

A    Yes.

Q    Okay.  So you opined that your dataset showed:

(As read):

Page 225

"Synchronous timing across all five platforms based on peak activity within 48 to 72 hours."

What does "synchronous timing" means?

A    So it was timing that was -- that was on par -- sorry.  If you look at like a bell curve, right, thinking of synchronous of the center of the bell curve.  So it was where most of the activity took place.  Which was in the normal -- sorry, I shouldn't say normal.  In the on-average hours of when posting takes place for that particular time zone.

Q    So the synchronous timing didn't refer to the time period of 48 to 72 hours?

MR. FRITZ:  Objection.

THE WITNESS:  So for UTC, which is how I do the data stamp, it looks at a specific period of time, when the posts were posted.  And there is usually a 48 to 72 hour time frame for any oddities for when the reporting -- sorry -- when the data in the dataset ensures that it's available.

So usually when I do the analysis, I would look at a 48 to 72 hour time frame to make sure that there is no outliers.

57 (Pages 222 - 225)

CONFIDENTIAL

Page 226

BY MS. GOVERNSKI:

Q   Okay.  And so you consider anything posted within 48 to 72 hours to be synchronous?

A   As part of this analysis, yes.

Q   What about other analyses?

A   Within the context of this analysis for social media, then yes.

Q   So in any analysis of social media, 48 to 72 hours is considered synchronous?

A   I can only talk about this particular analysis within these confines.  There is a myriad of different social media analysis and different ways of looking at things.  But in this context, yes.

Q   Okay.  But so you could define synchronous in different ways depending on what you're looking at?

MR. FRITZ:  Objection.

THE WITNESS:  Depending on the domain and what you're trying to analyze.  Yes.

BY MS. GOVERNSKI:

Q   So there is not like a standard definition of what it means to be synchronous?

MR. FRITZ:  Objection.

THE WITNESS:  I believe there's -- in

Page 227

context, it is standard.  So within this context, I do believe there is a standard definition.

BY MS. GOVERNSKI:

Q   I don't understand how there is a standard definition, but only in this context.

Can you explain that?

MR. FRITZ:  Objection.

THE WITNESS:  If we were talking about social media data in the medical field or in finance, there is arguably -- and that's outside of my purview.  There's arguably different ways of looking at synchronization, the same way as I know there is different ways of looking at forensics and tracking in those domains.

BY MS. GOVERNSKI:

Q   So if I wanted to know which domain, how different domains define synchronous, where would I look?

A   I don't know.  You would have to be a subject matter expert, assumingly, in that domain.

Q   Got it.  So only an expert could determine what synchronous means in any given context?

MR. FRITZ:  Objection.

THE WITNESS:  An expert would be the

Page 228

first person I would ask.  Yes.

BY MS. GOVERNSKI:

Q   So if I wanted to find literature to support that 48 to 72 hours was synchronous, where could I look?

MR. FRITZ:  Objection.

THE WITNESS:  I don't know.

BY MS. GOVERNSKI:

Q   I just have to ask you?

A   In this context?

MR. FRITZ:  Objection.

THE WITNESS:  If I'm the expert, then yes.

BY MS. GOVERNSKI:

Q   Let's go to paragraph 97.  Where the report explains that the three-day period was between August 6th and 9th.

How did you pick those dates?

A   What paragraph?

Q   Paragraph 97.  You can go to -- keep going down, Autumn.

A   My paragraph 97?

Q   Sorry.  Let's go to paragraph 36.  It's miscited in my outline.  Paragraph 36 says:

(As read):

Page 229

"All five platforms exhibit virtually simultaneous activity surges between August 6th and 9th."

Is that right?

A   Yes.

Q   You described this two to three-day period as "tight temporal synchronization", right?

A   I did.

Q   That's based on the definition that you just provided from your experience?

A   Yes.

Q   Okay.  And if we look at -- go up to paragraph 33, just a couple paragraphs above this, where you state that:

(As read):

"Analysis of posting activity in August of 2024... "

And you explain some of the data.  And you say:

(As read):

"This increase was so unusual that, statistically speaking, it would occur by chance less than once if you observed 100,000 random pieces of data."

58 (Pages 226 - 229)

CONFIDENTIAL

Page 230

Is that accurate?

A   Yes.

Q   Okay.  And then the next paragraph says that:

(As read):

"The August 2024 posting represents an exceptional departure from typical patterns."

Is that your testimony?

A   Yes.  I should probably have caveated it for social media.  But yes.

Q   Okay.  And it's your opinion that the August 2024 spike was, quote:

(As read):

"Not a random fluctuation, but rather an extraordinary event requiring explanation."

Right?  That's your opinion?

MR. FRITZ:  Objection.

THE WITNESS:  Yes, it is.

BY MS. GOVERNSKI:

Q   So why does the August 2024 spike require explanation?

A   I would say it requires explanation because one would wonder what caused the spike.  So

Page 231

you look at data points around that time period specifically in order to ideally explain what caused it.

Q   Okay.  Let's look at the next paragraph.  You say:

(As read):

"The August 2024 posting activity represents an exceptional departure from typical patterns."

And then could you please go down, Autumn.  And you say:

"The fact that this spike occurred across multiple platforms simultaneously."

So when you use the term "simultaneously" does that mean the same thing as that 48 to 72 hour window that we talked about earlier?

A   Yes.  From -- sorry -- 48 to 72 hours from -- sorry, August.  I don't have the date in front of me.  But yes.

Q   Okay.  So you use the term "simultaneous" which also could just mean synchronous.  Okay.

(As read):

"The fact that this spike occurred across multiple platforms

Page 232

simultaneously, coinciding with the film's release date, suggests a connection between these events.  However, while the statistics confirm something significant happened in August 2024, additional analysis would be needed to definitively establish that the film caused this increase rather than simply occurring at the same time."

So does that paragraph that I just read outloud accurately summarize your opinion?

MR. FRITZ:  Objection.

THE WITNESS:  I'm sorry.  Can you just tell me what paragraph you're on?

BY MS. GOVERNSKI:

Q   Yup.  Paragraph 34.  It's right on the screen, "the fact that this spike occurred across multiple platforms".  Right there.

A   Yes.

Q   So that -- those sentences, "the fact that" ending in "at the same time," accurately summarizes your opinion?

A   Yes.

MR. FRITZ:  Objection.

Page 233

THE WITNESS:  What I put in the report does.

BY MS. GOVERNSKI:

Q   Okay.  So you have not definitively established whether the film's release is what caused the August 2024 spike, right?

A   Definitively, no.

Q   Well, you used the word "definitively," right?

A   Right.  So I just wanted to answer it in that same context.  So definitively, no.

Q   You would need additional analysis in order to make a definitive conclusion, right?

A   Having a definitive conclusion would be, number one, very difficult.  Even if I had a forensics background.  So that's why I say definitive is usually not something that you would get even from a sophisticated data analysis or computational science analysis.  Because there are so many additional events that are unknown-unknowns that you would have to take into account.

So based on what is -- what is accessible, which is news cycles, which is public commentary, public information, I was able to associate the spike with the news cycle -- excuse

59 (Pages 230 - 233)

CONFIDENTIAL

Page 234

me -- the launch of the film itself.

Q   But you chose to use these words, that an additional analysis would be needed to definitively establish that the film release caused this increase rather than simply occurring at the same time.

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q   Right?

A   Definitively, yes, that is correct.

Q   And you did not perform that additional analysis that would be needed to definitively establish that the film release caused this increase rather than simply occurring at the same time, right?

A   I did not do an analysis of correlation to definitively prove it was in -- the spike was the outcome of the film launch.

Q   What does "correlation" mean?

A   Correlation means that there is a connection between what happened and the outcome.

Q   Okay.  And is that different from causation?

MR. FRITZ:  Objection.

THE WITNESS:  So correlation and causation are different.

Page 235

BY MS. GOVERNSKI:

Q   So you don't perform a causation analysis, right?

A   I did not.  Not in this instance, no.

Q   Okay.  Let's turn to paragraph 37.  Which I think should be the next paragraph.  You see paragraph 37 where it talks about Proportional Platform Distribution?

Do you see that?

A   I do.

Q   It says:

(As read):

        "The distribution of activity across
        the platforms during August 2024
        closely matched baseline proportions."

What do you mean when you say "baseline proportions"?

A   So the baseline that we established and discussed earlier.  Which was May, June, July.

Q   What if your May, June, July dataset was incomplete?  How would the proportional analysis change?

MR. FRITZ:  Objection.

THE WITNESS:  I'm not sure what you mean by "incomplete."

Page 236

BY MS. GOVERNSKI:

Q   What if you determined that you were missing a set of data from May, June, and July, how would that change your proportional analysis?

A   So the reason I chose to analyze data across five platforms was to mitigate any issues with not having sampling from the key social media sites that are used globally but specifically in the U.S.

Q   Okay.  But my question is, if it turns out that the few hundred posts that you had from TikTok, the 688 posts from TikTok were just the ones you happened to capture, but really there were 20,000 items on TikTok, wouldn't that end up changing your proportion for your subsequent analysis?

A   So I would have to look at the data in order to know that.  Because, again, I'm scraping the public posts that are available.  Because private posts, obviously, are not available as part of the API.

So I would have to look to see if additional data, again with the same parameters, with the same time frame, if there would be any difference.  But on average, because I'm looking at

Page 237

not just one site but five different sites, this should mitigate any issues or I should be able to capture if there is any issue in a particular social media site having odd spikes or things of that nature.

Q   But you're analyzing a proportion based on the proportion that existed during the baseline period, right?

A   Based on a dataset during that time period, yes.

Q   My question is, if your dataset was not complete, if it missed certain posts from certain activities, wouldn't your proportion change?

A   So the net new dataset that you're hypothetically talking about would have to completely skew completely differently than the dataset that I was able to pull based on the raw data on that platform.  So the chances of that is relatively small.

Q   But I'm not asking you the chances of it.  I'm asking you, if it turns out that say the scraper you used for TikTok turned out not to scrape everything, and that really there was a different universe of TikTok posts that you did not capture, wouldn't that alter the proportion that you were

60 (Pages 234 - 237)

CONFIDENTIAL

Page 238

using for your future analyses?

MR. FRITZ: Objection.

BY MS. GOVERNSKI:

Q   I don't think this should be all that complicated. Like if a dataset for TikTok increases, wouldn't that change your proportionality?

MR. FRITZ: Objection.

THE WITNESS: To answer your question, the dataset would have to be completely different than the dataset that I pulled. And directionally, that wouldn't make sense. Because, again, it's a randomized pull based on those keywords.

So you're getting a sampling of the parameters that I've selected, the keywords, and it's a random sample of the raw data that's reflective of that. So you shouldn't get -- with the same time frame, with the same keywords, you shouldn't have completely different raw data that wasn't represented in the initial pull.

BY MS. GOVERNSKI:

Q   So I'm asking in the hypothetical. If what you've called a random sample turned out to be under inclusive, wouldn't that alter your proportionality analysis?

Page 239

MR. FRITZ: Objection.

THE WITNESS: I don't see how that's possible with the way that a scraper pulls from the raw data API. So I can't -- I can't give you -- I'm sorry, I can't give you a yes or no based on a hypothetical.

BY MS. GOVERNSKI:

Q   So if -- let's just take this out of this report. If you were to determine proportionality based on ten to two, okay, like ten posts on X and two posts on Reddit, but it turned out there weren't really two posts on Reddit; there were 100. Wouldn't your proportionality analysis change as between ten and two and ten and 100?

A   Technically, that is always true because there are many other posts that we do not see because they are private. So, for instance, all of this is dependent on, number one, you're scraping a smaller amount of data than actually exists because you're scraping public posts. So you've already shrunk the universe down to what is public versus private. So if it is based on the same keywords, then there should be the same direction proportionally.

Q   Okay. So how do you reconcile saying

Page 240

that you've shrunk this down to publicly available posts with your testimony that it's a random sample?

I'm just trying to understand. Does your dataset reflect a random sample or does it reflect the universe of all public items that hit on your search terms?

MR. FRITZ: Objection.

THE WITNESS: It is a random sample of all public posts across each of the social media sites. You can only scrape and only have access to data that is public and not private.

BY MS. GOVERNSKI:

Q   Okay. So but it's a sample; it's not everything that was publicly available?

A   It is everything that Apify -- let me rephrase that, actually, because Apify has access to the API. It's everything that the API across each of the social media networks allowed Apify to have access to.

Q   Okay. How do you know that?

A   I know how APIs work for -- APIs in general.

Q   But you didn't use APIs; you used scrapers?

MR. FRITZ: Objection.

Page 241

THE WITNESS: So the scraper is Apify's terminology. They scrape through an API. So in one instance, Instagram has an API. They allow access to their API which connects to a raw dataset for companies such as Apify, Sprout Social, a myriad of different organizations or content creators to scrape from.

Meaning, that they say Instagram, for instance, says this is all the public posts based on the keywords that you have chosen. We are going to allow you access to be able to pull that data.

So when I say that it's everything that Instagram, Reddit, YouTube, et cetera, gave access to, it simply means of the public data they say this is -- whatever the confines that they decide as a social media site -- this is the API's that they have available for you to pull from.

BY MS. GOVERNSKI:

Q   Okay. So it's your testimony that every actor on Apify acts the way you just described?

MR. FRITZ: Objection.

THE WITNESS: I don't know how every actor on Apify operates.

BY MS. GOVERNSKI:

Q   Did you look at how the specific Apify

61 (Pages 238 - 241)

CONFIDENTIAL

Page 242

actors that you used operate?

A   The ones that I used, yes.  There are ones that I did not use that they have.

Q   So you understand how each of these four specific scrapers work?

A   Yes.

Q   Okay.  And it's your testimony that these four specific scrapers captured all of the publicly available data that hit on your search terms during the January 2024 to October 2025 time period?

A   No.  That's not what I said.

Q   Okay.  Say it again, please.

MR. FRITZ:  Objection.

THE WITNESS:  Social media platforms give access to third-parties such as Apify through their API.  Based on the keywords, I'm able to ask Apify to go in and quote/unquote scrape the API based on the time period and the keywords.  Therefore, Apify and I have access to whatever the social media platforms have allowed them to have access to.

BY MS. GOVERNSKI:

Q   So you don't know what the social media platforms have allowed the Apify actors to have access to?

A   I don't know what constraints, if any,

Page 243

social media sites put on their APIs.

Q   Okay.  So it's possible that they only allow Apify to access a small amount of the data that would have hit on your search terms, right?

MR. FRITZ:  Objection.

THE WITNESS:  So, no.  That's not what I would say.  Apify would have the same access as Sprouts Social or any other assuming third-party.

What I mean is that I don't -- of the universe that Instagram, as an example, has access to give of public posts.  I'm simply saying they can put constraints, the same way as YouTube can, the same way as X can, on what is available to be harvested from the API.

BY MS. GOVERNSKI:

Q   Right.  And so you don't know what those constraints are?

MR. FRITZ:  Objection.

THE WITNESS:  I do not.

BY MS. GOVERNSKI:

Q   And your Appendix C says that you used the YouTube data API; is that right?

A   Yes.

Q   So you didn't use Apify for YouTube?

A   So I used -- I used all of the -- I used

Page 244

the API first.  Just because I think in general, it's ideal.  If I'm not -- if for whatever reason it wasn't available, I used Apify.

Q   If the APIs were not available, you used Apify?

A   Yes.  So sometimes APIs can simply be down.  They can be sensitive.  They cannot run for a myriad of different reasons.  You might just be 500th in the queue versus in Apify or Sprout Social, that could be number one in the queue.

Q   Okay.  You just used what happened -- what was available to you at the time when you were ready to scrape, right?

A   Yes.  I used the best source available to what I had access to.

Q   Okay.  Let's go to report, paragraph 22, where you say that:

(As read):

"Data was collected through publicly available application programming interfaces or authorized data-scraping tools between January 2024 and October 2025."

So did you -- I'm trying to understand. Did you run the tools during that entire time

Page 245

period, or you ran the tools to capture information from that time period?

A   I ran the tools to capture information from that time period.

Q   Okay.  So when -- and you didn't run the tools, right; your assistant ran the tools?

A   My assistant, Taylor Hunter, ran the tools.  I double checked the tools.  I also am the one who ran the API scrape -- sorry, the YouTube, YouTube API scrape.

Q   When did those tools run?

A   October 2025.

Q   On a single day or?

A   No.  Over the course of -- so each of the platforms ran on a single day.  But each platform ran on a subsequent day.  So I'm just giving this as an example.  This is not the specifics.  YouTube ran on Monday, Twitter ran on Tuesday, so on and so forth.

Q   Got it.  So you ran each network on a single day, but not all on the same day?

A   Correct.

Q   And you produced to us your backup data, right?

A   Yes.

62 (Pages 242 - 245)

CONFIDENTIAL

Page 246

Q   You produced a number of -- actually let's, you know, we have -- we're going to mark as exhibit -- am I at 8?

THE REPORTER:  Yeah.  And I would like a break as soon as we can.  We've been going a long time.  Thank you.

MS. GOVERNSKI:  Yeah, sure.  Let's take a break.  Ms. Alexander, I realize we worked right through lunch and it's almost dinner.  Do you want to take a longer break and get something to eat or do you want to just take a quick break and get back into it?

THE WITNESS:  I prefer to take a quick break and get back into it.

MS. GOVERNSKI:  Okay.  Let's go off the record.

THE VIDEOGRAPHER:  We're off the record. It's 5:20 p.m.

(Recess.)

THE VIDEOGRAPHER:  We are back on the record.  It is 5:31 p.m.

BY MS. GOVERNSKI:

Q   Ms. Alexander, you describe a sentiment classification analysis and in paragraph 52 of your report, you state that:

Page 247

(As read):

    "Statistical volume analysis alone
    provides an incomplete picture of
    online reputation dynamics."

And that:

    "A systematic sentiment classification
    analysis was essential."

That is your opinion, right?

MR. FRITZ:  Objection.

THE WITNESS:  Yes.

BY MS. GOVERNSKI:

Q   Okay.  And what is a systematic sentiment classification analysis?

A   Going through and having it look at -- I use the three score, which is positive, negative, and neutral, on a classifier like BERT.  Which is a natural language processing solution that is used academically, practitionerly.  It shows up in research, to systematically associate each of the data or verbatims qualitative post with a sentiment score.

Q   And what is -- you used the terms "positive and negative", and what was the third you used?

A   The third is neutral.

Page 248

Q   Neutral.  How do you define each of those three terms?

A   So positive in the classifier looks at things that positive -- I'm trying to figure out how to define something without using the word.  Looks at things that are --

THE REPORTER:  Sorry, can you guys hold on for a second?  I can't hear anything.

MS. GOVERNSKI:  Yeah, let's go off the record.

THE VIDEOGRAPHER:  Sure.  We're off the record.  It's 5:33 p.m.

(Off the record due to audio issues on Zoom.)

THE VIDEOGRAPHER:  We are back on the record.  5:44 p.m.

BY MS. GOVERNSKI:

Q   Ms. Alexander, can you please explain how your sentiment analysis defined positive, negative and neutral?

A   So the way that the classifier looks at it versus how I would define it, in general, is slightly different.  The classifier I used for -- it looks at it from a score system.  So if something is based on natural language processing, based on fine-tuning, if something is more positive, it has a

Page 249

higher positive score.  If something is more negative, based on its training model, it classifies it as negative.  And if it's more neutral, is -- neutral is normally something that is -- I don't know want to say factual -- it's something that is usually more just straightforward without -- without additional nuance of being positive or negative. But they're score systems, in BERT.

Q   So the way -- when you were describing the classifier, which is positive, negative, or neutral, that's the classifiers that BERT itself assigns; is that right?

A   Yes.  Based on the model, based on fine-tuning, the BERT model looks at natural language processing to derive if it's positive, negative or neutral.

Q   What is "fine-tuning"?

A   Fine-tuning means the sensitivity, the -- a myriad of different factors.  It could be to reduce bias, to reduce how the model takes into account different parameters.

Q   Did you fine tune your BERT model?

A   No, I did not.

Q   Why not?

A   One, I didn't have access to fine tune.

63 (Pages 246 - 249)

CONFIDENTIAL

Page 250

It is -- the BERT model is for social media analysis. Well, I'm sorry -- it's for natural language processing, so I would argue that it doesn't need to be fine tuned. And I wouldn't -- I wouldn't make any adjustments to the --

Q  So what would be -- strike that.

What did the -- what types of contents did the BERT model designate as negative in this case?

A  What types of content -- content that was -- had different degrees. Because again, it's not just negative, it labels it as a score, first, that's on a negative side. It would be things that are derogatory -- derogatory, mean, rude, things of that nature.

Q  Okay. Derogatory as to whom?

A  Well, in this case, Blake Lively.

Q  Okay. So how would it classify content that was derogatory of Mr. Baldoni?

A  So it would -- if it looked at Mr. Baldoni, based on keywords, it would look at things like the association of the name, the context that his name appeared in, and if the -- if the negative sentiment or -- sorry. If the negative words were applied to Baldoni versus anyone in the

Page 251

post -- in the post.

Q  So what if a post was about both Ms. Lively and Mr. Baldoni and included positive and negative language, how would BERT know how to classify such a piece of content?

A  So BERT is trained on natural language processing. It has context, so it looks at the sentence structure and it looks at -- similar to, I guess, deconstructing the English language about who the negative or the positive personifier is associated with, and then it would classify it as positive, negative, or neutral, depending on the keywords --

Q  So were you able to tell BERT --

A  -- that you're looking for.

Q  -- that negative content about Ms. Lively should be classified as negative, but negative content about Mr. Baldoni should not?

A  So I was not -- I didn't include negative content about Baldoni because it was out of scope for the analysis.

Q  Well, what if your search terms hit on a post that included negative language about Mr. Baldoni?

MR. FRITZ:  Objection.

Page 252

THE WITNESS:  So if there was negative content in the post that had Blake Lively, because again, there had -- Blake Lively had to show up based on the keyword or parameters I put in. If there was also -- if there was negative content about Baldoni in the same post, then it would, again, associate what the -- what the sentiment was for Lively and not Baldoni.

BY MS. GOVERNSKI:

Q  And how did you teach BERT to look for the sentiment as to Ms. Lively and not look for the sentiment as to Mr. Baldoni?

A  So it's part of the parameters that I put in around the keywords that you saw in my report.

Q  What parameters did you put in? How would I know that?

MR. FRITZ:  Objection.

THE WITNESS:  Those are the keywords that you see in my report that I've included.

BY MS. GOVERNSKI:

Q  So your keywords were Ms. -- Blake Lively and we can go through some of the specifics, but how did BERT -- how was BERT able to derive from Blake Lively that you're only looking for content that is negative as to Ms. Lively as opposed to

Page 253

negative as to any other of the content in the report?

A  So you're able to isolate who the subject of the sentiment is for. So in this case, it was for Blake Lively. It could mention six other people in the content, but I was only concerned with the sentiment as associated with Blake Lively.

BY MS. GOVERNSKI:

Q  Okay. How are you able to give BERT that direction?

MR. FRITZ:  Objection.

THE WITNESS:  So it's part of the parameters when you're setting up the classifier run.

BY MS. GOVERNSKI:

Q  Okay. So did you produce your parameters when you set up the classifier run?

A  I'm sorry? Did I produce?

Q  Did you provide to us the parameters for your classifier run?

A  No, because it specifically negates any -- so the way that you put it into the system, you specify who the subject matter is. And in this case, it's the keywords around Lively. So it's not fine-tuning or anything like that. I'm simply

64 (Pages 250 - 253)

CONFIDENTIAL

Page 254

saying negate anyone other than Lively when applying sentiment scores.

Q   And where have you explained that in your report?

A   I don't believe I did.

Q   So if I wanted to understand all the different parameters that you instructed BERT to follow, how would I do that?

A   You would still be able to take my dataset, put it into BERT, based on python code that I provided you and keywords and the time frame. There is an element that says do you -- I'm not sure exactly what it says -- but should I focus on the core keywords only or should I analyze additional keywords. Using the keywords I provided, that's the focus of the analysis.

Q   So the only way that you educate BERT was by putting in the keywords --

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q   -- in the instructions?

A   In the dataset, yes.

Q   Okay.  And you refer to BERT as "the BERT family."  You understand that there are multiple types of BERT models, right?

Page 255

A   Yes.

Q   So what BERT model did you use?

A   I used the most recent BERT model, and I believe I specify it in my report.

Q   Where did you specify that in your report?

A   Let's see.  I don't put it in there. It's currently the only BERT model that is available through Google.  I don't think I specify the date -- the launch date of the BERT model.

Q   Okay.  Well, can you identify the BERT model that you used?

MR. FRITZ:  Objection.

THE WITNESS:  I would have to go and reference it.  I would have to look it up.

BY MS. GOVERNSKI:

Q   Okay.  Is there a reason you didn't disclose the specific BERT model you used?

A   There's no reason.  It's part of the BERT family so it's the one that's is currently accessible.

Q   But BERT models -- in order to replicate it, there is a lot BERT models, right?

MR. FRITZ:  Objection.

THE WITNESS:  There's different versions

Page 256

of the BERT models.

BY MS. GOVERNSKI:

Q   Too many to even enumerate, right?

MR. FRITZ:  Objection.

THE WITNESS:  I don't know if that's true.  It's the current version of BERT.

BY MS. GOVERNSKI:

Q   Okay.  But if we wanted to replicate your sentiment analysis based on what you disclose in your report, we would have to guess what BERT model you used?

MR. FRITZ:  Objection.

THE WITNESS:  I would say you could do that by going to the current BERT model, the latest version.

BY MS. GOVERNSKI:

Q   And just guessing that that's the one you used.

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q   Is that right?  We'd have to just guess --

A   Was that statement or a question?

Q   A question.  We would have to just guess that you used the most recent BERT model?

Page 257

MR. FRITZ:  Objection.

THE WITNESS:  You -- you -- there would be an inference that the latest one would be the one that you could default to.

BY MS. GOVERNSKI:

Q   Okay.  Is BERT or LLM a newer model?

A   LLM stands for Large Language Model.  So you'd have to be specific on what LLM you're referring to.

Q   Okay.  Well, did BERT models precede large language models?

A   They did.

Q   Okay.  So it doesn't depend on what type of LLM, right, it just -- BERT preceded LLMs?

MR. FRITZ:  Objection.

THE WITNESS:  So BERT is natural language processing.  And BERT is -- I believe BERT models came out, I'm guessing, but maybe 20 -- 15 to 20 years ago.

BY MS. GOVERNSKI:

Q   Okay.  And where did you obtain your BERT model from, you said Google?

A   Yes, correct.

Q   Did you run the BERT model using a computer program?

65 (Pages 254 - 257)

CONFIDENTIAL

Page 258

A   Using Python, yes.
Q   And how did you write the code to call the specific model and version that you mentioned?
A   So my assistant wrote the code, and I shared the code for each of the -- for each of the scrapes and for the sentiment.
Q   Do you know how to write code?
A   I know how to write code, enough. I wouldn't say I am the person to write code for complex matters by any means.
Q   Okay. So in the code that you produced, what version of the BERT model does it reflect?
MR. FRITZ: Objection.
THE WITNESS: It should reflect the most recent version.
BY MS. GOVERNSKI:
Q   The most recent as of what date?
MR. FRITZ: Objection.
THE WITNESS: As of October 2025.
BY MS. GOVERNSKI:
Q   Okay. Did you apply the BERT model on all of your dataset?
A   Yes.
Q   Okay. If I want to understand how your BERT model classified all of the information in your

Page 259

dataset, how would I do that?
MR. FRITZ: Objection.
THE WITNESS: How it classified? You would have to go into BERT to understand its general classifier system.
BY MS. GOVERNSKI:
Q   But if I wanted to understand any one post to understand how your BERT model classified that one post, how would I do that?
MR. FRITZ: Objection.
THE WITNESS: So you can see the score based on the dataset I provide. You can see the score that BERT gave each piece of -- each piece of -- of -- excuse me -- each post. But if your question is how it classified, there is -- you would have to go into the BERT model itself when replicating the run. Actually, I'm sorry. I'm going to -- that wouldn't be. You would have to go into BERT itself to understand, into the developer tools.
BY MS. GOVERNSKI:
Q   So where did you disclose the score for each post?
A   So I provided an aggregate, and it's in the zip file that was submitted.

Page 260

Q   But I'm not asking for an aggregate, I'm asking for the score for each individual post.
MR. FRITZ: Objection.
THE WITNESS: So the output from BERT is it clusters together. So it provided the score of -- the score of positive, negative and neutral.
BY MS. GOVERNSKI:
Q   So there is no way to see how it classified any individual social media item?
MR. FRITZ: Objection.
THE WITNESS: Is there a way to classify, no.
BY MS. GOVERNSKI:
Q   So you have no way of knowing if it accurately classified any of the 43,992 pieces of social media items?
MR. FRITZ: Objection.
THE WITNESS: I'm sorry. You mean 44,000?
BY MS. GOVERNSKI:
Q   43,992.
A   So I was able to go in the system and we hand verified a certain portion, which I reference in my report. So we went through and looked at 300 different posts. I believe it was 300, I'd have to

Page 261

just double check.
Q   Okay.
A   To -- hand eye verify the sentiment scores that they were correct in conjunction with the individual posts.
Q   Well, how did you know sentiment scores of those 300 posts?
A   Because it provides it in a -- you can open the tabs to see how their -- how the system is identifying the individual pieces of content.
Q   So you -- there is a way in the system to know how it's identifying each individual post?
A   Yes. To verify it, correct.
Q   And why haven't you provided us with that underlying classification data?
MR. FRITZ: Objection.
THE WITNESS: Because it wasn't necessary in order to replicate my work.
BY MS. GOVERNSKI:
Q   Well, if we want to be able to check how your BERT analyzer classified each one of the 43,992 social media items, how could we do that?
MR. FRITZ: Objection.
THE WITNESS: You could -- you could replicate the run itself, based on the data that I

66 (Pages 258 - 261)

CONFIDENTIAL

Page 262

provided.

BY MS. GOVERNSKI:

Q   But if we wanted to understand how your BERT model, the way you ran it, classified each one of those posts, how could we do that?

MR. FRITZ:  Objection.

THE WITNESS:  The only way would be to rerun it based on the code and dataset that I provided.

BY MS. GOVERNSKI:

Q   Well, if you were able to go in and see how all of the 43,000 social media items were classified, couldn't you just produce the outcome of that for us?

MR. FRITZ:  Objection.

THE WITNESS:  So the extract was an aggregate, was -- the downloadable version is an aggregate.

BY MS. GOVERNSKI:

Q   But for the 300 posts, couldn't you just, like, take a screenshot of it?

MR. FRITZ:  Objection.

THE WITNESS:  I'm sure, yes, that's one feasible way of capturing something that is on the screen.  You wouldn't get all 300 in said

Page 263

screenshot, but yes.

BY MS. GOVERNSKI:

Q   Yeah, but there is a feasible way that you could give us the classifications of your sentiment analysis, right?

MR. FRITZ:  Objection.

THE WITNESS:  So I did in aggregate.  I didn't on each individual post.

BY MS. GOVERNSKI:

Q   But there is a way, a feasible way that you could do it for each individual post, right?

MR. FRITZ:  Objection.

THE WITNESS:  It would have -- it would have been more work to extract it, and I didn't believe it was necessary.

BY MS. GOVERNSKI:

Q   How much more work?

A   I'd have to go through in the system to see, but it's not just a download of the CSV.

Q   So how long did it take you to do those 300 posts?

A   To do the verification of the 300 posts?

Q   No, to pull that data of 300 posts.

MR. FRITZ:  Objection.

THE WITNESS:  So the verification which

Page 264

is -- because it's just the subset, it's a randomized subset.  So that was, again, randomized, so we went through and hand confirmed that the score made sense to the physical post.  And we did that in the environment itself.

BY MS. GOVERNSKI:

Q   I understand.  But how long did it take you to pull the specific sentiment classify -- strike that.

How long did it take you -- I'm not talking about performing the analysis -- just to pull the information about how the 300 posts were classified?

MR. FRITZ:  Objection.

THE WITNESS:  So I'm not sure how much time it took because we looked at 300 randomized rows in the environment to confirm or disconfirm that the score itself was accurate.

BY MS. GOVERNSKI:

Q   So if you don't know how long that took, how do you know how long it would take you to run the same instruction on all of the social media items in your dataset?

A   So doing a -- performing by eye or hand to confirm if the score is accurate or not is done

Page 265

in real time in the environment.  I simply can't tell you how long that took.  I'm not sure what your question...

Q   Yeah, what I'm asking you is --

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q   -- you were able to identify 300 posts, right?  You were able to do a query and say pull 300 posts and tell me how you classified these 300, right?

A   We looked at 300 posts that were classified.

Q   Okay.  So how were you able to understand the classifications of those 300 specific items?

A   We looked at the content.  So the post itself, the verbiage, and we looked at the score that was given by BERT, the classifier to understand if that score was accurate, based on general knowledge of reading the posts and interpreting, based on just general knowledge of what would be positive, negative or neutral.

Q   Okay.  And if you wanted to understand how your sentiment analysis classified each of the 42,000, how would you do that?  43,000.  Sorry.

MR. FRITZ:  Objection.

67 (Pages 262 - 265)

CONFIDENTIAL

Page 266

THE WITNESS: So one way is to go through and eyeball every single one, to go through and look at the score and to look at the copy that is from the post.

BY MS. GOVERNSKI:

Q   I'm trying to understand where you would look to see the score for each individual post.

MR. FRITZ: Objection.

THE WITNESS: You would look in the BERT model itself, after it's classified, each piece of content.

BY MS. GOVERNSKI:

Q   Okay. So there exists, in the BERT model, a way to see how it classified each individual post?

A   In the environment, yes.

Q   And you did not produce to us any individual scores for any individual posts, right?

MR. FRITZ: Objection.

THE WITNESS: I did not produce scores for each individual piece of content.

BY MS. GOVERNSKI:

Q   And you didn't produce even -- sorry. Scratch that.

You didn't identify the specific 300

Page 267

posts that you checked, right?

A   No, it was a randomized post -- it was randomized 300 in order to confirm that the classifier was accurate. Again, to reproduce it, you wouldn't need that. You're able to reproduce it based on what we provided.

Q   Are we? Are we able to reproduce a randomized -- how do you know that my randomized sample would be the same as your randomized sample?

MR. FRITZ: Objection.

THE WITNESS: You're able to produce the -- in aggregate, the classifier, based on the model that I gave you -- or based on the BERT family using the latest model and the dataset.

BY MS. GOVERNSKI:

Q   But that's not my question. My question is: How could I receive the exact same 300 posts that you conducted your manual review on?

MR. FRITZ: Objection.

THE WITNESS: If it's randomized, you cannot.

BY MS. GOVERNSKI:

Q   So I cannot identify what 300 posts you manually reviewed based on the information that you've disclosed, right?

Page 268

MR. FRITZ: Objection.

THE WITNESS: That is correct.

MS. GOVERNSKI: My colleague is going to move nine documents into being Exhibit Share. I'm going to mark them as exhibits -- starting with Exhibit 8. So it will be 8, 9, 10, 11, 12, 13, 14, 15, 16. So she's going to move them all in there.

BY MS. GOVERNSKI:

Q   And while she does, can you tell me what BERT stands for?

A   Bidirectional -- bidirectional is the most important part. I'm not sure what the rest of it stands for.

Q   And how often have you used BERT other than in this case?

A   Probably once a week, this particular -- from September to present. I use it for class. I use it for work previously. Yeah, often. Frequently.

Q   So you personally run BERT weekly?

A   I personally use BERT for a myriad of different things in relation to my class. So my students are asked to run simulations, things of that nature. I use it for nonwork-related elements, as well as previously for work-related.

Page 269

Q   Okay. Do you see Exhibits 8 through 16 in your Exhibit Share? Or it's 8 to 11 right now. But there are more coming in. Why don't you go ahead and open Exhibit 8. And my colleague, Autumn, will also put it on the screen.

A   One second. Eleven is the last one?

Q   I'm looking at Exhibit 8 right now.

A   I'm downloading, is 11 the last one?

MS. GOVERNSKI: Oh, there is 13. Well, it should be 8 through 16. There's going to be nine altogether.

(Exhibit 8 marked for identification.)

THE WITNESS: Okay. Go right ahead.

BY MS. GOVERNSKI:

Q   Okay. So you see the post on your screen, it's looks like a Twitter post.

A   Exhibit 6?

Q   Exhibit 8.

A   Sorry. 8.

Q   It's also on your screen, you can see it marked.

A   Yes.

Q   Okay. And you see the second tweet that says:

(As read):

68 (Pages 266 - 269)

CONFIDENTIAL

Page 270

"Paying their effing salaries and pensions. WTF is wrong with us? That's $5 billion we sent to Ukraine this week. Eff @ZelenskyyUA. It will be great when this grift ends."

Do you see that?

A   Yes. I have it, yes.

Q   Do you have any opinions as to this tweet?

A   I don't have any opinions, no.

Q   Does it have anything to do with Ms. Lively?

MR. FRITZ:  Objection.

THE WITNESS:  Sorry. Not based on what I'm looking at right now, no.

BY MS. GOVERNSKI:

Q   Okay. Based on what you're looking at right now, would you include this tweet in your dataset?

A   Would I include it or would it come up in my dataset? I'm sorry. I just need to specify.

Q   Both.

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q   Both.

Page 271

MR. FRITZ:  Objection.

THE WITNESS:  So I don't include any of the data in my dataset, just to be clear. The data that I pull, for instance, comes from the keywords through Apify from the API.

BY MS. GOVERNSKI:

Q   Okay. Would you expect to see this tweet in your dataset?

MR. FRITZ:  Objection.

THE WITNESS:  I wouldn't expect it. I would have to see why it would have come up, maybe because of a hashtag or something. But no.

BY MS. GOVERNSKI:

Q   Okay. But based on the content on your screen, you wouldn't expect this to be in your dataset?

A   No.

Q   And how would your BERT sentiment analysis categorize this tweet?

A   I can't say definitively how BERT would classify it because that's just outside of my knowledge set. You would have to go in and run it through BERT. But if it was asked to classify it for Blake Lively around the keywords that I use in my report, it would either negate it or classify it

Page 272

as neutral.

Q   And if we wanted to figure that out, we would have to go into your BERT system?

MR. FRITZ:  Objection.

THE WITNESS:  The BERT system?

BY MS. GOVERNSKI:

Q   Yes.

A   Yes.

MS. GOVERNSKI:  Okay. Let's go to Exhibit 9. Hopefully, we can get through these pretty quick.

(Exhibit 9 marked for identification.)

BY MS. GOVERNSKI:

Q   This is a tweet -- let's zoom in a little bit -- that says:

(As read)

"@DrainBamager, MJF is better than us and we all know it. Pretty sad Adam Cole with his henchman and the devil garbage. Can't wait till MJF kicks his chulo and ends this story."

Do you have any opinions on this tweet?

A   No, I don't have any opinions.

Q   Would you expect to see this tweet in your dataset?

Page 273

A   So if it showed up in the dataset, it should be either negated or marked as neutral.

Q   So when you say "negated," what does that mean?

A   Negated meaning that it -- it wouldn't actually be a part of the extraction of the data that was pulled.

Q   So how do we know if posts have been negated?

MR. FRITZ:  Objection.

THE WITNESS:  So as part of the dataset that I sent you, it wouldn't be in that dataset.

BY MS. GOVERNSKI:

Q   Oh, okay. So it would -- if it was negated, it wouldn't be in the dataset you sent us?

A   So there's two ways of negating. There's negating at the extraction through Apify. So confirming that the content is -- is based on the parameters that we plugged into Apify. The second area of negation when it comes to -- when it comes to sentiment scoring. So on the sentiment scoring side, it would either be marked as neutral or it wouldn't say N/A., but it would have, like, a score of zero.

Q   So it would be included in the dataset

69 (Pages 270 - 273)

CONFIDENTIAL

Page 274

you provided us?

A   If it wasn't negated at the Apify pull and it was one of the posts in the dataset, then it wouldn't have been reflective in the sentiment analysis as a positive or negative.

Q   And how could we check to understand if your sentiment analysis negated a post like this?

A   So the classifier would negate it because it's not talking about Blake Lively.  The terms that it's looking to categorize the sentiment.

Q   But my question is:  How would we know if your sentiment analyzer negated this post or classified it?

MR. FRITZ:  Objection.

THE WITNESS:  So it's not my sentiment classifier.  The BERT classifier would usually look at something like this, and based on it not having Blake Lively or the terms that I referenced in my report, then there is no negative or positive scoring to put in conjunction with that name.

BY MS. GOVERNSKI:

Q   So we should just assume that sentiment analysis that you did, did something with this post?

MR. FRITZ:  Objection.

THE WITNESS:  So this post, number one, I

Page 275

don't recognize this post so I can't say if this is one of the posts from the dataset or not.  And if it went into the classifier, then the classifier would operate as though, again, because we don't see any context for Blake Lively in here, so the classifier would not give it a positive or negative scoring.

BY MS. GOVERNSKI:

Q   And that's just based on your own hunch about this, about how the classifier would treat this post?

MR. FRITZ:  Objection.

THE WITNESS:  That's how the BERT family works.

BY MS. GOVERNSKI:

Q   But I'm talking about this specific post.  If this specific post was in your sentiment analyzer, how would you confirm how it handled it?

A   The classifier operates that it takes into account context and it takes into account who is being spoken about, whether it's a brand or a person.  So because I asked for Blake Lively, along with the other keywords that I referenced, Blake Lively does not show up so it can't score sentiment to something that doesn't exist.

Q   So it's your assumption that BERT would

Page 276

not count this in your dataset?

MR. FRITZ:  Objection.

THE WITNESS:  Based on my knowledge of how BERT as a classifier works --

MS. GOVERNSKI:  Okay.  Let's go to Exhibit 10, which is a Reddit -- a post from Reddit about Sabrina Carpenter.

(Exhibit 10 marked for identification.)

BY MS. GOVERNSKI:

Q   What is this post?  Do you know?

A   It's about her Eras tour.

Q   So is this a Reddit or a subreddit?

A   Well, subreddit is a part of Reddit --

Q   Can you explain the difference?

A   It just means it's a sub-domain on Reddit.

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q   Okay.  Understood.  So that R/pop culture chat, is that a subreddit?

A   So that would be construed as a sub -- a section in Reddit, yes.

Q   So that's a subreddit?

A   There is -- I want to be specific because people define subReddits in very different ways.  So

Page 277

it is a section on Reddit or a group on Reddit.

Q   Well, how do you define "subReddits"?

A   I -- rather, instead using the word, I would rather just be specific in distinguishing what it is.

So if you go to Reddit, this looks like it was pulled from an area of Reddit or group that's called -- I'm sorry -- that's called pop culture chat.

Q   And do you have any opinions on this post?

A   No --

Q   Would you expect to see this post in your dataset?

MR. FRITZ:  Objection.

THE WITNESS:  No.

BY MS. GOVERNSKI:

Q   And how would your BERT sentiment analysis categorize this post?

MR. FRITZ:  Objection.

THE WITNESS:  If it was put into BERT based on parameters that I used, the keywords, then it would classify it as neutral or ignore it.

BY MS. GOVERNSKI:

Q   What is the difference between neutral or

70 (Pages 274 - 277)

CONFIDENTIAL

Page 278

ignore?

A   So it might come back with an error -- sorry, I shouldn't say error.  It might come back with code of no.  Depending on, again, if -- if there was multiple rows of data that didn't have keywords for Blake Lively.

MS. GOVERNSKI:  Okay.  Let's go to Exhibit 11, which is another piece of content from Reddit.  If we can scroll up a little bit, Autumn.

(Exhibit 11 marked for identification.)

BY MS. GOVERNSKI:

Q   So it says:

(As read):

"r/FauxMoi"

So would you describe that as a subsection of Reddit?

A   It looks like it's a group on Reddit, yes.

Q   Okay.  And the title of this is: "Frances Bean Cobain Pays Tribute to her Father, Kurt Cobain, 30 years After His Death."

Would you expect this post on Reddit to be part of your dataset?

MR. FRITZ:  Objection.

THE WITNESS:  I wouldn't.  No.

Page 279

BY MS. GOVERNSKI:

Q   How would your BERT sentiment analysis categorize this post?

MR. FRITZ:  Objection.

THE WITNESS:  Again, similarly as what I mentioned previously, it would either come back as a null or it would classify it as neutral.

MS. GOVERNSKI:  Okay.  Let's go to 12, Exhibit 12, which is an Instagram post.

(Exhibit 12 marked for identification.)

BY MS. GOVERNSKI:

Q   You see the first comment is "bookishrhapsodic."

Do you see that post that I'm referring to?

A   The one on the screen, "me, my books"?

Q   No, on the right side, you see the first comment:

(As read):

"Okay.  And this show of course! What's your comfort read, song, show?"

Do you see that?

A   Yes.

Q   And that's by someone, book IS -- bookisrhapsodic?

Page 280

A   I see that.

Q   Okay.  Would you expect this Instagram post to be in your dataset?

A   So it appears that there is multiple images in this.  So I would have to see -- as you can see from the arrow on the right-hand side.  So I would have to understand what data was scraped on the other pages.

Q   But from this specific comment.

(As read):

"Okay and this show of course!  What's your comfort read, song, show?"

Would you expect that specific comment to be included in your dataset?

A   Just the comment?

Q   Yup.

A   Just that one specific comment?

Again, I would have to look at additional context of the entire Instagram post.  But I'm not sure.

MS. GOVERNSKI:  Okay.  Let's go to Exhibit 13 which is an Instagram post that says -- has a lot of hashtags and says.

(As read):

"Choose what makes your heart bloom."

Page 281

(Exhibit 13 marked for identification.)

BY MS. GOVERNSKI:

Q   Do you see that?

A   Yes.

Q   So would you expect this to be in your dataset?

MR. FRITZ:  Objection.

THE WITNESS:  So again, you can see this is one of two images based on the dots along the bottom.  I would have to see the full context.

BY MS. GOVERNSKI:

Q   What about this one quote:

(As read):

"Choose what makes your heart bloom."

Followed by hashtags.  Would you expect that one comment to be in your dataset?

A   If it was, again, it would be negated from a sentiment perspective.  But yeah, no.

MS. GOVERNSKI:  Okay.  And let's go to Exhibit 14, which is a post on TikTok.  It's really hard to see, Autumn, can you Zoom in as much as you can to the bottom where you see "moon struck fate."

(Exhibit 14 marked for identification.)

BY MS. GOVERNSKI:

Q   And it says "finale" followed by a series

71 (Pages 278 - 281)

CONFIDENTIAL

Page 282

of hashtags.

"IP, only pen voiceover on hyphen be lift on hyphen island -- hyphen is island.

Do you see that?

A   Yeah.  I can't make it out but I see the post itself.

Q   Would you expect that -- this post to be included in your dataset?

A   Not sure.  I would say no.

MS. GOVERNSKI:  Okay.  Let's look at the next one.  Exhibit 15, which is another TikTok and let's zoom way in again, Autumn.

(Exhibit 15 marked for identification.)

BY MS. GOVERNSKI:

Q   The message on the bottom says:

(As read):

"Massage is a path to a happier life. Book a massage appointment and let's be happy."

And then it has a series of hashtags.

Do you see that?

A   I do.

Q   Would you expect this to be in your dataset?

Page 283

A   Again, just because this is obviously a video still, I don't know what the rest of the video content is.  So based on just the content that I can see at the bottom, then I would say no.

Q   So when your BERT sentiment analyzer was looking at content, would it look at the actual video?

MR. FRITZ:  Objection.

THE WITNESS:  It would look at the -- it would look at the data around the post.  So when it's video for instance, it looks at things like the metadata.  It looks at context around what the -- what the hashtags are, what the posts are, written content is underneath.  And any other data points that are able to be extracted.

BY MS. GOVERNSKI:

Q   Okay.  So that way you just described what's underneath, it would look at included in what it would look at would be this text:  "Massage is a path to a healthier life", et cetera?

A   Correct.  That would be one of the pieces it would look at.

Q   How would your BERT analyzer classify this post?

A   In the context of the keywords that I was

Page 284

looking at it, it would classify this either as again going to null or as neutral.

Q   Okay.  So you produced your underlying data to us, right?

A   Yes.

Q   And you produced a series of README files, actually five of them.  One for each platform; is that correct?

A   That's correct.

Q   Okay.  Who -- what are the README files?

MR. FRITZ:  Objection.

THE WITNESS:  The README files are instructions.

BY MS. GOVERNSKI:

Q   Instructions to what?

A   Instructions to the recipient to give context, to give additional information, to contextualize.

Q   Who wrote the content of the README files?

A   My assistant wrote the content for the README files.

Q   Your assistant we talked about?

A   Taylor Hunter.

Q   Okay.  Ms. Hunter.  Did you review the

Page 285

content of the README files?

A   Yes.

Q   Did you -- is all of the README files you produced to us accurate?

A   I would have flagged anything that I saw as an issue.  So accuracy on a README file is -- I'm not sure how to say if something is right or wrong --

Q   But you would have reviewed all of the README files before you produced them to us?

A   Before I submitted them.  Yes.

MS. GOVERNSKI:  I'm going to mark as Exhibit 16 the README file that you produced to us in connection with your Reddit analysis.  Just give Autumn a second.  Okay.  It should be in there and Autumn will put it on the screen.

(Exhibit 16 marked for identification.)

BY MS. GOVERNSKI:

Q   Okay.  Ms. Alexander, is this the Reddit README file that you produced to us?

A   I'm sorry.  Which -- is this Exhibit 16?

Q   Yes.

A   Yes.  It looks like.

Q   It says here.

(As read):

72 (Pages 282 - 285)

CONFIDENTIAL

Page 286

"Quick Analysis of Blake Lively Reddit posts, (January 2024 to October 2025) 879 posts total from the dataset."

Do you see that?

A    I'm sorry.  What are you?

Q    Just reading the first two lines.  879 posts total from the dataset.

Do you see that?

A    I do.

Q    Okay.  So this references posts, not comments, right?

A    This is referring to posts.  Correct.

Q    So you didn't collect comments.  Only posts on Reddit?

A    So with the posts, there are comments associated with them as well.

Q    But this doesn't say that.  This says 879 posts.

MR. FRITZ:  Objection.

THE WITNESS:  So with the posts, comments are usually associated.  So you just showed me TikTok.  That was a post.  And then you README the comments that were associated with that post.

BY MS. GOVERNSKI:

Q    So is the database that you produced of

Page 287

Reddit, does it include all of the posts and the comments that were -- that comprised your dataset?

A    So the -- I have to go back and look. But the posts should include the comments that were on that post.

MS. GOVERNSKI:  Okay.  So it's your position when it says 879 posts, that each individual one would include however many comments were part of that post?

A    If they were associated with the post.

Q    Associated with the post means under the post?  Responding to the post?

A    So if the data extract allowed for the comments to be pulled with the post, then yes, the comments would be associated with the post.

Q    Well, this isn't hypothetical.  Did your Reddit scraper that you used allowed you to pull the comments?

MR. FRITZ:  Objection.

THE WITNESS:  I would need to go in and actually look at the data.

BY MS. GOVERNSKI:

Q    How would it look like in the data?  What would it look like?

A    It would be a row of data.

Page 288

Q    The comments would be contained within the spreadsheet?

A    Within the row, yes.

Q    Okay.  And the date here is January 2024 to October 2025.  Why for purposes of Reddit did you include posts that went back to January 2024?

A    So the target that I was looking at was January 2024 to the present, which for this report, was October 2025.

Q    But if your baseline was May to June of 2024, why did you include in your Reddit analysis posts between January and May 2024?

A    So that helps when doing the forecast that is in my report to have a larger period of data in order to look at a regression and to forecast with and without the spike.

Q    Okay.  So the specific -- if we were to -- wanted to understand what of the 18,879 posts were from the baseline period, we would look in your backup data and look at the dates of the posts themselves?

A    I'm sorry.  Say that once more?

Q    Let's look.  It says baseline period is May to July 2024.  Mean is about 20 posts a month.

Do you see that?

Page 289

A    Yes.

Q    So 20 posts a month for three months would be 60 posts?

A    Baseline period May through July. August 2024.  Mean is approximately 20 posts per month.  Yes.  The average is approximately 20 posts per month.

Q    Your dataset of May to July 2024, the baseline period is around 60 posts?

A    Sixty posts via --

Q    Reddit.

A    This particular.  Yes.

Q    Okay.  And in your opinion is 60 posts sufficient to draw any conclusions about that baseline period?

A    So in itself, no.  In aggregate, yes.

Q    In aggregate with the other baseline numbers in your other dataset?

A    Right.  Which is why I looked at five different --

Q    Okay.

A    -- social media platforms.

Q    Okay.  And this is accurate that August of 2024 had 105 posts?

A    I would have to go back and just double

73 (Pages 286 - 289)

CONFIDENTIAL

Page 290

check.

Q   But you have no reason to think that your README files are not accurate, right?

A   No.  There's no reason to assume that.

Q   Actually do you know how many comments and posts on Reddit were included in Dr. Mayzlin's dataset?

A   How many comments and posts from Reddit were included in Mayzlin's?  I don't have offhand.  I have to refer to the report.

Q   If I were to represent to you that there were 250,000 comments and posts on Reddit just between May 2024 and February 2025, would that number surprise you?

MR. FRITZ:  Objection.

THE WITNESS:  It wouldn't surprise me.  I believe Reddit was the one that she scraped the most data from.

BY MS. GOVERNSKI:

Q   Okay.  So how do you reconcile that you pulled 879 posts from a longer time period than Dr. Mayzlin's from a shorter time period?

A   Again she -- based on my recollection of her approach, she used an LLM to produce this information.  So again, I tried to replicate it in

Page 291

order to understand the post, the sentiment, et cetera.  And I wasn't able to do that.

Q   Sorry.  Go on.

A   Period.  I will end there.

Q   But what I don't understand is why didn't you just look at the 250,000 posts and comments on Reddit and look at them and compare them with just the 879 in your dataset?

MR. FRITZ:  Objection.

THE WITNESS:  Because I needed to understand the origins and verify the origins in order to do any subsequent analysis.

I'm not able to verify where the data came from, from her dataset, based on the information I was given in her expert report.  So alternatively, I went to pull a more diverse set of data across more networks in order to analyze it.

BY MS. GOVERNSKI:

Q   I'm having trouble understanding how 879 posts from Reddit is a greater set of data points than the 250,000 comments and posts in Dr. Mayzlin's Reddit dataset.

MR. FRITZ:  Objection.

THE WITNESS:  I refer to a larger number of social media sites for diversity.

Page 292

BY MS. GOVERNSKI:

Q   Okay.  But 250,000 comments and posts is 250,000 plus more than your entire dataset.

MR. FRITZ:  Objection.

THE WITNESS:  So again, quantity is not always a factor in accuracy or representation.

BY MS. GOVERNSKI:

Q   Right.  But you did not do any analysis of Dr. Mayzlin's actual data to understand if it's representative, right?

MR. FRITZ:  Objection.

THE WITNESS:  I couldn't replicate what she developed in order to analyze it.

BY MS. GOVERNSKI:

Q   But you didn't just look at the comments and do any of your own spot checking on the 250 posts in her Reddit data?

MR. FRITZ:  Objection.

THE WITNESS:  No.  Because that wasn't to my understanding my assignment.

BY MS. GOVERNSKI:

Q   But it didn't strike you as a proffered expert in this case that, I don't know, 870 versus 250, that seems a little off, maybe we should check?

MR. FRITZ:  Objection.

Page 293

THE WITNESS:  No, it did not.

BY MS. GOVERNSKI:

Q   Okay.  It says:

(As read):

"September dropped back down to 25, (76 percent decline.)"

Dropped down to 25 what?

A   Baseline period.

(Witness reading.)

So that's looking at volume.

Q   So in September, the posts dropped down to 25 posts?

A   Yes, based on this.  So August was 175 posts and we saw -- sorry -- a 76 percent decline in September down to 25 posts is what --

Q   Okay.  So your conclusions about what the Reddit data showed after the August spike was based on 25 posts?

MR. FRITZ:  Objection.

THE WITNESS:  I'm sorry.  Can you just repeat the last question?

BY MS. GOVERNSKI:

Q   Sure.  Your opinion based on the Reddit dataset of what occurred after the August spike was based on 25 posts.

74 (Pages 290 - 293)

CONFIDENTIAL

Page 294

A    A piece of the analysis was based on 25 posts that month during that -- on Reddit.

Q    Well, I'm talking about just Reddit.

So were there other posts other than the 25 mentioned here that you considered with respect to Reddit?

A    No.  I would have to go into the dataset.  But it would be the amount in the file.

Q    Okay.  So under Results, it says:

(As read):

"Spike is real and statistically significant."

Which refers to the August spike.  "But" in capital letters.

(As read):

"BUT the timing is right when the movie came out (August 9th) and when the alleged campaign started (August 2nd).  So can't really say which caused it from temporal data alone."

That's an accurate statement, right?

A    All right.  Just one second.  Yes.  But you would have to go on and read the results in its entirety.

Q    Okay.  Well, it says:

Page 295

(As read):

"The fact it immediately crashed 76 percent in September suggests movie hype more than sustained campaign.  Bots would be consistent over time."

Is that what you were referring to?

A    Yes.  And:

(As read):

"Activity patterns look normal.  79.5 percent weekday posting, natural hourly curve - excuse me -- and doesn't have the hallmark of coordinated activity."

Q    Okay.  So the results for Reddit were based on the about 60 posts for the baseline period and 100 posts for August and 25 posts for September, right?

A    Yes.  Based on the README, I would probably go in and just double check the dataset.  But yes.

Q    Okay.  So this README says that the alleged campaign started on August 2nd.  What is that based on?

A    I'd have to check.  But I believe that is in the discovery materials that I referenced on

Page 296

materials -- materials referenced.

Q    Okay.  Do you have any personal knowledge about whether or when -- sorry strike that.

Do you have any personal knowledge about whether the alleged digital manipulation started on August 2nd?

A    Sorry.  Did you say personal knowledge?

Q    Yeah.

A    No.

Q    Do you have any knowledge generally based on what you reviewed in this case?

A    Maybe I don't understand what you're asking.

Q    Let me ask the question in a better way.

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q    Do you have any reason to believe that the digital campaign started on August 2nd?

MR. FRITZ:  Objection.

THE WITNESS:  Based on the discovery material I was given, the alleged campaign had a date associated with it.  And I believe that's where I pulled the August 2nd date specifically.

BY MS. GOVERNSKI:

Q    Okay.  And what if it turned out that the

Page 297

digital part of the campaign started after August 2nd?

MR. FRITZ:  Objection.

THE WITNESS:  That would not change my analysis.

BY MS. GOVERNSKI:

Q    It wouldn't, say, if the campaign started on August 9th as opposed to August 2nd, wouldn't removing the data between August 2nd and August 9th have an impact on your outcome?

MR. FRITZ:  Objection.

THE WITNESS:  I hate to answer a question with a question but I guess my question would be why would we remove the data between August 2nd and August 9th?

BY MS. GOVERNSKI:

Q    Well, if the campaign started August 9th, wouldn't the period between August 2nd and August 9th be part of the baseline?

A    So there is a reason why I didn't include August 1, for instance.  And I wouldn't have included August 8th if the assumption was it started on the ninth.

So the baseline should be a period before there is any alleged manipulation, before there is

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

CONFIDENTIAL

Page 298

an actual launch of a movie. Whatever could aggressively increase sentiment one way or the other. Which is why I chose that for the baseline.

Q Right. So I mean your August spike is only one month. So August 1st through ninth or August 2nd through ninth is a whole week, right, that's seven days?

A Yes.

MR. FRITZ: We'll stipulate to that.

BY MS. GOVERNSKI:

Q So your data about the August spike would go from three weeks of data -- or from four weeks of data to three weeks of data, right?

A No.

MR. FRITZ: Objection.

THE WITNESS: The spike itself is based on just data. Based on what happened in real life. So there was a spike in sentiment, in overall volume. Just overall. So the spike happened irrespective of if it was a marketing campaign, despite whatever caused it. The spike still occurred.

BY MS. GOVERNSKI:

Q So why would the period from August 2nd to August 9th not be included in the baseline?

Page 299

MR. FRITZ: Objection.

THE WITNESS: I wouldn't include it in the baseline because I would end the baseline at a month -- a month outside of where we see an effective month. So you would want ideally several months of -- I don't want to say clean -- several months of un-destructive data as much as you can isolate those factors.

BY MS. GOVERNSKI:

Q So if the campaign started August 28th, would you include all of August in the spike?

A So irrespective of the alleged campaign, irrespective of -- a spike occurred in August outside of causation. So I took the baseline as the months previous to that spike in order to develop a baseline.

Q So you don't know or can't say one way or the other whether the spike started the first week in August or the second week of August?

You just didn't look at that, right?

MR. FRITZ: Objection.

THE WITNESS: I had daily data but the spike in general was in August and it's -- I think I specify in the report when the spike, when the spike occurred, when we saw the data, when volume

Page 300

increased. I believe I gave a date in the report.

BY MS. GOVERNSKI:

Q Okay. And you said that in your report that you used the Reddit scraper actor, right?

A Yes. The API.

Q Okay. The Reddit scraper actor does not allow users to perform searches.

Are you aware of that?

MR. FRITZ: Objection.

THE WITNESS: So in Apify, you are able to pull Reddit based on keywords.

MS. GOVERNSKI: Let's pull up what will be Exhibit 17.

(Exhibit 17 marked for identification.)

MS. ADAMS-JACK: Which document, Meryl?

MS. GOVERNSKI: The Reddit scraper actor. While we're here, let's go into the README where it says -- sorry, Autumn, while you're pulling that up, can you scroll down to the bottom of this?

BY MS. GOVERNSKI:

Q Okay. It says:

(As read):

"Reddit API pulls for Blake Lively, It Ends With Us, Justin Baldoni, top subs, pop-culture chat, 265 posts, Fauxmoi,

Page 301

189 posts, Romance books, 154."

Do you see that?

A Yes.

Q Are you aware that 265 plus 189 plus 154 adds up to 608. Maybe.

MS. GOVERNSKI: Kevin, you can stipulate that.

MR. FRITZ: Not without a calculator.

BY MS. GOVERNSKI:

Q I can represent to you they add up to 608. So I'm trying to understand are 608 of your Reddit -- of the data in the Reddit dataset from those three top subs?

A I'm not sure. The question is -- is it from Blake Lively, It Ends with Us, Justin Baldoni?

Q No. You see it says "top subs", right?

A Yes.

Q What are top subs?

A Top subs are the higher volume subs across Reddit.

Q And subs are subReddits?

A Yes. That's how Reddit refers to them.

Q Okay. So when you resisted using that term earlier, and you instead said subcategories, do they mean the same thing?

76 (Pages 298 - 301)

CONFIDENTIAL

Page 302

MR. FRITZ: Objection.

THE WITNESS: So subsections, I believe, is a more general use of looking at groups or sections across websites. SubReddits is very specific in someone understanding and knowing the architecture of Reddit.

BY MS. GOVERNSKI:

Q When you recall that we actually looked at posts from pop -- sub Reddit called pop culture chat and from FauxMoi, right?

A From pop culture chat, yes. I don't remember the FauxMoi.

Q Do you remember the Kurt Cobain one?

A Yes.

Q So 608 of the Reddit posts in your dataset were from these three subReddits, right?

A Top subs, yes. So 265 posts, 189, and 154.

Q Okay. And then it says Reddit API pulls. You didn't list Reddit API in your data sources. Why not?

A So we didn't use the Reddit API pulls. We used the Apify -- excuse me -- Apify Reddit pull.

Q Let's -- now the exhibit should be in there. Exhibit 17. The Reddit post scraper. You

Page 303

see it's Reddit scraper. Is this the API that you used?

You can see in the bottom, it's Apify.com.

A Yes. That should be the scraper.

Q That you used?

A Yes, I believe so.

Q Okay. And you can see it says:

(As read):

"Fastest, the most affordable, and stable, doesn't need any login or authentication, scrapes data (detailed posts, comment with votes, media, links, and replies) from Reddit based on a provided subReddits, username, specific link, or the homepage, with an optional limit on the number of posts retrieved."

Do you see that?

A I do.

Q So what subReddits did you enter here?

A So the -- excuse me. So the subreddit is optional.

Q What did you provide for this?

A I do not -- let me just double check.

Page 304

Q Well, what are you double checking?

A I am looking at the exhibit that you provided in the README files.

Q In the README file where it says "top subs, pop culture, chat fauxmoi, and romance books"?

A No. To see if we stated in the README file that there was any -- so that should have been left blank.

Q Well, then how would you search?

Because as we just looked at, this scraper requires you to either enter the subreddit or the username or the specific link or the homepage.

MR. FRITZ: Objection.

THE WITNESS: Here, we would have entered the homepage and the --

BY MS. GOVERNSKI:

Q I'm not asking what you would have done. What did you do?

MR. FRITZ: Objection.

THE WITNESS: So for this run, we would not have filled out any of the optional.

BY MS. GOVERNSKI:

Q What would you have filled out?

Let's go back, Autumn, please to the

Page 305

scraper that Ms. Alexander said she used, 17. Which says that it can provide these things based on a provided subreddit, username, specific link or the homepage. So you have to give one of them.

A No. So one of the options when you go in, again, they are all optional. So we would have provided the keywords --

Q Where on?

MR. FRITZ: Objection.

BY MS. GOVERNSKI:

Q Sorry. Go on.

A We would have provided the keywords under, I believe it's under information.

MS. GOVERNSKI: Okay. I actually have that. So let's go to the next Reddit scraper, Autumn.

THE WITNESS: Sorry. This is on manual so I would just look at the Json. So if you would like, I can refer to the Json file.

BY MS. GOVERNSKI:

Q Did you produce the Json file?

A So that would have been part of assuming the raw data or the script that Taylor used to fill this out.

Q The script that Taylor used. Did you

77 (Pages 302 - 305)

CONFIDENTIAL

Page 306

review the script that Taylor used?

A   The Json, no.  I reviewed the python and the extracts.

Q   Okay.  So you don't actually know what Taylor filled out to scrape Reddit?

MR. FRITZ:  Objection.

THE WITNESS:  I don't have the data readily available in front of me to reference.

BY MS. GOVERNSKI:

Q   As you sit here today, you don't know what Ms. Hunter did to scrape Reddit?

MR. FRITZ:  Objection.

THE WITNESS:  I'm happy to reference it to provide an answer.

BY MS. GOVERNSKI:

Q   Well, you don't provide an answer in your report, right?

A   The question isn't posed in my report.

Q   But describing how you identified the content on Reddit is not described in your report, other than saying that you used an Apify scraper?

MR. FRITZ:  Objection.

THE WITNESS:  That's what I provided in my report.  Yes.

Page 307

BY MS. GOVERNSKI:

Q   So Exhibit 18 is the information tab for the same Reddit scraper you can say it says based on a provided subreddit username specific link or the homepage and you see the specific input fields.

The actor accepts the following input fields.  If none are provided, it defaults to just scraping Reddit.com.

(Exhibit 18 marked for identification.)

A   Yes.  I see that.  So you don't have to define an optional -- like I said, on the first page, they were all optional.  So if you do not put a definition in, it scrapes Reddit as a whole.

Q   Okay.  So your dataset scraped Reddit as a whole?

A   I can answer that definitively if I reference the Json file that she used.

Q   But the Json file --

A   Because we didn't specify any optional input in the README file, then I would say there were no optional inputs that were added.

Q   So was it just a coincidence that 608 of the items in your Reddit dataset are from those three specific subReddits identified in the README file?

Page 308

MR. FRITZ:  Objection.

THE WITNESS:  So in the README file, it's looking at showing where the greatest amount of volume came from and again, if those are the major subReddits, then that would take up a large amount of volume.  Irrespective of the rest of Reddit.com.

BY MS. GOVERNSKI:

Q   Okay.  Well, let's look at your input.  Let's mark as Exhibit 18 your Reddit input.  Sorry.  It was Exhibit 19, which is an Excel spreadsheet.

By the way, who created the input spreadsheets?

(Exhibit 19 marked for identification.)

A   Those were done by Taylor.

Q   Did you review them?

A   I looked through each of the Excels before submitting them.

Q   Okay.  And so these input spreadsheets accurately reflect all of the data on which your opinions are based?

MR. FRITZ:  Objection.

THE WITNESS:  As a whole, it's based on all of the data that we collected and analyzed.

BY MS. GOVERNSKI:

Q   Yeah, so all of the five input files that

Page 309

comprise your entire dataset is what your opinions are based on, correct?

A   That is correct.

Q   Okay.  So let's scroll down to row 161.  I'm told that all this weird stuff on top is from the CSV file conversion to Excel.

So if we go to 161, you see that this is a post from January 5th 2024, which is consistent with the README file explaining that the Reddit dataset started back in January, right?

A   So this is a time stamp of January 2024, yes, via Reddit.

Q   Okay.  So that is consistent with the README file which said that the Reddit dataset collected content dating back to January 2024, right?

A   Yes.  So the input date for Reddit should have started in January 2024.  That was input.

Q   Okay.  And if we go to column F, you see it says "pop culture chat", right?

A   I see that.

Q   Okay.  And that's one of those subReddits that we talked about?

A   Yes.  That's one of them.

Q   Okay.  Can you look at the content and

78 (Pages 306 - 309)

CONFIDENTIAL

Page 310

tell me how your BERT sentiment analyzer characterized this post?

A   I would have to -- I don't want to make an assumption.  I would have to go back and look at the score that was given.

Q   Okay.  So we couldn't, based on this data, know how your sentiment analyzer categorized this post?

MR. FRITZ:  Objection.

THE WITNESS:  Unless you reproduced it in the BERT classifier.

BY MS. GOVERNSKI:

Q   Okay.  And if you scroll down.  Let's just, Autumn, scroll down to column F a little bit.

We see movies, movies, romance books, fauxmoi, movies, pop culture chat, pop culture chat, romance books.

So does this column, row F, adequately capture the subReddits that are comprised in your Reddit dataset?

A   This would pull from the subReddits, yes.  This would attach where the post pulled from across Reddit.

Q   Okay.  And we've already established that 608 of these posts in this column were from those

Page 311

three subReddits that we identified in the README file, right?

A   Yes.  From a volume perspective.  Yes.

Q   And you don't really know why the scraper pulled 608 items specifically from those three subReddits, right?

A   I would guess that it was because the keywords were relevant or the content somehow was relevant based on, again, Blake Lively, It Ends with Us, and the other keywords that I specify in the report.

Q   Well, why do you have to guess?

A   Because I didn't write the code for the scraper.

Q   So we would have to ask Ms. Hunter to really understand how you identified your dataset?

MR. FRITZ:  Objection.

THE WITNESS:  No, I'm not the one who wrote the API, for instance, for Reddit because the question, I believe, was why did it pull this particular data.  So that wouldn't be necessarily on the README file.  That would also be on how the scraper itself is -- or how API is used across Reddit.

Page 312

BY MS. GOVERNSKI:

Q   And isn't the most logical conclusion that you typed in -- or that Ms. Hunter typed in these three subReddits into the scraper?

MR. FRITZ:  Objection.

THE WITNESS:  No, because I believe there is data outside of the subReddits.

BY MS. GOVERNSKI:

Q   Right, but I'm talking about just the 608 within the subreddit.

A   I'm not sure I understand.  You're asking did she input into the optional field to identify those specific subReddits?

Q   The specific subReddits that she noted in her file that add up to 608 of the posts, isn't it possible that she just searched those Reddits using the data scraper we talked about?

A   If she only searched those, then you wouldn't have data from any other section.

Q   Unless she did an additional search, right, for that remaining 100 plus?

A   I don't believe that's what she did.

Q   But you don't know?

MR. FRITZ:  Objection.

THE WITNESS:  I would say with confidence

Page 313

that that is not -- not how she utilized the scraper.

BY MS. GOVERNSKI:

Q   But as you sit here today, you can't tell us what she did to utilize the scraper.

MR. FRITZ:  Objection.

THE WITNESS:  I did not give her any direction to add in optional fields, so I do not believe that she took it on her own onus to add in subreddit classifiers into fields that were optional.

BY MS. GOVERNSKI:

Q   But how do you explain that the API scraper that you used specifically does not contemplate entering search terms?

MR. FRITZ:  Objection.

THE WITNESS:  So the subReddits, or the categories that are the largest across any social media platform, will be ones that come back most often with data, especially if the information is relevant to that particular genre, classification, subreddit.

BY MS. GOVERNSKI:

Q   Okay.  Let's go to row 225.  And sorry -- oh, no.  Sorry.  227.  You see the post "Frances

79 (Pages 310 - 313)

CONFIDENTIAL

Page 314

Bean Cobain Pays Tribute to Her father, Kurt Cobain, 30 years After His Death," and in column F it's FauxMoi.

Q   Do you see that?

A   Yes, I'm on that row.

Q   Okay.  And that's the post we looked at earlier, right?

A   It has the same title, yes.

Q   Okay.  And the same subreddit, FauxMoi?

A   Yes.

Q   Okay.  So how did your BERT sentiment analyzer characterize this post?

MR. FRITZ:  Objection.

THE WITNESS:  So I think -- you asked me that question when we were looking at the actual image.  So again, I would say it should have classified it as null or neutral.

BY MS. GOVERNSKI:

Q   Okay.  So how many of the posts in this dataset should have been qualified as null or neutral?

A   I would have to go through and look at them individually to see which ones would be classified as positive sentiment, negative sentiment, null, or neutral.

Page 315

Q   Okay.  From this, we wouldn't be able to determine these things?

A   On how the classifier would classify it, no, we're not able to tell based on this.

MS. GOVERNSKI:  Let's -- Autumn, if you can move the TikTok README and we will mark that as Exhibit 20.

(Exhibit 20 marked for identification.)

BY MS. GOVERNSKI:

Q   Do you know, Ms. Alexander, how many videos are on TikTok every month?

A   In TikTok?

Q   Uh-huh.

A   I don't know offhand, no.

Q   What about every day?

A   I don't know offhand.

Q   Ballpark?

MR. FRITZ:  Objection.

THE WITNESS:  I couldn't even venture to guess.

BY MS. GOVERNSKI:

Q   Does 34 million sound like maybe around what you would expect?

MR. FRITZ:  Objection.

THE WITNESS:  I guess it would depend if

Page 316

that's global or U.S.

BY MS. GOVERNSKI:

Q   But it doesn't sound crazy to you that there would be tens of millions of TikTok videos every day posted?

A   No, that sounds rational.

Q   Okay.  Exhibit 20 is your -- the TikTok README file.  Do you see that on your screen?

A   Yes.

Q   Okay.  And you see it says "Analysis of Blake Lively TikTok videos, 688 videos total from the dataset."

Is that right -- is that right?

A   Sorry, just give me a second. August 27th, I believe that's correct.

Q   Okay.  So when you look at what it calculates, you see the baseline period mean about eleven videos per month; is that right?  Is that accurate?

MR. FRITZ:  Objection.

THE WITNESS:  I'd want to go into the dataset to just confirm, but that's what this reads, yes.

BY MS. GOVERNSKI:

Q   Okay.  But we talked about earlier that

Page 317

you would have confirmed the accuracy of the README files before you produced them to us, right?

A   I would have gone through and README each of the README me files.

Q   So this README file says that there were eleven videos per month, which is about 33 videos from May to July 2024; is that right?

A   That's what this says, yes.

Q   Okay.  And it says the August spike is 187 videos, right?

A   It does.

Q   Okay.  So your analysis of the August spike, with respect to TikTok, was based on 187 videos?

A   That's what this says.  Again, I would want to check the data.

Q   Okay.  We'll do that.  And then September dropped to 31, right?

A   Based on this read my file, yes.

Q   Okay.  And then the -- in the results, the results in the README file would be based on the other data described in the README file, right?

A   I'm not sure I understand the question.

Q   I mean, the results here are based on the number of posts it describes that we just discussed,

80 (Pages 314 - 317)

CONFIDENTIAL

Page 318

right?

A    So --

MR. FRITZ:  Objection.

THE WITNESS:  -- again, I would want to go in and just double check that the -- that the total numbers are, indeed, accurate.  But the results should be consistent with what I have in my report.

BY MS. GOVERNSKI:

Q    And the comment that:

(As read):

"The same timing issue as to all platforms:  Movie came out August 9th, alleged campaign, August 2nd, can't say what caused it from timing alone"

Is still your opinion, right?

A    Yes, again, going back to use of the word "definitive" that we talked about earlier.

Q    Okay.  So you -- but they don't use the word -- she doesn't use the word "definitive" here, right?

A    I believe I use it in my report.

Q    Right.  But not it's not in the README file, right?

MR. FRITZ:  Objection.

Page 319

THE WITNESS:  The README file was written by Taylor Hunter, the report was written by myself.

BY MS. GOVERNSKI:

Q    Oh, so do you not stand behind Ms. Hunter's work as described in the README files?

MR. FRITZ:  Objection.

THE WITNESS:  I use different verbiage, based on, again, analyzing and doing the interpretation of the data.  That's why I am the end publisher of the report.  This is information that Taylor is feeding in based on her analysis, aggregation, and pulling of the datasets.

BY MS. GOVERNSKI:

Q    But you didn't make any edits to her comments in the README file, right?

A    No, I did not.

Q    And you used a TikTok hashtag crawler actor, right?

A    I'm sorry.  A hashtag crawler actor?

Q    Uh-huh.

A    So it was the actor for the API for TikTok, I don't believe it actually calls itself a crawler.  I don't remember that verbiage in the way that it's --

Q    Okay.  Let's look at your report to

Page 320

refresh your recollection.  If you can put it on the screen on page 109.  Okay.  You see it says "Apify TikTok hashtag crawler actor."

Do you see that?

A    Oh, so if that's the way I identified it there, then I'm assuming that is the way it is -- it has named itself, yes.

Q    Well, why are you assuming if you put it in your appendix?

A    So if that's the way that it is described, then when I use it in sourcing, I use the verbiage of what it is called.

Q    Okay.  And do you understand that TikTok hashtag scraper allows you to extract data from TikTok videos that used a particular hashtag?

A    Yes.

Q    So what specific hashtags did you use?

A    So you don't have to specify a hashtag, just to be clear.  You can use keywords in that scraper as well.

MS. GOVERNSKI:  Okay.  Well, let's take a look at that scraper.  Actually, before we do, the TikTok hashtag scraper is called TikTok hashtag crawler actor.  Okay.  Let's look at Exhibit 21.  And Autumn, go ahead and do Exhibit 22 as the TikTok

Page 321

input.

(Exhibit 21 marked for identification.)

BY MS. GOVERNSKI:

Q    You should have Exhibit 21 in your Exhibit Share.  We will put it in up on screen.

You see this is Apify TikTok hashtag scraper, right?

A    Yes.

Q    It says:

(As read):

"What is TikTok Hashtag Scraper.  It's a. . . powerful tool that allows you to extract data from TikTok videos that use a particular hashtag."

Do you see that?

A    Yes, I'm reading it.

Q    Okay.  And then if you look, it provides how to scrape TikTok with the TikTok hashtag scraper.  And it has five specific points.  The third of one, says "Add one or more TikTok hashtags."

Do you see that?

A    Yes, I do.

Q    So what hashtags did you use to scrape TikTok?

CONFIDENTIAL

Page 322

A    So we would not have used hashtags.  So I would have to go back into the dataset to see if this is the appropriate scraper or if it's a different one.

Q    So when you listed a TikTok hashtag crawler, it's your testimony that you did not actually ask it to crawl certain hashtags?

MR. FRITZ:  Objection.

THE WITNESS:  No.  So hashtags -- some hashtags came with the data, but the point of the data analysis was not to specify a hashtag, so it shouldn't have been this particular scraper.

BY MS. GOVERNSKI:

Q    How would I determine what scraper you used if it's not the scraper that you listed in your materials?

A    So I would have to check the output data, but we did not use a hash -- we did not use hashtags.  We identified the keywords that I mentioned in my report.  So it would have to be a scraper that was not hashtag only.

MS. GOVERNSKI:  Okay.  So let's go to Exhibit 22, which is your TikTok input data.  And we'll mark this as Exhibit 22.

(Exhibit 22 marked for identification.)

Page 323

BY MS. GOVERNSKI:

Q    Okay.  Let's -- well, I don't know, let's look at rows 3 and 4.  That looks like the exact same post, right?

A    Rows 3 and 4?

Q    Uh-huh.

A    Yes.

Q    Why does your data include two of the same posts?

A    Let's look at the time stamp.

Q    Let's scroll over.  We can look at all the columns to see that they are all the same.

A    I'm not sure why there's duplicate, but it could be from translation, it could be from -- I'm not sure --

Q    Okay.

A    -- each post should be a unique post.

Q    It should be.  Why is that?

A    So again, it may be a unique post.  It may be an identical post so it could have been from two different --

(Witness reading.)

I don't see any differentiation across any of the columns, so I'm not sure why it shows up twice.

Page 324

Q    Okay.  Let's go to 31 and 32.  These are the same two, right, as each other?

A    Yes.

Q    Do you have any idea of how many of the entries in your TikTok data are actually duplicates?

A    I don't know.

Q    Isn't it important for you to know that?

MR. FRITZ:  Objection.

THE WITNESS:  It's not necessarily important.  Because again, as I'm pulling them from the scraper -- or from the API, TikTok is looking at these as individual entries, which is why they are on individual rows, assuming on the conversion process from the file that I submitted.  So they may be duplicative, but if you were to back out why they show up twice, the assumption is they would show up twice on two different accounts.

BY MS. GOVERNSKI:

Q    Okay.  So let's assume, hypothetically, that every single one of your TikTok videos is in here twice, that would mean that your dataset of TikTok videos is not actually 688, it's 688 divided by two, right?

A    Based on the assumption that you just outlined?

Page 325

Q    Yup.

A    Based on your assumption, that's one way of calculating, yes.

MS. GOVERNSKI:  Okay.  Let's go to what we will mark as Exhibit 23, which will be the YouTube README.

(Exhibit 23 marked for identification.)

BY MS. GOVERNSKI:

Q    You should have Exhibit 23 now.

A    Yes.

Q    And you see that this says "16,337 comments."

Do you see that?

A    1,789 comments?

Q    16,337 comments, right?

A    This is YouTube analysis?

Q    YouTube analysis, on the screen.

A    Oh, at the top, it says 16,337.  Yes.

Q    Okay.  That says "comments," not videos, right?

A    This says "comments," yes.

Q    So your YouTube analysis looked only at comments?

A    I would have to go back into the data, but to see how -- how it was collapsed.  So if it

82 (Pages 322 - 325)

CONFIDENTIAL

Page 326

looked at comments only, or if each line had a comment, along with any additional metadata or data from the videos.

Q    But that would be in your input files, right?

A    No, not necessarily.

Q    What do you mean?

A    So if I classify something as a post on Instagram, you can interpret that as one post, or as some of the images that you showed me, there was one post but there were multiple frames that you have to analyze. So depending how the data -- what is able to be extracted with the data, it could show information for that one Instagram post that you show. But as I mentioned, there were like five different tabs. So it could also give information for those different tabs.

Q    So that wouldn't be in the Excels that you produced to us?

A    No, it should. If it was available, it should.

Q    So that was my question. If you pulled more than the comments, that would be reflected in the input Excel that you provided us.

A    In the dataset, yes.

Page 327

Q    Okay. And if -- let's go down to results. Well, actually, we can start with what it calculates. It shows 85 comments per month for the May to July. 1789 comments for August. And 445 for September. Do you have any reason to think that those numbers are inaccurate?

A    No, I don't believe they are. I believe they are accurate.

Q    Okay. And then in results, it again says "spike is absolutely massive." And in the second paragraph, it says:

(As read):

"Same timing issue as all other platforms - movie came out August 9, alleged campaign August 2. Can't definitively say which caused it."

Right?

A    Yes, I'm reading that.

Q    Then is says:

(As read):

"Then there were additional spikes in January/February (when lawsuit was filed) and October 2025 - which shows that volume correlates with newsworthy events, supporting organic

Page 328

explanation."

Do you see that?

A    I do.

Q    Is that your opinion or is that Ms. Hunter's opinion?

MR. FRITZ: Objection.

THE WITNESS: So that is an inference that Ms. Hunter made. It is an inference that I've also made in addition to that.

BY MS. GOVERNSKI:

Q    Okay. So what is your basis for understanding that spikes in January and February and October were related to newsworthy events?

A    So based on the data, we saw that there was the spike initially in August. And then in December, around the time of filing the lawsuit, there was additional spike.

Q    So you didn't consider any other events that occurred in December that could have caused that spike?

A    I didn't see -- I didn't find any other data that highlighted other key news cycles that would be able to be considered.

Q    In the dataset, in your dataset, right?

A    Correct.

Page 329

Q    You didn't go out and look for other explanations?

A    No, I didn't actively look at macroeconomic factors.

MS. GOVERNSKI: Okay. Let's' look at the input for your YouTube, which should be Exhibit 24.

(Exhibit 24 marked for identification.)

BY MS. GOVERNSKI:

Q    This is your underlying YouTube data, right?

A    Yes, this looks like the CSV.

Q    Okay. And so column B shows the time stamp, you see it starts with May 16, right?

A    Yup.

Q    Okay. And let's go over to column I, you see "search term," so that reflects the search terms that you used in YouTube, right?

A    That is the search term that is used with the scraper, yes.

Q    Yeah, so why -- well, a scraper, you didn't use a scraper, you used the YouTube data API, right?

A    With the API.

Q    Okay. So why does this spreadsheet have a search term and your other spreadsheets don't?

83 (Pages 326 - 329)

CONFIDENTIAL

Page 330

A   It would be the way we were able to extract the file itself.

Q   So if you didn't actually use search terms with the other scrapers, could that also be an explanation of why there is not a column that says "search terms"?

A   No, the output of the files is dependent on the parameters that either a scraper or an API gives you back.  So you wouldn't add or remove anything.

Q   So if we go to -- there is video ID column, column F and a title of the video in J.

Do you see that?

A   Column F, yes --

Q   And J.

Do you see that?

A   Yes.

Q   Okay.  And you see the video title for -- gosh, everything on screen right now is It Ends with Us official trailer, right?

A   For video title, yes.

Q   Yeah.  So who picked this video?

A   I'm not sure what you mean "who picked the video."

Q   Well, who picked to analyze this video?

Page 331

A   So all of this data came back based on the keywords and the time that we provided to YouTube's API.

MS. GOVERNSKI:  So Autumn, can you copy the video ID here?  The Dlet_U31, can you copy that?  And then can you do a filter for that?  If you go to the -- yeah, perfect.  Oh, no.  You just took it away.  Thank you.  And go to video ID, and let's look for that one.  Autumn, if you just go -- wait, Autumn.  Can you just -- go to -- go out of this.  Just go to the top -- the arrow, the arrow on F, on F, the arrow on F.  Right there and paste it right here under "search."  Okay?  And then do "okay."

BY MS. GOVERNSKI:

Q   So do you see on the bottom left, Ms. Alexander, it's 200 of 16,337 records?

A   200 -- yes, I see that.

Q   So why are there exactly 200 comments to this trailer?

MR. FRITZ:  Objection.

THE WITNESS:  I wouldn't know why there is 200 comments on a trailer.

BY MS. GOVERNSKI:

Q   Do you know whether you could have collected all of the comments to this trailer?

Page 332

MR. FRITZ:  Objection.

THE WITNESS:  So we collected what was available via the keywords that we entered and the time frame.  This is the dataset that was given back from the API.

MS. GOVERNSKI:  Okay.  Autumn, let's get Exhibit 25, which is the post that matches what we just looked at, the It Ends with Us trailer.

(Exhibit 25 marked for identification.)

BY MS. GOVERNSKI:

Q   And how many comments do you see in this document?

A   In total -- let's see, 8,582 comments.

Q   Okay.  So why does your dataset only include 200 of them?

A   There's -- one of the possible reasons is because there is a maximum amount of comments that are available via the API.  I'd have to go back to YouTube's API to just double check that.  But there's usually a maximum.  It could also mean that, at the time, that was all that was available.  I mean, I'm not sure of the specific reason why.

Q   That's a pretty big difference between 208,000.  Wouldn't that be important for you to understand?

Page 333

MR. FRITZ:  Objection.

THE WITNESS:  So it wouldn't if the 200 is a randomized sample of the 8,352.

BY MS. GOVERNSKI:

Q   Well, how do you know whether the 200 is an accurate sample of the 8,000 posts?

A   All I can say is that based on the API, that is the data that we would have received from -- from scraping or from providing those keywords.  So I would assume that there is a maximum.  I would have to go into -- I'm not as familiar with YouTube's API, I would have to confirm and why it would cut off.  But the likely assumption is that there are sometimes maximum amounts of downloads that you could get.  And I'm assuming it was cut off at 200, which is why it's a specific number.

Q   Well, I don't understand why you have to assume that if this is your report and your search.

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q   Why don't you know whether the API that you used was capped at 200 comments?

A   That's not readily -- that's not knowledge I readily have available.

Q   Who would have that my knowledge readily

84 (Pages 330 - 333)

CONFIDENTIAL

Page 334

available?

MR. FRITZ: Objection.

BY MS. GOVERNSKI:

Q   Ms. Hunter?

A   Google -- no, Google.

Q   Okay.

A   YouTube.

Q   And you didn't think it was important for you to understand that.

MR. FRITZ: Objection.

THE WITNESS: I don't think that it would change the analysis.

BY MS. GOVERNSKI:

Q   Okay. Are you aware of how many people viewed this trailer? Are you aware when the trailer came out?

A   No, no.

Q   Are you aware that the trailer came out during the baseline period?

A   I wasn't until you just mentioned it.

Q   Wouldn't that affect your analysis of what the appropriate baseline period is?

A   It could have an effect, yes. It would actually make the baseline higher.

Q   Wouldn't the baseline need to come from a

Page 335

period that didn't include a film-related event?

MR. FRITZ: Objection.

THE WITNESS: Not necessarily. So ideally, a baseline should be of a non-statistically significant news cycle or period of time without any large media cycles. So if, as you said, this came out during that period of the baseline, that would actually increase, assumingly, my overall baseline and not lower it. Which would then mean the spike, subsequently -- again, assumptions -- that the spike subsequently wasn't as high from the baseline as I originally thought.

BY MS. GOVERNSKI:

Q   Okay. Let's look back at the YouTube rows 2 through 7, you see rows 2 and 3, 4 and 5, 6 and 7, 8 and 9, 10 and 11, 12 and 13, I mean, all the way down, they're exact duplicates, right, they are counted twice?

MR. FRITZ: Objection.

THE WITNESS: So duplicate -- so I just want to clarify.

MR. FRITZ: I don't think there is a question pending.

So just note my objection.

MS. GOVERNSKI: There was. My question

Page 336

was: These are exact duplicates, right?

MR. FRITZ: Okay. You can answer that.

THE WITNESS: I don't know if they are exact duplicates. I will say the content appears to be the same. There could be different reasons for that. It could be the same user posted twice. There could be -- I don't know possibly other reasons.

BY MS. GOVERNSKI:

Q   Okay. But posted twice at the exact same time?

A   I'm not sure what caused this.

Q   And do you know how many pieces of data in this YouTube dataset reflect duplicates?

A   I do not.

Q   Okay. Let's go to row 344, which is from August 9th. And you start seeing comments saying:

(As read):

"Justin Baldoni is a huge part of this movie and deserves to promote it as much as Blake Lively does."

Do you see that? We can expand this so you can see it.

Do you see that?

A   Yes.

Page 337

Q   How would your sentiment analysis -- actually, Ms. Lively's name doesn't appear in this. Oh, yes, it does.

Okay. "As much as Blake Lively does." so how did your sentiment analyzer categorize this text -- I mean this post?

A   I would have to go back and refer to the number that it gave this post.

Q   Okay. Let's go to row 353. And it says:

(As read):

"Justin deserves more spotlight."

How -- Ms. Lively is not mentioned in that post, how would your analyzer categorize this statement?

MR. FRITZ: Objection.

THE WITNESS: The classifier should put that in either null or neutral.

BY MS. GOVERNSKI:

Q   Okay. How many of the posts that we're looking at here, in your YouTube data, should have been classified as null or neutral?

A   I can't answer that just offhand. I'd have to go into the data to look.

Q   The data that you didn't provide us?

A   Or this data specifically, and go through

85 (Pages 334 - 337)

CONFIDENTIAL

Page 338

each one.

Q   Okay.  Well, let's do that.  How do you know how this one was categorized?

A   So I could replicate that, as you could, by putting the data into the classifier that's accessible and seeing the output on what the score is.

Q   Was this one of the posts that you manually checked?

A   I do not know.

MS. GOVERNSKI:  Okay.  I think we can pause right now.  I'd like to go off the record.

THE VIDEOGRAPHER:  We're off the record.

MS. GOVERNSKI:  John, can you tell me how much time we've been on the record?

THE VIDEOGRAPHER:  Sure.  Off the record.  It's 7:42 p.m.

(Recess).

THE VIDEOGRAPHER:  We're back on the record.  It's 7:49 p.m.

BY MS. GOVERNSKI:

Q   Ms. Alexander, you create -- your report says you performed a network structure analysis; is that right?

A   Yes.

Page 339

Q   Have you -- well, what are your notes?

A   I'm sorry.  What are my notes?

Q   Nodes.  N-O-D-E-S.

A   Oh, I'm sorry.  So the nodes that I used for the analysis are from Google -- sorry, there's a word associated with it.

Q   What are you looking at right now, Ms. Alexander?

A   I'm looking at my report.

Q   Okay.  Where in your report does it describe your nodes?

A   On page -- actually, so it doesn't describe it on the report itself.

Q   Okay.  So how would I know what your nodes were?

A   I would have to go back into the dataset that I provided you in the -- in the -- in the README file.  I'm not sure where I included it.

Q   You didn't produce any work product relating to your network structure analysis?

A   So that's not necessary to replicate the data.

Q   Well, you just described that the nodes would be located in a README file, but you didn't produce to us with the README file, right?

Page 340

A   I would have to check the data file -- I mean, sorry.  The data folder itself.  If they are not in there, to caveat, that's not necessary to reproduce it.

Q   So how would we know what nodes you used?

A   So unless I'm fine-tuning the nodes themselves, you can use any nodes outside of Google or any other third party in order to look at a similar analysis.

Q   And what are your edges?

A   I don't know without looking.

Q   Okay.  So you wouldn't know unless you looked at the data?

A   Correct.

Q   Okay.  And you conducted a time series forecasting, right?

A   That's in the report, yes.

Q   But you didn't use your BERT sentiment analysis for purposes of the time series forecasting, right?

A   No, I did not.

Q   Why didn't you?

A   Because BERT is -- is -- does its best job on looking at natural language processing versus forecasting.  I used it for the sentiment analysis

Page 341

specifically.

Q   What is your basis for that statement about BERT being best used for the way you used it but not for time series forecasting?

A   BERT was built to be a natural language processor.  It has a myriad of data that backs it up for contextualization, tonality.  It's -- it's an industry standard for use.

Q   But why wouldn't you -- well, what did you use for your sentiment -- time series forecasting sentiments?

A   I used the -- I used the -- I used just the forecasting.  I used a regression model and a forecasting technique.

Q   How did you identify the sentiment of the posts for purposes of your time series forecasting?

A   I took it from the sentiment, the aggregate sentiment of the -- of the output of BERT.

Q   Oh, so you did use the BERT outcome for purposes of the time series forecasting?

A   As the baseline for sentiment, but the forecast itself was done with a regression model.

Q   Okay.  So you did not use a keyword-based classification for your time series forecasting?

A   For my time series, with the spike and

86 (Pages 338 - 341)

CONFIDENTIAL

Page 342

without the spike, that's a specific chart in my report, the baseline is the outputs of BERT, which is a classifier. And I used a regression model forecasted with the spike and without the spike.

Q   And so when, in your report, you describe using 20 positive keywords and 20 negative keywords, how did you use those keywords?

A   So those keywords are still the keywords based on the inputs that I provide in my report. Those keywords were the ones that I used consistently for the scraper across the APIs and were part of the aggregate of the data that came out of the classifier. And I used that into the regression model.

Q   Well, you have 20 -- you have specific keywords here. You say positive keywords like love, amazing, talented, support, and then negative keywords like hate, terrible, toxic, boycott. So it's your testimony that you used those terms in your BERT analysis?

A   So I pulled out the major cluster of -- based on volume. I pulled those out, and I asked it -- sorry. I instructed the system to give me a sentiment score based on those keywords. Based on the output from the BERT model, or BERT classifier,

Page 343

I then conducted a regression analysis.

Q   So why didn't you just use the sentiment scores from the BERT model that we discussed earlier?

A   Because the total sentiment was an aggregate. So I needed more granular information than the aggregate scores.

Q   But you testified earlier that you could look at the specific scores for each post.

A   And in a subsequent question that you asked me was why I did not give that as an output. One of the reasons is because it was difficult to get the data on a subaggregate level out of BERT in order to do the analysis. So --

Q   I understand -- sorry. Go on.

A   So I used specific keywords.

Q   Okay. So your time series forecasting depends on both, as an initial level, the BERT sentiment classifier and then -- and keywords from the BERT sentiment analysis?

A   So it's the sentiment scores, the keywords that I provided, and then outside of that, the final step is to do a forecast.

Q   Okay. So if I wanted to recreate what you just described, how would I do that?

Page 344

A   So in order to recreate the forecast with spike and without spike, you are able to go into the dataset I provided and Python code, and you should be able to replicate it, based on everything I provided.

Q   Well, you didn't provide us with all of your positive and negative keywords.

A   But it's not based on all of the positive and negative keywords. So if you look -- so if you take the output from BERT, which is the classifier, it provided aggregate sentiment scores. I used that as a base. Outside of that, I also looked at keywords that were associated with the sentiment, and I provided a forecast and a counterfactual.

Q   So if we wanted to recreate, how would we find the complete list of the keywords that you used?

A   You don't need the complete list of the keywords in order to recreate it. So if you go into the files that I provided, you should be able to see the details in the dataset and the README file.

Q   Who came up with the list of keywords?

A   For that specific -- for the forecast and the counterfactual?

Q   Uh-huh.

Page 345

A   I believe that was me.

Q   Okay. So do you have that list?

A   I would have to look at the -- I would have to look at my data folder.

Q   Do you have a data folder of --

A   The zip file that I provided to -- to counsel.

Q   Okay. So you're saying that the data file you provided us should include the list of keywords that you used?

A   It should provide you with everything you need to replicate --

Q   That wasn't my question.

MR. FRITZ: Objection.

BY MS. GOVERNSKI:

Q   Does the data you provided us include the list of all the keywords you used?

A   I would have to look to see if that is included.

Q   Okay. So how often have you created a regression model?

A   How often?

Q   Yeah.

A   I -- so a regression analysis, I've done it at Ipsos, as well as Nielsen, as part of leading

87 (Pages 342 - 345)

CONFIDENTIAL

Page 346

the Bases team, which is a product that we use on a daily basis for clients.

Q    How often did you create a regression?

A    I probably did regressions or checked regressions that my team did on a weekly basis.

Q    Okay.  Your report lists certain documents including Ms. Lively's discovery responses.  Did you personally review all of her responses to the interrogatories?

A    The last word was "interrogatories"?

Q    Yup.

A    I'm not sure what -- what you mean.

Q    In your Exhibit Appendix C, it states that you reviewed Ms. Lively's third amended responses and objections to a set of interrogatories.  It lists four documents.  I'm wondering if you reviewed personally all of those interrogatory responses.

A    I would have, yes.  I went through the files meticulously, so --

Q    Okay.

A    -- I went through everything that was provided.

Q    Okay.  And did you review the underlying materials that are referenced in the

Page 347

interrogatories?

A    I'm not sure I reviewed the underlying materials, no.

Q    Okay.  What was your response to parts of the interrogatory that discussed how the defendants boosted contents on social media?

A    I can't -- I don't recall the data that -- or the context that you're referring to.

Q    Okay.  Well, what is your reaction to understanding that the defendants communicated about boosting social media?

MR. FRITZ:  Objection.

THE WITNESS:  So I read through -- I recall some of the claims, but I can't remember if it was in that report or if it was part of Dr. Mayzlin's and Dr. Humphreys' report and them referencing it.  I can't tease out the difference between where the information came from in my mind.

BY MS. GOVERNSKI:

Q    Okay.  Well, Ms. Lively's interrogatory included multiple pages of quotes from direct emails and communications amongst the defendants.

Do you remember reviewing those?

A    Not offhand.  I remember some of it, but again, I'm not sure if it's from the report or --

Page 348

I'm not sure if it's from the amended or from Dr. Mayzlin and Dr. Humphreys.

Q    Okay.  So in one of the communications, they talked about successfully shifting the narrative online.  Did you consider that communication?

A    The communication, no, that was not part of my consideration.  So the goal that I went into with analyzing was to look at it without assumptions or applied assumptions to look at the dataset from a clean perspective.

MR. FRITZ:  John, how long have we been on the record?

MS. GOVERNSKI:  Well, we can go off the record, if you want to get a check of the time.

THE VIDEOGRAPHER:  Seven hours exactly.

MS. GOVERNSKI:  Was his question included in that?

Okay.  I have one final question.  Are we still on the record, John?

THE VIDEOGRAPHER:  Yes.

BY MS. GOVERNSKI:

Q    One final question.  So when you said you wanted to look at the data without considering the external materials, you then did not consider any of

Page 349

the communications amongst the defendants when you were reaching your conclusions?

A    I'm not sure I understand the question.  Are you talking about the underlying data that was -- or the material that is referenced outside of the actual amended itself?

Q    I'm talking about in the interrogatory, the specific quotes over multiple pages from email communications and text communications amongst the defendants.

A    So, I'm sorry.  So you keep using the word "interrogatories," and that's not something I'm familiar with.  So I read through the amended -- the amendment from Ms. Lively.  If you're referring to references of emails or, I don't know, any content that was not in that amended document, then no, I probably did not review and/or consider it.

MS. GOVERNSKI:  Okay.  I'm going to keep this deposition open and seek relief from the Court to have an additional 30 minutes of time, given how the deposition started.

MS. ADAMS-JACK:  Can we claw back Exhibit 26?  We didn't get to it, and I think it expired my ability to pull it back.

THE STENOGRAPHIC REPORTER:  That's a

88 (Pages 346 - 349)

CONFIDENTIAL

Page 350

Maggie question.

THE A/V TECHNICIAN: I think that should be -- that can be done. I won't be able to do that right now. I also don't have access to that because of the time that's elapsed. But we can -- we can figure that out.

MS. GOVERNSKI: Okay. I will send an email.

THE STENOGRAPHIC REPORTER: Thank you.

MS. GOVERNSKI: Okay. Well, Ms. Alexander, we may be back here, at least for some time, so we will work to schedule that promptly.

MR. FRITZ: And the record should reflect we proposed an additional five minutes to avoid judicial intervention and that was rejected by Ms. Lively's counsel.

THE STENOGRAPHIC REPORTER: And Counsel, do we need that part with the judge earlier on that court call, do we need that transcribed with the same transcript?

MS. GOVERNSKI: It should be transcribed, but it can be its own separate transcript. We probably need to then provide that to the Court.

THE STENOGRAPHIC REPORTER: Okay.

Page 351

MS. GOVERNSKI: Thank you.

THE VIDEOGRAPHER: Okay to go off the record, everybody?

MS. GOVERNSKI: Yes, thank you.

THE VIDEOGRAPHER: Okay. We're off the record. It's 8:06 p.m.

(WHEREUPON THE DEPOSITION CONCLUDED AT 5:06 p.m. PST, 8:06 p.m. EST)

Page 352

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 16th day of December, 2025.

_____
ASHLEY SOEVYN
CSR No. 12019

Page 353

BLAKE LIVELY vs. WAYFARER STUDIOS LLC, ET AL.
12/15/2025 - NICOLE ALEXANDER
E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____

_____  _____
NICOLE ALEXANDER          Date

89 (Pages 350 - 353)

CONFIDENTIAL

Page 354

BLAKE LIVELY vs. WAYFARER STUDIOS LLC, ET AL.
12/15/2025 - NICOLE ALEXANDER

ACKNOWLEDGEMENT OF DEPONENT

I, NICOLE ALEXANDER, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

NICOLE ALEXANDER            Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

90 (Page 354)

CONFIDENTIAL

**[& - 18]**                                                                     Page 1

| **&** | 154:12,19 | **1160**   131:23 | **15**   1:22 2:23 |
|---|---|---|---|
| **&**   3:5 4:4 5:4 | 162:22 163:14 | 132:1,17 | 10:6 11:4,14 |
| 9:5 14:17,21 | 239:12,14 | 142:10 | 12:4,18 13:4 |
| 14:24 16:14 | 295:16 312:21 | **118**   11:15 | 14:3 69:7 86:4 |
| **0** | **100,000**   229:24 | **11:04**   2:22 14:6 | 113:21 118:5 |
|  | **10017**   9:9 | **11:25**   110:11 | 257:18 268:7 |
| **001**   61:14,19 | **10049**   1:7 2:7 | **12**   10:16,20 | 282:12,14 |
| 63:10 | **101**   151:9 | 12:13 25:13,19 | **154**   301:1,4 |
| **002**   62:20 63:5 | **10100**   6:17 | 161:15 268:6 | 302:18 |
| 63:12 67:11 | **105**   289:24 | 279:8,9,10 | **15th**   14:6 |
| 125:20 144:18 | **106**   162:22 | 335:16 | **16**   11:7 12:20 |
| **0o0**   1:3 2:3 | **108**   127:20 | **12/15/2025** | 268:7 269:1,10 |
| 14:1,4 185:12 | 128:10,16 | 353:2 354:2 | 285:13,17,21 |
| **1** | 144:18 160:16 | **12/22/24**   12:9 | 329:13 |
|  | **109**   128:4 | **12/4/25**   12:21 | **16,000**   217:8 |
| **1**   10:14 11:7 | 140:11,15,16 | 13:7 | **16,337**   325:11 |
| 16:9,11 198:7 | 207:10,12 | **12019**   1:24 | 325:15,18 |
| 200:11 297:21 | 320:2 | 2:25 11:5 12:5 | 331:16 |
| **1,096**   209:24 | **11**   12:12 | 13:5 15:6 | **161**   309:4,7 |
| 210:3 | 140:24 268:6 | 352:25 | **164**   152:3 |
| **1,191**   210:5 | 269:2,8 278:8 | **125**   9:8 | **169**   35:22 |
| **1,789**   325:14 | 278:10 335:16 | **12:00**   61:8 | 43:16 214:17 |
| **1.1**   174:14 | **11/18/25**   12:20 | **12:09**   61:11 | 224:4 |
| 175:8 184:7 | 12:23,24 13:8 | **12:11**   62:14 | **16th**   352:22 |
| **10**   10:12 12:10 | 13:9,10 | **12:12**   62:17 | **17**   12:21 209:7 |
| 268:6 276:6,8 | **110**   207:3,7 | **13**   12:15 268:6 | 300:13,14 |
| 335:16 | **110,000**   35:12 | 269:9 280:22 | 302:25 305:1 |
| **10/18/25**   12:13 | 35:13,19 | 281:1 335:16 | **1700**   4:9 |
| 12:15 | **112**   11:11 | **131**   11:17 | **175**   293:13 |
| **10/25/25**   12:16 | **113**   11:14 | **14**   12:16 81:15 | **1789**   327:4 |
| **10/27/25**   12:18 | **1139**   132:1,17 | 81:16 268:6 | **17th**   167:4 |
| **100**   44:11 | 142:9 | 281:20,23 | **18**   12:22 79:12 |
| 148:20,24 | **1140**   132:13 | **147**   11:21 | 79:15 80:16,17 |
| 149:23 151:10 |  |  | 80:22 307:2,9 |

CONFIDENTIAL

**[18 - 282]**                                                                                        Page 2

308:9

**18,879**  288:18

**1801**  7:9

**187**  317:10,13

**1875**  5:8

**189**  301:1,4
302:17

**19**  12:23
308:10,13

**1976**  220:7
221:3

**1:16**  112:8

**1:25**  111:6

**1:26**  112:11

**1st**  298:5

**2**

**2**  10:18 11:8
61:23,25 64:3
67:2,8 129:9
198:3,3,4
207:10 209:6
214:16,19
327:15 335:15
335:15

**2,039**  217:7

**20**  10:12 12:24
36:17 43:8,21
79:22 129:5,7
129:9 257:18
257:18 288:24
289:2,5,6
315:7,8 316:7
342:6,6,15

354:15

**20,000**  236:14

**200**  152:3
331:16,17,18
331:22 332:15
333:2,5,16,22

**20004**  6:8

**20006**  5:10

**201-0005**  7:13

**2012**  71:22

**2013**  69:25
70:6

**2014**  79:8

**202**  5:13 6:10

**2022**  41:24
68:10,11,24
221:5

**2023**  74:14
75:12 85:16

**2024**  41:17,25
42:1,5,22
197:18 198:10
200:12 205:25
208:24 209:17
214:3,11
229:17 230:6
230:13,22
231:7 232:6
233:6 235:14
242:10 244:22
286:2 288:4,6
288:8,11,12,24
289:5,8,24
290:13 309:8

309:11,15,18
317:7

**2025**  1:22 2:24
11:4,7,9 12:4
13:4 14:3,6
16:19 17:16
41:18,24 42:6
42:23 74:14
75:12 197:18
198:11 200:13
202:19 203:16
206:1 242:10
244:23 245:12
258:19 286:2
288:5,9 290:13
327:23 352:22

**2029**  8:9

**2049**  4:8

**208,000**  332:24

**20th**  45:9,13

**21**  10:13,17
13:7 320:24
321:2,4

**212**  3:16 9:11

**219**  11:23

**22**  11:16 13:8
117:16 118:4,7
118:9 198:5
244:16 320:25
322:23,24,25

**225**  313:24

**227**  313:25

**23**  13:9 142:14
142:24 325:5,7

325:9

**24**  1:7 2:7
10:14,15 13:10
329:6,7

**240-2927**  6:10

**248-5100**  6:19

**25**  1:7 2:7
13:11 16:20
25:8 36:17
43:21 213:19
293:5,7,12,15
293:18,25
294:1,5 295:16
332:7,9

**250**  292:16,24

**250,000**  290:12
291:6,21 292:2
292:3

**26**  349:23

**265**  300:25
301:4 302:17

**269**  12:7

**27**  10:16,17

**272**  12:9

**276**  12:10

**278**  12:12

**279**  12:13

**27th**  316:15

**28**  10:18,19,20
151:15

**280**  32:22

**281**  12:15,16

**282**  12:18

CONFIDENTIAL

**[285 - 6th]**                                                                 Page 3

**285**  12:20
**28th**  299:10
**2:53**  185:7
**2nd**  294:18
  295:22 296:6
  296:18,23
  297:2,8,9,14,18
  298:6,24
  318:14

**3**

**3**  11:7,9,10
  90:25 91:2
  93:5 323:3,5
  335:15
**3/23/24**  12:10
**30**  20:7 26:25
  278:21 314:2
  349:20
**300**  12:21
  260:24,25
  261:7 262:20
  262:25 263:21
  263:22,23
  264:12,16
  265:7,8,9,11,14
  266:25 267:3
  267:17,23
**303-1245**  5:13
**307**  12:22
**308**  12:23
**31**  317:18
  324:1

**310**  4:13 6:19
  7:13 8:13
**312-4207**  4:13
**315**  12:24
**32**  209:6,10,11
  324:1
**321**  13:7
**323**  13:8
**325**  13:9
**329**  13:10
**33**  229:13
  317:6
**332**  13:11
**34**  232:17
  315:22
**344**  336:16
**35**  151:22
**353**  337:9
**36**  228:23,24
**37**  235:5,7
**376-7878**  8:13
**3:58**  185:14
**3rd**  45:4,5,6
  60:7 167:1,2

**4**

**4**  11:11,14,15
  112:19,21
  113:3,9 118:12
  323:3,5 335:15
**4.9**  214:22
**4/5/25**  12:12
**400**  8:10

**401**  6:7
**42**  209:9,9
**42,000**  265:24
**42,992**  224:16
**42,995**  224:21
**43,000**  187:2,4
  187:16,24
  262:12 265:24
**43,992**  175:20
  180:16 181:4,5
  181:17,24
  182:7 188:8
  209:16 260:15
  260:21 261:21
**44,000**  175:6,11
  205:16,17,25
  260:19
**445**  327:4
**449**  1:7 2:7
**47**  142:14,24
**48**  223:25
  225:3,14,19,23
  226:3,8 228:4
  231:16,18
**4a**  113:7,14,21
**4b**  118:11,14
  118:15

**5**

**5**  11:17 130:23
  130:25 131:1,3
  141:12 142:24
  223:19,21
  224:5,10 270:3

  335:15
**5/16/2024**
  13:11
**50**  43:7
**500th**  244:9
**52**  246:24
**55**  144:11
**5:20**  246:18
**5:31**  246:21
**5:33**  248:12
**5:44**  248:15
**5th**  7:9 309:8

**6**

**6**  10:13 11:21
  147:16,20,23
  269:17 335:15
**6,000**  217:8
**60**  289:3,9,13
  295:15
**608**  301:5,11,11
  302:15 307:22
  310:25 311:5
  312:9,15
**62**  11:8
**650**  35:19
**655-3549**  9:11
**6669**  352:23
**688**  217:9
  236:12 316:11
  324:22,22
**6th**  228:17
  229:3

CONFIDENTIAL

**[7 - academic]**                                                  Page 4

| 7 |
|---|
| **7**   10:19 11:23 219:15,15,17 219:18 335:15 335:16 |
| **7.1139**   131:23 |
| **70**   149:13,25 |
| **72**   224:1 225:3 225:14,19,23 226:3,9 228:4 231:16,18 |
| **75**   36:14 43:21 |
| **750**   6:17 |
| **76**   293:6,14 295:3 |
| **79.5**   295:10 |
| **7:42**   338:17 |
| **7:49**   338:20 |
| **7th**   9:8 |

| 8 |
|---|
| **8**   12:7 246:3 268:6,6 269:1 269:2,4,7,10,12 269:18,19 335:16 |
| **8,000**   333:6 |
| **8,352**   333:3 |
| **8,582**   332:13 |
| **80**   36:14 43:21 151:23 152:4 |
| **849-7000**   3:16 |
| **85**   327:3 |

**86**   146:21 150:11
**865**   3:10
**87**   139:16 140:17,19 146:24 147:7 148:5,14,25
**870**   292:23
**879**   217:9 286:3,6,17 287:7 290:21 291:8,19
**89,101**   35:16
**8:04**   2:22
**8:06**   2:23 351:6 351:8
**8th**   3:11 297:22

| 9 |
|---|
| **9**   10:15 12:9,22 268:6 272:10 272:12 327:14 335:16 |
| **90**   151:16 189:22 |
| **90017**   3:12 |
| **90067**   4:10 6:18 7:10 8:11 |
| **91**   11:10 |
| **92**   155:1 |
| **93**   58:17 |
| **96**   175:3,8,16 |
| **97**   152:11 153:20 158:13 |

228:15,20,22
**9th**   6:7 221:16 228:17 229:3 294:17 297:8,9 297:15,17,19 298:25 318:13 336:17

| a |
|---|
| **a.m.**   2:22,22 14:6 |
| **aadams**   5:12 |
| **abel**   1:10 2:10 7:3 8:3 9:3 18:1 |
| **aberrations** 211:1 |
| **ability**   51:20 349:24 |
| **able**   15:21 34:2 34:9 38:1 58:20,21 59:11 59:15 85:7 102:18 107:11 107:23 108:19 115:20 161:23 182:3,5 184:1 186:3,8 187:5 187:20 204:2 204:25 205:1 220:17 221:12 233:24 237:2 237:17 241:11 242:16 251:14 |

252:23 253:3,9 254:9 260:22 261:20 262:11 265:7,8,13 267:5,7,11 283:15 291:2 291:13 300:10 315:1,4 326:12 328:23 330:1 344:2,4,20 350:3
**above**   229:13
**absolutely** 327:10
**academia** 25:11 65:8 124:12,17 127:17 155:23 156:1,3,4,6,7 156:12,21,24 157:6,10,12,14 157:18 158:12 158:19 159:5,9 190:14,15 204:10 218:19 218:22 219:4
**academic**   31:12 31:13 52:25 53:5,7,12 64:3 65:8,10,14,16 69:21 120:5 124:9,10,16 127:22,25 157:22,23

CONFIDENTIAL

**[academic - actually]** Page 5

158:24 159:14 160:12 173:14 223:17

**academically** 247:18

**academics** 123:23 124:1

**accept** 203:20 203:23,24

**accepts** 307:6

**access** 59:7 73:22 88:9 99:1 176:20,22 179:19 182:23 240:10,16,19 241:3,11,13 242:15,19,20 242:24 243:3,7 243:10 244:15 249:25 350:4

**accessible** 178:3 233:23 255:21 338:6

**account** 55:24 95:11,12 128:19 129:12 156:9 233:21 249:21 275:19 275:19

**accounts** 42:14 88:18,19 94:11 104:18 180:11 324:17

**accuracy** 49:3 149:20 175:17 175:18 285:6 292:6 317:1

**accurate** 49:7 52:2 58:10 60:12 66:9,13 67:25,25 69:9 69:16 70:1 80:7 98:10 150:6,19 165:5 166:16 201:6 201:11,12,16 202:14 204:23 205:19 230:1 264:18,25 265:18 267:4 285:4 289:23 290:3 294:21 316:19 318:6 327:8 333:6

**accurately** 232:12,22 260:15 308:19

**acknowledge...** 354:3

**acronym** 122:18

**act** 103:2

**action** 352:19

**active** 85:10

**actively** 69:18 329:3

**activities** 85:11 88:17 95:13,24 96:1 237:13

**activity** 91:14 92:4 93:1 104:18 106:4 106:21 107:10 107:12 191:25 198:9 199:6 200:2,12 202:18 210:14 223:25 225:2,8 229:2,16 231:7 235:13 295:9 295:13

**actor** 193:6 241:20,23 300:4,6,16 307:6 319:18 319:19,21 320:3,24

**actors** 38:5,11 106:8,20 192:3 193:1 212:22 212:24 242:1 242:23

**actresses** 192:3 193:2 212:22 212:24

**acts** 241:20

**actual** 89:12 104:8 113:4 129:17 139:1 141:20,22

143:9 172:20 187:21 201:21 201:25 202:6 214:13 283:6 292:9 298:1 314:15 349:6

**actually** 48:12 52:5 54:1 55:22 58:22 68:2 72:8 81:10,21 86:25 89:3 101:15 102:13 103:20 104:5 108:24 112:14 115:6 122:8 124:6 125:10 162:16 168:9 170:8 171:9 176:1 190:12 198:5 206:25 207:2 209:5 213:8 239:19 240:16 246:1 259:17 273:6 284:7 287:21 290:5 302:8 305:14 306:4 319:22 320:22 322:7 324:5,22 327:2 330:3 334:24 335:8 337:2 339:12

CONFIDENTIAL

ad  123:11
adam  272:18
adams  5:6
  14:16 91:3,7
  93:11 147:18
  300:15 349:22
adapt  63:19
adaptation
  63:17
adapted  63:18
add  301:10
  312:15 313:8,9
  321:20 330:9
added  64:17
  115:9 146:13
  163:19 164:14
  307:21
addition
  157:22 158:5
  158:23 328:9
additional  55:6
  64:4 79:6
  145:4 151:15
  165:9 188:21
  189:9,11
  193:25 206:7
  217:3 232:6
  233:12,20
  234:3,10
  236:23 249:7
  254:14 280:18
  284:17 312:20
  326:2 327:21
  328:17 349:20

350:15
additions  354:6
address  54:5,10
  55:13
adds  48:14
  301:5
adequate  57:18
adequately
  310:18
adjunct  69:24
  70:2,5,13
adjustments
  250:5
admit  113:2
adopting  179:6
advanced
  31:14
advertisers
  84:22 122:18
  122:24 123:1
advertising
  90:8 98:22
  106:18,22
advise  20:21
affect  334:21
affordable
  303:10
afforded  73:22
age  56:5 104:17
ages  56:19
aggregate
  211:23 218:5
  218:21,25
  221:13 259:24

260:1 262:17
  262:18 263:7
  267:12 289:16
  289:17 341:18
  342:12 343:6,7
  344:11
aggregated
  220:18
aggregating
  82:3 87:8
  222:11
aggregation
  319:12
aggressive
  79:21
aggressively
  298:2
ago  17:9 25:4
  134:23 161:16
  161:21 257:19
agree  95:9
  97:24 98:2
  118:25 119:10
  223:11
agreed  107:24
agreement
  95:22
ahead  16:8
  53:4 67:10
  99:24 104:4
  120:18 126:17
  161:5 178:14
  182:19 185:5
  269:4,13

320:25
ahouraian  8:6
  8:7
ahouraianlaw...
  8:12
ai  11:11,16,21
  46:5,9,12,14,16
  46:20,21,22
  51:22,23 52:1
  52:1,3,6,6,23
  53:14,14,16,23
  53:23 54:10,12
  54:13,17,23
  55:20 56:1,8,9
  56:11,15,23
  57:5,6,9,10,14
  57:16,18,20,20
  71:5,9 75:17
  75:19,20,23
  78:12,15 114:1
  127:1 144:7
  146:12,18
  148:19,20,25
  149:8,9,14,17
  149:20,24
  150:5,10,12,17
  151:3,10,17,23
  152:4 154:12
  154:20 155:1
  163:14,20
ais  56:24
akaltgrad  7:12
al  1:8,13,15 2:8
  2:13,15 11:3

CONFIDENTIAL

**[al - analysis]** Page 7

12:3 13:3 14:9 140:21 141:3 143:13 153:10 353:1 354:1
**alexander** 1:19 2:19 10:2 11:2 11:7,9,13 12:2 13:2 14:7 15:17,19,20 21:2 23:9,14 24:9,15 27:21 28:7,12 59:11 60:10 61:13 62:19 112:13 112:14 113:20 120:19 135:10 135:17 138:10 138:14 152:13 183:8 185:23 246:8,23 248:17 285:19 305:1 315:10 331:16 338:22 339:8 350:11 353:2,24 354:2 354:4,12
**alexander's** 11:14,15
**algorithm** 46:13
**algorithmic** 99:2 115:18
**algorithms** 114:4 115:21

**align** 142:20 148:10
**aligning** 11:12
**allegations** 216:9
**alleged** 294:18 295:22 296:5 296:21 297:25 299:12 318:14 327:15
**allow** 51:25 52:3 94:9 241:3,11 243:3 300:7
**allowed** 33:16 53:15 81:2 111:7 240:18 242:20,23 287:13,17
**allows** 217:6 320:14 321:12
**alpert** 11:18 132:22 144:14
**alter** 237:25 238:24
**alternatively** 193:11 291:16
**altogether** 36:2 43:18 269:11
**amazing** 342:17
**amber** 118:10
**amend** 62:23

**amended** 11:8 59:22,25 60:3 60:5,6,9,14,24 61:17,24 62:20 63:11 66:21,24 66:24 67:6 189:19 346:14 348:1 349:6,13 349:16
**amendment** 349:14
**american** 122:15,17,21 122:22,25
**amir** 7:7 16:24 19:3
**amount** 77:8 79:5 100:21 106:1 119:18 180:8 206:22 210:2 239:19 243:3 294:8 308:3,5 332:17
**amounts** 333:14
**ampersand** 56:3
**ampersands** 56:4
**amplification** 93:3 155:9
**amplifying** 114:6

**ana's** 122:16
**analyses** 226:5 238:1
**analysing** 11:19
**analysis** 11:24 12:20 23:25 32:9 35:1 36:24 43:11 44:12 58:4 81:25 86:9 101:12,15 121:15,20,22 125:7,15 128:20 129:14 149:8 156:11 156:21 157:11 158:8 162:11 166:7 167:8 177:9 182:4 185:25 186:25 187:21 188:2,5 188:8,23 193:21 203:21 204:5,12,12 209:15 211:17 216:14,17,19 217:6,16,23,24 218:4,12,13,19 218:25 219:2 220:3,10,11,17 220:21 221:4,6 221:12,19 222:3,7,12,14

CONFIDENTIAL

**[analysis - api]**                                                     Page 8

223:7,9,16,23
224:5,6,11,11
224:12 225:22
226:4,6,8,11,12
229:16 232:6
233:12,18,19
234:3,11,15
235:3,21 236:4
236:16 238:25
239:13 246:24
247:2,7,13
248:18 250:2
251:21 254:16
256:9 263:5
264:11 265:23
271:19 274:5,7
274:23 277:19
279:2 285:14
286:1 288:11
291:12 292:8
294:1 297:5
316:10 317:12
319:11 322:11
325:16,17,22
334:12,21
337:1 338:23
339:5,20 340:9
340:19,25
342:20 343:1
343:14,20
345:24
**analysts**  87:11
**analytical**
  30:25

**analytics**  24:25
  25:9 43:8,23
  44:10 45:12,14
  58:2 81:3,7,9
  81:17,19,20,22
  81:23 82:1,8
  82:11 85:3
  86:5,6,9,17
  87:18,21,24
  88:3 90:5
**analyze**  102:15
  180:13 201:9
  205:13 216:22
  217:21 226:20
  236:5 254:14
  291:17 292:13
  326:12 330:25
**analyzed**
  166:16 214:3
  218:2 308:23
**analyzer**
  261:21 274:12
  275:17 283:5
  283:23 310:1,7
  314:12 337:5
  337:13
**analyzing**  37:1
  37:1 83:8
  131:12 141:10
  141:24 220:24
  237:6 319:8
  348:9
**angeles**  3:12
  4:10 6:18 7:10

8:11
**announce**
  118:14
**annu**  30:8
**anomalies**
  106:3
**anomaly**  103:1
**answer**  10:10
  20:22 21:10,12
  21:15,19,22
  23:22 24:4,13
  26:8 27:16,24
  30:22 33:12
  38:8 44:2
  47:10 48:3,9
  54:25 55:9
  56:17,19 64:22
  65:21 66:23
  69:17 71:25
  72:14 73:14,25
  76:2 77:6,19
  77:22 79:2
  82:9 83:6
  91:22 95:10,16
  96:16 98:8
  101:21 103:7
  105:4 108:12
  108:19 120:19
  121:9 126:13
  127:13 129:25
  130:17 133:10
  133:20 139:11
  140:4 142:3
  145:21,23

149:5 150:3,16
  151:6,12,19,25
  154:14 155:4
  156:18 159:15
  161:3 164:25
  165:21 166:11
  169:12 171:15
  175:23 176:14
  178:13,24
  182:10,19
  183:8,24 184:1
  204:17 212:8
  213:6 233:10
  238:9 297:12
  306:14,16
  307:16 336:2
  337:22
**answered**  26:2
  111:20
**answering**
  165:7 183:2
**answers**  98:18
**anybody**
  176:20 178:4
**anymore**  62:6
**anyone's**
  204:21
**ap**  194:18
**apa**  49:6
**api**  207:24
  208:16 236:21
  239:4 240:17
  240:17 241:2,3
  241:4 242:16

CONFIDENTIAL

**[api - article]**

Page 9

| | | | |
|---|---|---|---|
| 242:17 243:14 | 321:6 | 173:24 243:21 | **area** 273:20 |
| 243:22 244:1 | **apify's** 241:1 | 320:9 346:13 | 277:7 |
| 245:9,10 271:5 | **apify.com.** | **application** | **areas** 78:14 |
| 300:5,23 | 303:4 | 244:20 | 165:6 |
| 302:19,20,22 | **apis** 188:2 | **applied** 147:1 | **arguably** 44:25 |
| 303:1 311:19 | 240:21,21,23 | 147:11 186:14 | 212:21 227:10 |
| 311:23 313:13 | 243:1 244:4,6 | 186:15 187:12 | 227:11 |
| 319:21 324:11 | 342:11 | 187:15 250:25 | **argue** 176:1 |
| 329:21,23 | **apologies** 101:6 | 348:10 | 222:21,24 |
| 330:8 331:3 | **apologize** 28:21 | **apply** 186:14 | 250:3 |
| 332:5,18,19 | 66:11 154:16 | 187:15 258:21 | **argument** |
| 333:7,12,21 | **appear** 108:2 | **applying** | 211:11 |
| **api's** 241:16 | 116:25 143:18 | 184:10 185:24 | **arrow** 280:6 |
| **apify** 13:7 | 146:6 337:2 | 254:1 | 331:11,11,12 |
| 37:21,22 38:6 | **appearance** | **appointment** | **art** 218:7,10 |
| 38:11 42:7,10 | 22:14 | 282:19 | **article** 11:17 |
| 42:14 181:10 | **appeared** | **appointments** | 49:24 128:5,8 |
| 181:12 182:3,6 | 143:15 250:23 | 69:22 | 128:23 129:16 |
| 182:24 183:14 | **appearing** 1:20 | **appreciate** | 131:9 132:6,16 |
| 183:17 203:10 | 2:21 | 127:5 | 133:9,19,23 |
| 205:8 206:10 | **appears** 54:4,8 | **approach** | 134:13,15 |
| 206:13,23 | 54:11,14 131:8 | 24:23,24 40:1 | 135:8,10,18,21 |
| 207:24 208:1,4 | 280:4 336:4 | 290:24 | 136:9,17,24 |
| 208:6,14 | **appended** | **appropriate** | 137:8,20 |
| 240:15,16,18 | 125:11 354:7 | 27:7 322:3 | 138:21 139:15 |
| 241:5,20,23,25 | **appendix** 63:5 | 334:22 | 140:3,13 |
| 242:15,16,18 | 63:6 125:20,21 | **appropriately** | 141:20,22 |
| 242:23 243:3,7 | 125:24 126:2 | 55:13 | 142:11 144:15 |
| 243:24 244:3,5 | 126:11,22 | **approximately** | 144:22 145:7,9 |
| 244:9 271:5 | 160:9,13 | 174:14 289:5,6 | 145:12,13,13 |
| 273:17,19 | 168:10,20 | **arato** 19:18 | 145:15,19 |
| 274:2 300:10 | 169:1,17,17 | **architecture** | 146:6 152:22 |
| 302:23,23 | 170:13,21 | 302:6 | 153:1,3,5,11,12 |
| 306:21 320:2 | 171:3,6 173:10 | | 153:14,19,23 |

CONFIDENTIAL

**[article - attend]**                                      Page 10

167:15,16
168:3,4,12,13
168:17 171:12
**articles**  123:6,7
130:22 133:17
134:8,9 152:24
159:5,19 173:4
173:6,9,14
**articulate**
21:21 189:19
**artificial**  46:2
74:5 75:16
78:7 97:5
**artificially**
94:11 95:20
96:13
**ash**  110:7,16,18
110:21 111:1
111:12,20
137:13,23
138:24 139:5
**ashley**  1:24
2:24 11:5 12:5
13:5 15:5
185:15 352:2
352:24
**asia**  222:6
**aside**  34:7 49:5
**asked**  23:23
24:22 26:25
29:24 30:16
33:15 39:21,22
40:16 41:2,6
54:2 66:14

99:21 111:3,4
112:3 137:24
185:16 268:23
271:23 275:21
314:14 342:22
343:11
**asking**  23:2,3,8
26:6 31:3
49:23 91:6
99:12 105:11
121:13 135:11
135:17 137:11
137:12,21
156:13,15
157:5 170:17
175:19 176:25
185:23 186:13
187:14 208:9
217:20 237:20
237:21 238:22
260:1,2 265:4
296:13 304:18
312:11
**aspects**  75:25
76:13
**assert**  188:21
**asset**  100:1
**assets**  97:15
98:4,13 99:8,9
99:22 100:1
**assigned**
166:23
**assignment**
73:2,4,13 78:8

81:1 164:23
165:2,14 166:1
166:4,20
292:20
**assigns**  249:12
**assist**  30:19
46:3 65:17
**assistance**
29:19
**assistant**  28:20
28:23,24 29:15
30:20 36:3,22
245:6,7 258:4
284:21,23
**associate**  51:14
92:15,18
233:25 247:19
252:7
**associated**
88:23 156:2
251:11 253:7
286:16,21,23
287:10,11,15
296:22 339:6
344:13
**association**
122:16,21,25
250:22
**association's**
122:22
**assume**  186:19
274:22 290:4
324:19 333:10
333:18

**assuming**  31:22
120:6 132:15
142:25 221:2
243:8 320:6,8
324:13 333:15
**assumingly**
227:20 305:23
335:8
**assumption**
27:5 57:16
194:19 216:20
275:25 297:22
310:4 324:16
324:24 325:2
333:13
**assumptions**
108:12 203:12
335:10 348:9
348:10
**astroturfing**
198:19 199:13
199:14,15,22
199:23 200:5,6
200:10
**attach**  310:22
**attached**  46:6
**attacks**  114:16
**attempt**  100:22
**attempting**
89:12 100:2
**attempts**
114:13
**attend**  74:13

CONFIDENTIAL

**[attention - back]**                                                           Page 11

**attention**  63:4
**attorney**  6:6,16
  8:8 9:7 20:18
  27:18,23 28:3
  65:22,25 66:6
  165:20 352:18
**attorneys**  3:9
  4:7 5:7 7:8
  16:22 17:3,7
  18:25 19:8,17
  19:20 27:1
**attributed**  56:1
**audio**  195:1
  248:13
**august**  20:8
  23:15 197:18
  198:10 200:12
  209:17 214:3
  214:11 228:17
  229:3,16 230:6
  230:13,22
  231:7,19 232:6
  233:6 235:14
  289:5,23
  293:13,17,24
  294:13,17,18
  295:16,22
  296:6,18,23
  297:2,8,8,9,9
  297:14,15,17
  297:18,19,21
  297:22 298:4,5
  298:6,11,24,25
  299:10,11,13

299:19,19,23
316:15 317:9
317:12 318:13
318:14 327:4
327:14,15
328:15 336:17
**authentic**
  107:12,24,25
  108:3,16
**authentically**
  103:1 104:12
**authentication**
  303:12
**authenticity**
  94:9 101:1,4
**author**  124:8
  146:1 157:2,6
**authored**  120:4
  120:4,9,13,23
**authorities**
  222:2
**authorized**
  244:21
**authors**  48:6
  48:14 132:20
  132:24 135:22
  143:14,14,17
  143:23,24
  144:4,5,8,13,15
  145:4,7,18,18
  146:6,13
  156:14 159:24
**automated**
  89:6 96:2,14

100:6,9,12
**autumn**  5:6
  14:16 58:17,20
  58:21,23 90:25
  93:8 118:10
  126:17 147:17
  228:21 231:11
  269:4 278:9
  281:21 282:13
  285:15,16
  300:18 304:25
  305:16 310:14
  315:5 320:25
  331:4,9,10
  332:6
**availability**
  27:8 203:10
**available**  27:10
  29:21 31:2
  41:17 42:7,9
  42:13,21 52:17
  176:6 178:19
  205:10,10
  206:10 207:24
  208:2,15,18
  223:18 225:21
  236:19,20
  240:1,14
  241:17 242:9
  243:13 244:3,4
  244:12,14,20
  255:8 306:8
  326:20 332:3
  332:18,21

333:24 334:1
**avenue**  9:8
**average**  211:4
  211:21 225:10
  236:25 289:6
**avoid**  101:18
  102:10 350:15
**aware**  50:8
  56:12 300:8
  301:4 334:14
  334:15,18

**b**

**b**  11:15 118:12
  329:12
**b.s.**  72:8
**b1**  197:25
**b2**  198:2
**b2b**  84:13,14
  84:20,21
**babayan**  3:8
**bach**  19:18
**bachelor's**
  71:15,20 72:5
**back**  20:8
  26:24 35:10
  39:6,14 41:13
  52:9 57:9 61:4
  61:10 62:16
  66:10 70:3,7
  91:3 103:15
  109:14 110:11
  111:6 112:10
  117:16 137:13

CONFIDENTIAL

**[back - baseline]**                                    Page 12

| | | | |
|---|---|---|---|
| 137:24 138:24 | **backup** 172:14 | 188:4,19,22 | 298:16,17 |
| 139:5 141:12 | 172:17,21 | 189:2,12 | 300:11 303:14 |
| 144:17 150:22 | 245:23 288:20 | 190:19,22 | 305:2 307:3 |
| 151:3 152:8,23 | **bad** 117:22 | 191:6 192:21 | 308:20,22 |
| 185:13,16,19 | **baldoni** 7:3 8:3 | 197:9 199:5,6 | 309:2 310:6 |
| 203:18 206:4 | 9:3 17:21,25 | 200:16 201:17 | 311:9 315:4 |
| 220:1 246:11 | 250:19,21,25 | 201:23 202:19 | 317:13,19,21 |
| 246:14,20 | 251:3,18,20,24 | 203:9 204:1,24 | 317:24 319:8 |
| 248:14 278:2,3 | 252:6,8,12 | 205:6,12 213:8 | 319:11 324:24 |
| 279:6 287:3 | 300:24 301:15 | 216:19 222:14 | 325:2 328:14 |
| 288:6 289:25 | 336:19 | 225:2 229:9 | 331:1 333:7 |
| 293:5 304:25 | **ballpark** 77:25 | 233:22 237:6,9 | 341:23 342:9 |
| 309:10,15 | 203:15 315:17 | 237:17 238:13 | 342:22,24,24 |
| 310:4 313:19 | **base** 17:13 | 239:5,10,22 | 344:4,8 |
| 318:17 322:2 | 107:22 344:12 | 241:9 242:16 | **baseline** 91:19 |
| 324:15 325:24 | **based** 34:10,25 | 242:17 248:24 | 92:1,2 102:24 |
| 330:9 331:1 | 39:16 42:17 | 248:24 249:2 | 104:12 208:23 |
| 332:4,18 | 47:12 54:3 | 249:13,13 | 208:23 209:1,2 |
| 335:14 337:7 | 76:5 91:14,20 | 250:21 252:4 | 210:2,13 |
| 338:19 339:16 | 91:25 95:7 | 254:10 256:9 | 212:11,15,17 |
| 349:22,24 | 101:15 103:14 | 259:12 261:25 | 212:17,21 |
| 350:11 | 104:11 114:16 | 262:8 265:18 | 235:15,16,18 |
| **background** | 123:10 152:25 | 265:20 267:6 | 237:7 288:10 |
| 19:9 23:24 | 155:22,23,24 | 267:12,13,24 | 288:19,23 |
| 24:1,10 25:7 | 157:20 158:4 | 270:14,17 | 289:4,9,15,17 |
| 27:6 30:1 | 158:21 159:1,4 | 271:14 273:18 | 293:8 295:15 |
| 31:12,13 32:6 | 159:15 160:4 | 274:17 275:8 | 297:19,24 |
| 46:14 150:22 | 160:11 162:3,4 | 276:3 277:22 | 298:3,25 299:3 |
| 178:16 233:16 | 163:1,5 164:2 | 281:9 283:3 | 299:3,14,16 |
| **backgrounds** | 166:7 168:23 | 290:23 291:14 | 316:17 334:19 |
| 24:21 | 171:1 176:5,23 | 293:13,17,23 | 334:22,24,25 |
| **backing** 167:2 | 178:2 181:14 | 293:25 294:1 | 335:4,7,8,11 |
| **backs** 341:6 | 182:3 186:6 | 295:15,18,23 | 341:21 342:2 |
| | 187:23 188:1,2 | 296:10,20 | |

CONFIDENTIAL

**baselines** 91:24
212:23
**bases** 346:1
**basic** 25:8
189:16 190:10
**basically**
215:14
**basis** 21:22
23:3 87:16
100:11 105:13
123:4,11
127:11 155:17
156:15 158:23
160:15 191:1
210:22 211:14
328:11 341:2
346:2,5
**bean** 12:12
278:20 314:1
**began** 45:15
**beginning** 2:21
14:12 32:24
**behalf** 2:19
14:15,21,24
17:19 18:5
**behavior** 11:10
88:12 91:11,13
92:8,14,21
97:12 98:3
103:11 104:1
106:10,12,14
106:16,19
107:1 122:7
124:21 131:13

136:12,17,21
138:4 139:10
141:11,25
199:15,24
**behaviors**
94:13,19 95:3
**behaviour**
11:20
**beings** 99:3
100:22 115:16
**belief** 159:1
**beliefs** 114:4
**believe** 17:20
18:6,23 19:4
40:12 51:23
63:8 67:7
72:15 80:9,16
80:23 90:4
110:15 127:3
128:3 135:23
145:11,15
146:11 149:8
156:2,13,20
158:6,22,24
161:25 167:4
169:6 199:12
200:7 217:11
226:25 227:2
254:5 255:4
257:17 260:25
263:15 290:17
295:24 296:17
296:22 300:1
302:2 303:7

305:13 311:20
312:6,22 313:9
316:15 318:22
319:22 327:7,7
345:1
**bell** 225:6,8
**bellutta** 128:5
128:9,16
**bender** 5:5
**benefit** 100:4
100:23
**bert** 247:16
249:8,11,14,22
250:1,8 251:4
251:6,14
252:10,23,23
253:9 254:7,10
254:17,23,23
254:25 255:2,3
255:8,10,11,18
255:19,22,23
256:1,6,10,14
256:25 257:6
257:10,14,16
257:17,17,21
257:24 258:12
258:21,25
259:4,8,13,16
259:19 260:4
261:21 262:4
265:17 266:9
266:13 267:13
268:10,14,20
268:21 271:18

271:20,23
272:3,5 274:16
275:12,25
276:4 277:18
277:21 279:2
283:5,23 310:1
310:11 314:11
340:18,23
341:3,5,18,19
342:2,20,25,25
343:3,13,18,20
344:10
**best** 244:14
340:23 341:3
**better** 44:7
217:6 272:17
296:14
**bfreedman**
7:11
**bias** 249:20
**biases** 76:4
**bibliographies**
48:21 49:4
**bidirectional**
268:11,11
**big** 18:10 82:3
128:24 332:23
**bill** 36:2
**billed** 35:8,11
35:12,19
**billion** 270:3
**bio** 64:25 65:5
67:9,10,16,24
69:15

CONFIDENTIAL

**bit**  42:11 67:14 124:12 171:17 193:15 272:15 278:9 310:14

**blake**  1:5,15 2:5,15,20 4:3 5:3 6:3 11:3 12:3 13:3 14:8 176:3,11 179:2 179:9,18 180:10 206:17 250:17 252:2,3 252:21,24 253:5,7 271:24 274:9,18 275:5 275:21,22 278:6 286:1 300:23 301:15 311:9 316:11 336:21 337:4 353:1 354:1

**blank**  201:4 304:8

**blanking** 177:19

**bloom**  280:25 281:14

**blown**  123:22

**blvd**  6:17

**board**  19:2

**book**  11:11,14 11:16 25:11 64:5,14,15 113:1,3,4,6,16

113:22 119:13 120:2,25 191:10,18 279:24 282:19

**bookishrhaps...** 279:13

**bookisrhapso...** 279:25

**books**  279:16 301:1 304:5 310:15,17

**boost**  94:11 95:20 96:13

**boosted**  197:7 347:6

**boosting**  97:5 347:11

**bot**  88:17 90:6 106:9,12,14,15 106:16,19,21 107:1,9 198:25

**bots**  88:8,10,14 88:20 89:7,8 90:11 95:23 98:21 106:18 107:16 199:1,1 200:1 295:5

**bottom**  281:10 281:22 282:16 283:4 300:19 303:3 331:15

**bound**  105:18

**bounded** 185:10

**boycott**  342:18

**brand**  119:19 119:20 275:20

**brand's**  117:23 118:21

**branding** 121:16

**brands**  119:12 119:13,14,15 119:23,25 213:10

**break**  36:1,19 60:14,18 108:21 109:12 110:2 111:5,6 111:18 112:16 246:5,8,10,11 246:14

**breakdown** 43:3,6,9,19

**breakout**  34:21 35:2

**bring**  125:13

**broader**  200:19

**brought**  90:4

**bruns**  145:4

**bryan**  7:6 22:2

**buckets**  44:4

**bug**  16:3,4

**built**  76:6 341:5

**bulk**  43:10

**bulleted**  157:19 157:20

**bullets**  155:7 155:13,16 156:8,15,25 157:7,25 158:23 159:15 159:20

**burst**  128:19 129:13

**business**  71:12 79:6 84:9,11 84:16,16,25 85:6 106:23 119:16,20

**businesses** 84:22

**c**

**c**  3:1 4:1 5:1 6:1 7:1 8:1 9:1 125:20,21,24 126:2,11,22 160:9,13 168:10,10,20 168:20 169:1,1 169:17,17 170:13,13,21 170:21 171:3,6 173:10,24 243:21 346:13

**calculate**  35:7

**calculates** 316:17 327:3

**calculating** 325:3

CONFIDENTIAL

**[calculation - certainty]**                                    Page 15

| | | | |
|---|---|---|---|
| **calculation** 213:16 | **cambridge** 74:8 74:13,20,24 77:10 | **case** 1:7,7,7 2:7 2:7,7 16:15 17:24 24:25 | **categorized** 310:7 338:3 |
| **calculator** 35:18 301:8 | **campaign** 27:14 102:9 | 37:6,8 38:15 38:17 55:11 | **causation** 234:22,25 235:2 299:14 |
| **california** 1:24 2:24 3:12 4:10 6:18 7:10 8:11 15:5 352:3,21 | 108:16 165:8 217:12 220:25 294:18 295:4 295:22 296:18 296:21 297:1,7 | 59:5 70:7 73:2 73:5,13,19,23 78:8 81:1 103:24 104:8 104:13 105:6 | **cause** 100:3,23 100:23 **caused** 230:25 231:2 232:8 |
| **call** 17:14 20:7 20:11 23:15,19 24:2,16,22 25:20,24 27:1 27:4,12,21 28:3,7,14 33:10 53:18 58:23 84:20 138:8,11 143:8 185:2,9 192:22 214:8 219:1 258:2 350:20 | 297:17 298:20 299:10,12 318:14 327:15 **campaigns** 106:25 125:8 **campbell** 145:4 **capital** 294:14 **capped** 333:22 **capture** 236:13 237:3,24 245:1 245:3 310:19 **captured** 87:7 242:8 | 105:16 106:11 106:12,13,19 106:21 107:10 107:17 108:6,9 121:18,19 146:10,15 159:11 160:16 161:16,18,22 162:19 163:4 163:18 164:23 181:11 189:1,6 194:6 197:17 212:16 218:16 | 233:6 234:4,12 294:19 298:21 318:15 327:16 328:19 336:12 **caution** 66:4 **caveat** 340:3 **caveated** 230:10 **celebrities** 212:22 213:9 **celebrity** 212:19 |
| **callback** 26:13 26:17,20 | **capturing** 262:24 | 250:9,17 253:4 253:24 268:15 | **center** 225:7 **centralized** |
| **called** 21:7 25:23 26:24 67:17 72:23 81:21 82:11 91:10 128:18 160:16 205:18 219:2 238:23 277:8,8 302:9 320:12,23 | **care** 29:13 110:1 **career** 31:18 124:4 213:17 222:15 **carpenter** 12:11 276:7 | 292:23 296:11 **cases** 100:9 171:8 **categories** 43:23 313:18 **categorize** 271:19 274:10 | 139:24 155:9 **century** 4:8 7:9 8:9 **certain** 79:4 106:2 127:8 171:1,2 222:8 237:12,12 260:23 322:7 |
| **calling** 165:18 **calls** 319:22 | **cas** 49:10 | 277:19 279:3 337:5,13 | 346:6 **certainty** 187:6 |

CONFIDENTIAL

**[certificate - clarify]** Page 16

**certificate**
 352:1
**certified**  2:24
 352:2
**certify**  352:4,17
**cetera**  25:11
 76:23 84:18
 121:16 179:21
 190:8 193:2
 241:13 283:20
 291:2
**chain**  161:25
**chance**  51:23
 149:13 229:23
**chances**  237:18
 237:20
**change**  43:25
 44:4 149:14
 216:14,18,19
 235:22 236:4
 237:13 238:6
 239:13 297:4
 334:12 353:4,7
 353:10,13,16
 353:19
**changed**
 207:12
**changes**  63:6
 85:17 119:7
 354:6
**changing**
 236:15
**channels**  39:22

**characterize**
 314:12
**characterized**
 310:2
**charge**  166:6,8
 166:9,12,21
**chart**  342:1
**charts**  57:22,23
 57:24 58:3,4,6
 58:7 209:20
**chat**  62:9
 276:20 277:9
 300:25 302:10
 302:11 304:5
 309:20 310:16
 310:16
**check**  36:24
 48:25 49:11,22
 50:1,3,6,9,14
 50:20 54:22
 55:2 60:11
 69:6,8 92:3
 102:5,5 111:14
 111:15 129:15
 261:1,20 274:6
 290:1 292:24
 295:19,24
 303:25 317:16
 318:5 322:17
 332:19 340:1
 348:15
**checked**  38:19
 38:20 245:8
 267:1 338:9

 346:4
**checker**  51:22
 51:24 52:3,6
 57:5 149:17
 150:10
**checkers**  52:1,1
 55:21 56:9,11
 56:23 57:9,14
 57:18 149:21
 150:18
**checking**  49:18
 49:20 51:2,11
 51:17 55:7
 56:7 292:16
 304:1
**checks**  50:19
 51:20 150:6
**chennai**  79:13
**china**  79:13
 222:6
**choose**  51:10
 280:25 281:14
**chose**  134:15
 234:2 236:5
 298:3
**chosen**  241:10
**chronologica...**
 64:6
**chulo**  272:21
**circumstance**
 106:10
**citation**  48:1
 52:4,7 126:24
 127:12,15

 130:2 143:6,23
 145:17 146:5
 148:13 155:15
 156:16 158:9
 160:12 169:9
 169:20 223:17
**citations**  47:24
 47:25 48:21
 127:6,9,10
 154:3 159:22
 170:19
**cite**  128:5
 129:22 130:2,4
 130:6 135:10
 139:15 142:14
 143:6 146:5,20
 146:25 147:2
 152:9,17
 156:13,24
 160:16 167:15
 169:8,18,22
 172:2
**cited**  135:18
 137:6 140:9
 159:2 171:1
 173:2,5,7,9
**city**  215:24
**claim**  139:16
**claims**  347:14
**clarifier**  40:4
**clarify**  95:5
 99:16 130:7
 174:19 335:21

CONFIDENTIAL

**[class - column]**

**class** 52:21,25 74:18 81:13,14 81:16,22 178:18 268:17 268:22

**classes** 52:14 52:15 56:12 76:21 77:5 81:24

**classification** 246:24 247:6 247:13 261:15 313:21 341:24

**classifications** 263:4 265:14

**classified** 221:11 251:17 258:25 259:3,8 259:15 260:9 260:15 261:21 262:4,13 264:13 265:9 265:12,23 266:10,14 274:13 314:17 314:24 337:21

**classifier** 39:24 247:16 248:3 248:20,22 249:10 253:13 253:17,20 259:5 265:17 267:4,12 274:8 274:16,16

275:3,3,5,9,18 276:4 310:11 315:3 337:16 338:5 342:3,13 342:25 343:19 344:10

**classifiers** 92:22,23 249:11 313:10

**classifies** 249:2

**classify** 89:18 89:18 250:18 251:5,11 260:11 264:8 271:21,23,25 277:23 279:7 283:23 284:1 315:3 326:8

**classroom** 77:8

**claw** 349:22

**clean** 299:6 348:11

**cleaned** 87:8

**cleaner** 210:23

**cleaning** 82:3

**clear** 52:3 137:3,19 138:20 271:3 320:19

**click** 88:5,10

**clicking** 96:9

**client** 20:18 27:18,23 28:3 65:22,25 66:6

165:20

**clients** 17:19 85:7 88:18,21 346:2

**clipped** 134:8

**clipping** 126:24

**close** 45:1 212:1,5

**closed** 62:5 66:17,25

**closely** 142:20 148:10 235:15

**cluster** 342:21

**clustering** 139:23 156:10

**clusters** 101:14 260:5

**cobain** 12:12 278:20,20 302:13 314:1,1

**code** 12:20 39:2 39:3,11 58:8 254:10 258:2,4 258:5,7,8,9,11 262:8 278:4 311:13 344:3

**codifying** 57:15

**coefficients** 139:24

**coincide** 92:14

**coincidence** 150:14 307:22

**coinciding** 232:1

**coined** 200:2 220:6 221:3

**cole** 272:19

**collapsed** 325:25

**colleague** 58:17 91:9 118:16 147:14 219:14 223:20 268:3 269:4

**collect** 200:19 286:13

**collected** 244:19 308:23 309:15 331:25 332:2

**collective** 18:7 194:19 217:22

**college** 53:11

**colleges** 56:10 56:13

**colloquialisms** 55:25

**columbia** 52:11 52:19,22 53:10 53:17 68:3,7 70:16,17,21

**column** 36:8 309:19 310:14 310:18,25 314:2 329:12 329:15 330:5 330:12,12,14

CONFIDENTIAL

**[columns - concept]**                                    Page 18

**columns**
  323:12,24
**combinable**
  220:15,23
  223:14
**combination**
  223:10
**combinations**
  180:10
**combined**
  209:15 210:15
**combining**
  223:14
**come** 19:10
  23:14,23 24:22
  40:19 47:12
  57:9 70:2,3,7
  110:10 111:6
  114:15 150:21
  151:3 182:6
  186:12 189:9,9
  206:15 210:22
  218:1 270:20
  271:11 278:2,3
  279:6 313:19
  334:25
**comes** 36:9
  96:10 127:15
  186:25 188:20
  192:1 219:12
  271:4 273:20
  273:20
**comfort** 279:21
  280:12

**comfortable**
  32:7
**coming** 19:2,12
  157:24 269:3
**command**
  139:25 147:9
**comment**
  279:12,18
  280:9,13,15,17
  281:16 303:13
  318:10 326:2
**commentary**
  168:6 192:24
  233:24
**commenting**
  190:10
**comments**
  286:11,13,15
  286:20,23
  287:2,4,8,14,15
  287:18 288:1
  290:5,8,12
  291:6,21 292:2
  292:15 319:15
  325:12,14,15
  325:19,21,23
  326:1,23 327:3
  327:4 331:18
  331:22,25
  332:11,13,17
  333:22 336:17
**commitment**
  94:8

**communicate**
  33:9 54:21
**communicated**
  347:10
**communication**
  24:5 192:9
  348:6,7
**communicati...**
  161:4 347:22
  348:3 349:1,9
  349:9
**community**
  94:14 95:7
  97:17
**comp** 31:16
  83:16
**companies**
  32:14 114:15
  120:14 213:25
  241:5
**company** 31:20
  31:20,21 32:12
  90:21 107:8
**compare** 291:7
**compared**
  67:17 212:21
**complete** 15:21
  16:5 39:1
  182:2 224:17
  237:12 344:16
  344:18 354:9
**completed**
  45:12

**completely**
  49:6 115:6
  184:25 237:16
  237:16 238:10
  238:19
**complex** 97:13
  98:3 258:10
**complicated**
  238:5
**components**
  39:5 163:4
**compound**
  182:18
**comprise** 309:1
**comprised**
  174:25 177:11
  186:24 188:9
  287:2 310:19
**computational**
  30:25 82:17,19
  82:22 83:4
  131:9,16
  132:17 142:21
  144:24 148:11
  156:11 233:19
**computer**
  66:15 83:12,15
  219:23 257:25
**computers** 99:2
**con** 78:16
**concentration**
  72:11,12,19
**concept** 47:3
  125:14

CONFIDENTIAL

**[concepts - content]**

**concepts** 125:9
  125:10 147:2,4
  147:6,12
**concerned**
  253:6
**concierge** 9:23
**conclude** 180:1
**concluded**
  351:7
**conclusion**
  211:20 233:13
  233:14 312:2
**conclusions**
  186:1,15
  289:14 293:16
  349:2
**conduct** 89:6
**conducted**
  267:18 340:15
  343:1
**conducting**
  179:24
**conference**
  30:12 33:10
  185:9
**conferences**
  159:6 191:7,9
**conferencing**
  2:21
**conferred**
  74:18
**confidence**
  312:25

**confident**
  148:18 175:15
**confidential**
  1:17 2:17 14:2
  105:12
**confines** 226:11
  241:15
**confirm** 59:21
  61:16,19
  189:25 232:4
  264:17,25
  267:3 275:17
  316:22 333:12
**confirmation**
  194:15
**confirmed**
  223:23 264:3
  317:1
**confirming**
  273:18
**confused**
  163:17 184:25
  203:19
**conjunction**
  31:5 124:7
  196:7,14 261:4
  274:20
**connection**
  232:3 234:20
  285:14
**connects** 241:4
**consider** 60:15
  70:12 126:1,8
  226:2 328:18

  348:5,25
  349:17
**consideration**
  348:8
**considered**
  68:18 97:6,7
  125:22 126:12
  169:10 191:23
  192:1,18
  220:15,23
  226:9 294:5
  328:23
**considering**
  348:24
**consistency**
  190:2
**consistent**
  103:19 189:24
  198:12 202:25
  295:5 309:8,13
  318:7
**consistently**
  342:11
**consolidated**
  1:14,15 2:14
  2:15
**constraints**
  242:25 243:12
  243:17
**construed**
  276:21
**consumers**
  84:18 95:8

**contact** 23:17
**contacted**
  29:24
**contain** 191:16
**contained**
  126:22 288:1
**contemplate**
  313:15
**content** 39:17
  39:18 41:23
  46:17 47:21
  52:8 67:19
  91:15,18,25
  94:12 101:12
  101:13 103:15
  103:15,22
  104:20,24
  105:1,6,9,10,15
  105:25 106:3,4
  106:5,9 114:1
  114:5 115:17
  115:22 160:11
  168:23 171:22
  171:23 174:8
  176:11 190:11
  192:9,13
  196:24 241:6
  250:10,10,18
  251:5,16,18,20
  252:2,5,24
  253:1,6 261:10
  265:15 266:11
  266:21 271:14
  273:18 278:8

CONFIDENTIAL

**[content - counsel]**

283:3,3,6,14
284:19,21
285:1 306:20
309:15,25
311:8 336:4
349:15
**contents** 135:3
192:11 250:7
347:6
**context** 47:14
95:21 99:25
100:13 124:15
165:9 168:5,15
174:8 177:6
178:17 196:20
226:6,13 227:1
227:1,5,23
228:10 233:11
250:22 251:7
275:5,19
280:19 281:10
283:12,25
284:17 347:8
**contextualiza...**
200:8 217:3
341:7
**contextualize**
284:18
**contextually**
197:11,12
**continue** 60:25
**continued**
119:2

**contract**
105:18
**contribute**
114:20
**control** 22:22
126:21 140:1
147:10
**controlled**
97:15 98:5,13
**conversation**
19:3,14 20:15
21:3,11 27:5,9
33:2 56:18
161:7
**conversations**
112:15
**conversion**
309:6 324:13
**converting**
85:9
**cooley** 7:5
16:14
**coordinate**
99:4
**coordinated**
11:20 89:11,21
90:15 95:23
96:1 100:16,22
103:2 104:17
108:16 114:13
114:16 116:2
128:19 129:12
131:12 135:21
136:12,17,21

138:4 139:10
139:19 141:11
141:24 157:13
198:18,21,24
199:3,6 200:1
220:25 295:12
**coordinating**
89:15 98:21
**coordination**
11:18 100:10
101:14 104:10
131:10,11
141:4,9,23
142:2 144:23
**copy** 46:17,18
65:16 66:19
113:4,16 125:1
125:3 129:16
154:4 169:24
266:3 331:4,5
**cordially** 30:14
**core** 31:9
254:14
**corporate**
119:14
**correct** 17:17
19:13,16 26:15
32:20 33:4
34:13 35:21
36:16,18 37:11
39:5 40:6 47:1
47:7 52:12
58:14 67:1
69:19 70:10

71:6,18 75:14
82:21 85:20
117:7 121:2
156:3 162:4,20
169:6 188:10
197:16 217:11
224:14 234:9
245:22 257:23
261:4,13 268:2
283:21 284:8,9
286:12 309:2,3
316:15 328:25
340:14 352:15
352:22 354:8
**corrections**
354:6
**correctly** 39:4
**correlates**
327:24
**correlation**
234:15,18,19
234:24
**corresponden...**
26:1
**counsel** 14:12
14:17 15:2
18:20,21 19:4
22:13,16,22
26:21 28:18,23
45:21 60:8
112:16 130:22
143:3 145:12
161:4,7 345:7
350:17,18

CONFIDENTIAL

**[counsel's - cycles]**                                    Page 21

counsel's  20:21 21:14

counsels  17:22

count  276:1

counted  335:18

counterfactual 344:14,24

couple  85:2 115:12 145:24 182:20 229:13

course  16:21 17:10 18:16 51:13 52:24 68:11 69:3,5 70:8,24 71:2,4 71:7 79:24 124:4 126:9,10 126:12 169:2 197:23 213:17 245:14 279:20 280:11

courses  68:16 69:2,11 70:20 72:4,4 75:5 76:12,14,18

court  1:1 2:1 22:23 109:7,14 109:23 110:1,1 110:13,24 138:9,11 185:3 185:9 349:19 350:20,24

courts  162:25 164:1

cover  105:20 113:1

coverage  192:2 192:5 196:15 198:15 199:11

cpg  107:7

crashed  295:2

crawl  322:7

crawler  319:17 319:19,23 320:3,24 322:6

crazy  316:3

create  52:13,16 179:25 338:22 346:3

created  52:15 54:12 58:12 76:4,23 87:25 104:19 308:11 345:20

creation  128:19 129:13

creative  46:17

creators  241:6

credentials 25:10

credibility 194:14

credits  70:24

criteria  163:1 164:3,16 181:14

cross  23:1 109:9,16,20,22

110:9,12,17,25 111:2,9,25 112:5 183:4 223:23

crunch  203:18

csr  1:24 11:5 12:5 13:5 352:25

csv  263:19 309:6 329:11

culminates 73:8 78:14

culotta  172:3 172:24

culture  276:19 277:8 300:25 302:9,11 304:5 309:20 310:16 310:16

curation  114:1

current  31:18 61:1 68:1,3 69:15 70:12,17 189:19 256:6 256:14

currently  17:8 32:9,10 56:20 68:6 70:20 221:5 255:8,20

curve  225:6,8 295:11

custody  161:25

customer  11:12 108:3

customers  85:7 85:10,10 107:23,24,25 108:1

cut  53:6 115:8 333:13,15

cv  1:7,7 2:7,7 25:7 58:16 63:5,14,17,20 64:9,13,14,16 64:19 65:3,4,6 65:9,10,14,16 65:18 66:8,10 66:19 67:5,6 67:18,22 71:15 74:4 78:18,24 81:8 84:5 86:11,18,19 120:2 124:24

cycle  191:19 193:23 194:10 194:10,13 196:10 233:25 335:5

cycles  191:13 191:15,17 196:3,7,13 197:14 198:13 199:8,10 233:23 328:22 335:6

CONFIDENTIAL

**[d - dataset]**                                                Page 22

| d | | | |
|---|---|---|---|
| **d** 339:3 | 121:20,22 | 236:17,23 | 324:5 325:24 |
| **d.c.** 5:10 6:8 | 125:11 128:24 | 237:18 238:16 | 326:2,12,13 |
| **dailies** 211:5 | 156:10 166:16 | 238:19 239:4 | 328:14,22 |
| **daily** 190:17 | 167:8 172:6,7 | 239:19 240:11 | 329:9,21 331:1 |
| 210:16,22,24 | 172:9,17,20,21 | 241:11,14 | 333:8 336:13 |
| 210:25 211:2,3 | 172:24 174:22 | 242:9 243:3,22 | 337:20,23,24 |
| 211:6,10,14 | 175:2,2 176:5 | 244:19,21 | 337:25 338:5 |
| 299:22 346:2 | 176:17,20,21 | 245:23 247:20 | 339:22 340:1,2 |
| **damage** 119:4 | 176:23 177:9 | 261:15,25 | 340:13 341:6 |
| **data** 23:24 | 178:2,4 179:20 | 263:23 271:3,3 | 342:12 343:13 |
| 24:24 25:9 | 180:4,13,20 | 273:6 278:5 | 345:4,5,8,16 |
| 29:2,9,10 31:4 | 187:1,4,12 | 280:7 283:10 | 347:7 348:24 |
| 31:8,19,24,25 | 188:3,4,19 | 283:14 284:4 | 349:4 |
| 32:3,4,9 34:25 | 198:24 200:22 | 287:13,21,23 | **database** |
| 36:23 37:9,12 | 200:25 201:2,3 | 287:25 288:14 | 286:25 |
| 37:13,14 38:21 | 201:5,8,17,19 | 288:20 290:18 | **dataset** 31:3 |
| 38:23 39:1 | 201:21,24,25 | 291:13,17,20 | 33:13,19 39:13 |
| 40:2,2,5,8,8,18 | 202:5,6,10,14 | 292:9,17 | 39:17 42:20 |
| 40:23 42:4,11 | 202:21,23 | 293:17 294:20 | 124:22 174:11 |
| 42:12,17,21 | 203:11,24 | 297:9,14 | 174:23,24 |
| 43:11 44:10,11 | 205:1,2,12,22 | 298:11,12,13 | 175:3,6,11,15 |
| 45:12 58:2,4 | 206:4 207:4,13 | 298:13,17 | 176:1,9,10,18 |
| 81:3,7,9,16,18 | 209:15 210:8 | 299:7,22,25 | 177:2,10,11 |
| 81:20,22,24,25 | 210:11,17,18 | 301:12 302:20 | 178:22,25 |
| 82:1,2,4,5,7,11 | 210:19,20,23 | 303:12 305:23 | 179:1,5,7,17 |
| 83:12,17,18 | 211:13,16,19 | 306:7 308:19 | 181:5,6 182:1 |
| 85:3 86:5,6,9,9 | 211:21,24 | 308:23 310:7 | 182:2,8,24 |
| 86:17 87:7,7,8 | 212:2,6,12 | 311:21 312:7 | 183:18,22 |
| 87:9,11,18,21 | 214:7 216:22 | 312:17,19 | 184:7,11 |
| 87:24 88:2,2,5 | 218:1 223:3 | 313:20 317:16 | 185:25 186:9 |
| 90:5 91:20 | 225:17,20 | 317:22 319:9 | 186:15,16,23 |
| 106:2 121:15 | 227:9 229:18 | 320:14 321:13 | 187:3,5,17 |
| | 229:25 231:1 | 322:10,11,17 | 188:6,9 203:20 |
| | 233:18 236:3,5 | 322:23 323:8 | 204:1,6,18,21 |

CONFIDENTIAL

**[dataset - define]**    Page 23

204:22 205:3,6
206:3 208:16
208:19 224:7
224:13,15,17
224:19,23
225:21 235:20
237:9,11,14,17
238:5,10,11
240:4 241:4
254:10,22
258:22 259:1
259:12 262:8
264:23 267:14
270:19,21
271:3,8,16
272:25 273:1
273:11,12,15
273:25 274:3
275:2 276:1
277:14 278:23
280:3,14 281:6
281:16 282:9
282:25 286:3,7
287:2 289:8,18
290:7 291:8,14
291:22 292:3
293:24 294:7
295:19 301:12
302:16 307:14
307:23 309:1
309:10,14
310:20 311:16
314:20 316:12
316:22 322:2

324:21 326:25
328:24,24
332:4,14
336:14 339:16
344:3,21
348:10
**datasets**  58:8
58:11,12 76:5
83:8 186:20
200:16 202:3
203:13 206:6
223:10 319:12
**date**  35:12
41:12,14 43:17
74:12 146:1
166:24 167:5
231:19 232:2
255:9,10
258:17 288:4
296:22,23
300:1 309:17
353:24 354:12
**dated**  352:22
**dates**  228:18
288:20
**dating**  309:15
**daubert**  160:16
160:19,20,23
161:1,10,13,20
162:3,8,13,21
162:24 163:2,8
163:25 164:12
164:20

**daubert's**
164:11
**day**  18:9 38:24
52:2 84:24,24
199:2 213:20
213:20,21,21
228:16 229:6
245:13,15,16
245:21,21
315:15 316:5
352:22 354:15
**days**  45:3,5
298:7
**dds**  88:8
**de**  210:21
**death**  278:21
314:2
**debate**  23:12
49:5
**decay**  224:2
**deceive**  98:22
**deceiving**  97:17
**december**  1:22
2:23 11:4 12:4
13:4 14:3,6
221:16 328:16
328:19 352:22
**deception**
97:13 98:3
**deceptive**  115:9
**decide**  65:2
72:17 123:7,12
133:18 160:25
168:19 207:18

241:15
**decided**  37:14
85:18 168:5
207:22
**deciding**  37:17
**decision**  82:4
**decisions**  114:3
**declare**  352:20
354:4
**decline**  293:6
293:14
**deconstructing**
251:9
**dedicated**  58:1
**deemed**  354:6
**deeper**  78:9
102:25
**default**  257:4
**defaults**  307:7
**defendant**  1:12
2:12
**defendants**  1:9
1:15 2:9,15 7:2
8:2 9:2 14:22
14:25 17:24
18:5,9,10,14,18
18:21 28:18
45:21 216:10
216:12,16
347:5,10,22
349:1,10
**define**  82:23
99:22 121:6,11
177:5,7,25

CONFIDENTIAL

**[define - destructive]**

199:8 200:5
221:17 222:3
226:15 227:17
248:1,5,21
276:25 277:2
307:11
**defined**  176:16
190:18,21
221:19,22
248:18
**defines**  47:4
136:21 138:3
139:9 200:6
**definitely**  52:20
**definition**
84:15 136:12
136:17 144:2
178:22 179:6
190:2,4,13,19
190:22 195:20
195:23 220:3
220:16 221:2
222:19 223:9
223:16,17
226:23 227:2,5
229:9 307:13
**definitive**
233:13,14,17
318:18,20
**definitively**
55:2,4 57:19
232:7 233:4,7
233:8,11 234:3
234:9,11,16

271:20 307:16
327:16
**defraud**  100:3
**degree**  31:14
71:16,20,23
72:5,16,19,24
72:25 73:1,11
73:12 74:6,7
74:15,23 76:1
76:16 77:3,8
77:18 78:7,18
79:7,9,11,17,18
79:20,24 81:4
81:8 82:7,21
83:15,16,17,18
83:20,21 84:1
84:3
**degrees**  82:6,10
82:14,15
250:11
**dent**  100:14
**depart**  85:18
**department**
87:19,25
**departure**
85:19 230:7
231:8
**depend**  55:11
257:13 315:25
**dependent**
239:18 330:7
**depending**  41:7
50:25 55:23
56:5 68:14

115:22 123:8
193:4 226:16
226:19 251:12
278:4 326:12
**depends**  49:21
82:2 186:23
196:24 343:18
**depo**  43:17
**deponent**
352:14 354:3
**deposition**  1:19
2:18 3:4 14:2,7
15:10 22:8,15
22:17 23:12
34:24 43:15,24
60:25 134:22
138:9 195:12
349:19,21
351:7
**depth**  81:5
**derive**  202:22
249:15 252:23
**dern**  6:14
**derogatory**
250:14,14,16
250:19
**describe**  25:5
80:6,10 83:9
88:14 90:11
150:22 165:25
214:11 215:6
246:23 278:15
339:11,13
342:5

**described**
25:14 76:13
115:24 117:11
191:3 194:22
214:4 218:17
224:6 229:6
241:20 283:17
306:20 317:22
319:5 320:11
339:23 343:25
**describes**
317:25
**describing**
86:10 215:3
220:14 224:6
224:11 249:9
306:19
**description**
11:6 12:6 13:6
86:6
**deserves**
336:20 337:11
**design**  11:24
221:15
**designate**
105:12 250:8
**designated**
14:19
**designed**  65:21
94:13
**desktop**  66:22
**despite**  298:21
**destructive**
299:7

CONFIDENTIAL

**[detail - disagree]**                                    Page 25

| | | | |
|---|---|---|---|
| **detail**  64:12 | **developing** | 108:11 115:12 | 323:21 324:17 |
| **detailed**  303:12 | 43:13 46:16 | 116:18 119:19 | 326:16,17 |
| **details**  344:21 | **deviation** | 122:15 123:10 | 336:5 |
| **detect**  216:24 | 209:25 210:4 | 124:12 125:8,8 | **differentiation** |
| **detecting**  11:19 | 210:12 211:25 | 129:14 133:17 | 323:23 |
| 131:12 141:4 | 212:4,10 | 141:8 142:6 | **differently** |
| 141:10 142:1 | 213:14 214:1 | 143:22 159:6 | 67:20 237:16 |
| 144:23 | 214:22 | 173:13,22 | **difficult**  96:18 |
| **detection** | **deviations**  63:2 | 177:13 180:9 | 99:3 100:15 |
| 128:19 129:13 | **devil**  272:19 | 181:5 182:6 | 116:12,13 |
| **determination** | **devise**  102:9 | 183:17,18 | 175:25 233:15 |
| 166:4 196:22 | **difference**  36:3 | 186:20 187:10 | 343:12 |
| **determine** | 46:11 63:25 | 192:5 196:13 | **difficulty**  43:3 |
| 187:5 194:9 | 67:5 96:8 | 196:17 199:23 | **dig**  102:25 |
| 206:19 210:9 | 130:5 236:25 | 200:2 201:19 | **digital**  84:1,3 |
| 210:12 216:8 | 276:14 277:25 | 206:5,6 208:22 | 117:21 296:5 |
| 227:22 239:9 | 332:23 347:17 | 215:14 216:23 | 296:18 297:1 |
| 315:2 322:14 | **differences** | 217:2,20 | **dina**  9:24 14:18 |
| **determined** | 64:6,8 | 218:23 219:1 | **dinner**  246:9 |
| 38:16 105:1,16 | **different**  17:22 | 220:17 222:19 | **direct**  63:4 86:2 |
| 169:3 236:2 | 24:21 32:1 | 222:21,22 | 86:3,4 142:24 |
| **determining** | 38:3,5 39:7,21 | 223:10 226:12 | 347:21 |
| 103:10 162:13 | 42:13 43:22 | 226:12,16 | **directing** |
| 196:10 | 44:23,24,25 | 227:11,13,17 | 141:24 |
| **devastating** | 47:22 48:23 | 234:21,25 | **direction** |
| 117:20 118:19 | 49:17,20 50:5 | 237:1,23 | 239:23 253:10 |
| **develop**  46:6 | 56:1 66:24 | 238:10,19 | 313:8 |
| 47:11 299:15 | 67:16 76:17 | 241:6 244:8 | **directionally** |
| **developed** | 77:12 81:23 | 248:22 249:19 | 238:11 |
| 47:15 75:19 | 84:19 85:2 | 249:21 250:11 | **directly**  26:21 |
| 76:6 87:1 | 95:23 98:18 | 254:7 255:25 | 202:2 |
| 146:12 292:13 | 99:1 100:20 | 260:25 268:22 | **dirllp.com**  6:9 |
| **developer** | 102:1,6,14 | 276:25 289:20 | **disagree**  97:25 |
| 259:19 | 104:10 106:15 | 319:7 322:4 | |

CONFIDENTIAL

**discipline**
56:13 121:4,6
121:13 157:12
**disciplines**
83:11 122:2
125:8
**disclose** 20:14
21:11 54:3
65:21 66:4
158:11 161:3
212:23 255:18
256:9 259:22
**disclosed** 53:21
53:22 54:2,5
267:25
**disclosure** 24:4
66:5 165:18
**disconfirm**
264:17
**discord** 198:12
**discourse**
196:12
**discovery**
295:25 296:20
346:7
**discretion**
53:19
**discuss** 24:22
28:17 52:25
53:13
**discussed** 76:22
123:17,21
141:9 224:12
235:19 317:25

343:3 347:5
**discusses** 220:3
**discussing** 90:1
90:2 156:8
165:13
**discussion**
113:6 179:18
**dispersion**
139:23 147:9
**dissect** 36:3
**dissecting**
196:17
**disseminated**
194:15
**dissemination**
194:16
**distinction**
123:24
**distinctions**
53:15
**distinctive**
139:20
**distinguishing**
277:4
**distracted**
138:25
**distribution**
224:1 235:8,13
**district** 1:1,2
2:1,2
**diverse** 291:16
**diversity**
177:15 291:25

**divide** 44:8
**divided** 324:22
**division** 84:12
**dlet** 331:5
**docs** 46:5,7
**document**
11:10,21,23
59:7 67:1,2,12
93:14,23 94:1
95:6 147:15,22
300:15 332:12
349:16
**documents**
152:24 268:4
346:7,16
**doing** 22:11
34:25 35:1,6
38:21 43:7
93:16 95:2
101:15,17
126:15 134:12
182:3 188:5
204:11,12
214:2 220:17
222:7,12
264:24 288:13
319:8
**domain** 226:19
227:16,20
276:15
**domains**
227:14,17
**dots** 281:9

**double** 245:8
261:1 289:25
295:19 303:25
304:1 318:5
332:19
**download**
66:17 93:13
148:3 263:19
**downloadable**
262:17
**downloaded**
66:22 67:3
163:5 219:21
**downloading**
59:12 113:12
147:24 269:8
**downloads**
333:14
**dr** 14:17 151:3
165:9,10
166:13,13
167:11,12,13
167:16 170:9
171:11 172:3,3
172:23,23
173:13 174:11
174:12,22
175:4,16 176:2
177:16 184:4
184:15 185:25
186:5 187:3,8
199:19 200:5
200:24 201:1
202:5 203:20

CONFIDENTIAL

**[dr - employee]**                                                          Page 27

204:18 290:6
290:22 291:21
292:9 347:16
347:16 348:2,2
**draft** 63:14,16
125:24 171:25
**drafted** 44:20
**drafting** 28:13
45:2,15 46:3
125:23
**drafts** 44:22
**drainbamager**
272:17
**dramatically**
214:8
**draw** 186:14
289:14
**driven** 71:5
114:1 198:13
214:24
**drop** 39:3
**dropped** 293:5
293:7,11
317:18
**dropping**
103:22
**due** 109:25
110:23 248:13
**dunn** 6:4 14:15
**dupes** 210:21
**duplicate**
323:13 335:20
**duplicates**
324:5 335:17

336:1,4,14
**duplicative**
105:6 182:7
324:15
**dynamics**
247:4

**e**

**e** 3:1,1 4:1,1 5:1
5:1 6:1,1 7:1,1
8:1,1 9:1,1
85:5 127:4
339:3 353:3,3
353:3
**earlier** 23:17
57:25 66:23
92:6 129:2
146:5 149:8,10
149:20 155:19
155:22 201:20
218:17 231:17
235:19 301:24
314:7 316:25
318:18 343:4,8
350:19
**early** 160:20
**ease** 152:10
**easier** 93:18
144:19
**easily** 31:23
**east** 4:8 8:9
**eastern** 14:6
**eat** 246:10

**echo** 170:5
171:17,20
**economics**
83:24
**edges** 340:10
**edit** 45:19,21
46:24
**edited** 123:16
**editing** 46:18
65:18
**editor** 123:18
**edits** 319:14
**educate** 254:17
**educated** 56:6
**education**
56:19 73:8
**eff** 270:4
**effect** 39:14
40:3 117:10
132:10 162:1
334:23
**effective** 299:5
**effectiveness**
124:21 125:6
**effing** 270:1
**effort** 200:1
**ehudson** 4:11
**eight** 45:3,5
**either** 51:1
66:20 99:5
100:2,23 115:5
115:14 119:24
122:1 134:8
176:6 198:22

199:5 200:1
271:25 273:2
273:22 279:6
284:1 304:11
330:8 337:17
**elapsed** 350:5
**electronic**
25:25
**element** 47:17
101:25 214:1
254:12
**elements** 62:24
78:11 119:22
158:7 268:24
**eleven** 188:12
269:6 316:18
317:6
**elizabeth** 11:18
132:21
**else's** 179:1
201:3
**email** 17:14,14
33:11 349:8
350:8
**emails** 347:21
349:15
**emanuel** 3:5
**emotions**
115:13,14
**employed**
162:11
**employee**
352:18

CONFIDENTIAL

**[enable - examination]**                                          Page 28

| | | | |
|---|---|---|---|
| **enable** 94:13 | 204:22 205:5 | **enumerate** | 193:2 241:13 |
| **encompasses** | **ensures** 225:21 | 256:3 | 283:20 291:2 |
| 176:3 | **ensuring** 87:9 | **environment** | 353:1 354:1 |
| **encyclopedia** | 201:4 | 264:5,17 265:1 | **ethical** 11:11 |
| 11:23 221:15 | **enter** 303:21 | 266:16 | **ethics** 11:16 |
| 222:20 | 304:11 | **eras** 276:11 | 74:5 75:16 |
| **ended** 41:16 | **entered** 22:4,14 | **errata** 354:7 | 78:7,11 |
| 70:22 | 57:8 61:14 | **error** 39:9,10 | **evaluate** |
| **ends** 13:11 18:2 | 147:19 211:20 | 48:11 130:19 | 162:25 164:1 |
| 206:18 270:5 | 304:15 332:3 | 142:25 278:2,3 | **event** 230:16 |
| 272:21 300:24 | **entering** | **escalating** | 335:1 |
| 301:15 311:10 | 313:15 | 116:17 | **events** 114:14 |
| 330:20 332:8 | **enterprise** | **escalation** | 232:3 233:20 |
| **enforce** 53:24 | 119:16,19 | 116:1 | 327:25 328:13 |
| **enforced** 54:3 | **entertainment** | **especially** | 328:18 |
| **engage** 22:25 | 198:14 199:9 | 54:16 117:22 | **everybody** |
| 23:11 94:12,18 | 199:11 | 217:1 313:20 | 351:3 |
| 95:3 114:5 | **entire** 35:1 | **esra** 4:5 | **everyday** 178:6 |
| 115:22 | 39:13 93:23 | **essential** 247:7 | 178:9 |
| **engaged** 20:16 | 94:1 135:8 | **est** 2:22,23 | **exact** 43:3 53:7 |
| 23:10,16 30:3 | 138:6 162:2 | 351:8 | 53:12 117:10 |
| **engagement** | 166:19 176:17 | **establish** 232:7 | 148:5 166:24 |
| 19:3,12,15 | 176:23 181:17 | 234:4,12 | 183:11 221:10 |
| 115:23,24 | 244:25 280:19 | **established** | 222:11 267:17 |
| 161:14,15 | 292:3 309:1 | 162:12 233:5 | 323:3 335:17 |
| **engagements** | **entirely** 180:15 | 235:18 310:24 | 336:1,4,10 |
| 64:5,12 | 180:17 183:18 | **et** 1:8,13,15 2:8 | **exactly** 33:17 |
| **engineering** | **entirety** 134:16 | 2:13,15 11:3 | 34:25 48:3 |
| 85:3 121:15 | 294:24 | 12:3 13:3 14:9 | 170:5 198:4 |
| **english** 251:9 | **entitled** 105:13 | 25:11 76:23 | 203:6 223:1 |
| **ensure** 59:19 | 137:7 138:18 | 84:18 121:16 | 254:13 331:18 |
| 85:7 126:21 | 157:23 | 140:21 141:3 | 348:16 |
| 164:15 175:20 | **entries** 82:13 | 143:13 153:10 | **examination** |
| 201:18,24 | 324:5,12 | 179:21 190:8 | 10:1,5 15:15 |

CONFIDENTIAL

**[examination - expert]**                                    Page 29

352:10
**examining**
   218:14
**example**  48:15
   103:17 104:7
   146:13 171:11
   243:10 245:17
**examples**  54:2
   104:25 155:16
   197:13
**excel**  12:23
   13:8,10 36:6
   308:10 309:6
   326:24
**excels**  308:16
   326:18
**exceptional**
   230:7 231:8
**excerpt**  11:14
   11:15 113:6,20
   117:16
**excuse**  68:3
   77:11 93:22
   165:1 166:9
   183:5 184:22
   191:18 233:25
   259:14 295:11
   302:23 303:22
**excused**  137:16
**executionary**
   71:10
**executive**  78:24
   78:25 80:25
   81:9,12,18

**executives**  79:1
   79:4 80:20,21
**exhibit**  11:6,7,8
   11:10,11,14,15
   11:17,21,23
   12:6,7,9,10,12
   12:13,15,16,18
   12:20,21,22,23
   12:24 13:6,7,8
   13:9,10,11
   16:9,11 61:23
   61:25 62:7,20
   63:10 64:3
   67:2,8 90:24
   90:25 91:2
   93:5 112:13,18
   112:19,21
   113:3,5,7,8,9
   113:21 118:8
   118:10,12
   125:20 130:23
   130:25 131:1,3
   139:20 141:12
   142:24 143:1,3
   144:11,18
   147:16,20,23
   152:12 198:3,4
   207:10 209:6
   219:15,17,18
   229:1 246:3
   268:4,6 269:2
   269:4,7,12,17
   269:18 272:10
   272:12 276:6,8

278:8,10 279:9
   279:10 280:22
   281:1,20,23
   282:12,14
   285:13,17,21
   300:13,14
   302:24,25
   304:2 307:2,9
   308:9,10,13
   315:7,8 316:7
   320:24,25
   321:2,4,5
   322:23,24,25
   325:5,7,9
   329:6,7 332:7
   332:9 346:13
   349:23
**exhibited**
   198:11
**exhibits**  11:1
   12:1 13:1
   131:4 268:5
   269:1
**exist**  48:12 49:4
   49:8 121:3
   122:1 275:24
**existed**  237:7
**exists**  191:19
   239:19 266:13
**exited**  62:9
**expand**  336:22
**expect**  271:7,10
   271:15 272:24
   277:13 278:22

280:2,13 281:5
   281:15 282:8
   282:24 315:23
**expected**
   160:14
**experience**  25:9
   78:17 79:5
   88:14 121:20
   121:25 155:17
   155:23,24
   156:20 157:21
   158:21 159:16
   162:18 167:11
   229:10
**experienced**
   32:7
**experiment**
   179:24
**expert**  9:24
   11:7,8 19:10
   24:20,23 33:21
   34:1,2,5,11,11
   34:15 59:4,16
   64:1 73:18
   96:20 98:17
   121:18,19
   155:24 162:7
   162:25 164:1
   164:11 165:2,4
   166:22 172:2,4
   172:12 182:2
   196:2,10
   227:20,21,25
   228:12 291:15

CONFIDENTIAL

**[expert - feeding]**                                                    Page 30

292:23
**expertise** 25:5
  121:11 162:12
  164:19 199:22
**experts** 14:19
  34:8 165:3
  167:5 173:2,12
  173:16,21
  176:21
**expired** 349:24
**explain** 23:3,8
  23:8 38:20
  46:8,11 84:14
  101:7 103:13
  123:24 132:13
  136:20 138:3
  139:9 145:17
  153:5 164:12
  175:14 196:9
  198:20 227:6
  229:18 231:2
  248:17 276:14
  313:13
**explained**
  254:3
**explaining**
  184:23 309:9
**explains** 228:16
**explanation**
  130:15 148:23
  149:4 151:8,14
  151:21 152:2
  230:17,23,24
  328:1 330:5

**explanations**
  329:2
**extent** 18:24
  21:10 24:4
  58:5 73:21
  78:6 80:25
  82:13 92:12
  161:3 165:17
  165:17
**external** 348:25
**extract** 262:16
  263:14 287:13
  320:14 321:13
  330:2
**extracted**
  283:15 326:13
**extraction**
  273:6,17
**extracts** 306:3
**extraordinarily**
  210:7 214:23
**extraordinary**
  210:6 214:11
  215:4,7 230:16
**extrapolated**
  33:17
**extreme** 215:5
**extremely**
  96:18 99:3
  100:15 115:15
  115:15 116:13
  175:25
**eye** 261:3
  264:24

**eyeball** 266:2

**f**

**f** 309:19 310:14
  310:18 314:2
  330:12,14
  331:11,12,12
**face** 203:24,25
**facebook** 84:19
  95:11 179:20
  221:8 222:25
**fact** 149:22
  214:10 215:5
  223:11 231:12
  231:24 232:18
  232:21 295:2
**factor** 102:5
  197:2,3 217:1
  292:6
**factors** 102:6,9
  108:19 197:5
  249:19 299:8
  329:4
**factual** 249:5
**factually** 47:5
  129:23
**faculty** 122:11
  122:13
**faith** 51:19
**fake** 94:11
  114:22 115:11
**fall** 102:23
**false** 115:6
  196:18,25

197:6
**familiar** 82:16
  91:10 133:1
  219:11 333:11
  349:13
**family** 254:24
  255:20 267:13
  275:12
**far** 41:13
**farm** 98:21
**farr** 5:4 14:17
**fast** 117:22
**fastest** 303:10
**fate** 281:22
**father** 278:20
  314:1
**fauxmoi** 278:14
  300:25 302:10
  302:12 304:5
  310:16 314:3,9
**feasible** 262:24
  263:3,10
**feature** 42:15
  127:2 149:16
**february**
  197:18 198:11
  200:13 202:19
  203:16 290:13
  327:22 328:12
**feed** 115:13
**feedback**
  195:11
**feeding** 319:11

CONFIDENTIAL

**[feel - focused]**

**feel** 32:7

**fein** 9:5 14:21
14:24

**felt** 107:8
203:11

**female** 19:20
19:21

**ferrara** 152:18
153:10,19

**fever** 16:1,1

**field** 83:8 227:9
312:12

**fields** 307:5,7
313:8,10

**fifth** 177:19

**figueroa** 3:10

**figure** 60:24
101:15 248:4
272:2 350:6

**file** 36:6 259:25
285:6,13,20
294:8 304:4,7
305:19,21
307:17,18,20
307:25 308:2
309:6,9,14
311:2,22
312:15 316:8
317:5,19,21,22
318:24 319:1
319:15 324:14
330:2 339:18
339:24,25
340:1 344:21

345:6,9

**filed** 327:23

**files** 284:7,10
284:12,20,22
285:1,3,10
290:3 304:3
308:25 317:2,4
319:5 326:4
330:7 344:20
346:20

**filing** 328:16

**fill** 26:9 305:24

**filled** 26:1,12
26:19 304:22
304:24 306:5

**film** 191:22
192:4,17,23
193:1,7,10
198:13 199:8
199:10 232:8
234:1,4,12,17
335:1

**film's** 232:2
233:5

**filter** 331:6

**final** 168:23
343:23 348:19
348:23

**finale** 12:17
281:25

**finance** 81:4,22
227:10

**financially**
352:19

**find** 55:20 85:8
134:5 228:3
328:21 344:16

**finding** 148:24
160:2

**findings** 142:20
148:10

**fine** 76:7
248:25 249:14
249:17,18,22
249:25 250:4
253:25 340:6

**fingerprinting**
102:4 157:14

**fingerprints**
93:4 139:21

**finish** 41:4
80:23 111:4
120:18 182:11
183:6,8

**finished** 51:7
65:24 66:3
68:7 184:24

**firm** 19:5

**first** 16:13 20:4
25:18,20 26:12
31:6 63:6,9
93:5 94:5 95:5
99:19 135:14
137:16 152:16
159:15 160:22
176:16 178:4
179:1,19 181:1
182:21 197:17

197:19 201:2
203:25 204:22
207:21 217:21
228:1 244:1
250:12 279:12
279:17 286:6
299:18 307:11

**fit** 27:7 93:14

**five** 39:21
60:22 177:13
188:3 203:1
205:22 207:4
216:2,5,6,10,23
217:2,6 218:16
223:24 225:1
229:1 236:6
237:1 284:7
289:19 308:25
321:19 326:15
350:15

**flagged** 285:5

**flip** 101:5

**floor** 3:11 7:9
9:8

**flow** 88:10
103:19

**fluctuation**
230:15

**focus** 64:1 72:2
72:16,17 73:16
81:3 208:22
254:13,16

**focused** 63:21
63:23 64:3

CONFIDENTIAL

**[focused - fritz]**                                    Page 32

177:1 195:18
**folder** 38:22,23
  61:23 340:2
  345:4,5
**folks** 219:1
**follow** 21:19
  24:6 183:7
  254:8
**followed**
  281:15,25
**following** 20:21
  21:14 119:25
  307:6
**follows** 138:1
  139:7
**footnote** 129:8
  129:9 140:24
  140:24 141:2
  142:13 168:3,7
  169:23 170:2
  170:10,19
  171:13
**footnotes** 48:21
  127:8 170:7,12
  170:14 171:6,9
**forecast** 288:13
  288:15 341:22
  343:23 344:1
  344:14,23
**forecasted**
  342:4
**forecasting**
  340:16,20,25
  341:4,11,13,14

341:16,20,24
  343:17
**foregoing**
  352:5,15,21
  354:5
**foreign** 106:20
**foremost**
  159:15
**forensics** 31:1
  88:22 227:13
  233:16
**form** 46:15
  90:16 92:1
  95:25 160:15
  204:13 217:1
**formal** 136:11
**formatted**
  80:21
**formatting**
  34:4
**forms** 97:13
  98:3,23
**forth** 245:19
  352:6
**fortunately**
  34:2
**forum** 124:10
**forward** 21:18
  65:16
**found** 62:24
  149:12 150:11
  154:25 224:8
**four** 172:2
  242:4,8 298:12

346:16
**frame** 40:24,25
  41:19 42:18
  188:4 197:18
  197:20 200:17
  200:23 201:21
  203:3 204:24
  205:6,11 206:9
  206:10 215:25
  222:11 225:19
  225:23 236:24
  238:18 254:11
  332:4
**frames** 326:11
**framework**
  11:19 131:12
  141:10,24
**frameworks**
  54:15
**frances** 278:19
  313:25
**francis** 12:12
**frankly** 53:6
  55:1 72:3
  109:25
**free** 122:10
**freedman** 7:5,6
  16:14,15,17,23
  17:4,7,19
  18:22,25 19:23
  21:23 22:2,2,3
  22:5,9,14,18
  33:3 65:17

**frequently**
  198:23 268:19
**friday** 45:6
**fritz** 14:20,20
  17:8 19:1,24
  20:13,18,23
  21:9,18,25
  22:22,24 23:3
  23:6,11,20
  24:3,12 26:7
  27:15,24 28:5
  28:10,15 30:21
  38:7 41:1,3
  42:24 44:1
  45:24 46:25
  47:9 48:8,17
  49:9,16 51:5
  51:12 53:3
  54:24 55:8,17
  56:16,25 57:12
  59:6,10,18
  60:1,11,17,21
  61:3,6 64:21
  65:20,24 66:3
  68:20 69:17
  70:9 71:25
  72:14 73:6,14
  73:25 74:25
  76:2 77:6,19
  78:20 80:2,8
  80:18 82:9
  83:2,6 85:13
  86:12,23 87:4
  90:13 91:22

CONFIDENTIAL

**[fritz - fritz]** Page 33

| | | | |
|---|---|---|---|
| 93:13,22 94:2 | 145:23 146:8 | 194:24 195:21 | 267:19 268:1 |
| 94:20,25 95:15 | 146:22 149:1,5 | 196:4 197:1 | 270:13,23 |
| 96:15,22 98:7 | 150:2,15,24 | 201:14 202:12 | 271:1,9 272:4 |
| 99:14,18,23 | 151:5,11,18,24 | 203:22 204:7 | 273:10 274:14 |
| 100:18 101:20 | 152:5,12 153:7 | 204:19 205:20 | 274:24 275:11 |
| 102:11,19 | 153:15,21 | 206:2 208:12 | 276:2,17 |
| 103:6 104:3 | 154:7,13,21 | 212:7 213:1,4 | 277:15,20 |
| 105:3,17 107:4 | 155:3 156:17 | 215:8 217:14 | 278:24 279:4 |
| 108:5,10,17,20 | 157:1,8 158:1 | 219:10 220:12 | 281:7 283:8 |
| 108:24 109:3,6 | 158:14 159:3 | 221:20 222:16 | 284:11 286:19 |
| 109:10,17,21 | 159:12,21 | 225:15 226:18 | 287:19 290:15 |
| 109:25 110:5 | 161:2 163:9,15 | 226:24 227:7 | 291:9,23 292:4 |
| 110:10,19,23 | 164:5,13,24 | 227:24 228:6 | 292:11,18,25 |
| 111:3,10,23 | 165:16 166:10 | 228:11 230:19 | 293:19 296:15 |
| 112:1,6 113:15 | 168:1 169:5,11 | 232:13,25 | 296:19 297:3 |
| 113:18 116:5 | 169:21 170:4 | 234:6,23 | 297:11 298:9 |
| 116:15 118:4,8 | 170:15,22 | 235:23 238:2,8 | 298:15 299:1 |
| 120:8,16,18 | 171:4,14 | 239:1 240:7,25 | 299:21 300:9 |
| 121:7 123:13 | 173:19 174:2 | 241:21 242:13 | 301:8 302:1 |
| 126:13 127:13 | 174:17 175:5 | 243:5,18 247:9 | 304:14,20 |
| 128:10 129:19 | 175:10,22 | 251:25 252:17 | 305:9 306:6,12 |
| 129:25 130:9 | 176:13 177:3 | 253:11 254:19 | 306:22 308:1 |
| 130:17 132:7 | 177:12 178:7 | 255:13,24 | 308:21 310:9 |
| 133:10,20 | 178:10,14,23 | 256:4,12,19 | 311:17 312:5 |
| 134:1 135:5,7 | 179:11,15 | 257:1,15 | 312:24 313:6 |
| 135:13,19 | 180:2,24 181:8 | 258:13,18 | 313:16 314:13 |
| 136:4,23 137:2 | 181:19 182:9 | 259:2,10 260:3 | 315:18,24 |
| 137:5,9,15,22 | 182:13,17 | 260:10,17 | 316:20 318:3 |
| 138:5,7,11,15 | 183:5,23 184:6 | 261:16,23 | 318:25 319:6 |
| 138:20 139:2,4 | 184:16,19,22 | 262:6,15,22 | 322:8 324:8 |
| 139:11 140:4 | 185:5 186:18 | 263:6,12,24 | 328:6 331:20 |
| 140:12 141:16 | 187:19,25 | 264:14 265:5 | 332:1 333:1,19 |
| 142:3 143:7 | 189:7 190:20 | 265:25 266:8 | 334:2,10 335:2 |
| 144:1,6 145:20 | 191:24 193:16 | 266:19 267:10 | 335:19,22 |

CONFIDENTIAL

**[fritz - go]**                                              Page 34

336:2 337:15
345:14 347:12
348:12 350:14
**fritz's** 138:24
**front** 231:20
306:8
**fruition** 125:14
**full** 15:18 30:7
68:10 69:3,5
69:10,13 70:8
75:8 80:15,17
80:19 121:14
123:22 176:10
281:10
**fully** 184:25
**functionality**
62:10
**further** 352:17
**future** 11:16
70:8 71:8
189:14 238:1

**g**

**gains** 196:17
**gallagher** 5:4
14:17
**garbage** 272:20
**gemini** 46:6,7
**gene** 219:5,8
220:6
**general** 54:8
76:19 106:17
145:25 190:1
200:9 206:21

212:20 240:22
244:1 248:21
259:4 265:18
265:20 299:23
302:3
**generally**
104:23 178:6
296:10
**generated**
11:22 58:9
89:4 146:17
148:19,25
149:14 150:23
151:4 154:12
154:20 155:2
**generating**
47:4
**generative** 46:9
46:16,20,22
53:14 54:23
56:14,24 57:6
144:7 146:12
146:18 149:9
163:20
**generator**
150:5,18
**genre** 313:21
**getting** 24:17
118:16 238:14
**gist** 85:12
**give** 15:10,21
22:17 27:19
39:25 40:11,22
40:25 43:6

98:19 185:18
206:13 213:19
239:4,5 242:14
243:11 253:9
263:4 275:6
284:16,17
285:14 305:4
313:7 316:14
326:16 342:23
343:11
**given** 54:2 81:5
166:21 172:11
176:4,17 186:7
201:18 227:22
265:17 291:15
296:21 310:5
332:4 349:20
354:9
**gives** 78:9
217:3 330:9
**giving** 16:5
22:15,18 64:4
245:16
**glass** 219:6,9
220:6
**glg** 23:16,16
24:10,20 25:1
25:3,6,12,19,22
26:20,22,23
27:10 36:2
161:14,15,17
**global** 84:8,25
124:21 222:6
316:1

**globally** 180:10
236:8
**go** 16:8 33:24
36:2,24 37:17
38:1,22,25
39:2,6,14
41:13 49:11
51:7 53:4
58:16 59:14
60:19 61:2
62:11 66:10
67:10 71:13
76:4 93:5
99:24 104:4
111:18 116:17
116:23 117:3
117:16 118:6
118:11 120:18
125:11,12,18
125:20 126:17
129:5 132:12
136:13 137:19
140:6,8,11,15
140:16 141:12
144:17,18
152:8,23
158:19 160:2
160:13 161:5
175:1 178:14
182:19 185:1,3
185:5,18 191:8
197:23 198:5,5
203:18 207:1,3
207:7 208:4

209:5,6,10
214:16 223:19
228:15,20,23
229:12 231:10
242:17 244:16
246:15 248:9
252:22 255:14
259:4,16,18
260:22 262:11
263:18 266:1,2
269:3,13
271:22 272:3,9
276:5 277:6
278:7 279:8
280:21 281:19
287:3,20
289:25 291:3
294:7,23
295:19 298:12
300:17 304:25
305:5,11,15
309:7,19 310:4
313:24 314:22
316:21 318:5
320:25 322:2
322:22 324:1
325:4,24 327:1
329:1,15
330:11 331:6,8
331:9,10,10,11
332:18 333:11
336:16 337:7,9
337:23,25
338:12 339:16

343:15 344:2
344:19 348:14
351:2
**goal** 85:5 97:16
348:8
**goals** 85:9
88:12
**god** 122:6
**goes** 214:8
**going** 16:8
21:18,19 22:23
23:11 28:21
29:25 35:17
45:14 58:17
60:13,15,19,25
67:10 71:13,14
72:7 85:25
90:24 93:25
96:10 99:20
101:23 103:15
108:20,25
109:10,17
110:10 111:5
113:2,3,15
115:11 118:14
127:19 130:22
131:3 138:8
139:13 144:19
147:14 168:4
177:24 185:1,2
191:7 194:2
201:19 204:23
211:5,6 228:21
241:10 246:2,5

247:14 256:14
259:18 268:3,5
268:7 269:10
284:2 285:12
318:17 349:18
**good** 14:14,20
15:4,17 85:18
101:17 102:20
185:21 206:22
**goods** 84:17
107:9,13
**google** 46:5,7
49:14,25 51:2
52:5 161:12
162:3,15 195:7
195:8,9 255:9
257:22 334:5,5
339:5 340:7
**googled** 161:11
161:18
**googling** 49:24
**gosh** 219:23
330:19
**gotten** 49:6
**government**
75:21
**governments**
114:15
**governski** 6:5
10:6 14:14,15
15:1,16 16:8
16:12 20:1,16
20:20 21:1,13
21:21 22:3,8

22:13,21 23:2
23:7,13,21
24:8,14 26:11
27:20 28:1,6
28:11,16 31:10
38:10 41:9
43:1 44:6 46:1
47:2,18 48:13
49:13,19 51:6
51:15 53:8
55:3,14,19
56:21 57:3,21
58:15,25 59:1
59:9,14,23
60:4,8,13,19,23
61:5,12,22
62:1,11,18
64:24 65:23
66:1,7 68:22
69:20 70:11
72:6,18 73:10
73:20 74:3
75:3 76:11
77:15,21,24
78:21,23 80:5
80:13,24 82:12
83:3,10 85:14
86:15 87:2,13
90:18,23 91:5
91:8 92:5 93:8
93:15,20,25
94:4,23 95:1
95:18 96:19
97:2 98:11

CONFIDENTIAL

**[governski - governski]**                                      Page 36

| | | | |
|---|---|---|---|
| 99:16,21 100:5 | 149:11 150:9 | 195:24 196:8 | 263:2,9,16 |
| 102:7,16 103:3 | 150:20 151:1,7 | 197:4 201:22 | 264:6,19 265:6 |
| 103:12 104:21 | 151:13,20 | 202:16 204:3 | 266:5,12,22 |
| 105:8,23 | 152:1,7,15 | 204:15 205:4 | 267:15,22 |
| 107:14 108:8 | 153:9,17,24 | 205:23 206:11 | 268:3,8 269:9 |
| 108:14,22 | 154:9,17,24 | 208:20 212:13 | 269:14 270:16 |
| 109:1,5,7,12,18 | 155:6 156:22 | 213:12 215:11 | 270:24 271:6 |
| 109:23 110:4,7 | 157:4,16 | 217:15 219:14 | 271:13 272:6,9 |
| 110:13,18,21 | 158:10,16 | 219:19,22 | 272:13 273:13 |
| 111:1,7,11,15 | 159:7,17 160:1 | 220:19 221:24 | 274:21 275:7 |
| 111:18 112:3 | 161:9 163:11 | 222:18 226:1 | 275:14 276:5,9 |
| 112:12,18,22 | 163:21 164:8 | 226:21 227:3 | 276:18 277:17 |
| 113:2,10,17,19 | 164:18 165:11 | 227:15 228:2,8 | 277:24 278:7 |
| 116:9,19 118:6 | 165:23 166:18 | 228:14 230:21 | 278:11 279:1,8 |
| 118:9,15,17 | 168:8 169:7,15 | 232:16 233:3 | 279:11 280:21 |
| 120:11,21 | 170:1,6,18,24 | 234:7 235:1 | 281:2,11,19,24 |
| 121:10 123:15 | 171:7,19 | 236:1 238:3,21 | 282:11,15 |
| 126:17,20 | 173:23 174:5 | 239:7 240:12 | 283:16 284:14 |
| 127:16 128:12 | 174:20 175:7 | 241:18,24 | 285:12,18 |
| 128:15 129:21 | 175:13 176:7 | 242:21 243:15 | 286:24 287:6 |
| 130:3,14,20 | 176:24 177:4 | 243:20 246:7 | 287:22 290:19 |
| 131:2 132:11 | 177:20 178:12 | 246:15,22 | 291:18 292:1,7 |
| 133:13,24 | 178:20 179:3 | 247:11 248:9 | 292:14,21 |
| 134:4 135:9,15 | 179:12,22 | 248:16 252:9 | 293:2,22 |
| 136:1,7,25 | 180:14 181:2 | 252:20 253:8 | 296:16,24 |
| 137:4,6,13,22 | 181:15,20 | 253:15 254:20 | 297:6,16 |
| 138:7,13,17,22 | 182:11,14,25 | 255:16 256:2,7 | 298:10,23 |
| 139:4,14 | 183:15 184:2,9 | 256:16,20 | 299:9 300:2,12 |
| 140:10,14 | 184:17,21 | 257:5,20 | 300:16,20 |
| 141:19 142:5 | 185:1,15,20,22 | 258:16,20 | 301:6,9 302:7 |
| 143:12 144:3 | 186:21 187:22 | 259:6,21 260:7 | 304:17,23 |
| 144:10 146:3,9 | 188:7 189:13 | 260:13,20 | 305:10,14,20 |
| 146:23 147:14 | 190:23 192:7 | 261:19 262:2 | 306:9,15 307:1 |
| 147:21 149:3 | 193:19 195:4 | 262:10,19 | 308:7,24 |

CONFIDENTIAL

310:12 312:1,8 313:3,12,23 314:18 315:5,9 315:21 316:2 316:24 318:9 319:3,13 320:21 321:3 322:13,22 323:1 324:18 325:4,8 328:10 329:5,8 331:4 331:14,23 332:6,10 333:4 333:20 334:3 334:13 335:13 335:25 336:9 337:18 338:11 338:14,21 345:15 347:19 348:14,17,22 349:18 350:7 350:10,22 351:1,4

**gptzero** 11:21 50:16 148:4 149:23 150:1 151:9,15,22 154:5,11,19 163:13

**gptzero's** 148:23

**grade** 49:2

**graduate** 71:19 74:7

**graham** 11:17 132:21 140:21 141:3 143:13 144:13,21 146:25 147:2 147:12 148:14 152:9,17

**grammarly** 50:12,15 149:12,16,24 150:1

**granting** 77:8

**granular** 343:6

**graph** 88:5

**great** 15:13 122:5 219:23 270:5

**greater** 291:20

**greatest** 308:3

**grift** 270:5

**group** 18:10 199:3 277:1,7 278:17

**groups** 302:3

**growth** 11:12

**guarantee** 181:6 183:20

**guess** 19:25 30:14 36:13 70:25 78:1 144:20 203:10 251:9 256:10 256:22,24 297:13 311:7

311:12 315:20 315:25

**guessing** 256:17 257:18

**guys** 248:7

**h**

**h** 353:3

**half** 166:25 167:2

**hallmark** 295:12

**hallucinated** 47:21,24,25 48:2 129:22 130:1,4,6 143:6,9

**hallucination** 47:4 48:16,19 48:20,24 130:8 130:13 143:16 143:21,21,22 143:25 144:5,9 146:7,14

**hallucinations** 48:11

**hames** 11:18 132:21 144:13

**hand** 15:8 260:23 261:3 264:3,24 280:6

**handle** 32:8 91:3

**handled** 28:13 275:17

**handles** 31:19

**handling** 22:10

**happen** 54:7

**happened** 103:1 111:23 111:24 192:25 232:5 234:20 236:13 244:11 298:17,19

**happier** 282:18

**happy** 115:15 197:21 282:20 306:13

**hard** 187:11 281:21

**harm** 100:3,23 106:22 114:15 117:19 118:19

**harvested** 243:14

**hash** 322:18

**hashtag** 13:7 271:12 319:17 319:19 320:3 320:14,15,18 320:23,23 321:6,11,14,18 322:5,11,21

**hashtags** 103:19,20 123:10 280:23 281:15 282:1

CONFIDENTIAL

**[hashtags - hunter's]**  Page 38

282:21 283:13 320:17 321:21 321:24 322:1,7 322:9,10,19

**hat**  98:16

**hate**  297:12 342:18

**head**  84:8,25

**healthier**  12:18 283:20

**hear**  77:21 248:8

**heard**  31:21 32:13 50:12 56:3 219:8

**heart**  280:25 281:14

**heath**  7:3 8:3 9:3 17:25

**help**  44:14,15 44:17 79:5 132:13

**helpful**  93:16 93:17

**helps**  288:13

**henchman** 272:19

**hereto**  354:8

**high**  40:20 47:12 51:22 57:10 139:23 212:4,9,10,11 218:13 220:15 335:11

**higher**  46:12 105:7 177:16 212:18,20 249:1 301:19 334:24

**highest**  86:4

**highlight**  76:10

**highlighted** 328:22

**highly**  148:18

**hired**  51:19

**historically** 91:25

**hit**  41:23 42:4 42:22 88:12 177:22 181:18 181:25 183:19 240:5 242:9 243:4 251:22

**hits**  180:22

**hoc**  123:11

**hold**  20:13 162:7 165:16 165:16 178:10 222:9 248:7

**holmes**  3:7

**home**  195:7,8,9

**homepage** 303:16 304:13 304:16 305:4 307:5

**homogeneity** 155:11 156:10

**homogeneous** 101:13 103:15

**honest**  193:10

**honestly**  19:19 20:7 26:4 125:2 132:8 161:11

**hopefully** 272:10

**hoping**  200:23

**hour**  32:22 35:19 62:5 225:19,23 231:16

**hourly**  295:11

**hours**  34:17 35:5,8,22 43:4 43:16 77:8,16 79:22 108:21 109:11 224:1 225:3,10,14 226:3,9 228:4 231:18 348:16

**howard**  152:17 152:21 153:5

**hubs**  140:1 147:10 155:9

**hudson**  4:5

**huge**  336:19

**huh**  18:3 43:12 101:10 115:7 148:8 149:18 193:24 207:9 315:13 319:20

323:6 344:25

**human**  48:10 99:3 100:22 115:16,17 122:7 150:22 198:24 200:2

**humans**  90:17 96:25 100:16 199:4

**humphrey's** 165:10 166:13

**humphreys** 172:3,23 347:16 348:2

**hunch**  275:8

**hundred**  58:1 236:11

**hunter**  28:25 29:1,6,19,24,24 30:16 32:17,19 32:21,23 33:5 33:7 36:17 37:6,9,14 39:20 40:8 41:23 42:4,20 43:20 44:13 58:12 167:8 245:7 284:24 284:25 306:11 311:15 312:3 319:2 328:8 334:4

**hunter's**  31:12 32:6 38:20

CONFIDENTIAL

**[hunter's - include]**                                    Page 39

319:5 328:5
**hybrid** 75:6,10
**hype** 295:4
**hyphen** 282:2,3
  282:3
**hypothetical**
  117:4 184:3
  192:15 238:22
  239:6 287:16
**hypothetically**
  237:15 324:19
**hypotheticals**
  184:1

**i**

**idea** 154:5
  201:10 324:4
**ideal** 244:2
**ideally** 41:7
  203:8 231:2
  299:5 335:4
**identical** 67:19
  103:17,18
  105:6 224:2
  323:20
**identifiable**
  101:2 102:14
  139:25
**identification**
  16:11 61:25
  91:2 112:21
  113:9 118:12
  131:1 147:20
  219:18 269:12

272:12 276:8
278:10 279:10
281:1,23
282:14 285:17
300:14 307:9
308:13 315:8
321:2 322:25
325:7 329:7
332:9
**identified**
  106:24 133:12
  144:15 145:18
  183:18,19
  306:19 307:24
  311:1,16 320:5
  322:19
**identifiers**
  78:15 101:24
**identifies** 136:9
**identify** 14:12
  102:18 107:11
  133:9 135:23
  136:3 140:2
  157:17 159:9
  180:15,22
  194:4,11,12
  212:20 255:11
  265:7 266:25
  267:23 312:12
  341:15
**identifying**
  149:9 261:10
  261:12

**ignore** 277:23
  278:1
**illegitimate**
  193:4,15
  194:10 196:6
  196:11,24
  197:14 199:8
  199:25
**image** 314:16
**images** 280:5
  281:9 326:10
**immediately**
  295:2
**impact** 96:10
  99:5 100:3
  117:24 118:21
  297:10
**impactful**
  100:14
**implications**
  37:3 71:12
**important**
  211:1 268:12
  324:7,10
  332:24 334:8
**impossible**
  116:13 176:5
**improperly**
  22:10
**inaccessible**
  180:12
**inaccuracy**
  150:5

**inaccurate**
  150:1 166:17
  170:3,11 327:6
**inaccurately**
  197:12
**inadequate**
  150:18
**inappropriate**
  111:5
**inauthentic**
  11:10 91:11,13
  92:8,14 97:12
  97:14 98:2,4
  98:13 99:8,9
  99:22 100:1
  103:10,25
  104:25 105:2
  105:16 108:1
**inauthenticity**
  101:6,8,9,19,25
  102:10
**incident** 104:23
  117:23 118:20
**include** 17:25
  58:2 85:3 86:7
  106:14,25
  127:1,6,8,12
  146:5 156:16
  169:1 174:24
  251:19 270:18
  270:20 271:2
  287:1,4,8
  288:6,11
  297:20 299:2

CONFIDENTIAL

**[include - input]**                                                Page 40

299:11 323:8 332:15 335:1 345:9,16

**included**  43:16 106:12 169:20 170:13,14 171:2 188:14 251:3,23 252:19 273:25 280:14 282:9 283:18 290:6,9 297:22 298:25 339:18 345:19 347:21 348:17

**includes**  42:20 54:23 57:22 98:3 143:23 184:4,7

**including**  46:13 217:17 346:7

**inclusive** 238:24

**incomplete** 235:21,25 247:3

**incorporated** 81:25

**incorrect**  22:24 47:5 48:22 129:23 143:10 143:22 146:1,2 158:15 194:21

**incorrectly** 54:15

**increase**  95:24 209:22 229:21 232:8 234:4,12 298:2 335:8

**increased** 197:9 300:1

**increases**  238:6

**independent** 161:5 162:18 199:21 220:14 220:22,24

**index**  10:1 11:1 12:1 13:1

**india**  79:13

**indicate**  132:2

**indicated** 132:14

**indication** 143:15

**indicative** 212:1,5,9

**indicia**  56:23

**individual**  30:5 76:14 96:9 97:16 98:5,14 123:6 175:1 179:8 180:12 194:5 217:24 221:6,11 222:7 222:22 223:12 260:2,9 261:5 261:10,12 263:8,11 266:7 266:15,18,18

266:21 287:8 324:12,13

**individual's** 56:5

**individually** 217:22 218:24 314:23

**individuals** 21:4,7 24:21 27:12 56:13 80:21 97:16 98:5,6,14 100:22 114:16 115:20 133:2 178:18 199:4 213:10

**industry** 190:22,24 191:2,9 218:8 218:11 341:8

**inference**  200:7 257:3 328:7,8

**inferences** 165:5 166:15

**inflated**  106:4 106:5,6

**inflating** 106:22

**influence** 139:19

**influences** 114:2

**inform**  159:19

**information** 27:17 47:5 64:4,7 66:5,8 105:19 115:4,6 115:13,21 129:24 137:7 162:1 165:19 178:19 188:20 189:8,9 194:21 205:19 233:24 245:1,3 258:25 264:12 267:24 284:17 290:25 291:15 305:13 307:2 313:20 319:10 326:14 326:16 343:6 347:18

**informed**  73:23 82:4

**initial**  238:20 343:18

**initially**  328:15

**initiatives** 214:2

**inorganic** 92:15,22,23 97:7 116:4,8 116:11,23 165:8,13,25 166:5

**input**  307:5,6 307:20 308:8,9 308:11,18,25

CONFIDENTIAL

**[input - ip]**                                                                 Page 41

309:17,18
312:12 321:1
322:23 326:4
326:24 329:6
**input.csv** 13:10
**input.xlsx**
12:23
**inputs** 182:22
215:19,20
307:21 342:9
**inputting**
181:12
**inputxlsx** 13:8
**insight** 202:22
**insights** 33:18
75:19 87:7
**instagram**
12:14,15 95:12
177:17 179:20
208:1,5,7,10,11
208:14,17
216:4 217:9
221:7 222:25
241:3,8,13
243:10 279:9
280:2,19,22
326:9,14
**instance** 54:15
90:8 92:17
102:1 173:12
173:15 177:17
187:10 197:8
209:20 212:19
235:4 239:17

241:3,9 271:4
283:11 297:21
311:19
**instances**
114:22
**institution** 50:2
**instruct** 20:14
21:12 24:3
27:15 65:20
161:2 165:20
**instructed**
254:7 342:23
**instructing**
21:22 22:16
**instruction**
10:10 21:9,15
21:19 24:12
27:19,24 28:5
28:10,15 40:1
264:22
**instructions**
24:7 39:19
254:21 284:13
284:15,16
**integrate** 221:1
**integrated**
81:20
**integrates**
220:22
**intelligence**
46:2 74:5
75:16 78:7
**intend** 188:13
188:16

**intended**
145:14,16
**intense** 115:21
**inter** 17:23
**interact** 16:22
17:3,6 91:15
91:18
**interacted**
16:24 18:24
91:25 219:3
**interaction**
18:17
**interactions**
18:13
**interdisciplin...**
83:7,11
**interest** 123:6
214:24
**interested**
352:19
**interface**
208:13
**interfaces**
244:21
**internally**
89:18 90:22
91:20
**interpret** 32:3
326:9
**interpretation**
319:9
**interpreting**
265:19

**interrogatories**
346:9,10,16
347:1 349:12
**interrogatory**
346:18 347:5
347:20 349:7
**interrupt** 137:9
183:1,6
**interrupted**
137:16
**interrupting**
138:12
**interruption**
195:1
**intervention**
350:16
**interviews**
192:3
**interwoven**
76:16
**introduce**
131:3
**introduced**
61:22 147:19
**intuition** 159:2
**investigating**
128:18 129:12
**investment**
119:5,18
**involved**
103:25 176:22
192:4
**ip** 282:2

CONFIDENTIAL

**[ipsos - keywords]**

**ipsos** 104:15 107:6 120:17 124:8 155:20 213:24 222:4 345:25

**irregularities** 50:7,9

**irregularity** 215:16,23 216:1

**irrelevant** 173:25

**irrespective** 192:10 298:20 299:12,13 308:6

**isaacson** 6:4 14:15

**island** 12:17 282:3,4

**isolate** 253:3 299:8

**issue** 237:3 285:6 318:12 327:13

**issues** 104:9 219:25 236:6 237:2 248:13

**item** 62:19 260:9

**items** 174:12,25 180:16 181:18 181:24,25 182:7 184:5

187:3,4,16,24 188:8 205:25 209:16 210:5 212:5 217:7,8 217:17 224:16 236:14 240:5 260:16 261:22 262:12 264:23 265:14 307:23 311:5

**j**

**j** 330:12,15

**jack** 5:6,12 14:16 91:3,7 93:11 147:18 300:15 349:22

**jamey** 7:3 8:3 9:3 17:25

**january** 41:17 41:24,25 42:1 42:5,22 205:25 242:10 244:22 286:2 288:4,6 288:8,12 309:8 309:10,11,15 309:18 327:22 328:12

**jennifer** 1:10 2:10 7:2 8:2 9:2 18:1

**job** 57:18 86:9 173:15,21 340:24

**jobs** 73:17,22

**john** 9:25 14:10 338:14 348:12 348:20

**joining** 14:16

**joint** 79:9

**jointly** 124:9

**jones** 3:3

**jonesworks** 1:12 2:12 3:3

**journal** 122:6 122:16,17,22 123:18 128:24 131:8,15 132:3 132:5,17 144:24

**journals** 121:3 122:1,8 123:3 123:5,16,20 128:25 131:19

**json** 305:18,19 305:21 306:2 307:17,18

**judge** 350:19

**judicial** 350:16

**july** 208:24 211:16 235:19 235:20 236:3 288:24 289:4,8 317:7 327:4

**june** 211:16 235:19,20 236:3 288:10

**justice** 162:17

**justice's** 163:6 164:7

**justin** 7:3 8:3 9:3 300:24 301:15 336:19 337:11

**k**

**k** 5:8

**kaltgrad** 7:7 17:1,12

**kane** 9:23

**karl** 220:5

**kbender** 5:11

**keep** 138:12 169:9 224:21 228:20 349:11 349:18

**kevin** 14:20 17:8 84:18 109:18 110:13 111:7,11 135:16 136:25 145:22 213:3 301:6

**key** 64:6 164:2 214:1 236:7 328:22

**keyword** 252:4 341:23

**keywords** 40:10,11,14,15 40:16,19 42:5

CONFIDENTIAL

**[keywords - large]**                                        Page 43

42:17 160:5
178:2 179:2
180:6,9 181:12
181:18 205:9
206:7,7 222:10
238:13,15,18
239:22 241:10
242:16,18
250:21 251:13
252:14,18,21
253:24 254:11
254:14,15,15
254:18 271:4
271:24 275:22
277:22 278:6
283:25 300:11
305:7,12 311:8
311:10 320:19
322:19 331:2
332:3 333:9
342:6,6,7,8,8
342:10,16,16
342:18,24
343:16,19,22
344:7,9,13,16
344:19,22
345:10,17
**kicks**   272:20
**kim**   20:6
**kind**   30:18 31:9
39:10 50:2
74:6 76:19
93:3 199:10

**kinrich**   172:4
172:24
**knocked**   195:7
**know**   17:22
21:25 22:5,10
30:14,17 33:18
35:7 40:8,16
43:2 47:19
50:13,14,17,18
51:16 54:20
56:8 59:16
68:25 69:6
75:20 77:9
82:23 83:4
91:5 93:24
95:16 101:12
102:1 103:20
108:18 110:19
110:19 111:21
114:12 116:20
118:23 125:2
127:11 128:13
129:15 133:4,6
133:11,14
136:5 137:15
146:15,17
147:16 148:1
150:25 152:6
153:16 154:8
157:23 166:24
167:12 170:23
170:25 180:18
182:15 184:4
184:10 190:15

192:25 195:22
195:25 199:3,4
200:4 201:6
202:4 203:17
205:17 211:9
219:5,12,19
227:12,16,19
228:7 236:18
240:20,21
241:22 242:22
242:25 243:16
246:2 249:5
251:4 252:16
256:5 258:7,8
261:6,12
264:20,21
267:8 272:18
273:8 274:11
276:10 283:2
290:5 292:23
299:17 306:4
306:10 310:7
311:4 312:23
315:10,14,16
323:2 324:6,7
331:21,24
333:5,21 336:3
336:7,13 338:3
338:10 339:14
340:5,11,12
349:15
**knowing**
260:14 302:5

**knowingly**
193:13 194:20
**knowledge**
52:23 71:5
79:6 105:14
127:15 160:24
173:20 213:8
265:19,20
271:22 276:3
296:2,4,7,10
333:24,25
**known**   30:11
**kristin**   3:6 5:5
**kristintahler**
3:13
**kurt**   278:20
302:13 314:1

**l**

**l**   28:25
**labels**   250:12
**landscape**
117:21
**language**   54:18
58:19 76:7,8
247:17 248:24
249:15 250:3
251:4,6,9,23
257:7,11,16
340:24 341:5
**large**   83:8
257:7,11 308:5
335:6

CONFIDENTIAL

**[larger - lists]**                                              Page 44

larger  175:16 200:15,23 214:7 218:25 288:14 291:24
largest  313:18
latest  125:19 198:1,2 256:14 257:3 267:14
launch  191:21 234:1,17 255:10 298:1
launched 191:20
launching 191:18
laurenne  3:8
laurennebaba... 3:15
law  3:9 4:7 5:7 6:6,16 7:8 8:6 8:8 9:7 19:5 22:11
law.com  9:10
laws  352:21
lawsuit  327:22 328:16
lawyer  162:5
lead  1:7 2:7 87:5 185:25
leaders  37:24
leadership 71:16,23 72:1 72:9,22,24 73:1,11

leading  345:25
learn  154:10,18 161:10
learned  81:18
learning 137:18
leave  85:16
left  115:14 168:6 170:10 304:8 331:15
legal  9:23 117:20 118:19 160:16
legitimacy 195:20
legitimate 191:12,14,15 191:17,19,23 192:1,10,18 193:3,7,8,11,14 193:22 194:9 195:19,19 196:2,3,6,11,23 198:13 199:10 199:25
letters  294:14
level  46:12 218:13 220:16 343:13,18
leveraged 78:15
lftcllp.com  7:11 7:12

license  15:6
life  12:19 48:12 56:2 73:7 147:3 178:6,9 216:22 282:18 283:20 298:17
lift  282:3
light  189:9,10
likelihood 51:23 152:4 154:6,20
likely  57:10 99:1 114:5 149:24 150:12 154:12 155:1 163:14 333:13
liking  190:10
limit  200:19 303:17
limitations 41:12,15
limited  139:22 197:20 200:13
lindsey  6:15 15:2
line  10:11 23:5 23:9 87:10 94:8 108:23 175:1 326:1 353:4,7,10,13 353:16,19
liner  7:5 16:14 16:15,17,23 17:4,7,19

18:22,25 19:23 33:3 65:17
lines  286:6
link  49:23 62:3 62:6,7 98:21 303:16 304:12 305:3 307:4
links  303:14
list  72:11 74:12 82:7 120:3 124:23 157:19 157:20 160:14 160:19 168:9 168:20 169:10 169:17 173:10 173:24 188:11 188:11 207:4,5 302:20 344:16 344:18,22 345:2,9,17
listed  81:8 84:3 86:19 126:2 129:1 131:18 132:24 141:17 143:14,17 170:21 174:14 188:17 322:5 322:15
lists  71:15 74:4 78:24 126:11 127:22 145:3 148:20 346:6 346:16

CONFIDENTIAL

**[literal - look]**                                          Page 45

| | | | |
|---|---|---|---|
| **literal** 84:15 | 275:21,23 | **login** 303:11 | 194:15 197:25 |
| **literally** 80:20 | 278:6 286:1 | **london** 79:14 | 200:23 205:15 |
| 103:18 221:5 | 300:23 301:15 | **long** 77:13 | 209:5 211:11 |
| **literature** | 311:9 316:11 | 81:14 122:7 | 212:15 214:6 |
| 121:1 228:3 | 336:21 337:4 | 138:25 246:5 | 214:19 218:23 |
| **litigation** 18:12 | 337:12 349:14 | 263:20 264:7 | 219:24 220:2 |
| 18:16 25:15,21 | 353:1 354:1 | 264:10,20,21 | 225:6,23 |
| 26:13 34:3 | **lively's** 14:18 | 265:2 348:12 | 227:18 228:5 |
| 160:21 161:18 | 14:18 337:2 | **longer** 68:5 | 229:12 231:1,4 |
| **little** 42:11 | 346:7,14 | 246:10 290:21 | 236:17,22 |
| 67:14 124:12 | 347:20 350:17 | **look** 38:23 39:1 | 241:25 247:14 |
| 144:19 193:15 | **ljl** 1:7,7 2:7,7 | 39:21 41:6 | 250:21 252:10 |
| 272:14 278:9 | **llc** 1:8,12,13 2:8 | 43:22 47:19,21 | 252:11 255:15 |
| 292:24 310:14 | 2:12,13 3:4 7:2 | 47:22 48:2,4,7 | 266:2,3,7,9 |
| **live** 33:5 | 8:2 9:2 11:3 | 52:5 58:15 | 274:16 280:18 |
| 125:10,11,12 | 12:3 13:3 14:9 | 59:16 71:9 | 282:11 283:6,9 |
| **lived** 156:19 | 353:1 354:1 | 73:7 75:19 | 283:10,18,19 |
| 157:20 | **llm** 76:5,7 | 76:8 77:1 88:4 | 283:22 287:3 |
| **lively** 1:5,15 | 186:5,9,10 | 88:5,16 90:23 | 287:21,23,24 |
| 2:5,15,20 4:3 | 187:8,11,12 | 92:20 93:14,18 | 288:15,19,20 |
| 5:3 6:3 11:3 | 202:8 257:6,7 | 93:20,23 94:5 | 288:23 291:6,7 |
| 12:3 13:3 14:8 | 257:8,14 | 97:9 101:24,25 | 292:15 295:9 |
| 14:16 15:3 | 290:24 | 102:23 106:1,3 | 299:20 305:18 |
| 176:3,11 179:2 | **llms** 76:4,5,22 | 108:16 111:22 | 308:8 309:25 |
| 179:9,18 | 78:10 257:14 | 112:20,23 | 310:4 314:22 |
| 180:10 198:10 | **llp** 4:4 16:14 | 126:19 127:20 | 316:16 319:25 |
| 206:18 212:20 | **local** 66:11,19 | 128:4 130:21 | 320:22,24 |
| 250:17 251:3 | **located** 79:10 | 131:16,22 | 321:17 323:3 |
| 251:16 252:2,3 | 339:24 | 140:7 141:2,12 | 323:10,11 |
| 252:8,11,21,24 | **location** 140:6 | 142:13 144:11 | 329:1,3,5 |
| 252:25 253:5,7 | **log** 77:13 | 146:19,20 | 331:9 335:14 |
| 253:24 254:1 | **logged** 208:6,7 | 148:2 153:12 | 337:23 340:8 |
| 270:12 271:24 | **logical** 312:2 | 180:13 190:6 | 343:9 344:9 |
| 274:9,18 275:5 | | 193:22 194:14 | 345:3,4,18 |

CONFIDENTIAL

**[look - making]**                                                    Page 46

348:9,10,24
**looked**  55:11
  58:7 61:16
  76:3 88:19
  107:17,18,18
  107:21,23
  124:20,20
  125:6,7 145:9
  148:14 166:7
  174:23 176:4
  177:16,17
  188:20 196:12
  200:11,15
  210:13 216:3
  216:23 250:20
  260:24 264:16
  265:11,15,16
  289:19 302:8
  304:10 308:16
  314:6 325:22
  326:1 332:8
  340:13 344:12
**looking**  19:9
  27:6,13 29:14
  34:10 39:4
  40:9 41:17
  47:15,20 52:7
  58:7 66:18,19
  67:1,2,8 72:1
  78:11 82:2
  93:3,9 95:5
  99:10,12 107:6
  118:5 125:13
  126:6 128:10

128:12 144:16
146:25 157:11
176:19,19
180:3,7 193:18
196:15 209:9
210:5,24 211:3
211:4,10,10,13
211:15 215:14
217:2,5,20
218:13,21
220:16 221:6
222:8,10
226:13,17
227:12,13
236:25 251:15
252:24 269:7
270:15,17
274:10 283:6
284:1 288:7
293:10 302:3
304:2 308:3
314:15 324:11
337:20 339:7,9
340:11,24
**looks**  31:25
  32:3 58:22
  81:23 83:8
  129:22 210:20
  210:21 224:7
  225:17 248:3,5
  248:20,23
  249:14 251:7,8
  269:16 277:6
  278:17 283:11

283:12 285:23
323:3 329:11
**los**  3:12 4:10
  6:18 7:10 8:11
**lot**  32:14 36:22
  76:9 87:21
  100:9 108:11
  127:9 134:7
  183:25 196:22
  255:23 280:23
**love**  12:16
  342:16
**lower**  335:9
**lunch**  246:9

---
**m**
---

**m**  3:8 11:7,9
  75:8
**ma'am**  15:7
**macdonnell**
  9:25 14:10
**macroecono...**
  329:4
**made**  27:5 32:7
  40:20 57:23,24
  144:4,8 165:5
  165:6 166:15
  205:8 211:11
  264:4 328:8,9
  352:10 354:5
**maggie**  9:23
  350:1
**mail**  85:5

**maintain**  85:6
**major**  72:23
  114:14,14
  194:20 216:6
  308:4 342:21
**majority**
  178:17,18,19
  179:8
**make**  35:19
  39:1,3,12
  47:13,16 49:4
  49:8 51:20
  53:15 56:2
  58:9 63:5 67:1
  67:12 69:9
  96:8,10 100:14
  108:12,16
  116:24 129:7
  137:2,10,18
  139:2 165:7
  166:4 179:5
  183:2 184:3,16
  197:25 199:4
  201:7 203:2
  204:25 211:2
  225:23 233:13
  238:12 250:5
  282:6 310:3
  319:14 334:24
**makes**  89:20
  145:18 280:25
  281:14
**making**  85:9
  203:12 222:8

**male** 19:20
**maleficent**
  89:19
**manage** 72:2
**management**
  71:16,24 72:9
  72:22,24 73:1
  73:12
**manatt** 4:4
**manatt.com**
  4:11,12
**manipulate**
  89:13
**manipulated**
  116:8,11
  214:25
**manipulating**
  198:24
**manipulation**
  78:12 89:22
  90:16 92:22,24
  197:10 198:19
  198:21 214:25
  296:5 297:25
**manipulative**
  106:19 190:7,9
  196:19 198:25
  199:2,15,25
  216:25
**manual** 96:2
  97:5 100:7,10
  107:16 267:18
  305:17

**manually**
  267:24 338:9
**marginal** 87:17
**marie** 15:19
**mark** 90:25
  113:7 130:23
  147:15 219:15
  246:2 268:5
  285:12 308:9
  315:6 322:24
  325:5
**marked** 16:9
  16:11 61:19,25
  62:20 91:2
  112:19,21
  113:9,21
  118:12 131:1,4
  147:20 219:18
  269:12,21
  272:12 273:2
  273:22 276:8
  278:10 279:10
  281:1,23
  282:14 285:17
  300:14 307:9
  308:13 315:8
  321:2 322:25
  325:7 329:7
  332:9
**market** 213:25
  213:25
**marketed**
  191:23

**marketing**
  11:12 25:10
  69:24 70:13
  72:3,4,10,20
  73:17,22 78:16
  81:6 84:2,4,8,9
  84:12,25 85:1
  87:19,25 95:2
  102:21 119:6
  121:5,14,14,20
  121:22 122:6
  122:15,21
  124:20 125:6
  157:11 158:7
  191:25 192:10
  192:13,14,16
  192:19,22,23
  193:7,9 298:20
**mass** 176:17
**massage** 12:18
  282:18,19
  283:19
**massive** 100:21
  211:5 214:2
  327:10
**master** 74:9
**master's** 75:7,8
  75:9,15 78:6
**match** 130:12
  141:15 143:2,4
**matched**
  235:15
**matches** 332:7

**matching**
  130:16
**material** 54:23
  114:7,9 117:9
  296:21 349:5
**materials**
  125:22 126:1,8
  127:23 160:15
  168:21,22
  169:10 171:1,2
  172:22 173:2
  295:25 296:1,1
  322:16 346:25
  347:3 348:25
**mathematician**
  35:18
**mathematics**
  83:19,20,21
**matter** 14:8
  16:10 26:14
  28:9 34:12
  35:6 61:15
  62:21 110:24
  188:13 192:8
  227:20 253:23
**matters** 29:13
  37:2 258:10
**maximum**
  332:17,20
  333:10,14
**mayzlin** 9:24
  14:18 167:11
  167:12,13,16
  169:8 170:3

**[mayzlin - melissa]**                                        Page 48

172:3 173:13
174:12,22
186:5 187:8
200:5 348:2
**mayzlin's**
151:3 165:9
166:13 170:9
171:11 172:23
174:11 175:4
175:16 176:2
177:16 184:4
184:15 185:25
187:3 199:19
200:24 201:1
202:5 203:20
204:18 290:6,9
290:22 291:21
292:9 347:16
**mba** 78:24,25
79:1,3 80:25
81:10,12,18
**mean** 22:24
30:10 33:13
41:10 42:9
46:20 47:8
48:20 49:2
50:2 55:21
72:12 88:7,8
89:1,3 91:13
91:21 95:20,22
96:7 98:12
100:1,19 101:3
101:7 103:5
106:16 114:9

115:1 116:16
120:5,6 121:16
126:4 134:21
146:1 156:5
164:4 171:20
174:6,18
178:10 189:23
190:9 191:13
194:2 209:18
209:25 210:4
212:14 218:4
218:10 231:16
231:22 234:18
235:16,24
243:9 250:14
260:18 273:4
288:24 289:5
298:4 301:25
316:17 317:24
324:21 326:7
330:23 332:20
332:22 335:9
335:16 337:6
340:2 346:12
**meaning** 43:23
213:23 241:8
273:5
**means** 47:11
83:5 84:14
89:2 96:24
98:20 171:21
174:3 178:1
180:6 204:14
209:20 210:6

218:12 223:10
225:4 226:23
227:22 234:19
241:14 249:18
258:10 276:15
287:11
**meant** 115:13
191:16 221:3
**media** 11:20
12:7,9,10,12,13
12:15,16,18
23:24 30:25
37:24 38:3,6
38:12,25 39:22
41:8,8,11
42:13,16 78:13
85:5 100:14
103:19 104:16
107:7 114:2
131:14 136:12
136:18,22
138:4 139:10
141:5,11,25
142:2 144:24
156:21 174:12
174:25 176:19
177:14,15
179:18 180:4
180:11,16
181:18,25
184:5 187:3,16
187:24 190:11
190:25 191:2,5
192:5 196:6

198:9,14
199:11 200:12
201:8 202:3,18
205:25 207:21
207:22 209:16
213:9 216:6
217:1 218:23
221:7 222:7
226:7,8,12
227:9 230:11
236:7 237:4
240:9,18
241:16 242:14
242:19,22
243:1 250:1
260:9,16
261:22 262:12
264:22 289:22
291:25 303:13
313:19 335:6
347:6,11
**medical** 227:9
**medium** 84:22
119:16,20
**meet** 15:25
23:23 71:2
162:11 164:15
**meets** 162:13
164:11 178:22
**meister** 9:5
14:21,24
**melissa** 7:3 8:3
9:3 18:1

CONFIDENTIAL

**[member - models]**                                                    Page 49

| | | | |
|---|---|---|---|
| **member**  1:7 2:7 | 91:18,23 92:9 | 186:14,16,23 | 194:12 |
| 122:12 | 92:17 94:19 | 187:14,16 | **misnomer** |
| **memory**  137:12 | 95:2,6,11,13,21 | 204:5,6,8,10,13 | 42:12 |
| 137:19 | 97:17 98:16,18 | 204:18,21 | **misrepresent** |
| **mentality** | 98:20,24 99:10 | 205:2 218:18 | 94:10 |
| 194:19 | 104:7,8,25 | **methods**  11:23 | **missed**  237:12 |
| **mention**  72:9 | 105:5,11 | 183:12 | **missing**  39:12 |
| 86:6 253:5 | 106:13 120:14 | **meticulously** | 177:18 236:3 |
| **mentioned**  19:1 | 121:12,13 | 346:20 | **mistake**  137:17 |
| 21:17 33:12 | 124:4 155:20 | **mgovernski**  6:9 | **mitch**  14:23 |
| 50:23 55:10,20 | 209:15 213:23 | **middle**  109:2,3 | **mitchell**  9:6 |
| 64:12 82:20 | 213:24 217:23 | 184:18 | **mitigate**  120:1 |
| 86:5,10,18,19 | 218:4,12,19 | **million**  174:14 | 236:6 237:2 |
| 99:3 101:11 | 219:2 220:3,10 | 175:9 184:5,8 | **mitra**  8:7,12 |
| 119:17 124:3 | 220:11,21 | 315:22 | **mjf**  272:17,20 |
| 134:7 149:7,20 | 221:4,12,19 | **millions**  316:4 | **mla**  49:6 |
| 157:21 159:14 | 222:3,14 223:7 | **mind**  185:16 | **model**  249:2,13 |
| 160:10 209:23 | 223:9,16,23 | 219:13 347:18 | 249:14,20,22 |
| 258:3 279:6 | 224:5,11 | **mindset**  114:10 | 250:1,8 255:2 |
| 294:5 322:20 | **meta's**  87:10 | **minority** | 255:3,8,10,12 |
| 326:15 334:20 | 90:22,24 91:9 | 178:19 | 255:18 256:10 |
| 337:12 | 91:16 95:8 | **minute**  20:7 | 256:14,25 |
| **meryl**  6:5 14:14 | 98:1 106:9 | 26:25 138:25 | 257:6,7,22,24 |
| 41:4 93:24 | 196:20 | **minutes**  36:9 | 258:3,12,21,25 |
| 113:16 118:5 | **metadata** | 36:10 60:22 | 259:8,16 262:4 |
| 118:13 128:11 | 283:12 326:2 | 111:19 112:6 | 266:10,14 |
| 300:15 | **method**  220:21 | 185:18 349:20 | 267:13,14 |
| **message**  282:16 | **methodologies** | 350:15 | 341:13,22 |
| **met**  17:8 29:6 | 162:11 | **miscited** | 342:3,14,25 |
| 33:7 167:13 | **methodology** | 228:24 | 343:3 345:21 |
| **meta**  11:24 | 125:4 161:23 | **misinformation** | **models**  76:8 |
| 84:5,6,10,16,17 | 161:23 163:1 | 114:21 115:2,3 | 254:25 255:22 |
| 87:20,22 88:15 | 164:2,10 | 115:11,19,25 | 255:23 256:1 |
| 89:24 90:20 | 184:11 185:24 | 191:16 193:13 | 257:10,11,17 |

CONFIDENTIAL

**[modify - needed]**

**modify** 64:25 65:2

**module** 81:10

**moment** 63:3 93:23

**monday** 1:22 2:23 11:4 12:4 13:4 14:3 45:7 45:8 245:18

**monica** 6:17

**month** 12:22 197:19 209:21 210:6 211:21 211:22 288:24 289:2,6,7 294:2 298:5 299:4,4,5 315:11 316:18 317:6 327:3

**monthly** 210:16,18,19 210:20 211:3,4 211:7,10,13,14 211:24

**months** 79:12 79:15 80:16,17 80:22 84:7 134:23 210:17 211:16,18 214:7 289:2 299:6,7,15

**moon** 281:22

**morning** 14:14 14:20 15:4,17

**moses** 4:6

**motivate** 117:6

**mouth** 22:19

**move** 74:20 130:23 268:4,7 315:6

**moved** 112:13 112:18

**movie** 191:18 191:19,19,20 206:18 294:16 295:3 298:1 318:13 327:14 336:20

**movies** 310:15 310:15,16

**moving** 22:19 65:16 147:15

**msf** 9:10

**mst** 74:4,9

**multiple** 44:22 57:9 135:11,18 231:13,25 232:19 254:24 278:5 280:4 326:11 347:21 349:8

**multiples** 214:7

**mute** 22:13

**myriad** 32:1 37:25 47:22 48:22 81:23 84:19 85:11 99:1 102:6

116:18 125:7 133:16 159:6 173:13 180:9 206:5 215:13 226:11 241:5 244:8 249:19 268:21 341:6

**n**

**n** 3:1 4:1 5:1 6:1 7:1 8:1 9:1 273:23 339:3

**name** 15:18 16:25 20:9 30:7,8 86:1 122:4 129:17 136:8 168:2 219:11 250:22 250:23 274:20 337:2

**named** 320:7

**names** 20:2,4 122:7

**narrative** 348:5

**narrow** 200:20

**nathan** 7:3 8:3 9:3 18:1

**national** 122:17 122:22,25

**natural** 76:6 247:17 248:24 249:14 250:2 251:6 257:16 295:10 340:24

341:5

**nature** 27:11 37:4 46:18 56:6 84:23 88:13 122:7 192:6 237:5 250:15 268:24

**nearly** 189:22

**necessarily** 49:5 64:19 311:21 324:9 326:6 335:3

**necessary** 177:8 261:17 263:15 339:21 340:3 354:7

**need** 22:6,6 59:14 60:15 68:15 96:25 117:1,2 118:14 168:19 177:25 179:24 203:4 203:16 211:9 213:2,7 233:12 250:4 267:5 270:21 287:20 303:11 334:25 344:18 345:12 350:19,20,24

**needed** 64:18 77:17 85:8 160:12 202:24 232:7 234:3,11 291:10 343:6

CONFIDENTIAL

**needs** 216:25
**negate** 254:1
  271:25 274:8
**negated** 273:2
  273:3,5,9,15
  274:2,7,12
  281:17
**negates** 253:21
**negating**
  273:16,17
**negation**
  273:20
**negative** 39:23
  89:13 99:5
  115:15 199:5
  247:15,23
  248:18 249:2,3
  249:7,10,16
  250:8,12,13,24
  250:24 251:4
  251:10,12,16
  251:17,17,19
  251:23 252:1,5
  252:25 253:1
  260:6 265:21
  274:5,19 275:6
  314:24 342:6
  342:17 344:7,9
**negatively**
  100:2
**neither** 176:1
**net** 46:17
  237:14

**network** 11:18
  24:21 25:6,8
  25:12 29:8,21
  30:6,9 37:22
  41:8 88:6,9
  96:25 97:6,14
  98:4,13 99:7
  100:16 107:16
  128:20 129:13
  131:10,11
  139:20,24
  141:9,23
  196:21 217:5
  245:20 338:23
  339:20
**networks** 41:14
  41:16 121:21
  121:24,25
  135:22 141:4
  142:2 144:23
  177:14 203:1,2
  203:5,9 217:5
  217:5 218:24
  240:18 291:17
**neutral** 39:23
  247:16,25
  248:1,19 249:3
  249:4,11,16
  251:12 260:6
  265:21 272:1
  273:2,22
  277:23,25
  279:7 284:2
  314:17,21,25

337:17,21
**never** 32:2,12
  33:25 110:5
**new** 1:2,21,21
  2:2 9:9,9 38:14
  46:17 79:13
  118:8 128:13
  188:20 189:8
  194:17 204:13
  237:14
**newer** 257:6
**newly** 104:18
**news** 114:22
  115:11 117:21
  117:22 191:13
  191:15,16,17
  191:19,20,22
  192:4,25
  193:23 194:10
  194:10,13,18
  194:20 196:3,7
  196:10,13,18
  197:14 198:13
  199:8,10
  214:24 233:23
  233:25 328:22
  335:5
**newsworthy**
  327:24 328:13
**nicole** 1:19 2:19
  10:2 11:2,7,8
  11:13 12:2
  13:2 14:7
  15:19 93:13

99:24 110:10
  111:10 353:2
  353:24 354:2,4
  354:12
**nielsen** 120:17
  213:24 345:25
**nielson** 222:5
**nine** 268:4
  269:10
**ninth** 162:10
  297:23 298:5,6
**nodes** 339:3,4
  339:11,15,23
  340:5,6,7
**non** 88:24,25
  89:1,2,5,16,17
  90:10,14 92:7
  190:7,9 335:4
**nonwork**
  268:24
**nope** 128:12
**norm** 64:23
  92:21 102:23
  215:22
**normal** 29:8,9
  29:10 63:17
  93:2 104:11
  105:7 107:22
  210:2 225:9,10
  295:9
**normally** 49:2
  49:10 54:19
  65:15 70:23
  100:8 199:16

CONFIDENTIAL

**[normally - objection]**                                      Page 52

210:23 249:4
**norms** 156:20
**northwest** 5:9
**notary** 354:13
354:19
**note** 40:20
94:25 335:24
**noted** 213:4
312:14 354:7
**notes** 339:1,2
352:16
**notice** 2:20
**noticing** 14:13
**noun** 178:11
**november** 11:7
11:9 45:4,5,6
60:6,7 167:1,2
**nuance** 249:7
**null** 279:7
284:2 314:17
314:20,25
337:17,21
**number** 21:7
54:21 57:22
85:6 124:3
132:5 142:10
192:22 194:4
198:3 201:4,5
201:16 209:8
212:1,5 213:19
224:10 233:15
239:18 244:10
246:1 274:25
290:14 291:24

303:17 317:25
333:16 337:8
**numbers** 48:7
106:22 132:1
132:13 142:9,9
142:18 143:2
203:18 217:11
289:18 318:6
327:6
**numerous**
134:9 213:16
**nw** 6:7
**nyu** 52:10 68:1
68:5,8,13,25
69:3,11,15,25
70:14 71:16,19
72:9,13 81:10

**o**

**o** 28:25 127:4,4
339:3
**oath** 352:7
**objection** 19:24
23:4,20 26:7
30:21 38:7
41:1 42:24
44:1 45:24
46:25 47:9
48:8,17 49:9
49:16 51:5,12
53:3 54:24
55:8,17 56:16
56:25 57:12
60:1 64:21

65:25 66:2
68:20 69:17
70:9 71:25
72:14 73:6,14
73:25 74:25
76:2 77:6,19
78:20 80:2,8
80:18 82:9
83:2,6 85:13
86:12,23 87:4
90:13 91:22
94:20,25 95:15
96:15,22 98:7
99:15 100:18
101:20 102:11
102:19 103:6
104:3 105:3
107:4 108:5,10
108:17 116:5
116:15 120:8
120:16 121:7
123:13 126:13
127:13 129:19
129:25 130:9
130:17 132:7
133:10,20
134:1 135:5,19
136:4 138:25
139:11 140:4
141:16 142:3
143:7 144:1,6
145:20 146:8
146:22 149:1,5
150:2,15,24

151:5,11,18,24
152:5 153:7,15
153:21 154:7
154:13,21
155:3 156:17
157:1,8 158:1
158:14 159:3
159:12,21
163:9,15 164:5
164:13,24
166:10 168:1
169:5,11,21
170:4,15,22
171:4,14
173:19 174:2
174:17 175:5
175:10,22
176:13 177:3
177:12 178:7
178:23 179:11
179:15 180:2
180:24 181:8
181:19 182:9
182:17 183:23
184:6 186:18
187:19,25
189:7 190:20
191:24 193:16
194:24 195:21
196:4 197:1
201:14 202:12
203:22 204:7
204:19 205:20
206:2 208:12

CONFIDENTIAL

**[objection - oh]**                                                Page 53

| | | | |
|---|---|---|---|
| 212:7 213:1,5 | 277:15,20 | 352:9 | **odd**  237:4 |
| 215:8 217:14 | 278:24 279:4 | **obligation** | **oddities**  93:1 |
| 219:10 220:12 | 281:7 283:8 | 124:1 | 210:22 217:4 |
| 221:20 222:16 | 284:11 286:19 | **observable** | 225:19 |
| 225:15 226:18 | 287:19 290:15 | 215:16 | **oddity**  217:25 |
| 226:24 227:7 | 291:9,23 292:4 | **observed** | **offer**  6:14 |
| 227:24 228:6 | 292:11,18,25 | 229:24 | 158:9 165:4 |
| 228:11 230:19 | 293:19 296:15 | **obtain**  27:17 | 166:14 188:13 |
| 232:13,25 | 296:19 297:3 | 257:21 | 188:16 200:22 |
| 234:6,23 | 297:11 298:15 | **obtained**  79:10 | 215:19 |
| 235:23 238:2,8 | 299:1,21 300:9 | 79:17 | **offered**  121:18 |
| 239:1 240:7,25 | 302:1 304:14 | **obviously** | 189:5,12 |
| 241:21 242:13 | 304:20 305:9 | 119:16,18 | **offering**  159:10 |
| 243:5,18 247:9 | 306:6,12,22 | 125:12 236:20 | 164:10 165:8 |
| 251:25 252:17 | 308:1,21 310:9 | 283:1 | 189:1,5,18 |
| 253:11 254:19 | 311:17 312:5 | **occur**  229:22 | **offers**  215:20 |
| 255:13,24 | 312:24 313:6 | **occurred** | **offhand**  30:17 |
| 256:4,12,19 | 313:16 314:13 | 231:12,24 | 31:20 35:2 |
| 257:1,15 | 315:18,24 | 232:18 293:24 | 50:11 77:9,14 |
| 258:13,18 | 316:20 318:3 | 298:22 299:13 | 77:23 135:6 |
| 259:2,10 260:3 | 318:25 319:6 | 299:25 328:19 | 136:6 139:12 |
| 260:10,17 | 322:8 324:8 | **occurring** | 153:2,16 |
| 261:16,23 | 328:6 331:20 | 232:9 234:5,13 | 156:14 157:3 |
| 262:6,15,22 | 332:1 333:1,19 | **occurs**  215:21 | 158:9 203:17 |
| 263:6,12,24 | 334:2,10 335:2 | **october**  16:18 | 223:18 290:9 |
| 264:14 265:5 | 335:19,24 | 17:16 33:1 | 315:14,16 |
| 265:25 266:8 | 337:15 345:14 | 41:18 42:6,23 | 337:22 347:24 |
| 266:19 267:10 | 347:12 | 45:9,13 135:1 | **official**  13:12 |
| 267:19 268:1 | **objections** | 167:4 206:1 | 330:20 |
| 270:13,23 | 21:24 22:7,12 | 242:10 244:23 | **offline**  29:12 |
| 271:1,9 272:4 | 22:16,17,19 | 245:12 258:19 | **oh**  12:13,15 |
| 273:10 274:14 | 137:1,23 138:8 | 286:2 288:5,9 | 35:25 58:23 |
| 274:24 275:11 | 138:10 139:5 | 327:23 328:13 | 65:6 67:22 |
| 276:2,17 | 185:3 346:15 | | 93:6 97:21,23 |

CONFIDENTIAL

**[oh - okay]**                                                          Page 54

| | | | |
|---|---|---|---|
| 104:2 118:6,11 | 79:15 80:6 | 162:5,18 163:7 | 220:20 221:14 |
| 128:13 144:20 | 81:11,16 82:6 | 163:12,16 | 221:25 223:6 |
| 145:24 147:1 | 87:18 88:25 | 164:9,22 166:3 | 223:15,19 |
| 185:20 198:5 | 90:23 91:5 | 166:8,22 | 224:15,23 |
| 198:18 207:12 | 92:6 93:20 | 167:19 170:2 | 226:2,15 |
| 209:10 213:3,3 | 94:3,5 97:3,9 | 170:12 171:8 | 229:12 230:3 |
| 219:23 269:9 | 98:15 99:23 | 172:2,9,14,16 | 230:12 231:4 |
| 273:14 313:25 | 111:18 113:2 | 173:1 174:10 | 231:21,22 |
| 319:4 320:5 | 113:24 114:17 | 174:15,24 | 233:4 234:21 |
| 325:18 331:7 | 115:10 119:2 | 175:3,14 | 235:5 236:10 |
| 337:3 339:4 | 120:2,15 | 177:10 178:5 | 239:10,25 |
| 341:19 | 122:19 124:18 | 178:21 179:4 | 240:13,20 |
| **okay**   17:10,24 | 126:17 127:1 | 179:23 181:16 | 241:19 242:7 |
| 18:8 20:10 | 127:21,22 | 182:5,13 184:3 | 242:12 243:2 |
| 27:2 29:1 | 128:4,8,23 | 185:17,20,21 | 244:11,16 |
| 31:17 33:5 | 129:6 130:8,21 | 186:13 187:23 | 245:5 246:15 |
| 35:4,9,17,22 | 131:3 132:23 | 189:4,21 190:4 | 247:12 250:16 |
| 36:19 37:5 | 134:16 136:2,8 | 190:12,18 | 250:18 253:9 |
| 38:19 40:13 | 136:11,15 | 191:1,6 192:8 | 253:16 254:23 |
| 43:2,19 44:17 | 139:15 140:10 | 194:8 195:8,18 | 255:11,17 |
| 45:16 48:14 | 140:18 141:13 | 195:25 196:9 | 256:8 257:6,10 |
| 51:16 52:8,13 | 141:21 142:8 | 199:7,13,21 | 257:13,21 |
| 52:17,21 53:20 | 142:13 144:11 | 200:4,11 | 258:11,21,24 |
| 53:24 55:4,20 | 144:17 145:3 | 201:23 202:4 | 261:2 265:13 |
| 58:15 59:10 | 146:19 147:11 | 202:17 203:14 | 265:22 266:13 |
| 60:17 61:13,18 | 147:22,25 | 205:5 206:12 | 269:1,13,15,23 |
| 62:11 63:3,9 | 148:4,15,16 | 206:24 207:15 | 270:17 271:7 |
| 66:18 67:4,9 | 149:22 150:10 | 208:21 209:4 | 271:14 272:9 |
| 67:22 68:12,23 | 152:8,16,21 | 209:23 210:16 | 273:14 276:5 |
| 69:2,7,14,21 | 153:4 154:25 | 214:16,19 | 276:19 278:7 |
| 70:16 71:1,13 | 155:7,15 | 215:3,6,12,17 | 278:19 279:8 |
| 72:7,12,25 | 156:12,23 | 216:2 217:7,12 | 279:20 280:2 |
| 73:21 74:4,9 | 160:13 161:10 | 218:3,7,17 | 280:11,21 |
| 74:20 75:11,15 | 161:12,19 | 219:14,23,24 | 281:19 282:11 |

CONFIDENTIAL

**[okay - order]** Page 55

| | | | |
|---|---|---|---|
| 283:17 284:3 | 332:14 334:6 | 313:19 314:23 | 224:10 230:12 |
| 284:10,25 | 334:14 335:14 | 342:10 | 230:18 232:12 |
| 285:15,19 | 336:2,10,16 | **ongoing** 87:16 | 232:23 247:8 |
| 286:10 287:6 | 337:4,9,19 | **online** 38:2 | 289:13 293:23 |
| 288:4,17 | 338:2,11 | 49:24 52:17 | 318:16 328:4,5 |
| 289:13,21,23 | 339:10,14 | 80:6 247:4 | **opinions** 28:8 |
| 290:20 292:2 | 340:12,15 | 348:5 | 114:3 159:10 |
| 293:3,16 294:9 | 341:23 343:17 | **onus** 313:9 | 187:17,23 |
| 294:25 295:14 | 343:24 345:2,8 | **open** 45:1 | 188:12,12,17 |
| 295:21 296:2 | 345:20 346:6 | 61:18 66:11,15 | 188:18,21,23 |
| 296:25 300:3,6 | 346:21,24 | 66:23 131:4 | 188:25 189:3,4 |
| 300:21 301:23 | 347:4,9,20 | 261:9 269:4 | 189:11,17 |
| 302:19 303:8 | 348:3,19 | 349:19 | 198:6 270:8,10 |
| 305:14 306:4 | 349:18 350:7 | **operate** 78:10 | 272:22,23 |
| 307:14 308:8 | 350:10,25 | 242:1 275:4 | 277:10 308:20 |
| 308:18 309:4 | 351:2,5 | **operates** | 309:1 |
| 309:13,19,22 | **old** 128:14 | 241:23 275:18 | **opportunity** |
| 309:25 310:6 | **olivia** 3:7 | **operational** | 24:24 |
| 310:13,24 | **oliviaholmes** | 119:7 | **opposed** 34:23 |
| 313:24 314:6,9 | 3:14 | **operations** | 252:25 297:8 |
| 314:11,19 | **once** 17:13 | 17:23 139:19 | **opposite** |
| 315:1 316:7,10 | 38:21 71:3 | **opined** 224:23 | 199:10 |
| 316:16,25 | 216:15 229:23 | **opinion** 57:7,11 | **optional** 303:17 |
| 317:9,12,17,20 | 268:16 288:22 | 73:23 160:15 | 303:23 304:22 |
| 318:19 319:25 | **one's** 176:18 | 162:10 164:10 | 305:6 307:11 |
| 320:2,13,21,24 | **ones** 34:7 38:13 | 188:24 192:18 | 307:12,19,21 |
| 321:17 322:22 | 54:16 89:4 | 197:17,20 | 312:12 313:8 |
| 323:2,16 324:1 | 102:1 104:19 | 198:7 200:11 | 313:11 |
| 324:19 325:4 | 104:20 122:12 | 200:13,15,16 | **options** 60:16 |
| 325:19 327:1,9 | 122:20 125:12 | 200:20,22 | 208:8 305:5 |
| 328:11 329:5 | 129:1,3 133:15 | 202:21 203:3 | **orchestrating** |
| 329:12,15,24 | 172:11 173:18 | 208:21 214:16 | 98:25 |
| 330:18 331:13 | 173:18 206:9 | 214:19 223:19 | **order** 32:1,3 |
| 331:13 332:6 | 236:12 242:2,3 | 223:21 224:5 | 46:5 66:23 |

CONFIDENTIAL

**[order - p.m.]**                                              Page 56

77:17 82:4
87:5 88:20
96:13,21 97:1
99:5 105:20
106:2,22
107:19 125:9
182:21 186:5
200:22 202:21
203:2 204:21
205:13 208:8
211:20 215:15
216:24 218:24
231:2 233:13
236:18 255:22
261:18 267:3
288:15 291:1
291:12,17
292:13 299:15
340:8 343:14
344:1,19
**ordinarily**
  100:12
**organic**  88:24
  88:25 89:1,2,5
  89:16,17,23,25
  90:2,6,8,10,14
  92:7,12,13,18
  92:21 97:4,6,6
  115:24,25
  116:4,7,11,25
  165:8,12,25
  166:5 189:22
  189:25 190:5,6
  190:13,18

191:3 192:13
198:12 214:23
327:25
**organically**
  117:14
**organization**
  52:23 71:5
  80:22 85:17
**organizations**
  75:21 241:6
**oriented**  198:1
**origin**  90:7
**original**  61:14
  61:20 62:25
  66:16 67:5
  103:21 115:5
**originally**
  15:24 62:4
  168:4 335:12
**origins**  194:5
  291:11,11
**outcome**
  182:15 184:12
  186:7,16,22
  187:6 234:17
  234:20 262:13
  297:10 341:19
**outcomes**  32:4
  51:17 166:15
  186:8,25
**outdated**  65:11
  68:2
**outlet**  194:20

**outliers**  225:24
**outline**  228:24
**outlined**  324:25
**outloud**  232:12
**output**  187:13
  212:12 260:4
  322:17 330:7
  338:6 341:18
  342:25 343:11
  344:10
**outputs**  183:14
  186:6 187:10
  188:1 342:2
**outreach**  25:25
**outside**  28:22
  40:18 54:9
  92:1 93:2
  98:17,24 99:25
  102:23,24
  104:11 107:22
  146:1 150:7
  162:14,15,16
  164:21 200:10
  202:22 210:1,1
  215:25 227:10
  271:21 299:4
  299:14 312:7
  340:7 343:22
  344:12 349:5
**overall**  65:4,6
  87:10 125:13
  149:20 176:2
  210:14 211:13
  215:15 222:12

298:18,19
335:8
**overarching**
  86:1
**overlap**  180:17
**overnight**
  117:24 118:21
**oversaw**  86:21
**oversee**  86:22
**overview**  54:17
**own**  22:16
  52:13,16 90:21
  98:20 117:6
  120:1 155:17
  155:23 160:25
  162:3,4 176:20
  177:2 190:19
  275:8 292:16
  313:9 350:23
**owned**  85:3,4
  87:6

**p**

**p**  3:1,1 4:1,1
  5:1,1 6:1,1 7:1
  7:1 8:1,1 9:1,1
**p.m.**  2:23,23
  61:8,11 62:14
  62:17 112:8,11
  185:7,14
  246:18,21
  248:12,15
  338:17,20
  351:6,7,8

CONFIDENTIAL

**[packages - particular]**                                    Page 57

**packages** 50:6 50:8 172:8,9 172:25

**page** 10:5,11 11:6,14,16 12:6 13:6 16:13 48:6 58:16 64:11 93:6,21 97:19 113:21 117:16 118:4,5,7 119:25 128:4 128:10 132:3,5 132:12,15 139:16 140:6 142:8,9,17 143:2 144:18 160:16 188:18 207:3,7 209:7 307:12 320:2 339:12 353:4,7 353:10,13,16 353:19

**pages** 132:16 142:10,14,24 207:11 280:8 347:21 349:8

**paid** 32:21 35:13,15 90:8 192:13

**paper** 47:20 51:21 57:8 124:7,19,23 125:5 132:20

134:17 135:4 136:11,21 138:3 139:9,13 140:8 143:4,9 143:24 156:14 157:3,5 159:23 170:10

**papers** 50:20 120:5,9,12,13 124:4,5 127:25

**paperwork** 72:21

**par** 225:6

**paragraph** 93:6 94:6 97:20 129:5,9 140:16,17,19 146:20,21,24 147:7 148:5,14 148:25 149:13 149:23,25 150:11 152:11 152:17 153:6 153:20,25 154:6,11,20 155:1 158:13 163:13 198:5 209:6,11 214:17 224:4 228:15,19,20 228:22,23,24 229:13 230:3 231:4 232:11 232:15,17

235:5,6,7 244:16 246:24 327:11

**paragraphs** 127:9,11 150:21 151:2,9 151:15,22 152:3 158:12 162:21 229:13

**parameters** 40:22 206:8 221:10 222:10 236:23 238:15 249:21 252:4 252:13,15 253:13,16,19 254:7 273:19 277:22 330:8

**paraphrasing** 161:24

**paris** 79:13,14

**park** 4:8 7:9 8:9 9:8

**part** 18:7 19:4 19:8 21:8 24:20,25 25:1 25:3,8,12,13,19 27:9 33:15 34:3 49:11 75:6,9,13,22 79:3 81:3,8,9 81:10,11,17 86:17 88:16 95:21 143:1

172:12 173:11 173:15 181:5 182:1,21 184:14 187:4 187:17 193:23 194:9 213:20 213:21 215:22 217:22 226:4 236:20 252:13 253:12 255:19 268:12 273:6 273:11 276:13 278:23 287:9 297:1,19 305:22 336:19 342:12 345:25 347:15 348:7 350:19

**partially** 17:21

**participant** 139:22 147:9

**participate** 77:17

**particular** 29:4 38:15,25 69:12 73:11 81:5 106:10 114:11 132:16 133:23 136:6 158:6 160:10 200:16 202:20 207:21 209:21 212:18 218:15 225:11 226:10 237:3

CONFIDENTIAL

[particular - perspective]                                    Page 58

268:16 289:12
311:21 313:21
320:15 321:14
322:12
**particularly**
56:4 75:20
78:12 96:24
98:22
**parties** 2:20
242:15 352:18
**parts** 81:21
140:2 222:6
347:4
**party** 1:11,12
2:11,12 14:13
55:22 57:17
176:20,21
178:4 179:1,19
180:12 181:1
243:8 340:8
**paste** 53:6
331:12
**path** 12:18
282:18 283:20
**patrick** 12:8
**patterns** 32:4
193:25 198:11
215:12,13,18
215:21 216:24
224:3 230:8
231:9 295:9
**pause** 338:12
**pay** 32:19
88:21

**paying** 270:1
**pays** 278:20
314:1
**peak** 223:25
225:2
**pearson** 220:5
**peer** 124:5,8,10
124:11,13,14
204:9
**pen** 282:2
**penalties**
117:20 118:20
**penalty** 352:20
**pending** 109:19
110:8,14
111:12 112:2
335:23
**pensions** 270:2
**people** 56:4
84:13,18 94:9
107:12 117:6
213:11 253:5
276:25 334:14
**percent** 36:14
36:14 43:7,8
44:11 58:1
148:20,24
149:13,23,25
150:11 151:3
151:10,16,23
152:4 154:12
154:19 155:1
163:14 175:3,8
175:16 293:6

293:14 295:3
295:10
**percentage**
40:21 44:9
51:22 57:10
**percentages**
43:22
**perception**
23:5 149:14
**perceptions**
114:19
**perfect** 331:7
**perform** 37:12
87:14 234:10
235:2 300:7
**performed** 37:9
87:17 97:14
98:4 103:24
338:23
**performing**
88:3 264:11,24
**period** 41:6
106:2 158:22
176:12,17
179:10 181:13
183:13 197:19
200:14,19,20
201:6,12 202:1
202:6,11,14,22
203:16 205:19
208:23,24
210:13 221:9
225:14,17
228:16 229:7

231:1 237:8,10
242:10,18
245:1,2,4
288:14,19,23
289:4,9,15
290:21,22
291:4 293:8
295:15 297:18
297:24 298:24
316:17 334:19
334:22 335:1,5
335:7
**periods** 176:4
208:22
**perjury** 352:20
**person** 29:17
33:7,8 80:11
228:1 258:9
275:21
**personal** 29:13
127:15 296:2,4
296:7
**personally**
172:18,21
208:4,10
268:20,21
346:8,17
**personifier**
251:10
**perspective**
44:9 71:10,11
75:18 81:4
84:25 90:9
98:17 102:21

CONFIDENTIAL

**[perspective - positive]**                                    Page 59

115:17,18
165:4 166:14
198:25 281:18
311:3 348:11
**ph**  30:8
**phelps**  4:4
**phil**  75:8
**phillips**  4:4
**philosophy**
75:8,18
**phone**  23:15
**physical**  113:4
264:4
**physically**
77:10 79:10
176:5
**pick**  38:11
117:13 216:4
228:18
**picked**  143:10
330:22,23,25
**picture**  247:3
**piece**  29:5 35:1
103:21 120:25
251:5 259:13
259:13 266:10
266:21 278:8
294:1
**pieces**  174:11
229:24 260:15
261:10 283:21
336:13
**place**  64:7
107:19,20

225:9,11 352:6
**placed**  64:7
**plaintiff**  1:6,11
2:6,11,19 4:3
5:3 6:3
**plaintiff's**  9:24
34:8 165:3
**plaintiffs**  1:14
2:14 3:3
**planted**  117:9
196:20
**platform**
176:19 223:23
235:8 237:18
245:15 284:8
313:19
**platforms**
91:16 95:8
106:9 114:2
177:15 188:3
190:11 201:8
202:3 205:22
207:21,22
210:15 216:3,5
216:7,10,13,17
217:2,18,21,21
217:24 218:1,6
218:16 223:25
225:2 229:1
231:13,25
232:19 235:14
236:6 242:14
242:20,23
245:15 289:22

318:13 327:14
**plausible**  47:5
129:23
**play**  188:21
**please**  14:12,13
15:7,18 22:13
22:21,22 38:20
61:18 110:16
110:18 111:12
111:15 125:19
126:19 135:4
135:17 137:9
137:13,23
138:23 139:5
140:2 142:24
164:12 185:4
204:16 231:10
242:12 248:17
304:25
**plugged**  205:10
273:19
**plus**  292:3
301:4,4 312:21
**point**  16:2
44:10 70:4
134:19,20
201:4 211:21
211:24 322:10
**points**  210:8,11
211:17,19
231:1 283:14
291:20 321:19
**polarizing**
114:7,9 117:5

117:8
**policies**  52:25
53:5 87:11
**policy**  53:7,12
53:18,18,20,24
91:10
**political**  105:22
106:19 196:17
**politics**  98:23
114:13 196:7
196:15
**pop**  276:19
277:8 300:25
302:9,9,11
304:5 309:20
310:16,16
**popularity**
94:12 197:9
**portion**  260:23
**pose**  109:11
**posed**  306:18
**position**  20:19
86:17 287:7
**positioned**
171:25 197:11
197:12
**positions**
106:25
**positive**  39:23
89:13 99:6
199:5 247:15
247:23 248:3,4
248:18,25
249:1,7,10,15

CONFIDENTIAL

**[positive - predicted]**                                   Page 60

251:3,10,12
260:6 265:21
274:5,19 275:6
314:24 342:6
342:16 344:7,8
**positively**
100:3
**possess** 82:14
**possible** 19:22
96:5,12,18
102:13,17
108:3 116:22
117:15 130:19
179:16 239:3
243:2 312:16
332:16
**possibly** 16:18
180:21 336:7
**post** 12:7,9,10
12:12,13,15,16
12:18,21
104:12 117:6
193:21,21
247:20 251:1,1
251:2,23 252:2
252:6 259:8,9
259:14,23
260:2 261:12
263:8,11 264:4
265:15 266:4,7
266:15 267:2
269:15,16
274:7,12,23,25
275:1,10,15,16

276:6,10
277:11,13,19
278:22 279:3,9
279:14 280:3
280:19,22
281:20 282:7,8
283:10,24
286:22,23
287:5,9,10,11
287:12,12,14
287:15 291:1
302:25 309:8
310:2,8,22
313:25 314:6
314:12 323:4
323:17,17,19
323:20 326:8,9
326:11,14
332:7 337:6,8
337:13 343:9
**posted** 225:18
226:3 316:5
336:6,10
**posting** 102:1,3
104:11,20
225:11 229:16
230:6 231:7
295:10
**posts** 175:20
177:22 178:3
215:24 225:18
236:11,12,19
236:20 237:12
237:24 239:10

239:11,12,16
239:20 240:2,9
241:9 243:11
260:25 261:5,7
262:5,20
263:21,22,23
264:12 265:7,9
265:11,19
266:18 267:1
267:17,23
273:8 274:3
275:2 283:13
286:2,3,7,10,12
286:14,15,18
286:20 287:1,4
287:7 288:6,12
288:18,20,24
289:2,3,5,6,9
289:10,13,24
290:6,8,12,21
291:6,20,21
292:2,17
293:11,12,14
293:15,18,25
294:2,4 295:15
295:16,16
300:25 301:1
302:9,15,17
303:13,17
310:25 312:15
314:19 317:25
323:9 333:6
337:19 338:8
341:16

**potential** 85:7
85:10 88:6,7
161:18
**power** 75:17
**powerful**
321:12
**pr** 18:2 121:16
192:1
**praavi** 30:8,8
**practice** 22:11
190:16 218:23
**practitioner**
63:21,23 64:1
64:13,14,16,19
123:25 124:13
124:15 147:13
157:15 158:5
158:22 159:16
160:11 204:11
218:22 219:4
**practitionerly**
247:18
**practitioners**
71:8,9
**precede** 257:10
**preceded** 19:14
257:14
**predated** 78:18
**predict** 57:5
151:9 154:5
**predicted**
149:23,24
151:15,22
154:19 163:13

CONFIDENTIAL

**[predominantly - projected]**                                    Page 61

**predominantly**
  39:25 88:10
**prefer**  246:13
**preparation**
  36:23 43:17
**prepared**  16:14
**preparing**  17:5
  34:23 43:5,14
  43:24 126:9,10
  126:12 135:16
  168:15 169:2
**present**  3:4
  9:22 69:25
  70:7 221:6
  268:17 288:8
**presented**
  115:4 124:9
  160:22
**press**  192:1
  194:6
**pretty**  67:20
  89:22 194:23
  272:11,18
  332:23
**prevent**  16:5
**previous**
  104:14 119:24
  299:15
**previously**
  29:22 30:2
  37:19 38:14
  61:14 134:9
  268:18,25
  279:6

**principle**
  119:21
**prior**  18:12
  19:2,11 213:21
  213:23
**prioritize**  114:4
**private**  31:3
  236:20 239:17
  239:22 240:11
**privilege**  20:18
  23:5,9 27:18
  27:23 28:4
  65:22,25 66:6
  165:20
**privileged**  24:5
**privy**  103:9
**pro**  78:16
**proactively**
  161:8
**probability**
  52:5 148:20,24
  151:10,16,23
**probably**  17:9
  36:14 65:1
  68:2 79:21
  100:19 114:11
  130:11 134:18
  134:23 164:6
  221:3 230:10
  268:16 295:19
  346:4 349:17
  350:24
**problem**  62:25

**problematic**
  104:20
**proceedings**
  14:2 352:5
**process**  19:8
  21:8 25:14
  27:3 29:18
  33:15 49:12
  124:11 183:10
  194:23 324:14
**processing**  76:7
  247:17 248:24
  249:15 250:3
  251:7 257:17
  340:24
**processor**
  341:6
**produce**  60:5
  253:16,18
  262:13 266:17
  266:20,23
  267:11 290:24
  305:21 339:19
  339:25
**produced**
  61:15 245:23
  246:1 258:11
  284:3,6 285:4
  285:10,13,20
  286:25 317:2
  326:19
**producers**
  192:3

**product**  84:9
  84:11 85:1
  125:14 339:19
  346:1
**professional**
  147:3
**professor**  49:1
  52:10 53:19
  68:2,3,18
  69:15,24 70:13
  70:17 219:5,8
**proffered**
  292:22
**progeny**  162:25
  163:3,8,17,18
  164:1
**program**  74:21
  75:4,13,22
  76:24 77:1
  79:17,25 80:4
  80:7,10,12,15
  80:17 257:25
**programmatic**
  106:18
**programming**
  76:19,20
  244:20
**programs**
  95:23 99:2
**project**  31:2,5
  31:6 32:24
  33:19
**projected**
  154:11

CONFIDENTIAL

**[projects - pulled]**                                         Page 62

**projects**  30:2,3
  30:24
**promote**  84:17
  115:16 336:20
**promotional**
  85:11
**prompt**  195:15
  195:16
**prompted**  24:2
  24:10 161:12
**promptly**
  350:13
**prompts**
  181:11 186:10
  187:9 204:1
**pronounce**
  30:7
**propensity**
  47:13 105:7
**properties**  87:6
  193:3,4
**proportion**
  236:15 237:6,7
  237:13,25
**proportional**
  43:6 203:7
  224:1 235:7,21
  236:4
**proportionality**
  238:7,25 239:9
  239:13
**proportionally**
  239:24

**proportions**
  43:25 235:15
  235:17
**proposed**
  350:15
**propounded**
  352:9
**proprietary**
  105:19
**protected**
  27:18,22 28:3
  66:5 165:19
**protective**
  105:20
**prove**  234:16
**provide**  56:23
  82:4 136:11
  157:2 217:23
  223:16 253:19
  259:12 303:24
  305:2 306:14
  306:16 337:24
  342:9 344:6
  345:11 350:24
**provided**  41:20
  42:20 58:8
  59:24 61:20
  129:16 130:22
  143:3 145:12
  172:15 173:13
  174:22 188:5
  206:3 229:10
  254:11,15
  259:24 260:5

  261:14 262:1,9
  267:6 274:1
  303:15 304:3
  305:3,7,12
  306:23 307:4,7
  326:24 331:2
  339:17 343:22
  344:3,5,11,14
  344:20 345:6,9
  345:16 346:23
**provides**  208:1
  247:3 261:8
  321:17
**providing**
  195:11 333:9
**proving**  57:20
**pst**  2:22,23
  351:8
**public**  42:14,17
  75:20 119:6
  178:3,3 198:12
  233:23,24
  236:19 239:20
  239:21 240:5,9
  240:11 241:9
  241:14 243:11
  354:19
**publication**
  48:16 132:25
  143:19
**publications**
  120:3,4,23
  170:20

**publicity**
  198:14 199:9
  199:11
**publicly**  42:21
  240:1,14 242:8
  244:19
**publish**  124:1
  194:17,18,20
**published**  25:7
  120:23 121:1
  123:20 124:25
**publisher**
  319:10
**pull**  35:17
  58:16 97:1
  113:11 125:18
  201:7 205:1,1
  237:17 238:13
  238:20 241:11
  241:17 263:23
  264:8,12 265:8
  271:4 274:2
  287:17 291:16
  300:11,12
  302:23 310:21
  311:20 349:24
**pulled**  118:16
  188:3 202:2
  205:8,21 206:6
  221:16 238:11
  273:7 277:7
  287:14 290:21
  296:23 310:22
  311:5 326:22

CONFIDENTIAL

**[pulled - r]**                                                                                    Page 63

342:21,22
**pulling** 300:18
  319:12 324:10
**pulls** 239:3
  300:23 302:19
  302:22
**purchases**
  107:19,20
**purchasing**
  107:13 114:3
**purporting**
  221:16
**purpose** 23:19
**purposes** 113:5
  115:9 125:16
  128:1 133:19
  136:16 174:13
  288:5 340:19
  341:16,20
**pursuant** 2:20
**purview** 86:25
  227:11
**pushing** 106:8
**put** 23:16 34:9
  64:19 86:8
  90:24 98:16
  110:11 206:8,9
  233:1 243:1,12
  252:4,13,15
  253:22 254:10
  255:7 269:5
  274:20 277:21
  285:16 307:12
  320:1,8 321:5

337:16 352:7
**putting** 16:21
  17:11 33:24
  34:1,17 91:9
  160:9 254:18
  338:5
**python** 36:24
  39:2,3 254:10
  258:1 306:2
  344:3

**q**

**qc** 58:6
**qualified**
  314:20
**qualifiers** 89:3
**qualitative**
  223:12 247:20
**quality** 126:21
  133:6
**quantitative**
  223:5,13
**quantity** 292:5
**quarter** 77:11
**quarterly**
  211:12
**queries** 186:10
  188:5 221:10
  222:10
**query** 206:8
  265:8
**question** 25:16
  26:2 27:17
  41:5 42:2 44:5

46:10 65:4
66:23 75:2
78:22 79:2
95:10 99:17
109:2,2,4,11,15
109:18 110:3,7
110:14 111:4
111:12,20
112:2,3 137:3
137:14,24,25
138:2,16,24
139:1,3,6,8
154:16 157:10
165:17,22
169:14 178:13
180:19 182:12
182:21 183:1,2
183:16 184:14
184:18,20
185:16 189:16
192:22 195:3
200:18 204:4
204:16,17
207:5 224:9
236:10 237:11
238:9 256:23
256:24 259:15
265:3 267:16
267:16 274:11
293:21 296:14
297:12,13,13
301:14 306:18
311:20 314:15
317:23 326:22

335:23,25
343:10 345:13
348:17,19,23
349:3 350:1
**questioning**
  108:23
**questions** 20:22
  26:3,6 30:1,15
  30:18 31:9
  65:21 165:7
  352:9
**queue** 123:10
  244:9,10
**quick** 246:11
  246:13 272:11
  286:1
**quinn** 3:5
**quinnemanue...**
  3:13,14,15
**quite** 17:21
  53:6 72:3
  116:17
**quote** 139:17
  161:22 179:17
  230:13 242:17
  281:12
**quotes** 347:21
  349:8

**r**

**r** 3:1 4:1 5:1 6:1
  7:1 8:1 9:1
  28:25 127:4
  276:19 278:14

CONFIDENTIAL

**[r - really]** Page 64

353:3,3
**radicalize**
  115:20
**raise**  15:7
**rally**  100:21
**ran**  39:2,3 85:2
  245:1,3,6,7,9
  245:15,16,17
  245:18,20
  262:4
**random**  229:24
  230:15 238:16
  238:23 240:2,4
  240:8
**randomized**
  238:13 264:2,2
  264:16 267:2,3
  267:8,8,9,20
  333:3
**rare**  100:9
**rather**  69:8
  127:17,18
  214:24 230:15
  232:9 234:5,13
  277:3,4
**rational**  47:13
  316:6
**ratios**  93:3
**raw**  186:20
  187:1 188:3,6
  201:8,21,25
  202:3,6,13
  205:22 208:16
  208:19 237:17

238:16,19
239:4 241:4
305:23
**reach**  24:10
  60:20 211:20
**reached**  29:20
  161:17
**reaching**  349:2
**reaction**  347:9
**read**  57:17
  69:23 94:7
  95:4 97:11
  109:8,14
  111:17 113:25
  114:18 117:18
  119:3 122:14
  122:15,16,20
  123:3,5,7,12
  126:15 128:25
  129:3 131:20
  134:8,9,16,23
  135:1,7,13,16
  136:13 137:20
  137:24 138:1
  138:21 139:7
  139:18 140:13
  141:22 142:19
  142:23 148:9
  148:17 155:8
  159:5 160:20
  160:23,25
  161:21 162:14
  162:15,16,19
  162:23 163:5

163:24 164:6
164:21 166:12
168:4,13,17
172:18,19
175:2 198:8
209:14 214:21
220:20 223:22
224:25 228:25
229:15,20
230:5,14 231:6
231:23 232:11
235:12 244:18
247:1 269:25
272:16 278:13
279:19,21
280:10,12,24
281:13 282:17
285:25 293:4
294:10,15,23
295:1,8 300:22
303:9 317:19
318:11 321:10
327:12,20
336:18 337:10
347:13 349:13
354:5
**readily**  223:18
  306:8 333:23
  333:24,25
**reading**  122:14
  162:4 167:16
  200:7 265:19
  286:6 293:9
  321:16 323:22

327:18
**readme**  12:24
  13:9 284:6,10
  284:12,19,22
  285:1,3,6,10,13
  285:20 286:22
  290:3 295:18
  295:21 300:17
  304:3,4,6
  307:20,24
  308:2 309:9,14
  311:1,22 315:6
  316:8 317:1,3
  317:4,5,21,22
  318:23 319:1,5
  319:15 325:6
  339:18,24,25
  344:21
**reads**  316:22
**ready**  93:24
  244:13
**real**  48:12 56:2
  89:20 216:22
  265:1 294:11
  298:17
**realize**  246:8
**realized**  88:23
**really**  79:2
  101:17 201:7
  236:13 237:23
  239:12 281:20
  294:19 311:4
  311:16

CONFIDENTIAL

**reason**  15:20 16:4 48:25 69:12 145:11 195:6 236:5 244:2 255:17 255:19 290:2,4 296:17 297:20 327:5 332:22 353:6,9,12,15 353:18,21
**reasons**  48:23 48:23 54:9 206:5 244:8 332:16 336:5,8 343:12
**rebuilding** 117:24 118:21
**rebut**  166:23
**rebuttal**  165:2 166:14
**recall**  20:10 118:18 119:8 144:13,14 153:11 167:16 168:2 302:8 347:7,14
**receipt**  78:18
**receive**  26:17 26:20 34:14 62:3 74:17,23 77:17 79:7 122:12 166:22 182:3 183:12 183:13 267:17

**received**  25:20 26:13 60:9,10 74:15 167:9,10 183:14 333:8
**receiving** 122:14
**recent**  142:21 148:11 255:3 256:25 258:15 258:17
**recently**  134:18 134:20
**recess**  61:9 62:15 112:9 185:8 246:19 338:18
**recipient** 284:16
**recognize** 275:1
**recollection** 26:5 36:11 134:12,14 137:8 138:18 153:1,14,19 290:23 320:1
**reconcile** 239:25 290:20
**record**  14:5 15:18 59:15,19 60:20 61:2,7 61:11 62:12,13 62:17 111:17 112:1,4,7,11

138:1,20 139:7 185:2,2,4,6,14 246:16,17,21 248:10,12,13 248:15 338:12 338:13,15,16 338:20 348:13 348:15,20 350:14 351:3,6
**recorded**  1:19 2:18 352:11
**records**  205:16 331:16
**recovering** 119:4
**recovery** 119:23
**recreate**  343:24 344:1,15,19
**reddit**  12:11,12 12:20,21,22,23 177:17 206:24 216:4 217:9,13 221:8 222:25 239:11,12 241:13 276:6,6 276:12,13,16 276:22 277:1,1 277:6,7 278:9 278:16,17,22 285:14,19 286:1,14 287:1 287:17 288:5 288:11 289:11

290:6,8,12,17 291:7,20,22 292:17 293:17 293:23 294:2,3 294:6 295:14 300:4,6,11,16 300:23 301:12 301:12,20,22 302:6,9,15,19 302:20,22,23 302:25 303:1 303:14 305:15 306:5,11,20 307:3,13,14,23 308:9 309:9,12 309:14,17 310:20,23 311:19,24
**reddit.com.** 307:8 308:6
**reddits**  312:16
**reduce**  249:20 249:20
**refer**  18:8,20 63:9,11 81:7 84:13 140:21 209:1,4 224:15 224:19 225:13 254:23 290:10 291:24 305:19 337:7
**reference**  29:23 37:21 63:1 126:24 127:18

CONFIDENTIAL

**[reference - removing]** Page 66

127:19 140:6
145:14,16
147:6 152:23
153:3 182:1
255:15 260:23
306:8,13
307:17
**referenced**
23:17 28:23
86:2 181:10
274:18 275:22
295:25 296:1
346:25 349:5
**references** 49:3
133:16 141:18
286:10 349:15
**referencing**
114:12 139:13
153:22 159:23
196:14 347:17
**referred** 29:7
29:23
**referring** 18:10
34:11 89:6
106:14 124:14
224:20 257:9
279:14 286:12
295:6 347:8
349:14
**refers** 28:20
47:3 97:12
197:17 223:9
224:5,10
294:13 301:22

**reflect** 82:7
112:1 142:10
170:20 240:4,4
258:12,14
308:19 336:14
350:14
**reflected**
326:23
**reflective**
176:11 238:17
274:4
**reflects** 188:25
207:5 214:23
329:16
**refresh** 320:1
**regard** 174:9
**regarding**
161:17 194:13
**regards** 90:5
119:17 165:9
**regions** 104:10
**regression**
125:7 204:11
288:15 341:13
341:22 342:3
342:14 343:1
345:21,24
346:3
**regressions**
346:4,5
**regular** 63:20
64:9 67:17
123:4

**regularly**
128:25 129:3
131:20
**regulations**
11:16 105:18
**rejected** 350:16
**rejoining** 58:24
**relate** 92:7
**related** 92:16
115:11 176:11
268:24,25
328:13 335:1
**relating** 339:20
**relation** 268:22
**relations** 119:6
**relative** 352:17
**relatively**
237:19
**release** 194:6
232:2 233:5
234:4,12
**relevant** 38:15
38:16 73:1,4
73:12,17,21
78:8 81:1
164:16 206:17
206:20 311:8,9
313:21
**reliable** 55:23
57:11
**reliably** 57:5
**relied** 128:1
138:22 157:18
157:24 158:12

168:21,22
170:3 171:1,9
**relief** 22:23
349:19
**rely** 51:17
107:16 125:15
136:16 169:3
169:18 170:8
174:3,6
**relying** 147:12
173:22
**remaining**
312:21
**remember** 20:2
26:4 31:20,22
72:3 118:23
132:8 171:24
172:24 302:12
302:13 319:23
347:14,23,24
**remembering**
43:3
**remote** 75:4
77:13
**remotely** 1:20
**remove** 171:13
171:23 297:14
330:9
**removed** 168:6
169:23,24
171:18,22
**removes** 210:21
**removing**
297:9

CONFIDENTIAL

**[repeat - represent]** Page 67

| | | | |
|---|---|---|---|
| **repeat** 57:2 | 37:21 40:12 | 168:24 169:2,9 | 342:9 346:6 |
| 78:19 86:13 | 43:13,23 44:14 | 169:19,23,24 | 347:15,16,25 |
| 94:22 137:13 | 44:16,18,20,22 | 170:7 171:12 | **reported** 1:24 |
| 138:24 139:5 | 45:1,2,15,17,19 | 173:22 174:1,4 | 85:23,24 |
| 169:14 181:22 | 45:22 46:3,6 | 174:9,13,25 | **reporter** 2:25 |
| 184:13 204:25 | 46:21,24 47:3 | 177:1,6,8 | 15:4,6,13 |
| 209:8 212:3 | 57:22 58:16,18 | 182:2 185:24 | 109:7,14,24 |
| 216:15 224:9 | 59:4,17,22,25 | 188:11,15,17 | 110:1,2,14,24 |
| 293:21 | 60:5,6,9,9,15 | 188:25 189:3,5 | 111:13,16,21 |
| **repeating** | 60:24 61:1,1 | 189:10,19,22 | 118:13 130:24 |
| 185:16 224:21 | 61:13,14,17,18 | 191:12 198:1,2 | 137:25 139:7 |
| **rephrase** 28:22 | 61:20,24 62:20 | 199:17,19 | 185:17 219:16 |
| 240:16 | 62:23,25 63:7 | 200:8,9 205:11 | 246:4 248:7 |
| **rephrasing** | 63:10,11,18 | 205:16 207:3 | 349:25 350:9 |
| 184:21 | 66:16,21 67:5 | 209:5 214:17 | 350:18,25 |
| **replicatable** | 67:6 85:21 | 223:20 228:16 | 352:3 |
| 181:13 | 92:12,13,16,19 | 233:1 239:9 | **reporter's** |
| **replicate** | 92:20 97:4 | 244:16 246:25 | 352:1 |
| 183:10 186:6 | 125:16,19,23 | 252:14,19 | **reporting** |
| 201:1 204:1 | 126:3,5,6,9,12 | 253:2 254:4 | 88:11 225:20 |
| 255:22 256:8 | 127:7,9 128:2 | 255:4,6 256:10 | **reports** 34:2,5 |
| 261:18,25 | 128:5,13,14 | 260:24 271:25 | 34:11,12,15 |
| 290:25 292:12 | 129:5 133:19 | 274:19 288:8 | 66:20 86:2,3,4 |
| 338:4 339:21 | 135:11,16 | 288:14 290:10 | 165:4,5 166:13 |
| 344:4 345:12 | 136:16 138:23 | 291:15 299:24 | 166:23 167:9 |
| **replicating** | 140:8,11,15,19 | 300:1,3 306:17 | 167:10 172:3,5 |
| 181:9 259:17 | 144:17 148:4 | 306:18,20,24 | 173:3 200:10 |
| **replies** 303:14 | 150:21 151:3 | 311:11 318:8 | **repost** 103:22 |
| **report** 11:7,8 | 151:10,16,23 | 318:22 319:2 | 104:13 |
| 16:9,13,22 | 152:3,8 158:11 | 319:10,25 | **represent** |
| 17:5,11 28:13 | 159:2 162:22 | 322:20 333:18 | 142:10 162:1 |
| 28:17,20 33:25 | 164:16 165:10 | 338:22 339:9 | 176:9 178:17 |
| 34:1,10,18,19 | 165:10 167:15 | 339:10,13 | 180:10 290:11 |
| 34:22 35:1,3 | 168:3,5,16,23 | 340:17 342:2,5 | 301:10 |

CONFIDENTIAL

**[representation - rhee]** Page 68

| | | | |
|---|---|---|---|
| **representation** 292:6 | **requested** 352:14 | **respect** 40:23 109:25 110:18 110:23 134:12 294:5 317:13 | **return** 107:8,9 107:9 |
| **representative** 175:15,20,25 176:2,10,15,16 176:18,23 177:5,7,8,14,21 177:23,25 178:1,6,8,16,22 179:2,6,8,17,25 180:4,7 201:20 201:25 202:5 202:10 204:24 205:6 292:10 | **require** 21:10 24:4 230:22 | **responding** 287:12 | **returning** 107:13 |
| | **required** 159:9 354:13 | **response** 149:25 165:18 347:4 | **reveal** 161:5 |
| | **requires** 119:5 161:3 230:24 304:11 | | **revenue** 85:8 88:12 |
| | **requiring** 230:16 | **responses** 346:8,9,15,18 | **review** 59:15 59:19 124:11 133:19 134:22 136:23 165:3 172:4,5,10,16 172:21 173:1,4 173:6,21 267:18 284:25 306:1 308:15 346:8,24 349:17 352:13 |
| | **rerun** 39:7,15 39:16 262:8 | **responsibility** 11:12 | |
| **represented** 205:18 238:20 | **research** 11:23 11:23 36:21 43:4 55:22 57:14,17 133:7 142:22 148:12 150:6 156:9 157:13,22,24 158:4,6,24 160:24 178:15 188:22 189:12 213:25 214:1,2 216:8 221:15 221:19,21 247:19 | **responsible** 48:15 87:10 | |
| **representing** 181:11 | | **rest** 47:14 268:12 283:2 308:6 | |
| **represents** 181:17,24 230:6 231:8 | | **restrictions** 41:7,10 | |
| | | **result** 184:11 | **reviewed** 34:12 124:5,8,10,13 124:14 136:15 169:2 172:7,7 172:13,14 173:10,14,18 174:10,13,16 174:21 204:9 217:7 267:24 285:9 296:11 306:2 346:14 346:17 347:2 |
| **reproduce** 201:5 267:4,5 267:7 340:4 | | **results** 180:18 181:7 183:21 220:22 294:9 294:23 295:14 317:20,21,24 318:7 327:2,9 | |
| **reproduced** 310:10 | | **retain** 16:15,17 32:16,23 | |
| **reproducible** 12:20 201:17 | **reshaping** 46:17 | **retained** 17:15 17:19 33:2,4 134:25 | |
| **reputation** 247:4 | **resisted** 301:23 | | **reviewing** 173:16 347:23 |
| **reputational** 117:19 118:18 119:4 | **resolution** 60:20 | | |
| | **resolved** 16:1 | **retrieved** 303:18 | **rhee** 6:4 14:15 |

CONFIDENTIAL

**richard** 12:9
**right** 15:8
  18:22 19:12
  22:9,19 26:14
  32:13 35:20,23
  40:5 43:17
  46:14 47:6
  51:20 52:11
  58:24 59:5,12
  61:6,15 66:15
  67:6,8 69:22
  71:4,17 72:10
  73:24 76:19
  78:18 81:8
  82:8,20 96:2
  96:14,20 100:7
  103:5 106:17
  111:20 115:15
  115:24 117:6
  119:21 122:23
  128:6,9 129:18
  131:13,17,17
  132:24 137:25
  141:3,11,15
  142:2,11 143:3
  144:21,22
  145:8 146:4,25
  147:24 148:8
  155:21 156:1
  157:12 162:13
  166:1 167:6
  175:4,9,19
  179:13 180:23
  181:3 184:5

186:22 187:7
188:8,18 194:3
196:14,25
197:15 198:2,2
198:7 199:9
202:9 208:24
209:9 211:19
211:21 212:16
214:12 217:10
223:4 224:7,13
224:16 225:7
229:4,7 230:18
232:17,19
233:6,9,10,13
234:8,14 235:3
237:8 243:4,16
243:22 244:13
245:6,24 246:8
247:8 249:12
254:25 255:23
256:3,21
257:14 263:5
263:11 265:8
265:10 266:18
267:1,25 269:2
269:7,13
270:15,18
279:17 280:6
284:4 285:7
286:11 289:19
290:3 292:8,10
294:16,21,22
295:17 298:4,6
298:13 299:20

300:4 301:16
302:10,16
306:17 309:10
309:16,20
311:2,6 312:9
312:21 314:7
316:13,13,18
317:2,7,10,18
317:22 318:1
318:16,21,23
318:24 319:15
319:18 321:7
323:4 324:2,23
325:15,20
326:5 327:17
328:24 329:10
329:13,17,22
330:19,20
331:12,12
335:17 336:1
338:12,24
339:7,25
340:16,20
350:4
**rigor** 161:23
**risk** 120:1
**role** 32:10
  73:18 85:24
  86:11 105:24
  106:1
**roll** 221:12
  222:12
**rolls** 211:23

**romance** 301:1
  304:5 310:15
  310:17
**rooted** 190:13
  190:15,16
  218:18
**roots** 75:17
**row** 175:2
  287:25 288:3
  309:4 310:18
  313:24 314:5
  336:16 337:9
**rows** 264:17
  278:5 323:3,5
  324:13 335:15
  335:15
**rude** 250:14
**rule** 107:15
**run** 39:7 40:1
  49:14 51:21,25
  88:4 184:15
  203:21 204:5
  204:10,17,21
  205:2 213:13
  244:7,25 245:5
  245:11 253:14
  253:17,20
  257:24 259:17
  261:25 264:21
  268:20,23
  271:22 304:21
**running** 46:14
  87:23

CONFIDENTIAL

**[s - scrape]**                                                                          Page 70

| **s** | |
| --- | --- |

**s**  3:1,10 4:1 5:1
6:1 7:1 8:1 9:1
339:3 353:3
**sabrina**  12:11
276:7
**sad**  272:18
**sage**  11:23
**salaries**  270:1
**sales**  107:8
125:11
**sam**  11:17
132:21
**sample**  175:21
179:25 180:4,5
180:7 203:2,4
238:16,23
240:2,4,8,13
267:9,9 333:3
333:6
**samples**  34:14
**sampling**  236:7
238:14
**santa**  6:17
**sarah**  4:6
**sarowitz**  7:4
8:4 9:4 18:1
**sat**  86:25
**saw**  40:17
104:6,24 106:9
107:10 206:22
209:20 252:14
285:5 293:14

299:25 328:14
**saying**  63:22
86:16 100:11
140:12 158:2,3
158:22 192:13
193:12 194:5
221:18 239:25
243:11 254:1
306:21 336:17
345:8
**says**  16:13 36:8
51:22 67:22
68:1 69:15,22
70:6 93:21
94:6 97:10
98:12 99:7
110:8,14
114:17 117:17
131:22 141:2
143:13 147:19
170:2 192:16
200:11 207:13
209:13 220:6
222:23 223:11
228:24 230:3
235:11 241:9
243:21 254:12
254:13 269:24
272:15 278:12
280:22,23
281:25 282:16
285:24 286:17
287:7 288:23
293:3 294:9,25

295:21 300:18
300:21 301:16
302:19 303:8
304:4 305:2
307:3 309:20
316:10 317:5,8
317:9,15 320:2
321:9,20
325:11,18,19
325:21 327:9
327:11,19
330:5 337:9
338:23
**scale**  83:8 96:4
96:6 100:10,14
102:10 194:2,3
216:25 218:25
**schedule**
350:12
**scholar**  49:14
49:25 160:4
**school**  77:2,4
**schuster**  9:6
14:23,23
**sci**  31:16 83:16
**science**  24:24
31:1 71:15
83:5,12,12,13
83:15,17,18
131:9,16
132:18 142:21
144:25 148:11
156:11 158:7
233:19

**sciences**  82:17
82:19,22
**scientific**  194:8
195:20,23
**scientist**  29:2,9
29:11 31:19,24
179:23
**scope**  29:16
166:19 251:20
**score**  247:15,21
248:23 249:1,8
250:12 259:11
259:13,22
260:2,5,6
264:3,18,25
265:16,18
266:3,7 273:23
275:23 310:5
338:6 342:24
**scores**  254:2
261:4,6 266:18
266:20 343:3,7
343:9,21
344:11
**scoring**  273:21
273:21 274:20
275:6
**scrape**  38:2
39:20 40:2,14
40:15 42:14
207:23 237:22
240:10 241:2,7
242:17 244:13
245:9,10 306:5

CONFIDENTIAL

**[scrape - see]**

306:11 321:18
321:24
**scraped** 38:24
40:5 41:23
42:4 280:7
290:17 307:14
**scraper** 12:21
12:22 13:7
208:1,5,11,14
208:15 237:21
239:3 241:1
287:17 300:4,6
300:16 302:25
303:1,5 304:11
305:1,15
306:21 307:3
311:4,14,23
312:4,17 313:2
313:5,14
320:14,20,22
320:23 321:7
321:11,19
322:3,12,14,15
322:21 324:11
329:19,20,21
330:8 342:11
**scrapers** 58:13
207:1,6,16,18
207:20,23
208:17 240:24
242:5,8 330:4
**scrapes** 206:4
258:6 303:12
307:13

**scraping** 36:23
37:10,12,13,15
38:22 40:8,23
42:16 208:16
208:18 236:18
239:18,20
244:21 307:8
333:9
**scratch** 266:24
**screen** 58:18
59:2 67:11,13
72:7 93:9,19
126:18,19
144:19,20
147:25 148:2
152:10 206:14
219:20 220:2
232:18 262:25
269:5,16,20
271:15 279:16
285:16 316:8
320:2 321:5
325:17 330:19
**screenshot**
262:21 263:1
**script** 305:23
305:25 306:1
**scroll** 59:7
138:6 278:9
300:19 309:4
310:13,14
323:11
**search** 41:24
42:22 160:4

162:3 177:22
180:22 181:4
181:25 183:20
206:15 240:6
242:9 243:4
251:22 304:9
312:20 313:15
329:16,16,18
329:25 330:3,6
331:13 333:18
**searched**
312:16,18
**searches** 181:3
300:7
**sec** 113:12
**second** 52:9
62:19 63:6
71:14 93:21
106:21 176:20
180:12,20
184:13 206:13
206:25 248:8
269:6,23
273:19 285:15
294:22 299:19
316:14 327:10
**secondarily**
43:13
**secondly** 201:3
201:18
**section** 188:18
188:25 276:22
277:1 312:19

**sections** 302:4
**see** 27:7 29:21
30:2 31:1
33:17 34:2,6
45:6 50:6 59:2
61:23 62:2
64:10 65:13
67:13 88:11
90:10 91:24
92:3 93:14
94:16 97:18
107:21,23
112:6 113:20
114:24 116:3
118:1 127:22
128:8,16,21
129:8,11,16
131:24 132:13
140:7,9,22,25
141:3,6,14
142:15 144:21
145:1,3,5
148:5,6,13,21
148:22 152:11
152:16,19
160:17 166:14
197:24 198:16
204:6 207:12
208:4,8 209:11
209:19 215:1,2
215:25 217:4
220:4,8,13
221:15 222:13
235:6,9 236:22

CONFIDENTIAL

**[see - separate]**

239:2,16
252:19 255:7
259:11,12
260:8 261:9
262:11 263:19
266:7,14 269:1
269:15,20,23
270:6 271:7,11
272:24 275:4
277:13 279:12
279:14,17,22
280:1,5,6
281:3,8,10,21
281:22 282:5,6
282:22 283:4
286:4,8 288:25
299:4 301:2,16
303:1,3,8,19
304:6 307:5,10
309:7,19,21
310:15 313:25
314:4,23 316:8
316:10,17
320:2,4 321:6
321:15,22
322:2 323:12
323:23 325:11
325:13,25
328:2,21
329:13,16
330:13,16,18
331:15,17
332:11,13
335:15 336:22

336:23,24
344:20 345:18
**seeded**  196:16
196:16
**seeing**  64:3
103:21 105:6
336:17 338:6
**seek**  22:23
349:19
**seeks**  27:17
**seelig**  9:5 14:21
14:24
**seem**  116:11
**seems**  194:22
292:24
**seen**  30:13
57:14 102:12
103:9,13,14,25
104:8,8,14,16
110:5 114:15
114:21 115:19
150:7
**segment**  178:18
**select**  165:3
208:3
**selected**  38:13
39:13 133:22
133:25 134:2
206:25 207:23
238:15
**semester**  52:19
52:22 54:1,20
68:7,11 69:3,5
69:10 70:3,4,8

70:22
**semesters**
76:17
**seminars**  68:14
68:16,17,23
**sempertegui**
12:9
**send**  113:3,15
350:7
**sending**  31:6
**sensational**
114:6,8 117:5
117:8
**sensationalism**
116:1
**sensationalized**
117:12
**sense**  39:12
47:14,16 56:2
89:20,25 90:3
165:6,7 201:7
238:12 264:4
**sensitive**  244:7
**sensitivity**
249:18
**sent**  60:6
107:20 270:3
273:12,15
**sentence**  47:14
97:10,22,24
118:3 142:23
163:7,23 251:8
**sentences**
232:21

**sentiment**
39:24 155:10
156:10 204:5
204:12 209:21
246:23 247:6
247:12,20
248:18 250:24
252:7,11,12
253:4,7 254:2
256:9 258:6
261:3,6 263:5
264:8 265:23
271:18 273:21
273:21 274:4,7
274:10,12,15
274:22 275:16
275:23 277:18
279:2 281:18
283:5 291:1
298:2,18 310:1
310:7 314:11
314:24,25
337:1,5 340:18
340:25 341:10
341:15,17,18
341:21 342:24
343:2,5,19,20
343:21 344:11
344:13
**sentiments**
341:11
**separate**  19:4,5
31:7 87:19
180:16,17

CONFIDENTIAL

**[separate - similar]**                                                Page 73

185:10 350:23
**separated**
  208:21
**september**
  16:18,18,19
  17:15 32:25
  33:1 134:25
  268:17 293:5
  293:11,15
  295:3,16
  317:17 327:5
**sequence**
  110:19,20,22
**series** 281:25
  282:21 284:6
  340:15,19
  341:4,10,16,20
  341:24,25
  343:17
**served** 33:21
  167:5
**service** 37:23
  94:10
**services** 84:17
  85:4
**set** 26:25 41:8
  50:25 176:2
  180:16,20
  184:4 214:7
  236:3 253:17
  271:22 291:16
  291:20 346:15
  352:6

**sets** 41:11
**setting** 253:13
**seven** 102:3
  298:7 348:16
**several** 17:22
  32:11 100:20
  101:25 122:3
  163:1 164:2
  217:20 220:14
  220:22 299:5,6
**shanghai** 79:13
**shape** 46:15
  90:16 95:24
**shapiro** 19:17
**share** 31:3
  33:13,16,16
  58:18,20,21,25
  62:8 67:11
  71:14 72:7
  90:25 93:7,8
  93:15 106:8
  112:14,19
  113:8 126:18
  144:19 152:13
  197:21 219:20
  223:20 268:4
  269:2 321:5
**shared** 33:18
  34:7 38:22,23
  62:4 123:9
  258:5
**sharing** 93:12
  147:25 152:9
  206:13

**she'll** 59:18
**shifting** 348:4
**short** 64:25
  65:5 67:9,10
  67:16,24 69:14
  77:14
**shorter** 290:22
**shorthand** 2:25
  352:2,16
**show** 12:14,15
  31:7 54:16
  72:19 103:20
  115:21 157:13
  177:11 252:3
  275:23 279:20
  279:21 280:11
  280:12 324:16
  324:16 326:13
  326:15
**showed** 222:20
  224:24 273:1
  286:21 293:17
  326:10
**showing** 105:7
  144:20 212:16
  212:17 308:3
**shown** 115:19
**shows** 55:23
  177:13 247:18
  323:24 327:3
  327:23 329:12
**shrunk** 239:21
  240:1

**sic** 214:25
**side** 34:8 71:11
  84:12,20 85:6
  157:15 250:13
  273:22 279:17
  280:6
**sign** 95:8 146:7
**signature**
  352:23
**signatures** 56:1
  100:25 101:1,3
  101:6,8,9
  102:22 103:5
  104:17 107:11
  107:25 190:7
  215:17,19
**significance**
  209:22,24
  211:3
**significant** 37:3
  180:5 210:7
  214:14 232:5
  294:12 335:5
**significantly**
  40:17 57:19
**signified** 132:9
**signifier** 175:17
**signifiers**
  107:21
**signs** 54:12
  101:18 102:10
**silo** 221:7,8,8
**similar** 34:3
  37:25 65:8

CONFIDENTIAL

**[similar - software]**                                    Page 74

149:19 178:3 198:21 199:7 199:15,20 223:1 251:8 340:9

**similarly** 27:16 279:5

**simply** 54:18 56:2 57:16 150:6 193:17 232:9 234:5,13 241:14 243:11 244:6 253:25 265:1

**simulations** 268:23

**simultaneous** 229:2 231:21

**simultaneously** 231:14,15 232:1

**single** 117:23 118:20 199:2 245:13,15,21 266:2 324:20

**sit** 116:20 136:20 137:14 138:2,14,23 139:8 152:25 153:4,13,18 156:23 159:18 176:8 188:24 189:17 306:10 313:4

**site** 85:6 96:9 237:1,4 241:16

**sites** 42:13 216:23 221:7 222:7 236:8 237:1 240:10 243:1 291:25

**sits** 138:17,18

**sitting** 66:22 138:5

**six** 84:7 102:3 170:19 197:19 253:5

**sixty** 289:10

**size** 175:17

**skew** 114:19 237:16

**skewed** 92:4 107:22 115:5

**skews** 211:6

**skilled** 85:25

**skills** 72:2 73:8

**skip** 70:3

**slew** 192:5

**slightly** 67:20 115:5 248:22

**sloane** 6:14

**small** 76:8 84:22 119:15 119:19 237:19 243:3

**smaller** 175:3,8 203:13 239:19

**smear** 27:14 217:12

**smoother** 210:23

**smoothing** 210:21 211:12

**smoses** 4:12

**social** 11:20 12:7,9,10,12,13 12:15,16,18 23:24 30:24 37:24,25 38:3 38:6,12,25 39:22 41:8,8 41:11 42:12,16 78:13 82:17,19 82:22 83:4 85:5 88:5 100:13 103:19 104:16 107:7 114:1 121:21 121:23,24,25 131:14,16 132:18 136:12 136:18,22 138:4 139:10 141:5,11,25 142:2,21 144:24,24 148:11 156:21 156:21 157:11 158:7 174:11 174:25 176:19 177:14,15

179:18 180:3 180:11,16 181:18,24 184:5 187:3,24 190:11,25 191:2,4 196:6 198:9 200:12 201:8 202:2,18 205:25 207:21 207:22 209:16 213:9 216:6 217:1 218:23 221:7 222:7 226:7,8,12 227:9 230:11 236:7 237:3 240:9,18 241:5 241:16 242:14 242:19,22 243:1,8 244:9 250:1 260:9,16 261:22 262:12 264:22 289:22 291:25 313:18 347:6,11

**society** 74:5 75:16,21 78:8

**soevyn** 1:24 2:24 11:5 12:5 13:5 15:5 352:2,24

**software** 37:23 50:5,8 126:23

CONFIDENTIAL

**[solely - specific]**　　　　　　　　　　　　　　Page 75

| | | | |
|---|---|---|---|
| **solely** 187:23 192:9 200:20 | 140:16 143:17 145:22 146:24 147:4 154:15 156:5 158:20 161:24 163:17 168:18 169:13 172:11 177:18 177:18 181:22 183:1 184:13 184:19 186:9 191:7,8 194:25 195:2,7,25 197:7,8 207:7 207:12 209:8 210:10 212:3 213:3 214:5 215:20 216:15 217:19 218:9 219:25 220:1 224:8 225:6,9 225:20 228:23 231:18,19 232:14 239:5 245:9 248:7 250:2,24 253:18 259:17 260:18 265:24 266:23 269:19 270:14,21 277:8 278:3 285:21 286:5 288:22 291:3 293:14,20 296:3,7 300:18 | 305:11,17 308:9 313:24 313:25 316:14 319:19 339:2,4 339:5 340:2 342:23 343:15 349:11 | 22:15,17,19 64:5,12 66:1 67:9 137:1,23 138:8,10,25 139:5 179:4 185:3 229:22 |
| **solemnly** 15:9 | | **sort** 43:6 55:6 89:19 90:15 107:17 121:3 134:10 | **specific** 39:25 73:12 77:7 87:24 88:2 100:4 103:23 104:22,24 |
| **soliciting** 29:18 | | | 105:1,5,9,10,15 |
| **solution** 50:6 107:7 144:7 146:12 247:17 | | **sorting** 82:3 | 106:13,17,21 123:20 134:15 |
| **solutions** 9:23 84:20 85:25 | | **sound** 35:23 218:18 315:22 316:3 | 136:2 156:7,25 157:7 166:5 |
| **song** 279:21 280:12 | | **sounds** 102:20 167:6 193:15 196:22 199:7 219:11 316:6 | 170:10 171:24 180:8 197:20 207:1,4 210:8 210:11 218:11 |
| **soon** 26:16 246:5 | | **source** 139:16 161:24 244:14 | 221:2,4 225:17 241:25 242:5,8 255:18 257:8 |
| **sophisticated** 233:18 | | **sources** 126:22 159:14 192:5 207:4,13 302:20 | 258:3 264:8 265:14 266:25 275:15,16 |
| **sorry** 15:1 16:24 21:25 25:24 32:1 37:7 38:4 42:1 44:3 51:7 57:1 60:3 63:22 64:10 65:6,24 66:3 67:23 68:10 77:4,21 78:19 85:23 86:13 90:14 93:6,23 94:21 97:19,23 99:13 99:14 101:5,22 104:13 115:8 116:24 118:4,6 118:10 121:5,8 122:17 128:14 130:1 137:5,15 | | **sourcing** 320:11 | 276:24 277:4 280:9,13,17 288:17 302:5 |
| | | **southern** 1:2 2:2 | 303:16 304:12 305:3 307:4,5 |
| | | **speak** 17:11 58:18 98:17 110:16 | 307:24 312:13 312:14 320:17 |
| | | **speaking** 21:7 21:24 22:7,12 | 321:19 332:22 |

CONFIDENTIAL

**[specific - statement]**

333:16 342:1 342:15 343:9 343:16 344:23 349:8

**specifically** 27:7 30:24 31:2 40:7 46:16 49:23 53:16 55:11 76:9,13,21 78:10,13 79:4 87:6 88:17,18 92:20 99:21 104:6,14 114:12 115:3 121:21 140:5 147:5 164:15 165:7,13 176:25 186:11 195:18 196:13 198:25 199:18 201:7 208:7,9 210:3 216:10 216:23 231:2 236:8 253:21 296:23 311:5 313:14 337:25 341:1

**specifics** 245:17 252:22

**specify** 51:4,9 253:23 255:4,5 255:9 270:21 299:24 307:19

311:11 320:18 322:11

**speed** 67:11

**spend** 34:17

**spent** 35:6 43:4 79:16

**spheres** 204:11

**spike** 88:20 89:12,15 209:17,19 214:4,5,9,11,15 215:5,6 230:13 230:22,25 231:12,24 232:18 233:6 233:25 234:16 288:16 293:17 293:24 294:11 294:13 298:4 298:11,16,18 298:19,21 299:11,13,15 299:18,23,24 299:24 317:9 317:13 327:10 328:15,17,20 335:9,10 341:25 342:1,4 342:4 344:2,2

**spikes** 215:25 237:4 327:21 328:12

**spoke** 26:21

**spoken** 21:3 30:12 191:9 275:20

**sporadic** 78:3

**spot** 292:16

**spotlight** 337:11

**spread** 114:20 115:10 117:14

**spreadsheet** 288:2 308:10 329:24

**spreadsheets** 308:12,18 329:25

**sprout** 37:25 241:5 244:9

**sprouts** 243:8

**st** 74:10

**stability** 224:2

**stable** 303:11

**staff** 121:14

**stamp** 225:17 309:11 323:10 329:13

**stand** 45:16 74:10 118:3 319:4

**standard** 63:1 162:24 163:8 163:25 164:11 209:24 210:3 210:12 211:25 212:4 213:13

214:1 226:22 227:1,2,5 341:8

**standards** 94:15 95:6,7 162:8,12,13 164:20

**stands** 122:17 162:3 257:7 268:10,13

**start** 45:2 80:23 110:3 116:7,10 167:7 167:8 327:2 336:17

**started** 111:3 294:18 295:22 296:5,18 297:1 297:7,17,23 299:10,18 309:10,18 349:21

**starting** 268:5

**starts** 132:5,6 212:20 329:13

**state** 15:9,18 229:14 246:25 352:3

**stated** 80:10 96:17 158:18 205:11 304:6

**statement** 118:23,25 119:10,17,24

CONFIDENTIAL

**[statement - subreddit]**                                    Page 77

140:3 142:18 150:7 192:20 256:23 294:21 337:14 341:2

**statements** 153:6,20 179:9 352:10

**states** 1:1 2:1 148:16 162:10 346:13

**stating** 191:1

**statistical** 209:22,23 211:2 214:22 220:21 247:2

**statistically** 37:2 47:16 57:19 180:5 210:7 229:22 294:11 335:4

**statistics** 83:22 232:4

**stay** 59:18 177:1 189:24

**ste** 6:17

**steno** 15:5

**stenographic** 15:4,13 111:13 111:16,21 118:13 130:24 185:17 219:16 349:25 350:9 350:18,25

**stenographic...** 1:24 352:11

**step** 110:15 343:23

**stephanie** 3:3

**steps** 126:21

**steve** 7:4 8:4 9:4 18:1

**stipulate** 298:9 301:6

**stomach** 16:3,4

**stop** 21:23 22:6 22:6,11 68:8 69:10 71:14 93:11 111:11 136:25 137:23 138:7,9 139:4 206:13

**store** 134:10

**stories** 196:15 196:16,18

**storing** 126:24

**story** 31:8 77:13 194:16 272:21

**straightforward** 249:6

**strasberg** 6:15 15:2

**strategic** 71:10

**strategy** 81:5 81:24

**stream** 85:8 88:5

**street** 3:10 5:8 6:7

**strike** 38:4 50:22 127:7 168:18 196:1 223:7 250:6 264:9 292:22 296:3

**string** 47:17

**struck** 281:22

**structure** 47:15 251:8 338:23 339:20

**structures** 139:25

**student** 50:5,20 51:21 54:20 56:14

**student's** 57:8

**students** 48:21 52:9 53:25 54:1 75:9,10 268:23

**studies** 74:11 75:7,9 78:7 103:24 115:19 220:14,23,24 221:11 222:6 223:9,12

**studios** 1:8,13 2:8,13 7:2 8:2 9:2 11:3 12:3 13:3 14:9 353:1 354:1

**study** 75:1,17 75:22 78:14 79:12 169:8 183:21,21 222:23,24,25 222:25 223:3,5

**stuff** 309:5

**sub** 276:15,21 302:9

**subaggregate** 343:13

**subcategories** 301:24

**subject** 227:20 253:3,23

**subjective** 55:15 193:15 194:23

**submission** 51:1 172:12

**submissions** 173:12,16,21

**submit** 50:4

**submitted** 49:21 54:6,7 59:5 143:5 152:24 224:18 259:25 285:11 324:14

**submitting** 308:17

**subreddit** 276:12,13,20 276:23 303:22

CONFIDENTIAL

**[subreddit - surprise]**

Page 78

304:11 305:3
307:4 312:10
313:10,22
314:9
**subreddits**
276:25 277:2
301:21 302:4
302:16 303:15
303:21 307:24
308:5 309:22
310:19,21
311:1,6 312:4
312:7,13,14
313:17
**subs** 300:24
301:13,16,18
301:19,19,21
302:17 304:5
**subscribe**
122:8
**subscribed**
354:14
**subscription**
181:10
**subsection**
278:16
**subsections**
302:2
**subsequent**
107:8 119:24
236:15 245:16
291:12 343:10
**subsequently**
30:3 66:25

194:18 335:10
335:11
**subset** 264:1,2
**substance**
20:14 21:11
**substantial**
119:5
**substantive**
112:15 161:4
203:12
**successfully**
348:4
**succinct** 135:23
**sufficient**
202:18 289:14
**sufficiently**
32:8
**suggest** 110:2
184:24
**suggestion**
184:16
**suggests** 232:2
295:3
**suite** 4:9 8:10
**sullivan** 3:5
**summarize**
135:3,12,18
232:12
**summarizes**
232:23
**summary** 25:8
135:24
**summer** 74:19

**supervised**
88:3
**supplement**
189:15
**support** 140:3
153:5 169:18
228:4 342:17
**supported**
157:22
**supporting**
327:25
**supports**
142:18 153:19
156:7,24 157:6
158:25 159:10
223:17
**supposed** 15:25
127:10 170:25
173:17
**supposedly**
135:15
**sure** 17:21,23
19:19 20:8
31:16 32:25
39:1,3 48:3
49:4,8 56:3
58:9 61:5 67:1
67:12 69:8,9
70:25 72:21
73:3 76:9
77:14,16,23
78:2 82:25
83:13 85:9,25
96:24 98:1

103:14 105:20
113:13,17
114:14 116:17
116:18 121:8
129:7 130:6
132:4 133:22
136:19 137:2
137:10 139:2
142:7 163:19
166:24 170:16
174:18 179:5
183:2 186:11
192:12 197:25
201:15,16
204:25 205:9
214:13 222:8
224:10 225:24
235:24 246:7
248:11 254:12
262:23 264:15
265:2 268:12
280:20 282:10
285:7 293:23
301:14 312:11
317:23 323:13
323:15,24
330:23 332:22
336:12 338:16
339:18 346:12
347:2,25 348:1
349:3
**surges** 229:2
**surprise** 154:22
154:23 155:2

CONFIDENTIAL

163:12 290:14 290:16

**surprised** 154:10,18 155:5,5

**surrounding** 198:9

**survey** 26:1,3,6 26:12,16,19

**surveys** 26:10

**suspect** 56:14

**sussing** 105:24

**sustained** 295:4

**sv** 85:23

**switch** 93:12

**sworn** 14:11 354:14

**syllabi** 52:13 52:16,24 53:7 53:9,10,10,11 53:13

**synchronate** 96:13

**synchronizati...** 139:22 147:8 155:10 227:12 229:7

**synchronized** 96:4

**synchronous** 223:24 225:1,4 225:7,13 226:3 226:9,16,23 227:17,22

228:4 231:22

**synonym** 92:10

**synthesio** 104:15 107:6

**system** 49:22 50:1,3,19,23,24 51:11,17 248:23 253:22 259:5 260:22 261:9,11 263:18 272:3,5 342:23

**systematic** 247:6,12

**systematically** 247:19

**systems** 249:8

**t**

**t** 28:25 127:4 353:3,3

**ta** 51:10,13

**tab** 307:2

**tabs** 261:9 326:16,17

**tag** 18:2

**tags** 123:10

**tahler** 3:6

**taitelman** 7:5 16:14

**take** 36:25 55:5 55:24 59:15 60:12,14,17,21 60:23 65:15

76:12 93:22,23 108:15,21 109:12 110:2 111:6 117:25 118:22 174:8 187:2 233:21 239:8 246:7,10 246:11,13 254:9 262:21 263:20 264:7 264:10,21 308:5 320:21 344:10

**taken** 2:19 73:18 171:21 192:2 352:5,16

**takes** 225:11 249:20 275:18 275:19

**talented** 342:17

**talk** 23:1,24 35:4 75:18 87:23 109:9,16 109:20,22 110:9,12,17,25 111:2,9,25 112:5 119:12 119:13,25 125:9 162:21 183:4 206:12 223:15 226:10

**talked** 56:7 58:13 142:8,9 144:12,12

149:10 155:19 155:22 198:22 210:14 216:2 231:17 284:23 309:23 312:17 316:25 318:18 348:4

**talking** 35:25 40:7 67:12 104:23 111:11 115:4 121:12 144:22 147:5 172:20 190:10 193:6,9 209:2 218:20 220:11 223:1 227:8 237:15 264:11 274:9 275:15 294:3 312:9 349:4,7

**talks** 79:9 84:5 84:8 161:22 223:13 235:7

**target** 88:12 288:7

**targeted** 79:3 80:20

**tarnish** 117:23 118:20

**tas** 49:11 50:24 50:24

**task** 32:8

**taught** 68:9,10 68:12,23

CONFIDENTIAL

**[taylor - testimony]** Page 80

| | | | |
|---|---|---|---|
| **taylor** 28:25 | **technique** | 294:20 | **terms** 41:24 |
| 29:1,23,24 | 341:14 | **ten** 45:3,5 | 42:22 43:4,19 |
| 35:24 44:11 | **techniques** | 79:25 80:3,7 | 76:22 98:1 |
| 57:24 245:7 | 102:4 | 80:10,11,11 | 114:8 165:12 |
| 284:24 305:23 | **technology** | 111:19 112:6 | 165:24 177:22 |
| 305:25 306:1,5 | 69:25 70:13 | 239:10,10,14 | 180:23 181:4 |
| 308:14 319:2 | 71:11 75:23 | 239:14 | 181:25 183:20 |
| 319:11 | 90:17 190:25 | **tens** 316:4 | 196:3 206:15 |
| **teach** 53:12 | 191:2,4 198:23 | **term** 27:2,3 | 206:17,19,21 |
| 68:5,14 69:3 | **telephone** | 77:11,12 81:15 | 212:18,19 |
| 70:3,4,7,20 | 33:10 | 82:16 88:25 | 240:6 242:9 |
| 71:7 252:10 | **tell** 19:7 26:23 | 89:5,23 90:10 | 243:4 247:22 |
| **teaches** 71:8 | 27:13 28:2,8 | 90:12,20 91:10 | 248:2 251:22 |
| **teaching** 52:22 | 28:12 29:18 | 92:6,11,13 | 274:9,18 |
| 68:6,7,8 69:10 | 31:8 35:8 | 97:4 99:22 | 313:15 329:16 |
| 69:18 71:5 | 75:25 87:3 | 106:17 115:1 | 330:4,6 342:19 |
| **team** 28:22 | 105:10,21 | 165:15 178:5 | **terow** 127:1 |
| 60:11 85:4 | 107:3 153:2 | 189:21,23 | **terrible** 342:18 |
| 86:22 87:11,18 | 167:19 193:14 | 190:3,5,12,13 | **tertiary** 43:14 |
| 87:24,24 88:3 | 202:7,9,13 | 190:16,19,22 | **tested** 125:4 |
| 346:1,5 | 206:25 232:15 | 191:3,12,14 | **testified** 57:25 |
| **teams** 85:2 | 251:14 265:2,9 | 198:18 199:16 | 67:4 174:15,21 |
| 86:20,24 87:1 | 268:9 310:1 | 200:3,9 201:11 | 343:8 |
| 87:21 | 313:4 315:4 | 201:12,13 | **testify** 27:13 |
| **tease** 116:6 | 338:14 | 209:17 215:10 | **testifying** 18:4 |
| 347:17 | **telling** 184:19 | 218:3,4,7,9,10 | **testimony** 15:9 |
| **technical** | **tells** 82:5 | 220:7,10 | 15:22 16:6 |
| 219:25 | **telltale** 54:12 | 221:17 222:13 | 43:5 55:16 |
| **technically** | **temporal** 92:25 | 231:15,21 | 56:22 57:4 |
| 46:4 53:17 | 101:12 104:9 | 301:24 329:16 | 59:24 150:13 |
| 239:15 | 139:21 147:8 | 329:18,25 | 150:17 155:12 |
| **technician** | 155:10 215:12 | **terminology** | 168:25 169:16 |
| 58:22 350:2 | 215:13,18,20 | 199:20 241:2 | 173:25 178:21 |
| | 215:20 229:7 | | 179:7,14 |

CONFIDENTIAL

**[testimony - time]** Page 81

181:16,21,23
205:24 207:25
223:6,8 230:9
240:2 241:19
242:7 322:6
342:19 352:8
354:9
**texas** 33:6
**text** 148:18
283:19 337:6
349:9
**textguard**
150:11 154:25
**thank** 15:13
17:2 62:17
118:14 127:5
189:21 246:6
331:8 350:9
351:1,4
**thanks** 41:4
113:18
**thing** 15:2
93:10 121:23
138:6 158:3
189:23 215:18
221:4 231:16
301:25
**things** 27:8,10
35:5 36:23
37:3 46:13,18
47:23 52:4
54:4 55:24
56:3,6 76:3,8
78:12 84:22

85:4 88:4,10
88:13 89:9,10
92:1,2,21 93:2
95:22 96:9
101:11,13
103:16,17,18
104:16 114:12
125:9 145:25
159:6 169:3
182:20 192:2,6
194:14 197:13
210:20 215:14
219:2 222:9
226:13 237:4
248:4,6 250:13
250:14,22
268:22,23
283:11 305:2
315:2
**think** 30:11
31:13 38:14
50:11 58:25
60:2,3 64:5
69:7 71:11
73:16 76:15
78:15 80:15
83:14 93:11
100:20,25
106:7 114:10
114:11 117:2,3
119:23 122:18
124:11 143:20
149:10 150:4,5
158:2 159:19

161:11 177:25
197:8 209:7
217:19 219:7
235:6 238:4
244:1 255:9
290:2 299:23
314:14 327:5
334:8,11
335:22 338:11
349:23 350:2
**thinking** 225:7
**third** 1:11,12
2:11,12 55:22
57:17 150:10
176:21 242:15
243:8 247:23
247:25 321:20
340:8 346:14
**thought** 18:6
51:7 108:1
118:5 137:17
213:3 335:12
**threats** 88:6,7
**three** 17:9
26:18 39:24
69:1,1 70:3,25
82:6,13 122:2
132:23 144:13
144:15 210:17
211:15,16,18
211:19 217:3,5
228:16 229:6
247:15 248:2
289:2 298:12

298:13 301:13
302:16 307:24
311:1,5 312:4
**tight** 139:21
229:7
**tiktok** 12:17,19
12:24 13:7,8
216:4 217:9,13
236:12,12,14
237:22,24
238:5 281:20
282:12 286:22
315:6,11,12
316:4,7,11
317:13 319:17
319:22 320:3
320:13,15,23
320:23,25
321:6,11,13,18
321:18,20,25
322:5,23 324:5
324:11,20,22
**till** 272:20
**time** 14:6 20:17
21:2 23:10
25:18,20 40:24
40:25 41:6,19
42:17 43:7
44:25 48:22
58:1 60:23
68:9,10 69:13
75:6,8,9,13
79:3 80:17,19
85:18 106:2

Veritext Legal Solutions

212-267-6868                www.veritext.com                516-608-2400

CONFIDENTIAL

**[time - traceable]** Page 82

114:11 137:16
167:1,8 176:4
176:12,17
179:9 181:13
183:13 188:4
189:23 197:18
197:20 200:14
200:17,19,20
200:23 201:6
201:12,21,25
202:6,11,14,22
203:3 204:24
205:6,11,19
206:8,10
208:22,23,23
215:21,24,25
219:3 221:9
222:11 225:11
225:14,18,19
225:23 231:1
232:10,22
234:5,13
236:24 237:9
238:18 242:10
242:18 244:12
244:25 245:2,4
246:6 254:11
264:16 265:1
290:21,22
295:5 309:11
323:10 328:16
329:12 331:2
332:4,21 335:5
336:11 338:15

340:15,19
341:4,10,16,20
341:24,25
343:17 348:15
349:20 350:5
350:12 352:6,7
352:10
**timeframe** 93:2
**times** 69:3,4
71:1 77:2
102:2,3 104:11
115:16 135:11
135:18 189:22
190:1 194:17
213:13,15,18
**timing** 215:17
215:19,23
223:24 225:1,4
225:5,13
294:16 318:12
318:15 327:13
**timothy** 11:17
132:21
**title** 48:5 71:4
129:11,14
141:3,8,22
142:1 143:11
159:23 206:18
278:19 314:8
330:12,18,21
**titled** 11:10,11
11:18,21,23
**titles** 141:14
142:6

**today** 14:16
15:20 16:6
18:5 113:6
116:20 136:20
137:8,14 138:2
138:5,14,17,19
138:23 139:8
152:25 153:4
153:13,18
156:24 159:18
176:9 188:24
189:18 306:10
313:4
**today's** 117:21
**together** 16:21
17:11 30:13
33:24 34:1,10
34:18 160:9
260:5
**told** 168:18
309:5
**tonality** 341:7
**took** 75:5,11
225:9 264:16
264:20 265:2
299:14 313:9
331:7 341:17
**tool** 37:19,22
42:16 104:16
182:6,22
183:11,17
321:12
**toolkit** 11:19
131:10,11

135:22 136:10
141:10,23
**tools** 31:7
37:15,17,22
38:1,1,4,6
96:14 136:3,8
207:4,13
244:22,25
245:1,3,6,6,8,8
245:11 259:20
**top** 62:4 131:17
131:22 148:16
197:23 300:24
301:13,16,18
301:19 302:17
304:4 309:5
325:18 331:11
**topic** 123:8
124:18 191:10
**total** 36:9,10
38:24 77:16
205:12,14
209:21 212:5
286:3,7 316:11
318:6 332:13
343:5
**touched** 17:13
**tour** 276:11
**towards** 79:18
79:20
**toxic** 342:18
**traceable**
102:22

212-267-6868    www.veritext.com    516-608-2400

CONFIDENTIAL

**[tracking - u.s.]**                                                                Page 83

| | | | |
|---|---|---|---|
| **tracking** 37:24 107:18 213:10 227:14 | **trouble** 291:19 | **tuesday** 245:18 | 245:18 269:16 |
| **traffic** 88:11,20 88:21,22 89:4 89:12,13,15 90:6,7 92:3 95:24 96:11 190:7 | **true** 110:4 124:7 150:8 192:17 193:18 193:18 194:3,4 194:13 196:18 196:24 197:6 197:10 222:9 239:15 256:6 352:15,21 354:8 | **tune** 249:22,25 **tuned** 250:4 **tuning** 76:7 248:25 249:14 249:17,18 253:25 340:6 **turn** 50:10 235:5 **turnaround** 166:25 | **two** 19:7,7,17 23:17 62:24,24 75:12 77:10 78:2 83:14 84:6,7 98:18 98:23 104:25 108:21 109:10 116:6 130:11 130:15 141:14 166:25 167:2 |
| **trailer** 13:12 330:20 331:19 331:22,25 332:8 334:15 334:15,18 | | | 180:18 201:5 203:8 208:17 217:2,5,25 |
| **trained** 251:6 **training** 249:2 **transcribed** 185:10 350:20 350:22 352:12 | **trust** 11:13 57:18 117:24 118:21 **truth** 15:11,11 15:11 | **turned** 192:17 195:8,9,10 219:24 237:22 238:23 239:11 296:25 | 229:6 239:10 239:11,12,14 273:16 281:9 286:6 323:8,21 324:2,17,23 |
| **transcript** 185:11 350:21 350:23 352:13 352:16 354:5,9 | **truthful** 15:21 16:5 117:10 192:20 **try** 82:24 83:1 137:9 189:24 204:25 211:8 | **turnitin** 50:10 50:18 51:1 52:4 **turns** 216:12 216:16 236:10 237:21 | **type** 26:5 88:2 94:18 95:3 97:5 105:15 107:16 257:13 |
| **translation** 323:14 | **trying** 22:25 75:5 88:9 99:4 100:25 103:23 104:22 106:7 109:11 150:12 157:17 163:22 169:19 180:1 180:12 189:15 212:10,15 226:20 240:3 244:24 248:4 266:6 301:11 | **tweet** 103:22 104:13 269:23 270:9,18 271:7 271:19 272:14 272:22,24 | **typed** 312:3,3 **types** 250:7,10 254:25 |
| **travel** 79:19 **travels** 117:22 **treat** 275:9 **trend** 125:13 **trial** 176:22 **tribute** 278:20 314:1 | | **twelve** 25:4 **twice** 323:25 324:16,17,21 335:18 336:6 336:10 | **typical** 230:7 231:9 |
| | | | **u** |
| | | | **u** 12:7 **u.s.** 162:17 163:5,6 216:7 222:5,6 236:9 |
| **tried** 203:25 290:25 | | **twitter** 179:20 216:3 217:8 | |

CONFIDENTIAL

**[u.s. - use]**                                                                                                  Page 84

| | | | |
|---|---|---|---|
| 316:1 | 18:9,21 20:19 | 343:15 349:3 | 237:24 239:21 |
| **u31**  331:5 | 21:6 23:2,4 | **understanding** | 240:5 243:10 |
| **uh**  18:3 43:12 | 24:2 27:6,22 | 17:18 23:18 | **universities** |
| 101:10 115:7 | 55:12 63:10,12 | 24:9,16,19 | 50:4,13,19 |
| 148:8 149:18 | 75:5 81:2 94:2 | 31:11,17 32:4 | 56:7,8,11 |
| 193:24 207:9 | 104:22 105:13 | 41:22 42:3,19 | **university** |
| 315:13 319:20 | 133:18 134:11 | 57:13 72:2 | 49:22 70:17,18 |
| 323:6 344:25 | 135:20 138:15 | 78:9,10 95:19 | 74:7 |
| **ukraine**  270:3 | 150:12 157:9 | 99:8 102:25 | **unknown** |
| **un**  299:7 | 157:17 159:8 | 121:17 125:21 | 233:20 |
| **unavailable** | 159:13 163:22 | 139:3 159:5 | **unknowns** |
| 29:12,22 30:6 | 164:9 169:19 | 161:19 162:2 | 233:20 |
| **unaware**  32:15 | 170:16 173:17 | 163:2 164:22 | **unquote**  179:17 |
| **under**  86:25 | 174:12 178:13 | 168:21 199:14 | 242:17 |
| 87:19 94:14 | 179:5,13 | 291:19 292:20 | **unreliable** |
| 97:3 162:24 | 184:20,23,25 | 302:5 328:12 | 55:21 |
| 163:8,25 | 189:14 192:12 | 347:10 | **untraceable** |
| 238:24 287:11 | 200:9 209:2 | **understood** | 102:18,20,21 |
| 294:9 305:13 | 215:16 217:4 | 32:16 33:20 | **untrue**  193:12 |
| 305:13 331:13 | 224:20 227:4 | 80:14 102:8 | **unusual**  229:21 |
| 352:7,20,20 | 240:3 242:4 | 127:20 137:11 | **updated**  65:11 |
| **undergraduate** | 244:24 254:6 | 137:12 165:21 | **updating**  65:13 |
| 72:16 76:15 | 254:24 258:24 | 166:3 176:8 | **upping**  190:11 |
| **underlying** | 259:4,7,8,19 | 192:21 276:19 | **urquhart**  3:5 |
| 172:5 182:23 | 262:3 264:7 | **unhappy** | **usage**  54:13 |
| 187:1 190:2,4 | 265:13,17,22 | 107:13 | 88:12 190:7 |
| 199:24 212:1 | 266:6 274:6 | **unique**  205:16 | **use**  27:3 29:10 |
| 261:15 284:3 | 280:7 288:18 | 323:17,19 | 29:25 31:7 |
| 329:9 346:24 | 291:1,5,11 | **united**  1:1 2:1 | 34:3 37:15,18 |
| 347:2 349:4 | 292:9 296:12 | **universe**  42:21 | 38:12 39:22 |
| **underneath** | 301:11 311:16 | 176:3,23 | 46:2,5,9,13,19 |
| 283:14,18 | 312:11 317:23 | 181:17,24 | 46:20,22 49:3 |
| **understand** | 320:13 332:25 | 205:18 207:6 | 50:14,19,24 |
| 15:24,25 18:4 | 333:17 334:9 | 207:15 224:20 | 51:11 52:3 |

CONFIDENTIAL

**[use - usual]**                                                    Page 85

| | | | |
|---|---|---|---|
| 53:13,23 54:18 | 268:24 271:24 | 216:13,17 | **username** |
| 56:4,9,11,23 | 302:3,22 | 221:4 222:4,4 | 303:15 304:12 |
| 57:5 65:10 | 318:17,19,20 | 222:13 233:8 | 305:3 307:4 |
| 77:11 84:19 | 318:22 319:7 | 236:8 237:22 | **users**  88:23 |
| 88:25 89:5,6 | 320:11,11,17 | 240:23 242:1,2 | 89:3,11,12,15 |
| 89:19,23 90:10 | 320:19 321:14 | 243:21,25,25 | 91:15,17,24 |
| 90:11,19,22 | 321:24 322:18 | 243:25 244:3,4 | 95:8 104:12 |
| 92:9,11,13,15 | 322:18 329:21 | 244:11,14 | 114:5 115:22 |
| 92:18 94:11 | 330:3 340:7,18 | 247:17,22,24 | 117:13 190:10 |
| 97:4 102:4 | 341:8,10,19,23 | 248:22 255:3 | 300:7 |
| 104:8 106:11 | 342:7 343:2 | 255:12,18 | **uses**  49:22 50:2 |
| 114:8 149:8 | 346:1 | 256:11,18,25 | 52:4 75:20 |
| 152:10,12 | **used**  27:2 37:19 | 268:14 277:22 | 97:5 191:2,12 |
| 168:5 177:24 | 38:13 51:18 | 287:17 290:24 | **using**  49:24 |
| 178:5,16 182:6 | 53:23 54:5,14 | 300:4 302:23 | 52:6 56:3,14 |
| 182:21,22 | 54:14,19 88:20 | 303:2,6 305:1 | 57:15 58:12 |
| 186:9,10 187:9 | 89:25 90:5,6 | 305:24,25 | 87:9 90:11,15 |
| 189:21,23,24 | 92:6 116:21 | 306:1,21 | 95:22 96:14 |
| 190:12 191:14 | 126:23 128:1 | 307:17 311:23 | 97:8 127:14 |
| 198:18 199:16 | 135:22 140:3,7 | 313:14 319:17 | 128:19 129:13 |
| 199:17,19 | 155:19 165:13 | 320:15 322:1 | 143:20 159:14 |
| 200:24 201:10 | 165:24 166:6 | 322:15 329:17 | 168:11 178:4 |
| 201:19 207:1 | 181:12 183:17 | 329:18,21 | 180:8 181:4 |
| 207:19 208:15 | 186:5,11 187:8 | 333:22 339:4 | 183:11 191:10 |
| 209:17 210:8 | 187:11 190:1 | 340:5,25 341:3 | 201:3 221:9 |
| 210:11,16,19 | 190:16 199:2 | 341:3,12,12,12 | 238:1 248:5 |
| 212:10 214:4 | 199:18,19 | 341:13 342:3 | 254:15 257:24 |
| 218:3 220:10 | 201:12,13,20 | 342:10,13,19 | 258:1 267:14 |
| 221:10,22 | 201:24 202:7 | 343:16 344:11 | 277:3 301:23 |
| 231:15,21 | 203:10 205:7 | 344:17 345:10 | 312:16 342:6 |
| 234:2 240:23 | 206:7,16,17,21 | 345:17 | 349:11 |
| 242:3 243:24 | 207:6,16 214:6 | **user**  93:1 95:6 | **usual**  91:15,17 |
| 247:15 255:2 | 214:10,14 | 95:10,13,22 | 91:19 |
| 268:17,18,21 | 215:9 216:10 | 336:6 | |

**[usually - volume]**                                    Page 86

| | | | |
|---|---|---|---|
| **usually** 27:9 36:21 37:5,8 48:11 51:9 53:25 54:21 64:18 79:4 80:21 98:23 101:23 102:22 103:4,9 115:13 115:16 116:1 122:20 123:5 123:22 124:2 132:9 134:10 194:13 195:13 195:15 210:22 218:12 225:19 225:22 233:17 249:6 274:16 286:21 332:20 | **variance** 212:11 | **version** 44:25 256:6,15 258:3 258:12,15 262:17 | 62:16 112:7,10 185:6,13 246:17,20 248:11,14 338:13,16,19 348:16,21 351:2,5 |

usually 27:9
36:21 37:5,8
48:11 51:9
53:25 54:21
64:18 79:4
80:21 98:23
101:23 102:22
103:4,9 115:13
115:16 116:1
122:20 123:5
123:22 124:2
132:9 134:10
194:13 195:13
195:15 210:22
218:12 225:19
225:22 233:17
249:6 274:16
286:21 332:20
utc 225:16
utilize 313:5
utilized 313:1

**v**

v 11:3 12:3
13:3 14:8
58:22 350:2
valid 204:6,9
validate 208:7
value 203:21
203:24,25
variable 212:2
212:6
variables 32:1
222:9

variance
212:11
variety 97:13
various 38:5
114:21
vast 96:25
106:1
vastly 119:18
venture 78:1
315:19
verb 178:11
verbalize 67:20
verbatim 148:5
175:2
verbatims
247:20
verbiage 77:12
90:21,22,24
92:16 103:17
155:19,21
191:11 222:22
265:16 319:7
319:23 320:12
verification
263:22,25
verified 208:13
260:23
verify 208:10
261:3,13
291:11,13
veritext 9:23
14:11 113:4
versa 116:10
194:7

version 44:25
256:6,15 258:3
258:12,15
262:17
versioning
171:17
versions 44:23
44:24 172:1
255:25
versus 36:9
43:5,5 46:17
57:20 64:9
90:8 115:5
119:19 195:19
196:16 211:14
239:21 244:9
248:21 250:25
292:23 340:24
vetting 19:8
21:8 25:14
27:2 29:25
30:1,15,19
33:15
vice 116:10
194:6
video 1:19 2:18
2:21 283:2,2,7
283:11 330:11
330:12,18,21
330:22,24,25
331:5,8
videographer
9:25 14:5,10
61:7,10 62:13

62:16 112:7,10
185:6,13
246:17,20
248:11,14
338:13,16,19
348:16,21
351:2,5
videos 315:11
316:4,11,11,18
317:6,6,10,14
320:15 321:13
324:20,22
325:19 326:3
viewed 334:15
violations
94:14
viral 114:23
115:11
virtual 75:4
virtually 229:1
visualization
31:4 63:1
visualize 31:8
visuals 58:9
voiceover
282:2
volume 200:21
202:21,23
203:15,15
205:13,14
206:22 209:21
215:15 247:2
293:10 298:19
299:25 301:19

CONFIDENTIAL

**[volume - week]**                                        Page 87

308:4,6 311:3
327:24 342:22
**voluntary**
85:19
**volunteered**
86:16,20
**votes**  303:13
**vp**  85:24,24
**vs**  1:7,11,14 2:7
2:11,14 353:1
354:1

**w**

**wait**  184:24
197:24 272:20
331:9
**walk**  76:24
**want**  19:25
28:8 51:11
53:16 59:6,21
60:12,17 66:25
82:3 95:5
98:16,16 99:18
122:3 135:7,13
136:23 137:2
137:10,19,20
138:6,15,21
140:12 179:5
179:13 183:2
194:12 197:25
198:5 208:22
209:10 246:9
246:11 249:5
258:24 261:20

276:24 299:5,6
310:3 316:21
317:16 318:4
335:21 348:15
**wanted**  99:16
108:2 130:7
139:2 199:19
201:7 207:22
227:16 228:3
233:10 254:6
256:8 259:7
262:3 265:22
272:2 288:18
343:24 344:15
348:24
**wants**  59:9
**washington**
5:10 6:8
**way**  39:8 44:7
45:22 46:3,15
46:22 49:3
54:20 55:1,25
57:15 64:25
65:7,18 76:15
89:13 90:16
91:15 92:9,11
92:12 95:24
97:3,8 98:15
99:6,10 100:16
100:20 119:12
143:10 147:1
166:7,16
171:24 185:18
190:21 191:3

193:17 194:8
194:11 200:4,5
201:19,23
202:4,7,9
207:2 211:6
221:4,18,22,23
222:2 227:12
239:3 241:20
243:12,13
248:20 249:9
253:22 254:17
260:8,11,14
261:11 262:4,7
262:24 263:3
263:10,10
266:1,14
282:13 283:17
296:14 298:2
299:17 308:11
319:23 320:5,6
320:10 325:2
330:1 335:17
341:3
**wayfarer**  1:8
1:13 2:8,13 7:2
8:2 9:2 11:3
12:3 13:3 14:8
17:20,25 18:8
18:13,18,21
28:18 45:21
353:1 354:1
**wayfarer's**
28:23

**ways**  49:17,20
91:17,19
100:20 102:14
103:8,10
115:12 116:17
116:18,21
194:4 198:24
226:13,16
227:11,13
273:16 276:25
**we've**  16:9
30:12 60:10
104:7,8,16
107:5 108:20
109:10 112:18
114:14 115:18
121:12 146:25
156:8 222:4,4
246:5 310:24
338:15
**webb**  12:8
**weber**  6:14
**website**  85:5
162:17 163:6
164:7
**websites**  302:4
**week**  15:25
17:13 60:7,7
71:1,3 77:2
78:4,5 79:22
79:25 80:3,7
80:10,11 81:16
268:16 270:4
298:6 299:18

CONFIDENTIAL

**[week - witness]** Page 88

| | | | |
|---|---|---|---|
| 299:19 | **witness** 10:2,10 | 116:16 120:9 | 176:15 177:13 |
| **weekday** | 14:11,22,25 | 120:17,20 | 178:8,15,25 |
| 295:10 | 15:12 19:10,25 | 121:8 123:14 | 179:16 180:3 |
| **weekly** 268:20 | 20:24 24:3,6 | 126:15 127:14 | 180:25 181:9 |
| 346:5 | 24:23 26:9 | 129:20 130:1 | 182:20 183:9 |
| **weeks** 17:9 | 27:16 30:23 | 130:10,19 | 183:25 184:7 |
| 26:18 77:10 | 33:21 38:9 | 132:8 133:11 | 186:19 187:20 |
| 79:16,18,19,20 | 41:2,3,5 42:25 | 133:22 134:2 | 188:1 189:8 |
| 79:23 80:11,14 | 44:3 47:1,11 | 135:6,20 136:5 | 190:21 191:25 |
| 81:15 166:25 | 48:10,18 49:10 | 137:10 139:12 | 193:17 194:25 |
| 167:3 298:12 | 49:17 51:13 | 140:5 141:17 | 195:2,22 196:5 |
| 298:12,13 | 53:5 55:1,10 | 142:4 143:8 | 197:2 201:15 |
| **weird** 309:5 | 55:18 56:18 | 144:2,7 145:22 | 202:13 203:23 |
| **went** 36:6 | 57:1,13 59:6 | 145:24 149:2,7 | 204:8,20 |
| 62:10 125:10 | 59:12,21 60:2 | 150:4,17,25 | 205:21 206:3 |
| 183:10,11 | 64:23 65:20 | 151:6,12,19,25 | 208:13 212:8 |
| 211:17,18 | 66:4 68:21 | 152:6,14 153:8 | 213:2,7 215:9 |
| 260:24 264:3 | 69:18 70:10 | 153:16,22 | 219:11,21 |
| 275:3 288:6 | 72:1,15 73:7 | 154:8,15,22 | 220:13 221:21 |
| 291:16 346:19 | 73:16 74:2 | 155:4 156:19 | 222:17 225:16 |
| 346:22 348:8 | 75:1 76:3 77:7 | 157:2,9 158:2 | 226:19,25 |
| **west** 7:9 | 77:23 80:3,9 | 158:15 159:4 | 227:8,25 228:7 |
| **whatsapp** | 80:19 82:10 | 159:13,22 | 228:12 230:20 |
| 84:19 | 83:7 86:13,24 | 161:2,6 163:10 | 232:14 233:1 |
| **wide** 53:17 | 87:5 90:14 | 163:16 164:6 | 234:24 235:24 |
| **willkie** 5:4 | 91:23 93:18 | 164:14 165:1 | 238:9 239:2 |
| 14:17 | 94:3,21 95:16 | 166:12,14 | 240:8 241:1,22 |
| **willkie.com** | 96:17,23 98:9 | 168:2 169:6,13 | 242:14 243:6 |
| 5:11,12 | 99:25 100:19 | 169:22 170:5 | 243:19 246:13 |
| **window** 231:17 | 101:22 102:12 | 170:16,23 | 247:10 252:1 |
| **withdraw** | 102:20 103:8 | 171:5,16 | 252:18 253:12 |
| 78:21 99:19 | 104:5 105:5,21 | 173:20 174:3 | 255:14,25 |
| **withdrawing** | 107:5 108:6,11 | 174:18 175:6 | 256:5,13 257:2 |
| 99:19 | 108:18 116:6 | 175:11,24 | 257:16 258:14 |

| | | | |
|---|---|---|---|
| 258:19 259:3 | 316:21 318:4 | 29:11,16 30:13 | 153:25 162:22 |
| 259:11 260:4 | 319:1,7 322:9 | 31:1,9 35:2 | 258:2,7,8,9 |
| 260:11,18 | 323:22 324:9 | 36:8,10,25 | 311:13 |
| 261:17,24 | 328:7 331:21 | 38:19,20 43:10 | **writing** 43:5,8 |
| 262:7,16,23 | 332:2 333:2 | 43:23 44:9 | 43:24 44:15,18 |
| 263:7,13,25 | 334:11 335:3 | 54:8 56:9,10 | 46:18 118:18 |
| 264:15 266:1,9 | 335:20 336:3 | 58:2 77:13 | 118:24 119:8 |
| 266:20 267:11 | 337:16 347:13 | 87:12,14 88:16 | **written** 124:5 |
| 267:20 268:2 | 352:7,8 | 88:22 96:4,6 | 191:10 283:13 |
| 269:13 270:14 | **women** 23:17 | 104:6,15 | 319:1,2 |
| 271:2,10 272:5 | **wonder** 230:25 | 123:19 155:20 | **wrong** 48:6,6 |
| 273:11 274:15 | **wondering** | 160:11 164:15 | 130:11 145:25 |
| 274:25 275:12 | 86:18 346:17 | 196:5 199:25 | 197:11 270:2 |
| 276:3 277:16 | **woolley** 152:18 | 213:20,21 | 285:8 |
| 277:21 278:25 | 152:21 153:5 | 240:21 242:5 | **wrote** 55:5 |
| 279:5 281:8 | **word** 29:25 | 261:18 263:14 | 124:3,7 155:12 |
| 283:9 284:12 | 44:20 45:16 | 263:17 268:18 | 155:13 163:7 |
| 286:20 287:20 | 55:5 143:20 | 268:25 319:5 | 167:17 258:4 |
| 290:16 291:10 | 154:2 163:16 | 339:19 350:12 | 284:19,21 |
| 291:24 292:5 | 163:18 177:24 | **worked** 29:4,22 | 311:19 |
| 292:12,19 | 199:23 212:10 | 125:10 191:4 | **wtf** 270:2 |
| 293:1,9,20 | 214:5,6,10,13 | 246:8 | **x** |
| 296:20 297:4 | 233:8 248:5 | **working** 54:19 | **x** 12:7,9 177:17 |
| 297:12 298:16 | 277:3 318:17 | 69:13 79:18,20 | 239:10 243:13 |
| 299:2,22 | 318:20,20 | 84:21 128:14 | **y** |
| 300:10 302:2 | 339:6 346:10 | 213:9 | **y** 28:25 |
| 304:15,21 | 349:12 | **works** 32:9 | **yeah** 22:9 38:1 |
| 305:17 306:7 | **words** 47:17 | 84:16 275:13 | 60:13,14,19 |
| 306:13,23 | 89:19 166:5 | 276:4 | 68:1 69:5 75:4 |
| 308:2,22 | 194:16 195:19 | **world** 89:20 | 85:11 86:16 |
| 310:10 311:18 | 205:7 214:5 | 221:19,21 | 107:9 158:19 |
| 312:6,25 313:7 | 234:2 250:25 | **write** 46:21 | 167:4 169:16 |
| 313:17 314:14 | **work** 25:15,21 | 54:21 55:25 | 175:12,24 |
| 315:19,25 | 27:10 29:3,5,9 | 56:4 113:24 | |

CONFIDENTIAL

**[yeah - zotero]** Page 90

181:23 209:9
222:1 246:4,7
248:9 263:3
265:4 268:18
281:18 282:6
296:8 308:25
329:20 330:22
331:7 345:23

**year** 30:12 41:6
143:11

**yearly** 211:12

**years** 25:4,9,13
25:19 32:11
69:4 70:3
75:12 78:2
79:5 84:6,7
117:25 118:22
161:16 213:19
257:19 278:21
314:2

**york** 1:2,21,21
2:2 9:9,9 79:13
194:17

**youtube** 13:9
13:10,12
177:18 216:3
217:8 241:13
243:12,22,24
245:9,10,17
325:6,16,17,22
329:6,9,17,21
334:7 335:14
336:14 337:20

**youtube's**
331:3 332:19
333:12

**yup** 118:15
128:14 198:4
220:6 232:17
280:16 325:1
329:14 346:11

**z**

**z** 127:4

**zelenskyyua**
270:4

**zero** 151:3
273:24

**zhu** 145:4

**zip** 259:25
345:6

**zone** 225:12

**zoom** 26:25
46:13 61:4
62:5,9 67:14
148:7 248:13
272:14 281:21
282:13

**zotero** 126:23
127:3 154:4

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.