# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

BLAKE LIVELY,

                    Plaintiff,

v.

WAYFARER STUDIOS LLC, JUSTIN BALDONI,
JAMEY HEATH, STEVE SAROWITZ, IT ENDS
WITH US MOVIE LLC, MELISSA NATHAN, THE
AGENCY GROUP PR LLC, and JENNIFER ABEL,

                    Defendants.

------------------------------------------------------------------- x

JENNIFER ABEL,

                    Third-Party Plaintiff,

v.

JONESWORKS LLC,

                    Third-Party Defendant.

Civ. Action No. 1:24-cv-10049-LJL

Related to:
Civ. Action No. 1:25-cv-00779-LJL

## <u>INITIAL EXPERT WITNESS DISCLOSURE (Fed. R. Civ. P. 26(a)(2))</u>

Pursuant to Federal Rules of Civil Procedure Rule 26(a)(2) Defendants Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, The Agency Group PR LLC and Jennifer Abel ("Defendants") disclose the following retained expert:

1.      Defendants intend to call James Haggerty as an expert witness at the time of trial of this action.

1

461892.1

2. Mr. Haggerty is expected to testify at trial regarding the facts and opinions contained in his report attached hereto as Exhibit A.

Dated: October 17, 2025
Los Angeles, CA

**LINER FREEDMAN TAITELMAN
+ COOLEY**

By:___*/s/ Ellyn S. Garofalo*_____
        Bryan J. Freedman
        Ellyn S. Garofalo
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Tel: (310) 201-0005
Email: bfreedman@lftcllp.com
        egarofalo@lftcllp.com

**MEISTER SEELIG & FEIN PLLC**
        Mitchell Schuster
        Kevin Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
Email: ms@msf-law.com; kaf@msf-law.com

2

461892.1

# EXHIBIT "A"

strategic communications consulting

# PRCG | **Haggerty** LLC

**Expert Report**

**of**

**James F. Haggerty**

**CEO, PRCG Haggerty LLC**

October 10, 2025

45 BROADWAY / SUITE 3140 / NEW YORK, NY 10006 / t 212 683 8100 / prcg.com

2

**Contents**

I.      Summary of Qualifications                                                    3

II.     The Assignment                                                              6

III.    Parties and Factual Background                                              7

IV.     Materials Reviewed                                                          9

V.      Summary of Findings                                                         11

VI.     An Overview of Crisis Communications and Scenario Planning                  12

        a.  Initial Analysis
        b.  Scenario Planning for Potential Crises
        c.  The "Baseline Response"
        d.  Media Monitoring
        e.  Misperceptions about the Field of Crisis Communications

VII.    Application of these Principles to this Case                                21

        a.  Analysis of the TAG "Scope of Work" Document
        b.  The "Scenario Planning" Document
        c.  The Time It Would Take to Create a Digital Marketing Program
        d.  Tools Purporting to Measure Positive and Negative Media Mentions

VIII.   Conclusion                                                                  31

Exhibit A: James F. Haggerty Curriculum Vitae                                       33

Exhibit B: The Agency Group (TAG) Scope of Work                                     40

Exhibit C: "Scenario Planning – It Ends With Us" document                          42

3

This report has been prepared in connection with *Lively v. Wayfarer Studios LLC et al.* (Case No. 1:24-cv-10049) and related proceedings.

### I.    Summary of Qualifications

My name is James F. Haggerty. I am President and CEO of PRCG | Haggerty LLC, a New York-based public relations firm with an international reputation in crisis communications, litigation communications, and other sensitive reputational communications situations.

I am also an attorney admitted in two states (New York and Florida) and the author of several books on communications topics. I served as a columnist for *American Lawyer's Corporate Counsel* magazine from 2011 to 2014, writing a column on the interplay among media, legal and crisis issues, and reputation. Over the years, I have also authored articles, whitepapers, and other material on communications topics, which have appeared in publications that include *USA Today,* the *National Law Journal, The New York Law Journal, Business Law Today* (American Bar Association), *Forbes, Fortune, Entrepreneur* and other publications. I am an Adjunct Professor of Law at Stetson University College of Law in St. Petersburg, Florida, teaching a course entitled "Advocacy in the Court of Public Opinion." I am also President of Reputation Advisors International (RAI), a global nonprofit business association of senior communications professionals in 13 cities around the world.

I have been involved in public relations work, including crisis, litigation and other areas of sensitive communications, since 1985, and in my present firm (which I own) since 1993. By at least the mid-1990s, I began to specialize in crisis communications, litigation communications and related fields.

This report is based on my public relations, crisis communications and litigation communications experience, which has been developed over the course of 30-plus years. Over the

4

years, I have worked in government, and with public companies, private companies, nonprofit organizations, labor unions and high-profile individuals. I work every day with clients on public perception, reputation management and related strategy during critical communications situations.

It should be noted, however, that I am not a celebrity publicist, and I have never testified as an expert witness at trial or by deposition. That said, in the past three decades, I have been involved in some of the largest lawsuits of their kind in history, including (where it is not a violation of client confidentiality, I refer to specific cases):

- The largest single-family Holocaust restitution claim, over key parcels of land in central Berlin—including the land upon which a portion of Hitler's bunker was built (the *Wertheim Department Store* litigation);
- The largest class action lawsuit ever filed against the United States government (the *Cobell Indian Trust* case);
- At the time, the largest divorce and child custody case in history (*Duff v. Perelman*);
- One of the largest global financial fraud investigations in history;
- At the time, the largest intellectual property verdict and appeal;
- Several of the largest antitrust cases in history;
- The largest bankruptcy in post-war German history, involving one of Europe's preeminent media companies; and
- At the time, the largest employment discrimination class action in history.

My firm has also worked on a host of other sensitive and highly charged cases involving (among other areas): financial services, product liability, defamation and First Amendment issues, real estate, organized labor, sexual harassment, intellectual property, money laundering and bribery, trusts and estates and family succession, bankruptcy, and international espionage.

My work is well-known and recognized both nationally and internationally. I have been repeatedly named by London-based international legal directory *Chambers & Partners* as one of the top communications professionals in the United States. Over the years, reviews in *Chambers* have called me a "powerhouse" who "thinks on a different level," bringing a "double barrel of legal and media experience" to my work.

5

In 2017, *PR News* named me to its list of "50 Game Changers" for my work as a "trailblazer" in litigation communications.

In 2023 *Business Insider* named me as one of "18 top public-relations experts CEOs scramble to hire in a crisis."

I am the author of two notable books in the communications field. The first, *In the Court of Public Opinion: Winning Strategies for Litigation Communications,* was first published in 2003 by John Wiley & Sons. The book deals specifically with communications during lawsuits and other legal disputes. The second and third editions of *In the Court of Public Opinion* were published in 2009 and 2019 by the American Bar Association. I eventually took back the rights to the book and published a new third edition through Hart + Harvest Press, a publishing imprint I own.

*Financial Times* called the first edition of *In the Court of Public Opinion* "the perfect handbook for this age of show trials." It has been positively featured and/or reviewed in such publications as *The New York Law Journal, PR Week, O'Dwyer's PR Services Report,* the *Boston Herald,* and *The Champion,* a publication of the National Association of Criminal Defense Attorneys. In addition, the public relations trade publication *Holmes Report* noted that I "literally wrote the book on Litigation PR."

In 2017, I wrote *Chief Crisis Officer: Structure and Leadership for Effective Communications Response,* published in hardcover by the American Bar Association, which more broadly focused on—in this age of instantaneous media and social media—having the leadership and planning in place *before* a crisis hits. In 2019, a paperback edition was published, with a new preface. As with *In the Court of Public Opinion,* I eventually retook the rights to *Chief Crisis Officer* and published a new paperback edition, with a new preface, in 2023.

6

*Chief Crisis Officer* has been positively featured in media that include the *Harvard Business Review, Fortune* magazine, and *Entrepreneur.* In its review, *Harvard Business Review* noted that, to prepare properly for negative reputational events:

> In *Chief Crisis Officer,* [Haggerty] suggests that companies take three preemptive steps: designate an insider who will manage any situation that might arise (not the CEO, but someone trusted enough to make a big decision—such as the CEO's Chief of Staff, an experienced PR hand, or an assistant general counsel); appoint a rapid response team to help that person; and give that team some scenario training.[1]

> *Chief Crisis Officer* was also featured in the book *Collaborative Crisis Management*

(University of Chicago Press, 2022), by Thomas A. Cole and Paul Verbinnen, which notes that:

> Haggerty outlines a process he calls "A.C.T.," which stands for "Assess, Create, and Train," as the best way to be prepared: "Assess potential crises and the teams that will handle them; Create a plan of action that includes the checklists, templates, and other resources you will need in the event of a crisis; and, train the crisis team as well as the broader team where applicable, and table top virtual scenarios to ensure the plan is executed properly in a variety of situations."[2]

In this report, I will call upon the material in both *In the Court of Public Opinion* and *Chief Crisis Officer* (along with many other sources) to discuss, among other issues, standard practices in the public relations industry when dealing with sensitive reputational situations, and the importance of being prepared for response before a crisis occurs.

My full curriculum vitae (CV), attached as Exhibit "A," provides additional details on my background and qualifications.

