# EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---

BLAKE LIVELY,

Plaintiff,

vs.        CASE NO. 24-CV-10049-LJL (LEAD CASE)

25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

_____

JENNIFER ABEL,

Third-party Plaintiff,

vs.

JONESWORKS, LLC,

Third-party Defendant.

_____

WAYFARER STUDIOS LLC, et al.

Consolidated Plaintiffs,

vs.

BLAKE LIVELY, et al.

Consolidated Defendants.

_____

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF MICHAEL ROBBINS

Los Angeles, California

Monday, November 24, 2025

Stenographically Reported by:  Ashley Soevyn,
CALIFORNIA CSR No. 12019

Pages 1 - 270

Page 1

record.   The time is 2:50 p.m.

                         (Recess.)

              THE VIDEOGRAPHER:  We're back on the
record.   The time is 3:04 p.m.

BY MS. ZELDIN:

        Q    So, Mr. Robbins, I know you wanted to
talk about your opinions about Ms. Fromholz's
report.  And while I don't agree that you have an --
will have an opportunity at trial to do so, I
welcome now for you to give me whatever your
opinions are.  And if you could just tell me what
are -- how many opinions do you have or you intend
to offer, and then we'll go through them one by one?

        A    Sure.  So she has four opinions.

        Q    Uh-huh.

        A    So I will respond to each of the four.

        Q    Okay.

        A    So her first opinion relates to whether
the company met its legal obligations -- using her
words -- to respond to the harassment complaints
because she says they implemented the 17
protections, and therefore, there was no reason to
conduct an investigation.  And furthermore, that was
all the remedial acts that would need to be taken.
So that's her first opinion.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q    Okay.

A    Then continuing to list, her second opinion is that she knows, somehow, what an investigator would determine.  And what an investigator would determine is that the incidents alleged by Ms. Lively either didn't occur or, at least, not in the form that Ms. Lively raised.

Her third opinion relates to the intimacy issues, which we've talked about a little bit.  And her fourth relates to the reputation issue, which we talked a little bit about.

So what would you like me to do?

Q    Well, she's rebutting you.  So she had these four opinions in rebuttal to you.  But why don't you go through each one and tell me what your opinion is, and then that's all I need to know.

A    So her first opinion is not a rebuttal of mine because I never gave an opinion about legal obligations.  I wouldn't give an opinion about the law, and I didn't talk about obligations.  But otherwise, it's perfect rebuttal.  So in other words, she's not rebutting me.  The --

Q    In your opinion.

A    I didn't say anything in my -- about legal obligations, to the contrary.  So I didn't

CONFIDENTIAL

give opinions on the law, and I didn't talk about obligations.  So she's not rebutting me.  But regardless -- so basically, she says this:  The company studio implemented the 17 protections granted at Ms. Lively's behest, not theirs.  But, okay, she says nothing more occurred, with which I don't agree, but -- and so they met their legal obligations, and there was no reason to conduct an investigation.  So I have several things to say about that.

Thing number one is Ms. Fromholz says that she went through AWI National Training Institute, and she earned designation AWI-CH, AWI's certificate holder, which is a program accredited by ANSI, the American National Standards Institute. I've taught at, I think, 13 of them -- it might be 14, but I think 13.

So I know what we teach.  We do not teach that there's no reason to conduct an investigation if you stop the alleged incidents from occurring. We teach if there's an allegation of a possible violation of your harassment or retaliation policies, you need to conduct an investigation.

And so -- and then we talk about what the investigation should consist of as well.  So what

Page 245

CONFIDENTIAL

she's saying is contrary to the training that she got, at least from AWI.

Additionally, we all know she's conducting investigations. She's not saying, gee, stop it, and there's no reason to conduct an investigation. Taking -- taking her position to its logical extreme, a potential client calls her up, says, "We have a harassment allegation. A supervisor is making sexual comments. Would you investigate?" If she's being honest in her opinion, she should say -- would say, "There's no reason for me to conduct an investigation, just tell the supervisor to stop making sexual comments. And if he never makes a sexual comment again, well, then there's no reason to investigate."

