# EXHIBIT 3

Highly Confidential - Attorneys' Eyes Only - Subject to Protective Order

# THE FROMH💡LZ FIRM

law that works

ANN FROMHOLZ

**Exhibit: 1**
**Witness: FROMHOLZ**
Date: 12/11/25
CSR#12019: Ashley Soevyn

**Blake Lively v. Wayfarer Studios, LLC, et al.**

**U.S. District Court, Southern District of New York**

**Case No.: 1:24-cv-10049-LJL**

### Rebuttal Report of Expert Witness
### Ann Fromholz

## I.     Background and Experience

1. My name is Ann Fromholz. I have served as the principal attorney for The Fromholz Firm since February 2015, when I founded the firm. I have significant expertise in all areas of employment law, including issues related to workplace investigations. I have provided testimony as an expert in employment law issues in approximately twenty cases. My business address is ███████████████████████████████. A copy of my CV is attached hereto as Exhibit A and a list of the cases in which I have testified as an expert witness is attached as Exhibit B.

2. I have a B.A. in History from Dartmouth College and a J.D. from the University of Southern California Gould School of Law. I was admitted to the California bar in December 1994. I have more than thirty-one years of experience in employment law.

3. I am a Fellow in the College of Labor and Employment Lawyers, have been identified as a Southern California Super Lawyer since 2014, have been named as a Best Lawyer in America since 2020, and have been named one of the Top 50 Women Attorneys in Los Angeles.

4. From 1994 to 1995, I was a litigation associate at the national law firm Sheppard, Mullin, Richter & Hampton. From 1995 to 1997, I was an employment and labor associate at the national law firm Morgan, Lewis & Bockius. From 1997 to 1998, I was an employment and labor associate at the national law firm Orrick, Herrington & Sutcliffe. From 1998 to 2000, I was corporate counsel and head of human resources at a now-defunct company called BestOffer.com. From 2000 to 2005, I was an associate and then a partner in the labor and employment group at the national firm Seyfarth Shaw. From 2006 to 2008, I was Senior Counsel at Kaiser Foundation Health Plan, Inc. (known as Kaiser Permanente). From 2008 to 2010, I was Senior Counsel at ConocoPhillips Company. From 2010 to 2012, I was Vice President and Chief Counsel, Enterprise Labor and Employment, for Caesars Entertainment Corporation. From 2012 through 2015, I was a partner in the national labor and employment law firm Jackson Lewis.

law that works.com



Highly Confidential - Attorneys' Eyes Only - Subject to Protective Order

# THE FROMHOLZ FIRM

5. I have attended numerous training courses and sessions on conducting investigations, including courses put on by the Association of Workplace Investigators, Seyfarth Shaw and Jackson Lewis, sessions at American Bar Association Labor and Employment Law conferences and American Employment Law Council conferences, and CLE presentations by numerous law firms and corporations. I also have conducted numerous training courses on conducting investigations, including "train the trainer" courses where I have instructed HR professionals how to train others to conduct investigations.

6. I have conducted hundreds of workplace investigations into allegations of harassment, discrimination, bullying, and other alleged workplace misconduct. I have been retained by companies in numerous sectors from entertainment to manufacturing to finance to insurance and by schools and non-profits, among other employers.

## II. Assignment

I have been retained by defendant Wayfarer Studios LLC ("Wayfarer" or the "Studio"), Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, The Agency Group PR LLC, Jennifer Abel (the "Wayfarer Parties"),[1] principally to review and respond to the expert witness report prepared by Michael Robbins, informed by my knowledge, experience, and training in the area of workplace investigations.

## III. Summary of Opinions

1. My first opinion is that Robbins erred in his conclusion that Wayfarer failed in its obligation to conduct an investigation into concerns that Lively raised during the filming of It Ends With Us (the "Film") because Wayfarer, Baldoni, Heath, and other defendants took immediate action to correct and prevent conduct about which Lively complained and, therefore, an investigation would have been superfluous. All the alleged inappropriate acts took place solely during the first phase of production, from May – June of 2023. During the production stoppage from June 15, 2023 through November 8, 2023 occasioned by guild strikes, Lively continued to communicate with Baldoni and did not make any complaints. On November 9, 2023, the day the strikes ended, and the Studio was arranging to resume production, Lively, through counsel, sent Wayfarer a list of seventeen (17) demands to make the workplace safe for everyone, in her view, and demanded that Wayfarer, Baldoni, Heath, and others agree to the demands before she would return to production. The cover email attaching the demands stated Lively was "willing to forego a more formal HR process…as long as the set is safe moving forward." The Studio agreed to Lively's seventeen (17) demands. Lively convened an all-hands meeting at her home in New York City on January 4, 2024, the day before production was set to resume to air her grievances with Wayfarer, Baldoni, Heath, a representative from Sony, and others. None of the allegations of misconduct in the Complaint took place during the second phase or production. Again, these corrective actions rendered an investigation superfluous.

2. My second opinion is that Robbins erred in his conclusion that Wayfarer failed in its obligation to conduct an investigation because an investigation would have shown that a preponderance of the evidence did not support Lively's allegations.

3. My third opinion is that Robbins erred in his conclusion that Wayfarer violated "Entertainment Industry-specific intimacy protocols," by failing to require an intimacy

---

[1] The other defendants are Jed Wallace, and Street Relations Inc. together with the Wayfarer Parties, the above defendants are referred to collectively as "Defendants."

