# EXHIBIT 14

CONFIDENTIAL

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---


BLAKE LIVELY,

                    Plaintiff,

    vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)

                           25-CV-449 (LJL) (MEMBER CASE)


WAYFARER STUDIOS LLC, ET AL.


                    Defendants.

_____

JENNIFER ABEL,

              Third-party Plaintiff,

    vs.

JONESWORKS, LLC,

              Third-party Defendant.

_____

WAYFARER STUDIOS LLC, et al.

              Consolidated Plaintiffs,

    vs.

BLAKE LIVELY, et al.

              Consolidated Defendants.

_____


                  **CONFIDENTIAL**

   VIDEO-RECORDED DEPOSITION OF MICHAEL ROBBINS

                Los Angeles, California

                Monday, November 24, 2025



Stenographically Reported by:  Ashley Soevyn,

CALIFORNIA CSR No. 12019

Pages 1 - 270


                                        Page 1

CONFIDENTIAL

Q    And did you represent, primarily, plaintiffs or defendants?

A    Defendants, with occasional pro bono cases for plaintiffs.

Q    In your work as an expert, do you primarily work for plaintiffs or defendants?

A    I get hired more often than plaintiffs than defendants.

Q    How much of your work is plaintiff-based rather than defense-based?

A    So you're asking about my work as an expert.

Q    Yes.

A    It's probably about two-thirds or three-quarters plaintiff and the rest defense.

Q    Have you worked in the entertainment industry?

A    Yes.

Q    When did you work in the entertainment industry?

A    So by "working," you mean as an employee?

Q    Yes.

A    So I was in-house for four years from, I think, very late 1979 or very early 1980 through most of '82.

Page 24

CONFIDENTIAL

Q    Where?

A    CBS for two years.  And then there was a company called Golden West Broadcasters, Golden West Television -- my pause was I'm trying to make sure the years are right, so total of four years -- which was owned by Gene Autry.  And so I worked there as well.

Q    In your job at CBS, what did you do? What was your role?

A    Most of it was day-to-day advice to management on labor and employment issues.  I also did investigations.  And I did some litigation.

Q    When you were at CBS, what was your title?

A    At the beginning, an attorney and then senior attorney.

Q    Did you do any work with nudity riders?

A    No.

Q    Did you do any work with intimacy coordinators?

A    No.

Q    In your job at Golden West, what was your title there?

A    Director of labor relations and labor counsel.

Page 25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q    And how long were you there?

A    Two years.

Q    And what was your job responsibilities?

A    Same things as CBS, except I also did union negotiations.  Oh, and at both places, I did arbitrations.

Q    Did you work on any nudity riders while at Golden West?

A    No.

Q    Did you work on -- with any intimacy coordinators?

A    No.  The job didn't exist at that point or even close to existing at that point.

Q    When did that job first start existing?

A    Roughly 2017 in the UK.

Q    When in the United States?

A    Shortly thereafter.

Q    When it first -- when the job of intimacy coordinator first started existing, did it exist in the theater as opposed to movies and television?

A    I don't know the answer to that.

Q    Did you speak with or meet with any lawyer in connection with this assignment other than the initial meeting that you had with Ms. Roeser?

A    Yes.

Page 26

BY MS. ZELDIN:

Q    Do any of the cases that are listed in Exhibit B involve issues regarding intimacy coordinators?

A    No.  I have never testified about that issue before.

Q    Have you ever testified regarding nudity writers before?

A    No.

Q    Have you ever testified about the impact of retaliation in the entertainment industry?

A    I've never testified about that, but I've written about it and presented about it.

Q    Where have you written about it?

A    So there are two articles that were cowritten by me.  One was published by the Association of Workplace Investigators, or AWI; and the other in the Daily Journal.

Q    Okay.  And the Daily Journal is a legal newspaper for lawyers, correct?

A    Yes.

Q    And AWI is an organization you founded, correct?

A    No.

Q    Did you cofound it?

A    No.

Page 31

other than what we have -- what is in your report and the work you already identified reading these four extra documents?

MS. ROESER:  Objection.

THE WITNESS:  Yes.

BY MS. ZELDIN:

Q    What do you intend to do?

A    Read Ms. Fromholz's deposition.  And then, prior to trial, review documents again to get ready for trial.

Q    What documents do you intend to review to get ready for trial?

A    Same ones that I reviewed for purpose of my report.  Plus the one, the additional ones we did today.

Q    Anything else?

A    No.

Q    Under the category "Other" in Exhibit C, you say that you had a conversation with somebody named Laura Rikard?

A    Yes.

Q    She's the owner of something called "Theatrical Intimacy Education," correct?

