# EXHIBIT 15

# AWI JOURNAL

**VOLUME 13    I    NUMBER 3    I    DECEMBER 2022**

THE OFFICIAL PUBLICATION OF THE ASSOCIATION OF WORKPLACE INVESTIGATORS

ASSOCIATION OF
WORKPLACE INVESTIGATORS®

## Investigations in Hollywood: It's the Same, but Different

By Michael A. Robbins and Matthias Wagener



From the perspective of a workplace investigator, the entertainment industry is unique. (It is unique for other reasons as well.) This article explores the differences in conducting investigations in the entertainment industry and provides practical guidance for both the investigators conducting them and the companies engaging those investigators. This guidance also extends to similar issues that may arise in other industries.

### 1. Employment Relationship and Access to Witnesses

In most industries, the parties and the bulk of the witnesses are employed by the same employer. This is convenient for workplace investigators because it usually allows relatively easy access to witnesses (at least those who are current employees). Similarly, sometimes there is a single employer in entertainment investigations, such as when a single motion picture studio produces a movie, hires all the actors and staff on the production, and then distributes the movie as well. But the question "who is the witness' employer?" in entertainment investigations is often not that simple, and this can create challenges regarding access to witnesses.

For example, sometimes a studio will contract with a production company to produce a film, and the production company will simply rent a sound stage for filming. In some of those situations, the rental agreement only grants use of the four walls of the soundstage, so the production company has to hire all production personnel. Other times, while the "above-the-line" employees (actors, directors, writers, and producers) may be employed by the production company, the "below-the-line" employees (such as camera operators, electricians, grips, art directors, costume designers, hair

stylists, post-production editors, set decorators, sound engineers, drivers, and carpenters) may be employed by the studio that owns the soundstage.

Additionally, while there are many well-established production companies, it is fairly common for a production company to exist only for a specific project (e.g., for a particular TV or film production). After the project is over, the production company disbands. To further complicate matters, a project that is shot in multiple locales may have to utilize different below-the-line-employees in each locale, who may work for different production companies. Some production staff also might be needed for only a single day to shoot a particular scene.

The potential for all these different employers creates complications for investigators conducting entertainment investigations in several ways.

First, it might be difficult to identify relevant witnesses because of the sheer number of production personnel involved and the fact that many of them worked for different employers or in different locales. For example, a complainant might not be able to specifically identify witnesses to an on-set altercation because the complainant does not regularly work with them. An investigator may need to review crew lists, call sheets, payroll records, calendars, or other production documents (from multiple production companies) to determine who was working on the day in question to help identify witnesses.

continued on page 5

## Investigations in Hollywood: It's the Same, but Different *continued from page 1*

Second, once the witnesses are identified, the next challenge comes in locating them. Because of the transient nature of production work, witnesses might already have moved on to another production (and to another production company), potentially leaving behind minimal or outdated contact information. In these situations, the investigator can try a simple internet or social media search, such as Instagram or IMDb. In the case of above-the-line employees, the investigator also can try contacting the witness' talent agent, manager, or publicist. If those efforts fail to locate the witness, the investigator might weigh the potential downsides of asking around for anyone still in contact with the witness (recognizing that this could broadly disclose the witness' involvement and allow others to taint the witness).

Third, even successfully identifying and locating a witness does not guarantee their participation in the investigation, as the company engaging the investigator might not have an employment relationship with the witness. For example, if a female actor raises harassment allegations regarding a male actor who worked on the same project, and that project ends before the investigation takes place, both parties may have moved on to different projects with different employers. While a company may be able to compel current employees to cooperate in an investigation (in jurisdictions where employees have a statutory duty of loyalty to the employer), it has no such recourse for former employees, independent contractors, or other third parties. This challenge often arises in investigations involving former reality show contestants, who may have little to no reason to cooperate with an investigation because they typically do not have an ongoing duty to the production company that engaged them.

> An investigator may need to review crew lists, call sheets, payroll records, calendars, or other production documents (from multiple production companies) to determine who was working on the day in question to help identify witnesses.

## 2. Documentary Evidence

Gathering relevant documentary evidence also involves different hurdles in entertainment investigations with multiple employers. In most industries, investigators have relatively easy access to relevant documents. Typically, the investigator can simply ask the client company to provide copies of relevant HR records and access to company email and instant messaging systems. But in entertainment investigations, this type of evidence can be elusive.

As a threshold challenge, the company with possession, custody, or control of relevant records might not actually be the investigator's client. As discussed above, a TV or film production could have multiple employers involved. Investigators may need to ask their client company to help obtain cooperation from other companies involved in the production.

