# EXHIBIT 16

Read Today's Digital Edition

 

Place Your Legal Notices

News ▾    Perspective ▾    Network    People ▾    Special Reports ▾    Verdicts    Appellate    Legal Notices/Ads ▾    Submit ▾    Sign In

‹ COLUMNS

 Scan to receive breaking news text alerts.

**Trending**

Appeals court stays contempt sanction against San Francisco public defender
Apr. 9, 2026

The illusion of the confidant: When the chat window feels like privilege but isn't
Apr. 3, 2026

LA personal injury hub ends as court returns to single-judge model
Apr. 3, 2026

**Enewsletter Sign-up**

Entertainment & Sports
Jan. 19, 2024

# Investigations in Hollywood – there's no business like show business

When conducting an investigation that has attracted media publicity, an investigator should be mindful of how that publicity can impact the investigation, and be disciplined enough to say "no comment" in response to media inquiries.





### Matthias H. Wagener

Founder and Managing Partner
Wagener Law

Matthias H. Wagener is the founder and managing partner of Wagener Law, a law firm dedicated to conducting independent workplace investigations. He has been practicing employment law for 25 years, and since 2010 his practice has focused on neutral investigations. He has conducted numerous investigations in the entertainment industry, including many arising out of the #MeToo movement.

See more...



### Michael A. Robbins

President
EXTTI Incorporated

Michael A. Robbins is president of EXTTI Incorporated - a company he founded 26 years ago. The professionals at EXTTI provide Expert Testimony, Training and Investigation services in employment matters. Michael has conducted and/or supervised well over 600 workplace investigations. He has served as an expert witness in more than 700 employment cases - primarily on workplace investigation issues. Michael has extensive experience conducting investigations in the entertainment industry (film, television, streaming, gaming, sports, gambling).

See more...

### Related Content

DAILY APPELLATE REPORT

Employment Law

**Lyle v. Warner Brothers Television Productions**

Writers' assistant on television show 'Friends' did not establish prima facie case of hostile workplace environment sexual harassment.

Imagine the following scenario: after jogging together, two employees, a male and a female, sit on the grass to rest and chat. The female subsequently claims that her male coworker suddenly grabbed her, pulled her up off the grass, and wrapped her legs around him as he resumed jogging. After she complained to HR, the employer hired an independent, neutral workplace investigator to investigate the allegations.

In most circumstances, determining what occurred would be challenging for any investigator. Without any witnesses or other corroborating evidence, the investigator would be left with one person's word against the other's. Deciding which party is more credible would be difficult.

But in Hollywood, where any moment may be caught on camera, maybe it's not so difficult.

The incident took place during a movie shoot. Under those circumstances, ample evidence existed to resolve the "he said, she said" situation. The investigator reviewed the script, which called for the actors to jog, then rest on the grass. The male actor was then supposed to help the female actor up, and once up, they were to jog off together. Thus, the investigator could see that the script called for a very different scene from what the complainant alleged had occurred.

The investigator also had the benefit of reviewing film outtakes. They supported that the situation had transpired exactly as the complainant had alleged. Furthermore, the Director, Assistant Director, and other production employees on set witnessed the entire incident. The abundant evidence in this case allowed the investigator to make factual findings relatively easily.

Here, the unique nature of the entertainment industry created an unusual advantage in the availability of evidence as compared to a "non-industry" investigation. However, in most situations, entertainment industry investigations present their own unique challenges for investigators that largely do not exist in other industries.

**Employment relationships**

For example, the answer to "who is the witness' employer?" in entertainment industry investigations is often not that simple, which in turn creates challenges regarding access to witnesses. In non-industry investigations, the same entity usually employs the majority of the parties or witnesses, so an investigator can simply arrange to meet with witnesses through a company contact. Employment relationships typically are not so straightforward in entertainment industry investigations.

