# EXHIBIT 35

**BETTY B HOLDINGS LLC**

**SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**

**Dated as of May 19, 2023**

THE UNITS REPRESENTED BY THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

**Exhibit**
**Betty B 2**

1

BL-000022233

**SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF BETTY B HOLDINGS LLC** (as amended, restated or otherwise modified from time to time in accordance herewith, this "**Agreement**"), dated as of May 19, 2023 (the "**Effective Date**"), by and among (i) Betty B Holdings LLC, a Delaware limited liability company (the "**Company**"), (ii) Ippon Holdings LLC, a New York limited liability company ("**Ippon**"), (iii) LOL HATA LLC, a Delaware limited liability company ("**Lender**"), (iv) Belfer Capital Partners, L.P., a Delaware limited partnership ("**Belfer**"), (v) Gruyere Frusa LLC, a Delaware limited liability company ("**Gruyere**"), (vi) ACG Buzz LLC, a Delaware limited liability company ("**ACG Buzz**"), and (vii) each other Person admitted to the Company as a member in accordance with the terms hereof and listed on the Schedule of Members (individually, a "**Member**" and collectively the "**Members**").

W I T N E S E T H:

WHEREAS, Ippon, Lender, Belfer, Gruyere, ACG Buzz and the other "Holders" listed on Schedule A to the Exchange Agreement (as defined below) (the foregoing referred to collectively as, the "**BB Holders**") have contributed, transferred and assigned to the Company all of their limited liability company interests (collectively, the "**Betty Buzz Interests**") in Betty Buzz LLC, a Delaware limited liability company ("**Betty Buzz**"), and in exchange for such contribution, transfer and assignment, the Company has issued to the BB Holders Units (as defined below) of the Company, pursuant to the terms and conditions of that certain Exchange Agreement dated as of February 24, 2023 (as amended, restated or otherwise modified from time to time in accordance therewith, the "**Exchange Agreement**", and the exchange consummated pursuant thereto being referred to herein as, the "**Exchange**");

WHEREAS, immediately after the Exchange, the Company raised capital through the sale of Common Units to the 2023 Purchasers (as defined below) pursuant to the terms and conditions of that certain Unit Purchase Agreement dated as of February 24, 2023 (as amended, restated or otherwise modified from time to time in accordance therewith, the "**2023 Unit Purchase Agreement**", and the equity financing consummated pursuant thereto being referred to herein as, the "**Equity Financing**");

WHEREAS, in connection with the Exchange and the Equity Financing, and as contemplated by the Exchange Agreement, the initial Limited Liability Company Agreement of the Company, dated as of January 24, 2023 was amended and restated in its entirety pursuant to that certain Amended and Restated Limited Liability Company Agreement of the Company, dated as of February 24, 2023 (the "**Prior LLC Agreement**");

WHEREAS, pursuant to the Prior LLC Agreement, the Company is authorized to issue an aggregate of 10,000 Incentive Units, of which 8,833.333 Incentive Units have been issued to employees and other service providers prior to the Effective Date and 1,166.667 remain available for issuance to employees and service providers as of the Effective Date; and

CONFIDENTIAL

BL-000022234

WHEREAS, the Company desires to issue an aggregate of 4,062.655 Incentive Units to certain service providers and employees and, in connection therewith, the Board and the Members desire to amend and restate in its entirety the Prior LLC Agreement to, among other things, increase the aggregate number of Incentive Units authorized to be issued hereunder from 10,000 Incentive Units to 12,895.988 Incentive Units in accordance herewith.

NOW, THEREFORE, the parties hereto, for and in consideration of the mutual covenants set forth herein and for other good and valuable consideration, the adequacy receipt and sufficiency of which are hereby acknowledged, hereby amend and restate the Prior LLC Agreement in its entirety as follows:

1.       FORMATION; DEFINITIONS

1.1       Formation; Name; Office.  The Company has been organized and formed under and pursuant to the Delaware Limited Liability Company Act, as amended from time to time (the "**Act**"), to be conducted under the name "Betty B Holdings LLC" or such other name as the Board (as defined below) shall determine. The principal place of business and office of the Company shall be located at 381 Park Avenue South, Suite 1015, New York, New York 10016 or at such other place or places as the Board may from time to time designate.  The Company, the Board and the Members hereby approve, ratify and confirm all actions taken by Andrew T. Chrisomalis as the authorized person in executing, and filing with the Secretary State of the State of Delaware, the Company's certificate of formation.

1.2       Treatment of Company. For U.S. federal and applicable state and local income tax purposes, the Company will be treated as a continuation of Betty Buzz.

1.3       Purposes.  The purposes for which the Company has been formed are (a) to directly or indirectly, through subsidiaries and Affiliates, invest in, and own, manage, maintain and dispose of securities of, each of Betty Buzz and BBZ IP Holdings LLC, a Delaware limited liability company ("**BBZ IP**"), and their respective Affiliates, successors and assigns, (b) to accomplish and fund any lawful activities which shall at any time appear conducive to, or expedient for, the protection or benefit of the Company or its assets and in furtherance of the foregoing purposes; and (c) to engage in all activities necessary, customary, convenient, related or incident to any of the foregoing.

1.4       Foreign Qualification.  Prior to the Company's conducting business in any jurisdiction, the Board shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company in such jurisdiction if required by applicable law.  At the request of the Company, each Member shall execute, acknowledge, swear to and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

1.5       Duration.  The term of existence of the Company commenced on the date of the filing of the Company's certificate of formation with the Secretary of State of Delaware

2

BL-000022235

and shall be perpetual, unless the Company is earlier dissolved in accordance with either the terms of this Agreement or the Act.

1.6     Designated Agent.  The name of the Company's registered agent for service of process shall be Cogency Global Inc., and the address of the Company's registered agent and the address of the Company's registered office in the State of Delaware is 850 New Burton Road, Suite 201 Dover, Delaware 19904, located in Kent County.  The designated agent may be changed from time to time by the Company.  If the Company's designated agent shall ever resign, then the Company shall promptly appoint a successor.

1.7     Title to the Property of the Company.  Title to any and all property, real, personal or mixed, tangible or intangible, owned by, or leased to, the Company shall be held in the name of the Company or any wholly-owned subsidiary.  No Member individually shall have any direct ownership in the property of the Company.

1.8     No State-Law Partnership.

(a)     The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture, and that no Member, Manager or officer shall be a partner or joint venturer of any other Members, Manager or officer by virtue of this Agreement, for any purposes other than as is set forth in the last sentence of this Section 1.7(a), and this Agreement shall not be construed to the contrary.  Notwithstanding the foregoing, the Company shall be treated as a partnership for federal and, if applicable, state or local income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

(b)     So long as the Company is treated as a partnership for United States federal income tax purposes, to ensure that Units are not traded on an established securities market within the meaning of Treasury Regulations Section 1.7704-1(b) or readily tradable on a secondary market or the substantial equivalent thereof within the meaning of Treasury Regulations Section 1.7704-1(c), notwithstanding anything to the contrary contained herein, (i) the Company shall not participate in the establishment of any such market or the inclusion of its Units thereon, and (ii) the Company shall not recognize any Transfer made on any such market by (A) redeeming the Transferred Units held by the Transferee (in the case of a redemption or repurchase by the Company), or (B) admitting the Transferee as a Members or otherwise recognizing any rights of the Transferee, such as a right of the Transferee to receive Company distributions (directly or indirectly) or to acquire an interest in the capital or profits of the Company.

1.9     Definitions. As used in this Agreement:

"**Adjusted Capital Account Balance**" means, with respect to each Member, the balance in such Member's Capital Account after (i) increasing such balance with any amounts which such Member is obligated or treated as obligated to restore with respect to any deficit balance in such Capital Account pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(*c*), or

3

                                                              BL-000022236

is deemed to be obligated to restore with respect to any deficit balance pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-(2)(i)(5) and (ii) reducing such balance with the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) and (*6*).

"**Affiliate**" means, with respect to any Person, any other Person who, directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such specified Person.  For purposes of this definition, "control" (including the terms "controlled by" and "under common control with") when used in respect of any specified Person means the power to direct the management and policies of such specified Person, directly or indirectly, whether through the ownership of voting securities, by contract, or otherwise or the ownership of more than half of the equity or similar economic interests in an entity.  With respect to a Person who is an individual, Affiliate means a Family Group Member of such individual.

"**Aggregate 2022 and 2023 Purchaser Percentage**" means the quotient, expressed as a percentage, equal to (x) the total number of 2022 Units and 2023 Units divided by (y) the total number of all Common Units and vested Incentive Units then outstanding.

"**Aggregate 2022 and 2023 Purchaser Percentage Interest**" means, with respect to a 2022 Purchaser and a 2023 Purchaser, as applicable, the quotient, expressed as a percentage equal to (x) the number of 2022 Units and/or 2023 Units, as applicable, held by such Purchaser, as applicable, divided by (y) the total number of 2022 Units and 2023 Units.

"**BBZ IP License Agreement**" means that certain License and Royalty Agreement, dated as of February 24, 2023, by and between BBZ IP and Opco, as amended, restated or otherwise modified from time to time in accordance therewith.

"**BBZ IP Support Fee  Agreement**" means that certain IP Support Fee Agreement, dated as of February 24, 2023, by and between BBZ IP and Opco, as amended, restated or otherwise modified from time to time in accordance therewith.

"**Belfer Member**" means Belfer and all Permitted Transferees of Belfer.

"**Brand**" means, collectively, the trademarks and other intellectual property associated with the "Betty Buzz" brand owned by Betty Buzz and the trademarks and other intellectual property associated with the "Betty Booze" brand owned by BBZ IP.

"**Capital Contributions**" means the total value of cash and fair market value of property contributed to the Company by Members and which shall include initial Capital Contributions and any additional Capital Contributions made by any Member.

"**Capital Contribution Priority Percentage**" means a fraction expressed as a percentage with respect to each Member as follows: 0.5/13 with respect to Gruyere, 1/13 with respect to Ippon, 1.5/13 with respect to Lender, and 10/13 with respect to Belfer.

"**Capital Contribution Residual Percentage**" means 21.95% with respect to Gruyere and 78.05% with respect to Ippon.

"**Code**" means the Internal Revenue Code of 1986, as amended.

4

BL-000022237

"**Company Products**" means non-alcoholic beverage products which are sold or offered for sale under the Brand, including but not limited to soda water, tonic water, flavored tonic water, flavored soda water and ginger beer, but not including coffee and beer.

"**Competitive Products**" means any non-alcoholic beverage product, including but not limited to tonic water, soda water and ginger beer, but excluding coffee and beer.

"**Covered Persons**" means any Member, any Affiliate of a Member, any officer, Manager, employee or agent of the Company, Member or any Affiliate thereof.

"**Depreciation**" means, for each Period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Period, except that if the Gross Asset Value of an asset differs from its adjusted tax basis for federal income tax purposes at the beginning of such Period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Period bears to such beginning adjusted tax basis; provided, however, that if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board and consistently applied.

"**Endorsement Agreement**" means that certain Amended and Restated Endorsement Agreement, dated as of February 24, 2023, by and between the Company and Lender (as the same may be amended, restated or otherwise modified from time to time in accordance with the terms thereof), which amends and restates in its entirety that certain Endorsement Agreement, dated as of July 30, 2021, by and between Betty Buzz and Lender.

"**Endorsement Term**" means the "Term" as defined in the Endorsement Agreement.

"**Equity Security**" or "**Equity Securities**" means, with respect to the Company (i) any capital stock, membership interests, Units or other share capital, (ii) any securities directly or indirectly convertible into or exchangeable for any capital stock, membership interests, Units or other share capital or containing any profit participation features, (iii) any rights or options directly or indirectly to subscribe for or to purchase any capital stock, membership interests, Units, other share capital or securities containing any profit participation features or to subscribe for or to purchase any securities directly or indirectly convertible into or exercisable or exchangeable for any capital stock, membership interests, Units, other share capital or securities containing any profit participation features, (iv) any equity appreciation rights, phantom equity rights or other similar rights, or (v) any securities of the kind described in clauses (i) through (iv) above that are issued or issuable with respect to the securities referred to in clauses (i) through (iv) above in connection with a combination of shares, Units, membership interests, recapitalization, merger, consolidation or other reorganization.

"**Excluded Units**" means any Units (or other Equity Securities convertible into or exercisable for Units) issued by the Company:

5

CONFIDENTIAL                                                                BL-000022238

(i)    as a Unit dividend or upon any Unit split, reverse Unit split or other subdivision or combination of the then outstanding Units, as approved by the Board;

(ii)    as Incentive Units issued in accordance with this Agreement;

(iii)    pursuant to the 2023 Unit Purchase Agreement; and

(iv)    as securities upon and in connection with an Incorporation Transaction.

"**Family Group Member**" means (i) the parents, grandparents, brothers, sisters, descendants (whether natural or adopted) and spouse of the specified individual; (ii) any spouse, descendant, ancestor, heir, legatee or successor of any person specified in clause (i) above; (iii) any trust or family office entity or investment entity (without regard to its form as a trust, partnership, limited liability company or other entity) created for the benefit of any individual described in clauses (i) and (ii) above, and any beneficiary of such trust or family office entity; (iv) any executor or administrator for any of the individuals or their respective estates described in clauses (i) through (ii) above; (v) any partnership or limited liability company consisting solely of individuals described in clauses (i) through (iv) above; and (vi) any tax exempt corporate foundation created by any of the persons described in clauses (i) through (v) above exclusively engaged in charitable purposes.

"**Fully-Diluted Percentage Interest**" means, with respect to a Member and as of a particular time of determination and without duplication, the quotient, expressed as a percentage, determined by dividing (x) the number of all Units including Units issuable upon exercise or conversion of Equity Securities (and whether any such right is exercisable immediately or only with the passage of time), including unvested and vested Equity Securities, then held by such Member by (y) the total number of all Units including Units issuable upon exercise or conversion of Equity Securities (and whether any such right is exercisable immediately or only with the passage of time), including unvested and vested Equity Securities of the Company then outstanding, but not including any authorized or reserved but unissued Incentive Units.

"**Gross Asset Value**" means, with respect to any asset of the Company, the asset's adjusted basis for federal income tax purposes; provided, however, that if an asset is contributed to the Company, the initial Gross Asset Value of such property shall equal its fair market value as of the time of contribution; provided, further, that the Gross Asset Value of an asset may be adjusted pursuant to Section 2.11, Sections 7.1(f) and 7.3(c) as necessary or appropriate to reflect the relative economic interests of the Members in the Company.

"**Gruyere Contribution Agreement**" means that certain Contribution Agreement, dated as of July 30, 2021, by and between Gruyere and Betty Buzz, as amended, restated or otherwise modified from time to time in accordance therewith.

"**Gruyere Member**" means Gruyere and all Permitted Transferees of Gruyere.

6

                                        BL-000022239

"**Incentive Holdco**" means a limited liability company or other entity formed for the principal purpose of consolidating the ownership by employees and service providers of Incentive Units for accounting, administrative and/or other business purposes.

"**Ippon Contribution Agreement**" means that certain Contribution Agreement, dated as of July 30, 2021, by and between Ippon and Betty Buzz, as amended, restated or otherwise modified from time to time in accordance therewith.

"**Ippon Member**" means Ippon and all Permitted Transferees of Ippon.

"**Lender Member**" means Lender and all Permitted Transferees of Lender.

"**Lien**" means any option, pledge, security interest, lien, charge, encumbrance, mortgage, trust deed, easement, lease, sublease, claim, right of way, covenant, condition or restriction (whether on sale, transfer or disposition or otherwise) whether imposed by agreement, law or otherwise, whether of record or otherwise.

"**Liquidation**" means any voluntary or involuntary bankruptcy, liquidation, dissolution or winding up of the Company.

"**Liquidation Event**" means the occurrence of any of (i) a Liquidation or (ii) a Sale of the Company.

"**Lively**" means Blake Lively, a natural person.

"**Loan Agreement**" means that certain Amended and Restated Senior Secured Loan Agreement, dated as February 24, 2023, by and among (i) Betty Buzz, as borrower, (ii) the Company, as guarantor, (iii) BBZ IP, as guarantor, and (iv) Belfer, as lender (as the same may be amended, restated or otherwise modified from time to time in accordance therewith), which amends and restates in its entirety that certain Senior Secured Loan Agreement, dated as July 30, 2021, by and between Betty Buzz and Belfer.

"**Major Member**" means a Common Member who, together with its Affiliates, has contributed a minimum of US$500,000 to the Company.

"**New Securities**" shall mean Equity Securities issued after the Effective Date, excluding Excluded Units.

"**Opco**" means Betty Booze Opco LLC, a Delaware limited liability company.

"**Percentage Interest**" means, with respect to any Member and as of a particular time of determination, the quotient, expressed as a percentage, determined by dividing (x) the then total number of Common Units and vested Incentive Units held by such Member, by (y) the total number of all Common Units and vested Incentive Units then outstanding.

"**Permitted Transferee**" means (i) with respect to any Member that is not an individual, any Affiliate thereof, including, without limitation, any limited or general partner thereof, (ii) with respect to a Member that is an individual, any Family Group Member, (iii) with respect to an individual Member, a corporation or other entity that is an Affiliate of such individual Member and/or any Family Group Member, and (iv) with respect to an individual

7

BL-000022240

Member, a Person to whom Units have been transferred by operation of law, by will or by the laws of descent.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, entity (whether or not legally formed) or government (whether federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

"**Profit**" and "**Loss**" mean for each Period, an amount equal to the Company's taxable income or loss for such Period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, deduction or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss) with the following adjustments:

(i)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss pursuant to this definition shall be added to such taxable income or loss;

(ii)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*i*), and not otherwise taken into account in computing Profit or Loss pursuant to this definition, shall be subtracted from such taxable income or loss;

(iii)    Gain or loss resulting from any disposition of Company assets with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value as the cost basis of the property disposed of, notwithstanding that the adjusted tax basis of such property may differ from its Gross Asset Value;

(iv)    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Period;

(v)    In the event the Gross Asset Value of any Company asset is adjusted pursuant to Sections 7.1(f) and 7.3(c), the amount of such adjustment shall be taken into account as gain or loss for purposes of computing Profit or Loss; and

(vi)    Any items of income, gain, loss, deduction or credit specially allocated pursuant to Section 7.3 shall not be taken into account in computing Profit or Loss.

"**Restricted Activity**" means any of the following activities: (i) promoting or endorsing Competitive Products, (ii) representing, managing, operating, joining, controlling or participating in the promotion, endorsement, management, operation or control of any business,

8

BL-000022241

firm or entity which owns and sells Competitive Products as part of its primary business function, or (iii) being connected with, as partner, director, officer, agent, employee, representative or any other similar capacity, any business, firm or entity which owns and sells Competitive Products as part of its primary business function. For purposes of the definition of "Restricted Activity", an entity which owns and sells Competitive Products as part of its primary business function shall be defined as an entity or business in which at least 25% of the gross sales of such entity and its Affiliates (determined on a consolidated basis) arise from the sale of non-alcoholic beverages.

