# EXHIBIT 49

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

BLAKE LIVELY,                          )
                                       )
   Plaintiff,                          ) Civil Action No.
                                       )
    vs.                                ) 1:24-cv-10049-LJL
                                       )
WAYFARER STUDIOS LLC, a                ) (Consolidated for
Delaware Limited Liability             ) pretrial purposes
Company, JUSTIN BALDONI, an            ) with
Individual, JAMEY HEATH, an            ) 1:25-cv-00449-LJL
Individual, STEVE SAROWITZ, an         ) Rel:
Individual, IT ENDS WITH US            ) 1:25-cv-00779-LJL
MOVIE LLC, a California                )
Limited Liability Company,             )
MELISSA NATHAN, an Individual,         )
THE AGENCY GROUP PR LLC, a             )
Delaware Limited Liability             )
Company, JENNIFER ABEL, an             )
Individual, JED WALLACE, an            )
Individual, and STREET                 )
RELATIONS INC., a California           )
Corporation,                           )
                                       )
   Defendants.                         )

VIDEOCONFERENCE DEPOSITION OF

ASHLEE HUMPHREYS, Ph.D.

November 25, 2025

Stenographically Reported by:

ANDREW R. PITTS, CSR, RPR

Page 1

I reserve the right to revise or supplement the report.

Q. Okay. And what would cause you to revise or supplement a report?

A. It's hard to say. I just reserve the right to.

Q. Okay. Looking at page 3 of your report, II Assignment, I'm just going to read some portions, and then I'll ask you some questions, if that's okay.

A. Sure.

Q. "I was engaged by counsel on behalf of Blake Lively to analyze the impact to Ms. Lively's reputation, if any, from the retaliation campaign that was orchestrated by the Defendants to manipulate online discussion of Ms. Lively in August 2024."

Did I read that correctly?

A. That's correct.

Q. In that sentence next to "retaliation campaign," you have a footnote number 4, correct?

A. That's correct.

Q. And footnote number 4 says, "Throughout this project, I use the phrase, 'retaliation campaign' to mean the allegedly coordinated PR and

Page 67

crisis campaign organized by Defendants against Ms. Lively.  I base this portion of my analysis on the assumption that a retaliation campaign did occur.  I understand that Dr. Dina Mayzlin, another retained expert in this matter, has found a retaliation online campaign against Ms. Lively occurred in August 2024."

Did I read that correctly?

A.   Yes.  At the beginning you said "project" and not "report," but yes, in general, yes.

Q.   Thank you.  So as part of your scope of representation, were you being asked to determine whether there was a retaliation campaign?

A.   No.

Q.   So if I understand it correctly, your role as a potential expert witness is to determine whether there was damage caused and what the cost associated with repairing that damage would be; is that correct?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   That sounds correct.

BY MR. SCHUSTER:

Q.   Okay.  And sitting here today under oath, you're not testifying to the fact that there was a

Page 68

retaliation campaign, correct?

A.   Correct.

Q.   You are relying on -- you are basing your analysis on the assumption that a retaliation campaign occurred; is that correct?

A.   For that portion of my report, that's correct.

Q.   At the bottom of paragraph 8, you add, "In addition, I have reviewed the expert report of Dina Mayzlin, who I understand was retained by counsel for the Plaintiff in this matter."

Is that correct?

A.   That's correct.

Q.   Did you review all of the underlying material that Ms. Mayzlin purportedly used in formulating her report?

A.   What do you mean by reviewed?

Q.   If she had attachments, if she had exhibits, if she had quotes, if she had articles, if she had Tweets, if she had Instagram postage, you reviewed all of the underlying posts that she relied upon in formulating her report, or did you just review her report for substance?

A.   I primarily used her report for substance. There might have been instances where I consulted

Page 69

BY THE WITNESS:

A.   Yes.

BY MR. SCHUSTER:

Q.   Have you personally done any independent investigation as to whether a retaliation campaign occurred, or have you relied on Dr. Mayzlin's findings?

A.   What do you mean by independent investigation?

Q.   Have you or anyone at your behest gone out with the task of saying, "I know Mayzlin says there's a retaliation campaign, but I want to verify it for myself.  I don't want to rely on someone else's opinion"?

So did you or anyone at your behest undertake an investigation to determine whether a retaliation campaign did, in fact, occur or not?

A.   So as I cite in my report, I refer to several depositions that speak to this, and I cite to several Bates documents that also speak to this.

Q.   Okay.  So you're referring to some of the evidence that has been exchanged in the case that has led you to an assumption, but you undertook -- it was not your task as an expert in this case to determine whether a retaliation campaign occurred or

Page 76

did not occur, fair?

A.   I'm sorry, could you repeat the question?

Q.   It was not your job, it was not within your purview to determine whether there was a retaliation campaign or not?

A.   Correct.  It's my understanding that Ms. -- that Dr. Mayzlin addressed this.

Q.   Okay.  Did you know who Blake Lively was before beginning this assignment?

A.   Yes.

Q.   Did you personally know Blake Lively?

A.   No.

Q.   What did you know about her, if anything?

A.   I knew she was on a show called Gone -- called Gossip Girl.  I knew she was an actress. I knew she was married to Ryan Reynolds.  That's pretty much what I knew about her.

Q.   Did you know anything about Ryan Reynolds before engaging in this assignment?

A.   I knew that he was an investor in Mint Mobile and had done very well financially in that.

Q.   Have you ever met him?

A.   No.

Q.   Have you ever done any work on behalf of him?

Page 77

Q. Okay. Do you have any firsthand information about who, if anyone, introduced negative associations about Ms. Lively, or is your opinion dependent upon what Ms. Mayzlin has written?

A. As I say in footnote 4 of my report, I am relying on Dr. Mayzlin's opinion.

Q. Okay. Are you -- and, again, my apologies if I've asked this.

Are you aware of any negativity or negative associations surrounding Blake Lively prior to August of 2024?

A. I'm aware of the information provided in this case that had a before period, yes.

Q. Okay. What is your recollection of the negative associations that surrounded Blake Lively as you gleaned from the case?

A. So one example of this is in Dr. Mayzlin's report. And, again, what I mean to say is that she documented do these negative associations, are they present in the period prior to August 2024, and she finds that they were not present in any substantial amount.

Q. But what were those negative associations? So when you say they were present, you mean were they being talked about online?

Page 84

BY MR. SCHUSTER:

Q.   You could see why that might be a positive reaction to that event?

MS. BENDER:   Objection.

