**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY,<br><br>     Plaintiff,<br><br>-v-<br><br>WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, JENNIFER ABEL, JED WALLACE, and STREET RELATIONS INC.,<br><br>     Defendants. | No. 1:24-cv-10049-LJL |

<u>**DEFENDANTS' OPPOSITION TO PLAINTIFF BLAKE LIVELY'S OMNIBUS**</u>
<u>**MEMORANDUM IN SUPPORT OF HER MOTIONS IN LIMINE**</u>

492374.1

## TABLE OF CONTENTS

**Page(s)**

I.    Opposition To Plaintiff's Motion In Limine No. 1: Defendants Should Be Permitted To Present Evidence Of Lively's Reputation Before The Alleged "Smear Campaign" ................................................................................................................ 6

    A.    Articles And Evidence Establishing Lively's Preexisting Reputation Are Not Inadmissible Hearsay Or Character Evidence ....................................................... 7

    B.    The Probative Value Of Evidence Relating To Lively's Reputation Far Outweighs Its Potential Prejudice ........................................................................... 10

    C.    Articles Depicting Lively's Preexisting Reputation Are Not Lay Opinion .......... 11

II.    Opposition To Plaintiff's Motion In Limine No. 2: Defendants Should Be Permitted To Offer Evidence Concerning Lively's Abuse Of New York's Legal System ............... 12

III.    Opposition To Plaintiff's Motion In Limine No. 3: Ryan Reynolds' Creation Of The "Nicepool" And "Ladypool" Scenes To Publicly Shame Baldoni In "Deadpool & Wolverine" Is Relevant To Wayfarer's Motive For Engaging A Crisis Manager ............. 14

IV.    Defendants' Opposition To Plaintiff's Motion In Limine No. 4: Evidence About Lively's And Ryan Reynolds' Net Worth And Financial Status Is Relevant To Lively's Powerbroker Theory ......................................................................................... 17

V.    Opposition To Plaintiff's Motion In Limine No. 5: Defendants Should Be Permitted To Use Internal Sony Communications To Rebut Lively's Trial Arguments .................. 18

VI.    Opposition To Plaintiff's Motion In Limine No. 6: Defendants Should Be Permitted To Respond To Lively's Argument That The Defense In This Litigation Constitutes Retaliation By Offering Testimony Concerning The Impact This Litigation Has Had On Them ...................................................................................................................... 22

VII.    Opposition To Plaintiff's Motion In Limine No. 7: Defendants Should Be Allowed To Introduce Lively's Own Statements For Impeachment Purposes And To Show The Common Practice Of Using Public Relations Statements By The Parties And Their Counsel To Shape Public Opinion ........................................................................... 23

VIII.    Opposition To Plaintiff's Motion In Limine No. 8: Defendants Should Be Permitted To Present The Testimony Of Non-Party Kjersti Flaa To Respond To Plaintiff's Expert And Trial Argument That Defendants Were Responsible For Boosting The Insensitive "Little Bump" Interview With Lively ............................................................................. 25

IX.    Conclusion ........................................................................................................................ 27

492374.1

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aramony v. United Way of Am.*,
 254 F.3d 403 (2d Cir. 2001)................................................................................................16

*Arizona v. California*,
 460 U.S. 605 (1983)............................................................................................................16

*Bularz v. Prudential Ins. Co.*,
 93 F.3d 372 (7th Cir. 1996) .................................................................................................9

*Burdick v. Kurilovitch*,
 792 F. App'x 868 (2d Cir. 2019) ......................................................................................8, 9

*Cardillo v. Doubleday & Co., Inc.*,
 518 F.2d 638 (2d Cir. 1975)...............................................................................................10

*Cerasani v. Sony Corp.*,
 991 F. Supp 343 (S.D.N.Y. 1998) ......................................................................................10

*Gen. Motors LLC Ignition Switch Litig.*,
 No. 14-MD-2543 (JMF), 2015 WL 8130449 (S.D.N.Y. Dec. 3, 2015) ..................................14

*George v. Celotex Corp.*,
 914 F.2d 26 (2d Cir.1990).....................................................................................................8

*Guccione v. Hustler Magazine, Inc.*,
 800 F.2d 298 (2d Cir. 1986)...........................................................................................10, 26

*Marcone v. Penthouse Int'l Mag. for Men*,
 754 F.2d 1072 (3d Cir. 1985).................................................................................................9

*Michelson v. United States*,
 335 U.S. 469 (1948)..............................................................................................................8

*Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Grp.*,
 937 F. Supp. 276 (S.D.N.Y. 1996) .....................................................................................21

*New York City Dep't of Fin. v. Twin Rivers, Inc.*,
 No. 95 CIV. 1389 HB HBP, 1997 WL 299423 (S.D.N.Y. June 5, 1997) ..............................16

*Ouern v. Jordon*,
 440 U.S. 332 (1979)............................................................................................................16

492374.1

*Rekor Systems, Inc. v. Loughlin,*
  2023 WL 1777248, (S.D.N.Y. Feb. 6, 2023)...................................................................13

*Schafer v. Time, Inc.,*
  142 F.3d 1361 (11th Cir. 1998) ......................................................................................9

*Tagliaferri v. Szulik,*
  No. 15 Civ. 2685 (LGS), 2016 WL 3023327 (S.D.N.Y. May 25, 2016)..............................10

*Tomaino v. O'Brien,*
  315 F. App'x 359 (2d Cir. 2009) .....................................................................................13

*United States v. Dupree,*
  706 F.3d 131 (2d Cir. 2013)...............................................................................................7

*United States v. Garcia,*
  413 F.3d 201 (2d Cir. 2005).............................................................................................11

*United States v. Gillier,*
  No. 23-6280-CR, 2024 WL 4344732 (2d Cir. Sept. 30, 2024)..............................................20

*United States v. Ilori,*
  No. 21-CR-00746 (MKV), 2022 WL 2452258 (S.D.N.Y. July 5, 2022) ...............................21

