## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BLAKE LIVELY,<br><br>      Plaintiff,<br><br>v.<br><br>WAYFARER STUDIOS LLC, et al.,<br><br>      Defendants. | No. 24-cv-10049 (LJL) |

### <u>PLAINTIFF BLAKE LIVELY'S MEMORANDUM OF LAW IN OPPOSITION TO THE AGENCY GROUP PR LLC'S RENEWED MOTION FOR SUMMARY JUDGMENT</u>

Esra A. Hudson (admitted *pro hac vice*)
Naeun Rim (admitted *pro hac vice*)
Stephanie A. Roeser (admitted *pro hac vice*)
Sarah E. Moses (admitted *pro hac vice*)
Sareen K. Armani
Katelyn A. Climaco
Manatt, Phelps & Phillips LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
(310) 312-4000
ehudson@manatt.com
nrim@manatt.com
sroeser@manatt.com
smoses@manatt.com
sarmani@manatt.com
kclimaco@manatt.com

Matthew F. Bruno
Manatt, Phelps & Phillips LLP
7 Times Square
New York, NY 10036
mbruno@manatt.com

Meryl C. Governski (admitted *pro hac vice*)
Dunn Isaacson Rhee LLP
401 9th Street NW
Washington, DC 20004
(202) 240-2927
mgovernski@dirllp.com

Michael J. Gottlieb
Koren Bell
Willkie Farr & Gallagher LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 855-3000
mgottlieb@willkie.com
kbell@willkie.com

Kristin E. Bender
Willkie Farr & Gallagher LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1000
kbender@willkie.com

Michael S. Schachter
Aaron E. Nathan
Michaela A. Connolly
Melissa Taustine
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000
mschachter@willkie.com
anathan@willkie.com
mconnolly@willkie.com
mtaustine@willkie.com

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

BACKGROUND ................................................................................................................2

ARGUMENT......................................................................................................................8

    I.      TAG's Motion Erroneously Applies a Direct-Liability Test to Lively's Aiding-and-Abetting Claim. ................................................................................8

    II.    Even if They Applied, Raines' Limits on Direct or Agency-Based FEHA Liability Would Not Bar Lively's Section 12940(i) Claim Against TAG...................14

    III.   TAG Does Not Dispute the Elements of Aiding-and-Abetting. ..................................17

CONCLUSION..................................................................................................................18

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Alch v. Superior Court*,
   122 Cal. App. 4th 339 (Cal. Ct. App. 2004) ........................................................................9, 11

*Caldwei v. Montoya III*,
   1994 WL 17131358 (Cal. Ct. App. Sept. 28, 1994) ................................................................12

*DiBella v. Hopkins*,
   403 F.3d 102 (2d Cir. 2005)..............................................................................................16, 17

*Fiol v. Doellstedt*,
   50 Cal. App. 4th 1318 (Cal. Ct. App. 1996) ..........................................................................10

*Goodson v. County of Plumas*,
   2023 WL 4678990 (E.D. Cal. July 21, 2023) .........................................................................11

*Harper v. DISA Global Solutions, Inc.*,
   2025 WL 643630 (C.D. Cal. Jan. 28, 2025) .....................................................................11, 12

*Hooters of America, LLC v. Superior Court of Riverside County*,
   2024 WL 2793404 (Cal. Ct. App. 2024) ...............................................................................11

*Jones v. Lodge at Torrey Pines Partnership*,
   42 Cal. 4th 1158 (Cal. 2008)................................................................................................12

*Logan v. ADP, Inc.*,
   2025 WL 1144051 (Cal. Ct. App. Apr. 18, 2025) .................................................................11

*Malekzadeh v. Costco Wholesale Corp.*,
   2023 WL 4311262 (N.D. Cal. Apr. 10, 2023) ..................................................................11, 18

*Mobley v. Workday, Inc.*,
   740 F.Supp.3d 796 (N.D. Cal. 2024) ...............................................................................11, 15

*Radentz v. American Assn. of Physician Spec., Inc.*,
   2014 WL 12601013 (C.D. Cal. Aug. 18, 2014)......................................................................13

*Raines v. U.S. Healthworks Medical Group*,
   15 Cal. 5th 268 (Cal. 2023)........................................................................................12, 14, 15

*Reno v. Baird*,
   18 Cal. 4th 640 (Cal. 1998)............................................................................................12, 13

*Smith v. BP Lubricants USA Inc.*,
   64 Cal. App. 5th 138 (Cal. Ct. App. 2021) ......................................................................10, 15

ii

**Statutes**

Cal. Gov't Code § 12940(i) ..............................................................................9, 14

**Other Authorities**

Alison Boschoff, *How Blake Lively's Fairytale Turned Into a PR Nightmare*, Daily Mail (Aug. 20, 2024), https://www.dailymail.co.uk/femail/article-13761985/How-Blake-Livelys-fairytaleturned-PR-nightmare-Amid-growing-backlash-ALISON-BOSHOFF-reveals-wentwrong-Hollywoods-golden-girl.html...........................................................................................................7

Lillian Gissen, *How Blake Lively COPIED Best Friend Taylor Swift to Promote It Ends With Us*, Daily Mail (Aug. 17, 2024), https://www.dailymail.co.uk/tvshowbiz/article-13750525/blake-lively-taylor-swiftcopied-friendship-justin-baldoni-drama.html ....................................................7

Rebecca Rubin, Tatiana Siegel, *"It Ends With Us" Sequel in Doubt Amid Blake Lively-Justin Baldoni Feud: "There's Probably No World Where They Work Together Again,"* Variety (Aug. 27, 2024), https://variety.com/2024/film/news/it-endswith-us-sequel-in-doubt-blake-lively-justin-baldoni-feud-1236114099. .......................................................................................8

Plaintiff Blake Lively respectfully submits this opposition to The Agency Group PR LLC's ("TAG") renewed motion for summary judgment (Dkt. No. 1285, "TAG MSJ").

