**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| BLAKE LIVELY,<br><br>      Plaintiff,<br><br>v.<br><br>WAYFARER STUDIOS LLC, et al.,<br><br>      Defendants. | No. 24-cv-10049 (LJL) |

<u>**PLAINTIFF BLAKE LIVELY'S OMNIBUS MEMORANDUM OF LAW**</u>
<u>**IN OPPOSITION TO DEFENDANTS' MOTIONS *IN LIMINE***</u>

Esra A. Hudson (admitted *pro hac vice*)
Naeun Rim (admitted *pro hac vice*)
Stephanie A. Roeser (admitted *pro hac vice*)
Sarah E. Moses (admitted *pro hac vice*)
Sareen K. Armani
Katelyn A. Climaco
2049 Century Park East, Suite 1700
Los Angeles, California 90067
(310) 312-4000
ehudson@manatt.com
nrim@manatt.com
sroeser@manatt.com
smoses@manatt.com
sarmani@manatt.com
kclimaco@manatt.com

Matthew F. Bruno
7 Times Sq
New York, NY 10036
(212) 790-4500
mbruno@manatt.com

Meryl C. Governski (admitted *pro hac vice*)
401 9th Street NW
Washington, DC 20004
(202) 240-2927
mgovernski@dirllp.com

Michael J. Gottlieb
Koren Bell
2049 Century Park East
Los Angeles, California 90067
(310) 855-3000
mgottlieb@willkie.com
kbell@willkie.com

Kristin E. Bender
1875 K Street NW
Washington, DC 20006
(202) 303-1000
kbender@willkie.com

Michael Schacter
Aaron Nathan
Michaela A. Connolly
Melissa Taustine
787 7th Avenue
New York, NY 10019
(212) 728-8000
MSchacter@willkie.com
anathan@willkie.com
mconnolly@willkie.com
mtaustine@willkie.com

*Attorneys for Blake Lively*

**TABLE OF CONTENTS**

**Page**

I.   Opposition to Defendants' Motion *in Limine* No. 1 To Preclude Evidence of the Alleged Bad Experiences of Other Women ................................................................................. 1

   A.   Defendants Mischaracterize the Evidence at Issue ..................................................... 1

   B.   The Evidence is Essential to Establishing Lively's Reasonable Belief ................. 4

      1.   Slate and Plank Support Lively's Subjective Belief ................................... 5

   C.   The Evidence is Relevant to Rebut Defendants' Defenses ................................... 8

   D.   The Other Female Witnesses Are Also Percipient Witness to the Smear Campaign and Its Effects ........................................................................................11

   E.   Defendants' Rule 404 Argument Fails ....................................................................11

II.  Opposition to Defendants' Motion *in Limine* No. 2 To Preclude Evidence of Alleged Weight-Related Comments ..................................................................................... 12

III. Opposition to Defendants' Motion in Limine No. 3 To Preclude Evidence Concerning Alleged Sexual Assault ........................................................................................ 14

IV.  Opposition to Defendants' Motion *in Limine* No. 4 To Preclude All References To Other Clients Of Melissa Nathan and Jed Wallace ........................................................ 16

V.   Opposition to Defendants' Motion *in Limine* No. 5 To Preclude Evidence and Argument Relating to Pretrial Filings And the Court's Ruling ........................................ 24

VI.  Opposition to Defendants' Motion *in Limine* No. 6 To Preclude References To Other Lawsuits Involving Defendants, The Dismissed Defendants, Or Their Counsel ............. 30

VII. Opposition To Defendants' Motion *in Limine* No. 7 To Preclude Any Reference to a Surreptitious Recording of Nonparty Steve Sarowitz ..................................................... 32

VIII. Opposition to Defendants' Motion *in Limine* No. 8 To Preclude Evidence Of Steve Sarowitz's Wealth, Financial Resources, And The Payment Of Defendants' Legal Fees  34

IX.  Opposition to Defendants' Motion *in Limine* No. 9 To Preclude Evidence Relating to Bryan Freedman ................................................................................................................. 37

X.   Opposition to Defendants' Motion *in Limine* No. 10 To Preclude Evidence And Argument Concerning Retaliation In Anticipation Of Future Protected Activity............................. 40

XI.  Opposition to Defendants' Motion *in Limine* No. 11 To Preclude Lively's Prior Descriptions Of Her Experience ......................................................................................... 44

XII. Opposition to Defendants' Motion *in Limine* No. 12 To Preclude Evidence Concerning Remedial Measures Taken By Defendants .......................................................... 49

XIII. Opposition to Defendants' Motion *in Limine* No. 13 To Preclude Lively From Offering Improper Lay Opinion .......................................................................................... 53

   A.   The Court Should Deny MIL No. 13's Attempt To Exclude Testimony About Third Parties' Subjective Beliefs Whether Defendants' Conduct Was Improper.. 53

   B.   The Court Should Deny MIL No. 13's Attempt To Exclude Testimony About Third Parties' Subjective Beliefs That The Cut Of The Movie Lively Helped Edit Was Better Than Baldoni's Version ....................................................................... 57

   C.   The Court Should Deny MIL No. 13's Attempt To Exclude Testimony About Third Parties' Subjective Beliefs About Lively's Character ................................. 58

XIV.    Opposition to Defendants' Motion *in Limine* No. 14 To Preclude Speculative Evidence About The Use Of "Bots" ............................................................................................ 59

XV.     Opposition to Defendants' Motion *in Limine* No. 15 To Preclude Evidence Concerning The Following Irrelevant Topics ................................................................................. 62

XVI.    Opposition to Defendants' Motion *in Limine* No. 16 To Preclude Evidence and Argument of Reputational Harm Damages ............................................................................... 68

      A.    Factual Background ............................................................................................... 69

      B.    Lively Adequately Disclosed Reputational Damages under Fed. R. Civ. P. 26(a)(1)(A)(iii) ..................................................................................................... 71

            1.    Lively's Disclosure of Noneconomic, Reputational Damages Satisfies Rule 26 Requirements ................................................................................ 71

            2.    Defendants Cannot Satisfy Rule 37(c)(1)'s Standard for Preclusion ........ 74

      C.    The Court Should Reject Defendants' Attempt to Exclude Relevant Reputational Damages arising from Defendants' Retaliatory Lawsuit ...................................... 77

XVII.   Opposition to Defendants' Motion *in Limine* No. 17 To Preclude Evidence And Argument Relating To Plaintiff's Allegedly Lost Profits And Lost Royalties ................................. 79

      A.    Lively Has Standing to Recover Her Share of the Companies' Lost Profits Caused By Defendants' Retaliation That Targeted Her Individually ............................... 80

      B.    The Companies' Lost Profits Are Relevant to The Jury's Determination of Noneconomic Damages for Reputational Harm ................................................... 84

XVIII. Opposition to Defendants' Motion *in Limine* No. 18 To Preclude Evidence Of Emotional Distress Damages Beyond "Garden Variety" Emotional Distress Damages .................... 85

XIX.    Opposition to Defendants' Motion *in Limine* No. 19 To Bifurcate The Issue Of Punitive Damages ................................................................................................................. 88

**CONCLUSION** .......................................................................................................... 90

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*AA Medical P.C. v. Almansoori*,
No. 20-CV-03852 (DG) (JMW), 2023 WL 7688688 (E.D.N.Y. Oct. 4, 2023).......................89

*Acosta v. Ross*,
2025 WL 2578079 (S.D.N.Y. Sept. 5, 2025)..................................................................53

*Adams v. Kmart Corp.*,
2001 WL 969049 (N.D. Cal. Aug. 10, 2001) ...............................................................55

*Adams v. New York State Unified Ct. Sys.*,
2023 WL 5003593 (S.D.N.Y. Aug. 4, 2023)..................................................................54

*Aldous v. Honda Motor Co.*,
1996 WL 312189 (N.D.N.Y. May 30, 1996).................................................................100

*Ali v. Connick*,
No. 11-CV-5297 (NGG) (VMS), 2016 WL 3002403 (E.D.N.Y. May 23, 2016) ...................74

*Ali v. New York City Env't Control Bd.*,
670 F. App'x 26 (2d Cir. 2016) ................................................................................94

*Angelucci v. Century Supper Club*,
41 Cal. 4th 160 (2007) ...........................................................................................91

*Anthem, Inc. v. Express Scripts, Inc.*,
660 F. Supp. 3d 169 (S.D.N.Y. 2023)..........................................................................86

*Asanjarani v. City of New York*,
No. 09-CV-7493 (JCF), 2011 WL 6811027 (S.D.N.Y. Dec. 27, 2011) ..............................39

*Baca v. City of Los Angeles*,
No. B326863, 2025 WL 900477 (Cal. Ct. App. Mar. 25, 2025) ..........................80, 83, 84, 95

*Bailey v. San Francisco Dist. Attorney's Off.*,
16 Cal. 5th 611 (2024) ............................................................................................20

*Barbera v. Grailed, LLC*,
No. 24-CV-3535 (LJL), 2025 WL 2098635 (S.D.N.Y. July 25, 2025)................................41

*Berry v. Stevinson Chevrolet*,
74 F.3d 980 (10th Cir. 1996) ....................................................................................38

*Bowles v. Osmose Utilities Servs., Inc.*,
443 F.3d 671 (8th Cir. 2006) ...........................................................................21, 48, 64

*Broadspring, Inc. v. Congoo, LLC*,
No. 13–CV–1866 (JMF), 2014 WL 7392905 (S.D.N.Y. Dec. 29, 2014)..............................79

*Budwig v. Allegiant, LLC*,
2020 WL 5235671 (E.D. Cal. Sept. 2, 2020)..................................................................98

**TABLE OF AUTHORITIES**

**Page(s)**

*Cadena v. Pacesetter Corp.*,
  224 F.3d 1203 (10th Cir. 2000) ................................................................21, 48, 64

*Campanella v. County of Monroe*,
  853 F. Supp. 2d 364 (W.D.N.Y. 2012) ...............................................................89

*Campbell v. Cellco P'ship*,
  2012 WL 3240223 (S.D.N.Y. Aug. 6, 2012) .......................................................98

*Cann v. Ford Motor Co.*,
  658 F.2d 54 (2d Cir. 1981)..................................................................................63

*Cantu v. Flanigan*,
  705 F. Supp. 2d 220 (E.D.N.Y. 2010) ...............................................90, 94, 95, 96

*Carroll v. Trump*,
  151 F.4th 50 (2d Cir. 2025) ................................................................................48

*Castillo v. Isakov*,
  2024 WL 5323851 (S.D.N.Y. Dec. 27, 2024) .....................................................98

*Castro v. City of New York*,
  No. 06-CV-2253, 2009 WL 2461144 (E.D.N.Y. Aug. 10, 2009) ..........................46

*Cates v. Trs. of Columbia Univ. in City of New York*,
  330 F.R.D. 369 (S.D.N.Y. 2019) ................................................................. passim

*Celeste C. Smith v. Wayfarer Foundation, et al.*,
  Case No. 26-cv-01940 (N.D. Ill. Feb. 20, 2026) .........................................42, 43, 44

*Colson v. Mingo*,
  No. 18-CV-2765, 2025 WL 688832 (S.D.N.Y. Mar. 4, 2025).........................39, 42

*Commodore Home Sys., Inc. v. Superior Ct.*,
  32 Cal. 3d 211 (1982) ........................................................................................92

*Computer Assocs. Int'l, Inc. v. Simple.com, Inc.*,
  247 F.R.D. 63 (E.D.N.Y. 2007)..........................................................................99

*Cooter v. Angeles Nat'l Golf Club*,
  2015 WL 5719140 (Cal. Ct. App. Sept. 29, 2015) ...............................................23

*Cullet v. Edwards Manufacturing Company of Alberta Lea*,
  2024 WL 5145565 (S.D.N.Y. Dec. 17, 2024) ......................................................62

*Dennis v. Cnty of Fairfax*,
  55 F.3d 151 (4th Cir. 1995) ................................................................................63

*Dep't of Fair Employment & Housing v. Lucent Techs., Inc.*,
  642 F.3d 728 (9th Circ. 2011)..............................................................................98

*Design Strategy, Inc. v. Davis*,
  469 F.3d 284 (2d Cir. 2006)................................................................................86

iv

## TABLE OF AUTHORITIES

**Page(s)**

*Diamond v. Sokol,*
   2007 WL 3168469 (S.D.N.Y. Oct. 29, 2007) ....................................................98

*Dixon v. Reid,*
   No. 23-CV-09878 (JAV), 2025 WL 3638953 (S.D.N.Y. Dec. 16, 2025) ...............................75

*Doe 1 v. United States Twirling Ass'n, Inc.,*
   2024 WL 1858230 (E.D.N.Y. Apr. 28, 2024) ...........................................99

*Dollman v. Mast Indus., Inc.,*
   2011 WL 3911035 (S.D.N.Y. Sept. 6, 2011)...........................................99

*Eckhart v. Fox News Network, LLC,*
   No. 20-CV-5593 (RA), 2021 WL 4124616 (S.D.N.Y. Sept. 9, 2021) ....................................38

*Edwards v. Container Kraft Carton & Paper Supply Co.,*
   161 Cal. App. 2d 752 (1958) ...............................................93

*Enchante Accessories, Inc. v. Turko Textiles, LLC,*
   2023 WL 395221 (S.D.N.Y. Jan. 25, 2023) ..............................................88

*Estate of Hamilton v. City of N.Y.,*
   627 F.3d 50 (2d Cir. 2010)...............................................63

*Falzon v. Johnson,*
   2016 WL 11430072 (E.D.N.Y. Oct. 24, 2016).......................................100

*Farghaly v. Potamkin Cadillac-Buick-Chevrolet-Geo, Ltd.,*
   2021 WL 4267656 (S.D.N.Y. Sept. 20, 2021)..........................................99

*Figueroa v. Boston Scientific Corp.,*
   2003 WL 21488012 (S.D.N.Y. Jun. 27, 2003) ...............................................62

*Foster v. Berwind Corp.,*
   No. 90-CV-0857 (JMK), 1991 WL 83090 (E.D. Pa. May 14, 1991) ....................................39

*Freeman v. Odyssey Healthcare Operating A, LP,*
   2022 WL 18216096 (C.D. Cal. Mar. 28, 2022)......................................27

*Funk v. Belneftekhim,*
   No. 14-CV-376 (BMC), 2020 WL 7642868 (E.D.N.Y. Dec. 23, 2020) ................................84

*George v. Celotex Corp.,*
   914 F.2d 26 (2d Cir. 1990)...............................................57

*Goldsmith v. Bagby Elevator Co.,*
   513 F.3d 1261 (11th Cir. 2008) ...............................................23

*Gorbea v. Verizon New York, Inc.,*
   No. 11-CV-3758 (KAM) (LB), 2014 WL 2916964 (E.D.N.Y. June 25, 2014) ......................39

*Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.,*
   245 F.3d 1172 (10th Cir. 2001) ...............................................68

**TABLE OF AUTHORITIES**

**Page(s)**

*Griffin v. Finkbeiner*,
689 F.3d 584 (6th Cir. 2012) ....................................................................................26

*Haas v. Del. & Hudson Ry. Co.*,
282 F. App'x 84 (2d Cir. 2008) .................................................................................86

*Hamza v. Saks Fifth Ave., Inc.*,
2011 WL 6187078 (S.D.N.Y. Dec. 5, 2011) .............................................................26

*Hansard v. Pepsi-Cola Metro. Bottling Co.*,
865 F.2d 1461 (5th Cir. 1989) ...................................................................................68

*Hart v. RCI Hosp. Holdings, Inc.*,
90 F. Supp. 3d 250 (S.D.N.Y. 2015)..........................................................................37

*Hausler v. JP Morgan Chase Bank, N.A.*,
127 F. Supp. 3d 17 (S.D.N.Y. 2015)..........................................................................43

*Hu v. City of New York*,
927 F.3d 81 (2d Cir. 2019)...................................................................................91, 95

*In re Agent Orange Prod. Liab. Litig.*,
95 F.R.D. 192 (E.D.N.Y. 1982)..................................................................................45

*In re General Motors LLC Ignition Switch Litig.*,
2017 WL 4417693 (S.D.N.Y. Oct. 3, 2017) ........................................................60, 61

*In re Parmalat Secs. Litig.*,
598 F. Supp. 2d 569 (S.D.N.Y. 2009).........................................................................34

*Jackson v. Scotts Co.*,
No. 08-CV-1064 (LAK), 2008 WL 4355349 (S.D.N.Y. Sept. 24, 2008)...............80, 83, 85

*Johnson v. United Cerebral Palsy/Spastic Children's Found. of Los Angeles & Ventura Ctys.*,
173 Cal. App. 4th 740 (2009) ...............................................................................22, 23

*Jones v. Niagara Frontier Transp. Auth. (NFTA)*,
836 F.2d 731 (2d Cir. 1987)........................................................................................93

*Kashef v. BNP Paribas SA*,
No. 16-CV-3228, 2025 WL 2324214 (S.D.N.Y. Apr. 11, 2025) ...............................46

*Keawsri v. Ramen-Ya Inc.*,
No. 17-CV-2406 (LJL), 2022 WL 2391692 (S.D.N.Y. Jul. 1, 2022) (Liman, J) ....................45

*King v. Aramark Servs. Inc.*,
96 F.4th 546 (2d Cir. 2024) ........................................................................................27

*Kunstler v. City of New York*,
242 F.R.D. 261 (S.D.N.Y. 2007) ..........................................................................80, 82

*Liberty Sackets Harbor LLC v. Vill. of Sackets Harbor*,
776 F. App'x 1 (2d Cir. 2019) ....................................................................................94

**TABLE OF AUTHORITIES**

**Page(s)**

*Lightfoot v. Union Carbide Corp.*,
  110 F.3d 898 (2d Cir. 1997) ................................................................................................68

*Lively v. Wayfarer Studios LLC*,
  786 F. Supp. 3d 695 (S.D.N.Y. 2025) .................................................................................42

*Lively v. Wayfarer Studios LLC*,
  No. 24-CV-10049, 2026 WL 905447 (S.D.N.Y. Apr. 2, 2026) .......................................38, 90

*Lively v. Wayfarer Studios LLC*,
  No. 25-CV-10049, 2026 WL 852740 (S.D.N.Y. Mar. 27, 2026) ...............................39, 41, 42

*Lore v. City of Syracuse*,
  670 F.3d 127 (2d Cir. 2012) ................................................................................................95

*Lujan v. Minagar*,
  124 Cal. App. 4th 1040 (2004) ...........................................................................................53

*Lupia v. N.J. Transit Rail Ops., Inc.*,
  No. 21-CV-11077 (LJL), 2023 WL 2387100 (S.D.N.Y. Mar. 7, 2023) (Liman, J.) ...............73

*Marshall v. Port Auth. of New York & New Jersey*,
  2022 WL 17491006 (S.D.N.Y. Dec. 5, 2022) (Liman, J.) ....................................................99

*McCoy v. Pac. Mar. Assn.*,
  216 Cal. App. 4th 283 (2013) .............................................................................................92

*McKenna v. Permanente Med. Grp., Inc.*,
  894 F. Supp. 2d 1258 (E.D. Cal. 2012) ...........................................................................54, 55

*McSweeney v. Cohen*,
  776 F. Supp. 3d 200 (S.D.N.Y. 2025) .................................................................................38

*Mendoza v. W. Med. Ctr. Santa Ana*,
  222 Cal. App. 4th 1334 (2014) .........................................................................21, 47, 64, 77

*MF Global Holdings, Ltd. v. PricewaterhouseCoopers LLP*,
  232 F. Supp. 3d 558 (S.D.N.Y. 2017) .................................................................................33

*Moore v. Rubin*,
  No. 17-CV-6404 (BMC), 2020 WL 13573582 (E.D.N.Y. Jan. 31, 2020) .............................39

*N. Am. Soccer League, LLC v. U.S. Soccer Fed., Inc.*,
  No. 17-CV-5495 (HG), 2025 WL 1311115 (E.D.N.Y. May 6, 2025) ....................................48

*N. Am. Soccer League, LLC v. United States Soccer Fed., Inc.*,
  754 F.Supp.3d 373 (E.D.N.Y. 2024) ...................................................................................29

*Nejadian v. Cnty. of Los Angeles*,
  40 Cal. App. 5th 703 (2019) ...............................................................................................54

*Norman v. Wayfarer Studios, LLC, et al.*,
  Cal. Super. Ct. Case No. 20STCV46882 .....................................................................42, 43, 44

**TABLE OF AUTHORITIES**

**Page(s)**

*Karkare on behalf of JN v. Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers Loc. 580,*
140 F.4th 60 (2d Cir. 2025) ...................................................................................94

*Orsaio v. New York State Dep't of Corr. & Cmty. Supervision,*
2022 WL 351827 (N.D.N.Y. Jan. 14, 2022)....................................................26, 27

*Pantoja v. Anton,*
198 Cal. App. 4th 87 (2011) ...............................................................20, 22, 23, 26

*Park W. Radiology v. CareCore Nat. LLC,*
675 F. Supp. 2d 314 (S.D.N.Y. 2009)..............................................................28, 43

*Pearl v. City of Los Angeles,*
36 Cal. App. 5th 475 (2019) ...................................................................................83

*Perez v. Progenics Pharms., Inc.,*
204 F.Supp.3d 528 (S.D.N.Y. 2016)................................................................60, 61

*Picard v. Sage Realty,*
No. 20-CV-10109 (JFK), 2021 WL 5926059 (S.D.N.Y. Dec. 15, 2021)...............74

*Pilitz v. Inc. Vill. of Freeport,*
No. 12-CV-5655 (JS) (ARL), 2020 WL 6945927 (E.D.N.Y. Nov. 25, 2020) ........86

*Prozeralik v. Cap. Cities Commc'ns, Inc.,*
222 A.D.2d 1020 (1995) .........................................................................................95

*Prozeralik v. Cap. Cities Commc'ns, Inc.,*
82 N.Y.2d 466 (1993) ..............................................................................................95

*Quinby v. WestLB AG,*
2008 WL 3826695 (S.D.N.Y. Aug. 15, 2008)...............................................98, 99

*Quinton v. Am. Express Co.,*
No. 19-CV-566 (NGG) (JRC), 2025 WL 1994848 (E.D.N.Y. July 17, 2025)........73

*Reitter v. City of Sacramento,*
87 F. Supp. 2d 1040 (E.D. Cal. 2000)....................................................................19

*Rhee-Karn v. Lask,*
674 F. Supp. 3d 75 (S.D.N.Y. 2023)......................................................................88

*Roberts v. Ford Aerospace & Commc'ns Corp.,*
224 Cal. App. 3d 793 (1990) ...........................................................................48, 64

*Rodriguez v. Village of Port Chester,*
535 F. Supp. 3d 202 (S.D.N.Y. 2021)..............................................................83, 86

*Rudnicki v. Farmers Ins. Exch.,*
2024 WL 20165 (Cal. Ct. App. Jan. 2, 2024) ........................................................53

## TABLE OF AUTHORITIES

**Page(s)**

*S.E.C. v. Treadway*,
 438 F. Supp. 2d 218 (S.D.N.Y. June 9, 2006) ........................................................73

*Salaam v. Syracuse Model Neighborhood Facility*,
 2012 WL 893487 (N.D.N.Y. Mar. 15, 2012) ........................................................54

*Saladino v. Stewart & Stevenson Servs., Inc.*,
 No. 01–CV–7644 (SLT) (JMA), 2011 WL 284476 (E.D.N.Y. Jan. 26, 2011) ......................83

*Seely v. White Motor Co.*,
 63 Cal. 2d 9 (1965) (en banc) ........................................................93

*Shorter v. Hartford Fin. Servs. Grp., Inc.*,
 No. 3:03CV0149 (WIG), 2005 WL 3536122 (D. Conn. Dec. 6, 2005) ................................44

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
 No. 17-CV-8457 (JMF), 2024 WL 4246159 (S.D.N.Y. Sept. 18, 2024) ..............................50

*Sleepy's, LLC v. Select Comfort Wholesale Corp.*,
 2012 WL 716944 (E.D.N.Y. Mar. 5, 2012) ........................................................58

*Sohnen v. Charter Comms., Inc.*,
 761 F.Supp.3d 556 (E.D.N.Y. 2025) ........................................................100, 101

*Sprint/United Mgmt. Co. v. Mendelsohn*,
 552 U.S. 379 (2008) ........................................................21

*State Dep't of Health Servs. v. Superior Ct.*,
 31 Cal. 4th 1026 (2003) ........................................................53

*Steele v. Youthful Offender Parole Bd.*,
 162 Cal. App. 4th 1241 (2008) ........................................................52, 53

*Storrs v. Univ. of Cincinnati*,
 2018 WL 684759 (S.D. Ohio Feb. 2, 2018) ........................................................23

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*,
 No. 15-CV-211 (LGS), 2025 WL 1565327 (S.D.N.Y. June 3, 2025) ................................39

*Szarzynski v. Roche Lab'ys, Inc.*,
 2010 WL 811445 (W.D.N.Y. Mar. 1, 2010) ........................................................54

*Taylor v. Nabors Drilling USA, LP*,
 222 Cal. App. 4th 1228 (Cal. Ct. App. 2014) ........................................................99

*Torres v. Gristede's Operating Corp.*,
 628 F. Supp. 2d 447 (S.D.N.Y. 2008) ........................................................38

*U.S. ex rel. Feldman v. van Gorp*,
 No. 03-CV-8135 (WHP), 2010 WL 2911606 (S.D.N.Y. July 8, 2010) ................................74

*United States v. Abel*,
 469 U.S. 45 (1984) ........................................................32

## TABLE OF AUTHORITIES

**Page(s)**

*United States v. Chiu*,
36 F.4th 294 (1st Cir. 2022)................................................................................61

*United States v. Dupree*,
706 F.3d 131 (2d Cir. 2013)...............................................................................57

*United States v. Fama*,
No. 12-CR-186 WFK, 2012 WL 6102700 (E.D.N.Y. Dec. 10, 2012) ...................................69

*United States v. Garcia*,
413 F.3d 201 (2d Cir. 2005)................................................................................70

*United States v. Giovannetti*,
919 F.2d 1223 (7th Cir. 1990) .......................................................................69, 70

*United States v. Johnson*,
117 F.4th 28 (2d. Circ. 2024)...............................................................................58

*United States v. Obayagbona*,
627 F. Supp. 329 (E.D.N.Y. 1985) ............................................................31, 32, 36

*United States v. Ray*,
2022 WL 558146 (S.D.N.Y. Feb. 24, 2022)................................................................60

*United States v. Roye*,
2016 WL 4147133 (D. Conn. Aug. 4, 2016) ..............................................................61

