# EXHIBIT 2

** C O N F I D E N T I A L **

* CONTAINS ATTORNEYS' EYES ONLY MATERIAL *

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 1:24-CV-10049-LJL
(Consolidated with 1:25-cv-00449-LJL)
-------------------------------x
BLAKE LIVELY,

            Plaintiff,

      - against -

WAYFARER STUDIOS LLC, a Delaware
Limited Liability Company, JUSTIN
BALDONI, an individual, JAMEY HEATH, an
individual, STEVE SAROWITZ, an individual,
IT ENDS WITH US MOVIE LLC, a California
Limited Liability Company, MELISSA
NATHAN, an individual, THE AGENCY
GROUP PR LLC, a Delaware Limited Liability
Company, JENNIFER ABEL, an individual,
JED WALLACE, an individual, and STREET
RELATIONS INC., a California Corporation,

            Defendants.
-------------------------------x
                (Caption continued)
                September 30, 2025
                10:09 a.m.


        Videotaped Deposition of ISABELA
FERRER, taken by Defendants, pursuant to
Subpoena, held at the offices of Meister
Seelig & Fein PLLC, 125 Park Avenue, New
York, New York, before Todd DeSimone, a
Registered Professional Reporter and Notary
Public of the State of New York.

Page 1

FERRER - CONFIDENTIAL

A.    Yes.

Q.    Can you tell me what happened during the filming of that scene?

A.    My co-star and I were filming a sex scene and after a couple of takes, after cut, Justin Baldoni turned to my co-star and I and said "I know I'm not supposed to say this, but that was hot."

Q.    Was anyone else present when Mr. Baldoni said that?

A.    Yes.

Q.    Who else was present?

A.    The crew that were in the room for the closed set, my co-star, and I don't recall her being there, but I'm assuming the intimacy coordinator.

Q.    What, if anything, did you say after Mr. Baldoni made that comment?

A.    I laughed it off.

Q.    What, if anything, did Alex say after Mr. Baldoni made that comment?

A.    Nothing.

Q.    Did you and Alex ever discuss that comment subsequently?

Page 68

FERRER - ATTORNEYS' EYES ONLY

Q.     On page IF_28, in the middle you wrote "Absolutely.  I really hope he feels one day morally responsible for promoting bullying towards us after the way he's treated us already.  And I'm grateful I'm not taking it too personally and am aware that it's bullshit."  I'm going to stop there.

How did Justin promote bullying towards you?

A.     Given the online hate that I was getting, it seemed like there was nothing being done to speak out against the bullying that was happening to the women and the cast, while he was going along with the rest of his press run, and I assume anybody that was online would have seen what was going on.

So also from what I had gathered information-wise from people such as Blake, it was kind of assumed that due to hiring a PR crisis manager that this kind of narrative was starting to get spun online.

Page 175

FERRER - ATTORNEYS' EYES ONLY

I think your answer was "I think at that point the fact that he wasn't recognizing that something was happening was enough for me to not want to speak to him."  And I think you are referring to the something happening as the negative online comments; is that correct?

A.      Yes.

MS. ROESER:  Objection.

Q.      Were you seeing any negative online comments about Justin Baldoni?

A.      No.

Q.      The only negativity was towards, that you saw, was towards your fellow actors?

A.      And myself.

Q.      And yourself?

A.      Mainly me.

MS. ROESER:  Objection.

Q.      You can put that one to the side.

(Ferrer Exhibit 7 marked for identification.)

Q.      Ms. Ferrer, I'm going to show

Page 183

FERRER - CONFIDENTIAL

A.      No.

Q.      Did Blake Lively ever suggest to you that this movie is a girls night out kind of movie?

MS. ROESER:  Objection.

MR. MICHELMAN:  Objection.

A.      No.

Q.      In the next sentence of that same text you wrote "Justin has been playing all of this up because he knows he's about to get his shit exposed so he's hyping her up and then playing the victim at the same time."

What did you mean when you said "Justin has been playing all of this up"?

A.      I think I meant the bullying and the narrative that was coming out after the premieres and after it was deemed by the public on social media that me and Blake and the rest of the cast didn't care about the real meaning of this movie, and given his, again, lack of really like speaking up for any of us or talking or coming out publicly to even defend not

Page 189

FERRER - CONFIDENTIAL

Blake, but even just me, I found it to be kind of in line with then him promoting himself and his voiced opinions about domestic violence and him being able to kind of be the only person to talk about that.  So it seemed to me that he was playing this narrative up that we don't care and that he does.

Q.    Do you know if Justin wanted to participate in the press with you?

MS. ROESER:  Objection.

A.    I don't know.

Q.    Do you know if he wanted to participate in press with Blake Lively?

MS. ROESER:  Objection.

