# EXHIBIT 10

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

BLAKE LIVELY,                    )
     PLAINTIFF,                  )  CASE NO.
                                 )  1:24-CV-10049-LJL
VS.                              )  (CONSOLIDATED WITH
                                 )  1:25-CV-00449-LJL
WAYFARER STUDIOS LLC,            )
JUSTIN BALDONI, JAMEY            )
HEATH, STEVE SAROWITZ,           )
IT ENDS WITH US MOVIE            )
LLC, MELISSA NATHAN,             )
THE AGENCY GROUP PR              )
LLC, JENNIFER ABEL, JED          )
WALLACE, AND STREET              )
RELATIONS INC.,                  )
     DEFENDANTS.                 )
_____
JENNIFER ABEL,                   )
     THIRD-PARTY                  )
     PLAINTIFF,                  )
                                 )
VS.                              )
                                 )
JONESWORKS LLC,                  )
     THIRD-PARTY                  )
     DEFENDANT.                  )
_____
WAYFARER STUDIOS LLC,            )
JUSTIN BALDONI, JAMEY            )
HEATH, IT ENDS WITH US           )
MOVIE LLC, MELISSA               )
NATHAN, JENNIFER ABEL,           )
AND STEVE SAROWITZ,              )
     CONSOLIDATED                )
     PLAINTIFFS,                 )
                                 )
VS.                              )
                                 )
BLAKE LIVELY, RYAN               )
REYNOLDS, LESLIE                 )
SLOANE, VISION PR,               )
INC., AND THE NEW YORK           )
TIMES COMPANY,                   )
     CONSOLIDATED                )
     DEFENDANTS.                 )

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

ORAL AND VIDEOTAPED DEPOSITION OF JED WALLACE

OCTOBER 9, 2025

CONFIDENTIAL - ATTORNEYS' EYES ONLY

ORAL AND VIDEOTAPED DEPOSITION OF JED WALLACE, produced as a witness at the instance of the Blake Lively and duly sworn, was taken in the above styled and numbered cause on Thursday, October 9, 2025, from 9:14 a.m. to 7:36 p.m., before Janalyn Elkins, CSR, in and for the State of Texas, reported by computerized stenotype machine, at the offices of Jackson Walker, 100 Congress Avenue, Suite 1100, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 23

incorporation for Street Relations from California to Texas in 2025?

A.   We were now living in Texas.

Q.   Okay.  But you moved in 2021, right?

A.   Yes.

Q.   So why didn't you change it in 2021?

A.   I don't recall.

Q.   Okay.  Do you have a -- a title at Street Relations?

A.   Founder is what I've used.

Q.   Are there any other officers or directors of Street Relations?

A.   No.

Q.   How would you describe the services that Street Relations offers in the digital space?

A.   Specifically in the digital space?

Q.   Specifically in the digital space.

A.   That would depend on the circumstances.

Q.   Okay.  Can you give me -- if you had to describe your full range, Street Relations' full range of capabilities in the digital space, how would you describe that full range of capabilities?

A.   Minimal.

Q.   What do you mean minimal?

A.   We don't do anything as far as action in the

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 24

digital space.  It's an observant monitoring role.

Q.  Okay.  Is that what you would say to a client who came to you and asked you to describe what you were capable, what services Street Relations was capable of performing in the digital space?

MR. BABCOCK:  Objection.

THE WITNESS:  Could you rephrase the question?

Q.  (BY MR. GOTTLIEB)  You -- you said that the -- Street Relations' full range of capabilities was minimal and that you don't do anything as far as action in the digital space, it's an observant monitoring role.  And my question was is that how you would describe your services to a client that came to Street Relations interested in engaging your services?

A.  It depends on the client, the client in question.

Q.  So maybe and maybe not?

A.  It depends on the situation.

Q.  Okay.  Let me try my question one more time.

MR. BABCOCK:  Could you hang on for a second?

