# EXHIBIT 41

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - x

BLAKE LIVELY,

                    Plaintiff,

     v.


WAYFARER STUDIOS LLC, a      Civ. Action No.
Delaware Limited
Liability Company,           1:24-cv-10049-LJL
JUSTIN BALDONI, an
individual, JAMEY HEATH,     (Consolidated for
an individual, STEVE
SAROWITZ, an individual,     pretrial purposes with
IT ENDS WITH US MOVIE
LLC, a California            1:25-cv-00449-LJL)
Limited Liability
Company, MELISSA NATHAN,     Rel. 1:25-cv-00779-LJL
an individual, THE
AGENCY GROUP PR LLC, a
Delaware Limited
Liability Company,
JENNIFER ABEL, an
individual, JED WALLACE,
an individual, and
STREET RELATIONS INC., a
California Corporation

                    Defendants.
- - - - - - - - - - - - - - x

          Videotaped Deposition of BLAKE LIVELY

                    New York, New York

                 Wednesday, July 30, 2025

                        10:15 A.M.

        CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Pages: 1 - 294
Reported By: Anita M. Trombetta, RMR, CRR,
California CSR No. 14647

BY ATTORNEY FREEDMAN:                                15:35:50

Q  Do you believe that certain of the             15:35:50
defendants deployed bots in an attempt to harm     15:35:52
your reputation?                                   15:36:00

ATTORNEY HUDSON:  Objection.                   15:36:01

A  I believed that they deployed a social          15:36:02
plan to harm my reputation, yes.                   15:36:20

Q  Do you believe that -- have you ever told       15:36:22
anybody that the -- any of the defendants have     15:36:28
used bots?                                         15:36:31

A  I felt like they did, yes.                      15:36:33

Q  My question is, have you told anyone that       15:36:38
they did?                                          15:36:42

A  Yes.                                            15:36:42

Q  Who have you told that the defendants           15:36:43
employed bots?                                     15:36:46

A  I don't recall specifically who I -- who        15:36:48
all I said that to.                                15:37:05

Q  Did you ever put it in writing anywhere         15:37:06
that any of the defendants were deploying bots to  15:37:08
harm your reputation?                              15:37:12

A  I believe so, yes.                              15:37:14

Q  Where did you put it in writing?               15:37:16
Who did you send that to?                          15:37:18

ATTORNEY HUDSON:  Objection.  Compound.        15:37:19

A   I believe I sent text messages to friends and loved ones.

Q   And what is your -- which of the defendants used bots to harm your reputation?

ATTORNEY HUDSON:  Objection.

A   Can you be more specific?

Q   Sure.

You understand who the defendants are who you're suing here?

A   Is that a question?

Q   Yes.

A   Yes, I do.

Q   Which one of those individuals were engaged in using bots --

ATTORNEY HUDSON:  Objection --

Q   -- to harm your reputation?

ATTORNEY HUDSON:  Objection.

A   My understanding is that they worked together.

Q   So you believe that every one of the defendants were involved in using bots to harm your reputation?

ATTORNEY HUDSON:  Objection.

Q   Is that correct?

A   I believe that the defendants worked

together to harm my reputation digitally.

Q Do you believe they used bots to do so?

ATTORNEY HUDSON: Objection.

A I'm not sure if they used bots.

Q Was there a point in time when you were sure that they used bots to harm your reputation?

A I believe they did, yeah.

Q Why did you believe that?

A Because of the experience that I was having and because others felt the same.

Q What experience were you having?

A Harassment.

Q What do you mean by that?

A I mean digital harassment.

Q And do you mean by that, negative stories that came out about you?

ATTORNEY HUDSON: Objection.

A Negative stories are an element of what I was experiencing at the time.

Q And which of the defendants were involved in helping to put out negative articles about you?

ATTORNEY HUDSON: Objection.

A I am not any of the defendants, so I can't speak to them.

Q What did Melissa Nathan do to put out

hired where there were text messages that said, "There is nothing to do here. All the press that's coming out is organically bad against Blake Lively"?

ATTORNEY HUDSON: Objection.

Q Do you recall that?

A No.

Q Other than what you've testified to and the attorney-client privileged stuff that you can't testify to, do you have any other facts upon which you base your belief that there was this negative smear campaign? And when I say that, I'm referring to digital, I'm referring to articles and other forms of media.

ATTORNEY HUDSON: Objection.

