# Exhibit 2

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- x

BLAKE LIVELY,

                              Plaintiff,

        -vs-

WAYFARER STUDIOS LLC, a Delaware Limited

Liability Company, JUSTIN BALDONI, an

individual, JAMEY HEATH, an individual, STEVE

SAROWITZ, an individual, IT ENDS WITH US MOVIE

LLC, a California Limited Liability Company,

MELISSA NATHAN, an individual, THE AGENCY

GROUP PR LLC, a Delaware Limited Liability

Company, JENNIFER ABEL, an individual, JED

WALLACE, an individual, and STREET RELATIONS

INC., a California Corporation,

                              Defendants.

------------------------------------------------- x

                              December 11, 2025

                              9:11 a.m.

        **HIGHLY CONFIDENTIAL**

    DEPOSITION of JAMES HAGGERTY in the

above-captioned matter, taken pursuant to

Notice, held the offices of Willkie Farr &

Gallagher, 787 Seventh Avenue, New York, New

York before Fran Insley, a Notary Public of the

States of New York and New Jersey.

Page 2

A P P E A R A N C E S:

WILLKIE FARR & GALLAGHER LLP

Attorneys for Blake Lively

787 Seventh Avenue

New York, New York 10019

BY:  KRISTIN BENDER, ESQ.

JOANNA LAMBERTA, ESQ.

Phone: (202) 303-1245

kbender@willkie.com

MEISTER SEELIG & FEIN PLLC

Attorneys for Wayfarer Studios

LLC, Justin Baldoni, Jamey Heath

Steve Sarowitz, It Ends With Us

Movie LLC, Melissa Nathan, Jennifer

Abel, and The Agency Group PR LLC

125 Park Avenue, 7th Floor

New York, New York 10017

BY:  KEVIN FRITZ, ESQ.

MITCHELL SCHUSTER, ESQ.

Phone: (212) 655-3570

kaf@msf-law.com

Page 3

A P P E A R A N C E S (Continued):

ALSO PRESENT:

COREY WAINANA, Videographer

oOo

Page 4

------------------ I N D E X --------------------

WITNESS                EXAMINATION BY            PAGE

JAMES HAGGERTY    MS. BENDER                     6


--------------- E X H I B I T S ---------------

HAGGERTY            DESCRIPTION                  PAGE

EXHIBIT 1    Mr. Haggerty's Expert Report    48
             October 10, 2025
EXHIBIT 2    Printout from Mr. Haggerty's    145
             book, Chief Crisis Officer
EXHIBIT 3    Crisis Communications Lessons
             From the First Trump
             Administration                  169
EXHIBIT 4    Blog Post of Aztek             282
EXHIBIT 5    Printout of Source             284

             (Exhibits produced.)

Page 5

HAGGERTY - HIGHLY CONFIDENTIAL

THE VIDEOGRAPHER:  Good morning, everyone.  We are going on the record at 9:11 a.m. on Thursday, December 11, 2025.

This is media unit one of the video-recorded deposition of James Haggerty in the matter of Blake Lively versus Wayfarer Studios LLC, et al.

My name is Corey Wainaina, representing Veritext Legal Solutions, and I'm the videographer.  The court reporter is Fran Insley, also from the firm Veritext Legal Solutions.  I'm not authorized to administer an oath, I'm not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MS. BENDER:  Good morning.  My name

Page 6

Haggerty - Highly Confidential

is Kristin Bender, Willkie Farr and Gallagher, on behalf of plaintiff Blake Lively.  I'm joined here today with my colleague, Joanna Lamberta.

MR. FRITZ:  Good morning.  Kevin Fritz, from Meister Seelig & Fein, on behalf of the defendants and the witness. I'm joined by my partner, Mitchell Schuster.

J A M E S   H A G G E R T Y ,

having been first duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY

MS. BENDER:

Q.    Good morning, Mr. Haggerty.

A.    Good morning.

Q.    From the materials that you've submitted, it's my understanding that you have not testified as an expert at a deposition or at trial previously; is that right?

A.    That's correct, yes.

Q.    Have you ever been deposed or testified at trial not as an expert witness?

Page 198

Haggerty - Highly Confidential

mentioned in this book various -- primarily brand related things where they create word clouds based upon word usage in media and other sources, things like that, which would be more on the analysis side.

