UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BLAKE LIVELY,

               Plaintiff,

       -v-

WAYFARER STUDIOS LLC, JUSTIN BALDONI,
JAMEY HEATH, STEVE SAROWITZ, IT ENDS
WITH US MOVIE LLC, MELISSA NATHAN, THE
AGENCY GROUP PR LLC, JENNIFER ABEL, JED
WALLACE, and STREET RELATIONS INC.,

               Defendants.

Case No. 1:24-cv-10049-LJL
(consolidated with 1:25-cv-00449-LJL)

---

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF JAMES F. HAGGERTY

---

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT............................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 2

PROCEDURAL HISTORY .................................................................................................. 4

    A.  Lively's Remaining Claims................................................................................. 4

    B.  Lively's Interrogatory Responses ...................................................................... 5

    C.  The Expert Report of James F. Haggerty................................................................ 5

    D.  The Opinion and Order dated April 2, 2026 ....................................................... 6

LEGAL STANDARD............................................................................................................ 8

ARGUMENT ........................................................................................................................ 9

    I.     PLAINTIFF'S MOTION TO EXCLUDE SHOULD BE DENIED ............................ 9

        A.  Haggerty's Opinions are Relevant to the Claims Made by Plaintiff........................ 9

            1.  Standard Industry Practices in Public Relations and Communications
               are Relevant.................................................................................................... 9

            2.  Haggerty Does Not Tell the Jury What Result to Reach ................................ 12

            3.  Haggerty's Opinions Are Properly Deemed Expert Testimony ..................... 14

            4.  The Allegations in the Second Amended Complaint Are Relevant................ 16

        B.  Haggerty is Qualified to Render Opinions 5 and 6 ................................................ 16

        C.  Haggerty's Opinions are Reliable ......................................................................... 18

        D.  There is No Prejudice to Lively .............................................................................. 20

CONCLUSION ..................................................................................................................... 21

i

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*523 IP LLC v. CureMD.Com*,
  48 F. Supp. 3d 600 (S.D.N.Y. 2014) ...................................................................................... 14

*Abreu Bautista v. Pagan-Rodriguez*,
  2025 WL 1730213 (S.D.N.Y. June 23, 2025) ......................................................................... 20

*Alfa Corp. v. OAO Alfa Bank*,
  475 F. Supp. 2d 357 (S.D.N.Y. 2007) ..................................................................................... 19

*Alto v. Sun Pharma. Indus., Inc.*,
  2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021) .......................................................................... 15

*Am. Nat'l Fire Ins. Co. v. Mirasco, Inc.*,
  265 F. Supp. 2d 240 (S.D.N.Y. 2003) ....................................................................................... 9

*Bailey v. S.F. Dist. Att'ys Off.*,
  552 P.3d 433 (Cal. 2024) ......................................................................................................... 11

*Bank of N.Y. Mellon Trust Co., N.A. v. Solstice ABS CBO II, Ltd.*,
  910 F. Supp.2d 629 (S.D.N.Y. 2012) ......................................................................................... 8

*Bocoum v. Daimler Trucks N. Am. LLC*, No.,
  2022 WL 902465 (S.D.N.Y. Mar. 28, 2022) ........................................................................... 20

*Borawick v. Shay*,
  68 F.3d 597 (2d Cir. 1995) ........................................................................................................ 9

*Boucher v. U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996) ........................................................................................................... 8

*Calltrol Corp. v. LoxySoft AB*,
  2025 WL 2720984 (S.D.N.Y. Sept. 24, 2025) ......................................................................... 16

*Capri Sun GmbH v. Am. Beverage Corp.*,
  595 F. Supp. 3d 83 (S.D.N.Y. 2022) ....................................................................................... 12

*Clayton Int'l, Inc. v. Nebraska Armes Aviation, LLC*,
  2025 WL 1937621 (D. Neb. July 15, 2025) ............................................................... 1

*Conti v. Doe*,
  2020 WL 6162104 (S.D.N.Y. Oct. 21, 2020) ............................................................ 18

*Dallal v. New York Times Co.*,
  352 Fed. Appx. 508 (2d Cir. 2009) ........................................................................... 11

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ..................................................................................................... 8

*E.E.O.C. v. Morgan Stanley & Co.*,
  324 F.Supp.2d 451 (S.D.N.Y. 2004) ......................................................................... 11

*Hayes v. S. Fid. Ins. Co.*,
  2014 WL 5305683 (E.D. La. Oct. 15, 2014) .............................................................. 1

*Highland Capital Mgmt., L.P. v. Schneider*,
  551 F. Supp. 2d 173 (S.D.N.Y. 2008) ......................................................................... 9

*In re Blech Sec. Litig.*,
  2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ............................................................ 9

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*,
  643 F. Supp. 2d 482 (S.D.N.Y. 2009) ....................................................................... 20

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*,
  2008 WL 1971538 (S.D.N.Y. May 7, 2008) .............................................................. 12

*In re Mirena IUD Prods. Liab. Litig.*,
  169 F. Supp. 3d 396 (S.D.N.Y. 2016) ....................................................................... 15

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................................................. 15, 16

*In re: North Sea Brent Crude Oil Futures Litig.*, No.,
  2016 WL 1271063 (S.D.N.Y. Mar. 29, 2016) ........................................................... 19

*Jinn v. Sig Sauer, Inc.*,
  2023 WL 2919558 (S.D.N.Y. Apr. 12, 2023) ............................................................ 19

*Johnston v. Borders*,
2018 WL 8244335 (M.D. Fla. May 2, 2018)................................................................... 14

*Kaiser Aluminum Warrick, LLC v. US Magnesium, LLC*,
766 F. Supp. 3d 462 (S.D.N.Y. 2025) ...........................................................................20

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999)...........................................................................................................8

*Louis Vuitton Malletier S.A. v. Sunny Merchandise Corp.*,
97 F. Supp. 3d 485 (S.D.N.Y. 2015) ...............................................................................19

*Nimely v.  City of New York*,
414 F.3d 381 (2d Cir. 2005) ...........................................................................................18

*Novartis Pharma AG v. Incyte Corp.*,
2024 WL 3608338 (S.D.N.Y. July 29, 2024)....................................................................9

