**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| BLAKE LIVELY,<br><br>               Plaintiff,<br><br>v.<br><br>WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, JENNIFER ABEL, JED WALLACE, and STREET RELATIONS INC.,<br><br>               Defendants. |

No. 1:24-cv-10049-LJL

**MEMORANDUM OF LAW IN OPPOSITION TO**
**LIVELY'S MOTION TO EXCLUDE THE TESTIMONY OF**
**DEFENSE EXPERT NICOLE ALEXANDER**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND AND SUMMARY OF OPINIONS ....................................................... 1

ARGUMENT ..................................................................................................................... 9

I.      ALEXANDER OFFERS PROPER REBUTTAL TESTIMONY ..................................... 9

II.     ALEXANDER'S TESTIMONY IS RELEVANT AND HELPFUL ............................... 10

III.    ALEXANDER IS AMPLY QUALIFIED ........................................................... 13

IV.     ALEXANDER'S DATA IS RELIABLE ............................................................. 19

V.      ALEXANDER'S METHODOLOGY AND APPLICATION THEREOF
        ARE RELIABLE ..................................................................................... 24

CONCLUSION.................................................................................................................. 29

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Alan L. Frank L. Assocs., P.C. v. OOO RM Inv.*,
  No. 17-CV-1338 (NGG) (ARL),
  2021 WL 1906468 (E.D.N.Y. May 12, 2021) .............................................................. 19

*Arista Recs. LLC v. Lime Grp. LLC*,
  No. 06-CV-5936-KMW,
  2011 WL 1674796 (S.D.N.Y. May 2, 2011) ................................................................ 15

*Better Holdco, Inc. v. Beeline Loans, Inc.*,
  666 F. Supp. 3d 328 (S.D.N.Y. 2023) ........................................................................ 19

*Capri Sun GmbH v. Am. Beverage Corp.*,
  595 F. Supp. 3d 83 (S.D.N.Y. 2022) ..................................................................... 10, 22

*Capstone Logistics Holdings, Inc. v. Navarrete*,
  No. 17-CV-4819-GBD-BCM,
  2019 WL 12239656 (S.D.N.Y. Mar. 19, 2019) .......................................................... 10

*Emerson Elec. Co. v. Suzhou Cleva Elec. Appliance Co.*,
  No. 4:13-CV-01043 SPM,
  2015 WL 2176964 (E.D. Mo. May 8, 2015) .............................................................. 26

*Emig v. Electrolux Home Prods. Inc.*,
  No. 06-cv-4791 (KMK),
  2008 WL 4200988 (S.D.N.Y. Sept. 11, 2008) ........................................................... 16

*Ferlito v. Harbor Freight Tools USA, Inc.*,
  No. CV 20-5615 (GRB) (SIL),
  2025 WL 1181699 (E.D.N.Y. Apr. 23, 2025) ............................................................ 18

*Gill v. JUS Broad. Corp.*,
  No. 19-cv-4216 (DLI) (PK),
  2024 WL 4107251 (E.D.N.Y. Sept. 6, 2024) ............................................................ 15

*Hart v. BHH, LLC*,
  No. 15-CV-04804,
  2018 WL 3471813 (S.D.N.Y. July 19, 2018) .......................................................... 9, 10

*In re Zimmer M/L Taper Hip Prosthesis or M/L Taper Hip Prosthesis*
  *With Kinectiv Tech. & Versys Femoral Head Prods. Liab. Litig.*,
  No. 18-MC-2859 (PAC),
  2021 WL 1405185 (S.D.N.Y. Apr. 14, 2021) ............................................................ 10

*Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins. Co.*,
  645 F. Supp. 3d 95 (E.D.N.Y. 2022) ...................................................................................... 10

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ................................................................................... 15

*Martin v. Brighthouse Life Ins. Co.*,
  No. 21-CV-02923 (MMG),
  2025 WL 2731710 (S.D.N.Y. Sept. 25, 2025) ................................................................... 9, 10

*McCullock v. H.B. Fuller Co.*,
  61 F.3d 1038 (2d Cir. 1995) ................................................................................................... 16

*Nnebe v. Daus*, No. 06-CV-4991 (RJS),
  2023 WL 6881992 (S.D.N.Y. Oct. 18, 2023) ......................................................................... 23

*Park W. Radiology v. CareCore Nat'l LLC*,
  675 F. Supp. 2d 314 (S.D.N.Y. 2009) ................................................................................... 10

*Phoenix Light SF Ltd. v. Bank of New York Mellon*,
  No. 14-CV-10104 (VEC),
  2019 WL 5957221 (S.D.N.Y. Nov. 13, 2019) ......................................................................... 19

*Price v. L'Oreal USA, Inc.*,
  No. 17-cv-614 (LGS),
  2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020) ......................................................................... 23

*Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*,
  No. 08-CV-0931,
  2014 WL 12788845 (E.D.N.Y. Mar. 31, 2014) ....................................................................... 16

*Rekor Sys., Inc. v. Loughlin*,
  No. 19-CV-7767 (LJL),
  2022 WL 2063857 (S.D.N.Y. June 8, 2022) ..................................................................... 10, 26

*Richman v. Sheahan*,
  415 F. Supp. 2d 929 (N.D. Ill. 2006) ..................................................................................... 26

*Scott v. Chipotle Mexican Grill, Inc.*,
  315 F.R.D. 33 (S.D.N.Y. 2016) ............................................................................................... 10

*Sec. & Exch. Comm'n v. Revelation Cap. Mgmt., Ltd.*,
  215 F. Supp. 3d 267 (S.D.N.Y. 2016) ............................................................................... 13, 18

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*,
  467 F.3d 107 (2d Cir. 2006) ................................................................................................... 16

*Wang v. Omni Hotels Mgmt. Corp.*,
  No. 3:18-CV-2000 (CSH),
  2023 WL 4304875 (D. Conn. June 30, 2023)................................................................. 26

*White Elec. Servs., Inc. v. Franke Food Serv. Sys., Inc.*,
  No. 09-CV-504-CVE-PJC,
  2010 WL 3368541 (N.D. Okla. Aug. 24, 2010) ........................................................... 26

**Rule**

Fed. R. Evid. 702 ....................................................................................................... 16

**Other Authority**

Wright & Miller, 8A Fed. Prac. & Proc. Civ. § 2031.1 (3d ed.) .................................... 26

**INTRODUCTION**

Lively devotes a full 35 pages of *Daubert* briefing to Defendants' rebuttal expert Nicole Alexander, in an attempt to ensure the jury hears only the one-sided presentation of Lively's purported experts on social media manipulation.  Lively's motion takes a shotgun approach, raising virtually every quibble she can find, no matter how strained or trivial.  Her arguments are meritless.  If Lively's experts are permitted to present their opinions, Defendants are entitled to rebut.  Moreover, in many instances, Lively's arguments are equally if not more applicable to her own experts Mayzlin and Culotta and thus serve only to provide further reasons for their exclusion.

**BACKGROUND AND SUMMARY OF OPINIONS**

1.      **Qualifications.**  Alexander is an expert in marketing, digital ecosystems, and data analytics.  *See* Declaration of Alexandra A.E. Shapiro, Ex. 1 (Alexander Rpt.) ¶¶ 1-2, 7.  She holds an executive MBA jointly conferred by NYU Stern School of Business, the London School of Economics, and HEC Paris, as well as a master's degree from the University of Cambridge relating to large-language models and artificial intelligence.  *See id.* ¶ 2; *id.* at 92.  Alexander currently serves on the faculty of Columbia University and has taught courses at NYU in the field of marketing and technology.  *See id.* ¶ 1; *id.* at 92; Ex. 2 (Alexander Dep.) at 68-71.

