# Exhibit 2

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---


BLAKE LIVELY,

            Plaintiff,

   vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)
                     25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.,

            Defendants.
_____
JENNIFER ABEL,
            Third-party Plaintiff,
   vs.
JONESWORKS, LLC,
            Third-party Defendant.
_____
WAYFARER STUDIOS LLC, et al.,
            Consolidated Plaintiffs,
   vs.
BLAKE LIVELY, et al.,
            Consolidated Defendants.
_____

**CONFIDENTIAL**


VIDEO-RECORDED DEPOSITION OF NICOLE ALEXANDER

APPEARING REMOTELY FROM

New York, New York

Monday, December 15, 2025


Stenographically Reported by:  Ashley Soevyn,
CALIFORNIA CSR No. 12019

44

MR. FRITZ:  Objection.

You can answer.

THE WITNESS:  I'm sorry.  Do they change -- does she have the same buckets as I do; is that the question?

BY MS. GOVERNSKI:

Q    Let me ask it a better way.

So how would you divide up, from a percentage perspective, the work done on just the data analytics point?

A    For Taylor, it's 100 percent data analysis.

Q    Got it.  So she -- Ms. Hunter did not help you at all with the report itself?

A    No, she didn't help me with the writing of the report.

Q    Okay.  Did anyone help you with the writing of the report?

A    No.

Q    So you drafted every word of the report?

A    Yes.

Q    Were there multiple drafts of the report?

A    Yes, different versions.

Q    How many different versions were there?

A    Arguably, a different version every time

45

I open and close the report.  So...

Q    When did you start drafting the report?

A    I would say eight to ten days before November 3rd.

Q    Eight to ten days before November 3rd. Let's see, November 3rd is a Friday -- no, a Monday --

A    It's a Monday.

Q    -- so like October 20th, something like that?

A    Around there.  Yes.

Q    And so was the data analytics completed by October 20th then?

A    No, there was still some analytics going on, but I began drafting the report.

Q    Okay.  So do you stand by every word in the report?

A    Yes.

Q    Did anyone edit your report?

A    No.

Q    Did Wayfarer defendants' counsel edit your report in any way?

A    No.

MR. FRITZ:  Objection.

46

BY MS. GOVERNSKI:

Q    Did you use artificial intelligence to assist in the drafting of the report in any way?

A    So yes, because everything technically has AI in it.  So I use Google Docs in order to develop the report.  So Gemini is attached to that, and I have Gemini on for my Google Docs --

Q    Can you explain --

A    -- but I did not use generative AI, if that's the question.

Q    Can you explain the difference?

A    So AI is the higher level.  It is an algorithm.  Most things that you use, including Zoom right now, has AI running in the background in some way, shape or form.

Generative AI is specifically developing net new content in creative versus reshaping, copy editing, copy writing, things of that nature.

Q    So when you say you did not use generative AI, did -- you mean that you did not use AI to write the report?

A    I did not use generative AI in any way, so...

Q    Even to edit the report?

MR. FRITZ:  Objection.

47

THE WITNESS:  Correct.

BY MS. GOVERNSKI:

Q    Your report refers to the concept of hallucination and it defines it as "generating plausible but factually incorrect information"; is that right?

A    Correct.

Q    What does that mean?

MR. FRITZ:  Objection.

You can answer.

THE WITNESS:  So it means to develop something that would come next, based on a high propensity that that would be rational and make sense with the context that the rest of the sentence structure has developed.  So it's a -- it's looking at statistically does this make sense as the next element within that -- within that string of words.

BY MS. GOVERNSKI:

Q    So what would that look like, you know, if you're looking at a paper or something, what would a hallucinated content look like?

A    It can look like a myriad of different things.

Q    Sometimes are citations hallucinated?

A    Citations can be hallucinated.  Yes.

51

submission, it would either be Turnitin or via checking through Google --

Q    Do you have --

A    -- I don't specify.

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q    I'm sorry.  I thought you finished.  Go on.

A    I don't specify usually.

Q    So you let the TA choose whatever checking system they would want to use?

MR. FRITZ:  Objection.

THE WITNESS:  The TA or the course associate, yes.

BY MS. GOVERNSKI:

Q    Okay.  And how do you know that you can rely on the outcomes of whatever checking system they've used?

A    I -- I've hired them so I have faith in their ability to -- to make the right checks.

Q    So if they run a student paper through an AI checker and it says there is a high percentage chance likelihood that this is AI, do you believe the checker?

A    No, I don't allow them to run it through

52

AI checkers because AI checkers are not -- they are not accurate at the end of the day.  So I don't allow them to use AI checker, just to be clear.  I said Turnitin for things like citation that uses probability or Google to actually look up.  So they are not AI -- they're not using a AI checker.  They are looking up the citation itself.

Q    Okay.  Well, what about the content of your students -- well, let me back up for a second.

Do you -- you're a professor at NYU and Columbia, right?

A    Correct.

Q    Okay.  Do you create your own syllabi for those classes?

A    For the classes that I've created, yes, I create my own syllabi.

Q    Okay.  And are those available online at all?

A    The one for Columbia for this semester is definitely.

Q    Okay.  And what is the class that you're teaching at Columbia this semester?

A    It is AI and the knowledge organization.

Q    So does your syllabi in that course discuss any academic policies for the class?

54

actually, the students for semester have always disclosed. I've asked -- I've given them examples of how to disclose, and that is enforced based on things like if they -- if it appears that someone has used it and hasn't disclosed, I address it with them. If they have submitted something, which didn't happen -- if they have submitted something that appears not to be their work in general -- and, again, there's other reasons for that outside of AI -- then I address that with them as well.

Q So you said if it appears like it was created by AI. What are some of the telltale signs of AI usage?

A If it appears that they have used -- used frameworks incorrectly, for instance. If they have -- especially ones that maybe show up in -- like an AI overview, if there is any -- if there is any language that they use that just simply is not normally used by them, again, after working with the student for a semester, you know the way that they, number one, communicate, and usually how they write.

Q So how do you check whether their material includes generative AI?

MR. FRITZ: Objection.

You can answer.

55

THE WITNESS:  Frankly, there is no way to definitively check.

BY MS. GOVERNSKI:

Q   Okay.  Not definitively, but do you just take their word for it when they say, "no, I wrote this?"  And you don't do any sort of additional checking?

MR. FRITZ:  Objection.

You can answer.

THE WITNESS:  As I mentioned, it would depend on the case, so what specifically it looked like they did.  And then I would understand how to address it appropriately.

BY MS. GOVERNSKI:

Q   So it's all subjective; is that your testimony?

MR. FRITZ:  Objection.

THE WITNESS:  Yes.

BY MS. GOVERNSKI:

Q   Okay.  So you mentioned that you find AI checkers unreliable.  What did you mean by that?

A   There's actually third-party research that shows that they are not reliable.  Depending on -- they take into account things like colloquialisms, the way that you write.  There is

56

different signatures that are attributed to AI, which simply don't make sense in real life. So I'm sure you've heard things like using an ampersand. People use ampersands to write, particularly depending on the individual's age, how they were educated, things of that nature.

Q    You talked about universities checking for AI. Do you know whether the universities for which -- for which you work use AI checkers?

A    The colleges that I work for within the universities do not use AI checkers for any of the classes I'm aware of.

Q    So how do colleges discipline individuals if they suspect that a student is using generative AI?

MR. FRITZ: Objection.

You can answer.

THE WITNESS: This is a conversation for the ages across education. So there is no answer to that currently.

BY MS. GOVERNSKI:

Q    So it's your testimony that there are no AI checkers that provide any indicia of the use of generative AIs?

MR. FRITZ: Objection.

57

THE WITNESS:  I'm sorry.  Could you repeat that?

BY MS. GOVERNSKI:

Q    So it's your testimony that there is no AI checker that can reliably predict the use of generative AI?

A    Yes, that's my opinion.  Yes.

Q    And what if a student's paper is entered into multiple AI checkers and they all come back with a high percentage of likely to be AI; is that also, in your opinion, not reliable?

MR. FRITZ:  Objection.

THE WITNESS:  So to my understanding and the research that I've seen, most AI checkers are all using the same -- the same way of codifying what the assumption of AI is.  And, again, this is simply third-party research that I've read.  So no, I don't have a trust that AI checkers do an adequate job of definitively, or even statistically significantly proving, that something is AI versus not AI.

BY MS. GOVERNSKI:

Q    Your report includes a number of charts. Who made the charts?

A    The charts were made by Taylor.

Q    So earlier when you testified that a

68

A    Yeah.  So it says "Current NYU Professor."  That actually is probably the outdated.  It should say "Current Columbia Professor," excuse me.

Q    You no longer teach at NYU?

A    I am not currently teaching there, no.  I finished teaching the semester at Columbia.

Q    When did you stop teaching at NYU?

A    My last -- the last time I taught was 2022.  I'm sorry.  The last time I taught a full semester course was 2022.

Q    Okay.  Well, what have you taught since then at NYU?

A    I teach, like, seminars depending on if they need me.

Q    Like one-off seminars or courses?

A    No.  One-off seminars.

Q    And that's considered being a professor there?

MR. FRITZ:  Objection.

THE WITNESS:  Yes.

BY MS. GOVERNSKI:

Q    Okay.  How many seminars have you taught since 2022?

A    For NYU, I don't know.  I would say

69

three, both -- maybe three.

Q   Okay.  And how many courses -- how many times did you teach a full semester course at NYU?

A   How many times?  Like over the years?

Q   Yeah.  A full semester course.

A   I don't know.  I would have to check.

Q   Okay.  At least 15, you think?

A   Not sure.  I would rather just check to make sure I'm accurate.

Q   Why did you stop teaching full-semester courses at NYU?

A   No particular reason.  Mostly because I was working full-time as well.  So...

Q   Okay.  So when you say -- when the short bio says "Current NYU Professor", that is not accurate?

MR. FRITZ:  Objection.  You can answer.

THE WITNESS:  I'm not actively teaching, correct.

BY MS. GOVERNSKI:

Q   Okay.  And when your academic appointments right below says:

(As read):

"Adjunct Professor of Marketing

Technology, NYU, 2013 to present," is

70

that accurate?

A   So as an adjunct, you can come in and teach one semester, skip three years, come back, teach another semester.  That's the whole point of being an adjunct.

Q   Got it.  So when it says "2013 to present," it's just in case you come back to teach a full-semester course in the future?

