# Exhibit 3

CONFIDENTIAL – Attorneys' Eyes Only

UNITED STATES DISTRICT COURT

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Blake Lively,<br><br>   Plaintiff,<br><br>  v.<br><br>WAYFARER STUDIOS LLC, a Delaware Limited Liability Company, JUSTIN BALDONI, an individual, JAMEY HEATH, an individual, STEVE SAROWITZ, an individual, IT ENDS WITH US MOVIE LLC, a California Limited Liability Company, MELISSA NATHAN, an individual, THE AGENCYGROUP PR LLC, a Delaware Limited Liability Company, JENNIFER ABEL, an individual, JED WALLACE, an individual, and STREET RELATIONS INC., a California Corporation<br><br>   Defendants. | Case No. 1:24-cv-10049-LJL<br>(Consolidated with 1:25-cv-00449-LJL) |

**EXPERT REPORT OF DINA MAYZLIN**
**OCTOBER 17, 2025**

CONFIDENTIAL – Attorneys' Eyes Only

**TABLE OF CONTENTS**

I.    Introduction...........................................................................................................1

    A.    Qualifications...........................................................................................1

    B.    Assignment .............................................................................................3

    C.    Facts and Data Considered......................................................................3

II.   Summary of Opinions ........................................................................................4

III.  Background ........................................................................................................7

    A.    Parties.....................................................................................................7

    B.    Relevant Allegations and Timeline.......................................................10

    C.    Data Sources Used for My Analysis......................................................15

IV.   Overview of Foundational Marketing Principles and Academic Research Relevant to My Analysis ...............................................................................................18

    A.    Branding Principles and the Role of Consumer Perception....................18

    B.    The Influence of Personal Brands on Associated Commercial Brand Performance ...20

    C.    Academic Research Links Online Conversations to Product Sales...........24

    D.    Academic Research on the Seeding and Manipulation of Online Conversations .......27

V.    Assessing the Impact of Manipulation of Online Conversations .........................34

    A.    A Campaign to Manipulate Online Conversations ......................................35

    B.    Changes in Brand Perceptions Starting in August 2024................................44

    C.    Analysis of Changes in the Sentiment and the Content of Online Conversations.......51

        1.  LLM-driven Sentiment Classification of Online Conversations .............. 53

        2.  Manual Validation of LLM Results (Sentiment Classification)............... 59

        3.  LLM-driven Thematic Analysis of Online Conversations ....................... 61

    D.    Analysis of Changes in Sentiment and Associated Harm to Ms. Lively and Her Commercial Brands .............................................................................................74

        1.  A Sentiment Shift in Online Conversations in Early August 2024 Harmed Ms. Lively's Commercial Brands ............................................................. 75

        2.  The Sales Trends Across Ms. Lively's Commercial Brands Are Consistent with Negative Impact from the Manipulation of Online Conversations............................................................................................. 87

## I.    INTRODUCTION

### A.    Qualifications

1.    I am the Robert E. Brooker Chair in Marketing at the Marshall School of Management, University of Southern California ("USC Marshall"). My academic research focuses on how businesses manage advertising, communication strategies, and social interactions, particularly in the domains of word of mouth, online reviews, and social media. I currently teach undergraduate, M.B.A., and Ph.D. courses on digital marketing, digital analytics, and quantitative modeling. I have also served as Associate Dean for the Ph.D. Program at USC Marshall, represented the business school on the university-wide Tenure and Tenure-Track Faculty Affairs Committee, chaired the USC Marshall Promotions and Tenure Committee, and participated in numerous faculty hiring and review committees. Before joining USC, I was an Associate Professor of Marketing at the Yale School of Management.

2.    I am the author or co-author of numerous scholarly articles and several book chapters. My work has been published in leading journals including *Marketing Science*, *Journal of Marketing Research*, *Management Science*, and *The American Economic Review*, and the *RAND Journal of Economics*. My research explores how firms manage and influence digital conversations, with a focus on topics such as social media management, the manipulation of online reviews, online word of mouth, and influencer marketing. My recent work has examined how firms shape influencer behavior through affiliation strategies, how trolls manipulate curation algorithms, and the digital platforms' strategic presentation of online reviews. My earlier research includes empirical investigation into how firms manipulate consumer beliefs through biased or promotional online reviews, the effect of firm-created conversations on product sales,

CONFIDENTIAL – Attorneys' Eyes Only

and the causal effect of online word of mouth on product sales. To date, according to Google Scholar, my publications have been cited more than 20,000 times.

3.      My academic contributions have been recognized with several prestigious awards, including three INFORMS Society for *Marketing Science* Long Term Impact Awards (2011, 2013, 2017), the John D.C. Little Best Paper Award, the O'Dell Award for the paper published in *Journal of Marketing Research* that made the most significant long-term contribution to the field of marketing (a study of how online book reviews influence product sales), the Frank M. Bass Outstanding Dissertation Award, and the John A. Howard AMA Doctoral Dissertation Award.

4.      I served as Associate Editor at *Marketing Science* from 2018 to 2024 and previously held the same position at *Journal of Marketing Research*. I continue to serve on the editorial boards of several major marketing journals. In these roles, I regularly evaluate emerging research in marketing science and oversee the peer review of submissions spanning a broad set of marketing topics.

5.      I have served as an expert witness in marketing-related litigation and arbitration matters. I have filed expert reports and provided testimony at deposition and trial in cases involving the aggregation and display of product reviews, reputational harm from fabricated negative reviews, deceptive advertising, and the effect of false claims made on social media on investor behavior. A copy of my CV, together with a list of the trial and deposition testimony I have given in the last four years, is attached as **Appendix A**.

6.      I am being compensated at the rate of $900 per hour for my time. The research and analysis supporting this report was performed by Analysis Group personnel under my direction and guidance. Rates for other staff working on this matter range from $485 to $1,050

CONFIDENTIAL – Attorneys' Eyes Only

per hour. Neither my compensation nor that of Analysis Group is contingent upon my findings, the testimony I may give, or the outcome of this litigation.

**B.    Assignment**

7.    I have been engaged by counsel for Blake Lively to evaluate whether there is evidence of manipulation of online conversations allegedly financed and/or executed by Defendants, and to assess the potential impact of the manipulation on Ms. Lively's brands. In particular, I have been asked to determine: (1) whether, how, and the extent to which manipulation affected online conversations and consumer attitudes about Ms. Lively and her brands, and (2) whether this manipulation negatively impacted the sales of Ms. Lively's brands, namely, Betty Buzz, Betty Booze, and Blake Brown Beauty.

**C.    Facts and Data Considered**

8.    In forming my opinions, I have reviewed documents and other materials provided to me by counsel for Plaintiff, as well as materials obtained from public sources. These include, among others, academic publications in marketing and consumer behavior, marketing materials related to Ms. Lively's brands, social media data, news articles, and other publicly available information. The sources on which I rely are identified in this report and the accompanying exhibits or listed in the attached **Appendix B**.

9.    I reserve the right to supplement my opinions in response to any additional information provided to me or in light of documents and testimony brought forth.[1]

---

[1]    Of note, new information may become particularly valuable since Defendants described their campaign as "untraceable." KCASE-000004802-805 (Case and Nathan Short Message Report August 2024) at 803 ("All of this will be most importantly untraceable.").

3

CONFIDENTIAL – Attorneys' Eyes Only

## II.    SUMMARY OF OPINIONS

10.    On the basis of my review of the information identified herein, I have reached the following opinions:

11.    I observe reputational and commercial harm to Ms. Lively's businesses–Blake Brown Beauty, Betty Booze, and Betty Buzz–consistent with established findings in academic literature. First, the literature shows that online conversations play a causal role in shaping consumer behavior. Second, academic research demonstrates that celebrity reputations, personal brands, and affiliated commercial brands are tightly linked such that reputational shocks to a celebrity can transfer directly to affiliated brands. Finally, efforts to manipulate digital discourse by strategically seeding negative and even false information about the target, amplifying negative comments made by others, as well as other tactics such as the manipulation of the online platforms' curation algorithm can change online conversations, distort consumer perceptions, reduce brand equity, and ultimately depress sales. (See **Section IV**).

12.    In August 2024, I observe a marked shift in the volume, the content, and the sentiment of online conversations about Ms. Lively, consistent with the onset the Defendants' orchestrated campaign, as alleged by Ms. Lively. Importantly, I was also unable to identify alternative external events that could plausibly explain this change. This, along with: (1) the close alignment between the change in the online conversations in the direction consistent with the tactics and the goals of the manipulation campaign, and (2) the close alignment between the timing of the change in the online conversations and the documented campaign timeline leads me to conclude that the Defendants' strategic manipulation of online conversations caused the observed negative shift in online sentiment toward Ms. Lively and her brands. More specifically:

4

CONFIDENTIAL – Attorneys' Eyes Only

a.  Based on documents produced by Defendants and others in this matter, what Ms. Lively described as a "retaliation campaign" appears to have begun in August 2024 with the objective of seeding and amplifying negative information about her. Produced documents outline campaign scenarios, including the nature of the content that the Plaintiffs would seed online. My review of these materials, in addition to the observed patterns of content amplification, suppression, and algorithmic manipulation is consistent with efforts to manipulate online conversations about Ms. Lively. (See **Section V.A**).

b.  Prior to August 2024, online conversations consistently reflected favorable associations with Ms. Lively's personal image and her consumer ventures, underscoring the sharp break from the previously positive baseline. (See **Section V.B**).

c.  My analysis confirms a pronounced rise in the volume of online conversations beginning in August 2024, closely tracking the campaign timeline. Moreover, around the same period, I also observe a rise in the negative sentiment of the online conversations. (See **Section V.C.1**). Further, the review of these negative conversations shows that, starting in August and resurfacing in December 2024, an increasing share of online conversations explicitly echoed the narratives advanced by Defendants in their campaign. (See **Section V.C.3**).

13.   The escalation of negative sentiment in online conversations was followed by measurable declines in sales across Ms. Lively's consumer brands. In particular:

CONFIDENTIAL – Attorneys' Eyes Only

a.  The sentiment shift in early August 2024 disrupted core marketing channels, leading to pauses and restrictions on brand Instagram activity and diminishing Ms. Lively's visible role in promoting the brands. (See **Section V.D.1**).

b.  Sales data reveal a decline when compared to expected or initial sales: Betty Buzz's growth inflected downward from mid-August 2024; Betty Booze underperformed expectations through late 2024; and Blake Brown Beauty's launch momentum deteriorated quickly and remained depressed. (See **Section V.D.2**).

14.    Taken together, my analysis supports the inference that manipulated online conversations seeded and amplified negative conversations, substantially altering online discourse about Ms. Lively. As a result, harm to her as an individual was likely, and because her commercial brands are closely linked to her personal reputation, this harm translated into damage to her businesses. The observed sequence of events–an abrupt shift in negative sentiment, persistence and amplification of seeded topics, and a subsequent decline in sales–is consistent with well-documented findings in marketing scholarship showing how reputational shocks can propagate through consumer conversations to erode brand equity and affect commercial performance.

CONFIDENTIAL – Attorneys' Eyes Only

## III.    BACKGROUND

### A.    Parties

15.    Plaintiff Blake Lively is an actress and entrepreneur. She played the role of Lily Bloom in *It Ends With Us* (the "Film") and also served as a producer of the Film.[2] Ms. Lively resides in New York.[3]

16.    Defendant Wayfarer Studios LLC ("Wayfarer Studios") is an independent production company co-founded by Justin Baldoni and Steve Sarowitz and led by Chief Executive Officer ("CEO") Jamey Heath.[4] Wayfarer Studios is a Delaware limited liability company with its principal place of business in California.[5] Wayfarer Studios co-financed and produced the Film.[6] Further, Wayfarer Studios formally employed all cast and crew through its production entity, It Ends With Us Movie LLC.[7]

---

[2]    *See,* Second Amended Complaint, *Blake Lively v. Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, The Agency Group PR LLC, Jennifer Abel, Jed Wallace, and Street Relations Inc.*, Case No. 1:24-cv-10049-LJL, United States District Court for the Southern District of New York, July 30, 2025 ("Second Amended Complaint"), ¶¶ 2, 56.

[3]    *See,* Second Amended Complaint, ¶ 56.

[4]    *See,* Second Amended Complaint, ¶¶ 57, 59; *See also,* "About Wayfarer," *Wayfarer*, available at https://www.wayfarerstudios.com/#about, accessed on October 10, 2025 ("Wayfarer Studios is an independent studio actively developing, producing, and fully financing a slate of highly original, genre-defining, and globally impactful feature films, episodic television, documentaries, unscripted series, and podcasts. Co-founded by Justin Baldoni and Steve Sarowitz, and led by CEO Jamey Heath and President Tera Hanks, the studio's work highlights the power of human connection—debunking the traditional studio model by championing inspirational stories that serve as true agents for social change.").

[5]    *See,* Second Amended Complaint, ¶ 57.

[6]    *See,* Second Amended Complaint, ¶ 57.

[7]    *See,* Second Amended Complaint, ¶ 57.

CONFIDENTIAL – Attorneys' Eyes Only

17.     Defendant Justin Baldoni is the co-founder and co-chairman of Wayfarer Studios.[8] He served as director, and played the lead role of Ryle Kincaid in the Film.[9] Mr. Baldoni is/was a resident of California.[10]

18.     Defendant Jamey Heath is the CEO of Wayfarer Studios and has served in that role since March 2024.[11] He was the President of Wayfarer Studios during the production of the Film.[12] Mr. Heath resides in California.[13]

19.     Defendant Steve Sarowitz is the co-founder and leading financier of Wayfarer Studios.[14] He resides in Illinois.[15]

20.     Defendant It Ends With Us Movie LLC "is a company that entered into an agreement regarding Plaintiff's acting services and regarding the contractual rider for the Film."[16] It Ends With Us Movie LLC "is a California limited liability company with its principal place of business in California."[17]

---

[8]    *See,* Second Amended Complaint, ¶ 58; *See also,* "About Wayfarer," *Wayfarer*, available at https://www.wayfarerstudios.com/#about, accessed on October 10, 2025 ("Co-founded by Justin Baldoni and Steve Sarowitz, and led by CEO Jamey Heath and President Tera Hanks, the studio's work highlights the power of human connection—debunking the traditional studio model by championing inspirational stories that serve as true agents for social change.").

[9]    *See,* Second Amended Complaint, ¶¶ 2, 76.

[10]    *See,* Second Amended Complaint, ¶ 58.

[11]    *See,* Second Amended Complaint, ¶ 59; *See also,* "About Wayfarer," *Wayfarer*, available at https://www.wayfarerstudios.com/#about, accessed on October 10, 2025 ("Co-founded by Justin Baldoni and Steve Sarowitz, and led by CEO Jamey Heath and President Tera Hanks, the studio's work highlights the power of human connection—debunking the traditional studio model by championing inspirational stories that serve as true agents for social change.").

[12]    *See,* Second Amended Complaint, ¶ 59

[13]    *See,* Second Amended Complaint, ¶ 59.

[14]    *See,* Second Amended Complaint, ¶ 60.

[15]    *See,* Second Amended Complaint, ¶ 60.

[16]    *See,* Second Amended Complaint, ¶ 61.

[17]    *See,* Second Amended Complaint, ¶ 61.

CONFIDENTIAL – Attorneys' Eyes Only

21.     Defendant Melissa Nathan is a crisis communications specialist and the founder of The Agency Group PR LLC ("TAG").[18] She resides in California and was retained by Wayfarer Studios on behalf of Mr. Baldoni to manage media strategy in response to internal complaints against Mr. Baldoni and others associated with Wayfarer Studios.[19]

22.     TAG is a Delaware limited liability company with its principal place of business in California.[20] TAG conducts communications services, specializing in crisis communications.[21] TAG was contracted to handle crisis strategy and communications for Wayfarer Studios on behalf as Mr. Baldoni during and after the production of the Film.[22]

23.     Defendant Jennifer Abel is CEO and founder of RWA Communications LLC.[23] She resides in California and is a publicist for Wayfarer Studios and Mr. Baldoni.[24]

24.     Defendant Jed Wallace is a Public Relations Consultant who is the President, Director and Secretary of Street Relations Inc ("Street Relations").[25] He resides in Texas and was retained by Wayfarer Studios to perform digital services related to the Film's release and surrounding controversy.[26]

---

[18]   *See,* Second Amended Complaint, ¶ 62-63.

[19]   *See,* Second Amended Complaint, ¶¶ 29, 62, 193, 199.

[20]   *See,* Second Amended Complaint, ¶ 63.

[21]   *See,* Second Amended Complaint, ¶ 197.

[22]   *See,* Second Amended Complaint, ¶¶ 29-30, 193, 199.

[23]   *See,* Second Amended Complaint, ¶ 64.

[24]   *See,* Second Amended Complaint, ¶¶ 29, 64.

[25]   *See,* Second Amended Complaint, ¶¶ 65, 217.

[26]   *See,* Second Amended Complaint, ¶¶ 37-38, 222-223.

CONFIDENTIAL – Attorneys' Eyes Only

25.    Street Relations is a company that "describes itself as a 'crisis mitigation firm.'"[27] It was engaged by Wayfarer Studios, at TAG's recommendation, to implement online public relations tactics and digital crisis responses.[28] Street Relations is a corporation with its principal place of business in Texas.[29]

## B.    Relevant Allegations and Timeline

26.    Plaintiff, Ms. Lively, asserts that she was subjected to "invasive, unwelcome, unprofessional, [] sexually inappropriate[,]" and retaliatory conduct during and after the Film's development and release.[30] Plaintiff reported many of these behaviors as early as May 2023 but asserts that no meaningful investigative or corrective actions were taken at that time.[31]

27.    In November 2023, Ms. Lively negotiated contractual safeguards memorialized in a document titled "Protections for Return to Production."[32] This document addressed consent, physical safety, script control, and anti-retaliation provisions, and was agreed to by Sony and Wayfarer Studios executives.[33] Filming resumed in January 2024, after these safeguards were agreed upon.[34]

---

[27]    Second Amended Complaint, ¶ 66.

[28]    *See,* Second Amended Complaint, ¶¶ 218, 223. *See also*, STREET 1.000008 (Street Relations Invoice to Wayfarer Studios for Digital Consulting Strategy and Services for TAG.Wayfarer.JB August 8, 2024)

[29]    *See,* Second Amended Complaint, ¶ 66.

[30]    Second Amended Complaint, ¶ 78; *See also,* Second Amended Complaint, ¶¶ 1, 5-6, 103-104, 134.

[31]    *See,* Second Amended Complaint, ¶¶ 131-132.

[32]    Second Amended Complaint, ¶¶ 146-150.

[33]    *See,* Second Amended Complaint, ¶¶ 148-156. Specifically on retaliation provisions, the document established: "There shall be no retaliation of any kind against [Ms. Lively] for raising concerns about the conduct described in this letter or for these requirements. Any changes in attitude, sarcasm, marginalization or other negative behavior, either on set or otherwise, including during publicity and promotional work, as a result of these requests is retaliatory and unacceptable, and will be met with immediate action." Second Amended Complaint, Exhibit B.

[34]    *See,* Second Amended Complaint, ¶¶ 21, 157.

CONFIDENTIAL – Attorneys' Eyes Only

28.      Ms. Lively alleges that despite the Protections for Return to Production, she was subjected to what she described as a "retaliation campaign"[35] initiated by Defendants.[36] This campaign included a "[s]cenario [p]lanning" strategy to pre-emptively shape the narrative and launch an "untraceable" campaign of "astroturfing,"[37] "social media manipulation," and reputation management/engineering.[38] As part of the campaign, Mr. Baldoni engaged with "publicists, crisis managers, digital media strategists, and litigators [….] to 'bury' and 'destroy' anyone that challenged [Mr. Baldoni's] brand."[39] Defendants Wayfarer Studios and Mr. Baldoni engaged Defendants TAG, Mr. Wallace and Street Relations, to "to create, seed, manipulate, and advance disparaging content that appeared to be authentic on social media platforms and internet chat forums, including the specific platforms[…] Reddit, TikTok, and Instagram."[40] Content linked to the campaign also appeared in other channels, including X (formerly known as Twitter) and other major publications such as Page Six, The Daily Mail, Newsweek, NY Post, TMZ, and BuzzFeed.[41] The impact of this campaign allegedly resulted in a negative public sentiment

---

[35]   As per the Second Amended Complaint, "retaliation campaign" refers to the set of actions including "planted stories, social media posts, and other online content" undertaken by Mr. Baldoni, Mr. Sarowitz and their associates that allegedly "resulted in the viral spread of hateful, threatening, and derogatory content directed at Ms. Lively." Second Amended Complaint, ¶¶ 5, 44-45, 295.

[36]   *See,* Second Amended Complaint, ¶¶ 190-203.

[37]   *See,* Chan, Jovy, "Online Astroturfing: A Problem Beyond Disinformation," *Philosophy and Social Criticism*, Vol. 50 (3), June 2022, pp. 507-528 ("Chan 2022"), p. 507 ("Coordinated inauthentic behaviours online are becoming a more serious problem throughout the world. One common type of manipulative behaviour is astroturfing."), p. 510 ("Online astroturfing: a practice where a centralized source disseminates colluded information on the internet pretending that such information comes from a large number of unconnected individuals. The key thing to note from the definition is that the nature of astroturfing involves a pretense.").

[38]   Second Amended Complaint, ¶¶ 29-31, 196-197, 203-206, 303.

[39]   Second Amended Complaint, ¶ 5.

[40]   Second Amended Complaint, ¶¶ 29, 222-223.

[41]   *See,* Second Amended Complaint, ¶¶ 327, 330, 334, 337.

CONFIDENTIAL – Attorneys' Eyes Only

towards Ms. Lively,[42] which harmed her personal image,[43] as well as brands associated with her, namely Betty Booze, Betty Buzz and Blake Brown Beauty.[44]

29.    Ms. Lively asserts that the campaign described in the Second Amended Complaint was designed both to retaliate against her for reporting misconduct and to preemptively discredit her should she choose to bring her claims to public attention.[45] She further alleges that the campaign generated what she characterizes as "online hate and vitriol," including "violent threats" to her and her family that substantially harmed her and her associated businesses.[46] Ms. Lively also mentions to have "sustained harm, including to her business and

---

[42]    The email correspondence among Sony personnel from August 13, 2024, confirms that the sentiment towards Ms. Lively was negative one week prior to the release of the Film, coinciding with the timeline of the retaliation campaign as described in the Second Amended Complaint. SPE_BL0021860-871 at 861 ("[…] the topic breakdown around the controversy was 89% Anti-Blake, 7% Neutral, 4% Pro-Blake. TikTok saw the highest levels of Anti-Blake topics, while other platforms were more neutral/pro-leaning. Press headlines were either neutral toward Blake or Anti-Blake.").

[43]    *See,* Second Amended Complaint, ¶ 44 ("[…] the purpose of this 'social manipulation' […] aimed to […] retaliate against Ms. Lively by battering her image, harming her businesses, and causing her and her family severe emotional harm.").

[44]    *See,* Second Amended Complaint, ¶¶ 343-345 ("Around the same time, the social media accounts for […] Betty Buzz and Betty Booze—were flooded by hateful comments, which began to echo through other social and traditional media outlets. When Ms. Lively limited comments on her personal Instagram account to limit the toxic harassment she was receiving, those users simply migrated to the social media accounts and websites of Blake Brown, Betty Buzz, and Betty Booze. Many of the negative comments on these businesses' social media accounts and websites had nothing to do with the products or brands, but instead referenced the Film, Mr. Baldoni, and/or Ms. Lively as a 'bully' or 'mean girl.' […] For example, posts on Betty Booze's social media include the following messages: […] (a) 'Cancel Blake!' […] (c) '@bettybooze Stunned by the greed and utter lack of human decency, yes. […] (a) 'Bitchy hair everywhere'"), ¶ 342 ("Based on internal sales projections, the sudden and unexpected negative media campaign launched against Ms. Lively depressed retail sales of Blake Brown products by 56%–78%.").

[45]    *See,* Second Amended Complaint, ¶¶ 185-186 ("Mr. Baldoni told his team that they needed a plan to get ahead of the claims against him, in the event they were to go public. […] 'We should have a plan for IF she does the same when [the] movie comes out.' It is worth noting that this 'plan' was not conceived of to respond to any particular allegation—it was entirely about managing the public perception Mr. Baldoni feared might follow the theoretical possibility that Ms. Lively might decide to unfollow his social media accounts.").

[46]    Second Amended Complaint, ¶ 44 ("As their own words reveal, the purpose of this 'social manipulation' plan was two-fold: it aimed to both (a) conceal the pattern of harassment and other misconduct by Mr. Baldoni, Mr. Heath, and Wayfarer, and (b) retaliate against Ms. Lively by battering her image, harming her businesses, and causing her and her family severe emotional harm."), ¶ 45 ("In just days, the retaliation campaign had resulted in the viral spread of hateful, threatening, and derogatory content directed at Ms. Lively, her family, and other female cast members, as well as harassment and cyber bullying of the same. Online hate and vitriol found its way onto the social media accounts of much of the cast of the Film, Ms. Lively, Mr. Reynolds, and numerous businesses associated with them."), ¶ 339 ("This campaign has been devasting to Ms. Lively,[…] Ms. Lively and her family have been forced

CONFIDENTIAL – Attorneys' Eyes Only

profession, as well as her reputation […] [and to have] suffered loss of income and interference with future income."[47] A timeline of events as described in the Second Amended Complaint, is illustrated in **Figure 1** below:

**Figure 1: Timeline of Events[48]**



_____

to contend with not only an incessant and wide-reaching negative media campaign, but also violent threats against Ms. Lively and many who associate with her."), ¶ 342 ("The long-planned launch of her haircare line, Blake Brown […] was caught up in the crossfires of the negative environment against Ms. Lively. […] Based on internal sales projections, the sudden and unexpected negative media campaign launched against Ms. Lively depressed retail sales of Blake Brown products by 56%–78%.").

47    Second Amended Complaint, ¶ 438.

48    *See,* "Blake Lively Announces the Launch of Betty Buzz," *PR Newswire*, September 23, 2021, available at https://www.prnewswire.com/news-releases/blake-lively-announces-the-launch-of-betty-buzz-301384046.html, accessed on September 10, 2025 ("NEW YORK, Sept. 23, 2021 /PRNewswire/ -- Today Blake Lively announced the launch of Betty Buzz, a new line of non-alcoholic, sparkling mixers made from clean ingredients."); *See also,* Lupupa, Jill, "Blake Lively Says She Created New Betty Booze Line Because She's 'Tired' from Raising 4 Kids," *People*, June 30, 2023, available at https://people.com/blake-lively-launches-new-betty-booze-hard-seltzers-tired-raising-four-kids-7555270, accessed on October 7, 2025 (Blake Lively, "[t]he actress, 35, launched a new line of canned cocktails on Thursday [(June 29, 2023)]."); Lavinthal, Andrea, "Blake Lively's Hair Is No Longer Full of Secrets: All About Her Debut Haircare Line, Blake Brown!," *People*, July 31, 2024, available at https://people.com/blake-lively-launches-haircare-line-blake-brown-details-8686090, accessed on September 2, 2025 ("Launching exclusively @target @targetstyle August 4th & on BlakeBrownBeauty.com Aug 5."); Roeloffs, Mary Whitfill, "Baldoni Vs. Lively Feud: Judge Dismisses Lively's Case Against Baldoni's Social Media Guru," *Forbes*, July 16, 2025, available at https://www.forbes.com/sites/maryroeloffs/2025/07/16/baldoni-vs-lively-feud-

CONFIDENTIAL – Attorneys' Eyes Only

30.     On January 16, 2025, Wayfarer Studios, Mr. Baldoni, and other affiliated parties filed a complaint against Ms. Lively, Ryan Reynolds, and their associates, alleging a campaign of defamation, extortion, and reputational sabotage related to Ms. Lively's assumed control of the Film and her subsequent public allegations.[49] The Wayfarer Complaint further asserts that the shift in public sentiment was entirely the result of self-inflicted backlash stemming from Ms. Lively's own brand messaging, and that the statements Ms. Lively cites as evidence of a

---

judge-dismisses-livelys-case-against-baldonis-social-media-guru/, accessed on September 12, 2025 ("Jan. 16, 2025 Baldoni filed a federal lawsuit in New York against Lively, her husband Ryan Reynolds, her publicist Leslie Sloane and Sloane's firm Vision PR alleging his co-star 'tormented' him, his family and his partners, falsely accused him of sexual harassment and used him as a 'scapegoat' to dodge the negative press surrounding."); Roeloffs, Mary Whitfill, "All Of Justin Baldoni's Allegations Against Blake Lively Explained—As He Releases 'It Ends With Us' Outtakes," *Forbes*, January 22, 2025, available at https://web.archive.org/web/20250124040408/https://www.forbes.com/sites/maryroeloffs/2025/01/22/all-of-justin-baldonis-allegations-against-blake-lively-explained-as-he-releases-it-ends-with-us-outtakes/, accessed on September 2, 2025 ("'It Ends With Us' director and star Justin Baldoni has filed a $400 million countersuit against co-star Blake Lively, claiming the actress 'hijacked' the film he was directing, falsely claimed sexual harassment to bury negative sentiments against her and launched her own 'calculated and vitriolic smear campaign' to destroy his career, after she alleged he sexually harassed her on set and helped engineer an online campaign to damage her reputation."); Second Amended Complaint, ¶¶ 15-16, 19-21, 23, 29-31, 50-51, 77, 84, 102, 134-136, 140-143, 193-223, 229, 342, 349. Plaintiff Ms. Lively filed an Amended Complaint on February 18, 2025, and subsequently filed the Second Amended Complaint on July 30, 2025.

49     Complaint, *Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, It Ends With Us Movie LLC, Melissa Nathan, and Jennifer Abel v. Blake Lively, Ryan Reynolds, Leslie Sloane, and Vision PR, Inc.*, Case No. 1:25-cv-00449-LJL, United States District Court Southern District of New York, January 16, 2025 ("Wayfarer Complaint").

14

CONFIDENTIAL – Attorneys' Eyes Only

manipulation campaign were taken out of context and misrepresented.[50] The Wayfarer

Complaint was dismissed on June 9, 2025.[51]

### C.    Data Sources Used for My Analysis

31.    For my analyses, described in **Section V**, I retrieved data from three major social

media platforms–X, Reddit, and YouTube–using a data provider called Pulsar TRAC

("Pulsar").[52] Pulsar allows for customized searches across social media platforms using

keyword-based queries that incorporate Boolean (conditional) logic.[53] To identify relevant

conversations, I constructed a set of *inclusion keywords* based on common variations of Ms.

---

[50]    Wayfarer Complaint ¶¶ 6, 140, 146, 179 ("Lively also sprinkled in cross-promotions with her alcohol brand, Betty Booze. This was a massive error in judgement. Social media commenters quickly pointed out that this tie-in was in particularly poor taste, […]"), ¶ 185 ("Lively ordered her team to begin a campaign to frame herself as a martyr and pin the blame of Plaintiffs."), ¶ 257 ("The [New York Times Dec 21, 2024] Article refers to the 17-point letter of production conditions that Lively insisted upon. […] By insisting on superfluous or already-extant 'protections,' Lively laid the foundation for her baseless claims of pervasive sexual harassment."), ¶ 259 ("Lively and her team used cherry-picked text messages, stripped of context and even manipulated, to peddle a narrative that Plaintiffs had responded to Lively's complaints about purported sexual harassment by plotting to destroy her reputation through a shadow smear campaign."), ¶ 264 ("This omitted context is critical, as it demonstrates that each subsequent message in the exchange was similarly intended as sarcasm,"), ¶ 265 ("Any negative press about Lively was unequivocally a consequence of her own actions. Even the Times itself acknowledged Lively's public missteps in an August 17, 2024, article titled, 'It Ends with Us: The Press Tour Drama, Explained.'"), ¶ 266 ("Lively's marketing efforts, … were widely criticized as insensitive. … Her actions naturally triggered organic public criticism and unleashed a cycle of negative coverage[.]").

[51]    I note that Defendants filed an amended complaint on January 31, 2025. Opinion and Order, *Blake Lively (Plaintiff) v. Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, The Agency Group PR LLC, Jennifer Abel, Jed Wallace*, and *Street Relations Inc.(Defendants)*, *Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, The Agency Group PR LLC, Jennifer Abel, Jed Wallace*, and *Street Relations Inc.(Plaintiffs) v. Blake Lively (Defendants)* Case Nos. 1:24-cv-10049-LJL (Lead Case) and 1:25-cv-00449-LJL (Member Case), United States District Court for the Southern District of New York, June 9, 2025. *See also*, Robertson, Katie, "Judge Dismisses Justin Baldoni's Suits Against Blake Lively and The New York Times," *The New York Times*, June 9, 2025, available at https://www.nytimes.com/2025/06/09/business/media/justin-baldoni-blake-lively-lawsuit-dismissed.html, accessed on September 17, 2025 ("A federal judge on Monday [June 9, 2025] dismissed a lawsuit that the actor Justin Baldoni had filed against his former co-star Blake Lively and her husband, Ryan Reynolds, as well as The New York Times.").

[52]    "Pulsar TRAC," *Pulsar Platform*, available at https://www.pulsarplatform.com/solutions/pulsar-trac, accessed on September 8, 2025.

[53]    "TRAC: Full Boolean Operator Guide," *Pulsar Library*, available at https://intercom.help/pulsar/en/articles/6976653-trac-full-boolean-operator-guide, accessed on October 16, 2025.

CONFIDENTIAL – Attorneys' Eyes Only

Lively's name, her known usernames, and the names of her product brands.[54] This approach was designed to capture a broad range of online content referencing Ms. Lively and her commercial brands. I also implemented a set of *exclusion keywords* to filter out irrelevant results, particularly posts referencing individuals and celebrities with similar names as Ms. Lively.[55] These exclusion keywords were informed by my observation that many online conversations included unrelated celebrity mentions or tags, often used to artificially boost user engagement.

32.      The format of online conversations retrieved from Pulsar varies by the social media platform from which the content originates. For Reddit, the dataset includes both original posts and their associated comments, with each post and comment represented as a separate row. For YouTube, Pulsar includes the video title together with the associated description as an individual row. Additionally, each comment on YouTube vidoes is also included as an individual row. For X, the dataset includes all posts, reposts (formerly known as retweets), and replies, with each entry likewise structured as a distinct row in the dataset. This standardized row-level format enables consistent processing and analysis across platforms, despite underlying structural differences.

33.      Based on what the Second Amended Complaint describes as a "retaliation campaign,"[56] for the purposes of this analysis, I assume that a potential campaign could have

---

[54]    Any conversations with at least one of the following keywords were selected: "Blake Lively," "Blake Reynolds," "Blake Ellender," "Blake Brown," "blakelively," "@blakelively," "Betty Buzz," and "Betty Booze."

[55]    Posts containing any of the following exclusion keywords were removed from the dataset: "James Blake," "Blake Griffin," "Blake Shelton," "Blake Anderson," "Blake Jenner," "Blake Cooper," "Blake Snell," and "Blake Bortles."

[56]    As per the Second Amended Complaint, "retaliation campaign" refers to the set of actions including "planted stories, social media posts, and other online content" undertaken by Mr. Baldoni, Mr. Sarowitz and their associates that allegedly "resulted in the viral spread of hateful, threatening, and derogatory content directed at Ms. Lively." Second Amended Complaint, ¶¶ 5, 44-45, and Section F. The Second Amended Complaint also refers to the retaliation campaign as a "smear campaign." Second Amended Complaint, ¶ 285.

CONFIDENTIAL – Attorneys' Eyes Only

been most prominently active during August 2024, based on the timing and content of communications referenced in the Second Amended Complaint.[57] Accordingly, for X and Reddit, I retrieved all online conversations from May 1, 2024, through February 28, 2025. For YouTube, due to platform-specific availability limitations in Pulsar, data were collected from May 14, 2024, through February 28, 2025. Each online conversation in the data represents an individual instance of user-generated content collected from a social media platform. An online conversation may consist of: (1) a Reddit post or reply, (2) a Tweet (original, reply, or retweet), or (3) a YouTube video (with associated description text and title) or comment.[58] The distribution of online conversations across different social media platforms per timelines mentioned is shown in **Figure 2**.

