# EXHIBIT A

CONFIDENTIAL

                                          **Page 1**

              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF NEW YORK
                      ---oOo---


BLAKE LIVELY,

                Plaintiff,

    vs.         CASE NO. 24-CV-10049-LJL (LEAD CASE)
                            25-CV-449 (LJL) (MEMBER CASE)


WAYFARER STUDIOS LLC, ET AL.

                Defendants.
_____
JENNIFER ABEL,
                Third-party Plaintiff,
    vs.
JONESWORKS, LLC,
                Third-party Defendant.
_____
WAYFARER STUDIOS LLC, et al.
                Consolidated Plaintiffs,
    vs.
BLAKE LIVELY, et al.
                Consolidated Defendants.
_____
                  **CONFIDENTIAL**
      **CONTAINING ATTORNEYS' EYES ONLY PORTIONS**
       VIDEO-RECORDED DEPOSITION OF ANN FROMHOLZ
                Los Angeles, California
              Thursday, December 11, 2025



Stenographically Reported by:  Ashley Soevyn,
CALIFORNIA CSR No. 12019

CONFIDENTIAL

Page 47

that's not listed but...

Q    So not every training that you've attended is listed on here?

A    I don't know that I listed any.  Maybe I listed one training, but I've attended many trainings.

Q    And not every investigation you've conducted is listed here?

A    I don't think I listed any investigation on here.

Q    You are currently employed with the Fromholz Firm; is that right?

A    That's correct.

Q    What is your role?

A    I'm the principal.

Q    Have you been a principal since you started there in 2015?

A    Well, I started the firm in 2015, so yes.

Q    So you founded the firm?

A    I did.

Q    And what are your responsibilities as a principal at the Fromholz Firm?

A    I maintain my practice.  I also run the business part of the firm, and I oversee the two employees we have.

CONFIDENTIAL

Page 48

Q   So do you -- does the firm have a total of three employees, including yourself?

A   Yes.

Q   You conduct workplace investigations, right?

A   Among other things, yes.

Q   What other things do you do?

A   I counsel businesses.  I counsel employees.  I handle some litigation.

Q   You counsel businesses and employees with respect to employment law issues?

A   Yes.

Q   Did you say that you -- do you represent clients in litigation?

A   Yes.

Q   Do you represent employers or employees in litigation?

A   Employers.

Q   Let me finish my question, please.

        MS. ZELDIN:  It sounded like she did.

        MS. ROESER:  She didn't.

BY MS. ROESER:

Q   You represent employers in litigation?

A   That's right.

Q   What percentage of your practice is

CONFIDENTIAL

Page 49

litigation-based?

A    Right now, probably 15 percent.

Q    And what percentage of your practice is advice and counsel-based?

A    Probably 15 percent.

Q    What percentage of your practice is based on workplace investigations?

A    I would say 50 to 60.

Q    And what kind of investigations do you perform?

A    Oh gosh, a wide range.  Harassment -- my investigations are into internal claims of harassment, retaliation, bullying.  I'm sometimes asked to investigate complaints that really wouldn't rise to the level of a violation of policy, but the company wants to look into it anyway because it's affecting the workplace.  So there's not really a way to put a name to that except maybe bad management or people not getting along.

I've been asked to look into complaints regarding misuse of company credit cards and expense accounts.  A whole range of -- of employment law-related or workplace-related complaints.

Q    How long have you been conducting workplace investigations?

CONFIDENTIAL

Page 50

A   I think my first one was in about -- I know which firm it was.  Hold on.  In about 1998.

Q   What firm were you at when you conducted your first workplace investigation?

A   Orrick.

Q   How many workplace investigations would you estimate that you have performed since 1998 -- you said 1998, right?

A   Correct.  Hundreds.  I can't estimate beyond that, though.

Q   More than 100?

A   Well, more than -- probably, yes, well more than 100.

Q   More than 200?

A   I would guess so, yes.

Q   More than 300?

A   I don't know that I can even guess at that point.

Q   Okay.  More than 200?

A   That's my guess, yes.

Q   Your guess or your estimate?

A   Estimate more than 100; guess more than 200.

Q   Fair.  How many investigations have you conducted this year, in 2025?

CONFIDENTIAL

Page 51

A   Oh, I have no idea.  Twenty-some maybe. I don't know.  It's all in -- I just don't keep the track of that in my head.  It's all in my -- in my records.

Q   Would you say between 10 and 20 this year?

A   I think it's probably more than 20.

Q   Twenty to 30?

A   That's my guess, yeah.

Q   Is that an average number for you per year, or is this year exceptionally busy or exceptionally slow?

A   I think this year is probably a little lower than others.  But, you know, every year is different.

