# EXHIBIT B

CONFIDENTIAL

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---

BLAKE LIVELY,

　　　　　　Plaintiff,

　vs.　　　CASE NO. 24-CV-10049-LJL (LEAD CASE)

　　　　　　　　25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

　　　　　Defendants.

_____

JENNIFER ABEL,

　　　　Third-party Plaintiff,

　vs.

JONESWORKS, LLC,

　　　　Third-party Defendant.

_____

WAYFARER STUDIOS LLC, et al.

　　　　Consolidated Plaintiffs,

　vs.

BLAKE LIVELY, et al.

　　　　Consolidated Defendants.

_____

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF MICHAEL ROBBINS

Los Angeles, California

Monday, November 24, 2025

Stenographically Reported by:  Ashley Soevyn,

CALIFORNIA CSR No. 12019

Pages 1 - 270

Page 1

she can determine by reviewing documents.  But, obviously, one can't.

And it also shows that if there were to be an investigation, that is one of the things that the investigator would have to be determined -- would have to determine; in other words, what happened in that incident.  In which case, it is a disputed issue, despite Ms. Fromholz saying there are no disputed facts, and an investigation would -- an investigator would have to determine credibility, and Ms. Fromholz can't possibly know how the investigator would do with respect to that; though, she thinks she can.

Q    All right.  Anything else with respect to Ms. Carroll's deposition?

A    No.

Q    Okay.  The AWI training materials, did that change your opinion?

A    Didn't change my opinion.

Q    What did it do for your opinion?

A    Ms. Fromholz says that she went to the National Training Institute given by AWI and earned the designation, AWI-CH.  So I looked back -- I taught at 13 of the National Training Institutes, so I looked back at some of the materials we used in

Page 40

the National Training Institutes, materials that clearly show that when there is an allegation of harassment or retaliation, you have to investigate it; that the purpose of the investigation is to find out what happened so that you know what to do.  And knowing what to do is more than simply getting issues stopped, because you have to take other kinds of actions as well depending upon the results of the investigation.  So that was part of it.

Also at the training institute, we not only talk about when to conduct an investigation, but also how to determine credibility, which involves interviewing witnesses.  Ms. Fromholz somehow thinks despite the training that she was given by AWI, that she can determine credibility without interviewing witnesses.  Of course, an impossibility.  So it's completely contrary to what she was taught.  And I'm sure it's contrary to what she does as well.

Q    So you intend to offer opinions regarding Ms. Fromholz's opinions, correct?

A    Yes.

Q    You also said that you looked at the motion for summary judgment.  What did you -- did you look at the entire thing?  Did you read all the

Page 41

A    So nudity, simulated sex, hyper exposure, and other intimate scenes.

Q    Isn't it just nudity or simulated sex?

A    No.

Q    What is the third thing you think that is in there?

A    It is in there.  Hyper exposure.

Q    Hyper exposure.  What does that mean?

A    There is no specific definition, which is why a studio or production company needs to be specific, for the reasons I've described.  But it means a situation where the actor is pulled into a vulnerable situation, not necessarily involving nudity.  Though, it could.  But involving something sexual to some degree.

Q    Okay.  What were the intimate scenes that were filmed in phase one of production?

A    I didn't say there were scenes.  But there was one scene.

Q    One scene.  What was the scene that you believe was intimate in phase one?

A    The birthing scene.

Q    And why do you believe it was intimate if there was no definition of "intimate"?

A    Two reasons.  Reason number one is

Page 82

because according to Ms. Talbot, the -- there was profile nudity which she said an actor could consider to be nudity.  So that was early part of her deposition.

And in the later part of her deposition, she said there was nudity in the scene, and that would mean that an intimacy coordinator would get involved.  So that is one reason.  Both comments that Ms. Fromholz ignores.  And then, secondly --

Q    So I'm going to ask you, please, to not comment on Ms. Fromholz's report until and unless I ask you about it.  All right?

A    If I feel like I should do it, I will do it.  And you shouldn't be stopping me in the middle of a question.  But if you feel like you're going to do it, do it.

MS. ROESER:  Agreed.  Objection.

BY MS. ZELDIN:

Q    If I ask a question, answer the question.

A    Can I continue with my answer?

Q    Yes.

A    And secondly, in my opinion, there was hyper exposure.  And the reason I say that is because if you look at the scene, which I have, Ms. Lively is laying on an examination table or

Page 83

CONFIDENTIAL

another, I don't remember any of the prior investigations.

BY MS. ZELDIN:

Q    When you conducted these other investigations that you were referring to, did you personally conduct the investigation or did someone else?

A    I personally conducted the investigation. Give me a second as to whether I worked with someone else.

On last year's, I worked with someone else, but I was the lead investigator. Year before, I worked with someone else, but I was the lead investigator. The one we've been talking about, I worked with someone else, but I was the lead investigator.

Q    Did any of these investigations involve an intimacy coordinator?

