# EXHIBIT 1

P7UClinO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LINER FREEDMAN TAITELMAN
COOLEY, LLP,

                Movant,

        v.                              25 Mc. 289 (LJL)

BLAKE LIVELY,

                Respondent.

------------------------------x
                                        New York, N.Y.
                                        July 30, 2025
                                        2:00 p.m.

Before:

                        HON. LEWIS J. LIMAN,

                                        District Judge

                        APPEARANCES

LINER FREEDMAN TAITELMAN COOLEY LLP
        Attorneys for Movant
BY:  ELLYN S. GAROFALO
        -and-
MEISTER SEELIG & FEIN LLP
BY:  KEVIN A. FRITZ

WILLKIE FARR & GALLAGHER LLP
        Attorneys for Defendant
BY:  MICHAEL GOTTLIEB
        KRISTIN BENDER
        AARON E. NATHAN
        -and-
MANATT PHELPS & PHILLIPS LLP
BY:  STEPHANIE A. ROESER

(Case called)

MS. GAROFALO:  Good afternoon, your Honor.  Ellen Garofalo for the Liner Freedman parties.

MR. FRITZ:  Good afternoon, your Honor.  Kevin Fritz from Meister Seelig & Fein on behalf of the movant.

THE COURT:  Good afternoon.

And for the responding parties.

MR. GOTTLIEB:  Good afternoon, your Honor.  Mike Gottlieb from Willkie Farr & Gallagher on behalf of the respondent.  With me at counsel table is Kristin Bender and Aaron Nathan, also from Willkie Farr & Gallagher, as well as Stephanie Roeser from Manatt.

THE COURT:  Good afternoon.

All right.  I'm prepared to hear argument on the motion by the Liner parties to quash the subpoena served by the Lively parties.  I'll hear from you, Ms. Garofalo, and then I'll hear from counsel for respondent.  It might be easier if you speak from the podium, if you wouldn't mind.

MS. GAROFALO:  I would not mind at all.

Good afternoon again, your Honor, and thank you for having this hearing, hearing us on this issue.  I want to keep my statements relatively brief.  I think the parties have expressed their positions in the papers filed with the Court. I know they're a little bit off base because of the procedure we use in California in discovery motions.

P7UClinO

I want to start by discussing the overall difference between this case and those cases in which courts have permitted discovery from opposing counsel.  In all of the cases, including those cited by the Lively parties, there was no dispute that opposing counsel was either involved in a prior concluded lawsuit or in the events underlying the claims, for instance, where an opposing counsel drafted a contract, and that contract is now in dispute in a breach of contract case.

In the other instances, the courts allow discovery of things such as engagement letters, in some cases payments from insurance companies or even the payment of legal fees in connection with disputes over attorneys' fees.  In every case, there was no dispute that the lawyer was involved and that the documents being sought were actually in existence and in the possession of the counsel who discovery was sought from.

Here we have an allegation of — and I use opposing counsel's language — an untraceable smear campaign.  We have dates, including the dates in the categories of documents listed in the subpoena, ranging all the way back from July 1st, 2024 to the present.  Whether or not the Liner firm was involved in the smear campaign, has documents responsive to the requests, had any communications during any particular period of time with content creators is in dispute.

THE COURT:  Let me ask you about that, Ms. Garofalo, because one might say that the fact that something is in

P7UClinO

dispute means that it is the appropriate subject for discovery.

First of all, it seems to me that, under Rule 26, the plaintiff is entitled to discovery with respect to any documents relevant to the allegations in the complaint. And so I should look to the allegations in the complaint. Do you dispute that at all?

MS. GAROFALO: I do not dispute the general rule, your Honor.

THE COURT: So if that's the case and part of the allegation is that, as a matter of retaliation, there was a smear campaign that was launched against Ms. Lively, and that by the design of the Wayfarer parties, it was designed to be untraceable, and I think there is evidence there were derogatory statements made about Ms. Lively after the allegations of sexual harassment. How is it, other than through serving a request to the Liner parties, that the Lively parties would be able to try to prove up their theory that the source of the negative stories was the Wayfarer parties?

MS. GAROFALO: Well, there are two issues there, your Honor. One is that discovery of course is permissible from the Wayfarer parties. Discovery is also permissible and has been exercised extremely liberally by Ms. Lively, directed to third-party content creators and so forth. There were actually 107 content creators whose communications — relating to Ms. Lively in this matter — were either subpoenaed directly or

were the subject of a subpoena, their accounts to Google and so forth.

THE COURT:  So I take it your position here is that the subpoena to the Liner parties is inappropriate because they should get it directly from the content creators?

MS. GAROFALO:  That would be the first step.  Again --

THE COURT:  And I take it that is your position, they should go to the content creators?

MS. GAROFALO:  They should and they have.  As I understand it, to date at least, the subpoenas to the content creators have had a couple of results.  One is in the content creators making representations that, in fact, there were no such communications.  In other cases, as your Honor knows, the content creators have moved to quash or filed various motions in this court.

Again, just going back to Rule 26 --

THE COURT:  So stop there for a second.  On the assumption that those motions from the content creators are well founded, or even if they're not in isolation well founded, isn't it more appropriate to go to the horse's mouth, so to speak, to go to Liner rather than burden the content creators with subpoenas?

MS. GAROFALO:  Well, again, we are not talking about the general case under Rule 26, but opposing counsel.  And I do want to get to some of the requests so I can illustrate to the

Court what exactly is the problem with the subpoena.

So far, neither the subpoenas to content creators, at least to the best of my understanding, your Honor, nothing has yielded any communications between Mr. Freedman for the Liner firm with content creators. We've been in this case — I haven't, but everybody else has — I think about eight months and, so far, nothing has surfaced. "Untraceable" may merely mean we're guessing, we're speculating that it happened. Was there negative --

THE COURT: To be fair to the other side, the "untraceable" actually comes from one of the Wayfarer documents. So it's not a word that was created by the Lively parties, it was created on the Wayfarer side. Do you dispute that?

MS. GAROFALO: I do not, your Honor. I stand corrected.

My point was that something may be untraceable if it never happened. So far, the efforts to find the discovery, and I'm to start with one of the problems with these requests, they span a period either from July or August 1st, 2024 all the way through the present. So, just estimating, at least half of that period of time was after the CRD complaint was filed and the litigation commenced.

Prior to the litigation commencing, and I will represent to the Court that the Liner firm was not formally

retained until December 2024, and in fact the very first billing in this case, despite the allegations that have floated around, was on December 21st, 2024, the day after Ms. Lively filed her CRD complaint.

THE COURT:  Do you know when the first communication took place between the Wayfarer parties and the Liner parties as to which a claim of attorney-client privilege would be asserted?

MS. GAROFALO:  So where we are now, and we produced a privilege log, I was on a flight, I believe late last night, California time.  During the pre-litigation period prior to December 2024, December 20th, 2024, there are no privilege documents because, at least with a majority of these requests, there were no communications and there are no responsive documents, and that would apply to categories 1 through 4.  So any communications would have been included in the post-litigation period.

THE COURT:  You understand the reason why I'm asking the question, because we all know that there are communications that sometimes can take place in anticipation of representation where there might be a claim of privilege, you were very careful in saying here's when the retainer letter is, but is there a date earlier than that when there was communications in anticipation of representation?

