**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BLAKE LIVELY,

                    Plaintiff,

v.

WAYFARER STUDIOS LLC, et al.,

                    Defendants.

No. 24-cv-10049 (LJL)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S PROFFERED EXPERTS**

**TABLE OF CONTENTS**

**Page**

I.  THE COURT SHOULD DENY DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF DR. JENNIFER FREYD. ...................................................................3

    A.  BACKGROUND ..............................................................................................5

        1.  Dr. Freyd's Extensive Background As A Highly Respected Researcher. ...............5

        2.  Dr. Freyd's Opinions Generally and Assuming the Truth of the Allegations. ......6

    B.  ARGUMENT ...................................................................................................6

        1.  Dr. Freyd's Opinions Are Admissible to Contextualize Complex Interpersonal Workplace Relationships Including Those At Issue Here. ................6

            a.  Testimony on DARVO is Admissible. .................................8

            b.  Testimony on Betrayal Trauma and Institutional Betrayal is Admissible. ............11

            c.  Testimony on Betrayal Blindness is Admissible. ...............13

            d.  Dr. Freyd's Second Opinion Is Admissible. .....................15

        2.  Dr. Freyd's Opinions Are Not Offered As "Medical Evidence of Emotional Distress." ......16

        3.  Dr. Freyd's Opinions Are Reliable As Applied Because They Are Not Medical Diagnoses That Require A Clinical Evaluation. ..................17

        4.  Dr. Freyd Will Not Testify As A Summation Witness. ........................18

        5.  Wholesale Exclusion is Unwarranted. ...............................................19

II. THE COURT SHOULD DENY DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PROF. DINA MAYZLIN. ...........................................................20

    A.  BACKGROUND ............................................................................................22

    B.  ARGUMENT .................................................................................................23

        1.  Professor Dina Mayzlin's Testimony Is Reliable. .............................23

            a.  Professor Mayzlin's Opinions Are The Product Of Reliable Principles and Methods. .........23

            b.  Professor Mayzlin's Testimony Is Admissible Because She Has Reliably Applied Established Scientific Principles and Methods In This Case. ..................28

        2.  Professor Mayzlin's Testimony Is Admissible Because It Will Help The Jury Determine Facts In Issue. ..................51

            a.  Professor Mayzlin's Analysis Reflects Expertise and Specialized Knowledge, and Defendants' Cases are Inapposite. ..................52

        b.     Professor Mayzlin Properly Measured the Harm from Defendants' Retaliatory Campaign. .......................................................................54

III.   THE COURT SHOULD DENY DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF DR. ARON CULOTTA. ...........................................................56

    A.    BACKGROUND ...........................................................................................57

       1.    Dr. Culotta's Expertise in Social Network and Statistical Analysis .....................57

       2.    Dr. Culotta's Social Network Analysis in the Instant Case ...............................58

    B.    ARGUMENT ..................................................................................................63

       1.    Dr. Culotta's Testimony Is Reliable. ..................................................................64

           a.     Dr. Culotta's Opinions Are the Product of Reliable Principles and Methods. .............................................................................................64

           b.     Dr. Culotta's Testimony Is Admissible Because He Has Reliably Applied Established Principles and Methods To This Case. ...........................66

       2.    Dr. Culotta's Testimony Is Admissible Because It Will Help the Jury Determine a Fact in Issue. ....................................................................................79

           a.     Dr. Culotta's Opinions as to TikTok, Reddit, and YouTube Are Not Speculative and Are Admissible under Rule 403. ........................................79

           b.     Dr. Culotta's qualitative observations as to TikTok are helpful to the jury. .....................................................................................................82

           c.     Dr. Culotta's TikTok analysis as to both anti-Lively and pro-Baldoni observations are helpful to the jury. ...........................................................83

           d.     Dr. Culotta's Reference to Defendants' Involvement Is Permissible ...............84

           e.     Dr. Culotta's Conclusion As To Other Platforms Is Not Speculative. ..............85

IV.   THE COURT SHOULD DENY DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF DR. ASHLEE HUMPHREYS. ..............................................85

    A.    BACKGROUND ...........................................................................................87

       1.    Dr. Humphreys' Expertise in Social Media, Marketing, and Reputational Repair. ..................................................................................................................87

       2.    Dr. Humphreys' Analysis in the Instant Case. ....................................................88

    B.    ARGUMENT ..................................................................................................89

       1.    Dr. Humphreys' Testimony About the Retaliatory Statements Is Relevant. .........90

       2.    Dr. Humphreys' Testimony Is Reliable and Reflects Reliable Application of Principles and Methods to the Facts of the Case. ............................................92

           a.     Dr. Humphreys' opinions are independent of Dr. Mayzlin's analysis. ..............92

           b.     Dr. Humphreys' approach to "alternative explanations" does not render her testimony regarding the Retaliatory Phrases unreliable. ...........................94

           c.     Dr. Humphreys' data collection is reliable. ....................................................95

       d.    Dr. Humphreys' Retaliatory Statements analysis is reliable without interviewers or consideration of positive statements. ......................................97

       e.    Dr. Humphreys' testimony regarding the Damages Model is the product of reliable principles and methods..................................................................98

V.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JEFFREY H. KINRICH. .........................................................99

    A.    ARGUMENT....................................................................................................102

       1.    Mr. Kinrich's Opinion Calculates Ms. Lively's Economic Losses Under Various Scenarios. ...................................................................................102

       2.    Mr. Kinrich's Expert Opinion Is Admissible and Relevant to Prove Damages Suffered Directly by Ms. Lively, Whether Economic or Noneconomic. ...................................................................................104

       3.    Mr. Kinrich's Lost Profits Opinion Is Not Speculative and Is Based on Sufficient Facts and Data. ...................................................................108

           a.    Mr. Kinrich Relied On Projections Prepared In the Ordinary Course of Business, Which Are Considered "Presumptively Reliable."........................110

           b.    Mr. Kinrich Independently Verified the Projections.....................................112

           c.    The Cases Cited By Defendants Are Distinguishable Because They Involve New Ventures That Never Existed.......................................................114

           d.    Mr. Kinrich Considered And Ruled Out Alternative Causes. ........................116

VI.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF MICHAEL ROBBINS.........................................................118

    A.    BACKGROUND .............................................................................................119

    B.    ARGUMENT....................................................................................................121

       1.    Defendants' Challenge to Robbins' First Opinion Fails.....................................121

           a.    Robbins' First Opinion is Relevant to Retaliation and Liability for Punitive Damages.......................................................................................121

           b.    Robbins' First Opinion is Not a Legal Conclusion and His Testimony Will Assist the Jury, Not Invade its Province. ...............................................124

       2.    Defendants' Challenge to Robbins' Second Opinion Fails. ................................126

           a.    Robbins' Second Opinion is Relevant to Retaliation and Not a Legal Conclusion..................................................................................................126

           b.    Robbins is Qualified to Offer his Second Opinion.........................................126

       3.    Defendants' Challenge to Robbins' Third Opinion Fails. ..................................128

VII.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF MICHAEL SIPPEL. .........................................................129

    A.    BACKGROUND .............................................................................................130

    B.    ARGUMENT....................................................................................................131

iii

      1.        Defendants' Attacks on Opinion 1 Fail ...............................................131

      2.        Defendants' Attacks on Opinion 2 Fail. ...........................................134

VIII. THE COURT SHOULD DENY DEFENDANTS' MOTION TO EXCLUDE THE
     TESTIMONY OF RICHARD MARKS. ...................................................................137

  A.    BACKGROUND ...........................................................................................138

  B.    ARGUMENT................................................................................................141

      1.        Mr. Marks' Lost Earnings Analysis is Admissible.............................141

          a.      Mr. Marks' expert testimony is based on sufficient facts and data.................142

          b.      Defendants' scattershot critique is unavailing.................................145

          c.      Defendants' caselaw is inapposite..................................................148

      2.        Mr. Marks Is Qualified to Opine on Ms. Lively's Endorsements. ......150

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*In re Acetaminophen – ASD-ADHD Prods. Liab. Litig.*,
  707 F. Supp. 3d 309 (S.D.N.Y. 2023)................................................................50

*Adams-Flores v. City of New York*,
  No. 2024 WL 519819 (S.D.N.Y. Feb. 9, 2024)...................................................92

*Ahmad v. New York Univ.*,
  No. 1:22-CV-01248 (JLR), 2025 WL 3022862 (S.D.N.Y. Oct. 29, 2025),
  *appeal withdrawn sub nom. Ahmad v. Mellynchuk*, No. 25-3118, 2026 WL
  698932 (2d Cir. Jan. 23, 2026), *and vacated in part*, No. 1:22-CV-01248
  (JLR), 2026 WL 234594 (S.D.N.Y. Jan. 29, 2026) ...............................................18

*Ali v. New York City Env't Control Bd.*,
  670 F. App'x 26 (2d Cir. 2016) ......................................................................105

*Alla v. Verkay*,
  979 F. Supp. 2d 349, 376–377 (E.D.N.Y. Oct. 30, 2013 .....................................138

*Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting Env't Consulting, Inc.*,
  743 F. Supp. 3d 530 (S.D.N.Y. 2024)..............................................................93

*Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*,
  No. 14-CV-6544(KAM)(GRB), 2018 WL 1525686 (E.D.N.Y. Mar. 27, 2018)...................109

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002).................................................................... *passim*

*Andrews v. Metro North Commuter Railroad Co.*,
  882 F.2d 705 (2d Cir. 1989)...........................................................................52

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
  537 F. Supp. 3d 273 (N.D.N.Y. 2021)...........................................................52, 53

*Arista Recs. LLC v. Lime Grp. LLC*,
  784 F. Supp. 2d 398 (S.D.N.Y. 2011)...........................................................66, 67

*Arista Recs. LLC v. Lime Grp. LLC*,
  No. 06-CV-5936 (KMW), 2011 WL 1674796 (S.D.N.Y. May 2, 2011) ...............................94

*Asahi Kasei Pharma Corp. v. Actelion Ltd.*,
  222 Cal. App. 4th 945 (2013) ........................................................................109

*Ashland Management, Inc. v. Janien*,
  82 N.Y.2d 395 (1993) .................................................................109, 110, 115

*Baca v. City of Los Angeles*,
No. B326863, 2025 WL 900477 (Cal. Ct. App. Mar. 25, 2025) ...........................................104

*Bailey v. San Francisco Dist. Attorney's Off.*,
16 Cal. 5th 611 (2024) .................................................................................................55

*Bertuccelli v. Universal City Studios LLC*,
2020 WL 6156821 (E.D. La. Oct. 21, 2020) .........................................................................37

*Better Holdco, Inc. v. Beeline Loans, Inc.*,
666 F. Supp. 3d 328 (S.D.N.Y. 2023)...................................................................................66

*Bihun v. AT&T Info. Sys., Inc.*,
13 Cal. App. 4th 976 (1993) ...............................................................134, 144, 145, 146, 147

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996) ..............................................................................94, 140, 150, 151

*Bower v. O'Hara*,
759 F.2d 1117, 1127 (3d Cir. 1985)...........................................................................145, 147

*Bowles v. Osmose Utilities Servs., Inc.*,
443 F.3d 671 (8th Cir. 2006) .......................................................................................124

*Bozick v. Conagra Foods, Inc.*,
No. 19-CV-4045 (LJL), 2022 WL 4561779 (S.D.N.Y. Sept. 28, 2022) ................................79

*Brown v. Waterbury Bd. of Educ.*,
247 F. Supp. 3d 196 (D. Conn. 2017)...............................................................................122

*Bryant ex rel. Bryant v. Milhorat*,
2013 WL 12368616 (E.D.N.Y. Sept. 30, 2013) ...................................................................43

*Byrd v. Brown*,
No. 09-cv-5755, 2010 WL 6764702 (S.D.N.Y. Oct. 25, 2010), *report and
recommendation adopted*, No. 09-cv-5755, 2011 WL 2162140 (S.D.N.Y. June 1, 2011) ........7

*Cadena v. Pacesetter Corp.*,
224 F.3d 1203 (10th Cir. 2000) .....................................................................................124

*Calltrol Corp. v. LoxySoft AB*,
2025 WL 2720984 (S.D.N.Y. Sept. 24, 2025)....................................................................126

*Campanella v. County of Monroe*,
853 F. Supp. 2d 364 (W.D.N.Y. 2012)................................................................................90

*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*,
239 F.3d 179 (2d Cir. 2001)..............................................................................................50

*Canino v. H.R.P., Inc.*,
  105 F. Supp. 2d 21 (S.D.N.Y. 2000)........................................................................................19

*Cantu v. Flanigan*,
  705 F. Supp. 2d 220 (E.D.N.Y. 2010) .............................................................................101, 105

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ...........................................................................................50, 69

*Carroll v. Trump*,
  683 F. Supp. 3d 302 (S.D.N.Y. 2023)...........................................................................87, 94, 95

*CCM Touring LLC v. Moonbug Ent. Ltd.*,
  2026 WL 848392 (S.D.N.Y. Mar. 27, 2026).................................................................114, 121

*Celador Int'l, Ltd. v. Walt Disney Co.*,
  Case No. CV 04-3541 FMC (RNFx) (C.D. Cal. 2010) .......................................................140

*Chen-Oster v. Goldman, Sachs & Co.*,
  114 F. Supp. 3d 110 (S.D.N.Y. 2015).....................................................................................79

*Cifone v. City of Poughkeepsie*,
  234 A.D.2d 331 (1996) ..........................................................................................................101

*Clerveaux v. E. Ramapo Cent. Sch. Dist.*,
  984 F.3d 213 (2d Cir. 2021).............................................................................................65, 81

*Commodore Home Sys., Inc. v. Superior Ct.*,
  32 Cal. 3d 211 (1982) ............................................................................................................105

*Cramer v. Grand Rapids Show Case Co.*,
  223 N.Y. 63, 119 N.E. 227 (1918)........................................................................................114

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)......................................................................................................... *passim*

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)...................................................................................................................1

*Dershowitz v. United States*,
  2015 WL 1573321 (S.D.N.Y. Apr. 8, 2015)........................................................................143

*Deutsch v. Novartis Pharm. Corp.*,
  768 F.Supp.2d 420 (E.D.N.Y. 2011) .......................................................................49, 50, 116

*In re Digital Music Antitrust Litig.*,
  321 F.R.D. 64 (S.D.N.Y. 2017) ..............................................................................................67

*Discover Fin. Servs. v. Visa U.S.A., Inc.*,
  582 F. Supp. 2d 501 (S.D.N.Y. 2008)..............................................................................115

*Dixon v. Int'l Bhd. of Police Officers*,
  504 F.3d 73 (1st Cir. 2007)....................................................................................130, 135

*Dixon v. Reid*,
  2025 WL 2417299 (S.D.N.Y. Aug. 21, 2025).......................................130, 134, 135, 150, 151

*Dover v. British Airways, PLC (UK)*,
  254 F. Supp. 3d 455 (E.D.N.Y. 2017) ...................................................................................32

*E.E.O.C. v. Beauty Enters., Inc.*,
  361 F. Supp. 2d 11 (D. Conn. 2005).....................................................................................12

*E.E.O.C. v. Morgan Stanley & Co.*
  324 F. Supp. 2d 451, 462 (S.D.N.Y. 2004), *aff'd in part sub nom.*
  *E.E.O.C. v. Morgan Stanley & Co.*, No. 01-CV-8421(RMB) (RLE),
  2004 WL 1542264 (S.D.N.Y. July 8, 2004)............................................................................8

*Edwards v. Container Kraft Carton & Paper Supply Co.*,
  161 Cal. App. 2d 752 (1958) .....................................................................................105, 108

*El Ansari v. Graham*,
  No. 17-CV-3963 (VEC), 2019 WL 3526714 (S.D.N.Y. Aug. 2, 2019) (MDD) .....................18

*In re Elysium Health-ChromaDex Litig.*,
  2022 WL 421135 (S.D.N.Y. Feb. 11, 2022)............................................................................2

*Ermaris Bio, PBC v. Trs. of Columbia Univ. in City of New York*,
  No. 25 CIV. 3691 (JPC), 2026 WL 520456 (S.D.N.Y. Feb. 25, 2026).........................114, 115

*F.D.I.C. v. Suna Assocs., Inc.*,
  80 F.3d 681 (2d Cir. 1996).............................................................................................33, 72

*Falise v. Am. Tobacco Co.*,
  258 F. Supp. 2d 63 (E.D.N.Y. 2000) ...................................................................................65

*Feltenstein v. City of New Rochelle*,
  2018 WL 3752874 (S.D.N.Y. Aug. 8, 2018)..........................................................................16

*Ferlito v. Harbor Freight Tools USA, Inc.*,
  2025 WL 1181699 (E.D.N.Y. Apr. 23, 2025) ........................................................................37

*Figueroa v. Bos. Sci. Corp.*,
  254 F. Supp. 2d 361 (S.D.N.Y. 2003)...................................................................................82

*In re Fosamax Prods. Liability Litig.*,
    924 F. Supp. 2d 477 (S.D.N.Y. 2013)................................................................80

*Freeman v. Giuliani*,
    732 F. Supp. 3d 30 (D.D.C. 2024) ...............................................................87, 95, 96

*GeigTech East Bay LLC v. Lutron Elecs. Co.*,
    2023 WL 6614486 (S.D.N.Y. Sept. 20, 2023)................................................... *passim*

*In re: Gen. Motors LLC Ignition Switch Litig.*,
    2015 WL 9480448 (S.D.N.Y. Dec. 29, 2015) ...................................................138

*George v. Edwards*,
    No. 01-CV-6481(JBW), 2003 WL 22964391 (E.D.N.Y. Sept. 4, 2003)...........................7, 14

*Goldstein v. Montefiore Medical Center*,
    2025 WL 2726791 (S.D.N.Y. Sept. 25, 2025).........................................................52

*Gray Gables Corp. v. Arthur*,
    2022 WL 905393 (2d Cir. Mar. 29, 2022)...........................................................104

*Green Rush, LLC v. Xhale Tobacco & Hookah, Inc.*,
    2024 WL 4958221 (S.D. Miss. Oct. 10, 2024).........................................................96

*Gussack Realty Co. v. Xerox Corp.*,
    224 F.3d 85 (2d Cir. 2000)...........................................................................111

*Hayden v. IBM Corp.*,
    2025 WL 1697021 (S.D.N.Y. June 17, 2025) ....................................................53, 83

*Hedren v. Allen*,
    No. D061186, 2013 WL 6587921 (Cal. Ct. App. Dec. 16, 2013) ................................. *passim*

*Hodnett v. Medalist Partners Opportunity Master Fund II-A, L.P.*,
    No. 1:21-CV-00038 (JLR), 2025 WL 2607548 (S.D.N.Y. Sept. 9, 2025) ...........................114

*Hope v. California Youth Auth.*,
    134 Cal. App. 4th 577 (2005) ........................................................................133

*Hygh v. Jacobs*,
    961 F.2d 359 (2d Cir. 1992)............................................................................11

*Int'l Cards Co., Ltd. v. MasterCard Int'l Inc.*,
    No. 13 CIV. 2576 (LGS), 2016 WL 7009016 (S.D.N.Y. Nov. 29, 2016)....................106, 112

*Int'l Telepassport Corp. v. USFI, Inc.*,
    89 F.3d 82 (2d Cir. 1996) ...........................................................................108

*J.G. v. New York City Dep't of Educ.*,
719 F. Supp. 3d 293 (S.D.N.Y. 2024).................................................................................28

*Jones v. Niagara Frontier Transp. Auth. (NFTA)*,
836 F.2d 731 (2d Cir. 1987)..............................................................................................105

*Kairam v. West Side GI, LLC*,
2025 WL 2935321 (S.D.N.Y. June 21, 2025) ..........................................................91

*Karkare on behalf of of JN v. Int'l Ass'n of Bridge, Structural, Ornamental &
Reinforcing Iron Workers Loc. 580*,
140 F.4th 60 (2d Cir. 2025) ......................................................................................105

*Kassman v. KPMG LLP*,
416 F. Supp. 3d 252 (S.D.N.Y. 2018).......................................................................121

*Katt v. City of New York*,
151 F. Supp. 2d 313 ...................................................................................................18

*Kenford Co. v. Erie Cnty.*,
67 N.Y.2d 257, 493 N.E.2d 234 (1986)....................................................................114

*Kerner v. Hughes Tool Co.*,
56 Cal. App. 3d 924 (Ct. App. 1976)........................................................................108

*Kohls v. Ellison*,
2025 WL 66514 (D. Minn. Jan. 10, 2025).................................................................28

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)......................................................................................2, 31, 129

*Liberty Sackets Harbor LLC v. Vill. of Sackets Harbor*,
776 F. App'x 1 (2d Cir. 2019) ...................................................................................105

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018).......................................................................76

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
801 F. Supp. 3d 330 (S.D.N.Y. Sept. 25, 2025) ........................................................95

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
589 F. Supp. 3d 302 (S.D.N.Y. 2022)..................................................................97, 111

*Lippe v. Bairnco Corp.*,
288 B.R. 678 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004).................................106

*Lively v. Wayfarer Studios LLC*,
2026 WL 905447 (S.D.N.Y. Apr. 2, 2026)................................................................65

x

*LivePerson, Inc. v. [24]7.AI, Inc.*,
　2018 WL 6257460 (N.D. Cal. Nov. 30, 2018) ....................................................................55

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
　97 F. Supp. 3d 485 (S.D.N.Y. 2015)......................................................................40, 43, 52, 74

*In re Lyondell Chem. Co.*,
　558 B.R. 661 (Bankr. S.D.N.Y. 2016)...................................................................................49

*In re M/V MSC FLAMINIA*,
　No. 12-CV-8892 (KBF), 2017 WL 3208598 (S.D.N.Y. July 28, 2017)................................80

*Malletier v. Dooney & Bourke, Inc.*,
　525 F. Supp. 2d 558 (S.D.N.Y. 2007)............................................................................55, 74

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
　602 F. Supp. 3d 767 (D. Md. 2022) ....................................................................................36

*Matrixx Initiatives, Inc. v. Siracusano*,
　563 U.S. 27 (2011)..............................................................................................................80

*In re Matter of NIR*,
　797 F. App'x 23 (2d Cir. 2019) ....................................................................................17, 18

*Matthews v. Hewlett-Packard Co.*,
　No. 15 CIV. 3922 (DAB), 2017 WL 6804075 (S.D.N.Y. Dec. 22, 2017) .............................18

*Mazzocchi v. Windsor Owners Corp.*,
　204 F. Supp. 3d 583 (S.D.N.Y. 2016)..................................................................................18

*McCoy v. Pac. Mar. Assn.*,
　216 Cal. App. 4th 283 (2013) ......................................................................................55, 105

*McCullock v. H.B. Fuller Co.*,
　61 F.3d 1038 (2d Cir. 1995).................................................................................... *passim*

*Media Glow Digital, LLC v. Panasonic Corp. of N. Am.*,
　No. 16-CV-7907 (HBP), 2019 WL 1055527 (S.D.N.Y. Mar. 6, 2019)..................................78

*Mendoza v. W. Med. Ctr. Santa Ana*,
　222 Cal. App. 4th 1334 (2014) ......................................................................13, 121, 122

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
　341 F. Supp. 3d 213 (S.D.N.Y. 2018)..................................................................................83

*Mono v. Peter Pan Bus Lines, Inc.*,
　13 F. Supp. 2d 471, 480 (S.D.N.Y. 1998)..............................................................143, 145, 147

*Morgan Stanley Mortg. Cap. Holdings LLC,*
289 F. Supp. 3d 484 (S.D.N.Y. 2018)................................................................65

*Mullen v. Bodum USA, Inc.,*
No. 23-CV-1166 (AT), 2025 WL 1735423 (S.D.N.Y. June 23, 2025) ...................78

*Munafo v. Metropolitan Transportation Authority,*
No. 00-CV-0134 (ERK), 2003 WL 21799913 (E.D.N.Y. Jan. 22, 2003) ...............18

*Nat'l Ass'n for Advancement of Colored People, Spring Valley Branch v. E. Ramapo Cent.
Sch. Dist.,*
462 F. Supp. 3d 368 (S.D.N.Y. 2020)................................................................65

*Nature's Plus Nordic A/S v. Nat. Organics, Inc.,*
982 F. Supp. 2d 237 (E.D.N.Y. 2013) ..............................................................109

*Nazir v. United Airlines, Inc.,*
178 Cal. App. 4th 243 (2009) ..........................................................................122

*Nelson v. Pace Suburban,*
2022 WL 1401529 (N.D. Ill. Mar. 21, 2022)....................................................125

*Nieves-Villanueva v. Soto-Rivera,*
133 F.3d 92 (1st Cir. 1997)..............................................................................124

*Nimely v. City of New York,*
414 F.3d 381 (2d Cir. 2005).............................................................................11

*Oliveri v. Delta S.S. Lines, Inc.,*
849 F.2d 742 (2d Cir. 1988).............................................................138, 139, 140

*In re Omnicom Grp. Inc. Erisa Litig.,*
2022 WL 18674830 (S.D.N.Y. Dec. 23, 2022) ...................................................40

*Orozco v. WPV San Jose,*
LLC, 36 Cal. App. 5th 375 (2019)....................................................................108

*Pacific Life Ins. Co. v. Bank of New York Mellon,*
No. 2021 WL 673479 (S.D.N.Y. Feb. 22, 2021)..................................................43

*Patriarch Partners Agency Servs., LLC v. Zohar CDO 2003-I, Ltd.,*
2025 WL 2592224 (S.D.N.Y. Sept. 8, 2025)......................................................103

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
638 F. Supp. 3d 227 (E.D.N.Y. 2022) ................................................................66

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.,*
LLC, 691 F. Supp. 2d 448 (S.D.N.Y. 2010).........................................................66

*Perona v. Time Warner Cable Inc.*,
   2016 WL 9087260 (C.D. Cal. Aug. 12, 2016)..................................................................125

*In re Pfizer Inc. Sec. Litig.*,
   819 F.3d 642 (2d Cir. 2016)...............................................................................................32

*Phoenix Light SF Ltd. v. Wells Fargo Bank, N.A.*,
   574 F. Supp. 3d 197 (S.D.N.Y. 2021)..................................................................................19

*Post Univ. Inc. v. Learneo, Inc.*,
   No. 21-CV-1242 (VDO), 2025 WL 2709370 (D. Conn. Sept. 23, 2025)..............................74

*Questrom v. Federated Dep't Stores, Inc.*,
   84 F. Supp. 2d 483 (S.D.N.Y. 2000)..................................................................................106

*R.F.M.A.S., Inc. v. So*,
   748 F. Supp. 2d 244 (S.D.N.Y. 2010)..................................................................................48

*Ridge Clearing & Outsourcing Sols., Inc. v. Khashoggi*,
   No. 07-CV-6611 (RJH), 2011 WL 3586468 (S.D.N.Y. Aug. 12, 2011)..........................66, 67

*Roberts v. Ford Aerospace & Commc'ns Corp.*,
   224 Cal. App. 3d 793 (Ct. App. 1990)................................................................................123

*Ross v. Guy*,
   No. 18-CV-1340 (WFK) (PK), 2022 WL 768196 (E.D.N.Y. Mar. 14, 2022) .......................18

*Saldana v. Tex. Dep't of Transp.*,
   2015 WL 3952328 (W.D. Tx. June 29, 2015) ............................................................124, 125

*Schonfeld v. Hilliard*,
   218 F.3d 164 (2d Cir. 2000)........................................................................................101, 114

*Schoolcraft v. City of New York*,
   2015 WL 6444620 (S.D.N.Y. Oct. 23, 2015)........................................................................32

*Scott v. Chipotle Mexican Grill, Inc.*,
   315 F.R.D. 33 (S.D.N.Y. 2016) .......................................................................19, 66, 67, 83

*SEC v. Ripple Labs, Inc.*,
   No. 20 CIV. 10832 (AT), 2023 WL 5670711 (S.D.N.Y. Mar. 6, 2023) ..........................65, 67

*Seely v. White Motor Co.*,
   63 Cal. 2d 9 (1965) (en banc) ............................................................................................105

*Shampine v. US Foods, Inc.*,
   2022 WL 17098731 (E.D. Tenn. Nov. 21, 2022) ................................................................125

*Silva v. Lucky Stores, Inc.*,
65 Cal. App. 4th 256 (1998) ........................................................................................122

*Sitter v. Ascent Healthcare Sols., Inc.*,
2011 WL 2682976 (N.D. Cal. July 8, 2011)................................................................124

*Skillz Platform Inc. v. Papaya Gaming, Ltd.*,
2025 WL 3012836 (S.D.N.Y. Oct. 27, 2025).................................................................40

*Spectrum Dynamics Medical Limited, v. GE Healthcare Technologies, Inc., et al.*,
2026 WL 926689 (S.D.N.Y. Apr. 6, 2026)..................................................................103

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
2026 WL 100576 (S.D.N.Y. Jan. 14, 2026) ..................................................................50

*Supply & Bldg. Co. v. Estee Lauder Inter., Inc.*,
2001 WL 1602976 (S.D.N.Y. Dec. 14, 2001) ...............................................................48

*Tardif v. City of New York*,
344 F. Supp. 3d 579 (S.D.N.Y. 2018)...........................................................................82

*Tchatat v. City of New York*,
315 F.R.D. 441 (S.D.N.Y. 2016) ..................................................................................18

*In re Teva Secs. Litig.*,
2021 WL 872156 (D. Conn. Mar. 9, 2021) .............................................................65, 66

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*,
41 F.3d 1570 (2d Cir. 1994).......................................................................................108

*TVT Recs. v. Island Def Jam Music Grp.*,
250 F. Supp. 2d 341 (S.D.N.Y. 2003).........................................................143, 144, 145, 151

*Tyus v. Urban Search Mgmt.*,
102 F.3d 256 (7th Cir. 1996) .......................................................................................31

*U.S. E.E.O.C. v. Scolari Warehouse Markets, Inc.*,
488 F. Supp. 2d 1117 (D. Nev. 2007).........................................................................123

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*,
313 F. Supp. 2d 213 (S.D.N.Y. 2004)..............................................................76, 78, 84

*United States v. Johnson*,
2019 WL 1130258 (S.D.N.Y. Mar. 11, 2019) ...............................................................40

*United States v. Jones*,
965 F.3d 149 (2d Cir. 2020)...........................................................................................2

*United States v. Lumpkin*,
  192 F. 3d 280 (2d Cir. 1999)..................................................................................19

*United States v. Phillips*,
  No. 22-cr-138, 2023 WL 6620146 (S.D.N.Y. Oct. 10, 2023) ..................................66

*United States v. Pollok*,
  139 F.4th 126 (2d Cir. 2025) ........................................................................6, 7, 12

*United States v. Ray*,
  583 F. Supp. 3d 518 (S.D.N.Y.)...........................................................................19

*United States v. Ray*,
  No. 20-CR-110, 2022 WL 101911 .....................................................................66, 72

*United States v. Scop*,
  846 F.2d 135 (2d Cir. 1988), *on reh'g*, 856 F.2d 5 (2d Cir. 1988) ........................125

*United States v. Smith*,
  806 F. Supp. 3d 382 (S.D.N.Y. 2025)....................................................................53

*United States v. Thomas*,
  No. 7:23-CR-00481-NSR-1, 2025 WL 2860312 (S.D.N.Y. Oct. 9, 2025)................9

*United States v. Torres*,
  No. 20CR608 (DLC), 2021 WL 1947503 (S.D.N.Y. May 13, 2021),
  *aff'd*, No. 21-2665-CR, 2023 WL 378942 (2d Cir. Jan. 25, 2023)....................7, 13

*United States v. Zhong*,
  26 F.4th 536 (2d Cir. 2022) ...........................................................................19, 53

*US Dominion, Inc. v. Newsmax Media, Inc.*,
  No. N21C-08-063 EMD (Del. Super. Ct. Mar. 28, 2025) ......................................58

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  2024 WL 4476088 (S.D.N.Y. Oct. 11, 2024)....................................................43, 53

*Velez v. Lasko Prods., LLC*,
  2025 WL 1865165 (S.D.N.Y. July 7, 2025) ...........................................................91

*Vertellus Holdings LLC v. W.R. Grace & Co.-Conn.*,
  2021 WL 3883597 (D. Md. Aug. 12, 2021) ...........................................................55

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011).....................................................................51

*Wadsworth v. Walmart Inc.*,
  348 F.R.D. 489 (D. Wyo. 2025) .............................................................................27

*In re Wireless Telephone Servs. Antitrust Litig.*,
   385 F. Supp. 2d 403 (S.D.N.Y. 2005)...............................................................................95

*Wysinger v. Auto. Club of S. Cal.*,
   157 Cal. App. 4th 413 (2007) ..........................................................................................55

*Yanowitz v. L'Oreal USA, Inc.*,
   36 Cal. 4th 1028 (2005) ...................................................................................................55

*Yphantides v. Cnty. of San Diego*,
   2023 WL 7555301 (S.D. Cal. Nov. 14, 2023) ..........................................................121, 124

*Z.H. v. New York City Dep't of Educ.*,
   2024 WL 3385690 (S.D.N.Y. July 12, 2024) ...................................................................28

*Zhang v. City of New York*,
   2023 WL 6316249 (S.D.N.Y. Sept. 28, 2023).................................................................91

**Statutes**

Cal. Gov't Code § 12940(h)....................................................................................................91

**Other Authorities**

Amy Pei & Dina Mayzlin, "Influencing Social Media Influencers Through
   Affiliation," 41 (3), *Marketing Sci.* 593–615 (Dec. 2021)..........................................22

Arctic Shift data is collected from the official Reddit API,
   https://github.com/ArthurHeitmann/arctic_shift/blob/master/file_content_explanati
   ons.md......................................................................................................................81

Aron Culotta & Jennifer Cutler, "Mining Brand Perceptions from Twitter Social
   Networks," 35 Marketing Sci. 343 (2016),
   https://cs.tulane.edu/~aculotta/pubs/culotta16mining.pdf .......................................65

AWI, *About AWI*, https://www.awi.org/page/about_AWI (last visited Apr. 23, 2026) ..............119

Brealey, Richard A., Myers, Stewart C., Allen, Franklin, *Principles of Corporate Finance*
   91 (McGraw-Hill Irwin ed., 10th ed.).......................................................................106

CACI 351 ...............................................................................................................................105

CACI 3963 .............................................................................................................................133

CACI VF-2504........................................................................................................................105

11 *Corbin on Contracts* § 56.17 (2025)....................................................................................109

Daniel J. Hopkins & Gary King, A Method of Automated Nonparametric Content
  Analysis for Social Science., 54 Am. J. Political Sci., 229, 242 (Jan. 2010),
  https://gking.harvard.edu/sites/g/files/omnuum7116/files/gking/files/words.pdf ...................41

David Godes & Dina Mayzlin, "Firm-Created Word-of-Mouth Communication:
  Evidence From a Field Test," 28 (4) *Marketing Sci.* 721–39 (July–Aug. 2009).....................22

DEP'T. OF FAIR EMP. AND HOUS., *California Department of Fair Employment and
  Housing Workplace Harassment Prevention Guide for California Employers* (Mar.
  2017) (https://calcivilrights.ca.gov/wp-content/uploads/sites/32/2017/06/DFEH-
  Workplace-Harassment-Guide.pdf) .......................................................................................125

Dina Mayzlin, "Promotional Chat on the Internet," 25 (2) *Marketing Sci.*, 155–63
  (Mar.–Apr. 2006) ....................................................................................................................22

Dina Mayzlin, Yaniv Dover & Judith Chevalier, "Promotional Reviews: An Empirical
  Investigation of Online Review Manipulation," 104 (8) *Am. Economic Rev.* 2421–55
  (Aug. 2014) ..............................................................................................................................22

Fabio Barbero et al., "Multi-Modal Embeddings for Isolating Cross-Platform Coordinated
  Information Campaigns on Social Media,", in Disinformation in Open Online Media:
  MISDOOM 2023 (Davide Ceolin et al. eds., 2023), https://arxiv.org/pdf/2309.12764. .........85

Fed. R. Civ. P. 702 ...........................................................................................................................23

Fed. R. Evid. 702 .................................................................................................................. *passim*

Fed. R. Evid. 703 ....................................................................................................................19, 116

Fed. R. Evid. 704 ...........................................................................................................................124

Federico Cinus et al., "Exposing Cross-Platform Coordinated Inauthentic Activity
  in the Run-Up to the 2024 U.S. Election," at 541 in Proceedings of the ACM
  Web Conference 2025 (2025), https://doi.org/10.1145/3696410.3714698; ............................85

Feuerriegel, Stefan et al., "Using Natural Language Processing to Analyse Text Data in
  Behavioural Science," *Nature Reviews Psychology*, Vol. 4, January 2025) ...........................33

Guide: What is CPM? Amazon Ads,
  https://advertising.amazon.com/library/guides/cost-per-mille ...............................................96

FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3d ed. 2011),
  https://www.fjc.gov/sites/default/files/materials/21/SciMan3D01.pdf ..................................41

*Institutional Betrayal and Courage*, CENT. FOR INST. COURAGE,
  https://www.institutionalcourage.org/tracking-research.........................................................17

*Jennifer Freyd*, GOOGLE SCHOLAR,
   https://scholar.google.com/citations?user=eviUYRUAAAAJ&hl=en (last
   visited Apr. 23, 2026) ..........................................................................................................5

Judith A. Chevalier & Dina Mayzlin, "The Effect of Word of Mouth on Sales:
   Online Book Reviews," 43 (3) *J. of Marketing Res.*, 345–54 (Aug. 2006)............................22

Kate Starbird, "Examining the Alternative Media Ecosystem Through the Production of
   Alternative Narratives of Mass Shooting Events on Twitter," in Proceedings of the 11th
   International AAAI Conference on Web and Social Media (2017),
   https://ojs.aaai.org/index.php/ICWSM/article/view/14878/14728 .........................................75

Laura Rikard, *About*, https://laura-rikard.com/about/ (last visited Apr. 23, 2026)......................127

Liu et al. at 184; Savvas Zannettou et al., On the Origins of Memes by Means of
   Fringe Web Communities, in Proceedings of the Internet Measurement
   Conference 2018, at 1, 10 (2018), https://arxiv.org/pdf/1805.12512; ....................................74

Maria Castaldo et al., "Fake Views Removal and Popularity on YouTube," 14 Sci.
   Rep. 15443 (2024), https://www.nature.com/articles/s41598-024-63649-w............................81

Matt Grobar, Sony's Debut Trailer for 'It Ends With Us' Starring Blake Lively
   Clocks 128.1M Views In First 24 Hours, Biggest Recent Debut For Female
   Event Movie, Deadline (May 22, 2024), https://deadline.com/2024/05/it-ends-
   with-us-trailer-clocks-128-1-million-views-first-24-hours-1235927513/ ..............................44

Md Kaykobad Rexa et al., "Model, Analyze, and Comprehend User Interactions
   Within a Social Media Platform," in the 2024 27th International Conference
   om Computer and Information Technology (2024),
   https://ieeexplore.ieee.org/abstract/document/11022085; ......................................................81

Michael Robbins & Matthias H. Wagener, *Investigations in Hollywood: It's the
   Same, But Different* 13 AWI J. no. 3, at 1 (Dec. 2022). ........................................................129

Oluwaseyi Adeliyi et al., "Detecting and Characterizing Inorganic User
   Engagement on YouTube," Workshop Proceedings of the 18th International
   AAAI Conference on Web and Social Media: CySoc (2024),
   https://workshop-proceedings.icwsm.org/pdf/2024_01.pdf.; ..................................................70

Ping Liu, Aron Culotta et al., "Forecasting the Presence and Intensity of Hostility
   on Instagram Using Linguistic and Social Features," Proceedings of the 12th
   International AAAI Conference on Web and Social Media, at 181, 184 (2018),
   https://ojs.aaai.org/index.php/ICWSM/article/view/15022/14872 .........................................65

Pulsar, "Pulsar in Academic Research,"
   https://www.pulsarplatform.com/academic-research ..............................................................31

Reilly, R. F., & Schweihs, R. P., *The Handbook of Advanced Business Valuation*
(McGraw-Hill ed., 1999) ...........................................................................................106

SAG AFTRA, *About*, https://www.sagaftra.org/about (last visited Apr. 22, 2026) ............126, 128

Samuel Arowosafe and Ernest Makata, "Polarization an Sentiment Shifts in Reddit Discussion
on the US Foreign Aid Freeze," 6 J. Media 199 (2025),
https://www.mdpi.com/2673-5172/6/4/199 ..........................................................................82

Shadi Shajari & Nitin Agarwal, "Safeguarding YouTube Discussions: A Framework for
Detecting Anomalous Commenter and Engagement Behaviors," 15 Soc. Network
Analysis & Mining 54 (2025), https://www.researchgate.net/publication/392167001 ...........70

Tuğrulcan Elmas et al., "Ephemeral Astroturfing Attacks: The Case of Fake
Twitter Trends at 403," in 2021 IEEE European Symposium on Security and
Privacy (2021), https://doi.org/10.1109/EUROSP51992.2021.00035.....................................81

## INTRODUCTION

Ms. Lively respectfully submits this opposition to Defendants' motion to exclude the testimony and opinions of Plaintiff's proffered experts Dr. Jennifer Freyd, Prof. Dina Mayzlin, Dr. Aron Culotta, Jeffrey H. Kinrich, Michael Robbins, Michael Sippel, and Richard Marks ("Motion" or "Mot."). For the reasons described herein, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rules of Evidence 702, 401, and 403, Defendants' Motion should be denied in its entirety.

## LEGAL STANDARD

The introduction of expert testimony is governed by FRE 702, which provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;

  (b) the testimony is based on sufficient facts or data;

  (c) the testimony is the product of reliable principles and methods; and

  (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."[1]

Analyzing whether a proffered opinion is admissible under Rule 702 breaks down into two prongs: (1) the reliability of its reasoning or methodology, and (2) its relevance to the facts of the case. *See Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579, 589 (1993). This inquiry must

---

[1] Nothing in the 2023 Amendment to Rule 702 "impose[d] any new, specific procedures . . . . Similarly, nothing in the amendment requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support. The Rule 104(a) standard does not require perfection." Fed. R. Evid. 702, Advisory Committee Notes to 2023 amendments.

focus "on principles and methodology, not on the conclusions that they generate." *Id.* at 595. The Court's objective in exercising its gatekeeping function here "[i]s to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Courts begin "with a presumption that expert evidence is admissible." *In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *1 (S.D.N.Y. Feb. 11, 2022) (quotation omitted). The Rule 702 analysis "is a flexible one," and its requirements are contextualized by the "liberal thrust of the Federal rules and their 'general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert*, 509 U.S. at 587–88, 594, 597 (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988) and concluding that "'[g]eneral acceptance' [of scientific theory or technique by the scientific community] is not a necessary precondition to the admissibility of scientific evidence"). The Court's task is to assess reliability of the methodology, not choose between competing views of the evidence. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

Disputes as to an expert's methodology "go to the weight, not the admissibility, of his testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995). Rather than exclusion, when a party disagrees with an expert's conclusions, it may use "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" to address that evidence at trial. *Daubert*, 509 U.S. at 596; *United States v. Jones*, 965 F.3d 149, 162 (2d Cir. 2020) ("Although expert testimony should be excluded if it is speculative or conjectural, … or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison…. other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.").

2

**I.      THE COURT SHOULD DENY DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF DR. JENNIFER FREYD.**

Defendants seek to exclude the testimony of Dr. Jennifer Freyd, a highly respected trauma researcher whose social science research explains interpersonal dynamics that are routinely misunderstood by lay jurors. But Defendants' motion rests on a fundamental mischaracterization of what Dr. Freyd actually offers. They repeatedly and incorrectly re-label her social science testimony as medical opinion, then attack that strawman under Fed. R. Evid. 702 ("Rule 702"). Defendants' arguments fail upon a proper characterization of her testimony.

*First,* Dr. Freyd's opinions are admissible because she offers research-based testimony explaining patterns of behavior—specifically, DARVO, betrayal trauma, institutional betrayal, and betrayal blindness—and applies that framework to this case. She provides context on complex dynamics including how an individual can continue working in a workplace relationship even after the company betrays her, and how an accused can escalate his response to allegations against him from simple denial to aggressive attacks on the victim's character, ultimately reversing the role of victim and offender. This is a retaliation case arising from Defendants' campaign to "bury" Ms. Lively after she complained of workplace harassment. Dr. Freyd's testimony is crucial for the jury to assess Defendants' post-complaint retaliatory animus and Defendants' claimed reasonableness of defensive measures. Without this expert context, jurors risk misconstruing that an aggressive counterattack necessarily implies falsity of the underlying complaint, rather than understanding that it can itself be a predictable response to being accused.

*Second,* Dr. Freyd's opinions are not offered as medical evidence of emotional distress or to support garden variety emotional distress. Instead, Dr. Freyd will testify to research-based testimony describing patterns of conduct that are crucial to assist the jury in evaluating evidence

3

involving complex interpersonal and institutional workplace dynamics. The Court's order precluding medical evidence of emotional distress does not impact such social science testimony.

**Third,** Defendants' do not dispute the validity of Dr. Freyd's underlying theories—which they concede are reliable "in general"— but rather contend that Dr. Freyd's opinions are unreliable as applied because she did not conduct a clinical evaluation of Ms. Lively. That argument misunderstands both Dr. Freyd's expertise and her opinions. Dr. Freyd is not a treating clinician and does not purport to offer medical diagnoses. Her opinions are grounded in decades of peer-reviewed research, accepted methodologies, and established research tools. Rule 702 does not require a social-science expert to perform a medical assessment, and Defendants cite to no authority imposing such a requirement.

**Fourth,** Defendants' characterization of Dr. Freyd's opinions as improper summation is incorrect. Dr. Freyd does not resolve disputed facts, assess credibility, instruct the jury on the law, or tell the jury what result to reach. Opining on a research framework generally, and applying that framework to assumed facts, is not impermissible summation. Her report repeatedly emphasizes that her opinions are based on assumed facts precisely because factual determinations are reserved for the jury. And any question as to such assumptions goes to weight, not admissibility.

**Finally**, Defendants cite to no authority requiring wholesale exclusion of Dr. Freyd's testimony. Excluding Dr. Freyd's testimony entirely would distort Rule 702's purpose far beyond its gatekeeping function.

4

A.      BACKGROUND

### 1.      Dr. Freyd's Extensive Background As A Highly Respected Researcher.

Dr. Freyd is a highly cited and respected researcher, and professor of clinical and trauma psychology.[2] Dkt. No. 1334-1 (Expert Report of Dr. Jennifer Freyd ("Freyd Report" or "Freyd Rep.")) at 2. Her numerous publications have been cited in research literature over 27,000 times.[3] She has been awarded numerous honors, including the highest honor by the American Psychological Foundation, the Gold Medal Award for Impact in Psychology. *See id.*, Ex. 1 (CV) at 2. Dr. Freyd is not a therapist or licensed clinician. Freyd Rep. at 3. Instead, as Defendants acknowledge, Dr. Freyd is a "trauma researcher" who focuses on behavior, and specifically, "the psychology of trauma," as well as the "impact of interpersonal and institutional trauma on mental and physical health, behavior, and society." *Id.*; Mot. at 12. Dr. Freyd pioneered interconnected theories that have been extensively researched and relied upon by respected individuals in the field. These theories focus on patterns of behavior in perpetrators' conduct and victims' responses:

- **DARVO**: Dr. Freyd introduced the term DARVO decades ago. It occurs when "Perpetrators and their defenders may Deny the behavior, Attack the victim confronting them, and Reverse the roles of Victim and Offender." Research shows that DARVO is associated with "reducing the believability of victim reports when heard by third parties." Education about DARVO "can reduce its negative impact on victims and observers."

- **Betrayal Trauma**: Dr. Freyd introduced the term, betrayal trauma, in 1991. It concerns "the nature of the victim-perpetrator relationship" and "occurs when someone you trust and/or someone who has power over you mistreats you."

- **Institutional Betrayal**: Dr. Freyd introduced the term institutional betrayal in 2007. It occurs "when the institution an individual trusts or depends on mistreats that individual." That mistreatment can be through acts of commission—such as employers harassing or retaliating against an employee—or omission—such as "a failure to protect when there is a reasonable

---

[2] Defendants do not challenge Dr. Freyd's qualifications. Dr. Freyd has a doctorate in the field from Stanford University, and was a tenured professor of psychology until her retirement. Her CV highlights that she has published hundreds of peer-reviewed articles, published a Harvard Press award-winning book, and previously opined on these issues. *See* Freyd Rep. at 3 & Ex. 1; *see id*. at Appendix A (listing testimony in last four years).

[3] *See Jennifer Freyd*, GOOGLE SCHOLAR, https://scholar.google.com/citations?user=eviUYRUAAAAJ&hl=en (last visited Apr. 23, 2026).

expectation to be protected, such as when an employee who reports being sexually harassed continues to be victimized after their employer fails to take action." Research shows institutional betrayal is "related to measurable harm" and is assessed using a "research tool" that is "not a medical assessment."

- **Betrayal Blindness**: Dr. Freyd's related theory, betrayal blindness, is the "unawareness, not-knowing, and forgetting of betrayal traumas" by victims, perpetrators, and witnesses to "preserve the relationships, institutions, and social systems on which they depend." It can lead to, e.g., "minimization of the significance of the event, and delays in disclosure."

*See* Freyd Rep. at 4–13.

### 2. Dr. Freyd's Opinions Generally and Assuming the Truth of the Allegations.

First, Dr. Freyd provides an extensive research framework explaining her theories ("General Framework Opinion"). *Id*. Second, Dr. Freyd applies that research framework to assumptions to offer two as-applied opinions:

(1) "Ms. Lively has experienced and continues to experience betrayal trauma, institutional betrayal, and DARVO perpetrated by [Defendants]." ("First Opinion").

(2) "Defendants' actions put Ms. Lively at increased risk of the symptoms of distress consistent with research on the mental and physical health impact of betrayal trauma, institutional betrayal, and DARVO." ("Second Opinion").

Freyd Rep. at 1, 14.

### B. ARGUMENT

### 1. Dr. Freyd's Opinions Are Admissible to Contextualize Complex Interpersonal Workplace Relationships Including Those At Issue Here.

Dr. Freyd offers research-based testimony describing patterns of conduct that are crucial to assist the jury in evaluating evidence involving complex interpersonal and institutional workplace dynamics. Courts routinely permit expert testimony that "provides jurors with information to assist them in evaluating, and placing into perspective, conduct that may be the result of complex interpersonal relationships that could be difficult for a jury to understand on its own." *United States v. Pollok*, 139 F.4th 126, 140–41 (2d Cir. 2025). The Second Circuit regularly upholds the

6

"admission of expert testimony to explain conduct not normally familiar to most jurors." *United States v. Torres*, No. 20CR608 (DLC), 2021 WL 1947503, at *7 (S.D.N.Y. May 13, 2021), *aff'd*, No. 21-2665-CR, 2023 WL 378942 (2d Cir. Jan. 25, 2023) (citing *United States v. Joseph*, 542 F. 3d 13, 22 (2d Cir. 2008), *abrogated on other grounds by United States v. Ferguson*, 676 F.3d 260, 276 n.14 (2d Cir. 2011) (citation omitted)) (permitting expert testimony on "coercive control, which is a psychological dynamic often seen in abusive relationships that leads an abuse victim to behave in counterintuitive ways" because it assisted the jury to "contextualize that seemingly counterintuitive behavior"); *see also George v. Edwards*, No. 01-CV-6481(JBW), 2003 WL 22964391, at *4 (E.D.N.Y. Sept. 4, 2003) (expert testimony on rape trauma syndrome probative when offered not to prove that a rape had occurred, but to "educate the jurors about a common but seemingly puzzling reaction (delay in reporting)").

For example, in *Pollok*, the court affirmed the admission of expert testimony on "the general dynamics of sexual abuse, including coercive control tactics" because "given the complexity of these types of interpersonal dynamics," they were "beyond the ken of the average juror" and the testimony "could aid the jury in assessing the relationship between, and behavior of, the defendant and his victims." 139 F. 4th at 140 (citing *United States v. Shine*, No. 20-314, 2022 WL 761520, at *4 (2d Cir. Mar. 14, 2022) (summary order) (holding the district court did not abuse its discretion in admitting expert testimony regarding common practices and methods used in the commercial sex industry)). Similarly, in *Byrd v. Brown*, the court permitted expert testimony on battered woman's syndrome ("BWS") that helped contextualize a victim's behavior, including that "women who exhibit symptoms of BWS are often under the 'coercive control' of their abusers such that they feel compelled to do everything the abuser demands in order to avoid provoking his disfavor." No. 09-cv-5755, 2010 WL 6764702, at *3, 7, 8, (S.D.N.Y. Oct. 25, 2010), *report and*

7

*recommendation adopted*, No. 09-cv-5755, 2011 WL 2162140 (S.D.N.Y. June 1, 2011) (finding that allowing the testimony would not "constitute reliance on that testimony to prove the defendant's misconduct." (citing *United States v. Taylor*, 820 F. Supp. 124, 127 (S.D.N.Y. 1993)).

Additionally, courts permit expert testimony that opines on both social science theory generally, as well as application of that theory to the present case specifically. For example, in *E.E.O.C. v. Morgan Stanley & Co.*, the court permitted expert testimony on social science research about gender bias in the workplace including the effect of gender stereotypes on personnel decisions, as well as application of that social science research to that case to assess "how these stereotype types may have affected [Defendant's] decisions." 324 F. Supp. 2d 451, 462 (S.D.N.Y. 2004), *aff'd in part sub nom. E.E.O.C. v. Morgan Stanley & Co.*, No. 01-CV-8421(RMB) (RLE), 2004 WL 1542264 (S.D.N.Y. July 8, 2004). Here, each of Dr. Freyd opinions satisfies Rule 702 by providing a "framework to understand trauma response," Freyd Rep. at 2, without which the jury will prejudicially fill gaps with lay misconceptions.

### a.      Testimony on DARVO is Admissible.

Dr. Freyd's testimony on DARVO provides critical research-based context for the jury to evaluate Defendants' post-complaint behavior—the key evidence in this case. DARVO explains a pattern by which the accused not only deny the alleged conduct, but then take the dramatic step of attacking the accuser, so much so that they reverse the roles of victim and offender. Freyd Rep. at 10–12. Dr. Freyd's testimony, as applied here, assists jurors in evaluating whether Defendants' aggressive response to Ms. Lively's complaints follows a scientifically supported pattern.

Specifically, Dr. Freyd explains that Defendants: (i) *denied* misconduct when Baldoni claimed the complaints were taken the wrong way and "all manipulation," and "Heath essentially offered a performative acknowledgment of the women's experiences;" (ii) *attacked* Ms. Lively when she raised concerns by becoming cold, irritated, and uncollaborative, and by "shift[ing] the

8

focus from the misconduct to the accuser's character;" and (iii) *reversed victim and offender* by attempting to "make themselves the victim of Ms. Lively's unwillingness to take photos at the film's premiere" with Baldoni, attacking Ms. Lively's character in the press, and filing lawsuits against Ms. Lively in three jurisdictions to sue her "into oblivion" by accusing her of lying about her complaints to take control of the Film. Freyd Rep. at 28–36.

Dr. Freyd will provide a framework for evaluating whether Defendants' counterattack fits DARVO's research-driven response by abusers—a response that is effective in "rendering victims less believable." Freyd Rep. at 11. Absent Dr. Freyd's testimony, jurors may incorrectly assume that Defendants' aggressive counterattack—including a PR campaign and litigation tactics attacking Ms. Lively's character—necessarily implies the falsity of Ms. Lively's complaints, rather than understanding that it can itself be a predictable response to being accused. This is precisely why Dr. Freyd opines that "Wayfarer's entire defense in such court proceedings is a classic example of DARVO." Freyd Rep. at 34; *see, e.g.*, *Morgan Stanley & Co.*, 324 F. Supp. 2d at 462 (admitting expert social science testimony on gender bias in the workplace, generally, and as applied to the defendant, specifically); *United States v. Thomas*, No. 7:23-CR-00481-NSR-1, 2025 WL 2860312, at *4 (S.D.N.Y. Oct. 9, 2025) (permitting expert testimony by psychologist on dynamics of sex abuse relevant to "contextualize [minor victim's] testimony" and "help explain why an adult is able to manipulate a minor into engaging in commercial sex").

Dr. Freyd's testimony also provides jurors a behavioral framework to evaluate Defendants' retaliatory animus. This testimony is especially critical given the Court's response to Defendants' argument that they took no adverse employment action against Ms. Lively because their actions were reasonably intended to protect themselves. The Court noted, "[t]here are limits to the response that the accused can make in response to claims of harassment." Dkt. No. 1273 at 131–132. Indeed,

"There is an important difference between defending oneself, on the one hand, and threatening, intimidating, or otherwise interfering with someone's right to pursue a discrimination claim on the other." *Id*. (citing, *e.g.*, *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 84 (1st Cir. 2007)). The Court found that "certain conduct" by Defendants "could be construed as directed not at Lively's allegations and at undermining their credibility, ***but as an attack on her professional reputation and livelihood***" and that there "is evidence from which a jury could find that the Wayfarer Parties planned more aggressive action, not only to 'destroy' Lively's accusations but to destroy her and her career." *Id*. at 132 (emphasis added). The Court specifically noted that there is "some direct evidence that the plan to destroy Lively and her career was put into action," including through "working to place 'all kinds of garbage' on Lively in traditional media outlets." *Id*. at 133. Given the Court's order finding that Defendants' conduct could be construed as an attack, the jury should hear the DARVO framework to contextualize a research-based pattern of behavior.[4]

Defendants seek to exclude portions of Dr. Freyd's opinions only as they relate to DARVO on the basis that they are confusing, not helpful, or not necessary. Mot. at 20. But such testimony is especially necessary in light of Dr. Freyd's research showing that DARVO "reduc[es] the believability of victim reports when heard by third parties," and "education about DARVO can reduce its negative impact on victims and observers." Freyd Rep. at 11. Dr. Freyd does not opine on whether retaliation occurred or whether Defendants' explanations are truthful. She explains how jurors can evaluate Defendants' post-complaint conduct without defaulting to lay assumptions that aggressive counterattacks necessarily imply the falsity of Ms. Lively's underlying complaints.

---

[4] Even The Agency Group PR, LLC's ("TAG") April 10, 2026 motion for summary judgment claimed that "Lively took steps to damages Baldoni's reputation," including by "unfollowing Baldoni on social media," having her husband describe Baldoni to others in a certain way, and telling Sony, which co-produced and co-financed the Film, that she would not attend the film's premiere if Baldoni was also present. Dkt. No. 1285 at 7. The jury should have the research-based DARVO framework by which to assess Defendants' efforts of reversing victim and offender.

Defendants' reliance on *Nimely* and *Hygh* is misplaced. Those cases prohibit expert testimony that instructs the jury on the law, resolving credibility disputes, or tells the jury what result to reach. *See Nimely v. City of New York*, 414 F.3d 381, 397–98 (2d Cir. 2005); *Hygh v. Jacobs*, 961 F.2d 359, 364–65 (2d Cir. 1992). Dr. Freyd does none of that here. She instead explains a recognized pattern of behavior so that the jury can better assess the evidence for itself.

### b.    Testimony on Betrayal Trauma and Institutional Betrayal is Admissible.

Dr. Freyd's testimony on betrayal trauma and institutional betrayal—such as when an institution mistreats an individual—assists the jury to understand the workplace dynamics between Ms. Lively and Defendants, and avoid lay misconceptions about what workplace protections should look like when a complaint is raised. Dr. Freyd opines that "Ms. Lively experienced betrayal trauma and institutional betrayal at the hands of Defendants" and "Wayfarer, through their actions and inactions, allowed this betrayal trauma and institutional betrayal to go on for longer than it likely would have had they responded adequately to concerns that Ms. Lively raised…" Freyd Rep. at 14. Indeed, research shows that institutional betrayal can occur through an employer's "failure to protect when there is a reasonable expectation to be protected, such as when an employee who reports being sexually harassed continues to be victimized after their employer fails to take action." Freyd Rep. at 14.

Using a non-medical research tool called the IBQ-2 questionnaire, and assuming the truth of allegations, Dr. Freyd opined on Defendants' institutional response. *See* Freyd Rep. at 20-27 (IBQ-2 analysis). For example, as to one IBQ-2 factor assessing whether the institution played a role in making it difficult to report experience, Dr. Freyd summarizes evidence that Defendants "never provided" Ms. Lively an HR resource, funneled all HR reporting back to them, and failed to have an HR department dedicated to the Film. Freyd Rep. at 24-27 (collecting testimony). She

11

opines that "Ms. Lively's experience are consistent with many, if not all, of the behaviors captured by the IBQ-2 survey items." Freyd Rep. at 20. That institutional structure—combined with Defendants' decision not to conduct an investigation after any complaints—provides the jury an institutional betrayal lens with which to view Defendants' actions. Freyd Rep. at 18, 26–27.

That framework is essential to the jury's evaluation of the workplace environment in which Ms. Lively raised concerns, including Defendants' post-complaint retaliatory animus and Defendants' claimed reasonableness of defensive measures. Without such context, jurors may otherwise assume, with no basis, that the absence of a formal HR investigation, or Ms. Lively's efforts to maintain professional working relationships after she complained of Defendants' conduct, reflect a reasonable institutional response by Defendants. In fact, Defendants are counting on the jury doing just that. Such a conclusion would be prejudicial to Ms. Lively. *See, e.g.*, *Pollok*, 139 F.4th at 140–41 (admitting expert testimony on general dynamics of sexual abuse to assist the jury in "assessing the relationship between, and behavior of, the defendant and his victims"); *Morgan Stanley & Co.*, 324 F. Supp. 2d at 462 (admitting expert testimony on gender bias in the workplace, generally, and as applied to the defendants, specifically); *E.E.O.C. v. Beauty Enters., Inc.*, 361 F. Supp. 2d 11, 17-18 (D. Conn. 2005) (permitting expert testimony on well-recognized theory to explain that rule in workplace did not achieve its purported goal of promoting workplace safety); *see also id.* (citing *United States v. Hall*, 93 F. 3d 1337, 1345 (7th Cir. 1996) (reasoning that social science expert opinion is relevant where it shows that a commonly held belief might be incorrect).

That context is especially important in light of Defendants' continued conduct. In Defendants' April 10, 2026 MIL No. 12, Defendants sought to exclude evidence of the Contract Rider Agreement ("CRA")—a document that Ms. Lively sent to Wayfarer in November 2023 in

12

which she requested that Wayfarer agree to implement seventeen protections to ensure a safe set going forward—arguing that the Court should "prohibit Lively from offering evidence or argument" concerning the CRA "for the purpose of proving liability or the existence of some prior wrongdoing." Dkt. No. 1312 at 35–37. Ms. Lively insisted on the CRA provisions precisely because of Defendants' failures to enforce the very policies they already had in place that prohibited workplace misconduct. *See* Dkt. No. 1364 at 62–64 (Opp. to MIL). Defendants refused to address the CRA's contents in the way Wayfarer's policies dictated such complaints should be addressed—namely, via an investigation—and instead, Baldoni simply decreed that the claims were all "manipulation." *Id*. The jury should assess Defendants' reaction to the CRA, and thus Defendants' retaliatory motive, in the context of Dr. Freyd's research-based institutional betrayal. *See, e.g.*, *Mendoza v. W. Med. Ctr. Santa Ana*, 222 Cal. App. 4th 1334, 1343–45 (2014) (finding employer's "numerous shortcomings" with respect to an investigation following an employee's harassment complaints may be considered evidence from which to infer "retaliatory animus" for firing the employee after making such complaints).

**c.     Testimony on Betrayal Blindness is Admissible.**

Dr. Freyd's testimony on betrayal blindness—the unawareness of betrayal trauma when individuals minimize, normalize, or delay confronting trusted actors about their conduct to preserve relationships, institutions, and social systems on which they depend—assists jurors in "contextualizing [] seemingly counterintuitive behavior." *Torres*, 2021 WL 1947503, at *7. Specifically, Dr. Freyd ties betrayal blindness to Ms. Lively's very first interaction with Baldoni, when he stated to Ms. Lively that he was circumcised, which Ms. Lively found "disturbing." Freyd Rep. at 16. Ms. Lively's reaction at the time was to write the comment off as "taking a benign conversation too far" given it was one comment and "he seemed nice." *Id*. Dr. Freyd opines that this initial interaction between Ms. Lively and Baldoni "planted the seeds" for betrayal blindness

13

in Ms. Lively's interactions with him going forward, whereby Ms. Lively "continued to give [Baldoni] the benefit of the doubt" as he continued violating her boundaries.

Dr. Freyd's testimony is crucial because it provides the jury a research-proven framework by which to assess seemingly counterintuitive behavior—how Ms. Lively could simultaneously recognize problematic conduct, while continuing her professional obligations with Defendants.[5] Without such context, jurors might incorrectly interpret Ms. Lively's actions as counter to a reasonable, good faith belief of harassing conduct, even though her actions followed a research-proven pattern to preserve a relationship. They may also incorrectly evaluate the timing of Ms. Lively's complaints, without understanding contextual research directly bearing on a complainant's delays in raising concerns. *See, e.g.*, *Byrd*, 2010 WL 6764702, at 3, 7, 8 (permitting expert testimony on BWS to contextualize victim's behavior); *George*, 2003 WL 22964391, at *4 (permitting expert testimony on rape trauma syndrome to contextualize delay in rape reporting). Defendants challenge a single sentence of Dr. Freyd's report relating to betrayal blindness: "It is my opinion that Ms. Lively's willingness to overlook this inappropriate comment [regarding Baldoni stating he was circumcised] reflected both a maturity in understanding that sometimes good people say inappropriate things, but also planted the seeds for a kind of low-level betrayal blindness, whereby Ms. Lively continued to give Mr. Baldoni the benefit of the doubt as he continued to make inappropriate remarks and violate Ms. Lively's boundaries in a sexually

---

[5] While the Court noted that Ms. Lively "enjoyed the economic independence to walk at any moment with the only consequence being that she would potentially be in breach of contract," Dkt. No. 1273 at 74, Dr. Freyd's testimony on behavioral research sheds light on the choice of walking away or putting up with harassing conduct. *See* Freyd Rep. at 5-6. Indeed, Ms. Lively "felt a responsibility to keep the production on track for the benefit of all cast and crew." Freyd Rep. at 5-6, 19 (citations omitted). A breach of contract is not an abstract state of being that would have ended at the breach. Such a breach would surely have resulted in a substantial lawsuit by Wayfarer, or at minimum a credible threat of one that would have quickly ended any notion of "walk[ing] at any moment." The choice to continue to endure a workplace permeated by sex-based conduct and retaliation, or to invite aggressive litigation from a very well-funded adversary, is a Hobson's choice. No amount of economic independence can effectively resolve that dilemma.

14

inappropriate way." Mot. at 18-19; Freyd Rep. at 16. To the extent Defendants challenge that sentence alone or the broader theory of betrayal blindness generally, their argument rests on a mischaracterization of the theory.

Defendants assert that this one sentence "falls far short of a diagnosis." Mot. at 18. As set forth *infra*, Dr. Freyd does not offer diagnoses. She offers social science research for context. Defendants also manufacture a "fit" question by wrongly defining betrayal blindness as "suppression of a painful memory" and arguing it is "well within the ken of the ordinary juror." Mot. at 18. They then claim that Dr. Freyd's finding that "Lively oscillated between awareness of Mr. Baldoni and Wayfarer's toxic behavior and an understandable desire to hope for the best," "has nothing to do with 'betrayal blindness.'" *Id.* Defendants' arguments miss the mark. Properly defined, betrayal blindness provides context on how Ms. Lively perceived, processed, and responded to Defendants' conduct over time in order to preserve her working relationship. It is relevant in assessing both the objective, and her subjective belief of harassing conduct. *See* Dkt. No. 1273 at 97–98. Accordingly, Dr. Freyd's testimony is admissible.

### d.    Dr. Freyd's Second Opinion Is Admissible.

Dr. Freyd's Second Opinion likewise satisfies Rule 702. Dr. Freyd opines that exposure to betrayal trauma, institutional betrayal, and DARVO is generally associated with an increased risk of symptoms of distress in the general population, and that here, Defendants' conduct, if true, put Ms. Lively at "increased risk" of such responses consistent with research on those theories. Freyd Rep. 36–38. Dr. Freyd also opines that each new instance of institutional betrayal "exacerbates the harm of betrayal trauma." *Id.* This testimony provides a lens with which to assess the compounding harm of multiple betrayals by Defendants, where jurors might otherwise infer that Ms. Lively's continued professional functioning negates the possibility of any distress associated with workplace betrayal. This context is particularly important given that "alleged retaliatory acts are

15

to be considered collectively, rather than individually, and may take the form of a series of subtle, yet damaging, injuries." Dkt. No. 1273 at 99 (citing *Bailey v. S.F. Dist. Atty's Off.*, 552 P. 3d 433, 451 (Cal. 2024); *Yanowitz v. L'Oreal USA, Inc.,*116 P.3d 1123, 1139 (2005) (quotations omitted)). Without Dr. Freyd's testimony, jurors may neglect to see the cumulative nature of Defendants' conduct. Accordingly, Dr. Freyd's opinions are admissible.

### 2.    Dr. Freyd's Opinions Are Not Offered As "Medical Evidence of Emotional Distress."

Defendants' assertion that Dr. Freyd's testimony on betrayal trauma and institutional betrayal must be excluded as "medical evidence of emotional distress" because Ms. Lively waived such evidence, rests on a mischaracterization of Dr. Freyd's opinions. While the Court barred "medical evidence" of emotional distress, it expressly permitted evidence of "garden-variety emotional distress," including evidence that the plaintiff suffered humiliation, anxiety, stress, embarrassment, loss of sleep, or loss of appetite. *See* Dkt. No. 313 (Memo Endorsement); *see, e.g.*, *Feltenstein v. City of New Rochelle*, 2018 WL 3752874, at *5 (S.D.N.Y. Aug. 8, 2018) (citation omitted) (explaining that plaintiff could testify about her allegations that "she suffered 'emotional distress, including but not limited to humiliation, embarrassment, stress, and anxiety'").

Dr. Freyd's testimony is not offered to *prove* emotional distress of any kind. Nor is it offered to prove, as Defendants' claim, "opinions regarding the trauma Lively supposedly suffered." Mot. at 14. Dr. Freyd will not testify that Ms. Lively did, in fact, suffer any injury. Instead, as set forth *supra*, Dr. Freyd offers research-based testimony to rebut the faulty inference that Ms. Lively's continued functioning negates the possibility of any distress. Indeed, Dr. Freyd's theories are measured using "research tools" that are "not [] medical assessment[s]." Freyd Rep. at 10.

16

### 3. Dr. Freyd's Opinions Are Reliable As Applied Because They Are Not Medical Diagnoses That Require A Clinical Evaluation.

Defendants also mischaracterize Dr. Freyd's Second Opinion that "Defendants' actions put Ms. Lively at increased risk of the symptoms of distress," as an attempt to "diagnose a patient." Mot. at 18. They then use that mischaracterization to argue that the absence of a clinical evaluation of Ms. Lively renders the opinion unreliable in application. Mot. at 15.

Notably, Defendants do not contend that Dr. Freyd's General Framework Opinion—on betrayal trauma, institutional betrayal, or related concepts—is unreliable. To the contrary, they concede they are reliable "in general." Mot. at 15 ("even assuming that Dr. Freyd's theories are reliable 'in general'…").[6] Defendants cannot credibly argue that those theories become unreliable merely because Dr. Freyd applies them to the allegations in this case without a clinical interview. Dr. Freyd does not purport to diagnose Ms. Lively. Defendants themselves refer to the Second Opinion as "not-quite-diagnosis." Mot. at 13. They also acknowledge that Dr. Freyd is not a "therapist or licensed clinician." *Id*. at 17. Rather, as set forth *supra*, her opinions are offered for a different purpose—to provide a framework of proven patterns of behavior.

Courts have rejected the proposition that expert testimony grounded in social science research is inadmissible solely because the expert did not personally examine a litigant. For example, in *In re Matter of NIR*, the Second Circuit affirmed the district court's judgment after the district court permitted an expert psychologist's testimony that opined without any clinical interviews that the petitioner's abuse of the respondent would "likely continue" and there was a "high likelihood" that the parties' children would develop a psychological disorder should he

---

[6] Indeed, Dr. Freyd's theories are discussed in numerous publications. *See* Freyd Rep. at 14-13 & n.1-16; Freyd Rep., Ex. 1 (CV) at 10-31 (listing, *e.g.*, books and publications); *see also, e.g.*, *Tracking Research: Comprehensive Database of Studies on Institutional Betrayal and Courage*, CENT. FOR INST. COURAGE, https://www.institutionalcourage.org/tracking-research (tracking publications) (last visited Apr. 23, 2026).

witness such abuse. 797 F. App'x 23, 27 (2d Cir. 2019) (summary order). The court found that the petitioner cited to "no authority indicating that it is improper for a district court to rely on a psychologist's testimony if that testimony is based on social science research rather than in-person examination." *Id.* Similarly, Dr. Freyd opines based on social science research that Defendants' actions put Ms. Lively at "increased risk" of certain symptoms. Freyd Rep. at 36–38.

Defendants' cited cases are inapposite. Each involves experts who offered individualized diagnoses or medical conclusions. For example, in *Tchatat v. City of New York*, the court excluded a psychiatrist's testimony who diagnosed the plaintiff with paranoid schizophrenia and antisocial personality disorder—diagnoses drawn from the Diagnostic and Statistical Manual of Mental Disorders ("DSM")—without conducting a patient interview for a "reliably produced and accurate psychiatric diagnosis." 315 F.R.D. 441, 445 (S.D.N.Y. 2016). Dr. Freyd offers no such opinions. And the remainder of Defendants' cited cases all address experts who diagnosed or found the plaintiff to suffer from psychiatric conditions such as PTSD, major depressive disorder, bipolar disorder, or depression.[7] Evaluated within their proper scope, Dr. Freyd's opinions reflect reliable principles applied for a non-diagnostic purpose, and are therefore admissible under Rule 702.

### 4. **Dr. Freyd Will Not Testify As A Summation Witness.**

Defendants' contention that Ms. Lively intends to use Dr. Freyd as a summation witness misconstrues both the scope of Dr. Freyd's testimony and the governing standard. Mot. at 19–20.

---

[7] *See Katt v. City of New York*, 151 F. Supp. 2d 313 (posttraumatic stress disorder ("PTSD") and symptoms of emotional distress); *Ross v. Guy*, No. 18-CV-1340 (WFK) (PK), 2022 WL 768196, at*4 (E.D.N.Y. Mar. 14, 2022) (PTSD); *Ahmad v. New York Univ.*, No. 1:22-CV-01248 (JLR), 2025 WL 3022862, at*29 (S.D.N.Y. Oct. 29, 2025), *appeal withdrawn sub nom. Ahmad v. Mellynchuk*, No. 25-3118, 2026 WL 698932 (2d Cir. Jan. 23, 2026), *and vacated in part*, No. 1:22-CV-01248 (JLR), 2026 WL 234594 (S.D.N.Y. Jan. 29, 2026) (major depressive disorder ("MDD") and PTSD); *Mazzocchi v. Windsor Owners Corp.,* 204 F. Supp. 3d 583, 602-03 (S.D.N.Y. 2016) (bipolar disorder); *El Ansari v. Graham*, No. 17-CV-3963 (VEC), 2019 WL 3526714, at *5 (S.D.N.Y. Aug. 2, 2019) (MDD); *Matthews v. Hewlett-Packard Co.*, No. 15 CIV. 3922 (DAB), 2017 WL 6804075, at *2-5 (S.D.N.Y. Dec. 22, 2017) (MDD); *Munafo v. Metropolitan Transportation Authority*, No. 00-CV-0134 (ERK), 2003 WL 21799913, at *19-20 (E.D.N.Y. Jan. 22, 2003) (depression).

An expert does not become a summation witness merely by applying specialized knowledge to assumptions or explaining behavioral dynamics. *See* Fed. R. Evid. 702, 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed…"). At trial, Dr. Freyd will not narrate trial testimony, assess credibility, or instruct the jury what conclusion to reach.[8] To the contrary, her testimony supplies jurors with a research-based lens to evaluate evidence they will hear from fact witnesses that they may otherwise misinterpret.

Indeed, Dr. Freyd's Report expressly disclaims any role in fact-finding and repeatedly makes clear that her opinions are based on assumed facts. *See, e.g.*, Freyd Rep. at 14, 33, 38 ("[m]y opinions assume that the facts presented in documents I have received are as presented"; "my analysis assumes that Wayfarer, through TAG and others, engaged, in whole or in part, in the conduct set forth in the Scenario Planning document"). And contentions that an expert's "assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Phoenix Light SF Ltd. v. Wells Fargo Bank, N.A.*, 574 F. Supp. 3d 197, 201 (S.D.N.Y. 2021) (citing *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quotations omitted).

### 5.    <u>Wholesale Exclusion is Unwarranted</u>.

Defendants cite to no case warranting exclusion of Dr. Freyd's testimony entirely. Any concern about overreach can be addressed through appropriate limitations, not wholesale exclusion. *See, e.g.*, *Canino v. H.R.P., Inc.*, 105 F. Supp. 2d 21, 28 (S.D.N.Y. 2000) ("doubts about usefulness of expert testimony should be resolved in favor of admissibility") (quotations omitted).

---

[8] The cases on which Defendants are inapplicable. They concern expert testimony that resolved factual disputes or assessed credibility of fact witnesses. Mot. at 19–20 (citing *Nimely*, 414 F.3d at 398; *United States v. Zhong*, 26 F.4th 536, 556 (2d Cir. 2022); *United States v. Ray*, 583 F. Supp. 3d 518, 540 (S.D.N.Y.); *Tchatat*, 315 F.R.D. at 445; *United States v. Lumpkin*, 192 F. 3d 280, 289 (2d Cir. 1999).

Excluding all testimony would improperly deprive the jury of relevant explanatory context and extend Rule 702 beyond its gatekeeping function.

## II.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PROF. DINA MAYZLIN.

Professor Dina Mayzlin's ("Prof. Mayzlin") testimony is admissible under Rule 702. Drawing on nearly *three decades* of subject-matter expertise in digital marketing, analytics, and economics; using the very methods that she teaches in this nation's highest-ranked higher-learning institutions; and applying well-established analytical techniques, including her own published, peer-reviewed model; Prof. Mayzlin designed a scientific methodology in this case to determine (1) whether there is evidence of manipulation of online conversations financed and/or executed by Defendants and, (2) if so, the manipulation's impact on Ms. Lively's brands, namely, Betty Buzz, Betty Booze, and Blake Brown Beauty. Dkt. No. 1331-2 (Expert Report of Dina Mayzlin ("Mayzlin Rep.")) ¶ 7. She concluded that Defendants' campaign to "bury," "destroy," and discredit Ms. Lively played a central role in shifting consumer attitudes against her. *Id.* ¶ 113. As a result, all three of Ms. Lively's commercial brands saw drastic declines in sales. *Id.* Prof. Mayzlin's opinions are based on and reliably apply social science methods and techniques that satisfy Rule 702 and *Daubert*. *See id*. ¶¶ 13–113; Mot. at 20–41.

Prof. Mayzlin's testimony will be helpful to the jury because it will establish the adverse action element of retaliation and aid in calculating damages. Dkt. No. 520 ¶¶132–34; 295–97; 391, 398.

Notwithstanding their hyperbolic rhetoric, Defendants do not raise meaningful challenges to Prof. Mayzlin's actual methodology. Instead, Defendants repeat their now familiar common sense theories of "organic" causation and offer a generic critique of using artificial intelligence ("AI") large language models ("LLMs"). But LLMs offer a reliable, objective, and scientific

method for identifying and classifying topics from large volumes of social media text, and Prof. Mayzlin used transparent and reliable principles to direct the LLM in this case. Indeed, during her five-hour deposition, Defendants posed virtually no questions of Prof. Mayzlin regarding either the LLM's suitability in large-scale text analysis or whether she applied it correctly here. *See* Ex. A Deposition of Dina Mayzlin ("Mayzlin Dep.") at 185:22–187:16.[9] Moreover, despite having access to *all* of Prof. Mayzlin's raw data, coding, LLM prompts, and findings for more than six months, (Ex. B, Lively Expert Witness Disclosures), Defendants cannot cite to a single hallucination in Prof. Mayzlin's data set of over 1 million pieces of content. There is a reason for that—unlike the horror stories cited in Defendants' AI cases, Prof. Mayzlin did not direct the LLM to assemble or generate content. Instead, the LLM was limited to classifying text from a data set assembled entirely via a collection method ***that Defendants do not challenge***, with results verified manually. Defendants mock certain results of that classification, but tellingly, the sum total of the LLM's errors that Defendants have identified (after months of scrutiny) amounts to a statistically insignificant error rate of 0.91%.

Apart from their irrelevant attacks on AI hallucinations that have not occurred here,[10] Defendants' core argument is that the jury can simply default to common sense to decide why a series of online narratives attacking Ms. Lively's reputation and character happened to catch fire on social media in mid-August, 2024. But Defendants' self-serving gut feelings that the public *must have* organically stumbled upon, and chosen to engage with, their favorite take downs of Ms. Lively are ***useless*** to the jury; what is of great utility, by contrast, is the objective statistical analysis of more than one million social media posts offered by one of the nation's leading experts in the

---

[9] Ms. Lively attaches the Mayzlin Dep. to the Declaration of K. Bender in Support of this Opposition.
[10] In contrast, as discussed in Ms. Lively's Motion to Exclude Testimony of Nicole Alexander, Defendants' rebuttal expert included in her report multiple citations that appeared to be hallucinated. *See* Dkt. No. 1291 at 22.

manipulation of online content about celebrities and their brands. Defendants fundamentally misunderstand Prof. Mayzlin's expertise and methodology in this case, Ms. Lively's claims, and how damages are calculated under FEHA.

In sum, it is Defendants' *Daubert* Motion, *not* Prof. Mayzlin's opinions, that is based on *ipse dixit* without any support in relevant law, industry expertise, literature, practices, methods, or math. The Court should deny Defendants' motion and admit Prof. Mayzlin's testimony under Rule 702.

## A.    BACKGROUND

Prof. Mayzlin is a leading academic experts on online word-of-mouth, digital conversations, and manipulation of online content, with multiple highly cited publications in top journals such as *American Economic Review*, *Marketing Science*, and *Journal of Marketing Research*, including foundational work on the causal impact of manipulated online content.[11] Prof. Mayzlin empirically investigates these topics, including by creating, implementing, and analyzing related scientific models. Mayzlin Rep. at 101–03. Prof. Mayzlin has won *five* top awards in her discipline, one of which she was awarded *three times*. *Id.* at 101. Holding two degrees from MIT, Prof. Mayzlin has spent decades teaching undergraduate, MBA, and PhD courses on digital marketing, analytics, and quantitative modeling at Yale and at the University of Southern California—where she is now the Robert E. Brooker Chair in Marketing. *Id.* ¶ 1. She has served as an expert witness on numerous occasions. *Id.* at 100. It is undisputed that Prof. Mayzlin

---

[11] *See, e.g.*, Dina Mayzlin, "Promotional Chat on the Internet," 25 (2) *Marketing Sci.*, 155–63 (Mar.–Apr. 2006) ("Mayzlin 2006"); Judith A. Chevalier & Dina Mayzlin, "The Effect of Word of Mouth on Sales: Online Book Reviews," 43 (3) *J. of Marketing Res.*, 345–54 (Aug. 2006) ("Word of Mouth Study"); David Godes & Dina Mayzlin, "Firm-Created Word-of-Mouth Communication: Evidence From a Field Test," 28 (4) *Marketing Sci.* 721–39 (July–Aug. 2009) ("Godes and Mayzlin 2009"); Dina Mayzlin, Yaniv Dover & Judith Chevalier, "Promotional Reviews: An Empirical Investigation of Online Review Manipulation," 104 (8) *Am. Economic Rev.* 2421–55 (Aug. 2014) (the "AER Rep." or "AER Report"); Amy Pei & Dina Mayzlin, "Influencing Social Media Influencers Through Affiliation," 41 (3) *Marketing Sci.* 593–615 (Dec. 2021) ("Pei and Mayzlin 2022").

possesses the "knowledge, skill, experience, training, or education" necessary to qualify her as an expert in online word-of-mouth manipulation and its commercial effects. Fed. R. Civ. P. 702. Because Defendants do not challenge Prof. Mayzlin's qualifications (nor can they), this opposition focuses on the reliability and relevance of her methodology.

**B.     ARGUMENT**

Prof. Mayzlin's testimony meets all of the conditions imposed by Rule 702. Her opinions and methodology are reliable. Prof. Mayzlin applied well-established empirical methods for analyzing large-scale text data to a dataset of over one million online conversations, and her methods are consistent with peer-reviewed academic literature. Prof. Mayzlin's testimony is also relevant and helpful to the jury. It will illuminate the existence, scope, and commercial impact of Defendants' coordinated digital smear campaign—matters that no lay juror could plausibly discern from the raw data alone—thereby establishing both the adverse-action element of retaliation and the basis for calculating Ms. Lively's substantial damages. Defendants' objections rest on mischaracterizations of Prof. Mayzlin's methods, inapplicable fears about uses of AI that simply do not apply here, and disagreements with Prof. Mayzlin's conclusions, all of which go to weight rather than admissibility, and none of which warrant exclusion.

**1.     <u>Professor Dina Mayzlin's Testimony Is Reliable</u>.**

Prof. Mayzlin's testimony is reliable under Rule 702(c)–(d) because it is the "product of reliable principles and methods" which she "reliably applied" to the facts of the case.

**a.     Professor Mayzlin's Opinions Are The Product Of Reliable Principles and Methods.**

Prof. Mayzlin's research is well-grounded in established academic literature. Prof. Mayzlin roots her investigation in academic literature that (1) online conversations causally influence consumer behavior and product sales; (2) celebrity reputations and affiliated commercial brands

23

are inextricably intertwined, "such that reputational shocks to a celebrity can transfer directly to" the brands they own; and (3) online conversations can be strategically shaped and manipulated to influence commercial performance. Mayzlin Rep. ¶¶ 11, 41–45.

Prof. Mayzlin's expertise in digital marketing, analytics, and economics, underlies her methodology. Prof. Mayzlin's methodology applies her own published, peer-reviewed research on the causal effects of online word-of-mouth and the manipulation of online reviews.[12] *Id.* ¶ 2.

Contrary to Defendants' suggestions, Prof. Mayzlin did not apply AI tools to collect her data set. Instead, Prof. Mayzlin collected her own data, using reputable and unchallenged tools, and assembled a large sample size of *over one million* online conversations retrieved from three major social media platforms—X/Twitter, Reddit, and YouTube—from May 1, 2024, through February 28, 2025,[13] which provided a baseline period and a post-discontinuity period consistent with the study's causal inference framing. *See id.* ¶¶ 65–66.

Prof. Mayzlin then applied mutually reinforcing analytical techniques that are reliable and accepted in her field. Specifically, she deployed Latent Dirichlet Allocation ("LDA") Topic Modeling, two different LLM approaches (a type of artificial intelligence or "AI"), and manual review applied to validate both LLM tactics. *See generally id.*; *see also id.* ¶¶ 2, 55, 61, 66. Prof. Mayzlin used LDA, which "is a well-established methodology for identifying and extracting underlying topics from unstructured text, including social media content." *Id.* ¶ 61. "LDA infers . . . patterns directly from the data without predefined categories or human judgment, it offers a systematic, data-driven, and impartial means of summarizing large volumes of text." *Id.* ¶ 61.

---

[12] Defendants not only fail to contest the reliability of the underlying literature, they actually go to great lengths to *credit* Prof. Mayzlin's expert report, Ex. C, the AER Report. Defendants discuss how the AER Report "contains several pages of robustness checks to test alternative explanations for the results" and state how it "contains assumptions and controls." Mot. at 30.

[13] Prof. Mayzlin used this time period to capture and classify relevant conversations during periods before and after August 2024 to "measur[e] the evolution of the sentiment of the conversations and the evolution of the content about Ms. Lively in the aftermath." Mayzlin Rep. ¶¶ 65–66; *see also* Mayzlin Dep. at 76:10–20.

24

Prof. Mayzlin further used two different LLM approaches to classify online conversations into public sentiment categories (positive, negative, neutral, and mixed)—an unsupervised method and a direct method. *Id.* ¶ 68. For the unsupervised method, Prof. Mayzlin did not guide the model regarding which emotion(s) to identify, "giving [the model] the freedom to choose the most appropriate emotion(s) applicable." *Id.* ¶ 70. "[T]he results were manually reviewed[ ] and grouped." *Id.* ¶ 71. For the direct method, Prof. Mayzlin "instructed [the model] to classify . . . sentiment . . . into one of four predefined categories." *Id.* ¶ 74.

Finally, Prof. Mayzlin conducted a separate thematic analysis of online conversations using the LLM to evaluate whether four specific narratives from Defendants' "Scenario Planning"[14] document were echoed in online conversations, deploying intentionally conservative prompts. *Id.* ¶¶ 80, 82–83 & n.169.

Prof. Mayzlin assured validation of results through manual review both for the LLM's sentiment classification and thematic analysis. *Id.* ¶¶ 77–78, 88. The human reviewers adhered to a blind coding protocol. Mayzlin Dep. at 185:5–21. Without any preconceptions, the human coders were given detailed written instructions and classified conversations independently. Mayzlin Rep. at 124. A random sample of 300 online conversations was selected for manual validation of the LLM's sentiment and thematic validation. *Id.* ¶¶ 77–78, 88. With respect to the sentiment classification, the LLM and manual reviews achieved an 85% agreement rate when grouped into

---

[14] These narratives include: (1) "[p]roduction members lost their jobs due to [Ms. Lively's] takeover and insisted upon involvement—including loss of budget due to rescheduling shoot days when [Ms. Lively] refused to show up"; (2) "[w]hen [Ms. Lively] wasn't able to get her way on set or behind the scenes, she involved her husband to create an imbalance [sic] of power between her and [Mr. Baldoni]. [Mr. Reynolds] went so far as to use his power to call agents and agencies, Sony, and other key players so that [Ms. Lively] would get her way"; (3) "[Ms. Lively]'s less than favorable reputation in the industry spans decades and has been reported—there were issues on Gossip Girl, the Town, A Simple Favor, and more"; and (4) "[t]here is a clear, likely motive due to the film's value and fanbase, in which [Ms. Lively] is attempting to bully her way into buying the rights for It Starts With Us." Mayzlin Rep. ¶ 66; Dkt. No. 521-4 at 3 (the "Scenario Planning Document"). Prof. Mayzlin reviewed the Scenario Planning Document, Bates No. KCASE-000004208-211, which is identical to the version cited as an exhibit to Ms. Lively's Second Amended Complaint.

"negative" and "non-negative" sentiments. *Id.* ¶ 79. Importantly, the LLM favored Defendants, classifying 25.3% of the conversations as negative, while the human reviewers classified a higher percentage, 27.7%, of the conversations as negative. *Id.* ¶ 79. With respect to the thematic classification, the LLM and manual reviews yielded an overall agreement rate of 84%. *Id.* ¶ 90. "This close alignment supports the conclusion that the LLM-driven methodology produces aggregate sentiment trends that closely mirror those obtained through manual classification." *Id.* ¶ 79. The LLM thematic classification approach was shown to be even more conservative than the LLM sentiment classification approach. It identified only 2.7% of the sample as agreeing with at least one manipulated narrative compared to 18.3% identified by human reviewers. *Id.* ¶ 90. These empirical results indicate that the LLM *understates* the prevalence of both negative sentiment and manipulated narratives.

Ultimately, the data revealed, first, "that there were two distinct spikes in the *volume* of online conversations: (1) around early August 2024, and (2) in late December 2024, which extends until February 2025." *Id.* ¶ 55. Second, the data showed "that the themes observed in the spikes of negative sentiment in early August 2024 and in December 2024 are closely related to the manipulated narratives about Ms. Lively and narratives from media articles seeded in early August 2024." *Id.* ¶ 81. Based on the data, Prof. Mayzlin concluded that (1) Defendants manipulated online conversations about Ms. Lively, which (2) led to lowered sales of Ms. Lively's commercial brands. *Id.* ¶ 34. As further indicia of reliability, to allow reproduction and verification, Prof. Mayzlin submitted her full raw data and code with her findings. Mayzlin Dep. at 96:10–24.

By failing to challenge their validity, Defendants effectively concede that all but one of the principles and methods Prof. Mayzlin used here are reliable. Their sole objection is to her use of the LLM, arguing that because Prof. Mayzlin used a type of AI, her data is inherently unreliable,

26

and her opinions must be excluded as a matter of course. *See* Mot. at 31–35. In doing so, Defendants critique an application of AI that Prof. Mayzlin ***did not deploy***, and ignore the scientific acceptance and applicability of LLM models to large-scale text analyses.

Prof. Mayzlin used the LLM model, GPT-4o, as a data-classification tool to analyze *existing* text (i.e., the data that she collected), *not* to retrieve or generate new information. Mayzlin Rep. at 525 n.153. She used the LLM to assist in classifying a large amount of reliably sourced and independently gathered data. *See id.* ¶ 66. The LLM did not generate the underlying data, nor did it generate descriptive summaries or aid in drafting Prof. Mayzlin's findings or conclusions. *See id.* The LLM only classified the large number of online conversations, which is a task that would be impracticable to accomplish through manual review. *Id.* ¶ 66; *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489, 493 (D. Wyo. 2025) ("When done right, AI can be incredibly beneficial for attorneys and the public."). This practice is widely accepted in the social science community. Mayzlin Rep. at 55 n.152 (citing Timoshenko, Artem, Chengfeng Mao, and John R. Hauser, "Can Large Language Models Extract Customer Needs as well as Professional Analysts?" *Social Science Research Network*, January 2025, 1–30 ("We examine whether Large Language Models (LLMs) can automatically extract [customer needs ("CN") from textual data] . . . . The extracted CNs are well-formulated, sufficiently specific to identify opportunities, and justified by source content (no hallucinations).")). Given the tone of their *Daubert* Motion, it may come as a surprise that during her deposition, Defendants asked Prof. Mayzlin a grand total of ***three questions*** regarding the LLM, two related to the reliability of LLM as a tool for large-scale text analysis. *See* Mayzlin Dep. at 185:22–187:16. And, as she explained then and has demonstrated via citations to the academic literature, LLM use is "the state of the art now in the industry and also in academia,"

27

and "GPT-4o is probably the most popular model for that . . . It's really effective which is why it's taken over in a short amount of time." *Id.* at 186:12–187:4.

Prof. Mayzlin's report, citations to academic literature, and testimony more than establish that the use of the LLM—particularly when constrained to classification and verified manually (which demonstrated a high level of agreement between LLM and manual results)—is reliable methodology. None of Defendants' authorities hold otherwise; their cases describe completely unrelated generative AI use wherein AI created false information wholesale. *See Kohls v. Ellison*, 2025 WL 66514, at *5 (D. Minn. Jan. 10, 2025) (excluding expert testimony where affidavit contained ChatGPT-generated citations to fake sources, leading to false statements under oath and undermining the expert's "competence and credibility"); *J.G. v. New York City Dep't of Educ.*, 719 F. Supp. 3d 293, 308 (S.D.N.Y. 2024) (discussing cases in which "ChatGPT proved unable to distinguish between real and fictitious case citations" and rejecting law firms' argument that "ChatGPT supports the fee award it urges," noting that the firm "does not identify the inputs on which ChatGPT relied" and "whether ChatGPT . . . considered" certain data); *Z.H. v. New York City Dep't of Educ.*, 2024 WL 3385690, at *5 (S.D.N.Y. July 12, 2024) (same). That is not how Prof. Mayzlin used AI here, and, as discussed below, she applied the LLM model reliably via objective standards.

> **b.**    **Professor Mayzlin's Testimony Is Admissible Because She Has Reliably Applied Established Scientific Principles and Methods In This Case.**

Prof. Mayzlin reliably applied established principles and methods in statistics, machine learning, and text analysis to a large body of data. Her approach is consistent with modern empirical research on large-scale text data. Contrary to Defendants' insistence, *every single step* of Prof. Mayzlin's analysis was not only documented and well-explained, but it was reliably applied and rooted in established literature, as the chart illustrates below.

| Methodological Step | Examples of Reference Guides and Academic Support |
|---|---|
| **Selection of Data Relevant to Legal Controversy**<br><br>Report Section III.C<br><br>Prof. Mayzlin gathered data from Twitter/X, Reddit, and YouTube using a social media data platform called Pulsar Trac. | 1. **Use of Pulsar**: Pulsar, "Pulsar in Academic Research," https://www.pulsarplatform.com/academic-research ("Pulsar in Academic Research") ("Pulsar has been used as a primary data collection and analysis tool in peer-reviewed academic research and institutional reports published between 2018 and 2026, across journals and conference proceedings including the Journal of Medical Internet Research, Frontiers in Veterinary Science, Frontiers in Big Data, the Journal of Marketing Management, and Proceedings of SPIE.").<br>2. **Use of Online Platforms for Data**: Ex. D, Seshadri Tirunillai and Gerard J. Tellis, "Mining Marketing Meaning from Online Chatter: Strategic Brand Analysis of Big Data Using Latent Dirichlet Allocation" ("Mining Marketing Meaning"), 51(4) *J. of Marketing Res.*, 463 (Aug. 2014) ("Online chatter, or user-generated content, constitutes an excellent emerging source for marketers to mine meaning at a high temporal frequency").<br>3. **Use of Tweets for Sentiment Manipulation**: Ex. E, Christopher A. Bail, Christopher et al., "Assessing the Russian Internet Research Agency's Impact on the Political Attitudes and Behaviors of American Twitter Users in Late 2017," 117 (1) Proceedings of the National Academy of Sciences, 243 (Jan. 2020) ("We study this question using longitudinal data that describe the attitudes and online behaviors of 1,239 Republican and Democratic Twitter users from late 2017 merged with nonpublic data about the Russian Internet Research Agency (IRA) from Twitter . . . . These campaigns reportedly involve vast social-media armies that impersonate Americans and amplify debates about divisive social issues such as immigration and gun control.").<br>4. **Use of online content for brand reputation**: Ex. F, Feng Zhu & Xiaoquan (Michael) Zhang, "Impact of Online Consumer Reviews on Sales: The Moderating Role of Product and Consumer Characteristics," 74 *J. of Marketing*, 133, 136–37 (Mar. 2010) ("[C]onsumers use a mix of online (e.g., online reviews, blogs) and offline (e.g., family and friends, salespeople, magazines) WOM information to help structure their decisions."). |
| **Descriptive Data Overview and Temporal Trends**<br><br>Report Section V.A.<br><br>Prof. Mayzlin performed data aggregations and constructed tables illustrating the volume and temporal trends. This analysis showed that the volume of conversations mentioning Ms. Lively increased significantly in August 2024 and in December 2024 through February 2025. | 1. **Volumetric Analyses/Distributions**: Ex. G, Chevalier and Mayzlin 2006 at 347 ("Table 1 presents the summary statistics for the main variables of interest in our data."); Ex. C, AER Rep. at 2427, 2449 ("Table 1 provides summary statistics for review characteristics, using hotels as the unit of observation, for the set of hotels that have reviews on both sites . . . . Table 2 provides summary measures of the hotel's own characteristics."). |
| **Initial/Exploratory Comparison of Textual Patterns in Data Between Periods**<br><br>Report Section V.B.<br><br>Prof. Mayzlin used an LDA model to get an initial, unsupervised view of the data in the corpus. To understand | 1. **LDA Analysis**: Ex. H, David M. Blei, Andrew Y. Ng & Michael I. Jordan, "Latent Dirichlet Allocation," 3 *J. of Machine Learning Res.*, 993, 1007 (Mar. 2003) ("Blei Study") ("[W]e provide an illustrative example of the use of an LDA model on real data . . . these distributions seem to capture some of the underlying topics in the corpus."). |

29

| Methodological Step | Examples of Reference Guides and Academic Support |
|---|---|
| the data and its characteristics without imposing pre-selected labels or categories that may introduce bias. It also motivated the more systematic analysis that followed by establishing that narratives shifted. | |
| **Systematic Comparison of Sentiment in Data Between Periods**<br><br>Report Section V.C.1<br><br>Prof. Mayzlin used an LLM model to classify the sentiment into sentiment classes (positive, negative, neutral, and mixed). Prof. Mayzlin used multiple methods—the "Unsupervised Method" and the "Direct Method" and obtained similar results with both. | 1. **Use of Multiple Methods**: Ex. I, Justin Grimmer & Brandon M. Stewart. "Text as Data: The Promise and Pitfalls of Automatic Content Analysis Methods for Political Texts." 21(3) *Political Analysis*, 1, 4, 14 (2013) ("Grimmer Study") ("Principle 3: There Is No Globally Best Method for Automated Text Analysis," "Or, additional steps can be taken to improve accuracy, including: applying other methods, using ensembles of methods, or switching the quantity of interest to proportions.").<br>2. **Use of LLM-driven Direct/Unsupervised Method**: Ex. J, Artem Timoshenko, Chengfeng Mao & John R. Hauser, "Can Large Language Models Extract Customer Needs as well as Professional Analysts?" Social Science Res. Network, (Jan. 2025) 1–30, 1 ("Timoshenko Study") ("We examine whether Large Language Models (LLMs) can automatically extract [customer needs ("CN") from textual data] . . . . The extracted CNs are well-formulated, sufficiently specific to identify opportunities, and justified by source content (no hallucinations).").<br>3. **Standardization of Emotions Extracted (Unsupervised Method) via Review of a Set of 3,000**: Ex. I, Grimmer Study at 1, 2 ("The primary problem is volume: there are simply too many political texts," "Rather, the methods that we profile here are best thought of as amplifying and augmenting careful reading and thoughtful analysis."). |
| **Assessment of Thematic Alignment with Narratives**<br><br>Report Section V.C.3<br><br>Prof. Mayzlin used an LLM model to study the emergence of narrative themes aligning with Defendants' Scenario Planning Document (also known as "Supervised Classification" in the literature). | 1. **Alignment of Narratives**: Ex. I, Grimmer Study at 21 ("If topics are valid, then external events should explain sudden increases in attention to a topic."); *id.* at 7 ("Assigning texts to categories is the most common use of content analysis methods in political science. For example, researchers may ask if campaigns issue positive or negative advertisements (Ansolabehere and Iyengar 1995), if legislation is about the environment or some other issue area (Adler and Wilkerson 2011), if international statements are belligerent or peaceful (Schrodt 2000), or if local news coverage is positive or negative (Eshbaugh-Soha 2010).").<br>2. **Use of LLM-based Methods for Classification of Narratives**: Ex. K, Stefan Feuerriegel et al., "Using Natural Language Processing to Analyse Text Data in Behavioural Science," 4 Nature Reviews Psychology, 96, 104 (Jan. 2025) ("Feuerriegel et al.") ("One important advantage is their high accuracy for measuring psychological constructs from text data. For example, previous research found that LLMs can accurately predict intercorrelations between different personality scale items."). |
| **Human Driven Validation and Comparison of Results**<br><br>Report Sections V.C.2, V.C.3<br><br>Prof. Mayzlin verified her LLM results by asking a team | 1. **Benefit of AI-Human Collaboration**: Ex. K, Feuerriegel at 103 ("Human validation (comparing the labels assigned by NLP with those assigned by human annotators, typically for a smaller subset of the original dataset) is typically needed to ensure the accuracy of dictionary-based approaches.").<br>2. **Need for Validation**: Ex. I, Grimmer Study at 2 ("This means that the performance of any one method on a new data set cannot be guaranteed, and therefore validation is essential when applying automated content methods.").<br>3. **Number of Samples for Validation**: Mining Marketing Meaning at 470 ("The coders were given the task of reading each of the reviews to arrive at a set |

30

| Methodological Step | Examples of Reference Guides and Academic Support |
|---|---|
| of manual reviewers (who were blind to the broader case context) to classify a sample. | of dimensions and associated valence by parsing the review on the basis of the presence of such terms in each of the reviews. We randomly selected 100 reviews from each brand in a market for this purpose."). <br> 4. **Use of Confusion Matrices to Report Validation**: Ex. I, Grimmer Study at 13 ("Table 2 Confusion matrix: comparing human and supervised coding."). <br> 5. **Acceptable Result for Validation**: Ex. D, Mining Marketing Meaning at 471 ("The average interrater agreement statistic across all the markets in the sample is k = .59 (the market-specific interrater statistic is 60% [mobile phones], 62% [computers], 57% [data storage], 53% [toys], and 61% [footwear]). Given the nature of the task and the level of ambiguity the raters faced while making decisions, these figures indicate a moderate to substantial agreement between the two raters and the automated analysis (for significance figures for the agreement ratings, see Landis and Koch 1977)."). |

Prof. Mayzlin relied on a dataset of over one million online conversations, applied a structured, multi-step, analytical framework grounded in established marketing and empirical research—including large-scale text analysis, thematic identification, and sentiment classification, coupled with manual validation—to reach her aggregate conclusions. *See* Mayzlin Rep. ¶¶ 65–113. This is above and beyond what is needed to show that Prof. Mayzlin reliably applied established scientific principles and methods. *See Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 593–94 (1993) ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one."); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ("[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."); *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263–64 (7th Cir. 1996) (*Daubert* framework applied to social science expert who would testify about advertising campaigns).

Defendants do not rely on any academic literature or expertise to attack the reliability of Prof. Mayzlin's opinions. They rely instead on unsupported logic and irrelevant cases. Defendants also spend the bulk of their opposition challenging Prof. Mayzlin's *conclusion* that Defendants are responsible for manipulating the online conversations around Ms. Lively, shifting the public's sentiment negatively, and thereby likewise driving down the profits of her brands. *See, e.g.,*

31

Mayzlin Dep. at 57:8–16. Throughout pages, they set forth their own theories for what they think best explains the sudden public fascination with negative online content about Ms. Lively during the periods of spikes. *See* Mot. at 23–28. But it is well settled that, in evaluating a *Daubert* motion, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002); *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 662 (2d Cir. 2016). Each of Defendants' arguments amount to disagreements with Prof. Mayzlin's opinions—all of which go to weight rather than admissibility. *Dover v. British Airways*, *PLC (UK)*, 254 F. Supp. 3d 455, 461 (E.D.N.Y. 2017) (citing *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). That alone defeats Defendants' motion. *See Schoolcraft v. City of New York*, 2015 WL 6444620, at *2 (S.D.N.Y. Oct. 23, 2015) (Under *Daubert* and its progeny, the Court is required to assess reliability of the methodology, not to choose between competing views of the evidence).

      i.    <u>Professor Mayzlin's Methodology Follows Accepted Scientific Processes and Is Consistent With Her Prior Published Work.</u>

Defendants argue that Prof. Mayzlin "has never previously applied [this methodology] and appears to have concocted [it] solely for purposes of this litigation." Mot. at 21. But courts have consistently held that an expert may develop a methodology for litigation purposes and apply accepted methodologies in new ways, provided they do so based on reliable principles and methods (as Defendants' own case recognizes). *See Amorgianos*, 303 F.3d at 269 (stating that courts must "assure[ ] that an expert, when formulating an opinion for use in the courtroom, will employ the same level of intellectual rigor as would be expected in the scientific community"); *see also McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to the strengths of [an expert's] credentials, faults in his use of" a particular "methodology, or lack of textual authority

32

for his opinion, go to the weight, not the admissibility, of his testimony."); *id.* at 1043 (allowing testimony despite the fact that expert "could not point to a single piece of medical literature" in support of his opinion); *F.D.I.C. v. Suna Assocs., Inc.*, 80 F.3d 681, 687 (2d Cir. 1996) (finding reliable and relevant expert who relied on "a hybrid of two widely-recognized methods" specifically developed for the case). And, for all the reasons discussed *supra* at 28–31, Prof. Mayzlin reliably applied established principles here.

Defendants also go to great lengths to distinguish Prof. Mayzlin's AER Report from her methodology here, ignoring that (1) Prof. Mayzlin relied on other literature,[15] (2) the methodological framework underlying both studies is exactly the same, and (3) the two studies are alike in many ways. For starters, Defendants could have explored during Prof. Mayzlin's deposition all the ways in which her study here derives from an objective scientific process. They failed to do so. Prof. Mayzlin's methodology both in her AER Report and here comes directly from the scientific process described in a highly-cited research paper that provides a framework for large-scale content analysis. Ex. I, Grimmer Study at 1–3; Ex. O, H. Andrew Schwartz et al. "Personality, Gender, and Age in the Language of Social Media: The Open-Vocabulary Approach." 8 (9) *PloS one* 1, 3 (2013) ("Perhaps one of the most comprehensive language analysis surveys outside of psychology is that of Grimmer & Stewart . . . . They summarize how automated methods can inexpensively allow systematic analysis and inference from large political text collections, classifying types of analyses into a of hierarchy.").

---

[15] Mayzlin Rep. at 48, n.139 (Puranam, Dinesh, Vishal Narayan, and Vrinda Kadiyali,, "The Effect of Calorie Posting Regulation on Consumer Opinion: A Flexible Latent Dirichlet Allocation Model with Informative Priors," *Marketing Science*, Vol. 36 (5), August 2017) and 52, n.152 Timoshenko, Artem, Chengfeng Mao, and John R. Hauser, "Can Large Language Models Extract Customer Needs as well as Professional Analysts?" *Social Science Research Network*, January 2025, and Feuerriegel, Stefan et al., "Using Natural Language Processing to Analyse Text Data in Behavioural Science," *Nature Reviews Psychology*, Vol. 4, January 2025).

As illustrated below, consistent with the gold standards of text analysis, Prof. Mayzlin's methodological framework in this case (like her AER Report) included exploration, topic extraction, sentiment classification, narrative and thematic classification, and validation (all denoted in green).



**Fig. 1**   An overview of text as data methods.

*See* Grimmer Study at 2.

Prof. Mayzlin followed this same foundational framework in both the AER study and this one. To illustrate, in both, Prof. Mayzlin: (1) independently collected data—there, hotel reviews, here, social media posts, AER Rep. at 2427–30; Mayzlin Rep. ¶¶ 31–33; (2) tabulated and aggregated the data—there, by reporting mean, minimum, and maximum valuations for reviews, here, by volumetric averages, counts, and charts, AER Rep. at 2428 (Table 1); Mayzlin Rep. ¶¶ 55–59; (3) used systematic analytical procedures—there, regression analysis, here, LLM and LDA-driven analyses, AER Rep. at 2437, 2440; Mayzlin Rep. ¶¶ 61–76; (4) compared against

baselines—there, to platforms with weak and strong content policies, here, to before-and-after narratives, sentiment, and seeded articles, AER Rep. at 2434–36; Mayzlin Rep. ¶¶ 80–87; and (5) validated results—there, using statistical significance tests, here, using human validation and confusion matrices, AER Rep. at 2437 (Table 3), 2440 (Table 4), 2457 (Table 7); Mayzlin Rep. ¶¶ 77–79, 88–90.

Thus, contrary to Defendants' arguments that Prof. "Mayzlin's expert report in this case" lacks "robustness checks or formal statistical methods," Mot. at 30, the methodology underlying the two studies is the same, and Sections V.C.2. and V.C.3.c. of Prof. Mayzlin's report thoroughly discuss her checks and balances. Because each study is calibrated to different problems, it should come as no surprise that they apply principles in different ways. Prof. Mayzlin need not replicate exactly her previous work, she need only apply established principles reliably. To demand otherwise would stifle scientific innovation. *Daubert*, 509 U.S. at 593–94 ("Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability, . . . and in some instances well-grounded but innovative theories will not have been published . . . . Some propositions, moreover, are too particular, too new, or of too limited interest to be published."); Fed. R. Evid. 702, Advisory Committee Notes to 2000 amendments (discussing relevant factors, including "[w]hether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying") (citation modified). In fact, the literature itself recognizes that variation in methodology is not only normal, it is expected. Ex. I, Grimmer Study at 3 ("There is no globally best method for automated text analysis."); *id.* at 4 ("Different data sets and different research questions often lead to different quantities of interest.").

35

ii.    Professor Mayzlin Reliably Applied the LLM Model.

Additionally, Professor Mayzlin reliably applied the LLM tool. After baselessly wholesale rejecting the use of the LLM as a reliable text-analysis tool in the first place, Defendants attempt to cross-examine Prof. Mayzlin on paper, with questions they did not bother to pose during her deposition, in an effort to undermine her application of the LLM. But, remarkably, Defendants cite no legal or scientific authorities undermining the methodology, no errors they discovered in attempting to replicate her work, and no statistical basis for rejecting her findings.

Defendants cite to random and unverified public accounts of using GPT-4o in a manner that produced errors in coaxing the tool to follow user prompts, Mot. at 32, despite the fact that Prof. Mayzlin, an expert in her field, encountered no such difficulties. And they point to an inapposite case where the court excluded expert opinion regarding a damages model that the expert did not test, whereas Prof. Mayzlin did here, to assure it would provide reliable results. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 602 F. Supp. 3d 767, 786 (D. Md. 2022) (stating expert had a "requirement to show that" his model "can in fact product reliable results by actually testing it").

Prof. Mayzlin controlled every step of the LLM process—inputting independently collected data, directing the model with disclosed prompts, constraining it, and testing its output. Prof. Mayzlin did not use the tool to generate new content, wherein the risk of hallucinations arises; instead, the LLM's findings rest on a dataset that Prof. Mayzlin personally collected using Pulsar, the reliability of which Defendants have not contested. Drawing on her expertise, Prof. Mayzlin then configured the LLM in a manner likely to "minimize the possibility of random variations in the LLM's responses," and created tailored prompts that gave the LLM meticulous instructions for the output, alongside specific formatting instructions to ensure consistency in output. Mayzlin Rep. at 129. Because it does not generate content, the LLM's worst error would be misclassifying a

36

conversation. *See id.* ¶ 66. Professor Mayzlin accounted for this risk in three ways. First, she wove her expertise into specific and cabined prompts. Next, Prof. Mayzlin used two approaches to classify the sentiment of online conversations—an "unsupervised method" and a "direct method." *Id.* ¶ 68. She observed that the trends between the two were "very similar," further assuring the accuracy of the results. *Id.* ¶ 76. Finally, Prof. Mayzlin conducted a manual validation of the LLM results, wherein two neutral, human reviewers who were "blind to the case" and "given very detailed instructions," Mayzlin Dep. at 185:5–12, independently reviewed a random sample of conversations, Mayzlin Rep. ¶ 79. Here, too, there was "close alignment" between the classifications of the LLM and the human reviewers.[16] *Id.*

Prof. Mayzlin's methodology was scientific, objective, replicable, and reliable. *Cf. Bertuccelli v. Universal City Studios LLC*, 2020 WL 6156821, at *2 (E.D. La. Oct. 21, 2020) (finding expert's "methodology reliable given that he conducted an artificial intelligence assisted facial recognition analysis of" two works "to determine whether the use of mathematics and target facial recognition algorithms comparing the two works would find that human perception would view the works as substantially similar," qualifying him as an expert, and stating that Defendants' concerns "can be explored on cross-examination but do not necessitate completely excluding" expert's opinions and testimony); *Ferlito v. Harbor Freight Tools USA, Inc.*, 2025 WL 1181699, at *4 (E.D.N.Y. Apr. 23, 2025) (finding no issue with expert use of AI where "[t]here is no indication that [expert] used ChatGPT to generate a report with false authority or that his use of AI would render his testimony less reliable").

---

[16] The LLM was actually more favorable to Defendants than the manual review, classifying *fewer* conversations as negative than the human reviewer. Mayzlin Rep. ¶ 79. The manual reviewers found over six times as many conversations agreeing with the four narratives from Defendants' Scenario Planning Document. *Id.* ¶ 90.

It is also not the only analysis Prof. Mayzlin performed. Prof. Mayzlin also used an LDA model, another "well-established methodology for identifying and extracting underlying topics from unstructured text, including social media content." Mayzlin Rep. ¶ 61 & n.139 (citing Puranam, Dinesh, Vishal Narayan, and Vrinda Kadiyali, "The Effect of Calorie Posting Regulation on Consumer Opinion: A Flexible Latent Dirichlet Allocation Model with Informative Priors," *Marketing Science*, Vol. 36 (5), August 2017, 726–746, 727 (LDA models "have been developed by computer scientists (specifically in the machine learning discipline) to analyze words in large sets of original text to discover the themes or topics within.")). This tool, too, found similar results. *See* Mayzlin Rep. ¶¶ 62–64.

Defendants claim that the LDA model "contributes little to [Prof. Mayzlin's] conclusions," dissecting her multi-pronged approach into a bare component. Mot. at 31 n.8. But Prof. Mayzlin stresses in her report that "[t]o understand the potential effects of online conversation manipulation on Ms. Lively's personal brand and commercial brands, it is important to first examine public perception before August 2024," and to do so, she uses the LDA model. Mayzlin Rep. ¶ 61. During her deposition, Prof. Mayzlin testified, "[m]y report works as a portfolio of analysis," describing the "six or seven different analys[e]s" she conducted. Mayzlin Dep. at 189:7–13. Regardless, the degree to which Prof. Mayzlin relied on the LDA model has no bearing on the reliability of the LLM model; both are independently reliable, and, here, were used together and reinforced one another. *See id.* ¶¶ 62–64 (using LDA model to examine social media data collected to conduct initial analysis of keywords and "topics" associated with Ms. Lively before August 2024); *id.* ¶¶ 65–67 (using LLM model to classify and interpret conversations" across a relevant time period that "capture[s] nuanced language patterns" and "analyz[es] large collections of documents").

38

Importantly, Defendants have had many months, with all of Prof. Mayzlin's data, LLM prompts, and methods, to demonstrate errors in her statistical analysis. They have failed. Defendants do not provide a single example of a hallucination in Prof. Mayzlin's study, nor any reason based on mathematical or scientific principles to challenge her methodology's validity. Instead, Defendants resort to pseudo-statistics. They identify a series of social media posts that they assert were misclassified by the LLM, claiming that 2,801 conversations report only that Ms. Lively filed this lawsuit,[17] while another 492 posts were misclassified as negative when they should have been classified as positive. Mot. at 32–35. But even accepting Defendants' assertion on its face, that these 3,293 conversations should have been excluded from the corpus of 361,050 negative conversations identified by the LLM would yield a statistically insignificant error rate of 0.91%—*less than one percent*. And these 3,293 conversations amount to just 0.29% of the 1.1 million conversations Prof. Mayzlin analyzed. None of this has any meaningful effect on Prof. Mayzlin's aggregate results, and none of it provides a basis to exclude her testimony. *See* Mayzlin Rep. at 63 (Figure 11) (reporting both false positive and false negatives as part of the validation analysis); *see also* President's Council of Advisors on Science and Technology (US), 2016. *Report to the President, Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-comparison Methods. References*.[18] ("Examiners have sometimes testified, for example, that their conclusions are '100 percent certain;' or have 'zero,' 'essentially zero,' or 'negligible,' error rate. As many reviews—including the highly regarded 2009 National Research Council study—have noted, however, such statements are not scientifically defensible: all laboratory tests and feature-

---

[17] This also assumes that posts about Ms. Lively suing are not negative, do not harm Ms. Lively's reputation, and do not stem from Defendants "g[etting] the ball rolling," Mayzlin Dep. at 131:3–10, ignoring Prof. Mayzlin's conclusions that Defendants' "themes that were planted back in August." Mayzlin Dep. at 179:4–8.

[18] https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_science_report_final.pdf.

comparison analyses have non-zero error rates."); Ex. L, Box, G. E. (1976). Science and statistics. *J. of the Am. Statistical Ass'n*, *71* (356), 791–99, 792 ("Since all models are wrong the scientist must be alert to what is importantly wrong. It is inappropriate to be concerned about mice when there are tigers abroad.").

Ultimately, the issues Defendants have raised are quintessential topics for cross-examination, not grounds for excluding the testimony. That is especially true here, where Prof. Mayzlin's study focuses on broad trends, not individual posts. *See* Mayzlin Rep. at 59, 61, 68, 73 (Figures 9, 10, 12, 13); *see also In re Omnicom Grp. Inc. Erisa Litig.,* 2022 WL 18674830, at *4 (S.D.N.Y. Dec. 23, 2022) (if Defendants believe expert "overlooked critical evidence in developing his opinions, that can be addressed on cross-examination and does not go to [her] ability to offer [her] testimony"); *Skillz Platform Inc. v. Papaya Gaming, Ltd.*, 2025 WL 3012836, at *7 (S.D.N.Y. Oct. 27, 2025) (party's skepticism of expert's survey was to be "explored on cross-examination" because objections to methodology did "not require exclusion" at the *Daubert* stage).

Defendants separately argue, without any citation to literature or expert testimony of their own, that a manual review of 600 posts, 300 each for sentiment and themes, is "insufficient." Mot. at 34. But that assertion is *ipse dixit*. The relevant question is not whether raw numbers are facially impressive to counsel; it is whether a chosen sample is defensible, representative, and capable of exposing error rate. *See Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 510–11 (S.D.N.Y. 2015) (examining sample size); *United States v. Johnson*, 2019 WL 1130258, at *18–19 (S.D.N.Y. Mar. 11, 2019) (analyzing error rate) (collecting cases). The answer to each of these questions here is a resounding yes.

First, Defendants' sampling criticism conflates two different things: analysis of the full sample—that is, the corpus—and validation of the coding. The sentiment and thematic results in

Prof. Mayzlin's report were run on a corpus of 1.1 million online conversations, not a sample. The two 300-post samples were used only for manual validation of the coding. That distinction matters. The purpose of the manual review was not to estimate what was in the corpus as a whole, but to test whether the coding as-applied to that full corpus was sufficiently accurate for a reliable statistical analysis. Defendants' 300/1,129,730 ratio therefore proves nothing. The relevant statistical question is whether the validation sample is large enough to estimate coding accuracy with acceptable precision. *See* Mining Marketing Meaning at 470 ("The coders were given the task of reading each of the reviews to arrive at a set of dimensions and associated valence by parsing the review on the basis of the presence of such terms in each of the reviews. We randomly selected 100 reviews from each brand in a market for this purpose."); Daniel J. Hopkins & Gary King,[19] A Method of Automated Nonparametric Content Analysis for Social Science., 54 Am. J. Political Sci., 229, 242 (Jan. 2010) ("The conclusion here is clear: coding more than about 500 documents to estimate a specific quantity of interest is probably not necessary, unless one is interested in much more narrow confidence intervals than is common or in specific categories that happen to be rare. For some applications, as few as 100 documents may even be sufficient."); FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE[20] 246 (3d ed. 2011) (usually no single required number and population size has little bearing on the precision of estimates for the population average).

That is precisely what the margin-of-error calculation addresses. And Prof. Mayzlin performed it correctly. She drew a sample at random, with 100 posts selected from each of the three relevant time periods, to ensure adequate coverage across periods with materially different

---

[19] https://gking.harvard.edu/sites/g/files/omnuum7116/files/gking/files/words.pdf
[20] https://www.fjc.gov/sites/default/files/materials/21/SciMan3D01.pdf

posting volumes, including the periods with pronounced spikes in activity. Mayzlin Rep. ¶¶ 77–79, 88–90.

On the negative versus non-negative classification, Prof. Mayzlin reported that the LLM agreed with the manual reviewers 85% of the time. *Id.* ¶ 79. The margin of error[21] for that validation result is 5.3%. Put differently, the reported accuracy is 85% ± 5.3%, which means that, even at the lower bound, the LLM's accuracy is 79.7%. In other words, even in the worst case, the validation result remains at or about the level typically regarded as reasonable. Ex. D, Mining Marketing Meaning at 471 ("The average interrater agreement statistic across all the markets in the sample is k = .59 (the market-specific interrater statistic is 60% [mobile phones], 62% [computers], 57% [data storage], 53% [toys], and 61% [footwear]). Given the nature of the task and the level of ambiguity the raters faced while making decisions, these figures indicate a moderate to substantial agreement between the two raters and the automated analysis (for significance figures for the agreement ratings, see Landis and Koch 1977).); Ex. M, Neuendorf, Kimberly A., The Content Analysis Guidebook (Sage 2017) ("Neuendorf Study"), ("Most basic textbooks on research methods in the social sciences do not offer a specific criterion or cut off figure, and those that do report a criterion vary somewhat in their recommendations. Ellis (1994, p. 91) indicates a 'widely accepted rule of thumb' of correlation coefficients exceeding .75 to .80 indicative of high reliability. Frey, Botan, and Kreps (2000) declare a 70% agreement to be considered reliable."). Defendants do not dispute this.

On the thematic analysis, Prof. Mayzlin reported that the LLM agreed with the manual reviewers 84% of the time. Mayzlin Rep. ¶ 90. Similar to the above, the margin of error for this

---

[21] More technically, the margin of error is derived from a 99% confidence interval. This means that, under standard statistical assumptions, and repeating the validation under comparable conditions, the true accuracy would fall within the 99% confidence error bound in 99 out of 100 such exercises.

result is 5.5%. As such, the reported accuracy is 84% ± 5.5%, which in the worst case is 78.5%, well within the range prescribed as reasonable by most authors. *Id.* Defendants do not dispute this either.

Prof. Mayzlin analyzed the full universe and used a random validation sample to test the accuracy of the coding applied to that universe. That accuracy is high, even when accounting for the worst-case margin of error. Critiques as to the expert's decision-making are for cross examination, not for preclusion.[22] *See GeigTech East Bay LLC v. Lutron Elecs. Co.*, 2023 WL 6614486, at *13 (S.D.N.Y. Sept. 20, 2023) (criticisms of "sample size, whether as over or under inclusive, go to the weight a trier of fact should accord [the expert's] testimony"); *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2024 WL 4476088, at *14 (S.D.N.Y. Oct. 11, 2024) (same); *see also Pacific Life Ins. Co. v. Bank of New York Mellon*, No. 2021 WL 673479, at *17 (S.D.N.Y. Feb. 22, 2021) (challenges to factual completeness "go to weight, not admissibility, and are fodder for cross-examination"); *Louis Vuitton*, 97 F. Supp. 3d at 509-10; *see also Bryant ex rel. Bryant v. Milhorat*, 2013 WL 12368616, at *10 (E.D.N.Y. Sept. 30, 2013) (expert's testimony admissible despite that the expert only reviewed the relevant documentation of 28 of 318 individual patients because a "small sample size is not a bar to admissibility").

### iii.    Professor Mayzlin Applied a Multifaceted, Self-Reinforcing Approach.

Defendants also assert that Prof. Mayzlin's conclusion is nothing more than observing timing, but this fundamentally misunderstands her methodology. Prof. Mayzlin's analysis is focused on "discontinuity design," a causal inference approach that looks for a sudden, sharp

---

[22] Nor is Defendants' on-paper battle of the experts appropriate here. Mot. at 34. Contrary to Defendants' assertions, Prof. Mayzlin disclosed the LLM's settings, her prompts, and LLM's limitations and the ways in which she accounted for those limitations in Appendix D of her report. Mayzlin Rep. at 129–38. In contrast, Prof. Nicole Alexander's research results could not be replicated, despite Prof. Mayzlin's efforts to do so; she relied on irrelevant data; she misquoted Prof. Mayzlin's work in support of her own; and astonishingly given Defendants' critique of Prof. Mayzlin, Alexander's *own* citations appeared hallucinated, or non-existent. Mayzlin Dep. at 189:23–191:24.

*change* in the data. Mayzlin Dep. at 57:8–16. When she identifies such a change, Prof. Mayzlin then looks for something that is also *different* that may have caused the shift. *Id.* at 57:11–16. Here, what was *different* was Defendants' launch of their smear campaign. *Id.* at 112:2–23. Prof. Mayzlin's conclusion is based on the entirety of her analysis—which is volumetric, sentiment, and thematic—and it is reinforced by the fact that the narratives identified in the planning documents that Defendants used to launch their smear campaign appeared with great frequency during the spikes in negative sentiment directed toward Ms. Lively, which provides evidence that *Defendants' behavior* drove the shift. *Id*. Prof. Mayzlin opines that these themes were not meaningfully present before August, when they increased sharply. *Id.* at 115:16–116:7.

Defendants propound alternative explanations for the negative sentiment shift toward Ms. Lively, most of which amount to some version of the argument that the public attention generated by the release of a major motion picture would have been expected to create negative attention on Ms. Lively's past. Mot. at 23–24. That is an argument for the jury, not for exclusion. In any event, Prof. Mayzlin addressed this argument directly: marketing for *It Ends With Us* (the "Film") began many months in advance of its release into theaters, including the release of the Film's enormously popular trailer in May;[23] substantial marketing events, including Book Bonanza, in June; and significant press coverage, including early reviews, in July—indeed, Colleen Hoover testified that marketing was "pretty much done" by the premiere in early August. Mayzlin Rep. ¶ 64. The steps that follow illustrate how discontinuity design works. Despite all of this public-facing promotional activity, including considerable attention on Ms. Lively **while she was marketing the Film**,

---

[23] Indeed, Defendants' appeal to common sense would have this Court ignore the reality that the film's first trailer, released in mid-May of 2024, had 128 million views in its first 24 hours, which outperformed the wildly successful trailers for *Barbie* or *Wicked*. Matt Grobar, Sony's Debut Trailer for 'It Ends With Us' Starring Blake Lively Clocks 128.1M Views In First 24 Hours, Biggest Recent Debut For Female Event Movie, Deadline (May 22, 2024), https://deadline.com/2024/05/it-ends-with-us-trailer-clocks-128-1-million-views-first-24-hours-1235927513/.

"[b]etween May 2024 and August 2024, there [w]as no evidence of recurrent negative sentiment towards Ms. Lively" *until mid-August*. *Id.* That is, the entire arc of marketing for this Film played out publicly, generating hundreds of millions of impressions of online content, yet sentiment remained stable until *after* the marketing had successfully led to box office success. The spike did not materialize until August—after Defendants began their smear campaign—and Defendants have offered nothing beyond illogical speculation to rebut Prof. Mayzlin's causal inference.

In concluding that Defendants were the cause in the negative sentiment shift, Prof. Mayzlin considered alternative causes. That is built into the discontinuity model. Therefore, Defendants' arguments that "Mayzlin ignore[d] the strong evidence of negative sentiment against Ms. Lively in her own dataset" is baseless. Mot. at 26. To the contrary, as Figure 12 illustrates, regardless of the chatter in May–July 2024, the sentiment toward Ms. Lively remained positive-to-neutral:



**Figure 12: The Percentage of Negative Conversations Supporting at Least One Manipulated Lively Narrative**[172]

Mayzlin Rep. at 68. That there was no change in sentiment until August 2024 is what matters.

For this reason too, no matter how many times Defendants attempt to blame the victim in their *Daubert* Motion (and during deposition), Prof. Mayzlin explained why Ms. Lively was not

45

the cause of the sentiment shift. *Id.* ¶ 91. Prof. Mayzlin concluded that, comparing the period before August to the period in mid-August, there was *no* "discontinuity in what [Lively] was doing . . . . What Blake Lively was doing . . . was fairly stable." Mayzlin Dep. at 115:11–15. Prof. Mayzlin reaffirmed at her deposition that she further re-considered and rejected every alternative that Defendants now propound again. *See id.* at 124:24–125:14 (denying plausibility that "unfollowing" Baldoni would explain sentiment shift); *id.* at 168:22–171:18 (noting that private text messages in which Sony executives were gossiping about Ms. Lively were unrelated to the analysis); Mayzlin Rep. ¶¶ 85–86, n.175 & 86 n.179 (recognizing that Koslow admitted to placing a story bashing Ms. Lively for promoting her haircare line during the Film's press, which was recognized as a "Seeded Narrative" within Mayzlin's model).

Similarly, Defendants' argument that other negative sentiment—apart from the specific scenarios identified in the Scenario Planning document—arose in high numbers after August 2024 only undermines their position. To be sure, the data shows that there was a spike in many negative narratives about Ms. Lively, including certain narratives that pre-dated August 2024. But the point of Prof. Mayzlin's analysis is that *all* of this negative conversation spiked in a manner that was incongruous with the timing of the release of a wildly-popular box office smash, but entirely consistent with Defendants having "lit the match." Mayzlin Dep. at 131:20–25. Once lit, the fire spread through social media taking advantage of algorithmic design and informational cascades— in other words, amplification of the negative topics that Defendants inserted into social media platforms in August 2024 led viewers to notice and engage with content on other negative topics about Ms. Lively or her brands. *See* Mayzlin Rep. at 32 n.98 & 41 n.131. And once online sentiment shifted about Ms. Lively and her brands, that sentiment calcified. *See id.* ¶ 57 ("This

pattern aligns with the long-term effects of content manipulation, in which initial messaging continues to shape public discourse long after its introduction.").

Defendants baselessly assert that Prof. Mayzlin "uncritically" accepted company documents in opining on the decline in Ms. Lively's brand equity. Mot. at 37–38. But Prof. Mayzlin emphasized the importance of scrutinizing the data for *any and all* causes of this discontinuity, Mayzlin Rep. ¶ 12; explained that she specifically confirmed "*several times*" with the management of Ms. Lively's companies—both through meetings and through documentation, such as presentations and sales data, that "*there were no other changes*," including "in the marketing of the product, in the marketing space or the pricing," or anything else, Mayzlin Dep. at 58:20–59:1; and explicitly stated that she found nothing else "that could plausibly explain this change," Mayzlin Rep. ¶ 12. That conclusion makes sense—Ms. Lively's brands were thriving throughout many of the supposedly shocking events on which Defendants fixate, including during the high visibility marketing period prior to August for the Film. Yet her companies remained stable, financially and operationally, until they cratered (astonishingly, at the same moment that the Film delivered enormous dividends at the box office). Mayzlin Rep. ¶¶ 105–13.

Defendants' purported smoking gun appears to be a dispute over a figure caption rather than any substantive methodological flaw. In her report, Prof. Mayzlin states that "a small set of repeat users posted sustained, negative commentary over time, a pattern shown in Figure 19." Mayzlin Rep. ¶ 100. Figure 19 is captioned "Examples of Repeat Harassers Persistently Commenting" and is sourced to a single page of the Blake Brown Media Impact Overview. *Id.* Even accepting Defendants' contention that the figure depicts only a single account, the use of plural language in the caption reflects the broader finding documented elsewhere in the same exhibit (Ex. N, BL_000038835–858), which catalogues multiple categories of problematic

47

accounts—including "Accounts Engaged in Harassing Activity" (Figure 17) and "Inactive Accounts Engaged in Harassing Activity" (Figure 18). Mayzlin Rep. ¶ 199. It is preposterous to suggest that the use of a plural noun in a figure caption renders an entire expert opinion inadmissible under Rule 702.

Defendants' cited cases are also inapposite. In *Supply & Bldg. Co. v. Estee Lauder Inter., Inc.*, the expert based his report *exclusively* on "his client's unrealistic assurances rather than available records" because he relied on summaries of purchase orders prepared by plaintiff's general manager, which the court called the "client's conclusory statements" and not the orders themselves. 2001 WL 1602976 at *4 (S.D.N.Y. Dec. 14, 2001). And in *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244 (S.D.N.Y. 2010), the plaintiff's experts neither showed their work regarding their assumptions and relied-upon information nor independently reviewed documents. *Id*. at 269–70. Prof. Mayzlin's diligent analysis stands in stark contrast. She has explained how she sourced her data (Mayzlin Dep. at 75:9–16 (explaining that she collected her own data)), how she analyzed the data (Mayzlin Rep. at 129–38 (explaining the models utilized)), and the factors she considered (Mayzlin Rep. at 77, n.186) (noting that a price reduction in products was considered and rejected as an alternative cause because it would not "ordinarily be expected to cause a decline in sales"); *see also* Mayzlin Rep. at B-11; Mayzlin Dep. at 57:17–59:21 (noting discussions with Blake Brown Beauty and Betty B Holdings LLC management about marketing and sales factors)). Prof. Mayzlin also reviewed the deposition transcripts of Katherine Case and Breanna Koslow and other documents to understand "defendants' assumed conduct." *See* Mayzlin Rep. at B-1–3.

Applying her marketing expertise and literature[24] regarding brand equity and reputational spillover, Prof. Mayzlin observed and concluded that, because all three of Ms. Lively's brands

---

[24] Defendants' argument that Prof. Mayzlin should not be allowed discuss the literature on which she relies to form her opinions or the documents that informed her methodology and how they did so—including selected timeframe,

(Betty Booze, Betty Buzz, and Blake Brown Beauty) sharply declined in sales, *reversing month-over-month growth and positive sales trends*, the shift in sentiment as to Ms. Lively's personal brand was to blame. *See id.* ¶¶ 93–96, 104–13. Here, Defendants argue that negative reviews about Blake Brown products' efficacy and formulation caused the stiff decline in brand sales. Mot. at 39 n.12. But, even if such consumer complaints about Ms. Lively's brands exist, they do not explain the timing, scale, and thematic consistency of the observed sentiment shift. *See* Mayzlin Dep. at 112:2–23; 138:3–21; 144:11–20. At best, this is a competing factual narrative, not a flaw in Prof. Mayzlin's methodology.

Prof. Mayzlin articulated her causal-inference framework (a discontinuity design), explained why she selected the timeframe and baseline, and took affirmative steps to search for exogenous market factors—for both her conclusion regarding *why* there was a shift in sentiment and *how* it impacted Ms. Lively's brands—and concluded none existed. Mayzlin Rep. ¶¶ 104–13; *see also* Mayzlin Dep. at 144:11–20 ("I can't rule out every single alternative hypothesis . . . . But what I can tell you is, based on my data, I see this discontinuous change in the tone of the conversations, in the volume of the conversations, and the themes of the conversations in a way that reflects directly the documented evidence in how the Wayfarer team was thinking about . . . which points would stick."). That is more than sufficient. *Deutsch v. Novartis Pharm. Corp.,* 768 F.Supp.2d 420, 474 (E.D.N.Y. 2011) ("[A]n expert need not rule every potential cause" before reaching her conclusion. She must only provide "a reasonable explanation for dismissing specific

---

prompts underlying her thematic analysis, and conclusions derived therefrom—may be easily rejected. It is fair game under the federal rules. *See* Fed. R. Evid. 702, Advisory Committee Notes ("[R]ule [702] recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts."); *In re Lyondell Chem. Co.*, 558 B.R. 661, 669 (Bankr. S.D.N.Y. 2016) ("[T]he request to exclude testimony because the underlying documents are potentially hearsay, or where the experts' record reliance is closely tied to technical conclusions, must be denied . . . . Experts receive some 'leeway' regarding hearsay evidence . . . . A report is not merely a 'conduit for hearsay' when the expert's reliance on the record is closely tied to the formation of his opinions or conclusions.").

alternate factors identified by the defendant."); *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2026 WL 100576, at *9 (S.D.N.Y. Jan. 14, 2026) ("[T]he expert must make some reasonable attempt to eliminate some of the most obvious causes . . . . It is not required, however, that an expert categorically exclude each and every possible alternative cause in order to render the proffered testimony inadmissible.") (citation modified). Defendants' irrelevant cases do not hold otherwise. *See In re Acetaminophen – ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 336 (S.D.N.Y. 2023); *Deutsch v. Novartis Pharm. Corp.,* 768 F.Supp.2d 420, 474 (E.D.N.Y. 2011) (both arise in the medical, not social science context, where the underlying literature and causation analyses— including "differential diagnosis," which by definition, is systematically ruling out other causes— vary drastically from the standards at issue here).

That Defendants do not like her conclusion (or proffer their own) is not a reason to exclude it. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 76 (S.D.N.Y. 2015) ("[T]rial courts must consider only the *admissibility* of expert evidence rather than its weight or credibility."). Challenges to assumptions and omitted variables are addressed by competing expert testimony and cross-examination. *See* Dkt. No. 1292-1 (Expert Report of Nicole Alexander) ("Alexander Rep.")); *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) ("To the extent that [defendant] asserts that there were gaps or inconsistencies in the reasoning leading to [expert's] opinion in this case . . . such arguments to go the weight of the evidence, not to its admissibility."). And whether Defendants' alternative explanations better explain the sentiment shift and resulting harm to Ms.

Lively is for the jury to evaluate. *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 537 (S.D.N.Y. 2011) (citing *Knapp v. Leonardo*, 46 F.3d 170, 179 (2d Cir. 1995)).

### 2. Professor Mayzlin's Testimony Is Admissible Because It Will Help The Jury Determine Facts In Issue.

Additionally, Prof. Mayzlin's testimony is relevant under Rule 702(a). In assessing whether proffered testimony is relevant, courts look to Rule 401 and examine whether "it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action." Fed. R. Evid. 401; *Daubert*, 509 U.S. at 591; *Amorgianos*, 303 F.3d at 265. Here, Prof. Mayzlin's testimony will help the jury determine *factual* questions, namely: whether Defendants' media manipulation and smear campaign affected conversations and consumer attitudes about Ms. Lively and whether that manipulation negatively impacted the sales and performance of Ms. Lively's brands. Mayzlin Rep. ¶ 7.

Prof. Mayzlin's testimony is critical. In their own words, Defendants intended for their scheme to destroy Ms. Lively in the public's eye to be "untraceable," Dkt. No. 1230-66 at 3, spoke openly about avoiding putting things in writing, Ex. P, NATHAN_000002462 at 2, and made use of ephemeral messaging platforms, Dkt. Nos. 1230-57 at 74–75; 1233-54 at 72–73; 1233-87 at 3; 1233-66 at 5. However, using scientific methods, a body of evidence, and cross-comparisons of large-scale sentiment shifts combined with emerging narratives, Prof. Mayzlin is able to connect Defendants' stated plans to "bury" Ms. Lively with their intended outcome. Defendants insist that counsel can accomplish the same by introducing "documents and testimony . . . through fact witnesses." Mot. at 37. But that is backwards—the speculation of lay witnesses about when and how the public decided to notice and care about specific narratives in an endless sea of online content, and how that shift in attitude impacted Ms. Lively's businesses, is certain to be unhelpful. By contrast, the use of specialized marketing, statistics, and economic principles through Prof.

Mayzlin's expert testimony is quintessentially the kind that will be helpful to the trier of fact. *Louis Vuitton Malletier S.A.*, 97 F. Supp. 3d at 504 (accepting expert's testimony as helpful where the testimony would "streamline the presentation of [] data to the jury, saving the jury time and avoiding unnecessary confusion").

### a.    Professor Mayzlin's Analysis Reflects Expertise and Specialized Knowledge, and Defendants' Cases are Inapposite.

Defendants further lodge a hodgepodge of *personal* attacks aimed at keeping Prof. Mayzlin off the stand, claiming that Prof. "Mayzlin does not apply any expertise," Mot. at 25–26, 37; "recites" or "regurgitates" content, *id.*; and otherwise "summarize[s]," *id.* at 21. None of the cases Defendants cite in support bear any resemblance to the methods Prof. Mayzlin applied.

In three of them—*Andrews v. Metro North Commuter Railroad Co.*, 882 F.2d 705 (2d Cir. 1989), *Goldstein v. Montefiore Medical Center*, 2025 WL 2726791 (S.D.N.Y. Sept. 25, 2025), and *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273 (N.D.N.Y. 2021)—courts precluded experts from testifying where their opinions were not the product of any methodology or specialized knowledge. First, the "expert" in *Andrews* improperly testified about easily observable events regarding the condition of the railroad platform, mainly, "that the station was dirty, filthy and kind of icy, that the platform had trash and ice on it and that the lighting was very dim," but "[t]he jury needed no special training or expertise to decide whether the platform . . . was a 'safe place.'" 882 F.2d at 708 (discussing other improper testimony including opining on the law). Second, the "expert" in *Goldstein* was slotted to do nothing more than inappropriately infer one's state of mind by speculating regarding a supervisor's decision not to consider plaintiff for a promotion. 2025 WL 2726791, at *9. Finally, the "expert" in *AngioDynamics* did not conduct any "specialized economic analysis that would assist a fact-finder in interpreting the record evidence he relies on. Rather, he recite[d] that evidence, [drew] inferences that a fact-finder could glean

from merely examining the evidence itself, and conclude[d] from those inferences that the evidence establishe[d] causation." 537 F. Supp. 3d at 333. In contrast with all, Prof. Mayzlin, a leading expert in her field applies marketing and economics principles to help the jury understand broad social media trends on a celebrity's brands and profitability. Mayzlin Rep. at 4–5 (explaining qualifications); 100–09 (detailing awards and credentials); ¶¶ 51–113 (performing analysis); 129–38 (describing LLM methodology).

In three other of Defendants' cited cases—*United States v. Zhong*, 26 F.4th 536 (2d Cir. 2022), *Hayden v. IBM Corp.*, 2025 WL 1697021 (S.D.N.Y. June 17, 2025), and *United States v. Smith*, 806 F. Supp. 3d 382, 414 (S.D.N.Y. 2025)—the expert testimony improperly invaded the province of the jury or was otherwise unduly prejudicial, again features absent here. First, in *Zhong*, the testimony of the expert "exceed[ed] its proper scope," where he "interpret[ed] and vouch[ed] for the admissible evidence [the government] had offered," by stating it was "troubling" and raised "major red flags," and came "dangerously close to usurping the jury's function by providing an overall conclusion of criminal conduct," in addition to testifying to severely prejudicial matters of tangential relevance to the case, including "the history of slavery and sharecropping in the United States as providing background for his opinions." 26 F.4th at 556–57. Next, in *Hayden*, the court kept out testimony where an expert incorporated plaintiff's interrogatory responses, assumed a legal conclusion, and "engage[d] in credibility determinations by frequently adopting the testimony of fact witnesses in the case to support his own opinions." 2025 WL 1697021, at *9. Finally, in *Smith*, the court declined to allow the defendant to allow someone to opine as to the circumstances of his interrogation—which would be a "backdoor means of putting" the defendant's hearsay in "without subjecting him to cross examination." 806 F. Supp. 3d at 414. None of those are remotely close to Prof. Mayzlin's opinions which omit any mention

of witness testimony, parties' written submissions, or observations regarding individual motivations.

### b.    Professor Mayzlin Properly Measured the Harm from Defendants' Retaliatory Campaign.

Lastly, Defendants contend that because the Court identified certain categories of "reasonable defensive measures" that would not constitute actionable retaliation, Prof. Mayzlin's analysis is fatally flawed for including social media posts reflecting those themes. Mot. at 35–37. In doing so, Defendants fundamentally mischaracterize the Court's summary judgment opinion, the scope of Prof. Mayzlin's assignment, and the burden on Ms. Lively.

First, the Court did not hold that narratives in the Scenario Planning document were non-actionable as a matter of law (indeed, the Court did not grant summary judgment to Defendants on any aspect of Ms. Lively's retaliation claim). Rather, the Court drew a nuanced, fact-specific distinction between permissible "defensive measures" and conduct that "crossed the line." Dkt. No. 1273 at 131. It specifically identified the Scenario Planning Document and stated that "[t]here is evidence from which a jury could find that the Wayfarer Parties planned more aggressive action, not only to 'destroy' Lively's accusations but to destroy her and her career." *Id.* at 132. It was precisely because the Scenario Planning narratives "could be construed as directed not at Lively's allegations and at undermining her credibility, but as an attack on her professional reputation and livelihood," *id*. at 132, that the Court denied summary judgment on the FEHA claim. *Id.* at 134. Thus, far from non-actionable, the Court found the narratives that Prof. Mayzlin tracked sufficient to create triable issues of fact for the jury as to which conduct underlying them is actionable. *Id.*

Even setting that aside, Defendants (once again) conflate two distinct questions: (1) which specific acts of theirs constitute actionable retaliation, and (2) whether Defendants' orchestrated campaign caused measurable harm to Ms. Lively's reputation and brands. Prof. Mayzlin addresses

the latter. Her report examines whether there was "a marked shift in the volume, the content, and the sentiment of online conversations about Ms. Lively, consistent with . . . the Defendants' orchestrated campaign." Mayzlin Rep. ¶ 12. She linked the shift to declines in sales across three of Ms. Lively's commercial brands. *Id.* She speaks to damages, not liability, which she measures in aggregate. The damages flow from a single, integrated campaign to "destroy" Ms. Lively. Order at 117; *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1055–56 (2005) ("[W]e need not and do not decide whether each alleged retaliatory act constitutes an adverse employment action in and of itself" where plaintiff alleged defendant's "actions formed a pattern of systematic retaliation."); *Bailey v. San Francisco Dist. Attorney's Off.*, 16 Cal. 5th 611, 638 (2024) ("[T]he alleged retaliatory acts are to be considered 'collectively,' rather than individually."); *McCoy v. Pac. Mar. Assn.*, 216 Cal. App. 4th 283, 299 (2013) ("Actionable retaliation need not be carried out in 'one swift blow,' but rather may be 'a series of subtle, yet damaging, injuries.'"); *Wysinger v. Auto. Club of S. Cal.*, 157 Cal. App. 4th 413, 424 (2007) (describing "pattern of conduct, the totality of which constitutes an adverse employment action").

Nothing Defendants say shows otherwise.[25] Defendants cases are *both* non-binding *and* inapposite. *See LivePerson, Inc. v. [24]7.AI, Inc.*, 2018 WL 6257460, at *2 (N.D. Cal. Nov. 30, 2018) (excluding expert testimony on all 28 alleged trade secrets in "bellwether trial in which only 15 of the 28 alleged trade secrets will be at issue," thus "the jury's verdict will necessarily encompass fewer than all of the alleged trade secrets"); *Vertellus Holdings LLC v. W.R. Grace & Co.-Conn.*, 2021 WL 3883597, at *16 (D. Md. Aug. 12, 2021) (excluding, in trade secrets case,

---

[25] If the Court were to agree with Defendants, at most, this would be the subject of a limiting instruction, not grounds for exclusion. *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 571–72 (S.D.N.Y. 2007) ("[The Southern District of New York] . . . routinely relie[s] upon limiting instructions to remind[ ] the jury of its role and of the limits of expert testimony [and] clarify the extent of their consideration of such testimony. Further, the Second Circuit has recognized a strong presumption that juries follow limiting instructions.") (internal citations omitted).

55

expert testimony based on the assumption that plaintiff proved all of his claims even court ruled that plaintiff cannot succeed on some).

Prof. Mayzlin's thematic analysis is one component of a broader analytical framework that also encompasses sentiment classification, brand perception data, and sales performance. Defendants have not revealed any methodological defects in Prof. Mayzlin's analysis, her opinions reflect reliable application, will be helpful to the trier of fact, and should be admitted in full.

### III.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF DR. ARON CULOTTA.

Dr. Aron Culotta is a tenured Professor of Computer Science at Tulane University and holds the Nicholas J. Altiero Endowed Professorship in the School of Science and Engineering. With over 80 peer-reviewed publications spanning social network analysis, natural language processing, and machine learning, he has conducted numerous studies applying computational methods to analyze online perceptions of brands and influence operations. Drawing on his decades of experience and prevailing methodological standards in the field, Dr. Culotta analyzed the online social environment on TikTok, Reddit, and YouTube, concluding that each platform reflects indicia of a coordinated campaign to manipulate online discussion of Ms. Lively in August 2024. Defendants do not dispute that Dr. Culotta possesses the "knowledge, skill, experience, training, or education" to qualify as an expert in the analysis of online social networks. Fed. R. Evid. 702.

Dr. Culotta's testimony is admissible under Rule 702's reliability and relevance requirements. Conducting statistical analysis across large datasets to identify statistical outliers and anomalous patterns is a widely accepted methodology in computational social science. Dr. Culotta reliably applied this methodology to evaluate the social media environment surrounding Ms. Lively, employing the same techniques as other peer-reviewed studies to use to detect

statistical anomalies across social network datasets. His opinions are grounded in reliable methods and techniques that satisfy both Rule 702 and the *Daubert* framework.

Dr. Culotta's conclusions are also directly relevant to a key factual issue in this case: the existence of "artificial," as compared to "organic," activity during the alleged retaliatory campaign in August 2024. Dkt. No. 1273 at 134. Dr. Culotta's analysis reflects statistically extraordinary indicia of inauthentic activity regarding anti-Lively content on social media platforms TikTok, Reddit, and YouTube. His opinions that engagement patterns across these three platforms are consistent with inauthentic activity will help the jury to evaluate Ms. Lively's retaliation claims and Defendants' denials as to taking any steps to facilitate anti-Lively narratives.

Defendants seek to exclude every opinion offered by Dr. Culotta as "pseudoscience" based on novel "metrics." Mot. at 41. But Dr. Culotta's use of a reliable statistical methodology, paired with qualitative observations, is admissible. Despite having spent months with Dr. Culotta's dataset, Defendants have been unable to identify any defects in either the data set or the methodology Culotta used to analyze it—instead, they simply disagree with his conclusions. But arguments that Dr. Culotta drew the wrong conclusions from sound data, reliable methods, and his decades of experience, are arguments for the jury. *See Amorgianos*, 303 F.3d at 266 ("[T]he district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert reached or the district court's belief as to the correctness of those conclusions"); *McCullock*, 61 F.3d at 1044.

### A.    BACKGROUND

#### 1.    Dr. Culotta's Expertise in Social Network and Statistical Analysis

Dr. Culotta has nearly two decades of experience in the field of social network and statistical analysis. *See* Dkt. No. 1334-7 (Expert Report of Dr. Culotta ("Culotta Report" or "Culotta Rep.")) ¶¶ 1–5; *id.* at App. A. He earned a Ph.D. in Computer Science from the University

of Massachusetts, before working as chief scientist at IT.com, where for 15 years he implemented large-scale statistical models of textual and relational data. Culotta Rep. ¶ 2; *id.* at App. A. Dr. Culotta has taught computer science with a focus in social network analysis and language processing since 2009 and has published or contributed to the publication of more than 80 different articles in his field, which include statistical models that he designed, coded, and ran across social media networks such as Twitter, Instagram, Reddit, and online review sites like Yelp, Airbnb, and Amazon. Culotta Rep. ¶ 2; *id.* at App. A; Ex. Q, Deposition of Dr. Culotta ("Culotta Deposition" or "Culotta Dep.")) at 35:22–36:1. He currently serves in several capacities: as a tenured Professor of Computer Science at Tulane University, where he teaches and conducts research regarding natural language processing, social network analysis, and machine learning; as a Data Scientist at Voluble, where he develops data science solutions to analyzing social media for litigation; and in several other community roles, including on the Steering Committee of the International Conference on Web and Social Media, dedicated "to developing computational approaches to online social network data." Culotta Rep. ¶¶ 3–4; *id.* App. A. Dr. Culotta has previously been qualified as a rebuttal expert. *See* Decision and Order of the Special Master, *US Dominion, Inc. v. Newsmax Media, Inc.*, No. N21C-08-063 EMD, (Del. Super. Ct. Mar. 28, 2025) (denying in full motion to exclude Dr. Culotta's expert testimony on social media data analysis).

### 2.    Dr. Culotta's Social Network Analysis in the Instant Case

Ms. Lively retained Dr. Culotta to assess "whether or not there are markers of inauthenticity among the posts or platforms discussed" by Defendants. Culotta Rep. ¶ 7. After determining which social media platforms Defendants referenced in their correspondence for insight into potential platforms targeted, *id.* ¶¶ 39–48, Dr. Culotta conducted his analysis across three social media platforms: TikTok, Reddit, and YouTube. Culotta Dep. at 19:9–10. For purposes of his Report, Dr. Culotta relied on a limited set of documents from the case and more

58

than 60 academic articles and books. Culotta Rep. at App. C; Culotta Dep. at 20:5–10 (reviewed documents that "identify both the timing and the content that is consistent with" data analysis).

*TikTok Analysis.* Dr. Culotta first assessed whether there is evidence of the manipulation of like counts and comment content on TikTok videos about Ms. Lively. *See* Culotta Rep. ¶¶ 50–67. For this analysis, Dr. Culotta collected a dataset of videos in July and August 2024 from TikTok using Open Measures, a tool that enables researchers to track contributor discussion across social media platforms. *Id.* ¶ 50. The dataset is comprised of TikTok posts returned by searches of four hashtags directly relevant to the subject matter of the alleged campaign— #blakelively, #justinbaldoni, #itendswithus, and #itendswithusmovie. *Id.* ¶¶ 50–51. Using an automated process to extract publicly available metadata, Dr. Culotta supplemented the resulting dataset of 1,861 videos returned by Open Measures by identifying the Top Comment (i.e., "the top-level comment that generated the greatest number of likes on a given post") for each post and recorded the number of likes for the video and the Top Comment. *Id.* ¶ 51 & nn.138–39.[26] From there, Dr. Culotta calculated the number of likes on the Top Comment as compared to the number of likes on each parent video (the "Top-Comment Share"). Using that metric, he evaluated whether there were abnormal patterns associated with the Top-Comment Shares of posts in dataset—for example, whether there were unusually high number of likes on a Top Comment to a TikTok video than there were on the video itself. *Id.* ¶ 52; Culotta Dep. 32:4–10.

Dr. Culotta's statistical analysis measured from a baseline of 9.2% average Top-Comment Share among all videos published in August 2024 in the dataset. *Id.* ¶ 54 & fig. 1. This baseline shows the expected Top-Comment Share among videos related to Ms. Lively, Baldoni, and the Film in Dr. Culotta's dataset. Dr. Culotta further evaluated and manually coded the sentiment of

---

[26] The 1,861 videos generated more than 330 million likes, more than 2 million comments (labeled "replies" in column G), and 4 billion views, collectively. Ex. R, TikTok – Posts and Comments.

each Top-Comment in the dataset to determine whether it expressed one of the following sentiments: "anti-Lively," "pro-Lively," "anti-Baldoni," "pro-Baldoni," or "unsure/unrelated."[27] *Id.* ¶ 53. A second independent reviewer annotated a random sample of 300 comments, achieving an 80 percent agreement rate with the initial sentiment coding. Culotta Rep. ¶ 53 n.141; Culotta Dep. 35:10–17.[28]

Dr. Culotta's key findings as to TikTok demonstrate that (1) anti-Lively Top-Comment Shares were 21.6%, double the baseline, and (2) pro-Baldoni Top-Comments Shares were 11.4%, also higher than the baseline. Culotta Rep. ¶¶ 53–54. Dr. Culotta's analysis using a two-sided Mann-Whitney U test revealed these figures to be statistically significant anomalies in the data— that is, both the anti-Lively and pro-Baldoni average comment shares were a "statistically significant deviation from the mean." *Id.* ¶ 54 & n.145; Culotta Dep. 59:13–18 (testifying that the "confident very small p values … serve[] to indicate that [the Top-Comment shares at issue] were extreme outliers"); Culotta Dep. 60:20–24. Dr. Culotta further determined that the average Top-Comment Share for anti-Lively comments increased from 1.7% in July to 21.5% after July, and that pro-Baldoni comments increased from 0.5% to 11.3%. Culotta Rep. ¶ 56 & fig. 3.[29]

---

[27] The "unsure/unrelated" category also captured neutral content. For instance, the following comments were coded as unsure/unrelated: "I'm going to see this movie by myself! So excited! 😊" Comment posted by Bethany Race, @BethanyRace1, TikTok, https://www.tiktok.com/@bethanyrace1/video/7399715475208375584); "The way I asked my best friend to go and bought tickets before she even replied 🍿" Comment posted by Jen Otd @Jen_otd, TikTok, https://www.tiktok.com/@jen_otd/video/7400217187144715562. Ex. R, TikTok – Posts and Comments at row 181 & 214.

[28] A sample size of 300 is sufficient to draw valid statistical inferences.

[29] Dr. Culotta also performed a qualitative analysis of individual posts and comments on TikTok that incorporates the August Top-Comment Share baseline of 9.2%. Culotta Rep. ¶¶ 58-66. Among other observations, Dr. Culotta determined that the 10 posts with the highest Top-Comment Shares in Dr. Culotta's dataset are all anti-Lively and well-above the baseline of 9.2% (¶¶ 58-59, fig. 4), and that one post appearing in a text from TAG employees a Top-Comment Share of 74.7%, which is "more than eight times greater than the overall average." Culotta Rep. ¶ 64; *see also* Culotta Rep. ¶¶ 60-63, 65-66 (providing additional observations); Culotta Dep. at 70:2–5 (referencing "the strikingly similar language, combined with the anomalous-like values together" as "indicators of potential coordinated behavior").

***Reddit Analysis.*** Dr. Culotta also evaluated Reddit to determine whether inauthenticity was reflected in upvote and downvote behavior captured scores (i.e., the sum of upvotes minus downvotes generated by a post or comment). *See id.* ¶¶ 68–87. To conduct this analysis, Dr. Culotta focused on the r/Fauxmoi subreddit, the largest celebrity-focused community on Reddit, with more than 2.5 million subscribers during the period of analysis. *Id.* ¶ 71 & n.90. Dr. Culotta collected all data from the r/Fauxmoi subreddit from Project Arctic Shift, a large-scale public archiving project that preserves monthly Reddit data. *Id.* ¶ 73. In all, Dr. Culotta's dataset encompassed more than 9,000 posts and 480,000 comments, which together generated a combined score—that is, the combined score of all comments generated by a post—of more than 28 million. *Id.* ¶ 81. This census dataset (as compared to a sample) provided a robust baseline against which Dr. Culotta could reliably identify anomalous activity.

From there, Dr. Culotta analyzed the performance of posts and comments, as measured by their scores (which is a metric native to the Reddit platform)—published on the r/Fauxmoi subreddit during a four-month window between May 1, 2024 and August 31, 2024. *Id.* ¶¶ 70, 73–74 & fig. 7; Culotta Dep. 75:21–76:9; *see* Ex. S, Reddit – August 14 Fauxmoi Analysis; Ex. T, Reddit – Fauxmoi Posts and Comments; Ex. U, Reddit – Fauxmoi Statistical Tests.

Dr. Culotta's analysis of the daily combined Comment Scores (*i.e.*, the sum of the score generated by all comments from each day in the dataset) across the May to August period revealed a daily combined Comment Score on August 14, 2024, exceeding 650,000—***the largest value by far in the entire study period and more than five standard deviations above the mean***, as reflected in Dr. Culotta's sum of daily Comment Scores for the study period. Culotta Rep. ¶ 74, fig. 7; *see* Ex. S, Reddit – August 14 Fauxmoi Analysis. Dr. Culotta also evaluated posts with the highest combined Comment Scores across the entire time period for all of the r/Fauxmoi subreddit,

61

observing that of the 9,102 posts published in Fauxmoi during the study period, eight posts about Ms. Lively ranked among the top-100, including three from August 14. Culotta Rep. ¶¶ 81–83 & figs. 10-11. All of the August 14 posts in this category were determined to be statistically exceptional, ***even when restricting the analysis to the 100 highest ranking posts in the entire dataset***. Culotta Rep. ¶ 83 n.218. Dr. Culotta also observed that 13 comments about Ms. Lively or Mr. Baldoni were in the top-100 comments ranked by Comment Score, and four comments about Ms. Lively were in the bottom-100 comments ranked by Comment Score. *Id.* ¶ 84. Again, Dr. Culotta's statistical assessment revealed that the scores associated with 13 of the highest-ranking and four of the lowest-ranking comments are extreme and statistically significant. *Id.* ¶¶ 84–85 & nn.220–21.

After identifying the statistical anomalies, Dr. Culotta performed a content analysis to assess what was driving the activity in the anomalous voting patterns in the Fauxmoi subreddit. Dr. Culotta observed that 23 of 106 posts published on the subreddit on August 14 were related to Ms. Lively and/or Mr. Baldoni and made up approximately 80% of the daily combined Comment Score for August 14—meaning that content related to Ms. Lively was driving the abnormal voting activity observed on the most anomalous day in the dataset. *See id.* ¶ 75. Dr. Culotta's content analysis further determined that the highest-ranking comments from August 14 were consistently expressing anti-Lively or pro-Baldoni sentiment. *Id.* ¶ 84 & n.221. He also observed that the lowest-ranking comments were consistently expressing pro-Lively or anti-Baldoni sentiment. *Id.* In each case, this demonstrated that content aligned with the stated goals of the campaign was driving the abnormal voting activity on August 14.[30] Dr. Culotta additionally observed a near-30%

---

[30] Dr. Culotta also reviewed the highest- and lowest-ranking comments in the entire dataset to understand the content, observing that the highest-ranking comments were anti-Lively or pro-Baldoni, and that pro-Lively comments were among the lowest-ranking comments in the entire dataset of over 480,000 comments. Culotta Rep. ¶¶ 85–86 & fig. 13–14.

decline in upvote data on the "little bump" post captured by Arctic Shift, yet observed no similar decrease for other posts published on the same day, a finding consistent with upvote count manipulation in light of Reddit's manipulation policies. *Id.* ¶ 80 & n.214 & fig. 9.

*YouTube Analysis.* Last, Dr. Culotta assessed YouTube for evidence of manipulation associated with the "little bump" video of a 2016 interview of Ms. Lively by journalist Kjersti Flaa. *See id.* ¶¶ 75, 88–95. Dr. Culotta's dataset, pulled from the YouTube API, was comprised of all comments on the video of Ms. Flaa's interview—34,486 comments in total. *Id.* ¶ 89. Using this dataset, Dr. Culotta conducted a statistical analysis measuring from a baseline reflecting the count of comments mentioning "bully" before/after 1:30 pm on August 14, when TAG suggested that the "baby bump" YouTube video be "sent to Jed," referring to Mr. Wallace. *Id.* ¶¶ 9(C)(a), 91; Culotta Dep. 93:23–94:3. Dr. Culotta observed that although the "baby bump" interview initially received very limited views or engagement when posted to Ms. Flaa's YouTube channel, both views and engagement increased dramatically starting on August 14, 2024. Culotta Rep. ¶ 90. His analysis concluded that the proportion of "bully"-related comments increased from a baseline of 2% (pre-TAG suggestions) to 5.2% (post-TAG suggestion), and that the proportion of "bully"-related comments with more than 500 likes increased from a baseline of 3% (pre-TAG suggestions) to 10.4% (post-TAG suggestion). Culotta Rep. ¶¶ 93–95 & fig 18; *see also* Ex. V, YouTube – Little Bump Comment Analysis.

## B.    ARGUMENT

Dr. Culotta's expert testimony meets all the conditions imposed by Rule 702. His opinions are the "product of reliable principles and methods" governing the field of social network data analysis, and he "reliably applied" that methodology to the facts of the case. Part III(A)(1). His

opinions are also based on sufficient data to draw his conclusions, and they "will help the trier of fact" to determine a key factual question at issue: namely, the existence of artificial activity regarding Ms. Lively online in August 2024. Part III(A)(II). Defendants do not generally challenge Dr. Culotta's qualifications as an expert based on the "knowledge, skill, experience, training, or education" that he has accrued over decades. *See* Part III(A)(1); *see generally* Mot. at 40–58. Instead, they argue that Dr. Culotta's opinions are not reliable or relevant based only on their say-so, and without support in relevant literature or methods.

### 1. Dr. Culotta's Testimony Is Reliable.

### a. Dr. Culotta's Opinions Are the Product of Reliable Principles and Methods.

Dr. Culotta's opinions rely on a layered assessment encompassing statistical analysis supplemental qualitative observations. Each is admissible and generally accepted as compliant with Rule 702 and the *Daubert* guideposts.

Defendants seek to exclude Dr. Culotta's testimony in full, yet never acknowledge his core statistical analysis. Tellingly, Defendants approve of the methodology elsewhere in their omnibus Motion, referring to "formal statistical methods" as demonstrating "assumptions and controls, which are made explicit, so that others in the scientific community can evaluate the research yield accordingly." Mot. at 29–30; *Daubert*, 509 U.S. at 593–94 (guideposts of reliability include that the method has been subjected to peer review, has a known or potential rate of error, and is generally accepted in the relevant scientific community).

Dr. Culotta's statistical analysis includes manual sentiment coding in which a trained researcher reads and classifies text according to predefined categories. This is an established method in computational social science that is routinely employed in peer-reviewed studies and it serves as a standard by which sentiment analyses are validated. *See, e.g.*, Aron Culotta & Jennifer

Cutler, "Mining Brand Perceptions from Twitter Social Networks," 35 Marketing Sci. 343 (2016), https://cs.tulane.edu/~aculotta/pubs/culotta16mining.pdf ("Another popular technique is sentiment analysis, i.e., quantifying the overall positive and negative sentiments expressed online about a brand."); Ping Liu, Aron Culotta et al., "Forecasting the Presence and Intensity of Hostility on Instagram Using Linguistic and Social Features," in Proceedings of the 12th International AAAI Conference on Web and Social Media, at 181, 184 (2018), https://ojs.aaai.org/index.php/ICWSM/article/view/15022/14872 (using human workers to code hostility in Instagram comments).

Courts routinely permit expert testimony relying on statistical analysis. *See, e.g.*, *Deutsche Bank Nat'l Tr. Co. for Morgan Stanley Structured Tr. I 2007-1 v. Morgan Stanley Mortg. Cap. Holdings LLC*, 289 F. Supp. 3d 484, 493 (S.D.N.Y. 2018) ("statistical sampling is an appropriate means of attempting to prove both liability and damages"); *Nat'l Ass'n for Advancement of Colored People, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 381 (S.D.N.Y. 2020), aff'd sub nom. *Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021) (relying on expert's statistical analysis); *In re Teva Secs. Litig.*, 2021 WL 872156, at *36–40 (D. Conn. Mar. 9, 2021) (rejecting *Daubert* challenge to "application of a commonly used statistical technique" as bearing on weight, not admissibility); *Falise v. Am. Tobacco Co.*, 258 F. Supp. 2d 63 (E.D.N.Y. 2000) (rejecting *Daubert* challenge of two experts conducting statistical analysis); *SEC v. Ripple Labs, Inc.*, No. 20 CIV. 10832 (AT), 2023 WL 5670711, at *13 (S.D.N.Y. Mar. 6, 2023) (permitting expert testimony based on methodology involving categorizing new events); *see also Lively v. Wayfarer Studios LLC*, 2026 WL 905447, *59 (S.D.N.Y. Apr. 2, 2026).

Dr. Culotta also provided a qualitative analysis for the social media platforms he evaluated, situating it within the broader statistical trends observed in the overall dataset. *E.g.*, Culotta Rep.

¶¶ 60–67. Qualitative assessment of datasets—placing results from data into context—is a widely used approach to data analysis in computational social science and is regularly deemed admissible under Rule 702. *See, e.g.*, *Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 413–14 (S.D.N.Y. 2011) (denying motion to exclude testimony of computer scientist where his "report makes clear that his opinions are based upon his observation and collection of relevant information" and he had "substantial expertise in computer software design and engineering"); *In re Teva Secs. Litig.*, 2021 WL 872156, at *36-40; *Ridge Clearing & Outsourcing Sols., Inc. v. Khashoggi*, No. 07-CV-6611 (RJH), 2011 WL 3586468, at *3 (S.D.N.Y. Aug. 12, 2011) (admitting expert testimony regarding dramatic percentage change across time periods); *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 374–75 (S.D.N.Y. 2023) (admitting expert opinion where expert sorted data to compare similarities); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, LLC, 691 F. Supp. 2d 448, 459–60 (S.D.N.Y. 2010) (finding a primarily quantitative expert qualified to conduct related qualitative analysis based on decade of experience); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 251–52 (E.D.N.Y. 2022) (admitting data comparisons because "data analysis is beyond the ken of a layperson and the proper subject of expert testimony").[31]

### b.    Dr. Culotta's Testimony Is Admissible Because He Has Reliably Applied Established Principles and Methods To This Case.

Dr. Culotta reliably applied his statistical methods and qualitative observations to the facts of this case. He collected a defined dataset, computed engagement ratios and platform-metric

---

[31] *See also Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016) (admitting expert testimony noting that expert testimony is permissible for where it "synthesizes or 'summarizes data'" or "draw[s] inferences that would not be apparent without the benefit of experience or specialized knowledge"); *United States v. Ray*, No. 20-CR-110, 2022 WL 101911, at *13 (Liman, J.) (accepting expert's qualitative research methodology based on her experience in the relevant field); *United States v. Phillips*, No. 22-cr-138, 2023 WL 6620146, at *12 (S.D.N.Y. Oct. 10, 2023) (Liman, J.) (explaining that expert's reliance on scholarly articles and mass media did not render testimony inadmissible "as long as [she] bases [her] conclusions on [her] own expertise and analysis, and as long as those sources are 'of a type reasonably relied upon by experts' in [her] field") (quotation omitted).

trends across that dataset, reported observable patterns, and identified anomalous anti-Lively and pro-Baldoni patterns of engagement on TikTok, Reddit, and YouTube through numerous statistical analyses—a recognized and reliable scientific method. In both his report and his deposition testimony, Dr. Culotta explained the reasons why he applied the methodologies that he did and why those decisions are rooted in his experience and expertise.

With respect to TikTok and Reddit, Dr. Culotta identified the statistically exceptional patterns by analyzing native platform metrics—TikTok video likes, TikTok comments likes, and Reddit comments scores—and sentiment coding according to disclosed categories and applied his coding to the datasets.[32] He was personally involved and ultimately responsible for making the decisions about how to collect the dataset and analyze it both statistically and qualitatively—for example, selecting statistical methods he deployed, and engaging with particular posts for purposes of sentiment analysis. Each dataset was provided to Defendants, and Defendants do not dispute that Dr. Culotta's results can be fully replicated. *See Ridge Clearing & Outsourcing* Sols, 2011 WL 3586468, at *3; *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 84 (S.D.N.Y. 2017); *Scott*, 315 F.R.D. at 45 (S.D.N.Y. 2016); *Ripple Labs, Inc.*, 2023 WL 5670711, at *8 (noting that the fact that expert's "methodology is testable and reproduceable" supports admitting testimony).

Additionally, Dr. Culotta concluded based on his qualitative assessments that the social media platform data reflects extreme percentage values clustered around certain key dates during the retaliation period. Assisting the jury with understanding complex patterns in datasets that are inaccessible to a layperson, but evident to someone with Dr. Culotta's specialized training and experience, is precisely what Rule 702 permits. *See, e.g.*, *Ripple Labs, Inc.*, 2023 WL 5670711, at *13; *Arista Recs. LLC*, 784 F. Supp. 2d at 413.

---

[32] As discussed below, Dr. Culotta did not use a second-level coder in connection with his Reddit analysis, as it was unnecessary for his analysis. *See* Culotta Rep. ¶¶ 76–79; Part III(B)(1)(v).

Defendants do not offer their own countervailing expert, but instead caricature Dr. Culotta's analysis and misread industry literature. Significantly, Defendants do not address or challenge—and thus concede—that Dr. Culotta's statistical analyses are a product of reliable and widely accepted principles and methods in the statistical field. They also do not challenge Dr. Culotta's qualitative assessments as an approach. Instead, they focus on the margins, objecting to: (1) the manner in which Dr. Culotta's analysis is applied to the data in the form of Top Comments (on TikTok) and Post/Comment Scoring (on Reddit) (Mot. at 41–45, 51–53), (2) his sentiment analysis approaches with respect to TikTok and Reddit (Mot. at 45–47, 52), (3) the size of his TikTok and Reddit datasets (Mot. at 47–48, 53), and (4) the approach to his YouTube analysis regarding the "little bump" video (Mot. at 54–56). The problem for Defendants is that these objections are inappropriate for a *Daubert* challenge. As explained below, all of Defendants' criticisms amount to claimed deficiencies going to weight, not admissibility, *see McCullock*, 61 F.3d at 1044, and in any event, as described below, none of Defendants' criticisms has merit.

> iv.   Dr. Culotta's use of Top Comments and Comment Scoring as to TikTok and Reddit is reliable.

Defendants frame Professor Culotta's "Top-Comment Share" assessment on TikTok and his "Comment Score" assessment on Reddit as "invented," "hocus-pocus" metrics for which there is "no empirical basis." Mot. at 41–42, 51–52. Despite levying the charge that "Culotta's method is flawed on many levels," Defendants scrape together only one: that there are no scientific studies using Top-Comment Shares and Comment Scores. Mot. at 42–43, 51–52. Defendants ignore that Dr. Culotta's analysis is based on specific approaches to understanding data that are established and reliable (Part III(A)(1)) and misinterpret peer-reviewed studies deploying analogous approaches.

68

The relevant question is not whether researchers have used "Top-Comment" ratios for TikTok research, or "Comment Scores" for Reddit analysis, but whether Dr. Culotta's underlying methodological approach is reliable. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 75 (S.D.N.Y. 2015) ("To be admissible, the proposed expert testimony must be based 'on a reliable foundation'"). It is. Dr. Culotta's conclusions are based on objective, replicable, and reliable statistical analyses of various engagement metrics across these datasets. Culotta Rep. ¶¶ 54 & n.145 (TikTok); ¶¶ 74, 82–84 & nn.218, 220, 221 (Reddit); ¶¶ 90–95 (YouTube (temporal analysis)).[33] They also ignore that Dr. Culotta's statistical assessments are complemented by qualitative assessments of the data, drawing meaningful percentage comparisons across them. *Id.* ¶¶ 54–57 (TikTok); 75, 77, 79 (Reddit); 93–94 (YouTube). And they ignore that Dr. Culotta corroborated his assessments with sentiment coding reflecting further agreement for his conclusions as to anomalies in the data. *Id.* ¶¶ 53 & n.141 (TikTok); ¶¶ 76–79 (Reddit); ¶¶ 93–94 (YouTube). Each of these approaches is reliable and permissible under Rule 702 and *Daubert*.

The academic research that Dr. Culotta considered in connection with formulating his opinions support his approach. *See* Culotta Dep. 33:9–16; 34:22–23. The literature reflects the foundational principle that "anomalous correlations among engagement metrics" can serve as "hallmarks of coordinated inauthentic behavior." Culotta Rep. at ¶ 53 n.141. The reason is that while it may be possible for inauthentic actors to manipulate one engagement metric (e.g., likes, follower counts, etc.), it is much more challenging to maintain a consistent relationship between related metrics. Each of the articles that Defendants discuss (Mot. 42–45) deploys an analysis of

---

[33] As to Reddit, while Defendants incorrectly assert that Dr. Culotta created the metric of "Comment Score," that is false. As Dr. Culotta explained, "a comment score is *provided by the platform* that is roughly the difference between the number of upvotes that comment received minus the number of downvotes that comments received." Culotta Dep. 75:24-76 (emphasis added).

social media metrics that statistically deviate from the mean or median in order to identify inauthentic behavior—just as Dr. Culotta does here.

Yang et al. (2013) built a detection framework around distorted engagement ratios to identify inauthentic user patterns, analyzing features such as retweets and follower-to-following ratios across Twitter accounts. Dkt. No. 1334-9. Kirdemir & Adeliyi (2023) detected cross-metric inconsistencies on YouTube by considering relationships among views, comments, and subscriber counts, which serve as key markers of inauthenticity, classifying these anomalies on a scale defined by standard deviations from the mean. Dkt. No. 1334-10. And Jahn et al. (2023) evaluated reactions to posts (as does Dr. Culotta) to identify inauthentic behavior when reactions no longer correlate with content quality, reporting results in terms of mean and standard deviation. Dkt. No. 1334-11. The foundation of each study is the same one that Professor Culotta applies: measuring engagement, identifying deviations from expected values, and flagging anomalous patterns as indicators of inauthenticity. Culotta Rep. ¶ 52; *see also* Mot. at 43 n.15 (listing the ratios used in Kirdemir's YouTube analysis, including views to subscribers and views to comments, to detect inauthenticity). Other articles, including those referenced by Dr. Culotta, perform similar platform analyses at a larger scale.[34]

Defendants criticize Yang, Kirdemir & Adeliyi, and Jahn, even though this peer-reviewed research deploys the same methodological approach of identifying statistically significant patterns of suspicious engagement in social media metrics. Defendants claim that Yang's value is negligible because of its focus on Twitter "spam" accounts (i.e., inauthentic accounts). Mot. at 43.

---

[34] *See* Oluwaseyi Adeliyi et al., "Detecting and Characterizing Inorganic User Engagement on YouTube," in Workshop Proceedings of the 18th International AAAI Conference on Web and Social Media: CySoc (2024), https://workshop-proceedings.icwsm.org/pdf/2024_01.pdf.; Shadi Shajari & Nitin Agarwal, "Safeguarding YouTube Discussions: A Framework for Detecting Anomalous Commenter and Engagement Behaviors," 15 Soc. Network Analysis & Mining 54 (2025), https://www.researchgate.net/publication/392167001.

But the heart of Dr. Yang's approach is conducting statistical comparisons to a "normal" baseline.[35] Dr. Culotta does the very same—quantifying the relationship between two naturally coupled engagement signals and identifying instances where that relationship deviates from expected norms. Culotta Rep. ¶¶ 52–54, 72–74, 91–95. Defendants also attempt to diminish the precedent set by Kirdemir & Adeliyi, even though it conducts an analysis of YouTube via a time-series analysis of engagement trends based on "metrics of video production and engagement" (including views and comments on posts). Dkt. No. 1334-10 at 4. The study identifies the "suspicious coordination of comments" as a marker of suspicious behavior, based on part on the presence of suspicious commenter behavior gleaned from "the ratio of the number of unique commenters in cliques to the total number of [co-commenter] in the network." *Id.* at 13–15 ("For example, cliques in the channel with the highest ratio of participation in cliquish behavior (0.68) have an average degree 7.75 times."). By focusing on spikes in commenting behavior, this approach tracks the approach by Dr. Culotta, who similarly conducted a time-series analysis of the "little bump" video and evaluated anomalous spikes in comment keywords. Culotta Rep. ¶¶ 90–95. As to Jahn, *the entire study* is designed to ascertain inauthentic activity through "elevating or suppressing topics through coordinated[] up- or downvoting social media posts" by identifying instances where voting behavior deviates from expectation based on the content, and distinguishing between "boosters" who systematically upvote one type of content versus "distorters" who systematically down vote other types of content. Dkt. No. 1334-11 at 10; Culotta Rep. ¶¶ 76–79. So, too, does Dr. Culotta with respect to his Reddit assessment, where he finds

---

[35] For example, as one measure of inauthenticity, Yang evaluates a "bi-directional links" ratio, a marker of authenticity, and compares that ratio between normal and spam accounts. Dkt. No. 1334-9 at 8 (observing that "around 70% of spammers' values are less than 0.2, while only around 50% of all accounts' values are less than 0.2").

upvote/downvote patterns that deviate from expectation in statistically and practically significant ways. *E.g.*, Culotta Rep. ¶¶ 74, 82–84 & nn.218, 220, 221.

Any acknowledgement in these studies that the evaluation of coordinated online activity is an evolving field with imperfections does not render Dr. Culotta's approach excludable. That is particularly so given that each of these studies, like Dr. Culotta's, evaluated inauthentic behavior by assessing statistical anomalies in engagement metrics. None of these articles "suggests that no method for detecting inauthentic activity on social media has yet been validated" or "that the social media data used by Culotta is totally inadequate for the task." Mot. at 44. Instead, taken together, these studies demonstrate that identifying inauthentic behavior through engagement anomalies— whether through cross-metric inconsistencies, temporal spikes, or coordinating voting—is not only feasible but an established approach. Thus, Dr. Culotta's methodology for identifying cross-metric inconsistencies as markers of inauthentic behavior is comfortably grounded within the analytical approaches recognized in this field and sound under Rule 702. *See* Culotta Rep. at 24 n.140; Culotta Dep. 58:16–22, 60:20–24.

Although Dr. Culotta does, "[a]n expert need not 'back his or her opinion with published studies that unequivocally support his or her conclusions.'" *See, e.g.*, *United States v. Ray*, No. 20-cr-110 (LJL), 2022 WL 101911, at *8 (S.D.N.Y. Jan. 11, 2022) (noting that a contrary rule "'would effectively resurrect a Frye-like bright-line standard'") (quoting *Amorgianos*, 303 F.3d at 266–67). Instead, publication is not a *sine qua non* of admissibility if "the reasoning or methodology underlying the testimony is scientifically valid," and "that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93; *F.D.I.C. v. Suna Associates, Inc.*, 80 F.3d 681, 687 (2d Cir. 1996) (upholding the admission of expert testimony based on a hybrid of two widely used methods). At the very least, that is the case here.

Defendants' argument that Dr. Culotta's TikTok and Reddit analyses must be excluded because they are not clones of analyses previously conducted (Mot. at 44), is out of step with what is required. Rule 702(a) permits an expert to share their "scientific, technical, or other specialized knowledge" in assisting the trier of fact. As noted, Dr. Culotta has an esteemed background not only in statistics and computational methods, but with respect to social media networks. In reliance on that expertise, Dr. Culotta determined that the modality of the platforms he was reviewing allowed for assessment of meaningful anomalies tailored to the function of each platform. For TikTok, a video-based application often viewed by phone, Dr. Culotta determined that the modality of the platform would reveal anomalies based on extreme engagement with comments, including engagement going significantly beyond expected engagement with the parent post. Culotta Dep. 58:25–59:9; 60:20–24 (discussing that additional effort to open the comments is in tension with the app's interface). For Reddit, a comment-focused platform, Dr. Culotta determined that meaningful anomalies would best be measured through extreme up- or downvoting those comments. Culotta Rep. ¶ 70 (explaining that Reddit's popularity of posts is driven by upvotes and downvotes). And for YouTube, Dr. Culotta evaluated significant views and engagement in the comments based on his determination that such engagement would present indicia (or not) of inauthentic engagement. Culotta Rep. ¶¶ 88–89 (selecting the "little bump" video because "Defendants indicated that they wanted to boost an article linking to the video," and querying the YouTube API for all comments to assess volume and patterns). Dr. Culotta's decision ***based on his expertise*** to assess statistical anomalies in Top-Comment Share on TikTok, Comment Scores on Reddit, and comments on YouTube is well grounded, admissible, and precisely what Rule 702 contemplates.

73

v.    Dr. Culotta's sentiment analysis on TikTok and Reddit is reliable.

Defendants criticize Dr. Culotta's sentiment coding of TikTok and Reddit as "subjective" and "unreliable." Mot. at 46-47, 52. But sentiment coding is a standard practice in social media analysis. As Dr. Culotta testified, and as is reflected in analogous research, inter-annotator reliability exercises are "very common" in the field, performed "[a]nytime a researcher produces a new dataset" to "add[] validity." Culotta Dep. 42:25–43:5; *see also* Liu et al. at 184; Savvas Zannettou et al., On the Origins of Memes by Means of Fringe Web Communities, in Proceedings of the Internet Measurement Conference 2018, at 1, 10 (2018), https://arxiv.org/pdf/1805.12512; Dkt. No. 1334-12.

Defendants do not identify any missing information that renders Dr. Culotta's coding non-reproducible or verifiable. They identify only one example of a coding by Dr. Culotta where they disagreed with the coding itself (Mot. at 47)—which is already accounted for in Dr. Culotta's disclosed 80% inter-reliability rate. Given that Defendants have had access to Dr. Culotta's dataset for months, their inability to claim more than a single coding error is telling.

Unable to pinpoint any specific fault with Dr. Culotta's coding, Defendants attempt to undermine the randomly selected sample of 300 (Culotta Rep. ¶ 53 n.141) by slicing and dicing the entire dataset in mathematically unsupportable ways. To do so, they cut out nearly two-thirds of the 300-post sample reflecting agreement between the coders—*that is, they cut out 78.1% of the agreement between the coders*—to conclude that inter-coder reliability falls below 50% and, thus, that there is a 50-50 chance Dr. Culotta coded the sample wrong. Mot. at 46–47. But by removing cases of agreement, Defendants artificially depress the overall agreement rate in illogical and unsupportable ways.[36]

---

[36] Defendants' cited authority on coding does not support their position to the contrary. *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 605 (S.D.N.Y. 2007). For one thing, the quoted "inconsistent scoring and subjective coding"

In fact, using Defendants' own (highly misleading) method to compute the agreement rate between coders for instances in which *neither* annotator selected "unsure/unrelated," the agreement is near 90%. *See* Dkt. 1334-12 at columns "Coder 1," "Coder 2," and "Agreement." Specifically, in the sample of 300 posts reviewed by a second coder, there are 59 posts for which neither reviewer coded the post as "Unsure/Unrelated," meaning that each reviewer either coded the posts anti-Lively, pro-Lively, or pro-Baldoni. Among these posts, both reviewers agreed on the sentiment 53/59 times (89.8%). Thus, agreement between coders is actually *higher* when distinguishing among anti-Lively, pro-Lively, and pro-Baldoni comments.

Defendants are also wrong that Dr. Culotta's Reddit analysis cannot be trusted because it lacks second-level sentiment coding. Single-coder approaches are deployed in peer-reviewed literature. *See, e.g.*, Kate Starbird, "Examining the Alternative Media Ecosystem Through the Production of Alternative Narratives of Mass Shooting Events on Twitter," in Proceedings of the 11th International AAAI Conference on Web and Social Media (2017), https://ojs.aaai.org/index.php/ICWSM/article/view/14878/14728 (using a single coder for classifications of alternative media domains). That approach is more than sufficient here, as Defendants have failed to identify even a ***single*** example of a Reddit post they consider to be coded inaccurately. Perhaps more importantly, Dr. Culotta's outlier findings as to Reddit do not depend on sentiment coding, which merely provides additional context for his quantitative analysis. Only after Dr. Culotta identified anomalous activity via "Comment Score" did Dr. Culotta code their sentiment, providing contextualization of statistical spikes observed in the data. *See* Culotta Rep.

---

language is misleading: it comes not from the case analysis, but from the case's parenthetical explanation of a *different* (inapplicable) case. *Id.* at 605. For another, *Malletier* related to the exclusion of a consumer survey due to the "cumulative effect of … errors of methodology, implementation, and reporting of results"—not disagreement among coders. *Cf. Post Univ. Inc. v. Learneo, Inc.*, No. 21-CV-1242 (VDO), 2025 WL 2709370, at *6 (D. Conn. Sept. 23, 2025) (rejecting challenge to expert coding where inconsistencies with coder during deposition failed to show methodology used was completely unreliable).

¶¶ 74, 76–77, 80; Culotta Dep. 75:22–76:9. Such observations are appropriate, and, in any event, Dr. Culotta's Reddit analysis stands independent of the observations made in those four paragraphs of his report. *See* Culotta Rep. ¶¶ 76–79.

      vi.    <u>Dr. Culotta's TikTok analysis of more than 1,800 videos and Reddit analysis of an entire subreddit is reliably based on a comprehensive dataset.</u>

Defendants argue that Dr. Culotta's TikTok and Reddit datasets are "insufficient" based only on the premise that other studies have conducted analyses of larger datasets. Mot. at 47–48 (TikTok); *id.* at 53 (Reddit). But Dr. Culotta's datasets were robust and complete collections from available data. Far from "selective" and "skewed," (Mot. at 48) the TikTok dataset included *all* available videos responsive to a broad hashtag query of #blakelively, #justinbaldoni, #itendswithus, and #itendswithusmovie from July and August 2024. Culotta Rep. ¶¶ 50–51; *supra* n.26 (dataset included 1,861 videos generating more than 330 million likes, more than 2 million comments, and 4 billion views). [37] Dr. Culotta's Reddit dataset was the entirety of the r/Fauxmoi subreddit across a four-month period. Culotta Rep. ¶ 73; Ex. T, Reddit – Fauxmoi Posts and Comments. These census-style data collections on significant scale permitted him to conduct a robust statistical analysis. Culotta Rep. at 25 n.145; *id.* Culotta Rep. ¶¶ 54–57, 60–67 (percentage comparisons of Top-Comment Share and sentiment prevalence before and after the alleged campaign period, and review of engagement anomalies). That is all that Rule 702 requires. *See U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 232 (S.D.N.Y. 2004) (small sample size of fewer than 100 data points does not necessitate exclusion of expert testimony where expert determines results are statistically significant); *In re*

---

[37] It also bears mentioning that Dr. Culotta's TikTok dataset is nearly triple the size of the TikTok dataset (i.e., 1,861 as compared to 688) of Nicole Alexander, Defendants' expert—even before removing Alexander's duplicate data. Dkt. No. 1327-5; Expert Report of Nicole Alexander ¶ 21, dated October 17, 2025, ¶ 21. Professor Culotta's TikTok data set is also more than double the size of Alexander's entire Reddit dataset (879). *Id.* Defendants cannot argue that Professor Culotta's dataset is insufficient while offering Alexander's testimony as reliable.

*LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 527 (S.D.N.Y. 2018) (rejecting challenge to expert's statistical analysis as based on insufficient sample size, noting that "a meaningful statistical analysis yielding a significant result can be based on a small sample, and reliability does not depend on sample size alone" (quoting David H. Kaye & David A. Freedman, Reference Guide on Statistics, in Reference Manual on Scientific Evidence 211, 255 n.108 (3d ed. 2011))).[38]

### vii.    Dr. Culotta's YouTube analysis is reliable.

Dr. Culotta analyzed the "little bump" interview on YouTube by querying the YouTube API for all 34,486 comments left on the video and determining that "bully"-related terms appeared in only 14 comments before the TAG suggestion on August 14, 2024 to "send to Jed," but rapidly increased thereafter, amounting to over 1,700 comments using bully-related terms. Culotta Rep. ¶¶ 91, 93.

Defendants argue that Professor Culotta's analysis is unreliable because Dr. Mayzlin finds that some number of social media users called Lively a bully in the months prior to the alleged retaliation campaign. Mot. at 55. But Dr. Culotta's testimony does not depend on the absence of that terminology in that pre-retaliation period. Instead, his testimony focuses on the dramatic increase in volume and proportion of the word "bully" (from 14 to over 1,700) in YouTube comments before and after the TAG suggestion on August 14, occupying a significantly increased share of top comments (from 3% to 10.4%). Culotta Rep. ¶¶ 93–94 & fig. 18. Dr. Culotta's observations reflect meaningful assessments of the sharp increase of such anti-Lively terminology

---

[38] The peer-reviewed materials Dr. Culotta references in his report also confirm that these volumes comprise a sufficient dataset. Culotta Rep. App. C (*citing* Robert Epstein & Ronald E. Robertson, *The Search Engine Manipulation Effect (SEME) and Its Possible Impact on the Outcomes of Elections*, 112 Proc. Nat'l Acad. Sci. E4512, E4514, E4516–17 (2015); Kevin Aslett et al., *Online Searches to Evaluate Misinformation Can Increase Its Perceived Veracity*, 625 Nature 548, 549–51 (2024)).

that appeared on this specific YouTube video almost immediately after TAG sent the video to Wallace for amplification. *Id.* ¶ 91& 53 n.242.

Defendants argue that Dr. Culotta's analysis is unreliable because he does not consider or rule out "potential alternative causes" for the increase in comment volume and "bully"-related terms following the TAG suggestion. Mot. at 55. But Rule 702 does not require an expert to rule out every alternative cause. *See U.S. Info. Sys., Inc.*, 313 F. Supp. 2d at 238 (an expert, even one who opines on causation, is not required to "categorically exclude each and every possible alternative cause"). In fact, Dr. Culotta's report expressly identifies the publications that Defendants cite (Reddit, Buzzfeed, and the Daily Mail) as well as the video's broader context, and Defendants are free to raise such issues on cross-examination. *See Mullen v. Bodum USA, Inc.*, No. 23-CV-1166 (AT), 2025 WL 1735423, at *5 (S.D.N.Y. June 23, 2025) (alternative causes to be addressed on cross-examination); *Media Glow Digital, LLC v. Panasonic Corp. of N. Am.*, No. 16-CV-7907 (HBP), 2019 WL 1055527, at *5 (S.D.N.Y. Mar. 6, 2019) ("Courts have long recognized that the existence of alternative factual scenarios that an expert has not considered in rendering an opinion goes only to the weight and credibility of the expert's testimony, not its admissibility").

More importantly, Dr. Culotta's YouTube opinion is not a causation analysis. It does not require showing, nor does it attempt to show, that the use of "bully"-related terms was originated by Defendants in the first instance. Instead, the relevant inquiry is whether there are signs of inauthentic amplification after the alleged smear campaign period began—which Dr. Culotta identifies through observed patterns across the YouTube data that are consistent with coordinated manipulation. Culotta Rep. ¶ 95.

2.    **Dr. Culotta's Testimony Is Admissible Because It Will Help the Jury Determine a Fact in Issue.**

a.    **Dr. Culotta's Opinions as to TikTok, Reddit, and YouTube Are Not Speculative and Are Admissible under Rule 403.**

Defendants maintain that Dr. Culotta's analysis across TikTok, Reddit, and YouTube are speculative in "merely raising the possibility of social media manipulation." Mot. at 50–51 (TikTok); *id.* at 53–54 (Reddit); *id.* at 56 (YouTube). Defendants are wrong—Dr. Culotta's assessments are certain to be helpful to the trier of fact, and will result in no unfair prejudice to Defendants.

***First***, "it is not necessary for each expert to provide evidence establishing every element of a party's case." *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 125 (S.D.N.Y. 2015) (rejecting motion to exclude expert who disavowed attempting to find causal connection). The fact that Dr. Culotta was not assigned to conduct a causal analysis, and then proceeded to not conduct a causal analysis, only bolsters the appropriateness of his testimony. *See* Culotta Rep. ¶ 7; Culotta Dep. 93:10–12 (scope of assignment was to identify "indicators of inauthenticity," not to perform a "causal analysis"). Dr. Culotta can help the jury understand where and when evidence of inauthentic behavior directed at Ms. Lively appeared in August of 2024, while leaving for the jury to decide, based on other expert and fact testimony, whether it is more likely than not that Defendants "untraceable" "social manipulation" plan was the cause. *See* Dkt. No. 1273 at 133 ("It is fair to presume that the Wayfarer Parties did what they said that they planned to do.").

The only case Defendants cite to the contrary is *Bozick v. Conagra Foods, Inc.*, No. 19-CV-4045 (LJL), 2022 WL 4561779, at *30 (S.D.N.Y. Sept. 28, 2022) (Liman, J.), but there, the excluded expert was offering an opinion specifically that the phenomena at issue "was the cause" of the subject injuries. *Id.* at *30. This authority is inapplicable to Dr. Culotta *not* offering a causation opinion. Indeed, Dr. Culotta's appropriately-cabined testimony is the opposite of

speculative—it is precise, reliable, and therefore admissible. *In re Fosamax Prods. Liability Litig.*, 924 F. Supp. 2d 477, 505 (S.D.N.Y. 2013) (rejecting motion to exclude expert testimony on basis that expert's findings used "consistent with" language); *In re M/V MSC FLAMINIA*, No. 12-CV-8892 (KBF), 2017 WL 3208598, at *14 (S.D.N.Y. July 28, 2017) (rejecting "speculative" challenge where expert referred to "findings and conclusions as 'plausible,' 'likely,' 'possib[le],' or based on contingencies and 'assumptions'") (citation omitted). At bottom, Dr. Culotta's testimony is not only non-speculative, but will assist the jury—as is required under Rule 702(a)— in understanding the online environment that Defendants have claimed is "organic[]" despite their "untraceable" campaign. *See* Culotta Rep. ¶¶ 39, 42.

**Second**, Defendants seek to exclude Dr. Culotta's opinions given that he "offers no 'known or potential rate of error' that would allow a jury to give his testimony the appropriate weight" except to "raise[] the specter of 'potential inauthentic behavior,' inviting the jury to speculate." Mot. at 50. However, as discussed *supra*, Dr. Culotta performed multiple statistical tests. *See, e.g.*, Culotta Rep. at 25 n.145. His opinions incorporate the findings of the statistical tests he conducted to assess whether observed differences are likely to have occurred by chance. See *id.* n.145 (TikTok), n.218, n.220, n.221 (Reddit). Dr. Culotta's statistical analysis included p-values. *See, e.g.*, *id.* at 25 n.145. Those "confident very small p values… serve[] to indicate that [the Top-Comment shares at issue] were extreme outliers," and functions as a built-in error rate. Culotta Dep. 59:13–18. These p-values (and z-scores)[39] are precisely the type of "error rate" information that Rule 702 contemplates, and *Daubert* does not otherwise require experts to calculate error-rate separately from their data analysis process. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S.

---

[39] While Defendants do not complain of a lack of error rate as to Dr. Culotta's Reddit assessment, he also calculated z-scores for that analysis "to determine the significance level of that deviation" of observed patterns. Culotta Dep. 59:13–18.

27, 39 n.6 (2011) (explaining that a p-value represents the probability of obtaining the observed data if the null hypothesis is true, and that results falling below a preselected significance level are "unlikely to be the result of random error," thereby functioning as a built-in error rate); *Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 235 (2d Cir. 2021) (rejecting claim that expert failed to calculate error rates where party "error rates are 'built into the model'").

***Third***, Dr. Culotta's observations regarding the potential for removing manipulated content pursuant to Reddit's policies, and the 30% decrease in post upvote counts associated with an August 14 post sharing the "little bump" YouTube video were presented as part of a broader pattern of suspicious Reddit activity. *See* Culotta Rep. ¶ 80. Rather than "cit[ing] generic webpages," Dr. Culotta's analysis rests on Reddit itself, which provides bi-annual transparency reports that disclose removal for content manipulation and addresses vote manipulation in particular. Culotta Rep. ¶ 80 & n.214 (citing Reddit July–December 2024 Transparency Report, https://redditinc.com/policies/transparency-report-july-to-december-2024 ("As in previous reporting periods, the vast majority of admin removals were for content manipulation .…")).[40]

Dr. Culotta's observations provide important context on key Reddit evidence and is not a basis for exclusion. Mot. at 53.[41] That said, exclusion of this component of Dr. Culotta's opinion

---

[40] Notably, Dr. Culotta's observation on this front tracks with peer-reviewed studies reflecting declines in engagement metrics related to the removal of inauthentic activity on other platforms. *See* Maria Castaldo et al., "Fake Views Removal and Popularity on YouTube," 14 Sci. Rep. 15443 (2024), https://www.nature.com/articles/s41598-024-63649-w (research finding that removing fake views from view count on YouTube is common and that 54% of corrections occur after the videos have stopped collecting views entirely). Indeed, it is a known and observed approach by online malicious actors to effectuate removal of artificial or manipulated content subsequent to manipulation. *See, e.g.*, Tuğrulcan Elmas et al., "Ephemeral Astroturfing Attacks: The Case of Fake Twitter Trends at 403," in 2021 IEEE European Symposium on Security and Privacy, (2021), https://doi.org/10.1109/EUROSP51992.2021.00035 (finding deliberate deletion of activity after achieving the manipulation goal).

[41] Defendants argue without support that Reddit archives on "Arctic Shift" are of "unknown reliability." Mot. at 53. Arctic Shift data is collected from the official Reddit API (https://github.com/ArthurHeitmann/arctic_shift/blob/master/file_content_explanations.md ("All data is retrieved through the official reddit API.")). It has been relied upon in peer-reviewed publications. *See, e.g.*, Md Kaykobad Rexa et al., "Model, Analyze, and Comprehend User Interactions Within a Social Media Platform," in the 2024 27th International Conference om Computer and Information Technology (2024), https://ieeexplore.ieee.org/abstract/document/11022085; Samuel Arowosafe and Ernest Makata, "Polarization an

does not impact his other Reddit conclusions, which stand on their own. *Compare* Culotta Rep.

¶ 80 (addressing removal) with ¶¶ 72–79, 81–86 (remainder of Reddit analysis).

> **b.     Dr. Culotta's qualitative observations as to TikTok are helpful to the jury.**

Defendants' argument that Dr. Culotta's qualitative observations about "pattern[s] of repeated themes and language" among Top Comments on TikTok are mere lay observations, minimizes Dr. Culotta's qualifications and mischaracterizes the role of these observations. Mot. at 48–50.[42] Analyzing the language of social media posts in connection with social network analysis and natural language processing has been a focus of Dr. Culotta's research for over fifteen years. Culotta Rep. at App. A.

Rule 702(a) does not require a separate credential in "evaluating social media language," because Dr. Culotta's expertise and knowledge directly support the challenged analysis. *See Figueroa v. Bos. Sci. Corp.*, 254 F. Supp. 2d 361, 369 (S.D.N.Y. 2003); *Tardif v. City of New York*, 344 F. Supp. 3d 579, 598 (S.D.N.Y. 2018) (quoting *Arista Recs. LLC v. Lime Grp. LLC*, No. 06-CV-5936 (KMW), 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011)) ("If an expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent"). Any concerns regarding the patterns Dr. Culotta observes go to weight, not admissibility. *See McCullock*, 61 F.3d at 1044.

---

Sentiment Shifts in Reddit Discussion on the US Foreign Aid Freeze," 6 J. Media 199 (2025), https://www.mdpi.com/2673-5172/6/4/199.

Further, archive.org pages confirm the accuracy of the Arctic Shift upvote data. *Compare, e.g.*, Ex S, Reddit – August 14 Fauxmoi Analysis at "Upvote Discrepancies," row 4, column E (reflecting post score of 16,790 from the Arctic Shift                                    dataset,                                    *with* https://web.archive.org/web/20240815213858/www.reddit.com/r/Fauxmoi/comments/1ertsu2/the_blake_lively_inter view_that_made_me_want_to/ (reflecting post score of "17K" as of August 15, 2024).

[42] Defendants also argue in a sentence that Dr. Culotta's qualitative analysis on TikTok is outside of his expertise. Mot. at 48–50 (TikTok). As stated here, given Dr. Culotta's depth of experience on exactly these issues, that assertion is incorrect.

Unlike in Defendants' cases,[43] Dr. Culotta's qualitative assessments as to TikTok permit him to contextualize his quantitative methodology. *See, e.g.*, Culotta Dep. 70:2–5 (referencing that "the strikingly similar language, combined with the anomalous-like values together, are indicators of potential coordinated behavior"). Dr. Culotta's qualitative analysis for TikTok is not made of free-floating observations. Instead, it is directly tied to his statistical analysis on the platform because the qualitative observations relate only to posts identified as having abnormally high Top-Comment Shares relative to the overall dataset. Such observations aid in the interpretation of the underlying quantitative anomalies he evaluates and would not be obvious to the average juror, who knows little to nothing about online coordinated campaigns. *See Scott*, 315 F.R.D. at 45 (expert testimony for "inferences that would not be apparent without the benefit of experience or specialized knowledge").

### c.    Dr. Culotta's TikTok analysis as to both anti-Lively and pro-Baldoni observations are helpful to the jury.

Defendants assert that Dr. Culotta's TikTok analysis "improperly aggregates actionable and non-actionable conduct" by including pro-Baldoni posts in his data set even though the Court observed "it was permissible for Baldoni to request that the digital team 'boost' certain videos which he believed were favorable to his image." Mot. at 51 (quoting Dkt. No. 1273 at 131). This argument confuses liability with admissibility. Dr. Culotta assesses indicia of inauthenticity, but he does not opine on whether a given post is actionable. Culotta Rep. ¶ 9. The dramatic delta in Top-Comment status of anti-Lively and pro-Baldoni on the one hand, and pro-Lively and anti-

---

[43] Defendants' cases are inapplicable. Neither even relates to an expert's qualitative assessment contextualizing quantitative findings. In *Hayden*, the excluded expert merely placed slide decks side by side and concluded one was "based on" the other without examining source code, testing his conclusions, or applying specialized methodology. *Hayden v. IBM*, 2025 WL 1697021, at *7–8 (S.D.N.Y. June 17, 2025). In *Mirena*, the court excluded experts who developed causation theories solely for litigation using a "malleable and vague" methodology that failed *Daubert. In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 268 (S.D.N.Y. 2018).

Baldoni content on the other hand, provides strong evidence as to the existence and trends apparent in inauthentic digital markers in August 2024. This is so even though Defendants will not be liable for steps that exclusively involved boosting pro-Baldoni content. Regardless, Dr. Culotta distinguishes between pro-Baldoni and anti-Lively content throughout his report. *See, e.g.*, Culotta Rep. at 3-4, fig. 1 at 26, fig. 2 at 27, fig. 3 at 28. Thus, a jury can reach conclusions about the change in anti-Lively sentiment online without respect to the pro-Baldoni posts evaluated by Dr. Culotta.

### d.    Dr. Culotta's Reference to Defendants' Involvement Is Permissible.

Defendants are incorrect that that Dr. Culotta improperly "summarize[s]" case documents. Mot. at 56–57. Dr. Culotta uses a modest set of documents as a hypothesis to test against—for example, identifying relevant social media platforms to evaluate. Mot. at 56–57; Culotta Rep. ¶ 48 (case documents "offer insight into the potential scope of the alleged campaign, including the platforms targeted, the messages that may have been elevated or suppressed, the techniques relied on, and, in some cases, even individual posts that may have been of particular interest to the alleged campaign."); Culotta Dep. 20:7–10 (explaining that discovery documents help to "identify both the timing and the content that is consistent with what [he] find[s] in the analysis"). It is "well settled that an expert is free to offer testimony to provide a background for the case," and an expert may properly rely on case materials to "describe the setting in which the parties were operating" so long as his "ultimate conclusions are based on the application of 'standard … methodology' to the facts at hand." *U.S. Info. Sys., Inc.*, 313 F. Supp. 2d at 237 (permitting expert to rely on depositions to provide factual context for economic analysis). In referencing the documents in connection with his independent statistical and related analyses, Dr. Culotta does just that. *See e.g.*, Culotta Rep. ¶¶ 60, 93.

More practically, Dr. Culotta's analysis incorporating these documents will serve as a critical reference point for Ms. Lively's retaliation timeline. His report catalogs Defendants' communications describing their plans to manipulate social media platforms—the very platforms Dr. Culotta then measured for anomalies. *See* Culotta Rep. ¶¶ 39–45.

### e.    Dr. Culotta's Conclusion As To Other Platforms Is Not Speculative.

Defendants argue that Dr. Culotta's conclusion that "the presence of markers of inauthenticity in these three domains [of TikTok, Reddit, and YouTube] suggests that inauthentic activity was likely present in others" is impermissibly speculative. Culotta Rep. ¶ 97; Mot. at 58. But considerable prior research reflects that coordinated campaigns frequently operate across multiple platforms using shared content and tactics. *See, e.g.*, Federico Cinus et al., "Exposing Cross-Platform Coordinated Inauthentic Activity in the Run-Up to the 2024 U.S. Election," at 541 in Proceedings of the ACM Web Conference 2025, (2025), https://doi.org/10.1145/3696410.3714698; Fabio Barbero et al., "Multi-Modal Embeddings for Isolating Cross-Platform Coordinated Information Campaigns on Social Media," in Disinformation in Open Online Media: MISDOOM 2023 (Davide Ceolin et al. eds., 2023), https://arxiv.org/pdf/2309.12764. This peer-reviewed research, Dr. Culotta's identification of indicia of manipulation across the social media platforms discussed by Defendants (*see, e.g.*, Culotta Rep. ¶¶ 67, 79, 95–96), and Defendants' express discussions of manipulating content across various social media platforms (*id.* ¶¶ 37–48), support Dr. Culotta's conclusion, based on his expertise, that such artificial manipulation may have happened elsewhere.

### IV.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF DR. ASHLEE HUMPHREYS.

Dr. Humphreys, a Professor of Integrated Marketing Communications at Medill School of Journalism and Professor of Marketing at the Kellogg School of Management, Northwestern

85

University, will assist the jury in quantifying the reach of harmful language about Ms. Lively associated with Defendants' retaliatory campaign, and the reputational damages attributable to Defendants' retaliatory statements. She applies her widely-recognized expertise in marketing, social media, and consumer research to analyze and explain: (1) the value of person brand, including for public figures like Ms. Lively; (2) how broadly key terms from the alleged retaliation campaign spread across various media channels ("Impressions Model for Retaliatory Phrases"), and the harm to Ms. Lively's reputation and personal brand; (3) how broadly five statements made by Defendants' agent about Ms. Lively spread across various media channels ("Impressions Model for Retaliatory Statements"); (4) the receptivity of the audience to these Retaliatory Statements (also known as "At-Issue Statements"), the persistence of the audience's negative opinions, and the corresponding damage to Ms. Lively's reputation ("Impact Assessment"); and (5) the estimated costs of a mixed-media marketing campaign to repair the damage to Ms. Lively's reputation caused by the Retaliatory Statements, calibrated to the media spread and audience ("Damages Model"). *See* Dkt. No. 1334-49 (Amended Expert Report of Dr. Ashlee Humphreys ("Humphreys Report" or "Humphreys Rep.") ¶¶ 8–11.

In their Motion, Defendants do not challenge Dr. Humphreys' qualifications to offer her opinions, nor do they meaningfully challenge the admissibility of Dr. Humphreys' Impressions Model for Retaliatory Phrases or her Impact Assessment. *See infra* Part IV(B)(2). Instead, they levy the legally erroneous claim that the Retaliatory Statement testimony is now "irrelevant" because the defamation cause of action has been dismissed, and the counterfactual claim that Dr. Humphreys' opinion about the harm caused by the retaliation campaign is "based entirely" on Dr. Mayzlin's analysis, together with a set of scattershot arguments related to other aspects of Dr.

86

Humphreys' opinions. Mot. at 99–103. Because Defendants fail to raise any credible challenge to Dr. Humphreys' opinions, the Court should deny their Motion in full.

### A.   BACKGROUND

### 1.   Dr. Humphreys' Expertise in Social Media, Marketing, and Reputational Repair.

Dr. Ashlee Humphreys has been on the faculty at Northwestern for 17 years, regularly teaching classes on social media, consumer and marketing research, crisis communication, and reputation repair. Humphreys Rep. ¶ 2. She serves in several high-level editorial positions for top journals in the field and has received various awards and recognitions, including as a Marketing Science Institute Scholar—one of a select group of 35 marketing scholars recognized as "amongst the most prominent marketing scholars in the world." Humphreys Rep. ¶¶ 5–6.

Dr. Humphreys regularly publishes peer-reviewed research and literature about digital media, social media, and marketing strategy. Humphreys Rep. ¶ 3. Among these, she is the author of *Social Media: Enduring Principles* (Oxford University Press, 2016), a review and synthesis of the empirical social science research on social media. *Id.* Her research on how markets are created through shifts in social structure was selected as a lead article in the *Journal of Marketing*, the highest-impact peer-reviewed journal in the field. Humphreys Rep. ¶ 4.

Dr. Humphreys has also served as a qualified expert on numerous occasions, deploying similar analyses in cases involving reputational damage, including in this District. *See Carroll v. Trump*, 683 F. Supp. 3d 302, 329–32 (S.D.N.Y. 2023) (rejecting challenges to Dr. Humphreys' trial testimony regarding her calculation of impressions generated by statements made by Donald Trump about the writer E. Jean Carroll and her estimation of the cost of a reputational repair campaign); *Freeman v. Giuliani*, 732 F. Supp. 3d 30, 58–62 (D.D.C. 2024) (rejecting challenges to Dr. Humphreys' trial testimony "about 'the reputational harm' caused by Giuliani and his co-

conspirators' statements" and her "'estimate for [a] reputational repair campaign' using an 'impressions' model, which involved 'measur[ing] the reach of the statements that were at issue in the case'").

### 2.      Dr. Humphreys' Analysis in the Instant Case.

Ms. Lively retained Dr. Humphreys to analyze the impact, if any, to Ms. Lively's reputation from the retaliation campaign orchestrated by Defendants to manipulate online discussion of Ms. Lively beginning in August 2024, as well as the reputational impact of retaliatory statements made by Defendants' agent in December 2024 and January 2025. Humphreys Rep. ¶¶ 8–9. Dr. Humphreys: (1) calculated the number of impressions of the Retaliatory Phrases, and assessed the resulting harm, and (2) calculated the number of impressions of the Retaliatory Statements, as well as conducted an Impact Assessment, and a related Damages Model estimating the costs to repair Ms. Lively's reputation based on the impact of those impressions. *Id.* ¶ 8–11.

For her Impressions Models, Dr. Humphreys gathered and summed the impressions from each source that contained the content of interest, including: (a) social media platforms such as TikTok, YouTube, Instagram, Facebook, and X; (b) online news websites and articles using the third-party analytics tool SEMRush; and (c) television. Humphreys Rep. ¶¶ 67, 123–36. Her approach incorporated platform-reported view counts (i.e., impressions counts) where available, and she documented each step of her analytical pipeline. *Id.* ¶¶ 123–42. Based on this data, Dr. Humphreys calculated over 176 million impressions of posts associating Ms. Lively with the Retaliatory Phrases and approximately 116 million impressions of the Retaliatory Statements, each of which she describes as conservative estimates. Humphreys Rep. ¶¶ 68–69, 138–42, App. E, G.[44]

---

[44] Dr. Humphreys additionally provided conservative calculations of impressions on a subset of other topics including as to the "little bump" interview (generating over 7 million impressions), proliferation of Sage Steele's content regarding Ms. Lively (generating over 2.9 million impressions), and discussion of the "friction" narrative (over 2.05

For her Impact Assessment, Dr. Humphreys evaluated several factors to determine whether the Retaliatory Statements harmed Ms. Lively's reputation, including the credibility of the sources, the prominence of the publications, and the prevalence of the statements in online discussions regarding Ms. Lively. Humphreys Rep. ¶¶ 143–94. Dr. Humphreys concluded that the Retaliatory Statements damaged Ms. Lively's reputation, noting that "untold numbers of online comments repeat the . . . claims, which indicates that many consumers were receptive to the [Retaliatory Statements] and that those statements drove attitudinal change toward Ms. Lively." *Id.* ¶ 193.

For her Damages Model, Dr. Humphreys estimated the costs of a corrective mixed-media marketing campaign calibrated to repair the reputational harm caused by the Retaliatory Statements. Humphreys Rep. ¶¶ 195–211. Drawing on peer-reviewed research establishing that changing an existing attitude requires approximately three to five exposures, Dr. Humphreys calculated the cost of generating the necessary corrective impressions across each media channel in proportion to the original sources of dissemination, using industry-standard cost-per-mille ("CPM") rates. *Id.* ¶¶ 204–10; App. H. She further adjusted for audience receptivity using YouGov consumer polling data, applying a 55.2% receptivity rate reflecting the percentage of U.S. adults who did not view Ms. Lively favorably. *Id.* ¶ 202. Based on this methodology, Dr. Humphreys estimated that a corrective campaign for the Retaliatory Statements would conservatively cost between $14,625,160 and $24,375,267. *Id.* ¶ 211.

## B.    ARGUMENT

Dr. Humphreys' expert testimony satisfies each requirement of Rule 702. Her opinions are the "product of reliable principles and methods" governing the fields of marketing, social media analysis, and consumer research, and she has "reliably appli[ed]" those methods to the facts of this

---

million impressions). Humphreys Rep. ¶ 75 n.173 & App. D. Defendants do not challenge Dr. Humphreys' calculations as to these topics or otherwise address them.

89

case. Fed. R. Evid. 702(c)-(d). Her testimony "will help the trier of fact" determine key factual questions at issue: namely, the reach and impact of the retaliatory narratives on Ms. Lively's reputation, and the cost of repairing that harm. Fed. R. Evid. 702(b).

### 1. **Dr. Humphreys' Testimony About the Retaliatory Statements Is Relevant.**

Contrary to Defendants' claim, the Court's dismissal of Ms. Lively's defamation cause of action does not make Dr. Humphreys' testimony about the Retaliatory Statements "irrelevant." Mot. at 98, 100–101. This ignores the pivotal role that the Retaliatory Statements play in Ms. Lively's surviving retaliation, aiding and abetting, and contract claims. Because the Retaliatory Statements are a core part of the retaliation campaign, Dr. Humphreys' testimony about the reach and impact of the Retaliatory Statements, and the damages Ms. Lively suffered from them, remains central to the questions the jury must decide.

Like their motion *in limine* to exclude Dr. Humphreys' testimony about the Retaliatory Statements, Dkt. No. 1312 at 51–52, Defendants' *Daubert* challenge rests on the false premise that, because the Court dismissed the defamation claim on privilege grounds, evidence of the damages stemming from the Retaliatory Statements is no longer relevant. Once again, that is not the law. *See* Dkt. No. 1363 at 79. The dismissal of a cause of action on privilege grounds does not render evidence relating to the underlying conduct irrelevant where—as here—it is independently probative of different surviving claims and independently supports recoverable damages flowing from retaliatory acts. *See*, *e.g.*, *Campanella v. County of Monroe*, 853 F. Supp. 2d 364, 371–75 (W.D.N.Y. 2012) (rejecting defamation claims subject to common interest privilege while allowing retaliation claims based on the same underlying conduct to proceed); Dkt. No. 1324 at 4 ("Wayfarer and IEWUM unlawfully retaliated by seeking to undermine Ms. Lively's character and professional reputation, . . . attacking her professional reputation . . . and *filing a frivolous and*

*legally improper retaliatory lawsuit against Ms. Lively and her husband*.") (emphasis added); *id.* at 12 (referencing "retaliation against Ms. Lively, . . . *in relation to Defendants' retaliatory lawsuit* . . . ) (emphasis added); Dkt. No. 1252-1 at 43 ("In Response to Lively's CRD Complaint, Defendants *Continued Their Retaliatory Campaign* With A Baseless Lawsuit And Defamatory Statements.") (emphasis added).

As Ms. Lively has consistently alleged, Defendants retained Freedman specifically because of his reputation for being willing to "bury" his clients' opponents. *See* Dkt. No. 1233-25 at 3 ("[B]ryan as he's not well respected" and "he's a killer [a]nd would bury Blake"); Dkt. No. 1252-1 at 31–32. Then—after Ms. Lively filed her CRD Complaint, an act unquestionably protected by the FEHA, *see* Cal. Gov't Code § 12940(h)—(forbidding retaliation "because the person has filed a complaint, testified, or assisted in any proceeding under this part")—Freedman made good on his promise to sue anyone associated with Ms. Lively's CRD Complaint "into oblivion" by filing Defendants' retaliatory lawsuit, and then doubling down on the dissemination of this retaliatory content in his statements to the media on behalf of Defendants. Dkt. No. 743 at 9 n.10; Dkt. No. 1252-2 ¶¶ 787, 802, 814. As such, the Retaliatory Statements, and Dr. Humphreys' testimony about the Retaliatory Statements, remains squarely relevant to the surviving claims.

Because Dr. Humphreys' testimony about the spread and harm of the Retaliatory Statements remains squarely relevant, Defendants' cases on this point—which involve either a full dismissal or a dismissal of all claims relevant to an expert's opinion—are inapposite. *See Velez v. Lasko Prods., LLC*, 2025 WL 1865165, at *5 (S.D.N.Y. July 7, 2025) (granting summary judgment in full and directing case to be closed); *Kairam v. West Side GI, LLC*, 2025 WL 2935321, at *32 (S.D.N.Y. June 21, 2025) (denying motion *in limine* as moot where portions of expert opinion related to claims recommended for dismissal); *Zhang v. City of New York*, 2023 WL 6316249, at

91

*14 n.9 (S.D.N.Y. Sept. 28, 2023) (denying motion *in limine* as "unnecessary at this stage of the proceedings"); *see also Adams-Flores v. City of New York*, No. 2024 WL 519819, at *3–4 (S.D.N.Y. Feb. 9, 2024) (excluding exhibits or portions of exhibits that were irrelevant to remaining claims).

### 2. Dr. Humphreys' Testimony Is Reliable and Reflects Reliable Application of Principles and Methods to the Facts of the Case.

Defendants' remaining arguments fare no better. Dr. Humphreys' testimony relies on well-established principles and methods in the fields of marketing, consumer research, and strategic communications. Her Impressions Model employs a systematic, quantitative methodology for calculating the number of times content is viewed across media platforms—an approach that is standard practice in the digital marketing and advertising industry. Humphreys Rep. ¶¶ 123–26. Her Impact Assessment applies principles drawn from peer-reviewed research on source credibility, audience receptivity, and attitude change to evaluate the reputational harm caused by the Retaliatory Statements. *Id.* ¶¶ 143–94. And her Damages Model draws on accepted marketing practices for designing corrective campaigns, including industry-standard CPM rates and peer-reviewed research on the frequency of impressions required to achieve attitude change. *Id.* ¶¶ 195–211. Each component of Dr. Humphreys' analysis is grounded in the same principles and methods that she has applied in her academic research, in her professional work, and in prior federal litigation where her testimony has been admitted. Defendants' superficial attempts to exclude her testimony should be rejected. *See infra* Part IV(B)(1)(a)–(b) (addressing Retaliatory Phrases); Part IV(B)(1)(c)–(d) (addressing Retaliatory Statements).

### a. Dr. Humphreys' opinions are independent of Dr. Mayzlin's analysis.

Defendants make the vague conclusory claim that "the first part of Humphreys' analysis, regarding damage allegedly suffered by Lively due to Defendants' purported retaliation

campaign," should be excluded because it is "[b]ased [e]ntirely" on Dr. Mayzlin's analysis, which Defendants independently seek to exclude. Mot. at 99. In fact, Dr. Humphreys does not rely on Dr. Mayzlin's analysis to calculate the number of impressions of the Retaliatory Phrases and assess harm, and her testimony does not rise or fall with Dr. Mayzlin's.

Instead, as Dr. Humphreys explains, she makes the assumption that a retaliation campaign did occur—acknowledging in this context that Dr. Mayzlin found evidence that a retaliation campaign had in fact occurred in August 2024—and then proceeds to calculate the number of impressions of the Retaliatory Phrases and assess whether and to what extent Ms. Lively's reputation was harmed. *See Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting Env't Consulting, Inc.*, 743 F. Supp. 3d 530, 544 (S.D.N.Y. 2024) ("expert testimony may be premised on assumptions"); Humphreys Rep. ¶ 8 n.4; ¶¶ 56, 66-119. In particular, after acknowledging Dr. Mayzlin's findings, *see id.* ¶ 66, Dr. Humphreys conducts her *own* collections and calculations of impressions from social media, online, and traditional media containing the Retaliatory Phrases (a total of "over 176 million impressions"), *see id.* ¶¶ 66-69, and undertakes her own assessment of the harmful impact of the retaliation campaign, *see*, *e.g.*, *id.* ¶ 69 ("[T]he substantial number of impressions of posts that establish associations between Ms. Lively and the terms . . . is another indicator that the retaliation campaign in August 2024 had negative impacts on Ms. Lively's reputation."); *see also id.* ¶¶ 70–119 (conducting further "additional analyses," including of "search engine data, tabloid coverage, and social media discussions" to assess harm to Ms. Lively's reputation). Nothing about Dr. Humphreys' data, her analysis, or her conclusion that there were over 176 million impressions of posts associating Ms. Lively with the Retaliatory Phrases and subsequent assessment of harm is contingent on Dr. Mayzlin's opinions. Any challenge to her testimony based on the assumption that a retaliation campaign did occur thus goes to weight, not

93

admissibility. *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quotation

marks and citations omitted) (except for "bad faith" or misaligned assumptions, "other contentions

that the assumptions are unfounded go to the weight, not the admissibility of the testimony."); *see*

*also Carroll*, 683 F. Supp. 3d at 330–31 (holding that arguments "concern[ing] certain assumptions

Professor Humphreys made or did not make in forming her expert opinion" "go primarily to the

weight, rather than the admissibility of Professor Humphreys' testimony").

### b.    Dr. Humphreys' approach to "alternative explanations" does not render her testimony regarding the Retaliatory Phrases unreliable.

Defendants argue that Dr. Humphreys' analysis of the Retaliatory Phrases is unreliable

because she failed to "investigate or consider any alternative explanations for the purported

damage to Lively's reputation." Mot. at 99–100.[45] This reveals a misunderstanding of Dr.

Humphreys' methodology. Dr. Humphreys conducted a mathematical calculation of the number

of impressions on posts containing the negative "mean girl," "bully," or "tone deaf" phrases. *See*

*supra* Part IV(B)(2)(a); Humphreys Rep. ¶¶ 66–69. Any "alternative explanations" for potential

reputational harm beyond these terms (including Defendants' "bevy of prior problematic acts,"

Mot. at 99)[46] are irrelevant to her methodology. Dr. Humphreys' methodology is reliable because

it accounts for precisely the universe of relevant content. In turn, Defendants' complaints go (at

most) to weight. *See Arista Records LLC v. Lime Group LLC*, 2011 WL 1674796, at *17 (S.D.N.Y.

May 2, 2011) (rejecting challenge to expert's opinion based on failure to account for alternative

evidence because it was not relevant to the proffered opinion); *see also Geigtech East Bay LLC v.*

---

[45] Defendants challenge only Dr. Humphreys' analysis of the Retaliatory Phrases on this basis. Mot. at 99 (referencing the Retaliatory (i.e., At Issue) Statements as alternative explanations that Dr. Humphreys considered). Contrary to Defendants' suggestion, the Retaliatory Statements are not an "alternative explanation[]" for the purported damage to Ms. Lively's reputation, but a key part of Defendants' retaliation campaign against her.

[46] Certain of these are subject to Ms. Lively's pending MIL #1, which seeks preclusion of improper character evidence and lay opinion concerning Ms. Lively's reputation. Dkt. No. 1326.

*Lutron Elecs. Co., Inc.*, 2023 WL 6614486, at \*28 (S.D.N.Y. Sept. 20, 2023) (alternative factual scenarios go to weight and credibility).[47]

### c.       Dr. Humphreys' data collection is reliable.

Defendants fault Dr. Humphreys for relying on SEMRush, a third-party analytics platform, to measure impressions of the Retaliatory Statements. Mot. at 102. They also complain that Dr. Humphreys did not "de-duplicat[e] the individuals who create those impressions." Mot. at 102.

***First,*** Defendants provide no basis for asserting that SEMRush is a flawed data source. Mot. at 102. What they mysteriously characterize as "common concerns about SEMRush" contradicts that SEMRush is a standard tool that is widely used and relied upon in the marketing industry and in academic research. *See* Humphreys Rep. ¶ 127; Ex. W ("Humphreys Dep.") 155:8–9, *id.* 155:19.[48] Nor are Defendants correct that SEMRush is unreliable because the tool has not been peer-reviewed. To the contrary, courts have concluded that Dr. Humphreys' method is sufficiently peer-reviewed. *Freeman*, 732 F. Supp. 3d at 62 (rejecting post-trial challenge to Dr. Humphreys' method and reiterating plaintiffs' argument supporting its reliability because "each piece of the damages methodology that she [was] employing have been peer-reviewed" and that the "record … [was] clear from her testimony that she applies consistent methodologies" in her reports). The fact that Dr. Humphreys has relied on SEMRush in multiple other cases in testimony as a qualified expert undermines Defendants' claim. *See Carroll*, 683 F.Supp.3d at 328–32;

---

[47] The cases that Defendants rely on for this point are inapposite as they involve calculations or models that were offered to prove causation. *See In re Wireless Telephone Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 427-28 (S.D.N.Y. 2005) (excluding regression analysis offered to show that "defendants' tying practices have resulted in increased handset prices" where it failed to account for two other major developments that could have impacted prices); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d 330, 455-56 (S.D.N.Y. Sept. 25, 2025) (excluding expert testimony regarding whether injury was caused by defendants' violation of antitrust laws where the expert had not accounted for obvious alternative explanations). Dr. Humphreys' opinion is not an analogous "causal" analysis.

[48] 10 million users have relied on SEMRush's data and SEMRush's web traffic analytics are based on data from 200 million panelists and 1 billion events analyzed daily. Stats and Facts, SEMRush, https://www.semrush.com/stats/.

*Freeman*, 732 F. Supp. 3d at 62; *see also Green Rush, LLC v. Xhale Tobacco & Hookah, Inc.*, 2024 WL 4958221, at *4 (S.D. Miss. Oct. 10, 2024) (admitting report by marketing expert using SEMRush software). Moreover, even if Defendants' criticisms of SEMRush were correct, they address only a marginal portion (3%) of the data. As Defendants concede, Dr. Humphreys' use of SEMRush relates only to online news—not all the other the impressions from social media and television—affecting merely 3,559,144 of the total 116,959,530 impressions. Mot. at 102; Humphreys Rep. ¶¶ 127–29; Humphreys Rep. at 71 fig. 10. Thus, the claim that Dr. Humphreys' testimony should be excluded on this basis is unfounded.

**Second,** the reliability of Dr. Humphreys' methodology does not depend on de-duplicating users, because she does not base her analysis on users. Instead, impressions are the industry-standard approach to measurement, and those impressions are never de-duplicated. Humphreys Dep. 176:20-24.[49] All of the conclusions Dr. Humphreys draws, and the damages she calculates, account for this known feature of digital media measurement used in the marketing and ad industry as a matter of course.

Putting aside that Defendants provide no evidence that Dr. Humphreys counted the same impression twice (she did not), Dr. Humphreys' impression counts are conservative and would more than make up for any theoretical overcounting under Defendants' theory. Humphreys Rep. ¶¶ 69, 129, n.325, n.330, 139–42, 185. The fundamental point is this: Defendants are conflating unique viewers with impressions. Their argument suggests that Dr. Humphreys has drawn conclusions based on a calculation of unique viewers and thus has made an error in her calculations. But Dr. Humphreys calculated impressions—not unique viewers—and therefore

---

[49] *See also* Guide: What is CPM? Amazon Ads, https://advertising.amazon.com/library/guides/cost-per-mille ("Cost per mille (CPM) … refers to the total ad spend for every 1,000 impressions an ad receives."); Meta Platforms, Inc., Form 10-K 2025 at 67 (Jan. 28, 2026) ("Impressions are considered delivered when an ad is displayed to a user.").

none of Dr. Humphreys' conclusions rest on the assumption that 100M+ *individuals* were exposed to this information. Defendants might object to Dr. Humphreys' decision to use impressions as the operative metric, but that, again, is no basis to exclude her testimony. *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 330-31 (S.D.N.Y. 2022) ("[W]here an expert's methodology overcomes the hurdle of being based on a reliable process, remaining controversies as to the expert's methods and conclusions generally bear on the weight and credibility—but not admissibility—of the testimony.") (citation omitted).

### d.    Dr. Humphreys' Retaliatory Statements analysis is reliable without interviewers or consideration of positive statements.

Defendants also argue that Dr. Humphreys' conclusion that the Retaliatory Statements damaged Ms. Lively's reputation lacks support because she did not: (1) interview the creators or viewers of the captured posts, (2) consider "countervailing effects" of positive statements near the Retaliatory Statements, or (3) speak with the parties in this case. Mot. at 101–02. Defendants offer no explanation for *why* these points render Dr. Humphreys' analysis unreliable, but instead summarily conclude that "[c]onsidering all these issues, Humphreys' analysis cannot plausibly support the conclusion that Freedman's [Retaliatory] Statements unequivocally caused harm to Lively's reputation." *Id.* at 101.

As explained, Dr. Humphreys' Impressions Model reflects a quantitative calculation of the impressions generated by the Retaliatory Statements. It does not depend on any individual user's opinion of the Retaliatory Statements. Dr. Humphreys' testimony on this point was unequivocal: "what was relevant here was counting the impressions of the at-issue statements." Humphreys Dep. 117:3–4, 139:10–12 ("I create a very precise count of exactly how many viewers viewed that or how many impressions the at-issue statements received."), 121:5–125:8. Given this, Defendants' complaint that Dr. Humphreys failed to consider the "countervailing effects" of

97

positive statements near the Retaliatory Statements is irrelevant. Likewise, interviews with the posts' *creators* or the parties themselves would have no bearing on Dr. Humphreys' analysis, because subjective beliefs are irrelevant to the dissemination of the Retaliatory Statements.

Dr. Humphreys' Impact Assessment disposes of Defendants' argument that Dr. Humphreys has failed to account for whether Ms. Lively's reputation was in fact harmed by the Retaliatory Statements. *See* Humphreys Rep. ¶¶ 143–94. Dr. Humphreys evaluated whether the 116 million impressions generated by the Retaliatory Statements harmed Ms. Lively's reputation by looking at audience receptivity and the prevalence of the messages. *Id.* She concluded that "Ms. Lively's reputation has been harmed by the [Retaliatory] Statements." *Id.* ¶ 192; *id.* at ¶¶ 193–94 ("[M]any consumers were receptive to the [Retaliatory] Statements and that those statements drove attitudinal change towards Ms. Lively."); Humphreys Dep. 103:11–20. This conclusion confirms the evident harm to Ms. Lively without the need for individualized interviews.

### e.    Dr. Humphreys' testimony regarding the Damages Model is the product of reliable principles and methods.

Defendants take issue with Dr. Humphreys' damages calculation. They point to no errors in Dr. Humphreys' mathematics or CPM calculations to suggest her methodology is unreliable. Instead, they assert that Ms. Lively's own media and the "ameliorative reputational effect" of a litigation victory would suffice to repair Ms. Lively's reputation. Mot. at 102–03. This conclusory claim, which is also the subject of Defendants' proffered rebuttal expert testimony (Wagner Rep. ¶ 154), is no basis to exclude the testimony.

Defendants' premise is also unfounded. There is no reason to believe that news of such a victory in this case would reach the intended audience at all or with the frequency necessary to restore Lively's reputation following Defendants' retaliation campaign. *See* Dkt. No. 1330 at 11; Humphreys Dep. at 174:6–25. Nor is there any guarantee that a successful jury verdict would

persuade those who credited the Retaliatory Statements, since "increasing polarization, in the American context, both politically and culturally, means that attitudes about many topics have become more entrenched and harder to change." Humphreys Rep. ¶ 43. As to Ms. Lively's own platforms, targeting the receptive audience means identifying the audience that "follows the sources associated with Mr. Freedman and Mr. Baldoni and others." Humphreys Dep. 159:23– 160:4; Humphreys Rep. ¶ 48. There is no basis to presume that the audience that follows Lively on social media are the target audience that were receptive to Defendants' Retaliatory Statements, or that Ms. Lively's own assurances would repair the harm. *See* Humphreys Dep. 159:6–10 ("Reputation isn't built by what you say about yourself."). Ms. Lively also does not have infinite resources to perform reputational repair activities, where allocating time and effort to reputational repair efforts comes at the opportunity cost of promoting her other brands, projects, and personal brand. Nor should Ms. Lively, as the injured party, be required to bear that burden.

## V.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JEFFREY H. KINRICH.

In August 2024, as part of their plan to retaliate against Ms. Lively for opposing a hostile work environment created by the Wayfarer Parties, Defendants devised a scheme to attack her as "insensitive" and "tone deaf" for promoting her haircare brand, Blake Brown, and her beverage brand, Betty Booze, while starring in a movie about domestic violence. Dkt. No. 1230-59 at 3 (Defendants plotting to "bring in the fact that she promoted a haircare line and her own drink brand as part of promo"). ███████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████.[50] The financial impact of Defendants' misconduct on

---

[50] Dkt No. 1331-6 (*see, e.g.* ████████████████████████████████████████████████████████████████

Ms. Lively's interest in these companies was swift and devastating. After seven years of development, Blake Brown, which had launched in August 2024 and initially defied projections by generating sales of more than $7 million in its first month, saw sales decline dramatically to just $374,000 to $462,000 a week by September. Dkt. No. 1233-117 (Expert Report of Jeffrey H. Kinrich ("Kinrich Rep.")) ¶ 12. Likewise, after three years of development, by the end of 2024, Betty Booze was generating only a third of the revenue it had been generating prior to Defendants' online manipulation. *Id.* ¶ 17. In a matter of weeks, Ms. Lively saw years of her time and financial investment erased. Defendants now seek to exclude evidence of the millions of dollars in financial harm they caused by shutting out the opinion of Ms. Lively's damages expert Jeffrey Kinrich. Mot at 68–84. The Court should deny these efforts.

To be clear, Defendants do not attack Mr. Kinrich's credentials, qualifications, or his methodology, nor could they. *Id.* Mr. Kinrich is a Certified Public Accountant with more than 40 years of experience analyzing damages in commercial disputes who has testified in approximately 100 cases since 2017. Kinrich Rep. at App'x. A. He uses the well-regarded discounted cash-flow ("DCF") method to reach his damages calculations, a methodology that ███████████████ ███████████████████████ Dkt. No. 1340-1 (Expert Report of Michael J. Wagner ("Wagner Rep.")) ¶¶ 42–49. Instead, Defendants resort to technicalities and argue, as they did in MIL No. 17, that Ms. Lively lacks standing to seek "lost profits" damages suffered by Family Hive LLC (which owns Blake Brown) and Betty B (which owns Betty Booze) (together with Family Hive LLC, "Companies") because she holds her interest in the Companies through a holding company, LOL HATA, LLC ("LOL HATA"), ██████████████████ Dkt. No. 1312 at 53–54. These are red herrings. Mr. Kinrich calculated Ms. Lively's economic

████████████████████████████████████████

100

damages based on the reduced value of her share in the Companies as a result of their lost profits. Under the DCF method, the amount of the reduced value in her interest is the same, however that interest is held, whether Ms. Lively received distributions or not.[51] The Court should reject Defendants' attempt to deny Ms. Lively her day in court based on corporate formalities that have no bearing on the ultimate value of her economic damages. Moreover, even if the Court were to find that Ms. Lively lacked "standing" to seek lost profits, evidence of Mr. Kinrich's opinion should nonetheless be admitted to guide the jury in determining the value of her noneconomic damages for reputational harm. *See Cantu v. Flanigan*, 705 F. Supp. 2d 220, 231 (E.D.N.Y. 2010).

The Court should also reject Defendants' argument that Mr. Kinrich's opinion should be excluded as overly "speculative." Mot. at 77–79. Contrary to Defendants' suggestions, "there is no per se rule precluding a new business from recovering lost profits." *Cifone v. City of Poughkeepsie*, 234 A.D.2d 331 (1996). The cases Defendants rely on are inapposite because they involved business ventures that never even came into fruition, making the very existence of those profits far too tenuous for any expert opinion to have foundation. *See, e.g.*, *Schonfeld v. Hilliard*, 218 F.3d 164, 173 (2d Cir. 2000) (no lost profits for cable channel that never existed). That is not the case here. While Blake Brown and Betty Booze were newer ventures, they entered the market and performed long enough to allow Mr. Kinrich to verify the reasonableness of company-endorsed projections—projections that, in the case of Blake Brown, were actually *outperformed* by real-world sales. Kinrich Rep. ¶ 40. In the case of Betty Booze, the product was

---

[51] Defendants wrongly claim that Mr. Kinrich assumed Ms. Lively was the 100% owner of LOL HATA without evidence. Mot. at 71. Mr. Kinrich relied on a Promotional Services and License Agreement between Family Hive LLC and LOL HATA, *see* Dkt. No. 1245-178 at 2, which correctly indicated that LOL HATA was entirely owned/controlled by Ms. Lively. Ms. Lively is now the 99.452% managing member of LOL HATA. As previously disclosed, *see* Kinrich Rep. ¶ 7, Mr. Kinrich is prepared to update his opinion to reflect this *de minimis* difference. Moreover, as the managing member of LOL HATA, Ms. Lively has the sole discretion to take distributions from LOL HATA at any time. That said, her ability to take profit distributions does not impact Mr. Kinrich's opinion of the value of her economic damages, as discussed *infra*.

on the market for over a year, and Mr. Kinrich relied on projections prepared in the ordinary course of business by an experienced management team to conduct his calculations. *Id.* ¶ 15. Although Defendants claim otherwise, Mr. Kinrich describes in his report all of the steps he took to independently verify and test the assumptions underlying those projections. *Id.* ¶¶ 18–63. All of Defendants' other complaints are appropriate subjects of cross-examination, not bases for exclusion. For these reasons, Mr. Kinrich's opinion satisfies the requirements of Fed. R. Evid. 702, and Defendants' motion should be denied.

A.    ARGUMENT

1.    **Mr. Kinrich's Opinion Calculates Ms. Lively's Economic Losses Under Various Scenarios.**

Mr. Kinrich calculates the economic damages suffered by Ms. Lively based on her proportional ownership interest in the Companies. To perform this calculation, Mr. Kinrich used the DCF method to first determine the "but for" profits of Family Hive and Betty B (*i.e.*, the profits each company would have made but-for Defendants' misconduct) and then subtracted their "actual profits" from the "but for" calculation.[52] *Id.* ¶¶5, 25–60. He then multiplied that number by Ms. Lively's ownership percentage in each company through LOL HATA to calculate the economic harm to Ms. Lively's interest based on the Company's lost profits. *Id.* ¶¶ 5, 62–63. For Blake Brown, Mr. Kinrich also calculated the lost royalties Ms. Lively would have earned from Blake Brown but for Defendants' retaliation. *Id.*

Defendants characterize Mr. Kinrich's damages opinion as falling "between $39,600,000 and $143,500,000" to suggest that Mr. Kinrich gave himself an absurdly wide margin of error.

---

[52] Mr. Kinrich did not include a damages calculation associated with Betty Buzz, which is Ms. Lively's non-alcoholic beverage brand, because "management had doubts about the profitability and sustainability of Betty Buzz for reasons unrelated to the online manipulation." Kinrich Rep. ¶¶ 14 n.23, 19 n.36. Among other things, management for Betty B had determined that while "[t]otal spirits-based RTDs are demonstrating explosive growth," it would be difficult for Betty Buzz, a non-alcoholic mixer, to "gain[] real profitability in the US," and thus ultimately decided to focus on Betty Booze (a ready-to-drink "RTD" beverage) as the anchor product. Dkt. No. 1233-123 at 7-6.

102

Mot. at 70. That is misleading. The "range" is the result of Mr. Kinrich calculating specific damages numbers under multiple scenarios, all of which he explains and supports (Kinrich Rep. 2–3):

(1) For Blake Brown, he estimated the economic damages to Ms. Lively's interest to be:
   a. $45.1 million in a scenario where the brand ultimately never recovers ("Shutdown Case"); and
   b. $19.4 million dollars in a scenario where the brand recovers after a planned marketing investment ("Marketing Investment Case").
(2) For Betty Booze, he estimated the economic damages to Ms. Lively's interest to be:
   a. $28.3 million in a Shutdown Case;
   b. $7.9 million if the company were to recover to pre-retaliation levels within two years of the retaliation ("2-Year Delay Case"); and
   c. $11.2 million if the company were to recover within three years of the retaliation.
(3) For Ms. Lively's lost royalties from Blake Brown, he estimated those losses to be:
   a. $70.2 million in a Shutdown Case; and
   b. $12.3 million in the Marketing Investment Case.

Experts are permitted to calculate damages to account for multiple scenarios, and the difference in range created by these varying scenarios is not grounds for exclusion. *See Spectrum Dynamics Medical Limited, v. GE Healthcare Technologies, Inc., et al.*, 2026 WL 926689, at *16 (S.D.N.Y. Apr. 6, 2026) ("Certainly, a party may ask its expert to present different damages computations based on various assumptions"); *Patriarch Partners Agency Servs., LLC v. Zohar CDO 2003-I, Ltd.*, 2025 WL 2592224, at *10 (S.D.N.Y. Sept. 8, 2025) (denying motion to exclude testimony where expert presented damages range from "less than $5 million to almost $40 million"). When totaling Mr. Kinrich's damages calculations within each corresponding scenario, the lowest scenario assumes the Marketing Investment Case for Blake Brown and the 2-Year Delay case for Betty B, for a total damages amount of $39.6 million. Kinrich Rep. ¶ 5. The highest scenario assumes the Shutdown Case for both companies, for a total damages amount of $143.6 million. These different scenarios account for Mr. Kinrich's range, not a margin of error. *Id*.

103

## 2.    Mr. Kinrich's Expert Opinion Is Admissible and Relevant to Prove Damages Suffered Directly by Ms. Lively, Whether Economic or Noneconomic.

Defendants repeat their argument that Ms. Lively lacks "standing" to pursue damages for her FEHA retaliation, aiding and abetting, and breach of contract claims—the same argument Defendants made in MIL No. 17. Dkt. No. 1312 at 53–54. As set forth in Ms. Lively's opposition to MIL No. 17, which she incorporates here by reference (Dkt. No. 1363 at 91–97), Defendants' "standing" argument is meritless. In short, Defendants have cited exclusively to cases where the individual plaintiffs were held to lack standing because they had not alleged any individual injuries and were seeking lost profits for legal injuries that had been directed at a company or some other third party.[53] Dkt. No. 1312 at 53-54. In contrast, here, Ms. Lively has alleged claims for employment retaliation under FEHA, the aiding and abetting of that retaliation, and the breach of a contract that prohibited such retaliation. *See* Dkt. No. 1363 at 91–97. The alleged injury—retaliation for objecting to a hostile work environment—was directed at Ms. Lively, not the Companies. *Id.* Ms. Lively was not required to bring these claims derivatively on behalf of the Companies, nor would it have been possible for her to do so, as the Companies were not the ones who suffered employment retaliation. *Id.* California law permits Ms. Lively to seek any economic damages caused by Defendants' retaliation as compensatory damages under FEHA and as special damages for breach of contract, and she is thus entitled to seek the full panoply of damages necessary to make her whole, including her interest in any lost profits.[54] *Id.* at 92-96. Mr. Kinrich's opinion is admissible and relevant to prove the amount of those economic damages.

Even if the Court were to hold that Ms. Lively lacks standing to seek lost profits, she is separately entitled to seek noneconomic damages for reputational harm. *See Baca v. City of Los*

---

[53] *See Gray Gables Corp. v. Arthur*, 2022 WL 905393, at *1 (2d Cir. Mar. 29, 2022) (individual shareholders of company owning building lacked standing to bring action against government for wrongful condemnation of building

*Angeles*, No. B326863, 2025 WL 900477, at \*12 (Cal. Ct. App. Mar. 25, 2025) (non-economic damages under FEHA include "injury to reputation and humiliation")*.* Blake Brown and Betty Booze were businesses built on Ms. Lively's reputation and image—the lost profits of these ventures caused by attacks on Ms. Lively are direct evidence of the value her reputation brought these brands. Dkt No. 1363 at 96-97. Such evidence is independently admissible to assist the jury in ascertaining the severity and real-world value of Ms. Lively's reputational harm, which would otherwise be difficult to quantify. *See Cantu*, 705 F. Supp. 2d at 231 ($150 million jury award for reputational harm reasonable because of "evidence demonstrating that the injury to Cantu's reputation led to lost contracts valued at $289,950,000 and $69,000,000, which underscore[d] the severity of the damage to Cantu's reputation").[55] *See* Dkt. No. 1363 at 91–97.

The Court should disregard Defendants' fixation on whether any profit distributions would ultimately have flowed to Ms. Lively. Mot. at 70–72, 83. Defendants' argument fundamentally misconstrues Mr. Kinrich's opinion and the basic principles of economic damages. Defendants appear to be under the misimpression that Ms. Lively has made a claim for *lost distributions*. *Id.*

---

because plaintiffs alleged no violation of their *individual civil rights* rather than rights of company); *Jones v. Niagara Frontier Transp. Auth. (NFTA)*, 836 F.2d 731, 736 (2d Cir. 1987) (individual contractor had no standing to sue for failure to award construction contracts to company where injuries alleged "all involved injuries to the corporation" and there were "no allegations that defendants had taken any actions against [individual] in his individual capacity"); *Karkare on behalf of JN v. Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers Loc. 580*, 140 F.4th 60, 64–65 (2d Cir. 2025) (attorney-in-fact plaintiff had no standing to bring ERISA action on behalf of patient where plaintiff "does not argue that he has suffered any direct injury"); *Liberty Sackets Harbor LLC v. Vill. of Sackets Harbor*, 776 F. App'x 1, 3 (2d Cir. 2019) (no standing for member to pursue a first amendment retaliation claim where injury stemmed from denial of *the company's* application for variance and member "does not allege an injury independent of [the company's] injuries); *Ali v. New York City Env't Control Bd.*, 670 F. App'x 26, 27 (2d Cir. 2016) (individual had no standing to sue city for injuries stemming from city's issuance of violation notices to *his company*).
[54] *See, e.g.*, *Commodore Home Sys., Inc. v. Superior Ct.*, 32 Cal. 3d 211, 221 (1982) (under FEHA, "all relief generally available in noncontractual actions, including punitive damages, may be obtained"); *McCoy v. Pac. Mar. Assn.*, 216 Cal. App. 4th 283, 308 (2013) ("FEHA does not limit damages and 'all forms of relief granted to civil litigants generally . . . are available'") (quoting *Commodore*); *Seely v. White Motor Co.*, 63 Cal. 2d 9, 14 (1965) (en banc) (affirming award of lost business profits to individual); *Edwards v. Container Kraft Carton & Paper Supply Co.*, 161 Cal. App. 2d 752, 760–61 (1958) (same); *see also* CACI VF-2504 (identifying lost profits as a category of recoverable damages under FEHA); *see* CACI 351 (special damages for breach of contract available if, when the parties made the contract, the defendant "knew or reasonably should have known of the special circumstances leading to the harm").
[55] Ms. Lively does not intend to seek the amounts calculated by Mr. Kinrich as both economic and noneconomic damages, and any risk of double recovery can easily be addressed through a curative jury instruction.

That is incorrect. Mr. Kinrich used the DCF method to calculate the economic damages associated with the reduction in the value to Ms. Lively's *ownership interest* in Blake Brown and Betty Booze based on the "lost profits" calculation of those businesses. Kinrich Rep. ¶ 5 (calculating damages "suffered by Ms. Lively *based on her interest* in Blake Brown" and "suffered by Ms. Lively *based on her interest* in Betty Booze"). Whether Ms. Lively was harmed because her portion of any potential "lost profit" distributions was reduced or whether she was harmed because the value of her ownership interest in Blake Brown and Betty Booze was diminished, the method of calculating the amount of that harm is the same: the DCF method.

It is well-established in both case law and the principles of corporate finance that the DCF method is one of the most reliable ways to calculate both lost profits and the value of a business interest. *See Lippe v. Bairnco Corp.*, 288 B.R. 678, 689 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) ("Many authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow ('DCF') method"); *Int'l Cards Co., Ltd. v. MasterCard Int'l Inc.*, No. 13 CIV. 2576 (LGS), 2016 WL 7009016, at *5 (S.D.N.Y. Nov. 29, 2016) (damages expert used "reliable principles and methods for valuing [the subject company] and calculating lost profits," including "the discounted cash flow method"); *Questrom v. Federated Dep't Stores, Inc.*, 84 F. Supp. 2d 483, 488 (S.D.N.Y. 2000) (noting DCF is considered the "preeminent valuation methodology"); Brealey, Richard A., Myers, Stewart C., Allen, Franklin, *Principles of Corporate Finance* 91 (McGraw-Hill Irwin ed., 10th ed.) ("The value of a business is usually computed as the discounted value of free cash flows out to a valuation horizon (H), plus the forecasted value of the business at the horizon, also discounted back to present value"); Reilly, R. F., & Schweihs, R. P., *The Handbook of Advanced Business Valuation* 274 (McGraw-Hill ed., 1999) ("[t]he discounted cash flow method is probably the most common method used to calculate

106

a plaintiff's lost profits"). Because the measure is the same, it is immaterial whether Ms. Lively suffered the loss in the form of reduced cash distributions or simply in the diminishment of the value of her ownership interests—both are subject to the same DCF calculation, and the amount of the economic loss is ultimately the same.[56] Mr. Kinrich's analysis of economic loss does not depend on whether any particular amount would have been distributed to Ms. Lively because distributions are merely one possible way business value may be realized. Mr. Kinrich's lost profits analysis is thus a way to measure the loss associated with Ms. Lively's ownership interest in Blake Brown and Betty by assessing the businesses' lost profits in a "but for" world where Defendants did not retaliate against Ms. Lively, and the actual world in which they did. Kinrich Rep. ¶ 5. This analysis does not rely in any way on actual distributions being made to Ms. Lively or anyone else.

As a separate matter, Defendants' hairsplitting arguments regarding standing and distributions have no application to Mr. Kinrich's opinion as to Ms. Lively's lost royalties, which are based on net *revenues*, not profits. As explained by Mr. Kinrich, Ms. Lively is ███████████

███████████████████████████████████████

███████████████████. Kinrich Rep. ¶ 63. Dkt. No. 1245-178; Ex. X at 7 (BL-00003873), Ex. Y at 1 (BL-000034271). Ms. Lively, ███████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████  Thus, even if Defendants' standing and distribution arguments had any merit (they do not), they would have no bearing on Ms. Lively's royalty damages.

---

[56] Mr. Kinrich notes in his report, "Technically, and as will be seen below, damages are computed as lost cash flows, not lost profits. I use the phrase 'lost profits' throughout this report because that is the common way to refer to these types of damages." Kinrich Rep. ¶ 19.

### 3.    Mr. Kinrich's Lost Profits Opinion Is Not Speculative and Is Based on Sufficient Facts and Data.

Defendants next argue that Mr. Kinrich's lost profits opinion must be excluded as too speculative because Blake Brown and Betty Booze are early-stage business ventures. To the extent that Defendants contend that lost profits are not available to newer businesses, they are wrong. *See, e.g.*, *Orozco v. WPV San Jose*, LLC, 36 Cal. App. 5th 375, 399 (2019) (evidence of five months of prior profits was substantial evidence to project future profits); *Kraft Carton & Paper Supply Co.*, 161 Cal. App. 2d 752, 758 (1958) (affirming lost profits award for plaintiff who "was in business for only a few days" prior to the wrongful conduct). There is "not a per se rule forbidding the award of lost profits damages to new businesses, but rather an evidentiary rule that creates a higher 'level of proof needed to achieve reasonable certainty as to the amount of damages.'" *Int'l Telepassport Corp. v. USFI, Inc.*, 89 F.3d 82, 86 (2d Cir. 1996) (citation omitted) (upholding arbitrator's damages award based on lost profits of a new business venture). Courts recognize that "any calculation of damages based on lost profits always entails a degree of uncertainty caused by the need to rely on assumptions and estimates." *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1579 (2d Cir. 1994). But the "mere fact that a party disagrees with the methodology utilized or a particular assumption does not render proof speculative." *Id.* (cleaned up). Ultimately "'whether the claim involves an established business or a new business . . . the test remains the same, *i.e.*, whether future profits can be calculated with reasonable certainty.'" *Int'l Telepassport Corp.*, 89 F.3d at 85, quoting *Ashland Management, Inc. v. Janien*, 82 N.Y.2d 395, 404 (1993). Reasonable certainty does not require lost profits to be calculated with "mathematical precision." *Orozco*, 36 Cal. App. 5th at 398. It is enough for the plaintiff to "demonstrate a reasonable probability that profits would have been earned except for the [defendant's conduct]." *Kerner v.*

*Hughes Tool Co*., 56 Cal. App. 3d 924, 937 (Ct. App. 1976); *also see Am. Tech. Ceramics Corp. v. Presidio Components, Inc*., No. 14-CV-6544(KAM)(GRB), 2018 WL 1525686, at *9 (E.D.N.Y. Mar. 27, 2018) (for lost profits damages, a plaintiff may use "any method showing, with reasonable probability, entitlement to lost profits 'but for' the infringement"). It is the jury's role to determine "the probabilities as to whether damages are reasonably certain to occur in any particular case." *Asahi Kasei Pharma Corp. v. Actelion Ltd.,* 222 Cal. App. 4th 945, 972 (2013).

Courts have admitted expert opinions on lost profits for early-stage businesses where the experts based their opinions on reliable information, such as sales data of comparable companies, the input of the company's experienced marketing team, and the existence of a known customer base. *See, e.g.*, *Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 982 F. Supp. 2d 237, 239 (E.D.N.Y. 2013) (denying motion to exclude expert's lost profits opinion despite no track record of profits where expert considered comparable sales of competitor for "relatively new businesses"); *Ashland Mgmt. Inc*., 82 N.Y.2d at 406 (lost profits expert opinion based on projections for new investment model admitted where opinion was based on parties' realistic estimates of future assets, an existing customer base, and an experienced marketing team). *See also* 11 *Corbin on Contracts* § 56.17 (2025) ("[P]roof of lost profits in a new business will be more difficult, but such damages may be established through expert testimony, economic and financial data, market analyses, records of similar enterprises and other relevant comparisons"). Mr. Kinrich's lost profits analysis more than meets this standard. Mr. Kinrich relied on contemporaneous company forecasts and materials prepared in the ordinary course of business and verified them through interviews with company management, independent analysis of market trends, a review of similar products, the existence of a large social media presence, and actual sales data. Kinrich Rep. ¶¶ 33, 36-40, 50-56, App'x B.

109

These are precisely the kinds of independent verification methods courts have held make lost profits opinions for newer businesses admissible. *See Ashland Mgmt. Inc.*, 82 N.Y.2d at 406.

Defendants fault Mr. Kinrich for (1) relying on company-endorsed projections that Defendants claim he failed to independently validate, and (2) failing to consider a series of argumentative, hypothetical "alternative causes" for the companies' decline. Mot. at 70–83. Neither of these arguments is a basis for exclusion. Mr. Kinrich was right to rely on company-endorsed projections, and Defendants' various critiques of the assumptions and alternative reasons he considered all go to the weight of Mr. Kinrich's opinions, not the admissibility. *See e.g.*, *GeigTech E. Bay LLC v. Lutron Elecs. Co.*, 2023 WL 6614486, at *41.

### a.    Mr. Kinrich Relied On Projections Prepared In the Ordinary Course of Business, Which Are Considered "Presumptively Reliable."

Defendants curiously criticize Mr. Kinrich for relying on projections that were created in the ordinary course of business by the Companies or at their direction, complaining that such forecasts are nothing more than an entrepreneur's "cheerful prognostications." Mot. at 73, 75, 78 (citing *Schonfeld*, 218 F.3d at 173). Far from being optimistic "prognostications," the forecasts are professional projections based on detailed data and analysis that Mr. Kinrich independently corroborated through market research and review of actual sales figures. Kinrich Rep. ¶¶ 32–41, 53–56. For Blake Brown, Mr. Kinrich relied on an extensive July 2023 forecast prepared by Deloitte,[57] one of the most reputable accounting firms in the world. *Id.* ¶¶ 32–41. For Betty Booze,

---

[57] Defendants misleadingly suggest that ██████████████████████████████████████
████████████████████████████████████████████████████████████████ Mot. at 75.
████████████████████████████████████████████████████████████████████████████
Kinrich Rep. ¶¶ 32-33. *See* Ex. Z at 61:2-15 (Kinrich Dep.). Mr. Kinrich explained that ████████████
████████████████████████. Kinrich Rep. ¶ 32; Ex. Z at 71:20-72:15 (Kinrich Dep.). He did not testify that ████████████████████

Mr. Kinrich relied on financial projections prepared by Betty B's experienced management team in October 2024 in the ordinary course of business. *Id.* ¶¶ 49-56. In both cases, Mr. Kinrich confirmed that management respectively had reviewed and agreed with the forecasts. *Id.* ¶¶ 46, 53–54, 56, App'x. B. For Blake Brown, he confirmed that ███████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████. *Id.* ¶¶ 32–40; Ex. Z at 88:9–

90:19 (Deposition of Jeffrey Kinrich ("Kinrich Deposition" or "Kinrich Dep.")). ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* at 40:7–41:7. It is

well settled that the "use of management projections is presumptively appropriate," especially when they were "made in the ordinary course of business." *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 332 (S.D.N.Y. 2022) (citing cases).

Defendants fault Mr. Kinrich for relying on a third-party forecast for Blake Brown while simultaneously faulting him for relying on a management-prepared forecast for Betty Booze. Mot. at 72-83. Defendants are wrong to suggest that reliance on either kind of information supports exclusion. "Courts in this circuit have consistently allowed the testimony of experts relying on internal company data, on the ground that any issues with the underlying data goes only to the weight that should be afforded their testimony but not its reliability." *GeigTech E. Bay LLC*, 2023 WL 6614486, at *41 (citing cases). At the same time, courts also recognize that "an expert may rely on data that she did not personally collect." *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85,

---

[58] Defendants attempt to make hay about the fact that Mr. Kinrich's report inadvertently stated that the Deloitte projections were created in 2024, instead of 2023. Mot. at 74–75. This is a strawman argument ████████████
███████████████████████████████████████████████ x. Z, at 95:13–96:22. (Kinrich Dep.)

111

94 (2d Cir. 2000). That an expert "used projections prepared by another party does not render her opinions based on those projections inadmissible." *Int'l Cards Co., Ltd.*, 2016 WL 7009016, at \*6.

### b.    Mr. Kinrich Independently Verified the Projections.

Mr. Kinrich's report sets forth the extensive steps he took to independently verify the forecasts before deciding to rely on them. Mr. Kinrich first evaluated the Companies' financial documents to ensure they were accurate and consistent with market data. For Betty Booze, Mr. Kinrich confirmed that the "assumptions used in the [Betty Booze] forecast are consistent with contemporaneous evidence." Kinrich Rep. ¶¶ 22, 50, 52. As Mr. Kinrich explains, Betty B's projections were based on expected performance through four distribution channels: (1) new innovations, (2) reorders, (3) the brand's partnership with Princess Cruises, and (4) international markets. *Id.* ¶ 53. Mr. Kinrich conducted his own independent market research to confirm that the forecasted growth through these channels was "consistent with growth achieved by other brands in the RTD alcohol market," including analogous celebrity-backed alcoholic drinks. *Id.* ¶¶ 53–56. Mr. Kinrich also compared the Betty Booze forecast to the historical sales numbers of comparable ready-to-drink ("RTD") brands, such as Mom Water and Carbliss, and concluded that the Betty Booze projections were "in line with the experience of other recent RTD entrants." *Id.* ¶ 53. Mr. Kinrich then considered Betty Booze's actual sales performance and distribution history over the course of its year on the market, including that it had expanded to more than 5,000 accounts across major national retailers as of August 2024, exceeding the internal forecast for 4,800 accounts. *Id.* ¶ 54. He also reviewed Betty Booze's social media following, confirming that it ranked second among RTD brands with a social media following, behind only White Claw, as well as observing that Ms. Lively and Betty Buzz had a combined following of 46 million followers. *Id.* ¶ 55. Finally, Mr. Kinrich confirmed that Betty B's management had substantial experience building and scaling celebrity-owned alcoholic brands, including Sombra Mezcal and Aviation Gin, demonstrating a

112

"proven track record" of taking emerging alcohol brands to significant scale. *Id.* ¶ 56. For all of these reasons, Mr. Kinrich concluded that Betty B's internal forecast for growth was reasonable.

For Blake Brown, Mr. Kinrich explains that ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████ *Id.* ¶ 33; Ex. AA at 6 (BL-000021798). To verify the reasonableness of Deloitte's forecast, Mr. Kinrich conducted third-party market research to confirm Deloitte's assumptions about anticipated consumer behavior with respect to beauty products and "masstige" hair care brands, including by reviewing survey findings. *Id.* ¶ 36. Mr. Kinrich further corroborated Deloitte's conclusions about Blake Brown's growth potential by reviewing comparable sales figures for similar "masstige" brands. *Id.* ¶ 37. Mr. Kinrich also reviewed Deloitte's benchmarking based on industry analyses of (1) comparable public companies, (2) private acquisitions, and (3) venture financings, and confirmed that their forecast assumptions aligned with observed market transactions. *Id.* ¶ 38. Mr. Kinrich also reviewed the deposition testimony of Family Hive's management to confirm that the forecast was in-line with real-word company data, and conducted further verification of those facts by interviewing Family Hive management himself. Kinrich Rep. ¶¶ 32–40, App'x. B. Importantly, Mr. Kinrich's reliance on Deloitte's forecast was grounded in Blake Brown's *actual sales at Target*, which ultimately exceeded the forecast's most aggressive projections, making Defendants' nitpicking about the bases for "productivity level" assumptions irrelevant and further corroborating the forecasts' reliability. Kinrich Rep. ¶ 40.[10] ███████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████ *Id*. ¶¶ 62-63; Ex. X at 7 (BL-00003873), Ex. Y at 1 (BL-000034271).

###### c. The Cases Cited By Defendants Are Distinguishable Because They Involve New Ventures That Never Existed.

The cases Defendants rely on that reject expert reliance on so-called "cheerful prognostications" are distinguishable in that they all involve businesses that never launched at all and did not rely on *any* actual sales data. *Schonfeld*, 218 F.3d 164, 171 (2d Cir. 2000) (lost profits opinion for cable news channel that never existed too speculative); *Kenford Co. v. Erie Cnty.*, 67 N.Y.2d 257, 263, 493 N.E.2d 234, 236 (1986) (lost profits opinion for construction and operation of a stadium that was never built too speculative); *CCM TOURING LLC, v. MOONBUG ENTERTAINMENT LTD.*, Defendant., No. 23-CV-7116 (VSB) (VF), 2026 WL 848392, at *6-7 (S.D.N.Y. Mar. 27, 2026) (excluding lost royalty opinion based on financial projections for shows that had never occurred); *Hodnett v. Medalist Partners Opportunity Master Fund II-A, L.P.*, No. 1:21-CV-00038 (JLR), 2025 WL 2607548, at *29 (S.D.N.Y. Sept. 9, 2025) (dismissing claims for lost profits for a brand new device penetrating an untapped market and where expert opinion relied only on projections, not any past sales); *Ermaris Bio, PBC v. Trs. of Columbia Univ. in City of New York*, No. 25 CIV. 3691 (JPC), 2026 WL 520456, at *4 (S.D.N.Y. Feb. 25, 2026) (lost profits too speculative for new medication not yet on the market); *Cramer v. Grand Rapids Show Case Co.*, 223 N.Y. 63, 65, 119 N.E. 227, 227 (1918) (lost profits too speculative for new store where plaintiffs lacked business experience). Moreover, many of the new business ventures at issue in these cases depended on wildly uncertain variables before a single dollar in profits could be generated. For example, in *Schonfeld*, the plaintiff needed to secure $44 million in financing to launch the hypothetical news channel. 218 F.3d at 174. In *Kenford*, for the parties to perform pursuant to a stadium operating agreement, the stadium first needed to be constructed. 67 N.Y.2d

at 260 (1986). In *Ermaris Bio, PBC*, for a new medication to hit the market, it needed to survive several clinical trials and obtain FDA approval. 2026 WL 520456, at *4 (S.D.N.Y. Feb. 25, 2026).

Similar uncertainties did not exist here. Blake Brown and Betty Booze products were already post-development. Blake Brown ████████████████████████████████ ████████████████████████████████████████████████ Kinrich Rep. ¶ 33; Ex. AA at 6 (BL-000021798). Betty Booze was not "aspiring" to be in 5,000 retailer accounts—it had those accounts, and the number exceeded projections. *Id.* ¶ 56. The facts here are thus more akin to those in *Ashland Mgmt. Inc.*, where the court held a lost profits award for a new investment model was not speculative because it was based on evidence of the party's "carefully studied professional judgement" on estimates; an existing customer-base from the company's other products; and past success in the field. 82 N.Y.2d at 406. Similarly, Ms. Lively's losses associated are rooted in detailed financial projections prepared by experienced business leaders as corroborated by industry data and actual sales figures. Kinrich Rep. ¶¶ 5–6, 22, 32–41, 44-45, 50-60, 62–63, App'x. B. Mr. Kinrich's reliance on these forecasts was thus reliable. *Id.*

As to Defendants' complaints that Mr. Kinrich relied on a working capital forecast prepared by a shareholder for Family Hive, or a presentation prepared by a third party for the company's performance—again, these are areas for cross-examination not exclusion. *See GeigTech E. Bay LLC,* 2023 WL 6614486 at *41 ("any issues with underlying [company] data goes only to the weight that should be afforded their testimony but not its reliability"). *See also Discover Fin. Servs. v. Visa U.S.A., Inc.*, 582 F. Supp. 2d 501, 507 (S.D.N.Y. 2008). That said, Defendants omit the fact that the ████████████████████████████████████████ ███████████ *See* Ex. BB. (Deposition of Laura Tedesco ( "Tedesco Deposition" or "Tedesco Dep.")) at 108:2-109:1. Defendants also omit Family Hive's CEO's testimony, which Mr. Kinrich

reviewed, ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████  *Id.* at 176:12-21.

### d.      Mr. Kinrich Considered And Ruled Out Alternative Causes.

Defendants next claim that Mr. Kinrich's opinion must be excluded because he failed to consider every possible "alternative cause" for Ms. Lively's damages. Mot. at 82. This is not grounds for exclusion. Even according to Defendants' own authority, "an expert need not rule out every potential cause in order to satisfy *Daubert.*" *Deutsch v. Novartis Pharms. Corp.,* 768 F. Supp. 2d 420, 474 (E.D.N.Y. 2011); Mot. at 23. The expert need only "address obvious alternative causes" and provide a "reasonable explanation" for dismissing specific alternate factors. *Id*. Mr. Kinrich has met that standard here.

First, Defendants ignore that Mr. Kinrich *did* rule out alternative explanations. When calculating the economic damages for Ms. Lively's interest in Betty B, Mr. Kinrich determined that any decline in sales for the Betty Buzz product was due to facts unrelated to the online manipulation conduct. Kinrich Rep. ¶ 14 n.23. Mr. Kinrich then *excluded* the Betty Buzz product line from his economic damages calculation. *Id.* In other words, the scope of his opinion was directly impacted by his consideration of alternative causes for Ms. Lively's damages.

Second, Mr. Kinrich gave a reasonable explanation for why he ruled out other causes for the decline in Blake Brown and Betty Booze sales. He explained in his report that he was relying on the expert opinion of Professor Dina Mayzlin to conclude that \Defendants' online manipulation was the cause of the harm. *Id.* ¶¶ 2 n.3, 22; *see* Fed. R. Evid. 703. According to Professor Mayzlin's independent analysis, by early to mid-August 2024, "numerous negative comments" appeared on the websites of Betty Booze and Blake Brown products from accounts with "no followers, no profile image, and no prior history," *see* Dkt. No. 1233-118 (Expert Report of Dina Mayzlin ¶¶ 97,

116

98–99), all characteristics Professor Mayzlin identified as consistent with sock puppet activity and astroturfing tactics. *Id.* ¶ 47. Professor Mayzlin concluded that this flood of negative sentiment—resulting from \Defendants' manipulation of online conversations—caused reputational spillover, and with it, measurable harm to Lively's businesses. *Id.* ¶ 104. Sales declined drastically: from August 11, 2024, to September 28, 2024, Betty Buzz's Amazon sales decreased nearly 58%, *see id.* ¶ 105; Betty Booze revenue plummeted from $3.4 million during its first three months on the market to just $1.2 million from August to December 2024, "falling 70% below the brand's initial target," *see id.* ¶ 108; and Blake Brown Beauty, which peaked "at over $3 million during the week of August 10, 2024," saw sales drop to $1.21 million by August 17." *Id.* ¶ 111. This uniform decline is consistent with brand-wide disruption, not product specific underperformance. *Id.* ¶ 112. Apart from relying on Professor Mayzlin's opinion, Mr. Kinrich independently investigated alternative causes by interviewing management of the Family Hive and Betty B, all of whom confirmed there were no other plausible explanations for the steep declines in sales. Kinrich Rep. App'x. B.

Critically, Defendants' list of "alternative causes" are not alternative causes at all—most are simply examples of Defendants' online manipulation or the natural result of that manipulation. Mot. at 81–82. The rest are just argumentative hypotheticals based on speculation. For example, Defendants criticize Mr. Kinrich for ███████████████████████████████ ███████████████████████████████████████████ and ███████ ████████████████████████████████████████████████ ████████████████ *Id.* These are *the very themes Defendants advanced as part of their retaliation campaign*. *See* Dkt. No. 1230-59 at 3. They also cite to Ms. Lively's ███████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

117

 Mot. at 81–82. Defendants also point to a generalized ███████████████████████████████████████████ ██████████████████████.” Mot. at 81. ███████████████████████████

███████████████████████████████████████████████████████████

████████████████████ Wagner Rep. ¶ 64. Far from alternative causes Mr. Kinrich failed to consider, Defendants' unsubstantiated theories provide no basis to exclude his expert opinion.

## VI.   THE COURT SHOULD DENY DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF MICHAEL ROBBINS.

It is by now well-established that Ms. Lively had concerns about Baldoni and Heath's conduct in connection with the Film, and that she repeatedly raised those concerns during filming and after. Wayfarer insists that they "fully resolved" Ms. Lively's concerns, and that, as a result, Ms. Lively's raising complaints or otherwise opposing harassing conduct could not have motivated the subsequent retaliatory campaign nor any other retaliatory act asserted in this lawsuit. Tellingly, however, Defendants seek to exclude expert testimony that bears directly on these issues.

Specifically, Defendants move to bar the testimony of Michael Robbins, a seasoned human resources expert with nearly five decades of experience. *See* Mot. at 58–68. Robbins, who has conducted more than 600 workplace investigations, opines on standard practices to prevent and correct harassment and retaliation in the workplace, including those specific to the entertainment industry; how Wayfarer failed to comply with those standard practices and its very own policies and trainings; and how retaliation for workplace harassment in the entertainment industry, where reputation is paramount, differs from retaliation in other industries. *See* Dkt. No. 1334-13 (Expert Report of Michael Robbins ("Robbins Rep.")) at 2-3.

118

Defendants challenge Robbins as unqualified to offer his stated opinions and contend that his opinions are inadmissible. *See* Mot. at 58–68. Defendants are wrong on both challenges, as further detailed below.

## A.    BACKGROUND

Robbins brings nearly five decades of experience in workplace practices and investigations. *See* Robbins Rep. at 26-28. He practiced as a labor and employment attorney for 20 years, including as managing partner of a leading entertainment law firm, and is the Founder and President of EXTTI, which provides expert testimony, training, and investigation services in the employment area. *Id.* at 26. As President of EXTTI, Robbins regularly provides trainings to companies and other workplace investigators regarding best practices for conducting investigations, including for the Association of Workplace Investigators ("AWI").[59] *Id.* at 27. Robbins is also a preeminent investigator of workplace harassment, discrimination, and retaliation allegations. *Id.* at 26–27. He has supervised over 600 investigations. *Id*. Robbins has been retained as an expert witness over 750 times for both plaintiffs and defendants, primarily in matters involving employers' efforts to prevent and investigate harassment and retaliation, including in cases in the entertainment industry. *Id.*; Robbins Dep. at 28:5–24 (expert testimony in 20–50 entertainment cases related to sexual harassment).

Robbins has served as a Consent Decree Monitor in Federal District Courts; is a Fellow of the College of Labor and Employment Lawyers; has served as President of major workplace investigator organizations, including AWI and the Society of Independent Workplace Investigators ("SIWI"); is a long-time member of the Executive Board of the Los Angeles County

---

[59] AWI is a professional organization of 3,000+ workplace investigators that offers education, training, and other resources regarding investigation best practices. Ex. CC (Deposition of Michael Robbins ("Robbins Dep.")) at 32:4–19; *see also* AWI, *About AWI*, https://www.awi.org/page/about_AWI (last visited Apr. 23, 2026).

Bar Association's Labor and Employment Law Section, which he also previously chaired; and has taught labor and employment courses at multiple universities. Robbins Rep. at 26-30, 32–40; Robbins Dep. at 21:23–22:23, 32:4–12.

Robbins has extensive experience in the entertainment industry specifically. He has advised entertainment clients as a practicing attorney and performed numerous investigations in the industry, including into harassment allegations on film and television sets that involve issues related to the performance of intimacy and the use of intimacy coordinators. Robbins Rep. at 26–30, 32–40; Robbins Dep. at 58:19–61:18 (related to 2023 investigation regarding an actress's allegations of harassment against a male co-star). In connection with his investigation work and as part of his expertise in harassment prevention, Robbins has reviewed and is familiar with the guidelines, standards, and protocols issued by SAG-AFTRA, related to the use of nudity riders and intimacy coordinators in connection with film and television sets. Robbins Rep. at 11–12; Robbins Dep. at 55:13–58:10, 81:22–82:15, 137:15–138:6.

Drawing on his vast experience, Robbins offers three opinions that will assist the jury in assessing Ms. Lively's retaliation claim: (1) **First**: Defendants failed to follow standard practices and their own policies and procedures with respect to preventing harassment and retaliation from occurring in connection with the Film; (2) **Second**: Defendants failed to follow standard practices designed to prevent harassment and retaliation from occurring, including by violating "Entertainment Industry-specific intimacy protocols"; and (3) **Third**: how retaliation for workplace harassment in the entertainment industry is particularly harmful.

120

B.    ARGUMENT

1.    **Defendants' Challenge to Robbins' First Opinion Fails.**

a.    **Robbins' First Opinion is Relevant to Retaliation and Liability for Punitive Damages.**

Defendants challenge that Robbins' first opinion was only relevant to Ms. Lively's former sixth cause of action for failure to investigate, prevent, and or remedy harassment in violation of California Government Code Section 12940, Mot. at 63–64, but this argument ignores the relevance of his testimony to Ms. Lively's surviving claims. Robbins' first opinion regarding standard practices and policies for preventing harassment and retaliation and Wayfarer's deviation therefrom is plainly relevant to Ms. Lively's retaliation and punitive damages claims, as well as Defendant's primary defense—that they engaged in only reasonably defensive measures, without retaliatory motive or malice for purposes of punitive damages liability.

Courts routinely accept expert testimony regarding standard workplace policies and practices and whether a defendant's actions comport with such standards and/or the defendant's own policies and practices. *See Mendoza v. W. Med. Ctr. Santa Ana*, 222 Cal. App. 4th 1334, 1343–45 (2014); *Yphantides v. Cnty. of San Diego*, 2023 WL 7555301, at *6 (S.D. Cal. Nov. 14, 2023) (finding Robbins' opinions regarding defendant's failure to comply with its own investigation policies relevant to pretext); *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 272–273 (S.D.N.Y. 2018) (permitting expert testimony regarding whether employer compensation and promotion policies comported with standard practices); *see also CCM Touring LLC v. Moonbug Ent. Ltd.*, 2026 WL 848392, at *20 (S.D.N.Y. Mar. 27, 2026) ("experts may also testify about whether a party's actions comport with industry customs and standards"). In *Mendoza*, for example, the court of appeal recognized that expert testimony regarding "numerous shortcomings" in defendants' investigation of plaintiff's harassment complaints could support an inference of

121

"retaliatory animus." *Mendoza*, 222 Cal. App. 4th at 1344. There, plaintiff's expert criticized defendants' investigation on the grounds that defendants did not prepare a formal investigation plan, did not take written statements from the complainant or accused, interviewed the complainant and accused simultaneously rather than separately, and failed to interview any other witnesses before concluding the investigation and terminating plaintiff's employment. *Id.* at 1337–38. The court rejected defendants' challenge to this expert testimony, finding that the jury's charge was to determine defendants' "subjective motivation" and that "the lack of a rigorous investigation. . . is evidence suggesting that defendants did not value the discovery of the truth so much as a way to clean up the mess that was uncovered [following the] complaint." *Id.* at 1344. Ultimately, the court left to the jury "to decide whether the expert's characterization of the investigation is accurate and whether to infer from that characterization that defendants had retaliatory animus." *Id.*

As in *Mendoza*, here, Robbins' testimony regarding Wayfarer's "numerous shortcomings" in responding to Ms. Lively's and others' concerns is relevant to *why* Defendants later launched their press and social media campaign against Ms. Lively. *See Brown v. Waterbury Bd. of Educ.*, 247 F. Supp. 3d 196, 217 (D. Conn. 2017) ("An employer's failure to follow internal procedure may serve as evidence of pretext."); *Nazir v. United Airlines, Inc.*, 178 Cal. App. 4th 243, 280 (2009) ("An employer's failure to interview witnesses for potentially exculpatory information evidences pretext."); *Mendoza*, 222 Cal. App. 4th at 1344–45; *Silva v. Lucky Stores, Inc.*, 65 Cal. App. 4th 256, 263 (1998) (noting the plaintiff failed to provide an expert addressing "the objective reasonableness of [defendant's] factual determination of misconduct or whether [defendant] conducted an appropriate investigation under the circumstances."). Specifically, such testimony bears on whether Defendants' subsequent campaign was defensive, as they insist, or retaliatory. This is especially pertinent where, as here, Defendants' primary defense has been that they had *no*

122

*reason to retaliate against Ms. Lively* because they allegedly resolved all her concerns as of January 2024. *See* Dkt. 1242 at 13, 14, 23, 26, 43–44. Robbins' opinion that Wayfarer failed to comport with standard practices or its own policies to prevent harassment and retaliation bears directly on this defense. Such failure indicates that Defendants were not as concerned with remedying any alleged harassing conduct or ensuring a safe workplace as they were with maintaining their own carefully curated images—so much so that Heath suggested they would not conduct an investigation because he believed that it would be better "*not to have a written record*." *See* Dkt. No. 1230-15 (Deposition of Alex Saks ("Saks Dep.")) at 118:13–119:5.

Robbins' first opinion is also relevant to and will assist the jury in deciding whether to find liability for punitive damages—specifically whether Defendants acted with malice and/or ratified TAG's conduct during the retaliation campaign. *See, e.g.*, *U.S. E.E.O.C. v. Scolari Warehouse Markets, Inc.*, 488 F. Supp. 2d 1117, 1147 (D. Nev. 2007) (relying on Robbins' expert report in denying summary judgment and finding that his report "rife with instances of [defendant's] . . . failure to enforce its policies, creates sufficient evidence to allow a punitive damages claim to proceed"); *Roberts v. Ford Aerospace & Commc'ns Corp.*, 224 Cal. App. 3d 793, 801 (Ct. App. 1990) (that defendant "does not fully investigate and fails to repudiate the employee's conduct" is relevant to malice and ratification) (citation omitted). Indeed, understanding how standard practices and Wayfarer's own policies dictated how Wayfarer should have responded to workplace concerns supports an inference that Wayfarer intentionally disregarded those standards to conceal concerns about its conduct, thereby fueling its later retaliatory acts.

Defendants' position that Robbins' testimony was only, if ever, relevant to Ms. Lively's failure to prevent, investigate, or remedy cause of action further deflates when considering that evidence of an employer's investigation is relevant in the context of punitive damages even in Title

123

VII cases, under which no independent failure to prevent cause of action exists. *See, e.g.*, *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1209 (10th Cir. 2000) (affirming punitive damages award based in part on investigation that was "inadequate...if not a complete sham"); *Bowles v. Osmose Utilities Servs., Inc.*, 443 F.3d 671, 675 (8th Cir. 2006) (affirming punitive damages award based in part on the company's "indifference to the racially discriminatory behavior of its foreman").

> **b.      Robbins' First Opinion is Not a Legal Conclusion and His Testimony Will Assist the Jury, Not Invade its Province.**

Robbins' first opinion that Wayfarer did not follow standard practices or its own policies and procedures is not a legal conclusion. It is permissible for an expert to opine on whether a defendant follows "generally acceptable human resources practices." *See Saldana v. Tex. Dep't of Transp.*, 2015 WL 3952328, at *3 (W.D. Tx. June 29, 2015) (finding expert opinion was not a legal opinion); *Yphantides*, 2023 WL 7555301, at *7 (same). In the employment context, opinion on "best or good practices and insufficiencies," which may "inform what is reasonable," is routinely found to be the proper subject of expert testimony. *Sitter v. Ascent Healthcare Sols., Inc.*, 2011 WL 2682976, at *1 (N.D. Cal. July 8, 2011) (cataloguing cases). Such result is consistent with the very case upon which Defendants rely, *Nieves-Villanueva v. Soto-Rivera,* finding expert testimony concerning "actual personnel policies. . . are unobjectionable," but excluding conclusions that the defendants' practices "were contrary to . . . municipal law." 133 F.3d 92, 99 (1st Cir. 1997). Consistent with Federal Rule of Evidence 704 and case law, Robbins does not offer any opinion as to whether harassment or retaliation in fact occurred, but instead, explains accepted standards for responding to workplace concerns and how Wayfarer's failed to comport with both those standard practices and Wayfarer's own policies and trainings. Robbins Rep. at 9–23.

124

Nor does Robbins' use of terms like "complaints of harassment" or "investigation," or cites to guidance from the EEOC or California Civil Rights Department (formerly DFEH),[60] render his opinion an inadmissible legal conclusion. To the contrary, it would call his expert opinion into question if Robbins failed to reference these topics and guidance. Indeed, myriad courts have previously permitted the expert testimony of Robbins, Robbins Rep. at 42–48 (expert testimony list), and other experts who reference and rely on the very topics and resources Defendants complain of here, *see, e.g., Shampine v. US Foods, Inc.,* 2022 WL 17098731, at *6 (E.D. Tenn. Nov. 21, 2022) (finding expert testimony relying on EEOC guidance and AWI materials admissible); *Nelson v. Pace Suburban*, 2022 WL 1401529, at *3–5 (N.D. Ill. Mar. 21, 2022) (admitting expert opinion relying on EEOC guidance and resources from the Society of Human Resources Management ("SHRM")); *Saldana*, 2015 WL 3952328, at *4 (same); *Perona v. Time Warner Cable Inc.*, 2016 WL 9087260, at *3 (C.D. Cal. Aug. 12, 2016) (permitting Robbins' opinion, finding it would "assist the jury in understanding how the EEOC and the California Department of Fair Employment and Housing have evaluated . . . claims").

Finally, Robbins' first opinion will assist the jury and is within his expertise. Defendants' reliance on *Perona* to argue that Robbins is unqualified to testify regarding Wayfarer's employment policies because he never worked for the Company is misplaced. Mot. at 65–66. Defendants cherry pick one of the few cases in which a court has excluded portions of Robbins' opinion. That case, however, related to disability accommodation issues not relevant here, *Perona*,

---

[60] Defendants mischaracterize such materials as "regulations," Mot. at 65, when, in truth, they are *guidelines*, not statements of law. Indeed, the DFEH Guidelines, in particular, are meant for use *by employers. See* DEP'T. OF FAIR EMP. AND HOUS., *California Department of Fair Employment and Housing Workplace Harassment Prevention Guide for California Employers* (Mar. 2017) (https://calcivilrights.ca.gov/wp-content/uploads/sites/32/2017/06/DFEH-Workplace-Harassment-Guide.pdf). These guidelines stand in stark contrast to the opinion excluded in *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988), *on reh'g,* 856 F.2d 5 (2d Cir. 1988), which "drew directly upon the language of the statute and accompanying regulations."

2016 WL 9087260, at *2, and is against the weight of authority routinely permitting opinion regarding whether a defendant employer complied with its own policies, *see supra* at 124–25.

### 2. Defendants' Challenge to Robbins' Second Opinion Fails.

#### a. Robbins' Second Opinion is Relevant to Retaliation and Not a Legal Conclusion.

Robbins' second opinion—on standard practices to prevent harassment and retaliation on film and television sets—is plainly relevant to Ms. Lively's claim that she was retaliated against following reporting harassment on a film set. Robbins' second opinion is specifically relevant to establishing Ms. Lively's subjective belief of a hostile environment on set and that Wayfarer acted with malice and retaliatory motive—as evidenced by their failure to follow standard practices generally implemented in any workplace and on film sets, in particular. *See supra* Part VI(B)(1)(a). And, as with his first opinion, Robbins' testimony with respect to the SAG-AFTRA guidelines, or other standards, does not constitute a legal conclusion. Indeed, SAG-AFTRA is a labor union, not a legal or governing body with the right to promulgate laws or create legal rights of action. *See* SAG AFTRA, *About*, https://www.sagaftra.org/about (last visited Apr. 22, 2026).

#### b. Robbins is Qualified to Offer his Second Opinion.

Defendants next argue that Robbins is not qualified to opine that Wayfarer deviated from entertainment-specific standards to prevent harassment on film and television sets, including through the use of intimacy coordinators, nudity riders, and closed set protocols because Robbins is not himself a "performer, entertainment executive, or intimacy coordinator" and has not personally drafted a nudity rider. Mot. at 62. This argument ignores both the nature of Robbins' opinion and expert qualification requirements. *See Calltrol Corp. v. LoxySoft AB*, 2025 WL 2720984, at *4 (S.D.N.Y. Sept. 24, 2025) ("When an expert has expertise or qualifications, in a 'general field closely related to the subject matter in question, the court will not strike the testimony

126

solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.'" (citation omitted)).

Robbins need not have been an intimacy coordinator nor drafted a nudity rider to testify as an expert on these matters. Robbins draws from his extensive investigation experience for entertainment industry clients and involving issues related to intimacy in films, the relevant guidelines, standards, and protocols issued by SAG-AFTRA (including, the SAG-AFTRA Quick Guide for Scenes involving Nudity and Simulated Sex and the SAG-AFTRA Standards and Protocols for the Use of Intimacy Coordinators), and guidance from Laura Rikard, an experienced Intimacy Coordinator, educator and academic researcher on intimacy coordination, and a founder of the intimacy discipline in the performing arts.[61] Robbins Rep. at 26–30, 52; Robbins Dep. at 44:18–46:12. This more than satisfies the "specialized knowledge" requirement of Rule 702. Fed. R. Evid. 702. *See supra* Part VI(B)(1)(b) (confirming that experts may rely on professional guidance and resources in forming opinions); *see also McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (Second Circuit endorses a liberal interpretation of Rule 702 qualification requirement, which considers "practical experience" and "specialized knowledge gained through experience, training, or education"). Robbins' second opinion is part and parcel of Robbins' overall expertise in harassment and retaliation prevention—nudity riders, intimacy coordinators, and closed set protocols are additional mechanisms designed to protect employees from harassment at work (and that Wayfarer failed to effectively implement). Robbins Rep. at 11–12. Moreover, this opinion is not an impermissible legal conclusion; SAG-AFTRA is a labor union,

---

[61] Rikard is an intimacy coordinator and SAG-AFTRA Member, founder of Theatrical Intimacy Education (an established training organization for intimacy coordinators), a Professor of Theatre and an academic researcher and expert in the field of intimacy, and a published author on the topic. She has been honored for her work in intimacy with the Kennedy Center Medallion and by the National Alliance of Acting Teachers. *See* Laura Rikard, *About*, https://laura-rikard.com/about/ (last visited Apr. 23, 2026).

not a legislative body. *See* SAG AFTRA, *About*, https://www.sagaftra.org/about (last visited Apr.

22, 2026).

### 3.    Defendants' Challenge to Robbins' Third Opinion Fails.

Defendants challenge Robbins' third opinion regarding the unique impact of retaliation in

the entertainment industry on the grounds that Robbins is not qualified to offer such an opinion,

that the opinion will not assist the trier of fact, and that the opinion is unreliable. *See* Mot. at 66–

68. Each fails.

First, Defendants grossly mischaracterize Robbins' third opinion to argue that he is not

qualified to offer it. Despite Defendants' characterization, Robbins does not offer any opinion

related to Ms. Lively's damages or purport to quantify her reputational harm. Instead, his opinion

solely posits that reputations in the entertainment industry carry a different weight and a different

vulnerability due to, among other things, the level of public interest and scrutiny surrounding the

industry as well as the influence and reach of "powerbrokers." Robbins Rep. at 22–23. Robbins

opines, for example, that an accused's ability to impact a complaining actress's future career

opportunities is more severe in the entertainment industry than, for example, at an insurance firm

in part, because of the power and influence that Hollywood power players carry.[62] *Id.* Robbins is

qualified to offer this expert opinion based on his decades of experience with workplace

harassment and retaliation in the entertainment industry. For the same reason, Defendants' attack

that Robbins' third opinion is not reliable because it is a "personal opinion" or "pure advocacy,"

fails. Robbins' third opinion is expert analysis based on Robbins' long-standing work in the

---

[62] That Defendants even dispute this premise, or argue it is irrelevant or unhelpful, is incredible. Defendants' primary defense in this matter is that Ms. Lively *privately* complaining about harassment could have such untold consequences for their own careers in the industry that they had to hire crisis PR to destroy her. Dkt. No. 1242 at 39–43. Would Defendants really be making the same arguments if they worked at an insurance firm or as a plumber? Of course not.

entertainment industry, including his authorship of articles and presentations on this very topic.[63]
*See*, *e.g.*, *Kumho Tire Co.*, 526 U.S. at 152; *McCullock*, 61 F.3d at 1043.

Robbins' third opinion will assist the jury in determining whether Defendants acted with retaliatory motive, whether Defendants' acts were "reasonable defensive measures" as they insist, and whether Defendants acted with malice such that punitive damages are appropriate. It will also educate the jury as to the potential impact of Defendants' conduct on Ms. Lively's ability to obtain future work, including not only film projects but also endorsement opportunities. Robbins' third opinion is thus admissible. Indeed, Defendants' challenges bear primarily on weight, rather than admissibility. *See McCullock*, 61 F.3d at 1044; *Amorgianos*, 303 F.3d at 267.

## VII.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF MICHAEL SIPPEL.

The Court should reject Defendants' motion to exclude the testimony of Michael Sippel, a Certified Public Accountant who has worked in the entertainment industry for nearly 20 years, who, in conjunction with Richard Marks, opines that Ms. Lively suffered lost acting, endorsement, and speaking opportunities ████████████████████████████████ after the release of the Film, and the onset of Defendants' retaliation campaign. Mr. Marks' and Mr. Sippel's opinions work in tandem: Mr. Marks, an entertainment transactional lawyer with over 50 years of experience, opines on the acting, endorsement, and speaking opportunities and commensurate compensation that an actress of Ms. Lively's caliber reasonably could have expected to receive following the success of the Film absent Defendants' retaliation. ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[63] Michael Robbins & Matthias H. Wagener, *Investigations in Hollywood: It's the Same, But Different*, 13 AWI J. no. 3, at 1 (Dec. 2022).

██████ Mr. Sippel then converts those projects and compensation terms into a sample schedule ██████████████ following the release of the Film, █████████████████ ███████████████████████████████ As set forth in Ms. Lively's opposition to Defendants' motion to exclude Mr. Marks, this is precisely the type of expert evidence that courts in the Second Circuit and California have held to be admissible. *See* Part VIII(B)(1)(c). Defendants' own authority confirms this. *Dixon v. Reid*, 2025 WL 2417299, at *6 (S.D.N.Y. Aug. 21, 2025) (expert testimony on anticipated records sales based on historical data was admissible when the expert "sets forth in detail each step in his analysis, as well as all data inputs"). As *Dixon* confirms:

> Any calculation of future earnings is to some extent a predictive exercise, subject to a degree of uncertainty. How long would a person have worked? How long would they be expected to live? How long would they have stayed at a particular job? Would they have been promoted or received bonuses? Would they have been subject to lay offs or medical crises that would have limited their earnings? Would they have changed their careers at some point in the future? That future events are inherently unknowable does not mean future earnings are unrecoverable. Rather, the uncertainty highlights why courts insist that any such calculations be grounded in a sufficient factual predicate, to ensure that damages can be reasonably estimated.

*Id.* Mr. Sippel's analysis meets this standard, and Defendants' arguments fail.

## A.    BACKGROUND

Mr. Sippel presents two alternative damages calculations based on Mr. Marks' opinions. In Opinion 1, Mr. Sippel calculates the value of the lost professional opportunities Ms. Lively could have reasonably expected to receive in a "but for" world where Defendants did not retaliate against her and she was able to reap the financial rewards of the Film's tremendous success. To do so, Mr. Sippel ████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

130

████████████████████████████████████████████████████████

██████████████████████ Dkt. No. 1340-4 (Expert Report of Mr. Sippel ("Sippel Rep.")) ¶¶ 13–

14; Ex. DD (Sippel Rep. Exs. C, D).  ████████████████████████

██████████████████████████████████████████████████████

█████ *See id.* ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████ Sippel Rep. ¶ 21. ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████ *Id.* ¶ 37. ████████████

██████████████████████████████████████████ *Id.* ¶¶ 38–40. ████████

███████████████████████████████████████████████ *Id.* ¶ 45.

In <u>Opinion 2</u>, Mr. Sippel calculates ██████████████████████

██████████████████████████████████████████████████████

████████████████████████████████ Sippel Rep. ¶ 44. ████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████ *Id.*

## B.    ARGUMENT

### 1.    <u>Defendants' Attacks on Opinion 1 Fail</u>

Defendants take issue with two aspects of Mr. Sippel's Opinion 1. ████████

██████████████████████████████████████████████████████

██████████████████████████ Mot. at 94, citing Sippel Rep. ¶ 18. ████████

██████████████████████████████████████████████████████

131

███████████████ Mot. at 94. █████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████ Ex.

EE at 400:9–14. (Grey Stone Depo.). As set forth in Ms. Lively's opposition to Defendants' motion

to exclude Mr. Marks' opinion, Mr. Sippel is entitled to rely on ████████████████████

█████████████████████████████████ *See* Part VIII(B)(1)(b).

███████████████████████████████████████████

█████████████████████████████████████████ *See* Ex. DD

(Sippel Rep., Exs. C, D). ████████████████████████████

███████████████████████████████████████████████████████

████████████████ (Mot. at 94), ██████████████████████████

███████████████████████████████████████████████████████

Defendants cannot complain that ████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████ Mot. at 94, citing Sippel Rep. ¶ 37.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████ Mot. at 94. Defendants are wrong on the facts and the law.

In support of their contention that Ms. Lively "will likely receive" additional, unidentified

income in the future, Defendants cite to a single line from the deposition of ████████████

█████████████████████████████████████████████ *Id.* Defendants

make too much of this testimony. When read in context, it is clear that █████████████

132

Dkt. No. 1331-41 at 149:7–22 (Zavala Dep.) ████████

Regardless, Mr. Sippel reserved the right to update his opinions in advance of trial ████████

On mitigation, Defendants get the burden entirely backwards. It is *Defendants* who bear the burden of proving mitigation and they entirely failed to do so here. "The general rule is that the measure of recovery...is the amount of salary...for the period of service, less the amount which the employer affirmatively proves the employee has earned or with reasonable effort might have earned from other employment....[T]he employer must show that the other employment was comparable, or substantially similar, to that of which the employee has been deprived; the employee's rejection of or failure to seek other available employment of a different or inferior kind may not be resorted to in order to mitigate damages." *Hope v. California Youth Auth.*, 134 Cal. App. 4th 577, 595 (2005) (citing *Parker v. Twentieth Century–Fox Film Corp.*,3 Cal.3d 176, 181–82 (1970); *see also* CACI 3963 (burden on defendant to prove plaintiff-employee failed to mitigate damages). Here, Defendants have not adduced a single piece of evidence showing that Ms. Lively could have obtained "substantially similar" professional opportunities, that she failed to make "reasonable efforts" to obtain this employment, or the amount Ms. Lively could have earned from this employment. Defendants' failure to meet their burden does not affect the admissibility of Mr. Sippel's opinion.

133

### 2.    Defendants' Attacks on Opinion 2 Fail.

Defendants also seek to exclude Sippel's Opinion 2 on three bases, all of which

fail. ██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████ Mot.

at 96. It is well established that past earnings inform future earnings, and courts routinely rely on

a plaintiff's recent earnings as the most probative evidence of future earnings. *See Hedren v. Allen*,

No. D061186, 2013 WL 6587921 at *8–9 (Cal. Ct. App. Dec. 16, 2013) (calculating plaintiff's

lost earnings based on recent work history, including jobs "in the year trial was held" and pending

offers at trial); *Bihun v. AT&T Info. Sys., Inc.*, 13 Cal. App. 4th 976, 996 (1993) (affirming lost

earnings award in FEHA case based in part on plaintiff's most recent compensation levels).

Defendants' own authority confirms the same. In *Dixon*, 2025 WL 2417299, at *2, the

Court denied defendant's motion to exclude expert testimony on the lost earnings of plaintiff, a

music executive who alleged she was sexually harassed by the former head of Arista Records and

thus deprived of commissions on record sales for Kanye West and John Legend, both of whom did

not sign with Arista because of defendant. *Id*. Plaintiff offered an expert with "over two decades

of diverse experience in the music industry" who opined on the "hypothetical earnings Plaintiff

would have received from the A&R commission structure had she successfully signed West and

Legend." *Id*. To do so, the expert looked to plaintiff's employment agreement for her commission

structure and the methodology for calculating those commissions and researched West and

Legend's contracts with their current labels as well as their sales data by year to determine "how

many records and singles sold across various mediums and the price per unit. He then integrated

this information into an "interactive report" that allowed the reader to calculate lost commissions

based on how long plaintiff remained at Arista, and West and Legend's royalty rates. *Id*.

The Court held these opinions were admissible because the expert's report "sets forth in detail each step in his analysis, as well as all data inputs." *Id*. at *6. The court held that "historical data regarding record sales" was sufficiently reliable, and any question about whether West or Legend would have released the same records at Arista as at their current labels went to the weight of the evidence, not its admissibility. *Id*. The court reasoned that "[t]he use of historical data may not provide exactitude, but allows for calculations to a reasonable certainty, which is all the law requires." *Id*. The court also rejected defendant's argument that the expert's opinion was speculative because it was unknown whether West and Legend would have signed with Arista, or whether they would have been deemed plaintiff's designated artists. The court explained:

> Defendant misapprehends the nature of Plotkin's inquiry. Plotkin is not purporting to offer an opinion as to whether West or Legend would have signed to Arista, or if they had whether Dixon would have been responsible for signing them. His opinions are limited to a calculation of what commissions Plaintiff would have been entitled to under the terms of employment contract in the hypothetical world where she was responsible for signing the artists while at Arista.

*Id.* As in *Dixon*, Mr. Sippel has decades of experience in the entertainment industry, and opines on



Also like in *Dixon*, Mr. Sippel relied on

*See* Sippel Rep.; Ex. DD (Exs. C, D.) As the court held in *Dixon*, this type of "historical data" is sufficiently reliable to quantify Ms. Lively's earnings in a "hypothetical world" where Defendants did not retaliate against her, and any disagreement over the underlying

135

assumptions goes to the weight, not the admissibility of his opinions. █████████████

████████████████████████████████████████████████████

    ***Second***, Defendants claim that Mr. Sippel improperly relied on ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ Mot. at 97.

Defendants misapprehend Mr. Sippel's opinion. ████████████████████████████

████████████████████████████████ Sippel Rep. ¶ 44. ████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████ Sippel Rep. ¶ 19; Marks Rep. at 10.

    ***Finally***, Defendants contend that assuming Ms. Lively would earn ████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████ Mot. at 97. In support they note that ████████████████████

████████████████████ Mot. at 97. As set forth in the Marks Opposition, and Part

VIII(B)(1)(a), Ms. Lively's ████████████████ supply a reliable foundation to calculate ████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████ Ex. EE at 353:23–356:13 (Grey Stone Depo)

Ex. FF at 177:24–179:5 (Zavala Depo); Marks Rep. at 7–8. ████████████████

█████████████████████████████████████████████████████

████████████████████████████ Ex. EE at 376:10–18 (Grey Stone Depo).

    All of Defendants' critiques of Mr. Sippel's opinions fall flat.

## VIII.  THE COURT SHOULD DENY DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF RICHARD MARKS.

The Court should reject Defendants' challenge to the expert testimony of Richard Marks, a transactional attorney with over 50 years of experience negotiating compensation agreements in the entertainment industry who has served as a testifying expert in approximately 30 matters involving the television and motion picture industries. Mr. Marks opines on the acting, endorsement, and speaking opportunities and commensurate compensation that an actress of Ms. Lively's caliber would have been "positioned to secure" in the five years following the success of the Film absent Defendants' retaliation. Marks Rep. at 1-2. Mr. Marks grounds his opinion in ███

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ Contrary to Defendants' claims, Mr. Marks's opinions represent precisely the type of expert evidence regarding future earnings that courts have held is admissible. *See*, *e.g.*, *Oliveri v. Delta S.S. Lines, Inc.*, 849 F.2d 742, 744–45 (2d Cir. 1988) (affirming trial court's admission of expert testimony regarding expected compensation amounts based on expert's fifteen years of industry experience and personal knowledge of compensation and benefits in marine engineering contracts); *Alla v. Verkay*, 979 F. Supp. 2d 349, 376–377 (E.D.N.Y. Oct. 30, 2013) (affirming trial court's admission of expert testimony on plaintiff's employment prospects from past earnings, comparable salary for similar demographics, and hypothetical salary in intended career); *In re: Gen. Motors LLC Ignition Switch Litig.*, 2015 WL 9480448, at *6 (S.D.N.Y. Dec. 29, 2015) (denying motion to exclude expert testimony on plaintiff's overtime calculations and retirement age to calculate lost earnings); *Hedren v. Allen*, 2013 WL 6587921 at *8–9 (Cal. Ct. App. Dec. 16,

137

2013) (unpublished) (affirming trial court's admission of combined testimony from talent agent expert and economist expert about actress's likely compensation from hypothetical future acting opportunities).

While projections about future earnings contain inherent uncertainties, where, as here, an expert has based his opinion on empirical evidence of past earnings and success, the expert is permitted to rely on his own industry knowledge to provide an opinion regarding future earnings prospects. *See Oliveri*, 849 F.2d at 744–45 (expert testimony about future compensation admissible "despite uncertainty that plaintiff would have received future promotions in those positions"). That is precisely what Mr. Marks has done here. Defendants' challenges go to weight—not wholesale exclusion of the expert evidence.

### A.    BACKGROUND

Mr. Marks has worked in private practice and in-house for major entertainment studios ████████████████████████████████████████████████████. Dkt. No. 1340-3 (Expert Report of Mr. Marks ("Marks Rep.") at 2. He has represented ████████ ████████████████████████████████████████████████████ ████████████████████████████████ *Id*. In those roles, he has ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ *Id*. at 2–3. Based on his extensive experience ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ *Id*. at 3–6. As Mr. Marks will testify at trial, he has worked on ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

138

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████. *See id.* Among his

substantial experience as a testifying expert ██████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████ Marks Rep. at 3.

Mr. Marks concludes that, based on ██████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████ *Id.* at 15. In particular, Mr. Marks opines that

█████████████████████████████████████████████

██████████████



---

[64] To remain conversative, Mr. Marks does not include ██████████████████████

████████████████ Marks Rep. at 1.



*Id*. at 1–2.

To reach these opinions, Mr. Marks considers ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████ *See id*. at 7–

12. He reviews data regarding the ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████ *Id*. at 8–12.

Mr. Marks then details the enormous box office success the Film enjoyed—grossing $350

million worldwide on a $30 million budget—and how that success provided ███████████

███████████████████████████████████████████████

███████████████████ *Id*. at 12–13. Indeed, as Mr. Grey Stone confirmed, "what that should

have represented for her is her true arrival as a top-tier movie star and an ability to command, not

only *a significant increase in her compensation moving forward*, but just as importantly, if not

even more, a significant rise in her opportunities to follow with great filmmakers, with studio

films." Dkt. 1230-33 (Deposition of Justin Grey Stone ("Stone Dep.") at 397:22–399:8 (emphasis added).

Finally, Mr. Marks describes how, instead of

. Marks Rep. at 14–15. As

*Id.* Instead,

she has received only

*Id.* at 14. She has received

*Id.* at 14–15.

Mr. Marks concludes that

*Id.* at 16.

## B.    ARGUMENT

### 1.    <u>Mr. Marks' Lost Earnings Analysis is Admissible</u>.

Defendants argue that Mr. Marks's opinions are based "almost exclusively on speculation as to future events." Mot at 87–93. That is not the case—Mr. Marks' opinion is grounded in

. But as is well established, while evidence of future earning capacity "may be suspect if it is presented by expert witnesses who do not provide an adequate foundation for the assumptions they make," where, as here, the

141

testimony is "supported by empirical evidence such as contracts or wage scales, such evidence is admissible *notwithstanding that the plaintiff might not have progressed as he anticipated*." *Oliveri*, 849 F.2d at 745 (emphasis added). While assumptions that are "speculative and conjectural" or "so unrealistic and contradictory as to suggest bad faith" should be excluded, other contentions that the assumptions are unfounded "go to the weight, not the admissibility, of the testimony." *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir. 1996). Expert testimony should be excluded as speculative only if it is "based on *unrealistic* assumptions regarding the plaintiff's future employment prospects." *Id.* (emphasis added). Defendants' scattershot critique goes at most to the weight rather than the admissibility of the testimony.

### a.      Mr. Marks' expert testimony is based on sufficient facts and data.

Consistent with that principle, and supporting Mr. Marks' testimony in this case, courts in the Second Circuit recognize that expert testimony regarding future earnings is admissible if it is based on historical data regarding past earnings. *See, e.g., Mono v. Peter Pan Bus Lines, Inc.*, 13 F. Supp. 2d 471, 480 (S.D.N.Y. 1998) (admitting expert projections regarding future earnings where it was not based on speculation that a future freelance business might flourish, but grounded instead in historical data regarding past earnings); *Dershowitz v. United States*, 2015 WL 1573321, at *32 (S.D.N.Y. Apr. 8, 2015) ("The starting point to determine the value of past and future lost earnings is a decedent's gross income at the time of death" (cleaned up)); *see also TVT Recs. v. Island Def Jam Music Grp.*, 250 F. Supp. 2d 341, 350–51 (S.D.N.Y. 2003) (expert testimony admissible to prove a celebrity's lost profits where the testimony is based on "market performance of other similar or related" works, including "prior work" by the same celebrity). A jury may also consider "expected changes" in future earnings "where it is probable that such changes were forthcoming." *Mono*, 13 F. Supp. 2d at 478.  Courts have also held that expert testimony based on industry or professional experience is admissible to support the loss of quality or quantity of

opportunities, even in cases involving the entertainment industry where compensation is less predictable. *See*, *e.g.*, *Hedren*, 2013 WL 6587921 at *8-9 (affirming admission of expert testimony that senior actress would likely have earned at least $2,000 a day for 30 days out of the year until she turned 90); *Island Def Jam Music Grp.*, 250 F. Supp. 2d at 349 (expert was "reasonable to rely . . . on Ja Rule's popularity and the performance of his solo albums as a basis to project" sales of new album with music group).

Mr. Marks' opinions are grounded ███████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████. This is not a case where an entertainment expert is relying on nothing but his own industry experience to opine that an actress who has been an extra in a few television shows could have earned compensation that is typically reserved for movie stars. Ms. Lively *is* a movie star, not an aspiring movie star. Since 2017, she has starred in four major motion pictures, including *A Simple Favor* ███████████████ ████████████████████████████████████, *The Rhythm Section* ████████ *Another Simple Favor* ████████████████████████████████ and *It Ends With Us* ████████████████ Marks Rep. at 9–10. Mr. Marks reviewed ████████ ██████████████████████████████████ *Id*. at 9–10, Ex. 1. He also reviewed ████████ ████████████████████████████████████████████████ *Id*. at 12, Ex. 1. This is the very type of evidence that courts have approved as providing the proper foundation that would allow an expert to reach a conclusion as to lost earnings. *See, e.g.*, *Mono*, 13 F. Supp. 2d at 480 (admitting expert projections regarding future earnings where it was not based on speculation that a future freelance business might flourish, but grounded instead in historical data regarding past earnings); *Bihun v. AT&T Information Systems, Inc.*, 13 Cal. App.

143

4th 976, 996 (1993) (expert incorporated evidence of past performance in lost earnings calculation); *see also Island Def Jam Music Grp.*, 250 F. Supp. 2d at 349 (expert relied on artist's past solo album sales as basis to rely on projections of future album sales of music group for lost profits analysis).

The law is also clear that a jury may consider "expected changes" in future earnings "where it is probable that such changes were forthcoming." *See Mono*, 13 F. Supp. 2d at 478; *Bihun*, 13 Cal. App. 4th at 996 (lost earnings under FEHA can include pay increases based on anticipated future promotions); *Bower v. O'Hara*, 759 F.2d 1117, 1127 (3d Cir. 1985) (labor contracts showing pay rates for carpet layers in New York admissible to prove lost future earning capacity even though plaintiff did not live in New York and was not a union member because "[t]here is evidence that [plaintiff] would have gone to New York to pursue his trade as a carpet layer, had he not been injured" and whether plaintiff would have commanded the same wages as those of union members went only to the weight, not to the relevancy of the evidence). As Mr. Marks explains, and as was confirmed by ███████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████ Marks Rep. at 13. Moreover, Mr. Marks considered concrete evidence that █████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████ *Id*. at 12–13. He considered ███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████. *Id*. Based on these empirical facts, Mr. Marks reasonably concluded that ██████████████████████████████████ ████████████████████████████████████████████████████████

144

████████████████████████████████████████████████████

████████████████████████████████ *Id.* at 13. He then relied on his 50 years of

experience ████████████████████████████████████████████

████████████████████████████████████████████████

### b.    Defendants' scattershot critique is unavailing.

Defendants assert that Mr. Marks' future lost earnings are not sufficiently rooted in ██

██████████████████████████████████████████████████████

████████████ Mot. at 83–87. But Mr. Marks spends pages of his report detailing ████████

█████████████████████████████████████████████ Marks Rep.

at 7–8. Moreover, as a matter of law (and common sense) more recent earnings are most probative

of future pay. *See Hedren*, 2013 WL 6587921 at *8–9 (calculating actress's lost earnings based on

expert recitation of recent work history, including jobs "in the year trial was held" and pending

offers at the time of trial); *Bihun,* 13 Cal. App. 4th at 996 (affirming lost earnings award in FEHA

case based in part of plaintiff's most recent compensation levels). Mr. Marks ████████████

██████████████████████████████████████████████████████

████████████

Defendants next take issue with the fact that Mr. Marks did not consider ████████

███████████████████████████████████ Mot. at 88. Similarly, Defendants

assert that Mr. Marks did not know about ████████████████████████████████

████████████ *Id.* Mr. Marks includes in his report ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████ *Id.*; Marks Rep. at 14. To assume ████████████████████████████████

███████████████████████████████ would itself be speculative.

145

Defendants then assert that Ms. Lively had ███████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████ Marks Rep. at 9. Defendants also

contend that Mr. Marks' opinion of ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████ Mot. at 88. But as discussed above, cases are clear that Mr. Marks

is entitled to rely on the success of Ms. Lively's past works ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████. *See, e.g., Mono*, 13 F. Supp. 2d at 478; *Bihun*, 13 Cal. App. 4th at

996; *Bower*, 759 F.2d at 1127.

Defendants next argue that Ms. Lively cannot claim ████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████ Mot. at 88 (citing

Marks Dep. at 61:20–62:21). This misses the point of Mr. Marks' opinion altogether. Mr. Marks

opines on Ms. Lively's lost professional opportunities based on a "but for" world in which

Defendants did not retaliate against Ms. Lively, and she was not forced to sue to protect her rights.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ Marks Rep. at 16–17. Moreover,

Mr. Marks' opinion that Ms. Lively would have ████████████████████████████

146

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████ *Id.* at 9–10. At the very least, Mr. Marks' opinion as to ████

█████████████████████████ is relevant and should be admitted—whether █████████

█████████████████████████████ is not subject to expert opinion and is for the jury to

decide. *See Oliveri*, 849 F.2d at 744–45.

Defendants then point to █████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████. Mot. at 89. However, █████████████ have already been

accounted for.  Defendants appear to be ignoring ████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████ Ex. DD at Ex. C. (Sippel Rep., Ex. C.) Defendants'

argument is all the more absurd when, as Defendants concede, certain of ██████████

███████████████████████████████████████████████████████████

██████████████████████████████████ *See* Mot. at 89. And, as Mr. Marks

will testify at trial, because ████████████████████████████████████

███████████████████████████████████████

Defendants then criticize Mr. Marks for relying on █████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████ Ex. FF at 12:19–20, 14:4–12;

(Zavala Depo); Ex. EE at 15:24–16:7; 352:24–353:2 (Grey Stone Depo). *Hedren* makes clear that

an expert is entitled to rely on testimony from industry professionals, including the plaintiff's own talent representatives, to assess future lost opportunities. *Hedren*, 2013 WL 6587921 at *8–9.

Defendants' criticism that Mr. Marks did not

. Ex. FF at 177:24–179:5 (Zavala Depo.)

Ex. EE at 353:23–356:13. (Grey Stone Depo.) Given their professional experience,

Defendants further argue that Mr. Marks assumes

Mot. at 89. This statement is plainly contradicted by Mr. Marks' report, which addressed

*Id*. at 89–90. Beyond that,

Thus, Mr. Marks is not

### c.    Defendants' caselaw is inapposite.

For all of these reasons, the cases on which Defendants rely do not resemble the situation here. In *Boucher v. U.S. Suzuki Motor Corp.*, even though the plaintiff seeking lost earnings had only ever worked "sporadically," the expert assumed that the plaintiff would have worked 40 hours

per week, every week for the rest of his career, and that he would have received regular wage increases and fringe benefits equal to approximately 19%, even though there was no testimony or documentation that the plaintiff would have received these benefits. 73 F.3d at 22.  The Second Circuit vacated the lost-earnings award because the expert's projections were driven by "unrealistic," unsupported assumptions that broke completely from the plaintiff's demonstrated work history. *Id.* (the court noting "nothing of probative value . . . accounts for the reversal assumed by the expert" in projecting Boucher's lost earnings).

Similarly, in *Dixon v. Reid*, the district court granted the defendant's motion to preclude the plaintiff's expert testimony for lack of methodology and failure to quantify damages. 2025 WL 2417299, at *6 (S.D.N.Y. Aug. 21, 2025). The plaintiff sought lost earnings and offered an expert who specialized in the field of "executive compensation in the music industry" to testify to her earnings projections. *Id*. at *1. However, the expert did not calculate the "plaintiff's lost earnings based on her actual compensation at the time she left [the employer]," including because the expert did not calculate any lost earnings and failed to consider the plaintiff's income, longevity in the industry, or a quantifiable range of damages. *Id*. The expert assumed, without any evidence to support the assumption, that "Plaintiff not only would have continued to have a successful career in the music industry, but that she would have reached the pinnacle of the profession to become the CEO of a major record label." *Id*. at *5. The expert's testimony was excluded in its entirety because it relied on assumptions of the plaintiff's career trajectory propped by "hypothetical promotions, bonuses, and business deals" which lacked any evidentiary foundation. *Id*. at *5–6.

By contrast, and as discussed in more detail above, Mr. Marks based his opinion on ██

███████████████████████████████████████████████

███████████████████████████    He did not have to ███████████████████

149



████████████████████████████████████████████████████

██████████████████████████████ Her ███████████████████

████████████████████████████████████████ Marks Rep. at 13.

Mr. Marks thus ties his ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ *Id*. at 11–13. ███████████

████████████████████████████████████████████████████

██████████████████████████ *Boucher*, 73 F.3d at 2; Marks Rep. at 8–12. Moreover,

unlike in *Dixon*, Mr. Marks presents ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████.[65] *See* 2025 WL 2417299 at *5–6;

Marks Rep. at 8-12. For these reasons, ██████████████████████████

Mr. Marks has provided a sufficient factual basis to support his opinions. Marks Rep. at 7–9.

### 2.    <u>Mr. Marks Is Qualified to Opine on Ms. Lively's Endorsements</u>.

Finally, Defendants claim that Mr. Marks should not be entitled to opine on ████████

████████████████████████████████████████████████████

██████████████████████████████████████ Mot. at 92–93. Both

arguments fail. Like the experts in *Hedren* and *Island Def Jam*, Mr. Marks himself has "extensive

experience" in all aspects of the entertainment industry. *Hedren* 2013 WL 6587921 at *9 (expert

with "extensive knowledge of the Hollywood film and television industry and market for [ ] actors"

was qualified to testify); *Island Def Jam*, 250 F. Supp. 2d at 351–52 (expert's CV "indicates

---

[65] This same argument applies to Defendants' argument about Ms. Lively's lost endorsement opportunities. Mot. at 92–93.

extensive experience within the music and entertainment industry . . . which, together with his accounting background, adequately qualifies him to make [ ] projections of [music album] sales projections").

So too here where Mr. Marks has over 50 years of experience in Hollywood deal making, including in the current climate where actor deals are not siloed from other professional opportunities, like endorsements, that flow from that exposure. As Mr. Marks will testify at trial, studios and production companies are oftentimes required to review an actor's endorsement commitments in managing scheduling, and major talent agencies like, for example, ██████████████████

██████████████ coordinate among groups to serve these interrelated parts of an actor's career. *See* WME, *Acting Talent*, https://www.wmeagency.com/expertise/ (last visited April 24, 2026) (listing "acting talent," "television," "motion picture," "fashion," "brands," and "speaking" as areas of WME's expertise). Thus, Mr. Marks' own experience, and those upon whom he relied to form his opinions, provide more than enough expertise to support his opinions. And, in arguing that Mr. Marks did not consider ██████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████ As such, it is *Defendants'* arguments that are speculative and should be disregarded.

## CONCLUSION

For the foregoing reasons, Defendants' motion to exclude the expert testimony of Plaintiff's experts Dr. Jennifer Freyd, Prof. Dina Mayzlin, Dr. Aron Culotta, Dr. Ashlee Humphreys, Jeffrey H. Kinrich, Michael Robbins, Michael Sippel, and Richard Marks, should be denied in its entirety.

151

Dated: April 24, 2026

Respectfully submitted,

/s/ Michael J. Gottlieb

MANATT, PHELPS & PHILLIPS LLP
Esra A. Hudson (admitted *pro hac vice*)
Naeun Rim (*pro hac vice* pending)
Stephanie A. Roeser (admitted *pro hac vice*)
Sarah E. Moses (admitted *pro hac vice*)
Sareen K. Armani
Katelyn A. Climaco
2049 Century Park East, Suite 1700
Los Angeles, California 90067
(310) 312-4000
ehudson@manatt.com
nrim@manatt.com
sroeser@manatt.com
smoses@manatt.com
sarmani@manatt.com
kclimaco@manatt.com

Matthew F. Bruno
7 Times Square
New York, NY 10036
(212) 790-4525
mbruno@manatt.com

*Attorneys for Blake Lively*

WILLKIE FARR & GALLAGHER LLP
Michael J. Gottlieb
Koren L. Bell
2029 Century Park East
Los Angeles, CA 90067
(310) 855-3111
mgottlieb@willkie.com
kbell@willkie.com

Kristin E. Bender
Anna M. Gotfryd
1875 K Street NW
Washington, DC 20006
(202) 303-1000
kbender@willkie.com
agotfryd@willkie.com

Michael S. Schachter
Aaron E. Nathan
Michaela A. Connolly
Melissa S. Taustine
M. Annie Houghton-Larsen
787 Seventh Avenue
New York, NY 10019
(212) 728-8904
mschachter@willkie.com
anathan@willkie.com
mconnolly@willkie.com
mtaustine@willkie.com
mhoughton-larsen@willkie.com