# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---

BLAKE LIVELY,

Plaintiff,

vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)

25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

_____

JENNIFER ABEL,

Third-party Plaintiff,

vs.

JONESWORKS, LLC,

Third-party Defendant.

_____

WAYFARER STUDIOS LLC, et al.

Consolidated Plaintiffs,

vs.

BLAKE LIVELY, et al.

Consolidated Defendants.

_____

**CONFIDENTIAL**


VIDEO-RECORDED DEPOSITION OF DINA MAYZLIN

APPEARING REMOTELY FROM

Los Angeles, California

Tuesday, December 2, 2025


Stenographically Reported by:

Ashley Soevyn, CALIFORNIA CSR No. 12019

APPEARING REMOTELY FROM MARINA DEL REY, CALIFORNIA

JOB No. 7771655

Pages 1 - 204


Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---

BLAKE LIVELY,

                Plaintiff,

  vs.       CASE NO. 24-CV-10049-LJL (LEAD CASE)

                      25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

              Defendants.

_____

JENNIFER ABEL,

           Third-party Plaintiff,

  vs.

JONESWORKS, LLC,

           Third-party Defendant.

_____

WAYFARER STUDIOS LLC, et al.

           Consolidated Plaintiffs,

  vs.

BLAKE LIVELY, et al.

           Consolidated Defendants.

_____

**CONFIDENTIAL**

Video-recorded Deposition of DINA MAYZLIN, taken on behalf of the Wayfarer parties, with all parties appearing via video conferencing beginning at 10:02 a.m.  and ending at 3:27 p.m. on Tuesday, December 2, 2025, before me, ASHLEY SOEVYN, California Certified Shorthand Reporter No. 12019.

Page 2

CONFIDENTIAL

A P P E A R A N C E S:


For the Plaintiff Blake Lively:

        MANATT PHELPS & PHILLIPS LLP

        BY:  SARAH MOSES

        BY:  JAKE KIM

        Attorneys at Law

        2049 Century Park East

        Suite 1700

        Los Angeles, California 90067

        smoses@manatt.com

        jkim@manatt.com

        (310) 312-4207

Page 3

CONFIDENTIAL

A P P E A R A N C E S:

For the Defendants Wayfarer Studios LLC, Jennifer

Abel, Melissa Nathan and Justin Baldoni, Jamey Heath

and Steve Sarowitz:

        MEISTER SEELIG & FEIN

        BY:  MITCHELL SCHUSTER

        BY:  JORDAN BIENER

        BY:  JOAQUIN EZCURRA

        BY:  BENJAMIN BISTRICER

        Attorneys at Law

        125 Park Avenue, 7th Floor

        New York, New York 10017

        ms@msf-law.com

        jb@msf-law.com

        je@msf-law.com

        bb@msf-law.com

        (212) 655-3549

Page 4

discontinuity design.  So I see a big change and I    11:18:11
--

Q    I'm sorry, I didn't understand what you just said.  Could you repeat?

A    Okay.  Are you having trouble hearing me?    11:18:17

Q    No, it was just a word.  You use some type of design.

A    Oh, okay.  I used what is called discontinuity design, discontinuity.  Okay?

Q    Okay.    11:18:29

A    It's this idea that something changes, you know, something changes suddenly and that's one type of causal inference technique.  And so the discontinuity here was the sudden change in August.  Change in conversations and ultimately change, you    11:18:48 know, a fall in sales.

So what I wanted to do was to reach out to management and to make sure there were no other exogenous factors that affected that.  And by exogenous factors, I mean other things that were    11:19:03 going on.  For example, something in the competitive space, something in the pricing, something as part of, you know, just the kind of competitive marketing landscape.  For this reason, I wanted to have -- to check in with the brands.  You know, so the three    11:19:24

Page 57

brands that were involved.                                11:19:27

And so I instructed the AG team to ask, were there any other changes, you know, perhaps that you saw?  Something your competitors were doing, the pricing, or anything like that.  And Marimer said  11:19:40 no, there were no other changes.  You know, the -- what was going on was what is discussed in the case and my report, was the change in conversations, the -- you know, the -- and then the controversy and, you know, the tanking of the sales.         11:19:58

And for Betty B Holdings, the same thing. I wanted to check, were there other exogenous factors?  Something to do with, you know, anything else.  Anything else that I'm missing, I want to make sure, you know, I'm not misattributing what was  11:20:16 going on to some other factor that I don't know about as a researcher.  But the marketers that are close to the problem, they might -- they know it.

And, again, so I was there for that Zoom call.  And I asked those executives, you know,       11:20:34 several times, were there changes?  Were there changes?  And other changes in the marketing of the product, in the marketing space or the pricing or anything like that?  And, again, the answer was the same.  What was going on was the controversy that  11:20:54

Page 58

impacted sales.                                                    11:20:57

Q   Did you ask for any documents from Blake Brown Beauty or Betty B Holdings as part of those discussions you had?

When I say "you," whether it's you or           11:21:17
someone from the Analysis Group, was there any supporting documentation asked for as part of those discussions?

A   We already had a lot of -- a lot of data from them.  I had a lot of presentations, kind of    11:21:35
sales data.  And all of that is -- you know, most of it is -- it's documented in my report.  So if you look at my report, the data and sales, the -- some of the -- if you look at my footnotes, it actually came from those products, from the branding.  From    11:21:52
the brands.

