# EXHIBIT Q

CONFIDENTIAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

BLAKE LIVELY,

Plaintiff,

v.                            Case No.

1:24-cv-10049-LJL

WAYFARER STUDIOS LLC, a

Delaware Limited Liability

Company, et al.

Defendants.


* * * * * * * * * * * * * * * * * * * * * * * * * *

*** CONFIDENTIAL ***


VIDEOTAPED DEPOSITION OF:

ARON CULOTTA


Thursday, November 20, 2025

10:01 a.m. (CST)

New Orleans, Louisiana


Reported by:   YOLANDA J. PENA, CCR, RPR

No. 2017002 in and for the

State of Louisiana


Page 1

Veritext Legal Solutions

Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

A P P E A R A N C E S

FOR THE PLAINTIFF:

WILLKIE FARR & GALLAGHER LLP

(BY:  KRISTIN BENDER, ESQ.)

(BY:  JULIET DALE, ESQ.)

1875 K STREET, NW

WASHINGTON, D.C.  20006

(202) 303-1245

kbender@willkie.com

jdale@willkie.com

- AND -

MANATT PHELPS & PHILLIPS LLP

(BY:  SARAH E. MOSES, ESQ.) [via Zoom]

2049 CENTURY PARK EAST, SUITE 1700

LOS ANGELES, CALIFORNIA  90067

(310) 312-4128

smoses@manatt.com

FOR THE DEFENDANTS:

LINER FREEDMAN TAITELMAN + COOLEY LLP

(BY:  AMIR KALTGRAD, ESQ.) [via Zoom]

(BY:  BRYAN J. FREEDMAN, ESQ.) [via Zoom]

1801 CENTURY PARK WEST, 5th FLOOR

LOS ANGELES, CALIFORNIA  90067

akaltgrad@lftcllp.com

bfreedman@ftllp.com

- AND -

AHOURAIAN LAW

(BY:  MITRA AHOURAIAN, ESQ.) [via Zoom]

2029 CENTURY PARK EAST, SUITE 400

LOS ANGELES, CALIFORNIA  90067

(310) 376-7878

mitra@ahouraianlaw.com

Page 2

CONFIDENTIAL

A P P E A R A N C E S (Continued)


FOR THE DEFENDANTS:
     MEISTER SEELIG & FEIN PLLC
     (BY:  JOAQUIN EZCURRA, ESQ.) [via Zoom]
     (BY:  JORDAN BIENER, ESQ.) [via Zoom]
     125 PARK AVENUE, 7th FLOOR
     NEW YORK, NEW YORK  10017
     je@msf-law.com
     jb@msf-law.com
             - AND -
     SHAPIRO ARATO BACH LLP
     (BY:  ALEXANDRA SHAPIRO, ESQ.) [via Zoom]
     500 FIFTH AVENUE, 40th FLOOR
     NEW YORK, NEW YORK  10110
     (212) 257-4881
     ashapiro@shapiroarato.com

     (BY:  JONATHAN P. BACH, ESQ.) [via Zoom]
     1140 AVENUE OF THE AMERICAS, 17TH FLOOR
     NEW YORK, NEW YORK  10036
     (212) 257-4880
     jbach@shapiroarato.com



     ALSO PRESENT:

          MORGAN WILLIAMS, VIDEOGRAPHER

          MAGGIE KANE, EXHIBIT TECHNICIAN [via Zoom]

Page 3

perform a causal analysis, but I would say that there are many indicators here of a connection between this activity and the defendants.

BY MR. KALTGRAD:

Q.    And what are the indicators that you're referring to?

A.    So this would be the -- kind of the -- the main points in the document, right.  So the analysis of those three platforms, TikTok, Reddit, and YouTube, and the anomalous behavior that -- that I find therein.

Q.    Okay.  So my understanding from your report is that you've analyzed certain characteristics of TikTok, Reddit, and YouTube, and you found that -- your opinion is that there may be some inauthentic online activity.

