# EXHIBIT W

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

BLAKE LIVELY,                        )
                                     )
   Plaintiff,                        ) Civil Action No.
                                     )
   vs.                               ) 1:24-cv-10049-LJL
                                     )
WAYFARER STUDIOS LLC, a              ) (Consolidated for
Delaware Limited Liability           ) pretrial purposes
Company, JUSTIN BALDONI, an          ) with
Individual, JAMEY HEATH, an          ) 1:25-cv-00449-LJL
Individual, STEVE SAROWITZ, an       ) Rel:
Individual, IT ENDS WITH US          ) 1:25-cv-00779-LJL
MOVIE LLC, a California              )
Limited Liability Company,           )
MELISSA NATHAN, an Individual,       )
THE AGENCY GROUP PR LLC, a           )
Delaware Limited Liability           )
Company, JENNIFER ABEL, an           )
Individual, JED WALLACE, an          )
Individual, and STREET               )
RELATIONS INC., a California         )
Corporation,                         )
                                     )
   Defendants.                       )

VIDEOCONFERENCE DEPOSITION OF

ASHLEE HUMPHREYS, Ph.D.

November 25, 2025

Stenographically Reported by:

ANDREW R. PITTS, CSR, RPR

Page 1

MS. BENDER:  Objection.

BY THE WITNESS:

A.    I would not be surprised.  For the people who received his comments, that did not emerge in my impact analysis at all.

BY MR. SCHUSTER:

Q.    On page 5 -- and I apologize, towards -- it's B, the At-Issue Statements.

Do you see that paragraph?

A.    I do.

Q.    It reads, "The at-issue statements harmed Ms. Lively's reputation by introducing new negative associations and strengthening existing negative associations with her in the public sphere."

What statements issued by Bryan Freedman were new negative associations?

A.    So the ones that I have -- one of them that I find in my analysis is the association with Ms. Lively as a liar that would lie in a government proceeding or document.

Q.    Do you know if Mr. Freedman believed in the statement he made at the time that he made it?

MS. BENDER:  Objection.

BY THE WITNESS:

A.    I do not know.

Page 103

BY MR. SCHUSTER:

Q.   Why wasn't that relevant?

A.   So what was relevant here was counting the impressions of the at-issue statements.  This article contained an at-issue statement, and so it was counted.

Q.   I'm going to go off topic a little bit.

When we talk about impressions as it relates to at-issue statements, I'm going to ask you to help me because I am definitely social media and technologically challenged.

What does an impression mean?

A.   So an impression is someone being exposed to an at-issue statement.  So typically that's counted -- new media, digital media, is always counted in impressions.  It's a statement occurring in front of somebody at a given time.

Q.   So could I give you an example?  And let me know if I should be living on Mars or not.  I go on Instagram, I see something, I don't know if I have to like it or don't like it, but I see it.

Is that an impression?

A.   Yes.

Q.   If I go back later that afternoon to look at that same posting because now I want to see

Page 117

BY MR. SCHUSTER:

Q.   And is the truth of this statement relative to your analysis?

A.   Not -- not exactly, no.

Q.   Okay.  Thank you.  Flipping to page 84, in the middle of paragraph 165, you refer to another post in Figure 12 -- and I'm assuming these are a sample of the posts that you used in generating your report; is that correct?

A.   That's correct.

Q.   And these are a sample of the at-issue statements that you aggregated; is that correct?

A.   Yes, these are examples of audience response to his statement.

Q.   Got you.  Okay.

In the middle, a poster named Jari, jari@laindiiuu, is having a conversation somehow -- I don't know how to characterize these posts, but there are some people up there, and this poster writes, "She was proven to be a" -- let's see.

"Blake Lively is Amber Heard in the making. She was proven to be a pathological liar.  Let's wait until all comes out.  He is innocent until proven guilty.  As of right now, Blake Lively has been proven to be a bully.  Look at her past

Page 121

interviews."

Again, do you know who posted this or -- is -- I'm sorry, this is on Twitter; is that right?

A.   This is from X, or Twitter, yes.

Q.   Formerly known as Twitter.

And do we call it a post when something's on Twitter?

A.   I guess now we call it a post when it's on X, so yeah.

Q.   Okay.  Do you know who Jari is that's referred to at the top of this post?

A.   So I believe there are two different posts here.  The quotation that you read from, I believe this is footnote 394, comes from a username called paperkrums.

Q.   Okay.

A.   And the post in Figure 12 comes from another user called Jari but also has this handle L-A-N-D-U. That's footnote 393.

