# EXHIBIT CC

CONFIDENTIAL

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---0O0---

BLAKE LIVELY,

                  Plaintiff,

   vs.        CASE NO. 24-CV-10049-LJL (LEAD CASE)

                  25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

               Defendants.

_____

JENNIFER ABEL,

          Third-party Plaintiff,

   vs.

JONESWORKS, LLC,

          Third-party Defendant.

_____

WAYFARER STUDIOS LLC, et al.

          Consolidated Plaintiffs,

   vs.

BLAKE LIVELY, et al.

          Consolidated Defendants.

_____

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF MICHAEL ROBBINS

Los Angeles, California

Monday, November 24, 2025

Stenographically Reported by:  Ashley Soevyn,
CALIFORNIA CSR No. 12019

Pages 1 - 270

Page 1

CONFIDENTIAL

which clients do, things like that wouldn't be on the CV.

Q     When you say E-X-T-T-I?

A     Yes.  Pronounced EXTTI.

Q     EXTTI.  Is that your company?

A     Yes.

Q     And how many people work at your company?

A     So we have 12 people who are either full-time or close to full-time.  And we have two independent contractors.  One of whom works occasionally and one very occasionally.

Q     And what does the people -- what is your -- what does EXTTI do?

A     EXTTI stands for the three main things we do.  But we do a couple of other things, too.  So it's expert testimony, training, and investigations. Expert testimony is obvious.  Training, we do training on how to avoid harassment, discrimination, and retaliation.  And we also do training on how to conduct workplace investigations.  The number one thing we do, by far, is conduct workplace investigations.

And then two people at our company do coaching, but I'm not one of them.  And I've been a consent decree monitor in federal court twice.

Page 21

CONFIDENTIAL

Q    What did you do as a decent -- a consent decree monitor?

A    So both cases -- in both cases, the EEOC had sued the employers.  One was ABM Industries and the other was Big Lots.  It's public knowledge.  And the EEOC reached agreements with both companies, but required them to do certain things, and they needed a monitor to do that.  So I was chosen and approved by the Court to be the monitor.

So, basically, what I did is I made sure that the training that they gave was consistent with standard practices.  And they were required to do training both for supervisory and nonsupervisory employees.  I was supposed to look at their policies as well, and make sure they were consistent with standard practices.

Most importantly, when harassment allegations arose, I was supposed to make sure that they responded correctly; that they did an investigation; that the investigation was consistent with standard practices; and that then they reached reasonable conclusions based on those investigations.

Q    You practiced labor and employment law for many years, correct?

Page 22

trial?

Q    Either.

A    So in depositions, probably at least two-thirds; trials probably the same.

Q    Have you ever opined in an entertainment case involving allegations of sexual harassment?

A    Yes.

Q    How many?

A    I don't know the answer.

Q    More than 100?

A    No, I don't think so.

Q    More than 20?

A    Yes.

Q    More than 50?

A    Unsure.

Q    So somewhere between 20 and 50, would that be accurate?

A    Probably.

Q    And were all these cases sexual harassment cases, or were they also race or other types of harassment?

A    The bulk were sexual harassment, but I don't specifically remember whether other kinds of harassment were involved.

Q    In cases that you were an expert in

Page 28

Q    Were you a charter member?

A    "Charter member" just means joined early on; but, yes.

Q    What is your role -- what has your role ever been in AWI?

A    At one point, I was a vice president.  At one point, I was president.  And then I was on committees after that, mostly relating to the national training institutes.

Q    What is AWI?

A    The Association of Workplace Investigators.

Q    What is it?  What does it do?

A    Right now, it's an organization of a little over 3,000 internal and external workplace investigators.  And AWI basically teaches about how to do proper workplace investigations and when to do proper workplace investigations.  And I can tell you how we do that if you wish, or not.

Q    I think I will just ask you some other questions first.  Okay?

Were you familiar with Blake Lively prior to being retained in this matter?

MS. ROESER:  Objection.

