# EXHIBIT 10
## Filed Under Seal

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

BLAKE LIVELY,                      )
    PLAINTIFF,                 )  CASE NO.
                              )  1:24-CV-10049-LJL
VS.                                )  (CONSOLIDATED WITH
                              )  1:25-CV-00449-LJL
WAYFARER STUDIOS LLC,              )
JUSTIN BALDONI, JAMEY              )
HEATH, STEVE SAROWITZ,             )
IT ENDS WITH US MOVIE              )
LLC, MELISSA NATHAN,               )
THE AGENCY GROUP PR                )
LLC, JENNIFER ABEL, JED            )
WALLACE, AND STREET                )
RELATIONS INC.,                    )
    DEFENDANTS.                )
_____
JENNIFER ABEL,                     )
    THIRD-PARTY                )
    PLAINTIFF,                 )
                              )
VS.                                )
                              )
JONESWORKS LLC,                    )
    THIRD-PARTY                )
    DEFENDANT.                 )
_____
WAYFARER STUDIOS LLC,              )
JUSTIN BALDONI, JAMEY              )
HEATH, IT ENDS WITH US             )
MOVIE LLC, MELISSA                 )
NATHAN, JENNIFER ABEL,             )
AND STEVE SAROWITZ,                )
    CONSOLIDATED               )
    PLAINTIFFS,                )
                              )
VS.                                )
                              )
BLAKE LIVELY, RYAN                 )
REYNOLDS, LESLIE                   )
SLOANE, VISION PR,                 )
INC., AND THE NEW YORK             )
TIMES COMPANY,                     )
    CONSOLIDATED               )
    DEFENDANTS.                )

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

ORAL AND VIDEOTAPED DEPOSITION OF JED WALLACE

OCTOBER 9, 2025

CONFIDENTIAL - ATTORNEYS' EYES ONLY

ORAL AND VIDEOTAPED DEPOSITION OF JED WALLACE, produced as a witness at the instance of the Blake Lively and duly sworn, was taken in the above styled and numbered cause on Thursday, October 9, 2025, from 9:14 a.m. to 7:36 p.m., before Janalyn Elkins, CSR, in and for the State of Texas, reported by computerized stenotype machine, at the offices of Jackson Walker, 100 Congress Avenue, Suite 1100, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 23

incorporation for Street Relations from California to Texas in 2025?

A.   We were now living in Texas.

Q.   Okay.  But you moved in 2021, right?

A.   Yes.

Q.   So why didn't you change it in 2021?

A.   I don't recall.

Q.   Okay.  Do you have a -- a title at Street Relations?

A.   Founder is what I've used.

Q.   Are there any other officers or directors of Street Relations?

A.   No.

Q.   How would you describe the services that Street Relations offers in the digital space?

A.   Specifically in the digital space?

Q.   Specifically in the digital space.

A.   That would depend on the circumstances.

Q.   Okay.  Can you give me -- if you had to describe your full range, Street Relations' full range of capabilities in the digital space, how would you describe that full range of capabilities?

A.   Minimal.

Q.   What do you mean minimal?

A.   We don't do anything as far as action in the

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 24

digital space.  It's an observant monitoring role.

Q.  Okay.  Is that what you would say to a client who came to you and asked you to describe what you were capable, what services Street Relations was capable of performing in the digital space?

MR. BABCOCK:  Objection.

THE WITNESS:  Could you rephrase the question?

Q.  (BY MR. GOTTLIEB)  You -- you said that the -- Street Relations' full range of capabilities was minimal and that you don't do anything as far as action in the digital space, it's an observant monitoring role.  And my question was is that how you would describe your services to a client that came to Street Relations interested in engaging your services?

A.  It depends on the client, the client in question.

Q.  So maybe and maybe not?

A.  It depends on the situation.

Q.  Okay.  Let me try my question one more time.

MR. BABCOCK:  Could you hang on for a second?

Would you give a little space between his question and your answer?  Because I was going to object to one, but you beat me to it.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 30

at one point in time said you had a proprietary formula for defining artists and trends?

