# Exhibit 1

# EXHIBIT 20

## Filed Under Seal

Page 1

** C O N F I D E N T I A L **

* CONTAINS ATTORNEYS' EYES ONLY MATERIAL *

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 1:24-CV-10049-LJL
(Consolidated with 1:25-cv-00449-LJL)
-----------------------------------x
BLAKE LIVELY,
            Plaintiff,
        - against -
WAYFARER STUDIOS LLC, a Delaware
Limited Liability Company, JUSTIN
BALDONI, an individual, JAMEY HEATH, an
individual, STEVE SAROWITZ, an individual,
IT ENDS WITH US MOVIE LLC, a California
Limited Liability Company, MELISSA
NATHAN, an individual, THE AGENCY
GROUP PR LLC, a Delaware Limited Liability
Company, JENNIFER ABEL, an individual,
JED WALLACE, an individual, and STREET
RELATIONS INC., a California Corporation,
            Defendants.
-----------------------------------x
                (Caption continued)
                September 5, 2025
                9:10 a.m.


        Videotaped Deposition of KATHERINE
CASE, taken by Plaintiff, pursuant to
Subpoena, held at the offices of Willkie
Farr & Gallagher LLP, 787 Seventh Avenue,
New York, New York, before Todd DeSimone, a
Registered Professional Reporter and Notary
Public of the State of New York.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Civ. Action No. 1:25-cv-779

------------------------------------x

STEPHANIE JONES and JONESWORKS LLC,

                    Plaintiffs,

        - against -

JENNIFER ABEL, MELISSA NATHAN,

JUSTIN BALDONI, WAYFARER STUDIOS LLC,

and JOHN DOES 1-10,

                    Defendants.

------------------------------------x

Page 158

K.  CASE - CONFIDENTIAL

Do you see that?

A.    I do.

Q.    Who is Bryan?

A.    I believe Bryan Freedman.

Q.    Bryan and Jed were working in collaboration with TAG on the Rebel Wilson account?

A.    I didn't work on that account, so I'm not sure.

Q.    You worked on the copy that Melissa was requesting for that account, correct?

A.    This was a one-off request.

Q.    So you did some work on that account, correct?

A.    Specifically I assisted with this copy.

Q.    And you knew that Jed and Bryan were working together asking for the copy that you were preparing for that account, correct?

MR. BREED:  Objection.

MR. FREEDMAN:  Objection.

A.    Melissa alerted me at that

K. CASE - CONFIDENTIAL

time.

Q.    You knew that both Jed and Bryan were to receive the copy, correct?

MR. BREED:  Objection.

MS. EMERY:  Objection.

A.    I knew that Melissa needed the copy.

Q.    For whom?

A.    In her text message she said Jed and Bryan were looking for it.

Q.    Did Mr. Freedman work with TAG and Jed on the Wayfarer account?

A.    Not during the summer of 2024.

Q.    When is your understanding that Mr. Freedman started that work?

A.    It is my understanding that it was following Blake's CRD complaint, Civil Rights Department complaint in December.

Q.    When TAG was looking to identify a subcontractor for digital services in connection with the Wayfarer account, did TAG receive multiple quotes for those services?

A.    That was communicated to me by

Page 374

K. CASE - CONFIDENTIAL

prep that they had spoken to anyone representing the Wayfarer parties prior to your preparation?

A.    I can't say.

Q.    Ms. Case, are you aware of various websites and social media accounts that are disparaging of Ms. Jones?

MR. BREED:  Objection.

A.    I am aware of websites about Ms. Jones.

Q.    Did you create any of the websites that are disparaging of Ms. Jones?

A.    No.

Q.    Who did?

A.    I don't know.

Q.    How did you become aware of the websites that are disparaging of Ms. Jones?

MR. BREED:  Objection.

MR. FREEDMAN:  Objection.

Q.    How did you become aware of the websites disparaging Ms. Jones?

A.    I received a call from Melissa in early May.  It was communicated to me that a website had been requested.

Page 375

K. CASE - CONFIDENTIAL

Q.    A website had been requested?

A.    The creation of a website had been requested.

Q.    By whom?

MR. FREEDMAN:  Objection.

MR. BREED:  Let's designate this AEO, please.

MS. TAHLER:  We can go off.

THE VIDEOGRAPHER:  Yeah.

A.    Melissa represented to me that a potential new client had requested the formulation of a website.

Q.    Who was that new client?

MR. FREEDMAN:  Objection.

A.    At the time it was represented to me that it was ██████████

Q.    Melissa Nathan told you that ██████████ had requested preparation of a website about Ms. Jones?

MR. FREEDMAN:  Objection.

A.    She represented to me that he had requested the creation of a website of this nature.

Q.    Did she tell you anything else

Page 376

K.  CASE - CONFIDENTIAL

about what ███████████ had requested?

     A.     Not what he had requested specifically.

     Q.     Generally what he had requested?

     A.     Not necessarily what he had requested, but specific language was communicated.

     Q.     What was that specific language?

     A.     That Stephanie holds clients hostage, that she leaks clients' secrets, and that she treats her employees poorly, amongst others.

     Q.     Ms. Nathan told you that ███████████ had said the things that you just said to her?

     A.     No.

     Q.     Who did Ms. Nathan say said that Stephanie holds clients hostage?

          MR.  BREED:   Objection.

