# EXHIBIT 11
## Filed Under Seal

CONFIDENTIAL

**Page 1**

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---

BLAKE LIVELY,

Plaintiff,

vs.        CASE NO. 24-CV-10049-LJL (LEAD CASE)

25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

_____

JENNIFER ABEL,

Third-party Plaintiff,

vs.

JONESWORKS, LLC,

Third-party Defendant.

_____

WAYFARER STUDIOS LLC, et al.

Consolidated Plaintiffs,

vs.

BLAKE LIVELY, et al.

Consolidated Defendants.

_____

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF MELISSA NATHAN

Los Angeles, California

Monday, September 29, 2025

Stenographically Reported by:  Ashley Soevyn,
CALIFORNIA CSR No. 12019

CONFIDENTIAL

Page 2

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---


BLAKE LIVELY,

                    Plaintiff,

    vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)

                            25-CV-449 (LJL) (MEMBER CASE)


WAYFARER STUDIOS LLC, ET AL.


                    Defendants.

_____

JENNIFER ABEL,

             Third-party Plaintiff,

    vs.

JONESWORKS, LLC,

             Third-party Defendant.

_____

WAYFARER STUDIOS LLC, et al.

             Consolidated Plaintiffs,

    vs.

BLAKE LIVELY, et al.

             Consolidated Defendants.

_____

                    **CONFIDENTIAL**

             Video-recorded Deposition of

MELISSA NATHAN, taken on behalf of the Plaintiff

Blake Lively, Pursuant to Notice, at the offices of

Willkie Farr & Gallagher, 2029 Century Park East,

Los Angeles, California beginning at 9:35 a.m.  and

ending at 7:32 p.m. on Monday, September 29, 2025,

before me, ASHLEY SOEVYN, California Certified

Shorthand Reporter No. 12019.

CONFIDENTIAL

Page 196

BY MR. GOTTLIEB:

Q    Okay.  And I mean, here Ms. Case says that the team will focus on the social and digital elements and she gives some specifics on that?

A    I see that.

Q    And, again, you earlier testified Mr. Wallace was the only social or digital team that you had in mind for this work?

MR. GLOVER:  Objection.  Form.

THE WITNESS:  No, I think earlier, I did say that we were reaching out to one or two in a different text message.  But yes, in this instance, this was around Street Relations.

BY MR. GOTTLIEB:

Q    Okay.  This quote is a description of services that is describing the services that Street Relations would provide; is that right?

MR. FREEDMAN:  Objection.

MR. GLOVER:  Objection.  Form.

THE WITNESS:  I did not write this.

BY MR. GOTTLIEB:

Q    Did you write any of this, Ms. Nathan?

A    I didn't -- I don't think I did, no.

Q    Okay.

A    I'm not -- I could have, unless you want

CONFIDENTIAL

Page 197

to show me something else.  But I do not speak this kind of language either.

Q    Okay.  Is it possible that you received some language from Mr. Wallace that you provided that language to Ms. Case and that some of that language wound up here in this email?

MR. GLOVER:  Objection.  Form.

MR. FREEDMAN:  Objection.

THE WITNESS:  I mean, I don't recall that.  But this isn't what we do, so she would have got the language somewhere.

BY MR. GOTTLIEB:

Q    Okay.  I just want to understand if you're saying it's possible or not possible that you provided some of this content to Ms. Case?

A    I don't recall if it was me.  I don't use this type of language, but I -- unless there's something that I'm like, here Katie, please write this.  I honestly don't recall.

Q    Okay.  You see here Ms. Case writes:

(As read):

"The integral part is to execute all without fingerprints"?

A    Yes, I do.

Q    And that echoes something that you wrote

CONFIDENTIAL

Page 198

in a document we looked at a little while ago about being -- efforts being untraceable, right?

A    I can see that sentence, yes.

Q    Was it your understanding that that was important to Mr. Heath in the services that would be provided in the social or digital space?

MR. FREEDMAN:  Objection.

THE WITNESS:  I can't think to what Mr. Heath was thinking.  But I do know in situations like this, it's high stakes.  You don't want -- it's confidential.  You don't want -- you know, it's a crisis.

BY MR. GOTTLIEB:

Q    Okay.  And the bullet points that you see there.

A    Uh-huh.

Q    There is a description of services.  Do you see those?

A    After "specific efforts include"?

Q    Yes.

A    Yes.

Q    And is it your understanding that these were services that Street Relations could provide if called upon to do so for the Wayfarer parties?

MR. GLOVER:  Objection.  Form.

CONFIDENTIAL

Page 199

MR. FREEDMAN:  Objection.

THE WITNESS:  Again, I don't know exactly where she got the language from.  If there was an email that I have missed in which it's either me or someone else doing it, I can -- but, you know, we don't -- I don't work in the digital space.  Like, all of this is like a completely different language to me.

BY MR. GOTTLIEB:

Q    I understand that and I promise you we'll look at that --

A    That's fine.

Q    -- that text that you're searching for.

A    Yeah.

Q    I'm really just trying to understand -- I mean, this was conveyed by Katie Case --

A    Katie.

