# EXHIBIT 4
## FILED UNDER SEAL

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---

BLAKE LIVELY,

Plaintiff,

vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)

25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

_____

JENNIFER ABEL,

Third-party Plaintiff,

vs.

JONESWORKS, LLC,

Third-party Defendant.

_____

WAYFARER STUDIOS LLC, et al.

Consolidated Plaintiffs,

vs.

BLAKE LIVELY, et al.

Consolidated Defendants.

_____

**CONFIDENTIAL**

**CONTAINING ATTORNEYS' EYES ONLY PORTIONS**

VIDEO-RECORDED DEPOSITION OF ANN FROMHOLZ

Los Angeles, California

Thursday, December 11, 2025

Stenographically Reported by:  Ashley Soevyn,

CALIFORNIA CSR No. 12019

CONFIDENTIAL

Page 32

A   I believe so.  Yes.

Q   Did you review parts of the summary judgment opposition related to the retaliation claims?

A   No.

Q   Did -- are you aware that Ms. Lively filed a declaration in support of her opposition for summary judgment?

A   Yes, I believe it was referred to in the opposition.

Q   Did you review that declaration?

A   No.

Q   Why not?

A   Because I don't think that's relevant to my opinions.  My opinions are here.  I was trying to refresh my recollection about what the facts and allegations were.

Q   Well, part of your opinion relates to Ms. Lively's allegations about conduct on the set of the film and related to the film, right?

A   At the time, yes.  What Wayfarer -- what the Wayfarer Defendants or Wayfarer parties could or should have done at the time.

Q   Are you aware that Ms. Lively's declaration relates to conduct that occurred on set?

CONFIDENTIAL

Page 33

A    I have not reviewed her declaration.

Q    Do you understand that Ms. Lively is alleging that some of the retaliatory conduct she experienced was part of the hostile work environment?

A    No.  That's not my understanding.

Q    It's not?

A    I don't have that understanding except to the extent that Mr. Robbins testified about a conversation at a dinner with Colleen Hoover that Justin Baldoni and Colleen Hoover had.

Q    A dinner that Mr. Baldoni had with Ms. Hoover in May 2024 or about there?

A    Maybe.  I don't know the date.

Q    What do you recall about that dinner?

A    I recall that the allegation is that there was some negative talk about Ms. Lively and that Mr. Robbins in his deposition said that if that negative talk had gotten to others, that could be considered retaliation, and he said it could be -- might be considered harassment.

Q    Did you agree with that?

A    No.

Q    Why not?

A    As to the retaliation, perhaps.  I don't

CONFIDENTIAL

Page 34

know.  As to the harassment, no.  There was no gender based conduct.  No sexual conduct.  I don't understand how it could possibly be considered harassment.

Q    Do you agree that retaliatory conduct can contribute to a hostile work environment?

A    A hostile work environment as legally defined.  So a hostile work environment as defined in the context of sexual harassment does not include retaliation.  That's a separate claim.

Q    So is it your opinion that retaliatory conduct cannot contribute to a hostile work environment?

MS. ZELDIN:  Objection.

THE WITNESS:  Well, you're asking me for a legal opinion.  Do you want me to give a legal opinion?

BY MS. ROESER:

Q    Yes.

MS. ZELDIN:  Objection.

THE WITNESS:  Okay.  In my legal opinion, a retaliation -- a claim for retaliation is separate from a claim for harassment.

BY MS. ROESER:

Q    Have you been designated to offer legal

Page 35

opinions in this case?

A    No.

Q    Turning quickly back to Exhibit C.  Who selected the materials for you to review?

A    I was provided the materials by Liner Freedman.

Q    By Ms. Zeldin?

A    By someone at her firm.

Q    Did you ask for any specific materials?

A    I may have asked for additional deposition transcripts.  I think most of them were provided.

Q    Did you ask for any materials that were not provided to you?

A    No.

Q    So am I correct that Liner Freedman selected the materials that you would review in connection with this matter?

A    No.  I just said that I asked for additional deposition transcripts that were not initially provided to me.

Q    The documents that were initially provided to you, were they selected by Liner Freedman?

A    That's right.  Oh, you know what else I

CONFIDENTIAL

Page 36

asked for, I asked for video.  If there were particular video clips.  And those were provided to me.

Q    What video clips did you ask for?

A    I can't remember what I asked for versus what I was initially provided.  But I had a number -- there were a number of video clips that I ended up looking at.

Q    Deposition videos or?

A    No.

Q    Video footage from the film?

A    Yes.

Q    If I use the term "the film" throughout this deposition, will you understand that I'm referring to the film, It Ends with Us?

A    Yes.

Q    Did you -- the deposition transcripts that are identified in Exhibit C or in the materials that Mr. Robbins reviewed, did you review those depositions in full?

A    I reviewed -- well, these four that are listed under deposition transcripts and exhibits.  I reviewed Ann Carroll's in full.  I don't have the list of what was in Mr. Robbins' report.  I reviewed some of those in full, but I think not all of them.

Page 40

A    Yes.

Q    Did you review exhibits to the depositions that you reviewed?

A    Yes.

Q    All of them?

A    I looked at all of them, so it -- opened them and looked at them.  I had them all electronically.  I didn't review thoroughly all of them, no.

Q    And the exhibits that you did not thoroughly review were not a basis for your opinion; is that right?

A    I believe that's right.

Q    Have you interviewed anyone to form the basis of your opinions in this matter?

A    No.

Q    Anyone that you've spoken with in connection with your role as an expert in this case that you have not disclosed yet?

A    No.

Q    Did you watch the movie It Ends with Us?

A    I did.

Q    Was that before or after you were retained as an expert in this case?

A    After.

CONFIDENTIAL

Page 60

four.

Q    Okay.  And you've testified at two arbitration hearings; is that right?

A    One of these is wrong.  In the DoubleLine Group case, I testified at the arbitration hearing.  So that was -- I need to change my little spreadsheet.  It's the -- and I think I misspelled the person's name too.  Barach & Damiani v. DoubleLine.

Do you see that?

Q    Uh-huh.  Okay.  So?

A    Three arbitration hearings.

Q    Three arbitration hearings?

A    Yes.

Q    In each of the cases in which you've been an expert, have you testified about issues related to workplace investigations?

A    No.

Q    What other issues have you testified about?

A    Other what's characterized as HR-related issues.  So employment law issues.  I've also testified -- in fact, in one case that Mr. Robbins was involved in -- disability accommodations and investigations.  The Tyler Skaggs case has to do

CONFIDENTIAL

Page 61

with a huge range of things.  So a huge range of HR issues.  So all related to employment law.

Q    Have you previously opined on whether a workplace investigation should or should not have been conducted?

A    I think so.

Q    How many times?

A    I don't know.

Q    Have you opined on whether a workplace investigation should or should not have been conducted in a -- in a hostile work environment or retaliation case?

A    Yes.

Q    How many times?

A    I don't know.

Q    More than three?

A    I would say no, because most of the cases have to do with the -- most investigation cases have to do with the sufficiency of the investigation.

Q    As opposed to whether an investigation should occur?

A    That's correct.

Q    When you're giving expert testimony about the sufficiency of an investigation, what factors do you consider?

CONFIDENTIAL

Page 62

A    I consider legal obligations and the factors really laid -- well, are laid out in the CRD guide mostly, and then rely on my experience.

Q    Do you consider whether an investigation was promptly initiated, for example?

MS. ZELDIN:  Objection.

THE WITNESS:  So the -- the standard is that an investigation is prompt and thorough, reached a reasonable good faith conclusion, and that it -- that it -- sorry.  The outcome is that the conduct in question stopped and is not repeated.  I didn't say that the right way, but that's the standard.  So that's what I consider.

BY MS. ROESER:

Q    Do you consider, in determining whether an investigation is sufficient, whether witnesses are interviewed?

A    Yes, every investigation is different.  So yes, I look at the totality of the investigation to determine whether it was sufficient.

Q    Would you consider, for example, if a complainant was interviewed or not?

A    I would consider, based on the circumstances, who was interviewed, what information was looked at, et cetera.

Page 63

Q    What documents might have been reviewed, for example?

A    Yes.

Q    Would you also, as part of opining on whether an investigation is sufficient, consider whether any corrective or remedial steps were taken?

A    Yes.

Q    Including whether disciplinary action was issued, for example?

A    Yes, but the standard doesn't have to do with disciplinary action; it has to do with corrective action that makes the conduct stop.  So the goal is not disciplinary action.  Sometimes disciplinary action is appropriate to make the conduct stop, but what I look at is whether the conduct stopped.

Q    Can you give me some examples of corrective action that you're referring to?

A    Well, often a conversation is enough to stop the conduct.  Often a conversation, you know, saying "don't do that again" is enough to stop the conduct.

Q    So is it your opinion that an employer can satisfy their obligation to prevent harassment by simply directing a accused employee to stop what

Page 64

they're doing?

MS. ZELDIN:  Objection.

