**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| BLAKE LIVELY,<br><br>                      Plaintiff,<br><br>v.<br><br>WAYFARER STUDIOS LLC, et al.,<br><br>                  Defendants. | No. 24-cv-10049 (LJL) (lead case) |

**PLAINTIFF BLAKE LIVELY'S MOTION TO EXCLUDE THE
OPINIONS AND TESTIMONY OF JAMES F. HAGGERTY**

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   HAGGERTY'S OPINIONS ...................................................................................1

III.  LEGAL STANDARD..............................................................................................3

IV.   ARGUMENT...........................................................................................................6

   A.    All of Haggerty's Opinions Must Be Excluded as Irrelevant. .......................6

      1.    Haggerty's Opinions on "Standard" Industry Practices Are Irrelevant
            Because Lively Alleges Retaliatory Conduct (Opinions 1–4)................................. 6

      2.    Haggerty's Instruction on How the Jurors "Should" Regard Evidence
            Is Improper (Opinions 1 & 3). .............................................................................. 7

      3.    Haggerty's Opinions Amount to Nothing More Than Unhelpful
            Lay Testimony (Opinions 1–6). ............................................................................ 8

      4.    Haggerty's Opinions Regarding the Second Amended Complaint
            Are Irrelevant (Opinions 5–6)............................................................................. 11

   B.    Haggerty Is Unqualified to Render Opinions 5 and 6....................................12

   C.    All of Haggerty's Opinions Must Be Excluded as Unreliable.......................14

   D.    Haggerty's Opinions Must Be Excluded as Prejudicial under FRE 403. ......15

i

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Abreu Bautista v. Pagan-Rodriguez*,
    2025 WL 1730213 (S.D.N.Y. June 23, 2025) ..........................................................................

*Alto v. Sun Pharm. Indus., Inc.*,
    2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021).................................................................5, 6, 9, 14

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)....................................................................................................4, 5

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    2015 WL 5003528 (S.D.N.Y. Aug. 20, 2015)................................................................................9

*Andrews v. Metro N. Commuter R.R. Co.*,
    882 F.2d 705 (2d Cir. 1989).........................................................................................................8

*Bocoum v. Daimler Trucks N. Am. LLC*,
    2022 WL 902465 (S.D.N.Y. Mar. 28, 2022) ..............................................................................14

*Borawick v. Shay*,
    68 F.3d 597 (2d Cir. 1995)...........................................................................................................5

*Campbell v. Metro. Prop. & Cas. Ins. Co.*,
    239 F.3d 179 (2d Cir. 2001).........................................................................................................4

*Chen-Oster v. Goldman, Sachs & Co.*,
    114 F. Supp. 3d 110 (S.D.N.Y. 2015)...........................................................................................5

*Colon v. Metro-N. Commuter R.R. Co.*,
    778 Fed. App'x 7 (2d Cir. 2019)................................................................................................12

*Conti v. Doe*,
    2020 WL 6162104 (S.D.N.Y. Oct. 21, 2020)..............................................................................12

*Cross Com. Media, Inc. v. Collective, Inc.*,
    2014 WL 11343849 (S.D.N.Y. Aug. 21, 2014).............................................................................9

*Dallal v. New York Times Co.*,
    352 Fed. App'x 508 (2d Cir. 2009)..............................................................................................6

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)...........................................................................................................4, 5, 11

*E.E.O.C. v. Morgan Stanley & Co.*,
    324 F. Supp. 2d 451 (S.D.N.Y. July 2, 2004)...........................................................................6, 7

*In re Elysium Heath-ChromaDex Litig.*,
    2022 WL 421135 (S.D.N.Y. Feb. 11, 2022) .................................................................13

*Fordec Realty Corp. v. Travelers Excess and Surplus Lines Co.*,
    2019 WL 3817213 (S.D.N.Y. Aug. 14, 2019) ..............................................................1

*General Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) .....................................................................................................5

*Jinn v. Sig Sauer, Inc.*,
    2023 WL 2919558 (S.D.N.Y. Apr. 12, 2023) .............................................................14

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.* (*In re Keurig*),
    2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) ...............................................................11

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) .................................................................................................4, 5

*Media Sport and Arts, s.r.l. v. Kinney Shoe Corp.*,
    1999 WL 946354 (S.D.N.Y. Oct. 19, 1999) ..............................................................10

*In re Mirena IUD Prods. Liab. Litig.*,
    169 F. Supp. 3d 396 (S.D.N.Y. 2016) ..........................................................................9

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005) ......................................................................................12

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    691 F. Supp. 2d 448 (S.D.N.Y. 2010) ..........................................................................5

*R.B. Ventures, Ltd. v. Shane*,
    2000 WL 520615 (S.D.N.Y. May 1, 2000) ................................................................15

*In re Rezulin Prods. Liab.*,
    309 F.Supp. 2d 531 (S.D.N.Y. 2004) ........................................................................8, 9

*Sec. and Exch. Comm'n v. Laura*,
    680 F. Supp. 3d 204 (E.D.N.Y. 2023) ........................................................................11

