# EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- x

BLAKE LIVELY,

                              Plaintiff,

          -vs-

WAYFARER STUDIOS LLC, a Delaware Limited

Liability Company, JUSTIN BALDONI, an

individual, JAMEY HEATH, an individual, STEVE

SAROWITZ, an individual, IT ENDS WITH US MOVIE

LLC, a California Limited Liability Company,

MELISSA NATHAN, an individual, THE AGENCY

GROUP PR LLC, a Delaware Limited Liability

Company, JENNIFER ABEL, an individual, JED

WALLACE, an individual, and STREET RELATIONS

INC., a California Corporation,

                              Defendants.

------------------------------------------------- x

                              December 11, 2025

                              9:11 a.m.

          **HIGHLY CONFIDENTIAL**

     DEPOSITION of JAMES HAGGERTY in the

above-captioned matter, taken pursuant to

Notice, held the offices of Willkie Farr &

Gallagher, 787 Seventh Avenue, New York, New

York before Fran Insley, a Notary Public of the

States of New York and New Jersey.

Page 2

A P P E A R A N C E S:

WILLKIE FARR & GALLAGHER LLP

Attorneys for Blake Lively

787 Seventh Avenue

New York, New York 10019

BY:  KRISTIN BENDER, ESQ.

JOANNA LAMBERTA, ESQ.

Phone: (202) 303-1245

kbender@willkie.com

MEISTER SEELIG & FEIN PLLC

Attorneys for Wayfarer Studios

LLC, Justin Baldoni, Jamey Heath

Steve Sarowitz, It Ends With Us

Movie LLC, Melissa Nathan, Jennifer

Abel, and The Agency Group PR LLC

125 Park Avenue, 7th Floor

New York, New York 10017

BY:  KEVIN FRITZ, ESQ.

MITCHELL SCHUSTER, ESQ.

Phone: (212) 655-3570

kaf@msf-law.com

Page 3

A P P E A R A N C E S (Continued):

ALSO PRESENT:

COREY WAINANA, Videographer

oOo

Page 42

Haggerty - Highly Confidential

A.    There was one, actually, now that I think of it, and I don't know if it was a week ago or when, I went back.  I couldn't remember. There was one deposition mentioned of Leslie Sloane, and I couldn't remember if I had finished it, so I went back and checked to see.

Q.    Who is Leslie Sloane?

A.    I believe she's a PR representative of Blake Lively, if that is correct.

Q.    And it's your understanding that you had disclosed that you had previously reviewed Leslie Sloane's deposition transcript; is that right?

A.    To the best of my knowledge, yes.

Q.    And had you reviewed any of Ms. Sloane's deposition transcript prior to submitting your report?

A.    You mean prior to preparing the report?

Q.    Prior to submitting your report on October 17th, had you reviewed any of Ms. Sloane's deposition transcript?

A.    Yes.

Q.    What are the other deposition

Haggerty - Highly Confidential
transcripts that you recall reviewing in whole
or in part prior to submitting your expert
report?

A.    Well, they're listed in the report.
I guess off the top of my head, Ms. Able's,
Ms. Nathan's.  I don't remember what else is
listed in the report and what else I reviewed
in preparing it.

Q.    So it's fair to say, though, at the
very least you recall reviewing deposition
transcripts of Ms. Sloane, Ms. Abel and
Ms. Nathan in advance of submitting your expert
report?

A.    Whatever is in the expert report is
what I...

Q.    Well, Ms. Sloane's transcript is not
indicated in the expert report, but you've
testified that you did review it in advance of
submitting your report, correct?

A.    Oh, it's not listed in the -- as one
of the depositions reviewed for the report?

Q.    That's correct.  Is that an
omission?

A.    Huh?

Page 44

Haggerty - Highly Confidential

Q.    Is that a mistake?

MR. FRITZ:  Objection.  You can answer.

A.    Yeah, that would be a mistake that it wasn't included, yes.

Q.    But you can't recall any other transcripts of those individuals that you reviewed in advance of submitting your report, correct?

A.    That's correct.

MR. FRITZ:  Just for the record, Ms. Nathan's transcript is listed.

MS. BENDER:  Ms. Sloane's transcript is not listed.

MR. FRITZ:  Oh, Sloane?  I'm sorry. Okay.  My mistake.

Q.    Did you review any documents produced in this litigation either in advance of submitting your report or in preparation for your deposition today?

A.    Any documents...

Q.    Produced in this litigation in connection with your expert work in this case.

A.    I consulted the docket, certainly.

Haggerty - Highly Confidential

Q.    But you didn't review any documents that, for example, were provided by one party to another that would reflect their emails or text exchanges, correct?

A.    I think there was one expert report. In preparation of this report, no.

Q.    Have you reviewed any expert reports in this case?

A.    There was one expert report that was sent to me and I looked at it briefly.

Q.    What expert report was that?

A.    I couldn't tell you who, but it begins with an M, if that helps.

Q.    Did you review Dr. Mayzlin's report?

A.    What's the last name?

Q.    Mayzlin.

A.    It could have been, yes.

MR. FRITZ:  Don't speculate.

Q.    What do you recall about that report, from what you read?

A.    I don't recall much at all.  It was a long report and very -- yeah, I don't recall much at all about it.

Q.    Did you review the opinions offered

Page 81

Haggerty - Highly Confidential

by simply background, but it certainly gave me a full glimpse of the case.

Q.    Are you aware that Ms. Nathan had two days of depositions in this case?

A.    I am not specifically aware of that.

Q.    You've indicated that you've reviewed only one day of Ms. Nathan's deposition testimony; is that correct?

A.    That's correct.

Q.    In other words, you did not review a second day of Ms. Nathan's deposition testimony, correct?

A.    I honestly don't recall whether or not I did.

Q.    You indicated previously that this was a complete list of materials reviewed other than Ms. Sloane's deposition transcript.  Are you also suggesting that you may have reviewed Ms. Nathan's second day of testimony?

A.    I'm not suggesting that.  I just can't tell you sitting here one way or the other.  It could be the case that the second day was sort of assumed and the sentence should have read beginning, or if that was -- I don't

Page 82

Haggerty - Highly Confidential

even know if that was the first day or the second day.  My point is I don't know.

Q.    But to be clear, the materials reviewed section listed here reflects your and your team's best efforts at the time it was assembled to reflect the materials that you had reviewed, right?

A.    On mine, yes.

Q.    And there's only one day of Ms. Nathan's testimony reflected, correct?

A.    That is correct, yes.

Q.    Do you know who Katherine Case is?

A.    I have seen the name.  I can't specifically say who that is.

Q.    Do you know who Breanna Koslow is?

A.    Again I've seen the name but I can't specifically tell you who that is.

Q.    You did not review the deposition testimony of Ms. Case or Ms. Koslow, correct?

A.    That's correct.

Q.    You didn't review any emails or text exchanges in documents involving Ms. Case or Ms. Koslow, correct?

A.    To my knowledge, no, unless it was

Page 98

Haggerty - Highly Confidential

Q.   Does PRCG provide digital advertising services?

A.   I believe we may have placed digital advertising at various points but it's not something I market.

Q.   It's not the bread and butter for PRCG's service offerings; is that right?

A.   It's less than that.

Q.   Do you personally do any digital advertising work?

A.   No.

Q.   Do you consider yourself an expert in digital advertising?

A.   Absolutely not.

Q.   Can you tell me what the Reputation Advisors International is?

A.   Yes, it's a network of communications professionals in various locations across the globe.

Q.   What does Reputation Advisors International do?

A.   We meet, we discuss communications issues, we exchange ideas and discuss the different conditions in the individual markets.

