**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| BLAKE LIVELY,<br><br>               Plaintiff,<br><br>v.<br><br>WAYFARER STUDIOS LLC, et al.,<br><br>               Defendants. | No. 24-cv-10049 (LJL) (lead case) |

**PLAINTIFF BLAKE LIVELY'S MOTION TO EXCLUDE**
**TESTIMONY OF NICOLE ALEXANDER**

**TABLE OF CONTENTS**

Page

INTRODUCTION ......................................................................................................................1

FACTUAL BACKGROUND .......................................................................................................3

    A.    Ms. Alexander's Background ..........................................................................................3

    B.    Ms. Alexander's Eleven Opinions ...................................................................................3

    C.    The Data Set.....................................................................................................................4

    D.    The Meta-Analysis...........................................................................................................6

    E.    The Signature Comparison ..............................................................................................7

    F.    The "Sentiment Classification"........................................................................................7

    G.    "Time Series Forecasting" ...............................................................................................8

LEGAL STANDARD...................................................................................................................8

I.    THE COURT SHOULD PRECLUDE MS. ALEXANDER'S ATTEMPT TO OFFER AFFIRMATIVE OPINIONS DISGUISED AS REBUTTAL TESTIMONY. ...............................................................................................................9

II.    MS. ALEXANDER IS NOT QUALIFIED TO OFFER ANY OF THE OPINIONS. ......................................................................................................................10

    A.    Ms. Alexander Is Not Qualified To Offer The Daubert Opinion. ...............................11

    B.    Ms. Alexander Is Not Qualified To Offer The Harm Opinions....................................11

    C.    Ms. Alexander Is Not Qualified To Offer The Organic Or Sentiment Opinions.........................................................................................................................12

II.    MS. ALEXANDER'S OPINIONS ARE IRRELEVANT AND UNHELPFUL. ..............16

III.    RULE 702(B) REQUIRES EXCLUDING MS. ALEXANDER'S OPINIONS. ..............18

    A.    The "Meta-Analysis" Is Based On Mystery Data..........................................................19

    B.    The Sentiment Opinion Relies On Mystery Data ..........................................................19

    C.    Ms. Alexander Admits Her Data Set Is Representative Of Nothing. ...........................20

    D.    The Small Size Of The Data Set Diminishes The Reliability Of The Opinions..........22

    E.    The Data Set Contains Inexplicable Errors...................................................................23

    F.    Ms. Alexander's Lack Of Familiarity With The Collection, Contents, And Outputs Of The Data Set Renders Her Opinions Unreliable. ....................................25

IV.    RULE 702(C) REQUIRES EXCLUDING MS. ALEXANDER'S OPINIONS. .............25

    A.      Ms. Alexander's "Meta-Analysis" Is Not A Methodology. ........................................26

    B.      The Signature Comparison Is Not A Methodology ......................................................27

    C.      Ms. Alexander Cannot Bridge The Gap To Her Sentiment Opinion............................30

    D.      Ms. Alexander Did Not Apply Any Methodology When Choosing Date
            Ranges.......................................................................................................................32

    E.      Ms. Alexander's Harm Opinions Do Not Rely On Any Methodology. ......................33

V.      RULE 702(D) REQUIRES EXCLUDING MS. ALEXANDER'S OPINIONS. ..............34

CONCLUSION.................................................................................................................................35

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*3DT Holdings LLC v. Bard Access Sys. Inc.*,
    2022 WL 2951593 (S.D.N.Y. June 24, 2022),
    *aff'd*, 2023 WL 4072832 (2d Cir. June 20, 2023)...................................................34

*Alto v. Sun Pharm. Indus., Inc.*,
    2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021)...................................................26, 28

*Amorgianos v. Amtrak*,
    303 F.3d 256 (2d Cir. 2002)...................................................................8, 25

*Arista Recs. LLC v. Lime Grp. LLC*,
    2011 WL 1674796 (S.D.N.Y. May 2, 2011) ...............................................11, 12, 14

*Atlantic Specialty Ins.* v. *AE Outfitters Retail Co.*,
    970 F. Supp. 2d 278 (S.D.N.Y. 2013)...................................................................18

*Chen-Oster v. Goldman, Sachs & Co.*,
    2022 WL 814074 (S.D.N.Y. Mar. 17, 2022),
    *on reconsideration in part*, 2022 WL 3586460 (S.D.N.Y. Aug. 22, 2022)...........20, 21, 22, 31

*Daniels-Feasel v. Forest Pharms., Inc.*,
    2021 WL 4037820 (S.D.N.Y. Sept. 3, 2021), *aff'd sub nom.*
    *Daniels-Feasel v. Forest Pharms., Inc.*, 2023 WL 4837521 (2d Cir. July 28, 2023)..............33

*Daubert v. Merrell Dow Pharmaceuticals Inc.*,
    509 U.S. 579 (1993)...................................................................... *passim*

*E.E.O.C. v. Bloomberg L.P.*,
    2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010)........................................9, 20, 26, 27

*In re Elysium Health-ChromaDex Litig.*,
    2022 WL 421135 (S.D.N.Y. Feb. 11, 2022).......................................................25

*Freeman v. Deebs-Elkenaney*,
    2024 WL 3634738 (S.D.N.Y. Aug. 1, 2024)................................................21, 27

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)...................................................................25, 31, 33

*Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins. Co.*,
    645 F. Supp. 3d 95 (E.D.N.Y. 2022). .......................................................9

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.* (*In re Keurig*),
    2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) .................................................10

*King v. Wang*,
    2021 WL 5237195 (S.D.N.Y. Nov. 9, 2021) ............................................................... *passim*

*Kohls v. Ellison*,
    2025 WL 66514 (D. Minn. Jan. 10, 2025) .............................................................. 14

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ...................................................................................... 9

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
    209 F. Supp. 3d 612 (S.D.N.Y. 2016), *aff'd sub nom. LVL XIII Brands, Inc. v.*
    *Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir. 2017) .......................................... *passim*

*Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007) ..................................................................11, 12, 17

*Napolitano v. Synthes, Inc.*,
    2014 WL 12868859 (D. Conn. May 2, 2014) ..............................................................21

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005) ..............................................................................11, 12, 25

*Nnebe v. Daus*,
    2023 WL 6881992 (S.D.N.Y. Oct. 18, 2023) ..............................................................20, 22

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
    164 F.3d 736 (2d Cir. 1998) ..............................................................................11, 18

*Oakley* v. *MSG Networks, Inc.*,
    2026 WL 523770 (S.D.N.Y. Feb. 25, 2026) ............................................................... *passim*

*Oleg Cassini, Inc. v. Electrolux Home Prods., Inc.*,
    2014 WL 1468118 (S.D.N.Y. Apr. 15, 2014) ..............................................................27

*Pac. Life Ins. Co. v. Bank of New York Mellon*,
    571 F. Supp. 3d 106 (S.D.N.Y. 2021) ..................................................................... *passim*

*Price v. L'Oreal USA, Inc.*,
    2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020) ..............................................................22, 23

*Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*,
    49 F. Supp. 3d 385 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016) ........................33

*Rekor Sys., Inc. v. Loughlin*,
    2022 WL 2063857 (S.D.N.Y. June 8, 2022) (Liman, J.) .................................................9, 10

*Rowe Ent., Inc. v. William Morris Agency, Inc.*,
    2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003) ...........................................................18, 20

iv

*SLSJ, LLC v. Kleban*,
    277 F. Supp. 3d 258 (D. Conn. 2017)..................................................................18

*State of New York v. United Parcel Serv., Inc.*,
    2016 WL 4735368 (S.D.N.Y. Sept. 10, 2016)......................................................32

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3*, *AFL-CIO*,
    313 F. Supp. 2d 213 (S.D.N.Y. 2004)..................................................................20

*United States v. Coriaty*,
    300 F.3d 244 (2d Cir. 2002)................................................................................18

*United States v. Ray*,
    583 F. Supp. 3d 518 (S.D.N.Y. 2022) (Liman, J.).......................................... *passim*

*United States v. Smith*,
    2026 WL 122337 (S.D.N.Y. Jan. 16, 2026) ........................................................16

*United States v. Tin Yat Chin*,
    371 F.3d 31 (2d Cir. 2004)...................................................................................16

*Zaremba v. Gen. Motors Corp.*,
    360 F.3d 355 (2d Cir. 2004).................................................................................10

## Other Authorities

American Marketing Association, *Academic Journals*,
    https://ama.org/ama-academic-journals/;..................................................................13

Association of National Advertisers, *Marketing Knowledge Center*,
    https://ana.net/mkc .................................................................................................. 13

Apify, *Get real-time web data for your AI,* apify.com/ ....................................................5

Cornell University, *ALBERT: A Lite BERT for Self-Supervised Learning of*
    *Language Representations* (Sept. 26, 2019) ..........................................................30

Emilio Ferrara et al., *The Rise of Social Bots*,
    59 COMMC'NS OF THE ACM 96 (2016) ................................................................13

Fed. R. Civ. P. 26.............................................................................................................9

Fed. R. Evid. 401 ...........................................................................................................16

Fed. R. Evid. 702 ................................................................................................... *passim*

GitHub, *Google-Research/Bert*, https://github.com/google-research/bert ...................30

GPTZero, *The #1 AI Detector for Students*, http://gptzero.me/students.......................14

Graham, T., Bruns, A., Zhu, G., & Campbell, R. (2024). *Detecting coordination networks in social media.*, J. OF COMPUTATIONAL SOCIAL SCIENCE 7(1) ...............................13

Local Rule 8(B)(i) ...........................................................................................................1

National Advertisers, *Marketing Knowledge Center*, https://ana.net/mkc ....................................13

NVIDIA Corporation, *BERT*, https://nvidia.com/en-us/glossary/bert/; ........................................30

Provost, *Generative AI Policy*, http://provost.columbia.edu/content/office-senior-vice-provost/ai-policy ..............................................................................................14

PyTorch, *RoBERTa,* pytorch.org/hub/pytorch_fairseq_roberta/ ....................................................30

Samuel C. Woolley and Philip N. Howard, *Political Communication, Computational Propaganda, and Autonomous Agents*, 10 INT'L J. OF COMMC'N 4882 (2016) .......................13

Timothy Graham, Sam Hames, and Elizabeth Alpert, *The Coordination Toolkit: A Framework for Detecting and Analysing Coordinated Behaviour on Social Media,* 7 J. OF COMPUTATIONAL SOC. SCI. 1139 (2024) ...........................................................13

Plaintiff Blake Lively respectfully moves to exclude the testimony of Nicole Alexander, whom Defendants plan to offer as an expert witness to rebut the opinions of Drs. Ashlee Humphreys and Dina Mayzlin regarding Defendants' manipulation of online commentary about Ms. Lively and the reputational harm she suffered as a result, pursuant to Rule 702 of the Federal Rules of Evidence ("Rule" or "Rules") and *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993) ("*Daubert*").[1]

## INTRODUCTION

Ms. Alexander's testimony requires exclusion for multiple independently fatal reasons. Ms. Alexander intends to opine that the "extraordinary" "spike" in negative media coverage that Ms. Lively experienced in August 2024 was "organic" and not the result of a "coordinated manipulation campaign" in an effort to rebut the opinions of Dr. Mayzlin, who concluded that Defendants' strategic manipulation of online conversations caused the marked negative shift in online sentiment toward Ms. Lively and her brands. *See* Ex. 1 ("Report" or "Rep."); Ex. 2 ("Deposition" or "Dep."). Ms. Alexander did not analyze Dr. Mayzlin's data set of more than 1 million pieces of data and offers no opinions on it, and instead offers new opinions based on an entirely distinct set of data. All of Ms. Alexander's opinions are new ones disguised as rebuttal testimony, which alone warrants their exclusion. *Infra* Argument § I. Nor is Ms. Alexander qualified to offer any of them. While Ms. Alexander concedes her education does not equip her to offer the opinions, neither does her professional background, comprised primarily of two marketing jobs at two companies she held for around four of the past ten years. Her lack of specialized knowledge is apparent in her Report and Deposition testimony, during which Ms.

