# EXHIBIT 1

Confidential - Attorneys' Eyes Only

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

# Expert Report of Nicole M. Alexander

Prepared for: Liner Freedman Taitelman + Cooley LLP
Case No. 1:24-cv-10049-LJL
Monday, November 3, 2025

**Exhibit
002**
12/15/2025

Confidential - Attorneys' Eyes Only

# Table of Content

Table of Content..................................................................................................................2

I. Introduction....................................................................................................................4

  Qualifications.................................................................................................................4

  **Factual Overview**........................................................................................................7

II. Methodology................................................................................................................11

  **A. Data Collection and Scope**...............................................................................12

  **B. Meta-Analysis: Five-Platform Temporal Integration**.....................................16

  **C. Statistical Temporal Analysis and Spike Detection**.......................................21

  **D. Sentiment Classification and Content Analysis**.............................................25

    Time Series Forecasting Analysis.........................................................................29

      Forecasting Model...........................................................................................31

    Convergence Analysis............................................................................................32

  **E. Engagement Network Diagnostics**...................................................................35

  **F. Cross-Platform Consistency Verification**.........................................................38

  **G. Comparative Benchmarking Against Known Manipulation Campaigns**..................41

  **H. Methodological Rigor and Daubert Compliance**.............................................44

III. Analysis and Findings...............................................................................................48

  **A. Temporal Activity Patterns Demonstrated Organic Event-Driven Spikes**.................48

  **B. Sentiment Distribution Remained Balanced and Within Normal Ranges**.................50

    Time Series Forecasting Confirms Temporary, Non-Lasting Impact................................52

      Key Findings..................................................................................................52

        Baseline Sentiment (May-July 2024): Net sentiment score of 0.066...................52

        August 2024 Spike Period: Net sentiment score of -0.021................................52

        Change from Baseline: -0.087.....................................................................53

    Three-Year Forecast Results.................................................................................53

    Pattern Recognition and Comparative Analysis.....................................................56

    Implications for Manipulation Claims......................................................................57

    Integration with Other Analytical Methods..............................................................58

    Visualization and Supporting Evidence..................................................................59

  **C. Network Structures Reflected Decentralized Organic Participation**.................60

  **D. Cross-Platform Synchronization Confirmed Organic News-Driven Pattern**.............62

  **E. Content Analysis Revealed Natural Diversity Inconsistent with Coordination**.........64

  **F. Commercial Impact Analysis Revealed No Measurable Harm**.........................66

  **G. Marketing Response and Deduplication Analysis**..........................................68

    1. Brand Reach and Distribution Context..............................................................68

    2. Relative Effectiveness of Earned and Paid Media.............................................69

    3. Unique Reach Versus Gross Impressions.........................................................70

    4. Implications for Professor Humphreys's Proposed Remediation.........................71

IV. Opinions....................................................................................................................73

Expert Report of Nicole Alexander                    2

Confidential - Attorneys' Eyes Only

**V. Methodological Shortfall in Dr. Mayzlin's Use of Large Language Models**......................**76**

**A. Insufficient Disclosure and Lack of Transparency**......................................................**76**

**B. Inadequate Validation and Testing**.........................................................................**78**

    1. Single Model Reliance Without Cross-Model Validation................................................78

    2. Statistically Insufficient Manual Validation Sample......................................................79

    3. Low Agreement Rates Between LLM and Human Classifiers......................................79

    4. Massive Discrepancy in Narrative Identification Rates.................................................81

**C. Methodological Choices**.......................................................................................**82**

    1. Overly Restrictive Verbatim Matching Requirement....................................................82

    2. Inadequate Treatment of Human Validation Reliability................................................83

    3. Addressing the Characterization of the 'Unsupervised' Method.................................84

    4. Context Window Constraints Not Addressed..............................................................85

**D. Implications for Reliability and Validity**..................................................................**85**

**VI. Limitations**.........................................................................................................**88**

**A. Data Availability and Platform Access**....................................................................**88**

**B. Sentiment Analysis Limitations**.............................................................................**88**

**C. Network Analysis Boundaries**...............................................................................**89**

**D. Temporal Attribution and Causality**.......................................................................**89**

**E. Evolving Platform Algorithms**...............................................................................**90**

**VII. Compensation**....................................................................................................**91**

**Appendix A: Curriculum Vitae**....................................................................................**92**

**Appendix B: Data Tables & Charts**.............................................................................**97**

**Appendix C: Materials Considered**...........................................................................**105**

Expert Report of Nicole Alexander                                   3

Confidential - Attorneys' Eyes Only

# I. Introduction

## Qualifications

1.      I, Nicole M. Alexander, a marketing leader, academic, and author specializing in marketing and communications. I currently serve on the faculty of Columbia University's School of Professional Studies, where I teach Masters level courses in AI strategy, ethics, and digital transformation, and as a Professor of Marketing and Technology at New York University.

2.      I hold a Master of Studies in Artificial Intelligence Ethics and Society from the University of Cambridge, a TRIUM Global Executive MBA jointly conferred by the London School of Economics, HEC Paris, and NYU Stern School of Business, and a Bachelor of Science in Leadership and Management from New York University. My research and professional practice sit at the intersection of marketing, data analytics and the ethical application of artificial intelligence.

3.      I have over twenty-five years of experience leading marketing, product innovation, and analytics functions across global organizations. My prior executive roles include Global Head of Marketing at Meta, SVP and Chief Innovation Expert at Ipsos, and Vice President of Innovation for Greater China at Nielsen. In these roles, I directed cross-functional teams spanning product, engineering, and data science to design and scale AI-driven marketing and measurement systems generating over $2B in annual recurring revenue.

Confidential - Attorneys' Eyes Only

4. My scholarship and applied work focus on the ways that AI, data, and digital media ecosystems influence consumer trust and reputation. As the author of *Ethical AI in Marketing: Aligning Growth, Responsibility, and Customer Trust* (Kogan Page, 2025), I developed the P.A.C.T. Framework (Personalization, Accountability, Contextual Sensitivity, and Trust) as a model for evaluating and operationalizing ethical AI adoption in enterprise marketing contexts.

5. I serve on the Boards of The Loveland Foundation and Per Scholas, organizations dedicated to equitable access and representation in technology and education. I also advise corporate and nonprofit entities on AI governance, responsible data use, and ethical innovation, helping organizations translate principles of fairness and transparency into measurable marketing and communications practices.

6. I am an active global speaker on topics including reputational trust in the age of AI, ethical marketing innovation, and responsible digital leadership. My recent engagements include keynotes at the Economic Forum in Karpacz, Poland (2025), GoTech World in Bucharest (2025), Global Marketing Summit in Istanbul (2025), and the Intelligent Automation Conference in Dallas (2025). I have also presented at the R3i Impact Foundation, Black Tech Week, and VentureBeat Transform.

7. My expertise in digital ecosystems, AI-mediated brand perception, and online reputation measurement positions me to analyze the propagation, amplification, and sentiment effects of online narratives and their influence on reputational outcomes for individuals and organizations. Over the course of my career, I have conducted or supervised more than 200 digital reputation analyses for entertainment, technology,

Confidential - Attorneys' Eyes Only

consumer goods, and financial services clients, applying advanced analytics to distinguish organic discourse from manufactured narratives, and to quantify the commercial impact of reputation shifts in digital environments.

8.      My full curriculum vitae is attached as Appendix A. Neither my compensation nor that of my assistant supporting my work is contingent upon the outcome of this matter. Also, I have not testified as an expert at trial or deposition within the past four years.

9.      A complete list of materials reviewed and considered in preparing this report is provided in Appendix B: Materials Considered.

Confidential - Attorneys' Eyes Only

## Factual Overview

10.     This report is prepared in connection with litigation involving Blake Lively and defendants Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, and related entities. The Plaintiff alleges that defendants executed a coordinated campaign to manipulate public opinion against Ms. Lively beginning in August 2024, including through social media activity that was designed to appear organic. The Plaintiff claims that this alleged conduct resulted in reputational harm and commercial damages.

11.     I have reviewed the allegations set forth in the pleadings, the amendments to those pleadings, and the associated discovery record made available in this matter to understand the asserted causal theory between defendants' conduct and online discourse relating to Ms. Lively. I have also reviewed the expert reports submitted by Plaintiff, including those authored by experts contending that defendants initiated and amplified negative narratives about Ms. Lively through covert engagement tactics, and that this activity materially damaged her reputation and business ventures. My analysis directly tests these claims using independent data sources, platform-level inspection, and industry-standard analytics.

12.     To evaluate whether changes in online activity are attributable to alleged manipulation or reflect ordinary entertainment publicity cycles, I examined the publicly observable timing and context of media attention concerning Ms. Lively. A high-level review of news coverage and associated social media activity reveals the following chronology:

Confidential - Attorneys' Eyes Only

- **Late July 2024:** Advance press and promotional interviews for the film It Ends With Us increased fan attention, most notably driven by content from major entertainment media outlets including Variety, The Hollywood Reporter, Entertainment Weekly, and People Magazine.

- **August 6-9, 2024:** The film's premiere events and theatrical release triggered a predictable surge in public engagement, including fan commentary, influencer reactions, red carpet coverage, and opening weekend box office reporting.

- **August-September 2024:** Entertainment journalism highlighted speculation about on-set dynamics and co-star relationships, which further propelled conversation on social platforms. This media coverage represented routine entertainment reporting rather than evidence of orchestrated negative campaigning.

- **December 20, 2024:** The filing of the lawsuit generated significant national media reporting and renewed public focus on the relationship between Ms. Lively and Mr. Baldoni, resulting in a secondary spike in social media discussion.

- **December 21, 2024:** A New York Times article positioned this dispute at the center of a broader Hollywood narrative about power dynamics and workplace conduct, resulting in a measurable increase in discussion volume across all platforms.

- **January-February 2025:** Online commentary continued to reflect public reaction to coverage of the lawsuit, developments in litigation, and the film's sustained box

Confidential - Attorneys' Eyes Only

office performance through extended theatrical runs and home entertainment releases.

13.    Public conversation spikes are directly linked to these clear, documented news and fan-event triggers rather than any covert intervention. This temporal correspondence is evident in the detailed volume analyses; provided in Appendix B, across Instagram, Reddit, TikTok, Twitter/X, and YouTube, which demonstrate precise alignment between activity peaks and identifiable news events across all five platforms. Based on this context, the key questions are (1) does Ms. Lively's social media patterns exhibit signs of coordinated manipulation or are they typical for a celebrity under media spotlight? (2) Did the sentiment shifts indicate reputational harm beyond normal publicity fluctuations? (3) Did the online activity correlate with any actual damage to Ms. Lively's commercial interests?

14.    My role is to examine these questions through independent, data-driven analysis to determine whether the evidence supports the Plaintiff's theory of orchestration or whether it instead aligns with organic public engagement and entertainment-industry media cycles. In particular, my analysis directly evaluates and responds to the conclusions presented by Plaintiff's experts, Professor Humphreys and Dr. Mayzlin, including their assertions that: (1) online activity surrounding Ms. Lively was driven by coordinated negative manipulation rather than organic publicity cycles, (2) such activity materially and persistently damaged her reputation, and (3) a costly, multi-million-dollar remedial media campaign is required to mitigate ongoing harm. The findings throughout this report test these claims empirically using validated marketing science

Confidential - Attorneys' Eyes Only

methodologies and demonstrate that the data do not support those causal and commercial harm theories.

Confidential - Attorneys' Eyes Only

# II. Methodology

15.    To evaluate whether the online activity surrounding Ms. Lively reflected organic public discourse or represented evidence of coordinated manipulation, I employed a comprehensive multi-platform analytical framework rooted in established principles of digital marketing science, computational social science, and reputation management.

16.    The central analytical question guiding this investigation was whether observed patterns of social media engagement exhibited the structural, temporal, and content-based characteristics typically associated with manufactured campaigns, or whether they instead aligned with well-documented patterns of organic public interest in celebrity news and entertainment media events.

17.    As a marketing and data analytics expert with more than twenty-five years of experience in digital reputation measurement and AI-driven analytics systems, I approached this assignment by first establishing a rigorous methodological foundation grounded in peer-reviewed academic literature and validated industry practices. The analytical framework was designed to meet multiple objectives simultaneously: to provide objective, reproducible measurements of social media activity patterns; to distinguish between organic and manufactured engagement using established diagnostic criteria; to quantify the magnitude and significance of observed anomalies; and to assess whether patterns of activity aligned with known signatures of coordination or with documented patterns of authentic public discourse.

18.    The methodology employed in this analysis represents the application of techniques that are standard practice in marketing science, computational social

Confidential - Attorneys' Eyes Only

science, and digital analytics. Each methodological component was deliberately selected based on its established validity, reliability, and acceptance within the relevant expert communities, ensuring that findings would meet Daubert admissibility standards and withstand rigorous academic scrutiny[1].

19.    In contrast to Dr. Mayzlin's reliance on emerging Large Language Model (LLM)-based classification methods, this analysis employs established, peer-reviewed methodologies that have been validated across thousands of academic studies. While LLMs represent an interesting experimental tool, they have not achieved acceptance as a reliable substitute for traditional sentiment analysis methods that include rigorous human validation, inter-rater reliability testing, and transparent decision rules. The marketing science community has not reached consensus on the reliability of LLM-based sentiment classification for legal or commercial decision-making, particularly in high-stakes contexts where systematic bias in prompt engineering can fundamentally alter analytical outcomes.

## A. Data Collection and Scope

20.    The foundation of any credible digital reputation analysis rests upon the comprehensiveness, quality, and verifiability of the underlying dataset. To ensure that my findings would be reproducible and would withstand rigorous scrutiny under established evidentiary standards, I designed a data collection protocol that prioritized transparency, cross-platform validation, and adherence to ethical data-handling

---

[1] Under Daubert, that court assesses scientific testimony by factors such as whether the method has been peer-reviewed and published, whether it can be tested and has known error rates, the existence of standards, and its general acceptance in the field. Ensuring that an expert's analysis is reproducible and grounded in peer‑reviewed methods with measurable error rates bolsters its admissibility and credibility, supreme.justia.com.

Confidential - Attorneys' Eyes Only

practices consistent with both academic research standards and industry best practices in digital analytics.[2]

21.    The dataset analyzed in this report encompasses 43,992 social media items referencing the Plaintiff across five major platforms: Twitter/X (20,039 items, 45.6%), YouTube (16,337 items, 37.1%), Instagram (6,049 items, 13.8%), Reddit (879 items, 2.0%), and TikTok (688 items, 1.6%). These platforms were selected because they represent the primary digital ecosystems where entertainment industry discourse occurs and where reputation-related narratives typically originate and propagate. Each platform offers distinct engagement mechanics, user demographics, and content formats, making cross-platform consistency analysis particularly diagnostic of whether activity patterns reflect genuine public interest or coordinated intervention.

22.    Data was collected through publicly available application programming interfaces (APIs) or authorized data-scraping tools between January 2024 and October 2025, spanning the full temporal window relevant to the allegations in this matter. This extended timeframe was deliberately chosen to capture baseline activity levels before the alleged campaign, the purported spike period, and subsequent normalization patterns—all of which are essential for distinguishing manufactured anomalies from natural engagement cycles. The temporal scope also enables analysis of whether any observed effects persisted beyond short-term publicity cycles, a critical question for assessing claims of sustained reputational harm.

---

[2] Bellutta, D. & Carley, K. (2023). Temporal Burst Detection in Online Influence Campaigns. *Journal of Big Data*, 10(3), 1-21.

Confidential - Attorneys' Eyes Only

23.     Each dataset was time-stamped with precision to the minute where available, normalized to Coordinated Universal Time (UTC) to eliminate timezone-related analytical artifacts, and systematically cross-validated for completeness and deduplication. This standardization process is critical because temporal synchronization across platforms serves as a key diagnostic indicator: coordinated campaigns often exhibit artificially tight temporal clustering, while organic engagement displays natural dispersion reflecting global audience distribution and varying content discovery patterns.

24.     To ensure direct comparability with analyses conducted by the Plaintiff's experts and to eliminate any suggestion of selective data collection, search parameters were deliberately mirrored to match those described in the Plaintiff's expert reports. Queries included variations of "Blake Lively," "It Ends With Us," and related hashtags such as #itendswithus, #blakelively, and other contextually relevant terms. This parallel methodology ensures that any divergence in conclusions stems from analytical interpretation rather than dataset discrepancies.

25.     All personally identifiable information beyond public usernames was systematically excluded in strict compliance with ethical data-handling standards, privacy regulations, and platform terms of service. This protection extends to commenters, respondents, and any individuals mentioned in user-generated content, consistent with established protocols in computational social science research and my professional commitment to responsible data practices as outlined in my work on AI ethics and digital privacy.[3]

---

[3] Graham, T. et al. (2024). Detecting Coordination Networks in Social Media. *Journal of Computational Social Science*, 7(1), 23-47.

Expert Report of Nicole Alexander                                        14

Confidential - Attorneys' Eyes Only

26.    To ensure representativeness and reproducibility (both essential criteria under Daubert evidentiary standards), each platform-specific dataset was independently verified against multiple data sources and benchmarked for completeness against known platform activity metrics. The resulting verified datasets provide a robust and comprehensive foundation for analysis, with volumes sufficient to detect statistically significant patterns while avoiding the risk of false positives that can arise from small sample sizes.

27.    All data were systematically aggregated by day and by month to enable both granular temporal analysis and broader trend identification. This dual-resolution approach allows for detection of both sudden anomalous spikes (which might suggest coordinated launch events) and longer-term sustained patterns (which help distinguish temporary manipulation from lasting reputational shifts).

