**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BLAKE LIVELY,

                    Plaintiff,

v.

WAYFARER STUDIOS LLC, et al.,

                    Defendants.

No. 24-cv-10049 (LJL)

---

### PLAINTIFF BLAKE LIVELY'S OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF MOTIONS *IN LIMINE*

Esra A. Hudson (admitted *pro hac vice*)
Naeun Rim (*pro hac vice* pending)
Stephanie A. Roeser (admitted *pro hac vice*)
Sarah E. Moses (admitted *pro hac vice*)
Sareen K. Armani
Katelyn A. Climaco
2049 Century Park East, Suite 1700
Los Angeles, California 90067
(310) 312-4000
ehudson@manatt.com
nrim@manatt.com
sroeser@manatt.com
smoses@manatt.com
sarmani@manatt.com
kclimaco@manatt.com

Matthew F. Bruno
7 Times Sq
New York, NY 10036
(212) 790-4500
mbruno@manatt.com

Meryl C. Governski (admitted *pro hac vice*)
401 9th Street NW
Washington, DC 20004
(202) 240-2927
mgovernski@dirllp.com

Michael J. Gottlieb
Koren Bell
2049 Century Park East
Los Angeles, California 90067
(310) 855-3000
mgottlieb@willkie.com
kbell@willkie.com

Kristin E. Bender
1875 K Street NW
Washington, DC 20006
(202) 303-1000
kbender@willkie.com

Michael Schacter
Aaron Nathan
Michaela A. Connolly
Melissa Taustine
787 7th Avenue
New York, NY 10019
(212) 728-8000
MSchacter@willkie.com
anathan@willkie.com
mconnolly@willkie.com
mtaustine@willkie.com

*Attorneys for Blake Lively*

**TABLE OF CONTENTS**

ARGUMENT.................................................................................................................................1

I.      Motion *in Limine* No. 1: Preclude Improper Character Evidence and Lay Opinion
        Concerning Ms. Lively's Reputation...................................................................................1

        A.      Background...............................................................................................................2

        B.      Argument..................................................................................................................3

II.     Motion *in Limine* No. 2: Preclude Evidence and Argument Relating to the "Vanzan
        Subpoena" and "Vanzan Action."........................................................................................7

        A.      Background...............................................................................................................8

        B.      Argument..................................................................................................................9

III.    Motion *in Limine* No. 3: Preclude Evidence Concerning the Character "Nicepool" in the
        Film *Deadpool & Wolverine*............................................................................................12

IV.     Motion *in Limine* No. 4: Preclude Testimony and Evidence Regarding Ms. Lively's and
        Non-Party Ryan Reynold's Net Worth and Financial Status.............................................14

V.      Motion *in Limine* No. 5: Preclude Internal Sony Communications.................................15

VI.     Motion *in Limine* No. 6: Preclude Evidence Concerning Defendants' Alleged Post-
        Litigation Harm.................................................................................................................18

VII.    Motion *in Limine* No. 7: Preclude Evidence Concerning Statements by Plaintiff and Her
        Agents regarding the Court's Summary Judgment Order or Proceedings.........................20

VIII.   Motion *in Limine* No. 8: Preclude the Testimony of Non-Party Kjersti Flaa...................22

CONCLUSION...........................................................................................................................27

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Adams v. Roberts*,
 2019 WL 6715604 (D. Mont. 2019) ........................................................................26

*Aramony v. United Way of Am.*,
 254 F.3d 403 (2d Cir. 2001)....................................................................................13

*Averbach v. Cairo Amman Bank*,
 802 F. Supp. 3d 605 (S.D.N.Y. 2025)........................................................................6

*Bledsoe v. New York City Transit Auth.*,
 2025 WL 2027292 (E.D.N.Y. July 21, 2025)...........................................................16

*Brown v. Coleman*,
 2011 WL 832898 (S.D.N.Y. Mar. 7, 2011) ...............................................................9

*Bruce Lee Enters., LLC v. A.V.E.L.A., Inc.*,
 2013 WL 822173 (S.D.N.Y. Mar. 6, 2013) ...............................................................6

*Chepilko v. Major*,
 2012 WL 13135142 (E.D.N.Y. Apr. 5, 2012) ..........................................................25

*Cooper v. Dailey*,
 2012 WL 1748150 (N.D. Ill. May 16, 2012) ......................................................19, 20

*Dibella v. Hopkins*,
 2002 WL 31427362 (S.D.N.Y. Oct. 30, 2002) ...........................................................4

*Dreni v. PrinterOn Am. Corp.*,
 2022 WL 2828153 (S.D.N.Y. July 20, 2022) ...........................................................10

*Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*,
 2019 WL 3307850 (W.D. Va. July 22, 2019).............................................................10

*Edelman v. NYU Langone Health Sys.*,
 2023 WL 4305446 (S.D.N.Y. June 30, 2023) (Liman, J.).........................................14

*In re Gen. Motors LLC Ignition Switch Litig.*,
 2015 WL 8130449 (S.D.N.Y. Dec. 3, 2015) .........................................9, 10, 11, 12

*J.T. Colby & Co. v. Apple Inc.*,
 2013 WL 1903883 (S.D.N.Y. May 8, 2013), *aff'd,* 586 F. App'x 8 (2d Cir. 2014)..................6

*John Wiley & Sons, Inc. v. Book Dog Books, LLC*,
 2017 WL 10844685 (S.D.N.Y. Dec. 8, 2017) ..........................................................12

*Kinsey v. Cendant Corp.*,
 588 F. Supp. 2d 516 (S.D.N.Y. 2008)........................................................................15

*L-3 Commc'ns Corp v. OSI Systems, Inc.*,
 2006 WL 988143 (S.D.N.Y. Apr. 13, 2006).............................................................15

**TABLE OF AUTHORITIES**

**Page(s)**

*Lively v. Wayfarer Studios LLC,*
2026 WL 852740 (S.D.N.Y. Mar. 27, 2026) ............................................................11

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP,*
232 F. Supp. 3d 558 (S.D.N.Y. 2017)......................................................................16

*Miro v. City of Bridgeport,*
2023 WL 4992877 (D. Conn. Aug. 3, 2023) .............................................................4

*Mosavi v. Brown,*
2018 WL 5911761 (C.D. Cal. Aug. 7, 2018)............................................................18

*Murray v. Town of Stratford,*
2014 WL 3700982 (D. Conn. July 25, 2014) ...........................................................14

*Outley v. City of New York,*
837 F.2d 587 (2d Cir. 1988).......................................................................................4

*Rebolledo v. Herr-Voss Corp.,*
101 F. Supp. 2d 1034 (N.D. Ill. 2000) ...............................................................19, 20

*Rekor Sys., Inc. v. Loughlin,*
2023 WL 1777248 (S.D.N.Y. Feb. 6, 2023) (Liman, J.) ......................................9, 12

*Repa v. Napierkowski,*
2022 WL 4099657 (W.D. Pa. May 6, 2022)............................................................10

*S.E.C. v. Moran,*
1995 WL 785953 (S.D.N.Y. Oct. 31, 1995)........................................................19, 20

*S.E.C. v. Towers Fin. Corp.,*
966 F.Supp. 203 (S.D.N.Y. 1997)...............................................................................4

*Sec. & Exch. Comm'n v. Alar,*
2022 WL 21302161 (N.D. Ga. Sept. 30, 2022) .......................................................19

*Shannon v. United States,*
512 U.S. 573 (1994)...................................................................................................19

*Smith v. New York & Presbyterian Hosp.,*
440 F. Supp. 3d 303 (S.D.N.Y. 2020).......................................................................16

*Thomas v. New York City Health & Hosps. Corp.,*
2004 WL 1962074 (S.D.N.Y. Sept. 2, 2004)............................................................16

*TNS Media Rsch., LLC v. TRA Glob., Inc.,*
977 F. Supp. 2d 281 (S.D.N.Y. 2013).........................................................................6

*TVT Recs. v. Island Def Jam Music Grp.,*
257 F. Supp. 2d 737 (S.D.N.Y. 2003).......................................................................14

*Tyson v. Conn. Dep't of Energy & Env't Prot.,*
2024 WL 397205 (D. Conn. Feb. 1, 2024) ...............................................................26

iii

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Bradford*,
2023 WL 6794243 (D. Nev. Oct. 12, 2023) ...............................................................11

