# Exhibit 18

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---

BLAKE LIVELY,

                Plaintiff,

   vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)

                          25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

                Defendants.

_____

JENNIFER ABEL,

            Third-party Plaintiff,

   vs.

JONESWORKS, LLC,

            Third-party Defendant.

_____

WAYFARER STUDIOS LLC, et al.

            Consolidated Plaintiffs,

   vs.

BLAKE LIVELY, et al.

            Consolidated Defendants.

_____

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF ANDREA GIANNETTI

Culver City, California

Tuesday, September 23, 2025

Stenographically Reported by:  Ashley Soevyn,
CALIFORNIA CSR No. 12019

CONFIDENTIAL

Page 101

Q    And by "the strike," you mean what?

A    The writers' strike.

Q    And why did the writers' strike shut the production down?

A    They were picketing and trying to find locations where we were shooting.  And they were picketing, and people were uncomfortable crossing the picket line.

Q    During this first phase of the production, it sounds like it was about six weeks; is that right?

A    Yes.

Q    During this first phase of the production, how often did you go to the set, if ever?

A    I'd have to pull up my travel -- I was there in the beginning.  I can't tell you the amount of days.  I can remember it more, like, what scenes were shot that I was and present for.  Maybe I -- in this first section, maybe I visited three times.

Q    And when you went to the set, what was the purpose of your visit?

A    Just really to say hello, check in.  It wasn't required that I be there, but I was invested.

Q    And other than visiting the set, what was

CONFIDENTIAL

Page 102

the -- what were the nature of your other interactions with the production team during this period, May 15th through June 30th?

A    You know, mostly it was approving any script changes, reviewing dailies, discussing dailies and performance with Justin.  There was an incident on the first day about paparazzi and the reaction, kind of dealing with that.  A lot of wardrobe.

Q    So this is when you were on the set or not on the set?

A    Both.

Q    Okay.  So and how did you interact when you were not on the set?  Was it by Zoom, email, same as before?

A    Yeah, a lot of texts and phone calls.  There was a lot less time.

Q    And where was the movie shot during this period?

A    New Jersey.

Q    And where were you?

A    Los Angeles.

Q    So other than the time -- the three times you went to the set, you were in Los Angeles?

A    Correct.

Page 103

Q    The times that you went to the set, were you there for more than one day?

A    Yeah.

Q    How many days typically?

A    Maybe three.

Q    So during the course of the six weeks, you had three trips where you were on the set three days?

A    I don't know for sure.  I could get you that information, but I don't remember.  But I -- you know, maybe three, maybe four at most.  I -- I tend to try and not stay too long.

Q    And why is that?

A    Because my life is in Los Angeles.

Q    And what did you typically do when you were on set?

A    Just watch.  Just be at video village in between filming, talk to the producers, talk to Justin, talk to the actors.

Q    And what was your purpose of being there?

A    Mostly encouragement.  Support.

Q    Were -- was part of your role to protect Sony's investment?

A    Sure.

Q    Was anyone else from Sony consistently on

CONFIDENTIAL

Page 120

A    The example she gave over and over again were about the first AD and about scheduling and the time that she would be called in and the hair and makeup and -- and -- that a lot of the reasons if there was lateness on that day, it was the first AD's fault.

Q    Anything else that you recall Ms. Lively reporting to you in the category of "too loose"?

A    No.

Q    So have you now told me about all of the things that you recall Ms. Lively complaining about to you about Mr. Baldoni?

A    That I can recall in this moment, yes.

Q    Going back to Mr. Heath.  You said there was a issue regarding the showing of the birth of his child?

A    Uh-huh.

Q    Tell me what you recall about that?

A    I was on set.  I was not there -- I was not present when it happened, even though I was on set.  I believe Jamey came to me first and said he showed the video; Justin asked him to show the video.  And she was surprised and did not -- I don't know how he said -- she didn't take it well.

Q    Did Mr. Heath describe what he had shown

CONFIDENTIAL

Page 239

Q    During phase one when you weren't present on the set, you -- were you communicating or speaking to anyone that was working on the set?

A    Very regularly.

Q    On a daily basis?

A    If not every day, every other day.  Very closely.

Q    And who were the people that you were communicating with at that time while you weren't on set?

A    Jamey, Justin, Alex, and, occasionally, Blake.

Q    Anyone else?

A    Maybe the line producer, but I don't think so.

Q    Let's talk about your communications with Blake Lively during phase one.

How often did you communicate with Blake Lively at that time about the film?  Daily?  Weekly?  Monthly?

A    I can't recall exactly.

Q    Do you think it was closer to daily or closer to weekly?

A    It was not daily.  And it -- if I remember correctly, it tended to be in spurts.

CONFIDENTIAL

Page 295

Q    Was Ryan Reynolds her manager?

A    No.

Q    He was her husband, correct?

A    Correct.

Q    Part of what Blake was complaining about in these protections was what she thought was sexist behavior, correct?

A    I don't know.

Q    She asked her husband to talk to her studio on a movie in his capacity as her husband, correct?

        MS. HUDSON:  Objection.

        THE WITNESS:  I don't know.

BY MR. FREEDMAN:

Q    Todd Black was hired as the A-list producer, correct?

A    Correct.

Q    Did Wayfarer agree to the 17-point list?

        MS. HUDSON:  Objection.

        THE WITNESS:  I don't know the wording, but yes, we -- we agreed to the protections so she would return to work.

BY MR. FREEDMAN:

Q    Did you talk with anyone about why -- anyone at Wayfarer about why they agreed to the

CONFIDENTIAL

Page 296

17-point list?

    A    No.  I knew why.

    Q    Why?

        MS. HUDSON:  Objection.

        THE WITNESS:  Because there was a tremendous amount of money that had been invested and spent, and we had to finish the movie or it was unreleasable.

BY MR. FREEDMAN:

    Q    Did Blake Lively threaten to leave the movie if the 17-point list wasn't signed without alteration or revision?

        MS. HUDSON:  Objection.

        THE WITNESS:  That's my understanding.

BY MR. FREEDMAN:

    Q    Do you recall telling Jamey Heath that you thought Blake was a fucking terrorist?

        MS. HUDSON:  Objection.

        THE WITNESS:  Yes.

BY MR. FREEDMAN:

    Q    At that point in time, how much money had Sony invested in the movie?

    A    Well, I believe the ingoing budget was 28 and change, 28 million and change.  We had three weeks left -- I -- I -- I'm -- at least

CONFIDENTIAL

Page 338

A    No.

Q    Was Sanford Panitch ever on set, as far as you know?

A    No.

Q    Was Tom Rothman ever on set, as far as you know?

A    No.

Q    Was Josh Greenstein ever on set, as far as you know?

A    No.

Q    Do you know whether Ms. Lively ever discussed any of the concerns that she had with the behavior of Justin Baldoni and Jamey Heath with Michael Marshall?

MR. FREEDMAN:  Objection.

THE WITNESS:  I don't know, but I don't think so.

BY MS. HUDSON:

Q    Do you know whether Ms. Lively ever discussed the concerns that she had with Jamey Heath or Justin Baldoni with Sanford Panitch?

MR. FREEDMAN:  Objection.

THE WITNESS:  I don't know, but I don't think so.

CONFIDENTIAL

Page 353

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.  Dated this 25th day of September, 2025.

ASHLEY SOEVYN

CSR No. 12019