# Exhibit 21

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---

BLAKE LIVELY,

　　　　　　Plaintiff,

vs.　　　　CASE NO. 24-CV-10049-LJL (LEAD CASE)

　　　　　　　25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

　　　　　　Defendants.

_____

JENNIFER ABEL,

　　　　　Third-party Plaintiff,

vs.

JONESWORKS, LLC,

　　　　　Third-party Defendant.

_____

WAYFARER STUDIOS LLC, et al.

　　　　　Consolidated Plaintiffs,

vs.

BLAKE LIVELY, et al.

　　　　　Consolidated Defendants.

_____

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF MELISSA NATHAN

Los Angeles, California

Monday, September 29, 2025

Stenographically Reported by:  Ashley Soevyn,
CALIFORNIA CSR No. 12019

CONFIDENTIAL

Page 139

of whether you thought these were accurate or
helpful messaging points?

A    Not -- not at the time, no.  I don't
remember.

Q    And it's your testimony, I think, that
you had no view at this time whether Ms. Lively had
a less than favorable reputation in the industry?

A    At the beginning, like I testified, I did
not know -- right at the beginning, I had no idea.

Q    Did you believe at this point in time
that when Ms. Lively wasn't able to get her way on
set or behind the scenes, she involved her husband
to create an imbalance of power between her and
Mr. Baldoni?

A    At what time?

Q    At the time this document was created.

A    I'm not sure if this was the exact time.

Q    Okay.  Do you see the scenarios that have
been listed out?

A    I do.

Q    Do you see in the first scenario, you
say:

        (As read):

            "Depending upon the scope of her push,
            we recommend planting a seed earlier on

CONFIDENTIAL

Page 332

Do you see that?

A    Yes.

Q    Because of the old case that happened to him when he was, I think, 19?

You see that?

A    I see that.

Q    And you said you needed to brainstorm on that?

A    Yes.

Q    Ms. Abel responds:

(As read):

"I didn't even think about that.  Yes, I knew that from 1986."

Do you see that?

A    I see that, yeah.

Q    Ms. Nathan, did any representative of Ms. Lively ever make this argument, the argument on the second page, that this was why?

MR. FREEDMAN:  Objection.

THE WITNESS:  No.

BY MR. GOTTLIEB:

Q    Did any representative of Ms. Lively ever say anything about this?

A    No.  But at that point we've been lied about, lied on.  We had received death threats.  I

Page 333

had to call my child's school.  We wanted to move out of our house.  My whole team and Jen, we were in complete states of panic and fear and shock because of the lies that had been spread about us.

We were kind of -- we were trying to be prepared, as is our job as to anything that you and your team might do.

Q    Okay.

MR. GOTTLIEB:  Can I get a time check, please?

THE VIDEOGRAPHER:  5:08.

MR. GOTTLIEB:  All right.  I think this is good time for a break.

THE VIDEOGRAPHER:  The time is 4:49 p.m. Off the record.

(Recess.)

THE VIDEOGRAPHER:  The time is 5:12 p.m. We're back on record.

THE WITNESS:  Can I just correct the record on one thing that I remembered when I did some research after you asked me --

MR. GOTTLIEB:  I'm gonna --

THE WITNESS:  -- about the client I worked with, with Jed?

MR. GOTTLIEB:  Sorry?

CONFIDENTIAL

(As read):

"I can add many women who are part of the production.  Not sure I should go too much deeper there, based on trying to make it look organic/like I don't have too much insider info."

Do you see that?

A    I see that.

Q    Do you feel like the video that Ms. Steele put out looked organic?

A    I can't even remember it.

Q    Did you ever watch it?

A    I'm pretty sure maybe at the time, I did. Like I said, that period of time was absolutely horrendous.  I was completely scared for myself and my child, and I really don't remember much.  It was one of the worst possible times of my life.  So no, I was not concentrating, and as you can see, I'm not on it.  I didn't reply.

Q    And I'm sorry about that, Ms. Nathan, and I'm sorry I have to ask these questions, but --

A    I'm just trying to give you context.

Q    Ms. Abel offers some comments, right?

MR. FREEDMAN:  Objection.

THE WITNESS:  I can see her name, yes.

Page 407

sending process servers to people's homes, right?

MR. FREEDMAN:  Objection.

THE WITNESS:  I do understand that.

BY MR. GOTTLIEB:

Q    Would you have given that statement if you had known that Ms. Lively's lawyers reached out at the moment her lawsuit was filed in the Southern District of New York and asked your attorneys to accept service?

MR. FREEDMAN:  Objection.

THE WITNESS:  Well, if my -- if that was the case, then I wouldn't of -- the situation of when the process server came to my house and there was a tree on my roof and my kid was crying and we were about to evacuate, then that wouldn't have happened.  So it was kind of a moot point.  It wouldn't have happened.

BY MR. GOTTLIEB:

Q    It wouldn't have happened unless your lawyers chose not to accept service, right?

MR. FREEDMAN:  Objection.

THE WITNESS:  I mean, I'm not sure but the -- if -- if I was -- that the -- that's how I was served, and I was served, I think the fires were on the 7th or the 8th, and I was served on one of

CONFIDENTIAL

Page 408

those days.  And I find it quite despicable that anyone was serving anyone when all the houses were burning and some of our team even lost their whole houses.  So that's how I personally feel.  Yeah.

BY MR. GOTTLIEB:

Q    Ms. Nathan, I'm sorry that that happened to you.

A    I'm not even asking for that.  I'm just saying that --

Q    I'm offering it to you.

A    Thank you.

Q    I'm sorry that that happened to you.

A    Thank you.

Q    That is why I will represent to you that we reached out to your attorney, who's sitting right next to you, and asked if he would accept service on your behalf.  And I wish he would have said yes.

MR. FREEDMAN:  Objection.

BY MR. GOTTLIEB:

Q    Do you wish he would have said yes?

MR. FREEDMAN:  Move to strike.

THE WITNESS:  The whole -- I mean, I wish all of this wouldn't have happened, so...

BY MR. FREEDMAN:

Q    Did you ever come to learn that your

CONFIDENTIAL

Page 431

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.  Dated this 1st day of October, 2025.

ASHLEY SOEVYN

CSR No. 12019