**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY, <br><br>                Plaintiff, <br><br> v. <br><br> WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, JENNIFER ABEL, JED WALLACE, and STREET RELATIONS INC., <br><br>                Defendants. | No. 1:24-cv-10049-LJL |

**MEMORANDUM OF LAW IN SUPPORT OF**
**THE WAYFARER PARTIES' MOTION TO EXCLUDE THE TESTIMONY OF**
**PLAINTIFF'S PROFFERED EXPERTS**

491311.3

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................................. 2

TABLE OF AUTHORITIES ........................................................................................................... 5

INTRODUCTION ......................................................................................................................... 11

LEGAL STANDARD.................................................................................................................... 11

ARGUMENT ................................................................................................................................ 12

I.      THE COURT SHOULD EXCLUDE THE TESTIMONY OF JENNIFER FREYD....... 12

    A.  Freyd's Opinions....................................................................................................... 13

    B.  Freyd's Opinions Regarding Lively's Emotional Damages Are Inadmissible.......... 14

       1.  Lively Has Waived The Right To Offer Expert Testimony In Support Of Her
          Emotional Damages ..................................................................................... 14

       2.  Freyd's Opinions Regarding Lively's Emotional Damages Are Inadmissible
          Under Rule 702 ........................................................................................... 15

    C.  Freyd's Other Opinions Are Inadmissible Under Rules 702 And 403 ....................... 18

       1.  Freyd Should Not Be Allowed To Testify About Lively's Supposed "Low-Level
          Betrayal Blindness" ..................................................................................... 18

       2.  Freyd Should Not Be Allowed To Testify As A Summation Witness .................. 19

       3.  Freyd Should Not Be Allowed To Testify About DARVO................................. 20

II.     THE COURT SHOULD EXCLUDE THE TESTIMONY OF DINA MAYZLIN .......... 20

    A.  Mayzlin Should Not Be Allowed To Opine That Defendants Manipulated Online
       Sentiment ................................................................................................................. 21

       1.  Mayzlin's "Manipulation" Opinion .................................................................. 21

       2.  Mayzlin's Opinion Is Not Grounded In Any Expertise Or Actual Methodology. 22

       3.  Mayzlin's Purported Methodology Is Untested And Fundamentally Unreliable . 28

       4.  Mayzlin's Reliance On ChatGPT's AI Model To Evaluate And Classify Her Data
          Destroys The Reliability Of Her Opinions .......................................................... 31

       5.  Mayzlin's Opinion Relies On Social Media Posts This Court Has Held Do Not
          Qualify As Retaliation ................................................................................... 35

    B.  Mayzlin Should Not Be Allowed To Opine That Defendants Harmed Lively's
       Consumer Brands..................................................................................................... 36

    C.  Mayzlin Should Not Be Allowed To Summarize Academic Literature Or Discovery
       Documents ............................................................................................................... 39

III.    THE COURT SHOULD EXCLUDE THE TESTIMONY OF ARON CULOTTA ........ 41

    A.  Culotta's Testimony About TikTok Is Inadmissible .................................................. 41

1. Culotta Relies On Meaningless "Metrics" That Are Unreliable Indicators Of Inauthentic Activity ................................................................................ 41

2. Culotta Relies On A Subjective And Unreliable Classification Of The "Sentiment" Expressed By TikTok Comments .................................................... 45

3. Culotta Has Insufficient Data From Which To Draw Any Conclusions .............. 47

4. Culotta's Qualitative Analysis Is Unhelpful, Unduly Prejudicial, And Falls Outside His Expertise ........................................................................ 48

5. Culotta's Conclusions Are Unhelpful And Unduly Prejudicial Because They Invite Speculation ............................................................................ 50

6. Culotta Improperly Aggregates Actionable and Non-Actionable Conduct .......... 51

B. Culotta's Testimony About Reddit Is Inadmissible ............................................ 51

1. Culotta Again Offers Meaningless Metrics, Unreliable Coding, Inadequate Data, And Speculative Conclusions ..................................................... 51

2. Culotta's Speculation Regarding "Removed" Upvotes Is Inadmissible .............. 53

C. Culotta's Testimony About YouTube Is Inadmissible ............................................. 54

D. Culotta Should Not Be Allowed To Opine On Defendants' Involvement Or Summarize Case Documents ............................................................................ 56

E. Culotta Should Not Be Allowed To Speculate About Other Platforms .................... 58

IV. THE COURT SHOULD EXCLUDE THE TESTIMONY OF MICHAEL ROBBINS ... 58

A. Robbins' Qualifications and Opinions ............................................................... 59

B. Robbins Is Unqualified To Testify Regarding Intimacy Coordinators, Nudity Riders, And Reputational Harm ............................................................................ 61

C. Robbins' Opinions Relating to Workplace Investigations Are Inadmissible ............. 63

D. Robbins' Reputation Harm Opinion Is Inadmissible ............................................. 66

V. THE COURT SHOULD EXCLUDE THE TESTIMONY OF JEFFREY KINRICH ..... 68

A. Kinrich's Opinions ....................................................................................... 69

B. Kinrich's Lost Profits Analysis Should Be Excluded Because Lively Lacks Standing To Seek Such Damages ............................................................................ 70

C. Kinrich's Lost Profits Analysis Should Be Excluded As Purely Speculative ............ 72

1. Kinrich's Opinion of Family Hive's Lost Profits is Speculative. ...................... 73

2. Kinrich's Opinion of Betty B's Lost Profits is Speculative ............................. 77

D. Kinrich's Opinions Are Not Based on Sufficient Facts or Data ................................ 80

1. Kinrich Was Not Aware of the Companies' Distribution Schedules ................... 82

2. Kinrich Relies on Unreliable Documents .................................................... 83

491311.3

VI.     THE COURT SHOULD EXCLUDE THE TESTIMONY OF RICHARD MARKS ...... 84

    A. MARKS' OPINION............................................................................................. 85

    B. Marks' Opinion Is Not Based On Sufficient Facts Or Data And His Methodology Consists of Pure Speculation ................................................................................ 87

        1. Marks' Opinion of Lost Earnings From Acting Should be Excluded .................. 87

        2. Marks' Opinion of Lost Earnings From Endorsements Should be Excluded....... 92

VII.    THE COURT SHOULD EXCLUDE THE TESTIMONY OF MICHAEL SIPPEL ....... 93

    A. SIPPEL'S OPINION......................................................................................... 93

    B. Sippel's Opinion Based on the Marks Report Should be Excluded .......................... 94

    C. Sippel's Alternative 1-Year Average Damages Opinion Should be Excluded........... 95

VIII.   The Court Should Exclude the testimony of Dr. Ashlee Humphreys.............................. 98

    A. Humphreys Admitted That Her Opinion Regarding Defendants' Purported Retaliation Campaign Was Based Entirely on Dr. Mayzlin's Analysis and Therefore Suffers from the Same Defects.................................................................................................. 99

    B. Humphreys Failed to Consider Alternative Explanations for Any Alleged Damage to Lively's Reputation.......................................................................................... 99

    C. Humphreys' Opinions Concerning the At-Issue Statements are Irrelevant.............. 100

    D. Humphreys' Conclusion That the At-Issue Statements Damaged Lively's Reputation is Not Supported by Her Analysis ........................................................................ 101

    E. Humphreys' Analysis of the At-Issue Statements Fails to Satisfy Other Elements of the Reliability Standard....................................................................................... 102

    F. Humphreys' Estimate of the Costs of a Reputational Repair Campaign is Unreliable Because She Failed to Consider Lively's Existing Social Media Resources ........... 102

I.      CONCLUSION............................................................................................... 103

491311.3

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*523 IP LLC v. CureMD.Com*,
48 F. Supp. 3d 600 (S.D.N.Y. 2014)......................................................................61

*In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*,
707 F. Supp. 3d 309 (S.D.N.Y. 2023).....................................................................27

*Adams-Flores v. City of New York*,
No. 18-cv-12150, 2024 WL 519819 (S.D.N.Y. Feb. 9, 2024) ..............................101

*Ahmad v. New York Univ.*,
No. 1:22-CV-01248 (JLR), 2025 WL 3022862 (S.D.N.Y. Oct. 29, 2025),
*appeal withdrawn sub nom. Ahmad v. Mellynchuk*, No. 25-3118, 2026 WL
698932 (2d Cir. Jan. 23, 2026) ...............................................................................16

*Ali v. NYC Env't Control Bd.*,
670 F. App'x 26 (2d Cir. 2016) .......................................................................70, 71

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)............................................................................ *passim*

*Anderson News, L.L.C. v. Am. Media, Inc.*,
No. 09-cv-2227, 2015 WL 5003528 (S.D.N.Y. Aug. 20, 2015), *aff'd*, 899 F.3d
87 (2d Cir. 2018)....................................................................................................40

*Andrews v. Metro North Commuter R. Co.*,
882 F.2d 705 (2d Cir. 1989).....................................................................18, 26, 66

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
537 F. Supp. 3d 273 (N.D.N.Y. 2021)...................................................................37

*Auther v. Oshkosh Corp.*,
No. 09-cv-00527, 2013 WL 5272959 (W.D.N.Y. Sept. 16, 2013).........................40

*Bank of New York Mellon v. WMC Mortg., LLC*,
2015 WL 4887446 (S.D.N.Y. Aug. 17, 2015)....................................................78, 95

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996)....................................................................87, 90, 95

*Bozick v. Conagra Foods, Inc.*,
No. 19-CV-4045 (LJL), 2022 WL 4561779 (S.D.N.Y. Sept. 28, 2022) (Liman,
J.).............................................................................................................................50

5

*Brink's Glob. Servs. USA, Inc. v. Bonita Pearl Inc.*,
No. 22-cv-6653, 2024 WL 4227760 (S.D.N.Y. Sept. 18, 2024) ...........................................25

*Bustamante v. KIND, LLC*,
100 F.4th 419 (2d Cir. 2024) .................................................................................11, 12

*Cacciola v. Selco Balers, Inc.*,
127 F. Supp. 2d 175 (E.D.N.Y.2001) ....................................................................66

*CCM Touring LLC v. Moonbug Entertainment Ltd.*,
No. 23-CV-7116 (VSB) (VF), 2026 WL 848392 (S.D.N.Y. Mar. 27, 2026)...................73, 77

*Chapman v. Procter & Gamble Distrib., LLC*,
766 F.3d 1296 (11th Cir. 2014) ..............................................................................23

*Choi v. Tower Rsch. Cap. LLC*,
2 F.4th 10 (2d Cir. 2021) .......................................................................................11

*Crown Cork & Seal Co. Master Ret. Trust v. Credit Suisse First Boston Corp.*,
No. 12-cv-05803, 2013 WL 978980 (S.D.N.Y. Mar. 12, 2013)....................................52, 102

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)............................................................................ *passim*

*Densberger v. United Techs. Corp.*,
297 F.3d 66 (2d Cir. 2002)......................................................................................64

*Deutsch v. Novartis Pharms. Corp.*,
768 F. Supp. 2d 420 (E.D.N.Y. 2011) .................................................................23, 82

*Dixon v. Reid*,
No. 23-CV-09878 (JAV), 2025 WL 2417299 (S.D.N.Y. Aug. 21, 2025)...................... *passim*

*E.E.O.C. v. Locs. 14 & 15, Int'l Union of Operating Eng'rs*,
No. 72 CIV. 2498 (VLB), 1981 WL 163 (S.D.N.Y. Feb. 11, 1981) ......................................66

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) ...............................................................................23

*Ermaris Bio, PBC v. Trs. of Columbia Univ. in City of New York*,
No. 25 CIV. 3691 (JPC), 2026 WL 520456 (S.D.N.Y. Feb. 25, 2026)..................................73

*Goldstein v. Montefiore Med. Ctr.*,
No. 22-cv-6723, 2025 WL 2726791 (S.D.N.Y. Sept. 25, 2025) ...........................................26

*Gray Gables Corp. v. Arthur*,
No. 21-1551-CV, 2022 WL 905393 (2d Cir. Mar. 29, 2022)..........................................70, 71

6

*Gyllenhammer v. Am. Nat'l Red Cross*,
No. 15-cv-1143, 2018 WL 1956426 (N.D.N.Y. Jan. 23, 2018) ................................................24

*Hayden v. Int'l Bus. Machines Corp.*,
No. 21-cv-2485, 2025 WL 1697021 (S.D.N.Y. June 17, 2025) ........................................28, 49

*Hodnett v. Medalist Partners Opportunity Master Fund II-A, L.P.*,
No. 1:21-CV-00038 (JLR), 2025 WL 2607548 (S.D.N.Y. Sept. 9, 2025) .................73, 77, 79

*Holland Loader Co., LLC v. FLSmidth A/S*,
313 F. Supp. 3d 447 (S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) ........................79

*Hygh v. Jacobs*,
961 F.2d 359 (2d Cir. 1992).....................................................................................................20

*Inficon, Inc. v. Verionix, Inc.*,
182 F. Supp. 3d 32 (S.D.N.Y. 2016).........................................................................................78

*J.G. v. New York City Dep't of Educ.*,
719 F. Supp. 3d 293 (S.D.N.Y. 2024).......................................................................................31

*Karkare ex rel. JN v. Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers Loc. 580*,
140 F.4th 60 (2d Cir. 2025) ......................................................................................................70

*Jones v. Niagara Frontier Transp. Auth. (NFTA)*,
836 F.2d 731 (2d Cir. 1987)..........................................................................................70, 71, 72

*JTRE Manhattan Ave. LLC v. Cap. One, N.A.*,
No. 1:21-CV-05714 (JLR), 2024 WL 3227010 (S.D.N.Y. June 27, 2024)...............................63

*Kairam v. West Side GI, LLC*,
No. 18-cv-01005, 2025 WL 2935321 (S.D.N.Y. June 21, 2025) ...........................................101

*Karavitis v. Makita U.S.A., Inc.*,
722 F. App'x 53 (2d Cir. 2018) .................................................................................................61

*Kenford Co. v. Erie Cnty.*,
67 N.Y.2d 257 (1986) ................................................................................................................87

*Kohls v. Ellison*,
No. 24-cv-3754, 2025 WL 66514 (D. Minn. Jan. 10, 2025) .....................................................31

*Kozak v. Liberty Mar. Corp.*,
729 F. Supp. 3d 277 (E.D.N.Y. 2024) .......................................................................................40

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)..............................................................................................15, 18, 28, 67

491311.3

*Liberty Sackets Harbor LLC v. Vill. of Sackets Harbor*,
　　776 F. App'x 1 (2d Cir. 2019) ...............................................................................70

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
　　801 F. Supp. 3d 330 (S.D.N.Y. 2025)..................................................................100

*LivePerson, Inc. v. [24]7.AI, Inc.*,
　　No. 17-CV-01268-JST, 2018 WL 6257460 (N.D. Cal. Nov. 30, 2018)..................37

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
　　209 F. Supp. 3d 612 (S.D.N.Y. 2016)..............................................................52, 61

*Maldonado v. Town of Greenburgh*,
　　No. 18-CV-11077 (KMK), 2024 WL 4336771 (S.D.N.Y. Sept. 26, 2024),
　　*reconsideration denied,* No. 18-CV-11077 (KMK), 2025 WL 1898950
　　(S.D.N.Y. July 9, 2025) ........................................................................................11

*Malletier v. Dooney & Bourke, Inc.*,
　　525 F. Supp. 2d 558 (S.D.N.Y. 2007)..............................................................47, 61

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
　　602 F. Supp. 3d 767 (D. Md. 2022) .....................................................................32

*Marx & Co. v. Diners' Club Inc.*,
　　550 F.2d 505 (2d Cir. 1977)..................................................................................64

*McBeth v. Porges*,
　　No. 15-CV-2742 (JMF), 2018 WL 5997918 (S.D.N.Y. Nov. 15, 2018)...............63

*McCullock v. H.B. Fuller Co.*,
　　981 F. 2d 656 (2d Cir. 1992)..................................................................................61

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
　　341 F. Supp. 3d 213 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020) ........45, 49

*In re Mirena IUS Levonorgestrel-Related Products Liability Litigation (No. II)*,
　　982 F.3d 113 (2d Cir. 2020)..............................................................................11, 54

*Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc.*,
　　598 F. Supp. 3d 158 (S.D.N.Y. 2022)....................................................................63

*Nieves-Villanueva v. Soto-Rivera*,
　　133 F.3d 92 (1st Cir. 1997)....................................................................................65

*Nimely v. City of New York*,
　　414 F.3d 381 (2d Cir. 2005)............................................................................ *passim*

8

*Nora Beverages, Inc. v. Perrier Group of Am., Inc.*,
   164 F.3d 736 (2d Cir. 1998)................................................................................................61

*Owen v. Kerr-McGee Corp.*
   698 F. 2d 236 (5th Cir. 1983) ............................................................................................64

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994)................................................................................................82

*Perona v. Time Warner Cable Inc.*,
   No. EDCV1402501MWFSPX, 2016 WL 9087260 (C.D. Cal. Aug. 12, 2016).....................65

*Potter v. United States*,
   No. 17-cv-4141, 2020 WL 2836440 (S.D.N.Y. May 30, 2020)...........................................23

*R.F.M.A.S., Inc. v. So*,
   748 F. Supp. 2d 244 (S.D.N.Y. 2010)................................................................................23

*In re Rezulin*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004)................................................................................66

*Rodriguez v. Vill. of Port Chester*,
   535 F. Supp. 3d 202 (S.D.N.Y. 2021)................................................................................24

*Ruggiero v. Warner-Lambert Co.*,
   424 F.3d 249 (2d Cir. 2005)...................................................................................28, 31, 45

*Schonfeld v. Hilliard*,
   218 F.3d 164 (2d Cir. 2000).......................................................................72, 73, 75, 78

*Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*,
   No. 95-cv-8136, 2001 WL 1602976 (S.D.N.Y. Dec. 14, 2001)...........................................23

*Tchatat v. City of New York*,
   315 F.R.D. 441 (S.D.N.Y. 2016) ..................................................................................16, 19

*United States v. Lumpkin*,
   192 F.3d 280 (2d Cir. 1999)..............................................................................................19

*United States v. Ray*,
   583 F. Supp. 3d 518 (S.D.N.Y. 2022) (Liman, J.)..............................................................19

*United States v. Scop*,
   846 F.2d 135 (2d Cir. 1988)..............................................................................................65

*United States v. Smith*,
   806 F. Supp. 3d 382 (S.D.N.Y. 2025).................................................................................37

9

*United States v. Zhong*,
    26 F.4th 536 (2d Cir. 2022) ................................................................12, 19, 28, 41

*Velez v. Lasko Prods., LLC*,
    No. 22-cv-08581, 2025 WL 1865165 (S.D.N.Y. July 7, 2025)............................................100

*Vertellus Holdings LLC v. W.R. Grace & Co.-Conn.*,
    No. CV SAG-18-3298, 2021 WL 3883597 (D. Md. Aug. 12, 2021) ......................................37

*In re Wireless Telephone Servs. Antitrust Litig.*,
    385 F. Supp. 2d 403 (S.D.N.Y. 2005)................................................................................100

*Z.H. v. New York City Dep't of Educ.*,
    No. 23-cv-3081, 2024 WL 3385690 (S.D.N.Y. July 12, 2024)................................................31

*Zaccaro v. Shah*,
    746 F. Supp. 2d 508 (S.D.N.Y. 2010)........................................................................87, 90, 95

*Zaremba v. Gen. Motors Corp.*,
    360 F.3d 355 (2d Cir. 2004)........................................................................................61

*Zhang v. City of New York*,
    No. 17-cv-5415, 2023 WL 6316249 (S.D.N.Y. Sept. 28, 2023) ...........................................101

*Zucchella v. Olympusat, Inc.*,
    No. CV197335DSFPLAX, 2023 WL 2628107 (C.D. Cal. Jan. 10, 2023)............................62

**Other Authorities**

Fed. R. Civ. P. 26(a)(2)(B)(i)..............................................................................................24

Fed. R. Evid. 104(a)........................................................................................................11

Fed. R. Evid. 401 .....................................................................................................12, 36

Fed. R. Evid. 403 ................................................................................................ *passim*

Fed. R. Evid. 702 ................................................................................................ *passim*

Fed. R. Evid. 703 ........................................................................................................37

Fed. R. Evid. 704 ................................................................................................ *passim*

491311.3

## INTRODUCTION

Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rules of Evidence 702, 401, and 403, Defendants move to exclude the testimony and opinions of Plaintiff's proposed experts Jennifer Freyd, Dina Mayzlin, Aron Culotta, Ashlee Humphreys, Jeffrey H. Kinrich, Michael Robbins, Michael Sippel, and Richard Marks.[1]

## LEGAL STANDARD

Lively has the burden of proving, by a preponderance of the evidence, that her experts' testimony "is based on sufficient facts or data," "is the product of reliable principles and methods," "reflects a reliable application of the principles and methods to the facts of the case," and "will help the trier of fact."  Fed. R. Evid. 702; *accord Daubert*, 509 U.S. at 597; *Choi v. Tower Rsch. Cap. LLC*, 2 F.4th 10, 20 (2d Cir. 2021).  The Court must "take a hard look" at the testimony and "undertake a *rigorous examination*" of each of Rule 702's requirements because an expert's "methodology must be reliable at every step of the way."  *In re Mirena IUS Levonorgestrel-Related Products Liability Litigation (No. II),* 982 F.3d 113, 123 (2d Cir. 2020). In this way, the Court "acts as a gatekeeper" against unreliable and irrelevant expert opinions. *Bustamante v. KIND, LLC*, 100 F.4th 419, 427 (2d Cir. 2024).  "Rule 702 was amended" in 2023 to reemphasize this judicial role, and to counter the practice of some courts to treat questions about an expert's basis or methodology as "questions of weight and not admissibility." *Maldonado v. Town of Greenburgh*, No. 18-CV-11077 (KMK), 2024 WL 4336771, at *10 n.14 (S.D.N.Y. Sept. 26, 2024), *reconsideration denied,* No. 18-CV-11077 (KMK), 2025 WL 1898950 (S.D.N.Y. July 9, 2025); *see* Fed. R. Evid. 702 advisory committee's note (2023 amend.) (describing such prior rulings as "an incorrect application of Rules 702 and 104(a)").

---

[1] Unless otherwise noted, all legal quotations are cleaned up.

In addition to reliability, Lively has the burden of showing not only that her experts' testimony meets the bare relevance threshold of Rule 401 but that the expert's specialized knowledge is on a subject matter "beyond the ken of the average juror" and will "help the trier of fact." *United States v. Zhong*, 26 F.4th 536, 555 (2d Cir. 2022). Because expert evidence can be "both powerful and quite misleading" the district court "exercises more control over experts than over lay witnesses" under Rule 403, which plays a "uniquely important role" in assessing expert testimony. *Bustamante*, 100 F.4th at 427; *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).

## ARGUMENT

## I.    THE COURT SHOULD EXCLUDE THE TESTIMONY OF JENNIFER FREYD

Lively offers Jennifer Freyd, Ph.D, a trauma researcher, to opine that Lively suffered "betrayal trauma" and "institutional betrayal" and is therefore at "extremely high" risk of such symptoms as "suicidal ideation," "hallucination," and "self harm," among others. Such testimony is plainly inadmissible. First, Lively expressly waived the right to offer expert mental health testimony. She did so when Defendants requested discovery to probe her mental condition. In refusing such discovery, she made clear she would offer no more than evidence of "garden-variety" emotional damages and would rely solely on percipient witnesses. Second, even absent this express waiver, Freyd's opinion, formed without interviewing Lively, reviewing her medical records, conducting clinical tests, or speaking with her medical providers, is almost pure *ipse dixit*, and palpably unreliable. Third, Freyd essentially offers a closing argument in support of Lively, based on her own interpretation of documents and testimony. Her theory is that Defendants' conduct fits the pattern of "DARVO," a term Freyd herself invented, about how perpetrators typically retaliate against their victims. None of this is helpful or reliable and will only confuse the jury. It also unfairly prejudices Defendants by bringing in a backdrop of

12

unrelated conduct by others, none of which is at issue here.  Freyd's testimony should be excluded in its entirety.

### A.    Freyd's Opinions

Freyd is an academic researcher in the field of trauma response but "not … a therapist or licensed clinician."  Declaration of Ellyn S. Garofalo Ex. 1 (Freyd Rpt.) at 2.[2]  Her opinions center on theories she began developing in the 1990s: "betrayal trauma," "institutional betrayal," and "DARVO," which "stands for Deny, Attack, and Reverse Victim and Offender."  *Id.* at 4-11. In reaching her opinions, she did not conduct a clinical interview of Lively or perform any tests, nor did she review Lively's medical records or speak with her medical providers.  Instead, she has relied exclusively on the deposition testimony, pleadings, and other litigation materials provided by Lively's counsel.  *Id.* at App'x B.

