# EXHIBIT 3

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---

BLAKE LIVELY,

Plaintiff,

vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)

25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

_____

JENNIFER ABEL,

Third-party Plaintiff,

vs.

JONESWORKS, LLC,

Third-party Defendant.

_____

WAYFARER STUDIOS LLC, et al.

Consolidated Plaintiffs,

vs.

BLAKE LIVELY, et al.

Consolidated Defendants.

_____

**CONFIDENTIAL**


VIDEO-RECORDED DEPOSITION OF DINA MAYZLIN

APPEARING REMOTELY FROM

Los Angeles, California

Tuesday, December 2, 2025


Stenographically Reported by:

Ashley Soevyn, CALIFORNIA CSR No. 12019

APPEARING REMOTELY FROM MARINA DEL REY, CALIFORNIA

JOB No. 7771655

Pages 1 - 204


Page 1

CONFIDENTIAL

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---

BLAKE LIVELY,

Plaintiff,

vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)

25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

_____

JENNIFER ABEL,

Third-party Plaintiff,

vs.

JONESWORKS, LLC,

Third-party Defendant.

_____

WAYFARER STUDIOS LLC, et al.

Consolidated Plaintiffs,

vs.

BLAKE LIVELY, et al.

Consolidated Defendants.

_____

**CONFIDENTIAL**

Video-recorded Deposition of DINA MAYZLIN, taken on behalf of the Wayfarer parties, with all parties appearing via video conferencing beginning at 10:02 a.m. and ending at 3:27 p.m. on Tuesday, December 2, 2025, before me, ASHLEY SOEVYN, California Certified Shorthand Reporter No. 12019.

Page 2

discontinuity design.  So I see a big change and I   11:18:11
--

Q    I'm sorry, I didn't understand what you just said.  Could you repeat?

A    Okay.  Are you having trouble hearing me?   11:18:17

Q    No, it was just a word.  You use some type of design.

A    Oh, okay.  I used what is called discontinuity design, discontinuity.  Okay?

Q    Okay.   11:18:29

A    It's this idea that something changes, you know, something changes suddenly and that's one type of causal inference technique.  And so the discontinuity here was the sudden change in August.  Change in conversations and ultimately change, you   11:18:48 know, a fall in sales.

So what I wanted to do was to reach out to management and to make sure there were no other exogenous factors that affected that.  And by exogenous factors, I mean other things that were   11:19:03 going on.  For example, something in the competitive space, something in the pricing, something as part of, you know, just the kind of competitive marketing landscape.  For this reason, I wanted to have -- to check in with the brands.  You know, so the three   11:19:24

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

brands that were involved.    11:19:27

And so I instructed the AG team to ask, were there any other changes, you know, perhaps that you saw?  Something your competitors were doing, the pricing, or anything like that.  And Marimer said    11:19:40 no, there were no other changes.  You know, the -- what was going on was what is discussed in the case and my report, was the change in conversations, the -- you know, the -- and then the controversy and, you know, the tanking of the sales.    11:19:58

And for Betty B Holdings, the same thing. I wanted to check, were there other exogenous factors?  Something to do with, you know, anything else.  Anything else that I'm missing, I want to make sure, you know, I'm not misattributing what was    11:20:16 going on to some other factor that I don't know about as a researcher.  But the marketers that are close to the problem, they might -- they know it.

And, again, so I was there for that Zoom call.  And I asked those executives, you know,    11:20:34 several times, were there changes?  Were there changes?  And other changes in the marketing of the product, in the marketing space or the pricing or anything like that?  And, again, the answer was the same.  What was going on was the controversy that    11:20:54

Page 58

Is it possible that people just don't                11:30:07
like Blake Lively?

MS. MOSES:  Objection.

THE WITNESS:  My data -- so I'm a data
driven person, right?  I'm a scientist.  My data      11:30:16
tells me that the word of mouth about Blake Lively
was very positive before August.  The topics that
were discussed were very positive.  And then there
was a change, you know, very negative change.  So as
a scientist, based on my data, I would have to tell   11:30:32
you that this -- you know, this change was due to
manipulation.

BY MR. SCHUSTER:

Q    Were you aware of anything negative about
Blake Lively prior to August of 2024?  Or are you     11:30:46
only aware of the very positive -- your words --
reaction to Blake Lively?

MS. MOSES:  Objection.

THE WITNESS:  I'm not sure what do you
mean?  Are --                                         11:30:59

BY MR. SCHUSTER:

Q    Were you aware --

A    Are you talking about my data or me as a
person?

Q    You as a person, as the expert on whether   11:31:05

Page 66

really allowing API access to their data.                11:47:24

For example, if I wanted to get data from TikTok for my own research, not even for this case, just for my own stuff, I would have to be approved as a researcher.  It would take a few months.  And they might not approve me.  So, you know, it's up to them.  They're just very protective about their data.  And that's the reason why they don't have API access so I can't really scrape it.  They don't allow that.  And they don't work with big data collection aggregators like Pulsar.

Q    Like Pulsar.  Okay.  And to your knowledge between the time period of May 2024 and February 2025, were videos or comments posted on TikTok about Blake Lively, Justin Baldoni, this case, or any of the other parties to this case?

