# EXHIBIT 17

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---

BLAKE LIVELY,

                    Plaintiff,

    vs.        CASE NO. 24-CV-10049-LJL (LEAD CASE)

                        25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

                    Defendants.

_____

JENNIFER ABEL,

            Third-party Plaintiff,

    vs.

JONESWORKS, LLC,

            Third-party Defendant.

_____

WAYFARER STUDIOS LLC, et al.

            Consolidated Plaintiffs,

    vs.

BLAKE LIVELY, et al.

            Consolidated Defendants.

_____

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF JEFFREY KINRICH

Los Angeles, California

Tuesday, November 25, 2025

Stenographically Reported by:  Ashley Soevyn,
CALIFORNIA CSR No. 12019

Pages 1 - 128

Page 1

A    I believe her name is Laura Tedesco, but    10:12:08
if I have the name mispronounced or even slightly
off, please forgive me.  I don't -- I'm not really
good with names sometimes.

Q    And you understand that Blake Brown is    10:12:17
the sort of brand name of the haircare products that
were -- that you discuss in your report?

MS. CONNOLLY:  Objection.

BY MR. KALTGRAD:

Q    Is that right?    10:12:24

A    It's both a brand name, and I think a DBA
for the company itself.

Q    Okay.  And the company itself is Family
Hive; is that your understanding?

A    I think that's its legal name, yes.    10:12:35

Q    Okay.  How many times did you speak to
Ms. Tedesco?

A    Two or three, at least.  I don't think it
extended to four.  But I -- I can't tell you with
absolute certainty it did not.    10:12:51

Q    Do you recall when the last time you
spoke to her was?

A    No, I can't remember if it was before my
report went in or if I had one more conversation
after my report.  I do know I got information from    10:13:18

Page 15

skyrocket at the same time as the alleged social                10:31:59

media campaign occurred, that would be contrary

evidence.   We do not have that contrary evidence.

So in that sense, I provide evidence

consistent with causation, but I do not personally          10:32:12

make the further leap to say that the social media

campaign existed.   I will let others -- other

witnesses and other evidence provide that further

statement.

BY MR. KALTGRAD:                                                 10:32:31

Q    Do you have an understanding when Blake

Brown started selling products?

A    I would have to go back -- I do in my

report.   I don't in my -- I don't have it memorized.

Q    Do you know the month?                                 10:32:44

A    I --

Q    Does July of 2024 sound right?

A    For wholesale sales, that's roughly

correct.   I think near the end of the month.   But

the retail sales started, I think, in August so they       10:33:02

would be stocking the supply chain.   It could be the

end of July.

Q    Okay.   So sometime -- your understanding,

sometime end of July, beginning of August 2024,

retail sales started; is that right?                            10:33:23

Page 30

A    That sounds right.  Without my report and    10:33:25
without the numbers in front of me, I don't want to
go any further than that.

Q    Okay.  Do you have an understanding of
when the alleged social media campaign started?    10:33:32

A    In -- my understanding is sometime in
August 2024.

Q    Do you know if it was beginning of
August, end of August?

MS. CONNOLLY:  Objection.    10:33:47

THE WITNESS:  I don't have those facts in
my head.

BY MR. KALTGRAD:

Q    Okay.  So you testified just previously
that your understanding was that Blake Brown was    10:33:52
meeting all of its targets until the alleged social
media campaign started, correct?

MS. CONNOLLY:  Objection.

THE WITNESS:  Or until it took effect,
yes.    10:34:07

BY MR. KALTGRAD:

Q    And your understanding is that started
sometime in August of 2024?

A    I can't -- I just can't remember with any
specificity.    10:34:13

Page 31

Q    Okay.  You also mentioned you discussed    10:34:14
the marketing planning documents with Ms. Tedesco.
Do you have something specific you're referring to?

MS. CONNOLLY:  Objection.

THE WITNESS:  Not without -- not without    10:34:26
referring to the documents themselves.  And even
then, I may not be able to remember exactly what
documents we -- we pulled up.  We pulled a number of
documents.  In fact, let me amend my statement.  I
will not be able to remember which exact documents    10:34:39
we pulled up because we pulled up quite a number on,
you know, screen share, but I could not itemize them
for you.

BY MR. KALTGRAD:

Q    Do you know if the documents that you    10:34:51
reviewed have all been produced in this case?

MS. CONNOLLY:  Objection.

THE WITNESS:  Yes, they all would have.
They were all produced documents.  Everything I had
that I shared to ask -- to be asked about was a    10:35:03
document that I got.  There was a Bates-numbered
document.

BY MR. KALTGRAD:

Q    You said you discussed personal
background and experience.  Are you talking about    10:35:12

Page 32

reasonably achievable.                                    10:46:00

I looked at many things, much of this is reflected in my report, of course, about the achievements of other brands and whether other brands that were similarly positioned achieved    10:46:20 similar results.

I then looked at other celebrity brands. Not to say that all celebrity brands are successful, because they're not.  But to say whether other celebrity brands can achieve these kind of results,    10:46:36 to say that these results are not impossibilities. Not sort of as a check on whether they are actually achievable.

Let's see.  What else?  I looked for other causes.  I looked to see if there's    10:46:54 anything -- maybe this is repeating what I said before so if so, I apologize.  But I looked to see whether there were any things -- whether there were any things that would have led to a likely expectation short of the business plan that are not    10:47:20 tied to the online manipulation.  And I did not find any.

Q    Did you discuss those potential causes in your report?

A    Generally speaking, yes.  I don't know    10:47:38

Page 42

that I discussed every one of them.  I discussed 10:47:40
that I had found the projection to be reasonable.  I
don't know that I discussed every possible.  Well,
probably didn't.  Because these are all just
supporting details. 10:47:55

Q   Do you recall generally what else you
discussed with the Betty B representatives?

MS. CONNOLLY:  Objection.

THE WITNESS:  I don't -- I don't remember
anything else as I sit here.  I'm sure there are 10:48:08
specific details.  But I don't know that I can come
up with anything, except as we talk through it
today.  Maybe something else will come to mind.

BY MR. KALTGRAD:

Q   And the Betty B projections you are 10:48:21
referring to, those are projections created by
personnel at Betty B, correct?

MS. CONNOLLY:  Objection.

THE WITNESS:  I believe so.

BY MR. KALTGRAD: 10:48:29

Q   Had you ever spoken to Blake Lively?

A   No.

