# EXHIBIT 21

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                )
BLAKE LIVELY,                   )
                                )
          Plaintiff,            )
                                )
     vs.                        ) No. 1:24-CV-10049-LJL
                                ) (Consolidated with
WAYFARER STUDIOS LLC, a         ) 1:25-CV-00449-LJL)
Delaware Limited Liability      )
Company, JUSTIN BALDONI, an     )
individual, JAMEY HEATH, an     )
individual, STEVE SAROWITZ, an) HIGHLY CONFIDENTIAL -
individual, IT ENDS WITH US    ) ATTORNEYS' EYES ONLY
MOVIE LLC, a California         )
Limited Liability Company,      )
MELISSA NATHAN, an individual,)
THE AGENCY GROUP PR LLC, a      )
Delaware Limited Liability      )
Company, JENNIFER ABEL, an      )
individual, JED WALLACE, an     )
individual, and STREET          )
RELATIONS INC., a California    )
Corporation,                    )
                                )
          Defendants.           )
_____)
                                )
(RELATED CONSOLIDATED CASE.)    )
_____)


        VIDEOTAPED DEPOSITION OF LAURA TEDESCO
               Los Angeles, California
             Monday, September 29, 2025


Reported by:
RENEE A. PACHECO, RPR, CLR
CSR No. 11564
Job No. 7624695                       PAGES 1 - 208


                                              Page 1

through January/February and July/August.

So just kind of as a starting point, as a brand launching, you line up to one of those key time frames.  The end of 2023 there was agreement between Target and Family Hive that we would launch in the July/August time frame to line up to the very busy kind of back-to-school moment.

Q   Is there a specific date that you consider the launch date for the brand?

A   Formal launch date is August 4th.

Q   2024?

A   Correct.

Q   I'm going to show you another document. This is actually a portion of the pages from the complaint.  I'm not going to mark this as an exhibit.  I'm just going use it to kind of refer to.

Give me a moment to -- let me know when you're able to see that.

A   Yes.  I just opened it.

Q   Okay.  Now, this is a couple of pages from the complaint filed by Ms. Lively.  This is actually the Second Amended Complaint.  So this one was filed in July of 2025.

And at the bottom of Page 123, which is the first page you see there, there's a Paragraph 342 --

Page 35

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

operating.

MR. KALTGRAD:  Okay.  We've been going for about an hour.  Do you want to take a five-minute break?

MS. CROWLEY:  Yeah, that would be great.    09:43AM
Thank you.

THE VIDEOGRAPHER:  We are going off the record.  The time is 12:43 p.m.

(Recess.)

THE VIDEOGRAPHER:  We're back on record.    09:50AM
The time is 12:51 p.m.

BY MR. KALTGRAD:

Q    Ms. Tedesco, before you became CEO of Family Hive, were you -- did you ever hold the position of CEO at any other company?    09:51AM

A    No.

Q    And you have a business degree?

A    Yes.

Q    What position did you have before you came to Family Hive?    09:51AM

A    Immediately before Family Hive, I was the chief marketing and chief strategy officer at a company called the Honey Pot Company and was there for about three years.

Q    Okay.  I just introduced another exhibit,    09:51AM

Page 55

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

Q   Okay.  If you look at Page 38, like I said, which is - if you look at the bottom right, there's Bates-stamped documents starting with BL.  So this one ends at 803.

Do you see that?                              09:54AM

A   Yes.

Q   And there's a signature there for LOL HATA LLC by Blake Lively as manager.

Do you see that?

A   Yes.                                       09:54AM

Q   Okay.  And is it your understanding that Blake Lively is the manager of LOL HATA LLC?

A   I honestly don't know the ins and outs of LOL HATA and its relationship to Blake.

Q   Do you know if she's a member of LOL HATA?   09:55AM

A   I don't have that information.

Q   Okay.  On Page 41, which is 806, there's a signature for Blake Lively as manager of Family Hive LLC.

Do you see that?                              09:55AM

A   I do.

Q   And is that correct, that Blake Lively is the manager of Family Hive LLC?

A   I'm honestly not sure of what the like origin or intention behind that is.  She's obviously   09:55AM

Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

A    Just CEO.

Q    Are members of Family Hive entitled to distributions?

