# EXHIBIT 26

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

_____

BLAKE LIVELY,                     )
                                  )
         Plaintiff,               )
                                  )
    vs.                           ) No. 1:24-CV-10049-LJL
                                  ) (Consolidated with
WAYFARER STUDIOS LLC, a           ) 1:25-cv-00449-LJL)
Delaware Limited Liability        )
Company, JUSTIN BALDONI, an       )
individual, JAMEY HEATH, an       )
individual, STEVE SAROWITZ, an)
individual, IT ENDS WITH US       )
MOVIE LLC, a California            )
Limited Liability Company,        )
MELISSA NATHAN, an individual,) HIGHLY CONFIDENTIAL -
THE AGENCY GROUP PR LLC, a        ) ATTORNEYS' EYES ONLY
Delaware Limited Liability        )
Company, JENNIFER ABEL, an        )
individual, JED WALLACE, an       )
individual, and STREET            )
RELATIONS INC., a California      )
Corporation,                      )
                                  )
         Defendants.              )
_____)
(RELATED CONSOLIDATED CASE.)   )
_____)

REMOTE VIDEOTAPED DEPOSITION OF ANDREW T. CHRISOMALIS

New York, New York

Wednesday, September 24, 2025

Reported by:

RENEE A. PACHECO, RPR, CLR, CSR No. 11564

Job No. 7624620                          PAGES 1 - 236

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

designated as the representative for those topics; correct?

A   Yes.

MS. FISSELL:  Objection.

MR. BRUNO:  Join.                          09:39AM

BY MR. KALTGRAD:

Q   What is your role with Betty B Holdings?

A   The chairman of the company.

Q   Do you hold any other titles?

A   No.                                    09:39AM

Q   Are you acting as the CEO as well?

A   Effectively, yes, I've assumed those responsibilities?

Q   And how long have you been the chairman of the company?                                09:39AM

A   Since inception.

Q   And when was that?

A   I think it was 2021.

Q   And for how long -- when did you assume the role or the responsibilities as CEO?    09:39AM

A   Earlier in 2025.

Q   And what were the circumstances of you assuming the responsibilities of CEO?

A   The departure of the prior CEO.

Q   And who was that?                      09:40AM

Page 25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q   And was -- were you selling both alcoholic and nonalcoholic products at that point?

A   No.

Q   Which one were you selling at this point?

A   Nonalcohol.                                      09:41AM

Q   When did you start selling alcoholic products?

A   I believe it was 2023.

Q   And I believe you said that your understanding is Betty B Holdings was formed in 2021; is that right?                             09:42AM

A   Well, the predecessor company was formed in 2021.

Q   And what was the predecessor company?

A   Betty Buzz, LLC, which is -- well, okay.        09:42AM

Q   Is that now a subsidiary of Betty B Holdings?

A   Yes.

Q   When was Betty B Holdings formed?

A   I believe it was 2023 as well.                  09:42AM

Q   Was there -- what was the reason for forming a new entity and making Betty Buzz a subsidiary?

A   The introduction of a new product line.

Q   And why did that necessitate or drive the     09:43AM

Page 27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A    Yes.

Q    -- signed by Blake Lively as manager?

A    Yep.

Q    Okay.  And is it your understanding that Blake Lively is the manager for LOL HATA LLC?    10:33AM

A    Yes, that's my understanding.

Q    Do you know if she's a member of LOL HATA LLC?

A    I would imagine, but I don't --

Q    You don't know one way or the other?    10:34AM

A    I believe she is.

Q    Do you know what percentage of ownership interest in LOL HATA LLC she has?

A    I -- I --

Q    If you don't know, that's okay.    10:34AM

A    I think it's 100 percent, but I'm not 100 percent sure.

Q    What is your belief based on?

A    I don't recall.

Q    If you look at the next page, it has a    10:34AM
schedule of members.

        Do you see that?

A    Yes, I do.

Q    And the third entity listed there is LOL HATA LLC.    10:34AM

Page 63

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q   Any other point in time?

A   I don't recall the details in the document. I'd have to check.

Q   Has there ever been a distribution for Betty B?                                             10:51AM

A   No.   There has not.

Q   On Page 41 of the PDF Bates 22273 -- it's actually Page 40 of the document.

A   Yes.

Q   Okay.   Right before Section 7.3, there's a                                             10:51AM
paragraph that says (as read):

"For illustrative purposes only

attached hereto as Exhibit C is an

example waterfall calculation

illustrating the calculation of                                             10:51AM

hypothetical distributions pursuant

to the Section 7.2 and pursuant to

Section 8.3 in the case of a

liquidation event."

Do you see that?                                             10:51AM

A   I do.

Q   Okay.   And then it's referring to an
Exhibit C, which is the last page of the document if
you can turn to that.   And I know it's very small,
so you can try and blow that up.                                             10:52AM

Page 72

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A    Yep.

Q    And this is that example of a waterfall distribution reference; correct?

A    Yes, it is.

Q    And is it correct that under this example    10:52AM
distribution, if there was a distribution of up to
$13 million, LOL HATA would be entitled to 1.4
million of that distribution; is that right?

MR. BRUNO:   Objection to form.

THE DEPONENT:   Yeah, I believe that's what    10:52AM
that says, yes.

BY MR. KALTGRAD:

Q    Okay.   And then for the -- if there's an
additional $18 million distributed, LOL HATA is only
entitled to $77,000 in distribution; is that right?    10:52AM

A    According to this table, yes.

Q    Okay.   Has this table been amended since
the -- in the third or fourth LLC agreements?

A    Yes.

Q    And how has it been amended?    10:53AM

A    I don't recall the specifics, but it's been
amended as part of the additional investments that
went into the company.

Q    Would LOL HATA be entitled to more in the
13 million and 18 million or less based on the    10:53AM

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

amendments?

MR. BRUNO:  Objection to form.

THE DEPONENT:  I'd have to check.

BY MR. KALTGRAD:

Q  Okay.  You can't tell me without looking at    10:53AM
the document; is that right?

A  I cannot tell you looking at this document.
And I would have to look at that document, correct.

Q  Let's look at another exhibit I'm going to
show you.  And this document has been marked          10:53AM
"Attorneys' Eyes Only," so I just want to make sure
there's no one else on the line here.