**II. The Assignment**

I have been retained by Liner Freedman Taitelman + Cooley LLP, on behalf of its clients, to prepare a report on crisis communications planning, scenario planning, and standard public

---

[1] McGinn, Daniel, "Leading, Not Managing In Crisis," *Harvard Business Review*, November-December 2017, page 164.
[2] Cole, Thomas and Verbinnen, Paul, *Collaborative Crisis Management* (University of Chicago Press, 2022), page 165 (Apple Books).

7

relations practice when facing potentially negative reputational events. I was asked to provide an analysis of best practices in the field of public relations and its sub-category, crisis communications, as well as the reasons for undertaking these best practices to minimize reputational risk and prevent damage to personal and organizational brand. I have reviewed the "Scope of Work" document prepared by The Agency Group (TAG), a crisis communications firm, and a document entitled "Scenario Planning—It Ends With Us," prepared by TAG, and publicly available documents.[3] [4]

I have not worked with either law firm in the past, nor have I ever met or worked with any of the parties in this litigation.

The analysis presented is up to date as of October 10, 2025. I reserve the right to amend or supplement my opinions if new information becomes available.[5]

### III.    Parties and Factual Background

The facts of this case are covered exhaustively in the legal filings and will not be repeated at length here. Following, however, is my understanding of the relevant facts and claims:

This lawsuit (and related actions) involves disputes between Blake Lively, an actress, and Justin Baldoni, an actor. Ms. Lively and Mr. Baldoni both starred in the film *It Ends with Us*.[6] The

---

[3] I was assisted in the preparation of this report by my colleagues at PRCG | Haggerty LLC and its affiliated consultants, whom I supervised. Throughout my report, the word "I" is used to refer to work conducted by myself, assisted by these colleagues, under my direction.

[4] For the purposes of writing this report, I am being compensated at a rate of $925 per hour. I will be compensated at a rate of $1,100 per hour for deposition and/or trial testimony. My compensation is in no way contingent on the nature of my findings, the presentation of my findings in this report or subsequent testimony, or the outcome of this or any other proceeding. I have no other interest in this proceeding.

[5] Throughout this report, the sources I cite use the terms "organization," "company," "corporation," "CEO," or "brand" in different circumstances. As described in my book, *Chief Crisis Officer*, while there are differences, the general concepts and standards of practice remain the same regardless of the individual or entity. A high-profile actor, for example, may be—at the same time—an individual, a brand, and a company official: "You are very much a business and a brand of your own. All of those around you. . . need to be skilled in the management of crisis events and you should have a personal crisis response plan in place for that Tweet, social media post or other public action that can threaten your brand and your livelihood." *Chief Crisis Officer,* page xviii.

[6] Ms. Lively is referred to by name in this report, while her attorneys are usually referred to as "Lively attorneys."

8

movie was co-produced by Wayfarer Studios LLC (Wayfarer), where Mr. Baldoni serves as co-Chairman (Sony Pictures Entertainment was another producer).

Along with Mr. Baldoni, Steve Sarowitz is a co-founder of Wayfarer. Jamey Heath is the Chief Executive Officer of Wayfarer. The Agency Group PR LLC ("TAG") is a public relations firm specializing in crisis communications that was hired to work with Mr. Baldoni and Wayfarer, with Melissa Nathan its founder and head. Jennifer Abel is a publicist for Wayfarer and Mr. Baldoni. All of these parties are defendants in the Second Amended Complaint filed by Ms. Lively in this action, and are referred to at various times in this report as the "Wayfarer parties."

On or about August 2, 2024, Wayfarer retained TAG to provide crisis-management services to the other Wayfarer parties. At the time of their hiring, rumors were swirling regarding issues during the filming of *It Ends With Us*, and strife between Ms. Lively and Mr. Baldoni. In the weeks leading up to the August 6, 2024, premiere of *It Ends With Us,* Ms. Lively and others "unfriended" Mr. Baldoni on social media, and Mr. Baldoni was not allowed to be seen with Ms. Lively at the premiere.

Just after the premiere of *It Ends With Us,* news broke of the rift between Ms. Lively and Mr. Baldoni, and the dispute became a major media and social media story.

On December 20, 2024, Ms. Lively filed an administrative complaint with the California Civil Rights Department ("CRD"), alleging sexual harassment and other abuses by Mr. Baldoni and Wayfarer during the production of *It Ends With Us.* Synchronized with this filing, *The New York Times* published a story (with accompanying video) entitled "'We Can Bury Anyone': Inside

9

a Hollywood Smear Machine," which provided details of the CRD complaint and Mr. Baldoni's alleged actions, as well as material taken from Ms. Abel's personal mobile phone.[7]

On December 31, 2024, Ms. Lively filed a complaint in this action, making similar allegations. Of relevance to this report, in the instant action Ms. Lively claims that TAG was retained *not* to provide standard crisis communications services given the perceived threat of reputational damage but rather to engage in "a sophisticated press and digital" campaign to smear her in retaliation for the exercise of her rights to speak up about Wayfarer's misconduct on set. The work of TAG and others working on Wayfarer's behalf is described as a "smear campaign," and—it is alleged in the SAC—is not in keeping with standard practices in the public relations industry and in its sub-category, crisis communications.

## IV.    Materials Reviewed

For the purposes of this study, the following relevant documents were reviewed:

- Ms. Lively's Second Amended Complaint in this action (Docket No. 521);
- The First Amended Complaint of the Wayfarer parties (Docket No. 50), along with attached exhibits;
- A document entitled "Scope of Work," prepared by The Agency Group and presented to Jamey Heath and Tera Hanks, dated July 26, 2024;
- A document entitled "Scenario Planning—*It Ends With Us*," which was attached as Exhibit "D" to the aforementioned Second Amended complaint;
- The September 25, 2025, deposition of Jennifer Abel;
- The September 26, 2025, deposition of Jennifer Abel; and
- The September 29, 2025, deposition of Melissa Nathan.

To complete this analysis, I have also consulted a variety of books, studies, and other sources to accurately describe the subject matter of this report—i.e., the practice of crisis

---

[7] Meghan Twohey, et.al., "'We Can Bury Anyone': Inside a Hollywood Smear Machine," *New York Times*, December 21, 2024, https://www.nytimes.com/2024/12/21/business/media/blake-lively-justin-baldoni-it-ends-with-us.html?searchResultPosition=1 (last accessed October 7, 2025).

45 BROADWAY / SUITE 3140 / NEW YORK, NY 10006 / t 212 683 8100 / prcg.com

10

communications, when it is utilized, the ethical dimensions, and why it is deemed essential for

organizations and individuals for the practice of reputational risk management.[8]

---

[8] As discussed, this review of the literature in the field includes my own two books, *In the Court of Public Opinion: Winning Strategies for Litigation Communications, Third Edition* (Hart + Harvest Press, 2022), and *Chief Crisis Officer: Structure and Leadership for Effective Communications Response* (Hart + Harvest Press, 2023).

11

## V.    Summary of Findings

After reviewing the information provided in this case, performing independent research and analysis, and drawing on my own professional background in the field of crisis and legal-related communications, I am prepared to testify as to the following:

a. **Crisis Communications management in the face of reputational risk has long been an accepted, ethical, and standard practice to mitigate potential issues in the media, in social media and before other key audiences.** In a modern media age, lack of preparedness can greatly accelerate a reputational crisis. Thus, the lack of crisis communications planning can be highly damaging to brand and reputation.

b. **Rather than evidence of nefarious intent, the hiring of a crisis management consultant is ethical, prudent, and standard practice.** Popular media and misinformation regarding the role of the crisis communications manager feed the inaccurate and negative perception of these professionals.

c. **The "Scope of Work" agreement prepared by TAG, and the subsequent "Scenario Planning" document, are in keeping with standard practice in the crisis communications field as evidence of <u>reactive</u> crisis planning.**

d. **Effectively changing public opinion in media and social media tends to take weeks or, more often, months.** It is highly unlikely that negative reputational sentiment could have been artificially created over the course of mere days.

e. **Tools to measure media and social media "sentiment" are sometimes less effective during crises, litigation, or other sensitive, dispute-related public issues.** There is a need, therefore, to drill down on the data, particularly when attempting to discover causal relationships.

12

## VI.    An Overview of Crisis Communications and Scenario Planning

### a.    Initial Analysis

For the purposes of this report, it is important to understand the field of crisis communications and scenario planning and its importance to ensuring reputational risk management for organizations of all sizes, as well as for high-profile individuals who might find themselves thrust into the unwanted glare of a media or social media spotlight.

Reputation is an essential element of brand: "…reputation plays a critical role in shaping stakeholder perceptions and influencing business outcomes in the modern business landscape."[9] An essential element of reputation management is crisis communications planning,[10] which is considered "crucial for managing and mitigating the impact of unexpected events on corporate reputation, operations, and stakeholder trust."[11] A 2004 book by Harvard Business School Press puts it well:

> A crisis is a change—either sudden or evolving—that results in an urgent problem that must be addressed immediately. For a business, a crisis is anything with the potential to cause sudden and serious damage to its employees, reputation or bottom line.[12]

In my book *Chief Crisis Officer,* I define a crisis as follows: "an unstable or critical state of affairs that threatens to have an undesirable or negative impact on an organization's reputation, business or goals."[13]

Another pre-eminent practitioner in the field puts it this way:

---

[9] Nuortimo, Harkonen, and Breznik, "Exploring corporate reputation and crisis communication," *Journal of Marketing Analytics,"* October 3, 2024.
[10] Id.
[11] Id.
[12] *Crisis Management: Master the Skills to Prevent Disasters* (Harvard Business School Press, 2004). (hereinafter "Harvard Business School"), page xvi.
[13] *Chief Crisis Officer,* page 5.