Or one other example, she gets called by a potential client who says, "We have sexual harassment allegations. We would like you to investigate. One of the allegations is that he sexually assaulted an employee." So if she's being honest, she would say, "Well, just tell him to stop sexually assaulting people. And if he stops, well, then there's no reason to conduct an investigation." But we know in the real world, she would accept both of those, and she would investigate.

Page 246

CONFIDENTIAL

And part of the problem with her opinion is that she says that's all you need to do in this circumstance.  All you need to do is stop the incidents.  And aside from the fact that, as I said, I don't agree that the incidents were stopped.  The -- part of the reason to conduct an investigation is to stop the incidents, sure.  But part of the reason to conduct an investigation is to find out if somebody violated the company's policies.

So in a situation here, had there been an investigation, the investigator would have to decide did Mr. Baldoni or Mr. Heath recognize that there was potential sexual harassment, and did they follow the company's policy to report it so that it could be investigated?  And if so, they should be disciplined for that.  Not necessarily the recommendation of the investigator depends whether internal or external.

And secondly, did anybody here violate our policy by harassing Ms. Lively or any of the others?  And if so, they should be disciplined for that.  So it's not enough just to stop incidents.  And Ms. Fromholz knows that, too, because we talked about that in the AWI Institute.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

And also, another reason to reach conclusions and take action, even if one of the actions you've taken is to stop the harassment, is because you need to see if there's some kind of remedial action that needs to be taken.  For example, we don't know if we distributed our policy, we better distribute it because people don't understand what's happening, assuming that the investigator would determine that there was harassment going on.  And also, maybe we need to train people again because, obviously, if the investigator determined there was harassment, people don't understand.

So those are all things that are contrary to what Ms. Fromholz said.  It's contrary to her own training, and it's contrary to what she does as well.  And that's my first opinion about her first opinion.

Q    Okay.

A    Want me to keep going?

Q    Yes.  Please.

A    Okay.

Q    When you're done --

A    Oh, okay.

Q    Thank you.

Page 248

A    So her second opinion is basically this: She says that she knows what an investigator would determine if there was an investigation conducted. There is no possible way for her to know what an investigator would determine because you can't determine what an investigator would determine based on -- on reading documents, reading depositions or reading documents because that doesn't place you in a position to determine credibility.

And clearly, despite what she wrote in one part of her report, she understands that credibility would have to be determined here.  And the reason is because she wrote that the investigator would determine that the incidents that were alleged by Ms. Lively either didn't occur, or at least in the form that she said they did.  In other words, that the investigator would not believe Ms. Lively.  Therefore, she knows the credibility needs to be determined, and there are many issues here that do require a determination of credibility.

So -- but aside from that, let me talk about things that she's forgotten.  Totality of the circumstances and also credibility.  So what has she forgotten?  She's forgotten that there are a number of other allegations beyond the ones that she lists.

Page 249

So in her report, she says well, here are the facts.  There's no dispute about them, even though there is.  And then, here's what the investigator would determine.

But she didn't list all of the allegations.  And I listed them earlier today.  Talking about his wife and he having simultaneous orgasms, teasing her about not seeing porn, never having seen porn, talking about his own porn addiction, continuing to come into the trailer -- and Mr. Heath coming into the trailer -- even after the trailer incident occurred, supposedly biting her lip.  Those are all additional allegations.  She doesn't even list them, and then says, well, I know what the investigator would determine without even listing those as things to be determined.

She also forgets that you need to look at the totality of the circumstances, which we treat -- we teach at AWI.  And so what that means is you need to look at not only things that were directed toward Ms. Lively but things that she heard about.  And, in fact, if you look at the company's policy, it says you can be harassed not just by things that are directed toward you, which is true, of course.  So that means anything she knew about Ms. Slate and her

Page 250

allegations and anything she knew about Ms. Ferrer's allegations. And we know she knew about Ms. Slate's, and according to Ms. Ferrer, she knew, at least, about one of those.

Also, an investigator would interview similarly situated people, other female actors working with Mr. Baldoni. That would include Ms. Ferrer, who has three incidents with Mr. Baldoni. Ms. Slate, maybe some others as well, but she forgets all of that.