Highly Confidential - Attorneys' Eyes Only - Subject to Protective Order

# THE FROMH◉LZ FIRM

coordinator to be present on set during Phase 1, failing to have a signed nudity rider in place in Phase 1, and allegedly failing to have a closed set during the birthing scene.

4. My fourth opinion is that Robbins erred in his conclusion that the entertainment industry is unique in that post-employment actions that affect a person's reputation can harm their future job prospects.

## IV. Documents Reviewed

A list of the documents I considered in reaching my opinions is attached hereto as Exhibit C.

## V. Factual Background Relevant to My Opinions

The following is a summary of the relevant evidence I have reviewed.

### A. Blake Lively and Jenny Slate Complained About Three Comments by Justin Baldoni to Women to which They Took Offense – the Comments Did Not Recur

1. Lively alleged that Baldoni commented, "I like your outfit" in May 2023 during rehearsal when, as she was wearing a low-cut dress with a jacket over it, she bent over and the jacket opened. (Lively 85).

2. Lively testified that Baldoni said that scenes and characters' wardrobe needed to be "sexy" or "hot." Lively testified that these statements did not make her uncomfortable. (Lively 100-101).

3. Lively alleged that, during filming of the bar scene on or about May 23, 2023, she was wearing a jacket over a "onesie," a loose, one-piece pajama made of fleece. She alleged that the jacket had been approved as wardrobe and that Baldoni, the Film's director, said he wanted to see the onesie—also approved wardrobe, which Baldoni, Slate, and Hasan Minhaj also were wearing—without the coat over it. Lively alleged that, when she removed the coat and was wearing the onesie, Baldoni said that she looked "sexy" and, when she told him that was not what she was going for, that she looked "hot." (Lively 102-104)

4. Lively testified that she made clear to Baldoni, at the time the above incident happened, that his comment crossed a line. Lively further testified that Baldoni acknowledged that he made a mistake. (Lively 104-105)

5. Lively testified that, while discussing a sex scene in the draft script and her objection that it seemed pornographic to her, Baldoni told her that he was once addicted to pornography and thus understood it well. (Lively 131-132)

6. Lively alleged that, on one occasion, Baldoni told her and her assistant that he was sexually abused in a previous relationship. Lively said, "At the end this story, Mr. Baldoni shared that it had caused him to reexamine his past. He then said: 'Did I always ask for consent? No. Did I always listen when they said no? No,' Mr. Baldoni claimed this was an example of how we all have things from which we can learn and grow." (Lively Ex. 1049, ¶ 39)

7. Slate alleged that, on or about May 18, 2023, when she was wearing leather pants that were part of wardrobe for a scene, Baldoni told her she looked sexy. (Slate 50-53).

8. Slate testified that she responded that "it's a good look." (Slate 53).



Highly Confidential - Attorneys' Eyes Only - Subject to Protective Order

# THE FROMH🔘LZ FIRM

9. Slate testified that, after Baldoni told Lively that she looked sexy, Slate told him that commenting on actors' bodies and their wardrobes is irrelevant or unnecessary or inappropriate or distracting and "we're just not doing this anymore." (Slate 42-43).

10. Baldoni told Slate that he heard her concerns and that adjustments would be made. Slate responded, "well received." (Slate Ex. 12). Slate understood this to mean that adjustments would be made and said that it was enough for her to focus and do her work. (Slate 101).

11. The above three comments were the only allegedly inappropriate comments Baldoni made during the production of the Film and they were all made during Phase 1 of production.[2]

12. Although she did not testify about this, Lively's complaint filed with the CRD alleges that Baldoni acted inappropriately because he did not involve an intimacy coordinator in scenes that involved kissing and that he improvised during scenes that involved kissing. (Lively Ex. 1049, ¶ 31).

13. Experienced and trained intimacy coordinator Talbot testified that the participation of an intimacy coordinator is not necessary for kissing scenes. (Talbot 25, 26).

14. Lively also alleged that Baldoni acted inappropriately during the filming of a slow dance scene. She alleged that he dragged his lips down her neck and said, "It smells so good." She also alleged that, during the slow dance scene, Baldoni spoke to her out of character and that this was inappropriate. She alleged that he was "caressing [her] with his mouth." (Lively Ex. 1049, ¶ 32).

15. A video of the entire filming of the slow dance scene, with the sound enhanced and with captions, is available on YouTube.
(https://www.youtube.com/watch?v=_RqSPgHVezQ&t=6s). This video shows several things that contradict Lively's allegations. First, it shows that Baldoni did not drag his lips down Lively's neck. Second, it shows that Baldoni's reference to how she smelled was in response to Lively apologizing for getting scented spray tan or body makeup on him. Third, it showed that Lively talked as much or more than Baldoni did during the filming of the scene, that speaking out of character she suggested the scene should reflect how she and her husband interact, by talking, and that she encouraged the kissing and near kissing, saying that they needed to give the audience what they wanted.

16. In addition, Lively initiated unchoreographed kissing on multiple occasions. She did so during the scene when Baldoni's character proposed to her character in the hospital room. (WAYFARER_0000140494, IEWU0519230011 at 14:51). She also initiated eight unscripted kisses during a scene in the hallway hospital. She initiated one kiss in the scene, and there were eight takes. She added these kisses without discussion or express permission. (WAYFARER_0000140494, A012C004_230519M8, 24-CV-10049_0001474-75).

**B.    Lively Alleged that Jamey Heath Twice Engaged in Conduct that She Believed Was Inappropriate**

1. Lively alleged that, in May 2023, Heath entered the hair and makeup trailer where she was getting her body makeup removed. She alleged that she told him to turn and face the wall because she had no clothing on her upper body. She alleged that, at some point while they were talking, Heath turned away from the wall and toward her.