A    Yes.

Q    And why did you talk to her?

Page  44

CONFIDENTIAL

A    I talked to her because counsel suggested I talk to her.  She's an intimacy coordinator.  She also teaches intimacy coordinators.  And so they -- I assume they thought -- because I don't know exactly what was in their minds -- that they thought that her thoughts might be useful to me.

Q    Were they?

A    Yes.

Q    What thoughts were useful -- strike that.

Let's start with, when did you speak with her?

A    Before I wrote my report, but I don't remember how long before.

Q    Did you speak with her by yourself, or was somebody else present?

A    I think Ms. Roeser was present.

Q    And did you know Ms. Rikard yourself or were you introduced through counsel?

A    Introduced through counsel.

Q    And you had a conversation by phone or by Zoom or in person?

A    Phone.  I think.

Q    And how long was the call?

A    Forty-five minutes to an hour.

Q    And did you have more than one call with

Page 45

her?

A    No.

Q    Did you take notes of this call?

A    Yes.

Q    Do you intend to rely upon the opinions that she's -- that Ms. Rikard gave you or the information she imparted to you during that phone call?

MS. ROESER:  Objection.

THE WITNESS:  Some of the information that she gave me was useful for me to -- in terms of forming opinions.

BY MS. ZELDIN:

Q    You did not turn over your notes of that conversation, correct?

A    Well, nobody asked -- there was no request for production of documents.  But aside from that, I don't have the notes anymore.

Q    We're in federal court.  Anything that you considered in forming your opinions needs to be produced, period.  We don't need to ask for a document request.

MS. ROESER:  Objection.

MS. ZELDIN:  What happened to the notes?

THE WITNESS:  I had notes for a short

Page 46

CONFIDENTIAL

you're using the wrong standard.

Q    What is the right standard?

A    Severe or pervasive as in the training materials.

Q    Oh, sorry.  I thought I said severe or pervasive.

Is a single incident of calling somebody -- you're a lawyer, right?

A    I am a lawyer.

Q    All right.  And you're an employment lawyer?

A    Yes, I don't practice in the traditional sense anymore; but, yes.

Q    All right.  But you decide whether or not an investigation is necessary, correct?  You provide opinions about that topic?

A    My answer hasn't changed.  No, I do not provide, at least as an investigator, opinions about that.  But as an expert witness, sure.

Q    Right.

A    And I train people about that, too.

Q    Okay.  And is it necessary to conduct an investigation when there is one incident of a director calling the actress who's wearing a costume sexy?

Page 113

CONFIDENTIAL

Weinstein.

Q    Right.   And you give the example of Weinstein.   Are you analogizing Justin Baldoni to Harvey Weinstein?

MS. ROESER:   Objection.

THE WITNESS:   Only in the attempt to try to destroy people's careers.   But in terms of the amount of influence, no.   In terms of the amount of money available, maybe yes, because Mr. Sarowitz was financing a lot of this and he's apparently a billionaire or something like that.

BY MS. ZELDIN:

Q    Does Mr. Baldoni have the same influence that Mr. Weinstein had?

MS. ROESNER:   Objection.

THE WITNESS:   Now, no -- now, yes, but then, no.   Now, he has more influence than Mr. Weinstein has.   Mr. Weinstein has none right now.   But at the time, no.

BY MS. ZELDIN:

Q    All right.   And Mr. Baldoni didn't have as much influence in the industry, in the Hollywood industry than Mr. Reynolds, correct?

MS. ROESNER:   Objection.

THE WITNESS:   I think that's probably

Page 235

CONFIDENTIAL

true.  But also, unlike Weinstein, the way you can try to influence people has changed dramatically.  And certainly, compared to Alfred Hitchcock, for example, and Tippi Hedren, because now you have social media.  That largely didn't exist then.  And with enough money, you can do things that you couldn't do before, even if you have less influence, as long as you have got money.

BY MS. ZELDIN:

Q    And does Mr. Reynolds have money?

MS. ROESNER:  Objection.

THE WITNESS:  I'm sorry.

Sure, he does.

BY MS. ZELDIN:

Q    Okay.  A lot of money, right?

MS. ROESNER:  Objection.

THE WITNESS:  I don't know details, but a lot of money.

BY MS. ZELDIN:

Q    All right.

After the film wrapped, Lively told Sony that she would not agree to promote the film unless she was permitted to participate in the edit; isn't that right?

A    Or something to that effect, yes.

Page 236

CONFIDENTIAL

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.  Dated this 25th day of November, 2025.

ASHLEY SOEVYN

CSR No. 12019

Page 268