Assuming the other companies cooperate, they often do not have the same records as a typical company because of the nature of their relationships with their personnel. Such companies frequently do not use enterprise email and instant messaging systems. To obtain those types of records, the investigator may need to request them directly from the individuals who actually sent or received the messages. Because these individual records custodians may not have a duty to cooperate, they might elect to decline the request. This barrier creates an evidentiary challenge for the investigator, particularly if the evidence is material to the investigation.

In contrast, some aspects of entertainment investigations make it easier to obtain relevant evidence. For example, in many productions, the cameras used to film the production might have been rolling at the time of the incident being investigated. The investigator can therefore review actual film, as well as film from the cutting room floor, to help determine what happened.[1] In other cases, even if film is not available, there might be audio records. For example, in many reality TV shows, participants are typically on microphone 24/7 and even when off-camera. Post-production personnel can help an investigator review this type of information.

As another example, if the investigation involves a particular scene in a scripted TV show or movie, then the script itself could be an excellent source of evidence. Imagine that a sex scene called for an actor to touch another actor in a certain manner, and that actor allegedly deviated from the script by touching the other actor much more intimately. The script could be evidence that the touching was (or was not) unwelcome, depending on what it called for the actors to do. The investigator should interview any intimacy coordinators,[2] who often participate in choreographing these scenes, and may have relevant knowledge regarding any limits the actors agreed upon beforehand. Note, however, that some deviations from the script might be a permissible part of the "creative process" (discussed in more detail below), such as ad-libbing lines that contain sexual content.

## 3. Public Interest and Media Attention

The entertainment industry also differs from most other industries in that it tends to garner a tremendous amount of interest from the media. Thus, while harassment or similar allegations in a non-

entertainment industry business tend not to generate public interest (obviously with some exceptions), the public is more likely to discover and disseminate such allegations arising from the entertainment industry. This is particularly the case when well-known actors, directors, or producers are involved. This, too, creates challenges for investigators.

Often in these situations, the complaining party or responding party may decide to address the allegations in public. For example, if a tabloid learns of the contentions, the responding party may call a press conference to relay their account and try to get ahead of the story. Such publicity can undermine the investigation by tainting witnesses or causing them to choose sides—frequently, the side who has more "power" in the industry.

> The entertainment industry also differs from most other industries in that it tends to garner a tremendous amount of interest from the media.

The public nature of entertainment investigations can therefore amplify the importance of a threshold issue: investigator selection. A company should first consider whether to handle the investigation in-house or to use an independent (outside), neutral investigator. For lower-risk cases, an in-house investigation conducted by internal HR personnel might be appropriate and more economical than paying for an outside investigator. But for other cases, particularly those involving the potential for significant financial, legal, or public relations exposure, an independent investigator has several advantages.

To begin with, witnesses often are more willing to cooperate with an outside, neutral investigator. Among other things, hiring an independent investigator might signal that the company really takes the matter seriously and will take appropriate action as a result. An outside investigator can also help a company deal with the intense media scrutiny that high-profile entertainment investigations often involve. The media have become increasingly skeptical of a company's ability to conduct a fair, impartial, and thorough investigation *of itself*. A company can sometimes obtain favorable PR by issuing a media statement that it has hired an independent, neutral investigator and intends to fully cooperate with the investigation.

An investigator conducting an investigation that has attracted media publicity should be especially mindful of how that can impact the investigation. For example, reporters might request a public comment from the investigator. The investigator should let the company know beforehand that "no comment" will be the investigator's response to such inquiries. As another example, third-party witnesses may elect to talk to reporters about their interviews with the investigator. Or they might publish their experiences on social media (and, in some cases, they might even publish surreptitious recordings of their witness interviews).

## 4. Powerbrokers and the Fear of Being Blackballed

Another unique aspect of entertainment investigations is that other industries do not have powerbrokers like those in the entertainment industry. For example, if an employee raises harassment allegations at an insurance company and then decides to leave for another company, outside individuals would likely not have any power to affect that employee's ability to obtain a job at another insurance firm.

In contrast, powerbrokers like Harvey Weinstein had the ability to affect people's careers—even beyond the reach of their own projects. For example, an actor who refused to engage in sexual activity with a powerbroker might find their career destroyed—including on projects completely unrelated to the powerbroker. Although the entertainment industry appears to be changing for the better, fear of powerbrokers having a deleterious effect on careers remains a prominent concern even now, five years after the start of the #MeToo movement and the public reckoning faced by many high-profile individuals and companies. These levels of influence and fear simply do not exist in any other industry.