Commonly (but not always) in industry investigations, the parties and witnesses are employed by a variety of entities. A film is often produced by a production company. The production company may rent a soundstage for filming, or the soundstage might be provided by a studio. "Below-the-line" employees (such as camera operators, electricians, grips, etc.) could be employees of the studio, the production company, or the owners of the soundstage – or none of those, in the case of independent contractors.

The production company may have a relationship with a larger company that regularly produces films, or it might be an entity set up only to produce a particular project. By the time the investigation takes place, that entity might have long since disbanded, with the potential witnesses dispersed to other projects. Plus, if the incident took place in a distant location (perhaps even during filming outside the U.S.), potential witnesses could be scattered throughout the country or the world.

Obviously, these scenarios can create logistical difficulties for the investigator in terms of identifying and locating witnesses. They also potentially create uncertainties with respect to who is jurisdictionally qualified to interview witnesses located in various states or countries. Under many state laws, if the investigation is being conducted by an attorney, only attorneys licensed to practice law in that state are qualified to conduct outside investigations there.

To complicate matters, successfully identifying and locating a witness does not guarantee their participation in the investigation, because the company engaging the investigator might not have an employment relationship with the witness. While a company may be able to compel current employees to cooperate in an investigation (in jurisdictions where employees have a statutory duty of loyalty to the employer), it has no such recourse for former employees, independent contractors, or other third parties. Although an employee may recognize the importance of cooperating with their own employer's investigation, that may not be the case with an individual employed by a different employer, or who was employed only on a particular project – especially a project that has long since wrapped.

**Public interest**

Another complication in entertainment industry investigations stems from the public-facing nature of the business. The entertainment industry tends to generate a great deal of attention compared to other industries. For example, public interest and scrutiny seldom descend upon the internal affairs of an insurance company, but allegations involving well-known actors, directors, or producers tend to attract a wide audience. Numerous TV shows, podcasts, and periodicals exclusively cover the industry, and they often spread rumors or information about allegations that can create challenges for investigators.

Sometimes in these situations, the parties may decide to address the allegations in public. For example, the responding party (or their manager or attorney) might call a press conference or issue a press release to profess their innocence. In response, an individual raising allegations against a well-known celebrity may hire equally well-known counsel, then call a press conference of their own. Such publicity can undermine the investigation by tainting witnesses or causing them prematurely to choose sides.

As high-profile cases receive media attention, additional complainants may feel encouraged to come forward with similar stories or allegations. While most investigations involve fairly recent conduct, high-profile cases often implicate conduct that occurred years, or even decades ago. In such cases, investigators are more likely to encounter difficulties in locating witnesses and evaluating stale memories.

One reason that older incidents might be investigated is because the production company or network might have concerns about continuing to utilize an actor accused of past misconduct, fearing the negative consequences/publicity of such retention. For example, an investigation was conducted into allegations against a well-known celebrity in which not only current sexual assault allegations were investigated, but similar incidents from decades before. Once again, this usually doesn't happen in other industries because there simply is not enough interest to generate publicity in the first place.

Third-party witnesses also may elect to talk to reporters about their interviews with the investigator, or they might publish their experiences on social media (and, in some cases, they might even publish surreptitious recordings of their witness interviews). Indeed, the content of a witness interview described by the witness has been posted on social media, and later republished by the media, despite a request that the witness keep the interview confidential. This would not occur in a vast majority of industries because the interview wouldn't have public appeal. It's only newsworthy because it's "entertainment."

Public scrutiny often forces the investigation "under a microscope," which amplifies the importance of a threshold issue: investigator selection. For investigations involving the potential for significant financial, legal, or public relations exposure, selection of an independent, neutral investigator has critical advantages.

To begin with, hiring an outside investigator impliedly signals that the company takes the

matter seriously and will take appropriate action. Witnesses are often skeptical about a company's neutrality and commitment to addressing possible adverse findings, but they may feel more motivated to cooperate when the company has demonstrated a commitment to engaging an outside investigator.