"**Sale of the Company**" means any of (i) the sale, transfer, assignment, conveyance or other disposition (including by merger or consolidation, but excluding any sales by Members made as part of an underwritten public offering of the Company's securities) in one transaction or a series of related transactions, of more than 50% of all outstanding Units, (ii) the consummation of a consolidation, merger or reorganization of the Company, unless the Members immediately before such consolidation, merger or reorganization own, directly or indirectly, at least a majority of the combined securities of the outstanding securities of the Person resulting from such consolidation, merger or reorganization, (iii) the sale, lease, transfer, assignment, conveyance or other disposition of more than fifty percent (50%) of the assets of the Company, or (iv) the acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended) of beneficial ownership (within the meaning of Rule 13d-3 promulgated thereunder) of 50% or more of all outstanding Units; provided, however, that the following events shall not constitute a "Sale of the Company": (A) a transaction, including a merger or consolidation (other than a sale of all or substantially all of the Company's assets), in which the holders of the securities of the Company immediately prior to such transaction hold, directly or indirectly, a majority of the securities in the successor entity or its parent immediately after such transaction that will be owned in substantially the same proportion by the Persons who held the Company's securities immediately before such transaction; (B) a sale, lease, exchange or other transaction in one transaction or a series of related transactions of all or substantially all of the Company's assets to an Affiliate of the Company a majority of the outstanding securities of which will be owned in substantially the same proportion by the Persons who held the Company's securities immediately before such transaction; (C) a sale of new Units to one or more investors pursuant to the sale of the Company's equity securities in which none of the proceeds therefrom are distributed to any of the Members or their Affiliates; (D) the sale of the Company's securities in an initial public offering; (E) an Incorporation Transaction or reincorporation of the Company solely to change its jurisdiction or conversion or merger of the Company into a corporation or other form of entity; (F) a transaction undertaken for the primary purpose of creating a holding company that will be owned in substantially the same proportion by the Persons who held the Company's securities immediately before such transaction; or (G) a Transfer of Units between existing Members that otherwise would constitute a "Sale of the Company," provided that such Transfer is otherwise permitted hereunder.

"**Securities Act**" means the Securities Act of 1933, as amended.

9

BL-000022242

"**Transfer**" means any sale, transfer, assignment, pledge, mortgage, exchange, hypothecation, grant of a security interest, or creation of a Lien.  The terms "Transferee," "Transferor," "Transferred" and other forms of the word "Transfer" shall have correlative meanings.

"**Treasury Regulations**" means the Income Tax Regulations promulgated under the Code.

"**Unit Purchase Agreement**" means that certain Unit Purchase Agreement, dated as of July 31, 2021, by and among (i) Betty Buzz, (ii) Lender, (iii) Belfer, (iv) Ippon and (v) Gruyere, as amended, restated or otherwise modified from time to time in accordance therewith.

"**Vendor**" means Best Bev LLC.

"**Vendor EIA**" means that certain Equity Incentive Agreement dated as of May 19, 2023, by and between the Company and Vendor, as amended, restated or otherwise modified from time to time in accordance therewith.

"**Vendor Units**" means an aggregate of 987.654 Incentive Units granted to Vendor pursuant to and in accordance with the terms and conditions set forth in the Vendor EIA.

"**2022 Purchasers**" means the "Purchasers" as defined in the 2022 Unit Purchase Agreement.

"**2022 Unit Purchase Agreement**" means that certain Unit Purchase Agreement, dated as of January 31, 2022, by and among Betty Buzz and the 2022 Purchasers, as amended, restated or otherwise modified from time to time in accordance therewith.

"**2022 Units**" means the Common Units purchased by the 2022 Purchasers pursuant to the 2022 Unit Purchase Agreement.

"**2023 Purchasers**" means the "Purchasers" as defined in the 2023 Unit Purchase Agreement.

"**2023 Units**" means the Common Units purchased by the 2023 Purchasers pursuant to the 2023 Unit Purchase Agreement.

2.      <u>CAPITAL CONTRIBUTIONS; UNITS</u>

2.1      <u>Capital Contributions</u>. Each Member has made a Capital Contribution to the Company in the amount set forth opposite such Member's name on the Schedule of Members (as defined below).  In consideration for such Capital Contributions made or to be made by the Members to the Company and as set forth on the Schedule of Members, the Company has issued to each Member limited liability company interests in the Company as described and provided for in <u>Section 2.2</u> below and as set forth on the Schedule of Members.  The Members shall not have any obligation to make additional Capital Contributions to the Company.  Each

10

BL-000022243

Member hereby agrees and acknowledges that (a) the assets contributed by Ippon to Betty Buzz pursuant to the Ippon Contribution Agreement constitute a Capital Contribution by Ippon to Betty Buzz in the aggregate amount equal to $15,048,780, allocated among such assets as specified in such Ippon Contribution Agreement, as the agreed upon fair market value of such assets, and (b) the asset contributed by Gruyere to Betty Buzz pursuant to the Gruyere Contribution Agreement constitute a Capital Contribution by Gruyere to Betty Buzz in the aggregate amount equal to $4,451,220, which is the agreed upon fair market value of such asset.

2.2    Units; Percentage Interests.  "Limited liability company interests" (as such term is defined and used in the Act) in the Company shall be represented by units (each, a "**Unit**"). Units shall be (i) Common Units (the "**Common Units**"), and (ii) Incentive Units (the "**Incentive Units**", which, for clarity, are comprised of and include Incentive Pool A Incentive Units (as defined below), the Vendor Units and Incentive Pool B Incentive Units (as defined below).  All Incentive Units shall be issued and issuable as Profits Interests (defined below).  Common Units and Incentive Units shall be identical in all respects except as expressly provided for herein.  Units shall not be certificated unless otherwise determined by the Board.  The name and address of the Members, the number and class of Units owned by each Member, the Capital Contributions made to the Company by each Member, the Percentage Interest and the Fully-Diluted Percentage Interest of each Member are and shall be set forth on the attached Schedule of Members, as may be amended by the Company at any time and from time to time pursuant to this Agreement (the "**Schedule of Members**").  The number of Units, the Percentage Interest and the Fully-Diluted Percentage Interest of each Member are subject to adjustment in accordance with the terms of this Agreement.  To the extent that any such adjustment is required pursuant to this Agreement, the parties hereto acknowledge and agree that the Schedule of Members shall automatically be deemed amended and restated to reflect the correct Units, Percentage Interest and Fully-Diluted Percentage Interests of each Member without any further action of the parties hereto, except that the Company shall promptly notify Lender of any such revised Schedule of Members. Further, the name of each 2022 Purchaser and 2023 Purchaser, the number of 2022 Units and/or 2023 Units, as applicable, owned by such 2022 Purchaser and/or 2023 Purchaser, as applicable, and the Aggregate 2022 and 2023 Purchaser Percentage Interest are and shall be set forth on the attached Schedule of 2022 and 2023 Purchasers (the "**Schedule of 2022 and 2023 Purchasers**"). Subject to Section 3.9 hereof, to the extent applicable, the Board may establish different series and classes of Units with such rights and preferences as it deems appropriate in its sole discretion.  A Member holding only Common Units may be referred to herein as a "**Common Member**."  Any Member holding only Incentive Units may be referred to herein as an "**Incentive Member**".  Any Person who becomes a Member after the Effective Date shall, as a condition of admission to the Company as a Member, agrees to be bound by this Agreement and shall in furtherance thereof, execute a joinder agreement in the form attached hereto as Exhibit A (the "**Joinder Agreement**").

2.3    **Classes. EACH MEMBER ACKNOWLEDGES THAT SUBJECT TO SECTION 3.9 HEREOF, TO THE EXTENT APPLICABLE, THIS AGREEMENT GRANTS THE BOARD THE RIGHT TO CREATE CLASSES OF UNITS IN WHICH SUCH MEMBER MAY NOT HOLD AN INTEREST, INCLUDING WITHOUT LIMITATION CLASSES ESTABLISHED AFTER SUCH MEMBER WAS ADMITTED TO THE**

11

                                                                BL-000022244

COMPANY.  EACH MEMBER ACKNOWLEDGES THAT EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT SUCH MEMBER HAS NO RIGHT TO PARTICIPATE IN ANY NEWLY CREATED CLASS OF UNITS.

2.4    **Incentive Units.**

(a)    Subject to Section 3.9, the Board is authorized, and may determine, to issue Incentive Units to employees and other service providers in a maximum amount of 12,895.988 Incentive Units, of which (i) 8,833.333 Incentive Units have been issued to employees and other service providers prior to the Effective Date (collectively, the "**Incentive Pool A Incentive Units**"), and, for clarity, of which 3,333.33 of such Incentive Pool A Incentive Units have been issued to employees of Maximum Effort Marketing, LLC, or its successor(s), as designated by Lender, at its sole discretion, subject to customary terms for vesting and forfeiture, (ii) 987.654 Incentive Units have been issued to Vendor pursuant to the Vendor EIA and are referred to herein as the Vendor Units, and (iii) an aggregate of 3,075.001 Incentive Units are reserved for issuance to certain employees on and after the Effective Date (collectively, the "**Incentive Pool B Incentive Units**"). Under no circumstances shall any Incentive Units be issued to (i) Ippon or any of its Affiliates or any of Ippon's or such Affiliates' respective managers, officers, employees, agents, or representatives, or (ii) a Bad Actor (as defined below).  The Incentive Units are intended to be treated as profits interests for U.S. federal income tax purposes within the meaning of IRS Revenue Procedures 93-27 and 2001-43 (each, a "**Profits Interest**").

(b)    Each Member authorizes the Board to elect to apply the safe harbor (the "**Safe Harbor**") set forth in proposed Treasury Regulation Section 1.83-3(l) and proposed IRS Revenue Procedure published in Notice 2005-43 (together, the "**Proposed Treasury Regulation**") (under which the fair market value of an interest in an entity taxable as a partnership that is transferred in connection with the performance of services is treated as being equal to the liquidation value of the interest) if such Proposed Treasury Regulation or a similar Treasury Regulation is promulgated as a final or temporary Treasury Regulation.  If the Board determines that the Company should make such election, the Board is hereby authorized to amend this Agreement without the consent of any Member or other Person to provide that (x) the Company is authorized and directed to elect the Safe Harbor, (y) the Company and each Member (including any Person to whom a Unit is transferred in connection with the performance of services) will comply with all requirements of the Safe Harbor with respect to all Units Transferred in connection with the performance of services while such election remains in effect and (z) the Company and each Member will take all actions necessary, including providing the Company with any required information, to permit the Company to comply with the requirements set forth or referred to in the applicable Treasury Regulations for such election to be effective until such time (if any) as the Board determines, in its sole discretion, that the Company should terminate such election.  Notwithstanding anything to the contrary in this Agreement, each Member expressly confirms and agrees that it will be legally bound by any such amendment.  Notwithstanding the preceding sentences, no election or amendment shall be made pursuant to this Section 2.4 if the Safe Harbor, when finalized, is substantially different from the one included in the Proposed Treasury Regulation, unless the Board has determined

12

                                                     BL-000022245

that the application of the Safe Harbor would not result in materially adverse tax consequences to the Members.

(c)     Except as provided in the last paragraph of Section 7.2, each Member holding an Incentive Unit shall be treated as the owner of any Incentive Unit granted thereto from the date of grant, and each Member holding an Incentive Unit shall take into account the distributive share of the Company's income, gain, loss, deduction, and credit associated with such Incentive Unit determined in accordance with this Agreement in computing its income tax liability for the entire period during which such Member owns the Incentive Unit.

(d)     The Board may, subject to the prior written consent of the Lender Member in accordance with Section 3.9, form an Incentive Holdco.  In the event the Company issues any Incentive Unit to an Incentive Holdco with respect to one or more employees or service providers, the Company shall (i) issue such Incentive Unit to Incentive Holdco and (ii) direct Incentive Holdco to grant corresponding non-voting membership interests in Incentive Holdco ("**Upstairs Incentive Units**") to such service provider or employee or an entity on behalf of such service provider or employee.  Pursuant to such direction, Incentive Holdco shall grant such Upstairs Incentive Units to such service provider or entity (as applicable) pursuant to a written agreement between Incentive Holdco and such service provider or entity (as applicable) (an "**Upstairs Award Agreement**").  Upstairs Incentive Units may be subject to vesting, forfeiture, repurchase and/or any other terms set forth in the applicable Upstairs Award Agreement; provided that such terms are consistent with the terms of the corresponding Incentive Units. The cancellation or forfeiture from time to time of any Upstairs Incentive Units by any holder thereof shall automatically result in a decrease in an equal number of Incentive Units held by Incentive Holdco; provided, however, after such forfeiture, such forfeited Incentive Units shall be authorized for issuance in accordance with this Agreement. For the avoidance of doubt, no holder of any Upstairs Incentive Units shall have any rights under this Agreement as a result of ownership of such Upstairs Incentive Units.  Each Incentive Member covenants and agrees that, upon the request of the Company, he, she or it shall contribute all Incentive Units owned by him, her or it to Incentive Holdco and further covenants and agrees to execute and deliver all documents reasonably requested by the Company in connection therewith; provided, that such contribution shall not adversely affect the economic and other rights, vesting schedule and other material terms of such Incentive Units. Each Incentive Member hereby irrevocably constitutes, appoints and empowers each of the Managers with full power of substitution and re-substitution, as his, her or its true and lawful attorney-in-fact, in his, her or its name, place and stead and for his, her or its use and benefit, to execute, certify, acknowledge, file, record and swear to all instruments, agreements and documents necessary or advisable for carrying out such contribution if such Member fails to execute the same within ten (10) days of the Company's written request therefor.

(e)     The Company and each Incentive Member shall treat such Incentive Member as the owner for income tax purposes of its Incentive Units from the date of grant, and such Member shall take into account its distributive share of Profit, Loss, income, gain, deduction and credit associated with its Incentive Units in computing such Member's income tax

13

BL-000022246

liability for the entire period during which such Incentive holds Incentive Units. Except as otherwise determined by the Board or as set forth in this Agreement, both the Company and all Members shall (a) treat all issued Incentive Units as outstanding for tax purposes, (b) treat Incentive Holdco as a partner for tax purposes with respect to any Incentive Units awarded thereto, and (c) file all tax returns and reports consistently with the foregoing.

2.5     Capital Contributions.  Except as expressly set forth herein, no Member shall receive any interest on its Capital Contributions to the Company.

2.6     Withdrawal of Capital.  No Member shall have the right to withdraw any part of such Member's Capital Contributions.  Distributions to the Members made in accordance with Section 7.2 and Section 8.3 as a return of Capital Contributions shall not be prohibited by this Section 2.6.

2.7     Source of Distributions.  No Member shall be personally liable for the return of the Capital Contributions of any other Member, or any portion thereof, it being expressly understood that any such return shall be made solely from the Company's assets.

2.8     Representations and Warranties of the Members.  Each Member as of the date of its, his or her admission as a Member hereby represents and warrants, in each case to each of the other Members and the Company as follows:

(a)     Such Member has the requisite power and authority (whether corporate or otherwise) and legal capacity to enter into, and to carry out its obligations under, this Agreement.  The execution and delivery by such Member of this Agreement and the consummation by such Member of the transactions contemplated hereby have been duly authorized by all necessary action (corporate or otherwise) on the part of such Member.

(b)     This Agreement has been duly executed and delivered by such Member and constitutes a valid and legally binding obligation enforceable against such Member in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to the general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

(c)     Such Member is not subject to, or obligated under, any provision of (i) any agreement, contracts, arrangement or understanding, (ii) any license, franchise or permit, or (iii) any law, regulation, order, judgment or decree, that would be breached or violated, or in respect of which a right of termination or acceleration or any encumbrance or other lien on any of such Member's assets would be created, by such Member's execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby.

14

CONFIDENTIAL                                                BL-000022247

(d)     No authorization, consent or approval of, waiver or exemption by, or filing or registration with, any public body, court or other governmental authority or any other third party is necessary on such Member's part for the consummation of the transactions contemplated by this Agreement that has not previously been obtained by such Member.

(e)     No Person has or will have, as a result of any act or omission by such Member, any right, interest or valid claim against the Company or any other Member for any commission, fee or other compensation as a finder or broker, or in any similar capacity, in connection with any of the transactions contemplated by this Agreement.

(f)     The Units being acquired by such Member are being acquired for such Member's own account and not with a view to, or for sale in connection with, any distribution or public offering thereof within the meaning of the Securities Act or any applicable state securities laws.  Such Member understands that its Units have not been registered under the Securities Act or any state securities laws by reason of their contemplated issuance in transactions exempt from the registration and prospectus delivery requirements thereof and that the reliance of the Company and others upon such exemptions is predicated in part upon the representations and warranties of such Member contained herein.

(g)     Such Member is acquiring its interest in the Company based upon its own investigation, and the exercise by such Member of its rights and the performance of its obligations under this Agreement will be based upon its own investigation, analysis and expertise. Such Member has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits and risks of the investment contemplated by this Agreement and such Member is able to bear the economic risk of its investment in the Company (including a complete loss of its investment).

(h)     Each Member recognizes that no public market exists for its Units, and no representation has been made to such Member that any such public market will exist in the future.  Each Member understands that it must bear the economic risk of its investment in the Company indefinitely unless its Units are registered pursuant to the Securities Act or an exemption from such registration is available, and unless the disposition of Units is registered or qualified under applicable state securities laws or an exemption from such registration or qualification is available.  Each Member understands that there is no assurance that any exemption from the Securities Act will be available, or, if available, that such exemption will allow it to dispose of or otherwise transfer any or all its Units, in the amounts or at the times any such Member might desire.

(i)     If the Company proposes an offering of its securities in reliance on Rule 506 of the Securities Act, the Company intends to conduct an inquiry of all Members that beneficially own twenty percent (20%) or more of the Company's outstanding voting equity securities, calculated on the basis of voting power (each, a **"20% Holder"**) as to whether any 20% Holder or any Rule 506(d) Related Party of such 20% Holder is a "bad actor" within the meaning of Rule 506(d) promulgated under the Securities Act (a **"Bad Actor"**).  If (a) any 20% Holder fails to provide any requested information to the Company within ten (10) business days of the date

15

     BL-000022248

of the request therefor or (b) any 20% Holder indicates that it or any Rule 506(d) Related Party of such 20% Holder is a Bad Actor, then, other than in connection with any vote arising under Section 242(b) of the Delaware General Corporation Law or comparable section of the Act, such 20% Holder agrees that it shall not cast any vote in respect of the Company's equity securities beneficially owned by such 20% Holder that are equal to or in excess of 20% of the Company's outstanding voting equity securities, calculated on the basis of voting power.  Notwithstanding the foregoing, the voting restrictions under this Section 2.8(i) shall cease as to a 20% Holder at such time as such 20% Holder certifies or recertifies to the Company that neither it nor any of its Rule 506(d) Related Parties is a Bad Actor.  For purposes of this Agreement, **"Rule 506(d) Related Party"** shall mean a Person covered by the "Bad Actor" disqualification" provision of Rule 506(d) of the Securities Act.