BY THE WITNESS:

A.   What do you mean by a positive reaction?

BY MR. SCHUSTER:

Q.   Well, I guess reactions to the news, right? It could be positive, it could be -- they could be negative, they could be neutral.

Here, we're talking about an alleged retaliation campaign that caused damage to her reputation.  So are there other factors that could have caused damage to her reputation unrelated to this alleged retaliation campaign, such as getting Justin Baldoni fired by his agent?

MS. BENDER:   Objection.

BY THE WITNESS:

A.   There may be other statements that cause reputational harm.  My analysis addresses only the damage caused by the at-issue statements.

BY MR. SCHUSTER:

Q.   Okay.  So -- thank you.  So you did not look into any other potential causes of potential damage to her reputation other than the at-issue

Page 91

statements?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   Those were not relevant to my analysis.

BY MR. SCHUSTER:

Q.   The only thing that was relevant to your analysis was did the at-issue statements, those by Bryan Freedman, cause damage to her reputation necessitating reputation repair?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   So the damages assessed -- the damages assessment in my analysis is tied directly to the reach of the at-issue statements.

BY MR. SCHUSTER:

Q.   Right.  And that was the only thing that was considered, correct?

A.   Correct.  Other statements, to the extent that other statements were not these statements, they weren't relevant to my analysis.

Q.   And would other statements by Blake Lively or Ryan Reynolds be potentially relevant to an analysis of reputational damage?

MS. BENDER:  Objection.

Page 92

BY THE WITNESS:

A.   No, those statements may cause harm, but I did not assess the harm to other -- from other statements in my analysis.  I assessed the harm only to the at-issue statements.

BY MR. SCHUSTER:

Q.   I understand that that was your task, to assess the harm attributed to the at-issue statements.

My question is, as an expert in this field, are there other statements that could have been issued other than the at-issue statements by people other than Bryan Freedman that could have caused harm to her reputation?  I know you --

A.   Yes, but again, it's not relevant to my damages assessment.

Q.   Because you're only looking at at-issue statements?

A.   I am only correcting for the harm attributable to the at-issue statements.

Q.   But how do you know the harm is solely attributable to the at-issue statements if you're not looking at other potential causes to the reputational harm?

A.   So I base the corrective campaign only as

Page 93

tied solely to the at-issue statements in this case and the reach of the at-issue statements, and it's not tied to other statements.

Q.   Is it your opinion that no other statements by others other than Bryan Freedman could cause reputational harm to Blake Lively?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   No, that's not my opinion.

BY MR. SCHUSTER:

Q.   And so you would agree that other statements could cause reputational harm to Blake Lively?

A.   I did not assess other statements in my analysis.

Q.   I understand that you didn't.

I'm asking you as someone who is here before us as a purported expert whether other statements other than the at-issue statements could cause harm to Blake Lively's reputation?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   Yes, it is possible for other statements to cause harm to Blake Lively's reputation.

Page 94

believing these at-issue statements, what was the size of that audience?

A.   So an absolute volume, I don't know that that information is available, but I can tell you on a percentage basis based on polling data.

Q.   Okay.  Well, whose data, what data did you pull to determine the size of the audience?

A.   So YouGov, which is a reputable survey agency, conducted a survey of Ms. Lively's popularity and familiarity.  So it contains -- it basically measures people who like Blake Lively.  If those people like Blake Lively, then I don't consider them to be receptive to the statement.

For people who are unfamiliar, have an unformed opinion about Blake Lively, I think they are receptive to information if their attitude is unformed.  If they are negative about Ms. Lively on other matters, they are receptive to the information.

Q.   And who is the polling company that was used to gather this information from the audience?

A.   This is a survey conducted quarterly by YouGov of a representative portion of the United States.

Q.   And are they paid for this service?

A.   I'm sorry, how do you mean?

Page 96

Q. Yeah, so I'm trying to understand.

Are they tasked with going out and polling people about Blake Lively?

A. Yes, I don't know their exact status. I believe they may be a nonprofit or they're kind of a polling service.

Q. Okay. So this polling service, were they engaged to go out and speak with X number of people about their impressions of Blake Lively; as you said, some may come back favorable, some may come back unclear, some may come back negative?

Who is the polling company who did this, who engaged them to do it, how much were they paid?

A. Correct. So the information for YouGov is contained in a footnote that I could perhaps point you to, if that would help.

Q. Yes.

A. They're a public -- they do this for public good. It's not -- they weren't retained by us.

I believe one place to find it is footnote 285 -- or 283 would give you probably the best summary. That's page 59, paragraph 108.

Q. 108. Got it. Okay.

Do you know how many people were polled by YouGov?

Page 97

A.   So I believe they poll at least a thousand people each quarter of a nationally representative population -- a sample.

Q.   And did you witness any of those interviews between YouGov and the people they polled?

A.   I believe it's done as a survey.  My guess is it's an online survey that people fill out.

Q.   Did you ever personally speak with any of the people who were polled?

A.   No.

Q.   I would like to talk about if the news, and this "news" in quotes, was congruent with their prior beliefs, they are more receptive; is that correct?

A.   That's correct.

Q.   And if it comes from a source they trust, they're more receptive; is that correct?

A.   That's correct.

Q.   In this case, what is the source that was trusted that delivered this information?

A.   The source is Mr. Freedman.

Q.   I'm sorry, was --

A.   Was Mr. Freedman.

Q.   Mr. Freedman?

A.   Yes, as the source of the at-issue

Page 98

claims that -- from Mr. Freedman, that "Ms. Lively's allegations of sexual harassment are false, and that in actuality no sexual harassment occurred."

Do you have any knowledge about the truth or false or veracity of her sexual harassment allegations, whether they happened, didn't happen, do you have any knowledge or information about that?

MS. BENDER:  Objection.

BY THE WITNESS:

A.    I do not.

BY MR. SCHUSTER:

Q.    Then you wrote, "Additionally, I understand that Mr. Freedman has continued to make public statements about Ms. Lively following the filing of this lawsuit which repeats similar themes about Ms. Lively making false allegations and being a bully."

Do you know how many statements, public statements, Mr. Freedman made following the filing of this lawsuit which repeated those similar themes?

A.    I do not know.  I cite to footnote 311 here, which references the underlying basis that may contain that information.

Q.    Do you know if any of Mr. Freedman's statements were responded to by anyone on behalf of

Page 114

Ms. Lively, such as her attorneys, denying what Mr. Freedman said, casting light on Mr. Freedman or what he said?  Are you aware of any of those statements or whether, in fact, they were made?