*United States v. Phillips,*
  No. 22-CR-138 (LJL), 2023 WL 6620146 (S.D.N.Y. Oct. 10, 2023) ....................................11

*United States v. Ray,*
  No. 20-CR-110 (LJL), 2022 WL 813942 (S.D.N.Y. Mar. 16, 2022) ....................................20

*United States v. Wade,*
  512 F. App'x 11 (2d Cir. 2013) ...............................................................................16, 17

*United States v. Zhong,*
  26 F.4th 536 (2d Cir. 2022) ..............................................................................................8

*Williams v. City of New York,*
  No. 19-CV-3347 (LJL), 2023 WL 2911023 (S.D.N.Y. Apr. 12, 2023) ................................21

*World Wide Ass'n of Specialty Programs v. Pure, Inc.,*
  450 F.3d 1132 (10th Cir. 2006) .........................................................................................9

## Other Authorities

Federal Rule of Evidence 403.................................................................................................10

Federal Rule of Evidence 404.............................................................................................7, 8

Federal Rule of Evidence 404(b) ...........................................................................................8

4

492374.1

Federal Rule of Evidence 405(b) ............................................................................................9

Federal Rule of Evidence 608(b) ..........................................................................................13

Federal Rule of Evidence 701 ...............................................................................................11

Federal Rule of Evidence 801(c) ............................................................................................7

Federal Rule of Evidence 803 .................................................................................................8

Federal Rule of Evidence 803(3) ..........................................................................................20

Federal Rule of Evidence 803(21) ..........................................................................................8

N.Y. Pattern Jury Instr. - Civil 3:29 (2023) ....................................................................10, 26

492374.1

Pursuant to the Court's Case Management Plan and Scheduling Order, as amended on March 26, 2026 (Dkt. No. 1265), Defendants Wayfarer Studios LLC, It Ends With Us Movie LLC and The Agency Group PR LLC (collectively, "Defendants") respectfully submit this omnibus memorandum of law in opposition to Plaintiff Blake Lively's motions in limine 1-8.

**I.      Opposition To Plaintiff's Motion In Limine No. 1: Defendants Should Be Permitted To Present Evidence Of Lively's Reputation Before The Alleged "Smear Campaign"**

Plaintiff Blake Lively's Motion in Limine No. 1 flies in the face of well-entrenched law. Lively placed her reputation squarely at issue by seeking over $290 million in harm to her personal and professional reputation and livelihood.  Nevertheless, Lively seeks to exclude evidence demonstrating that prior to the alleged 'smear campaign' that purportedly damaged her reputation, she already had a well-earned and well-publicized reputation as, among other things, a 'mean girl' and 'tone deaf.'  Lively specifically identifies five press articles and "others like them" as excludable.[1]  Each painted Lively as 'tone deaf' and a 'mean girl.'  Lively understandably would prefer to keep this evidence from the jury, arguing that the articles portraying her as a tone-deaf mean girl, are hearsay, inadmissible character evidence, improper lay opinion and unduly prejudicial.[2]

---

[1] Lively cites five articles including two articles dated October 13, 2014 – one captioned "Lively Premieres Racist Photo Spread on Preserve" (Hudson Decl. Ex. 6) and the other "Blake Lively wants to return to a time of cute hats and slavery" (*Id*. Ex. 9), an August 4, 2020 article criticizing her plantation wedding for its glorifying slavery (*Id*. Ex. 8), an August 2024 Page Six article discussing Lively's 2012 interview with Elle magazine in which she used a transgender slur (*Id*. Ex. 6), and an E article criticizing Lively's anti-trans comments and in so doing, resurrecting an earlier article captioned "Does This Dress Make Me Look Tranny?"  (*Id*. Ex. 7). Dkt. No. 1326, pp. 3, 6.

[2] Lively suggests that Defendants will use these stories "to present argument" and "elicit testimony" as to the truth of the underlying facts contained in these articles, *i.e.*, that Ms. Lively had racist leanings.  Dkt. No. 1326, p. 3.  The concern is misplaced as Lively's views on race or the message sent about her plantation wedding are not at issue – the only issue is the public perception of her before the alleged smear campaign.

492374.1

The evidence Plaintiff seeks to exclude is not hearsay as it is not being offered for the truth of the matter asserted (to wit, that Lively is a 'mean girl,' 'bully,' 'tone deaf' or something similar) and, in any event, the hearsay rule expressly carves out character evidence. In fact, courts recognize that reputation can *only* be proven with hearsay. Lively's other grounds for exclusion, lay opinion and undue prejudice, are equally frail. Rule 404 does not warrant exclusion of character evidence where, as here, a plaintiff placed his or her character directly at issue.[3] Lively did just that when she sued for reputational harm leaving the defense to prove, among other things, that her reputation was so tarnished it could not have been impugned or diminished by an alleged digital campaign by Defendants. Finally, Lively's lay opinion argument hinges on the notion that Defendants may not present evidence of Lively's preexisting reputation because none of their experts opined on the impact to the public. The argument seems to be that absent expert testimony the articles constitute lay opinion based upon "speculation and hearsay." Dkt. No. 1326, pp. 5-6.

Lively should not be permitted to cripple the defense by stripping Defendants of evidence of Lively's pre 'smear campaign' reputation that include her reputation was tarnished long before she stepped foot on the set of *It Ends With Us* – evidence that it is pivotal to negate causation.

A.    **Articles And Evidence Establishing Lively's Preexisting Reputation Are Not Inadmissible Hearsay Or Character Evidence**

Evidence of Lively's reputation prior to encountering Defendants is not hearsay. Hearsay is a declarant's out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801(c) advisory committee's note; *see, e.g., United*

---

[3] All references are to the Federal Rules of Evidence unless otherwise noted.

7

*States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (out of court statement offered for fact it was made not hearsay); *George v. Celotex Corp.,* 914 F.2d 26, 30 (2d Cir.1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay.")