### INTRODUCTION

Under the best reading of California law, a business-entity agent like TAG clearly may be held liable for aiding and abetting FEHA retaliation. TAG's contrary arguments rely on two concepts that are inapplicable here: (1) limitations on the *direct* liability of business-entity agents for discrimination or retaliation as articulated by the California Supreme Court's decision in *Raines*; and (2) limitations on *individual* liability under the California Supreme Court's decisions in *Reno* and *Jones.* But *Raines* is irrelevant because Lively has not brought a direct liability claim against TAG. And to the extent *Reno* and *Jones* limit *aiding-and-abetting* liability, that is because those cases involve supervisory employees of a defendant employer. *Reno* (and *Jones*, following *Reno*) also hold that such employees cannot be held liable for aiding and abetting their employer on a theory similar to the intracorporate conspiracy doctrine, namely that the employer cannot logically aid and abet itself. But that logic does *not* extend to *agents* of a defendant employer, like TAG—the doctrine is limited instead to *employees*. And it *certainly* does not extend to an employer's business-entity agents, like TAG, because agents, unlike individual employees, *can* be held directly liable for FEHA discrimination and retaliation.

TAG does not meaningfully dispute that legal framework. Instead, TAG's renewed motion rests on a single proposition: that a business-entity agent can be *directly* liable for FEHA *discrimination* (and by extension, retaliation) "only when it carries out FEHA-regulated activities," and, according to TAG, such activities are limited to "the traditional activities performed by an employer in an employment relationship." TAG MSJ at 6 (internal quotation marks omitted). TAG then assumes that a business-entity agent can only be liable for *aiding and abetting retaliation* where it could also have been directly liable for retaliation under that standard, a misapplication

1

of *Raines* that finds no support in the logic of *Reno*. Indeed, there would be little need for an aiding and abetting provision if the only entities it covered were also, by definition, directly liable. But even if TAG were correct that *Raines*'s limitation applies to the aiding-and-abetting context, TAG would still be liable. As this Court has already held, the conduct in which TAG participated *was* "FEHA-regulated" because targeting Lively's professional reputation constitutes an actionable adverse employment action. "FEHA covers not only employment actions that are reasonably likely to adversely and materially affect an employee's job performance but also the employee's opportunity for advancement in his or her career." Dkt. No. 1273 ("MSJ Opinion") at 129 (internal quotation marks omitted). And as this Court has already found, Lively has put forward evidence from which a jury could conclude that TAG carried out such actions on Wayfarer's behalf. *Id.* at 131–34. Thus, TAG's sole argument—that it cannot be liable because it did not perform any "FEHA-regulated activities"—is wrong on the facts and the law.

Meanwhile, it is undisputed that TAG (which had more than five employees throughout the relevant period) meets the necessary definition of "employer." Nor does TAG dispute that sufficient evidence exists for a jury to conclude that it knowingly and substantially assisted the conduct that Lively challenges as actionable retaliation—and even if TAG *had* disputed that in its renewed motion, the record contains more than enough such evidence. TAG's renewed motion for summary judgment should be denied.

## **BACKGROUND**

The summary judgment record is detailed extensively in Lively's opposition to the motion for summary judgment (Dkt. No. 1064) and in the Court's MSJ Opinion. Lively summarizes an illustrative selection of relevant facts here, none of which appear to be challenged for purposes of this motion.

2

TAG is a limited liability company that, during the period relevant here, has always had more than five employees. Gottlieb Decl., Ex. 57 at 31:3–12. Wayfarer retained and onboarded TAG against the backdrop of Lively's protected complaints. By the time TAG entered the picture in July 2024, Wayfarer had already received complaints from Lively over a year earlier in May 2023, received the Protections for Return to Production letter in November 2023, and participated in the January 4, 2024 all-hands meeting at which Lively identified conduct she regarded as sexually inappropriate and retaliatory. R. 56.1 ¶¶ 122, 208, 582, 586. Among other things, TAG knew about the anti-retaliation provision in the Protections Letter, and that it expressly prohibited retaliation of "any kind" for Lively raising concerns, and expressly defined retaliation to include any "[a]ny . . . negative behavior . . . during publicity and promotional work." Gottlieb Decl., Ex. 197 at 2. After Lively informed Sony in July 2024 that she would not appear in press with Baldoni (another protected form of opposition to Baldoni's conduct), Tera Hanks, the President of Wayfarer, asked Wayfarer's publicist, Stephanie Jones, for recommendations for a crisis communications team. R. 56.1 ¶¶ 668, 673. Jennifer Abel also asked Jamey Heath to share with her "the legal letter that was sent by [Lively] and her team—per our conversation, we will go through point by point and draft context surrounding each situation. We can then flag what we are missing that would be helpful to arm us in the case we need to refute any of the claims." *Id.* ¶ 671.