*United States v. Saget*,
377 F.3d 223 (2d Cir. 2004)................................................................................34

*United States v. Salameh*,
152 F.3d 88 (2d Cir. 1998)..................................................................................35

*United States v. Scully*,
877 F.3d 464 (2d Cir. 2017).................................................................................50

*United States v. Smothers*,
652 F.Supp.3d 271 (E.D.N.Y. 2023) .......................................................................30

*United States v. Teva Pharms. USA, Inc.*,
No. 13-CV-3702 (CM), 2019 WL 13244252 (S.D.N.Y. July 1, 2019) ..................................74

*United States v. Thomas*,
2025 WL 2860312 (S.D.N.Y. Oct. 9, 2025) ...............................................................60

*United States v. Thornhill*,
667 F. App'x 310 (2d Cir. 2016) ..........................................................................70

*United States v. Triumph Cap. Grp., Inc.*,
237 F. App'x 625 (2d Cir. 2007) ..........................................................................36

*United States v. Whitmore*,
359 F.3d 609 (D.C. Cir. 2004)..............................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Zhong*,
 26 F.4th 536 (2d Cir. 2022) ..................................................................................30

*Viada v. Osaka Health Spa, Inc.*,
 No. 04 CIV. 2744 ...................................................................................... 44, 49, 75

*Vicuna v. O.P. Schuman & Sons, Inc.*,
 298 F.Supp.3d 419 (E.D.N.Y. 2017) ..............................................................62, 63

*Wasche v. Orchard Hosp.*,
 No. 2:18-CV-02246-MCE-DB, 2020 WL 4923710 (E.D. Cal. Aug. 21, 2020).....................66

*We Shall Overcome Found. v. Richmond Org., Inc.*,
 No. 16-CV-2725, 2018 WL 400776 (S.D.N.Y. Jan. 12, 2018) ..............................45

*Wechsler v. Hunt Health Sys., Ltd.*,
 No. 94-CV-8294 (PKL), 2003 WL 21998980 (S.D.N.Y. Aug. 22, 2003)........................74, 75

*Williams v. Boulevard Lines, Inc.*,
 No. 10-CV-2924 (DF), 2013 WL 5652589 (S.D.N.Y. Sept. 30, 2013).....................80, 83, 84

*Williams v. Cnty. of Orange*,
 No. 03-CV-5182 (LMS), 2005 WL 6001507 (S.D.N.Y. Dec. 13, 2005) ................................86

*Williams v. Geraci*,
 No. 14-CV-5742 (SIL), 2020 WL 5848738 (E.D.N.Y. Sept. 30, 2020)...........................43, 44

*Williams v. Trader Pub. Co.*,
 218 F.3d 481 (5th Cir. 2000) ................................................................................83

*Yanowitz v. L'Oreal USA, Inc.*,
 36 Cal. 4th 1028 (2005) ............................................................................38, 53, 55

*Zubulake v. UBS Warburg LLC.*,
 382 F. Supp. 2d 536 (S.D.N.Y. 2005).................................................................39, 40

## STATUTES

Cal. Civ. Code § 1431.2(b)(2) ......................................................................................83

Cal. Gov't Code § 12940(h).....................................................................................51, 53

California Fair Employment and Housing Act ..........................................................52

ERISA .........................................................................................................................94

FEHA .................................................................................................................. passim

## RULES

Fed. R. Civ. P. 32(a)(1), 32(a)(4)(B) .............................................................................34

Fed. R. Civ. P. 37(e)(2).................................................................................................41

Fed. R. Civ. P. 42(b) .....................................................................................................99

# TABLE OF AUTHORITIES

**Page(s)**

Fed. R. Civ. P. 11 .................................................................................................37, 38, 39, 41

Fed. R. Civ. P. 26 .......................................................................................................80, 83, 84, 85

Fed. R. Civ. P. 26(a) ......................................................................................................82, 83, 84

Fed. R. Civ. P. 32 ........................................................................................................................34

Fed. R. Civ. P. 37 ........................................................................................................................88

Fed. R. Civ. P. 37(c)(1) ..........................................................................................................80, 85

Fed. R. Civ. P. 54(b) ...................................................................................................................45

Fed. R. Civ. P. 59 ........................................................................................................................98

Fed. R. Evid. 105 ........................................................................................................................90

Fed. R. Evid. 401 .................................................................................................29, 34, 44, 73

Fed. R. Evid. 402 .................................................................................................................34, 73

Fed. R. Evid. 403 ................................................................................................................ passim

Fed. R. Evid. 404 .................................................................................................25, 40, 46

Fed. R. Evid. 404(a) ..............................................................................................................40, 70

Fed. R. Evid. 404(b) ..............................................................................................................40, 44

Fed. R. Evid. 407 .................................................................................................62, 63, 64

Fed. R. Evid. 701 ................................................................................................................ passim

Fed. R. Evid. 801(c)(2) .................................................................................................................57

Fed. R. Evid. 801(c)(2) .................................................................................................................57

Fed. R. Evid. 801(d)(2) .................................................................................................30, 34, 45, 74

Fed. R. Evid. 803 .................................................................................................................58, 59

## OTHER AUTHORITIES

Wright & Miller, 23 Fed. Prac. & Proc. Evid. § 5282 (2d ed. 2026).............................................62

Wright & Miller, 23 Fed. Prac. & Proc. Evid. § 5284 (2d ed. 2026).............................................62

*Moore's Federal Practice* § 26.22[4][c] (3d ed. 2023) .................................................................82

Plaintiff Blake Lively hereby responds to Defendants' Motions *in Limine* Dkt. No. 1312 (the "Motion" or "Mot." or "MIL").  For the reasons that follow, Lively respectfully requests that Defendants' motions be denied in their entirety.

## I.    Opposition to Defendants' Motion *in Limine* No. 1 To Preclude Evidence of the Alleged Bad Experiences of Other Women

Defendants seek to exclude testimony from seven women—each with direct knowledge of Baldoni and Heath's conduct—not because it is irrelevant, but because it is powerful. *See* Mot. at 1. Their motion rests on the false premise that this evidence is not relevant to Lively's retaliation claims. But it plainly is. The challenged testimony is *central* to all of (1) Lively's subjective and objective belief that Baldoni's and Heath's conduct was unlawful, an essential element of her claim; (2) Defendants' false narrative that Lively orchestrated others on the Film to turn against Baldoni, thereby justifying Defendants' smear campaign as a "reasonable" defensive measure; and (3) the collateral effects of that retaliatory campaign on other women associated with the film. Excluding this testimony would allow Defendants to offer unchallenged self-serving testimony at trial about the events that prompted the entire cast to decline to appear alongside Baldoni at the Film's premiere, as well as cause Lively and others to complain directly to Wayfarer's leadership. The law does not permit Defendants to exclude evidence that directly refutes the defense Defendants intend to introduce, or evidence that directly supports Lively's claims.

### A.    Defendants Mischaracterize the Evidence at Issue

Defendants begin from a distorted and incomplete account of the testimony they seek to exclude. By selectively minimizing, fragmenting, and at times misstating that testimony, they

1

attempt to repackage highly probative corroborating evidence as a collection of isolated and insignificant "other bad acts."[1] That is simply wrong.

Jenny Slate is an eyewitness who experienced sexually harassing and gendered conduct from Baldoni and Heath on set—conduct Lively personally observed and discussed with Slate during filming, in addition to Lively's own experiences. *See* Dkt. No. 1230 at 1230-12. Slate independently decided not to promote the Film with Baldoni or Heath based on how she had been treated and she shared that decision with her own team as early as June 2023—well before the period Defendants now attribute to Lively's supposed influence. *Id*.; *see* Hudson Decl., Ex. 1, at JS0000284. Slate was also one of many women on the cast who experienced collateral online hate in the wake of Defendants' retaliatory campaign against Lively.

Isabela Ferrer likewise experienced inappropriate and sexualized comments from Baldoni on set, including statements such as "I'm not supposed to say this, but that was hot" immediately after an intimate scene depicting an underage character losing her virginity, as well as comments that sexualized her to her co-star. *See* Hudson Decl., Ex. 2, at 68:3–9; 244:3–245:17; 246:14–247:3; 252:21–254:3; 283:24–284:9. Ferrer independently chose to distance herself from Baldoni, including electing not to appear with him in promotion. *Id*. at 269:8–270:9. She also has firsthand knowledge of the public hate and hostility resulting from Defendants' retaliatory smear campaign and how that backlash collaterally affected herself and other women associated with the Film, also disproving the narrative that Lively's allegedly tone-deaf marketing was the cause of an "organic" backlash against her. *Id*. at 175:10–25; 183:11–19; 189:9–190:9; 208:15–210:4; 278:17–281:18.

Defendants similarly reduce Alex Saks' testimony to a few instances where Baldoni "yelled" while under "stress." Mot. at 12. This interpretation mischaracterizes and artificially

---

[1] Defendants do not identify what they specifically seek to exclude or whether they seek to exclude *all* evidence related to Slate, Ferrer, Saks, Hall, Plank, Hoover, or Ayoub. Their motion should be denied for this reason alone.

narrows Saks' testimony, which is far broader. She confirmed that she ***never observed Baldoni treating men the same way he treated her***. *See* Hudson Decl., Ex. 3, at 67:2–70:19; 74:11–76:6; 76:16–81:14; 171:20–23; 243:20–25; 244:8–16. Early on, Saks developed concerns about the absence of any meaningful HR structure on set and the obvious problem that Baldoni and Heath were the only people to whom complaints could be directed—even complaints about their own conduct. *Id*. at 59:7–61:18. She recommended that Wayfarer investigate concerns on set, which it refused to do. *Id*. at 118:13–119:5. And she concluded that Baldoni should be removed as director and that Heath should not be allowed on set. *Id*. at 99:10–20; 101:14–106:15; 108:19–112:1; *see* Hudson Decl., Ex. 4 at SPE_BL0002023. Based on her experiences on the Film, Saks also concluded she would not work with Baldoni or Heath again (though she would work with Lively) and did not want to attend the premiere with them. *See* Hudson Decl., Ex. 3, at 296:1–8 (Saks Tr. 296:1-8)

IEWU writer Christy Hall's role is likewise not irrelevant or attenuated. *See* Mot. at 13. Hall told Saks that Baldoni did not respect her as a female voice and that she did not want to be associated or do press with him because of his dismissive behavior. *See* Hudson Decl, Ex. 3, at 153:2–157:2; 154:3–155:20. Hall's complaints informed Saks' understanding of Baldoni's conduct and contributed to Saks' independent conclusion that his behavior was serious enough to warrant removal.

Colleen Hoover also had far more involvement than Defendants suggest. *See* Mot. at 12-13. She did not merely express "dissatisfaction" with her role in production. Hoover worked closely with Lively on Sony's cut of the Film and developed her own independent concerns regarding Baldoni's conduct and editorial decisions. *See* Hudson Decl., Ex. 5, at 93:6–12; 93:15–95:13; 99:15–100:21; 104:8–105:9; 120:1–14; 121:8–11. She felt marginalized and exploited by

Baldoni and, after witnessing Baldoni and Heath disparage Lively in May 2024, chose to distance herself from them permanently. *Id*. at 50:19–51:2; 66:2–68:20; 75:6–78:6; 85:6–17; 134:5–16. Hoover also did not appear publicly with Baldoni or Heath and, like other women associated with the film, experienced substantial public backlash resulting from Defendants' online smear campaign and Baldoni's unilateral shift in the film's messaging despite following Wayfarer and Sony's approved marketing plan. *Id*. at 153:2–157:8; 174:7–175:24.

Claire Ayoub, writer and director of *Empire Waist*, another film produced by Baldoni and Wayfarer during the same general period, had similar experiences with Baldoni on her own set. Mot. at 13. Ayoub declared under oath that Baldoni was verbally abusive toward her, prompting her to bar him from set and refuse to do press with him in August 2024. *See* Dkt. No. 1230, at 1230-32. She was also a percipient witness to statements by Sarowitz threatening to target Lively and her husband, which plainly bear on Wayfarer and IEWUM's retaliatory motive.

Finally, Liz Plank's testimony will not be based on vague or unspecified concerns. Mot. at 13. Plank "warned" Lively about Baldoni before filming, describing her own experience working with him as "one of the worst days of [her] life," informing Lively's subjective belief that Wayfarer and IEWUM treated women differently than men at work. *See* Hudson Decl., Ex. 6, at BL-000021654–56. Lively discussed her experiences with Plank contemporaneously, describing set as "HR nuts." *Id*. at BL-000021656–21657. Defendants' attempt to reduce this evidence to a collection of trivial or unrelated "other bad acts" ignores both its substance and its significance.

**B.      The Evidence is Essential to Establishing Lively's Reasonable Belief**

As this Court has already recognized, where no underlying FEHA violation has been found, "the question is the reasonableness of the [plaintiff's] belief that [she] was opposing a practice prohibited by the FEHA." Dkt. No. 1273, at 47. Defendants' contention that existence of a "sex-based discriminatory motive" is no longer at issue outright ignores Lively's burden on retaliation.

4

Lively still must show both that she subjectively believed she was opposing unlawful conduct and that her belief was objectively reasonable. *Id.* The challenged evidence is essential to do so.

### 1.    Slate and Plank Support Lively's Subjective Belief

Plank and Slate's testimony directly supports Lively's subjective state of mind. Plank "warned" Lively about Baldoni before production, and Lively reported her experiences to Plank contemporaneously as events unfolded. This evidence goes directly to what Lively knew, experienced, and understood about the conduct she was opposing. *See Reitter v. City of Sacramento*, 87 F. Supp. 2d 1040, 1046 (E.D. Cal. 2000).

Likewise, Baldoni's comment to Slate—"I can say this because my wife is here, but you look sexy in what you're wearing"—and similar conduct that Slate and Lively discussed in real time, support Lively's good-faith belief that Defendants were engaging in unlawful conduct. Slate and Lively frequently communicated about how disturbed they were by Baldoni's and Heath's behavior. Slate also independently reported her concerns about Baldoni and Heath's conduct to Saks—concerns shared with Wayfarer that it refused to investigate. *See* Hudson Decl., Ex. 3, at 101:15–106:15; 108:19–112:1; 118:13–119:5; Dkt. No. 1230 at 1230-12. In addition, Slate personally observed Baldoni's conduct towards Lively, perceived it to be inappropriate, confronted Baldoni about it, and has spoken to Baldoni's callous reaction to the same—all facts which support Lively's belief and Defendants' retaliatory animus. Dkt. No. 1230, at 1230-12.

Defendants' effort to dismiss this evidence as "stray remarks" is meritless. Mot. at 14. The California Supreme Court expressly rejected the rigid federal "stray remarks" doctrine in the FEHA context. In *Reid v. Google, Inc.*, the Court held that earlier comments—made outside an employment decision or by non-decisionmakers—may still be circumstantial evidence of discriminatory animus. 50 Cal. 4th 512, 539–41 (2010). The Court cautioned against categorically excluding such evidence, holding that its significance depends on context, including who made

the remarks, when they were made, and how they relate to other evidence. *Id*. at 541. Thus, even remarks that are not independently actionable may corroborate other evidence, illuminate patterns of behavior, and gain significance when viewed in context. *Id*.

That principle applies here. Defendants improperly isolate Baldoni's comments to Slate from the broader record. Whether Baldoni's comments to Slate are, on their own, actionable as harassment is of no moment.[2] A workplace must be viewed in its totality. *Bailey v. San Francisco Dist. Attorney's Off.*, 16 Cal. 5th 611, 628 (2024). Considered alongside testimony from multiple women describing similar conduct and its effects, those statements are not meaningless "stray remarks," but part of a pattern of gendered behavior that bears directly on Defendants' credibility, their asserted justifications, and the reasonableness of Lively's belief. This Court has already found that Baldoni's comments about Slate's physical appearance could support a finding that Lively reasonably believed she was opposing an unlawful environment.[3] Dkt. No. 1273, at 53–54.

### 2.    *The Other Women's Experiences Support Objective Reasonableness*

The experiences of the other women—including Saks, Hall, Ferrer, and Ayoub[4]—are equally important to establishing Lively's credibility as well as the objective reasonableness of her concerns. To understand the insidious and gendered nature of Baldoni's and Heath's conduct, the jury must hear from the women themselves about what they experienced and why it was problematic. *See Pantoja v. Anton*, 198 Cal. App. 4th 87, 118 (2011) (finding that trial court erred by excluding "me too" evidence because if admitted, the jury would have had additional grounds

---

[2] Whether Slate, allegedly, felt her own issues with Baldoni were ultimately resolved sufficiently that she decided not to *sue* him does not negate the relevance of her concerns to Lively's reasonable belief. *Cf.* Dkt. No. 1312 at 11.

[3] Defendants also argue the statements to Slate are not probative because they were "made during costumed rehearsals in a film that tried to capture a sexy aesthetic." But this ignores Slate's testimony about the comment and that a reasonable juror could find Baldoni's comments were on Slate's personal physical appearances, rather than her appearance as an actor or character. *See* Dkt. No. 1273 at 53. Whose account is credible is for the jury to decide.

[4] Defendants attempt to bury this evidence because Hall, Plank, and Ayoub were not deposed fails. *See* Mot. at 13. Defendants had every opportunity to depose these witnesses, who were each listed on Lively's initial disclosures, and chose not to.

for believing that defendant harbored a gender bias that was expressed in his words and actions toward her, and additional grounds for disbelieving defendant). How women in *this* workplace, and other Wayfarer workplaces, view Baldoni and Heath's behavior is directly relevant to Baldoni's and Heath's, and by extension Wayfarer's and IEWUM's discriminatory mental state. *Id.* at 114–115.

Defendants argue that these experiences are too dissimilar from Lively's to matter. Mot. at 15-116. The law does not impose a bright-line rule excluding "me too" evidence; rather admissibility turns on how closely the evidence relates to the plaintiff's circumstances and theory. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008). Here, the overlap between Lively's case and the testimony of other women is substantial. These women interacted with the same individuals, in closely related contexts (each in a work environment overseen by Wayfarer, Baldoni and Heath), during the same time, and experienced gendered conduct they independently perceived as harmful. Saks' testimony regarding Baldoni's conduct, the lack of HR protocols on set, Heath's role as the sole reporting avenue, and Wayfarer's refusal to investigate concerns about sex-based behaviors because Heath believed that it would be better "*not to have a written record*" demonstrates a workplace structure that a reasonable person could view as hostile to reporting and inherently suspect. *See* Hudson Decl., Ex. 3, at 118:13–119:5. Indeed, Saks' testimony regarding Wayfarer's failure to investigate concerns is directly relevant to both retaliatory animus and punitive damages.[5] *See Mendoza v. W. Med. Ctr. Santa Ana*, 222 Cal. App. 4th 1334, 1343–45 (2014); *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1209 (10th Cir. 2000); *Bowles v. Osmose Utilities Servs., Inc.*, 443 F.3d 671, 675 (8th Cir. 2006). Defendants' assertion that Saks' testimony cannot show gender-based animus because an environment "equally harsh" for men and women

---

[5] Plaintiff intends to seek a jury instruction that "other acts" evidence may be considered to determine causation on Lively's retaliation claims and ratification and malice for purposes of punitive damages.

is not actionable, *see* Mot. at 15, ignores Saks' testimony that she never saw Baldoni treat male individuals the same way and that an employer may create a hostile work environment because it "feels important or powerful while humiliating women." *Pantoja*, 198 Cal. App. 4th at 114–15. Any "mini trial" about this incident would be brief; there is no evidence that Baldoni yelled at, diminished, or failed to investigate a complaint raised by any male in connection with the Film.

Ferrer will also testify to Baldoni's sexualized comments toward her. *See* Hudson Decl., Ex. 2, at 68:3–9; 244:3–245:17; 246:14–247:3; 252:21–254:3; 283:24–284:9. That the comments were made in the presence of a male co-star misses the point. The comments sexualized *Ferrer*, and she perceived them as such. That they were uttered to or around others does not neutralize their gendered content.

Ayoub provides additional independent confirmation. She worked on a different Wayfarer-produced film, but independently decided not to appear in press with Baldoni, Dkt. No. 1230 at 1230-32, reinforcing that concerns about Baldoni's conduct were not unique to Lively. Ayoub's testimony also underscores that Baldoni had previously had others refuse to promote a Wayfarer film alongside him but did *not* retaliate—the difference, here, was that Lively's sexual harassment claims threatened to shatter Baldoni's curated feminist image.

Any differences among the women's experiences go to weight, not admissibility. In the FEHA context, "[d]issimilarities between the facts related in the other employees' declarations and the facts asserted by plaintiff with regard to her own case go to the weight of the evidence, not its admissibility." *Johnson v. United Cerebral Palsy/Spastic Children's Found. of Los Angeles & Ventura Ctys.*, 173 Cal. App. 4th 740, 767 (2009).

### C.     The Evidence is Relevant to Rebut Defendants' Defenses

California law squarely rejects Defendants' contention that evidence of other women's experiences is irrelevant or inadmissible simply because those incidents did not occur in Plaintiff's

presence or were not known to her at the time. To the contrary, "me too" evidence—testimony from other employees or individuals who experienced similar conduct—may be admissible in the FEHA context even where the conduct occurred outside the plaintiff's presence and outside the period of her employment. *Pantoja*, 198 Cal. App. 4th at 117–118.

Such evidence is expressly relevant to demonstrate motive, intent, knowledge, and absence of mistake, to rebut a defendant's proffered justifications and factual claims, and to impeach credibility. *Id*. at 110–113; *see also Johnson*, 173 Cal. App. 4th at 760. Courts have consistently recognized that this type of evidence is particularly probative where, as here, defendants advance a narrative that their actions were legitimate or undertaken in good faith; in that circumstance, evidence from others similarly situated may directly undermine that defense and test the credibility of the defendant's asserted explanations. *Pantoja*, 198 Cal. App. 4th at 116–18; *see also Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1286–87 (11th Cir. 2008) (such evidence admissible to rebut employer's defenses and credibility); *Storrs v. Univ. of Cincinnati*, 2018 WL 684759, at *7 (S.D. Ohio Feb. 2, 2018) (same); *Cooter v. Angeles Nat'l Golf Club*, 2015 WL 5719140, at *6 (Cal. Ct. App. Sept. 29, 2015) ("Me too" evidence admissible to rebut defenses).

Here, one of Defendants' central narratives is that Lively orchestrated a coordinated effort to alienate Baldoni—persuading others to unfollow him, refuse to promote the Film with him, and exclude him from the premiere. Defendants use this theory to both attack Lively's credibility and to justify their retaliatory conduct as "reasonable" defenses against an alleged reputational attack. The testimony Defendants seek to exclude is a direct and compelling rebuttal to that narrative.

The women at issue have testified that they decided not to promote the Film or be associated with Baldoni based on their own experiences and concerns, not on any direction from Lively. *See* Hudson Decl., Ex. 3, at 296:1–8, Ex. 2, at 269:8–270:9; Dkt. Nos. 1230, at 1230-12,

9

1230-32. More than that, their testimony shows that Baldoni and Heath alienated themselves—in other words, that *their own actions*, rather than anything Lively did, created the PR crisis allegedly underpinning their so-called defensive measures. Slate and Ferrer will testify that they made their own decisions regarding social media and promotional participation based on their personal experiences with Baldoni. *See* Dkt. No. 1230 at 1230-12; Hudson Decl., Ex. 2, at 269:8–270:9 Hoover will testify that after Baldoni and Heath openly disparaged Lively to her, she independently chose to never speak to Heath or Baldoni again. *See* Hudson Decl., Ex. 5, at 85:6–17. Saks will testify that she believed Baldoni should be replaced as director, that Heath should not be allowed on set, and that she would not work with either of them again. *See* Hudson Decl., Ex. 3, at 108:19–112:1; 296:1–8. Hall similarly chose to distance herself from Baldoni based on his conduct toward her. *Id.* at 152:23–157:2; 154:3–155:20. And Ayoub—working on another Wayfarer production at the time—had such serious concerns about Baldoni that she barred him from her set and refused to do press with him. *See* Dkt. No. 1230, at 1230-32. That pattern of independent decisions by multiple women, across different contexts all concerning Wayfarer, IEWUM, Baldoni and/or Heath's workplace conduct and without coordination, undermines Defendants' narrative at its core. It was not Lively who "turned" others against Baldoni; Baldoni's and Heath's own conduct led multiple women to reach similar conclusions on their own. Excluding that testimony would leave the jury with a misleading and one-sided account.

The same evidence also rebuts Defendants' separate claim that Lively fabricated or leveraged sexual harassment allegations to seize control of the film. Apart from the testimony and documents described above, Hoover had her own independent concerns about Baldoni, including his editorial decisions, and she worked collaboratively with Lively on an edit of the Film that Hoover believed was more faithful to the source material. Hoover's involvement—and her

10

independent criticism of Baldoni—demonstrates that Lively's role in the editing process was not the product of coercion or opportunism, but of shared concerns about the direction of the film.

In short, the testimony Defendants seek to exclude is not peripheral "other acts" evidence. It goes directly to the truth or falsity of Defendants' core defenses. Excluding it would insulate those defenses from meaningful challenges and present the jury with a distorted record.

### D. The Other Female Witnesses Are Also Percipient Witness to the Smear Campaign and Its Effects

The challenged testimony is also independently relevant to the nature and scope of Defendants' retaliatory conduct. Defendants' conduct to undermine and attack Lively's credibility extended beyond her and affected other women associated with the film, who appeared alongside Lively in press and promotion. Ferrer and Hoover will testify that they experienced the collateral effects of Defendants' actions, including online backlash and reputational harm. The shift in marketing and narrative surrounding the film—particularly Baldoni's unilateral "DV pivot"— while designed to harm Lively also had consequences for other women involved in the production. This evidence shows that Defendants' conduct was not narrowly tailored or merely defensive. It had broader, foreseeable consequences that impacted multiple women.

### E. Defendants' Rule 404 Argument Fails

Finally, Defendants' Rule 404 argument fails because the evidence is not offered to show that Defendants are "bad actors." *See* Mot. at 16. It is offered to establish the reasonableness of Lively's state of mind, to demonstrate the objective reasonableness of her belief, to rebut Defendants' claim that Lively orchestrated opposition to Baldoni, and to challenge Defendants' asserted justification that their retaliatory actions were "reasonably defensive." The probative value is substantial because the evidence goes directly to essential elements of Lively's case and Defendants' central defense.

11

The risk of undue prejudice is minimal. The challenged evidence is limited to a discrete group of witnesses closely connected to the relevant events. This is not remote or unrelated conduct likely to confuse the jury. It provides necessary context to issues the jury must decide. Any concern about misuse can be addressed through a limiting instruction. *See Pantoja*, 198 Cal. App. 4th at 118. Defendants' "mini-trials" argument likewise does not justify blanket exclusion. If accepted, that rationale would exclude nearly all "other acts" evidence, no matter how closely related to the plaintiff's theory. That is not the law. *See Griffin v. Finkbeiner*, 689 F.3d 584, 600 (6th Cir. 2012).