A.    I don't know.

Q.    Do you know if he wanted to participate in press with Colleen Hoover?

MS. ROESER:  Objection.

A.    Yes.

Q.    You know that he did want to?

MR. MICHELMAN:  Objection.

MS. ROESER:  Join.

A.    I know that he was going to and

Page 190

FERRER - CONFIDENTIAL

she wrote "instead of whatever the writer said about bring your GFs wear florals"?

MS. ROESER:  Objection.

A.    I think she is referencing Colleen saying something in an Instagram post.

Q.    Do you recall what Colleen's Instagram post was?

A.    I feel like it might have been a joint Instagram with her and other castmates in which the caption was or had like something under these terms, but I don't recall the specific post.

Q.    Okay.  You responded "Right, which is just wild because the only reason we were told to speak like that was through the studio and Justin is only speaking on DV to make everyone look bad."

Was it the studio who advised you of how to market this film?

MR. MICHELMAN:  Objection.

A.    From I was told, yes.

Q.    And did you ever speak with Justin as to why he was speaking on

Page 208

FERRER - CONFIDENTIAL

domestic violence?

A.      No.

Q.      What is the basis for your opinion or your text that Justin was only speaking on domestic violence to make everyone look bad?

A.      I think the opinion was based off of the context that I had gotten about the timing of when he decided to speak on it, when we were told to not, and I think the studio I'm referencing is Wayfarer.  So I think the dichotomy of Wayfarer telling us to not speak on it and then Justin going and speaking on it kind of looked to me in conclusion like he was trying to make it look like we wouldn't want to talk about it.

Q.      And was that anything more than an assumption on your part?

MS. ROESER:  Objection.

A.      It was an educated guess.

Q.      What went into you forming that educated guess?

A.      Me being told that I couldn't

Page 209

FERRER - CONFIDENTIAL

speak on domestic violence by his production company and then him going and speaking on it.

Q.    Anything other than that?

A.    No.

Q.    And at the point of this text, had you already viewed his cut or a portion of his cut of the movie?

A.    I had seen I think two scenes he had shown me, like portions of my scenes during reshoots months prior.

Q.    And where did he show that to you?

A.    During reshoots on set.

Q.    Is that at the New Jersey location?

A.    Yes.

Q.    Was there anything that happened during those reshoots that was inappropriate?

MS. ROESER:  Objection.

A.    No.

Q.    Anything about him showing you the two scenes that was inappropriate?

Page 210

FERRER - CONFIDENTIAL

A.     No.

Q.     Earlier in your testimony you spoke about three incidents that made you uncomfortable on set.  Do you recall that?

A.     Yes.

Q.     I believe the first one was a comment from Mr. Baldoni along the lines of "that was hot," following an intimate scene; is that right?

A.     Yes.

Q.     Why did that make you uncomfortable?

A.     It didn't feel appropriate in a work environment, and given that it was not necessarily like a note of any kind to do with my acting, it felt out of place and strange to hear about a scene, especially a scene that is meant to be a PG scene about two young teenagers having a very like innocent experience intimately, it felt out of place to hear my director say that as a personal thing to me and my co-star.

Q.     You felt that the comment was directed to you personally?

Page 244

FERRER - CONFIDENTIAL

MR. SCHUSTER:  Objection.

A.    It felt like it was directed to me and my co-stars -- or co-star personally, yeah.

Q.    You mentioned that -- did you say it was -- the scene was meant to be an innocent experience?

A.    Yeah, the context of the scene is that my character was losing her virginity, and the way it was described in the script and kind of broken down with the intimacy coordinator is it shouldn't have been sexy or hot or any term like that and it was much more so meant to be, yeah, innocent, leaning more so towards a PG kind of intimate scene.

Q.    Did you have a conversation with the intimacy coordinator in which she mentioned that the scene in which your character loses her virginity was not meant to be sexy or hot?

A.    I recall having a discussion not with those exact words, but along the lines of specifically to do with certain

Page 245

FERRER - CONFIDENTIAL

movements that we had choreographed and that it shouldn't feel -- it shouldn't necessarily feel adult.

Q.    Do you recall whether in rehearsing the intimate movements for that scene in which your character loses her virginity Mr. Baldoni suggested or recommended particular sexual positions that were more adult than innocent?

A.    No.

Q.    So the comment from Mr. Baldoni with respect to -- withdrawn.

So after you filmed a scene in which your character was to lose her virginity is when Mr. Baldoni commented "that was hot"?

A.    Quote, "I'm not supposed to say this, but that was hot," yeah.

Q.    He prefaced this with "I know I'm not supposed to say this"?

A.    I can't remember if -- I'm not sure if it was -- if he said quote, "I'm not sure if I'm supposed to say this" or "I'm not supposed to say this," but I know

Page 246

FERRER - CONFIDENTIAL

that "not supposed to say this" was in the context.