Would you give a little space between his question and your answer?  Because I was going to object to one, but you beat me to it.

CONFIDENTIAL - ATTORNEYS' EYES ONLY



CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 48



CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 72

about services on email?

A.   Not that I recall.

Q.   How about on text message?

A.   Not -- could you be more specific?

Q.   On any form of electronic communication?  Let's broaden it up.

A.   And the question did I have any communication with her about any types of services?

Q.   That you might provide to Wayfarer Studios?

A.   Yeah, we discussed monitoring.

Q.   Okay.  In what -- on what platform did you have that conversation with Ms. Nathan?

A.   I -- I -- I wouldn't know because I didn't know the client or the details yet.

Q.   Were you in -- I'm not talk -- sorry.  Maybe my question was unclear.  I wasn't talking about what platform for monitoring.  I was talking about the platform that you used to communicate with Ms. Nathan about that.  Was it Signal?

A.   We've communicated through Signal and phone calls.

Q.   By August 8th, 2024, had you communicated with Melissa -- Melissa Nathan on Signal?

A.   Related to this?

Q.   On anything?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 73

A.   Oh, yes.

Q.   Okay.  Did you also communicate with Ms. Nathan on the -- do you -- do you have an Apple iPhone?

A.   I do.

Q.   Okay.  Did you also communicate with Ms. Nathan as of August 8th, 2024 on the Apple messaging app, the iMessaging app?

A.   Ever before?

Q.   Yes.

A.   I believe so.

Q.   Would you say as between those two messaging applications as of August 8th, 2024, with respect to your communications with Melissa Nathan, you used one of those applications more than the other?

A.   I -- I would say yes, Signal.

Q.   You used Signal more?

A.   Uh-huh.

Q.   When do you recall -- do you -- do you recall a point in time when you started to use Signal more than regular text messaging with Melissa Nathan?

A.   No.

Q.   Okay.  At some point in time you did, though?

A.   No, I need a more specific question.

Q.   Okay.  Do you see, back to the email, Ms. Nathan says, (Reading:)  He is aware we're going for

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 79**



CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 80**



CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 81

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 84



CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 121



CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 126



CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 128



CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 132

Q.  Well, you say in the email, (Reading:)  This was forwarded without attachments.

Right?

A.  I do say that, but I don't recall.

Q.  And -- okay.  And you say, (Reading:)  This is exactly the kind of content (in theory, until I read them) that our team can elevate.

Right?

A.  I do say that.

Q.  So you seem to be saying, and correct me if I'm wrong, but you seem to be saying that whatever this attachment or article was, you hadn't read it yet?

A.  I -- I can't speak to that.  I'm not sure.

Q.  You don't remember if that's what you're saying here?

A.  I don't remember, no.

Q.  Well, nonetheless, whether you had read the article or not, you say, (Reading:)  This is exactly the kind of content that our team can elevate across all algorithmically driven platforms.

Correct?

A.  Yes.

Q.  Was your team capable of elevating content across algorithmically driven platforms?

A.  I don't have a team.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 133

Q.  Is Street Relations capable of elevating content across all algorithmically driven platforms?

A.  Absolutely not.

Q.  So you were being untruthful to ██████ when you said that "our team can elevate across all algorithmically driven platforms"?

MR. COOLEY:  Objection.

THE WITNESS:  Yeah, not at all.

Q.  (BY MR. GOTTLIEB)  You were not at all being untruthful?

A.  No.

Q.  Okay.  So Street Relations can't do that, right?

A.  Correct.

Q.  Okay.  So who was your team capable of elevating across all algorithmically driven platforms?

A.  If I'm referencing TAG, it would be whomever works for TAG to post stories.

Q.  And you're saying you have no memory at all of what team you were referencing here?

A.  No, I -- I think I said I'm referencing TAG as the team.

Q.  Okay.  So you think that TAG is capable of elevating content across all algorithmically driven platforms?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 153



CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 170

Q.   (BY MR. GOTTLIEB)   You're certain of that as you sit here today?

A.   As I recall.

Q.   Okay.   That's a different answer.   So saying to the best of my recollection I don't recall discussing this is one answer.   Saying that you're certain is another.   So I'm just trying to discern the difference to understand your testimony?