A Outside of attorney-client privileged conversations, I can refer back to the documents, the Jonesworks documents, and also the experience of being in this industry for over 20 years and understanding the -- the cadence of news and media. And my feelings about what happened weren't just mine. I experienced this shock in realtime alongside Sony, who had been studying the marketing and social sentiment of the film and the people in it the entire time, and they also felt

this way.

Q  Did you cause or suggest to the cast of It Ends With Us to stop following Justin Baldoni on social media?

ATTORNEY HUDSON:  Objection.

A  No.

Q  Did you have any discussions with anybody in the cast about that?

A  Yes, a couple of us spoke about it.

Q  And who did you speak with?

A  Jenny Slate was very upset on the first round of production, so she unfollowed him in May or June of 2023.  And before the film came out -- Jenny doesn't manage her social media.  She has a person do it for her.  And she noticed that this person had re-followed him.  And she really wanted these people out of her life, as she put it.  I don't know if those were the exact words.

And she was concerned about the tough position we were all in, which is wanting to protect the film and also wanting to respect her own boundaries and dignity.

Q  Who else did you have discussions with about unfollowing Justin Baldoni?

A  Colleen Hoover told me after she

character was being attacked.

And as a result, there were stories that were things I had never heard of and experiences I never had, as well as a mosaic of any context-free negative moment from my past.

Q  Did you -- do you believe that you've never received -- before the smear campaign, you'd never received negative press that called you a bully?

ATTORNEY HUDSON:  Objection.

A  That's not what I said.  I don't tend to read much press, but I have generally experienced a general level of positive and stable, healthy press.

Q  Do you recall anyone referring to you prior to the smear campaign as a bully or as a mean girl --

ATTORNEY HUDSON:  Objection.

Q  -- in the press?

ATTORNEY HUDSON:  Objection.

A  Specifically, no.

Q  So this was all new to you at this time?

ATTORNEY HUDSON:  Objection.

A  The magnitude with which these stories hit without any one event happening was not only new

of the narratives were assault on your character, that you were a mean girl, and that you're a bully? Those would be three of the -- when you say "many assaults"?

A Yes.

Q Okay. Can you name anything else? I mean, I understand it was a lot of negativity, and it was swirling around, but can you name anything else specifically other than those three things that you mentioned earlier in your testimony?

A It was a really painful time, so it was a time that I was trying to stay offline as much as possible. And I have four children, four young children, so I was not spending time online every day. It was too much.

So I don't remember specific articles or narratives because I was doing my best to stay away from it.

Q Okay. So as we sit here today, and I understand there may be reasons why you don't know sitting here today, but character, mean girl, and bully would be three, and you can't remember any else, correct?

ATTORNEY HUDSON: Objection.

A There were a lot -- there were a lot of

narratives.  Yeah, I remember those.  Those stick out to me the most.  But because it's been unrelenting since August, it's been a year of this, so I've really had to disconnect from the media or social media.  So it's hard to know where to start.

Q  Sure.

Even though it's been unrelenting for a year, you can't identify anything other than character, mean girls, and bully as you sit here today, correct?

ATTORNEY HUDSON:  Objection.

A  No, like I said, there were -- there were so many narratives --

Q  Sure.

A  -- I don't know where to start.

I'm not -- I don't think I'm understanding what you're asking of me.

Q  Why don't we start with us.  Just a little joke there, sorry.

Anytime you're in a case like this where words are -- either spoken or in writing are at issue, it's important for the defendants to find out what words you're complaining about.  And you testified earlier, and I did hear this, that you

were upset that your -- they said your character was -- you know, they called you a liar or something like that, and that you're a mean girl and you're a bully.  So those are specific things that we can react to.  But just to say there is a lot of stuff isn't helpful when you're trying to defend a case.  So that's why I'm trying to -- that's what I'm getting at.

A  I understand.

Q  So if there is anything other than character, mean girls, and bully, tell me now. And otherwise, we'll go on to some other things, because I have limited time to ask you questions.

A  I understand.

The difficulty I'm having in knowing how to answer this is that under each of those pillars is a flood of different stories and content and narrative.  So I can look at those as headlines, but if we're meant to be more granular within that, that's not what I'm not understanding.

Q  Okay.  Well, that's helpful, because those are the three headlines or the three pillars as you -- and then there may be variations underneath those three pillars, fair?

A  What -- can you say the three?  I don't

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, ANITA M. TROMBETTA, RMR, CRR, and Certified California Shorthand Reporter, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested [or not requested, as appropriate]; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 31st day of July, 2025.

My commission expires: 10.07.2025

_____

Anita M. Trombetta, RMR, CRR