Q.   Does monitoring include sentiment analysis or is sentiment analysis more of the analysis side?

MR. FRITZ:  Objection.

A.   Yeah, I think -- well, I think I just answered that, that it sort of all becomes a mishmash, that's a popular term, I don't know if I can use that in a deposition.

MR. FRITZ:  You can.

A.   The -- in the old days, a Google news search or even before that, a LexisNexis search provided no analysis tools.  More modern, maybe a monitoring software, provides analysis functions as well, including sentiment analysis.

Q.   What is your understanding of social media manipulation?

A.   You want to explain what you mean by understanding of it?

Haggerty - Highly Confidential

Q.    You use the term "social media manipulation" in your third opinion.  In referencing that term, what do you understand to mean social media manipulation as reflected in that opinion?

A.    Well, as it relates to media monitoring, affecting content or results of social media might be the best way to describe it.

Q.    That working definition of social media manipulation is only, in your opinion, as it relates to social media, excuse me, media monitoring?

A.    I'm sorry, I don't understand the question.

Q.    Yes, fair.  Do you have an understanding of what social media manipulation means not in relation to media monitoring?

A.    Well, I mean, the definition depends upon your definition of the word manipulation. So, we discussed earlier search engine optimization, which is part of the process of ensuring your search results are fine.  Now -- or positive, let's say.

Page 200

Haggerty - Highly Confidential

Now, if you were doing things to ensure that it is positive, that it is an effort to positively manipulate search results in the same way I'm going to go to a chiropractor they manipulate my spine, but not with a -- one hopes not with a pejorative effect.

Q.    So your opinion is saying that media monitoring should not be seen as an effort at social media manipulation, whether that manipulation is positive, negative, acceptable or unacceptable, correct?

A.    Yes.

Q.    And that's because media monitoring is not engaging with the content, rather it is observing it?

A.    Yes, it's -- it's bringing it in and to the extent analysis is involved, it's analyzing.

MR. FRITZ:  Kristin, when it's a natural breaking point, why don't we take a break.

MS. BENDER:  Yes, let me check.

MR. FRITZ:  Unless you have five

Page 201

Haggerty - Highly Confidential

minutes left.

MS. BENDER:  Yes, we can stop here.

THE VIDEOGRAPHER:  We are off the record.  The time is 2:44 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 3:00 p.m.

Q.    You are not offering an opinion on whether social media manipulation is standard in the crisis industry, correct?

A.    Again, it depends on what you are saying, manipulation can mean steps to effect results in a way that is neither positive nor negative.

Q.    In connection with the opinion that we are discussing, your third opinion --

A.    Oh, okay.

Q.    -- you're not offering any opinion on whether social media manipulation is standard in the crisis industry, correct?

A.    Well, it's -- the manipulation -- media monitoring should not be seen as an effort in social media manipulation.

Q.    And you're not affirmatively

Page 202

Haggerty - Highly Confidential

offering any opinion on whether social media manipulation is standard, correct?

A.    Is what?

Q.    Is standard.

A.    In the -- in the public relations field?

Q.    In -- correct.

A.    I would say to the extent that everything that a client does affects ultimately social media and -- and legacy or traditional media, then everything you do in public relations is to effect that.

Q.    You told me that your opinions are reflected on pages 31 and 32 of your report. Do you recall that?

A.    Yes.

Q.    Can you point me specifically to where you are offering an opinion that social media manipulation is standard in the crisis industry?

A.    I think there is -- I would have to reread the report a little more closely, but I guess the question was my opinion as opposed to what is contained in the report?

Page 203

Haggerty - Highly Confidential

Q.    That's correct.

A.    But your question right now is can I point to somewhere in the report.  I --

Q.    Can -- no, sorry.

A.    Yeah, go ahead, please, please, please.

Q.    I'm trying to figure out if you are offering an opinion on whether social media manipulation is standard in the crisis industry.  My understanding, based on looking at your opinions in the report, is that you are not, but am I incorrect?

A.    Well, this -- let me just say this bullet point relates to media monitoring.  I would have to read the entire report to give an opinion regarding social media manipulation with manipulation being affecting and not a positive or a negative.  But in response to your question, I was making the point that affecting social media is inherent in everything that is done in public relations.

Q.    I want to make sure that when you come to trial you will not be offering opinions that we haven't discussed.  So can you tell me

Page 204

Haggerty - Highly Confidential

as you are sitting here whether or not you are offering an opinion on social media manipulation and whether that is standard in the crisis industry?