*O'Loughlin v. USTA Player Dev. Inc.*,
2016 WL 5416513 (S.D.N.Y. Sept. 28, 2016)................................................................. 19

*Patriarch Partners Agency Servs., LLC v. Zohar CDO 2003-I, Ltd.*,
2025 WL 2592224 (S.D.N.Y. Sept. 8, 2025)....................................................................9

*Pension Committee of University of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
691 F. Supp. 2d 448 (S.D.N.Y. 2010) ...........................................................................16

*Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*,
988 F. Supp. 2d 395 (S.D.N.Y. 2013) ......................................................................14, 15

*Restivo v. Hessemann*,
846 F.3d 547 (2d Cir. 2017) .............................................................................................8

*Russo v. Tuttnauer USA Co., Ltd.*,
2024 WL 4449440 (E.D.N.Y. Oct. 2, 2024).....................................................................1

*Santoro ex rel. Santoro v. Donnelly*,
340 F. Supp. 2d 464 (S.D.N.Y. 2004) ...........................................................................17

*Scofield v. Guillard*,
  2026 WL 184517 (D. Idaho Jan. 23, 2026) ..................................................................14

*Snyder v. Wells Fargo Bank, N.A.*,
  2012 WL 4876938 (S.D.N.Y. Oct. 15, 2012)................................................................13

*Tiffany (NJ) Inc. v. eBay, Inc.*,
  576 F. Supp. 2d 457 (S.D.N.Y. 2007) ..........................................................................16

*U.S. v. Duncan*,
  42 F.3d 97 (2d Cir. 1993) .............................................................................................12

*U.S. v. Felder*,
  993 F.3d 57 (2d Cir. 2021) ...........................................................................................12

*U.S. v. Jiau*,
  734 F.3d 147 (2d Cir. 2013) .........................................................................................15

*U.S. v. Litvak*,
  808 F.3d 160 (2d Cir. 2015) ...........................................................................................8

*U.S. v. Mejia*,
  545 F.3d 179 (2d Cir. 2008) .........................................................................................15

*U.S. v. Wexler*,
  522 F.3d 194 (2d Cir. 2008) .......................................................................................8, 9

*United States v. Foster*,
  2014 WL 12687616 (S.D. Fla. Mar. 31, 2014)..............................................................14

*United States v. Jones*,
  965 F.3d 149 (2d Cir. 2020) .........................................................................................18

*United States v. Mendlowitz*,
  2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) ..........................................................10, 11

*United States v. Ray*,
  2022 WL 101911 (S.D.N.Y. Jan. 11, 2022) ..................................................................18

*United States v. Simmons*,
  470 F.3d 1115 (5th Cir. 2006) .......................................................................................18

**<u>Rules</u>**

F.R.E. 403 ................................................................................................................20

F.R.E. 701 ................................................................................................................14

F.R.E. 702 ..............................................................................................................8, 18

F.R.E. 704 ................................................................................................................12

Fed. R. Civ. P. 37(c)(1) ..............................................................................................1

Defendants Wayfarer Studios LLC ("Wayfarer"), It Ends With Us Movie LLC ("IEWUM"), and The Agency Group PR LLC ("TAG" and collectively with Wayfarer and IEWUM, the "Remaining Defendants")[1] respectfully submit this brief in opposition to plaintiff Blake Lively's motion to exclude the opinions and testimony of public relations and crisis communications expert James F. Haggerty (the "Motion").[2]

## PRELIMINARY STATEMENT

The crux of the Motion is that Haggerty's testimony is irrelevant because he purportedly "offers no opinion on whether social media ***manipulation***, as Ms. Lively alleges occurred here, is standard in the crisis industry." (Dkt. 1302, p. 2) (emphasis in original). However, despite Lively's mischaracterization, Haggerty *does*, in fact, opine on that topic. Although the Motion seemingly uses the word "manipulation" to describe control or change obtained by *unfair* or *deceptive* means, Lively's pleadings and verified interrogatory responses highlight that the "social manipulation" plan that was purportedly blessed by Wayfarer, and allegedly executed by TAG, consisted of ***standard*** public relations and crisis communications activities: communicating with the media, placing content with the media, publicizing content, quelling negative content about Baldoni, and magnifying negative content about Lively. (Dkt. 520, ¶ 230; Dkt. 1245-140, p. 6 – 29).

---

[1] The Remaining Defendants, along with former defendants Justin Baldoni, Jamey Heath, Steve Sarowitz, Melissa Nathan and Jennifer Abel are collectively referred to herein as the "Wayfarer Parties."

[2] The Motion contends that Haggerty's failure to sign his report and disclose therein that he reviewed a specific deposition transcript and a certain expert report warrants exclusion of his report and testimony. (Dkt. 1302, p. 1 n.1). However, Lively's counsel deposed Haggerty on December 11, 2025, was afforded the opportunity to examine him with respect to the facts and data considered by him in forming his opinions, and a signed version of the report is being filed contemporaneously herewith. Therefore, exclusion is not warranted. *See* Fed. R. Civ. P. 37(c)(1) (failure to follow expert-disclosure rules may result in exclusion of the expert opinion "unless the failure was substantially justified or is harmless"); *Clayton Int'l, Inc. v. Nebraska Armes Aviation, LLC*, No. 21-cv-309, 2025 WL 1937621, at *4 (D. Neb. July 15, 2025) (declining to exclude unsigned report because expert was asked about his opinions therein during deposition); *Russo v. Tuttnauer USA Co., Ltd.*, No. 21-cv-1720, 2024 WL 4449440 (E.D.N.Y. Oct. 2, 2024) (finding that failure to sign report was harmless because defendants were provided an opportunity to depose expert regarding her expert report); *Hayes v. S. Fid. Ins. Co.*, No. 14-cv-376, 2014 WL 5305683, at *13, *15 (E.D. La. Oct. 15, 2014) (declining to exclude expert opinion contained in unsigned report as rule violation was harmless).