"Over the course of [her] career," Alexander "ha[s] conducted or supervised more than 200 digital reputation analyses for entertainment, technology, consumer goods, and financial services clients, applying advanced analytics to distinguish organic discourse from manufactured narratives, and to quantify the commercial impact of reputation shifts in digital environments."  Ex. 1 (Alexander Rpt.) ¶ 7; *see also id.* ¶ 104.  Alexander performed analyses of this sort as Global Head of Marketing at Meta for Business & Product Marketing and in executive roles at

Ipsos and Nielsen. *Id.* ¶ 3; *id.* at 92. She has extensive experience investigating potential indicators of inauthentic activity, and her work has included rigorous quantitative and statistical analyses. *See, e.g.*, Ex. 2 (Alexander Dep.) at 84-88, 104-08, 124-25, 213-14, 345-46, 387.

2.    **Assignment and Scope of Work.** Defendants retained Alexander to rebut the testimony of Lively's proffered experts Dina Mayzlin, Aron Culotta, and Ashlee Humphreys concerning alleged manipulation of social media and alleged harm to Lively's reputation and consumer brands. *See, e.g.*, Ex. 1 (Alexander Rpt.) ¶¶ 14, 193. To that end, Alexander collected a data set of 43,992 social media posts from Twitter/X, YouTube, Instagram, Reddit, and TikTok, all related to Lively and from the period January 2024 through October 2025. *See id.* ¶¶ 21-22. She then "employed a comprehensive multi-platform analytical framework" based on her professional experience and relevant research, designed to evaluate "whether observed patterns of social media engagement exhibited the structural, temporal, and content-based characteristics typically associated with manufactured campaigns, or whether they instead aligned with well-documented patterns of organic public interest in celebrity news and entertainment media events." *Id.* ¶¶ 15-16.

3.    **Meta-Analysis (Cross-Platform Analysis).** Alexander performed a "meta-analysis" designed to assess the patterns of social media activity across platforms. *Id.* ¶ 31. "This cross-platform temporal framework is critical because manipulation campaigns and organic events produce distinctly different timing signatures when viewed collectively. Coordinated manipulation campaigns typically exhibit inconsistent cross-platform temporal patterns, with staggered timing, uneven platform targeting, and irregular distribution, due to the technical complexities of executing campaigns across multiple platforms with different bot detection systems and content requirements." *Id.* Alexander observed a spike in activity in

2

August 2024, coinciding with the film's release date, and looked at "multiple diagnostic indicators" to investigate whether the activity was manipulated or reflected organic user activity. *Id.* ¶¶ 34-35.

For instance, "[a]ll five platforms exhibited virtually simultaneous activity surges" in early August 2024, "coinciding precisely with the film's theatrical release and premiere events." *Id.* ¶ 36. "[T]ight temporal synchronization" of this sort "is diagnostic of a common external trigger (the film release) driving attention across all platforms simultaneously, rather than sequential campaign rollouts typical of manufactured operations." *Id.* In addition, "September 2024 activity declined to 837 items across all platforms, representing [a dramatic] reduction from the August peak and returning to near-baseline levels. This rapid attenuation is characteristic of short-term news-driven events and contradicts theories of sustained manipulation campaigns, which typically maintain elevated activity through continued resource investment and messaging discipline." *Id.* ¶ 38. Finally, "[t]he temporal decay pattern following the August spike exhibited smooth, exponential decline characteristic of organic attention cycles documented in academic literature on entertainment publicity events," and "[b]y October 2024, all platforms had returned to baseline activity levels, and no platform exhibited anomalous sustained elevation that would suggest ongoing manipulation." *Id.* ¶ 39. Accordingly, in Alexander's opinion, "the data overwhelmingly indicates that the integrated cross-platform pattern observed here is entirely inconsistent with coordinated manipulation" and instead exhibits "textbook characteristics of organic viral spread driven by a major external stimulus—in this case, the theatrical release of a highly anticipated film featuring a high-profile celebrity." *Id.* ¶ 40; *see also, e.g.*, *id.* ¶ 90.

**4.    Temporal Analysis.** Alexander also observed that, while the August 2024 spike in social media activity was significant, there was "a comparable spike in December 2024 (when

3

the lawsuit was filed) and again in October 2025 (during renewed legal news coverage).  These jumps occurred in direct alignment with real-world events driving public attention.  Notably, the lawsuit-related spike exceeded the August film-release-driven spike, reinforcing that the increases [we]re organic and event-responsive.  If August 2024 had been the result of a coordinated manipulation campaign, there would be no clear explanation for why authentic legal developments later generated even higher activity."  *Id.* ¶ 47; *see also id.* ¶¶ 108-10.  Alexander proceeded to analyze different "signatures" of "manipulation or of organic publicity-driven virality," described below, which "overwhelmingly align[ed]" with organic activity.  *Id.* ¶ 50.

  **5.**  **Sentiment Analysis.**  Alexander used a BERT-family transformer-based language model to classify the social media posts in her data set by sentiment toward Lively: positive, negative, or neutral.  *Id.* ¶¶ 54-56.  This classification "directly contradict[ed] the theory that August 2024 activity reflected a coordinated negative campaign.  In total across all platforms during August 2024, approximately 63% Positive, 20% Neutral, and 17% Negative sentiment.  This distribution is consistent with normal engagement patterns for celebrity-related content during publicity cycles."  *Id.* ¶ 57; *see also id.* ¶ 58.  In addition, Alexander performed a time-series forecasting analysis, using regressions, to determine that the August 2024 spike would not have "a lasting impact on long-term sentiment trajectory" and that sentiment would instead revert to levels expected if the spike had never occurred.  *Id.* ¶¶ 62-74, 111-39.  Alexander concluded that this evidence "strongly indicates that the August 2024 spike reflected genuine public interest (amplified by legitimate publicity surrounding a major film release) rather than manufactured negativity orchestrated by the defendants," and that "sentiment toward Blake Lively returned to its pre-campaign baseline and has remained stable since," which "contradicts claims of sustained reputational harm."  *Id.* ¶¶ 61, 111-12; *see also id.* ¶ 193.

6.      **Content Analysis.**  Alexander found that the "diversity in discussion topics" and the "[n]atural language variance metrics (including vocabulary diversity, syntactic complexity, and stylistic variation) all fell within expected ranges for organic user-generated content."  *Id.* ¶¶ 59-60; *see also id.* ¶¶ 150-52.  She also analyzed the four alleged "seeded narratives" identified by Mayzlin and determined that the very low prevalence of these narratives in the social media data "contradicts [Mayzlin's] manipulation theory."  *Id.* at 65.  Consequently, "the content patterns observed" by Alexander "align[ed] with organic engagement, not coordination." *Id.* ¶ 154.

7.      **Engagement Network Diagnostics.**  Whereas organic "viral content diffuses through social networks following predictable patterns shaped by natural information-sharing behavior," coordinated campaigns "exhibit distinctive structural signatures: centralized amplification from small numbers of high-influence nodes, artificial temporal synchronization, abnormally rapid propagation speeds, and network clustering patterns consistent with bot networks or paid influencer seeding."  *Id.* ¶ 81.  As a result, Alexander "conducted comprehensive network structure analysis on three platforms that provide sufficient API access for network mapping" and "calculated multiple network diagnostic metrics including network density (the proportion of possible connections that actually exist), degree centrality (the extent to which specific nodes dominate information flow), clustering coefficients (the degree to which users form tightly interconnected subgroups characteristic of coordinated activity), and betweenness centrality (identifying key bridge nodes that connect otherwise separate network communities)."  *Id.* ¶ 82.  "The results consistently indicated decentralized, diffuse engagement patterns entirely consistent with organic word-of-mouth (WOM) spread rather than orchestrated amplification."  *Id.* ¶ 83.