MR. FRITZ:  Objection.

THE WITNESS:  Correct.

BY MS. GOVERNSKI:

Q   So you would consider yourself a current Adjunct Professor of Marketing and Technology at NYU?

A   Yes.

Q   Okay.  And what about at Columbia University?  Are you a current professor at Columbia University?

A   Yes.

Q   How many courses do you currently teach at Columbia?

A   The semester just ended.  But one, normally.

Q   And how many credits is that course for?

A   I'm not sure.  I would guess three.

71

Q    Okay.  How many times a week does that course meet?

A    Once a week.

Q    Is this the right title of that course? "Teaching AI for the Knowledge Driven Organization"?

A    Yes.  Correct.

Q    What does that course teach?

A    It teaches practitioners or future practitioners about how to look at AI from a strategic perspective, from an executionary perspective; how to think about the technology side as well as the business implications.

Q    Okay.  I'm going to go off of this for -- I'm just going to stop the share for a second.

Your CV lists a Bachelor's of Science from NYU with a degree in Leadership Management; is that right?

A    Correct.

Q    When did you graduate from NYU?

A    With my Bachelor's degree?

Q    Yes.

A    2012.

Q    What is a degree in Leadership and Management?

MR. FRITZ:  Objection.  You can answer.

72

THE WITNESS:  It is looking at leadership skills, understanding how to manage.  I had a focus in marketing.  So quite frankly, I remember more of the marketing courses than the other courses for a Bachelor's degree.

BY MS. GOVERNSKI:

Q    Okay.  I'm going to share my screen again, actually.  So when you say here:  "B.S. Leadership in Management, NYU", it doesn't mention marketing, right?

A    I didn't list my concentration.  No.

Q    Okay.  What does a concentration mean at NYU?

MR. FRITZ:  Objection.  You can answer.

THE WITNESS:  I believe for any undergraduate degree, it's what your focus is that you decide to focus in.

BY MS. GOVERNSKI:

Q    Does your degree show a concentration in marketing?

A    On the paperwork, I'm not sure.

Q    And is Leadership and Management the major?  Is that what it's called?

A    Leadership and Management is the degree.

Q    That's the degree.  Okay.  How is a

74

again.

THE WITNESS:  Yes.

BY MS. GOVERNSKI:

Q    Okay.  And then your CV also lists an MST in Artificial Intelligence Ethics and Society.

What kind of a degree is that?

A    It's a graduate degree at the University of Cambridge.

Q    Okay.  MST, that's a Master of -- what does ST stand for?

A    Studies.

Q    And did you -- it doesn't list a date. When did you attend Cambridge?

A    2023 to 2025.

Q    So you just received that degree?

A    I did.

Q    When did you receive it?

A    We were -- my class was conferred over the summer sometime.

Q    Okay.  Did you move to Cambridge for this program?

A    I did not.

Q    So how did you receive this degree from Cambridge?

MR. FRITZ:  Objection.

75

THE WITNESS:  How did I study?  Is that the question?

BY MS. GOVERNSKI:

Q   Yeah.  Was it a remote virtual program? I'm just trying to understand how you took courses.

A   It was part-time.  So it was hybrid. That's why it's a Master's of Studies and not a Master's of Philosophy.  So M-Phil is for full-time students.  Master's of Studies is for part-time hybrid students.

Q   Okay.  So that's why you were -- it took you from 2023 to 2025.  That was the two years because it was a part-time program?

A   Correct.

Q   Okay.  And so what is a Master's in Artificial Intelligence Ethics in Society?

A   So we study the roots of AI from a power philosophy perspective.  We also talk about -- we look at insights around how AI has developed; the uses of AI particularly across, you know, public society, organizations, government.

Q   So do you as part of this program study AI technology itself?

A   Yes.

Q   So tell me about those aspects of the

76

degree.

MR. FRITZ:  Objection.  You can answer.

THE WITNESS:  We looked at things such as how LLMs are created, some of the biases that go into LLM, based on the datasets; how LLMs are developed and built.  Everything from the natural language processing, through fine tuning the LLM. We also look at things like small language models as well.  There is a lot.  I'm not sure specifically what to highlight.

BY MS. GOVERNSKI:

Q    How many courses did you take in those aspects specifically, what you just described?

A    So they are not individual courses the same way you would think of in an undergraduate degree.  They are interwoven into each of the different semesters.

Q    So there are no courses.  It's just a general kind of programming; is that right?

A    It's programming.  Yes.

Q    So how many classes were specifically on what we just discussed in terms of LLMs and how they are created, et cetera?

A    It came up in each program that we walk through.

78

A    I wouldn't venture to guess.  Over two years.  I'm not sure.

Q    Was it sporadic or something you did every week?

A    No.  It was done every week.

Q    And to what extent is your Master's of Studies degree in Artificial Intelligence Ethics and Society relevant to your assignment in this case?

A    It gives me a deeper understanding of specifically how LLMs operate.  Understanding how looking at the -- the ethics or the elements around AI, particularly around things like manipulation across social media, which was specifically one of my areas of study.  How that all culminates.  How to think about identifiers.  And how AI is leveraged, pro or con, in marketing.

Q    And all of the other experience in your CV predated the receipt of this degree, right?

A    I'm sorry.  Could you repeat that?

MR. FRITZ:  Objection.

MS. GOVERNSKI:  I will withdraw the question.

BY MS. GOVERNSKI:

Q    Your CV also lists an executive MBA. What is an executive MBA?

80

A    No.

MR. FRITZ:  Objection.

THE WITNESS:  No, it's not a ten-week program.

BY MS. GOVERNSKI:

Q    Okay.  So online, when they describe it as a ten-week program, that's not accurate?

MR. FRITZ:  Objection.

THE WITNESS:  I don't believe they describe it as a ten-week program.  It may be stated as ten weeks in-person, but it's not a ten-week program.

BY MS. GOVERNSKI:

Q    Understood.  So how many weeks is the full program, do you think?

A    I believe it's 18 months.

Q    A full-time program over 18 months?

MR. FRITZ:  Objection.

THE WITNESS:  It's not full-time because it's targeted to executives.  So it is literally formatted for individuals who are usually executives within their organization.  So it's 18 months, I believe, start to finish.

BY MS. GOVERNSKI:

Q    And to what extent is your executive MBA

81

relevant to your assignment in this case?

A    It has allowed me to understand -- again, my focus was on data analytics as part of that degree.  So it gave me both a finance perspective, it's given me depth in strategy in particular, as well as marketing.

Q    When you refer to data analytics, that's not listed as part of this degree on your CV, right?

A    Data analytics is part of the executive MBA.  It's actually part of the NYU module.

Q    Okay.  So how did -- how was it part of your executive MBA?

A    It's a class.

Q    How long was the class?

A    It's for the term.  So 14 weeks.

Q    Okay.  So a 14-week class in data analytics.  Was there anything else part of this executive MBA during which you learned about data analytics?

A    Data analytics was integrated within other parts as well that weren't actually called data analytics as a class.  So we had finance analytics, which looks at a myriad of different data.  We also had strategy classes that also incorporated data analysis.

84

Q    Do you have a degree in digital marketing?

A    The degree is not listed as digital marketing.  No.

Q    Your CV talks about you being at Meta. You were at Meta for two years?

A    Two years, six months.

Q    It talks about Global Head of Marketing, Business and Product Marketing.  Were you -- that's of all of Meta?

A    That's of the Business and Product Marketing division.  So I was on the side of what most people would refer to as B2B.

Q    Can you explain what B2B means, other than the literal definition?  What is that?

A    Business to business.  So Meta works -- Meta has goods and services that they promote to consumers, such as you, Kevin, et cetera.  So people that use Facebook, WhatsApp, a myriad of different solutions.  That's what we call the B2B side.

B2B is about working with the advertisers, small to medium businesses.  Things of that nature.

Q    And what did you do from a day-to-day perspective as a Global Head of Marketing Business

85

and Product Marketing?

A    I ran a couple of different teams that include data analytics, engineering, owned -- the owned services team.  So that is all the things like e-mail, social media, website.  And my goal was to, number one, maintain our site on the business side; ensure that clients or potential customers were able to find what they needed.  I also had revenue stream goals.  So making sure that we were converting potential customers into active customers.  And then a myriad of promotional activities.  Yeah.  That's the gist.

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q    Why did you --

Why did you leave in 2023?

A    There were changes in the organization so I decided it was a good time for me to depart.

Q    So it was a voluntary departure?

A    Yes, correct.

Q    Who did you report to while you were there?

A    I reported to the SV -- I'm sorry.  I reported to the VP, her role then was VP of -- I'm going to say Skilled Solutions.  But I'm not sure if

86

that's the overarching name.

Q   You've referenced having direct reports. How many direct reports did you have?

A   Direct reports, I had 15 at the highest.

Q   And you mentioned data analytics, but this description doesn't mention data analytics. Why doesn't it include that?

A   I didn't put it in there.  But most of my job was around data analysis, data analytics.

Q   Why have you mentioned that describing this role when it wasn't in your CV?

MR. FRITZ:  Objection.

THE WITNESS:  I'm sorry.  Can you repeat that?

BY MS. GOVERNSKI:

Q   Yeah, I'm just saying you've volunteered data analytics as part of this position, but it's not mentioned in your CV.  I'm just wondering why you mentioned it when it's not listed in your CV.

A   I volunteered it as one of the teams that I oversaw.

Q   How did you oversee that team?

MR. FRITZ:  Objection.

THE WITNESS:  It was one of the teams that sat under my purview.  So it's actually one of

87

the teams I developed while I was there.

BY MS. GOVERNSKI:

Q    Tell me about that.

MR. FRITZ:  Objection.

THE WITNESS:  So in order to lead our owned properties we specifically had to have insights on how data was captured; how data was cleaned; how we were aggregating data; how we were using data.  And then ensuring that it was not only responsible, but also in line with Meta's overall policies.  So I had a team of data analysts that did all of that work.

BY MS. GOVERNSKI:

Q    How much of that work did you perform yourself?

A    On an ongoing basis for what they did to what I performed, marginal.

Q    Okay.  There is a data analytics team separate from one under the marketing department at Meta, isn't there?

A    There are a lot of data analytics teams at Meta.

Q    Got it.  So when you talk about running a data analytics team, that's a specific team that you created in the marketing department?

88

A    Yes.