**Figure 2: Distribution of Online Conversations Across Platforms**

| Source | Count |
|---|---|
| X (Twitter) | 828,538 |
| Reddit | 254,428 |
| YouTube | 46,764 |
| **Total** | 1,129,730 |

**Notes:**
[1] X (Twitter) data ranges from May 1, 2024, to February 28, 2025.
[2] Reddit data ranges from May 1, 2024, to February 28, 2025.
[3] YouTube data ranges from May 14, 2024, to February 28, 2025.

---

[57]    *See*, Second Amended Complaint, ¶¶ 29, 31, 39, 214, 235, 250-255; *See also*, KCASE-000004802-805 (Case and Nathan Short Message Report August 2024), JONESWORKS 00013647-649 (Baldoni and TAG Team Short Message Report August 2024); BBKOSLOW-000008194-199 (TAG Team Short Message Report August 2024) at 196-197; NATHAN_000003433 (Email from Katie Case August 2024).

[58]    Note that I only analyze the description text and titles associated with YouTube videos, not the videos themselves.

CONFIDENTIAL – Attorneys' Eyes Only

## IV.    OVERVIEW OF FOUNDATIONAL MARKETING PRINCIPLES AND ACADEMIC RESEARCH RELEVANT TO MY ANALYSIS

34.    In this report, I evaluate whether there is evidence of manipulation of online conversations by the Defendants. I find evidence that the Defendants manipulated online conversations about Ms. Lively. The overall effect of this manipulation was to lower sales of Ms. Lively's commercial brands.

35.    Before I begin my analysis of the potential impact of manipulation of online conversations about Ms. Lively and her commercial brands, it is first necessary to consider foundational marketing principles and academic literature relevant to my analysis.

### A.    Branding Principles and the Role of Consumer Perception

36.    A brand functions as a signal of quality, which allows consumers to identify the source of a product and distinguish it from competing offerings.[59] The concept of brand equity refers to the added value a brand confers on a product, above and beyond its functional attributes driven by consumers' perceptions, emotions, and expectations.[60] Cultivating strong, favorable, and distinctive brand associations is essential to building equity which increases the likelihood

---

[59]    *See,* Kotler, Philip, and Kevin Lane Keller*, Marketing Management*, 15th ed., Pearson, 2016, p. 300 ("[A] brand [is] 'a name, term, sign, symbol, or design, or a combination of them, intended to identify the goods or services of one seller or group of sellers and to differentiate them from those of competitors.'"); *See also*, Keller, Kevin Lane, and Vanitha Swaminathan, *Strategic Brand Management*, 5th ed., Pearson, 2020 ("Keller and Swaminathan 2020"), p. 6 ("Brands identify the source or maker of a product and allow consumers to assign responsibility to a particular manufacturer or distributor.").

[60]    *See,* Keller and Swaminathan 2020, p. 105 ("Brand equity [is] [c]ustomers' subjective and intangible assessment of the brand, above and beyond its objectively perceived value."), p. 348 ("One vitally important aspect of the brand is its image, as reflected by the associations that consumers hold for it. It is useful for marketers to make a distinction between lower-level considerations, related to consumer perceptions of specific performance and imagery attributes and benefits, and higher-level considerations related to overall judgments, feelings, and relationships."); *See also,* Dubé, Jean-Pierre H., and Peter E. Rossi, *Handbook of the Economics of Marketing*, Vol. 1, Elsevier, 2019, pp. 292-293 ("Current marketing practice interprets the brand as 'a name, symbol, design, or mark that enhances the value of a product beyond its functional purpose' where the added value of these enhancements to the basic product are often broadly termed 'brand equity' (Farquar, 1989, p. 24).").

18

CONFIDENTIAL – Attorneys' Eyes Only

that consumers will include and then ultimately purchase from a brand in their consideration set.[61]

37.    For brands that are owned by or closely linked to a celebrity, the personal brand and the business brand are often deeply intertwined.[62] Consumer perceptions of the celebrity do not operate in isolation, instead they can directly shape attitudes towards associated products or brands.[63] When a celebrity is closely associated with a brand, shifts in sentiment toward the individual–whether positive or negative–can transfer to the product or brand itself.[64] In

---

[61]    *See, Keller* and Swaminathan 2020, p. 42 ("Customer-based brand equity occurs when the consumer has a high level of awareness and familiarity with the brand and holds some strong, favorable, and unique brand associations in memory. […] [T]he strength, favorability, and uniqueness of brand associations play a critical role in determining the differential response that makes up brand equity."), p. 43 ("Consumers must consider the brand whenever they are making purchase decisions to fulfill or satisfy a need. Raising brand awareness increases the likelihood that the brand will be a member of the consideration set, the handful of brands that receive serious consideration for purchase.").

[62]    Online conversations can significantly influence public perception and, consequently, the performance of the brand associated with a celebrity. However, if the brand was founded by the celebrity, the reputational damage caused by a scandal related to the celebrity is harder to overcome. *See,* Israeli, Ayelet et al., "What Makes A Successful Celebrity Brand," *Harvard Business Review*, May-June 2024, available at https://hbr.org/2024/05/what-makes-a-successful-celebrity-brand, accessed on September 10, 2025 ("When a celebrity is merely an endorser of a brand rather than an owner and creator of it, such scandals may be more easily overcome, because the tie between the celebrity and the brand is more easily severed. […] [W]hen the brand is owned by and deeply associated with the celebrity, it is harder to mitigate this risk.").

[63]    *See,* Eng, Bennie, and Cheryl Burke Jarvis, "Consumers and Their Celebrity Brands: How Personal Narratives Set the Stage for Attachment," *Journal of Product & Brand Management*, 2020, pp. 1-17 ("Eng and Jarvis 2020"), pp. 1-2 ("Celebrity personas are created through narratives, which are defined as the consumption of a celebrity brand's story through which the story receiver interprets it in a causal story-like structure. […] Thus, a relationship between a consumer and a celebrity can be viewed more accurately as a relationship between the consumer and the celebrity's brand (Luo et al., 2010)."); *See also,* Keller and Swaminathan 2020, p. 283 ("The rationale behind [celebrity endorsement] is that a famous person can draw attention to a brand and shape the perceptions of the brand, by the inferences that consumers make based on the knowledge they have about the famous person.").

[64]    *See,* Fournier, Susan, and Giana M. Eckhardt, "Putting the Person Back in Person-Brands: Understanding and Managing the Two-Bodied Brand," *American Marketing Association*, Vol. 56 (4), May 2019, pp. 602-619 ("Fournier and Eckhardt 2019"), p. 604 ("[R]esearch has shown that consumers can relate to person-brands in ways that are difficult or impossible for inanimate brands, and this can translate into trusting and committed relationships (Thomson 2006). Person-brands can benefit from authenticity, which drives trial and revenue growth (Moulard, Garrity, and Rice 2015; Thomson 2006). […] These perceptual advantages can translate to marketplace performance, whereby prominently connecting a person to a brand, product, or firm (through corporate naming conventions or celebrity CEOs) yields positive stock returns (Agrawal and Kamakura 1995; Ranft et al. 2006)."); *See also,* Hock, Stefan J., and Sascha Raithel, "Managing Negative Celebrity Endorser Publicity: How Announcements of Firm (Non)Responses Affect Stock Returns," *Management Science,* Vol. 66 (3), March 2019, pp. 1-23, p. 1 ("[R]eports of misbehavior become more frequent and can tarnish the endorser's stellar image (e.g., Tiger Woods' extramarital affairs or Michael Phelps smoking marijuana). This undesirable behavior can lead to negative spillover effects, such as lower evaluations of the endorsed product or brand (Till and Shimp 1998, White

particular, negative public sentiment toward the celebrity may diminish brand equity, eroding consumer trust and weakening the brand's ability to succeed in the marketplace.[65] This dynamic highlights the importance of consistency between the celebrity's personal reputation and the commercial positioning of their associated brands.[66]

## B.    The Influence of Personal Brands on Associated Commercial Brand Performance

38.    There is a well-established body of marketing research demonstrating that celebrities can have a measurable impact on product sales.[67] These studies show that when a celebrity endorses a product, positive associations with the celebrity can transfer to the brand, enhancing consumer perception and driving demand.[68] Conversely, when a celebrity endorser is

---

et al. 2009), which results in lower sales and profit (Tybout et al. 1981, Chung et al. 2013). […] For instance, […] Woods' sponsors lost more than 2% of their market value in the three weeks following his 2009 scandal.").

[65]    *See,* Eng and Jarvis 2020, p. 12 ("Transgression narratives appear to cause great harm to celebrity brands, as off-brand negative narratives elicit significantly lower levels of attachment than off-brand positive (anti-hero) narratives."); *See also,* Fournier and Eckhardt 2019, p. 605 ("By 2001, after 30 years in the making, the Martha Stewart brand stood as one of the worlds' strongest, with high levels of brand loyalty and resonance in popular culture. This situation changed radically in 2002, when Stewart was investigated and later jailed for insider trading and obstruction of justice in what was dubbed 'the ImClone scandal.' When news of the investigation surfaced, MSLO [Martha Stewart Living Omnimedia Inc.] stock dropped 23%, […] This much-publicized crisis destroyed over 70% of MSLO's market value in the short run and precipitated ten straight years of losses.").

[66]    *See,* Eng and Jarvis 2020, p. 11 ("Transgression narratives are not only negative in valence but they are also inconsistent with a celebrity brand's essence, which may generate feelings of disgust and betrayal. Compounding this effect, transgression narratives are high in external authenticity, as consumers are likely to believe these stories are true."); *See also,* Shimp, Terence A. and J. Craig Andrews, *Advertising, Promotion, and Other Aspects of Integrated Marketing Communications*, 9th ed., South-Western Cengage Learning, 2013, p. 294 ("Advertising executives require that the celebrity's behavior, values, appearance, and decorum be compatible with the image desired for the advertised brand. […] A celebrity's credibility is a primary reason for selecting a celebrity endorser.").

[67]    *See,* Pan, Meizhi et al., "Influencer Marketing Effectiveness: A Meta-Analytic Review," *Journal of the Academy of Marketing Science,* Vol. 53 (1), October 2024, pp. 52-78, p. 57 ("Congruence between the influencer and brand has positive effects on non-transactional outcomes, including consumer attitude, behavioral engagement, and purchase intention, as well as transactional outcomes, including purchase behavior and sales performance.").

[68]    *See,* Chung, Kevin YC, Timothy P. Derdenger, and Kannan Srinivasan, "Economic Value of Celebrity Endorsements: Tiger Woods' Impact on Sales of Nike Golf Balls," *Marketing Science,* Vol. 32 (2), March 2013, pp. 271-293, p. 271 ("We determine that from 2000 to 2010, the Nike golf ball division reaped an additional profit of $103 million through the acquisition of 9.9 million in sales from Tiger Woods' endorsement effect. Moreover, having Tiger Woods' endorsement led to a price premium of roughly 2.5%. As a result, approximately 57% of Nike's investment in Woods' $181 million endorsement deal was recovered just in U.S. golf ball sales alone."), p.

involved in negative publicity or controversy, those unfavorable associations may spill over to the endorsed product–leading to deterioration in brand sentiment and a measurable decline in sales performance.[69]

39.     Some celebrities cultivate commercial brands that are not only distinctive but also strongly associated with their personal brand identities to build resonance between the commercial brand and personal brand, including specific values, personality traits, or lifestyle attributes. To illustrate how celebrities extend their personal brands into their businesses, I provide several examples from the beauty and beverage industries. Beauty brands similar to Ms. Lively's Blake Brown Beauty include: Jessica Alba's The Honest Company (baby and personal care) that emphasizes clean, family-friendly products aligned with her image as a health-conscious parent,[70] Selena Gomez's Rare Beauty (makeup) that promotes mental health awareness and self-acceptance, echoing her personal journey and public advocacy,[71] Rihanna's

---

289 ("Our demand estimates suggest that [Tiger Woods] had a significantly positive effect on Nike products during the endorsement period.").

[69]     See, Knittel, Christopher R., and Victor Stango, "Celebrity Endorsements, Firm Value, and Reputation Risk: Evidence from the Tiger Woods Scandal," *Management Science*, Vol. 60 (1), January 2014, pp. 21-37, p. 21 ("We estimate the stock market effects of the Tiger Woods scandal on his sponsors and sponsors' competitors. In the 10–15 trading days after the onset of the scandal, the full portfolio of sponsors lost more than 2% of market value, with losses concentrated among the core three sponsors: Electronic Arts, Nike, and PepsiCo (Gatorade). Sponsors' day-by-day losses correlate strongly with Google search intensity regarding the endorsement-related impact of the scandal, as well as with qualitative indicators of endorsement-related news.").

[70]     See, "The Honest Company: How Jessica Alba Built a Clean Lifestyle Brand," *Brand Vision Insights*, October 20, 2024, available at https://www.brandvm.com/post/jessica-alba-built-a-clean-lifestyle-brand, accessed on September 1, 2025 ("A big part of the company's growth came from Jessica Alba's personal story and her desire to make safer products. […] She wasn't just the face of the brand but also an active participant in product development and company decisions. Alba regularly appeared in interviews, blog posts, and marketing campaigns discussing her journey into parenthood and why it drove her to start a business focused on safer products.").

[71]     See, Feldman, Lucy, "How Selena Gomez Is Revolutionizing the Celebrity Beauty Business," *Time*, May 29, 2024, available at https://time.com/6979619/rare-beauty/, accessed on September 2, 2025 ("[Selena Gomez's] openness about her mental health has endeared her to millions of young people coping with the isolating experiences of anxiety, depression, and other disorders. And she has channeled all of that into her company, Rare Beauty, a rising player she bills as a beauty brand that, instead of selling an unattainable image, aims to help people feel good about themselves. […] Rare Beauty's products, from a liquid highlighter to a body and hair mist with names like Positive Light and Find Comfort, are designed to be inclusive in terms of shade range and easy-to-use packaging (crucial to Gomez herself, who takes a drug for lupus that can cause her hands to shake). Gomez says Rare began

CONFIDENTIAL – Attorneys' Eyes Only

Fenty Beauty (makeup and haircare) that emphasizes inclusivity in shade ranges and hair textures while projecting bold, trendsetting aesthetic that mirrors her persona,[72] and Lady Gaga's Haus Labs (makeup) that promotes artistry and self-expression with bold color palettes, aligning with her image as distinctive performer and advocate for individuality.[73]

40.    Similarly, in the beverages industry–relevant to Ms. Lively's Betty Booze and Betty Buzz brands–other examples of celebrity brands include: Dr. Dre and Snoop Dogg's Gin & Juice cocktails leverage hip-hop culture and nostalgia surrounding their eponymous 1994 hit single,[74] Kylie Jenner's Sprinter vodka sodas extend her influencer-driven business portfolio into beverages, capitalizing on her status as a social media icon,[75] and Jennifer Lopez's Delola

---

not with her ideas for specific makeup products but instead with her hope to support people struggling with their mental health.").

[72]    *See,* "Meet the World of Fenty Beauty Brands," *Fenty Beauty*, available at https://fentybeauty.com/pages/about-the-brands, accessed on September 24, 2025 ("Rihanna was inspired to create the world of Fenty Beauty brands after years of partnering with the best of the best in the beauty industry—and still seeing a void for products that performed across all skintones + types and hair textures."); *See also*, Edwards, Kamylle, "How Rihanna is an Example of Women's Empowerment," *Revolt*, March 6, 2018, available at https://www.revolt.tv/article/2018-03-06/97869/how-rihanna-is-an-example-of-womens-empowerment, accessed on September 24, 2025.

[73]    *See,* Rogers, Sam, "Haus Laboratories: All the Facts About Lady Gaga's New Beauty Brand," *Vogue India*, July 10, 2019, available at https://www.vogue.in/beauty/content/haus-laboratories-lady-gaga-new-beauty-makeup-brand-all-details, accessed on September 24, 2025; *See als*o, Bailey, Alyssa, "Lady Gaga Says She Is 'One of Many' Who Will Fight for the LGBTQ+ Community During Trump Years," *Elle*, January 28, 2025, available at https://www.elle.com/culture/career-politics/a63592257/lady-gaga-fight-for-lgbtq-community-trump-quote/, accessed on September 22, 2025.

[74]    *See,* "Explore Gin's Next Episode," *Gin & Juice*, available at https://dreandsnoop.com/pages/about, accessed on October 16, 2025 ("The canned beverage is named, of course, for Snoop's beloved, Grammy-nominated 1994 song 'Gin & Juice,' from his classic debut album, Doggystyle, produced by Dr. Dre. Three decades after 'Gin & Juice' left an indelible mark on popular culture and helped establish Dre and Snoop as groundbreaking hip-hop superstars, the pair are now known as much for their wide-ranging entrepreneurial ventures as for their game-changing music."); *See also,* BL-000037970–8164 (Betty B Presentation October 2024) at 8152 ("Marketing strategy appears to be based on 4 key tactics: […] Leveraging Snoop Dogg's celebrity[.]"), at 153 ("They also use merch and branded stage items to merge what they do best (music) and connect living a lavish lifestyle with the brand. a. Ex; Snoop can often be seen wearing Gin & Juice sweatshirts at branded musical appearances."), at 156 ("Self-Driven Promo Centering the Brand Around Snoop Dogg […] Snoop has centered Gin & Juice in every one of his media appearances, musical appearances, and leverages guest appearances to put his brand in the spotlight.").

[75]    *See,* "Beyoncé's Whisky, Kylie Jenner's Canned Vodka Soda, Plus More Stars in the Alcohol Business," *People*, August 30, 2024, available at https://people.com/celebrities-who-have-their-own-liquor-and-beer-lines-8698416, accessed on October 9, 2025 ("Kylie Jenner said her canned vodka soda line 'captures the feeling of fun with your friends.'"); *See also*, Dennis, Rachel, "Kylie Jenner's Canned Vodka Sodas Just Hit the Shelves — and

CONFIDENTIAL – Attorneys' Eyes Only

cocktails incorporate her so-called alter ego "Lola" into cocktails that reinforce themes of glamour, wellness, and luxury derived from her public image.[76] Notably, both Kylie Jenner and Jennifer Lopez also have beauty brands, Kylie Cosmetics and JLo Beauty, respectively, further illustrating a wide potential product brand ecosystem associated with celebrity personal brands.[77]

41.    Brand associations linked to celebrities are shaped and reinforced through media appearances, interviews, social media, and broader digital engagement, among others, creating a feedback loop between the celebrities' personal identities and commercial brands.[78] Unlike traditional commercial brands, which typically operate under controlled marketing strategies, commercial brands linked to a celebrity's personal brand are more vulnerable to reputational volatility, often driven by shifts in public opinion, media framing, and online discourse.[79]

---

We Tried All 4 Flavors," *CNN*, March 21, 2024, available at https://www.cnn.com/cnn-underscored/health-fitness/kylie-jenner-sprinter-launch, accessed on September 4, 2025.

[76]    *See,* Japhe, Brad, "Jennifer Lopez Wants You To Know Why She Created Delola, And How She Enjoys Drinking It," *Forbes*, August 4, 2023, available at https://www.forbes.com/sites/bradjaphe/2023/08/04/jennifer-lopez-wants-you-to-know-why-she-created-delola-and-how-she-enjoys-drinking-it/, accessed on September 10, 2025 ("So the Amalfi Coast is really a big part of the Delola story? JL: 'Absolutely. […] Lola is a nickname that I was given. And that's who I say is the girl who dances on tables. […] That's who I always was, and I've always been. And we thought to name it 'from Lola' which in Spanish is Delola. And so, that for me was a whole lifestyle that came behind that. That's who I was when I was on the Amalfi Coast.'"); *See also,* "Welcome to the Delola Life," *Delola*, available at https://delolalife.com/, accessed on September 25, 2025 ("Our ready to enjoy world class crafted cocktails have been thoughtfully crafted with premium liquor, natural botanicals, are lower in calories* and are gluten free.").

[77]    *See,* "Homepage," *Kylie Cosmetics*, available at https://kyliecosmetics.com/, accessed on October 2, 2025; *See also,* "Homepage," *JLO Beauty*, available at https://jlobeauty.com, accessed on October 16, 2025.

[78]    *See,* Eng and Jarvis 2020, pp. 2-3 ("Celebrity brand narratives originate externally from a variety of stakeholders, including marketing practitioners, the celebrities themselves, the media and other consumers (Centeno and Wang, 2017). […] Additionally, social media have provided celebrities controllable channels through which they themselves can distribute narratives. The media, including news outlets, tabloids, paparazzi, etc. are another source of external celebrity brand narratives. […] Brand knowledge is created through associative learning, a process in which consumers make associations with brands through their experiences with them (Keller, 1993).").

[79]    *See,* Eng and Jarvis 2020, pp. 3-4 ("Unlike conventional firm-based brands (e.g. Apple, Nike and Polo), celebrity brands feature a unique fundamental characteristic: they directly represent a person, rather than an organization. […] [N]arratives (Kowalczyk and Pounders, 2016) featuring the celebrity brand's persona […] are conveyed by stakeholders such as media outlets and commercial firms to the marketplace and then perceived by consumers."); *See also,* Fournier and Eckhardt 2019, p. 605 ("By 2001, after 30 years in the making, the Martha Stewart brand stood as one of the worlds' strongest, with high levels of brand loyalty and resonance in popular culture. This situation changed radically in 2002, when Stewart was investigated and later jailed for insider trading

42.    Social media and digital platforms, as tools of brand communications, amplify both the reach and fragility of personal brands.[80] They can strengthen consumers' positive sentiments through direct engagement and transparency, but they also expose celebrities to misinformation, reputational attacks, and real-time negative shifts in sentiment.[81] As a result, the strength and clarity of a celebrity's personal brand can serve as a powerful asset or a critical vulnerability to an associated commercial brand, depending on public perception and engagement.

### C.    Academic Research Links Online Conversations to Product Sales

43.    Online conversations–including product reviews, social media posts, blog comments, and forum discussions–have become a powerful mechanism for shaping consumer perceptions and driving product sales. Online conversations play an important role in the

---

and obstruction of justice in what was dubbed 'the ImClone scandal.' When news of the investigation surfaced, MSLO stock dropped 23%, bringing the company to one-quarter of its initial public offering (IPO) value.").

[80]    *See,* Eng and Jarvis 2020, p. 1 ("Celebrities hold an increasingly powerful place in society, industry and marketing because of the emergence of social media."), p. 2 ("When the celebrity's narrative ends or is no longer compelling, the celebrity brand ceases to be celebrated and its value dwindles (Gabler, 2001)."); *See also,* Israeli, Ayelet et al., "What Makes A Successful Celebrity Brand," *Harvard Business Review*, May-June 2024, available at https://hbr.org/2024/05/what-makes-a-successful-celebrity-brand, accessed on September 10, 2025 ("Celebrity brands get attention—and that can cut both ways. Consumers may be skeptical about the brands, especially if the stars behind them are controversial or polarizing. Kardashian has millions of followers—but also millions of detractors. Sometimes it seems that people enjoy nothing more than tearing down a celebrity—and if that celebrity has launched a brand, it may get caught in the crossfire.").

[81]    *See,* Eng and Jarvis 2020, p. 3 ("[S]ocial media have provided celebrities controllable channels through which they themselves can distribute narratives. […] [S]ocial media is not only a channel for celebrities to convey narratives about themselves but it is also a channel where consumers can share (i.e. gossip, tweet, post, etc.) their own celebrity brand narratives with other consumers. […] When external sources such as marketers or the media produce and disseminate a storyteller narrative, it is received and interpreted by consumers in a causal story-like structure with a beginning, middle and end, where goals lead to actions that ultimately lead to outcomes (Aron et al., 2004; Escalas, 2004)."); *See also,* Israeli, Ayelet et al., "What Makes a Successful Celebrity Brand," HBR, available at https://hbr.org/2024/05/what-makes-a-successful-celebrity-brand, accessed on September 10, 2025 ("[S]ocial media (particularly with the use of video) has opened a direct line of communication between celebrities and their fans.").

consumer decision-making process.[82] Marketing and economics research has established that changes in the sentiment and volume of online conversations can influence consumer behavior and brand sales performance, as I discuss next.

44.    Economists and marketing scholars have applied causal inference methods to demonstrate that online conversations have a measurable effect on product sales.[83] For example, studies have shown that an increase in positive sentiment in online reviews increases product sales,[84] while an increase in negative sentiment decreases product sales.[85] Further, field experiments have shown that firms can actively increase product sales by stimulating online

---

[82]    *See,* Zhu, Feng, and Xiaoquan (Michael) Zhang, "Impact of Online Consumer Reviews on Sales: The Moderating Role of Product and Consumer Characteristics," *Journal of Marketing*, Vol. 74, March 2010, pp. 133-148 ("Zhu and Zhang 2010"), p. 136 ("[C]onsumers use a mix of online (e.g., online reviews, blogs) and offline (e.g., family and friends, salespeople, magazines) WOM information to help structure their decisions."); *See also,* Luca, Michael, and Georgios Zervas, "Fake It Till You Make It: Reputation, Competition, and Yelp Review Fraud," *Management Science*, January 2016, pp. 1-16 ("Luca and Zervas 2016"), p. 1 ("Consumer reviews are now part of everyday decision making.").

[83]    *See,* Chevalier, Judith A., and Dina Mayzlin, "The Effect of Word of Mouth on Sales: Online Book Reviews," *Journal of Marketing Research,* Vol. 43 (3), August 2006, pp. 345-354 ("Chevalier and Mayzlin 2006"), p. 345 ("Our econometric analysis is designed to answer the following question: If a cranky consumer posts a negative review of a book on bn.com but not on Amazon.com, would the sales of that book at bn.com fall relative to the sales of that book at Amazon.com? […] [W]e propose a 'differences-in-differences' approach."), p. 354 ("[C]ustomer word of mouth affects consumer purchasing behavior at two Internet retail sites."); *See also,* Chintagunta, Pradeep K., Shyam Gopinath, and Sriram Venkataraman, "The Effects of Online User Reviews on Movie Box Office Performance: Accounting for Sequential Rollout and Aggregation Across Local Markets," *Marketing Science,* Vol. 29 (5), September-October 2010, pp. 944-957, p. 950 ("[W]e find that average user ratings (valence) have a positive and statistically significant impact on box office revenues. […] [E]ven after accounting for endogeneity, online WOM appears to be playing a role in influencing box office performance of a movie via how much users like the movie on which they are commenting."); Dolega, Les, Francisco Rowe, and Emma Branagan, "Going Digital? The Impact of Social Media Marketing on Retail Website Traffic, Orders and Sales," *Journal of Retailing and Consumer Services*, Vol. 60, May 2021, p. 1 ("Using unique data over a 12-month period from a major online retailer, this paper examines the impact of daily social media activity on daily business outcomes: website traffic, orders and sales. […] [L]arger social media campaigns tend to result in significantly higher number of orders and sale income[.]").

[84]    *See,* Chevalier and Mayzlin 2006, p. 345 ("[A]n improvement in a book's reviews leads to an increase in relative sales at that site"), p. 346 ("[…] the addition of new, favorable reviews at one site results in an increase in the sales of a book at that site.").

[85]    *See,* Chevalier and Mayzlin 2006, p. 346 ("[A]n incremental negative review is more powerful in decreasing book sales than an incremental positive review is in increasing sales.").

conversations,[86] via the distribution of product samples to selected consumers,[87] seeding content[88] among influencers, or encouraging customers (or even non-customers) to talk to their social networks about the product.[89]

45.     Research further indicates that the impact of online conversations is particularly pronounced for brands that operate in digitally native or niche markets, where consumer discovery and evaluation of a product or brand occur primarily online.[90] This insight is particularly relevant to Ms. Lively's commercial brands as they rely, in large part, on digital

---

[86]    *See,* Godes, David, and Dina Mayzlin, "Firm-Created Word-of-Mouth Communication: Evidence From a Field Test," *Marketing Science,* Vol. 28 (4), July-August 2009, pp. 721-739 ("Godes and Mayzlin 2009"), p. 722 ("Using field data, we empirically demonstrate […] that the firm can create WOM [word of mouth] that drives sales. […] This is the first study to our knowledge to demonstrate that discussions created by the firm's actions rather than simply product experiences can have such an effect.").

[87]    *See,* Yao, Xinlin et al., "Dynamic Sales Impacts of Online Physical Product Sampling," *Information and Management*, Vol. 54 (5), July 2017, pp. 599-612, p. 600 ("The results indicate that administering online product sampling could increase overall sales by 41.6% compared with a control group (with similar products that did not offer sampling). […] [O]ur results suggest that the dominant effect of online product sampling may not lie in offering a direct trial experience to induce purchase; rather, an advertising effect may be equally, if not more, important for this strategy."); *See also,* Dost, Florian et al., "Seeding as Part of the Marketing Mix: Word-of-Mouth Program Interactions for Fast-Moving Consumer Goods," *American Marketing Association*, Vol. 83(2), pp. 62-81, ("Dost et al. 2019"), p. 62 ("FMCG marketers have […] regularly employed seeded marketing campaigns (SMCs), which use thousands of individuals who "buzz" about the product (Carl 2006; Godes and Mayzlin 2009). The idea is to select a certain number of customers as "seed agents" and to equip those agents with the product to be marketed (in the form of either actual products or samples) as well as additional brand information.").

[88]    In the marketing literature, "seeding" refers to the intentional placement of content in online forums or social media platforms to initiate or influence consumer conversations. *See*, Hinz, Oliver et al., "Seeding Strategies for Viral Marketing: An Empirical Comparison," *Journal of Marketing*, Vol. 75 (6), November 2011, pp. 55–71 ("Hinz et al. 2011"), p. 55 ("Seeding strategies have strong influences on the success of viral marketing campaigns[.]"); *See also,* Dost et al. 2019, p. 62 ("The authors present the first empirical analysis of this question using a rich data set collected on four brands from various European FMCG markets. […] They consistently find that firm-created word of mouth through SMC programs interacts […] positively with promotional activities […] [and] may increase total sales by approximately 3%–18% throughout the campaigns.").

[89]    *See,* Godes and Mayzlin 2009, p. 737 ("We have shown that in some cases, purely exogenous WOM is associated with higher week-to-week sales."); *See also,* Dost et al. 2019, p. 62 ("The idea is to select a certain number of customers as "seed agents" and to equip those agents with the product to be marketed (in the form of either actual products or samples) as well as additional brand information. The customers are then encouraged to engage with the product while also telling their peers about it.");Aral, Sinan, Lev Muchnik, and Arun Sundararajan, "Engineering Social Contagions: Optimal Network Seeding in the Presence of Homophily," *Network Science*, Vol. 1 (2), February 2013, pp. 125-153 ("Firms and policymakers are increasingly recruiting customers to take part in word-of-mouth (WOM) marketing campaigns.").

[90]    *See,* Zhu and Zhang 2010, p. 134 ("Our study also suggests that niche producers and producers that sell mostly through online channels should be more concerned about online consumer reviews and manipulations of online review systems because online reviews could significantly affect their sales.").

CONFIDENTIAL – Attorneys' Eyes Only

media and social platforms for promotion, distribution, and consumer engagement. As such, Ms. Lively's brands, like other celebrity-owned or celebrity-affiliated brands, are especially susceptible to fluctuations in the sentiment of online conversations, making them more vulnerable to the effects of manipulation of online conversations as I discuss in **Section V.D**.

### D.    Academic Research on the Seeding and Manipulation of Online Conversations

46.    A substantial body of academic literature demonstrates that online conversations can be strategically created or shaped by individuals, firms, or agents.[91] Moreover, these actors can surreptitiously manipulate online conversations to discredit individuals or brands.[92] This type of manipulation has been shown to influence user attitudes as well as commercial performance.[93]

---

[91]    *See, e.g.,* Godes and Mayzlin 2009, p. 721 ("[W]e demonstrate the potential usefulness of exogenously created WOM: conversations are created where none would naturally have occurred otherwise. […] [R]ather than hoping that satisfied customers would tell people about their products, these firms took actions to increase the number of conversations that were taking place."); *See also,* Aral, Sinan, and Dylan Walker, "Identifying Influential and Susceptible Members of Social Networks," *Science,* Vol. 337 (6092), June 2012, pp. 337-341, p. 337 ("We conducted a randomized experiment to measure influence and susceptibility to influence in the product adoption decisions of a representative sample of 1.3 Million Facebook users by randomly manipulating influence-mediating messages sent from a commercial Facebook application that lets users share information and opinions about movies, actors, directors and the film industry.").

[92]    *See, e.g.*, Mayzlin, Dina, Yaniv Dover, and Judith Chevalier, "Promotional Reviews: An Empirical Investigation of Online Review Manipulation," *The American Economic Review*, Vol. 104 (8), August 2014, pp. 2421-2455 ("Mayzlin, Dover, and Chevalier 2014"), p. 2422 ("[C]onsumers who are fooled by the promotional reviews may make suboptimal choices. […] [T]he potential presence of biased reviews may lead consumers to mistrust reviews."), p. 2448 ("For example, to hurt a competitor, a 'traveler' could claim to have witnessed a bed bug infestation."); *See also*, Luca and Zervas 2016, p. 1, ("[A] restaurant is more likely to commit review fraud when its reputation is weak, i.e., when it has few reviews or it has recently received bad reviews."), p. 3 ("[I]ndependent restaurants are more likely to leave positive fake reviews for themselves and […] fake negative reviews are more likely to occur when a business has an independent competitor.").

[93]    *See, e.g.*, Chevalier and Mayzlin 2006, p. 346 ("We show that the addition of new, favorable reviews at one site results in an increase in the sales of a book at that site relative to the other site. We find some evidence that an incremental negative review is more powerful in decreasing book sales than an incremental positive review is in increasing sales."); *See also,* Gandhi, Ashvin, Brett Hollenbeck, and Zhijian Li, "Misinformation and Mistrust: The Equilibrium Effects of Fake Reviews on Amazon. Com," *National Bureau of Economic Research*, Working Paper No. 34161, August 2025 ("Counterfactual policy simulations indicate that fake reviews reduce consumer welfare, shift sales from honest to dishonest sellers, and ultimately harm the platform."); Bail, Christopher A. et al., "Assessing the Russian Internet Research Agency's Impact on the Political Attitudes and Behaviors of American Twitter Users in Late 2017," *Proceedings of the National Academy of Sciences*, Vol. 117 (1) January 2020, pp. 243-250, p. 243 ("These campaigns reportedly involve vast social-media armies that impersonate Americans and amplify

CONFIDENTIAL – Attorneys' Eyes Only

47.    Indeed, there are several well-documented tactics that are involved in the

manipulation of online conversations.[94] Below is a summary of some of the most common

tactics:

- *Content amplification* refers to artificially increasing the visibility and reach of particular posts or messages via paid promotions, orchestrated re-sharing, or use of bots.[95] For example, practices such as coordinated upvoting, liking or re-tweeting, or sustained back-and-forth engagement can give the appearance of organic consumer engagement.[96]

---

debates about divisive social issues such as immigration and gun control."); Banerjee, Abhijit et al., "Using Gossips to Spread Information: Theory and Evidence from Two Randomized Controlled Trials," *Review of Economic Studies,* vol. 86 (6), February 2019, pp. 2453-2490, p. 2454 ("Policymakers and businesses often rely on key informants to diffuse new information to a community. The message is seeded to a number of people with the hope that it will diffuse via word of mouth."); Hinz et al. 2011, p. 55 ("Other empirical evidence also reveals that consumers increasingly rely on advice from others in personal or professional networks when making purchase decisions").