Q   Are you generally hired to conduct investigations by employers?

A   I've only been engaged to conduct investigations by employers, never by an employee.

Q   And are you conducting the investigations yourself, or are you overseeing others in conducting them?

A   Both.

Q   What percentage of investigations that you perform are you conducting yourself?

CONFIDENTIAL

Page 52

A    Probably 75.

Q    And the remaining 25 percent, you're overseeing someone else conducting the investigation?

A    So 75 or 80, and then 20 to 25.  Yeah.

Q    Do you view your investigative services as providing legal services?

A    So my engagement letter says that it is legal services, but I'm not providing legal advice.

Q    Legal services but not legal advice?

A    Yes.

Q    Can you explain that to me?

A    No.

Q    No?

A    I can't.

Q    Why not?

A    Well, my understanding is that workplace investigations conducted by an attorney are legal services, but I don't provide legal advice.

Q    Has your -- has your license ever lapsed?

A    In California, no.

Q    In any other state?

A    Yes.  In Nevada, right now, I have to update my CLE, so I'm not licensed in Nevada at the moment.

CONFIDENTIAL

Page 70

MS. ZELDIN:  Objection.

BY MS. ROESER:

Q    Yes or no?

MS. ZELDIN:  Objection.

THE WITNESS:  If it doesn't happen again, the employer has met their obligation.  Is that what I would advise if I were advising the employer?  I'm not sure.

BY MS. ROESER:

Q    What would you advise if you were advising an employer?

A    I might advise them something different depending on the facts.

Q    Like what?

A    I don't know.  I don't have all the facts.  And I'm not here to give legal advice.  That would be legal advice.

Q    Have you represented entertainment industry clients in litigation before?

A    Yes.

Q    Who?

A    Playboy.

Q    Any others?

A    I don't think so.

Q    Have you ever represented a film studio

CONFIDENTIAL

Page 71

or TV studio in litigation?

A    No.

Q    When did you represent Playboy?

A    When I was at Seyfarth.

Q    In multiple matters or in one matter?

A    I worked on multiple matters for Playboy.

Q    Did you represent Playboy in any litigations involving claims of harassment or retaliation?

A    Yes.

Q    When?

A    When I was at Seyfarth.

Q    Between 2001 and 2005?

A    Correct.

Q    Have you represented any entertainment industry clients in litigation in the last 20 years?

A    I'm trying to think if I did at Jackson Lewis, and I can't remember.  I don't believe I have since having my own firm.  I represented small companies related to the entertainment industry, but not studios.

Q    Have you conducted investigations for clients in the entertainment industry?

A    Yes.

Q    How many?

CONFIDENTIAL

Page 72

A       Probably 10, 15.

Q       When was the last investigation you conducted for a client in the entertainment industry?

A       Last year.

Q       Who was the client?

A       Warner Bros.

Q       Did the Warner Bros. investigation involve issues of harassment and retaliation?

A       Yes.

Q       Did the Warner Bros. investigation involve issues of hostile work environment?

A       Yes.

Q       Did the Warner Bros. investigation involve allegations raised with respect to a film or TV set?

A       Yes.

Q       Can you share what film or TV set?

A       I don't think I can.

Q       Was it film or TV?

A       It was television.

Q       Did the Warner Bros. investigation involve allegations raised by an actress or actor?

A       Yes.

Q       By an actress?

Page 73

A    Yes.

Q    Against who?

A    Against the show's creator, who is also an actor.

Q    Was the accused -- did they share scenes with the complainant?

A    I think so.

Q    In the Warner Bros. investigation, was the accused -- the accused was a creator, an actor in the show?

A    That's correct.

Q    Were they also a director?

A    Yes.

Q    Producer?

A    I think so.  But I don't know.

Q    Can you summarize the substance of the allegations?

A    Gosh, I'm not sure if I can.  It's confidential.  It was never litigation.  So I'm just not sure if I can talk about the allegations.

Q    Did the investigation for Warner Bros. involve issues related to the use of intimacy coordinators?

A    No.

Q    Did the Warner Bros. investigation

Page 97

BY MS. ROESER:

Q    Is one purpose of an investigation also communicating to employees that a company takes allegations of a hostile work environment or other unlawful conduct seriously?

MS. ZELDIN:  Objection.

THE WITNESS:  I don't know that that's a purpose.  It could be a result of the investigation.

BY MS. ROESER:

Q    And is a purpose of the investigation also to determine whether allegations can be substantiated?

MS. ZELDIN:  Objection.

THE WITNESS:  Well, that's the factual finding.  So the al -- the investigation finds facts.  So you find facts, and you make a determination based on the preponderance of the evidence standard whether the factual allegations are substantiated.  But it's all about facts.  Then it goes to the employer to determine what to do.