A    Those did not.

Q    Did any of them involve nudity riders?

A    No.

Q    Did any of them involve closed sets?

MS. ROESER:    Objection.

THE WITNESS:    No.

Page 91

she responded and he said "hot."

BY MS. ZELDIN:

Q    And what did she say when he said "sexy"?

A    "That's not what I was going for."

Q    Do you know whether or not there was any scene or any time during the filming of the movie after this incident on May 23rd where Justin ever referred to Blake either in costume or out of costume as "sexy" or "hot"?

MS. ROESER:  Objection.

THE WITNESS:  I do not believe that there was such an incident.

BY MS. ZELDIN:

Q    We talked about the reporting of the complaint.  The first one was on, you say, was on May 26.  That was the first time it was reported, and it was reported to Ange Giannetti at Sony, correct?

MS. ROESER:  Objection.

THE WITNESS:  It depends what you mean by reported.  But when -- because Ms. Lively and Ms. Slate say they talked to Mr. Baldoni after the comment itself was made.  That was at least expressing displeasure.  Would you call it a complaint or not, at least to put him on notice that

there's a potential sexual harassment situation.

BY MS. ZELDIN:

Q    And did Ms. Lively say "all good" after he apologized after that; do you know?

MS. ROESER:  Objection.

THE WITNESS:  I vaguely recall something like that.  Yes.

BY MS. ZELDIN:

Q    Then you say that you know that this conversation took place because of a text between Slate and someone named Josh Pearl.  Who's Josh Pearl?

A    I think it was Slate's manager or agent. I think I got a footnote saying that maybe.

Q    Right.  And in this text message, all it says is Blake alerted Ange at Sony yesterday.  It doesn't say about what, right?

A    Right.

Q    So you don't know what was alerted, correct?

MS. ROESER:  Objection.

THE WITNESS:  Not the details.  That is correct.

BY MS. ZELDIN:

Q    Did the text between Slate and Pearl use

Page 204

CONFIDENTIAL

BY MS. ZELDIN:

Q    No, we don't know why I contacted you, do we?

A    Well, I know what the email said.  And so I'm pretty well-known in this business.  I have no ability to destroy Ms. Fromholz's career, nor would I want to or try to because there's nothing like the entertainment industry.  I can't destroy her career and I wouldn't destroy her career.

And now you have my opinions.

BY MS. ZELDIN:

Q    You said one thing that I had a question about.  You said the incidents weren't stopped. What do you mean by that?

A    So after the hiatus and after the November 9 protections went in, then on May 6th there was a conversation at dinner with Mr. -- Ms. Hoover or Mr. Heath and Mr. Baldoni and Ms. Hoover's best friend, where if what Ms. Hoover is saying is true, could be con- -- or considered either additional harassment or retaliation.

And then, of course, the whole publicity thing.  I'm not reaching a conclusion about whether it was retaliation, but it could be considered that, in which case, that's a big incident that continued.

Page 259

CONFIDENTIAL

And, of course, the company -- let me finish.

Q    Back up, though, first.

A    You're interrupting my response.

Q    Your train of thought?  Yes, because you're -- you're giving me a narrative, and I just wanted to break in the middle of your narrative. The first thing you said was that dinner on May 6th could have been harassment to Blake Lively, correct?

A    Yes.

Q    How is that harassment to Blake Lively?

A    I'm not reaching --

MS. ROESER:  Objection.

THE WITNESS:  Sorry.

BY MS. ZELDIN:

Q    How could it possibly be?

A    The company's harassment and retaliation policy, first of all, said no retaliation.  Same violations.  Same policy.  And, secondly, if they're saying negative things about her, then that's badmouthing her, perhaps because she's raised a complaint.  So it could be harassment, as well, if it got back to her.  And I know Ms. Hoover and Ms. Lively did have conversations, which caused her to be concerned about Mr. Baldoni and Mr. Heath.

Page 260

CONFIDENTIAL

And then, of course, if the retaliation took place in the way she describes through the publicity campaign, well, the policy prohibited retaliation.  The same policy.  So it's another incident of violation, if true, of the same policy.

Q    So the retaliation that you're referring to in August, correct?

A    August?

Q    Yes.  The August retaliation, the one -- the publicity issue?

A    Oh, yeah.  Sorry.

Q    So the August retaliation that we're talking about is the alleged what?  What was the retaliation?

MS. ROESER:  Objection.

BY MS. ZELDIN:

Q    What is your understanding of what that could have been?

A    Yeah.  Alleged retaliation.  Because, again, I don't know if it was or it was not.

Q    Uh-huh.

A    So the publicity campaign to harm her reputation, which, apparently, did do some damage to the reputation.  I just don't know the extent.

Q    Do you know that there was a publicity

Page 261

CONFIDENTIAL

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.  Dated this 25th day of November, 2025.

ASHLEY SOEVYN

CSR No. 12019

Page 268