MS. GAROFALO:  There is a single text message on which

P7UClinO

Mr. Freedman was copied.  He did not participate in the text message.  I believe it was September 16th, 2024.  Other than that, there are no communications and there will be none discovered between Mr. Freedman or anyone at the Liner firm and the content creators.

So were the Court to order and deny the motion to quash, at least in part, and order the Liner firm to respond to categories 1 through 4, the answer would be none.  To be more specific, those categories seek agreements with content creators and any payments from the Liner firm to content creators.

No. 4 asks for the Liner firm to identify all financial accounts of a law firm from which payments were made.  Since no payments were made and the response to that request would be none, there are no documents responsive to No. 4.

THE COURT:  So can I interrupt you for a second to ask what we're doing here on requests 1 to 4, why you're fighting?  I could write a very interesting opinion, I'm sure, for one side or the other, but --

MS. GAROFALO:  It is a very good question and I have tussled with it myself.  I believe the subpoena in itself is improper and should be quashed.  But again, so we don't end up here again, I am conveying to the Court what the issues will be — and it ties into my argument — that there are no communications at all between Mr. Freedman or anyone at the

Liner firm representing the Wayfarer defendants and content creators in the pre-litigation period.

With respect to the remaining requests --

THE COURT:  So let me just make sure I'm understanding you correctly.  With respect to 1 to 4, are you saying that for the entire time period up until present, the answer would be none?

MS. GAROFALO:  Correct.  The Liner firm and anyone associated with the Liner firm does not have contracts or agreements with content creators, and certainly did not pay content creators.  The response to those requests would be none.

THE COURT:  Are you withdrawing your objection?  I mean, it may be the prudent thing for me to do.  You'd then eliminate an issue on appeal were I to rule for you as to which something where you've represented the answer is none, but there's not formal response that it is none.

MS. GAROFALO:  I will say this, your Honor:  We were prepared to convey this information to the Court.  Again, our argument is that this subpoena is completely improper and should be quashed in its entirety.  However, anticipating the Court might say I will modify the subpoena, and those particular requests seem to target relevant information, cutting to the chase, we are disclosing to the Court that those would be the responses.  Our really significant issues relate

to requests 5 through 8, and I can go through each request with the Court.

These requests are exceedingly overbroad.  They sweep in reams of attorney-client information, they cover an extensive period during the litigation itself, and I can go through, if the Court would like, these requests and convey to the Court why they are improper and they should not be allowed.

THE COURT:  You're welcome to do that.

MS. GAROFALO:  So request No. 5.  This, again, is for a period from July 1st, 2024, before the Liner firm was involved, before the litigation started, all the way through the present, well after this litigation started in December, on December 20th, 2024.  That one seeks all documents and communications involving you and concerning Ms. Lively, Mr. Reynolds, Wayfarer, defendants, the digital campaign, the film.  That request sweeps in communications with clients clearly, plainly on its face, attorney-client communications. It is not limited, it is all documents and communications concerning.

THE COURT:  But they say they're not seeking privileged communications.  So tell me whether that's a sufficient answer for you.

MS. GAROFALO:  Well, it doesn't quite say that.

THE COURT:  I realize that the request, as drafted, doesn't have that -- I can say that, but your request is broad

P7UClinO

and you want me to quash the request in its entirety?

MS. GAROFALO:  Well, to the extent that the period of time bleeds into the actual litigation, communications may be privileged.  We did provide a privilege log, and I somehow suspect we'll be here in front of your Honor again, but it is our position that if such communications occurred, they would be privileged.

I want to go to the next one.  I am anticipating --

THE COURT:  You're not answering my question in its entirety.  As I read request No. 5, it calls for, among other things, communications and documents regarding communications with the content creators or with any digital online or influencer services by anybody at the Liner firm.

And so why is that not an appropriate subject of discovery?  You've told me why I shouldn't order the production of communications between the Liner firm and the Wayfarer parties between attorney and client, but why shouldn't I order production of documents, external-facing communications, excluding those that are privileged, but non-privileged communications involving third parties?

MS. GAROFALO:  Well, your Honor, again, the way this request reads and as written is much broader than that.

THE COURT:  I hear you saying that, but that's frequently true with respect to discovery requests.  And so if your only objection is that it would call for privileged

P7UClinO

information because it calls for communications between Liner and the Wayfarer parties, then I can address that.  If your objection is broader than that, you have to tell me why the objection is well founded.

MS. GAROFALO:  My objection is somewhat broader, and I would like to touch on the relevance issue.

THE COURT:  Okay.

MS. GAROFALO:  The smear campaign allegedly began, and I believe it's in the complaint, but there's a little chart showing a spike at negative publicity against Ms. Lively in August of 2024, again, before the Liner firm was involved.

The alleged relevance of this material is to the retaliation claim, that in response to complaints by Ms. Lively about harassment and other workplace conditions, there was a smear campaign in retaliation.  Ms. Lively's last possible complaint, based on the complaint, was in early January of 2024 at a meeting.  The alleged smear campaign, by Ms. Lively's own allegations, commenced in August of 2024.  There is no temporal proximity between the events, the complaints that Ms. Lively allegedly made, and the alleged smear campaign.  It was 8, 9, 10 or more months later.  This is an issue that we will be raising with the Court in the appropriate motions.

But the relevance of the smear campaign that allegedly occurred after December 20th of 2020, approximately a year after Ms. Lively allegedly made her complaints to the Wayfarer

P7UClinO

parties, lacks the temporal proximity required for retaliation under California's employment laws.

THE COURT:  Doesn't that particular argument get the sequence of legal issues backwards?  I would understand if there was a motion made directed to those allegations, I hear what you're saying, I'm not expressing a view one way or the other, I haven't studied that particular question to the extent that it would be necessary for me to render an opinion on it, but that seems to me to be the subject of either, one would think, a motion to dismiss, a motion to strike, a motion for summary judgment, or maybe a motion in limine would be the right vehicle for that, but on a discovery motion, I take the complaint as it's pled.

MS. GAROFALO:  Understood, your Honor.  I think it might also be the subject of a motion for judgment on the pleadings.

But, in any event --

THE COURT:  That's not --

MS. GAROFALO:  -- I understand that, your Honor.  But that's our argument on relevance on the tangential best relevance.

I want to go on to request No. 6.  July 1st through the present, documents and communications between, which is defined, you and any journalist, reporter, producer, editor, or other representative of a newspaper or online news source, and

P7UClinO

podcast, and so forth, and this one directly relates to the consolidated action.  So it clearly bleeds into the actual period of litigation.

Mr. Freedman — and I don't think anybody would tell the Court otherwise, as Ms. Lively's representatives have done — has made public statements to the press.  It's not a secret, it is a First Amendment, defendants are allowed to defend themselves, even publicly, particularly when such serious allegations are leveled against them.

So to the extent that this bleeds, again, into the period of litigation — and we're now talking about public-facing statements to the media, press, and so forth as distinguished from these morphos content creators who can be almost anyone who has a couple of followers — this request seems not to seek relevant information, it seems to seek information that is already in the possession, custody, and control of plaintiff, and it seeks information that is certainly, if it exists, available from third parties, including the traditional media outlets and so forth who are referenced in this particular request.

THE COURT:  You know that there's law in this circuit with respect to subpoenas directed to news organizations about their sources?