Did I ask them for new data or any additional data?  I don't really remember.  But I think at that point, we already had a lot of data.
I just wanted to make sure I wasn't missing          11:22:09
anything.

Q   I know your discussions had to do with what was going on in the competitive landscape, and the answer was nothing.  Everything was attributed to the allegations in the complaint.                  11:22:26

Page 59

What, if anything, did you do to verify    11:22:28
whether there were any other extrinsic factors going
on during the timeframe that you were researching?

A    Okay.  I'm actually going to break up
your question into two parts because it was a very    11:22:49
long question.

Q    My apologies.

A    So the first part was the way you
summarized my -- you know, what I told you was,
there was nothing going on.  That's not quite true.    11:22:59
There were, you know, the regular seasonal trends.
So, for example, August, the drink, the beverage,
you know, executives told us that it's actually --
you know, it's a big -- it's a big -- there is a lot
of drinking that happens in barbecues.  So it's    11:23:19
actually a very important, you know, time for the
beverage industry.

So there were sort of the regular things
going on.  But what I was looking for was a
discontinuity.  So what I was looking for was    11:23:35
something that was a change, right, like a big
change that was above and beyond the regular, you
know, workings of their landscape.  And so was there
some, you know, some promotion that the other side
ran all of a sudden?  Or was there something else?    11:23:53

Page 60

CONFIDENTIAL

And so that was the nothing part, that there wasn't    11:23:56
a sudden discontinuity.  So there was, of course,
always seasonality going on.  But these things are
continuous, and I was looking for something more
discontinuous.                                         11:24:10

The other part was, did I verify on my
own?  Can you just repeat the second part?  Because
it was such a long question.

Q    Yeah, I'm actually going to change the
question.  Thank you for that clarification.  But     11:24:22
you did say you were looking for what was a big
change and described things that happened seasonally
or just typical things that happen in a cycle of a
business.

Were you looking at potential big changes  11:24:37
outside of what was going on in the business that
might have resulted in negative online commentary?
Or was your focus on big changes as it related to
the businesses and the products?

MS. MOSES:  Objection.                          11:25:01

THE WITNESS:  So I was meeting with the
businesses.  So I wanted to know, from their
perspective.  And, again, this is -- I wasn't -- you
know, I wasn't looking -- I wasn't really talking
about them about -- if you think about my analysis    11:25:12

Page 61

CONFIDENTIAL

as two parts.  One was the social media part, and     11:25:19
then there was kind of the sales part.

I was looking to find alternative explanation for the fall in sales that we saw in     11:25:32
August.  You know, was there something that I was missing?  And so that's the expertise of the business.  They know their business well.  They have the data.  And so that's why I went to them to ask them, did you see -- was there something else going on that would result, you know, in kind of rapid     11:25:48
fall in sales in August?

BY MR. SCHUSTER:

Q    Who is the face of the business?

MS. MOSES:  Objection.

MR. SCHUSTER:  Who is the face of Blake     11:26:01
Brown Beauty?

THE WITNESS:  The face?

BY MR. SCHUSTER:

Q    Yeah.  Whose company is it?

MS. MOSES:  Objection.     11:26:14

THE WITNESS:  So there is a company and it has management.  But it's affiliated, obviously, you know, in terms of -- if you're asking me in terms of kind of advertising, social media communications, Blake Brown was the face of the     11:26:24

Page 62

CONFIDENTIAL

business, but it's also --                                11:26:29

BY MR. SCHUSTER:

Q    Who is Blake Brown?  You mean Blake

Lively?

A    Blake Lively.  But if you're asking me    11:26:34

were there -- was there like a corporate managerial

structure?  Yes.  These were businesses.  She wasn't

the CEO.  She was the, you know, the kind of -- this

was the celebrity -- you know, celebrity affiliated

brands.                                                   11:26:58

Q    Right.  So people affiliated the brand

with Blake Lively, correct?

MS. MOSES:  Objection.

THE WITNESS:  Yes.

BY MR. SCHUSTER:                                          11:27:03

Q    And that would be for Blake Brown Beauty

and Betty B Holdings and their products, correct?

A    If you look at the marketing, if you look

at how the brands were positioned, yes.  The brands

were definitely affiliated, associated with her.    11:27:19

And that's really part of my argument.  Why the

defamation, why the damage to her reputation

affected the brands.

Q    You just used the word "defamation."  Is

it your opinion that there was defamation?           11:27:32

Page 63

CONFIDENTIAL

MS. MOSES:  Objection.                                11:27:34

THE WITNESS:  Not at all.  So my opinion was more narrow.  So my opinion looked at, was there a change in word of mouth?  And was this manipulated by the Wayfarer team?                                   11:27:45

BY MR. SCHUSTER:

Q    Okay.

A    Whether or not -- defamation seems more like a legal term.  I'm definitely not a legal expert so I was looking at manipulation or word of   11:27:55 mouth.

Q    Understood.  I only asked about defamation because you used the word "defamation."

A    Okay.  I should say negative -- negative hit to her reputation.  Harm to her reputation is   11:28:06 the word I should use.

Q    And would negativity about Blake Lively cause a change potentially in how her products do?

A    If you read my report, there is a section that argues that there is a connection for celebrity  11:28:35 brands.  So yes, you're --

Q    I did read your report.

A    Good.

(Crosstalk.)

As a professor, it's always good to hear.  11:28:48

Page 64

CONFIDENTIAL

Q    I'm asking specific questions about your    11:28:57
report and about your testimony.  One of the things
you said were -- was you talked to management and
were inquiring about changes in the marketplace and
competitive edge and reasons for the decline in    11:29:12
sales.