What expertise do you have to link any of that to a defendant that a layperson wouldn't have?

A.    I --

MS. BENDER:  Objection.

A.    I would say my role here was -- my expertise here is primarily on the analysis of the social media itself.  I would say the links to the defendants primarily are derived from the discovery documents, which mentioned certain specific platforms, posts, and articles that feature very prominently as outliers in my analysis.

Page 19

BY MR. KALTGRAD:

Q.   So your opinion regarding the defendant comes from reviewing discovery documents; is that right?

MS. BENDER:  Objection.

A.   Again, my opinion is primarily looking at indicators of inauthenticity, and the links that are made to the defendant come from the results of that analysis paired with the discovery documents, which identify both the timing and the content that is consistent with what I find in the analysis.

BY MR. KALTGRAD:

Q.   When you're using the word "inauthentic," are you including boosting comments that are already on the internet as opposed to placing comments on the internet?

MS. BENDER:  Objection.

A.   I would consider both of those as types of inauthentic activity, yes.

BY MR. KALTGRAD:

Q.   Have you identified any instance where somebody added false content to Reddit, TikTok, or YouTube?

A.   My analysis wasn't really focused on the -- the truth or -- or falseness of different statements.

Q.   You're not intending to offer an opinion on

Page 20

CONFIDENTIAL

Q.   Okay.  And it says -- paragraph 52 says, [As read]:  "To assess whether there is evidence of manipulation present among this set of videos, I analyzed patterns in engagement metrics on posts and comments.  Specifically, I calculated the proportion of the number of likes on the top comment vs. the number of likes on each video (the 'Top-Comment Share').  Research -- researchers have found that deviations in engagement ratios such as this can act as reliable signals of potentially manipulated activity."

First of all, what do you mean by "manipulation"?

A.   In this case, the manipulation would be an -- an effort to boost certain comments attached to the specific videos.

Q.   And you cite a number of academic articles.  Is there any peer-reviewed study that you're aware of that found in the proportion of likes on a top comment compared to its parent post on TikTok is indicative of manipulation?

MS. BENDER:  Objection.

A.   I'm not aware of a super specific version of that.  I would say the literature I cite are all variants of that, looking at different ratios or comparisons between different types of engagement

Page 32

measures as an indicator of inauthenticity.

BY MR. KALTGRAD:

Q.   Well, are you aware of any study that says that the proportion of likes on a top comment on any social media platform compared to its parent post is indicative of manipulation?

MS. BENDER:  Objection.

A.   Again, I'd have to reconsider to see that specifically.  I would say certainly one of the ones I cite looks at anomalous behavior on YouTube, and the number of likes and views and comments are all used to detect that inauthenticity.

BY MR. KALTGRAD:

Q.   And which one -- which cite is that that you're referring to?

A.   This would be the Kirdemir 2023.

Q.   And what is the (indiscernible) study that applies here?

THE REPORTER:  I'm sorry.  Can you repeat the question?

BY MR. KALTGRAD:

Q.   What is the finding of that study that applies here?

A.   Again, I'd have to look at it again in more detail.  But based on my recollection, they were

Page 33

looking at how the correlation amongst different types of engagement metrics can be -- serve as a strong indicator of inauthenticity.

Q.   Okay.  But there -- there are lots of different engagement metrics.  I'm asking are you aware of any study that says the ratio of likes on a top comment to likes on a parent post is indicative of manipulation?

MS. BENDER:  Objection.

A.   I'd have to double-check, but again, I would say this is -- this is a -- this paper is -- is following the -- a very similar methodology for YouTube.

BY MR. KALTGRAD:

Q.   Other than this paper that you cited, can you cite to any other peer-reviewed article, study, that would indicate that likes on a top comment in proportion to likes on a parent post would be indicative of manipulation?

MS. BENDER:  Objection.

A.   Again, I can't recall right now one that is that specific.  I would say the earlier cite to Yang is a similar type of comparison on the Twitter platform.

BY MR. KALTGRAD:

Q.   Well, you didn't analyze Twitter in this case,

Page 34

right?