Q.   Did you ever speak with Jari?

A.   I did not.

Q.   Did you ever reach out to Jari in any way, shape, or form?

A.   I did not.

Q.   Did you ever reach out to paperkrums?

Page 122

A.   No.

Q.   Did I say that right, paperkrums?

A.   Yeah, that's right.

Q.   What is defamatory about a poster saying, "Let's wait until all comes out.  He is innocent until proven guilty"?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   So I'm not a lawyer.  I offer no opinion on if a statement is defamatory or not.

BY MR. SCHUSTER:

Q.   What is your concern with this statement that I just read?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   What do you mean by concern?

BY MR. SCHUSTER:

Q.   Well, why is it referenced in your report?

A.   So this example and the others are used to illustrate the reception of Mr. Freedman's statements by the public, namely do they believe them, do they endorse his statement.

Q.   But looking at this statement, "Look at her past interviews," isn't that indicative that this particular post is motivated not by what necessarily

Page 123

Mr. Bryan Freedman said, but by Blake Lively's past action?

A.   I believe that statement refers to a belief, a prior belief that makes her receptive to the statement that she's a liar.

Q.   Okay.  But isn't it possible that that prior belief came before Bryan Freedman ever uttered a word about Blake Lively?

A.   Not necessarily.

Q.   Not necessarily might also mean it is necessarily.  It could be either way; couldn't it?

A.   So her statement is made directly underneath Mr. Freedman's statement.  It would not appear in the public sphere but for his statement.

Q.   So if Bryan Freedman speaks about Blake Lively, and someone on X had formulated a previous opinion about Blake Lively based upon her past interviews and now speaks up, you're attributing her speaking up to Bryan Freedman and not her past opinions and impressions of Blake Lively?

A.   What I see in this particular post, although I offer many others and I have aggregate analyses as well, but what I see in her post is expressing a prior belief that makes her receptive to the idea that she's a pathological liar.  And that particular

Page 124

term, as I've said, did not show up in -- in any measure in the public discourse about Ms. Lively until after Mr. Freedman's statements.

Q.   And when you say public discourse, are you only talking about that relevant time period of your research, which is May 2024 through February 2025?

A.   Yes, those are where I did the bulk of my analyses.

Q.   Now, I believe you testified earlier about concerns with Mr. Freedman's access to social media profile -- or social media personalities such as Candace Owens or Megyn Kelly or Perez Hilton who have followers and can thereby disseminate a narrative; is that fair to say?

A.   Yes.  I believe we were talking about the endorsement of Ms. Kelly and Candace Owens of Mr. Freedman.

Q.   How many followers does Candace Owens have?

A.   I believe that information is available in the report, if you'd like to look at it.  It's, I believe, in the millions.

Q.   What about Perez Hilton?

A.   I believe it's also likely in the millions.

Q.   How many followers did Blake Lively have in April of 2024 on all of her social media platforms?

Page 125

notably driven by content from major entertainment media outlets, including Variety, The Hollywood Reporter, Entertainment Weekly, and People Magazine?

Are you aware of that?

A.   Yes.

Q.   And wouldn't that have drawn more attention to this situation, It Ends With Us, Justin Baldoni, Blake Lively?  Wouldn't something like that draw more attention and potentially more viewers?

A.   So I create a very precise count of exactly how many viewers viewed that or how many impressions the at-issue statements received.  Those are accounted for in my counts of the at-issue statements.

Q.   Well, I understand, but you're saying people only looked at the at-issue statements because they were generated by Bryan Freedman, you know, the puppet master.  I'm suggesting that people looked at the statements and other posts because of the circus surrounding this movie.

Is that a possibility that there were other factors that drew people to social media and to the media because of what was going on in this film?

MS. BENDER:  Objection.

Page 139

MS. BENDER:  Objection.

BY THE WITNESS:

A.   I'm not.

BY MR. SCHUSTER:

Q.   Have you ever heard that a common problem with Semrush is that it generates inaccurate statements?

A.   I'm not -- to my knowledge, it's a standard used tool in the industry.

Q.   And you've never heard any complaints about it?

A.   I have not.

Q.   Have you ever looked into whether there are any complaints about Semrush and how it's used and its results?

A.   No.

MS. BENDER:  Objection.

BY THE WITNESS:

A.   I know it's widely used.

BY MR. SCHUSTER:

Q.   In connection with utilizing Semrush, what is the -- what would the term "traffic" mean?

A.   So it depends on what you mean.

Q.   Okay.  I actually don't know what I mean. I'm just asking you something.  So if you don't know

Page 155

Reynolds couldn't use their own built-in media which has hundreds of millions of followers to institute this reputational repair that you claim is needed?