THE WITNESS:  Excuse me.  I knew who she

Page 32

CONFIDENTIAL

other than what we have -- what is in your report and the work you already identified reading these four extra documents?

MS. ROESER:  Objection.

THE WITNESS:  Yes.

BY MS. ZELDIN:

Q    What do you intend to do?

A    Read Ms. Fromholz's deposition.  And then, prior to trial, review documents again to get ready for trial.

Q    What documents do you intend to review to get ready for trial?

A    Same ones that I reviewed for purpose of my report.  Plus the one, the additional ones we did today.

Q    Anything else?

A    No.

Q    Under the category "Other" in Exhibit C, you say that you had a conversation with somebody named Laura Rikard?

A    Yes.

Q    She's the owner of something called "Theatrical Intimacy Education," correct?

A    Yes.

Q    And why did you talk to her?

Page 44

A    I talked to her because counsel suggested I talk to her.  She's an intimacy coordinator.  She also teaches intimacy coordinators.  And so they -- I assume they thought -- because I don't know exactly what was in their minds -- that they thought that her thoughts might be useful to me.

Q    Were they?

A    Yes.

Q    What thoughts were useful -- strike that.

Let's start with, when did you speak with her?

A    Before I wrote my report, but I don't remember how long before.

Q    Did you speak with her by yourself, or was somebody else present?

A    I think Ms. Roeser was present.

Q    And did you know Ms. Rikard yourself or were you introduced through counsel?

A    Introduced through counsel.

Q    And you had a conversation by phone or by Zoom or in person?

A    Phone.  I think.

Q    And how long was the call?

A    Forty-five minutes to an hour.

Q    And did you have more than one call with

Page 45

CONFIDENTIAL

her?

A   No.

Q   Did you take notes of this call?

A   Yes.

Q   Do you intend to rely upon the opinions that she's -- that Ms. Rikard gave you or the information she imparted to you during that phone call?

MS. ROESER:  Objection.

THE WITNESS:  Some of the information that she gave me was useful for me to -- in terms of forming opinions.

BY MS. ZELDIN:

Q   You did not turn over your notes of that conversation, correct?

A   Well, nobody asked -- there was no request for production of documents.  But aside from that, I don't have the notes anymore.

Q   We're in federal court.  Anything that you considered in forming your opinions needs to be produced, period.  We don't need to ask for a document request.

MS. ROESER:  Objection.

MS. ZELDIN:  What happened to the notes?

THE WITNESS:  I had notes for a short

Page 46

THE WITNESS:  To have definitions of intimacy, yes.

BY MS. ZELDIN:

Q   And where -- what authority does she have that says that there needs to be definitions of intimacy?

MS. ROESER:  Objection.

THE WITNESS:  She wasn't talking about authority, she was talking about what she believed was standard practice.  In other words, what is commonly done.

BY MS. ZELDIN:

Q   Okay.  And did she talk about SAG-AFTRA and what they require?

A   I knew what SAG-AFTRA required because I had those documents.  I had them before I got involved in this case.

Q   Do they require a definition of intimacy to be developed by the producers of the film?

A   So --

MS. ROESER:  Objection.

THE WITNESS:  To answer you -- the rest of your earlier question before you asked the second question, I don't remember specifically whether she and I talked about SAG-AFTRA.  Maybe, but I just

Page 55

CONFIDENTIAL

don't remember.

And as to the answer to your second question, that's the problem -- that there's not a specific definition -- and so that's why in order to take proactive steps to protect actors, to keep it a safe set and to prohibit harassment, you need definitions for the term so that you know what to do in order to call an intimacy coordinator and do the other things I mentioned; closed set and also a nudity rider.

BY MS. ZELDIN:

Q    Are intimacy coordinators required on all sets?

MS. ROESER:  Objection.

THE WITNESS:  It depends what you mean by "required."  And what -- what you mean by "all sets."

BY MS. ZELDIN:

Q    Well, do you believe -- are you -- strike that.