A.   I do vaguely remember that.

Q.   What does that mean?

A.   I don't recall at the time.

Q.   Do you have any understanding as you sit here today of what it means to have a proprietary formula for defining artists and trends?

A.   I -- I don't know what that means exactly.

Q.   Do you have a proprietary formula for anything relating to the digital space?

A.   I do not.

Q.   Do you have any services that you offer in the digital space that you consider to give Street Relations a competitive advantage vis-à-vis its competitors?

A.   I do not.

MS. TROUPSON:  Can we pause on the record briefly?  Our real time died.

MR. GOTTLIEB:  Can we go off the record, please?

VIDEOGRAPHER:  Going off the record.  Time is 9:40.

(Brief recess.)

VIDEOGRAPHER:  Back on the record.  Time is 9:41.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 48

optimization.  And so I --

MR. BABCOCK:  In defense of the court reporter, I thought you said SCO myself.

MR. GOTTLIEB:  Well, my apologies to everyone here, then.

MR. BABCOCK:  Well, no, I mean...

Q.  (BY MR. GOTTLIEB)  So I'll go back to my question, which was have you ever conveyed to a client that either you or Street Relations were capable of manipulating the SEO?

A.  Not that I recall.

Q.  Are you or Street Relations capable in any respect of manipulating SEO?

MR. COOLEY:  Objection.

THE WITNESS:  Absolutely not.

Q.  (BY MR. GOTTLIEB)  Okay.  Have you ever worked with any team on heavy clipping and algorithm boosting?

A.  What -- what is heavy clipping?

MR. BABCOCK:  Yeah.  That's -- that's -- that's fine.

Q.  (BY MR. GOTTLIEB)  You've got to answer my question.  Have you ever --

MR. BABCOCK:  If you don't know --

Q.  (BY MR. GOTTLIEB)  Have you ever worked with any team on heavy clipping and algorithm boosting?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 72

about services on email?

A.   Not that I recall.

Q.   How about on text message?

A.   Not -- could you be more specific?

Q.   On any form of electronic communication?   Let's broaden it up.

A.   And the question did I have any communication with her about any types of services?

Q.   That you might provide to Wayfarer Studios?

A.   Yeah, we discussed monitoring.

Q.   Okay.   In what -- on what platform did you have that conversation with Ms. Nathan?

A.   I -- I -- I wouldn't know because I didn't know the client or the details yet.

Q.   Were you in -- I'm not talk -- sorry.   Maybe my question was unclear.   I wasn't talking about what platform for monitoring.   I was talking about the platform that you used to communicate with Ms. Nathan about that.   Was it Signal?

A.   We've communicated through Signal and phone calls.

Q.   By August 8th, 2024, had you communicated with Melissa -- Melissa Nathan on Signal?

A.   Related to this?

Q.   On anything?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 73

A. Oh, yes.

Q. Okay. Did you also communicate with Ms. Nathan on the -- do you -- do you have an Apple iPhone?

A. I do.

Q. Okay. Did you also communicate with Ms. Nathan as of August 8th, 2024 on the Apple messaging app, the iMessaging app?

A. Ever before?

Q. Yes.

A. I believe so.

Q. Would you say as between those two messaging applications as of August 8th, 2024, with respect to your communications with Melissa Nathan, you used one of those applications more than the other?

A. I -- I would say yes, Signal.

Q. You used Signal more?

A. Uh-huh.

Q. When do you recall -- do you -- do you recall a point in time when you started to use Signal more than regular text messaging with Melissa Nathan?

A. No.

Q. Okay. At some point in time you did, though?

A. No, I need a more specific question.

Q. Okay. Do you see, back to the email, Ms. Nathan says, (Reading:) He is aware we're going for

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 79

worked on that involved Katie Case prior to this time?

A.   I don't know.

Q.   But you know that you had worked with her at -- on at least one occasion before?

A.   Yes.

Q.   And she thought you were the best of the best?

MR. BABCOCK:  Objection.

MR. COOLEY:  Join.

THE WITNESS:  Yeah, is that a question?

Q.   (BY MR. GOTTLIEB)  She thought you and your team were truly best of the best; is that right?

MR. BABCOCK:  Objection.

MR. COOLEY:  Same.  Same.