     A.     I don't know who might have said that.  This language was communicated to me.

Page 377

K. CASE - CONFIDENTIAL

Q.     By Ms. Nathan?

A.     The conversation was with her, yes.

Q.     It was a conversation?

A.     Yes.

Q.     Did Ms. Nathan send you any written communications about this?

A.     Not about the language to be used, no.

Q.     Generally about the websites?

A.     At that time, no.

Q.     At any time?

A.     There was conversation about the copy that I had written based on the information provided, I redrafted and sent back to her.

Q.     Did you draft the copy for the website about Ms. Jones?

A.     Based on the conversation and the language provided to me, I provided copy.

Q.     So yes, you provided -- you wrote the copy that was -- that became the website of Ms. Jones?

Page 382

K. CASE - CONFIDENTIAL

StephanieJonesLeaks.com.

Do you recognize this as the copy that you drafted?

A.    I believe so, yes.

Q.    Do you know how this went from the copy that you drafted to becoming a website?

A.    I do not.

Q.    Did Melissa communicate anything to you about how this became a website after you provided her with the copy?

MR. FREEDMAN:  Objection.

A.    No.

Q.    Do you understand there came a time where this website was shut down?

MR. BREED:  Objection.

A.    No.

Q.    Did you understand that there came a time where there was a second website?

A.    At the time I wasn't aware that there was a second website, no.

Q.    After you provided Ms. Nathan

Page 383

K. CASE - CONFIDENTIAL

with the copy for Exhibit 35, did you have any other discussions with Ms. Nathan about websites regarding Ms. Jones?

MR. FREEDMAN:  Objection.

A.      Websites, plural, no.  I was asked to help alongside her to draft a handful of tweets for the Twitter page, and I was asked, again, based on language that I was provided to extrapolate that into updates to the website.

Q.      You referred to the Twitter page.  What is the Twitter page?

A.      I don't recall the specific handle.  I was told that at the time the site went public there was a corresponding Twitter page.

Q.      Was that Twitter handle @LyingStephJones?

MR. FREEDMAN:  Objection.

A.      I'm not sure.  I don't recall what the Twitter page was.

Q.      Melissa told you that there was a corresponding Twitter handle?

A.      She asked if I could assist in

K. CASE - CONFIDENTIAL
drafting tweets, so I inferred that the
Twitter handle was related.

Q.    Did she tell you that the
tweets that you had drafted had in fact
been posted?

A.    She did not communicate that,
no.

Q.    Did you form an understanding
that they had been posted?

MR. FREEDMAN:  Objection.

A.    Yes.

Q.    Based on what?

A.    Seeing them on the Twitter
page.

Q.    How many tweets did you prepare
for the Twitter page?

A.    Roughly five or six.

Q.    How did you provide those to
Ms. Nathan?

A.    I believe maybe Signal.  I
don't really recall.

Q.    Do you recall communicating
with Ms. Nathan on Signal regarding
Ms. Jones?

Page 387

K. CASE - CONFIDENTIAL

A.      There was never a formal explanation.  I was simply asked to draft tweets.

Q.      Do you know whether Melissa had any other assistance in this?

A.      I don't know.

Q.      Do you know whether she worked with Jed Wallace on this?

MR. FREEDMAN:  Objection.

A.      I spoke with Jed in conjunction to Melissa as it related to the tweets.

Q.      And what did you and Jed discuss?

MR. FREEDMAN:  Objection.

MS. EMERY:  Objection.

A.      The tweets.

Q.      What about the tweets?

A.      I provided them via Signal.

Q.      Was it your understanding that Jed was going to post the tweets?

MR. FREEDMAN:  Objection.

MR. BREED:  Objection.

MS. EMERY:  Objection.

A.      I don't know.

Page 505

K. CASE - CONFIDENTIAL

not exactly sure what she did; is that correct?

A.      That's correct.

Q.      Do you have any ill will of Melissa Nathan?

A.      No.

Q.      Earlier you testified that the ███████████████████ were turned down by TAG as clients?

A.      That's my understanding.

Q.      Isn't it true that you yourself personally worked for them on the side?

A.      I wouldn't qualify it as working with them.

Q.      Are you saying you didn't perform any services whatsoever for the ███████████████ ?

A.      It was requested that I connect with them to create a website in conjunction with their ongoing litigation.

Q.      And that was not for TAG, it was outside of TAG, right?

A.      I'm not sure.

Q.      Well, Melissa Nathan turned

Page 506

K. CASE - CONFIDENTIAL

down the ████████████████, she didn't want them as clients; isn't that correct?

A.    She didn't want them as clients for TAG, but I did connect with Melissa and Jed as it related to the website.

Q.    As it related to the ████████ website, were you paid for that?

A.    I received payment for work done in conjunction with Jed and Melissa.

Q.    You are saying that Jed and Melissa did work for the ████████ ████████?

A.    I'm saying they asked me to perform work for the ████████████████

Q.    And the ████████████████ when did you do that work?

A.    I don't recall off the top of my head.  I believe in October.

Q.    And that was after TAG had turned them down as clients, correct?

A.    That's my understanding.

Q.    Did you do any other work on the side?

MS. TAHLER:  Objection.

Page 519

CERTIFICATION

I, TODD DeSIMONE, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of September, 2025.

TODD DESIMONE