Q    -- who works for you --

A    Uh-huh.

Q    -- to Mr. Heath --

A    Uh-huh.

Q    -- and it is a description, according to Ms. Case, following up on the social/digital conversation this morning with specifics about social and digital mitigation and remediation?

CONFIDENTIAL

Page 205

Do you see that?

A    I see that.

Q    And then at 12:36 p.m., you type out:

(As read):

"30K monthly for three month minimum,

properly and strategically monitor

damaging Reddit/subreddit, X, Discord,

X or et cetera threads relating to

concerning opposition and manage the

narrative.  This can only be done with

legacy admin for each platform.  They

work for us."

A    I see that.

Q    Do you see that?

You wrote that?

A    I did.

Q    Where did you get that language?

A    I'm not sure where -- who sent it to me.

Q    Is there any person other than

Jed Wallace who could have sent that to you?

MR. GLOVER:  Objection.

THE WITNESS:  I wasn't speaking to anyone

else on -- at this point for this case.

BY MR. GOTTLIEB:

Q    And these -- these services are a

CONFIDENTIAL

Page 206

description of services that you believe

Jed Wallace -- Jed Wallace could provide, right?

MR. GLOVER:  Objection.  Form.

THE WITNESS:  I do not understand what

these services are, so -- half of them, I don't

understand what they are.

BY MR. GOTTLIEB:

Q    Okay.  What half do you understand?

A    I understand monitoring.

Q    Okay.

A    I do understand the Wiki situation

because I've had different issues with that from my

other clients.  That's why you need admin editors,

which is very aboveboard.

Q    Okay.

A    I don't --

Q    That's a reference to the second sentence

here:

(As read):

"With seasoned admin editors on

peripheral elements like Wikipedia and

fan pages"?

A    Yes, you need to have editors to be able

to overlook Wikipedia these days.  It's different to

what it used to be.

Page 283

wolves?" at 7:31 p.m.  And Ms. Chozick responds at 7:40 p.m.:

(As read):

"I told our friend Josh that Melissa is a boss and has a cool client.  Josh told his wife, who is a very prominent publicist.  Sarah somehow told The Hollywood Reporter, and now they are doing a story on Mel."

A     Uh-huh.

Q     Do you see that?

A     Yes.

Q     That's a reference to The Hollywood Reporter story that was about you, right?

MR. FREEDMAN:  Objection.

THE WITNESS:  But this is not true.

BY MR. GOTTLIEB:

Q     This is not true?

A     No.

Q     Ms. Chozick just made that up?

A     Not just made it up.  This is -- This is not -- the way that you're characterizing it is not actually what happened.

Q     How is it not what happened?

A     Well, Josh, who we -- who I know very

CONFIDENTIAL

Page 284

well, he is friends with Pamela McClintock, and, like, they all know each other -- they did not place this story on me.

Q    Well, I didn't --

A    You just did.  You just said that --

Q    I didn't say they placed the story.

A    So --

Q    There's a distinction between placing a story and a reporter learning information; is there not?

A    Yes.

Q    So Ms. Chozick here is saying that, "Josh told his wife, who's a prominent publicist."  What's Josh's wife's name?

A    Sarah.

Q    And Sarah somehow told The Hollywood Reporter.

Do you see that?

A    I see that.

Q    You don't say anywhere in this chain, do you, that that's incorrect; do you?

A    Yeah, because I didn't need to.

Q    You -- they continue discussing down, about how:

(As read):

CONFIDENTIAL

Page 285

"You will hate this, but it needs to be done."

A    Uh-huh.

Q    And Ms. Chozick says:

(As read):

"I didn't mean to be your publicist, but this is good."

Do you see that?

A    Uh-huh.

Q    (As read):

"Rock star crisis PR"?

A    Uh-huh.

Q    You screenshot your conversation with Ms. McClintock on the next page and say:

(As read):

"I swear Amy"?

A    Uh-huh.

Q    And Ms. Chozick then has a few comments about what your conversation with Ms. McClintock might have been, right?

A    Uh-huh.

Q    It says:

(As read):

"Tell her to call me if she needs a reporter to say nice things about you."

CONFIDENTIAL

Page 286

A     Uh-huh.

Q     And then Ashley says:

(As read):

"What publication?"

Ms. Chozick says, "THR."

And it continues down.  And at no point -- I guess, why don't you point me to where in this conversation you see an understanding from your friends that what was described by Ms. Chozick at 7:40 p.m. was just a joke.  It didn't happen at all.

MR. FREEDMAN:  Objection.

THE WITNESS:  My friends are always -- they are joking about me here.

BY MR. GOTTLIEB:

Q     Right.  And they're joking about you, but --

A     There's a joke there.  There's a joke at the end of it.

(As read):

"Men are always a problem."

This is the way my friends talk to me.

Q     Your testimony is --

A     Yes.

Q     -- that this recitation of events:

(As read):

CONFIDENTIAL

Page 301

of as you sit here?