THE WITNESS:  It's my opinion that an employer can stop harassment -- can -- can meet its obligation by taking steps that stop the conduct. So if the conduct has stopped, then the action -- and it hasn't repeated, then I believe the action was sufficient.

BY MS. ROESER:

Q    So if an employee complains that their supervisor made a sexual comment about their body, is it your opinion that it would be sufficient for an employer to satisfy their obligation to prevent harassment to direct the supervisor not to make those comments anymore?

MS. ZELDIN:  Objection.

THE WITNESS:  I don't have enough information because you have to find -- you have to determine whether that happened.  If we're assuming that that happened, right, are we assuming that what the person complained about actually did happen?

BY MS. ROESER:

Q    Yeah, assume that.

MS. ZELDIN:  Objection.

THE WITNESS:  Okay.  And if -- if there's

CONFIDENTIAL

Page 70

MS. ZELDIN:  Objection.

BY MS. ROESER:

Q    Yes or no?

MS. ZELDIN:  Objection.

THE WITNESS:  If it doesn't happen again, the employer has met their obligation.  Is that what I would advise if I were advising the employer?  I'm not sure.

BY MS. ROESER:

Q    What would you advise if you were advising an employer?

A    I might advise them something different depending on the facts.

Q    Like what?

A    I don't know.  I don't have all the facts.  And I'm not here to give legal advice.  That would be legal advice.

Q    Have you represented entertainment industry clients in litigation before?

A    Yes.

Q    Who?

A    Playboy.

Q    Any others?

A    I don't think so.

Q    Have you ever represented a film studio

CONFIDENTIAL

Page 71

or TV studio in litigation?

A    No.

Q    When did you represent Playboy?

A    When I was at Seyfarth.

Q    In multiple matters or in one matter?

A    I worked on multiple matters for Playboy.

Q    Did you represent Playboy in any litigations involving claims of harassment or retaliation?

A    Yes.

Q    When?

A    When I was at Seyfarth.

Q    Between 2001 and 2005?

A    Correct.

Q    Have you represented any entertainment industry clients in litigation in the last 20 years?

A    I'm trying to think if I did at Jackson Lewis, and I can't remember.  I don't believe I have since having my own firm.  I represented small companies related to the entertainment industry, but not studios.

Q    Have you conducted investigations for clients in the entertainment industry?

A    Yes.

Q    How many?

CONFIDENTIAL

Page 72

A     Probably 10, 15.

Q     When was the last investigation you conducted for a client in the entertainment industry?

A     Last year.

Q     Who was the client?

A     Warner Bros.

Q     Did the Warner Bros. investigation involve issues of harassment and retaliation?

A     Yes.

Q     Did the Warner Bros. investigation involve issues of hostile work environment?

A     Yes.

Q     Did the Warner Bros. investigation involve allegations raised with respect to a film or TV set?

A     Yes.

Q     Can you share what film or TV set?

A     I don't think I can.

Q     Was it film or TV?

A     It was television.

Q     Did the Warner Bros. investigation involve allegations raised by an actress or actor?

A     Yes.

Q     By an actress?

Page 73

A    Yes.

Q    Against who?

A    Against the show's creator, who is also an actor.

Q    Was the accused -- did they share scenes with the complainant?

A    I think so.

Q    In the Warner Bros. investigation, was the accused -- the accused was a creator, an actor in the show?

A    That's correct.

Q    Were they also a director?

A    Yes.

Q    Producer?

A    I think so.  But I don't know.

Q    Can you summarize the substance of the allegations?

A    Gosh, I'm not sure if I can.  It's confidential.  It was never litigation.  So I'm just not sure if I can talk about the allegations.

Q    Did the investigation for Warner Bros. involve issues related to the use of intimacy coordinators?

A    No.

Q    Did the Warner Bros. investigation

CONFIDENTIAL

Page 74

involve issues related to improvisation of physical
or sexual contact during scenes?

          A     No.

          Q     Did the Warner Bros. investigation
involve retaliation allegations?

          A     Yes.  Yes.

          Q     Other than the Warner Bros.
investigation, have you conducted other
investigations related to film or TV sets?

          A     Yes.  But I can't remember specifics.

          Q     How many?

          A     One or two.

          Q     Other than the Warner Bros.
investigation, have you investigated allegations
raised by an actress on a film or a TV set?

          A     Yes.

          Q     How many?

          A     I think those other two.  The ones I
recall that I don't recall the specifics of had to
do with allegations of harassment.

          Q     Can you disclose the names of the clients
of those one or two other allegations?

          A     I don't remember.  It was a while ago.

          Q     How long ago?

          A     Say six or seven years ago.

CONFIDENTIAL

Page 83

BY MS. ROESER:

Q    Have you served as an expert witness in a litigation for an entertainment client before?

A    No.  Just looking to make sure.  No.

Q    The other credibility factors that you mentioned.  One of them was contradiction.  What does that mean?

A    That means if a witness's account of an incident or an incident for this example is contradicted by other people's accounts or by contemporaneous emails, text messages, that sort of thing.

Q    And what about motive to lie?  What does that mean?

A    If the person -- I can't think of an example, but it sometimes becomes apparent that someone has a motive to lie about a situation.

Q    Can you give an example of how that might come about, like how you might assess that someone has a motive to lie?

A    I can't really.  But you specifically can't assess that a person who is what we call the responding party has a motive to lie because they're alleged to have done something.  That can't be the basis for finding they have a motive to lie.  But

CONFIDENTIAL

Page 85

find that the responding party has a motive to lie simply because of the allegations or things related to, you know, them being alleged to have done something.

BY MS. ROESER:

Q    It could be possible?

MS. ZELDIN:  Objection.

THE WITNESS:  A lot of things could be possible.

BY MS. ROESER:

Q    You mentioned another factor was whether a witness was forthcoming or evasive.  How do you assess or evaluate that?

A    If they answer questions or just decline to answer questions or if they sort of answer a different question.  Then the one that is asked if, they are being pushed for an answer and just won't give an answer, or if they -- again, the flip side of that is being forthcoming and answering questions and, you know, giving full answers to whatever the line of questioning is.

Q    So do you agree that interviews are the best way to assess credibility of witnesses?

MS. ZELDIN:  Objection.

THE WITNESS:  Interviews or in this case,

CONFIDENTIAL

Page 86

there was sworn testimony.  So evaluating the sworn testimony.

BY MS. ROESER:

Q    Have you ever assessed credibility by just reading documents before?

MS. ZELDIN:  Objection.

THE WITNESS:  By reading interviews, yes.

BY MS. ROESER:

Q    How often?  What percentage of your investigations have you assessed credibility based solely on documents without interviewing any witnesses?

MS. ZELDIN:  Objection.

THE WITNESS:  I've had investigations where other people have done some of the interviews. So I have reviewed the interview notes from the interviews that they conducted and then reviewed the interview notes from the interviews I conducted.

BY MS. ROESER:

Q    Have you ever conducted an investigation in which you assessed credibility without interviewing anyone?

A    Without anyone being interviewed?

Q    Yeah.

A    No.  Well, I'm trying to think.  I don't

CONFIDENTIAL

Page 87

think so.  But, again, here, there is sworn testimony which stands in place of interviews.

Q    Well, I want to talk about that a little bit.  Because do you agree that there is information that you can glean from an interview with someone, where you speak to them and ask them questions, that you can't glean from written testimony?

MS. ZELDIN:  Objection.

THE WITNESS:  Well, I mean, and that's -- that's the difficulty of demeanor.  And we're warned against using demeanor as a credibility factor.

BY MS. ROESER:

Q    Do you agree that there is information that you can glean from an interview with someone that you cannot get from written testimony?

MS. ZELDIN:  Objection.  What is written testimony?

MS. ROESER:  A deposition transcript.

THE WITNESS:  See, I don't think so because they're under oath.  They don't have -- they're -- I think they are more truthful.  People are more truthful in a deposition than they are in an interview with me where it's not sworn testimony.

BY MS. ROESER:

Q    When you give -- when you interview a

CONFIDENTIAL

Page 88

witness as part of an investigation and you're

assessing their credibility, do you consider the

emotion that they bring into the interview?

A    No.

Q    Never?

A    I try not to.  Because, again, that's

demeanor.

Q    Do you consider how they respond to

questions in the moment?

MS. ZELDIN:  Objection.

BY MS. ROESER:

Q    What their facial expression looks like,

for example?

A    No.  See, that's demeanor.  And that's

where we're cautioned against using things like body

language or expression because we're not experts in

that.

Q    So why do you interview witnesses then?

Why don't you just have them write written

statements?

A    So that I can get their responses to my

questions.  A written statement would just be them

answering questions without me having the

opportunity to follow up or they just write their

version of events, not even in response to a

CONFIDENTIAL

Page 89

question.  I want to be able to ask questions, dig down, follow up.  All of which is done -- I do in depositions as well.

Q    Yeah.  So you want to be able to ask questions to the witness, right?

MS. ZELDIN:  Objection.