*Snyder v. Wells Fargo*,
    2012 WL 4876938 (S.D.N.Y. Oct. 15, 2021) ...........................................................7, 8

*In re Terrorist Attacks on Sept. 11, 2001*,
    2023 WL 3116763 ........................................................................................................6

*United States v. Bright*,
    2022 WL 53621 (2d Cir. Jan. 6, 2022) .........................................................................4

iii

*United States v. Castillo*,
    924 F.2d 1227 (2d Cir. 1991)...................................................................................8

*United States v. Duncan*,
    42 F.3d 97 (2d Cir. 1994) .........................................................................................8

*United States v. Gatto*,
    986 F.3d 104 (2d Cir. 2021).....................................................................................15

*United States v. Jiau*,
    734 F.3d 147 (2d Cir. 2013).......................................................................................8

*United States v. Mejia*,
    545 F.3d 179 (2d Cir. 2008).......................................................................................8

*United States v. Mendlowitz*,
    2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) ...............................................6, 7, 10

*United States v. Ray*,
    583 F. Supp. 3d 518 (S.D.N.Y. 2022)................................................................14, 15

*United States v. Tin Yat Chin*,
    371 F.3d 31 (2d Cir. 2004).......................................................................................12

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007).......................................................................................4

## Rules

Fed. R. Civ. P. 26................................................................................................................1

Fed. R. Civ. P. 37................................................................................................................1

Fed. R. Evid. 401 .............................................................................................................11

Fed. R. Evid. 403 .............................................................................................................15

Fed. R. Evid. 702 ....................................................................................................4, 7, 15

## I.     INTRODUCTION

Defendants offer James Haggerty to opine on "standard" crisis communications and how the jury "should" perceive them.  But Mr. Haggerty's perceptions of how the crisis industry operates in "standard" scenarios is irrelevant to this case, where Ms. Lively alleges that the Defendants used the media to retaliate against her for raising concerns of a hostile work environment on the set of the film *It Ends With Us*.  For this reason, and those stated herein, his opinions and testimony should be excluded in full.

## II.     HAGGERTY'S OPINIONS

Haggerty advances six opinions regarding the retention, perception, and function of crisis communications managers (Opinions 1–3); a summary of two case documents (Opinion 4); and criticism of the charts in Ms. Lively's Second Amended Complaint (Opinions 5–6).[1] Ex. 1 (Haggerty Rep.) at 31-32; Ex. 2 (Haggerty Dep.) at 143:20-24.

**Opinion 1:** Haggerty opines that the "hiring of a crisis communications consultant in the face of perceived reputational threats should not be considered in any way evidence of a negative, or nefarious, intent" by the client, and is instead "entirely acceptable, appropriate, and prudent" for those "seeking to mitigate reputational risk."  Ex. 1 (Haggerty Rep.) at 31; Ex. 2 (Haggerty Dep.) at 163:19-164:6, 173:2-14.  He confusingly maintains that the retention of a crisis communications consultant "is always standard, prudent, acceptable, appropriate and ethical," yet he also admits that he cannot assess whether crisis retentions or planning are, in fact, always ethical

---

[1] Because Haggerty did not sign his report, and Haggerty failed to identify each of the sources considered in connection with his report, Defendants failed to comply with Federal Rule of Civil Procedure 26(a)(2)(B)(ii) which additionally warrants exclusion of his report and testimony.  *See* Fed. R. Civ. P. 37(c)(1); *Fordec Realty Corp. v. Travelers Excess & Surplus Lines Co.*, 2019 WL 3817213, at *8-10 (S.D.N.Y. Aug. 14, 2019); Ex. 2 (Haggerty Dep.) at 42:2-44:6 (admitting that he reviewed the deposition transcripts of Leslie Sloane, omitted from the reviewed materials listed in the report as a "mistake that it wasn't included …."), 45:8-18 (admitting that he reviewed a report from Plaintiff's expert, seemingly by Dr. Dina Mayzlin, not disclosed in report), 81:16-82:3 (unable to say whether he reviewed Melissa Nathan's second day of deposition testimony, not disclosed in report).

1

137697328.v1

and is not offering an opinion on what was ethical in the instant case. Ex. 2 (Haggerty Dep.) at 107:18-108:7, 161:10-15, 164:13-165:2, 175:18-176:21.

**Opinion 2:** Haggerty claims that a "misunderstanding of the role of a crisis communications manager often feeds negative perceptions." Ex. 1 (Haggerty Rep.) at 31. He bases this opinion primarily on unspecified experience and his assessment of "popular culture." Ex. 2 (Haggerty Dep.) at 178:11-23, 179:11-180:3, 185:12-22. Opinion 2 is not specific to this case. *Id*. at 189:5-21, 191:10-192:3 ("… I have done no analysis on what perceptions were related to the defendants.").

**Opinion 3:** Haggerty opines that "[m]edia monitoring is a standard practice" in public relations and crisis communications and "should not be seen as an effort at social media manipulation." Ex. 1 (Haggerty Rep.) at 31. "[S]tandard means that in the industry, many are utilizing it." Ex. 2 (Haggerty Dep.) at 161:23-162:3. Haggerty offers no opinion on whether social media *manipulation*, as Ms. Lively alleges occurred here, is standard in the crisis industry. *Id*. at 193:19-24, 201:16-24, 204:22-205:5.