Haggerty - Highly Confidential

what they need to do in a crisis; is that right?

A.    That's correct.

Q.    Do you have any certifications or degrees in crisis management or crisis communications?

A.    To my knowledge, no.  Nor do I particularly know if there is a certification.

Q.    Do you have any certifications or degrees in digital marketing, sentiment analysis or reputation management?

A.    No.

Q.    Are there any ethical or model rules or guidelines for PR for crisis professionals?

A.    There may be, but I don't have specific information on that.

Q.    Are you familiar with any ethical or model rules or guidelines for PR crisis professionals?

A.    I am not familiar with that, no.

Q.    Are you offering any opinions on what is ethical in connection with this case?

A.    I don't think in this report.  I think in this report I was solely looking at

Haggerty - Highly Confidential

this perception that crisis communication is somehow unethical, and more than that, the retention of crisis communications counsel is somehow unethical.  That somehow it means you're up to something, which is a common misperception about the whole field.

Q.    What is your definition of unethical?

MR. FRITZ:  Objection.

A.    That's a very amorphous thing. Certainly falsity would be unethical.

Q.    Anything else?

A.    I mean, again, it's very amorphous.

Q.    Are you offering an opinion that there's a perception that crisis communications is somehow unethical?

MR. FRITZ:  Objection.

A.    Yes.

Q.    And how are you defining unethical in that opinion?

A.    Well, the types of -- as I describe in the report, the types of things people think go on and the job of a crisis communications professional involves things that would be

Page 113

Haggerty - Highly Confidential

Q.    Are you familiar with what SEO is?

A.    Yes.

Q.    What is it?

A.    Search engine optimization.

Q.    And do you perform SEO in connection with any matters you work on?

A.    It is certainly part of the thinking and the strategy that goes into how to handle a particular crisis.

Q.    Do you know the specifics of how an SEO strategy is implemented?

A.    You know, I'm not an expert on SEO strategy, so I have some knowledge, but I don't know what your definition of specific knowledge would be.

Q.    What knowledge do you have on the implementation of SEO strategy?

A.    Well, I understand that search engine optimization, primarily through Google, informs a lot of opinions.  And that there are reasons why both positive and negative information would show up on the first page or first two pages of Google, for example, that can be unrelated to reality, to the truth.  And

Page 116

Haggerty - Highly Confidential

Q. Does PRCG engage other vendors on behalf of its clients to implement SEO strategy?

A. Yes.

Q. Which vendors?

A. There's one vendor that we have used named Five Blocks that does this specifically.

Q. Is that, from your understanding, the primary service that Five Blocks provides related to SEO?

MR. FRITZ: Objection.

A. My understanding is it is one of the services they offer.

Q. Five Blocks is a reputation management company; is that right?

A. I don't know how they specifically describe themselves.

Q. What services has PRCG retained Five Blocks for?

A. On behalf of clients to analyze search results to get a sense of the perceptions in search results, and to advise and implement strategies to ensure that the positives are more easily acceptable --

Page 122

Haggerty - Highly Confidential

are tiny variations.

Q.    And would those standard practices include, to your mind, providing a scope of work and providing a scenario planning document?

A.    Just repeat that question because I don't a hundred percent understand it.

Q.    Do you think it's standard in the crisis industry to provide a scope of work and a scenario planning document?

MR. FRITZ:  Objection.

A.    Based on my experience, a scope of work generally is included in most public relations contracts so that the client can know what they're buying, and I think that scenario planning and creating scenario planning documents is a universally accepted part of crisis communication planning.

Q.    Universally accepted as reflected in the books and articles on this topic; is that right?

A.    Well, I mean, beyond that based upon -- in this report, and to give my opinion, based upon everything I have experienced, know,

Page 123

Haggerty - Highly Confidential

and everyone I spoke to through the years who are also in the field.

Q.    When you say everything you've experienced and know, are you referring to your personal work as a crisis professional in the field?

A.    Well, beyond that, actually, to others in the field that I've discussed these issues with, reading in the field, learning in the field over 30 years at least.

Q.    If you turn to page 4 of your report.

A.    Of the report?

Q.    Yes, sir.

A.    Okay.

Q.    You say, "Over the years I have worked in government and with public companies, private companies, nonprofit corporations, labor unions and high-profile individuals."  Do you see that?

A.    Yes.

Q.    Have you performed public relations, crisis communication and litigation communications work for each of these

Page 124

Haggerty - Highly Confidential
categories?

A.    That would be too hard to parse the term, so I can't answer.

Q.    Have you provided crisis communications work for each of these categories?

A.    Again, the same answer.  I don't quite have that information.

Q.    Have you provided crisis communication support for companies?

A.    Yes, yes.

Q.    Have you provided crisis communication support for high-profile individuals?

A.    Yes.

Q.    How many cases in the last five years where you provided crisis communication support related to individuals rather than companies?

A.    I couldn't even tell you.

Q.    Multiple individuals and multiple companies; is that right?

A.    Yes.

Q.    On page 4 you identify that you have

Page 125

Haggerty - Highly Confidential
been involved in some of the largest lawsuits of their kind in history, and you list eight examples.  Do you see that?

A.     Uh-huh.

Q.     Your involvement here is not as a practicing attorney but as a crisis professional; is that right?

MR. FRITZ:  Objection.

A.     Let me make sure.  That is correct.

Q.     From each of these cases, did you provide crisis planning support in particular?

A.     Yes.  I mean, sometimes planning -- sometimes, quite frankly, you're called up at the last minute and planning becomes execution at the same time because the crisis is happening in a piece -- in a legal action at the moment.

Q.     In your experience is crisis planning virtually an inherent part of any crisis work that would be performed?

A.     It is an inherent best practice in any crisis work or -- for any organization, and I include in that high-profile individuals who are a brand and part of a corporation itself.

Page 126

Haggerty - Highly Confidential

Because inevitably organizations of all sizes or individuals, what have you, are going to face a negative event, and having the structure and the ability to respond effectively in those situations is critical.

Q.    Is crisis planning and crisis execution, are those inextricable from each other?

A.    No.

Q.    They're two separate things albeit related; is that right?

A.    Yes.  One, I would add, is the preparation and planning if something happens, and the other is what happens, I suppose, in executing on that plan.

Q.    All the crisis work listed here is relating to litigation; is that right?

A.    Yes.  That appears so, yes.

Q.    And the last bullet references the largest employment discrimination class action in history?

A.    Yes.

Q.    And that was largest at the time; is that right?

Page 143

Haggerty - Highly Confidential
crisis communications as well as the reasons
for undertaking these best practices to
minimize reputational risk and prevent damage
to personal and organizational brand."  Do you
see that?

A.    I do see that, yes.

Q.    So this assignment, if I'm
understanding it, relates to planning, standard
practice and best practices; is that correct?