---

[1] The Court's Local Rule 8(B)(i) does not explicitly reference *Daubert* motions. Accordingly, Ms. Lively is filing separate *Daubert* motions subject to an agreement with opposing counsel as to page limits (a total of 80 pages allocated across the four separate *Daubert* motions). To the extent Local Rule 8(B)(i) applies, Ms. Lively respectfully requests leave to file individual *Daubert* motions and separate from the omnibus *motions in limine* brief.

Alexander "didn't know" virtually anything about the academia on which her opinions purportedly rely and could not explain why artificial intelligence ("AI") detection software was "highly confident" that more than half of the text in her Report was "AI generated." *Infra* Argument § II.

If Ms. Alexander survives the threshold inquiry into her background (which she should not), her opinions require exclusion because they are irrelevant and unhelpful. Ms. Alexander's primary opinions rely on comparing the dates of the data in her data set with the dates of public events, *without considering* whether Defendants' alleged conduct caused or impacted the media coverage of Ms. Lively. Leaving aside that members of a jury can compare dates without the help of an "expert," Ms. Alexander's own admission that she cannot, and further analysis would be required to, connect her opinions to the ultimate question of the case—whether Defendants engaged in a coordinated manipulation campaign—renders her opinions irrelevant. *Infra* Argument § III. If Ms. Alexander somehow meets her burden on experience and relevance, Rule 702(B)-(D) necessitates her exclusion. Ms. Alexander cannot meet her burden under Rule 702(B) because she admitted her data set is not "representative" of online commentary about Ms. Lively, is *96 times smaller* than Dr. Mayzlin's data set, and is riddled with errors of which Ms. Alexander was unaware and could not explain during her Deposition. *Infra* Argument § IV. Ms. Alexander also cannot meet the requirements of Rule 702(C) because she admittedly did not apply any recognized methodology and relies exclusively on her own *ipse dixit* that cannot bridge the gap between her data and her opinions. *Infra* Argument § V. Finally, Rule 702(D) requires Ms. Alexander's exclusion because whatever "methodology" she applied, she did not do so reliably to the facts in the case. *Infra* Argument § VI. Ms. Alexander cannot shoulder her burden for each of these reasons, any one of which alone requires her exclusion.

**FACTUAL BACKGROUND**

A.    **Ms. Alexander's Background**

Ms. Alexander possesses an undergraduate degree from New York University ("NYU") in Leadership and Management and an executive MBA and a Master of Studies degree in Artificial Intelligence Ethics and Society, which she received in 2014 and 2025, respectively. Rep. at Appendix A ("CV"); ¶2.[2] Ms. Alexander was last employed at Meta, where she worked for two-and-a-half years in the Business and Product Marketing division, promoting Meta's "Business-to-Business" products before leaving in 2023 due to organizational changes. Dep. at 84:5-85:20. Prior to Meta, Ms. Alexander worked in the "global innovation department" at a company called IPSOS between 2019 and 2020. CV.[3] Ms. Alexander serves as an adjunct professor of a class that educates "practitioners or future practitioners about how to look at AI from a strategic perspective, from an executionary perspective" at Columbia University, although her CV identifies herself as an adjunct professor at both Columbia and NYU even though she has not taught at the latter since 2022. *Compare* CV and ¶1, *with* Dep. at 67:24-71:12.

B.    **Ms. Alexander's Eleven Opinions**

Ms. Alexander has never served as an expert witness in any litigation. Dep. at 25:12-21. For purposes of this litigation, she claims an expertise in "data analysis, marketing, and specifically social networks." Dep. at 121:17-21; ¶¶3, 7, 169. Ms. Alexander testified that her assignment was to serve as a rebuttal expert to Drs. Mayzlin and Humphreys. ¶14; Dep. at 166:12-17. Her specific assignment was to answer three questions: "(1) does Ms. Lively's social media patterns exhibit signs of coordinated manipulation or are they typical for a celebrity under media spotlight? (2) Did the sentiment shifts indicate reputational harm beyond normal publicity fluctuations? (3) Did the

---

[2] All cites using the paragraph symbol (¶) are to the Report unless otherwise noted.
[3] There is a gap in Ms. Alexander's employment between 2016 and 2019. *See* Rep. at 92-93.

online activity correlate with any actual damage to Ms. Lively's commercial interests?" ¶13. Ms.

Alexander seeks to offer eleven opinions, which organize into four general topics:

1) "changes in online activity" relating to Ms. Lively "exhibited patterns consistent with organic public discourse driven by legitimate news cycles, film publicity, and entertainment media coverage, rather than coordinated manipulation" based on temporal, network, and content factors (¶¶12, 169 (**Opinions 1-2, 4-7, 10 ("Organic Opinions"**)));

2) the "sentiment" of the online activity about Ms. Lively "remained predominantly positive" (¶169 (Opinion 3 ("Sentiment Opinion")));

3) there was "no measurable commercial harm" to Ms. Lively based on the online sentiment and her business records (¶169 (**Opinions 8, 11 ("Harm Opinions"**))); and

4) the "methodologies employed in this analysis meet established *Daubert* standards" (¶169 (**Opinion 9 ("*Daubert* Opinion"**))).

¶169 ("Opinions"). Ms. Alexander confirmed that the eleven Opinions represent the sum of what

she intends to opine on and that none of them relate to causation. Dep. at 188:11-189:20, 214:3-

215:10, 220:10-18, 230:3-235:4, 328:18-329:4.[4]

### C.    The Data Set

Ms. Alexander relied on an assistant, whom she identified as Taylor Hunter, to collect data

from Instagram, Reddit, TikTok, X, and YouTube (the "Five Platforms"). ¶107; Dep. at 28:20-

30:4, 36:19-38:18. Ms. Alexander did not give Ms. Hunter "any specific instruction on how to

approach it, how to run the data, or how to scrape the data, anything to that effect" and checked

her work only for undefined "completeness." Dep. at 38:19-40:18.[5] Ms. Hunter used YouTube's

application programming interface ("API") to scrape content from that platform, and relied on

data-scraping tools available on Apify to scrape data from the other four platforms because

---

[4] The Report includes an Appendix of Materials Considered ("Materials Considered"), which Ms. Alexander testified reflects the universe of the materials she considered while preparing the Report but also which she confirmed only includes "content that was in" the final Report. Rep. at 105-109; Dep. at 126:8-16, 170:12-173:22.

[5] Ms. Alexander had never before worked with Ms. Hunter, and could not testify as to her academic background or the company for which she worked, and could not recall any questions she asked about her experience before her retention. Dep. at 28:20-31:23.

platform-provided APIs were "not available" on the day Ms. Hunter scraped data from them. Dep. at 28:20-30:24, 36:19-40:24, 243:21-245:22.[6] In all, Ms. Hunter scraped 43,992 pieces of online content from the Five Platforms: 6,049 from Instagram; 879 from Reddit; 688 from TikTok; 20,039 from X; and 16,337 from YouTube. Ex. 3 (chart of Data Set by month and platform); Ex. 4-8 (collectively, "Data Set"); ¶107; Dep. at 174:24-175:12, 188:8-10, 217:7-11.[7]

Ms. Alexander confirmed during her deposition that her Data Set is **not** "representative of the overall universe that encompasses Blake Lively during the given periods of time that we looked at." Dep. at 40:22-41:21, 175:19-176:6; ¶22. Rather, the Data Set is whatever content "the social media networks allowed Apify to have access to" on the day of scraping that met the parameters Ms. Hunter entered. Dep. at 240:13-19; *see also id.* at 39:19-41:21, 175:14-176:6, 178:21-180:13, 242:12-20. Ms. Hunter detailed what she scraped and her own observations of the data in five README text files (one for each platform), which Ms. Alexander confirmed that she reviewed, confirmed as accurate, and produced as part of her backup materials. Ex. 9 ("README Files"); Dep. at 284:3-285:11 ("My assistant wrote the content for the README files."); *id.* at 319:1-2 ("The README file was written by Taylor Hunter"). The Data Set reflects the following information about each of the five platforms:

- **Instagram**. The 6,049 pieces of data from Instagram derive from one of the following three URLs: instagram.com/explore/tags/blakelively/ (3000 pieces of data); instagram.com/explore/tags/itendswithus/ (3000 pieces of data); and instagram.com/explore/tags/itendswithusMovie/ (49 pieces of data). Ex. 4 ("Input URL" column (Column A));

- **Reddit**. The 879 pieces of data from Reddit derive from five specific subreddits: "movies"; "entertainment"; "popculturechat"; "romancebooks"; and "Fauxmoi" (with the last three being the "top subs"). Ex. 5 ("subreddit" column (Column F));

---

[6] APIFY IS A THIRD-PARTY "SOFTWARE AS A SERVICE" WEBSITE. *SEE* APIFY, *GET REAL-TIME WEB DATA FOR YOUR AI*, APIFY.COM/.

[7] The chart attached as Exhibit 3 is derived entirely from the raw data attached hereto as Exhibits 4-8.

- **TikTok**. Virtually all of the 688 pieces of data from TikTok reflect videos that include either #blakelively or #itendswithus in the content. Ex. 6 ("content" column (Column C));
- **X and YouTube**. The 20,039 pieces of data from X and 16,337 from YouTube reflect comments that hit on the search terms: "Blake Lively"; "Blake Lively Justin Baldoni"; "It Ends With Us"; and "It Ends With Us drama." Ex. 9 at 7, 9.