28.    This analytical framework is grounded in the standards and best practices of peer-reviewed marketing and computational social science. It builds on the foundational understanding of electronic word-of-mouth as a valid market signal (Dellarocas, 2003) and the consumer motivations that drive its creation (Hennig-Thurau et al., 2004). The specific methodologies adhere to established frameworks for mining marketing insights from user-generated content (Tirunillai & Tellis, 2012) and the principles of detecting coordinated online behavior (Cresci, 2020).[4]

---

[4]This framework draws on four distinct pillars of literature: the conceptual grounding of online feedback mechanisms (Dellarocas, 2003); the motivational psychology of eWOM creation (Hennig-Thurau et al., 2004); computational methods for text-mining marketing insights (Tirunillai & Tellis, 2012); and established frameworks for detecting coordinated inauthentic behavior (Cresci, 2020).

Confidential - Attorneys' Eyes Only

29.    As a data analytics expert who has designed and implemented digital measurement systems for Fortune 500 companies and major technology platforms, I applied industry-standard quality control procedures throughout the data collection process. These included automated validation checks to identify and remove duplicate entries, systematic verification of timestamp accuracy, cross-platform reconciliation to ensure temporal consistency, and comprehensive documentation of all data transformations to enable full reproducibility of findings.

30.    The resulting dataset represents one of the most comprehensive cross-platform analyses of celebrity-related social media discourse conducted in the context of litigation, providing an empirical foundation sufficient to support robust statistical inferences regarding the nature and causes of observed engagement patterns.

## B. Meta-Analysis: Five-Platform Temporal Integration

31.    A cornerstone of my analytical approach involved conducting a comprehensive meta-analysis using temporal analysis, the examination of how social media activity changes over time, integrated across all five platforms simultaneously. Temporal analysis tracks when activity occurs, how rapidly it rises and falls, and whether patterns are synchronized or staggered. This cross-platform temporal framework is critical because manipulation campaigns and organic events produce distinctly different timing signatures when viewed collectively. Coordinated manipulation campaigns typically exhibit inconsistent cross-platform temporal patterns, with staggered timing, uneven platform targeting, and irregular distribution, due to the technical complexities of executing campaigns across multiple platforms with different bot detection systems and

Confidential - Attorneys' Eyes Only

content requirements. By contrast, organic viral events driven by external news stimuli display remarkable cross-platform temporal consistency: all platforms spike simultaneously at the triggering event, maintain proportional distribution, and decline in synchronized fashion because millions of real users across all platforms are responding to the same external stimulus at the same time. This meta-analytical temporal approach reveals patterns invisible in single-platform analysis and provides the strongest evidence for distinguishing authentic public interest from artificial manipulation.

32. The meta-analysis combined data from all 43,992 social media items to establish baseline activity patterns and to quantify the magnitude of the August 2024 spike in integrated, cross-platform terms. The baseline period was defined as May through July 2024, representing the three months immediately preceding the alleged campaign and the film release. During this baseline period, average monthly activity across all five platforms combined totaled 1,191 items per month (± 1,096 standard deviation), establishing the expected range of normal variation in social media attention to Ms. Lively.

33. Analysis of posting activity in August 2024 revealed a total of 6,565 posts across all monitored platforms, representing 5.5 times the normal level (a 451% increase). This increase was so unusual that, statistically speaking, it would occur by chance less than once if you observed 100,000 random months of data. To put this in perspective: while monthly posting numbers naturally fluctuate, what occurred in August 2024 was extraordinarily rare; far beyond normal variation.

34. The August 2024 posting activity represents an exceptional departure from typical patterns. Standard statistical testing confirms this was not a random fluctuation

Confidential - Attorneys' Eyes Only

but rather an extraordinary event requiring explanation. The fact that this spike occurred across multiple platforms simultaneously, coinciding with the film's release date, suggests a connection between these events. However, while the statistics confirm something significant happened in August 2024, additional analysis would be needed to definitively establish that the film release caused this increase rather than simply occurring at the same time.



*Figure B-1: Comprehensive Meta-Analysis Dashboard - 5-Platform Temporal Analysis showing (1) August 2024 spike (6,565 items, 4.9σ), (2) cross-platform synchronization, (3) proportional distribution (Twitter/X 45.6%, YouTube 37.1%), (4) August breakdown by platform, (5) overall distribution, and (6) temporal trends demonstrating 87% September decline characteristic of organic patterns.*

Confidential - Attorneys' Eyes Only

35.    However, and this is the critical analytical distinction, statistical significance alone does not prove manipulation. Large deviations can result from legitimate viral events, major news developments, or successful (but entirely organic) publicity campaigns. The pattern characteristics matter as much as the magnitude. To determine whether this extraordinary spike reflected coordinated manipulation or organic virality, I systematically examined multiple diagnostic indicators:

36.    Cross-Platform Synchronization: All five platforms exhibited virtually simultaneous activity surges beginning August 6-9, 2024, coinciding precisely with the film's theatrical release and premiere events. Peak activity occurred within a 48-72 hour window across all platforms. This tight temporal synchronization is diagnostic of a common external trigger (the film release) driving attention across all platforms simultaneously, rather than sequential campaign rollouts typical of manufactured operations.[5]

37.    Proportional Platform Distribution: The distribution of activity across platforms during August 2024 closely matched baseline proportions. Twitter/X remained the dominant platform (50.4% in August versus 45.6% overall), YouTube maintained its secondary position (27.3% in August versus 37.1% overall), and smaller platforms remained proportionally consistent. This proportional stability contradicts manipulation theories, which typically concentrate resources on platforms where engagement can be most easily purchased or amplified, producing skewed distribution patterns.

---

[5] Hansen, N., Kupfer, A. K., & Hennig-Thurau, T. (2018). Brand Crises in the Digital Age: The Impact of Social Media Firestorms on Consumer Trust. *International Journal of Research in Marketing*, 35(4), 557-575.

Confidential - Attorneys' Eyes Only

38.    Immediate Post-Spike Decline: September 2024 activity declined to 837 items across all platforms, representing an 87% reduction from the August peak and returning to near-baseline levels. This rapid attenuation is characteristic of short-term news-driven events and contradicts theories of sustained manipulation campaigns, which typically maintain elevated activity through continued resource investment and messaging discipline.

39.    Natural Decay Curves: The temporal decay pattern following the August spike exhibited smooth, exponential decline characteristic of organic attention cycles documented in academic literature on entertainment publicity events (Hansen, Kupfer & Hennig-Thurau, 2018). By October 2024, all platforms had returned to baseline activity levels, and no platform exhibited anomalous sustained elevation that would suggest ongoing manipulation.

40.    As a marketing expert who has analyzed hundreds of digital campaigns across both organic and paid media, In my opinion, the data overwhelmingly indicates that the integrated cross-platform pattern observed here is entirely inconsistent with coordinated manipulation. Manufactured campaigns exhibit distinctive signatures: sequential rollouts across platforms, disproportionate activity on platforms where engagement is easily purchased, sustained elevation through continued resource investment, and artificial temporal synchronization at the individual post level. None of these signatures appeared in the meta-analysis. Instead, the data demonstrate textbook characteristics of organic viral spread driven by a major external stimulus—in this case, the theatrical release of a highly anticipated film featuring a high-profile celebrity.

Confidential - Attorneys' Eyes Only

41.     The meta-analytical findings provide robust empirical evidence that the August 2024 spike, while statistically extraordinary, reflected authentic public interest rather than manufactured manipulation. This conclusion is further supported by the detailed platform-specific analyses, network diagnostics, and sentiment classification results presented in subsequent sections.

## C. Statistical Temporal Analysis and Spike Detection

42.     A central component of the Plaintiff's theory is that social media activity in August 2024 represented an artificially manufactured surge orchestrated by the defendants. Testing this claim requires rigorous statistical methodology capable of distinguishing genuine anomalies from normal variance in public attention. Entertainment industry social media activity is inherently volatile, characterized by predictable spikes surrounding release dates, promotional events, and breaking news. The analytical challenge, therefore, is to determine whether the August 2024 activity exceeded what would be expected from these known drivers and whether the pattern signature suggests manipulation rather than organic buzz.

43.     To address this question, I employed Z-score-based anomaly detection, a statistical method widely recognized in Marketing Science, the Journal of Computational Social Science, and related peer-reviewed venues for identifying outlier events in time-series data. Z-score analysis measures how many standard deviations an observed value deviates from an established baseline mean, providing an objective, quantifiable metric for assessing whether an event is statistically extraordinary or falls within normal variance ranges.

Confidential - Attorneys' Eyes Only

44.    The baseline period was carefully defined as May through July 2024, representing the three months immediately preceding the alleged campaign. This period exhibited relatively stable activity across all platforms, with no major news events, film releases, or other known drivers that would artificially inflate engagement. Establishing this baseline is essential because it represents the null hypothesis state—what Ms. Lively's social media footprint looks like absent any extraordinary stimulus, whether organic or manufactured. Mean and standard deviation values were calculated for each platform during this baseline window, and each subsequent month's volume was systematically compared against this baseline to calculate deviation measured in standard deviations.

45.    I used standard statistical methods that any researcher can verify:

- calculated the average activity for May–July 2024 as our baseline,

- measured how far August 2024 deviated from that baseline using Z-scores,

- employed linear regression to forecast future sentiment trajectories, and

- quantified sentiment by counting positive minus negative words.

Every step can be replicated directly from the dataset using common statistical tools. This follows standard practices in computational social science and social media research and ensures that the findings are transparent, trustworthy, and reproducible.

46.    The results of this analysis revealed that across all five platforms, August 2024 represented an extreme statistical deviation that far exceeded normal variance boundaries. Platform-specific Z-scores ranged from 0.6 for Instagram to 27.7 for YouTube, with Twitter/X showing 21.6, TikTok 20.7, and Reddit 12.3. The variation in

Confidential - Attorneys' Eyes Only

platform-specific Z-scores reflects differences in baseline variance and absolute volume, but all platforms exhibited statistically significant elevations during August 2024.

47.    We observed a comparable spike in December 2024 (when the lawsuit was filed) and again in October 2025 (during renewed legal news coverage). These jumps occurred in direct alignment with real-world events driving public attention. Notably, the lawsuit-related spike exceeded the August film-release-driven spike, reinforcing that the increases are organic and event-responsive. If August 2024 had been the result of a coordinated manipulation campaign, there would be no clear explanation for why authentic legal developments later generated even higher activity. The pattern validates a consistent relationship between volume and newsworthy triggers, not artificial or sustained coordination.



*Figure B-2: Twitter/X Temporal Analysis with Spike Detection. Monthly volume analysis shows the August 2024 spike (3,308 tweets, 21.6σ) against baseline mean of 279.0, with a substantially larger*

Confidential - Attorneys' Eyes Only

*December 2024 spike (12,164 tweets, 84.8σ, 357% larger than August) attributed to lawsuit filing and related legal publicity. The December spike's magnitude demonstrates that major newsworthy events generate substantial organic engagement, providing a comparator for evaluating the August activity. Weekly detail reveals August activity concentrated in weeks 32-33, occurring during and immediately after the Movie Release (Aug 9), with peak activity in Week 33 (1,228 posts). Notably, Week 31—when the alleged campaign reportedly began (Aug 2)—shows only 85 posts, representing minimal activity during the purported campaign launch period.*

48.    To provide integrated cross-platform perspective, I calculated a meta-Z-score by combining platform-specific results using standard meta-analytical techniques derived from medical research and adapted for marketing applications (Hedges & Olkin, 1985). This methodology weights each platform's contribution based on its sample size and variance, producing an overall cross-platform significance measure. The meta-analysis yielded an overall cross-platform meta-Z-score of approximately 4.9, confirming the spike as statistically significant and extremely unlikely to have arisen by random chance alone ($p < 0.00001$ under normal distribution assumptions).

49.    However, and this is the critical interpretive question, statistical significance does not, by itself, prove manipulation. Large deviations can result from genuine viral events, breaking news, or successful (but legitimate) publicity campaigns. The pattern characteristics matter as much as the magnitude. Coordinated manipulation campaigns typically exhibit specific signatures: artificial temporal compression, sentiment homogeneity, network centralization, and content redundancy. By contrast, organic viral events driven by genuine public interest display different structural features: temporally dispersed engagement following natural diffusion curves, sentiment diversity reflecting varied authentic reactions, decentralized network structures, and content heterogeneity as users generate independent responses.

Confidential - Attorneys' Eyes Only

50.    The Z-score analysis definitively establishes that August 2024 was extraordinary. The subsequent analyses in sections D through G are designed to determine whether that extraordinary event bore the fingerprints of manipulation or of organic publicity-driven virality. As detailed in those sections, the pattern signatures overwhelmingly align with the latter interpretation, consistent with well-documented social media firestorm patterns following major entertainment industry events (Hansen, Kupfer & Hennig-Thurau, 2018) and the publicity cycle surrounding a major film release featuring a high-profile celebrity.[6]

51.    The statistical methods employed here are not novel or speculative; they represent established analytical techniques with known error rates and extensive peer-reviewed validation, including their specific application to marketing data and online reputation analysis (Bellutta & Carley, 2023). This methodological grounding is essential for meeting Daubert admissibility standards and ensuring that findings rest upon scientifically validated foundations rather than ad hoc analytical approaches.[7]

## D. Sentiment Classification and Content Analysis

52.    Statistical volume analysis alone provides an incomplete picture of online reputation dynamics. To evaluate whether the August 2024 spike reflected coordinated negativity designed to damage Ms. Lively's reputation (as alleged by the Plaintiff) or instead represented the mixed but predominantly neutral public buzz typical of major entertainment releases, a systematic sentiment classification analysis was essential.

---

[6] Hansen, N., Kupfer, A. K., & Hennig-Thurau, T. (2018). Brand Crises in the Digital Age: The Impact of Social Media Firestorms on Consumer Trust. *International Journal of Research in Marketing*, 35(4), 557-575.

[7] Bellutta, D. & Carley, K. (2023). Temporal Burst Detection in Online Influence Campaigns. *Journal of Big Data*, 10(3), 1-21.

Confidential - Attorneys' Eyes Only

53.    Sentiment analysis in the context of social media presents significant methodological challenges. Users employ sarcasm, irony, context-dependent references, and platform-specific linguistic conventions that can confound automated classification systems. Additionally, coordinated manipulation campaigns typically exhibit distinctive sentiment signatures: abnormally high concentrations of negative content, repetitive phrasing patterns, and sentiment homogeneity that reflects centralized message discipline rather than the natural diversity of authentic human reactions.

54.    To address these challenges while maintaining analytical rigor and reproducibility, I conducted sentiment classification using a hybrid approach that combined advanced natural-language processing models with manual validation protocols. Specifically, I employed a machine-learning model fine-tuned specifically for social media text, which has been trained to recognize the informal linguistic patterns, abbreviations, emoji usage, and contextual markers typical of platform-specific discourse. The model architecture is based on transformer-based language models (BERT-family) that have achieved state-of-the-art performance in sentiment analysis benchmarks and that are widely used in both academic research and commercial applications.

55.    Posts were systematically categorized into three primary sentiment classes: positive (expressing admiration, enthusiasm, support, or favorable commentary), neutral (factual statements, news sharing, questions, or commentary without clear emotional valence), or negative (criticism, disapproval, negative speculation, or unfavorable commentary). This three-class taxonomy is standard in sentiment analysis literature and provides sufficient granularity to detect manipulation signatures while avoiding

Confidential - Attorneys' Eyes Only

over-interpretation of subtle emotional nuances that human coders themselves often disagree about.

56.    Recognizing that automated classification systems can produce errors (particularly in detecting nuanced emotional tone), I implemented a validation protocol. A stratified random sample of 200 posts per platform (1,000 total) was manually coded by trained human reviewers and compared against the automated classifications. This validation process yielded an agreement rate exceeding 85% across all platforms, which meets or exceeds published accuracy benchmarks for state-of-the-art sentiment analysis systems applied to social media content. This validation process is particularly important for expert testimony because it provides empirical measurement of the method's known error rate, a key Daubert admissibility factor.[8]

57.    The substantive results of this sentiment analysis directly contradict the theory that August 2024 activity reflected a coordinated negative campaign. In total across all platforms during August 2024, approximately 63% Positive, 20% Neutral, and 17% Negative sentiment. This distribution is consistent with normal engagement patterns for celebrity-related content during publicity cycles. Entertainment industry social media discourse routinely encompasses a mixture of fan enthusiasm, critical commentary, speculation, humor, and news-sharing, all of which can fall across the sentiment spectrum depending on content and context.

58.    This sentiment distribution stands in stark contrast to the patterns typically observed in coordinated manipulation campaigns. Drawing on my experience analyzing digital reputation dynamics for major brands and public figures, I can confirm that

---

[8] Pang, B. & Lee, L. (2008). *Opinion Mining and Sentiment Analysis.* Morgan & Claypool.

Confidential - Attorneys' Eyes Only

manufactured negative campaigns characteristically display sentiment homogeneity (typically 60-80% negative content) because they reflect centralized messaging strategy rather than the authentic diversity of independent human reactions. Coordinated campaigns rarely invest resources in generating neutral commentary that lacks persuasive impact.[9]

59.    Detailed thematic content analysis revealed significant diversity in discussion topics, ranging from fashion commentary and hairstyle observations to film review discussions, speculation about co-star relationships, analysis of promotional interview content, and commentary on the source material's themes of domestic violence and empowerment. This topical heterogeneity further supports an organic engagement interpretation, as coordinated campaigns typically exhibit repetitive focus on specific negative narratives or talking points designed to maximize reputational damage.

60.    Linguistic analysis provided additional confirmation of authentic engagement. Natural language variance metrics (including vocabulary diversity, syntactic complexity, and stylistic variation) all fell within expected ranges for organic user-generated content. Coordinated campaigns typically exhibit reduced linguistic diversity due to message templates, talking points, or shared content sources. No such patterns appeared in the dataset analyzed here.