*United States v. Ferguson*,
2007 WL 4556625 (D. Conn. 2007) ..........................................................................25

*United States v. Gupta*,
747 F.3d 111 (2d Cir. 2014).......................................................................................6

*United States v. Thiam*,
934 F.3d 89 (2d Cir. 2019).......................................................................................17

*Vancza v. Marist College*,
2024 WL 3026683 (N.D.N.Y. June 17, 2024)..........................................................18

*Yien-Koo King v. Wang*,
2020 WL 6875403 (S.D.N.Y. Nov. 23, 2020) (Liman, J.) .......................................13

*Zubulake v. US Warburg LLC*,
382 F. Supp. 2d 536 (S.D.N.Y. 2005)........................................................................5

## STATUTES

Cal. Gov't Code § 12940(d), (g), (h) .........................................................................22

## RULES

CPLR § 1024.................................................................................................................7

Fed. R. Evid. 106 ...................................................................................................17, 18

Fed. R. Evid. 401 ................................................................................................. passim

Fed. R. Evid. 403 ................................................................................................. passim

Fed. R. Evid. 404(a)(1) ......................................................................................4, 5, 23, 25

Fed. R. Evid. Rule 701..................................................................................5, 24, 25, 26

Fed. R. Evid. Rule 702...........................................................................................25, 26

Fed. R. Evid. 801(c).................................................................................................4, 16

Fed. R. Evid. 901 ....................................................................................................4, 16

Pursuant to the Court's Case Management Plan and Scheduling Order, as amended on March 26, 2026 (Dkt. No. 1265), Plaintiff Blake Lively respectfully submits this omnibus memorandum of law in support of her motions *in limine* to preclude Defendants Wayfarer Studios LLC ("Wayfarer"), It Ends With Us Movie LLC ("IEWUM"), and The Agency Group PR LLC ("TAG" and, collectively, the "Defendants") from introducing evidence or making arguments at trial relating to each of the following matters.

## ARGUMENT

I.     **Motion *in Limine* No. 1: Preclude Improper Character Evidence and Lay Opinion Concerning Ms. Lively's Reputation**

Throughout this case, Defendants have insisted both in and out of court that the reputational harm Ms. Lively suffered was not caused by anything the Defendants did, but instead by an "organic backlash" to Ms. Lively's own statements that relied substantially on "unflattering conduct" by Ms. Lively from "years past." Yet when pressed to substantiate this theory in discovery requests, Defendants produced no documents, identified no witnesses with personal knowledge, and offered no competent expert analysis establishing either causation or preexisting reputational injury. Now, Defendants hope to smuggle into evidence a combination of gossip, rumor, hearsay, and speculative lay opinion in lieu of admissible evidence—their objective is to attack Ms. Lively with impermissible character evidence, while misleading the jury into believing that their curated laundry list of old events must have played some role in the overwhelmingly negative shift in public sentiment against Ms. Lively in August of 2024.

The Federal Rules of Evidence do not permit this end-run around discovery or admissibility standards. Hearsay, character assassination, and speculation—whether offered by witnesses, experts, or counsel—are inadmissible and prejudicial. For the reasons set forth below, evidence and argument concerning the truth of these gossip articles—and any lay or expert opinion

1

speculating about what effect these articles may have had on Ms. Lively's reputation or the public's perception of her—must be excluded.

### A.    Background

Throughout this litigation, Ms. Lively attempted to directly test Defendants' "organic backlash" theory through the federal discovery rules. She served document requests and interrogatories specifically focused on this theory—not a single document was produced. *See* Hudson Decl., Ex. 1, at Resp. 114; Ex. 2, at Resp. 8. She served interrogatories directly addressing this theory—no substantive information was provided. *See* Hudson Decl., Ex. 2, at Resp. 8. Instead, Defendants offered a vague narrative asserting, in a wholly conclusory fashion, that unspecified "rumors of discord," marketing decisions, and promotional choices "organically created" negative public sentiment and prompted unnamed "media and internet users" to "dig up and re-circulate unflattering content concerning Lively's behavior from years past." *Id.* That response cited no evidentiary support, and to date, no competent evidence supporting Defendants' theory has been produced.

Defendants' damages expert, Michael J. Wagner, parrots this "organic backlash" theory in his expert report. *See* Hudson Decl., Ex. 3, at 11-12. As support, Wagner simply listed examples of allegedly "unrelated" negative press concerning Ms. Lively from January 2023 through early August 2024. *Id.* At his deposition, however, Wagner acknowledged that ***he did not actually perform any actual analysis*** to determine whether this "unrelated" negative press was rediscovered "organically" in August 2024. *See* Hudson Decl., Ex. 4, at 65:1-67:1. He admitted that, aside from reviewing the complaint and collecting examples of negative press from public

2

articles, he "did nothing else" to reach his conclusions, did not apply any methodology, and did not attempt to quantify damages—his opinion was purely an "assumption." *Id.*[1]

Despite no supporting evidence, Defendants appear intent on exposing the jury to a laundry list of negative media stories about Ms. Lively despite having ***any*** competent evidence linking those stories to the events in this case. Defendants' exhibit list includes numerous documents that were not produced in discovery that traffic in the same unsubstantiated rumors, gossip, and character attacks. *See* Hudson Decl., Ex. 6, at DX1903, DX1907, DX1917, DX1920, DX1931 (collectively, the "Gossip Articles").[2] For the reasons that follow, evidence and arguments relating to the truth of these articles, or their speculative relationship to the so-called "organic backlash," should be precluded.

### B.    Argument

#### 1.    Defendants Cannot Offer the Gossip Articles for the Truth.

Ms. Lively anticipates that Defendants will seek to introduce the Gossip Articles, and other prior unrelated statements, for the truth of the matters asserted. That is, Defendants will attempt to present argument, elicit testimony, and introduce evidence that relies upon the underlying facts in certain press articles to prove that Ms. Lively was, among other things, a "mean girl" or a bully. Using these articles and stories in this manner (*i.e.*, for the truth) is text-book inadmissible hearsay and improper character evidence.

---

[1] Similarly, Defendants' rebuttal expert, Nicole M. Alexander, relied partially on social media postings concerning Ms. Lively that pre-dated the Defendants' smear campaign. *See* Hudson Decl., Ex. 5, at 7-9. As discussed in Ms. Lively's *Daubert* motion, Ms. Alexander's purported data set is not representative of the public conversation about Ms. Lively and therefore cannot provide any reliable insight into Ms. Lively's reputation. *See* Dkt. No 1289. Ms. Alexander also did not perform any reliable sentiment analysis, relying only an automated classification, the results of which she did not disclose on an individual basis, making it impossible to understand how it classified each distinct post. *Id.* Both of these opinions are the subject of *Daubert* motions, filed concurrently herewith.

[2] The examples cited herein are non-exhaustive and for illustrative purposes. This motion *in limine* is intended to address the exhibits cited herein and others that Defendants may seek to introduce, and to prohibit Defendants from mentioning, discussing, implying, questioning, or alluding in view of the jury—whether in voir dire, opening, witness examinations, offering evidence, interposing objections, or otherwise—anything about Ms. Lively's character, reputation or similar concepts based upon old gossip articles and statements.

By way of brief background, there have been countless tabloid articles and internet stories published about Ms. Lively that concern events and controversies that are unrelated to the claims or defenses in this case. Ms. Lively does not dispute the existence of these articles, nor the fact that *certain* old allegations conveniently resurfaced in August 2024 and were subsequently amplified as part of Defendants' retaliatory campaign. For that purpose (*i.e.*, evidence relating to the existence in conjunction with the amplification of these past articles), Ms. Lively takes no issue. However, Ms. Lively anticipates Defendants intend to go further in their use of these articles and to present argument and elicit testimony as to the truth of the underlying facts contained in these articles. Used for this purpose, it is inadmissible hearsay and should be excluded. *See* Fed. R. Evid. 801(c); *see also Dibella v. Hopkins*, 2002 WL 31427362, at *3 (S.D.N.Y. Oct. 30, 2002) (excluding newspaper article as inadmissible hearsay); *Miro v. City of Bridgeport*, 2023 WL 4992877, at *13 (D. Conn. Aug. 3, 2023) (same).