Freyd's central opinion is that Lively suffered "betrayal trauma" and "institutional betrayal," and that, as a result, Lively is "at increased risk" of certain "symptoms of distress": "Betrayal blindness"; "Revictimization"; "Depression and suicidal ideation"; "Anxiety"; "Shame"; "PTSD"; "Dissociation"; "Physical illness"; "Hallucinations"; "Self harm"; and "Problematic substance abuse."  *Id.* at 1, 15, 37-38.  Freyd "would expect … Lively's risk associated with the above symptoms to be extremely high."[3]  *Id.* at 38.

In addition to this not-quite-diagnosis, Freyd would opine on Lively's supposed "low-level betrayal blindness, whereby … Lively continued to give … Baldoni the benefit of the doubt as he continued to make inappropriate remarks and violate … Lively's boundaries."  *Id.* at 16.  In

---

[2] All Exhibits referenced in this Motion are to the Declaration of Ellyn S. Garofalo and will be referred to herein simply as "Ex. ___."

[3] Freyd does not opine that Lively exhibits any of these symptoms or will in the future. Her opinion merely speculates on a generalized "risk."

491311.3

Freyd's "opinion … Lively oscillated between awareness of … Baldoni's and Wayfarer's toxic behavior and an understandable desire to hope for the best." *Id.* at 19.

Finally, Freyd would offer various narrative "opinions" repackaging Lively's allegations and theory of the case under the guise of an opinion on "DARVO." For example, Freyd would testify to her "opinion that … Lively experienced a pattern of retaliation and intentional reputation damage directed at [her]." *Id.* at 26. She would offer her "opinion that … Baldoni's texts to his friends … downplayed [Lively's] concerns while at the same time acknowledging that she was accusing him of sexual harassment." *Id.* at 27. She would offer her "opinion that Mr. Baldoni and Mr. Heath continued to cover up Lively's experience" "at a dinner with [author] Colleen Hoover." *Id.* She would give her "opinion that … Heath … offered a performative acknowledgment of the women's experiences, recognizing them only to deny their validity and reassert his version of events." *Id.* at 29. She would explain her "opinion that … each time Ms. Lively raised a concern, Wayfarer minimized her concerns and attacked her instead." *Id.* She would give her "opinion that Wayfarer engaged in further Attack and RVO by causing the online Smear Campaign to commence with Attack and RVO themes." *Id.* at 32.

This goes on and on, and is all set up for the punchline: "In my opinion, Wayfarer's entire defense in [these] court proceedings is a classic example of DARVO." *Id.* at 34.

### B. Freyd's Opinions Regarding Lively's Emotional Damages Are Inadmissible

#### 1. Lively Has Waived The Right To Offer Expert Testimony In Support Of Her Emotional Damages

Freyd's testimony regarding "betrayal trauma" and "institutional betrayal" must be excluded because Lively expressly waived all but "garden-variety" emotional damages and forswore expert testimony to support those damages. To moot Defendants' motion to compel access to Lively's medical records, Lively agreed to the dismissal of her claims for intentional

14

491311.3

and negligent emotional distress.  Dkt Nos. 264, 266.  Lively subsequently told the Court that she "waive[d] the right to offer testimony or evidence of the identity, records, treatment or diagnoses or her health care providers related to such emotional distress" but may "[m]ay offer evidence of garden-variety emotional distress damages … including testimony of herself and percipient corroborating witnesses."  Dkt. No. 308.  The Court so-ordered Lively's letter, ruling that Lively was precluded from offering "medical evidence of emotional distress" but could offer "evidence of garden-variety emotional distress."  Dkt. No. 313.

These representations and rulings are crystal clear and bar Lively from offering Freyd's opinions regarding the trauma Lively supposedly suffered and her heightened "risk for significant physical and mental health impacts."  Ex. 1 (Freyd Rpt.) at 38.  Had Lively reserved, and not waived, the right to offer an expert mental health testimony, Defendants would have been entitled to appropriate discovery, including relevant medical and psychological records and an independent medical examination conducted by an appropriate clinical professional.  Having cut off such avenues of discovery, Lively is now precluded from offering evidence on the same topic.

2.    <u>Freyd's Opinions Regarding Lively's Emotional Damages Are Inadmissible Under Rule 702</u>

Freyd's opinions on emotional damages are also inadmissible because, even assuming that Freyd's theories are reliable "in general," Freyd has not applied these theories reliably in forming her opinions as to "the particular matter" at issue in this case.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153-54 (1999).  An expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" outside the litigation context.  *Id.* at 152; *accord Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265-66 (2d Cir. 2002).  Freyd plainly has not done so here.

15

"It is generally accepted practice in the field of psychiatry for a diagnosis to be made based on the examination of the individual being assessed." *Tchatat v. City of New York*, 315 F.R.D. 441, 445 (S.D.N.Y. 2016) (citing DSM-V at 21).  Accordingly, "court decisions involving psychological or psychiatric expert testimony typically recite that the testifying expert has personally interacted with the patient." *Id.* (collecting cases).  For example, in *Katt v. City of New York*, the psychologist "based her opinion on six hours of face-to-face interviews … a study of [plaintiff's] medical records and life history, and a clinical test to determine causality." 151 F. Supp. 2d 313, 350-51 (S.D.N.Y. 2001).  In *Ross v. Guy*, the psychologist's opinion was based on "a clinical interview and observation of the Plaintiff, review self-report measures, and review of medical records." No. 18-CV-1340 (WFK) (PK), 2022 WL 768196, at*4 (E.D.N.Y. Mar. 14, 2022); *see also, e.g.*, *Ahmad v. New York Univ.*, No. 1:22-CV-01248 (JLR), 2025 WL 3022862, at*29 (S.D.N.Y. Oct. 29, 2025), *appeal withdrawn sub nom. Ahmad v. Mellynchuk*, No. 25-3118, 2026 WL 698932 (2d Cir. Jan. 23, 2026), and *vacated in part,* No. 1:22-CV-01248 (JLR), 2026 WL 234594 (S.D.N.Y. Jan. 29, 2026)  (treating clinical psychologist "held 353 individual, hour-long therapy sessions with plaintiff").

In contrast, the opinions of psychological experts who render their opinions without conducting a clinical interview are generally excluded.  In *Tchatat*, for example, the court excluded a psychiatrist's opinion that was "based only on his review of medical records, deposition testimony, and other documents."  315 F.R.D. at 446.  Similarly, in *Mazzocchi v. Windsor Owners Corp.*, the court excluded a psychiatrist's opinion that plaintiff's actions were "consistent with 'text book descriptors' of bipolar disorder" where the opinion was not a "diagnosis" and was not based on an "in-person examination of [plaintiff] or a review of her medical records."  204 F. Supp. 3d 583, 602-03 (S.D.N.Y. 2016).

16

Even psychologists who *do* interview their patients may be barred from giving an opinion if their evaluation is insufficiently thorough—*e.g.*, if they do not review relevant medical records, conduct appropriate tests, or follow up with the patient's medical providers.  In *El Ansari v. Graham*, the court excluded the plaintiff's expert psychologist's diagnosis as unreliable even where the psychologist conducted a clinical interview because the psychologist "never reviewed any of the Plaintiff's medical records or made any effort to contact her medical providers."  No. 17-CV-3963 (VEC), 2019 WL 3526714, at *5 (S.D.N.Y. Aug. 2, 2019).  In *Matthews v. Hewlett-Packard Co.*, the court excluded the plaintiff's psychological expert, who had interviewed the plaintiff for three hours over the course of four meetings, where the psychologist did not review the plaintiff's medical records or perform additional psychological testing.  No. 15 CIV. 3922 (DAB), 2017 WL 6804075, at *2-5 (S.D.N.Y. Dec. 22, 2017).  In *Munafo v. Metropolitan Transportation Authority*, the court excluded a psychiatrist who conducted only a "sparse examination," relied "entirely on [the plaintiff's] own … statements" and did not "exhibit the rigorous application of scientific principles."  No. 00-CV-0134 (ERK), 2003 WL 21799913, at *19-20 (E.D.N.Y. Jan. 22, 2003).

Freyd, who is "not … a therapist or licensed clinician," has not interviewed Lively, reviewed her medical records, conducted tests, spoken with her medical providers, or, ultimately, rendered a diagnosis.  Rather, she has reviewed deposition transcripts, pleadings, and other litigation documents, presumably selected by counsel, and based on these documents is willing to opine that Lively is at "increased risk" of severe trauma-related symptoms, all because of Defendants' alleged "betrayal."  She has done no follow up and apparently has not probed Lively's claims in any way.  And Freyd's bar for betrayal does not appear to be particularly high: she states that a person would be "categorize[d] … as having experienced institutional betrayal"

17

if they checked just one item on a twelve-item checklist.  Ex. 1 (Freyd Rpt.) at 10.  This is not the kind of thorough, neutral, and scientific evaluation that a psychologist would undertake if seeking to diagnose a patient outside the litigation setting.  *Kumho*, 526 U.S. at 152.

### C.    Freyd's Other Opinions Are Inadmissible Under Rules 702 And 403

#### 1.    Freyd Should Not Be Allowed To Testify About Lively's Supposed "Low-Level Betrayal Blindness"

Freyd's opinion about Lively's supposed "low level betrayal blindness" is also unreliable and therefore inadmissible.  Freyd's opinion falls far short of a diagnosis and was arrived at without using any of the tools—clinical interview, tests, review of medical records—that would be used by a psychologist doing actual clinical work.

Freyd's testimony about "betrayal blindness" is also not a "fit" for the case.  *Daubert*, 509 U.S. at 591 (discussing "fit" requirement).  Freyd describes "betrayal blindness" as "the unawareness, not-knowing, and forgetting of betrayal traumas."  Ex. 1 (Freyd Rpt.) at 5.  But this is not a case involving the suppression of a painful memory.  Rather, Freyd would testify that "Lively … tried to see the best in Wayfarer, and Mr. Baldoni," that Lively "felt a responsibility to keep the production on track for the benefit of all cast and crew," and that Lively "oscillated between awareness of Mr. Baldoni and Wayfarer's toxic behavior and an understandable desire to hope for the best."  *Id.* at 19.  That has nothing to do with "betrayal blindness" as Freyd describes it.  In any event, these issues are completely irrelevant now that Lively's sexual harassment claims have all been dismissed.

Moreover, to the extent that "low-level betrayal blindness" is just "hoping for the best" it is well within the ken of the ordinary juror and therefore not a proper subject of expert opinion. *See Andrews v. Metro North Commuter R. Co.*, 882 F.2d 705, 707-08 (2d Cir. 1989).  Lively can, of course, testify to these points, and the jury either will or will not believe her.  But the jury is

491311.3

more than capable of reaching its own conclusions without ventriloquism or commentary from an expert, especially one who has never even evaluated Lively.

     2.     <u>Freyd Should Not Be Allowed To Testify As A Summation Witness</u>

Lively apparently also plans to use Freyd as a summation witness, describing and commenting on the evidence while showing by her presence on the stand that an expert believes and supports Lively's case. Such testimony should not be permitted. A party "may not use expert testimony to provide itself with an additional summation by having the expert interpret the evidence." *Zhong*, 26 F.4th at 556. By echoing the narrative of the in-court testimony without offering a true opinion, such testimony "may improperly bolster the account given by fact witnesses." *Nimely*, 414 F.3d at 398.

Here, Freyd will offer a variety of narrative "opinions," including that that Lively "experienced a pattern of retaliation and intentional reputation damage," that "Wayfarer minimized her concerns and attacked her," that "Lively was … victimized repeatedly," and even that "Wayfarer's entire defense in [these] court proceedings is a classic example of DARVO." Ex. 1 (Freyd Rpt.) at 29-34.

None of this is proper expert opinion. Rather "[i]t is a regurgitation of the [plaintiff's case] uttered through the mouth of an expert." *United States v. Ray*, 583 F. Supp. 3d 518, 540 (S.D.N.Y. 2022) (Liman, J.); *see also Tchatat*, 315 F.R.D. at 444 ("[a]cting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise"). Of course, Lively may argue some of these points in summation, if they have evidentiary support. But she should not be permitted to weaponize the "added aura or reliability that necessarily surrounds expert testimony" to tell her story through a witness whose only knowledge of the case comes through hearsay and who is using no real expertise to form her "opinions." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999). Such testimony is inadmissible under Rule 702

19

and under Rule 403, which has a "uniquely important role" in the court's scrutiny of expert testimony "given the unique weight such evidence may have in a jury's deliberations." *Nimely*, 414 F.3d at 397.

### 3. Freyd Should Not Be Allowed To Testify About DARVO

Freyd's proposed opinions about "DARVO" are also not helpful, not necessary, and will only confuse the jury. The question for the jury is whether Defendants retaliated against Lively in a manner cognizable under the law, not whether their behavior constitutes "DARVO." Freyd's testimony on DARVO is neither relevant nor a subject on which the jury requires assistance.

Moreover, experts must not be permitted to "usurp[] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Nimely*, 414 F.3d at 397. The Court will instruct the jury on the elements of retaliation and Freyd's theorizing about "DARVO" will only lead to unnecessary confusion. The "opinions" on DARVO are also an attempt to have a supposed expert on retaliation look at the facts and opine "tell the jury what result to reach." *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) (quoting Fed. R. Evid. 704 advisory committee's note (1972)). The testimony is inadmissible under both Rule 702 and Rule 403.

***

Freyd's opinions should be excluded in their entirety, and she should not be permitted to testify at trial.

## II. THE COURT SHOULD EXCLUDE THE TESTIMONY OF DINA MAYZLIN

Dina Mayzlin opines that Defendants "manipulated" online conversations concerning Lively to damage her reputation, and that such "manipulation" caused the sales of Lively's consumer products to decline. Mayzlin's opinions are baseless and fail virtually every

20

requirement for admitting expert testimony. It is difficult to overstate the flaws in her "methodology," which she has never previously applied and appears to have concocted solely for purposes of this litigation. With respect to causation, Mayzlin's approach is thoroughly unscientific, and to make matters worse, depends upon a notoriously unreliable "artificial intelligence" model to analyze the data. The shortcomings in Mayzlin's techniques force her to fill in gaps with speculation and guesswork, as well as to make summation-style arguments based on her interpretation of particular documents without the application of any particular expertise. Her analysis is unreliable every step of the way, and it should be excluded in full. At a minimum, Mayzlin should not be permitted to summarize and interpret emails and other case documents for the jury.

### A. Mayzlin Should Not Be Allowed To Opine That Defendants Manipulated Online Sentiment

#### 1. Mayzlin's "Manipulation" Opinion

Mayzlin first opines that Defendants launched an online smear campaign beginning in August 2024 that caused a massive spike in the volume of online conversations about Lively and in the percentage of such conversations that were negative. As the touchstone for her analysis, Mayzlin asked ChatGPT's artificial intelligence model to categorize a sample of social media posts from May 2024 to February 2025 according to their sentiment toward Lively (positive, neutral, negative, or mixed). Relying largely on this AI-based delineation, Mayzlin concludes that the volume of social media posts spiked and became increasingly negative in August 2024 and again in December 2024. Ex. 2 (Mayzlin Rpt.) at 56, 58. Mayzlin also asked the ChatGPT model to count how many of the negative posts about Lively reflect themes that also purportedly appear in Defendants' "Scenario Planning" document. Based on the ChatGPT model's response, Mayzlin determined that although certain themes appeared on social media before August 2024,

21

they appeared more frequently starting in August 2024 (less than 4% of negative posts) and a bit more starting in January 2025 (roughly 10% of negative posts).  *Id.* at 65; *see also id.* at ¶¶ 83, 96.  Mayzlin performed the same AI-based exercise with topics from two *Daily Mail* articles that Defendants supposedly "planted" in mid-August 2024, and she received similar results.  *Id.* at 70.

Based on the results of the AI-driven surveys, Mayzlin claims to have found "discontinuous change" in the "online conversations about Blake Lively" in August 2024— supposedly reflecting "negativity that wasn't there before" and "themes" that match those of the "scenario planning document" and two *Daily Mail* articles.  She thus "infer[s]" that "there was manipulation of social media by the Wayfarer team."  Ex. 3 (Mayzlin Dep.) at 112.  How did Mayzlin rule out possible alternative causes?  In her report, Mayzlin merely says: "It is my understanding that there are no other significant external events during this time that could reasonably explain the observed shift in public sentiment."  Ex. 2 (Mayzlin Rpt.) at ¶ 91.  As support for her "understanding," Mayzlin cites a single source: her "[d]iscussions with management" of Lively's consumer brands.  *Id.* at ¶ 91 n.186.  On this basis, Mayzlin concludes that, "[g]iven the absence of alternative external events that could explain this change, and the close alignment between the rise in unfavorable conversations and the documented campaign timeline, it is reasonable to infer that the manipulation of online conversations was the catalyst."  *Id.* at ¶ 91.

        2.      <u>Mayzlin's Opinion Is Not Grounded In Any Expertise Or Actual Methodology</u>

Mayzlin's reasoning falls far short of what the Federal Rules require from testifying experts.  "[A] causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of Fed. R. Evid. 702."

491311.3

*R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 273 (S.D.N.Y. 2010); *accord, e.g.*, *Potter v. United States*, No. 17-cv-4141, 2020 WL 2836440, at *5-6 (S.D.N.Y. May 30, 2020); *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1310 (11th Cir. 2014).  "[O]ne cannot determine whether something caused an observed effect without controlling for other equally plausible causes of that effect."  *R.F.M.A.S.*, 748 F. Supp. 2d at 273.  Thus, reliable expert testimony "must at least address obvious alternative causes and provide a reasonable explanation for dismissing" them.  *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 474 (E.D.N.Y. 2011); *accord, e.g.*, *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1053-55 (9th Cir. 2025).

Mayzlin relies solely on the "close alignment" in time between the August 2024 increase in online conversations and negative posts and Defendants' purported campaign.  She fails to address any alternative causes, let alone explain them away.  Her vague assertion that "discussions with management" ruled out other causes does not suffice.  "Assumptions based on conclusory statements of the expert's client, rather than on the expert's independent evaluation[,] are not reasonable."  *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, No. 95-cv-8136, 2001 WL 1602976, at *4 (S.D.N.Y. Dec. 14, 2001); *accord R.F.M.A.S.*, 748 F. Supp. 2d at 249-50, 272-73.  "I asked the client and the client couldn't think of anything" is not the application of science and is wholly inadequate for a causation opinion.

Of course, there *were* plenty of other reasons why more people would be talking about Lively in the second week of August, and why some of those online conversations may have been negative.  Lively was *the* star of a major Hollywood movie that premiered on August 6 and was released to the public on August 9 with massive success.  People talk about movies at the time they are released.  It is hardly surprising that people online were talking about Lively in the days and weeks that followed the premiere.  And, as everyone knows, much online discourse is

23

491311.3

negative, often with no rhyme nor reason except the desire to take the successful down a notch. Mayzlin herself appeared to recognize this at her deposition. *See* Mayzlin Dep. 129:16-130:20 (admitting it is "[n]ot surprising" the film premiere would "trigger[] a surge in public engagement" and "commentary," including "speculation about on-set dynamics and … costar relationships"); *id.* at 141:14-142:5 (opining that "trolls" and "haters" unaffiliated with Defendants attacked Lively on social media).

There is also significant evidence that Lively's own actions in July and August of 2024 caused the massive outpouring of vitriol online. These actions include Lively's deliberate and highly visible efforts to ostracize Baldoni by persuading cast members to "unfollow" him on social media, which touched off frenzied press speculation about a celebrity feud. Defs.' Mot. Sum. J., Dkt. No. 955, at 13. They also include Lively's decision to cross-promote a serious film about domestic violence with her haircare brand, alcoholic beverages, and her husband's superhero movie. *Id.* at 15. Lively herself recognized this, as did multiple Sony executives. *Id.* at 15; *see, e.g.*, 56.1 ¶ 288 (Sony president: "She did it to herself. If she just let him come to the premiere or didn[']t make all the cast unfollow him or kick him off the movie … then none of the sleuthing would have happened. The hair sell at the same time was epic level stupid. She wouldn't listen."). It is inexplicable that Mayzlin chose to ignore these alternative explanations in her report and to pretend they do not exist.

Lively cannot fill that gap with Mayzlin's deposition testimony,[4] and in fact, Mayzlin's deposition laid bare the defects in her analysis. When asked whether she considered alternative

---

[4] An expert report "must contain … a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Thus, a "deficient expert report may not be cured by supplementing it with later deposition testimony." *Gyllenhammer v. Am. Nat'l Red Cross*, No. 15-cv-1143, 2018 WL 1956426, at *5 n.4 (N.D.N.Y. Jan. 23, 2018); *accord Rodriguez v. Vill. of Port Chester*, 535 F. Supp. 3d 202, 211 (S.D.N.Y. 2021) (excluding

24

causes, Mayzlin responded: "So I mean, in some sense, I did.  Because I didn't see any discontinuity in what [Lively] was doing. … [W]hat Blake Lively was doing, you know, was fairly stable." Ex. 3 (Mayzlin Dep.) at 115.  As Mayzlin was well aware, however, the film premiere and the launch of Lively's haircare brand both took place in early August 2024.  Ex. 2 (Mayzlin Rpt.) at ¶¶ 64 n.151, 110-11; Ex. 3 (Mayzlin Dep.) at 129-30.  Mayzlin evidently failed to consider the impact of these events, or the impact of any of Lively's other actions discussed above.  She simply judged it "possible, but … implausible" that "Lively did [some]thing in August to cause the change in how the online community was talking about her."  Ex. 3 (Mayzlin Dep.) at 155.  Mayzlin's testimony is neither "based on sufficient facts or data," nor "a reliable application of [her] principles and methods to the facts of the case."  Fed. R. Evid. 702.

Mayzlin fared no better when pressed about specific alternative causes at her deposition. Confronted with text messages in which Sony executives attributed the online backlash to Lively's own missteps, Mayzlin gave the non-response that Sony executives "gossiping about Blake Lively" had "nothing to do with [her] data or [her] analysis or what [she] was hired to do." Ex. 3 (Mayzlin Dep.) at 168-71.  When asked about the possible effect of Lively telling her costars to "unfollow" Baldoni, Mayzlin gave her subjective judgment that it was not "plausible" this issue would "take off with such a force" by itself, adding, irrelevantly, that this was particularly implausible if Baldoni's "inappropriate behavior on the set" justified the shunning. *Id.* at 124-25, 159.  Mayzlin repeatedly returned to her argument that some of the online conversations were consistent with themes in Defendants' "scenario planning" document and the *Daily Mail* articles.  *E.g.*, *id.* at 147, 165-67.  But this sort of reasoning—comparing the contents

---

"causal" explanation provided at deposition but not in report); *Brink's Glob. Servs. USA, Inc. v. Bonita Pearl Inc.*, No. 22-cv-6653, 2024 WL 4227760, at *9-10 (S.D.N.Y. Sept. 18, 2024) (excluding expert testimony about data discussed at deposition but not in report).

of simple documents, weighing probable explanations, and drawing inferences—does not involve the application of any expertise.  A "party may not present an expert to make simple inferences drawn from uncomplicated facts, which do[es] not help the jury and serve[s] only to buttress Plaintiff's case."  *Goldstein v. Montefiore Med. Ctr.*, No. 22-cv-6723, 2025 WL 2726791, at *9 (S.D.N.Y. Sept. 25, 2025).  Such an expert improperly "supplants the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence," and must be "exclude[d]."  *Id.* at *6; *see Andrews*, 882 F.2d at 708 (issues within "the jury's ken" are "not a proper subject of expert testimony").  And it is equally possible that the authors of the "scenario planning" document and the online commentators were both focused on Lively's obvious weaknesses *because* they were obvious weaknesses.

To make matters worse, Mayzlin ignores the strong evidence of organic negative sentiment against Lively *in her own dataset*, which undermines her theory that Defendants caused the social media backlash against Lively.  From May-July 2024, there were many criticisms of Lively on social media that Mayzlin does not attribute to Defendants, and which simply took off in August 2024.  Consider the criticism of Lively's wedding on a slave plantation and antebellum-themed lifestyle blog.  Mayzlin's backup data contains over 270 negative social media posts containing the words "plantation," "antebellum," or "racist" from May-July 2024,[5] and over 10,000 in or after August 2024.  That topic alone was more popular

---

[5] *E.g.*, May 1: "[Taylor Swift] is friends with tons of racists. Blake lively got married on a plantation."  May 6: "She defended her plantation wedding for years.  She's not THAT cool."  May 6: "She and Ryan got married in a slave plantation (they apologized after receiving backlash). And then she created a lifestyle website that glorified and romanticized the Antebellum South aka the Plantation era driven by slave labor. She has not apologized despite the backlash."  July 9: "she also had a blog called preserve with published articles titled things like 'the allure of antebellum'. interesting how a white women, whose never lived in the south, has such a strong pull to the pre civil war south."