Do you know?

A    For sure.  For sure there were videos posted.  And in fact, in the report, I used some examples.  I talk about TikTok but in a very kind of anecdotal way because we don't have, you know, Pulsar access.  But yeah, TikTok is a super popular platform.  I wish I had access to them on a -- you know, but I just don't have access to them. Researchers don't have access to them.  It's not    11:48:46

Page 79

CONFIDENTIAL

accessible.  If I were to go and scrape it, I would    11:48:50
be breaking the law.  I don't think I can do it for
myself either.  I would not break the law.

Q    What about Facebook?

A    So Facebook.  Facebook is also very, very    11:49:00
protective of its data.  If an account is private,
you know, and it makes sense, it's kind of a little
bit more personal data.  People share pictures of
kids and so forth.  If an account is private, you
cannot get access to that account at all.  If you    11:49:20
see research being published about Facebook, that's
someone who worked at Facebook or had some kind of
agreement with Facebook.  You can't just go and
access the data through API.  Facebook will be --
will not let you do that.    11:49:37

Q    Could you access it via a subpoena?

MS. MOSES:  Objection.

THE WITNESS:  So I don't know as much of,
kind of, legal access of data in that way.

BY MR. SCHUSTER:    11:49:49

Q    Do you know if subpoenas were served by
the Plaintiff on any social media platforms?

MS. MOSES:  Objection.

THE WITNESS:  So this was all data that I
got -- you know, I got with the help of the AG team.    11:50:05

Page 80

CONFIDENTIAL

A    Yeah.  So what I'm doing here is     12:02:29
something that I've done in my own research.  Which
is, you know, how do you -- how do you diagnose
manipulation in a setting where people are trying to
hide it?  You know, so in this case, they talk about  12:02:43
no fingerprints, you know, untraceable.

So you can't diagnose it conversation by
conversation.  I can't tell you whether, you know, a
Reddit post was -- you know, was put there by a
paid -- you know, a paid -- you know, the street     12:03:00
relations team.  I can't do that.  By design, that's
what it was designed to do, and I can't do it.

But what I can do is, I can look at the
conversations in the aggregate.  So I can't diagnose
it on the micro level, but I can diagnose it on a    12:03:18
macro level.  So what is not untraceable here and
what is not untraceable on any manipulation campaign
is that on the aggregate, the parties are -- you
know, the parties who are trying to manipulate are
changing conversations.  And they are changing them  12:03:34
in a pretty like, you know, like a discontinuous
way.  Right?  So it goes from, you know, positive
and neutral to basically negative.

And that's what I'm doing here.  I'm
looking at -- you know, I'm looking at the aggregate  12:03:49

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

Q    Would you agree that those sites,       11:51:39
Facebook, Instagram, TikTok had photos, videos,
comments, conversations about the parties to this
case?

A    Oh, for sure, 100 percent.  But that's       11:51:55
sort of the dilemma of the researcher.  You can't --
there is some data you have access to and some data
you don't have access to.  These are companies.
They have rules.  You can't just go grab their data
if that's what you need.  I deal with that as a       11:52:12
researcher all the time.  Again, just for my own
research, I would love to have Instagram data.  I
would love to have TikTok data.  These are
proprietary data sources that are -- you know, that
I don't have access to.                               11:52:26

Q    Would any data you were lucky enough to
obtain through a platform like Facebook or TikTok or
Instagram, would that be unreliable data?

MS. MOSES:  Objection.

THE WITNESS:  Can you define to me what       11:52:42
you mean by lucky enough to obtain?  Give me some --
what does that mean?

BY MR. SCHUSTER:

Q    You said it was challenging to obtain it.
So let's say there were no challenges and you were       11:52:51

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

able to obtain the information from those platforms. 11:52:55
You were able to obtain samples from Facebook. You were able to obtain a data set from Instagram or TikTok. Would that information have been reliable, unreliable or something else? 11:53:11

MS. MOSES: Objection.

THE WITNESS: Actually, that's a really interesting point. The data would actually not be reliable. I will tell you why. So, again, if you think about something like Facebook, most of the 11:53:23 accounts are private and some portion of the accounts are not private. So if you're getting data from them, let's say I broke their terms of use. Lucky enough means I'm breaking their terms of use, and I'm scraping stuff. You know, it has to be a 11:53:39 public account. I'm actually not getting representative data.

So since the majority of accounts are private, I'm looking at some portion of accounts that are sort of -- you know, people made a weird 11:53:52 choice to post pictures of their kids and make it public. So it would be a problem.

So any kind of -- I believe that was a problem for, you know, for the rebuttal report. When you get -- I'm very suspicious of Instagram 11:54:07

Page 83

CONFIDENTIAL

level.  I'm looking at -- and I'm looking at all          12:03:55
these different measures, you know, these different
metrics.  So I'm looking at the volume, the
sentiment.

Q    What is the design that you're talking          12:04:03
about?  Does it have a name?

A    So it's -- it's -- so it's not a name.
But it is what I've used before.  So I have a paper
published in AR that uses something similar, kind of
on a large level, on a kind of a high level similar          12:04:22
idea.  Which is to say, look, we don't know, you
know, review by review, what is fake.  But I can
tell you what -- you know, what -- on the aggregate,
what the distribution of reviews looks like.  And
it's the same type of idea here.          12:04:46

Q    Has your design been peer-reviewed?