Q   Is there anyone else that you spoke to
other than the people you mentioned regarding your
opinions? 10:48:47

Page 43

MS. CONNOLLY:  I would just like to note   10:51:30
for the record that we are designating the entirety
of this deposition testimony including -- or
deposition transcript, excuse me, including all
testimony and exhibits as confidential reserving the   10:51:41
right to elevate that designation to Attorneys' Eyes
Only, and in this instance, we will do so given that
Mr. Kinrich's report is marked Attorneys' Eyes Only.

BY MR. KALTGRAD:

Q    This is your report, Mr. Kinrich?   10:52:02

A    Page 1 is.  I assume you've copied it
properly, but it appears to be.

Q    You are a CPA, correct?

A    I am.

Q    Do you have any other certifications or   10:52:11
licenses?

A    I am what is called an ABV, which is
Accredited in Business Valuation.  And I'm a CFF,
which is Certified in Financial Forensics.

Q    And if you flip to Appendix A, I'll give   10:52:27
you a second to find it here.

A    I have it.

Q    This is a copy of your most recent CV; is
that right?

A    It is.   10:52:46

Page 46

Q    Look at paragraph 2 of your report.    10:53:01

A    We're done with that.  Yeah.  Yes.

Q    And in paragraph 2, the second sentence says:

(As read):    10:53:13

"In particular, I have been asked to determine Ms. Lively's losses attributable to damage" -- you know what, strike that question.  That's a different question.  Page 7.  Sorry,    10:53:29 paragraph 7.  I'm sorry.  It's paragraph 11.

A    We're making progress.  Can I -- sorry for the humor.  I shouldn't joke.

Q    You note that Blake Brown was in    10:53:50 development for seven years in paragraph 11?

MS. CONNOLLY:   Is that a question?

BY MR. KALTGRAD:

Q    Do you see that?

A    I do.    10:53:57

Q    Okay.  Where did that information come from?

A    I don't have a separate recollection other than the footnote that it refers to here.

Q    Okay.  And the footnote is to a PR    10:54:16

Page 47

question.  Is there a way to share this on the video    11:10:07
such that we can also see this?

MR. KALTGRAD:  Well, it's on the Zoom.  I
don't know, is it being captured on video?

THE VIDEOGRAPHER:  No.  Let's go off the    11:10:15
record.

MR. KALTGRAD:  Okay.  Let's go off the
record for a second.

THE VIDEOGRAPHER:  We are going off the
record.  The time is 11:10 a.m.    11:10:21

(Recess.)

THE VIDEOGRAPHER:  We're back on the
record.  The time is 11:28 a.m.

BY MR. KALTGRAD:

Q    Mr. Kinrich, we were looking at the    11:28:12
spreadsheet, but I just want to briefly refer you
back to your report for a second, paragraph 32.

A    Yes.

Q    And the first sentence ends with a
definition of Blake Brown forecast.    11:28:32

Do you see that?

A    Yes.

Q    And the footnote 51 that refers to
BL-39169.

Do you see that?    11:28:44

Page 60

A    I do.                                                    11:28:45

Q    Okay.  I will represent that this Excel spreadsheet that we were looking at was produced as BL-39169, so I just want to confirm that that's what you were referring to as the Blake Brown forecast.    11:28:52 That's the -- these are the -- that's what you're referring to as the Blake Brown forecast; is that correct?

A    If the Bates numbers match, the answer is yes.                                                       11:29:03

Q    Thank you.  We're looking back at the Blake Brown forecast, Exhibit 4.  And you have a printout in front of you as Exhibit 4A, the section I'm looking at.  But under the Target Revenue Summary for Total Retail Revenue, do you see that?    11:29:17

A    Not yet, but I'm sure you will help me see it.

Q    Sure.  If you look down at your little spreadsheet in front of you.  It says Retail Revenue and Target Revenue Summary is expanded there.    11:29:30

Do you see that?  Sort of brown line in the middle?

A    I do see that.

Q    Okay.  And below that, it says Retail Revenue?                                                      11:29:38

Page 61

A    I see it.                                                    11:29:39

Q    It's easier to point up here.  So here's the Retail Revenue.  Do you see that?

A    Yes.

Q    Then is your understanding that this                        11:29:52 section describes the projections for Retail Revenue at Target?

A    I didn't pay much attention to this spreadsheet at all.  I looked at the higher level version of it so I actually don't follow the -- I    11:30:06 mean, I didn't follow the spreadsheet.

Q    When you say the higher level version of it, are you referring to like a PowerPoint presentation?

A    Yes.                                                        11:30:09

Q    Okay.  So let me just direct you here to what I'm looking at, cell T-128.  Do you see that has a 7,270,000?

Do you see that?

A    Yes, I do.                                                  11:30:28

Q    And that's under the Column Q3 for 2024.

Do you see that?

A    I do.

Q    Okay.  And the next column over is for Q4 for 2024, and the projection was 6.5 million.    11:30:33

Page 62

that say they blew the Deloitte projections out of the water.  Those are my words, not theirs.  But they way overexceeded.  They had sales much higher than they expected.  Numbers, things of that sort. Those are all paraphrases of what occurred in numerous places throughout the documents.

Q    And when you say "the documents," you're referring to the Blake Brown PowerPoint presentations?

A    Generally speaking, yes.

Q    Can you think of any other document that's not a Blake Brown PowerPoint presentation that refers to the financial performance of Blake Brown?

A    I mean, there are some spreadsheets that probably do it.  They may be incorporated in a PowerPoint but they are spreadsheets showing financial results.

Q    Did you reference those spreadsheets in your report if you relied on them?

A    I don't -- I mean, in aggregate I did.  I don't know that -- I didn't use those higher numbers as part of my damage calculations, if that's what you're asking.  But I certainly talk about how they exceeded expectations.

Page 66

Q    Well, I guess my question is:  Your    11:35:02
knowledge of them exceeding expectations comes from
the PowerPoint presentation; is that right?

        MS. CONNOLLY:  Objection.

        THE WITNESS:  And the underlying numbers    11:35:10
that drive those PowerPoint presentations.

BY MR. KALTGRAD:

Q    Well, that's what I'm trying to get at.
Where do those underlying numbers come from?  Is it
just what you have seen in PowerPoint presentations    11:35:17
or have you seen them elsewhere, is my question?

        MS. CONNOLLY:  Objection.

        THE WITNESS:  In the financial reporting
of Blake Brown.

BY MR. KALTGRAD:    11:35:25

Q    What financial reporting of Blake Brown
have you seen?

A    I can't assign it to you from memory.
There are financials reporting of their sales that
are in excess of the expectations.    11:35:39

Q    Sure.

A    They are reflected in the PowerPoint,
certainly.