A    When you say "members," you mean the groups listed on -- in Exhibit A?                    09:58AM

Q    Yes.

A    Currently Blake Lively is entitled to royalties.  And Give Back Beauty receives distribution service fees for resources that it lends to Family Hive operations, and those are built    09:58AM into my -- my P&L.

Q    If there's any profit in the company though that's not necessarily distributed at this time, does it go back into the capital accounts; is that how it works?                                            09:59AM

A    The intention when there is profit is that it would be reinvested into the business to be able to further drive growth.

Q    Has there ever been a distribution of profits in Family Hive?                                      09:59AM

A    Not to my knowledge, no.

Q    I'm going to look at another document, Exhibit 3.  One moment.

(Defendants' Exhibit 3 was marked for identification.)                                          09:59AM

Page 61

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

THE DEPONENT:  Yes.  We -- we work with them sort of across the business particularly how it pertains to Blake's broader ecosystem.

BY MR. KALTGRAD:

Q   And you still work with Maximum Effort?          10:08AM

A   Not really.  They're on retainer, but we don't necessarily do much with them.

Q   When was the last time Maximum Effort was substantively involved in the business?

MS. CROWLEY:  Objection to form.          10:09AM

MR. BRUNO:  Objection to form.

MS. CROWLEY:  If you understand, you can answer.

THE DEPONENT:  What do you mean by "substantively involved"?          10:09AM

BY MR. KALTGRAD:

Q   When was the last time Maximum Effort did any work for the business?

MS. CROWLEY:  Objection to form.

MR. BRUNO:  Join.          10:09AM

THE DEPONENT:  We had members of the team more involved at launch because we didn't have our own team build-out.  But we really shifted away from having them involved in the day-to-day.

MR. KALTGRAD:  I'm going to move on to          10:09AM

Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

Exhibit 7.

(Defendants' Exhibit 7 was marked

for identification.)

BY MR. KALTGRAD:

Q   Let me know when you can see that, please.      10:10AM

And this is "Attorneys' Eyes Only" document.

A   I can see it.

Q   Okay.  And I will represent to you that the

way this was produced to us, the e-mail we just saw

was the Bates number just preceding this document's      10:10AM

Bates number.

Now, you'll see on the top, it has a date

of July 2024.  Is it your understanding that this

was prepared around July 2023?

A   That's my understanding --      10:10AM

MR. BRUNO:  Objection; form.

THE DEPONENT:  My understanding this is a

July 2023 document.

BY MR. KALTGRAD:

Q   Okay.  Thank you.      10:10AM

And can you tell -- can you explain briefly

what this document is?

A   It was the next touch base on the business

plan.

Q   And your understanding it was prepared      10:11AM

Page 70

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

around July 2023?

MR. BRUNO:  Objection to form.

MS. CROWLEY:  Objection to form.

THE DEPONENT:  Yes.  As a continuation of the June 2023 document.                    10:11AM

BY MR. KALTGRAD:

Q   Understood.

We saw the e-mail as Exhibit 6 with this document being sent to the people on the e-mail.

Do you know if it was ever sent to anybody   10:11AM else besides those people?

MR. BRUNO:  Objection to form.

MS. CROWLEY:  Objection to form.

THE DEPONENT:  I don't know.

BY MR. KALTGRAD:                                 10:11AM

Q   Okay.  And, again, there's a draft stamp on most pages here and that's because this is not what you'd call the final version; is that right?

MS. CROWLEY:  Objection.

MR. BRUNO:  Join.                                10:12AM

THE DEPONENT:  That's my assumption, yes.

BY MR. KALTGRAD:

Q   Was there ever any discussion with Deloitte from the company side that the projections they were making were either too high or too low?         10:12AM

Page 71

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

BY MR. KALTGRAD:

Q   When you say "basics of the business," what do you mean by that?

A   Well, I think the general brand positioning and product assortment was reasonably established.    10:14AM
And so, in bringing that to Deloitte, the question for Deloitte was to do its typical comprehensive assessment of the market and inform kind of a -- and create a business plan that could bring that position and that product approach to life and to    10:14AM
help Family Hive understand the best way to go about realizing its ambition.

Q   Okay.  And if you turn to Page 2, that's sort of the -- that is the ambition that you just referenced, to be a billion-dollar company; right?    10:15AM

A   Correct, and, of note, the billion-dollar valuation, which means how much the company would be worth to someone acquiring.