You should be able to see that now.

A  What is it called?

Q  It's Betty B3?                                 10:54AM

A  Yep.  Okay.  I have it, yep.

(Defendants' Exhibit 3 was marked
for identification.)

BY MR. KALTGRAD:

Q  And have you ever seen this document           10:54AM
before?

A  Yes.

Q  And what is this document?

A  What is it?

Q  Yeah.                                          10:54AM

Page 74

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A    This is a summary of the current ownership of -- of Blake Lively investment in the company.

Q    And is it accurate as of today, to your knowledge?

A    To my knowledge -- yes, to my knowledge, it is.                                                         10:54AM

Q    Do you know when this was created?

A    I don't recall exactly when it was created.

Q    Do you know who created it?

A    I can -- I believe I know who created it, yes.                                                          10:55AM

Q    Who created it?

A    Our vice president of finance.

Q    And do you know why it was created?

A    I don't recall exactly why.                                                                             10:55AM

Q    Was it created for purposes of this litigation?

A    I don't recall.  It was created to summarize the Lively family interest in the company.

Q    You've got LOL HATA LLC and the Ryan Reynolds Trust.  Why is the Ryan Reynolds Trust listed in here, if you know?                                                                                                   10:55AM

A    Why is it listed in this document?

Q    Yeah.

A    Because it's a member of the company.                                                                   10:55AM

Page 75

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q    And we see that LOL HATA has a 21.65 fully diluted ownership interest.  Do you see that?

A    I do.

Q    Okay.  So that's -- that's gone down from that second amended LLC agreement, which was about 30 percent.  Does that reflect the dilution that you talked about?

A    Yes.

Q    Would that mean that LOL HATA would have a lower distribution in the event of a sale based on a lower diluted ownership percentage?

MR. BRUNO:  Form.

THE DEPONENT:  Yeah, I'm not sure I understand what that means.  I'd have to look at the most recent document.

BY MR. KALTGRAD:

Q    The most recent LLC agreement?

A    Yes.

Q    I'll pull up another exhibit here.

(Defendants' Exhibit 4 was marked for identification.)

BY MR. KALTGRAD:

Q    This one is not marked "Attorneys' Eyes Only."

A    I don't see it.

10:56AM

10:56AM

10:56AM

10:56AM

10:57AM

Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

e-mail address?

MR. BRUNO:  Objection to form.

THE DEPONENT:  It's a -- a dba.  It's a moniker of what we use as a company name.

BY MR. KALTGRAD:                                    11:16AM

Q    So Betty B has a dba of Alps Beverages?

A    Not Betty B.  It's just -- it's a -- an e-mail domain that we use for ease of dealing with customers.

Q    Well, which entity --                          11:16AM

A    Really it's just an e-mail domain.

Q    Okay.  But it's part of the Betty B company though.  He's not e-mailing from a different company?

A    No.  He's acting in capacity as vice          11:16AM
president of finance for Betty B, correct.

Q    Okay.  And he's e-mailing George at Maximum Effort.

A    Yes.

Q    And do you know who Guillaume Cuvelier is?     11:16AM

A    Sure.  He's a investor in -- friend.

Q    And he's an investor in Betty B Holdings?

A    He is.

Q    And Nishat Gupta, you said he was the CEO at this time at this time; is that right?          11:17AM

Page 91

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A    Correct.

Q    At this time he was the CEO.  Okay.

A    He was.

Q    Okay.  You say (as read):

"Hi George, hope all is well.    11:17AM

I've attached the investor

presentation that you asked for.

Let us know if you have any

questions."

Was this part of the same effort to get    11:17AM

Maximum Effort to invest in Betty B Holdings.

MR. BRUNO:  Objection to form.

THE DEPONENT:  When you say -- I don't

understand -- when you say the same effort, this was

a -- sort of a -- I mean, effectively.  I would say    11:17AM

effectively, yes.

BY MR. KALTGRAD:

Q    Well, let me ask a different question.

Why were you sending this e-mail?

A    Because we were looking to close on our    11:18AM

investment run.

Q    And that was -- the investor -- a play here

was Maximum Effort; correct?

A    Correct.

Q    I'm going to show you Exhibit 7, which    11:18AM

Page 92

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

has --

A    New exhibit --

Q    I'm sorry?

A    New exhibit, you said?

Q    Yeah.  Give me a moment to pull it up.                 11:18AM
This one has been marked "Attorneys' Eyes Only."

(Defendants' Exhibit 7 was marked

for identification.)

BY MR. KALTGRAD:

Q    It's just loading right now.  It's a bit of            11:19AM
a big document.

Okay.  I think it's up now.

A    Yep, opening it up.

I've got it open.  It says "June 2024
Company Overview"?                                          11:19AM

Q    Yes.  And do you recognize this as the
attachment to Exhibit 6 that we just looked at?

A    Yeah, it makes sense that that would be the
attachment, yep.

Q    Were you involved in the preparation of               11:19AM
this?

A    I would have been involved at some level,
certainly would have looked at it, yes.

Q    And do you know, was this prepared around
June of 2024?                                              11:20AM

Page 93

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

that we had discussed earlier.

Q   And you also said that you were unable to do any brand activation.  Why were you unable do that?

A   Well, I think said we were unable do a          11:54AM
brand spot led by Blake, who's our biggest brand asset, and we were unable to do it because the brand had gone, you know, dark from that perspective of doing a big produced spot because of, you know, quite frankly, the very negative sentiment and          11:54AM
amplified commentary and vitriol and hate that was on -- you know, that was on the Internet and amplified, you know, by social media and the content, et cetera, that we had talked about earlier.          11:54AM

So the decision was made not to produce, you know, significant marketing spots with our biggest asset, who's Blake and the face of the brand and cofounder.

Q   The second bullet point here says (as          11:55AM
read):

"Given BL's busy schedule

during the key RTD summer season,

time for trade engagement has been

limited both in person and virtual          11:55AM

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

events."

What is that referring to exactly?

A    Leading up to the August -- you know, the August movie.  You know, Blake had been obviously busy with the movie, completing a movie and promotion of the movie, and so her time to engage with some of the decision-makers, et cetera, in the trade was a little bit limited, that's what that says.