13

For an event or situation to deserve the label "crisis," it should be an existential threat, have a realistic risk that it could evolve into that kind of threat or, at least, have the potential to cause severe and lasting financial or reputational damage.

Sometimes, it is hard to tell at the outset whether a bad event or situation is, or has the potential to mature into, a crisis. Many people will hesitate to express a view along those lines, lest they be labeled "Chicken Littles." But it is better to calmly anticipate that potential than to, Pollyannaishly, be caught flatfooted.[14]

In my work and writing, I tend to put crises into two categories: the "exploding" and the "unfolding."[15] The exploding crisis will often be a physical crisis, such as an accident, incident of violence, or natural disaster. The unfolding would include things such as legal matters, litigation, and investigations, as well as negative reputational attacks of any sort, either by an organized opposing party (such as a litigant in a lawsuit) or by unorganized members of the community, through statements in traditional media or through social media and other technology-based platforms.[16]

The elements of effective crisis communications response generally include:

- A risk assessment to determine potential vulnerabilities, whether as a general matter, or when rumored or suspected threats to reputation are perceived;

- Scenario planning for various eventualities, should they occur, including a strategy, overall goals, objectives, and tailored messages;

- Effective media and social media monitoring to ensure the company, high-profile individual, organization, or other entity understands the current state of perceptions and trends that might indicate either of the growth or downward trend, of a crisis event, as well as to identify false information that needs to be corrected or misconstrued information for which context needs to be provided.[17]

---

[14] Cole, Thomas, and Verbinnen, Paul, *Collaborative Crisis Management: Prepare, Execute, Recover, Repeat* (University of Chicago Press, 2022).
[15] *Chief Crisis Officer*, page 6.
[16] Id.
[17] An excellent overview of the key elements of an effective crisis response plan can be found in a book by two of my colleagues, Jim Rocco and Thom Weidlich, in a field that shares much in common with entertainment: sports. See *Sports Crisis Communications: Cases and Controversy* (Hart + Harvest Press, 2025), pp. 23-33.

14

Ideally, such a plan also includes a "rapid response" component: that is, a structure and chain of leadership that allows the crisis response to move quickly in the face of rapidly moving events, with a proper plan, proper messages, and proper execution.[18]

Through all disciplines and all types of organizations—corporate, nonprofit, individual, public or private companies in the fields of industry, media, professional and financial services, sports and entertainment, or others—crisis communications is a standard, acceptable, and ethical practice to minimize risk by ensuring a coordinated and timely response to a negative reputational event. Indeed, the lack of effective crisis planning can put an entity in an extremely precarious position. As one commentator notes, "If you do not have a quick and effective crisis communication plan in place, the press will fill that 'media vacuum' with information, comment or opinion, which does more to sell their story and less to protect your business."[19] Or as I put it in *Chief Crisis Officer:* "I would equate [having no crisis communications plan in place] to sending your team onto the field, and only then making up the plays. You may win the game... but I wouldn't bet on it."[20] Other experts point out that the first step is to answer the question "What kinds of crises should we be preparing for?"[21]

Finally, as described in much of the literature cited in this report, effective crisis communications planning is an ongoing process. As mentioned in Section I, I prefer a system I call "A.C.T.," which stand for Assess, Create, and Train:

---

[18] See, generally, Chapter 4 of my book *Chief Crisis Officer,* "Rapid Response: Where BP and Target Went Wrong . . . and Where You Can Go Right," p. 77, *et. seq.*
[19] Anthonissen, Peter. *Crisis Communication: Practical PR Strategies for Reputation Management & Company Survival* (Kogan Page Ltd., 2008,) page 26.
[20] *Chief Crisis Officer,* page 1.
[21] Cole and Verbinnen, page 15.

15

# A.C.T.



**Train:**
To ensure the
Crisis Plan
actually works

**Assess:**
Potential Crises,
and the best
team for the job

**Create:**
A plan for
efficient and
effective
response.

As described in *Chief Crisis Officer,* A.C.T. is a continuous cycle during which you:

- Assess potential crises and the team(s) who will handle them;
- Create a plan of action that includes the checklists, templates, and other resources you will need in the event of a crisis; and
- Train the core team, as well as the broader team where applicable, in tabletop or other virtual scenarios to ensure the plan is executed properly in a variety of situations.[22]

### b.    Scenario Planning for Potential Crises

As systems like A.C.T. and others outlined in the crisis communications literature show, it is critical to understand that a crisis communications plan is not a description of what you *are* doing, but rather a plan of action for what you *will* do *if* certain events occur. A central element of the crisis communications plan, therefore, is "scenario planning," sometimes called "contingency planning." According to the Harvard Business School's book *Crisis Management: Master the Skills to Prevent Disasters*:

> Contingency planning involves organizing and making as many decisions as you can *before* a crisis occurs. Precrisis planning gives people the time they need to consider all options, think things through, discuss the merits of different reactions, and even test their preparedness to act. Each of those tasks is much easier to do in normal times, but difficult and stressful to do in the middle of a crisis. Every contingency plan should include a communication plan—one capable of speaking to stakeholders.[23]

---

[22] *Chief Crisis Officer,* page 54.
[23] Harvard Business School, page 41.

16

Similarly, Thomas Cole and Paul Verbinnen, in their book *Collaborative Crisis Management:*

*Prepare, Execute, Recover, Repeat,* state:

> When a crisis does occur, communications become easier once the inner circle agrees about the course of action. The people who are impacted want to know what happened, why you think it happened, and what you are going to do about it. If you don't have such alignment, your crisis management and crisis communications efforts are doomed.[24]

Cole and Verbinnen add: "Informed by these general understandings, it is easy to see that

taking concrete steps to prepare for crisis scenarios, long before an actual crisis occurs, is a

worthwhile exercise."[25]

Jonathan Bernstein, a crisis communications specialist and former director at Ruder Finn Inc,

one of the largest public relations firms in the country, writes in his 2011 book *Manager's Guide*

*to Crisis Management:*

> [...] gather your team for long brainstorming sessions on all the potential crises that can affect your organization [...] [y]ou can begin to think about possible responses, about best/worst case scenarios, etc. Better now than when under the pressure of an actual crisis.[26]

Further, under a heading entitled "Before it Becomes Public," Bernstein adds, regarding the

pitfalls that occur in the absence of planning:

> Don't make the mistake of only starting work on a potential crisis after it becomes public. Even if you've decided you won't play ostrich, you can still foster your developing crisis by deciding not to do any advance preparation. Before the situation becomes public, you still have some proactive options available. You could, for example, thrash out and even test some planned key messages so that you'll communicate promptly and credibly when the crisis breaks publicly. This will help avoid addressing the issue from a defensive posture. Use the scenarios you've developed as the basis for all forms of training and drills [...][27]

---

[24] Cole and Verbinnen, page 136.
[25] Id., page 14.
[26] Bernstein, Jonathan, *Manager's Guide to Crisis Management* (McGraw Hill, 2011), page 24.
[27] Id., page 25.

17

Or as another experienced practitioner in the field (who is also one of my colleagues and collaborators), Eric Rose of EKA PR, wrote more recently: "No plan can prevent every crisis. But a culture of preparedness—anchored by clear values, trained spokespeople, real-time risk monitoring, and tested communications plans—makes all the difference."[28]

### c.    The "Baseline Response"

Very often in crisis situations, the right decision is to do as little as possible except plan, monitor, and have a strategy ready in case a crisis occurs. I write about this and the importance of what I have called a "Baseline Response" in my book *In The Court of Public Opinion*:

> Any case that lends itself to media interest, even at low levels, needs to have a baseline response—that is, a minimal level of preparedness to handle whatever public scrutiny may come your way [...] This will vary depending on your circumstances, but in general, such a baseline media response usually consists of:
>
> - A strategy memo outlining possible responses,
> - Development of the "message"—a written statement or message points that allow your spokesperson to respond effectively, and
> - Media and social media monitoring so that you can immediately identify any increase in media interest in your story and respond accordingly.[29]

### d.    Media Monitoring

The practice of media monitoring and producing "daily sentiment reports" on behalf of clients—and analyzing (or even cheering) such results—is a standard practice. Sometimes this includes tabulating what are called "sentiment reports" for clients as well.

Indeed, you would be hard-pressed to find a public relations firm that *isn't* monitoring media on behalf of clients and reporting back with analysis of what has been written.

---

[28] Eric Rose, "What to Do When Things Go Wrong: Protecting the Brand," EKA PR, August 2025, https://www.ekapr.com/wp-content/uploads/2025/08/what-to-do-when-things-go-wrong_protecting-the-brand_2025-updated-.pdf (last accessed October 7, 2025).
[29] *In the Court of Public Opinion*, page 156.

18

Many of the main textbooks in the public relations field make this point explicitly. Consider

commentary from a well-known textbook on the subject, *The Practice of Public Relations,* by

Fraser Seitel:

"[…] monitoring the web has become a frontline public relations responsibility."[30]

"[…] this monitoring function, in particular, is a must for any organization."[31]

"Monitoring the internet is another frontline public relations responsibility."[32]

Similarly, *Public Relations Strategies and Tactics, Eleventh Edition,* by Dennis Wilcox, et. al.