And then also, there are a bunch of issues that clearly need to be determined in terms of credibility. She says the facts are not in dispute. They absolutely are in dispute. So let me just give you some examples.

The incident in the trailer. There are completely different stories about what happened. And mostly, Ms. Lively, Ms. Carroll, and Ms. Baker giving one side of the story and Mr. Heath a completely different -- almost completely different side of the story. So if you believe him, he was invited in. He may have seen somebody breastfeeding. He was there for a short period of time, and that was it.

And if you believe them, as soon as he

Page 251

started opening the door, all three of them said "don't come in" or "wait" or "stop"; that she told him to turn around, which he also admits; that he then, despite promising to not turn around, he did turn around, saw her with her breasts exposed, and did so for five minutes, maybe through the mirror. That has to be determined by an investigator as to which story is true.

The same with the naked video incident. Ms. Fromholz says, well, Ms. Lively only saw the very first few minutes of the video where there is no naked wife -- at least you can't see her naked. Because -- I guess because Mr. Heath said that.  She didn't explain why she thinks that was the case. But Ms. Lively said I saw the video of his wife naked, but how would Ms. Lively know that unless she saw the video of the wife naked?  One of the factors an investigator would consider is plausibility.  How plausible is it that Ms. Lively, having never seen the wife naked in the video, would know that the wife was naked in the video?  Not very.  So you have to determine credibility.

On the "hot" comment and "sexy" comments, the investigator would have to determine, as we've talked about before, what -- was he directing this

CONFIDENTIAL

toward the person?  Was he directing it toward the costume?  Was he directing it toward the scene or to the character?  An investigator would have to make a determination of that.  Ms. Fromholz can't do that by simply reading deposition transcripts.

One incident which I found interesting is that Ms. Fromholz mentions the incident about Mr. Baldoni saying "nice outfit" -- or "I like your outfit."  That's what it was.  Well, she didn't -- she says it's an undisputed fact.  She doesn't talk about the parts that are undisputed, which are the important parts of that incident, if they occurred, which is that he glanced at her chest and then gestured toward her chest.  That's in dispute.

And also there's an issue here about him making the scenes more intimate.  More sexual.  The question is, Why?

Did he do that because Sony wanted him to do that?  Maybe.  Or because Ms. Hoover wanted him to do that?  Maybe.  Or because he thought it was a better film?  Maybe.  Did he do that because he wanted to be more intimate with Ms. Lively?  Maybe.  Did he ask her to do an orgasm scene because he wanted to see that for sexual reasons or because he thought it would help the film?  And there's an

Page 253

allegation that he wanted her to do a nude scene as well.  Same questions.  An investigator would determine those things.

And so Ms. Fromholz couldn't possibly know what an investigator would determine because she's not in a position to determine credibility. And taken to its logical extreme -- not even extreme, it's just an extension.  A client calls her up and says, "We'd like you to do an investigation. A supervisor's making sexual comments."  She should say no.  If she's being honest about her views in her report.  No, there's no reason to spend money on an investigation.  Get someone to give me witness statements.  Give me relevant documents.  I will determine credibility based on those, which we all know is not what she does.

It's not what she was trained to do.  At AWI, we trained her to know when an investigation should be conducted, and when conducted, to interview witnesses and determine credibility.  In fact, we do a one-day mock where the students, in small groups, conduct an investigation from beginning to end.  Then, as the presenters, we put up the evidence on either side, and then say, "Now your job is to determine credibility."  And she had

Page 254

CONFIDENTIAL

to pass a witness examination, a witness interview examination.  So she knows what she's saying is not true.

The remaining two are faster.  So, hopefully, you won't get too much bored any further.

So with respect to the issue of intimacy, she doesn't understand that the issue here is that you want to be proactive.  Yes, following SAG-AFTRA guidelines and recommended standards is part that.  But the overriding concern is safety on the work -- in -- in the workplace of preventing harassment, which is what the guide actually says. And so you have to be proactive about that.