---

[2] Phase 1 of production of the Film took place between May 15, 2023, and ended on June 14, 2023, as a result of strikes by the Writers Guild of America and SAG-AFTRA. Production did not resume until January 5, 2024.



Highly Confidential - Attorneys' Eyes Only - Subject to Protective Order

# THE FROMHOLZ FIRM

2. Lively's hairdresser, Ann Carroll, held up a cutting cape so that Heath could not see Lively's naked upper body. (Caroll 53) Lively was feeding her baby with one breast and Lively's makeup artist, Vivian Baker, put a towel over Lively's other breast so Heath could not see it. (Baker 75).

3. Heath recalled that on May 16, 2023, he, Baldoni, Saks, and Gianetti approached Lively's makeup trailer to have a meeting that Lively had requested be held in her trailer. Heath recalled hearing someone say "come in" or something similar. He recalled entering the trailer and, seeing that Lively appeared to be breastfeeding, he asked if he should come back later. He testified that Lively told him to look away, which he did. Heath described a two-to-three-minute conversation in which they discussed when to have a meeting. (Heath 211-213).

4. Lively alleged that on May 23, 2023, Heath showed her a "moving image" of a naked woman and that, as soon as she saw the naked woman, she asked him to stop. Lively testified that Heath told her it was a video of his wife giving birth. (Lively 190-191, Heath 192-193).

5. Heath testified that he had one video of the day of his child's birth on his phone. That video does not depict the actual birth but instead depicts the baby, covered by a cloth, lying on the mother's chest. The video is quite dark. Heath is seated behind his wife. His wife's bare shoulders are visible but no nudity is visible in the first twenty (20) or more seconds of the video (Heath 183-184, WAYFARER_000141838).

6. Lively contracted COVID and was away from production from May 26, 2023, to May 31, 2023. (Gianetti 259, Lively 185).

7. On June 1, 2023, there was a meeting in Lively's trailer in which some of the above incidents involving Baldoni and Heath were discussed. Lively, Heath, and Alex Saks, one of the Film's producers, were in attendance. (Saks 135-138, Gianetti 126, 129, Heath 214-224).

8. Gianetti testified that during the June 1 meeting in Lively's trailer, Heath apologized and Lively made clear that her privacy was important and that Heath should not enter her trailer. (Gianetti 129).

9. Gianetti believed that the situation had been addressed by the June 1 meeting. (Gianetti 130). In her complaint and in her deposition, Lively did not identify additional conduct by Heath after the June 1, 2023, meeting that she found inappropriate.

## C. The Additional "Explicit" Scenes Were not Included After Lively Opposed Them

1. Lively alleged that Baldoni added additional scenes with gratuitous sexual elements to scenes after she agreed to take on the role. (Lively 66, 74).

2. Lively told Baldoni that she opposed the addition of the sexual elements and conceded that the scenes were modified as a result of her concerns. (Lively 75).

## D. There Was No Nudity or Simulated Sex During Phase 1 of Production

1. SAG-AFTRA guidelines suggest that intimacy coordinators "be hired in scenes involving nudity or simulated sex or upon request in other intimate or hyper-exposed scenes." (SAG-AFTRA Standards and Protocols for the Use of Intimacy Coordinators, Talbot, Ex. 38).

2. SAG-AFTRA guidelines suggest a closed set when filming scenes involving nudity or simulated sex.



Highly Confidential - Attorneys' Eyes Only - Subject to Protective Order

# THE FROMH🔆LZ FIRM

3.    Elizabeth ("Lizzy") Talbot was hired to be the intimacy coordinator for the Film and served as the intimacy coordinator for Phase 1. Talbot was hired in April of 2023, well in advance of the start of production. (Talbot 111).

4.    Lively was asked if she wanted to speak with Talbot about the nudity scenes as they were being written during pre-production, but said it was not necessary. (BL_000009220, BALDONI-000018766).

5.    There were no scenes involving nudity or simulated sex during Phase 1 of the production. (Talbot 73, Saks 204).

6.    Talbot reviewed the script and identified scenes that might require a nudity rider. Talbot requested Baldoni describe what would be in those scenes to propose to Lively, which he did. (Talbot 32, 41, 44, Ex. 7). Talbot met with Lively to review Baldoni's proposal regarding nudity and intimate scenes for purposes of memorializing them in a nudity rider. In early May 2023, Talbot had a phone call with Lively and her lawyer, Lindsey Strasberg, regarding the language of the nudity rider. (Talbot 56-58).

7.    Lively's team continued to negotiate the nudity rider during Phase 1. Lively therefore was aware of the terms of the nudity rider. (Talbot, Ex. 12). In June of 2023, Wayfarer's attorney sent Lively's attorney the final SAG-approved Nudity Rider that Lively had negotiated. (Grey Stone, Ex. 2, Grey Stone 140). Lively and her team delayed signing the nudity rider. (Giannetti 290) Despite multiple requests and ongoing requests by Wayfarer's lawyers, Lively did not sign it. (Giannetti 290).

8.    A nudity rider is not required for birthing scenes if there is no nudity. (Talbot 27, 28). SAG defines nudity as "anything that can be seen under a bikini" (Talbot 24, SAG-AFTRA Standards and Protocols for the Use of Intimacy Coordinators, Talbot, Ex. 38),

9.    There is no such thing as "implied nudity" or "partial nudity" with respect to SAG guidelines and no nudity rider is required in such circumstances. (Talbot 99-101).