As a result, witnesses who might otherwise be willing to cooperate may hesitate or refuse entirely because they fear being blackballed in the entertainment industry. For example, a complainant might fear not being selected to work on a subsequent production—maybe one produced by an entirely different production company—if it could involve one or more of the same principals as the last production.

## 5. Celebrity Parties
Entertainment investigations sometimes involve celebrity or other high-profile accused parties, such as actors, showrunners/EPs, producers, directors, talent agents, and studio and production executives. Their involvement can present unique challenges for investigators in several ways.

First, as these cases receive public attention in the media, they sometimes encourage others to come forward with similar stories or allegations. Thus, while most investigations involve fairly recent conduct, high-profile cases often implicate conduct that occurred years—or even decades—ago. As a result, investigators will more likely encounter difficulties in locating witnesses and evaluating stale memories. After many years, witness recollec-

tions may be spotty or flatly incorrect as to certain details. Memories also may have been tainted or influenced in various ways, perhaps by what the witness has read in the press or by questions posed to the witness by the complainant, the respondent, or attorneys. To minimize these issues, an investigator should act quickly to reach potential witnesses before others do.

Second, high-profile accused parties or witnesses often retain counsel to represent them for purposes of investigation interviews. As the #MeToo cases illustrate, allegations against high-profile individuals frequently involve sexual assault or other criminal conduct that implicates not only the alleged perpetrator, but also witnesses who could be charged with aiding and abetting or other criminal misconduct. Thus, attorneys may block access to important witnesses entirely, or instruct them to assert their Fifth Amendment right against self-incrimination and to not answer questions. Investigators will have to determine whether it is fair or reasonable to draw an adverse inference in such cases. Alternatively, attorneys may condition their client's cooperation on a prior review of the allegations or evidence, which is not a standard or effective investigations practice.

Finally, celebrities sometimes seek to have their managers, talent agents, or publicists attend their interview. In general, investigators should not permit such third parties to attend. First, these individuals may be percipient witnesses in the investigation, and such witnesses should be interviewed separately. Second, given that many investigations of this nature are conducted under attorney-client privilege, having a third-party attend could result in a privilege waiver.

## 6. Sexual Situations and Creative Process Issues

One of the most interesting substantive differences in entertainment investigations is the application of the "creative process" in sexual harassment investigations. In most industries, creative expression is not the company's product. For example, sexually coarse and vulgar language would not be necessary or appropriate at a car rental company, an aerospace factory, or a pharmaceutical company. But that's not the case on many TV and film productions.

This issue was famously litigated in the 2006 California Supreme Court decision in *Lyle v. Warner Bros. Television Productions* (AKA the "Friends" case).[3] In *Lyle*, the Court recognized that a certain degree of sexually coarse and vulgar language not aimed at the complainant (a writer's assistant) is a necessary part of the creative process in the writers' room of an adult-oriented comedy production featuring sexual themes. This applies even if some of the otherwise inappropriate language ends up on the cutting room floor and not in the final version of the show, because the creative process necessarily involves attempts at creativity that end in failure.

Investigators conducting entertainment investigations must bear these principles in mind and allow a certain amount of leeway for otherwise inappropriate language or behavior if it is a necessary part of the creative process. Many TV shows and films deal with sexual subject matter and contain sexual scenes—some quite explicit. Sensitive subjects may arise not just in the writers' room, but also on set when actors take creative license by ad-libbing lines that contain potentially offensive content. Workplace investigators in the industry frequently must determine whether the line was crossed in light of *Lyle*.

The artistic process adds another layer of complexity in determining where to draw the line between work-related and non-work-related interactions. For example, if a male lead actor has sexual scenes with a female actor/complaining party, are his sexual comments and touching off-set improper, or simply part of his creative process as a method actor?

## 7. Geography

Geography brings another unusual aspect to entertainment investigations. Sometimes, just like most other businesses, employees in the industry work at a single location. But other times, a particular project involves various geographic locations. A motion picture might shoot scenes in several foreign countries and then return to the U.S. to shoot certain scenes at one of the many soundstages across the country. A production may choose from the extensive soundstages in New York, Atlanta, Los Angeles, and several other U.S. cities, or from popular soundstages outside the United States (like London and Vancouver). Alleged incidents could have occurred at some or all of those locations.