Similarly, engaging an outside investigator can temper the intense media scrutiny that high-profile entertainment investigations often involve. Indeed, the media have become increasingly skeptical of a company's ability to conduct a fair, impartial, and thorough investigation *into itself*. NBCUniversal was in this situation when it decided to conduct an internal investigation regarding the allegations of sexual misconduct against Matt Lauer. In contrast, a company can sometimes obtain favorable PR by issuing a press release that it has hired an experienced and well-regarded outside investigator. For example, the NFL received positive feedback when it hired a former U.S. Attorney and SEC Chair to investigate numerous sexual harassment allegations against Daniel Snyder, the (now former) owner of the Washington Commanders.

When conducting an investigation that has attracted media publicity, an investigator should be especially mindful of how that publicity can impact the investigation. The investigator needs to resist the "siren pull" of a celebrity investigation, be disciplined enough to say "no comment" in response to media inquiries, and simply do their job.

### Powerbrokers

Hollywood presents another unusual complexity in the form of "powerbrokers." Many industries involve powerful and influential people, but in the entertainment industry, a powerbroker might have the ability to adversely affect a person's entire career. For example, an actor who refuses to engage in sexual activity with a powerbroker might find their career entirely destroyed – including on projects completely unrelated to the powerbroker.

These levels of influence and fear simply do not exist in any other industry. For example, if an employee raises harassment allegations at an insurance company and then decides to leave for another company, outside individuals probably would not have any power to affect that employee's ability to obtain a job at another insurance firm. In contrast, think of the numerous retaliation allegations regarding Harvey Weinstein "blacklisting" his accusers, or much earlier, the allegations concerning Alfred Hitchcock's destroying Tippi Hedren's career. Although this problem is improving to some degree, fear of powerbrokers having a deleterious effect on careers remains a prominent concern even now, six years after the start of the #MeToo movement.

This fear sometimes affects the ability of an investigator to obtain relevant, unfavorable information regarding the powerbroker. Witnesses who would otherwise be willing to cooperate may hesitate or refuse entirely because they are scared of being blacklisted in the industry. They often ask the investigator about confidentiality and whether they can be adequately protected from retaliation. Frequently they question the company's motives in conducting the investigation, and whether they can trust the company to actually take appropriate action if the allegations are substantiated. They weigh this latter point and ask, "Why should I participate and risk retaliation, if the company is unlikely to do anything about it anyway?"

Obviously, retaliation fears exist in all industries, but the influence of powerbrokers – and the very real examples of blacklisting that have colored Hollywood's history – dramatically amplifies those fears in the entertainment industry.

### Outside events

The industry also presents unique situations involving conduct that takes place outside of working hours or off company premises, which happens much less frequently in other industries. For an employer to face liability for unlawful harassment, there needs to be a connection between work and the harassment. But in the entertainment world, the distinction between what is work related, and what is not, can be hard to discern.

When an incident occurs at the workplace (such as on set), the work connection clearly exists. Similarly, if an incident occurs outside the workplace, but it is in the course and scope of employment (for example, harassment during a business trip), the connection usually exists as well.

However, it is not uncommon for employees to gather for an event that, at most, has a tenuous connection to work. Consider a harassment incident that allegedly takes place at an outside party or a bar where attendance was not required by the employer. In either of those scenarios, an insurance company employer might think, "This is not work-related, so I'm not responsible, and the incident doesn't need to be investigated."

But the thinking in the entertainment industry often is different. For example, what if a lead actor on a TV show is accused of sexually assaulting a coworker at an awards show after party, where the actor simply might have been there to be seen and thereby obtain publicity for their current project? Or what if the situation takes place at a location completely unrelated to work (such as a private residence, outside of work hours)? The potential negative publicity in either of these scenarios might compel the employer to investigate anyway.

As another example, imagine an allegation in which production employees gather for an unsanctioned hotel room party after a long day working on location, and one of the production employees sexually assaults a co-worker. In that situation, the company would be on notice that one of its employees might be an ongoing threat to others in the production and, therefore, it might have a duty to investigate and take interim action to protect its staff. Of course, interim

action might be difficult here as well. For example, would a production company suspend an accused actor while shooting was still in process?