2.9     No Appraisal Rights.  The Members shall not have appraisal rights with respect to any Units or other interests in the Company under any circumstances.

2.10     Preemptive Rights.

(a)     Applicability.  Certain Members shall have preemptive rights as set forth in this Section 2.10.

(b)     Issuance Notice.  The Company shall not offer, sell or issue any New Securities unless the Company first submits a written notice (the "**Issuance Notice**") to the Common Members (each such Member, an "**Eligible Member**"), identifying the terms of the proposed offer, sale or issuance (including price, number and aggregate amount of New Securities being offered, sold or issued), and offering to each of the Eligible Members the opportunity to purchase up to such Eligible Member's Preemptive Share of the New Securities proposed to be issued, at the price and on the terms specified in the Issuance Notice.  The Company shall keep such offer open and irrevocable for a period of thirty (30) days following receipt by the Eligible Members of such Issuance Notice, and the Eligible Members will have the right to elect to purchase the New Securities so offered by giving written notice thereof to the Company within such thirty (30)-day period (each, an "**Exercise Notice**"), which shall specify the number of New Securities to be purchased by such Eligible Member.  "**Preemptive Share**" means, with respect to an Eligible Member, an amount of such additional New Securities as would permit such Eligible Member to maintain immediately after the issuance of such New Securities the Fully-Diluted Percentage Interest in the Company such Eligible Member possessed immediately prior to such issuance.

(c)     Right to Purchase Excess New Securities.  If any Eligible Member elects to exercise such rights with respect to less than such Eligible Member's Preemptive Share, the Company shall notify each other Eligible Member who has delivered an Exercise Notice, that such Eligible Member shall be entitled to purchase from the Company its pro rata portion (which means the fraction that results from dividing (i) the aggregate number of Common Units owned by such Eligible Member (immediately before giving effect to the issuance, as determined based upon each such Member's Fully-Diluted Percentage Interest) by (ii) the number of Common Units owned by all Eligible Members exercising in full their preemptive rights with respect to their

16

CONFIDENTIAL                                                                                          BL-000022249

respective Preemptive Shares (immediately before giving effect to the issuance, as determined based upon each such Member's Fully-Diluted Percentage Interest) of those New Securities which such Eligible Member elected not to purchase (the "**Excess New Securities**"). The Company shall continue to offer additional pro rata portions to Eligible Members choosing to purchase their full pro rata portion of such Excess New Securities pursuant to this Section 2.10(c) until the earlier of all New Securities proposed to be issued by the Company have been purchased by Eligible Members or all Eligible Members have purchased the maximum number of New Securities indicated in their respective Exercise Notice. Any New Securities so offered which are not purchased by the Eligible Members pursuant to such offer may be sold by the Company at any time within one hundred eighty (180) days following the termination of the above referenced thirty (30)-day period, but only on the terms and conditions set forth in the Issuance Notice. The Company will not offer, sell or issue any New Securities after such one hundred eighty (180)-day period or on terms and conditions other than those set forth in the original Issuance Notice without renewed compliance with this Section 2.10.

(d)    Issuance of New Securities. At the consummation of the issuance of such New Securities, the Company shall issue certificates or make a notation in a book entry system, as applicable, representing the New Securities to be purchased by each Eligible Member exercising preemptive rights pursuant to this Section 2.10 registered in the name of such Eligible Member, against payment by such Eligible Member of the purchase price for such New Securities in accordance with the terms and conditions as specified in the Issuance Notice.

(e)    Terms and Conditions of Sale. Any sale of New Securities pursuant to this Section 2.10 shall be made on such terms and conditions as are determined by the Board, which terms and conditions may include, among other things, a preferential return on such investment, superior dividend, voting and liquidation rights and/or a reduction in the Members' Fully-Diluted Percentage Interests as a result of the issuance of the New Securities. The Members specifically acknowledge that such New Securities may have preferential terms to the existing securities and may result in dilution to the existing Members' interest in the Company.

(f)    Limitations on Preemptive Rights. Notwithstanding the foregoing, the right to purchase granted under this Section 2.10 will be inapplicable with respect to any issuance of Excluded Units. Notwithstanding anything herein to the contrary, the Company shall not be obligated to issue, sell or offer to sell New Securities pursuant to this Section 2.10 to any Person that is not an Accredited Investor.

(g)    Schedule of Members. The Board shall amend or supplement the Schedule of Members to reflect issuances of New Securities to Eligible Members in accordance with this Section 2.10.

(h)    Termination of Preemptive Rights. The provisions of this Section 2.10 shall terminate (i) immediately prior to the consummation of an initial public offering and/or a Sale of the Company, and (ii) in the case of the Lender Member, immediately upon the occurrence of the events described in Section 8.3.2 of the Endorsement Agreement and the Company's termination of the Endorsement Agreement pursuant thereto (such event, a "**Morals**

17

                                                                      BL-000022250

Clause Termination Event"), and in such case, the rights to purchase granted to the Lender Member pursuant this <u>Section 2.10</u> automatically shall terminate and be of no further force and effect.

3.    <u>MANAGEMENT OF THE COMPANY</u>

3.1    <u>Establishment of the Board of Managers</u>.

(a)    The full and entire management of the business and affairs of the Company shall be vested in a Board of Managers which shall have and may exercise all of the powers that may be exercised or performed by the Company (the "**Board of Managers**" or "**Board**").  Except where the approval of the Members is expressly required by this Agreement or by nonwaivable provisions of the Act, the Board of Managers shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business.  The Board collectively shall constitute the "manager" as such term is used and defined in the Act, and no Manager in his, her or its individual capacity as such shall have the authority to act for, or bind, the Company.

(b)    The Members hereby agree that the Board of Managers shall consist of up to seven (7) individuals (each, a "**Manager**") appointed in the following manner, and, if necessary to accomplish the below, each Member agrees to vote all Units in favor of the election of the following individuals to the Board:

(i)    four (4) Managers shall be appointed by Ippon or its Permitted Transferees (collectively, the "**Ippon Managers**");

(ii)    two (2) Managers shall be appointed by Lender or its Permitted Transferees (collectively, the "**Talent Managers**"); and

(iii)    one (1) Manager shall be appointed by Belfer or its Permitted Transferees (collectively, the "**Belfer Manager**").

Each Manager shall serve until his or her successor is appointed and qualified or until their earlier resignation, removal or death.  Managers may resign at any time and for any reason.  Managers need not be Members of the Company or residents of the State of Delaware.  Unless and until the Ippon Member appoints an individual to serve as its fourth (4th) designee to the Board of Managers, the Board of Managers shall consist of six (6) Managers. The initial Managers of the Company shall be:

**Ippon Managers:**

Andrew T. Chrisomalis
Guillaume Cuvelier
Blake A. Spahn

18

**Talent Managers:**

Blake Lively
Ryan Reynolds

**Belfer Manager:**

Jodi Ganz

(c)       The Ippon Member shall have the right, in its sole discretion, to appoint its fourth (4th) Ippon Manager to serve on the Board of Managers at any time after the Effective Date, which appointment shall be subject to the prior written approval of the Lender Member, which approval shall not be unreasonably withheld, delayed or conditioned.

(d)       Subject to Section 3.1(e) below, any Manager designated pursuant to Section 3.1(b) or Section 3.1(c), as applicable, may be removed during his/her term of office, with or without cause, by and only by the affirmative vote or written consent of that Person or Persons which have the power to appoint that Manager pursuant to the applicable subsection of Section 3.1(b) or Section 3.1(c), as applicable.  Any vacancy created by the death, resignation or removal in the office of a Manager designated pursuant to Section 3.1(b) or Section 3.1(c), as applicable, may be filled by and only by the affirmative vote or written consent of that Person or Persons which have the power to appoint that Manager pursuant to the applicable subsection of Section 3.1(b) or pursuant to Section 3.1(c), as applicable; provided, however, that any appointment of a replacement Manager by the Lender Member shall be subject to the prior written approval of the Ippon Member, which approval shall not be unreasonably withheld, delayed or conditioned, and any appointment of a replacement Manager by the Ippon Member shall be subject to the prior written approval of the Lender Member, which approval shall not be unreasonably withheld, delayed or conditioned.  Appointment of any replacement Manager pursuant to this Section 3.1(d) or Section 3.1(e) below shall be made promptly upon delivery to the Company by the Person(s) entitled to appoint such replacement Manager of a written notice of such appointment containing the name and address of such replacement Manager.

(e)       Notwithstanding the foregoing or anything to the contrary herein:

(i)       Upon and after (x) the occurrence of a Morals Clause Termination Event and/or (y) or the commission by Reynolds of an act which constitutes a Reynolds Morals Clause Violation (as defined below), the Board may, by majority vote or written consent (which majority shall not include the vote or consent of Lively and Reynolds), remove Lively and/or Reynolds, as applicable, as a Manager. Upon any such removal, the Lender Member shall have the right to appoint a replacement Manager to fill the vacancy created thereby; provided, that any such replacement Manager by the Lender Member shall be subject to the prior written approval of the Ippon Member, which approval shall not be unreasonably withheld, delayed or conditioned. As used herein, a "**Reynolds Morals Clause Violation**" occurs if Reynolds commits an act or has committed an act prior to the Effective Date that, (1) after the Effective

19

CONFIDENTIAL

BL-000022252

Date is reported in at least two (2) news publications of stature and reputation similar to that of The New York Times (one of which may be The New York Times); and (2) justifiably shocks, insults or offends a significant portion of the community in the metropolitan area of New York City or the Greater Los Angeles area; and (3) causes a material and lasting adverse effect on Reynold's public image or the public image of the Company and/or its subsidiaries.

(ii)    If any Ippon Manager commits an act which constitutes an Ippon Morals Clause Violation (as defined below), then the Board may, by majority vote or written consent (which majority shall not include the vote or consent of the Ippon Manager who committed the Morals Clause Violation), remove such Ippon Manager. Upon any such removal, the Ippon Member shall have the right to appoint a replacement Manager to fill the vacancy created thereby; provided, that any such replacement Manager by the Ippon Member shall be subject to the prior written approval of the Lender Member, which approval shall not be unreasonably withheld, delayed or conditioned. As used herein, an "**Ippon Morals Clause Violation**" occurs if an Ippon Manager commits an act or has committed an act prior to the Effective Date that, (1) justifiably shocks, insults or offends a significant portion of the community in the metropolitan area of New York City or the Greater Los Angeles area; and (2) causes a material and lasting adverse effect on such Person's public image or the Company's public image.

(f)    (i)    The number of Managers that shall constitute a quorum for the transaction of business at a meeting of the Board shall be a simple majority of the number of Managers then in office.  Except as required by the Act or as otherwise set forth in this Agreement, every act or decision done or made by at least a simple majority of the Managers present at a meeting duly held and at which a quorum is present shall be the act of the Board.

(ii)    Any action which may be taken at a meeting of the Board may be taken without a meeting pursuant to a written consent of the Board so long as (A) all Managers are provided with a copy of the applicable written consent prior to the date such written consent is executed by the Managers, and (B) the requisite number of Managers needed to approve the subject action(s) execute such written consent.  Consents may be signed in counterparts and the Company shall retain such consents with the books and records of the Company.

(iii)    Regular meetings of the Board shall be held at least quarterly and in any event upon at least ten (10) days' notice to all Managers.  Special meetings of the Board for any purpose may be called by any Manager, with reasonable notice to all Managers.   Any notice of a meeting of the Board shall include an agenda for such meeting. Minutes of each meeting shall be kept and retained with the books and records of the Company and (except as prohibited or restricted by this Agreement) distributed to all Managers prior to the next Board meeting. Meetings of the Board may be held at any place that has been designated in the notice of the meeting.

(iv)    A Manager may participate in a meeting through use of telephone or similar communication equipment (such as Skype), so long as all Managers

20

                                                    BL-000022253

participating in such meeting can hear one another.  Such participation constitutes presence in person at such meeting for all purposes including quorum.

    3.2    <u>Powers of the Board</u>.

    (a)    Subject to the limitations set forth herein, the Board shall have the right and authority to take all actions which it deems necessary, useful or appropriate for the management and conduct of the Company's business. The Board may exercise all powers of the Company and do all such lawful acts and things as are not (i) prohibited by the Act, the Company's certificate of formation or this Agreement or (ii) required to be exercised or done, or approved, by the Members.  Except as otherwise expressly provided in this Agreement or the Act,  subject to any consent rights under any separate written agreement between the Company and any Member or its Affiliates (including without limitation the Endorsement Agreement), none of the Members shall have any right to control or manage, nor shall they take any part in the control or management of, the property, business or affairs of the Company.

    (b)    Without limiting the generality of <u>Section 3.2(a)</u> above or the powers allowed to the Board by the Act, and subject to the consent rights set forth in <u>Section 3.9</u> and <u>Section 3.10</u>, the Board shall have the power to do all things necessary or convenient to carry out the business and affairs of the Company, including, without limitation, the power:

    (i)    to manage the affairs and business of the Company and to set such policies and establish such business plans and procedures as the Board shall determine;

    (ii)    to negotiate, execute and enter into any and all contracts and agreements necessary for, or otherwise related to, the Company's business, including, without limitation, the operation or management of the Company or the ownership, operation or management of any asset owned by the Company;

    (iii)    to deposit, withdraw, invest, pay, retain and distribute the Company's funds and/or raise capital in any manner that is not inconsistent with the provisions of this Agreement, including, without limitation, to make loans to any and all third parties;

    (iv)    to borrow money and incur liabilities and other obligations, either on a secured or unsecured basis;

    (v)    to purchase, lease or otherwise acquire any real, personal or mixed property;

    (vi)    to admit a new member or consent to the Transfer by a Member of his, her or its Units to any Person, or subject to the preemptive rights of the Members, otherwise issue or sell additional Units in the Company or any security, warrant, option or right (whether contingent or otherwise) to purchase or acquire any Units in the Company to any Person (including, without limitation, the Managers and employees, members, Affiliates, partners or managers thereof), including, without limitation, the issuance of new classes of security that are senior to the existing Units in any or all respects, including, without limitation,

21

BL-000022254

liquidation and/or distribution preferences, dividends, consent rights, management participation rights, redemption rights and to proportionately reduce the equity and/or amounts of distributions of each of the current Members;

(vii)    to enter into any joint venture, partnership or similar arrangement with any other Person or to cause the Company to convert, by sale, merger, reorganization, consolidation or otherwise, to any other Person;

(viii)    to open one or more depository accounts and make deposits into such accounts, and to determine rules for the signing of checks and withdrawals from such accounts;

(ix)    to commence, prosecute or defend any proceeding in the Company's name or to bring, defend and settle actions at law or at equity;

(x)    to voluntarily dissolve and liquidate the Company;

(xi)    to file a voluntary petition by the Company pursuant to a federal bankruptcy proceeding;

(xii)    to execute and file any other certificate or other instrument which may be required to be filed by the Company to transact business under the laws of the State of Delaware or any other foreign, federal or state government where the Company may transact business or any amendments thereto;

(xiii)    to convert the Company into a corporation in any jurisdiction;

(xiv)    to continue the Company as (or merge the Company into) a Delaware limited liability company or a limited liability company in another jurisdiction; and

(xv)    to execute, acknowledge and deliver any and all instruments, and take any and all actions, which may be deemed necessary or desirable to effect any of the foregoing or any of the other provisions of this Agreement.

(c)    The Board may from time to time appoint officers of the Company as it deems appropriate, and may delegate any or all of its duties to such officers. No officer need be a Member. Any officers so designated shall have such authority and perform such duties as the Board may, from time to time, prescribe or as may be provided in this Agreement. The Board may assign titles to particular officers. Unless the Board otherwise specifies, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Board pursuant to this Section 3.2(c). Each officer shall hold office until his or her successor shall be duly designated and shall qualify or until his or her death or until he or she shall resign or shall

22

CONFIDENTIAL

BL-000022255

have been removed by the Board.  Any number of offices may be held by the same individual. The initial Chief Executive Officer of the Company shall be Nishat Gupte.

3.3    Determinations of Board.  The Members agree that all determinations, decisions and actions made or taken by the Board in accordance with this Agreement shall be conclusive and absolutely binding upon the Company, the Members and their respective successors, assigns and personal representatives.

3.4    Indemnification. The Company shall indemnify each Manager in accordance with Article 9 and any Indemnification Agreement executed by the Company and each such Manager (an "**Indemnification Agreement**").  Upon the appointment of any new Manager pursuant to this Agreement, the Company shall execute an Indemnification Agreement with such Manager on the same terms as the Indemnification Agreements executed with all other Managers.

3.5    Reimbursements; Compensation. The Managers shall be entitled to reimbursement of the same or substantially similar reasonable, documented expenses incurred in connection with their service as Managers.  No Manager shall receive any compensation for acting as a Manager.

3.6    Fiduciary Duties.

(a)    Subject to, and as limited by the express provisions of, this Agreement, the officers, in the performance of their duties as such, shall owe to the Members duties of loyalty and due care to the same extent as officers of a corporation as imposed by Delaware law.  The provisions of this Agreement, to the extent that they restrict the duties (including fiduciary duties) and liabilities of a Manager or officer otherwise existing at law or in equity, are agreed by the Members to replace such duties and liabilities of such Manager or Officer.  The Members hereby waive all fiduciary duties with respect to the Managers.

(b)    The Board of Managers does not, in any way, guarantee the return of any Member's Capital Contribution, Capital Account or a profit for the Members from the operation of the Company.  The Board of Managers is not responsible to any Member for the loss of his, her or its investment or a loss in operations, unless the result shall have been a result of fraud, gross negligence, or a willful and wrongful taking by the Board of Managers as finally determined by a court of competent jurisdiction in a non-appealable decision.

3.7    Performance of Duties; Liability of Managers and Officers.  In performing his or her duties, each Covered Person shall be entitled to rely in good faith on the provisions of this Agreement and on information, opinions, reports, or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Profits, Losses or special allocations of the Company or any facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid), of the following other Persons or groups:  (a) one or more officers or employees of the Company; (b) any attorney, independent accountant, or other Person employed or engaged by

23

BL-000022256

the Company; or (c) any other Person who has been selected with reasonable care by or on behalf of the Company, in each case as to matters which such Covered Person reasonably believes to be within such other Person's professional or expert competence.  The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in Section 18-406 of the Delaware Act.  No individual who is a Manager or an officer of the Company, or any combination of the foregoing, shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager or an officer of the Company or any combination of the foregoing

       3.8     <u>Other Activities of the Managers</u>.  Subject to the terms of any other agreement between the Company and Manager or the Company and a Member and except as otherwise limited by <u>Section 4.5(b)</u> hereof, each Manager may engage, directly or indirectly, in any other business venture or ventures of any nature and description, independently or with others (whether or not competitive with, relating to, or in any manner connected with, the business of the Company) and neither the Company, nor any of the other Members or Managers shall have any rights in and to any such business ventures or the income or profits derived therefrom.