MS. BENDER:  Objection.

BY THE WITNESS:

A.  I'm not.

BY MR. SCHUSTER:

Q.  In paragraph 122, it reads, "The at-issue statements were made directly to reporters and press outlets specifically on December 21, 2024, specific to the New York Times."

Are you familiar with the statement in the New York Times on December 21st, 2024?

A.  I am.

Q.  Do you recall the substance of the statement that Mr. Freedman made to the New York Times on December 21st, 2024?

A.  It might be best -- I have it in Appendix F to consult it, if you'd like.

Q.  Sure.  So that would be page 170, I think, of your report.

A.  Okay.  I have it here.

Q.  And would that be the first big box of Appendix F, because it has the footnote 493?

Page 115

A.   I believe so, yes.

Q.   Do you know if this article was the first time the New York Times wrote about the issues between Blake Lively and Justin Baldoni?

A.   I do not.

Q.   Are you aware of an article issued by the New York Times about the Justin Baldoni/Blake Lively issues?

A.   Sorry, which article?

Q.   A New York Times article.

A.   Do you have the date of that article?

Q.   I could pull that up and come back to that, but if you're not familiar with it, I'll --

MS. BIENER:   December 21st.

BY MR. SCHUSTER:

Q.   Yes, so that would have been -- that's the same article, December 21st article.

Did you read the entire article?

A.   At some point, I may have, yes.

Q.   Would you have considered that article about Mr. Baldoni, Blake Lively, or something else?

MS. BENDER:   Objection.

BY THE WITNESS:

A.   I did not perform that assessment in my analysis.   It wasn't relevant.

Page 116

BY MR. SCHUSTER:

Q.   Why wasn't that relevant?

A.   So what was relevant here was counting the impressions of the at-issue statements.  This article contained an at-issue statement, and so it was counted.

Q.   I'm going to go off topic a little bit.

When we talk about impressions as it relates to at-issue statements, I'm going to ask you to help me because I am definitely social media and technologically challenged.

What does an impression mean?

A.   So an impression is someone being exposed to an at-issue statement.  So typically that's counted -- new media, digital media, is always counted in impressions.  It's a statement occurring in front of somebody at a given time.

Q.   So could I give you an example?  And let me know if I should be living on Mars or not.  I go on Instagram, I see something, I don't know if I have to like it or don't like it, but I see it.

Is that an impression?

A.   Yes.

Q.   If I go back later that afternoon to look at that same posting because now I want to see

Page 117

BY MR. SCHUSTER:

Q.    And is the truth of this statement relative to your analysis?

A.    Not -- not exactly, no.

Q.    Okay.  Thank you.  Flipping to page 84, in the middle of paragraph 165, you refer to another post in Figure 12 -- and I'm assuming these are a sample of the posts that you used in generating your report; is that correct?

A.    That's correct.

Q.    And these are a sample of the at-issue statements that you aggregated; is that correct?

A.    Yes, these are examples of audience response to his statement.

Q.    Got you.  Okay.

In the middle, a poster named Jari, jari@laindiiuu, is having a conversation somehow -- I don't know how to characterize these posts, but there are some people up there, and this poster writes, "She was proven to be a" -- let's see.

"Blake Lively is Amber Heard in the making.  She was proven to be a pathological liar.  Let's wait until all comes out.  He is innocent until proven guilty.  As of right now, Blake Lively has been proven to be a bully.  Look at her past

Page 121

interviews."

Again, do you know who posted this or -- is -- I'm sorry, this is on Twitter; is that right?

A.   This is from X, or Twitter, yes.

Q.   Formerly known as Twitter.

And do we call it a post when something's on Twitter?

A.   I guess now we call it a post when it's on X, so yeah.

Q.   Okay.  Do you know who Jari is that's referred to at the top of this post?

A.   So I believe there are two different posts here.  The quotation that you read from, I believe this is footnote 394, comes from a username called paperkrums.

Q.   Okay.

A.   And the post in Figure 12 comes from another user called Jari but also has this handle L-A-N-D-U.  That's footnote 393.

Q.   Did you ever speak with Jari?

A.   I did not.

Q.   Did you ever reach out to Jari in any way, shape, or form?

A.   I did not.

Q.   Did you ever reach out to paperkrums?

Page 122

A.    No.

Q.    Did I say that right, paperkrums?

A.    Yeah, that's right.

Q.    What is defamatory about a poster saying, "Let's wait until all comes out.  He is innocent until proven guilty"?

MS. BENDER:  Objection.

BY THE WITNESS:

A.    So I'm not a lawyer.  I offer no opinion on if a statement is defamatory or not.

BY MR. SCHUSTER:

Q.    What is your concern with this statement that I just read?

MS. BENDER:  Objection.

BY THE WITNESS:

A.    What do you mean by concern?

BY MR. SCHUSTER:

Q.    Well, why is it referenced in your report?

A.    So this example and the others are used to illustrate the reception of Mr. Freedman's statements by the public, namely do they believe them, do they endorse his statement.

Q.    But looking at this statement, "Look at her past interviews," isn't that indicative that this particular post is motivated not by what necessarily

Page 123

term, as I've said, did not show up in -- in any measure in the public discourse about Ms. Lively until after Mr. Freedman's statements.

Q.   And when you say public discourse, are you only talking about that relevant time period of your research, which is May 2024 through February 2025?

A.   Yes, those are where I did the bulk of my analyses.

Q.   Now, I believe you testified earlier about concerns with Mr. Freedman's access to social media profile -- or social media personalities such as Candace Owens or Megyn Kelly or Perez Hilton who have followers and can thereby disseminate a narrative; is that fair to say?

A.   Yes.  I believe we were talking about the endorsement of Ms. Kelly and Candace Owens of Mr. Freedman.

Q.   How many followers does Candace Owens have?

A.   I believe that information is available in the report, if you'd like to look at it.  It's, I believe, in the millions.

Q.   What about Perez Hilton?

A.   I believe it's also likely in the millions.

Q.   How many followers did Blake Lively have in April of 2024 on all of her social media platforms?

Page 125

A.   I did not make that the focus of my analysis, but I would not be surprised if it were in the millions.

Q.   Would you be surprised if it was more than Candace Owens?

A.   No.

Q.   Would you be surprised if it was more than Megyn Kelly?

A.   I'd like to see the particular numbers in that case, but --

Q.   How about Ryan Reynolds, how many followers does he have?

A.   I don't know.

Q.   Did you look?

A.   I don't believe -- I may have.  I don't recall the number offhand.

Q.   And if you looked, would you be looking at all of their social media accounts, Instagram; TikTok; X, formerly known as Twitter; Facebook?  All of that would matter, would it not, when calculating followers or access to public?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   It depends.