Evidence of Lively's preexisting reputation is not being offered for the truth that she is a 'mean girl,' 'bully,' difficult to work with or 'tone deaf' but to establish Lively's reputation prior to the alleged 'smear campaign' to show that Defendants' alleged conduct did not cause further harm to her existing reputation. Even assuming the material that Lively seeks to exclude could be deemed hearsay, hearsay is admissible if it falls within an enumerated exception to the hearsay rule. Fed. R. Evid. 803. It is universally recognized that reputation evidence "must be based on hearsay." *United States v. Zhong*, 26 F.4th 536, 554 (2d Cir. 2022) (citing *United States v. Lynch*, 366 F.2d 829, 832 (3d Cir. 1966)). Accordingly, Rule 803 provides an exclusion to the hearsay rule for "reputation among a person's associates or in the community concerning the person's character." *Id.* (quoting Fed. R. Evid. 803(21)); *see also Michelson v. United States*, 335 U.S. 469, 477 (1948) ("When the defendant elects to initiate a character inquiry…[n]ot only is he permitted to call witnesses to testify from hearsay, but indeed such a witness is not allowed to base his testimony on anything but hearsay.")

Nor are the articles excludable as character evidence under Rule 404. First, Defendants are not seeking to admit the articles as evidence to prove character but rather for some other purpose, namely, to rebut Plaintiff's theory of reputational harm. *See Burdick v. Kurilovitch*, 792 F. App'x 868, 870 (2d Cir. 2019) (prior arrest and conviction admissible where it was not admitted to establish character but to allow the jury to assess plaintiff's theory of reputational harm); Fed. R. Evid. 404(b) (although evidence of a wrong or act is "not admissible to prove a

8

person's character in order to show that on a particular occasion the person acted in accordance with the character," "[t]his evidence may be admissible for another purpose, such as proving motive, intent, preparation, plan, knowledge, identity absence of mistake, or lack of accident.")

Media reports relating to Lively's reputation are also admissible under Rule 405(b), which permits the introduction of opinion evidence, reputation evidence and specific instances of conduct when the character of a person is an element of the claim or defense or is otherwise at issue, as in the case of a claim for damages due to reputational harm. *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1138 (10th Cir. 2006) (citing Fed. R. Evid. 405(b)).  "[A] charge of defamation or libel commonly make damage to the [plaintiff's] reputation or character an essential element of the case" and admissible under Federal Rule of Evidence 405(b).  *Schafer v. Time, Inc.*, 142 F.3d 1361, 1371–72 (11th Cir. 1998); *see, e.g.*, *Burdick*, 792 F. App'x at 870 (where plaintiff sought reputational harm damages, the Court properly permitted the introduction of a prior arrest and related criminal proceedings so that the jury could assess plaintiff's "theory of reputational harm"); *Marcone v. Penthouse Int'l Mag. for Men,* 754 F.2d 1072, 1079 (3d Cir. 1985) (holding that evidence of tarnished reputation arising out of broad range of criminal activity was relevant to issue of damage to plaintiffs reputation); *Bularz v. Prudential Ins. Co.*, 93 F.3d 372, 378–79 (7th Cir. 1996) (finding evidence of general reputation in business dealings "relevant to determining whether [plaintiffs] reputation was already compromised at the time that [defendant] allegedly defamed him, and thus to the jury's computation of damages"); *World Wide Ass'n*, 450 F.3d at 1137-38 (media account evidence was properly admitted in defamation action for the purpose of demonstrating that plaintiff's claims of damages in the form of lost profits "could have been due to those sources rather than [defendant's] statements").

9

Although Lively's claim is nominally for retaliation, she is seeking the same reputational harm damages as recoverable for defamation and libel. Thus, character evidence is admissible as an element of her reputational harm and lost profits damages.

### B.    The Probative Value Of Evidence Relating To Lively's Reputation Far Outweighs Its Potential Prejudice

Lively next invokes Rule 403 to argue that the articles and similar evidence are more prejudicial than probative. As noted, Lively opened the door to this evidence – and made it highly relevant – by putting her reputation at issue and forcing Defendants to defend the allegations by, among other things, showing that they did not cause harm to her already tarnished reputation. A plaintiff's existing reputation is universally recognized as relevant to a claim for reputational harm. For instance, New York's Pattern Jury Instruction – Civil 3:29 recognizes the importance of a plaintiff's existing reputation in determining the appropriate damages award by instructing that a factor for the jury to consider is "the plaintiff's standing in the community." N.Y. Pattern Jury Instr. – Civil 3:29 (2023). Such evidence is also admissible under the "libel-proof doctrine" which permits a defendant accused of causing reputational harm to show that the plaintiff is libel-proof because his or her reputation is already so badly tarnished that the plaintiff cannot be further injured by even false statements on the same subject. *See Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 303 (2d Cir. 1986) (citing *Cardillo v. Doubleday & Co., Inc.*, 518 F.2d 638, 638-40 (2d Cir. 1975)); *see also Cerasani v. Sony Corp.*, 991 F. Supp 343, 352–53 (S.D.N.Y. 1998) (holding that the plaintiff's reputation was "so badly tarnished" that "he can suffer no further harm and that no reasonable jury could award more than nominal damages"); *Tagliaferri v. Szulik*, No. 15 Civ. 2685 (LGS), 2016 WL 3023327, at *3 (S.D.N.Y. May 25, 2016) (applying the defamation-proof plaintiff doctrine and holding that plaintiff's slander claim could not be sustained because the alleged statements did not further impair his reputation). By way of

10

492374.1

example, while labeling a plaintiff as a murderer would ordinarily harm a plaintiff's reputation, calling Jeffrey Dahmer a murderer would not sully his reputation which included a reputation as a murderer.[4]