The record also shows that TAG was expressly briefed on the substance of Lively's allegations at the outset of the engagement. On July 25, 2024, Nathan and TAG Vice President Katherine Case met with Heath and Hanks for an introductory call, during which Wayfarer provided details regarding the Protections Letter and the incidents to which it alluded. R. 56.1 ¶¶ 677–78. TAG's own contemporaneous notes reflect that Wayfarer wanted a strategic response, confirming that the engagement was framed around taking action related to Lively's complaints

3

contained in part in her "legal letter." Shapiro Decl., Ex. 164 at 1. After the call, Wayfarer engaged TAG. R. 56.1 ¶ 680.

Days after its initial meeting with Wayfarer, TAG discussed drafting a "scenario document" that would develop a strategy to "desensationalize" Lively's story by "tee[ing] up a friendly to run the day of or right after the premiere, someone who is covering the overall film" of Baldoni "say[ing] something along the lines of 'me and Blake had our differences but I still respect her' so we at least set the stage and can then *give the rest on background to reporters*[.] So when the hit piece runs it's not as big of a shock." R. 56.1 ¶ 684 (emphasis added). TAG circulated its scenario planning document to Wayfarer the next day. *Id.* ¶ 685 (hereinafter "Scenario Planning Document"). That Scenario Planning Document emphasized Lively's "less than favorable reputation in the industry" and proposed "planting stories about the weaponization of feminism" to portray Lively and her circle as bullies. *Id.* ¶¶ 687–88. Around the same time, Nathan and other TAG employees began speaking regularly on background with reporters, including TAG's "friendlies" at the Daily Mail, TMZ, and New York Post, while leaving no written trail of what they were telling these reporters as "sources" familiar with the matter. On August 4, 2024, Abel texted Nathan that she was "having reckless thoughts of wanting to plant pieces this week of how horrible Blake is to work with." *Id.* ¶ 694. Nathan responded "same," and shared that she had "already off the records Spoke to the editor [of the] Daily Mail because she's my friend" and that "[s]he's ready when we are." *Id.* On August 7, 2024, Breanna Koslow texted the "JB PR (W/O JB)" group that "[w]e are starting to hear things from our friendlies . . . daily mail, TMZ, NYP. So need to shift messaging . . . And potentially getting ahead of this / Belloni item." Gottlieb Decl., Ex. 278 at 8. On August 9, 2024, Nathan successfully convinced the New York Post's Page Six

4

reporter—who is also Nathan's sister—to "reduce[] down" language referring to Baldoni as a "Sexual predator" to "chauvinistic" and "borderline abusive." *Id.* ¶¶ 737–38.

The record shows that TAG knew and understood its work for Wayfarer was in furtherance of unlawful conduct, further evidenced by the fact that it took pains to execute its plans in a way that would be "untraceable," "without fingerprints" and that could not be written down because of the consequences if its conduct was discovered. For example, after Wayfarer received the Scenario Planning Document from TAG, Baldoni texted Abel that he was "[n]ot in love with [it]," adding, "Not sure I'm feeling the protection I felt on the call." Gottlieb Decl., Exs. 46, 195 at 1. Abel immediately shared this with Nathan, stating, "I'm going to confidentially send you something he's texting me and Jamey on the side just to arm you before this call. I think you guys need to be tough and show the strength of what you guys can do in these scenarios. He wants to feel like she can be buried…" Gottlieb Decl., Ex. 47 at 1. Nathan responded: "Of course- but you know when we send over documents we can't send over the work we will or could do because that could get us in a lot of trouble." *Id.* She added: "We can't write it down to him[.] We can't write we will destroy her." *Id.* at 2. To which Abel replied, "Of course not. But I told him that's the point of talking through." *Id.* Nathan then observed, "He has to look at it as an information document for us to be armed with. That's all. Imagine if a document saying all the things that he wants ends up in the wrong hands. . . . you know we can bury anyone[.] But I can't write that to him[.] I will, I'll be very tough." *Id.* at 3. Nathan also sent an agenda to Abel for an upcoming call with Baldoni, which included "[d]iscuss[ing] a more aggressive way to get ahead of this[.]" *Id.* at 7. Nathan additionally emphasized to Abel and Heath that "[a]ll of this will be most importantly untraceable." Gottlieb Decl., Ex. 66 at 2.

TAG also operationalized the digital campaign strategy. Baldoni's talent agent wrote in a message that "Justin's crisis team [was] ready for a war with [Lively]" and that they had "all kinds of garbage on her." Gottlieb Decl., Ex. 198 at 1. TAG also connected Wayfarer with a digital-mitigation firm led by Jed Wallace/Street Relations, describing the firm as capable of narrative seeding, algorithmic influence, content suppression, and online engagement undertaken "without fingerprints." R. 56.1 ¶¶ 709–10, 715; Gottlieb Decl., Ex. 207. TAG engaged directly with social media influencers and content generators to disseminate its messaging. R. 56.1 ¶ 780; Gottlieb Decl., Exs. 287 at 11–12, 288 at 11–12, 289. For example, Nathan messaged Perez Hilton that he was "in [her] circle of BF trust" and that she would be "HAPPY for [him] to say this," followed by explicit language—"You can say …"—to which Hilton responded, "Will get on these later!" Gottlieb Decl., Ex. 290 at 2–4.