## II.     Opposition to Defendants' Motion *in Limine* No. 2 To Preclude Evidence of Alleged Weight-Related Comments

Defendants' MIL No. 2 seeks to exclude evidence that Baldoni made comments about Lively's weight to her personal trainer. *See* Mot. at 17. The motion should be denied for three reasons.

***First***, Baldoni's weight-related comments are plainly relevant to Lively's FEHA retaliation claim – specifically, to whether she reasonably and in good faith believed she was opposing unlawful employment practices. *See* Dkt. No. 1273, at 106–07. In retaliation cases, courts in the Second Circuit routinely permit evidence concerning the conduct and circumstances that led the plaintiff to engage in protected activity. *See Orsaio v. New York State Dep't of Corr. & Cmty. Supervision*, 2022 WL 351827, at *3 (N.D.N.Y. Jan. 14, 2022), *aff'd*, 2023 WL 3410554 (2d Cir. May 12, 2023) (permitting evidence underlying a dismissed discrimination claim to prove plaintiff's reasonable, good-faith belief); *Hamza v. Saks Fifth Ave., Inc.*, 2011 WL 6187078, at *8 (S.D.N.Y. Dec. 5, 2011) (same). The weight-related comments form part of the context in which Lively experienced and assessed Baldoni's conduct and therefore bear directly on the reasonableness of her belief that she was opposing unlawful behavior.

***Second***, contrary to Defendants' assertion, Lively does not seek to introduce this evidence "solely to portray Baldoni in a negative light or suggest a propensity to engage in inappropriate behavior." Mot. at 18. The evidence is offered for a proper, non-propensity purpose: to establish Lively's state of mind – namely, her good-faith belief that she was opposing conduct prohibited by FEHA – as well as Defendants' retaliatory motive and intent. *See Freeman v. Odyssey Healthcare Operating A, LP,* 2022 WL 18216096, at \*2 (C.D. Cal. Mar. 28, 2022) (allowing evidence offered to establish retaliatory motive and intent). Critically, Lively need not prove that Baldoni's conduct ultimately constituted actionable sexual harassment to prevail on her retaliation claim; it is enough that she reasonably believed it did. *See Orsaio*, 2022 WL 351827, at \*3. Whether the comments independently "fall within the purview of the sexual harassment statutes," Mot. at 18, is therefore beside the point. Moreover, as the Court noted in its April 2nd Order, "[e]vidence that an employer made weight-related comments to persons of one only gender could in certain circumstances help demonstrate a hostile work environment based on sex." Dkt. No. 1273, at 110 (citing *King v. Aramark Servs. Inc.*, 96 F.4th 546, 564 (2d Cir. 2024)). Further, regardless of whether this particular comment was itself harassing, or whether Lively could have reasonably believed it to be so, the Court further explained that it is still relevant context because "sexual harassment claims must be viewed based on the totality of the circumstances." *Id.* at 112.

***Finally***, Defendants' cursory Rule 403 arguments fail to show that the probative value of this evidence is substantially outweighed by any risk of unfair prejudice, confusion, or delay. *See* Mot. at 17. There is nothing inflammatory or collateral about evidence of statements made by Baldoni that are part of the same course of conduct that prompted Lively's complaint. Far from diverting the jury's attention, this evidence provides necessary context for evaluating both her protected activity and Defendants' alleged retaliation.

Defendants' reliance on *Park West Radiology* is misplaced. Unlike the "mini-trial" concerns at issue there – where the court excluded evidence relating to separate fraud allegations by a non-party – the challenged evidence here concerns conduct by a central actor, during the relevant time period, arising from the same working relationship that gave rise to Lively's complaint and the alleged retaliation. In addition, evidence relating to this incident would require ***zero*** additional witnesses and any documentary evidence concerning this event is likely to be separately admissible because it addresses other issues in this case (including, but not limited to the Contract Rider Agreement). *See infra* Opp. to MIL No. 12. Simply put, the presentation of this evidence will not in any way threaten to sidetrack the jury into unrelated disputes. *See Park W. Radiology v. CareCore Nat. LLC*, 675 F. Supp. 2d 314, 325 (S.D.N.Y. 2009).

For these reasons, Defendants' MIL No. 2 should be denied.

### III.    Opposition to Defendants' Motion in Limine No. 3 To Preclude Evidence Concerning Alleged Sexual Assault

Defendants' MIL No. 3 fails to identify what specific evidence and/or testimony they seek to preclude. Mot. at 18.[6] The MIL should be denied on that basis alone, as it is impossible to discern from Defendants' vague references what evidence they are seeking to exclude.

That said, Lively may elicit testimony and/or introduce evidence concerning admissions Baldoni has made to her during the Film's production regarding his past sexual relationships,

---

[6] References to "sexual assault" also appear in Defendants' amended complaint, in which they alleged that Lively's publicist "escalated" a false narrative "by telling [a Daily Mail] reporter that [Lively] was 'sexually assaulted.'" Dkt. No. 50, at ¶ 193.  That Daily Mail reporter, James Vituscka, subsequently submitted a declaration clarifying that he erred in his use of the phrase "sexually assaulted" and that Lively's publicist "never told [him] that Lively was sexually harassed or sexually assaulted by Justin Baldoni," a fact which he made clear to Defendants' and their counsel before they sued Lively's publicist for defamation. Dkt. No. 286-1, at ¶¶ 2-3, 5; *see also* Dkt. No. 684-1; Dkt. No. 1268, at 2 ("It appears that the accusation against the Sloane Parties was false.  It may have been knowingly false."). To the extent this is the evidence Defendants seek to preclude, that request should also be denied, as it is plainly relevant to the credibility of material witnesses, and Defendants' retaliatory motive in filing their lawsuit against Lively and others.

which Lively and others personally witnessed.  For instance, in her declaration submitted in

opposition to Defendants' motion for summary judgment, Lively attested that:

> At one point during the first phase of filming, I was in a car with Baldoni, security detail, and my assistant.  During that drive, Baldoni divulged that he had not always asked for consent in sexual relationships and that he had not always listened when they said no.  Prior to sharing this disturbing admission, Baldoni grabbed my female assistant's arm long and slow and said, this "stays in this car."

Hudson Decl., Ex. 7, at ¶ 22. Lively's driver/security offered corroborating testimony relating to

Baldoni's statements in this car ride. Hudson Decl., Ex. 8, at 44:19–46:4; 46:12–47:9; 87:12–90:8;

92:23–93:10. To the extent MIL No. 3 is intended to exclude evidence and testimony concerning

these admissions by Baldoni, it should be denied. This unsolicited sexual commentary is highly

probative of Lively's reasonable, good faith belief that she was subjected to sexual harassment in

the workplace, a required element of her retaliation claim. *See* Fed. R. Evid. 401. Indeed, the Court

cited this evidence when analyzing this element of her claim in its Summary Judgment Decision

and Order, which clearly establishes its probative value and relevance. *See* Dkt. No. 1273, at 115.

While it may be prejudicial to Defendants, any prejudice does not *substantially* outweigh its critical

probative value.  *See* Fed. R. Evid. 403; *N. Am. Soccer League, LLC v. United States Soccer Fed.,*

*Inc.*, 754 F.Supp.3d 373, 379 (E.D.N.Y. 2024) (denying motion *in limine* to exclude evidence as

prejudicial "[b]ecause virtually all evidence is prejudicial to one party or another, [and] to justify

exclusion under Rule 403, the prejudice must be unfair and involve some adverse effect beyond

tending to prove a fact or issue that justifies admission.").  In fact, any perceived prejudice is belied

by the fact that Baldoni, himself, has spoken publicly about the same issues he confessed to Lively

and others.  *See* Jane Randel, *Boys Will Be Human | A Talk on Healthy Masculinity with Justin*

*Baldoni* (Mar. 7, 2023), https://www.youtube.com/watch?v=t48m6Ee9G18 (noting that "***I'm sure***

***I have crossed boundaries and lines*** in my teens and twenties not even thinking about it simply because of the porn I was consuming" (emphasis added)).[7]

What is more, this evidence is plainly admissible as, among other things, a statement by a party opponent, *see* Fed. R. Evid. 801(d)(2), made on a topic that is directly relevant to the case. Even the manner of the communication is relevant, because the fact that Baldoni made this disclosure in the small, confined space of a car, where none of the passengers could avoid hearing him and all were present for work purposes only, combined with his warning that "this stays in the car," suggests that he was aware he should not be saying it and did so anyway. For each of these reasons MIL No. 3 should be denied.[8]

## IV.    Opposition to Defendants' Motion *in Limine* No. 4 To Preclude All References To Other Clients Of Melissa Nathan and Jed Wallace

Defendants seek to exclude exhibits referencing clients of Melissa Nathan and Jed Wallace under Rules 402 and 403. Mot. at 19–21. While Lively agrees that the identities of certain Nathan or Wallace's clients may be properly redacted as irrelevant to the claims at issue,[9] several aspects

---

[7] Likewise, in his book *Man Enough: Undefining My Masculinity*, Baldoni recounts events in which he struggled with issues of consent. *See* Hudson Decl., Ex. 9, at BL-000007561 ("I am asking questions of myself in hopes that together the collective 'we' can ask those same questions. Like, . . .'***Why did I keep asking after she said no?***'"), at BL-000007727 ("Should I ask her or just find the moment and do it? ***Do I need consent?***").)

[8] Defendants' two criminal cases do not compel a different result, *see* Mot. at 18, and turn on a Rule 403 analysis that is inapplicable in this civil matter—that is, whether the "admission of evidence of ***uncharged crimes***" is "more inflammatory than the ***charged crime***." *United States v. Zhong*, 26 F.4th 536, 553 (2d Cir. 2022) (emphasis added); *United States v. Smothers*, 652 F.Supp.3d 271, 294 (E.D.N.Y. 2023) (same). That aside, neither case lend Defendants support. In *Smothers*, the court ***rejected*** each of the defendant's Rule 403 arguments, including one that challenged the admissibility of evidence related to a prior shooting, since such evidence "is no more inflammatory than the predicate acts alleged in the Indictment, which alleges 'multiple acts of murder.'" 652 F.Supp.3d at 294. And, in *Zhong*, which involved charges of forced labor, the Second Circuit found error in admitting evidence of uncharged crimes concerning "kidnappings, weapon use, imprisonment, threats of physical injury, and evictions of workers' families," since those extreme acts of violence had little bearing on the underlying charges. 26 F.4th at 552-53. Defendants would be hard pressed to advance a similar argument here and, in fact, make no attempt to demonstrate how Baldoni's *admissions* would be more inflammatory than the claims brought by Lively.

[9] Wallace should not be permitted to redact "client" names absent a showing that the individual whose identity he seeks to shield is in fact his "client." For a number of individuals discussed at Wallace's deposition, including ██████ ████████, Wallace repeatedly insisted they were ***not*** his client and had never engaged him to perform services of any kind (and, therefore, could not possibly have any expectation of privacy in whatever voluntary assistance Wallace was providing). *See, e.g.*, Hudson Decl., Ex. 10, at 84:1–16, 178:19–179:1, 207:10–12.

16

of their client work and clientele are directly relevant and highly probative of Lively's claims: (1) the services Wallace either described himself *actually performing,* or at minimum offered as services he was capable of performing, to powerful and influential individuals around the same time Wayfarer engaged Wallace to perform *exactly the same* services; (2) Nathan's prior representation of Johnny Depp; and (3) the identities of ███████ and the ███████ ███████—both of whom are relevant to digital campaigns conducted by Nathan and Wallace. Each of these facts, as described herein, is essential to challenging the credibility of Nathan and Wallace, who during their depositions testified under oath not just that they did not take any actions to manipulate online narratives about Lively, but also (contrary to numerous of their own text messages and emails) insisted that they had *never* engaged in such activities and would not even understand how to do so. As such, the documents Defendants seek to exclude are admissible. *United States v. Obayagbona*, 627 F. Supp. 329, 336 (E.D.N.Y. 1985) ("Credibility of a witness is always critical in assessing the probative force of a testimonial line of proof and thus the probability of the truth of the material proposition.").



During his deposition, Wallace repeatedly insisted under oath that his "███████ ███████," and that his company Street Relations does not ███████ Hudson Decl., Ex. 10, at 23:19–24:1. Wallace further testified, remarkably, that Street Relations has no commercially sensitive, proprietary, or otherwise secret methods, tools, or techniques that give it a competitive advantage. *Id.* at 30:10–16. He testified that neither he nor Street Relations were ███████ ███████—including, among other things, ███████" *id.* at 48:12–15, "███████ ███████," *id.* at 133:1–14, or ███████, *id.* at 281:19–282:8.

17

Wallace's communications with clients, prospective clients, and other individuals he disclaimed as "clients" yet performed considerable services for during the relevant period of time, prove that these are precisely the types of services he routinely offered and performed. *See, e.g.*, Dkt. No.1233-68; Dkt. No. 1233-67; Dkt. No. 1233-158. The fact that TAG routinely sent out descriptions of Street Relations' capabilities including these services is *directly* relevant to rebutting the Defendants' mantra that the *only thing they understood* Wallace did was engage in "monitoring" of online activity. Hudson Decl., Ex. 11, at 196:22–197:2, 198:22–199:8, 205:3– 206:9, 301:10–15, 381:13–382:11.

Moreover, Lively has the right to challenge Wallace's credibility in testifying that because he did not even understand what the services described in his own scope of work document were, he could not possibly have performed them for Wayfarer. Hudson Decl., Ex. 10 at 277:12–285:3. The jury is entitled to consider Wallace's considerable contemporaneous communications in which he admits not just that he knew what those services were, but that ***he regularly performed them***. *See, e.g.*, Dkt. No. 1233-61, at 3 ("I have the forensic guys rewriting the ▮▮▮▮▮▮ metadata . . . it has been weaponized (algorithmically)"); *id.* at 4 ("we are suppressing those posts/links/articles too"); Dkt No. 1233-68, at 2–3 ("I . . . have the various teams heavily clipping and algorithm boosting it for you and all keywords I've got trending for you."); *id.* at 3 (stating he will "handle" suppressing a story "and setup an algorithm to manage concerns related"); Dkt. No. 1233-63, at 2 ("I need to be able to throw a ton of upvotes at the stuff that is rah rah for him . . . and need to downvote everything else that's acting as a drag on him as part of our mandate from you and yours."); Dkt. No. 1233-65, at 2 ("We are undoing years of suppression related to your name and all related handles"); Dkt. No. 1233-66 ("[U]se our team of specialists to build all the digital (Reddit, site, X, 4 Chan, discord, etc) messaging to trend and dominate in client's favor.").

18

The jury must be allowed to review these messages to decide whether Wallace was lying when he wrote them, or was instead lying when he insisted under oath that he ██████████████████ and that the ████████████████████████████████████████████. Hudson Decl., Ex. 10, at 72:11–73:12, 132:23–25, 153:7–14, 170:20–171:2; *see Obayagbona*, 627 F. Supp. at 336 ("[T]he jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.") (quoting *United States v. Abel*, 469 U.S. 45, 52 (1984)).[10]

Lively's need for this evidence is compounded by Defendants' spoliation of critical communications. Wallace admitted that he ████████████████████████████ ████████████████████████████████. Hudson Decl., Ex. 10 at 72:25–73:12; 315:17–22. With those communications permanently destroyed, Lively has very few contemporaneous messages between Wallace and TAG that document the "digital" work Street Relations was performing on behalf of Wayfarer. Instead, the jury must make inferences, and to do so the jury is entitled to consider evidence of the services Wallace was offering to and conducting for other clients at the same time in assessing the credibility of Wallace and Nathan's monitoring-only narrative.

Wallace's deposition testimony underscores why the ***identity*** of those for whom he was performing services (some of whom Wallace insisted were ***not*** his clients) is far more probative than prejudicial. When confronted with contemporaneous communications like the ones described

---

[10] Defendants' reliance on *MF Global Holdings, Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558 (S.D.N.Y. 2017) is misplaced. There, the Court assessed whether "references to well-known historical accounting scandals"—in which neither party had any role—were unduly prejudicial. *Id.* at 580. The Court found the historical accounting scandals to be only "marginally relevant to explain the historical context" of regulations applied to plaintiff, and excluded the evidence, unless both parties' experts intended to "base their opinion on historical comparisons." *Id.* at 580. This case has no application here where the evidence of Wallace and Nathan's prior client work is highly relevant to show their capabilities in the digital space and impeaches their testimony denying such capabilities.

above, Wallace dismissed his representations mere ███████ or denied engaging in the conduct described. *See e.g.*, Hudson Decl., Ex. 10, at 121:3–25, 126:7–128:5, 132:1–133:14, 202:2–5. But the *identity* of the individuals to whom Wallace claimed to be making misrepresentations about his own services is directly relevant to whether his ███████ claim is credible. This is particularly true with respect to one of Wallace's contacts, who he disclaimed as a client, ██████████████ ████████████████████████████. The stature and prominence of ████████████— including the potential professional consequences of making written misrepresentations to a ████ ██████████████████—makes it less likely that Wallace was misrepresenting in private the nature of his capabilities and ordinary work, and far more likely that has written descriptions of his services should be credited over his subsequent, false, and self-serving deposition testimony. *See United States v. Saget*, 377 F.3d 223, 230 (2d Cir. 2004) (statements made to a person viewed as an ally in a private setting carry greater indicia of trustworthiness).  In that instance, the identity of the client is not merely relevant—it is essential.

The fact that Wallace and Street Relations are no longer parties to this action, Mot. at 21, is irrelevant to the admissibility of Wallace's testimony and documents. Wayfarer retained Street Relations and paid $90,000 for three months of Street Relations' services. Hudson Decl., Ex. 10, at 81:2–24. The services that Street Relations performed on Wayfarer's behalf as part of that engagement are directly relevant to Lively's claims against Defendants, and the statements that Wallace made regarding the work he was performing for Wayfarer are plainly admissible as an agent of Wayfarer. *In re Parmalat Secs. Litig.*, 598 F. Supp. 2d 569, 575 (S.D.N.Y. 2009) ("For centuries, the principal has been liable for the torts . . . of its agent as long as the agent acted within the scope of its employment."); Fed. R. Evid. 801(d)(2)(D). Nor does it matter that Wallace has elected not to appear live at trial. Mot. at 21. Under Federal Rule of Civil Procedure 32, Wallace's

20

deposition testimony is plainly admissible against Defendants because Defendants were "represented at the taking of the deposition," and Wallace "is more than 100 miles from the place of the hearing or trial." Fed. R. Civ. P. 32(a)(1), 32(a)(4)(B).

The same conclusion should be reached as to Nathan's representation of Johnny Depp during his highly public trial against Amber Heard.[11] On August 13, 2024, The Hollywood Reporter published a story reporting that Baldoni "retained the services of Melissa Nathan, who represented Johnny Depp during the Amber Heard trial."[12] This revelation came at an important turning point in Wayfarer's retaliation campaign against Lively, and Lively will testify about how Wayfarer's retention of Johnny Depp's crisis PR team influenced her understanding of Wayfarer's conduct at that moment in time. The point is *not* that Nathan was "immoral and a wrongdoer," Mot. at 20, but rather to underscore how Lively understood the torrent of online hatred that appeared virtually overnight on the heels of premiering a box office smash. *United States v. Salameh*, 152 F.3d 88, 123 (2d Cir. 1998) ("Evidence that tends to prove a character trait of a defendant is admissible if it is offered for another, proper purpose.").

Further, the fact that the Hollywood Reporter article specifically references Johnny Depp is directly relevant to evidence that impeaches Nathan's credibility. The day after the article was published, Baldoni told Nathan that he was ███████████████ specifically "████████████████████████████████ ████" Hudson Decl., Ex. 12 at NATHAN_000003972. Nathan responded to her client's frustration about having been linked in the press to Johnny Depp by falsely accusing two different

---

[11] Lively does not seek to admit evidence regarding the identities of TAG's other clients or the services it provided to other clients, except as further described herein.

[12] Carly Thomas, Pamela McClintock, *Justin Baldoni Hires Crisis PR Veteran Amid Alleged 'It Ends With Us' Rift*, The Hollywood Reporter (Aug. 13, 2024), https://www.hollywoodreporter.com/movies/movie-news/justin-baldoni-hires-pr-crisis-manager-melissa-nathan-it-ends-with-us-1235973715/.

people for having leaked the fact of TAG's retention by Wayfarer to the Hollywood Reporter. With certain audiences, Nathan fingered Lively's publicist, Leslie Sloane, as being behind the story, even though Nathan told Sloane herself that she knew Sloane had not placed the article. Hudson Decl., Ex. 13, at NATHAN_0000025230-31; Ex. 14, at LS_0000355. With others, including Jennifer Abel, Nathan blamed Stephanie Jones. Hudson Decl., Ex. 15, at JONESWORKS_00016314. All the while, Nathan concealed her knowledge (documented in her text messages) that the Hollywood Reporter learned about TAG's representation of Wayfarer from Nathan's own friends. Dkt. No. 1066-42 at 2. At her deposition, Nathan insisted that these text messages were just jokes, but the jury cannot evaluate the credibility of that self-serving claim without understanding the content of the article or why it so upset Baldoni (namely, the Depp comparison). Hudson Decl., Ex. 11, at 283:1–286:20.

The facts surrounding the publication of The Hollywood Reporter article go directly to Nathan's credibility when she testifies, as she testified to repeatedly during her deposition, that Lively and her publicist had placed multiple negative stories about Wayfarer with the press in August of 2024, and that TAG was merely responding to such stories in self-defense. *See, e.g.*, Hudson Decl., Ex. 11, at 314:20–315:10, 364:7–12. Lively must be permitted to elicit testimony, and introduce documentary evidence, regarding The Hollywood Reporter article and Nathan's representation of Johnny Depp to allow the jury to assess Nathan's credibility. *Obayagbona*, 627 F. Supp. at 336.

Finally, Lively intends to present evidence that Nathan and Wallace have worked collaboratively, including at the same time as the events in question in this case, to create websites to harm the reputation of their clients' foes or bolster the reputation of their clients. To do so, Lively will inherently need to identify either the clients or the targets of Nathan and Wallace's efforts,

22

including [REDACTED] (target) and [REDACTED] (client). The relevance of this evidence is again to impeach the credibility of Nathan and Wallace, who both not only denied participating in the creation of any such websites, but disclaimed even the understanding of how one would go about doing such a thing. *See* Hudson Decl., Ex. 16, at 39:21–40:10, 43:24–44:8; 75:17–76:3; Ex. 17, at 131:20–132:12; 203:18–204:5.  Yet again, this self-serving testimony is directly contradicted by their own text messages, a voice note, and the under oath testimony of Nathan's employee, Katie Case. *See, e.g.*, Hudson Decl., Ex. 18, at KCASE-000004950; Ex. 19; Ex. 20, at 374:21–377:22, 382:25–384:18, 387:8–19, 158:6–159:11, 505:8–506:22 . Evidence that Nathan and Wallace lied under oath about their involvement in the creation of multiple digital campaign websites is admissible because it is highly probative evidence of whether they are also lying about their involvement in a digital smear campaign launched against Lively, as well as their insistence that all Wallace and his company do when working with Nathan is engage in "monitoring." *United States v. Triumph Cap. Grp., Inc.*, 237 F. App'x 625, 629 (2d Cir. 2007) ("Nothing could be more probative of a witness's character for untruthfulness than evidence that the witness has previously lied under oath.") (quoting *United States v. Whitmore*, 359 F.3d 609, 619 (D.C. Cir. 2004)).  To the extent that such evidence is prejudicial, that is a problem created entirely by Nathan and Wallace's deceptive testimony—the issue would be entirely different had they simply admitted to doing the things they describe doing in their text messages and emails.

For the foregoing reasons, Lively requests that the Court admit into evidence: (1) Wallace's communications with other clients evidencing his capabilities in the digital space, as well as the identity of [REDACTED], (2) Nathan's representation of Johnny Depp, and (3) the smear websites created by Nathan and Wallace, and the identities of the clients or targets associated with

23

those websites.[13]

### V.    Opposition to Defendants' Motion *in Limine* No. 5 To Preclude Evidence and Argument Relating to Pretrial Filings And the Court's Ruling

Defendants seek to preclude all "reference" to Lively's motions for sanctions as well as to "the Court's rulings on such motions," and to "exclude any evidence, argument, or suggestions relating to the dismissed Wayfarer Complaint." Mot. at 22, 24. That motion should be denied to the extent it seeks to preclude evidence and argument relating to Defendants' dismissed action against Lively and Reynolds, for which the Court imposed sanctions under Rule 11. The motion should also be denied to the extent it seeks to prevent the jury from hearing about Defendants' spoliation of evidence, because permitting such argument may be among the remedies for such spoliation.

*First*, contrary to Defendants' broad claims about the irrelevance and prejudicial nature of "evidence relating to [a court's] previous decisions in the case, including sanctions motions," Mot. at 22, in the circumstances of this case, Defendants' dismissed action and the Court's Rule 11 determination is directly relevant to Lively's retaliation claims and not unfairly prejudicial. Specifically, Lively is entitled to introduce evidence that IEWUM brought an objectively baseless action against her and argue that this was a retaliatory adverse action.

As this Court has recognized, under California law "[r]etaliation claims are inherently fact specific, and the impact of an employer's action in a particular case must be evaluated in context," considering "the unique circumstances of the affected employee as well as the workplace context

---

[13] Defendants seem to draw no distinction between documents "*exclusively* referencing other clients of Nathan and Wallace," and "communications referencing services for Wayfarer Studios *and* other clients" on the same internal text thread, requesting instead that the Court "preclude these exhibits" indiscriminately. Mot. at 19. Such wholesale exclusion of the document would be inappropriate and unwarranted. To the extent any references to Nathan or Wallace's clients are deemed irrelevant or prejudicial, targeted redactions—rather than wholesale exclusion—are the proper remedy. *See Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250, 288 (S.D.N.Y. 2015) ("Because these portions do not add to the probative value of the emails and could prove unfairly prejudicial . . . redaction as proposed by plaintiff is appropriate.") (citation omitted).

of the claim." *Lively v. Wayfarer Studios LLC*, No. 24-CV-10049, 2026 WL 905447, at \*61 (S.D.N.Y. Apr. 2, 2026) (quoting *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1052 (2005).). And the Court has further recognized that one of Defendants' core defenses in this case is their assertion that "even if they contemplated taking offensive action against Lively, they never ended up doing so." *Id.* at \*62. IEWUM's filing of an objectively baseless claim against Lively, for which it was sanctioned under Rule 11, constitutes a retaliatory adverse action and thus bears directly on an element of Lively's statutory and contract claims; it also disproves Defendants' self-serving narrative that they never followed through on their intentions to retaliate against her. Separately, and combined with a jury's conclusion that Defendants and other third party witnesses' testimony on that subject is not credible, could support a verdict in Lively's favor. *Id.* at \*62–63.