Q.    The second instance that you mentioned that made you feel uncomfortable I believe was a -- was it at a rehearsal? Oh, apologies, it was a scene in the kitchen; is that right?

A.    Yes.

Q.    And why did that scene make you feel uncomfortable?

MR. MICHELMAN:  Objection.

Q.    Let me rephrase.

You mentioned that there was an incident in which Mr. Baldoni gave you a note about licking cookie dough off of your co-star's finger and looking up at him; is that right?

MR. MICHELMAN:  Objection.

MR. SCHUSTER:  Objection.

A.    No, it was a spoon in which he was feeding me the cookie dough, but yes, it was a note to lick it and look up at my co-star in a manner that I immediately kind of associated with something that had a

Page 247

FERRER - CONFIDENTIAL

addition to being one of the lead actors and the director, Mr. Baldoni was also a co-chairman of Wayfarer Studios?

A.      I think so, yes.

Q.      And did you have any concerns about Mr. Baldoni acting as an actor, director, and co-chairman of the studio before joining the film?

A.      No.

Q.      And looking back, do you have any concerns about him acting in those three roles simultaneously?

A.      I don't have concerns.  I mean, given the context of everything that has happened now, it is kind of hard not to look at it with some sort of bias of, yeah, it is hard to not look at it biased now, but I think it's a lot of power in a project.

Q.      Did you also mention that Alex shared with you when he met Mr. Baldoni he commented something to the effect of "I really want you to get to know Isabela" and then winked at him?

Page 252

FERRER - CONFIDENTIAL

A.     Yeah, it was after the first day Alex and I met, and after -- it was the first day on the set in the location in New Jersey when I had just been driven out.  I was introduced to Alex, Alex and I met, and then, this is according to Alex a couple of months later, when there was a moment when I was away from both of them and we were getting ready to go to Jersey City again, or not again, for the first time, from in New Jersey, Justin pulled Alex aside and said that he wanted Alex to get to know me really well, and yes, winked at him.

Q.     And you were uncomfortable learning about that interaction?

A.     Yes.

Q.     Why is that?

A.     Because I had just met Alex and that was my director and to insinuate something of that kind of manner I found to be inappropriate.

Q.     Did you feel that comment from Mr. Baldoni that Alex should get to know you and then winking was sexualizing you?

Page 253

FERRER - CONFIDENTIAL

MR. SCHUSTER: Objection.

A. Yes.

Q. I'm going to turn your attention to Exhibit 15. Oh, no, sorry, the last exhibit we looked at, Exhibit 14.

A. Okay. We are looking at the last one?

Q. Yes. And this is a document stamped IF_00001 that counsel for the Wayfarer parties asked you about earlier. Do you recall reviewing this document?

A. Yes.

Q. And in the first paragraph, the first blue paragraph on the page, you were reflecting to Mr. Baldoni "I couldn't have asked for a more welcoming environment."

Do you see that?

A. Yes.

Q. And at the time that you wrote this, was that an accurate representation of how you felt about the workplace?

A. Yes, because I think two things can be true at the same time, so I think I can feel welcome in a place and people can

Page 254

FERRER - CONFIDENTIAL

Q.      Did you want to appear in press and promotion with Mr. Baldoni?

A.      I didn't really mind.  Prior to hearing the other words that were expressed about him, I was happy to do anything at that point.

Q.      And once you learned about the experiences that other people had had with Mr. Baldoni on set, did you want to appear in press and promotion with him?

A.      Not particularly.

MR. SCHUSTER:  Objection.

Q.      Why not?

A.      If a group of people are saying pretty negative things about a person that kind of validate the situations that I also experienced on set that I thought were inappropriate, it didn't really make me excited to work with him again.

Q.      Did hearing that Ms. Lively or Ms. Slate had uncomfortable experiences on set impact how you felt about comments that were made to you or about you by Mr. Baldoni?

Page 269

FERRER - CONFIDENTIAL

A.      Yes.

Q.      How?

A.      It validated why I thought they were inappropriate.

Q.      And is that because other people were feeling the same way?

MR. SCHUSTER:  Objection.

A.      Yes.

Q.      Do you believe that -- or was it your impression that Ms. Lively genuinely felt uncomfortable with Mr. Baldoni's conduct towards her?

MR. SCHUSTER:  Objection.

MR. MICHELMAN:  Can you read that back for me or restate it?

MS. ROESER:  Yeah.

Q.      It was, was it your impression that Ms. Lively generally felt uncomfortable with Mr. Baldoni's conduct towards her?

MR. SCHUSTER:  I renew my objection.