A.   We didn't have a discussion about the scope of work.

Q.   Okay.   And you're sure about that?

A.   I'm sure about that.

Q.   All right.   Did you discuss it with her after she sent it?

A.   I don't recall.

Q.   Okay.   So you might have discussed it with her after, but you're sure you didn't discuss it with her before?

A.   Yeah, I don't recall.

Q.   Do you see the next bullet down says, (Reading:)   Use our team of specialists to build all the digital (Reddit, site, X, 4 Chan, discord, et cetera) messaging to trend and dominate in client's favor?

A.   I do.

Q.   Are you aware of any team of specialists that

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 171

exists that can do that?

A.   I'm not.

Q.   Is Melissa Nathan a technically sophisticated person?

MR. COOLEY:  Objection.

MR. BABCOCK:  Objection.

THE WITNESS:  Yeah, I'd -- I'd need a more specific question.

Q.   (BY MR. GOTTLIEB)  Do you think Melissa Nathan understands, for example, the -- the concept of something being algorithmically weaponized?

MR. BABCOCK:  Objection.

MR. COOLEY:  Join.

THE WITNESS:  I don't know.

Q.   (BY MR. GOTTLIEB)  Do you think she understands how to influence content on 4chan?

MR. BABCOCK:  Objection.

MR. COOLEY:  Objection.

THE WITNESS:  I don't know.

Q.   (BY MR. GOTTLIEB)  Would it surprise you to learn in her testimony under oath in this case she testified that she doesn't even have social media?

MR. BABCOCK:  Objection.

THE WITNESS:  I -- I -- I don't -- I don't -- have no idea if that would surprise me or not.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 178



CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 179

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 202

A.   I -- I don't recall exactly.

Q.   Well, I mean, how often do you tell people that you have some team working on something, when it's not true?

A.   It's puffery.

Q.   This is puffery?  Okay.

You say, (Reading:)  Either way this is our wheelhouse and I'm happy to discuss.

Do you see that?

A.   I do.

Q.   What are you trying to convey when you tell somebody "this is our wheelhouse"?

A.   It's crisis management.

Q.   And you're trying to convey to ████████ that the problem she's facing is in the wheelhouse of you and Ms. Nathan, right?

A.   I don't know specifically.  Crisis management is the wheelhouse.

Q.   But you're not talking about crisis management generally to ██████, right?  You're talking about the problems she's facing?

A.   We don't know the details yet.

Q.   So you were saying then that all crisis management is in your wheelhouse?

A.   I don't know exactly what there -- what's being

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 207**



CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 277



CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 278**



CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 279**



CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 280

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 281



CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 282



CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 283

CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 284

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 285



CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 315

THE WITNESS:  Yeah, I -- I -- I don't -- I don't recall.

Q.  (BY MR. GOTTLIEB)  So you can't rule it out?

MR. COOLEY:  Objection.

THE WITNESS:  I -- I need to know more details.

Q.  (BY MR. GOTTLIEB)  You've got to answer my question, sir.  It's a yes or no question.  Can you rule out the possibility that you were on a Signal chain with Katie Case and Melissa Nathan as this -- on the date of this message here, August 8th, 2024?

MR. COOLEY:  Same objection.

MR. BABCOCK:  Me too.

THE WITNESS:  Yeah, I -- I don't know what indicates this is a Signal message, so I'd need to know more information.

Q.  (BY MR. GOTTLIEB)  Okay.  You were communicating with people at TAG by this time in August of 2024, right, on Signal?

A.  Sure, yes.

Q.  Including Melissa Nathan?

A.  Correct.

Q.  Okay.  And you just don't recall whether this is among the Signal messages that -- or Signal chains that you were on?