MR. FRITZ:  Objection.

A.    I think I did.

Q.    And are you?

A.    In response to your question, I am saying that social media manipulation in the non-pejorative sense, in the sense of effecting results is standard in everything in the public relations field because every effort that is taken in the public relations field ultimately has an impact on social media.

Q.    And you're -- what you've just described to me, you are saying is apparent from the background discussion in your report?

A.    I'm saying I would have to -- I'm saying it's in response to your question.  I would have to read through the report again.

Q.    Okay.  But you don't have anywhere in your report in mind as to where you offer that opinion, correct?

A.    Yes, since I haven't read it, I -- I

Page 205

Haggerty - Highly Confidential

was responding to your questions, but since I haven't reread the report for that specific point, I -- I don't have any particular place in mind if that is the case.

Q.    Have you personally conducted media monitoring for crisis clients?

A.    By "personally," do you mean my company?

Q.    I mean you individually.

A.    Yes.

Q.    And do you personally conduct social media monitoring?

A.    I have, yes.

Q.    And is that a role that you carry out in your crisis -- for your crisis clients regularly?

A.    For all my clients.

Q.    Is it a more junior task or is it something you, yourself, continue to do?

A.    Well, we are not a particularly large firm, so it's certainly something that I do in addition to others in my firm.

Q.    And at a larger firm, where there are more individuals who could conduct this, do

Page 206

Haggerty - Highly Confidential

you think that it would be -- it is a more junior task to be conducted?

A.    What is interesting is I never is -- I've never worked in a large public relations firm, so I can't tell you the extent to which the senior -- more senior people, if that's your question, are -- are actively engaging in media monitoring.

Q.    Does your public relations firm offer social media monitoring and media monitoring as a standard offering?

A.    Yes.

Q.    On page 17 of your report, Section 7D addresses media monitoring.  Do you see that?

A.    D, yes, yes, yes.

Q.    And do you reference the practice of media monitoring and producing daily sentiment reports on behalf of clients, do you see that?

A.    Yes.

Q.    And so, the producing of daily sentiment reports, you said, is related to monitoring but is more on the analysis side of things, correct?

Page 207

Haggerty - Highly Confidential

A.     That would be correct, yes.

Q.     Would you say -- would you say that crisis monitoring is a bread and butter service offered by public relations and crisis firms?

A.     Yes.

Q.     Do you believe that one would be hard pressed to find a public relations firm that isn't off -- isn't monitoring media on behalf of clients?

A.     I think that's correct, yes.  That's obviously, I think, in the report.

Q.     Do you think that media monitoring is digitally sophisticate -- sophisticated work?

A.     I don't, off the top of my head, know if I have used that term.  I will tell you that the software can sometimes give inaccurate portrayal of, not the monitoring part of it, but the analysis part of it.

Q.     But you don't have a thought either way as to whether media monitoring using a service or not using a service is digitally sophisticated effort, correct?

A.     Well, I suppose in a digitally

Haggerty - Highly Confidential sophisticated effort, as I mentioned earlier, there is a Google news search that sends alerts to you.  Then there are more sophisticated services dedicated to capturing presumably more and the user interface on that can be sometimes difficult to understand.  And that, sort of, is not -- not everyone is attuned to the -- to that.  And so, to the extent that the software is a little bit more sophisticated to use, then -- then I would say it is digitally sophisticated, if that makes sense.

Q.    In today's day and age, do you and does your company typically, manually monitor or do you use services and software to conduct that monitoring?

A.    Both.

Q.    And do you think that same principles apply as to other public relations firms?

A.    I think it's -- it's probably an accepted practice to both manually look for media coverage or social media coverage and then to also use software which will send you alerts in the similar way to a Google news

Page 209

Haggerty - Highly Confidential

alert.

Q.    Does media monitoring include boosting, amplifying or suppressing content?

A.    No.

Q.    Does media monitoring include efforts to shift the narrative?

A.    No.

Q.    Is clipping a part of monitoring?

A.    When I started it was.  When there were things to clip.  It is clipping -- that's antiquated term for media monitoring.  And back when I started in this business before God forbid the internet, there would be services that would quite literally review every media outlet for mentions of your client, and then clip the articles and mail them to you.