Those complained of activities are specified in the "Scope of Work" and "Scenario Planning" documents prepared by TAG (Dkt. 521-4), which Haggerty reviewed and concluded were standard based upon his decades of experience in the industry. (Dkt. 1303-1, p. 3, 22 – 24, 32). Furthermore, at his deposition, Haggerty testified that "social media manipulation in the non-pejorative sense, in the sense of effecting results is standard in everything in the public relations field because every effort that is taken in the public relations field ultimately has an impact on social media." (Fritz Dec., Ex. 2, at 204:9 – 15). In other words, a publicist's job is to shape (*i.e.*, affect or manipulate) the public's perception of his or her client. Indeed, Lively's own publicist Leslie Sloane testified that her job is to "balance out stories if they're negative and if they're untrue." (Dkt. 1245-105, at 16:7 – 18). Haggerty's testimony is relevant and reliable and will help the jury understand the evidence concerning public relations and crisis communications activities.

## STATEMENT OF FACTS

In 2019, Baldoni obtained the rights to produce a film based on Colleen Hoover's best-selling novel "It Ends With Us" (the "Film"). (R.56.1 ¶ 8; Dkt. 954-14).[3] In December 2022, Lively, a well-known, prominent actor, was cast as the female lead. (R.56.1 ¶ 21; Dkt. 954-24, at 12; Dkt. 954-20). During the production of the Film and thereafter, Lively actively worked to damage Baldoni's reputation via certain actions, including but not limited to: (1) unfollowing Baldoni on social media (and prompting other cast members to similarly do so), which knowingly triggered the press and fans to suspect a "feud" (R.56.1 ¶¶ 242, 262; Dkt. 520, ¶ 186 n.26; Dkt. 954-171, at -721); (2) causing her husband Ryan Reynolds (another well-known, prominent actor) to disparage Baldoni as a "thoroughbred predatory fraudster" to WME, the powerful talent agency that represented Baldoni at the time (R.56.1 ¶ 245; Dkt. 954-149); (3) excluding Baldoni from

---

[3] Citations to "R.56.1" are citations to the Amended Rule 56.1 Statement of Undisputed Material Facts. (Dkt. 1243).

2

promotional and marketing events for the Film in June and July 2024, which, as Lively was aware, generated adverse publicity for Baldoni (R.56.1 ¶¶ 246 – 248); and (4) refusing to attend the Film's premiere in August 2024 if Baldoni was present, which compelled Sony (the co-producer and co-financer of the Film) to exile Baldoni and his guests to a basement while Lively was glamorously photographed on the red carpet.  (R.56.1 ¶¶ 249 – 250; Dkt. 954-155; Dkt. 954-56).

Meanwhile, and for years prior to the events at issue herein, Jonesworks LLC and its employee Jennifer Abel performed public relations services for Wayfarer and Baldoni (collectively, the "Wayfarer Clients").  (R.56.1 ¶ 252).  Given Lively's tactics preceding the premiere of the Film, the Wayfarer Clients sought a crisis management professional to work along with Jonesworks in connection with potential negative publicity related to the Film.  (R.56.1 ¶¶ 253 – 256). On July 26, 2024, TAG circulated to Wayfarer a proposed "Scope of Work" for its crisis management services, which included "design[ing] and implement[ing] a crisis communications strategy to protect and enhance the reputations of Justin Baldoni, Wayfarer Studios, and their executives while navigating through anticipated and unforeseen challenges leading to the [Film] premiere and its aftermath."  (Dkt. 964-23).  On August 2, 2024, Wayfarer retained TAG "as its non-exclusive public relations counsel to assist with mutually agreed strategic communications services … as laid out in the [Scope] of Work which is hereby incorporated into this Agreement." (Dkt. 1245-101, ¶ 1).  On August 2, 2024, TAG sent Wayfarer and Jonesworks a "Scenario Planning" document listing various possible options for responding to the public relations crisis facing the Wayfarer Clients.  (Dkt. 964-26; Dkt. 521-4).  The stated objective therein was to "[p]rotect the reputation of Justin Baldoni, Jamey Heath, and Wayfarer Studios in the lead up, during, and following the premiere" of the Film and related goals.  (Dkt. 521-4).

3

## PROCEDURAL HISTORY

### A.    Lively's Remaining Claims

On July 30, 2025, Lively filed a Second Amended Complaint in which she asserted various claims, including: (a) retaliation in violation of California's Fair Employment and Housing Act ("FEHA") against IEWUM and Wayfarer; (b) aiding and abetting retaliation in violation of FEHA against TAG; and (c) breach of an agreement she calls the "Contract Rider Agreement" against IEWUM (collectively, the "Remaining Claims").  (Dkt. 520, ¶¶ 386 – 393, 408 – 415, 425 – 433).

In short, Lively alleges that the defendants engaged in a campaign to injure her reputation in retaliation for her claims of a (purported) hostile work environment on the set of the Film.  (*Id.*).  More specifically, Lively alleges that:

> Ms. Abel, Ms. Nathan, Mr. Wallace, Street Relations, and others employed or engaged by TAG perpetrated a retaliation scheme against Ms. Lively, in collusion with Mr. Sarowitz, Mr. Baldoni, Mr. Heath, and Wayfarer. This scheme was what TAG described as a "social manipulation" plan relying on direct and constant media engagement, the seeding of content on traditional and social media platforms, the boosting of content (sometimes the very content that TAG and its affiliates had seeded), the suppressing of negative content about Mr. Baldoni, and the amplifying of negative content about Ms. Lively (including through engagement via comments on social media).

(*Id.* ¶ 230).  The Second Amended Complaint further claims that "[w]hen media sources made direct inquiries regarding potentially unflattering stories about Mr. Baldoni specifically, Ms. Nathan, Ms. Abel, and their teams worked to suppress those stories."  (*Id.*).

According to Lively's pleadings, (now-dismissed defendants) Jed Wallace and his company Street Relations "weaponized a digital army … to create, seed, promote, and engage with content that appeared to be authentic on social media platforms and internet chat forums."  (*Id.* ¶¶ 38, 293a–n).  Lively does *not* allege that any of the Remaining Defendants (or any of the Wayfarer Parties) took the same purported actions.