5

For instance, "the top ten accounts [on X] ranked by retweet frequency collectively represented less than 5% of total mentions," which is inconsistent with the coordinated use of "amplifier accounts"; the "network density metric (0.0023) indicated a sparse, naturally dispersed network structure" that is "characteristic of organic viral spread across large, loosely connected audiences rather than the dense, tightly clustered networks typical of coordinated bot activity or astroturfing campaigns"; and the "clustering coefficient analysis revealed values (0.089) consistent with random organic networks rather than the high clustering (>0.4) characteristic of coordinated groups operating in concert." *Id.* ¶¶ 83-84. Furthermore, various "[a]ccount-level diagnostics" such as "[a]ccount creation dates," "[f]ollower-to-following ratios, posting frequencies, and engagement histories all fell within normal ranges for authentic users, with no evidence of bot-like behavior patterns." *Id.* ¶ 86. There were also "no anomalous geographical clusters that might suggest coordinated seeding from troll farm locations or click farm operations." *Id.* ¶ 153. The absence of these "coordination signatures" provided "strong empirical evidence against the manipulation hypothesis." *Id.* ¶ 87; *see also id.* ¶¶ 140-44.

**8.    Comparative Benchmarking.** Alexander also "conducted comparative benchmarking of the observed patterns against documented characteristics of known coordination campaigns in academic literature and industry case studies." *Id.* ¶ 96. She identified a number of "diagnostic signatures" of manipulation campaigns from the literature and her professional experience, many of which are described above, including "[c]entralized amplification hubs," "[t]emporal synchronization," "[s]entiment homogeneity," "[l]inguistic templates," and "[n]ew account clustering." *Id.* ¶ 97. Alexander determined that these "diagnostic signatures" were absent from the data and that instead, "the observed patterns

aligned consistently with documented characteristics of organic viral events driven by entertainment publicity." *Id.* ¶ 98.

9.      **Alleged Commercial Harm.**  Based on social media sentiment toward Lively and her companies, the companies' internal business records, the "significant commercial success" of a major film starring Lively, as well as other factors, Alexander opined that the evidence was inconsistent with Lively's theory that she suffered reputational damage or commercial harm from the alleged manipulation campaign.  *See id.* ¶¶ 155-57, 168,

10.      **Methodological Shortfalls in Mayzlin's Use of AI.**  Alexander further opines that Mayzlin's "conclusions are not sound" because they are based on her flawed application of the GPT-4o large language model (LLM), an artificial intelligence (AI) tool, for the purpose of classifying social media posts.  *Id.* ¶ 170.  "Mayzlin's implementation" of the AI model "exhibits numerous methodological shortcomings that fundamentally undermine the reliability and validity of her conclusions." *Id.*  These shortcomings include Mayzlin's failure to disclose important parameters used for the AI model, failure to disclose the development of prompts used to instruct the AI model, reliance on a single model without testing alternatives, failure to validate the AI model's results with a sufficiently sized sample, low agreement rates between the AI model's results and the human reviewers, unreliable emotion-to-sentiment mapping methodology, and failure to account for various technical constraints.  *See id.* ¶¶ 172-92.  These are "foundational flaws that undermine the reliability and validity of Dr. Mayzlin's conclusions." *Id.* ¶ 193.

Alexander further observes that there is "a scaling inconsistency in the Plaintiff's theory—the limited number of supposed 'markers' Dr. Culotta identifies" in his expert report "is irreconcilable with the sweeping, 1.1-million-post sentiment shift that Dr. Mayzlin asserts" based on the results of her AI model." *Id.*  Thus, "[t]he totality of the data is more coherently explained

by normal, high-volume, news-driven engagement surrounding a major film release, not by coordinated manipulation." *Id.*

Lively does not challenge the admissibility of this testimony in her *Daubert* motion.

**11.      Rebuttal to Humphreys's Opinions.**  Alexander also addresses Humphreys's argument that the alleged damage to Lively's reputation warrants a paid remedial communication campaign.  *Id.* ¶ 159.  Alexander opines the performance of Lively's consumer brands and Lively's ownership of an Instagram account with a massive number of followers counsels against resorting to paid media.  *Id.* ¶¶ 159-61, 163, 165-66, 168.  In addition, Humphreys's model of social media "impressions" inflates the alleged damage to Lively's reputation because it "aggregates exposures across multiple platforms without deduplicating individuals," thereby "overstat[ing] the scale of the exposed audience and therefore the magnitude of any potential reputational response."  *Id.* ¶ 163; *see also id.* ¶¶ 164, 167.  Lively does not challenge the admissibility of this testimony in her *Daubert* motion.

**12.      Enumerated Opinions.**  In another section of her report, Alexander lists her opinions related to social media manipulation and commercial harm for ease of reference.  *See id.* ¶ 169.  These opinions can be summarized as follows:  <u>Opinion 1:</u> The observed social media activity was consistent with organic public discourse rather than coordinated manipulation.  <u>Opinion 2:</u> The August 2024 spike coincided with the film release and followed patterns characteristic of major entertainment publicity cycles rather than of manipulation.  <u>Opinion 3:</u> Sentiment analysis shows that social media conversations about Lively were predominantly positive, which is inconsistent with coordinated negative campaign, and the time-series forecasting analysis shows no lasting impact on sentiment trajectory.  <u>Opinion 4:</u> Network structure analysis was consistent with organic spread rather than coordinated activity.  <u>Opinion 5:</u>

Cross-platform meta-analysis shows public interest in an external stimulus rather than manufactured activity.  Opinion 6: The signatures of coordinated manipulation campaigns were systematically absent from the dataset.  Opinion 7: Content analysis was inconsistent with coordinated campaigns.  Opinion 8: There was no measurable commercial harm to Lively's brand partnerships or business ventures.  Opinion 9: The methodologies Alexander applied meet *Daubert*'s standards for reliability.  Opinion 10: The December 2024 spike further confirms that social media activity was related to major news events regardless of any alleged manipulation campaign.  Opinion 11: Lively's business records show positive performance, which is inconsistent with substantial consumer response to the alleged negative narratives.  *See id.*

## ARGUMENT

## I.    ALEXANDER OFFERS PROPER REBUTTAL TESTIMONY

There is no merit to Lively's argument that Alexander offers affirmative opinions in the guise of rebuttal.  *See* Mot. at 9-10.  The sole basis for Lively's argument is that Alexander used a "different 'methodology'" and "different Data Set" from Mayzlin to conclude that social media activity during the relevant period was organic rather than manipulated.  *Id.* at 9.[1]  However, Alexander "was not required to use the same methodology" as Mayzlin—to the contrary, "[i]t is well established that an expert may rely on new methodologies for the purpose of rebutting or critiquing the opinions of the opposing party's expert witness."  *Martin v. Brighthouse Life Ins. Co.*, No. 21-CV-02923 (MMG), 2025 WL 2731710, at *8 (S.D.N.Y. Sept. 25, 2025)[2] (quoting *Hart v. BHH, LLC*, No. 15-CV-04804, 2018 WL 3471813, at *9 (S.D.N.Y. July 19, 2018), and

---

[1] Lively concedes that Alexander's testimony concerning the alleged harm to Lively's brands is proper rebuttal.  *See* Mot. at 10 n.12.  Lively says nothing about Alexander's opinions attacking Mayzlin's and Humphreys's methodologies, which cannot be anything other than rebuttal.

[2] Unless otherwise noted, all legal quotations are cleaned up.

*Park W. Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 326 (S.D.N.Y. 2009)); *accord, e.g.*, *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 140-41 (S.D.N.Y. 2022); *In re Zimmer M/L Taper Hip Prosthesis or M/L Taper Hip Prosthesis With Kinectiv Tech. & Versys Femoral Head Prods. Liab. Litig.*, No. 18-MC-2859 (PAC), 2021 WL 1405185, at *2 (S.D.N.Y. Apr. 14, 2021); *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819-GBD-BCM, 2019 WL 12239656, at *4 (S.D.N.Y. Mar. 19, 2019).