Q    What type of specific data was the data analytics team that you supervised performing?

A    They would run -- we would look at things like social graph, click stream data.  We would look at potential threats across our network.

Q    What does potential threats mean?

A    It could mean anything from bots to DDS.  Someone trying to access our network.  To -- it was predominantly around things like bots, click flow traffic, reporting to see if these were -- if we were on target to hit revenue goals, usage behavior.  Things of that nature.

Q    Describe your experience with bots while you were at Meta.

A    Part of the work that we did was to look at bot activities specifically across when it came to clients.  So specifically if there were accounts that were -- accounts that looked like there were -- that bots were used in order to spike traffic, whereas clients had to then pay for said traffic, we would do forensics work around if that traffic was realized, if it was associated with users, or if it was non-organic.

Q    Okay.  You use the term "non-organic."

89

What does non-organic mean?

A    Non-organic means that it doesn't have qualifiers.  That would mean that users actually were the ones that generated the traffic.

Q    So when you use the term "non-organic", you're referring to automated conduct like the use of bots?

A    It could be bots or it could be other things as well.

Q    What other things?

A    It could be users of -- coordinated actual users attempting to spike traffic or to, in a negative or positive way, manipulate the traffic somehow.

Q    So users coordinating to spike traffic would be non-organic?

A    That would be non-organic.  We wouldn't classify it as that.  Internally, we would classify it as sort of -- we use words like maleficent, but that makes no sense in the real world.  So it would be something that would be a coordinated manipulation pretty much.

Q    So you didn't use the term "organic" while at Meta?

A    We used organic but not in the sense that

91

you here?

(Exhibit 3 marked for identification.)

MS. ADAMS-JACK:  I'm back.  I can handle it.

MS. GOVERNSKI:  Okay.  You know the one I'm asking for?

MS. ADAMS-JACK:  Yes.  Yes, got it.

BY MS. GOVERNSKI:

Q    As my colleague is putting up Meta's policy, are you familiar with a term called "inauthentic behavior"?

A    Yes.

Q    What does inauthentic behavior mean?

A    It is activity that is not based on the usual way that users interact with content across Meta's platforms.

Q    What are the usual ways that users interact with content on Meta?

A    The usual ways would be taking a baseline based on data that we have internally.

Q    What does that mean?

MR. FRITZ:  Objection.  You can answer.

THE WITNESS:  So within Meta, we have baselines that we can see how users have historically interacted with our content.  Based on

92

that, we would form a baseline.  So things outside of that baseline would be things that were -- that we would check to see why the traffic or whatever the activity was, was skewed.

BY MS. GOVERNSKI:

Q    Okay.  So when you used the term earlier "non-organic" how, if at all, does that relate to inauthentic behavior?

A    From the way that we use that at Meta, it could be a synonym.

Q    What about the way that you use the term organic in your report, to what extent does the way that you use the term organic in your report coincide with inauthentic behavior?

A    I didn't associate the use of inorganic in my report with anything, any verbiage related to Meta, for instance.

Q    What did you associate the use of organic in your report to?

A    In my report, I specifically look at organic behavior, being things within the norm that didn't have classifiers of inorganic manipulation.

Q    What are classifiers of inorganic manipulation?

A    It could be anything like temporal

94

about the entire document, though.

MR. FRITZ:  I understand.

THE WITNESS:  Okay.

BY MS. GOVERNSKI:

Q    Okay.  If you can look at the first paragraph, and it says:

(As read):

"In line with our commitment to authenticity, we don't allow people to misrepresent themselves on our service, use fake accounts, artificially boost the popularity of content or engage in behaviors designed to enable other violations under our community standards."

Do you see that?

A    Yes.

Q    Did you engage in any of these type of behaviors while you were at Meta?

MR. FRITZ:  Objection.

THE WITNESS:  I'm sorry?  Could you repeat that?

BY MS. GOVERNSKI:

Q    When you were --

MR. FRITZ:  Note my objection.

95

BY MS. GOVERNSKI:

Q    When you were doing marketing at Meta, did you engage in any of these type of behaviors?

A    Let me just read this again.  So I -- so I want to clarify first.  So you have me looking at a document from Meta that is about user standards.  So this is community-based standards on what consumers or users that sign up on Meta's platforms agree to.

So to answer your question, as a user at Meta, someone with a Facebook account, someone with an Instagram account, I did not do any of these activities while at Meta as a user.

Q    And why not?

MR. FRITZ:  Objection.

THE WITNESS:  I don't know how to answer that.

BY MS. GOVERNSKI:

Q    What is your understanding of "artificially boost"?  What does that mean?

A    So in this context for Meta, as part of their user agreement, it would mean using things like different programs or bots or coordinated activities to increase traffic in some way, shape, or form.

96

Q    And coordinated activities could be manual, right, not automated?

A    They can be, yes.  It would have to be very, very synchronized for it to work at scale, but yes, it is possible.

Q    When you say "to work at scale," what do you mean?

A    To -- to make a difference.  So you, as an individual, clicking on things across the site is not going to make an impact when it comes to traffic.

Q    But -- but it's possible that you could synchronate in order to artificially boost without using automated tools, right?

MR. FRITZ:  Objection.

You can answer.

THE WITNESS:  So as I stated before, it's possible, but it's extremely difficult to do so.

BY MS. GOVERNSKI:

Q    Right.  You would have to be an expert in order to do that?

MR. FRITZ:  Objection.

THE WITNESS:  I wouldn't say that. That's -- I'm not sure what that means particularly. But you would need to have a vast network of humans

97

in order to pull that off.

BY MS. GOVERNSKI:

Q    Okay.  And would, under the way that you use the term "organic" in your report, would that type of artificial boosting that uses a manual network be considered organic or not organic?

A    That would be considered inorganic, the way that I'm using it.

Q    Okay.  And if we look at the next sentence, it says:

(As read):

"Inauthentic behavior refers to a variety of complex forms of deception performed by a network of inauthentic assets controlled by the same individual or individuals with the goal of deceiving Meta or a community."

Do you see that?

A    Sorry, what page are you on for that one?

Q    The same paragraph.

A    Oh.

Q    Just the next sentence.

A    Oh, yes, sorry.

Q    And do you agree with that sentence?

A    I don't disagree with it.  It's -- it's

99

access to a myriad of different -- most likely, computers and algorithmic programs. Because, again, as I mentioned, human beings is extremely difficult to coordinate that. And am I trying to do it in order to impact something in either a negative or positive way.

Q    And when it says "a network of inauthentic assets," what is your understanding of "inauthentic assets"?

A    So the way that Meta is looking at this --

Q    I'm asking how you are looking at it. Sorry.

MR. FRITZ:  Sorry.

Objection.

MS. GOVERNSKI:  I wanted to clarify my question.

MR. FRITZ:  Why doesn't -- do you want to withdraw it?  Are you withdrawing the first one or you're going to ask another one?

MS. GOVERNSKI:  I specifically asked, how do you define the term "inauthentic assets"?

MR. FRITZ:  Okay.

Go ahead, Nicole.

THE WITNESS:  Outside of this context, I

100

would say inauthentic assets would mean any asset that is attempting to either negatively or positively impact something, defraud or cause harm or specific benefit.

BY MS. GOVERNSKI:

Q    And that could be automated or it could be manual, right?

A    As I said before, it's normally automated.  And in rare cases, with a lot of coordination at scale, it could also be manual.

Q    What is your basis for saying that it's ordinarily automated?

A    So, again, in the context of social media, for it to be impactful, make a dent at scale, it is extremely difficult to do that in a coordinated way with a network of humans.

Q    How could you do it?

MR. FRITZ:  Objection.

THE WITNESS:  I mean, there is probably several different ways.  The one way I could think of would be to rally a massive amount of, again, individuals, human beings in a coordinated attempt that would either cause benefit or cause harm.  But there would have to be -- it would have to have signatures -- I'm trying to think how -- it would

101

have to have signatures of authenticity, though, for it not to be identifiable.

Q   What does that mean, "signatures of authenticity"?

A   I'm sorry.  I should flip that.  I should have said signatures of inauthenticity.  Apologies.

Q   Can you explain what you mean by "signatures of inauthenticity"?

A   Signatures of inauthenticity?

Q   Uh-huh.

A   So as I mentioned before, things like, you know, like temporal analysis, content, homogeneous content.  It would be things like coordination clusters.  But, again, that would all be based on actually doing the analysis to figure out if that -- if that was there.

Q   So if someone was really good at doing this, couldn't it avoid those signs of inauthenticity?

MR. FRITZ:  Objection.

You can answer.

THE WITNESS:  Sorry.  There's -- I'm not going to say always, but there is usually identifiers, which is why you don't just look at one element of inauthenticity.  You look at several

102

different ones.  So, for instance, you know, posting times, that would just be one.  So if someone got around posting times, there is still six or seven other fingerprinting techniques that you can use. So you don't just check one factor; you check a myriad of different factors.

BY MS. GOVERNSKI:

Q    But if someone understood what all those factors are, couldn't they devise a campaign at scale to avoid those signs of inauthenticity?

MR. FRITZ:  Objection.

THE WITNESS:  I have not seen that to actually be possible, where it's -- that it's not identifiable in any of the different ways that you would analyze it.

BY MS. GOVERNSKI:

Q    Isn't it possible that you just wouldn't be able to identify it because it was untraceable?

MR. FRITZ:  Objection.

THE WITNESS:  So untraceable sounds good from a marketing perspective.  Untraceable is still traceable.  So there are usually signatures that fall outside of what the norm would look like or outside of a baseline.  And that would, then, get you to dig deeper into understanding why that

103

happened, if it was authentically an anomaly or if it was a coordinated act.

BY MS. GOVERNSKI:

Q    So you say "usually," but that doesn't mean that there is always signatures, right?

MR. FRITZ:  Objection.

You can answer again.

THE WITNESS:  In all of the ways that I have seen and been privy to, there are usually -- there have been ways of determining inauthentic behavior.

BY MS. GOVERNSKI:

Q    How have you seen that?  Can you explain?

A    Sure.  So I've seen it based on -- again, going back to, like, content, homogeneous content. So things where you have -- this is just one example -- things where you have identical verbiage, like literally identical, or even things around social media as consistent as the flow of hashtags. So the -- you know, how hashtags actually show up. And I'm seeing that from an original piece of content dropping, not a re-tweet, not a repost.