[94]    *See,* Roescher, Franziska et al., "What's the Strategy of Russia's Internet Trolls? We Analyzed Their Tweets to Find Out," *The Washington Post*, November 19, 2018, available at https://www.washingtonpost.com/news/monkey-cage/wp/2018/11/19/whats-the-strategy-of-russias-internet-trolls-we-analyzed-their-tweets-to-find-out/, accessed on October 1, 2025; *See also,* Belton, Catherine, and Joseph Menn, "Russian Trolls Target U.S. Support for Ukraine, Kremlin Documents Show," *The Washington Post*, April 8, 2024, available at https://www.washingtonpost.com/world/2024/04/08/russia-propaganda-us-ukraine/, accessed on October 1, 2025; Bing, Christopher, "Fake Kamala Hit-and-Run Story Is the Work of Russian Propaganda Group, Microsoft Says," *Reuters*, September 17, 2024, available at www.reuters.com/world/us/fake-kamala-hit-and-run-story-is-work-russian-propaganda-group-microsoft-says-2024-09-17/, accessed on September 30, 2025; Blakely, Rhys, "Kremlin Spreads Lies About MMR Jab," *The Times*, August 24, 2018, available at https://www.thetimes.com/business-money/technology/article/kremlin-spreads-lies-about-mmr-jab-32t3tfcq9, accessed on October 16, 2025; MacFarquhar, Neil, "Inside the Russian Troll Factory: Zombies and a Breakneck Pace," *The New York Times*, February 18, 2018, available at www.nytimes.com/2018/02/18/world/europe/russia-troll-factory.html, accessed on October 1, 2025.

[95]    A bot is an automated software program designed to perform specific tasks online, often without direct human input. *See,* "What is a Bot?" *AWS*, available at https://aws.amazon.com/what-is/bot/, accessed on September 11, 2025; *See also*, Mehta, Swapneel et al., "Estimating the Impact of Coordinated Inauthentic Behavior on Content Recommendations in Social Networks," *ICML 2022 Workshop AI for Agent-Based Modelling (AI4ABM)*, 2022 ("Mehta et al. 2022"), p. 1 ("[A] professional botnet tool […] [can] simulate online personas replete with profile pictures, behaviors specific to the social media platforms, all with the goal of manufacturing fake 'trending social media events en masse.'").

[96]    *See,* Tardelli, Serena et al., "Multifaceted Online Coordinated Behavior in the 2020 US Presidential Election," *EPJ Data Science*, Vol. 13 (33), April 2024, pp. 1-2 ("[…] the prevalence of automated social bots […] raised questions about their influence in amplifying content, including low-credibility information. Notably, beyond organized campaigns by specific actors, everyday social media users also contributed to the dissemination of divisive narratives."), p. 2 ("[C]oordinated behavior implies that the concept extends beyond orchestrated campaigns, encompassing also other forms of coordination such as grassroots movements where genuine actors […] collaborate to amplify their messages."); *See also,* Beaman, Lori et al., "Can Network Theory-Based Targeting Increase Technology Adoption?" *American Economic Review,* Vol. 111 (6), June 2021, pp. 1918-1943, p. 2 ("A rich empirical literature has documented faster diffusion when technologies were seeded with people who are central in the network[.]"); Banerjee, Abhijit et al., "The Diffusion of Microfinance," *Science*, Vol. 341 (6144), July 2013, pp. 1236498-1 - 1236498-7, p. 1236498-1 ("[P]articipants are seven times as likely to pass information compared to

CONFIDENTIAL – Attorneys' Eyes Only

- *Algorithmic manipulation* refers to the strategic exploitation of platform algorithms[97]–such as recommendation, ranking or trending systems–to influence which content is served to users. Since these algorithms often prioritize engagement metrics (e.g., clicks, likes, or shares), their manipulation can amplify sensational, polarizing, or inauthentic content.[98] Algorithmic manipulation is often reinforced through inauthentic behavior misrepresenting what appears to be user-driven content.[99]

- *Content suppression* is a content manipulation tactic that reduces the visibility or accessibility of targeted content by flagging, reporting, or coordinated down-voting.[100] For example, if multiple accounts report a post on Instagram, the platform may remove it under its community standards, regardless of the original content's validity.

---

informed nonparticipants, but information passed by nonparticipants still accounts for roughly one-third of eventual participation.").

[97] Platform algorithms are sets of rules used by digital platforms to sort and rank content. *See*, "The Algorithm: Understand It, Leverage It," *Forbes Councils*, November 6, 2024, available at https://councils.forbes.com/blog/understanding-and-leveraging-the-algorithm, accessed on October 16, 2025 ("[A]lgorithms play a pivotal role in determining how content is sorted, ranked, and displayed. These formulas analyze factors such as user engagement, content relevance, and timeliness to personalize the user experience by showing content most likely to interest the individual user.")

[98]    *See*, Mehta et al. 2022, p. 1 ("Ranking and recommendation systems have played a tremendous role with platforms relying heavily on large-scale algorithms to populate the content stream that a user interacts with, called their 'feed' or 'timeline.' However, these systems have been shown to suffer from biases, and even promote hateful content[.] […] [T]hese algorithms often rely on metrics that can be manipulated through coordinated activity including fake profiles and illicit collusion. […] This makes such algorithms a popular attack vector for coordinated campaigns attempting to promote misleading content on social networks."); *See also*, Pei, Amy, and Dina Mayzlin, "Influencing Social Media Influencers Through Affiliation," *Marketing Science*, Vol. 41 (3), December 2021, pp. 593-615 ("Pei and Mayzlin 2022"), p. 593 ("Social media influencers are category enthusiasts who often post product recommendations. Firms sometimes pay influencers to skew their product reviews in favor of the firm.")..

[99]    *See*, Metzler, Hannah, and David Garcia, "Social Drivers and Algorithmic Mechanisms on Digital Media," *Perspectives on Psychological Science*, Vol. 19 (5), July 2023, pp. 735-748, pp. 736-737 ("Most current digital-media algorithms strongly optimize for engagement. […]. Engagement metrics primarily promote content that fits immediate human social, affective, and cognitive preferences and biases rather than quality content […] or long-term goals and values[.] […] Popularity metrics can also be gamed with inauthentic behavior, including bots, organized trolls, and fake-account networks."); *See also,* Mehta et al. 2022, p. 1 ("One of the reasons is that these algorithms often rely on metrics that can be manipulated through coordinated activity including fake profiles and illicit collusion […]. This makes such algorithms a popular attack vector for coordinated campaigns attempting to promote misleading content on social networks.").

[100]    *See,* Mehta et al. 2022, p. 3 ("Brigading, in the Reddit context describing intercommunity conflicts during which antagonistic members of one subreddit actively downvote comments in order to deprioritise them for content recommendation systems and effectively censor them (Datta & Adar, 2019).").

CONFIDENTIAL – Attorneys' Eyes Only

- *Impersonation of genuine sources* in online environments through use of sock puppets,[101] bots, or troll accounts[102] by bad actors to imitate genuine consumers or authentic sources lends false legitimacy to content.[103] Sock puppet accounts typically contain fictitious information that cannot be traced back to a real identity.[104] Such accounts can be deployed to spread content that appears to be authentic user-generated commentary but is entirely fabricated.[105]

- *Astroturfing* describes deceptive campaigns designed to manufacture the appearance of widespread grassroots support–whether for a policy, brand, or narrative–when little genuine public backing exists.[106] This often involves deploying multiple online identities or fake pressure groups to mislead audiences

---

[101]    A sock puppet account is a fake or deceptive online identity created by an individual to manipulate discussions, simulate support or opposition, or conceal the identity of the true poster. *See,* Johnson, Ilah, "Understanding the What, Why, and How for Sock Puppet Accounts," *Medium*, September 11, 2024, available at https://medium.com/@ilahj/understanding-the-what-why-and-how-for-sock-puppet-accounts-081b47245846, accessed on September 12, 2025; *See also*, Mehta et al. 2022, p. 3 ("Influence Operations, wherein a set of 'puppet' accounts are used to push a certain narrative through repetitive posts and comments reiterating the same, [falsify] the appearance of credibility and popular sentiment.").

[102]    A troll account typically refers to an identity used to provoke, harass, or sow discord in online conversations. Trolls may engage in systematic attacks or post inflammatory content to distort public perception or derail discussion. *See,* Assardo, Luis, "Investigating Digital Threats: Trolling Campaigns," *Global Investigative Journalism Network,* May 24, 2023, available at https://gijn.org/resource/investigating-digital-threats-trolling-campaigns/, accessed on September 12, 2025.

[103]    *See,* Mayzlin, Dina, "Promotional Chat on the Internet," *Marketing Science*, Vol. 25 (2), March-April 2006, pp. 155-163 ("Mayzlin 2006"), p. 155 ("The marketers' ability to disguise their promotion as consumer recommendations is made possible by the anonymity enjoyed by participants of online communities. Ultimately, our identities as well as our incentives are obscure in the virtual world.").

[104]    *See,* Johnson, Ilah, "Understanding the What, Why, and How for Sock Puppet Accounts," *Medium*, September 11, 2024, available at https://medium.com/@ilahj/understanding-the-what-why-and-how-for-sock-puppet-accounts-081b47245846, accessed on September 12, 2025 ("When creating a sock puppet account, it's crucial to use entirely fabricated information: - Fake name[,] - Fake location[,] - Fake job[,] - Fake images[,] - Fake phone numbers[.] By relying on these fake details, the investigator can safely navigate social media platforms like Facebook, Instagram, LinkedIn, and Twitter without revealing their true identity.").

[105]    I note that the Second Amended Complaint references concerns raised by Mr. Baldoni to Ms. Nathan about "seeing comments on Instagram 'on random posts defending me by people who are private with no followers and they feel like bots.'" *See,* Second Amended Complaint, ¶ 257; Ferrara, Emilio et al., "The Rise of Social Bots," *Communications of the ACM*, Vol. 59 (7), July 2016, pp. 96-104 ("Ferrara et al. 2016"), p. 99 ("Sophisticated bots can generate personas that appear as credible followers, and thus are more difficult for both people and filtering algorithms to detect. They make for valuable entities on the fake follower market, and allegations of acquisition of fake followers have touched several prominent political figures in the U.S. and worldwide.").

[106]    *See,* Chan 2022, p. 511 ("Online astroturfing: a practice where a centralized source disseminates colluded information on the internet pretending that such information comes from a large number of unconnected individuals. The key thing to note from the definition is that the nature of astroturfing involves a pretense."); *See also*, Bikhchandani, Sushil, David Hirshleifer, and Ivo Welch, "A Theory of Fads, Fashion, Custom, and Cultural Change as Informational Cascades," *Journal of Political Economy*, Vol. 100 (5), October 1992, pp. 992-1026, p. 992 ("An informational cascade occurs when it is optimal for an individual, having observed the actions of those ahead of him, to follow the behavior of the preceding individual without regard to his own information. We argue that localized conformity of behavior and the fragility of mass behaviors can be explained by informational cascades.").

CONFIDENTIAL – Attorneys' Eyes Only

into believing a position is commonly held.[107] Such activities have migrated to comment sections and forums, where persona-management software can fabricate authentic-looking profiles–with email accounts, histories, and online personas– and unleash them strategically to sway discourse in a way that appears organic.

- *Manipulated or fake reviews* refers to the strategic use of online reviews to distort consumer perception and decision-making by parties with material interest. This includes creating *promotional reviews*–fabricated positive feedback intended to boost a product's reputation–often posted by the producer itself.[108] Another common tactic is *the use of fake negative reviews*, where firms post manufactured negative reviews to harm competitors' products.[109]

- *Hijacking comment sections* refers to the practice of steering or distorting online conversations in ways that serve a strategic objective–often by mimicking authentic user engagement.[110] While not typically analyzed in isolation, this tactic aligns closely with the concept of promotional reviews.[111]

48.    Existing research, including my own, has demonstrated that manipulation of online platforms–particularly through comment threads, reposting, upvoting, and sustained

---

[107]    *See,* Bienkov, Adam, "Astroturfing: What is It and Why Does It Matter?" *The Guardian*, February 8, 2012, available at https://www.theguardian.com/commentisfree/2012/feb/08/what-is-astroturfing, accessed on September 10, 2025 ("Multiple online identities and fake pressure groups are used to mislead the public into believing that the position of the astroturfer is the commonly held view.").

[108]    *See,* Mayzlin, Dover, and Chevalier 2014, p. 2425 ("The potential for biased reviews to affect consumer responses to user reviews has been recognized in the popular press. Perhaps the most intuitive form of biased review is the situation in which a producer posts positive reviews for its own product."); *See also,* Luca and Zervas 2016, p. 1 ("As the popularity of [consumer review websites] has grown, so have concerns that the credibility of reviews can be undermined by businesses leaving fake reviews for themselves or for their competitors. There is considerable anecdotal evidence that this type of cheating is endemic in the industry."), p. 14 ("We show that [review fraud] is widespread—nearly one out of five reviews is marked as fake, by Yelp's algorithm.").

[109]    *See,* Mayzlin, Dover, and Chevalier 2014, p. 2425 ("Other forms of biased reviews are also possible. For example, rival firms may benefit from posting negative reviews of each other's products."); *See also,* Luca and Zervas 2016, p. 2 ("In addition to leaving reviews for itself, a restaurant may commit review fraud by leaving a negative review for a competitor."); *See also,* Pei and Mayzlin 2022, p. 593 ("Social media influencers are category enthusiasts who often post product recommendations. Firms sometimes pay influencers to skew their product reviews in favor of the firm.").

[110]    *See,* Leiva, Laura, "Brand Hijacking is Real (And It Starts in The Comments)," *Viral Nation,* July 31, 2025, available at https://www.viralnation.com/resources/blog/brand-hijacking-is-real-and-it-starts-in-the-comments, accessed on September 10, 2025 ("Comment sections can shift from celebration to war zone in hours. One minute it's fire emojis and love. The next? Trolls are stirring the pot. A competitor drops a snide comment. Your audience starts arguing with itself.").

[111]    *See,* Mayzlin, Dover, and Chevalier 2014, p. 2421-2422 ("The presence of undetectable (or difficult to detect) fake reviews may have at least two deleterious effects on consumer and producer surplus. First, consumers who are fooled by the promotional reviews may make suboptimal choices. Second, the potential presence of biased reviews may lead consumers to mistrust reviews. This in turn forces consumers to disregard or underweight helpful information posted by disinterested reviewers.").

CONFIDENTIAL – Attorneys' Eyes Only

algorithmic engagement–can significantly affect the visibility and perceived legitimacy of content.[112] The effectiveness of these tactics lies in their ability to manufacture what appears to be organic public opinion.[113]

49.    Further, these online content manipulation tactics diffuse information beyond a single platform, as digital media ecosystems are highly interconnected.[114] Academic research shows that manipulated content seeded on one online platform can migrate to another, where it can be reposted, reframed, or amplified by users.[115] For example, short-form posts on one

---

[112]    *See,* Mayzlin, Dover, and Chevalier 2014, p. 2421-2422 ("The presence of undetectable (or difficult to detect) fake reviews may have at least two deleterious effects on consumer and producer surplus. First, consumers who are fooled by the promotional reviews may make suboptimal choices. Second, the potential presence of biased reviews may lead consumers to mistrust reviews. This in turn forces consumers to disregard or underweight helpful information posted by disinterested reviewers."); *See also,* Luca and Zervas 2016, p. 1 ("As the popularity of [consumer review websites] has grown, so have concerns that the credibility of reviews can be undermined by businesses leaving fake reviews for themselves or for their competitors. There is considerable anecdotal evidence that this type of cheating is endemic in the industry."); Ferrara et al. 2016, p. 99 ("Sophisticated bots can generate personas that appear as credible followers, and thus are more difficult for both people and filtering algorithms to detect. They make for valuable entities on the fake follower market, and allegations of acquisition of fake followers have touched several prominent political figures in the U.S. and worldwide."); Chan 2022, p. 507 ("Coordinated inauthentic behaviours online are becoming a more serious problem throughout the world."); Pei and Mayzlin 2022, p. 593 ("Social media influencers are category enthusiasts who often post product recommendations. Firms sometimes pay influencers to skew their product reviews in favor of the firm.").

[113]    *See,* Mayzlin, Dover, and Chevalier 2014, pp. 2421-2422 ("The presence of undetectable (or difficult to detect) fake reviews may have at least two deleterious effects on consumer and producer surplus. First, consumers who are fooled by the promotional reviews may make suboptimal choices. Second, the potential presence of biased reviews may lead consumers to mistrust reviews. This in turn forces consumers to disregard or underweight helpful information posted by disinterested reviewers."); *See also,* Shao, Chengcheng et al., "The Spread of Low-Credibility Content by Social Bots," *Nature Communications*, Vol. 9, November 2018, pp. 1-9 ("Shao et al. 2018), p. 5 ("Relatively few accounts are responsible for a large share of the traffic that carries misinformation. These accounts are likely bots […] First, bots are particularly active in amplifying content in the very early spreading moments, before an article goes 'viral.' Second, bots target influential users through replies and mentions. People are vulnerable to these kinds of manipulation […] As a result, bots amplify the reach of low-credibility content, to the point that it is statistically indistinguishable from that of fact-checking articles."); Dost et al. 2019, p. 62 ([F]irm-created word of mouth through SMC programs interacts negatively with all tested forms of advertising but positively with promotional activities.").

[114]    *See,* Murdock, Isabel, Kathleen M. Carley, and Osman Yagan, "An Agent-Based Model of Cross-Platform Information Diffusion and Moderation," *Social Network Analysis and Mining*, Vol. 14 (145), July 2024, pp. 1-23 ("Murdock, Carley, and Yagan 2024"), p. 1 ("Social media platforms are highly interconnected because many users maintain a presence across multiple platforms.").

[115]    *See,* Zannettou, Savvas et al., "The Web Centipede: Understanding How Web Communities Influence Each Other Through the Lens of Mainstream and Alternative News Sources," *Association for Computing Machinery,* IMC' 17, November 2017, pp. 405-417, p. 405 ("Using large social networks like Twitter and Facebook, misleading, false, or agenda-driven information can quickly and seamlessly spread online, deceiving people or influencing their opinions. Also, the increased engagement of tightly knit communities, such as Reddit and 4chan,

CONFIDENTIAL – Attorneys' Eyes Only

platform such as X (formerly known as Twitter) may be used to redirect audience to long-form content on another platform such as YouTube.[116] Such cross platforms links, involving initial seeding on a targeted platform, can increase reach and quickly amplify across the broader online ecosystem.[117]

50.     When executed systematically, online manipulation tactics can have sustained effects on brand equity, consumer trust, and ultimately, sales.[118] The campaign against Ms. Lively, as outlined in the Second Amended Complaint, reflects an example of such online manipulation. According to documents and communications produced in this litigation, the

---

further compounds the problem, as their users initiate and propagate alternative information, not only within their own communities, but also to different ones as well as various social media.").

[116]    *See,* Murdock, Carley, and Yagan 2024, p. 2 ("One such study analyzed how Twitter and YouTube were used in a campaign against the White Helmets during the Syrian civil war. It found that "alternative" news websites were used effectively to direct users from short-form content on Twitter to large sets of videos on YouTube (Starbird and Wilson 2020). Another study, focusing on Russian disinformation during the 2016 U.S. election, found that the Internet Research Agency (IRA) may have used Reddit to test content before spreading it on Twitter (Lukito 2020).").

[117]    *See,* Micallef, Nicholas et al., "Cross-Platform Multimodal Misinformation: Taxonomy, Characteristics and Detection for Textual Posts and Videos," *Association for the Advancement of Artificial Intelligence*, Vol. 16 (1), May 2022, pp. 651-662, p. 1 ("A common technique used to spread misinformation in social media platforms is to use cross-platform links to increase reach and evade detection by a single platform."), p. 11 ("In this work, we characterized how YouTube videos are used in social media posts on different platforms to spread misinformation or refute it, and how multiple platforms are leveraged to increase the reach of these videos.").

[118]    *See,* Bambauer-Sachse, Silke, and Sabrina Mangold, "Brand Equity Dilution Through Negative Online Word-of-Mouth Communication," *Journal of Retailing and Consumer Services*, Vol. 18 (1), January 2011, pp. 38-45 ("Bambauer-Sachse and Mangold 2011"), p. 44 ("[N]egative online product reviews have considerable detrimental effects on consumer-based brand equity and thus lead to a significant brand equity dilution. […] [W]e found that even brands with regard to which consumers have a considerable brand knowledge are not immune from such detrimental effects."); *See also,* Wan, Yan et al., "Retailer Response to Negative Online Consumer Reviews: How Can Damaged Trust be Effectively Repaired?" *Information Technology and Management*, Vol. 24 (1), June 2022, pp. 37-53, p. 37 ("[T]he visibility of negative comments may significantly damage the retailer's reputation […] perceived retailer service problems […] have significant negative impacts on three dimensions of consumer trust beliefs (benevolence, integrity and competence), and consumer trust beliefs have significant impacts on consumer purchase intentions."); Chevalier and Mayzlin 2006, p. 346 ("the addition of new, favorable reviews at one site results in an increase in the sales of a book at that site relative to the other site. We find some evidence that an incremental negative review is more powerful in decreasing book sales than an incremental positive review is in increasing sales."); Godes and Mayzlin 2009, p. 722 ("[…] we empirically demonstrate […] that the firm can create WOM that drives sales. […] This is the first study to our knowledge to demonstrate that discussions created by the firm's actions rather than simply product experiences can have such an effect."), p. 737 ("We have shown that in some cases, purely exogenous WOM is associated with higher week-to-week sales.").

CONFIDENTIAL – Attorneys' Eyes Only

strategy was designed to be "most importantly untraceable,"[119] and involved the deliberate creation and amplification of content that would appear to originate from ordinary members of the public but was in fact orchestrated by paid agents.[120]

## V.    ASSESSING THE IMPACT OF MANIPULATION OF ONLINE CONVERSATIONS

51.    To evaluate the impact of manipulation of online conversations, I draw on the academic research described in **Section IV** to empirically assess how online conversations evolved around Ms. Lively and her commercial brands. Using my experience, academic literature, and data from multiple social media platforms covering the relevant period, I analyze: (1) available information regarding the campaign to manipulate online conversations, (2) relevant brand perceptions prior to August 2024, as well as the change in perceptions starting in August 2024, (3) changes in the volume and sentiment of online conversations over time, (4) changes in thematic content of online conversations over time, and (5) the relationship between these changes and commercial outcomes, including marketing disruptions, sales declines, and product reviews.

---

[119]    KCASE-000004802-805 (Case and Nathan Short Message Report August 2024) at 803 ("Quote two $25k per month - min 3 months as it needs to seed same as above - this will be for creation of social fan engagement to go back and forth with any negative accounts, helping to change narrative and stay on track. All of this will be most importantly untraceable. There is a lot more to both of these quotes but, easier to discuss via phone in terms of capabilities and what I have personally experienced in and out of crisis scenarios."); *See also*, Second Amended Complaint, ¶¶ 29, 214.

[120]    JONESWORKS 00013647-649 (Baldoni and TAG Team Short Message Report August 2024) at 648 ("Justin Baldoni […] Hey Tag team, I've been seeing some IG comments on random posts defending me by people who are private with no followers and they feel like bots. Can you please confirm we are not doing any of that? I really don't want bots defending me as it feeds into their potential narrative […] Melissa Nathan […] I can fully fully confirm we do not have bots. This is not also what we do- bots look fake to anyone. […] Bots and fan accounts also run pretty organically by now with all the Al platforms and Google Analytics itself - there is no bot army that's a myth these days. Any digital team these days is far more intelligent to utilise something so obvious."). *See also*, Second Amended Complaint, ¶¶ 31, 39, 214, 235, 250-255.

CONFIDENTIAL – Attorneys' Eyes Only

52.     Taken together, my findings demonstrate a clear causal pathway. Online narratives about Ms. Lively, including those related to her commercial brands, were largely positive before August 2024. Beginning in early August 2024, manipulated content seeded and amplified negative narratives, ultimately producing sharp and sustained deterioration in sentiment. This reputational harm weakened perceptions of Ms. Lively, which in turn spilled over to her commercial ventures–eroding brand equity, undermining marketing effectiveness, and contributing to measurable sales declines across Betty Buzz, Betty Booze, and Blake Brown Beauty. In the subsections that follow, I show how my analysis of available evidence collectively supports the conclusion that the manipulation of online conversations was a central driver in the decline of Ms. Lively's business ventures' performance.

### A.     A Campaign to Manipulate Online Conversations

53.     The online conversations pertaining to Ms. Lively starting in August 2024 is an example of online manipulation. Defendants Wayfarer Studios, Mr. Baldoni, Mr. Heath, and Mr. Sarowitz retained Ms. Nathan and her company, TAG, along with Mr. Wallace and his company, Street Relations, to execute a plan that was "most importantly untraceable."[121] This plan involved "starting threads with theories the team approves of,"[122] the "creation of social fan engagement to go back and forth with any negative accounts, helping to change [*sic*] narrative

---

[121]  KCASE-000004802-805 (Case and Nathan Short Message Report August 2024) at 803 ("Quote two $25k per month - min 3 months as it needs to seed same as above - this will be for creation of social fan engagement to go back and forth with any negative accounts, helping to change narrative and stay on track. All of this will be most importantly untraceable."); *See also*, Second Amended Complaint, ¶ 29.

[122]  HEATH_000028187 (Email from Jennifer Abel August 7, 2024) ("Organically engaging with audiences in the right way, starting threads with theories the team approves of, and asking questions that no longer place Wayfarer and Justin on the back foot."); *See also*, Second Amended Complaint, ¶ 29.

CONFIDENTIAL – Attorneys' Eyes Only

and stay on track,"[123] and broader online manipulation tactics that involved "work[ing] to remove links that are harmful to Wayfarer Studios, Justin, and the narrative alongside the appropriate teams," and "[t]aking down full Reddit and all social accounts as needed."[124]

54.     These tactics are consistent with the manipulation of online conversations, including sock puppet activity, where fabricated or deceptive online identities are used to sustain engagement and artificially amplify narratives, effectively creating a distorted perception of commentary. Further, the communications produced in this matter describe conducting practices such as "social manipulation" involving "the boosting of content (sometimes the very content that TAG and its affiliates had seeded), the suppressing of negative content about Mr. Baldoni, and the amplifying of negative content about Ms. Lively (including through engagement via comments on social media)[,]"[125] which are examples of content amplification, content suppression, and algorithmic manipulation designed to exploit platform algorithms and artificially extend the visibility and lifespan of narratives that align with the campaign's objectives.

55.     Based on data from social media as detailed in **Section III.C**, I analyze the online conversations pertaining to Ms. Lively from May 1, 2024 through February 28, 2025. The findings show that there were two distinct spikes in the *volume* of online conversations: (1) around early August 2024, and (2) in late December 2024, which extends until February 2025.

---

[123]   KCASE-000004802-805 (Case and Nathan Short Message Report August 2024) at 803 ("Quote two $25k per month - min 3 months as it needs to seed same as above - this will be for creation of social fan engagement to go back and forth with any negative accounts, helping to change narrative and stay on track. All of this will be most importantly untraceable."); *See also*, Second Amended Complaint, ¶ 29.

[124]   HEATH_000028187 (Email from Jennifer Abel August 7, 2024).

[125]   *See,* Second Amended Complaint, ¶¶ 230, 250-256; *See also*, KCASE-000004802-805 (Case and Nathan Short Message Report August 2024); JONESWORKS 00013647-649 (Baldoni and TAG Team Short Message Report August 2024); KCASE-000001093-097 (Case and Butler Short Message Report August 2024); KCASE-000001540-544 (Baldoni Team and TAG Team Short Message Report August 2024).

CONFIDENTIAL – Attorneys' Eyes Only

56.    There was a substantial increase in the volume of online conversations related to Ms. Lively starting in early August 2024 as compared to the volume of online conversations prior to this time period. As evidenced in **Figure 3**, between the weeks ending July 14 and August 18, 2024, the volume of online conversations referencing Ms. Lively rose from a weekly count of fewer than 1,800 posts to nearly 80,000.[126] Further, my analysis reveals a second distinct spike in the volume of online conversations in late December 2024, which extends to February 2025. The weekly count of online conversations jumped from fewer than 3,000 in the week ending December 15, 2024, to over 110,000 in the weeks ending December 22, 2024 and December 29, 2024. The spike persisted into the following year, with the weekly count of conversations exceeding 27,000 throughout January and February 2025. Both of these spikes are consistent with the onset of the "retaliation campaign" that was launched in August 2024 as described in the Second Amended Complaint and the documents produced in this litigation.[127]

---

[126]    *See* backup for database with online conversations from Pulsar TRAC, retrieved on September 8, 2025. I also note that online conversations about Ms. Lively displayed a negative shift around early August 2024 and extended through at least February 2025 as I explain in **Section V.C**. Produced documents describe a similar pattern, noting that what was referred to as "Anti-Blake" sentiment increased sharply between August 12 and August 18, 2024 from approximately 24% to 62% across major social platforms (Twitter/X, Instagram, TikTok, Facebook, YouTube, and Reddit). *See,* SPE BL0022000-018 at 016.

[127]    Second Amended Complaint, ¶¶ 5, 44-45, and Section F.

CONFIDENTIAL – Attorneys' Eyes Only

**Figure 3: Volume of Online Conversations Referencing Ms. Lively[128]**



**Notes:**

[1] This exhibit reflects all online conversations collected from X, Reddit, and YouTube that match one of the following inclusion keywords: "Blake Lively," "Blake Reynolds," "Blake Ellender," "Blake Brown," "blakelively," "@blakelively," "Betty Buzz," and "Betty Booze," and none of the following exclusion keywords: "James Blake," "Blake Griffin," "Blake Shelton," "Blake Anderson," "Blake Jenner," "Blake Cooper," "Blake Snell," and "Blake Bortles."

[2] The data is aggregated based on the week ending Sunday, with the exception of the initial partial week from May 1 to May 5, 2024 (both days inclusive), and the final partial week from February 24 to February 28, 2025 (both days inclusive).

57.     The existence of manipulation of online conversations is also supported by documents and communications produced in this case that reveal an intention to boost and amplify harmful narratives once seeded.[129] Although I present my detailed analysis in the next section, the data show that the increased volume of online conversations was predominantly

---

128     *See* backup for database with online conversations from Pulsar TRAC, retrieved on September 8, 2025.

129     *See,* Second Amended Complaint, ¶¶ 250-255.

CONFIDENTIAL – Attorneys' Eyes Only

negative, targeting Ms. Lively, her character, and her husband.[130] The themes of online conversations during both the periods of August 2024 and December 2024 through February 2025 are similar, suggesting that the later surge was not organically generated, but rather, was an extension or amplification of narratives originally seeded in August 2024. This pattern aligns with the long-term effects of content manipulation, in which initial messaging continues to shape public discourse long after its introduction.[131] By artificially elevating negative conversations and extending the online life cycle of harmful narratives, the manipulation of online conversations disrupted public sentiment and created a misalignment between Ms. Lively's established brand identity prior to August 2024, and the information presented to audiences through manipulated online conversations.

---

[130]  *See,* Second Amended Complaint, ¶ 205 ("The Scenario Planning Document provides TAG's 'recommendation' 'to get ahead of this narrative . . . .' *Id*. This included suggesting misleading messaging that: (1) '[p]roduction members lost their jobs due to [Ms. Lively's] takeover and insisted upon involvement'; (2) Ms. Lively 'involved her husband to create an ilmbalance [sic] of power between her and [Mr. Baldoni]'; (3) Ms. Lively has a 'less than favorable reputation in the industry'; and (4) Ms. Lively had 'a clear, likely motive. . . to bully her way into buying the rights for It Starts With Us,' the sequel to the Film currently owned by Wayfarer."); *See also,* KCASE-000004208-211 at 209-211.

[131]  Bambauer and Mangold 2011, p. 38 ("[C]onsumers tend to specifically look for negative reviews because negative information is considered as being more diagnostic and informative than positive or neutral information and thus is weighted more heavily in judgments than is positive information (Herr et al., 1991). Thus, negative compared to positive online WOM communication is not only harmful for companies, it even has stronger effects on consumer response variables (Park and Lee, 2009)."), p. 44 ("The findings of our empirical study show that negative online product reviews have considerable detrimental effects on consumer-based brand equity and thus lead to a significant brand equity dilution. […] even high brand equity can be significantly diluted by negative online product reviews and because such detrimental effects will become even more important with increasing improvement and spread of network technology."); *See also,* Shao et al. 2018, p. 1 ("Bots amplify [low-credibility] content in the early spreading moments, before an article goes viral. They also target users with many followers through replies and mentions. Humans are vulnerable to this manipulation, resharing content posted by bots. Successful low-credibility sources are heavily supported by social bots."), p. 4 ("[E]ach amount of sharing activity by likely bots tends to trigger a disproportionate amount of human engagement. The same amplification effect is not observed for articles from fact-checking sources.").

CONFIDENTIAL – Attorneys' Eyes Only

58.      Further, I analyzed the volume trend across the entire online conversations dataset for three illustrative keywords, (1) "mean girl,"[132] (2) "bully,"[133] and (3) "tone deaf"[134] that were allegedly used by the Defendants when manipulating online conversations or to describe Ms. Lively's actions. In **Figure 4, Figure 5**, and **Figure 6,** I plotted the trend of the weekly proportion of online conversations that mention these keywords relative to the total number of online conversations in that week.

---

[132]   *See, e.g.*, Second Amended Complaint, FN 97 ("Nobody is going to buy this crap now. Good job in ruining your brand before it even started. Nasty mean girls never prosper.").

[133]   *See, e.g.,* Second Amended Complaint, ¶ 344 ("A bully, uptight, backstabbing person that loves to see people suffering so she can feel good. Disgusting.").

[134]   *See, e.g.*, Wayfarer Complaint, ¶ 10 ("Lively's disastrous marketing efforts and tone-deaf press interviews and appearances backfired and led to widespread criticism of Lively's promotional approach to the Film's highly sensitive focus on domestic violence.").

CONFIDENTIAL – Attorneys' Eyes Only

**Figure 4: Proportion of Online Conversations Mentioning "Mean Girl"**



**Notes:**

[1] The graph shows the weekly proportion of online conversations containing the keyword "mean girl." A conversation is counted if this keyword appears in the text. For conversations where the post type is "post," the text includes both the title and content. For conversations where the post type is "engagement," only the content is used. Proportions are based on the total number of conversations within each week.

[2] The data is aggregated based on the week ending Sunday, with the exception of the initial partial week from May 1 to May 5, 2024 (both days inclusive), and the final partial week from February 24 to February 28, 2025 (both days inclusive).

[3] When matching for the keyword, I included common variations in spelling, capitalization, and spacing. For example, "mean girl" would also match to "Mean Girl," "meangirl," or "mean girl."

CONFIDENTIAL – Attorneys' Eyes Only

**Figure 5: Proportion of Online Conversations Mentioning "Bully"**



**Notes:**

[1] The graph shows the weekly proportion of online conversations containing the keyword "bully." A conversation is counted if this keyword appears in the text. For conversations where the post type is "post," the text includes both the title and content. For conversations where the post type is "engagement," only the content is used. Proportions are based on the total number of conversations within each week.

[2] The data is aggregated based on the week ending Sunday, with the exception of the initial partial week from May 1 to May 5, 2024 (both days inclusive), and the final partial week from February 24 to February 28, 2025 (both days inclusive).

[3] When matching for the keyword, I included common variations in spelling, capitalization, and tense. For example, "bully" would also match to "Bully," "bullying," "bullied," or "bullies."

42

CONFIDENTIAL – Attorneys' Eyes Only

**Figure 6: Proportion of Online Conversations Mentioning "Tone Deaf"**



**Notes:**

[1] The graph shows the weekly proportion of online conversations containing the keyword "tone deaf." A conversation is counted if this keyword appears in the text. For conversations where the post type is "post," the text includes both the title and content. For conversations where the post type is "engagement," only the content is used. Proportions are based on the total number of conversations within each week.

[2] The data is aggregated based on the week ending Sunday, with the exception of the initial partial week from May 1 to May 5, 2024 (both days inclusive), and the final partial week from February 24 to February 28, 2025 (both days inclusive).

[3] When matching for the keyword, I included common variations in spelling, capitalization, and spacing. For example, "tone deaf" would also match to "Tone Deaf," "tonedeaf," or "tone deaf."

59.    As shown in **Figure 4, Figure 5**, and **Figure 6**, there are few mentions of these three keywords until early August. Nonetheless, from August 2024, through February 2025, all three keywords started to get regularly used in online conversations. The "mean girl" keyword peaks at 7.9% of all weekly online conversations, which corresponds to 4,399 online conversations in the week ending January 19, 2025. The "bully" keyword peaks at 4.0% of all weekly online conversations, which corresponds to 2,663 online conversations in the week ending February 02, 2025. The "tone deaf" keyword peaks at 2.6% of all weekly online

43

CONFIDENTIAL – Attorneys' Eyes Only

conversations, which corresponds to 2,047 online conversations in the week ending August 18, 2024.