BY MS. ROESER:

Q    When you conduct an investigation and you interview a witness, do you give them a direction that they won't be retaliated against for participating in the investigation?

CONFIDENTIAL

A    Yes.

Q    Do you advise an accused employee that you interview as part of an investigation that they are not to retaliate against anyone involved in the investigation?

A    Yes.

Q    Do you advise them that they are not to retaliate against the person who complained about their conduct?

A    I don't specifically say that.  I say, you may not retaliate against anybody for their participation in the investigation.

Q    Why do you do that?

A    Because retaliation is not permitted.

Q    Right.  So you advise interviewees they are not to retaliate against anyone who participated in the investigation, right?

A    Correct.

Q    In part, because giving that direction helps prevent future retaliation?

MS. ZELDIN:  Objection.

THE WITNESS:  I hope it helps prevent retaliation related to the investigation.

BY MS. ROESER:

Q    Related to someone raising concerns, for

CONFIDENTIAL

Page 99

example?

MS. ZELDIN:  Objection.

THE WITNESS:  Well, what I say is, you may not retaliate against anyone for their participation in the investigation, and you may not be subjected to retaliation for your participation. So that instruction is limited to the investigation.

BY MS. ROESER:

Q    And you say that to prevent retaliation?

MS. ZELDIN:  Objection.

THE WITNESS:  Right.  But my role is limited to the investigation, so not more broadly. But yes, to prevent retaliation or discourage retaliation related to the investigation.

BY MS. ROESER:

Q    I'm sorry.  So are you saying that you give that direction not to retaliate, and it doesn't apply to the initial complaint that prompted the investigation?

MS. ZELDIN:  Objection.

THE WITNESS:  That's not what I said.

BY MS. ROESER:

Q    Okay.  Can you say it again?

A    Yes.  The retaliation -- the -- the scope -- my -- my instructions have to do with the

CONFIDENTIAL

Page 100

investigation itself.  Not more broadly.  That's, you know, up to the company.

Q    But does your admonition, that there may be no retaliation for participating in the investigation, apply to the complaint?

A    Mean -- meaning, you can't retaliate against the person who complained?

Q    Correct.

A    Oh, yes.

Q    And so one of your goals is to prevent -- when you conduct an investigation, one of your goals is to prevent retaliation against someone who raises concerns about a hostile work environment?

A    I wouldn't say that's a goal.  The goal of the investigation is to find facts.  But yes, a part of the process is to instruct people that retaliation is not permitted.

Q    An important part of the process, right?

A    Well, it's a part of the process that I do every time.

Q    You do it every time, right?

A    With every witness, yes.

Q    So it's important?

MS. ZELDIN:  Objection.

THE WITNESS:  Yes.  There are other

CONFIDENTIAL

Page 101

important parts of the process.

BY MS. ROESER:

Q    And if an investigation isn't conducted, presumably there's no direction that you can't retaliate against the person who complained, right?

MS. ZELDIN:  Objection.

THE WITNESS:  There's no instruction within an investigation, no.  But there, I assume, are policies against retaliation.

BY MS. ROESER:

Q    Are you aware of Mr. Baldoni at any time being advised that he cannot retaliate against Ms. Lively for raising concerns?

A    I don't know.

Q    Are you aware of Mr. Heath being directed at any time that he cannot retaliate against Ms. Lively for raising concerns?

A    I don't know.

Q    Are you aware of Mr. Baldoni ever being advised that he cannot retaliate against employees -- let me strike that.

Are you aware of Mr. Baldoni being advised that he cannot retaliate against Ms. Slate for raising concerns about his behavior?

MS. ZELDIN:  Objection.

Page 222

BY MS. ROESER:

Q    In the beginning of the video that you saw?

A    Right.  I don't think there -- well, I don't remember the end.  I watched the full video but...

Q    Do you remember in the video that Mrs. Heath's breasts and nipples are visible during certain points?

A    Later on in the video, yes.

Q    In the video you saw, were Ms. Heath's legs spread?  Do you recall that?

A    I think so.  I think her knees were up and still apart.  But I could be wrong.

Q    And to be clear, your opinion, with respect to Mr. Heath showing Ms. Lively the birth video might change depending on what video he showed her?

MS. ZELDIN:  Objection.

THE WITNESS:  It might.  This opinion is dependent on the video that I saw.

BY MS. ROESER:

Q    Okay.  It's dependent on Mr. Heath showing her this specific video that you saw?

A    Yes.  I can't opine as to any other

CONFIDENTIAL

Page 274

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.  Dated this 12th day of December, 2025.

ASHLEY SOEVYN

CSR No. 12019