MS. GAROFALO:  I do, your Honor.  But again --

THE COURT:  How do I deal with that and accept your

P7UClinO

argument?

MS. GAROFALO:  Because the statements that are really being targeted here were public statements that Mr. Freedman went on the air, talked to TMZ, talked to whomever it is. Those are public statements.  It does not fall within the category of documents or information that's obtainable solely from opposing counsel, again, during the period of time in which the litigation is proceeding.

Now, to continue, your Honor.  No. 8, August 1st, 2024 through the present, all documents, including --

THE COURT:  I think you wanted 7 and 8, right?

MS. GAROFALO:  You're right, your Honor.  Let me go back to 7.

THE COURT:  7 and 8, I take it, are coupled together in a lot of ways.

MS. GAROFALO:  7 is for the time period of August 1st, 2024 through the present, all documents, communications, reflecting any communication with any source that provided you information relating to, or that formed the basis for, Mr. Freedman's public statements regarding Ms. Lively.

I don't think it would be too facile to summarize by saying the primary source for Mr. Freedman's information, as all lawyers, is their client's.  This, head-on, seeks attorney-client communications.  It is exceedingly overbroad. It leads right into the litigation, period, without even having

P7UClinO

to discuss any communications that may or may not have been had prior to the commencement of litigation, but, again, reflecting any communication with any source that provided you information that formed the basis for Mr. Freedman's public statements regarding Ms. Lively.

THE COURT:  So what would you say to the response to that anticipatory repudiation that says we're not seeking the communications between the Wayfarer parties and the Liner parties, we're seeking communications that the Liner parties had with third parties that provided the source for the statements?

MS. GAROFALO:  I'm not sure, your Honor, why the source for that information would be relevant.  The source of the information doesn't tell you what the information is, whether the information was true or not true, but say the source of the information was "I picked up a Hollywood Reporter last week."

THE COURT:  But they actually asked for communications reflecting any communications with any source.  So what I think this request calls for, but we'll hear from the Lively parties in a moment, is if somebody from the Liner firm had a conversation with a third party and that informed Mr. Freedman's statements, they're saying we want that.  There is a claim in this case that Mr. Freedman's statements were false and defamatory.  So what's the objection to the

P7UClinO

communications with third parties?

MS. GAROFALO:  If Mr. Freedman is alleged to have made false and defamatory statements, the statements are false and defamatory according to Ms. Lively on their face.  Of course we dispute the allegation.  But assuming that that is the allegation, what the source was, whether "I read something in the Hollywood Reporter," whether "my hairdresser said, 'hey, I heard something terrible from another client about Ms. Lively'" is not relevant to whether or not the statement was defamatory.  The statement was either defamatory because it was untrue, it harmed Ms. Lively in her repu --

THE COURT:  Isn't it relevant whether the statement was rendered with some knowledge of its falsity?  And aren't you going to make the argument at some point in this case that "we believed the statements that we were making," and therefore isn't it irrelevant whether there was a foundation or whether these were just reckless allegations of lies?

MS. GAROFALO:  Again, the primary source of information relating to this case — and I think I can say this for all parties in which attorneys represent clients — are the clients.  Clients are the one who tell you what happened, the clients are the ones that know the facts of the case.

THE COURT:  I mean that's, I don't know, it may be that that's how an attorney does business.  My experience, attorneys also sometimes talk to a number of people when

they're putting on a case, not just their client, they don't always take their client's word for it. That's what the other side is saying, that Mr. Freedman presumably didn't just take Wayfarer's word for it, he did an investigation. "We want the communications that were part of that investigation that formed the basis for his statements."

MS. GAROFALO: Post-litigation, that kind of investigation would fall within the ambit of the work product doctrine and the work product privilege. Prior to litigation, it might if litigation was anticipated, but surely after the litigation commenced on December 20th, 2024, any attempt to develop the facts, to speak to sources who might have information on the facts, not merely including clients, but witnesses, perhaps others, internal investigations, those are privileged, those are work product if the tasks were formed in connection with developing a case. This seems to me to just head-on run into both the attorney-client and work product privileges.

Again, this is discovery, not from a third party, but from opposing counsel. Courts in this district frown or disfavor seeking discovery from opposing counsel. So if plaintiff would like to go out and interview witnesses, they're certainly free to do it. They're not entitled to our work product, and they're not entitled to work product that would reveal litigation strategies, which is exactly what this

P7UClinO

request targets.

Only one more.

THE COURT:  Okay.

MS. GAROFALO:  The next one, August 1st, 2024 through the present, which is a year, they would like all documents, including mobile phone billing records, sufficient to show calls you — meaning the Liner firm — or Mr. Freedman made and/or received with any source concerning information relating to, or that formed the basis of, Mr. Freedman's public statements regarding Ms. Lively.

First, we run into the same problem of same work product issues, particularly in connection with the period of time during which the litigation was active and proceeding.  We may very well run into attorney-client privilege issues, but now let's talk about relevance and over-breadth.  This is a law firm, it may not be as big as Willkie Farr, but we do have 20 lawyers, and all of those lawyers have cellphones, and the firm has huge -- not that I've ever seen the phone billing records, but one could imagine pretty extensive records, which include phone numbers of calls with all kinds of people, including clients.  The relevance of a bunch of phone numbers for over a year for 20 lawyers from landlines and cellphones and whatever else is swept into this is extremely burdensome and harassing on opposing counsel.  The fact that it might yield a phone number or two, perhaps, but weighed against the burden of a

request like this.  And of course, your Honor, not every lawyer at the Liner firm is involved in this case, just the lucky few.

So this request seems to be really beyond the pail, particularly given the timeframe of this request, the scope of the request, and if counsel for Ms. Lively will next tell you, your Honor, that "we can redact the phone records," I don't think it takes much imagination to conceive of what the burdensome task that would be to obtain and redact a year's worth of phone records and similar documents to cull out maybe a call that might have been with a member of the press.

So this one, seems to me, is in a category all its own when it comes to burdensomeness and harassment, and again, one of the reasons that the courts are clear about disfavoring discovery from opposing counsel, is because of the burden and the potential for harassment in imposing tasks like this.

THE COURT:  Let me ask you a couple of other just general questions.  What is the law that, in your view, I'm to apply in this case?  Might I apply the *Freedman* case or am I to apply *Shelton*?  It's been transferred from California.  What do you think?

MS. GAROFALO:  I think, your Honor, that — and as some of the cases, at least California cases, point out — there really isn't that much difference between *Shelton* and *Freedman*. *Freedman* is a little more liberal.  I think this Court has in fact applied basically the *Freedman* standards.  I understand

P7UClinO

the breadth of Rule 26, but I do think that the Freedman factors should be considered by the Court and I think they apply here. And under the *Freedman* factors, as we discussed in our papers, the subpoena and/or the individual requests that we've discussed are not a proper discovery tool.

THE COURT: One other point. Though you haven't made much of an argument to me today on requests 1 to 4, you have made arguments in your papers on those. One of the points that the other side says is retainer agreements are not privileged.

My question to you is this is a request for not attorney-client retainer agreements, but retainer agreements with third parties by counsel. Do you have authority that speaks to the question of whether retainer agreements by a law firm with a third party in the course of representing a client are entitled to any protection against disclosure?