And my question to you is -- and I think
you've just answered it -- is if there is negativity
or negative comments about Blake Lively, that could
negatively impact sales of her products, correct?    11:29:25

A    Correct.

Q    And is it possible that negative comments
about Blake Lively have nothing to do with an
alleged online manipulation campaign, but negative
comments could be the people just don't like Blake    11:29:42
Lively?  Is that possible?

MS. MOSES:  Objection.  Objection.

THE WITNESS:  There are two parts of my
report.  So did a lot of work, and did a lot of
analysis showing that there was manipulation --    11:29:58
BY MR. SCHUSTER:

Q    I understand.  And I'm going to get --

A    That's the first point.

Q    And I'm going to get to your report, but
I would like you to answer my question.    11:30:06

Page 65

CONFIDENTIAL

Is it possible that people just don't    11:30:07

like Blake Lively?

MS. MOSES:  Objection.

THE WITNESS:  My data -- so I'm a data

driven person, right?  I'm a scientist.  My data    11:30:16

tells me that the word of mouth about Blake Lively

was very positive before August.  The topics that

were discussed were very positive.  And then there

was a change, you know, very negative change.  So as

a scientist, based on my data, I would have to tell    11:30:32

you that this -- you know, this change was due to

manipulation.

BY MR. SCHUSTER:

Q   Were you aware of anything negative about

Blake Lively prior to August of 2024?  Or are you    11:30:46

only aware of the very positive -- your words --

reaction to Blake Lively?

MS. MOSES:  Objection.

THE WITNESS:  I'm not sure what do you

mean?  Are --    11:30:59

BY MR. SCHUSTER:

Q   Were you aware --

A   Are you talking about my data or me as a

person?

Q   You as a person, as the expert on whether  11:31:05

Page 66

CONFIDENTIAL

that manipulation negatively impacted her brand, you   11:31:10

said the word of mouth about Blake Lively, it was

all very positive.

My question to you is:  Was it all very

positive about Blake Lively prior to August of 2024?   11:31:21

A    The data would reveal what I found is

that yes, it was largely -- it was very positive

before.

Q    And was all of that positivity about

Blake Lively organic or was any of that positivity    11:31:39

the result of Blake Lively's public relations team?

MS. MOSES:  Objection.

THE WITNESS:  So, again, what I'm using

here is what is called discontinuity design.  I'm

looking at the change.  I'm not making -- there is    11:31:59

nothing in my report that talks about, you know,

what was -- how was word of mouth generated before.

All I know is that I can tell you what the word of

mouth was before, and I can tell you a very sharp

change in August.                                     11:32:18

BY MR. SCHUSTER:

Q    Okay.  So you have no idea how the word

of mouth resulted in a very positive reaction to

Blake Lively prior to August of 2024?  You don't

know whether it was natural?  You don't know if it    11:32:26

Page 67

CONFIDENTIAL

was a result of her good work?  You don't know if it    11:32:29

was a result of her good looks?  You don't know if

it was a result of her public relations machine?

MS. MOSES:  Objection.  Just give me a

moment to object.    11:32:42

THE WITNESS:  Sorry.  So I have some

ideas.  Let me actually go back.  Do you want to

take a look at the exhibits in the case so we're a

little bit more --

BY MR. SCHUSTER:    11:32:49

Q    Not yet.

A    Not yet?

Q    I would like an answer to my question.
How do you know that it was a very positive
environment about Blake Lively prior to August of    11:33:03
2024?

A    Okay.  So let me just correct myself a
little bit.  Before August of 2024, there was a lot
of -- the word of mouth about her was actually
neutral.  So it was neither positive nor negative.    11:33:16
It was just neutral.  And then there was also
positivity as well.  So it was a mix of basically
neutral and positive.  There was just a lack of
negativity.

I know a little -- I mean, I know some    11:33:30

Page 68

things about the word of mouth.  Because I did -- I   11:33:33
did what is something called LDA analysis so I will
look at the topics.  I can tell you what people are
talking about.  You know, there is a lot of talk
about outfits, you know, just sort of, you know,   11:33:47
other celebrities.

So based on that, I would say -- and,
again, based on the fact that there is also a lot of
neutral conversations, I don't -- I don't see any
negativity.  And it seems very natural for people   11:34:03
to -- you know, it seems like the type of celebrity
discussions that, you know, celebrity -- that people
talk about celebrities.  They talk about their
jewelry, their outfits.  You know, the Met Gala
was -- I believe is like a gathering where people --  11:34:16
you know, there is like a big party and celebrities
come and she wears -- I guess she's very
fashionable, I learned.  And so, you know, they
talk -- there was a lot of talk about her outfits,
and people seem to enjoy talking about that.   11:34:32
So I would say that based on my data, it just seemed
like, you know, these were positive, neutral
conversations about celebrities.  That's all I can
say.

Q   When did you -- was there a start date to   11:34:47

Page 69

CONFIDENTIAL

when you began looking at Blake Lively's reputation   11:34:51

online?  Like was there a baseline, as of

August 2024, she was mostly positive, as of

April 2024, she was mostly positive?  Do you have a

start date for me?                                    11:35:11

        A    Yeah, so I did a pull from Pulsar TRAC

Data, and we went back -- I went back to the

beginning of May 2024.