A.   No, sir.

Q.   Paragraph 53, you say, "I reviewed the Top-Comment for each post in the dataset and coded whether it expressed positive or negative sentiment toward Ms. Lively, positive or negative sentiment toward Mr. Baldoni, or neither."

How did you decide whether a comment was positive or negative towards Mr. Baldoni or Ms. Lively?

A.   So as this says, I analyzed it based on the content itself and the context, and then we also had a second annotator label these separately to get measures of kind of agreement.

Q.   Okay.  So you read the comments, and then you made a judgment call.  This is pro-Lively or anti-Lively.  Is that basically what you did?

A.   More or less.  And yes, these are all available in our -- in our backup data as well.

Q.   Do you have any specific expertise in analyzing whether comments are pro or anti in any way?

MS. BENDER:  Objection.

A.   Well, I mean, so I've been doing research in social media since around 2009, and so I've spent a lot of time staring at posts and comments and trying to contextualize them and understand them, including for

Page 35

sentiment analysis.  So I would say I've -- I've done quite a bit of this type of work before.

BY MR. KALTGRAD:

Q.   I see.  Is there some kind of protocol that you used to decide what's pro-Lively or anti-Lively or pro-Baldoni or anti-Baldoni, or is this sort of your gut feeling?

MS. BENDER:  Objection.

A.   I wouldn't characterize it as a gut feeling. I would say, you know, you typically have a -- kind of the point of the -- the secondary review is to kind of measure that agreement to determine whether there's ambiguity in these things, but again, I would refer to the backup documents we produced for any concerns around that labeling process.

BY MR. KALTGRAD:

Q.   But was there -- I'm going -- I'm going to go back to my question.

Was there some kind of protocol you used?  Did you say if it's got this term, it's going to be pro-Lively; if it's got this term, it's going to be anti-Lively?

A.   It wasn't certainly term-based like that.  It was based on the entire context of the post.

Q.   Okay.  So you read the comment, you made a

coder was, right?

MS. BENDER:  Objection.

A.   Again, not as I sit here today.

BY MR. KALTGRAD:

Q.   Okay.  And you're not sure exactly what instructions they were given, correct?

MS. BENDER:  Objection.

A.   I would say I had a high-level understanding of what the -- the instructions were, but I did not specifically sit down and -- and write those instructions out myself.

BY MR. KALTGRAD:

Q.   Are you -- are you aware of any peer-reviewed study that says having a second reviewer do a sentiment analysis determines credibility for the first reviewer?

A.   Yes, I would say it's quite common to do this sort of reliability test to -- to validate the annotation.

Q.   Do you cite any examples of studies that you know of as you sit here?

A.   Off the top of my head?

Q.   Yeah.

A.   Excuse me.  So I can't recall, like, exact full citations right now.  Again, my own work has done this in the past, and it's very common in this field.

Page 42

I would say anytime a -- it's very common when a researcher produces a new dataset, for example, to -- to provide these inter-annotator reliability measures because that adds validity to people who then use that dataset in the future.

Q.   How did you determine what the 300 sample volume set was going to be?

A.   That was a random sample.  It's a uniform random sample.

Q.   And who did the random sample?  Was that you, or did Voluble do that?

A.   I can't recall all the specifics right now, but if I had to estimate, I would say probably Voluble generated that sample.

Q.   Do you know how it was done?

A.   So again, I didn't -- I don't recall the specifics, but typically, one would use a random number generator to shuffle the instances in order to pull the 300 to be labeled.

Q.   Okay.  That's typical, but you're not sure if that's what was done here, correct?

MS. BENDER:  Objection.

A.   My recollection is that that's what was reported to me as being done.

BY MR. KALTGRAD:

CONFIDENTIAL

MR. KALTGRAD:  Dr. Culotta, I'm now looking at --

THE VIDEOGRAPHER:  We are going back on the record.

MR. KALTGRAD:  Oh, I'm sorry.