A.   Yes, there is a reason.

Q.   What is that?

A.   So as I discuss in my report, reputation is built largely by collective agreement, by what people say about you about you.  Reputation isn't built by what you say about yourself.  It's built collectively.

Q.   So you need a third party to vouch for you to make it credible?

A.   That's one way to put it, yes.

Q.   Is there a reason why Blake Lively couldn't use Taylor Swift, a third party with a gazillion followers, to speak for her or vouch for her and help restore her reputation?

MS. BENDER:  Objection.

BY THE WITNESS:

A.   Yes.

BY MR. SCHUSTER:

Q.   Why?

A.   So in marketing practice, you want to target the receptive audience, and in this case, you'd want to target the audience who is receptive to

Page 159

Mr. Freedman's statements and to Mr. Baldoni in general. And so you would want to pick the audience that follows the sources associated with Mr. Freedman and Mr. Baldoni and others.

BY MR. SCHUSTER:

Q. So the hope would be that through this 14- to $26 million campaign, you would sway those individuals who were previously swayed by Bryan Freedman?

A. Yes, that's congruent with what I'm saying. Yes.

Q. Do you know who a Mr. Kinrich is?

A. I don't.

Q. I'm sorry, you don't?

A. I don't.

Q. I believe Plaintiffs have a damages expert whose name is Mr. Kinrich, Jeffrey H. Kinrich. Have you heard that name?

A. I haven't heard that exact name, no.

Q. Have you reviewed any report on damages from the Plaintiff?

A. I don't recall reviewing his report.

Q. Okay. Well, Mr. Kinrich acknowledges that, "Ms. Lively's brands achieved extraordinary market penetration at the very time of the alleged

Page 160

in her favor, it's your opinion that she will still need this 14- to $26 million reputational repair despite a jury verdict in her favor?

A.    That's correct.

Q.    And why is that?

A.    So the purpose of the campaign to correct the reputational damage is targeted at those who received the initial statements.  Because of a number of factors related to digital media and the way communication functions in the media system, it's not at all a foregone conclusion that the target audience will receive that message of the verdict.  It's not a foregone conclusion that they will trust that message.  And it's not at all a foregone conclusion that that verdict would repair the reputational harm.

Q.    Is it your opinion that a jury verdict from the Southern District of New York in the case of Blake Lively versus Justin Baldoni is not going to be circulated across this country?

A.    So as I said, it will -- that news will be circulated.  It's not a foregone conclusion that that will make it to the target audience in question, to the people who were initially exposed to the at-issue statements.  It's also not a foregone conclusion that they will trust the implications of a jury verdict.

Page 174

A.    It's my opinion that they were exposed to one of the at-issue statements.

Q.    How do you know that?

A.    That's kind of the way that this is measured.  So impressions are measured as the audience being exposed to an image or a statement.

Q.    How do you know what portion of the statement the audience viewed?  I mean, if it's a one-liner, sure, but if it's a post and commentary, how do you know that the audience viewed the at issue statement without -- as you admitted, never speaking or communicating with any member of the target audience?

A.    So it's true that in impressions, you have the person being potentially exposed to the at-issue statements.  That's also true in terms of the campaign itself.

So for the corrective campaign, you can expose people to a corrective message.  They may or may not receive it, attend to it, et cetera.  There's sort of some apples to apples comparison there where in the industry, providers buy impressions in which they serve content that has a persuasive message.  That's how it works.

Q.    If I've heard you correctly, even the

Page 176

REPORTER CERTIFICATE

I, ANDREW R. PITTS, C.S.R. within and for the County of Cook and State of Illinois, do hereby certify that heretofore, to wit, on Tuesday the 25th day of November, 2025, personally appeared before me via videoconference, ASHLEE HUMPHREYS, Ph.D., in a cause now pending and undetermined in the United States District Court of the Southern District of New York, wherein BLAKE LIVELY is the Plaintiff, and WAYFARER STUDIOS LLC, a Delaware Limited Liability Company, JUSTIN BALDONI, an Individual, et al., are the Defendants.

I further certify that the said witness was first duly sworn to testify to the truth, the whole truth and nothing but the truth in the cause aforesaid; that the sworn testimony then given by said witness was reported stenographically by me in the presence of the said witness remotely via videoconference, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the videoconference testimony so given by said witness as aforesaid.

I further certify that the signature to

Page 191

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

the foregoing videoconference deposition was reserved by counsel for the Defendants.  I further certify that the taking of this deposition was pursuant to Notice, and that there were present in person and via videoconference at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF:  I have hereunto set my hand and affixed my seal this 26th day of November, 2025.

ANDREW R. PITTS, CSR, RPR

CSR, COOK COUNTY, ILLINOIS

Page 192