Are you trying to offer an opinion in this case as to whether or not an intimacy coordinated was required on this particular set?

MS. ROESER:  Objection.

THE WITNESS:  I don't testify about

Page 56

CONFIDENTIAL

requirements.

BY MS. ZELDIN:

Q    What do you testify about then?

A    Standard practices and, depending on the situation, the employer's own policies and procedures.

Q    Okay.  What standard practice are you pointing to with respect to intimacy coordinators?

A    You mean what is it based on, or what do I think the practice is?

Q    Start with what the practice is, and then tell me what the basis is.

A    So my opinion as to what the practice is is that the employer needs to set up a protocol as to when to bring in an intimacy coordinator.  And in order to set up a protocol, you have to know what intimacy is.  And in order to know what intimacy is, you need a definition of intimacy.

And once you have that, then, when there are scenes that are involving intimacy or if there's sort of borderline things where an actor might think that this was a scene that required it and you're being proactive because you want to keep the set safe and prohibit harassment, to prevent it as best you can, you bring in an intimacy coordinator.

Page 57

CONFIDENTIAL

The intimacy coordinator would meet with the director, would try to understand the scene and the director's vision, would look at the script as well.  Then if the intimacy coordinator did think that -- that his or her services -- which I've never known a male intimacy coordinator, but maybe there are some -- would then talk to the actors involved, gauge their comfort level, be present during the rehearsal of the scene and present during the shooting of the scene.

Q   What experience do you have with intimacy coordinators?

MS. ROESER:  Objection.

THE WITNESS:  My experience relates to -- because it's a new job -- relates to investigations that I've done and other things I've learned through conducting investigations.

BY MS. ZELDIN:

Q   What investigations have you done involving an intimacy coordinator?

A   So the most recent time was the investigation that I can recall that was closest to the facts in this case, and I can tell you about that if you wish.

Q   Yes, please.

Page 58

A    So I did an investigation -- I think it was in 2022; yes, 2022 -- involving a film that was based on a book that had been written by a female author.  The lead female actor in the film claimed that the lead male actor had been harassing her.  So we got brought in by the production company.  The allegations were that the lead male actor had made sexual comments to her, that the lead male actor, on one occasion, had touched her inappropriately, not -- and it wasn't -- the touching wasn't during a rehearsal or during the shooting of a scene.

And "touching" is wrong -- really the wrong word.  Had physical contact with her.  It's a little more accurate.  And that also, on one occasion, the male actor had improvised a scene that turned it from a nonsexual scene to a somewhat sexual scene.  And so as part of that investigation, I interviewed lots of parties, including an intimacy coordinator.  I looked at the script.  I looked at outtakes and reached conclusions.

Q    What were the sexual comments?

A    I don't remember the comments.  I remember the rest.

Q    Were they sexy or hot, or were they something different?

Page 59

A     I don't remember the comments themselves well enough.  That's too many investigations since then as well, but...

Q     When you said "touched her inappropriately," what kind of physical contact are we talking about?

A     So they were in a -- I think they were staying in a hotel, and they were in a -- like a common area of the hotel.  And she claimed that he made comments to her, and then he picked her up physically.

Q     And then you say that he improvised a scene making something nonsexual sexual?

A     At least more sexual, which is what I think I said.

Q     More sexual.

A     So the scene called for them to be jogging together.  And then exhausted, they were supposed to lay down on the grass, which they did. Then the scene called for them to talk and joke a little bit, and then he was supposed to stand up hold out his hands to help her up, and then they were to jog off onto the sunset -- into the sunset. Although, I don't think it was actually sunset; but, okay.

Page 60

CONFIDENTIAL

Instead, what was alleged is that they laid down on the grass, they talked, they joked, he held out his hands for her.  She took his hands, he pulled -- he was a very big guy.  He pulled her up, wrapped her legs around him, put his head basically on her breasts or between her breasts and then jogged off with her in that position.

Q    Was this the only example that you can tell me about where you conducted an investigation where an intimacy coordinator was involved?