THE WITNESS:  That's what she wrote.

Q.   (BY MR. GOTTLIEB)  And again, you didn't tell anyone that you don't have a team, right?

A.   Everyone that knows me knows I don't have a team.

Q.   Everyone who knows you knows you don't have a team?

A.   Well, let me rephrase that.  I don't have a team.  So why you would say that, I don't know.

Q.   Why she would say that?

A.   Sure.

Q.   You don't know?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 80

A.  Why?  Sure.

Q.  Okay.

(Exhibit No. 3 was marked.)

Q.  (BY MR. GOTTLIEB)  This is Exhibit 3.
Mr. Wallace, you've been handed what's been marked
Exhibit 3, which is a document bearing the Bates Nos.
Street 1.0084 through 85.

Do you recognize this document, sir?

A.  I -- I do.

Q.  What is it?

A.  It is a -- an email from their bill pay system.

Q.  And whose bill pay system?

A.  Wayfarer's.

Q.  And who is it to?

A.  It's to me, Street Relations.

Q.  And -- and is this indicating that Wayfarer
Studios had sent a payment set to arrive around
September 23, 2024?

A.  Yes.  That's what it seems.

Q.  The payment amount was $30,000?

A.  Yes.

MR. GOTTLIEB:  Okay.  The next one, please.

(Exhibit No. 4 was marked.)

Q.  (BY MR. GOTTLIEB)  Exhibit 4.  Mr. Wallace,
Exhibit 4 is a one-page document bearing the Bates No.

Page 81

Street 1.00087.

Q. Do you recognize this document?

A. I do.

Q. What is it?

A. It's an invoice.

Q. An invoice from whom to whom?

A. From Street Relations to Wayfarer Studios.

Q. And for what amount?

A. $30,000.

Q. And what is the date?

A. The date of the invoice or the date at the top of the invoice?

Q. Sure. Start there.

A. October 1st, 2024.

Q. And what was the date range for services?

A. 10/5 to 11/5.

Q. And the amount was $30,000?

A. Yes.

Q. Okay. Did you receive three payments from this client for your services?

A. I did.

Q. In the amount of $90,000 in total?

A. Yes.

Q. Did you receive any additional payments from this client?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 84

Q. You did perform work with TAG for ▌▌▌▌▌▌ after this point in time?

A. I did not.

Q. You never performed any work for ▌▌▌▌▌▌?

A. I did not. We were not engaged.

Q. You were never engaged to do anything for ▌▌▌▌▌?

A. I was not.

Q. Were you ever engaged to do any work for any person relating to ▌▌▌▌▌?

A. No.

Q. Were you ever engaged to do any work in support of -- whether him directly, indirectly or through a third party, work that related to ▌▌▌▌▌?

MR. COOLEY: Objection.

THE WITNESS: I -- I was never engaged.

Q. (BY MR. GOTTLIEB) Okay. Do you see in this -- in this cover email, Ms. Koslow is writing directly to ▌▌▌▌▌?

A. I see that.

Q. And she says here that, (Reading:) We have put together a scope of services reflecting our support across earned media as well as digital and social management.

And then she puts Jed in parentheses?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 121

good to suppress this story.

A.  I see it.

Q.  You see less than an hour later, you respond and say, (Reading:)  Ok - I'll handle that and set up an algorithm to manage concerns related.

A.  I do see that.

Q.  Were you being truthful in what you said to ▮▮▮▮▮▮▮ there?

A.  Yeah, we never moved forward.  So I was not being truthful.

Q.  You were making a misrepresentation to him?

A.  I think puffing.

Q.  Were you capable of setting up an algorithm to manage the concerns related with the story?

A.  Not at all.

Q.  Did you know somebody who was?

A.  I don't recall.

Q.  As you sit here today, can you think of anyone on Earth who's capable of setting up an algorithm to manage concerns related to a story?

MR. COOLEY:  Objection.

MR. BABCOCK:  Same objection.

THE WITNESS:  Yeah, I -- I cannot.