A    I'm trying to think of what else there has been.  There's been a fair few.  There was -- I'm trying to think what else.  I can't -- you know, there's been -- there's a few.  When you say not specifically the legal firms, it's legal firms that bring someone like me in.  So that's where I get my relationships from.  That's how I get hired, is by a legal.  So no, not really.

Q    Using the most recent experiences you've had with Mr. Wallace --

A    Yeah.

Q    -- can you describe what he does?

A    He monitors digital and he works in the digital space.  I do also have knowledge that he helps a lot of people as well.  So he helps people who are either in active addiction, who have had addiction problems.  So I do have knowledge that in his genre of work, that he does help people a lot.

Q    Have you ever worked with Mr. Wallace on such a project?

A    On addiction?

Q    Yeah.

A    No.

Q    From the projects in which you have

CONFIDENTIAL

**Page 314**

A     Yes.

Q     What did you mean by that?

A     Because you want to have someone that takes on both people, not just all men or women. You want to have someone that's fair and reasonable.

Q     On the next page, 2154, there is another reference to a statement?

A     Yes.

Q     And you and Ms. Abel have a reaction to that.  Again, you say here:

(As read):

"Career killer for them and Wayfarer. No.  Have to fight it."

Do you see that?

A     Yes.

Q     You say:

(As read):

"Lawyer up now."

A     Yes.

Q     So your view at this point was that Mr. Baldoni and Mr. Heath needed a litigator; is that right?

A     Yes.

Q     They needed to retain one immediately?

MR. FREEDMAN:  Objection.

CONFIDENTIAL

Page 315

THE WITNESS:  I think in my opinion -- I'm not a lawyer.  I'm a crisis publicist and a normal publicist.  I think Blake's behavior, what she had been showing, was entirely unreasonable.  I think Leslie Sloane placing stories and the things I was starting to hear were becoming -- it was just -- it was awful.

And Justin was petrified.  And, really, why I was hired was to protect the movie.  So yes, I was doing my job.

BY MR. GOTTLIEB:

Q    You thought that there was a pretty good shot this was heading down the litigation path?

MR. FREEDMAN:  Objection.

THE WITNESS:  Again, I'm not a lawyer, but I did want them to speak to a lawyer because I am not a lawyer.

BY MR. GOTTLIEB:

Q    On the next page, at 11:42 a.m., you say:

(As read):

"Can I start a Signal thread with you, me, and Jed, just in case you need him to connect you to Bryan because they're very close?"

Do you see that?

Page 364

Q    In this text at 12:37 p.m., your testimony is --

A    Talking to everyone -- sorry.

Q    Your testimony is, that is a reference to talking the client off the ledge?

A    Absolutely, yeah.

Q    Okay.  What were the two pieces you were referencing?

A    The one that Leslie Sloane placed at the New York Post which was about Justin Baldoni.  It was a negative piece with my sister, Sara Nathan. And I don't know the second one.  I can't remember.

Q    Was the second one a Daily Mail story?

A    I can't remember.

Q    Did you talk to your sister about that piece before it ran?

A    Yes.

Q    And in talking to your sister about that piece before it ran, you made certain arguments and provided certain information about things that you thought she shouldn't print, right?

A    As I would do to every reporter, but the piece was negative against Justin Baldoni.

Q    So the answer to my question is yes?

A    Yes.

CONFIDENTIAL

Page 381

          so obvious."

     A     Yes.

     Q     How do you know that?

     A     I just -- it's my assumption because bots do look -- well, those, Hey, this product is great. Like I was saying, looks ridiculous.

     Q     Do you really -- have you really not had conversations with people in the digital space to understand the basis for what you said there?

     A     This is just from my -- how I am starting to learn about it.  As I'm still now learning about it.

     Q     At any point in time, have you come to understand the very specific thing that Mr. Wallace was doing?

          MR. GLOVER:  Objection.

          MR. FREEDMAN:  Objection.

          THE WITNESS:  No.

BY MR. GOTTLIEB:

     Q     Were you ever curious about what he might be doing?

     A     No.

     Q     If you don't know what he was doing, how do you know that he was doing nothing, other than monitoring social media?

CONFIDENTIAL

Page 382

A    But that is what he was doing.

Q    How do you know that?

A    Because that's exactly what he told us he was doing.  And he was monitoring something that we do not do, the social landscape and digital landscape.

Q    When did Mr. Wallace tell you that the only thing he was doing was monitoring social media accounts?

A    I do not recall the exact time and date he told me anything.

Q    Okay.  Does it make any sense to you at all, if the only thing Mr. Wallace was doing was monitoring social media accounts, why your colleagues at TAG repeatedly sent things to him to boost or amplify?

MR. GLOVER:  Objection.  Form.

THE WITNESS:  Does it make sense to me?

BY MR. GOTTLIEB:

Q    Yes.

A    For positive things, yes.  To look at. This is positive, yes.

Q    Okay.  So then your testimony is not that the only thing Mr. Wallace was doing was monitoring, right?

CONFIDENTIAL

Page 431

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.  Dated this 1st day of October, 2025.

ASHLEY SOEVYN

CSR No. 12019