THE WITNESS:  And get their response and follow up, yes.

BY MS. ROESER:

Q    Uh-huh.

And you want to be able to dig down on the questions, is that right, with the witness?

A    That's right.  Yeah, follow up on the questions, yes.

Q    Did you have any input into the questions that were asked of Ms. Lively during her deposition?

A    I did not.

Q    And your review of her deposition transcript was limited to the questions that she was asked during that deposition, right?

A    Yes.

Q    And it's possible that you would have asked Ms. Lively different questions than the attorney who questioned her, right?

A    It's possible I would have asked her --

CONFIDENTIAL

Page 90

other people questions in different ways or different questions.

Q    You could have dug in different directions, for example?

A    Yes, but that also is true when I have another investigator interviewing witnesses.  I might have asked questions in different ways, but I then rely on their notes from their interview to make the factual finding and the credibility assessment.  It's -- it's virtually identical.

Q    Are you aware if Ms. Lively was asked during her deposition about each of the allegations that she raised in this case?

A    I haven't committed her deposition to memory, and I haven't reviewed it in full since before I wrote my report, so I don't know that I could tell you what was in her deposition.

Q    You don't know?

A    I haven't committed it to memory.

Q    Do you know if she was asked in her deposition about each incident that she believes to have been inappropriate or contributed to a hostile work environment on set?

MS. ZELDIN:  Objection.

THE WITNESS:  I'm sorry.  You spoke too

CONFIDENTIAL

Page 91

quickly.  Can you say that again?

BY MS. ROESER:

Q    Do you know if during her deposition, Ms. Lively was asked about each incident she believes to have been -- to have contributed to a hostile work environment on set?

MS. ZELDIN:  Same objection.

BY MS. ROESER:

Q    Or in connection with the film?

A    I don't know if she was asked that question specifically, no.

Q    You don't know if she was asked about each incident that she believes contributed to the hostile work environment against her?

A    Again, I -- I don't have specific recollection of every question in the deposition.

Q    Uh-huh.  Do you know if -- do you know if Ms. Lively was asked in her deposition about each incident that she raised to Wayfarer during the production?

MS. ZELDIN:  Objection.

THE WITNESS:  I don't know if she was asked that question specifically.

BY MS. ROESER:

Q    You don't know if she was asked about

CONFIDENTIAL

Page 92

each incident, right?

MS. ZELDIN:  Objection.

THE WITNESS:  Well, you just asked me a different question.

BY MS. ROESER:

Q    I asked you, do you know if Ms. Lively was asked in her deposition about each incident that she raised to Wayfarer during the production?

A    Right.

Q    You don't know?

A    I'm not sure.

Q    Mm-hmm.  So if you don't know the answer to that, how can you offer an opinion on whether Wayfarer responded to her concerns appropriately?

MS. ZELDIN:  Objection.

THE WITNESS:  Well, there are -- there are two things -- I think, there are two separate issues here.  One is the issue of their response or investigation and whether the action they took was sufficient.  And the other is the question of the -- what an investigator might have find -- might have found or would have found had they investigated.

BY MS. ROESER:

Q    Sure.  Let's take the first one.

How could you come to a conclusion about

CONFIDENTIAL

Page 97

BY MS. ROESER:

Q   Is one purpose of an investigation also communicating to employees that a company takes allegations of a hostile work environment or other unlawful conduct seriously?

MS. ZELDIN:  Objection.

THE WITNESS:  I don't know that that's a purpose.  It could be a result of the investigation.

BY MS. ROESER:

Q   And is a purpose of the investigation also to determine whether allegations can be substantiated?

MS. ZELDIN:  Objection.

THE WITNESS:  Well, that's the factual finding.  So the al -- the investigation finds facts.  So you find facts, and you make a determination based on the preponderance of the evidence standard whether the factual allegations are substantiated.  But it's all about facts.  Then it goes to the employer to determine what to do.

BY MS. ROESER:

Q   When you conduct an investigation and you interview a witness, do you give them a direction that they won't be retaliated against for participating in the investigation?

CONFIDENTIAL

Page 98

A    Yes.

Q    Do you advise an accused employee that you interview as part of an investigation that they are not to retaliate against anyone involved in the investigation?

A    Yes.

Q    Do you advise them that they are not to retaliate against the person who complained about their conduct?

A    I don't specifically say that.  I say, you may not retaliate against anybody for their participation in the investigation.

Q    Why do you do that?

A    Because retaliation is not permitted.

Q    Right.  So you advise interviewees they are not to retaliate against anyone who participated in the investigation, right?

A    Correct.

Q    In part, because giving that direction helps prevent future retaliation?

MS. ZELDIN:  Objection.

THE WITNESS:  I hope it helps prevent retaliation related to the investigation.

BY MS. ROESER:

Q    Related to someone raising concerns, for

CONFIDENTIAL

Page 99

example?

MS. ZELDIN:  Objection.

THE WITNESS:  Well, what I say is, you may not retaliate against anyone for their participation in the investigation, and you may not be subjected to retaliation for your participation. So that instruction is limited to the investigation.

BY MS. ROESER:

Q    And you say that to prevent retaliation?

MS. ZELDIN:  Objection.

THE WITNESS:  Right.  But my role is limited to the investigation, so not more broadly. But yes, to prevent retaliation or discourage retaliation related to the investigation.

BY MS. ROESER:

Q    I'm sorry.  So are you saying that you give that direction not to retaliate, and it doesn't apply to the initial complaint that prompted the investigation?

MS. ZELDIN:  Objection.

THE WITNESS:  That's not what I said.

BY MS. ROESER:

Q    Okay.  Can you say it again?

A    Yes.  The retaliation -- the -- the scope -- my -- my instructions have to do with the

CONFIDENTIAL

Page 100

investigation itself.  Not more broadly.  That's, you know, up to the company.

Q    But does your admonition, that there may be no retaliation for participating in the investigation, apply to the complaint?

A    Mean -- meaning, you can't retaliate against the person who complained?

Q    Correct.

A    Oh, yes.

Q    And so one of your goals is to prevent -- when you conduct an investigation, one of your goals is to prevent retaliation against someone who raises concerns about a hostile work environment?

A    I wouldn't say that's a goal.  The goal of the investigation is to find facts.  But yes, a part of the process is to instruct people that retaliation is not permitted.

Q    An important part of the process, right?

A    Well, it's a part of the process that I do every time.

Q    You do it every time, right?

A    With every witness, yes.

Q    So it's important?

MS. ZELDIN:  Objection.

THE WITNESS:  Yes.  There are other

Page 101

important parts of the process.

BY MS. ROESER:

Q    And if an investigation isn't conducted, presumably there's no direction that you can't retaliate against the person who complained, right?

MS. ZELDIN:  Objection.

THE WITNESS:  There's no instruction within an investigation, no.  But there, I assume, are policies against retaliation.

BY MS. ROESER:

Q    Are you aware of Mr. Baldoni at any time being advised that he cannot retaliate against Ms. Lively for raising concerns?

A    I don't know.

Q    Are you aware of Mr. Heath being directed at any time that he cannot retaliate against Ms. Lively for raising concerns?

A    I don't know.

Q    Are you aware of Mr. Baldoni ever being advised that he cannot retaliate against employees -- let me strike that.

Are you aware of Mr. Baldoni being advised that he cannot retaliate against Ms. Slate for raising concerns about his behavior?

MS. ZELDIN:  Objection.

CONFIDENTIAL

Page 102

THE WITNESS:  I don't know.

BY MS. ROESER:

Q    When you conduct investigations into harassment or hostile work environment --

A    Hostile work environment is harassment.

Q    Sure.

A    Okay.

Q    When you conduct investigations into a hostile work environment, does it happen that in the course of -- let me strike that.

In the course of your investigations into hostile work environments, do you come across evidence that the complainant might be subject to retaliation as well?

A    Have I, in the past, come across evidence that the complainant has been subjected to retaliation?

Q    Let me ask it this way.

Is it something that you consider as part of your investigations?

A    If the complainant might be subjected to retaliation?

Q    Yeah.

A    No, not unless there's an allegation of retaliation, because I give an instruction, and I

CONFIDENTIAL

Page 104

as evidence that they were retaliating?

MS. ZELDIN:  Objection.

THE WITNESS:  Well, a supervisor's response to someone not saying, no, I'm not going to go out with you, could be evidence of retaliation. What I'm saying is, I don't believe getting huffy or something like that is an adverse employment action, is retaliation.

BY MS. ROESER:

Q    I didn't ask you that.

MS. ZELDIN:  Yes, you did.

BY MS. ROESER:

Q    Do you agree that how a supervisor responds when concerns about their behavior are raised is relevant to your investigations?

A    It can be, yes.

Q    Uh-huh.  And why is that?

A    Well, again, as I've said, their response could be evidence of retaliation, depending on what the response is.

Q    Do you think that the purpose of a deposition and an investigative interview are different?