**Opinion 4:** Haggerty opines that the "Scope of Work" and "Scenario Planning" documents prepared by The Agency Group PR for the Wayfarer Defendants are "in keeping with standard crisis communications planning practices." Ex. 1 (Haggerty Rep.) at 32. He does not offer any opinion on whether carrying out these documents, as Ms. Lively alleges occurred here, is standard. Ex. 2 (Haggerty Dep.) at 218:10-24, 220:19-24, 240:16-25 ("I am not focused on the execution but on the planning document itself and whether it was standard"). Haggerty admits his "analysis" of these documents consists of "directly quot[ing]" and "paraphras[ing]." *See, e.g.*, *id*. at 222:8-17.[2]

---

[2] *See also id.* at 242:7-242:24 ("Q. …[Y]our analysis is a summary of what is contained in part of the Scenario Planning document, correct? A. That is correct. Q. And the first bullet point here, that reflects your analysis is a summary of

**Opinion 5:** Haggerty relies on depictions in the Second Amended Complaint reflecting negative coverage of Ms. Lively to conclude that the depicted "growth in media and social media coverage negative to Ms. Lively" "is unlikely to have been caused by the work done by the crisis communications consultant hired by the Wayfarer parties, given the short timeframe" between TAG's retention and the growth. *Id*. at 268:2-6; ECF No. 521 ¶¶ 326, 332, 334. Haggerty does not know what "growth" his opinion refers to (Ex. 2 (Haggerty Dep.) at 264:10-19, 265:12-266:11) and did not evaluate metrics or conduct his own analysis of the coverage (*id.* at 266:12-14, 266:20-24, 278:20-279:11). Instead, Opinion 5 is based on his "view" and "a couple of sources"—namely, two publicly available digital marketing websites discovered while drafting his report. *Id*. at 274:8-10, 276:2-10 ("I did some research online just to make sure the opinions I had were valid.").

**Opinion 6:** Haggerty concludes that he found Lively's sentiment graphs "hard to discern," and that "if you are going to understand a sentiment analysis, you really need to dig deeper in the context of a sensitive communication situation." *Id*. at 293:16-23; *see also id.* 291:8-18. He offers this opinion despite disclaiming expertise in data analysis and agrees that the sentiment charts may well be valid and correct. *Id*. at 291:19-25, 292:9-12, 294:15-24.

## III.    LEGAL STANDARD

A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion if: "(a) the expert's scientific, technical, or other

---

what is contained in part of the Scenario Planning document, correct? A. That is correct. … Q. Okay. And the same holds true for the next bullet point? … A. Yes. Q. And the next — the same holds true for "Key Messaging Points," correct? A. Yes. Q. And is that also the case for the final bullet on page 24? A. Yes."), 222:18-225:20 (referencing "the paraphrase in the next sentence may include some level of analysis of what was in the original" … "seems to track pretty carefully the actual language, but, … to the extent stating what is in the 'Overview' section is analysis of it, I would say that that would be the case but it depends on how deep an analysis you consider that."), 243:7-9 ("[A]s I review what is actually in the document, I am paraphrasing in a manner that includes analysis."); 245:7-24, 247:13-248:5, 248:6-18 ("Q. The summary in the first two sentences of this bullet point include your analysis embedded in that summary; is that correct? A. Yes, for example, saying it appears clearly stated, and I don't know — again, I would have to go back. I suspect this is a paraphrase.").

specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Bright*, 2022 WL 53621, at *2 (2d Cir. Jan. 6, 2022) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)). That rule requires the proponent to establish and the trial judge to find "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). This "gatekeeping obligation" applies "to all expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

"The objective of [the gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. Relevancy is determined by whether the proffered evidence "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Campbell ex rel campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001)). Reliability is determined by considering if (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Amorgianos*, 303 F.3d at 266.

4

Notwithstanding "a presumption that expert evidence is admissible," *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (citing *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)), a court still must determine that the evidence is "sufficiently reliable so as to be admissible." *Amorgianos*, 303 F.3d at 268. "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* at 267. "[I]t is critical that an expert's analysis be reliable at every step." *Id.* Even "[i]f the witness is relying solely or primarily on experience, [he still] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Alto v. Sun Pharm. Indus., Inc.*, 2021 WL 4803582, at *2 (S.D.N.Y. Oct. 13, 2021) (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 473 n.148 (S.D.N.Y. 2010)).