A.    Yes, I think so.

Q.    Are those the core of your
assignment?

A.    I think that was the core of it,
yes.

Q.    If we turn to page 31 of your
report.  There is a Section 8 that reads
"Conclusion."  Do you see that?

A.    I do, yes.

Q.    Do these bullet points reflected on
pages 31 and 32 reflect your opinions offered
in this case?

A.    Hold on.  (Witness reviewing
document).  Yes.

Q.    Is this an accurate and complete

Page 144

Haggerty - Highly Confidential

list of your opinions that you're offering in this case?

MR. FRITZ: Objection.

A. To my knowledge, yes.

Q. Reputation is an essential element of brand, correct?

A. Yes.

Q. Can you please define what a crisis is for me?

A. Well, I think I --

MR. FRITZ: Objection.

A. -- give my definition -- I think that was asked already, but I think I give my definition in the report.

Q. Can you adopt the definition in your report today?

A. Hold on just a moment.

Q. Are you looking for the definition?

A. Yes, I'm looking for --

MR. FRITZ: Do you want him to look at page 12.

MS. BENDER: Yes, I'm waiting.

Q. Once you find page 12, I'm going to ask a question again, so let me know when you

Page 150

Haggerty - Highly Confidential
segmented for that.

Q.    There's no such thing as a standard crisis, correct?

A.    I think every -- you know, what I always say is you can't plan for everything but you can plan for the likely things to happen. So there's no standard plan, but what is standard throughout the public relations industry as much as anything is that you ought to plan for this and have a plan in place to respond.

Q.    The way crisis plans are ultimately carried out is not standard, correct, it varies from case to case?

A.    It does vary, yes.

Q.    And that's because crises themselves are case by case, correct?

A.    Well, there are elements of that.  I mean, the more -- the way I see it more often is that a plan was prepared, everyone forgot about it, and so when the crisis occurs they just jump up and ad hoc it, if that makes sense.

Q.    Can you please explain the

Page 161

Haggerty - Highly Confidential

planning and execution is always standard, acceptable and ethical?

MR. FRITZ:  Objection.

A.    Is always?  I'm sorry.

Q.    Correct.

A.    Well, I don't know of every single situation, so I don't know if it is always the case.

Q.    There are cases in which crisis planning or crisis execution is not ethical, correct?

A.    Again, I don't know every crisis planning process, so I really couldn't answer whether that is the case.

MR. FRITZ:  Note my objection, please.

Q.    Now, on page 14 in the second paragraph, you say, "Crisis communications is a standard, acceptable, and ethical practice." Do you see that?

A.    I do see that, yes.

Q.    What is the difference between "standard" and "acceptable," if there is one?

A.    Well, I suppose in this context

Page 162

Haggerty - Highly Confidential
standard means that in the industry, many are utilizing it.

Acceptable means that it is something, and ethical kind of goes to this as well, it's not something to be seen as indicative. On the one hand, indicative necessarily of a problem or of malintent, if that is a word.

And then ethical is that it's not the nefarious spin doctoring.

Q. You're not offering an opinion on the ethics of crisis planning or execution, are you?

A. I think I -- that was the assignment, right, that it's an ethical -- a standard, acceptable and ethical practice.

Q. Can you turn to page 31 of your report, please.

A. Yes.

Q. You've indicated that these are the opinions you intend to offer in this case, do you recall that?

A. Yes.

Q. Do you see any reference to the

Page 163

Haggerty - Highly Confidential

ethics that you are mentioning?

A. I appear at the end to have substituted the word -- it looks like the word "prudent" for the word "ethical," but that was not intended in any way to, in my conclusion, indicate I didn't believe it was also ethical.

Q. So, you are offering an opinion on specifically whether crisis retention is an acceptable, appropriate and ethical practice?

A. The -- you mean the retention of a crisis communications consultant?

Q. Yes.

A. Whether it is a reputable and ethical practice?

Q. I'm just looking at the first bullet of your opinion.

A. Okay.

Q. It says, "It is well established that such a retention is entirely acceptable, appropriate, and prudent for organizations, brands (personal or corporate), and high-profile individuals." Do you see that?

A. Yes, I do.

Q. Does that accurately state your

Page 164

Haggerty - Highly Confidential

opinion?

A.     Well, to the extent that you pointed out that I forgot to include the word "ethical" in there, I would say that it's also ethical as I stated earlier in the report.

Q.     What qualifications do you have to offer an opinion on what is or is not ethical?

A.     Just my knowledge and experience over 35 years of not only working in the field but also considering public practices and journalistic practices.

Q.     And it's your opinion that crisis retention can be ethical but is not necessarily always ethical?

A.     When you say "crisis retention," you mean the retention of a crisis communications consultant?

Q.     That's right.

A.     My opinion is it is always standard, prudent, acceptable, appropriate and ethical. As to whether it is always that case, I do not have information on every single instance where there is a retention of a crisis communications consultant, so I'm not -- I can't comment.  I

Page 165

Haggerty - Highly Confidential

mean, I can't respond to that.

Q.    If you turn to page 20 of your report.  Do you see the second block paragraph here?

A.    Hmm-hmm.

Q.    You reference "the fixer, the spin-doctor, the operative" and then in the next sentence, you reference "moving in the shadows to bury facts, getting the right people to say the right things; the fixer who knows what strings to pull and buttons to push to make a problem go away; the sleek operative dropping an envelope with incriminating photos, or trading a good story for a better story not involving your client."  Do you see that?

A.    I do see that, yes.

Q.    Are those, in your opinion, ethical and prudent crisis behaviors?

A.    Well, that's from my book and it's in the context of misperceptions related to crisis communications.  Depending upon -- I can't think of a positive connotation of shady Svengali, but the -- going one after another, you know, you have to sort of parse each, sort

Page 173

Haggerty - Highly Confidential

Q.    And there -- it seems to me that there are two components to your opinion but you can tell me if I'm wrong.  One is that retaining a crisis consultant is acceptable and prudent and the other is that the retention should not be viewed as indicative of negative intent by the client; is that correct?

A.    I think among the opinions expressed in the report, yes, that's two.

Q.    Are those the two components that comprise the first opinion reflected here on page 31?

A.    Yes, it appears to be the case.

Q.    What do mean by negative or nefarious intent?

A.    I think the common definitions.

Q.    What is your definition of negative intent in connection with this opinion?

A.    I would say, you know -- I'm pausing because I'm trying to figure out the accurate way to describe it.  It would be negative in that you're kind of looking to create a result that is divorced from facts and truth.

Q.    And is that also the way you are

Page 175

Haggerty - Highly Confidential
didn't -- based upon my review of the Scope of
Work and the Scenario Planning document, it did
not appear to me that that was the intent.

Q.    So, are you offering an opinion as
to defendants' intent but only based on your
review of Scope of Work and Scenario Planning
document?

MR. FRITZ:  Objection.

A.    I think -- I don't think I'm
offering an opinion related to intent at all.
What I am saying is that the Scenario Planning
and Scope of Work documents appear very
straightforward and standard practice and not
evidence of a negative nefarious intent, which
is in keeping with the way the hiring of crisis
communications consultant should be viewed.

Q.    And when you are saying that the
Scenario Planning and Scope of Work documents
appear very straightforward and standard
practice and not evidence of a nefarious --
negative nefarious intent, whose intent are you
referring to?

A.    I suppose ultimately the defendants.

Q.    Isn't it up to the jury to decide

Haggerty - Highly Confidential

what the defendants' intent was?

MR. FRITZ:  Objection.