### D.    The Meta-Analysis

Because of the limited amount of data available from each of the Five Platforms, Ms. Hunter aggregated data from the five of them to perform what Ms. Alexander termed a "meta-analysis." ¶¶15, 18-19, 31-41. The Report calls the "meta-analysis" the "cornerstone" of Ms. Alexander's "analytical approach" on which the Organic Opinions and Opinions 8 and 9 appear to depend. ¶¶31, 169. The "meta-analysis" breaks the data into three periods: the "Baseline" Period of May to July 2024 ("three months immediately preceding the alleged campaign and the film release" (¶¶32, 44)); the August "Spike" (an "extraordinary" spike in content about Ms. Lively in August 2024 (¶¶33-35)); and the Post-Spike Period (beginning in September 2024 and ending in October 2024 (when activity "returned to baseline levels" (¶¶38-39, 109))). Ms. Alexander produced an Excel, README, and code file (which Ms. Hunter wrote and executed (Dep. at 36:19-40:24)) relating to the "meta-analysis" that are attached hereto as a combined exhibit. *See* Ex. 10.[8] The Excel backup file, which Ms. Alexander titled "Meta Input," breaks down the "meta-analysis" data by month, platform, and "count." *Id*. at 1-3 ("Meta Input"). While the total "count" of data in the Meta Input matches the total count of data in the Data Set, the monthly and per-platform counts do not match, as reflected in Exhibit 11. *See* Ex. 11; *Compare See* Ex. 10 at 1-3, *with* Ex. 3, *and* Exs. 4-8. For example, the Meta Input "count" reflects 3,718 Instagram comments

---

[8] Pages 1-3 of Ex.10 reflect the "Meta Input" file. Pages 4-5 reflect the "Meta Sentiment README" file. Pages 6 through 16 reflect the "Meta Code" file. Pages 17 through 22 reflect the "Meta-Analysis README" file.

from 2024, 265 of which are listed as from August, while the Data Set count reflects only 11 pieces of data from Instagram in 2024, two of which are listed as from August. *See* Ex. 11.

### E.    The Signature Comparison

To determine whether the public discourse about Ms. Lively was "organic" or the result of a "coordinated manipulation campaign," Ms. Alexander compared the results of the above-described "meta-analysis" to the "structural, temporal, and content-based characteristics typically associated with manufactured campaigns" (what she calls "diagnostic signatures" of coordinated campaigns). ¶¶16, 97, 169 (Opinions 1-2, 4-7, 10) (hereinafter, "Signature Comparison").[9] Ms. Alexander used the Signature Comparison to reach the Organic Opinions, which she summarized as: "None of these signatures appeared in the meta-analysis. Instead, the data demonstrate textbook characteristics of organic viral spread driven by a major external stimulus—in this case, the theatrical release of a highly anticipated film featuring a high-profile celebrity." ¶40.[10]

### F.    The "Sentiment Classification"

Because statistical "volume analysis alone provides an incomplete picture of online reputation dynamics," the Report states a "systematic sentiment classification analysis was essential." ¶52. To perform a "sentiment classification analysis," Ms. Hunter wrote the code for a software model called "BERT" to assign positive, negative, or neutral to the Data Set based on "natural language." Dep. at 246:23-254:22, 258:2-10; ¶¶54-55 ("Sentiment Classification"). Ms. Alexander intends to opine that the "sentiment" of the online activity about Ms. Lively "remained predominantly positive" because the Sentiment Classification assigned 63 percent of the 6,565

---

[9] After performing the Signature Comparison, Ms. Alexander purported to perform a statistical analysis and linear regression to confirm that the August Spike was "extraordinary." ¶¶45-50.
[10] *Accord* ¶¶107, 125, 148.

posts from the month of August 2024 as "positive," followed by 20 percent "neutral" and 17 percent "negative." ¶¶52, 57, 169 (Opinion 3); Dep. at 247:12-249:16.

### G.    "Time Series Forecasting"

The Report describes a "time series forecasting analysis" that Ms. Alexander claims to have used to determine whether there was "a lasting impact" on public sentiment about Ms. Lively. ¶¶62-80, 115-139 ("Time Series Forecast"). Ms. Alexander did not use the outputs of the BERT analyzer for purposes of the "time series forecasting analysis"—the Report instead describes a separate sentiment analyzer that used dictionary-based, specific positive and negative keywords, such as "love", "amazing", "talent", and "support" versus "hate", "terrible", "toxic", or "boycott." ¶¶63-65. Ms. Alexander relied on the Time Series Forecast in the Sentiment Opinion to conclude that there would be "no lasting impact" of the online commentary about Ms. Lively and, therefore, that commentary reflects "temporary organic event responses, not sustained manipulation campaigns which would show permanent trajectory shifts." ¶169.

## LEGAL STANDARD

Federal Rule of Evidence 702 provides that a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise", only if:

(a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."

(Rule 702 (B)-(D) ("Reliability Factors")). Pursuant to Rule 702 and *Daubert*, a district court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable" at "every step." *Daubert*, 509 U.S. at 589; *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d

8

Cir. 2002). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *King v. Wang*, 2021 WL 5237195, at \*10 (S.D.N.Y. Nov. 9, 2021) (Liman, J.) (citation omitted); *E.E.O.C. v. Bloomberg L.P.*, 2010 WL 3466370, at \*14 (S.D.N.Y. Aug. 31, 2010). This "gatekeeping obligation" applies "to all expert testimony" and "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 152 (1999). The "'proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied.'" *United States v. Ray*, 583 F. Supp. 3d 518, 532 (S.D.N.Y. 2022) (Liman, J.) (citing cases).

## I. THE COURT SHOULD PRECLUDE MS. ALEXANDER'S ATTEMPT TO OFFER AFFIRMATIVE OPINIONS DISGUISED AS REBUTTAL TESTIMONY.

The Court should strike Ms. Alexander's testimony because it attempts to introduce entirely new opinions on a new subject under the guise that they are "rebuttal." *Rekor Sys., Inc. v. Loughlin*, 2022 WL 2063857, at \*7 (S.D.N.Y. June 8, 2022) (Liman, J.); *accord Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins. Co.*, 645 F. Supp. 3d 95, 106 (E.D.N.Y. 2022). None of the Opinions have anything to do with Dr. Humphreys' analysis. ¶169; *see* Fed. R. Civ. P. 26 (must provide "a complete statement of all opinions the witness will express and the basis and reasons for them"). And the Organic and Sentiment Opinions are entirely distinct from Dr. Mayzlin's opinions because Ms. Alexander chose to apply an entirely different "methodology" to an entirely different Data Set, rather than to Dr. Mayzlin's set of 1.1 million pieces of raw data, which was

9

provided to defense counsel in full.[11]   Ms. Alexander testified that she "*would assume*" that applying one another's methods would lead to different opinions because of the "different raw datasets", but she did not know for sure because she did not perform any analysis of Dr. Mayzlin's data set or attempt to apply her own methodologies to it, which forecloses Ms. Alexander's ability to "explain, repel, counteract or disprove" Dr. Mayzlin's analysis. Dep. at 174:10-175:12, 183:15-186:20, 200:11-202:15, 204:16-205:3, 292:15-20; *Rekor*, 2022 WL 2063857, at *7.[12]   The Defendants cannot perform an end run around their strategic decision not to serve an affirmative report by serving affirmative opinions under the guise of a "rebuttal" report.

## II.    MS. ALEXANDER IS NOT QUALIFIED TO OFFER ANY OF THE OPINIONS.

Ms. Alexander cannot meet the "threshold" requirement of demonstrating that she is "'qualified as an expert by knowledge, skill, experience, training, or education'" to opine on any of the Opinions. *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 636 (S.D.N.Y. 2016), *aff'd sub nom. LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir. 2017); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.* (*In re Keurig*), 2025 WL 354671, at *3 (S.D.N.Y. Jan. 30, 2025). She conceded that her undergraduate degree is not relevant to any of her Opinions, other than affording her access to marketing jobs. Dep. at 71:15-74:2. Her testimony about the relevance of her post-undergraduate studies—that she took a class in "data analytics" and learned "how AI is leveraged, pro or con, in marketing" (Dep. at 78:6-82:11)—does not provide her with specialized expertise. *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 359–60 (2d Cir. 2004) (excluding witness from testifying on automobile design based solely

---

[11] Ms. Alexander says she disregarded Dr. Mayzlin's data set because she could not "ensure" that it was "representative based on the time frame" but she did not attempt to reconcile that decision with her admission that her Data Set was not and did not need to be "representative" of anything. Dep. at 174:10-176:6, 200:24-201:9, 203:19-205:3.

[12] The only Opinions that arguably relate to Dr. Mayzlin's opinions are the Harm ones, but Ms. Alexander is not qualified to provide those for the reasons discussed immediately below.

on finding that he had the "meager qualifications" of "only a bachelor's degree in engineering and his only practical experience was in designing parts for automobile air bags"). Neither the college course Ms. Alexander teaches nor the book she authored is relevant here as none of the Opinions relate to the focus of those activities: the ethical use of AI. CV; *Arista Recs. LLC v. Lime Grp. LLC*, 2011 WL 1674796, at *5–6 (S.D.N.Y. May 2, 2011). Without relevant experience in education or academia, Ms. Alexander must—but cannot—demonstrate that her various marketing positions for large corporations provide her with knowledge necessary to offer any of the Opinions. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).

### A.     Ms. Alexander Is Not Qualified To Offer The *Daubert* Opinion.

The Court can exclude the *Daubert* Opinion without analysis because Ms. Alexander does not possess a law degree, is not a lawyer, is not an expert on *Daubert*, and only knows about it from a Google search. *See* Dep. at 160:13-164:21. She also cannot testify about legal conclusions. *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 566–67 (S.D.N.Y. 2007).

### B.     Ms. Alexander Is Not Qualified To Offer The Harm Opinions.

Ms. Alexander lacks the qualifications necessary to opine on a lack of "commercial harm" to Ms. Lively's "brand partnerships or business ventures," namely, Ms. Lively's haircare line, Blake Brown, and her ready-to-drink alcoholic beverage line, Betty Booze (Opinion 8). Nor is Ms. Alexander qualified to conclude that any decline in the sales of those brands was motivated by "expected category trends" in the alcohol and hair industry (Opinion 11). Ms. Alexander does not have a degree in finance, economics, accounting, mathematics, statistics, cinema economics, box office forecasting, media distribution, entertainment finance, or the entertainment, alcohol, or haircare industries. The marketing roles she has filled for various companies do not qualify her to opine on any possible topic relating to Ms. Lively's businesses. *See Nimely v. City of New York*, 414 F.3d 381, 399 n.13 (2d Cir. 2005) ("[I]t is worth emphasizing that, because a witness qualifies

11

as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields.") (citation omitted); *see Ray*, 583 F. Supp. 3d at 544. Ms. Alexander confirmed as much by testifying that her position at Meta provided her only with "marginal" experiences analyzing data by overseeing a team that would "look at things like social graph, click stream data." Dep. at 86:5-88:6. Whatever "marginal" experience Ms. Alexander has analyzing data during her two years working at Meta does not equip her to analyze documents showing in-depth financial and other performance metrics in the business sectors relevant here. *Nimely*, 414 F.3d at 399 n.13.