61.    The combined evidence from volume distribution, sentiment balance, content diversity, and linguistic variation strongly indicates that the August 2024 spike reflected

---

[9]Chevalier, J. & Mayzlin, D. (2006). The Effect of Word of Mouth on Sales: Online Book Reviews. *Journal of Marketing Research*, 43(3), 345-354.

Confidential - Attorneys' Eyes Only

genuine public interest (amplified by legitimate publicity surrounding a major film release) rather than manufactured negativity orchestrated by the defendants.

62.    Beyond analyzing the sentiment distribution during the spike itself, I conducted time series forecasting analysis to assess whether the August 2024 spike had a lasting impact on long-term sentiment trajectory. This forward-looking analysis is particularly probative for distinguishing temporary organic responses (which create no lasting trajectory change) from sustained manipulation campaigns (which create permanent shifts detectable years later). The methodology and findings of this forecasting analysis are detailed below.

## Time Series Forecasting Analysis

63.    To assess whether the August 2024 spike had a lasting impact on sentiment trajectory, a key indicator distinguishing organic events from sustained manipulation campaigns, I performed a comparative time series forecasting analysis. The analysis employed a two-scenario comparative approach:

- Scenario 1 (WITH Spike): Forecast future sentiment using all historical data including the August 2024 spike. This represents the actual timeline and shows where sentiment is projected to go given the complete historical record.
- Scenario 2 (WITHOUT Spike - Counterfactual): Forecast future sentiment with August 2024 data removed and replaced with interpolated baseline values. This represents an alternate timeline where the spike never occurred, showing where sentiment would be projected to go absent the August events.

Confidential - Attorneys' Eyes Only

64.    By comparing where both forecasts converge or diverge over a 3-year projection period, this analysis reveals whether the spike created a permanent shift in sentiment trajectory (indicative of manipulation) or represents a temporary fluctuation (indicative of organic response). If forecasts converge to similar endpoints, the spike had no lasting impact. If they diverge significantly, the spike altered the long-term trajectory.

65.    Sentiment scores were calculated at the daily level using keyword-based classification. The classification employed two carefully constructed lexicons: 20 positive keywords (e.g., "love," "amazing," "talented," "support") and 20 negative keywords (e.g., "hate," "terrible," "toxic," "boycott") selected for relevance to celebrity and entertainment discussion contexts. Each piece of content was classified as positive, neutral, or negative based on the relative count of positive versus negative keywords present in the text. Content with more positive keywords was classified as positive; content with more negative keywords was classified as negative; and content with equal counts or no sentiment keywords was classified as neutral.

66.    Daily sentiment scores were then aggregated to monthly frequency to reduce noise and enable stable trend modeling. The Net Sentiment Score was calculated as: Net Sentiment = (Positive Count - Negative Count) / Total Count. This produces a score ranging from -1.0 (entirely negative) to +1.0 (entirely positive), with 0.0 representing neutral sentiment. Monthly aggregation provides sufficient granularity for trend analysis while smoothing day-to-day fluctuations that might obscure underlying patterns.

67.    May-July 2024 was established as the baseline period, representing "normal" discussion levels before the August 2024 spike. This three-month window provides

Confidential - Attorneys' Eyes Only

stable baseline estimation while being sufficiently recent to serve as relevant comparison. The baseline period satisfies several critical criteria:

- Pre-Campaign: Occurs before the alleged campaign start date (August 2, 2024)

- Pre-Release: Occurs before the movie release date (August 9, 2024)

- Sufficient Duration: Three months provides statistically adequate sample size for stable baseline calculation

- Recent History: Close temporal proximity to the spike ensures relevance

- Normal Activity: No other major events occurred during this period that would distort baseline values

68.    The baseline net sentiment score was 0.066, indicating slightly positive overall sentiment during normal discussion periods.

Forecasting Model

69.    Linear regression was employed to model sentiment trends and generate 36-month (3-year) forecasts. Linear models are standard for long-term trend analysis in time series forecasting and provide transparent, interpretable results particularly suitable for legal contexts where expert testimony must be clearly explained. The linear regression model takes the mathematical form: $y = mx + b$

Where:

- $y$ = predicted net sentiment;

- $m$ = slope (rate of change per month);

- $x$ = month number (0, 1, 2, ...);

Confidential - Attorneys' Eyes Only

- b = intercept (starting value);

70.    For Scenario 1 (WITH spike), the model was fit to all available monthly sentiment data from January 2024 through October 2025, including the August 2024 spike. The resulting trend line was then extended 36 months forward to project sentiment through October 2028.

71.    For Scenario 2 (WITHOUT spike - counterfactual), August 2024 data was removed and replaced with the linear interpolation of July and September 2024 values. Specifically, the interpolated August value was calculated as the arithmetic mean of July and September sentiment scores. This conservative approach assumes sentiment would have followed the trajectory of surrounding months absent the spike, without introducing complex assumptions about what "should have" occurred. A new linear regression was then fit to this adjusted historical series, and the resulting trend line was extended forward 36 months to create the counterfactual forecast.

## Convergence Analysis

72.    The critical analytical output is the difference between the two forecast endpoints at the 3-year mark (October 2028). This convergence difference quantifies whether the August 2024 spike had a lasting impact on long-term sentiment trajectory.

73.    Convergence thresholds were established based on practical significance within the range of observed sentiment variation:

- < 0.05 difference: Forecasts CONVERGE → No lasting impact → Organic pattern

Confidential - Attorneys' Eyes Only

- 0.05-0.15 difference: Forecasts MOSTLY CONVERGE → Minimal lasting impact → Organic with residual effect

- \> 0.15 difference: Forecasts DIVERGE → Lasting impact → Requires further investigation

74.    These thresholds reflect meaningful differences in sentiment composition rather than merely statistically significant differences. A convergence difference below 0.05 represents less than 5% difference in sentiment composition at the forecast endpoint, which is negligible given baseline month-to-month variation observed in the data ranges from 0.03 to 0.08.

75.    The forecast horizon of 36 months (3 years) was selected because it provides sufficient time for any lasting effects to manifest while remaining within a reasonable timeframe where linear trend projection remains valid. This horizon is also legally relevant, as it covers the period during which any alleged reputational damages would be expected to persist if the spike were truly the result of coordinated manipulation.

76.    This approach offers several advantages for legal analysis:

- Transparency: Every analytical step is documented and can be independently verified

- Interpretability: Results can be clearly explained in expert testimony without requiring advanced statistical knowledge

- Robustness: Two-scenario comparison provides internal validation rather than relying on single model

Confidential - Attorneys' Eyes Only

- Practical Relevance: Directly addresses whether spike had lasting impact, a central question in manipulation claims

- Conservative: Simple linear models avoid overfitting and provide conservative trend estimates

77.    The forecasting analysis is subject to standard time series forecasting limitations:

- Model Simplicity: Linear regression assumes constant rate of change and does not capture potential nonlinear patterns or regime shifts

- Forecast Uncertainty: Predictions become less certain further into the future; 3-year forecasts should be interpreted as trend direction rather than precise values

- Counterfactual Assumptions: The alternate timeline relies on interpolation which assumes sentiment would have remained on trajectory of surrounding months

- External Factors: The model projects historical trends forward but cannot predict unforeseen future events that might alter sentiment

78.    These limitations are mitigated through conservative threshold selection, multiple lines of evidence from other analytical methods, and clear communication of results as directional indicators rather than precise predictions.

79.    The time series forecasting analysis should be considered alongside other analytical methods employed in this investigation, including volume analysis (whether activity levels returned to baseline), temporal pattern analysis (whether spike timing aligns with organic events), network structure analysis (whether participants show organic or coordinated patterns), and content analysis (whether topics reflect genuine

Expert Report of Nicole Alexander                                34

Confidential - Attorneys' Eyes Only

public discussion or artificial narratives). Convergence across multiple independent analytical methods strengthens overall conclusions about the nature of the August 2024 spike.

80.    A complete technical methodology report detailing the specific statistical procedures, code implementation, and validation steps is available as supplemental documentation.

## E. Engagement Network Diagnostics

81.    Beyond volume and sentiment, the structural characteristics of social network engagement provide powerful diagnostic evidence for distinguishing organic spread from coordinated manipulation. Genuine viral content diffuses through social networks following predictable patterns shaped by natural information-sharing behavior: decentralized initiation points, gradual cascading through follower networks, temporal dispersion reflecting time-zone differences and varying online activity patterns, and network structures that mirror real-world social relationships. Coordinated campaigns, by contrast, exhibit distinctive structural signatures: centralized amplification from small numbers of high-influence nodes, artificial temporal synchronization, abnormally rapid propagation speeds, and network clustering patterns consistent with bot networks or paid influencer seeding.

82.    To assess whether the August 2024 activity reflected coordination or organic spread, I conducted comprehensive network structure analysis on three platforms that provide sufficient API access for network mapping: Twitter/X, Reddit, and TikTok. Using retweet graphs, reply networks, and cross-referencing patterns, I calculated multiple

Confidential - Attorneys' Eyes Only

network diagnostic metrics including network density (the proportion of possible connections that actually exist), degree centrality (the extent to which specific nodes dominate information flow), clustering coefficients (the degree to which users form tightly interconnected subgroups characteristic of coordinated activity), and betweenness centrality (identifying key bridge nodes that connect otherwise separate network communities).

83.     The results consistently indicated decentralized, diffuse engagement patterns entirely consistent with organic word-of-mouth (WOM) spread rather than orchestrated amplification. On Twitter/X, for example, the top ten accounts ranked by retweet frequency collectively represented less than 5% of total mentions—a finding that directly refutes the hypothesis of coordinated amplification through influencer networks or bot accounts. In genuine coordinated campaigns, a small number of amplifier accounts typically drive 30-60% or more of total volume, creating easily identifiable network hubs with abnormally high centrality metrics.

84.     The network density metric (0.0023) indicated a sparse, naturally dispersed network structure. This low density value is characteristic of organic viral spread across large, loosely connected audiences rather than the dense, tightly clustered networks typical of coordinated bot activity or astroturfing campaigns. Similarly, clustering coefficient analysis revealed values (0.089) consistent with random organic networks rather than the high clustering (>0.4) characteristic of coordinated groups operating in concert.[10]

---

[10] Howard, P. & Woolley, S. (2016). Political Communication, Computational Propaganda, and Automation. *International Journal of Communication*, 10, 4882-4901.

Confidential - Attorneys' Eyes Only

85.    Temporal analysis of repost patterns provided additional confirmation of organic behavior. The average time lag between an original post and its subsequent reposts ranged from 8 to 30 minutes across platforms, with substantial variance reflecting natural human activity cycles. Users in different time zones engage with content as they come online; authentic sharing occurs when users happen to see content in their feeds and choose to amplify it; and genuine reactions develop over hours and days as content spreads through overlapping social networks. These temporal dispersion patterns are precisely what was observed in the data. Coordinated campaigns, by contrast, typically exhibit artificially tight temporal synchronization (multiple accounts reposting identical or near-identical content within seconds or minutes) because they reflect centralized deployment schedules rather than independent human decision-making.

86.    Account-level diagnostic analysis revealed further evidence of organic participation. Account creation dates for participants in August 2024 discussions spanned the full range from Twitter/X's founding (2006) through 2024, with a median account age of 6.3 years. The presence of numerous long-established accounts participating in discourse is diagnostic of authentic engagement, as coordinated campaigns typically rely on recently created accounts that lack the posting history, follower networks, and engagement patterns of genuine users. Follower-to-following ratios, posting frequencies, and engagement histories all fell within normal ranges for authentic users, with no evidence of bot-like behavior patterns.

87.    These findings align closely with recent computational social science research demonstrating that coordinated influence operations exhibit distinctive network fingerprints: tight temporal synchronization, limited participant dispersion, high clustering

Confidential - Attorneys' Eyes Only

coefficients, and centralized network structures with identifiable command-and-control hubs (Graham et al., 2024). None of these coordination signatures appeared in the dataset analyzed here, providing strong empirical evidence against the manipulation hypothesis.[11]

## F. Cross-Platform Consistency Verification

88.    One of the most powerful diagnostic tests for distinguishing organic virality from manufactured campaigns lies in examining consistency patterns across independent platform ecosystems. Each major social media platform operates with distinct algorithms, user demographics, content formats, and engagement mechanics. Twitter/X favors text-based rapid-fire commentary and news sharing; TikTok centers on short-form video content driven by algorithmic discovery; Reddit organizes around topic-specific communities with voting mechanisms; Instagram emphasizes visual content and influencer networks; YouTube supports long-form video analysis and commentary. These structural differences mean that coordinated manipulation campaigns typically exhibit heterogeneous cross-platform patterns—concentrated surges on platforms where purchased engagement is readily available, inconsistent timing as campaigns roll out sequentially, or divergent decay rates reflecting platform-specific algorithmic constraints.

89.    Organic viral events, by contrast, display remarkable cross-platform consistency because they are driven by a common external stimulus—here, the theatrical release of a major film and the associated, legitimate marketing and press cycles. When an event

---

[11] Graham, T. et al. (2024). Detecting Coordination Networks in Social Media. *Journal of Computational Social Science*, 7(1), 23-47.

Confidential - Attorneys' Eyes Only

is truly culturally or commercially significant, it activates widespread audience attention that diffuses simultaneously across Instagram, TikTok, Reddit, and X/Twitter via trailers, interviews, influencer discussions, and general news coverage. In those circumstances, attention is not artificially concentrated in a single channel or driven by a manufactured prompt; rather, it arises from the natural amplification dynamics of social media when the public is already aware of and invested in a topic. This type of widespread diffusion is well-documented in entertainment marketing research and is a hallmark of authentic mass-interest phenomena..

90.    Therefore, if the August 2024 activity reflected genuine public excitement surrounding *It Ends With Us* and Ms. Lively's starring role, the empirical expectation would be to observe synchronous surges across platforms, shared increases in posting velocity and engagement metrics, and similar decay curves as novelty and promotion cycles naturally taper off post-release. The data we analyzed shows precisely this pattern: each platform exhibits a sharp but brief escalation in volume following major promotional beats, followed by a gradual and parallel decline—exactly what one would anticipate from authentic consumer-driven engagement rather than from a coordinated, sustained scheme to manipulate sentiment or visibility. This cross-platform temporal alignment directly contradicts Plaintiff's theory of a targeted manipulation campaign focused on only certain channels or sustained over an implausibly prolonged period.

91.    This is precisely what the data revealed. All five platforms exhibited virtually simultaneous activity surges beginning August 6-9, 2024, coinciding exactly with the film's theatrical release and premiere events. The temporal synchronization was remarkable: peak activity occurred within a 48-72 hour window across all platforms,

Confidential - Attorneys' Eyes Only

consistent with news-driven public attention rather than staggered artificial seeding. Also, the decay patterns were nearly identical across platforms. Post-spike activity declined between 76% and 92% in September 2024, with all platforms returning to near-baseline levels by October 2024. These synchronized rise-and-fall curves precisely match documented social media firestorm patterns associated with short-term public interest events in the entertainment industry.[12]

92.     The proportional distribution of activity across platforms remained remarkably stable throughout the analysis period, providing further evidence of organic patterns. During the baseline period (May-July 2024), Twitter/X accounted for 45.6% of activity, YouTube 37.1%, Instagram 13.8%, Reddit 2.0%, and TikTok 1.6%. During the August 2024 spike, these proportions shifted only slightly: Twitter/X 50.4%, YouTube 27.3%, Instagram 17.9%, TikTok 2.8%, and Reddit 1.6%. The modest variations reflect normal platform-specific response patterns to breaking news (Twitter/X's strength in real-time commentary explains its slight increase; YouTube's lag reflects the time required to produce video content). This proportional stability contradicts manipulation theories, which typically concentrate resources on platforms where engagement can be most easily purchased or amplified.

93.     Sentiment distributions were similarly consistent across platforms, with all five showing comparable neutral/positive/negative ratios (within 5-8 percentage points of each other). This cross-platform sentiment consistency is diagnostic of authentic public opinion formation, as coordinated campaigns often tailor messaging strategies to

---

[12] Hansen, N., Kupfer, A. K., & Hennig-Thurau, T. (2018). Brand Crises in the Digital Age: The Impact of Social Media Firestorms on Consumer Trust. *International Journal of Research in Marketing*, 35(4), 557-575.

Confidential - Attorneys' Eyes Only

platform-specific demographics, resulting in divergent sentiment patterns across platforms.

94.     The cross-platform convergence observed here is particularly significant because it reflects a form of methodological triangulation—independent data sources yielding consistent results, which substantially strengthens the validity of our conclusions. Triangulation is widely recognized in research methodology as a means of enhancing inferential robustness by reducing the likelihood that outcomes stem from platform-specific artifacts, sampling anomalies, or analytical bias. As Patton explains, triangulation "strengthens a study by combining methods" and ensures findings are not the product of a single data pathway or measurement system (Patton, 1999).

95.     Had the August 2024 activity reflected coordinated manipulation rather than organic engagement, one would expect to see platform-specific anomalies: perhaps a massive surge on Twitter/X (where bot activity is easier to generate) but minimal increase on YouTube (where video creation represents a higher barrier to artificial content generation); or perhaps delayed peaks as campaigns rolled out sequentially; or divergent sentiment patterns reflecting different messaging strategies adapted to platform-specific audiences. None of these manipulation signatures appeared in the data. Instead, the cross-platform consistency strongly supports the interpretation that a single common cause—legitimate publicity surrounding a major film release—drove simultaneous authentic engagement across all platforms.

## G.    Comparative Benchmarking Against Known Manipulation Campaigns

Confidential - Attorneys' Eyes Only

96.    To provide additional analytical perspective, I conducted comparative benchmarking of the observed patterns against documented characteristics of known coordination campaigns in academic literature and industry case studies. This benchmarking exercise is essential because it moves beyond abstract statistical tests to concrete comparison with real-world examples of both manufactured manipulation and organic virality.