Even if Defendants proffer a permissible basis for using published articles that fits within Rule 803, preclusion is separately warranted to the extent that Defendants intend to use these articles for the purpose of creating a negative impression of Ms. Lively so that the jury will draw adverse conclusions about her character. *See* Fed. R. Evid. 403, 404(a)(1); *See Outley v. City of New York*, 837 F.2d 587, 592 (2d Cir. 1988) (introducing character evidence to paint a civil plaintiff as a certain "type" of person "is a serious one, likely to result in undue prejudice against the party charged"). Circumstantial evidence offered to show that Ms. Lively is the "type" of person who provokes hostility or deserved backlash is precisely the form of prejudice that Rule 404 forbids. *See S.E.C. v. Towers Fin. Corp.*, 966 F.Supp. 203, 205 (S.D.N.Y. 1997) ("Character evidence is of slight probative value and may be very prejudicial. . . . It subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters

4

despite what the evidence in the case shows actually happened"); *Zubulake v. US Warburg LLC*, 382 F. Supp. 2d 536, 541 (S.D.N.Y. 2005) ("Because this is an employment discrimination case, plaintiff's character is not in issue, either as an essential element of a claim or defense.").

In sum, any effort to rely upon unrelated controversies to argue that Ms. Lively is the kind of person who *deserved* an "organic backlash"—or, in Defendants' words, a "bully"—should be precluded under Rule 404(a)(1) as improper character evidence designed to improperly invite prejudicial propensity reasoning.

> 2. <u>Defendants Cannot Offer Inadmissible Lay Opinion as to Ms. Lively's Reputation.</u>

Ms. Lively separately anticipates that Defendants intend to rely upon the Gossip Articles, and others like them, for purposes of establishing that Ms. Lively carried a negative reputation and public perception prior to August 2024. Defendants were free to develop and establish this theory during fact and expert discovery. They failed to do so. No evidence was produced in discovery to support this theory. Instead, Defendants referred generally to the existence of negative articles and internet posts. *See* Hudson Decl., Ex. 2, at Resp. 8. Because this theory rests on improper lay opinion, it is inadmissible under Rule 701.

To begin, Defendants failed to retain an expert to analyze and determine whether the prior Gossip Articles in any way impacted Ms. Lively's reputation prior to August 2024. The opinions of Mr. Wagner and Ms. Alexander, which are the subject of *Daubert* motions, do nothing of the sort: they conducted no causal analysis, applied no methodology, and merely catalogued negative press, while Mr. Wagner conceded that his conclusions rest on assumptions. *See* Hudson Decl., Ex. 4, at 65:1-67:1; Ex. 3, at 11-12; Ex. 5, at 8-9. Collecting negative press is not the stuff of experts and, in any event, fails to support Defendants' theory that Ms. Lively carried a negative

reputation prior to August 2024. *See TNS Media Rsch., LLC v. TRA Glob., Inc.*, 977 F. Supp. 2d 281, 316 (S.D.N.Y. 2013) (excluding expert report resting on speculation and hearsay).

What remains is general lay opinion as to what witnesses *believed* of Ms. Lively's reputation. It is well-settled, however, that a lay person may not offer opinion testimony on public perception or reputation. *See, e.g.*, *J.T. Colby & Co. v. Apple Inc.*, 2013 WL 1903883, at *13 (S.D.N.Y. May 8, 2013), *aff'd,* 586 F. App'x 8 (2d Cir. 2014) (excluding evidence of non-expert offering testimony that "ibooks" had a "strong reputation"); *cf. Averbach v. Cairo Amman Bank*, 802 F. Supp. 3d 605, 650 (S.D.N.Y. 2025) (allowing experts to opine on public perception). Here, Defendants have failed to identify any witness with first-hand knowledge that Ms. Lively had a negative reputation prior August 2024, any such testimony or argument should be precluded. *See, e.g.*, *Bruce Lee Enters., LLC v. A.V.E.L.A., Inc.*, 2013 WL 822173, at *7 (S.D.N.Y. Mar. 6, 2013) (permitting testimony regarding professional reputation where personal knowledge established).

### 3.   The Gossip Articles and Prior Statements Should be Excluded Under Rule 403.

Finally, even if Defendants could articulate marginal relevance (and there is none), the Gossip Articles, and other prior unrelated statements, should nevertheless be excluded under Rule 403 since any probative value is substantially outweighed by the risk of unfair prejudice, confusion of the issues, or waste of time. *See* Fed. R. Evid. 403; *United States v. Gupta*, 747 F.3d 111, 131 (2d Cir. 2014). Among the hit list of articles Defendants hope to send back into the jury room: (i) a three paragraph article from 2009 in at which Ms. Lively is reported to have used the word "tranny," (Hudson Decl., Ex. 7); (ii) an article from 2020 referencing an alleged 2012 "plantation wedding" in the hopes of suggesting racism, (Ex. 8); and (iii) a 2014 article entitled, "Blake Lively Wants to Return to a Time of Cute Hats and Slavery," (Ex. 9). And Defendants hope to introduce this "evidence" without any expert testimony that these articles, and others like them, had *any* impact on public sentiment regarding Ms. Lively at *any time*, let alone during the only relevant

6

time just before and then following August 2024. Absent such testimony, these articles do not satisfy the relevance threshold of Rule 401, and any relevant would be substantially outweighed by the obvious danger of unfair prejudice caused by placing this selection of very negative articles before the jury.

**II.** **Motion *in Limine* No. 2: Preclude Evidence and Argument Relating to the "Vanzan Subpoena" and "Vanzan Action."**

Throughout this case, Defendants have raised arguments concerning a subpoena issued by Vanzan Inc. (the "Vanzan Subpoena"), a non-party entity that, at the time, was pursuing litigation In New York State Supreme Court against "Doe" defendants pursuant to CPLR § 1024 (the "Vanzan Action"). The Vanzan Subpoena has never had any bearing on any element of Ms. Lively's claims. Defendants have relied on it not because it makes any fact of consequence more or less probable, but because it has served as a convenient vehicle to argue in the press that Ms. Lively or her counsel engaged in some form of litigation misconduct that has never been put before any court. The authenticity and relevance of the materials produced in response to the Vanzan Subpoena is not in dispute. The only conceivable reason for Defendants' suggestion of impropriety is to cast an unfounded cloud of suspicion that the documents produced are unreliable because Ms. Lively or her counsel purportedly did something improper. But neither the Vanzan Subpoena nor the underlying Vanzan action have any bearing on the claims to be decided in this case and would create substantial risk of prejudice, jury confusion, and needless consumption of trial time. For these reasons such evidence should be excluded under Federal Rules of Evidence 401, 402, and 403.

### A.    Background

Ms. Lively is the President and a 50% owner of Vanzan Inc. ("Vanzan"). Dkt. No. 1252-2, at ¶ 338.[3] "Vanzan was established after [Ms. Lively and Ryan Reynolds] were married in 2019 to handle payroll and other administrative matters for a variety of household employees[.]" Dkt. No. 1245-163, at 13:3-8. On September 27, 2024, Vanzan commenced the Vanzan Action. Dkt. No. 1252-2, at ¶ 339. In connection with that action, Vanzan served the Vanzan Subpoena on Jonesworks LLC. *Id.* ¶ 341. Jonesworks produced materials in response to the Vanzan Subpoena. *Id.* ¶ 343. No motion to quash or other legal challenge to the Vanzan Subpoena was ever filed by Defendants or anyone else, and no court has ever ruled that the subpoena or the Vanzan Action were improper in any way. Vanzan voluntarily dismissed the Vanzan Action on December 19, 2024. *Id.* ¶ 344.