491311.3

than any of the "themes" that Mayzlin attributes to Defendants.  Posts criticizing Lively for supporting Woody Allen and bullying Kate Middleton also appeared in the months before August 2024 and then took off.[6]  Mayzlin does not claim that Defendants planted or promoted these topics.  These are just a few examples, and there are surely more.  Mayzlin does not make any effort to "address [this] evidence" in her report, even though it is "highly relevant to [her] conclusion," and thus "exclusion of the proffered testimony is warranted."  *In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 336 (S.D.N.Y. 2023).

At her deposition, Mayzlin admitted that the overwhelming majority of "negative conversations online about Blake Lively" did not fit Defendants' purported "themes."  Ex. 3 (Mayzlin Dep.) at 138-39.  She claimed this was "probably" because Defendants' actions inspired other "trolls" or "haters" of Lively to resurface "other negative stories."  *Id.* at 141-42. Mayzlin admitted that she "can't tell" what "percentage of the conversations were manipulated," but she insisted the wave of negative sentiment "wouldn't have happened" unless "the Wayfarer team got the ball rolling" and "lit the match that then burned the forest."  *Id.* at 117, 131, 139. All of this is speculation, not the rigorous analysis required of an expert.  Mayzlin acknowledges, for instance, that Defendants did not generate the "spike" of negative posts in December 2024— rather, the lawsuits filed at that time brought "renewed attention" to the parties' dispute and

---

[6] At least 13 negative posts in May-July 2024 mention Woody Allen (*e.g.*, "I don't like Blake Lively much either because she defended working with Woody Allen and called him 'very empowering.'"; ""Farrow literally outed him as a pedo with that op ed in 2014 that was widely talked about, I don't wanna hear any billshit [*sic*] excuses about how Blake 'didn't know'"). Over 3,900 negative posts mention "Woody" in or after August 2024.

At least 37 negative posts in May-July 2024 mention Lively's bullying of Kate Middleton (*e.g.*, "Blake lively the nasty lady that made horrible comment about princess Catherine who had cancer!"; "I used to like Blake until she jumped on the 'where's Kate' bandwagon[.] She really is a mean girl"; "who knew Blake enjoyed bullying women with cancer?").  Over 1,500 negative posts mention "Middleton" or "cancer" in or after August 2024.

491311.3

Lively herself, and "the same kind of topics, … came up again." *Id.* at 177-79.  But why was the "spike" in August 2024 any different?  How can Mayzlin rule out that Lively's own missteps, or the release of a film in which Lively played a starring role, "renewed attention" to past controversies and "lit the match that then burned the forest"?  Mayzlin has no answer.  She simply dismisses this explanation as "possible, but … implausible."  Ex. 3 (Mayzlin Dep.) at 155.

In short, Mayzlin's explanations and underlying causal analysis appear to be either merely off-the-cuff surmises or common-sense explanations untethered to any actual expertise.  She "merely offers a particular interpretation" of the evidence and "does no more than counsel for plaintiff will do in argument" to the jury.  *Hayden v. Int'l Bus. Machines Corp.*, No. 21-cv-2485, 2025 WL 1697021, at \*9 (S.D.N.Y. June 17, 2025).  But a party "may not use expert testimony to provide itself with an additional summation by having the expert interpret the evidence."  *Zhong*, 26 F.4th at 556.  And where, as here, an expert's analysis is "simply inadequate to support the conclusions reached," Rule 702 "mandate[s] [its] exclusion."  *Amorgianos*, 303 F.3d at 266; *accord Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005).  Mayzlin should not be permitted to opine that Defendants "manipulated" online conversations, let alone caused an online conflagration.

> 3.     <u>Mayzlin's Purported Methodology Is Untested And Fundamentally Unreliable</u>

Mayzlin resorts to logical leaps and speculation because her "methodology" leaves her no other choice:  it was concocted for this litigation alone, without the thoroughness and care that one would ordinarily expect for causal analysis.  A district court, however, "must make certain that an expert … employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho*, 526 U.S. at 152; *see also Amorgianos*,

28

491311.3

303 F.3d at 269 (expert "formulating an opinion for use in the courtroom [must] employ the same level of intellectual rigor as would be expected in the scientific community"). Mayzlin's analysis falls well short of that standard and must be excluded.

Mayzlin, a professor of marketing, characterizes herself as a "scientist" who is simply reporting what "[m]y data tells me." Ex. 3 (Mayzlin Dep.) at 66. She claims that "what [she is] doing" in her expert report "is something [she has] done in her own research." *Id.* at 90. But when asked for more details about these methods, she backpedaled, explaining that she has "a paper published in A[E]R" that uses "kind of a high level similar idea." *Id.* at 91. She admitted that the paper does not contain the methodology itself, but "sort of [the] idea behind the design." *Id.* at 91-92. When asked if her "design [has] been peer-reviewed," she could only say that "the idea behind the design was in this A[E]R paper," and that the paper "was peer-reviewed" and took "inspiration" from the work of "very famous people." *Id.* at 91-93.

If this sounds like Mayzlin is straining hard to anchor her expert report in the academic literature, that is because she is. It is true that Mayzlin's report contains citations to a paper she published in the *American Economic Review* (AER).[7] Like Mayzlin's report, the objective of her AER paper is to study fake online commentary—in that case, online hotel reviews. But the similarities end there. The two works might share the same goal, but they do not share a methodology. The AER paper uses a statistical approach based on the premise that hotel reviews on Expedia are hard to fake (since only verified customers can leave reviews), while hotels reviews on TripAdvisor are easy to fake (since anyone can leave reviews). The paper hypothesizes that small independent hotels are more likely to give themselves fake positive

---

[7] Mayzlin, Dina, Yaniv Dover, and Judith Chevalier, "Promotional Reviews: An Empirical Investigation of Online Review Manipulation," *The American Economic Review*, Vol. 104 (8), August 2014, pp. 2421-2455.

29

reviews and give neighboring hotels fake negative reviews. The paper tests this hypothesis by assessing the relationship between a hotel's characteristics (size, neighbors, etc.), on the one hand, and the difference between that hotel's TripAdvisor and Expedia ratings, on the other, using a "differences in differences" regression analysis. The paper also contains several pages of robustness checks to test alternative explanations for the results. In other words, as with most scientific work, the AER methodology contains assumptions and controls, which are made explicit, so that others in the scientific community can evaluate the research yield accordingly.

Mayzlin's expert report in this case contains virtually none of these features. There are no robustness checks or formal statistical methods. The key feature of the AER paper is lacking, namely the ability to set a "benchmark" for genuine reviews by comparing "two different [review] platforms with dramatically different costs of cheating." AER Paper at 2436. Mayzlin's expert work might resemble the AER paper if she had compared two social media platforms, with dramatically different safeguards against manipulation, before and after the beginning of August 2024. But that is not what Mayzlin did. Instead, she performed a simple comparison of sentiment and discussion topics over time, with no apparent precedent in the literature and no evaluation of alternative causes. Her ersatz methodology was devised for this litigation only. The lack of controls makes that methodology inherently suspect.

The wide gulf between Mayzlin's academic work and her expert work is fatal to the admissibility of her testimony. Mayzlin does not employ "the same level of intellectual rigor that characterizes the practice of an expert in [her] field." *Amorgianos*, 303 F.3d at 265-66. Her methodology lacks any firm foundation in the literature she cited, and no other indicia of reliability are present, since that methodology "has [*not*] been tested," "has [*not*] been subjected to peer review and publication," does *not* have a "known or potential rate of error," and "has

30

[*not*] gained 'general acceptance' in the relevant scientific community." *Id.* at 266.  Rule 702 therefore "mandate[s]" the exclusion of her testimony, which "is based on data, a methodology, [and] studies that are simply inadequate to support the conclusions reached." *Id.*; *accord Ruggiero*, 424 F.3d at 253.

4.    Mayzlin's Reliance On ChatGPT's AI Model To Evaluate And Classify Her Data Destroys The Reliability Of Her Opinions

Mayzlin's testimony must also be excluded for an entirely independent reason:  her opinion relies on data that was evaluated and classified by "GPT-4o, which is the LLM model that supports ChatGPT." Ex. 2 (Mayzlin Rpt.) at ¶ 66.  Mayzlin relied on GPT-4o to classify social media posts according to sentiment and to identify the posts that reflect certain "themes." *See, e.g.*, *id.* at ¶¶ 67-68.  This is a key step in her analysis, and an essential foundation for her opinion.  If GPT-4o cannot be relied upon to perform this task correctly, all the conclusions she draws are unreliable.[8]

Courts in this District and around the country have found that artificial intelligence models like GPT-4o cannot be relied on to synthesize information correctly, including for expert analyses. *See Kohls v. Ellison*, No. 24-cv-3754, 2025 WL 66514, at *1 (D. Minn. Jan. 10, 2025) (rejecting expert declaration drafted with the assistance of "GPT 4-o," where "GPT-4o provided [the expert] with fake citations to academic articles"); *J.G. v. New York City Dep't of Educ.*, 719 F. Supp. 3d 293, 307-08 (S.D.N.Y. 2024) (rejecting "ChatGPT-4" summary of attorney billing rates and discouraging the use of ChatGPT for this purpose "[b]arring a paradigm shift in [its] reliability of this tool"); *Z.H. v. New York City Dep't of Educ.*, No. 23-cv-3081, 2024 WL

---

[8] Earlier in her report, Mayzlin uses a separate "LDA" model to identify topics discussed on social media, but this model contributes little to her conclusions, which depend on the entire "portfolio" of analysis performed largely by GPT-4o. *E.g.*, Ex. 3 (Mayzlin Dep.) at 188:24-189:13.

31

3385690, at *5 (S.D.N.Y. July 12, 2024) (same, because "ChatGPT has been shown to be an unreliable resource"); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 602 F. Supp. 3d 767, 787 (D. Md. 2022) (excluding expert testimony because expert's "willingness to rely on his own untested conclusion that his [artificial intelligence] model could reliably be applied to the facts of this case is insufficient to meet the requirements of Rule 702").

Academic publications and online commentary also cast doubt on the use of these tools for serious analytical purposes. One medical paper, which tested the ability of GPT-4o to generate short literature reviews, found that "nearly two-thirds of citations" included by GPT-4o were "fabricated or inaccurate."[9] Just as alarming is the OpenAI Developer Community forum, which contains a webpage entitled "GPT-4o not following simple and clear instructions."[10] There, GPT-4o users report various problems with the model:

- "I am asking GPT-4o to write a paragraph between 400 and 500 words. It will not follow this instruction and wrote the first paragraph with 635 words…. I ask it to do it again with a word count between 400 and 500, and it proceeds to send an almost identical paragraph and tell me it is 499 words, when in reality it is 621."

- "I've run multiple tests and confirmed that the issue isn't with my prompts either. GPT-4o consistently fails to adhere to specific instructions, much like how you described."

- "ChatGPT 4o is the worst model in following any kind of instructions. It just says what it wants to say."

There are strong reasons to believe that GPT-4o was equally unreliable when Mayzlin asked it to identify and categorize social media posts. Although GPT-4o classified 361,050 posts

---

[9] Jake Linardon et al., *Influence of Topic Familiarity and Prompt Specificity on Citation Fabrication in Mental Health Research Using Large Language Models: Experimental Study*, Journal of Medical Internet Research (Nov. 12, 2025), available at https://mental.jmir.org/2025/1/e80371.

[10] https://community.openai.com/t/gpt-4o-not-following-simple-and-clear-instructions/768674.

491311.3

as expressing "negative" sentiment toward Lively, many of these posts do nothing of the sort.

Thousands of misclassified posts do little more than report that Lively filed this lawsuit:

- **1,845 posts/reposts:** "RT @DiscussingFilm: Blake Lively has reportedly filed a lawsuit against 'IT ENDS WITH US' co-star &amp; director Justin Baldoni for sexual harassment and launching a smear campaign against her. https://t.co/XjeP1FKIs2 https://t.co/0t4dfpPS1B"

- **908 posts/reposts:** "RT @PopBase: Blake Lively has filed a lawsuit against Justin Baldoni accusing him of sexual harassment and a coordinated effort to destroy her reputation, TMZ reports. https://t.co/vIbj66VB64"

- **48 posts/reposts:** "RT @screentime: Justin Baldoni has been dropped by his talent agency WMEThis follows after Blake Lively filed a lawsuit against Baldoni for sexual harassment and launching a smear campaign against her following the release of their 'IT ENDS WITH US' film https://t.co/Nxsy1TcFpA"

In addition, many posts misclassified as "negative" appear to express *positive* sentiment

toward Lively and come to her defense.  For instance:

- **417 posts/reposts:** "The unmasking of the Baldoni crisis management/media campaign to destroy Blake Lively makes me crave the unmasking of the campaign to destroy Meghan Markle - and who is behind it"

- **40 posts/reposts:** "Justin Baldoni sexually harassed Blake Lively and then retaliated - to ruin her life.He hired Johnny Depp's PR firm to destroy Blake's reputation because she voiced her concerns publicly.This PR firm destroyed Amber Heard's reputation when she was fighting defamation"

- **35 posts/reposts:** "It was always an open secret that Justin Baldoni was creepy towards Blake Lively on set. The rest of the cast had unfollowed Justin for a reason.But of course film twt wanted to defend their favourite white man so they assisted him in his campaign to destroy Blake's reputation."

This is just a small selection of examples.  Defense counsel have identified many more,[11]

and undoubtedly a large number are yet to be discovered.  It is impossible to know how many

---

[11] *See, e.g.*, **(1)** "There is a concerted effort by cancel culture , usually leftists,  to destroy Blake lively.  Why? I don't know much about BL, but I'm raising an eyebrow with this situation. A lot of these things she said have been out there for a while, why now? Who'd she piss off?"; **(2)** "why are you bullying this woman? because you find reasons to brand her the worst human on the plant? is your horse so high that you think you are a good person for being a bully online?

491311.3

more egregious errors GPT-4o made in classifying the *1.1 million posts* that Mayzlin fed into the model.  Mayzlin had a pair of reviewers double-check only a miniscule sample of 300 posts for sentiment (0.03% of total posts) and themes (0.08% of negative posts).  Ex. 2 (Mayzlin Rpt.) at ¶¶ 78, 89.  This is insufficient to prove by a preponderance of the evidence that GPT-4o's classifications were reliable, or that they would be helpful to the jury and not unduly prejudicial. *See* Fed. R. Evid. 403, 702.  All the more so because, as explained by Defendants' expert Nicole Alexander, Mayzlin's use of GPT-4o suffered from serious methodological flaws, including Mayzlin's failure to disclose the model's settings, failure to disclose the testing and refinement of her prompts, failure to account for well-known LLM limitations, and exclusive reliance on a single LLM without testing alternatives.  Ex.4 (Alexander Rpt.) at § V.  In short, Mayzlin relies

---

what is the goal here? to destroy Blake Lively?"; **(3)** "i truly wouldn't give a fuck about baldoni and blake lively if the media wasn't so insistent upon letting him clear his name, ur saying an A list star like blake lively w connections she has filed a lawsuit with plenty of probable evidence and is still somehow the evil villain"; **(4)** "I've always thought that women here were too cynical about men who claim to be feminists. And then this happens.Justin Baldoni has spent years, with a book and speaking tours on toxic masculinity and supporting feminism. Turns out he's just as much of a creep as other #metoo men. And worse, because he did everything in his power to preemptively destroy Blake Lively on the off chance she talk about what he did. Because his whole reputation is based on him being one of the good ones. All those text messages also shines a light on exactly what they did to Amber Heard."; **(5)** "Do you see this? Do you understand this? This director hired a firm to create a social media campaign to destroy Blake Lively's reputation. DO. YOU. UNDERSTAND. THIS: Blake Lively sues 'It Ends with Us' co-star Justin Baldoni for sexual harassment"; **(6)** "This 1/2 gay POS is wanting to destroy Blake lively's life because she wouldn' give into his and his partners satanical sex acts. What a cesspool hollywood is"; **(7)** "I see a concerted effort to destroy Blake Lively because of The End of Us"; **(8)** "Justin Baldoni has a billionaire friend who literally said he'd spend 100 million to destroy Blake lively. I'm spending however much money I want to make sure he can't."; **(9)** "Justin is a rapey creep who was backed by a Billionaire who threw 100 million into the pot to destroy Blake Lively. There is no picking and choosing!Justin is a rapey creep about to be cancelled. Hopefully his entire team with him. Including TAG PR"; **(10)** "Melissa Nathan was hired to destroy Blake Livelys reputation in anticipation of what was going to happen."; **(11)** "I encourage everyone to read the most recent NYT article about the sinister attempt to destroy Blake Lively. And lots of your social media accounts participated in it."; **(12)** "This case shows the power of PR and social media. How a targeted multichannel PR campaign ruins one's reputation.The PR person hired to destroy Blake Lively reputation is the same one hired for Johnny Depp against Amber Heard."

34

491311.3

on a black-box of GPT-4o processes, the inner details of which have not been disclosed.  She thus relies on a methodology that, among other flaws, is for the most part unarticulated and unknown.  That is unacceptable for any expert.  Mayzlin's testimony should be excluded in its entirety.

5. <u>Mayzlin's Opinion Relies On Social Media Posts This Court Has Held Do Not Qualify As Retaliation</u>

The Court's ruling on summary judgment underscores another fatal flaw in Mayzlin's methodology: her analysis relies on social media posts that are not actionable as retaliation and are therefore irrelevant to Lively's surviving claims.  Among other  things, the Court noted several categories of reasonable response by Defendants, outside the bounds of actionable conduct, including the right to "use proxies—both disclosed and undisclosed—to defend [them]sel[ves], and the "right to assert … that Lively could not be credited," including by "elevating stories that would cast doubt" and "pointing to evidence that Lively had ulterior motives for making claims of harassment."  Sum. J. Op. 131.

Mayzlin undertook, however, to have GPT 4-o classify posts and stories containing these themes, based on the assumption that they were problematic and "manipulated Lively narratives."  Ex. 2 (Mayzlin Rpt.) at ¶ 82 n.168.  One of the supposedly "manipulated" narratives was that "[w]hen Blake Lively wasn't able to get her way on set or behind the scenes, she involved her husband to create an imbalance of power between her and Justin Baldoni.  Ryan Reynolds went so far as to use his power to call agents and agencies, Sony, and other key players so that she would get her way."  *Id.*  Mayzlin instructed GPT-4o to "[i]nclude posts that suggest she relied on outside influence, personal relationships, or leverage to secure her way in production matters.  Implicit references to favoritism, privilege, or pressure in her favor should also be included."  *Id.*  Another supposedly "manipulated" narrative was that "[t]here is a clear,

35

likely motive due to the movie It Ends With Us's value and fanbase, in which Blake Lively is attempting to bully her way into buying the rights for It Starts With Us." *Id.* Mayzlin instructed GPT-4o to "[c]ount both explicit and implicit commentary suggesting she moved to take over the film." *Id.*

In other words, Mayzlin's purported evidence of manipulation includes a substantial volume of posts that would not be actionable as retaliation even if they were manipulated. Because Mayzlin makes no attempt to isolate and rely solely on potentially actionable posts and bases her opinion on more than such posts, her opinion about social media manipulation confuses the issues and is irrelevant and unhelpful to the trier of fact. Moreover, it is unduly prejudicial to the extent Mayzlin points her finger at online conduct outside actionable bounds and that cannot possibly support any surviving legal claim. Mayzlin's testimony should therefore be excluded under Rules 702, 401, and 403.

### B. Mayzlin Should Not Be Allowed To Opine That Defendants Harmed Lively's Consumer Brands

Mayzlin's opinion that Lively's consumer brands suffered from Defendants' "manipulation" of social media is premised on her opinions that (i) such "manipulation" occurred and (ii) but for such "manipulation," Lively would not have been the target of negative online commentary. These opinions should be excluded, so Mayzlin's opinion on the downstream effects should be excluded as well.

In addition, because Mayzlin's "manipulation" opinions rely on social media posts that are not actionable as retaliation, and Mayzlin has not focused solely on the effect of any potentially actionable posts, Mayzlin cannot demonstrate that any damage to Lively's brands was attributable to actionable posts, let alone the extent of such damage. Her opinion is therefore unreliable and unhelpful to the jury. Indeed, courts routinely exclude expert opinion that fails to

36

apportion the alleged harm between actionable and non-actionable conduct. *See, e.g.,*

*LivePerson, Inc. v. [24]7.AI, Inc.*, No. 17-CV-01268-JST, 2018 WL 6257460, at *2 (N.D. Cal.

Nov. 30, 2018) (citing *02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064,

1077 (N.D. Cal. 2005)); *Vertellus Holdings LLC v. W.R. Grace & Co.-Conn.*, No. CV SAG-18-

3298, 2021 WL 3883597, at *16 (D. Md. Aug. 12, 2021).

The Court should also exclude Mayzlin's brand-harm opinion for other reasons. Mayzlin

devotes eleven pages of her report to opining that negative online sentiment toward Lively

caused a "decline in brand equity" for Lively's companies. Ex. 2 (Mayzlin Rpt.) at 76-87. In

that section, however, Mayzlin cites virtually nothing other than documents and testimony

provided by Lively's companies, including the deposition of a Blake Brown executive and

internal reports and presentations from Betty B that discuss consumer surveys, "anecdotal"

summaries of social media posts, and investigations of hostile social media accounts. *Id*.

In so doing, Mayzlin does not apply any expertise. She simply assumes the contents of

the documents are true, recites the relevant portions, and says they are consistent with her

opinion. This is not permissible expert testimony—it is simply vouching. It is the regurgitation

of hearsay or, at best, of documents and testimony that could be introduced through fact

witnesses. *See, e.g.*, Fed. R. Evid. 703; *United States v. Smith*, 806 F. Supp. 3d 382, 413-14

(S.D.N.Y. 2025) (excluding expert testimony that was merely a "regurgitation" of "hearsay"

statements and a "backdoor means of putting [his client's] view of events before the jury");

*AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 333-34 (N.D.N.Y. 2021)

(collecting similar S.D.N.Y. cases and excluding expert's testimony "because it does little more

than summarize record evidence[,] including sales and market share data and documents

produced in this litigation[,] and lend [his] expert credentials to [the plaintiff's] interpretation of

37

491311.3

that evidence"). An expert should not be permitted to supplant the role of the jury in drawing inferences from documents and testimony, especially where, as here, the inferences are not informed by any specialized, technical, or scientific knowledge or method.

To take just one example of Mayzlin's uncritical acceptance of company documents, Mayzlin cites a "Blake Brown Media Impact Overview" that allegedly shows "a pattern" of "repeat users post[ing] sustained, negative commentary over time," and she includes an excerpt of that document that she entitles "Examples of Repeat Harassers Persistently Commenting." Ex. 2 (Mayzlin Rpt.) at 87. Despite Mayzlin's reference to a "pattern" and repeated use of plural nouns, the document shows only a *single* social media account engaged in repeated hostile posts. *See id*. Mayzlin's decision to parrot the document's inaccuracies confirms that this sort of testimony is improper under Rules 702 and 403. In essence, she takes a lay document and merely endorses it with the aura of expertise. What's missing is the application of any specialized knowledge on her part.

Mayzlin also claims that "sales data" for Lively's consumer products supports her opinion that online "manipulation" harmed Lively's brands. Ex. 2 (Mayzlin Rpt.) at 87-95. As with her prior opinions, however, Mayzlin's analysis of sales data employs no real methodology. It rests entirely on timing—*i.e.*, a decline in sales of Lively's products in or after August 2024—which is inadequate to show causation. As before, Mayzlin made no effort to investigate or rule out alternative causes, such as the organic backlash to Lively's promotion of alcohol and haircare brands in connection with a film about domestic violence. Mayzlin's opinion relies on "the absence of other external market factors during this period" *id.* at ¶ 113, but she cites no support for that assumption other than cursory "check in" conversations with company management, in which management "said no, there were no other changes. … What was going on was the

38

controversy that impacted sales." Ex. 3 (Mayzlin Dep.) at 57-58. As before, this reliance on client assurances is inadequate for expert testimony.[12]

It is also telling that management attributed their losses to "the controversy," rather than online manipulation specifically. Other than speculation, Mayzlin provides no basis to conclude that "the controversy" would not have occurred without online manipulation, or that online manipulation made any substantial contribution. As Mayzlin admits, only 4% of negative posts in August 2024 reflected the purported Wayfarer "themes." Ex. 2 (Mayzlin Rpt.) at ¶¶ 83, 96. "[T]here is simply too great an analytical gap between the data and the opinion proffered," and as a result, Mayzlin's testimony must be excluded. *Amorgianos*, 303 F.3d at 266.