A    Absolutely.  It was published -- well,
the design on my paper?

Q    The design that you used for the analysis
in this case, has that been peer-reviewed?          12:04:57

A    I mean, the idea behind the design was in
this AR paper that I have.  That was peer-reviewed.
I mean, I didn't send this out to peer review
because it's a legal case.

Q    Okay.  So other than this design being in          12:05:15

Page 91

CONFIDENTIAL

your paper and your paper was peer-reviewed, are you   12:05:17
aware of any other review of the design that you
used in your analysis of this case?

A    Yes.  So, again, it's not -- it's sort of
idea behind the design.  So a lot of the literature   12:05:32
in economics that looks at cheating uses the same
type of idea.  So the guy behind Steve Levitt was
behind the popular Freakonomics blog and books uses
something different -- something very similar.

So for example, you know, you look at   12:05:55
incentives and you look at whether distribution, on
the aggregate, things change based on those
incentives.  You can't -- you don't know for sure --
like you know, you don't know for sure if this
one -- you know, if this -- again, if this review is   12:06:09
fake, if this particular thing is fake, we do know
that on the aggregate things looks different.  If
Steve Levitt has used it.  I use Steve Levitt's work
as inspiration.

There are other papers that look at sort   12:06:24
of, you know, clandestine things.  Things that are
like, you know, like arms trading for countries
where there is an embargo.  They use the same kind
of idea.

Q    I'm still -- I'm not sure I understood   12:06:39

Page 92

CONFIDENTIAL

the answer.                                                    12:06:45

        A    Okay.

        Q    Was your design peer-reviewed?

        A    I'm not sure I understand the question.

        Q    Are you familiar with what peer-reviewed  12:06:50
means?

        A    Was my design -- was my idea behind the
design, yes, it was peer-reviewed.  It was -- the
same idea has been used by me, has been used by
other people who are very famous people.              12:07:05

        Q    Okay.  And has your design been
independently verified?

             MS. MOSES:  Objection.

BY MR. SCHUSTER:

        Q    Did the design that you used in your       12:07:12
analysis, has it been independently verified to say,
yup, this works?

             MS. MOSES:  Objection.

             THE WITNESS:  I think when I was working
on this case, it was a confidential matter.  I          12:07:24
couldn't really send it to a journal or even really
talk to my friends about it.

BY MR. SCHUSTER:

        Q    Yes or a no?

             MS. MOSES:  Objection.                     12:07:35

Page  93

CONFIDENTIAL

as you see fit.                                          12:44:52

THE WITNESS:  Okay.  So my -- so my report, in my report I show that -- I show in all these different ways, you know, in different -- you know, I caught the data different ways, different       12:45:04 types of analyses.  I think I do something like, you know, five or six different types of analysis, that there was a change.

There was a sudden change, a discontinuous change in the online word of mouth, in   12:45:15 the online conversations about Blake Lively.  And I show that there was negativity but that there was negativity that wasn't there before.  So the conversations, again, changed from positive and neutral to, you know, there was a sizable amount of    12:45:34 negative conversations.

But I go beyond that.  So I looked at the topics and I looked at, you know, the themes of the conversations.  And the themes really reflected the scenario planning document, you know, the articles    12:45:54 that we know were planted by the Baldoni team.  And based on that, I infer that yes, there was manipulation of social media by the Wayfarer team.

BY MR. SCHUSTER:

Q    You inferred that there was manipulation.   12:46:05

Page 112

CONFIDENTIAL

why there was a change in opinion about Blake Lively 12:48:34 during the time period that you looked at?

And if I -- I know you talked to the business people and you said to the business people, anything in the marketplace that we should know 12:48:47 about?  But did you consider any other reasons why there was a change in the online commentary about Blake Lively during the period of May 2024 to February 2025?

A    So I mean, in some sense, I did.  Because 12:49:05 I didn't see any kind of discontinuity in what she was doing.  So she was doing -- you know, the little bump video I think was around for a long time.  That was done a long time ago.  So what Blake Lively was doing, you know, was fairly stable. 12:49:23

And so -- and, again, one of the -- like for example, one of the analysis I did was, I looked at the themes in the -- like, for example, the article, the articles planted by the Wayfarer teams. And I looked at, you know, do you see that sort of 12:49:41 text appearing, you know, those four themes.  Are they appearing in conversations.

I saw them appearing in August and not appearing before.  So there was lots of indications that, you know -- and same thing for scenario 12:50:00

Page 115

CONFIDENTIAL

Q    What in those articles was untrue?          12:51:13

MS. MOSES:  Objection.

THE WITNESS:  That's really not part of
my assignment.  Also really beyond my expertise.  I
don't really have insider knowledge.          12:51:24

BY MR. SCHUSTER:

Q    I'm having trouble understanding.  You're
saying that an article was planted that contained a
narrative and if that narrative contains -- is
factually accurate or is true, why is that wrong?    12:51:39

MS. MOSES:  Objection.

MR. SCHUSTER:  I will rephrase the
question.