Q    Okay.  So they're reflected in the
PowerPoint.  But I just want to be clear.  Have you    11:35:50

Page 67

seen documents that are not in the PowerPoint that    11:35:53
are underlying financial documents?  For example,
have you seen audited financial statements for
Blake Brown and Family Hive?

        MS. CONNOLLY:  Objection.    11:36:04

        THE WITNESS:  I don't remember whether
they do audits.  But that would not be a useful
source because audits are annual, and these would be
much more -- much smaller time slices.

BY MR. KALTGRAD:    11:36:15

Q   Okay.  So have you seen -- you mentioned
the word spreadsheets.  But have you seen
spreadsheets with financial data other than what
you've seen in a Blake Brown PowerPoint
presentation?    11:36:27

        MS. CONNOLLY:  Objection.

        THE WITNESS:  I don't remember whether
they were simply cutting and pasting spreadsheets
into a PowerPoint or whether they were an Excel
file.    11:36:40

BY MR. KALTGRAD:

Q   I'm going to look back at the -- and this
probably is in your Exhibit 4.  You can look on the
third page or you can look on the screen.  But I'm
going to the product tab.    11:36:57

Page 68

THE STENOGRAPHIC REPORTER:  What tab?    11:37:01

MS. CONNOLLY:  Just quickly.  It looks like these -- these numbers.  The pages are not numbered sequentially.  I want to be clear as to what page we should be looking at.    11:37:08

MR. KALTGRAD:  Sure.  The pages are not numbered sequentially because they're just printed selections of the PowerPoint presentation.  But I'm looking at the third page of the document.

THE WITNESS:  You said the third or    11:37:17
fourth?

BY MR. KALTGRAD:

Q    Third.

A    Third.  I am there.  The one with the sort of a yellow column in the second column?    11:37:24

Q    Yes.

A    Okay.

Q    And I just expanded on the screen there. There's a row that says "starting productivity by product by channel."    11:37:39

Do you see that?

A    I do.

Q    Okay.  And we can see that each contemplated product, according to this forecast, was assigned a baseline productivity level.  You see    11:37:46

Page 69

that?                                                            11:37:52

A    I see that.

Q    Do you know how the baseline productivity levels were determined?

A    I do not.                                                   11:37:59

Q    If we look at the next page under Exhibit 4A.  It's tab SP.  And I'm looking at row 741.  There's a row that says "Productivity Growth Details."

Do you see that?                                                11:38:16

A    I do.

Q    And then underneath that 743, it says "percent growth profile."

Do you see that?

A    I do.                                                       11:38:24

Q    And then in rows 744 through 757 are the various products listed.

Do you see that?

A    I do.

Q    Okay.  And then scrolling over, we have      11:38:36 various projected growth percentages for each of the contemplated Blake Brown products.

Do you see that?

A    I do.

Q    And those go from Q2 of 2024 through Q4      11:38:47

Page 70

of 2028.                                                          11:38:53

        Do you see that?

    A    I do.

    Q    Now, some of the growth percentages are
quite significant.  If you look, for example, at the   11:39:02
repair shampoo, there is a 30 percent growth in Q1
of 2025.

        Do you see that?

        MS. CONNOLLY:  Objection.

        THE WITNESS:  I see that number.          11:39:15

BY MR. KALTGRAD:

    Q    Okay.  Do you have an understanding for
how the assumptions for growth percentages were
determined?

    A    I do not.                                11:39:22

    Q    So you just accepted these percentages
for purposes of your opinion, correct?

        MS. CONNOLLY:  Objection.

        THE WITNESS:  I did not accept the
percentages.  I did not even deal with the        11:39:33
percentages.  What I accepted was the overall
projection taken as a whole, not without concerning
myself with the individual details, that individual
details can be off.  I -- I understand that.  That's
always the case for any projection.               11:39:49

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

The question is, whether the overall          11:39:50
picture painted by the projection, recognizing the
details can go -- some details can be off high; some
details can be off low.  Some things can change.
They will change.  They absolutely will change.          11:40:05
Every projection will have differences between it
and actuals.  The ultimate question is whether the
projection itself is a reasonable expectation of the
expected value.

BY MR. KALTGRAD:                                          11:40:16

    Q    Okay.

    A    And so I did not accept the -- any given
item as sacrosanct, but I accepted the overall
expectation taken as a whole as a reasonable
expectation.                                             11:40:29

    Q    Okay.  But you understood that the
revenue projections reflected in these Blake Brown
forecasts incorporated these growth percentage
assumptions, correct?

        MS. CONNOLLY:  Objection.                    11:40:39

        THE WITNESS:  That is one of the elements
used to arrive at the overall expectation.

        MR. KALTGRAD:  Can we get 21798?  I'm
sorry, what number are we on?

        THE STENOGRAPHIC REPORTER:  Five.             11:41:13

Page 72

MR. KALTGRAD:  Five.  Okay.                    11:41:13

(Exhibit 5 marked for identification.)

MS. CONNOLLY:  I just want to confirm for the record that we're still on Attorneys' Eyes Only.

BY MR. KALTGRAD:                                11:41:55

Q    Do you have Exhibit 5 in front of you, Mr. Kinrich?

A    I do.

Q    Okay.  This is the PowerPoint presentation that you referred to that you relied on    11:42:01 as the Blake Brown forecast; is that right?

A    I think embedded in here is the Blake Brown forecast.

Q    Okay.

A    It is -- it's a long document, but    11:42:12 the Blake Brown forecast is in here.

Q    I just want to be clear.  You said earlier that you were relying on a PowerPoint presentation rather than the Excel spreadsheet.  Is this the PowerPoint presentation that you were    11:42:25 referring to, Exhibit 5?

MS. CONNOLLY:  Objection.

THE WITNESS:  The document that includes the present -- the projection is this document.

Page  73

BY MR. KALTGRAD:                                           11:42:38

     Q     Okay.  Thank you.

           If you look at the page that ends in

21846.

     A     I'm sorry.  Let me go back to your prior      11:42:54

question.  Don't get me wrong.  We -- meaning me and

my staff -- looked at the Excel to confirm that

things matched up and that the numbers tied and

things of that sort.  But the projections

themselves, it was easier to work with the high        11:43:08

level summary that's reflected both at the high

level in the spreadsheet and at -- in the PowerPoint

document itself.  It's not that we typed the numbers

off the PowerPoint.

           We -- we prefer to use spreadsheets.         11:43:22

We're accountants and economists.  But we didn't go

into each of the various details because that was

not necessary.  There was no value add for that.  We

understood it based on the overall trends,

descriptions, value, discussions both from this        11:43:39

document and from our discussions with counsel.