Q   If you look at Page 14 which, is Bates stamp 811.    10:15AM

A   Okay.

Q   Under "Organization" it says, (as read):

        "Based on analysis of similar

        beauty start-ups and unique needs of

        the Ellender Brown launch plan, it's    10:15AM

Page 73

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

recommended that a dedicated team of ten FTE is built over the next 18 to 24 months augmented by a suite of services being provided by GBB."

And FTE refers to full-time employees?                10:16AM

MR. BRUNO:  Objection to form.

THE DEPONENT:  Correct.

BY MR. KALTGRAD:

Q   How many full-time employees does Family Hive have now?                10:16AM

A   Including myself, there are seven of us.

Q   Do you know how many it had in July of 2023?

A   The only team member who preceded me started, I think, August or September.  So in July,    10:16AM I believe, it would have been zero, but I don't know her exact start date.

Q   Okay.  And you started -- I'm sorry.  Tell me again when you started as CEO?

A   April of 2024.                10:17AM

Q   So before April of 2024, was it your understanding there were six full-time employees in the company?

MS. CROWLEY:  Objection.

MR. BRUNO:  Join.                10:17AM

Page 74

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

THE DEPONENT:  No.  Before me, there was one full-time employee.  I was the second full-time employee.

BY MR. KALTGRAD:

Q   Okay.  Thank you.  Now I understand.                    10:17AM

If you look down at "Key Role" it says, (as read):

"It is recommended that a chief of staff role be created and filled quickly in the immediate term."          10:17AM

Is there a chief of staff currently at the company?

A   No.

Q   Was there ever?

A   No.  There were different recommendations          10:18AM in terms of the right sort of most important role. And over the course of discussions with Deloitte came sort of the recognition that having an executive overseeing the business was important and could, in the short term, supplant the chief of          10:18AM staff.

Q   If you look at under "Governance," the second sentence starts, (as read):

"In addition, we strongly recommend that Ellender Brown          10:18AM

Page 75

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

A    I do.

Q    Was a full-time chief marketing officer

hired for Family Hive?

A    Yes.

Q    And who was hired?                                    10:29AM

A    The individual Mindel Klein.

Q    And then it says, (as read):

        "PR and social media FT -- as a

full-time hire, as it is the key

channel to drive demanding -- demand          10:29AM

leading to launch."

Do you see that?

A    Yes.

Q    And was a full-time PR and social media

manager hired?                                           10:29AM

A    Yes.

Q    And who was that?

A    An individual (inaudible).

DEPOSITION REPORTER:  Can you say it again?

THE DEPONENT:  Sofanni (phonetic).          10:29AM

DEPOSITION REPORTER:  The last name?

THE DEPONENT:  Delhante (phonetic).

BY MR. KALTGRAD:

Q    And when was that person hired?

A    January of 2024 -- or, sorry, 2025.        10:29AM

Page 83

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

Q   So prior to January of 2025, there was no full-time social media or PR role; is that right?

A   The role was open, we were trying to find somebody.  So as I mentioned earlier, other team members were owning the -- the social media.   10:30AM

Q   We'll look at another document now. Exhibit 8.

          (Defendants' Exhibit 8 was marked

          for identification.)

BY MR. KALTGRAD:                              10:30AM

Q   Let me know when you can see that, please.

A   Yes, I can see it.

Q   Okay.  This document is titled:  "Agreed Revisions to the Transaction Agreements August 7, 2023."                              10:31AM

          Do you see that?

A   I do.

Q   And the transaction agreements are described as the LLC A; is that the LLC agreement we already looked at?                              10:31AM

A   Where are you referencing?

Q   I'm looking -- it's kind of in the middle of the page.  It says, "Transaction Agreements," in bold.  There's kind of a list of six definitions in the middle of the first page.                              10:31AM

                                             Page 84

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

"In July 2025, Ellender Brown

plans to expand into Ulta."

What is Ulta?

A   Ulta is sort of a masstige/prestige

retailer.                                               10:38AM

Q   And did Ellender Brown expand into Ulta in

July 2025?

A   We did not.

Q   There are no -- no Ellender Brown or Blake

Brown products available at Ulta currently; correct?   10:38AM

A   Correct.