Q    So, I mean, would it be fair to say she was just too busy to do in-person events leading up to August 2024?

MR. BRUNO:  Objection; form.

MS. FISSELL:  Objection.

THE DEPONENT:  That's not what that says. It said it had been -- has been limited.  It doesn't say that she was too busy to do anything.  It just says that she had been limited.

BY MR. KALTGRAD:

Q    Okay.  So she did some things but not to the extent that you would have liked her to do; is that fair?

MR. BRUNO:  Objection to form.

MS. FISSELL:  Objection.

THE DEPONENT:  Yeah, I'm not sure -- I

Page 118

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

mean, she had had a busy schedule.  And so you always -- you know, some of these things are done in an ad hoc fashion where they're not planned out months in advance and some are planned out, you know, months in advance or weeks in advance.  So    11:56AM it's always ad hoc and ad hoc opportunity.

So some of that didn't happen which we had hoped to happen.  Doesn't mean that it was, you know, bargained for, 100 percent expected.

BY MR. KALTGRAD:    11:56AM

Q   To be clear, you're talking about the time period leading up to the premiere of the movie; is that right?

MR. BRUNO:  Objection to form.

THE DEPONENT:  I'm just talking about the    11:56AM period of time in the calendar, that season coincided -- some of it coincided with the movie, yes.

BY MR. KALTGRAD:

Q   The next bullet point talks about a loss of    11:57AM market share with Total Wine, and it says due -- loss has been primarily due to Surfside.

Do you know why Surfside jumped ahead of Betty B in terms of market share?

MR. BRUNO:  Objection to form.    11:57AM

Page 119

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

THE DEPONENT:  Do I know why?  It's hard to say exactly why.

The brand is -- was -- you know, that brand is widely adopted -- let me just say, you know, we went from a 6 percent to a 4 percent share but still quite -- quite robust and quite -- you know, quite -- quite significant, you know, result as of the time of this analysis or when this was written.

So we declined a bit, but on a relative basis only.  Then why Surfside increased would be tough to tell.

BY MR. KALTGRAD:

Q   Surfside is a competitor of Betty Booze; is that right?

A   Yep.

Q   So on Page 6 continues the Executive Summary, and kind of that most indented bullet point says (as read):

"While significantly off

plan ..."

Do you see that?

A   We're on Betty Booze --

Q   We're on Page 6 of the deck.

A   Yep, yep, I see where you're at.

Q   Okay.  And that's referring to the expected

Page 120

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

investment.

Was that investment actually made?

A    Ultimately, yes.

Q    Okay.  Do you know what the current liabilities of Betty B Holdings is?          12:05PM

A    In terms of -- in terms of -- what do you mean by liabilities?

Q    Well, like on a balance sheet.  Would it be listed --

A    I don't know what the you know current, you      12:05PM know short-term receivables or whatnot are.  But if you mean -- do you mean long-term -- you know current long-term liabilities?

Q    Yes.

A    Like debt?          12:05PM

Q    Yeah.

A    Debt -- no debt.  Debt free.

Q    Okay.  Do you know what the assets of Betty B Holdings are currently?

A    I don't.  I'd have to check.          12:06PM

Q    Do you have an estimate?

A    I don't.

Q    On Page 12, there's a note that you finalized a new chief marketing officer to replace the current head of marketing.          12:06PM

Page 127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Who was the current head of marketing in August of 2024?

A   We had a -- a woman that you know is effectively serving that role, but more as a -- on a consultation basis, intern basis.   12:06PM

Q   And who was that?

A   Believe --

MS. FISSELL:   Form.

THE DEPONENT:   I believe her name was Katie Paley, P-a-l-e-y I think.  I can't recall the last name.   12:06PM

BY MR. KALTGRAD:

Q   And was there a reason that Ms. Paley was leaving around October of 2024?

A   She was not -- she was not a CMO.  She was a interim marketing person, you know, stepping into a role, and we were seeking a permanent CMO for a while.   12:07PM

Q   Do you know when Ms. Paley actually left that role?   12:07PM

A   I don't recall, no.

Q   Was a CMO ultimately hired?

A   Yes.

Q   Do you know when?

A   In late -- after this meeting, but I   12:07PM

Page 128

believe it was late 2024.

Q    And who was that person?

A    I'm not sure the, you know, relevance.  But you know I --

THE DEPONENT:  Rachel, I don't know if that's --                                                12:08PM

MS. FISSELL:  I mean, yeah.  Why do you need to know these people's names?  I mean, there's just privacy concerns here given the public nature of this lawsuit.                                      12:08PM

MR. KALTGRAD:  I understand.  There's a protective order in this case.  So anything can be designated.  But this lawsuit does have to do with marketing of the product, and this is a chief marketing officer.  So I think it's relevant in terms of what Ms. Lively is claiming as far as her damages.                                              12:08PM

THE DEPONENT:  Let me say this person -- there was a person on board for I think right around 100 days.  And that was it.  So it was -- it was a person that ultimately did not work out for the company.  So I'm not sure that she's honestly relevant.                                           12:08PM

BY MR. KALTGRAD:

Q    Was that person fired by the company?                                                    12:08PM

Page 129

MR. BRUNO:  Objection.

THE DEPONENT:  That person ultimately resigned from the company.

BY MR. KALTGRAD:

Q   Were they fired?                                    12:09PM

MS. FISSELL:  Objection; asked and answered.

MR. BRUNO:  Join.

BY MR. KALTGRAD:

Q   You can still answer.                               12:09PM

MS. FISSELL:  You can answer.

THE DEPONENT:  They were resigned.  I -- I -- I think I answered.

BY MR. KALTGRAD:

Q   Well, I'm not sure that did give me an             12:09PM
answer.  Were they asked to leave by the company?

MS. FISSELL:  Objection.

MR. BRUNO:  Join.

THE DEPONENT:  Yeah, I don't recall.  My recollection is that they, that she resigned.   12:09PM

BY MR. KALTGRAD:

Q   You said it didn't work out.  Why didn't she work out?

A   The company, you know, restructured itself, and effectively you know that role was ultimately   12:09PM

Page 130

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

eliminated.