(Pearson, 2014), states:

Public relations firms and company departments working primarily on a local basis, for
example, often have a staff members scan area newspapers for client or product mentions
[…] [l]arge companies with regional, national, or even international outreach usually retain
monitoring services to scan large numbers of publications and various internet/social media
sites.[33]

And from a white paper produced by the Institute for Public Relations and Peppercomm titled

"Navigating a Changing Media Landscape":

The shift toward "clickbait" content and the rise of AI-generated media have heightened
the need for vigilance in media monitoring as professionals are increasingly focused on
combating misinformation and disinformation.[34]

Again, based upon my experience, I would say it would be difficult to find a public relations

firm that *doesn't* engage in such practices on behalf of clients. Given the fact that it is standard

legal practice to monitor media, services to assist public relations firms in this effort proliferate.

---

[30] Seitel, Fraser, *The Practice of Public Relations* (Pearson Education, Kindle edition, 2020), page 168.
[31] Id., page 212.
[32] Id., page 223.
[33] Wilcox, Dennis, et. al., *Public Relations Strategies and Tactics, Eleventh Edition,* (Pearson, 2014), page 201.
[34] McCorkindale, Tina, et.al., *Navigating a Changing Media Landscape* (Institute for Public Relations &
Peppercomm, October 5, 2024), found at: https://instituteforpr.org/navigating-a-changing-media-landscape/

19

These include CisionOne[35], Brandwatch[36], Meltwater[37], Prowly[38], and Critical Mention[39]. Many also offer "sentiment reports, which compile positive and negative sentiment using keywords and, increasingly, artificial intelligence."[40]

### e.    Misperceptions about the Field of Crisis Communications

But what is a crisis management consultant, and what is the importance of retaining a such a consultant to confront potential negative reputational events? Consider this statement, from the former head of Crisis Communications and Risk Management at Edelman Public Relations, the largest public relations firm in the world, as reported in my book *Chief Crisis Officer:*

> […] we are the field generals and the surgeons for companies that face destabilizing risk. And in that capacity, we help companies and other entities navigate the unnatural environment that they're thrust into in either high-profile litigation or crisis, which is fundamentally a different business challenge than most companies are equipped to handle.[41]

Unfortunately, however, enormous misconceptions about the field of crisis communications have developed over the past several decades. These misconceptions can lead to the perception that the mere act of hiring of a crisis communications professional is evidence of negative intent. As described in various sources, popular perceptions, influenced by television shows, movies, and

---

[35] https://www.cision.com/lp/p/media-monitoring/
[36] https://www.brandwatch.com/p/social-media-monitoring-tool/
[37] https://www.meltwater.com/en
[38] https://prowly.com
[39] https://www.criticalmention.com
[40] According to Meltwater, for example:
"Sentiment" is a metric, designed to provide useful insight into how audiences feel about and perceive a brand, particularly on social media platforms and in editorial news media. This marketing metric helps brands manage and protect their reputations, while monitoring the online environment […] Sentiment analysis determines whether text is positive, negative, or neutral by extracting particular words or phrases, through opinion mining — and serves as a key component of any advanced analytics. https://www.meltwater.com/en/blog/analyse-sentiment-with-media-intelligence

[41] *Chief Crisis Officer,* page 184.

20

other popular cultural offerings, can sometimes paint a less than accurate picture—and less in favorable picture—of the field.

Consider the following, from an article entitled "The Problem with Crisis Comms: Why Our Presence Sparks Suspicion," published by *The Crisis Communications Network:*

> Our job is to provide strategic counsel, manage reputational risk, and, when necessary, reshape narratives to reflect the truth rather than public misconception. And yet, our existence in a crisis often confirms suspicions that 'something must be wrong.' […] professionals are assumed to be working behind the scenes to salvage reputations at any cost. But this assumption fails to recognise that crisis PR, when done ethically, is about strategy, accountability, and guiding organisations through complex reputational challenges […] most crisis communications professionals know that good crisis management is all about preparation. It seems entirely logical that any diligent CEO might – and arguably should – retain crisis communications experts not just in response to crises, but to prevent them from escalating in the first place.[42]

I also addressed this issue specifically, beginning in 2017, with the first edition of my book *Chief Crisis Officer: Structure and Leadership for Effective Communications Response*, published by the American Bar Association, where I write:

> There is a mythology around the crisis manager—the fixer, the spin-doctor, the operative—forged through movies and television programs over the past few decades. The shady Svengali, moving in the shadows to bury facts, getting the right people to say the right things; the fixer who knows what strings to pull and buttons to push to make a problem go away; the sleek operative dropping an envelope with incriminating photos on a reporter's desk, or trading a good story for a better story not involving their client. I'd love to say that my business works that way—not only would my job be easier, but I personally would seem a lot more interesting. But that's not what we do in the crisis communications business.[43]

More recently, consider the commentary of a crisis communications professional, appearing with several colleagues, on National Public Radio (NPR) in August 2025, when discussing the

---

[42] Soryal, Kaleigh-Anne, "The Problem with Crisis Comms: Why Our Presence Sparks Suspicion," *Crisis Communications Network,* March 15, 2025, https://ciprcrisiscommsnetwork.com/the-problem-with-crisis-comms-why-our-presence-sparks-suspicion/ (last accessed October 4, 2025)
[43] *Chief Crisis Officer*, page xiii.

21

television show *Scandal*, which appeared on the ABC television network from 2012 to 2018,[44] and its misrepresentation of the practice of crisis communications:

> What I like about the fact that *Scandal* aired was that it introduced crisis communications to a wide swath of the general public, but the day in, day outs of folks like Amanda, Molly, and me are probably quite different from Olivia Pope. I can only speak for myself, but I know, you know, I've never had anybody stagger into my office covered in blood, telling me that they woke up next to someone and they don't know what to do with the body, or I can confirm unequivocally that I've never slept with the president of the United States, unlike Olivia Pope [...][45]

> I think, too, the assertion that it's truth twisting, I kind of reject that premise on its face 'cause I think that's a negative sort of way of looking. And I also think people tend to think about crisis communications as they use other disparaging sort of terms like spin doctor, et cetera, damage control. I actually think the inverse is true and the most effective way to manage a crisis is to do something that I would describe as press the truth, which is that you're taking an active role as an organization or an individual in driving a narrative based on the facts.[46]

It has been my experience that once you separate fact from fiction—and reality from the imaginings of scriptwriters—you learn that crisis communication, at its core, is a discipline predicated on ensuring preparedness: i.e., cohesive planning and preparations so that, should a crisis occur, the organization or high-profile brand is better equipped for a timely and appropriate response. Throughout my work as a consultant, writer, and teacher, I have seen many examples of wrong perceptions of crisis communications planning infect popular thinking on these issues.

### VII.    Application of these Principles to this Case

I have analyzed two documents that describe what the crisis communications consultants in this case were assigned to do for the Wayfarer parties: a "Scope of Work" document prepared by The Agency Group (TAG) (Exhibit "B") and a document entitled "Scenario Planning—It Ends

---

[44] https://www.imdb.com/title/tt1837576/ (last accessed October 4, 2025).
[45] "Ask a Crisis Communications Specialist," National Public Radio, August 6, 2025, at 3:13, https://www.npr.org/2025/08/06/1256812304/ask-a-crisis-communications-specialist (last accessed October 4, 2025).
[46] Id., at 3:23.

Case 1:24-cv-10049-LJL    Document 1303-1    Filed 04/10/26    Page 26 of 54

22

With Us," which was Exhibit "D" to Ms. Lively's Second Amended Complaint (SAC). (Exhibit "C").

### a.    Analysis of the TAG "Scope of Work" Document

As to the "Scope of Work" document, my analysis follows:

- TAG's "Scope of Work" document is, by my reading, a standard and appropriate proposal for crisis communication services (following the guidelines above). In fact, I would say this document is "boilerplate"—the type of proposal one might see for any corporate client.

- TAG's goal is clear from the "Overview": It is charged with "protecting the reputation of Justin Baldoni, Wayfarer Studios, and its applicable executives," while navigating through anticipated and unforeseen challenges leading up to the premiere of *It Ends With Us*.

- The "Overview" also suggests that the role of TAG will be to "mitigate references of controversy," which, to me, means minimize any conflict between Mr. Baldoni and Ms. Lively. The "Overview" then goes on to suggest that TAG will also be involved with correcting inaccurate narratives and promoting factual, positive messages in order to balance the coverage.

- Under a section entitled "Crisis Prevention & Mitigation," the "Scope of Work" details all of the normal things that a crisis communications firm does for a client, whether that client is an individual, a business, a public company, or a nonprofit organization. This includes: creating statements, talking points, and background information to reflect the client's core values; preparing scenario planning documents to prepare for various eventualities; considering third parties, unrelated to any potential dispute, who could offer insight and context if needed; and providing input on media inquiries—that is if media should call the Wayfair parties—with the express goal of mitigating negative stories or correcting inaccuracies. Finally, there is a section on monitoring media and social media.

- Under a section entitled "Branding & Messaging," the "Scope of Work" talks about: supporting the Wayfarer parties' existing public relations efforts; researching audiences and understanding their sensitivities; ensuring unified messages; providing input on media inquiries; and monitoring and "flagging" inaccurate and negative stories, to ensure factual accuracy, context and a balanced viewpoint. Finally, the "Scope of Work" mentions media training, which is a standard part of any communications planning effort.

Overall, the "Branding & Messaging" section repeats much of what was in the "Crisis Prevention & Mitigation" section, with additional language regarding working closely with existing public relations consultants. All in all, this is much like any standard statement of work you would expect to see in the public relations field for any client.