In my opinion, as you know, the birthing scene was -- involved intimacy and hyper exposure and nudity.  And so there should have been a closed set, and there should have been a nudity rider before filming the scene.  The nudity rider wasn't signed until seven months after the scene. Ms. Fromholz has decided the set was closed.  And "closed" doesn't mean closed to the public; it means closed within closed protocols, which they didn't even develop until a month after the scene.

So here's the evidence about the set being closed.  Ms. Carroll said I wasn't an

Page 255

essential person, I was there during the filming of the scene. Ms. Lively says Mr. Sarowitz was there during the scene. He's certainly not an essential person. He said he wasn't there. I will get back to that in a second. Ms. Talbot said I reviewed the call sheet, which I have to. It doesn't say it is a closed set. It doesn't say only essential people should be there, et cetera.

So when Ms. Fromholz says that it was not -- that it was a closed set, the only evidence she has is that Mr. Sarowitz wasn't there, which just means he wasn't there. It doesn't mean it was a closed set. It just means he wasn't there. So it should have been a closed set.

And then most importantly, because it affects all this, they should have established definitions of "intimacy," created a protocol as to when to bring the intimacy coordinator in. And that means talk to director, talk to the actors involved, be present for the rehearsal, be present for the filming. None of that happened with respect to the birthing scene. Ms. Fromholz says, well, they had trained, experienced intimacy coordinators. That's great. They were. What she doesn't understand is the intimacy coordinators don't get involved until

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

the studio calls them to get involved.  And the studio is not going to call them to get involved unless they have a definition of intimacy protocols that say, "Here's an intimate scene.  We need to get the intimacy coordinator involved to do all the things that the intimacy coordinator did not do in the birthing scene."

So now you have my opinion about that.

And the last one is the fast one.  She says the entertainment industry is just like any other industry.  Doctors, lawyers, investigators, even me, electricians all depend on their reputation.  Sure they do.  But nobody except in that industry and related has the ability to try to destroy somebody's career.  And I will give you two examples.

You mentioned lawyers.  A female lawyer at one the defense firms claims that the male managing partner of the firm sexually harassed her.  She complains.  No investigation is done.  She decides to go to another firm.

The managing partner of the firm, the first firm, can't do anything to stop her from her career -- her future career and going to the next place.  Speaking as a former equity partner in an

international law firm, equity partner in a medium-sized firm, a hiring partner for the West Coast of the international firm and --

Q    And a man.

A    I'm sorry?

Q    And a man.

A    And the managing partner of the --

MS. ROESER:  Objection.

THE WITNESS:  -- managing partner of a medium-sized firm.  The firm is -- the next firm is concerned about this:  What experience and expertise does she have?  Does that complement what we are doing, or does it add to an area in which we want to get into?  What clients are going to come to her?  Do they conflict in some way with our clients?  How much business is she bringing?  And during interviews, does she get along with the other partners?

The managing partner in the first firm cannot destroy her career going forward.  And as to me and our investigators, I'm a pretty well-known investigator, and I'm a very well-known investigator -- expert on workplace investigations, particularly in the industry, which is why you contacted me as well.

Page 258

CONFIDENTIAL

BY MS. ZELDIN:

Q    No, we don't know why I contacted you, do we?

A    Well, I know what the email said.  And so I'm pretty well-known in this business.  I have no ability to destroy Ms. Fromholz's career, nor would I want to or try to because there's nothing like the entertainment industry.  I can't destroy her career and I wouldn't destroy her career.

And now you have my opinions.

BY MS. ZELDIN:

Q    You said one thing that I had a question about.  You said the incidents weren't stopped.  What do you mean by that?

A    So after the hiatus and after the November 9 protections went in, then on May 6th there was a conversation at dinner with Mr. -- Ms. Hoover or Mr. Heath and Mr. Baldoni and Ms. Hoover's best friend, where if what Ms. Hoover is saying is true, could be con- -- or considered either additional harassment or retaliation.

And then, of course, the whole publicity thing.  I'm not reaching a conclusion about whether it was retaliation, but it could be considered that, in which case, that's a big incident that continued.

Page 259

CONFIDENTIAL

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.  Dated this 25th day of November, 2025.

ASHLEY SOEVYN

CSR No. 12019

Page 268