10.   The scene of Lily Bloom giving birth did not involve nudity. (Talbot 69). Lively was wearing a heavy prosthetic belly (Vivian Baker 99-100), hospital gown, and black shorts or a black underwear, which can be seen in the behind-the-scenes video of the scene. (WAYFARER_0000140494, A014C002_230522F0 at 0:25).

## VI.   Opinions

### A.    Robbins Incorrectly Concludes That Wayfarer Failed in Its Obligations Regarding Lively's Complaints

1.    Wayfarer lived up to its obligations of preventing and correcting unwanted behavior.

   a)    The purpose of an investigation is to find facts. Here, Wayfarer did not dispute the facts[3] that were alleged and, instead, took action to ensure that any of the alleged unwanted conduct and comments did not recur.

   b)    Even if Wayfarer had conducted an investigation, the corrective action would not have changed. Wayfarer lived up to its legal obligation because it ensured that the unwanted conduct did not recur.

---

[3] This is not to say that Wayfarer concedes that the allegations are true but, instead, that they took action assuming the facts to be true.



Highly Confidential - Attorneys' Eyes Only - Subject to Protective Order

# THE FROMH◉LZ FIRM

c)   Ultimately, an employer is required to prevent and correct unlawful behavior. (California Civil Rights Department *Harassment Prevention Guide* ("CRD Guide"), p. 14). Specifically, the CRD Guide states that "To meet this obligation, an employer should: Address misconduct, even if it does not rise to the level of a policy or legal violation. Stopping unwanted behavior even when it is not yet serious enough to violate the law prevents it from progressing further."

d)   Wayfarer took steps to prevent the complained-of conduct from recurring at the time it received the complaints.

e)   Wayfarer again took action to prevent the complained-of conduct from recurring, when, in November 2023, it agreed to the 17-point rider that Lively demanded. On November 9, 2023, while filming remained stayed due to the strikes, Wayfarer received an email letter from Lively's counsel, Lindsey Strasberg, stating Lively was "willing to forgo a more formal HR process in favor of everyone returning to work and finishing the Film as long as the set is safe moving forward." (Dkt. 520, Ex. ¶ 16, Ex. A; BL-000038463-38465).

f)   With the November 9, 2023 email, Lively's counsel presented a list of seventeen "Protections for Return to Production" allegedly intended "to remedy the misconduct that Ms. Lively and others had reported earlier that year." (Dkt. 520, ¶ 16, Ex. A). The "Protections" did not identify any act of alleged discrimination or harassment but rather included certain conditions including the hiring of a new producer, the presence of a Sony representative on the set, an 'all hands' meeting before the resumption of filming and a prohibition against broadly defined "harassment and retaliation." (*Id.*, Ex. A).

g)   Lively and her counsel threatened Wayfarer and Sony that Lively would not return to complete the Film unless IEWUM accepted the "Protections." (Zavala 117Zavala, Ex. 5; Gianetti 296). Wayfarer and Sony did accept the "Protections" and production resumed on January 5, 2024.

h)   Phase 2 of production proceeded without unwanted conduct. (Lively, Ex. 1055, Giannetti, Ex. 20, Zavala 130). Therefore, an investigation would have been superfluous.

2.   Even if Wayfarer had investigated Lively's complaints, the preponderance of the evidence standard would have led to a finding that most of the alleged conduct did not occur, at least in the form that Lively alleged.

a)   The standard that an investigator must apply when finding facts is whether a preponderance of the evidence supports a finding that the alleged conduct occurred or did not occur. (CRD Guide 11, https://calcivilrights.ca.gov/wp-content/uploads/sites/32/2025/04/Harassment-Prevention-Guide-2025.pdf).

b)   Lively complained that Baldoni commented that she looked "sexy" and "hot" in a onesie, which was part of the wardrobe. Baldoni was the director of the Film and Lively conceded that he said on other occasions that scenes and characters' wardrobes needed to be "sexy" or "hot"; Lively did not find these comments to be inappropriate. (Lively 100-101)

c)   Lively conceded that she used the word "sexy" regarding characters or scenes in the film. (Lively 120-121)



Highly Confidential - Attorneys' Eyes Only - Subject to Protective Order

# THE FROMHOLZ FIRM

d)    Baldoni wanted to make a movie that was sexy, which Lively knew well. Prior to accepting the role, Lively read the script, and knew that the story focused on domestic violence and the Film would include sexual content. (Zavala 42-43; Grey Stone 65-66).

e)    When Lively signed onto the Film, the intent was to make an R rated film, per the agreement with Sony. (Gianetti 201). Prior to the commencement of filming, an "Actor's Loanout Agreement" for Lively's acting services (the "Loanout Agreement") was negotiated. The Loanout Agreement includes an acknowledgment by Lively that the Film would include sexual content including simulated sexual activity and might be "R" rated based on strong sexual or violent content. (Grey Stone 137-38, Ex. 2, Greenberg 309). Lively signed on to an "R" rated film, then required scenes be taken out to make it PG-13. BL_000018396-18400.

f)    Lively cannot have it both ways. She cannot say that the comments were appropriate when addressed to or about others but not appropriate when addressed to or about her. She knew that the movie was a sexy one and was intended to be R rated. It defies credulity that she would find a comment about her wardrobe to be inappropriate. For this reason, a preponderance of the evidence would not sustain this allegation.

g)    Similarly, Slate complained that Baldoni commented that she looked sexy in part of her wardrobe. As in the instance with Lively, Baldoni was the director and was talking about a character in wardrobe. For the same reasons that applied to Lively's allegation, a preponderance of the evidence would not sustain Slate's allegation.