Additionally, the production company (or studio) might be in one city, while the parties and witnesses could be scattered in cities throughout the U.S. (or even outside the U.S.). And many, if not all of them, might have moved on to other projects located in still other areas by the time the investigation takes place.

Not only does all this present potential logistical problems for the investigator, it also raises the issue of who is qualified under state, provincial, or international laws to conduct the investigation. Investigators often can deal with the logistical issues by using video conference technology (such as Zoom) to conduct witness interviews with non-local witnesses, thus avoiding travel time and costs. But the investigator qualification issue is more complex. Indeed, in some jurisdictions it is unlawful for an outside attorney who is not licensed in that state to conduct a workplace investigation there.[4] Entertainment investigations involving multiple jurisdictions, including the one in which the attorney investigator is licensed, raise legal and ethical questions. For example, can a California-based outside investigator conduct an investigation for a production company located in California concerning incidents that occurred in Paris and New York when witnesses are scattered (but some are in California)? An investigator should consult local

law and counsel where necessary to ensure compliance in tricky situations like this.

## 8. Conduct Outside of Work

The very nature of the entertainment industry increases the chances of allegations involving incidents that took place offsite and outside of working hours. Although this is not unique to the entertainment industry, it does tend to happen more often than in other industries. Many production employees tend to meet regularly outside of the workplace, for example, when they are filming on location together and are all staying at the same hotel. Sometimes they get together after work for dinner or drinks, and sometimes they attend parties together. Some of those parties might be work-related, some not. In the entertainment industry, the distinction between work-related and not can be hard to discern.

Consider a harassment incident that allegedly occurred at a non-work-related party where celebrities gathered in part to generate publicity for themselves and their projects.[5] Or say an incident occurred at an awards show, or a party relating to an awards show, which the complainant and respondent attended to be "seen," but their attendance was not a requirement of work.

The threshold issue in these examples is whether a company has a duty to investigate misconduct taking place during one of these events. If the company did not sanction or even know of the event, the company might be inclined not to investigate. But what if someone claims that a production employee sexually assaulted another production employee? In that case, the company would be on notice that someone might be an ongoing threat to its employees and, therefore, might have a duty to investigate and take other interim action to protect its staff.

An investigator in these situations may need to explore whether the employer sanctioned the event in question, or whether the employer required or "strongly encouraged" attendance. An investigator may also need to determine whether anyone at the company knew, or should have known, of the potential for the respondent to engage in the misconduct at issue. However, even in circumstances where there is no duty to investigate, the failure to investigate non-work-related incidents could result in adverse publicity for the employer—particularly if the complaining party and responding party are scheduled to continue working together on that particular project.

## Conclusion

Entertainment investigations have many unusual aspects compared to investigations in other industries. These differences highlight the importance of selecting a seasoned investigator who has adequate training, background, and prior experience in the industry. Investigator choice can be especially important where adverse public relations exposure is a bigger risk than legal ex-

posure. While the adage "there's no such thing as bad publicity" may ring true for the talent, corporate Hollywood has been facing a reckoning that may continue for years to come.

---



*Michael A. Robbins is President of EXTTI Incorporated, where he and his colleagues provide Expert Testimony, Training and Investigation services in employment matters. He is a Past President of the Association of Workplace Investigators (AWI), is a Past Chair of the Los Angeles County Bar Association's Labor & Employment Section and past member of the Executive Committee of the California Lawyers Association Labor & Employment Section. He has been involved in the entertainment industry since 1979.*



*Matthias Wagener is the founder and Managing Partner of Wagener Law, a law firm dedicated to conducting independent workplace investigations. He has been practicing employment law for over 20 years, and since 2010 his practice has focused on neutral investigations. He has conducted numerous investigations in the entertainment industry, including many arising out of the #MeToo movement.*

### Endnotes

[1] We refer to "film" metaphorically here, as productions are most commonly shot digitally nowadays.

[2] An intimacy coordinator is member of the production who ensures the well-being of actors who participate in sex scenes or other intimate scenes.

[3] 38 Cal. 4th 264 (2006).

[4] *See, e.g.,* Cal. Bus. Prof. Code §§ 7520 et seq. (establishing an exception to the rule that California investigations be conducted by licensed private investigators, when the investigator is functioning as an attorney.)

[5] For example, in *Doe v. Capital Cities*, 50 Cal. App. 4th 1038 (1996), an aspiring actor was first drugged and then gang-raped by a casting director and four other men one Sunday at the casting director's home. The appellate court reversed the trial court's dismissal of ABC, holding that ABC could be liable even though the aspiring actor was not an ABC employee.