### The creative process

Another unique aspect of entertainment industry investigations is the consideration of the "creative process" to sexual harassment allegations. Many TV and film productions involve portraying sexual situations, sometimes very explicit ones. That is certainly not the case in most other industries. For example, sexually coarse and vulgar language would not be necessary or appropriate at an automobile factory. Investigators conducting entertainment investigations must allow a certain amount of leeway for otherwise inappropriate language or behavior when it constitutes a necessary part of the creative process.

This issue was famously litigated before the California Supreme Court in *Lyle v. Warner Bros. Television Productions* (AKA the "Friends" case). 38 Cal. 4th 264 (2006). In *Lyle*, the Court recognized that a certain degree of sexually coarse and vulgar language not necessarily aimed at the complainant (in that case, a writer's assistant) is a necessary part of the creative process in the writer's room of an adult-oriented comedy production featuring sexual themes. This applies even if some of the vulgar language ends up on the cutting room floor, because the creative process necessarily involves attempts at creativity that are not successful.

To complicate matters, sensitive subjects may not be confined to the writer's room, but may also appear on set. Consider a complaint involving a TV talk show in which the producers allegedly made sexually explicit jokes over headsets worn by staff and the show's host while the show was recording. Even if one of the staff members listening in may have found the jokes offensive, the jokes arguably were developed for the host to use and generate entertainment for the audience. If the practice helped make "good TV," it arguably was a necessary part of the producers' creative process.

As another example, imagine an accused actor claiming that their ad-libbing potentially offensive statements or actions was simply part of their method acting. Further, consider if the actions were even encouraged by the director in order to create multiple unique takes from which to select during post production. Is it harassment, or just part of the creative process?

The artistic process makes it much less clear where the line between appropriate and inappropriate conduct lies in light of *Lyle*.

### Conclusion

Investigations in the entertainment industry are like no other. Sometimes, the industry presents circumstances that make conducting workplace investigations easier for the investigator. More frequently, however, "there's no business like show business" means investigators will face unique issues and challenges to overcome.

#376607

**Submit your own column for publication to Diana Bosetti**

**For reprint rights or to order a copy of your photo:**
Email Jeremy_Ellis@dailyjournal.com for prices.
Direct dial: 213-229-5424

**Send a letter to the editor:**
Email: letters@dailyjournal.com

**Enewsletter Sign-up**

**Current News**
**Columns**
**Discipline Report**
**On The Move**
**Podcasts**
**Videos**

**Daily Appellate**
**Verdicts**
**Judicial Profiles**
**ADR Profiles**
**Firm Profiles**
**Corporate Counsel**
**People**

**Top 100**
**Top Bankruptcy**
**Top Boutiques**
**Top Cannabis Lawyers**
**Top Family Law Lawyers**
**Top Health Care Lawyers**
**Top Plaintiffs**
**Top Trade Secrets Lawyers**
**Top Under 40**
**Top Verdicts**
**Top Women**

**Antitrust**
**Banking & Financial Services**
**CLAY awards**
**Commercial Litigators**
**Cyber/AI**
**Estate & Wealth**
**Intellectual Property**
**Labor & Employment**
**Neutrals**
**New Laws**
**Niche Lawyers**
**Probate**
**Professional Responsibility**
**Real Estate/Development**
**Recruiting**
**Special Coverage**
**Technology**
**White Collar**

**Daily Commerce (Los Angeles, CA)**
**The Daily Transcript (San Diego, CA)**
**Riverside Business Journal**
**Orange County Reporter**
**San Jose Post-Record**
**The Inter-City Express (Oakland, CA)**
**The Daily Recorder (Sacramento, CA)**
**The Record Reporter (Phoenix, AZ)**

© 2026 Daily Journal Corporation. All Rights Reserved. | Feedback | Advertise With Us | Printing Services | Privacy | User Agreement | SEC | About ⏶ | Submit ⏶