       3.9     <u>Lender Protective Provisions</u>.  In addition to Lender's other approval rights set forth in this Agreement, but subject to the last paragraph of this <u>Section 3.9</u>, the Company shall not, without the prior written consent of the Lender Member:

       (a)     during the Endorsement Term, engage any celebrity (or other influencer) to provide promotional or brand ambassador services to the Company or to license the rights to use their name and likeness or to otherwise endorse the Company or any Company Products, provided that nothing herein shall prohibit, and Lender's consent shall not be required for, the engagement by the Company of trade or topical influencers such as bartenders, brand ambassadors, mixologists, and club/party hosts;

       (b)     issue any new Units or any security or obligation that is by its terms, directly or indirectly, convertible into, exchangeable or exercisable for Units, other than the issuance of 12,895.988 Incentive Units;

       (c)     amend, restate or modify the terms of this Agreement in any way other than as permitted under <u>Section 11.6</u>;

       (d)     increase or decrease the size of the Board of Managers;

       (e)     make any loan or advance to, or own any stock or other Equity Securities of, any Subsidiary or other Person unless it is wholly-owned by the Company, and except advances and payments made pursuant to the BBZ IP License Agreement;

       (f)     make any loan or advance to any Person, including any employee, Manager or director, except (i) advances and similar expenditures in the ordinary course of

24

BL-000022257

business or in respect of Incentive Units as approved by the Board of Managers, and (ii) advances and payments made pursuant to the BBZ IP License Agreement;

(g)     enter into or be a party to any transaction with any Member, Manager, officer or employee of the Company or any Affiliate or any Family Group Member thereof, except for the transactions pursuant to (i) the Endorsement Agreement, (ii) the Loan Agreement and the other Loan Documents (as defined in the Loan Agreement), (iii) the BBZ IP License Agreement, and (iv) the BBZ IP Support Fee Agreement;

(h)     establish any Subsidiaries unless they are wholly-owned by the Company or a Subsidiary of the Company;

(i)     make any investment other than investments in prime commercial paper, money market funds, certificates of deposit in any United States bank having a net worth in excess of $100,000,000 or obligations issued or guaranteed by the United States of America, in each case having a maturity not in excess of two (2) years;

(j)     change the principal business of the Company, enter new lines of business, or exit the current line of business;

(k)     incur any indebtedness for borrowed money exceeding an aggregate principal amount of five million ($5,000,000) dollars;

(l)     make any individual capital expenditure in excess of $250,000, other pursuant to the BBZ IP License Agreement and the BBZ IP Support Fee Agreement;

(m)     accept any Capital Contribution from any Member except as contemplated by the 2023 Unit Purchase Agreement;

(n)     issue any new Units to Ippon in connection with any Capital Contribution by Ippon other than its initial Capital Contribution and pursuant to the 2023 Unit Purchase Agreement;

(o)     hire, terminate the employment of, or change the compensation of the Chief Executive Officer, Chief Operating Officer or Chief Marketing Officer of the Company (or other individual with the functional equivalent of any of the foregoing positions), or hire an individual with annual compensation in excess of $275,000 or increase the salary of any existing employee of the Company in excess of $275,000; provided, that, notwithstanding the foregoing, the Company may pay to the Chief Executive Officer of the Company an annual salary of up to $300,000;

(p)     create an Incentive Holdco and/or enter into the operating agreement of any such Incentive Holdco, including any amendments or revisions thereto;

(q)     amend, repeal or modify any provisions of Section 9.10 of this Agreement;

25

CONFIDENTIAL                                                          BL-000022258

(r)      convert the Company to a corporation pursuant to <u>Section 6.7</u>;

(s)      approve of any Transfer of Units or other Equity Securities, other than a Permitted Transfer; or

(t)      agree to, or enter into any agreement to do, any of the foregoing.

Notwithstanding the foregoing or anything herein to the contrary, the Lender Member's consent rights in respect of the matters set forth in clauses (a), (b), (k) and (m) of this <u>Section 3.9</u> automatically shall terminate and be of no further force and effect immediately upon the occurrence of a Morals Clause Termination Event.

3.10    <u>Belfer Protective Provisions</u>.  In addition to Belfer's other approval rights set forth in this Agreement, the Company shall not, without the prior written consent of the Belfer Member:

(a)      issue any new Units or any security or obligation that is by its terms, directly or indirectly, convertible into, exchangeable or exercisable for Units, other than the issuance of 12,895.988 Incentive Units and the issuance of Common Units pursuant to the 2023 Purchase Agreement;

(b)      enter into or be a party to any transaction with any Member, Manager, officer or employee of the Company or any Affiliate or any Family Group Member thereof, except for the transactions pursuant to (i) the Endorsement Agreement, (ii) the Loan Agreement and other Loan Documents, (iii) the BBZ IP License Agreement, and (iv) the BBZ IP Support Fee Agreement;

(c)      incur any indebtedness for borrowed money other than pursuant to the Loan Agreement;

(d)      exercise the Renewal Option pursuant to a Regular Renewal (as each such term is defined in the Endorsement Agreement) in accordance with Section 8.2 of the Endorsement Agreement (and for clarity, the Belfer Member's consent shall not be required for, and nothing contained herein shall grant the Belfer Member a consent right in respect of, the Company's exercise of a Sale Renewal (as defined in the Endorsement Agreement) under the Endorsement Agreement);

(e)      engage a replacement Brand ambassador to provide services and endorse Company Products following the termination of the Endorsement Agreement; or

(f)      agree to, or enter into any agreement to do, any of the foregoing.

3.11    <u>Termination of Endorsement Agreement</u>. The Endorsement Agreement may be terminated by the Company on the grounds set forth in Section 8.3 thereof upon (and only upon) the vote or consent of a majority of the disinterested Managers.

26

BL-000022259

4.    <u>MEMBERS</u>

4.1    <u>Members</u>.  Each Member shall be a "member" as such term is defined in the Act.  No Member (in his, her or its capacity as a Member) shall have any voting rights or management rights whatsoever, except as expressly provided in this Agreement or as may be required by an unwaiveable provision of the Act.  Any action that may be taken at a meeting of the Members pursuant to applicable and unwaiveable provisions of the Act may be taken by written consent (but only in accordance with the same procedures and limitations set forth in <u>Section 3.1(d)(ii)</u> hereof) of the requisite holders of Units delivered to the Company, in lieu of a vote at a meeting of Members.  No Member may resign or withdraw from the Company.  Except as otherwise provided in this Agreement, the liability of the Members, as such, for any obligations, debts or liabilities incurred by the Company shall be limited to the amount of Capital Contributions that the Members have made to the Company.

4.2    <u>Aggregation of Units</u>. All Units held or acquired by Affiliates shall be aggregated together for the purpose of determining the availability of any rights under this Agreement and such Affiliates may apportion such rights as among themselves in any manner they deem appropriate.

4.3    <u>Additional Members</u>.  Subject to <u>Section 3.9</u>, the Board may cause the Company to admit a Person as a Member of the Company (an "**Additional Member**") and issue Units to such Person upon such Person furnishing to the Company (a) an executed counterpart to this Agreement and (b) such other documents or instruments the Company deems necessary or appropriate to effect such Person's admission as a Member (including entering into an investor representation agreement, subscription agreement or such other documents as the Company may deem appropriate in its sole discretion).  Such admission shall become effective on the date on which the Company determines that such conditions have been satisfied and when any such admission is shown on the books and records of the Company.  Upon the admission of an Additional Member, the Company shall cause the Schedule of Members to be amended to include such Additional Member.  Other than as set forth in <u>Section 2.10</u>, no Member shall have preemptive rights on the issuance of any Units to any Person.

4.4    <u>Confidentiality</u>.  The Members acknowledge that, from time to time, they may receive non-public information from or concerning the Company, the release of which may damage the Company, its Affiliates or Persons with which each of the foregoing does business.  Each Member covenants and agrees that, without the prior consent of the Company, such Member and such Member's Representatives and the successors and assigns thereof, shall not disclose or use for any purpose whatsoever, or divulge, disseminate or disclose to any third party (other than as may be required by law), any proprietary or confidential information relating to the Company and its businesses, including, without limitation, financial information, development plans, pricing information, business methods, management information systems and software, recipes, processes, customer lists, supplier lists, leads, solicitations and contacts, know-how, show-how, inventions, techniques, improvements, specifications, trade secrets, agreements, research and development, business plans and marketing plans of the Company (all

27

    BL-000022260

of such information being hereinafter referred to as "**Confidential Information**"), whether or not any of the foregoing are copyrightable or patentable.  With respect to Lender only, "Confidential Information" shall also include, without limitation, all personal and business information (e.g. phone numbers, addressees, travel schedules and other personally identifiable information), documents and photographs, in each case relating in any way to Lively, Reynolds and her/his family, relatives, associates, friends, and/or acquaintances and to Lively's and Reynolds' Affiliates, which has not been made available or confirmed to the general public by Lively or Reynolds.  For purposes of this Section 4.4, "**Representative**" means, as to any party, its Affiliates as well as such party and such party's Affiliates' employees, directors, partners, trustees, officers, financing sources, and representatives (including without limitation, financial advisors, lawyers, and accountants).   Notwithstanding the foregoing, a Member may disclose Confidential Information (a) if, in the opinion of such Member's counsel, it is required to do so by law or valid legal process (provided the Member, if permitted by law, notifies the Company in writing promptly of any such requirement as soon as practicable prior to any such disclosure and reasonably cooperates with the Company in any attempt to obtain confidential treatment of such information), (b) to Representatives of such Member who have a need to know such Confidential Information and who owe an obligation of confidentiality to such Member pursuant to terms at least as protective as those contained in this Section 4.4 or (c) in connection with the enforcement of his, her or its rights under this Agreement and any other agreements with the Company.  The provisions of this Section 4.4 shall survive and continue to bind each Member notwithstanding any such Member ceasing to be a Member of the Company.

4.5    Other Business.

(a)    Except as may be otherwise provided in this Agreement or in a separate agreement between the Company and such Person, any Member and Affiliate of a Member, and any officer, director, employee, shareholder or other person holding a legal or beneficial interest in any entity which is a Member or Affiliate of a Member, may engage in, or possess an interest in, other business ventures of every nature and description, independently or with others.  This Agreement shall not confer upon the Company or any Member any right or opportunity to participate in any such independent venture undertaken by another Member or any right to the income or profits derived therefrom.

(b)    Notwithstanding the foregoing, no Manager or Member or any of its controlled (as such term is defined in the definition of "Affiliate" in Section 1.8(a) hereof) Affiliates shall engage in any Restricted Activity while a Member or Manager of the Company; provided however that Lender and its Affiliates shall be permitted to engage in any Restricted Activity (i) during the term of the Endorsement Agreement if such activity would not be prohibited under the second paragraph of Section 2.2 of the Endorsement Agreement, and (ii) at any time following the termination of the Endorsement Agreement, unless the Endorsement Agreement was terminated by the Company pursuant to Section 8.3 of the Endorsement Agreement.

4.6    No Authority to Bind Company.  No Member (in his, her or its capacity as a Member) shall have the authority or power to represent or act for or on behalf of the Company,

28

BL-000022261

to do any act that would be binding on the Company or to make any expenditures or incur any obligations on behalf of the Company unless such Member also is an officer of the Company authorized to do such act, make such expenditure or incur such obligation and such Member is acting in such capacity. No Member shall hold himself, herself or itself out or lead any other party to believe that such Member has the authority to bind the Company unless expressly authorized by the Board. Any Member who takes any action or binds the Company in violation of this Section 4.6 shall be solely responsible and liable for all losses, expenses and damages of any kind whatsoever incurred by the Company as a result of such unauthorized action or binding, and shall indemnify, defend and hold harmless the Company therefrom.

4.7    Renouncement of Opportunities. To the fullest extent permitted by law the Company renounces any interest or expectancy of the Company and its Subsidiaries in, or in being offered an opportunity to participate in, business opportunities, that are from time to time presented to any of the Managers or the Members or any of their respective officers, directors, agents, stockholders, members, partners, Affiliates and subsidiaries, even if the opportunity is one that the Company might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so, and no such Person shall be liable to the Company or any of its Subsidiaries for breach of any fiduciary or other duty, as a director, Manager or officer or otherwise, by reason of the fact that such Person pursues or acquires such business opportunity, directs such business opportunity to another Person or fails to present such business opportunity, or information regarding such business opportunity, to the Company.

4.8    Consent of Spouse. As a condition of admission to the Company as a Member, the spouse of a Member who is a natural person shall execute and deliver to the Company a consent of spouse in the form attached hereto as Exhibit B (the "**Consent of Spouse**").

5.    ACCOUNTING PROVISIONS

5.1    Fiscal Year.  The fiscal and taxable year of the Company shall be the calendar year unless otherwise required by law. The Board shall cause audited annual financial statements to be prepared each year by an independent certified public accountant reasonably satisfactory to Lender and Belfer, and Lender and Belfer does hereby approve Marks Paneth to provide such services; provided, that Belfer shall have the right, in its reasonable discretion, to remove Marks Paneth (or any such replacement accountant appointed by the Board and approved by Lender and Belfer as provided herein). Included in such financial statements will be a statement of operations, balance sheet, statement of Member's capital and a statement of cash flows. The Company's independent certified public accountant will issue an Independent Examination Report on the annual pro forma consolidated financial statements.  The Company shall cause (i) unaudited quarterly financial statements to be delivered to each Major Member promptly (but in any event no later than forty-five (45) calendar days) following the end of each quarter, and (ii) audited annual financial statements to be delivered to each Common Member promptly (but in any event no later than ninety (90) calendar days) following the end of each fiscal year, commencing with the fiscal year ended December 31, 2022.

5.2    Books and Accounts.

29

CONFIDENTIAL                                                                                  BL-000022262

(a)     Complete and accurate books and accounts shall be kept and maintained for the Company at the principal place of business of the Company or at such other place as designated by the Company.  Such books and accounts shall be kept on the cash or accrual basis, as the Company may select in accordance with generally accepted accounting principles and practices and shall include separate accounts for each Member.  A list of the names and addresses of the Members shall be maintained as part of the books and records of the Company.  Each Major Member shall be permitted reasonable access to the principal place of business of the Company upon reasonable notice and during regular business hours to examine and copy the books and records of the Company; provided, that, any such Representative executes and delivers to the Company a Non-Disclosure Agreement in a form reasonably satisfactory to the Company.  The Company reserves the right not to disclose to any Member who is not a Major Member any other Member's Percentage Interest or number of Units held.  Except as otherwise set forth in this Section 5.2(a), the Members hereby waive all rights contemplated by Section 18-305 of the Act, to the fullest extent permitted by law.

(b)     All funds received by the Company shall be deposited in the name of the Company in such bank account or accounts as the Company may designate from time to time, and withdrawals therefrom shall be made upon the signature of the authorized signatory on behalf of the Company as the Company may designate from time to time.  All deposits and other funds not needed in the operation of the Company's business may, in the discretion of the Company, be deposited in interest-bearing bank accounts or in a money market fund, or invested in treasury bills, certificates of deposit, and/or U.S. government security-backed repurchase agreements or similar short-term money market instruments, or funds investing in any of the foregoing.

5.3     Tax Reports.  Ippon shall cause to be prepared after the end of each taxable year of the Company and filed, on or before their respective due dates (as the same may be extended), all federal and state income tax returns of the Company for such taxable year and shall take all commercially reasonable action as may be necessary to permit the Company's accountants to prepare and timely file such returns.  The Company shall use commercially reasonable efforts to deliver to each Member a Form 1065 (Schedule K-1) within ninety (90) days after the end of each taxable year reflecting the Member's pro rata share of income, loss, credit and deductions for such taxable year.

5.4     Tax Audits.

(a)     Ippon is hereby designated the "tax matters partner" of the Company within the meaning of Section 6231(a)(7) of the Code and in any similar capacity under state or local law and, for any taxable period subject to the provisions of Section 6223 of the Code (as amended by the New Partnership Audit Rules), Ippon shall be appointed the "partnership representative" of the Company (in each such capacity, the "**Tax Matters Member**").  Except to the extent specifically provided in the Code or the Treasury Regulations (or the laws of relevant non-U.S. federal taxing jurisdictions) and except as expressly provided otherwise in this Agreement, the Tax Matters Member (acting after discussion with and the approval of the Board)

30

                                          BL-000022263

shall have exclusive authority to act for or on behalf of the Company with regard to tax matters, including the authority to make (or decline to make) any available tax elections (including making any elections under Sections 6221(b) and 6226(a) of the Code if the Tax Matters Member determines in good faith that such an election would be in the best interests of the Company and its Members).  Notwithstanding the foregoing, the Tax Matters Member shall provide prompt written notice to the other Members of the commencement of, and keep the other Members reasonably informed as to developments relating to tax audits, examinations, assessments or tax legal proceedings affecting the Company. The Members agree to take all actions and provide any information reasonably requested by the Company or the Tax Matters Member to comply with the New Partnership Audit Rules, including, where applicable, filing amended returns as provided in Sections 6225 or 6226 of the Code and providing confirmation thereof to the Tax Matters Member.  The financial burden of any imputed underpayment (as determined under Section 6225 of the Code (pursuant to the New Partnership Audit Rules) or other tax assessment imposed on the Company and associated interest, adjustments to tax and penalties arising from an adjustment that are imposed on the Company (a "**Tax Adjustment**") shall be borne by the Members and former Members of the Company as reasonably determined by the Board.  This Section 5.4(a) shall apply to any comparable provision of state or local tax law, and shall survive the dissolution or termination of the Company and the withdrawal or other transfer of interests of or by any Member.  The Tax Matters Member shall determine whether to make, modify or revoke any available election pursuant to the Code (defined below) or other tax law with respect to the Company. Each Member will upon reasonable request timely supply any information necessary to give proper effect to such election. In the event any Member fails to timely comply with its obligations under Section 6226(b) of the Code concerning any Tax Adjustment, then such Member shall have the same liability to the Company and the Company shall have the same remedies against such Member as in the case of a Delinquent Member as specified in Section 7.5 hereof.