Page 126

BY MR. SCHUSTER:

Q.   So if we're concerned about the reach that Candace Owens and Perez Hilton has in disseminating information, wouldn't be also be interested in knowing the reach that Ryan Reynolds and Blake Lively have in disseminating information?

MS. BENDER:   Objection.

BY THE WITNESS:

A.   I don't -- I don't see how, no.

BY MR. SCHUSTER:

Q.   Did Blake Lively utilize any other sources to get her story out about what transpired in this case?

MS. BENDER:   Objection.

BY THE WITNESS:

A.   I don't know.   It was not relevant to my analysis.

BY MR. SCHUSTER:

Q.   Did you ever review her relationship with Taylor Swift?

MS. BENDER:   Objection.

BY THE WITNESS:

A.   I'm aware it came up in some of the social media discourse, but it wasn't a focus of my analysis.

Page 127

BY MR. SCHUSTER:

Q.   Do you know how many followers Taylor Swift has?

A.   I don't.

Q.   Would you be surprised that over all platforms, she has close to 600 million followers?

A.   I would not be.

Q.   Have you ever met Blake Lively?

A.   No.

Q.   Have you ever meat Ryan Reynolds?

A.   No.

Q.   Have you ever met any of the Defendants in this case?

A.   No.

Q.   Have you had any conversations with Blake Lively about your role in this case?

A.   No.

Q.   Have you had any conversations with Ryan Reynolds about your role or scope of responsibility in this case?

A.   No.

Q.   Have you spoken with any of the other attorneys representing the other Defendants in this case, again not interested in any conversations with Ms. Bender or anyone from Willkie Farr, but have you

Page 128

into the report?

A.   No, that attorney at the time seemed -- represented to me that she was unaware that I was part of the other -- this present case.

Q.   What was the purpose of the reach-out from that attorney?

A.   She was inquiring looking for an expert, I believe.

Q.   Okay.  In this case or another case?

A.   I believe in another case.

Q.   And just to close the loop, on any of the posts that you reviewed that are part of your report, did you ever speak or communicate with any of the individuals who posted?

A.   No.

Q.   So you would not have firsthand knowledge as to their mindset as to whether they were pro-Blake and then motivated to be anti-Blake or whether they were neutral and motivated.  Yours is based on the analysis that you did and not on any conversations with a human being; is that correct?

A.   That's correct, I did not speak with them directly.

Q.   And by speak, I mean communicate in any way:  E-mail, text, any form of communication?

Page 130

A.   That's correct.

Q.   Are you aware that Ms. Lively was publicly criticized for promoting It Ends With Us, a film about domestic violence, with a catch phrase "Wear Your Florals" because she portrayed a florist in the movie?  Are you aware of that?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   Yes.

BY MR. SCHUSTER:

Q.   And do you know when Ms. Lively used that catch phrase "Wear Your Florals"?

A.   No, I would imagine it was around the premier of the movie.

Q.   And would that have been within the time period May 2024 through February 2025?

A.   Yes.

Q.   And if there were -- if there was a negative reaction to Ms. Lively using that phrase during that time period, would that have been something picked up on in your search, that it was a -- sorry.  I lost my train of thought.

Would that have been something that would have been picked up on your search as negative comments or disparaging comments or harmful

Page 131

comments?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   So I believe that refers to part 1 of my analysis and Dr. Mayzlin's report relating to one of the keywords, such as tone deaf, and one of the narratives prior to the -- Mr. Freedman's at-issue statements, which I think we were just discussing.

BY MR. SCHUSTER:

Q.   Okay.  So maybe I'm confused.

If somebody, a viewer, hears her say, "Let's wear our florals," and forms the opinion that she's just tone deaf, this is a movie about domestic abuse and she's talking about florals, and now they're online using the term tone deaf, would that post, would that comment be something caught up in the research that you and Dr. Mayzlin did in compiling the number of negative comments or the percentages that switched from positive to negative?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   So pertaining to that narrative and that keyword being tone deaf, yes, that would be picked up, and I believe Dr. Mayzlin does an analysis specifically of that term.

Page 132

BY MR. SCHUSTER:

Q.   Okay.  But it would have been picked up and as part of your analysis even though it had nothing to do with an at-issue statement; this is a viewer who took exception to something that Blake Lively said or did during your time period, correct?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   So I have an analysis of the at-issue statements for Mr. Freedman that occurred after that time period, and I have an analysis of the impact of the allegedly retaliatory campaign.  So yes, that would have been picked up in my analysis in part 1.

BY MR. SCHUSTER:

Q.   And what proof, if any, did you have that the poster complaining about Blake Lively being tone deaf was part of a retaliatory campaign?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   I believe that's covered in Dr. Mayzlin -- I mean, yeah, Dr. Mayzlin's report which I cite.

BY MR. SCHUSTER:

Q.   As you sit here today, do you have an opinion as to whether an independent person's commentary about Blake Lively being tone deaf is

Page 133

part of a retaliatory campaign?

A.    So what I can tell you based on Dr. Mayzlin's findings is that the phrase tone deaf experienced a dramatic uptick in the month of August and I believe again in December.  And that corresponded, again in Dr. Mayzlin's report, with the alleged dates of the retaliatory campaign.

BY MR. SCHUSTER:

Q.    Okay.  Do you have any opinion as to whether a third party who uses the word tone deaf is participating in a retaliation campaign?

MS. BENDER:  Objection.

BY THE WITNESS:

A.    I can tell you at the aggregate level, the term tone deaf increased dramatically during that period.

BY MR. SCHUSTER:

Q.    Do you know the person who used the term tone deaf?

A.    Which person?

Q.    The one in the post we were just talking about.

A.    So if someone used the term tone deaf -- and they have, and I can't find the exact post right now -- and that person -- what proof, if any, do you

Page 134

have, not Dr. Mayzlin, what proof, if any, do you have that that poster was participating in the retaliation campaign allegedly initiated by the Defendants?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   So as I testified previously, I do not offer an opinion on the retaliatory campaign itself.  I can tell you that the dramatic increase in the term tone deaf occurred in that period as cited in Dr. Mayzlin's report, and I can tell you from my impact analysis that that association caused reputational harm.