## C.    Articles Depicting Lively's Preexisting Reputation Are Not Lay Opinion

Lively's final Hail Mary is that articles and similar publications establishing her existing reputation somehow constitute inadmissible lay opinion.  Not so.  A lay person is someone who testifies based on personal knowledge rather than specialized training.  *See* Fed. R. Evid. 701. Lay opinion refers to an opinion or inference that a non-expert witness provides during their testimony.  *Id*.  Rule 701 allows a lay witness to offer an opinion if three conditions are met: the opinion is rationally based on the witnesses' own perception, it helps the jury understand the testimony or determine a fact and does not rely on scientific, technical, or other specialized knowledge.  *See* Fed. R. Evid. 701 advisory committee's note to 2000 amendment (explaining that "lay testimony results from a process of reasoning familiar in everyday life"); *United States v. Phillips*, No. 22-CR-138 (LJL), 2023 WL 6620146, at *7 (S.D.N.Y. Oct. 10, 2023) (allowing lay members of Bloomberg chat to testify as lay witnesses to their understanding of defendant's meaning in text messages they did not see contemporaneously); *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005) ("Rule 701 simply recognizes lay opinion as an acceptable 'shorthand' for the 'rendition of facts that the witness personally perceived.'"  (quoting 4 Weinstein's Federal Evidence § 701.03[1])).

Lively does not seek to exclude opinion testimony by a lay witness, but publications that demonstrate the state of Lively's reputation before the alleged smear campaign.  Lively urges that there is no fact or expert opinion evidence "establishing that Ms. Lively carried a negative

---

[4] By using this example, Defendants do not mean to compare Ms. Lively to Jeffrey Dahmer.

492374.1

reputation and public perception prior to August 2024" and that Defendants are relying on the existence of negative press which constitutes lay opinion.  Dkt. No. 1326, p. 5.  Plaintiff deliberately misses the point.  In contrast to the cases cited by Plaintiff, Defendants are not offering the articles to prove public perception but only to compare her pre and post reputation to show whether the alleged 'smear campaign' had a negative, or indeed any effect on Lively's reputation.  If not Lively's claim for reputational harm damages fails.  Defendants do not intend to call any witness to offer an opinion on public perception.  The question is not whether the public perceived that Lively was a 'mean girl,' 'bully' or 'tone deaf,' but whether these allegations were widely circulated before Lively encountered Wayfarer.  This is not lay opinion.

## II.    Opposition To Plaintiff's Motion In Limine No. 2: Defendants Should Be Permitted To Offer Evidence Concerning Lively's Abuse Of New York's Legal System

There is no serious dispute that Lively used Vanzan Inc., a company through which she and her husband pay their personal employees, to file a sham lawsuit in New York state court against ten unidentified "Doe" defendants.  Nor that the sole purpose of filing this lawsuit, promptly dismissed without any defendant being served, was so that Lively could issue a pre-answer subpoena to Wayfarer's former publicist, Stephanie Jones.  Nor that the point of these shenanigans was to provide Jones with legal cover to turn over communications Jones had taken from Jennifer Abel's phone.  Nor that Lively filled out her CRD complaint with inflammatory snippets of these communications and then provided that complaint to the New York Times, *before* she filed it, giving the paper the basis for its highly damaging December 2024 story about Baldoni.

This outrageous misconduct is highly relevant to the issues that Lively has framed for trial.  Lively has placed Defendants' actions in this litigation squarely at issue.  She plans to argue that Defendants' litigation conduct, including their filing of counterclaims against Lively,

was retaliation for Lively's protected conduct, which she defines to include her filing of this lawsuit.  Defendants have moved to preclude Lively from offering such evidence at trial.  Dkt. No. 1310, pp. 21-24.  However, if the Court permits Lively to proceed on this theory, Defendants will argue that their actions in this litigation were reasonable defensive measures.  Dkt. No. 1273, pp. 99-101, 129-34.  To support this argument, Defendants will show that they knew from the moment the New York Times story broke that Lively had wrongfully obtained their publicists' confidential work product.  This wrongful and damaging conduct by Lively was the background to Defendants' filing their counterclaims.  This context tends to show that Defendants' actions in this litigation were reasonable and proportionate defensive measures, and not illegal retaliation.

Separately, to the extent Lively is claiming damages to her reputation based on the manner in which Defendants have litigated this case, including the filing of their counterclaims, Defendants are entitled to present evidence of alternative causes for Lively's declining reputation.  Her own aggressive litigation tactics, including the filing of a sham lawsuit against make-believe "Doe" defendants just to obtain subpoena power, cannot be ignored as a factor that colors her current reputation and contributes to the diminishment of her fan base.

Finally, the filing of the sham Vanzan lawsuit, an act of outright deceit against the court system, is also directly relevant to Lively's credibility and may be inquired into on cross-examination.  *See* Fed. R. Evid. 608(b).  The Second Circuit has recognized that evidence of other litigation may be appropriate for this purpose.  *See Tomaino v. O'Brien*, 315 F. App'x 359, 360-61 (2d Cir. 2009).  Defendants do not plan to dwell on the Vanzan lawsuit and do not anticipate that it will occupy much trial time.

This case is not like *Rekor Systems, Inc. v. Loughlin*, in which this Court excluded evidence of other litigation completely unrelated to the transactions at issue in the case and

13

492374.1

therefore "irrelevant."  2023 WL 1777248, *4 (S.D.N.Y. Feb. 6, 2023).  Dkt. No. 1326, pp. 9, 12.

Nor is it like *In re: Gen. Motors LLC Ignition Switch Litig.*, in which the court explained that

there was "no evidence of intentional misconduct" but merely "construing the concept of

relevance too narrowly and thus withholding documents and materials that should have been

turned over."  No. 14-MD-2543(JMF), 2015 WL 8130449 at *4 (S.D.N.Y. Dec. 3, 2015); Dkt.

No. 1326, pp. 9, 10, 12. Lively's intentional misconduct is self-evident, closely related to the

events at issue, and relevant both to the substantive issues to be decided by the jury and to

Lively's credibility.