TAG also planted negative stories in the media about Lively and Reynolds. In fact, on August 13, 2024, Koslow texted Case bullet points for a Daily Mail "think piece on the whole PR debacle behind the scenes," including talking points such as "a film with serious subject matter . . . being promoted with focus on flowers/clothes"; "[w]hy would Blake allow this to happen? How could she? What is she thinking right now regarding her team?"; and "did Blake's inability to relate to regular people / what they want to see, just slight her big moment?" R. 56.1 ¶ 751. Case approved and added that they should "bring in the fact that she promoted a haircare line and her own drink brand as part of promo." Id. ¶ 752. Later that day, Koslow texted Nathan about this "think piece" and noted that it would be framed such that "it's not so obviously placed," to which Nathan responded, "Yes" "Let's go." Id. The resulting Daily Mail article, published August 20, reported that although "[t]his should be the crowning moment of Blake Lively's career . . . Lively

6

has come under fire for aggressively marketing her personal projects – not just her haircare, but her drinks company – seemingly on the back of a film dealing with domestic violence."[1]

Moreover, on August 15, 2024, Nathan told Abel that the Daily Mail was "hounding [her] re HR complaints," so she deflected by telling them to instead "look into how [Lively] is emulating her best friend [T]aylor with the charm bracelets and shit" because "[i]t was the only thing [she] could give of[f] the top of [her] head that looked organic and wouldn't seem like we placed about the film." R. 56.1 ¶ 755. Case then emailed the Daily Mail reporter with "helpful" links comparing Lively to Taylor Swift. *Id.* ¶ 756. The resulting Daily Mail article, published August 17, quoted "a source" who "told DailyMail.com exclusively" that "Blake has been relying on Taylor to get her through this storm . . . by using their friendship for interviews and other promotional work directly related to the film" and that Lively laughed at the concept of making herself available to domestic violence survivors, "show[ing] how out of touch she is."[2] Given Nathan and Case's communications with the Daily Mail reporter, this anonymous "source" is virtually certain to be Nathan or Case.

On August 15, 2024, Koslow spoke to Tatiana Siegel from Variety about an article focusing on the union violations that Reynolds allegedly committed by working on the script during the WGA strike and replacement editors being brought in to re-cut the film. R. 56.1 ¶ 758. Koslow emphasized that the placement would be "hands off" and not "some bigger takedown . . . which could backfire." *Id.* On August 27, Variety published the article, reporting that "Reynolds' involvement [in It Ends With Us] raises . . . WGA issue[s]" and that "[s]ources say" Reynolds

---

[1] Alison Boschoff, *How Blake Lively's Fairytale Turned Into a PR Nightmare*, Daily Mail (Aug. 20, 2024), https://www.dailymail.co.uk/femail/article-13761985/How-Blake-Livelys-fairytaleturned-PR-nightmare-Amid-growing-backlash-ALISON-BOSHOFF-reveals-wentwrong-Hollywoods-golden-girl.html.

[2] Lillian Gissen, *How Blake Lively COPIED Best Friend Taylor Swift to Promote It Ends With Us*, Daily Mail (Aug. 17, 2024), https://www.dailymail.co.uk/tvshowbiz/article-13750525/blake-lively-taylor-swiftcopied-friendship-justin-baldoni-drama.html.

writing the rooftop scene "came as news to Baldoni, who thought the scene had been ad libbed by Lively."[3] These "sources" are most likely Koslow and other TAG team members, considering that Koslow "had a convo with Tatiana," who was "interested doing a piece on the fact that people are overlooking the violation that occurred." Gottlieb Decl., Ex. 231 at 2. These stories—each conceived, sourced, and green-lit by TAG employees—illustrate that TAG actively executed a media campaign targeting Lively's reputation.

And as this Court noted, TAG's efforts were fruitful. Expert evidence indicates that the retaliation campaign TAG orchestrated generated a "conservative" estimate of over 176 million online "impressions" branding Lively a "bully," "mean girl," and "tone deaf." Gottlieb Decl., Ex. 271 ¶¶ 67–69. Polling indicates a 30% increase in negative attitudes toward Lively from June to September 2024. *Id.* ¶ 108. Professor Humphreys found that "the retaliation campaign promoted specific, identifiable frames associated with Ms. Lively, and these became widely circulated during and after the period of the campaign," becoming "the lens through which the general public integrated new information" and resulting in "a lasting negative impact on Ms. Lively's reputation." *Id.* ¶ 119. Dr. Mayzlin similarly observed "a marked shift in the volume, the content, and the sentiment of online conversations about Ms. Lively, consistent with the onset [of] the Defendants' orchestrated campaign." Gottlieb Decl., Ex. 267 ¶ 12.

## ARGUMENT

### I.    TAG's Motion Erroneously Applies a Direct-Liability Test to Lively's Aiding-and-Abetting Claim.

TAG's renewed motion for summary judgment attacks a theory of liability Lively does not assert. Lively brings a single claim against TAG under the California Fair Employment and

---

[3] Rebecca Rubin, Tatiana Siegel, *"It Ends With Us" Sequel in Doubt Amid Blake Lively-Justin Baldoni Feud: "There's Probably No World Where They Work Together Again,"* Variety (Aug. 27, 2024), https://variety.com/2024/film/news/it-endswith-us-sequel-in-doubt-blake-lively-justin-baldoni-feud-1236114099.

Housing Act ("FEHA") for aiding and abetting retaliation in violation of Government Code § 12940(i). *See* Dkt. No. 521 ¶¶ 408–15. TAG nonetheless frames its motion around whether it can be held directly liable under FEHA, arguing that because it did not hire, fire, supervise, compensate, or discipline Lively, it falls categorically outside FEHA's reach. *See* TAG MSJ at 8–10. But Lively does not bring a direct-liability retaliation claim against TAG. Instead, Lively alleges that TAG knowingly and substantially assisted Wayfarer's retaliatory campaign by coordinating and executing an "astroturfing" effort designed to discredit and "bury" her after she complained of sexual harassment on the set of *It Ends With Us*. *See id.* ¶¶ 408–15. In addressing this claim, TAG's motion conflates direct liability with aiding-and-abetting liability and asks the Court to read limitations into § 12940(i) that neither the statute nor the case law recognizes.