As is well established, retaliatory conduct can include retaliatory litigation. And while courts "have held that an employer who is facing a lawsuit filed by its employee charging discrimination can file a counterclaim without committing an adverse action within the meaning of the antidiscrimination statutes *so long as the counterclaim is filed without a retaliatory motive and with a reasonable basis in fact or law*," *McSweeney v. Cohen*, 776 F. Supp. 3d 200, 253 (S.D.N.Y. 2025) (emphasis added), the flip side is also true: "Courts have held that baseless claims or lawsuits designed to deter claimants from seeking legal redress constitute impermissibly adverse retaliatory actions[.]" *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 472 (S.D.N.Y. 2008) (collecting cases); *see Eckhart v. Fox News Network, LLC*, No. 20-CV-5593 (RA), 2021 WL 4124616, at \*22 (S.D.N.Y. Sept. 9, 2021) ("[O]nly *reasonable* defensive measures are immune from allegations of retaliation.") (internal quotation marks omitted) (emphasis in original); *see also Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996) (recognizing that "malicious-prosecution-like scenarios" can constitute actionable retaliation).

25

Defendants' dismissed complaint is thus of unquestionable relevance to Lively's claims. So is the Court's ruling under Rule 11, which confirmed beyond doubt that IEWUM filed that action without an objectively reasonable basis to do so. Specifically, the Court held that IEWUM "simply had no basis to sue Lively or Reynolds for civil extortion," and did not identify "even an arguable basis in law or fact" for IEWUM to assert a tortious interference claim against them. *Lively v. Wayfarer Studios LLC*, No. 25-CV-10049, 2026 WL 852740, at *4 (S.D.N.Y. Mar. 27, 2026). Moreover, as the Court recognized, those objectively baseless claims were not harmless, including on the grounds that other plaintiffs who brought those claims did not face sanctions: "A claim by a person that the defendant has committed a tort or breached a contractual relationship is not to be made lightly. It can carry reputational consequences, even if that same claim is properly made by another party." *Id.* at *5.

IEWUM's conduct in filing the lawsuit and the Court's conclusions about its reasonableness are unquestionably relevant to Lively's claims. Lively should be allowed to present evidence to the jury that IEWUM filed a lawsuit against her that the Court determined to be objectively baseless, and to ask the jury to conclude based on that and other evidence that IEWUM's true motive for filing that action was retaliation for her opposing conduct during the production of the film, including by filing the CRD complaint in California.[14]

---

[14] All of the cases relied on by Defendants concern prior rulings on discovery sanctions, other pending lawsuits, and prior dismissed or unpled claims that did not result in Rule 11 sanctions. *See Colson*, 2025 WL 688832, at *3 (evidence "pertinent *solely* to dismissed or unpled claims is irrelevant") (emphasis added); *Gorbea v. Verizon New York, Inc.*, No. 11-CV-3758 (KAM) (LB), 2014 WL 2916964, at *2 (E.D.N.Y. June 25, 2014) (same, with respect to claims dismissed at summary judgment); *Moore v. Rubin*, No. 17-CV-6404 (BMC), 2020 WL 13573582, at *3 (E.D.N.Y. Jan. 31, 2020) (stating the general proposition that "evidence of other lawsuits" is generally inadmissible, without discussing the relevance of the specific lawsuits at issue); *Asanjarani v. City of New York*, No. 09-CV-7493 (JCF), 2011 WL 6811027, at *1 (S.D.N.Y. Dec. 27, 2011) ("evidence relating *exclusively* to claims previously dismissed is generally inadmissible") (emphasis added); *Zubulake v. UBS Warburg LLC.*, 382 F. Supp. 2d 536, 546 (S.D.N.Y. 2005) (excluding evidence of discovery misconduct in favor of the adverse inference instruction ordered as a remedy for that misconduct); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, No. 15-CV-211 (LGS), 2025 WL 1565327, at *7 (S.D.N.Y. June 3, 2025) (prior discovery rulings); *Foster v. Berwind Corp.*, No. 90-CV-0857 (JMK), 1991 WL 83090, at *1 (E.D. Pa. May 14, 1991) (excluding evidence of unadjudicated claims because they are mere

Moreover, no cognizable prejudice, much less unfair prejudice, would result. Defendants do not explain how introduction of this particular evidence would be prejudicial, only asserting in conclusory fashion that it is so. Mot. at 24. Not only would the relevance of this evidence not be substantially outweighed by the danger of unfair prejudice, it would be unfair *to Lively* to exclude this evidence: any prejudice would reflect not unfairness, but the accuracy of Lively's contention that IEWUM engaged in actionable retaliatory conduct against her. It would be unfair to Lively to exclude such evidence because she filed a motion seeking to establish that IEWUM's claims were objectively baseless, and then the Court agreed with that position. To be clear, in light of the Court's ruling, it is hard to imagine that a reasonable jury could disagree that IEWUM's claims lacked an objectively reasonable basis in law or fact, or that it was a reasonable defensive measure. But at a minimum, no unfair prejudice would result from the jury hearing evidence relating to that lawsuit and the Court's Rule 11 decision, much less any unfair prejudice that would substantially outweigh that evidence's probative value. Defendants' Rule 401, 402, 403 arguments must be rejected.

Similarly, Defendants' Rule 404 argument must be rejected as to this evidence because it would not be offered to prove "that on a particular occasion" any party "acted in accordance with" any "character" or "trait." Fed. R. Evid. 404(a), (b). To the contrary, Lively seeks to introduce this evidence in order to establish that IEWUM engaged in particular conduct, because *that conduct,* if proved, would establish an element of her claims. The fact that IEWUM filed a lawsuit against Lively that was found to be objectively baseless simply is not character evidence when offered to prove that IEWUM's committed a retaliatory adverse action against Lively by filing *that lawsuit*. Defendants' Rule 404 argument must be rejected.

---

"allegations"). Defendants cite no case bearing on the issue here, namely the admissibility of evidence of a retaliatory lawsuit that has been found by a court to be objectively baseless, where the plaintiff seeks to use such evidence to prove that the lawsuit itself was a component of unlawful retaliation against her. As illustrated by the cases cited above, such evidence has direct relevance and is not substantially outweighed by the danger of unfair prejudice.

27

A similar analysis applies to evidence relating to Defendants' spoliation of evidence. As even Defendants' own case recognizes, at a minimum, the jury must hear whatever adverse inference or similar instruction results from Lively's spoliation motion. *Zubulake*, 382 F. Supp. 2d at 546 (excluding evidence of discovery misconduct in favor of the adverse inference instruction ordered as a remedy for that misconduct). As Lively explained in that motion, the potential remedies for Defendants' conduct may include mandatory presumptions regarding the lost information, or permissive or mandatory adverse inference instructions to be delivered to the jury. Dkt. No. 874, at 24 (citing Fed. R. Civ. P. 37(e)(2)). And in the alternative (and at a minimum), Lively should "be permitted to present evidence and argument to the jury regarding the lost documents" and to seek further curative instructions. *Id.* at 24–25 (quoting *Barbera v. Grailed, LLC*, No. 24-CV-3535 (LJL), 2025 WL 2098635, at \*11 (S.D.N.Y. July 25, 2025)); *see* Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment. To the extent Lively's spoliation motion is granted in any relevant part, not only must evidence of that ruling not be excluded, whatever remedy she receives must be *presented* to the jury.

Finally, Defendants seek to exclude "any reference to court proceedings involving pretrial publicity and sealing." Mot. at 25. While it is difficult to understand what evidence Defendants may be referring to, to the extent this request seeks to prevent Lively from introducing evidence of the damages she suffered as a result of Defendants' retaliatory litigation, it must be rejected. That evidence includes evidence of various publicity stunts, statements, and a digital campaign Defendants and their agents engaged in in order to make hay out of their retaliatory lawsuit and maximize its harmful effect on Lively. Independent of whether that conduct is itself actionable (such as Bryan Freedman's retaliatory statements made on behalf of his clients), that conduct is indisputably relevant to the damages Lively suffered as a result of the retaliatory lawsuit, because

28

it was one of the mechanisms by which that damage was inflicted. As the Court recognized in granting Lively's Rule 11 motion, "A claim by a person that the defendant has committed a tort or breached a contractual relationship is not to be made lightly. It can carry reputational consequences, even if that same claim is properly made by another party." *Lively*, 2026 WL 852740, at *5. Defendants sought to inflict just such "reputational consequences" by drumming up coverage of their $400 million lawsuit, and Lively is entitled to present that evidence to the jury.[15] As one of Defendants' own cases recognizes, even evidence (there, relating to a plaintiff's dismissed claims) that must be excluded on relevance grounds as to liability may be admitted for the purpose of proving damages. *Colson v. Mingo*, No. 18-CV-2765 (JGLC), 2025 WL 688832, at *3 (S.D.N.Y. Mar. 4, 2025). And any potential prejudice to Defendants would be easily cured by an instruction making clear to the jury that they can consider such evidence only as it relates to damages.[16]

---

[15] For example, Defendants' counsel made various statements to the press trumpeting the dismissed action's extortion claim, including that Defendants' dismissed action would show "all of the evidence which will show a pattern of bullying and threats to take over the movie" and that Lively "used other people to communicate those threats and bully her way to get whatever she wanted," Dkt. No. 545-1, at 5; that Lively made "multiple demands and threats . . . during production which included her threatening to not showing up to set, threatening to not promote the film, ultimately leading to its demise during release, if her demands were not met," Dkt. No. 545-1, at 2; and that Lively "used these allegations of sexual harassment, and she used these allegations of bullying to try and leverage her position so that she could be the de facto director in the case," Dkt. No. 545-1, at 5. But as the Court has held, the dismissed action failed to allege that Lively had any obligation to promote the Film with Baldoni or to act in the Film "no matter the circumstances"—and "[a] refusal to provide that which one has no obligation to provide is not a threat; it is a bargaining position." *Lively v. Wayfarer Studios LLC*, 786 F. Supp. 3d 695, 747 (S.D.N.Y. 2025); *id.* at 749 ("Even if they turn out to be unneeded, an employee can insist on protections at workplace for sexual harassment without being accused of extortion. If an employer accedes, it cannot later claim to be a victim of the employee's wrongful threats."). And with respect to IEWUM, the Court later held that IEWUM "simply had no basis" for its civil extortion claims against Lively. *Lively*, 2026 WL 852740, at *4. No unfair prejudice would result from looking to IEWUM's own counsel's statements referencing IEWUM's objectively baseless claims of extortionate threats to measure the damages attributable to IEWUM's retaliatory lawsuit.

[16] Lively's MIL No. 7 seeking to exclude the "MSJ Statement Evidence" is differently situated, because unlike evidence of Defendants' conduct surrounding the dismissed action, the "MSJ Statement Evidence" is of no arguable relevance to any claim or defense. And even if it were, it would be prejudicial to Lively for Defendants to be permitted to draw a false equivalence between the MSJ Statement Evidence and Defendants' own trumpeting of a retaliatory $400 million lawsuit that, as to IEWUM, lacked no objective basis in law or fact. *See* Dkt. No. 1333, at 21–22. Needless to say, should the Court grant this portion of Defendants' motion in limine, it must also grant Lively's MIL No. 7.

29

**VI.** **Opposition to Defendants' Motion *in Limine* No. 6 To Preclude References To Other Lawsuits Involving Defendants, The Dismissed Defendants, Or Their Counsel**

Lively understands Defendants' MIL No. 6 as attempting to preclude references only to the following lawsuits: (1) *Jones et al. v. Abel et al.* (25-cv-779); (2) *Norman v. Wayfarer Studios, LLC, et al.*, Cal. Super. Ct. Case No. 20STCV46882 ("*Norman*") and *Celeste C. Smith v. Wayfarer Foundation, Wayfarer Pathways, and Steve Sarowitz*, Case No. 26-cv-01940 (N.D. Ill. Feb. 20, 2026) ("*Smith*"); and (3) any other unspecified lawsuits "involving Melissa Nathan." *See* Mot. at 25–29. For the reasons discussed below, Lively does not object to the Court excluding references to *Jones* or discussions about the merits of the *Norman* and *Smith* cases, with some slight modifications to the Defendants' request. Lively disagrees that the Court should exclude references to any other lawsuits involving Nathan.

***First***, Lively agrees that the parties should not introduce references to the *Jones* matter, but requests that the Court expand such a ruling to preclude any questioning into the allegations in that matter that are irrelevant to the claims and defenses in this matter, even without any explicit reference to the lawsuit. For example, neither party should be permitted to introduce evidence or seek testimony relating to the contract between Stephanie Jones and Wayfarer (or Baldoni) or between Ms. Jones and Jennifer Abel or any alleged related breaches of the same. The Court should not permit the Defendants to use the expected testimony of Jones as another chance at discovery in the *Jones* case. The Court should, however, permit the use of filings in the *Jones* matter as party admissions, recorded recollection, past inconsistent statements, or other forms of impeachment. *See Park West Radiology,* 675 F. Supp. 2d at 336 (contents of a filing in another case may be admissible for past recorded recollection) (cited in Mot. at 26); *Williams v. Geraci*, No. 14-CV-5742 (SIL), 2020 WL 5848738, at *12 (E.D.N.Y. Sept. 30, 2020) (permitting use of another lawsuit as evidence because "it is being introduced for another purpose, to impeach Williams's credibility

and show inconsistency in his statements"); *Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 38 (S.D.N.Y. 2015) (factual admissions made in another proceeding "may be considered as evidentiary admissions").

***Second***, Lively agrees that the Court can properly limit any use of the allegations in the *Norman* or *Smith* pleadings or any attempt to use the materials in those cases for the truth of the matter asserted. But it is appropriate and consistent with the Rules to permit Lively to use *Norman* and *Smith* to probe disparities between how Wayfarer handled those cases—both involving allegations raised by men—and how it chose *not* to address the complaints Lively and other women made about the conduct of Baldoni and Heath. *Cf. Shorter v. Hartford Fin. Servs. Grp., Inc.*, No. 3:03CV0149 (WIG), 2005 WL 3536122, at *2 (D. Conn. Dec. 6, 2005) (denying defendant's motion for judgment as a matter of law on claims of race and gender discrimination in part because the plaintiff "produced substantial evidence that the infractions of company policy were selectively and discriminatorily investigated," with one "set of rules applied to defendant's investigation" of a black male and "another set of rules" in its investigation of a white female). Defendants' Rule 403 and 404 arguments are inapplicable because Lively does not intend to use *Norman* or *Smith* to show any "propensity for unfair treatment of employees," but rather to show a disparity in how Wayfarer applied its own anti-discrimination and retaliation policies. *See* Mot. at 26–27.[17]

***Third***, the Court should deny the Defendants' request to exclude unspecified "other actions involving Melissa Nathan." Mot. at 28. The Court can deny this request on its face given Defendants' failure to "specify the writings or potential testimony that the movants believe should be excluded from the trial of this action" is self-defeating. *Viada v. Osaka Health Spa, Inc.*, No. 04 CIV. 2744 VMKNF, 2005 WL 3435111, at *1 (S.D.N.Y. Dec. 12, 2005) (denying motion in limine

---

[17] The bulk of the cases cited by the Defendants relate to attempts to use other lawsuits for the truth of the matter asserted, which makes them inapposite here.

because the lack of specificity meant the court was "unable to determine, with any degree of certainty, whether the writings and testimony sought to be excluded from the trial would be inadmissible"). To the extent the Defendants are referring to the multiple lawsuits against Nathan relating to work she has performed with other clients, there are non-hearsay reasons why Lively is permitted to use materials filed in such cases, including, for example, Nathan's own judicial admissions, as well as addressing her credibility before the jury. *See Williams*, 2020 WL 5848738, at \*9, \*11 (evidence of prior lawsuits can be admitted if "offered for a different purpose under Rule 404(b)," which include proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident").[18]

## VII.    Opposition To Defendants' Motion *in Limine* No. 7 To Preclude Any Reference to a Surreptitious Recording of Nonparty Steve Sarowitz

Steve Sarowitz's statements to Claire Ayoub go to the heart of Lively's retaliation claim. Defendants raise no legal challenge to the propriety of the recording—instead, they take issue with the relevance of Sarowitz's statements and insist that their interpretation of what Sarowitz meant should preclude the jury from hearing the statements at all. But the jury is entitled to decide for itself how to interpret Sarowitz's promise that if Lively and Reynolds "ever cross the line, ever, then I will go after them,"[19] and Lively is entitled to argue that this statement was evidence of his plan, intent, or motive to engage in unlawful retaliation, as this Court has already recognized. *See* Fed. R. Evid. 801(d)(2), 803(3).  Specifically, the Court quoted Sarowitz directly ("There will be two dead bodies when I'm done.  You know, and so not dead, but, you know . . . But you're dead

---

[18] In contrast, none of these categories applies to Lively's MIL No. 2, which seeks to exclude evidence regarding Vanzan.  Dkt. No. 1326 at 7. That evidence lacks any conceivable relation to Lively's claims pursuant to Federal Rules of Evidence 401–03, whereas this evidence will be addressed as to *inter alia* Nathan's knowledge, opportunity, and intent in connection with participation in the creation of websites and digital activity as to others, including at the very same time in August 2024. *See supra* Opp. to MIL No. 4, (citing Hudson Decl., Ex. 18 at 4; Ex. 19 at 1; Ex. 18, at 10).
[19] Defendants omit this portion of the recording from their description of the relevant statements. Mot. at 29.

to me . . . So that kind of—that kind of dead, but dead to a lot of people.") in its discussion of the retaliatory campaign, finding that, based in part on that statement, "[t]here is evidence from which a jury could find that the Wayfarer Parties planned more aggressive action, not only to "destroy" Lively's accusations but to destroy her and her career." Dkt. No. 1273 at 132-133.

Sarowitz, who remains a party in this case until judgment is entered,[20] is the co-founder, co-chairman, and chief financier of Wayfarer, and his motive, knowledge, and intent in this context[21] are directly attributable to Wayfarer itself. Sarowitz's statements are squarely relevant to the question whether Defendants' conduct "crossed the line" from "reasonable defense measures" to unlawful retaliation. Dkt. No. 1273 at 130–32. Indeed, Sarowitz's statement that he planned to "go after" Lively and her husband, alongside his reflexive explanation that by referring to "39,000 dead bodies," what he really meant is that he intended to make Lively and Reynolds "dead to a lot of people," is far more incriminating than it is exonerating.[22] Regardless, Defendants' subjective interpretation of what Sarowitz truly meant is a quintessential credibility determination that the jury is entitled to make for itself. *See Castro v. City of New York*, No. 06-CV-2253, 2009 WL 2461144, at *5 (E.D.N.Y. Aug. 10, 2009) (holding that statement made by an agency's director of human resources is admissible because it "concerns plaintiff" and "is clearly relevant to the issue of retaliatory animus" by "evidenc[ing] an intent to retaliate against plaintiff").

---

[20] *Keawsri v. Ramen-Ya Inc.*, No. 17-CV-2406 (LJL), 2022 WL 2391692, at *1 (S.D.N.Y. Jul. 1, 2022) (Liman, J) (noting, where summary judgment granted, that "judgment has not been entered under Rule 54(b) and they remain defendants"); *We Shall Overcome Found. v. Richmond Org., Inc.*, No. 16-CV-2725, 2018 WL 400776, at *1 (S.D.N.Y. Jan. 12, 2018) (when order does not adjudicate all of the claims in the case, it "does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities"); *In re Agent Orange Prod. Liab. Litig.*, 95 F.R.D. 192, 194 (E.D.N.Y. 1982) ("Until such a final judgment is entered, the government is still a party to these actions.").

[21] Sarowitz was speaking within the scope of his agency for Wayfarer Studios, as emphasized by the very part of the quote that Defendants seek to highlight. Mot. at 29 ("I will protect the studio like Israel protected itself from Hamas. . . . I'm going to spend a lot of money to make sure the studio is protected.").

[22] Even the most charitable reading of Sarowitz's comment ***is a threat*** to harm the standing and reputation of Lively *and her husband* if she did anything that Sarowitz believed "crossed the line."

Defendants complain that hearing Sarowitz's own words will somehow prejudice the jury against Wayfarer, but "the fact that an item of evidence against a party is damning does not constitute, by itself, unfair prejudice" because "[b]y definition, evidence admitted against a party tends to be prejudicial." *Kashef v. BNP Paribas SA*, No. 16-CV-3228, 2025 WL 2324214, at *3 (S.D.N.Y. Apr. 11, 2025). The recording speaks directly to Wayfarer's intent to retaliate against Lively and the scope of that retaliation, and as this Court has already held, "[i]t is fair to presume that the Wayfarer Parties did what they said they planned to do." Dkt. No. 1273 at 133. The strong probative value of this evidence, as recognized by the Court, outweighs any potential for unfair prejudice. *See Kashef*, 2025 WL 2324214, at *3.

Rule 404 also does not help Defendants. The recording is not offered to prove that Sarowitz is a person of bad character or that he committed a prior bad act. Rather, the recording captures a statement of intent about Sarowitz's plan to spend "a lot of money" to ensure that Lively and her husband would be "dead to a lot of people." The jury should be permitted to consider Sarowitz's contemporaneous statements directly articulating the retaliatory motive and plan carried out by Defendants.

## VIII.    Opposition to Defendants' Motion *in Limine* No. 8 To Preclude Evidence Of Steve Sarowitz's Wealth, Financial Resources, And The Payment Of Defendants' Legal Fees

Evidence of Sarowitz's financial resources in this case is not being offered as inadmissible atmospherics of deep pockets, but instead for the relevant purpose of proving, through Sarowitz's own statements, that Wayfarer engaged in unlawful retaliation. The jury is entitled to consider evidence showing how Sarowitz referenced his wealth in the context of threatening Lively, including both his statement at the New York City premiere that he was willing to spend $100 million to ruin the lives of Lively and Reynolds, Dkt. No. 963-85 at 4, as well as his later comment that he did not think Lively and Reynolds were "actually . . . billionaires" in the context of

34

promising to "go after" them if they were to ever "cross the line." Dkt. No. 1245-161. The jury may conclude, from such statements, that Sarowitz sought to intimidate Lively from engaging in protected activity—namely, the filing of a legal claim—by threatening to tap into an unlimited war chest if Lively were to file a claim.

In other statements, Sarowitz referenced his wealth as a way to minimize and dismiss Lively's and other women's complaints of harassment on set, further discouraging Wayfarer from investigating such claims. In May 2023, when Baldoni shared with Sarowitz how "the ladies had feelings about" comments made on set, Sarowitz responded that "he should come to s[et] and remind Blake who's money this is." Dkt. No. 1230-31 at 3. Similarly, regarding Lively's complaint that Sarowitz was on the "closed set" during the filming of the birth scene, Sarowitz testified—in a portion of his deposition designated by Defendants—that "[w]hile I might have technically been non-essential, I did invest $30 million and paid for her salary . . . and I consider that to be essential. [If] Lively considers that not to be essential, she can send me a check." Dkt. No. 963-6, Sarowitz Tr. 169:14–23. Both instances are evidence of Wayfarer wielding its power, in the form of Sarowitz's wealth, to silence or dismiss complaints without investigation. As such, this evidence is directly relevant to both retaliatory animus and punitive damages. *See Mendoza v. W. Med. Ctr. Santa Ana*, 222 Cal. App. 4th 1334, 1343–45 (2014); *Roberts v. Ford Aerospace & Commc'ns Corp.*, 224 Cal. App. 3d 793, 801–02 (1990); *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1209 (10th Cir. 2000); *Bowles v. Osmose Utilities Servs., Inc.*, 443 F.3d 671, 675 (8th Cir. 2006).

The fact that Sarowitz has tapped into his considerable wealth to pay for the expenses in Wayfarer's smear campaign and retaliatory litigation also goes to the bias of numerous witnesses in the case. Sarowitz has testified that he provides all of the financing for Wayfarer, that what harms Wayfarer financially harms him personally, and appears to be financing the publicity

expenses, vendor costs, and legal fees of not only Wayfarer but a number of third-party witnesses. *See, e.g.*, Dkt. No. 1230-11, 131:23–132:3, 363:9–364:15; Dkt. No. 1251-1, at 177:9–178:4.; Dkt. 1233-25 at 3 (June 2024 text chain indicating Sarowitz will be paying for "great lawyers just to be armed with"); Dkt. No. 1233-89 at 2 (Baldoni telling Sarowitz he is "already helping by wayfarer paying for the pr teams. That's you loving me."). As such, Sarowitz has considerable bias as a testifying witness, and the jury is entitled to understand why. *See N. Am. Soccer League, LLC v. U.S. Soccer Fed., Inc.*, No. 17-CV-5495 (HG), 2025 WL 1311115, at *11, n.5 (E.D.N.Y. May 6, 2025) (holding that witness's "personal financial stake in this case had substantial probative value") (citations and internal quotation marks omitted).

As Defendants acknowledge, evidence of wealth is relevant to the determination of punitive damages. *Carroll v. Trump*, 151 F.4th 50, 85 (2d Cir. 2025) (jury instructed to consider the amount necessary to deter future wrongdoing in determining punitive damages). Despite no longer being a Defendant in this action, Sarowitz's wealth remains highly relevant to determining the amount of appropriate punitive damages. Sarowitz not only testified that he is ████████ ████████ but that he is "not sure where Wayfarer ends and I start," when it comes to damages to Wayfarer's financial interest. Hudson Decl. Ex. 21, at 100:18–22; Dkt. No. 1230-11, at 131:23–132:3; Dkt. No. 1251-1, at 177:9–178:4. Because Wayfarer—through Sarowitz—has access to virtually unlimited funding, the jury should consider the impact on Sarowitz's wealth in determining what punitive damages award would deter Wayfarer's future wrongdoing.

Even if the Court disagrees and deems general evidence of Sarowitz's wealth inadmissible, that ruling should not preclude Lively from introducing into evidence otherwise relevant and admissible statements made by Sarowitz himself that may reveal the extent of his wealth. *See, e.g.*, Dkt. No. 1230-11, at 132:10–14 (confirming his $30 million investment in Film); Dkt. No. 1230–

36

31 at 3 (Sarowitz suggesting he should come to set to "remind Blake who's money this is"); Dkt. No. 963-85 at 4 (evidence that Sarowitz said that he was "prepared to spend $100 million to ruin the lives of Lively and her family"). The probative value of such evidence outweighs any potential prejudice of an inference of wealth, particularly when such an inference will be easily drawn from Sarowitz's role as financier of Wayfarer, and where Lively will similarly be presumed to have significant wealth (reducing the likelihood that the jury is prejudiced one way or the other by class status).