A.      Yes.

Q.      Was it also your impression

Page 270

FERRER - CONFIDENTIAL

A.     Yes.

Q.     In connection with the film?

A.     I recall that, yes.

Q.     Are you aware if Mr. Baldoni attended any of those floral-themed events in connection with the film?

A.     I'm not sure.

Q.     Did you understand whether Wayfarer had helped develop the plan that the film be marketed -- about how the film be marketed?

A.     I found out after the fact, like after the movie came out.  I didn't know while promo was happening who was controlling what.

Q.     Who do you recall communicating to you, if anyone, how you were to market the film?

A.     I believe it was through Sony. I don't really recall, to be honest.  I just remember showing up.

Q.     You testified earlier something to the effect that in the August 2024 timeframe you came to a conclusion that

Page 278

FERRER - CONFIDENTIAL

Mr. Baldoni, something about an ingenuine narrative.  Do you remember that?

A.    Yes.

Q.    What did you mean when you said "ingenuine narrative"?

A.    This is regarding --

Q.    I believe it was in connection with the text, "the best con artist I have ever witnessed."

A.    Yes.  I believe that references the fact that he was doing press for -- in support of domestic violence victims, and it felt ingenuine because we were instructed from what I was informed by his production company to not speak on domestic violence and then he went out of his way and did his own press run in the United States where he did only speak on domestic violence, and then when the rest of the cast, mainly the women, got cyberbullied online for it, he didn't do anything to stop it or to tell people that that was inappropriate and that they shouldn't cyberbully people.  So that was the part

Page 279

FERRER - CONFIDENTIAL

that felt ingenuine.

Q.      Fair to say that you received some amount of online hate for not focusing on domestic violence in connection with promoting the film?

MR. SCHUSTER:  Objection.

A.      Yes.

Q.      And fair to say that Ms. Lively also received some amount of online hate for the manner in which she promoted the film?

MR. SCHUSTER:  Objection.

A.      Yes.

Q.      Without focusing on domestic violence?

A.      Yes.

Q.      And you were instructed, in fact, not to focus on domestic violence in promoting the film?

MR. SCHUSTER:  Objection.

A.      Yes.

Q.      Did Wayfarer ever make some sort of -- any sort of public statement to your knowledge acknowledging that they had

Page 280

FERRER - CONFIDENTIAL

instructed you or other cast members not to focus on domestic violence in connection with promoting the film?

MR. SCHUSTER:  Objection.

A.    They never did.

Q.    Are you aware of Wayfarer or Mr. Baldoni making any statement acknowledging the bullying or negative press that you were experiencing online?

A.    No.

Q.    Are you aware of Wayfarer or Mr. Baldoni making any press statement or acknowledgment of the bullying or negative press that other cast members were experiencing online?

MR. SCHUSTER:  Objection.

A.    No.

Q.    Around the August 2024 timeframe, did you notice -- you noticed an upswell of negativity about Ms. Lively online?

A.    Yes.

Q.    Attacks that she was a bully or a mean girl, for example?

Page 281

FERRER - CONFIDENTIAL

MR. SCHUSTER:  Objection.

A.    Working in what sense?

Q.    How would you -- did you find her to be supportive of you as a co-star, for example?

A.    Yes.

Q.    And do you recall Ms. Lively advocating for you to get a presenting credit in the film?

A.    Uh-huh, yes.

Q.    Do you believe that your relationship with Ms. Lively or Mr. Reynolds has biased your testimony today in any way?

MR. SCHUSTER:  Objection.

A.    No.

Q.    Going back to certain of the comments that Mr. Baldoni made during filming, were you and Alex dating at the time Mr. Baldoni inquired whether you were single?

A.    No.

Q.    Did you interpret Mr. Baldoni's comments to Alex to suggest that he should

Page 283

FERRER - CONFIDENTIAL

pursue you romantically or sexually?

A.    Yes.

Q.    Did you feel that it was appropriate for your boss to encourage your co-star to pursue you romantically or sexually?

MR. SCHUSTER:  Objection.

A.    No.

MS. ROESER:  Nothing further.

MR. SCHUSTER:  That was five, that was very fair.  Ms. Ferrer, I just have a few and then we are going to get you out of here.

THE WITNESS:  Sounds good.

EXAMINATION BY MR. SCHUSTER:

Q.    When Mr. Baldoni made the comment of --

MR. MICHELMAN:  Do you mind saying it again?  I couldn't hear you.

MR. SCHUSTER:  No problem.

Q.    When Mr. Baldoni made the comment after the intimate scene between you and Alex and used the words "that was hot," what were you wearing?

Page 284

CERTIFICATION

I, TODD DeSIMONE, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 1st day of OCTOBER, 2025.

TODD DESIMONE

Page 301