Q.    On page 18 of your report, you reference excerpts from two textbooks in the public relations field, as well as a white paper.  Do you see that?

A.    Sources, is that what you are saying?

Q.    Yes, sir.

A.    Yes, yes.

Page 263

Haggerty - Highly Confidential

is designed to really tar our opponent with a negative narrative, is that appropriate?

A.    I would not use the word "tar."  I would -- I am not sure, I mean, I would use the term negative narrative.  I think if there were -- as I explained before, if there were facts and truth that helps put what is happening during the course of a dispute in proper context, there is nothing wrong with bringing that to the attention of public audiences.

Q.    So long as doing so is truthful, correct?

A.    I think that's correct, yes.

Q.    If you turn to page 32, the second bullet point on this page reflects your fifth opinion in this case regarding the timing of -- well, I'll just read it.

A.    Yeah, yeah.

Q.    Is it correct that your fifth opinion in this case is that, "The growth in media and social media coverage negative to Ms. Lively, starting in August 2024, is unlikely to have been caused by the work done

Page 264

Haggerty - Highly Confidential

by the crisis communications consultant hired by the Wayfarer parties, given the short timeframe"?

A.    Yes, yes.

Q.    Your opinion references growth in media and social media coverage negative to Ms. Lively?

A.    Correct.

Q.    What growth are you referring to?

A.    I think in various -- it was a little hard to tell, and I've -- I explained elsewhere in the report the difficulties in parsing media and social media sentiment and the troubles I have had with it, but there certainly had been alleged a growth in negative commentary around the time of the premier of the movie, which would have -- which obviously generates its own activity.

Q.    And were you referencing the sentiment charts in Ms. Lively's complaint in your opinion?

A.    I believe that's the next bullet point is the difficulty in parsing something as complicated as a dispute.

Page 265

Haggerty - Highly Confidential

Q.    With respect to growth and negative coverage, is it more of a holistic understanding as to the growth of negative coverage as to Ms. Lively, or did you review any, kind of, graphs or quantitative analysis in connection with that?

A.    Well, there were the -- in the report I -- I do go over the sentiment reports that were provided in the second amended complaint.

Q.    And does that provide your basis of an understanding of what the growth in media and social media coverage about Ms. Lively looked like in August of 2024?

A.    That provides me with a -- I mean, again, it was -- it was rather confusing, quite frankly, but it does -- it was in support of what the allegations were in the second amended complaint.

Q.    Okay.  But just focusing on your fifth opinion in this case, the growth in media and social media coverage, are you talking holistically about the growth that you understand from your review of the complaint,

Page 266

Haggerty - Highly Confidential

or are you looking at something specific when you are talking about that growth?

MR. FRITZ:  Objection.

A.    Well, I don't know if I would use the word "holistically," but based upon the second amended complaint and other materials that I looked at, there is an allegation that -- coinciding with the premier, negative media.  I couldn't tell if it was media or social media or whatever occurred.

Q.    Okay.  Did you look at any specific metrics in connection with that growth?

A.    I did not.

Q.    And it's based on your understanding of Ms. Lively's allegations in her complaint that there was a spike in negative coverage starting on August 8th?

A.    Those charts in particular, yes.

Q.    And you have not reviewed any reports of Ms. Lively and the coverage of Ms. Lively during August 2024 outside of what you viewed in Ms. Lively's complaint, correct?

A.    I did not -- no, I don't think so.

Q.    What is the timeframe for your

Page 267

Haggerty - Highly Confidential

opinion?

MR. FRITZ:  Objection.

A.    I guess I need to understand what you mean by -- you don't mean the timeframe of preparing this opinion?

Q.    No.  Your opinion references given the short timeframe, what timeframe are you referring to?

A.    Yes, I believe that's detailed in the report, and I don't have the exact dates, but I can -- I can turn to that.  I think it might be in the factual --

Q.    You address, for your reference, on page 25, the time it would take to create a digital marketing program?

A.    Okay.  And also in the -- okay, yes, they're on there.  So, my understanding is reflected in the report.

Q.    And what is your understanding of the short timeframe?

MR. FRITZ:  Objection.

A.    That Ms. Nathan was retained on approximately August 2nd and Mr. Wallace was not retained until at least August 8th.

Page 268

Haggerty - Highly Confidential

Q.    And so, your opinion is about the short timeframe between the retention of these individuals or companies and the spike that you understand was alleged on August 8th, correct?