**B.**     <u>**Lively's Interrogatory Responses**</u>

In her Third Amended Responses and Objections to TAG's Second Set of Interrogatories (the "Interrogatory Responses"), Lively purports to identify the "negative content about [her] (including through the engagement of social media)" that she alleges was "amplified" by TAG. (Dkt. 1245-140, p. 6 – 29). Each of the specific instances identified in Lively's Interrogatory Responses consists of public relations activities, including standard crisis communications services performed by TAG pursuant to its engagement by Wayfarer. (*Id.*).

In her Interrogatory Responses, Lively further alleges that TAG: (a) "amplified" negative content about her "by virtue of recommending services to be performed by Mr. Wallace and Street Relations and facilitating that engagement"; and (b) "by direct communications with Mr. Wallace and/or digital teams identifying relevant narratives as well as content to be amplified, boosted, or similar conduct, in order to negatively affect the online conversation regarding [her]." (*Id.*, p. 29 – 30). Stated differently, according to Lively, TAG improperly amplified negative content about her by merely recommending, communicating with, and identifying narratives for Jed Wallace.

**C.**     <u>**The Expert Report of James F. Haggerty**</u>

Haggerty was retained on behalf of the Wayfarer Parties "to prepare a report on crisis communications planning, scenario planning, and standard public relations practice when facing potentially negative reputational events. [He] was asked to provide an analysis of best practices in the field of public relations and its sub-category, crisis communications, as well as the reasons for undertaking these best practices to minimize reputational risk and prevent damage to personal and organizational brand." (Dkt. 1303-1, p. 6 – 7). In his report, Haggerty provides a complete statement of his opinions as well as the basis and reasons for each of them, identifies the facts or data considered by him in forming his opinions, exhibits that he used to summarize or support his

opinions, his qualifications, a statement that he has never testified as an expert witness, and a statement of the compensation to be paid to him for study and testimony in the case, as required by Rule 26(a)(2)(B).

Haggerty's opinions are:

1. The hiring of a crisis communications consultant in the face of perceived reputational threats should not be considered in any way evidence of a negative, or nefarious, intent. Rather, it is well established that such a retention is entirely acceptable, appropriate, and prudent for organizations, brands (personal or corporate), and high-profile individuals seeking to mitigate reputational risk, particularly in the face of threats. ("Opinion 1").
2. A misunderstanding of the role of a crisis communications manager often feeds negative perceptions regarding the role of crisis communications. ("Opinion 2").
3. Media monitoring is a standard practice in all public relations—and particularly in crisis communications and other sensitive communications matters—and should not be seen as an effort at social media manipulation. ("Opinion 3").
4. The "Scope of Work" document prepared by The Agency Group (TAG), as well as the document entitled "Scenario Planning—*It Ends With Us*" are in keeping with standard crisis communications planning practices. ("Opinion 4").
5. The growth in media and social media coverage negative to Ms. Lively, starting in August 2024, is unlikely to have been caused by the work done by the crisis communications consultants hired by the Wayfarer parties, given the short timeframe. ("Opinion 5").
6. Tools to measure media and social media "sentiment" are sometimes less effective during crises, litigation, or other sensitive, dispute-related public issues. There is a need, therefore to drill down on the data, particularly when attempting to discover causal relationships. ("Opinion 6").

(*Id.*, p. 31 – 32). Lively's counsel conducted Haggerty's deposition on December 11, 2025, and extensively questioned him about his report and his opinions. (Dkt. 1303-2).

### D.    The Opinion and Order dated April 2, 2026

On September 26, 2025, the Wayfarer Parties filed a motion for judgment on the pleadings. (Dkt. 810). On November 12, 2025, the Wayfarer Parties filed a motion for summary judgment. (Dkt. 952). In an Opinion and Order dated April 2, 2026, the Court granted the Wayfarer Parties'

6

motions to the extent of dismissing ten of Lively's thirteen claims and denying the motions with respect to the Remaining Claims.[4] (Dkt. 1273).

With respect to the Remaining Claims (all of which are based upon the so-called smear campaign), the Court issued rulings consistent with Haggerty's opinion that the services specified in TAG's Scope of Work and Scenario Planning documents are standard and appropriate in the crisis communications industry. (Dkt. 1303-1, p. 21 – 24, p. 32).

The Court held that "much of what Lively complains is not actionable. The Wayfarer Parties were entitled to engage public relations and crisis management specialists to protect their reputations." (Dkt. 1273, p. 130). The Court further ruled: "The Wayfarer Parties were also entitled to prepare responses to the Protections Letter and the accusations that it implied. That included the right to assert that the claims against them were untrue or misconstrued, and that Lively could not be credited. It also included the right to convey to the viewing public reasons why Lively's account could not be trusted, including pointing to evidence that Lively had ulterior motives for making claims of harassment and that she did not believe the claims she was making." (*Id.*, p. 130 – 131).

Furthermore, the Court noted that, through disclosed and undisclosed proxies, "it was permissible for Baldoni to request that the digital team 'boost' certain videos which he believed were favorable to his image, … and for TAG to work behind the scenes to emphasize" Baldoni's reputation "and to tone down inflammatory allegations against him." (*Id.*, p. 131). "The Wayfarer Parties similarly would have been within their rights in elevating stories that would cast doubt on whether Lively was a credible reporter of the events that occurred on the set." (*Id.*).

---

[4] Lively previously stipulated to the dismissal, with prejudice, of her claims for intentional and negligent infliction of emotional distress. (Dkt. 337).

## LEGAL STANDARD

Federal Rule of Evidence 702 states:

[A] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

(F.R.E. 702). The proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993). "Expert testimony is admissible when it will assist the trier of fact to understand the evidence or to determine a fact in issue." *U.S. v. Wexler*, 522 F.3d 194, 204 (2d Cir. 2008). It is well settled that "expert witnesses are permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation," provided the opinions are upon the expert's "own application of principles within his expertise to the facts of the case." *Bank of N.Y. Mellon Trust Co., N.A. v. Solstice ABS CBO II, Ltd.*, 910 F. Supp.2d 629, 640 (S.D.N.Y. 2012).