"Rebuttal evidence is properly admissible when it will explain, repel, counteract or disprove the evidence of the adverse party," *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016), and that is precisely the function of Alexander's testimony. Alexander's testimony concerns the "same subject matter" as Mayzlin's and Culotta's—namely, the question of whether social media commentary concerning Lively was organic or manipulated—and reaches a different conclusion. Nothing more is required. *See id.*; *Martin*, 2025 WL 2731710, at *8; *Capstone Logistics*, 2019 WL 12239656, at *5; *Hart*, 2018 WL 3471813, at *9. The cases that Lively cites are inapposite because they concerned purported rebuttal reports that "stray[ed] far afield from [any] response to the opinions expressed" in the adversary's initial reports and were not even "inconsistent with" those opinions. *Rekor Sys., Inc. v. Loughlin*, No. 19-CV-7767 (LJL), 2022 WL 2063857, at *7, *9 (S.D.N.Y. June 8, 2022); *see also Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins. Co.*, 645 F. Supp. 3d 95, 106 (E.D.N.Y. 2022) (report "plainly contain[ed] assertions beyond those intended solely to contradict or rebut" adversary's experts).

## II.    ALEXANDER'S TESTIMONY IS RELEVANT AND HELPFUL

Lively grossly mischaracterizes Alexander's testimony in order to portray it as irrelevant and unhelpful. *See, e.g.*, Mot. at 16-18. *First*, Lively repeatedly claims that Alexander admitted at her deposition that her data set was not "representative." *Id.* at 16; *see also, e.g.*, *id.* at 2, 5, 10 n.11, 20, 22 n.22. In fact, Alexander testified that *no expert*—including Mayzlin—could ensure

10

that their social media data sets were representative, given the practical limitations on access to such data. *See* Ex. 2 (Alexander Dep.) at 175:25-176:6 ("[N]either my dataset nor Dr. Mayzlin's set is representative of the overall universe that encompasses Blake Lively during the given periods of time that we looked at because it's physically impossible, based on the data that is available to either of us."); *id.* at 176:17-23 ("[N]o one's dataset is representative unless you're … a social media platform looking at their own data. So anybody with access to second-party or third-party data, which would be any of the experts involved in this trial, would not have access to representative data based on the entire universe."); *id.* at 178:21-180:13 (same).[3] If Alexander is right, then Lively's experts should not be permitted to testify either. Lively cannot weaponize Alexander's scientific realism and humility for the purpose of excluding Alexander alone.

*Second*, Lively claims that Alexander's analysis is untethered to the "facts of the case" because she supposedly "did not consider" emails and other documents produced in discovery concerning Defendants' alleged social media campaign. Mot. at 17, 34. In fact, Alexander was aware of those documents, since she reviewed Lively's complaint, expert reports, and discovery responses that discussed them at length. *See* Ex. 1 (Alexander Rpt.) ¶ 11 & App'x C; Ex. 2 (Alexander Dep.) at 346:13-348:2; *see also* Dkt. No. 1321 at 40 & n.13, 56-57. Alexander acknowledges that Lively and her experts rely on these documents to make claims about Defendants' conduct, but the purpose of Alexander's analysis is to "test[] these claims using independent data sources, platform-level inspection, and industry-standard analytics." Ex. 1 (Alexander Rpt.) ¶ 11; *accord* Ex. 2 (Alexander Dep.) at 348:3-11 ("[T]he goal … was to look at [the issue] without assumptions … [and] look at the dataset from a clean perspective."). This is

---

[3] Alexander's assessment is consistent with the literature cited by Lively's expert Aron Culotta, which indicates that the available social media data is inadequate for the purpose of detecting inauthentic activity. *See* Dkt. No. 1321 at 44, 47-48.

entirely proper and ensures that Alexander's opinions are based on her areas of expertise. It is not the province of an expert to review and opine on the contents of emails produced in discovery, as Lively's experts purport to do. *See* Dkt. No. 1321 at 40 & n.13, 56-57. An "analysis" of that sort is unhelpful to the jury and usurps its role, serves merely as a vehicle for attorney argument, and adds nothing to the experts' technical analyses.

*Third*, Lively claims that Alexander fails to answer the "ultimate question" because she does not address whether Defendants manipulated social media in August 2024. Mot. at 16-18. That is false. Throughout her report, Alexander opines that Defendants *did not* manipulate social media.[4] In suggesting otherwise, Lively engages in sleight of hand. Lively quotes portions of Alexander's report and deposition in which Alexander explains that the film's release coincided with the August 2024 spike on social media, which suggests it may have caused the spike, but Alexander cannot "definitively establish" that the film's release was the cause. Mot. at 17. In other words, Alexander could not rule out all other possibilities. But Alexander *did rule out* the possibility that matters—namely, the theory that Defendants manufactured a social media campaign against Lively. Alexander's testimony is therefore directly relevant to Lively's claims.

---

[4] *See, e.g.*, Ex. 1 (Alexander Rpt.) ¶ 40 ("In my opinion, the data overwhelmingly indicates that the [evidence] observed here is entirely inconsistent with coordinated manipulation."); *id.* ¶ 50 ("The subsequent analyses … are designed to determine whether [social media activity in August 2024] bore the fingerprints of manipulation or of organic publicity-driven virality. As detailed in those sections, the pattern signatures overwhelmingly align with the latter interpretation…."); *id.* ¶ 99 ("[T]he August 2024 activity exhibited none of the hallmarks of coordinated manipulation…."); *id.* ¶ 107 ("I find no signatures of coordinated manipulation of public discourse surrounding Ms. Lively during the relevant time period. Instead, the data consistently demonstrate patterns characteristic of organic public engagement driven by legitimate news cycles, film promotion, and entertainment media coverage."); *id.* ¶ 144 ("[T]he data overwhelmingly indicates the network patterns observed here are inconsistent with coordination.").

Lively also misconstrues Alexander's analysis when she argues that Alexander merely "compar[ed] the timing" of the film's release to the spike in social media activity.  Mot. at 17.  Alexander did much more than that, performing many other analyses, in order to reach her conclusion that Defendants did not manipulate social media.  *See, e.g.*, *supra* at 2-7.  It is Mayzlin and Culotta whose analysis boils down to an inference from timing, not Alexander.  *See* Dkt. No. 1321 at 22-23, 38, 54-57 & n.21.  Lively's argument is therefore an argument for excluding her own experts.  *See* Mot. at 17-18.

## III.    ALEXANDER IS AMPLY QUALIFIED

Lively faces an uphill battle in arguing that Alexander lacks sufficient qualifications to testify as an expert.  "Courts within the Second Circuit have liberally construed expert qualification requirements when determining if a witness can be considered an expert" and have emphasized that "an expert should not be required to satisfy an overly narrow test of h[er] own qualifications."  *Sec. & Exch. Comm'n v. Revelation Cap. Mgmt., Ltd.*, 215 F. Supp. 3d 267, 273 (S.D.N.Y. 2016) (collecting cases).

1.    **Social Media Opinions.**  There is no serious question that Alexander is qualified to opine that social media evidence shows organic user activity rather than coordinated manipulation.  Alexander's expertise derives from both her extensive work experience and her formal education.  As Alexander explained in her report: "Over the course of my career, I have conducted or supervised more than 200 digital reputation analyses for entertainment, technology, consumer goods, and financial services clients, applying advanced analytics to distinguish organic discourse from manufactured narratives, and to quantify the commercial impact of reputation shifts in digital environments."  Ex. 1 (Alexander Rpt.) ¶ 7; *see also id.* ¶ 104.  This included Alexander's two and a half years as Meta's Global Head of Marketing for Business & Product Marketing.  *Id.* at 92.  In that role, "most of [her] job was around data analysis," and she

oversaw the "data analytics" team, which did "forensic work" to investigate whether the user "traffic" on Meta's social media platforms was "non-organic." Ex. 2 (Alexander Dep.) at 84-88; *see also id.* at 387. This was relevant to her role because Meta "clients" like advertisers would ordinarily "pay for said traffic" and therefore had an interest in ensuring it was legitimate. *Id.* at 88. At Meta and previous employers like Ipsos, Alexander looked at various potential indicators of inauthentic activity, including "coordination across different regions" outside of "normal posting times," and the "coordinated" use of "newly created" accounts posting "problematic content." *Id.* at 104. At her deposition, Alexander described cases she worked on, including a case involving "political" content posted by "foreign actors." *See id.* at 105-08.