Q    But I'm trying to ask, like, specific case studies that you have performed or been involved in where you have seen inauthentic

104

behavior.

          A    Oh --

                MR. FRITZ:  Objection.

                Go ahead.

                THE WITNESS:  -- so that actually is one.
That is one that we saw specifically in my work at
Meta.  So that's one that I'm -- one example.  We've
also seen actual use case at Meta.  We've seen
issues where there were like temporal -- where
coordination across different regions.  So they were
outside of, like, normal posting times, based on the
baseline of when users authentically post,
re-tweet -- sorry, for -- repost in this case.

                I've also seen specifically in previous
work with Ipsos, through Synthesio, which is a
social media tool that we had.  We've seen things
like coordinated signatures around, like, age
activity.  So where accounts were, like, newly
created and they were all the ones -- they were the
ones that were posting problematic content.

BY MS. GOVERNSKI:

          Q    But I'm trying to understand a specific
incident.  Like not just talking generally, but what
was the specific content that you saw to be
inauthentic?  You gave two examples at Meta.  What

105

were the specific content that you determined that was inauthentic?

MR. FRITZ: Objection.

You can answer again.

THE WITNESS: So at Meta, in one specific case, it was seeing duplicative identical content showing up at a higher propensity than normal.

BY MS. GOVERNSKI:

Q   What was the specific content?

A   So I cannot tell you the specific content for anything I did within Meta. Are you asking --

Q   You can designate it as confidential, but I'm entitled to understand the basis of your knowledge.

What was the specific type of content that, in that case, you determined was inauthentic?

MR. FRITZ: Well, if there is some contract that she's bound by or regulations that said this is proprietary information, then I'm not sure the protective order would cover that.

THE WITNESS: I can tell you that it was political.

BY MS. GOVERNSKI:

Q   And what was your role in sussing out that content?

106

A    So my role was to look at the vast amount of data over a certain period of time in order to look at anomalies that this content was being -- that this content was inflated or the activity around the content was inflated.

Q    How was it inflated?

A    Trying to think of how I can -- how I can share.  There were actors that were pushing this content across Meta's platforms, and we saw bot behavior in that circumstance, or in that particular use case.

Q    And so that case included bot behavior. Did the other specific Meta case that you were referring to include bot behavior?

A    The other one did.  It was different bot behavior.  So -- I mean, because bot is a very general term, just to be specific, right? Programmatic advertising is bots.  So this was manipulative bot behavior in the political case that was foreign actors.

The second case was bot activity specific to inflating advertising numbers in order to harm a business.

Q    And have you ever identified, in any of your positions, any campaigns that did not include

107

bot behavior?

A    Yes.

Q    Tell me about those.

MR. FRITZ:  Objection.

THE WITNESS:  We've had -- so some were with Ipsos.  We were looking through Synthesio, which was our social media solution, for when a CPG company felt that sales and the subsequent return of -- yeah, return -- return of goods was around bot activity.  We saw that that was not the case.  So we were able to identify that it had the signatures of authentic activity where people were just purchasing, were unhappy, and were returning goods.

BY MS. GOVERNSKI:

Q    And how did you rule out that it was this type of manual network that did not rely on bots?

A    So we looked at sort of -- in that case, we looked at tracking.  So we looked at where the purchases were taking place, where the order was taking place, where the purchases were sent to.  And we looked to see if there were any signifiers that skewed outside of what their normal base of customers looked like.  So we were able to see that their authentic customers, which they agreed with were authentic customers, had the same signatures as

108

what they thought were inauthentic customers.

Q    And if someone wanted to appear to be an authentic customer, that would be possible, wouldn't it?

MR. FRITZ:  Objection.

THE WITNESS:  In this case, it would not have been.

BY MS. GOVERNSKI:

Q    What about in any case?

MR. FRITZ:  Objection.

THE WITNESS:  That's a lot of different assumptions I would have to make.  I couldn't answer that.

BY MS. GOVERNSKI:

Q    Well, what would it take for someone to make a coordinated campaign look authentic?

MR. FRITZ:  Objection.

THE WITNESS:  I don't know all the factors to be able to answer that.

MR. FRITZ:  We've been going for about two hours.  Why don't we take a break now?

MS. GOVERNSKI:  When I'm done with this line of questioning.

MR. FRITZ:  Well, no, actually, we're going to --

121

literature that you've published?

A    Correct.

Q    What sort of journals exist in your discipline?

A    Sorry, in marketing?

Q    How would you define your discipline?

MR. FRITZ:  Objection.

THE WITNESS:  I'm sorry, I'm not sure how to answer that.

BY MS. GOVERNSKI:

Q    How would you define your expertise?

A    We've just got done talking about Meta. If you're asking in my discipline at Meta, I was in marketing.  Full-staff marketing.  So that's everything from data analysis to engineering to -- I mean, PR, branding, et cetera.

Q    Well, what is your understanding of why you're being offered as an expert in this case?

A    So as an expert in this case, it's for my experience in data analysis, marketing, and specifically social networks.

Q    So in data analysis, marketing, or what was the last thing you said?  Social?

A    Social networks.

Q    Social networks.  In your experience in

122

either of those, are there journals that exist in any of those three disciplines?

A    There are several.  You want me to just name them?

Q    That would be great.

A    Journal of Marketing, God, they all have long names.  Nature Human Behavior and something.  I don't actually subscribe to the journals so...

Q    Any --

A    I don't have to.  We get them free as faculty.

Q    Which ones do you receive as a member of the faculty?

A    I read -- because receiving and reading are different.  I read American Marketing Association and their journal.  I read ANA's Journal.  I'm sorry.  Stands for American National Advertisers, I think the acronym is.

Q    Okay.

A    Those are the ones I usually read.

Q    So American Marketing Association and the American National Association's Journal; is that right?

A    Of Advertisers.

Q    American National Association of

124

obligation of having to publish.  Whereas, academics usually do.

Q    You mentioned that you wrote a number of papers for Meta in the course of your career.  Have any of the papers you've written been peer-reviewed?

A    None that -- well, actually, no, that's not true.  Yes.  A paper that I wrote in conjunction with another author at Ipsos was peer-reviewed and we presented that at an academic -- jointly at an academic forum.  And that was peer-reviewed.  I think that's it.  A peer review process like in academia is a little bit different than peer-reviewed for a practitioner.

Q    When you were referring to peer-reviewed in this context, was it for a practitioner or was it academic?

A    That was academia.

Q    Okay.  And what was the topic of that paper?

A    We looked at -- we looked at marketing effectiveness and behavior across -- across a global dataset.

Q    And why did you not list that paper in your CV?

A    Because it wasn't published.

125

Q    Do you have a copy of it?

A    Honestly, I don't know.  I may have a copy of it somewhere.

Q    What was the methodology that was tested in that paper?

A    So we looked at marketing effectiveness. So we looked at regression analysis of a myriad of different campaigns across different disciplines. In order to talk about things like concepts, how concepts actually worked well if they went live, if they didn't go live.  We appended sales data to that, for the ones that did go live, obviously.  And just looking at the overall trend of how to bring a product concept to fruition.

Q    Did you rely on that analysis for purposes of this report?

A    No.

Q    Let's go -- if you can pull up your report, please.  Let's do the latest one, Exhibit 002.  Let's go to Appendix C.  What is your understanding of what Appendix C is?

A    Those are materials I considered when drafting my report.

Q    Did you draft Appendix C?

A    Yes.

146

incorrect.  I mean, outside of the author, the date is also incorrect, so...

BY MS. GOVERNSKI:

Q    Right.  So how did -- you just said earlier that if a cite -- citation were to include authors who did not appear on the article, it would be a sign of a hallucination.

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q    How is that not the case here?

A    So I believe I said if something was developed through a generative AI solution that added authors, it would be an example of hallucination.

Q    And how do you know that's not the case here?

A    Because I know this wasn't generated by generative AI.

Q    Okay.  Well, let's look at that.  Let's look at the paragraph that you cite this for, paragraph 86.

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q    Sorry.  87.  This is the same paragraph we've been looking at, right, where you cite Graham?

147

Oh, by the way, have you ever applied the concepts that you cite Graham for in your professional life?

A    I'm sorry, which concepts are we specifically talking about?

Q    The concepts that you reference here in this paragraph 87.

A    So temporal synchronization, yes. Participant dispersion, yes.  And command and control hubs, yes.

Q    Okay.  But when you applied those concepts, were you relying on Graham?

A    As a practitioner, no.

MS. GOVERNSKI:  So my colleague is going to be moving into a document, which I will mark as Exhibit 6.  Let me know when you have it.

Autumn, are you here?

MS. ADAMS-JACK:  I'm here.  I just entered it in.  It says it's being introduced.

(Exhibit 6 marked for identification.)

BY MS. GOVERNSKI:

Q    Okay.  Do you have that document, Exhibit 6, up?

A    It's downloading right now.

Q    Okay.  I'm also sharing my screen.  Let

149

MR. FRITZ:  Objection.

THE WITNESS:  No.

BY MS. GOVERNSKI:

Q    You have no explanation for that?

MR. FRITZ:  Objection.  You can answer
again.

THE WITNESS:  I do not.  As I mentioned
earlier, I don't believe in AI analysis for the use
of identifying if something is generative AI.  I
think we talked about that earlier.

BY MS. GOVERNSKI:

Q    So if another -- if Grammarly found the
same paragraph had a 70 percent chance of being
generated by AI, would that change your perception
at all?

A    So Grammarly has a feature that is also
an AI checker --

Q    Uh-huh.

A    -- which, again, is -- is similar to what
I mentioned earlier with the accuracy of overall AI
checkers.

Q    Okay.  So what about the fact that
GPTZero predicted this paragraph was 100 percent
likely to be AI, and Grammarly predicted this
paragraph to be 70 percent, your response is that

150

both GPTZero and Grammarly must be inaccurate?

MR. FRITZ:  Objection.

You can answer again.

THE WITNESS:  So I don't think it's about the inaccuracy.  I think it's about AI generator checks not simply being accurate.  And research, outside of my statement, has also seen this to be true.

BY MS. GOVERNSKI:

Q   Okay.  And then a third AI checker, TextGuard, found this one paragraph to be 86 percent likely to be AI.  So I'm just trying to understand, is it your testimony that that is just a coincidence?

MR. FRITZ:  Objection.

You can answer again.