### B.    Changes in Brand Perceptions Starting in August 2024

60.    Ms. Lively's personal brand is closely intertwined with her commercial brands, namely Betty Buzz, Betty Booze, and Blake Brown Beauty.[135] These brands rely on her public image and reputation to create meaningful brand associations that help differentiate them.[136] While Ms. Lively's businesses, like all brands, rely in part on innovation and product quality, their commercial success is closely tied to the strength and consistency of her personal brand. Ms. Lively's brand equity is communicated and reinforced through public disclosure, including online conversations, media coverage and social media engagement.

61.    To understand the potential effects of online conversation manipulation on Ms. Lively's personal brand and commercial brands, it is important to first examine public perception before August 2024.[137] To do so, I use a Latent Dirichlet Allocation ("LDA") model on the

---

[135]   In a traditional endorsement arrangement, a celebrity serves primarily as a spokesperson, lending their image and perceived credibility to a product or company without holding any ownership stake or operational role. In contrast, celebrity-owned brands are those in which the public figure plays a foundational role, often as a founder, creative lead, or equity stakeholder, with the brand identity closely aligned to their personal values, lifestyle, and public persona. Blake Lively serves as both the owner and the endorser of Betty Buzz, Betty Booze, and Blake Brown Beauty.

[136]   Israeli, Ayelet et al., "What Makes A Successful Celebrity Brand," *Harvard Business Review*, From the Magazine, May-June 2024, available at https://hbr.org/2024/05/what-makes-a-successful-celebrity-brand, accessed on September 10, 2025 ("Celebrity brands get attention—and that can cut both ways. Consumers may be skeptical about the brands, especially if the stars behind them are controversial or polarizing. Kardashian has millions of followers—but also millions of detractors. Sometimes it seems that people enjoy nothing more than tearing down a celebrity—and if that celebrity has launched a brand, it may get caught in the crossfire. […] In addition to ongoing scrutiny, celebrity brands face the risk that the celebrity will be involved in a scandal or a legal or ethical transgression, reflecting poorly on the brand.").

[137]   The retaliation campaign as described in the Second Amended Complaint appears to have begun between July 31 and August 2, 2024 (See **Figure 1**). To take a conservative approach and ensure a clean baseline, my "before August 2024" period includes data only up to July 24, 2024, ending one week prior to the potential campaign's onset.

CONFIDENTIAL – Attorneys' Eyes Only

social media data I collected and describe in **Section III.C** to conduct an initial analysis of keywords and "topics" associated with Ms. Lively's personal brand within online conversations.[138] Topic modelling via LDA is a well-established methodology for identifying and extracting underlying topics from unstructured text, including social media content.[139] The LDA model identifies patterns in natural language to automatically group online conversations into distinct "topics." In this context, a "topic" refers to a cluster of words that frequently appear together and reflect a shared theme or subject of discussion. By examining how words co-occur across large numbers of posts, in this case over one million online conversations, the model reveals underlying, or latent themes that characterize the discourse. Importantly, because LDA infers these patterns directly from the data without predefined categories or human judgement, it offers a systematic, data-driven, and impartial means of summarizing large volumes of text.

62.     Between May 1, 2024, and July 24, 2024, online content frequently associated Ms. Lively with "topics" related to broader themes of high-profile fashion and luxury culture events (e.g., "Met Gala," "New York Premiere"), associations with prominent fashion figures

---

[138]   Blei, David M., Andrew Y. Ng, and Michael I. Jordan, "Latent Dirichlet Allocation," *Journal of Machine Learning Research*, Vol. 3, March 2003, pp. 993-1022, p. 993 ("We describe *latent Dirichlet allocation* (LDA), a generative probabilistic model for collections of discrete data such as text corpora. LDA is a three-level hierarchical Bayesian model, in which each item of a collection is modeled as a finite mixture over an underlying set of topics. Each topic is, in turn, modeled as an infinite mixture over an underlying set of topic probabilities.").

[139]   *See,* Puranam, Dinesh, Vishal Narayan, and Vrinda Kadiyali,, "The Effect of Calorie Posting Regulation on Consumer Opinion: A Flexible Latent Dirichlet Allocation Model with Informative Priors," *Marketing Science*, Vol. 36 (5), August 2017, pp. 726-746, p. 727 ("Our model belongs to a class of probabilistic topic models termed Latent Dirichlet Allocation (LDA) models (Blei et al. 2003), which have been developed by computer scientists (specifically in the machine learning discipline) to analyze words in large sets of original text to discover the themes or topics within. We summarize a large collection of reviews into a few representative latent topics (e.g., price, service, menu item, cuisine) and characterize these topics by a probability distribution over all words in reviews.").

Tirunillai, Seshadri, and Gerard J. Tellis, "Mining Marketing Meaning from Online Chatter: Strategic Brand Analysis of Big Data Using Latent Dirichlet Allocation," *Journal of Marketing Research*, Vol. 51 (4), August 2014, pp. 463-479, pp. 464-465 ("[…] LDA efficiently analyzes data at a highly granular temporal level, it allows for exploration of dynamics over time. […] [LDA] can complete many steps of the analysis using unsupervised methods that involve little human intervention, even labeling dimensions. As a result, it is not necessary for the researcher to know the latent dimensions in advance.").

CONFIDENTIAL – Attorneys' Eyes Only

(e.g., "Gigi Hadid," "Rihanna," "Taylor Swift," members of "Blackpink"), branded jewelry and design campaigns (e.g., "Tiffany" and "Tiffany Titan") and stylistic descriptors reflecting elegance and influence (e.g., "stun" and "inspired") (See **Figure 7**).[140] There were also mentions of the Film's premiere (e.g., "theaters august," "exclusively theatres," and "Justin Baldoni."). These keywords capture how Ms. Lively was publicly perceived from May through July 2024 and highlight the positive keywords that were frequently connected to her persona in online conversations. **Figure 7** also illustrates a clear absence of negative topics.[141]

---

[140]   *See* backup for database with online conversations from Pulsar TRAC, retrieved on September 8, 2025; *See also,* BL-000037970–8164 (Betty B Presentation October 2024) at 8005 ("Our Founder […] Tastemaker and fashion icon.").

[141]   The distribution of topics and representative word pairs after August 2024 can be seen in **Figure 8Error! Main Document Only.** below.

46

CONFIDENTIAL – Attorneys' Eyes Only

**Figure 7: Distribution of Topics and Representative Word Pairs Before July 25, 2024[142]**

| Topic Number[1] | Topic Word Pairs[2] | Topic Frequency[3] | Topic Count[3] |
|---|---|---|---|
| 1 | ryan reynolds, deadpool wolverine, gigi hadid, ends starring, justin baldoni, new york, starring justin, trailer ends, theaters august, york premiere, taylor swift, baldoni theaters, wolverine new, eras tour, swift eras | 21.3% | 32,643 |
| 2 | met gala, gala rihanna, popculture2000s met, tiffany titan, rosé tiffany, titan launch, launch roséxtiffanyandco, rosé rosé, divinekitt livel, new set, set rosé, theroseconnect new, blackpink rosé, theroseconnect rosé, pharrell williams | 14.2% | 21,696 |
| 3 | lady deadpool, ryan reynolds, just ryan, reynolds wig, deadpool just, funny lady, know probably, probably funny, rawbebeef know, tiffany titan, pharrell williams, friends house, williams new, gather celebrate, jewelry collection | 13.2% | 20,189 |
| 4 | ryan reynolds, new photo, blackpink rosé, rosé stun, stun new, popbase blackpink, taylor swift, scenes deadpoolandwolverine, reynolds scenes, culturecrave ryan, eras tour, trailer ends, tour madrid, swift eras, madrid spain | 10.0% | 15,297 |
| 5 | itendswithus sonypictures, theaters august, exclusively theaters, august itendswithus, watch look, look itendswithusmovie, line weeping, weeping watch, gather line, itendswithusmovie premieres, premieres exclusively, taylornation13 gather, ryan reynolds, hugh jackman, placement posters | 9.4% | 14,318 |
| 6 | statue libey, dress inspired, oxidation process, inspired oxidation, process statue, libey moment, popculture2000s dress, taylor swif, swif friendship, friendship years, swftisa taylor, deadpool wolverine, gigi hadid, wolverine premiere, hadid stun | 9.0% | 13,754 |
| 7 | rosé new, new picture, viraltakes rosé, new photo, blackpink rosé, aboutmusicyt blackpink, met gala, blackpink rose, rose caught, caught event, filmfare blackpink, ryan reynolds, gigi hadid, red carpet, ariana grande | 6.7% | 10,308 |
| 8 | ryan reynolds, wait taylor, ll say, say waiting, tell child, child ll, child wait, taylor tell, 4th child, reynolds jokingly, jokingly 4th, theswiftsociety ryan, statue libey, notgwendalupe statue, ig post | 5.8% | 8,936 |
| 9 | titan collection, tiffany titan, taylor swift, colleen hoover, blackpink rosé, rosé wore, collection launch, pink minidress, alongside tiffany, minidress alongside, coquettish pink, wore coquettish, ellemagazine blackpink, like colleen, make like | 5.4% | 8,315 |
| 10 | gigi hadid, deadpool wolverine, taylor swift, margot robbie, wolverine premiere, billie eilish, pedro pascal, hadid deadpool, cillian murphy, robbie cillian, eilish pedro, pascal margot, murphy metgala, mssmklsn billie, popbase gigi | 4.9% | 7,518 |

**Notes:**

[1] The LDA model allocates "topics" to the corpus of online conversations based on shared word usage.

[2] The topics generated by the LDA model correspond to representative word pairs that identify the topic, showing the top 15 word pairs that best illustrate each theme.

[3] The LDA model assigns every post a relative "weight" for each topic based upon the word pairs it contains. The topic with highest associated weight was then selected.

[4] The results of the LDA model are presented as is, without correcting misspellings in the underlying data or because of the LDA model's reformatting. Because of word-stemming procedures applied by the LDA model, it sometimes surfaces unusual root forms of the word ("libey" instead of "liberty").

---

[142]    *See* backup for database with online conversations from Pulsar TRAC, retrieved on September 8, 2025.

CONFIDENTIAL – Attorneys' Eyes Only

63.    In contrast, from July 25, 2024, until August 31, 2024,[143] new "topics" in the online conversations referencing Ms. Lively's personality, history, and behavior (e.g., "mean girl," "uncomfortable set," and "history problems"), criticism about her wedding (e.g., "married plantation," and "plantation love"), past interviews (e.g., "Norwegian interviewer," "nightmare interview," and "interviewer Kjersti"), and past controversies surrounding Woody Allen and his movie, Café Society (e.g., "Woody Allen," "Cafe Society," and "promoting Woody")[144] became visible in the conversations as shown in **Figure 8** below. While positive topics and keywords still exist ("lady deadpool," "deadpool based," "popculture2000s britney"), they are increasingly mingled with the negative keyword references above, demonstrating a shift in the discussion about Ms. Lively.

---

[143]    For this "topic" analysis, I excluded online conversations from December 2024 onward to avoid capturing discussions related to the filing of the Original Complaint (e.g., references to sexual harassment).

[144]    In 2016, Blake Lively was subject to controversy over her criticism of a rape joke referencing Woody Allen made in the opening ceremony of the 2016 Cannes Film Festival. *See,* Setoodeh, Ramin, "Blake Lively Rips Cannes for Controversial Woody Allen Rape Joke," *Vatriety,* May 12, 2016, available at https://variety.com/2016/film/news/blake-lively-rips-cannes-for-controversial-woody-allen-rape-joke-1201772516/, accessed on October 15, 2025.

CONFIDENTIAL – Attorneys' Eyes Only

**Figure 8: Distribution of Topics and Representative Word Pairs from July 25, 2024, through August 31, 2024[145]**

| Topic Number[1] | Topic Keywords[2] | Topic Frequency[3] | Topic Count[3] |
|---|---|---|---|
| 1 | ryan reynolds, domestic violence, time used, reynolds butt, probably does, does time, didn react, grabbing ryan, butt didn, react probably, sydglenx grabbing, taylor swift, deadpool wolverine, brad pitt, talking domestic | 12.7% | 26,446 |
| 2 | britney spears, ends premiere, spears 2002, forever britney, britney stan, meant forever, forever forever, spears meant, versace dress, 2002 2024, popculture2000s britney, iconic versace, spears iconic, dress 2002, 2002 ends | 11.7% | 24,321 |
| 3 | lady deadpool, deadpool based, rob liefeld, played character, character lady, created character, character deadpoolandwolverine, based played, liefeld says, says created, culturecrave rob, justin baldoni, child sex, sex trafficking, mean girl | 11.1% | 23,044 |
| 4 | ryan reynolds, abusive relationship, escaping abusive, movie escaping, deadpool wolverine, wear florals, lead actor, colleen hoover, oh wait, sexy mysterious, wait wasn, described movie, yeah wear, florals comfoin, cinema knowing | 10.7% | 22,239 |
| 5 | hugh jackman, baz luhrmann, luhrmann vogue, ryan reynolds, directed baz, filmupdates hugh, hate train, jackman directed, justin baldoni, taylor swift, like know, swift song, favorite child, pick song, favorite taylor | 10.4% | 21,756 |
| 6 | ryan reynolds, parker posey, justin baldoni, woody allen, kjersti flaa, nightmare interview, cafe society, promoting woody, café society, norwegian interviewer, star parker, shares nightmare, society 2016, interviewer kjersti, flaa shares | 9.9% | 20,581 |
| 7 | married plantation, got married, domestic violence, love god, god woman, plantation love, hasn gagged, gagged got, woman tl, muglare hasn, social media, entire cast, hired crisis, cast abuser, making uncomfoable | 9.4% | 19,503 |
| 8 | justin baldoni, 37th bihday, set ends, feel uncomfoable, happy 37th, uncomfoable set, told people, people justin, history problems, baldoni feel, justin history, scene justin, ends revealed, lifts air, problems lifting | 8.5% | 17,794 |
| 9 | van der, serena van, der woodsen, woodsen era, sooo serena, pinkmochhi sooo, justin baldoni, taylor swift, simple favor, colleen hoover, chrissy teigen, new chrissy, lizcrokin new, brandon sklenar, getting outta | 8.1% | 16,808 |
| 10 | deadpool wolverine, ryan reynolds, ends drama, halle berry, husband movie, asked time, storm deadpool, said yeah, movie storm, storm said, yeah asked, box office, justin baldoni, sit right, doesn sit | 7.7% | 15,947 |

**Notes:**

[1] The LDA model allocates "topics" to the corpus of online conversations based on shared word usage.

[2] The topics generated by the LDA model correspond to representative word pairs that identify the topic, showing the top 15 word pairs that best illustrate each theme.

[3] The LDA model assigns every post a relative "weight" for each topic based upon the word pairs it contains. The topic with highest associated weight was then selected.

[4] The results of the LDA model are presented as is, without correcting misspellings in the underlying data or because of the LDA model's reformatting. Because of word-stemming procedures applied by the LDA model, it sometimes surfaces unusual root forms of the word ("libey" instead of "liberty").

---

[145]  *See* backup for database with online conversations from Pulsar TRAC, retrieved on September 8, 2025.

49

CONFIDENTIAL – Attorneys' Eyes Only

64.     It is also my understanding that Ms. Lively started promoting the Film around June 2024 in accordance with what the Sony marketing plan described as "Talking Points," which included: "[a]void[ing] talking about this film that makes it feel sad or heavy——— it's a story of hope," and "[f]ocus[ing] more on Lily's strength and resilience as opposed to describing the film as a story about domestic violence."[146] Floral themes and backgrounds were tested by Sony in trailers,[147] and also promoted by Mr. Baldoni and Ms. Hoover.[148] Ms. Hoover testified that the marketing plan was probably approved by Mr. Baldoni, the Film's director, for use by

---

[146]   BL-000026874–876 (Email Regarding "It Ends With Us" Talking Points) at 876; *See also*, VanHoose, Benjamin, and Lizz Schumer, "It Ends with Us First Reactions: Blake Lively Movie Brings 'All the Feelings' — 'I Was a Crying Mess,'" *People*, available at https://people.com/it-ends-with-us-first-reactions-blake-lively-movie-brings-all-the-feelings-8665200, accessed on October 9, 2025 ("The actress, [Blake Lively], 36, attended a surprise screening showcasing an unfinished version of the film at Book Bonanza in Grapevine, Texas, on Saturday, June 15."); blakelively, "Better 3 Weeks Late than Never?," *Instagram*, July 10, 2024, available at https://www.instagram.com/p/C9QrZBlJhD6/?img_index=1, accessed on October 10, 2025; Itendswithusmovie, and sonypictures, "Thank You #BookBonanza2024 for Letting us Share #ItEndsWithUsMovie with You," *Instagram*, June 16, 2024, available at https://www.instagram.com/p/C8TdnV0uQQd/?img_index=1, accessed on October 9, 2025. Defendants claim instead that Ms. Lively was promoting the Film in a "tone-deaf" manner. Wayfarer Complaint, ¶¶ 8, 10.

[147]   *See, e.g.*, SPE_BL0003359–406 at 361 ("Moving forward, build on Desire with background on Lily's character outside of romance […] feeling more uplifting via its flower-shop ending. This uplift aligns with the top story positioning of wanting to see 'Lily's transformation and journey of self-discovery and empowerment.'"); SPE_BL0002262–300 at 264 (" Moving forward, try combining the best of the trailers and adding new material […] [I]ncorporating some version of the flower shop sign turning on to represent Lily's outside-of-relationship interests (and/or adding additional context on her beyond the flower shop so that audiences better understand who she is as a person outside of her romantic relationships)."); *See also*, Deposition of Margaret Colleen Hoover, *Blake Lively vs. Wayfarer Studios LLC et al., Jennifer Abel vs. Jonesworks, LLC, Wayfarer Studios et al. vs. Blake Lively et al.*, Case No. 24-CV-10049-LJL, United States District Court for the Southern District of New York, September 29, 2025 ("Hoover Deposition"), pp. 62:12-63:24 ("Q. […] can you describe the trailer screening? What was it? A. They had invited influencers and readers to come and watch the -- the trailer early, before it released to the public. […] there was an event afterward where we interacted with people. Justin and I sat behind a makeshift flower booth and made bouquets of flowers, and then I also did my EPK that day. Q. And what is an EPK? A. When you record promo for the movie. Q. And the promo that you recorded for the movie, was there some sort of prewritten script for you? A. Yes. […] Q. Do you know who prepared the script? A. Sony […] I don't know if it was Sony or Wayfarer […] Q. Did you understand that Sony was responsible for the marketing of the film with Wayfarer? A. Yeah. Well, I -- I wasn't sure, like, who made the marketing plan or anything like that, but I know that there were -- there was a lot of conversation between me and Sony's marketing team about marketing. […] you mentioned that at the trailer screening there was a flower booth, and you and Justin Baldoni were making flowers? […] A. Flower bouquets.").

[148]   Hoover Deposition, pp. 63:19-64:6 ("Q. And you mentioned that at the trailer screening there was a flower booth, and you and Justin Baldoni were making flowers? […] A. Flower bouquets. […] Q. Oh. And do you know whose idea was to do that? A. No. The whole event was a floral theme because Lily is a florist. And so they had a lot of flowers everywhere and wanted Justin and I to make bouquets to hand out to the readers who were there.").

CONFIDENTIAL – Attorneys' Eyes Only

the team.[149] Between May 2024 and early August 2024, there is no evidence of recurrent negative sentiment towards Ms. Lively as seen in **Figure 9** and **Figure 10** below,[150] and "negative online commentary directed towards the women in the film" starts in early August.[151]

### C.    Analysis of Changes in the Sentiment and the Content of Online Conversations

65.    Based on the data I collected from social media sources, I analyzed the online conversations about Ms. Lively from May 1, 2024 through February 28, 2025 and find that the online conversations about Ms. Lively displayed a negative shift around early August 2024 and extended through at least February 2025.

66.    I developed a framework to identify and classify relevant conversations–both before and after August 2024–with the goal of measuring the evolution of the sentiment of the conversations and the evolution of the content about Ms. Lively in the aftermath of the manipulation of online conversations. I conducted two analyses: a sentiment classification analysis and a thematic analysis as I describe in this section. Both analyses employ large language model-driven ("LLM") approaches to systematically classify and interpret online

---

[149]    Hoover Deposition, pp. 155:3-156:4 ("Q. […] And what -- what was it that made you feel that Mr. Baldoni was sharing an article for the purpose of affecting the conversation? A. […] Blake was getting so much online hate, and a lot of it was about the flowers and her wearing floral jeans, and I just didn't understand why all of that was being said when Justin and I made bouquets, and […] this was his movie, and I'm sure he approved the marketing plan and -- that we went along with.").

[150]    *See,* Section V.D.1.

[151]    Hoover Deposition, pp. 174:8-175:6 ("Q. […] You mentioned this negative online commentary directed towards the women of the film […] at this time, August of 2024. Did you experience that yourself prior to the premiere on August 6th? A. A. No. It was -- it was -- it was pretty sudden and shocking, to be honest. […] Q. And had the marketing changed at all in terms of the themes? A. I mean, it was pretty much done by the time the movie came out. I didn't do any more marketing after that. Q. But the types of, you know, florals and things along those lines that were being marketed after the film premiered and following, were they any different than what you had been doing at Book Bonanza, for example, or in any of the other promotional experiences you had participated in? A. Not that I know of. […]").

CONFIDENTIAL – Attorneys' Eyes Only

conversations across the relevant period.[152] An LLM is a type of artificial intelligence built to recognize and generate human-like language by learning from vast amounts of text. Rather than grouping words into topics, an LLM learns patterns of meaning, context, and word relationships, enabling it to interpret and summarize text, identify similarities in phrasing, or generate coherent written responses. In this way, it can assist in analyzing large collections of documents by capturing nuanced language patterns that might be difficult or cumbersome to detect through manual review or simpler statistical models. I use GPT-4o, which is the LLM model that supports ChatGPT.[153] To confirm the validity of the LLM-driven analyses, my team manually reviewed a sample of the online conversations. I evaluated the agreement between the results of the manual review and the LLM results to confirm the robustness of the LLM-driven approach as discussed in **Section V.C.2** and **Section V.C.3.c.**

67.    I understand that Wayfarer Studios and TAG focused their "Scenario Planning" around several narratives, four of which relate directly to Ms. Lively ("manipulated Lively narratives"), namely: (1) "[p]roduction members lost their jobs due to [Ms. Lively's] takeover and insisted upon involvement–including loss of budget due to rescheduling shoot days when [Ms. Lively] refused to show up," (2) "[w]hen [Ms. Lively] wasn't able to get her way on set or behind the scenes, she involved her husband to create an imbalance [sic] of power between her

---

[152]    *See,* Timoshenko, Artem, Chengfeng Mao, and John R. Hauser, "Can Large Language Models Extract Customer Needs as well as Professional Analysts?" *Social Science Research Network,* January 2025, pp. 1-30, p. 1 ("We examine whether Large Language Models (LLMs) can automatically extract [customer needs from textual data]. […] The extracted CNs are well-formulated, sufficiently specific to identify opportunities, and justified by source content (no hallucinations)."); *See also,* Feuerriegel, Stefan et al., "Using Natural Language Processing to Analyse Text Data in Behavioural Science," *Nature Reviews Psychology*, Vol. 4, January 2025, pp. 96-111, p. 104 ("One important advantage is their high accuracy for measuring psychological constructs from text data. For example, previous research found that LLMs can accurately predict intercorrelations between different personality scale items").

[153]    GPT-4o was developed by OpenAI. I connected to this LLM via an Application Programming Interface ("API") hosted on Microsoft Azure, which enables querying the LLM.

and [Mr. Baldoni]. [Mr. Reynolds] went so far as to use his power to call agents and agencies, Sony, and other key players so that [Ms. Lively] would get her way," (3) "[Ms. Lively]'s less than favorable reputation in the industry spans decades and has been reported–there were issues on Gossip Girl, the Town, A Simple Favor, and more," and (4) "[t]here is a clear, likely motive due to the film's value and fanbase, in which [Ms. Lively] is attempting to bully her way into buying the rights for It Starts With Us."[154] Using the "Scenario Planning" materials as described in the Second Amended Complaint and in materials produced in this litigation, I designed several analyses for evaluating the impact on manipulated Lively narratives on online conversations about Ms. Lively.

### 1.    LLM-driven Sentiment Classification of Online Conversations

68.    Using the Pulsar data described in **Section III.C**, I analyze trends in the sentiment expressed in online conversations about Ms. Lively. To perform this analysis, I employ an LLM driven approach to classify the sentiment of each online conversation. I use two methods in this LLM driven approach–unsupervised and direct–to group online conversations in one of the four sentiment categories: *positive*, *negative*, *neutral*, or *mixed*.

### a.    Unsupervised Method

69.    First, a total of 3,000 total online conversations were randomly sampled, with 1,000 drawn from each of three time periods: (1) May 1, 2024, to July 24, 2024, (2) July 25, 2024, to August 30, 2024, and (3) August 31, 2024, to February 28, 2025. I chose these time

---

[154]    KCASE-000004208–211 at 209.

CONFIDENTIAL – Attorneys' Eyes Only

periods based on the trends in the volume of online conversations as shown in **Figure 9**, to ensure that I obtained a representative set of samples from all major periods of activity.

70.    Second, each of the 3,000 online conversations was submitted to the LLM to extract the predominant emotion(s) expressed towards Ms. Lively or her husband, Mr. Reynolds.[155] The LLM was not offered guidance on which emotion(s) to identify, giving it the freedom to choose the most appropriate emotion(s) applicable to each supplied online conversation.

71.    Third, the results were manually reviewed, and grouped based on semantically similar emotions, creating overarching *emotion categories*. For example, "anger," "angry," and "pissed" were all grouped into a singular "angry" category.[156] This step was taken to standardize and simplify labeling. I mapped these emotions to *sentiment types*, namely, positive, negative, and neutral. For example, the "angry," "disappointed," and "frustrated" emotion categories were all mapped to the negative sentiment type.[157] Posts that had emotions across sentiment types were assigned the mixed sentiment type.

---

[155]    The instruction provided to the LLM was: "From the provided text, identify the dominant moods expressed toward Blake Lively and/or Ryan Reynolds. Rules: Focus exclusively on Blake Lively and Ryan Reynolds. If both are mentioned together, evaluate them jointly as a pair. If they are mentioned separately with different moods, return all dominant moods. - If neither is referenced, or if no clear mood is expressed, return "neutral." If multiple dominant moods are plausible, include them all. Focus exclusively on Blake Lively and Ryan Reynolds. Do not infer beyond the text. Stay literal and context-bound. Return all the dominant moods. Default to neutral if no mood is expressed."

[156]    Because the LLM was given the freedom to allocate emotions to online conversations as it deemed applicable, it sometimes used inconsistent phraseology for the same emotion. "Angry," "anger," and "pissed" is one such example.

[157]    The sentiment outputs generated by the LLM were categorized into four predefined sentiment types based on associated emotion keywords. The *positive* category included the following emotions: "admiration", "amused", "excited", and "supportive." The *negative* category included the following emotions: "angry", "critical", "defensive", "hate", "hostile", and "mocking." Conversations labeled as ["neutral"] by the model were classified as *Neutral*. If the LLM output included emotions exclusively from a single sentiment category (e.g., only positive or only negative moods), the post was assigned the corresponding sentiment label. If both positive and negative moods were present, the post was classified as *mixed*. In cases where *neutral* co-occurred with either *positive* or *negative*, the non-neutral sentiment category took precedence in the classification.

CONFIDENTIAL – Attorneys' Eyes Only

72.     Fourth, the full dataset of online conversations was then analyzed using the LLM, with each post classified by the LLM into one or more of the emotion categories created in the manual review step above.[158] The resulting emotion categories for each online conversation were then programmatically mapped to one of the four sentiment types as described above. As a result of this methodology, each of the online conversations from the full data set was assigned a unique classification of positive, negative, neutral, or mixed sentiment. I call this method "*unsupervised*" because the approach is non-prescriptive in terms of the emotions to look for. Stated differently, the initial determination of the set of emotions prevalent in the data was made directly by the LLM without any guidance from me. The advantage of this approach is that it is more explanatory and less dependent on the LLM model's direct sentiment classification. Instead, the LLM identified emotion categories, which I then manually mapped to corresponding sentiment categories. As I show in **Section V.C.2** below, this method aligns closely with the results from a more direct approach (**Section V.C.1.a**) of asking the LLM to classify sentiment in a single step.

73.     The distribution of the four sentiment categories can be seen in **Figure 9** below.

---

[158]   The instruction provided to the LLM was: "From the provided text, identify the dominant moods expressed toward Blake Lively and/or Ryan Reynolds. Rules: - Focus exclusively on Blake Lively and Ryan Reynolds. - If both are mentioned together, evaluate them jointly as a pair. - If they are mentioned separately with different moods, return all dominant moods. - If neither is referenced, or if no clear mood is expressed, return ['neutral']. - If multiple dominant moods are plausible, include them all. Focus exclusively on Blake Lively and Ryan Reynolds. Do not infer beyond the text. Stay literal and context-bound. Allowed moods: admiration, amused, angry, critical, defensive, excited, hate, hostile, mocking, neutral, supportive. Return all the dominant moods. Default to [neutral] if no mood is expressed."

CONFIDENTIAL – Attorneys' Eyes Only

**Figure 9: Unsupervised Method - Distribution of Sentiments Expressed in Online Conversations[159]**



**Notes:**

[1] Sentiment extraction was conducted using a GPT-4o large language model (LLM). Each online conversation was evaluated for the dominant emotion(s) expressed toward Blake Lively and/or Ryan Reynolds, based on the following instruction provided to the LLM: "From the provided text, identify the dominant moods expressed toward Blake Lively and/or Ryan Reynolds. Rules: Focus exclusively on Blake Lively and Ryan Reynolds. If both are mentioned together, evaluate them jointly as a pair. If they are mentioned separately with different moods, return all dominant moods. If neither is referenced, or if no clear mood is expressed, return [neutral]. If multiple dominant moods are plausible, include them all."

[2] The unsupervised methodology was applied to a random sample of 3,000 social media posts, equally divided across three time periods: May 1, 2024–July 24, 2024; July 25, 2024–August 30, 2024; and August 31, 2024–February 28, 2025. The model was not pre-supplied with any emotions, allowing it to identify the most salient emotion in each conversation independently. This initial extraction yielded a broad range of emotions.

[3] Emotions were then manually reviewed by the research team, who grouped semantically similar emotions into overarching emotion categories for clarity and consistency (e.g., "angry," "anger," and "pissed" were all grouped under "angry"). The overarching emotion categories were then mapped to four sentiment types as discussed in the footnote of the figure title.

[4] The LLM was then applied to the full dataset to classify each post into one or more of the overarching emotion categories. Unlike the first step, this second step involved explicitly instructing the LLM to assign posts to one or more of the predefined overarching categories. Each post was subsequently mapped to a single sentiment label: Positive, Negative, Neutral, or Mixed.

[5] The data is aggregated based on the week ending Sunday, with the exception of the initial partial week from May 1 to May 5, 2024 (both days inclusive), and the final partial week from February 24 to February 28, 2025 (both days inclusive).

CONFIDENTIAL – Attorneys' Eyes Only

> b.    *Direct Method*

74.    The direct method analyzes the entire dataset of online conversations in a single step. Each online conversation is individually submitted to the LLM. The model is explicitly instructed to classify the sentiment expressed toward Ms. Lively or Mr. Reynolds into one of four predefined sentiment categories: *positive*, *negative*, *neutral*, or *mixed*.[160] This contrasts with the unsupervised method, in which the LLM first assigns emotion categories (e.g., angry, amused, excited) to each online conversation, which are then programmatically mapped to sentiment categories based on a predefined correspondence between emotions and sentiment types.

75.    I plot the distribution of the four sentiment categories in **Figure 10** below.

---

[159]    Analysis based on online conversations from May 2024 to February 2025, aggregated at weekly level. As detailed in **Section III.C**, for Reddit, the dataset includes both original posts and their associated comments, with each post and comment represented as a separate row. For YouTube, Pulsar returns the video title, description, and all associated comments, with each of these elements also represented as individual rows. For X, the dataset includes all posts, reposts (formerly known as retweets), and replies, with each entry likewise structured as a distinct row in the dataset. This standardized row-level format enables consistent processing and analysis across platforms, despite underlying structural differences. *See* backup for database with online conversations from Pulsar TRAC, retrieved on September 8, 2025. Overarching emotion categories were then mapped to four sentiment types as follows: Positive (e.g., "admiration," "happy," "grateful"), Negative (e.g., "angry," "disappointed," "frustrated"), Neutral (e.g., "indifferent," "questioning," or "lacking emotion"), or Mixed (e.g., a post expressing both "admiration" and "indifference"). Posts containing only Positive, Negative, or Neutral emotions were labeled accordingly. Posts expressing both Positive and Negative emotions were labeled as Mixed. Posts that included Neutral content in addition to either Positive or Negative were assigned to the non-neutral category. For example, a post expressing both Neutral and Negative content was labeled Negative.

[160]    The instruction provided to the LLM was: "From the provided text, classify the overall sentiment expressed toward Blake Lively and/or Ryan Reynolds. Rules: Focus exclusively on Blake Lively and Ryan Reynolds. If both are mentioned together, evaluate them jointly as a pair. If they are mentioned separately but with different sentiments, return a single label that best reflects the overall sentiment of the text. If both positive and negative sentiments are strongly present, return Mixed. If neither is mentioned, or if no clear sentiment is expressed, return Neutral. Do not infer beyond the text. Stay literal and context-bound."

CONFIDENTIAL – Attorneys' Eyes Only

**Figure 10: Direct Method - Distribution of Sentiment Categories Expressed in Online Conversations[161]**



**Notes:**

[1] Sentiment extraction was conducted using a GPT-4o large language model (LLM). Each online conversation was evaluated for the dominant emotion(s) expressed toward Blake Lively and/or Ryan Reynolds, based on the following instruction provided to the LLM: "From the provided text, classify the overall sentiment expressed toward Blake Lively and/or Ryan Reynolds. Rules: Focus exclusively on Blake Lively and Ryan Reynolds. If both are mentioned together, evaluate them jointly as a pair. If they are mentioned separately but with different sentiments, return a single label that best reflects the overall sentiment of the text. If both positive and negative sentiments are strongly present, return Mixed. If neither is mentioned, or if no clear sentiment is expressed, return Neutral. Do not infer beyond the text. Stay literal and context-bound."

[2] The model uses a supervised methodology, meaning that it is instructed to classify each post into a predefined set of sentiment types: Positive, Negative, Neutral, or Mixed. If the LLM is uncertain, or if the conversation does not explicitly express a sentiment toward Blake Lively and/or Ryan Reynolds, the classification defaults to Neutral. These sentiment types are prescriptively defined by the research team, rather than generated by the LLM itself.

[3] The data is aggregated based on the week ending Sunday, with the exception of the initial partial week from May 1 to May 5, 2024 (both days inclusive), and the final partial week from February 24 to February 28, 2025 (both days inclusive).

---

[161]    *See* backup for database with online conversations from Pulsar TRAC, retrieved on September 8, 2025. Analysis based on online conversations from May 2024 to February 2025, aggregated at weekly level.

CONFIDENTIAL – Attorneys' Eyes Only

76.     While there are small differences in the classification of individual online conversations, the overall trends observed in **Figure 10**, based on the direct method are very similar to the trends observed in **Figure 9**, based on the unsupervised method.[162] Both methods show a pronounced increase in the overall volume of online conversations beginning in August 2024, accompanied by a sharp shift toward more negative sentiment during the same period.

### 2.    *Manual Validation of LLM Results (Sentiment Classification)*

77.     To confirm the validity of the two LLM-driven methodologies described above, my team also conducted a manual review and classification of a sample of the online conversations. I created a random sample of 300 online conversations with 100 conversations, each sampled from the three time periods described in **Section V.C.1** above: (1) May 1, 2024, to July 24, 2024 (2) July 25, 2024, to August 30, 2024, and (3) August 31, 2024, to February 28, 2025.