MS. GAROFALO: I don't, your Honor. But I take a very practical, straightforward view of things. The fact here is they do not exist. They just don't exist. We cannot produce something that doesn't exist. There is no real point in debating whether or not if something fictional existed, it would --

THE COURT: That's in a way what I'm struggling with on your points 1 through 4. On one hand, you're asking me to render a ruling. If I have to render a ruling, I have to think through the legal principles. On the other hand, you're saying

P7UClinO

to me, you know, Judge, it's irrelevant because, as a practical matter, there's nothing there on 1 to 4.  If you want me to render a ruling, it would be helpful to have the legal material that would support each side.  If you're saying to me, "Judge, I want you to render a ruling," I do have other things to do in my job.  And so it would be useful to know, do I really need to address 1 through 4 in your mind or can I just say that the Liner firm is ordered to respond to 1 to 4 because the request is the motion to quash is withdrawn.

MS. GAROFALO:  Let me focus first on request No. 4. Request No. 4, the analysis is similar to request No. 8.  That is asking a law firm to identify all of their financial accounts by name, account number --

THE COURT:  No, it's not.  You made this point before. You said request No. 4 calls for the Liner firm to identify the name of a financial institution used to make or receive any capital P payment, and then it goes on.  You said to me before, well, the Liner firm did not make or receive any capital P payment, therefore it's a null category.  That's what you said to me before.

MS. GAROFALO:  Understood, your Honor.  And yes, that's correct.  But the Court, as I understood it, was asking about the arguments if we were not saying there are none, and I think the Court --

THE COURT:  My point is just you said to me the answer

P7UClinO

to 1 through 4 is there's none.  So why are you asking me to write an opinion saying you don't have to answer the question that you've answered in a response to a document request that you've answered here today in front of this assembled crowd?

MS. GAROFALO:  Understood, your Honor.  But you asked me if there was an alternative argument.  No. 4 seeks financial information presumingly -- well, it asks for account information and so forth.  Presumably what plaintiff is thinking, and I don't presume to know, is to subpoena Liner law firm bank accounts in order to find --

THE COURT:  You're going to answer No. 4 "none."  You're not going to give them any financial documents.

MS. GAROFALO:  Understood, your Honor.

THE COURT:  So you're not giving them any third parties, any banks to subpoena.

MS. GAROFALO:  Understood, your Honor, and that's why I focused on requests 5 through 8 in anticipation the Court might find that those first four requests are permissible.  So we are eliminating the argument, your Honor, and asking for a modification of the subpoena on categories 5 through 8.

THE COURT:  All right.  Let me hear from the Lively parties.  Why don't you focus on 5 through 8.  It sounds like 1 through 4 are no longer at issue.

MR. GOTTLIEB:  Your Honor, I think, if I could just back up for a moment to some background that I think is

P7UClinO

relevant to all of the requests, and then I'm happy to go through the individual ones.  There is one point at least I'd like to get to with respect to requests 1 through 4 because I'm not sure we're seeing eye to eye with our friends with the way they responded to that.  But I want to back up to what the sort of overarching argument for both relevance and the reasons why we've sought this information in all the categories in this case.

THE COURT:  And you'll make sure to, in the course of your argument, address why the information that you're seeking is not available from other sources, including particularly from the Wayfarer parties, who presumably have the right to the client files and have custody and control with respect to what's in the Liner party's possession.

MR. GOTTLIEB:  Sure, your Honor, I'll address that, as well.

So this is not sort of a typical subpoena one sees to a law firm.  Ms. Lively's retaliation and defamation claims in particular in her amended complaint each allege very specific actions taken either by the Liner firm or by Mr. Freedman in his capacity as partner at the Liner firm with respect to Ms. Lively's retaliation and defamation claims, and I want to touch on each.

So the retaliation claim in the amended complaint alleges that the defamatory campaign was orchestrated by the

Wayfarer parties and executed by Mr. Wallace, who the complaint describes as a fixer known for orchestrating untraceable social media attacks through his firm's street relations. This is somebody that, as we explained in our papers in this motion but also in the amended complaint, was represented as having a very close relationship with Mr. Freedman at the time he was brought in in August. Until the presentation here today, Liner had not really denied the allegation that we had made, that Mr. Freedman had been part of the Wayfarer team since August of 2024 when the retaliatory campaign is alleged to have begun, which is paragraph 221 of our amended complaint.

I should note also that --

THE COURT: Let me just look at your complaint. What paragraph were you referring to in the amended complaint?

MR. GOTTLIEB: I believe it was paragraph 221 on docket 84.

THE COURT: Okay. I see that.

MR. GOTTLIEB: I should note, also, we didn't put this in our papers, but we'd be happy to submit additional briefing on this. In their own exhibit A to their now dismissed amended complaint, there's a series of text messages in which defendant, Melissa Nathan, is communicating to other defendants in this case about the need to be in touch immediately with Bryan Freedman in the period between August 8th and August 12th, 2024. She's communicating that to the other

P7UClinO

defendants.  And so I was surprised to hear the representation that there was not any activities or any communications of note between Mr. Freedman and the Wayfarer parties during that period of time.

I should also note with respect to the privilege log, which we did receive, there are no communications on the privilege log with Mr. Freedman during that August period of time, or anybody else at Liner Freedman, notwithstanding the evidence I just mentioned.  The last entry on this privilege log that we received is from November 18th, 2024.  So there's not a single entry on this privilege log after November 18th, 2024, notwithstanding the representation that my friend just made about that.

Of course the complaint also alleges a defamation cause of action.  That defamation cause of action is alleged in the amended complaint as being a continuation and a worsening of the retaliation campaign.  The complaint pleads eight specific defamatory statements that Ms. Lively has alleged that Mr. Freedman published, acting as an agent of the Wayfarer parties with actual malice.  That is at pages 95 to 96 of the amended complaint as well as pages 133 to 134 of the same.

Mr. Freedman has released many more of these same kinds of statements since the filing of the amended complaint. In those statements, we allege that Mr. Freedman falsely accused Ms. Lively of fabricating her sexual harassment claims

P7UClinO

to take control of the film, essentially accusing her of committing perjury in the filing of her complaint before the California Civil Rights Department.

We lay this out in extensive detail in ways that show exactly why we issued a subpoena.  Paragraph 298 of the complaint explains that Mr. Freedman regularly issues inflammatory content to media outlets appearing on any show that will have him, including those hosted by his own clients, and that is part of the issue here and that is part of the reason for the subpoena we have issued.

THE COURT:  So maybe we can start to get to the particular question.  Maybe we can start at 7 to 8, which is sort of where I think you ended off, Mr. Freedman's statements. I guess my question to you is you say you're not looking for the communications between Mr. Baldoni, or the Wayfarer parties, and Mr. Freedman.  But your request as drafted would pick up all kinds of *Hickman v. Taylor* attorney-work product, pick up all of the interviews, if there were any, that the Liner firm did in its defense of this lawsuit.  How can it be that by asserting that a lawyer made defamatory statements, accused the other side of lying, that that opens the door to all of the work product?

MR. GOTTLIEB:  So, your Honor, I think that, first of all, we offered to meet and confer, and did meet and confer with the defendants on the scope of these requests, and those

P7UClinO

communications essentially broke down.  And so there's a number of these requests that we had offered to -- or at least indicated our willingness to consider narrowing the amendments to, and we're prepared to do that today.