        Q    Is there a type of rating that a

celebrity has that, you know, she had a 50 percent    11:35:30

approval rating, a 90 percent approval rating, a

10 percent approval rating?  Is there anything like

that that exists in your world?

        A    That, I don't know.

        Q    So other than as of May 2024, your        11:35:44

testimony is the online communications about

Blake Lively were very positive; is that correct?

        A    There was a mix of neutral and positive.

             (Audio difficulties here.)

        Q    Do you know whether Blake Lively employed  11:36:14

public relations teams to assist in creating this

very positive or neutral reaction about her as of

May 2024?

             MS. MOSES:  Objection.

             THE WITNESS:  I'm sure she has public      11:36:42

Page 70

relations teams.  I did know about her posts on 11:36:44 Instagram.  So like every other celebrity, every other person, every other celebrity, I'm sure she wanted to convey a positive image.  And she did her best, you know, she posted, and she, you know, 11:37:00 looked her best.  She posted and she dressed well and she gave honest interviews.  So that's all I know.

BY MR. SCHUSTER:

Q    Did you ever speak with any one person on 11:37:08 behalf of Blake Lively?

A    I did not.

Q    Do you know if she had a public relations person or team employed by her in May of 2024?

A    I don't know.  But my inference is that 11:37:37 what seemed like celebrities do, especially high profile ones, so she probably had one too.

Q    Why do you believe that celebrities employ public relations professionals?

A    Public image is very important.  And, you 11:37:55 know, her job -- her job is in the movie industry so, you know, people go to see movies of people they like.  Also, she has these brands and so, you know, there is kind of a commercial, you know, her public -- her image is very important for her also, 11:38:17

Page 71

CONFIDENTIAL

you know, for her brands as well.    11:38:22

And so my assumption would be that there are professionals who are -- you know, there is a big difference between, you know, doing PR to just sort of maintain a positive image and doing PR to    11:38:36 try to manipulate word of mouth in a negative way about someone you don't like.

Q    Of course.  Do you know if Blake Lively ever engaged PR to manipulate social media sites?

MS. MOSES:  Objection.    11:39:00

THE WITNESS:  Everything I read connected to this case made me think that she was, in fact, very careful not to speak -- you know, she wasn't speaking too much to the media.  I remember there was so much change, I think it was in the complaint,    11:39:11 that, you know, there was nothing in there that made me think that she was engaging in that.

BY MR. SCHUSTER:

Q    Do you think she ever spoke negatively about Justin Baldoni?    11:39:22

MS. MOSES:  Objection.

THE WITNESS:  Spoke to her husband?  To her friends?  Spoke to whom?

BY MR. SCHUSTER:

Q    Any -- did she ever speak negatively    11:39:30

Page 72

CONFIDENTIAL

about Justin Baldoni that made its way into the          11:39:35

public sphere?

              MS. MOSES:  Objection.

              THE WITNESS:  You're asking me questions

about personal conversations that I would have no          11:39:42

instance of knowing.

BY MR. SCHUSTER:

      Q    I'm not asking you about personal

conversations.  You're talking about the importance

of PR as it relates to celebrities.  You just said          11:39:51

there's a big difference between celebrities who

have PR.  And there's a big difference between PR

and manipulation, which you have opined my clients

are responsible for.  I asked a question whether

you're aware whether Blake Lively or any of her          11:40:08

representatives ever participated in online

manipulation?  Do you know; yes or no?

              MS. MOSES:  Objection.

              THE WITNESS:  I did not -- you know, I

stick to things that I have data on and that I have          11:40:19

documents and I saw no documents that relate to

that.

BY MR. SCHUSTER:

      Q    Did you look?  Did you research whether

Blake Lively and/or any of her representatives ever          11:40:30

Page  73

participated in online manipulation to improve her    11:40:34

reputation?

MS. MOSES:  Objection.

THE WITNESS:  I did not research that.

It was not part of my assignment.    11:40:44

BY MR. SCHUSTER:

Q    Understood.  Your only assignment was to

research whether the Defendants participated in

online manipulation, at least part one of your

assignment, correct?    11:41:00

A    That is correct.

Q    Have you ever asked Blake Lively and/or

any of her representatives whether they participated

in online manipulation?

MS. MOSES:  Objection.    11:41:18

THE WITNESS:  There was nothing in

anything that I saw that would suggest to me that

this was happening.  And so the thought didn't occur

to me because it just was not something that there

was any evidence -- there was no evidence of that at    11:41:32

all.  So no, I did not.

BY MR. SCHUSTER:

Q    No evidence of what was provided to you

to review, correct?

MS. MOSES:  Objection.    11:41:40

Page 74

BY MR. SCHUSTER:                                              11:41:40

Q    Is it your testimony that out of what you reviewed, you did not see any evidence; is that correct?

A    I saw no evidence based on the research    11:41:49 that I had done.  It did not occur to me.  I did not -- this was not something that was part of my assignment so I did not go into it.

Q    So the only research you did was to review the materials that were provided to you,    11:42:02 correct?

MS. MOSES:  Objection.

THE WITNESS:  That's incorrect.  So I actually gathered a lot of data, so that Pulsar TRAC data was over one million online posts, so I    11:42:13 collected a lot of data myself.

BY MR. SCHUSTER:

Q    And what was the date of the Pulsar collection?

A    So when was it pulled?                    11:42:21

Q    No.  Was there a range for Pulsar?  Does it go from the beginning of time or was there a specific time period you utilize to pull communications?