THE VIDEOGRAPHER:  The time is 11:21.

You're all good.

BY MR. KALTGRAD:

Q.   Dr. Culotta, I'm now looking at paragraph 54 of your report.  If you could, turn there.  And towards the bottom of paragraph 54, it says, "Both the anti-Lively and pro-Baldoni average comment shares are a statistically significant deviation from the mean, suggesting there was a concerted effort to seed and/or elevate these comments."

On what basis do you draw the conclusion that a deviation from the mean means a concerted effort to seed and/or elevate the comments?

A.   So I guess there would be two -- two primary issues here.  One, the -- such a large deviation from the mean is an indicator of anomalous behavior, right, something that is not typical of a TikTok user.

But the second reason has to do with this top comment idea in the first place via the interface, right.  So on TikTok, of course, it's very video-based,

Page 58

CONFIDENTIAL

and typically, one is scrolling through videos.  So the user effort required to first open up the comment section, scroll to a comment, and upvote it is just, from a user perspective, a very kind of unusual thing to do at that level of frequency.

So both the anomalous statistics that I talk about as well as kind of the anomalous engagement with the platform itself, both serve as indicators that this was done through a concerted effort.

Q.  How much of a standard deviation would have to occur to reach the conclusion that there was concerted effort?

A.  Again, there's no strict threshold here.  I did a statistical test to determine the significance level of that deviation, and that's in footnote 145.  And all of those are your confident very small p values, which serves to indicate that they were extreme outliers.

Q.  And when you say "deviation from the mean," you're referring to the mean top comment share for August for the four different categories that you've listed there, right?

A.  It's the mean over all -- over all top comments in August.

Q.  And that's reflected in Figure 1?

Page 59

CONFIDENTIAL

A.    Yes, sir.  That's the 9.2 percent in Figure 1.

Q.    How did you calculate the top comment share mean?

A.    So for every top comment in August, each one has a top-comment share value, and I simply averaged those over all of the top comments collected for August.

Q.    Is it your opinion that unless there is a -- strike that.

Are you offering the opinion that if there is a standard deviation from the mean for either anti-Lively, pro-Baldoni, pro-Lively, or unsure/unrelated categories, that would equate to a concerted effort to seed or elevate the comments?

MS. BENDER:  Objection.

A.    I'm not offering that one standard deviation is -- is a threshold, necessarily.

THE REPORTER:  I'm sorry.  Can you repeat that?

A.    I'm not offering that one standard deviation is a threshold.  What I am saying is that this significant deviation from the mean combined with the modality of the app itself contextually serve as -- as strong evidence of a concerted effort here.

BY MR. KALTGRAD:

Page 60

similar language, that's evidence of manipulation?

A.    I'm saying that the strikingly similar language, combined with the anomalous-like values together, are indicators of potential coordinated behavior, yes.

Q.    Is the description of "strikingly similar language" based on any methodology?

A.    This particular analysis is -- is -- is just based on a qualitative analysis of these particular comments.

Q.    So just your view that these are -- look like strikingly similar language?

MS. BENDER:  Objection.

A.    In this particular example here, it's looking at, for example, the word "me" and the -- the types of comments that are being made around that.  I think they do look strikingly similar.

BY MR. KALTGRAD:

Q.    Okay.  So when you said the word "me," to you, combined with the number of likes, suggests online manipulation?

MS. BENDER:  Objection.

A.    Again, I mean, it's not just the single word "me," of course.  But it's the context of just being used in these comments serves as an additional marker

Page 70

CONFIDENTIAL

Q.   Are TikTok users able to dislike comments?

A.   I'm trying to remember as I sit here.  I know there was some back-and-forth on that.  I'd have to double-check.  But my -- my current recollection is no, but that is something that's changed on the platform.

Q.   Okay.  If they were able to dislike comments, would that analysis of dislike of comments been useful to your report?

MS. BENDER:  Objection.