A    It's the only time I interviewed an intimacy coordinator, I think.  And I think I would remember it because the job is so new.  But I have been involved in other investigations where there were intimacy issues and questions were raised about whether an intimacy coordinator had been brought in or not.  But I don't think I have ever interviewed one except for this.

Q    What other situations were you involved with where you did an investigation where there was a question about whether an intimacy coordinator should have been involved?

MS. ROESER:  Objection.

THE WITNESS:  Yeah, I'm sorry.  And also riders.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

A    I am aware of those facts, yes.

Q    And you're also aware that filming stopped on June 14th, 2023, due to the strikes by the Writers Guild and by SAG-AFTRA?

A    Correct.  Above-the-line strikes.

Q    And then the filming -- there was a hiatus in filming, and it did not start up again until January 5th, 2024, and concluded on February 9th, 2024, correct?

A    Yes.

Q    All right.  So there's two phases of the film.  Phase one that occurred in 2023 and ended in June of 2023.  And the other in 2024.  And that was phase two?

A    That's my understanding.

Q    All right.  Do you agree that none of the -- Lively's intimate scenes were rehearsed or filmed during phase one of production?

MS. ROESER:  Objection.

THE WITNESS:  I disagree.

BY MS. ZELDIN:

Q    Do you know how SAG-AFTRA defines intimate scenes?

A    To the extent there is a definition, yes.

Q    What is the definition by SAG-AFTRA?

Page 81

A    So nudity, simulated sex, hyper exposure, and other intimate scenes.

Q    Isn't it just nudity or simulated sex?

A    No.

Q    What is the third thing you think that is in there?

A    It is in there.  Hyper exposure.

Q    Hyper exposure.  What does that mean?

A    There is no specific definition, which is why a studio or production company needs to be specific, for the reasons I've described.  But it means a situation where the actor is pulled into a vulnerable situation, not necessarily involving nudity.  Though, it could.  But involving something sexual to some degree.

Q    Okay.  What were the intimate scenes that were filmed in phase one of production?

A    I didn't say there were scenes.  But there was one scene.

Q    One scene.  What was the scene that you believe was intimate in phase one?

A    The birthing scene.

Q    And why do you believe it was intimate if there was no definition of "intimate"?

A    Two reasons.  Reason number one is

A    Again, you're quoting things that I've never seen, so -- but I will take your word for it.

MS. ROESER:  Objection.

BY MS. ZELDIN:

Q    Is that what it does?

MS. ROESER:  Objection.

THE WITNESS:  I don't get the periodical anymore, but that seems accurate.

BY MS. ZELDIN:

Q    The periodical summarizes what the law requires, correct?

MS. ROESER:  Objection.

THE WITNESS:  Among other things.

BY MS. ZELDIN:

Q    On page 10, you talk about what you believe are standards in the entertainment industry, right?

A    Yes.

Q    You state that there should be a nudity rider when there are intimacy scenes, and you think that -- I'm going to ask you again, though, what is an intimacy scene?

MS. ROESER:  Objection.

THE WITNESS:  Same as I said before.  But it's scene involving intimacy, which is simulated

Page 137

CONFIDENTIAL

sex, nudity, hyper exposure or other intimacy.

That's what SAG-AFTRA says.

BY MS. ZELDIN:

Q    You state that a nudity rider should specify if a body double is to be used.

A    Yes.

Q    Was a body double used in this film?

A    Not to my knowledge.

Q    So that portion was irrelevant, correct? Your reference to that?

MS. ROESER:  Objection.

THE WITNESS:  Oh, no.  I'm just generally describing a nudity rider, but it's not specifically relevant to this film.  That's correct.

BY MS. ZELDIN:

Q    All right.  You also state that:

(As read):

"An intimacy coordinator should be on set for any scenes involving intimacy, including nudity, and such scenes should be shot on a closed set."

What scene should be shot on a closed set?

A    Exactly what I said, scenes involving intimacy.

Page 138