Q.  (BY MR. GOTTLIEB)  Not a single person?

A.  No.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 126

A.   That somebody who was trying to hurt ████████ ████████ digitally.

Q.   And so -- and -- and at least in this example, somebody who's trying to hurt ████████████ digitally is doing that by posting a bunch of stuff in Reddit forums?

A.   Looks that way.

Q.   And then you say, (Reading:)  I need to be able to throw a ton of upvotes at the stuff that is rah rah for him, especially in ██████████████████████ ████████████████████ and need to downvote everything that's acting as a drag on him as part of our mandate for you and yours.

Do you see that?

A.   I do.

Q.   Are you proposing a service to ████████ in that sentence?

A.   I am not.

Q.   So what do you mean when you say "as part of our mandate from you and yours"?

A.   Pending some type of engagement, he would need to hire somebody to work his social media campaign.

Q.   Well, why did you say I?  Why did you say, (Reading:)  I need to be able to throw a ton of upvotes at the stuff that is rah rah rah for him?

A.   I don't know.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q.   You didn't say what you need is someone who can throw a ton of upvotes at stuff that's rah rah rah for him, right?

A.   No.

Q.   And you didn't say I know some people that might be able to do that for you, right?

A.   Correct.

Q.   What you said is, (Reading:)  I need to be able to throw a ton of upvotes at the stuff that's rah rah rah for him.

        Right?

A.   That's what's said.

Q.   And -- and so when you say that's not a service that you can provide, do you really mean you're incapable, even relying upon the work of others, of providing that service to ▮▮▮▮▮▮▮▮?

        MR. BABCOCK:  Objection.

        MR. COOLEY:  Join.

        THE WITNESS:  Well, could you rephrase that question?

Q.   (BY MR. GOTTLIEB)  Well, I'm just trying to understand how it is congruous to use the language I need to be able to do this as part of our mandate from you and yours?

A.   Uh-huh.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 128

Q.   For you to say that's not actually something you can do.  I'm just -- can you help explain that to me?

A.   I cannot.  It's not something.  I wouldn't know how to do upvotes.

Q.   But is that a service that you understand how to procure or get from somebody else?

A.   No, I would have a client secure that for themselves.

Q.   Okay.  That's a service that at least you understand exists out there somewhere in the market; is that right?

A.   I -- I -- I think that's safe to say.

Q.   Okay.  So you understand that there is someone or some people out there in the market that are capable of throwing a ton of upvotes at positive content and downvoting everything else?

A.   It exists.

Q.   And would you know a person or persons to contact if you had a client that was interested in obtaining those services?

A.   I would not.

Q.   Would you know someone who knew people who could be contacted?

A.   I do not.  I would instruct a client to Google

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 132

Q.  Well, you say in the email, (Reading:)  This was forwarded without attachments.

Right?

A.  I do say that, but I don't recall.

Q.  And -- okay.  And you say, (Reading:)  This is exactly the kind of content (in theory, until I read them) that our team can elevate.

Right?

A.  I do say that.

Q.  So you seem to be saying, and correct me if I'm wrong, but you seem to be saying that whatever this attachment or article was, you hadn't read it yet?

A.  I -- I can't speak to that.  I'm not sure.

Q.  You don't remember if that's what you're saying here?

A.  I don't remember, no.

Q.  Well, nonetheless, whether you had read the article or not, you say, (Reading:)  This is exactly the kind of content that our team can elevate across all algorithmically driven platforms.

Correct?

A.  Yes.

Q.  Was your team capable of elevating content across algorithmically driven platforms?

A.  I don't have a team.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 133

Q.   Is Street Relations capable of elevating content across all algorithmically driven platforms?

A.   Absolutely not.

Q.   So you were being untruthful to ██████████ when you said that "our team can elevate across all algorithmically driven platforms"?

MR. COOLEY:  Objection.

THE WITNESS:  Yeah, not at all.