A    Well, yes and no.  The purpose is to gather information from the person being interviewed

CONFIDENTIAL

Page 106

THE WITNESS:  Sometimes.

BY MS. ROESER:

Q    Generally?

A    Well, or it settles.

MS. ZELDIN:  90 percent of the time.  No winner or loser.

THE WITNESS:  It's an adversarial proceeding.

BY MS. ROESER:

Q    It's an adversarial proceeding.  Is an investigative interview adversarial, in your opinion?

A    It shouldn't be.

Q    And that makes it different than a deposition, right?

A    To some degree, yes.  But, again, you're asking the same sorts of questions.

Q    Can you turn back to your resume, please, Exhibit A?

A    Sure.  Yup.

Q    Under "Education," it says that you are a -- you have a Association of Workplace Investigators Certificate Holder?

A    Yes.

Q    What does that mean?

CONFIDENTIAL

Page 140

A    I don't know.

Q    So you have not seen any evidence?

A    I don't know any.

Q    Do you know if Wayfarer advised cast and crew how they could raise concerns about the workplace if they had them?

A    I don't know.

Q    Have you seen any evidence that they did that?

A    I don't recall any.

Q    Are you familiar with a training presentation that Wayfarer allegedly provided to cast and crew on the film?

A    Familiar with it in what sense?

Q    Have you reviewed it in this case?

A    I think so.

Q    Do you know if Wayfarer provided anti-harassment training to cast and crew?

A    I saw reference to it.  I believe they did.  I don't know who attended.

Q    Do you know if there's any record of who attended?

A    I don't know.

Q    Is it your opinion that Wayfarer's response Ms. Lively's Ms. Lively's concerns is

consistent with its policy set forth in the employee handbook that we just went through?

MS. ZELDIN:  Objection.

THE WITNESS:  It's not consistent with every step.  But -- hold on.  There was something that I saw.  Give me a minute.  Okay.  So there were a couple references here.

(As read):

"Wayfarer Studios encourages the prompt reporting of complaints or concerns so that rapid and corrective action can be taken before relationships become irreparably strained."

That's actually what happened here.

BY MS. ROESER:

Q    You think Wayfarer took action that prevented relationships from being irreparably strained?

A    Wayfarer took corrective action to ensure that the conduct complained about did not recur. That's what corrective action means.

Q    The sentence that you read from?

A    Correct.

Q    Said "before relationships become irreparably strained".

CONFIDENTIAL

Page 142

Do you see that?

A    But I was focusing on the constructive action.  And above, it says "Wayfarer Studios can investigate and if appropriate take corrective action."  The key here is they took the corrective action so an investigation would have been superfluous.

Q    Is it your opinion that Wayfarer prevented relationships from becoming irreparably strained between Mr. Baldoni and Ms. Lively?

A    I don't know what their relationship is now.  I mean, they're suing each other.

Q    So is it your opinion that Wayfarer prevented the relationship between Mr. Baldoni and Ms. Lively from becoming irreparably strained?

A    I don't know what caused their relationship --

MS. ZELDIN:  Objection.  Beyond the scope.  Read your objections at the deposition of Robbins.  Now she'll say, well, argumentative and your tone.

MS. ROESER:  Kim, enough.  Enough.

MS. ZELDIN:  Stop your tone.

MS. ROESER:  My tone?

MS. ZELDIN:  Yeah, your tone.

MS. ROESER: Enough.

MS. ZELDIN: Enough of you.

MS. ROESER: I've heard that one before, actually.

MS. ZELDIN: Uh-huh.

MS. ROESER: Yes, before at a deposition.

THE WITNESS: So do I. Because I have a teenager. I recognize.

MS. ROESER: That is what teenagers say. Yeah. Correct.

THE WITNESS: I'm sorry, my nose. I think I'm getting a cold.

MS. ROESER: Do you need more tissue?

THE WITNESS: I don't know what it is. Just my nose won't stop running.

BY MS. ROESER:

Q    So I asked you if it was your opinion that Wayfarer's response to Ms. Lively's concerns was consistent with the policy set forth in the handbook? And you said it's not consistent with every step, right?

A    Correct.

Q    What steps is Wayfarer's response to Ms. Lively's concerns inconsistent with that are set forth in the handbook?

A    Well, they did not, as we know, go through the steps of an investigation.  My position, my opinion is that investigation would have been superfluous because they went all the way to the end and took the corrective action.  Made sure that the conduct did not recur.

Q    Mr. Baldoni did not raise Ms. Lively's concerns to Wayfarer's HR, right?

A    I don't believe so.

Q    Neither did Mr. Heath?

A    I don't believe so.

Q    Mr. Heath testified that he did not consider an investigation, right?

MS. ZELDIN:  You didn't say test, did you?  You said tested, rather than testified?

BY MS. ROESER:

Q    Heath testified that he did not consider conducting an investigation into Ms. Lively's concerns, correct?

A    I think so.  But I -- again, I didn't memorize his testimony.

Q    Is that consistent with Wayfarer's policies?

A    As I said, they didn't conduct the investigation, which is laid out here, because they

CONFIDENTIAL

Page 145

went to the end result immediately.

Q    Is that a no?

A    Well, it's an explanation.

Q    Is it consistent with Wayfarer's policies?

MS. ZELDIN:  Objection.

THE WITNESS:  In that they didn't go through the steps of the investigation, no.

BY MS. ROESER:

Q    Did you review Ms. Saks' testimony?

A    I did.

Q    Are you aware -- do you recall her testimony that she encouraged Mr. Baldoni and Mr. Heath to conduct an investigation into behaviors on set?

A    I think so.  Again, I haven't committed any of these to memory.

Q    Do you recall that Ms. Saks testified that in response to her recommendations, Mr. Heath suggested that they would not be performing an investigation because it would be better not to have a written record of it.  Do you recall that testimony?

A    I think that's right.

Q    Is that consistent -- if that's true,

CONFIDENTIAL

Page 160

BY MS. ROESER:

Q    Do Wayfarer's policies say that whether an investigation occurs is up to the employee?

MS. ZELDIN:  Objection.

THE WITNESS:  They do not.

BY MS. ROESER:

Q    Can you turn to Subparagraph F, please?

A    Uh-huh.

Q    You write, the second sentence, "the protections" -- I assume you're referring to the November 9th, 2023, 17 protections?

A    Well, right.  Because it's called Protections for Return to Production.

Q    Okay.  So:

(As read):

"The protections did not identify any act of alleged discrimination or harassment."

Do you see that?

A    I do.

Q    Is that your opinion?

A    They don't allege any specific act.  They say, no more of this, no more of that.

Q    Do you believe -- is it your opinion that the 17 protections put Wayfarer on notice of

CONFIDENTIAL

Page 161

allegations of harassment or potential retaliation?

A    Yes.

Q    Are you aware that Mr. Baldoni described the 17-point list to his friends as "all manipulation"?

A    I don't believe I know that.

Q    Do you think that's an appropriate way for a chairman of a studio who is accused of harassment to describe harassment complaints?

MS. ZELDIN:  Objection.  Beyond the scope.

THE WITNESS:  He's talking to his friends.  I don't know if it's appropriate or inappropriate.

BY MS. ROESER:

Q    Are you aware that after receiving 17 protections, Mr. Baldoni described them as "an effort to gain power over him personally in the studio"?

MS. ZELDIN:  Same objection.

THE WITNESS:  No, who did he -- who did he say that to?

BY MS. ROESER:

Q    Are you aware that Mr. Baldoni, after receiving the protections, stated "Of course we all

CONFIDENTIAL

Page 162

know what this document insinuates, that I am unsafe/sexually harassing, et cetera, et cetera, et cetera."

Did you know that?

A    No.

Q    Assuming those statements are true, that Mr. Baldoni said those, does it change any opinion that you've offered in this case?

A    I don't know who he said them to.  If he said them to friends, trusted confidants and friends, no.

Q    What if he said them to the CEO of the studio?

A    If there was action taken because of that, perhaps.

Q    What if he said that to the co-chairman of the studio?

A    Again, same thing.

Q    It would change your opinion?

A    No, I said if there was action taken based on what he said.

Q    What kind of action?

A    Well, if they ignored the complaints and didn't agree to them -- ignored the protections and didn't agree to them because he didn't like them.

CONFIDENTIAL

Page 163

But the studio did agree to them.

Q    Is it your view that Mr. Baldoni accepted as true that he sexually harassed Ms. Lively or was unsafe in workplace?

MS. ZELDIN:  Objection.

THE WITNESS:  No, that's not what I said. What I said was, Wayfarer agreed to these protections, and the conduct did not recur.

BY MS. ROESER:

Q    So --

A    And I don't know what the conduct was because it was never specified.

Q    It would not change any opinion you've offered in this case that after receiving the 17 protections, Mr. Baldoni messaged the co-chairman of the studio, Mr. Sarowitz, and said "it's all manipulation, and we all know what this insinuates, that I'm unsafe and sexually harassing.  It's an effort to gain power over me personally."