"In short, the district court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Amorgianos*, 303 F.3d at 265-66 (quoting *Kumho Tire*, 526 U.S. at 152). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

5

IV.    **ARGUMENT**

A.    **All of Haggerty's Opinions Must Be Excluded as Irrelevant.**

1.    **Haggerty's Opinions on "Standard" Industry Practices Are Irrelevant Because Lively Alleges Retaliatory Conduct (Opinions 1–4).**

Expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Alto*, 2021 WL 4803582, at \*3 (quoting *Daubert*, 509 U.S. at 591). "[U]nlike lay witnesses, experts may give background information, but even that information must help the jury decide the case." *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 3116763, at \*19 (S.D.N.Y. Apr. 27, 2023) (citing *Daubert*, 509 U.S. at 592). Courts in this Circuit regularly preclude expert testimony concerning industry practice on the basis of irrelevance. *See, e.g.*, *Dallal v. N.Y. Times Co.*, 352 F. App'x 508, 512 (2d Cir. 2009) (preclusion of expert appropriate where industry practice irrelevant to party's theory of case); *E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 464 (S.D.N.Y. 2004); *United States v. Mendlowitz*, 2019 WL 6977120, at \*5-6 (S.D.N.Y. Dec. 20, 2019) (citing cases).

Haggerty's Opinions 1–3 address "standard" PR industry practices regarding the retention of crisis professionals, perceptions regarding their function, and how they operate.[3] Similarly, Haggerty's Opinion 4 concludes that the Scope of Work and Scenario Planning documents constitute standard crisis communications planning. Ex. 1 (Haggerty Rep.) at 32. None of these opinions sufficiently relates to the case at hand.

---

[3] Ex. 2 (Haggerty Dep.) at 107:2-108:7 (as to Opinion 1, "Q. Are you offering any opinions on what is ethical in connection with this case? A. I don't think in this report. …"), 189:14-21 (as to Opinion 2, "Q. … you've conducted no analysis as to whether the public generally misunderstood the role of TAG Street Relations or Melissa Nathan or Jennifer Abel as crisis communications professionals; is that correct? A. That's correct."), 191:10-192:3 ("I have done no analysis on what perceptions were related to the defendants."), 193:19-24 (as to Opinion 3, "Q. This is, again, not an opinion that you're offering specifically about the defendants and their monitoring in this case, correct? A. I am just rereading it. Yes, it would be hard."). Of note, these opinions are analyzed only in the "overview" section of his report rather than the analysis section regarding "application" to the instant case. *See* Ex. 1 (Haggerty Rep.) at 2. To the extent Defendants aim to expand Haggerty's statements to opinions relating to Defendants (e.g., Ex. 2 (Haggerty Dep.) at 175:18-24, 183:13-21), the Court should reject that attempt. *See* Ex. 1 (Haggerty Rep.) at 31-32; (Haggerty Dep.) at 143:20-144:5 (identifying opinions listed as accurate and complete).

6

More specifically, whether or not crisis retentions in general, monitoring in general, or Defendants' assembling the Statement of Work and Scenario Planning documents collectively align with the norm for the crisis industry in the "standard" case is irrelevant to whether Defendants' conduct amounts to retaliation for engaging in protected activity, or other unlawful conduct. Thus, whatever may be "standard" in the crisis industry absent the retaliatory overlay here has no bearing on the issues to be presented to the jury. *See Morgan Stanley & Co.*, 324 F. Supp. 2d at 464.[4] Indeed, "the fact that certain conduct may be common or general practice in an industry [is] not relevant to the jury's consideration of the conduct of [Defendants], and is not a defense." *Mendlowitz*, 2019 WL 6977120, at *5. Nor will Haggerty's explanation as to generalized "misperceptions" about the crisis industry—untethered from any of the acts the Defendants are alleged to have engaged in here—"help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

At best, Haggerty's opinions are irrelevant background. At worst, they encroach upon the role of the jury by offering a legal conclusion that Defendants did not engage in retaliation (and introduce a significant risk of prejudice for that same reason, as discussed below at Section D, *infra*). Opinions 1–4 should be excluded on this basis.

### 2.  Haggerty's Instruction on How the Jurors "Should" Regard Evidence Is Improper (Opinions 1 & 3).

Haggerty's Opinions 1 and 3 include a mandate that the jury "should not" regard the retention of a crisis professional as reflecting negative intent, nor regard "media monitoring

---

[4] In *Morgan Stanley,* an employment discrimination case, the defendant attempted introduce an expert to testify that the compensation paid to the defendant was within industry standard. The court in that case excluded the expert testimony as irrelevant and unhelpful to trier of fact because "fact that Morgan Stanley's compensation is consistent with industry practices is irrelevant to a determination of whether the company discriminated." 324 F. Supp. 2d at 464. Likewise here, Haggerty's opinions as to "standard" crisis communications does not bear on whether Defendants discriminated against Ms. Lively by retaliating against her.

as an effort at social manipulation." Ex. 1 (Haggerty Rep.) at 34. Haggerty's Opinions 1 and 3 impermissibly invade the province of the jury by instructing them on what to conclude.

"[W]hen an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *Snyder v. Wells Fargo Bank N.A.*, 2012 WL 4876938, at *4 (S.D.N.Y. Oct. 15, 2012) (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)). If permitted, Haggerty's report and testimony that the retention of TAG and Street Relations and work performed pursuant to those engagements "should not be" viewed negatively would threaten to replace the jury's role in deciding whether the facts demonstrate, among other things, Defendants' retaliatory motive and liable conduct. Such an instruction would impermissibly undermine the jury's role of reaching its own conclusion based on those facts. *Snyder*, 2012 WL 4876938, at *4.