A.    That's a legal question that I'm probably not in a position to answer.

Q.    You're an attorney, correct?

MR. FRITZ:  He's not -- we are not offering him as a legal expert.

Q.    Are you instructing him not to answer?

A.    I'm -- I believe the question is am I an attorney.  I feel comfortable answering that.  Yes, but I'm not in the role of attorney.

Q.    You don't have a reaction either way as to whether it would be up to jury to decide the issues of defendants' intent, correct?

MR. FRITZ:  Objection.

A.    I'm not -- same answer.  I'm not going to offer what -- an answer to what is a legal question.

Q.    Are you identifying, in your opinions, whether certain facts in the case do or don't count as evidence?

A.    In -- in this report?

Page 178

Haggerty - Highly Confidential

A.    Well, I mean, that's -- it strikes me as also requesting an answer to two different things.

Q.    Putting aside whether or not it's prudent to retain a crisis consultant, do you agree that the conduct of a crisis consultant in executing the crisis plan can be improper?

A.    Yes, depending upon their actions, yes.

Q.    The second opinion reflected here states, "A misunderstanding of the role of a crisis communications manager often feeds negative perceptions regarding the role of crisis communications."  Do you see that?

A.    I do see that, yes.

Q.    What is the misunderstanding that you are referring to here?

A.    Well, it's what I refer to in the report, is that popular culture has created this sense that a crisis PR or crisis communications consultant is, I mean, colloquial up to no good.

Q.    And sometimes that's the case, correct?

Page 179

Haggerty - Highly Confidential

A.    I cannot -- since I don't know what others do that closely, I can't comment on whether it's sometimes.

Q.    You think that in every situation crisis consultants are exclusively up to good?

MR. FRITZ:  Objection.

A.    I do not -- I do not think that.  I just have no basis to say whether it's sometimes.

Q.    Understood.  Are you basing this opinion on any materials that you've referenced in your report?

A.    On the materials referenced in the report?

Q.    Yes.  Are you reaching this conclusion exclusively on the basis of your experience in the industry or are you also relying on materials that you've cited in your report?

A.    I would say it's a combination.  I mean, primarily, having been around, you know, I certainly have experience and background in the area formed over 30 years.  As part of the report, I said, well, let's look at best

Page 180

Haggerty - Highly Confidential
practices and relevant writing on the topic to see if that personal experience is valid.

Q.    If you turn to page 19 of your report, this is part 6E of your report entitled "Misperceptions about the Field of Crisis Communications."  Do you see that?

A.    Hmm-hmm.  Hmm-hmm.

MR. FRITZ:  You have to answer --

A.    Oh, I'm sorry, yes.  Yes, I do.

Q.    And do you know, as described in various sources, popular perceptions influenced by television shows, movies and other popular cultural offerings can sometimes paint a less than accurate picture unless in favorable picture of the field.  Do you see that?

A.    Where is that exactly?  I'm sorry? Page 19.

Q.    You know what, you're right, I'm not seeing that on page 19 either.  Well, actually, it starts at the very last line for me on page 19.

A.    Okay, okay.  Yes, I do see that.

Q.    When you refer to various sources here, are you referring to the sources that are

Page 181

Haggerty - Highly Confidential

cited across pages 19 through 21?

A.    Yes.

Q.    When you reference "popular perceptions," are you referring to the general public?

A.    Yes.

Q.    Does that include crisis individuals themselves?

A.    As to whether it includes crisis professionals, crisis communications professionals, I think they would know better but I can't exclude them from the public.

Q.    But they are at least aware of the perception of the crisis industry, correct?

A.    Presumably they would be aware, yes.

Q.    It's commonly known that there is a public perception that the crisis industry is painted in a less than favorable light, correct?

A.    Yes, I can't speak for every crisis communications professional, but that is the popular perception.

Q.    Can individuals watch these television shows, movies and other popular

Page 182

Haggerty - Highly Confidential

cultural offerings and reach the conclusion that crisis individuals are misleadingly being painted in a negative light?

MR. FRITZ:  Objection.

A.    I think you would have to ask the individuals watching.

Q.    Can you explain to me how you are bringing your expertise to bear on reaching this conclusion that there is a misunderstanding of what crisis professionals do in the industry?

A.    Just based on my experience over the course of 30 years and as someone who consumes maybe too much popular entertainment or more than I should --

Q.    What -- what experience over the course of the last 30 years allows you to reach the opinion that you're offering about the misunderstanding of the role of crisis professionals feeding negative perceptions about them?

A.    I can't give you a specific necessarily, but based upon my recollection, I have been asked about the field.  I have read

Page 183

Haggerty - Highly Confidential

about it in a way that misrepresents quite negatively the field.  All of that builds into my perception.  Experience is someone who is obviously in the field for 30 years and so paying attention.

Q.    Are you offering an opinion that there was a misunderstanding of the role of the crisis professionals in this case?

A.    By whom would be my -- I mean, I know I'm not supposed to respond to a question, but I would need to know by whom.

Q.    Yeah.  My read of your opinion is that you're offering an opinion that speaks about a misunderstanding of crisis communications managers generally, but not as to any of the defendants in this case; is that correct?

A.    Well, I couldn't say as to what they thought or didn't think about the field.

Q.    You're not offering an opinion that the general public misunderstood the role of TAG Street Relations or Melissa Nathan, correct?

A.    I think that based upon the popular

Page 185

Haggerty - Highly Confidential

A.    I think just generally, yes.

Q.    Are you drawing on your -- strike that.

You reference certain sources in the footnotes on pages 19 through 20.  Excuse me, let's talk about footnote numbers.  Footnotes 42 through 46, do you see those?

A.    Forty through 46?

Q.    Footnote 42 through 46.

A.    Forty-two through 46, okay.

Q.    Are these the sources that you are relying on in connection with offering this opinion?

MR. FRITZ:  Objection.

A.    Well, again, the majority of the opinion would be based on my experience having been a professional in the field, but those opinions that I've cited and I've listed is what I described before.  Let's broaden it out beyond my experience over 30 years and see what is out there about it.

Q.    And in footnote 42 references what is a blog post, correct?

A.    Well, I don't know if it's a --

Page 189

Haggerty - Highly Confidential

Q. And this is a publicly accessible podcast, correct, anyone can listen to it?

A. Correct, yes.

Q. So, you've referenced the blog post, your book and a commentary in a podcast on National Public Radio as supporting your opinion in connection with your own expertise. Are there any other sources that you were relying on for offering this opinion?

A. No, but I, once again, point out the dominant view is based on my experience having done this for 35 years.

Q. And just to be clear, and I apologize if I have asked this, but you've conducted no analysis as to whether the public generally misunderstood the role of TAG Street Relations or Melissa Nathan or Jennifer Abel as crisis communications professionals; is that correct?

A. That's correct.

Q. And if it turned out public perceptions were positive about TAG or Melissa Nathan as crisis communications managers, would that affect your opinion in any way?

Page 191

Haggerty - Highly Confidential

A.    I'm going to need you to repeat that question too, and I apologize, I'm getting a little sunlight right through that window, but I don't expect we can move the table.

Q.    Should we go off the record?

THE VIDEOGRAPHER:  I can do it while you're talking.  It's fine.

MS. BENDER:  Okay.  Fine.

Q.    All I'm trying to understand is whether or not this opinion is specific to the defendants in this case or whether it's more general.

MR. FRITZ:  Objection.