### C.       Ms. Alexander Is Not Qualified To Offer The Organic Or Sentiment Opinions.

Conceding that she lacks degrees in marketing, digital marketing, computer science, data science, statistics, data analytics, digital marketing, or computational social sciences, Ms. Alexander claims it is her experience as a "practitioner" in "marketing science" that provides her with the specialized knowledge in the field of "data analysis, marketing, and specifically social networks." *See* Dep. at 121:17-123:6, 158:2-160:12. Both sets of opinions rely on data and statistical analyses, including the regression models and "meta-analysis," but Ms. Alexander is not a data scientist or statistician, and any incidental statistical or data-analytical work she has performed in her marketing jobs is insufficient to render her an expert in either. *Supra* at 10-11; *Arista*, 2011 WL 1674796, at \*5–6 (disqualifying expert because even if he "has experience working with statistics, he has never performed statistical analyses or surveys of human populations"); *Malletier*, 525 F. Supp. 2d at 664 ("occasional use of statistics in his daily life simply does not qualify him as an expert on that complex subject.").

Both the Report and her Deposition confirm that Ms. Alexander does not possess specialized knowledge required to offer the Organic or Sentiment Opinions. To the extent Ms. Alexander has performed any research, it never has been published in any journal or peer-reviewed

publication, which she believes is reserved "usually for more full-blown academics." Dep. at 120:22-24; 123:16-23.[13] She never has served as an editor for any academic or scientific journals, does not subscribe to any, and could identify only two during her Deposition. Dep. at 121:17-123:6.[14] Ms. Alexander's lack of specialized knowledge with her own purported field of expertise was apparent when she could not answer basic questions about the primary journal articles on which she purported to rely.[15] *Compare* ¶¶25 n.3, 87 n.11, 97, *with* Dep. at 135:3-6 ("I cannot" summarize the Graham Article), *and* at 152:21-153:8 ("I can't tell you offhand" what the Howard Article is about or why it supports analysis), *and* at 153:10-23 (same as to Ferrara Article).[16] ==The Report parrots the verbiage of the Graham Article to provide the framework for the Organic Opinions==,[17] but Ms. Alexander could not:

- define computational social sciences ("I don't know how I would define that");

---

[13] While Ms. Alexander testified that one article she wrote during her employment at IPSOS was "peer reviewed," she confirmed it was not published and she did not rely on it for purposes of her Report. Dep. at 123:23-125:17.

[14] Ms. Alexander testified that she reviewed a journal published by The American Marketing Association and the American National Advertisers. The former publishes multiple journals, including the *Journal of Marketing*, and the latter publishes industry reports, surveys, benchmarks, white papers, and other practitioner-oriented materials. *See* American Marketing Association, *Academic Journals*, https://ama.org/ama-academic-journals/; Association of National Advertisers, *Marketing Knowledge Center*, https://ana.net/mkc.

[15] (1) Samuel C. Woolley and Philip N. Howard, *Political Communication, Computational Propaganda, and Autonomous Agents*, 10 INT'L J. OF COMMC'N 4882 (2016) ("Howard Article"), attached as Ex. 12; (2) Emilio Ferrara et al., *The Rise of Social Bots*, 59 COMMC'NS OF THE ACM 96 (2016) ("Ferrara Article"), attached as Ex. 13; and (3) Graham, T., Bruns, A., Zhu, G., & Campbell, R. (2024). *Detecting coordination networks in social media.*, J. OF COMPUTATIONAL SOCIAL SCIENCE 7(1), 23–47 ("Graham Citation") (Rep. at 108). As discussed below, the Graham Citation is inaccurate. The proper citation should be Timothy Graham, Sam Hames, and Elizabeth Alpert, *The Coordination Toolkit: A Framework for Detecting and Analysing Coordinated Behaviour on Social Media*, 7 J. OF COMPUTATIONAL SOC. SCI. 1139 (2024) ("Graham Article"), which is attached as Ex. 14.

[16] In response to questions about how Ms. Alexander would summarize the article, opposing counsel repeatedly asserted improper speaking objections, asking whether counsel wanted her "to read the entire article" notwithstanding that the questions asked for Ms. Alexander's best recollection. Dep. at 135:3-139:13.

[17] *See, e.g.,* ==¶¶23 ("coordinated campaigns often exhibit artificially tight temporal clustering, while organic engagement displays natural dispersion"), 31 ("Coordinated manipulation campaigns typically exhibit inconsistent cross-platform temporal patterns"; "By contrast, organic viral events driven by external news stimuli display remarkable cross-platform temporal consistency"; "different timing signatures"); 40 ("distinctive signatures"); 42 ("pattern signature"); 49 ("Coordinated manipulation campaigns typically exhibit specific signatures"); 50 ("pattern signatures"); 55 ("manipulation signatures"); 81 ("structural signatures"); 87 ("coordination signatures"); 95 ("manipulation signatures"); 124 ("Coordinated manipulation campaigns"; "typically show") (all without supporting citations).==

- explain how she identified the Graham Article since she did not regularly read the Journal of Computational Social Sciences ("I don't know how I identified it");

- summarize its contents other than repeating the title ("the article in and of itself is about coordinated networks and the toolkit that the authors used to identify them"); or

- identify the parts of it that supported her Signature Comparison. Dep. at 82:16-83:9, 130:3-147:13.

Ms. Alexander's unfamiliarity with the academia cited in her Report is consistent with the "100 percent" probability prediction by AI-detection software that the paragraphs in the Report describing this academia (¶¶86, 97) were "AI generated." Ex. 16 at 167-68, 189-90. In total, AI checker software predicted the same for some or all of 96 of the 200 paragraphs in Ms. Alexander's Report, with a total of 170 out of 200 paragraphs reflecting a probability of at least 80 percent. *See id*. ("highly confident this text is AI generated"). Notwithstanding that the same software found that certain paragraphs in her Report (largely describing her own background) had a zero percent chance of being AI generated, Ms. Alexander denied having used generative AI and blamed the AI checkers as inaccurate. *See id*. at 1-3, 15, 326; Dep. at 46:2-47:1, 51:21-52:7, 148:4-164:7.[18] Ms. Alexander offered a similar denial when confronted with multiple citations in the Report that appeared hallucinated—which the Report defined as "***plausible but factually incorrect information***" (**¶174**)—even though the citations met that definition. *Compare* Graham Citation, *with* Graham Article; Dep. at 142:17-146:18.[19] Ms. Alexander's inability to substantively engage with the literature on which she relies, coupled with indicia of generative AI usage, undermines

---

[18] Contrary to Ms. Alexander's testimony that the "colleges that I work for within the universities do not use AI checkers for any of the classes" (Dep. at 56:7-12), Columbia University's Office of the Provost contemplates the use of AI detection software as a data point. Office of the Provost, *Generative AI Policy*, http://provost.columbia.edu/content/office-senior-vice-provost/ai-policy. GPTZero's website identifies a number of educational organizations as clients. *See* GPTZero, *The #1 AI Detector for Students*, http://gptzero.me/students.

[19] *Compare* Rep. at 108 (Bellutta, D., & Carley, K. M. (2023). *Investigating coordinated account creation using burst detection and network analysis*. Journal of Big Data, 10, Article 20) *with id*. ¶20 n.2 & 51 n.7 & 101 n.13 (citing Bellutta, D. & Carley, K. (2023). Temporal Burst Detection in Online Influence Campaigns. *Journal of Big Data*, 10(3), 1-21).

her credibility. *See Kohls v. Ellison*, 2025 WL 66514, at *4 (D. Minn. Jan. 10, 2025) (citation to AI generated sources "shatters" credibility); *Arista*, 2011 WL 1674796, at *5–6.

After being unable to testify about the academia in her Report, Ms. Alexander emphasized that her Opinions, and any part of the Report that does not include a citation, depend only on her own "personal knowledge" and "practitioner work." Dep. at 127:8-160:12. Whatever professional experience Ms. Alexander may possess by virtue of her various marketing positions does not provide sufficient specialized knowledge to opine on the ultimate question in this case, which she understands is whether Defendants perpetuated an online retaliation campaign "designed to appear organic." ¶10. Ms. Alexander admitted that she did not "know all the factors to be able to answer" how someone could make a coordinated campaign "appear organic" and lacked experience to assess forms of "coordinated activities" other than those that rely on the use of "bots" or bot "farms" (which she encountered while at Meta). Dep. at 95:19-99:6, 108:2-109:19, 116:3-117:3. Given her limited experience at Meta, Ms. Alexander conceded that the Organic and Sentiment Opinions required her to put on a different "hat": "Do you want me to put my Meta hat on, or do you want me to speak from the perspective of an expert outside of Meta? Because there's two different answers" to what she would consider a coordinated manipulation campaign. *Id*. at 98:12-99:6.[20] Her admission that her expert "hat" is different from her Meta "hat" is consistent with the fact that all three of the professional experiences that Ms. Alexander claims make her qualified to offer the Organic and Sentiment Opinions relate to the use of bots, as opposed to online manipulation via other, non-bot means. *See* Dep. at 103:4-106:23 ("manipulative bot behavior"); 101:7-106:23 ("signatures" of "bot activity"); 106:24-108:1 (same); *see also* 95:19-98:10, 99:7-102:15, 198:18-199:6.

---

[20] The way Ms. Alexander defined "organic" for purposes of this case is not rooted in academia or her professional experience. Dep. at 88:25-92:22, 190:4-191:11.

The Court "'may properly conclude'" that Ms. Alexander is "insufficiently qualified" to offer the Organic and Sentiment Opinions because her alleged "'expertise is too general or too deficient'" to satisfactorily proffer any of the necessary explanations. *Id.*; *see United States v. Smith*, 2026 WL 122337, at *6 (S.D.N.Y. Jan. 16, 2026) (rejecting "'shorthand summaries'" and lack of specificity of past experiences to find expert lacked "meaningful experience"); *accord United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) ("To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."); *LVL XIII Brands*, 209 F. Supp. 3d at 638 ("experience and education may qualify him as an expert in certain areas of fashion history and intellectual property law" but not "the central, and largely empirical, issue addressed in his report").