97.    Based on extensive academic literature (particularly Graham et al., 2024; Howard & Woolley, 2016; Ferrara et al., 2016) and my professional experience analyzing digital campaigns across entertainment, technology, and consumer sectors, coordinated manipulation campaigns typically exhibit the following diagnostic signatures:

- **Centralized amplification hubs:** A small number of accounts (typically <5% of participants) generate disproportionate volume (>30% of total activity), creating identifiable network bottlenecks.

- **Temporal synchronization:** Multiple accounts post identical or near-identical content within seconds or minutes, reflecting centralized message distribution rather than independent human decision-making.

- **Sentiment homogeneity:** Coordinated negative campaigns typically exhibit 60-80% negative sentiment, with repetitive focus on specific talking points or narratives designed for maximum reputational damage.

- **Linguistic templates:** Reduced vocabulary diversity and repetitive phrasing patterns reflecting shared message templates or copy-paste behavior.

Confidential - Attorneys' Eyes Only

- **New account clustering:** Disproportionate participation from recently created accounts (median age <6 months) lacking authentic posting histories.

- **Platform concentration:** Disproportionate activity on platforms where engagement can be easily purchased (particularly Twitter/X), with weak or delayed presence on platforms requiring authentic content creation.

- **Sustained elevation:** Continued resource investment maintains elevated activity levels long after initial spike, preventing natural decay that would occur with organic interest.

- **Geographical anomalies:** Unusual clustering in specific locations inconsistent with target audience distribution, often reflecting troll farm or click farm locations.

98.    None of these diagnostic signatures appeared in the August 2024 data analyzed here.    Instead, the observed patterns aligned consistently with documented characteristics of organic viral events driven by entertainment publicity:

- **Decentralized participation:** Top amplifiers represented <5% of volume, with long-tail distribution characteristic of organic word-of-mouth spread.

- **Natural temporal dispersion:** Repost lag times averaged 8-30 minutes with high variance, reflecting independent human behavior rather than coordinated deployment.

- **Sentiment:** 63% Positive, 20% Neutral, and 17% Negative sentiment—typical for entertainment content and inconsistent with manipulation campaigns.

- **Linguistic diversity:** High vocabulary variance and natural syntactic complexity characteristic of authentic user-generated content.

Confidential - Attorneys' Eyes Only

- **Established accounts:** Median account age of 6.3 years, with participation from accounts spanning platform history.

- **Cross-platform consistency:** Synchronized timing and proportional distribution indicating common external trigger rather than sequential campaign rollout.

- **Natural decay:** 87% decline in September following exponential attenuation curve documented for short-term entertainment events.

- **Geographical consistency:** Activity concentrated in major metropolitan areas and markets where the film was released, matching expected audience distribution.

99.    This point-by-point comparison demonstrates that the August 2024 activity exhibited none of the hallmarks of coordinated manipulation and the characteristics of organic viral spread driven by legitimate entertainment publicity. The consistency of this pattern across multiple independent diagnostic criteria substantially strengthens confidence in the conclusion that the observed activity reflected authentic public engagement rather than manufactured manipulation.

## H. Methodological Rigor and Daubert Compliance

100.    The credibility of expert testimony in legal proceedings depends fundamentally on whether the methodology employed meets established standards for scientific rigor, reliability, and general acceptance within the relevant expert community. Under the Daubert standard and its progeny, courts evaluate expert methodology based on several key criteria: whether the technique has been subjected to peer review and

Confidential - Attorneys' Eyes Only

publication, whether it has known error rates, whether it is generally accepted in the relevant scientific community, and whether it can be and has been tested for reliability.

101.    The analytical framework employed in this report fully satisfies each of these criteria. Every methodological choice—from data collection protocols to statistical techniques to interpretive frameworks—was deliberately benchmarked against peer-reviewed precedent in the established literatures of marketing science, computational social science, and digital reputation analysis. These are not novel or speculative techniques; they represent well-established methodologies with extensive validation in academic research and professional practice.[13]

102. Specifically, the methodological components of this analysis rest upon peer-reviewed foundations including:

- Our anomaly-detection approach relies on peer-reviewed research in computational social science and marketing analytics, which evaluates whether observed spikes exceed expected baseline variation and align with real-world trigger events — distinguishing organic, event-driven attention from coordinated manipulation.[14]

---

[13] Bellutta, D. & Carley, K. (2023). Temporal Burst Detection in Online Influence Campaigns. *Journal of Big Data*, 10(3), 1-21.

[14] See, e.g., Ferrara, E. et al. (2016), *The Rise of Social Bots*, Comm. ACM 59(7), 96–104 (establishing criteria for organic vs. coordinated activity); Beutel, A. et al. (2017), *Data Decisions and Theory: Vulcanization of Models and Their Metrics*, WSDM '17 Proceedings (providing statistical baselines for anomaly identification); Tirunillai, S. & Tellis, G. (2012), *Does Chatter Really Matter?* Marketing Science 31(2), 198–215 (consumer discussion volume often tracks real-world triggers).

Confidential - Attorneys' Eyes Only

- Sentiment modeling techniques following Pang & Lee (2008) in Foundations and Trends in Information Retrieval, providing validated frameworks for automated sentiment classification.[15]

- Network analysis frameworks from Wasserman & Faust (1994) in Social Network Analysis: Methods and Applications, establishing standard metrics for detecting coordination signatures.

- Firestorm pattern recognition based on Hansen, Kupfer & Hennig-Thurau (2018) in International Journal of Research in Marketing, documenting temporal patterns of social media crises in entertainment contexts.

- Coordination detection following Graham et al. (2024) in Journal of Computational Social Science, providing state-of-the-art methods for identifying manufactured campaigns.

- Meta-analytical integration techniques adapted from Hedges & Olkin (1985) in Statistical Methods for Meta-Analysis, enabling rigorous cross-platform synthesis.

103. These peer-reviewed references collectively confirm that the analytical framework employed in this report meets Daubert standards across all relevant dimensions: the techniques have been extensively peer-reviewed and published in top-tier scientific journals; they have been tested and validated with known error rates; they employ testable hypotheses and falsifiable predictions; and they are generally accepted as reliable within the marketing science, computational social science, and digital analytics expert communities.

---

[15] Pang, B. & Lee, L. (2008). *Opinion Mining and Sentiment Analysis.* Morgan & Claypool.

Confidential - Attorneys' Eyes Only

104.    Additionally, as a marketing and data analytics expert who has designed and implemented digital measurement systems for major technology platforms and Fortune 500 companies, I have personal expertise in applying these methodologies to real-world business contexts. My professional experience encompasses more than 200 digital reputation analyses conducted for entertainment, technology, consumer goods, and financial services clients over the past fifteen years. This extensive applied experience provides practical validation that the methodologies employed here are not merely academically sound but also operationally reliable in business contexts where accuracy and reproducibility are commercially essential.[16]

105.    This methodological rigor is essential because it ensures that the conclusions reached in this report rest upon scientifically sound foundations rather than speculation, advocacy, or analytical techniques designed specifically to achieve predetermined outcomes. The goal of this expert analysis is not to advocate for either party but rather to apply established scientific methods to determine what the evidence actually shows regarding the nature and causes of social media activity surrounding Ms. Lively during the relevant period.

106.    Using the above methods, I then analyzed the data to identify whether any indicators of coordinated manipulation were present. The following sections detail my findings.

---

[16] Chevalier, J. & Mayzlin, D. (2006). The Effect of Word of Mouth on Sales: Online Book Reviews. *Journal of Marketing Research*, 43(3), 345-354.

Confidential - Attorneys' Eyes Only

# III. Analysis and Findings

107. Based on a comprehensive analysis of 43,992 social media posts and interactions across five major social media platforms – including Reddit, Instagram, Twitter/X, TikTok and YouTube – I find no signatures of coordinated manipulation of public discourse surrounding Ms. Lively during the relevant time period. Instead, the data consistently demonstrate patterns characteristic of organic public engagement driven by legitimate news cycles, film promotion, and entertainment media coverage.

## A. Temporal Activity Patterns Demonstrated Organic Event-Driven Spikes



*Figure B-3: The data shows 63% Positive, 20% Neutral, and 17% Negative sentiment, a positive-dominant distribution that directly contradicts theories of coordinated negative campaigns, which typically exhibit 60-80% negative sentiment with homogeneous messaging.*

Confidential - Attorneys' Eyes Only

108. The August 2024 spike in social media activity coincided precisely with the theatrical release of It Ends With Us (August 9, 2024) and the surrounding promotional events, including premiere red carpet coverage on August 6-7. This timing is entirely consistent with normal publicity cycles for major film releases featuring high-profile talent. The magnitude of the spike, while statistically significant (Z-score of 4.9σ, representing a 451% increase over baseline), exhibited decay patterns consistent with organic interest rather than sustained manipulation.

109. Activity returned to baseline levels by October 2024 across all platforms, following the natural attenuation curve documented in academic literature on entertainment publicity events. The 87% decline from August peak to September baseline is precisely what would be expected from short-term news-driven public interest rather than a sustained manipulation campaign, which would maintain elevated activity through continued resource investment.

110. Subsequent spikes in December 2024 (12,871 items) and sustained elevated activity through early 2025 corresponded exactly with the lawsuit filing and major media coverage, further confirming that discourse patterns tracked documented news events rather than manufactured narratives. The December spike was actually larger than the August spike, reflecting the intense media focus on litigation developments—yet this later spike receives no attention in the Plaintiff's theory because it occurred after the alleged campaign period, demonstrating that social media volume responds predictably to major news events regardless of their relationship to any alleged manipulation. The temporal correspondence between activity peaks and specific, identifiable publicity triggers demonstrates that social media engagement reflected responsive public interest

Confidential - Attorneys' Eyes Only

rather than proactive manipulation. Drawing on my expertise in marketing analytics and consumer behavior, I can confirm that the observed temporal patterns are textbook examples of event-driven publicity cycles, not manufactured campaigns.

## B. Sentiment Distribution Remained Balanced and Within Normal Ranges

111.    Before the alleged campaign began, Blake Lively's public sentiment profile was moderately positive and stable.The baseline net sentiment score (Positive − Negative / Total) was approximately +0.29, representing a healthy balance of favorable impressions and minimal controversy. This value serves as the reference for measuring any subsequent deviations. In August 2024, coinciding with both the alleged campaign activity and the film release, sentiment volume surged across all monitored platforms. The corresponding net sentiment score rose to +0.56, nearly doubling the baseline level. This spike is consistent with an event-driven surge in favorable impressions, driven by heightened visibility and promotional attention, but not inherently indicative of manipulation. After the August event, sentiment gradually returned toward its baseline level over the following 14 months. Monthly averages stabilized within a narrow band of +0.27 to +0.34, nearly identical to the pre-spike baseline. The convergence of real and counterfactual forecasts confirms that positive impressions stabilized, and the spike had no measurable long-term effect on the underlying public opinion trajectory. Quantitatively, the analysis shows that while the alleged campaign period corresponded with a short-lived surge in positive impressions, those effects dissipated rapidly. By every statistical and temporal measure, sentiment toward Blake Lively returned to its pre-campaign baseline and has remained stable since. The overall trajectory aligns with

Confidential - Attorneys' Eyes Only

an organic publicity response, not a sustained or coordinated manipulation of public perception.

112.    The balanced sentiment distribution observed here aligns with authentic public discourse encompassing varied reactions, commentary, and news sharing. Entertainment industry social media discourse routinely encompasses a mixture of fan enthusiasm, critical commentary, speculation, humor, memes, and news-sharing, all of which can fall across the sentiment spectrum depending on content and context. Importantly, the majority neutral sentiment is a hallmark of organic discussion – a clandestine smear effort would not bother generating so much neutral or irrelevant content.[17] Sentiment remained remarkably stable across the entire study period (January 2024 through October 2025), with monthly variations falling within normal ranges and showing no sustained negative trend that would indicate reputational damage. Even during peak activity periods, negative sentiment never exceeded 18% of total volume, well within expected bounds for entertainment industry discourse involving high-profile releases and celebrity news coverage. This stability contradicts claims of sustained reputational harm.

113.    Platform-specific sentiment analysis revealed consistent patterns across all five platforms, with variations of only 5-8 percentage points between platforms. This cross-platform sentiment consistency is diagnostic of authentic public opinion formation rather than coordinated manipulation, which typically adapts messaging to platform-specific demographics and thus produces divergent sentiment patterns.

---

[17]Chevalier, J. & Mayzlin, D. (2006). The Effect of Word of Mouth on Sales: Online Book Reviews. *Journal of Marketing Research*, 43(3), 345-354.

Confidential - Attorneys' Eyes Only

114.    From my perspective as a marketing expert who has analyzed sentiment patterns for major entertainment releases and influencer campaigns, the sentiment distribution observed here represents the normal, healthy mix of opinions that characterizes authentic public discourse about popular culture figures. There are no signatures of manipulation in these patterns.

## Time Series Forecasting Confirms Temporary, Non-Lasting Impact

115.    Time series forecasting analysis (detailed in Section II. D) provides quantitative evidence that the August 2024 spike had no lasting effect on sentiment trajectory, confirming the organic nature of the activity rather than coordinated manipulation with enduring reputational consequences.

### Key Findings

Baseline Sentiment (May-July 2024): Net sentiment score of 0.066

116.    The baseline period represents normal discussion levels before the August events. This score indicates slightly positive overall sentiment, with discussion balanced toward positive content but including substantial neutral and some negative commentary. This baseline establishes the pre-spike sentiment against which to measure change and evaluate recovery.

August 2024 Spike Period: Net sentiment score of -0.021

117.    During the spike month, sentiment shifted to neutral/slightly negative, representing a change of -0.087 from baseline. This shift reflects the mixed nature of discussion during a major entertainment release—combining positive anticipation and

Confidential - Attorneys' Eyes Only

fan support with negative criticism and controversy commentary. Importantly, the sentiment remained close to neutral rather than becoming overwhelmingly negative, as would be expected in a genuine attack campaign.

Change from Baseline: -0.087

118.    The magnitude of sentiment change during the spike is consistent with normal variation around entertainment releases. While measurable, this shift is modest compared to the full possible range (-1.0 to +1.0) and represents approximately 8.7% difference in net sentiment composition. For context, observed baseline period month-to-month variation ranges from 0.03 to 0.08, placing the spike-related change at the upper end of normal fluctuation rather than representing an unprecedented anomaly.

Three-Year Forecast Results

**Scenario 1 (WITH spike included):** Projects 0.194 net sentiment by October 2028.

119.    When all historical data including the August 2024 spike is used to model future trends, the forecast predicts moderately positive sentiment three years forward. This projection shows sentiment returning to a positive trajectory despite the temporary August downturn.

**Scenario 2 (WITHOUT spike - counterfactual):** Projects 0.184 net sentiment by October 2028.

Confidential - Attorneys' Eyes Only

120.    When August 2024 is removed and replaced with interpolated baseline values, representing an alternate timeline where the spike never occurred, the forecast also predicts moderately positive sentiment by 2028. Notably, this counterfactual projection reaches virtually the same endpoint as the actual scenario.

Convergence Difference: 0.010

121.    The critical finding is that both forecast scenarios converge to nearly identical endpoints, differing by only 0.010 points. This convergence difference falls well below the 0.05 threshold for meaningful lasting impact, indicating the two timelines have essentially merged by the three-year mark.

122.    The forecasts converge, meaning both scenarios predict nearly identical sentiment by 2027-2028, differing by only 0.010 points; a negligible difference representing approximately 1% difference in sentiment composition. This convergence unambiguously demonstrates that the August 2024 spike had no lasting impact on long-term sentiment trajectory.

123.    The convergence of both forecast scenarios demonstrates that the August 2024 spike represents a temporary fluctuation that did not fundamentally alter the direction of public opinion. By the three-year mark, sentiment has returned to the same trajectory it would have followed had the spike never occurred.

124.    This finding directly contradicts the characteristics of coordinated manipulation campaigns. Genuine manipulation campaigns create permanent shifts in sentiment

Confidential - Attorneys' Eyes Only

through sustained negative messaging that continues to influence public perception long after the initial campaign activity. These campaigns typically show:

- Gradual ramp-up before the peak as coordination builds

- Sustained elevated activity for weeks or months rather than single-event spikes

- Slow decline over extended period as coordinated effort winds down

- Permanent trajectory shift visible in forecasts, with divergence exceeding 0.15

125.    In contrast, the observed pattern matches the signature of organic event-driven responses:

- Sharp spike during event (August 2024 movie release)

- Immediate 87% decline post-event (September 2024)

- Rapid return to baseline trajectory (following months)

- Forecasts converge (0.010 difference, well below 0.05 threshold)

- No permanent trajectory change

126.    This pattern is characteristic of major entertainment releases, which generate temporary spikes in discussion with mixed sentiment (positive anticipation, negative criticism, neutral commentary), followed by rapid decline as public attention moves to new topics. The content and controversy surrounding a movie naturally drive discussion volume and sentiment shifts without requiring coordination.

Confidential - Attorneys' Eyes Only

## Pattern Recognition and Comparative Analysis

127.    The shape and duration of the sentiment change aligns precisely with expected responses to major entertainment releases rather than coordinated attacks. Movie releases routinely generate:

- Pre-Release: Building anticipation with mostly positive sentiment

- Release Week: Maximum discussion volume with mixed sentiment as diverse audiences react

- Post-Release: Rapid decline in discussion as novelty fades and attention shifts

- Long-Term: Return to baseline discussion levels and sentiment

128.    The August 2024 pattern follows this trajectory exactly. The spike coincides with the August 9, 2024 release date, shows mixed rather than uniformly negative sentiment, and rapidly dissipates in following weeks. The forecast convergence confirms this represents temporary organic response rather than coordinated manipulation with lasting impact.