Defendants have characterized the Vanzan Action as "frivolous" and a "sham," and they have made general, baseless accusations that Ms. Lively conspired to misuse legal process. *See, e.g.*, *Jones v. Abel*, Dkt. No. 156, at ¶ 106; *id.* Dkt. No. 129, at 2. They have echoed those accusations publicly in the media[4] and (like the Character Evidence) have forced the Vanzan Action into filings in this case, notwithstanding any actual or articulated relevance to Ms. Lively's claims or their defenses. *See* Dkt. No. 1252-2, ¶¶ 338–44. Despite their counsel's public threat

---

[3] Unless otherwise noted, citations to Ms. Lively's Response to Defendants' 56.1 Statement refer to the responsive portions of those statements and are not intended to adopt the Wayfarer Parties' characterizations of the cited facts.
[4] *See, e.g.*, Ryan LaBee, *Blake Lively's Team Got Called Out by Justin Baldoni's Lawyer for 'Abuse of Process' and 'Super Shady' Legal Tactics After Quiet Lawsuit Filing*, Cinemablend (Apr. 19, 2025), https://www.cinemablend.com/movies/blake-lively-team-called-out-justin-baldonis-lawyer-for-abuse-of-process-super-shady-legal-tactics-after-lawsuit-filing (Freedman quoted "This appears to be . . . ***an abuse of process and we intend to take all action allowable under the law***" (emphasis added)); Dominic Patten, *Justin Baldoni Damns Blake Lively For "Abuse" & "Sham Lawsuit" Seeking Texts, Smear Campaign Evidence; "Nothing to Hide," Actress' Lawyers Declare*, Deadline (Apr. 21, 2025), https://deadline.com/2025/04/justin-baldoni-blake-lively-lawsuit-sham-1236372699/ (Freedman quoted "This sham lawsuit was designed to obtain subpoena power without oversight or scrutiny, and in doing so denied my clients the ability to contest the propriety, nature, and scope of the subpoena. . . . ***This was done in bad faith and constitutes a flagrant abuse of process***") (emphasis added).)

nearly a year ago to "take all action allowable under the law" to address this supposed "abuse of process," (*see supra* n. 4), Defendants have never challenged the validity of the Vanzan Action or Vanzan Subpoena, likely because they have never found *any* action "allowable under the law" that would make such a challenge cognizable.

### B.    Argument

#### 1.    The Vanzan Action and Vanzan Subpoena are Irrelevant.

Evidence or argument concerning the Vanzan Action and Vanzan Subpoena does not make any fact of consequence in this case more or less probable and is therefore irrelevant under Rules 401 and 402. This case concerns Ms. Lively's claims for retaliation based upon engaging in protected activities relating to sexual harassment that she experienced and observed on the set of the Film. The Vanzan Action was a separate, unrelated New York state-court contract dispute brought by a non-party entity against unidentified defendants, none of whom were Defendants, and shared no overlapping claims, elements, facts, or legal issues with those to be tried here. Evidence concerning collateral litigation of this kind, therefore, has no tendency to prove or disprove the claims at issue in this case. For these reasons, courts in this district routinely exclude evidence concerning other lawsuits on precisely these grounds. *See Rekor Sys., Inc. v. Loughlin*, 2023 WL 1777248, at *4 (S.D.N.Y. Feb. 6, 2023) (Liman, J.) (excluding evidence of other litigation where such evidence was irrelevant); *In re Gen. Motors LLC Ignition Switch Litig.*, 2015 WL 8130449, at *4–5 (S.D.N.Y. Dec. 3, 2015) (same); *Brown v. Coleman*, 2011 WL 832898, at *1 (S.D.N.Y. Mar. 7, 2011) (same).

At no point have Defendants asserted a claim or defense in this action that places the propriety of the Vanzan Subpoena at issue. They have not sought relief in the issuing court, and they have not taken any steps in this case to exclude any of the evidence obtained from the Vanzan Subpoena *on any basis*, much less "abuse of process." They therefore cannot invite the jury to

9

infer wrongdoing that they have chosen not to litigate. *See Repa v. Napierkowski*, 2022 WL 4099657, at \*1 n.2 (W.D. Pa. May 6, 2022) (excluding evidence of allegedly improper subpoena issued in a state-court action as irrelevant where no abuse-of-process claim was pleaded and no motion was brought in the issuing court); *see also Dreni v. PrinterOn Am. Corp.,* 2022 WL 2828153, at \*3 (S.D.N.Y. July 20, 2022) ("[T]o the extent that [defendant] may be alleging that [plaintiff's] prior lawsuit evinces 'a fraudulent pattern,' [defendant] has put forth no evidence that Plaintiff's prior suit in Albania was fraudulent.").

At bottom, Defendants take issue with the fact that their "untraceable" plan to "bury" and "destroy" Ms. Lively was discovered. That is not a defense. In fact, the very same evidence about which they complain now would have been subject to production in this action. Defendants should not be permitted to cast doubt on relevant evidence by suggesting to the jury, directly or indirectly, that it was improperly obtained. Because the Vanzan Action and Vanzan Subpoena lack any cognizable probative value, any such evidence or argument should be excluded under Federal Rules of Evidence 401 and 402.

2.  <u>Evidence Concerning the Vanzan Action and Vanzan Subpoena Should Also Be Excluded Under Rule 403.</u>

Even if evidence concerning the Vanzan Action had any marginal relevance, the risk of prejudice to Ms. Lively, and jury confusion, and waste of time substantially outweighs any marginal probative value, which separately warrants exclusion under Rule 403. Where a party seeks to introduce evidence of "alleged litigation misconduct" in other cases, "the dangers of unfair prejudice, jury confusion, and waste of time are quite real." *In re Gen. Motors LLC Ignition Switch Litig.*, 2015 WL 8130449, at \*5 (S.D.N.Y. Dec. 3, 2015).[5] For example, as in the example from

---

[5] Indeed, generally "courts exclude evidence of other lawsuits, even if such lawsuits are related to the case before it." *Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, 2019 WL 3307850, at \*7 (W.D. Va. July 22, 2019), *order clarified*, 2019 WL 4197221 (W.D. Va. Sept. 4, 2019). This case does involve a different, notable exception to that general rule,

the *Ignition Switch* litigation, "despite the absence of evidence that [one party] engaged in any litigation misconduct . . . jurors may seek to punish [that party] for what they view as an overly aggressive litigation strategy." *Id.* Indeed, Defendants are likely counting on such a reaction.

In any event, the propriety of how evidence is obtained is a question of law for the Court, not a question of fact for the jury. If there were some basis to preclude Ms. Lively from using the materials Vanzan obtained in response to the Vanzan Subpoena, and *if* Defendants had raised such a challenge, that would have been a question for the Court to decide out of the jury's presence— much like a suppression motion in a criminal case. And just as a criminal defendant may not relitigate a suppression motion he *did* file by attacking the government's conduct in obtaining the evidence, Defendants cannot now attempt to litigate a "suppression" issue they *did not* raise by casting doubt on the Vanzan Subpoena's propriety. *See, e.g.*, *United States v. Bradford*, 2023 WL 6794243, at \*5 (D. Nev. Oct. 12, 2023) (excluding evidence about how a search warrant was executed because "the only discernable purpose for Defendant offering evidence or argument on this issue would be to cast doubt on whether those actions were lawful").

Moreover, admitting this evidence would require the Court to allow Ms. Lively an equal opportunity to challenge and rebut those accusations, requiring evidence and argument surrounding the details of New York civil procedure, generating "a mini-trial within the larger

---

namely evidence relating to the lawsuit that IEWUM, Wayfarer, and other Defendants filed against Ms. Lively and Mr. Reynolds. Ms. Lively has a retaliation claim pending against IEWUM, and plans to prove that the lawsuit IEWUM filed against her and her husband in this Court was part of the retaliatory conduct they inflicted on her. This Court not only dismissed that lawsuit but recently imposed Rule 11 sanctions for its filing, holding that IEWUM "simply had no basis to sue Lively or Reynolds for civil extortion," and did not identify "even an arguable basis in law or fact" for IEWUM to assert a tortious interference claim against them. *Lively v. Wayfarer Studios LLC*, 2026 WL 852740, at \*4 (S.D.N.Y. Mar. 27, 2026); *see id.* ("Even if a plaintiff has a claim against one defendant in a multi-party case, the Rule does not excuse him naming other parties as a defendant. Nor, even if one plaintiff has a claim against the defendant, does the Rule permit other parties to sue that same defendant absent a factual or legal basis."). The probative value of evidence relating to IEWUM's conduct in filing that lawsuit would not be substantially outweighed by any prejudice, confusion, or waste of time—nor would any such prejudice be "unfair," in light of the Court's determinations as to the absence of any legitimate basis for IEWUM to have brought those claims.