**C.      Mayzlin Should Not Be Allowed To Summarize Academic Literature Or Discovery Documents**

Mayzlin's opinions are unsound, but in addition, her report contains lengthy discussions of subjects that are not appropriate for testimony at trial. First, Mayzlin's report contains a review of the academic literature concerning "celebrity reputations" and "personal brands," as well as online manipulation "tactics" like "algorithmic manipulation" and "content suppression." Ex. 2 (Mayzlin Rpt.) ¶ 11 & § IV. As Mayzlin admits, however, her discussion of specific online tactics is purely "theoretical," since she "d[id]n't really do an analysis" of that subject and

---

[12] It is also especially dubious here. First, Lively's expert Jeffrey Kinrich reviewed company documents and determined that "management had doubts about the profitability and sustainability of Betty Buzz … [and] decided to shut down the brand for reasons unrelated to the online manipulation." Ex. 5 (Kinrich Rpt.) at 7-8. Second, Blake Brown launched in August 2024 (Ex. 2 (Mayzlin Rpt.) at ¶¶ 110-11), so there was no track record or other reason for management to expect success. Mayzlin cites academic papers for the notion that newly launched brands often grow *id.* ¶ 113, but that is hardly proof that this particular brand would be expected to succeed. In fact, the Blake Brown documents cited by Mayzlin show that the company received many complaints about its products from consumers who experienced scalp itching, extreme dryness, and hair loss. Ex. 6 [BL-000038794]. Mayzlin's failure to address this data is inexplicable.

491311.3

"didn't look for" evidence of any particular tactic.  Ex. 3 (Mayzlin Dep.) at 171-73, 180-82.  Nor

is there any indication that Mayzlin is an expert in most, let alone all, of these tactics.  Permitting

such testimony would invite speculation from the jury and cause undue prejudice.  *See* Fed. R.

Evid. 403.  More generally, expert testimony is not the place to "simply 'parrot' the ideas of

other experts or individuals" that may have some theoretical connection to the case, such as the

literature on online manipulation or celebrity branding.  *Auther v. Oshkosh Corp.*, No. 09-cv-

00527, 2013 WL 5272959, at *3 (W.D.N.Y. Sept. 16, 2013).

Mayzlin's report also discusses various documents produced in discovery that supposedly

evidence the "manipulation" campaign and support her opinions.[13]  The jury, however, is

perfectly capable of understanding these documents without expert testimony, which would

serve only to emphasize their importance.  It is "inappropriate for experts to act as a vehicle to

present a factual narrative of interesting or useful documents for a case, in effect simply

accumulating and putting together one party's story."  *Kozak v. Liberty Mar. Corp.*, 729 F. Supp.

3d 277, 294 (E.D.N.Y. 2024); *accord, e.g.*, *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-

cv-2227, 2015 WL 5003528, at *2, *4 (S.D.N.Y. Aug. 20, 2015) (expert should not "merely

recite what is on the face of documents produced during discovery"), *aff'd*, 899 F.3d 87 (2d Cir.

---

[13] *E.g.*, Ex. 2 (Mayzlin Rpt.) at ¶ 12.a ("Based on documents produced by Defendants and others in this matter, what Lively described as a "retaliation campaign" appears to have begun in August 2024 with the objective of seeding and amplifying negative information about her."), ¶ 50 ("According to documents and communications produced in this litigation, the strategy was designed to be 'most importantly untraceable'…."), ¶ 53 ("Wayfarer Studios, Mr. Baldoni, Mr. Heath, and Mr. Sarowitz retained Ms. Nathan and her company, TAG, along with Mr. Wallace and his company, Street Relations, to execute a plan that was "most importantly untraceable."), ¶ 57 ("The existence of manipulation of online conversations is also supported by documents and communications produced in this case that reveal an intention to boost and amplify harmful narratives once seeded."), ¶ 80 ("In addition to the manipulated Lively narratives outlined in the Defendants' 'Scenario Planning' document, additional produced documents indicate that TAG initiated a campaign to pitch and promote content to online news sources.").

491311.3

2018); *Zhong*, 26 F.4th at 556 (expert should not give a "summation"). Mayzlin should not be permitted to do this, if her testimony is admitted at all.

## III.    THE COURT SHOULD EXCLUDE THE TESTIMONY OF ARON CULOTTA

Professor Aron Culotta also offers an opinion concerning the manipulation of social media, which he calls "inauthentic activity." But as with Mayzlin, Culotta's anticipated testimony is precisely the type of pseudoscience Rule 702 was designed to exclude. Among other defects, Culotta's opinions rely on social media "metrics" of his own invention, like "Top-Comment Shares" on TikTok, which he claims were abnormally high for "anti-Lively" posts. This analysis is completely uninformative, however, since Culotta has no basis for claiming that such metrics are indicators of "inauthentic" activity. Culotta's data also shows that he failed to reliably classify social media posts as "anti-Lively," a step which is indispensable to his analysis. At bottom, Culotta merely shows there might have been elevated levels of anti-Lively sentiment on social media, while unjustifiably leaping to the conclusion that this could not have happened naturally. Moreover, he relies heavily on emails and other communications produced in discovery, as opposed to any accepted methodology, to support that inference. This is not true expert testimony. Culotta's opinions should be excluded in their entirety, and at a minimum, he should not be permitted to testify about case documents that he has no business summarizing and interpreting for the jury.

### A.    Culotta's Testimony About TikTok Is Inadmissible

#### 1.    Culotta Relies On Meaningless "Metrics" That Are Unreliable Indicators Of Inauthentic Activity

Culotta theorizes that comments on TikTok were artificially manipulated to boost negative sentiment about Lively, but the methodology he applies to reach that conclusion is fundamentally unreliable. Culotta's opinion relies on metrics that he claims are indicators of

41

"inauthentic" activity, but he has no empirical basis for that claim, and thus no reliable justification for drawing any inference from those metrics.

Culotta collected TikTok videos related to Lively, Baldoni, or their film from July and August 2024.  Ex. 7 (Culotta Rpt.) at ¶¶ 50-51.  He identified the "top comment" nested under each video (the comment with the highest number of "likes") and compared the number of "likes" on that comment to the number of "likes" on the video itself—a ratio that he calls the "Top-Comment Share."  *Id.* at ¶ 52.  He then used his subjective judgment to "code" the overall sentiment of each top comment as either "pro-Lively," "anti-Lively," "pro-Baldoni," "anti-Baldoni," or "unsure/unrelated."  *Id.* at ¶¶ 53-54; Ex. 8 (Culotta Dep.) at 35:14-18, 36:19-37:5. Culotta determined that the top comments he unilaterally deemed "anti-Lively" or "pro-Baldoni" had a significantly "greater than average" Top-Comment Share.  Ex. 7 (Culotta Rpt.) at ¶ 54.  He interprets these results as "suggesting there was a concerted effort to seed and/or elevate these comments."  *Id.* at ¶ 54.

Culotta's method is flawed on many levels, but the last step is hocus-pocus.  Culotta fails to cite *any* evidence that "Top-Comment Share" is indicative of inauthentic online activity.  He appears to have invented that metric himself and offers no reason to believe it is reliable or has any probative value.  At his deposition, Culotta admitted that he was "not aware" of any scientific study of Top-Comment Share.  Ex. 8 (Culotta Dep.) at 32:16-33:12.  He cited only two academic papers that supposedly use "similar" methods, Yang 2013 and Kirdemir 2023, and his report cites a third, Jahn 2023.  *Id.* at 32:16-35:2; Ex. 7 (Culotta Rpt.) at ¶ 52 n.140.[14]  But none

---

[14] Chao Yang et al., "Empirical Evaluation and New Design for Fighting Evolving Twitter Spammers" (2013) Ex. 9; Baris Kirdemir et al., "Towards Characterizing Coordinated Inauthentic Behaviors on YouTube" (2023) Ex. 10; Laura Jahn et al., "Detecting Coordinated Inauthentic Behavior in Likes on Social Media: Proof of Concept" (2023) Ex. 11.

491311.3

of these papers even remotely supports the method Culotta used. None of them analyzes activity on TikTok. None mentions "Top-Comment Share." None even suggests that the ratio of "likes" on comments versus posts on *any* social media platform is an indicator of inauthentic activity. To the contrary, these articles show that Culotta's method is unprecedented and unreliable.

The Yang article focuses exclusively on Twitter "spam" accounts. The authors identify accounts that have posted "malicious or phishing URLs" and evaluate other means of detecting such accounts—for instance, by investigating their use of automated applications to post tweets, and by analyzing the accounts they follow for various features like "clustering" social relationships. Ex. 9 (Yang art.) at 3, 6-8. Culotta employs none of these approaches, perhaps because Defendants are not accused of running a phishing operation.

The Kirdemir and Jahn articles both *undermine* Culotta's thesis. The Kirdemir article focuses on YouTube and discusses a variety of indicators and analytical methods that Culotta did not employ. Ex. 10 (Kirdemir art.) § 3.2.[15] Most importantly, the authors do not even purport to identify a reliable method for detecting inauthentic activity. Rather, they express their hope that their "study may lead to the development of an accurate and effective methodology for the timely detection of harmful manipulative campaigns" *id.* at § 1—which suggests that no such methodology yet exists, and that Culotta is merely improvising.

---

[15] Kirdemir identified six potential indicators for YouTube, weighted and aggregated to create a "suspicion score": (1) correlation of number of views to number of subscribers, (2) correlation of number of views to number of videos, (3) correlation of number of views to number of comments, (4) correlation of number of subscribers to number of videos on a YouTube channel, (5) correlation of number of subscribers to number of comments on a YouTube channel, and (6) correlation of number of videos to number of comments on a YouTube channel. Ex. 10 § 3.2. He did not rely on the suspicion score alone but applied extensive further analysis including "peak detection," "principal component analysis," a "clustering" algorithm, and analyzing "networks" or "cliques" of accounts that commented on the same videos. *Id*. at §§ 3.2-4.2.

43

The Jahn article is even worse for Culotta. It offers a bleak assessment of researchers' ability to detect inauthentic activity on social media, particularly as it relates to user "reactions" such as "likes" or "upvotes." According to the authors, "research" on inauthentic "reactions" is "quite scarce," and "[l]ittle work exists on identifying … inauthentic votes." Ex. 11 (Jahn art.) at 2-3. Inadequate data is a large part of the reason. "[R]eactions data is available only in severely limited quantities, if at all," and "Twitter is the only platform that offers *any* access, with limitations." *Id.* at 3 & n.8.[16] To make up for the lack of real data, the authors create "synthetic" data—fictional social media users that upvote or downvote a fictional post—on which they test "clustering" models to detect coordinated activity. *Id.* at 4-10. While acknowledging the limitations of these models (which Culotta did not use), they argue that "social media platforms" should "open access to [the] reactions data" that "is necessary to evaluate, tweak and deploy promising methods" of this sort for "combat[ting] coordinated inauthentic behavior." *Id.* at 4, 11. Thus, like Kirdemir, the Jahn article suggests that no method for detecting inauthentic activity on social media has yet been validated, and that the social media data used by Culotta is totally inadequate for the task. He is applying a methodology that has been recognized neither as sufficiently developed nor as valid in his field.

Culotta also claims that the proportion of "anti-Lively" or "pro-Baldoni" top comments increased after July 2024 and that their Top-Comment Share increased too. Ex. 7 (Culotta Rpt.) at ¶¶ 55-57. He offers no reason to believe that these data points suggest inauthentic activity and

---

[16] *See also id.* at 3 ("[D]ata concerning users' reactions is very difficult for researchers to obtain: none of the currently existing datasets include it, and neither Meta, Twitter, nor Reddit supply this data in necessary scope."); *id.* ("[R]esearchers do not have access to the empirical truth about accounts involved in coordinated inauthentic behavior. Qualified guesses can be made based on suspicious similarities in behavior or profile features, but *de facto*, it remains unknown whether two users' actions are authentically correlated or inauthentically coordinated….").

491311.3

does not even purport to anchor them in the scientific literature.  After all, an increase in anti-Lively "top comments" just means there was more negative sentiment against Lively.

Culotta's opinion must therefore be excluded.  "To permit [Culotta] to testify … would invite the jury to guess as to the validity of a novel and untested theory based essentially on his say-so," but "[t]he courtroom is not the place for scientific guesswork."  *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 270-71 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020).  Culotta does not employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Amorgianos*, 303 F.3d at 265-66.[17]  His methodology is untethered to the scientific literature, "has [*not*] been tested," "has [*not*] been subjected to peer review and publication," does *not* have a "known or potential rate of error," and "has [*not*] gained 'general acceptance' in the relevant scientific community."  *Id.* at 266.  Thus, Culotta's testimony is "based on data, a methodology, [and] studies that are simply inadequate to support the conclusions reached," and as a result, "Rule 702 mandate[s] [its] exclusion."  *Id.*; *accord Ruggiero*, 424 F.3d at 253.

> 2. Culotta Relies On A Subjective And Unreliable Classification Of The "Sentiment" Expressed By TikTok Comments

Culotta's opinion should also be excluded because he did not reliably classify the TikTok comments in his dataset as "anti-Lively," "pro-Baldoni," or the other categories he selected.  Thus, even if Top-Comment Share were a defensible metric, Culotta cannot reliably claim that

---

[17] Notably, Culotta testified that he did not employ the analyses discussed in sources he cited in his report, including "behavioral trace extraction," "bipartite network construction," "cluster analysis," and the analysis of potential indicators like "account age," "follower/following ratios," "client/app usage," "[n]etwork position and tie patterns," "account age distribution," "post/repost ratios," "privileged positions near cascade roots," "shorter action delays," and "alter[ed] cascade size/height distributions."  Ex. 8 (Culotta Dep.) at 22-31; Ex. 7 (Culotta Rpt.) at ¶¶ 23-25.

491311.3

"anti-Lively" or "pro-Baldoni" top comments had elevated Top-Comment Shares—which is the key premise of his TikTok opinion. Ex. 7 (Culotta Rpt.) at ¶ 54.

Culotta did not apply any specific protocol in "coding" the TikTok comments as "pro-Lively," "anti-Lively," "pro-Baldoni," "anti-Baldoni," or "unsure/unrelated." Ex. 7 (Culotta Rpt.) at ¶¶ 53-54. He simply reviewed each top comment in his dataset and "made a judgment call" all his own about the sentiment it expressed. Ex. 8 (Culotta Dep.) at 35:14-18, 36:19-37:5. When asked what expertise he had in evaluating social media comments, Culotta could only respond that he has "spent a lot of time staring at posts and comments and trying to contextualize them and understand them." *Id.* at 35:19-25.

To "validate" his coding, Culotta had a second reviewer code a sample of 300 comments from his dataset and compared their decisions.[18] Culotta meant to show that his own coding was reliable, but in fact, he showed the opposite. Although Culotta claims that he and the second reviewer agreed 80% of the time (242 out of 300 coding decisions), they mostly just agreed on classifying comments as "unsure/unrelated" (189 out of 242 coding agreements, or 78%). Ex. 12 (TikTok Validation data). In 52 cases (over 17% of the sample), both reviewers apparently chose "unsure/unrelated" because they could not decipher comments written in foreign languages, emojis, or gibberish. *Id.* The two reviewers' agreement on the "unsure/unrelated" category therefore provides little insight into whether Culotta properly coded comments as "anti-Lively."

---

[18] Ex. 7 (Culotta Rpt.) at 25 n.141; Ex. 8 (Culotta Dep.) at 36:4-15. Culotta did not directly provide instructions to the second reviewer, who was instructed by Culotta's expert witness firm. Ex. 8 (Culotta Dep.) at 39:7-42:3. Culotta did not know the identity of the second reviewer, whether the reviewer followed any specific protocols, or whether the reviewer had any relevant expertise. *Id.* Culotta was not even sure how the 300 sample comments were chosen. *Id.* at 43:6-19. He was also unsure whether foreign-language comments were translated. *Id.* at 37:15-38:6.

Indeed, where at least one reviewer coded a comment as something other than "unsure/unrelated" (111 cases), they agreed *less than 50% of the time* (53 cases)—an agreement rate that Culotta reluctantly admitted was moderate at best.  Ex. 8 (Culotta Dep.) at 45:2-50:5; Ex. 12 (TikTok Validation data).  Culotta coded 68% more comments as "anti-Lively" than did the second reviewer (Ex. 8 (Culotta Dep.) at 66:8-67:10), including comments that were clearly meant to compliment Lively.  *E.g.*, Ex. 12 (TikTok Validation data) at row 240 (praising Lively as "[t]he original It Girl," with clapping-hands and smiling-face emojis).  Thus, Culotta's own "validation sample" illustrates that his coding is unreliable and far from impartial.  The jury cannot rely on Culotta's assertion that a comment is "anti-Lively" if there is a 50-50 chance he coded it wrong.  *See* Fed. R. Evid. 403, 702(c)-(d); *see also, e.g.*, *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 605 (S.D.N.Y. 2007) (rejecting survey under Rules 403 and 702 because of "inconsistent scoring and subjective coding").

### 3. Culotta Has Insufficient Data From Which To Draw Any Conclusions

Culotta's opinion is also inadmissible because it is not "based on sufficient facts or data" to be reliable.  Fed. R. Evid. 702(b).  His TikTok dataset consisted of only 1,861 videos and their top comments.  Ex. 7 (Culotta Rpt.) at ¶ 51.  By contrast, the Kirdemir article that Culotta cites analyzed "936,247 [YouTube] videos, 99,415,476 comments, 115,825,225 subscribers and over 51 billion views" Ex. 10 (Kirdemir art.) at 1, while the Yang article analyzed "nearly 500,000 Twitter accounts which posted over 14 million tweets" Ex. 9 (Yang art.) at 3.  To be sure, these studies had broader goals, but their numbers illustrate the extremely limited size of the dataset used by Culotta.

This is perhaps unsurprising, since the Jahn article explains that "reaction" data (such as the TikTok "likes" analyzed by Culotta) is unavailable in sufficient quantities.  Even Lively's expert Dina Mayzlin testified that "[r]esearchers don't have access to [TikTok data]," and as a

47

491311.3

result, she did not perform any formal analysis of TikTok, and her report only "talk[s] about TikTok … in a very kind of anecdotal way." Ex. 3 (Mayzlin Dep.) at 79:12-80:3; *accord id.* at 82:1-15. Mayzlin testified that if a researcher "were able to obtain a data set from … TikTok," it "would actually not be reliable" or "representative data." *Id.* at 82:24-83:17. In light of this testimony, it is unclear how Lively can offer both Mayzlin and Culotta as experts.

Furthermore, Culotta's dataset myopically focuses on the "top comment" on each TikTok video while ignoring all other comments. Ex. 8 (Culotta Dep.) at 56:8-12. Culotta did not review or consider any other comments with high numbers of "likes," even if they were favorable to Lively or unfavorable to Baldoni. *Id.* at 56:8-57:8. Thus, if the "top comment" on a video was anti-Lively and received 100 likes, but there were 99 pro-Lively comments with 99 likes each, Culotta's analysis would ignore the pro-Lively comments. It is unclear how a selective, skewed dataset of this sort could support reliable conclusions—which, incidentally, further demonstrates the folly of relying on "Top-Comment Share" as an indicator of inauthentic activity and may explain why such a method has never been recognized or confirmed in the field.

4.    Culotta's Qualitative Analysis Is Unhelpful, Unduly Prejudicial, And Falls Outside His Expertise

To buttress his opinion, Culotta reviewed the contents of the "top comments" and concluded, based on his reading of them, that there was a "suspicious pattern of repeated themes and language." Ex. 7 (Culotta Rpt.) at ¶ 67; *see also, e.g.*, *id.* ¶ 60 ("similar themes using similar language"); *id.* ¶ 65 ("strikingly similar language" in "anti-Lively" comments). This qualitative assessment is just as unreliable and unhelpful as Culotta's quantitative metrics, and it should be excluded. His subjective analysis is no more advanced than and should not supplant that of the jurors.

Lively has not established that Culotta "is qualified as an expert" in evaluating and comparing the language of social media posts or that he applies "reliable" methods. Fed. R. Evid. 702. When Rule 702 was amended in 2023, the Advisory Committee cautioned against the use of unreliable "feature comparison evidence (i.e., evidence that a set of features corresponds between two examined items)," which is precisely what Culotta attempts to offer here. Fed. R. Evid. 702 advisory committee's note (2023 amend.). The Advisory Committee specifically instructs that any expert opinions based on such a comparison "must be limited to those inferences that can reasonably be drawn from a reliable application of the principles and methods," and it encourages courts to demand "an estimate of the known or potential rate of error of the methodology employed." *Id.* Culotta applies no known, testable principles or methods here—"just … a qualitative analysis" based on his gut-feelings and suspicions. Ex. 8 (Culotta Dep.) at 70:6-17. This "malleable and vague approach is in tension with first principles under *Daubert*" and cannot possibly be admitted. *In re Mirena*, 341 F. Supp. 3d at 268; *accord Hayden*, 2025 WL 1697021, at *7 (expert opinion that "purported similarities" between products "necessarily indicate that [one] was based on [the other] is classic *ipse dixit* and is not appropriate expert testimony").

At a minimum, Culotta's testimony would not "help the trier of fact," since the jury is equally capable of comparing the language in the comments and coming to their own conclusions. Fed. R. Evid. 702(a); *see, e.g.*, *Hayden*, 2025 WL 1697021, at *8 (excluding expert testimony because "a jury could easily compare the two relevant [documents and] conduct the same facial analysis"). For instance, Culotta highlights several comments because they emphasize Lively's use of the word "me." Ex. 7 (Culotta Rpt.) at 33. A lay jury is well-equipped to evaluate that similarity without assistance from university professor. Moreover,

491311.3

allowing a professor to opine on the subject may mislead the jury into giving "undue weight" to

his ruminations. *Nimely*, 414 F.3d at 391; *see also* Fed. R. Evid. 403.

> 5.    Culotta's Conclusions Are Unhelpful And Unduly Prejudicial Because
> They Invite Speculation

Culotta's testimony is unhelpful and prejudicial for an even more basic reason. Despite

the strong language in his report, Culotta repeatedly qualified his conclusions when questioned

under oath at his deposition. At times, his testimony suggested that he was merely raising the

*possibility* of social media manipulation. For instance:

- "I mean that the top-share comment percentage provides evidence of -- of *possible* coordinated activity." Ex. 8 (Culotta Dep.) at 67:22-24 (emphasis added).

- "My point with this analysis is to mainly say that when we see both anomalous engagement behavior and homogenous language used, those two things combine to provide stronger evidence of *potential* inauthentic behavior." *Id.* at 68:11-15 (emphasis added).

- "I'm saying that the strikingly similar language, combined with the anomalous-like values together, are indicators of *potential* coordinated behavior, yes." *Id.* at 70:2-5 (emphasis added).

- "[I]t's the context of just being used in these comments serves as an additional marker of *potential* inauthenticity, yes." *Id.* at 70:24-71:1 (emphasis added).

It is difficult to understand what conclusions a jury is supposed to draw from these

assertions. Culotta offers no "known or potential rate of error" that would allow a jury to give

his testimony the appropriate weight. *Daubert*, 509 U.S. at 594. He simply raises the specter of

"potential inauthentic behavior," inviting the jury to speculate that such behavior occurred. This

is not a permissible use of expert testimony. *See* Fed. R. Evid. 403, 702; *see also Bozick v.*

*Conagra Foods, Inc.*, No. 19-CV-4045 (LJL), 2022 WL 4561779, at *30 (S.D.N.Y. Sept. 28,

2022) (Liman, J.) (excluding as "overly speculative" opinion of expert who acknowledged at

deposition that he was unable to "separate out … probability" of different causes of an explosion).  For this reason, too, Culotta's opinion regarding TikTok should be excluded.

> 6.    Culotta Improperly Aggregates Actionable and Non-Actionable Conduct

Culotta's analysis, like Mayzlin's, relies on social media posts that are not actionable as retaliation and are thus irrelevant to Lively's surviving claims.  As noted above, Culotta did not limit his analysis to "anti-Lively" posts—he also claimed that "pro-Baldoni" posts were supposedly manipulated.  In its summary judgment ruling, the Court held that "it was permissible for Baldoni to request that the digital team 'boost' certain videos which he believed were favorable to his image … and for TAG to work behind the scenes to emphasize his 'stellar reputation ….'" Sum. J. Op. 131.  Culotta's failure to disaggregate these non-actionable posts from his analysis confuses the issues and renders his opinion unreliable, unhelpful, and unduly prejudicial, thereby requiring its exclusion.