BY MR SCHUSTER:

Q    Does truth factor into your analysis at    12:51:56
all?

MS. MOSES:  Objection.

THE WITNESS:  Let me clarify.  I am not
making kind of a value judgment on, you know, what
is good and what is bad, what is wrong and what is    12:52:04
right.  All I'm saying is, there was manipulation.
So these were conversations that wouldn't have
happened.  This was an article that wouldn't have
appeared if certain -- if the Wayfarer team didn't
take strategic actions for them to happen.          12:52:20

Page 117

CONFIDENTIAL

the question.                                          12:59:35

BY MR. SCHUSTER:

Q    Were any of her actions -- could any of her actions as they relate to Justin Baldoni be viewed as negative?                                    12:59:43

MS. MOSES:  Objection.

THE WITNESS:  This really seems beyond. You know, you're asking me to make a value judgment. Which I am not comfortable.

BY MR. SCHUSTER:                                      12:59:50

Q    No, I'm asking you to tell me whether there are other factors that could have or should have been considered in your opinion.

Your opinion is, based upon a spike, it had to be the Defendants, or because I saw this    01:00:01 planning scenario, it had to be the Defendants.

I'm suggesting that there are other things that could have or should have been considered by you when trying to determine why there was a spike in online activity.            01:00:12

MS. MOSES:  Objection.  Wait for a question.

BY MR. SCHUSTER:

Q    So if Blake Lively told costars to unfollow Justin Baldoni, that could be viewed as    01:00:24

Page 124

CONFIDENTIAL

being a bully or mean.  That could prompt online    01:00:28

commentators to opine that she's not a very nice

person.  Would you agree with that?

           MS. MOSES:  Objection.

           THE WITNESS:  So what you're telling me    01:00:44

just still doesn't explain all the data.  Right?

So, you know, even if she -- okay, so she says to

unfollow him.  Then why all this information about

what happened on the set?  And also, why would it be

-- you know, if there is one or two people, you    01:01:02

know, putting on something on social media, which

seems odd that they would do that, why would it take

off with such a force?  No, I don't think that's

plausible either.

BY MR. SCHUSTER:    01:01:16

    Q    Have you ever worked on a movie set?

           MS. MOSES:  Objection.

           THE WITNESS:  I have not.

BY MR. SCHUSTER:

    Q    Have you ever worked on a case involving    01:01:20

a movie?

           MS. MOSES:  Objection.

           THE WITNESS:  Yes.

BY MR. SCHUSTER:

    Q    Okay.  Are you familiar with the    01:01:27

Page 125

CONFIDENTIAL

would have to reread the article so I don't know.     01:04:48

Q    Okay.   I think you said it's hard for you to understand why there was a spike in August; is that correct?

MS. MOSES:   Objection.     01:04:56

THE WITNESS:   Well, it's not that hard to understand because it was due to the manipulation.

BY MR. SCHUSTER:

Q    Of which you have no direct evidence, correct?     01:05:06

MS. MOSES:   Objection.

THE WITNESS:   This was outside the scope.

BY MR. SCHUSTER:

Q    Okay.

A    And it wasn't part of my approach.     01:05:11

Q    When did the film premiere?

A    So my recollection is, it also premiered in the beginning of August.

Q    Would the premiere of the film generate commentary about the film?     01:05:25

A    Sure.   Yeah, of course.

Q    So if I told you that between August 6th and 9th, the film premiere events and theatrical release triggered a surge in public engagement, including fan commentary, influencer     01:05:44

Page 129

CONFIDENTIAL

reactions, red carpet coverage, and opening weekend    01:05:48
box office reporting, would that be surprising to
you?

        MS. MOSES:  Objection.

        THE WITNESS:  Not surprising.    01:05:58

BY MR. SCHUSTER:

    Q    Okay.  Would you be surprised to learn
that between August of 2024 and September 2024,
entertainment journalism highlighted speculation
about on-set dynamics and costar relationships?    01:06:13

        MS. MOSES:  Objection.

        THE WITNESS:  What was the question?

BY MR. SCHUSTER:

    Q    Would that surprise you, that
entertainment journalism was highlighting    01:06:24
speculation about on-set dynamics and the costar
relationships between Blake Lively and
Justin Baldoni?

        MS. MOSES:  Objection.

        THE WITNESS:  Not surprising.    01:06:36

BY MR. SCHUSTER:

    Q    What, if anything, did the Defendants
have to do with entertainment journalism
highlighting the speculation about the dynamics and
the costar relationships?    01:06:47

Page 130

CONFIDENTIAL

MS. MOSES:  Objection.                                          01:06:49

THE WITNESS:  So I think that -- what I think about it is the following:  You know, how does a manipulation campaign work?  You know, you kind of have to get the ball rolling.  You get -- you know,     01:06:59 you put these tidbits, you know, and negativity is much more sticky than -- you know, and you put these kind of negative things about the person or the brand.  And then you're hoping that it will get amplified by others.                                        01:07:16

I think what happened in this case was the Wayfarer team got the ball rolling, played some stories, worked with Street Relations to amplify, to take down accounts, you know, and then, yeah, people reacted, people were interested, people passed the     01:07:34 information on and so forth.