           I just wanted to clarify the prior

answer.  Not that -- excuse me, I said with counsel,

that's wrong.  With the company.

     Q     Thank you.                                   11:43:58

Page 74

And I was referring to page 21846.    11:43:58

A    21846, let me get there.  All right.  I am there.

Q    Okay.  Now, this is a slide here.  It's titled "financial assumptions."    11:44:19

Do you see that?

A    I do.

Q    And it says:

(As read):

"Productivity assumptions versus peers    11:44:24
at Target."

Do you see that?

A    Yes.

Q    Okay.  And this compares the Blake Brown forecast assumptions for the productivity of Blake    11:44:40 Brown products to the productivity of other masstige category products sold at Target, correct?

MS. CONNOLLY:  Objection.

THE WITNESS:  It does do that comparison, yes.    11:45:03

BY MR. KALTGRAD:

Q    Okay.  And it projects that Blake Brown products are going to outperform all other competitors by 2030 in terms of their productivity.

Do you see that?    11:45:14

Page 75

MS. CONNOLLY:  Objection.                      11:45:15

THE WITNESS:  I don't think it says that.
Do you -- can you tell me where it says that?

BY MR. KALTGRAD:

Q    Well, the Blake Brown products            11:46:11
productivity levels are shown at the very top end of
the other products.  Do you see that?  Of the other
masstige products?

MS. CONNOLLY:  Objection.

THE WITNESS:  They're -- I think that is        11:46:21
not a true statement.  They are -- they are general
in the upper end, but there -- there are others that
are above them in some cases, not in all cases.  I
agree with you that -- that at some cases, they are
at the top, and other cases they are not.           11:46:32

BY MR. KALTGRAD:

Q    Okay.  For the shampoo and conditioners,
two of the Blake Brown products are at the very top.
Do you see that?

A    Two are and two are not.                   11:46:41

Q    Okay.  And for styles, one of the
products is the very top, and then there's one in
between, and then the other one is above all the
others.

Do you see that?                           11:46:48

Page 76

MS. CONNOLLY:  Objection.    11:46:49

THE WITNESS:  Yes.  One is at the top, and one is not.

BY MR. KALTGRAD:

Q    Okay.  And then for treatments, one    11:46:52
product is, for Blake Brown, is above all the other masstige products.

Do you see that?

MS. CONNOLLY:  Objection.

THE WITNESS:  It appears that's correct.    11:46:59

BY MR. KALTGRAD:

Q    Okay.  Do you know what the basis for assuming that the productivity levels are going to be at the top levels or at the very high levels that are reflected here?    11:47:10

MS. CONNOLLY:  Objection.

THE WITNESS:  I do not.

BY MR. KALTGRAD:

Q    Okay.  I'm looking back at Exhibit 4 now. And I'm going to go to the SP tab again.    11:47:18

A    Is that on my paper or on the screen?

Q    If you look at -- so now I'm looking -- on your paper, it's the fourth to last page.

A    Could I ask you to do me a favor because we're now on more exhibits.  You never did mark my    11:47:52

Page 77

copy of this because at one point, you didn't think    11:47:52
it would be an exhibit.  Is there a tab number that
you can fix that for?

MR. KALTGRAD:  Do 4A on this one.

(Exhibit 4-A marked for identification.)    11:48:04

THE WITNESS:  Thank you.  Thank you.

MR. KALTGRAD:  Okay.  So we're looking at
the fourth to the last page.

MS. MOSES:  Fourth to the last, you said?

MR. KALTGRAD:  I think that's what I    11:48:21
said?

THE WITNESS:  Is it easier -- should I be
looking at the paper or should I be looking at the
screen?

BY MR. KALTGRAD:    11:48:28

Q    Whichever is more comfortable for you,
but the paper reference is the fourth to the last
page.

A    All right.

Q    Okay.  And on the screen, it's row 974.    11:48:35
There is a -- you can see at the bottom, there's a
kind of grey box that says "Returns - % of Net
Sales."

Do you see that?

A    I do.    11:48:50

Page 78

Q    And this is a forecast of the percentage    11:48:51
of product returns; is that your understanding?

A    That's what it appears to be, yes.

Q    Okay.  And both Target and Ulta were
projected to have a rate of .5 percent return of net    11:49:02
sales.

Do you see that?

A    I do.

MS. CONNOLLY:  Objection.

BY MR. KALTGRAD:    11:49:09

Q    Do you know what the basis for the
assumption that there would be a .5 percent of
retail sale returns?

A    I do not.

MS. CONNOLLY:  Objection.    11:49:20

BY MR. KALTGRAD:

Q    Do you know what the average return rate
is for products at Target?

A    I do not.

Q    Do you know what the average return rate    11:49:27
for haircare products at Target is?

A    I do not.

Q    I'm going to turn back to your expert
report, Exhibit 1.  Now looking at paragraph 17.

A    Yes.    11:50:17

Page  79

Q      And the second sentence there says:      11:50:18

(As read):

"In the last five months of 2024, Betty

Booze generated only one-third of the

revenue it earned in the preceding four  11:50:22

months."

And you have a footnote 31 citing to

BL-37129_A.

Do you see that?

A    I do.                                      11:50:40

Q    Okay.

MR. KALTGRAD:  You can pull that one up.

MR. FINKEL:  319, you said?

MR. KALTGRAD:  37129.

THE STENOGRAPHIC REPORTER:  Exhibit 6 for   11:51:33

the record.

(Exhibit 6 marked for identification.)

MR. KALTGRAD:  I have marked as Exhibit 6

a document Bates stamped BL-37129-A.  And this is an

internal Betty B slideshow presentation.           11:51:41

Do you see that?

MS. CONNOLLY:  Objection.

THE WITNESS:  I don't know what you mean

by the word "internal" or "slideshow presentation."

Page 80

BY MR. KALTGRAD:                                          11:51:53

Q    This is a presentation that has a Betty B cover page that says April 2025, Confidential.

Do you see that?

A    I do.                                                11:52:03

Q    Do you have an understanding of who prepared this document?

MS. CONNOLLY:  Objection.

THE WITNESS:  My supposition would be someone at Betty B, but that is only a supposition.    11:52:13

BY MR. KALTGRAD:

Q    Do you have an understanding of why this document was prepared?

A    I would have a supposition, but I do not have personal knowledge.                           11:52:22

Q    Okay.  If you look at page 141, which is what you cited in your report.

A    Yes.

Q    This is a chart reflecting your statement in your report that Betty B -- Betty Booze generated    11:52:40 only 1 percent of the revenue in one of the preceding four months.

Do you see that?

MS. CONNOLLY:  Objection.