Q   At some point Ulta and Target had some kind

of a partnership.

Are you aware of that?

MS. CROWLEY:  Objection to form.                10:38AM

MR. BRUNO:  Join.

THE DEPONENT:  Yes.

BY MR. KALTGRAD:

Q   Okay.  And are you aware that that

partnership ended?                                      10:38AM

A   I am.

Q   As far as retail stores, is it correct that

Blake Brown is exclusively available at Target?

A   That is correct.

Q   Are you aware of any general retail decline   10:39AM

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

at Target in 2025?

     A    Clarify what you mean by "general retail decline," please.

     Q    Are you aware of any drop in foot traffic of people going into Target stores in July -- I mean, in 2025?                                    10:39AM

     A    Yes.

     Q    And do you know what that was based on?

          MS. CROWLEY:  Objection.

          MR. BRUNO:  Join.                                              10:40AM

          THE DEPONENT:  I think it's based on fewer people being in the store.

BY MR. KALTGRAD:

     Q    Do you know why fewer people were going in the store?                                                              10:40AM

          MS. CROWLEY:  Objection.

          MR. BRUNO:  Join.

          THE DEPONENT:  I'm not an expert in the space, so I don't know.

          MS. CROWLEY:  Yeah, this is well outside the scope of the noticed topics.                                     10:40AM

BY MR. KALTGRAD:

     Q    Do you recall hearing that Target had backtracked on DEI efforts at some point?

          MS. CROWLEY:  Objection; this is outside                      10:40AM

Page 91

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

the scope.

MR. BRUNO:  Form.

MS. CROWLEY:  Can we move on from there?

MR. KALTGRAD:  Well, I think it's relevant. I'm asking if there's knowledge here.    10:40AM

MS. CROWLEY:  Which topic is this relevant to?

MR. KALTGRAD:  It's relevant to the financial performance of the company.

MS. CROWLEY:  If you know, you can answer,    10:40AM and then we're going to move on.

THE DEPONENT:  Overall foot traffic is down, and it correlates to around when Target moved away from sort of DEI support.  That said, the category that we play in has remained relatively    10:41AM healthy and strong.

BY MR. KALTGRAD:

Q   Are you aware if the drop in foot traffic had any impact on sales at Target?

MR. BRUNO:  Objection; form.    10:41AM

MS. CROWLEY:  Objection to form.  Sales of what?

BY MR. KALTGRAD:

Q   Let's start with generally.

MS. CROWLEY:  Objection.    10:41AM

Page 92

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

five-minute break or -- is that okay?

MS. CROWLEY:  Can we have a little bit longer, like ten?

MR. KALTGRAD:  Okay.  I'm trying to respect the witness's time.  But ten minutes is fine with me.  Yeah.                                                    10:58AM

MS. CROWLEY:  Okay.  Thank you.

MR. KALTGRAD:  Is that okay, ten minutes?  Is that --

MS. CROWLEY:  That's good.  Thank you.    10:59AM

MR. KALTGRAD:  Okay.  Sure.  Off record.

THE VIDEOGRAPHER:  We're going off the record, the time is 1:59 p.m.

(Recess.)

THE VIDEOGRAPHER:  We're back on the record    11:09AM
the time is 2:09 p.m.

BY MR. KALTGRAD:

    Q    Ms. Tedesco, I just introduced Exhibit 10, if you could take a look at that.

    A    Sure.  Okay.  I have it up.                11:09AM

        (Defendants' Exhibit 10 was marked for identification.)

BY MR. KALTGRAD:

    Q    Have you ever seen this document before?

    A    I have.                                    11:09AM

Page 107

Q   What is this document?

A   This is a document that was prepared for shareholders by GBB that detailed the cash required for the Deloitte business plan.

Q   Do you know when this was prepared?      11:10AM

A   I believe it was this year.

Q   Sometime in 2025?

A   Yeah.  It's -- it's a shareholder document. So unfortunately, it's not one that I use as part of Family Hive or that I created, but.      11:10AM

Q   And your understanding is this is based on the August 2023 Deloitte five-year business plan?

MS. CROWLEY:  Objection.

MR. BRUNO:  Join.

DEPOSITION REPORTER:  Ms. Crowley, if you      11:11AM could speak up, please.  I can barely hear you.