Q   Were there any, any performance issues for the reason for her leaving?

MR. BRUNO:  Objection.

THE DEPONENT:  Not to my recollection.  I don't really recall though.   12:10PM

BY MR. KALTGRAD:

Q   Page 14 shows --

A   She -- she -- she left on good terms.  E-mailed the other day, so there's no -- no not on good terms.   12:10PM

Q   On Page 14, Betty Booze is more than 40 percent off its predicted gross revenue as of October.

Is that a correct calculation there?   12:10PM

A   What was the question?

Q   Is the chart on Page 14 accurate is my question.

A   The -- I'm trying to think what this says.  Page 14, my screen is a little zoomed in here.  Hold on.  Let's see.  This Betty Booze year-to-date results.   12:10PM

Yes, actual versus budget and then the prior year.  Yep.  As of this time, I assume this is correct, yes.   12:11PM

Page 131

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

because -- does that represent things that didn't happen or hadn't happened yet?

A   Did not happen, ultimately.  I mean, they were, you know, slated to happen.

I referred to some of these things earlier    12:14PM
in our conversation.  You know, the brand was not able to lead with its leading star and founder, Blake, in the crucial October-November-December time frame in terms of produced spots, broadcast sort of theatrical spots that we typically do, and that in    12:14PM
2023 we did, I think, four of, and that we certainly expected to do in 2024.

Q   On Page 68 in sort of the section titled "Limited trade engagement with BL during summer/launch period," and then 69 talks about    12:14PM
selfie videos -- do you see that?

A   I do.

Q   Do you know why Blake Lively only did one selfie video in July of 2024 and none in August?

MR. BRUNO:  Objection to form.    12:15PM

THE DEPONENT:  I don't recall.

(As read):

"BL selfie engagement per below, planning additional engagement including voice audio    12:15PM

Page 134

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

freeze during key summer launch period."

You know, I would imagine -- I don't know exactly what that meant, but we talked earlier about sort of in the August time frame, you know, this -- again, this deck is in September -- is in October, October 1st, after that sort of August-September time frame.

You know, there was -- there was obviously a lot of, you know, negative chatter online about the brand, and so from Blake's perspective, she was more quiet and reticent to come out, you know, with the brand because of the backlash.  And quite honestly, from a brand's perspective, we did not disagree with that assessment.  We --

BY MR. KALTGRAD:

Q   Did she -- I'm sorry, I didn't mean to cut you off.

A   Yeah, no, that's it.

Q   Did she tell you that was the case, that she was reticent to come out and promote the brand?

A   I don't recall that.  It was -- it sort of was very obvious for all of us.

Q   Why was it obvious?

A   Because when a promotion is met with, you

12:15PM

12:16PM

12:16PM

12:16PM

12:16PM

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

know, an onslaught of online, you know, hate and vitriol, you sort of -- and it's really amplified on social media, you sort of ask yourself the question is this going to do harm or do good for the brand, and that was it.                                    12:17PM

Q    But she hadn't done any selfie videos -- she did one in July of 2024; right?

MR. BRUNO:  Objection to form.

THE DEPONENT:  Yeah.  Let met just say, like, this -- this list, if you look prior to that,    12:17PM you know, this would be, in my experience at least, you know, which is 20-plus years doing this, you know, a caliber of, you know, founder of Blake's celebrity stature, this is a highly atypical to do this active of engagement in the period prior.    12:17PM

So I think you're asking the question almost in the reverse way, but tremendous engagement, you know, when -- in April and May and June, you know, prior to a busy few weeks and then ultimately the PR issue.                                 12:18PM

BY MR. KALTGRAD:

Q    Have you --

A    I think you have to put in this context, is what I'm saying.

Q    Was there an agreement for Ms. Lively to do    12:18PM

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

subject to future market, travel to market,

et cetera.

So it's something that's constantly in

flux.

Q   For those that don't -- aren't marked      12:19PM

complete, you're not sure if they were ultimately

completed; is that your testimony?

MR. BRUNO:  Objection to form.

THE DEPONENT:  My testimony is -- you know,

for example, you know, Midwest, we ultimately went      12:20PM

to the Midwest together.  I don't recall exactly

when that was.

And South Florida, subject to future

travel, we ultimately went to South Florida.  It was

after this fact, but --      12:20PM

So we did -- we did New Jersey -- we

ultimately did New Jersey.  It was after this fact.

So a lot of them were accomplished, just

necessarily not as of this time.

BY MR. KALTGRAD:      12:20PM

Q   On Page 72, this one talks about Zoom

appearances.  And the target month, again, are you

aware of what year that's supposed to be referring

to?

A   I believe that's probably '24.      12:20PM

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q   And it looks like as of October, only the first Zoom appearance had been completed; is that right?

MR. BRUNO:   Objection to form.

THE DEPONENT:   I don't -- I don't know                    12:21PM
that -- I don't know -- virtual investors distributors and top -- I don't know if this is a comprehensive listing of what we had done versus rather some of what we're looking to do, so we'd have to go back and double-check that.                    12:21PM

BY MR. KALTGRAD:

Q   Okay.  But for the rows that don't say completed, is it accurate those had actually not been completed as of October 2024?

A   I -- that looks to be the case.                    12:21PM

Q   Do you know why there were no Zoom appearances?

A   I mean, I can tell you we did the Zooms in Georgia, Massachusetts, New Jersey; all these were done.  All of the -- Florida, California, all of            12:21PM
these have -- total was done.  All this -- the vast majority of things on this list was accomplished.  I just don't remember exactly when it was accomplished.

Q   Do you know why there were none in the            12:22PM

Page 139

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

BY MR. KALTGRAD:

Q   Mr. Chrisomalis, I'm looking now at Page 76 of the document we were just looking at.  It has a reference at the bottom to the large -- (as read):

"A large portion of share for    12:33PM
the whole category has been taken
by Surfside.  Their volumes have
exploded over the last 12 months."

Do you have a sense of what you mean when you say "exploded"?  Like, how much volume were they    12:33PM
now selling?

A   I -- this was October of '24.  I don't recall.  It was -- you know, they were selling I think more than a million cases a year, a couple million cases.  I don't know the exact number.    12:33PM

Q   I'm looking at Page 79 right now.