45 BROADWAY / SUITE 3140 / NEW YORK, NY 10006 / t 212 683 8100 / prcg.com

23

### b.    Analysis of the "Scenario Planning—It Ends With Us" Document

As to the document entitled "Scenario Planning—It Ends With Us," again, the question presented is whether, in keeping with the general practices in the crisis communications field outlined above, this document is, in any way, out of the ordinary.

As with the "Scope of Work" document prepared by TAG, I believe it is a standard scenario planning document.

My analysis is as follows:

- The "Objective" section of this planning document appears clearly stated: To protect the reputation of Mr. Baldoni and Wayfarer as the *It Ends With Us* premieres (and in the wake of rumors of strife on the set). It is suggested that this will be done through publicly highlighting the achievements and efforts of the Wayfarer team in bringing the movie to completion, and Mr. Baldoni's commitment to inclusivity. There's nothing in this objective that I find out of the ordinary. It appears to be a simple outline of a reactive approach to protect Mr. Baldoni's reputation, should negative attacks occur. As described in the literature related to crisis communications, this is standard practice in reputational risk management and the mitigation of reputational risk.

- The reputational risk referred to in the "Overview" section of this document is Ms. Lively ("BL" in the document) making her "grievances public – via a blatant story or subtle leak." The section suggests that Mr. Baldoni, Mr. Heath and Wayfarer "own any misconceptions […] without being the louder antagonizer." It is standard practice for a crisis manager to identify the potential crisis and how to mitigate it.

- The planning document then outlines media and social media monitoring, as well as "flagging" any online content. An attempt to mitigate "false narratives" that begin in the digital space by being prepared to respond is very standard, and very reactive.

- The conclusion above is bolstered by the next section, "Crisis, Mitigation and Rapid Response." I have written extensively on this technique and the importance of responding to negative media and social media coverage in this age of instantaneous communication. As we have seen in Section VI, there is absolutely nothing untoward or otherwise negative about putting such a system in place. It is also pointed out that media will be managed "on background," which means not for

24

attribution, or (as described) as an unnamed "source."[47] This section also indicates that the public relations team will be working with the legal team as appropriate to ensure the narrative is properly represented in any and all coverage. Again, there is nothing unusual here, particularly given that it was made clear earlier in the document that the strategy's goal was to ensure the mitigation of false narratives.

- The document then identifies those media outlets of concern to the Wayfair parties, suggesting a full briefing to those outlets to ensure proper context. It then comes back to media monitoring, including producing daily sentiment reports to measure attitudes and opinions related to the Wayfair parties.

- Under the "Preparation Materials," the document describes creating messaging beforehand, as well as what information can be shared with journalists to put the story in proper context. It also discusses third parties who might support the Wayfair parties' position in these matters by describing their positive experiences working with Mr. Baldoni.

- Under "Key Messaging Points," the document provides context for the current dispute, from the Wayfarer parties viewpoint. Developing a message with which to respond to a public relations issue is standard practice.

- The next three sections are under the heading "If/Then Plan of Action." Each section describes recommendations for what the Wayfarer parties should do if Ms. Lively (or her husband, Ryan Reynolds) engages proactively with media. These are the true scenario planning sections of the planning document—again, very common in crisis communications planning.

In sum, this "Scenario Planning" document is standard practice in my field, and it is all *reactive*. It doesn't appear to have anything to do with engaging in a *proactive* program to smear Ms. Lively. Again, in this case, there appears to be a reliance on the supposition that the hiring of a crisis communications firm at all—or the preparation of a scenario planning document—in and of itself, is evidence of negative intent. That, as described in Section VI(d) above, is a serious misinterpretation of what crisis communication managers do, and how they are retained to mitigate reputational risk.

---

[47] It should be noted that, as a general matter, public relations people speak to media all the time in this manner, "off-the-record," or "on-background," in order to provide proper context to help media understand issues without the fear of being misquoted.

25

### c.     The Time it Would Take to Create a Digital Marketing Program

There are allegations in the SAC that the retention of Ms. Nathan—and the subsequent retention of another consultant in Texas by the name of Jed Wallace, of a company called Street Relations Inc.—led to considerable negative media and social media sentiment beginning on approximately August 8, 2024. This alleged effort on the part of these parties is, at various points in the complaint, called "social manipulation," or "social attack."[48] It is alleged that this goes beyond standard practice in the public relations profession and involved "weaponiz[ing] a digital army around the country from New York to Los Angeles and beyond to create, seed, promote, and engage with content that appeared to be authentic on social media platforms and internet chat forums."[49]

Based on the allegations in the SAC, it appears Ms. Nathan was not retained by the Wayfarer parties until August 2, 2024, while Mr. Wallace appears to not have been hired until at least August 8, 2024.[50] August 8, 2024 is the same day on which the SAC alleges Ms. Lively saw a significant spike in negative sentiment towards her.[51] Based on my experience, it is highly unlikely that a digital marketing plan could be prepared and *executed* within a few days (if not the same day). Providers in the digital marketing space seem to indicate the same. Consider this article from Aztek, a digital marketing firm:

> Digital marketing is not a "quick fix" or a one-and-done effort with results that happen overnight. . . [i]f you're looking for a general rule of thumb, you should give digital marketing at least three to six months to make an impact.[52]

---

[48] See, e.g., the SAC "Table of Contents," page 2.
[49] Id.
[50] Id., ¶ 226.
[51] Id., ¶ 326.
[52] "How Long Does Digital Marketing Take to See Results," November 19, 2024, https://www.aztekweb.com/blog/post/how-long-does-digital-marketing-take-to-see-results/, (last accessed October 5, 2024).

26

Similarly, Metric Marketing, a digital marketing business based in Saline, Michigan, estimates that for Search Engine Optimization (SEO) efforts, "It usually takes 3-6 months to start seeing results, and sometimes up to a year or more for highly competitive industries," while for "content marketing" (creating content for owned and third-party blogs and media platforms), "[t]he time it takes to see meaningful results can range from several months to a year, depending on the quality and relevance of your content."[53] Social media marketing timeframes can be shorter, but even then it can range from "weeks to months."[54]

To be sure, there are many forms of digital marketing—from SEO, to posting on a range of social media sites, to more elaborate, computer-generated efforts involving chatbots and, potentially, artificial intelligence (AI). But in my experience in high-profile legal disputes, these efforts take time as well.

Consider the experience of Joseph Cheshire, one of the lead lawyers in the infamous Duke lacrosse rape case, as detailed in my book *In the Court of Public Opinion: Winning Strategies for Litigation Communications.* This case began with an allegation of gang rape against members of the Duke Lacrosse team in March 2006. Durham County District Attorney Michael Nifong first announced the charges on March 30, 2006, on *CBS Early Show*, among other outlets.[55] Charges weren't completely dropped by North Carolina Attorney General Roy Cooper until April 2007.[56]

In an interview for my book, Mr. Cheshire recounts the amount of time, effort, and hard work it actually took to change perceptions—both in major media and online:

---

[53] "How long does it take to see digital marketing results?" *Metric Marketing* [undated] https://www.metricmarketing.com/faqs/how-long-does-it-take-to-see-digital-marketing-results/ (last accessed October 5, 2025).
[54] Id.
[55] Id.
[56] Robert P. Mosteller, The Duke Lacrosse Case, Innocence, and False Identifications: A Fundamental Failure to "Do Justice", 76 Fordham L. Rev. 1337 (2007), https://ir.lawnet.fordham.edu/flr/vol76/iss3/6 (last accessed October 5, 2025).

27

"It took an enormous amount of work to get [the media] to turn," he said. "It required establishing and maintaining credibility throughout the process." Cheshire reported that at the height of the case he was spending "four or five hours a day" just working on the communications elements of the case.[57]

Cheshire notes the critical role online blogs played in the process ("Our case was the first major high-profile case where dealing with blogosphere was an element of our public defense"[58]). Cheshire reports these bloggers were an essential element of getting the truth of the Duke Lacrosse rape case out and "making it stick"—especially a blog called "Durham-in-Wonderland" that Cheshire and his team worked with for more than six months.[59]

### d.    Tools Purporting to Measure Positive and Negative Media Mentions

The SAC provides three charts allegedly proving a vast surge in negative media and/or social media sentiment[60] that began to spike on August 8, 2024. These include a chart at ¶ 326 entitled "Net Volume of Positive and Negative Mentions of Blake Lively":



. . . a chart at ¶332 entitled "Normalized Net Sentiment of Mentions of Blake Lively":

---

[57] *In the Court of Public Opinion,* at 308.
[58] Id.
[59] Id.
[60] The SAC is unclear as to whether these charts detail media sentiment, social media sentiment, or both.

28



. . . and a chart at ¶334 entitled "Sentiment Trend":



In the SAC, none of these charts give any sense of the methodology used to compile the data, how decisions as to what is a "positive" or "negative" mention is determined, or even the monitoring service or software used to compile the sentiment and generate the data. Based upon my experience in preparing these reports in sensitive crisis and legal-related communications matters, it is my opinion that—absent further description of methodology and a deeper dive into the media mentions used to inform such data—it is impossible to tell whether this data is an accurate reflection of sentiment.