h)    Lively's allegation that Baldoni acted inappropriately during the filming of the slow dance scene is contradicted by the video of the scene, which includes the entirety of the filming of the scene. The video shows that Lively's allegations are, in fact, unsupported and that she engaged in the same or similar conduct that she alleges Baldoni did. In addition, Lively's allegation that she was not comfortable with Baldoni kissing her is undercut by the fact that Lively, on multiple occasions, initiated unscripted kisses of Baldoni. For these reasons, her allegation that Baldoni acted inappropriately during the filming of the slow dance scene would not be sustained by a preponderance of the evidence.

i)    Lively's allegation that Heath saw her naked breasts when he entered her trailer to speak to her was contradicted by the recollections of her hairdresser, Carroll, who recalled holding a cutting cape up so Heath could not see Lively, and of Baker, who recalled putting a towel over the breast that was not breastfeeding. Heath's own recollection of the interaction also contradicted Lively's account. Heath recalled that he looked away from Lively, as she requested he do, and that he did not look at her during the brief two-to-three-minute meeting.

j)    Lively's allegation that Heath showed her a video of his wife giving birth is contradicted not only by Heath's testimony but also, and perhaps more importantly, by the video itself. The only video that Heath had on his phone is one that depicts his wife and him in a tub, with their bare shoulders visible, and with the newborn baby on his wife's chest covered in a small towel. Lively said that she told him to stop the video almost immediately, and there is no nudity in the first part of the video, which is the only part she might have seen.

Highly Confidential - Attorneys' Eyes Only - Subject to Protective Order

# THE FROMH⊙LZ FIRM

**B.    Robbins Incorrectly Concludes That There Were Nudity Rider and Intimacy Coordinator Failures**

1.    Robbins opines that Wayfarer should have established closed set protocols before the birthing scene. He explains that he believes the scene involved "simulated nudity." First, Talbot, a trained Intimacy Coordinator, testified that the birthing scene did not involve nudity. (Talbot 27, 69). Second, the SAG-AFTRA intimacy guidelines apply to "nudity and simulated sex." There is no mention of the concept of "simulated nudity."

2.    Robbins also opines that Wayfarer somehow failed to involve the intimacy coordinator or secure a nudity rider because Baldoni "would 'improvise' by adding additional sexual contact to some of the scenes after Ms. Lively signed onto the Movie." Robbins ignores Lively's own testimony that, when she objected to the proposed sexual content, Baldoni modified the scenes and did not include it. (Lively 75). Therefore, there can be no failure to involve an intimacy coordinator because the scenes never happened.

3.    Additionally, when asked whether an intimacy coordinator met with her to cover some of these scenes and ask whether she was comfortable with them or not, Lively testified "that would not be standard at that point in production in my experience in over 20 years," although she had in fact met with the Intimacy Coordinator prior to production, expressed her boundaries, and negotiated her nudity rider. (Lively 64, Talbot 56-58). Lively also admitted she had never worked with an intimacy coordinator before this Film. (Talbot 58).

4.    Robbins also opines that Wayfarer somehow failed because it did not establish clear definitions of intimacy. However, the SAG-AFTRA guidelines are clear that intimacy involves nudity and simulated sex. In addition, intimacy coordinators—including Talbot—are trained and certified and thus know the definitions of intimacy. (Talbot 24, Ex. 30). It is not up to a studio to create such a definition.

5.    Robbins opines that Wayfarer failed because the birthing scene was not a closed set. Once again, the birthing scene did not involve nudity. (Talbot 69). Therefore, no closed set was required. Nonetheless, at Lively's request, the set was closed. (Heath 198).

6.    Robbins opines that Wayfarer failed because it did not offer Lively an intimacy coordinator for the birthing scene, even though it did not involve nudity. This opinion disregards SAG's guidelines for the use of intimacy coordinators, as well as Talbot's testimony that she discussed the scenes with Lively and Lively did not request an intimacy coordinator for the birthing scene. (Talbot 69).

7.    Robbins misapprehends the role of an intimacy coordinator and the guidelines that apply to the use of intimacy coordinators. He also ignores or misunderstands the testimony of Talbot, the intimacy coordinator who worked on phase one of the production. His opinions, which are based on his misunderstanding of the facts, are incorrect.

**C.    Robbins Incorrectly Concludes That Reputational Damage Is Unique to the Entertainment Industry**

1.    In part of his opinion that Wayfarer failed in its obligations regarding Lively's complaints, Robbins concludes that reputational damage is particularly problematic in the entertainment industry because powerful people can damage the reputation of people who depend on their reputation for future work opportunities. (Robbins 21).

2.    Robbins ignores the numerous other industries in which people develop work opportunities based on reputation, including his own. Lawyers, including expert witnesses and investigators,



Highly Confidential - Attorneys' Eyes Only - Subject to Protective Order

THE FROMH🔅LZ FIRM

develop future work opportunities based solely on reputation. So do innumerable other professionals, including doctors, architects, contractors, plumbers, electricians, therapists, consultants, and more.

3.   There simply is no support for the conclusion that actors are harmed more by reputational damage than other professionals.