(b)     Subject to Section 5.4(d), the Tax Matters Member is hereby authorized, but not required:

(i)     to enter into any settlement with the Internal Revenue Service with respect to any tax audit or judicial review which binds the Company or a Member;

(ii)     in the event that a notice of a final partnership administrative adjustment at the Company level of any item required to be taken into account by a Member for tax purposes (a "**final adjustment**") is mailed to the Tax Matters Member, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims;

(iii)     to intervene in any action brought by any Member for judicial review of a final adjustment;

31

CONFIDENTIAL     BL-000022264

(iv)    to file a request for an administrative adjustment with the Secretary at any time and, if any part of such request is not allowed by the Secretary, to file a petition for judicial review with respect to such request;

(v)    to enter into an agreement with the Internal Revenue Service to extend the period for assessing any tax which is attributable to any item required to be taken into account by the Company or a Member for tax purposes, or an item affected by such item; and

(vi)    to take any other action on behalf of the Members of the Company in connection with any administrative or judicial tax proceeding to the extent permitted by applicable law or regulations.

(c)    The Company shall indemnify and reimburse the Tax Matters Member for all reasonable and documented expenses, including legal and accounting fees, claims, liabilities, losses, and damages incurred in connection with any administrative or judicial proceeding with respect to the tax liability of the Members.  The payment of all such expenses shall be made before any distributions are made to Members or any discretionary reserves are set aside by the Company.  The taking of any action and the incurring of any expense by the Tax Matters Member in connection with any such proceeding, except to the extent required by law, is a matter in the absolute and sole discretion of the Tax Matters Member (acting after discussion with and the approval of the Board) and the provisions on limitations of liability and indemnification set forth herein shall be fully applicable to the Tax Matters Member in its capacity as such.

(d)    Anything herein to the contrary notwithstanding, the Tax Matters Member shall not make any decision binding on the Company in any proceedings or negotiations with any taxing authority without the prior written consent of the Board, including the written approval of at least one Talent Manager.

6.    TRANSFERS OF UNITS; SALE OF THE COMPANY

6.1    Prohibited Transfers.  Except as set forth in this Article 6, without the prior written consent of the Board and the Lender Member, which may be withheld in the sole discretion of either, no Member shall Transfer all or any part of his, her or its Units or other Equity Securities.  Any such purported Transfer shall be invalid and void, shall not bind the Company and shall have no effect whatsoever on the Company or its Members.  For avoidance of doubt, any Transfer of any equity securities issued by a Member which is an entity, other than Transfers to a Permitted Transferee, shall be deemed to constitute a Transfer for purposes of this Agreement. Notwithstanding the preceding sentence, no such Transfer shall be made to a Bad Actor.

6.2    Permitted Transfers.  Notwithstanding Section 6.1, a Member shall be permitted to Transfer his, her or its Units (a) to a Permitted Transferee, or (b) with the prior written consent of the Board and Lender; *provided that*, in all cases, any such Transfer is made in accordance with and subject to the provisions of this Article 6.

32

BL-000022265

6.3    <u>Further Limitations on Transfers</u>.  Notwithstanding anything herein to the contrary, without the prior written consent of the Board, which may be withheld in its sole discretion, no Transfer of any Units or portion thereof by a Member shall be made: (a) to a Person who, in accordance with applicable law, lacks the legal capacity to own, or otherwise is prohibited from owning, any such Units in the Company by reason of minority, incompetence or otherwise; (b) to a Person otherwise prohibited by applicable law from entering into such transaction or holding such Units; (c) if the Board determines, in its sole discretion, that such proposed Transfer would (i) cause the Company to have more than one hundred (100) partners (within the meaning of Treasury Regulation Section 1.7704-1(h), including the look-through rule in Treasury Regulation Section 1.7704-1(h)(3)) or cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704, (ii) cause a termination of the Company for purposes of Code Section 708,  (iii) have any other material and adverse federal income tax consequences to the Company or any Member (other than the Transferring Member) or (iv) cause the Company to be required to register as an "investment company" under the United States Investment Company Act of 1940, as amended; (d) which violates any other provision of this Agreement, and any such Transfer shall be void ab initio; or (e) which violates any securities or other applicable laws.  If any Transfer is attempted in any such case or otherwise in violation of this Agreement, the Transfer shall be void and shall not bind the Company.

6.4    <u>Transfers by Operation of Law</u>.  In the event of any Involuntary Transfer (as defined below) of a Unit, the Transferee shall not be substituted as a Member and shall not have any rights as a Member of the Company, including, without limitation, any voting rights attached to such Transferred Units.  "**Involuntary Transfer**" shall mean any involuntary Transfer or Transfer by operation of law of the Units held by any Member by or in which such Member shall be deprived or divested of any right, title or interest in or to such Units, including, without limitation, by seizure under levy of attachment or execution, by foreclosure upon a pledge, in connection with any voluntary or involuntary bankruptcy or other court proceeding to a debtor in possession, trustee in bankruptcy or receiver or other officer or agency, pursuant to any statute pertaining to escheat or abandoned property, pursuant to a divorce or separation agreement or a final decree of a court in a divorce action, upon or occasioned by the incompetence or death of any Member and to a legal representative of any such Member.

6.5    <u>Sale of the Company</u>.

(a)    Subject to the consents required pursuant to <u>Section 3.9</u>, if the Board approves a Sale of the Company, the Company shall deliver a notice to each Member containing the material terms thereof (a "**Sale Notice**").  The Company agrees that each Member shall have the right to participate in such Sale of the Company pursuant to this <u>Section 6.5</u> and <u>Section 8.3</u>.  Each Member agrees (i) to vote and/or consent in writing, as requested by the Board, all of its Units in favor of such Sale of the Company, and, if Units are to be Transferred, to Transfer all of its Units on the terms and subject to the terms and conditions contained in the Sale Notice and (ii) to vote and/or consent in writing in opposition to any and all other proposals that could delay or impair the ability of the Company to consummate such Sale of the Company.  Each Member agrees to cooperate with the Company and the Board in any such Sale of the Company

33

and agrees to execute and deliver all reasonably requested documents and instruments, including without limitation executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, indemnity agreement, escrow agreement, consent, waiver, governmental filing, share certificates duly endorsed for Transfer (free and clear of all Liens of any nature whatsoever) and any similar or related documents, make such representations and warranties and participate in indemnification obligations as are reasonably requested by the Company or the Board in order to consummate any such Sale of the Company, so long as the rights and obligations of all Common Members in connection with the foregoing are equally applicable to all Members on a pro rata basis; provided, however, that notwithstanding the foregoing none of the Members (1) shall have any obligation to make representations or warranties in connection with such Sale of the Company, other than customary representations and warranties given by sellers of equity with respect to good standing, power and authority, authorization, enforceability, no-conflict and title (the **"Organic Representations"**); (2) shall not be required to provide more than pro rata indemnification on a basis other than several and not joint; and (3) shall not be required to provide indemnification in excess of the consideration received by each such Member in such Sale of the Company (other than for breaches of the Organic Representations required to be made by such Member pursuant to clause (1) hereof). Each Member hereby agrees to refrain from exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to such Sale of the Company.

(b)     Each party to this Agreement hereby constitutes and appoints as the proxy of the party and hereby grants a power of attorney to the Company's Chief Executive Officer, with full power of substitution, with respect to the matters set forth in this Section 6.5, including without limitation, votes regarding any Sale of the Company, and hereby authorizes such Chief Executive Officer to represent and to vote or consent, as the case may be, if and only if the party (i) fails to vote within fifteen (15) days after a request in writing to do so (together with copies of all material information and contracts regarding the Sale of the Company) or (ii) attempts to vote (whether by proxy, in person or by written consent), in a manner which is inconsistent with the terms of this Agreement, all of such party's Units in favor of the approval of a Sale of the Company pursuant to and in accordance with the terms and provisions of this Section 6.5 or to take any action necessary to effect the provisions of this Section 6.5. Each of the proxy and power of attorney granted pursuant to the immediately preceding sentence is given in consideration of the agreements and covenants of the Company and the parties in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable. Each party hereto hereby revokes any and all previous proxies or powers of attorney with respect to the Units and shall not hereafter, grant or purport to grant any other proxy or power of attorney with respect to any of the Units, deposit any of the Units into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any Person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Units, in each case, with respect to any of the matters set forth herein. The Company shall provide the Members promptly with full copies of any documents executed and/or filed and a description of any other actions taken pursuant to the attorney-in-fact designation in this Section 6.5(b).

34

BL-000022267

(c)     The proceeds of such Sale of the Company (regardless of whether the transaction is structured as a Unit sale or an asset sale) shall be paid or distributed (as applicable) to the Members in accordance with Section 8.3, and the Company and each Member shall take such actions and execute such documents and instruments as may reasonably be required to cause the proceeds of such Sale of the Company (after payment of all expenses incurred in connection therewith) to be paid and distributed to the Members in accordance with Section 8.3.

(d)     In connection with such Sale of the Company, the Members who are not Accredited Investors will, at the request of the Company, appoint a "purchaser representative" (as such defined term is defined in Rule 501 of Regulation D promulgated pursuant to the Securities Act), reasonably acceptable to the Company.  If the Members appoint a "purchaser representative" acceptable to the Company or appoint as the "purchaser representative" the Person requested by the Company if one is requested, the Company shall pay the reasonable fees of such "purchaser representative" incurred in the exercise of his duties in such capacity.  If the Members do not appoint a "purchaser representative" acceptable to the Company or do not appoint as the "purchaser representative" the Person requested by the Company if one is requested, the Company shall not be obligated to any fees of such "purchaser representative."

6.6     Assignments; Substituted Members.

(a)     A Transferee of any Units or other interest in the Company (or any portion thereof), in accordance with the provisions of this Article 6, shall be admitted to the Company as a Member (a "**Substituted Member**") and shall be entitled to all the rights of a Member with respect to such Transferred Units or interest if and only if (i) the assignor gives the Transferee such right, (ii) either the Transferee is a Permitted Transferee or such Transfer has been approved by the Board and otherwise been made in accordance with this Agreement, (iii) the Transferee has agreed in writing to be bound by the provisions of this Agreement and the Transferee assumes in writing the liabilities of the Member Transferring Units and (iv) if the Transferee is a natural person, the spouse of Transferee has executed a Consent of Spouse.

(b)     The Company shall be entitled to treat the record owner of any Units or other interest in the Company as the absolute owner thereof and shall incur no liability for distributions made in good faith to such owner until such time as (i) a written assignment of such Units or other interest in the Company, which assignment is permitted pursuant to and made in accordance with the terms and conditions of this Article 6, has been received and accepted by the Board and has been recorded on the books of the Company and (ii) all fees and expenses of the Company and the Board incurred in connection with such Transfer have been paid in full.  Upon the admission of a Substituted Member, the Schedule of Members attached hereto shall be amended to reflect the Transfer to the Substituted Member.

(c)     Following an assignment of Units that is permitted under this Article 6, (i) the Transferee of such Units who is admitted as a Substituted Member (A) shall be treated as having made all of the Capital Contributions in respect of, and received all of the

35

BL-000022268

allocations and distributions received in respect of, such Units, and (B) shall succeed to the Capital Account associated with such Units and (ii) any Permitted Transferee (whether or not admitted as a Member) shall receive allocations and distributions in respect of such Units as if such Transferee were a Member.

(d)     The Transferor and Transferee of any Units shall be jointly and severally obligated to reimburse the Company for all reasonable expenses (including attorneys' fees and expenses) of any Transfer or proposed Transfer, whether or not consummated.  A Transfer of Units permitted hereunder shall constitute an assignment of the economic rights of such Units in accordance with the Act and shall not constitute admission to the Company of the Transferee unless the provisions of this Section 6.6 have been fulfilled.

(e)     A Person to whom a Unit is assigned but who is not admitted as a Substituted Member pursuant to this Section 6.6 shall be entitled only to receive distributions and to receive allocations of income, gain, loss, deduction or credit to which the assignor would have been entitled (to the extent assigned).  The assignee shall have no other rights except pursuant to the preceding sentence and, without limiting the generality of the foregoing, shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Agreement.  In accordance with Section 18-702(b)(3) of the Act, a Member who assigns all of its Units (if and as permitted by this Agreement) shall cease to be a Member of the Company.

(f)     Upon the divorce of a Member who is a natural person (the "**Divorced Party**"), (i) any spouse ("**Spouse**") of such Divorced Party who may acquire Units in the Company by reason of such divorce, shall have only the rights of an assignee (and not the rights of a Substituted Member) and, accordingly, shall not be entitled to participate in the management of,  or otherwise vote, approve or decide upon any matter affecting the business and affairs of, the Company or any matter that such Member, as the case may be, is entitled to vote, approve or decide upon under this Agreement, (ii) the rights of the Spouse as an assignee shall be limited solely to sharing in any allocations and/or distributions of Profits, Losses (and items thereof), cash flow and liquidating distributions to which such Member, as the case may be, is entitled to receive under this Agreement, (iii) the Spouse shall not have any authority to act for or bind the Company, and (iv) the Divorced Party shall continue to be obligated to perform all of such Divorced Party's duties and obligations under this Agreement.

6.7     Corporate Conversion.

(a)     Upon the approval of the Board, subject to the prior written consent of the Lender Member pursuant to Section 3.9, of a plan to incorporate the Company (the "**Incorporation Plan**"), each Member will Transfer such Member's Units to a corporation specifically formed for such purpose (the "**Corporation**") in exchange for stock of the Corporation

36

BL-000022269

and which maintains the relative rights and preferences (including any preference on distributions or liquidation) of the Members hereunder (the "**Incorporation Transaction**").

(b)     Each Member shall consent to and raise no objections against, and shall take all necessary and desirable actions in connection with the consummation of the Incorporation Transaction.  The Company (or Corporation) shall pay any and all of its and the Members' fees, costs and expenses (including organizational, legal and accounting expenses and filing fees) incurred in connection with the Incorporation Transaction.  The Corporation shall issue its stock in the Incorporation Transaction in accordance with the Incorporation Plan, which shall specify the classes of stock, options or other equity securities for which the Units and other securities of the Company shall be exchanged and which shall attach as an exhibit the form of organizational document which shall set forth the rights and privileges of such classes of stock. Each Member shall receive shares of stock, options or other equity securities in the Corporation in a manner as to reflect their ownership interest in the Company, as determined in good faith by the Board; provided, that, in the event of an Incorporation Transaction, the Company shall use commercially reasonable efforts to structure the conversion or transaction so that the economics of the equity held by the Members are as similar as possible to the economics immediately prior to the Incorporation Transaction and to structure the Incorporation in a tax efficient manner to the Members.  Upon such conversion, this Agreement shall terminate except as provided in this Section 6.7 and with respect to Article 9.  The Members shall take any actions and execute any documents reasonably requested by the Company in connection with any such conversion including executing a shareholders agreement containing the terms of this Agreement.

7.     DISTRIBUTIONS AND ALLOCATIONS

7.1     Capital Accounts.

(a)     The Company shall establish and maintain a capital account for each Member (each, a "**Capital Account**").

(b)     Each Member's Capital Account shall be increased by (i) the amount of cash and the fair market value of property (net of liabilities secured by such contributed property that the Company assumes or takes subject to) contributed by such Member to the Company, and (ii) allocations to the Member of profits of the Company.

(c)     Each Member's Capital Account shall be decreased by (i) the amount of money and the fair market value of property (net of liabilities secured by such distributed property that such Member assumes or takes subject to) distributed to it by the Company, and (ii) allocations to the Member of loss of the Company.

(d)     Each Member's Capital Account shall be further adjusted as may be necessary in order for the Members' Capital Accounts to be determined and maintained in accordance with Income Treasury Regulations Section 1.704-1(b)(2)(iv).

CONFIDENTIAL                                                                                    BL-000022270

(e)      In the event of any Transfer of Units, the Transferee shall succeed to the Capital Account of the Transferor with respect to the interest Transferred.

(f)      In the sole and absolute discretion of the Board, the Capital Accounts of the Members may be increased or decreased to reflect a revaluation of property of the Company (including intangible assets such as goodwill) on the Company's books upon the occurrence of a revaluation event as described in Treasury Regulations Section 1.704-1(b)(2)(iv)(f) which involves more than a de minimis amount of capital contributed or distributed, or more than de minimis interest in the Company if affected.  Upon such revaluation:  (i) the Gross Asset Value of all assets of the Company shall be adjusted based on the fair market value of such property (taking into account Code Section 7701(g)) on the revaluation date, and (ii) the unrealized income, gain, loss or deduction with respect to such property (that has not been reflected in the Capital Accounts previously) shall be allocated among the Members as if there were a taxable disposition of such property for such fair market value on the revaluation date.

7.2      Distributions.  Subject to the provisions of this Section 7.2 and Section 7.6, the Company may make distributions to the Members at such times and in such amounts as the Board, in its sole and absolute discretion, shall determine out of legally available funds therefor.  All distributions made pursuant to this Section 7.2 (and expressly excluding for purposes of this Section 7.2 any distributions made in respect of a Liquidation Event, which shall be made in accordance with the provisions of Section 8.3) shall be made to the Members in the following order and priority, subject to the Distribution Limitations set forth in this Section 7.2:

(a)      first, $13,000,000 shall be distributed as follows: (i) an amount equal to $13,000,000, minus an amount equal to (x) $13,000,000 multiplied by (y) the Aggregate 2022 and 2023 Purchaser Percentage, shall be distributed to Gruyere, Ippon, Lender, and Belfer, pro rata in accordance with their respective Capital Contribution Priority Percentages, and (ii) an amount equal to (x) $13,000,000 multiplied by (y) the Aggregate 2022 and 2023 Purchaser Percentage shall be distributed to the 2022 Purchasers and 2023 Purchasers pro rata in accordance with their Aggregate 2022 and 2023 Purchaser Percentage Interests, in each case, taking into account all distributions previously made pursuant to this clause (a) (whether under this Section 7.2 or Section 8.3);

(b)      second, $18,000,000 shall be distributed as follows:  (i) an amount equal to $18,000,000, minus an amount equal to (x) $18,000,000 multiplied by (y) the Aggregate 2022 and 2023 Purchaser Percentage, shall be distributed to Gruyere and Ippon pro rata in accordance with their respective Capital Contribution Residual Percentages, and (ii) an amount equal to (x) $18,000,000 multiplied by (y) the Aggregate 2022 and 2023 Purchaser Percentage shall be distributed to the 2022 Purchasers and 2023 Purchasers pro rata in accordance with their Aggregate 2022 and 2023 Purchaser Percentage Interests, in each case, taking into account all distributions previously made pursuant to this clause (b) (whether under this Section 7.2 or Section 8.3);

(c)      third, solely in connection with a distribution of proceeds arising from a Liquidation Event, $9,000,000 shall be distributed as follows: (i) an amount equal to

38

                                                                BL-000022271

$9,000,000, minus an amount equal to (x) $9,000,000 multiplied by (y) the Aggregate 2022 and 2023 Purchaser Percentage, shall be distributed to Lender, and (ii) an amount equal to (x) $9,000,000 multiplied by (y) the Aggregate 2022 and 2023 Purchaser Percentage shall be distributed to the 2022 Purchasers and 2023 Purchasers pro rata in accordance with their Aggregate 2022 and 2023 Purchaser Percentage Interests; and

(d)     thereafter, to all of the Members pro rata in accordance with their Fully-Diluted Percentage Interests.