BY MR. SCHUSTER:

Q.   Okay.  But if the tone deaf was caused by Blake Lively, isn't the reputational harm her problem?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   I don't -- I don't offer an opinion on that matter.

BY MR. SCHUSTER:

Q.   Are you aware that Ms. Lively was the reason for an assistant director who worked on her film A Simple Favor for quitting her job and that

Page 135

Ms. Lively made her cry?  Are you aware of that allegation?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   I'm not.

BY MR. SCHUSTER:

Q.   And is it your testimony that that type of allegation has no impact on the damage to Ms. Lively's reputation?

A.   Attributed to Mr. Freedman's statements, correct, it has no relevance.

Q.   So anything that happened in the past prior to May 2024 has no relevance to Mr. Freedman's statements; is that correct?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   It has no relevance to the damages for what it would cost to repair the damage by Mr. Freedman's statements.

BY MR. SCHUSTER:

Q.   But how can you say that all of the damage was caused by Mr. Freedman's statements when there are other acts that have shown Ms. Lively to be viewed in a negative light?

MS. BENDER:  Objection.

Page 136

A.   So as you can see in some of my sources, the impression rate for TikTok, for example, is 12 percent.  What that means is that if you have 100 followers, 12 of those 100 followers will see what you post.  That's the impression rate.

What that means is that it's incredibly unlikely -- if you have 100 followers and only 12 of them see a statement, it becomes very unlikely that those same 12 followers see both of your statements, that you have two impressions.  Namely it's .12 times .12, which is about 1 percent.

Q.   Well, weren't there things going on at the time that would draw more attention to the movie and Blake Lively and Justin Baldoni during this relevant time period?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   I'm not sure.  How do you mean?

BY MR. SCHUSTER:

Q.   Well, we're talking about May 2024 through February 2025, correct?

A.   That's correct.

Q.   Are you aware that in late July 2024, advanced press and promotional interviews for the film It Ends With Us increased fan attention most

Page 138

notably driven by content from major entertainment media outlets, including Variety, The Hollywood Reporter, Entertainment Weekly, and People Magazine?

Are you aware of that?

A.   Yes.

Q.   And wouldn't that have drawn more attention to this situation, It Ends With Us, Justin Baldoni, Blake Lively?  Wouldn't something like that draw more attention and potentially more viewers?

A.   So I create a very precise count of exactly how many viewers viewed that or how many impressions the at-issue statements received.  Those are accounted for in my counts of the at-issue statements.

Q.   Well, I understand, but you're saying people only looked at the at-issue statements because they were generated by Bryan Freedman, you know, the puppet master.  I'm suggesting that people looked at the statements and other posts because of the circus surrounding this movie.

Is that a possibility that there were other factors that drew people to social media and to the media because of what was going on in this film?

MS. BENDER:  Objection.

Page 139

BY THE WITNESS:

A.   I don't view that as relevant to my analysis.

BY MR. SCHUSTER:

Q.   Is it relevant to your analysis that Blake Lively refused to take pictures with her co-star? Do you think that might generate some negative publicity and backlash?

MS. BENDER:   Objection.

BY MR. SCHUSTER:

Q.   Unrelated to the statements by Bryan Freedman?

A.   Again, I don't think it's relevant to my assessment of the damage incurred by Mr. Freedman's statements.

Q.   Is it relevant that Blake Lively refused to attend the premiere if Mr. Baldoni attended the premier?  Do you think that would generate negative publicity and negative impact her reputation?

MS. BENDER:   Objection.

BY THE WITNESS:

A.   I don't think that's relevant to my analysis.

BY MR. SCHUSTER:

Q.   Do you think that Ms. Lively instructing

Page 140

other members of the cast to unfollow Justin Baldoni on social media, which became a public thing, would negatively impact her reputation and have a negative impact on her and her brands?

MS. BENDER:  Objection.

BY THE WITNESS:

A.  Again, I don't view that as relevant to my analysis.

BY MR. SCHUSTER:

Q.  Do you think it's relevant to your analysis that many of the fans of the book were upset that Blake Lively was even cast in the role of Lily Bloom in this production?

MS. BENDER:  Objection.

BY THE WITNESS:

A.  I don't believe that is relevant to my analysis.

BY MR. SCHUSTER:

Q.  Is it relevant to your analysis that there was a public backlash to Blake Lively's desire to control her wardrobe and that what she wore offended people?

MS. BENDER:  Objection.

BY THE WITNESS:

A.  I don't view that as relevant to my

Page 141

analysis.

BY MR. SCHUSTER:

Q.   Is it relevant to your analysis that Blake Lively and Ryan Reynolds were married on a slave plantation and that people remember that?

MS. BENDER:   Objection.

BY THE WITNESS:

A.   I don't view that as relevant to my analysis to Mr. Freedman's statements.

BY MR. SCHUSTER:

Q.   So the only damage caused to Blake Lively is attributed to Bryan Freedman's statements; is that correct?

MS. BENDER:   Objection.

BY THE WITNESS:

A.   So my damages analysis addresses the harm directly tied to the impressions that Mr. Freedman's statements received and not to other statements.

BY MR. SCHUSTER:

Q.   Did you do an analysis as to what percentage of harm suffered by Blake Lively is attributed to her own actions?

A.   Again, it was not relevant to my analysis of Mr. Freedman's statements.

Q.   Is the amount of harm which you attribute

Page 142

to -- is the amount of harm you claim Blake Lively suffered the total amount harm which she suffered, or do you apportion it saying this is the portion of harm that you have sustained, 50 percent of this is related to Bryan Freedman's statements but the other 50 percent is related to your bad acts and statements?

Did you ever do that analysis?

MS. BENDER:  Objection.

BY THE WITNESS:

A.    No, I tie my damages analysis directly to Mr. Freedman's statements and not to other actions or statements of other parties.

BY MR. SCHUSTER:

Q.    Are you aware that Ms. Lively publicly bullied staff for leaving a styling hair pin in her hair when she did interviews at the Amfar Gala in New York in 2016?

MS. BENDER:  Objection.

BY THE WITNESS:

A.    I was not aware of that.

BY MR. SCHUSTER:

Q.    It did have the term bully in that, though, correct?

MS. BENDER:  Objection.

Page 143

BY THE WITNESS:

A.   I don't have -- if you want to provide me with that article, I'd be happy to assess it.

BY MR. SCHUSTER:

Q.   Would it matter whether you assessed it, because if it happened prior to May 2024, it's not relevant to your analysis, correct?