### III.   Opposition To Plaintiff's Motion In Limine No. 3: Ryan Reynolds' Creation Of The "Nicepool" And "Ladypool" Scenes To Publicly Shame Baldoni In "Deadpool & Wolverine" Is Relevant To Wayfarer's Motive For Engaging A Crisis Manager

"Nicepool" was a character created by Lively's husband, Ryan Reynolds, for the highly

successful film *Deadpool & Wolverine*.  The film was released in July 2024 on the cusp of the

media frenzy over the Lively-Baldoni dispute.[5]  "Nicepool" was a thinly disguised caricature of

Baldoni, who is skewered for his niceness and advocacy of women.  Reynolds plays "Nicepool"

(a Deadpool variant with a man bun) and Blake Lively voices "Ladypool."  In one scene,

Nicepool appears before a flower shop – an obvious reference to Lively's character "Lily

Bloom," who is a florist in *It Ends With Us*.  Ladypool shoots Nicepool multiple times in front of

the flower shop and his head is eventually blown off.  In another scene, Reynolds and Lively take

a jab at Baldoni when Nicepool assures Deadpool, "It's okay, I identify as a feminist."  Another

insult to Baldoni occurs when Deadpool yells, in a very out-of-context outburst, "Where in God's

---

[5] The film was released on July 26, 2024. *See* www.marvel.com/movies/deadpool-and-wolverine. Mr. Reynolds starred in the film as Deadpool and is credited as a co-writer of the movie. *Id.*

name is the intimacy coordinator?!"[6]  This is an obvious reference to Lively's allegation that Baldoni had "improvised physical intimacy that had not been rehearsed, choreographed, or discussed" with her, "with no intimacy coordinator involved."  It is impossible to watch the "Nicepool" segment of *Deadpool & Wolverine* and not understand why Baldoni and Wayfarer felt besieged in July 2024 and were compelled to bring in a crisis management team.

Baldoni and Wayfarer's motive for engaging a crisis manager to plan a defensive public relations strategy is directly relevant to defeat Lively's core claim that Defendants were acting in retaliation for her complaints of sexual harassment over a year earlier.  Nevertheless (or perhaps for precisely this reason), Plaintiff seeks to exclude this very public attack on Baldoni and Wayfarer on the grounds that this Court has already found the footage irrelevant and therefore the law of the case doctrine mandates its preclusion.  Plaintiff glosses over both the fact that the Court's findings related to the malice element of a now-dismissed defamation claim against Reynolds, not Lively's claims against the Wayfarer Defendants, and that application of the law of the case doctrine, even if it is applicable, is discretionary.

Lively relies on a footnote in the Court's Order dismissing Wayfarer's defamation claim against Reynolds for failure to plead malice (Dkt. No. 296) and a post dismissal Order granting third party Marvel Entertainment's Motion to Quash a Subpoena seeking confidential business records (Dkt. No. 303).  In the first Order, the Court found that Wayfarer's claim that Reynolds created "Nicepool" to mock Baldoni was a protected opinion and therefore insufficient to establish the malice required for defamation.  Dkt. No. 296, p. 51 ("To the extent the Amended Complaint suggests that Reynold's portrayal of "Nicepool" could be defamatory, *id.*, the portrayal of Baldoni as a fake feminist who makes inappropriate comments is clearly subjective

---

[6] *See* www.distractify/p/nicepool-justin-baldoni-theory

15

492374.1

and unverifiable opinion.")  The order denying discovery from Marvel (*Deadpool & Wolverine*'s production company) also relates to Wayfarer's dismissed defamation claim against Reynolds. Neither order found that evidence relating to 'Nicepool' was irrelevant to Wayfarer's defense to Lively's claims that the engagement of a crisis manager to formulate a defensive public relations strategy not to retaliate for Lively's complaints of harassment over a year earlier.

Nor does the law of the case doctrine advance Lively's cause.  The doctrine is limited to issues actually determined.  *Ouern v. Jordon,* 440 U.S. 332, 347 n. 18 (1979).  "Questions that have not been decided do not become the law of the case merely because they could have been decided."  *New York City Dep't of Fin. v. Twin Rivers, Inc.*, No. 95 CIV. 1389 HB HBP, 1997 WL 299423, at *2 (S.D.N.Y. June 5, 1997) (quoting 18 Charles A. Wright, et al., *Federal Practice & Procedure* § 4478 at 789 (1981)).  As noted, the Court has not decided that "Nicepool" is irrelevant to Lively's retaliation claims, *i.e.*, whether the crisis management plan was in retaliation or a defensive measure to counter Lively's (and Reynolds') very public attacks on Baldoni and Wayfarer.

Furthermore, application of the doctrine is "discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001); *see also Arizona v. California,* 460 U.S. 605, 618 (1983) (law of the case doctrine "does not limit the tribunal's power").  A ruling on the relevance of Nicepool in the context of a third-party subpoena or as evidence of malice in in defamation against Reynolds is a pre-trial evidentiary ruling, which can be revisited.  *United States v. Wade*, 512 F. App'x 11, 14 & n. 1 (2d Cir. 2013) (in the case of evidentiary rulings, the law of the case doctrine is not a "'straitjacket' that cannot be revisited in appropriate instances" (quoting *Cruz v. U.S. Lines Co.*, 386 F.2d 803, 804 (2d Cir. 1967)).  "[E]ven assuming there is some outer limit

16

on a district court's discretion to revisit evidentiary rulings, it is clear that pre-trial evidentiary rulings may be revisited where no prejudice accrues to the party that had previously thought it had secured a favorable ruling from the district court." *Id*. (citing cases).