FEHA's aiding and abetting provision creates an independent basis for liability that does not depend on whether the alleged aider-and-abettor could be held directly liable for the principal's conduct. And the cases limiting aiding and abetting liability to exclude individual employees acting on behalf of their employer do so for a different reason, akin to the intracorporate conspiracy doctrine: a corporation cannot aid and abet itself. TAG's argument thus appeals to the wrong legal framework.

Section 12940(i) imposes liability on "any person" who aids, abets, incites, compels, or coerces a FEHA violation. Cal. Gov't Code § 12940(i). The statute does not ask whether the defendant qualifies as an employer or performed FEHA-regulated employment functions. Instead, courts apply common-law aiding-and-abetting principles, under which liability turns on the alleged aider-and-abettor's knowledge and substantial assistance of the employer's conduct, not on its employer status or agency relationship. *See Alch v. Superior Court*, 122 Cal. App. 4th 339, 389

n.48, 390 (Cal. Ct. App. 2004); *Fiol v. Doellstedt*, 50 Cal. App. 4th 1318, 1325–26 (Cal. Ct. App. 1996); MSJ Opinion at 136–37.

The California Court of Appeal has expressly rejected the rule TAG advances here. *See Smith v. BP Lubricants USA Inc.*, 64 Cal. App. 5th 138, 145–46 (Cal. Ct. App. 2021). In *Smith*, the plaintiff asserted an aiding-and-abetting FEHA claim against a vendor and one of its sales representatives based on racially discriminatory remarks allegedly made during a product presentation to the plaintiff and his coworkers. *Id.* Neither defendant employed the plaintiff, supervised his work, nor exercised any employment authority over him; they were outside entities invited to the workplace solely to market their product. *Id.* Although the plaintiff's claim ultimately failed on the merits, the Court of Appeal squarely "reject[ed] [defendants'] argument that they cannot be liable under FEHA because they were never [the plaintiff's] employer." *Id.* The court emphasized that FEHA prohibits "any person" from aiding or abetting discrimination and that, for that reason, "individuals and entities who are not the plaintiff's employer may be liable under FEHA for aiding and abetting the plaintiff's employer's violation." *Id.* (citing *Alch*, 122 Cal. App. 4th at 389–90). In doing so, *Smith* confirms that aiding-and-abetting liability does not depend on an employment relationship or the performance of employment-related functions, but on knowledge and substantial assistance.[4]

---

[4] Defendants rely on *Smith* for the contrary proposition: "Significantly, the Court determined that . . . *Jiffy Lube's employees*, including [plaintiff], *were effectively Castrol's clients, patrons or customers*." TAG MSJ at 9. Defendants contend that this means that *Smith* is consistent with their position that FEHA aiders-and-abettors must have "participated in employment-related conduct and stepped into the proverbial shoes of employers." *Id.* But Defendants quote language from a different section of *Smith* dealing with the plaintiff's Unruh Civil Rights Act claim. *Smith*, 64 Cal. App. 5th at 149–53. The Unruh Act "prohibits intentional discrimination in access to public accommodations" and only applies to "business establishments" that are "generally open to the public." *Id.* (internal quotation marks omitted). It was in *that* context—evaluating whether Jiffy Lube constituted a "business establishment" under the Unruh Act—that the *Smith* court found it "significant[]" that Jiffy Lube's employees "were effectively Castrol's clients, patrons, or customers." Where it separately discussed FEHA aiding-and-abetting, *Smith* was clear that this limitation does not apply. *Id.* at 145–46 ("We first reject BP and Pumarol's argument that they cannot be liable under FEHA because they were never Smith's employer. FEHA prohibits 'any person' from aiding or abetting workplace discrimination. (Gov. Code, § 12940, subd. (i).) For that reason, individuals and entities who are not the plaintiff's employer may be liable under FEHA for aiding and abetting the plaintiff's employer's violation of FEHA.").

10

Likewise, in *Alch*, the court held that non-employer talent agencies could be liable under § 12940(i) where they knowingly used their own practices to assist discriminatory conduct. 122 Cal. App. 4th at 390. Other courts have reached the same conclusion for non-employer entities. *See, e.g.*, *Harper v. DISA Global Solutions, Inc.*, 2025 WL 643630, at *2 (C.D. Cal. Jan. 28, 2025) (holding that third-party background screening company could be liable for aiding and abetting FEHA discrimination); *Hooters of America, LLC v. Superior Court of Riverside County*, 2024 WL 2793404 (Cal. Ct. App. 2024) (unpublished) (holding that a franchisor could be liable for aiding and abetting franchisee's employment violations);[5] *Malekzadeh v. Costco Wholesale Corp.*, 2023 WL 4311262 (N.D. Cal. Apr. 10, 2023) (holding that third-party benefits distributor could be liable for aiding and abetting disability discrimination); *see also Mobley v. Workday, Inc.*, 740 F.Supp.3d 796 (N.D. Cal. 2024) (assuming without deciding that third-party software vendor could be liable for aiding and abetting discrimination).