## IX. Opposition to Defendants' Motion *in Limine* No. 9 To Preclude Evidence Relating to Bryan Freedman

Defendants attempt to preclude, in a single concluding sentence without any argument or citation to authority, any mention of Bryan Freedman. *See* Mot. at 31. The Court should reject that argument not just because it lacks any supporting authority or argument, or because it fails to specify the evidence it seeks to exclude, *see Viada.*, No. 04 CIV. 2744 VMKNF, 2005 WL 3435111, at *1, but also because it would implicate a significant amount of evidence documenting the Defendants' retaliation campaign separate and apart from Freedman's voluminous media appearances. For example, as the Court referenced in its summary judgment order, one important piece of evidence reflecting "steps to harm" Lively's reputation was the group chat that Freedman started amongst his colleagues, clients, and influencer Sage Steele to discuss how to "use" Steele to create a video that "can go viral" with the appearance of being "organic[]." Dkt. No. 1273 at 126. Freedman appears elsewhere as well, including an admission (by Melissa Nathan) that he attempted to intimidate Jenny Slate from participating in Lively's case, communications with media outlets and social media personalities designed to procure negative coverage of Lively, and even threatening media outlets with patently frivolous lawsuits if they did not bow to his demands. *See* Dkt. No. 1236-2 at ¶¶ 805, 818–823; 1233-113 at 2, 1233-114 at 3, 1233-115 at 2. Freedman's

apparent regrets regarding his own words and conduct do not provide a basis to exclude demonstrably relevant evidence. *See Sjunde AP-Fonden v. Gen. Elec. Co.*, No. 17-CV-8457 (JMF), 2024 WL 4246159, at *1 (S.D.N.Y. Sept. 18, 2024) ("the Court will not exclude all references to counsel's involvement" in the underlying events); *cf. United States v. Scully*, 877 F.3d 464, 474 (2d Cir. 2017) (reversing trial court's exclusion of testimony about attorney involved in case, including based on rejecting argument that it was prejudicial because he was "in court every day" (citation modified)). Defendants' main objection to Freedman's media statements relies on the false premise that they are relevant only to  Lively's defamation claim. *See* Mot. at 30–31. But Freedman's statements to the media not only are directly relevant to the retaliation, they also are *part of the retaliatory campaign*. *See, e.g.*, Dkt. No. 1064 at 32 ("In Response to Lively's CRD Complaint, Defendants Continued Their Retaliatory Campaign With A Baseless Lawsuit And Defamatory Statements."). In its Order denying summary judgment as to Lively's retaliation claim under FEHA, the Court explained that there "comes a point where the accused stops simply defending him or herself and starts taking action that a reasonable jury could view as retaliation" and provided examples of "key messaging" that crosses the line include suggesting that  Lively "'had a less than favorable reputation in the industry'" and that Lively made "marketing missteps." Dkt. No. 1273 at 132–133.

As Lively has consistently alleged, Defendants retained Freedman specifically *because* of his reputation for being willing to "bury" his clients' opponents. *See* Dkt. No. 1233-25 at 3 ("[B]ryan as he's not well respected [b]ut he's a killer [a]nd would bury Blake"); Dkt. No. 1064 at 20–21. Meanwhile, Sarowitz vowed to use all of his resources if Lively "cross[ed] the line," and he had "lawyers ready to go." Dkt. No. 1075 at ¶ 333. Sure enough—after Lively filed her CRD Complaint, an act unquestionably protected by the FEHA, *see* Cal. Gov't Code § 12940(h)

(forbidding retaliation "because the person has filed a complaint, testified, or assisted in any proceeding under this part")—Freedman promised to sue anyone associated with Lively's CRD Complaint "into oblivion." Dkt. No. 743 at 9 n.10. Defendants' retaliatory lawsuit followed. And channeling further retaliatory messaging through counsel was part of the strategy to capitalize on its public impact; Freedman's colleagues recommended that Defendants take advantage of the litigation privilege to launder more retaliatory statements into the public. *See* Dkt. No. 1233-111 at 5.

Freedman repeated those same "key messaging" points in his statements to the media on behalf of his clients, including by stating: Lively filed the CRD Complaint as a "desperate attempt to 'fix' her negative reputation"; she filed this lawsuit because "she quite simply could not accept that the public had organically seen through her façade"; and that Lively made "threats" in order to "be in control of marketing the movie." *See* Dkt. No. 1236-2 at ¶¶ 787, 802, 814. As discussed above in Lively's opposition to Defendants' MIL No. 5, Freedman's statements trumpeted Defendants' narrative of Lively to the public—purportedly based on Defendants' allegations in their retaliatory lawsuit—that the Court later concluded largely was not just meritless, but objectively baseless. *See supra*, at Opp. to MIL No. 5. And as discussed below in Lively's opposition to Defendants' MIL No. 16, those statements retain independent relevance for purposes of measuring damages attributable to Defendants' retaliatory conduct. *See infra*, at Opp. to MIL No. 16. Whether Freedman's statements meet the elements of defamation, or are subject to any

privilege, is thus irrelevant—the statements are directly relevant to Lively's surviving retaliation claim.[23]

Defendants' Rule 403 argument— that the jury will independently believe that defamation and defamation damages "are still issues"—is far too remote to justify their remedy. It presumes both that the jury cannot follow its instructions, and that the jury would have followed the case details sufficiently closely to understand that there was once a defamation claim, but no longer. If *arguendo* there exists that a concern, the proper recourse is not excluding relevant information but rather asking jurors via voir dire whether they have such knowledge and, if so, if it would impede their ability to evaluate fairly the claims presented to them.

## X. Opposition to Defendants' Motion *in Limine* No. 10 To Preclude Evidence And Argument Concerning Retaliation In Anticipation Of Future Protected Activity

Defendants' attempt to preclude Lively from introducing evidence and argument concerning Defendants' anticipatory retaliation measures is contrary to both governing law and the record before the Court. Their motion incorrectly asserts that retaliation can only be based on *past* protected activity. That is not the law under the California Fair Employment and Housing Act ("FEHA"), which governs Lively's retaliation claims. California courts have expressly recognized that "FEHA protects employees against preemptive retaliation." *Steele v. Youthful Offender Parole Bd.*, 162 Cal. App. 4th 1241, 1255 (2008). Indeed, adopting the limitation Defendants urge here "would create a perverse incentive" for employers to retaliate against employees before they have an opportunity to complain or oppose unlawful conduct, or file claims regarding FEHA violations. *Id.* at 1254 (citing *Lujan v. Minagar*, 124 Cal. App. 4th 1040, 1045–46 (2004)). As stated in *Steele*:

---

[23] Defendants' prediction that such evidence would "sacrific[e] privileges fundamental to our system of justice," Mot. at 31, ignores not only that the Court sanctioned Freedman for filing some of the very same claims they now seek to shield as privileged, but also that the Court already has held that communications "for the purpose of Freedman obtaining public relations advice [] are not privileged." Dkt. No. 749 at 13.

> The legislative purpose underlying FEHA's prohibition against retaliation is to prevent employers from deterring employees from asserting good faith discrimination complaints. ***Employer retaliation against employees who are believed to be prospective complainants*** or witnesses for complainants ***undermines this legislative purpose just as effectively as retaliation after the filing of a complaint***. To limit FEHA in such a way would be to condone ***"an absurd result."***

*Id.* at 1255 (internal citations omitted; emphasis added); *see also Rudnicki v. Farmers Ins. Exch.*, 2024 WL 20165, at *11 (Cal. Ct. App. Jan. 2, 2024), *reh'g denied* (Jan. 19, 2024), *review denied* (Apr. 17, 2024). Accordingly, evidence that Defendants acted to punish ***or deter*** Lively from further opposing unlawful conduct or anticipating that she may file an administrative complaint or lawsuit (both of which are protected by the "participation" clause under Government Code section 12940(h)), is squarely relevant and admissible.

Tellingly, Defendants rely largely on federal authority interpreting Title VII and New York state and local retaliation statutes, none of which govern Lively's FEHA claim. While California courts draw guidance from Title VII case law, *see* Dkt. No. 1273, at 99 (citing *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1053 (2005)), FEHA departs in key respects, including that it protects employees against preemptive retaliation. *See State Dep't of Health Servs. v. Superior Ct.*, 31 Cal. 4th 1026, 1040 (2003) ("[o]nly when FEHA provisions are similar to those in Title VII do we look to the federal courts' interpretation of Title VII as an aid in construing the FEHA"). Even if the Court did look to Defendants' Title VII cases, they are inapposite. *See Acosta v. Ross*, 2025 WL 2578079, at *11 (S.D.N.Y. Sept. 5, 2025) (no Title VII/NYSHRL/NYCHRL retaliation where employee requested, and was granted, an exemption to employer's COVID-19 vaccination and testing policy, and later initiated the lawsuit as an alleged "stop order" for that discontinued policy); *Adams v. New York State Unified Ct. Sys.*, 2023 WL 5003593, at *4 (S.D.N.Y. Aug. 4, 2023) (no Title VII retaliation where employee was terminated for noncompliance with a vaccine policy where employee failed to obtain a vaccination or timely exemption *before* ever seeking an

41

exemption); *Salaam v. Syracuse Model Neighborhood Facility*, 2012 WL 893487, at *3 (N.D.N.Y. Mar. 15, 2012) (no Title VII retaliation where claimed protected activity occurred three weeks after alleged retaliatory act); *Szarzynski v. Roche Lab'ys, Inc.*, 2010 WL 811445, at *12 (W.D.N.Y. Mar. 1, 2010) (no Title VII retaliation where plaintiff complained about a supervisor letter that was "a little bit out of the ordinary" and "not good business practice" but did not believe such conduct to be discriminatory of the time of his complaint).

The few California cases that Defendants cite are easily distinguished—the key difference here being that there is no dispute that Wayfarer and IEWUM were aware of not only Lively's concerns and earlier protected activity, but that they also *expected* that she would engage in further protected conduct, including by making her "grievances" public through filing legal claims. *See, e.g.*, Hudson Decl., Ex.5, at 75:6–78:6; 85:6–17 (Heath expressed to Hoover his concern that Lively would bring sexual harassment claims).

In *Nejadian v. Cnty. of Los Angeles*, 40 Cal. App. 5th 703, 724 (2019), for example, the court refused to find retaliation based on an employee's statements to a coworker that he felt discriminated against, but only because those statements were not reported to management and therefore did not put the employer on notice of the employee's concerns, an issue not present here. *Id.* Defendants' reliance on *McKenna v. Permanente Med. Grp., Inc.*, 894 F. Supp. 2d 1258 (E.D. Cal. 2012), fares no better. There, the court found only that the plaintiff failed to plead a causal connection between her alleged protected activities and termination, without addressing whether the termination was anticipatory. *Id.* at 1280. Further, Defendants' final California case, *Adams v. Kmart Corp.*, 2001 WL 969049, at *1 (N.D. Cal. Aug. 10, 2001), supports rather than undermines admissibility of evidence and argument regarding retaliatory acts taken in anticipation of further protected activity. There, the dispositive inquiry was whether the decisionmaker knew that the

42

plaintiff had previously reported concerns about a public policy violation when he decided to terminate her. He did not know, and therefore could not have terminated her in retaliation for doing so. *Id.* at *4 ("both the Ninth Circuit and California courts have held that the decisionmaker's ***knowledge*** of the protected activity is an essential element") (emphasis added). This is consistent with California law that protected acts must be viewed in the totality of the circumstances and that an employee need only "sufficiently convey" opposition to unlawful conduct to be protected. *See, e.g.*, *Yanowitz*, 36 Cal. 4th at 1047–48.

The Court has already recognized this principle here, finding "a jury could find that the Wayfarer Parties were motivated not just by fear ***of what would be disclosed*** but by the protected actions Lively had taken in the past." Dkt. No. 1273 at 136 (emphasis added). The record is clear that by Summer 2024, when Defendants were "scenario planning" ways to "bury" Lively, Defendants were on notice of her protected activity, understood Lively "thought they had behaved in a discriminatory manner," and also expected Lively would make her "grievances" public and/or file legal claims. *See*, *e.g.*, Dkt. No. 1273 at 116–17; Hudson Decl., Ex. 22, at NATHAN_000005497 (Scenario Planning Document), Hudson Decl., Ex. 23, at NATHAN_000005552–54 ("we can bury anyone"), Hudson Decl., Ex. 42, at BALDONI_000026194 (Baldoni acknowledging that the Protections Letter "insinuates" "that i am/ unsafe /sexually harassing"); Hudson Decl., Ex. 24, at TOSKOVIC_000000678 (Heath requesting a timeline of all "alleged incidents" raised by Lively); Hudson Decl., Ex. 25, at HEATH_000046882. As a direct result of fears that Lively would do so, Defendants decided to "go to war" and consulted with their current counsel, Bryan Freedman, based on a recommendation that "he's a killer [a]nd would bury Blake." Hudson Decl., Ex. 26, at JONESWORKS_00037248. On this record, Defendants cannot reasonably dispute that the alleged character attacks were

43

undertaken because they feared Lively would publicize or *legally assert* allegations that they had created a hostile environment in connection with the Film.

To preclude Lively from introducing evidence and argument related to Defendants' fear that Lively would speak out and/or assert claims against them, the proactive steps that Defendants took to deter that activity, and that such steps constitute unlawful retaliation, would create precisely the "absurd" and "perverse" result California cautions against. Indeed, it would allow Defendants to present an unchallenged story about how they allegedly took only "reasonably defensive measures," without giving the jury essential and necessary context from which to infer that Defendants' retaliatory campaign was undertaken both based on Lively's prior protected acts (including the Protections Agreement and January 4 meeting, among others) and also to preempt and deter Lively from speaking out or filing claims against them. It would also signal to employers that if they act quickly enough, they can retaliate against an employee that they *know* has concerns (including by publicly attacking their character) so long as they strike first. FEHA does not permit that result. Accordingly, the motion should be denied.

## XI.    Opposition to Defendants' Motion *in Limine* No. 11 To Preclude Lively's Prior Descriptions Of Her Experience

Defendants seek to preclude evidence and testimony concerning Lively's communications to others about her "objections about her experience on set" on relevance and hearsay grounds. Mot. at 33.  This Motion should be denied for at least three reasons.

*First*, the evidence identified by Defendants goes to a key issue to be presented to the jury—specifically, Lively's reasonable, good faith belief that she was subject to unlawful harassment and Defendants' defenses to the same (*see* Dkt. No. 1273, at 106-16; *see also id.* at 108-16 (discussing the inappropriate acts identified by Lively))—and is admissible for non-

44

hearsay purposes.[24]  For example, PTX-814 is the 30-point list Lively read during the January 4, 2024 "all hands" meeting, which contemporaneously documented what was said during that pivotal meeting. *See* SOMF, at ¶ 209. While Heath denies that Lively read every point on the list, other witnesses that attended this meeting confirmed that she did. *Compare* Hudson Decl., Exs. 28 at 280:22-283:6; *with* Ex. 3 at 175:11-176:10; Ex. 29 at 173:25–175:25. This list also plainly put Defendants on notice of Lively's concerns regarding inappropriate conduct that Lively and others experienced. PTX-814, offered for this purpose, is not hearsay under FRE 801(c)(2). *See United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) ("a statement offered to show its effect on the listener is not hearsay."); *see also George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) (same).

Defendants do not dispute that immediately after the January 4 meeting, Baldoni wrote to his "Prayers and support" group describing the list that "was read from a phone all of the things that I did[.]" Hudson Decl., Ex. 42 at 2. And in their subsequent "timeline" document, Wayfarer mentions how the "production planning meaning turned [into an] HR complaints meeting on Jan 4, 2024." Hudson Decl., Ex. 25. This is further evidence that goes to retaliatory intent, demonstrating that Defendants understood both the topic and the substance of the January 4 meeting to relate to Lively's protected complaints of sexual harassment. Moreover, in the context of jury instructions, Defendants' proposed an instruction in which the jury should be advised that it is not unlawful to take an adverse employment action against a disruptive protected activity that

---

[24] Defendants disingenuously argue that "some of Lively's allegations are not disputed," Mot. at 35, and incredibly, count among those allegations the dance scene (about which Lively has described the many ways in which Baldoni engaged in unwelcome touching and other behavior) and the onesie scene (in which Baldoni told Lively that she's sexy and hot and rolled his eyes when she and Ms. Slate objected, saying he "must have missed the sexual harassment training."). While it is true that what happened was caught on Film, everything about how those events felt and why they were so disturbing is contested, and Lively's and Slate's testimony on those issues is paramount to the issue of a reasonable, good faith belief in harassment. In fact, these are two of the more than six separate incidents that the Court specifically discussed in determining that (when viewed together) the record supported Lively's good faith and objective belief that "the Wayfarer Parties created a hostile work environment under FEHA." Dkt. No. 1273, at 111-16.

undermines the chain of command (seemingly referring to the January 4 meeting). Dkt. No. 1319, at 32-35. While Lively strongly objects to that highly inappropriate instruction here, it is plain that Defendants intend to present the January 4 meeting as such. It would be highly prejudicial to Lively to allow Defendants to characterize the content of the meeting in such a manner without being able to show the jury what Lively's contemporaneous note reflects was actually discussed.

Likewise, communications between Lively and other female cast-members regarding their experiences on set are both relevant and admissible. *See, e.g.*, Mot., Ex. B, at PTX-158, PTX-195,[25] PTX-392. In their previous submissions, Defendants have suggested that Lively and Slate exaggerated their feelings and overreacted to what Defendants call misunderstandings and minor events. *See, e.g.*, Dkt. No. 955, at 26. As such, written communications between Lively and others during and immediately after production shut down—in which they share their discomfort, pain, and frustration, as well as their concerns about returning—goes directly to Lively's reasonable, good faith belief that she experienced sexual harassment and Defendants' defense to the same. *See also* Opposition to MIL No.1. And, given that these communications reflect Lively's (as well as other's) mental and emotional state after experiencing Defendants' misconduct, they fall within the present sense impression and then-existing mental state exceptions to hearsay. *See* Fed. R. Evid. 803(1) and (3); *see also United States v. Johnson*, 117 F.4th 28,46 (2d. Circ. 2024) (affirming admission of email under Rule 803(2) and 803(3)); *Sleepy's, LLC v. Select Comfort Wholesale Corp.*, 2012 WL 716944, at *1 (E.D.N.Y. Mar. 5, 2012) (denying defendant's motion to exclude plaintiff's email evidence where statements were admissible for purposes under Rule 803(3) to "show[] their motive not to buy from [defendant].").

---

[25] Defendants incorrectly cite PTX-193.

The same is true for the witness testimony Defendants seek to exclude—each of which, again, provide testimony that reflects Lively's state of mind and impressions. Mot. at 33. For example, Defendants seek to preclude testimony from third parties Anne Carroll and Vivian Baker who personally witnessed Heath force his way into Lively's makeup trailer and gawk at her while she was half nude, with her breasts exposed. *See* Hudson Decl., Ex. 30 at 53:11–55:23; 56:6–57:18; 59:16–61:25; Ex. 31 at 71:25–72:24; 74:8–13; 77:10–78:2; 81:7–81:24; 154:9–17. Like the written communications described above, the testimony Defendants now specifically challenge concern Lively's raw reaction immediately after incidents of misconduct, such as (i) Baldoni's improvised intimacy; (ii) Baldoni's pornography addiction; (iii) the birthing scene; (iv) Heath showing Lively a video of his wife giving birth; (v) discussions regarding sexual relationships; and (vi) other incidents that were "perceived" as making Lively uncomfortable: testimony that again falls squarely within Rules 803(1) and 803(3). *See* Mot. Ex. D at 73:8-19; 91:1-10; 120:20-121:16; Ex. E at 92:17-93:6; 118:2-14; 210:15-24. Similarly, the testimony at issue involving Colleen Hoover again reflects Lively's emotional state—that she felt "hurt[]" after "being so viciously mistreated" by Baldoni and Heath. *See* Mot. Ex. A at 136:2-5; *see also* Ex. B at PTX-344 ("This job has been the hardest of my life. . . . I couldn't want any validation of my feelings or experience"). The challenged testimony, like the statements identified above, are again directly relevant to Lively's good faith belief regarding sexual harassment and rebut Defendants' gratuitous characterizations of these incidents as minor misunderstandings.

***Second***, the statements at issue are separately admissible under Rule 801(d)(1)(B) as prior consistent statements. At every turn, Defendants have criticized the events identified by Lively as false—going so far as to suggest that Lively fabricated the incidents in order to gain control over the Film. *See* Dkt. No. 1273, at 106 ("the Wayfarer Parties have suggested that Lively used her

experience on set as a cudgel for control over the Film."); *see also* Dkt. No. 50, Defendants' First Amended Complaint, at ¶ 17, (accusing Lively and others of "advancing a fabricated narrative in the press that the Wayfarer Parties had sexually harassed Lively"); ¶ 83 (claiming Lively's allegations concerning the birth scene were "false"); ¶¶ 104-06 (describing as "illogical and categorically false" Lively's allegations that Heath entered her trailer while she was in a state of undress).  Defendants' litigation and public relations strategy from day one has been to attack Lively's credibility by accusing her of having an improper motive (stealing control of the movie) and of manufacturing her claims, which they now claim necessitated "reasonable defensive measures" in response to supposed false charges. Dkt. No. 955, at 27-3.

In doing so, Defendants have opened the door wide to evidence and testimony establishing that she raised sexual harassment concerns before any purported improper motive existed, and that her beliefs were genuine, as corroborated by her numerous contemporaneous messages and statements regarding her negative experience. *See In re General Motors LLC Ignition Switch Litig.*, 2017 WL 4417693, at *5 (S.D.N.Y. Oct. 3, 2017) (denying motion *in limine* seeking to preclude prior consistent statements as prior consistent statements, pursuant to Rule 801(d)(1)(B), based upon defense's anticipated charge of motive); *see also Perez v. Progenics Pharms., Inc.*, 204 F.Supp.3d 528, 560-61 (S.D.N.Y. 2016) (admitting prior consistent statements).[26] The Court's

---

[26] The cases on which Defendants rely are inapposite.  For instance, both *United States v. Ray*, 2022 WL 558146, at *5 (S.D.N.Y. Feb. 24, 2022) and *United States v. Thomas*, 2025 WL 2860312, at *7 (S.D.N.Y. Oct. 9, 2025) involved pre-trial affirmative motions by the government for the admission of victim statements as prior witness statements, which were denied as "premature" because there was no indication that the declarant's credibility would be attacked such that would warrant Rule 801(d)(1)'s application.  The remaining authority cited is even farther afield and concerned attempts to introduce prior statements that were unrelated to the purported charge advanced at trial—no similar argument is advanced by Defendants here (nor could they, given their consistent position in this case).  *See United States v. Chiu*, 36 F.4th 294, 301 (1st Cir. 2022) (holding that "the government's broader attacks on [the defendant's] credibility" did not support the defendant's effort to introduce highly specific statements under Rule 801(d)(1); *see also United States v. Roye*, 2016 WL 4147133, at *3 (D. Conn. Aug. 4, 2016) (denying government's introduction of prior statements where it was (i) unclear the statements met the meaning of Rule 801(a) and (ii) did not rebut the challenges of credibility).

decision in *General Motors* is instructive. In advance of a bellwether trial relating to injuries sustained from a car accident (purportedly due to a power malfunction of the vehicle), the defendant made known that it intended to argue that the plaintiff had a motive "to blame the crash on something other than driver error" and, in a motion *in limine*, sought to preclude the plaintiff from offering statements she made to her mother and the responding officer about the crash. *Id.* Given the defendant's intended charge of motive, the Court denied the motion, reasoning that the plaintiff's "prior consistent statements are thus admissible to rebut New GM's express or implied charge[.]" *Id.* A similar outcome is warranted here: the statements identified by Defendants do not "bolster" Lively; rather, they rebut the very charge they have repeatedly asserted in this case—that she manipulated and manufactured issues on set in order to gain control.  This falls squarely within the intended purpose of Rule 801(d)(1) and warrants denial of MIL No. 11.

***Finally***, denial of MIL No. 11 is warranted because, as Defendants acknowledge, evidentiary determinations as to prior consistent statements at this stage are premature. Mot. at 34-35. Lively agrees, and has neither moved for pre-admission of this evidence, nor sought an advisory ruling in a vacuum, as Defendants appear to be doing. For this additional reason, denial is warranted.

## XII. Opposition to Defendants' Motion *in Limine* No. 12 To Preclude Evidence Concerning Remedial Measures Taken By Defendants

Defendants' MIL No. 12 makes a blanket request to preclude "evidence concerning remedial measures" purportedly taken by Defendants and identifies, as examples of such evidence, the Contract Rider Agreement ("CRA") (the source of Lively's breach of contract claim) and Nudity Rider, both of which are agreements, not remedial measures. Mot. at 35-37. This Motion should be denied for a number of reasons.

As the name suggests, Rule 407 is intended to encourage people to voluntarily "take precautionary measures *after* an accident by assuring them that such action cannot be used as evidence of past conduct." Wright & Miller, 23 Fed. Prac. & Proc. Evid. § 5282 (2d ed. 2026) (emphasis added). As such, to trigger Rule 407's protections, the voluntary remedial actions must have taken place *after* the event-causing injury. *See Figueroa v. Boston Scientific Corp.*, 2003 WL 21488012, at *1 (S.D.N.Y. Jun. 27, 2003) ("By its terms . . . Rule 407 bars evidence of remedial measures taken *after* an injury or harm. Rule 407 does not apply to pre accident conduct") (emphasis in original)); *Cullet v. Edwards Manufacturing Company of Alberta Lea*, 2024 WL 5145565, at * 7 (S.D.N.Y. Dec. 17, 2024) ("Rule 407 is . . . inapplicable to pre-accident conduct."). Here, there can be no dispute that the key harm at issue in this case as it goes to trial (*i.e.*, those injuries stemming from the *retaliatory* campaign) occurred *after* the creation and execution of both the CRA (signed on January 19, 2024) and Nudity Rider (signed on January 18, 2024). It follows that neither document—nor testimony relating to the same—could logically constitute a *subsequent* remedial measure within the meaning of Rule 407. *Vicuna*, 298 F.Supp.3d at 450 (rejecting Rule 407 argument where concept of new schematic design was incepted *prior* to injury); Wright & Miller, 23 Fed. Prac. & Proc. Evid. § 5284 (2d ed. 2026) ("Rule 407 is clear that the evidence is excluded only if the injury or harm precedes the remedial measure."). Timing aside, Defendants' effort to stretch Rule 407's application here fails for the following additional reasons.