A.    Correct.

Q.    Does your opinion extend to any allegations Ms. Lively has made about the Wayfarer defendants after August 8, 2024?

A.    I think my opinion stated that it would take time, even given -- even if the allegations were true and there were evidence or specific allegations, it would take time to -- you know, and again, it would take time to get that done, which would indicate to me that it -- it -- you know, correlation is not causation.  So, it would indicate to me it was not the result of these hirings that all of a sudden this happened.

Q.    Are you aware that Ms. Lively has alleged an ongoing retaliation campaign?

A.    You'll have to explain "ongoing retaliation campaign."

Q.    Are you aware that Ms. Lively has alleged retaliation campaign against her

Page 269

Haggerty - Highly Confidential
extending into January and February 2025?

A.    I am not specifically aware as to the dates.  I understand that there are allegations of retaliation.  I mean, the question -- what I struggle with, there is a legal sense of retaliation, which I have no opinion on and then there is a more general allegation of retaliation, if that makes sense.

Q.    Are you aware that Ms. Lively has alleged that certain media and social media coverage that is negative as to her in January and February 2025 was caused by the Wayfarer defendants or their agents?

A.    I am not specifically aware of that allegation.

Q.    Under your opinion, there would be enough time for results from any efforts in media or social media to have shown themselves between the time of retention in August 2024 and January or February 2025, correct?

A.    I think that -- so that would be -- excuse me if I count on my fingers, that would be five months, August, September, October, November, January.  Again, based upon my

Haggerty - Highly Confidential

report, that is certainly possible, but August 8th or 9th seems highly unlikely.

Q.   So, you're saying it is possible in January, February 2025, highly unlikely August 8th, when is the point that you're in 2024 that your opinion extends to?

A.   I mean, I guess the opinion is that given the hiring dates of the professionals in question, that spike that is alleged coinciding with the premier and everything that went on around the premier is not a result of any action by anyone.

Q.   Okay.  So, your opinion is specifically with respect to the spike alleged on August 8th, correct?

A.   I believe that's what is in the report, yes.

Q.   When you say unlikely to have been caused, does that mean less than 50 percent likely?

MR. FRITZ:  Objection.

A.   I don't know how to answer that.

Q.   What do you mean by unlikely to have been caused?

Page 271

Haggerty - Highly Confidential

A.    In my experience, over 30-plus years, it doesn't happen that way.

Q.    What doesn't happen that way?

A.    That a person is hired, as an example, on a Tuesday and there is a sudden spike in media or social media coverage on a Wednesday, and particularly in the face of other things going on, including, again, from my review, you know, rumors and gossip amongst people who are on the set, unfriending.  There is a whole issue with the premier and them not being seen together.  All of those things happening, that makes it even more unlikely, but certainly to -- again, within -- it is the same day in the case of Mr. Wallace.

Q.    Is the date that TAG began work in connection with this engagement relevant in any way?

A.    Well, I mean, I guess we just discussed that.  I mean, the -- what I'm saying is that things don't happen this quickly.

Q.    I understand that you are relying on TAG's engagement date, but if TAG began work before being engaged, would that be relevant to

Page 272

Haggerty - Highly Confidential

your analysis?

A.    I think that's entirely dependent upon the exact, you know, facts, including timeframe but also what they were doing.

Q.    And is it correct that maybe, in your opinion, one or two days might not make a difference but a week or two would affect your opinion?

MR. FRITZ:  Objection.

A.    I do not think that is the opinion expressed in here nor do I -- nor do I hold that.

Q.    How long would TAG, in your expertise, need to have been working to effectuate the type of spike that you were evaluating on August 8th?

MR. FRITZ:  Objection.

A.    You know, that is -- I would have to know a whole lot more about perceptions beforehand, so it's impossible to make a determination.

Q.    The only factor that you've evaluated in support of this causation analysis is the timing of the engagements and the timing

Page 273

Haggerty - Highly Confidential

of the spike on August 8th, correct?

A.    Yes, I mean, it's in the report, yes.

Q.    And that -- and your conclusion is based largely on your expertise but also based on certain digital marketing programs that are in your report?

A.    My conclusion, as with the entire report, is based upon my experience in these issues, and the length -- I mean, we've discussed earlier the length of time it takes to even get everyone in the room and in agreement, you know, as to a course of action.