Expert testimony need not rest on traditional scientific methods. *U.S. v. Litvak*, 808 F.3d 160, 180, n. 25 (2d Cir. 2015). "Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from …specialized experience.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148-49 (1999). A court need only "assess whether the expert employs the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017). Further, unless an expert's assumptions are so unrealistic and contradictory as to constitute bad faith, "contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id*. (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

8

The admission or preclusion of expert opinion evidence is committed to the discretion of the Court. *Wexler*, 522 F.3d at 204. However, "*Daubert* reinforces the idea that there should be a presumption of admissibility of evidence." *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995).

## ARGUMENT

### I.    PLAINTIFF'S MOTION TO EXCLUDE SHOULD BE DENIED

### A.    Haggerty's Opinions are Relevant to the Claims Made by Plaintiff

1.    Standard Industry Practices in Public Relations and Communications are Relevant

"[I]t is proper for an expert to testify as to the customs and standards of an industry, and to opine as to how a party's conduct measured up against such standards." *In re Blech Sec. Litig.*, No. 94-cv-7696, 2003 WL 1610775, at *19 (S.D.N.Y. Mar. 26, 2003) (quotation omitted). "Although experts may not offer legal conclusions, …experts may opine on relevant industry custom as informed by the expert's expertise." *Patriarch Partners Agency Servs., LLC v. Zohar CDO 2003-I, Ltd.*, No. 16-cv-4488, 2025 WL 2592224, at *13 (S.D.N.Y. Sept. 8, 2025); *see also Novartis Pharma AG v. Incyte Corp.*, No. 20-cv-400, 2024 WL 3608338, at *12 (S.D.N.Y. July 29, 2024) (expert permitted to "opine on what, in his view, is customary within the industry, or consistent with industry customs or practices"); *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 180 (S.D.N.Y. 2008) (expert allowed to testify as to "customs and practices of the industry"); *Am. Nat'l Fire Ins. Co. v. Mirasco, Inc.*, 265 F. Supp. 2d 240, 252 (S.D.N.Y. 2003) ("experts may testify as to the customary practices in a profession or industry").

Here, Haggerty, an expert in public relations and crisis communications, opines the following regarding customs and standards in his industry: (1) the hiring of a crisis communications consultant in the face of reputational threats is appropriate and prudent; (2) the role of the crisis communications manager does not entail a negative or nefarious intent; (3) media

9

monitoring is a standard practice in public relations and does not imply social media manipulation; and (4) the content of the "Scope of Work" and "Scenario Planning" documents were consistent with standard communications planning practices.  (Dkt. 1303-1, p. 31 – 32).

Lively argues that "whether or not crisis retentions in general, monitoring in general, or Defendants' assembling the Statement of Work and Scenario Planning documents collectively align with the norm for the crisis industry in the 'standard' case is irrelevant to whether Defendants' conduct amounts to retaliation for engaging in protected activity, or other unlawful conduct." (Dkt. 1302, p. 7).[5]  However, in the Second Amended Complaint, Lively alleges that the "adverse employment action" to which she was purportedly subjected consisted of a "social manipulation" plan.  (Dkt. 520, ¶ 230).  According to the pleadings, the "social manipulation" plan that was "approved" by Wayfarer and "perpetrated" by its crisis communications consultant TAG (merely) consisted of communicating with the media, placing content with the media, publicizing content, quelling negative content about TAG's client, and magnifying negative content about Lively – all activities outlined in the Scope of Work and Scenario Planning documents.  (*Id.*).  The Remaining Defendants are entitled to have Haggerty explain to the jury that such activities are standard and routine in the public relations/crisis communications industries.

Lively's reliance upon *United States v. Mendlowitz*, No. 17-cr-248, 2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) is misplaced.  In that criminal case, defendant Mendlowitz was charged with various federal crimes (mail fraud, wire fraud, and conspiracy to commit those frauds).  *Id.* at *1.  The Government moved to exclude expert testimony regarding standard practices in the payment processing industry and how Mendlowitz's company's practices fit within those standard practices.  *Id.* at *3.  The Court reserved decision and, after various fact witnesses testified at trial

---

[5] Lively does *not* dispute that Haggerty is qualified to render Opinions 1 through 4.

about standard practices in the payment processing industry, the Court granted the Government's motion to exclude the expert testimony. *Id.* In denying a subsequent motion for a new trial, the Court reasoned that "the fact that certain conduct may be common or general practice in an industry was not relevant to the jury's consideration of Defendant Mendlowitz, and is not a defense to wire fraud." *Id*. at \*5. *Mendlowitz* is distinguishable because it was a *criminal* case (not a civil case) wherein the expert testimony was excluded *during* the jury trial (not in advance) only after *several* fact witnesses testified on the industry practices (which Lively cannot ensure will occur here) and the industry practice was not a defense to committing the *federal crime* of wire fraud. Here, no one has been criminally indicted for anything. Given that Lively's Second Amended Complaint attributes nefarious conduct to the Scenario Planning document (which is attached thereto), Haggerty should be permitted to explain to the jury that the contents thereof are standard.

In *Dallal v. New York Times Co.*, 352 Fed. Appx. 508 (2d Cir. 2009), the Court precluded the testimony of expert witnesses on newspaper custom and practice in a copyright infringement case that did not involve custom and practice but rather "how [defendant] understood its bargain with [plaintiff] in light of its own practice." *Id*. at 512. Here, there is no similar "bargain" between Lively and the Wayfarer Clients warranting preclusion of Haggerty's testimony.[6]

Quite simply, Haggerty does *not* opine on whether Lively's "terms, conditions, or privileges of employment" were materially altered for the worse. *Bailey v. S.F. Dist. Att'ys Off.*, 552 P.3d 433, 450 (Cal. 2024). Similarly, Haggerty does *not* opine on whether the public

---

[6] The other case upon which Lively relies, *E.E.O.C. v. Morgan Stanley & Co.*, 324 F.Supp.2d 451 (S.D.N.Y. 2004) is also off point. In that class action sex discrimination case, defendant Morgan Stanley proposed expert testimony assessing how "Morgan Stanley's compensation system fits into the compensation customs and practices of Wall Street firms and explains how legitimate business reasons motivate financial service firms to adopt the type of compensation system that Morgan Stanley uses." *Id.* at 463. Unsurprisingly, the Court excluded the expert testimony because "[t]he fact that Morgan Stanley's compensation is consistent with industry practices is irrelevant to a determination of whether the company discriminated." *Id.* at 464.