Lively claims that Alexander's experience relates exclusively to the detection of automated "bots" rather than other forms of manipulation (*see* Mot. at 15), but that is not the case. Alexander testified that her work at Meta was not limited to "bots" but also included "coordinated users attempting to spike traffic or to … manipulate the traffic somehow," which Meta would "classify" as "maleficent" activity. Ex. 2 (Alexander Dep.) at 89. She would look for "activity that is not based on the usual way that users interact with content across Meta's platforms," based on various factors like "temporal oddities" and "amplification ratios." *Id.* at 91-92. After all, Meta does not permit users to "artificially boost" content whether through "bots" or "coordinated activities" performed "manual[ly]" by a "network of humans." *Id.* at 94-97. Alexander noted that coordinated human activity could be detected through "temporal analysis," "homogeneous content," "coordination clusters," and other markers. *Id.* at 99-103. Lively's criticism is therefore unfounded. Indeed, Alexander has vastly more experience investigating inauthentic activity on social media than Mayzlin or Culotta, each of whom has

14

none whatsoever.  The most that can be said for Mayzlin is that she wrote a single paper about fake *hotel reviews* that bears no resemblance to her expert report.  *See* Dkt. No. 1321 at 29-30.

Lively also makes implausible attacks on Alexander's expertise in the quantitative methods she employs, such as statistical analyses.  *See* Mot. at 12.  Alexander holds an executive MBA jointly conferred by three prestigious business schools (NYU, LSE, and HEC), where she studied "data analytics" as part of the marketing curriculum.  Ex. 2 (Alexander Dep.) at 80-81. As explained above, much of Alexander's work has centered around data analytics, including at Meta.  At various other employers, Alexander performed or checked "regression" analyses "on a weekly basis" and regularly employed other statistical methods, *id.* at 213-14, 345-46, and she has presented a peer-reviewed paper that used "regression analysis" across a "global dataset," *id.* at 124-25.  By contrast, in the cases Lively cites, the experts had virtually no relevant expertise. *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) (expert "admitted" he understood regressions only "in simplistic terms," based on a course taken "30 years earlier," and that he "did not conduct" the regression analysis on which his opinions relied); *Arista Recs. LLC v. Lime Grp. LLC*, No. 06-CV-5936-KMW, 2011 WL 1674796, at *5-6 (S.D.N.Y. May 2, 2011) (expert had "never taken a class" focused on statistics, could not "answer basic questions about statistical principles," and had "never performed statistical analyses" of subjects relevant to the case).

Equally misplaced are Lively's arguments that Alexander has not published in academic journals and is supposedly unfamiliar with the academic literature.  *See* Mot. at 12-14.  "There is no requirement that a witness ... have published scholarly articles on the subject matter at issue to be qualified under Rule 702."  *Gill v. JUS Broad. Corp.*, No. 19-cv-4216 (DLI) (PK), 2024 WL 4107251, at *4 (E.D.N.Y. Sept. 6, 2024).  "[A]n expert may be qualified based on h[er]

experience," irrespective of her academic credentials. *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 132 (2d Cir. 2006)) (citing Fed. R. Evid. 702); *accord Emig v. Electrolux Home Prods. Inc.*, No. 06-cv-4791 (KMK), 2008 WL 4200988, at *5 (S.D.N.Y. Sept. 11, 2008) ("[I]t is not uncommon for a person to qualify as an expert based on his or her experience alone."). Indeed, Alexander confirmed that "in [her] professional life" she had "applied the concepts" discussed in her report and the academic literature, such as "temporal synchronization" and "[p]articipant dispersion." Ex. 2 (Alexander Dep.) at 147. But Lively also gives short shrift to Alexander's academic background. Alexander obtained a master's degree from Cambridge, where the use of technology for "manipulation across social media … was specifically one of [her] areas of study." *Id.* at 78; *see also id.* at 74-76. She serves on Columbia's faculty and has taught courses at NYU in the field of marketing and technology. *See* Ex. 1 (Alexander Rpt.) ¶ 1; *id.* at 92; Ex. 2 (Alexander Dep.) at 68-71. She reads journals pertinent to her field. *See* Ex. 2 (Alexander Dep.) at 121-22; Mot. at 13 n.14. Any "[d]isputes as to the strength of h[er] credentials … go to the weight, not the admissibility, of h[er] testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995); *accord Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, No. 08-CV-0931, 2014 WL 12788845, at *3 (E.D.N.Y. Mar. 31, 2014) ("[T]he qualifications necessary to testify as an expert are minimal.").

     **2.**      **Purported Use of AI.** Lively also tries to cast doubt on Alexander's expertise by claiming that "AI-detection software" predicted that some of Alexander's report was "AI-generated." Mot. at 14; *see also id.* at 25. But Alexander unequivocally testified under oath that she "drafted every word of the report" and "did not use generative AI in any way." Ex. 2 (Alexander Dep.) at 44-47; *accord id.* at 146, 154-55. Although Lively claims that citations in Alexander's report "appear[] hallucinated," they are citations to *real articles* where portions of

16

the citations are incorrect—not citations to made-up sources. *See* Mot. at 14 & n.19. Moreover, Alexander testified that purported "AI checkers" are fundamentally unreliable and often rejected in academic settings. Ex. 2 (Alexander Dep.) at 51-52, 54-57, 149-50. Lively provides no basis to dispute Alexander's testimony, particularly since she concedes that Alexander has deep expertise concerning AI models. *See, e.g.*, *id.* at 74-76, 78; Ex. 1 (Alexander Rpt.) at 92.[5]

The Court need not even take Alexander at her word, since multiple independent sources corroborate her testimony. According to the University of San Diego Legal Research Center, "multiple studies have shown that AI detectors were 'neither accurate nor reliable.'"[6] Another article notes that "[i]f you feed America's most important legal document—the US Constitution—into a tool designed to detect text written by AI models like ChatGPT, it will tell you that the document was almost certainly written by AI."[7] Dozens of institutions of higher education have banned or discouraged the use of AI detection software, including but not limited to MIT, NYU, and Yale.[8] Just last week, the *Washington Post* published an opinion piece entitled "Why honest students fear AI detectors: Chatbot detectors are unreliable and their use

---

[5] Alexander devotes an entire section of her report to discussing methodological shortfalls in Mayzlin's use of AI, and Lively does not even attempt to challenge her qualifications or her methodology. *See* Ex. 1 (Alexander Rpt.) § V.

[6] University of San Diego Legal Research Center, "Generative AI Detection Tools: The Problems with AI Detectors: False Positives and False Negatives" (last updated Dec. 4, 2025), https://lawlibguides.sandiego.edu/c.php?g=1443311&p=10721367 (collecting articles).

[7] Benj Edwards, "Why AI writing detectors don't work," Ars Technica (July 14, 2023), https://arstechnica.com/information-technology/2023/07/why-ai-detectors-think-the-us-constitution-was-written-by-ai/.

[8] Parents for Leveraging Ethical AI Standards in Education, "Schools that Banned AI Detectors" (last updated Sept. 20, 2024), https://www.pleasedu.org/resources/schools-that-banned-ai-detectors.

17

threatens honest students."[9]  Lively's reliance on such unreliable detection methods is unsurprising, but it is not a basis to exclude Alexander's testimony.

**3.     Harm Opinions.**  Lively is also wrong to argue that Alexander "lacks the qualifications necessary to opine on a lack of 'commercial harm'" to Lively's brands.  Mot. at 11-12.  Alexander may not have a degree related to the "alcohol" or "haircare" industries (*id.*), but neither does Mayzlin, who has a generic background in economics and marketing.  *See* Ex. 3 (Mayzlin Rpt.) at App'x A.  Alexander similarly has an academic background in marketing (including an MBA), as well as extensive professional experience in that field (including as Global Head of Marketing at Meta).  *See, e.g.*, Ex. 1 (Alexander Rpt.) at App'x A; Ex. 2 (Alexander Dep.) at 68-72, 81, 84.  Requiring Alexander to have knowledge of the specific "business sectors" at issue (Mot. at 12) is too high a bar and an "overly narrow test" of qualifications.  *Revelation Cap. Mgmt.*, 215 F. Supp. 3d at 273; *see also Ferlito v. Harbor Freight Tools USA, Inc.*, No. CV 20-5615 (GRB) (SIL), 2025 WL 1181699, at *2 (E.D.N.Y. Apr. 23, 2025) (in "a products liability action, an expert witness is not strictly confined to his area of practice, but may testify concerning related applications," and his "lack of knowledge or experience with the product at issue" goes to "weight" rather than admissibility).  Indeed, Mayzlin's opinion on the purported harm to Lively's brands is not based on any specialized knowledge—just a summary of the companies' marketing documents.  *See* Dkt. No. 1321 at 37-39.  Rebutting such testimony does not require any deep industry expertise.