THE WITNESS:  My testimony is that AI generator checkers are -- are inadequate and not accurate.

BY MS. GOVERNSKI:

Q   How come the paragraphs in your report that describe your background all came back as human generated?

MR. FRITZ:  Objection.

THE WITNESS:  I do not know why.

154

A    Yes.

Q    Every word?

A    So the citations themselves, I get from Zotero, but yes, the copy itself, yes.

Q    Any idea how GPTZero would predict the likelihood of this paragraph?

MR. FRITZ:  Objection.

THE WITNESS:  I don't know.

BY MS. GOVERNSKI:

Q    Would you be surprised to learn that GPTZero projected that this paragraph was 100 percent likely to be AI generated?

MR. FRITZ:  Objection.

You can answer.

THE WITNESS:  I'm sorry.  What was the question there?  I apologize.

BY MS. GOVERNSKI:

Q    Would you be surprised to learn that GPTZero predicted that there was 100 percent likelihood that this paragraph was AI generated?

MR. FRITZ:  Objection.

THE WITNESS:  It wouldn't surprise or not surprise me.

BY MS. GOVERNSKI:

Q    Okay.  And then TextGuard also found that

155

this paragraph was 92 percent most likely to be AI generated.  Would that surprise you?

MR. FRITZ:  Objection.

THE WITNESS:  Same answer.  I wouldn't be surprised or not surprised.

BY MS. GOVERNSKI:

Q    Okay.  And so these bullets here:

(As read):

"Centralized amplification hubs,
Temporal synchronization, Sentiment
homogeneity."

You wrote -- it's your testimony that you wrote these bullets?

A    Yes.

Q    Okay.  And there's no citation for these bullets.  So is this one of those examples where the basis for these are just your own experience?

A    Yes.  Those are also some of the same verbiage I used earlier when we talked about the work that I did at Meta as well as at Ipsos.

Q    Right.  So that verbiage, and when you talked about it earlier, that's not based on academia; that's just based on your own experience?

A    That's based on my expert experience, yes.

162

effect on how you represent information.

Q    And is your entire understanding of what Daubert stands for based on your own Google search?

A    Yes, based on my own reading, correct.

Q    Okay.  You're not a lawyer?

A    No, I'm not.

Q    Do you hold yourself out as an expert on the Daubert standards?

A    Not at all.

Q    So when your ninth opinion states that the methodologies employed in this analysis meet established standards, you have no expertise in determining what meets Daubert standards, right?

A    Outside of what I read, no.

Q    Outside of what you read on Google?

A    Well, actually, outside of what I read on the U.S. Justice website.

Q    Okay.  You have no independent experience other than having read the case?

A    Correct.

Q    And you talk about Daubert in paragraphs 100 to 106 of your report.  And you write:

(As read):

"Under the Daubert standard and its progeny, Courts evaluate expert

163

methodology based on several criteria."

What is your understanding of Daubert progeny?

A    So it is the case -- the components, based on what I downloaded and read from the U.S. -- U.S. Justice's website.

Q    Okay.  And you wrote that sentence, "under the Daubert standard and its progeny"?

MR. FRITZ:  Objection.

THE WITNESS:  Yes.

BY MS. GOVERNSKI:

Q    Okay.  And would it surprise you that GPTZero predicted this paragraph also to be 100 percent likely to be AI?

MR. FRITZ:  Objection.

THE WITNESS:  Okay.  Is it the word "progeny" that's -- I'm sorry.  I'm confused about that.  It's a case and then it's the word "progeny" added onto it.  So I'm not sure what would be generative AI about that.

BY MS. GOVERNSKI:

Q    I'm just trying to understand how you came up with the sentence:

(As read):

"Under the Daubert standard and its

164

progeny, Courts evaluate expert methodology based on several key criteria."

A      I mean, it's --

MR. FRITZ:  Objection.

THE WITNESS:  Again, I probably read it on the Justice's website.

BY MS. GOVERNSKI:

Q      Okay.  And I don't understand why you were offering an opinion on whether your methodology meets Daubert's standard if you're not an expert in Daubert.  Can you please explain?

MR. FRITZ:  Objection.

THE WITNESS:  So I added that in specifically to ensure that I, my work, would meet the criteria that would be relevant for the report itself.

BY MS. GOVERNSKI:

Q      Even though you have no expertise in the Daubert standards?

A      Outside of what I read, no.

Q      Okay.  What is your understanding of what your assignment was in this case?

MR. FRITZ:  Objection.

You can answer again.

175

A    I did not go into each individual line of data -- like, row of data and read them verbatim.

Q    Okay.  Your dataset is 96 percent smaller than Dr. Mayzlin's, right?

MR. FRITZ:  Objection.

THE WITNESS:  My dataset is 44,000.

BY MS. GOVERNSKI:

Q    And that's 96 percent smaller than 1.1 million, right?

MR. FRITZ:  Objection.

THE WITNESS:  44,000, is my dataset. Yeah.

BY MS. GOVERNSKI:

Q    Okay.  Well, can you explain how you can be confident that your dataset is representative when Dr. Mayzlin's is 96 percent larger?

A    Size is not a signifier of accuracy or -- of accuracy, I would say.

Q    Right.  So I'm asking how could you ensure that your 43,992 posts were a representative sample?

MR. FRITZ:  Objection.

You can answer again.

THE WITNESS:  Yeah, so I would say representative is extremely difficult.  I would

176

actually argue that neither my dataset nor Dr. Mayzlin's set is representative of the overall universe that encompasses Blake Lively during the given periods of time that we looked at because it's physically impossible, based on the data that is available to either of us.

BY MS. GOVERNSKI:

Q    Understood.  So you cannot, as you sit here today, represent that your dataset is representative of the full dataset that would be reflective of the Blake Lively-related content during this time period?

MR. FRITZ:  Objection.

You can answer again.

THE WITNESS:  So "representative" would first have to be defined.  Representative of the entire mass of data for any given time period, no one's dataset is representative unless you're looking at a social media platform looking at their own data.  So anybody with access to second-party or third-party data, which would be any of the experts involved in this trial, would not have access to representative data based on the entire universe.

BY MS. GOVERNSKI:

Q    I'm asking you specifically about your

178

what representative means.

My data is based on the keywords that were accessible for public -- public posts, similar to, again, anybody not using first-party data.

Q    Okay.  Well, how would you use the term "representative" generally in your everyday life?

MR. FRITZ:  Objection.

THE WITNESS:  Representative in my everyday life?

MR. FRITZ:  Hold on.  Do you mean as a verb or a noun?

BY MS. GOVERNSKI:

Q    Answer the question as you understand it.

MR. FRITZ:  Go ahead.

THE WITNESS:  So having a research background, I would use representative in the context of does this represent the majority of individuals within a class, a segment, a majority, a minority, or the majority of information available.

BY MS. GOVERNSKI:

Q    Okay.  Is it your testimony that your dataset meets your definition of "representative"?

MR. FRITZ:  Objection.

You can answer again.

THE WITNESS:  My dataset and no one

179

else's dataset, unless it's a first-party, would be representative of the keywords around Blake Lively.

BY MS. GOVERNSKI:

Q    Okay.  So just speaking about your dataset, I just want to make sure I understand. Adopting your definition of "representative," it's your testimony that your dataset is not representative of the majority of the individual statements about Blake Lively during this time period?

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q    Is that right?  I just want to understand what your testimony is.

MR. FRITZ:  Same objection.

THE WITNESS:  It's not possible for a dataset to be, quote, unquote, representative of all of the social media discussion around Blake Lively, unless you are a first-party that is -- has access to that data, such as Twitter, Instagram, Facebook, et cetera.

BY MS. GOVERNSKI:

Q    Okay.  So if you are a scientist and you're conducting an experiment, don't you need to create a representative sample?  Otherwise, what is

180

it that you're trying to conclude?

MR. FRITZ:  Objection.

THE WITNESS:  So when looking at social media data, it's not about a representative sample; it's about a statistically significant sample. Because keywords, in and of themselves, means that you're not looking at a representative sample because you are only using a specific amount of keywords.  There are a myriad of different combinations that represent Blake Lively globally across social media.  There's also accounts that are inaccessible by any second-party individual trying to look and analyze data.

BY MS. GOVERNSKI:

Q    So if you were to identify an entirely separate set of 43,992 social media items, like entirely separate, there's no overlap between the two, how do you know the results would be the same?

A    Again, the question would be what is the second set of data about.

Q    Well, you said that you can't possibly identify everything, even if it hits on search terms, right?

MR. FRITZ:  Objection.

THE WITNESS:  No one -- no one can,

200

is done in a coordinated effort either through bots or through human activity.  It's a different coined term.

Q    Okay.  And how do you know that the way you define astroturfing is the way that Dr. Mayzlin defines astroturfing?

A    I believe it's an inference from reading through her report and the contextualization in that report.  Also, I understand the general term of astroturfing outside of both of our reports.

Q    Okay.  So opinion 1 says that you looked at social media activity between August 2024 through February 2025.  So is this opinion limited to that time period?

A    This opinion, yes.  I looked at larger datasets, but this particular opinion is based on that time frame.

Q    So that was my next question.  Why did you collect from a broader time period but limit this opinion solely to the more narrow time period?

A    Because I didn't have enough volume of data in order to offer that opinion through the larger frame of time that I was hoping to look at.

Q    So why didn't you just use Dr. Mayzlin's data?

201

A    So I couldn't replicate Dr. Mayzlin's data, first of all.

And secondly, using someone else's data just point blank without ensuring that, number one, I could reproduce it.  Number two, that the data is, you know, accurate of that time period, doesn't really make sense.  So I specifically wanted to pull raw data from the social media platforms themselves to analyze.

Q    So you have no idea -- well, you use the term -- what did you just say?  Accurate -- you just used the term "accurate of the time period," is that the term you used?

MR. FRITZ:  Objection.

THE WITNESS:  I'm not sure what I just said.  I'm not sure if it was accurate or -- number one, her data, it wasn't reproducible based on what I was given.  Secondly, it was -- to ensure that the data was -- I'm going to use it in a different way than we used it earlier -- representative of the actual raw data during the time frame.

BY MS. GOVERNSKI:

Q    Okay.  So how -- based on the way you just used it, how did you ensure that your data was representative of the actual raw data from the time

202

period?

A    It was pulled directly from the social media platforms, from their raw datasets.