78.     A pair of reviewers were asked to classify the 300 online conversations into one of the four sentiments: *positive, negative, neutral, and mixed*. The reviewers were provided with a set of instructions for independently classifying the online conversations as well as for resolving discrepancies between their classifications in a reconciliation phase. The full set of instructions for classification and reconciliation is detailed in **Appendix C, Section I**. The reconciled classification results from the reviewers were systematically compared to the LLM

---

[162]    The sentiment classification results produced by the unsupervised and direct methods were quantitatively compared by tallying out how many of the emotion categories were the same between the two methodologies. Out of 1,129,730 online conversations, 958,477conversations produced the same emotion categories by both methodologies, resulting in an agreement of 84.84% Thus, indicating a strong level of agreement between the two approaches.

CONFIDENTIAL – Attorneys' Eyes Only

classifications for the same online conversations. **Figure 11** below illustrates a "confusion matrix," indicating a cross-comparison between the manual and LLM classifications using the direct method.

### Figure 11: Cross-Tabulation of Manual and LLM Classifications[163]

| | | Manual Classification | | | |
|---|---|---|---|---|---|
| | | Positive | Negative | Neutral | Mixed |
| **LLM Classification** | Positive | 30 | 0 | 4 | 1 |
| | Negative | 9 | 57 | 7 | 3 |
| | Neutral | 45 | 26 | 110 | 7 |
| | Mixed | 0 | 0 | 0 | 1 |

**Note:**
This table illustrates a cross-tabulation on the sample of 300 results of the manual classifications against the classifications generated by the LLM.

| | | Manual Classification | |
|---|---|---|---|
| | | Non-Negative | Negative |
| **LLM Classification** | Non-Negative | 198 | 26 |
| | Negative | 19 | 57 |

**Note:**
This table groups the classifications under neutral, positive, and mixed under a single "non-negative" category. It illustrates the cross-tabulation on the sample of 300 results of the negative and non-negative manual classifications against the corresponding classifications generated by the LLM.

CONFIDENTIAL – Attorneys' Eyes Only

79.    As evidenced in **Figure 11,** the LLM and manual reviews demonstrate relatively strong level of agreement. Across the full sample, the level of agreement between the LLM and human reviewers is 66%.[164] Furthermore, when sentiment types are grouped into two categories–"non-negative" (i.e., positive, neutral, and mixed) and "negative"–the agreement rate increases to 85%. In the manually reviewed sample of 300 online conversations, the LLM classified 76 conversations (25.3%) as Negative, while human reviewers classified 82 conversations (27.7%) as Negative.[165] This close alignment supports the conclusion that the LLM-driven methodology produces aggregate sentiment trends that closely mirror those obtained through manual classification, particularly with respect to identifying and quantifying negative sentiment.

### 3.    *LLM-driven Thematic Analysis of Online Conversations*

80.    In addition to the sentiment classification, I conducted a thematic analysis to evaluate whether specific narratives that Defendants planned were seeded and amplified within online conversations. In particular, one part of my analysis focuses on identifying whether these narratives, as emphasized by Wayfarer Studios and Mr. Baldoni in the "Scenario Planning,"[166] were reflected in online conversations. The other part of my analysis focuses on narratives from

---

[164]   In this context, I define "agreement" as instances in which both the LLM and the manual reviewer assigned the same sentiment classification to a given online conversation. For example, if the level of agreement is 75%, it means the manual reviewer and LLM obtained the same classification of sentiment on 75% of all online conversations reviewed by both. *See*, backup calculations.

[165]   *See*, backup calculations.

[166]   The four manipulated Lively narratives are, "Production members lost their jobs due to [Ms. Lively's] takeover and insisted upon involvement – including loss of budget due to rescheduling shoot days when [Ms. Lively] refused to show up," "When [Ms. Lively] wasn't able to get her way on set or behind the scenes, she involved her husband to create an Imbalance [sic] of power between her and [Mr. Baldoni]. [Mr. Reynolds] went so far as to use his power to call agents and agencies, Sony, and other key players so that [Ms. Lively] would get her way," "[Ms. Lively's] less than favorable reputation in the industry spans decades and has been reported – there were issues on Gossip Girl, the Town, A Simple Favor, and more," and "There is a clear, likely motive due to the film's value and fanbase, in which [Ms. Lively] is attempting to bully her way into buying the rights for It Starts With Us." KCASE-000004208-211 at 209.

CONFIDENTIAL – Attorneys' Eyes Only

seeded media articles to identify whether narratives included in the articles were reflected in online conversations. I examined online conversations from May 2024 until February 2025.

81.     My findings show that the themes observed in the spikes of negative sentiment in early August 2024 and in December 2024 are closely related to the manipulated Lively narratives and narratives from media articles seeded in early August 2024. Such results demonstrate that the two spikes in negative sentiment were likely both seeded and driven by manipulation of online conversations.

          *a.*      *Thematic Analysis of Negative Sentiment in Online Conversations across Time Periods Linked to Manipulated Lively Narratives*

82.     To begin this analysis, I restricted the full dataset of 1,129,730 online conversations to those classified as negative using the direct method as described in **Section V.C.1.a**.[167] Thus, filtering resulted in 361,050 conversations. Next, each negative online conversation was submitted to the LLM along with the verbatim text of the four manipulated Lively narratives made by Wayfarer Studios and Mr. Baldoni as part of their "Scenario Planning" (with minor adjustments for spelling and grammar consistency).[168] The LLM was then

---

[167]   *See,* **Figure 2** for the distribution of the full dataset.

[168]   The exact instructions used for the LLM for each of the four manipulated Lively narratives were: (1) "Does the post support the following narrative: "Production members lost their jobs due to Blake Lively's takeover and insisted upon involvement - including loss of budget due to rescheduling shoot days when she refused to show up." Answer with yes/no, followed by a concise single sentence response. Unrelated posts must be no. Agreement can be explicit or implicit. Include posts that mention or imply crew being fired, losing work, leaving the production, financial strain, wasted resources, or scheduling disruptions connected to her actions. Indirect mentions of any form of job loss also counts. Count both explicit statements and indirect implications as yes. Exclude posts that do not in any way link to her involvement." (2) "Does the post support the following narrative: "When Blake Lively wasn't able to get her way on set or behind the scenes, she involved her husband to create an imbalance of power between her and Justin Baldoni. Ryan Reynolds went so far as to use his power to call agents and agencies, Sony, and other key players so that she would get her way." Answer with yes/no, followed by a concise single sentence response. Unrelated posts must be no. Include posts that are implicitly supportive. Include posts that suggest she relied on outside influence, personal relationships, or leverage to secure her way in production matters. Implicit references to favoritism, privilege, or pressure in her favor should also be included. Count both explicit and implicit power-related signals tied to her or her allies. Exclude only posts with no connection to her." (3) "Does the post support the following narrative: "Blake Lively's less than favorable reputation in the industry

instructed to determine whether the content of each conversation aligned with any of the four manipulated Lively narratives.

83.    For each conversation, the model returned a series of four Boolean ("Yes" or "No") responses corresponding to whether the post aligned with any of the four manipulated Lively narratives. This approach allowed for an evaluation of how frequently the "Scenario Planning" campaign's core narratives appeared in the body of negative online sentiment. **Figure 12** below illustrates how the share of negative online conversations aligning with at least one of the four manipulated Lively narratives evolved over time. The figure shows that**,** prior to August 2024, virtually none of the negative conversations expressed agreement with even one of the four manipulated Lively narratives. In the days following the campaign's launch, however, the weekly proportion of such conversations rose to around 4%, and rose again to 10%[169] immediately after Ms. Lively filed her Original Complaint on December 20, 2024.[170] This corresponds to 327 and 1,359 posts per week in contrast to zero or near-zero posts before August 2024.

---

spans decades and has been reported - there were issues on Gossip Girl, the Town, A Simple Favor, and more." Answer with yes/no, followed by a concise single sentence response. Unrelated posts must be no. Include weak or hearsay examples. Include posts that directly or indirectly reference her unfavorable reputation in the film/TV industry, such as prior conflicts, professional issues, or reports of difficult behavior. Posts about seemingly isolated incidents should be included. Count both general commentary on her professional standing or reputation in Hollywood, and specific incidents within her past works. Exclude unrelated personal attacks or vague negativity unrelated to her career." (4) "Does the post support the following narrative: 'There is a clear, likely motive due to the movie It Ends With Us's value and fanbase, in which Blake Lively is attempting to bully her way into buying the rights for It Starts With Us.' Answer with yes/no, followed by a concise single sentence response. Include posts that refer to her exerting pressure, aggressive involvement, manipulating, or maneuvering to control the film It Starts With Us or to acquire its rights. Count both explicit and implicit commentary suggesting she moved to take over the film. Exclude posts unrelated to the film."

[169]    My approach of flagging agreement between online conversations and the manipulated Lively narratives is intentionally conservative. The model was required to evaluate the text of the manipulated Lively narratives verbatim, without any prompt engineering or rephrasing to facilitate identification.

[170]    Second Amended Complaint, ¶ 294.

CONFIDENTIAL – Attorneys' Eyes Only

84.    Taken together, **Figure 10** and **Figure 12** and reveal two patterns: (1) there was a complete absence of conversations echoing the manipulated Lively narratives in the "Scenario Planning" prior to August 2024; (2) there was a sharp increase after August 2024 in both the share of conversations endorsing the manipulated Lively narratives and the overall volume of negative conversations. These trends suggest that the manipulated Lively narratives seeded and fueled subsequent negativity, first in August 2024 and again in the period spanning December 2024 through February 2025. This pattern is consistent with academic research documenting how initial negative messaging can amplify and mutate over time, spawning related negative sentiments beyond the original claims.[171]

---

[171]    *See*, Meng, Fanhui et al., "Spreading Dynamics of Information on Online Social Networks," *Proceedings of the National Academy of Sciences (PNAC)*, Vol. 122 (4), January 23, 2025, p. 1 ("Specifically, in 2010, Centola observed in an online propagation experiment that the more times people see a piece of information, the more willing they are to spread it. Accordingly, the social reinforcement effect in information spreading on online social networks was proposed."); *See also*, Yin, Fulian et al., "Sentiment Mutation and Negative Emotion Contagion Dynamics in Social Media: A Case Study on the Chinese Sina Microblog," *Information Sciences*, Vol. 594, February 18, 2022, pp. 118-135, p. 119 ("In the propagation chain, negative emotional contagion encompasses a wide range of users, including not only those who have never been exposed to the message before (i.e., those who are susceptible to the message and are emotionless before the exposure) but also those who have already become information mediators (i.e., those who are emotional). Having experienced social interplay, a user makes his/her own emotional choice: personal sentiments are objectively influenced but subjectivity may remain, and sentiment copying or sentiment mutation will occur.").

CONFIDENTIAL – Attorneys' Eyes Only

**Figure 12: The Percentage of Negative Conversations Supporting at Least One Manipulated Lively Narrative[172]**



**Notes:**
[1] Narrative classification was conducted using a GPT-4o large language model (LLM).
[2] Details on classifications and prompts in footnote of figure title.
[3] The data is aggregated based on the week ending Sunday, with the exception of the initial partial week from May 1 to May 5, 2024 (both days inclusive), and the final partial week from February 24 to February 28, 2025 (both days inclusive).

---

[172]   *See* backup for database with online conversations from Pulsar TRAC, retrieved on September 8, 2025. Analysis based on online conversations from May 2024 to February 2025, aggregated at weekly level. *See also,* **Figure 2** for the distribution of the full data set. FN.

Job Loss narrative classification was conducted using the following instruction provided to the LLM: "Does the post support the following narrative: 'Production members lost their jobs due to Blake Lively's takeover and insisted upon involvement - including loss of budget due to rescheduling shoot days when she refused to show up.' Answer with yes/no, followed by a concise single sentence response. Unrelated posts must be no. Agreement can be explicit or implicit. Include posts that mention or imply being fired, losing work, leaving the production, financial strain, wasted resources, or scheduling disruptions connected to her actions. Indirect mentions of any form of job loss also counts. Count both explicit statements and indirect implications as yes. Exclude posts that do not in any way link to her involvement."

Imbalance of Power narrative classification was conducted using the following instruction provided to the LLM: "Does the post support the following narrative: 'When Blake Lively wasn't able to get her way on set or behind the scenes, she involved her husband to create an imbalance of power between her and Justin Baldoni. Ryan Reynolds went so far as to use his power to call agents and agencies, Sony, and other key players so that she would get her way.' Answer with yes/no, followed by a concise single sentence response. Unrelated posts must be no. Include posts that are implicitly supportive. Include posts that suggest she relied on outside influence, personal relationships,

CONFIDENTIAL – Attorneys' Eyes Only

b. *Thematic Analysis of Negative Sentiment in Online Conversations across Time Periods Linked to Seeded News Articles*

85.    In addition to the manipulated Lively narratives outlined in the Defendants' "Scenario Planning" document, additional produced documents indicate that TAG initiated a campaign to pitch and promote content to online news sources.[173] The seeding included two articles in the Daily Mail that were negative towards Ms. Lively. Ms. Koslow, Executive Vice President at TAG, admitted that the Daily Mail article titled "*How Blake Lively's fairytale turned into a PR nightmare: Amid a growing backlash, ALISON BOSHOFF reveals where it all went*

---

or leverage to secure her way in production matters. Implicit references to favoritism, privilege, or pressure in her favor should also be included. Count both explicit and implicit power-related signals tied to her or her allies. Exclude only posts with no connection to her."

Poor Reputation narrative classification was conducted using the following instruction provided to the LLM: "Does the post support the following narrative: 'Blake Lively's less than favorable reputation in the industry spans decades and has been reported - there were issues on Gossip Girl, the Town, A Simple Favor, and more.' Answer with yes/no, followed by a concise single sentence response. Unrelated posts must be no. Include weak or hearsay examples. Include posts that directly or indirectly reference her unfavorable reputation in the film/TV industry, such as prior conflicts, professional issues, or reports of difficult behavior. Posts about seemingly isolated incidents should be included. Count both general commentary on her professional standing or reputation in Hollywood, and specific incidents within her past works. Exclude unrelated personal attacks or vague negativity unrelated to her career."

Film Takeover narrative classification was conducted using the following instruction provided to the LLM: "Does the post support the following narrative: 'There is a clear, likely motive due to the movie It Ends With Us's value and fanbase, in which Blake Lively is attempting to bully her way into buying the rights for It Starts With Us.' Answer with yes/no, followed by a concise single sentence response. Include posts that refer to her exerting pressure, aggressive involvement, manipulating, or maneuvering to control the film It Starts With Us or to acquire its rights. Count both explicit and implicit commentary suggesting she moved to take over the film. Exclude posts unrelated to the film."

[173]    *See,* KCASE-000004208-211 at 208 ("Crisis Mitigation and Rapid Response […] TAG will confirm outlets intending on covering the story, especially those impactful to Justin, Jamey and Wayfarer's interests, are fully briefed on the situation including and not limited to The Hollywood Reporter, Variety, Deadline, The Wrap, New York Post, Daily Mail, etc."); *See also*, ABEL_000006072-078 at 072 ("Hi team — so far, extremely limited pickup on Daily Mail or Page Six. We'll continue to keep an eye out and send pieces as needed, but so far it's been steady coverage on pure speculation. We've also started to see a shift on social, due largely to Jed and his team's efforts to shift the narrative towards shining a spotlight on Blake and Ryan. Again we'll continue to send links and screenshots but wanted to send an update in the meantime."); Second Amended Complaint, ¶ 330.

CONFIDENTIAL – Attorneys' Eyes Only

*wrong for Hollywood's golden girl*,"[174] dated August 20, 2024, was "placed" by her, [175] while

Ms. Case, Vice President of TAG at the time, admitted that she "provided links"[176] to support the

writing of the Daily Mail article titled "*How Blake Lively COPIED best friend Taylor Swift to*

*promote It Ends with Us... before turning to singer to help crisis manage backlash and Justin*

*Baldoni drama*,"[177] dated August 17, 2024. Further, an email exchange between Ms. Case and

---

[174]   Boshoff, Alison, "How Blake Lively's Fairytale Turned Into A PR Nightmare: Amid A Growing Backlash, Alison Boshoff Reveals Where It All Went Wrong For Hollywood's Golden Girl," *Daily Mail,* August 20, 2024, available at https://www.dailymail.co.uk/femail/article-13761985/How-Blake-Livelys-fairytale-turned-PR-nightmare-Amid-growing-backlash-ALISON-BOSHOFF-reveals-went-wrong-Hollywoods-golden-girl.html, accessed on September 30, 2025.

[175]   Deposition of Breanna Koslow, *Blake Lively vs. Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, The Agency Group PR LLC, Jennifer Abel, Jed Wallace, and Street Relations Inc.*, Case 1:24-CV-10049-LJL (Consolidated with 1:25-CV-00449-LJL), United States District Court Southern District of New York, September 9, 2025, p. 312:2-8 ("Does this appear to be a true and accurate copy of the story that was published by Ms. Boshoff at the Daily Mail on August 20th? A. I believe so. Q. Did you place this story? A. Yes."). Ms. Koslow (also known as "Breanna Butler") shared "think piece" points with Alison Boshoff's team on August 13, 2024, to which Ms. Case said "Yes. To all[,]" and suggested adding that "[Ms. Lively] promoted a haircare line and her own drink brand as part of promo." *See also*, KCASE–000002821-826 (Butler and Case Short Message Report August 2024) at 822 ("Breanna Butler […]For Alison - hands off think piece on the whole PR debacle behind the scenes: Story -Jeopardizes the film's brand, financially I legacy wise if this impact the sequel -You have a film with serious subject matter, not only being promoted with focus on flowers/clothes, but a PR campaign distracting audiences away from important messaging to play out a high school fight between two stars. Why would Blake allow this to happen? How could she? What is she thinking right now regarding her team? -Where were the opportunities to promote resources for survivors of domestic abuse? -Questions, did Blake's inability to relate to regular people / what they want to see, just slight her big moment? -JLo references all over TikTok. Next JLo whose career suffered from her tone deafness of her own brand? -Blake's publicist started her own firm through Harvey Weinstein backing[…] Katie Case […] Yes. To all. Also let's bring in the fact that she promoted a haircare line and her own drink brand as part of promo.").

[176]   Deposition of Katherine Case*, Blake Lively vs. Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, The Agency Group PR LLC, Jennifer Abel, Jed Wallace, and Street Relations Inc.*, Case 1:24-CV-10049-LJL (Consolidated with 1:25-CV-00449-LJL), United States District Court Southern District of New York, September 5, 2025 ("Case Deposition"), p. 259:2-15 (Q. "[D]id you communicate with Mr. Vituscka about Ms. Lively at all? A. Yes. Q. What about? A. I was connected with him via Melissa Nathan. I was told he was writing a piece for the Daily Mail about how her promotion matched that of Taylor Swift's during her Eras tour. Q. And did you provide him content in connection with his writing that article? A. I provided links that were readily available online.").

[177]   Gissen, Lillian, "How Blake Lively Copied Best Friend Taylor Swift to Promote It Ends With Us…Before Turning to Singer to Help Crisis Manage Backlash and Justin Baldoni Drama," Daily Mail, August 17, 2024, available at https://www.dailymail.co.uk/tvshowbiz/article-13750525/blake-lively-taylor-swift-copied-friendship-justin-baldoni-drama.html, accessed on October 7, 2025.

CONFIDENTIAL – Attorneys' Eyes Only

James Vituscka from August 15, 2024, provides evidence for the seeding of links for the second Daily Mail article mentioned above.[178]

86.    I conducted a thematic analysis using an LLM to investigate whether the themes expressed in the two Daily Mail articles (the "Seeded News Articles") were also prevalent in the online conversations during the relevant period. I analyzed the same 361,050 online conversations described in **Section V.C.3.a**, that were classified as negative based on the direct method. Since the Seeded News Articles were very long and touched upon several tangential topics not directly related to Ms. Lively, I reviewed and extracted four narratives ("Seeded narratives")[179] from these articles, which were specifically linked to Ms. Lively. Each negative online conversation was submitted to the LLM along with the text from the four Seeded narratives.[180] The LLM was instructed to determine whether the content of each conversation aligned with any of the verbatim text from the Seeded narratives.

---

[178]    *See,* NATHAN_000003433; *See also,* Case Deposition, p. 259:2-15.

[179]    The four Seeded narratives I selected are: (1) "Lively has come under fire for aggressively marketing her persona projects – not just her haircare, but her drinks company – seemingly on the back of a film dealing with domestic violence," (2) "Blake Lively's influence drew the rest of the cast into her orbit and away from Baldoni, whose movie it was," (3) "Blake Lively has been 'relying' on her best friend Taylor Swift to help get her through the recent media 'storm,' and is hoping to 'use their friendship' to distract from the drama while promoting her new flick It Ends With Us," and (4) "Blake is trying to get Taylor to help pull her out of this mess by using their friendship for interviews and other promotional work." I note that seeded narrative (2) seems to be related to the Imbalance of Power narrative from the Scenario Planning.

[180]    The exact instructions used for the LLM for each of the four narratives were:

Product Promotion Controversy narrative classification was conducted using the following instruction provided to the LLM: "Does the post support the following narrative: 'Blake Lively has come under fire for aggressively marketing her personal projects – not just her haircare, but her drinks company – seemingly on the back of a film dealing with domestic violence.' Answer strictly with yes/no. Unrelated posts must be no. Agreement can be explicit or implicit. Include posts that reference or criticize her promotion of personal ventures (haircare or drinks brand) in close connection with It Ends With Us or its themes. Posts noting public backlash, insensitivity, or controversy around timing of product promotion count as supportive. Count both explicit and implicit criticism suggesting she promoted or marketed her personal brands alongside It Ends With Us or its themes in a way perceived as insensitive or opportunistic. Exclude posts that merely mention her business ventures without linking them to controversy or backlash."

Taylor Swift PR Strategy narrative classification was conducted using the following instruction provided to the LLM: "Does the post support the following narrative: "Blake Lively is trying to get Taylor Swift to help pull her out of this mess by using their friendship for interviews and other promotional work." Answer strictly with yes/no.

68

CONFIDENTIAL – Attorneys' Eyes Only

87.     For each conversation, the model returned a series of four Boolean ("Yes" or "No") responses corresponding to whether the post aligned with each of the Seeded narratives individually. This approach allowed for an evaluation of how frequently negative online conversations aligned with each Seeded narrative. **Figure 13** below illustrates how the proportion of negative online conversations aligned with at least one of the four Seeded narratives evolved over time. The figure shows that, similar to the manipulated Lively narratives, prior to August 2024, virtually none of the negative conversations aligned with even one of the four Seeded narratives. In the days following the campaign's launch, however, the weekly proportion of such conversations rose to around 4%, and rose again to 6% in the weeks after Ms. Lively filed her Original Complaint on December 20, 2024.[181] This corresponds to 1,481 and 711 posts per week in contrast to zero or near-zero posts before August 2024.

---

Unrelated posts must be no. Agreement can be explicit or implicit. Include posts that mention or imply Blake Lively trying to get Taylor Swift to help her during the backlash by using their friendship for interviews, publicity, or promotional work connected to It Ends With Us. Count both explicit and implicit statements suggesting she is intentionally using her friendship with Taylor Swift for publicity, interviews, or other promotional efforts to influence perception. Exclude posts where the friendship is mentioned only as emotional support or without any reference to media or PR activity."

Taylor Swift Distraction narrative classification was conducted using the following instruction provided to the LLM: "Does the post support the following narrative: "Blake Lively has been 'relying' on her best friend Taylor Swift to help get her through the recent media 'storm,' and is hoping to 'use their friendship' to distract from the drama while promoting her new flick It Ends With Us.' Answer strictly with yes/no. Unrelated posts must be no. Agreement can be explicit or implicit. Include posts that mention her turning to Taylor Swift for moral or public support in response to negative coverage, or using their friendship to distract from the drama while promoting It Ends With Us. Count both explicit and implicit mentions of her relying on Taylor Swift's friendship to divert or soften negative coverage during controversy around It Ends With Us. Exclude posts that describe coordinated PR or promotional planning; focus only on distraction or reliance for image stability."

Influence Over Production narrative classification was conducted using the following instruction provided to the LLM: "Does the post support the following narrative: 'Blake Lively's influence drew the rest of the cast into her orbit and away from Justin Baldoni, whose movie it was.' Answer strictly with yes/no. Unrelated posts must be no. Agreement can be explicit or implicit. Include posts that describe her as dominating or redirecting creative or social influence on set, especially references to cast loyalty shifting toward her and away from the director. Mentions of her controlling or centralizing role in production dynamics count as supportive. Count both explicit and implicit claims that she exerted influence over cast, crew, or creative control, leading to a shift in authority or loyalty away from Justin Baldoni. Exclude posts that do not describe influence, control, or on-set dynamics tied to her involvement."

181    Second Amended Complaint, ¶ 294.

CONFIDENTIAL – Attorneys' Eyes Only

**Figure 13: Proportion of Negative Conversations Supporting at Least One Seeded Narrative[182]**



**Notes:**
[1] Narrative classification was conducted using a GPT-4o large language model (LLM).
[2] Details on classifications and prompts and classifications in footnote of figure title.
[3] The data is aggregated based on the week ending Sunday, with the exception of the initial partial week from May 1 to May 5, 2024 (both days inclusive), and the final partial week from February 24 to February 28, 2025 (both days inclusive).

---

[182]    *See* backup for database with online conversations from Pulsar TRAC, retrieved on September 8, 2025. This analysis is based on online conversations from May 2024 to February 2025, aggregated at a weekly level. *See also,* **Figure 2** for the distribution of the full data set.

Product Promotion Controversy narrative classification was conducted using the following instruction provided to the LLM: "Does the post support the following narrative: 'Blake Lively has come under fire for aggressively marketing her personal projects – not just her haircare, but her drinks company – seemingly on the back of a film dealing with domestic violence.' Answer strictly with yes/no. Unrelated posts must be no. Agreement can be explicit or implicit. Include posts that reference or criticize her promotion of personal ventures (haircare or drinks brand) in close connection with It Ends With Us or its themes. Posts noting public backlash, insensitivity, or controversy around timing of product promotion count as supportive. Count both explicit and implicit criticism suggesting she promoted or marketed her personal brands alongside It Ends With Us or its themes in a way perceived as insensitive or opportunistic. Exclude posts that merely mention her business ventures without linking them to controversy or backlash."

Taylor Swift PR Strategy narrative classification was conducted using the following instruction provided to the LLM: "Does the post support the following narrative: 'Blake Lively is trying to get Taylor Swift to help pull her out

70

CONFIDENTIAL – Attorneys' Eyes Only

c.      *Manual Validation of LLM Results (Thematic Analysis Linked to manipulated Lively Narratives)*

88.     To confirm the validity of the LLM-driven methodology for thematic analysis, my team conducted a manual review and classification of a sample of the negative online conversations.[183] I created a random sample of 300 negative online conversations, with 100 conversations each sampled from three time periods respectively: (1) May 1, 2024, to July 24, 2024 (2) July 25, 2024, to August 30, 2024, and (3) August 31, 2024, to February 28, 2025.

89.     Two independent reviewers were asked to assess the four manipulated Lively narratives advanced by Wayfarer, Mr. Baldoni, Mr. Heath, and Mr. Sarowitz in the Second Amended Complaint. Specifically, they assessed whether each of the 300 negative online conversations expressed support for or agreement with any of the four manipulated Lively

---

of this mess by using their friendship for interviews and other promotional work.' Answer strictly with yes/no. Unrelated posts must be no. Agreement can be explicit or implicit. Include posts that mention or imply Blake Lively trying to get Taylor Swift to help her during the backlash by using their friendship for interviews, publicity, or promotional work connected to It Ends With Us. Count both explicit and implicit statements suggesting she is intentionally using her friendship with Taylor Swift for publicity, interviews, or other promotional efforts to influence perception. Exclude posts where the friendship is mentioned only as emotional support or without any reference to media or PR activity."

Taylor Swift Distraction narrative classification was conducted using the following instruction provided to the LLM: "Does the post support the following narrative: 'Blake Lively has been 'relying' on her best friend Taylor Swift to help get her through the recent media 'storm,' and is hoping to 'use their friendship' to distract from the drama while promoting her new flick It Ends With Us.' Answer strictly with yes/no. Unrelated posts must be no. Agreement can be explicit or implicit. Include posts that mention her turning to Taylor Swift for moral or public support in response to negative coverage, or using their friendship to distract from the drama while promoting It Ends With Us. Count both explicit and implicit mentions of her relying on Taylor Swift's friendship to divert or soften negative coverage during controversy around It Ends With Us. Exclude posts that describe coordinated PR or promotional planning; focus only on distraction or reliance for image stability."

Influence Over Production narrative classification was conducted using the following instruction provided to the LLM: "Does the post support the following narrative: 'Blake Lively's influence drew the rest of the cast into her orbit and away from Justin Baldoni, whose movie it was.' Answer strictly with yes/no. Unrelated posts must be no. Agreement can be explicit or implicit. Include posts that describe her as dominating or redirecting creative or social influence on set, especially references to cast loyalty shifting toward her and away from the director. Mentions of her controlling or centralizing role in production dynamics count as supportive. Count both explicit and implicit claims that she exerted influence over cast, crew, or creative control, leading to a shift in authority or loyalty away from Justin Baldoni. Exclude posts that do not describe influence, control, or on-set dynamics tied to her involvement."

183    As classified by the LLM using the direct method.

CONFIDENTIAL – Attorneys' Eyes Only

narratives. The reviewers were provided with a set of instructions governing both their independent assessments and the subsequent reconciliation phase used to resolve any classification discrepancies. The full set of instructions for both identification and reconciliation processes is presented in **Appendix C, Section II**. The reviewers' reconciled classifications of negative online conversations were systematically compared to the LLM results. **Figure 14** below illustrates a "confusion matrix," summarizing this cross-comparison between the manual review and the LLM results.

72

CONFIDENTIAL – Attorneys' Eyes Only

**Figure 14: Cross-Tabulation of Manual and LLM Classifications of Manipulated Lively Narratives**[184]



| | | Manual Classification | |
|---|---|---|---|
| | | *Yes* | *No* |
| **LLM Classification** | *Yes* | 8 | 0 |
| | *No* | 47 | 245 |

**Note:**

This table shows the cross-tabulation of manual classifications and LLM classifications across the sample of 300 posts. Classifications are grouped into two categories: "Yes" (the online conversation expresses support for at least one Lively narrative, as flagged by either the LLM or manual reviewers) and "No" (the online conversation does not support any of the Lively narratives, as flagged by either the LLM or manual reviewers). Rows represent the LLM predictions, and columns represent the manual classifications.

90.     As evidenced in the figure, the LLM and manual results demonstrate a high degree of agreement on the classifications. The overall agreement[185] between the LLM and manual review results is 84%. My LLM methodology is a highly conservative approach to estimating trends that support the manipulated Lively narratives in comparison to a human-driven manual approach. The validation results support this claim; in the sample of 300 negative

---

[184]    *See* backup for database with online conversations from Pulsar TRAC, retrieved on September 8, 2025; *See also,* **Figure 2** for the distribution of the full data set.

[185]    In this context, I define "overall agreement" as instances in which both the LLM and the manual reviewer aligned on agreement or disagreement with each of the four manipulated Lively narratives of the "Scenario Planning." For example, if the overall agreement was 75%, it means the LLM and manual reviewers provide the same classification on 75% of all online conversations reviewed by both.

CONFIDENTIAL – Attorneys' Eyes Only

online conversations, the LLM identified 8 conversations (2.7%) as agreeing with at least one of the four manipulated Lively narratives, while the manual reviewers identified 55 conversations (18.3%) as agreeing with at least one of the four manipulated Lively narratives.

91.    It is my understanding that there are no other significant external events during this time that could reasonably explain the observed shift in public sentiment.[186] Given the absence of alternative external events that could explain this change, and the close alignment between the rise in unfavorable conversations and the documented campaign timeline, it is reasonable to infer that the manipulation of online conversations was the catalyst for the observed negative change in sentiment of online conversation.

> ### D.    Analysis of Changes in Sentiment and Associated Harm to Ms. Lively and Her Commercial Brands

92.    In this section I examine how the manipulation of online conversations and the resulting shift in sentiment toward Ms. Lively corresponds with harm to her personal and commercial brands. Negative sentiment beginning in early August 2024 was followed by disruptions in marketing strategy, erosion of brand equity, and a sharp decline in sales performance. These findings are consistent with the conclusion that manipulated online conversations had a negative impact on the performance of Ms. Lively's commercial brands.

---

[186]    Discussions with management, see Appendix B. I note, however, that a price reduction to Betty Booze's all single flavor 4-packs and variety 6-packs occurred later in 2025. However, this change does not alter my conclusion, as a price decrease would not ordinarily be expected to cause a decline in sales. *See,* BL-000038170–269 (Betty B Update May 2025) at 187.

CONFIDENTIAL – Attorneys' Eyes Only

> 1. *A Sentiment Shift in Online Conversations in Early August 2024 Harmed Ms. Lively's Commercial Brands*

93. As discussed in **Section IV.B**, personal brands can influence commercial brand performance, especially when the celebrity is not just an endorser but also a brand founder like Ms. Lively is for Betty Buzz, Betty Booze, and Blake Brown Beauty. These commercial brands are intentionally built around Ms. Lively's personal identity.[187] As a result, the identifiable negative shift in public sentiment toward Ms. Lively, especially one amplified through online conversations, would be expected to affect the performance of these commercial brands.

---

[187] *See,* "From My Shower to Yours." *Blake Brown Beauty*, available at https://www.blakebrownbeauty.com/pages/about, accessed on September 10, 2025 ("Ever since I was a kid, through adolescence, early adulthood, motherhood, work, personal life, whenever, wherever, the single most identifiable part about me has always been my personalit… no? Not my personality? Oh... My hair. […] I've spent 7 years (I know. It toggles between impressive and wtf took so long) obsessively developing every detail of Blake Brown, which legally makes it my third born child. […] As someone who desperately loves design, I wanted our products to look stunning on your shelf because that's valuable space in your home. It should be beautiful. I was uncompromising on achieving all of those things at once. […]"); *See also,* "Blake Lively, Founder of Betty Buzz," *Betty Buzz*, available at https://bettybuzz.com/pages/learn, accessed on September 10, 2025 ("Blake Lively founded Betty Buzz with a simple idea - that what we drink should be held to the same standards as the foods we eat."); BL-000038270–339 (Betty B Company Overview October 2024) at 297 ("This is Betty Booze Sparkling Spirits Gourmet Ingredients […] Inspired by homemade recipe's from Blake Lively's kitchen."); _000038170–269 (Betty B Update May 2025) at 194 ("Vodka Iced Tea 360$^0$ Marketing Launch Plan […] A media and influencer event that celebrates the launch with Blake Lively, generating heightened demand leading up to launch[.]"); BL-000028664–725 (Betty B Company Overview June 2024) at 679 ("Betty Booze Opportunity […] Best in Class Marketing: A-list Founder, Billions of Earned Media Impressions and #2 RTD on Instagram[.]"); BL-000028664–725 (Betty B Company Overview June 2024) at 701 ("Betty Buzz Opportunity […] Breakthrough marketing: A-list Founder, Billions of Earned Media Impressions and Top 10 Non-Alc. Sparkling Non-Alcoholic Beverage on Instagram[.]"); BL-000033111–141 (Betty B Q3 2024 Update) at 130 ("Betty Buzz 2024 Prime Day Recap […] Blake amplification throughout the two day period[.]"); BL-000033111–141 (Betty B Q3 2024 Update) at 132 ("Betty Buzz 2024 Prime Day Recap July 16 – 17, 2024 […] Blake 's Post Effect […] Blake's in feed post had a domino story sharing effect […] Zoom with Blake […] A week prior to Prime Day, Blake hosted a Zoom with top performing Amazon influencers to officially launch mocktails, resulting in Betty Buzz prime day posts to millions of followers[.]"); BL-000034272–292 (Blake Brown Update September 2024) at 284 ("Building the Blake Brown Brand: 3 Drivers 1. Visibility […] Target, PR, Social, Establishing Blake as founder […]"); BL-000034272–292 (Blake Brown Update September 2024) at 286 ("Priorities YTG […] Brand Distinctiveness & POV: […] Brand Campaign w/ Blake: Q4-Q1[.]"); BL-000037661–748 (Betty B Brand Overview November 2023) at 683 ("Breakthrough Marketing at All Touch Points […] Creative […] Compelling, PR-worthy ads from BL/ Maximum Effort-amplified by retail partner."); BL-000037970-8164 (Betty B Presentation October 2024) at 005 ("Our Founder […] Founded by A-list Hollywood actress Blake Lively […] At the Top of her Game […] Tastemaker and fashion icon[.]"); BL-000034272–292 (Blake Brown Update September 2024) at 291; BL-000037923–958 (Betty B Update March 2024) at 938; BL-000037970–8164 (Betty B Presentation October 2024) at 032, 078-079; BL-000038170-269 (Betty B Update May 2025) at 196; BL-000037866–919 (Betty B Board Meeting) at 880, 881, 883, 884, 897, 901.