So, for example, on request No. 7, we were never interested, to the extent that a client or one of Mr. Freedman's clients or one of the Wayfarer defendants was a source, that was certainly not our intent in drafting this request, and we would concede we would not be entitled to those.  Those would constitute attorney-client privileged communications, and to the extent the Court wanted to narrow the scope of this request to reflect that, we would have no objection to that.

THE COURT:  But if, hypothetically, they spoke to somebody else who was on the set who was in a position to see what was happening on the set, would that be within the -- and it formed the basis for Mr. Freedman's statements, the persons that they interviewed said what Ms. Lively said happened on the set didn't happen on the set.

MR. GOTTLIEB:  Your Honor, if the purpose of those interviews was to inform public statements, we don't think it falls within the work product protection.  Work product protection would protect certain types of investigatory interviews that are met in preparation of defense of legal claims and in analysis of legal issues.  That is not what we

P7UClinO

have sought here and that is not the nature of the allegations in the complaint.

What we have sought here is discovery into the information on which Mr. Freedman, as agent of the Wayfarer parties, relied when making his defamatory public statements about Ms. Lively.  That type of information goes directly to the knowledge requirement, whether it -- we haven't obviously briefed which one is applicable yet, but the knowledge requirement for asserting a defamation claim, we have to be able to allege mental state under governing Second Circuit and Southern District law.  And so we should be entitled to some amount of discovery on that.

THE COURT:  So haven't I written actually in this case.  Isn't it the law that the mental state that would be relevant would be the Wayfarer party's mental state?  You argue that Mr. Freedman made these statements as agent for the Wayfarer parties.  If Mr. Freedman believed in good faith that these statements were true, that would not excuse the Wayfarer parties if the statements were linked back to them, if they knew that it was false.  If Mr. Freedman thought it was false, but the Wayfarer parties didn't think that it was false, his knowledge would be imputed to them.  It's their knowledge that is relevant in your case.

MR. GOTTLIEB:  I think, notwithstanding that, your Honor, there's obviously no way for us to probe the

communications between Mr. Freedman and his clients.  So the only way for us to be able to get at information and what the factual knowledge and factual basis of the Wayfarer party's was in formulating some of these statements would be those types of communications.

I would say, also, your Honor, one thing that makes this case quite different is, in this case, you have certain statements that Mr. Freedman has made out in public, including some that he's put in front of this Court that he's alleged on the basis of confidential sources.  There's one example of an allegation that he made against our client and against her counsel of extortion that this Court struck from the record that was based entirely on a confidential source.  We believe we're entitled to discovery on that.  We believe we're entitled to know who that confidential source was and what the nature of those communications were.  That is in part what request 7 and request 8 get at, is the ability for us to probe into that discovery rather than allowing Mr. Freedman to go out and make these kinds of statements and accusations, claim that it's based on confidential sources, engage in a public relations exercise and rely on privilege.  We don't think that privilege applies in those circumstances.

THE COURT:  I guess I would understand if the issue came up in litigation and there was a claim he relied on confidential sources, but isn't the answer to that, that to the

P7UClinO

extent that the Wayfarer parties invoke privilege with respect to the communications, they're not going to be able to rely upon those communications in defense of the statements?

MR. GOTTLIEB:  That would require that the privilege invocation be based on information that is not even clear they would have in their possession, but I take your Honor's point, that one available argument test would be they can't rely on that privilege.  I think our concern is not even having the factual basis of knowing because these kinds of communications will never appear on a privilege log if we're not able to test the communications that Liner Freedman is having with third parties that directly informed the statements and accusations and allegations that they're making.  So that is our concern, that is what we were after with request No. 7.  And obviously request No. 8 is essentially a tagalong to request No. 7 that is designed to provide essentially phone records that go to the same kinds of communications.

THE COURT:  So have you asked the Wayfarer parties for any of the information in their possession, custody, and control that would form the basis for Mr. Freedman's statements or support Mr. Freedman's statements?

MR. GOTTLIEB:  Yes, your Honor, we have.  We have made -- give me one moment.  I apologize.  So we have submitted not just requests to the Wayfarer parties, but as my friend noted, considerable third-party subpoenas in an effort to get

P7UClinO

this information through other means.

So we have submitted RFPs and interrogatories to the Wayfarer party, most of which have not been produced.  Those include requests for production to the parties, including the Wayfarer party's efforts to manipulate, affect, and engage with social media, the use of inauthentic activities for paid content, including trolls, bots, paid content, plated or incentivized accounts.  We've asked for the public statements or press releases issued by the Wayfarer --

THE COURT:  I assume you defined Wayfarer parties broadly enough to include Mr. Freedman and the Liner firm?

MR. GOTTLIEB:  We have, your Honor, and we have not seen an objection to that in our requests.

And we have also asked for phone records, which were an issue at the start of this case.  We asked for phone records to the Wayfarer parties going to their communications that would be relevant in this way.  The Wayfarer parties have not produced a single phone record to us.  We have not, to my knowledge at least, and maybe my friends will correct me, to my knowledge, I don't believe we've seen a single one of the press releases or draft statements or communications relating to those press releases or draft statements that we requested from the Wayfarer parties, and we are nearing the end of discovery.  So perhaps my friends will correct me, but to the extent we have received those in production, I am unaware of them.  So we

have tried to get at those requests.

The only other thing I'll say about request No. 8, your Honor, we're happy to narrow this request. To the extent the Court would permit us on request No. 7, then we'd be happy to narrow request No. 8 to a narrower set of custodians that would be interested. Chiefly, given the allegations in the complaint, we're interested in Mr. Freedman's communications, and we can live with a limitation that that's the only attorney or custodian, that we would want those relevant phone records for at Liner Freedman, at least for the time being. To the extent there are other of the lucky few, as my friend described them, it doesn't sound like the request would be all that burdensome. It doesn't sound like they have all that many people at the firm who are working on the case.

If I could go back to some of the prior requests, your Honor. Why don't I do 5 and 6. I actually think that request No. 6 is probably, at least in our view, the most straightforward. This is a straightforward request seeking communication between Liner and unidentified third parties. This goes directly to the defamation allegations in the complaint. Ms. Lively expressly alleges in her complaint that Mr. Freedman, acting as an agent for the Wayfarer parties, defame her. There can be no question that the communications that occurred with reporters, with editors, with representatives of media organizations relating to those

P7UClinO

statements would be relevant communications in discovery.

Even outside of the question of mental state, it would go to falsity, it would go to publication, it would go to the extent of the dissemination of the allegedly defamatory statements. One of the things that we would want to show, for example, for damages purposes are the number of outlets that receive these statements and the number of individuals who were exposed to them.

That also goes, by the way, not just to the defamation claims, but to the retaliation claims, as well, since we have alleged that one of the promises made to Ms. Lively contractually was that she would not be retaliated against, including in publicity around the movie and around the film, and including for engaging in any protected activity or protected conduct with the Wayfarer parties. So --

THE COURT: So let me interrupt you on request No. 6 because it's tremendously broad. As drafted, it would pick up Mr. Freedman leaving this courtroom or -- I don't know whether, I guess Garofalo, are you and Mr. Fritz members of the Liner firm?

MS. GAROFALO: I am, your Honor. Mr. Fritz is not.

THE COURT: So if Ms. Garofalo leaves this courtroom and gives her spin on what I've said or what you've said or what she said, that would be picked up. If it was Mr. Freedman who was here and he gave his spin, that would be picked up.