A    So my report talks about that.  So the    11:42:37

Page 75

CONFIDENTIAL

data range was from May 2024 to February 2025.    11:42:42

Q    So you did not pull or review any online conversations about Blake Lively prior to May 2024; is that correct?

A    That's right.    11:43:04

Q    Did you research, outside of Pulsar, did you or Analysis Group research any online articles, conversations, posts about Blake Lively that existed prior to May 2024?

A    Okay.  So let me just address a little    11:43:25 bit what discontinuity design is in causal inference.  You usually look at sort of time windows.  So before and after the event.  So I looked at a three months' time window.  It's a fairly long time window before August.  So I had    11:43:47 data from May, June, and July and then a longer time window afterwards.  Because when it -- you know, there was also an event in November of 2024.  That's sort of the scientific reason why I looked at three months.    11:44:10

There was also some technical reasons why three months was appropriate.  Because Pulsar actually -- you go back in time -- or can't go back all the way in time so there was some limitations. So one year was, you know, we did a little bit more    11:44:23

Page 76

CONFIDENTIAL

mean, I can write.  You know, I can do some coding,    12:10:08

yeah, sure.

        Q    Okay.  Was the code that was drafted to

do the analysis in this case, was that peer-reviewed

by anyone in the industry?                            12:10:21

            MS. MOSES:  Objection.

            THE WITNESS:  No.

            MR. SCHUSTER:  Okay.

BY MR. SCHUSTER:

        Q    Was the code independently verified by    12:10:39

anyone other than the Analysis Group?

        A    So the code was included as part of the

production.  So the code was shared with -- you

know, with the other side.  And so they could, if

they wanted to, they could definitely rerun it.  So    12:10:57

that's the idea, is that everything is documented.

Everything is there.  You can -- you can recreate

all the graphs.  You can recreate all the analysis.

So I handed in the raw data, the code, and then, you

know, so they could do it.  I don't know.            12:11:14

        Q    Who is they?

        A    Anybody in your firm.  Nicole Alexander.

Anybody else who wanted to rerun it, they could

rerun it.

        Q    Okay.  Has the code been independently    12:11:29

Page 96

CONFIDENTIAL

as you see fit.                                    12:44:52

THE WITNESS:  Okay.  So my -- so my report, in my report I show that -- I show in all these different ways, you know, in different -- you know, I caught the data different ways, different  12:45:04 types of analyses.  I think I do something like, you know, five or six different types of analysis, that there was a change.

There was a sudden change, a discontinuous change in the online word of mouth, in  12:45:15 the online conversations about Blake Lively.  And I show that there was negativity but that there was negativity that wasn't there before.  So the conversations, again, changed from positive and neutral to, you know, there was a sizable amount of  12:45:34 negative conversations.

But I go beyond that.  So I looked at the topics and I looked at, you know, the themes of the conversations.  And the themes really reflected the scenario planning document, you know, the articles  12:45:54 that we know were planted by the Baldoni team.  And based on that, I infer that yes, there was manipulation of social media by the Wayfarer team.

BY MR. SCHUSTER:

Q   You inferred that there was manipulation.  12:46:05

Page 112

why there was a change in opinion about Blake Lively   12:48:34
during the time period that you looked at?

          And if I -- I know you talked to the
business people and you said to the business people,
anything in the marketplace that we should know   12:48:47
about?  But did you consider any other reasons why
there was a change in the online commentary about
Blake Lively during the period of May 2024 to
February 2025?

     A    So I mean, in some sense, I did.  Because   12:49:05
I didn't see any kind of discontinuity in what she
was doing.  So she was doing -- you know, the little
bump video I think was around for a long time.  That
was done a long time ago.  So what Blake Lively was
doing, you know, was fairly stable.                12:49:23

          And so -- and, again, one of the -- like
for example, one of the analysis I did was, I looked
at the themes in the -- like, for example, the
article, the articles planted by the Wayfarer teams.
And I looked at, you know, do you see that sort of    12:49:41
text appearing, you know, those four themes.  Are
they appearing in conversations.

          I saw them appearing in August and not
appearing before.  So there was lots of indications
that, you know -- and same thing for scenario       12:50:00

Page 115

CONFIDENTIAL

planning.  Particular things -- you know, little          12:50:02

bump was just one of many things that was going on.

Production, she was a bully, she was a mean girl,

things were happening on the set, kind of

behind-the-scenes stuff.  Which was exactly the          12:50:13

things that were said in the documents.  And they

were appearing in these conversations in August.

Q    Okay.  What articles were -- I think you

used the word "planted" by the Wayfarer teams.  The

Wayfarer team.                                           12:50:29

A    Yeah.  So there were two articles that I

used.  One was a Variety article and then the other

one was, I think, The Daily Mail.

Q    And what do you mean by "planted"?

A    So they were -- there was a publicist who  12:50:41

fed certain talking points to the author.

Q    What is wrong with that?

MS. MOSES:  Objection.

THE WITNESS:  What is wrong with that?

BY MR. SCHUSTER:                                         12:50:58

Q    Yes.

A    In theory, that's not wrong.  But in this

case, it spread this kind of -- you know, these kind

of themes that amplified those themes and spread

them.  It harmed Blake Lively's reputation.             12:51:08

Page 116

CONFIDENTIAL

the question.                                          12:59:35

BY MR. SCHUSTER:

Q    Were any of her actions -- could any of
her actions as they relate to Justin Baldoni be
viewed as negative?                                   12:59:43

MS. MOSES:  Objection.