A.   I'm not going to speculate on that right now.

BY MR. KALTGRAD:

Q.   But you didn't analyze any dislike of comments, correct?

A.   My focus was not on the dislike behavior on TikTok, correct.

Q.   You say your focus, but you didn't analyze it at all, right?

A.   Only to the extent it would have influenced the data directly, but I did not perform an analysis of dislikes on TikTok, no.

Q.   You also talk about inauthentic activity on Reddit, and you refer to a comment score.  What is a comment score?

A.   So a comment score is provided by the platform that is roughly the difference between the number of

Page 75

CONFIDENTIAL

upvotes that comments received minus the number of downvotes that comments received.

Q. And how is it calculated exactly? Do you know?

A. So the exact algorithm is not publicly published by Reddit. Part of the reason is they're trying to prevent manipulation of that metric. But what we do know is -- is, as I said, it's roughly that difference between upvotes and downvotes.

Q. And you were offering the opinion that because there was a high comment score on a specific Reddit thread in August 14th, 2024, that's evidence of some kind of manipulation; is that right?

MS. BENDER: Objection.

A. I would say the Reddit analysis is broader than that specific thing, but yes, I would say the extreme outlier activity we see on August 14th is a strong indicator of potential inauthentic activity.

BY MR. KALTGRAD:

Q. Are you aware of any peer-reviewed study showing that a comment score on Reddit is indicative of social media manipulation?

A. Again, I think some of the literature we discussed earlier that focuses on anomalous engagement metrics would -- would support this type of analysis.

Page 76

indicators that there was manipulation attempts for this.

Q.   Okay.  But have you -- does your analysis tie back to a defendant in any way?

MS. BENDER:  Objection.

BY MR. KALTGRAD:

Q.   Are you offering an opinion that defendants were behind boosting of this content?

MS. BENDER:  Objection.

A.   Again, my goal is not to perform a causal analysis here.  It was primarily to look at indicators of inauthenticity.  And in this case, the timing and the content and the type of video this was is consistent with that link, but I did not perform a causal analysis for that specific question.

BY MR. KALTGRAD:

Q.   So what analysis did you perform in terms of the YouTube video?

THE REPORTER:  I'm sorry?

BY MR. KALTGRAD:

Q.   What analysis did you perform for the YouTube video?

A.   Sure.  So my analysis here was twofold:  one, to look at the timing of comments that were made on the YouTube video related to this -- to this link; and

Page 93

secondly, to look at the presence of particular terms, such as the term "bully," that appeared in those comments.

Q.   What expertise do you have that a layperson would not have to look at comments and the timing?

A.   Well, for sure, there's a lot that goes into collecting, cleaning, and analyzing the data in order to answer those types of questions, as well as the text analysis to pull out particular words of interest in the -- in the data.

Q.   And what particular words did you pull out?

A.   So in this case, we were looking at the word "bully" and a couple variants of it.

Q.   Are you aware of any peer-reviewed study that says that pulling out terms and comments, looking at the timing is indicative of online manipulation?

MS. BENDER:  Objection.

A.   So yes, I would say -- I would say that the literature we cite in this report, some of which we've discussed, looks at anomalous engagement and language behaviors as signals of inauthenticity.  I would say that this analysis falls into that camp.

BY MR. KALTGRAD:

Q.   Okay.  So you've seen -- what did your analysis -- you know, what did your analysis reveal

Page 94

CONFIDENTIAL

REPORTER'S PAGE

I, YOLANDA J. PENA, Certified Court Reporter in and for the State of Louisiana, (CCR #2017002), Registered Professional Reporter (RPR #970346), the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, do hereby state on the record:

That due to the interaction in the spontaneous discourse of the proceeding, double dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a transcription of proceedings, and that the double dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any spelling of words and/or names which could not be verified through reference material have been denoted with the parenthetical "(phonetic)";

That the parenthetical "(sic)" is used to denote when a witness stated a word or phrase that appears odd or erroneous to show that it was quoted exactly as it stands.

YOLANDA PENA, CCR, RPR

Page 100

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127