Q.   (BY MR. GOTTLIEB)  You were not at all being untruthful?

A.   No.

Q.   Okay.  So Street Relations can't do that, right?

A.   Correct.

Q.   Okay.  So who was your team capable of elevating across all algorithmically driven platforms?

A.   If I'm referencing TAG, it would be whomever works for TAG to post stories.

Q.   And you're saying you have no memory at all of what team you were referencing here?

A.   No, I -- I think I said I'm referencing TAG as the team.

Q.   Okay.  So you think that TAG is capable of elevating content across all algorithmically driven platforms?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 153

Q.   Does that at all refresh your recollection as to who ████████████████████████ is?

A.   It -- it doesn't.  I was not on that call.

Q.   Okay.  You were not on the call that Melissa Nathan is referring to here?

A.   No.

Q.   Do you see that -- that she says, (Reading:) This side of the account will be lead by our ████████ ███████████ team, Jed and his digital team will be maximizing all the new ███████████ story links that will come from this.

A.   I do.

Q.   You see here another reference to your digital team?

A.   I do.

Q.   Is that accurate?

A.   It is not.

Q.   Did you respond to this to correct Ms. Nathan?

A.   I did not respond to this.

Q.   Did you ever tell anyone from the ████ team that you don't have a digital team?

A.   I did not.

Q.   Did you ever review the scope of work that was attached here?

A.   I don't recall.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 170

Q.   (BY MR. GOTTLIEB)   You're certain of that as you sit here today?

A.   As I recall.

Q.   Okay.   That's a different answer.   So saying to the best of my recollection I don't recall discussing this is one answer.   Saying that you're certain is another.   So I'm just trying to discern the difference to understand your testimony?

A.   We didn't have a discussion about the scope of work.

Q.   Okay.   And you're sure about that?

A.   I'm sure about that.

Q.   All right.   Did you discuss it with her after she sent it?

A.   I don't recall.

Q.   Okay.   So you might have discussed it with her after, but you're sure you didn't discuss it with her before?

A.   Yeah, I don't recall.

Q.   Do you see the next bullet down says, (Reading:)   Use our team of specialists to build all the digital (Reddit, site, X, 4 Chan, discord, et cetera) messaging to trend and dominate in client's favor?

A.   I do.

Q.   Are you aware of any team of specialists that

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 171

exists that can do that?

A.   I'm not.

Q.   Is Melissa Nathan a technically sophisticated person?

MR. COOLEY:  Objection.

MR. BABCOCK:  Objection.

THE WITNESS:  Yeah, I'd -- I'd need a more specific question.

Q.   (BY MR. GOTTLIEB)  Do you think Melissa Nathan understands, for example, the -- the concept of something being algorithmically weaponized?

MR. BABCOCK:  Objection.

MR. COOLEY:  Join.

THE WITNESS:  I don't know.

Q.   (BY MR. GOTTLIEB)  Do you think she understands how to influence content on 4chan?

MR. BABCOCK:  Objection.

MR. COOLEY:  Objection.

THE WITNESS:  I don't know.

Q.   (BY MR. GOTTLIEB)  Would it surprise you to learn in her testimony under oath in this case she testified that she doesn't even have social media?

MR. BABCOCK:  Objection.

THE WITNESS:  I -- I -- I don't -- I don't -- have no idea if that would surprise me or not.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 178

MR. GOTTLIEB:  This is 15?

(Exhibit No. 15 was marked.)

Q.  (BY MR. GOTTLIEB)  Exhibit 15 is a one-page document bearing the Bates No. Street 3.0381.  This is an email exchange on December 17th, 2024.  Let me know when you've taken a look.

A.  I see it.

Q.  Exhibit 15 is an email exchange between you, Melissa Nathan, and then it looks like Carolina Hurley on December 2 -- December 17th, 2024; is that correct?

A.  Yes.

Q.  And it looks like the first email in the chain down the bottom, you've sent something with a question mark, and Melissa Nathan has responded, (Reading:) Thank you - and I'm speaking to ████ Friday 1 pm Pacific.

Do you see that?