That wouldn't change your opinion at all?

A    No, because they agreed to the protections and nothing else happened.

Q    Would it change your opinion that, after receiving the protections, Mr. Baldoni messaged the co-chairman of the studio and said "there's even

CONFIDENTIAL

Page 164

silly things inferring Jamey was inappropriate, which is silly"?

A    No, because, again, they accepted the protections and nothing else happened.  Nothing inappropriate has been alleged after June 1st.

Q    Do you think it's an appropriate response to the co-chairman -- by the co-chairman of a studio who's been accused -- who has had allegations of harassment raised against him, to describe them as silly?

MS. ZELDIN:  Objection.  Beyond the scope of this witness' testimony?

THE WITNESS:  Do I think it's appropriate?  Probably not.  Does it change my opinion?  No.

BY MS. ROESER:

Q    That doesn't give you any concerns?

A    It doesn't change my opinion.

Q    That Mr. Baldoni described the 17 protections this way, it doesn't give you any concerns?

A    It doesn't change my opinion because the studio agreed to the protections.  Whatever his opinion was, the studio agreed to the protections and no further conduct occurred.

CONFIDENTIAL

Page 165

Q     Does -- does the -- that text message I read to you give you the impression that Mr. Baldoni took the allegations about his and Mr. Heath's behavior seriously?

MS. ZELDIN:  Objection.

THE WITNESS:  Does the text message?  No. But does agreeing to the protections and no further conduct occurring?  Yes.

BY MS. ROESER:

Q     The text message does not, though, right?

A     Correct.  But their actions, or lack of actions, lack of further conduct does.

Q     If the company conducted an investigation after receiving Ms. Lively's 17 protections, and in connection with that investigation, reviewed this text message from Mr. Baldoni, is it your opinion that would impact the credibility assessment made with respect to the allegations?

MS. ZELDIN:  Objection.

THE WITNESS:  I don't have enough facts to -- I don't know what the allegations are.

BY MS. ROESER:

Q     You don't know what Ms. Lively's allegations are?

A     In the 17 -- in the 17 protections, no.

CONFIDENTIAL

Page 166

Q    You don't?

A    I don't know specifically what this -- what the allegations were in the 17 protections.  I don't know what would come up in the investigation.  Maybe it would affect a credibility assessment; maybe not.  I don't know.

Q    Is that a text message you would consider in one of your investigations if it was sent by someone who was accused of harassing conduct?

A    I might.

Q    Why?

A    Why?  Because it might be relevant.

Q    To what?

A    To the investigation.

Q    What part of the investigation?

A    I'm not sure.  I don't know all the facts in this -- in this hypothetical investigation.

Q    Might it be relevant to someone's motive to lie?

MS. ZELDIN:  Objection.

THE WITNESS:  It could be.

BY MS. ROESER:

Q    Might it be relevant to credibility?

A    Well, motive to lie is part of credibility factors.

CONFIDENTIAL

Page 167

Q    So yes?

A    Well, it could be relevant to one of the credibility factors.

Q    Could it be relevant to determining whether the allegations could be substantiated?

A    Well, to the extent that credibility -- to the extent it affected the credibility assessment and credibility affects whether an allegation could be substantiated, yes.

Q    You've offered an opinion in this case that even if an investigation was conducted, it wouldn't have substantiated Ms. Lively's claims; is that right?

A    I believe that's right, yes.

Q    The text message that we just went through --

A    Uh-huh.

Q    -- does that change your opinion in any way?

A    No.

Q    Why not?

A    Because I looked at the -- the documents -- I'm sorry, the deposition testimony related to the allegations, each specific event and then the -- the credibility factors around that.  I

CONFIDENTIAL

Page 168

don't think that that one text message would have affected credibility assessments so much that it would have made the witness not credible.

Q    And what if Mr. Baldoni subsequently described Ms. Lively's 17 protections as manipulation again?

MS. ZELDIN:  Objection.

THE WITNESS:  I think it would be the same as the other one.  I don't think it would change.  It describes his same opinion.  I don't think it would --

BY MS. ROESER:

Q    What if Mr. Baldoni or Mr. Heath said that Ms. Lively manufactured any concerns she had about behavior to take over the movie?

MS. ZELDIN:  Objection.

BY MS. ROESER:

Q    Would that impact your opinions?

A    Again, it would -- it might go to motive to lie.  We've already talked about that with respect to Mr. Baldoni.  So with respect to Mr. Heath, it might affect one credibility factor.

Q    And would it affect -- and it would affect the credibility factor as to both Mr. Baldoni and Mr. Heath, right?

A    Yeah, I said that we already talked about that credibility factor with respect to Mr. Baldoni.

Q    If you can turn to paragraph G, please. The first sentence, you write:

(As read):

"Lively and her counsel threatened Wayfarer and Sony."

Do you see that?

A    Yes.

Q    "Threatened," was that your word?

A    Probably.

Q    What is the basis for your opinion that Ms. Lively threatened both Wayfarer and Sony?

A    She threatened not to come back.  She said, I'm not going to come back unless you accept this.

Q    Is it your opinion that an employee attempting to secure a safe workplace is making a threat?

A    Well, no, that's different.  That's a different use of the word.  Someone threatening not to do something, just saying, I'm not going to do it unless you do something first, it's not a threat. It's not a threat of danger, not a threat of doing something bad.  She's just saying, I'm not going to

CONFIDENTIAL

Page 180

Q    In forming your second opinion, you did not actually conduct an investigation, right?

A    I did not interview people and conduct an investigation in the traditional sense, no.

Can I put these away for now?

Q    You can put it to the side.

A    That's what I meant.

Q    Yes.

A    Away from in front of me.

Q    Yes.  You can look back to your report.

In all the trainings that you've received in workplace investigations, have you ever been trained that you can make credibility determinations based on deposition transcripts?

A    Not specifically, no.  Based on interviews, yes.

Q    You can make credibility determinations based on interviews?

A    Yes.  On interviews and, again, on notes of interviews if those interviews were done by someone else.

Q    By someone else who is an investigator?

A    Presumably.  Someone else acting as an investigator.

Q    So you reached conclusions about what an

CONFIDENTIAL

Page 181

investigation would show without performing any of the traditional steps of an investigation, right?

A    No.  I -- I didn't do interviews.  But I did do the traditional steps of looking at relevant documents and, you know, assessing the evidence.  So taking the deposition transcripts in the place of interviews, then I did what I normally would do.  So I think the one step rather that I didn't do, the one traditional step, is interviews.

Q    You agree that an attorney taking a deposition who is advocating for a client is in a different position than an investigator who is presumably neutral, right?

A    Yes.

Q    In your second opinion, you make factual findings about what did or did not occur, correct?

A    What I believe a preponderance of the evidence shows.

Q    And, again, the only evidence that you would consider in reaching those opinions is, it's either included in your report or attached as -- identified in Exhibit C?

A    Yes.  So either identified in Exhibit C or in Mr. Robbins' report.  There is no evidence in my report.  There's -- there's summaries and

CONFIDENTIAL

Page 183

A    I don't know specifically.  It's laid out here in the next two page -- page and a half.

Q    The factual findings that you made with respect to opinion 2?

A    Yes.

Q    Required you to choose which witnesses you believed or not, right?

A    Yes.

Q    To decide who's more credible?

A    Yes.

Q    And with respect to this, Ms. Lively's allegations, you have decided that Mr. Baldoni is more credible than she is?

A    In some cases, yes.

Q    In what cases?

A    Well, I mean, I can go through all of them, but I think I decided he or somebody else was more credible than she.

Q    Okay.  And you also made a determination that Mr. Heath, in certain instances, is more credible than Ms. Lively?

A    Yes.

Q    In any instances, with respect to your second opinion, did you come to a conclusion that Ms. Lively was more credible than either Mr. Baldoni

CONFIDENTIAL

Page 204

almost kissing.

Q    Did you observe in the footage Ms. Lively nuzzling into Mr. Baldoni's neck?

A    No.

Q    Did you observe her putting her thumb on his lips?

A    No.

Q    Did you observe Ms. Lively kissing Mr. Baldoni's forehead?

A    No.

Q    Did you observe Ms. Lively rubbing her mouth on Mr. Baldoni's neck?

A    No.

Q    The next sentence in this paragraph, you write:

(As read):

"Lively's allegation that she was not comfortable with Baldoni kissing her is undercut by the fact that Lively, on multiple occasions, initiated unscripted kisses with Baldoni."

Do you see that?

A    Yes.

Q    What are you referring to here?

A    I'm referring to -- I believe the birth

Page 205

scene where she grabs him and kisses him.  And then there's a scene in the hospital where he's walking in with the little girl and she runs out and gives him something and kisses him so...

Q   Let's talk about those two scenes.  I believe the first one you mentioned, the birth scene, would that be maybe the proposal scene where they're in a hospital?

A   Maybe.

Q   And Mr. Baldoni's character's sister is giving birth?

A   Yes.

Q   Okay.