### 3.     Haggerty's Opinions Amount to Nothing More Than Unhelpful Lay Testimony (Opinions 1–6).

Expert testimony is limited to those occasions "where the subject matter of the testimony is beyond the ken of the average juror." *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991). Conversely, expert testimony that seeks to address "lay matters, which a jury is capable of understanding without the expert's help," is not relevant and therefore not admissible. *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 554 (S.D.N.Y. 2004) (quoting *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989)); *United States v. Jiau*, 734 F.3d 147, 154 (2d Cir. 2013); *United States v. Mejia*, 545 F.3d 179, 194-96 (2d Cir. 2008) (a district court errs when it allows an expert to testify as to matters which require no specialized knowledge).

None of Haggerty's opinions addresses anything but lay matters that a jury could understand without his assistance. As to Opinion 1, a juror could readily conclude that retaining a crisis consultant is a standard step in obtaining crisis support. Conversely, as Haggerty concedes,

8

whether any ***particular*** retention is "acceptable" or "prudent" or "ethical" is a case-by-case determination, and he offers no opinion as to the Defendants here. *See, e.g.*, Ex. 2 (Haggerty Dep.) at 164:20-25 ("As to whether it is always that case, I do not have information …."). Nor would such an opinion be admissible even if it were being offered because it would invade the province of the jury. *See supra*. Haggerty's Opinion 1 thus will not assist the trier of fact in any way.

In Opinion 2, Haggerty relies on publicly accessible, popular culture sources and his lay experience "as someone who consumes maybe too much popular entertainment" for the proposition that there are negative perceptions about the misunderstood role of crisis communications. *Id*. at 179:16-180:3. But any juror who watches television and reviews the evidence in this case could reach that conclusion, or the opposite one, on their own.[5] Similarly, as to Opinion 3, any juror would have a common understanding of what it means to "monitor" media, without a need for Haggerty's perspective.

Haggerty's Opinion 4 is similarly unhelpful because it amounts to nothing more than a summary of the Scope of Work and Scenario Planning documents. Experts who "merely recit[e] what is on the face of a document produced during discovery do no more than that which the finder of fact could him or herself do, and such experts' reports may be precluded on this basis alone." *See Anderson News, L.L.C. v. Am. Media, Inc.*, 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20, 2015) (internal quotation omitted) (quoting *Cross Com. Media, Inc. v. Collective, Inc.*, 2014 WL 11343849, at *9 (S.D.N.Y. Aug. 21, 2014)). Testimony that "merely relays the contents of documents without any expert analysis" is insufficient. *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 481 (S.D.N.Y. 2016); *Alto*, 2021 WL 4803582, at *8 (where an expert's report

---

[5] *See id*. at 181:24-182:7 ("Q. Can individuals watch these television shows, movies and other popular cultural offerings and reach the conclusion that crisis individuals are misleadingly being painted in a negative light? … A. I think you would have to ask the individuals watching."), 182:14-16 (describing himself as "someone who consumes maybe too much popular entertainment or more than [he] should").

"merely summarizes [the expert's] reading of internal emails and documents," those "purported opinions will not assist the Court [and jury] in evaluating that evidence" because the expert "conclusions [] displace those of the finder of fact"); *In re Rezulin Prods. Liab.*, 309 F. Supp. 2d at 554 (excluding expert testimony where the opinion was based on the expert's review of "in-house documents, memos and emails"); *Alto*, 2021 WL 4803582, at *8 (excluding expert testimony that "is no more than arguments and conclusory statements about questions of fact masquerading behind a veneer of expertise" (citation modified)).

Here, Haggerty describes the contents of the Scope of Work and Scenario Planning documents and then concludes that their preparation is standard practice in the crisis industry. Ex. 2 (Haggerty Dep.) at 222:18-225:20. But he concedes that this conclusion is based on no "analysis." *See, e.g.*, *id*. at 222:12-17 ("Q. Do you provide any analysis as to the overview in the Scope of Work document as reflected in this bullet point? A. Well, only to the extent I have directly quoted one point and then paraphrased the other.").[6] And he concedes that "there's no standard [crisis communications] plan." *Id*. at 150:8. Such expert testimony is of no use to the trier of fact.[7]

---

[6] 226:23-227:4 ("Q. What analysis are you providing of this section [of the Scope of Work document]? A. Well again, it would be the same answer…I believe it is a paraphrase. In fact, it is a paraphrase of the bullet points [in the document]."), 242:25-243:9 ("Q. What analysis did you conduct [of the Scenario Planning document]…beyond what is reflected in your report on page 24? A. Well, again, as I review what is actually in the document, I am paraphrasing in a manner that includes analysis."), 247:19-248:18 ("Q. And your analysis summarizes the document, correct? … A. Yes, for example, saying [the Scenario Planning document's contents] appears clearly stated, and I don't know— again, I would have to go back. I suspect this is a paraphrase."), 249:17-24 ("Q. …your analysis is that [the Scenario Planning document] is an outline of a reactive approach to protect Mr. Baldoni's reputation should negative attacks occur? A. Yes, and obviously the analysis is it appears clearly stated…"). Even if Haggerty's report passed muster as expert analysis, such conclusions would warrant exclusion for other reasons. *See* Part IV A.1 (what is "standard" is irrelevant); Part IV C (conclusory opinions based on expertise are unreliable).