A.    I think there are parts of this report that are more general as to the reasons one hires someone to engage in crisis communication planning, the misperceptions as to that.  I don't have any specific information about what misperceptions the defendants may have had at any given time.

Q.    Or any specific information about what perceptions the public had of the defendants, correct?

A.    Yeah, I have done no analysis on

Page 192

Haggerty - Highly Confidential

what perceptions were related to the defendants.

Q.   And you've done no analysis on what misunderstandings there were of the role of the crisis communications defendants in this case, correct?

MR. FRITZ:  Objection.

A.   Could you -- could you describe in more detail?

Q.   Can you please tell me what analysis you've conducted on what misunderstandings there were about the role of the crisis communications defendants in this case?

MR. FRITZ:  Objection.

A.   Was that what analysis?

Q.   Yes, what analysis have you conducted on what misunderstandings there were about the role, specifically as to the crisis communications defendants in this case?

MR. FRITZ:  Objection.

A.   Only what is contained in the materials in the report, and -- which includes, you know, general understanding of the case and my experience.

Page 193

Haggerty - Highly Confidential

Q.    Your third opinion reflected here on page 31.

A.    Okay.

Q.    You see that it says, "Media monitoring is a standard practice in all public relations -- and particularly in crisis communications and other sensitive communications matters -- and should not be seen as an effort at social media manipulation"?

A.    I do see that.

Q.    What background, knowledge or other qualifications are you relying on in offering this opinion?

A.    Well, it's included in the report, and again, based upon my 30-plus years of doing this.

Q.    This is, again, not an opinion that you're offering specifically about the defendants and their monitoring in this case, correct?

A.    I am just rereading it.  Yes, it would be hard -- although it would be hard to monitor media in any other way than what is

Page 201

Haggerty - Highly Confidential

minutes left.

MS. BENDER:  Yes, we can stop here.

THE VIDEOGRAPHER:  We are off the record.  The time is 2:44 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 3:00 p.m.

Q.    You are not offering an opinion on whether social media manipulation is standard in the crisis industry, correct?

A.    Again, it depends on what you are saying, manipulation can mean steps to effect results in a way that is neither positive nor negative.

Q.    In connection with the opinion that we are discussing, your third opinion --

A.    Oh, okay.

Q.    -- you're not offering any opinion on whether social media manipulation is standard in the crisis industry, correct?

A.    Well, it's -- the manipulation -- media monitoring should not be seen as an effort in social media manipulation.

Q.    And you're not affirmatively

Page 204

Haggerty - Highly Confidential

as you are sitting here whether or not you are offering an opinion on social media manipulation and whether that is standard in the crisis industry?

MR. FRITZ:  Objection.

A.    I think I did.

Q.    And are you?

A.    In response to your question, I am saying that social media manipulation in the non-pejorative sense, in the sense of effecting results is standard in everything in the public relations field because every effort that is taken in the public relations field ultimately has an impact on social media.

Q.    And you're -- what you've just described to me, you are saying is apparent from the background discussion in your report?

A.    I'm saying I would have to -- I'm saying it's in response to your question.  I would have to read through the report again.

Q.    Okay.  But you don't have anywhere in your report in mind as to where you offer that opinion, correct?

A.    Yes, since I haven't read it, I -- I

Page 205

Haggerty - Highly Confidential
was responding to your questions, but since I haven't reread the report for that specific point, I -- I don't have any particular place in mind if that is the case.

Q.    Have you personally conducted media monitoring for crisis clients?

A.    By "personally," do you mean my company?

Q.    I mean you individually.

A.    Yes.

Q.    And do you personally conduct social media monitoring?

A.    I have, yes.

Q.    And is that a role that you carry out in your crisis -- for your crisis clients regularly?

A.    For all my clients.

Q.    Is it a more junior task or is it something you, yourself, continue to do?

A.    Well, we are not a particularly large firm, so it's certainly something that I do in addition to others in my firm.

Q.    And at a larger firm, where there are more individuals who could conduct this, do

Page 217

Haggerty - Highly Confidential

Q.    How do you make that assessment when Scope of Work documents may vary from case to case?

A.    Well, I mean, anything that is a standard, there are variations, but when I read the language of a document from any public relations firm as to scope of work, based on my experience, I would recognize what is standard in the industry.

Q.    And remind me, what is that experience specifically that you are calling on in reaching your opinion as to the Scope of Work document?

MR. FRITZ:  Objection.

A.    Well, it's my 30-plus years doing this.

Q.    Is it the cases you are working on, the individuals you spoke with, are there other components of that experience that you can elaborate on for me?

MR. FRITZ:  Objection.

A.    Well, everything I described earlier, things I read, knowledge I gained, conversations with others, things that have

Page 218

Haggerty - Highly Confidential
come across my desk.  It's -- that's what creates experience, doesn't it?  It's everything that you're exposed to.

Q.    You're not offering an opinion here as to whether any defendant carried out what is reflected in the Scope of Work document or the Scenario Planning document in a standard manner, correct?

A.    I think that I made -- in the report I discuss the issue of timing as relates to, which sort of came from media monitoring, and the timing of execution, but as to an analyzing those two documents, there was no other information upon which I -- I accept those documents upon which I base my analysis.

Q.    So, other than the timing of execution, you're not offering an opinion as to whether any defendant carried out what is reflected in the Scope of Work document or the scenario planning document in a standard manner, correct?

A.    That's not -- yeah, that's not in the report anyway.

Q.    When is the scope of work typically

Page 220

Haggerty - Highly Confidential

have no knowledge of that one way or the other.

Q.    In your experience, are scopes of work tailored to the individual clients?

A.    To varying degrees, yes.

Q.    So, typically, there would be one or more conversations before a scope of work or similar document is provided?

MR. FRITZ:  Objection.

A.    Again, I can't say what is typical in terms of number of conversations.

Q.    In your experience, have you had conversations with the client before providing a scope of work?

A.    Yes.

Q.    In most of the cases that you've worked on?

A.    Yes.

Q.    Do you agree that the actual services ultimately provided to a crisis client may differ from what is identified in a scope of Work?

MR. FRITZ:  Objection.

A.    I think that can happen.

Q.    Do you agree that the scopes of work

Page 222

Haggerty - Highly Confidential

as to that portion of the document in this bullet point, correct?

A.    In the first bullet point?

Q.    In the second bullet point.

A.    And I don't understand the question. I'm sorry, could you repeat it?

Q.    The second bullet point addresses the "Overview" section of the Scope of Work document, correct?

A.    Yes.

Q.    Do you provide any analysis as to the overview in the Scope of Work document as reflected in this bullet point?

A.    Well, only to the extent I have directly quoted one point and then paraphrased in the other.

Q.    The bullet point below this also discusses the "Overview" section of the Scope of Work document, correct?

A.    That is correct, yes.

Q.    Do you provide any analysis of the "Overview" section in this bullet point?

A.    Yes.

Q.    And what is that analysis?

Page 223

Haggerty - Highly Confidential

A.     In this bullet point it appears, you know, very specific, which, to me, means minimize any conflict between Mr. Baldoni and Ms. Lively.  Hold on.  Do you want me -- let me just read the rest of it.  (Witness reading document.)

And then the -- you know, the paraphrase in the next sentence may include some level of analysis of what was in the original.