## II.    MS. ALEXANDER'S OPINIONS ARE IRRELEVANT AND UNHELPFUL.

Ms. Alexander's testimony requires exclusion because it has no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Ray*, 583 F. Supp. 3d at 532 (citing *Amorgianos*, 303 F.3d at 265); *see also* Fed. R. Evid. 401. Ms. Alexander's admission that her Data Set is not a "representative" sample of online discourse about Blake Lively alone is fatal. Dep. at 175:19-176:6. Whatever her nonrepresentative Data Set may show provides no "'direct link'" to the "ultimate question" of whether (in Ms. Alexander's own words) "defendants executed a coordinated campaign to manipulate public opinion against Ms. Lively beginning in August 2024, including through social media activity that was designed to appear organic." ¶10; *Ray*, 583 F. Supp. 3d at 538 (excluding expert on relevance grounds because of the lack of any "'direct link'" between the opinions and the ultimate issue). Ms. Alexander admits that she does not intend

16

to offer any link between the Organic and Sentiment Opinions and *the Defendants' conduct* (i.e., the ultimate question):

> The August 2024 posting activity represents an exceptional departure from typical patterns. Standard statistical testing confirms this was not a random fluctuation but rather an extraordinary event requiring explanation. The fact that this spike occurred across multiple platforms simultaneously, ***coinciding with the film's release date, suggests a connection between these events.*** However, while the statistics confirm something significant happened in August 2024, ***additional analysis would be needed to definitively establish that the film release caused this increase rather than simply occurring at the same time***.

¶34 (emphasis added); Dep. at 214:3-215:10, 220:10-18, 230:3-235:4, 328:18-329:4 (confirms she "didn't actively look" for other explanations).[21] Ms. Alexander confirmed that she reached the Organic or Sentiment Opinions solely based on being "able to associate" the contents of the nonrepresentative Data Set with "organic" and "legitimate" events (like the Film's release and this lawsuit). *See* Dep. at 233:22-234:1; ¶¶12, 44, 49, 95, 99, 169. She does not cannot offer any opinion on whether any of the negative media coverage is tied to Defendants because ***she did not consider a single document or communication produced in this case that relates to the Defendants***, including conversations reflecting that they seeded anti-Lively content in print and online news sources and manipulated online discourse. Lively MSJ Opp. at 20-35. At best, Ms. Alexander can testify that social media items in her Data Set "simply occur[ed] at the same time" as public events relating to the Film. ¶34. Testimony comparing the timing of the data in her Data Set with the dates of public events is neither relevant nor helpful to the trier of fact. *Malletier*, 525 F. Supp. 2d at 566 ("lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help"); *see Pac. Life Ins. Co. v. Bank of New York Mellon*, 571 F. Supp. 3d 106, 114 (S.D.N.Y. 2021) ("A court should not admit expert testimony that is 'directed solely to lay matters which a

---

[21] The README Files confirm the lack of any nexus to the ultimate question. *See* Ex. 9 at 3 ("can't really say which caused it"), 5 ("Same timing issue as all platforms - movie came out Aug 9th, alleged campaign Aug. 2. Can't say what caused it from timing alone."), 7 ("Can't really tell which caused it from temporal data alone.").

jury is capable of understanding and deciding without the expert's help'"); *Atlantic Specialty Ins. v. AE Outfitters Retail Co.*, 970 F. Supp. 2d 278, 291–92 (S.D.N.Y. 2013) (excluding testimony because "a lay person is entirely capable of reaching this conclusion without the help of an expert") (citation omitted). Permitting Ms. Alexander to testify about irrelevant findings will "mislead rather than assist the finder of fact." *Nora*, 164 F.3d at 746.

## III.    RULE 702(B) REQUIRES EXCLUDING MS. ALEXANDER'S OPINIONS.

Rule 702(B) requires Ms. Alexander show that her opinions rely on "sufficient facts and data," which means that a data "sample [must be] adequate, the data gathering techniques reliable, and the conclusions drawn demonstrated to be statistically significant." *Rowe Ent., Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at *1 (S.D.N.Y. Sept. 15, 2003) (citing *Guardians Ass'n of New York City Police Dep't, Inc. v. Civ. Serv. Comm'n of City of New York*, 633 F.2d 232, 240 (2d Cir. 1980)). Expert opinions based on inaccurate data "are useless—'Garbage in; garbage out'":

> The phrase garbage in—garbage out, or GIGO, is the postulate that no matter how sophisticated and capable an information processor is, the quality of that information it generates cannot be superior to the quality of the information it received. In other words, *an expert working on inaccurate data will only yield misleading results.*

*SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 281 n.21 (D. Conn. 2017) (emphasis in original); *accord United States v. Coriaty*, 300 F.3d 244, 256 (2d Cir. 2002). In her Report, Ms. Alexander confirms that the "foundation of any credible digital reputation analysis rests upon the comprehensiveness, quality, and verifiability of the underlying dataset." ¶20. Despite agreeing in theory that data must be reliable, *her* Data Set is demonstrably unreliable and cannot support any of her Opinions for multiple, independently fatal reasons.

18

### A.     The "Meta-Analysis" Is Based On Mystery Data.

The Organic Opinions and Opinions 8 and 9 require exclusion because their "cornerstone" is the "meta-analysis," and whatever data the "meta-analysis" depends on is not the data in the Data Set. The chart below, excerpted from Exhibit 11, illustrates the discrepancies between the Meta Input and the Data Set during the Baseline Period (in blue), August Spike (in red), and Post-Spike (in green):

| | Instagram (Meta Input) | Instagram (Data Set) | Reddit (Meta Input) | Reddit (Data Set) | TikTok (Meta Input) | TikTok (Data Set) | X (Meta Input) | X (Data Set) | You Tube (Meta Input) | You Tube (Data Set) | TOTAL (Meta Input) | TOTAL (Data Set) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2024-05 | 271 | 2 | 42 | 24 | 29 | 11 | 926 | 345 | 808 | 114 | 2076 | 496 |
| 2024-06 | 236 | 1 | 38 | 12 | 25 | 3 | 812 | 118 | 705 | 14 | 1816 | 148 |
| 2024-07 | 265 | 2 | 42 | 24 | 28 | 20 | 908 | 374 | 791 | 126 | 2034 | 546 |
| 2024-08 | 1175 | 2 | 105 | 105 | 184 | 187 | 3309 | 2663 | 1792 | 1789 | 6565 | 4746 |
| 2024-09 | 181 | 0 | 28 | 25 | 18 | 31 | 621 | 203 | 539 | 445 | 1387 | 704 |
| 2024-10 | 198 | 1 | 32 | 25 | 21 | 41 | 679 | 145 | 591 | 388 | 1521 | 600 |

COMPARISON OF "COUNT" IN META INPUT AND DATA SET

Ex. 11. For example, the Meta Input "count" reflects 1,175 pieces of Instagram data from August 2024, while the Data Set count contains only *two pieces of data from Instagram in August 2024*. *Id*. At best, the disconnect indicates that the "meta-analysis" relies on inaccurate data. At worst, it means that Ms. Alexander's "meta-analysis" does not depend on any data at all, which would be consistent with Ms. Hunter's instruction in the Meta Code to: "***Generate synthetic monthly data matching the meta-analysis findings***." Ex. 10 at 6 (emphasis added).

### B.     The Sentiment Opinion Relies On Mystery Data.

Ms. Alexander failed to disclose any of the underlying materials related to the purported Sentiment Classification, which defeats Rule 702(C) for the reasons discussed below. *Infra* at 25-35. But the minimal amount of information she did disclose about the basis for her Sentiment Opinion in Figure B-3 (¶107) reflects that, like the "meta-analysis," the data underlying the Sentiment Opinion does not match the Data Set. *See* Figure B-3. Figure B-3 indicates that the Sentiment Classifier classified around 100 posts in January 2024, and more than that number each

19

in February, March, and April 2024, for a total number of at least 400 pieces of data from those four months. *Id*. But the actual Data Set reflects only 19, 16, 20, and 14 items from January, February, March, and April 2024 respectively, totaling *only 69 posts in aggregate*. Ex. 3. The discrepancy between Figure B-3 and the Data Set is fatal to the Sentiment Opinion.

## C.     Ms. Alexander Admits Her Data Set Is Representative Of Nothing.

Ms. Alexander's admission that the Data Set is not a representative sample means that any conclusions drawn from the Data Set are limited to *the Data Set itself*. But the Opinions go far beyond observations about the Data Set itself by asserting broad propositions about all of the online discourse about Ms. Lively between January 2024 and October 2025. The Court should exclude the Opinions because they make assertions as if the Data Set were a representative sample even though Ms. Alexander admits that it is not. *See Rowe*, 2003 WL 22124991, at *1; *see Nnebe v. Daus*, 2023 WL 6881992, at *3 (S.D.N.Y. Oct. 18, 2023) (exclusion where expert facts are not "in any way representative"); *Chen-Oster v. Goldman, Sachs & Co.*, 2022 WL 814074, at *8 (S.D.N.Y. Mar. 17, 2022), *on reconsideration in part*, 2022 WL 3586460 (S.D.N.Y. Aug. 22, 2022) ("Exclusion is appropriate when an expert does not show that his data is 'a fair proxy' for the process he claims to be analyzing") (citation omitted); *E.E.O.C.*, 2010 WL 3466370, at *14 (making "no effort to ensure that the materials that he reviewed were representative" "undermines the reliability of his analysis").

Leaving aside Ms. Alexander's admission that the Data Set is representative of nothing, her inability to articulate sound "data gathering techniques" proves her Opinions are unreliable. *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3*, *AFL-CIO*, 313 F. Supp. 2d 213, 233 (S.D.N.Y. 2004) ("reliability of any analysis depends upon an unbiased selection of sample data"). Ms. Alexander struggled during her deposition to explain exactly how Ms. Hunter had collected the data; while insisting that Ms. Hunter "would have" instructed the Apify actors to

20

scrape data that hit on certain search terms, Ms. Alexander admitted that she did not "know what constraints" the "social media sites" placed on what Apify could obtain or how the actors operated. *See* Dep. at 241:19-23, 243:7-8, 242:22-243:1; Rep. at 109. The Data Set itself reflects that Ms. Hunter instructed the Apify actors in different ways based on what parameters the Apify actors permitted, such as directing them to scrape specific URLs, subreddits, and hashtags in the case of Instagram, Reddit, and TikTok, respectively. *See supra* at 5-6; *compare* Exs. 4-6, *with* Ex. 15 (Scraper FAQs), *and* Rep. at 109 (TikTok scraper titled "Hashtag Crawler"). In other words, Ms. Hunter could have (and the Data Set itself reflects that she may have) ***manipulated the output by selectively choosing specific URLs, subreddits, and hashtags***. *See Freeman v. Deebs-Elkenaney*, 2024 WL 3634738, at *5 (S.D.N.Y. Aug. 1, 2024) (excluding report as unreliable where selection of data "embeds bias"); *Napolitano v. Synthes, Inc.*, 2014 WL 12868859, at *1 (D. Conn. May 2, 2014) ("selection bias, in the form of using an unrepresentative data set" is "proper basis for excluding testimony"). Even if and when Ms. Hunter used search terms, the output is unreliable because Ms. Alexander could not "provide a sufficient explanation as to how she decided on the terms" other than picking ones "that were general enough" and that "had a good amount of volume across Apify." Dep. at 206:15-23; *Chen-Oster*, 2022 WL 814074, at *6 (exclusion for failure to sufficiently explain search term selection). One specific YouTube video is illustrative of the unreliability of the Data Set and Ms. Alexander's inability to defend it. She was "not sure of the specific reason" why Ms. Hunter collected only exactly 200 comments out of a total of 8,652 comments on a YouTube video of the Film's trailer but only could "assume" it was "because there is a maximum amount of comments that are available via the API." Dep. at 330:11-333:24; *compare* Ex. 8 at column F (Video ID: Dlet_U31), *with* Ex. 19. Ms. Alexander testified that it would not be "important" for her to understand why her Data Set contained only exactly 200

21

comments out of 8,652 "if the 200 is a randomized sample" but she could not confirm that was the case. Dep. at 332:11-333:24. The lack of a sound data gathering technique forecloses finding that the Data Set provides a reliable basis from which to extrapolate any opinions.