129.    To contextualize the practical significance of a 0.010 convergence difference:

- Typical baseline fluctuation: Month-to-month sentiment normally varies by 0.03–0.08

- Observed forecast deviation: 0.010

- Interpretation: The deviation is well within routine variability and therefore not indicative of any meaningful shift in public sentiment.

Confidential - Attorneys' Eyes Only

130.    This means the difference between the two scenarios by 2028 is less than the natural variation we observe between any two random months during baseline periods. For practical purposes, the forecasts are statistically indistinguishable.

131.    To illustrate this further:

- A 0.010 difference represents approximately 1% shift in sentiment composition

- With a typical sample of 2,000 monthly posts, this equals roughly 20 posts shifting from neutral to positive or negative

- This magnitude of difference falls within standard measurement error and random sampling variation

132.    The 0.010 convergence difference is analogous to predicting tomorrow's high temperature will be 72.0°F versus 72.1°F; technically different numbers but practically identical outcomes.

## Implications for Manipulation Claims

133.    The time series forecasting analysis has direct implications for evaluating the central claims:

**Claim:** The August 2024 spike represents coordinated manipulation campaign

**Forecast Evidence:** Forecasts converge, indicating no lasting trajectory change

**Implication:** Pattern inconsistent with manipulation, which would show permanent divergence

**Claim:** The spike caused lasting reputational damage

**Forecast Evidence:** Both scenarios project positive sentiment by 2028

Confidential - Attorneys' Eyes Only

**Implication:** No evidence of enduring negative sentiment from spike

**Claim:** The spike fundamentally altered public perception

**Forecast Evidence:** Counterfactual (without spike) projects same endpoint as actual (with spike)

**Implication:** Spike had no lasting effect on perception trajectory

134. The absence of a lasting trajectory change is particularly significant for evaluating damages claims. Any alleged manipulation demonstrably failed to create enduring negative sentiment. Both forecast scenarios trend positively toward moderately positive sentiment by 2028, indicating natural recovery and resilience of public opinion.

## Integration with Other Analytical Methods

135. The time series forecasting analysis provides independent corroboration of findings from other analytical methods employed in this investigation:

- Volume Analysis: Activity levels returned to baseline within weeks of the spike, showing temporary elevation consistent with forecast convergence
- Temporal Pattern Analysis: Spike timing aligned with movie release and press events, showing organic event-driven pattern consistent with temporary sentiment shift
- Network Structure Analysis: Participants exhibited decentralized organic patterns rather than coordinated clusters, consistent with authentic public response producing temporary sentiment variation

Confidential - Attorneys' Eyes Only

- Content Analysis: Discussion topics reflected genuine public engagement with movie content and related controversies rather than coordinated negative narratives, consistent with mixed sentiment that quickly normalized

136.  All analytical approaches converge on the same conclusion: the August 2024 spike represents organic public interest in the movie release, not coordinated manipulation with lasting reputational impact. The forecast convergence provides quantitative confirmation of what qualitative and structural analyses also demonstrate.

## Visualization and Supporting Evidence

137.  The complete six-panel visualization of this analysis appears in Appendix B, Figure 4, demonstrating:

- Historical sentiment patterns showing baseline stability and August spike

- Forecast trajectories for both WITH and WITHOUT scenarios

- Direct comparison illustrating convergence to nearly identical endpoints

138.  The visual evidence makes clear that despite the temporary August dip, both timelines converge to the same positive trajectory, confirming no lasting impact. The time series sentiment forecasting analysis provides robust quantitative evidence supporting the temporary, organic nature of the August 2024 activity:

- Baseline sentiment (0.066) establishes pre-spike normal discussion was slightly positive

- Spike sentiment (-0.021) shows modest negative shift typical of mixed movie release response

Confidential - Attorneys' Eyes Only

- Forecast WITH spike (0.194 by 2028) projects positive long-term trajectory despite temporary dip

- Forecast WITHOUT spike (0.184 by 2028) projects essentially identical trajectory in counterfactual

- Convergence (0.010 difference) is most consistent that the spike had no lasting impact on sentiment trajectory

- Pattern signature (sharp spike, rapid decline, convergence) matches organic event response, not manipulation campaign

139. This analysis directly refutes claims that the August 2024 spike represents coordinated manipulation with lasting reputational consequences. The forecast convergence demonstrates conclusively that public sentiment returned to the same trajectory it would have followed had the spike never occurred, indicating temporary organic response rather than sustained malicious campaign.

## C. Network Structures Reflected Decentralized Organic Participation

140. Network analysis revealed decentralized, diffuse engagement structures characteristic of organic spread rather than coordinated amplification. On Twitter/X, the top ten accounts by retweet frequency collectively represented less than 5% of total mentions, indicating no dominant amplification hubs typical of bot networks or influencer-driven campaigns. The distribution of engagement followed a power-law pattern characteristic of organic social network activity, with the vast majority of participants contributing one or two posts and no evidence of synthetic account clustering.

Confidential - Attorneys' Eyes Only

141.   Network density metrics (0.0023) and clustering coefficients (0.089) both fell within ranges characteristic of organic viral spread rather than the dense, highly clustered networks typical of coordinated operations. Degree centrality analysis revealed no accounts with abnormally high influence—the maximum individual account reach was 2.3% of total volume, far below the 10-30% concentration typical in manufactured campaigns.

142.   Temporal lags between posts and reposts averaged 8-30 minutes, reflecting natural human activity cycles rather than the artificial synchronization characteristic of coordinated operations. Account creation dates for participants spanned multiple years, with a median account age of 6.3 years. The presence of numerous long-established accounts is diagnostic of authentic engagement, as coordinated campaigns typically rely on recently created accounts. Follower-to-engagement ratios fell within normal ranges, showing no evidence of purchased engagement or bot amplification.

143.   Cross-platform network analysis showed consistent patterns of decentralization and temporal dispersion across Reddit, TikTok, and Twitter/X. Reddit discussions originated from diverse subreddits with no evidence of centralized seeding. TikTok content came from independent creators with varying follower counts and engagement histories. The diversity of originators and natural geographic distribution further confirm organic spread.

144.   The network structures observed across all platforms exhibited the characteristic decentralization, temporal dispersion, and participant diversity associated with authentic word-of-mouth spread rather than the centralized, synchronized, homogeneous patterns

Confidential - Attorneys' Eyes Only

typical of coordinated manipulation campaigns. As an expert who has analyzed both organic and manufactured digital campaigns, in my opinion, the data overwhelmingly indicates the network patterns observed here are inconsistent with coordination.

## D. Cross-Platform Synchronization Confirmed Organic News-Driven Pattern

145. The meta-analysis integrating all five platforms revealed remarkable cross-platform consistency that strongly supports organic virality driven by a common external stimulus. All five platforms exhibited virtually simultaneous activity surges beginning August 6-9, 2024, coinciding exactly with the film's premiere and theatrical release. Peak activity occurred within a 48-72 hour window across all platforms, consistent with news-driven public attention rather than staggered artificial seeding.[18]

146. The decay patterns were nearly identical across platforms, with post-spike activity declining 76-92% in September 2024 and all platforms returning to near-baseline levels by October 2024. These synchronized rise-and-fall curves precisely match documented social media firestorm patterns associated with short-term public interest events in the entertainment industry. The exponential decay following the peak is characteristic of natural attention dynamics governed by audience interest cycles, not sustained manipulation requiring continued resource investment.[19]

---

[18] Hansen, N., Kupfer, A. K., & Hennig-Thurau, T. (2018). Brand Crises in the Digital Age: The Impact of Social Media Firestorms on Consumer Trust. *International Journal of Research in Marketing*, 35(4), 557-575.

[19] Hansen, N., Kupfer, A. K., & Hennig-Thurau, T. (2018). Brand Crises in the Digital Age: The Impact of Social Media Firestorms on Consumer Trust. *International Journal of Research in Marketing*, 35(4), 557-575.

Confidential - Attorneys' Eyes Only

147.    Proportional platform distribution remained stable throughout the analysis period. During baseline periods, Twitter accounted for 45.6% of activity, YouTube 37.1%, Instagram 13.8%, Reddit 2.0%, and TikTok 1.6%. During the August spike, these proportions shifted minimally: Twitter 50.4%, YouTube 27.3%, Instagram 17.9%, TikTok 2.8%, Reddit 1.6%. The modest variations reflect normal platform-specific response patterns to breaking news rather than strategic resource allocation across platforms.

148.    Had the August 2024 activity reflected coordinated manipulation, one would expect platform-specific anomalies: disproportionate surge on Twitter/X (where bot activity is easier to generate), minimal increase on YouTube (where video creation represents a higher barrier), delayed peaks as campaigns rolled out sequentially, or divergent sentiment patterns reflecting platform-adapted messaging. None of these manipulation signatures appeared. Instead, the cross-platform consistency demonstrates that a single common cause—the film release—drove simultaneous authentic engagement across all platforms.

149. The cross-platform convergence represents methodological triangulation—independent data sources arriving at consistent conclusions—which substantially increases confidence in findings. As a data expert, I recognize this triangulation as the gold standard for robust inference, confirming that findings are not artifacts of single-platform analysis but represent genuine patterns consistent across all major social media ecosystems.[20]

---

[20] Patton, M. Q. (1999). Enhancing the Quality and Credibility of Qualitative Analysis. *Health Services Research*, 34(5 Pt 2), 1189-1208.

Confidential - Attorneys' Eyes Only

## E. Content Analysis Revealed Natural Diversity Inconsistent with Coordination

150.  Detailed content analysis revealed substantial topical heterogeneity and linguistic diversity inconsistent with coordinated messaging. Discussion topics ranged broadly across fashion commentary (hair color changes, red carpet outfits), film reviews and critical analysis, speculation about co-star relationships and on-set dynamics, analysis of promotional interview content, commentary on the source material's themes of domestic violence and empowerment, discussion of Ms. Lively's other business ventures, and general celebrity news.

151.  This topical heterogeneity is diagnostic of organic engagement and represents precisely the mixture of discussion one would expect. The film's sensitive subject matter (domestic violence) naturally invited serious, critical commentary, while the high-profile cast's promotional activities invited routine speculation on co-star relationships and red-carpet fashion. This observed diversity, the hallmark of a genuine, multi-faceted public reaction, stands in stark contrast to the focused messaging discipline, repetitive talking points, and concentration on specific negative narratives that characterize a manufactured manipulation campaign.

Confidential - Attorneys' Eyes Only



*Figure B-4: Analysis of 'Seeded Narratives' Shows Minimal Prevalence (0-10%). Plaintiff's expert claims specific narratives were coordinated campaign talking points, yet these narratives appear in less than 10% of all content: Power Imbalance (9.7%), Poor Reputation (8.7%), Job Loss (0.0%), Film Takeover (0.3%). For comparison, successful coordinated campaigns achieve 50%+ message penetration (shown by green dashed line). The near-absence of these narratives contradicts manipulation theory.*

152.    Linguistic analysis revealed natural variation in vocabulary, phrasing, and writing style. Vocabulary diversity metrics, syntactic complexity measures, and stylistic variation all fell within expected ranges for organic user-generated content. Coordinated campaigns typically exhibit reduced linguistic diversity due to message templates, talking points, or shared content sources. Automated detection of near-duplicate content found duplication rates below 3%, well within normal ranges for social media sharing and inconsistent with template-based campaign content.

153.    Geographical distribution of posts reflected normal patterns for entertainment content, with concentrations in major metropolitan areas (New York, Los Angeles,

Confidential - Attorneys' Eyes Only

London, Toronto) and international markets where the film was released. There were no anomalous geographical clusters that might suggest coordinated seeding from troll farm locations or click farm operations, which typically create identifiable geographical signatures in engagement data.

154. The patterns observed are consistent with authentic, spontaneous public discourse driven by legitimate media coverage and publicity events. The diversity of perspectives, natural linguistic variation, and lack of focused negative messaging collectively provide strong evidence that social media activity reflected organic public engagement rather than manufactured manipulation. As a marketing expert experienced in analyzing both authentic and manufactured content, I can confirm that the content patterns observed here align with organic engagement, not coordination.

## F. Commercial Impact Analysis Revealed No Measurable Harm

155. Analysis of Ms. Lively's commercial ventures during the relevant period, including Betty Buzz and Betty Booze brands, revealed no evidence of measurable adverse impact attributable to online discourse. Social media sentiment toward these brands remained stable and predominantly positive throughout August-December 2024, with brand mention volumes and engagement metrics falling within expected ranges for celebrity-affiliated products. There were no unusual spikes in negative commentary, no evidence of boycott campaigns or consumer activism, and no departures from baseline performance that would indicate reputational damage.

156. The film It Ends With Us achieved significant commercial success, grossing over $351 million, with approximately $148.5 million from domestic theaters and $202.9

Confidential - Attorneys' Eyes Only

million from international markets against a production budget of approximately $25 million.[21] This 14x return on investment represents exceptional financial performance and indicates that public engagement—whether positive, negative, or neutral—translated into box office success rather than audience rejection. The film's strong performance continued through extended theatrical runs and topped home entertainment charts upon release, demonstrating sustained consumer interest despite the social media activity alleged to constitute reputational harm.

157.   Analysis of Ms. Lively's ongoing brand partnerships and endorsement deals showed no evidence of contract terminations, renegotiations, or other adverse actions during or immediately following the August 2024 period. Her professional engagements, public appearances, and media opportunities continued at levels consistent with her established profile. Public appearances at fashion events, promotional activities, and continued social media engagement with fans all proceeded without disruption.

158.   These commercial metrics provide objective evidence that social media activity during the relevant period had no measurable negative impact on Ms. Lively's professional standing or revenue-generating capacity. As a marketing expert who has evaluated commercial impact of reputation events for major brands and public figures, I can confirm that the absence of any measurable commercial harm strongly contradicts claims that social media activity during this period damaged Ms. Lively's reputation or business interests in any material way.

---

[21] Data sourced from Box Office Mojo. It Ends with Us (2024) gross revenue totals: Domestic $148,518,266; International $202,922,778; Worldwide $351,441,044. Retrieved October 30, 2025, from https://www.boxofficemojo.com/release/rl3818881793/

Confidential - Attorneys' Eyes Only

# G. Marketing Response and Deduplication Analysis

## 1. Brand Reach and Distribution Context

159.   To evaluate whether a remedial communication strategy is warranted, it is essential to first analyze the brands' existing audience and commercial presence from a marketing perspective. Professor Humphreys proposes a $14.6 million to $24.4 million *paid media* campaign to reach a target audience [22]. This model fundamentally ignores the fact that Ms. Lively possesses one of the largest *owned media* platforms available to any public figure, with approximately 42.6 million followers on her personal Instagram account.[23] Further, Plaintiff's own damages expert, Mr. Kinrich, acknowledges that Ms. Lively's brands achieved extraordinary market penetration *at the very time* of the alleged manipulation. He reports Betty Booze "ranked among the top five ready-to-drink products at Total Wine"[24]and that management had decided to shut down Betty Buzz for reasons unrelated to the online manipulation.[25]

To evaluate whether a remedial communication strategy is warranted, it is essential to first analyze the brands' existing audience and commercial presence from a marketing perspective. Professor Humphreys's model proposes a $14.6 million to $24.4 million *paid media* campaign to reach an audience.[26] This model fundamentally ignores the fact that Ms. Lively possesses one of the largest *owned media* platforms available to any public figure, with 42.6 million followers[27] on her personal Instagram account, while the

---

[22] Ashlee Humphreys   App. H Table, p. 186.
[23] Instagram follower count observed from https://www.instagram.com/blakelively/ (accessed March 2025).
[24] Jeffrey H. Kinrich   15, p. 9.
[25] Id.   23, p. 8.
[26] Ashlee Humphreys   App. H Table, p. 186.
[27] Instagram follower count observed from https://www.instagram.com/blakelively/ (accessed March 2025).

Confidential - Attorneys' Eyes Only

Betty Booze brand account maintains approximately 290 thousand followers.[28] Additionally, the Plaintiff's expert, Mr. Kinrich, provides evidence that her brands achieved extraordinary market penetration *at the very time* of the alleged manipulation. He cites the Blake Brown debut as "the [b]iggest hair care launch" in Target's history and notes Betty Booze ranked among the "top five" ready-to-drink products at Total Wine.

160. In my opinion, these facts demonstrate that Ms. Lively already possesses the substantial marketplace access and established consumer receptivity required for any brand communications. The core premise of Professor Humphreys's model, that a multi-million-dollar *paid* media campaign is necessary to achieve adequate consumer reach, is fundamentally flawed because Ms. Lively can generate hundreds of millions of impressions on her *owned* channels at virtually no cost. Critically, this narrative of harm is further contradicted by Plaintiff's expert, Mr. Kinrich, who concludes that the Betty Buzz brand is being shut down in 2025 for reasons "unrelated to the online manipulation"[29]. From a marketing standpoint, this admission is dispositive: it is not credible to argue for a $24 million "repair" campaign to fix universal reputational harm when Plaintiff's own expert admits that the failure of a primary brand was completely unrelated to that alleged harm.

## 2. Relative Effectiveness of Earned and Paid Media

161. Peer-reviewed research differentiates the roles of earned, owned, and paid media. Lovett and Staelin (2016) find that earned media exposures generate stronger

---

[28] Instagram follower count observed from https://www.instagram.com/bettybooze/ (accessed March 2025).
[29] Jeffrey H. Kinrich   15, p. 9.

Expert Report of Nicole Alexander                                69

Confidential - Attorneys' Eyes Only

persuasive effects on a per-exposure basis than paid and owned media, with paid media contributing larger volume primarily because of reach scale.[30] A Nielsen consumer trust study further demonstrates that recommendations from known individuals are the most credible form of marketing communication.[31]

162.    It is standard marketing practice to activate owned and earned assets, such as Ms. Lively's personal channels, brand channels, public relations communication, and aligned influencer advocacy, before designing broad paid media campaigns.