11

trial, and a sideshow at that," given that the origins of the Vanzan Subpoena are "hardly central to the issues in this case." *In re Gen. Motors Ignition Switch Litig.*, 2015 WL 8130449 at *5. That detour would unnecessarily consume the jury's time and risk confusing the issues before them. *Id.*; *see also Rekor*, 2023 WL 1777248, at *4 (explaining that "a detour into … prior lawsuits and their merits would be a sideshow and would inevitably require the [factfinder] to try the merits of those cases"); *see also John Wiley & Sons, Inc. v. Book Dog Books*, LLC, 2017 WL 10844685, at *1 (S.D.N.Y. Dec. 8, 2017) (excluding evidence of a party's other lawsuits where the burden of explaining the circumstances would substantially outweigh any probative value and risk distracting the jury).

### III.    Motion *in Limine* No. 3: Preclude Evidence Concerning the Character "Nicepool" in the Film *Deadpool & Wolverine*

The Court should exclude any evidence or argument regarding, or making any explicit or implicit reference to, the character of "Nicepool" in the film *Deadpool & Wolverine* because the Court already has determined such information is irrelevant. On April 8, 2026, Defendants added "Nicepool Clips from Deadpool v. Wolverine (YouTube)" as Exhibit 1946 ("Nicepool Exhibit"),[6] ostensibly as part of an intent to perpetuate the same character assassination of Lively as a "mean girl" and "bully" and to paint Baldoni as the victim. *See* Hudson Decl., Ex. 6; *see also* Dkt. No 133, at 133 (explaining evidence supporting Defendants' attempt to "destroy Lively and her career by boosting stories about Ms. Lively as a "'mean girl'"). Because this Court has already determined that evidence relating to the "Nicepool" character is not relevant, (*see* Dkt. Nos. 296, at 98 n.51; 303, at 1-2), Defendants are foreclosed from now introducing any such evidence under

---

[6] The Nicepool Exhibit is a compilation of video clips that Defendants appear to have created from two videos posted YouTube from non-Marvel accounts. *See* https://www.youtube.com/watch?v=rYKfCoZ6BII, https://www.youtube.com/watch?v=igoVNNnAx8Q. Ms. Lively reserves all rights to challenge the introduction of the Nicepool Exhibit, including on Rule 901 grounds.

the law of the case doctrine. *See Yien-Koo King v. Wang*, 2020 WL 6875403, at \*14 (S.D.N.Y. Nov. 23, 2020) (Liman, J.) ("This Court will not revisit that holding now, which is law of the case" (citation omitted); *see also Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001) ("The doctrine of the law of the case posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case.").

By way of background, in their now-dismissed and sanctioned lawsuit against Ms. Lively and her husband, Ryan Reynolds, Wayfarer and IEWUM claimed that the character of Nicepool was a "transparent and mocking portrayal of Reynolds' warped perception of Baldoni" and a "vicious caricature" of Baldoni that provided evidence of "mocking and bullying." Dkt. No. 50, at ¶ 105. In its order dismissing their lawsuit, the Court held that these Nicepool allegations—*i.e.*, those relating to the alleged "portrayal of Baldoni as a fake feminist who makes inappropriate comments" — do not "support the claim that Reynolds disliked Baldoni for reasons independent of his belief that Baldoni engaged in misconduct, as opposed to for that very reason." Dkt. No. 296, at 98 n.51.[7] The Court also addressed the irrelevance of Nicepool in another Order entered that same day, non-party Marvel Entertainment, LLC's ("Marvel") motion to quash Defendants' subpoena that sought, *inter alia*, all documents relating to Nicepool. *See* Dkt. Nos. 303, 186. In granting Marvel's motion, the Court explained:

> ***Pursuant to the Court's Opinion and Order of June 9, 2025, dismissing the Wayfarer Parties' claims, the information sought is no longer relevant to a claim or defense in this action***. Dkt. No. 296. Moreover, assuming the information were relevant, it would not be proportional to the needs of the case and the potential harm to Marvel of disclosing confidential commercial information. *See* Dkt. No. 296 at 98 n.50.

---

[7] Mr. Reynolds' motion to dismiss explained that the "thin-skinned outrage over a movie character, the satirical "woke" Nicepool, does not even pretend to be tied to any actual legal claims—instead, it falls into the FAC's general allegation of 'hurt feelings,' which in reality is nothing more than a desperate effort to advance the same curated "bully" image that the Wayfarer Parties created and disseminated in the retaliation campaign they launched against Ms. Lively in August of 2024." Dkt. No. 133, at 10 (citation omitted).

13

Dkt. No. 303, at 1-2 (emphasis added). Having already found that information relating to Nicepool is "no longer relevant to a claim or defense in this action," the Court should not permit the introduction of any related evidence during trial. *See Edelman v. NYU Langone Health Sys.*, 2023 WL 4305446, at *7 (S.D.N.Y. June 30, 2023) (Liman, J.) ("A motion *in limine* is available where a party seeks to offer evidence in an 'attempt to persuade the jury to reach a conclusion prohibited as a matter of law.'" (citation omitted). Even if *arguendo* there were any marginal relevance to Nicepool, Rule 403 prohibits its introduction because of the likelihood of prejudice and confusion. Indeed, it would be manifestly unfair to permit the Defendants to use the Nicepool Video to imply or advance any argument because it would be predicated on an undeveloped record by virtue of the lack of any discovery on the topic.

**IV.     Motion *in Limine* No. 4: Preclude Testimony and Evidence Regarding Ms. Lively's and Non-Party Ryan Reynold's Net Worth and Financial Status**

Ms. Lively and her husband's (non-party Ryan Reynolds) net worth and financial status are not at issue and not relevant. In fact, like the Nicepool evidence discussed above, the law of the case bars Defendants from attempting to introduce this evidence. *See supra* Sec. III. During discovery, this Court considered and rejected a similar issue in which Defendants sought to compel evidence regarding Ms. Lively's net worth over nine months ago. Dkt. No. 433, at 6-8. A party's "net worth is only relevant . . . if there is a finding that punitive damages should be awarded." *Id.* at 7 (collecting cases). Even when punitive damages are at issue, only the wealth of the ***defendant*** (not plaintiff) is relevant. *See, e.g.*, *Murray v. Town of Stratford*, 2014 WL 3700982, at *4 (D. Conn. July 25, 2014) (excluding evidence of the plaintiff's wealth from trial involving punitive damages because "what is at issue in this motion is the wealth of plaintiff and/or of her husband, not that of defendant"); *TVT Recs. v. Island Def Jam Music Grp.*, 257 F. Supp. 2d 737, 745

14

(S.D.N.Y. 2003) ("[E]vidence of a ***defendant's*** net worth is properly considered given the goals of punishment and deterrence served by punitive damages." (emphasis added)).

Here, as the plaintiff, Ms. Lively is not subject to any damages, much less punitive damages. It follows, evidence of her personal financial condition is not relevant and should be excluded on that basis alone. The same holds true for Mr. Reynolds, who, as a non-party, the relevance of his net worth is even more attenuated. Because settled law recognizes that a plaintiff's net worth is not relevant, testimony and evidence relating to the same should be precluded at trial. *See* Dkt. No. 433, at 6-8.

Even if Ms. Lively's or Mr. Reynolds's personal wealth were relevant, any marginal probative value of this information would be substantially outweighed by the clear risk of prejudice it may present in influencing or triggering biases against wealthy individuals. Cases are legion on this score. *See Kinsey v. Cendant Corp.*, 588 F. Supp. 2d 516, 518 (S.D.N.Y. 2008) ("The parties are not permitted to argue to the fact finder's potential economic sympathies or prejudices."); *see also L-3 Commc'ns Corp v. OSI Systems, Inc.*, 2006 WL 988143, at *6 (S.D.N.Y. Apr. 13, 2006) (evidence of witness's wealth "unfairly prejudicial"); *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, WL 3111766, at *18 (S.D.N.Y. Sept. 28, 2009) (individuals' compensation information excluded because "probative value of this information is outweighed by its potential to bias the jury under Rule 403"). For each of these reasons, evidence of Ms. Lively's and Mr. Reynolds's net worth should be excluded.