## B.    Culotta's Testimony About Reddit Is Inadmissible

> 1.    Culotta Again Offers Meaningless Metrics, Unreliable Coding, Inadequate Data, And Speculative Conclusions

Culotta's opinion that there are indicia of inauthentic activity on Reddit is just as unreliable and unhelpful as his TikTok opinion.  They are largely mirror images of each other and are inadmissible for the same reasons.  Culotta just swaps one social media platform for another, substitutes one meaningless "metric" for another, and uses a similarly inadequate dataset to reach his conclusions.  His testimony concerning Reddit should therefore be excluded as well.

a.    Culotta claims that "anti-Lively" and "pro-Baldoni" comments on Reddit have elevated "comment scores," meaning that the ratio of "upvotes" to "downvotes" is abnormally large, while "pro-Lively" comments have low scores.  Ex. 7 (Culotta Rpt.) at ¶¶ 72-79, 81-87, 96.  If this sounds familiar, that is because it is Culotta's "Top-Comment Share" in different

51

garb—another metric that Culotta offers without showing it is a reliable indicator of inauthentic activity.  In his report, Culotta does not even bother to cite any evidence supporting its use.  At his deposition, Culotta was unable to point to any study finding that "comment scores" can suggest inauthentic activity.  Ex. 8 (Culotta Dep.) at 76:20-77:5.  The most he could do was refer to the literature he had previously cited, *id.*, but as shown above, that literature does not help him in the slightest.  For this reason alone, his Reddit opinion is inadmissible and should be excluded.[19]

   b.  Like his analysis of TikTok, Culotta's comparison of Reddit "comment scores" relies on his subjective determination that the Reddit comments in his dataset are pro-Lively, anti-Lively, pro-Baldoni, anti-Baldoni, or "unsure/unrelated."  Ex. 7 (Culotta Rpt.) at ¶ 76.  But unlike TikTok, when it came to Reddit, Culotta did not even bother with a second reviewer to check whether his sentiment coding was accurate.  Ex. 8 (Culotta Dep.) at 78:16-79:17.  This lapse surely does not suggest that his coding was *more* reliable for Reddit.  The TikTok coding shows that Culotta's sentiment analysis was unreliable and ungrounded in expertise, and there is no reason to believe his Reddit coding was any different or reflected any dramatic improvement.  Culotta's Reddit opinion should be excluded for this reason as well.

---

[19] At his deposition, Culotta offered two reasons to credit his metric that do not appear in his report.  They should be disregarded, and are also meritless.  *First*, Culotta claimed his experience "having worked for a long time with this type of data" supported his use of comment scores.  Ex. 8 (Culotta Dep.) at 90:9-12.  That is inadequate, since Culotta does not explain "how [his] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702, Adv. Comm. Notes, 2000 Amend.; *accord, e.g.*, *LVL XIII Brands*, 209 F. Supp. 3d at 636, 647.  *Second*, Culotta claimed to have compared the "heterogeneity" of the comments to the "homogen[eity]" of the comment scores in some way.  Ex. 8 (Culotta Dep.) at 90:9-19.  Culotta did not, however, document any comparison of this sort or explain why it is a reliable methodology.  We cannot "retrace his steps" to "test" his conclusions and are "left only with his *ipse dixit*."  *LVL XIII Brands*, 209 F. Supp. 3d at 645 & nn.34-35; *see also Nimely*, 414 F.3d at 399.

c.      Culotta's Reddit opinion is also based on insufficient data. The Jahn 2023 article that Culotta cites in his report states that "data concerning users' reactions" on "Reddit" is not available "in necessary scope" for the purpose of researching inauthentic activity. Ex. 11 (Jahn art.) at 3. Culotta does not explain why he disagrees or how he avoided any such problem, even though it is Lively's burden to show that Culotta used sufficient data. Fed. R. Evid. 702(b).

d.      As with TikTok, Culotta at times suggests that he is merely providing evidence "consistent" with "potential" inauthentic activity on Reddit. Ex. 7 (Culotta Rpt.) at ¶ 79; Ex. 8 (Culotta Dep.) at 76. This confirms that—far from offering reliable, relevant testimony—Culotta is offering speculation that will prejudice Defendants and will not assist the jury.

2.      Culotta's Speculation Regarding "Removed" Upvotes Is Inadmissible

In addition to discussing "comment scores," Culotta speculates that Reddit may have suspected that certain upvotes were manipulated and, for that reason, may have "remove[d]" them from the platform. Ex. 7 (Culotta Rpt.) at ¶ 80. Culotta's theory is premised on third-party records of unknown reliability, namely an archive of Reddit posts called "Arctic Shift." Culotta claims that for two Lively-related posts, the number of upvotes recorded by Arctic Shift was higher than the number of upvotes visible on Reddit around the time Culotta submitted his report, suggesting a decrease between those two points in time. He also cites generic webpages that say Reddit sometimes removes content for suspected manipulation. Culotta was unable, however, to identify any evidence showing that these specific upvotes were manipulated or were removed by Reddit, let alone removed by Reddit because of suspected or actual manipulation. Ex. 8 (Culotta Dep.) at 81:1-82:15. He also testified that it "would be hard for me to say" whether any other reason could cause a discrepancy in upvotes. *Id.* at 80:14-24. Perhaps for this reason, Culotta repeatedly equivocated about the strength and meaning of his conclusions:

- "Such an anomalous finding is *consistent with* an attempt to manipulate upvote counts, as Reddit actively removes content from its platform for content manipulation (which includes vote manipulation)." Ex. 7 (Culotta Rpt.) at ¶ 80 (emphasis added).

- "I'm offering that the extreme drop in upvote counts as compared to other posts in the dataset is a *potential* marker of Reddit attempting to mitigate *potential* manipulation of this scoring metric." Ex. 8 (Culotta Dep.) at 80:17-20 (emphasis added).

- "[W]hat I'm saying is that simply because something still exists on the platform does not mean that Reddit does not consider it as -- as *possibly* a result of manipulation." *Id.* at 83:15-18 (emphasis added).

Moreover, Culotta provides no evidence that in the circumstances where Reddit removes content for suspected manipulation, it does so reliably and with a low rate of error. Thus, even if Reddit did remove the upvotes that Culotta identified, it is unclear what inference a jury could properly draw from that decision. Culotta's analysis is "[un]reliable at every step of the way," *In re Mirena*, 982 F.3d at 123, in addition to being speculative, prejudicial, and unhelpful to the jury. It should be excluded in full.

### C.    Culotta's Testimony About YouTube Is Inadmissible

Culotta's opinion concerning inauthentic activity on YouTube is even more simplistic. Culotta observes that although journalist Kjersti Flaa posted the "little bump" video of her interview with Lively on August 10, 2024, the number of comments increased significantly starting on August 14, 2024 and used the word "bully" more than before. Culotta finds the timing significant because on August 14, 2024 at 1:30 p.m. ET, the TAG public relations team suggested sending a *Daily Mail* article that discussed the "little bump" video to Jed Wallace (an event Culotta calls "the TAG Suggestion"). Ex. 7 (Culotta Rpt.) at ¶ 91. Culotta finds the word "bully" significant because Lively's bullying was a theme discussed in the TAG "scenario planning" document. *See id.* ¶ 93 & n.244.

This is just a miniature version of Mayzlin's analysis, and it is inadmissible for the same reasons. Culotta provides no reliable basis for suggesting that Defendants caused the uptick in YouTube comments. Neither the timing of the comments, nor the presence of a theme as commonplace as "bullying," is remotely sufficient. Culotta also fails to apply any expertise, since he does little more than observe an increase in YouTube comments after certain Defendants had a discussion that he finds suspicious. His observation that the comments and the TAG "scenario planning" document both use the word "bully" is one that any layperson could make. Culotta admits he is merely drawing inferences from "timing" and "case documents"—something jurors do in every case. Ex. 8 (Culotta Dep.) at 94:4-97:3. That is not admissible testimony.

Mayzlin actually confirms that Culotta's analysis is unreliable. Her report shows that social media users called Lively a "bully" in May, June, and July 2024, before the alleged campaign against Lively began. Ex. 2 (Mayzlin Rpt.) at 42. In Mayzlin's backup data, dozens of posts criticize Lively for "bullying" Kate Middleton, including 14 tweets or retweets that ask, "who knew Blake enjoyed bullying women with cancer?" Culotta has no basis to claim that Defendants planted this seed.

Furthermore, while Culotta insinuates that the "TAG Suggestion" led to the uptick in comments on the "little bump" video about bullying, Culotta's own report identifies publications about the "little bump" video on Reddit, Buzzfeed, and the Daily Mail that *preceded* the "TAG Suggestion" by a few hours and are equally plausible candidates. Ex. 7 (Culotta Rpt.) at 53-56.[20] In fact, the media attention to this video may have been the trigger for TAG's suggestion. These

---

[20] Culotta's graphs misleadingly omit the Daily Mail article, and in a footnote, Culotta admits that his graphs may severely understate the number of comments on the video before the "TAG Suggestion" took place. *Compare id.* at ¶ 90 & n.241, *with id.* at 54-56.

491311.3

articles could easily have fueled the negative comments on YouTube, but Culotta fails to consider these potential alternative causes, let alone rule them out. This is yet another reason why his testimony is unreliable and must be excluded.

This may also be why Culotta at times says the evidence is "consistent" with manipulation, without affirmatively showing the evidence is inconsistent with other potential causes. Ex. 7 (Culotta Rpt.) at ¶ 95; Ex. 8 (Culotta Dep.) at 95:16-23. Culotta's opinion is difficult to pin down, since he insisted at his deposition that his "goal [wa]s *not* to perform a causal analysis" and that he "did *not* perform a causal analysis" of whether "defendants were behind" the uptick in comments. Ex. 8 (Culotta Dep.) at 93:7-15 (emphasis added). This is perplexing given that Culotta's analysis consists entirely of drawing a connection between YouTube comments and *Defendants' words and actions*. Since Culotta admits he cannot opine on causation, he should not opine at all, since he would merely be inviting the jury to speculate.

### D.    Culotta Should Not Be Allowed To Opine On Defendants' Involvement Or Summarize Case Documents

YouTube is the most obvious place where Culotta tries to attribute the purported "inauthentic activity" to the Defendants, but not the only one. Early in his report, Culotta engages in a lengthy discussion of "Defendants alleged campaign," replete with citations to the complaint, deposition testimony, and other documents and communications. Ex. 7 (Culotta Rpt.) at ¶¶ 37-48. When discussing TikTok, Culotta emphasizes that TAG employees discussed certain of the posts that supposedly had anomalous "Top-Comment Shares." *Id.* at ¶¶ 60-61, 64, 67. When discussing Reddit, Culotta finds it "notabl[e]" that a "spike" in the combined

56

491311.3

comment score on August 14, 2024 "aligns" with the timing of certain TAG text messages.  *Id.* ¶ 74.[21]

Testimony of this sort, however, is no more proper in these contexts than it was for YouTube.  None of it involves expertise or any reliable methodology, and none of it is admissible at trial.  Indeed, Culotta admits that "documents produced via discovery" and "deposition testimony" are his *only* basis for linking Defendants to the purported inauthentic activity.  Ex. 8 (Culotta Dep.) at 19:11-25, 73:1-22.  He admits that his technical analysis was not designed to "determin[e] that any specific piece of content was placed by any individual," including the Defendants.  *Id.* at 68:8-21.  He admits that "[t]he scope of [his] assignment did not include a causal analysis," and that his "goal wasn't to determine the impact [of any] particular event" on social media activity.  *Id.* at 18:11-19:3, 51:11-52:7.  Accordingly, even if Culotta is allowed to opine that inauthentic activity was present on social media, he should not be allowed to opine that Defendants were responsible.

Nor should Culotta be allowed to summarize or interpret case documents at trial.  That invades the province of the jury.  It is one thing for an expert to apply a specialized methodology, but quite another to marshal and connect facts in a manner typically saved for the fact-finder or for counsel during closing argument.  His report suggests that he plans to provide a narrative of Defendants' alleged social media campaign.  *E.g.*, Ex. 7 (Culotta Rpt.) at ¶¶ 37-48.  This would give Lively another summation in the guise of expert testimony, which is impermissible, prejudicial, and unhelpful to the trier of fact.

---

[21] This "timing" argument is unreliable for reasons already discussed at length.  In addition, any spike in comments (and thus "combined comment score") is unsurprising because articles about Lively were published that day.  Ex. 7 (Culotta Rpt.) at ¶¶ 74 n.193, 90.

57

E.    **Culotta Should Not Be Allowed To Speculate About Other Platforms**

After discussing TikTok, Reddit, and YouTube, Culotta concludes with the broad assertion that "the presence of markers of inauthenticity in these three domains suggests that inauthentic activity was likely present in others." Ex. 7 (Culotta Rpt.) at ¶ 97. It is difficult to imagine a conclusion that is more speculative or lacking in rigorous analysis. It should be excluded, and Culotta's overreaching in this regard casts serious doubt on the reliability of his other testimony.

IV.    **THE COURT SHOULD EXCLUDE THE TESTIMONY OF MICHAEL ROBBINS**

Lively offers Michael Robbins, a lawyer and workplace investigator, to opine that (1) the Wayfarer Parties allegedly failed to follow standard practices, their own policies and procedures, and entertainment industry-specific intimacy protocols "with respect to preventing harassment and retaliation from occurring relating to the movie *It Ends With Us*" by not conducting an investigation; (2) the Wayfarer Parties failed to take steps to prevent harassment and retaliation because it did not conduct such an investigation; and (3) that there is a "unique nature of the Entertainment Industry" such that an "actor's career in the Industry can be affected both before and even after the project on which she is working has been completed" because there are "powerbrokers" like Harvey Weinstein. Ex. 13 (Robbins' Rpt.) at 1-2, 21.

Robbins' first two opinions are no longer relevant given the Court's summary judgment order dismissing with prejudice Plaintiff's Sixth Count for failure to investigate, prevent, and/or remedy harassment and retaliatory actions in violation of California Government Code action 12940 (Count 6, Dkt. No. 520 at 134-35, ¶¶ 405-406), which has been dismissed (Dkt. No. 1273 at 140-141). Even if that claim had not been dismissed, Robbins should have been precluded from testifying regarding whether the Wayfarer Parties failed to follow standard practices and their own policies. As a preliminary matter, Robbins is not qualified to testify regarding

58

entertainment industry-specific intimacy protocols such as intimacy coordinators and nudity riders. Further, his proffered opinions are legal conclusions which improperly invade the province of the Court and the jury.

Robbins's third opinion and related testimony concerning reputational harm in the entertainment industry must be excluded because Robbins is not qualified to testify on this subject, and to the extent that he is qualified, any such opinion should be excluded because it will not assist the trier of fact and is not reliable.

### A.  Robbins' Qualifications and Opinions

Robbins is a lawyer who practiced employment law with law firms in Los Angeles and Beverly Hills. Ex. 14 (Robbins Dep.) at 113:7-13; Ex. 13 (Robbins Rpt.) at Ex. A. He also worked as an in-house attorney at Golden West Broadcasters/Golden West Television and CBS from 1980 to 1982. Ex. 14 (Robbins Dep.) at 24:16-25:16. Since 1998, Robbins has worked for a company he founded called EXTII, where he conducts workplace investigations and provides expert testimony, training and investigations on employment issues including those "issues relating to the employer's efforts to prevent and investigate discrimination, harassment, and retaliation and other misconduct." Ex. 13 (Robbins' Rpt.) at 25.

Most of Robbins' report addresses the basis for his first two opinions. In a section titled "Policies and Procedures," Robbins details Wayfarer Studios and Sony Entertainment's written employment policies, the now-dismissed individual defendants' understanding of those policies, and the harassment training delivered to those involved on the film. Ex. 13 (Robbins Rpt.) at 3-7. In another section titled "Standard Practices," Robbins quotes extensively from the EEOC's Enforcement Guidance, which support his opinion that there are four basic prevention steps: "(1) promulgate, maintain, and enforce good [footnote] harassment and retaliation policies; (2) conduct harassment and retaliation prevention training; (3) when harassment and retaliation

59

491311.3

allegations arise, treat them seriously and conduct an adequate investigation; and (4) take prompt and appropriate disciplinary and/or remedial action based upon the investigation." Ex. 13 (Robbins Rpt.) at 8-9. Robbins also relies upon other legal publications including the California Department of Fair Employment and Housing Workplace Harassment Guide for California Employers promulgated by the California Department of Fair Employment and Housing. *Id*. at 9-10. In a section he titles "Complaints and Failures to Investigate," Robbins selectively reviews portions of deposition testimony and documents which he claims supports his opinion that an investigation should have taken place. *Id*. at 11-20.

Robbins also opines that there are entertainment industry specific standards reflected in the SAG-AFTRA Quick Guide for Scenes involving Nudity and Sex, which he says are "designed to provide a harassment free/safe workplace"; he claims these standards were not followed. *Id*. at 10-11. Specifically, Robbins opines that there were "Nudity Rider and Intimacy Coordinator Failures." *Id*. at 22. He claims that studios and production companies are responsible for ensuring that Nudity Riders are signed prior to any intimacy. *Id.*

Robbins opines that Lively alleges that she "suffered reputational damage as a result of the retaliation against her." He acknowledges that he has "not been asked to determine whether retaliation occurred here," nor is he in "a position to determine that anyway." *Id.* at 2, n. 4. Nevertheless, he proffers the opinion that the entertainment industry is unique because it has "powerbrokers" like Harvey Weinstein who have the "ability to affect people's careers—even beyond the reach of their own projects." Robbins opines that as a result of these powerbrokers, "reputational damage is particularly problematic in the Entertainment Industry." These powerbrokers, Robbins opines, have the ability to negatively impact the future careers of actors (and other "above the line" individuals such as directors, writers, etc.)." *Id.* at 21. Robbins

60

491311.3

opines that "fear of powerbrokers having a deleterious effect on careers remains a prominent concern" and these "levels of influence and fear simply do not exist in any other industry." *Id.*

**B.    Robbins Is Unqualified To Testify Regarding Intimacy Coordinators, Nudity Riders, And Reputational Harm**

As a threshold matter, a district court should not allow an expert witness to testify if the witness is not qualified to testify about the subject matter at issue. *See Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 360 (2d Cir. 2004) (where expert is not qualified, an analysis of the remaining *Daubert* factors "seems almost superfluous"); *Karavitis v. Makita U.S.A., Inc.*, 722 F. App'x 53, 55 (2d Cir. 2018) (An expert must be qualified by knowledge, skill, experience, training, or education to give an expert opinion); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998) (upholding exclusion of proffered expert who lacked relevant experience). The Court should base its determination on the expert's "knowledge, skill, experience, training or education," as well as the expert's "background and practical experience." *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 642 (S.D.N.Y. 2014). The Court should compare the witness's area of expertise to the proffered opinions to "ensure that the expert will actually be testifying on issues or subject matter within his or her area of expertise." *Id.* (citations and quotations omitted). "An expert qualified in one subject matter does not thereby become an expert for all purposes. Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702" and should be excluded. *Malletier*, 525 F. Supp. 2d at 642; *see, e.g., McCullock v. H.B. Fuller Co.*, 981 F. 2d 656, 657-58 (2d Cir. 1992) (testimony regarding the adequacy of defendant's warnings was excluded where expert, who was an industrial and electrical engineer, lacked training or experience in "chemical engineering, toxicology, environmental engineering, or the design of warning labels"); *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 638 (S.D.N.Y. 2016) ("It is

61

491311.3

well established that even if 'a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express opinions as to other fields.'") (citations omitted).

Robbins does not have any education, training, or experience which would qualify him to testify about entertainment industry protocols, including nudity riders and intimacy coordinators. He has never been a performer, entertainment executive, or intimacy coordinator. As a lawyer at studios more than three decades ago, he provided day-to-day advice on labor and employment issues, performed workplace investigations, "did some litigation," and "did union negotiations." Ex. 14 (Robbins Dep.) at 25:8-6. He did not work with nudity riders or intimacy coordinators as an attorney. *Id*. at 25:8-26:12. In fact, intimacy coordinators did not exist until approximately 2017. *Id*. at 26:14-17. In his work as an investigator Robbins only interviewed one intimacy coordinator in connection with one investigation, which hardly qualifies him to testify in this area. *Id*. at 61:8-18. Indeed, Robbins' lack of qualifications and experience in the area required him to consult with an intimacy coordinator to render his opinions. *Id*. at 44:18-46:18.

Robbins is also not qualified to testify regarding reputational harm—let alone reputational harm in the entertainment industry. His credentials and work experience are wholly unrelated to damages based on reputational harm. *Zucchella v. Olympusat, Inc.*, No. CV197335DSFPLAX, 2023 WL 2628107, at *15 (C.D. Cal. Jan. 10, 2023) (excluding expert whose "credentials and work experience appeared wholly unrelated to calculating damages based on lost earning capacity and reputational harm" as unqualified). He is not an economist, accountant, nor an expert in reputational harm. Further, as noted, his experience in the entertainment industry is limited to his experience as a lawyer and a workplace investigator. Robbins admittedly has never been an expert in reputational harm in the entertainment industry

491311.3

or otherwise.  Ex. 14 (Robbins Dep.) at 31:10-13.  Nor has Robbins written any peer-reviewed articles or taught on the subject of reputational harm in the entertainment industry.  Robbins points to two articles he wrote, claiming they concern this subject.  However, the two almost identical articles he co-authored relate "to **conducting investigations** in the Entertainment Industry."  Exs. 15, 16.  The articles comment in passing on the "potential influence of powerbrokers" in the entertainment industry providing Harvey Weinstein as an example of a person who "had the ability to affect people's careers – even beyond the reach of their own projects."  But this point is only made in the context of Robbins' opinion that because of these powerbrokers "witnesses who might otherwise be willing to cooperate may hesitate or refuse entirely because they fear being blackballed in the entertainment industry."  *Id*.  These articles did not discuss the effect of retaliation in the entertainment industry on reputational harm.  Rather, the articles focused on Robbins' opinions about potential difficulties faced in conducting workplace investigations in the entertainment industry.

### C.    Robbins' Opinions Relating to Workplace Investigations Are Inadmissible

Robbins' testimony is not relevant to any viable claim and is therefore inadmissible under Federal Rules of Evidence 402 and 702.  *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." (citation omitted)).  Therefore, the Court should exclude Robbins' testimony as irrelevant.  *See, e.g.*, *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 745-46 (S.D.N.Y. 2011) (declining to consider methodological flaws in a confusion survey where survey was excluded as irrelevant); *JTRE Manhattan Ave. LLC v. Cap. One, N.A.*, No. 1:21-CV-05714 (JLR), 2024 WL 3227010, at *17 (S.D.N.Y. June 27, 2024) (granting motion to exclude plaintiff's expert because it was not relevant to plaintiff's surviving claims); *Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc.*, 598 F. Supp. 3d 158, 193 (S.D.N.Y. 2022) (same); *McBeth v. Porges*, No. 15-CV-

63

2742 (JMF), 2018 WL 5997918, at *7 (S.D.N.Y. Nov. 15, 2018) (same).  Robbins' testimony was only relevant (if at all) to Plaintiff's Sixth Count for failure to investigate, prevent and remedy harassment and retaliation in violation of FEHA.  Summary judgment was granted on Plaintiff's claim that IEWUM and Wayfarer failed to investigate, prevent and remedy harassment and retaliation in violation of FEHA.  Dkt. No. 1273 at 140 (dismissing Count 6); *see also* Dkt. No. 1070 at 49-50.  Robbins' testimony is therefore no longer relevant.

Even if Robbins' opinions regarding workplace investigations were arguably relevant, they were not admissible.  Robbins seeks to invade the province of the Court and jury by opining about legal guidelines, applying those legal guidelines to Defendants' conduct and rendering legal conclusions.  Specifically, Robbins seeks to opine whether Wayfarer and IEWUM met legal standards for investigating Plaintiff's complaints.  *See, e.g.*, Ex. 13 (Robbins Rpt.) at 1, 22 ("Once again, the Studio did not take reasonable steps to prevent harassment and retaliation from occurring").  But that is not the role of an expert, but the role of the Court and the jury.

In his report Robbins concludes that Wayfarer failed to meet, or adequately meet, the EEOC's and the DFEH's guidelines.  Ex. 13 (Robbins Rpt.) at 8-9.  The Advisory Committee Notes to Fed. R. Evid. 704 make clear that questions which would merely allow the witness to tell the jury the result to reach are not permitted.  Nor is Rule 704 intended to allow a witness to give legal conclusions.  *See* Adv. Comm. Note, Fed. R. Evid. 704; *Densberger v. United Techs. Corp.*, 297 F.3d 66, 74 (2d Cir. 2002) ("It is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions" (citation and quotation marks omitted); *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 508 (2d Cir. 1977) (expert improperly "gave his opinion as to the legal standards which he believed to be derived from the contract and which should have governed [defendant's] conduct); *Owen v. Kerr-McGee Corp.*

698 F. 2d 236, 240 (5th Cir. 1983) ("Allowing an expert to give his opinions on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant").