So there is still -- the Wayfarer -- my sort of -- you know, my point is that my data tells me that this wouldn't have happened on its own. That the Wayfarer -- you know, there was a presence     01:07:54 of a manipulation.  You know, I can't tell exactly how much of it was it -- was every comment posted? Was it 10 percent of the comments?  Was it 5 percent of the comments?  But they lit the match that then burned the forest.                                         01:08:09

Page 131

CONFIDENTIAL

She's apologized for it.  So it's factual.  It    01:15:35
happened.

My point being, there are things that
happened in Blake Lively's past.  That's my analogy
to something being dormant.  Did you consider that    01:15:44
any of these underlying past acts by Blake Lively,
these dormant acts, could have organically begun to
be talked about in the August time period because of
other acts that Blake Lively did, things she said,
or acts that she took that resurrected people    01:16:04
talking about her past?  Did you consider that?

A    Again, going back to my data, which is
really the thing that I have.  You know, that's my
expertise.  What I see is this kind of a change.
Also, I see that the themes that are talked about    01:16:23
very, very closely mirror the themes that the
publicity team for Baldoni placed into the articles
and also that had in the scenario planning.

So no, I don't think it's plausible that
this stuff kind of appeared on its own.  I think,    01:16:42
you know, people worked to make it appear.

Q    Were there things talked about that were
not a part of the themes that you saw in the
scenario planning?

Were there conversations, negative    01:16:59

Page 138

conversations online about Blake Lively that were    01:17:01
not one of the four themes that you were searching
for?

A    Yes.

Q    Okay.  And is it your opinion that those    01:17:08
conversations, outside of those four themes in this
scenario planning, is it your opinion that those
conversations were also initiated, seeded, planted,
exploited by the Defendants or they are
conversations that organically happened?    01:17:30

MS. MOSES:  Objection.

THE WITNESS:  So this really was outside
of the scope of my assignment.  Again, I don't --
you know, my assignment was to figure out the
existence of manipulation.  I didn't have to -- my    01:17:42
assignment was not to figure out what percentage of
the conversations were generated.  What percentage,
you know, were organic negative -- organically
negative or planted.

But what I'm very comfortable sticking to    01:17:57
is my opinions on the existence of manipulation, the
extent to which -- you know, what percentage of
conversations were manipulated versus not, I can't
really tell you.

Page 139

CONFIDENTIAL

you let me know whether you think it's plausible for    01:19:29

someone in August of 2024 to say, I was neutral --

A    Can I react to what you were saying?

Q    I would like to ask my question.

A    Okay.  Go ahead.                                 01:19:41

Q    It has been alleged that Blake Lively

bullied a female assistant director into quitting

her job.  Happened in the past but talked about on

Reddit.

Did you find that in your Reddit search?    01:19:56

A    My assignment was not to sort of

specifically look at, you know, each post.  It was

to look at --

Q    Is it plausible that in August 2024,

someone researched Blake Lively's past acts and      01:20:11

said -- because they heard about her antics on the

set of It Ends with Us, and said, let me look into

Blake Lively.  Wow, she bullied a female AD into

quitting her job.  And goes online and starts

talking negatively.  Is that plausible?             01:20:31

A    I think that what you're telling me is

actually probably -- there is part of -- there is

probably some of that happening.  Right?  So the

Baldoni team plants these negative stories and that

sort of cascades into a bunch of other negative     01:20:49

Page 141

CONFIDENTIAL

stories.  And those stories are not necessarily        01:20:53

being planted by the Baldoni team.  They are planted

by other people, maybe trolls, maybe whatever,

haters.  But, again, my point is, they planted the

seeds and then it took off.                            01:21:05

     Q    Okay.  Is there anything about the seeds

which they planted that was untrue?

          MS. MOSES:  Objection.

          THE WITNESS:  Beyond the scope of my

assignment.                                            01:21:15

BY MR. SCHUSTER:

     Q    Okay.  So just so I understand, because

they planted the seeds, anything that grew from

those seeds is their problem or their fault?

          MS. MOSES:  Objection.                       01:21:30

          THE WITNESS:  I am not assigning fault

here.

BY MR. SCHUSTER:

     Q    Let me rephrase the question.

     A    What I'm saying is that if they didn't       01:21:37

plant those seeds, this wouldn't have happened.

     Q    How do you know that?

     A    Because that's sort of the definition of

a seed.  Right?  It's a thing that starts the

reaction.  So if you don't start the reaction, you     01:21:52

Page 142

CONFIDENTIAL

really all I needed.                                          02:13:52

Q    Okay.  I believe you expressed that your opinion was that Blake Lively did nothing in August to cause the change in how the online community was talking about her.  Do I remember that correctly or   02:14:07 did I characterize that correctly?

A    The way I would characterize as my response to that is that it is possible, but, you know, implausible that this happened.

Q    Possible but implausible?                              02:14:24

A    That's right.

Q    Okay.  Thank you.

Are you aware that Blake Lively was participating in a press tour for It Ends with Us during your subject time period, August 2024?  Are   02:14:43 you aware that she was participating in a press tour?

A    My understanding was the press tour actually -- the publicity on the movie started before the movie.                                             02:14:59

Q    Okay.  Are you aware that Blake Lively was also participating in a press tour for her husband's movie Deadpool and Wolverine?