THE WITNESS:  Yes.                                       11:52:52

Page 81

BY MR. KALTGRAD:                                    11:52:56

Q    Okay.  Have you seen the underlying financial data that is not in this PowerPoint presentation that reflects these numbers?

MS. CONNOLLY:  Objection.              11:53:03

THE WITNESS:  I don't know.

BY MR. KALTGRAD:

Q    In paragraph -- I'm going back to Exhibit 1 now.  Your report.

A    Yes.                                          11:53:16

Q    Paragraph 19.  Going to page 10.  There is a sentence -- there is a parenthesis that says "technically."

Do you see that?

A    Not yet.                                      11:53:31

Q    Very top of the page at page 10?

A    Yes.

Q    (As read):

"Technically, and as will be seen below, damages are computed as lost     11:53:36 cash flows, not lost profits.  I use the phrase 'lost profits' throughout this report because that is the common way to refer to these types of damages."                                 11:53:47

Page 82

Is it your understanding that -- let's    11:53:48
start with Betty B.  Blake Lively would not be
entitled under the corporate documents to the value
of lost cash flows at any point?

MS. CONNOLLY:  Objection.    11:54:07

THE WITNESS:  That sounds like a legal
question.  It's not within my expertise.

BY MR. KALTGRAD:

Q    Okay.  Well, do you have an understanding
that if the company distributed all of its profits    11:54:19
today, would Ms. Lively be entitled to the value of
lost cash flows?  Do you have an opinion on that?

MS. CONNOLLY:  Objection.

THE WITNESS:  Are you distinguishing in
that question between cash flows and profits or are    11:54:33
you not intending to?

BY MR. KALTGRAD:

Q    I am not intending to.

A    If the company made distributions, she
would get her share.    11:54:44

Q    What do you mean by "her share"?

A    It would flow through various entities,
and she would ultimately benefit from her
shareholdings.

Q    So is it your understanding that if she    11:54:59

Page 83

has a certain interest in the company, that's the    11:55:01

amount of the lost profits or cash flows -- I am

using that interchangeably at this point -- that she

would receive if the company distributed those

profits?    11:55:14

        MS. CONNOLLY:  Objection.

        THE WITNESS:  Unless there is a subtlety

that I'm missing, the answer is yes.

BY MR. KALTGRAD:

    Q    Are you aware of whether the corporate    11:55:22

documents of Betty B describe how distributions are

made to shareholders?

        MS. CONNOLLY:  Objection.

        THE WITNESS:  I am not aware.  I would

have to go look to answer that question.    11:55:30

BY MR. KALTGRAD:

    Q    Okay.  Are you aware whether Blake Lively

has any direct ownership interest of Betty B

Holdings?

        MS. CONNOLLY:  Objection.    11:55:48

        THE WITNESS:  You mean as opposed to

through LOL HATA, for example?

BY MR. KALTGRAD:

    Q    Yes.

    A    My understanding is all of her businesses    11:56:00

Page 84

are held through her -- I will call it business 11:56:02 holding company, that's my phrase.  Not meant to imply anything other than I don't know what else to call it.  Which is LOL HATA.

Q    If you look at paragraph 21 of your 11:56:27 report, you say:

(As read):

"The profits under each scenario are calculated using a discounted cash flow DCF approach." 11:56:32

You see that?

A    I'm sorry, what page?

Q    Paragraph 21.

A    Yes.  I see that.

Q    Did you consider any other approach to 11:56:37 calculating lost profits?

A    I guess conceptually, I did.  Because I'm always thinking at the beginning of any case I work on, what are the approaches that make any economic or logical sense.  I didn't spend any great amount 11:57:41 of time on any other approaches because none other -- no other approach seemed to be relevant in this case.  So, you know, there wasn't any -- there wasn't more than, you know, two seconds worth of consideration.  But I at least tick through them in 11:57:55

Page 85

Do you see that?                                    11:58:50

A    Yes.

MS. CONNOLLY:  Objection.

BY MR. KALTGRAD:

Q    Where did that understanding come from?    11:58:51

A    From discussions with Betty B's management.

Q    So Betty B's management told you, we expect a two or three-year delay, in your discussions with them?                                    11:59:03

A    Yes.

Q    Did you speak to anybody from Deloitte about the Blake Brown projections?

MS. CONNOLLY:  Objection.

THE WITNESS:  No.                                    11:59:21

BY MR. KALTGRAD:

Q    Do you know any specific person at Deloitte that was involved in the preparation of the projections?

MS. CONNOLLY:  Objection.                            11:59:32

THE WITNESS:  I do not.

BY MR. KALTGRAD:

Q    I am now looking at paragraph 32 of your report.  And in paragraph 32, you say that:

(As read):                                    11:59:57

Page 87

"To calculate the free cash flow for    11:59:57

Blake Brown, you start with EBITDA

forecasts from 2024 through 2030

prepared by Deloitte Consulting LLP,

Deloitte, in July 2024 before the    12:00:07

online manipulation began."

Why did you use the date of 2024?

MS. CONNOLLY:    Objection.

THE WITNESS:    Because at the time, I

thought that's when they were prepared.  I now    12:00:17

understand they were probably originally prepared in

2023.    That was not apparent to me at the time.    But

they were used by the company in 2024 and adopted by

the company as their projections in 2024.    So my

statement was factually in error.    But functionally    12:00:36

irrelevant because the company endorses them as of

2024.    And actually endorses them as of today as to

what they believe would have been achievable as of

that time.    So I apologize for the misstatement, but

it has no impact on my analysis.    12:00:56

BY MR. KALTGRAD:

Q    No need to apologize.    What do you mean

by the company endorsed them in 2024?

A    By making the projection, by putting them

in their analysis in 2024, the company was stating,    12:01:08

Page 88

and has stated to me through my discussions with the company, that in 2024, that was their then good faith belief based on their own analysis that they had done in the intervening year since Deloitte had prepared the original analysis, that those projections were, in fact, reasonable and achievable.

And that, in fact, now -- when I say now, I mean a few weeks ago when I spoke to them -- with hindsight they believe today, given everything they know that just happened, had the online manipulation not occurred, they were, in fact, still reasonable and still believe that those were reasonable projections, the most reasonable expectations that could have been and would have been achieved but for the online manipulation.

Q    You said by putting them in their analysis in 2024.  What do you mean by that?

A    By putting them in the documents, the 2024 documents that I cite to.  These are 2024 documents, even though Deloitte's underlying projection had been prepared a year earlier.

Q    And you're referring to the PowerPoint presentation that says July 2024 on there?

A    Yes.