MS. CROWLEY:  Apologies.  I said, Objection.

BY MR. KALTGRAD:

Q   Is that right?      11:11AM

A   That's my understanding.

Q   And you think it was GBB that created the document?

A   It was.  I know it was GBB.  It was created to supplement the Deloitte business plan because      11:11AM

Page 108

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

A   Correct.

Q   Okay.  Is it based on anything else besides what you already testified to?

A   The only other piece I would pull in if you've done a dramatic -- a lot of, not dramatic, but a lot of consumer perception and clinical work on the formulas to understand the experience that we would expect consumers to have with the products.

And in those early weeks of feedback and, let's say, the first half of August, the positive feedback was very consistent with the results that we had coming out of our clinical trials and our consumer perception studies.

So from there, it would be that very dramatic difference, reported difference, starting sort of mid-August in terms of product experience and product performance.

It was just very inconsistent with not only the initial launch feedback we had gotten, but the, you know, validation work we had done on the formulas prior to launch.

Q   Okay.  If we look at the first product here, it's Nourishing Shampoo.

Do you see that?

A   Yes.

11:31AM

11:31AM

11:31AM

11:32AM

11:32AM

Page 123

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

Q    And you say (as read):

"The most frequently mentioned issue with 42.11 percent of comments highlighted problem such as dryness, bitterness [sic] and damage to hair.

"Formula.  21 percent of the comments pointed out issues related to the formula causing hair problems.

"Packaging.  Many users found the packaging to be impractical or difficult to use.

"Scents.  10.53 of the percent of the comments mentioned the scent was overpowering or unpleasant."

And there's no mention in this e-mail about a dislike of Blake Lively; right?

A    I do not --

MR. BRUNO:  Objection to form.

DEPOSITION REPORTER:  I didn't hear your answer.

THE DEPONENT:  By design.

BY MR. KALTGRAD:

Q    What do you mean by that?

A    What you see here is what I have to dig

Page 124

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

into as a operator to understand the experience consumers are having with the physical product.

Q   Okay.

A   And so that's -- I mean, these comments are all related to the product itself.                11:33AM

Q   (As read):

"Nourishing Mask talks about hair dryness, lack of effectiveness and packaging issues."

And, again, you're not mentioning Blake       11:33AM
with relation to that product; right?

That's a "yes"?

A   Correct.  For the same reason as the shampoo.

Q   (As read):                                  11:33AM

"Strengthening shampoo talks about overpowering scent, impractical packaging and performance.

"Strengthening Mask.  Overpowering        11:33AM
scent, impractical packaging, bad performance, too expensive.

"Leave-in conditioner.  Complaints about poor performance.  The scent again.  A thick or sticky formula.     11:34AM

Page 125

Being overpriced and bad packaging."

Under "Performance" it says, (as read):

"The most prominent negative feedback revolves around performance issues or users felt the product didn't work effectively."

Pre-shampoo Mask, again, complaints about price, bad scent and packaging.

Glam Mousse.   You quote a few things about -- a few reviews saying (as read):

"Made my hair -- made hair feel like straw, made hair frizzy, not clean and made hair feel greasy. Fails as a dry shampoo."

And then dry shampoo (as read):

"Frequent complaints about product formula, leaving hair stiff, sticky or an unpleasant residue."

And none of these reviews mentioned Blake Lively; correct?

A    Again, this document was prepared for me to determine what, if any, action I could take on the marketing efforts, the education and understanding of the products and the formulas and people's experience with them.

Page 126

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

And so I think in terms of the connection with Blake, it wasn't part of this assessment.  I think what's important to know this is a kind of point in time.

And, again, my kind of best assessment of    11:35AM some of the feedback that we were getting, because ultimately, you know, as a CEO, you can't be egregious about the feedback.

You have to look at it and understand if there's anything that needs to be done or action as    11:35AM a result.  And this would be the intention behind this e-mail.

Q   I'm going to show you another exhibit, which will be Exhibit 13.

(Defendants' Exhibit 13 was marked    11:36AM for identification.)

BY MR. KALTGRAD:

Q   Let me know when you can see that.

A   I can see it.

Q   Okay.  And is it your understanding that    11:36AM this is a compilation of the Target review data that's attached to the e-mail that was Exhibit 12?

A   Yes.  For that moment in time.  It was not comprehensive.