A   Yep.

Q   And there's a bullet point at the bottom that says -- well, the title is "We lowered our shipment forecast from 200,000 cases to 125,000    12:34PM
cases in 2024."

And the bullet point -- the first bullet point says (as read):

" The lower forecast is a
result of limited brand marketing    12:34PM

Page 141

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

to date thus far in 2024."

Do you see that?

A    Yep.

Q    And what is that a reference to?

A    And then to share that point, continues    12:34PM
to -- later to an anticipated launch with Southern.

So one was just Southern -- SGWS is
Southern Glazier's Wine and Spirits, which is our
national distributor for alcohol for Betty Booze.
They are the largest distributor in America.  We    12:34PM
launched with them later than we had anticipated, so
part of the shortfall and expectation is related to
that.

And then part of the shortfall and
expectation is related to the fact that we didn't    12:34PM
produce, you know, the significant brand marketing,
if you will, that we had planned or expected.

So the big broadcast pieces that get us
billions of earned media impressions and generate,
you know, very significant brand awareness.  That's    12:35PM
the business model.

The business model is, you know, massively
well-known celebrity creates outstanding creative
content with us that gets seen by millions and
millions of people, creates billions of public --    12:35PM

Page 142

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

public media impressions, and results in trial and ultimately sales for the brand.

So we did not get that, as we talked about, you know, in August and September.

Q   And why was the launch with Southern Glazer delayed?                    12:35PM

A   That delay was more just technical, contractual onboarding, et cetera, with Southern.

Q   To your understanding, that had nothing to do with any negative publicity of the brand; is that    12:36PM
right?

MR. BRUNO:   Objection to form.

BY MR. KALTGRAD:

Q   You can still answer.

A   Yeah, that was -- that was prior to the    12:36PM
August time period.

Q   Okay.   I'm looking at Page 104, which is the slide that says (as read):

"What we need to win in 2025
and 2026 from BL/MEM."                    12:36PM

And BL is Blake Lively; correct?

A   Yes.

Q   And what is MEM?

A   Maximum Effort Marketing.

Q   Now, are you -- is the reference to Maximum    12:36PM

Page 143

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

New York, New York, Wednesday, September 24, 2025

3:09 p.m.

THE VIDEOGRAPHER:  Okay.  So we are back on record.  The time is 3:09 p.m.                          03:09PM

ANDREW T. CHRISOMALIS,

having been previously placed under oath,

was examined and testified as follows:

EXAMINATION

BY MR. KALTGRAD:

Q   Welcome back, Mr. Chrisomalis.  We were looking at Exhibit 8 when we took a break.  Do you still have that in front of you?                          03:09PM

A   I -- well, hold -- yes, I do, actually, yep.

Q   Okay.  Great.  If you could, turn to Page 162.

A   Yes.                                             03:09PM

Q   And this says (as read):

"Impact of recent events."

Do you see that?

A   I do.

Q   Okay.  And the next page is some sort of a     03:09PM

Page 153

chart, and it's titled "Negative Sentiment Has

Primarily Centered on Social With Negative Sentiment

Reducing Recently."

Who prepared this chart, if you know?

A   This was -- yes, our head of digital/social   03:10PM

media, so Deven Machette, who I mentioned earlier.

Q   Okay.  And do you know when this was

prepared, approximately?

A   It would have been I believe done -- I

believe it was probably right before the October 1st   03:10PM

date, you know, so sometime in -- I see notes here

for September 16th, so sometime in the September

time frame, right before the meeting --

Q   Okay.

A   -- before the meeting -- yeah, within a   03:10PM

week or two before the meeting, I guess.

Q   Okay.  And there's several columns here.

The handle is sort of self-explanatory.  And these

are Instagram handles; is that right?

A   Yes.  To my knowledge, yes.   03:11PM

Q   And the post talks about the specific post

made by those handles; right?

A   Post is just meant to describe the brand

post, yeah.

Q   Okay.  And we've got the date.  What does   03:11PM

Page 154

"number of negative" mean?

A    Number of "likes," number of "comments," number of negative -- I believe that is negative comments.

Q    Okay.  And then what about negative -- 03:11PM "percentage negative comments," do you know what that means?

A    "Percentage negative comments" would be of the comments, the total comments, how many were negative. 03:11PM

Q    Okay.

A    And it's a division, yep.

Q    Is "percentage negative overall," does that include the "likes"?  Is that why it's a lower percentage? 03:11PM

A    I think it's just -- no, I believe it's just that out of all of anybody that commented, how many of them had negative things to say.

Q    Okay.  And then did Deven fill in the column of "reason for negativity"? 03:12PM

A    Yes.

Q    Okay.  And that basically is a summary of the negative comments; is that right?

A    That's a summary meant to be a short form summary, yes. 03:12PM

Page 155

Q    Okay.  If we look at the first one, the
first row, 8-7-2024, and those are post related to
the IEWU premiere.  You understood that to be the
"It Ends With Us" premiere?

A    Yeah.  I believe that's correct, yeah.                03:12PM

Q    And according to the chart, there were 310
negative comments on Betty Buzz or Betty Booze's
social media accounts, accounting for 75 percent of
the total comments; right?  That's what it's
showing?                                                  03:13PM

A    Yes.

Q    Did Deven decide whether a comment was
positive or negative?  She was the one who made that
determination?

MR. BRUNO: (Inaudible).                                   03:13PM

THE DEPONENT:  I believe she did, yes.

DEPOSITION REPORTER:  I didn't understand.

Did someone object?

MR. BRUNO:  Yes, this is Matthew Bruno,
counsel for plaintiff.                                    03:13PM

BY MR. KALTGRAD:

Q    And on that row, the summary reason for
negativity is listed as (as read):

"Domestic violence advocacy (in

connection with booze) tone deaf."                        03:13PM

Page 156

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Do you understand what that refers to?

A    I have an idea.

Q    Can you tell me what the idea is?

A    I think it's suggesting that the fact that there was a Betty Booze, I guess, post or mention post that Betty Booze, both handles, including Betty Booze, posted something about the movie premiere.