This is for a simple reason: absent further analysis, it could be the case that *any* mention of the dispute between Ms. Lively and Mr. Baldoni would be recorded as a negative for Ms. Lively, regardless as to how it treats Ms. Lively in comparison to Mr. Baldoni, *because any mention of the dispute itself could be deemed—by its very nature—a negative*. That is the problem with many tools for measuring online sentiment—the algorithms that produce results lack appropriate nuance for dealing with complicated issues such as sentiment during disputes.

In other words, once the public began to focus on on-set strife between Ms. Lively and Mr. Baldoni, the unfriending of Mr. Baldoni on social media sites, and his absence from the premiere of *It Ends With Us,* any attention to these issues at all could be picked up by media and social media monitoring as a "negative."[61]

I have faced this issue before in my work and have written about it in my book *Chief Crisis Officer.* In Chief Crisis Officer, I describe this problem in the context of reports generated by digital tools that labeled media and social media sentiment as "neutral," when this simply could not be the case:

> We were working on a very contentious issue during the summer of 2015 for an entertainment company that was in a difficult, adversarial negotiation with one of the largest online retailers in the world. Put bluntly, the retailer was putting the screws to my client in ways that only a true monopolist can. The crisis was playing out day-to-day before the deeply opinionated stakeholders in this community: first in the trade media, then in major media, such as *The New York Times* and *The Wall Street Journal*, and social media.[62]

---

[61] Indeed, although the charts in ¶¶ 326 and 332 end before the *New York Times* article was published on December 21, 2024, the chart in ¶ 334—though somewhat blurred in the SAC—shows a massive spike in "negative" social media sentiment coinciding with the publication of the *New York Times* investigative article entitled " 'We Can Bury Anyone': Inside a Hollywood Smear Machine," which includes the subhead "Private messages detail an alleged campaign to tarnish Blake Lively after she accused Justin Baldoni of misconduct on the set of 'It Ends With Us.'" It would be hard for anyone who read the story on December 21, 2024, to conclude it was a "negative" for Ms. Lively. See https://www.nytimes.com/2024/12/21/business/media/blake-lively-justin-baldoni-it-ends-with-us.html?searchResultPosition=1

[62] *Court of Public Opinion,* page 154.

30

I go on to describe how, as crisis communication consultants to the company in question, we "engaged a media and social media monitoring service to better understand public sentiment—in as close to real time as possible. . . [t]he service we used was automated, utilizing what we thought were sophisticated algorithms to sift through the enormous quantity of social media posts."[63] The media sentiment report broke down the results into three categories: "Positive," "Negative," and "Neutral."[64] Upon review however, we noticed the social media sentiment reports showed that most social media commentary was "Neutral" category—which made no sense to our team:

> The strange part was that the neutral comments, by far, dominated the numbers. Indeed, more than two-thirds of the social media contact on Facebook, Twitter, and other social media outlets was neutral, with positive and negative comments about evenly split in the other one-third.

> This data made no sense. We worked on at least four major media articles in the week prior, all of which were positive. We made our case quite well and ensured that the right messages had gotten out effectively and in language that was straightforward, compelling, and reframed the way audiences would look at the crisis.

> That should have been reflected in the numbers. Indeed, given the public tempest over this particular commercial negotiation, one would have assumed that very few "neutral" parties existed in the first place. After all, on so contentious an issue, why would someone who is neutral be posting about the topic anyway? Presumably, the neutrals wouldn't care one way or another.[65]

Upon drilling down into the individual social media posts more carefully, we discovered that the media monitoring service was mismarking results "because the criteria they set up (automated, following an algorithm) for measuring the positive or negative aspects of this issue was faulty":

> The problem? The analysis did not consider the underlying tone of the individual articles being forwarded, and the headlines and synopses of those articles were

---

[63] Id.
[64] Id, at page 155
[65] Id.

31

usually neutral in tone. Clearly, a Tweet of a positive article is positive, right? If you read the article and agreed with its underlying argument, you tweeted it. In this case, if the tweet didn't include positive commentary on my client's position, the resulting tweet was characterized as "neutral" rather than positive. There was no way to pick up the overall characterization of the dispute without taking a closer look at the tone of the underlying article being tweeted.

We went back and broke down the results; this was no small task considering the thousands of social media posts related to this issue. As it turned out, instead of two-thirds of the social media being neutral, neutral sentiment was less than 20 percent.[66]

The key point here, vis-à-vis the instant case, is not that there wasn't negative sentiment, but that without a deeper understanding of the validity of this data, it is impossible to tell.

## VIII.    Conclusion

Based on my professional background and experience in the crisis communications field, and after a review of relevant literature related to crisis communications, I am prepared to testify that:

- The hiring of a crisis communications consultant in the face of perceived reputational threats should not be considered in any way evidence of a negative, or nefarious, intent. Rather, it is well established that such a retention is entirely acceptable, appropriate, and prudent for organizations, brands (personal or corporate), and high-profile individuals seeking to mitigate reputational risk, particularly in the face of threats.

- A misunderstanding of the role of a crisis communications manager often feeds negative perceptions regarding the role of crisis communications.

- Media monitoring is a standard practice in all public relations—and particularly in crisis communications and other sensitive communications matters—and should not be seen as an effort at social media manipulation.

---

[66] Id., at page 156.

32

- The "Scope of Work" document prepared by The Agency Group (TAG), as well as the document entitled "Scenario Planning—It Ends With Us" are in keeping with standard crisis communications planning practices.

- The growth in media and social media coverage negative to Ms. Lively, starting in August 2024, is unlikely to have been caused by the work done by the crisis communications consultants hired by the Wayfarer parties, given the short timeframe.

- Tools to measure media and social media "sentiment" are sometimes less effective during crises, litigation, or other sensitive, dispute-related public issues. There is a need, therefore, to drill down on the data, particularly when attempting to discover causal relationships.

33

# Exhibit A

**Curriculum Vitae**

James F. Haggerty
PRCG | Haggerty LLC
(212) 683-8100
jhaggerty@prcg.com

## Work Experience

**PRCG | Haggerty LLC & PRCG | *Sports***
New York, NY
President and CEO
*Internationally known strategic communications firm with an emphasis on litigation communications and crisis communications. Through PRCG | Sports, the firm works on a range of sports-related issues, including those related to Name, Image, and Likeness (NIL) and other cutting-edge areas of law and regulation.*
1993-present

**Reputation Advisors International (formerly The Crisis Protection Network)**
*Global Network of Senior Reputation Counselors*
Chairman and President, 2022 – present
Board Member, 2016 – present

**Adjunct Professor of Law**
**Stetson University College of Law**
Spring 2025 - present

Teaching a course in litigation and crisis communications entitled "Advocacy in the Court of Public Opinion," focusing on the legal, ethical and practical dimensions of ensuring litigation is managed properly outside the courtroom.

**Law Practice**

I have engaged in the occasional practice of law over the years, with an emphasis in cases of a public nature, in areas that include product liability, false advertising, and defamation/First Amendment matters. In that capacity, I represented more than 3,000 victims of the Haitian cholera disaster in a lawsuit against the United Nations (*Laventure v. United Nations,* 746 F. App'x 80 (2d Cir. 2018); *cert. denied,*140 S. Ct. 108 (2019)).

2

## Education

Stetson University College of Law, Gulfport, Florida
J.D., 1992

Fordham University School of Law, New York, New York
1989-1990

Binghamton University (State University of New York)
B.A., Dual Major: English Literature and Rhetoric; Political Science, 1988

Marist College, Poughkeepsie, New York 1983-1984.

## Bar Admissions

Florida,1994
New York, 1995
U.S. District Court, Southern and Eastern Districts of New York
United States Supreme Court, 2019

## Books and Book Chapters

Contributor, "Crisis Communications," *United On Guns Mass Shooting Playbook* (Public Health Advocacy Institute, Northeastern University School of Law, 2025) (scheduled).

Editor & Foreword, *Sports Crisis Communications: Cases & Controversy* (Hart + Harvest Press, Spring 2025).

Co-author, *Navigating Reputational Harm: A Deep Dive into Repairing, Measuring, Metrics, and Legal Implications of Reputational Harm in the Internet Age*, (Media Monograph Series, Hart + Harvest Press, 2024), with Eric Rose.

Author, *Chief Crisis Officer: Structure and Leadership for Effective Litigation Response*, (American Bar Association, 2017; Paperback edition with new Preface, 2019; Hart & Harvest edition with new Preface, 2023).

Author, *In the Court of Public Opinion: Winning Strategies for Litigation Communications, 3rd Edition* (American Bar Association, 2019; reissued by Hart + Harvest Press, 2022).

Chapter, "Working with Public Relations Experts in High-Profile Criminal Cases," *Media Coverage in Criminal Justice Cases* (American Bar Association, 2013), Andrew E. Taslitz, Ed.

Chapter, "The Origins and Current Status of Litigation-PR in the United States," *Litigation-PR: alles Was Recht ist,* (Springer VS, 2012), Lars Rademacher & Alexander Schmitt-Geiger, Eds.

Author, *In the Court of Public Opinion: Winning Strategies for Litigation Communications, 2nd Edition* (American Bar Association Publishing, 2009).

Author, *In the Court of Public Opinion, Korean Edition* (Communication Books, Seoul, 2006).

*In the Court of Public Opinion: Winning Your Case with Public Relations* (John Wiley & Sons, 2003).

## Articles

Columnist, *American Lawyers' Corporate Counsel Magazine,* 2011 – 2015. Finalist, Best Commentary, Jesse H. Neal Awards, 2012 and 2013.