## VII.   Conclusion

For the above reasons, my opinions are that:

1.   Robbins erred in his conclusion that Wayfarer failed in its obligation to conduct an investigation into concerns that Lively raised during the filming of the Film because Wayfarer, Baldoni, Heath, and other defendants took immediate action to correct and prevent conduct about which Lively complained and, therefore, an investigation would have been superfluous;

2.   Robbins erred in his conclusion that Wayfarer failed in its obligation to conduct an investigation because an investigation would have shown that a preponderance of the evidence did not support Lively's allegations;

3.   Robbins erred in his conclusion that Wayfarer violated "Entertainment Industry-specific intimacy protocols"; and

4.   Robbins erred in his conclusion that the entertainment industry is unique in that post-employment actions that affect a person's reputation can harm their future job prospects.

Date: November 3, 2025

Respectfully submitted,

*[signature: Ann Fromholz]*

Ann Fromholz

# EXHIBIT A

### ANN HALEY FROMHOLZ
### THE FROMHOLZ FIRM



## EDUCATION

University of Southern California Law School, J.D., 1994
Dartmouth College, B.A., 1990
Association of Workplace Investigators Certificate Holder
Association of Title IX Administrators
    Civil Rights Investigator Training, Level 1, 2, and 3 courses
Trial Advocacy Group, Advanced Trial Advocacy Program
Straus Institute for Dispute Resolution, Pepperdine University, Mediating the Litigated Case
National Institute for Trial Advocacy, Building Trial Skills

## BAR ADMISSIONS

California
Nevada
Texas (Inactive)

## COURT ADMISSIONS

United States Supreme Court
United States Court of Appeals for the 9th Circuit
United States District Court for the Central District of California
United States District Court for the Southern District of California
United States District Court for the Northern District of California
United States District Court for the Eastern District of California

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2015 – present: | Employment Attorney, Investigator, Expert Witness<br>The Fromholz Firm PLC, Owner/Principal |
| 2012 – 2015: | Shareholder/Partner, Employment Law<br>Employment Litigation Practice Group<br>Collegiate and Professional Sports Practice Group<br>Jackson Lewis LLP |
| 2010 – 2012: | Vice President and Chief Counsel, Enterprise Labor & Employment<br>Caesars Entertainment Corporation |
| 2008 – 2010: | Senior Counsel, Labor & Employment Law<br>ConocoPhillips Company |
| 2006 – 2008: | Senior Counsel, Labor & Employment Law |

Liaison Counsel, National Special Investigations Unit
Kaiser Foundation Health Plan, Inc.

2001 – 2005:     Partner, Employment Law
Seyfarth Shaw LLP

1999-2001:       Director of Human Resources and Corporate Counsel
BestOffer.com

1997-1998:       Associate, Employment Law
Orrick, Herrington & Sutcliffe LLP

1995-1997:       Associate, Labor & Employment Law
Morgan, Lewis & Bockius

1994-1995:       Associate, Employment Law
Sheppard, Mullin, Richter & Hampton

## HONORS AND AWARDS
Member, Chancery Club of Los Angeles
Life Fellow, American Bar Foundation
Fellow, Litigation Counsel of America
Fellow, College of Labor & Employment Lawyers
Member, Chief, 2022-2023
Lawyer of the Year, Employment Law, Pasadena, 2021-2023
Daily Journal Top 100 Employment Lawyers, 2021
Top 50 Women Lawyers in Southern California, 2019
Southern California Super Lawyer, 2014 – 2024
Best Lawyers in America, 2020-2023
Pasadena Magazine Top Lawyer, 2018 – 2024
Named by The Hollywood Reporter as "One of Six Lawyers at the Center of the Anti-Harassment Movement", 2018
Named by USC Law School as "Top Harassment Lawyer", 2018

## PROFESSIONAL AND COMMUNITY ACTIVITY
College of Labor and Employment Lawyers
    2023 – present: Credentialing Committee
Los Angeles County Bar Association
    2013-2019, 2022 - 2024: Judicial Appointments Committee
    2019 – present: President's Advisory Committee on Women in the Profession
    2013 – 2022, 2025 – present: Domestic Violence Legal Project volunteer
    2022 – present: Volunteer Settlement Officer, Los Angeles Resolve Law MSC Program
    2023 – 2024: Solo and Small Firms Section, Executive Committee
    2019 – 2020: Judicial Elections Evaluation Committee
    2017 – 2019: Board of Directors, Counsel for Justice
The Gooden School
    2024 – present: Member, Board of Directors
National Charity League

2023 – 2024: Board of Directors, Chapter Parliamentarian
2022 – 2023, 2024 – present: Philanthropy Liaison to Pasadena Humane
U.S. Soccer Federation
2022 – 2024: Los Angeles Development Council
Constitutional Rights Foundation
2013 – 2019: Founder and Coach, Animo Pat Brown Charter High School mock trial team
American Bar Association, Labor and Employment Law Section
2009-2018: National Conference on EEO Law Planning Committee
2009-2011: Social Media Marketing Committee Chair
2009:    Leadership Development Program
1995 – present: Member
American Employment Law Council
2008-2018:    Member
Association of Workplace Investigators
2016-present:    Sustaining Member, Member
Dartmouth Lawyers Association
2008-2012:    Board of Directors, Secretary
2008-present:    Member
Association of Junior Leagues International, Inc.
2008-2010:    Junior League of Houston: Board Member, Director of Children's Health and Education Projects; Committee Chair; Member
1995-2008:    Junior League of Los Angeles: Board Member, Training Director; Committee Chair; Member