Notwithstanding the foregoing or anything herein to the contrary the following additional distribution limitations and provisions ("**Distribution Limitations**") shall apply:

(i)     A Member holding Incentive Units shall not be entitled to distributions pursuant to this Section 7.2 unless such Incentive Units are expressly permitted to participate in such distributions under the terms of the incentive award agreement pursuant to which such Incentive Units were issued to such Incentive Member, and the amounts that would otherwise have been distributed to such Incentive Member shall instead be distributed ratably to the Members entitled to participate in such distribution.

(ii)     Distributions payable in respect of unvested Incentive Units that are expressly entitled to participate in distributions pursuant to this Section 7.2 shall be held in reserve by the Company in a segregated account and credited to the applicable Incentive Member but shall not be payable to such Incentive Member unless and until such unvested Incentive Units have vested and become vested Incentive Units; provided, however, that such foregoing limitations shall not apply to tax distributions that otherwise would be payable to such Incentive Members pursuant to Section 7.6.  Upon the forfeiture by any Member of such Incentive Units for any reason, any such reserved amounts shall instead be distributed ratably to the Members entitled to participate in such distribution.  Any amounts withheld pursuant to the first sentence of this clause (ii) shall be paid to the Incentive Members not later than upon a Liquidation Event and prior to any distribution made to the Members pursuant to Section 8.3.

(iii)     Solely in connection with a distribution of proceeds arising from a Liquidation Event, if, and only if, distributions from the proceeds thereof in an aggregate amount of $145,893,600 have been made to the Members entitled thereto pursuant to Section 8.3(a)-(c) inclusive, then, distributions to the Members pursuant to Section 7.2(d) shall be paused and the next distributions shall be made to Vendor until such time as Vendor shall have received an amount equal to the product obtained by multiplying (x) the aggregate amount of distributions previously made to the Members upon a Liquidation Event pursuant to Section 8.3(a)-(c) inclusive, by (y) Vendor's Percentage Interest (as defined below) (such distribution, the "**Vendor Catch-Up Distribution**"); provided, that, in no event shall the amount of the Vendor Catch-Up Distribution exceed an aggregate amount of $1,000,000. After such Vendor Catch-Up Distribution has been made pursuant to this clause (iii), distributions to the Members of the proceeds of such Liquidation Event shall resume in accordance with Section 7.2(d). As used in and for

39

BL-000022272

purposes of this clause (iii), "**Vendor's Percentage Interest**" means, with respect to Vendor and as of a particular time of determination, the quotient, expressed as a percentage, determined by dividing (x) the then total number of vested Vendor Units held by Vendor, by (y) the total number of all Common Units, vested Incentive Pool A Incentive Units and vested Vendor Units (for clarity, excluding for this purpose all vested Incentive Pool B Incentive Units) then outstanding.

For illustrative purposes only, attached hereto as Exhibit C is an example waterfall calculation illustrating the calculation of hypothetical distributions pursuant this Section 7.2 and pursuant to Section 8.3 in the case of a Liquidation Event.

> 7.3    Allocation of Profits and Losses.

(a)    General. Except as otherwise required by Code Section 704 and the Treasury Regulations thereunder, Profit or Loss, and, to the extent necessary, individual items of income, gain, loss and deduction of the Company for each Fiscal Year or other period ("**Period**") of the Company shall be allocated among the Members in such a manner that, as of the end of such Period, the Adjusted Capital Account Balance of each Member shall equal (proportionately), as nearly as possible, to the amount that would be distributed to each such Member under this Agreement, determined as if the Company were to sell the assets of the Company for an amount of cash equal to their Gross Asset Value, pay the liabilities of the Company, and distribute the proceeds pursuant to Section 8.3; *provided*, however, that Section 7.2(c) shall only be taken into account for purposes of this Section 7.3 in in connection with a Liquidation Event in the fiscal year of such Liquidation Event.

(b)    Book-Tax Accounting Disparities. Solely for federal income tax purposes, if property of the Company is reflected in the Capital Accounts of the Members at a Gross Asset Value that differs from the adjusted tax basis of such property, allocations of depreciation, amortization, income, gain or loss with respect to such property shall be made among the Members, using the traditional method or such other method as determined by the Board in its sole and absolute discretion in a manner which takes such difference into account in accordance with Code Section 704(c) and the Treasury Regulations thereunder.

(c)    Adjustment to Capital Accounts for Distributions of Property. In the sole absolute discretion of the Board, if the Company distributes property that is reflected in the Capital Accounts of the Members at a Gross Asset Value that differs from the fair market value of such property at the time of distribution, the difference may be treated as Profit or Loss on the sale of such property and shall be allocated among the Members as of the time immediately prior to such distribution in accordance with Section 7.3(a).

(d)    Allocations in Event of Transfer. If an interest in the Company is transferred in accordance with this Agreement, allocations of Profits and Losses as between the transferor and transferee shall be made using any method selected by the Board and permitted under Code Section 706.

40

    BL-000022273

(e)     Tax Allocations. Items of Company income, gain, loss, deduction or credit recognized for federal income tax purposes shall be allocated among the Members for federal income tax purposes on the same basis as their respective book items but in a manner that is consistent with the requirements of the Code and the Treasury Regulations.

(f)     Regulatory Allocations. Notwithstanding any other provisions of this Agreement, the following special allocations of Profits and Losses shall be made in the following order:

(i)     Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(f), if there is a net decrease in Company Minimum Gain for any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to this paragraph (a) shall be made in proportion to the respective amounts required to be allocated to each Member pursuant hereto. Company Minimum Gain shall have the meaning ascribed to such term in Treasury Regulations Section 1.704-2(b)(2). This paragraph (i) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(ii)     Member Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member who has a share of such Member Nonrecourse Debt Minimum Gain determined in accordance with Treasury Regulations Section 1.704-2(i)(5) shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). Allocations pursuant to this paragraph (b) shall be made in proportion to the respective amounts required to be allocated to each Member pursuant hereto. Member Nonrecourse Debt Minimum Gain shall have the meaning ascribed to such term in Treasury Regulations Section 1.704-2(i)(2). This paragraph (ii) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(iii)     Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), and such Member has a deficit Adjusted Capital Account Balance, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate the deficit as quickly as possible. This paragraph (iii) is intended to constitute a "qualified income offset" under Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(iv)     Nonrecourse Deductions. Nonrecourse Deductions for any Period shall be allocated among the Common Members in accordance with the number of

41

     BL-000022274

Common Units held by them.  Nonrecourse Deductions shall have the meaning ascribed to such term in Treasury Regulations Section 1.704-2(b)(1).

(v)    Member Nonrecourse Deductions.  Member Nonrecourse Deductions for any Period shall be specially allocated to the Member that bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).  Member Nonrecourse Deductions shall have the meaning ascribed to such term in Treasury Regulations Section 1.704-2(i)(2).  Member Nonrecourse Debt shall have the meaning ascribed to such term in Treasury Regulations Section 1.704-2(b)(4).

(vi)    Code Section 754 Adjustments.    To the extent an adjustment to the adjusted basis of any Company asset pursuant to Code Section 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*), to be taken into account in determining Capital Accounts, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*).

(g)    Curative Allocations.    To the extent necessary to avoid any economic distortions which may result from application of Section 7.3(f) (the "**Regulatory Allocations**"), future items of income, gain, loss, expense and deduction shall be allocated as appropriate as determined by the Board in order to remedy any economic distortions that the Regulatory Allocations might otherwise cause.

(h)    Modifications to Preserve Underlying Economic Objectives.  In the event that there is a change in the federal income tax law, or the allocations provided for in this Agreement do not comply with the substantial economic effect and capital account rules set forth under Code Section 704 and the Treasury Regulations thereunder or otherwise properly reflect the economic interests of the Members, the Board shall make such modifications to the allocation provisions of this Agreement necessary to preserve the underlying economic objectives of the Members and to comply with such provisions of the Code and the Treasury Regulations.

(i)    Forfeiture Allocations.  In the event of a forfeiture of Units at such time as there is final or temporary guidance substantially similar to the concepts contained in Proposed Regulations Section 1.704-1(b)(4)(xii)(c) relating to forfeiture allocations, the Company shall make allocations of Profit and Loss in accordance with such provision.

7.4    No Return of Distributions.  No Member shall have any obligation to refund to the Company any amount that shall have been distributed to such Member pursuant to this Agreement, subject, however, to the rights of any third-party creditor under law.

42

BL-000022275

7.5     Amounts Withheld.  All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Company or to the Members or any allocation of taxable income to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this Article 7 for all purposes under this Agreement.  The Company is authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over any federal, state or local government any amounts required to be withheld pursuant to the Code or any provisions of any other federal, state or local law and shall allocate such amounts to the Members with respect to whom such amounts were withheld.  If the amount required to be withheld with respect to a Member exceeds the amount which otherwise would have been distributed to such Member, such Member shall pay to the Company the amount of such excess within five (5) days after the giving of written demand therefor by the Board. If such Member (herein called a "**Delinquent Member**") shall fail to pay such excess within said five-day period, then (i) interest shall accrue thereon at or equal to the lesser of twenty four percent (24%) per annum or the maximum rate permitted by law commencing as of the date such Delinquent Member received such excess distribution, (ii) such excess amount together with interest accrued thereon as aforesaid shall be a lien upon the Units of the Delinquent Member in favor of the Company and may be recovered from the first distributions to which the Delinquent Member would otherwise have been entitled from the Company until such excess amount is fully repaid together with interest thereon as aforesaid, and (iii) the Company, in addition to and without limiting any of its other rights and remedies, may institute an action against the Delinquent Member for collection of such excess amount and interest; in any such action, the Company shall be entitled to recover, in addition to such excess amount and interest, all attorneys' fees, disbursements and court costs incurred by the Company in connection with its efforts to collect the amounts due from such Delinquent Member.  In addition, such Delinquent Member shall indemnify and hold harmless the Company and each of the other Members and the Board and the employees of the Company from all liabilities, losses, costs and expenses, including, without limitation, penalties imposed by the Internal Revenue Service or any state or local taxing authority, for failure to remit the required amount of taxes to the appropriate governmental authority.

7.6     Tax Distributions. To the extent that any Member is allocated taxable income from the Company as a result of it being a Member, other than in connection with a Liquidation Event, the Company shall, in priority to distributions pursuant to Section 7.2 and in accordance with this Section 7.6, make distributions to such Members in amounts to be determined as set forth in this Section 7.6.  The amounts distributable pursuant to this Section 7.6 shall be the amounts necessary to enable the Members (or any Persons whose tax liability is determined by reference to the income of a Member) to discharge their U.S. federal, state, local income tax liabilities arising from the allocations made pursuant to this Article 7 to the Member as determined by the Board, computed using the Assumed Tax Rate.  As used herein, "**Assumed Tax Rate**" means for any taxable year, the highest marginal combined rate of United States federal (including the rate of tax imposed by Section 1411 of the Code but excluding any potential deduction pursuant to Section 199A of the Code), state and local income tax applicable to an individual resident in New York, New York (or, if higher, a corporation doing business in New York, New York), taking account of any differences in rates applicable to ordinary income, dividends

43

                                                                                      BL-000022276

and capital gains and any allowable deductions in respect of such state and local taxes in computing a Member's liability for federal income tax.  In determining the distributions to be made under this Section 7.6 with respect to a Member for any taxable year, if a Member is allocated a tax loss or credit hereunder for any taxable year, the amount of such loss or credit shall be carried forward and applied to offset any taxable income allocated to such Member hereunder for each succeeding taxable year or year in which such Member is allocated taxable income hereunder until such loss or credit is fully absorbed by taxable income allocated to such Member hereunder for each succeeding taxable year or years in which such Member is allocated taxable income hereunder until such loss or credit is fully absorbed by taxable income allocated to such Member hereunder consistent with applicable rules relating to loss or credit carry forwards under the Code and applicable state rules. In the event any such entity-level tax is elective, the Board, in its sole discretion, can decide whether to make such election. Any distributions made pursuant to this Sections 7.6 shall be treated as advances on distributions for purposes of Section 7.2.  Upon a Liquidation Event, the Company shall comply with the liquidation distribution provisions set forth in Section 8.3.  The tax distributions required under this Section 7.6 shall not apply to taxable income as a result of such Liquidation Event, and the Company shall not make any further tax distributions pursuant to this Section 7.6 subsequent to such Liquidation Event.  The Company shall make the distributions required by this Section 7.6, if any, on a quarterly basis and at least ten (10) days prior to the due date for payment of estimated federal income taxes by an individual taxpayer; provided that if the Company does not have sufficient cash to make such entire distribution, it shall only be required to distribute an amount equal to available cash as reasonably determined by the Board (with the shortfall required to be paid at such time as there is then sufficient cash as reasonably determined by the Board) and shall distribute such amount among the Members in proportion to the amounts that they would have been entitled to receive if there had been sufficient cash to make the full distribution.

8.    LIQUIDATION AND TERMINATION OF THE COMPANY

8.1    Dissolution. The Company shall be dissolved and its affairs shall be wound up (a "**Liquidation**") on the first to occur of the following:

(a)    Subject to the restrictions set forth in Section 3.9 hereof, upon the written consent of the Board; or

(b)    the entry of a decree of judicial dissolution under the Act.

The death, retirement, resignation, expulsion, withdrawal, bankruptcy or dissolution of any Member shall not cause the dissolution of the Company and thereafter the Company shall continue its existence.

8.2    Winding Up.  Upon a Liquidation, the business and affairs of the Company shall be wound up in accordance with the Act.

44

    BL-000022277

8.3    Liquidating Distributions.  Upon a Liquidation Event, the assets and funds of the Company available for distribution to its Members shall be distributed in the following manner and order of priority:

(a)    first, to pay the matured or fixed debts and liabilities of the Company including any debts to any Member or other amounts owed to a Member as permitted hereunder, including, without limitation, the costs and expenses of the Liquidation Event and all payments required to be made under the BBZ IP Support Fee  Agreement and the BBZ IP License Agreement;

(b)    second, to establish any reserves that the Liquidating Agent (as defined below) may deem necessary for any contingent, un-matured or unforeseen liability of the Company in the case of a Liquidation; and

(c)    finally, in accordance with Section 7.2, except that for purposes calculating the distributions to be made to the Members upon a Liquidation Event under Section 7.2(d), such distributions shall be made to the Members based upon their Percentage Interests (and not their Fully-Diluted Percentage Interests, which for clarity, shall be used to calculate distributions of operating income only under Section 7.2).

Notwithstanding anything to the contrary herein, (x) no Member shall receive distributions of any kind in respect of unvested Units, and (y) and Members holding Incentive Units shall be subject to the Distribution Limitations set forth in clauses (i), (ii) and (iii) in the penultimate paragraph of Section 7.2 in respect of distributions upon a Liquidation Event.

Notwithstanding anything to the contrary herein, prior to the distribution of any proceeds from a Liquidation Event to the Members, the Company and Gruyere will in good faith determine the amount of cash, if any, required to be reserved by the Company for the maintenance or other disposition of Opco and Gruyere, including without limitation, for any future tax obligations resulting therefrom.

8.4    Liquidating Agent.  Upon the approval of the Liquidation of the Company, the Company shall be liquidated in accordance with this Article 8 and the Act.  The liquidation shall be conducted and supervised by the Board or a Person appointed by the Board (the "**Liquidating Agent**").  The Liquidating Agent shall have all of the rights and powers with respect to the assets and liabilities of the Company in connection with the Liquidation and termination of the Company that the Board would have with respect to the assets and liabilities of the Company prior to the Liquidation.  Without limiting the foregoing, the Liquidating Agent is hereby expressly authorized and empowered to execute and deliver any and all documents which are necessary or desirable to effectuate the liquidation and termination of the Company and the Transfer of any asset or liability of the Company.  The Liquidating Agent shall have the right from time to time, by revocable powers of attorney, to delegate to one or more Persons any or all of such rights and powers and such authority and power to execute and deliver documents, and, in connection therewith, to fix the reasonable compensation of each such Person, which compensation shall be charged as an expense of the Liquidation.  The Liquidating Agent is also

45

CONFIDENTIAL

BL-000022278

expressly authorized to distribute the Company's property to the Members subject to liens and encumbrances.

8.5    Statements on Termination.    Each Member shall be furnished with a statement prepared by the Company's regular accountants setting forth the assets and liabilities of the Company as of the date of complete liquidation, and each Member's share thereof.  Upon compliance with the distribution plan set forth herein, the Members shall cease to be such, and the Liquidating Agent shall execute, acknowledge and cause to be filed, where appropriate under law, a certificate of dissolution of the Company.

8.6    Distribution of Non-Liquid Assets.  If the Liquidating Agent shall determine that it is not practicable to liquidate all of the assets of the Company, then the Liquidating Agent shall cause the fair market value of the assets not so liquidated to be determined by appraisal by the Board.  Such assets, as so appraised, shall be retained or distributed by the Liquidating Agent as follows:

(a)    The Liquidating Agent shall retain assets having a fair market value equal to the amount, if any, by which the net proceeds of liquidated assets are insufficient to satisfy the debts and liabilities of the Company (other than any debt or liability for which neither the Company nor the Members are personally liable), to pay the costs and expenses of the dissolution and liquidation, and to establish reserves, all subject to the provisions of Section 8.3 of this Agreement.  The foregoing shall not be construed, however, to prohibit the Liquidating Agent from distributing, pursuant to Section 8.3 of this Agreement, property subject to Liens at the value of the Company's equity therein.

(b)    The remaining assets (including, without limitation, receivables, if any) shall be distributed to the Members by way of undivided interests therein in such proportions as shall be equal to the respective amounts to which each Member is entitled pursuant to Section 8.3 above.  If, in the judgment of the Liquidating Agent, it shall not be practicable to distribute to each Member an undivided aliquot share of each asset, the Liquidating Agent may allocate and distribute specific assets to one or more Members as tenants-in-common as the Liquidating Agent shall determine to be fair and equitable, taking into consideration, inter alia, the basis for tax purposes and fair market value of each asset distributed.

(c)    Prior to a Sale of the Company, the Board shall deliberate the feasibility of consummating a Sale of the Company pursuant to which the proceeds of such sale are in the form of publicly traded securities listed on the New York Stock Exchange and/or NASDAQ.

8.7    Orderly Liquidation.  A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors, so as to minimize the losses normally attendant upon liquidation.

46

CONFIDENTIAL

BL-000022279

8.8 <u>Certificate of Cancellation</u>. Upon the completion of the Liquidation, the Liquidating Agent shall cause to be filed with the Secretary of State of the State of Delaware the Company's certificate of cancellation.