A.   Yes, as I said, those prior associations would be built into our comparative analysis of the before and after the at-issue time periods.

Q.   Is there anything that Ms. Lively could have done prior to May 2024 that would impact your analysis?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   I mean, what do you mean by anything?

BY MR. SCHUSTER:

Q.   If she killed someone, would that impact her popularity, would that impact her marketing, would that impact her social media presence?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   If that were the case, we would have to assess it.  To my knowledge, she did not.

Page 144

beliefs do make them more receptive to a claim.  So to the extent that people have a prior belief about Ms. Lively, it will increase their receptivity to other statements, some of which might be congruent with the retaliatory change, such as the fact that she's tone deaf or a bully or whatever.  So as I discuss in my report, it does affect receptivity.

BY MR. SCHUSTER:

Q.  When you say retaliatory campaign, I just want to make sure.  We are talking about alleged retaliatory campaign because you have no independent knowledge of a retaliatory campaign, correct?

A.  That's correct.

Q.  Are you aware of the infamous interview that Ms. Lively had with a Kjersti Flaa?

A.  I am, yes.

Q.  Does that interview or what Ms. Lively said during that interview impact your analysis at all?

MS. BENDER:  Objection.

BY THE WITNESS:

A.  Which part of my analysis are you referring to?

BY MR. SCHUSTER:

Q.  To whether people might be predisposed to look at her a certain way given her prior actions

Page 148

and conduct, could you foresee a situation where a viewer was aware of that video where she was inappropriate with and insulting to an interviewer and where some viewer might carry that grudge with them when now hearing about her lawsuit against Justin Baldoni and saying, "Huh, not such a nice person.  I don't believe her.  I don't like her.  I think she's being untruthful given the way she treated this reporter or other people prior to this"?

MS. BENDER:  Objection.

BY MR. SCHUSTER:

Q.  Is that a theory that you at least considered?

A.  So are you referring to part 1 of my analysis or part 2 of my analysis?

Q.  I think part 1.

A.  So yes, I consider that, for example, on page 40.  This is paragraph 78 where I discuss the interview.  And it may come up elsewhere, but here's where I discuss the impact of that.

"I also understand Defendants discussed sharing a Daily Mail article discussing a recently resurfaced 2016 interview with Ms. Lively.  The reporter was quoted" -- and et cetera.  And then

Page 149

I just say, "The YouTube of the interview was popular.  It was viewed over 7.2 million times. Several other publications also published articles about the interview, including BuzzFeed, the New York Post, and Page Six."

Q.   Was there anything untrue about that interview that was circulated?

A.   I have not assessed the truth or falsity of the interview.

Q.   Did you ever hear anyone claim that that interview was manufactured by the Defendants?

A.   No, I have not.

Q.   So as far as you are aware, Blake Lively said exactly what is depicted in that video?

A.   Yes.

Q.   And the Defendants had nothing to do with that interview, correct?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   So as I say here, "I understand the Defendants discussed sharing a Daily Mail article discussing a recently resurfaced 2016 interview."

BY MR. SCHUSTER:

Q.   So I'll clarify my questions.

Did the Defendants have anything to do with

Page 150

the initial interview and what Ms. Lively said during that interview?

A.   Not to my knowledge.

Q.   Is it your opinion that the Defendants had some responsibility in the resurfacing of that interview?

A.   As I say in footnote 4, I base my opinions on Dr. Mayzlin's report regarding the retaliation campaign, alleged retaliation campaign.

Q.   Are you familiar with the show Saturday Night Live?

A.   Yes.

Q.   Have you ever watched it?

A.   Yes.

Q.   Are you aware that Ryan Reynolds appeared on the Saturday Night Live anniversary show?

A.   I was not.

Q.   Are you aware that Blake Lively was also in the audience during that show?

A.   I was not.

Q.   Are you aware of how many people watched that show?

A.   No.

Q.   Would it surprise you that approximately 15 million people watched that show?

Page 151

MS. BENDER:  Objection.

BY THE WITNESS:

A.   No.

BY MR. SCHUSTER:

Q.   Are you aware of Ryan Reynolds's comment during that show?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   I am not.

BY MR. SCHUSTER:

Q.   You haven't heard any commentary, haven't seen any memes, nothing about what Ryan Reynolds did or said during that Saturday Night Live anniversary show?

A.   That's correct.

MS. BENDER:  Objection.

BY MR. SCHUSTER:

Q.   Are you aware that his comment during that show was not well received by viewers?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   I'm not.

BY MR. SCHUSTER:

Q.   Are you aware that this show took place after the litigation had already been commenced?

Page 152

MS. BENDER:  Objection.

BY THE WITNESS:

A.   I had never thought of the timing there. I am aware there was that show, but I do not know where it occurred in timing with the litigation.

BY MR. SCHUSTER:

Q.   Are you aware that there was some negativity associated with the comment made by Ryan Reynolds on that show?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   No.

BY MR. SCHUSTER:

Q.   Are you aware that some viewers viewed the appearance negatively and accused Blake Lively and Ryan Reynolds of using the Saturday Night Live stage to make light of the serious legal allegations she has made?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   No.

BY MR. SCHUSTER:

Q.   Do you have any reason to believe that the Defendants are responsible in any way, shape, or form for the negativity that people were expressing

Page 153

about Ryan Reynolds and Blake Lively as a result of that appearance?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   I did not study that incident.

BY MR. SCHUSTER:

Q.   Are you aware that they were -- the couple was accused of trying to manipulate their public perception with their appearance and Ryan Reynolds' comment?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   I was not.

BY MR. SCHUSTER:

Q.   What is Semrush?

A.   Semrush is a third-party service that offers people information about visitors to websites.

Q.   And do you -- did you utilize Semrush?

A.   I did use it in part 2 of my analysis.

Q.   Do you still utilize Semrush when conducting analysis?

A.   Yes.

Q.   Are you aware that people complain of a common problem with Semrush in that it generates inaccurate data?

Page 154

MS. BENDER:  Objection.

BY THE WITNESS:

A.  I'm not.

BY MR. SCHUSTER:

Q.  Have you ever heard that a common problem with Semrush is that it generates inaccurate statements?

A.  I'm not -- to my knowledge, it's a standard used tool in the industry.

Q.  And you've never heard any complaints about it?

A.  I have not.

Q.  Have you ever looked into whether there are any complaints about Semrush and how it's used and its results?

A.  No.

MS. BENDER:  Objection.