IV.    **Defendants' Opposition To Plaintiff's Motion In Limine No. 4: Evidence About Lively's And Ryan Reynolds' Net Worth And Financial Status Is Relevant To Lively's Powerbroker Theory**

Plaintiff seeks to exclude evidence of Lively and her husband's net worth and financial status. At first blush, Plaintiff's net worth would seem irrelevant. Here, however, Lively's own expert, Michael Robbins, has opined in his report and deposition testimony about power imbalances in the film industry which allow one party to exert substantial leverage over the less powerful party. Declaration of Ellyn S. Garofalo Ex. 1 (Robbins Rpt.), p. 21; Ex. 2 (Robbins Dep.), at 234:17-235:1  Initially, Robbins provided this opinion as to Steve Sarowitz, Wayfarer's financier, arguing that his wealth was relevant to show the balance of power between Lively and Wayfarer/Baldoni. Garofalo Decl. Ex. 2 (Robbins Dep.) at 235:2-11. When asked about how Ryan Reynolds' wealth and status as a power broker affected the Wayfarer-Lively relationship, he either could not or would not answer. *Id*. at 235:21-236:18. In any event, Lively's own expert has opined that in connection with the entertainment industry, a party's wealth manifests in his or her level of power, and is relevant to explain the dynamics between the plaintiff and defendant. Lively, through her husband's status as an A-list star and director, coupled with his vast resources, tends to show why Sony, WME, which at Reynolds' urging dropped Baldoni and Wayfarer as clients, and even Defendants were lined up behind Lively and were loath to stand up to even Lively's most outrageous demands. It also tends to negate any argument by Lively that the wealth of Wayfarer's financier, Steve Sarowitz, somehow created a power imbalance between Wayfarer and Lively. Simply put, Plaintiff put her and Reynolds' net worth at issue. If Robbins testifies on the power imbalance, the Reynolds family's net worth becomes relevant.

17

Further, apart from net worth, evidence of Lively's finances is directly relevant to her claim for hundreds of millions of dollars in damages allegedly caused by the purported 'smear campaign' including lost employment opportunities and profits.  Evidence of Lively's income from these sources before the alleged smear campaign is critical to determine whether she in fact suffered losses in the form of diminished income and revenue.  Also, Lively typically does not accept acting opportunities which conflict with Reynolds' acting schedule – particularly when he is able to garner a higher income for his movies than she can; their income is therefore relevant. Surely Lively understands the importance of this evidence not only to the defense but to her own ability to prove her alleged damages.

Finally, Plaintiff will inevitably point to Wayfarer's motion in limine to exclude evidence of Steve Sarowitz's wealth and net worth.  However, Sarowitz is in a very different position.  In contrast to Lively, Sarowitz is no longer a party and his net worth is not relevant to a determination of punitive damages or any other issue relevant to Lively's claims.

## V.     Opposition To Plaintiff's Motion In Limine No. 5: Defendants Should Be Permitted To Use Internal Sony Communications To Rebut Lively's Trial Arguments

The Court should deny Lively's blanket motion to preclude Defendants from offering internal Sony communications.  Lively primarily objects on hearsay grounds, but Defendants will offer these communications for the non-hearsay purpose of rebutting Lively's claim that her allegedly good reputation within the movie industry was tarnished by Defendants' alleged retaliation following the premiere of the film.  In other words, Defendants will offer these communications not for their truth but to show that Sony executives expressed strong negative views about her.  Defendants will also offer these communications to rebut Lively's argument that it was not her threats and use of leverage but her strong relationship with Sony that led Sony

18

492374.1

to agree to her demands—a crucial question at a trial in which the jury will have to determine whether Defendants' actions were illegal retaliation or reasonable defensive measures.

Lively plans to ask the jury for tens of millions of dollars in damages based on her allegation that Defendants' actions following the premiere of the film tarnished her previously 'sterling' reputation. But the evidence will show that Lively's reputation at Sony Pictures, one of the Big Five studios, was already in the ditch as the direct result of her appalling behavior during the making of the film. This included her insistence on taking control of the movie, her insistence on excluding Baldoni from the premiere, and her refusal to promote the movie unless her demands were met.

The negative views of Lively expressed by top-level Sony executives are highly probative on this point. Sanford Panitch is the President of Sony Motion Picture Group. In a March 11, 2024 message exchange with Ange Giannetti, a Sony Production executive, Panitch expressed dismay that Lively was doing her own cut of the movie, asked how Sony could "control her creative control," and then described Lively as "a terroridt [sic]." Dkt. No. 1327 (Hudson Decl. Ex. 10). Giannetti, another senior executive, responded: "Respectfully, there is NO process that works for her. There isn't. What is important is that WE have a baseline so we know. You can tell her everything, include her in everything and still it does not hold." *Id.* Then, on June 19, 2024, Panitch expressed shock that Wayfarer had given in to Lively's demands: "I can't believe they caved on the producer credit for her … This is truly insanity." Dkt. No. 1327 (Hudson Decl. Ex. 12). And when Giannetti told Panitch that Lively was now demanding that Wayfarer remove "a film by Justin Baldoni" from the credits, Panitch shot back: "I don't want us to ask them [to] do that for her[,] she can ask herself[,] we've bent over backwards enough. This is getting to the point of absurdity." *Id.*

19

492374.1

These communications suggest that these key executives—the people with the power to approve or kill a movie idea and veto casting—might hesitate to work with Lively again in the future. They suggest, in short, that Lively had a bad reputation, at least among the people who mattered at Sony. And all of this was months before Defendants supposedly set out to destroy Lively's career in retaliation for her claims of harassment. Given the consolidation of the movie industry, Sony is a hugely important data point, to say nothing of the fact that Josh Greenstein, at the time co-president of Sony Pictures and aware of situation with Lively, is now co-chair of Paramount Pictures.

Moreover, these communications are not being offered for the truth and therefore are not hearsay. *See United States v. Ray*, No. 20-CR-110 (LJL), 2022 WL 813942, at **3-4 (S.D.N.Y. Mar. 16, 2022) (out-of-court statements admissible "not for the truth"); *United States v. Gillier*, No. 23-6280-CR, 2024 WL 4344732, at *2 (2d Cir. Sept. 30, 2024) (same). For example, they would not be used to show that Lively was in fact "a terroridt [sic]," as Panitch described her, or to show that there was "NO process that works for her," as Giannetti complained. Rather, they would be admitted to show that people who mattered at Sony vehemently expressed these negative views of her long before the film premiere, and would be used to undermine the conclusion offered by Lively's experts that Lively's reputation was good in the industry before Defendants allegedly destroyed it.