The Court of Appeal's decision in *Alch* squarely illustrates the point. There, the defendants were non-employer talent agencies that did not hire, fire, supervise, or discipline the plaintiffs. 122 Cal. App. 4th at 390–92. The court nonetheless held that the agencies could be liable under § 12940(i) because they allegedly knew the studios were engaged in discrimination and used their own referral practices to substantially assist that conduct. *Id.* Liability turned on the agencies' independent participation, not on agency or employment authority. *See id.* Other courts have similarly analyzed agency liability independently from aiding and abetting liability. *See Logan v. ADP, Inc.*, 2025 WL 1144051 (Cal. Ct. App. Apr. 18, 2025) (unpublished) (analyzing

---

[5] "Even though unpublished California Courts of Appeal decisions have no precedential value under California law, [federal courts are] 'not precluded' from considering such decisions 'as a possible reflection of California law.'" *See Goodson v. County of Plumas*, 2023 WL 4678990, at *20 n.2 (E.D. Cal. July 21, 2023) (quoting *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1167 n.6 (9th Cir. 2011)).

agency-based liability and aiding-and-abetting liability separately); *Harper*, 2025 WL 643630, at *2–3 (treating direct business-entity agent liability under *Raines* and aiding-and-abetting liability as distinct inquiries); *Caldwei v. Montoya III*, 1994 WL 17131358, at *6–7, 11 (Cal. Ct. App. Sept. 28, 1994) (unpublished) (analyzing separately whether individual defendants could be liable as agents of the employer and whether they could be liable as aiders and abettors).

The cases tying aiding-and-abetting liability to the possibility of direct liability do so for a different reason. In *Reno v. Baird*, the California Supreme Court held that non-employer individuals, specifically supervisory employees, could not be directly liable for FEHA discrimination. 18 Cal. 4th 640, 662 (Cal. 1998). *Reno* further explained that although aiding and abetting liability *did* apply to "third parties such as customers or suppliers," it could not extend to the supervisory employees because that would be tantamount to holding that the corporation had aided and abetted itself:

> The concept of aiding and abetting involves two separate persons, one helping the other. Here we deal with individual employees of a corporate employer. A corporation can act only through its individual employees. Our question is whether it can properly be said that a corporate employee is 'aiding and abetting' his or her corporate employer when the corporate employee acts on behalf of the corporation by making a personnel decision or, more precisely, whether this is the meaning intended by the Legislature.

*Id.* at 655–56 (citation modified). *Reno* held that given the oddity of concluding that a corporate employee could have aided and abetted his or her employer by acting "on behalf of the corporation," the California Legislature would have spoken in clearer terms had it intended that result. *Id.* at 656.[6]

---

[6] In *Jones v. Lodge at Torrey Pines Partnership*, the California Supreme Court extended the holding of *Reno* to direct-liability retaliation claims, holding that "*Reno's* rationale for not holding individuals personally liable for discrimination applies equally to retaliation," but did not address aiding and abetting. 42 Cal. 4th 1158, 1164 (Cal. 2008).

*Reno* thus draws a critical distinction between employee-agents who act on behalf of the employer, like individual supervisors, and independent non-employee agents who assist the employer's unlawful conduct. Employee agents acting within the scope of their employment cannot aid and abet their own employer (just as they cannot conspire with the entity that employs them), but outside actors who "help[] another commit a prohibited act" may be liable under § 12940(i). *Id.* at 655 (internal quotation marks omitted).[7] Any other interpretation would effectively read FEHA's "aiding and abetting" provision out of the statute.

Together, *Reno*, *Alch*, and *Smith* foreclose TAG's attempt to limit § 12940(i) to actors who can be held directly liable for discrimination or retaliation. To the contrary, only certain specific non-employers *cannot* be held liable for aiding and abetting: those who, because they are employees of the corporation in question, cannot conspire with or aid or abet that corporation as a matter of law. TAG is not such an entity.

TAG's renewed motion for summary judgment does not address this distinction between direct liability and aiding-and-abetting liability, merely assuming that to the extent TAG could not be directly liable for retaliation (also an unsupported proposition, as explained below), it could not be liable for aiding and abetting retaliation. But that reasoning is unsupported by the logic of the California Supreme Court's precedents and, if adopted, would write the aiding-and-abetting provision out of the statute.

---

[7] TAG's reliance on *Radentz v. American Assn. of Physician Spec., Inc.*, 2014 WL 12601013 (C.D. Cal. Aug. 18, 2014) is misplaced. *See* TAG MSJ at 8. *Radentz* does not apply, much less establish, a general rule limiting aiding-and-abetting liability to employers aiding third parties. Rather, the court applied *Reno*'s rule correctly but stated it erroneously: *Radentz* rejected an attempt to plead aiding-and-abetting against employee agents where the alleged misconduct involved only the employer's internal operations because, as a matter of law, an employer cannot aid and abet itself through the actions of its own employees. *Id.* (citing *Reno*, 18 Cal. 4th at 655–56). The court's observation that § 12940(i) is "meant to prohibit employers from aiding and abetting third-parties, such as customers or suppliers" was simply a mistake—a reversal of what *Reno* actually says, as is evident from a comparison between the quoted language from *Radentz* and the passage of *Reno* to which it cites.