*First*, the CRA is not a "remedial measure" as Rule 407 understands that concept, because it did not involve the voluntary introduction of policies or "measures 'that would have made an *earlier* injury or harm less likely to occur.'" *Vicuna v. O.P. Schuman & Sons, Inc.*, 298 F.Supp.3d 419, 450 (E.D.N.Y. 2017) (quoting Fed. R. Evid. 407 (emphasis in original).) To the contrary, prior to the CRA, Wayfarer *had* policies and procedures expressly prohibiting workplace

misconduct, sexual harassment, and retaliation. Hudson Decl., Ex. 32 at 5-7 ("Equal Employment Opportunities, Anti-Harassment, and Anti-Retaliation Policy"); *see also* Ex. 33 (Respect in the Workplace Training). Defendants simply ignored them. Lively insisted on the CRA provisions precisely because of Defendants' failure and refusal to enforce the very policies and practices that Wayfarer already had in place. Thus, the CRA never constituted a change in measure, policy or practice of the kind Rule 407 seeks to protect, but rather a contractual mechanism to force Wayfarer to honor the rules it had already put in place.[27] The many cases cited by Defendants prove this point by contrast and concern classic examples of voluntary remedial measures taken *after* an injury or accident—precisely what Rule 407 is intended to address. *See, e.g.*, *Cann v. Ford Motor Co.*, 658 F.2d 54, 60 (2d Cir. 1981) (modified product design and change in owner's manual made in response to car accident and purported design defect); *Estate of Hamilton*, 627 F.3d at 53 (change in promotion process after complaints of discrimination).

And, as for the Nudity Rider, Wayfarer knew as early as April 2023 that "[t]here will be a ton of nudity riders for this show [sic]" and began negotiating the Nudity Rider with Lively the following month, prior to filming. Hudson Decl., Ex. 34 at 1; Ex. 35 at 1. The Nudity Rider was neither subsequent nor remedial—it was simply part of a standard process that was always planned and in the works from the outset, for a film that contemplated nudity.

---

[27] The laundry-list of cases cited by Defendants, Mot. at 36, 36 n.6, 37 n.7, all stand for the same general, non-controversial, proposition that **voluntary** policy changes or remedial measures taken after an accident or complaint cannot presented to prove liability, based on the policy considerations underlying Rule 407. *Estate of Hamilton v. City of N.Y.*, 627 F.3d 50, 54 (2d Cir. 2010) (Rule 407 "generally prohibits a plaintiff from introducing evidence of subsequent remedial measures taken by the defendant in order to establish the defendant's underlying liability"); *Dennis v. Cnty of Fairfax*, 55 F.3d 151, 154 (4th Cir. 1995) ("As a general matter, voluntary remedial acts are no basis for subsequent liability."). None of these cases, however, address the issue presently before this Court—which concerns the introduction of agreements that were the product of extensive arm's length negotiations and have ***nothing*** to do with "voluntary" or unilateral changes to policies or procedures in response to a complaint or an injury, which is the root concern that Rule 407 seeks to address.

***Second***, Defendants have abandoned any claim they might have to the protections of Rule 407 by arguing that they only agreed to the CRA under "economic duress." *See* Dkt. No. 296, at 48-71 (discussing and dismissing Defendants' extortion claim). Indeed, Defendants included this claim in their own $400 million lawsuit for civil extortion.[28] A party cannot enjoy the evidentiary benefit of a "remedial measure," when they so vehemently rejected it that they sued over its very existence.

***Third***, Defendants' reaction to the CRA, and their admissions about what they believed it represented, both at the time and later under oath, is material, highly relevant, and probative evidence in this case. Both Baldoni and Heath understood that 17-point protections list upon which the CRA was based addressed incidents that Lively and others had previously raised, and they both viewed it as, at minimum, insinuating sexual harassment against them. *See* Hudson Decl., Ex. 42 at 2. Despite this, Wayfarer refused to address the CRA's contents the way Wayfarer's policies dictated such complaints should be addressed—namely, via an investigation—and instead, Baldoni simply decreed that the claims were all "manipulation." *Id.* The jury is entitled to consider these agreements, as well as Defendants' reaction to them, because they go to retaliatory motive, as well as malice and ratification for the purposes of punitive damages under the FEHA. *See Mendoza*, 222 Cal. App. 4th at 1343–45; *Roberts v. Ford Aerospace & Commc'ns Corp.*, 224 Cal. App. 3d 793, 801 (Ct. App. 1990); *Cadena* 224 F.3d at 1209 (affirming punitive damages award based in part on investigation that was "inadequate...if not a complete sham"); *Bowles v. Osmose Utilities Servs., Inc.*, 443 F.3d 671, 675 (8th Cir. 2006) (affirming punitive damages award based in part on the company's "indifference to the racially discriminatory behavior of its foreman").

---

[28] Although this claim was dismissed *with prejudice* on June 9, 2025, in their proposed jury instructions, Defendants improperly attempted to assert "economic distress" as an affirmative defense to the CRA-based breach of contract claim, an issue that Lively is seeking leave to separately brief. *See* Dkt. No. 1319, at 17, 43-46.

Likewise, the existence, timing, and terms of the Nudity Rider are necessary to show the scope of what Lively understood would be the intimate scenes in the Film. This is critical, highly relevant and probative to Lively's reasonable, good faith belief that unlawful harassment occurred, particularly with respect to the filming of the birth scene, which Lively asserts she was pressured to film nude even though it was never contemplated in the Nudity Rider, among other things, in violation of SAG guidelines. *See* Hudson Decl., Ex. 36 at 23 (discussing "Nudity Rider and Intimacy Coordinator Failures"); *see also* Ex. 7 at ¶¶ 11-14).

***Finally***, because the anticipated use of the Contract Rider Agreement and Nudity Rider is plainly relevant and admissible, Defendants' alternative request for an unspecified "limiting instruction" is baseless and not supported by the law or facts. Mot. at 37.[29] For these reasons, MIL No. 12 should be denied.

### XIII.    Opposition to Defendants' Motion *in Limine* No. 13 To Preclude Lively From Offering Improper Lay Opinion

#### A.    The Court Should Deny MIL No. 13's Attempt To Exclude Testimony About Third Parties' Subjective Beliefs Whether Defendants' Conduct Was Improper.

In MIL No. 13, Defendants ask this Court to exclude deposition testimony of Alex Saks (who served as an independent producer on the set of the Film) and Warren Zavala (who is Lively's agent), to keep the jury from hearing their views that Baldoni and Heath acted inappropriately by *inter alia* ██████████████████████████████████████████ ███████████████████████████████████████████████ Mot. at 38. It also seeks to exclude a message in which Slate tells her team that Baldoni's and Heath's behavior is

---

[29] Defendants argue that "[w]hile the retaliation provision of the CRA may be relevant for purposes of establishing her alleged breach, none of the other provisions of the CRA are relevant for that purpose," Mot. at 37; however, this argument ignores that evidence of sexual harassment remains relevant to establishing Lively's retaliation claim. *See supra* Opp. to MIL No. 1.

"unprofessional" "gross" and "disturbing." *Id*. at 38–39. Notably, Defendants implicitly concede that such evidence is relevant, which they must because, as the Court has explained, proving that Lively reasonably believed Wayfarer engaged in harassment "contains both a subjective and objective component." Dkt. No. 1273, at 97–98. Testimony and evidence from others who communicated contemporaneously about the underlying events is directly probative of both the subjective and objective inquiries. *See supra* Opp. to MIL No 1; *see also Wasche v. Orchard Hosp.*, No. 2:18-CV-02246-MCE-DB, 2020 WL 4923710, at *8 (E.D. Cal. Aug. 21, 2020) ("When evaluating whether harassment exists, courts look to the totality of the circumstances."). Conceding relevance, Defendants attempt to exclude such evidence pursuant to Rule 702, but this analysis supports the opposite conclusion: that the evidence is admissible. The Court should reject Defendants' arguments to exclude the testimony of Saks and Zavala, as well as Slate's message, for the reasons discussed below.

*First*, as discussed, *see* MIL Opp. Nos. 1 and 11, Slate is an eyewitness who experienced and observed sexually harassing and gendered conduct from Baldoni and Heath on set and independently decided, based on her experience and observations, not to promote the Film with them—a decision she shared with her own team in June 2023, well before the period Defendants now attribute to Lively's supposed influence.  The June 4, 2023, message Defendants seek to exclude reflects Slate's contemporaneous discussion with her team about the basis for her independent decision not to promote the Film with Baldoni and Health—namely, because she found their conduct to be "unprofessional" "gross" and "disturbing."  It is compelling evidence that directly refutes Defendants' claim that Lively orchestrated opposition to Baldoni and that their retaliatory actions were "reasonably defensive" by demonstrating that in fact *their own actions* created the PR crisis allegedly underpinning their so-called defensive measures, and it is also

highly probative of the Lively's subjective and objectively reasonable belief that Baldoni's and Heath's conduct was unlawful. There is no basis to exclude this critical evidence under Rule 701 because it is not lay opinion and, in any event, satisfies the requirements of the Rule.

The same conclusion applies to the testimony of Saks and Zavala about their view of Baldoni's and Health's conduct, which is also highly probative of Lively's subjective and objectively reasonable belief that their conduct was unlawful, refutes Defendants' claim that Lively orchestrated opposition to Baldoni and that their retaliatory actions were "reasonably defensive," and is squarely admissible. As discussed, *see* MIL Opp. No. 1, based on Saks's experiences, observations, and contemporaneous communications with Lively and Slate, she developed concerns about the absence of any meaningful HR structure on set and the obvious problem that Baldoni and Heath were the only people to whom complaints could be directed; recommended that Wayfarer investigate concerns on set, which it refused to do; determined that Baldoni should be removed as director and that Heath should not be allowed on set; concluded that she would not work with Baldoni or Heath again (though she *would work* with Lively); and, like Slate, *independently* decided that did not want to attend the premiere with them. As to Zavala, based on Lively's contemporaneous report of her experiences and his view that Baldoni and Heath's conduct was inappropriate, he recommended that she consult legal counsel, engaged in numerous discussions with Sony's executive vice president about Baldoni and Health's conduct, and took the unprecedented step in his 24-year career of attending the production set twice. Hudson Decl., Ex. 27 at 28:20-29:19; 32:7-17; 37:1-23; 38:10-22.

There is no basis to exclude this evidence under Rule 701. As an initial matter, contrary to Defendants' claim, the at-issue testimony is not inadmissible because Saks and Zavala did not "themselves observe" the incidents but rather received contemporaneous reports from Lively.

Mot. at 39.  Rule 701 requires only that the evidence be "rationally based on the witness's perception," which the advisory notes explain means based on "first-hand knowledge or observation." Fed. R. Evid. 701(a); Fed. R. Evid. 701 advisory committee's notes on 2000 amendments. Here, the testimony of Saks and Zavala reflects their "first-hand knowledge" and "observation" of Lively's real-time complaints about the unlawful conduct—including their own opinions of and reactions to her complaints—and their testimony is rationally based on those objective facts. *See Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 911 (2d Cir. 1997) (abrogated on other grounds) (affirming admission of testimony that harassment was based on age because witness was "in a position to have acquired personal knowledge of the facts that formed the basis of his opinion"); *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1179 (10th Cir. 2001) (citing *Hansard v. Pepsi-Cola Metro. Bottling Co.*, 865 F.2d 1461, 1465 (5th Cir. 1989)) (employee testimony about age discrimination claims was admissible "even though the witness had no firsthand knowledge of the termination at issue because the testimony was based on the witness' own experience as an employee with the defendant company and his familiarity with its hiring policy."). For the same reasons, their testimony is also "helpful" to the jury, contrary to Defendants' claim (Mot. at 39-40): their own reactions, based on how Lively described the conduct on set shortly after it occurred, go directly to essential elements of Lively's case and Defendants' central defense.  And there is no reason to credit Defendants' argument that the testimony relies on specialized knowledge, Mot. at 40, because it reflects their personal reactions based on Lively's contemporaneous reports.[30] *See* Hudson Decl., Exs. 28 at 280:22-283:6; *see United States v. Fama*, No. 12-CR-186 WFK, 2012 WL 6102700, at *2 (E.D.N.Y. Dec. 10, 2012)

---

[30] Moreover, with respect to Ms. Saks, Jamey Heath testified that in his view, *she* was the person that cast and crew should have been complaining to if they had any HR concerns on the production. Hudson Decl. Ex. 28 at 130:7-131:10. Although Lively disputes Heath's view, Defendants cannot scapegoat Ms. Saks as the person responsible for handling complaints, and then take the position that she is not qualified to speak about her observations.

("When a lay witness has particularized knowledge by virtue of her experience, she may testify-even if the subject matter is specialized or technical-because the testimony is based upon a layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702." (citations omitted)).

**B.    The Court Should Deny MIL No. 13's Attempt To Exclude Testimony About Third Parties' Subjective Beliefs That The Cut Of The Movie Lively Helped Edit Was Better Than Baldoni's Version**

There is likewise no basis to exclude evidence that Hoover, Greenstein, and Slate believed that the version of the Film that Lively helped edit was superior to Baldoni's version based on their own perception from their screening of the competing Film cuts. Mot. at 41. This testimony directly refutes Defendants' claim that Lively coerced Sony to release the version of the Film she helped edit by threatening them. *See, e.g.,* Dkt. 955, at 11–12. If the Court permits Defendants to introduce such evidence during trial, then evidence showing that the actual reason Sony released that version is *because the consensus was that it was better than Baldoni's version* is highly relevant and admissible.

The Court should reject Defendants' claim that Rule 701 precludes this evidence based on their conclusory assertions. Nor would applying Rule 701 make sense because the testimony reflects these witnesses' state of mind at the time of the events in question, and personal opinions based on personal knowledge of contemporaneous events is not lay testimony. *See United States v. Giovannetti*, 919 F.2d 1223, 1226 (7th Cir. 1990) (what the witness "called his 'opinion' was actually a report of the contents of his mind, of which people are normally assumed—whether correctly or not, it does not matter—to have direct rather than inferential knowledge. The admission of such testimony is not problematic."); *United States v. Thornhill*, 667 F. App'x 310, 311 (2d Cir. 2016) (quoting *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005) ("A witness is not offering opinion testimony unless the 'personal perceptions [take the] form of inferences or

57

conclusory opinions.'")). Even if Rule 701 had any applicability, its factors easily are met here because their testimony about the superiority of the version Lively helped edit is reasonably based on their own perception from their screening of the competing Film cuts (Rule 701(a) and (c)) and goes directly to demonstrating why Sony made the decision to release a cut of the Film Lively helped them edit (Rule 701(b)).

**C.    The Court Should Deny MIL No. 13's Attempt To Exclude Testimony About Third Parties' Subjective Beliefs About Lively's Character**

Contemporaneous evidence of Slate and Hoover praising Lively as a "talented, good, and inspiring person" is, likewise, not inadmissible lay testimony or character evidence. Mot. at 42. This testimony evidences how Lively's own co-workers actually viewed her on the set of the Film, and counters Defendants' claim that *she* was problematic, difficult to work with or otherwise brought negative backlash on herself due to her own behavior in connection with the Film. This is not character evidence because it is not offered to prove "that on a particular occasion [Lively] acted in accordance with the character or trait" that Slate and Hoover describe, but to prove how Lively was actually perceived, contrary to Defendants' narrative. Fed. R. Evid. 404(a).[31] As discussed above, the fact that these witnesses had positive opinions about Lively does not make them lay opinions, as opposed to reflections of their own states of mind. *See Giovannetti*, 919 F.2d at 1226. Moreover, both Slate and Hoover's opinions were expressed contemporaneously in the context of discussing Baldoni's behavior that is the subject of this lawsuit. Specifically, Slate's praise of Lively on May 19, 2023 reflects her empathizing with and supporting Lively in connection with a scene that Lively had just performed with Baldoni, with Slate recognizing how difficult it must have been for her in light of Baldoni's behavior toward Lively. *See* Mot. Ex. B at

---

[31] Lively does not concede the relevancy of attempting to prove any of these accusations as truthful, and has filed a motion in limine on these issues.

PTX-337 (JS0000485). Likewise, Slate's August 15, 2024 text to Lively is her contemporaneous reaction to the retaliatory media campaign when it was in full swing, and reflects her observations from that time, not character evidence of Lively. *See id.* at PTX-596 (BL000021016). As for Hoover's text to Lively, Defendants' consistent narrative is that Lively "stole" this movie by strong-arming Wayfarer and Sony with supposed "threats" of exposing false harassment claims. Hoover's text reflects the reality, which was that Hoover and Lively worked hand-in-hand on the Sony edit, and that *both* of them wanted to influence the Film's narrative and *both* of them were responsible for the final cut. The August 10, 2024 text chain is a profound expression of the culmination of that joint effort, in which Hoover praises Lively for the Film's weekend box office success, and Lively responds: "I have one note on your above text. Swap every "you" for "we." This is us. It starts right here with you and me. It ends with US. I couldn't love and appreciate you more." *Id.* This text chain is not character evidence. It is highly probative and corroborating of Lively's experience, and would be prejudicial to her if Defendants' destructive narrative could not be rebutted by this contemporaneous communication.

## XIV.  Opposition to Defendants' Motion *in Limine* No. 14 To Preclude Speculative Evidence About The Use Of "Bots"

Defendants seek to exclude certain deposition designations and exhibits as "speculative musings by Lively and others" about Defendants' use of "bots," contending this evidence is unfairly prejudicial, hearsay, and amounts to speculative lay opinion. Mot. at 43.

***First***, Lively does not seek to admit this evidence for the truth that Defendants were using bots. Likewise, Defendants cannot use their own statements and communications for the truth that they were *not* using bots. Instead, Lively seeks to use the relevant communications and testimony to show the percipient witnesses' mental impressions at the time, including (to the extent

59

Defendants' motion extends to live testimony)[32] that of Lively—*i.e.*, how she was experiencing the retaliation, and that individuals were sharing the experience of seemingly inauthentic social media attacks that appeared instantaneously and out of nowhere. Defendants, in turn, may cross-examine Plaintiff's witnesses on that impression, and they may elicit testimony from their witnesses on this subject. But they cannot exclude evidence about what witnesses were perceiving and experiencing based on a "lay opinion" that Plaintiff is not even trying to establish.[33]

***Second***, the evidence Defendants seek to preclude does not require any lay witness to offer a technical opinion that a "bot" or "botnet" existed, or to attribute any inauthentic activity to Defendants. Any expert testimony regarding digital inauthenticity or attribution will be offered through Dr. Mayzlin and Dr. Culotta. *See* Dkt. Nos. 1233-118 (Mayzlin Report), 1230-70 (Culotta Report). Instead, any lay witness testimony and documentary evidence at issue uses "bots" as a common shorthand to describe suspicious, seemingly automated online activity as it was personally observed in real time starting in August 2024. This evidence, grounded in personal perception, is admissible under Federal Rules of Evidence 602 and 701.[34] As noted, any dispute regarding what specifically caused the observed online activity is appropriate for cross-examination, not categorical exclusion. *See Lupia v. N.J. Transit Rail Ops., Inc.*, No. 21-CV-11077 (LJL), 2023 WL 2387100, at *6 (S.D.N.Y. Mar. 7, 2023) (Liman, J.) (denying motion *in limine* where any "lack of personal knowledge regarding the *specific operation*" of subject at issue was "grist for cross-examination and not for exclusion") (emphasis added); *S.E.C. v. Treadway*, 438 F.

---

[32] Defendants' MIL No. 4 does not appear to seek to preclude live testimony regarding this topic—only largely unspecified "designated exhibits and testimony." Mot. at 43.

[33] *See generally* Lively Opp. to Defendants' MIL No. 13 (citing cases regarding use of lay opinion pursuant to Fed. R. Evid. 701).

[34] Defendants' MIL No. 14 does not appear to seek to preclude live testimony regarding this topic—only largely unspecified "designated exhibits and testimony." Mot. at 43. But the same principles apply: Lively and other live witnesses should be permitted to address, based on their personal knowledge, what they observed online starting in August 2024.

Supp. 2d 218, 226–27 (S.D.N.Y. June 9, 2006); *Quinton v. Am. Express Co.*, No. 19-CV-566 (NGG) (JRC), 2025 WL 1994848, at \*8–10 (E.D.N.Y. July 17, 2025).

*Third*, this evidence is highly relevant. Fed. R. Evid. 401, 402. Proving the point, Defendants have identified numerous documents for inclusion on their *own* exhibit list regarding "bots." These reflect, among others, reference to "bots" in connection with: acknowledgement of the public conversation regarding Baldoni, Wayfarer's knowledge of digital services performed on their behalf, and Nathan's prior associations with digital services on behalf of clients. *See* Dkt. No. 1245-127 at 1, 3 (Nathan addressing "why we don't use 'bots,'" and "[t]he people saying that there are bots and this is a PR play on your side"), Dkt. No. 1245-145 at 7 (Nathan's denials as to using "Russian bot[s]" in connection with her work on behalf of Johnny Depp); Dkt. No. 964-80 at 3 (Baldoni seeking reassurance as he "really [didn't] want bots defending me as it feeds into their potential narrative"); *id.* at 4 (Nathan's clarification that "bots look fake to anyone" and "[t]he other team is doing something very specific…."). Defendants cannot simultaneously rely on these "bot"-related communications to advance their narrative while precluding percipient witnesses and documents describing personal observations of the digital environment during the alleged retaliation period. Given the substantial probative value of this evidence—including to show state of mind and damages—Rule 403 does not warrant exclusion.

*Fourth*, Defendants' request is premature. Defendants cite no Federal Rule or authority in support of their assertion that this evidence is "hearsay," and their argument is premature given their failure to identify the universe of deposition testimony or documents at issue, and to explain—document by document—why each is inadmissible and why any hearsay exception would not apply. *See Wechsler v. Hunt Health Sys., Ltd.*, No. 94-CV-8294 (PKL), 2003 WL 21998980, at \*3 (S.D.N.Y. Aug. 22, 2003); *Ali v. Connick*, No. 11-CV-5297 (NGG) (VMS), 2016 WL 3002403, at

61

*6 (E.D.N.Y. May 23, 2016).[35] Defendants' request is similarly premature because the Court cannot determine *in limine* what foundation will be laid at trial for each witness's personal knowledge and the purpose of each piece of evidence that Lively will seek to admit. *See, e.g.*, *U.S. ex rel. Feldman v. van Gorp*, No. 03-CV-8135 (WHP), 2010 WL 2911606, at *9 (S.D.N.Y. July 8, 2010); *United States v. Teva Pharms. USA, Inc.*, No. 13-CV-3702 (CM), 2019 WL 13244252, at *13 (S.D.N.Y. July 1, 2019) (motion *in limine* denied given impossibility of assessing witness personal knowledge in advance); *see generally Picard v. Sage Realty*, No. 20-CV-10109 (JFK), 2021 WL 5926059, at *3 (S.D.N.Y. Dec. 15, 2021) ("A district court should exclude evidence on a motion in limine only when the evidence is clearly inadmissible on all potential grounds.") (cleaned up) (citation omitted).

**XV.    Opposition to Defendants' Motion *in Limine* No. 15 To Preclude Evidence Concerning The Following Irrelevant Topics**

Defendants request that the Court exclude evidence on nine "topics," without explanation and supported solely by citations to Fed. R. Evid. 401, 402 and 403. Mot. at 43–44. Defendants' requests should be denied for three independent reasons. *First*, the motion should be denied as impermissibly vague. *Second*, each specified category of evidence is plainly relevant. *Third*, it seeks relief duplicative of that requested in a pending *Daubert* motion.

***First***, the motion should be denied as impermissibly vague. "A district court is well within its discretion to deny a motion *in limine* that fails to identify the evidence with particularity or to present arguments with specificity." *Wechsler v. Hunt Health Sys., Ltd.*, No. 94 CIV. 8294(PKL), 2003 WL 21998980, at *3 (S.D.N.Y. Aug. 22, 2003) (citation omitted). Defendants' motion suffers from both flaws.

---

[35] The only two documents Defendants identify are admissible given that they reflect, *inter alia*, Lively's state of mind as a result of the sudden onslaught of online activity regarding her (PTX-527) and the effect on Lively's businesses of perceived anomalous activity (PTX-653). Fed. R. Evid. 801(d), 803(3), (6).

Defendants simply enumerate in a numbered list the "topics" of evidence they deem appropriately subject to exclusion. None sufficiently identifies the evidence Defendants seek to exclude. For example, Defendants seek to categorically exclude "videos," "podcasts," "speeches," and other material such as "full episodes of [Baldoni's and Heath's] *Man Enough* podcast and Baldoni's books." Mot. at 43–44. They did not identify the portions of the podcasts, books or speeches they seek to exclude.[36] Likewise, Defendants seek to exclude evidence regarding whether consent was provided for tape-recorded phone calls without specifying the phone calls at issue or the persons who did or did not provide consent. *Id*. at 44. Defendants also seek to exclude unspecified "comments on various social media posts endorsing Lively's allegations." *Id.* They identify two examples of such posts, but do not otherwise identify the particular comments or which of Lively's allegations the comments allegedly endorse. Without the detail outlined here, the Court has no ability to review the documents and determine whether there are grounds for exclusion. The motion should be denied on this basis. *Dixon v. Reid*, No. 23-CV-09878 (JAV), 2025 WL 3638953, at *4 (S.D.N.Y. Dec. 16, 2025) (denying motion *in limine* as "overly broad and vague."); *see also Viada v. Osaka Health Spa, Inc*., No. 04 CIV. 2744 VMKNF, 2005 WL 3435111, at *1 (S.D.N.Y. Dec. 12, 2005) (denying motion *in limine* where defendants did not sufficiently specify the evidence they believed should be excluded at trial).

As for the legal basis for exclusion of the nine "topics," in the preambulatory paragraph of their motion, Defendants state that "none are relevant" and claim that they "will lead only to juror confusion, unfair prejudice and an unnecessarily long trial." Mot. at 43. Defendants' unsupported, unexplained assertions cannot dictate the admissibility of key and relevant evidence in this

---

[36] Lively is willing to meet and confer with Defendants on the portions of Baldoni's books and *The Man Enough* podcasts we intend to use for any purposes other than impeachment in advance of trial days.

litigation.[37] *Infra* Opp. to MIL 15.