Q.    In other words, you're saying even after the engagements of TAG and Street Relations on August 2nd and August 8th, respectively, you don't know if they started working immediately?

A.    No, I'm not saying that at all.

Q.    Why did you reference the time to take to even get everyone in the room?

A.    Well, because it's not -- you can be working and it still take time, depending upon exactly what you are doing and how well it is

Page 274

Haggerty - Highly Confidential

working and how well everyone is working together.

Q.    And you did not offer an opinion on what would be enough time to see change, your opinion is only that you know this was not enough time?

A.    I think for -- my opinion, and, again, based upon primarily my view and a couple of sources, is that, you know, there is very -- we are talking about many, many things here.  We are talking about legitimate or major media coverage.  We are talking about trade media coverage.  We are talking about social media activity, both in terms of content and in terms of interaction, after content interaction, let's call it, and we are talking about search engine optimization.  All of that takes different times and it's all entirely dependent on what you are doing.  You know, for example, if you're going to -- you know, if you're going to place a story in the New York Times, that can take a week, a month, a year, depending upon many, many factors.

Q.    Once a media source is placed, it is

Page 275

Haggerty - Highly Confidential

seen by the public from that point forward, correct?

MR. FRITZ: Objection.

A. So, once a media story -- once a story is put in the media, your question is do people see it?

Q. I guess my question is, is your opinion talking about the timeframe here is too short for whatever was done to affect the public and their perception or is your opinion that nothing would have been done yet because it takes time after an engagement?

A. I suppose my opinion would be both.

Q. And you don't know whether or not anything was done as of August 2nd and August 8th, correct?

A. You mean prior to those dates?

Q. Correct.

A. No, I don't have information on that.

Q. On page 25 of your report.

A. Okay.

Q. This is discussing the time it would take to create a digital marketing program.

Page 276

Haggerty - Highly Confidential

How did you select the source pulled from as text website?

A.     Well, based on this -- so, I have, again, based on my experience, a general view of the time it takes to put things in place, in terms of, again, we are talking about many things when we talk about media and social media.  And so, I did some research online just to make sure the opinions I had were valid.

Q.     You just spoke of your experience of the time it takes to put things in place.  What is your experience of the time it takes for once things are effectuated, there to be an impact in the media or social media online?

A.     I think it's entire -- it's dependent on so many factors it's impossible to say.

Q.     Can you give me a few of those factors, please?

A.     Well, I mean, it's the one I explained about if the interest was -- that The New York Times be interested in one aspect or another of an issue.  You know, it's dependent on so many factors, even in that isolated case,

Page 277

Haggerty - Highly Confidential

where are -- where are their heads at, what are they working on, what is going on there.  You know, or what is the interest, what other steps they need to take.  I have worked on stories in major media that have taken a year.

Q.    Once a -- you don't think that once a New York Times article is published, that would affect sentiment and volume coverage of that article?

A.    Oh, I do think it would.

Q.    From the time it's published, correct?

A.    I think in terms of volume of sentiment, is that the question?

Q.    My question is:  Do you think that publication of an article in the New York Times would affect coverage from the moment that article was published?

A.    I think that depending upon the story, you know, there are cases where other media report on a media report.  You know, where the -- where CNN mentions a Wall Street Journal report.  Then people who are interested, then, you know, a publication like

Page 278

Haggerty - Highly Confidential

the Wall Street Journal or New York Times no doubt has their own social media operation and they would -- they would send it out.

Q. And how did you select the Metric Marketing source that is cited on page 26?

A. The same thing, I looked for online sources to give a sense for what is out there.

Q. Okay. Were you familiar with Aztek or Metric Marketing before preparing this report?

A. I may have heard of the names but were not -- was not specifically familiar.

Q. Do you think that you could have found similar sources from similar -- similar businesses that have sources echoing what these sources say?

A. I suspect given my experience with it that there probably are.

Q. You're not a digital marketing expert, correct?

A. That's correct, yes.

Q. Do you have any expertise in evaluating metrics of causation?

A. You'll have to explain what you mean

                    Haggerty - Highly Confidential
by that.