11

relations/crisis management actions at issue herein were "an attack on [Lively's] professional reputation and livelihood." (Dkt. 1273, p. 132).  Those issues will be decided by the jury.

       2.      <u>Haggerty Does Not Tell the Jury What Result to Reach</u>

"An opinion is not objectionable just because it embraces an ultimate issue." (F.R.E. 704). In determining whether an expert opinion improperly crosses this line, courts follow the guidance set forth by the Second Circuit in *U.S. v. Duncan*, 42 F.3d 97 (2d Cir. 1993), which held:

> When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.  When this occurs, the expert acts outside of his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination.  In evaluating the admissibility of expert testimony, this Court requires the exclusion of testimony which states a legal conclusion.

*Id*. at 101.  The *Duncan* Court held that courts should be "particularly concerned [where] the witness repeatedly track[s] the exact language of the statutes and regulations which the defendant had allegedly violated and used judicially defined terms such as 'manipulation,' 'scheme to defraud' and 'fraud.'"  *Id*.  Where experts do not do so, courts routinely permit their opinions to be expressed.  *See U.S. v. Felder*, 993 F.3d 57, 74 (2d Cir. 2021) (expert opinion regarding what was in defendant's hand permissible because expert "did not tell the jury what result to reach with respect to any of the charges at issue"); *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 133 (S.D.N.Y. 2022) (expert's opinion that trademark was "likely famous" did not usurp factfinder's role where it did not track the exact language of the Trademark Dilution Act or use judicially defined terms); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*, No. 1:00-cv-1898, 2008 WL 1971538, at *14 (S.D.N.Y. May 7, 2008) (in products liability case, expert permitted to opine that ethanol was a "feasible alternative" to MTBE because the expert "does not testify as to the legal meaning of a feasible alternative or otherwise attempt to instruct the jury on the law").

Lively takes issue with Opinions 1 and 3 to the extent Haggerty states that hiring a crisis communications consultant when faced with reputational threats "should not" be viewed negatively and that media monitoring "should not" be considered social media manipulation, respectively. (Dkt. 1302, p. 7 – 8). It is unclear why Lively takes issue with these opinions given that the Court recently ruled that the Wayfarer Parties "were entitled to engage public relations and crisis management specialists to protect their reputations" and to publicly respond to Lively's accusations (which, of course, required the monitoring of media). (Dkt. 1273, p. 130 – 131).

Lively erroneously contends that, if permitted, "Haggerty's report and testimony that the retention of TAG and Street Relations and work performed pursuant to those engagements 'should not be' viewed negatively would threaten to replace the jury's role in deciding whether the facts demonstrate, among other things, Defendants' retaliatory motive and liable conduct." (Dkt. 1302, p. 8). Haggerty's report neither tracks the language of FEHA nor contains any opinions on judicially defined terms such as protected activity or adverse employment action. The report simply analyzes the public relations and crisis communications work conducted by the Wayfarer Clients' professionals, as set forth in the Scope of Work and Scenario Planning documents, through the prism of the customs and practices in the industry. (Dkt. 1303-1, p. 21 – 32).

The sole case cited for Lively's argument is *Snyder v. Wells Fargo Bank, N. A.*, No. 11-cv-4496, 2012 WL 4876938 (S.D.N.Y. Oct. 15, 2012), in which the Court precluded an expert report that concluded that the defendant breached its fiduciary duty to the plaintiff in connection with handling the latter's investment accounts, and that another witness's deposition testimony was not credible and should be discounted. Here, Haggerty neither tells the jury what conclusion to reach on the elements of the Remaining Claims nor challenges the credibility of any witness.

13

3.    Haggerty's Opinions Are Properly Deemed Expert Testimony

Lively cites two reasons why Haggerty's opinions constitute unnecessary lay testimony. Neither argument succeeds.  First, Lively contends that "[n]one of Haggerty's opinions addresses anything but lay matters that a jury could understand without his assistance."  (Dkt. 1302, p. 8). Not so.  "Lay testimony results from a process of reasoning familiar in everyday life, whereas expert testimony results from a process of reasoning which can be mastered only by specialists in the field."  *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 634 (S.D.N.Y. 2014) (quoting F.R.E. 701 advisory committee's note).  As discussed above, "[i]t is of course common for testimony regarding the customs and practices in a particular industry to be the subject of expert testimony." *Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 403 (S.D.N.Y. 2013). Courts routinely hold that expert testimony in the areas of public relations and crisis communications is admissible.  *See Johnston v. Borders*, No. 15-cv-936, 2018 WL 8244335, at *3 (M.D. Fla. May 2, 2018) ("The average juror will not be versed in the management and rehabilitation of one's online reputation."); *see also Scofield v. Guillard*, No. 22-cv-00521, 2026 WL 184517, at *3 (D. Idaho Jan. 23, 2026) (expert permitted to testify about general principles of public relations); *United States v. Foster*, No. 13-cr-20063, 2014 WL 12687616, at *5 (S.D. Fla. Mar. 31, 2014) (expert permitted to testify regarding whether conduct was "within the standards, ethics and boundaries of current marketing and public relation practices").

Haggerty's opinions all rely on his expertise in the public relations/crisis communications industry and the standards in that industry.  (Dkt. 1303-1, p. 31 – 32).  Lively's claims that jurors can simply divine for themselves whether the retention of a crisis consultant is "standard" in the industry under certain circumstances, or that they can analyze any negative perceptions arising

14

from the hiring of one, are absurd.  These are exactly the kinds of customs and practices on which expertise is helpful and needed.  *Reach Music Pub., Inc.*, 988 F. Supp. 2d at 403.

By contrast, the cases cited by Lively involve issues that require no expertise whatsoever. In *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004), the Court excluded proffered expert testimony concerning the history of foreign regulators and Glaxo-Wellcome with respect to Rezulin.  *Id*. at 554.  In *U.S. v. Jiau*, 734 F.3d 147 (2d Cir. 2013), the Court held that expert testimony on the issue of the materiality of insider information was unnecessary where "[t]he surprise professed by [] analysts in reaction to her information … and the trades they made to exploit that information could have conclusively demonstrated materiality." *Id*. at 154.  In *U.S. v. Mejia*, 545 F.3d 179 (2d Cir. 2008), no expertise was required on the statistics of how many firearms had been seized from MS-13 members, what they had been arrested for, *etc.  Id*. at 195.