The Court should therefore reject Lively's challenges to Alexander's qualifications.[10]

---

[9] https://www.washingtonpost.com/opinions/2026/04/13/ai-detectors-students/ (Apr. 13, 2026).

[10] Lively faults Alexander for opining that her methods meet *Daubert*'s standards for scientific reliability, even though she is not a lawyer.  *See* Mot. at 11.  Defendants agree that Alexander will not present that opinion to the jury.  Alexander simply intended to confirm her

## IV.     ALEXANDER'S DATA IS RELIABLE

1.     **Alexander's Meta-Analysis Is Sound.**  Lively identifies a discrepancy between the number of social media posts used in Alexander's "meta-analysis" and the number of posts in Alexander's overall data set.  *See* Mot. at 19.  Lively did not raise this discrepancy at Alexander's deposition or at any point until now.  Alexander has investigated the issue and found that the data file used for the meta-analysis was incorrect.  *See* Declaration of Nicole Alexander ("Alexander Decl.") ¶ 2.[11]  Alexander corrected the data file to ensure it matched her data set, re-ran her meta-analysis using the corrected data file, and determined that the ultimate outcome was unaffected (*i.e.*, the meta-analysis continues to support her opinions).  *Id.* ¶¶ 2, 4.

As before, Alexander saw that the August 2024 spike in social media activity occurred in close proximity across all five platforms; activity declined dramatically across every platform in September 2024, with reductions ranging between 75% and 92%; the temporal decay pattern exhibited a smooth, exponential decline characteristic of organic attention cycles; the hourly and day-of-week activity patterns were consistent with organic human behavior and inconsistent with bot activity; and there were massive spikes in December 2024 and October 2025, corresponding with the lawsuit filings and ongoing media coverage of the litigation.  *Id.* ¶¶ 5-8.  While the data reflects other minor changes (*e.g.*, it no longer reflects a strong consistency in the proportion of

---

understanding of the requirements that apply to expert reports.  *See* Ex. 2 (Alexander Dep.) at 162-64.

[11] "When a *Daubert* motion invokes concerns about the reliability and application of the expert's methodology, declarations that are responsive to such concerns are generally seen as supplying a permissible form of support."  *Alan L. Frank L. Assocs., P.C. v. OOO RM Inv.*, No. 17-CV-1338 (NGG) (ARL), 2021 WL 1906468, at *3 (E.D.N.Y. May 12, 2021); *accord, e.g., Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 358 n.9 (S.D.N.Y. 2023); *Phoenix Light SF Ltd. v. Bank of New York Mellon*, No. 14-CV-10104 (VEC), 2019 WL 5957221, at *2-5 (S.D.N.Y. Nov. 13, 2019).

posting activity across social media platforms throughout the relevant time period), these changes are not material and do not alter Alexander's opinions, as explained further in Alexander's declaration. *Id.* ¶¶ 9-11. Accordingly, any error in the meta-analysis has been corrected, and it is at most a subject for cross-examination, rather than a reason to limit Alexander's testimony.[12]

2. **Alexander's Sentiment Analysis Is Sound.** Lively argues that a similar error affected Alexander's sentiment analysis, but Lively is incorrect. *See* Mot. at 19-20; *see also id.* at 31. It is true that one of Alexander's bar charts related to sentiment analysis displays numbers of social media posts for January through May 2024 that are inconsistent with the figures in Alexander's data set.[13] This is, however, merely an error in the bar chart—not an error in the underlying analysis. Alexander confirmed that the sentiment analysis made use of the correct data set and therefore remains unchanged. *See* Alexander Decl. ¶ 13.

3. **Alexander's Data Gathering Is Reliable.** There is no merit to Lively's claim that Alexander gathered her social media data in an unreliable manner. *See* Mot. at 20-22, 25. As explained in her report:

- Alexander "designed a data collection protocol … consistent with both academic research standards and industry best practices in digital analytics." Ex. 1 (Alexander Rpt.) ¶ 20.

- "Data was collected through publicly available application programming interfaces (APIs) or authorized data-scraping tools between January 2024 and October 2025, spanning the full temporal window relevant to the allegations in this matter." *Id.* ¶ 22.

---

[12] Lively insinuates that the earlier data was somehow fabricated because the README file generated by Alexander's assistant refers to "synthetic monthly data." Mot. at 19. That is not the case, since the same page of the README file refers to using the actual data set of "43,992 items across all platforms." Declaration of Kristin Bender ("Bender Decl.") Ex. 10 at 6.

[13] This chart is the top left box in Figure B-7. *See* Ex. 1 (Alexander Report) at 102. Lively attributes the error to Figure B-3, but she must be mistaken, since Figure B-3 shows percentages rather than absolute numbers of social media posts. *See id.* at 47.

- "To ensure direct comparability with analyses conducted by the Plaintiff's experts and to eliminate any suggestion of selective data collection, search parameters were deliberately mirrored to match those described in the Plaintiff's expert reports.  Queries included variations of 'Blake Lively,' 'It Ends With Us,' and related hashtags such as #itendswithus, #blakelively, and other contextually relevant terms." *Id.* ¶ 24.

- For instance, Alexander's data set shows that the following search terms were used to collect content from YouTube: "It Ends With Us," "It Ends With Us drama," "Blake Lively," and "Blake Lively Justin Baldoni." *See* Bender Decl. Ex. 8.

- "As a data analytics expert who has designed and implemented digital measurement systems for Fortune 500 companies and major technology platforms, [Alexander] applied industry-standard quality control procedures throughout the data collection process." Ex. 1 (Alexander Rpt.) ¶ 26.

Lively claims that Alexander provided inadequate detail concerning her selection of search terms and speculates, as a result, that the searches may have been designed in a biased manner.  *See* Mot. at 20-21.  But elsewhere in Lively's motion, Lively confirms that Alexander used sensible, unbiased searches to collect social media posts related to Lively and the film.  *See id.* at 5 (Alexander's Instagram data contains the tags "blakelively," "itendswithus," or "itendswithusMovie"); *id.* (Alexander's Reddit data comes from "five specific subreddits" related to film and pop culture); *id.* at 6 (Alexander's TikTok data contains the tags "#blakelively" or "#itendswithus"); *id.* (Alexander's X and YouTube data contains the search terms "Blake Lively," "Blake Lively Justin Baldoni," "It Ends With Us," or "It Ends With Us drama").  Moreover, Lively's own experts Mayzlin and Culotta performed searches in a similar manner, using third-party tools and third-party collections of social media posts, which they admit did not result in a perfect collection of all possibly relevant data:

- Mayzlin "us[ed] a data provider called Pulsar TRAC" to obtain posts from X, Reddit, and YouTube and performed searches for "keywords" based on "Ms. Lively's name, her known usernames, and the names of her product brands." Ex. 3 (Mayzlin Rpt.) ¶ 31.

- Mayzlin did not collect data directly from the social media platforms—rather, ███████ ████████████████████████████████████████████████████ Ex. 4 (Mayzlin Dep.) at 78.

- Mayzlin acknowledged there were "platform-specific availability limitations in Pulsar" that limited her ability to collect data. Ex. 3 (Mayzlin Rpt.) ¶ 33; *see also* Ex. 4 (Mayzlin Dep.) at 76-78 (█████████████████████████████ ████ ).