Q    Okay.  So you don't know one way or the other whether Dr. Mayzlin's data was representative of the actual raw data from the time period?

A    There is no way to tell because she used an LLM.

Q    Right.  So you can't tell one way or the other whether her data was representative of the time period?

MR. FRITZ:  Objection.

THE WITNESS:  I cannot tell if her raw data is accurate of the time period that she has, no.

BY MS. GOVERNSKI:

Q    Okay.  So when you said there was not enough, not sufficient social media activity after February 2025, what was that based on?

A    So what I said was, for this particular opinion, there wasn't enough volume of data in order to derive an insight outside of this time period.

Q    What volume of data would you have needed?

A    It would have to be consistent across all

203

five of the networks.  So there should be an even sample across all networks in order to make an opinion after this time frame.

Q   Why do you need an even sample across all the networks?

A   So it doesn't have to be exactly the same, but there has -- it has to be proportional. So ideally, I would have had more of two of the networks, which I did not just based on availability, I guess, through Apify.  So I used the data that I felt was the most -- the most substantive and without making any assumptions on smaller datasets.

Q   Okay.  But you said there wasn't enough volume, so do you have a ballpark of how much volume you would need for the period after February 2025?

A   I don't know offhand.  It would -- I would have to go back and crunch the numbers.

Q   So what I'm confused about is why didn't you just accept Dr. Mayzlin's dataset for whatever value it has and run your analysis on that?

MR. FRITZ:  Objection.

THE WITNESS:  So I didn't accept it at face value, and nor should anyone just accept data at face value.  What I did was, I first tried to

213

MR. FRITZ:  Objection.

THE WITNESS:  -- because I didn't need to -- oh, sorry.  Oh, I thought Kevin said something.

MR. FRITZ:  I did.  I just noted my objection.

You can answer.

THE WITNESS:  Because I didn't need to. That's, again, based on my knowledge of actually working with celebrities across social media and tracking individuals, whether they are brands or people.

BY MS. GOVERNSKI:

Q   How many times have you run a standard deviation before?

A   How many times have I done the calculation?  Numerous.

Q   In the course of your career, how many times?

A   Over 25 years, I can't give you a number.

Q   Is it part of your day-to-day work?

A   It was part of my prior day-to-day work, yes.

Q   Prior, meaning at Meta?

A   At Meta, Ipsos, at Nielsen, which are all market research companies.  And, again, market

214

research, standard deviation is a key element of doing massive research initiatives.

Q   And when you analyzed August 2024, you described that as "a spike."  Why did you use those words -- or that word, sorry, "spike"?

A   I used that word because you have to look at a larger set of data across multiples months. And if something goes up dramatically, I would call that a spike.

Q   In fact, you've used the word "extraordinary" to describe the August 2024 spike, right?

A   I'm not sure if that's the actual word I used, but I will say yes, this was a significant spike.

Q   Okay.  Well, let's go to opinion 2 of your report, which is in paragraph 169.

A   Yes.

Q   Okay.  And if you can look at opinion 2, you say:

(As read):

"The 4.9 statistical deviation, while extraordinarily, reflects organic news-driven interest rather than manipulated [sic] manipulation."

248

Q    Neutral.  How do you define each of those three terms?

A    So positive in the classifier looks at things that positive -- I'm trying to figure out how to define something without using the word.  Looks at things that are --

THE REPORTER:  Sorry, can you guys hold on for a second?  I can't hear anything.

MS. GOVERNSKI:  Yeah, let's go off the record.

THE VIDEOGRAPHER:  Sure.  We're off the record.  It's 5:33 p.m.

(Off the record due to audio issues on Zoom.)

THE VIDEOGRAPHER:  We are back on the record.  5:44 p.m.

BY MS. GOVERNSKI:

Q    Ms. Alexander, can you please explain how your sentiment analysis defined positive, negative and neutral?

A    So the way that the classifier looks at it versus how I would define it, in general, is slightly different.  The classifier I used for -- it looks at it from a score system.  So if something is based on natural language processing, based on fine-tuning, if something is more positive, it has a

249

higher positive score.  If something is more negative, based on its training model, it classifies it as negative.  And if it's more neutral, is -- neutral is normally something that is -- I don't know want to say factual -- it's something that is usually more just straightforward without -- without additional nuance of being positive or negative. But they're score systems, in BERT.

Q   So the way -- when you were describing the classifier, which is positive, negative, or neutral, that's the classifiers that BERT itself assigns; is that right?

A   Yes.  Based on the model, based on fine-tuning, the BERT model looks at natural language processing to derive if it's positive, negative or neutral.

Q   What is "fine-tuning"?

A   Fine-tuning means the sensitivity, the -- a myriad of different factors.  It could be to reduce bias, to reduce how the model takes into account different parameters.

Q   Did you fine tune your BERT model?

A   No, I did not.

Q   Why not?

A   One, I didn't have access to fine tune.

250

It is -- the BERT model is for social media analysis.  Well, I'm sorry -- it's for natural language processing, so I would argue that it doesn't need to be fine tuned.  And I wouldn't -- I wouldn't make any adjustments to the --

Q    So what would be -- strike that.

What did the -- what types of contents did the BERT model designate as negative in this case?

A    What types of content -- content that was -- had different degrees.  Because again, it's not just negative, it labels it as a score, first, that's on a negative side.  It would be things that are derogatory -- derogatory, mean, rude, things of that nature.

Q    Okay.  Derogatory as to whom?

A    Well, in this case, Blake Lively.

Q    Okay.  So how would it classify content that was derogatory of Mr. Baldoni?

A    So it would -- if it looked at Mr. Baldoni, based on keywords, it would look at things like the association of the name, the context that his name appeared in, and if the -- if the negative sentiment or -- sorry.  If the negative words were applied to Baldoni versus anyone in the

251

post -- in the post.

Q   So what if a post was about both Ms. Lively and Mr. Baldoni and included positive and negative language, how would BERT know how to classify such a piece of content?

A   So BERT is trained on natural language processing.  It has context, so it looks at the sentence structure and it looks at -- similar to, I guess, deconstructing the English language about who the negative or the positive personifier is associated with, and then it would classify it as positive, negative, or neutral, depending on the keywords --

Q   So were you able to tell BERT --

A   -- that you're looking for.

Q   -- that negative content about Ms. Lively should be classified as negative, but negative content about Mr. Baldoni should not?

A   So I was not -- I didn't include negative content about Baldoni because it was out of scope for the analysis.

Q   Well, what if your search terms hit on a post that included negative language about Mr. Baldoni?

                MR. FRITZ:  Objection.

252

THE WITNESS:  So if there was negative content in the post that had Blake Lively, because again, there had -- Blake Lively had to show up based on the keyword or parameters I put in.  If there was also -- if there was negative content about Baldoni in the same post, then it would, again, associate what the -- what the sentiment was for Lively and not Baldoni.

BY MS. GOVERNSKI:

Q    And how did you teach BERT to look for the sentiment as to Ms. Lively and not look for the sentiment as to Mr. Baldoni?

A    So it's part of the parameters that I put in around the keywords that you saw in my report.

Q    What parameters did you put in?  How would I know that?

MR. FRITZ:  Objection.

THE WITNESS:  Those are the keywords that you see in my report that I've included.

BY MS. GOVERNSKI:

Q    So your keywords were Ms. -- Blake Lively and we can go through some of the specifics, but how did BERT -- how was BERT able to derive from Blake Lively that you're only looking for content that is negative as to Ms. Lively as opposed to

253

negative as to any other of the content in the report?

A    So you're able to isolate who the subject of the sentiment is for.  So in this case, it was for Blake Lively.  It could mention six other people in the content, but I was only concerned with the sentiment as associated with Blake Lively.

BY MS. GOVERNSKI:

Q    Okay.  How are you able to give BERT that direction?

MR. FRITZ:  Objection.

THE WITNESS:  So it's part of the parameters when you're setting up the classifier run.

BY MS. GOVERNSKI:

Q    Okay.  So did you produce your parameters when you set up the classifier run?

A    I'm sorry?  Did I produce?

Q    Did you provide to us the parameters for your classifier run?

A    No, because it specifically negates any -- so the way that you put it into the system, you specify who the subject matter is.  And in this case, it's the keywords around Lively.  So it's not fine-tuning or anything like that.  I'm simply

254

saying negate anyone other than Lively when applying sentiment scores.

Q    And where have you explained that in your report?

A    I don't believe I did.

Q    So if I wanted to understand all the different parameters that you instructed BERT to follow, how would I do that?

A    You would still be able to take my dataset, put it into BERT, based on python code that I provided you and keywords and the time frame. There is an element that says do you -- I'm not sure exactly what it says -- but should I focus on the core keywords only or should I analyze additional keywords.  Using the keywords I provided, that's the focus of the analysis.

Q    So the only way that you educate BERT was by putting in the keywords --

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q    -- in the instructions?

A    In the dataset, yes.

Q    Okay.  And you refer to BERT as "the BERT family."  You understand that there are multiple types of BERT models, right?

255

A    Yes.

Q    So what BERT model did you use?

A    I used the most recent BERT model, and I believe I specify it in my report.

Q    Where did you specify that in your report?

A    Let's see.  I don't put it in there. It's currently the only BERT model that is available through Google.  I don't think I specify the date -- the launch date of the BERT model.

Q    Okay.  Well, can you identify the BERT model that you used?

MR. FRITZ:  Objection.

THE WITNESS:  I would have to go and reference it.  I would have to look it up.

BY MS. GOVERNSKI:

Q    Okay.  Is there a reason you didn't disclose the specific BERT model you used?

A    There's no reason.  It's part of the BERT family so it's the one that's is currently accessible.

Q    But BERT models -- in order to replicate it, there is a lot BERT models, right?

MR. FRITZ:  Objection.

THE WITNESS:  There's different versions

256

of the BERT models.

BY MS. GOVERNSKI:

    Q    Too many to even enumerate, right?

        MR. FRITZ:  Objection.

        THE WITNESS:  I don't know if that's true.  It's the current version of BERT.

BY MS. GOVERNSKI:

    Q    Okay.  But if we wanted to replicate your sentiment analysis based on what you disclose in your report, we would have to guess what BERT model you used?

        MR. FRITZ:  Objection.

        THE WITNESS:  I would say you could do that by going to the current BERT model, the latest version.

BY MS. GOVERNSKI:

    Q    And just guessing that that's the one you used.

        MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

    Q    Is that right?  We'd have to just guess --

    A    Was that statement or a question?

    Q    A question.  We would have to just guess that you used the most recent BERT model?

257

MR. FRITZ:  Objection.

THE WITNESS:  You -- you -- there would be an inference that the latest one would be the one that you could default to.

BY MS. GOVERNSKI:

Q    Okay.  Is BERT or LLM a newer model?

A    LLM stands for Large Language Model.  So you'd have to be specific on what LLM you're referring to.

Q    Okay.  Well, did BERT models precede large language models?

A    They did.

Q    Okay.  So it doesn't depend on what type of LLM, right, it just -- BERT preceded LLMs?

MR. FRITZ:  Objection.

THE WITNESS:  So BERT is natural language processing.  And BERT is -- I believe BERT models came out, I'm guessing, but maybe 20 -- 15 to 20 years ago.

BY MS. GOVERNSKI:

Q    Okay.  And where did you obtain your BERT model from, you said Google?

A    Yes, correct.

Q    Did you run the BERT model using a computer program?

258

A    Using Python, yes.

Q    And how did you write the code to call the specific model and version that you mentioned?

A    So my assistant wrote the code, and I shared the code for each of the -- for each of the scrapes and for the sentiment.

Q    Do you know how to write code?

A    I know how to write code, enough.  I wouldn't say I am the person to write code for complex matters by any means.

Q    Okay.  So in the code that you produced, what version of the BERT model does it reflect?

MR. FRITZ:  Objection.

THE WITNESS:  It should reflect the most recent version.

BY MS. GOVERNSKI:

Q    The most recent as of what date?

MR. FRITZ:  Objection.

THE WITNESS:  As of October 2025.

BY MS. GOVERNSKI:

Q    Okay.  Did you apply the BERT model on all of your dataset?

A    Yes.

Q    Okay.  If I want to understand how your BERT model classified all of the information in your

259

dataset, how would I do that?

MR. FRITZ:  Objection.

THE WITNESS:  How it classified?  You would have to go into BERT to understand its general classifier system.

BY MS. GOVERNSKI:

Q    But if I wanted to understand any one post to understand how your BERT model classified that one post, how would I do that?

MR. FRITZ:  Objection.

THE WITNESS:  So you can see the score based on the dataset I provide.  You can see the score that BERT gave each piece of -- each piece of -- of -- excuse me -- each post.  But if your question is how it classified, there is -- you would have to go into the BERT model itself when replicating the run.  Actually, I'm sorry.  I'm going to -- that wouldn't be.  You would have to go into BERT itself to understand, into the developer tools.

BY MS. GOVERNSKI:

Q    So where did you disclose the score for each post?

A    So I provided an aggregate, and it's in the zip file that was submitted.

260

Q    But I'm not asking for an aggregate, I'm asking for the score for each individual post.

MR. FRITZ:  Objection.

THE WITNESS:  So the output from BERT is it clusters together.  So it provided the score of -- the score of positive, negative and neutral.

BY MS. GOVERNSKI:

Q    So there is no way to see how it classified any individual social media item?

MR. FRITZ:  Objection.

THE WITNESS:  Is there a way to classify, no.

BY MS. GOVERNSKI:

Q    So you have no way of knowing if it accurately classified any of the 43,992 pieces of social media items?

MR. FRITZ:  Objection.

THE WITNESS:  I'm sorry.  You mean 44,000?

BY MS. GOVERNSKI:

Q    43,992.

A    So I was able to go in the system and we hand verified a certain portion, which I reference in my report.  So we went through and looked at 300 different posts.  I believe it was 300, I'd have to

261

just double check.

Q    Okay.

A    To -- hand eye verify the sentiment scores that they were correct in conjunction with the individual posts.

Q    Well, how did you know sentiment scores of those 300 posts?

A    Because it provides it in a -- you can open the tabs to see how their -- how the system is identifying the individual pieces of content.

Q    So you -- there is a way in the system to know how it's identifying each individual post?

A    Yes.  To verify it, correct.

Q    And why haven't you provided us with that underlying classification data?

MR. FRITZ:  Objection.

THE WITNESS:  Because it wasn't necessary in order to replicate my work.

BY MS. GOVERNSKI:

Q    Well, if we want to be able to check how your BERT analyzer classified each one of the 43,992 social media items, how could we do that?

MR. FRITZ:  Objection.

THE WITNESS:  You could -- you could replicate the run itself, based on the data that I

262

provided.

BY MS. GOVERNSKI:

Q    But if we wanted to understand how your BERT model, the way you ran it, classified each one of those posts, how could we do that?

MR. FRITZ:  Objection.

THE WITNESS:  The only way would be to rerun it based on the code and dataset that I provided.

BY MS. GOVERNSKI:

Q    Well, if you were able to go in and see how all of the 43,000 social media items were classified, couldn't you just produce the outcome of that for us?

MR. FRITZ:  Objection.

THE WITNESS:  So the extract was an aggregate, was -- the downloadable version is an aggregate.

BY MS. GOVERNSKI:

Q    But for the 300 posts, couldn't you just, like, take a screenshot of it?

MR. FRITZ:  Objection.

THE WITNESS:  I'm sure, yes, that's one feasible way of capturing something that is on the screen.  You wouldn't get all 300 in said

263

screenshot, but yes.

BY MS. GOVERNSKI:

Q    Yeah, but there is a feasible way that you could give us the classifications of your sentiment analysis, right?

MR. FRITZ:  Objection.

THE WITNESS:  So I did in aggregate.  I didn't on each individual post.

BY MS. GOVERNSKI:

Q    But there is a way, a feasible way that you could do it for each individual post, right?

MR. FRITZ:  Objection.

THE WITNESS:  It would have -- it would have been more work to extract it, and I didn't believe it was necessary.

BY MS. GOVERNSKI:

Q    How much more work?

A    I'd have to go through in the system to see, but it's not just a download of the CSV.

Q    So how long did it take you to do those 300 posts?

A    To do the verification of the 300 posts?

Q    No, to pull that data of 300 posts.

MR. FRITZ:  Objection.

THE WITNESS:  So the verification which

264

is -- because it's just the subset, it's a randomized subset. So that was, again, randomized, so we went through and hand confirmed that the score made sense to the physical post. And we did that in the environment itself.

BY MS. GOVERNSKI:

Q I understand. But how long did it take you to pull the specific sentiment classify -- strike that.

How long did it take you -- I'm not talking about performing the analysis -- just to pull the information about how the 300 posts were classified?

MR. FRITZ: Objection.

THE WITNESS: So I'm not sure how much time it took because we looked at 300 randomized rows in the environment to confirm or disconfirm that the score itself was accurate.

BY MS. GOVERNSKI:

Q So if you don't know how long that took, how do you know how long it would take you to run the same instruction on all of the social media items in your dataset?

A So doing a -- performing by eye or hand to confirm if the score is accurate or not is done

265

in real time in the environment.  I simply can't tell you how long that took.  I'm not sure what your question...

Q    Yeah, what I'm asking you is --

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q    -- you were able to identify 300 posts, right?  You were able to do a query and say pull 300 posts and tell me how you classified these 300, right?

A    We looked at 300 posts that were classified.

Q    Okay.  So how were you able to understand the classifications of those 300 specific items?

A    We looked at the content.  So the post itself, the verbiage, and we looked at the score that was given by BERT, the classifier to understand if that score was accurate, based on general knowledge of reading the posts and interpreting, based on just general knowledge of what would be positive, negative or neutral.

Q    Okay.  And if you wanted to understand how your sentiment analysis classified each of the 42,000, how would you do that?  43,000.  Sorry.

MR. FRITZ:  Objection.

266

THE WITNESS:  So one way is to go through and eyeball every single one, to go through and look at the score and to look at the copy that is from the post.

BY MS. GOVERNSKI:

Q    I'm trying to understand where you would look to see the score for each individual post.

MR. FRITZ:  Objection.

THE WITNESS:  You would look in the BERT model itself, after it's classified, each piece of content.

BY MS. GOVERNSKI:

Q    Okay.  So there exists, in the BERT model, a way to see how it classified each individual post?

A    In the environment, yes.

Q    And you did not produce to us any individual scores for any individual posts, right?

MR. FRITZ:  Objection.

THE WITNESS:  I did not produce scores for each individual piece of content.

BY MS. GOVERNSKI:

Q    And you didn't produce even -- sorry. Scratch that.

You didn't identify the specific 300

267

posts that you checked, right?

A    No, it was a randomized post -- it was randomized 300 in order to confirm that the classifier was accurate.  Again, to reproduce it, you wouldn't need that.  You're able to reproduce it based on what we provided.

Q    Are we?  Are we able to reproduce a randomized -- how do you know that my randomized sample would be the same as your randomized sample?

MR. FRITZ:  Objection.

THE WITNESS:  You're able to produce the -- in aggregate, the classifier, based on the model that I gave you -- or based on the BERT family using the latest model and the dataset.

BY MS. GOVERNSKI:

Q    But that's not my question.  My question is:  How could I receive the exact same 300 posts that you conducted your manual review on?

MR. FRITZ:  Objection.

THE WITNESS:  If it's randomized, you cannot.

BY MS. GOVERNSKI:

Q    So I cannot identify what 300 posts you manually reviewed based on the information that you've disclosed, right?

268

MR. FRITZ:  Objection.

THE WITNESS:  That is correct.

MS. GOVERNSKI:  My colleague is going to move nine documents into being Exhibit Share.  I'm going to mark them as exhibits -- starting with Exhibit 8.  So it will be 8, 9, 10, 11, 12, 13, 14, 15, 16.  So she's going to move them all in there.

BY MS. GOVERNSKI:

Q    And while she does, can you tell me what BERT stands for?

A    Bidirectional -- bidirectional is the most important part.  I'm not sure what the rest of it stands for.

Q    And how often have you used BERT other than in this case?

A    Probably once a week, this particular -- from September to present.  I use it for class.  I use it for work previously.  Yeah, often.  Frequently.

Q    So you personally run BERT weekly?

A    I personally use BERT for a myriad of different things in relation to my class.  So my students are asked to run simulations, things of that nature.  I use it for nonwork-related elements, as well as previously for work-related.

319

THE WITNESS:  The README file was written by Taylor Hunter, the report was written by myself.

BY MS. GOVERNSKI:

Q    Oh, so do you not stand behind Ms. Hunter's work as described in the README files?