75

94.    First, my analysis of online conversations (**Section V.C**) provides direct support for the conclusion that the manipulation of online conversations, as set forth in the Scenario Planning document and the Seeded News Articles, resulted in measurable reputational harm to both Ms. Lively and her brands. Specifically, the tone of online conversations became more negative beginning the week of August 4, 2024 (i.e., week ending August 11), and extended until the week of September 1, 2024, as shown in **Figure 9** and **Figure 10** above. A high volume of negative online conversations resurfaced in late December 2024 and persisted through February 2025. This timing coincided with Ms. Lively's complaint[188] (December 20, 2024) and the Wayfarer Complaint[189] (January 16, 2025). The second surge in negative online conversations contributed to the emergence of more of the same negative "topics" as were observed in the August 2024 period,[190] as contrasted with the "topics" seen prior to August 2024 as discussed in **Section V.B**. This shift in sentiment led to a measurable erosion of her personal brand equity, which had previously served as a central asset across her commercial ventures, thus also diminishing the equity of her associated commercial brands.

95.    Supporting this decline in brand equity, surveys conducted by Betty Booze revealed that Ms. Lively's presence in marketing materials was associated with reduced consumer interest. In a March 2025 A/B survey,[191] participants who viewed marketing materials *without Ms. Lively's image* reported higher purchase intent and product favorability than those

---

[188]    *See*, **Section V.C.1** covering the sentiment analysis of social media data pulled from Pulsar, aggregated at the weekly level.

[189]    Wayfarer Complaint.

[190]    "Topics" as obtained from the LDA method. *See*, **Section V.B**.

[191]    The survey was conducted between February 29 and March 2, 2025, and included a total of 601 respondents. Participants were recruited to reflect a balanced sample of U.S. adults aged 21 to 49, with census-based balancing by gender. Respondents were screened to ensure recent alcohol consumption, with all included participants having consumed an alcoholic beverage within the past 90 days. *See,* BL-000038795–833 (Betty Booze Research Results March 2025) at795-798, 803.

shown a version *with Ms. Lively's image*.[192] These findings mark a notable reversal from a January 2023 survey in which Ms. Lively's inclusion increased purchase intent.[193] This shift in consumer response is consistent with the observed rise in negative online sentiment toward Ms. Lively and illustrates the extent to which Ms. Lively's reputational damage transferred to the Betty Booze brand, undermining its marketing plan.

96.    Additionally, my thematic analysis of the negative online conversations (**Section V.C.3**) shows that the manipulated Lively narratives from "Scenario Planning" about (1) Ms. Lively's involvement causing production staff to lose their jobs, (2) Ms. Lively enlisting her husband (Mr. Reynolds) to create a power imbalance against Mr. Baldoni, (3) Ms. Lively having a poor reputation in the industry, and (4) Ms. Lively conspiring to takeover It Ends With Us and buying the rights to its sequel, *It Starts with Us*, increased from near-zero to between 4% and 10% of the overall negative conversation volume from August 2024 through February 2025.[194]

97.    In response to the surge in negative commentary online–including a high volume of critical and hostile comments–Ms. Lively's brands' Instagram accounts had to pause

---

[192]   In the March 2025 survey (N=601), participants were randomly assigned to view marketing materials for Betty Booze either with or without Ms. Lively's image. 49% of participants exposed to the non-Lively group reported they would "probably" or "definitely" purchase the product, compared to 44% in the Lively group. Negative purchase intent also increased in the group exposed to Ms. Lively's image: 28% of respondents in the Lively group indicated they would "probably" or "definitely" not purchase the product, compared to 22% in the non-Lively group. Similar patterns were observed in product favorability ratings, with 63% of the non-Lively group indicating they "liked" the product (either "like a lot" or "like somewhat"), compared to 54% in the Lively group. Negative sentiment also increased with Ms. Lively's inclusion, as 18% of respondents shown her image reported they "disliked" the product (either "dislike somewhat" or "dislike a lot"), compared to 11% among those who did not see her image. *See,* BL-000038795–833 (Betty Booze Research Results March 2025) at 805, 808.

[193]   In the January 2023 survey, these effects were the opposite: 66% expressed purchase intent when shown Ms. Lively's image, compared to 57% in the non-Lively condition. There was also lower negative purchase intent among respondents shown Ms. Lively's image: 14% indicated they would "probably" or "definitely" not purchase the product, compared to 12% in the non-Lively group. *See,* BL-000038795–833 (Betty Booze Research Results March 2025) at 812.

[194]   *See,* **Figure 12**.

CONFIDENTIAL – Attorneys' Eyes Only

promotional activity.[195] The Blake Brown Beauty Instagram account disabled comments and ceased posting altogether from around August 20 to September 10, 2024,[196] effectively halting normal promotional activity. During this period, the account experienced a notable slowdown in follower growth, disrupting a previously consistent upward trajectory.[197] From a review of the official Instagram pages, Betty Buzz similarly held off posting from August 13 through September 4,[198] while Betty Booze paused for a full month, from August 8 through September 8, 2024.[199] This pullback in promotional activity was reflected in consumer interest trends: average search volume for both "Betty Buzz" and "Betty Booze" declined sharply in the second half of 2024, as shown by Google Trends data.[200] Although other ready-to-drink (RTD) brands such as

---

[195]  Deposition of Laura Tedesco, *Blake Lively vs. Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, The Agency Group PR LLC, Jennifer Abel, Jed Wallace, and Street Relations Inc.,* Case 1:24-CV-10049-LJL (Consolidated with 1:25-CV-00449-LJL), United States District Court for the Southern District of New York, September 29, 2025 ("Tedesco Deposition"), pp. 50:5-10, 51:16-20 ("Q. And we talked about that meant that you stopped posting on social media; is that right? […] A. We did stop posting on social media in mid-August […] So we reached a point where negativity was so great we were forced to go dark because the sort of negativity of having those comments outweighed the positivity of being able to continue to market on social media."); *See also,* Second Amended Complaint, ¶ 343 ("Around the same time, the social media accounts for Ms. Lively's brands— including Betty Buzz and Betty Booze—were flooded by hateful comments […] When Ms. Lively limited comments on her personal Instagram account to limit the toxic harassment she was receiving, those users simply migrated to the social media accounts and websites of Blake Brown, Betty Buzz, and Betty Booze. Many of the negative comments on these businesses' social media accounts and websites had nothing to do with the products or brands, but instead referenced the Film, Mr. Baldoni, and/or Ms. Lively as a 'bully' or 'mean girl.'"), ¶ 346 ("[T]he Baldoni-Wayfarer astroturfing campaign forced each of Ms. Lively's businesses to go 'dark' on social media in August. Ms. Lively did the same, for nearly two months, and during this time was unable to fulfill her obligations as the brand's founder, causing issues with many business partners and customers.").

[196]  Tedesco Deposition, p.30:14-23: ("Q. Did Family Hive shut down any social media accounts at any time in 2024? A. We did […] We stopped posting. So we did not post from around August 20th that sort of third week of August through, I think, around September 9th or 10th.").

[197]  *See,* BL-000037129–151 (Betty B Presentation April 2025) at 139.

[198]  There were no posts in the Betty Buzz Official Instagram Page (@bettybuzz) during this time period.

[199]  There were no posts in the Betty Booze Official Instagram Page (@bettybooze) during this time period.

[200]  *See,* BL-000038170–269 (Betty B Update May 2025) at 211; *See also,* BL-000033148–168 (Betty B Presentation November 2024) at 156.

CONFIDENTIAL – Attorneys' Eyes Only

Nutrl and Cutwater experienced some fluctuation in search volume in Summer 2024 compared to the prior year, Betty Booze saw a dramatic and disproportional decline in search interest.[201]

98.     Further, because available datasets for TikTok and Instagram are not comprehensive, I was unable to conduct a full analysis of those platforms.[202] However, there is anecdotal evidence that similar negative conversations appeared across these social media platforms during the same period. For example, internal brand reviews of selected Instagram promotional posts for Betty Booze and Betty Buzz from early to mid-August 2024 found that, on average, over 60% of comments were negative as described on internal marketing documents and shown in **Figure 15**.[203] Many of these comments referenced alleged support for domestic violence and public solidarity with Justin Baldoni, as seen in example posts from early August and mid-September 2024 in **Figure 16**. Internal documents also confirm that this pattern continues well into September 2024, with posts from early to mid-September attracting between 30% to 92% negative comments, depending on the post.[204]

---

[201]   *See,* BL-000037970-8164 (Betty B Presentation October 2024) at 8034.

[202]   Pulsar's "historics" data has variable ranges depending on the platform. While their X inventory searches nearly its entire history, and Reddit and YouTube retain content for a 25-month and 15-month period (sufficient for data collecting conducted across August and September), they do not maintain Instagram and Douyin (Chinese version of TikTok) historics data in compliance with these platforms. *See*, "TRAC Data Sources," *Pulsar Library*, available at https://intercom.help/pulsar/en/articles/6079475-trac-data-sources, accessed on September 10, 2025.

[203]   *See,* BL-000037129–151 (Betty B Presentation April 2025) at 143-151.

[204]   *See,* BL-000037129–151 (Betty B Presentation April 2025) at 143-151.

CONFIDENTIAL – Attorneys' Eyes Only

**Figure 15: Percentage of Negative Comments on Betty Booze and Betty Buzz Instagram Posts (Analysis from Produced Documents)[205]**

| Handle | Post | Date | # of Likes | # of Comments | # of Negative | % Negative | Reason for Negativity |
|--------|------|------|-----------|---------------|---------------|-----------|------------------------|
| BOTH | IEWU Premiere | 08/07/24 | 1,780 | 411 | 310+ | 75% | Domestic Violence Advocacy in connection with Booze (tone-deaf) |
| BOTH | Betty Blooms Carousel | 08/08/24 | 4,396 | 106 | 88 | 81% | Domestic Violence Advocacy in connection with Booze (tone-deaf) |
| @bettybuzz | Betty Blooms Floral Arrangement | 08/08/24 | 834 | 32 | 20 | 62% | DV / Team Justin |
| BOTH | Betty Blooms Reel | 08/09/24 | 750 | 113 | 90 | 79% | Domestic Violence Advocacy in connection with Booze (tone-deaf) |
| @bettybuzz | Mocktail Highlight | 08/13/24 | 600 | 150 | 97 | 64% | Promoting brands in relationship to DV, "Mean Girl" founder |
| @bettybuzz | Back To School | 09/04/24 | 347 | 41 | 27 | 65% | "Mean Girl" founder, "bump" references, cancelled |
| @bettybooze | Crisp Flavor Static Post | 09/08/24 | 178 | 13 | 12 | 92% | Tone-deaf, bully, "bump" references |
| @bettybuzz | Ginger Beer Highlight | 09/10/24 | 329 | 25 | 12 | 48% | "Bump" references, cancelled for being tone-deaf |
| @bettybuzz | Carcuterie Static Post | 09/16/24 | 274 | 20 | 6 | 30% | "Bump" references, light DV references |

---

[205]    Table and analysis from BL-000037129–151 (Betty B Presentation April 2025) at 138.

CONFIDENTIAL – Attorneys' Eyes Only

**Figure 16: Betty Booze and Betty Buzz Promotional Instagram Posts and Associated Comments[206]**





CONFIDENTIAL – Attorneys' Eyes Only



---

[206] BL-000037129–151 (Betty B Presentation April 2025) at 143, 145, 149, 151.

CONFIDENTIAL – Attorneys' Eyes Only

99.     A similar pattern emerged in connection with promotional posts for the Blake Brown Beauty brand (see **Figure 17**). On Instagram, numerous negative comments appeared under marketing campaign content, many of which were posted by potentially suspicious or low-activity accounts–often characterized by having no followers, no profile image, and no prior history as shown in **Figure 18**.[207]

**Figure 17: Examples of Accounts Engaged in Harassing Activity attacking Ms. Lively in Connection with the Film[208]**



---

[207]    A list of problematic bots examples is provided. *See,* BL_000038835–858 (Blake Brown Media Impact Overview November 2024) at 845.

[208]    BL_000038835–858 (Blake Brown Media Impact Overview November 2024) at 843.

CONFIDENTIAL – Attorneys' Eyes Only

**Figure 18: Examples of Inactive Accounts Engaged in Harassing Activity[209]**



---

[209]    BL_000038835–858 (Blake Brown Media Impact Overview November 2024) at 841.

84

CONFIDENTIAL – Attorneys' Eyes Only

100.    In addition to these seemingly suspicious accounts in **Figure 18**, a small set of repeat users posted sustained, negative commentary over time, a pattern shown in **Figure 19**.

**Figure 19: Examples of Repeat Harassers Persistently Commenting[210]**



101.    Beyond the nature of the accounts shown in **Figure 18** and **Figure 19**, there was a substantial volume of hostile comments, including those questioning Ms. Lively's credibility and attacking her appearance, challenging her and Mr. Reynold's celebrity influence, accusing her avoidance or minimization of domestic violence themes in her promotion of the film, and alleging her engagement with PR firms "to trash and smear Justin."[211] A comparable trend was

---

[210]    BL_000038835–858 (Blake Brown Media Impact Overview November 2024) at 844.

[211]    *See,* BL_000038835–858 (Blake Brown Media Impact Overview November 2024) at 840-845, at 841 ("How about you stop paying the media to trash and smear Justin that would be a good start your awful human being," "Straight to the garbage can. Anything Snake Lively touches."), at 843 ("Are these products also named after an abuser? Like your great alcoholic drinks?" "We want Justin's cut of the movie!! He actually care[s] about DV," "The days of people worshipping self-absorbed celebrities like you and Ryan are done. You're not the untouchable icons you think you are; you're here to serve us now, not the other way around," "Okay Blake Lively just blocked the comment section of her IG. RIDICULOUS."); *See also*, LIVMR_CP053_000000003 (Blake Brown Social Media Data), tab "TIK TOK TRACKER" and tab "IG POSITIVENEGATIVE TRACKER,"; LIVMR_CP054_000000003 (Blake Brown Instagram Comments Data).

observed on TikTok. From mid-August to early September, both tagged videos and comments reflected negative sentiment. Users frequently dismissed supportive content about Ms. Lively as "PR" efforts and repeatedly made hostile accusations regarding her alleged domestic violence advocacy.[212] While some TikTok comments praised the products, negative comments were consistent with the broader trend observed throughout social media in the aftermath of the manipulation of online conversations.

102.    Some of the product discussions for Blake Brown Beauty on the brand accounts (@blakebrownbeauty for Instagram and TikTok) further illustrate this dynamic. Rather than evaluating product performance, some comments appear to adopt a personal and often extreme tone, targeting Ms. Lively's appearance and credibility.[213] For example, social media users wrote: "I never looked at Blake's hair and said yeah I want that," "I genuinely think Blake's hair always loolks[sic] dry and burned out and needs a serious cut and conditioning treatment. She's definitely not a hair role model for me," "Her hair looks like she goes a month without washing it, why do we want it? No volume, no definition. Just messt [sic]," and "But Blake's hair is a disaster?"[214]

---

[212]   *See*, LIVMR_CP053_000000003 (Blake Brown Social Media Data); *See also*, LIVMR_CP054_000000004 (Blake Brown Instagram Comments Analysis).

[213]   Ms. Tedesco testified in her deposition that Blake Brown Beauty's brand handles experienced an influx of negative commentary directed at Ms. Lively and largely unrelated to product performance. Tedesco Deposition, p. 46:7-20 ("Q Do you have any information that any defendant in this case caused somebody to put those comments on any social media account for Blake Brown? […] THE DEPONENT: […] in my evaluation of the social media sentiment on the brand was that there was an influx of negativity as it pertains to Blake that flowed into our brand handles starting in mid-August of 2024."), p. 50:18-51:20 ("Q Okay. So in the midst of this very successful launch, as you described it, at Target, Blake Brown made the decision to stop posting content on social media; correct? […] THE DEPONENT: We announce the brand on July 31st and had tremendously positive reactions from consumers across social media, traditional media and then kind of in the form of sales at Target. […] Starting mid-August, our social media handles started being flooded with negativity related to Blake, and largely not related to the brand.").

[214]   LIVMR_CP053 000000003 (Blake Brown Social Media Data), tab "TIK TOK TRACKER".

CONFIDENTIAL – Attorneys' Eyes Only

103.    These examples underscore how the impact of the manipulation of online conversations extended beyond public discourse into consumer evaluations, with comments reflecting personal hostility rather than product-focused feedback. This type of spillover effect–where reputational attacks contaminate brand-related sentiment–is well-documented in the marketing literature and consistent with attempts to erode both brand equity and the personal brand of a founder.

2.    *The Sales Trends Across Ms. Lively's Commercial Brands Are Consistent with Negative Impact from the Manipulation of Online Conversations*

104.    Sales data from Ms. Lively's commercial brands–Betty Buzz, Betty Booze, and Blake Brown Beauty–reveal performance trends that are consistent with the conclusion that the manipulation of online conversations had a materially negative impact on both her personal and commercial brands. These trends show clear disruptions in sales growth, which align closely with the timing of the campaign and other related events, and follow a period of strong brand momentum. In this section, I review sales outcomes across multiple retail channels and time periods.

105.    Betty Buzz was launched on September 23, 2021 with five types of products, namely Sparkling Lemon Lime, Sparkling Grapefruit, Ginger Beer, Meyer Lemon Club Soda, and Tonic Water.[215] Sales data from Amazon show a notable decline beginning in mid-August 2024 for Betty Buzz, closely aligned with the timing of the manipulation of online conversations as seen in **Figure 20**. Between June 23 and August 10, 2024, prorated Amazon sales for Betty

---

[215]    *See,* "Blake Lively Announces the Launch of Betty Buzz," *PR Newswire*, September 23, 2021, available at https://www.prnewswire.com/news-releases/blake-lively-announces-the-launch-of-betty-buzz-301384046.html, accessed on October 7, 2025 ("NEW YORK, Sept. 23, 2021 /PRNewswire/ -- Today Blake Lively announced the launch of Betty Buzz, a new line of non-alcoholic, sparkling mixers made from clean ingredients."); *See also,* BL-000028664–725 (Betty B Company Overview June 2024) at 674.

CONFIDENTIAL – Attorneys' Eyes Only

Buzz totaled approximately $0.71 million, whereas in the subsequent seven-week period, from August 11 to September 28, 2024, sales dropped significantly to approximately $0.30 million, a decline of nearly 58%.

106.    This decline marks a reversal from prior performance. In the first seven months of 2024, total revenue across all sales channels for Betty Buzz grew by 66% compared to the same period in 2023,[216] while Amazon sales alone were up by 78% year-over-year from July 1 to August 15.[217] Notably, during the first half of August, Betty Buzz sales were up 73% year-over-year, however, in the second half of the month and through September, the brand experienced a sharp reversal, tracking 18% below 2023 levels.[218] Between August 16 and October 31, Amazon sales declined by 26% compared to the same period in 2023.[219]

---

[216]    *See,* BL-000037129–151 (Betty B Presentation April 2025) at 140.

[217]    *See,* BL-000037129–151 (Betty B Presentation April 2025) at 131.

[218]    *See,* BL-000037129–151 (Betty B Presentation April 2025) at 132.

[219]    *See,* BL-000037129–151 (Betty B Presentation April 2025) at 131.

CONFIDENTIAL – Attorneys' Eyes Only

**Figure 20: Decline in Betty Buzz's Online and Offline Sales[220]**



**Notes:**

[1] The manipulation campaign against Ms. Lively started sometime between July 31 and August 2, 2024.

[2] Amazon sales are used as a proxy for Betty Buzz's online sales. Offline sales are reported as aggregated totals across major retail partners, including Albertsons/Safeway, Whole Foods, Total Wine, and Hy-Vee.

[3] Amazon and offline retail partners report sales over different periods: Amazon reports from July 1–August 15 and August 16–October 31, 2024, while offline partners report from June 23–August 10 and August 11–September 28, 2024. To align the data, Amazon sales were estimated over the offline periods using a proration method. Total sales from each Amazon reporting window were divided by the number of days to calculate daily averages, which were then multiplied by the number of days in the corresponding offline period. As the August 11–September 28 offline period spans two Amazon reporting windows, daily averages from August 11–15 and August 16–September 28 were applied separately based on the relevant number of days.

107. This downturn was not limited to Amazon. Retail sales also declined across major distribution partners: according to Nielsen data covering the 14-week period ending September 28, 2024, sales dropped by 29% at Total Wine, 25% at Hy-Vee, 17% at Albertsons/Safeway, and 13% at Whole Foods, when comparing the final seven weeks of that period to the seven weeks prior.[221] Collectively, Betty Buzz experiences 18% decline in sales during the seven weeks ending September 28, 2024.[222] This sharp decline appears consistent with the conclusion that the

---

[220]   *See,* BL-000037129–151 (Betty B Presentation April 2025) at 131-133.

[221]   *See*, BL-000037129–151 (Betty B Presentation April 2025) at 133.

[222]   *See,* BL-000037129–151 (Betty B Presentation April 2025) at 133.

CONFIDENTIAL – Attorneys' Eyes Only

manipulation of online conversations had negative impact on the performance of Ms. Lively's commercial brands.

108.    Betty Booze was launched in June 2023[223] with three sparkling canned cocktails.[224] The product line expanded in April and September 2024 with new tequila and bourbon-based varieties, [225] and in June 2025, the brand introduced non-carbonated vodka RTD iced teas.[226] Betty Booze exhibited a comparable reversal in sales performance beginning in August 2024. From April to July 2024, its first three months in the market, the brand generated approximately $3.4 million in revenue.[227] However, from August through December 2024, revenue fell sharply to just $1.2 million, falling 70% below the brand's internal target.[228] Indeed, Betty Booze earned nearly three times more revenue in its first three months on the market than it did during the final five months of the year.[229] In fact, during this first three months, the brand significantly outperformed other celebrity RTD brands including Gin & Juice, Delola, and

---

[223]    Lupupa, Jill, "Blake Lively Says She Created New Betty Booze Line Because She's 'Tired' from Raising 4 Kids," *People*, June 30, 2023, available at https://people.com/blake-lively-launches-new-betty-booze-hard-seltzers-tired-raising-four-kids-7555270, accessed on October 7, 2025 (Blake Lively, "[t]he actress, 35, launched a new line of canned cocktails on Thursday [(June 29, 2023)]."

[224]    Sparkling Tequila with Lime Shiso, Sparkling Tequila with Oak-Smoked Lemonade, and Sparkling Bourbon with Apple Ginger Sour Cherry. *See,* BL-000028664–725 at 675.

[225]    Sparkling Tequila with Smoked Pineapple and the Sparkling Tequila Variety Pack in April 2024, and Sparkling Bourbon with Oak Smoked Lemonade and Bourbon Variety Pack in September 2024. *See*, BL-000028664–725 at 675, 693; *See also,* BL-000037923–958 at 938.

[226]    Vodka Iced Tea with Meyer Lemonade and Vodka Iced Tea with Passion Fruit. *See*, "Blake Lively's Betty Booze Launches New Vodka Iced Teas," *Ready-to-Drink Magazine*, June 4, 2025, available at https://rtdmagazine.com/blogs/rtd-cocktail-news/betty-booze-vodka-iced-tea, accessed on September 10, 2025 ("NEW YORK, June 4, 2025 […] [Betty Booze] is serving up its first-ever vodka-based drinks […] With the launch of Vodka Iced Tea + Meyer Lemonade and Vodka Iced Tea + Passion Fruit, Betty Booze is bringing its signature real-ingredient ethos to a new category: non-carbonated, ready-to-drink cocktails.").

[227]    *See,* BL-000037129–151 (Betty B Presentation April 2025) at 141.

[228]    *See,* BL-000037129–151 (Betty B Presentation April 2025) at 141.

[229]    *See,* BL-000037129–151 (Betty B Presentation April 2025) at 141.

CONFIDENTIAL – Attorneys' Eyes Only

Sprinter at Total Wine.[230] This downward trend was most clearly visible during Labor Day–a key week for RTD beverage sales.[231] In 2023, Betty Booze saw a 41% lift during the Labor Day period at Total Wine.[232] In 2024, that lift dropped to 16%, significantly underperforming the 30% average increase observed across all RTD brands at Total Wine, based on the median five weeks before and after Labor Day weekend.[233]

109.    As illustrated in Total Wine's sales data, weekly Betty Booze revenue tracked closely with the industry trend from launch through mid-2024, showing expected peaks around key events like Christmas 2023, Super Bowl 2024, and Memorial Day Weekend 2024.[234] Further, more than half of RTD sales typically occur between May and August–making the sharp decline in Betty Booze sales during this critical period especially anomalous relative to expected seasonal trends.[235]

---

[230]  During the 16 weeks ending August 31, 2024, Betty Booze generated over $900,000 in retail sales at Total Wine, compared to an estimated $200,000 – $225,000 for each of the following celebrity RTD brands: Gin & Juice (by Dr. Dre & Snoop Dogg), Delola (by Jennifer Lopez), and Sprinter (by Kylie Jenner). *See,* BL-000038270–339 at 304; *See also,* "Beyoncé's Whisky, Kylie Jenner's Canned Vodka Soda, Plus More Stars in the Alcohol Business," *People*, August 30, 2024, available at https://people.com/celebrities-who-have-their-own-liquor-and-beer-lines-8698416, accessed on October 9, 2025.

[231]  *See,* BL-000037129–151 at 134.("Labor Day [is] a Key RTD Selling Week[.]"). *See also,* Rachal, Maria, "At-Home Consumption, Ready-to-Drink Momentum Driving Canned Beverage Trends," *Packaging Dive*, September 13, 2023, available at https://www.packagingdive.com/news/canned-beverage-consumer-trends-rtd-crown-holdings/693436/, accessed on September 10, 2025 ("Traditionally in the U.S., the summer season has been a boon to beverage makers and the packaging companies that supply them. Memorial Day through Labor Day represented a peak season for consuming beer and other drinks.").

[232]  *See,* BL-000037129–151 (Betty B Presentation April 2025) at 134.

[233]  *See,* BL-000037129–151 (Betty B Presentation April 2025) at 134.

[234]  *See,* BL-000028664–725 (Betty B Company Overview June 2024) at 690.

[235]  *See,* BL-000037923–958 (Betty B Update March 2024) at 935 ("Betty Booze Must Win Summer 2024! […] Majority (>50%) of RTD Sales are in May-Aug").

CONFIDENTIAL – Attorneys' Eyes Only

110. Blake Brown Beauty launched exclusively at Target on August 4, 2024, and became available on a direct-to-consumer website, BlakeBrownBeauty.com, the following day, August 5, 2024 with a limited inventory.[236]

111. Blake Brown Beauty's launch trajectory was disrupted almost immediately in mid-August 2024, coinciding with the escalation of the manipulation of online conversations, followed by a sustained decline (See **Figure 21**). After debuting with strong initial sales–peaking at over $3 million during the week of August 10, 2024–sales dropped to approximately $1.21 million by August 17.[237] By August 31, Blake Brown Beauty sales had been cut nearly in half again, falling to $665,000.[238] The downward trend persisted through the remainder of 2024, with sales falling below $205,000 per week by January 2025 and remaining low through February 2025.[239]

---

[236]    *See,* Lavinthal, Andrea, "Blake Lively's Hair Is No Longer Full of Secrets: All About Her Debut Haircare Line, Blake Brown!," *People*, July 31, 2024, available at https://people.com/blake-lively-launches-haircare-line-blake-brown-details-8686090, accessed on September 2, 2025 ("Launching exclusively @target @targetstyle August 4th & on BlakeBrownBeauty.com Aug 5."). Also as discussed during a call on September 8, 2025, with Laura Tedesco, CEO of Blake Brown Beauty.

[237]    *See*, BL-000034433–436 (Blake Brown Update July 2025) at 435.

[238]    Shortly after Mr. Baldoni published an open letter on Instagram that drew substantial media attention and online engagement. *See,* BL-000034433–436 (Blake Brown Update July 2025) at 435.

[239]    *See*, BL-000034433–436 (Blake Brown Update July 2025) at 435-436.

CONFIDENTIAL – Attorneys' Eyes Only

**Figure 21: Blake Brown Beauty Weekly Retail Sales[240]**



Notes:
[1] The retaliation campaign against Ms. Lively started sometime between July 31 and August 2, 2024.
[2] The Baldoni-Lively situation began to escalate publicly following news that Baldoni had hired a crisis communications agency.
[3] Baldoni breaks the silence with a letter on Instagram drawing media interest and engagement.

112.    The decline in sales performance following the launch of Blake Brown Beauty was consistent across all individual products in the line available at Target at launch. As shown in **Figure 22**, each of the eight core SKUs[241]– experienced an initial increase in units sold per store during the week of August 10, 2024, followed by a sharp and sustained decline beginning the following week.[242] This downward trend continued through the end of August, with all products exhibiting significantly lower weekly per-store sales and no meaningful recovery

---

[240]   *See,* BL-000034433–436 (Blake Brown Update July 2025) at 435-436.

[241]   Strengthening Shampoo, Strengthening Mask, Nourishing Shampoo, Nourishing Mask, Rich Reset Pre-Shampoo Mask, All-In-Wonder Leave-In Potion, Glam Mousse, and Dry Shampoo. *See*, BL_000038835–858 (Blake Brown Media Impact Overview November 2024) at 837; *See also,* LIVMR_CP053_000000006 (Blake Brown Product Review Data).

[242]   I note that some delay would be expected between the start of negative online conversations affecting a brand and the subsequent impact on product purchase behavior as the information continues to reach more consumers.

CONFIDENTIAL – Attorneys' Eyes Only

through November 2024. The uniformity of this pattern supports the conclusion that the decline reflects a brand-wide disruption, rather than product-specific underperformance.

**Figure 22: Target Weekly Blake Brown Beauty Sales[243]**

Notes:
[1] The retaliation campaign against Ms. Lively started sometime between July 31 and August 2, 2024.
[2] "Blake Brown Classic Hairspray" and "Blake Brown Hair and Body Refresh Mist" were not included in the graph due to data limitations.
[3] Sales data are reported weekly, showing units sold per Target store per week.

113.    Taken together, these sales figures reveal a clear inflection point that aligns closely with the launch of the campaign against Ms. Lively. Research has shown that newly launched brands experience relatively strong initial growth during their first year, driven by high buyer acquisition.[244] A sudden decline in brand performance deviates from, for example, from established patterns and prior growth trajectories. In the absence of other external market factors during this period, the timing and content of the observed shifts in sentiment and sales

---

[243]  BL_000038835–858 (Blake Brown Media Impact Overview November 2024) at 837.

[244]  Trinh, Giang, Jenni Romaniuk, and Arry Tanusondjaja, "Benchmarking Buyer Behavior Towards New Brands," *Marketing Letters*, Vol. 27, December 2016, pp. 743-752, p. 743 ("In the first 12 months, new launches have more, but less loyal buyers than expected from NBD-Dirichlet benchmarks, irrespective of type, price point, or the sales gained by the new launch."); *See also*, Niederhoffer, Kate, Rob Mooth, David Wiesenfeld, and Jonathon Gordon, "The Origin and Impact of CPG New-Product Buzz: Emerging Trends and Implications," *Journal of Advertising Research,* Vol. 47 (4), 2007,, pp. 420-426.

Case 1:24-cv-10049-LJL   Document 1387-3   Filed 04/24/26   Page 98 of 138

CONFIDENTIAL – Attorneys' Eyes Only

performance strongly suggest the conclusion that the manipulation of online conversations

played a central role in driving this commercial impact.

Dina Mayzlin

October 17, 2025

95

# APPENDIX A

# CURRICULUM VITAE

CONFIDENTIAL – Attorneys' Eyes Only

Dina Mayzlin

Marshall School of Business                          Phone: 213-740-3360
University of Southern California                     mayzlin@marshall.usc.edu
701 Exposition Boulevard
Los Angeles, CA 90089

## ACADEMIC POSITIONS

Marshall School of Management, University of Southern California, Los Angeles, CA

| | |
|---|---|
| 2022 – present | Robert E. Brooker Chair in Marketing |
| 2019 – 2023 | Associate Dean for the Ph.D. Program & Professor of Marketing |
| 2012 – 2019 | Associate Professor of Marketing (with tenure) |

School of Management, Yale University, New Haven, CT

| | |
|---|---|
| 2007 – 2012 | Associate Professor of Marketing |
| 2001 – 2007 | Assistant Professor of Marketing |

## EDUCATION

| | |
|---|---|
| 1997 – 2001 | Sloan School of Management, Massachusetts Institute of Technology Ph.D., Marketing (degree granted in 2002) |
| 1993 – 1997 | Massachusetts Institute of Technology S.B., Economics |

## EXPERT WITNESS CONSULTING ASSIGNMENTS

Expert witness for the plaintiff in arbitration proceedings involving trademark infringement in the entertainment industry. Conducted an online experiment to test for trademark confusion. The work included report preparation, deposition and trial in the spring of 2024.

*United States v. Milton.* Expert witness for the U.S. Attorney's Office for the Southern District of New York as part of their criminal fraud case against Trevor Milton, the founder of the electric- and hydrogen-powered-car company Nikola Corp. Testimony before the jury related to the general effect of social media conversations, as well as Milton's statements on social media, on investor decisions. The trial took place in September of 2022.

*Cava Mezze Grill, LLC v. Mezeh Inc.* Expert witness for Cava in their false advertising case against Mezeh Inc. (law firm: Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP). Testimony related to the effect of manufactured negative reviews on the company's reputation. The deposition took place in June 2018.

## RESEARCH CITATIONS

Total number of Google Scholar citations (as of 06/02/2025): 20,582

CONFIDENTIAL – Attorneys' Eyes Only

## TOP AWARDS IN DISCIPLINE

Three-time winner (2011, 2013, and 2017) of INFORMS Society for Marketing Science Long Term Impact Award (given annually to a marketing paper published in *Marketing Science*, *Management Science*, or another INFORMS journal, that is viewed to have made a significant long run impact on the field of Marketing)

John D.C. Little Best Paper Award, 2011

O'Dell Award (awarded to the paper published in *JMR* in 2006 that had the most significant long-term contribution to the field of marketing), 2011

Frank M. Bass Outstanding Dissertation Award, 2006

John A. Howard AMA Doctoral Dissertation Award, 2001–2002

## OTHER HONORS

Marshall Faculty Award for PhD Mentoring, 2025

AMA-Sheth Doctoral Consortium Faculty Fellow, 2008, 2025

Marketing Science Doctoral Consortium Faculty Fellow, 2009, 2014, 2019, 2022, 2024

ISMS Early Career Camp Senior Fellow, 2023

Keynote Speaker CESifo Area Conference on the Economics of Digitization, 2022

Keynote Speaker at Interactive Marketing Research Summit, 2018

USC Marshall School of Business Dean's Award for Community, 2017

USC Marshall School of Business Dean's Award for Research Impact, 2016

Keynote speaker at New York Computer Science and Economics Day (NYCE 2016), NYU

Keynote speaker at Advertising & Consumer Psychology Conference on Social Media, San Diego, CA 2013

Keynote speaker at the ZEW (Centre for European Economics Research) 9th Conference on the Economics of Information and Communication Technologies, Mannheim, Germany 2011

Finalist INFORMS Society for Marketing Science Long Term Impact Award, 2010

Finalist John D.C. Little Best Paper Award, 2006, 2009

MSI Young Scholar, 2006

Finalist Frank M. Bass Outstanding Dissertation Award, 2005

## ACADEMIC PUBLICATIONS

- Libai, Barak, Ana Babic Rosario, Maximilian Beichert, Bas Donkers, Michael Haenlein, and Reto Hofstetter, P. K. Kannan, Ralf van der Lans, Andreas Lanz, Alice H. Li, Dina Mayzlin, Eitan Muller, Daniel Shapira, Jeremy Yang, Jeremy Lingling Zhang, "Influencer Marketing Unlocked: Understanding the Value Chains Driving the Creator Economy," forthcoming in *Journal of the Academy of Marketing Science,* 1-25.