P7UClinO

Clients do have a right to have their attorneys speak to members of the press, particularly in a high profile case, and give their interpretation.  The public has an interest in that also.  I wouldn't begrudge you speaking to members of the press and I'm not going to begrudge Ms. Garofalo doing that.

MR. GOTTLIEB:  Your Honor, we're happy to exclude from this request transcripts of public statements that attorneys give or a transcript of an interview that's publicly available online.  That's not what this request is after.

THE COURT:  I know that, but if you get out of here and you speak to a member of the press about your interpretation of what happened, it's not going to be reflected in a transcript.  Maybe what you're asking for is something narrower than that.  But if you're asking for every time an attorney from the Liner firm spoke to a member of the press about the consolidated action, that is really broad and actually quite chilling, I would think.

MR. GOTTLIEB:  Your Honor, I think we have made specific factual allegations in this case that make it unlike what this request would be like in an ordinary case.

And so I mentioned before at paragraph 298 in our amended complaint, we follow that up with additional allegations that part of Mr. Freedman's strategy and part of the strategy of the defendants in this case is to cultivate, essentially favor with friendly media sources, many of whom

P7UClinO

include Mr. Freedman's clients.  Paragraph 302 and 303 of the amended complaint allege that the Wayfarer parties spread these narratives by conferring with friendly media sources to fare out their narrative into the public, and that aids and advances the untraceable digital social manipulation campaign.

Your Honor, this should not be a particularly burdensome request.  Attorneys should not be regularly, dozens of times per day, texting with journalists about their case.  And to the extent they want to, they certainly have a right to do so, but those communications are not privileged either by work product attorney client, nor are they privileged under the First Amendment.  So an attorney can certainly make a choice to spend part of their day engaging in public relations and being a public relations advocate for their client, that's their right.  If they defame my client in the course of doing that, we are entitled to probe those communications in discovery.  One of the reasons that attorneys are often cautious about such statements is not just because of the concerns around Rule 3.6, but because of the concerns of defamation liability, which is a tort that predates of course the ratification of the First Amendment.  And the concerns about defamation liability that apply, if what you are doing is not making your arguments in court, but rather making your arguments to members of the press in order to influence the way the press covers a particular matter, that is precisely what we have alleged Mr. Freedman has

P7UClinO

done in this case and continues to do every day in this case when he is given the opportunity to do it.  And we believe that we're entitled to those communications and to those text messages, to those communications that he has engaged in.

THE COURT:  I mean, you alleged in the complaint a handful of statements, and I realized you used the word "including," but why shouldn't request No. 6, if it's permissible at all, be limited to the statements in paragraph 299?

MR. GOTTLIEB:  Your Honor, I think the problem with that is that Mr. Freedman has continued to make these statements since then, and one of our issues is that ordinarily, the way we would address this, would be at the close of discovery, we would simply -- and pretrial, we would have a conforming amendment to the complaint to include the additional statements or claims of liability that we learned. We haven't obviously have had the opportunity to do that yet, so confining the discovery around the defamatory statements when we -- to know that he has continued to make statements that we plan to allege to be defamatory once we have the opportunity to make that confirmative amendment would limit our ability to test those communications.

THE COURT:  So if he has made statements and they are defamatory and they are retaliatory, one wouldn't think you'd need discovery from the Liner firm to get those.  The internet

is pretty good at getting the statements.  If it's not available and you can't find it on the internet, it would be hard to imagine how it could form the basis for a claim of retaliation.  Do you disagree with that?  I mean, the statements that are not ascribed to him are not made, statements that he made to members of the press that don't get repeated are not going to fall under the basis for a claim.

MR. GOTTLIEB:  Your Honor, what that would cut out are the communications directly with the content creators and directly with, for example, the journalists and the efforts to shape their communications.

Now, my friend had made a representation when she was up here just a minute ago, and I want to make sure I get her words correctly.  She said nothing has yielded any communications between Mr. Freedman and the content creators, nothing has surfaced.  That is a misrepresentation, whether intentional or unintentional.  There is a client of Mr. Freedman who we have become aware of in the past weeks or so, not because of any documents disclosed to us by Wayfarer parties, but instead because of a document produced by a third party after this Court ordered them in a motion to compel to produce that document to us.  I am unable to say the name of this person in open court because there is a confidentiality designation around the document that was produced to us, though I'm happy to do so in a closed session if the Court wants, but

P7UClinO

the document in question is a text chain in which Bryan Freedman introduces one of his current clients to some of the Wayfarer parties in advance of the lawsuit that they filed in January against Ms. Lively, and shortly following that introduction, this particular client of Liner Freedman created and disseminated online content attacking Ms. Lively and the New York Times in January of 2025.  This was a document that was not produced to us by the Wayfarer parties, it was not included on this privilege log, and we only got it after we were forced to file and litigate a motion to compel a third party to produce this document to us, which the Court granted.

I should say also that the defendants have admitted being in communication with certain content creators that have been prolific in publishing derogatory information about Ms. Lively in this case.  Just to give you one example, your Honor, because I think it is relevant to the representations that Ms. Garofalo was making about content creators, the Wayfarer parties have admitted in an interrogatory that they have been in communication with and had conversations that matters relevant to this case with Perez Hilton.  Perez Hilton, we have attempted to subpoena for information through a third-party subpoena, has asserted reporter's privilege and has filed a motion to quash.

By our count, Perez Hilton has posted 540 unique content posts about Ms. Lively in this matter.  On January 2nd

P7UClinO

of this year, Mr. Hilton said in one of his broadcasts, I have a connection to Justin Baldoni, he and I have the same lawyer, Bryan Freedman. He had represented me for the last 19 years. In his post, he has repeatedly reported information by saying things like Team Baldoni confirmed this to me.

Now, we'll never be able to get -- I shouldn't say never, your Honor. It would be difficult for us to obtain that information directly from Mr. Hilton if he stands on a reporter's privilege. Obviously we'll litigate it and we believe we're entitled to obtain at least some of that information through third-party subpoenas. That will come before the Court at another time. But there is just absolutely no reason why the Liner firm should be exempt from providing their communications with someone like Mr. Hilton, who publicly said he is a Bryan Freedman client, is posting regularly about this case, and is saying in public that he is receiving information from the Team Baldoni.

That is one example. There are a bunch of others. Mr. Freedman has been on Megyn Kelly's podcast. Megyn Kelly is a client of Liner Freedman. There are also other individuals and content creators that have posted prolifically about this case that the Wayfarer parties have admitted to being in communications with. One of those is Candace Owens, who is also filing a motion to quash based on reporter's privilege who has had 33 podcasts, 45 minutes in length or longer since

P7UClinO

January of 2025, and was -- happened to be the first person after this Court struck Mr. Freedman's affidavit alleging extortion, she happened to be the first person who posted an exclusive scoop in which she claimed to have been told by Inside Source the information that was in Mr. Freedman's affidavit.

There are more examples, your Honor, there are many, many more examples of this, but the point is that there is considerable evidence that we have obtained, some of which having to scratch and claw our way through motions to compel with third parties, showing that the Liner firm is in communication with these content creators, and that is the reason why we have sought this information.

That does go, your Honor -- I haven't had a chance to talk about yet, which are requests 1 to 4. We obviously don't know the full basis of the representation that's being made by our friends about having no documents in response to any of these.