THE WITNESS:  This really seems beyond.
You know, you're asking me to make a value judgment.
Which I am not comfortable.

BY MR. SCHUSTER:                                      12:59:50

Q    No, I'm asking you to tell me whether
there are other factors that could have or should
have been considered in your opinion.

Your opinion is, based upon a spike, it
had to be the Defendants, or because I saw this       01:00:01
planning scenario, it had to be the Defendants.

I'm suggesting that there are other
things that could have or should have been
considered by you when trying to determine why there
was a spike in online activity.                       01:00:12

MS. MOSES:  Objection.  Wait for a
question.

BY MR. SCHUSTER:

Q    So if Blake Lively told costars to
unfollow Justin Baldoni, that could be viewed as      01:00:24

Page 124

CONFIDENTIAL

being a bully or mean.  That could prompt online          01:00:28

commentators to opine that she's not a very nice

person.  Would you agree with that?

MS. MOSES:  Objection.

THE WITNESS:  So what you're telling me     01:00:44

just still doesn't explain all the data.  Right?

So, you know, even if she -- okay, so she says to

unfollow him.  Then why all this information about

what happened on the set?  And also, why would it be

-- you know, if there is one or two people, you     01:01:02

know, putting on something on social media, which

seems odd that they would do that, why would it take

off with such a force?  No, I don't think that's

plausible either.

BY MR. SCHUSTER:                                     01:01:16

Q    Have you ever worked on a movie set?

MS. MOSES:  Objection.

THE WITNESS:  I have not.

BY MR. SCHUSTER:

Q    Have you ever worked on a case involving   01:01:20

a movie?

MS. MOSES:  Objection.

THE WITNESS:  Yes.

BY MR. SCHUSTER:

Q    Okay.  Are you familiar with the          01:01:27

Page 125

CONFIDENTIAL

MS. MOSES:  Objection.                          01:06:49

THE WITNESS:  So I think that -- what I think about it is the following:  You know, how does a manipulation campaign work?  You know, you kind of have to get the ball rolling.  You get -- you know,    01:06:59 you put these tidbits, you know, and negativity is much more sticky than -- you know, and you put these kind of negative things about the person or the brand.  And then you're hoping that it will get amplified by others.                              01:07:16

I think what happened in this case was the Wayfarer team got the ball rolling, played some stories, worked with Street Relations to amplify, to take down accounts, you know, and then, yeah, people reacted, people were interested, people passed the       01:07:34 information on and so forth.

So there is still -- the Wayfarer -- my sort of -- you know, my point is that my data tells me that this wouldn't have happened on its own. That the Wayfarer -- you know, there was a presence    01:07:54 of a manipulation.  You know, I can't tell exactly how much of it was it -- was every comment posted? Was it 10 percent of the comments?  Was it 5 percent of the comments?  But they lit the match that then burned the forest.                                  01:08:09

Page 131

CONFIDENTIAL

She's apologized for it.  So it's factual.  It          01:15:35
happened.

My point being, there are things that
happened in Blake Lively's past.  That's my analogy
to something being dormant.  Did you consider that      01:15:44
any of these underlying past acts by Blake Lively,
these dormant acts, could have organically begun to
be talked about in the August time period because of
other acts that Blake Lively did, things she said,
or acts that she took that resurrected people           01:16:04
talking about her past?  Did you consider that?

A    Again, going back to my data, which is
really the thing that I have.  You know, that's my
expertise.  What I see is this kind of a change.
Also, I see that the themes that are talked about       01:16:23
very, very closely mirror the themes that the
publicity team for Baldoni placed into the articles
and also that had in the scenario planning.

So no, I don't think it's plausible that
this stuff kind of appeared on its own.  I think,       01:16:42
you know, people worked to make it appear.

Q    Were there things talked about that were
not a part of the themes that you saw in the
scenario planning?

Were there conversations, negative          01:16:59

Page 138

CONFIDENTIAL

BY MR. SCHUSTER:                                          01:22:52

          Q    Okay.  But your report talks about a

causal relation between planting a seed and your

allegation that the Wayfarer parties are responsible

for initiating a retaliation campaign and the result  01:23:00

of that.

               My question is:  Isn't it possible that

there are other alternatives to the Wayfarer parties

putting stories out there about Blake Lively?

               MS. MOSES:  Objection.                   01:23:19

               THE WITNESS:  You know, I can't rule out

every single alternative hypothesis, you know, that

maybe the aliens landed, maybe something crazy

happened.  But what I can tell you is, based on my

data, I see this discontinuous change in the tone of  01:23:37

the conversations, in the volume of the

conversations, and the themes of the conversations

in a way that reflects directly the documented

evidence in how the Wayfarer team was thinking

about, you know, which points would stick.  And       01:23:52

that's what I see in my -- and that's what I'm happy

to talk about.

BY MR. SCHUSTER:

          Q    Okay.  I'm not talking about aliens.  I'm

talking about real people like the bullied female AD  01:24:01

Page 144

CONFIDENTIAL

like to show you an exhibit.  I'm just going to talk   02:29:49
to my associate Jordan about how to get this to you.
Has that been loaded?

MS. BIENER:  I just introduced it.  So if
she refreshes it, it should be there.   02:29:56

(Exhibit 2 marked for identification.)

MR. SCHUSTER:  Okay.  So Professor, I
think you have to hit refresh and then --

THE WITNESS:  I just see my report, but
maybe I'm -- hold on.  I see it.  It's loading.   02:30:17
Okay.