A.  I do.

Q.  Who or what is ████ ?

A.  ████ , as I recall, is a -- is a ████████ ████ .

Q.  Did you provide -- and by you, of course, I mean you -- you or Street provide any services to ████ ?

A.  We did not.

Q.  At any point in time?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 179

A.   We did not.

Q.   Did you provide any help to ▓▓▓▓ whether or not you were ever engaged to do so?

A.   I spoke with one of their leadership about ▓▓▓▓▓▓▓▓▓▓

Q.   Okay.  Was that with Ms. Nathan?

A.   I don't believe so.

Q.   Am I correct that TAG did some work for ▓▓▓ in 2024?

A.   I -- I don't know enough about that.  I assume yes.

Q.   You looked like you were about to say yes and then you said -- then you said I don't know?

A.   Well, you know -- I -- I see the -- you know, again, I -- I don't know enough about it.  I assume they did.

Q.   Okay.  In this message at the top, you've written to Ms. Nathan and to Carolina Hurley, also at TAG, at 5:33 p.m. on December 17, (Reading:)  Genuinely not concerned but if you are speaking with ▓▓▓ they were well aware of the digital component and leaned WAY into it while we made certain to clean up, monitor and manage the sentiment (particularly the massive negative sentiment) about them, their culture, their departing talent, et cetera...while we elevated the positive

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 202

A.   I -- I don't recall exactly.

Q.   Well, I mean, how often do you tell people that you have some team working on something, when it's not true?

A.   It's puffery.

Q.   This is puffery?  Okay.

You say, (Reading:)  Either way this is our wheelhouse and I'm happy to discuss.

Do you see that?

A.   I do.

Q.   What are you trying to convey when you tell somebody "this is our wheelhouse"?

A.   It's crisis management.

Q.   And you're trying to convey to ▓▓▓▓▓▓ that the problem she's facing is in the wheelhouse of you and Ms. Nathan, right?

A.   I don't know specifically.  Crisis management is the wheelhouse.

Q.   But you're not talking about crisis management generally to ▓▓▓▓▓▓ right?  You're talking about the problems she's facing?

A.   We don't know the details yet.

Q.   So you were saying then that all crisis management is in your wheelhouse?

A.   I don't know exactly what there -- what's being

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 207

Street or yourself would take a $15,000 fee for social or digital work with respect to this project?

A.  I don't recall.

Q.  Okay.  All right.  Did you or Street --

MR. GOTTLIEB:  We can go off AEO unless you instruct me otherwise, Mr. Babcock.

MR. BABCOCK:  Sure.

MR. GOTTLIEB:  When I go down this line of questioning.

Q.  (BY MR. GOTTLIEB)  Did you ever perform any work alongside Melissa Nathan for ███████████

A.  I did not.

Q.  And when I say work, I don't limit that question to a formal retention in which Street Relations was formally engaged by ███████████  I'm going to broaden it and say did you provide any kind of help at any point in time for work that Melissa Nathan was doing for ███████

A.  I recall having a discussion about content, but I don't recall anything beyond that.

Q.  What do you recall about the discussion about content?

A.  Again, I think -- I don't recall specifically what it was.  But they -- you know, if I remember this correctly, there was an issue that she had with a --

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 277

home.

Q.   Okay.  Do you see how in Ms. Abel's email to Ms. Case, Mr. Heath, Ms. Nathan, and Ms. Koslow, there is a reference to a separate team based in Hawaii?

A.   Yeah, I do see that.

Q.   Do you have any understanding of why Ms. Nathan thought -- or, sorry, why Ms. Abel thought that you or Street Relations had some team in Hawaii?

A.   I have no idea.

Q.   Did you ever ask her?

A.   I don't know.  I didn't see this email.

Q.   Okay.  Do you see Ms. Case email at 2:50 p.m. on August 7th?

A.   Yes.

Q.   And the subject line of that is "Social / Digital Mitigation / Remediation"?  Is that -- is that fair?

A.   Correct.

Q.   Do you see language in this Katie Case email that is similar or identical to language that we have looked at in the other statements of work that TAG sent out on which you were copied during this deposition?

MR. BABCOCK:  Objection.

MR. COOLEY:  Objection.

THE WITNESS:  I do see similar language.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 278

Q.   (BY MR. GOTTLIEB)  Similar language like, you know, references to CTR manipulation and contextual links?

A.   I do.

Q.   Similar language, like references to ranking within SERPs?

A.   I do.

MR. BABCOCK:  Objection.

Q.   (BY MR. GOTTLIEB)  Similar language like references to leveraging relationships with Discord, Reddit, X, IG, TikTok, YouTube, et cetera?