A   Sorry.  I'm not as familiar with the movie as everybody else on this case is.

Q   Fair enough.  I'm going to call it the proposal scene, if that's okay?

A   Fair enough.

Q   Okay.  Have you reviewed the script for the proposal scene?

A   I haven't.

Q   Okay.  How do you know that the kisses were unscripted?

A   Or maybe I have.  I don't know.  I don't know how I know that.

CONFIDENTIAL

Page 206

Q    Okay.  Do you know -- so you don't know what the script says?

A    I don't.  If I reviewed it, I don't remember.

Q    Okay.  If the script --

A    I think it says she kisses him all over his face or something like that.

Q    Right.  So kisses him all over his face.  Assuming that's what the script says.  Do you know how many kisses Mr. Baldoni and Ms. Lively shared in that proposal scene?

A    I don't.

Q    Do you think it was kisses that were not all over his face?

A    I don't remember.

Q    Is there something specific that you remember that led you to believe that she improvised that?

A    Not that I can think about right now.

Q    Okay.  Is that --

A    That's just --

Q    -- your opinion about the scene?

A    I'm not sure.

Q    Let me just finish my question.

Does it remain your opinion about the

CONFIDENTIAL

Page 207

proposal scene that Ms. Lively performed or improvised unscripted kissing?

A   I have to go back and look at it again.

Q   Okay.  We'll ask that you do that.

The second scene you mentioned is a hallway at the hospital.  Did you review the script related to that scene?

A   My understanding is there is no script for that scene.  That it was an improvised scene entirely.

Q   There's no script for that scene?

A   Well, that it was a new scene that she put in.  And that the kiss was not scripted.

Q   Do you know if Mr. Baldoni and Ms. Lively discussed the kiss in that hallway scene in advance?

A   I don't.

Q   Do you know if he consented to it?

A   I don't.

Q   If they discussed it and he consented to it, would that change your opinion?

A   Would it change my opinion that?

Q   She improvised kissing?

A   No.

Q   Why?

A   Because she was the one who ran up -- it

CONFIDENTIAL

Page 208

was her scene.  She started it.  It was her idea.

Q    I don't think I understand the distinction there.

A    My understanding is, it was an improvised scene.

Q    So your understanding is that the scene was never written down?

A    I believe that's right.  I could be wrong.

Q    And assuming that's true, it was never written down, if Ms. Lively, Mr. Baldoni, discussed the scene in advance and said there's going to be a kiss in this scene, do you still think that she improvised kissing in that scene?

A    I'm not sure.

Q    What is your understanding of the word "improvise" in connection with?

A    Well, did it without planning.  Did it without.

Q    Right.  Did it without plan?

A    Pre-planning.

Q    So if they discussed it and planned it, it wouldn't have been improvised?

A    If they discussed it and planned it, it might not have been improvised.

CONFIDENTIAL

Page 209

MS. ROESER:  Is this Exhibit 4?

THE STENOGRAPHIC REPORTER:  Exhibit 4 for the record.

(Exhibit 4 marked for identification.)

THE WITNESS:  Thank you.

BY MS. ROESER:

Q    Before we look at Exhibit 4, your understanding that Ms. Lively allegedly improvised kissing in that hallway scene, where did it come from?

A    I don't remember.

Q    Did it come from anyone's deposition transcript?

A    I don't remember.

Q    Did it potentially come from Defendant's counsel?

A    I don't remember.  I don't remember where it came from.

Q    You're not aware of any evidence that says that that scene was improvised or was directly by Ms. Lively?

A    I don't remember.

Q    Are you aware of any evidence?

A    You asking a million times is not going to help me remember.  I don't remember.

CONFIDENTIAL

Page 210

MS. ROESER:  Okay.  So Exhibit 4 is titled Plaintiff Blake Lively's Declaration in Support of Opposition to Defendant's Motion for Summary Judgment.  I will represent to you that this was filed with the Court.  It was filed under a seal, this whole transcript is confidential so we don't need to worry about that.

MS. ZELDIN:  It will be unsealed shortly.

BY MS. ROESER:

Q    If you could please direct your attention to page 3, paragraph 10.

A    Okay.

Q    She states -- actually, before you do that, if you could go to the last page, please.

A    Okay.

Q    You see that Ms. Lively has signed this declaration?

A    Yes.

Q    And that she's declared under penalty of perjury that it's true and correct?

A    Yes.

Q    Okay.  Turn back to paragraph 10.  It states:

(As read):

"On or around May 19th, 2023, I filmed

CONFIDENTIAL

Page 211

a scene in which my character, Lily Bloom, visits Baldoni's character at work to show that she loves him.  The intention was always to kiss in the scene, with everyone's knowledge and consent.  Along with my makeup artist, we planned lipstick that would not transfer onto Baldoni for the kiss, which we also shared with him.  While the scene was cut from the film, the version that appears in the film was one reshot to be in Ryle Kinkade's apartment instead.  And it, too, has a kiss.  As it is a pivotal moment for the character's story."

Do you see that?

MS. ZELDIN:  Love story.  You missed a word.

BY MS. ROESER:

Q    For the character's love story.

And does that paragraph of Ms. Lively's complaint change your opinion at all with respect to whether she improvised kissing in the hallway scene?

A    I'm sorry, where -- Oh, here we go.

Q    Paragraph H.

CONFIDENTIAL

Page 212

A    Yup.  Got it.  I would have to go back and see if there's competing evidence about this. I'm not sure.

Q    But you don't know of any competing evidence as you sit here?

A    I can't remember right now.

Q    Next paragraph, I, please.

A    Yes.

Q    This relates to the incident in which Mr. Heath entered Ms. Lively's hair and makeup trailer, right?

A    Yes.

Q    Okay.  At the end of this paragraph, you write:

          (As read):

               "Mr. -- he did not look at her during
               the brief two to three-minute meeting."
          Do you see that?

A    Yes.

Q    That is in reference -- it's your opinion that Mr. Heath did not look at Ms. Lively while they were in the trailer together?

A    No.  That was -- that was his recollection.  That was my recitation of what he testified to.

CONFIDENTIAL

Page 213

Q    Why don't you read that paragraph out loud?

A    Sure.

(As read):

"Lively's allegation that he saw her naked breast when he entered her trailer to speak to her was contradicted by the recollections of her hair dresser, Ann Carole, who recalled holding a cutting cape up so Heath could not see Lively.  And of Baker, who recalled putting a towel over the breast that was not breastfeeding.

Heath's own recollection of the interaction also contradicted Lively's account.  Heath recalled that he looked away from Lively, as she requested he do, and that he did not look at her during the brief two to three-minute meeting."

Q    You don't cite any evidence here, right?

A    I refer to it.  I didn't cite any deposition transcripts.  That's correct.

Q    In reaching this opinion, did you

CONFIDENTIAL

Page 214

consider testimony from Ms. Lively, Ms.Baker, and Ms. Carroll, that when Mr. Heath approached the trailer, they yelled "No, no, no.  Whoa, whoa, whoa" or "don't come in"?

A    Yes.  I was thinking about the allegation that he saw her naked breasts.  Because that to me is the potentially sexual conduct.

Q    Did you -- did you consider Ms. Carroll's testimony that Mr. Heath could have seen Ms. Lively's naked body in the mirror?

MS. ZELDIN:  Can you read back the question, please?

THE STENOGRAPHIC REPORTER:  Sure.

(Record read as follows:

"QUESTION:  Did you consider Ms. Carroll's testimony that Mr. Heath could have seen Ms. Lively's naked body in the mirror?")

THE WITNESS:  I think she said she wasn't sure.  She described holding a cutting cape up that would have covered her down to about her knees.

BY MS. ROESER:

Q    If Mr. Heath could have seen Ms. Lively's naked body in the mirror, would that change your opinion in that paragraph?

Page 215

A     If he did, that might change it.

Q     If he did look at her through the mirror and see her body?

A     It might.

Q     Did you consider Ms. Lively's testimony that Mr. Heath looked straight at her?

A     Yes, in her eyes.  But I considered that the cape was up so he saw her -- she said he looked in her eyes, I believe.

Q     You think Ms. Lively testified that Mr. Heath looked her in the eyes?

A     When she said he looked straight at her.

Q     You're assuming that means that he looked at her in the eyes?

A     Yes.

Q     Do you know that?

A     That's what I understood it to mean.

Q     Do you know that to be Ms. Lively's testimony?

A     I don't think she said he looked at my breast.  My understanding is that he looked at her eyes, and the way Ms. Carroll described it, she held the cape up over Ms. Lively's body so that he couldn't see her.

Q     You're aware that at the time, Ms. Lively

CONFIDENTIAL

Page 216

was wearing only a thong?

        A    Yes.

        Q    Just to be clear, do you recall Ms. Lively testifying that he looked her in the eyes specifically?

        A    I don't have a specific recollection of that.

        Q    So are you giving the opinion that Mr. Heath did not look at Ms. Lively's exposed breasts?