[7] Other fact witnesses can also speak on the subjects that Haggerty addresses in Opinions 1–4. Ex. 2 (Haggerty Dep.) at 150:8. Each of Opinions 1–4 can be readily addressed in lay testimony regarding the TAG and Street Engagements, the crisis planning work, and the monitoring (and social manipulation) that took place. *See, e.g.*, ECF Nos. 964-27 (Nathan 9/29 Dep.) at 111:1-112:23 (testifying as to scenario planning document and its purpose); 1230-52 (Abel 9/26 Dep.) at 171:2-15, 173:5-16, 187:16-188:1 (testifying as to guidance from TAG to "de-sensationaliz[e] any social media commentary"); 1230-57 (Case Dep.) at 47:13-49:23 (testifying as to crisis services TAG provided to Baldoni and Wayfarer), 153:10-154:9, 160:16-21 (testifying that TAG and Abel were "accounting for Ms. Lively" in their PR strategy, and that Wallace was a "contractor[]" for TAG who worked in "social or digital [re]mediation"); 1230-62

Last, as to Opinions 5–6, the jurors have no need for Haggerty's perspective on information contained in the pleadings given that he does not understand the charts and agrees they may well be valid. Ex. 2 (Haggerty Dep.) at 293:16-23, 291:8-18, 294:15-24.

### 4. Haggerty's Opinions Regarding the Second Amended Complaint Are Irrelevant (Opinions 5–6).

Haggerty's Opinions 5 and 6 are also irrelevant because they address information that has been superseded by the evidence in this case. Expert opinions must be relevant to the facts or issues that remain in dispute at trial; testimony that addresses allegations that have been superseded by the evidence in this case are not relevant and do not assist the trier of fact. *See* Fed. R. Evid. 401 (relevance means "of consequence in determining the action"); *Daubert, Inc.*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."); *SEC v. Laura*, 680 F. Supp. 3d 204, 220-21 (E.D.N.Y. 2023) (citations omitted) (expert opinions must be "relevant to the task at hand" and are "governed by the same test as any other evidence—Rule 401").

The charts Haggerty analyzes in Opinions 5 and 6 reflect negative media coverage of Lively in the aftermath of the Wayfarer Defendants' retaliatory media campaign. These charts were presented in the Second Amended Complaint and have since been superseded by other expert testimony and record evidence. *See, e.g.*, ECF Nos. 1230-70 (Culotta Report), 1233-118 (Mayzlin Report), 1233-126–30 (Humphreys Report); ECF No. 1254-118 (market testing regarding coverage of Lively and Baldoni). Given that these sentiment charts have, at this point, been

---

(Koslow Dep.) at 27:15-25 (testifying as to purpose of TAG retention and scenario planning); *see also Media Sport & Arts, s.r.l. v. Kinney Shoe Corp.*, 1999 WL 946354, at *3 (S.D.N.Y. Oct. 19, 1999) (excluding expert witness where fact witness's "testimony would be far more appropriate on this subject and renders [the expert's] secondhand knowledge unnecessary for the edification of the jury"); *Mendlowitz*, 2019 WL 6977120, at *7.

11

mooted by evidence that will actually be presented at trial, Haggerty's observations as to these sentiment charts are irrelevant and unnecessary.

### B.      Haggerty Is Unqualified to Render Opinions 5 and 6.

Haggerty is also unqualified to offer Opinions 5 and 6 regarding digital media and data, and they should accordingly be excluded.  A court must address the "threshold question of whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education' to render his or her opinions" before addressing the relevance or reliability of that witness's proposed testimony.  *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *3 (S.D.N.Y. Jan. 30, 2025) (quoting *Nimely v. City of N.Y.*, 414 F.3d 381, 396 n.11 (2d Cir. 2005)).  "To determine whether an expert is qualified 'courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony.'"  *Conti v. Doe*, 2020 WL 6162104, at *7 (S.D.N.Y. Oct. 21, 2020) (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)); *see also Colon v. Metro-N. Commuter R.R. Co.*, 778 F. App'x 7, 12 (2d Cir. 2019) (summary order).

Even assuming Haggerty can fairly be regarded as a general crisis communications and planning expert (as relevant to Opinions 1–4), "it by no means follows that he … is qualified to express expert opinions as to other fields."  *Nimely*, 414 F.3d at 399 n.13.  As noted, Haggerty's Opinion 5 is that "[t]he growth in media and social media coverage negative to Ms. Lively, starting in August 2024," as depicted in the charts in her Second Amended Complaint, "is unlikely to have been caused by the work done by the crisis communications consultant hired by the Wayfarer parties, given the short timeframe" between the retention and the onset of the "growth."  Ex. 2 (Haggerty Dep.) at 268:2-6.  In Opinion 6, Haggerty offers his impression of those charts, including that it was "hard to discern" which "service was used" to make them, and that

12

"understand[ing] a sentiment analysis" requires "dig[ging] deeper in the context of a sensitive communication situation." *Id*. at 293:16-23; *see also id.* at 291:8-18.