Q.     So, you are saying that your analysis of the "Overview" section is that it suggests the role of TAG will be to mitigate references of controversy, which, to you, means minimize any conflict between Mr. Baldoni and Ms. Lively?

A.     Yes.

Q.     In other words, your analysis is of the phrase "mitigate references of controversy" and what that means?

A.     Yes, which -- and I should add that all of this is in the context of public attention so to minimize publicly any conflict between Mr. Baldoni and Ms. Lively.

Haggerty - Highly Confidential

Q.    How are you drawing on your experience to reach the conclusion that "mitigate references of controversy" is referring to minimize any conflict mean Mr. Baldoni and Ms. Lively?

A.    Well, it would be based upon my reading and understanding of the words "mitigate references of controversy."

Q.    And the sentence, "The "Overview" then goes on to suggest that TAG will be involved with correcting inaccurate narratives and promoting factual, positive messages in order to balance the coverage."  Do you see that?

A.    Yes.

Q.    What is the analysis you provided there?

A.    I have to go back and look at what the actual "Overview" section said.  I'm saying that my summary, as it is not a direct quote, may have some element of analysis based upon my experience in seeing these documents.

Q.    And let's flip to the Scope of Work document, which I believe is an exhibit to your

Page 225

Haggerty - Highly Confidential

report, Exhibit B.  And are you there?

A.   Hmm-hmm.

Q.   Is it your understanding that you pulled this document from one of the public filings that you pulled from the docket?

A.   As I stated earlier, I don't know.

Q.   Okay.  In looking at the "Overview" section, can you tell me where -- what analysis you've conducted that relates to that third bullet point on page 22 other than the mitigate references and controversy reference?

A.   Yes, hold on just a moment.  Well, it seems to track pretty carefully the actual language, but, again, as discussed when we were discussing the bullet point, to the extent stating what is in the "Overview" section is analysis of it, I would say that that would be the case but it depends on how deep an analysis you consider that.

Q.   In Exhibit B right be -- so second paragraph of "Overview," second line in that paragraph, it references rapid interference to mitigate.  Do you see that?

A.   Yes.

Page 226

Haggerty - Highly Confidential

Q.    Remind me what "rapid interference" is.

A.    That would be a term, based on my experience, that would be a rapid response to references of controversy in accurate narratives, yeah.

Q.    And why is it important, if it is, to have rapid interference as compared to not rapid interference?

A.    Well, for the reasons I explained earlier.  We live in an age of where media moves very quickly, hence the need for rapid -- hence the need to be rapid, both -- to be rapid, which includes having a plan in place and then being able to move quickly.

Q.    If you return to your analysis on page 22, okay, the next bullet point down reflects your analysis of the scope of work section entitled "Crisis Prevention & Mitigation," correct?

A.    Uh-huh.

Q.    What analysis are you providing of this section?

A.    Well, again, it would be the same

Page 227

Haggerty - Highly Confidential

answer.  I have to -- I believe it is a paraphrase.  In fact, it is a paraphrase of the bullet points.

Q.    The paraphrase of the bullet points in the Scope of Work document; is that right?

A.    That's correct, yes.

Q.    And if you look at the next bullet point down on page 22, is that the same answer? In other words -- let me ask the question actually.

Does this -- what analysis does this reflect of the "Branding and Messaging" section of the Scope of Work?

A.    Well, this -- yes, this reflects -- I mean, in the process of analyzing -- of summarizing, some of the language may not track exactly so that would be my analysis of it.

Q.    If you turn to -- back to Exhibit B, can you tell me, is this limited only to if the media should reach out to the Wayfarer parties based on the face of the document?

A.    I do not believe it is.  It is limited to a response, but I do not believe it is limited to if the media should reach out.

Page 238

Haggerty - Highly Confidential

Q.    In your experience, are crisis plans living documents?

A.    Yes.

Q.    What is a living document?

A.    Well, it's as I discussed with the act.  You should be -- over the course of an organization's reliance on the plan, they should be constantly assessing what is needed, preparing or refining the plan and then training against it to make sure this is what is needed.  And that, again, is in the corporate environment.  I mean, I should say in the -- and by -- in a longer term, I have created a crisis plan for an organization type of environment.

Q.    Are crisis plans typically living documents for shorter crisis retentions?

A.    I don't think I'm -- for shorter crisis retentions, I've used that term because there is the training element and then the assessment and then the refinement of the plan.

The other thing that happens is an actual crisis can occur, and then in the wake of that crisis, the crisis communications team

Page 240

Haggerty - Highly Confidential

Q.    Your assessment as to whether the scenario planning document reflects standard crisis planning is specific as to that scenario planning document, correct?

A.    That is correct, the one that is an exhibit.

Q.    If there were additional scenario planning documents, would that change your opinion?

A.    No, because my opinion is only based upon that document.

Q.    In connection with your opinion No. 4.

A.    On page 32?

Q.    On page 32.  You're, again, not offering an opinion whether any defendant engaged in standard crisis communications with respect to the Scope of Work or scenario planning document, correct?

A.    I am not -- I am not -- in analyzing the Scope of Work document, I am -- or the Scenario Planning document, I am not focused on the execution but on the planning document itself and whether it was standard.

Page 242

Haggerty - Highly Confidential

scenario planning documents?

A.     Yes.

Q.     And they reflect your analysis as to the sections of the scenario planning document?

A.     Correct.

Q.     And the first bullet point here, that reflects your analysis is a summary of what is contained in part of the Scenario Planning document, correct?

A.     That is correct.  That is -- yes, that is correct.

Q.     Okay.  And the same holds true for the next bullet point?

A.     Which is under the preparation of materials --

Q.     Yes.

A.     Yes.

Q.     And the next -- the same holds true for "Key Messaging Points," correct?

A.     Yes.

Q.     And is that also the case for the final bullet on page 24?

A.     Yes.

Q.     What analysis did you conduct with

Page 243

Haggerty - Highly Confidential

respect to the "Preparation Materials, Key Messaging Points" and "If/Then Plan of Action" sections of the Scenario Planning document beyond what is reflected in your report on page 24?

A.    Well, again, as I review what is actually in the document, I am paraphrasing in a manner that includes analysis.

Q.    If you turn to Exhibit C, which is the Scenario Planning document, can you take a look at the section that references the preparation materials?

A.    Yes.

Q.    Do you see the very last line of this page references, "Times when BL called out, etc"?

A.    Yes.

Q.    Do you understand "BL" to mean Blake Lively?

A.    Yes.

Q.    Did you conduct any analysis of this?

A.    Yes, I believe -- can I go back to page 22?

Page 245

Haggerty - Highly Confidential

A.    Hold on.  This would be Exhibit C, Key Messaging Points?

Q.    Yes.  Did you -- just to ask a clean question.

A.    Yeah, yeah, yeah, please.

Q.    Did you conduct any analysis as to the specific Key Messaging Points reflected in the Scenario Planning document?

A.    I guess, if I understand your question correctly, it is -- the Key Messaging Points section of Exhibit C, the Scenario Planning document, did I analyze it in my summary on page 24?

Q.    Analyzed in your summary on page 24 that starts with the bullet point under "Key Messaging Points"?

A.    That would be more as to -- it would be both in Key Messaging Points -- hold on -- yes, it would be in Key Messaging Points, yes.

Q.    And does that reflect the entirety of your analysis of the Key Messaging Point section in the Scenario Planning document?