**D.        The Small Size Of The Data Set Diminishes The Reliability Of The Opinions.**

Ms. Alexander cannot meet her burden to demonstrate a sufficiently sized data set either. To defend the size of her data set, Ms. Alexander proclaims her Data Set to be "one of the most comprehensive cross-platform analyses of celebrity-related social media discourse conducted in the context of litigation." ¶30. But merely asserting this does not make it so, and her data set is a minimal fraction of the size of Dr. Mayzlin's set. *Price v. L'Oreal USA, Inc.*, 2020 WL 4937464, at *8 (S.D.N.Y. Aug. 24, 2020) (relying on a "low number" of data points and a "small sample set" "diminishes the reliability and probative value of" an expert's testimony); *see Nnebe*, 2023 WL 6881992, at *3 (exclusion where expert based opinion on a sample set of thirteen proceedings, which was a "tiny fraction of the hundreds" of proceedings); *Chen-Oster*, 2022 WL 814074, at *8 (same). Ms. Alexander has made no attempt to explain why her Data Set is 96 times smaller than Dr. Mayzlin's data, and confirmed it did not "strike" Ms. Alexander to question why her Data Set contained less than 1,000 pieces of data from Reddit as compared to 250,000 in Dr. Mayzlin's set from Reddit in half the amount of time. Dep. at 174:10-175:12, 290:5-18, 292:22-293:1, 331:4-333:16.[22] Nor does the Report defend 43,992 items as a sufficient volume of data, and Ms. Alexander could not explain during her deposition what volume of data would be sufficient. Dep. at 202:23-203:18.[23] She testified only that "there should be an even sample across all networks in

---

[22] Ms. Alexander's claim that size "is not a signifier of accuracy" (*id*. at 175:14-18) does not help her because her Data Set is not accurate (*supra* at 19-20; *infra* at 23-25) or representative of anything (*supra* at 20-22).

[23] Even the scant academia cited in the Report reflects the insufficiency of such a small data set. *See* Rep. n.2 (claiming "practices consistent with both academic research standards" based on a *Journal of Big Data* article which referenced a collection of more than 541 million tweets authored by 21 million users); *id*. n.3 & 11 (Graham Article referring to study involving 9 million tweets).

order to make an opinion" (*id*. at 202:23-203:3), which her Data Set fails to meet with data volumes ranging from 688 (in the case of TikTok) to 20,039 (in the case of X). *Supra* at 5-6.

Whatever Ms. Alexander may say to defend making Opinions based on 43,992 items, she must justify why the majority of her Opinions rely only on a subset of that already insufficient number.[24] She implicitly conceded that fewer than 20,000 pieces of data would not be "enough volume" to derive an opinion ***and yet most if not all of her Opinions make conclusions from fewer***. For example, Opinion 2 (about the August Spike) depends on only 4,746 pieces of data from August. Ex. 3. And all of the Opinions (except for maybe Opinion 11) depend on making some sort of comparison to the Baseline Period, which is comprised of only 1,190 items. Ex. 3; *Price*, 2020 WL 4937464, at *8.[25] Ms. Alexander cannot support ***any*** of her Opinions with her limited Data Set, as her own testimony confirms.

### E.    The Data Set Contains Inexplicable Errors.

Notwithstanding admitting that "each post" in her Data Set "should be a unique post" (Dep. at 323:8-17), Ms. Alexander ***learned for the first time***, and conceded during her deposition, that the Data Set contains multiple duplicates: more than 3,300 in the 16,337 items from YouTube, nearly 90 in the 6,049 Instagram items, and more than 70 in the 688 TikTok items. Exs. 4, 6, 8. Ms. Alexander claimed it was "not necessarily important" for her to understand why there were so many duplicates because she "assume[d]" there was a good reason. Dep. at 324:4-336:15.[26] She also did not know and could not quantify or explain why the Data Set contained

---

[24] Ms. Alexander acknowledged that "ideally" she would have had more data from TikTok and Reddit, respectively, but "did not just based on availability, I guess, through Apify." Dep. at 203:4-13.

[25] Ms. Alexander relies on the Baseline Period to determine the magnitude of the August Spike (e.g. ¶¶22, 32-34, 44-62, 108), "subsequent normalization" and "return to near-baseline levels" post-Spike (e.g. ¶¶22, 38), longer-term "decay pattern" (e.g. ¶¶39, 91, 109, 146), "normal" sentiment (e.g. ¶¶67, 111, 116-132), time-forecasting modeling (e.g. ¶79), and "commercial impact" on Ms. Lively's business (¶55).

[26] The YouTube raw data, which reflected the highest number of duplicative posts, helps explain what Ms. Alexander could not: the "search terms" column (Column I) reflects that identical posts hit on multiple of the search terms (e.g. "It Ends With Us" and "It Ends With Us Drama"). *See, e.g.*, *id*. at rows 2-43.

facially irrelevant content that she admitted should never have been included in the first place,

including the following pieces of content attached hereto in Exhibit 17:

- "Paying their effing salaries and pensions. WTF is wrong with us? That's $5 billion we sent to Ukraine this week. Eff @ZelenskyyUA. It will be great when this grift ends."[27]
- "DrainBamager, MJF is better than us and we all know it. Pretty sad Adam Cole with his henchman and the devil garbage. Can't wait till MJF kicks his chulo and ends this story."[28]
- "Sabrina Carpenter reflects on the end of her run opening The Eras Tour."[29]
- "Frances Bean Cobain Pays Tribute to her Father, Kurt Cobain, 30 years After His Death."[30]
- "Okay. And THIS SHOW of course! What's your comfort read, song, show?"[31]
- "Choose what makes your heart bloom."[32]
- "FINALE #fyp #enhypen #voiceover #enhypen_belift #enhypenisland"[33]
- "Massage is a path to a healthier lifeâ ¤â€ BOOK A MASSAGE APPOINTMENT AND LETS BE HAPPY TOGETHER AT THE END #massage #nuru #trending #happyending #fullservicemassage #viral #wellness #legit #fyp"[34]

(emphases added); Dep. at 314:11-315:4, 337:19-22. Ms. Alexander's "willingness to rely on insufficient facts and data" raises "concern with respect" to all of her Opinions. *King*, 2021 WL 5237195, at *14; *Ray*, 583 F. Supp. 3d at 544 (basing opinions on data provided without testing "amounts to nothing more than ipse dixit").

---

[27] *Compare* Ex. 17 at 1, *with* Ex. 7 (X) at row 3,916; Dep. at 269:23-271:12 ("wouldn't expect it" to be included).

[28] *Compare* Ex. 17 at 2, *with* Ex. 7 (X) at row 15,519; Dep. at 272:17-273:24 ("should be either negated or marked as 'neutral'").

[29] *Compare* Ex. 17 at 4, *with* Ex. 5 (Reddit) at row 200; Dep. at 276:5-277:16 ("Would you expect to see this post in your dataset?" "No.").

[30] *Compare* Ex. 17 at 5, *with* Ex. 5 (Reddit) at row 229; Dep. at 278:19-25 ("Would you expect this post on reddit to be part of your dataset?" "I wouldn't. No."); *see also id.* 313:24-314:17.

[31] *Compare* Ex. 17 at 6, *with* Ex. 4 (Instagram) at row 507; Dep. at 279:8-280:20 ("I'm not sure").

[32] *Compare* Ex. 17 at 7, *with* Ex. 4 (Instagram) at row 2,126; Dep. at 280:21-281:18 ("no").

[33] *Compare* Ex. 17 at 8, *with* Ex. 6 (TikTok) at row 659; Dep. at 281:19-282:10 ("I would say no").

[34] *Compare* Ex. 17 at 9, *with* Ex. 6 (TikTok) at row 684; Dep. at 282:11-283:4 ("I would say no").

**F.      Ms. Alexander's Lack Of Familiarity With The Collection, Contents, And Outputs Of The Data Set Renders Her Opinions Unreliable.**

Ms. Alexander's lack of involvement and familiarity with the collection, contents, and output of the Data Set "renders its reliability highly suspect." *Pac. Life Ins. Co. v. Bank of New York Mellon*, 571 F. Supp. 3d 106, 115 (S.D.N.Y. 2021). Ms. Alexander confirmed that she outsourced all of the work related to her Data Set to Ms. Hunter with minimal oversight. *Supra* at 4-6. Ms. Alexander's difficulty defending any step of the Data Set collection, especially when coupled with her inability to substantively engage with any of the academia and her apparent improper reliance on AI (discussed above), provides reason to doubt the reliability of all of her Opinions. Where, as here, "an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Nimely*, 414 F.3d at 396–97 (cleaned up); *see Pac. Life Ins. Co. v. Bank of New York Mellon*, 571 F. Supp. 3d 106, 115 (S.D.N.Y. 2021) (noting a "considerable lack of familiarity with his report").

**IV.     RULE 702(C) REQUIRES EXCLUDING MS. ALEXANDER'S OPINIONS.**

Even if Ms. Alexander's data was sound, Ms. Alexander "does not employ a sound methodology—or even a clearly identifiable one" to reach any of her Opinions. *Oakley* v. *MSG Networks, Inc.*, 2026 WL 523770, at *3 (S.D.N.Y. Feb. 25, 2026); *see Amorgianos*, 303 F.3d at 266. "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *King*, 2021 WL 5237195, at *20 (citations omitted). Neither *Daubert* nor the Rules require "a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" and, in such instances, a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *30 (S.D.N.Y. Feb.

11, 2022) (Liman, J.) (expert opinion testimony "that does no more than assert" a conclusion based on an "expert's 'personal opinion'" does not meet Rule 702(C)). Since Ms. Alexander "is relying solely or primarily on experience," she "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Alto v. Sun Pharm. Indus., Inc.*, 2021 WL 4803582, at *2 (S.D.N.Y. Oct. 13, 2021); *LVL XIII Brands*, 209 F. Supp. 3d at 636; *King*, 2021 WL 5237195, at *10.