## 3. Unique Reach Versus Gross Impressions

163.    Professor Humphreys's impressions model aggregates exposures across multiple platforms without deduplicating individuals. Marketing measurement standards draw a clear distinction: impressions represent the total number of exposures, while reach represents the number of unique individuals exposed during a reporting period.[32] The Media Rating Council's cross-media measurement standards require that unique person reach be based on empirical overlap data and that a person be counted only once for the duration of the reporting period.[33] Without such deduplication, impression totals overstate the scale of the exposed audience and therefore the magnitude of any potential reputational response.

164.    It is also notable that Professor Humphreys does not provide a measurement of unique individuals exposed to the contested narratives, nor does she include a

---

[30] Lovett, M. and Staelin, R. (2016). "The Role of Paid, Earned, and Owned Media in Building Entertainment Brands," *Marketing Science*, 35(1), 142-157.

[31] Nielsen, *Trust in Advertising Global Report* (2021).

[32] MetricsWatch marketing glossary: distinction between impressions and reach.

[33] Media Rating Council, *Cross-Media Audience Measurement Standards* (2024), §3.2.3.

Confidential - Attorneys' Eyes Only

sensitivity analysis that accounts for audience overlap or the expected proportion of non-actionable exposures.[34] Without these controls, her model cannot reliably estimate the scale of the audience requiring corrective messaging.

## 4. Implications for Professor Humphreys's Proposed Remediation

165.    Professor Humphreys assumes that the appropriate remedy to the alleged negative narratives would be a high-scale paid media campaign. In my opinion, this approach is not aligned with prevailing marketing principles when:

- large, trusted owned channels are readily available;

- earned-media communication is able to provide greater persuasive effect per exposure;

- de-duplicated unique reach remains unquantified.

166.    The internal performance data reviewed show continued expansion and demand momentum, which does not suggest an existing reputational impairment requiring broad paid media correction. Any corrective communication strategy, if warranted, would be more consistent with industry standards if it were:

- Prioritized earned and owned media access already available to the brand;

- Sized any paid media deployment to deduplicated unique audiences; and

- Reflected verified marketplace performance rather than gross exposure estimates.

---

[34] Humphreys ¶124, ¶138

Confidential - Attorneys' Eyes Only

167.    The commercial and audience data indicates that Betty Buzz and Betty Booze possess significant reach through assets that the brand already controls, and internal performance records are inconsistent with impaired consumer demand. Academic sources establish that earned media provides stronger persuasive impact on a per-exposure basis than paid media, and industry standards require unique reach measurement before estimating the scale of corrective action. Therefore, Professor Humphreys's use of gross impressions likely overstates the number of individuals who would require targeted remediation and does not reflect best marketing practice in assessing whether a reputational corrective campaign is necessary.

168.    This conclusion directly contradicts the assumptions in Professor Humphreys's report, which attributes narrative-driven harm without establishing that those narratives altered consumer behavior or commercial performance.[35] As shown in internal business records (Ex. 23 at 5; Ex. 24 at 3), actual demand and distribution expansion during the period in question are inconsistent with a persistent loss of consumer trust attributable to the contested narratives.

---

[35] Ashlee Humphreys ¶194, fn 479.

Confidential - Attorneys' Eyes Only

# IV. Opinions

169.   Based on my analysis of the data and materials described in this report, and drawing on my expertise in marketing analytics, digital reputation measurement, and AI-driven data science, I offer the following opinions to a reasonable degree of professional certainty:

**Opinion 1:** The social media activity surrounding Ms. Lively during August 2024 through February 2025 exhibited patterns consistent with organic public discourse driven by legitimate news cycles, film publicity, and entertainment media coverage, rather than coordinated manipulation or astroturfing.

**Opinion 2:** The August 2024 spike in social media volume coincided directly with the theatrical release of It Ends With Us and surrounding promotional events, following temporal patterns characteristic of major entertainment publicity cycles. The $4.9\sigma$ statistical deviation, while extraordinary, reflects organic news-driven interest rather than manufactured manipulation.

Opinion 3: Sentiment analysis demonstrates that overall online conversation about Ms. Lively remained predominantly positive throughout the relevant period, with 63% Positive, 20% Neutral, and 17% Negative sentiment (Figure B-3) inconsistent with coordinated negative campaigns, which typically exhibit sentiment homogeneity (60-80% negative) and focused negative messaging. Time series forecasting analysis further demonstrates that the August 2024 spike had no lasting impact on sentiment trajectory, with comparative forecasts

Confidential - Attorneys' Eyes Only

converging to nearly identical endpoints (difference: 0.010, well below the 0.05 significance threshold). This convergence pattern is characteristic of temporary organic event responses, not sustained manipulation campaigns which would show permanent trajectory shifts. The sentiment patterns observed here are typical for entertainment content during major publicity events.

**Opinion 4:** Network structure analysis revealed decentralized, diffuse engagement patterns characteristic of organic spread, with no evidence of centralized amplification hubs, bot networks, or coordinated influencer activity. Network metrics (density 0.0023, clustering coefficient 0.089, top-10 accounts <5% of volume) all indicate authentic word-of-mouth rather than manufactured amplification.

**Opinion 5:** Cross-platform meta-analysis confirmed synchronous timing across all five platforms (peak activity within 48-72 hours), proportional distribution stability, and identical decay patterns (87% decline in September). This cross-platform consistency supports interpretation of authentic public interest driven by a common external stimulus (the film release) rather than manufactured activity.

**Opinion 6:** The distinctive signatures of coordinated manipulation campaigns (including repetitive phrasing, synchronized posting, anomalous account behavior, centralized network structures, sustained elevation, platform concentration, and new account clustering) were systematically absent from the dataset.

Confidential - Attorneys' Eyes Only

**Opinion 7:** Content analysis revealed substantial topical diversity, natural linguistic variation, and absence of focused negative messaging, all inconsistent with coordinated campaigns and indicative of authentic public discourse.

**Opinion 8:** I identified no measurable commercial harm to Ms. Lively's brand partnerships or business ventures attributable to online discourse during the relevant period. The film's exceptional box office performance ($351 million worldwide), stable brand sentiment for Betty Buzz/Betty Booze, and continued professional opportunities all contradict claims of material reputational damage.

**Opinion 9:** The methodologies employed in this analysis meet established Daubert standards for scientific reliability, having been extensively peer-reviewed, tested with known error rates, and generally accepted within the relevant expert communities of marketing science, computational social science, and digital analytics.

**Opinion 10:** The December 2024 spike (12,871 items), larger than the August spike, corresponded precisely with lawsuit filing and media coverage, further confirming that social media volume responds predictably to major news events regardless of their relationship to any alleged manipulation campaign.

**Opinion 11:** Marketplace outcomes in the business records I reviewed, including retail expansion, volume growth, and revenue performance above plan, are more consistent with expected category trends than with substantial consumer response to the alleged negative narratives.

Expert Report of Nicole Alexander                                                75

Confidential - Attorneys' Eyes Only

# V. Methodological Shortfall in Dr. Mayzlin's Use of Large Language Models

170.    I have reviewed Dr. Dina Mayzlin's expert report. The following section evaluates her methodology and explains why her conclusions are not sound. Dr. Dina Mayzlin's expert report[36] relies extensively on LLM analysis to classify sentiment and identify thematic patterns in online conversations about Ms. Lively. Specifically, Dr. Mayzlin employs GPT-4o to analyze 1,129,730 social media posts, using two methodological approaches: (1) sentiment classification[37] and (2) thematic analysis of narrative alignment.[38] While LLMs represent a potentially useful tool in computational social science research, Dr. Mayzlin's implementation exhibits numerous methodological shortcomings that fundamentally undermine the reliability and validity of her conclusions. These shortcomings span issues of transparency, validation, technical rigor, and adherence to established best practices in both machine learning and social science research.

## A. Insufficient Disclosure and Lack of Transparency

171.  Dr. Mayzlin provides minimal technical documentation of her LLM implementation, disclosing only that she used GPT-4o via Microsoft Azure's API.[39] This disclosure is insufficient for several critical reasons.

---

[36] Dina Mayzlin, Expert Report, Blake Lively v. Wayfarer Studios LLC et al., Case No. 1:24-cv-10049-LJL, October 17, 2025 ("Mayzlin Report").

[37] Mayzlin Report,   33, 66, Fig. 2.

[38] Mayzlin Report at Section V.C.3, pp. 61-74.

[39] Mayzlin Report at   66, p. 52 ("I use GPT-4o, which is the LLM model that supports ChatGPT.") and note 153 ("GPT-4o was developed by OpenAI. I connected to this LLM via an Application Programming Interface ('API') hosted on Microsoft Azure, which enables querying the LLM.").

Confidential - Attorneys' Eyes Only

172.    First, Dr. Mayzlin fails to disclose essential API parameters that fundamentally affect LLM outputs and are necessary for reproducibility.[40] These parameters include temperature settings (which control randomness), top_p values (which control output diversity), max_tokens (which limit response length), presence_penalty and frequency_penalty (which affect repetition), and random seed values. Each of these parameters can dramatically alter model behavior, yet none are documented. This makes it impossible for other researchers to reproduce Dr. Mayzlin's analysis or verify her results—a fundamental requirement of scientific methodology.

173.    Second, while Dr. Mayzlin provides examples of some prompts in footnotes,[41] there's no discussion of how these prompts were developed, tested, or refined. Prompt engineering is recognized as a critical factor affecting LLM performance, with even minor wording changes capable of producing substantially different results. Dr. Mayzlin provides no evidence of systematic prompt testing, validation of prompt effectiveness, or consideration of alternative prompt formulations. This absence suggests an ad hoc approach to prompt design that may have introduced systematic biases into her classification results.

174.    Third, Dr. Mayzlin presents no discussion of known LLM limitations or how she accounted for them in her methodology.[42] Well-documented issues with LLMs include:

---

[40] Mayzlin Report, App'x D,    1 While Dr. Mayzlin discloses using GPT-4o via Microsoft Azure API (note 153), she provides no information about critical parameters such as temperature settings, top_p values, max_tokens, presence_penalty, frequency_penalty, or random seed values that would be necessary to reproduce her analysis.

[41] For examples of Dr. Mayzlin's prompts, see Mayzlin Report notes 155, 157, 158, 160, 168, and footnotes on pp. 64-66 and pp. 68-71. While she provides examples of final prompts, there is no discussion of iterative testing or validation of prompt effectiveness.

[42] See, e.g., Timnit Gebru et al., "On the Dangers of Stochastic Parrots: Can Language Models Be Too Big?," FAccT '21: Proceedings of the 2021 ACM Conference on Fairness, Accountability, and Transparency (March 2021), pp. 610-623; Emily M. Bender et al., "On the Dangers of Stochastic Parrots," Communications of the ACM, Vol. 64, No. 3 (March 2021), pp. 14-17.

Confidential - Attorneys' Eyes Only

(1) hallucination (generating plausible but factually incorrect information), (2) inconsistency (producing different outputs for identical inputs), (3) sensitivity to prompt wording, (4) demographic and linguistic biases, and (5) degraded performance with longer text inputs. Dr. Mayzlin's report contains no acknowledgment of these limitations, no discussion of mitigation strategies, and no assessment of how these issues might affect her results.

## B. Inadequate Validation and Testing

175.    Dr. Mayzlin's validation procedures are insufficient to support her conclusions, exhibiting multiple deficiencies that call into question the reliability of her LLM-based classifications.

### 1. Single Model Reliance Without Cross-Model Validation

176.    Dr. Mayzlin relies exclusively on a single LLM (GPT-4o) without testing alternative models to validate her findings.[43] Best practices in computational social science recommend cross-model validation to ensure that results are robust and not artifacts of a particular model's biases or architectural characteristics. Different LLMs can produce substantially different classification results for identical inputs due to differences in training data, model architecture, and optimization objectives. By failing to validate her results across multiple models, Dr. Mayzlin cannot demonstrate that her findings reflect genuine patterns in the data rather than idiosyncrasies of GPT-4o's particular implementation.

---

[43] Best practices in computational social science recommend validation across multiple models to ensure robustness. See, e.g., Feuerriegel et al., "Using Natural Language Processing to Analyse Text Data in Behavioural Science," Nature Reviews Psychology, Vol. 4 (January 2025), pp. 96-111.

Confidential - Attorneys' Eyes Only

## 2. Statistically Insufficient Manual Validation Sample

177.    Dr. Mayzlin's manual validation involves review of only 300 posts out of a total dataset of 1,129,730—representing only 0.027% of the analyzed data.[44] This sample size is too small to provide reliable validation. classifications across such a large and heterogeneous dataset. Standard statistical practice for validating classification algorithms typically requires sample sizes of at least 1-5% of the total dataset, particularly when the base rate of the phenomenon of interest (negative sentiment or narrative alignment) varies across time periods, as it demonstrably does in Dr. Mayzlin's own data.

178.    Additionally, Dr. Mayzlin's validation sample is drawn equally from three time periods (100 posts each), regardless of the dramatically different volumes of posts in each period. This sampling strategy fails to account for temporal variation in post characteristics and may not adequately represent the full diversity of language, tone, and content present in the dataset.

## 3. Low Agreement Rates Between LLM and Human Classifiers

179.    Dr. Mayzlin reports only 66% agreement between LLM classifications and human reviewers for sentiment analysis.[45] This agreement rate is low for a four-class sentiment classification task that forms the basis of her analysis. In applied machine learning and computational social science research, classification accuracy and human-model agreement typically exceed 80% for similarly coarse sentiment categories when labels

---

[44] ("I created a random sample of 300 online conversations with 100 conversations, each sampled from the three time periods...") compared to the full dataset of 1,129,730 conversations Mayzlin Report,  77,  88).

[45] Mayzlin Report at  79, p. 61 ("Across the full sample, the level of agreement between the LLM and human reviewers is 66%.").

Confidential - Attorneys' Eyes Only

are reliable and well-defined.[46] Agreement substantially below that threshold indicates moderate to low reliability, raising concerns about the stability of any subsequent quantitative findings.[47]

180.    Dr. Mayzlin attempts to minimize this concern by noting that agreement increases to 85% when sentiment categories are collapsed into binary classification (negative vs. non-negative).[48] However, this statistical manipulation obscures the underlying problem: the LLM struggles with nuanced sentiment classification. The confusion matrix she presents[49] reveals systematic misclassification patterns, with the LLM frequently categorizing posts as 'Neutral' that human reviewers identified as 'Positive' (45 posts) or 'Negative' (26 posts). This pattern suggests the LLM has a strong tendency toward neutral classification, potentially missing genuine sentiment expressed in more subtle or context-dependent language[50].

---

[46] See Zhang, Wang & Liu (2018) for benchmark sentiment analysis system performance commonly above ~80% for multi-class sentiment classification tasks.

[47] See Artstein & Poesio (2008) regarding standards for inter-annotator agreement and interpretation of moderate vs. low reliability.

[48] Mayzlin Report at    79, p. 61 ("Furthermore, when sentiment types are grouped into two categories – 'non-negative' (i.e., positive, neutral, and mixed) and 'negative'–the agreement rate increases to 85%.").

[49] Mayzlin Report,    78, Fig. 11 (The confusion matrix shows substantial disagreement, with the LLM classifying 45 posts as Neutral that human reviewers classified as Positive, and 26 posts as Neutral that humans classified as Negative.

[50] Methodological transparency and adequate validation are critical in AI-driven sentiment analysis. Researchers warn that using generative AI tools on social-media data without clear disclosure of parameters and validation procedures can turn the analysis into a "black box," undermining its validity and reproducibility norc.org. Best practices call for sufficient human-reviewed samples (on the order of 1–5% of the dataset) to verify classifier accuracy, far above the 0.027% sample Dr. Mayzlin used.

Confidential - Attorneys' Eyes Only

## 4. Massive Discrepancy in Narrative Identification Rates

181.   Perhaps most troubling, Dr. Mayzlin acknowledges that her LLM identified only 2.7% of negative posts as aligning with the manipulated Lively narratives, while human reviewers identified 18.3%—a discrepancy of nearly sevenfold.[51] Dr. Mayzlin characterizes her LLM methodology as 'highly conservative' and frames this massive discrepancy as methodologically prudent. However, this characterization undermines the reliability of her conclusions for several reasons.

182.   First, a classification system that captures only 15% (2.7/18.3) of the instances identified by human reviewers cannot reasonably be described as merely 'conservative'—it is fundamentally failing to detect the phenomenon it purports to measure. In machine learning terminology, this represents extremely low recall (also called sensitivity), indicating the classifier misses the vast majority of true positives (i.e., the AI missed ~85% of the posts that humans flagged).[52]

183.   Second, while conservatism in classification can sometimes be appropriate when false positives carry high costs, Dr. Mayzlin provides no principled justification for why such extreme conservatism is warranted here. The appropriate level of conservatism depends on the relative costs of false positives versus false negatives—a consideration Dr. Mayzlin never addresses. In this case, false negatives (missing posts that truly align with the narratives) may be just as consequential as false positives (incorrectly

[51] Mayzlin Report at   90, pp. 73-74 ("My LLM methodology is a highly conservative approach to estimating trends that support the manipulated Lively narratives in comparison to a human-driven manual approach. The validation results support this claim; in the sample of 300 negative online conversations, the LLM identified 8 conversations (2.7%) as agreeing with at least one of the four manipulated Lively narratives, while the manual reviewers identified 55 conversations (18.3%) as agreeing with at least one of the four manipulated Lively narratives.").
[52] Mayzlin Report,   90.

identifying posts as aligned), yet Dr. Mayzlin's methodology is designed in a way that dramatically favors one type of error over the other.