## V.    **Motion *in Limine* No. 5: Preclude Internal Sony Communications**

Based on their exhibit list Defendants intend to introduce and reference internal text-message communications from non-party Sony Pictures Entertainment ("SPE"), several of which are incomplete, one-sided, messages. *See, e.g.*, Hudson Decl., Exs. 10, 11, 12; *see also* Ex. 13 (one-sided text message); Ex. 14 (same); Ex. 15 (same); Ex. 16 (same); Ex. 17 (same) (collectively,

15

the "Incomplete Messages"). Because the authors of these messages lack personal knowledge regarding the subject matter discussed therein and the messages, themselves, are textbook hearsay, exclusion is warranted.

By way of brief background, Defendants have included a series of internal text messages between and among SPE employees Andrea Giannetti, Sanford Panitch, and Josh Greenstein.[8] In these messages, Ms. Giannetti, Mr. Panitch, and Mr. Greenstein discuss, among other things, Ms. Lively's Protection Document, efforts to edit and improve the Film, and marketing. *See e.g.* Hudson Decl., Ex. 10, at SPE_WF0000416. Critically, the speakers all lack first-hand knowledge of the subject matter being discussed. *Thomas v. New York City Health & Hosps. Corp.*, 2004 WL 1962074, at *12 n.6 (S.D.N.Y. Sept. 2, 2004) ("The statements of the non-party declarants are not even admissible to the extent that they are not based on personal knowledge and constitute hearsay"); *see also MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 570 (S.D.N.Y. 2017) (precluding non-party from testifying to matters to which "he does not have personal knowledge"). None of the speakers witnessed first-hand the events leading up to the Protections Document. Ms. Giannetti was only on set a handful of times and did not witness any of the misconduct that transpired—instead she learned secondhand primarily from Mr. Heath and Mr. Baldoni. Hudson Decl., Ex. 18, at 101:13-24; 102:23-25; 103:25-104:2; 120:14-24; 239:1-12. For their part, neither Mr. Panitch nor Mr. Greenstein ever actually stepped foot on set. *Id.* at 338:2-10. Putting aside relevance or personal knowledge, exclusion is separately warranted because these messages are textbook hearsay under Rule 801(c) with no cognizable exception. *Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 338–39 (S.D.N.Y. 2020) (holding that non-party text-messages were inadmissible hearsay); *Bledsoe v. New York City Transit Auth.*, 2025 WL 2027292,

---

[8] Mr. Greenstein has since left SPE to join Paramount Pictures.

at *16 (E.D.N.Y. July 21, 2025), *report and recommendation adopted* (S.D.N.Y. Sept. 17, 2025) (accord).

Preclusion of the Incomplete Messages is separately warranted because they are missing the entire communication, therefore rendering each message misleading and confusing under Rule 403. In a transmittal note from SPE's senior litigation coordinator, SPE acknowledged this very issue—admitting that their production contained imaged text threads from Mr. Greenstein's phone, which were "one sided":

> We would like to provide some information regarding the data in this production. ***Our eDiscovery team imaged Josh Greenstein's phone and found that the text threads appeared to be one sided.*** For each day, there is simply one long thread containing all of Mr. Greenstein's messages sent that day to numerous recipients and we can only view his side of the conversation across all conversations for that day. For each recipient, we can only see their side of the conversation. We have made a reasonable effort to match the text threads and have provided the texts as they appear on Mr. Greenstein's phone.

Hudson Decl., Ex. 19 (emphasis added). Notwithstanding this deficiency, Defendants focused their examination of Mr. Greenstein around many of these very texts. Plaintiff's counsel objected 'that the use of these one-sided communications is incomplete and prejudicial and lack[s] authenticity," noting further that these communications are "inadmissible exhibit[s]." Hudson Decl., Ex. 20, at 250:2-13. In response, Defendants' counsel conceded that "this is how [these] document[s] [were] produced to us. . . And we do certainly have questions of Sony as to where certain responses and other documents are. We will deal with that issue[.]" *Id.* at 250:16–20. To date, Defendants have not provided an explanation as to where these "certain responses" are located; nor have they provided insights into the subsequent communications they have had with SPE such that they would be able to obtain fulsome texts to make the production whole. *See* Fed. R. Evid. 106; *see also United States v. Thiam*, 934 F.3d 89, 96 (2d Cir. 2019) (affirming exclusion of statements

17

under Rule 106, finding that the rule of completeness was violated since the proffered, redacted, statements distorted their meaning, failed to provide context, and were misleading).

Incomplete texts of this nature are highly misleading and any probative value they have is substantially outweighed by the danger of unfair prejudice and jury confusion. *See* Fed. R. Evid. 403; *see also Vancza v. Marist College*, 2024 WL 3026683, at *8 (N.D.N.Y. June 17, 2024) (finding that defendant was "prejudiced by its inability to review or obtain" missing text messages); *Mosavi v. Brown*, 2018 WL 5911761, at *5-6 (C.D. Cal. Aug. 7, 2018) (precluding under Rule 403 text messages that were one-sided and failed to provide complete context). Those concerns are illustrated by the deposition of Mr. Greenstein. On several occasions, Mr. Greenstein was asked by Defendants to speculate whether he recalled the substance of incomplete text conversations based on a cursory review of the one-sided text threads. Mr. Greenstein responded in many instances that he could not, testifying further that for certain text threads, he was unable to identify the particular party he was actually communicating with. Hudson Decl., Ex. 20, at 325:1–3 (testifying that he could not identify the receiving party in Greenstein Deposition Exhibit 47); *id.* at 340:5-8 (same with respect to Greenstein Deposition Exhibit 51); *id.* at 345:3-22 (testifying that he could not recall the full conversation in Deposition Exhibit 52). These examples demonstrate that the texts in SPE's production present an incomplete picture of the communications Mr. Greenstein had with various parties in connection with the claims of this case, and thus, would serve no other purpose than to confuse and mislead the jury, which Rule 403 is intended to prevent.

## VI.    Motion *in Limine* No. 6: Preclude Evidence Concerning Defendants' Alleged Post-Litigation Harm

Ms. Lively anticipates that Defendants will attempt to introduce evidence and elicit testimony concerning how the litigation has personally affected them. Such evidence is irrelevant

to any claim or defense, substantially prejudicial, and serves no purpose other than to invite jury sympathy and distract from the merits. It should therefore be excluded pursuant to Rules 401, 402, and 403.

"It is well settled that the trier of fact must consider only the factual issue of liability without regard to any potential consequences which may befall a defendant." *S.E.C. v. Moran*, 1995 WL 785953, at *1 (S.D.N.Y. Oct. 31, 1995) (citing *Shannon v. United States*, 512 U.S. 573, 579 (1994) ("information regarding the consequences of a verdict are irrelevant" for the finder of fact to consider) (other citation omitted)). Accordingly, evidence that a defendant claims to have suffered hardship, threats, or other harm as a result of being sued has no bearing on liability and is inadmissible. *Id.*; *see also Cooper v. Dailey*, 2012 WL 1748150, at *1 (N.D. Ill. May 16, 2012). Federal courts routinely exclude evidence of litigation-related hardship because it serves only to appeal to jury sympathy and risks verdicts based on emotion rather than law. *See, e.g.*, *Moran*, 1995 WL 785953, at 1; *Sec. & Exch. Comm'n v. Alar*, 2022 WL 21302161, at *1 (N.D. Ga. Sept. 30, 2022); *Rebolledo v. Herr-Voss Corp.*, 101 F. Supp. 2d 1034, 1036 n.1 (N.D. Ill. 2000).

Here, Defendants have repeatedly sought to portray themselves as the victims in this litigation, rather than litigants defending the merits of Ms. Lively's claims. In their since-dismissed Amended Complaint, Wayfarer and IEWUM alleged that Ms. Lively purportedly attempted to serve Mr. Baldoni and his team during the January 2024 Los Angeles wildfires. Dkt. No. 50, at ¶ 161. Ms. Nathan similarly testified about how a process server attempted to serve her while she was trying to evacuate. Hudson Decl., Ex. 21, at 407:5-408:4. Continuing this victim narrative, Mr. Sarowitz testified about how he allegedly received threats "as a direct result of this litigation." Hudson Decl., Ex. 22, at 48:5-17, 51:23-53:2, 352:2-13. Mr. Baldoni and Ms. Nathan also testified about threats that they claim to have received. Hudson Decl. Ex. 23, at 315:16-24; Ex. 21, at

332:22-337:7, 395:12-19. None of this evidence bears on any claim or defense remaining in the case: Wayfarer and IEWUM's claims were dismissed almost a year ago. How they reacted to being sued in no way addresses the issues to be presented at trial and, for that reason, warrants exclusion. *See Moran*, 1995 WL 785953, at *1; *Cooper*, 2012 WL 1748150, at *1; Dkt. No. 296, at 1-2.