That Robbins' opinions constitute inadmissible legal conclusions is evidenced by his use of legal terms and his tracking of the text of the EEOC guidelines.  The Second Circuit in *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988) held proposed expert testimony was inadmissible because it constituted inadmissible legal conclusions, as evidenced by the fact that the opinion was couched in terms of "manipulation" and "fraud," terms lifted directly from the statute.  *Id*.  The terms "complaints of harassment" and "investigation," which are tracked from the EEOC guidelines, have a distinct, specialized legal meaning - different from the lay meaning of these terms.  The meaning of regulations is a question of law, not a question of fact.

Moreover, Robbins' anticipated testimony is unduly prejudicial and must be excluded under Federal Rule of Evidence 403.  If Robbins is permitted to testify about legal terms, the application of EEOC and DFEH regulations to Defendants' conduct, there is a significant risk the jury will abandon its efforts to evaluate the facts.  *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997) ("[T]he judge's expert knowledge of the law makes any such assistance [by a proposed expert witness] at best cumulative, and at worst prejudicial").

Finally, to the extent that Robbins purports to testify regarding Defendants' policies (or those of Sony Entertainment), this is not an area of expertise for Robbins as he has not worked for Wayfarer or Sony before.  Ex. 13 (Robbins Rpt.) at Ex. A.  There is no reason why the jurors should rely on Robbins' summary and assessment of Wayfarer's employment policy rather than read the policy themselves and hear the underlying evidence about that policy themselves. *Perona v. Time Warner Cable Inc.*, No. EDCV1402501MWFSPX, 2016 WL 9087260, at *3 (C.D. Cal. Aug. 12, 2016) (excluding Robbins' testimony about Time Warner's policies on the

491311.3

grounds that he had never worked for Time Warner and the jurors could hear the underlying evidence for themselves).

### D.    Robbins' Reputation Harm Opinion Is Inadmissible

Robbins' opinion that in the entertainment industry there are some people "with either power or money or influence, have the ability to try to destroy people's careers" is separately and independently inadmissible for several reasons.  Ex. 14 (Robbins Dep.) at 241:14-24.

First, this proposition is something the jury is capable of understanding on their own – no expert testimony is necessary.  Fed. R. Evid. 702 (to be relevant, the expert's testimony must assist "the trier of fact to understand the evidence or determine a fact in issue," and be grounded on the facts of the case);  *Andrews*, 882 F.2d at 708 (Expert testimony must not be directed "to lay matters which a jury is capable of understanding and deciding without the expert's help").

Second, Robbins' opinion runs afoul of the principle that an expert's role is to assist the trier of fact by providing information and explanations; the expert's role is not to be an advocate. Experts "perform a very different function in litigation than that of the lawyer; they do not serve as advocates, but as sources of information." *E.E.O.C. v. Locs. 14 & 15, Int'l Union of Operating Eng'rs*, No. 72 CIV. 2498 (VLB), 1981 WL 163, at *4 (S.D.N.Y. Feb. 11, 1981). Indeed, "'[w]hen expert witnesses become partisans, objectivity is sacrificed to the need to win.'" *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 184 (E.D.N.Y.2001) (quoting *Rubinstein by Rubinstein v. Marsh*, No. CV-80-0177, 1987 WL 30608, at *7 (E.D.N.Y. Dec. 10, 1987)).  Robbins' opinion is just argument for the jury to find in Plaintiff's favor regarding her alleged damages – which is an argument made by Plaintiff's counsel and should not also be made by Plaintff's expert.  *See In re Rezulin*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) ("[E]xperts should not be permitted to 'supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence.'").

66

491311.3

Third, Robbins' reputation harm opinion is not the product of reliable principles and methods. The court's task "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Robbins' reputational harm opinion is nothing more than his personal opinion. No rationale, analysis, data or facts support the opinion. He cites only his own articles, which cite nothing to support his opinions. And, as noted above, those articles do nothing more than to support Robbins' opinion that a workplace investigator might encounter obstacles in interviewing witnesses in the entertainment field – which is irrelevant.

Fourth, Robbins' opinion has no application to the facts in this case. Robbins says that "powerbrokers like Harvey Weinstein had the ability to affect people's careers – even beyond the reach of their own projects."

Even if that is the case, it has no application to the facts in this case. Who is the powerbroker in these facts? Robbins admits that Justin Baldoni was not a powerbroker – he did not have the same power or influence as Harvey Weinstein. Ex. 14 (Robbins Dep.) at 235:2-236:18). Robbins also agreed that Baldoni did not have as much influence or power in the entertainment industry as Blake and Ryan Reynolds. *Id.* at 235:2-18. Robbins speculated that Baldoni might have financial power because he thought perhaps Steve Sarowitz "was financing a lot of this and he's apparently a billionaire or something like that." *Id.* at 235:2-19. Robbins explained that ultimately even if someone does not have power and influence, he can control things "as long as you have got money." *Id.* at 235:21-236:8. Robbins admitted that the Reynolds have "a lot of money." *Id.* at 236:10-18.

67

In sum, Robbins' reputational harm opinion appears to be that in the entertainment industry there are some people with money who are able to influence public opinion. But that is certainly not unique to the entertainment industry and does not require an expert opinion. Regardless, Robbins' reputational harm opinion relies on a set of facts that are not analogous to this case. As such, the admission of his testimony would at best be misleading and prejudicial.

***

Robbins' opinions should be excluded in their entirety, and he should not be permitted to testify at trial.

## V.    THE COURT SHOULD EXCLUDE THE TESTIMONY OF JEFFREY KINRICH

The opinion of Plaintiff Blake Lively's expert, Jeffrey Kinrich, should be excluded because it fails to meet the admissibility requirements mandated by Federal Rule of Evidence 702 ("Rule 702"). Kinrich opines that Lively suffered lost profits and lost royalties related to two fledgling companies, Family Hive, LLC ("Family Hive") and Betty B Holdings, LLC ("Betty B") (collectively, the "Companies"). A third company, LOL HATA, LLC ("LOL HATA") owns a minority membership interest in each of the Companies. Kinrich assumes, without evidence, that Lively owns 100% of LOL HATA. Ex. 17 (Kinrich Dep.) at 101:14-102:4.

Family Hive is a haircare company that began selling its products a few days before Lively alleges Defendants began an online retaliation campaign against her resulting in a loss in company revenue. Betty B sells two beverages product lines – a nonalcoholic brand under the moniker Betty Buzz, and an alcoholic brand known as Betty Booze. Betty B was formed in 2021 and only sold Betty Buzz products at that time. The company did not launch Betty Booze products until 2023. Kinrich admits that the Betty Buzz brand failed for "reasons unrelated to the online manipulation" and therefore declines to calculate any lost profits related to Betty Buzz

68

491311.3

attributable to Defendants.  Ex. 5 (Kinrich Rpt.) at ¶ 19, fn 36.  Despite the failure of Betty Buzz operating under the same parent company and management as Betty Booze, Kinrich opines that the alleged online manipulation was the sole reason Betty Booze did not meet its projected revenues.  Ex. 17 (Kinrich Dep.) at 42:17-22.

Kinrich's opinion of damages, ranging between $39,600,000 and $143,500,000, is purely speculative, based on unsupported assumptions incorporated into profit projections generated by the fledgling Companies themselves or third parties with whom Kinrich did not communicate. Kinrich failed to validate any of the data contained in company presentations from which he derived his information and was unaware of the basis for any of the assumptions contained within the projections.  Rather, Kinrich bases his opinion that the projections were reasonable because the Companies "endorsed" those projections in 2024 and continue to do so now, in the midst of litigation.  Ex. 17 (Kinrich Dep.) at 87:23-89:16.  Kinrich opines that the Companies lost profits solely because of the conduct of Defendants, despite his failure to even review the full deposition transcripts of the Companies' representatives.  In any event, Kinrich's opinion is inadmissible for the simple reason that Lively lacks standing to bring claims for lost profits or lost royalties.

Kinrich's opinions fall far short of the standard for expert opinions under Rule 702 and *Daubert* and should be excluded.

### A.    Kinrich's Opinions

Kinrich opines that Lively has suffered damages "based on her interest" in Betty B (but only as to the Betty Booze product line) and Family Hive and "her lost royalties" from Family Hive.  Ex. 5 (Kinrich Rpt.) at 2-3.  Kinrich calculates the lost profit damages "as the difference between the but-for profits for [Family Hive/Betty Booze] and the actual profits in each case." *Id.*  The royalty damages are calculated based on Family Hive's purported lost profits.  *Id.*

69

Kinrich's report fails to note that Lively has no direct interest in Betty B Holdings or Family Hive and is not directly entitled to any royalties from Family Hive. Nevertheless, Kinrich opines that Lively has suffered (1) between $19,400,000 and $45,100,000 based on Family Hive's lost profits; (2) between $7,900,000 and $28,300,000 based on Betty Booze's lost profits; and (3) between $12,300,000 and $70,200,000 based on royalties a separate company, LOL HATA, LLC, might have been paid based on Family Hive's lost profits. In total, Kinrich opines Lively has suffered damages between $39,600,000 and $143,500,000. *Id.*

### B.    Kinrich's Lost Profits Analysis Should Be Excluded Because Lively Lacks Standing To Seek Such Damages

A shareholder "cannot sue in h[er] individual capacity to redress wrongs inflicted upon a corporation in which [s]he holds stock." *Gray Gables Corp. v. Arthur*, No. 21-1551-CV, 2022 WL 905393, at *1 (2d Cir. Mar. 29, 2022). "An individual lacks standing to sue when the alleged injury is based on an injury to a corporate entity". *Ali v. NYC Env't Control Bd.*, 670 F. App'x 26, 27 (2d Cir. 2016).

Courts routinely reject claims like Lively's in which individuals seek redress for corporate damages, including lost profits. *See Jones v. Niagara Frontier Transp. Auth. (NFTA)*, 836 F.2d 731, 736 (2d Cir. 1987) (affirming dismissal and noting "[a] shareholder—even the sole shareholder—does not have standing to assert claims alleging wrongs to the corporation"); *Karkare ex rel. JN v. Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers Loc. 580*, 140 F.4th 60, 65 (2d Cir. 2025) (no standing despite plaintiff's assertions that he was "personally aggrieved" and "may have faced the risk of financial loss as a result"); *Liberty Sackets Harbor LLC v. Vill. of Sackets Harbor*, 776 F. App'x 1, 3 (2d Cir. 2019); *Ali*, 670 F. App'x at 27 ("[A]n LLC and its owner or members are not interchangeable for the purposes of standing").

70

Kinrich calculates Lively's purported damages by calculating lost profits of Betty B (based on its Betty Booze product line) and Family Hive (based on its Blake Brown product line) and multiplying those lost profits by the membership interests of LOL HATA, an entity controlled by Lively.[22]  Ex. 5 (Kinrich Rpt.) at ¶ 21.  As explained by *Gray Gables Corp*, *Ali*, and *Jones*, neither LOL HATA's nor Lively's "share" of lost profits is recoverable as damages because Lively lacks standing to seek damages suffered by the Companies.  When Defendants raised Lively's lack of standing in their motion for summary judgment, Lively argued for the first time in her opposition that she actually seeks damages to her "business reputation" rather than lost profit damages.  However, that argument is directly contradicted by every iteration of Lively's initial disclosures, Kinrich's expert report, and Kinrich's deposition, each of which describe Lively's damages as "lost profits".  See Ex. 18 (2nd Amended Initial Disclosures) at 32 ("Lost profits in an amount of approximately $71,000,000, subject to expert testimony") and 34; Ex. 19 (3rd Amended Initial Disclosures) at 41 (same) and 43; Ex. 20 (4th Amended Initial Disclosures) at 41 ("Lost profits between approximately $39.6 million and $143.5 million subject to expert testimony") and 43[23]; Ex. 5 (Kinrich Rpt.) at 3 ("The total damages suffered by

---

[22] Kinrich admits that Lively has no direct ownership or membership interest in either Betty B or Family Hive, but rather owns interest through LOL HATA.  Ex. 17 (Kinrich Dep.) at 84:17-85:4. Kinrich assumes that Lively owns 100% of LOL HATA although admits he has no personal knowledge whether that assumption is true.  Ex. 17 (Kinrich Dep.) at 101:14-102:4.  In fact, Kinrich has no basis for his assumption because neither Betty B nor Family Hive's corporate representatives knew whether Lively owned 100% of LOL HATA and Kinrich did not speak directly to Lively.  Ex. 17 (Kinrich Dep.) at 43:21-22; Ex. 21 (Family Hive Dep.) at 58:11-16; Ex. 26 (Betty B Dep.) at 63:4-19.  Regardless, Lively's interest, whether direct or indirect, does not cure her lack of standing to seek any portion of the Companies' lost profits for the reasons described above.

[23] Each iteration of Lively's initial disclosures also contain a category of damages for "reputational harm" which notably does not include damages associated with Betty B or Family Hive.  Ex. 18 (2nd Amended Initial Disclosures) at 34; Ex. 19 (3rd Amended Initial Disclosures) at 43; Ex. 20 (4th Amended Initial Disclosures) at 43.

491311.3

Lively based on her lost profits in Blake Brown and Betty Booze, as well as her lost royalties from Blake Brown, are between approximately $39.6 million and $143.5 million"); Ex. 17 (Kinrich Dep.) at 83:9-24 (Lively would receive her share of profits if distributions were made).

Moreover, Lively and Kinrich never explain, because they cannot, how a calculation of lost profits equates to a loss of "business reputation." Lively's last minute semantic wordplay should be seen for what it is – an attempt to evade her own lack of standing to claim damages suffered by the Companies.

Lively's claim for royalties fares no better as the evidence establishes that Lively herself is not entitled to any royalties from the Companies. Ex. 22 (Family Hive Promotional Services Agreement) at 1, 10 (any royalties to be paid to LOL HATA); Ex. 21 (Family Hive Dep.) at 246:20-24 ("Q To your understanding, does Blake Lively have any direct entitlement to royalties that doesn't go through LOL HATA? A Not to my understanding. My understanding is everything goes through LOL HATA."); 240:7-19 (Lively has never been entitled to royalty payments directly). Lively is the plaintiff, not LOL HATA. Therefore, she lacks standing to seek damages for lost royalties to LOL HATA and the Court should exclude Kinrich's opinions in their entirety. *Jones*, 836 F.2d at 736 ("[a] shareholder—even the sole shareholder—does not have standing to assert claims alleging wrongs to the corporation").

###### C.      Kinrich's Lost Profits Analysis Should Be Excluded As Purely Speculative

"[A] plaintiff is entitled to recover lost profits only if he can establish both the existence and amount of such damages with reasonable certainty." *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000). Lost profit damages "may not be merely speculative, possible or imaginary." *Id.* citing *Kenford Co. v. Erie Cnty.*, 67 N.Y.2d 257, 261 (1986). "Although lost profits need not be proven with 'mathematical precision,' they must be 'capable of measurement based upon known reliable factors without undue speculation.'" *Id.* citing *Ashland Mgt. Inc. v. Janien,* 82

491311.3

N.Y.2d 395 (1993). "Evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate." *Id.*; *CCM Touring LLC v. Moonbug Entertainment Ltd.*, No. 23-CV-7116 (VSB) (VF), 2026 WL 848392, at *6 (S.D.N.Y. Mar. 27, 2026).   "Projections of future profits based upon 'a multitude of assumptions' that require 'speculation and conjecture' and few known factors do not provide the requisite certainty." *Schonfeld*, 218 F.3d at 172; *Ermaris Bio, PBC v. Trs. of Columbia Univ. in City of New York*, No. 25 CIV. 3691 (JPC), 2026 WL 520456, at *3 (S.D.N.Y. Feb. 25, 2026).

An expert may not rely on a business's own belief that future profits are reasonably certain because a business's "'cheerful prognostications' are not enough" to establish lost profits. *Schonfeld*, 218 F.3d at 173.  Nor may an expert simply rely on financial projections created by others without independently verifying the analysis or assumptions contained in such projections. *CCM Touring LLC,* 2026 WL 848392 at *6; *Hodnett v. Medalist Partners Opportunity Master Fund II-A, L.P.*, No. 1:21-CV-00038 (JLR), 2025 WL 2607548, at *29 (S.D.N.Y. Sept. 9, 2025). "Where lost profits 'are at issue, 'an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding' a party's future prospects.'" *Id.*

1.    Kinrich's Opinion of Family Hive's Lost Profits is Speculative

Family Hive is a fledgling hair care company which first launched its products on August 4, 2024, the same month that Lively alleges an online media campaign against her began leading to a decline in sales.  Ex. 17 (Kinrich Dep.) at 30:23-31:12; Ex. 21 (Family Hive Dep.) at 35:8-12.  Therefore, Kinrich bases his opinion on lost future profits on a track record of only a few days of sales.  Kinrich provides this opinion despite understanding that "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate." *Schonfeld*, 218 F.3d at 172.  In fact, Kinrich is the co-editor of the treatise "Lost Profit Damages: Principles, Methods, and Applications" which cites *Schonfeld* and

teaches "The 'evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate.' Due to this higher standard, courts 'routinely reject lost profit claims from unestablished businesses.'" Ex. 23 (Lost Profits Book) at 55. Lost Profit Damages further explains that "[a] lost profits claim by a new business that relies on the fickle preferences off the consuming public may be unduly speculative." *Id.* at 56. Kinrich fails to adhere to the standards set forth in his own treatise in opining that Lively would suffer lost profits of up to $45,100,000 based on LOL HATA's interest in Family Hive, a company that had a track record of a few days of sales.

To calculate lost profits, Kinrich relies on financial projections prepared by Deloitte Consulting LLP ("Deloitte") in July of 2023, over a year before Family Hive ever sold a single product. Ex. 5 (Kinrich Rpt.) at ¶ 32 and fn 51. The business plan describes Family Hive's "ambition" to become a $1 billion company and specifically notes that "the current competitive landscape highlights the importance of rapid launch to expansion to 'stand out'/breakthrough, and achieve the size and growth required to put the company on a path to a $1B valuation. – Very few beauty companies in masstige or prestige achieve more than $100M in retail sales." Ex. 24 (Family Hive Business Plan) at 2-3. In preparing his report, Kinrich incorrectly believed that Deloitte prepared the projections in July 2024, just before launch, rather than July 2023.[24] Ex. 5 (Kinrich Rpt.) at ¶¶ 22, 32 and fn 51; Ex. 17 (Kinrich Dep.) at 87:23-88:12. Kinrich attempts to dismiss his error as irrelevant because Family Hive "endorsed" the plan in 2024 and

---

[24] Deloitte did prepare a business plan with a cover page indicating a date of July 2024. However, that document was emailed to Family Hive in July 2023 and the Family Hive representative confirmed that it was prepared in July 2023 rather than July 2024. Ex. 21 (Family Hive Dep.) at 69:25-71:5; Exs. 25 (e-mail) and 24 (Family Hive Business Plan). Kinrich might not have made this error if he had read the deposition of Family Hive's representative in its entirety, which he did not. Ex. 17 (Kinrich Dep.) at 98:8-19.

74

491311.3

continues to endorse it.  Ex. 17 (Kinrich Dep.) at 7:23-88:20.  However, a company's own belief that its projections are reasonable does not make it so and does not help inform the expert determine whether it is objectively reasonable.  *Schonfeld*, 218 F.3d at 173 (company's "cheerful prognostications' are not enough" to establish lost profits.).

In addition, many factors and/or assumptions may have changed in the year between the creation of the projections and the launch.  For example, Family Hive anticipated Lively would be available to aggressively promote the brand prior to launch but the premier date of It Ends With Us changed in the intervening year causing a conflict and limiting Lively's availability.  Ex. 21 (Family Hive Dep.) at 170:5-171:13.  Family Hive also failed to implement many of Deloitte's recommendations prior to launch which Deloitte noted "needs to be true" to achieve the projections.  Ex. 21 (Family Hive Dep.) at 73:19-74:11; 75:6-13; 83:7-84:5.  Kinrich does not address any changed factors in the year leading up to launch.  Despite Kinrich's reliance on the Deloitte 2023 projections, he did not speak with anyone from Deloitte and was unaware of any specific individual involved in making the projections.  Ex.17 (Kinrich Dep.) at 87:12-21.

To test the reasonableness of the projections, Kinrich states "For each forecast…I reviewed the supporting information and determined that the underlying assumptions are reasonable and consistent with available evidence."  Ex. 5 (Kinrich Rpt.) at fn 37.  He defines the "Blake Brown Forecast" as the excel spreadsheet prepared by Deloitte in July 2023 and produced by Lively as BL-000039169.  Ex. 5 (Kinrich Rpt.) at ¶ 32 and fn 51.  However, when questioned about the document at deposition, Kinrich admitted he "didn't pay much attention to this spreadsheet at all." Ex. 17 (Kinrich Dep.) at 60:15-62:11.  As a result, Kinrich had no understanding of the basis for numerous assumptions contained in the financial projections, including:

491311.3

- The basis for the assumptions of Blake Brown's baseline productivity levels. Ex. 17 (Kinrich Dep.) at 68:22-70:5.

- The basis for the assumptions for anticipated growth percentages of Blake Brown products. Ex. 17 (Kinrich Dep.) at 70:6-71:15.

- The basis for the assumption that productivity levels were going to be at the top levels or at the very high levels that are reflected in Blake Brown forecast. Ex. 17 (Kinrich Dep.) at 73:6-73:24; 75:1-77:17

- The basis for the assumption that retail sale returns would hover around 5%[25] Ex. 17 (Kinrich Dep.) at 78:16-79:14.

Thus, Kinrich could not have determined the underlying assumptions were reasonable because he did not even know the bases for them. Kinrich could have gathered this information by interviewing someone from Deloitte who prepared the assumptions, but he did not. Ex. 17 (Kinrich Dep.) at 87:12-21.

Family Hive's projections also make extraordinary "implicit assumptions" for an unproven business that Deloitte noted "needs to be true" to obtain its financial goal. Ex. 24 (Family Hive Business Plan) at 11. For example, the projections assume Blake Brown products would be launched at 1,350 Ulta retail stores in its second year, the brand would achieve "rapid international expansion" at 3,500 retailers by its third year, consumers would be willing to pay the higher price point for the product, the product would perform better than established hair care products, the brand would receive volume discounts, and the cost of the product would not increase. Ex. 24 (Family Hive Business Plan) at 11. In addition, the projection identifies numerous "embedded risks" including "difficulty handling the scale and demand", "product development constraints", "not all stores carry 100% of products", productivity across the portfolio has average performance", unexpected costs from international expansion", continued

---

[25] Nor was Kinrich aware of the average return rates for Target generally or haircare products at Target. Ex. 17 (Kinrich Dep.) at 79:17-22.

491311.3

inflation puts pressure on costs". *Id.* Expert opinion based on projections "predicated on various assumptions, including [a company's ability to] penetrate new markets" may be excluded without verification of those assumptions. *Hodnett*, 2025 WL 2607548, at *29. As this district has recently found, where an expert "base[s] his opinion on financial projections created by others, which he did not independently verify in the context of projecting future earnings for a new business venture…" the opinion must be excluded. *CCM Touring LLC*, 2026 WL 848392, at *6. As Kinrich failed to verify the financial projections, his opinion on lost profits for Family Hive should be excluded.

Because Kinrich's analysis of lost royalties flows from his opinion of lost profits, his opinions regarding lost royalties must also be excluded as speculative. Ex. 5 (Kinrich Rpt.) at ¶ 62; *CCM Touring LLC*, 2026 WL 848392 at *6.

### 2.    Kinrich's Opinion of Betty B's Lost Profits is Speculative

Similarly, Kinrich's opinion of Betty B's lost profits is entirely speculative. Betty B started selling Betty Booze products in 2023 and did not make a profit through October 1, 2024, the date Kinrich uses for the company's future projections. Ex. 26 (Betty B Dep.) at 27:6-8; Ex. 27 (October 2024 projections) at 167. Kinrich bases his opinion on projections contained in an October 1, 2024 internal board presentation prepared by Betty B management. Ex. 5 (Kinrich Rpt.) at ¶ 50; Ex. 17 (Kinrich Dep.) at 91:11-14. The projections relied on by Kinrich for Betty B warrant even more scrutiny than Family Hive because they were prepared by the company itself. As noted in Kinrich's own treatise, Lost Profits Damages, reliance on management financial projections is a basis to exclude an expert opinion: "Experts have been harshly criticized – and at times excluded – for basing lost profits models on the plaintiff's business plans without validating and supporting their reasonableness. It is dangerous to merely assume that the forecasts are reasonable without appropriate testing." Ex. 23 (Lost Profits Book) at 303;

*see also Schonfeld*, 218 F.3d at 173 ("[Plaintiff] contends that the existence of lost profits was sufficiently established by the evidence that Cox, Schonfeld, the Hilliards, and the BBC all *believed* that profits from the Channel were reasonably certain. However, '[t]he entrepreneur's 'cheerful prognostications' are not enough.'"); *Inficon, Inc. v. Verionix, Inc.*, 182 F. Supp. 3d 32, 37 (S.D.N.Y. 2016) ("A defendant's own projections cannot satisfy the requisite level of certainty in situations involving a new product with relatively little sales history."). Yet Kinrich's report fails to describe any "testing" other than speaking with management of Betty B.