A    I don't think I knew that.

Q    Is it possible that her participation in   02:15:13

Page 155

CONFIDENTIAL

with my analysis.  What you're proposing would not    02:19:27
be consistent with my analysis.  I do not find it
plausible, no.

Q    You don't find it plausible that if
people heard that Blake had unfollowed her costar,    02:19:36
if she encouraged others to unfollow her costar, if
she threatened to not publicize the movie she was
asked to costar in, if she threatened to not
publicize the movie she was paid to perform in, none
of those things could account for a negative    02:20:00
backlash on social media; is that your testimony?

MS. MOSES:  Objection.

THE WITNESS:  So this is a bit beyond the
scope of my expertise.  But I'm confused why an
actress who was sexually harassed on a set would be    02:20:20
expected to spend a lot of time with a person who
sexually harassed her.  Those are the allegations.

BY MR. SCHUSTER:

Q    Professor, how do you know that
Blake Lively was sexually harassed?    02:20:30

A    I mean, you're giving me -- I don't know
that, but I would say -- so let me just kind of walk
through the consumer behavior.

Q    No.  You can walk through the consumer
behavior when your attorney asks you questions.    02:20:44

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

like to show you an exhibit.  I'm just going to talk  02:29:49
to my associate Jordan about how to get this to you.
Has that been loaded?

MS. BIENER:  I just introduced it.  So if
she refreshes it, it should be there.  02:29:56

(Exhibit 2 marked for identification.)

MR. SCHUSTER:  Okay.  So Professor, I
think you have to hit refresh and then --

THE WITNESS:  I just see my report, but
maybe I'm -- hold on.  I see it.  It's loading.  02:30:17
Okay.

BY MR. SCHUSTER:

Q    So I'm going to show you -- do you have
it, Professor?

A    I have it, yup.  02:30:25

Q    Okay.  I'm going to show you a two-page
document that is Bates-stamped SPE_WF0000793 and
794.  And I would like to direct your attention to
the second page of the document which has the text
on it.  Let me know if you have that.  02:30:46

A    Okay.

Q    Now, you've stated there is no plausible
explanation for the spike of online activity in
August of 2024.  And what I'm showing you is a text
exchange between two executives at Sony.  02:31:02

Page 168

CONFIDENTIAL

And as we talked about earlier, Sony was 02:31:05 involved in the production and financing of the movie It Ends with Us.  Okay?

And I'm going to read from you -- read for you the exchange.  Starts with Sanford Panitch.  02:31:18

(As read):

"It's quite ironic because she has a huge hit movie 2- 300 million plus. And probably will never work again or not for a while, although even Hathaway02:31:31 recovered.  Tom thinks she's probably and bizarrely unhirable right now."

The response from the person identified as "Home" is:

"This will pass.  She is going to be 02:31:43 fine."

That individual then responds:

"An apology to that reporter would help.  Something to survivors too other than a 24-hour thing or her Insta 02:31:56 stories too."

Mr. Panitch then responds:

"No.  Disagree.  She is done for.  At least for a while.  It's cooked.  She said she is retiring to Josh or 02:32:06

Page 169

CONFIDENTIAL

something.  It will take a few years.  02:32:08
Eva Mendez time.  She did it to
herself.  If she just let him come to
the premiere or didn't make all the
cast unfollow him or kick him off the  02:32:19
movie and did what everyone else has
done in show business for time and
memorial which is protect 'the show'
then none of the sleuthing would have
happened.  The hair sell at the same  02:32:32
time was epic level stupid.  She
wouldn't listen.  She knows better."

I don't know what the next word is --

"Intl is astounding 150 and 150 and
could be more."  02:32:49

Did I read that correctly?

Professor, did I read that email exchange
correctly?

A    Oh, did you read it like outloud, yeah,
you did.  02:33:01

Q    Okay.  Would you agree that these Sony
executives have a different opinion than yours as to
what could have caused the Blake Lively backlash?

MS. MOSES:  Objection.

THE WITNESS:  I mean, you're showing me  02:33:19

Page 170

CONFIDENTIAL

an exchange between two executives just kind of                02:33:20

gossiping about Blake Lively.  Sure.  I mean, I have

a million records, more than a million records.

Would love to talk about that.

BY MR. SCHUSTER:                                               02:33:33

    Q    I know.  But my question is:  Would you

agree that these two Sony executives agree that

Blake Lively bears responsibility for her actions?

      MS. MOSES:  Objection.

      THE WITNESS:  They are just the -- sure.       02:33:46

They are saying stuff about her.  They are blaming

her for everything.

BY MR. SCHUSTER:

    Q    That doesn't sit well with you?

      MS. MOSES:  Objection.                         02:33:56

      THE WITNESS:  It just has nothing to do

with my data or my analysis or what I was hired to

do.  Why I'm here but...

BY MR. SCHUSTER:

    Q    Does your data or analysis support the       02:34:04

claim that the Defendants manipulated any algorithms

on social media sites?