Page 89

even better.  And I did not incorporate that          12:04:05

expectation in my analysis.  So they believed that

the Deloitte forecast was actually too conservative,

but they didn't know that until after the launch.

Q    So the -- the Blake Brown forecast,          12:04:22

you're relying on projections originally prepared by

Deloitte, correct?

MS. CONNOLLY:  Objection.

THE WITNESS:  Yes.

BY MR. KALTGRAD:                                       12:04:31

Q    And the Betty B forecasts, you're relying

on projections prepared by Betty B itself, correct?

MS. CONNOLLY:  Objection.

THE WITNESS:  Internally, yes.

BY MR. KALTGRAD:                                       12:04:42

Q    Okay.  Did you perform any testing on

those forecasts --

MS. CONNOLLY:  Objection.

BY MR. KALTGRAD:

Q    -- for either of them?                        12:04:45

A    I performed quite a bit.  I -- we already

went over this.  I think I answered you in a long

monologue for both of these earlier in the

deposition, and I described some of it in the -- in

my report as well.                                    12:04:59

Page 91

underlying source documents another, I don't know if   12:45:40

I screwed up the referencing or whatever.  I

understand that the document itself is from 2023,

even though it's dated 2024.  What I tried to say

and may not have been as clear as I should have is   12:45:57

that the company -- I will use the word "endorsed,"

for lack of a better term -- that statement -- those

projections, as reasonable in 2024, as their view of

the world then.  And then, in my discussions with

them, as I've already said many times on the record,   12:46:13

endorsed that as what they thought was the

reasonable base case in 2024 and today.

So I understand the date of the document

was earlier, but they incorporated that as their

view of the world in 2024, even though the document   12:46:33

was from a prior period.  So I probably didn't say

that cleanly before.  I just wanted to hopefully

make it clean now.

Q   Okay.  How do you know they incorporated

it in 2024?  Is that based on your discussions you   12:46:45

had with them?

A   Yes.

MS. CONNOLLY:  Objection.

BY MR. KALTGRAD:

Q   On page 23 of your report, the second   12:47:07

Page 96

sentence says:                                          12:47:08

    (As read):

     "I use the net working capital forecast

     from 2024 through 2030" --

A I'm sorry, where?   I'm on the wrong page.   12:47:16

Q Sure.   Paragraph 41.

A Paragraph 41.   Yes, I see it.

Q Starting with the second sentence, I'm reading.

    (As read):                                  12:47:23

     "I use the net working capital forecast

     from 2024 through 2030 based on the

     'Working Capital Needs from Deloitte

     Business Plan.'"

    Do you see that?                             12:47:31

A I do.

Q And you cite to a document BL-39160.

    Do you see that?

A I do.

    MR. KALTGRAD:   I'm going to mark as          12:47:53

Exhibit 7 a document with Bates stamp BL-49160,

titled "Deloitte Business Plan Cash Requirements."

  (Exhibit 7 marked for identification.)

BY MR. KALTGRAD:

Q Do you have that in front of you,            12:48:25

Page 97

Mr. Kinrich?

A    I do.

Q    Do you know who prepared this document?

MS. CONNOLLY:  Objection.

THE WITNESS:  I do not.  I could speculate, but that's what it would be.

BY MR. KALTGRAD:

Q    Okay.  Did you review the depositions of -- you said you testified -- you testified earlier that you reviewed the second deposition of Family Hive in part, correct?

MS. CONNOLLY:  Objection.

THE WITNESS:  Laura Tedesco, you mean?

BY MR. KALTGRAD:

Q    Yes.

A    Yes.

Q    Did you review her first deposition?

A    At least in part, yes.  I don't know if I read the whole thing or not.

Q    Okay.  What about the deposition of Andrew Chrisomalis, did you review that in its entirety?

A    At least in part.  I know my staff read the entire thing and called parts of it to my attention.  And I reviewed large portions.  I don't

Page 98

know that I read the whole thing.                          12:49:07

Q    Is there a reason you didn't read the whole thing?

MS. CONNOLLY:  Objection.

THE WITNESS:  Just time and relevance.  I    12:49:11 mean, there were large portions of it that were not relevant to my issues.

BY MR. KALTGRAD:

Q    Okay.  How did you know they were not relevant if you didn't read them?                          12:49:21

MS. CONNOLLY:  Objection.

THE WITNESS:  Because other people in my office read them, and helped me understand which parts were on other subjects.

BY MR. KALTGRAD:                                          12:49:31

Q    Okay.  Are you aware that Ms. Tedesco testified that this document was actually prepared by Get [sic] Back Beauty?

MS. CONNOLLY:  Objection.

THE WITNESS:  I don't remember it.  I may    12:49:42 have been aware.  It doesn't -- that seems like a reasonable supposition.  In other words, that there is nothing inconsistent with that and my memory.

BY MR. KALTGRAD:

Q    Did you speak to anybody at Get Back      12:49:53

Page 99

Beauty prior to forming your opinion?                    12:49:55

       MS. CONNOLLY:  Objection.

       THE WITNESS:  No.

BY MR. KALTGRAD:

   Q    Do you know how Get Back Beauty          12:50:01

calculated working capital needs?

       MS. CONNOLLY:  Objection.

       THE WITNESS:  The document explains it,

so the answer is yes.

BY MR. KALTGRAD:                                         12:50:11

   Q    The document being Exhibit 7?

   A    Yes.

   Q    Looking back at Exhibit 1 again, I'm

looking at paragraph 42 now.  And you say:

       (As read):                               12:50:34

          "Based on the DCF analysis and inputs

          described above, I calculate the

          but-for value of Blake Brown to be

          $108.6 million as of March 31, 2026."

       Do you see that?                         12:50:46

   A    No, because you referenced me a page, and

I wasn't there yet.  So let's try again.

   Q    I'm sorry.  I'm looking at paragraph 42,

so it should be the same page you're on, I think.

   A    I now see it.  Yes.                      12:50:54

Page 100

Q    Okay.  So I was reading:    12:50:55

(As read):

"I calculate the but-for value of

Blake Brown to be $108.6 million as of

March 31, 2026."    12:51:02

You can see that?

A    I do.

Q    And you reference Exhibit 1 of your

report.  So I'm going to turn to Exhibit 1.  I think

the exhibits are before the appendices, if that's --    12:51:40

A    That clears up my current problem.  Thank

you.

All right.  I'm there.

Q    All right.  And I'm just looking --

excuse me -- at note number 1, which says:    12:52:03

(As read):

"Ms. Lively owns 100 percent of LOL

HATA, which owns 40 percent Family Hive

as of March 4, 2022.  This analysis

assumes that Family Hive owns    12:52:15

100 percent of Blake Brown."