Q   Look at Exhibit 14, coming in.    11:37AM

Page 127

MS. CROWLEY:  Objection to form.

MR. BRUNO:  Join.

MS. CROWLEY:  Can you be more specific?

BY MR. KALTGRAD:

Q   Did you have ever a conversation internally in the company about whether the company should be allowing Blake Lively to promote the hair care brand in conjunction with a movie relating to domestic violence?                                          12:52PM

MS. CROWLEY:  Objection to form.          12:52PM

MR. BRUNO:  Join.

THE DEPONENT:  I think the timeline is important here.  So, you know, the brand launch was established kind of end of, you know, mid- to end of 2023.                                          12:52PM

We -- we found out about the movie date in that, maybe, like May/June time frame.  Prior to that the intention was, you know, we have Blake kind of like on uninterrupted, you know, no distractions to really devote to launching the brand.          12:53PM

And given the business models is built on her likeness and her, as someone who has major credibility and likability, credibility in the hair care space and overall popularity and likability, the intention was to be able to have her really be          12:53PM

Page 170

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

the face of the brand for ongoing basis post-launch.

When the movie premier date was then shared that it would line up closely to the Target launch date, it actually, I'll say, it created a bit of a challenge for us.

12:53PM

Because the movie required her to take on responsibilities that took her away from being able to be 100 percent focused on the brand launch.

There was no strategic effort or plan to bring the two launches together.  And, again, it actually kind of worked against Blake Brown to not have our founder and face fully available for all our marketing needs.

12:54PM

BY MR. KALTGRAD:

Q    Okay.  And I'm going to ask you to try and keep your comments focused.  You can respond how you feel you need to respond, but I'm trying to be mindful of your time.

12:54PM

So let me ask this:  Do you recall a discussion about maybe it's not such a good idea to be promoting the hair care brand in conjunction with a movie about domestic violence?  Was that ever raised at the company?

12:54PM

MR. BRUNO:  Objection; form.

MS. CROWLEY:  Objection.

12:54PM

Page 171

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

THE DEPONENT:  We discussed the importance of promoting -- of launching and promoting the brand on its own.  And so connecting it to the movie was antithetical to that desire and approach.

BY MR. KALTGRAD:                                          12:54PM

Q   Did the company ever, in its analysis, say hey, We're getting a lot of comments about domestic violence here, and we may have a problem?  Was whatever raised?

MR. BRUNO:  Objection.                                   12:55PM

THE DEPONENT:  I think, broadly -- I'm sorry.  I think, broadly, we were evaluating all of the comments and feedback we were getting, and -- and, you know, as an operator, I'm focused on the parts of the brand and product that I can influence.     12:55PM

But, yes, we were highly aware of the themes and the overwhelming negative impact of comments related to Blake.

BY MR. KALTGRAD:

Q   Did the -- did the company take any action     12:55PM
once it saw that it was receiving a lot of comments related to domestic violence?

MS. CROWLEY:  Objection to form.

MR. BRUNO:  Join.

///

Page 172

BY MR. KALTGRAD:

Q   Page 25 lists product review examples, like my hair fell off; complete waste of money; feels like a cheap product; dried my hair out so bad?

Were these all from accounts that you had identified as bots?

MS. CROWLEY:   Objection to the form.

MR. BRUNO:   Join.

THE DEPONENT:   These are Target reviews or reviews left on target.com.   And, again, from an illustrative perspective -- this is not meant to be a comprehensive list but examples of some of the reviews that were being left that didn't necessarily focus on the product or, you know, quite extreme claims about the product in combination with either direct or inferred nod to Blake in the movie.

BY MR. KALTGRAD:

Q   I'm going to show you a new exhibit, which will be 23.

(Defendants' Exhibit 23 was marked for identification.)

BY MR. KALTGRAD:

Q   Do you recognize this document?

A   Yes.

Q   Did you prepare this document?

Page 175

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

because fundamentally those are the things that impact as an operator, the brand fundamentals.

Q   Has Family Hive ever been involved in litigation?

A   Not that I'm aware of.                01:28PM

Q   Has Family Hive ever been involved in any trademark dispute?

A   I think you probably know this, but trademark is a pretty standard practice.  So, yes, we file for trademarks, and then we defend them as     01:28PM needed.