For some reason somebody interpreted that as domestic violence advocacy in connection with the alcohol, which I'm not sure how that -- you know, where that came from.

But I don't remember the exact post, so I don't know exactly, I would say.

Q    Was there discussion prior to the -- let's say prior to this post about whether Betty Booze should be cross-promoting a movie having to do with domestic violence?

MR. BRUNO:  Objection to form.

THE DEPONENT:  I don't recall a specific conversation, but I know we always aim to be thoughtful about when and where, you know, we're promoting.

BY MR. KALTGRAD:

Q    As we can see from the reasons for negativity, there was some blowback based on the

Page 157

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

fact that there was an alcohol brand being cross-promoted with the movie; isn't that right?

MR. BRUNO:  Objection.

MS. FISSELL:  Objection.

THE DEPONENT:  Yeah, I think that feels like a conclusion, you know, to me.

For example, there was a movie premiere, a party.  The fact that the movie was about domestic violence, in my estimation, and just speaking as a single person, not -- but also, honestly, for the company, in my estimation, that wouldn't necessarily preclude the bar at the after-party serving alcoholic beverage, including Betty Booze.

BY MR. KALTGRAD:

Q   Okay.  I appreciate that.  But my question is, people were complaining about the fact that Betty Booze was being promoted as part of a movie having to do with domestic violence; isn't that right?

MS. FISSELL:  Objection.

MR. BRUNO:  Form.

THE DEPONENT:  Yeah, I don't know exactly what the exact post or comment says, but topically what you're suggesting is right, that there's, I guess, an implication of advocacy.

03:15PM
03:15PM
03:16PM
03:16PM
03:16PM

Page 158

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

It's such a weird -- I think it's phrased weirdly, I will say, looking back at this now, you know, "domestic violence advocacy."  I don't think anybody is advocating for domestic violence.  I think it's just phrased awkwardly.          03:16PM

But I think it's meant to say something like booze promotion, in light of domestic violence in the movie.  I think it's meant to sort of suggest that -- that concept, that there's a promotion in light of the fact that the movie has that.          03:17PM

So I don't think anybody is suggesting domestic violence advocacy, per se.  I mean, it's a nuance, but I think just the way it's written, it's a bit awkward.  Anyway --

BY MR. KALTGRAD:          03:17PM

Q   Sure.  I --

A   -- you know --

Q   Sorry.  Go ahead.

A   No, no.  That's basically it.

Q   Okay.  And then -- I mean, if we look at          03:17PM
the first four sort of posts and the reasons for negativity, they list (as read):

"Domestic violence advocacy in connection with booze, tone deaf, domestic violence advocacy in          03:17PM

Page 159

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

connection with booze, tone deaf

DV/Team Justin, and domestic

violence advocacy in connection

with booze, tone deaf."

So understanding your characterization of    03:17PM
whether or not it was advocacy, people were
commenting on the fact that a booze brand was being
promoted as part of this film and it upset certain
people, to your understanding; isn't that right?

A    Yeah, I think -- you know, I don't know --    03:18PM
again, I don't have the trail of how this all
unfolded or transpired, but I think what it's
suggesting is -- for example, that first post -- I
can't remember what it was, the IEWU post, "It Ends
With Us" post, the fact that Betty Booze posted    03:18PM
something about "It Ends With Us," to some people
felt like there was a connection between a movie
about domestic violence and an alcoholic beverage
brand, which felt tone deaf, which on one hand, you
know, part of me can understand.  On the other hand,    03:18PM
seeing it -- you know, again, I haven't seen how 310
of these comments came about.

You know, it was a few incipient comments
and then it lead to, you know, a stream of comments.
You know, I don't know how all that unfolded for    03:18PM

Page 160

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

each of these topics, but -- but, yeah, I mean, I think that that's what this is suggesting.

And, you know, I -- you know, again, I can't remember the exact specifics of all the posts. I think most, if not all -- I wouldn't want to say "all" without relooking, but my recollection is, you know, there were not many, if any -- maybe one or two -- but that could have been, you know, more thoughtfully curated, looking back.          03:19PM

I think the important thing to know is, you know, you have a small team. And as a small brand, you're always trying to survive as a brand and as a company and -- and succeed and hustle. And you have a lot going on at once and we're not always perfect.          03:19PM

So, you know, were we perfect in every instance here? I don't know. I would doubt it. But, you know, hopefully we were right, you know, more than we were wrong. And where we were wrong, it was not terribly wrong, hopefully.          03:19PM

Q   Did the changes in marketing personnel          03:20PM
relate to this blowback on social media accounts at all?

A   Absolutely not. You know, the person that maintained this -- our social media then maintains it still today.          03:20PM

Page 161

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q   Now, the first buyer you talked about is Kroger.

At this time Kroger was not buying Betty Buzz products; correct?

A   I believe that's correct.  That's what it says here.                                           03:41PM

Q   They'd actually discontinued Betty Buzz in 2023; isn't that right?

A   I believe that's correct, yeah.

Q   And it says they're "launching booze."                                           03:41PM
What does that mean exactly?

A   It says --

Q   I'm looking at the second --

A   -- "launching booze -- we were rolling out Betty Booze across their banners, across their                                           03:41PM
stores.

Q   Okay.  Look at the next page.  You may have to blow this up a bit.

A   Yeah.

Q   There's a snippet -- it looks like a                                           03:41PM
snippet from a September 10, 2024, e-mail related to
Kroger but doesn't actually include anyone from
Kroger.
Who is Ian Pilarski?
A   Yep, I see that.                                           03:42PM

Page 178

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q   I'm asking, who is he?

A   Ian is our head of sales for chains -- national chains.

Q   And Ian says (as read):

"Hi, all, quick FYI.  I just   03:42PM
got off the phone with SGWS Kroger
VP, and the first thing he
mentioned to me is that Betty Booze
was just discussed in Kroger's new
item meeting.  Unfortunately,   03:42PM
there's a negative taste in
Kroger's mouths based on the BL
interview press from the movie, and
they said they will be closely
monitoring sales on the brand."   03:42PM

Do you know what "the BL interview" refers to?