"Developing an SEO Strategy to Mitigate Reputational Harm," *PR News,* June 5, 2024 (with Eric Rose).

"Understanding a Lawsuit's News Flow for Optimum Communications Strategy," *PR News,* June 24, 2023 (with Thom Weidlich).

"Haiti, Liability and Beyond: Next Up, Legal Issues in Outer Space," *National Law Journal,* September 5, 2019.

"Commentary: How Facebook's Response Ignited the Cambridge Analytica Scandal," *Fortune,* March 27, 2018.

"Baseball's Legal Season," *Forbes, December 16, 2017.*

"The Crisis Won't Kill Your Business If You Get the Response Right," *Entrepreneur,* December 4, 2017.

"Crisis Communications," *Bank News,* February 1, 2017.

"Crisis Communications in Public Entities," *American City & County*, September 14, 2016.

"Crisis Communications for the Senior Living Community," *McKnight's Senior Living*, June 16, 2016.

4

"Why Tech Solutions Aren't Just About IPOs and Billion-Dollar Valuations," Inc. Magazine, June 5, 2015 (crisis communications software).

"International Patchwork of Media Laws Can Be a Minefield for Online Publishing," *National Law Journal,* January 8, 2007 (with Charles Glasser, Media Counsel, Bloomberg LP).

"Defamation Claim Would Be An Uphill Battle for PRSA," O'Dwyer's, July 1, 2005.

"Putting the Best Face on It: Litigation PR in the Era of 24-hour News," *Business Law Today* (American Bar Association), July/August 2004.

"The Litigation Media Checklist: A Tool for Managing Legal Communications Risk," *Executive Counsel,* July 2004.

"Public Opinion Can Trump Law," *USA Today*, October, 2, 2003.

"Media Strategist: Newest Member of the Litigation Team," *New York Law Journal,* 2002.

"Communicating When Clients Are in Court," *PR Week,* April 9, 2001.

"Marketing Your Firm: Toward Common Sense Branding Strategies," *New York Law Journal,* 2000.

"Get the Proper Mileage Out of Your Seminars," *Law Practice Management*, April 1995.

"How to Win the Games PR Firms Play," *National Law Journal*, March 20, 1995.

"Microsoft Dissed Its Audience," *National Law Journal, 1995*.

"Most Firms Don't View All Costs," *National Law Journal, 1991*.


## Presentations

Annual presenter at Stetson University College of Law's annual *National Conference on Law and Higher Education,* 2018 – 2025 (Co-Chair, 2022).

Annual speaker, *Law, Politics, and the Media* lecture series, Syracuse University's School of Law and Newhouse School of Communications, 2009 – 2011.

Host and moderator, CLE program: Beyond "No Comment": Legal Issues and Public Perception in the Media Age, New York City Bar Association, 2005-2006.

5

Numerous other presentations for bar associations, law schools, universities, and public relations societies.

**Recognition and Accolades**

Ranked as one of the leading litigation communications professionals in the United States by *Chambers and Partners* **International Legal Directory**, 2017-2025. One of only four professionals in the United States to be listed in every year of the ranking's existence.

Named by *Business Insider* as one of "18 top public-relations experts CEOs scramble to hire in a crisis," 2023.

Named by the *PR News* as one of the "50 Game-Changers of PR" for landmark work as "a trailblazer of Litigation PR," 2017.

Frequent commenter in major media on communications, crisis and litigation issues, including in *Newsweek, Politico, The New York Times, The Wall Street Journal,* CNN, Fox News, *Tampa Bay Times, Washington Post, American Lawyer*, the *National Law Journal,* ABA Journal, and others.

34

# Exhibit B



To: Jamey Heath, Tera Hanks
From: The Agency Group (TAG) PR
Subject: Scope of Work
Date: 7/26/24

**OVERVIEW**

TAG PR will work closely with Jonesworks, Justin Baldoni, Wayfarer Studios, and its applicable executives to design and implement a crisis communications strategy to protect and enhance the reputations of Justin Baldoni, Wayfarer Studios, and their executives while navigating through anticipated and unforeseen challenges leading up to the "It Ends With Us" premiere and its aftermath.

As part of our efforts to protect the company's position, TAG PR will provide ongoing strategic counsel and rapid interference to mitigate references of controversy, correct inaccurate narratives, and push out factual, positive messaging to create a level of control and balance in coverage surrounding the premiere and, in the months afterwards.

Our plan will be tailored to reach key audiences including selected media, industry decision makers, partners, investors, and other creatives to ensure the longevity and prosperity of Justin Baldoni, Wayfarer Studios, its applicable executives, and future projects.

Our approach will include the following elements:

**CRISIS PREVENTION & MITIGATION**

- Support Justin Baldoni, Wayfarer Studios and its applicable executives with independent strategic counsel and perspective.
- Curate statements, background information, and talking points for press reflecting the company's core values, key messaging and the integral role they played to bring this film to life.
- Develop a comprehensive scenario planning document outlining a series of potential outcomes with a suggested course of action for each variable.
- Catalog third party validators from the crew, previous projects, and other industry peers to establish credibility around the narrative and help shape perception in the press.
- Provide input on specific inquiries and liaise with reporters to mitigate negative stories/correct inaccuracies.
- Monitor coverage and social conversations, correcting and updating stories & headlines in real time.

HEATH_000031739



**BRANDING & MESSAGING**

As needed, our team can be helpful in identifying and supporting future proactive opportunities to further assuage any potential negativity. These efforts will include:

- Align with Jonesworks and team on the timeline for the coming months to establish key moments and determine accessible opportunities.
- Support Jonesworks in media management as appropriate, to ensure Justin, the company, and its team are positioned in a positive light.
- Define target audiences and identify areas of focus and sensitivity.
- Review, refine, and help to create all existing communications materials and incorporate consistent, unified messaging, including but not limited to, boilerplates, talking points, press releases, statements, event and appearance materials, promotional language, and more.
- Curate statements, background information, and responses for press.
- Provide input on press inquiries as appropriate and liaise with reporters through this time of crisis to filter through opportunities and determine which are valuable to Justin, Wayfarer Studios, and executives' overall profiles and reputations.
- Manage and oversee any potentially negative stories and correct inaccuracies, as necessary.
- Work with Jonesworks and team to monitor relevant coverage and social conversations while flagging, correcting, and updating as needed, adding statements, and background items, and more in real time.
- Perform media training and prep sessions by drafting and reviewing talking points and facilitating a mock interview experience, as necessary.

**FEES & EXPENSES**

Term: 3 months | Agency Fee: $15,000/month | Expenses: As Incurred

CONFIDENTIAL

HEATH_000031740

35

# Exhibit C

**\*\*CONFIDENTIAL\*\***

### SCENARIO PLANNING – IT ENDS WITH US

### OBJECTIVE

Protect the reputation of Justin Baldoni, Jamey Heath, and Wayfarer Studios in the lead up, during, and following the premiere of It Ends with Us, underscore the achievement and efforts of the Wayfarer team in bringing this movie to life, and emphasize Justin and the studio's commitment to their team and making the broader industry a more inclusive space.

### OVERVIEW

Though there are several potential scenarios at play here which we should be prepared for, should BL and her team make her grievances public – via a blatant story or subtle leak. Given she was made to compromise with the premiere, we feel she will move forward with doing so.

Our recommendation is to get ahead of this narrative, owning any misconceptions and addressing them head on. Ultimately, we need to be ready to take the air out of any story that does arise, as well as commentary and/or background narrative BL and her team put together, without being the louder antagonizer.

The TAG team will continue to media monitor, flag, and respond to any media proactively reaching out / reporting on the issue and will send regular reports on existing chatter that may arise. Additionally, our team's digital experts will continue to monitor and flag any online content related to the  crisis and/or mitigate if false narratives begin in the digital space.

**Crisis Mitigation and Rapid Response**

- Our team will establish a "rapid response" communication system which keeps Justin, Jamey, and Wayfarer Studios abreast of new coverage and narrative trends in real time, both in traditional media and social media.
- Alongside Jen Abel and her team, we will manage media inquiries regarding the news on background as "sources familiar."
- Working with legal as appropriate, we will provide information to ensure our narrative is properly represented in any and all coverage.
- TAG will confirm outlets intending on covering the story, especially those impactful to Justin, Jamey, and Wayfarer's interests, are fully briefed on the situation including and not limited to The Hollywood  Reporter, Variety, Deadline, The Wrap, New York Post, Daily Mail, etc.
- We will run real-time media monitoring reports with multiple daily updates on any coverage that arises and impact that the PR teams have had on stories.
- Further, we will produce daily sentiment reports which capture the reach and attitude of opinions online related to the issue and towards Justin, Jamey, and Wayfarer. These reports will also qualify the level of impact these stories have and the gradual decrease in interest post-crisis on this narrative.

**Preparation Materials:**

- Our team will develop clean, topline messaging outlining the facts in conjunction with Jen Abel and her team.
- Our team and Wayfarer Studios will discern what assets pertaining to communications, schedules, times when BL called out, etc. that we can share for off record and/or for context

1

purposes with journalists.

- Our team and Wayfarer Studios, alongside Jen Abel and team, will catalog third party advocates willing to provide a potential quote or engage with reporters on Justin and Jamey's behalf to mitigate negative narratives from a source outside of Wayfarer.
- Our team will collate a list of people who have publicly discussed their positive working experience with Justin – examples include Brandon Skylnar / Forbes, Colleen Hoover / Entertainment Weekly, etc.