## COLLEGE/UNIVERSITY AND K12 APPOINTMENTS

California State University (various campuses)
    Sexual Harassment, Sexual Assault, Discrimination Investigator
University of California (various campuses)
    Sexual Assault and Sexual Violence Appeal Hearing Coordinator
Claremont Consortium (various campuses)
    Sexual Harassment, Sexual Assault, Discrimination, Title IX Investigator
Occidental College
    Sexual Harassment, Title IX Investigator
Riverside Community College District
    Sexual Harassment, Sexual Assault, Discrimination Investigator
Public School Districts, California
    Sexual Harassment and Sexual Assault Investigator
Various Independent Schools, California
    Sexual Harassment and Sexual Assault Investigator

## EMPLOYMENT LAW AND INVESTIGATION WORK

- Conduct investigations into allegations of workplace misconduct, including sexual harassment, discrimination, bias, microaggressions, retaliation, theft, invasion of privacy, fraud, and violation of other workplace policies.
- Conduct investigations required by Title IX into allegations of sexual misconduct, sexual assault, sexual violence, sexual harassment, and discrimination on college and university campuses.

- Serve as hearing officer for appeals of sexual harassment and sexual assault related decisions for public and private universities.
- Testify as expert witness on investigations, employment law compliance, and human resources matters.
- Provide advice to employers regarding compliance with federal and state leave laws, disability accommodations and the interactive process, legally compliant hiring practices and performance management processes, diversity and inclusion issues, cutting-edge employee privacy and social media questions, and threats of workplace violence.
- Develop and deliver training to clients on a wide variety of employment law subjects, including managing within the law, accommodation of disabilities and the interactive process, conducting investigations, and harassment prevention.
- Develop company policies and procedures on subjects including EEO compliance, FMLA and state leaves, accommodation of disabilities under ADA and FEHA, wage and hour compliance, use of social media, harassment investigations, legally compliant hiring practices, performance management, diversity, and inclusion.
- Advise executives in negotiation of employment contracts, severance agreements, and other contracts.
- Serve as consent decree monitor.  Oversee compliance with consent decrees involving discrimination and harassment.
- Advise employers regarding employee privacy and employee data privacy, including HIPAA and ADA confidentiality issues.

Clients include: private and public organizations in the education, energy, entertainment, real estate, medical, legal, financial services, business services, manufacturing, technology, retail, hospitality, transportation, other industries and professions, and private and public education institutions

## SELECTED SPEECHES AND PUBLICATIONS

"Title IX 50 Years In: Looking to the Future as We Celebrate Progress," A Celebration of Women: 50 Years of Coeducation at Dartmouth, November 2022

"Employment Law Update," Network of Nonprofit Search Consultants Annual Meeting, April 2022

"Workplace Investigations: What Works and What Doesn't," Los Angeles County Bar Association breakfast briefing, September 2018

"Confidentiality Provisions and Non-Disclosure Agreements in Cases of Sexual Harassment," *Los Angeles Lawyer*, May 2018

"Sexual Harassment and Gender Inequality in the Entertainment Industry," USC School of Dramatic Arts, panel discussion, April 2018

"A Candid Legal Debate on Hollywood and #MeToo: 'Did the Law Fail Us?'," *The Hollywood Reporter*, roundtable participant, April 2018

"What to do When the #metoo Wave Hits Your Company," Dartmouth Lawyers Association Annual Meeting, February 2018

*Daily Journal* Labor & Employment Roundtable, published November 2017

"When the Complaining Employee Becomes Uncooperative," published in *Law360*, October 2017

"'I Would Do Anything for the Investigation, But I Won't Do That*: Political and Ethical Landmines Faced by Internal and External Investigators' *With apologies to Meat Loaf," Association of Workplace Investigators Annual Conference, October 2017

"What To Do When A Workplace Investigation Jumps The Tracks," published in *Law360*, June 2017

"Fox's Handling of O'Reilly Complaints — A Cautionary Tale," published in *Law360*, April 2017

"Jeweler's Handling of Employee Complaints Far From Sterling," published in *Law360*, April 2017

"Roundtable on Issues in Race Discrimination," ABA National Conference on Equal Employment Opportunity Law, March 2017

"When do you need an outside investigator?," published in *Los Angeles Daily Journal*, March 2017

"When the Workplace Grievance Is Too Hot to Handle," published in *Law360*, February 2017

"OFCCP's Focus on the Finish Line: Unfinished Business or Building a Legacy," ABA National Conference on Equal Employment Opportunity Law, March 2016

"FMLA Compliance," National Employment Law Institute, Employment Discrimination Law Update, July 2014

"Data and Privacy Protection in Operations and Licensing/Health Insurance Portability and Accountability Act (HIPAA): Marijuana may be exempt, but how do you handle information about an underlying medical condition?" Law Seminars International, July 2014

"Wellness Programs and the Workplace: the Key to Federal Compliance," ABA National Conference on Equal Employment Opportunity Law, March 2014

"When Soldiers Return: USERRA and Rightful Place Reinstatement," ABA National Conference on EEO Law, April 2013

"Social Media at Work: From Hiring to Firing," H.R. Star Conference, March 2013

"Federal and California Employment Law Update," ACC So-Cal In-House Counsel Conference, January 2013

"Cutting Edge ADAAA Issues: Top Tips for Handling Tough Hiring and Accommodation Issues and Complying with the Proposed OFCCP Regulations on Employing the Disabled," American Employment Law Council, October 2012

"EEOC Systemic Discrimination Cases," Jackson Lewis Corporate Counsel Conference, June 2012

"Equal Pay: Proving or Disproving the Existence of Unlawful Pay Bias," ABA National Conference on EEO Law, Moderator, March 2012