9. <u>EXCULPATION & INDEMNIFICATION</u>

9.1 <u>Exculpation</u>. None of the Managers shall be liable to the Company or to any officer or Member for (a) any loss suffered by the Company unless such loss is caused by such Manager's gross negligence, willful misconduct, knowing and intentional violation of law or material breach of this Agreement, in each instance, as finally adjudicated in a non-appealable decision by a court of competent jurisdiction, or (b) any errors in judgment or for any acts or omissions that do not constitute gross negligence, intentional misconduct, knowing violation of law or material breach of this Agreement.

9.2 <u>Right to Indemnification</u>. Subject to the limitations and conditions as provided in this <u>Article 9</u>, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative (hereinafter a "**Proceeding**"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, solely by reason of the fact that he or she, or a Person of whom he or she is the legal representative, is or was a Manager, an officer of the Company or while an officer is or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust or other enterprise, in each case shall be indemnified by the Company to the fullest extent permitted under applicable law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties, fines, settlements and reasonable expenses (including, without limitation, reasonable outside attorneys' fees) actually incurred by such Person in connection with such Proceeding; <u>provided that</u> (a) such Person's course of conduct was pursued in good faith and believed by him or her to be in the best interests of the Company and (b) such course of conduct did not constitute gross negligence, intentional misconduct, breach of fiduciary duty (other than with respect to a Manager), or knowing violation of law on the part of such Person and otherwise was materially in accordance with the terms of this Agreement. Indemnification under this <u>Article 9</u> shall continue with respect to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this <u>Article 9</u> shall be deemed contractual rights, and no amendment, modification or repeal of this <u>Article 9</u> shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any amendment, modification or repeal. It is expressly acknowledged that the indemnification provided in this <u>Article 9</u> could involve indemnification for negligence (but not gross negligence).

47

BL-000022280

9.3     Advance Payment.  The right to indemnification conferred in this Article 9 shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person of the type entitled to be indemnified under Section 9.2 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; provided that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of his good faith belief that he has met the standard of conduct necessary for indemnification under Article 9 and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article 9 or otherwise.

9.4     [Intentionally Omitted.]

9.5     Appearance as a Witness.  Notwithstanding any other provision of this Article 9, the Company may pay or reimburse reasonable out-of-pocket expenses incurred by a Manager, officer or employee in connection with his or her appearance as a witness or other participation in a Proceeding related to or arising out of the business of the Company at a time when he or she is not a named defendant or respondent in the Proceeding.

9.6     Non-Exclusivity of Rights.  The right to indemnification and the advancement and payment of expenses conferred in this Article 9 shall not be exclusive of any other right which a Manager, officer or other Person indemnified pursuant to this Article 9 may have or hereafter acquire under any law (common or statutory), provision of the Company's certificate of formation or this Agreement, separate contractual arrangement or otherwise.

9.7     Insurance.  The Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article 9.

9.8     Savings Clause.  If this Article 9 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Manager, officer or any other Person indemnified pursuant to this Article 9 as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the fullest extent permitted by any applicable portion of this Article 9 that shall not have been invalidated and to the fullest extent permitted by applicable law.

48

CONFIDENTIAL                                                                        BL-000022281

9.9     Transactions between the Company and the Members.  Notwithstanding that it may constitute a conflict of interest, the Members or their Affiliates may engage in any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or rendering of any service or the establishment of any salary, other compensation or other terms of employment) with the Company so long as such transaction is on an arms' length basis, is approved in advance by the Board and complies with Section 3.9, if applicable, following full disclosure to all Managers of the conflict of interest.

9.10     Insurance.     Notwithstanding anything to the contrary herein, at all times during the Company's existence, the Company shall (a) not amend, repeal or modify (in a manner adverse to the beneficiary thereof) any provision in any of this Agreement or of the Indemnification Agreement (or any successive Indemnification Agreement with any Manager), including without limitation the provisions of this Article 9, relating to the exculpation, indemnification or advancement of expenses of any Managers, directors or officers, it being the intent of the Members that the Managers and officers and directors of the Company shall be deemed to be third party beneficiaries to this provision, and (b) maintain for all Managers, officers and directors of the Company (each such Person, a "**D&O Beneficiary**") Directors and Officers liability insurance with minimum coverage in the amount of $2,000,000 million for base coverage and $2,000,000 million for excess coverage with respect to all losses, claims, damages, liabilities, costs and expenses (including attorney's fees and expenses), judgments, fines, losses, and amounts paid in settlement in connection with any cause of action or threatened cause of action, suit, claim, proceeding or investigation (each a "**D&O Claim**"), based on, or arising out of the fact that such D&O Beneficiary is or was, at any time, a Manager, officer, or director of the Company.  In addition, in connection with and prior to any Sale of the Company, the Company shall purchase a six year "tail" officers' and directors' liability insurance coverage that is no less favorable than the coverage offered to the D&O Beneficiaries immediately prior to any such Sale of the Company, with respect to any D&O Claim based on or arising out of the fact that such D&O Beneficiary was a Manager, officer or director of the Company at any time prior to the closing of any such Sale of the Company, to the extent that any such D&O Claim pertains to any matter or fact arising, existing or occurring prior to the closing of any such Sale of the Company, regardless of whether such D&O Claim is asserted or claimed prior to, at or after the closing of any such Sale of the Company.  The Company shall ensure that (x) each D&O Beneficiary shall be a named insured under the Directors and Officers liability policies referred to above and (y) any termination or amendment of the policy will require each D&O Beneficiary to be notified in writing from the insurance company.  Without in any way limiting the generality of the foregoing, this Section 9.10 cannot be amended, repealed, or modified in any way without the prior written consent of Lender pursuant to Section 3.9.

9.11     Indemnification Agreement. In the event of any inconsistency or ambiguity between any provision set forth in this Article 9 and any provision set forth in an Indemnification Agreement, such Indemnification Agreement shall govern.

49

BL-000022282

10.    SPECIFIC PERFORMANCE

10.1    Specific Performance.  The parties recognize and acknowledge that their Units are closely held and that, accordingly, in the event of a breach or default, or threatened breach or default, by one or more of the parties hereto of the terms and conditions of this Agreement, the damages to the remaining parties to this Agreement, or any one or more of them, may be impossible to ascertain and such parties will not have an adequate remedy at law.  In the event of any such breach or default, or such threatened breach or default, in the performance of the terms and provisions of this Agreement, any party or parties thereof aggrieved thereby shall be entitled to institute and prosecute proceedings in any court of competent jurisdiction, either at law or in equity, to enforce the specific performance of the terms and provisions of this Agreement, to enjoin further violations of the terms and provisions of this Agreement and/or to obtain damages.  Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies which any party may have under this Agreement or at law.  Each Member hereby waives any requirement for security or the posting of any bond or other surety and proof of damages in connection with any temporary or permanent award of injunctive, mandatory or other equitable relief and further agrees to waive the defense in any action for specific performance that a remedy at law would be adequate.

11.    GOVERNING PROVISIONS

11.1    Governing Law.  The limited liability company law of the State of Delaware shall govern all issues and questions concerning the relative rights of the Company and its Members.  All other issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law, rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances are not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

11.2    Consent to Jurisdiction.  The parties hereto hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Chancery Court of the State of Delaware and any state appellate court therefrom within the State of Delaware (or, if the Chancery Court of the State of Delaware declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware) over any suit, action or proceeding arising out of or relating to this Agreement. Each of the parties hereto, by execution and delivery of this Agreement, (i) expressly and irrevocably, consents and submits to the personal jurisdiction of any of such courts, (ii) consents to the service of any complaint, summons, notice or other process relating to any such action or proceeding by delivery thereof to such party by hand or by certified mail, delivered or addressed as set forth in Section 11.4 hereof, (iii) waives any claim or defense in any such action or proceeding based on any alleged lack of personal jurisdiction, improper

50

venue or forum non conveniens or any similar basis and (iv) agrees not to directly or indirectly bring or assert and claim, action or other proceeding in any jurisdiction or forum other than as specified above in this <u>Section 11.2</u>.

        11.3    <u>Entire Agreement</u>.  This Agreement (including the Schedule of Members and the executed signature pages attached hereto) constitutes the entire understanding among the parties hereto.  No waiver or modification of the provisions of this Agreement shall be valid unless it is in writing and signed by the party to be charged and then only to the extent therein set forth.

        11.4    <u>Notices</u>. Any notice, demand, request, instruction, correspondence, or other document required or permitted to be given hereunder by any party to the other shall be in writing and delivered (i) in person, (ii) by a nationally recognized overnight courier service requiring acknowledgment of receipt of delivery, (iii) by United States certified mail, postage prepaid and return receipt requested, or (iv) by email, as follows:

| if to the Company, to: | with a copy (which shall not constitute notice) to: |
|---|---|
| Betty B Holdings LLC | Cowan DeBaets Abrahams & Sheppard LLP |
| 381 Park Avenue South, Suite 721 | 41 Madison Avenue, 38th Floor |
| New York, New York 10016 | New York, NY  10010 |
| Attn: Andrew T. Chrisomalis | Attention:  Jason K. Berger |
| Email: andrew@educarecapital.com | Email: jberger@cdas.com |

and if to any Member, to such Member at the address indicated on the Schedule of Members or, if no address is listed on the Schedule of Members, then at the address set forth on such Member's signature pages hereto.

Notice shall be deemed given, received, and effective on: (i) if given by personal delivery or courier service, the date of actual receipt by the receiving party, or if delivery is refused on the date delivery was first attempted; (ii) if given by certified mail, the third day after being so mailed if posted with the United States Postal Service; and (iii) if given by email, the date on which the email is transmitted during the transmitter's normal business hours, or at the beginning of the next business day after transmission if confirmed at any time other than the transmitter's normal business hours.  Any Person entitled to notice may change any address to which notice is to be given to it by giving notice of such change of address as provided in this <u>Section 11.4</u>.  The inability to deliver notice because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date such attempt was first made.  A party's authorized counsel may deliver any notice on such party's behalf.

        11.5    <u>Execution</u>.  This Agreement may be executed in any number of counterparts, and as so executed, shall constitute one agreement binding on the Company and the Members. Executed counterparts to this Agreement may be delivered via PDF in electronic mail. This Agreement and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or

51

CONFIDENTIAL           BL-000022284

thereto, to the extent signed and delivered by means of email with scan, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of the Company, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument shall raise the use of email to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of email as a defense to the formation or enforceability of a contract, and each such party forever waives any such defense.

11.6    Amendments.  Subject to the provisions of Section 3.9 hereof, if applicable, this Agreement may be amended, restated or otherwise modified, and any provision of this Agreement may be waived, by the written consent of the Board; provided, however, that:

(a)    Lender's prior written consent shall be required for any such amendment, restatement or modification, or waiver of any provision of this Agreement modifying the rights or obligations of Lender, in each case in a manner which adversely affects the rights or obligations of Lender unless a Morals Clause Termination Event has occurred, in which case, Lender's prior written consent shall be required for any amendment, restatement or modification, or waiver of any provision of this Agreement modifying the rights or obligations of Lender in a manner that does not also apply to Ippon and Belfer; and

(b)    Belfer's prior written consent shall be required for any such amendment, restatement or modification, or waiver of any provision of this Agreement modifying the rights or obligations of Belfer, in each case in a manner which adversely affects the rights or obligations of Belfer.

All Members hereby agree to be bound in all respects by any and all amendments, restatements and other modifications of this Agreement.

11.7    Binding Effect. Each and all of the covenants, terms, provisions and agreements contained in this Agreement shall be binding upon and inure to the benefit of the Members and, except as otherwise provided herein, their respective heirs, executors, administrators, legal representatives, and permitted successors and assigns.

11.8    Further Assurances.  Each Member agrees to execute and deliver such further instruments and documents and do such further acts and things as requested by the Company which may be required to carry out the intent and purposes of this Agreement.

11.9    Waiver of Action for Partition.  Each Member irrevocably waives during the term of existence of the Company any right that they may have to maintain any action for partition with respect to the property of the Company.

CONFIDENTIAL                                                                                        BL-000022285

11.10    Merger Provision.  This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith.

11.11    Severability.  If any provision of this Agreement shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement shall not be affected and shall be enforceable to the fullest extent permitted by law.

11.12    No Third-Party Beneficiaries.  Except as is otherwise specifically provided for in this Agreement or as may otherwise be specifically agreed in writing by all of the Members, the provisions of this Agreement are not intended to be for the benefit of any creditor or other Person to whom any debts, liabilities, or obligations are owed by (or who otherwise has any claim against) the Company or any of the Members; and no such creditor or other Person shall obtain any benefit from such provisions or shall, by reason of any such foregoing provision, make any claim in respect of any debt, liability, or obligation against the Company, the Managers, (or any member or Affiliate thereof) or any of the other Members.  Notwithstanding the foregoing, a Person entitled to indemnification pursuant to Article 9 of this Agreement shall be a third-party beneficiary hereto.

11.13    Construction.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. The parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the party has not breached shall not detract from or mitigate the fact that the party is in breach of the first representation, warranty, or covenant. In this Agreement, unless otherwise specified, the following rules of construction apply: (i) references to "Articles," "Sections," "Schedules" and "Exhibits" are references to articles, sections or subsections, schedules and exhibits of this Agreement unless otherwise specified; (ii) references to any Person include references to such Person's successors and permitted assigns; (iii) words importing the singular include the plural and vice versa; (iv) words importing one gender include the other gender and the neuter; (v) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement; (vi) the word "or" shall mean "and/or"; (vii) a defined term has its defined meaning throughout this Agreement and in each Exhibit and Schedule to this Agreement, regardless of whether it appears before or after the place where it is defined; and (viii) "writing", "written" and comparable terms refer to printing, typing and other means of

53

reproducing words (including electronic media) in a visible form. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.

11.14  **WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY TO THE MAXIMUM EXTENT PERMITTED BY LAW IN ANY ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS IT CONTEMPLATES. THIS WAIVER APPLIES TO ANY ACTION OR OTHER LEGAL PROCEEDING, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH OF THE PARTIES ACKNOWLEDGES THAT IT HAS RECEIVED THE ADVICE OF COMPETENT COUNSEL IN CONNECTION HEREWITH.**

11.15  **REPRESENTATION. EACH OF THE MEMBERS ACKNOWLEDGES THAT IT HAS BEEN ADVISED BY THE COMPANY AND THE BOARD TO OBTAIN INDEPENDENT LEGAL AND TAX ADVICE CONCERNING THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS PROVIDED FOR HEREIN.  IN CONNECTION THEREWITH, EACH OF THE PARTIES HERETO HAS BEEN ADVISED BY, OR HAS HAD THE OPPORTUNITY TO OBTAIN, THE ADVICE OF ITS OWN INDEPENDENT LEGAL COUNSEL AND TAX ADVISORS IN CONNECTION THE PREPARATION, REVIEW AND EXECUTION OF THIS AGREEMENT. EACH MEMBER HEREBY AGREES AND ACKNOWLEDGES THAT THROUGH THE EFFECTIVE DATE COWAN DEBAETS ABRAHAMS & SHEPPARD LLP IS ACTING AS COUNSEL TO IPPON AND THE COMPANY IN CONNECTION WITH THE FORMATION OF THE COMPANY, THE NEGOTIATION AND DRAFTING OF THIS AGREEMENT AND THE OFFERING OF UNITS.  EACH MEMBER HEREBY CONSENTS TO THE FOREGOING REPRESENTATION THROUGH THE EFFECTIVE DATE.**

**[SIGNATURE PAGES FOLLOW]**

CONFIDENTIAL

BL-000022287

IN WITNESS WHEREOF, this Second Amended and Restated Limited Liability Company Agreement of Betty B Holdings LLC has been duly executed by the undersigned as of the Effective Date.

**THE COMPANY:**

**BETTY B HOLDINGS LLC**

By: _____
Name: Andrew T. Chrisomalis
Title: Chairman of the Board

55

CONFIDENTIAL                                                                BL-000022288

IN WITNESS WHEREOF, this Second Amended and Restated Limited Liability Company Agreement of Betty B Holdings LLC has been duly executed by the undersigned as of the Effective Date.

**THE MEMBERS:**

**BELFER CAPITAL PARTNERS, L.P.**

By: Belfer Management LLC, its General Partner

By: _____

Name: Laurence Belfer

Title: Manager

**LOL HATA LLC**

By: _____

Name: Blake Lively

Title: Manager

56

BL-000022289

IN WITNESS WHEREOF, this Second Amended and Restated Limited Liability Company Agreement of Betty B Holdings LLC has been duly executed by the undersigned as of the Effective Date.