BY THE WITNESS:

A.  I know it's widely used.

BY MR. SCHUSTER:

Q.  In connection with utilizing Semrush, what is the -- what would the term "traffic" mean?

A.  So it depends on what you mean.

Q.  Okay.  I actually don't know what I mean. I'm just asking you something.  So if you don't know

Page 155

what I mean, then I'll move on.

Do you know what the word "keyword" would mean when using Semrush?

A.    Roughly, yes.

Q.    Okay.  Are you aware that some users of Semrush have reported that Semrush's traffic and keyword volume estimates are significantly off, sometimes by a very large margin?

MS. BENDER:  Objection.

BY THE WITNESS:

A.    That -- the keyword, it would not bear on my analysis.  I did not do a keyword traffic analysis.

BY MR. SCHUSTER:

Q.    That wouldn't have impacted --

A.    That's correct.

Q.    Okay.  Are you aware of any reports from users of Semrush that the platform may not accurately track all websites?

A.    I'm not.

MS. BENDER:  Objection.

BY THE WITNESS:

A.    I'm not aware of that.

BY MR. SCHUSTER:

Q.    Are you aware of any reports from users of Semrush complaining that the platform is sometimes

Page 156

too aggressive, flagging issues that are minor or common and may not accurately reflect the health of the site?

A. It would help -- if I saw the underlying material, I could help you assess it.

Q. Okay. Are you aware of any peer-reviewed studies that relied on Semrush data?

A. I would have to look. I wouldn't be surprised to find it. Academics use it.

Q. Is that something that you would be willing to look for?

A. I could do a look. I know professionals use it all the time. They sort of have the most need for that kind of data because they place ads on these websites.

Q. I'm not sure that placing ads qualifies it is, you know, being peer-reviewed or scientifically tested. So if that's something you could do, that would be appreciated.

Now, this part 2 -- we've talked about part 1 -- talks about a reputational repair campaign; is that correct?

A. That's correct.

Q. And what is the cost that you attribute to the necessary reputational campaign for Blake

Page 157

Reynolds couldn't use their own built-in media which has hundreds of millions of followers to institute this reputational repair that you claim is needed?

A.   Yes, there is a reason.

Q.   What is that?

A.   So as I discuss in my report, reputation is built largely by collective agreement, by what people say about you about you.  Reputation isn't built by what you say about yourself.  It's built collectively.

Q.   So you need a third party to vouch for you to make it credible?

A.   That's one way to put it, yes.

Q.   Is there a reason why Blake Lively couldn't use Taylor Swift, a third party with a gazillion followers, to speak for her or vouch for her and help restore her reputation?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   Yes.

BY MR. SCHUSTER:

Q.   Why?

A.   So in marketing practice, you want to target the receptive audience, and in this case, you'd want to target the audience who is receptive to

Page 159

Mr. Freedman's statements and to Mr. Baldoni in general. And so you would want to pick the audience that follows the sources associated with Mr. Freedman and Mr. Baldoni and others.

BY MR. SCHUSTER:

Q. So the hope would be that through this 14- to $26 million campaign, you would sway those individuals who were previously swayed by Bryan Freedman?

A. Yes, that's congruent with what I'm saying. Yes.

Q. Do you know who a Mr. Kinrich is?

A. I don't.

Q. I'm sorry, you don't?

A. I don't.

Q. I believe Plaintiffs have a damages expert whose name is Mr. Kinrich, Jeffrey H. Kinrich. Have you heard that name?

A. I haven't heard that exact name, no.

Q. Have you reviewed any report on damages from the Plaintiff?

A. I don't recall reviewing his report.

Q. Okay. Well, Mr. Kinrich acknowledges that, "Ms. Lively's brands achieved extraordinary market penetration at the very time of the alleged

Page 160

Are you aware that in August, from August 6th to the 9th of 2024 the film's premiere event, the theatrical release, triggered a surge in public engagement, including fan commentary, influencer reactions, red carpet coverage, and opening weekend box office reporting?

Would you agree with that?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   I would need to look at the underlying sources, but I don't have a reason to disagree with that.

BY MR. SCHUSTER:

Q.   Would those type of events increase attention to the film, the actors, and/or the drama that had been going on?

A.   So what I observed in Dr. Mayzlin's report of this very issue -- analysis of this very issue was that not only was there increased volume, but there was also increased negative sentiment during the August time period, and there was increased negative associations congruent with the alleged retaliation campaign.

Q.   Is it possible that the negative sentiment related to Blake Lively's threats in connection with

Page 168

the film?

MS. BENDER:  Objection.

BY MR. SCHUSTER:

Q.   For example, Blake Lively said, "If my cut of this film is not used, we're pulling Taylor Swift's songs from the movie."

Could that have been a reason to create negative sentiment about Blake Lively in this target time period?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   That does not seem to be congruent with Dr. Mayzlin's analysis.

BY MR. SCHUSTER:

Q.   What was Dr. Mayzlin's analysis about Blake Lively threatening to pull Taylor Swift's songs?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   So what Dr. Mayzlin found was not only an increase in volume and an increase in negative sentiment, but also an increase in negative associations that were tied directly to the alleged retaliatory campaign represented not only in keywords such as tone deaf, bully, et cetera, but her analysis of the alleged campaign narrative.

Page 169

BY MR. SCHUSTER:

Q.   Do you recall Dr. Mayzlin referencing at all Blake Lively's threats to pull Taylor Swift's songs from the movie if she was not given permission to edit the film?  Was that discussed in Dr. Mayzlin's report?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   I don't recall that specific information.

BY MR. SCHUSTER:

Q.   Do you recall Dr. Mayzlin discussing Blake Lively's threats to not show up at the premiere if Justin Baldoni appeared?  Was that in her report?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   I don't recall if that's in her report or not.

BY MR. SCHUSTER:

Q.   Do you recall if Dr. Mayzlin discussed Blake Lively quitting the production at any time if she was not given certain control over the film?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   I don't recall that specifically.  I believe Dr. Mayzlin presents a timeline of events.

Page 170

BY MR. SCHUSTER:

Q.   Do you recall Dr. Mayzlin opining about whether the public reacted positively, negatively, or neutrally to Blake Lively's promotion of her alcohol brand in a movie about domestic abuse?

Was that covered in the report?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   I don't recall if it's covered in her report.

BY MR. SCHUSTER:

Q.   Do you recall any discussion about Blake Lively's brand Blake Brown which debuted as the biggest hair care launch in Target's history at or around the time of this movie launch?