Messages showing the frustration and dismay that Sony executives felt as Lively pushed to take control of the movie are also admissible under Rule 803(3) to rebut Lively's anticipated argument that she had a strong relationship with Sony, that in assuming various roles and greater control she was simply following Sony's wishes, and that Sony gladly acceded to her requests. Defendants will counter this argument by offering Sony's contemporaneous internal

20

communications to show that Sony executives were giving in to Lively's threat, most notably, her threat not to promote the film if her demands were not met. This context is relevant to show that Defendants took reasonable defensive actions against Lively's scorched earth power grab and were not retaliating against her because of her fully resolved complaints of sexual harassment from over a year earlier.

At a minimum, the admissibility of the internal Sony communications should not be resolved on a blanket basis but should be reserved until specific exhibits are offered at trial. As this Court has explained, "[t]he trial court should exclude evidence on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." *Williams v. City of New York*, No. 19-CV-3347 (LJL), 2023 WL 2911023, at *1 (S.D.N.Y. Apr. 12, 2023). Resolution of Lively's motion will require consideration of the evidence and arguments offered by Lively at trial and the particular exhibits or portions of exhibits offered by Defendants. The Court should therefore "reserve judgment on the motion until trial when admission of particular pieces of evidence is in an appropriate factual context." *Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996); *see also United States v. Ilori*, No. 21-CR-00746 (MKV), 2022 WL 2452258, at *2 (S.D.N.Y. July 5, 2022) (declining to make "blanket rulings [on hearsay issue] in advance of hearing the proffered evidence and any objection [and] knowing the context in which the statement is offered").[7]

---

[7] Lively separately argues that certain message chains recovered from Josh Greenstein's phone should be excluded because they do not contain both sides of the conversation. Dkt. No. 1326, pp. 17-18. However, the fact that these message chains are incomplete does not, without more, make them misleading or unintelligible. If Lively has specific concerns about specific exhibits they can be raised during trial.

**VI.    Opposition To Plaintiff's Motion In Limine No. 6: Defendants Should Be Permitted To Respond To Lively's Argument That The Defense In This Litigation Constitutes Retaliation By Offering Testimony Concerning The Impact This Litigation Has Had On Them**

Lively has taken the position throughout these proceedings that Defendants' actions in this litigation are a continuation of Defendants' retaliation against her for complaining about sexual harassment.  As noted, Defendants have moved to exclude this evidence.  Dkt. No. 1310, pp. 21-24.  However, if the Court permits Lively to argue to the jury that Defendants' litigation of this case constitutes retaliation, then Defendants must be permitted to put their actions in context by offering limited testimony concerning the effect that Lively's prosecution of this litigation has had on them.  Basic fairness demands no less.  For example, if Lively is permitted to argue that the claims Defendants filed against her were retaliation for Lively's complaints of sexual harassment, then Defendants must be permitted to explain that the accusations Lively levelled against them in this lawsuit affected them personally and professionally and called for a proportionate response.

Contrary to Lively's suggestion, Defendants do not plan to offer testimony concerning specific incidents, such as encounters with process servers during the January 2024 wildfires, or concerning threats received as a result of this litigation.  *See* Dkt. No. 1326, pp. 19-20.  Nor would Defendants offer evidence concerning the "consequences which may befall" them in the event of an adverse judgment.  *See id.* at 19.  Rather, if Lively is permitted to open the door to this subject, Defendants will offer brief, general testimony concerning the impact of this litigation and the reasons they felt compelled to put on a robust defense.

22

492374.1

**VII.    Opposition To Plaintiff's Motion In Limine No. 7: Defendants Should Be Allowed To Introduce Lively's Own Statements For Impeachment Purposes And To Show The Common Practice Of Using Public Relations Statements By The Parties And Their Counsel To Shape Public Opinion**

Lively seeks to exclude her public statements and those of her counsel relating to the case released in response to the Court's ruling on Defendants' dispositive motions.  In the first instance, these public statements by Lively's counsel Michael Gottlieb and Sigrid McCawley, a lawyer apparently engaged to handle public relations, are crafted to sway public opinion in Lively's favor and may have the effect of tainting the jury pool.  The opening sentence in Mr. Gottlieb's "Official Statement" is a gratuitous swipe at Wayfarer's counsel:

> It is completely unsurprising that Bryan Freedman does not understand the court's actual ruling.  He didn't even argue the summary judgment motion he's now spinning, had to bring in another law firm for the trial, and just last week was reprimanded by the court for having filed legally frivolous claims.

Hudson Decl. Ex. 25.  Gottlieb further states that "The fact that Bryan Freedman is claiming exoneration based on legal technicalities while facing trial next month tells you everything you need to know." *Id*.  This personal attack on counsel is equal to or worse than anything for which Lively has filed serial sanctions motions.

Lively reposted Gottlieb's statement on her own Instagram.  A "community note" on Instagram attempts to correct the misstatements in Lively's releases by advising Instagram users that Gottlieb's statement:

> [C]ontains cherry-picked information from the federal judge's ruling, which actually threw out 10/13 of Blake's claims, the core one being sexual harassment.
>
> The judge found that many of her claims of sexual harassment also did not rise to that level, and that the behavior in question was part of normal improvisation expected for that kind of scene.
>
> This post also ignores the fact that Blake had in fact kissed Justin Baldoni without his consent.

492374.1

Hudson Decl. Ex. 27.

In any event, the press releases of Lively and her surrogates are relevant in that they demonstrate the common practice of using public relations statements by parties and their counsel to shape public opinion – the very conduct that is the predicate for Lively's retaliation claims. The aftermath of the statements also demonstrates how such material spreads on the internet organically, with no interference or manipulation. *See, e.g.*, Garofalo Decl. Exs. 3-5.