13

**II.     Even if They Applied, *Raines*' Limits on Direct or Agency-Based FEHA Liability Would Not Bar Lively's Section 12940(i) Claim Against TAG.**

Drawing on *Raines v. U.S. Healthworks Medical Group*, 15 Cal. 5th 268 (Cal. 2023), TAG asserts that its liability turns on whether it was engaged in "FEHA-regulated activities," which TAG defines further as "the traditional activities performed by an employer in an employment relationship." TAG MSJ at 6. As TAG acknowledges, *Raines* was a direct liability case. For the reasons discussed above, the limitations on direct liability for FEHA discrimination or retaliation do not extend to aiding and abetting, except in the context of the employees of a defendant employer. *Supra* at 8–13. Stated differently, TAG's argument depends on an extension of *Raines* from the direct liability context to the aiding-and-abetting context that is not justified by the logic of *Reno*, which limited the aiding-and-abetting provision's independent scope for specific reasons that do not apply to business-entity agents. *Supra* at 8–13. But even if *Raines*'s "FEHA-regulated activities" limitation applied to TAG's aiding and abetting liability here, TAG would still be liable for the simple reason that the retaliatory adverse employment actions that TAG assisted *are* "FEHA-regulated."

In *Raines*, the California Supreme Court considered whether a business entity that serves as an employer's agent may be directly liable under FEHA when it carries out FEHA-regulated employment activities on the employer's behalf. *Raines*, 15 Cal. 5th at 274. The court answered that question in the affirmative, holding that such an agent may be directly liable where it satisfies the statutory definition of "employer" by having at least five employees and performs FEHA-regulated functions for the employer. *Id.* at 291.

Critically, *Raines* did not interpret § 12940(i), did not analyze aiding-and-abetting liability, and did not purport to limit the reach of FEHA's aiding-and-abetting provision. To the contrary, the Court expressly reserved "the scope of a business entity agent's possible liability under the

FEHA's aider and abettor provision." *Id.* ("We base our conclusion on our interpretation of the FEHA's definition of employer (§ 12926, subd. (d)); we express no view of the scope of a business entity agent's possible liability under the FEHA's aider and abettor provision (§ 12940, subd. (i))."). TAG's motion omits that reservation while attempting to extend *Raines*'s direct-liability principles into a statute the court did not construe.[8] *See* TAG MSJ at 10.

Activities that constitute actionable retaliation *are* "FEHA-regulated." As relevant here, and as this Court has already held, "FEHA covers not only employment actions that are reasonably likely to adversely and materially affect an employee's job performance but also the employee's opportunity for advancement in his or her career." MSJ Opinion at 129 (internal quotation marks omitted); *id.* ("The dissemination of a 'negative employment reference' can constitute an adverse employment action."). And as this Court has already found, Lively has put forward evidence from which a jury could conclude that TAG carried out such actions on Wayfarer's behalf. *Id.* at 131–34. Indeed, the bulk of the Court's discussion of the actionable retaliatory conduct in this case involves conduct that TAG substantially assisted:

> The Wayfarer Parties planned a public relations campaign that included as a "key messaging point" the fact that Lively had a "less than favorable reputation in the industry span[ning] decades," and that "[p]roduction members lost their jobs due to BL's takeover." Gottlieb Decl., Ex. 46 at 2. There is evidence from which a jury could find that the Wayfarer Parties planned more aggressive action, not only to "destroy" Lively's accusations but to destroy her and her career. Nathan told Abel, among other things, "[Y]ou know when we send over documents we can't send over the work we will or could do because that could get us in a lot of trouble.... We can't write we will destroy her.... Imagine if a document saying all the things

---

[8] TAG's attempted distinctions of *Smith*, 64 Cal. App. 5th 138 (Cal. Ct. App. 2021), and *Mobley v. Workday, Inc.*, 740 F. Supp. 3d 796, 813 n.6 (N.D. Cal. 2024), collapse under scrutiny. In neither case did the court suggest that aiding-and-abetting liability depends on whether the defendant "participated in employment-related conduct and stepped into the proverbial shoes of employers." TAG MSJ at 12–13. To the contrary, *Smith* expressly rejected that framing, holding that non-employer entities may be liable under § 12940(i) based on their independent conduct in facilitating a FEHA violation. *Smith*, 64 Cal. App. 5th at 145-46. *Mobley* assumed the availability of such liability for non-employer entities before dismissing on pleading grounds unrelated to employment authority. 740 F. Supp. 3d 796, 813. An assumption "without deciding" does not convert *Raines* into a categorical limitation on aiding and abetting liability. At most, *Mobley* underscores that no binding authority supports the sweeping rule TAG proposes.

that he wants ends up in the wrong hands.... you know we can bury anyone[.] But I can't write that to him." Gottlieb Decl., Ex. 47. . . .

There also is some direct evidence that the plan to destroy Lively and her career was put into action. In addition to boosting videos of himself, Baldoni requested that the digital team amplify a video criticizing Lively as insensitive to domestic violence survivors. R.56.1 ¶ 753. There is also evidence suggesting that TAG "sen[t] to Jed" the "little bump" video and a Daily Mail article entitled "HOLLYWOOD VILLIAN," which "branded" Lively "a mean girl." *Id.* ¶ 754. These are two examples of what Case described as "Jed and his team's efforts to shift the narrative towards shining a spotlight on Blake and Ryan." *Id.* ¶ 743. The record further supports the Wayfarer Parties working to place "all kinds of garbage" on Lively in traditional media outlets. *See id.* ¶ 696. Case and others pitched a story to a Daily Mail reporter focusing on Lively's supposed marketing missteps and posing questions such as, "Why would Blake allow this to happen?" and, "How could she?" *Id.* ¶¶ 751–53. A jury could find that these efforts were proactive and in line with Baldoni's desire "to feel like [Lively] can be buried." *Id.* ¶ 690.