**Second**, the motion should be denied because the evidence it seeks to exclude is relevant. The articles, videos, podcasts, speeches and books featuring statements by Baldoni, Heath and Sarowitz, for example, are relevant to Lively's claim of retaliation under FEHA. Specifically, they are relevant to show Defendants' retaliatory motive. Lively's protected activity risked Baldoni and Heath—and by extension, Wayfarer and IEWUM—being seen as "unsafe" and "harassing" to women, a reality Baldoni and Heath recognized in real time. *See, e.g.*, Dkt. No. 1273 at 116 ("Baldoni stated with respect to the Protections Letter, '[O]f course we all know what this document insinuates – that i am/ unsafe /sexually harassing etc etc etc . . .'"); *id.* ("Heath feared that Lively would file sexual harassment claims against him."). The protected activity, along with the implications thereof, was an existential threat to the feminist and purpose-driven brand Wayfarer, together with Baldoni, Heath and Sarowitz, had carefully crafted. It was wholly inconsistent with the public personas they had developed for Wayfarer and for themselves. *See, e.g.*, Dkt. No. 1328-2 at 50 (Baldoni: "To me, being an ally is about learning: learning through listening, learning through doing and learning through feedback. As men, we need to have empathy and recognize that women coming forward to share their stories takes tremendous courage . . . [w]hen we created *Man Enough*, we wanted to be sure that we are being responsible and thoughtful allies."); *id.* at 56–60 (Sarowitz: "And so my religion is to break apart all of the divisions that we've had for thousands of years, and my philanthropy is all about that . . . If you really want to say what Justin and I are doing together, what he does so well, and I support him in doing, is he makes moves that uplift our spirits. And I'm so happy to be his partner in doing that. So it's really another practical application of faith."); *id.* at 61, at 26:23–27:01 (Heath: "[T]here are people that

---

[37] Defendants themselves appear to cabin their legal objections to relevance when characterizing their MIL No. 15 as one to "preclude evidence concerning the following *irrelevant topics.*"

I've hurt. And when you've hurt people, you just gotta be accountable and be willing to accept that. And if I've hurt one woman, I've hurt 10 women, their sister and their mother and grandmother and children and so on. So the impact, the ripple effect is great. So I say these things so that hopefully another man that has some experience in my life, with this walk of life, can feel safe to acknowledge it in themselves and that they are not evil, that there are some things that are broken, but those broken things can be corrected, can be fixed."). Lively's protected activity was wholly inconsistent with the behavior of the faith-centric, accountable, and thoughtful allies that Baldoni, Heath and Sarowitz purported to be. They had a retaliatory motive to silence and attack Lively as the person threatening to undermine the personas developed in the articles, speeches, podcasts, books, and videos Lively seeks to introduce.

Evidence concerning Wayfarer's or IEWUM's policies and procedures for preventing and investigating sexual harassment are also relevant and probative of Lively's claim of retaliation under FEHA. Wayfarer's Employee Handbook, co-signed by Baldoni and Sarowitz as Co-Chairmen, incorporates an Equal Employment Opportunities, Anti-Discrimination, Anti-Harassment and Anti-Retaliation Policy. Dkt. No. 963-51 at 6–8. It also details Wayfarer's process for investigating complaints of wrongdoing, including the requirement to "maintain appropriate documentation and tracking" throughout the investigatory process. *Id*. at 8. Notwithstanding these policies, Heath relayed to producer Saks that he "did not want Wayfarer to conduct an investigation into concerns about his and Baldoni's behavior because he didn't want a written record of it anywhere." Dkt. No. 1230-15 at 42–43. The law is clear that failure to conduct a rigorous investigation may be compelling evidence of an employer's retaliatory animus or malice. *Mendoza v. W. Med. Ctr. Santa Ana*, 222 Cal. App. 4th 1334, 1343–45 (Cal. Ct. App. 2014) ("The lack of a rigorous investigation by defendants is evidence suggesting that defendants did not value the

65

discovery of the truth so much as a way to clean up the mess that was uncovered [following the] complaint."). Evidence of Wayfarer's and IEWUM's policies are relevant to show that they did not take preventative and investigative steps pursuant to them, which is relevant to Lively's retaliation claim. Defendants conceded such relevance when including Wayfarer's Employee Handbook as DTX-1116.

Evidence concerning picketing, or respect or lack of respect for picketing during the writer's strike is also relevant to Lively's retaliation claim, once again, because of Wayfarer's own words and actions. Lively would not offer evidence that Baldoni broke—and pressured his subordinates also to break—the picket lines to show that he is a person of poor character; instead, the purpose of the evidence is to show the retaliatory motive Wayfarer had in its placement of media stories *falsely* accusing Reynolds of crossing the picket lines for writing during the strike. Dkt. No. 1252-2 ¶ 758. Not only did the Defendants attack Lively's husband with no basis (he did not serve as a writer on the Film and violated no guild rules at any point in time), they deliberately attacked him knowing full well that Baldoni had not only regularly crossed the picket lines, but pressured others on the cast and crew to do the same. Baldoni proudly admitted the same, stating: "I think every time I was on set during the writers' strike, I was crossing the picket line." Hudson Decl., Ex. 37, at 227:13–15. Despite this, he has claimed that "the production" that was responsible for asking people to cross the lines. *Id.* at 227:16–228:5. Thus, for example, conversations between Lively and Jenny Slate regarding how uncomfortable Baldoni had made Slate by finding ways to "sneak in" to work during the writer's strike are directly relevant to Defendants' later retaliation on the very same subject. *See* Dkt. No. 1328-4 at 234 (Slate conveyed to Lively, "I think Justin is hoping to just sneak in to an entrance that they might not be at, but I don't want to sneak like that, it feels really bad to me…").

66

The remaining evidence Defendants seek to exclude is likewise relevant to Lively's retaliation claim under FEHA. Baldoni and Heath's receipt of consent for certain tape-recorded phone calls, including one with Slate and Lively, is directly relevant to whether Lively's belief of harassment or other wrongdoing in violation of FEHA was objectively reasonable. Evidence and argument concerning Lively's damages claims are relevant to show and calculate the type of harm Lively suffered by Defendants' retaliatory campaign. And the social media comments reflected on PTX-065 and PTX-113 are relevant to rebut a defense argument that Lively had a poor public image before August 2024.

As for the final "topic" of evidence Defendants seek to exclude, Defendants also contend that Lively plans to offer PTX-219A and PTX-409A to highlight "[c]omments on various social media posts endorsing Lively's allegations." Mot. at 44. That is incorrect. PTX-219A, an Instagram video posted by Baldoni, is an excerpt of a September 26, 2023, episode of *The Man Enough* podcast where Baldoni references, just three months after the filming of Phase I concluded, saying things he should not have said while filming IEWUM, compelling him to re-read his own book. *Compare* PTX-219A *with Work In Progress With Justin, Jamey & Liz*, We Are Man Enough (Sept. 26, 2023), https://www.youtube.com/watch?v=451Rr_KJTvE at 11:17–12:28 ("And while I've been gone, I was confronted with some real situations in which I had to re-read my own book . . . because of the unique situation I was in . . . I was resorting to like, seventh grade vocabulary . . . [I] had to go in and go like, 'Oh wait, I'm off course. I need to course correct here. And you know what, I shouldn't have said that. Why did I say that?'"). Baldoni's admission is direct evidence that he knew, in real time—*i.e.*, when and after Lively raised concerns about his conduct—that he a crossed a line on the Film's set.  PTX-409A is separately relevant to Baldoni's engagement in floral-centered marketing of the Film, a promotional approach he weaponized against Lively when

contrasting his later domestic violence-focused promotion of the Film against Lively's floral and fashion-focused promotion. Dkt. No. 1252-2 ¶¶ 751–53, 759.

*Third*, Defendants seek to exclude evidence and arguments concerning damages claims "as discussed in the Wayfarer Parties' accompanying *Daubert* motions." Mot. at 43. By Defendants' admission, this request is duplicative of the arguments raised in Defendants' *Daubert* motion to exclude the testimony of Jeffrey Kinrich, Michael Sippel, and Richard Marks. *Id. See also* Dkt. No. 1322 at 68–98. Defendants' request should denied on that basis. *Broadspring, Inc. v. Congoo, LLC*, No. 13–CV–1866 (JMF), 2014 WL 7392905, at *4 (S.D.N.Y. Dec. 29, 2014) (denying motion *in limine* as moot when seeking duplicative relief).

## XVI.  Opposition to Defendants' Motion *in Limine* No. 16 To Preclude Evidence and Argument of Reputational Harm Damages

Defendants seek to preclude Lively from introducing evidence of reputational damages attributable to Defendants' retaliatory conduct by recasting a damages issue as a discovery sanction. They insist that Rule 26(a)(1)(A)(iii) requires a precise "computation" of reputational harm damages, and that Lively's claimed failure to do so warrants wholesale preclusion under Rule 37(c)(1). But reputational harm is a paradigmatic noneconomic injury. Courts in this District recognize that noneconomic damages are inherently difficult to quantify and are not always susceptible to the kind of arithmetic computation Defendants demand. *See, e.g.*, *Jackson v. Scotts Co.*, No. 08-CV-1064 (LAK), 2008 WL 4355349, at *1 (S.D.N.Y. Sept. 24, 2008); *Williams v. Boulevard Lines, Inc.*, No. 10-CV-2924 (DF), 2013 WL 5652589, at *6 (S.D.N.Y. Sept. 30, 2013); *see also Baca v. City of Los Angeles*, No. B326863, 2025 WL 900477, at *12 (Cal. Ct. App. Mar. 25, 2025) (unpublished). What is more, Lively's detailed disclosures as to reputational harm and her expert's specific computations of it (which Defendants fail to acknowledge) satisfy even their overly exacting standard. *See* Dkt. No. 1233-126 (Humphreys Report) ¶¶ 66–68, ¶¶ 137–38,

¶¶ 195–211, figs. 2, 10, 18. Lively's disclosures went beyond what Rule 26 requires for noneconomic damages: they identified reputational harm as a damages category, tied it to Defendants' retaliatory conduct, and disclosed the methodology and estimated figures that would be refined through expert analysis. Given the nature of the damages sought, and the information disclosed, the Court can reject Defendants' argument on this basis alone.

Even if the Court agreed with Defendants that Lively's Rule 26 disclosures were technically lacking, Defendants cannot justify the extraordinary sanction they seek. Rule 37(c)(1) preclusion is discretionary, and a "harsh remedy" reserved for cases of genuine surprise and incurable prejudice—not a means to strike a central damages theory on the eve of trial. *See, e.g.*, *Cates v. Trs. of Columbia Univ. in City of New York*, 330 F.R.D. 369, 373–74 (S.D.N.Y. 2019); *Kunstler v. City of New York*, 242 F.R.D. 261, 264–65 (S.D.N.Y. 2007).

Lively's disclosures and timely supplementation provided Defendants with clear notice of the reputational-harm damages and the basis for them, and Defendants identify no discovery they were unable to pursue as a result. Defendants have known for the duration of this case that Lively alleges reputational harm from the alleged retaliatory conduct,[38] and they have had ample opportunity to explore that theory in fact and expert discovery. They cannot now manufacture prejudice by pointing, for the first time, to disclosure "defects" that deprived them neither of notice nor the ability to prepare their defense case.

### A.    Factual Background

Lively provided five rounds of initial disclosures in this case, on February 18, June 11, July 17, September 30, and October 29, 2025. Dkt. No. 1328-12–15, 17 (Lively Disclosures). Fact

---

[38] *See, e.g.*, Dkt. No. 84 ¶ 26 ("social manipulation" designed to "destroy" Lively's reputation); ¶ 205 (addressing Scenario Planning themes including "bully[ing]"); ¶ 334 (addressing "[t]he devastation to Ms. Lively's reputation"); ¶¶ 48, 273 n.42, 329 (addressing "mean girl"); Dkt. No. 84-4 (Scenario Planning Document); *see also* Dkt. No. 84 ¶¶ 297-99, 464 (discussing the Retaliatory Statements).

discovery closed on September 30,[39] expert reports were served on October 17, 2025, and expert discovery concluded on December 12, 2025.

Lively's Amended Disclosures (provided as of June 11, 2025) included a category for reputational harm, stating that documents that may be used to support her claims include those "regarding financial, *reputational*, economic, emotional, or other harm or damages." Dkt. No. 1328-13 at 28. Nevertheless, Defendants served discovery requests and subsequently filed a motion to compel discovery from Lively focused only on economic harm. *See* Dkt. No. 405 (discussing net worth, financial statements, and assets and liabilities); Dkt. No. 406 at 3 (addressing "the total dollar amount of the alleged damage, loss or expense; how that amount was calculated …"). Likewise, the Court's July 17, 2025 order, granting and denying in part, focused on Lively's disclosures as to economic damages. *See* Dkt. No. 433 at 5 ("But Lively must have some basis for stating that she has suffered economic damages."). Lively served her Second, and then Third, Amended Disclosures subsequent to the Court's order, at which point she provided an estimated damages figure in connection with the alleged retaliatory statements. Dkt. No. 1328-15. As of October 29, 2025, Lively had made her Fourth Amended Disclosures, well in advance of the expert discovery concluding on December 12, 2025. Dkt. No. 1328-17.

Lively's Fourth Amended Disclosures included the following as to Lively's reputational damages:

- "In the amount of approximately $24,375,267, based on a conservative estimated 116,959,530 impressions of the defamatory statements, subject to expert testimony." *Id.* at 43 (the "Retaliatory Statements");

- "In the amount of approximately $36.5 million to $40.5 million based on a conservative estimated 176,738,781 impressions of the terms "bully," "mean girl," and "tone deaf," attributable to the retaliatory campaign, which impressions are subject to expert testimony." *Id.* at 43–44 (the "Retaliatory Phrases").

---

[39] The depositions of Sarowitz, Baldoni, Grey Stone, Heath, and Wallace took place after September 30 and concluded only as of October 10, 2025.

*Id* at 44.

Lively's Fourth Amended Disclosures also made clear (as in prior disclosures) that these assessments "are conservative and subject to amendment"; that "Ms. Lively has identified each damages figure as the minimum sought in each category based on presently available information"; and that "Ms. Lively's damages depend largely on expert discovery, and the precise method of calculating damages is subject to expert discovery where applicable." *Id.*[40]

### B. Lively Adequately Disclosed Reputational Damages under Fed. R. Civ. P. 26(a)(1)(A)(iii)

#### 1. *Lively's Disclosure of Noneconomic, Reputational Damages Satisfies Rule 26 Requirements*

Lively seeks reputational damages for the harm incurred in connection with Defendants' retaliation campaign. Under California law, reputational harm is a sub-category of noneconomic damages, which in turn, are permissible in connection with FEHA claims. Cal. Civ. Code § 1431.2(b)(2); *Pearl v. City of Los Angeles*, 36 Cal. App. 5th 475, 491–92 (2019) (affirming noneconomic damages award under FEHA); *Baca*, 2025 WL 900477, at *12, 15 (affirming multi-million-dollar damages award under FEHA and noting noneconomic damages include "injury to reputation and humiliation") (citation omitted). Lively seeks her reputational damages pursuant to this framework. *See, e.g.*, Dkt. No. 1319 at 55 (proposed jury instructions) ("Reputational harm is an element of noneconomic damages recoverable under the FEHA.").

---

[40] The fact that Lively's disclosures evolved over time is unremarkable and simply reflects Lively's good-faith supplementation pursuant to Rule 26(e). *See* Dkt. No. 433, at 4 ("The plaintiff may not be able to clarify the precise method of calculating damages prior to expert discovery, and the amount initially claimed may turn out to be inaccurate."); *Cates*, 330 F.R.D. at 373 ("Even though Rule 26(a) does not elaborate further on the level of specificity required in the initial damages disclosure, it is plainly not the purpose of Rule 26(a) disclosures to create a trap for the unwary plaintiff at the outset of a case to have large portions of damages excluded."); *Moore's Federal Practice* § 26.22[4][c] (3d ed. 2023) (stating that disclosures are based on the "best information then available . . . however limited and potentially changing it may be").

Noneconomic damages are inherently difficult to quantify. This Court and others have acknowledged limitations of doing so, as well as the appropriateness of such subjective assessment for the jury. *See, e.g.*, *Williams*, 2013 WL 5652589, at \*6 (in a Rule 26(a) disclosure, "any calculation that may be provided [for such damages] would not be of much use to anyone"); *Rodriguez v. Village of Port Chester*, 535 F. Supp. 3d 202, 222 (S.D.N.Y. 2021) (noting under Rule 26(a) that noneconomic "damages are inherently difficult to compute and their determination is within the province of the jury"); *Jackson*, 2008 WL 4355349, at \*1 ("The quantification of such matters is, to say the least, difficult, and any calculation that might be provided would not be of much use to anyone."); *see also Saladino v. Stewart & Stevenson Servs., Inc.*, No. 01–CV–7644 (SLT) (JMA), 2011 WL 284476, at \*3 (E.D.N.Y. Jan. 26, 2011) ("[A]wards for pain and suffering do not lend themselves as easily to computation.") (cleaned up); *Williams v. Trader Pub. Co.*, 218 F.3d 481, 486 n.3 (5th Cir. 2000) (suggesting that Rule 26(a) may not require a specific calculation for noneconomic damages); *Baca*, 2025 WL 900477, at \*12.[41]

Where damages are subject to expert testimony, supplementation may be permitted, so long as a party had already disclosed the damages category and good-faith basis early and reserved the right to further address it. For example, in *Cates v. Trustees of Columbia University*, plaintiffs disclosed damages exceeding $242 million in their initial Rule 26 disclosures, explaining that "discovery and expert analysis will be necessary for a complete determination of damages" and expressly reserved their right to revise and supplement "by means of amendments or expert disclosures." 330 F.R.D. at 371 (cleaned up). The court held that disclosure was sufficient. *Id.* at

---

[41] While Defendants reference 15 cases in support of MIL No. 16, 13 relate exclusively to economic damages, discussing computations for economic damages, disclosures other than pursuant to Rule 26(a)(1)(A)(iii), and generalized propositions about "sandbagging." Defendants' two decisions that address noneconomic damages reject their position and permit such damages as evidence at trial pursuant to Rule 26(a)(1)(A)(iii) and Rule 37(c). *See Williams*, 2013 WL 5652589, at \*3; *Funk v. Belneftekhim*, No. 14-CV-376 (BMC), 2020 WL 7642868, at \*5 (E.D.N.Y. Dec. 23, 2020), *clarified on denial of reconsideration*, 2020 WL 13891271 (E.D.N.Y. Dec. 30, 2020).

373–74.

As applicable here, Lively's disclosure for her reputational harm damages satisfies Rule 26(a)(1)(A)(iii). She identified two categories of reputational harm damages and impressions counts: (1) the Retaliatory Phrases "tone deaf," "bully," and "mean girl," amounting to 176,738,781 impressions, in an amount of approximately $36.5 to $40.5 million and (2) the Retaliatory Statements made by Defendants' agent Bryan Freedman, amounting to 116,959,530 impressions, in an amount calculated at $24,375,267. Lively's disclosures were then addressed in detailed computations provided by Lively's expert, Dr. Humphreys. Particularly in light of Dr. Humphreys' detailed calculations, Defendants cannot credibly argue that they did not receive Lively's computations as to the impressions on either the Retaliatory Phrases or Retaliatory Statements, nor the dollar-amount calculations for the Retaliatory Statements. *See* Dkt. No. 1233-126 (Humphreys Report) ¶¶ 66–68 & fig. 2 (Impressions of media linking Lively to the negative terms "bully," "mean girl," and "tone deaf" amounting to 176,738,781 impressions); ¶¶ 137–38 ("Impressions Model" for retaliatory statements amounting to 116,959,530 impressions) & fig. 10 ("Total Impressions"); ¶¶ 195–211 ("Damages Model"), fig. 18 ("Total Cost for Corrective Campaign" amounting to $24,375,267).

Thus, even though Lively seeks reputational damages, she provided everything required under Rule 26 and more. She disclosed reputational harm as a category of damages, tied that category to Defendants' retaliatory conduct in the form of retaliatory phrases and statements, disclosed the impressions-based methodology used to quantify the reach of the challenged retaliatory phrases and statements, identified the number of impressions providing the basis for each, calculated the particular dollar damages associated with the Retaliatory Statements, and explained that expert analysis would clarify these figures as discovery progressed. Dkt. No. 1328-

73

12–15, 17 (Lively Disclosures). Lively's expert disclosures, reports, and testimony of Dr. Humphreys in particular provided additional detail. Nothing more was required. *See Jackson*, 2008 WL 4355349, at *1, *Cates*, 330 F.R.D. at 371, 373–74.

### 2. Defendants Cannot Satisfy Rule 37(c)(1)'s Standard for Preclusion

Even if the Court were to conclude that Lively's noneconomic disclosures should have been more detailed in some respect, Rule 37(c)(1) still does not warrant the drastic sanction Defendants seek. Courts in this Circuit evaluate preclusion under Rule 37(c)(1) by considering (1) the explanation for the disclosure issue; (2) the importance of the evidence; (3) prejudice to the opposing party; and (4) the possibility of a continuance or other cure. *See Cates*, 330 F.R.D. at 373. Defendants do not meaningfully engage with these factors—discussing only (1) and (3)—and they cannot carry their burden to show that any asserted noncompliance was neither substantially justified nor harmless.

*First*, to the extent Lively's reputation damages disclosure is insufficient, it is substantially justified given that these damages are noneconomic, and the quantification as to the spread of harm was appropriately the subject of expert analysis. This is particularly so given that Lively disclosed the category in which she sought damages (*i.e.*, reputational), attributed these damages to specific key themes of the retaliation campaign and statements made in relation to Defendants' retaliatory lawsuit, and provided the relevant calculations (*i.e.*, tracking the impressions of those themes and statements), later addressed by expert testimony, to Defendants.

*Second*, the evidence goes to a central component of Lively's damages case—the harm she suffered to her reputation as a result of Defendants' retaliatory conduct. The fact that evidence is "of obvious importance for [a party's] claim" is "a factor weighing in favor" of permitting the evidence, not excluding it. *Haas v. Del. & Hudson Ry. Co.*, 282 F. App'x 84, 86 (2d Cir. 2008)

74

(citing *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296–97 (2d Cir. 2006)); *see also Anthem, Inc. v. Express Scripts, Inc.*, 660 F. Supp. 3d 169, 186 (S.D.N.Y. 2023).

*Third*, Defendants articulate no concrete prejudice suffered by Lively's disclosures—no specific discovery they were unable to pursue, no expert analysis they were prevented from conducting, and no unfair surprise at trial. Non-compliance "is considered to be harmless when the party entitled to the [] disclosure has not been prejudiced." *Williams v. Cnty. of Orange*, No. 03-CV-5182 (LMS), 2005 WL 6001507, at *3 (S.D.N.Y. Dec. 13, 2005). Demonstrating prejudice is a particularly difficult showing when it comes to noneconomic damages. *See Rodriguez*, 535 F. Supp. 3d at 222; *Cates*, 330 F.R.D. at 373–74.[42]

Defendants assert three types of prejudice: (1) the inability to serve written discovery requests for information relating to Lively's alleged reputational harm damages; (2) the opportunity to examine fact witnesses, including Lively, regarding reputational harm damages; and (3) the inability to computations for their own damages experts to analyze and refute. Mot. at 50. Each falls short.

With respect to written discovery, Defendants were on notice of Lively's theory of reputational harm from the moment her lawsuit was filed, and Lively has long alleged that the retaliation campaign was based, in part, on Defendants' perpetuation of false and misleading narratives regarding her. *See* Dkt. Nos. 84, 520. Further, Defendants were well aware that Lively was pursuing reputational damages—*including as of June 2025*, while the fact discovery period was open, and were entitled to ask Lively questions regarding them. Dkt. No. 1328-13.

Defendants also had the opportunity to question fact witnesses regarding Defendants'

---

[42] In one of Defendants' cases, the Court found prejudice where Defendants had specifically compelled the information *seven separate times*. *See* Mot. at 45 (citing *Pilitz v. Inc. Vill. of Freeport*, No. 12-CV-5655 (JS) (ARL), 2020 WL 6945927, at *3 (E.D.N.Y. Nov. 25, 2020)). That is not the case here, where Defendants had never complained of Lively's reputational harm disclosures prior to MIL No. 16.

narratives surrounding Lively as "bullying," "tone deaf," and "mean girl" as well as the other retaliatory statements during fact discovery—including to Lively. Indeed, Defense counsel addressed them directly to Lively during her deposition in July 2025:

> Anytime you're in a case like this where words are -- either spoken or in writing are at issue, it's important for the defendants to find out what words you're complaining about. And you testified earlier, and I did hear this, that you. were upset that your -- they said your character was -- you know, they called you a liar or something like that, and that you're a mean girl and you're a bully. So those are specific things that we can react to.

Hudson Decl. 41 at 258:21–259:5.[43]

Nor are Defendants able to credibly claim that their expert discovery was prejudiced on the basis of Lively's disclosures. As Defendants admit, Lively's disclosures encompassing the category of reputational harm were first provided in June, and her latest Fourth Amended Disclosures were made in advance of the submission of expert reports on October 17, six weeks prior to the close of expert discovery in December.

The opinions offered by Dr. Mayzlin and Dr. Ashlee Humphreys further addressed this subject. In particular, Dr. Mayzlin's report discussed the proliferation of the terms "tone deaf," "bully," and "mean girl," and their association to the alleged retaliation campaign. Dkt. No. 1233-118 at 40–44 (Mayzlin Report). Further, Dr. Humphreys' report addressed the impressions stemming from both the Retaliatory Phrases (amounting to 176 million impressions) and the Retaliatory Statements (amounting to 116 million impressions), and Dr. Humphreys additionally addressed detailed calculations as to the cost to repair the harm from the Retaliatory Statements. Dkt. No. 1233-126 at 4–5, ¶¶ 195–211 ("Damages Model"), fig. 18. Defendants were on notice of these reports, were able to question the experts about their opinions on this subject, and were able

---

[43] *See also, e.g.*, Hudson Decl., Ex. 41, at 143:2–145:14 (reputation), 176:8–177:1 (campaign), 210:6–14, 257:19–259:20 (bully), 210:15–21, 257:19–259:20 (mean girl); Hudson Decl., Ex. 44, at 265:11–268:4 (bully); Dkt. No. 1063-4 at 278:10–278:15 (reputation).

to submit rebuttal expert opinions on these topics. *See, e.g.*, Dkt. No. 1340-1 ¶154 (Wagner Report) (rebutting Humphreys in connection with Lively's reputation); *see also* Dkt. No. 1292-1 (Alexander Report). Further, counsel for Defendants was able to ask questions of Dr. Humphreys regarding her computations. They chose *not* to ask a single question regarding her conclusion that the Retaliatory Phrases generated 176 million impressions, and asked only a handful of basic questions regarding the cost-to-repair damages figure associated with the Retaliatory Statements— all of which suggests that Defendants felt that they had all the necessary information that they now claim to be deprived of. *See* Hudson Decl. 43 at 173:14–174:4. In short, Defendants were not deprived of meaningful discovery opportunities in connection with Lively's disclosures, and any prejudice claimed now is negligible at best.