          Q.    Did you evaluate any metrics in
connection with this opinion?

          A.    You'll have to explain evaluating
any metrics for me.

          Q.    Did you collect any data?

          A.    No, I did not.

          Q.    Did you run a quantitative analysis
on any sample size?

          A.    No, I did not.

          Q.    Did you evaluate any particular
counter-stories to assess whether the coverage
in those stories was caused by the Wayfarer
defendants?

          A.    Can you repeat that question?  I
missed the first part of it.

          Q.    Did you -- in connection with your
opinion, did you evaluate any particular online
accounts or media stories to assess whether
they were caused by the Wayfarer defendants?

          A.    No, I think there were stories
that were -- there were allegations in the
second amended complaint that included
references to stories.

Page 280

Haggerty - Highly Confidential

Q.    But you don't know precisely what the negative coverage as to Ms. Lively consisted of?

A.    I know what the negative coverage that was alleged in the second amended complaint was.

Q.    And what was that?

A.    I -- I would have to go back and actually read it.

Q.    Did you evaluate the authenticity or inauthenticity of the coverage about Ms. Lively that is reflected in your opinion?

A.    What do you mean by authenticity or inauthenticity?

Q.    Do you have an understanding of what authentic content online is?

A.    Are we -- are we talking social media or mainstream media?

Q.    Social media.

A.    Yeah, on social media there is a term.  And, again, I'm not a digital media specialist, but it seems to be a term that is used as to authentic social media versus inauthentic, and with inauthentic being -- it's

Page 281

Haggerty - Highly Confidential

a little unclear to me exactly what is meant but in some way rigged.

Q.    And did you conduct any of that analysis in connection with offering this opinion?

A.    I did not.

Q.    Did you evaluate whether the coverage of Ms. Lively was facilitated through black hat methods?

A.    In terms of social media?

Q.    Yes.

A.    I did not, no.

Q.    Did you evaluate whether the coverage of Ms. Lively on social media was manipulated in any way?

A.    Again, manipulated is a bit of a loaded term, so I would have to know the definition of that.

Q.    I understand that there are multiple definitions of manipulated, but using any definition of manipulated, did you evaluate whether the coverage of Ms. Lively, that is the subject of your opinion, was manipulated?

MR. FRITZ:  Objection.

Page 299

C E R T I F I C A T E

I, FRAN INSLEY, hereby certify that the Deposition of JAMES HAGGERTY was held before me on the 11th day of December, 2025; that said witness was duly sworn before the commencement of testimony; that the testimony was taken stenographically by myself and then transcribed by myself; that the party was represented by counsel as appears herein;

That the within transcript is a true record of the Deposition of said witness;

That I am not connected by blood or marriage with any of the parties; that I am not interested directly or indirectly in the outcome of this matter; that I am not in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of December, 2025.

FRAN INSLEY

```
                                                    Page 300
```

VERITEXT LEGAL SOLUTIONS

NAME OF CASE: BLAKE LIVELY v. WAYFARER STUDIOS, ET AL

DATE OF DEPOSITION:  DECEMBER 11, 2025

NAME OF DEPONENT:  JAMES HAGGERTY

| PAGE | LINE(S) | CHANGE | REASON |
|------|---------|--------|--------|
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |

                            _____
                                    JAMES HAGGERTY

SUBSCRIBED AND SWORN TO BEFORE ME

THIS___DAY OF _____, 20__.

_____

(NOTARY PUBLIC)    MY COMMISSION EXPIRES:

**Errata Sheet for Deposition Transcript of James Haggerty**

Case:        *Blake Lively v. Wayfarer Studios LLC et al.*, Case No. 24-cv-10049-LJL
Witness:     James Haggerty
Date:        December 11, 2025

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 31 | 21 | Change "Garafola" to "Garofalo" | Typographical |
| 43 | 6 | Change "Able" to "Abel" | Typographical |
| 57 | 18 | Change "1,100 hours" to "$1,100/hour" | Typographical |
| 88 | 8 | Change "1909s" to "1990s" | Typographical |
| 91 | 3 | Change "1990" to "1993" | Clarification |
| 133 | 13 | Change "folds over" to "unfolds" | Typographical |
| 226 | 6-7 | Change "accurate narratives" to "inaccurate narratives" | Typographical |
| 247 | 2 | Change "of standard practice" to "is standard practice" | Typographical |

     I declare under penalty of perjury that the foregoing corrections are accurate to the best of my knowledge and belief.

_____                    01/21/2026
James Haggerty                                      Dated

1