Next, Lively erroneously contends that Opinion 4 (*i.e.* the Scope of Work and Scenario Planning documents are industry standard) "amounts to nothing more than a summary of" those documents. (Dkt. 1302, p. 9).  Haggerty does not simply summarize these documents; he analyzes whether their contents are in conformance with industry standards.  (Dkt. 1303-1, p. 22 – 24).  This stands in stark contrast to the opinions that were precluded in the cases Lively cites.  In *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016), an expert was precluded from offering an opinion that "largely consists of copied and pasted statements from internal Bayer documents." *Id*. at 481.  Lively does not claim that Haggerty has simply "copied and pasted" his Opinion 4 from other documents.  In *Alto v. Sun Pharma. Indus., Inc.*, No. 19-cv-09758, 2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021), an expert's opinion that a facility was operating at capacity derived from reading several internal emails and documents, and involved no expertise.  *Id*. at *8. As for *In re Rezulin Prods. Liab. Litig.*, an expert reviewed defendants' "in-house documents,

15

memos and emails," and then simply opined that they demonstrated the suppression of science – an issue the Court held the jury could determine with no expertise. 309 F. Supp. 2d at 554.

        4.        <u>The Allegations in the Second Amended Complaint Are Relevant</u>

"In assessing the relevance of proffered expert testimony, the Court looks to whether the testimony has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 459 (S.D.N.Y. 2007). Opinions 5 and 6 address whether the alleged misconduct could have caused the negative stories about Lively beginning in August 2024, and the degree to which data must be analyzed to establish a causal relationship during a crisis or litigation, respectively. (Dkt. 1303-1, p. 32). Lively claims that Opinions 5 and 6 are irrelevant because they address charts in the Second Amended Complaint that "have since been superseded by other expert testimony and record evidence." (Dkt. 1302, p. 11). However, there is no ruling that these charts were "superseded." These opinions are relevant and should not be excluded.

**B.**      **<u>Haggerty is Qualified to Render Opinions 5 and 6</u>**

Lively argues that Haggerty is unqualified to render Opinion 5 because he is not an expert in digital media. (Dkt. 1302, p. 12 – 13). However, Haggerty need not be an expert in a subset of his field to render his opinions. "Where an expert has expertise or qualifications, in a general field closely related to the subject matter in question, the court will not strike the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Calltrol Corp. v. LoxySoft AB*, No. 18-cv-9026, 2025 WL 2720984, at *4 (S.D.N.Y. Sept. 24, 2025) (expert in telecommunications industry could opine on predictive dialers, even though he was not a specific expert in dialers); *see also Pension Committee of University of Montreal Pension*

16

*Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 460 (S.D.N.Y. 2010) (expert deemed sufficiently qualified in qualitative portfolio analysis even though most of his experience was in quantitative portfolio analysis); *Santoro ex rel. Santoro v. Donnelly*, 340 F. Supp. 2d 464, 479 (S.D.N.Y. 2004) (expert deemed qualified to opine on fireplace heaters due to his "background in engineering and vast experience in the field of gas-fired consumer products").

Haggerty cites to Lively's allegations in that TAG was not retained by Wayfarer until August 2, 2024, that Jed Wallace was not retained until August 8, 2024, and that there was a "notable spike" of negative sentiment towards her on that (same) day, August 8, 2024. (Dkt. 1303-1, p. 25). Haggerty states that based upon his experience in public relations and crisis communications, "it is highly unlikely that a digital marketing plan could be prepared and *executed* within a few days (if not the same day)." (*Id.*) (emphasis in original). He also states that "[e]ffectively changing public opinion in media and social media tends to take weeks or, more often, months." (*Id.*, p. 11). In addition to his own experience, Haggerty's report quotes several sources in the digital marketing industry stating that, in general, results in digital marketing are not achieved for at least several months. (*Id.*, p. 25 – 26). When Haggerty was asked at his deposition about whether a significant spike in negative sentiment towards Lively could have been caused by Wayfarer's team by August 8 or August 9, 2024, he testified that "given the hiring dates of the professionals in question, that spike that is alleged coinciding with the premier[e] and everything that went on around the premier[e] is not the result of any action by anyone…. In my experience, over 30-plus years, it doesn't happen that way." (Fritz Dec., Ex. 2, at 268:2 – 271:3).

Although Lively contends that Haggerty lacks the "digital and data expertise to analyze" various "sentiment" *charts* in her pleadings (Dkt. 1302, p. 13), she does not explain why someone (such as Haggerty) with more than thirty years of experience in public relations and crisis

17

communications, which includes working with government agencies, public companies, private companies, and high-profile individuals, is unqualified to cast doubt on Lively's allegation that Wayfarer's team initiated and (apparently successfully) executed a public relations campaign, *in a day or two*, to turn the internet against her.  Opinion 5 is *not* a critique of Lively's sentiment charts.  Stated differently, Haggerty need not be a "digital and data" expert to opine that public relations professionals do not achieve spontaneous results, as Lively alleges occurred.

The cases cited by Lively demonstrate how far afield an expert's opinion must be for he or she to be deemed unqualified to render it.  In *Conti v. Doe*, No. 17-cv-9268, 2020 WL 6162104 (S.D.N.Y. Oct. 21, 2020), an expert in psychiatric ethics was deemed unqualified to opine on the facts plaintiff needed to include in his complaint to state a defamation claim.  *Id*. at *8.  In *Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005), a forensic pathology expert was held not to be "qualified as an expert on human perception or cognitive function-the subject areas implicated by his misperception hypothesis."  *Id*. at 399 n.13.  These cases do not involve issues "closely related" to the expert's general field of expertise.  Thus, Opinions 5 and 6 should not be precluded.