- Mayzlin did not personally oversee all aspects of information-gathering relevant to her report. For instance, ████████████████████████████ ████████████████████████████. *See* Ex. 4 (Mayzlin Dep.) at 55-56.

- Culotta did not perform any "data collection" himself and instead "left that" to his assistants. Ex. 5 (Culotta Dep.) at 11-12.

- Culotta's assistants used a third-party tool called "Open Measures" to collect TikTok videos that contained various "hashtags" related to Lively, Baldoni, or the film. Ex. 6 (Culotta Rpt.) ¶ 50. This "Open Measures sweep" was imperfect and missed at least one relevant post that Culotta was able to identify. *Id.* ¶ 60 n.162.

- When collecting TikTok comments, Culotta looked at *only* the first "two screen-lengths of comments" by "scrolling once" on each post. *Id.* ¶ 51 n.139.

- Culotta's assistants did not collect data directly from Reddit and instead used a third-party collection of Reddit data called "Project Arctic Shift" to obtain posts from a single subreddit called "r/Fauxmoi." *Id.* ¶ 73.

- Culotta's assistants collected comments on only a single YouTube video related to Lively. *Id.* ¶ 88. Even for this limited collection, Culotta identified a "discrepancy" between his data set and the data on a third-party site called Archive.org. *Id.* ¶ 91 n.241.

As a rebuttal expert, Alexander cannot be held to a higher standard than the experts she is rebutting. *See Capri Sun*, 595 F. Supp. 3d at 138 ("[r]ebuttal experts … have a less demanding task"); *id.* at 139 (rejecting plaintiff's attacks on rebuttal expert as "strikingly un-self-aware" given the shortcomings of its affirmative expert). Alexander's collection of data is sufficiently reliable, especially when measured against the techniques used by Lively's experts.

      **4.     Alexander's Data Set Is Sufficiently Large.** Lively faults Alexander for using a smaller data set than Mayzlin did, *see* Mot. at 22-23, but by itself that does not prove that Alexander's 44,000-post data set is *unreliable*. Alexander's data set is more representative of the

social media conversations concerning Lively given that it is drawn from five major social media platforms (Instagram, TikTok, Reddit, X, and YouTube), compared to Mayzlin's three platforms (Reddit, X, and YouTube).  Alexander's data set also compares favorably to Culotta's, since Culotta's TikTok analysis relies on only 1,861 videos, and his YouTube analysis relies on a single video.  *See* Ex. 6 (Culotta Rpt.) ¶¶ 51, 88.  In any event, the cases that Lively cites are inapposite because they involved data sets much smaller than Alexander's.  *See Price v. L'Oreal USA, Inc.*, No. 17-cv-614 (LGS), 2020 WL 4937464, at *8 (S.D.N.Y. Aug. 24, 2020) (criticizing 1,000-respondent damages survey); *Nnebe v. Daus*, No. 06-CV-4991 (RJS), 2023 WL 6881992, at *3 (S.D.N.Y. Oct. 18, 2023) (criticizing expert for relying on only 13 proceedings to opine on how New York ALJs behave generally).

Lively also takes Alexander's deposition testimony out of context to suggest that Alexander used insufficient data.  *See* Mot. at 22-23.  When asked why she "limited" her "opinion 1" to the period "between August 2024 through February 2025," Alexander answered that for "this particular opinion," there was not "enough volume of data" outside of that period because "there should be an even sample across all networks" for purposes of that analysis.  Ex. 2 (Alexander Dep.) at 200-03.  Contrary to Lively's suggestions, Alexander did not say that her data set was inadequate unless it contained an equal "sample" of posts per platform.  Alexander testified that "it doesn't have to be exactly the same," and that the data she analyzed was sufficiently "substantive."  *Id.* at 203.  Nor did Alexander say that she needed more than 20,000 pieces of data for any opinion other than Opinion 1, or that she needed 20,000 pieces of data for her "baseline period."  *Contra* Mot. at 23.  Lively's argument depends on misreading Alexander's testimony to find contradictions where there are none.  Indeed, Alexander's report clearly states that her "datasets provide a robust and comprehensive foundation for analysis, with

23

volumes sufficient to detect statistically significant patterns while avoiding the risk of false positives that can arise from small sample sizes." Ex. 1 (Alexander Rpt.) ¶ 26.

**5.      The Few Duplicate or Irrelevant Posts Are Immaterial.** *See* Mot. at 23-24. Lively identifies only 8 irrelevant social media posts, or 0.02% of the data set—a miniscule proportion that could not have affected any outcome. The "duplicate" posts amount to less than 8% of the data set and are also immaterial to Alexander's analysis. For instance, Alexander verified that the duplicates shifted the sentiment distribution in her data by a miniscule amount and therefore did not affect her sentiment analysis. *See* Alexander Decl. ¶ 12. In addition, Alexander re-ran other analyses without the duplicates, and her overall conclusions were unaffected—for instance, she saw a relatively synchronized spike and then decline in activity across platforms, consistent with organic user activity. *Id.* ¶¶ 3-8. Lively does not explain why the duplicate posts would skew any of Alexander's conclusions.

**V.      ALEXANDER'S METHODOLOGY AND APPLICATION THEREOF ARE RELIABLE**

**1.      Alexander's "Meta-Analysis" Is Reliable.** Lively's argument to the contrary is absurd—it boils down to the claim that Alexander is misusing the term "meta-analysis" to describe her methodology, since she is combining different data sets but not "the results of several independent studies." Mot. at 26-27. This is a debate of semantics, not substance. Regardless of terminology, Alexander's methodology is reliable. As explained above, Mayzlin combined data sets from different platforms so she could analyze the similarities or differences in social media activity across platforms. This "meta-analysis" of cross-platform patterns yielded results consistent with organic user activity, rather than coordinated manipulation. Lively does not question the substance of this analysis.

24

**2.**     **Alexander's "Signature Comparison" Methodology Is Reliable.**  Lively claims Alexander lacks an adequate basis for identifying "signatures" of inauthentic or organic activity on social media platforms.  *See* Mot. at 27-29.  As explained above, however, Alexander has extensive professional experience ferreting out inauthentic activity at Meta, where advertising revenue was on the line if the ad traffic was inauthentic.  *See supra* at 13-15; *see also* Ex. 1 (Alexander Rpt.) ¶ 97 (identifying "diagnostic signatures" based on "professional experience"); Ex. 2 (Alexander Dep.) at 147 (same).  In addition, it is perfectly reasonable for Alexander to cite academic literature concerning the detection of automated "bots" (Mot. at 28), as "bots" are a major form of social media manipulation, and it is "extremely difficult" to "artificially boost" social media content "without using automated tools."  Ex. 2 (Alexander Dep.) at 96-97.

Lively also claims that Alexander's report "parrot[s]" some of the text concerning "diagnostic signatures" that her assistant included in the accompanying README files.  Mot. at 29-30.  But it is entirely unsurprising that Alexander and her assistant would use similar language to describe the data, and it is irrelevant to the reliability of Alexander's methodology. Alexander consistently testified that regardless of what her assistant wrote in the README files, Alexander's expert report consists entirely of her own opinions.  *See* Ex. 2 (Alexander Dep.) at 45, 318-19, 328.  Alexander is not a "conduit" for her assistant's opinions or anyone else's.

**3.**     **Alexander's "Sentiment" Methodology Is Reliable.**  Lively asserts that Alexander failed to disclose sufficient detail concerning her use of the BERT model to classify the sentiment of social media posts.  *See* Mot. at 30.  But Alexander provided ample detail and was questioned at length on her use of this model at her deposition.  *See* Ex. 1 (Alexander Rpt.) ¶¶ 54-55; Ex. 2 (Alexander Dep.) at 248-268.  Lively's experts could have recreated Alexander's analysis by running the most recent BERT model over Alexander's data set to classify the posts

as positive, negative, or neutral toward Lively.  To the extent they required more information, Lively should have moved to compel while expert discovery remained open.[14]  Instead, Lively obtained an order compelling Alexander to testify at a second deposition concerning an entirely different subject (*see* Dkt. No. 1144), evidently unconcerned that she was unprepared to address Alexander's use of the BERT model.  Lively has no basis to complain of any prejudice.