MR. FRITZ:  Objection.

THE WITNESS:  I use different verbiage, based on, again, analyzing and doing the interpretation of the data.  That's why I am the end publisher of the report.  This is information that Taylor is feeding in based on her analysis, aggregation, and pulling of the datasets.

BY MS. GOVERNSKI:

Q    But you didn't make any edits to her comments in the README file, right?

A    No, I did not.

Q    And you used a TikTok hashtag crawler actor, right?

A    I'm sorry.  A hashtag crawler actor?

Q    Uh-huh.

A    So it was the actor for the API for TikTok, I don't believe it actually calls itself a crawler.  I don't remember that verbiage in the way that it's --

Q    Okay.  Let's look at your report to

328

explanation."

Do you see that?

A    I do.

Q    Is that your opinion or is that Ms. Hunter's opinion?

MR. FRITZ:  Objection.

THE WITNESS:  So that is an inference that Ms. Hunter made.  It is an inference that I've also made in addition to that.

BY MS. GOVERNSKI:

Q    Okay.  So what is your basis for understanding that spikes in January and February and October were related to newsworthy events?

A    So based on the data, we saw that there was the spike initially in August.  And then in December, around the time of filing the lawsuit, there was additional spike.

Q    So you didn't consider any other events that occurred in December that could have caused that spike?

A    I didn't see -- I didn't find any other data that highlighted other key news cycles that would be able to be considered.

Q    In the dataset, in your dataset, right?

A    Correct.

340

A   I would have to check the data file -- I mean, sorry.  The data folder itself.  If they are not in there, to caveat, that's not necessary to reproduce it.

Q   So how would we know what nodes you used?

A   So unless I'm fine-tuning the nodes themselves, you can use any nodes outside of Google or any other third party in order to look at a similar analysis.

Q   And what are your edges?

A   I don't know without looking.

Q   Okay.  So you wouldn't know unless you looked at the data?

A   Correct.

Q   Okay.  And you conducted a time series forecasting, right?

A   That's in the report, yes.

Q   But you didn't use your BERT sentiment analysis for purposes of the time series forecasting, right?

A   No, I did not.

Q   Why didn't you?

A   Because BERT is -- is -- does its best job on looking at natural language processing versus forecasting.  I used it for the sentiment analysis

341

specifically.

Q    What is your basis for that statement about BERT being best used for the way you used it but not for time series forecasting?

A    BERT was built to be a natural language processor.  It has a myriad of data that backs it up for contextualization, tonality.  It's -- it's an industry standard for use.

Q    But why wouldn't you -- well, what did you use for your sentiment -- time series forecasting sentiments?

A    I used the -- I used the -- I used just the forecasting.  I used a regression model and a forecasting technique.

Q    How did you identify the sentiment of the posts for purposes of your time series forecasting?

A    I took it from the sentiment, the aggregate sentiment of the -- of the output of BERT.

Q    Oh, so you did use the BERT outcome for purposes of the time series forecasting?

A    As the baseline for sentiment, but the forecast itself was done with a regression model.

Q    Okay.  So you did not use a keyword-based classification for your time series forecasting?

A    For my time series, with the spike and

342

without the spike, that's a specific chart in my report, the baseline is the outputs of BERT, which is a classifier.  And I used a regression model forecasted with the spike and without the spike.

Q    And so when, in your report, you describe using 20 positive keywords and 20 negative keywords, how did you use those keywords?

A    So those keywords are still the keywords based on the inputs that I provide in my report. Those keywords were the ones that I used consistently for the scraper across the APIs and were part of the aggregate of the data that came out of the classifier.  And I used that into the regression model.

Q    Well, you have 20 -- you have specific keywords here.  You say positive keywords like love, amazing, talented, support, and then negative keywords like hate, terrible, toxic, boycott.  So it's your testimony that you used those terms in your BERT analysis?

A    So I pulled out the major cluster of -- based on volume.  I pulled those out, and I asked it -- sorry.  I instructed the system to give me a sentiment score based on those keywords.  Based on the output from the BERT model, or BERT classifier,

343

I then conducted a regression analysis.

Q    So why didn't you just use the sentiment scores from the BERT model that we discussed earlier?

A    Because the total sentiment was an aggregate.  So I needed more granular information than the aggregate scores.

Q    But you testified earlier that you could look at the specific scores for each post.

A    And in a subsequent question that you asked me was why I did not give that as an output. One of the reasons is because it was difficult to get the data on a subaggregate level out of BERT in order to do the analysis.  So --

Q    I understand -- sorry.  Go on.

A    So I used specific keywords.

Q    Okay.  So your time series forecasting depends on both, as an initial level, the BERT sentiment classifier and then -- and keywords from the BERT sentiment analysis?

A    So it's the sentiment scores, the keywords that I provided, and then outside of that, the final step is to do a forecast.

Q    Okay.  So if I wanted to recreate what you just described, how would I do that?

345

A    I believe that was me.

Q    Okay.  So do you have that list?

A    I would have to look at the -- I would have to look at my data folder.

Q    Do you have a data folder of --

A    The zip file that I provided to -- to counsel.

Q    Okay.  So you're saying that the data file you provided us should include the list of keywords that you used?

A    It should provide you with everything you need to replicate --

Q    That wasn't my question.

MR. FRITZ:  Objection.

BY MS. GOVERNSKI:

Q    Does the data you provided us include the list of all the keywords you used?

A    I would have to look to see if that is included.

Q    Okay.  So how often have you created a regression model?

A    How often?

Q    Yeah.

A    I -- so a regression analysis, I've done it at Ipsos, as well as Nielsen, as part of leading

346

the Bases team, which is a product that we use on a daily basis for clients.

Q    How often did you create a regression?

A    I probably did regressions or checked regressions that my team did on a weekly basis.

Q    Okay.  Your report lists certain documents including Ms. Lively's discovery responses.  Did you personally review all of her responses to the interrogatories?

A    The last word was "interrogatories"?

Q    Yup.

A    I'm not sure what -- what you mean.

Q    In your Exhibit Appendix C, it states that you reviewed Ms. Lively's third amended responses and objections to a set of interrogatories.  It lists four documents.  I'm wondering if you reviewed personally all of those interrogatory responses.

A    I would have, yes.  I went through the files meticulously, so --

Q    Okay.

A    -- I went through everything that was provided.

Q    Okay.  And did you review the underlying materials that are referenced in the

347

interrogatories?

A    I'm not sure I reviewed the underlying materials, no.

Q    Okay.  What was your response to parts of the interrogatory that discussed how the defendants boosted contents on social media?

A    I can't -- I don't recall the data that -- or the context that you're referring to.

Q    Okay.  Well, what is your reaction to understanding that the defendants communicated about boosting social media?

MR. FRITZ:  Objection.

THE WITNESS:  So I read through -- I recall some of the claims, but I can't remember if it was in that report or if it was part of Dr. Mayzlin's and Dr. Humphreys' report and them referencing it.  I can't tease out the difference between where the information came from in my mind.

BY MS. GOVERNSKI:

Q    Okay.  Well, Ms. Lively's interrogatory included multiple pages of quotes from direct emails and communications amongst the defendants.

Do you remember reviewing those?

A    Not offhand.  I remember some of it, but again, I'm not sure if it's from the report or --

348

I'm not sure if it's from the amended or from Dr. Mayzlin and Dr. Humphreys.

Q   Okay.  So in one of the communications, they talked about successfully shifting the narrative online.  Did you consider that communication?

A   The communication, no, that was not part of my consideration.  So the goal that I went into with analyzing was to look at it without assumptions or applied assumptions to look at the dataset from a clean perspective.

MR. FRITZ:  John, how long have we been on the record?

MS. GOVERNSKI:  Well, we can go off the record, if you want to get a check of the time.

THE VIDEOGRAPHER:  Seven hours exactly.

MS. GOVERNSKI:  Was his question included in that?

Okay.  I have one final question.  Are we still on the record, John?

THE VIDEOGRAPHER:  Yes.

BY MS. GOVERNSKI:

Q   One final question.  So when you said you wanted to look at the data without considering the external materials, you then did not consider any of

HIGHLY CONFIDENTIAL

**Page 355**

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---

BLAKE LIVELY,                    )
                                 )
        PLAINTIFF,               ) CASE NO. 24-CV-10049-LJL
                                 ) (LEAD CASE)
      VS.                        )
                                 ) 25-CV-449 (LJL)
WAYFARER STUDIOS LLC, ET AL.,    ) (MEMBER CASE)
                                 )
            DEFENDANTS.          )
_____ )
JENNIFER ABEL,                   )
        THIRD-PARTY PLAINTIFF,   )
      VS.                        )
JONESWORKS, LLC,                 )
        THIRD-PARTY DEFENDANT.   )
_____ )
WAYFARER STUDIOS LLC, ET AL.,    )
        CONSOLIDATED PLAINTIFFS,)
      VS.                        )
BLAKE LIVELY, ET AL.,            ) VOLUME 2
        CONSOLIDATED DEFENDANTS.) (PAGES 355 TO 423)
_____ )

** HIGHLY C O N F I D E N T I A L **

(FOLLOWING TRANSCRIPT HAS BEEN DESIGNATED

HIGHLY CONFIDENTIAL)

VIDEO-RECORDED DEPOSITION OF NICOLE ALEXANDER

APPEARING REMOTELY FROM NEW YORK, NEW YORK

TUESDAY, JANUARY 6, 2026

REPORTED BY:  DAYNA HESTER, C.S.R. 9970

HIGHLY CONFIDENTIAL

Page 387

traffic comes from, something to that effect with social media.

Q.    And what was your response?

A.    I don't recall my specific response.

Q.    Well, what would be your response to that today?

MR. FRITZ:  Objection.

THE WITNESS:  During my time at Meta, I looked at things like flow of traffic, understanding where traffic originated, where it ended up.  That's general data analytics.

BY MS. GOVERNSKI:

Q.    Okay.  And so when you volunteer the terms "organic" or "inorganic" just now in your deposition, did those terms come up at all in the call?

MR. FRITZ:  Objection.

THE WITNESS:  I don't believe so.

BY MS. GOVERNSKI:

Q.    Okay.  So what prompted you to describe the call as discussing organic versus inorganic if those terms were not used during the call?

MR. FRITZ:  Objection.

You can answer again.

THE WITNESS:  As I said a moment ago,