- Pei, Amy and Dina Mayzlin (2022) "Influencing Social Media Influencers through Affiliation," *Marketing Science*, 41(3), 593-615.
    - Google Scholar citations (as of 06/02/2025): 90

CONFIDENTIAL – Attorneys' Eyes Only

- Brandes, Leif, David Godes and Dina Mayzlin (2022), "Extremity Bias in Online Reviews: The Role of Attrition." *Journal of Marketing Research*, 59 (4) 675-695.
  - Google Scholar citations (as of 06/02/2025): 39

- Chevalier, Judy, Yaniv Dover, and Dina Mayzlin (2018), "Channels of Impact: User Reviews when Quality is Dynamic and Managers Respond," *Marketing Science*, 37 (5), 688-709.
  - Google Scholar citations (as of 06/02/2025): 254

- Campbell, Arthur, Dina Mayzlin, and Jiwoong Shin (2017), "Managing Buzz," *The Rand Journal of Economics*, 48 (1), 203-229.
  - Google Scholar citations (as of 06/02/2025): 50

- Mayzlin, Dina (2016), "Managing Social Interactions," *The Oxford Handbook of the Economics of Networks* (Editors: Editors: Yann Bramoullé, Andrea Galeotti, Brian W. Rogers).

- Mayzlin, Dina, Yaniv Dover, and Judy Chevalier (2014), "Promotional Reviews: An Empirical Investigation of Online Review Manipulation," *American Economic Review*, 104 (8), 2421-55.
  - Google Scholar citations (as of 06/02/2025): 1,302

- Mayzlin, Dina (2013), "Social Media Management," *Advanced Database Marketing* (Editors: Neslin, Coussement, and De Bock).

- Mayzlin, Dina and Hema Yoganarasimhan (2012), "Link to Success: How Blogs Build an Audience by Monitoring Rivals," *Management Science*, 58 (9), 1651–1668.
  - Google Scholar citations (as of 06/02/2025): 147

- Thomadsen, Raphael, Robert Zeithammer, Dina Mayzlin, Yesim Orhun, Amit Pazgal, Devavrut Purohit, Ram Rao, Michael Riordan, Jiwoong Shin, Monic Sun, J. Miguel Villas-Boas (2012), "A Reflection on Analytical Work in Marketing: Three Points of Consensus," *Marketing Letters,* 23 (2), 381-389.

- Mayzlin, Dina and Jiwoong Shin (2011), "Uninformative Advertising as an Invitation to Search," *Marketing Science*, 30 (4), 666-685.
  - Winner, 2011 John D.C. Little Best Paper Award
  - This paper was reprinted in the Festschrift to honor John D.C. Little
  - Google Scholar citations (as of 06/02/2025): 265

- Godes, David and Dina Mayzlin (2009) "Firm-Created Word-of-Mouth Communication: Evidence from a Field Study," *Marketing Science,* 28 (4), 721-739.
  - Winner, 2017 INFORMS Society for Marketing Science Long Term Impact Award
  - Finalist, 2009 John D.C. Little Best Paper Award
  - Google Scholar citations (as of 06/02/2025): 1,320

- Lehmann, Donald and Dina Mayzlin (2007), "Communication and New Product Adoption," *The SAGE Handbook of Advertising* (Editors: Tellis and Ambler).

- Chevalier, Judith and Dina Mayzlin (2006), "The Effect of Word of Mouth on Sales: Online Book Reviews*," Journal of Marketing Research*, 43 (3), 345-354.
  - Winner, 2011 O'Dell Award (awarded to the paper published in *JMR* in 2006 that had the most significant long-term contribution to the field of marketing)

A-3

CONFIDENTIAL – Attorneys' Eyes Only

- Google Scholar citations (as of 06/02/2025): 9,823

- Mayzlin, Dina (2006), "Promotional Chat on the Internet," *Marketing Science*, 25 (2), 155-163.
    - Winner, 2013 INFORMS Society for Marketing Science Long Term Impact Award
    - Winner, 2006 Frank Bass Outstanding Dissertation Award
    - Finalist, 2006 John D.C. Little Best Paper Award
    - Google Scholar citations (as of 06/02/2025): 1,020

- Godes, David, Dina Mayzlin, Yubo Chen, Sanjiv Das, Chrysanthos Dellarocas, Bruce Pfeiffer, Barak Libai, Subrata Sen, Mengze Shi, Peeter Verlegh (2005), "The Firm's Management of Social Interactions," *Marketing Letters*, 16 (3), 415-428.
    - Google Scholar citations (as of 06/02/2025): 1,014

- Godes, David and Dina Mayzlin (2004), "Using Online Conversations to Study Word of Mouth Communication," *Marketing Science*, 23 (4), 545-560.
    - Winner, 2011 INFORMS Society for Marketing Science Long Term Impact Award
    - Finalist, 2010 INFORMS Society for Marketing Science Long Term Impact Award
    - Finalist, 2005 Frank Bass Outstanding Dissertation Award
    - Translated into French and reprinted in Recherche et Applications in Marketing, vol. 19, no. 4, 2004, pp. 89-110
    - Google Scholar citations (as of 06/02/2025): 4,519

- Gruber, Jonathan, John Kim, Dina Mayzlin (1999), "Physician Fees and Procedure Intensity: the Case of Cesarean Delivery," *Journal of Health Economics*, 18 (4), 473-490.
    - Google Scholar citations (as of 06/02/2025): 464

## OTHER PUBLICATIONS

- Brandes, Leif, David Godes and Dina Mayzlin (2023), "The Pros and Cons of Soliciting Customer Reviews," *Harvard Business Review*, https://hbr.org/2023/03/research-the-pros-and-cons-of-soliciting-customer-reviews.

- Mayzlin, Dina, Yaniv Dover, and Judy Chevalier (2012), "Who Gave That Hotel Five Stars? The Concierge," *Harvard Business Review,* https://hbr.org/2012/09/who-gave-that-hotel-five-stars-the-concierge.

## WORKING PAPERS

- Pei, Amy and Dina Mayzlin (2025), "Do Curation Algorithms Amplify the Effect of Trolls on Users?"

- Shoshani, Tal and Dina Mayzlin (2025), "The Economic and Social Impact of Professional Restaurant Reviews: Evidence from Consumer Mobility Data."

- Brandes, Leif, David Godes, and Dina Mayzlin (2025), "Strategic Review Presentation."

- Kim, SooHyun and Dina Mayzlin (2025), "Maximizing User's Time Spent on Short-Form Platforms through Noisy Signals."

CONFIDENTIAL – Attorneys' Eyes Only

## TEACHING (USC)

### MBA

Marketing and Consumer Research (MBA)
Digital Marketing (MBA, Undergraduate)
Digital Marketing and Analytics (Online MBA)

### PhD

Research Forum
Analytical Methods in Marketing

### Doctoral Advising (First Position)

SooHyun Kim (Chair, Current USC PhD Student)
Tal Shoshani (Chair, Current USC PhD Student)
Ignacio Riveras (Committee, Current USC PhD Student)
Yutong Shao (Committee, Current USC PhD Student)
Maansi Dalmia (Committee, Current USC PhD Student)
Poet Larsen (Committee, Harvard Business School Post Doc)
Ilya Lukibanov (Chair, AXS Data Scientist)
Isamar Troncoso Cortez (Committee, Harvard Business School)
Amy Lei (Chair, Northeastern University)
Mengxia Zhang (Committee, Western University Canada)
Ken Chuk (Committee, Cloud9 Esports Data Scientist)
Francesca Valsesia (Committee, University of Washington)
Zibin Xu (Committee, Shanghai Jiao Tong University)
Lin Liu (Committee, University of Central Florida)
Yaniv Dover (Post-Doctoral Advisor, Dartmouth)
Shachar Reichman (Outside Committee Member, Tel Aviv University)
Boudhayan Sen (Committee, McKinsey)
Hema Yoganarasimhan (Co-Chair, UC Davis, Winner of MSI Clayton Dissertation Proposal)
Sumon Datta (Committee, Purdue)
Jackie Luan (Committee, Dartmouth)

## SELECT SCHOOL AND UNIVERSITY SERVICE (USC)

1. Promotions and Tenure Committee (2023 – current, Chair in 2024 – 2025)
2. Marketing PhD program Coordinator (2017 – 2019)
3. Marshall representative to the USC Tenure, Tenure-Track Faculty Affairs Committee (2016 – 2018)
4. Marketing representative to the Marshall Faculty Council (2016 – 2017)
5. Tenure Track Faculty Marketing Chair Search Committee (2015 – 2016)
6. Marketing Chair Search Committee (2016)
7. APR Committee Chair (2014 – 2015)
8. Mentoring Committee (2012 – 2013)

## PROFESSIONAL ACTIVITIES

### Associate Editor

Marketing Science (2018 – 2024)
Journal of Marketing Research (2018 – 2021)

CONFIDENTIAL – Attorneys' Eyes Only

**Editorial Board**

Quantitative Marketing and Economics (2017 – present)
Customer Needs and Solutions (2013 – present)
Marketing Science (2007 – 2017)
Marketing Letters (2017 – 2023)
Journal of Interactive Marketing (2018 – 2024)
International Journal of Research in Marketing (2009 – 2023)
Journal of Marketing Research (2010 – 2013)

## SERVICE TO THE FIELD

ISMS Doctoral Dissertation Proposal Competition Chair, 2018, 2024
Erin Anderson Award Selection Committee Member, 2017, 2018, 2023, 2024, 2025
Organizing Committee Workshop on Platform Analytics, 2023
Chair of SICS Conference at Berkeley, 2021
Organizing Committee Bass Conference, 2021
Member Program Committee (PC) ACM Conference on Economics and Computation, 2019
Organizing Committee Marketing Science Conference Member, USC, 2017
Wittink Prize Selection Committee Member, 2016
Choice Symposium Session Co-Organizer, 2016, 2019
Member Senior Program Committee 13th ACM Conference on Electronic Commerce, 2012
Chair of Session on Social Media, Yale YCCI Conference, 2010 – 2012
Associate Editor for the special issue on Social Media and Business Transformation of *Information Systems Research*, 2011

## INVITED TALKS AND CONFERENCE PRESENTATIONS

2025

University of Miami Marketing Seminar
AMA-Sheth Foundation Doctoral Consortium at The Ohio State University
Marketing Science Conference in Washington D.C.
Zero Decade Marketing Theory Conference in London, U.K.
15th Workshop on the Economics of Advertising and Marketing in Tallinn, Estonia

2024

Johns Hopkins Marketing Seminar
Northeastern University Marketing Seminar
Marketing Science Conference in Sydney, Australia
Marketing Science Doctoral Consortium in Sydney, Australia
Monash University Mini-symposium in Melbourne, Australia
USC Gould / Analysis Group Global Competition Law Thought Leadership Conference
Northwestern University - University of Southern California Competition Policy Conference

2023

ISMS Early Career Camp Duke University
2023 Choice Symposium INSEAD
14th Economics of Advertising and Marketing Conference in Sofia
University of Iowa Marketing Symposium
MIT Marketing Seminar
Zero Decade Marketing Conference in Seattle

A-6

CONFIDENTIAL – Attorneys' Eyes Only

USC Marshall Initiative on Digital Competition AI Seminar

2022

CESifo Area Conference on the Economics of Digitization

Marketing Science Doctoral Consortium

13th Economics of Advertising and Marketing Conference in London

University of Science and Technology of China and University of Illinois Marketing Seminar

Yale University Marketing Seminar

USC Marshall Initiative on Digital Competition Anti-Trust Conference

2021

USC Information Sciences Institute AI Seminar

Haring Symposium (Haring-Sheth Distinguished Scholar)

2020

University of Washington PhD Seminar

Washington University St Louis Marketing Seminar

Bocconi University Milan Marketing Seminar

Virtual Digital Economy seminar

Center for Analytics and Business Insights Research Roundtable, Washington University, St. Louis, MO

2019

MIT Marketing Seminar

University of California at Riverside Marketing Seminar

Zero Decade Marketing Conference, Palm Springs, CA

NBER Economics of Digitization PhD Tutorial Speaker, Stanford University

Choice Symposium Session Co-organizer, Chesapeake Bay, Maryland

Social@IDC Conference Invited Speaker, Herziliya, Israel

Marketing Science Conference, Rome, Italy

Marketing Science Doctoral Consortium, Rome, Italy

Marketing Science Institute Accelerator Invited Speaker, MSI, Boston, MA

2019 NABE Tech Economics Conference (TEC2019) Invited Speaker, Seattle, WA

P&G Alumni Network - Large Cap CMO Forum

2018

16th ZEW Conference on the Economics of Information and Communication Technologies, Mannheim, Germany

11th Workshop on the Economics of Advertising and Marketing at Columbia University

Johns Hopkins University Marketing Seminar

Keynote Speaker at Interactive Marketing Research Summit, Amsterdam, Netherlands

Marketing - Industrial Organization Conference at Yale University

NBER Economics of Digitization, Stanford University

University of Toronto Marketing Seminar

UCLA Marketing Seminar

2017

Federal Trade Commission Panel on Consumer Protection at the Western Economic Association International Conference, San Diego, CA

Marketing Science Conference, Los Angeles, CA

Summer Institute on Competitive Strategy, UC Berkeley, CA

A-7

CONFIDENTIAL – Attorneys' Eyes Only

Marketing Science – Federal Trade Commission Conference on Marketing and Consumer Protection, Washington, D.C.

University of Florida Marketing Seminar

University of California Berkeley Marketing Seminar

University of California Davis Marketing Seminar

Hong Kong University of Science and Technology Marketing Seminar Camp, HK

Lazaridis School of Business and Economics Marketing Camp, Waterloo, Canada

2016

NBER Summer Institute (Economics of Digitization), Boston, MA

Choice Symposium Session Co-organizer Lake Louise, Canada

Interdisciplinary Center Marketing Seminar, Herziliya, Israel

Rotterdam School of Management and Erasmus School of Economics Marketing Seminar, Netherlands

Vienna University of Economics and Business Marketing Seminar, Austria

University of British Columbia Marketing Seminar

24th European Summer Symposium in Economic Theory, Gerzensee, Switzerland

New Directions in Applied Microeconomics – Theory and Evidence (IO and Social Networks), CalTech

Keynote speaker at New York Computer Science and Economics Day, New York University

2015

Columbia Business School Marketing Seminar

University of Missouri Marketing Distinguished Research Seminar

24th European Summer Symposium in Economic Theory, Gerzensee, Switzerland

New Directions in Applied Microeconomics – Theory and Evidence (IO and Social Networks), CalTech

2014

Arizona State University Marketing Seminar

Marketing Science Doctoral Consortium, Emory University

Marketing Science Conference, Emory University

Economics of Advertising and Marketing Conference, University of Vienna, Austria

2013

University of Colorado at Boulder Marketing Seminar

Texas A & M Marketing Camp

University of Washington Marketing Seminar

Northwestern University Marketing Seminar

Santa Clara University Marketing Seminar

2012

University of Texas at Dallas PhD Seminar

USC FBE Applied Economics Seminar

NBER Program on the Economics of Digitization

Marketing Science Conference, Boston University

Stanford University Marketing Seminar

University of Houston Marketing Seminar

2011

Washington University St Louis Marketing Seminar

Dartmouth Marketing Seminar

CONFIDENTIAL – Attorneys' Eyes Only

NYU Information Systems Seminar
UCSD Marketing Seminar
USC Marketing Seminar
University of Pennsylvania Marketing Seminar
NBER Summer Institute (Economics of Digitization), Boston, MA
Marketing Science Conference, Rice University
ZEW (Centre for European Economics Research) 9th Conference on the Economics of Information and Communication Technologies, Mannheim, Germany
4th Workshop on the Economics of Advertising and Marketing, Moscow, Russia
Yale Center for Customer Insights Conference
Hebrew University Marketing Seminar, Israel
Boston University Marketing Seminar

2010
3rd Workshop on the Economics of Advertising and Marketing, Barcelona, Spain
Invitational Choice Symposium, Miami Business School
Columbia University Marketing Seminar
Georgetown University Marketing Seminar

2009
University of Alberta at Edmonton Marketing Seminar Series
Wharton Interactive Media Initiative's Conference on Modeling Social Network Data
University of Pennsylvania ACR Conference, Pittsburgh
Marketing Science Conference, University of Michigan
University of Texas at Austin Marketing Seminar
Yale Microeconomic Theory Lunch
New England Marketing Consortium, Harvard Business School
Summer Institute in Competitive Strategy, Berkeley, CA (presented by co-author)
John D.C. Little Festschrift Celebration, Marketing Science Conference, University of Michigan (presented by co-author)
Yale School of Management Wednesday Lunch Seminar
Rotterdam School of Management and Erasmus School of Economics Marketing Seminar, Netherlands
University of Tilburg Marketing Seminar, Netherlands
University of Maryland Marketing Seminar

2008
QME Conference, New York University
Marketing Science Conference, University of British Columbia
Fourth Symposium on Statistical Challenges in Electronic Commerce Research, NYU
University of Maryland Marketing Camp
University of Minnesota Marketing Seminar
Carnegie Mellon University (Heinz School of Public Policy) Seminar

2007
MSI Young Scholars Conference, Park City, Utah

2006
Yale School of Management Wednesday Lunch Seminar Series
Summer Institute in Competitive Strategy, Berkeley, CA
Marketing Science Conference, University of Pittsburgh

A-9

CONFIDENTIAL – Attorneys' Eyes Only

DARPA Decision Sciences Research Council Meeting, San Francisco, CA
Marketing Science Institute Board Meeting, Boston, MA
Chicago Marketing Seminar Series, 2006
NYU/Columbia/Wharton/Yale Marketing Consortium, NYU

2005
Marketing in Israel Conference
Northeast Marketing Consortium, Harvard Business School
Washington University, St. Louis Marketing Seminar
New York University Marketing Seminar

2004
Harvard Business School Marketing Seminar
University of Pennsylvania Marketing Seminar

2003
MIT Marketing Seminar Series
Tel Aviv University Marketing Seminar Series
Interdisciplinary Center Herzliya Marketing Seminar Series
Marketing Science Conference, University of Maryland
Informs Conference, Atlanta
Summer Institute in Competitive Strategy, Berkeley, CA

2002
Marketing Science Conference, Edmonton, Canada
NYU/Columbia/Wharton/Yale Marketing Consortium

2001
Marketing Science Conference, Wiesbaden, Germany
Economics of the Internet, Stanford Institute for Theoretical Economics Summer Workshop
New York University Information Systems Research seminar
Fifth Invitational Choice Symposium, Asilomar, California
MIT Economic Theory Lunch

2000
Berkeley Marketing Seminar
Carnegie Mellon University Marketing Seminar
Cornell Marketing Seminar
Duke Marketing Seminar
MIT Marketing Seminar
Northwestern Marketing Seminar
Purdue Marketing Seminar
Rochester Marketing Seminar
University of Florida Marketing Seminar
University of California, Los Angeles Seminar
University of Southern California Marketing Seminar
University of Texas, Dallas Marketing Seminar
University of Toronto Marketing Seminar
University of Washington, Seattle Marketing Seminar
Washington University, St. Louis Marketing Seminar
Yale Marketing Seminar

**APPENDIX B**

**MATERIALS RELIED UPON**

CONFIDENTIAL - Attorneys' Eyes Only

**Legal Documents**

Second Amended Complaint, *Blake Lively v. Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, The Agency Group PR LLC, Jennifer Abel, Jed Wallace, and Street Relations Inc.*, Case No. 1:24-cv-10049-LJL, United States District Court for the Southern District of New York, February 18, 2025.

Complaint, *Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, It Ends With Us Movie LLC, Melissa Nathan, and Jennifer Abel v. Blake Lively, Ryan Reynolds, Leslie Sloane, and Vision PR, Inc.*, Case No. 1:25-cv-00449-LJL, United States District Court for the Southern District of New York, January 16, 2025.

Deposition of Breanna Koslow, *Blake Lively vs. Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, The Agency Group PR LLC, Jennifer Abel, Jed Wallace, and Street Relations Inc.*, Case No. 1:24-CV-10049-LJL (Consolidated with 1:25-cv-00449-LJL), United States District Court for the Southern District of New York, September 9, 2025.

Deposition of Katherine Case, *Blake Lively vs. Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, The Agency Group PR LLC, Jennifer Abel, Jed Wallace, and Street Relations Inc.*, Case No. 1:24-CV-10049-LJL (Consolidated with 1:25-cv-00449-LJL), United States District Court for the Southern District of New York, September 5, 2025.

Deposition of Laura Tedesco, *Blake Lively vs. Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, The Agency Group PR LLC, Jennifer Abel, Jed Wallace, and Street Relations Inc.*, Case No. 1:24-CV-10049-LJL (Consolidated with 1:25-cv-00449-LJL), United States District Court for the Southern District of New York, September 29, 2025.

Deposition of Margaret Colleen Hoover, *Blake Lively vs. Wayfarer Studios LLC et al., Jennifer Abel vs. Jonesworks, LLC, Wayfarer Studios et al. vs. Blake Lively et al.,* Case No. 24-CV-10049-LJL, United States District Court for the Southern District of New York, September 29, 2025.

Opinion and Order, *Blake Lively v. Wayfarer Studios LLC*, *Justin Baldoni*, *Jamey Heath*, *Steve Sarowitz*, *It Ends With Us Movie LLC*, *Melissa Nathan*, *The Agency Group PR LLC*, *Jennifer Abel*, *Jed Wallace*, and *Street Relations Inc.*, Case Nos. 1:24-CV-10049-LJL (Lead Case) and 1:25-cv-00449-LJL (Member Case), United States District Court for the Southern District of New York, June 9, 2025.

**Bates Stamped Documents**

ABEL_000006072–078 (Seeding by TAG Employees).

CONFIDENTIAL - Attorneys' Eyes Only

BBKOSLOW-000008194–199 (TAG Team Short Message Report August 2024).

BL-000026874–876 (Email Regarding 'It Ends With Us' Talking Points).

BL-000028664–725 (Betty B Company Overview June 2024).

BL-000033111–141 (Betty B Q3 2024 Update).

BL-000033148–168 (Betty B Presentation November 2024).

BL-000034272–292 (Blake Brown Update September 2024).

BL-000034433–436 (Blake Brown Update July 2025).

BL-000037129–151 (Betty B Presentation April 2025).

BL-000037661–748 (Betty B Brand Overview November 2023).

BL-000037866–919 (Betty B Board Meeting).

BL-000037923–958 (Betty B Update March 2024).

BL-000037970–8164 (Betty B Presentation October 2024).

BL-000038170–269 (Betty B Update May 2025).

BL-000038270–339 (Betty B Company Overview October 2024).

BL-000038795–833 (Betty Booze Research Results March 2025).

BL-000038835–858 (Blake Brown Media Impact Overview November 2024).

HEATH_000028187 (Email from Jennifer Abel August 7, 2024).

JONESWORKS_00013647–649 (Baldoni and TAG Team Short Message Report August 2024).

KCASE-000001093–097 (Case and Butler Short Message Report August 2024).

KCASE-000001540–544 (Baldoni Team and TAG Team Short Message Report August 2024).

KCASE-000002821–826 (Butler and Case Short Message Report August 2024).

KCASE-000004208–211 (Scenario Planning – It Ends With Us).

KCASE-000004802–805 (Case and Nathan Short Message Report August 2024).

CONFIDENTIAL - Attorneys' Eyes Only

LIVMR_CP053_000000003 (Blake Brown Social Media Data).

LIVMR_CP053_000000006 (Blake Brown Product Review Data).

LIVMR_CP054_000000003 (Blake Brown Instagram Comments Data).

LIVMR_CP054_000000004 (Blake Brown Instagram Comments Analysis).

NATHAN_000003433 (Email from Katie Case August 2024).

SPE_BL0021860–871 (MarketCast Email Correspondence July-August 2024).

SPE_BL0002262–300 (Trailer Test #3 Report March 2024).

SPE_BL0003359–406 (Trailer Test #1 Report February 2024).

STREET 1.000008 (Street Relations Invoice to Wayfarer Studios for Digital Consulting Strategy and Services for TAG.Wayfarer.JB August 8, 2024).

## Academic Literature

Aral, Sinan, and Dylan Walker, "Identifying Influential and Susceptible Members of Social Networks," *Science*, Vol. 337 (6092), June 2012, pp. 337-341.

Aral, Sinan, Lev Muchnik, and Arun Sundararajan, "Engineering Social Contagions: Optimal Network Seeding in the Presence of Homophily," *Network Science*, Vol. 1 (2), February 2013, pp. 125-153.

Bail, Christopher A. et al., "Assessing the Russian Internet Research Agency's Impact on the Political Attitudes and Behaviors of American Twitter Users in Late 2017," *Proceedings of the National Academy of Sciences*, Vol. 117 (1) January 2020, pp. 243-250.

Bambauer-Sachse, Silke, and Sabrina Mangold, "Brand Equity Dilution Through Negative Online Word-of-Mouth Communication," *Journal of Retailing and Consumer Services*, Vol. 18 (1), January 2011, pp. 38-45.

Banerjee, Abhijit et al., "The Diffusion of Microfinance," *Science*, Vol. 341 (6144), July 2013, pp. 1236498-1 - 1236498-7.

Banerjee, Abhijit et al., "Using Gossips to Spread Information: Theory and Evidence from Two Randomized Controlled Trials," *Review of Economic Studies*, Vol. 86 (6), February 2019, pp. 2453-2490.

Beaman, Lori et al., "Can Network Theory-Based Targeting Increase Technology Adoption?" *American Economic Review*, Vol. 111 (6), June 2021, pp. 1918-1943.

CONFIDENTIAL - Attorneys' Eyes Only

Bikhchandani, Sushil, David Hirshleifer, and Ivo Welch, "A Theory of Fads, Fashion, Custom, and Cultural Change as Informational Cascades," *Journal of Political Economy*, Vol. 100 (5), October 1992, pp. 992-1026.

Blei, David M., Andrew Y. Ng, and Michael I. Jordan, "Latent Dirichlet Allocation," *Journal of Machine Learning Research*, Vol. 3, March 2003, pp. 993-1022.

Chan, Jovy, "Online Astroturfing: A Problem Beyond Disinformation," *Philosophy and Social Criticism*, Vol. 50 (3), June 2022, pp. 507-528.

Chevalier, Judith A., and Dina Mayzlin, "The Effect of Word of Mouth on Sales: Online Book Reviews," *Journal of Marketing Research*, Vol. 43 (3), August 2006, pp. 345-354.

Chintagunta, Pradeep K., Shyam Gopinath, and Sriram Venkataraman, "The Effects of Online User Reviews on Movie Box Office Performance: Accounting for Sequential Rollout and Aggregation Across Local Markets," *Marketing Science*, Vol. 29 (5), September-October 2010, pp. 944-957.

Chung, Kevin YC, Timothy P. Derdenger, and Kannan Srinivasan, "Economic Value of Celebrity Endorsements: Tiger Woods' Impact on Sales of Nike Golf Balls," *Marketing Science*, Vol. 32 (2), March 2013, pp. 271-293.

Dolega, Les, Francisco Rowe, and Emma Branagan, "Going Digital? The Impact of Social Media Marketing on Retail Website Traffic, Orders and Sales," *Journal of Retailing and Consumer Services*, Vol. 60, May 2021.

Dost, Florian et al., "Seeding as Part of the Marketing Mix: Word-of-Mouth Program Interactions for Fast-Moving Consumer Goods," *Journal of Marketing*, Vol. 83 (2), March 2019, pp. 62–81.

Dubé, Jean-Pierre H., and Peter E. Rossi, *Handbook of the Economics of Marketing*, Vol. 1, Elsevier, 2019.

Eng, Bennie, and Cheryl Burke Jarvis, "Consumers and Their Celebrity Brands: How Personal Narratives Set the Stage for Attachment," *Journal of Product & Brand Management*, 2020, pp. 1-17.Ferrara, Emilio et al., "The Rise of Social Bots," *Communications of the ACM*, Vol. 59 (7), July 2016, pp. 96-104.

Feuerriegel, Stefan et al., "Using Natural Language Processing to Analyse Text Data in Behavioural Science," *Nature Reviews Psychology*, Vol. 4, January 2025, pp. 96-111.

Fournier, Susan, and Giana M. Eckhardt, "Putting the Person Back in Person-Brands: Understanding and Managing the Two-Bodied Brand," *American Marketing Association*, Vol. 56 (4), May 2019, pp. 602-619.

CONFIDENTIAL - Attorneys' Eyes Only

Gandhi, Ashvin, Brett Hollenbeck, and Zhijian Li, "Misinformation and Mistrust: The Equilibrium Effects of Fake Reviews on Amazon. Com," *National Bureau of Economic Research*, Working Paper No. 34161, August 2025.

Godes, David, and Dina Mayzlin, "Firm-Created Word-of-Mouth Communication: Evidence From a Field Test," *Marketing Science*, Vol. 28 (4), July-August 2009, pp. 721-739.

Hinz, Oliver et al., "Seeding Strategies for Viral Marketing: An Empirical Comparison," *Journal of Marketing*, Vol. 75 (6), November 2011, pp. 55–71.

Hock, Stefan J., and Sascha Raithel, "Managing Negative Celebrity Endorser Publicity: How Announcements of Firm (Non)Responses Affect Stock Returns," *Management Science*, Vol. 66 (3), March 2019, pp. 1-23.

Keller, Kevin Lane, and Vanitha Swaminathan, *Strategic Brand Management*, 5th ed., Pearson, 2020.

Knittel, Christopher R., and Victor Stango, "Celebrity Endorsements, Firm Value, and Reputation Risk: Evidence from the Tiger Woods Scandal," *Management Science*, Vol. 60 (1), January 2014, pp. 21-37.

Kotler, Philip, and Kevin Lane Keller, *Marketing Management*, 15th ed., Pearson, 2016.

Luca, Michael, and Georgios Zervas, "Fake It Till You Make It: Reputation, Competition, and Yelp Review Fraud," *Management Science*, January 2016, pp. 1-16.

Mayzlin, Dina, "Promotional Chat on the Internet," *Marketing Science*, Vol. 25 (2), March-April 2006, pp. 155-163.

Mayzlin, Dina, Yaniv Dover, and Judith Chevalier, "Promotional Reviews: An Empirical Investigation of Online Review Manipulation," *The American Economic Review*, Vol. 104 (8), August 2014, pp. 2421-2455.

Mehta, Swapneel et al., "Estimating the Impact of Coordinated Inauthentic Behavior on Content Recommendations in Social Networks," *ICML 2022 Workshop AI for Agent-Based Modelling (AI4ABM)*, 2022.

Meng, Fanhui et al., "Spreading Dynamics of Information on Online Social Networks," *Proceedings of the National Academy of Sciences (PNAC)*, Vol. 122 (4), January 2025.

Metzler, Hannah, and David Garcia, "Social Drivers and Algorithmic Mechanisms on Digital Media," *Perspectives on Psychological Science*, Vol. 19 (5), July 2023, pp. 735-748.

Micallef, Nicholas et al., "Cross-Platform Multimodal Misinformation: Taxonomy, Characteristics and Detection for Textual Posts and Videos," *Association for the Advancement of Artificial Intelligence*, Vol. 16 (1), May 2022, pp. 651-662.

CONFIDENTIAL - Attorneys' Eyes Only

Murdock, Isabel, Kathleen M. Carley, and Osman Yagan, "An Agent-Based Model of Cross-Platform Information Diffusion and Moderation," *Social Network Analysis and Mining*, Vol. 14 (145), July 2024, pp. 1-23.

Niederhoffer, Kate, et al., "The Origin and Impact of CPG New-Product Buzz: Emerging Trends and Implications." *Journal of Advertising Research,* December 2007, Vol. 47 (4), pp. 420-426.

Pan, Meizhi et al., "Influencer Marketing Effectiveness: A Meta-Analytic Review," *Journal of the Academy of Marketing Science*, Vol. 53 (1), October 2024, pp. 52-78.

Pei, Amy, and Dina Mayzlin, "Influencing Social Media Influencers Through Affiliation," *Marketing Science*, Vol. 41 (3), December 2021, pp. 593-615.

Puranam, Dinesh, Vishal Narayan, and Vrinda Kadiyali, "The Effect of Calorie Posting Regulation on Consumer Opinion: A Flexible Latent Dirichlet Allocation Model with Informative Priors," *Marketing Science*, Vol. 36 (5), August 2017, pp. 726-746.

Shao, Chengcheng et al., "The Spread of Low-Credibility Content by Social Bots," *Nature Communications*, Vol. 9, November 2018, pp. 1-9.

Shimp, Terence A., and J. Craig Andrews, *Advertising, Promotion, and Other Aspects of Integrated Marketing Communications*, 9th ed., South-Western Cengage Learning, 2013.

Tardelli, Serena et al., "Multifaceted Online Coordinated Behavior in the 2020 US Presidential Election," *EPJ Data Science*, Vol. 13 (33), April 2024.

Timoshenko, Artem, Chengfeng Mao, and John R. Hauser, "Can Large Language Models Extract Customer Needs as well as Professional Analysts?" *Social Science Research Network*, January 2025, pp. 1-30.

Tirunillai, Seshadri, and Gerard J. Tellis, "Mining Marketing Meaning from Online Chatter: Strategic Brand Analysis of Big Data Using Latent Dirichlet Allocation," *Journal of Marketing Research*, Vol. 51 (4), August 2014, pp. 463-479.

Trinh, Giang, Jenni Romaniuk, and Arry Tanusondjaja, "Benchmarking Buyer Behavior Towards New Brands," *Marketing Letters*, Vol. 27, December 2016, pp. 743-752.

Wan, Yan et al., "Retailer Response to Negative Online Consumer Reviews: How Can Damaged Trust be Effectively Repaired?" *Information Technology and Management*, Vol. 24 (1), June 2022, pp. 37-53.

Yao, Xinlin et al., "Dynamic Sales Impacts of Online Physical Product Sampling," *Information and Management*, Vol. 54 (5), July 2017, pp. 599-612.

CONFIDENTIAL - Attorneys' Eyes Only

Yin, Fulian et al., "Sentiment Mutation and Negative Emotion Contagion Dynamics in Social Media: A Case Study on the Chinese Sina Microblog," *Information Sciences*, Vol. 594, February 18, 2022, pp. 118-135.

Zannettou, Savvas et al., "The Web Centipede: Understanding How Web Communities Influence Each Other Through the Lens of Mainstream and Alternative News Sources," *Association for Computing Machinery*, IMC' 17, November 2017, pp. 405-417.

Zhu, Feng, and Xiaoquan (Michael) Zhang, "Impact of Online Consumer Reviews on Sales: The Moderating Role of Product and Consumer Characteristics," *Journal of Marketing*, Vol. 74, March 2010, pp. 133-148.


**Public Documents**

"About Wayfarer," *Wayfarer*, available at https://www.wayfarerstudios.com/#about, accessed on October 10, 2025.

Assardo, Luis, "Investigating Digital Threats: Trolling Campaigns," *Global Investigative Journalism Network*, May 24, 2023, available at https://gijn.org/resource/investigating-digital-threats-trolling-campaigns/, accessed on September 12, 2025.

Bailey, Alyssa, "Lady Gaga Says She Is 'One of Many' Who Will Fight for the LGBTQ+ Community During Trump Years," *Elle*, January 28, 2025, available at https://www.elle.com/culture/career-politics/a63592257/lady-gaga-fight-for-lgbtq-community-trump-quote/, accessed on September 22, 2025.