I would note, your Honor, that one of the things that request No. 1 seeks, it seeks any agreements. So whatever form those agreements might take between the Liner firm and content creators that is related to the action or the parties.

It also seeks any agreement in whatever form it might take with any content creator who has spoken publicly regarding the same. In other words, we'd like to know about Perez

Hilton, who has made 540 posts and who says Bryan Freedman is his lawyer. We would like to know if there actually is an agreement in place between the two of them, and because that agreement is not privileged, we believe that should be produced to us so that we can make our own determination, not relying upon the Liner firm about whether there's further discovery to be done about the nature of the relationship between that content creator and the Liner firm.

And I did not hear my friend to be representing that they have no agreements at all with any of the content creators that have been prolifically posting about this case such as the ones I just identified, but we do believe we're entitled to discovery on the question of whether they have any operative agreements with the individuals who just so happened to be turning out near daily content, all of which is derogatory to our client. We believe we're entitled to discovery on whether they have any kind of an existing agreement with them.

THE COURT: So she said none to me, but she also said in her final words that what they're asking me to rule on is 5 through 8 and not 1 through 4. So it would be a question for Ms. Garofalo, but if 1 through 4 were no longer at issue, you've won on those. I mean, maybe disagreements with respect to what they've produced in response, how to interpret 1 through 4, but aren't I done with respect to the motion to quash on those ones?

P7UClinO

MR. GOTTLIEB:  You are done, your Honor, but you might soon face a motion to compel from us if their position is that they don't -- essentially that they have no agreements that they have reached in order to generate content for this litigation and are unwilling to tell us anything else about the agreements they have with the content creators.  But I certainly agree that if 1 through 4 are done, it's done, and we'll, I suppose, have to come back to the Court for relief if they refuse to respond to the requests.

THE COURT:  If you come back to the Court for relief, you'll have to show me some basis for believing there are documents that are in existence and have not been produced.  But and maybe you've answered this question, but with respect to 1 through 4, if, hypothetically, there were agreements that fell within No. 1, why wouldn't those be producible by the Wayfarer parties?  Why wouldn't they be in the possession, custody, and control of the Wayfarer parties and therefore the Wayfarer parties being the appropriate source of those materials, not the Liner firm in the first instance?

MR. GOTTLIEB:  It is unclear to us whether the Wayfarer parties have any knowledge of the Liner firm's agreements or relationships with some of these content creators.  We simply don't know whether they would have custody or control over it.  We can certainly say this, your Honor, the Wayfarer parties haven't produced to us any kind of documents

or information reflecting communications between the Liner firm and content creators. There haven't been any. So the only documents --

THE COURT: Wouldn't that be within their possession, custody, and control? I mean, there's pretty good law out there that documents that are in the possession of an attorney are deemed to be within the control of the client. That's the reason why you don't go to the attorney in the first instance, you go to the client.

MR. GOTTLIEB: One would think, your Honor. It certainly depends how the law firm structures the relationship. One of our concerns is that the relationships here have been structured in a way to create obfuscation and separation. Perhaps that's not the case, but that's one of the things we're trying to probe. We're trying to probe whether there is some other agreement that is being used to prevent a digital trail, to prevent records to essentially shield the clients from having custody or control over these files.

THE COURT: They may not know of the existence of the agreements. Maybe I need the parties to address -- I don't know if California law is applicable here or New York law. Under New York law, even if the client's not aware of every contract that a law firm does with a third party who's assisting with a litigation upon the termination of the engagement, the client is entitled to all of that information

P7UClinO

back.  It's part of the client file.  The client is entitled to everything that's in the client file, and that means in discovery, if a request is made to the client, then the client has to get it from the law firm.

MR. GOTTLIEB:  I understand, your Honor.  Here's the one reservation I have with that is that it is -- staying with the Perez Hilton example.  If Mr. Freedman has an engagement with Perez Hilton, Perez Hilton has engaged Liner Freedman and Perez Hilton for representation on legal matters.  It has nothing to do with this case.  That would not be -- that agreement would not be in the custody or control of the Wayfarer parties, and if communications between the Liner firm and Mr. Hilton are essentially being placed under that agreement or if payments are being placed under that agreement, whether those payments come in the form of a retention agreement or refunding a retainer, for example, different forms of concealing payments, we believe we're entitled to know that information.  The only way we would ever be able to know that information is by understanding what agreement they have in place and them being able to probe that further in discovery.  Without that understanding, we could never get that from the Wayfarer parties.  The fact that Mr. Freedman has that relationship with many people putting out this content is directly relevant to showing how retaliation can be spread and also showing some of the methods and the ends by which the

P7UClinO

retaliation campaign has spread and also showing why the Wayfarer parties may have chosen and selected Mr. Freedman for representation in this case.  So we think it is relevant to be able to probe those issues, your Honor.

I think, your Honor --

THE COURT:  Is there any reason that you've got to believe there are other relationships besides that with Mr. Perez Hilton?

MR. GOTTLIEB:  Yes, your Honor.  There are three current and former Liner Freedman clients that are mentioned.  So there's Perez Hilton, there's the third one that I mentioned whose name I can't disclose, and then there's Megyn Kelly, and Megyn Kelly, Mr. Freedman went on a -- this is an example of one of the statements that's happened since the amended complaint that we haven't had a chance to add into the pleadings yet, but we certainly will be adding.

On June 11th -- I may have the date wrong.  Yeah, on June 11th, Mr. Freedman went on Ms. Kelly's podcast, and during that podcast, she introduced Mr. Freedman as the person, quote, waging war against Blake Lively who believes is not -- who he believes is not a good person.  She later referred to Ms. Lively as having a reputation for being a bitch, after which Mr. Freedman made repeated attacks on her character, including noting and wondering whether Ms. Lively is a narcissist, who just cannot accept, in his view, quote, how

P7UClinO

she's behaved, how she's treated reporters, and how she's treated people and how she's treated individuals, how she's treated waiting staff and others and saying, it's not okay, we don't like you.  These are the things that Mr. Freedman goes on his clients' shows and says about our client, attacking her character and credibility every time he has a chance.

So we believe that we are entitled to probe the nature of the relationship between the Liner firm and these clients as it is relevant to the defamation claims that we've alleged as well as the retaliation claims.  Those are the three clients that we know of, your Honor.  Part of the problem is we don't know who the other ones are that may be relevant to this.  This is what we've been able to piece together from a combination of public statements, documents produced to us by third parties in discovery, and that's really about it.

THE COURT:  Let me ask you the same question I asked the other side, which is whether the *Freedman* case is the law that I should apply in this case, and whether the fact that it's *dicta* technically makes a difference.

MR. GOTTLIEB:  Your Honor, it's not clear that *Shelton* or *Freedman* is governing authority for this case because both of those cases dealt with deposition requests for attorneys. Some of the cases that have been cited for the parties that follow those cases note that one of the lessons to be drawn from the case is that it's important for attorneys to use

P7UClinO

other, more limited means of probing information before going straight to an attorney deposition. That's exactly what we did here. We didn't come in immediately seeking Mr. Freedman's deposition, although we may at some point do that.