BY MR. SCHUSTER:

Q   So I'm going to show you -- do you have
it, Professor?

A   I have it, yup.   02:30:25

Q   Okay.  I'm going to show you a two-page
document that is Bates-stamped SPE_WF0000793 and
794.  And I would like to direct your attention to
the second page of the document which has the text
on it.  Let me know if you have that.   02:30:46

A   Okay.

Q   Now, you've stated there is no plausible
explanation for the spike of online activity in
August of 2024.  And what I'm showing you is a text
exchange between two executives at Sony.   02:31:02

Page 168

CONFIDENTIAL

And as we talked about earlier, Sony was    02:31:05
involved in the production and financing of the
movie It Ends with Us.  Okay?

And I'm going to read from you -- read
for you the exchange.  Starts with Sanford Panitch.    02:31:18

(As read):

"It's quite ironic because she has a

huge hit movie 2- 300 million plus.

And probably will never work again or

not for a while, although even Hathaway    02:31:31

recovered.  Tom thinks she's probably

and bizarrely unhirable right now."

The response from the person identified
as "Home" is:

"This will pass.  She is going to be    02:31:43

fine."

That individual then responds:

"An apology to that reporter would

help.  Something to survivors too other

than a 24-hour thing or her Insta    02:31:56

stories too."

Mr. Panitch then responds:

"No.  Disagree.  She is done for.  At

least for a while.  It's cooked.  She

said she is retiring to Josh or    02:32:06

Page 169

CONFIDENTIAL

something.  It will take a few years.    02:32:08

Eva Mendez time.  She did it to

herself.  If she just let him come to

the premiere or didn't make all the

cast unfollow him or kick him off the    02:32:19

movie and did what everyone else has

done in show business for time and

memorial which is protect 'the show'

then none of the sleuthing would have

happened.  The hair sell at the same    02:32:32

time was epic level stupid.  She

wouldn't listen.  She knows better."

I don't know what the next word is --

"Intl is astounding 150 and 150 and

could be more."                          02:32:49

Did I read that correctly?

Professor, did I read that email exchange correctly?

A    Oh, did you read it like outloud, yeah, you did.                                     02:33:01

Q    Okay.  Would you agree that these Sony executives have a different opinion than yours as to what could have caused the Blake Lively backlash?

MS. MOSES:  Objection.

THE WITNESS:  I mean, you're showing me    02:33:19

Page 170

CONFIDENTIAL

an exchange between two executives just kind of          02:33:20

gossiping about Blake Lively.  Sure.  I mean, I have

a million records, more than a million records.

Would love to talk about that.

BY MR. SCHUSTER:                                         02:33:33

    Q    I know.  But my question is:  Would you

agree that these two Sony executives agree that

Blake Lively bears responsibility for her actions?

        MS. MOSES:  Objection.

        THE WITNESS:  They are just the -- sure.   02:33:46

They are saying stuff about her.  They are blaming

her for everything.

BY MR. SCHUSTER:

    Q    That doesn't sit well with you?

        MS. MOSES:  Objection.                   02:33:56

        THE WITNESS:  It just has nothing to do

with my data or my analysis or what I was hired to

do.  Why I'm here but...

BY MR. SCHUSTER:

    Q    Does your data or analysis support the    02:34:04

claim that the Defendants manipulated any algorithms

on social media sites?

    A    Algorithmic manipulation, my report

doesn't talk about that.  Mentions it but doesn't --

I don't look for that.                                  02:34:23

Page 171

CONFIDENTIAL

was kind of that tension, was because of the                02:44:36

article, was because of the lawsuits being filed

and, you know, the speculation around the lawsuits

but the type of conversations that people were

having were still -- you know, those themes that            02:44:53

were planted back in August, we see them again

spiking in December.  And it really follows the same

kind of pattern.

         So I would say yes, the fact that the

lawsuit was filed, the complaint was filed, and the         02:45:11

lawsuit was filed renewed attention to the topic.

But also, again, the seeds that were planted in

August, you know, again, were in that -- you know,

the same kind of topics, you know, oh, the set, the

production, whatever, the bullying, all these things        02:45:29

that were planted came up again.  So that's why I

wanted to show both graphs.

    Q    Thank you.  And, again, just to confirm,

neither you or anyone from the Analysis Group have

ever spoken with, met with, or communicated with any        02:45:42

poster, any person that has posted on social media;

is that correct?

    A    That's correct.  And I really wasn't --

you know, I wasn't a part of the analysis.

    Q    Okay.  Now, you constructed a set of               02:45:58

Page 179

CONFIDENTIAL

A    Yeah, I think so.                               02:53:26

_____

Q    And what training did those analysts have to work with you on this?

A    So by design, I would want human raters     02:53:40 not to be super trained.  Like not to have too much information about Blake Lively or anything like that.  So they were blind to the case.  They were not working on the case, they were working on some other cases, and they were given very detailed     02:53:54 instructions.  And that's listed in Appendix C of my report.

Q    Did they know that this case involved Blake Lively or, as you said, did you say blind so they have no idea --                                  02:54:07

A    Blind, yeah.  They just -- I mean, they knew that -- the only thing they knew is that the posts were about, you know, Blake Lively or Ryan Reynolds.  But they didn't know the nature of the case, they weren't working on the case.  They      02:54:21 were not involved in the case in any way.