A.   I do.

Q.   But it's a little different, right, than some of the other statements of works we've looked at?

MR. COOLEY:  Objection.

MR. BABCOCK:  Same objection.

THE WITNESS:  I -- I don't know that offhand.

Q.   (BY MR. GOTTLIEB)  Okay.  Well, so, for example, one of the bullets, the third bullet down under specific efforts says that the social digital mitigation and remediation team will, (Reading:) Leverage relationships with this list of platforms, Discord, Reddit, X, IG, TikTok, YouTube, et cetera, to expose behavior of Blake and other parties, both current and

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 279

past and engage directly with communities to adjust or influence the conversations taking place in real time.

Do you see that?

A.  I do.

Q.  Did you ever discuss this language at any point in time with any of the people in the header to this email on August 7th, 2024?

A.  I did not.

Q.  Do you believe you have relationships at any of these platforms that would allow you to influence conversations taking place in real time?

A.  No.

Q.  Why did Ms. Case make this representation, to the best of your knowledge?

MR. COOLEY:  Objection.

MR. BABCOCK:  Objection.

THE WITNESS:  I would have to have -- know more details.

Q.  (BY MR. GOTTLIEB)  Okay.  So I think that means you have -- you don't have any understanding at all of where Ms. Case might have gotten this language from?

A.  I -- I do not.

Q.  Okay.  I'll represent to you that Ms. Case testified that she got the content for this from Melissa Nathan.  Do you have any idea where Melissa Nathan would

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 280

have gotten the ideas for this language from?

MR. BABCOCK:  Objection.

MR. COOLEY:  Join.

THE WITNESS:  I -- I -- I do not.

Q.  (BY MR. GOTTLIEB)  Did you have any conversations at all with Melissa Nathan between August 5th when she sent that email to you and 2:50 p.m. on August 7th, 2024?

A.  Can you repeat that question?  Did I have any conversations?

Q.  Yes.  Did you -- did you have any conversations at all with Melissa Nathan between August 5th and when you got the 16, 17-point list and 2:50 p.m. on August 7, 2024?

A.  I -- I believe so.  I don't recall exactly.

Q.  Okay.  It's possible you-all could have talked in advance of this email being sent by Katie Case?

A.  It's possible.

Q.  Do you have a recollection of talking to Katie Case at any time between August 5th and 2:50 p.m. on August 7th, 2024?

A.  I do not.

Q.  Okay.  Do you see the last bullet on the first page, (Reading:)  Properly and strategically monitoring damaging Reddit/Subreddit, X, Discord, et cetera --

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 281

including threads relating to concerning operations and manage the narrative.  This can be done with legacy admin for each platform.  As part of this, expert admins will also monitor and protect peripheral elements like Wikipedia, fan pages, and more to ensure threads and narratives are handled appropriately.

Do you see that?

A.  I do see that.

Q.  Is that a service that you and Street Relations can provide?

A.  It is not.

Q.  So that would not be a truthful description of a service that Street Relations could provide?

MR. COOLEY:  Objection.

MR. BABCOCK:  Objection.

THE WITNESS:  Again, properly and strategically monitor, that's the job, okay.  The rest of that, I can't speak to at all.

Q.  (BY MR. GOTTLIEB)  So if I'm understanding you, you could and Street Relations could properly and strategically monitor content emerging on social media, correct?

A.  Correct.

Q.  But where you would stop and take issue is by the time it gets to manage the narrative?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 282

A.   Correct.

Q.   And that is not -- your testimony is that is not something you could do?

A.   No.

Q.   That is not --

A.   That is not something that we do.

Q.   It is not something you're capable of doing?

A.   Incapable of doing that.

Q.   What about this next sentence "This can be done with legacy admin for each platform".  What does that mean?

A.   I don't know.  I didn't write that.

Q.   Did you ever talk to Melissa Nathan about legacy admins on any platforms?

A.   Not that I recall.

Q.   Okay.  Do you see the next bullet, (Reading:) Actively sway the algorithm with one SEO charged hub/site, created and overseen by the team?