        A    That he could not see them.  Because they were covered by -- the view would have been covered by this cutting cape and a towel, but the cutting tape is bigger.  They both sort of went to do something at the same time.

        Q    What is the basis of your statement that the meeting lasted for two to three minutes?

        A    Well, I didn't reach that conclusion. That was his -- that was my summary of his statement.

        Q    Got it.  If you could look at paragraph J, please.  Can you go ahead and read that for the record?

        A    Yes.

                (As read):

CONFIDENTIAL

Page 217

"Lively's allegation that Heath showed her a video of his wife giving birth is contradicted not only by Heath's testimony, but also and perhaps more importantly, by the video itself.  The only video that Heath had on his phone is one that depicts his wife and him in a tub with their bare shoulders visible and with the newborn baby on his wife's chest covered in a small towel.  Lively said that she told him to stop the video almost immediately and there is no nudity in the first part of the video, which is the only part she might have seen."

Q    Are you aware that there is a dispute between Ms. Lively and Mr. Heath about what version of the video he showed her that day?

A    No.  My understanding is there's only one video on his phone.

Q    Do you recall Mr. Heath's testimony in his deposition that there were multiple different versions of the birth video?

A    Not versions but parts --

Q    Parts?

CONFIDENTIAL

Page 218

A    I think that they were -- he said it was a long video and there were portions.

Q    So different parts of the birth were filmed?

A    I believe that's correct.

Q    And do you recall Mr. Heath's testimony that he had access to those different parts of the birth video via DropBox or some similar platform on his phone?

A    That he had access via DropBox, but the only one was on his phone.

Q    Via DropBox which could be accessed on his phone?

MS. ZELDIN:  Objection.

THE WITNESS:  I suppose it could be accessed on his phone.

BY MS. ROESER:

Q    If Mr. Heath had access to other parts of the birth video, would that change your opinion on what video was shown to her?

MS. ZELDIN:  Objection.

THE WITNESS:  I might have to look at the other videos.

BY MS. ROESER:

Q    Are you aware that other parts of the

CONFIDENTIAL

Page 219

video have been produced in this action?

A    I have no idea.  I've only looked at one video.  I've watched that one video.

Q    I will represent to you that in this action, Mr. Heath has produced videos of births of two of his children and that in total there are 14 parts.

MS. ZELDIN:  Objection.  They're not parts.  They are separate videos.

BY MS. ROESER:

Q    Okay.  There are 14 separate videos.

A    That have been produced?

Q    That have been produced.

A    I see.

Q    And many of those videos depict Mr. Heath's wife fully nude, breasts exposed, nipples.  And a number of them include -- can we -- should we mark this portion of the testimony Attorneys' Eyes Only?

MS. ZELDIN:  Yes, please.

(AEO DESIGNATION BEGINNING OF TESTIMONY)

MS. ROESER:  Closeups of her vagina.

THE WITNESS:  Uh-huh.

BY MS. ROESER:

Q    Before birth, during crowning, after.

CONFIDENTIAL

Page 220

Knowing that those videos exist, does that change your opinion with respect to Subsection I?

MS. ZELDIN:  Objection.

THE WITNESS:  Well, I suppose I would have to try to determine which video and how much of it he showed her.  Because, again, she said she only saw -- she stopped him immediately.  So if the beginning of each video is, you know, something innocuous like it is in the one I saw, then it would not change my opinion.

BY MS. ROESER:

Q   So is it right then that to conclude -- to make a conclusion about whether this allegation is substantiated, that Mr. Heath showed Ms. Lively a video of his nude wife at the workplace, you would have to first determine which of the 14 different videos he showed her?

MS. ZELDIN:  Objection.

THE WITNESS:  I would have to determine which one he showed her.

BY MS. ROESER:

Q   Do you recall Ms. Lively's testimony that the video she was shown was of Mr. Heath's wife fully nude with her legs spread?

A   Yes.

CONFIDENTIAL

Page 221

Q    You concluded here in part J --

A    Yes.

Q    -- no nudity.  There is no nudity in the first part of the video.  Which is the only part she might have seen; is that right?

A    Yes.

Q    So is it your opinion that Ms. Lively did not see any nudity in the video that Mr. Heath showed her?

A    Well, the video that I reviewed.

Q    How would Ms. Lively know that any of the videos contained nudity if she hadn't seen it, what Mr. Heath showed to her?

MS. ZELDIN:  Objection.

THE WITNESS:  I don't know.

BY MS. ROESER:

Q    Did you consider that when you came to your conclusion?

MS. ZELDIN:  Objection.

THE WITNESS:  No, because, I mean, it's obvious that this is a birthing tub, and it's clear that the woman -- that his wife is nude, even though you can't see the nudity.  And her knees are up.  So you can see sort of the position she was in.  You just can't see the nudity.

CONFIDENTIAL

Page 222

BY MS. ROESER:

Q     In the beginning of the video that you saw?

A     Right.  I don't think there -- well, I don't remember the end.  I watched the full video but...

Q     Do you remember in the video that Mrs. Heath's breasts and nipples are visible during certain points?

A     Later on in the video, yes.

Q     In the video you saw, were Ms. Heath's legs spread?  Do you recall that?

A     I think so.  I think her knees were up and still apart.  But I could be wrong.

Q     And to be clear, your opinion, with respect to Mr. Heath showing Ms. Lively the birth video might change depending on what video he showed her?

             MS. ZELDIN:  Objection.

             THE WITNESS:  It might.  This opinion is dependent on the video that I saw.

BY MS. ROESER:

Q     Okay.  It's dependent on Mr. Heath showing her this specific video that you saw?

A     Yes.  I can't opine as to any other

CONFIDENTIAL

Page 223

video.

Q    How did you reach the conclusion that the video that Mr. Heath showed Ms. Lively was the one that Mr. Heath says he showed rather than the one Ms. Lively said?

A    Because my understanding is that's the only one that is on his phone.  So that's the one I asked to see.

Q    You didn't ask to see any of the other videos?

A    I didn't understand -- I understood this was the one accessible on his phone.  So that's the one I asked to see.

MS. ROESER:  Okay.  Should we take another quick break?

MS. ZELDIN:  Sure.

(END OF AEO DESIGNATION OF TESTIMONY)

THE VIDEOGRAPHER:  We are going off the record.  The time is 3:40 p.m.

(Recess.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 3:57 p.m.

BY MS. ROESER:

Q    Ms. Fromholz, are you still feeling okay to continue?

CONFIDENTIAL

Page 224

A    I do.

Q    And you promise to tell me if at any point you don't?

A    Absolutely.

Q    Will you please share with me your third opinion offered in this case?

A    Yes, ma'am.  I'm going to go again to the summary, but I think they are the same.

(As read):

"My third opinion is that Robbins erred in his conclusion that Wayfarer violated entertainment industry specific intimacy protocols by failing to require an intimacy coordinator to be present on set during phase one, failing to have a signed nudity rider in place in phase one, and allegedly failing to have a closed set during the birthing scene."

Q    Okay.  I refer to this as your third opinion?

A    Yes.

Q    Great.  Have you ever worked on a film or TV studio, film or TV set?

A    I have not.

CONFIDENTIAL

Page 225

Q    Have you ever -- are you familiar with the role of an intimacy coordinator?

A    I am.

Q    What is your understanding of an intimacy coordinator's role based on?

A    My understanding is based on my review of Lizzy Talbot's deposition and the SAG AFTRA, the summary and the guidelines.  And so my understanding is that an intimacy coordinator is -- it changed. So at one point, recommended and now, best efforts. When there is nudity or simulated sex in a scene. That before, so I guess during phase one, nudity coordinator was recommended in scenes that involved nudity or simulated sex as defined by the SAG-AFTRA guidelines.

Q    Have you ever worked with an intimacy coordinator before?

A    I have not.

Q    Have you ever spoken to one?

A    I have not.

Q    If you could turn your attention to -- you're not a member of SAG, right?

A    I am not.

Q    Have you ever represented SAG in conducting an investigation?

CONFIDENTIAL

Page 231

an actor might be depicted as nude?

MS. ZELDIN:  Objection.

THE WITNESS:  Yes.  Because it's not -- they're not nude.  Yes.  There's no such thing as simulated nudity, is my understanding from Lizzy Talbot.

BY MS. ROESER:

Q    What is that understanding based on?

A    Lizzy Talbot's description of the definition of nudity.

Q    Do you recall Ms. Talbot's deposition testimony with respect to partial nudity?

A    Not specifically.

Q    Do you recall that she testified, for example, that there may have been high-hip nudity in the birthing scene in the film?

A    I recall her talking about high-hip nudity.  Yes.

Q    Do you recall her testimony that high-hip nudity could be considered nudity that might require an intimacy coordinator or a rider?

MS. ZELDIN:  Require.  Objection.

MS. ROESER:  In which an intimacy coordinator or rider would be recommended?

THE WITNESS:  Yes.

CONFIDENTIAL

**Page 235**

A    No.