By his own admission, Haggerty does not have the digital and data expertise to analyze these charts. *See id*. at 280:21-23 ("I'm not a digital media specialist"), 291:21-23 ("… I'm not an expert in data analysis any more than an expert in digital marketing or SEO"); *see also id.* at 98:10-15 ("Q. Do you consider yourself an expert in digital advertising? A. Absolutely not."), 113:13-14 ("I'm not an expert on SEO strategy"), 278:20-279:2 ("Q. You're not a digital marketing expert, correct? A. That's correct, yes. Q. Do you have any expertise in evaluating metrics of causation? A. You'll have to explain what you mean by that.").

Absent the requisite expertise, Haggerty's personal "view" on the time it takes to see growth in digital media is an insufficient basis for Opinion 5. *Id*. at 274:8-10; *see In re Elysium Heath-ChromaDex Litig*., 2022 WL 421135, at *30 (S.D.N.Y. Feb. 11, 2022) ("Expert opinion testimony that does no more than assert that something is insufficient because it is the expert's 'personal opinion' . . . is thus inadmissible."). Even if he had such expertise, Haggerty did not look at any underlying data that was used to create the charts. *See* Ex. 2 (Haggerty Dep.) at 266:12-14, 272:23-273:4. He therefore cannot confirm their accuracy, let alone smuggle in an opinion on *causation* as to them.

Likewise, Haggerty's conceded lack of data expertise is a death knell for Opinion 6. While such an opinion clearly requires expertise with data, Haggerty also suggests that Opinion 6 is based on his experience in being "on the receiving end of sentiment reports and other data." *Id*. at 291:23-25. Even so, his inability to identify the number of sentiment reports run in recent memory (*id.* 292:2-12), and his extrapolation from a *single* example of engaging with sentiment data (Ex. 1

13

(Haggerty Rep.) at 30-31) do not overcome his conceded lack of data expertise. *See* Ex. 2 (Haggerty Dep.) at 116:19-23 (conceding hiring outside vendor).

### C.    All of Haggerty's Opinions Must Be Excluded as Unreliable.

Haggerty touts three decades of experience in the crisis communications industry (particularly in the litigation communications subset) as the primary, and in some cases exclusive, basis for each of his opinions. *See, e.g.*, Ex. 1 (Haggerty Rep.) at 3; Ex. 2 (Haggerty Dep.) at 122:25-126:10, 179:23-180:3.    But because Haggerty "is relying solely or primarily on experience" for his opinions, "[he] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Ray*, 583 F. Supp. 3d 518, 533 (S.D.N.Y. 2022) (Liman, J.) (quoting *Alto*, 2021 WL 4803582, at *2).

This Court routinely excludes expert testimony that amounts to little more than asking the trier of fact to "tak[e] [their] word for it." *Jinn v. Sig Sauer, Inc.*, 2023 WL 2919558, at *8 (S.D.N.Y. Apr. 12, 2023); *see Abreu Bautista v. Pagan-Rodriguez*, 2025 WL 1730213, at *2 (S.D.N.Y. June 23, 2025) (excluding expert testimony where expert "fail[ed] to provide … reasoned explanation" as to how experience led to opinion); *Bocoum v. Daimler Trucks N. Am. LLC*, 2022 WL 902465, at *12 (S.D.N.Y. Mar. 28, 2022) (excluding expert who failed to "bridge the logical gap between [the] facts and his conclusion").

Haggerty's opinions warrant exclusion for this reason. Rather than closely tying his expertise to his opinions, throughout his deposition, Haggerty made only hopelessly vague references to his experience—even when pressed at length. For example, with respect to Opinion 2, Haggerty engaged in the following exchange:

> Q. … Are you reaching this conclusion exclusively on the basis of your experience in the industry or are you also relying on materials that you've cited in your report?

14

A. *I mean, primarily, having been around, you know, I certainly have experience and background in the area formed over 30 years....*

Q. Can you *explain to me how you are bringing your expertise to bear* on reaching this conclusion that there is a misunderstanding of what crisis professionals do in the industry?

A. *Just based on my experience over the course of 30 years* and as someone who consumes maybe too much popular entertainment or more than I should —

Q. *[W]hat experience over the course of the last 30 years* allows you to reach the opinion that you're offering about the misunderstanding of the role of crisis professionals feeding negative perceptions about them?

A. *I can't give you a specific necessarily*, but based upon my recollection, I have been asked about the field. I have read about it in a way that misrepresents quite negatively the field. All of that builds into my perception. *Experience is someone who is obviously in the field for 30 years and so paying attention*.