A.    I believe it does, yes.

Q.    Did you evaluate in any way which of

Page 247

Haggerty - Highly Confidential

public relations issue of standard practice.

Q.   So, that does not discuss that the Wayfarer parties were preparing these message points in the event something happened, correct?

MR. FRITZ:  Objection.

A.   Well, I think I did mention that the Wayfarer parties included the public relations consultant, The Agency Group and anyone else who was involved in the process on the defendants' side.

Q.   If you look at page 23, you analyze the "Objective" section of the scenario planning document, correct?

A.   Hmm-hmm.

MR. FRITZ:  You have to say yes.

A.   Oh, I'm sorry, yes.

Q.   And your analysis summarizes the document, correct?

A.   The -- I'm sorry, remind me what exactly I'm looking at here on page 23.

Q.   If you look at the first bullet point --

A.   Right.

Page 248

Haggerty - Highly Confidential

Q.      -- do you see that you're discussing the "Objective" section of the Scenario Planning document?

A.      Correct.

Q.      And the first two sentences are your summary of the document itself, correct?

A.      Hold on, let me read.  (Witness reading document.)  Well, it also includes not just a summary, but, again, my analysis.

Q.      The summary in the first two sentences of this bullet point include your analysis embedded in that summary; is that correct?

A.      Yes, for example, saying it appears clearly stated, and I don't know -- again, I would have to go back.  I suspect this is a paraphrase.

Q.      You say that there is nothing in this objective that I find out of the ordinary, and you go on to say, "It appears to be a simple outline of reactive approach to protect Mr. Baldoni's reputation should negative attacks occur."  Do you see that?

A.      Correct, yes.

Page 249

Haggerty - Highly Confidential

Q.   What are you basing this opinion on in connection with the "Objective" section of the Scenario Planning document?

A.   Hold on.  So this is the Scenario Planning document?

Q.   Yes, sir, the "Objectives" section.

A.   "Protect the reputation of Justin Baldoni, Jamey Heath and Wayfarer Studies in the lead up during and following with the premier of It Ends With Us_the achievement and efforts the Wayfarer team.  It's on -- it's Exhibit C.  In bringing this movie to life and emphasize Justin and the studio's commitment to their team and making the broader industry a more inclusive place."

Q.   And based on that objective, as you've read it on the face of the document, your analysis is that this is an outline of a reactive approach to protect Mr. Baldoni's reputation should negative attacks occur?

A.   Yes, and obviously the analysis is it appears clearly stated and the various points highlighting the achievements, et cetera.

Page 264

Haggerty - Highly Confidential
by the crisis communications consultant hired
by the Wayfarer parties, given the short
timeframe"?

A.     Yes, yes.

Q.     Your opinion references growth in
media and social media coverage negative to
Ms. Lively?

A.     Correct.

Q.     What growth are you referring to?

A.     I think in various -- it was a
little hard to tell, and I've -- I explained
elsewhere in the report the difficulties in
parsing media and social media sentiment and
the troubles I have had with it, but there
certainly had been alleged a growth in negative
commentary around the time of the premier of
the movie, which would have -- which obviously
generates its own activity.

Q.     And were you referencing the
sentiment charts in Ms. Lively's complaint in
your opinion?

A.     I believe that's the next bullet
point is the difficulty in parsing something as
complicated as a dispute.

Page 265

Haggerty - Highly Confidential

Q.    With respect to growth and negative coverage, is it more of a holistic understanding as to the growth of negative coverage as to Ms. Lively, or did you review any, kind of, graphs or quantitative analysis in connection with that?

A.    Well, there were the -- in the report I -- I do go over the sentiment reports that were provided in the second amended complaint.

Q.    And does that provide your basis of an understanding of what the growth in media and social media coverage about Ms. Lively looked like in August of 2024?

A.    That provides me with a -- I mean, again, it was -- it was rather confusing, quite frankly, but it does -- it was in support of what the allegations were in the second amended complaint.

Q.    Okay.  But just focusing on your fifth opinion in this case, the growth in media and social media coverage, are you talking holistically about the growth that you understand from your review of the complaint,

Page 266

Haggerty - Highly Confidential

or are you looking at something specific when you are talking about that growth?

MR. FRITZ:  Objection.

A.    Well, I don't know if I would use the word "holistically," but based upon the second amended complaint and other materials that I looked at, there is an allegation that -- coinciding with the premier, negative media.  I couldn't tell if it was media or social media or whatever occurred.

Q.    Okay.  Did you look at any specific metrics in connection with that growth?

A.    I did not.

Q.    And it's based on your understanding of Ms. Lively's allegations in her complaint that there was a spike in negative coverage starting on August 8th?

A.    Those charts in particular, yes.

Q.    And you have not reviewed any reports of Ms. Lively and the coverage of Ms. Lively during August 2024 outside of what you viewed in Ms. Lively's complaint, correct?

A.    I did not -- no, I don't think so.

Q.    What is the timeframe for your

Page 268

Haggerty - Highly Confidential

Q.     And so, your opinion is about the short timeframe between the retention of these individuals or companies and the spike that you understand was alleged on August 8th, correct?

A.     Correct.

Q.     Does your opinion extend to any allegations Ms. Lively has made about the Wayfarer defendants after August 8, 2024?

A.     I think my opinion stated that it would take time, even given -- even if the allegations were true and there were evidence or specific allegations, it would take time to -- you know, and again, it would take time to get that done, which would indicate to me that it -- it -- you know, correlation is not causation.  So, it would indicate to me it was not the result of these hirings that all of a sudden this happened.

Q.     Are you aware that Ms. Lively has alleged an ongoing retaliation campaign?

A.     You'll have to explain "ongoing retaliation campaign."

Q.     Are you aware that Ms. Lively has alleged retaliation campaign against her

```
                                              Page 272
```

Haggerty - Highly Confidential

your analysis?

A.    I think that's entirely dependent upon the exact, you know, facts, including timeframe but also what they were doing.

Q.    And is it correct that maybe, in your opinion, one or two days might not make a difference but a week or two would affect your opinion?

MR. FRITZ:  Objection.

A.    I do not think that is the opinion expressed in here nor do I -- nor do I hold that.

Q.    How long would TAG, in your expertise, need to have been working to effectuate the type of spike that you were evaluating on August 8th?

MR. FRITZ:  Objection.

A.    You know, that is -- I would have to know a whole lot more about perceptions beforehand, so it's impossible to make a determination.

Q.    The only factor that you've evaluated in support of this causation analysis is the timing of the engagements and the timing

Page 273

Haggerty - Highly Confidential

of the spike on August 8th, correct?

A.    Yes, I mean, it's in the report, yes.

Q.    And that -- and your conclusion is based largely on your expertise but also based on certain digital marketing programs that are in your report?

A.    My conclusion, as with the entire report, is based upon my experience in these issues, and the length -- I mean, we've discussed earlier the length of time it takes to even get everyone in the room and in agreement, you know, as to a course of action.

Q.    In other words, you're saying even after the engagements of TAG and Street Relations on August 2nd and August 8th, respectively, you don't know if they started working immediately?

A.    No, I'm not saying that at all.

Q.    Why did you reference the time to take to even get everyone in the room?

A.    Well, because it's not -- you can be working and it still take time, depending upon exactly what you are doing and how well it is

Page 274

Haggerty - Highly Confidential
working and how well everyone is working
together.