### A.    Ms. Alexander's "Meta-Analysis" Is Not A Methodology.

The Encyclopedia of Research Design defines the recognized methodology of Meta-Analysis as "a statistical method that integrates the results of several independent studies considered to be 'combinable.'" *See* Ex. 18 at 1. The Report relies on an article titled *Statistical methods for meta-analysis*, which adopts a similar definition, explaining that a Meta-Analysis is a way of "integrating independent studies":

> "Meta-analysis is the rubric used to describe quantitative methods for combining evidence ***across studies***. Because meta-analysis usually relies on data in the form of summary statistics derived from the primary analyses of studies, ***it is truly an analysis of the results of statistical analyses***."

Hedges, L. V., & Olkin, I. (1985). *Statistical methods for meta-analysis*. Academic Press (cited in Rep. at 108) (emphases added). A Meta Analysis relies on statistical methods to figure out "a solution to the problem of how to combine the results of studies using different scales of measurement"; for example, "different research studies may repeat the same experiment and measure the same construct but use instruments that yield numbers on completely different scales." *Id*. at 6. Ms. Alexander concedes, as she must, that she did not integrate "the results of several independent studies" and instead simply combined data from the Five Platforms. Dep. at 217:16-223:18. She called the recognized definition of a Meta-Analysis "outdated" and testified that she instead applied ***her own*** definition of "meta-analysis"—a "high-level analysis of aggregated

data"—because "in the research world, we use it in the way that I just defined it." *Id*. The Court need not and should not blindly accept Ms. Alexander's *ipse dixit* that she employed a Meta-Analysis as that term is used in the statistical field. *E.E.O.C.*, 2010 WL 3466370, at \*12 ("unorthodox method of interpreting his interaction model is unsupported by any professional literature or other source that would suggest his methodology is recognized by other statisticians"). Even if a Meta-Analysis is a legitimate methodology, *Daubert* requires "the reliability of the *specific* methodology used by the expert, not the reliability of an entire field of study" (which here means looking at what Ms. Alexander did, not what she labeled it). *Freeman*, 2024 WL 3634738, at \*4 (emphasis in original).

The Report does not provide any basis to credit Ms. Alexander's personal opinion that combining data from different sources constitutes a Meta-Analysis because it does not describe any "statistical method" that she employed or would be qualified to employ. *Oakley*, 2026 WL 523770, at \*3; *Oleg Cassini, Inc. v. Electrolux Home Prods., Inc.*, 2014 WL 1468118, at \*8 (S.D.N.Y. Apr. 15, 2014) (expert must explain how and why). To the extent there was any statistical method employed, Ms. Alexander was not the one responsible since she delegated the role of scraping and aggregating data to Ms. Hunter and therefore cannot testify to it. *Supra* at 4-6. *Pac. Life Ins. Co.*, 571 F. Supp. 3d at 116–18 (rejecting attempt to "merely adopt" another's opinions as "her own reflexively and without understanding the materials or methods underlying"); *E.E.O.C.*, 2010 WL 3466370, at \*15 ("Merely touting his expertise rather than relying on 'analytic strategies widely used by specialists' in the field does not make" an expert under Rule 702).

### B. The Signature Comparison Is Not A Methodology.

Ms. Alexander's Signature Comparison "analysis" amounts to a "'because I said so' explanation" that the Court need not and should not accept. *Ray*, 583 F. Supp. 3d at 542 (citation omitted). As discussed above, Ms. Alexander conceded that the Signature Comparison—including

the bulleted list of "diagnostic signatures" that provide the framework for that "analysis" (¶97)—relies entirely on her own experience as "a practitioner." Dep. at 147:11-13 (Q. "when you applied those concepts, were you relying on Graham? A. As a practitioner, no."); *accord* 155:7-158:25 ("bulleted list is based on my lived experience"; "based on my expert experience"; "based on my experience as a practitioner, period"; "work that I did at Meta as well as at Ipsos"). But the experience at Meta and Ipsos that Ms. Alexander identified had nothing to do with online campaigns designed to appear "organic," and she therefore cannot justify relying on her *ipse dixit* alone. ¶10; *supra* at 26-27; *Alto*, 2021 WL 4803582, at \*2; *LVL XIII Brands*, 209 F. Supp. 3d at 636; *King*, 2021 WL 5237195, at \*10.

If Ms. Alexander now attempts to bridge the gap between her experience and the Organic and Sentiment Opinions by relying on the three articles cited in the Report to support the "diagnostic signatures" she applied (¶¶86, 88, 93, 96–97), they do not help her. Like her own experience, the Howard and Ferrara Articles relate only to the "signatures" of automated (bot) campaigns and provide no basis to extend those "signatures" to other forms of manipulation. *See* Ex. 12 at 1, 4 (Howard Article discusses use of "political bots" to "manipulate public opinion"); Ex. 13 at 1 (Ferrara Article discusses "social bots" which it defines as "a computer algorithm that automatically produces content and interacts with humans on social media"). And, as with her perversion of meta-analyses, Ms. Alexander invokes the "toolkit" identified in the Graham Article as an "open-source software package and methodological framework" without employing the methods that would give it analytical heft. Ex. 14 at 18. Nor does Ms. Alexander provide any support for the ways she interpreted and applied the "diagnostic signatures." For example, Ms. Alexander concluded that all communications occurring within a 48-to-72 hour time period reflect "tight temporal synchronization" that would indicate "organic" activity (*see, e.g.*, ¶87 (citing

28

Graham Article)) but could not cite any literature defining a 3-day period as "tight" synchrony and confirmed it would be up to any individual expert to decide how to define "tight temporal synchronization." Dep. at 226:2-229:11.

The reliability of the Signature Comparison is also called into question by the Report's parroting of the language in the README files that Ms. Hunter (not Ms. Alexander) wrote applying the "diagnostic signatures." For example, Ms. Hunter concluded in the Meta README File that: "Cross-platform synchronization is the smoking gun for organic event. If 5 different platforms all spike at exactly the same time with proportional increases, that's not coordinated manipulation – that's a real-world event everyone's reacting to (movie release)." Ex. 10 at 5. Both the Meta README and other README files included similar conclusions, including that there was: "synchronized" timing; a pattern "inconsistent with coordinated manipulation"; an "immediate decline" that "contradict[s] sustained manipulation" and is "consistent with natural news cycle"; "textbook human behavior"; correlation of spike "with newsworthy events, supporting organic explanation"; "activity patterns" that "look very organic"; a "statistically significant" spike; and a "crash in Sept. suggests movie hype more than sustained campaign." Exs. 9 at 5, 7, 9, 11 & 13 and 10 at 4-5. The Report reaches the exact same conclusions as Ms. Hunter, and in some instances adopted ***verbatim language***, including in the Opinions themselves. *See, e.g.*, ¶169 ((Opinion 1: "patterns consistent with organic public discourse"); (Opinion 2: "spike in social media volume coincided" with "publicity cycles" that "reflect[] organic news-driven interest"); (Opinion 5: "synchronous timing across all five platforms")).[35] It appears that Ms. Alexander

---

[35] *See also, e.g.*, Rep. at 2 (header: "Temporal Activity Patterns Demonstrated Organic Event-Driven Spikes"); ¶¶31 ("all platforms ***spike simultaneously*** at the triggering event, maintain proportional distribution, and decline in ***synchronized*** fashion"), 34 ("spike" occurred "***simultaneously***"), 36 ("***Cross-Platform Synchronization***: All five platforms exhibited virtually ***simultaneous*** activity surges"; "all platforms ***simultaneously***"), 40 & 110 (using phrase "textbook" to describe human behavior); 46 ("statistically significant"); 47 ("pattern validates a consistent relationship

largely adopted Ms. Hunter's analysis of the Data Set without applying any further critical thought or method. While the law permits Ms. Alexander to use an assistant, courts "will preclude proffered witnesses who simply aggregate or recite the opinions of others" because an expert must be giving her "'*own* opinion'" and not "'simply be a conduit for the opinion of an unproduced expert.'" *Pac. Life*, 571 F. Supp. 3d at 115 (emphasis in original).

### C.    Ms. Alexander Cannot Bridge The Gap To Her Sentiment Opinion.

Even if she can explain why the data underlying her Sentiment Opinion does not match her Data Set (*supra* at 19-20), Ms. Alexander still cannot bridge the gap between the Data Set and her Sentiment Opinion because she has disclosed only the ***output*** and not the inputs, for example: the specific BERT model she used;[36] the instructions or parameters Ms. Hunter provided BERT; the sentiment classification at the post level, i.e. how BERT classified each individual post rather than the aggregate outcome; which of the 200 posts she claims to have validated by hand or the results of that validation; or the underlying code. Dep. at 255:2-268:2. Without any of that information, it is "impossible for a court or adversary to test—or a jury to assess" the reliability of Ms. Alexander's Sentiment Classification. *LVL XIII*, 209 F. Supp. 3d at 645. There is no way, for example, to understand how Ms. Alexander classified each of the individual posts in the Data Set or to confirm that it classified as "neutral" all of irrelevant posts identified above. *See supra* at 24. Ms. Alexander's only justification for failing to disclose any information necessary to understand

---

between volume and newsworthy triggers"); 49 ("statistical significance"); 91 ("All five platforms exhibited virtually *simultaneous* activity surges";  "temporal *synchronization* was remarkable"), 109 ("decline" in September "what would be expected from short-term news-driven public interest rather than a sustained manipulation campaign"), 145 ("All five platforms exhibited virtually *simultaneous* activity surges"); 169 ( "Opinion 2: **4.9σ statistical deviation**"; "Opinion 5: ***Cross-platform meta-analysis confirmed synchronous timing*** across all five platforms"); *id*. at B-1 ("**4.9**" and "***cross-platform synchronization***").

[36] "BERT" is a family of transformer-based language models that includes multiple variants each released in multiple versioned, pre-trained checkpoints by different developers. *See* Cornell University, *ALBERT: A Lite BERT for Self-Supervised Learning of Language Representations* (Sept. 26, 2019), arxiv.org/abs/1909.11942; NVIDIA Corporation, *BERT*, https://nvidia.com/en-us/glossary/bert/; PyTorch, *RoBERTa*, pytorch.org/hub/pytorch_fairseq_roberta/. Ms. Alexander testified that she used the "latest version available on Google" but Google makes multiple versions. *See* GitHub, *Google-Research/Bert*, https://github.com/google-research/bert.

how she reached the Sentiment Opinion is that Ms. Lively's expert should be able to recreate it. *See* Dep. at 248:17-268:2. But *Ms. Alexander* shoulders the burden to bridge the chasm. *See Joiner*, 522 U.S. at 146; *Chen-Oster*, 2022 WL 814074, at *6.[37]

The reported output of the Sentiment Classification proves its unreliability. For example, as discussed above, while Figure B-3 reports classifying nearly 60 out of 100 social media items from January 2024 as positive, the Data Set contains only 19 items total from that month: 16 Reddit posts and 3 TikTok comments. *Compare* Figure B-3, *with* Exs. 5 (at rows 162-176), *and* 6 (at rows 1-3). The TikTok items consist of two duplicate posts in a foreign language and one that states, "Blake Lively, and Justin Baldoni filming scene, for It Ends With Us." Ex. 6. Only 4 of 16 Reddit posts mention Ms. Lively. Ex. 5.[38] Leaving aside that all of the 19 posts are irrelevant to the allegations of the Complaint and that it is impossible to know how the Sentiment Classifier classified any of them (including the duplicates and foreign language posts), *all* of them are neutral at best. Yet, Figure B-3 assigns "positive sentiment" to nearly *nine times* that number of posts.