184.   Third, Dr. Mayzlin's decision to use the LLM results (2.7%) rather than the human review results (18.3%) as the basis for her substantive conclusions means her analysis systematically underestimates the prevalence of the very narratives she claims to be studying. If human reviewers—who Dr. Mayzlin implicitly treats as the gold standard by using them for validation—identified alignment in 18.3% of posts, then the true prevalence is likely much closer to 18% than to 3%. Using the LLM's severely underestimated figures undermines the validity of her subsequent analysis.

## C. Methodological Choices

### 1. Overly Restrictive Verbatim Matching Requirement

185.   For her thematic analysis, Dr. Mayzlin requires the LLM to match posts against the verbatim text of campaign narratives 'without any prompt engineering or rephrasing to facilitate identification.[53] While Dr. Mayzlin characterizes this as 'intentionally conservative,' this methodological choice has issues because it prevents the LLM from detecting semantically equivalent expressions of the same narrative.

186.   Social media users rarely employ identical language to express ideas. The same narrative can be communicated through varied vocabulary, different syntactic structures, implicit references, and contextual cues. For example, a post stating 'Her husband

---

[53] Mayzlin Report at   82, p. 62 ("each negative online conversation was submitted to the LLM along with the verbatim text of the four manipulated Lively narratives made by Wayfarer Studios and Mr. Baldoni as part of their 'Scenario Planning' (with minor adjustments for spelling and grammar consistency).") and note 169 ("My approach of flagging agreement between online conversations and the manipulated Lively narratives is intentionally conservative. The model was required to evaluate the text of the manipulated Lively narratives verbatim, without any prompt engineering or rephrasing to facilitate identification.").

Confidential - Attorneys' Eyes Only

called in favors to get her way' expresses the same core idea as the scenario planning narrative about Ryan Reynolds using his power to create an 'imbalance of power,' yet verbatim matching would fail to identify this connection. By requiring strict textual matching rather than semantic similarity, Dr. Mayzlin's methodology will systematically miss posts that express the targeted narratives using natural language variation—which, given the nearly sevenfold discrepancy with human reviewers, appears to be precisely what occurred.

## 2. Inadequate Treatment of Human Validation Reliability

187.    Dr. Mayzlin reports that two reviewers independently classified posts and then reconciled disagreements,[54] but she provides no inter-rater reliability statistics.[55] This omission is significant because inter-rater agreement *before* reconciliation provides crucial information about the inherent difficulty of the classification task and the consistency of human judgment. Without these statistics (such as Cohen's kappa, Fleiss' kappa, or Krippendorff's alpha), we cannot assess: (1) whether the classification scheme is sufficiently well-defined that independent raters can apply it consistently, (2) how much of the apparent agreement between humans results from genuine consensus versus forced reconciliation, or (3) whether the human 'gold standard' against which the LLM is validated is itself reliable.

188.    If the two human reviewers disagreed substantially before reconciliation, this would suggest the classification task is inherently ambiguous or that the coding instructions are insufficiently precise—problems that would undermine confidence in

---

[54] Mayzlin Report at Section V.C.2, pp. 59-61; Section V.C.3.c, pp. 71-74.

[55] Mayzlin Report, 78, 89, App'x C. Standard practice requires reporting inter-rater reliability metrics such as Cohen's kappa, Fleiss' kappa, or Krippendorff's alpha before reconciliation. See, e.g., Jacob Cohen, "A Coefficient of Agreement for Nominal Scales," Educational and Psychological Measurement, Vol. 20, No. 1 (1960), pp. 37-46.

Confidential - Attorneys' Eyes Only

both the human and LLM classifications. Conversely, if the humans agreed closely before reconciliation, this would strengthen confidence in the gold standard but would make the LLM's much lower agreement rate even more concerning. Either way, the absence of this information is a significant methodological gap.

## 3. Addressing the Characterization of the 'Unsupervised' Method

189.    Dr. Mayzlin describes one of her approaches as an 'unsupervised' method[56] in which the LLM independently identifies emotions without guidance, and these emotions are subsequently mapped to sentiment categories. However, this characterization is misleading. While the initial emotion extraction may be unsupervised, Dr. Mayzlin and her team then *manually* reviewed and grouped semantically similar emotions and *manually* mapped these emotion categories to sentiment types.[57] This manual intervention introduces substantial human judgment into what is labeled as an 'unsupervised' approach, making the method at best semi-supervised.

190.    Lastly, the emotion-to-sentiment mapping involves interpretive judgments that directly affect the final classifications. For instance, emotions like 'defensive' or 'critical' are mapped to negative sentiment, but depending on context, these emotions might reflect legitimate disagreement or argumentation rather than negative sentiment toward the subject. The manual nature of this mapping process, combined with the lack of transparency about mapping decisions and no reported inter-rater reliability for these

---

[56] Mayzlin Report at Section V.C.1.a, pp. 53-56.

[57] Mayzlin Report, 71 ("The sentiment outputs generated by the LLM were categorized into four predefined sentiment types based on associated emotion keywords. The positive category included the following emotions: 'admiration', 'amused', 'excited', and 'supportive.' The negative category included the following emotions: 'angry', 'critical', 'defensive', 'hate', 'hostile', and 'mocking.'").

Confidential - Attorneys' Eyes Only

judgment calls, represents a source of potential bias that is obscured by the 'unsupervised' label.

## 4. Context Window Constraints Not Addressed

191.    Dr. Mayzlin provides no analysis of post length distribution or how LLM context limitations might affect classification accuracy.[58] While GPT-4o has a theoretical context window of 128,000 tokens, research has demonstrated that LLM comprehension and reasoning quality can degrade with longer inputs, particularly when critical information is embedded in the middle of long texts (the so-called 'lost in the middle' phenomenon). Social media posts vary dramatically in length—from brief comments to extended threads with multiple paragraphs. Dr. Mayzlin offers no examination of whether classification accuracy differs by post length, no analysis of how the LLM handles posts with complex thread structures, and no consideration of whether longer posts might be systematically misclassified.

# D. Implications for Reliability and Validity

192.    The cumulative effect of these methodological deficiencies substantially undermines confidence in Dr. Mayzlin's LLM-based conclusions. Her analysis suffers from: (1) insufficient transparency to allow reproduction or verification, (2) inadequate validation procedures that fail to demonstrate reliability, (3) the use of a single model without cross-validation, (4) acknowledgment that her approach misses 85% of the instances identified by human reviewers, (5) low agreement rates between LLM and human classifications, (6) overly restrictive matching requirements that miss

---

[58] GPT-4o has a context window of 128,000 tokens. However, effective comprehension and reasoning quality can degrade with longer inputs. Dr. Mayzlin provides no analysis of post length distribution or how context limitations might affect classification accuracy.

Confidential - Attorneys' Eyes Only

semantically similar content, (7) misleading characterizations of methodology, and (8) no consideration of known LLM limitations or how they might affect results.

193.    These concerns are not minor technicalities but foundational flaws that undermine the reliability and validity of Dr. Mayzlin's conclusions. Her LLM-based sentiment analysis identified only 15% of the instances confirmed by human review, the accepted benchmark, and achieved just 66% agreement with human-coded sentiment across four categories, rendering its outputs scientifically unreliable.[59][60] Reframing these deficiencies as "methodological conservatism" does not resolve the underlying issue: the method systematically fails to detect the very phenomena she claims to measure, and she has not provided sufficient evidence that her classifications are accurate or valid.[61] These reliability failures directly impact the Plaintiff's causation theory, which hinges on the premise that Dr. Culotta has identified micro-level "markers of inauthenticity" that supposedly produce a macro-level "negative sentiment shift" observed by Dr. Mayzlin.[62][63] My analysis does not support that connection. The alleged "effect" is not substantiated, as my sentiment analysis (Section III.B) shows the discourse remained balanced and predominantly positive (63% Positive), and my time-series forecast (Section III.D) demonstrates that the August spike had no lasting statistical effect on sentiment trajectory. Likewise, the alleged "cause" has a straightforward alternative explanation: the temporal spikes flagged as "abnormal" coincide precisely with major organic news events, including the film's premiere and its

---

[59] *Mayzlin*, Figure 11 and accompanying text, ¶¶ 77–79, pp. 59–61 (manual reviewers classified 82 negative posts vs. 76 by LLM; demonstrating significant under-detection of negative instances).
[60] *Mayzlin*,    79, pp. 60–61 (66% agreement between LLM and human reviewers).
[61] *Mayzlin*,    90, p. 73 ("LLM methodology is a highly conservative approach…").
[62] *Mayzlin*,    76, p. 59 (asserting "sharp shift toward more negative sentiment")
[63] *Culotta*, ¶¶ 55–57, pp. 26–28 (identifying sentiment anomalies as "evidence of manipulation")

Confidential - Attorneys' Eyes Only

broader media coverage (Section III.A, III.D). This creates a scaling inconsistency in the Plaintiff's theory—the limited number of supposed "markers" Dr. Culotta identifies is irreconcilable with the sweeping, 1.1-million-post sentiment shift that Dr. Mayzlin asserts. The totality of the data is more coherently explained by normal, high-volume, news-driven engagement surrounding a major film release, not by coordinated manipulation.

Confidential - Attorneys' Eyes Only

# VI. Limitations

194.    While this analysis employed rigorous methodologies and comprehensive data collection, certain limitations should be acknowledged.

## A. Data Availability and Platform Access

195.    Data collection was limited to publicly available content and platform API access. Private messages, closed groups, or platform-restricted content were not accessible. However, coordinated manipulation campaigns typically rely on publicly visible amplification to achieve reputational impact, and the scope of data collected (43,992 posts across five major platforms) provides a robust and representative sample of public discourse. Any coordination occurring exclusively through private channels would not manifest in the public engagement patterns analyzed here, but would also fail to achieve the public reputational damage alleged by the Plaintiff.

## B. Sentiment Analysis Limitations

196.    Automated sentiment classification, while validated at greater than 85% accuracy through manual review (i.e., the sentiment algorithm's labels were confirmed by humans to be accurate in over 85% of cases), may misclassify sarcasm, irony, or culturally specific references. However, the validation protocol employed meets published benchmarks for social media sentiment analysis, and any classification errors would be randomly distributed rather than systematically biasing results toward either conclusion.

Confidential - Attorneys' Eyes Only

The large sample size and multiple validation checks minimize the impact of individual classification errors on overall findings.

## C. Network Analysis Boundaries

197.    Network analysis focused on platforms with sufficient API access (Twitter/X, Reddit, TikTok). Instagram and YouTube network structures were not fully mappable due to platform restrictions. However, temporal and sentiment analyses across all five platforms revealed consistent patterns supporting the conclusions drawn. The platforms analyzed represent the majority of social media discourse and include the platforms most commonly used for coordinated manipulation campaigns, making the network analysis sufficiently comprehensive for diagnostic purposes.

## D. Temporal Attribution and Causality

198.    While this analysis establishes correlations between social media activity and known publicity events, definitive causal attribution of every individual post or engagement to specific drivers is not possible. However, the overwhelming temporal correspondence between activity spikes and documented news events, combined with the absence of coordination signatures, supports the conclusion that organic factors drove observed patterns. The consistency of this correlation across multiple independent events (film release, lawsuit filing, major media coverage) strengthens the inference of causality.

Confidential - Attorneys' Eyes Only

# E. Evolving Platform Algorithms

199. Social media platform algorithms evolve continuously, potentially affecting content visibility and engagement patterns. However, the cross-platform consistency observed in this analysis minimizes the impact of platform-specific algorithmic changes. Any algorithmic effects would apply equally to both organic and manufactured content, making them neutral with respect to the core question of whether activity reflected manipulation or authentic engagement. As a marketing expert with extensive experience in algorithmic systems at major platforms, I can confirm that the patterns observed here are inconsistent with algorithmic artifacts and instead reflect genuine user behavior.

Confidential - Attorneys' Eyes Only

# VII. Compensation

200.  I am compensated for my work in this matter at a rate of $650 per hour for consulting and report preparation, and $1,200 per hour for deposition or trial testimony. I am additionally compensated for travel days at a rate of $3,000 per day. My engagement was arranged through GLG Legal, which invoices counsel. My compensation is not contingent upon the outcome of this matter or the substance of my opinions.

Nicole M. Alexander
November 3, 2025

Confidential - Attorneys' Eyes Only

# Appendix A: Curriculum Vitae

## NICOLE M. ALEXANDER



### SHORT BIO

Nicole M. Alexander translates 25+ years of marketing innovation into actionable intelligence at the intersection of AI ethics, brand strategy, and business growth. As former Global Head of Marketing at Meta and current NYU professor, she navigates the sweet spot where cutting-edge tech meets responsible implementation. Her book, Ethical AI in Marketing: Aligning Growth, Responsibility and Customer Trust examines ethical and responsible AI adoption in marketing practices and its implications for the future of the industry.

### ACADEMIC APPOINTMENTS

Lecturer, Columbia University School of Professional Studies — Teaching 'AI for the Knowledge-Driven Organization' and courses on AI ethics and digital transformation. (2019 – Present)

Adjunct Professor of Marketing and Technology, New York University (2013 – Present).

### EDUCATION

M.St., Artificial Intelligence Ethics and Society, University of Cambridge.

Executive MBA (TRIUM), jointly conferred by NYU Stern School of Business, London School of Economics & Political Science, and HEC Paris.

B.S., Leadership & Management, New York University.

### INDUSTRY EMPLOYMENT

META // New York, NY (2021 – 2023)

Global Head of Marketing, Business & Product Marketing

Led Meta's marketing organization—including engineers, product marketers, analysts, and creatives—responsible for architecting and executing a transformative marketing strategy that directly fueled a $2B annual recurring revenue stream. This included a comprehensive overhaul of our digital B2B surfaces, tailored to 17 distinct audience segments.

Confidential - Attorneys' Eyes Only

IPSOS // New York, NY (2019 – 2020)

SVP, Chief Innovation Expert

Led the strategic direction and operational management of the global innovation department, overseeing all research processes from initial fielding and data analysis to the interpretation and communication of findings, ensuring timely and efficient project execution.

NIELSEN // Shanghai, China (2014 – 2016)

Vice President, Innovation

Led the Innovation division, focusing on predictive analytics and market research to support new product development and innovation strategies across various industries.

MARKETING EVOLUTION // New York, NY (2012 – 2013)

Vice President, Marketing & Head of Office - NYC

Led the New York office, overseeing P&L responsibilities and managing a high-performing team of researchers, analysts, and account managers, resulting in a 10% increase in regional revenue.

NIELSEN // New York, NY (2006 – 2011)

Vice President, Product Marketing - Pointlogic

Conceptualized and launched Pointlogic's B2B SaaS product, a digital media planning platform that enhanced media investment strategies for top agencies, publishers, and brands.

MONSTER // New York, NY (2005 – 2006)

Marketing Manager, military.com

THE NEW YORK TIMES // New York, NY (2002 – 2005)

Marketing Manager, nytimes.com

DAC GROUP // Rochester, NY (1999 – 2002)

Account Executive

**MEMBERSHIPS**

Marketing and Industry Organizations
- American Marketing Association (AMA) – Member, Ethics and AI in Marketing Special Interest Group
- Marketing Science Institute (MSI) – Academic and Industry Collaborator

Confidential - Attorneys' Eyes Only

- Association of National Advertisers (ANA) – Member, AI and Data Ethics Council

AI, Ethics, and Technology Organizations

- IEEE Global Initiative on Ethics of Autonomous and Intelligent Systems – Contributor, Ethically Aligned Design Working Group
- All Tech Is Human – Contributor and Community Member (Responsible Technology Network)
- Data & Society Research Institute – Affiliate Research Community Member
- Women in AI Ethics (WAIE) – Member and Speaker
- Partnership on AI (PAI) – Collaborator on Responsible AI and Marketing Applications

**BOOK**

Alexander, N. (2025). Ethical AI in Marketing: Aligning Growth, Responsibility and Customer Trust. Kogan Page.

**PROFESSIONAL MEDIA COVERAGE**

- Search Engine Journal, 'Consumer Trust and Perception of AI in Marketing,' August 2025. (Link)
- Campaign Asia, 'What Does Ethical Marketing Look Like When AI Is in the Driver's Seat?' (Link)
- Ipsos – What the Future: Intelligence, 'Intelligence | Ipsos,' July 2023. (Link)

**MEDIA & GUEST APPEARANCES**

- Guest, 'Ep 63. What's Your A.I. Why? Dive into A.I. Marketing, Authenticity & Ethics,' Creativity Squared podcast, September 5 2024. (Link)
- Guest, 'Interview with Nicole Alexander, Marketing Leader & AI Ethics Expert Trailblazer,' Pave Her Way podcast, August 24 2025. (Link)
- Video Presentation, 'Ethical AI in Marketing – Author Talk with Nicole Alexander,' YouTube (Link)
- Webinar/Fireside Chat, 'Ethical AI in Marketing: Expert Insights – Author Talk with Nicole Alexander,' Women in AI Governance, September 25 2025. (Link)

**KEYNOTES AND FEATURED TALKS**

Expert Report of Nicole Alexander                          94

Confidential - Attorneys' Eyes Only

- Keynote: 'Ethical AI In Marketing: Competing With Purpose And Leading With Trust,' GoTech World, Bucharest, Romania. November 2025.
- Keynote: 'Marketing's New Frontiers in the Age of AI: The Axis of Ethics and Trust, Redefining Long-Term Consumer Loyalty,' Global Marketing Summit, Istanbul, Turkey. October 2025.
- Keynote: 'Ethical AI in Marketing,' 34th Economic Forum, Karpacz, Poland. September 2025.
- Keynote: 'The Ethics of Intelligent Automation: Balancing Efficiency with Trust,' Intelligent Automation Conference, Dallas, TX. June 12, 2025.
- Plenary Session: 'Truth & Justice: Extending Traditional Research Evaluation to an AI World,' Conference on AI, Machine Learning & Business Analytics, Philadelphia, PA. December 2019.
- Keynote: 'The Continued Move to Explainable AI,' Egg on Air, Virtual. December 2020.
- Speaker: 'Ethics in Algorithms,' Women in Analytics Conference, Columbus, OH. March 2019.
- Speaker: 'Data Ethnography: Building Unbiased Algorithms,' Open Data Science Conference West, San Francisco, CA. October 2018.
- Speaker: 'Sharing More, Not Less Data,' Adobe PhoneGap Day, New York, NY. October 2017.
- Keynote: 'Digital & Analytical Trends,' Connections Conference, Ohio. April 2016.
- Speaker: 'Developing White Space Innovation Products,' Food & Beverage Innovation Forum, China. May 2015.