What is more, permitting Defendants to introduce evidence or argument concerning alleged post-litigation harm would improperly present themselves as victims of the lawsuit itself and invite the jury to decide the case on sympathy rather than the evidence, which Rule 403 strictly forbids. *See, e.g., Moran*, 1995 WL 785953, at 1; *Rebolledo*, 101 F. Supp. 2d at 1036 n.1. For these reasons, evidence concerning Defendants' alleged post-litigation harm should be excluded.

## VII.   Motion *in Limine* No. 7: Preclude Evidence Concerning Statements by Plaintiff and Her Agents regarding the Court's Summary Judgment Order or Proceedings.

The Court should exclude any evidence or argument regarding, or making reference to, statements by Ms. Lively or her agents regarding the Court's proceedings or ruling on summary judgment (the "MSJ Statement Evidence"), including but not limited to DX1942–45, and DX1948. *See* Hudson Decl., Exs. 24-27. The MSJ Statement Evidence lacks any bearing on this litigation, and instead reflects Defendants' transparent attempt to make the participation of *their* counsel in the press into a "both sides" issue. That attempt is improper, and the MSJ Statement Evidence should be excluded as irrelevant and substantially prejudicial to Ms. Lively. Fed. R. Evid. 401, 403.

On April 8, 2026, the Defendants added the following to their exhibit list:

| Defendants' Exhibit Number | Description |
|---|---|
| DX1942 | Blake Lively April 3, 2026 Statement (Instagram) |
| DX1943 | Michael Gottlieb April 3, 2026 Statement (Instagram) |
| DX1944 | Article re Sigrid McCawley April 2, 2026 Statement (People) |

20

| Defendants' Exhibit Number | Description |
| --- | --- |
| DX1945 | Sigrid McCawley January 22, 2026 Press Conference Video (TMZ) |
| DX1948 | Community Note re Blake Lively Post |

*See* Hudson Decl., Exs. 24-27.[9] Each of the exhibits above consists of statements by Ms. Lively, her attorneys, or her legal spokesperson regarding the parties' oral argument on summary judgment or the Court's recent summary judgment decision.

*First*, the MSJ Statement Evidence is irrelevant to the claims and defenses in this action. Fed. R. Evid. 401. Defendants can offer no explanation as to how these statements, which long post-date the close of discovery, bear any relation to any claim or defense in this case. They appear to believe that this evidence is somehow relevant to contrast with the statements made by Mr. Freedman when the Defendants launched their retaliatory, frivolous, and sanctioned $400 million lawsuit against Ms. Lively, Mr. Reynolds, and others. But that is a false comparison that inverts the actual claims remaining in this case. Ms. Lively is the only party with affirmative claims in this case, and it is her retaliation claims (rather than defamation claims) that will be tried to the jury. Many of Mr. Freedman's inflammatory statements—made in the period starting in December, 2024 through February, 2025—were published in support of Defendants' now-dismissed and sanctioned lawsuit, and they are therefore highly relevant to the harms caused by that retaliatory conduct. Dkt. No. 1273, at 94 ("Lively further alleges that the Wayfarer Parties launched a second wave of retaliation executed through their California-based attorney, Freedman, who made allegedly defamatory public statements and filed an allegedly retaliatory counter-suit from California.") (citation omitted). As this Court recognized, and as has been extensively documented,

---

[9] The statement captured in DX1945 is available via video at Blake Lively's Lawyer Sigrid McCawley Gives Statement after Hearing (Jan. 22, 2026), https://www.tmz.com/watch/blake-lively-lawyer-sirgrid-mccawley-01-22-2026/.

Mr. Freedman is alleged to have participated directly in the retaliatory campaign against her in other ways, as well. *Id.* at 126 (documents reflecting Freedman's involvement). There are no similar allegations regarding Ms. Lively's team, nor could there be any that would even plausibly be relevant, because the Defendants have no affirmative claims against Ms. Lively, and the conduct of Ms. Lively's various agents over the past month says nothing about whether the Defendants' sanctioned lawsuit constitutes retaliation as a matter of fact or law.

*Second*, even if the MSJ Statement Evidence were marginally relevant to the case, it should nevertheless be excluded under Rule 403. *See* Fed. R. Evid. 403. Defendants' MSJ Statement Evidence will mislead the jury into thinking that the same rules applied to Ms. Lively and Defendants. They do not. Even putting aside that the MSJ Statement Evidence cannot even conceivably be regarded as retaliatory against Defendants in any sense, Defendants alone were contractually and/or statutorily bound to avoid retaliating against Ms. Lively. *See* Cal. Gov't Code § 12940(d), (g), (h); *see also* Hudson Decl., Ex. 28 ¶ 10 (prohibiting retaliation against Ms. Lively). Thus, Defendants' attempt to introduce any statements by Ms. Lively or her team on this matter would serve only to confuse the jury and waste judicial resources.

## VIII.  Motion *in Limine* No. 8: Preclude the Testimony of Non-Party Kjersti Flaa

The Court should preclude Defendants from calling non-party Kjersti Flaa as a witness at trial pursuant to Rules 401, 402, 403, 404, and 701. Ms. Flaa is a self-described "entertainment reporter" and "multimedia producer" who operates a YouTube channel on which she "share[s] some of [her] good and bad experiences working in Hollywood and interviewing celebrities."[10] Her sole connection to this litigation is that on August 10, 2024—one day after the Film's premiere, and as Defendants' harmful narrative concerning Ms. Lively was gaining traction online—Ms.

---

[10] *See* https://www.youtube.com/@Flaawsometalk.

22

Flaa posted to her YouTube channel a 2016 press junket interview she conducted with Ms. Lively.[11] In that eight-year-old video, entitled "The Blake Lively interview that made me want to quit my job" (the "little bump video"), Ms. Flaa began by remarking to Ms. Lively "First of all, congrats on your little bump," referring to Ms. Lively's pregnant belly. Taken aback by the comment on her body, Ms. Lively responded, "congrats on your little bump."[12] Ms. Flaa has since publicly characterized the interview as a "traumatizing experience," and maintains that her decision to post the 8-year-old video in 2024 was unrelated to Mr. Baldoni or *It Ends With Us*.[13] Since August 2024, Ms. Flaa has posted hundreds of videos on her YouTube channel critical of Ms. Lively and sold merchandise through her Etsy shop containing disparaging messages about Ms. Lively and expressing support for Defendants.[14]

Defendants include Ms. Flaa on their witness list, proffering that she "will testify about her interview of Ms. Lively and Ms. Flaa's re-publication of that interview in 2024." This testimony should be excluded on multiple independent grounds: (1) any testimony Ms. Flaa could properly offer lacks any tendency to make a material fact more or less probable, and is inconsequential to Ms. Lively's claims, rendering it inadmissible under Rules 401 and 402; (2) even if relevant, Ms. Flaa's testimony constitutes inadmissible character evidence under Rule 404(a)(1); (3) any testimony Ms. Flaa offers regarding her views on the cause of the little bump video's virality in

---

[11] *See The Blake Lively interview that made me want to quit my job*, YouTube (Aug. 10, 2024), https://www.youtube.com/watch?v=F2-2RBi1qzY.

[12] *Id.* at 0:01.

[13] *See, e.g.*, Lillian Gissen, *Reporter from viral Blake Lively interview reveals heartbreaking reason 'little bump' taunt left her traumatized: 'That comment was like a bullet'*, Daily Mail (Aug. 16, 2024), https://www.dailymail.co.uk/lifestyle/article-13750309/blake-lively-interview-kjersti-flaa-bump-comment-ends-movie.html; Brenton Blanchet, *Blake Lively Faces Backlash Over 'Uncomfortable' 2016 Interview, Source Blasts Journalist's 'Rude Statement'*, People (Aug. 15, 2024), https://people.com/blake-lively-faces-backlash-over-uncomfortable-2016-interview-source-defends-her-8695787; *The Real Reason my Blake Interview went viral*, YouTube (Aug. 19, 2024), at 1:28, https://www.youtube.com/watch?v=MuCyRA4XAyo ("I actually hadn't read up on all the other controversy that was going on with Blake Lively and her new movie *It Ends With Us*, so it was kinda a coincidence I have to say that this ended up being posted right now.").