Indeed, Betty B management prepared numerous projections since the company started selling Betty B products in 2023 and each has been shown to be unreliable requiring constant downward revisions prior to October 2024. Ex. 28 (Wagner Rpt.) at ¶¶ 77-79, figure 6. Thus, by October 2024, Betty B had already shown that its own numerous projections of Betty Booze revenue were unreliable. *Bank of New York Mellon v. WMC Mortg., LLC*, 2015 WL 4887446, at *9 (S.D.N.Y. Aug. 17, 2015) (excluding expert opinion relying on data without "an adequate basis" that such data was "sufficiently reliable").

The October 1, 2024 projections are based on the projections presented to potential investors in June 2024. Exs. 29 (email) and 30 (June 2024 Investor Presentation); Ex. 26 (Betty B Dep.) at 91:5-93:23. The June 2024 projections explicitly recognize the speculative nature of Betty B's internal financial projections by including a disclaimer on the first page of the presentation stating that it "may include projections and estimates… accompanied by words such as 'estimate,' 'project,' 'predict,' 'believe,' 'expect,' 'anticipate,' 'potential,' 'should,' 'would,' 'may,' 'plan,' 'goal,' 'target,' 'can,' 'could,' 'continuing,' 'ongoing,' 'intend' or other words that convey the uncertainty of future events or outcomes." Ex. 30 (June 2024 Investor Presentation) at 2. Betty B further notes that the projections "are inherently subject to significant business,

78

491311.3

<mark>economic, competitive, regulatory and other risks, contingencies and uncertainties, most of which are difficult to predict and many of which are beyond the control of any person or entity…
There can be no assurance that actual developments will be those anticipated by this presentation. Actual results may differ materially from those expressed or implied in these statements as a result of significant risks and uncertainties."</mark>   *Id.*   Thus, Betty B itself recognized the unstable nature of its own projections on which Kinrich relies.  Moreover, Kinrich fails to note that "documents prepared for the purposes of securing funding are of questionable reliance." *Hodnett*, 2025 WL 2607548, at *29; *see also Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 481 (S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) (rejecting evidence of damages where documents and projections relied on by the expert were "prepared for the purpose of ... securing funding" and did not "satisfy the requisite level of certainty in situations involving a new product with relatively little sales history").

Kinrich's opinion relies in part on scenarios where Betty Booze profits would be delayed by either 2 or 3 years due to the Defendants' alleged conduct.  Ex. 5 (Kinrich Rpt.) at ¶¶ 58-61. The delay scenarios were based solely on predictions made by the CEO of the company regarding how long it will take to recoup profits.  Ex. 17 (Kinrich Dep.) at 114:12-22.; Ex. 5 (Kinrich Rpt.) at fn 41.  However, the company has no expertise to make that determination and, as seen above, its own projections are unreliable.

Kinrich is unable to establish lost profits with any reasonable certainty.  Indeed, his opinion diverges by over $100,000,000 between his low and high estimates, "highlight[ing] the inherently speculative nature of his opinion." *Dixon v. Reid*, No. 23-CV-09878 (JAV), 2025 WL 2417299, at *5 (S.D.N.Y. Aug. 21, 2025).

491311.3

### D.    Kinrich's Opinions Are Not Based on Sufficient Facts or Data

#### 1.    Kinrich Fails to Address Alternate Causes of Losses

Kinrich's failure to review sufficient facts or data underlies his need to speculate resulting in an unreliable and inadmissible opinion.  For example, Kinrich readily admits that he did not read the full deposition transcripts of Betty B Holdings' and Family Hive's corporate representatives.  Ex. 17 (Kinrich Dep.) at 19:2-19; 98:8-99:7.  When asked why he did not read the transcripts in their entirety, he responded that he felt "there were large portions of it that were not relevant to my issues." [26]  Ex. 17 (Kinrich Dep.) at 99:2-14.  Because he did not read large portions of the transcripts, he determined that those portions were irrelevant to "his issues" by having others in his office read the transcripts and inform him which parts he should skip.  *Id.*  Kinrich did not describe which large portions of the transcripts he failed to read and consider.  Kinrich's cursory review of the key source of information for lost profits is inconsistent with his statement that he "looked to see whether there were any things -- whether there were any things that would have led to a likely expectation short of the business plan that are not tied to the online manipulation. And I did not find any."  Ex. 17 (Kinrich Dep.) at 42:17-22.  The vast majority of the Companies' depositions discussed other potential causes for their decline in revenue, many of which the Companies' themselves attributed losses to, including:

- Family Hive's CEO lack of experience running any other company.  Ex. 21 (Family Hive Dep.) at 55:13-16;

- Family Hive's failure to hire ten full time employees per its business plan.  Ex. 21 (Family Hive Dep.) at 73:19-74:11; Ex. 24 (Family Hive Business Plan) at 14;

---

[26] Kinrich's failure to review the available information might be due to the limited time he spent on the engagement.  Or perhaps not.  At deposition, Kinrich's "best estimate" on how much time he spent preparing his opinion was between 50 and 1,000 hours.  Ex. 17 (Kinrich Dep.) at 121:13-122:14.  A curiously imprecise range for a damages expert.

491311.3

- Family Hive's failure to hire a chief of staff per its business plan.  Ex. 21 (Family Hive Dep.) at 75:6-13;  Ex. 24 (Family Hive Business Plan) at 14;

- Family Hive's failure to hire a full time PR and social media manager prior to 2025 per its business plan.  Ex. 21 (Family Hive Dep.) at 83:7-84:5; Ex.  24 (Family Hive Business Plan) at 41;

- Retail decline at Target, Family Hive's sole retail distributor, due to Target's "move away" from DEI efforts.  Ex. 21 (Family Hive Dep.) at 90:22-92:14;

- Negative product feedback by Family Hive consumers, including overpowering or unpleasant scent, overpriced products, impractical or difficult to use packaging, and poor performance such as dryness and brittleness.  Ex. 21 (Family Hive Dep.) at 123:22-127:12; Ex. 31 (complaint summary email); Ex. 21 (Family Hive Dep.) at 151:13-152:8; Ex. 32 (Complaint Tracker spreadsheet); Ex. 21 (Family Hive Dep.) at 175:2-16;

- Lively's unavailability at launch of the Family Hive brand due to timing conflict with movie premier. Ex. 21 (Family Hive Dep.) at 170:5-171:13;

- Negative sentiment related to promoting Family Hive hair care products in relation to a movie about domestic violence.  Ex. 21 (Family Hive Dep.) at 172:6-18;

- Family Hive's trademark dispute for the mark "Beauty by Blake."  Ex. 21 (Family Hive Dep.) at 197:6-199:3;

- Family Hive's board of directors' decision not to invest the recommended amount of marketing budget requested by the CEO.  Ex. 21 (Family Hive Dep.) at 274:13-276:9;

- The departure of Betty B's CEO in early 2025.  Ex. 26 (Betty B Dep.) at 25:19-24;

- Lively's limited availability for "trade engagement" for Betty Booze in 2024.  Ex. 26 (Betty B Dep.) at 117:20-119:18;

- Betty B's loss of market share to a competitor prior to September 2024. Ex. 26 (Betty B Dep.) at 119:20-120:15; 141:2-15; Ex. 27 (October 2024 projections) at 76;

- The lack of a chief marketing officer for Betty B brands in 2024. Ex. 26 (Betty B Dep.) at 127:23-131:11;

- Lively's failure to release any "selfie videos" promoting Betty Booze between June 8, 2024 and July 30, 2024. Ex. 26  (Betty B Dep.) at 134:13-136:21; Ex. 27 (October 2024 projections) at 69;

- Lively's failure to make personal appearances to promote Betty Booze in early 2024.  Ex. 27 (October 2024 projections) at 70;

491311.3

- <mark>Lively's failure to promote Betty Booze through contemplated Zoom appearances throughout 2024.</mark> Ex. 26 (Betty B Dep.) at 138:21-139:15; Ex. 27 (October 2024 projections) at 72;

- <mark>A delay in launching Betty Booze at a national distributor due to "technical reasons" prior to August 2024.</mark>  Ex. 26 (Betty B Dep.) at 141:18-143:16;

- <mark>Customer dissatisfaction of "tone deaf" promotion of Betty Booze alcoholic product in connection with film about domestic violence.</mark>  Ex. 26 (Betty B Dep.) at 153:13-161:19; 188:1-190:1, Ex. 27 (October 2024 projections) at 163, Ex. 33 (November 2024 presentation) at 14;

- <mark>A national distributor's decision not to purchase Betty Booze products based on Lively's "interview press from the movie."</mark>  Ex. 26 (Betty B Dep.) at 178:20-181:5, Ex. 33 (November 2024 presentation) at 8;

- <mark>Betty Booze's price point 50% above competitors.</mark>  Ex. 26 (Betty B Dep.) at 201:15-203:19; Ex. 34 (May 2025 presentation) at 6, 43;

- <mark>Betty Booze's failure to include a lucrative vodka iced tea product in its brand line up in 2024.</mark>  Ex. 26 (Betty B Dep.) at 206:11-208:6; Ex. 34 (May 2025 presentation) at 8;

- <mark>Higher than expected shipping costs for Betty B products, resulting $800,000 in unanticipated costs for 2024.</mark>  Ex. 26 (Betty B Dep.) at 215:22-216:8; Ex. 34 (May 2025 presentation) at 65.

Kinrich failed to address these factors, and may not even be aware of them.  Kinrich's failure to address alternative causes for the business losses he considers requires exclusion of his testimony.  Reliable expert testimony "must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." *Deutsch*, 768 F. Supp. 2d at 474; *accord In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 768 (3d Cir. 1994) (affirming exclusion of expert testimony for failing to consider "alternative causes").

2.      Kinrich Was Not Aware of the Companies' Distribution Schedules

Kinrich was not even aware that <mark>Betty B's LLC Agreement provided that any distribution of profits was not to be made based on membership interest, but rather on an agreed distribution plan.</mark>  Ex. 17 (Kinrich Dep.) at 83:1-84:15.  For example, Betty B's Second Amended LLC

491311.3

agreement provides that despite LOL HATA owning a 32.78% interest in Betty B as of May 19, 2023, out of the first $31,000,000 in total distributions, LOL HATA would only be entitled to $1,508,655 – less than 5% of the distributions.  Ex. 35 (Betty B Second Amended LLC Agreement at 37-40, 63; Ex. 26 (Betty B Dep.) at 72:4-73:16.  In other words, even if Lively could claim lost profits, Kinrich did not calculate how much profit she would actually receive in distributions but for the conduct of the Defendants.

Moreover, the distribution plan contained in the Second Amended LLC agreement is no longer accurate because the agreement has been amended two more times[27] and LOL HATA now has a smaller interest in the company, but Betty B's corporate representative did not know how the distribution plan was amended.  Ex. 26 (Betty B Dep.) at 73:17-74:8.76:1-18.  And Betty B's own projections indicate that no distributions would be made through 2028 – in fact, the company anticipated requiring an infusion of equity.  Ex. 27 (October 2024 projections) at 156.  Similarly, Family Hive's "cash flow" document relied on by Kinrich indicates the company would require a $5 million capital contribution in 2024 with no plans for distribution.  Ex. 5 (Kinrich Rpt.) at ¶ 41, fn 88; Ex. 36 (Cash Flow Document) at 39163.  Kinrich also fails to note that neither Betty B nor Family Hive have ever authorized a distribution.  Ex. 26 (Betty B Dep.) at 72:4-6; Ex. 21 (Family Hive Dep.) at 61:19-21.

### 3.    Kinrich Relies on Unreliable Documents

Finally, the documents Kinrich relies on to determine the Companies' projections and actual financial results are themselves suspect and/or inadmissible.  For example, for the Family Hive projections, Kinrich relies on working capital forecasts from a 2024 document prepared by a shareholder, Get Back Beauty, LLC, rather than the company itself.  *See* Ex. 5 (Kinrich Rpt.) at

---

[27] Kinrich's list of documents reviewed does not identify the third or fourth amended Betty B LLC agreement.  Ex. 5 (Kinrich Rpt.) at Appendix B.

¶ 41; Ex. 17 (Kinrich Dep.) at 96:25-98:19; Ex. 21 (Family Hive Dep.) at 107:18-108:21.  And although Kinrich claims Family Hive "endorsed" the Deloitte business plan as of July 2024, Ms. Tedesco testified that because the estimate of free cash flow created by a shareholder, it is "not one I use as part of Family Hive."  Ex. 21 (Family Hive Dep.) at 107:18-108:10.  The document contains various assumptions but Kinrich does not know the basis for the assumptions because he did not speak to anyone from Get Back Beauty.  Ex. 17 (Kinrich Dep.) at 99:25-100:3.

Similarly, to determine Family Hive's actual financial performance for 2025, Kinrich relied on a presentation prepared by Marco Cecchini, who is not even employed by Family Hive, and therefore is not a document prepared in the normal course of business.  Ex. 5 (Kinrich Rpt.) at ¶ 46, fn 95.  Kinrich did not speak with or communicate with Cecchini to validate the financial data.  Nor did Kinrich review actual financial documents, but rather relied on information placed in PowerPoint board presentations.  Ex. 17 (Kinrich Dep.) at 66:11-68:20; Ex. 5 (Kinrich Rpt.) at Appendix B.

For the foregoing reasons, the testimony of Jeffrey Kinrich should be excluded in its entirety.

## VI.    THE COURT SHOULD EXCLUDE THE TESTIMONY OF RICHARD MARKS

The opinion of Plaintiff Blake Lively's expert, Richard Marks, should be excluded because it fails to meet the admissibility requirements mandated by Federal Rule of Evidence 702.  Marks' conclusions are not based on sufficient facts and data to support his analysis but rely on wild hypothetical assumptions and pure speculation.

Although Marks calculates that Lively earned just over $21 million in acting income for the eight years between 2017 and 2025, he opines that but for Defendants' conduct she would have earned up to $132 million "to a reasonable certainty" for acting services between 2024 and 2029, plus an additional $26 million for endorsements and speaking engagements.  Marks'

491311.3

opinions are based solely on his "experience" in the entertainment industry as a transactional attorney.

Marks' opinions rely on unsupported assumptions regarding her career trajectory, untethered to her work history as either an actress or endorser. Marks invents "likely" offers for Lively that are inherently speculative, highlighted by the fact that his calculations of lost earnings ranges from $67.5 million to $158.5 million. A $91 million margin of error for Marks' range of lost opportunities demonstrates just how speculative Marks' opinions are. Thus, Marks' opinions do not meet the standards of admissibility for expert testimony pursuant to Federal Rules of Evidence 702 and 403 and should be excluded.

### A.     Marks' Opinion

Marks opines that but for Defendants' conduct, Lively "was positioned" to secure various acting and endorsement deals between August 2024 and August 2029. Ex. 37 (Marks Rpt.) at 1. At his deposition, Marks clarified that in his opinion Lively was not only positioned to secure deals, but "would have been offered" the range of deals he identifies to a reasonable certainty but for the alleged smear campaign against her. Ex. 38 (Marks Dep.) at 100:17-24; 101:22-102:6; 103:4-17.

Marks identifies the following hypothetical deals Lively would have been offered between August 2024 and August 2029:

- At least three to four lead roles in high budget productions consisting of:
  - A prequel or sequel to It Ends With Us with total compensation to Lively between $25 million and $35 million (including profit participation between $10 million and $15 million);
  - Other major studio theatrical films with total compensation to Lively between $10 million and $15 million per project plus profit participation;

85

491311.3

- o Films made by streamers with total compensation to Lively between $12.5 million and $20 million per project;

- Two to three lead roles in independent or limited budget films with total compensation to Lively between $500,000 and $5 million per project plus profit participation;

- One or two smaller or cameo roles in films with total compensation to Lively between $750,000 and $1.25 million per project plus profit participation;

- One or two television series total compensation to Lively of up to $20 million;

- One or two endorsement deals yielded $7 million and $10 million each; and

- Ten to fifteen smaller engagements valued between $250,000 and $400,000 each.

Ex. 37 (Marks Rpt.) at 1-2.  Marks' opinion is based on his experience and purportedly "corroborated" by Lively's agent and manager, but not conversations with Lively.  Ex. 38 (Marks Dep.) at 15:8-16:8; 18:1-20:17; 78:10-16; 110:6-21.

As a basis for future compensation, Marks only reviewed Lively's film compensation since 2017 and prior endorsement deals.  Ex. 38 (Marks Dep.) at 32:1-15; 110:6-21.  According to Marks, a 2017 deal earned Lively $1,460,710 for A Simple Favor, including profit participation.  Ex. 37 (Marks Rpt.) at 9.  Subsequent to A Simple Favor, Lively earned $2.25 million for The Rhythm Section, although the film was "not successful at the box office at all".  Id.; Ex. 38 (Marks Dep.) at 114:9-16.  In 2023, Lively earned $9.75 million for Another Simple Favor including a streamer buyout bonus.  Ex. 37 (Marks Rpt.) at 10.  For It Ends With Us., Lively earned $7,634,238 inclusive of bonuses and profit participation through May 2025.  Ex. 37 (Marks Rpt.) at 10.

Marks opines that <mark>although Lively worked sporadically prior to 2024, he understands from Lively's deposition and her manager that she would be available for all of the opportunities he identified because she had "turned over a new leaf", "was now ready to work and take advantage of the opportunities she had."</mark> Ex. 38 (Marks Dep.) at 28:15-31:25. Marks does not identify any specific opportunity that was lost, but rather bases his opinion on hypothetical future projects.

<mark>Marks does not identify any projects for which Lively would be expected to earn income between now and August 2029.</mark> Ex. 37 (Marks Rpt.). In other words, Marks' opinion assumes Lively will earn no income whatsoever prior to August 2029 due to Defendants' conduct.

### B. Marks' Opinion Is Not Based On Sufficient Facts Or Data And His Methodology Consists of Pure Speculation

Where a damages analysis "relies almost exclusively on speculation as to future events", it is inadmissible. *Zaccaro v. Shah*, 746 F. Supp. 2d 508, 518 (S.D.N.Y. 2010). Specifically, "[w]here lost future earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). "Expert testimony as to lost earnings that is not grounded in a sufficient factual foundation should be excluded." *Dixon*, 2025 WL 2417299, at *5. Prediction of earnings in the entertainment industry is particularly uncertain. *See, e.g., Kenford Co. v. Erie Cnty.*, 67 N.Y.2d 257, 263 (1986).

### 1. Marks' Opinion of Lost Earnings From Acting Should be Excluded

Marks bases his opinion on the value of Lively's lost earnings on four films starring Lively between 2017 and 2024: <mark>A Simple Favor, The Rhythm Section, Another Simple Favor and It Ends With Us.</mark> Ex. 37 (Marks Rpt.) at 8; Ex. 38 (Marks Dep.) at 32:1-15. <mark>Marks did not consider her compensation for any projects prior to 2017.</mark> Ex. 38 (Marks Dep.) at 79:24-82:7.

Marks did not consider any offers Lively may have received that did not result in employment. Ex. 38 (Marks Dep.) at 46:21-47:21; 79:16-23; 102:21-103:2. Marks did not know whether Lively has been offered any employment since It Ends With Us premiered but assumes he would have been told if an offer had been made. Ex. 38 (Marks Dep.) at 91:15-22. Marks admits that prior to It Ends With Us, Lively had never been cast as a lead in any high budget film production. *Id.* at 53:8-17.

Marks calculates that Lively earned just over $21 million[28] in acting income between 2017 and 2025 yet opines that she would have earned up to $132.5 million[29] "to a reasonable certainty" for acting services between August 2024 and 2029 but for Defendants' conduct. Ex. 37 (Marks Rpt.) at 1-2, 8-11; Ex. 38 (Marks Dep.) at 103:4-17.

Marks opines Lively would earn up to $35 million on a prequel or sequel to It Ends With Us despite not knowing who owns the rights to such a project. Ex. 38 (Marks Dep.) at 61:20-62:4 ("the offer might have come from a third party who bought the rights from Wayfarer. It may have come from a third party that consolidated rights with the book. I don't know the rights situation."). In fact, Wayfarer owns the rights to derivative work and Marks did not consider that the parties would likely never work with each other again. *Id.* at 61:20-62:21. Most importantly, no sequel or prequel has been developed – an obvious predicate to Lively being offered a role in the film. Marks simply speculates that Lively would be offered up to $35 million for a role that does not even exist. Moreover, the $35 million projected income includes $15 million in

---

[28] $1,460,710 (A Simple Favor) + $2,250,000 (The Rhythm Section) + $9,750,000 (Another Simple Favor) + $7,634,238 (It Ends With Us) = $21,094,948.

[29] Lively's retained damages expert Richard Sippel calculated the sum of the opportunities identified by Marks as $132,500,000 in his own expert report. Ex. 39 (Sippel Rpt.) at 4-7 ($90,000,000 for Studio Film Opportunities + $22,500,000 for Independent, Limited Budget and Cameo Opportunities + $20,000,000 for Limited Television Series Opportunities).

491311.3

contingent compensation which would only occur if the sequel/prequel resulted in blockbuster success.  The performance of any potential prequel or sequel is highly speculative and not within Marks' expertise.  Lively has starred in her share of flops (e.g., The Rhythm Section) and her inclusion in a sequel in no way guarantees massive success at the box office leading to a guarantee of $15 million in contingent compensation.

Marks also failed to consider whether Lively's various theoretical film projects would conflict with the contractual obligations she owes to businesses she has founded, including Betty B Holdings, LLC and Family Hive, LLC.  Ex. 38 (Marks Dep.) at 72:5-10.  For example, Marks did not consider Lively's obligations under the Promotional Services and License Agreement with Family Hive, LLC which requires Lively to spend a certain amount of time per year participating in photo and video shoots, making personal appearances to endorse the brand, attending interviews or business meetings, posting content on social media, and general promotion.  Ex. 38 (Marks Dep.) at 72:5-10; 103:21-104:19; Ex. 22 (Family Hive Promotional Services Agreement) at § 2.4, Exhibit B.  Family Hive testified that Lively has always met her professional obligations to the company, a fact not considered by Marks.  Ex. 21 (Family Hive Dep.) at 228:22-229:9; 38 (Marks Dep.) at 72:5-10; 73:18-25; 74:16-24.

Marks claims he corroborated his opinion with Lively's longtime manager, Justin Grey Stone, and agent, Warren Zavala.  Ex. 38 (Marks Dep.) at 18:13-20:17.  Marks spoke to Grey Stone and Zavala after he formed his opinion, and never spoke with Lively. *Id.*; 78:10-16.

Marks' opinion is also based on his assumption that Lively will not secure any employment or income prior to August 2029.  He identifies a single project where Lively earned $210,000 for voice work but his future analysis does not identify other income Lively would likely receive in the next five years.  Ex. 37 (Marks Rpt.) at 14.  Although Marks relied on

89

Lively's agent, Warren Zavala, to "corroborate" his opinion, he apparently discounted Zavala's sworn testimony that Lively was likely to receive acting offers whether or not she prevails in her litigation.  Ex. 40 (Zavala Dep.) at 149:16-22 ("I think she's gonna get work either way.").

Under *Zaccaro*, *Boucher*, and *Dixon*, Marks' opinion should be excluded.  Marks' conclusions are purely speculatory and not based on Lively's employment history.  Marks' opinions also rely on unrealistic assumptions, including the assumptions that Lively would be available for this range of projects and that Lively would not earn any money at all through 2029 but for Defendants' conduct.