    A    Algorithmic manipulation, my report

doesn't talk about that.  Mentions it but doesn't --

I don't look for that.                                        02:34:23

Page 171

CONFIDENTIAL

Q    You didn't look for it or your findings        02:34:26
don't support allegations of manipulated algorithms?

A    So what I believe is, I've mentioned
algorithmic manipulation as one way in which social
media manipulation can be done.  Kind of in a        02:34:40
theoretical section, subsection of the report.

But I don't look for that, and I don't
really do an analysis on that.

Q    Okay.  So is there any evidence --

A    I think Aron Culotta did algorithmic        02:34:55
manipulation.  I think he looked at uploads.  Again,
I just -- I kind of skimmed his report yesterday.
But he was focusing on uploading manipulation.

Q    Yeah.  And I'm asking you a question and
if you could just answer my question, that would be        02:35:12
fantastic.

Did you find any evidence that the
Defendants manipulated algorithms?

A    I didn't find any evidence because I
didn't look for it.  That wasn't the focus of my        02:35:22
study.

Q    Okay.  Did you find any evidence that the
Defendants fabricated any negative reviews about
Blake Lively?

MS. MOSES:  Objection.        02:35:39

Page 172

CONFIDENTIAL

THE WITNESS:  I did look at reviews as    02:35:40
part of my analysis.  I looked at just those three
platforms.

BY MR. SCHUSTER:

Q    Did you find any evidence that the    02:35:47
Defendants fabricated any reviews about
Blake Lively?

A    I couldn't find it because I didn't
examine it.

Q    Because you didn't?  I didn't hear what    02:35:55
you said, I'm sorry.

A    I didn't examine reviews.  Reviews were
not part of my data set.

Q    Did you find any evidence to support a
claim that the Defendants made false claims about    02:36:07
Blake Lively on social media?

A    That wasn't part of my assignment, and I
didn't do that.

Q    Did you find any evidence to support a
claim that the Defendants seeded false information    02:36:29
about Blake Lively?

A    I -- so if the emphasis here is on false,
I didn't look at the, you know, truthfulness of the
claims.  I just looked at the claims, the textual
claims.    02:36:53

Page 173

CONFIDENTIAL

filed in California --                                  02:41:44

A    Oh, sorry.  California.

Q    -- in December of 2024.  Which was -- gained some news.  When did The New York Times article publish?                                  02:41:58

A    So I don't remember The New York Times one.

Q    Okay.  And do you recall if Ms. Lively filed her complaint in the Southern District in February of 2025?                                  02:42:12

A    I think I just remember it was after December.  So I mean -- is that when it was?  Then I trust you are telling me the right dates.

Q    Well, counsel said don't trust me so I'd listen to your attorney.                                  02:42:26

Is it possible that the filing of the complaint in California in December of 2024 was a cause for negative online commentary about Blake Lively?

A    Okay.  Let me show you another -- another  02:42:44 graph.

Q    Are you unable to answer that question without showing me a graph?

A    The graph would really help me.

Q    Okay.                                  02:42:55

Page 177

CONFIDENTIAL

A    Okay.  Here we go.  So -- so what I have    02:42:58
here in Figure 12 is another type of analysis I do.
Which is -- which basically is digging deeper into
the conversations than just the sentiment, you know,
negative, positive.  And that's the narratives one    02:43:26
that we talked about.  So these are the narratives
that we're taking out of.  So I think Figure 12 has
to do with scenario planning narratives.  Let me
just make sure.  Yeah, I think so.

        And in this graph, and it shows that --    02:43:50
so -- and this is only looking at the negative
conversations.  Which are the ones that, you know,
are part of the manipulation.  You're not going to
manipulate by putting positive conversations about
someone.                                              02:44:06

        And so we can see that what the
conversations were about were the same kind of --
you know, the same kind of theme.  So at least a
percentage of the conversations.  So you can see the
spike in August.  And what these bars mean is, the    02:44:15
percentage of the negative conversations that have
to do with one of these four narratives.

        And so what you can see is, in December,
the December spike.  Even though, yeah, I think it's
very possible that the spike was -- you know, there    02:44:32

Page 178

was kind of that tension, was because of the                02:44:36
article, was because of the lawsuits being filed
and, you know, the speculation around the lawsuits
but the type of conversations that people were
having were still -- you know, those themes that            02:44:53
were planted back in August, we see them again
spiking in December.  And it really follows the same
kind of pattern.

So I would say yes, the fact that the
lawsuit was filed, the complaint was filed, and the         02:45:11
lawsuit was filed renewed attention to the topic.
But also, again, the seeds that were planted in
August, you know, again, were in that -- you know,
the same kind of topics, you know, oh, the set, the
production, whatever, the bullying, all these things        02:45:29
that were planted came up again.  So that's why I
wanted to show both graphs.

Q    Thank you.  And, again, just to confirm,
neither you or anyone from the Analysis Group have
ever spoken with, met with, or communicated with any        02:45:42
poster, any person that has posted on social media;
is that correct?

A    That's correct.  And I really wasn't --
you know, I wasn't a part of the analysis.

Q    Okay.  Now, you constructed a set of       02:45:58

CONFIDENTIAL

inclusion keywords and a set of exclusion keywords    02:46:00

to assist you.  Was that for Pulsar?

     A   Yes.  That was to pull the data from

Pulsar.