Do you see that?

A    I do.

Q    Do you know whether Ms. Lively still owns

100 percent of LOL HATA?    12:52:24

Page 101

MS. CONNOLLY:  Objection.    12:52:27

THE WITNESS:   That's my assumption, and that is what I believe to be true.   I don't have personal knowledge.

BY MR. KALTGRAD:    12:52:34

Q    Do you know if that percentage has ever changed?

MS. CONNOLLY:  Objection.

THE WITNESS:   The same answer.

BY MR. KALTGRAD:    12:52:39

Q    Do you know if LOL HATA still owns 40 percent of Family Hive?

A    That is my understanding and assumption. I have no personal knowledge other than that is what I'm informed.    12:52:49

Q    And what is your understanding based on?

A    That that's what I've been informed.

Q    Were you informed by Family Hive?

MS. CONNOLLY:  Objection.

THE WITNESS:  I was informed by my staff,    12:52:57 who has inquired and received that information.

BY MR. KALTGRAD:

Q    Do you know if that percentage has ever changed?

A    I don't know if it was something    12:53:14

Page 102

different previously.  But my understanding is that    12:53:16

is what it is now, and there's every reason to

believe that that is what will continue.

Q    And when you say you're assuming Family

Hive owns 100 percent of Blake Brown, what do you    12:53:24

mean by that?

A    I mean I don't know what the question is.

That seems pretty self-evident.  So what is your

implied question?

Q    What is -- what is -- how are you    12:53:41

distinguishing Blake Brown versus Family Hive?

A    If it's an entity -- if it's a d.b.a.,

then there's no distinction to be made.  It's almost

a non sequitur.  It's just -- 100 percent is -- is

the obvious answer.  If there is d.b.a. or if there    12:54:00

is a legal entity here, I'm just saying that it's

100 percent part of Family Hive.

Q    Well, why did you include this in your

note?

A    To make sure that it was understood that    12:54:12

that is what I was assuming.

Q    Okay.  I'm going to look at -- back in

your report at page 24.

A    Yes.

Q    And here you're describing -- I'm looking    12:54:34

Page 103

at paragraph 44 through 46 now.  And this is the    12:54:37

shutdown case you're describing for Family Hive,

correct?

A    Yes.

Q    We looked previously at the Deloitte    12:54:49

business plan which talked about the EBITDA you are

relying on, correct?

MS. CONNOLLY:  Objection.

THE WITNESS:  It includes that for the

but-for world.    12:55:01

BY MR. KALTGRAD:

Q    Okay.  So you're relying on the financial

data that's contained in the Deloitte business plan

cash requirements document, correct?

MS. CONNOLLY:  Objection.    12:55:18

THE WITNESS:  As one component, yes.

MR. KALTGRAD:  Going to mark as Exhibit 8

a document that's entitled "Blake Brown Brand

Updated Confidential" with Bates No. BL-38373.

(Exhibit 8 marked for identification.)    12:56:45

BY MR. KALTGRAD:

Q    And if you turn to page 25.

A    Sorry.  Page 25?

Q    Yes, page 25.  Oh, sorry.  I'm looking at

your report again real quick.    12:56:58

Page 104

A    Not the document.    12:57:00

Q    Exhibit 1, page 25, you will see there's a footnote.  The first footnote references this document describing the actual financials of Blake Brown, correct?    12:57:12

MS. CONNOLLY:  Objection.

THE WITNESS:  Sorry.  Ask your question again, or have it reread.

MR. KALTGRAD:  Can you read the question.

THE STENOGRAPHIC REPORTER:  Sure.  Okay.    12:57:54

(Record read as follows):

"QUESTION:  Exhibit 1, page 25, you will see there's a footnote, the first footnote references this document describing the actual financials of    12:58:07 Blake Brown, correct?"

THE WITNESS:  Yes.

BY MR. KALTGRAD:

Q    Do you know who prepared Exhibit 8?

A    Name?  No.  I mean it's in a Family Hive    12:58:13 document or a Blake Brown document, but I couldn't tell you an individual.

Q    Do you know if it was prepared by an employee of Family Hive?

MS. CONNOLLY:  Objection.    12:58:24

Page 105

THE WITNESS:  I could speculate that that 12:58:27 would be the case.  That would be my expectation, but I do not know that with certainty.

BY MR. KALTGRAD:

Q    Do you know why this document was 12:58:37 prepared?

MS. CONNOLLY:  Objection.

THE WITNESS:  I could suppose but that's all it would be.  It would be a supposition.

BY MR. KALTGRAD: 12:58:49

Q    Are you aware that this document was prepared at the request of Blake Lively's lawyers?

MS. CONNOLLY:  Objection.

THE WITNESS:  I think I read that in one of the depositions. 12:59:02

BY MR. KALTGRAD:

Q    Did you read that this document was not use for any other purpose other than to provide to Blake Lively's lawyers?

MS. CONNOLLY:  Objection. 12:59:18

THE WITNESS:  I think -- I don't know if it's not used for any other purpose, but I did see it was prepared for -- I think the deposition testimony was prepared at the request of Blake Lively's lawyers. 12:59:29

Page 106

BY MR. KALTGRAD:                                    12:59:31

Q    And you're looking at the -- this
PowerPoint presentation prepared by somebody at the
request of Blake Lively's lawyers that contained
certain financial data, correct?                    12:59:49

MS. CONNOLLY:  Objection.

THE WITNESS:  Yes.

BY MR. KALTGRAD:

Q    Had you seen the backup for this data
that is placed into this PowerPoint presentation?    12:59:56

MS. CONNOLLY:  Objection.

THE WITNESS:  I have seen no further
detail.  This is the financial statement.  This is
the kind of financial statement I would expect to
get from any company.  I would not usually expect to    01:00:05
see detail below this from any of the clients I work
with unless there was a particular reason to ask for
it.

BY MR. KALTGRAD:

Q    In your shutdown case, you assume that    01:00:33
the royalties owed would be paid to LOL HATA in
perpetuity; is that right?

MS. CONNOLLY:  Objection.

THE WITNESS:  That is not limited to a
shutdown case.  Royalties would be paid independent    01:00:42

Page 107

of whether it's a shutdown case or otherwise.    01:00:46

BY MR. KALTGRAD:

Q    What is the basis for the assumption that royalties would be paid in perpetuity?

MS. CONNOLLY:  Objection.    01:00:54

THE WITNESS:  Well, that's the standard valuation assumption that businesses continue and operations continue.  The company has indicated to me that as long as the business would be expected to continue, they would expect to continue to pay    01:01:11 royalties on the similar basis to what they are paying now into the foreseeable future.