Q   And you're aware that someone has filed for the trademark Beauty by Blake which Family Hive has opposed?

A   I am aware of that.                01:28PM

DEPOSITION REPORTER:  I didn't hear the objections.

MR. BRUNO:  I stated -- this is counsel for Ms. Lively.  We object to the form.

BY MR. KALTGRAD:                01:29PM

Q   Has the company taken a position that it has been damaged by the use of a Beauty By Blake trademark by anyone else?

MS. CROWLEY:  Objection.

MR. BRUNO:  Objection.                01:29PM

Page 197

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

THE DEPONENT:  I believe we're in discovery period.  In terms of the details, our trademark attorney manages the details of it.  I think, generally speaking, trademark is pretty straightforward.                                        01:29PM

And so, if there's a mark that registered that's in conflict with a Family Hive mark, then we would, as normal course of business, as any brand would, object.

BY MR. KALTGRAD:                                          01:30PM

Q   Has the company quantified any damages associated with trademark dispute?

MS. CROWLEY:  Objection.  And I just caution you again not to discuss any discussions that you've had with counsel for Family Hive on this    01:30PM matter.

BY MR. KALTGRAD:

Q   That can be a "yes" or "no" for now?

So, I'm sorry.  Was there an answer?

A   Quantifying damages?                                01:30PM

Q   Yes.  The question was, Has the company quantified damages associated with a trademark dispute that it's involved in?

MR. BRUNO:  Objection; form.

MS. CROWLEY:  If you know, you can answer    01:30PM

Page 198

"yes" or "no."

THE DEPONENT: I don't know, not that I've been made aware.

BY MR. KALTGRAD:

Q   Has there ever been an offer to buy Family Hive?      01:30PM

A   Not that I'm aware of.  That would be a shareholder discussion though.

Q   Do you know what the current assets of Family Hive are as far as the number?      01:31PM

A   Not off the top of my head.

Q   Do you have an estimate?

A   No.

Q   You can't tell me if it's somewhere between 10 million and a hundred million?      01:31PM

MS. CROWLEY:  Objection.

MR. BRUNO:  Object; form.

BY MR. KALTGRAD:

Q   I mean, you are the 30(b)(6) witness on financial performance of the company.  So this is in the area that you would be expected to have educated yourself?      01:31PM

And is it your testimony that you don't have an estimate of what the current assets of the company are?      01:31PM

Page 199

company the required services as          01:13:31

further set forth in Exhibit B attached

hereto and then defining the services."

Do you see that?

A    Yes.                                 01:13:40

Q    Okay.  So now I'm going to scroll down to Exhibit B, which was just referenced.  And that's with Bates Number ending in 37850.

A    Okay.  I'm there.

Q    Okay.  And this is titled Exhibit B     01:14:04 Services.

Do you see that?

A    I do.

Q    And these are defined as four categories: "Service Days," "Social Media Posts" -- oh, I'm     01:14:11 sorry.  Three categories -- and "General Promotion."

Do you see that?

The three numbers.  Number one is "Service Days," number two is "Social Media Posts," and number three is "General Promotion."          01:14:31

A    Yes.

Q    Okay.  And just so I'm clear, is it the company's position that Blake Lively has met all of her obligations for services under this agreement?

MS. ROESER:  Objection.          01:14:46

Page 228

THE WITNESS:  Correct.  Blake has met her    01:14:47
obligations here.

BY MR. KALTGRAD:

Q    Okay.  And despite any negative publicity
that she was experiencing, she was still able to    01:15:01
meet the obligations under services under this
agreement, correct?

MS. ROESER:  Objection.

THE WITNESS:  Correct.

BY MR. KALTGRAD:                                     01:15:14

Q    Okay.  I'm going to go back to page 10,
and now I'm looking at Section 4.1.1.

Do you see that?

A    One sec.  Yes.

Q    This is titled "Product Royalties," and    01:15:33
it says:

(As read):

"During the license term and any

wind-down period as defined below,

company shall pay to lender (a) a    01:15:39

royalty equal to 5 percent of Wholesale

Gross Sales defined as Wholesale

Royalties, and (b) a royalty equal to

10 percent of consumer gross sales

defined as consumer royalties, and    01:15:56

Page 229

permitted under the company services agreement; is     01:28:43
that right?