A   I think that is a -- I don't want to say it's a typo.  I didn't write it.  But I think it's sort of an awkwardly or sloppily written summary, if   03:43PM you will, for just the negative PR.  I think that's a poor way to characterize just the environment of negative PR around Blake.

Q   Well, do you recall if there was a Blake Lively interview around August or September that   03:43PM

Page 179

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

generated negative PR?

A   I don't recall.  No, I don't -- I don't...

Q   I'm going to show you something real quick.
We don't need to mark this.  But this is just an
article from the Daily Mail, and I'm just using it          03:43PM
to see if it refreshes your recollection.

It's called --

A   Am I supposed to be looking at the Zoom
screen or what?

Q   No, no.  It's on the Exhibit Share.  It's          03:44PM
called Betty BAA, I think this is called.

A   Betty BAA?

Q   Yeah.

A   Okay.  Yep, I've got that.

Q   It's a Daily Mail article.  It's entitled          03:44PM
"Blake Lively fans blast 'It Ends With Us' actress
over tone-deaf and shallow interview with costars."

Do you see that?

A   I do.

Q   Does that refresh your recollection or          03:44PM
understanding about whether the BL interview refers
to this specific interview?

MR. BRUNO:  Objection to form.

THE DEPONENT:  It does not.  I read
countless, you know, pieces like this in the Daily          03:44PM

Page 180

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Mail tabloids and other things, and I -- it looks, you know, like many others -- you know, like others that I've read and in some ways no different.  I don't know -- this doesn't -- this doesn't trigger anything in me, no.                                          03:45PM

BY MR. KALTGRAD:

     Q   Okay.  You can put that away and we're going back to Exhibit 9, if you can.

     A   Go back to which one?

     Q   Exhibit 9, what we were just looking at.      03:45PM

     A   Yeah, I'm back there.

     Q   Yeah, the same page, Page 8.

     A   Page 8.  Okay.

     Q   And I'm continuing on with the e-mail (as read):                                             03:45PM

             "They are expecting a negative
         sales impact and they're wondering
         what BL be doing to course-correct
         and make things right with her
         audience."                                     03:45PM
         And a little further down it says (as
     read):
             "Do we have internal efforts in
         place to flip the script or
         messaging we can share with these     03:45PM

Page 181

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q    I'm on Page 10.  Let me see if can I blow it up here.

A    Okay.  Yeah.

Q    And on August 8th there's a Betty Blooms Carousel Instagram post.

03:52PM

A    Yep.

Q    Eighty-one percent of those comments were negative with the cited reason being (as read):

        "Domestic violence advocacy in connection with booze.  Tone deaf."

03:53PM

        And if you turn to Page 14, this is the actual post; correct?

A    I assume so.  I don't remember, but I imagine this looks like it.

Q    Okay.  And the comments you see (as read):

03:53PM

        "With Betty Blooms, we wanted to show how special it is when alcohol meets domestic violence.  Thank you for sharing the magic."

        And there's another one that says (as read):

03:53PM

        "Yeah let's get buzzed, wear our formals and watch some DV on the big screen with our friends.  So inappropriate.  You don't

03:53PM

Page 188

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

celebrate DV for booze sales."

This is one of the posts that is an example of why the Betty Booze's Instagram pages went dark; is that right?

MR. BRUNO:  Objection to form.          03:53PM

THE DEPONENT:  It's an example of negative comments that hit our social media comments.  And then -- you know, again, I have to go back and see what we said.  We said -- I think we were -- we're conflating a few different things.          03:54PM

I think on Page 9 we said the brand was forced to go dark.  And if you look at Page 9, those spikes were the brand.  And then the biggest spikes when Blake posted about the brand.  So she went dark on the brand.  That's layer one, and that's the          03:54PM
biggest reason for those spikes.

Layer two is the brand itself trying to figure out how to mute, you know, negative feedback in the commentary, which is another version of going dark.          03:54PM

When and how exactly that happened, I just don't recall.  That was, you know, specifically done by Deven who was, you know, a social media person.  You know, I don't know if "expert" is the right word but very, you know, skilled in social media.  So I          03:55PM

Page 189

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

think there's multiple levels of going dark there.

BY MR. KALTGRAD:

Q   Okay.  Well, Page 11 says -- talks about how the brands weren't getting as many new followers after negative PR.                                          03:55PM

Do you see that?

A   Uh-huh.

Q   Do you know what date range this refers to exactly?

A   It says on the left side and the right            03:55PM
side.  It says over the 30 days following the negative press.  I imagine that to be kind of mid-August time frame, but I don't know.

Q   Okay.

A   Some point in August to afterwards.              03:55PM

Q   So mid-August, the brands weren't getting as many followers on Instagram, which is also the same time that the brand went dark; correct?

A   Right.

Q   Let's look at Exhibit 10.                         03:55PM

(Defendants' Exhibit 10 was marked
for identification.)

BY MR. KALTGRAD:

Q   Okay.  That should pop up in a moment.

This is also Attorneys' Eyes Only.                      03:56PM

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

THE DEPONENT:  Sure.  Be back in five. And, you know, we can go till 8:00.  I've got a hard stop at 8:00.  I'm down at my office, so -- I have to get a bunch things prepared for a 5 a.m. departure tomorrow in New York, so -- but can I go till 8.                                                                04:09PM

MR. KALTGRAD:  All right.  We'll see where we get.  Thanks.

THE VIDEOGRAPHER:  Okay.  So we're going off the record.  The time is 4:09 p.m.                          04:09PM

(Recess.)

THE VIDEOGRAPHER:  Okay.  So we are back on record.  The time is 4:16 p.m.

BY MR. KALTGRAD:

    Q    Mr. Chrisomalis, I just introduced             04:16PM
Exhibit 12.  You can take a look at that one.
            (Defendants' Exhibit 12 was marked
            for identification.)
BY MR. KALTGRAD:
    Q    Do you see that?                                04:16PM
    A    Just popped up.  Yeah, May 8, 2025?
    Q    Yes.  And can you tell us what this
document is?
    A    Yeah.  This is a board update, board
investor -- board deck.                                 04:17PM

Page 201

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q    Okay.  So this was just shown to the board?

A    Four-plus months ago, yeah.

Q    Okay.  If we look at Page 6 -- well, let's start with Page 5.