**Key Messaging Points:**

- JB's stellar reputation among colleagues and industry peers - numerous quotes and interviews sharing positive experiences.
- JB has been a longtime activist and advocate of and for women in Hollywood, speaking out about challenges his colleagues faced before the Me Too movement even began (TED 2017).
- The "Man Enough" podcast has been a source of inspiration since it began, fostering a safe, encouraging environment for a range of perspectives to meet and discuss gender roles and how their rigidity affects everyone.
- While JB and JH attempted to foster a kind, safe, creative environment on set during a challenging period in Hollywood – resurgence of COVID-19, the writers strike, the SAG AFTRA strike – their efforts were continuously thrown back in their faces.
- Production members lost their jobs due to BL's takeover and insisted upon involvement – including loss of budget due to rescheduling shoot days when BL refused to show up.
- When BL wasn't able to get her way on set or behind the scenes, she involved her husband to create an ilmbalance of power between her and JB. RR went so far as to use his power to call agents and agencies, Sony, and other key players so that BL would get her way.
- BL's less than favorable reputation in the industry spans decades and has been reported – there were issues on Gossip Girl, the Town, A Simple Favor, and more.
- There is a clear, likely motive due to the film's value and fanbase, in which BL is attempting to bully her way into buying the rights for It Starts With Us.
- Our team will also include additional positive stats re: JB's career, his accolades, his inspiration to take on this project, obstacles he overcame, what's in store, etc.

**IF/THEN PLAN OF ACTION:**

**Scenario 1: Blake and team push out negative story re: Justin / Wayfarer post-premiere**

- Depending upon the scope of her push, we recommend planting a seed earlier on to position your truth / narrative around the ordeal in a subtle way to avoid having to backtrack.
- An idea for this, and working alongside Jen, is giving a friendly reporter who is covering the film a simple line hinting that while you and Blake didn't always agree at times "had our differences" you have respect for her. This way, if BL stories are softer, we don't look so aggressive. If it's a hit piece, then we've tee'd up reporters properly that there were issues with her. We would also ensure the story is broader, about the film, inspiration, etc. so that the line is one part of a larger piece.
- If her team is working on a longer lead, negative narrative, we would be given (a short) heads up in advance of the story and would, alongside Jen, correct inaccuracies in fact checking, mitigate false narratives, and point reporters toward third party advocates who can speak positively on your behalf.
- We would then brief people with a more robust version of the facts, executing a background approach, using third party advocates, and off record conversations with trusted friendlies to depict the truth of the situation. Targets would include popular industry newsletters (targeting industry peers, studio execs, investors, etc.) and social media (targeting JB's fanbase and those of

2

the novel/film) as well as trades / mainstream entertainment. Background information would include:

- Background briefing would clarify any misconceptions, what was taken out of context, and what can be chalked up to simple misunderstanding or miscommunication.
- Background briefing would highlight JB, JH, and Wayfarer's side of the story, what their truth is as it pertains to any allegations or negativity, facts based on the timeline, and issues they experienced on their end e.g. lost days of shooting, consistently adhering to demands, etc.
- Background briefing would include the fact that production members lost their jobs due to her involvement / takeover.
- Background briefing would include the numerous articles, interviews, and quotes of past colleagues who openly love working with Justin, and pointing to BL's less than favorable reputation of her twenty-year career.
- Background briefing would include pointing people to positive commentary, quotes, interviews from colleagues and peers of Justin praising his work, etc.

**Scenario 2: Blake subtly hints at her "experience" in post-premiere coverage, either in an interview, op ed, or otherwise.**

- Our prediction is that should BL address her "experience" on set in upcoming press, she will not name you directly but rather pepper in "easter eggs" alluding to your involvement, being mindful not to completely jeopardize her potential involvement with the film's sequel, while still planting seeds of doubt and speculation – especially amongst the passionate fan base.
- BL and her team have already begun to plant seeds around this, in insisting promotion be kept separate. Fans have already begun to speculate on socials that something is amiss.
- These pieces will likely come out following any potential hit piece and/or coverage from the premiere. Our recommended approach would be to provide reporters who reach out for comment, should it be obvious she's referring to you, with the appropriate background information (listed in Scenario 1) to ensure their stories are balanced and the speculation can be turned to another one of the many people she's had issues working with (Leighton Meester, Anna Kendrick, Ben Affleck, etc.).
- Additionally, we would advise taking further ownership of this narrative as an emerging director, lessons learned managing different egos, being the subject to an imbalance of power and/or navigating Hollywood, remaining dedicated throughout more challenging processes to protect the crew and production members, etc. – remaining strong but not specific or combative.
- This messaging can be woven into more positive press about the film, placed by Jen and team, so that you stay on the high road while sharing your truth in a respectful way. A subtle way to do this is to address some of the issues you faced on your podcast, and open the floor to discuss ways in which imbalances of Hollywood still need to be addressed, how teams can create safe environments for all cast and production members on set, etc.

**Scenario 3: Ryan comes forward in defense of his wife**

- Should Ryan come forward in defense of his wife, we would advise against any direct engagement, statement, etc.
- Inquiring reporters, and those in need of updating, would be given a pre-approved line of background, attributed to source, implying his lack of connection or involvement with the making of the film and that this is another imbalance of power and attempt to strongarm production by major A-list stars.
- Our team would also suggest (and will work with Jen Abel and her team on this) placing proactive interviews for Justin around the movie's debut, to speak to his experiences directing, what it's like to produce, direct and star in a movie, the difference between being in charge and

3

Case 1:24-cv-10049-LJL    Document 321-4    Filed 07/30/25    Page 5 of 5

being one of the cast, "lessons learned" from his experience as a director on this film and others, and what's to come in the IEWU universe.

- This will get ahead of any potential negative news placed by BL and/or her team, and seed doubt should BL or RR come forward with negative messaging.
- As part of this, our team can also explore planting stories about the weaponization of feminism and how people in BL's circle like Taylor Swift, have been accused of utilizing these tactics to "bully" into getting what they want.

4

## CERTIFICATE OF SERVICE

I, Rose Khatchikian, do hereby certify that I am not less than 18 years of age and that on this 17th day of October 2025, I caused a copy of the foregoing **INITIAL EXPERT WITNESS DISCLOSURE (Fed. R. Civ. P. 26(a)(2)** to be served on all counsel of record via email.

Dated: October 17, 2025
       Los Angeles, CA

                                                  Rose Khatchikian

3

461892.1

## PROOF OF SERVICE
*Blake Lively v. Wayfarer Studios, et al.*
Case No. 1:24-cv-10049-LJL

**MANATT, PHELPS & PHILLIPS, LLP**                    *Attorneys for Plaintiff*
Esra Hudson, Esq.
Sarah E. Moses, Es.
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
Tel: 310-312-4381
Email: ehudson@manatt.com
          SMoses@manatt.com

Stephanie Anne Roeser
One Embarcadero Center, 30th Floor
San Francisco, CA 94111
Tel: 415-291-7543
Email: sroeser@manatt.com

Matthew F. Bruno
7 Times Sq
New York, NY 10036
Tel: 212-790-4500
Email: mbruno@manatt.com

**WILKIE FARR & GALLAGHER LLP**                    *Attorneys for Plaintiff*
Aaron E. Nathan, Esq.
Michaela A. Connolly
787 7th Avenue
New York, NY 10019
Tel: 212-778-8000
Email: anathan@wilkie.com
          mconnolly@wilkie.com

Michael Gottlieb
Kristin Bender
1875 K. Street, N.W.
Suite 100
Washington, DC 20006-1238
Tel: 202-303-1000
Email: mgottlieb@willkie.com
          kbender@willkie.com

4

461892.1

**DUNN ISAACSON RHEE LLP**                    *Attorneys for Plaintiff*
Meryl C. Governski
401 Ninth Street NW
Washington, DC 20004
Tel: (202) 240-2900
Email: mgovernski@dirllp.com

**HAYNES AND BOONE, LLP**                     *Attorneys for Plaintiff*
Laura Lee Prather
Michael Lambert
98 San Jacinto Boulevard
Suite 1500
Austin, TX 78701
Tel: 512-867-8400
Fax: 512-867-8470
Email: laura.prather@haynesboone.com
        Michael.lambert@haynesboone.com

**QUINN EMANUEL URQUHART & SULLIVAN,**   *Attorneys for Third Party Defendant*
**LLP**                                        *Jonesworks LLC*
Kristin Tahler
865 S. Figueroa Street
Ste 10th Floor
Los Angeles, CA 90017
Tel: 213-443-3615
Email: kristintahler@quinnemanuel.com

Maaren Alia Shah
Morgan L. Anastasio
295 5th Avenue
New York, NY 10016
Tel: 212-849-7452
Email: maarenchoksi@quinnemanuel.com
        morgananastasio@quinnemanuel.com

Nicholas Inns
1300 I St NW
Suite 900
Washington, DC 20005
Tel: 202-774-6147
Email: nicholasinns@quinnemanuel.com

461892.1

**JACKSON WALKER L.L.P**
Charles L. Babcock, IV
Joel Glover
1401 Mckinney Street, Suite 1900
Houston, TX 77010
Tel: 713-752-4226
Fax: 713-752-4560
Email: cbabcock@jw.com
       jglover@jw.com

*Attorneys for Defendants Jed Wallace and Street Relations, Inc.*

6

461892.1