"Razzle Dazzle Non-Competes in the Electronic Workplace: Solicitation in the Age of Social Media," ABA Employment Rights and Responsibilities Committee Mid-Winter Meeting, March 2012

"Braveheart, Chicken Little, and Burger King: 10 Ways to Make In House Counsel Happy and More Ways Not to Tick Them Off," Fisher & Phillips Client Focus Weekend, September 2011

"Straight Allies in the Workplace," National LGBT Bar Association Lavender Law Conference, September 2011

"You Don't Own Me . . . Or Do You? The Latest Word on Contingent Workers, Including the Pros and Perils of Using Independent Contractors and Temporary Workers," ABA 4th Annual Section of Labor and Employment Law Conference, November 2010

"Using Independent Contractors and Other Contingent Workers: A Slippery Slope Getting Slipperier?" Association of Corporate Counsel Annual Meeting, October 2010

"The World of Employee Privacy – Managing Employee Privacy in a Global Work Environment," American Employment Law Council Annual Conference, October 2010

"Taking Diversity and Inclusion Efforts to the Next Level," ABA Annual Meeting, August 2010

"What the C-Levels *Really* Want to Ask Employment Lawyers," South Texas College of Law 23rd Annual Employment Law Conference, July 2010

"I Am Not the Boss of You: Complex Issues Raised by the Use of a Contingent Workforce," ABA National Conference on EEO Law, March 2010

"Diversity and Inclusion," University of Memphis Law Review Symposium, "Labor and Employment Law Today: Evolution or Revolution?" February 2010

# EXHIBIT B

| Plaintiff | Defendants | Case No | Testimony |
|---|---|---|---|
| Linda Goldman | As You Like It Silver Shop | 02:18-cv-06802 | Deposition |
| Kelly Hanker | Ray & Pyle | BC479542 | Deposition |
| John Doe | Dartmouth College | 19-CV-00013-JL | Deposition |
| Aaron Slator | AT&T | 1210034046 | Deposition, Arbitration |
| Lionel Harper | Charter Communications | 01-19-0004-5743 | Deposition |
| Barich & Damiani | Double Line Group | 1220064308 | Deposition |
| Isomar Juarez | Amada Senior Care | 1220066512 | Deposition, Arbitration |
| Yphantides | County of SD | 21CV1575 GPC BLM | Deposition |
| Dadachanji | Jack Druet, MD | 6679 | Deposition |
| Perez | Quad Graphics | CVRI2104048 | Deposition |
| Carranza | Spears Mfg. | 19STCV08016 | Deposition |
| Alfredo Flores | Tiva Dairy | CIVSB2112688 | Deposition |
| Savannah Alvarez | Walmart Associates, Inc. | 37-2021-00021970-CU-OE-CTL | Deposition |
| Sofia Beedy | Modesto Eye Center, Inc | CV-22-003838 | Deposition, Trial |
| Kelly Omarogbon | Stella Adler Studio of Acting | 23STCV23232 | Deposition, Trial |
| Lucia Beltre | 1736 Family Crisis Center | 22STCV29992 | Deposition |
| Gustavo Muñoz | Walmart Associates, Inc. | 5:23-CV-01154 | Deposition |
| Luis Pacheco | Costco Wholesale | CIVSB2206722 | Deposition |
| Rainy Prock | Valiplug | CV-21-000750 | Deposition |
| Tyler Skaggs | Angels Baseball LP | No. 30-2021-01231706-CU-PO-CJC | Deposition |

## EXHIBIT C

## Facts or Data Considered or Relied Upon

### Documents and Materials Considered or Relied Upon by Robbins

All documents, deposition transcripts (and related exhibits), and pleadings and filings listed in Exhibit C to Mr. Robbins' report.

### Deposition transcripts and exhibits

1.  09.25.2025 Deposition of Anne Carroll
2.  09.18.2025 Deposition of Warren Zavala
3.  10.05.2025 Deposition of Justin Grey Stone
4.  09.19.2025 Deposition of Danny Greenberg

### Documents

1.  BL-000009220
2.  BL-000009349 - 9352
3.  BL-000018396 - 18400
4.  BL-000018765 - 18766
5.  BL-000018767 - 18769
6.  BL-000018834 - 18837
7.  BL-000018839 - 18842
8.  BL-000018845 - 18846
9.  BL-000018847 - 18849
10. BL-000020400 - 20402
11. BL-000020403 - 20405
12. BL-000020882 - 20883
13. BL-000021178 - 21182
14. BL-000021190 - 21192
15. BL-000021197 - 21200
16. BL-000021208 - 21212
17. BL-000021664 - 21665
18. A.M.0000001 - 530
19. 24-CV-10049_0001168 - 1171
20. 24-CV-10049_0001189
21. 24-CV-10049_0001426 - 1434
22. 24-CV-10049_0001472 - 1480
23. 24-CV-10049_0003313 - 3321

1

24. BALDONI_000018766
25. BALDONI_000026091
26. BALDONI_000031447
27. BALDONI_000033514
28. WAYFARER_000140114
29. WAYFARER_0000140494, IEWU0621230163, IEWU062130165 IEWU062130164 . IEWU0519230011, A012C004_230519M8, A014C002_230522F0
30. WAYFARER_000141838
31. SPE_WF00000279 - 280
32. RR-SUBPOENA-000000176 - 177
33. Heath_000028505

**Pleadings and Filings**

CRD Complaint

**Other**

1. https://www.youtube.com/watch?v=_RqSPgHVezQ&t=6s
2. SAG-AFTRA Standards and Protocols for the Use of Intimacy Coordinators