THE MEMBERS:

**BELFER CAPITAL PARTNERS, L.P.**

By: Belfer Management LLC, its General Partner

By: _____
    Name: Laurence Belfer
    Title: Manager

**LOL HATA LLC**

By: _____
    Name: Blake Lively
    Title: Manager

56

CONFIDENTIAL

BL-000022290

**SCHEDULE OF MEMBERS**

**Dated as of the Effective Date**

| Name and Address of Member | Type of Units | Capital Contribution | Total Number of Units | Percentage Interest* | Fully-Diluted Percentage Interest** |
|---|---|---|---|---|---|
| | | | | | |
| **Ippon Holdings LLC**<br>381 Park Avenue South, Suite 1015<br>New York, NY 10016<br>Attn: Andrew T. Chrisomalis<br>Email: andrew@educarecapital.com | Common Units | 15,173,780 | 35,679.013 | 25.955% | 24.082% |
| | | | | | |
| **Gruyere Frusa LLC**<br>381 Park Avenue South, Suite 1015<br>New York, NY 10016<br>Attn: Andrew T. Chrisomalis<br>Email: blake@educarecapital.com | Common Units | 4,951,220 | 10,493.828 | 7.634% | 7.083% |
| | | | | | |
| **LOL HATA LLC**<br><br>c/o: ML Management Associates, Inc.<br>888 Seventh Avenue, 4th Floor<br>New York, NY 10106<br>Attn: Mark Landesman<br>Email: mlandesman@mlmgmt.com<br><br>with copies (which shall not constitute notice) to:<br><br>Management 360<br>10100 Santa Monica Boulevard, Suite 2300<br>Los Angeles, CA 90067<br>Attn: Justin Grey Stone<br><br>and<br><br>William Morris Endeavor<br>9601 Wilshire Boulevard<br>Beverly Hills, CA 90210<br>Attn: Todd Jacobs and Warren Zavala<br>Email: tjacobs@wmeagency.com and wzavala@wmeagency.com<br><br>and<br><br>Gibson, Dunn & Crutcher LLP<br>200 Park Avenue | Common Units | 2,125,000 | 45,061.728 | 32.780% | 30.415% |

58

CONFIDENTIAL

BL-000022291

| | | | | | |
|---|---|---|---|---|---|
| New York, NY 10166-0193<br>Attn: Stefan G. dePozsgay<br>Email: SdePozsgay@gibsondunn.com | | | | | |
| | | | | | |
| **Belfer Capital Partners, L.P.**<br>c/o Belfer Management LLC<br>767 Fifth Avenue, 46th Floor, New York, NY 10153<br>Email: Reporting@belfermgmt.com | Common Units | 11,175,000 | 34,493.827 | 25.092% | 23.282% |
| | | | | | |
| **ACG BUZZ LLC**<br>c/o Alliance Consumer Growth LLC<br>410 Park Avenue, Suite 600, New York, NY 10022<br>Attention: Josh Goldin<br>Email: jgoldin@acgpartners.com | Common Units | 8,500,000 | 8,395.061 | 6.107% | 5.666% |
| | | | | | |
| **Nathan Craig Fillion**<br>[ADDRESS]<br>[ADDRESS]<br>Email: [_____] | Common Units | 227,500 | 224.691 | 0.163% | 0.152% |
| | | | | | |
| **The Philly Trust**<br>[ADDRESS]<br>[ADDRESS]<br>Email: [_____] | Common Units | 250,000 | 246.914 | 0.180% | 0.167% |
| | | | | | |
| **Alfredo Alejandro Arevalo Martinez**<br>[ADDRESS]<br>[ADDRESS]<br>Email: [_____] | Common Units | 25,000 | 24.691 | 0.018% | 0.017% |
| | | | | | |
| **HIRRO LLC**<br>[ADDRESS]<br>[ADDRESS]<br>Email: [_____] | Common Units | 50,000 | 49.383 | 0.036% | 0.033% |
| | | | | | |
| **RonanWest LLC**<br>[ADDRESS]<br>[ADDRESS]<br>Email: [_____] | Common Units | 125,000 | 123.456 | 0.090% | 0.083% |
| | | | | | |

59

BL-000022292

| | | | | | |
|---|---|---|---|---|---|
| **Boss Entertainment Unlimited Company**<br>[ADDRESS]<br>[ADDRESS]<br>Email: [＿＿＿＿＿] | Common Units | 232,350 | 229.481 | 0.167% | 0.155% |
| | | | | | |
| **Mark Maynard**<br>[ADDRESS]<br>[ADDRESS]<br>Email: [＿＿＿＿＿] | Common Units | 40,000 | 39.506 | 0.029% | 0.027% |
| | | | | | |
| **Thomas Newberry**<br>[ADDRESS]<br>[ADDRESS]<br>Email: [＿＿＿＿＿] | Common Units | 200,000 | 197.530 | 0.144% | 0.133% |
| | | | | | |
| **Nishat Gupte**<br>[ADDRESS]<br>[ADDRESS]<br>Email: [＿＿＿＿＿] | Pool A Incentive Units | - | 3,500.000 | 0.637% | 2.362% |
| | | | | | |
| **George Dewey**<br>[ADDRESS]<br>[ADDRESS]<br>Email: [＿＿＿＿＿] | Pool A Incentive Units | - | 3,333.333 | 0.606% | 2.250% |
| | | | | | |
| **Katie Moslak**<br>[ADDRESS]<br>[ADDRESS]<br>Email: [＿＿＿＿＿] | Pool A Incentive Units | - | 500.000 | 0.091% | 0.337% |
| | | | | | |
| **Ian Pilarski**<br>[ADDRESS]<br>[ADDRESS]<br>Email: [＿＿＿＿＿] | Pool A Incentive Units | - | 500.000 | 0.091% | 0.337% |
| | | | | | |
| **Brian Redin**<br>[ADDRESS]<br>[ADDRESS]<br>Email: [＿＿＿＿＿] | Pool A Incentive Units | - | 333.333 | 0.061% | 0.225% |
| | | | | | |
| **Sophia Travaglia**<br>[ADDRESS]<br>[ADDRESS]<br>Email: [＿＿＿＿＿] | Pool A Incentive Units | - | 333.333 | 0.061% | 0.225% |
| | | | | | |
| **Beverley Smith**<br>[ADDRESS]<br>[ADDRESS]<br>Email: [＿＿＿＿＿] | Pool A Incentive Units | - | 333.333 | 0.061% | 0.225% |

60

BL-000022293

| | | | | | |
|---|---|---|---|---|---|
| **Best Bev LLC**<br>685 Broad Street Extension Waverly, NY 14892<br>Attention: Ryan Uszenski, Manager<br>Email: ruszenski@bestbev.co With a copy to Legal@bestbev.co | Pool A Incentive Units | - | 987.654 | 0.000% | 0.667% |

| | | | | | |
|---|---|---|---|---|---|
| Unissued Incentive Units reserved for issuance to employees and service providers | Pool B Incentive Units | - | 3,075.001 | 0.000% | 2.076% |
| | | | | | |
| **Total** | | **$43,074,850** | **148,155.097** | **100.000%*** | **100.000%**** |

\* Unvested Incentive Units are not included for purposes of the calculation of "Percentage Interest".

\*\* 3,075.001 Incentive Units reserved for issuance to employees and service providers as noted above are included for purposes of the calculation of "Fully-Diluted Percentage Interest".

61

CONFIDENTIAL

BL-000022294

## EXHIBIT A

**FORM OF JOINDER AGREEMENT**

57

CONFIDENTIAL

BL-000022295

This JOINDER AGREEMENT (this "**Joinder**") to that certain Second Amended and Restated Limited Liability Company Agreement, dated as of May 19, 2023, by and among **BETTY B HOLDINGS LLC**, a Delaware limited liability company (the "**Company**"), and the Members of the Company from time to time party thereto (as amended, restated or otherwise modified from time to time in accordance therewith, the "**Agreement**"), is made and entered into as of [INSERT DATE] by and between the Company and [NAME] (the "**New Member**").  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Agreement.

WHEREAS, the New Member has acquired certain [Common] [/] [Incentive] Units ("**New Member Units**"), and the Agreement and the Company require the New Member, as a holder of such New Member Units, to become a party to the Agreement, and the New Member agrees to do so in accordance with the terms hereof.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Joinder hereby agree as follows:

1.      Agreement to be Bound.  The New Member hereby agrees that upon execution of this Joinder, the New Member shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto and shall be deemed a Member for all purposes thereof.  In addition, the New Member hereby agrees that all New Member Units shall be deemed Units for all purposes of the Agreement.

2.      Notices.  For purposes of Section 11.4 of the Agreement, all notices, demands or other communications to the New Member shall be directed to:

> [Name]
> [Address]
> Telephone:
> Email:

3.      Successors and Assigns.  Except as otherwise provided in the Agreement, this Joinder shall bind and inure to the benefit of and be enforceable by the Company and its successors and assigns and the New Member and any subsequent holders of New Member Units and the respective permitted successors and assigns of each of them, so long as they hold New Member Units.

4.      Counterparts; Delivery by Email.  This Joinder may be executed in separate counterparts, each of which is deemed to be an original for all purposes and all of which taken together constitute one and the same agreement. This Joinder, and each other agreement or instrument entered into in connection herewith, and any amendments hereto or thereto, to the extent signed and delivered by means of email with scan, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect

58

BL-000022296

as if it were the original signed version thereof delivered in person.  At the request of either party hereto or to any such agreement or instrument, the other party hereto or thereto shall re execute original forms thereof and deliver them to the other party.  No party hereto or to any such agreement or instrument shall raise the use of email to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of email as a defense to the formation or enforceability of a contract, and each such party forever waives any such defense.

[END OF PAGE]
[SIGNATURE PAGE FOLLOWS]

59

BL-000022297

<u>SIGNATURE PAGE TO JOINDER</u>

IN WITNESS WHEREOF, the parties hereto have executed this Joinder as of the date first above written.

BETTY B HOLDINGS LLC


By:_____
Name:
Title:


[NEW MEMBER]


By:_____
Name:
Title:

60

                                                                                    BL-000022298

## EXHIBIT B

**FORM OF CONSENT OF SPOUSE**

61

CONFIDENTIAL

BL-000022299

62

I, [_____], spouse of [_____], acknowledge that I have read carefully the Second Amended and Restated Limited Liability Company Agreement of Betty B Holdings LLC, a Delaware limited liability company (the "**Company**"), dated as of May 19, 2023 (as amended, restated or otherwise modified in accordance therewith, the "**Agreement**"), and that I know the contents of the Agreement.  I am aware that the Agreement contains provisions regarding the voting and transfer of Units of the Company that my spouse may own, including any interest I might have therein. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Agreement.

I hereby agree that my interest, if any, in any Units of the Company subject to the Agreement shall be irrevocably bound by the Agreement and further understand and agree that any community property interest I may have in such Units of the Company shall be similarly bound by the Agreement.

I am aware that the legal, financial and related matters contained in the Agreement are complex and that I am free to seek independent professional guidance or counsel with respect to this Consent.  I have either sought such guidance or counsel or determined after reviewing the Agreement carefully that I will waive such right.


Dated: _____


_____

[*Name of Spouse*]

62

BL-000022300

## EXHIBIT C

## WATERFALL EXAMPLE

## Waterfall (Illustrative Example at $1bn Enterprise Value)

Betty B Holdings LLC Waterfall Example

| | Enterprise Value $ | 1,000,000,000 |
| --- | --- | --- |

**Return of Capital Invested**

| Member | | Amount | | July'21 Return | July'21 Return % | Share of net proceeds from 51 |
| --- | --- | --- | --- | --- | --- | --- |
| Ippon Holdings LLC | 7.141% $ | 928,374 | | $ 1,000,000 | 7.7% $ | 11,138 |
| Gruyere Frusa LLC | 3.871% $ | 503,171 | | $ 500,000 | 3.8% $ | 44,553 |
| LOL HATA LLC | 11.012% $ | 1,431,544 | | $ 1,500,000 | 11.5% $ | 55,691 |
| Beffer Capital Partners, L.P. / Other | 71.362% $ | 9,277,052 | | $ 10,000,000 | 76.9% $ | 104,700 |
| ACG BUZZ LLC | 5.826% $ | 757,401 | | $ - | 0.0% $ | 757,401 |
| Nathan Craig Fillion | 0.156% $ | 20,272 | | $ - | 0.0% $ | 20,272 |
| The Philly Trust | 0.171% $ | 22,277 | | $ - | 0.0% $ | 22,277 |
| Alfredo Alejandro Arevalo Martinez | 0.017% $ | 2,228 | | $ - | 0.0% $ | 2,228 |
| HIRRO LLC | 0.034% $ | 4,455 | | $ - | 0.0% $ | 4,455 |
| Ronan West LLC | 0.086% $ | 11,138 | | $ - | 0.0% $ | 11,138 |
| Boss Entertainment Unlimited Company | 0.159% $ | 20,704 | | $ - | 0.0% $ | 20,704 |
| Mark Maynard | 0.027% $ | 3,564 | | $ - | 0.0% $ | 3,564 |
| Thomas Newberry | 0.137% $ | 17,821 | | $ - | 0.0% $ | 17,821 |
| | 100.000% $ | 13,000,000 | | $ 13,000,000 | 100.0% $ | 1,075,942 |

**Distribution of Net Proceeds (after Return of Capital) up to $31m**

| Member | FDPI | Amount | | July'21 Return | July'21 Return % | Share of net proceeds from 51 |
| --- | --- | --- | --- | --- | --- | --- |
| Ippon Holdings LLC | 71.676% $ | 12,901,660 | | $ 14,048,780 | 78.1% $ | 15,422 |
| Gruyere Frusa LLC | 20.476% $ | 3,685,685 | | $ 3,951,220 | 22.0% $ | 61,689 |
| LOL HATA LLC | 0.428% $ | 77,111 | | $ - | 0.0% $ | 77,111 |
| Beffer Capital Partners, L.P. / Other | 0.805% $ | 144,969 | | $ - | 0.0% $ | 144,969 |
| ACG BUZZ LLC | 5.826% $ | 1,048,709 | | $ - | 0.0% $ | 1,048,709 |
| Nathan Craig Fillion | 0.156% $ | 28,068 | | $ - | 0.0% $ | 28,068 |
| The Philly Trust | 0.171% $ | 30,844 | | $ - | 0.0% $ | 30,844 |
| Alfredo Alejandro Arevalo Martinez | 0.017% $ | 3,084 | | $ - | 0.0% $ | 3,084 |
| HIRRO LLC | 0.034% $ | 6,169 | | $ - | 0.0% $ | 6,169 |
| Ronan West LLC | 0.086% $ | 15,422 | | $ - | 0.0% $ | 15,422 |
| Boss Entertainment Unlimited Company | 0.159% $ | 28,667 | | $ - | 0.0% $ | 28,667 |
| Mark Maynard | 0.027% $ | 4,935 | | $ - | 0.0% $ | 4,935 |
| Thomas Newberry | 0.137% $ | 24,675 | | $ - | 0.0% $ | 24,675 |
| | 100.000% $ | 18,000,000 | | $ 18,000,000 | 100.0% $ | 1,489,766 |

**Distribution of Net Proceeds (after Return of Capital) between $31m and $40m in Liquidation Event**

| Member | FDPI | Amount | | July'21 Return | July'21 Return % | Share of net proceeds from 51 |
| --- | --- | --- | --- | --- | --- | --- |
| Ippon Holdings LLC | 0.086% $ | 7,711 | | $ - | 0.0% $ | 7,711 |
| Gruyere Frusa LLC | 0.343% $ | 30,844 | | $ - | 0.0% $ | 30,844 |
| LOL HATA LLC | 92.152% $ | 8,293,673 | | $ 9,000,000 | 100.0% $ | 38,555 |
| Beffer Capital Partners, L.P. / Other | 0.805% $ | 72,484 | | $ - | 0.0% $ | 72,484 |
| ACG BUZZ LLC | 5.826% $ | 524,355 | | $ - | 0.0% $ | 524,355 |
| Nathan Craig Fillion | 0.156% $ | 14,034 | | $ - | 0.0% $ | 14,034 |
| The Philly Trust | 0.171% $ | 15,422 | | $ - | 0.0% $ | 15,422 |
| Alfredo Alejandro Arevalo Martinez | 0.017% $ | 1,542 | | $ - | 0.0% $ | 1,542 |
| HIRRO LLC | 0.034% $ | 3,084 | | $ - | 0.0% $ | 3,084 |
| Ronan West LLC | 0.086% $ | 7,711 | | $ - | 0.0% $ | 7,711 |
| Boss Entertainment Unlimited Company | 0.159% $ | 14,333 | | $ - | 0.0% $ | 14,333 |
| Mark Maynard | 0.027% $ | 2,468 | | $ - | 0.0% $ | 2,468 |
| Thomas Newberry | 0.137% $ | 12,338 | | $ - | 0.0% $ | 12,338 |
| | 100.000% $ | 9,000,000 | | $ 9,000,000 | 100.0% $ | 744,883 |

**Distribution of Net Proceeds (after Return of Capital) over $40m and below $145,893,600**

| Member | | Amount |
| --- | --- | --- |
| Ippon Holdings LLC | 24.761% $ | 26,220,523 |
| Gruyere Frusa LLC | 7.283% $ | 7,711,919 |
| LOL HATA LLC | 31.273% $ | 33,115,884 |
| Beffer Capital Partners, L.P. / Other | 23.939% $ | 25,349,529 |
| ACG BUZZ LLC | 5.826% $ | 6,169,534 |
| Nathan Craig Fillion | 0.156% $ | 165,126 |
| The Philly Trust | 0.171% $ | 181,457 |
| Alfredo Alejandro Arevalo Martinez | 0.017% $ | 18,145 |
| HIRRO LLC | 0.034% $ | 36,292 |
| Ronan West LLC | 0.086% $ | 90,728 |
| Boss Entertainment Unlimited Company | 0.159% $ | 168,646 |
| Mark Maynard | 0.027% $ | 29,033 |
| Thomas Newberry | 0.137% $ | 145,165 |
| Employees / Service Providers (Pool A) | 6.130% $ | 6,491,620 |
| | $ | 105,893,600 |

**Catch up (Distribution of Net Proceeds after Return of Capital over $145,893,600 and $146,893,600)**

| | | Amount |
| --- | --- | --- |
| BestBev | 100.000% $ | 1,000,000 |
| | $ | 1,000,000 |

**Distribution of Net Proceeds (after Return of Capital) over $146,893,600**

| Member | FDPI | Amount |
| --- | --- | --- |
| Ippon Holdings LLC | 24.082% $ | 205,446,825 |
| Gruyere Frusa LLC | 7.083% $ | 60,425,540 |
| LOL HATA LLC | 30.415% $ | 259,474,357 |
| Beffer Capital Partners, L.P. / Other | 23.282% $ | 198,622,289 |
| ACG BUZZ LLC | 5.666% $ | 48,340,424 |
| Nathan Craig Fillion | 0.152% $ | 1,293,815 |
| The Philly Trust | 0.167% $ | 1,421,780 |
| Alfredo Alejandro Arevalo Martinez | 0.017% $ | 142,176 |
| HIRRO LLC | 0.033% $ | 284,357 |
| Ronan West LLC | 0.083% $ | 710,884 |
| Boss Entertainment Unlimited Company | 0.155% $ | 1,321,397 |
| Mark Maynard | 0.027% $ | 227,483 |
| Thomas Newberry | 0.133% $ | 1,137,417 |
| Employees / Service Providers (Pool A) | 5.962% $ | 50,864,081 |
| Employees / Service Providers (Pool B) | 2.076% $ | 17,706,465 |
| BestBev | 0.667% $ | 5,687,109 |
| | 100.000% $ | 853,106,400 |

**Total Member Proceeds Distributed**

| Member | % Share | Amount |
| --- | --- | --- |
| Ippon Holdings LLC | 24.551% $ | 245,505,092 |
| Gruyere Frusa LLC | 7.236% $ | 72,357,160 |
| LOL HATA LLC | 30.239% $ | 302,392,568 |
| Beffer Capital Partners, L.P. / Other | 23.347% $ | 233,466,323 |
| ACG BUZZ LLC | 5.684% $ | 56,840,424 |
| Nathan Craig Fillion | 0.152% $ | 1,521,315 |
| The Philly Trust | 0.167% $ | 1,671,780 |
| Alfredo Alejandro Arevalo Martinez | 0.017% $ | 167,175 |
| HIRRO LLC | 0.033% $ | 334,357 |
| Ronan West LLC | 0.084% $ | 835,883 |
| Boss Entertainment Unlimited Company | 0.155% $ | 1,553,747 |
| Mark Maynard | 0.027% $ | 267,483 |
| Thomas Newberry | 0.134% $ | 1,337,416 |
| Employees / Service Providers (Pool A) | 5.736% $ | 57,355,702 |
| Employees / Service Providers (Pool B) | 1.771% $ | 17,706,465 |
| BestBev | 0.669% $ | 6,687,109 |
| Total | 100.000% $ | 1,000,000,000 |

63

CONFIDENTIAL

BL-000022301