A.   I recall at a high level Dr. Mayzlin mentioning this.

Q.   And is that consistent with a successful retaliation campaign against Blake Lively having such success with her brands and her businesses?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   It doesn't seem relevant to assessing the harm of the retaliation campaign.

Page 171

expert noted that her alcohol brand Betty Booze ranked among the top five ready to drink products at Total Wine?

Did you see that in Mr. Mayzlin's report?

A. I recall seeing something like that. Again, I did not base my report on that portion of her analysis.

Q. And, again, the success of her business enterprise does not impact your analysis of the need for costs associated with her personal reputational repair; is that correct?

A. I'm sorry, would you mind reasking it?

Q. Okay. I don't mind at all.

Is it your opinion that despite the success of her businesses, she still needs reputational repair in the amount of 14- to $26 million?

MS. BENDER: Objection.

BY THE WITNESS:

A. Yes.

BY MR. SCHUSTER:

Q. Does your analysis of the cost for reputational repair change at all if Ms. Lively prevails in her lawsuit?

A. No.

Q. So if she wins the case, and a jury finds

Page 173

in her favor, it's your opinion that she will still need this 14- to $26 million reputational repair despite a jury verdict in her favor?

A.   That's correct.

Q.   And why is that?

A.   So the purpose of the campaign to correct the reputational damage is targeted at those who received the initial statements.  Because of a number of factors related to digital media and the way communication functions in the media system, it's not at all a foregone conclusion that the target audience will receive that message of the verdict.  It's not a foregone conclusion that they will trust that message.  And it's not at all a foregone conclusion that that verdict would repair the reputational harm.

Q.   Is it your opinion that a jury verdict from the Southern District of New York in the case of Blake Lively versus Justin Baldoni is not going to be circulated across this country?

A.   So as I said, it will -- that news will be circulated.  It's not a foregone conclusion that that will make it to the target audience in question, to the people who were initially exposed to the at-issue statements.  It's also not a foregone conclusion that they will trust the implications of a jury verdict.

Page 174

Q. So do you believe it is a greater likelihood of success that the target audience will trust a paid-for advertising campaign as opposed to the verdict of a jury in the Southern District of New York, that that has more credibility from paid-for advertising than a trial in front of a judge and jury?

MS. BENDER: Objection.

BY THE WITNESS:

A. That's not my opinion.

BY MR. SCHUSTER:

Q. So what is your opinion?

A. So as you can see in my table of damages, I believe that's page 186, I recommend several channels. One of those would be classified as a paid channel. One, two, three, four, five -- six of those would be not considered "paid" channels in terms of traditional advertising.

Q. And not to belabor the point, but a jury verdict in her favor would not impact any of that calculation at all?

A. Correct.

Q. Is it your assumption that the viewers of all of the impressions listed in Appendix G saw or viewed one or more of the at-issue statements?

Page 175

A.   I did not view that as relevant to my analysis.

Q.   Would it be relevant to someone assessing the credibility of Blake Lively or the likability of Blake Lively?

A.   Again, I did not -- that was not relevant to my assessment of damages in this case.

Q.   Just one minute, please.

A.   Sure.

Q.   Does your damage model factor in any countervailing effects from content positive to Ms. Lively contained in the sources that have the at-issue statements?

A.   I'm sorry, what's the question?

Q.   Sure.  When you looked at the collection of at-issue statements, were all of them just at-issue statements, or was there other dialogue, colloquy, narrative contained within what you viewed that also had at-issue statements?

A.   So the at-issue statements was surrounded by other information, yes.

Q.   Okay.  And was some of that other information positive about Blake Lively?

A.   It may have been.  I'd say typically these were reported in news stories that contained a mix of

Page 184

information.

Q.   But would that mix of information include things that were not negative about Blake Lively? You know, was it situations where Freedman's statement could be found buried within an article or at the end of the article, but yet that article or statement contained other positive things about Blake Lively or her position about the case or her attorneys' position about the case, yet it still had an at-issue statement?

MS. BENDER:   Objection.

BY THE WITNESS:

A.   I can tell you it was surrounded by other information in the case.

BY MR. SCHUSTER:

Q.   Did you take into consideration that other information about the case when doing your analysis, or was your focus solely on, hey, here's an at-issue statement, in --

A.   My analysis was primarily of the existence of the at-issue statement.  Some accounting of that is made in including only the receptive audience.  So I don't include 100 percent of the people who -- or impressions.

MR. SCHUSTER:   Yeah, could we take five

Page 185

BY THE WITNESS:

A.   So it depends on the assumption.

BY MR. SCHUSTER:

Q.   Okay.  Well, let's go with the assumption which I think you referenced, the assumption that there is a retaliation campaign.

If there is no retaliation campaign or there is a finding that there is no retaliation campaign, doesn't that drastically impact your findings and report?

A.   Yes.  So as I say in footnote 4, I rely on her report and that assumption.  The associations, obviously, still cause reputational harm, but the attribution of those associations may be different.

Q.   Okay.  Understood.  And what, if anything, did you do to verify Dr. Mayzlin's findings, or did you pretty much just rely on her report?  I know you looked at some of the underlying things that she used and you reviewed her report, but anything else that you did to verify her findings or the veracity of her opinion?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   Which findings are you referring to exactly?

Page 187

BY MR. SCHUSTER:

Q. That there was a retaliation campaign.

A. Right. So I did consult some depositions in this case and some underlying material. Some of this, I believe, can be found on page 41, for example paragraph 80.

Q. Other than reviewing deposition testimony, did you do anything else to verify the existence of a retaliation campaign?

MS. BENDER: Objection.

BY THE WITNESS:

A. So I believe I also cite to some documents provided by counsel.

BY MR. SCHUSTER:

Q. Okay. Anything else?

A. Those are the two things that come to mind.

MR. SCHUSTER: Thank you very much for your time.

THE WITNESS: Thank you very much.

MS. BENDER: No questions from Plaintiffs. Thank you.

TECH ASSISTANT: We're going off the record 2:37 p.m.

COURT REPORTER: Question from the reporter: Orders for the transcript?

Page 188

the foregoing videoconference deposition was reserved by counsel for the Defendants.  I further certify that the taking of this deposition was pursuant to Notice, and that there were present in person and via videoconference at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF:  I have hereunto set my hand and affixed my seal this 26th day of November, 2025.

ANDREW R. PITTS, CSR, RPR

CSR, COOK COUNTY, ILLINOIS

Page 192