Most importantly the statements provide material to examine and impeach Lively at trial. For instance, Lively both directly and through her counsel, makes statements about the facts of the case and her subjective beliefs. To the extent Lively provides inconsistent testimony at trial, her public statements are properly used for impeachment. Gottlieb's press release also downplays Lively's now dismissed claims by stating that "The retaliation Ms. Lively faced for privately speaking up for a safe working environment has always been the beating heart of her case. It is why she filed her lawsuit." Hudson Decl. Ex. 25. Defendants should be allowed to examine Lively on the notion that the sexual harassment claims she has most avidly pursued and publicized were not really so important after all.

Lively's statements provide more legitimate fodder for examination. Lively asserts that physical pain and "abuse" from "digital violence" is a threat to women and children. Hudson Decl. Ex. 24. The statement includes vague and unsupported statistics such as purported "studies" that estimate "that between 16% and 58% of women have experienced online abuse of stalking, with 97% of gender-based violence service providers reported technology-facilitated abuse in their cases." *Id.* Lively avers that these issues (which have not been previously raised by Lively or her experts) will be the "heart" of the case she intends to bring at trial. *Id.* Taking

24

492374.1

Lively at her word, Defendants have every right to examine or at the very least impeach Lively with her statements and those of her surrogates.

**VIII.    Opposition To Plaintiff's Motion In Limine No. 8: Defendants Should Be Permitted To Present The Testimony Of Non-Party Kjersti Flaa To Respond To Plaintiff's Expert And Trial Argument That Defendants Were Responsible For Boosting The Insensitive "Little Bump" Interview With Lively**

Defendants' witness list includes entertainment reporter Kjersti Flaa who will testify about "her interview of Lively and Flaa's re-publication of that interview in 2024." Dkt. No. 1324 (JPTO draft, section IX). The 2016 interview went viral as a result of Lively's derogatory "little bump" comment to Flaa. Lively was visibly pregnant at the time of the interview. When Flaa noted Lively's "little bump," Lively flashed back with a nasty comment on Flaa's "little bump." Flaa, however, was not pregnant, was highly offended and made her extreme displeasure known in her posts. The remark, coupled with Lively's huffy demeanor, provoked substantial public criticism of Lively's mean girl attitude and insensitive, tone-deaf response on Flaa's comment.

Lively has cited the August 2024 resurgence of the Flaa 'little bump' interview as evidence of Defendants' alleged efforts to seed the internet with negative stories, implying that Defendants and their counsel were behind the republication and/or amplification. Lively's own "online manipulation" expert, Aron Culotta, mentions the "little bump" video interview 43 times in his expert report. Garofalo Decl. Ex. 6 (Culotta Rpt.). He mentions Flaa by name 10 times. *Id.* at ¶¶ 45, 86, 90. Culotta's entire "YouTube opinion" is based solely on the Little Bump video. *Id.* at 4, 52, ¶¶ 88-95 (opining that "indicia of a campaign to manipulate online discussion of Lively in August 2024 are apparent" based on increased use of the word "bully" in comments to Flaa's "little bump" video on YouTube). In addition, Lively's Second Amended Complaint cites articles regarding the "little bump" video to support her allegation that "Nearly decade-old

interviews of Ms. Lively were surfaced, commenting on her tone, posture, diction, and language," implying that Defendants were somehow responsible.  Dkt. 521, ¶ 329, p. 116 & n. 84.

Nevertheless, Lively seeks to exclude Flaa's testimony and evidence relating to the "little bump" interview.  Lively first argues that the testimony "lacks any tendency to make a material fact more or less probable and is inconsequential to Ms. Lively's claims."  Dkt. 1326, p. 23. Quite the contrary.  The "little bump" incident is relevant to Lively's reputation before it was allegedly damaged by the Wayfarer Defendants.  *See Guccione,* 800 F.2d at 303; N.Y. Pattern Jury Instr. – Civil 3:29 (2023).  Flaa will provide the jury with a full explanation of the incident, Lively's demeanor and Flaa's public response.  Flaa's testimony also tends to defeat Lively's claims that Defendants or their agents seeded the negative content that appeared on the internet beginning in August 2024.  Flaa will testify that Defendants were not in any way involved in her decision to republish the "little bump" interview in or about August 2024 and, in fact, that she never had contact with the Wayfarer Defendants, their counsel or their representatives.  She will explain that after seeing stories about the rift between Lively and Baldoni that surfaced in the July-August 2024 timeframe, she made the spontaneous decision to contribute her own negative experience with Lively to the conversation and that the story went viral organically not because of any influence exerted by the Wayfarer Defendants or their representatives.

Flaa's testimony provides evidence that is highly relevant to two aspects of Wayfarer's defense in that it will show Lively's preexisting reputation, that her mean girl, tone deaf reputation was attributable to Lively's own high handed conduct and that Wayfarer and its representatives were not involved in spreading or encouraging the "little bump" story that contributed to negative reputation.

## IX.    Conclusion

For the foregoing reasons, Defendants respectfully request the Court deny each of Plaintiff's motions in limine in their entirety.

Respectfully submitted,

Dated: April 17, 2026
       Los Angeles, CA

**LINER FREEDMAN TAITELMAN
+ COOLEY**

By:_____*/s/ Ellyn S. Garofalo*_____
Bryan J. Freedman
Ellyn S. Garofalo
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Tel: (310) 201-0005
Email: bfreedman@lftcllp.com
      egarofalo@lftcllp.com

SHAPIRO ARATO BACH LLP
Alexandra A. E. Shapiro
Jonathan Bach
Alice Buttrick
1140 Avenue of the Americas, 17th Floor
New York, NY 10036
Tel: (212) 257-4881
Email: ashapiro@shapiroarato.com
      jbach@shapiroarato.com
      abuttrick@shapiroarato.com

MEISTER SEELIG & SCHUSTER PLLC
Mitchell Schuster
Kevin Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
Email: ms@mss-pllc.com
      kaf@mss-pllc.com

AHOURAIAN LAW
Mitra Ahouraian (admitted *pro hac vice*)
2029 Century Park East, 4th Floor
Los Angeles, CA 90076
Tel: (310) 376-7878
Email: mitra@ahouraianlaw.com

492374.1