Wallace and TAG deny that they took proactive measures. Wallace has testified that Street Relations has only "minimal" digital capabilities related to "observant monitoring," and that it does not "do anything as far as action in the digital space." Shapiro Decl., Ex. 185 at 23:19–24:1. A jury could disbelieve that testimony. As detailed above, in pitching Wallace's services to Heath and Wayfarer, Case indicated that Wallace could offer "specific services" related to "[a]ctively sway[ing] the algorithm" and "starting threads with theories the team approves of, and asking questions that no longer place Wayfarer and Justin on the back foot." Gottlieb Decl., Ex. 207.

MSJ Opinion at 132–34. It is settled that Lively has presented sufficient evidence for a jury to conclude that the precise conduct TAG substantially assisted constituted adverse employment action under FEHA. *Id.* at 134 ("A jury can and should decide those questions."). Thus, it is also settled that the "activities" on which the aiding-and-abetting claim against TAG is based were "FEHA-regulated."

Finally, Defendants submit that the Court should not "create new law for the State of California." TAG MSJ at 10. But when a federal district court is confronted with an unsettled question of state law, it is the court's "job to predict how the forum state's highest court would decide the issue[]." *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005). "Principally," a court does so by considering "the language of the state intermediate appellate courts," as well as "the

16

language of other jurisdictions on the same issue and other sources the state's highest court might rely upon in deciding the question." *Id.* at 112. Here, that task is straightforward: California's appellate courts treat FEHA aiding-and-abetting as an independent source of liability regardless of the aider-and-abettor's status as an employer or participation in "FEHA-regulated activities," and the logic of the California Supreme Court precedents ruling out aiding-and-abetting liability for supervisory employees does not extend to business-entity agents of the employer.[9] Meanwhile, retaliatory adverse action such as disseminating negative information to harm a plaintiff's reputation is actionable under FEHA. The California Supreme Court would be highly likely to conclude that a jury could find TAG liable for FEHA aiding and abetting under these circumstances, and this Court should therefore do the same.

## III.    TAG Does Not Dispute the Elements of Aiding-and-Abetting.

TAG's renewed motion does not dispute that TAG knowingly and substantially assisted the conduct that Lively contends was actionable FEHA retaliation. Instead, TAG's motion is limited to the argument that that conduct did not constitute "employment-related practices." TAG MSJ at 8. That is wrong, for the reasons stated above. *Supra* at 8–16. It is therefore undisputed for purposes of this motion that TAG's conduct did satisfy the elements of FEHA aiding-and-abetting liability with respect to the retaliatory conduct that Lively actually challenges. *See supra* at 3–8.

Nevertheless, even if TAG disputed that it knowingly and substantially assisted a significant portion of the conduct on which Lively's retaliation claim is based, the record is more than sufficient for a jury to find in Lively's favor on that issue. Whether the elements of aiding-

---

[9] This conclusion is reinforced by one of the additional considerations this Court flagged in its MSJ Opinion: business-entity agents "are more likely to be able to negotiate over issues of indemnification and therefore less likely to be burdened by concerns about liability in carrying out their responsibilities on behalf of the employer." MSJ Opinion at 139. Sure enough, TAG did negotiate and execute an indemnification provision allocating liability for claims arising out of its work for Wayfarer. *See* Dkt. No. 1254-11.

17

and-abetting are satisfied is ordinarily a fact-intensive inquiry. *See Malekzadeh v. Costco Wholesale Corp.*, 2023 WL 4311262, at \*2 (N.D. Cal. Apr. 10, 2023). Viewed in the light most favorable to Lively, the record readily supports findings that TAG knew of her protected complaints and knowingly provided substantial assistance to a retaliatory campaign designed to damage her professional reputation and future career opportunities. *Supra* at 3–8. At a minimum, the evidence presents classic jury questions that preclude summary judgment.

## CONCLUSION

TAG's renewed motion for summary judgment should be denied.

18

Respectfully submitted,

Dated: April 17, 2026

/s/ Michael J. Gottlieb

Esra A. Hudson (admitted *pro hac vice*)
Naeun Rim (admitted *pro hac vice*)
Stephanie A. Roeser (admitted *pro hac vice*)
Sarah E. Moses (admitted *pro hac vice*)
Sareen K. Armani
Katelyn A. Climaco
Manatt, Phelps & Phillips LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
(310) 312-4000
ehudson@manatt.com
nrim@manatt.com
sroeser@manatt.com
smoses@manatt.com
sarmani@manatt.com
kclimaco@manatt.com

Matthew F. Bruno
Manatt, Phelps & Phillips LLP
7 Times Square
New York, NY 10036
(212) 790-4525
mbruno@manatt.com

Meryl C. Governski
Dunn Isaacson Rhee LLP
401 9th Street NW
Washington, DC 20004
(202) 240-2927
mgovernski@dirllp.com

Michael J. Gottlieb
Koren Bell
Willkie Farr & Gallagher LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 855-3000
mgottlieb@willkie.com
kbell@willkie.com

Kristin E. Bender
Willkie Farr & Gallagher LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1000
kbender@willkie.com

Michael S. Schachter
Aaron E. Nathan
Michaela A. Connolly
Melissa Taustine
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000
mschachter@willkie.com
anathan@willkie.com
mconnolly@willkie.com
mtaustine@willkie.com

*Attorneys for Blake Lively*

19