*Fourth*, Defendants—having never raised the alleged deficiency prior to the instant motion—have proposed no lesser measure than complete preclusion. However, to the extent the Court identifies any discrete gap, it can be cured through narrower measures than the drastic exclusion requested by Defendants. *Enchante Accessories, Inc. v. Turko Textiles, LLC*, 2023 WL 395221, at *2 (S.D.N.Y. Jan. 25, 2023) ("Preclusion of undisclosed evidence under Rule 37 is automatic, *but not mandatory*.") (citation omitted) (emphasis added); *Rhee-Karn v. Lask*, 674 F. Supp. 3d 75, 82 (S.D.N.Y. 2023) (denying motion in limine to preclude damages evidence and permitting plaintiff an opportunity to provide a definitive computation).

### C.    The Court Should Reject Defendants' Attempt to Exclude Relevant Reputational Damages arising from Defendants' Retaliatory Lawsuit

Defendants additionally seek to exclude any reputational damages associated with Dr. Humphrey's assessment of 116 million impressions and $24 million damages calculations regarding the Retaliatory Statements on the grounds that Lively's defamation claim has been dismissed on the grounds of fair report or litigation privilege. Mot. at 51–52.

77

Defendants' argument rests on a false premise: that because the Court dismissed Count Thirteen (defamation) on privilege grounds, Plaintiff must be barred from presenting any evidence—or recovering any damages—stemming from the Retaliatory Statements. That is not the law. The dismissal of a cause of action on privilege grounds does not preclude the underlying conduct from the case where it is independently probative of a different surviving claim (here, retaliation) and independently supports recoverable damages flowing from retaliatory acts. *See Campanella v. County of Monroe*, 853 F. Supp. 2d 364, 371–74 (W.D.N.Y. 2012) (rejecting defamation claims subject to common interest privilege while allowing retaliation claims based on the same underlying conduct to proceed); *see also AA Medical P.C. v. Almansoori*, No. 20-CV-03852 (DG) (JMW), 2023 WL 7688688, at \*20 (E.D.N.Y. Oct. 4, 2023) (noting "the privilege is only relevant to claims of defamation, slander or libel, none of which are at play here").

Dr. Humphreys' assessment of the Retaliatory Statements made by Defendants' agent Bryan Freedman regarding their retaliatory lawsuit remains applicable. Lively need not (and will not) try Count Thirteen, but she is entitled to prove that Defendants engaged in retaliatory conduct that includes public attorney statements alleged to be part of the retaliatory campaign, and that such conduct caused reputational injury. Accordingly, the Court should deny Defendants' request to exclude Plaintiff's reputational-harm damages evidence and the related calculated impressions on the ground that Count Thirteen was dismissed. At most, the Court may, if it deems appropriate, issue a limiting ruling that (i) Plaintiff may not present the Retaliatory Statements as a basis for defamation liability or "defamation" damages, but (ii) Plaintiff may introduce the statements—and Humphreys' damages quantifications—as evidence of retaliatory conduct, causation, and reputational injury recoverable under Lively's retaliation claims. Fed. R. Evid. 105.[44]

---

[44] Lively respectfully refers the Court to Lively's Opposition to MIL No. 9, which also addresses this subject.

### XVII.  Opposition to Defendants' Motion *in Limine* No. 17 To Preclude Evidence And Argument Relating To Plaintiff's Allegedly Lost Profits And Lost Royalties

The Court should reject Defendants' attempt to preclude evidence of Lively's share of lost profits from Betty B Holdings LLC ("Betty B") and Family Hive LLC ("Family Hive") (together, the "Companies")—companies in which she personally holds an ownership interest through her 99.452% ownership of LOL HATA, LLC ("LOL HATA"). Defendants' argument that Lively lacks standing to recoup her share of lost profits improperly conflates "injury" for purposes of standing with available damages. The evidence at trial will show that Defendants plotted to harm Lively's image by spreading online content criticizing her for promoting her haircare line and beverage brand while starring in a movie about domestic violence. The plan was to attack *Lively* for being insensitive and tone deaf, not the Companies. This "injury" belongs to Lively, and she is entitled to seek all economic damages caused by that injury through her FEHA retaliation, aiding and abetting, and breach of contract claims, all of which permit her to seek lost profits caused by that injury as economic damages.

Alternatively, if the Court determines that Lively lacks standing to seek lost profits as economic damages, the evidence must nonetheless be admitted to assist the jury in ascertaining the value of Lively's brand and reputation. In addition to seeking economic damages, Lively is seeking noneconomic damages for reputational harm, which, as discussed *supra*, can be difficult to quantify. In cases involving reputational harm, courts have relied on evidence of financial harm to businesses associated with the individual whose reputation was tarnished to determine the reasonableness of a jury's noneconomic damages award. *See, e.g.*, *Cantu v. Flanigan*, 705 F. Supp. 2d 220, 225 (E.D.N.Y. 2010). Here, the Companies were heavily reliant on Lively's name and likeness, and their financial performance is thus inextricably intertwined with the intangible value

79

of Lively's brand. Thus, evidence of any financial harm they suffered as a result of Defendants' attacks on Lively is independently admissible as evidence of the harm to Lively's reputation.[45]

**A.      Lively Has Standing to Recover Her Share of the Companies' Lost Profits Caused By Defendants' Retaliation That Targeted Her Individually**

Lively easily meets the requirements for standing to bring her claims. To establish Article III standing, Lively must demonstrate: "(1) an injury-in-fact, which is a concrete and particularized harm to a legally protected interest; (2) causation in the form of a fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendants; and (3) redressability, or a non-speculative likelihood that the injury can be remedies by the requested relief." *Hu v. City of New York*, 927 F.3d 81, 89 (2d Cir. 2019). Likewise, California standing "in general terms" requires that the plaintiff allege "injury—that is, some 'invasion of the plaintiff's legally protected interests." *Angelucci v. Century Supper Club*, 41 Cal. 4th 160, 175 (2007).

Lively has alleged claims for unlawful employment retaliation under FEHA, aiding and abetting that retaliation, and breach of the Contract Rider Agreement, including as to its anti-retaliation provision. The injury asserted through these claims is injury to Lively individually, not the Companies. Lively intends to prove at trial that Defendants' retaliation and misconduct "injured" her or invaded her legally protected interests by *inter alia* harming her brand and image, thus causing her both economic and noneconomic losses, including her portion of lost profits and royalties from the Companies. Accordingly, Lively is unquestionably the one who has "standing" to bring these claims and assert these damages, not the Companies.[46]

---

[45] Lively does not intend to seek double recovery for lost profits as both economic and noneconomic damages. Any potential for double recovery can easily be addressed by a curative jury instruction.

[46] Indeed, it is unclear how Lively could have possibly brought these claims "derivatively"—it is the *Companies* who would lack standing to assert claims for employment retaliation against a defendant who never employed them or for breach of a contract that did not involve them.

As part of their retaliation campaign, Defendants purposely targeted Lively's promotional activities with the Companies with the intent to harm Lively's *personal* image. In August 2023, they said to each other, "[L]et's bring in the fact that she promoted a haircare line and her own drink brand as part of promo." Hudson Decl., Ex 38. at 1. A few months later, Wayfarer co-founder Steve Sarowitz texted TAG, "Thanks. We are making progress," in response to TAG sharing links to content tied to Lively's promotional efforts in connection with alcoholic beverages. Hudson Decl., Ex. 39 at 1. Following Defendants' targeted retaliation against Lively, sales at the Companies declined materially, notwithstanding their prior success, resulting in millions of dollars in lost profits. Hudson Decl., Ex. 40 ¶¶ 46–48, 53–56, 59–61. As will be proven at trial, Lively owns 99.452% of LOL HATA, which owns 40% of Family Hive and 21.657% of Betty B. While Defendants' actions unquestionably harmed the Companies, they also harmed Lively's brand and thus her individual financial interest in those Companies. Thus, Lively is entitled to seek her share of those losses.

As for redressability, the law is clear that a plaintiff who has standing to assert FEHA retaliation is entitled to the full panoply of damages available to a civil litigant. *See, e.g.*, *Commodore Home Sys., Inc. v. Superior Ct.*, 32 Cal. 3d 211, 220 (1982) (under FEHA, "all relief generally available in noncontractual actions, including punitive damages, may be obtained"); *McCoy v. Pac. Mar. Assn.*, 216 Cal. App. 4th 283, 308 (2013) ("FEHA does not limit damages and 'all forms of relief granted to civil litigants generally . . . are available'") (quoting *Commodore*, 32 Cal. 3d at 220). An individual civil litigant's compensatory damages can include that individual's share of lost profits in a business venture. *See, e.g.*, *Seely v. White Motor Co.*, 63 Cal. 2d 9, 14 (1965) (en banc) (affirming award of lost business profits to individual); *Edwards v. Container Kraft Carton & Paper Supply Co.*, 161 Cal. App. 2d 752, 760-761 (1958) (same); *see also* CACI

VF-2504 (identifying lost profits as a category of recoverable damages under FEHA). Likewise, damages for contract violations can include special damages that were foreseeable at the time of contracting. *See* CACI 351 (special damages available if, when the parties made the contract, the defendant "knew or reasonably should have known of the special circumstances leading to the harm"). Here, given that the contract at issue expressly prohibited retaliation, any damages flowing from such retaliation will also be recoverable as foreseeable special damages for breach of contract.

Defendants misleadingly cite cases in which individuals were held to lack standing to seek lost profits because those individuals failed to assert any claims involving a personal harm. Unlike Lively, the individual plaintiffs in those cases were pursuing claims that *only* asserted injury to a company, with no allegations that would establish a personal injury to the individual distinct from the entity. For example, in *Gray Gables Corp. v. Arthur*, individual shareholders of a company owning a building lacked standing to bring an action against the government for wrongful condemnation of the building because they made no allegations suggesting that the government had violated their *individual civil rights* rather than rights of the company that owed the building. 2022 WL 905393, at *1 (2d Cir. Mar. 29, 2022). Similarly, in all of the other cases cited by Defendants, the courts found that the individual plaintiff had not alleged any injury to himself and was seeking lost profits for harms that had only been directed somewhere else. *See Jones v. Niagara Frontier Transp. Auth. (NFTA)*, 836 F.2d 731, 736 (2d Cir. 1987) (individual contractor had no standing to sue defendants for failure to award construction contracts to company where injuries alleged "all involved injuries to the corporation" and there were "no allegations that defendants had taken any actions against [individual] in his individual capacity"); *Karkare on behalf of JN v. Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers Loc. 580,*

82

140 F.4th 60, 65 (2d Cir. 2025) (attorney-in-fact plaintiff had no standing to bring ERISA action on behalf of patient for injuries suffered by patient where plaintiff "does not argue that he has suffered any direct injury"); *Liberty Sackets Harbor LLC v. Vill. of Sackets Harbor*, 776 F. App'x 1, 3 (2d Cir. 2019) (no standing for a company member to pursue a first amendment retaliation claim where all injury stemmed from denial of *the company's* application for a variance and member "does not allege an injury independent of [the company's] injuries); *Ali v. New York City Env't Control Bd.*, 670 F. App'x 26, 27 (2d Cir. 2016) (individual had no standing to sue city for injuries stemming from city's issuance of violation notices to *his company*). In each of these cases, the individual plaintiff suffered financial harm that was merely incidental to an injury that was actually directed at a separate entity or person.

In contrast, the injury Lively has asserted is an injury to herself—employment retaliation for her opposition to sexual harassment in the workplace and breach of a contract that prohibited the same. That retaliation took the form of public attacks on her for promoting her haircare and beverage businesses, all as part of Defendants' efforts to discredit and silence her. In other cases where plaintiffs have asserted a similar injury to their reputation, those individuals have been permitted to seek their portion of lost business profits as part of their economic damages *in addition* to seeking separate noneconomic damages for reputational harm and mental anguish. *See, e.g.*, *Cantu v. Flanigan*, 705 F. Supp. 2d 220, 225 (E.D.N.Y. 2010) (prominent businessman whose reputation was harmed awarded (i) $38 million in economic damages by jury as his share of lost contracts that would have been awarded to his businesses, and (ii) $150 million in noneconomic damages for harm to his reputation and mental anguish); *see also Prozeralik v. Cap. Cities Commc'ns, Inc.*, 222 A.D.2d 1020 (1995) (local businessman whose reputation was harmed awarded (i) $1.5 million in financial losses resulting from the plaintiff's customers and investors

withdrawing financial support, (ii) $6 million for noneconomic injuries for his reputation and standing in the community; and (iii) $3.5 million for noneconomic emotional harm), *judgment affirmed on appeal as modified*, *Prozeralik v. Cap. Cities Commc'ns, Inc.*, 222 A.D.2d 1020, 1020 (1995).[47] Moreover, where an individual and a company are both harmed, the Second Circuit has held that *both* can have standing to seek lost profits. *See, e.g.*, *Hu*, 927 F.3d at 89 (plaintiff construction companies and individual construction worker *both* had standing to bring suit against city and others for racial discrimination seeking losses of past and future business). Defendants therefore have no basis to exclude evidence of the economic harm Lively suffered in the form of her share of the Companies' lost profits.

**B.      The Companies' Lost Profits Are Relevant to The Jury's Determination of Noneconomic Damages for Reputational Harm**

Even if the Court finds that Ms. Lively lacks standing to seek her portion of these lost profits, the evidence is independently relevant and admissible to assist the jury's determination of the value of Lively's noneconomic reputational damages. Damages for reputational harm are commonly awarded in FEHA retaliation cases. *See Baca v. City of Los Angeles*, 2025 WL 900477, at *12 (Cal. Ct. App. Mar. 25, 2025) (non-economic damages under FEHA include "injury to reputation and humiliation"); *Lore v. City of Syracuse*, 670 F.3d 127, 154 (2d Cir. 2012) (affirming jury award for reputational harm for retaliation); *Osorio v. Source Enters.*, Inc., No. 05 CIV. 10029 (JSR), 2007 WL 683985, at *10 (S.D.N.Y. Mar. 2, 2007) (same). As an intangible harm, reputational harm can be difficult for a jury to quantify. In such cases, courts have upheld jury awards for reputational harm based on evidence presented at trial of the financial harm suffered

---

[47] The relevant facts of the case are summarized in *Prozeralik v. Cap. Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 470-71 (1993), which reversed the original judgment on other grounds and ordered a new trial. *See also Cantu, supra* (discussing history of *Prozeralik*).

by businesses associated with the plaintiff. In *Cantu*, for example, the court relied on evidence of the total amount of lost contracts suffered by a plaintiff's business to conclude that a jury's award of noneconomic damages for reputational harm was reasonable. *See Cantu*, 705 F. Supp. 2d at 231 (E.D.N.Y. 2010) (jury award of $150 million for reputational harm was reasonable because there was "evidence demonstrating that the injury to Cantu's reputation led to lost contracts valued at $289,950,000 and $69,000,000, which underscore[d] the severity of the damage to Cantu's reputation").

Lively must be permitted to present evidence of the value her brand brought to business ventures as part of her burden of proving the intangible damage that was done to her reputation. The value of a person's reputation is an inherently fact-specific inquiry. A jury is likely to weigh the reputation of a private civilian differently, for example, than the reputation of a celebrity whose name, image, and likeness has generated millions of dollars for companies. To provide the jury with the facts necessary to understand the value of Lively's reputation, she must be permitted to introduce evidence of the millions of dollars the Companies suffered in lost profits. Thus, at a minimum, evidence of the lost profits to Lively's haircare and beverage businesses should be admitted as evidence of reputational harm.

Because Lively has standing to seek lost profits, or alternatively because lost profits evidence is independently admissible as evidence of noneconomic reputational harm, the Court should deny MIL No. 17.

## XVIII. Opposition to Defendants' Motion *in Limine* No. 18 To Preclude Evidence Of Emotional Distress Damages Beyond "Garden Variety" Emotional Distress Damages

Defendants' MIL No. 18 seeks to limit both Lively's presentation of emotional distress to just her own testimony, and also cap Lively's recovery of emotional distress damages to $30,000. Mot. at 54-56.  Both aspects of this Motion should be denied.

To begin, this Court has already addressed the evidence Lively can present in support of her emotional distress, which is not limited to just her own testimony. *See* Dkt. No. 313. By way of background, on June 13, 2025, the parties stipulated to dismiss Lively's claims for intentional and negligent infliction of emotional distress. *See* Dkt. No. 335. In advance of that filing, on June 10, 2025, Lively sought clarification on the Court's Order denying Defendants' motion to compel information regarding the identity and treatment records of Lively's health care providers related to emotional distress, which the Court entered on the basis that Lively had expressed her intention to withdraw the emotional distress tort claims and further ordered that if she did not withdraw such claims, she would be barred from presenting evidence of emotional distress. *See* Dkt. No. 308. Specifically, Lively sought clarification that if her emotional distress tort claims *were* dismissed, "the Court [would] not preclude her from presenting testimony and evidence of garden-variety emotional distress damages on that basis, ***including testimony of herself and percipient corroborating witnesses***." *See id.* at 2 (emphasis added). The Court subsequently endorsed Lively's letter and clarified that its prior ruling (Dkt. No. 266) precluding evidence "referred to medical evidence of emotional distress" and would "not preclude Lively from offering of garden-variety emotional distress." Dkt. No. 313. Given that the Court has already ruled on this issue and confirmed Lively's right to present evidence of garden-variety emotional damages through testimony of herself ***and percipient corroborating witnesses***, Defendants' attempt to relitigate this issue should be denied.

Defendants' baseless attempt to arbitrarily cap Lively's emotional distress damages to $30,000 fares no better. As a practical matter, Lively "can have no idea what damages the jury will find established, and plainly cannot limit her evidence of damages to any particular number." *Diamond v. Sokol*, 2007 WL 3168469, at *5 (S.D.N.Y. Oct. 29, 2007) (denying similar motion *in*

*limine* seeking to "preclude plaintiff from introducing 'any evidence relating to alleged damages beyond $740,000'").  Moreover, none of the cases cited by Defendants address (let alone support) the relief they seek here: specifically, a pre-trial order capping Lively's potential recovery for garden-variety emotional distress damages,[48] which is essentially a preemptive remittitur.[49] Finally, the $5,000-30,000 range proposed by Defendants is not supported by authority. Mot. at 55. As an initial matter, Defendants' reliance on Second Circuit authority is not controlling, because this is an issue of state law under the FEHA. *See Budwig v. Allegiant, LLC*, 2020 WL 5235671, at *5 (E.D. Cal. Sept. 2, 2020) (writing "FEHA is a California law and the Court is hearing this case under its diversity jurisdiction. Therefore, the Court will apply state substantive law and federal procedural law.") (*citing Dep't of Fair Employment & Housing v. Lucent Techs., Inc.,* 642 F.3d 728 (9th Circ. 2011) (applying California substantive law to adjudicate a FEHA claim)). Furthermore, in both the Second Circuit and under the FEHA, courts have permitted awards of damages for garden-variety emotional distress far exceeding $100,000.  *See Campbell v. Cellco P'ship*, 2012 WL 3240223 (S.D.N.Y. Aug. 6, 2012) ($125,000 for garden-variety emotional distress claim); *Quinby v. WestLB AG*, 2008 WL 3826695, at *3 (S.D.N.Y. Aug. 15, 2008) (awarding plaintiff $300,000 in emotional distress damages for a "garden variety" claim); *Taylor v. Nabors Drilling USA, LP*, 222 Cal. App. 4th 1228, 1247-8 (Cal. Ct. App. 2014) (awarding

---

[48] Defendants likewise have proposed an improper jury instruction that purports to limit what the jury can award based on their proposed definition of "garden-variety" emotional distress damages. As set forth in prior briefing, however, the jury's award of damages will be based on the evidence that Lively presents, which is already limited by this Court's order to exclude "medical evidence of emotional distress." That is the only limitation that should apply here, and any argument that an award may be excessive – which is clearly premature – should be made in the context of a motion for a remittitur under Fed. R. Civ. P. 59. It is not an issue to be decided *in limine*.

[49] For instance, Defendants cite a Report and Recommendation this Court subsequently adopted, in which Magistrate Stein recommended default judgment be entered against defendants and $25,000 in garden-variety damages (based on two supporting affidavits) be awarded to the plaintiff. *See Castillo v. Isakov*, 2024 WL 5323851, at *11-12 (S.D.N.Y. Dec. 27, 2024). To the extent Defendants are concerned with an award exceeding the generally accepted range for garden variety emotional distress damages, it should be addressed by way of remittitur pursuant to Fed. R. Civ. P. 59 and not as a pre-trial motion. *See, e.g.*, *Quinby*, 2008 WL 3826695, at *3-4 (addressing challenge to excess compensatory damages under Fed. R. Civ. P. 59).

plaintiff $150,000 in past noneconomic damages under FEHA in part because "there was substantial evidence of significant emotional distress.").

For each of these reasons MIL No. 18 should be denied in its entirety.

**XIX.    Opposition to Defendants' Motion *in Limine* No. 19 To Bifurcate The Issue Of Punitive Damages**

Finally, Defendants' request to bifurcate punitive damages should be denied. Mot. at 56-57. To begin, "[b]ifurcation is the exception, not the rule." *See Computer Assocs. Int'l, Inc. v. Simple.com, Inc.*, 247 F.R.D. 63, 67 (E.D.N.Y. 2007) (collecting cases and denying bifurcation); *Farghaly v. Potamkin Cadillac-Buick-Chevrolet-Geo, Ltd.*, 2021 WL 4267656, at *2 (S.D.N.Y. Sept. 20, 2021) ("[J]uries 'routinely' determine punitive damages alongside liability").[50] That's because "[a] single trial tends to lessen the delay, expense and inconvenience to all concerned." *Dollman v. Mast Indus., Inc.*, 2011 WL 3911035, at *2 (S.D.N.Y. Sept. 6, 2011) (denying motion to bifurcate). And, as the party seeking bifurcation, Defendants bear the burden of demonstrating that such relief is warranted. *Doe 1 v. United States Twirling Ass'n, Inc.*, 2024 WL 1858230, at *2-3 (E.D.N.Y. Apr. 28, 2024) (denying motion to bifurcate). Defendants do not come close to meeting their burden and do not meaningfully address any of the factors articulated under Fed. R. Civ. P. 42(b), none of which support bifurcation.

***First***, bifurcation would inconvenience the parties and the Court and weighs against the relief Defendants seek. Among other things, this trial is already anticipated to be approximately three weeks; as such, "[a] decision to bifurcate the trial would only prolong the resolution of this already-lengthy litigation." *Sohnen v. Charter Comms., Inc.*, 761 F.Supp.3d 556, 574-6 (E.D.N.Y. 2025) (collecting cases and denying bifurcation). What is more, bifurcation would necessarily

---

[50] Defendants cite this Court's decision in *Marshall v. Port Auth. of New York & New Jersey*, 2022 WL 17491006, at *6 (S.D.N.Y. Dec. 5, 2022) (Liman, J.), where bifurcation was granted. In *Marshall*, however, the motion to bifurcate was ***unopposed***.

cause additional costs and inefficiencies since it would effectively require multiple rounds of trial testimony and evidence. *See id.*

*Second*, Defendants fail to demonstrate any colorable prejudice. Rather, the sole argument advanced on this score rests on the fact that evidence and testimony of their wealth would be prejudicial. Mot. at 57. However, as discussed above (*see supra*, Opp. to MIL No. 8), any marginal prejudice (and there is none) is substantially outweighed by the probative value of Defendants' net worth, which is directly relevant to Lively's retaliation claim. Specifically, Defendants' access to Sarowitz's wealth is what gave them the resources to hire a professional team to destroy Lively's reputation in a widespread, far-reaching smear campaign and ultimately pursue a retaliatory lawsuit. Defendants' willingness to use that wealth is also probative of their motive, their state-of-mind, and the lengths they were willing to go to discredit and silence Lively and others. That aside, any perceived prejudice can also be readily cured by a jury instruction. *See Falzon v. Johnson*, 2016 WL 11430072, at \*5 (E.D.N.Y. Oct. 24, 2016) (citing cases where claimed prejudice by unified trial could be remedied by limiting instruction when finding that it was unclear whether "bifurcation [would] eliminate or even substantially reduce the potential prejudice that Defendants fear"); *Aldous v. Honda Motor Co.*, 1996 WL 312189, at \*2 (N.D.N.Y. May 30, 1996) ("Defendants point to no particular factors specific to this case that distinguish the potential for prejudice here from the potential prejudice which is normally and customarily dealt with through an appropriate charge and curative instructions where necessary").

*Finally*, Defendants' conclusory assertion of jury confusion is of no moment. Mot. at 57. The three causes of action to be tried are not complex, and Defendants present no argument (legally or factually) as to how there is an increased possibility of confusion with presenting liability and

89

damages together in this case. *Sohnen*, 761 F.Supp.3d at 575-6 (rejecting similar argument and collecting cases). For each of these reasons, Defendants' motion should be denied.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motions *in limine*.

Dated: April 17, 2026

WILLKIE FARR & GALLAGHER LLP
Michael J. Gottlieb
2049 Century Park East
Los Angeles, California 90067
(310) 855-3000
mgottlieb@willkie.com

Kristin E. Bender
1875 K Street NW
Washington, DC 20006
(202) 303-1000
kbender@willkie.com

Aaron Nathan
Michaela A. Connolly
Melissa Taustine
787 7th Avenue
New York, NY 10019
(212) 728-8000
anathan@willkie.com
mconnolly@willkie.com
mtaustine@willkie.com

/s/ Esra A. Hudson

MANATT, PHELPS & PHILLIPS, LLP
Esra A. Hudson (admitted *pro hac vice*)
Naeun Rim (admitted *pro hac vice*)
Stephanie A. Roeser (admitted *pro hac vice*)
Sarah E. Moses (admitted *pro hac vice*)
Sareen K. Armani
Katelyn A. Climaco
2049 Century Park East, Suite 1700
Los Angeles, California 90067
(310) 312-4000
ehudson@manatt.com
sroeser@manatt.com
smoses@manatt.com
sarmani@manatt.com
kclimaco@manatt.com

Matthew F. Bruno
7 Times Sq
New York, NY 10036
(212) 790-4500
mbruno@manatt.com

DUNN ISAACSON RHEE LLP
Meryl C. Governski (admitted *pro hac vice*)
401 9th Street NW
Washington, DC 20004
(202) 240-2927
mgovernski@dirllp.com

90