C.      **Haggerty's Opinions are Reliable**

Lively contends that Haggerty "describes no methodology for any of his opinions…." (Dkt. 1302, p. 15).  However, "[n]ot every expert admissible under Daubert need rely on a method that conforms with the exactness of hard science methodologies." *United States v. Ray*, No. 20-cr-110, 2022 WL 101911, at *2 (S.D.N.Y. Jan. 11, 2022) (Liman, J.) (internal quotation marks and citations omitted). Instead, the inquiry conducted under Rule 702 is "flexible." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020).  Flexibility is particularly necessary when assessing expert testimony in the "social sciences," where "research, theories and opinions cannot have the exactness of hard science methodologies." *United States v. Simmons*, 470 F.3d 1115, 1123 (5th

18

Cir. 2006); *see also O'Loughlin v. USTA Player Dev. Inc.*, No. 14-cv-2194, 2016 WL 5416513, at *3 (S.D.N.Y. Sept. 28, 2016) (court's discretion in analyzing admissibility of expert evidence "is particularly broad where the area of expertise in question is not a so-called hard science").

Lively does *not* contest Haggerty's expertise in the public relations / crisis communications fields.  His opinions are based upon his 30-plus years of experience in the public relations and crisis communications fields (Dkt. 1303-1, p. 3 – 6), as well as literature he relied upon. (*Id.*, p. 9 – 21).  *See Alfa Corp. v. OAO Alfa Bank*, 475 F. Supp. 2d 357, 367 (S.D.N.Y. 2007) (expert's opinions were reliable where the expert "applies what research he did, as well as his experience in the insurance industry, to the facts of the case"); *In re: North Sea Brent Crude Oil Futures Litig.*, No. 13-md-02475, 2016 WL 1271063, at *7 (S.D.N.Y. Mar. 29, 2016) (economic expert's opinions held reliable because of his "reliance on the literature and his background"); *Louis Vuitton Malletier S.A. v. Sunny Merchandise Corp.*, 97 F. Supp. 3d 485, 507 (S.D.N.Y. 2015) ("[T]hat an analysis may be qualitative does not mean that it is unreliable for the purposes of *Daubert*.").  The report details various steps required for effective crisis communications, including initial analysis, scenario planning for potential crises, providing a baseline response, and media monitoring.  (Dkt. 1303-1, p. 12 – 21).  The report also applies the principles of effective crisis communications to the contents of the "Scope of Work" and "Scenario Planning" documents that TAG prepared for Wayfarer, and to the negative sentiment that Lively alleges was caused by Wayfarer's professionals within days (or less) of being retained.  (*Id.*, p. 21 – 31).

Lively's cases on reliability are distinguishable.  In *Jinn v. Sig Sauer, Inc.*, No. 20-cv-1122, 2023 WL 2919558 (S.D.N.Y. Apr. 12, 2023), the expert's identification of design defects in a pistol based solely on his experience were deemed unreliable because "[i]n design defect cases, testing…is usually critical to show that an expert adhered to the same standards of intellectual

19

rigor that are demanded in their professional work." *Id*. at *9.  Haggerty's opinions require no such testing.  In *Abreu Bautista v. Pagan-Rodriguez*, No. 24-cv-631, 2025 WL 1730213 (S.D.N.Y. June 23, 2025), a medical expert could not rely solely on his experience to opine that future medical costs would be $300,000 for surgery and $200,000 for the facility and anesthesia.  *Id*. at *2.  Here, Haggerty does not offer any opinions involving numerical figures that would require backup data.  In *Bocoum v. Daimler Trucks N. Am. LLC*, No. 17-cv-7636, 2022 WL 902465 (S.D.N.Y. Mar. 28, 2022), the expert admitted that his opinion regarding the adequacy of defendants' manuals was not based on any industry standard.  *Id*. at *12.  Here, Haggerty's opinions concerning the retention of a crisis communications consultant, the preparation of the Scope of Work and Scenario Planning documents, *etc.*, are explicitly stated to conform to industry standards.  (Dkt. 1303-1, p. 31 – 32).

**D.**     **<u>There is No Prejudice to Lively</u>**

Expert opinions should be excluded under F.R.E. 403 as prejudicial only where it is "*substantially likely* to mislead the jury or confuse the issues." *Kaiser Aluminum Warrick, LLC v. US Magnesium, LLC*, 766 F. Supp. 3d 462, 474 (S.D.N.Y. 2025) (emphasis added).  Such issues are better addressed through cross-examination and presentation of contrary evidence.  *Id*.; *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liability Litig.*, 643 F. Supp. 2d 482, 497 (S.D.N.Y. 2009) ("Exxon's skilled advocates should have no problem correcting jury confusion through cross-examination and summation."). Lively's speculative contention that Haggerty's opinions might confuse the jury as to the alleged retaliatory conduct does not meet the "substantially likely" standard.  (Dkt. 1302, p. 16).  Furthermore, Lively's attorneys can use cross-examination and contrary evidence to remedy any potential confusion.  If necessary, the Court can also issue jury instructions to avoid any confusion.

20

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Motion.

Dated:  April 24, 2026
      New York, NY

/s/ Kevin Fritz_____
MEISTER SEELIG & SCHUSTER PLLC
Mitchell Schuster
Kevin Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
(212) 655-3500
ms@mss-pllc.com
kaf@mss-pllc.com

LINER FREEDMAN TAITELMAN +
COOLEY, LLP
Bryan J. Freedman (pro hac vice)
Ellyn S. Garofalo (pro hac vice)
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
 (310) 201-0005
bfreedman@lftcllp.com
egarofalo@lftcllp.com

SHAPIRO ARATO BACH LLP
Alexandra A. E. Shapiro
Jonathan Bach
Alice Buttrick
1140 Avenue of the Americas, 17th Floor
New York, NY 10036
(212) 257-4881
ashapiro@shapiroarato.com
jbach@shapiroarato.com
abuttrick@shapiroarato.com

AHOURAIAN LAW
Mitra Ahouraian (pro hac vice)
2029 Century Park East, 4th Floor
Los Angeles, CA 90067
(310) 376-7878
mitra@ahouraianlaw.com

*Counsel for Wayfarer Studios LLC, It Ends
With Us Movie LLC, and The Agency Group
PR LLC*

21