Lively also claims that the sentiment analysis must have been inaccurate because "while Figure B-3 reports classifying nearly 60 out of 100 social media items from January 2024 as positive, the Data Set contains only 19 items total from that month."  Mot. at 31.  Her argument appears to rest on a misunderstanding of Figure B-3, which does not report numbers of posts (*e.g.*, 60 positive posts), but instead reports percentages (*e.g.*, 60% of posts were positive).  *See* Ex. 1 (Alexander Rpt.) at 48.

Lively argues that Alexander fails to explain why the time-series component of her sentiment analysis used "keywords" (which Lively calls a "dictionary-based" approach).  *See* Mot. 8, 31-32.  Alexander explains, however, that the time-series analysis involved a forecast of "sentiment scores" calculated based on the presence of positive or negative keywords in each post.  *See* Ex. 1 (Alexander Rpt.) ¶¶ 63-74, 111-23.  Relying solely on a three-class taxonomy of

---

[14] "By waiting until after the close of discovery to raise the claim that [a defendant's] experts' reports were insufficient, [the] plaintiff waive[s] any claim that they adversely affected her ability to depose the experts."  Wright & Miller, 8A Fed. Prac. & Proc. Civ. § 2031.1 (3d ed.) (summarizing *Richman v. Sheahan*, 415 F. Supp. 2d 929, 940 (N.D. Ill. 2006)); *accord Emerson Elec. Co. v. Suzhou Cleva Elec. Appliance Co.*, No. 4:13-CV-01043 SPM, 2015 WL 2176964, at *3 (E.D. Mo. May 8, 2015); *White Elec. Servs., Inc. v. Franke Food Serv. Sys., Inc.*, No. 09-CV-504-CVE-PJC, 2010 WL 3368541, at *3 (N.D. Okla. Aug. 24, 2010) ("Courts have held that by waiting in this manner a party waives its objection to the sufficiency of an expert report."). Moreover, Lively does not even attempt to justify what is, in effect, a request for preclusion sanctions under Rules 26 and 37—a "drastic" and "extreme" remedy for any purported violation. *Rekor Sys.*, 2022 WL 2063857, at *8; *see also Wang v. Omni Hotels Mgmt. Corp.*, No. 3:18-CV-2000 (CSH), 2023 WL 4304875, at *2 (D. Conn. June 30, 2023).

posts as positive, negative or neutral (*id.* ¶¶ 54-55) would have been an inferior approach because the regression analysis required "more granular information." Ex. 2 (Alexander Dep.) at 340-43.

**4.** **Alexander's Choice of Date Ranges Is Reliable.** Lively claims that it was "arbitrary" for Alexander to select February 2025 as the endpoint of her analysis even though she collected data from March 2025 through October 2025 as well. Mot. at 32-33. This choice was far from arbitrary, however, since Alexander was asked to rebut Mayzlin's report, and Mayzlin did not collect any data from after February 2025. *See* Ex. 3 (Mayzlin Rpt.) ¶ 33.[15]

Lively also criticizes Alexander for "collect[ing] data spanning January 2024 to October 2025 based on the volume of data that was 'available'—rather than based on any methodological reason." Mot. at 32. It is unclear, however, why a broad data collection of this sort would *undermine* the reliability of Alexander's conclusions, and Lively does not offer any explanation. Moreover, Mayzlin acknowledged that she limited her collection of data based on what was "available," rather than for another principled reason. *See* Ex. 3 (Mayzlin Rpt.) ¶ 33 ("For YouTube, due to platform-specific availability limitations in Pulsar, data were collected from May 14, 2024," rather than May 1, 2024.); Ex. 4 (Mayzlin Dep.) at 76-77 (███████████

████████████████████████████████

██████████ ); *id.* at 77-78 (█████ ); *id.* at 79-82 (███████████████

█████████████████████████████████████

██████ ).

---

[15] Lively claims Alexander made a judgment call about this date range based on what she "*felt* was the most" appropriate (Mot. at 32), but as noted above, there is an objective reason, and Mayzlin███████████████████████████████████ .
*See* Ex. 4 (Mayzlin Dep.) at 99 ████████████████████████
████████████████████ .

27

Lively also makes an opaque, incomprehensible argument about how Alexander's date ranges hypothetically might change depending on whether the alleged manipulation campaign began on August 2 or August 9. *See* Mot. at 35. Lively fails to explain how these hypothetical possibilities manifested themselves in any actual error on Alexander's part. Moreover, to the extent there was any error, it was shared by Mayzlin, whose date ranges were not strictly tied to the start of the alleged manipulation campaign. Mayzlin stated that her "'before August 2024' period includes data only up to July 24, 2024, ending one week prior to the potential campaign's onset," even though that cutoff date would exclude relevant data from the baseline period, such as anti-Lively sentiment that preceded the alleged campaign. Ex. 3 (Mayzlin Rpt.) ¶ 61 n.137.

5.      **Alexander's Choice of Platforms Is Reliable.** Lively suggests that Alexander's choice of five social media platforms was arbitrary (Mot. at 35), but this is nonsense. Alexander chose these platforms because they are "the primary digital ecosystems" for "entertainment industry discourse" (Ex. 1 (Alexander Rpt.) ¶ 21), and indeed, Mayzlin and Culotta collectively analyze four of the same five platforms (Reddit, X, TikTok, and YouTube, but not Instagram). Moreover, analyzing multiple platforms allowed Alexander to perform the cross-platform "meta-analysis" described above, which provides an additional methodological justification.

6.      **Alexander's "Harm" Opinions Are Reliable.** Lively asserts, without much explanation, that Alexander applied no methodology in reaching her "harm" opinions. *See* Mot. 33-34. But Alexander cited several factors in her analysis, including the "internal business records" of Lively's companies (Ex. 1 (Alexander Rpt.) ¶¶ 168-69), admissions made in the report of Lively's damages expert (*id.* ¶¶ 159-60), and other commercial metrics (*id.* ¶¶ 155-58), as well as the results of Alexander's analysis of social media sentiment toward Lively (*e.g.*, *id.* ¶¶ 57, 112, 134, 139). To the extent there is any deficiency in Alexander's opinions concerning

28

Lively's brands, it is equally if not more applicable to Mayzlin's opinions on that subject, which rest almost entirely on internal company documents and do not involve the application of any expertise. *See* Dkt. No. 1321 at 37-39.

## CONCLUSION

For the foregoing reasons, the Court should deny Lively's motion.

Dated:  April 24, 2026  
      New York, New York

/s/ Alexandra A.E. Shapiro  
SHAPIRO ARATO BACH LLP  
Alexandra A.E. Shapiro  
Jonathan P. Bach  
Fabien M. Thayamballi  
Alice Buttrick  
1140 Avenue of the Americas, 17th Floor  
New York, NY 10036  
Tel: 212-257-4881  
ashapiro@shapiroarato.com  
jbach@shapiroarato.com  
fthayamballi@shapiroarato.com  
abuttrick@shapiroarato.com  

LINER FREEDMAN TAITELMAN +  
COOLEY, LLP  
Bryan J. Freedman (pro hac vice)  
Ellyn S. Garofalo (pro hac vice)  
1801 Century Park West, 5th Floor  
Los Angeles, CA 90067  
Tel: (310) 201-0005  
bfreedman@lftcllp.com  
egarofalo@lftcllp.com  

MEISTER SEELIG & SCHUSTER PLLC  
Mitchell Schuster  
Kevin Fritz  
125 Park Avenue, 7th Floor  
New York, NY 10017  
Tel: (212) 655-3500  
ms@mss-pllc.com  
kaf@mss-pllc.com  

AHOURAIAN LAW  
Mitra Ahouraian (pro hac vice)

2029 Century Park East, 4th Floor
Los Angeles, CA 90067
Tel. (310) 376-7878
mitra@ahouraianlaw.com

*Counsel for the Wayfarer Parties*

30