Belton, Catherine, and Joseph Menn, "Russian Trolls Target U.S. Support for Ukraine, Kremlin Documents Show," *The Washington Post*, April 8, 2024, available at https://www.washingtonpost.com/world/2024/04/08/russia-propaganda-us-ukraine/, accessed on October 1, 2025.

"Beyoncé's Whisky, Kylie Jenner's Canned Vodka Soda, Plus More Stars in the Alcohol Business," *People*, August 30, 2024, available at https://people.com/celebrities-who-have-their-own-liquor-and-beer-lines-8698416, accessed on October 9, 2025.

Bienkov, Adam, "Astroturfing: What is It and Why Does It Matter?" *The Guardian*, February 8, 2012, available at https://www.theguardian.com/commentisfree/2012/feb/08/what-is-astroturfing, accessed on September 10, 2025.

Bing, Christopher, "Fake Kamala Hit-and-Run Story Is the Work of Russian Propaganda Group, Microsoft Says," *Reuters*, September 17, 2024, available at www.reuters.com/world/us/fake-kamala-hit-and-run-story-is-work-russian-propaganda-group-microsoft-says-2024-09-17/, accessed on September 30, 2025.

CONFIDENTIAL - Attorneys' Eyes Only

"Blake Lively Announces the Launch of Betty Buzz," *PR Newswire*, September 23, 2021, available at https://www.prnewswire.com/news-releases/blake-lively-announces-the-launch-of-betty-buzz-301384046.html, accessed on October 7, 2025.

"Blake Lively, Founder of Betty Buzz," *Betty Buzz*, available at https://bettybuzz.com/pages/learn, accessed on September 10, 2025.

"Blake Lively's Betty Booze Launches New Vodka Iced Teas," *Ready-to-Drink Magazine*, June 4, 2025, available at https://rtdmagazine.com/blogs/rtd-cocktail-news/betty-booze-vodka-iced-tea, accessed on September 10, 2025.

blakelively, "Better 3 Weeks Late than Never?," *Instagram*, July 10, 2024, available at https://www.instagram.com/p/C9QrZBlJhD6/?img_index=1, accessed on October 10, 2025.

Blakely, Rhys, "Kremlin Spreads Lies About MMR Jab," *The Times*, August 24, 2018, available at https://www.thetimes.com/business-money/technology/article/kremlin-spreads-lies-about-mmr-jab-32t3tfcq9, accessed on October 16, 2025.

Boshoff, Alison, "How Blake Lively's Fairytale Turned Into a PR Nightmare: Amid a Growing Backlash, ALISON BOSHOFF Reveals Where it All Went Wrong for Hollywood's Golden Girl," *Daily Mail,* August 20, 2024, available at https://www.dailymail.co.uk/femail/article-13761985/How-Blake-Livelys-fairytale-turned-PR-nightmare-Amid-growing-backlash-ALISON-BOSHOFF-reveals-went-wrong-Hollywoods-golden-girl.html, accessed on September 30, 2025.

Dennis, Rachel, "Kylie Jenner's Canned Vodka Sodas Just Hit the Shelves — and We Tried All 4 Flavors," *CNN*, March 21, 2024, available at https://www.cnn.com/cnn-underscored/health-fitness/kylie-jenner-sprinter-launch, accessed on September 4, 2025.

Edwards, Kamylle, "How Rihanna is an Example of Women's Empowerment," *Revolt*, March 6, 2018, available at https://www.revolt.tv/article/2018-03-06/97869/how-rihanna-is-an-example-of-womens-empowerment, accessed on September 24, 2025.

"Explore Gin's Next Episode," *Gin & Juice*, available at https://dreandsnoop.com/pages/about, accessed on October 16, 2025.

Feldman, Lucy, "How Selena Gomez Is Revolutionizing the Celebrity Beauty Business," *Time*, May 29, 2024, available at https://time.com/6979619/rare-beauty/, accessed on September 2, 2025.

"Foundry Models Sold Directly by Azure," available at https://learn.microsoft.com/en-us/azure/ai-foundry/foundry-models/concepts/models-sold-directly-by-azure?pivots=azure-openai&tabs=global-standard-aoai%2Cstandard-chat-completions%2Cglobal-standard#gpt-4o-and-gpt-4-turbo, accessed on August 10, 2025.

"From My Shower to Yours." *Blake Brown Beauty*, available at
https://www.blakebrownbeauty.com/pages/about, accessed on September 10, 2025.

Gissen, Lillian, "How Blake Lively COPIED Best Friend Taylor Swift to Promote It Ends With
Us…Before Turning to Singer to Help Crisis Manage Backlash and Justin Baldoni
Drama," *Daily Mail*, August 17, 2024, available at
https://www.dailymail.co.uk/tvshowbiz/article-13750525/blake-lively-taylor-swift-
copied-friendship-justin-baldoni-drama.html, accessed on October 7, 2025.

"Homepage," *Kylie* Cosmetics, available at https://kyliecosmetics.com/, accessed on October 17,
2025.

"Homepage," *JLO Beauty*, available at https://jlobeauty.com, accessed on October 16, 2025.

Israeli, Ayelet et al., "What Makes A Successful Celebrity Brand," *Harvard Business Review*,
May-June 2024, available at https://hbr.org/2024/05/what-makes-a-successful-celebrity-
brand, accessed on September 10, 2025.

Itendswithusmovie, and sonypictures, "Thank You #BookBonanza2024 for Letting us Share
#ItEndsWithUsMovie with You," *Instagram*, June 16, 2024, available at
https://www.instagram.com/p/C8TdnV0uQQd/?img_index=1, accessed on October 9,
2025.

Japhe, Brad, "Jennifer Lopez Wants You To Know Why She Created Delola, And How She
Enjoys Drinking It," *Forbes*, August 4, 2023, available at
https://www.forbes.com/sites/bradjaphe/2023/08/04/jennifer-lopez-wants-you-to-know-
why-she-created-delola-and-how-she-enjoys-drinking-it/, accessed on September 10,
2025.

Johnson, Ilah, "Understanding the What, Why, and How for Sock Puppet Accounts," *Medium*,
September 11, 2024, available at https://medium.com/@ilahj/understanding-the-what-
why-and-how-for-sock-puppet-accounts-081b47245846, accessed on September 12,
2025.

Lavinthal, Andrea, "Blake Lively's Hair Is No Longer Full of Secrets: All About Her Debut
Haircare Line, Blake Brown!" *People*, July 31, 2024, available at
https://people.com/blake-lively-launches-haircare-line-blake-brown-details-8686090,
accessed on September 2, 2025.

Leiva, Laura, "Brand Hijacking is Real (And It Starts in The Comments)," *Viral Nation*, July 31,
2025, available at https://www.viralnation.com/resources/blog/brand-hijacking-is-real-
and-it-starts-in-the-comments, accessed on September 10, 2025.

Lupupa, Jill, "Blake Lively Says She Created New Betty Booze Line Because She's 'Tired' from
Raising 4 Kids," *People*, June 30, 2023, available at https://people.com/blake-lively-

CONFIDENTIAL - Attorneys' Eyes Only

launches-new-betty-booze-hard-seltzers-tired-raising-four-kids-7555270, accessed on October 7, 2025.

MacFarquhar, Neil, "Inside the Russian Troll Factory: Zombies and a Breakneck Pace," *The New York Times*, February 18, 2018, available at www.nytimes.com/2018/02/18/world/europe/russia-troll-factory.html, accessed on October 1, 2025.

"Meet the World of Fenty Beauty Brands," *Fenty Beauty*, available at https://fentybeauty.com/pages/about-the-brands, accessed on September 24, 2025.

"Pulsar TRAC," *Pulsar Platform*, available at https://www.pulsarplatform.com/solutions/pulsar-trac, accessed on September 10, 2025.

Rachal, Maria, "At-Home Consumption, Ready-to-Drink Momentum Driving Canned Beverage Trends," *Packaging Dive*, September 13, 2023, available at https://www.packagingdive.com/news/canned-beverage-consumer-trends-rtd-crown-holdings/693436/, accessed on September 10, 2025.

Robertson, Katie, "Judge Dismisses Justin Baldoni's Suits Against Blake Lively and The New York Times," *The New York Times*, June 9, 2025, available at https://www.nytimes.com/2025/06/09/business/media/justin-baldoni-blake-lively-lawsuit-dismissed.html, accessed on September 17, 2025.

Roeloffs, Mary Whitfill, "All of Justin Baldoni's Allegations Against Blake Lively Explained—As He Releases 'It Ends With Us' Outtakes," *Forbes*, January 22, 2025, available at https://web.archive.org/web/20250124040408/https://www.forbes.com/sites/maryroeloffs/2025/01/22/all-of-justin-baldonis-allegations-against-blake-lively-explained-as-he-releases-it-ends-with-us-outtakes/, accessed on September 2, 2025.

Roeloffs, Mary Whitfill, "Baldoni Vs. Lively Feud: Judge Dismisses Lively's Case Against Baldoni's Social Media Guru," *Forbes*, July 16, 2025, available at https://www.forbes.com/sites/maryroeloffs/2025/07/16/baldoni-vs-lively-feud-judge-dismisses-livelys-case-against-baldonis-social-media-guru/, accessed on September 12, 2025.

Roescher, Franziska et al., "What's the Strategy of Russia's Internet Trolls? We Analyzed Their Tweets to Find Out," *The Washington Post*, November 19, 2018, available at https://www.washingtonpost.com/news/monkey-cage/wp/2018/11/19/whats-the-strategy-of-russias-internet-trolls-we-analyzed-their-tweets-to-find-out/, accessed on October 1, 2025.

Rogers, Sam, "Haus Laboratories: All the Facts About Lady Gaga's New Beauty Brand," *Vogue India*, July 10, 2019, available at https://www.vogue.in/beauty/content/haus-laboratories-lady-gaga-new-beauty-makeup-brand-all-details, accessed on September 24, 2025.

CONFIDENTIAL - Attorneys' Eyes Only

Setoodeh, Ramin, "Blake Lively Rips Cannes for Controversial Woody Allen Rape Joke," *Variety*, May 12, 2016, available at https://variety.com/2016/film/news/blake-lively-rips-cannes-for-controversial-woody-allen-rape-joke-1201772516/, accessed on October 15, 2025.

"The Algorithm: Understand It, Leverage It," *Forbes Councils*, November 6, 2024, available at https://councils.forbes.com/blog/understanding-and-leveraging-the-algorithm, accessed on October 16, 2025.

"The Honest Company: How Jessica Alba Built a Clean Lifestyle Brand," *Brand Vision Insights*, October 20, 2024, available at https://www.brandvm.com/post/jessica-alba-built-a-clean-lifestyle-brand, accessed on October 2, 2025.

"TRAC Data Sources," *Pulsar Library*, available at https://intercom.help/pulsar/en/articles/6079475-trac-data-sources, accessed on September 10, 2025.

"TRAC: Full Boolean Operator Guide," *Pulsar Library*, available at https://intercom.help/pulsar/en/articles/6976653-trac-full-boolean-operator-guide, accessed on October 16, 2025.

VanHoose, Benjamin, and Lizz Schumer, "It Ends with Us First Reactions: Blake Lively Movie Brings 'All the Feelings' — 'I Was a Crying Mess,'" *People*, available at https://people.com/it-ends-with-us-first-reactions-blake-lively-movie-brings-all-the-feelings-8665200, accessed on October 9, 2025.

"Welcome to the Delola Life," *Delola*, available at https://delolalife.com/, accessed on September 25, 2025.

"What is a Bot?" *AWS*, available at https://aws.amazon.com/what-is/bot/, accessed on September 11, 2025.

**Data**

Online conversations pulled from Pulsar, retrieved on September 8, 2025.

**Discussions with Management**

Discussion with management of Blake Brown Beauty on September 8, 2025.

Discussions with management of Betty B Holdings LLC on September 3, 2025.

**APPENDIX C**

**BLIND CODING INSTRUCTIONS**

CONFIDENTIAL – Attorneys' Eyes Only

I.      **BLIND CODING INSTRUCTIONS FOR VALIDATION OF LLM RESULTS: SENTIMENT CLASSIFICATION OF ONLINE CONVERSATIONS**

Thank you for agreeing to participate in the independent coding of online conversations. This document will provide an overview of this task and instructions on how to code online conversations.

**Overview**

- You are being asked to be one of two coders who will classify online conversations related to a celebrity (Blake Lively).

- You will be provided with one dataset for coding.

**Coding Instructions (online conversations)**

- The dataset comprises of 300 online conversations, with one conversation per row.

- First, you must classify each of the rows under one of the following sentiment categories: "Positive," "Negative," "Neutral," or "Mixed." Only one category can be provided to a specific row.

  o To apply a sentiment code, select one of the pre-built codes from the dropdown menu: "Positive," "Negative," "Neutral," or "Mixed." Be sure to apply only one code per row, based on the overall sentiment expressed.

- You will see specific text associated with each of the rows that are related to Blake Lively, her husband Ryan Reynolds, or her brands/products. Focus exclusively on Blake Lively and Ryan Reynolds:

  o If both individuals are mentioned together, evaluate them jointly as a pair.

  o If they are mentioned with different sentiments, assign a single sentiment category that best reflects the overall tone of the text.

  o If neither is mentioned, or if no clear sentiment is expressed, classify the text as "Neutral."

  o If the text contains both "Positive" and "Negative" sentiments, classify it as "Mixed."

  o Do not infer beyond the text. Only categorize what is explicitly stated or clearly implied within the content of the entry (i.e., do not infer).

- Second, you must assign applicable emotions to each row. You should add these emotions under the "Emotions Expressed" column and fill it with all the emotions applicable to that row, separating each emotion with a comma. For example, "angry, sad,

CONFIDENTIAL – Attorneys' Eyes Only

surprised." Rows that do not express any clear emotion may be left blank. Use only one word to describe an emotion.

- **Do not collaborate** with the other coder assigned to the same data in making your initial judgement. If in doubt, use your best judgement to proceed and make a note of your selected approach. The note can be shared with the team after your review is complete.

- **Take your time**. Please read the full text in each row and review at least twice before categorizing.

- **Manual review only**. The use of any large language model (LLM), AI, or any other programmatic/automated methods is strictly prohibited. All classifications should reflect your own independent judgement.

- **Handle misspellings thoughtfully**. Some text may contain typos, spelling or grammatical errors. Use your best judgment to interpret the intended meaning and assign sentiment accordingly.

**Adjudication process**

- After you and the other coder have independently completed their classifications independently, you will join a tie-break meeting with the other coder to resolve all the rows where the classifications **disagreed**. You can bring your notes from your review and discuss your assumptions and approach when making your classification. A member from the case team will attend this meeting to observe the tiebreaking process.

## II.    BLIND CODING INSTRUCTIONS FOR VALIDATION OF LLM RESULTS: THEMATIC ANALYSIS OF ONLINE CONVERSATIONS

Thank you for agreeing to participate in the independent coding of online conversations. This document will provide an overview of this task and instructions on how to code online conversations.

**Overview**

- You are being asked to review online conversations. We are asking you to indicate whether you agree with a set of assertions.

- You will be provided with a set of **four** assertions concerning Blake Lively and Ryan Reynolds. For each online conversation, please indicate separately whether you believe the conversation is in agreement with each of the four assertions.

CONFIDENTIAL – Attorneys' Eyes Only

**Review Instructions**

- The dataset comprises of 300 online conversations, with one conversation per row.

- For every online conversation you are assigned, compare it to each of the four provided assertions. Indicate for each assertion whether the online conversation expresses agreement with, support for, or otherwise aligns in its narrative with the assertion. (i.e., answer the following: does the online conversation support this assertion? Yes/No). Note that a given online conversation could potentially agree with more than one assertion.

  o Answer with a "Yes." or "No." You will be provided with a template.

- Here are the four assertions:

  (1) "Production members lost their jobs due to Blake Lively's takeover and insisted upon involvement—including loss of budget due to rescheduling shoot days when she refused to show up."

  - Agreement can be explicit or implicit.

  - Mark "No" for unrelated online conversations.

  - Mark "Yes" if the online conversation explicitly or implicitly agrees with the assertion, including references to crew being fired, losing work, leaving the production, financial strain, wasted resources, or scheduling disruptions connected to Blake Lively's described actions. Indirect mentions of any form of job loss should also be counted.

  - Mark "No" for any posts that do not connect in any way to Blake Lively's involvement.

  (2) "When Blake Lively wasn't able to get her way on set or behind the scenes, she involved her husband to create an imbalance of power between her and Justin Baldoni. Ryan Reynolds went so far as to use his power to call agents and agencies, Sony, and other key players so that she would get her way."

  - Agreement can be explicit or implicit.

  - Mark "No" for unrelated online conversations.

  - Mark "Yes" if the online conversation explicitly or implicitly agrees with the assertion, including references that suggest Blake Lively relied on outside influence, personal relationships, or any other leverage to secure her way in production matters. Implicit references to favoritism, privilege, or pressure in her favor should also be included. Count both explicit and implicit power-related signals tied to her or her allies.

C-3

CONFIDENTIAL – Attorneys' Eyes Only

- Mark "No" for any posts that do not connect in any way to Blake Lively or Ryan Reynolds.

(3) "Blake Lively's less than favorable reputation in the industry spans decades and has been reported t—there were issues on Gossip Girl, the Town, A Simple Favor, and more."

- Agreement can be explicit or implicit.

- Mark "No" for unrelated online conversations.

- Mark "Yes" if the online conversation explicitly or implicitly references her unfavorable reputation in the film/TV industry, including but not limited to prior conflicts, professional issues, or reports of difficult behavior. Posts about seemingly isolated incidents should be included. Count both general commentary on her professional standing or reputation in Hollywood, and specific incidents within her past works.

- Mark "No" for any unrelated personal attacks or vague negativity unrelated to her career.

(4) "There is a clear, likely motive due to the movie It Ends With Us's value and fanbase, in which Blake Lively is attempting to bully her way into buying the rights for It Starts With Us."

- Agreement can be explicit or implicit.

- Mark "No" for unrelated online conversations.

- Mark "Yes" if the online conversation explicitly or implicitly refers to Blake Lively exerting pressure, aggressive involvement, manipulating, or maneuvering to control the film It Starts With Us or to acquire its rights.

- Mark "No" for any posts unrelated to the film.

- Your response should be a binary "Yes" or "No" for each assertion to indicate agreement or disagreement respectively.

- In summary, your output should list all your assigned online conversations as a row, with four new columns indicating whether the conversation agrees with each corresponding assertion (Yes/No), and four additional columns with your one sentence reason answers.

- **Take your time**. Please read the full text in each row and review at least twice before categorizing.

- **Use your best judgement**. Do not consult with others or conduct any further online research.

CONFIDENTIAL – Attorneys' Eyes Only

- **Manual review only**. The use of any large language model (LLM), AI, or any other programmatic/automated methods is strictly prohibited. All classifications should reflect your own independent judgement.

- **Handle misspellings thoughtfully**. Some text may contain typos, spelling or grammatical errors. Use your best judgment to interpret the intended meaning and assign agreement to statements accordingly.

**Adjudication process**

- After you and the other coder have independently completed this task independently, you will join a tie-break meeting with the other coder to resolve all the rows where the agreement classifications **do not match** (e.g., Coder 1 marked as Yes, Coder 2 marked as No). You can bring your notes from your review and discuss your assumptions and approach when making your classification. A member from the case team will attend this meeting to observe the tiebreaking process.

**APPENDIX D**

**LARGE LANGUAGE MODEL PROMPTING METHODOLOGY**

CONFIDENTIAL – Attorneys' Eyes Only

In **Section V.C** of my report, I conducted two analyses using a Large Language Model (LLM): (1) Sentiment Analysis of Online Conversations and (2) Thematic Analysis of Online Conversations. These analyses were conducted by submitting the online conversations retrieved via Pulsar TRAC alongside tailored prompts, which are instructions given to the LLM. Specifically, I used GPT-4o (version 2024-11-20), which is available through Microsoft Azure.[1] The following LLM configuration settings were used: (1) Temperature: 0.0, (2) OpenAI API Version: 2025-01-01-preview, (3) System message: "Answer the question solely based on the post." The model can be accessed by any user with a valid Azure subscription and is priced on a per-request basis. While the settings above, particularly the Temperature setting, should minimize the possibility of random variations in the LLM's responses, some randomness is still possible. I expect these to have a minimal impact on the final results. My sampling and manual validation procedures in **Section V.C** of the report further supports the correctness of the conclusions drawn from LLM-driven methods.

A request to the LLM involved submitting an online conversation along with a corresponding prompt, which specified the task to be performed. I used different prompts depending on the objective of each analysis.

In addition to the prompt, the LLM was given specific formatting instructions to ensure consistency in output. For example, the model was required to begin its responses with a clear "Yes" or "No" to facilitate standardized interpretation of results (see below for more details on formatting instructions).

In the sections below, I provide the exact prompts used in the analyses presented in **Section V.C** of my report. The data and code for these analyses can be found in my production backup. Each prompt includes the text of the online conversation under consideration, represented by the placeholder "<<Text of the Online Conversation>>." The text of an online conversation is specified in the *content* column as retrieved from Pulsar TRAC.

- If the online conversation was not a reply to another conversation (i.e., *post type* column is *post*), both the *title* column followed by the *content* column were combined and inserted into the placeholder (separated by a comma).

- If the online conversation was a reply (i.e., *post type* column is *engagement*), only the text of the *content* column was inserted into the placeholder.

For example, firstly, consider the following original post on Reddit (the value of the *post type* column is *post*), from August 14, 2024:

Title: "*Justin Baldoni addresses 'friction' on set of It Ends With Us amid feud rumors with Blake Lively:*"

---

[1] The LLM used is called GPT-4o, developed by OpenAI. I connected to this LLM via an Application Programming Interface ("API") hosted on Microsoft Azure, which enables querying the LLM. *See*, "Foundry Models sold directly by Azure," available at https://learn.microsoft.com/en-us/azure/ai-foundry/foundry-models/concepts/models-sold-directly-by-azure?pivots=azure-openai&tabs=global-standard-aoai%2Cstandard-chat-completions%2Cglobal-standard#gpt-4o-and-gpt-4-turbo, accessed on August 10, 2025.

CONFIDENTIAL – Attorneys' Eyes Only

Content: "*Have you ever been on a film set where tensions were high? It's not uncommon for creative minds to clash, and the alleged friction between Justin Baldoni and Blake Lively during the filming of "It Ends With Us" is quite intriguing. Both seem to be vying for control over future projects, with Lively expressing her desire to direct and Baldoni seemingly stepping aside.*"

Consequently, the value of the <<Text of the Online Conversation>> placeholder for this online conversation will be:

> "Title: Justin Baldoni addresses 'friction' on set of It Ends With Us amid feud rumors with Blake Lively, Content*:* Have you ever been on a film set where tensions were high? It's not uncommon for creative minds to clash, and the alleged friction between Justin Baldoni and Blake Lively during the filming of "It Ends With Us" is quite intriguing. Both seem to be vying for control over future projects, with Lively expressing her desire to direct and Baldoni seemingly stepping aside.*"*

Secondly, consider the following post on X, also from August 14, 2024, which has the *post type* column as *engagement*:

Title: *N/A*

Content: "*RT @PopCrave: Blake Lively announces new haircare line, Blake Brown Beauty. https://t.co/KiMR3n9Wxv*"

Consequently, the value of the <<Text of the Online Conversation>> placeholder for this online conversation will be:

> "RT @PopCrave: Blake Lively announces new haircare line, Blake Brown Beauty. https://t.co/KiMR3n9Wxv*"*

## I.    FOR SECTION V.C.1.A – UNSUPERVISED METHOD:

This analysis comprised of two steps that use two different prompts to the LLM. As a first step, I prompted the model to classify sentiments for a randomly selected sample of 3,000 online conversations. The full prompt used for this task—including formatting guidelines—was as follows:

> "Please read the text carefully and then answer the question that follows, based on the text provided.
>
> Text: <<Text of the Online Conversation>>
>
> Question: From the provided text, identify the dominant moods expressed toward Blake Lively and/or Ryan Reynolds.
>
> Rules:
>
> o    Focus exclusively on Blake Lively and Ryan Reynolds.

CONFIDENTIAL – Attorneys' Eyes Only

- o  If both are mentioned together, evaluate them jointly as a pair.

- o  If they are mentioned separately with different moods, return all dominant moods.

- o  If neither is referenced, or if no clear mood is expressed, return ["neutral"].

- o  If multiple dominant moods are plausible, include them all.

Format: Always return a JSON-style list in square brackets, e.g., [mood1], [mood1, mood2], [mood1, mood2, mood3].

Additional Info: Focus exclusively on Blake Lively and Ryan Reynolds. Do not infer beyond the text. Stay literal and context-bound.

Response Criteria: Return all the dominant moods. Default to [neutral] if no mood is expressed."

As a second step, I instructed the LLM to classify the conversations into one of several emotion categories as determined by the previous step. The full prompt used for this task—including formatting guidelines—was as follows:

"Please read the text carefully and then answer the question that follows, based on the text provided.

Text: <<Text of the Online Conversation>>

Question: From the provided text, identify the dominant moods expressed toward Blake Lively and/or Ryan Reynolds.

Rules:

- o  Focus exclusively on Blake Lively and Ryan Reynolds.

- o  If both are mentioned together, evaluate them jointly as a pair.

- o   If they are mentioned separately with different moods, return all dominant moods.

- o  If neither is referenced, or if no clear mood is expressed, return ["neutral"].

- o  If multiple dominant moods are plausible, include them all.

CONFIDENTIAL – Attorneys' Eyes Only

Format: Always return a JSON-style list in square brackets, e.g., [mood1], [mood1, mood2], [mood1, mood2, mood3].

Additional Info: Focus exclusively on Blake Lively and Ryan Reynolds. Do not infer beyond the text. Stay literal and context-bound.

Response Criteria: Allowed moods: admiration, amused, angry, critical, defensive, excited, hate, hostile, mocking, neutral, supportive. Return all the dominant moods. Default to [neutral] if no mood is expressed."

## II.    FOR SECTION V.C.1.B – DIRECT METHOD

For this analysis, I prompted the LLM to classify each conversation into one of four sentiment categories: Positive, Negative, Neutral, or Mixed. The full prompt used for this task—including formatting guidelines—was as follows:

"Please read the text carefully and then answer the question that follows, based on the text provided.

Text: <<Text of the Online Conversation>>

Question: From the provided text, classify the overall sentiment expressed toward Blake Lively and/or Ryan Reynolds.

Rules:

o   Focus exclusively on Blake Lively and Ryan Reynolds.

o   If both are mentioned together, evaluate them jointly as a pair.

o   If they are mentioned separately but with different sentiments, return a single label that best reflects the overall sentiment of the text.

o   If both positive and negative sentiments are strongly present, return Mixed.

o   If neither is mentioned, or if no clear sentiment is expressed, return Neutral.

o   Do not infer beyond the text. Stay literal and context-bound.

CONFIDENTIAL – Attorneys' Eyes Only

Format: Always return a JSON-style list containing exactly one label, e.g. ["Positive"], ["Negative"], ["Neutral"], or ["Mixed"]

Additional Info: Focus exclusively on Blake Lively and Ryan Reynolds. Do not infer beyond the text. Stay literal and context-bound.

Response Criteria: Allowed sentiment: Positive, Negative, Neutral, or Mixed. Return exactly one dominant sentiment. Default to ["Neutral"] if no sentiment is expressed."

## III.    FOR SECTION V.C.3.A – THEMATIC ANALYSIS OF NEGATIVE SENTIMENT – MANIPULATED LIVELY NARRATIVES

For this analysis, I prompted the LLM to evaluate the online conversations for agreement with the four Lively narratives as described in my report.[2] I submitted four independent prompts to the LLM. The four prompts used for this task—including formatting guidelines—were as follows:

### PROMPT 1

"Please read the text carefully and then answer the question that follows, based on the text provided.

Text: <<Text of the Online Conversation>>

Question: Does the post support the following narrative: "Production members lost their jobs due to Blake Lively's takeover and insisted upon involvement - including loss of budget due to rescheduling shoot days when she refused to show up."

Format: Answer with yes/no, followed by a concise single sentence response. Unrelated posts must be no. Agreement can be explicit or implicit.

Additional Info: Include posts that mention or imply crew being fired, losing work, leaving the production, financial strain, wasted resources, or scheduling disruptions connected to her actions. Indirect mentions of any form of job loss also count.

---

[2]  The four Lively narratives are: (1) "[p]roduction members lost their jobs due to [Ms. Lively's] takeover and insisted upon involvement – including loss of budget due to rescheduling shoot days when [Ms. Lively] refused to show up," (2) "[w]hen [Ms. Lively] wasn't able to get her way on set or behind the scenes, she involved her husband to create an imbalance [sic] of power between her and [Mr. Baldoni]. [Mr. Reynolds] went so far as to use his power to call agents and agencies, Sony, and other key players so that [Ms. Lively] would get her way," (3)  "[Ms. Lively]'s less than favorable reputation in the industry spans decades and has been reported – there were issues on Gossip Girl, the Town, A Simple Favor, and more," and (4)  "[t]here is a clear, likely motive due to the film's value and fanbase, in which [Ms. Lively] is attempting to bully her way into buying the rights for It Starts With Us."

D-5

CONFIDENTIAL – Attorneys' Eyes Only

Response Criteria: Count both explicit statements and indirect implications as yes. Exclude posts that do not in any way link to her involvement."

**PROMPT 2**

"Please read the text carefully and then answer the question that follows, based on the text provided.

Text: <<Text of the Online Conversation>>

Question: Does the post support the following narrative: "When Blake Lively wasn't able to get her way on set or behind the scenes, she involved her husband to create an imbalance of power between her and Justin Baldoni. Ryan Reynolds went so far as to use his power to call agents and agencies, Sony, and other key players so that she would get her way."

Format: Answer with yes/no, followed by a concise single sentence response. Unrelated posts must be no. Include posts that are implicitly supportive.

Additional Info: Include posts that suggest she relied on outside influence, personal relationships, or leverage to secure her way in production matters. Implicit references to favoritism, privilege, or pressure in her favor should also be included.

Response Criteria: Count both explicit and implicit power-related signals tied to her or her allies. Exclude only posts with no connection to her."

**PROMPT 3**

"Please read the text carefully and then answer the question that follows, based on the text provided.

Text: <<Text of the Online Conversation>>

Question: Does the post support the following narrative: "Blake Lively's less than favorable reputation in the industry spans decades and has been reported—there were issues on Gossip Girl, the Town, A Simple Favor, and more."

Format: Answer with yes/no, followed by a concise single sentence response. Unrelated posts must be no. Include weak or hearsay examples.

CONFIDENTIAL – Attorneys' Eyes Only

Additional Info: Include posts that directly or indirectly reference her unfavorable reputation in the film/TV industry, such as prior conflicts, professional issues, or reports of difficult behavior. Posts about seemingly isolated incidents should be included.

Response Criteria: Count both general commentary on her professional standing or reputation in Hollywood, and specific incidents within her past works. Exclude unrelated personal attacks or vague negativity unrelated to her career."

**PROMPT 4**

"Please read the text carefully and then answer the question that follows, based on the text provided.

Text: <<Text of the Online Conversation>>

Question: Does the post support the following narrative: "There is a clear, likely motive due to the movie It Ends With Us's value and fanbase, in which Blake Lively is attempting to bully her way into buying the rights for It Starts With Us."

Format: Answer with yes/no, followed by a concise single sentence response.

Additional Info: Include posts that refer to her exerting pressure, aggressive involvement, manipulating, or maneuvering to control the film It Starts With Us or to acquire its rights.

Response Criteria: Count both explicit and implicit commentary suggesting she moved to take over the film. Exclude posts unrelated to the film."

## IV.    FOR SECTION V.C.3.B – THEMATIC ANALYSIS OF NEGATIVE SENTIMENT – SEEDED NEWS ARTICLES

For this analysis, I prompted the LLM to evaluate the online conversations for agreement with the four narratives from the Daily Mail articles.[3] I submitted four independent prompts to the LLM. The four prompts used for this task—including formatting guidelines—were as follows:

---

[3] The four Daily Mail narratives are: (1) "Lively has come under fire for aggressively marketing her persona projects – not just her haircare, but her drinks company – seemingly on the back of a film dealing with domestic violence," (2) "Blake Lively's influence drew the rest of the cast into her orbit and away from Baldoni, whose movie it was," (3) "Blake Lively has been 'relying' on her best friend Taylor Swift to help get her through the recent media 'storm,' and is hoping to 'use their friendship' to distract from the drama while promoting her new flick It Ends With Us," and (4) "Blake is trying to get Taylor to help pull her out of this mess by using their friendship for interviews and other promotional work."

CONFIDENTIAL – Attorneys' Eyes Only

**PROMPT 1**

"Please read the text carefully and then answer the question that follows, based on the text provided.

Text: <<Text of the Online Conversation>>

Question: Does the post support the following narrative: "Blake Lively has come under fire for aggressively marketing her personal projects – not just her haircare, but her drinks company – seemingly on the back of a film dealing with domestic violence."

Format: Answer strictly with yes/no. Unrelated posts must be no. Agreement can be explicit or implicit.

Additional Info: Include posts that reference or criticize her promotion of personal ventures (haircare or drinks brand) in close connection with It Ends With Us or its themes. Posts noting public backlash, insensitivity, or controversy around timing of product promotion count as supportive.

Response Criteria: Count both explicit and implicit criticism suggesting she promoted or marketed her personal brands alongside It Ends With Us or its themes in a way perceived as insensitive or opportunistic. Exclude posts that merely mention her business ventures without linking them to controversy or backlash."

**PROMPT 2**

"Please read the text carefully and then answer the question that follows, based on the text provided.

Text: <<Text of the Online Conversation>>

Question: Does the post support the following narrative: "Blake Lively is trying to get Taylor Swift to help pull her out of this mess by using their friendship for interviews and other promotional work."

Format: Answer strictly with yes/no. Unrelated posts must be no. Agreement can be explicit or implicit.

Additional Info: Include posts that mention or imply Blake Lively trying to get Taylor Swift to help her during the backlash by using their friendship for interviews, publicity, or promotional work connected to It Ends With Us.

D-8

CONFIDENTIAL – Attorneys' Eyes Only

Response Criteria: Count both explicit and implicit statements suggesting she is intentionally using her friendship with Taylor Swift for publicity, interviews, or other promotional efforts to influence perception. Exclude posts where the friendship is mentioned only as emotional support or without any reference to media or PR activity."

**PROMPT 3**

"Please read the text carefully and then answer the question that follows, based on the text provided.

Text: <<Text of the Online Conversation>>

Question: Does the post support the following narrative: "Blake Lively has been 'relying' on her best friend Taylor Swift to help get her through the recent media 'storm,' and is hoping to 'use their friendship' to distract from the drama while promoting her new flick It Ends With Us."

Format: Answer strictly with yes/no. Unrelated posts must be no. Agreement can be explicit or implicit.

Additional Info: Include posts that mention her turning to Taylor Swift for moral or public support in response to negative coverage, or using their friendship to distract from the drama while promoting It Ends With Us.

Response Criteria: Count both explicit and implicit mentions of her relying on Taylor Swift's friendship to divert or soften negative coverage during controversy around It Ends With Us. Exclude posts that describe coordinated PR or promotional planning; focus only on distraction or reliance for image stability."

**PROMPT 4**

"Please read the text carefully and then answer the question that follows, based on the text provided.

Text: <<Text of the Online Conversation>>

Question: Does the post support the following narrative: "Blake Lively's influence drew the rest of the cast into her orbit and away from Justin Baldoni, whose movie it was."

Format: Answer strictly with yes/no. Unrelated posts must be no. Agreement can be explicit or implicit.

D-9

CONFIDENTIAL – Attorneys' Eyes Only

Additional Info: Include posts that describe her as dominating or redirecting creative or social influence on set, especially references to cast loyalty shifting toward her and away from the director. Mentions of her controlling or centralizing role in production dynamics count as supportive.

Response Criteria: Count both explicit and implicit claims that she exerted influence over cast, crew, or creative control, leading to a shift in authority or loyalty away from Justin Baldoni. Exclude posts that do not describe influence, control, or on-set dynamics tied to her involvement."