What we have sought is a much more limited request. We think just that the ordinary Rule 26 standard is the governing authority for this particular motion to quash since we sought documents. If the Court is inclined to follow anything, we think following the *Freedman* test, which has been -- notwithstanding that it is *dicta*, it has been followed by a number of courts both within the Second Circuit, but also a lot of the cases from the Central District of California adopt *Freedman* tests rather than the *Shelton* test. We just don't think it makes sense -- any sense at all to apply this sort of very, very strict *Shelton* test, especially outside of the context of a request for a deposition. We think that the more flexible approach that the Freedman court described as being mandated by the federal rules, we agree that that more flexible approach would be the right way to approach this.

That having been said, your Honor, we think, as we articulated here, we satisfy the requirements whichever of those tests this Court adopts.

THE COURT: Ms. Garofalo, do you want a last word?

MS. GAROFALO: I do, your Honor. Firstly, I am honored to be called Mr. Gottlieb's friend.

P7UClinO

On March 31st, 2025, this Court --

THE COURT:  It is in fact what the Court expects of all counsel here.

MS. GAROFALO:  I understand.

THE COURT:  You argue vigorously for your client, but you're prepared to have a drink with each other afterwards.

MS. GAROFALO:  I meant that sincerely, your Honor.

On March 31st, 2025, this Court ruled in *McSweeney v. Cohen* basically that, once a case is started, a defendant can defend publicly and it cannot be the basis for a defamation claim.  We have blurred so many lines here.  One of those lines is, again, in pre-litigation, and after the commencement of litigation, and if I understood my friend Mr. Gottlieb correctly, we are now, or we should be, according to Mr. Gottlieb, required to document in a privilege log communications he believes are relevant after the commencement of litigation that is typically not done, and I do not believe that opposing counsel is going to be documenting all of their communications after this litigation commenced.

More importantly, and I apologize for not understanding that the first category of documents is seeking our engagement letters in other matters with clients who are not parties to this litigation, Mr. Gottlieb stood here and told us about Ms. Lively's allegations.  They are without factual support or basis other than innuendo.  Well,

P7UClinO

Mr. Freedman knows this person, and this person wrote something bad about Ms. Lively, and therefore Mr. Freedman must have caused this to happen.

As far as the public statements go, Mr. Freedman is defending his clients. Mr. Freedman has every right to do that. And I will note that the Lively -- Ms. Lively's counsel has also been quite forward in defending her position.

The one specific example that Mr. Gottlieb cited about retaliation and defamation was a statement that Mr. Freedman made about the claims that Ms. Lively is being retaliated against. Well, our statements or Mr. Freedman's statements that Ms. Lively is being retaliated against by statements that she, in effect, tried to take over this film is a part of the allegations and that this is all in retaliation somehow based on the events, this very fraught relationship between these parties during the movie. A, that is an allegation. It is also no secret, an important part of the defense in this case. Merely calling something that Ms. Lively or her counsel doesn't like defamatory doesn't make it defamatory. Mr. Freedman is allowed to speak publicly as is Ms. Lively and her counsel.

To seek discovery from opposing counsel on the thread that because this person knows this person, and that person knows this person, and therefore this must have happened, is not the standard. It doesn't establish relevance. Going back to this notion that the firm's engagement letters with other

P7UClinO

clients should be produced in this litigation, even though their engagement letters have zero to do with this, and in many cases preceded this litigation by years, is at least to me quite surprising.  For a plaintiff or a party to say, we need to see how the attorney-client relationship is structured with respect to third parties completely unrelated to this litigation, the former representation is, again, to say the least, surprising.  I don't believe it is a proper subject of discovery.  And I do believe that, to a certain extent, Ms. Lively is way out on a limb here.  Allegations are not facts.

I would also like to mention, because I likely overlooked it, the litigation privilege.  We have litigation privilege issues.  To the extent that anything occurred after the litigation was commenced, it is simply not enough to say, well, we think it was a smear campaign.  Mr. Freedman has made public statements in other cases.  This is not enough to overcome the disfavor that courts generally take with respect to discovery from opposing counsel.

The last thing.  Neither the Freedman firm nor the Wayfarer parties can produce documents that don't exist.  The insistence that there must be these documents because we allege and because we have these tenuous connections doesn't create the documents.  So we can be back here on a motion to compel as Mr. Gottlieb suggested he would be doing, but I expect opposing

counsel to be honest with the Court, and I expect -- I hold myself to a fairly high standard of honesty. The fact is that these agreements, and again, I misunderstood that they wanted unrelated retainer agreements --

THE COURT: (Indiscernible crosstalk).

MS. GAROFALO: -- creators in this case do not exist. And nothing Mr. Gottlieb said dictates otherwise.

I'm sorry, your Honor.

THE COURT: Do you disagree that your client, the Wayfarer parties, are entitled to the client file of the Liner firm with respect to this representation?

MS. GAROFALO: Of course not, your Honor.

THE COURT: And that would, I take it, include all agreements that the Liner firm has made with third parties in the course of the representation, regardless of whether or not the Wayfarer parties know of it?

MS. GAROFALO: I agree, your Honor. But of course they are not entitled to -- I think the example Mr. Gottlieb used was Perez Hilton. They certainly are not entitled to retainer agreements with Mr. Hilton, assuming the firm did represent him in some unrelated matter in the past.

THE COURT: But assuming that Mr. Freedman had communications with a content creator to shape the communications, would that be something that the Wayfarer parties would be entitled to get a copy of if they asked for

P7UClinO

it?

MS. GAROFALO:  If they asked for it, I assume so, your Honor.  But again, there is an assumption, there's a fiction that's been built here based on "documents exist."  At one point Mr. Gottlieb complained about Mr. Freedman being on the phone night and day, making comments.  I highly doubt that's true.  On the other hand, if he was, there are no documents. So the fact that documents are not listed in a privilege log should indicate that they don't exist.  Documents that were identified and withheld as privileged were logged, there may be some errors or deficiencies, there always are.  When we say there are no documents in discovery responses, there are no documents, and I don't think it's proper for Mr. Gottlieb to suggest that someone is not taking their obligations, their ethical obligations seriously.

And I'm sorry, your Honor, but if the Court has any other questions.

THE COURT:  I do have one question to you and one question to Mr. Gottlieb.

So am I understanding you correctly that with the exception of retainer agreements with other clients of the Liner firm, that there's no objection at the present to 1 to 4?

MS. GAROFALO:  Correct.  There are agreements that have nothing to do with this case at all.

THE COURT:  All right.  Let me ask Mr. Gottlieb my

P7UClinO

question.

Mr. Gottlieb, in one of the other discovery disputes in this case, I did order one of the parties on the Wayfarer side to disclose, in response to interrogatory, every content creator with whom they spoke.  Have you made such an interrogatory request of the Wayfarer parties?  And in that interrogatory, did you define the Wayfarer parties broadly enough to include Liner?

MR. GOTTLIEB:  May I confer with my colleagues for one moment.

(Pause)

So, your Honor, we did.  I believe it was interrogatory No. 5.  We did propound that interrogatory, we did receive an answer to it.  We have since understood that there will be some supplement to it based on some information provided in discovery, but it is not clear to us -- we believe that that definition would encompass communications between the attorneys at Liner Freedman and content creators.  It is not clear to us how that interrogatory was answered.

THE COURT:  Sounds like after I resolve this motion, there will be some other motions that I have to address.

Thank you, both, for your arguments, and I look forward to getting you an answer as soon as I'm able.  Thank you, all.

* * *