Q    Okay.  Large language model, has that achieved acceptance in the scientific community as a reliable substitute for traditional sentiment analysis methods?                                   02:54:45

Page 185

CONFIDENTIAL

A    So my answer will be yes.  So I use a    02:54:49
model called GPT-4o, and it's a transformer model.
Prior to GPT-4o, you know, sort of the prior version
of this type of model, which wasn't large language
model but was what is called a transformer model    02:55:05
just like, you know, the GPT, the T -- you might be
familiar with ChatGPT, but this is the engine behind
ChatGPT.

So the T actually stands for transformer.
And so prior to that, there were something called    02:55:18
transformer BERT was the Google transformer model.

But yeah, absolutely.  So the state of
the art now in the industry and also in academia are
to do sentiment analysis, is to use these kind of --
to use a large language model.  And GPT-4o is    02:55:34
probably the most popular model for that.

Q    Okay.  And is it your opinion that the
marketing science community has reached a consensus
on the reliability of large language model?

A    I think so.  You know, and I say this as    02:56:01
a -- I was just an associate editor of a journal
called Marketing Science, which is our top journal.
And I will give you an example.  If an author had a
paper that used BERT for example, which is kind of
the old version, people would just say why don't you    02:56:13

Page 186

CONFIDENTIAL

just use GPT-4o.                                        02:56:16

So I think it is pretty much the standard

thing now.  It's really effective which is why it's

taken over in a short amount of time.  The other

thing -- maybe I'm over-sharing a little bit -- the   02:56:35

other thing that it's really -- these LAR models are

really good at is that they -- their inputs are

sensitive to the context.

So Appendix C describes the prompt they

give.  And it basically allows you to ask questions   02:56:51

about, you know, what is your attitude about

Blake Lively.  Versus something like BERT, it just

kind of pretrained on -- you know, it doesn't really

allow you to take that as input.  So it's just like

is this positive or is this negative?  And here, you  02:57:05

can ask a more specific prompt.

Q    The spike that occurred in August of

2024, did that occur across multiple social media

platforms?  Or I think you looked at three?

A    Yeah, absolutely.  So I don't actually    02:57:31

differentiate between like -- you know, I think we

did do some robustness where we looked at the

patterns were similar across the platforms.  The

figures I give are actually aggregated across all

platforms.  But the patterns are similar.  Yeah, you  02:57:46

Page 187

prove manipulation?  Or is it your opinion that that 02:59:58 is the only thing you need to do to prove manipulation?

A  I would never assume that.  That's why -- this is just one out of many figures.  Right?  I 03:00:09 think the volume analysis is kind of the first thing I do.  I think I do six or seven different analysis. This is just the beginning.  By itself, absolutely not.  It would not prove anything.  But taken together as a portfolio of all of these different 03:00:26 analysis, look at the themes, the sentiment, and so forth, yes, then it works together.  My report works as a portfolio of analysis.

Q  Are you familiar that the entertainment industry -- withdrawn. 03:00:44

Would you agree that social media surrounding the entertainment industry is inherently volatile and prone to spikes?

MS. MOSES:  Objection.

BY MR. SCHUSTER: 03:01:00

Q  Or you don't know?

A  I don't know.

Q  Okay.  You had made reference to findings from Nicole Alexander in her report that you found, and I forgot the word that you used.  Curious or 03:01:42

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

troubling?                                              03:01:44

    A    Interesting choices.

    Q    Interesting choices.  Thank you.

         Can you tell me what about

Ms. Alexander's report did you believe to be          03:01:51

interesting choices by her?

    A    Yeah.  How long do you have?  You have a

storm coming?

    Q    I have a storm coming.  So if you can

give me kind of high level of that.                   03:02:06

    A    Yeah, so the first thing is that my team

at AG had trouble replicating her results.  I don't

think she provided sort of, you know, the data

really or the codes.  There were sort of a lot of

irrelevant posts.  A lot of the data that she         03:02:29

provided had nothing to do with Blake Lively.  So

she pulled her data kind of in a strange way.  So

there is a lot of sort of uncertainty about what she

did and how she did it.

         So there is kind of lots of questions       03:02:45

about what exactly she did.  I also saw some issues

with citations.  So for example, I'm cited.  My work

is cited three times in a way that makes no sense to

me.  She cites me incorrectly.  She makes a

conclusion that is not in my paper at all, you know,  03:03:10

Page 190

CONFIDENTIAL

even the topic of the paper is not what she says it    03:03:12
is.  It just makes no sense to me.  I couldn't even
figure out what was going on with that.

And there are a couple of citations that
look hallucinated.  They have -- they don't exist    03:03:27
basically, so there's -- or the name or titles are
off.  So, again, that usually happens when -- I
mean, I don't want to say that's what she did at all
because that's not my place.

But if this happened to one of my    03:03:45
students, I would say they were maybe using AI to
generate citations.

And then there are lots of statements
that are made that are just not true and not based
on anything that I just don't agree with.  How    03:03:57
things are manipulated, that's just not what the
literature says.  And some statistical -- I feel
like -- there was a statistical significance that
was made on just very few data points.  That's not
really -- that's not really allowed.    03:04:14

I would say just a bunch of different
issues from the beginning to the end, you know,
logic, data, citations, so I -- you know, I was
surprised.

Q    Now, in addition to opining upon the    03:04:35

Page 191

CONFIDENTIAL

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.  Dated this 3rd day of December, 2025.

ASHLEY SOEVYN, CSR No. 12019

Page 202

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127