A.   I do.

Q.   What on Earth does that mean?

MR. COOLEY:  Objection.

MR. BABCOCK:  Objection.

THE WITNESS:  I -- I don't know.

MR. GOTTLIEB:  Come on, Chip.

MR. BABCOCK:  It's the -- it's the what on

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 283

Earth is...

Q. (BY MR. GOTTLIEB)  What does that mean?

MR. BABCOCK:  I'll withdraw the objection.

Q. (BY MR. GOTTLIEB)  What does that mean?

MR. COOLEY:  I won't.

THE WITNESS:  I -- I don't know.  I didn't write this.

MR. BABCOCK:  We're covered.

Q. (BY MR. GOTTLIEB)  Have you ever spoken to Melissa Nathan about the topic of swaying an algorithm with an SEO charged hub/site?

A. Not that I recall.

Q. Is it possible you've ever had a conversation with Melissa Nathan about swaying an algorithm with an SEO charged hub or site?

A. Not that I recall.  I don't know enough to answer that question.

Q. Do you have any idea as you sit here today where Melissa Nathan might have gotten this language from?

A. I have no idea.

Q. And if Melissa Nathan testified that she is not a tech savvy person and that she was talking to you during this period of time, what would you say to that?

MR. COOLEY:  Objection.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 284

MR. BABCOCK:  Objection.

THE WITNESS:  I can't -- I can't say anything to that.

Q.  (BY MR. GOTTLIEB)  Okay.  Do you know what this means to take -- (Reading:)  Taking down a full Reddit and all social accounts as needed?

A.  I don't know what that means specifically.

Q.  Have you ever taken any action to -- I think I asked you this before.  Have you ever taken any action for any client in any work to have a social media user's account suspended, removed, or taken down?

A.  I have not.

Q.  Have you ever worked with anyone else who has done that?

MR. COOLEY:  Objection.

THE WITNESS:  I'd need to know more specifics.  But social media companies can do that.

Q.  (BY MR. GOTTLIEB)  Have you ever engaged with any representative of a social media company about the subject of taking down or suspending a user's account?

A.  Not that I recall.

Q.  Have you ever communicated with any social media platform about taking down or removing any content on a social media platform?

A.  Not that I recall.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 285

Q.   It's possible you have.  It's possible you haven't.  You just can't recall?

A.   I don't recall.

Q.   Okay.  Do you see how at the bottom of this email, Katie Case writes, (Reading:)  The social team are now worried about Blake activating the Taylor Swift fan base, which is a major concern.  With this in mind and to ensure Justin and the studio are 100 percent protected moving forward, they have now changed the fee to $30,000 per month due to the uptick in social chatter?

A.   I see that.

Q.   Do you know that in a previous quote sent to Wayfarer, TAG represented that the fee would be $25,000 per month?

A.   I don't know that offhand.

Q.   Do you have any idea why the quote went from $25,000 per month to the $30,000 per month that you ultimately charged?

MR. COOLEY:  Objection.

THE WITNESS:  Yeah, I can't speak to that. I don't know.

Q.   (BY MR. GOTTLIEB)  I think your testified earlier that $30,000 was your monthly fee; is that right?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 315

THE WITNESS:  Yeah, I -- I -- I don't -- I don't recall.

Q.  (BY MR. GOTTLIEB)  So you can't rule it out?

MR. COOLEY:  Objection.

THE WITNESS:  I -- I need to know more details.

Q.  (BY MR. GOTTLIEB)  You've got to answer my question, sir.  It's a yes or no question.  Can you rule out the possibility that you were on a Signal chain with Katie Case and Melissa Nathan as this -- on the date of this message here, August 8th, 2024?

MR. COOLEY:  Same objection.

MR. BABCOCK:  Me too.

THE WITNESS:  Yeah, I -- I don't know what indicates this is a Signal message, so I'd need to know more information.

Q.  (BY MR. GOTTLIEB)  Okay.  You were communicating with people at TAG by this time in August of 2024, right, on Signal?

A.  Sure, yes.

Q.  Including Melissa Nathan?

A.  Correct.

Q.  Okay.  And you just don't recall whether this is among the Signal messages that -- or Signal chains that you were on?