Q    If you could please turn back to Ms. Lively's declaration, which I believe is Exhibit 4.

A    Okay.

Q    Let's turn to page 4.  Sorry.  Page 3, paragraph 11.  Again, this is Ms. Lively's sworn declaration.  In paragraph 11, she writes:

(As read):

"On or around May 22nd, I filmed a scene in which my character gives birth.  The birth scene."

Paragraph 12 she states:

"Customary industry restrictions that in my experience have been put in place for partial or implied nudity were not implemented for the birth scene.  The set was not closed to non-essential personnel for the entirety of the scene."

Do you see that?

A    I do.

Q    Is it your opinion that the set was closed for the birth scene?

A    Well, that was my opinion based on the

CONFIDENTIAL

Page 236

evidence I reviewed.

Q   Which was what?

A   Well, I've cited Jamey Heath's testimony. And then Lizzy Talbot's testimony that it didn't require a closed set because it didn't involve nudity.

Q   So let's start with Mr. Heath's testimony.

A   Yes.

Q   Did you review the call sheet for the day of the birth scene?

A   I did.

Q   Do you recall Ms. Talbot testifying about the call sheet for the day of the birth scene?

A   Yes.

Q   Is it your understanding that when a scene is closed for intimacy purposes, that on the call sheet, there is a red box next to the scene that says "CLOSED" in big letters?

A   I'm not certain.

Q   Do you recall if the call sheet for the birth scene had a red box that said "CLOSED" next to the birth scene?

A   I'm not certain.

Q   So is your -- is your opinion that the

CONFIDENTIAL

Page 237

set was closed for the birth scene based entirely on Mr. Heath's deposition?

        A    I believe so.

        Q    Do you know whether Mr. Heath's testimony was, with respect to the scene being closed -- the set being closed generally to the public or for purposes of intimacy?

        A    My understanding was that it was for purposes of intimacy.

        Q    And if, in fact, his testimony was with respect to the set being closed to the general public, would that change your opinion whether Wayfarer appropriately closed the set for the day of the birth scene?

                MS. ZELDIN:   Objection.

                THE WITNESS:   I might have to go look at other -- other testimony.  But, again, you said the word "appropriately," and I -- I believe that Lizzy Talbot testified it was not required.  So I don't know if it was appropriate or inappropriate to close the set.

BY MS. ROESER:

        Q    Okay.  Well, so your opinion is that it was closed, right?

        A    So my opinion is, as I say here, that the

CONFIDENTIAL

Page 238

birthing scene -- closed set was not required because it didn't involve nudity but, nonetheless, it was closed.

Q    Okay.  So your opinion is that the set was closed for intimacy purposes?

MS. ZELDIN:  Objection.

THE WITNESS:  As we discussed, based on Jamey Heath's testimony.

BY MS. ROESER:

Q    Okay.  And viewing Ms. Lively's testimony here in paragraph 12, does that change your opinion with respect to whether the set was, in fact, closed?

A    Well, I think I would go back and review -- this is new to me.  I would go back and review the testimony and other evidence to determine if it was, in fact, closed.  But, again, the primary conclusion is that it did not -- it was not required to be closed.

Q    Your opinion that the set was closed might change, though?

A    I don't know.  It depends on what I -- what review.  I've looked at this.  I need to go back and look at evidence because, as I said, this is new to me.

CONFIDENTIAL

Page 239

Q    If you go on into paragraph 12, Ms. Lively's declaration, on the top of page 4, she writes:

(As read):

"Monitors for the scene were also active, when the standard for closed sets is to restrict the feed."

Do you see that?

A    I do.

MS. ZELDIN:  Objection.  Not to you, but to the sentence.  How does she have any foundation for that statement?  She doesn't.

MS. ROESER:  Objection to your speaking objection.

MS. ZELDIN:  Well, objection to the declaration you drafted for your client.

MS. ROESER:  Kim.

MS. ZELDIN:  What?

MS. ROESER:  It's -- your speaking objections are totally inappropriate, as is the suggestion that anyone drafted this -- that I drafted this for the client.

MS. ZELDIN:  I don't know if you did or Esra did or someone else did.

MS. ROESER:  Kim.

CONFIDENTIAL

Page 240

MS. ZELDIN:  Stephanie.

MS. ROESER:  You know that you're being inappropriate.

MS. ZELDIN:  Really?  And you're not?

MS. ROESER:  I'm not.  Just asking questions.

MS. ZELDIN:  You're asking questions and --

MS. ROESER:  Kim, come on, do we really need to do this during the last expert deposition?  Let's just leave it.

MS. ZELDIN:  Go.  Go.

THE WITNESS:  Is this the last expert deposition?

MS. ZELDIN:  No.

MS. ROESER:  No, I'm wrong.  But it might be our last deposition together, so...

MS. ZELDIN:  Thank God.

MS. ROESER:  Agreed.

BY MS. ROESER:

Q    Okay.  So --

A    So where were we?

Q    So in this declaration, Ms. Lively stated that monitors were active, right?

A    She did.

CONFIDENTIAL

Page 241

Q    Okay.  And is your understanding of a closed set for intimacy purposes is that monitors should not be active for non-essential personnel?

A    That's my understanding.

Q    In paragraph 13, Ms. Lively writes:

(As read):

"The script of the birth scene did not call for the simulation of nudity, and as a result, I did not discuss or consent to nudity with the film's intimacy coordinator in preparation for the birth scene through a nudity rider or otherwise."

Do you see that?

A    I do.

Q    Did you review the script of the birth scene?

A    I believe I did.

Q    Do you recall whether the script contained any indication that the scene would include nudity?

A    I believe it did not.

Q    In paragraph 6, Section B of your report.

A    Going to the other document.  Sorry.

Q    That's okay.  We're on page 9, B6, you

CONFIDENTIAL

Page 248

Sorry.  No.  Under the heading "When do you use an intimacy coordinator?"

A     Okay, yes.

Q     It says:

(As read):

"SAG-AFTRA believes that intimacy coordinators should be hired in scenes involving nudity or simulated sex or upon request for other intimate -- intimate and hyper-exposed scenes."

Do you see that?

A     I do.

Q     Do you have an understanding of what a "hyper-exposed scene" is?

A     I read it, and now I can't call it to mind.  I apologize.

Q     Is it your understanding, based on this document, that SAG-AFTRA believes intimacy coordinators should be hired, including upon request for other intimate and hyper-exposed scenes, that don't necessarily involve nudity or simulated sex?

MS. ZELDIN:  Objection.

THE WITNESS:  Yes.

BY MS. ROESER:

Q     Does that change your opinion in any way?

A    No.

Q    Why not?

A    Well, because Ms. Lively did not request an intimacy coordinator.

Q    For the birth scene?

A    That's my understanding, yes.

Q    And your understanding is also that Ms. Lively did not know that she was going to be simulating any form of nudity during the birth scene, correct?

A    Well, that's what I just read a moment ago, so...

Q    And is it your view that Ms. Lively could request an intimacy coordinator for a scene that she didn't know would involve any form of nudity?

A    Well, upon learning that it was, she could have.

Q    She could have in the moment when the scene was being filmed?

A    Well, it was before the scene.  But yes, on the day of, she could have requested it.

Q    She could have requested an intimacy coordinator to appear on set that day?

A    She could have asked, yes.

Q    You can just set it aside.

CONFIDENTIAL

**Page 253**

A    Yes.  So there's no such thing as performance of nudity, so it would be performance of simulated sex and depiction of nudity.

Q    Is there anything in either of these SAG-AFTRA documents that defines what nudity is?

A    Not in these -- well --

Q    For purposes of --

A    No, I believe it was Lizzy Talbot's definition that I was relying on, not in these documents.

Q    So the SAG-AFTRA guidelines, these two documents, for example, don't say that there's no such thing as partial nudity or simulated nudity, right?

A    I believe that's right.

Q    Have you ever drafted a nudity or intimacy rider before?

A    No.

Q    Have you ever negotiated one?

A    No.

Q    What is the basis for your opinion that it is not up to a studio to create a definition of intimacy?

A    That it is defined in the SAG-AFTRA standards.

CONFIDENTIAL

Page 261

the ability of reputational damage to damage or --
I'm sure I'm using different words each time --
derail someone's career.

Q    Do you have specific knowledge about the entertainment industry with respect to reputational damage?

A    Do I have specific knowledge?  Well, I have knowledge based on things I've read and things that have happened to people that have been publicized.

Q    What things have you read that forms the basis of this opinion?

A    Items during, for instance, the "Me Too" movement about people's careers being damaged in retaliation for their actions in refusing sexual advances.

Q    Articles, for example?

A    Yes.

Q    What else forms the basis for your knowledge with respect to entertainment industry and the ability to damage or derail someone's reputation?

A    Clients I have worked with who have worried about taking action and what that might do to their career.  And, in fact, things that have

CONFIDENTIAL

Page 274

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.  Dated this 12th day of December, 2025.

ASHLEY SOEVYN

CSR No. 12019