Ex. 2 (Haggerty Dep.) at 179:16-180:3, 182:8-183:6 (emphases added). This impossible pattern repeated itself for each of Haggerty's opinions.[8] He describes no methodology for any of his opinions that this Court can evaluate to determine whether that methodology was reliable. His only methodology appears to have been to look at a few materials and reach a conclusion based on his personal opinion and experience. Such equivocal nods toward purported expertise do not amount to a reasoned explanation as to how Haggerty's crisis experience reliably applies to any of his opinions. They must be excluded.

**D.      Haggerty's Opinions Must Be Excluded as Prejudicial under FRE 403.**

---

[8] *See id*. at 164:7-12 (regarding Opinion 1, "Just my knowledge and experience over 35 years of not only working in the field but also considering public practices and journalistic practices"), 193:13-18 (regarding Opinion 3, "Q. What background, knowledge or other qualifications are you relying on in offering this opinion? A. Well, it's included in the report, and again, based upon my 30-plus years of doing this."), 122:9-123:3 (regarding Opinion 4, testifying that providing scope of work and scenario planning documents is standard "based upon everything I have experienced, know, and everyone I spoke to through the years who are also in the field"), 217:8-218:4 (regarding Opinion 4), 276:4-18 (regarding Opinion 5, "… I have, again, based on my experience, a general view of the time it takes to put things in place, think … it's dependent on so many factors it's impossible to say"), 291:19-292:12 (regarding Opinion 6, while "not an expert in data analysis any more than an expert in digital marketing or SEO," noting that "in my business and in my field [I] have been on the receiving end of sentiment reports and other data" yet lacking "any idea [of] the number" of sentiment reports he has run over the last year).

15

Even if otherwise admissible, Opinions 1 through 4 must be excluded as prejudicial.   This Court has excluded expert testimony where "conduct of the parties at bar is hotly disputed" and thus expert testimony unhelpful "because such testimony does not provide the basis for a legitimate inference that plaintiff and defendant actually conducted themselves in that manner in this case." *R.B. Ventures, Ltd. v. Shane*, 2000 WL 520615, at *3-4 (S.D.N.Y. May 1, 2000) (precluding expert opinion on industry practice under Rules 702 and 403); *see also United States v. Gatto*, 986 F.3d 104, 118 (2d Cir. 2021) (affirming on basis of FRE 403 where expert's testimony might "cloud[] the issue for the jury"); *Ray*, 583 F. Supp. 3d at 540 (excluding testimony on the basis of confusion to the jury and unfair prejudice).

Ms. Lively's theory of liability, corroborated by the record, addresses Defendants' extensive execution of the retaliatory crisis plan far beyond retention and simple monitoring work. *See, e.g.*, ECF Nos. 1233-69 at STREET 1.000005 ("Wayfarer would like to move forward ASAP with social / digital mitigation and remediation"); 1233-137 at NATHAN_000000562 ("please start having social kill asap"); 1245-143 at BBKOSLOW-000004013 ("we've flagged to Jed and his team for more serious action on the social side"); 1245-146 at KCASE-000003859 ("the comments are working excellent").   Permitting Haggerty's testimony on "standard" retention, planning, and monitoring conduct in the crisis industry fails to capture the core of Defendants' alleged retaliatory conduct. Such testimony could lead the jury to the misleading conclusions that (1) Haggerty's opinions address all the alleged retaliatory conduct, and/or (2) that all of Defendants' work performed in connection with the case was "standard" and permissible ***even if retaliatory***.   For this same reason, it also risks intruding upon the province of the trier of fact by offering a legal opinion that the Wayfarer Defendants did not engage in retaliation.   The Court

16

should reject Defendants' attempts to use Haggerty's opinions as a backdoor to legitimizing their conduct.

Respectfully submitted,

Dated:          April 10, 2026                    /s/ Michael J. Gottlieb

MANATT, PHELPS & PHILLIPS LLP
Esra A. Hudson (admitted *pro hac vice*)
Stephanie A. Roeser (admitted *pro hac vice*)
Sarah Moses (admitted *pro hac vice*)
Sareen K. Armani
Katelyn A. Climaco
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
(310) 312-4000
ehudson@manatt.com
sroeser@manatt.com
smoses@manatt.com
sarmani@manatt.com
kclimaco@manatt.com

Matthew F. Bruno
7 Times Square
New York, NY 10036
(212) 790-4525
mbruno@manatt.com

WILLKIE FARR & GALLAGHER LLP
Michael J. Gottlieb
2029 Century Park East,
Los Angeles, CA 90067
(202) 303-1442
mgottlieb@willkie.com

Kristin E. Bender
1875 K Street NW
Washington, DC 20006
(202) 303-1000
kbender@willkie.com

Aaron E. Nathan
Michaela A. Connolly
Melissa S. Taustine
787 Seventh Avenue
New York, NY 10019
(212) 728-8000
anathan@willkie.com
mconnolly@willkie.com
mtaustine@willkie.com

DUNN ISAACSON RHEE LLP
Meryl C. Governski (admitted *pro hac vice*)
401 Ninth Street, NW
Washington, DC 20004
(202) 240-2900
mgovernski@dirllp.com

*Attorneys for Blake Lively*

17