Q.    And you did not offer an opinion on
what would be enough time to see change, your
opinion is only that you know this was not
enough time?

A.    I think for -- my opinion, and,
again, based upon primarily my view and a
couple of sources, is that, you know, there is
very -- we are talking about many, many things
here.  We are talking about legitimate or major
media coverage.  We are talking about trade
media coverage.  We are talking about social
media activity, both in terms of content and in
terms of interaction, after content
interaction, let's call it, and we are talking
about search engine optimization.  All of that
takes different times and it's all entirely
dependent on what you are doing.  You know, for
example, if you're going to -- you know, if
you're going to place a story in the New York
Times, that can take a week, a month, a year,
depending upon many, many factors.

Q.    Once a media source is placed, it is

Page 276

Haggerty - Highly Confidential

How did you select the source pulled from as text website?

A.    Well, based on this -- so, I have, again, based on my experience, a general view of the time it takes to put things in place, in terms of, again, we are talking about many things when we talk about media and social media.  And so, I did some research online just to make sure the opinions I had were valid.

Q.    You just spoke of your experience of the time it takes to put things in place.  What is your experience of the time it takes for once things are effectuated, there to be an impact in the media or social media online?

A.    I think it's entire -- it's dependent on so many factors it's impossible to say.

Q.    Can you give me a few of those factors, please?

A.    Well, I mean, it's the one I explained about if the interest was -- that The New York Times be interested in one aspect or another of an issue.  You know, it's dependent on so many factors, even in that isolated case,

Page 278

Haggerty - Highly Confidential
the Wall Street Journal or New York Times no
doubt has their own social media operation and
they would -- they would send it out.

Q.    And how did you select the Metric
Marketing source that is cited on page 26?

A.    The same thing, I looked for online
sources to give a sense for what is out there.

Q.    Okay.  Were you familiar with Aztek
or Metric Marketing before preparing this
report?

A.    I may have heard of the names but
were not -- was not specifically familiar.

Q.    Do you think that you could have
found similar sources from similar -- similar
businesses that have sources echoing what these
sources say?

A.    I suspect given my experience with
it that there probably are.

Q.    You're not a digital marketing
expert, correct?

A.    That's correct, yes.

Q.    Do you have any expertise in
evaluating metrics of causation?

A.    You'll have to explain what you mean

Page 279

Haggerty - Highly Confidential

by that.

Q.   Did you evaluate any metrics in connection with this opinion?

A.   You'll have to explain evaluating any metrics for me.

Q.   Did you collect any data?

A.   No, I did not.

Q.   Did you run a quantitative analysis on any sample size?

A.   No, I did not.

Q.   Did you evaluate any particular counter-stories to assess whether the coverage in those stories was caused by the Wayfarer defendants?

A.   Can you repeat that question?  I missed the first part of it.

Q.   Did you -- in connection with your opinion, did you evaluate any particular online accounts or media stories to assess whether they were caused by the Wayfarer defendants?

A.   No, I think there were stories that were -- there were allegations in the second amended complaint that included references to stories.

Page 280

Haggerty - Highly Confidential

Q.    But you don't know precisely what the negative coverage as to Ms. Lively consisted of?

A.    I know what the negative coverage that was alleged in the second amended complaint was.

Q.    And what was that?

A.    I -- I would have to go back and actually read it.

Q.    Did you evaluate the authenticity or inauthenticity of the coverage about Ms. Lively that is reflected in your opinion?

A.    What do you mean by authenticity or inauthenticity?

Q.    Do you have an understanding of what authentic content online is?

A.    Are we -- are we talking social media or mainstream media?

Q.    Social media.

A.    Yeah, on social media there is a term.  And, again, I'm not a digital media specialist, but it seems to be a term that is used as to authentic social media versus inauthentic, and with inauthentic being -- it's

Page 291

Haggerty - Highly Confidential

record, please.

THE VIDEOGRAPHER:  We are off the record.  The time is 5:12 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 5:20 p.m.

Q.    Mr. Haggerty, if you could turn to page 32 of your report.  The last bullet point you offered the opinion that, "Tools to measure media and social media "sentiment" are sometimes less effective during crises, litigation, or other sensitive, dispute-related public issues," and that "There is a need, therefore, to drill down on the data, particularly when attempting to discover causal relationships", correct?

A.    Correct.

Q.    What experience do you have with data analysis?

A.    Well, I'm not an expert in data analysis any more than an expert in digital marketing or SEO, but in my business and in my field have been on the receiving end of sentiment reports and other data.

Page 292

Haggerty - Highly Confidential

Q. And so, your opinion is based on your perspective of what exactly?

A. Of receiving media and social media sentiment reports and seeing how sometimes they are less effective dealing with a complex issue as opposed to a brand. Your Coca-Cola can, something like that.

Q. About how many sentiment reports have you run over the course of the last year?

A. I wouldn't have any idea what the number is. They are certainly not daily.

Q. And with respect to those sentiment reports, more often than not, have you had to engage in some type of recoding of the sentiment analysis?

A. Not necessarily recoding, but diving deep into a result to see exactly what is going on because, you know, any dispute or crisis is a negative event. And so, when there is public attention to that negative event, it will sometimes skew the way a traditional sentiment report views things.

Q. And your opinion references the sentiment reports in Ms. Lively's second

Page 293

Haggerty - Highly Confidential

amended complaint, correct?

A.      That is correct, yes.

Q.      You're not speaking more generally as to online or media sentiment about Ms. Lively during this time period, correct?

A.      I guess I didn't understand the question.

Q.      Your opinion is limited to the sentiment charts reflected in Ms. Lively's complaint?

A.      Correct.

Q.      Are you offering an opinion that these sentiment charts are inaccurate in any way?

A.      I'm offering the opinion that from the second amended complaint, it was hard to discern what it was evaluating or even what service was used to do that.  And in addition, I'm making -- I'm expressing the opinion that if you are going to understand a sentiment analysis, you really need to dig deeper in the context of a sensitive communication situation.

Q.      And so, you could not fully understand the sentiment analysis in the

Page 294

Haggerty - Highly Confidential

complaint because you didn't have the data, correct?

A.    I didn't know what the service was. I didn't know -- I don't think I could discern whether it was media or social media related sentiment.  I couldn't tell exactly what was meant by negative because, again, a dispute is inherently negative.

Q.    And the same would be true to any individual who picked up the complaint to read it, correct?

MR. FRITZ:  Objection.

A.    I can only speak for myself.

Q.    At the end of the day, the data reflected in those sentiment graphs may well be valid and correct?

MR. FRITZ:  Objection.

A.    I'm just -- I'm just thinking about your question for a second.  It is possible with the caveat that in, my opinion, the way that was presented in the second amended complaint seemed to indicate there wasn't a whole lot of thought put into it.

Q.    What are you basing that caveat on?

Page 299

C E R T I F I C A T E

I, FRAN INSLEY, hereby certify that the Deposition of JAMES HAGGERTY was held before me on the 11th day of December, 2025; that said witness was duly sworn before the commencement of testimony; that the testimony was taken stenographically by myself and then transcribed by myself; that the party was represented by counsel as appears herein;

That the within transcript is a true record of the Deposition of said witness;

That I am not connected by blood or marriage with any of the parties; that I am not interested directly or indirectly in the outcome of this matter; that I am not in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of December, 2025.

FRAN INSLEY