Ms. Alexander does not explain, including in the six pages of the Report without a single citation, why she used a BERT model for the Sentiment Classification and a dictionary-based model for the Time Series Forecast. ¶¶62-80. It appears that the Time Series Forecast used yet *another* set of data, since the chart on Page 102 reflects no data from January, February, or March 2024 and reflects more data in April than May (even though the Data Set contained 148 and 496 social media items in those months, respectively). *Compare* Rep. at 102, *with supra* at 19-20. Ms. Alexander did not produce any analytical outputs or code that would enable the verification of the

---

[37] Even if Ms. Lively's experts entered the Data Set into the BERT model as Ms. Alexander proposed, it would show nothing about what *Ms. Alexander* did, since she apparently used data other than the Data Set.

[38] *See* row 164, 170, 173-174.

data underlying the Time Series Forecast or to compare the outcome of the BERT-based and Dictionary-based methodologies.

### D.    Ms. Alexander Did Not Apply Any Methodology When Choosing Date Ranges.

Ms. Alexander's admission that Ms. Hunter collected data spanning January 2024 to October 2025 based on the volume of data that was "available"—rather than based on any methodological reason—confirms she did not apply any method (let alone a reliable one) to determine the relevant dates for the Opinions. Dep. at 41:14-21, 200:18-23, 202:17-22; *State of New York v. United Parcel Serv., Inc.*, 2016 WL 4735368, at *8 (S.D.N.Y. Sept. 10, 2016) ("failure to clarify a time period relevant to this case is a major flaw"). Leaving aside that the amount of data in the Data Set is overinflated due to errors (*supra* at 23-25) and unreliably small (*supra* at 22-23), the lack of any methodological reason for selecting the date range is confirmed by the fact that few if any of the Opinions actually rely on the full Data Set. While the Report is opaque as to the specific time ranges that support each of her Opinions, Ms. Alexander admits that she decided what opinions to make based on data that she "***felt*** was the most -- the most substantive and without making any assumptions on smaller datasets." Dep. at 203:10-13 (emphasis added).[39] Opinion 1 illustrates Ms. Alexander's arbitrary selection of date ranges. Ms. Alexander admitted in her deposition that she limited that opinion to the six-month period between August 2024 and February 2025 because she "didn't have enough volume of data in order to offer that opinion through the larger frame of time that I was hoping to look at." Dep. at 200:11-23. But the raw data includes 22,992 items between August 2024 and February 2025, as compared to 19,741 between March

---

[39] *See, e.g.*, ¶34 at Figure B-1 ("Meta-Analysis" January 2024 to October 2025), ¶47 at Figure B-2 ("Temporal Analysis" May 2024 to December 2024), ¶70 (purported regression model January 2024 to October 2025); ¶107 at Figure B-3 ("Sentiment Trends" January to December 2024); ¶155 ("Social media sentiment" "August-December 2024"); ¶169 (Opinion 1 August 2024 to February 2025); *id.* (Opinion 2 August 2024).

2025 and October 2025. *Supra* at 19-23.[40] If true that Ms. Alexander "was hoping" to look at "the larger frame of time," she must have had another reason for failing to do so because she had nearly the same amount of data for both time frames. Nonsensical explanations like these cast serious doubt on the reliability of her methodologies. Ms. Alexander's cherry-picking of different time ranges based on her own feelings and for no reason other than a supposed inability to collect a large enough sample size requires her exclusion. *See Daniels-Feasel v. Forest Pharms., Inc.*, 2021 WL 4037820, at \*5 (S.D.N.Y. Sept. 3, 2021), *aff'd sub nom. Daniels-Feasel v. Forest Pharms., Inc.*, 2023 WL 4837521 (2d Cir. July 28, 2023) ("Cherry-picking is a form of 'result-driven analysis,' which 'undermines principles of the scientific method' by 'applying methodologies (valid or otherwise) in an unreliable fashion.'" (citation modified and citation omitted)); *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 400 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016) ("a regression analysis must examine an appropriate selection of data" and an expert may "not 'cherry-pick' the time-frame or data points so as to make her ultimate conclusion stronger").

        **E.**       **Ms. Alexander's Harm Opinions Do Not Rely On Any Methodology.**

While the Report states that a "Commercial Impact Analysis Revealed No Measurable Harm" to support the Harm Opinions, Ms. Alexander's failure to describe any "analysis" supporting those opinions requires their exclusion. ¶¶155-158; *Oakley*, 2026 WL 523770, at \*3. The Report claims Opinion 8 is based on "online discourse" that Ms. Alexander does not identify, and she otherwise fails to bridge the divide between that undisclosed data and the opinion. (¶¶155, 169). Nor does Ms. Alexander describe any methodology (or her requisite experience) as to how

---

[40] The numbers in the meta-analysis reflect the same issues with 16,304 items for the time period between August 2024 and February 2025 and 14,632 for March 2025 through October 2025. Ex. 10.

she reached Opinion 11 on business outcomes generally or on the hair and alcohol industries specifically. *Supra* at 11-12.[41]

***

At bottom, Ms. Alexander asks the Court to accept an undisclosed black box, a set of aggregate outputs (that do not match her own Data Set), and her own *ipse dixit*, without the information necessary to validate or reproduce her results. The law requires far more. *Joiner*, 522 U.S. at 146; *Ray*, 583 F. Supp. 3d at 544.

## V.  RULE 702(D) REQUIRES EXCLUDING MS. ALEXANDER'S OPINIONS.

The Court need not consider Rule 702(D) because, for the reasons discussed above, Ms. Alexander did not apply *any* methodology other than her own say-so. But if, *arguendo*, she employed any methodology, her testimony would fail Rule 702(D) because the facts of the case were irrelevant to her "analysis." As discussed above, Ms. Alexander did not consider ***a single document*** about whether or how Defendants manipulated online conversation. Where an expert "'inexplicably' fails to analyze facts that his or her methodology would ordinarily 'take…into consideration,' that expert's opinion 'rests on a faulty assumption' and is 'not based on good grounds.'" *Oakley*, 2026 WL 523770, at *3 (cleaned up) (internal citation omitted); *Cf. 3DT Holdings LLC v. Bard Access Sys. Inc.*, 2022 WL 2951593, at *21 (S.D.N.Y. June 24, 2022), *aff'd*, 2023 WL 4072832 (2d Cir. June 20, 2023) (Liman, J.) (expert "was not aware of key documents or information that tended to contradict his conclusions demonstrates that his opinion did not rest on sufficient data").

The shaky factual grounds on which Ms. Alexander's "analysis" depends is laid bare by her testimony that seemingly no change in facts would alter her Opinions. Ms. Alexander testified

---

[41] The Report references the Kinrich Report, but rebutting this report was not part of her assignment, and she does not have the credentials to do so. ¶¶159, 160.

34

that her Opinions rely on data from the Five Platforms because they are the "five major social media platforms" in the United States, and **without consideration for whether Defendants are alleged to have used any or all of these Five Platforms**. Dep. at 216:2-7. **She even admits that her "analysis wouldn't change" if it turned out that Defendants only used one of the five**. Dep. at 216:12-217:6. Taken to its logical conclusion, that would mean she still would consider the full Data Set to look for signatures of manipulation *even if*, for example, Defendants manipulated communication *only* on TikTok <mark>(totaling 700 items in the Data Set).</mark> And her analysis "would not change" even if Defendants' manipulation did not occur until the middle or even the end of the month. Dep. at 296:4-300:1. In that world, she would continue to include all of the data from August in her Baseline Period—<mark>despite defining it as the period "*preceding* the alleged campaign"</mark> (¶44 (emphasis added))—because she preferred to "end the baseline at a month -- a month outside" of the alleged manipulation. *See* Dep. at 296:4-300:1. In her deposition, Ms. Alexander was unable to understand, let alone to justify, why her analysis would possibly change if she was using pre-manipulation data to draw conclusions about what happened post-manipulation:

> Q. "What if it turned out that the digital part of the campaign started after August 2nd?
>
> **A. THE WITNESS: That would not change my analysis.**
>
> Q. It wouldn't, say, if the campaign started on August 9th as opposed to August 2nd, wouldn't removing the data between August 2nd and August 9th have an impact on your outcome?
>
> **A. I hate to answer a question with a question but I guess my question would be why would we remove the data between August 2nd and August 9th?"**

*Id*. By turning a blind eye to Defendants' *actual conduct*, Ms. Alexander's Opinions exist only in a vacuum divorced from and unreconcilable with the facts of the case, which fails to meet Rule 702(D). *See Oakley*, 2026 WL 523770, at *3.

## CONCLUSION

For the reasons detailed herein, the Court should exclude Ms. Alexander's testimony.

35

Dated: April 10, 2026

Respectfully submitted,

/s/ Michael J. Gottlieb

MANATT, PHELPS & PHILLIPS, LLP
Esra A. Hudson (admitted *pro hac vice*)
Stephanie A. Roeser (admitted *pro hac vice*)
Sarah E. Moses (admitted *pro hac vice*)
Sareen K. Armani
Katelyn A. Climaco
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
(310) 312-4000
ehudson@manatt.com
sroeser@manatt.com

Matthew F. Bruno
7 Times Sq.
New York, NY 10036
(212) 790-4500
mbruno@manatt.com

WILLKIE FARR & GALLAGHER LLP
Michael J. Gottlieb
Kristin E. Bender
1875 K Street NW
Washington, DC 20006
(202) 303-1000
mgottlieb@willkie.com
kbender@willkie.com

Aaron E. Nathan
Michaela A. Connolly
787 7th Avenue
New York, NY 10019
(212) 728-8000
anathan@willkie.com
mconnolly@willkie.com

DUNN ISAACSON RHEE LLP
Meryl C. Governski (admitted *pro hac vice*)
401 Ninth Street, NW
Washington, DC 20004
(202) 240-2900
mgovernski@dirllp.com

*Attorneys for Blake Lively*

36