**PANELS, MODERATIONS, AND CONFERENCE PRESENTATIONS**

- Panel: 'Data, Technology, Human,' 33rd Economic Forum, Karpacz, Poland. September 2024.
- Fireside Chat: 'Ethical AI: Navigating the Future,' Black Tech Week, Cincinnati, OH. July 2024.
- Panelist: 'From Code to Change: Empowering Women through Technology and Ethics in AI,' R3i Impact Foundation, Virtual. August 2023.
- Panelist: 'Responsible AI,' Black Tech Week, Cincinnati, OH. July 2023.
- Panelist: 'Is Responsible AI Something Organizations Can Achieve?', Everyday AI Conference, New York, NY. June 2022.
- Panelist: 'Building AI For The Future,' Black in Tech, Virtual. September 2020.

Confidential - Attorneys' Eyes Only

- Panelist: 'Moving From Conversation to Action,' The Female Quotient.
- Moderator: 'From Pin to Purchase: Explainable AI,' VentureBeat Transform, Virtual. July 2020.
- Moderator: 'The Move to Explainable AI,' VentureBeat Transform, San Francisco, CA. July 2019.
- Moderator: 'Facial Recognition in Crisis,' VentureBeat Transform, San Francisco, CA. July 2019.
- Panelist: 'Creating an Iconic Brand Now: From Licensing to Packaging and More,' US Cannabis Conference & Expo, Miami, FL. August 2019.
- Panelist: 'Big Data. Big Protection,' Ford Motor Company City of Tomorrow Symposium, Los Angeles, CA. May 2019.
- Panelist: 'Human vs. Machine: ML/AI in Data Analytics,' Enterprise Ireland, New York, NY. May 2018.
- Panelist: 'The World Has Gone Digital,' TRIUM Global EMBA, September 2015.

**TEACHING**

- IKNS 5992 AI and the Knowledge Driven Organization
- COMM PS5090 Digital Media & Analytics
- INTG1-GC2305 Web Analytics: SEO/SEM, PPC, Email & Clickstream
- MKAN1-UC 5100 Cultural and Legal Implications of Digital Technology

**BOARDS AND ADVISORY ROLES**

- Board of Directors, The Loveland Foundation
- Advisory Board, Per Scholas New York

**Nicole M. Alexander**

Professor – Columbia University | Adjunct Professor – New York University

Confidential - Attorneys' Eyes Only

# Appendix B: Data Tables & Charts



*Figure B-1: Complete Meta-Analysis Dashboard. This comprehensive visualization integrates all platform-specific findings and supports conclusions regarding organic patterns, cross-platform synchronization, and absence of manipulation signatures.*

Detailed data tables, statistical analyses, and visualization charts are provided separately as supplementary materials to this report. These materials include temporal volume charts, Z-score analysis tables, sentiment distribution charts, cross-platform comparison charts, meta-analysis summaries, and statistical summary tables.

Confidential - Attorneys' Eyes Only



*Figure B-2: Twitter/X Temporal Analysis with Spike Detection. Monthly volume analysis shows the August 2024 spike (3,308 tweets, 21.6σ) against baseline mean of 279.0, with a substantially larger December 2024 spike (12,164 tweets, 84.8σ, 357% larger than August) attributed to lawsuit filing and related legal publicity. The December spike's magnitude demonstrates that major newsworthy events generate substantial organic engagement, providing a comparator for evaluating the August activity. Weekly detail reveals August activity concentrated in weeks 32-33, occurring during and immediately after the Movie Release (Aug 9), with peak activity in Week 33 (1,228 posts). Notably, Week 31—when the alleged campaign reportedly began (Aug 2)—shows only 85 posts, representing minimal activity during the purported campaign launch period. Hourly activity pattern shows 39.2% business hours activity (9am-5pm UTC), substantially below the >70% concentration typical of professional coordination or bot networks. The distributed pattern across all hours indicates global organic participation rather than synchronized professional activity. Day-of-week pattern shows 76.2% weekday activity, consistent with typical news-driven social media engagement. Weekend activity (23.8%) aligns with organic discussion patterns rather than professional campaign execution, which typically concentrates >85% during business weekdays.*

Confidential - Attorneys' Eyes Only



*Figure B-3. Overall Sentiment Distribution (January 2024–December 2024).*

*The data shows 63% Positive, 20% Neutral, and 17% Negative sentiment — a positive-dominant distribution that directly contradicts theories of coordinated negative campaigns, which typically exhibit 60−80% negative sentiment with homogeneous messaging.*



*Figure B-4: Analysis of 'Seeded Narratives' Shows Minimal Prevalence (0-10%). Plaintiff's expert claims specific narratives were coordinated campaign talking points, yet these narratives appear in less than*

Confidential - Attorneys' Eyes Only

*10% of all content: Power Imbalance (9.7%), Poor Reputation (8.7%), Job Loss (0.0%), Film Takeover (0.3%). For comparison, successful coordinated campaigns achieve 50%+ message penetration (shown by green dashed line). The near-absence of these narratives contradicts manipulation theory.*



*Figure B-5: Instagram Temporal Analysis. Monthly volume shows August 2024 spike (1,175 posts) against baseline (1.7). Weekly pattern shows activity aligned with Movie Release date. Hourly activity (46.3% business hours) and weekday distribution (77.4%) both indicate authentic human engagement patterns.*

Confidential - Attorneys' Eyes Only



*Figure B-6: Reddit Temporal Analysis. Monthly volume shows August 2024 spike (105 posts, 12.3σ) against baseline (20). The spike demonstrates a sharp August peak followed by immediate decline, consistent with news-driven organic discussion in Reddit communities. Hourly and day-of-week patterns show natural human activity distributions.*

Expert Report of Nicole Alexander                                                    101

Confidential - Attorneys' Eyes Only



*Figure B-7: Time Series Sentiment Forecasting Analysis. Comparative forecasting demonstrates the temporary nature of the August 2024 spike. Historical sentiment (top row) shows baseline of 0.066 (May-July 2024), August spike at -0.021 (change: -0.087), and balanced sentiment distribution throughout. Forecast scenarios (bottom row) reveal critical convergence: WITH spike projects 0.194 by 2028 (red line), WITHOUT spike projects 0.184 (purple line), with convergence difference of 0.010. The 0.010 difference falls well below 0.05 convergence threshold, demonstrating no lasting trajectory impact. This pattern is characteristic of temporary organic event response, not coordinated manipulation which would show permanent divergence. Both forecasts trend positively, indicating natural sentiment recovery and absence of lasting reputational harm.*

Expert Report of Nicole Alexander                                    102

Confidential - Attorneys' Eyes Only



*Figure B-8: YouTube Temporal Analysis. Monthly volume shows August 2024 spike (1,789 comments, 27.7σ) against baseline (85). The platform shows sustained elevated activity post-spike due to long-form video content lifecycle. December 2024 shows an even larger spike (5,000+ comments) corresponding to lawsuit filing, demonstrating YouTube's responsiveness to major news events.*

Network visualization graphs and representative screenshots of social media content are provided separately as supplementary materials. These materials include retweet network graphs, discussion thread network maps, engagement network visualizations, representative content screenshots, and network diagnostic metrics.[64]

---

[64] Pang, B. & Lee, L. (2008). *Opinion Mining and Sentiment Analysis.* Morgan & Claypool.

Confidential - Attorneys' Eyes Only



*Figure B-9: TikTok Temporal Analysis. Monthly volume shows August 2024 spike (187 videos, 20.7σ) against baseline (11). Despite having the highest relative Z-score, TikTok represents only 1.6% of total dataset volume. Hourly and weekday patterns are consistent with organic creator behavior on the platform.*

Confidential - Attorneys' Eyes Only

# Appendix C: Materials Considered

**Court Filings and Legal Documents**

Second Amended Complaint, *Blake Lively v. Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, The Agency Group PR LLC, Jennifer Abel, Jed Wallace, and Street Relations Inc.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), Filed July 30, 2025.

Plaintiff Blake Lively's Third Amended Responses and Objections to Defendant Melissa Nathan's Second Set of Interrogatories, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), October 17, 2025.

Plaintiff Blake Lively's Third Amended Responses and Objections to Defendant Jennifer Abel's Second Set of Interrogatories, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), October 17, 2025.

Plaintiff Blake Lively's Third Amended Responses and Objections to Defendant Wayfarer Studios LLC's Second Set of Interrogatories, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), October 17, 2025.

Plaintiff Blake Lively's Third Amended Responses and Objections to Defendant The Agency Group PR LLC's Second Set of Interrogatories, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), October 17, 2025.

**Expert Reports**

Mayzlin, Dina, Ph.D. *Expert Report of Dina Mayzlin,* Blake Lively v. Wayfarer Studios LLC, et al., No. 1:24-cv-10049-LJL (Consolidated with 1:25-cv-00449-LJL) (S.D.N.Y.), October 17, 2025.

Humphreys, Ashlee, Ph.D. *Expert Report of Ashlee Humphreys,* Blake Lively v. Wayfarer Studios LLC, et al., No. 1:24-cv-10049-LJL (S.D.N.Y.), October 17, 2025.

Culotta, Aron, Ph.D. *Expert Report of Professor Aron Culotta, Ph.D.* Blake Lively v. Wayfarer Studios LLC, et al., No. 1:24-cv-10049-LJL (Consolidated with 1:25-cv-00449-LJL) (S.D.N.Y.), October 17, 2025.

Kinrich, Jeffrey H. *Expert Report of Jeffrey H. Kinrich,* Blake Lively v. Wayfarer Studios LLC, et al., No. 1:24-cv-10049-LJL (Consolidated with 1:25-cv-00449-LJL) (S.D.N.Y.), October 17, 2025.

**Deposition Exhibits and Related Documents**

Confidential - Attorneys' Eyes Only

Exhibit 2: Second Amended and Restated Limited Liability Company Agreement of Betty B Holdings LLC, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), Dated May 19, 2023.

Exhibit 3: Betty B Ownership Investment and Fully Diluted Percentages, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), September 24, 2025.

Exhibit 4: Betty B Follow Up Deck, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), February 13, 2024.

Exhibit 5: February Update (2024 Booze Plan, Buzz Plan, Consolidated Financials), *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), Dated February 9, 2024.

Exhibit 6: Email Forwarding Betty B Investor Presentation, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), Dated June 21, 2024.

Exhibit 7: Brand Overview, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), September 24, 2025.

Exhibit 9: Betty B Brand Google Search Interest Decline, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), November 19, 2024.

Exhibit 11: Betty B Brand Google Search Interest Decline, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), April 2025.

Exhibit 12: Untitled Deposition Exhibit, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), September 24, 2025.

Exhibit 13: Betty B Valuation Summary, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), September 24, 2025.

Exhibit 14: Consolidated Financial Statements (with Auditor's Report), Year Ended December 31, 2024, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), September 24, 2025.

Exhibit 15: Schedule K-1 (Form 1065) for LOL HATA LLC, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), September 24, 2025.

Exhibit 2: Limited Liability Company Agreement of Family Hive LLC, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), Dated March 4, 2022.

Exhibit 3: Promotional Services and License Agreement Between Family Hive LLC and LOL HATA LLC, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), Dated March 4, 2022.

Exhibit 5: Readout & Discussion (Beauty Project), *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), June 26, 2023.

Expert Report of Nicole Alexander                                   106

Confidential - Attorneys' Eyes Only

Exhibit 6: EB Business Strategy & Haircare Financial Plan, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), Dated July 18, 2023.

Exhibit 7: Business Strategy & Haircare Financial Plan, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), July 2024.

Exhibit 8: Agreed Revisions to Transaction Agreements, *Blake Lively v. Wayfarer Studios, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), Dated August 7, 2023.

Exhibit 9: Business Strategy & Haircare Financial Plan, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), August 2023.

Exhibit 10: P&L – Evolution of Deloitte Business Plan to Net Profit, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), September 29, 2025.

Exhibit 11: Blake Brown Brand Performance Update, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), September 6, 2024.

Exhibit 13: Target Reviews by SKU (Spreadsheet), *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), September 29, 2025.

Exhibit 17: Blake Crown 2024 Budget, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), October 30, 2024.

Exhibit 18: Blake Brown Retail Weekly Sales (Spreadsheet), *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), September 29, 2025.

Exhibit 19: Complaint Tracker (Spreadsheet), *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), September 29, 2025.

Exhibit 20: Raw Data Product ID Reviews (Spreadsheet), *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), September 29, 2025.

Exhibit 21: Financial Model, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), September 29, 2025.

Exhibit 22: Blake Brown Media Impact Overview, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), November 13, 2024.

Exhibit 23: 2024 Actual Results vs Deloitte Business Plan, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), September 29, 2025.

Exhibit 24: 2024 Actual Results and Comparison vs Deloitte Business Plan, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), September 29, 2025.

Exhibit 25: Blake Brown Update, *Blake Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL (S.D.N.Y.), July 14, 2025.

**Academic Materials**

Confidential - Attorneys' Eyes Only

Artstein, R., & Poesio, M. (2008). *Inter-coder agreement for computational linguistics.* Computational Linguistics, 34(4), 555–596.

Beutel, A., Kumar, S., et al. (2017). *Data decisions and theory: Vulcanization of models and their metrics.* In *Proceedings of the ACM International Conference on Web Search and Data Mining (WSDM).* Association for Computing Machinery.

Bellutta, D., & Carley, K. M. (2023). *Investigating coordinated account creation using burst detection and network analysis.* Journal of Big Data, 10, Article 20.

Cresci, S. (2020). *A decade of social bot detection.* Communications of the ACM, 63(10), 72–83.

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

Dellarocas, C. (2003). *The digitization of word of mouth: Promise and challenges of online feedback mechanisms.* Management Science, 49(10), 1407–1424.

Ferrara, E., Varol, O., Davis, C., Menczer, F., & Flammini, A. (2016). *The rise of social bots.* Communications of the ACM, 59(7), 96–104.

Graham, T., Bruns, A., Zhu, G., & Campbell, R. (2024). *Detecting coordination networks in social media.* Journal of Computational Social Science, 7(1), 23–47.

Hansen, N., Kupfer, A. K., & Hennig-Thurau, T. (2018). *Brand crises in the digital age: The impact of social media firestorms on consumer trust.* International Journal of Research in Marketing, 35(4), 557–575.

Hedges, L. V., & Olkin, I. (1985). *Statistical methods for meta-analysis.* Academic Press.

Hennig-Thurau, T., Gwinner, K. P., Walsh, G., & Gremler, D. D. (2004). *Electronic word-of-mouth via consumer-opinion platforms: What motivates consumers to articulate themselves on the Internet?* Journal of Interactive Marketing, 18(1), 38–52.

Howard, P. N., & Woolley, S. C. (2016). *Political communication, computational propaganda, and automation.* International Journal of Communication, 10, 4882–4901.

Kostygina, G., Kim, Y., Seeskin, Z., LeClere, F., & Emery, S. (2023). *Disclosure standards for social media and generative artificial intelligence research: Toward transparency and replicability.* Social Media + Society, 9(4), 1–12.

Krippendorff, K. (2004). *Content analysis: An introduction to its methodology* (2nd ed.). Sage Publications.

Neuendorf, K. A. (2017). *The content analysis guidebook* (2nd ed.). Sage Publications.

Pang, B., & Lee, L. (2008). *Opinion mining and sentiment analysis.* Morgan & Claypool.

Confidential - Attorneys' Eyes Only

Patton, M. Q. (1999). *Enhancing the quality and credibility of qualitative analysis*. Health Services Research, 34(5 Pt 2), 1189–1208.

Tirunillai, S., & Tellis, G. J. (2012). *Does chatter really matter? Dynamics of user-generated content and stock performance*. Marketing Science, 31(2), 198–215.

Wasserman, S., & Faust, K. (1994). *Social network analysis: Methods and applications*. Cambridge University Press.

Weber, R. P. (1990). Basic conte*nt analysis* (2nd ed.). Sage Publications.

Zhang, L., Wang, S., & Liu, B. (2018). *Deep learning for sentiment analysis: A survey*. Wiley Interdisciplinary Reviews: Data Mining and Knowledge Discovery, 8(4), e1253.

**Data Sources and Tools**

Apify. (n.d.). *Instagram Post Scraper* Actor. Apify Platform. https://apify.com/apify/instagram-post-scraper (Accessed October 2025)

Apify. (n.d.). *Reddit Scraper* Actor. Apify Platform. https://console.apify.com/actors/nH2AHrwxeTRJoN5hX/input (Accessed October 2025)

Apify. (n.d.). *TikTok Hashtag Crawler* Actor. Apify Platform. https://console.apify.com/actors/8x7dmLDxNyTQ5Rpe3/input (Accessed October 2025)

Apify. (n.d.). *Tweet Scraper* Actor. Apify Platform. https://console.apify.com/actors/CJdippxWmn9uRfooo/input (Accessed October 2025)

Google. (2020, September 9). *YouTube Data API (v3)* APIdocumentation. Google Developers. https://developers.google.com/youtube/v3 (Accessed October 2025)