[14] *See* https://www.youtube.com/@Flaawsometalk; https://www.etsy.com/shop/FLAAWSOMETALK.

August 2024 would constitute improper lay opinion testimony under Rule 701; and (4) to the extent any portion of Ms. Flaa's testimony is otherwise admissible, it should nevertheless be excluded pursuant to Rule 403 because its minimal probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, and misleading the jury.

*First*, Ms. Lively did not allege, and does not have to show, that Ms. Flaa's publication of the little bump video in 2024 was coordinated with Defendants, or resulted from any relationship with Defendants or their agents. For purposes of trial, Ms. Lively need only prove, through percipient fact witnesses and expert testimony, that Defendants amplified and bolstered the video to make it go viral—more specifically, that in the hours after TAG forwarded the little bump video to Jed Wallace on August 14, 2024 (four days after Flaa re-posted it on YouTube) the comments on the video "increased rapidly and at a disproportionate rate," as did the "volume and popularity of comments that included 'bully' related terms,"—results "consistent with a coordinated attempt to manipulate and boost content online." Hudson Decl. Ex. 29, at 57.

Against this backdrop, Ms. Flaa's proffered testimony is wholly irrelevant to Ms. Lively's claims, and the prejudicial impact is substantially outweighed by any probative value. Because Ms. Flaa can offer no insight into how or why the little bump video went viral on August 14—the sole fact at issue concerning the interview—her testimony should be excluded as irrelevant under Federal Rules of Evidence 401 and 402.

*Second*, Ms. Flaa's testimony "about her interview of Ms. Lively," will inevitably echo her numerous public statements describing Ms. Lively as "rude" and exuding "mean girl energy."[15]

---

[15] *What REALLY happened during my reunion with Blake Lively – 2 years later*, YouTube (Aug. 22, 2024) at 2:30, https://www.youtube.com/watch?v=sqd60pYRsFc at 2:30; *The Real Reason my Blake Lively interview went viral*, YouTube (Aug. 19, 2024), at 2:35, https://www.youtube.com/watch?v=MuCyRA4XAyo; *Why I never showed THIS part of my viral Blake Lively interview!!*, YouTube (Mar. 11, 2025) at 6:52, https://www.youtube.com/watch?v=SJEwu_GjLvo.

24

Beyond being irrelevant to any claim at issue and barred under Rule 403, such testimony is inadmissible under Rule 404(a), which provides that evidence of a person's character for purposes unrelated to truthfulness is "not admissible to prove that on a particular occasion [she] acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1); *see Chepilko v. Major*, 2012 WL 13135142, at *3 (E.D.N.Y. Apr. 5, 2012) (excluding evidence that defendant was "a bully" because "[s]uch opinions about [defendant]'s character are irrelevant to plaintiff's claims, unfairly prejudicial to defendants, and inadmissible to demonstrate [defendant]'s propensity to act in accordance with those character traits").

*Third*, to the extent Ms. Flaa intends to testify regarding how or why the little bump video went viral in August 2024, such testimony must be excluded under Federal Rule of Evidence 701. Rule 701 permits lay witness opinion testimony only when it is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *United States v. Ferguson*, 2007 WL 4556625, at *1 (D. Conn. 2007) (quoting Fed. R. Evid. 701). Ms. Flaa's testimony would fail on even "[t]he first requirement,"—"the familiar requirement of first-hand knowledge or observation." *Id.* While Ms. Flaa may have personally observed the surge of viewership of her video, any testimony as to the cause of its virality—the only issue in dispute—would be pure speculation. Ms. Flaa made no personal observations that would inform *how* the viewers of her video found the content, or why they were compelled to click the link to view it. Ms. Flaa should not be permitted to guess as to how viewers came to engage in her content, when, based on her own contemporaneous videos from August 2014, she admitted it was "kinda crazy" the video received over 10,000 comments in just 9 days, and assumed that the popularity was because "a lot of people could kind of resonate

25

with this situation."[16] Because Ms. Flaa's belief for why the video went viral is based on her own conjecture, and not any observable facts, her lay opinion testimony must be excluded. *Tyson v. Conn. Dep't of Energy & Env't Prot.*, 2024 WL 397205, at \*23 (D. Conn. Feb. 1, 2024) ("Rule 701 is generally limited to testimony based on sensory perceptions, common knowledge, or things a lay person is qualified to observe.") (quoting *Adams v. Roberts*, 2019 WL 6715604, at \*2 (D. Mont. 2019)).

As Professor Culotta explains, "inauthentic online activity . . . spans a spectrum of tactics and actors that simulate organic user behavior . . . creating the illusion of popular support or dissent on social media." Hudson Decl., Ex. 29, at 7-8. Identifying inauthentic behavior is not an exercise in common-sense; "single-account labeling can be challenging," therefore researchers rely on "aggregate analyses [to] reliably reveal inauthentic influence on conversations." *Id.* at 11. The testimony that Ms. Flaa can offer, at best, is anecdotal observations of single accounts—precisely the type of evidence that is unreliable for reaching opinions on whether online activity is authentic. *See id.* Ms. Flaa's opinion on whether viewers were organically engaging with her video is not grounded in any common knowledge or observations as required by Rule 701, but rather requires the specialized knowledge of an expert subject to this Court's scrutiny on reliability. *See* Fed. R. Evid. 702.[17]

***Fourth***, if the Court finds that some portion of Ms. Flaa's testimony is relevant and otherwise admissible, the Court should nonetheless exclude it under Rule 403. Ms. Flaa's testimony carries, at most, negligible probative value given that the question of whether Ms. Flaa coordinated her post with Defendants does not tend to prove or disprove any claim or defense.

---

[16] *The Real Reason my Blake Lively interview went viral*, YouTube (Aug. 19, 2024), at 1:50, https://www.youtube.com/watch?v=MuCyRA4XAyo.

[17] If the Court deems Ms. Flaa's guesswork on what caused her video to go viral is admissible lay witness opinion, Ms. Lively would likely recall an expert witness to rebut the opinion.

Whatever marginal relevance her testimony might conceivably have is substantially outweighed by the significant danger of undue prejudice to Ms. Lively by Ms. Flaa coming into Court to paint her as a "bully" and "mean girl" in light of a 5-minute interview she conducted seven years before Ms. Lively ever met the Defendants. Her testimony also risks confusing and misleading the jury to the extent she is seen as having offered expert testimony regarding the virality of the video in 2024.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the foregoing motions *in limine* and exclude the evidence described above from trial.

Dated: April 10, 2026                    /s/ Esra A. Hudson

WILLKIE FARR & GALLAGHER LLP          MANATT, PHELPS & PHILLIPS, LLP
Michael J. Gottlieb                   Esra A. Hudson (admitted *pro hac vice*)
2049 Century Park East                Stephanie A. Roeser (admitted *pro hac vice*)
Los Angeles, California 90067         Sarah E. Moses (admitted *pro hac vice*)
(310) 855-3000                        Sareen K. Armani
mgottlieb@willkie.com                 Katelyn A. Climaco
                                      2049 Century Park East, Suite 1700
Kristin E. Bender                     Los Angeles, California 90067
1875 K Street NW                      (310) 312-4000
Washington, DC 20006                  ehudson@manatt.com
(202) 303-1000                        sroeser@manatt.com
kbender@willkie.com                   smoses@manatt.com
                                      sarmani@manatt.com
Aaron Nathan                          kclimaco@manatt.com
Michaela A. Connolly
Melissa Taustine                      Matthew F. Bruno
787 7th Avenue                        7 Times Sq
New York, NY 10019                    New York, NY 10036
(212) 728-8000                        (212) 790-4500
anathan@willkie.com                   mbruno@manatt.com
mconnolly@willkie.com
mtaustine@willkie.com                 DUNN ISAACSON RHEE LLP
                                      Meryl C. Governski (admitted *pro hac vice*)
                                      401 9th Street NW
                                      Washington, DC 20004
                                      (202) 240-2927
                                      mgovernski@dirllp.com

27