In *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21–22 (2d Cir. 1996), the Court excluded the plaintiff's damages expert who calculated lost earning based on the assumption the plaintiff would work full time for the rest of his career despite the fact that he had worked sporadically prior to the defendant's alleged conduct.  The Court noted "[t]he expert's projection thus was based on assumptions about [plaintiff's] employment prospects that represent a complete break with his work history of seasonal and intermittent employment." *Id.* at 22.  The Court also noted that although the plaintiff had been engaged in full time employment just prior to the defendant's alleged conduct and had been making more money than before, "this does not support an assumption that his employment prospects had undergone any fundamental change…, and it certainly cannot support an inference that, at the time he was injured, [plaintiff] was on the verge of a twenty-four year career of clock-punching." *Id.*

Similarly, in *Dixon*, 2025 WL 2417299, at *5–6, the Court excluded plaintiff's damages expert opining on future lost earnings as too speculative.  The expert opined that the music industry executive plaintiff would have earned somewhere between millions and hundreds of millions of dollars but for the defendant's alleged conduct, untethered to any factual basis.  *Id.* at

90

491311.3

\*5.  Moreover, the expert assumed that the plaintiff would not only remain successful but would rise to reach "the pinnacle of the profession". *Id.* The Court found the hypothetical career trajectory "lack[ed] sufficient evidentiary foundation, and thus cannot form the basis of an expert opinion." *Id.* The Court further noted that the expert's "conclusion that Plaintiff's lost earnings could range anywhere from seven to nine figures annually highlights the inherently speculative nature of his opinion." *Id.*

Lively's employment history shows she worked sporadically, often declining roles and work which would conflict with her husband, Ryan Reynolds' schedule, accepting only four acting roles since 2017.  Ex. 38 (Marks Dep.) at 46:21-47:6 ("My information comes from the agent and the manager saying that she got lots of offers. She was very picky…"); 74:25-75:11 ("I have seen through my research of the documents that have been provided to me, that she was picky about her roles, that she preferred not to work when her husband was working.").  Marks did not interview Lively, simply relying on his review of documents, and confirmation of his astronomical earnings opinion by people with a financial interest in Lively's professional success.  Nor does Marks' opinion conform to Lively's most recent employment.  The highest compensation ever received by Lively was $9 million with a $750,000 buyout for Another Simple Favor.  Marks has no basis to conclude she would receive $35 million for a single future project.  Nor does he have a basis to assume she would command a 25% streamer buyout when her past history shows she received 8%[30] at most.

---

[30] $750,000 / $9.000,000 = 8.3%.

Marks' wild speculation that Lively would have earned between $67,500,000[31] and $158,500,000 but for Defendants' conduct has no basis in fact and fails to account for any income she is likely to earn prior to August 2029.  Moreover, Marks' exceedingly broad range of potential earnings between $67.5 million and $158.5 million "highlights the inherently speculative nature of his opinion."  See *Dixon, supra,* 2025 WL 2417299, at *5.

2.     Marks' Opinion of Lost Earnings From Endorsements Should be Excluded

Marks does not claim to be an expert in endorsement contracts, yet opines Lively would likely receive endorsement offers over the next five years worth up to $26 million[32].  Ex. 37 (Marks Rpt.) at 18.  Marks bases his opinion on his understanding that between 2008 and 2023, Lively had various endorsement deals valued between $42,000 and $7.5 million (L'Oreal).  Ex. 37 (Marks Rpt.) at 12.  Of the seven previous endorsement deals identified by Marks, the average value is $1,352,429, with the L'Oreal deal being an extreme outlier at $7.5 million.  Exs. 41-47 (Endorsement contracts).  The second and third highest value deals were $1.05 million and $300,000.  Exs. 41, 46.  The total value of all seven prior endorsement deals is less than $10 million.  Exs. 41-47.

Marks also failed to consider exclusivity clauses that might restrict Lively's availability for other endorsements.  Ex. 38 (Marks Dep.) at 103:21-111:7.  For instance, Marks considered Lively's past deal with L'Oreal when valuing expected future endorsement deals.  However, he did not consider whether Lively's current obligations to her own hair care brand, Blake Brown,

---

[31] Lively's retained damages expert Richard Sippel used Mark's "range of opportunities" to calculate a minimum damages amount of $67,500,000 and a maximum damages amount of $158,500,000 for Lively's lost earnings.

[32] Lively's retained damages expert Richard Sippel calculated the sum of the endorsement opportunities identified by Marks as $26,000,000 in his own expert report.  Ex. 39 (Sippel Rpt.) at ¶ 31 ($20,000,000 for two multi-year endorsement deals valued at $10,000,000 each) + $6,000,000 for up to 15 "smaller engagements" valued at $400,000 each).

would prevent endorsements for hair care brands like L'Oreal. Ex. 38 (Marks Dep.) at 110:6-111:7. In fact, Lively is subject to an exclusivity agreement precluding her from entering into an endorsement agreement for competitive hair care products. Ex. 22 (Family Hive Promotional Services Agreement) at § 2.2. Marks is not an expert in endorsement deals, his opinion lacks any basis in fact, and relies purely on speculation and conjecture. The opinion should be excluded.

For the foregoing reasons, Marks' opinions should be excluded in their entirety.

## VII.    THE COURT SHOULD EXCLUDE THE TESTIMONY OF MICHAEL SIPPEL

The opinion of expert, Michael Sippel, should be excluded because it fails to meet the admissibility requirements mandated by Federal Rule of Evidence 702. Sippel's calculations are based on the highly speculative opinion of retained expert Richard Marks, who the Wayfarer Parties have moved to exclude. Should the Court exclude Marks' testimony, Sippel's opinion lacks any foundation and must be excluded.

Sippel offers an "alternative calculation", where he takes one-year's earnings and multiplies them by five. The opinion is, to say the least, speculative. Sippel, a forensic accountant, does not possess the expertise to opine that Lively would earn as much as she earned in her most profitable 12-month period every year for the next five years, especially when her work history shows she worked sporadically and often turned down offers.

Like Marks' opinion on which it is based, Sippel's alternative calculation is speculative and lacking foundation.

### A.    Sippel's Opinion

Sippel offers two opinions. First, he opines that "based on the expert report of Mr. Richard Marks" Lively has lost professional opportunities "within range of $67,500,000 to $158,500,000" which results in a damages claim for lost opportunities of $41,550,956 to $87,793,592 after applying certain deductions. Ex. 39 (Sippel Rpt.) at 3. Second, Sippel offers

93

491311.3

an alternative calculation of damages, completely disregarding Marks' opinion, basing a five-year calculation on Lively's earnings in the twelve month period preceding Defendants' alleged misconduct, opining that Lively suffered $34,300,124 in lost opportunities. *Id.* at 11. Both opinions should be excluded.

### B.     Sippel's Opinion Based on the Marks Report Should be Excluded

As described in Defendants' Motion to Exclude Richard Marks' testimony, Marks' opinions are speculative and not based on Lively's employment history. Marks' opinion is the foundation for Sippel's. Should the Court exclude Marks' opinion, Sippel's would be without any foundation, mandating exclusion. Even assuming Marks' opinion is admissible, Sippel's calculations assume that the variety of opportunities identified by Marks "would be spread as equally as possible" which would have the effect of maximizing Lively's earnings over five years. *See, e.g.*, Ex. 39 (Sippel Rpt.) at ¶ 18. Sippel provides no basis for that assumption. Marks merely opined that Lively would be offered up to a certain number of projects over five years but did not specify the timing of those projects and whether conflicts would interfere with her ability to participate. Sippel's analysis assumes that Lively would be available for all projects without regard for professional or personal conflicts.

Sippel also assumes that Lively will not obtain any employment or income prior to August 2029. He calculates an offset for a single project where Lively earned $210,000 for voice work but does not offset any income Lively would likely receive in the future. Ex. 39 (Sippel Rpt.) at ¶ 37. Sippel apparently did not consider the testimony of Warren Zavala, Lively's agent, that Lively was likely to receive acting offers whether or not she prevails in her litigation. Ex. 40 (Zavala Dep.) at 149:16-22 ("I think she's gonna get work either way."). Failure to identify any mitigation of damages should result in Sippel's exclusion.

491311.3

### C.    Sippel's Alternative 1-Year Average Damages Opinion Should be Excluded

Where a damages analysis "relies almost exclusively on speculation as to future events", it is inadmissible. *Zaccaro*, 746 F. Supp. 2d at 518. Specifically, "[w]here lost future earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). "Expert testimony as to lost earnings that is not grounded in a sufficient factual foundation should be excluded." *Dixon*, 2025 WL 2417299, at *5; *see also Bank of New York Mellon v. WMC Mortg., LLC*, 2015 WL 4887446, at *9 (S.D.N.Y. Aug. 17, 2015) (excluding expert opinion relying on data without "an adequate basis" that such data was "sufficiently reliable").

Although not included in his Summary of Opinion (*See* Ex. 39 (Sippel Rpt.) at ¶ 13), at the very end of his report Sippel includes a single paragraph with an additional "alternative approach" to damages which disregards Marks' opinion entirely. Ex. 39 (Sippel Rpt.) at ¶ 44 ("As an alternative approach, I was asked[33] to quantify damages using the last one year of Lively's actual activity just prior to the alleged Wayfarer Defendants' misconduct as the basis for the estimated Lost Professional Opportunities during the Five-Year Period.").

To perform this calculation, Sippel purported to add up Lively's compensation for the twelve-month period just prior to the alleged misconduct, stating in his report "During that year, Lively earned a total of $11,750,000, consisting of compensation from *Another Simple Favor, It Ends With Us*, and a Meta event." Ex. 39 (Sippel Rpt.) at ¶ 44. Although his report does not

---

[33] The fact that Lively asked Sippel to provide an alternative approach that discounted Marks' opinion entirely and results in a damages figure $7 million less than minimum damages calculation based on Marks' opinion (and $43 million less than the maximum damages calculation based on Marks' opinion) suggests Lively herself believes Marks' opinion vastly overstated any likely income.

identify the date the alleged misconduct began, Sippel's backup calculations indicate he used the twelve month period between August 6, 2023 and August 5, 2024.  Sippel then multiplied Lively's twelve month income by 5 to opine she would have earned $58,750,000 between August 2024 and August 2029 but for Defendants' alleged conduct.  Ex. 39 (Sippel Rpt.) at ¶ 44.  After making deductions such as fees owed to managers and agents and present value reductions, Sippel states that based on the 1-year average alternative analysis, "it is reasonable to conclude that the Lost Professional Opportunities to Lively are $34,300,124."  *Id.*

Sippel's opinion based on a cherry-picked twelve-month period of Lively's earnings should be excluded.  First, Sippel has not demonstrated any expertise in determining that Lively would earn the same amount of money every year that she earned between August 2023 and August 2024.  To the contrary, Sippel states that he was instructed to perform the calculation by others.  Ex. 39 (Sippel Rpt.) at ¶ 44.  Thus, Sippel's calculation is a backdoor attempt to present Lively's own opinion rather than his own.  Sippel has not provided any basis to conclude that Lively would earn $11,750,000 every year over the next five years, nor has he demonstrated that he could offer such an opinion.[34]  Sippel's report and resume demonstrate that he is a forensic accountant but do not demonstrate any experience or expertise in estimating future income for movie stars.  Ex. 39 (Sippel Rpt.) at ¶¶ 1-5 and Exhibit A.  Therefore, Lively has not shown that Sippel's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue" and his opinion should be excluded.

---

[34] Even if Sippel did possess expertise to opine on Lively's lost earnings, it would only serve to highlight the speculative nature of the opinions of Lively's experts given that he calculates maximum gross earnings over five years as $58,750,000; considerably smaller than the $158,500,000 identified by Lively's other expert, Richard Marks.

491311.3

In addition, the $11,750,000 calculated by Sippel includes compensation earned outside of the one-year period he identified.  For example, while Sippel includes the $750,000 buyout payment for Another Simple Favor in his twelve-month period between August 6, 2023 and August 5, 2024, Sippel's report notes that Lively did not receive any portion of the buyout payment until at least May 2025 with some payments to be made in 2026.  Ex. 39 (Sippel Rpt.) at ¶ 19.[35]  Therefore, including $750,000 as part of her one-year period earnings improperly inflates future earnings over the next five years by millions of dollars.

Moreover, Sippel's twelve-month average opinion is entirely speculative and is not based on Lively's employment history.  As evidenced by Marks' report and testimony, Lively worked sporadically between 2005 and 2024, often turning down work and declining to work at the same time as her husband, Ryan Reynolds, accepting only four acting roles since 2017.  Ex. 37 (Marks Dep.) at 46:21-47:6 ("My information comes from the agent and the manager saying that she got lots of offers. She was very picky…"); 74:25-75:11 ("I have seen through my research of the documents that have been provided to me, that she was picky about her roles, that she preferred not to work when her husband was working.").

Lively's income between August 2023 and August 2024 was much higher than any prior year, mostly due to the one time payment of $9,000,000 on Another Simple Favor.  Marks admits that prior to It Ends With Us, Lively had never been cast as a lead in any high budget film production.  Ex. 38 (Marks Dep.) at 53:8-17.  Also, according to Marks, the most Lively was paid in a single year prior to 2023 for an acting job was $2.25 million for the flop, The Rhythm

---

[35] "After principal photography for *Another Simple Favor* wrapped in May 2024, the first payment (25%) of the Buyout was received in May 2025, one year (or 12 months) after, and the second payment (25%) was received in August 2025, one quarter (or 3 months) later. Then, the remaining 50% is to be paid in two equal quarterly payments thereafter."

491311.3

Section.  Ex. 37 (Marks Rpt.) at 8-12.  Sippel provides no basis for extrapolating almost $12 million in income every year when Lively's past employment does not come close to that amount.  Any opinion that she would have made exponentially more money is based on pure speculation.  Basing an opinion on a single twelve month period to extrapolate five years of expected income is not based on sufficient facts or data and is not the product of reliable principles and methods.  Therefore the opinion should be excluded.

For the foregoing reasons, Sippel's opinions should be excluded in their entirety.

## VIII.    THE COURT SHOULD EXCLUDE THE TESTIMONY OF ASHLEE HUMPHREYS

Humphreys was "engaged by counsel on behalf of Blake Lively to analyze the impact to. Lively's reputation, if any, from the retaliation campaign that was orchestrated by the Defendants to manipulate online discussion of Lively in August 2024."  Ex. 48 (Humphreys Rpt.) at ¶ 8.  Humphreys also calculated the number of online "impressions" (*i.e.*, views) of what she calls the "At-Issue Statements" made by Defendants' attorney Bryan Freedman about Lively, the alleged reputational impact the At-Issue Statements had on Lively and the cost to repair the alleged damage to Lively's reputation.  *Id*. at ¶ 9.  Humphreys found that Lively's reputation was harmed by Defendants' purported retaliation campaign, that the At-Issue Statements harmed Lively's reputation, and that a reputational repair campaign to counteract that harm would cost between approximately $14.625 – $24.375 million.  *Id*. at ¶ 11.

However, Humphreys' opinions are based on unreliable analysis, and her testimony must be excluded.  Dr. Humphreys' opinions pertaining to the At-Issue Statements should be excluded because Lively's defamation claim based upon the At-Issue Statements has been dismissed, Dkt. No. 1273 at 149, and thus such opinions are irrelevant.

98

491311.3

A.    **Humphreys Admitted That Her Opinion Regarding Defendants' Purported Retaliation Campaign Was Based Entirely on Dr. Mayzlin's Analysis and Therefore Suffers from the Same Defects**

Humphreys admitted that she did not investigate whether Defendants engaged in an online retaliation campaign against Lively but instead relied on Dr. Mayzlin's analysis of this issue. Ex. 49 (Humprheys Dep.) at 67:7-69:13, 76:4-77:7, 84:1-6, 187:15-188:16. Thus, the first part of Humphreys' analysis, regarding damage allegedly suffered by Lively due to Defendants' purported retaliation campaign, suffers from the same defects as Dr. Mayzlin's analysis. Accordingly, Humphreys' opinion must likewise be excluded.

B.    **Humphreys Failed to Consider Alternative Explanations for Any Alleged Damage to Lively's Reputation**

Other than the At-Issue Statements, Humphreys did not investigate or consider any alternative explanations for the purported damage to Lively's reputation, even though she conceded that "it is possible for other statements to cause harm to Blake Lively's reputation." Ex. 49 (Humphreys Dep.) at 91:23-94:24. Humphreys did not consider a bevy of prior problematic acts taken or statements made by Lively (which, of course, were not instigated by Defendants), including:

- Lively's ill-conceived attempt to market the Film with the phrase "Wear Your Florals" (*id.* at 131:2-135:21);

- Lively causing an assistant director on a previous film to quit her job (*id.* at 135:23-136:19);

- Lively refusing to attend the premiere of the Film with Baldoni and encouraging other cast members to unfollow Baldoni online (*id.* at 140:16-141:8);

- Objections to Lively's casting in the Film and her questionable choice of wardrobe (*id.* at 141:10-142:1);

- Lively's wedding at a former slave plantation (*id.* at 142:3-9);

- Lively bullying of her staff for leaving a styling hairpin in her hair for a set of interviews she did in 2016 (*id.* at 143:15-144:10);

99

- Lively's "little bump" comment to a reporter in an infamous interview (*id.* at 148:14-151:3);

- The appearances by Lively and her husband Ryan Reynolds in a Saturday Night Live episode in which Reynolds made a tasteless comment alluding to this litigation (*id.* at 151:10-154:13);

- Lively threatening to pull Taylor Swift's songs from the Film if Lively's edit of the Film was not used (*id.* at 169:4-170:9);

- Lively promoting her own commercial brands in conjunction with the Film. *Id.* at 171:2-24.

Finally, Humphreys did not consider that attention to these past incidents may have resurfaced because of the advanced press for the Film in July 2024 and its premiere in August 2024. *Id.* at 138:12-140:3, 168:1-12. Humphreys' failure to consider these obvious alternative explanations for the alleged damage to Lively's reputation renders her opinion "essentially worthless" and suitable for preclusion. *In re Wireless Telephone Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 428 (S.D.N.Y. 2005) (expert's failure to test for "obvious and significant alternative explanations" renders analysis "essentially worthless") (internal quotation omitted); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d 330, 455 (S.D.N.Y. 2025) (experts' failure to substantively address compelling evidence warranted exclusion of experts' models).

C.      **Humphreys' Opinions Concerning the At-Issue Statements are Irrelevant**

Lively's Fourteenth Cause of Action for defamation against Wayfarer, Baldoni and Heath was solely based upon the At-Issue Statements. Dkt. No. 520, ¶¶ 447-465. In its Opinion & Order dated April 2, 2026, the Court granted summary judgment to those defendants on the defamation claim. Dkt. No. 1273 at 149. Therefore, Humphreys' opinions related to the At-Issue Statements should be excluded. *See Velez v. Lasko Prods., LLC*, No. 22-cv-08581, 2025 WL 1865165 (S.D.N.Y. July 7, 2025) (denying defendant's *Daubert* motion as moot given summary

491311.3

judgment in defendant's favor); *Kairam v. West Side GI, LLC*, No. 18-cv-01005, 2025 WL 2935321, at *32 (S.D.N.Y. June 21, 2025) (denying, as moot and without prejudice, motion to exclude portions of expert report concerning liability because Magistrate Judge recommended dismissal of claims); *Zhang v. City of New York*, No. 17-cv-5415, 2023 WL 6316249 (S.D.N.Y. Sept. 28, 2023) (denying, as moot, motion to preclude expert testimony given dismissal of claims); *see also Adams-Flores v. City of New York*, No. 18-cv-12150, 2024 WL 519819, at *3-*4 (S.D.N.Y. Feb. 9, 2024) (granting motion in limine to exclude portions of exhibits that are irrelevant to remaining claims).

In the unlikely event that Humphreys' opinions concerning the At-Issue Statements are not excluded based upon the dismissal of the defamation claim, such opinions should be excluded for the reasons set forth below.

### D. Humphreys' Conclusion That the At-Issue Statements Damaged Lively's Reputation is Not Supported by Her Analysis

Humphreys' conclusion that the At-Issue Statements damaged Lively's reputation is not supported by her analysis. Humphreys failed to interview any of the creators of the posts she examined, or the subjects of the interview data she used, to determine if they were, in fact, influenced by the At-Issue Statements. Ex. 49 (Humphreys Dep.) at 96:6-98:10, 121:5-123:1, 130:11-131:1. Moreover, Humphreys' analysis did not consider any countervailing effects to the At-Issue Statements by positive statements that may have appeared contemporaneously with the At-Issue Statements, or even in the same articles and posts that contained the At-Issue Statements. *Id.* at 114:24-117:6, 184:10-185:24. Furthermore, Humphreys admitted that she had not spoken with any of the parties in this case. *Id.* at 128:8-21. Considering all these issues, Humphreys' analysis cannot plausibly support the conclusion that Freedman's At-Issue Statements unequivocally caused harm to Lively's reputation. Thus, Humphreys' testimony

should be excluded.  *See Crown Cork & Seal Co. Master Ret. Trust v. Credit Suisse First Boston Corp.*, No. 12-cv-05803, 2013 WL 978980, at *3 (S.D.N.Y. Mar. 12, 2013) (concluding opinion should be rejected when "based on unfounded extrapolation, insufficient facts or data, or unsupported suppositions").

**E.    Humphreys' Analysis of the At-Issue Statements Fails to Satisfy Other Elements of the Reliability Standard**

Humphreys' analysis of the At-Issue Statements fails to satisfy at least two other elements of the *Daubert* reliability standard.  Humphreys used SEMRush, a third-party tool, to measure the views of the At-Issue Statements for online news.  Ex. 48 (Humphreys Rpt. ¶ 127).  However, at her deposition, Humphreys was unable to address any of the common concerns about SEMRush, including that its estimates can be significantly inaccurate, or to cite any peer-reviewed studies that relied upon SEMRush data.  Ex. 49 (Humphreys Dep.) at 154:15-157:9.  Moreover, as pointed out by Professor Alexander in her report, Humphreys' model counts "impressions" (*i.e.*, views) of the At-Issue Statements without de-duplicating the individuals who create those impressions, which, among other things, leads to an overestimate of "the scale of the audience requiring corrective messaging."  Ex. 4 (Alexander Rpt.) at ¶¶ 163-64, 167.

Given that Humphreys' analysis relies upon a tool which has not been peer-reviewed, and given that her damages estimate contains a potentially high rate of error, her analysis is unreliable and her testimony should be excluded.  *Daubert*, 509 U.S. at 593.

**F.    Humphreys' Estimate of the Costs of a Reputational Repair Campaign is Unreliable Because She Failed to Consider Lively's Existing Social Media Resources**

Humphreys' estimate of $14.625 – $24.375 million for a reputational repair campaign for Lively is unreliable because it critically fails to consider Lively's own extensive media resources for conducting such a campaign.  Humphreys did not consider how many social media followers

491311.3

Lively and her husband Reynolds had, or how many millions of followers friends of theirs such as Taylor Swift had.  Ex. 49 (Humphreys Dep.) at 125:24-128:7.  As Professor Alexander noted in her report, Lively had 42.6 million followers on her personal Instagram account alone as of March 2025, with hundreds of thousands more for her Betty Booze brand account.  Ex. 4 (Alexander Rpt.) at ¶¶ 159-60.  Humphreys also did not consider the ameliorative reputational effect that could occur if Lively obtains a jury verdict in her favor.  Ex. 49 (Humphreys Dep.) at 173:25-175:22.  Although Humphreys attempted to explain at her deposition why reputational repair through these avenues would supposedly not be effective, she failed to offer any peer-reviewed sources to support her view and, in any event, she failed to take these alternative resources into account.  Thus, Humphreys' estimate should be deemed unreliable and her testimony on this issue should be excluded.

## IX.    CONCLUSION

For the foregoing reasons, the Court should preclude the testimony of Lively's experts.


Respectfully submitted,

Dated:  April 10, 2026                    /s/ Ellyn S. Garofalo
        New York, New York                LINER FREEDMAN TAITELMAN
                                          + COOLEY, LLP
                                          Bryan J. Freedman (pro hac vice)
                                          Ellyn S. Garofalo (pro hac vice) 1801
                                          Century Park West, 5th Floor Los
                                          Angeles, CA 90067
                                          Tel: (310) 201-0005
                                          bfreedman@lftcllp.com
                                          egarofalo@lftcllp.com


                                          SHAPIRO ARATO BACH LLP
                                          Alexandra A.E. Shapiro
                                          Jonathan P. Bach
                                          Alice Buttrick

103

1140 Avenue of the Americas, 17th Floor
New York, NY 10036
Tel: 212-257-4881
ashapiro@shapiroarato.com
jbach@shapiroarato.com
abuttrick@shapiroarato.com

MEISTER SEELIG & SCHUSTER PLLC
Mitchell Schuster
Kevin Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
ms@mss-pllc.com
kaf@mss-pllc.com

AHOURAIAN LAW
Mitra Ahouraian (pro hac vice)
2029 Century Park East, 4th Floor
Los Angeles, CA 90067
Tel. (310) 376-7878
mitra@ahouraianlaw.com

*Counsel for the Wayfarer Parties*

104

491311.3