     Q   And who developed those keywords, both    02:46:16

the inclusive and exclusive keywords?

     A   So I developed the keywords.  I did talk

to the AG team, you know, when I developed it.  But

basically, I've done this for many projects.  You

have to -- you have to come up with -- you have to    02:46:35

pull the data, right, because the data is keywords

indexed so you have to --

     Q   Professor, my only question is who pulled

the keyword?  Who developed the keywords?

     A   I did.    02:46:51

     Q   Thank you.  Are you of the opinion that

the Defendants suppressed any content on social

media?

     A   That's not really part of my analysis.

     Q   That's a totally acceptable answer.    02:47:30

     Are you of the opinion that the

Defendants impersonated a genuine source on social

media in efforts to manipulate the conversations?

     A   Wasn't part of my assignment, wasn't part

of my analysis, wasn't part of my approach.    02:47:47

Page 180

CONFIDENTIAL

Q    Are you of the opinion that they    02:47:51
manipulated or posted fake reviews on social media?

A    Same as before.  I don't know, because I
didn't analyze.  It wasn't part of my analysis.

Q    Moving right along.    02:48:04

And you've never reviewed any negative
comments about Blake Lively that existed prior to --
prior to April 2024; is that correct?

MS. MOSES:  Objection.

BY MR. SCHUSTER:    02:48:28

Q    Have you reviewed any negative posts or
comments about Blake Lively that existed prior to
April 2024?

A    It wasn't part of my data set.  My data
set started in May.    02:48:39

Q    Okay.  So if there were negative online
commentary about Blake Lively that existed prior to
April 2024, you have no way of knowing whether the
Defendants were responsible for that negative
commentary or whether it's just folks who don't like    02:49:05
Blake Lively, correct?

MS. MOSES:  Objection.

THE WITNESS:  It wasn't part of my data
set, wasn't part of my analysis.  I can't really
have an opinion on this.    02:49:17

Page 181

CONFIDENTIAL

BY MR. SCHUSTER:                                    02:49:19

Q    Is it your opinion that the Defendants removed any positive posts or positive commentary about Blake Lively in this alleged retaliation campaign?                                          02:49:43

A    Again, I didn't -- wasn't part of my assignment.  I didn't form any opinions on any particular tactic but...

Q    Just showing that I read your report.  I believe you used two types of analysis to do your    02:49:59 testing.  One is a sentiment classification analysis and another is a thematic analysis; is that correct?

A    I did more than two.  But I did those two.  Yes.

Q    Okay.  Can you tell me what a sentiment    02:50:14 classification analysis is?

A    Yeah.  Sure.  Sentiment classification analysis -- we just went -- you know, I think I showed a couple of times the graph with the -- it basically looks at a conversation and says is it    02:50:27 positive, is it negative, is it mixed, or is it neutral?  So those are the four categories.  About --

Q    -- okay?

A    -- in this case, about Blake Lively, in    02:50:40

Page 182

CONFIDENTIAL

see a spike across all the platforms.  Absolutely.    02:57:49

Q    And did that spike -- if the -- if the film's premiere was in early August, would you agree that that spike occurred around the time of the film's release?    02:58:07

MS. MOSES:  Objection.

THE WITNESS:  Let me look.  So actually we see that -- let me just take a look -- so we're looking at Figure 3.  What page?

BY MR. SCHUSTER:    02:58:32

Q    Thirty-eight.

A    Thirty-eight.  Okay.  I see 38 in the PDF.  Okay.  So we see -- actually, we see the spike sort of in Figure 3.  See the volume of online conversations.  Yeah, we see a rise kind of in late    02:59:06 July.  But then the big spikes, there is one on August 11th.  And the greatest one is before that -- is after that.  So August 18th is the bigger one.  But yeah, it's basically kind of -- it begins and then it takes off mid-August.  And then    02:59:25 you said the premiere was in the first week?

Q    Yes, I believe so.

A    Maybe two weeks after the premiere.

Q    Would you agree that the statistical significance of the spikes, that that alone does not    02:59:50

Page 188

CONFIDENTIAL

prove manipulation?  Or is it your opinion that that   02:59:58

is the only thing you need to do to prove

manipulation?

A    I would never assume that.  That's why --

this is just one out of many figures.  Right?  I   03:00:09

think the volume analysis is kind of the first thing

I do.  I think I do six or seven different analysis.

This is just the beginning.  By itself, absolutely

not.  It would not prove anything.  But taken

together as a portfolio of all of these different   03:00:26

analysis, look at the themes, the sentiment, and so

forth, yes, then it works together.  My report works

as a portfolio of analysis.

Q    Are you familiar that the entertainment

industry -- withdrawn.                             03:00:44

Would you agree that social media

surrounding the entertainment industry is inherently

volatile and prone to spikes?

MS. MOSES:  Objection.

BY MR. SCHUSTER:                                    03:01:00

Q    Or you don't know?

A    I don't know.

Q    Okay.  You had made reference to findings

from Nicole Alexander in her report that you found,

and I forgot the word that you used.  Curious or     03:01:42

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.  Dated this 3rd day of December, 2025.

ASHLEY SOEVYN, CSR No. 12019

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127