BY MR. KALTGRAD:

Q    Did you review any documents that describe how long LOL HATA would be entitled to    01:01:28 royalties?

A    Well, I am aware of their contractual obligations, but that's not constraining on a business valuation.  I've done hundreds of valuations where a contract may exist for one year    01:01:44 at a time, yet you value it on a going concerned basis with the expectation of continuing operations. You don't value it for one year and assume the business ends.  And the company has assured me, consistent with what I would fully expect, that    01:02:00

Page 108

should the company continue to operate in the way it   01:02:02
expected to operate, that royalty arrangements would
be renewed on a very similar basis to what already
existed.  And that is not only what I expected, but
what I then projected.   01:02:20

Q   Do you know what the contractual
obligations were for royalties?

MS. CONNOLLY:  Objection.

THE WITNESS:  I think they were ten
years.   01:02:29

BY MR. KALTGRAD:

Q   In each of your scenarios, shutdown or
delay, you are assuming that there were losses of
sales because of the conduct of the defendants,
correct?   01:02:47

MS. CONNOLLY:  Objection.

THE WITNESS:  Yes.  The causation is
established as a result -- the causation came about
as a result of the defendant's actions through the
online manipulation.  Yes, correct.   01:03:02

BY MR. KALTGRAD:

Q   Yes, correct, that's an assumption you're
making, correct?

A   Yes.

Q   Okay.  You didn't perform any analysis   01:03:17

Page 109

yourself on whether any consumers were actually    01:03:19
exposed to negative statements about Ms. Lively; is
that right?

MS. CONNOLLY:  Objection.

THE WITNESS:  I did not perform anything    01:03:27
directly on that point.  What I did was observe an
impact that is consistent with that point but that
is not -- but I'm not the one reaching that
conclusion.

That is I observed the fall-off in sales    01:03:43
that is entirely consistent with the online
manipulation.  But I did not and I'm not drawing the
conclusion about the causation element other than
showing or observing that the sales trends are
consistent with that causation element.    01:04:00

BY MR. KALTGRAD:

        Q    Looking at page 25 now of your report.

        A    Yes.

        Q    Paragraph 47, that is where you start
describing marketing investment case regarding    01:04:18
Blake Brown, correct?

        A    Correct.

        Q    And what is the reason you had a scenario
for marketing investment case in your report?

        A    Because that is one of the two possible    01:04:34

Page 110

outcomes for Blake Brown.  They will either make the    01:04:36
marketing investment and succeed in pulling the --
pulling out of the rapid -- the climb that they are
in.  And will know substantially before trial.  We
won't know everything before trial, but we will know    01:05:05
a lot.  Or they will not succeed.  In which case,
the shutdown case will be the relevant scenario.

Q    And you're aware that Ms. Tedesco, as
CEO, requested $6.1 million investment in marketing
from the board?                                          01:05:22

        MS. CONNOLLY:  Objection.

        THE WITNESS:  I'm aware she did -- or I
think that's the number.  I'm aware she requested
more than she got.

BY MR. KALTGRAD:                                         01:05:31

Q    So you're aware that the board did not
approve the full $6.1 million investment, correct?

        MS. CONNOLLY:  Objection.

        THE WITNESS:  Yes.  We discussed this
earlier in my deposition when I said that this is        01:05:38
one of the areas that I will probably have to make
an update, and we will wait to do that because there
is no reason to make two updates.

BY MR. KALTGRAD:

Q    Do you know how many board members Family    01:05:47

Page 111

BY MR. KALTGRAD:                                        01:08:20

Q    Does your report reference any document that indicates they are on the cusp of a shutdown?

MS. CONNOLLY:  Objection.

THE WITNESS:  I don't know if -- I don't    01:08:29 remember what it references.  This is one of those things that, come closer to trial, we will know a lot more about what their trends and expectations are.  And we will hear from the company at trial as to where they are in their ability to recover.    01:08:46

BY MR. KALTGRAD:

Q    Is your presentation of a two- or three-year delay based on anything other than what you were told by the management of Betty B?

MS. CONNOLLY:  Objection.    01:09:05

THE WITNESS:  The calculation itself is based on a lot of documents and forecasts and things of that sort.  The time period itself is based on what I understand the company will testify about and about how long -- in their judgment and having done    01:09:23 this and having faced the challenges that they are facing, how long the delay will be.

BY MR. KALTGRAD:

Q    Still on Exhibit 1, I'm going to turn to Appendix C.4.                                          01:09:41

Page 114

BY MR. KALTGRAD:                                    01:17:13

Q    And similarly, for Betty Brown Family Hive -- sorry, Blake Brown -- your report doesn't allocate lost profits to any cause other than the conduct of the defendants?                          01:17:28

MS. CONNOLLY:  Objection.

THE WITNESS:  All my prior answers apply equally to Blake Brown.

BY MR. KALTGRAD:

Q    You are -- your hourly rate is $1,075; is    01:17:36 that correct?

A    It is.

Q    Do you have an estimate of how much time you spent on this case prior to your deposition?

A    I don't.                                      01:17:50

Q    Do you have a rough estimate?  Is it less than 50 hours, more than 50 hours?

MS. CONNOLLY:  Objection.

THE WITNESS:  It's probably more than 50 hours.                                                01:18:01

BY MR. KALTGRAD:

Q    Can you estimate if it's more than 100 hours?

MS. CONNOLLY:  Objection.

THE WITNESS:  I don't -- I don't know.      01:18:06

Page 121

BY MR. KALTGRAD:                                                01:18:06

Q    Somewhere between 50 and 100 is your best estimate?

MS. CONNOLLY:  Objection.

THE WITNESS:  No.  Otherwise, I would                01:18:11
have known.  I do not -- I'm not saying that.  I don't know.  It could be 200 hours.  I -- it could be -- it's not a thousand hours.

BY MR. KALTGRAD:

Q    Okay.                                                   01:18:18

A    I don't know.

Q    So somewhere less than a thousand hours but more than 50 hours, that's your best estimate?

A    I can't do any better than that.

Q    Do you know how much you have invoiced          01:18:33
for this matter to date?

A    I do not.  It's six figures and not seven.  But other than that, I can't tell you.

Q    Do you know if it's low six figures, high six figures, mid-six figures?                                   01:18:49

MS. CONNOLLY:  Objection.

THE WITNESS:  It's -- my recollection is it's at least mid-six figures, but I don't remember beyond that.

Page 122

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.  Dated this 26th day of November, 2025.

ASHLEY SOEVYN

CSR No. 12019

Page 126