A     Correct.

Q     Okay.  If I go back to Section 4.1.1, the
royalties section.                                     01:28:57

A     Okay.

Q     Now, this section provides that the
company shall pay to lender.  So the company pays
the royalty directly to LOL HATA, correct?

A     Correct.                                         01:29:18

Q     It does not pay Blake Lively directly,
correct?

A     We pay LOL HATA, correct.  Directly.

Q     Okay.  But there hasn't been a time where
you've wired a transfer to Blake Lively or written a   01:29:31
check to Blake Lively in her personal capacity?
Every payment for royalties has gone to LOL HATA; is
that right?

A     That is correct.

Q     Okay.  So under the agreement, 5 percent     01:29:45
of the wholesale gross sales equals the wholesale
gross royalties.  And do you know what the wholesale
gross sales were in 2024?

A     Of that -- and again, I usually work a
little bit more on net sales, if you were to gross     01:30:20

Page 240

THE WITNESS:  Again, we were adjusting to    02:31:03
the reality of what we were in.  In terms of the
sales, I can't magically generate cash.  So we
needed more -- it would have been great to invest
more; but at that moment, we had to make the hard    02:31:14
decision around cash investment and marketing.  So
we made every dollar work as hard as possible.

BY MR. KALTGRAD:

Q    And who made that decision?  Was it you
as the CEO, or was it the board?    02:31:33

A    It was a joint decision between myself
and the board.

Q    Okay.  Now in May of 2025, you actually
asked the board to increase the marketing budget; is
that right?    02:31:48

A    I have, yes.

Q    Okay.  And that board didn't make a
decision at least for several months, right?

MS. ROESER:  Objection.

MS. MAYO:  Objection.  And now this is    02:32:00
getting outside the scope of today's deposition
which is just about royalties.

MS. ROESER:  Agreed.

BY MR. KALTGRAD:

Q    You can still answer the question.  It's    02:32:16

Page 274

just a yes or no.  The board delayed making a    02:32:18
decision for several months; is that right?

            MS. ROESER:  Objection.

            MS. MAYO:  Objection.

            THE WITNESS:  Yes.    02:32:28

BY MR. KALTGRAD:

        Q    Has the board made a decision to date on
increasing the marketing?

            MS. ROESER:  Objection.

            MS. MAYO:  Objection.    02:32:34

            THE WITNESS:  Yes.

BY MR. KALTGRAD:

        Q    And is marketing being increased?

            MS. ROESER:  Objection.

            MS. MAYO:  Objection.    02:32:43

            THE WITNESS:  Yes.

BY MR. KALTGRAD:

        Q    Is it being increased by the level that
you had requested from the board?

            MS. ROESER:  Objection.    02:32:52

            MS. MAYO:  Objection.  And I'm going to
direct you not to answer.  We should move on from
this.  This is outside the scope of the deposition
topic.

            MR. KALTGRAD:  Well, I think that the    02:33:04

Page 275

royalties are directly related to the sales.  And    02:33:05
this is actually my last question on it.

So the only question is:  Did the board
make a decision to give as much money to marketing
as you requested from the board?    02:33:15

MS. MAYO:  Objection.

MS. ROESER:  Join.

THE WITNESS:  They gave me about two
thirds of what I asked for.

THE STENOGRAPHIC REPORTER:  What did    02:33:41
she -- gave you "about two thirds," she said?
"Two-thirds of what I asked for"?

THE WITNESS:  Correct.  Two thirds of the
amount I requested.

THE STENOGRAPHIC REPORTER:  Okay.  Got    02:33:41
it.

MR. KALTGRAD:  I'm going to look at
Exhibit 31.  Are you able to see that, Ms. Tedesco?

THE WITNESS:  Not yet.  Yes.  Now I can
see it.    02:34:35

(Exhibit 31 marked for identification.)
BY MR. KALTGRAD:

Q    This is another email from
Give Back Beauty to Blake Lively's accounting
management company.  It shows the royalties paid for    02:34:44

Page 276

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

I, the undersigned, a Certified Shorthand Reporter of the State of California, Registered Professional Reporter, Certified Live Note Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [  ] was [  ] was not requested. I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 09/30/2025

RENEE A. PACHECO

CSR No. 11564 RPR, CLR

Page 206