At this time Mr. Gupta had resigned as CEO    04:17PM
and you'd overtaken those responsibilities as of end of February; correct?

A    Yes.

Q    And the CMO position was eliminated entirely at this point; right?    04:17PM

A    Yes.

Q    And you said that was because of a restructuring?

A    Yep.

MR. BRUNO:  Objection to form.    04:17PM

BY MR. KALTGRAD:

Q    On Page 6, look in the middle.  It says (as read):

"Looking back in 2024, we met
our 6,000 account target for Betty    04:17PM
Booze."

What does that "6,000 account target" refer to?

A    Our objective for accounts sold in terms of
number of doors that sell Betty Booze.    04:18PM

Page 202

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q   And that target was met.

And then it says (as read):

"However, velocity and reorders

were weaker than expected."

What does "velocity" refer to?                    04:18PM

A   The rate of sale within a particular

account or door.

Q   Okay.  And the first bullet point under

that says (as read):

"We attribute this to quiet H2          04:18PM

marketing and being priced at about

50 percent premium to market

leaders at 14.99 per four-pack."

So one of the factors was the fact that

Betty Booze was about 50 percent more expensive than    04:18PM

competitors; is that right?

MR. BRUNO:  Objection to form.

THE DEPONENT:  That's one of the factors,

yes.

BY MR. KALTGRAD:                                  04:18PM

Q   Okay.  And you've identified in here one of

the key actions is to reprice at 11.99 for a -- for

a four-pack.

Do you see that?

A   Below that page.  I see that, yep.        04:19PM

Page 203

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q   Okay.  And the second sort of bolded statement (as read):

"After conducting a detailed channel profitability analysis for 2024 excluding any write-downs,            04:21PM Betty Buzz lost $3.79 per case across all channels, was profitable only in direct to retail sales."

Do you see that?

A   I do.            04:21PM

Q   Okay.  Page 13 talks about -- is titled "The Betty Booze Plan."  Take a look at Page 14. (As read):

"Two biggest priorities to drive Betty Booze velocity is to            04:21PM move into vodka iced tee as the No. 1 Betty Booze priority."

Do you see that?

A   Yes.

Q   (As read):            04:22PM

"And immediately reprice the Booze portfolio at 11.99 versus 14.99."

Do you see that?

A   I do.            04:22PM

Page 206

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q    Were those two things done?

A    Yes.

MR. BRUNO:   Objection to form.

BY MR. KALTGRAD:

Q    The answer was yes?                    04:22PM

A    Eventually, yeah.

Q    Did that drive up revenues?

MR. BRUNO:   Objection to form.

THE DEPONENT:   Well, this deck, as you pointed out, is relatively recent.  It's from May 8th.  And to actually execute this takes weeks and -- and a few months.  So one is -- is a two-part question.

And on the part is launching the vodka iced tea.  We launched it.  Came out a little bit later than we would have liked, but we did launch it in the late spring.

And then in terms of the pricing, you know, that -- if you understood the nuances of our business, that takes weeks and months to execute on shelf despite decisions being made in mid-May, you know.  So the answer is that has now been impact in the marketplace, yes.

BY MR. KALTGRAD:

Q    Why was the introduction of the vodka      04:23PM

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

product delayed?

A   I was just, you know, a few weeks behind schedule with some bottling production.

Q   Had nothing to do with negative PR?

MR. BRUNO:  Objection; form.                  04:23PM

THE DEPONENT:  No, no.

BY MR. KALTGRAD:

Q   Okay.  Page 27.  And you may not be able to see the page, so it's Bates ending with 196A?

MS. FISSELL:  What page of the PDF?           04:23PM

MR. KALTGRAD:  I'm not looking at the PDF. But the Bates is 196A.

THE DEPONENT:  It says, "PR launch event"?

BY MR. KALTGRAD:

Q   Yes that's the one.  It says (as read):   04:23PM

        "PR launch event.  Private

        media and influencer event hosted

        by Blake to celebrate the launch of

        vodka iced tees."

        Did that event happen?                04:24PM

A   Yes.

Q   And was Blake part of that?

A   She was.

Q   Okay.  Page 39, Betty Booze band -- brand performance.                                     04:24PM

Page 208

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q   -- the income statement for Betty B Holdings 2024.

A   Yep.

Q   And I think it says (as read):                    04:32PM

    "Discounting was 45 percent

    higher than expected, which

    includes returns of unsellable

    product."

    Did you perform any analysis to see why people were returning the product?          04:32PM

A   Unsellable just means wasn't -- doesn't mean consumers are returning the product.  It means the product has sat on shelves and is expired, and therefore the customers who are the retailers are telling us to take care of it as brand owners.  Does    04:32PM that make sense?

Q   Okay.  And then the write-offs here actually show a 2,181 percent higher than expected, at 3.3 million, and that's related to the expiration of the Betty Buzz stock?          04:32PM

A   I believe that's correct, yes.

Q   And selling distribution, it says, was about $800,000 higher than expected related to higher than expected cost of international shipping; is that right?          04:33PM

Page 215

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A   I lost where you are.  Selling distribution?

Q   Yeah.  If you look at the third bullet point on the right side.

A   Yep.  Yeah, those costs were higher than   04:33PM expected by 35 percent, higher than expected shipping cost, international shipping, as well as other shipping costs, yeah.

Q   If you look at 76 --

A   Uh-huh.   04:33PM

Q   -- the five-year cash flow model.  And it says (as read):

        "Assume 6.5 million of new

        equity."

        Is that on top of the 15 million that was   04:33PM already referenced earlier?

A   Where are you looking?  6.5 million -- 25 assumes 6.5 million of new equity, is what the bullet says.  Assumes conversion of all outstanding debt to equity.   04:34PM

        So what this is saying, is we had 6 million of debt outstanding.

Q   Uh-huh.

A   And so if we had 6.5 million of new equity, plus 6 million of debt converted to equity,   04:34PM

Page 216

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

I, the undersigned, a Certified Shorthand Reporter of the State of California, Registered Professional Reporter, Certified Live Note Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [  ] was [  ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name this 25th day of September, 2025.

RENEE A. PACHECO

CSR No. 11564 RPR, CLR

Page 233