# EXHIBIT 37

Docusign Envelope ID: 4D053079-EB55-4FEE-AC2A-FE321ED59EBE

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| Blake Lively,<br><br>        Plaintiff,<br><br>    v.<br><br>Wayfarer Studios LLC, et al.,<br><br>        Defendants. | Case No.  1:24-cv-10049-LJL<br>(Consolidated with 1:25-cv-00449-LJL) |

**EXPERT REPORT OF RICHARD MARKS**

**OCTOBER 17, 2025**

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**TABLE OF CONTENTS**

I.      OVERVIEW OF ASSIGNMENT ...................................................................................1

II.     SUMMARY OF OPINIONS .........................................................................................1

III.    QUALIFICATIONS AND EXPERIENCE .....................................................................2

IV.     DOCUMENTS RELIED UPON ...................................................................................3

V.      FRAMEWORK FOR INDUSTRY-STANDARD COMPENSATION ..............................3

        A.    Compensation Structure for Films ...................................................................3
              1.   Major Studio Film Productions ..............................................................3
              2.   Major Streaming Film Productions ........................................................4
              3.   Independent and Limited Budget Productions ........................................5

        B.    Compensation Structure for Limited Television Series .....................................5

        C.    Compensation Structure for Endorsements and Speaking Engagements .............6

VI.     BACKGROUND .........................................................................................................6

        A.    Summary of Relevant Allegations ...................................................................6

        B.    1998 – August 2024: Ms. Lively's Successful Career Leading Up to *It Ends With Us* ..............................................................................................7
              1.   2017 to August 2024: Lead Actress in Commercial Film Deals ............................................................................................... 8
              2.   2017 to August 2024: Voice Over, Directing, and Other Film Deals .......................................................................................... 12
              3.   2008 to August 2024: Endorsement and Speaking Engagement Deals .............................................................................. 12

        C.    May 2023 – August 2024: Successful Launch of *It Ends With Us* and Expected Impact on Ms. Lively's Professional Opportunities .................................12

        D.    August 2024 – Present: Ms. Lively's Decreased Opportunities Since the Alleged Retaliation Campaign .................................................................14

VII.    LOST PROFESSIONAL OPPORTUNITIES .................................................................15

        A.    Major Studio Feature Films ..........................................................................16

        B.    Independent, Limited Budget and Cameo Film Opportunities ...........................17

        C.    Limited Television Series .............................................................................18

        D.    Endorsements, Speaking Engagements, and Personal Appearances ...................18

VIII.   CONCLUSION .........................................................................................................18

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.      OVERVIEW OF ASSIGNMENT

I have been engaged by counsel for Blake Lively ("Plaintiff" or "Ms. Lively"), Manatt, Phelps & Phillips, LLP, to provide expert testimony in the matter of *Blake Lively v. Wayfarer Studios, et al.*[1]  Ms. Lively alleges that the defendants "mount[ed] a sophisticated and well-funded retaliation campaign" (the "Retaliation Campaign") that damaged Ms. Lively's reputation and resulted in lost professional opportunities.  I have been asked to identify Ms. Lively's lost professional opportunities as a result of the defendants' alleged wrongful conduct based on entertainment industry custom and practice and my experience therewith.

## II.     SUMMARY OF OPINIONS

It is my opinion that in the five-year period following the premiere of the film *It Ends With Us* (the "Film"), Ms. Lively was positioned to secure the following deals:

- Three to four lead roles, if not more, in high budget film productions:

  o   For a prequel or sequel to the Film, Ms. Lively would have been expected to receive fixed compensation in the range of $15,000,000 to $20,000,000, with profit participation between 15-20 points, resulting in $10,000,000 to $15,000,000 in contingent compensation, inclusive of both (a) profit participation, and (b) box office bonuses ranging between approximately $5,000,000 to $10,000,000.  Ms. Lively's total compensation on the prequel/sequel for the Film would likely have been $25,000,000 to $35,000,000.

  o   For other major studio theatrical films, Ms. Lively would have been expected to receive fixed compensation ranging from $10,000,000 to $15,000,000 per project, plus profit participation in the form of 10-15 percentage points.

  o   For films made by streamers, Ms. Lively would have been expected to receive compensation in the range of $12,500,000 to $20,000,000 per project, inclusive of her fixed compensation and streamer "buy-out," with a general allocation of 75% for fixed compensation and 25% for buy-out.

---

[1] *Blake Lively, v. Wayfarer Studios LLC, et al., Second Amended Complaint For Sexual Harassment, Retaliation, Breach of Contract, False Light, Defamation, and Other Claims,* filed July 30, 2025 ("SAC").

1

CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Two to three lead roles in independent or limited-budget films, with compensation ranging from $500,000 to $5,000,000 per project, plus customary participation, depending on the budget, genre, size of the cast, and other factors.

- One to two smaller or cameo roles on various film projects, commanding in the range of $750,000 to $1,250,000 per project per week for approximately 2-3 weeks per project, plus profit participation.

- One to two limited and/or ongoing television series as a lead actress for up to $20,000,000 for two, ten-episode seasons.

- One or two multi-year endorsement contracts, each in the $7,000,000 to $10,000,000 range.

- Up to ten to fifteen smaller engagements, including personal appearances, brand tie-ins and speaking engagements, each valued at $250,000 to $400,000.

## III.    QUALIFICATIONS AND EXPERIENCE

I am an attorney duly licensed to practice law in the State of California, and I have practiced in various sectors of the entertainment industry since 1974.  In addition to my years in private practice as a transactional attorney in boutique entertainment law firms as well as a major international firm, I have acted in senior legal and business affairs capacities for a boutique literary agency, major entertainment studios such as Paramount, Disney, and Universal, and leading independent production companies such as The Kushner-Locke Company and Weintraub Entertainment Group.  For the last five-and one-half years, I have practiced with my own firm, Richard Marks & Associates, an entertainment law firm representing clients such as ITV, MRC, Olive Bridge Entertainment, Jolie Productions, and many others in connection with development, production, and exploitation of entertainment content.

During my career as a transactional entertainment lawyer, I have worked in a legal and business affairs capacity on and in connection with many television series and motion picture productions.  I have negotiated – on both sides – numerous agreements between talent (such as

2

CONFIDENTIAL – ATTORNEYS' EYES ONLY

writers, directors, actors, and producers) and motion picture and television studios, networks, distributors, and streamers.  I am familiar with customary provisions included in such agreements, as well as provisions customarily sought by talent and studios and agreed to (or not, as the case may be) by the other.

I have been engaged as a testifying expert in approximately 30 matters involving the television and motion picture industries.  I have qualified as an expert in this field with various courts and arbitration tribunals, and I have testified at depositions, trials, and hearings therein. By way of example only, I served as a lead expert witness for the plaintiffs in *Celador Int'l, Ltd. v. Walt Disney Co.,* Case No.  CV 04-3541 FMC (RNFx) (C.D. Cal. 2010).  In that case, the jury returned a verdict for the plaintiffs and awarded over $270 million in damages based in part on my analysis and opinions.  *Id.*

True and correct copies of my general and testifying expert resumes are attached hereto as **Exhibit 2** and **Exhibit 3**, respectively.  My fee in this matter is $1200 per hour, and my compensation is not dependent on the outcome of the litigation.

## IV.    DOCUMENTS RELIED UPON

In forming my opinions below, I relied not only on my experience identified herein and in **Exhibits 2-3**, but I also received and reviewed the documents and data cited herein and those listed in **Exhibit 1**, which is attached hereto.

## V.    FRAMEWORK FOR INDUSTRY-STANDARD COMPENSATION

### A.    Compensation Structure for Films

#### 1.    *Major Studio Film Productions*

Major studios, such as Warner Brothers, Universal, Disney, Sony, and Paramount, typically compensate lead actors and actresses in major film productions through a compensation

3

CONFIDENTIAL – ATTORNEYS' EYES ONLY

structure that includes both (i) fixed compensation that is guaranteed and (ii) contingent compensation in the form of predetermined bonuses payable at predetermined milestones and/or an ongoing participation in the film's revenues from distribution, including the theatrical box office, streaming, merchandising, and television exploitation. The compensation that major studios offer to lead actors and actresses generally increases significantly based on a variety of factors, including, the actor's experience, versatility, accolades, and box-office success.[2] Each major studio offers top talent (actors, directors, and producers) participation in its "profits" derived from a particular motion picture. The "profits" are determined via detailed definitions that indicate which revenues go into the "pot" from which the studio deducts fees for its distribution services as well as its costs (development, production, distribution, and advertising) along with percentage charges for overhead and interest. While these definitions are the subject of negotiation, the major studios offer a template for leading talent with their most favorable terms, a so-called "best definition" at the applicable studio. Fixed compensation is generally paid weekly or bi-weekly over the course of principal photography, but can be paid at set tranches, *e.g.*, one third at the start of principal photography, one third in the middle, and one third on completion. Principal photography for major studio film productions generally ranges between 2-3 months.

### 2. *Major Streaming Film Productions*

Major streaming studios, such as Netflix, Amazon, and Apple, compensate lead actors and actresses with up-front, fixed compensation, without participation in box office gross amounts, given the absence of a traditional box office. In lieu of participations or other

---

[2] Although residuals are also part of the typical compensation structure, I have excluded them for purposes of this report.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

contingent compensation, the major streamers generally offer a "buy-out" which is an additional lump sum that is typically paid in defined, equal installments over a specified period of time following the initial release of the motion picture.  Fixed compensation is generally paid weekly or bi-weekly over the course of principal photography.  Principal photography for major streaming film productions generally ranges between 2-3 months.

### 3.    *Independent and Limited Budget Productions*

Independent and limited budget productions typically involve passion-driven projects with varied compensation structure.  Compensation varies widely depending on the genre and budget of the motion picture.  Fixed compensation is generally paid weekly or bi-weekly over the course of principal photography.  Contingent compensation as described above is also part of any such an agreement, and in many instances, is increased to reflect and "make-up for" a lower budget and therefore a lower guaranteed fee.  Principal photography for independent and limited budget productions generally ranges between 1-2 months.

### B.    Compensation Structure for Limited Television Series

Television actors earn compensation in various ways, depending on the type of show, the format, and their role in the production.  The most common payment structure for TV show actors is a "per episode" rate with a guaranteed number of episodes.  Top tier actors are often entitled to executive producer fees and/or profit participation in addition to their episodic fees. Fixed compensation is generally paid weekly or bi-weekly over the course of principal photography for the season.  Principal photography for limited television series of eight to ten episodes generally ranges between 4-5 months.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

C.     **Compensation Structure for Endorsements and Speaking Engagements**

Celebrities, including A-list actors, can secure various brand-related deals, which include multi-year endorsements for particular brands within an industry, one-off appearances (*e.g.*, an event or fashion show), and/or speaking engagements. Compensation structures for such agreements vary. Compensation for endorsements is typically through one payment upon signing an agreement, and additional payment(s) over the course of the term of the agreement. Compensation for speaking engagements and appearances is typically through one lump sum payment at the time of services.

## VI.     BACKGROUND

A.     **Summary of Relevant Allegations**

Ms. Lively, alleges, among other things, that she was sexually harassed on the set of the Film, and that Justin Baldoni ("Mr. Baldoni"), Wayfarer Studios LLC, and other executives, affiliates, and public relations professionals (together, the "Wayfarer Parties") engaged in a "sophisticated and well-funded retaliation campaign" designed to "destroy" Ms. Lively's reputation and punish her for speaking out about that harassment.[3] Ms. Lively claims that the Retaliation Campaign damaged her reputation, career, and business ventures, resulting in lost earnings, among other damages.[4] Specifically, beginning on or around the summer of 2024, before the Film's release, the Wayfarer Parties began making plans to combat Ms. Lively's narrative should she "make her grievances public."[5] Subsequently, around the time of the August 6, 2024 premiere of the Film, and continuing to this day, the Wayfarer Parties, "create[d],

---

[3] SAC ¶¶ 5, 26, 29, 33 49, 78.

[4] SAC ¶¶ 338-346.

[5] SAC ¶¶ 29-31.

6

CONFIDENTIAL – ATTORNEYS' EYES ONLY

seed[ed], manipulate[d], and advance[d] disparaging content that appeared to be authentic on social media platforms and internet chat forums."[6] Ms. Lively alleges that her reputation, acting career, and businesses sustained catastrophic harm as a result of the ongoing Retaliation Campaign.

**B.      1998 – August 2024: Ms. Lively's Successful Career Leading Up to *It Ends With Us***

Ms. Lively has been a fixture in the entertainment industry for two decades.  Over that time, she has worked consistently, starring in a diverse array of film and television projects across a range of genres.  For example, in 2005, she starred alongside Alexis Bledel and America Ferrera in *The Sisterhood of the Traveling Pants*, which grossed over $42 million worldwide against a $25 million budget, and achieved critical acclaim with an 82% Rotten Tomatoes score. *The Sisterhood of the Traveling Pants*, IMDb, https://www.imdb.com/title/tt0403508/ (last visited Oct. 14, 2025); The Sisterhood of the Traveling Pants, Rotten Tomatoes, https://www.rottentomatoes.com/m/sisterhood_of_the_traveling_pants (last visited Oct. 14, 2025.)  Ms. Lively went on to star in the renowned television series, *Gossip Girl*, from 2007 to 2012, for a total of six seasons.  Deposition of Warren Zavala, ("Zavala Dep.") at 175:15-176:19 (describing Gossip Girl as a "generational show"); Deposition of Justin Grey Stone ("Stone Dep.") at 354:13-21 ("Gossip Girl was an absolute phenomena, just a complete cultural explosion.  It hit the younger demographic in such a profound way and became, I would say, a cult classic."); Josh Duboff, *When Gossip Girl Ruled the World*, Vanity Fair (Aug. 30, 2017).

Ms. Lively's longtime agent, Warren Zavala, who has worked with her for about a decade, testified that he did not believe they "had any challenge getting Blake a job," and

---

[6] SAC ¶¶ 26, 38.

7

CONFIDENTIAL – ATTORNEYS' EYES ONLY

described her as "one of the kindest and most intelligent people I know." Zavala Dep. at 173:6-10, 173:18-174:4, 177:24-179:5. He also testified that Ms. Lively is an A-list actor, who has "always worked at a really high level, and [] has something very unique that most actresses in her age group don't have," given her early projects helped establish her audience with female audiences and fuel her future success. Zavala Dep. 175:15-176:23. With each project, she has moved closer to the highest echelon of actors, commanding increasingly significant compensation. Zavala Dep. at 175:12-176:23. Mr. Zavala confirmed market demand for Ms. Lively's acting services remained high over the years. Zavala Dep. at 177:24-179:5.

Ms. Lively's decades-long manager, Justin Grey Stone, who first met Ms. Lively on or about the time of *Gossip Girl*, testified that Ms. Lively had "an incredible platform" after "such a successful run on television," and that the "next step in that evolution was continuing to pursue really exceptional roles in the feature space and working with incredible filmmakers and sort of increasing the scope and scale of her audience." Stone Dep. at 353:23-354:4, 355:7-17. Mr. Stone also described her as "brilliant," "unbelievably talented," and an "incredibly hard worker and professional," which allowed for a "speedy trajectory" from television to feature film. Stone Dep. at 355:18-356:13.

In addition to Mr. Zavala and Mr. Stone's testimony, in my experience, Ms. Lively's staying power and versatility is rare for an actor and confirms that immediately before the Film, there existed a sustained demand for Ms. Lively's projects.

### 1.    2017 to August 2024: Lead Actress in Commercial Film Deals

After her success in television, Ms. Lively moved in earnest into film. Her long-time manager described Ms. Lively as "a shining star exception" who was able to transition from television to film on a "very, very speedy trajectory." Stone Dep. 355:18-25.

8

CONFIDENTIAL – ATTORNEYS' EYES ONLY

From 2017 to the release of the Film on August 4, 2024, Ms. Lively starred in three films, with significant commercial success: *A Simple Favor*, *The Rhythm Section*, and *Another Simple Favor* (the latter being released after the Film).  BL-000038889-936; BL-000039012-13; BL-000038967-9011; BL-000021911-57.   Ms. Lively's compensation increased during this time, commensurate with her growing stature.  *Id.*  Under her July 2017 agreement with Lionsgate for *A Simple Favor*, starring Ms. Lively and Anna Kendrick, Ms. Lively commanded $1,000,000 in fixed compensation and $460,710.62 in profit participation as of December 2024.  BL-000038889-936; BL-000039170.  Mr. Stone explained that Ms. Lively's ability to command profit participation on *A Simple Favor* was "a reflection of real influence and real stature in her ability to draw an audience, and so they were rewarding her as such."  Stone Dep. at 353:2-12.

The film was a runaway success, grossing $97.6 million at the box office against a $20 million budget, and achieving critical acclaim with an 84% Rotten Tomatoes score.  *See A Simple Favor (2018)*, The Numbers https://www.the-numbers.com/movie/Simple-Favor-A#tab=summary (last visited Oct. 14, 2025); *A Simple Favor*, Rotten Tomatoes, https://www.rottentomatoes.com/m/a_simple_favor (last visited Oct. 14, 2025); Stone Dep. at 361:13-16.  The film later found a new audience and further success on Netflix, ranking on the Global Top 10.  Arthur S. Poe, *'A Simple Favor' Becomes a Proper Hit on Netflix as the Sequel Is Currently Being Filmed*, IMDb (Jun. 1, 2024) https://www.imdb.com/news/ni64617824/.

Ms. Lively next signed on to star in *The Rhythm Section*, an action thriller co-starring Jude Law and Sterling K.  Brown.  *The Rhythm Section*, IMDb, https://www.imdb.com/title/tt7134096/ (last visited Oct. 14, 2025).  Under her November 2017 actor deal with TRS Productions Designated Activity Company, Ms. Lively received $2,250,000 in fixed compensation and would have been entitled to an additional $200,000-$6,750,000 in box

9

CONFIDENTIAL – ATTORNEYS' EYES ONLY

office bonuses under the contract terms depending on the film's performance. BL-000039012-13; BL-000038967-9011. The financials of this deal reflected Ms. Lively's expanding stature as an actress. Stone Dep. at 369:7-18.

In July 2019, Ms. Lively secured a "first look" deal with Amazon, which entitled her to a sum of $3.2 million for three years. BL-000038863-80; BL-000039109-112. This represented a career-milestone and confirmed that studios viewed Ms. Lively as an actress who could develop and "greenlight" a project. Stone Dep. at 371:20-372:9. In August 2022, Ms. Lively secured a directing deal from Fox Searchlight for a project called *Seconds*, with acclaimed writer and filmmaker Edgar Wright and producer Marc Platt, thereby further expanding her professional reach and versatility. BL-000039075-106; BL-000039014-54; Stone Dep. at 374:18-375:12.

In February 2023,[7] Ms. Lively achieved a career milestone in connection with *Another Simple Favor*, a sequel to the 2017 film. Ms. Lively secured $9,000,000 in fixed compensation, along with a $750,000 streamer buy-out payment, to be paid in four equal installments. BL-000021911-57; BL-000039397; BL-000039398. Amazon's willingness to pay Ms. Lively an upfront fee of nine times the fee she received on the original film is a testament to Amazon's confidence in the project's success. Stone Dep. at 374:18-375:12. Securing the *Another Simple Favor* deal placed Ms. Lively at the precipice of A-list stardom, positioning her to command eight-figure rates for big-budget studio and streaming films, among other forms of compensation. Zavala Dep. at 282:9-13; 176:20-23 (Q: "And based on those features you've just described of Ms. Lively, would you describe her as an A-list actor?" A: "Yes"); 176:24-177:17 (describing the qualities of an "A-list" actor by explaining that "there's a finite amount of major worldwide

---

[7] It is my understanding that from approximately 2014 through 2022, Ms. Lively was focused on building her family, and her businesses, including Betty Booze, Betty Buzz, and Blake Brown Beauty.

10

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

theatrical distributors . . . but the person that studios both want to have star in a film where they want to allocate a marketing span on a worldwide basis to support the movie that the actor is starring in, and also the pass the mom test, which is does your mother know their name. And they're also famous, whatever that means, but they have -- they have a level of fame, like, out in the zeitgeist but not for just being a celebrity.").

At the end of 2022, Ms. Lively came across the script for *It Ends With Us*. She immediately connected with the material and saw its potential. Deposition of Blake Lively ("Lively Dep.") at 18:8-11 (Q: "And what sparked your interest in getting involved with the movie?" A: "I thought the story was incredibly compelling, and it struck a nerve for me."); 19:1-4. Given Ms. Lively found the script compelling, she accepted compensation terms significantly lower than her market rate. Zavala Dep. at 189:3-16; Stone Dep. at 388:4-21 (Q: "And why, if you know, did Ms. Lively agree to a reduced fixed compensation in connection with this film?" A: "A few reasons. The first being that she really believed in the message and the story and the impact that it could have on women in her audience everywhere. She felt it was significant and very important for her to tell.").

Under her May 2023 *It Ends With Us* agreement, Ms. Lively earned $1,750,000 in fixed compensation, $2 million in total box office bonuses, and $3,884,238 in profit participation as of May 31, 2025. BL-000038599-636; BL-000039338; BL-000039356; BL-000039375; BL-000039339-55; BL-000039357-74; BL-000039376-94; BL-000039395; BL-000039396; Stone Dep. at 389:7-24 ("And certainly, her getting 10 percent of the back end is really truly meaningful participation and a huge marker for us in terms of the stepping stones of her compensation within her career to that point."). The success of the Film, which was distributed by Sony Pictures' label, Columbia Pictures, is detailed below in Section VI.C.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

2.      *2017 to August 2024: Voice Over, Directing, and Other Film Deals*

In addition to her roles as a lead actress, Ms. Lively also entered into voice over and directing deals from 2018 to December 2024, with major studios such as Paramount, demonstrating her continued versatility and expanding reach.  *See, e.g.*, BL-000039184-93; BL-000039075-106; BL-000039014-54; BL-000039060-74.

3.      *2008 to August 2024: Endorsement and Speaking Engagement Deals*

In addition to her acting, producing, and directing deals, Ms. Lively also secured endorsements and a speaking engagement across a wide variety of products and companies. From 2008 to 2023, Ms. Lively had endorsement deals or offers for various brands, including L'Oreal, Swarovski, Miss Sixty, Charlotte Tilbury, and Tiffany, ranging from $42,000 to $7,500,000 in fixed compensation.  *See, e.g.*, BL-000038937-57; BL-000038961-66; BL-000038958-60, BL-000039172-83, BL-000038881-88; BL-000039194-96.  In May 2024, she did a speaking engagement with Meta for $250,000 in fixed compensation.  BL-000039055-59.

**C.      May 2023 – August 2024: Successful Launch of *It Ends With Us* and Expected Impact on Ms. Lively's Professional Opportunities**

The Film premiered on August 6, 2024.  It grossed more than $350 million worldwide against a $25 million budget, making it an enormous box office success.  Deposition of Andrea Giannetti ("Giannetti Dep.") at 296:23-297:1 (noting budget of "at least $20 million"); Giannetti Dep. at 343:15-23 (grossing "close to $350 million"); Deposition of Josh Greenstein ("Greenstein Dep.") at 24:15-25:18 (describing the Film as a "[t]remendous success" that "wildly" exceeded expectations); Zavala Dep. at 280:2-24 ("I think it's on the list of probably 10 movies in the genre all time… I -- I mean, it's very rarefied air."); Stone Dep. at 396:23-397:21 ("It is a monstrous opening for a film of this stature…I think we were hoping for a home run, and this was an absolute grand slam."); Stone Dep. at 27:9-11 ("…when a $30 million movie opens

CONFIDENTIAL – ATTORNEYS' EYES ONLY

to $350 million, one can reasonably expect a very robust market to follow…"); Stone Dep. at 397:8-9 ("…the movie was made for a budget of somewhere around $30 million…").

This placed Ms. Lively at a pivotal stage in her career.  Zavala Dep. at 282:9-13 (agreeing that Ms. Lively was "at the apex of her career" at this time).  She was committed to working full-time and she was uniquely positioned to capitalize on a surge of career opportunities after the Film's wide-ranging success.  *See* Stone Dep. at 385:16-21; 397:22-399:2 (…"[W]hen you have a movie that opens No.  1…the phones are ringing off the hook with incoming opportunities and offers and meetings and etc. and so forth…"); Zavala Dep. at 177:4-179:5 (explaining that the success of the Film "would've been propulsive enough, I think, to sort of elevate her to even another level"); 284:1-11 ("The movie was a huge hit…I mean, it's just organic [Ms. Lively] would be in demand as an actress in the business.").

Given the commercial success of her recent work, and the financial terms she was able to command in connection with *Another Simple Favor*, it is reasonable to expect that Ms. Lively should have seen a marked increase in the quantity and quality of offers coming through, including as to major studio films (whether streaming or in theaters) as well as endorsements and speaking engagements, among other opportunities, with even more favorable compensation terms than her prior projects.  Stone Dep. at 397:22-399:8 ("And so what that should have represented for her is her true arrival as a top-, top-tier movie star and an ability to command, not only *a significant increase in her compensation moving forward*, but just as importantly, if not even more, a significant rise in her opportunities to follow with great filmmakers, with studio films.") (emphasis added); 399:13-23 ("[W]e would have been looking for and expecting, quite easily, a significant pay increase[.]").

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**D.      August 2024 – Present: Ms. Lively's Decreased Opportunities Since the Alleged Retaliation Campaign**

Following the start of the alleged online portion of the Retaliation Campaign in or around the summer of 2024, which coincided with the August 6, 2024, premiere of the Film, Ms. Lively's professional opportunities plummeted.  Lively Dep. at 225:16-228:5; Zavala Dep. at 285:22-286:4 (Q: "And you noticed there being just generally less interest in Ms. Lively in films?"  A: "Yes…Markedly so."  Q: "And did that begin shortly after the opening of It Ends With Us?" A: "Immediately.").  Ms. Lively received "no meaningful or real offers."  Zavala Dep. at 285:7-21 (Q:  "Okay.  And you testified that there were no offers after It Ends With Us." A: "No meaningful or real offers, correct."); 283:3-11 ("[S]he may have received offers for things that were unfinanced and not real. I mean, a lot of our business is putting things together at this point.  There's less production than there was on the film side, especially for theatrical. But yes, I found it peculiar that she didn't have real offers on go films."); Stone Dep. at 20:5-10 ("[S]ince there was a rise in negative criticism post-movie, the opportunities afforded her have been significantly less than what could have been reasonably expected after such a success.").

She secured one voice over deal in December 2024 for a guaranteed sum of $210,000, and one development deal (*i.e.*, with no guarantee that the film will be made) for her producing services in June 2025 for $500,000 fixed compensation and 5% of defined proceeds.  BL-000039060-74; BL-000039107-8.  Despite the success of the Film, she has not secured ***any*** offers for lead roles in "greenlit" (*i.e.*, for which the financier has committed to production) films or television series.  Lively Dep. 222:11-18 ("Well, there are opportunities that have not happened that would have after a film like that. There are films that I was meant to be a part of that I believe didn't happen because of everything that's occurred here."); Zavala Dep. at 283:3-11 ("…I found it peculiar that she didn't have real offer on go films."); 285:7-21. "Greenlit"

14

CONFIDENTIAL – ATTORNEYS' EYES ONLY

films were the type of deals Ms. Lively would have reasonably been expected to receive after the Film's success. *See* Zavala Dep. at 287:6-8 (Q: "Are these the type of deals you would've expected for Ms. Lively after It Ends With Us?" A: "No."). Ms. Lively has not received any meaningful offers for endorsements or speaking engagements either, all of which should have been flooding in. *See* Zavala Dep. at 286:5-9; *see also* Stone Dep. at 71:11-25, 397:22-399:23, 405:17-406:24.

## VII.     LOST PROFESSIONAL OPPORTUNITIES

I have been asked to opine on the likely professional opportunities and compensation available to Ms. Lively in the five-year period following the premiere of the Film on August 6, 2024 (the "Five-Year Period"). Based on industry standards, compensation benchmarks, the reasonable expectations of Ms. Lively's longtime agent and manager, and the typical career trajectory observed for similarly situated talent following a major breakout role, Ms. Lively would reasonably have been expected to secure significant increases in both compensation and career-defining opportunities during the Five-Year Period.[8] *See* Zavala Dep. at 280:2-24; 284:9-25; Stone Dep. at 405:17-406:24, 27:9-11 ("[W]hen a $30 million movie opens to $350 million, one can reasonably expect a very robust market to follow."). Josh Greenstein, formerly the President of the Motion Picture Group at Sony, testified that he would work with Ms. Lively again. Greenstein Dep. at 207:11-12. Alex Saks, the producer on the Film, also testified that she would work with Ms. Lively again. Deposition of Alexandra Saks ("Saks Dep.") at 296:1-4.

Ms. Lively's professional and personal commitments would have reasonably permitted her to complete at least two major projects annually, along with some endorsements and

---

[8] Because most acting agreements are highly confidential, the precise terms of other actors' agreements cannot be publicly disclosed.

15

CONFIDENTIAL – ATTORNEYS' EYES ONLY

speaking engagements.  It is my opinion that in August through December 2024, Ms. Lively should have started receiving offers for such projects, endorsements, and engagements, with commencement dates thereafter and into 2025.

### A.    Major Studio Feature Films

It is my opinion that Ms. Lively was positioned to obtain three to four lead roles, if not more, in high budget productions for major studios and/or streaming over the Five-Year Period, depending on her schedule and commitments.

Given the Film's tremendous success, it is reasonable to assume that one of these productions would have been a prequel or sequel to the Film.  Indeed, I understand such a project had been contemplated even prior to the release of the Film.  BL-000008567-72 (Mr. Baldoni texts Ms. Lively "Side note-was just thinking…. if we ever end up doing a sequel together… you should direct it.").  In light of the financial terms Ms. Lively was able to secure for *Another Simple Favor*, and her inevitable centrality in any project derivative of the Film, it is my opinion that Ms. Lively's actor and producer deal for this derivative project likely would have resulted in fixed compensation in the range of $15,000,000 to $20,000,000, with profit participation between 15-20 points.  Based on my experience with projects built upon established intellectual property, like any prequel or sequel here, that project likely would have performed equally well, if not better than the original.  Taking into account Ms. Lively's back-end earnings as of May 31, 2025 on the Film, (BL-000039376-94), and applying that sum to the enhanced deal Ms. Lively likely should have been able to secure on the prequel/sequel, Ms. Lively could reasonably have expected to earn an additional $10,000,000 to $15,000,000 in contingent compensation on the prequel/sequel, inclusive of both (a) profit participation, and (b) box office bonuses ranging

16

CONFIDENTIAL – ATTORNEYS' EYES ONLY

between approximately $5,000,000 to $10,000,000.  In sum, Ms. Lively's total compensation on the Film's prequel/sequel would likely have been $25,000,000 to $35,000,000.

Ms. Lively was further well-positioned to receive offers for non-derivative big-budget studio films for fixed compensation ranging from $10,000,000 to $15,000,000, plus profit participation in the form of 10-15 percentage points.[9]  Ms. Lively should have been able to secure the "pool" (or best) profit participation definition under established studio formulas, thus entitling her to the most favorable form of back-end compensation after the studio breaks even on the film.  For streaming originals, where profit participation is less common, Ms. Lively likely would have commanded compensation in the range of $12,500,000 to $20,000,000 per project, inclusive of her fixed compensation and buy-out, with a general allocation of 75% for fixed compensation and 25% for buy-out.[10]  She also should have been able to secure producer or executive producer deals for each project in which she starred, leading to additional, substantial compensation—especially given the producer credit that she was awarded by the Producers Guild of America (the PGA Mark) in connection with the Film.  BL-000016330-44.

**B.      Independent, Limited Budget and Cameo Film Opportunities**

Ms. Lively would also have been expected to secure two to three lead roles in independent or limited-budget films over the Five-Year Period.  Ms. Lively's likely compensation for such roles would have ranged from $500,000 to $5,000,000 per project, plus customary participation, depending on the budget, genre, size of the cast, and other factors.[11]

---

[9] Although profit participation, box office bonuses, and residuals would also be part of a typical compensation structure for this type of deal, to remain conservative, I have not quantified them for this Report.

[10] Although residuals would also be a part of a typical compensation structure for this type of deal, to remain conservative, I have not quantified them for this Report.

[11] Although profit participation, box office bonuses, and residuals could be a part of a typical compensation structure for this type of deal, to remain conservative, I have not quantified them for this Report.

17

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Ms. Lively could also have secured one to two smaller or cameo roles on various film projects, commanding in the range of $750,000 to $1,250,000 per project per week for approximately 2-3 weeks, plus profit participation.[12]

### C.    Limited Television Series

Over the Five-Year Period, Ms. Lively would have been expected to secure one to two limited and/or ongoing television series as a lead actress, each with an executive producer fee, participation, and credit.  Such roles could have been with leading television or streaming platforms including Apple, Netflix, HBO, and Amazon.  Based on prevailing industry standards, Ms. Lively would have been in a position to command $1,000,000 per episode, with guarantees of 8–10 episodes, per season, resulting in potentially $8,000,000 to $10,000,000 for a single-season project, and therefore up to $20,000,000 for two, ten-episode series in the Five-Year Period.[13]

### D.    Endorsements, Speaking Engagements, and Personal Appearances

During the Five-Year Period, Ms. Lively would have been expected to secure one or two multi-year endorsement contracts, each in the $7,000,000 to $10,000,000 range, as well as up to ten to fifteen smaller engagements, including personal appearances, brand tie-ins, and speaking engagements, each valued at $250,000 to $400,000.

### VIII.    CONCLUSION

Assuming Ms. Lively's allegations are true, Ms. Lively lost film, television, endorsement, and other professional opportunities in the Five-Year Period.

---

[12] Although profit participation, box office bonuses, and residuals could be a part of a typical compensation structure for this type of deal, to remain conservative, I have not quantified them for this Report.

[13] Although profit participation and residuals could be a part of a typical compensation structure for this type of deal, to remain conservative, I have not quantified them for this Report.

18

CONFIDENTIAL – ATTORNEYS' EYES ONLY

My opinions are provided to a reasonable degree of certainty based on my experience in the transactional entertainment industry, including its customs and practices, and Ms. Lively's past earnings.  In addition to the above opinions, I also have been asked to respond to any expert opinions offered by the Defendants and on any new evidence not now available, admitted at the trial, and/or in response to related matters.

Dated: October 17, 2025

DocuSigned by:

*Richard Marks*

By: _____
D556FBD028854CE...

Richard Marks

**EXHIBIT 1**

## FACTS OR DATA CONSIDERED OR RELIED UPON

### Documents

1. BL-000008567-72
2. BL-000016330-44
3. BL-000021911-57
4. BL-000038599-636
5. BL-000038863-80
6. BL-000038881-88
7. BL-000038889-936
8. BL-000038937-57
9. BL-000038958-60
10. BL-000038961-66
11. BL-000038967-9011
12. BL-000039012-13
13. BL-000039014-54
14. BL-000039055-59
15. BL-000039060-74
16. BL-000039075-106
17. BL-000039107-8
18. BL-000039109-112
19. BL-000039170
20. BL-000039171
21. BL-000039172-83
22. BL-000039184-93
23. BL-000039194-96
24. BL-000039338
25. BL-000039339-55
26. BL-000039356
27. BL-000039357-74
28. BL-000039375
29. BL-000039376-94
30. BL-000039395
31. BL-000039396
32. BL-000039397
33. BL-000039398
34. SPE_WF0000793-94

### Depositions

1. 2025-07-31 Deposition of Blake Lively
2. 2025-09-18 Deposition of Warren Zavala
3. 2025-09-23 Deposition of Andrea Giannetti
4. 2025-09-24 Deposition of Alexandra Saks
5. 2025-09-30 Deposition of Josh Greenstein

1

6.  2025-10-06 Deposition of Justin Grey Stone

## Pleadings

1.  2025-01-31 Wayfarer Parties' Amended Complaint, Dkt. 50
2.  2025-07-30 B. Lively Second Amended Complaint, Dkt. 521

## Other

1.  Discussions with Ms. Lively's talent agent and manager.
2.  *The Sisterhood of the Traveling Pants*, IMDb, https://www.imdb.com/title/tt0403508/ (last visited Oct. 14, 2025).
3.  The Sisterhood of the Traveling Pants, Rotten Tomatoes, https://www.rottentomatoes.com/m/sisterhood_of_the_traveling_pants (last visited Oct. 14, 2025).
4.  Josh Duboff, *When Gossip Girl Ruled the World*, Vanity Fair (Aug. 30, 2017).
5.  *A Simple Favor (2018)*, The Numbers https://www.the-numbers.com/movie/Simple-Favor-A#tab=summary (last visited Oct. 14, 2025).
6.  *A Simple Favor*, Rotten Tomatoes, https://www.rottentomatoes.com/m/a_simple_favor (last visited Oct. 14, 2025).
7.  Arthur S. Poe, *'A Simple Favor' Becomes a Proper Hit on Netflix as the Sequel Is Currently Being Filmed*, IMDb (Jun. 1, 2024) https://www.imdb.com/news/ni64617824/.
8.  *The Rhythm Section*, IMDb, https://www.imdb.com/title/tt7134096/ (last visited Oct. 14, 2025).

Docusign Envelope ID: 4D053079-FB55-4FEE-AC2A-FE321ED59EBE

**EXHIBIT 2**

**Richard Marks**



**Career History**

**Richard Marks & Associates** (April 2020 – Present)
Los Angeles, California
An Entertainment Law Firm

Principal and founding attorney continuing and expanding private entertainment transactional practice developed since 2004 for clients such as: ITV, Village Roadshow, MRC, Amazon, Jolie Productions, Olive Bridge Productions, Next5miles.  Engaged as forensic expert witness by clients such as Johnny Depp, WGA, and TWOWS.

**The Point Media** (2006 – March 2020)
Beverly Hills, California
An Entertainment Law Firm

Of Counsel in all aspects of small boutique entertainment law transactional practice, e.g., business affairs and legal work for development, production, and exploitation of content in all media including new and traditional platforms for clients such as: Relativity Media, Imperative, DirectTV, Fabrik, Mandalay, Ovation, Starz, WME, Shondaland.  Engaged as forensic expert witness by clients such as Warner Bros., ICM, HMRC, and Celador.

**Greenberg Traurig, LLP** (2004 – 2006)
Santa Monica, California
International Law Firm with over 2400 lawyers in 42 locations

Of Counsel in all aspects of large worldwide entertainment law transactional department, e.g., business affairs and legal work for programming development, production and exploitation in all media including network, syndication, foreign, home entertainment and new media for clients such as: Smith & Wesson, The Gurin Company, Smith & Weed Productions, Linda Ellman Productions, Summit Entertainment, and J. Walter Thompson; "Live 8" carriage agreements with AOL, MTV and domestic and foreign radio and television broadcasters as well as sponsorship agreements; Berry Gordy Jr. for development, production and exploitation of video, television and live theater projects; Downey Studios for leases to producer tenants; Direct TV for development and production of original programming; George Foreman for merchandising agreements; Robert Sillerman for acquisition of "American Idol"; Nat King Cole Estate for development, production and exploitation of television/video tribute project; and Lin TV for talent agreements.

**Nickelodeon Movies** (2003 – 2004)
Los Angeles, California
Business Affairs Consultant *(until outsourcing of legal and business servicing for division).*

Consultant in connection with development, production and distribution in all media of feature films for Paramount Pictures such "Barnyard", "Sponge Bob", and "Nacho Libre".

**Universal Network Television** (2002 – 2004)
Universal City, California
*Vice President of Business & Legal Affairs (until NBC purchase)*

Universal Network Television is a supplier of primetime live action television programming for the major networks.  Supervised legal and business affairs work on network series such as "Mr. Sterling" and "Just Shoot Me" as well as for USA Network development of projects such as "Kojak".

**Nelvana Communications** (2001 – 2002)
> Los Angeles, California
> *Vice President/LA General Counsel in charge of Business and Legal Affairs (until such operations re-located to Canada)*

> Nelvana is a leading independent producer/distributor of animated programming for theatrical, video, and television worldwide exploitation as well as subsidiary and ancillary publishing and merchandising licensing.

> - In charge of all business and legal affairs for development, domestic sales and licensing in all media for shows and properties such as "Babar", "Care Bears", "Berenstain Bears", "Little Bear", "Franklin" and "Rolie Polie Olie" to networks such as Nickelodeon, Disney Channel and PBS, toy manufacturers and publishers.
> - Supervised in house staff and outside counsel.
> - Managed transition of such services to Canadian counsel commencing as of 12/02.

**Kushner-Locke Company** (1993 - 2001)
> Los Angeles, California
> *Executive Vice President and General Counsel (until ceased operations)*

> Kushner-Locke was an independent producer/distributor of feature and direct-to-video films, television series, made-for-television movies, mini-series and animated programming for theatrical, network and cable television worldwide exploitation such as "Pinocchio" starring Martin Landau and Jonathan Taylor Thomas, "Harts of The West", "Gun", "Cracker", "1st & Ten" (first HBO original series).  It ceased operations in 2001.

> - Managed all legal and business affairs for all divisions of publicly traded company (KLOC) including development, financing, production, post-production, marketing, advertising and distribution of all production and programming in all media.
> - In charge of all personnel and labor issues and disputes and litigation.
> - Supervised in house staff and worked with outside counsel on corporate matters including public filings and IPO for US Search.com (SRCH).

**Law Offices of Richard Marks** (1992 - 1993)
> Los Angeles, California
> Represented clients in all areas of entertainment law.

**Media Home Entertainment** (1990 - 1992)
> Los Angeles, California
> *Senior Vice President and General Counsel (until sale to Fox)*

> Media Home Entertainment was one of the first and leading independent distributors Of home video entertainment product. In 1992, MHE's assets were acquired by Twentieth Century Fox Home Video, and it ceased operations.

> - Member of Board of Directors involved in all strategic planning including Fox Acquisition Agreement.

2

- Negotiated the terms and documentation of all development, production, distribution and acquisition agreements for product such as the "Nightmare on Elm Street" series, "Blue Velvet", Kathy Smith and Jane Fonda exercise videos, NFL Films, and original children's videos such as "Baby Songs".
- In charge of all legal enforcement and administration of copyrights and trademarks.
- Supervised in house staff and outside counsel in all areas of business and legal affairs.

**Walt Disney Pictures**, Touchstone and Animation (1990)
Burbank, California
*Of Counsel (during Sr. V.P. Legal's leave of absence)*

Responsible for all development and production legal work and involved in all such business affairs for feature films such as "Beauty & The Beast" and "Rocketeer".

**Weintraub Entertainment Group**, Motion Picture Division (1987 - 1990)
Los Angeles, California
*Vice President in Charge of Business and Legal Affairs (until ceased operations)*

Weintraub Entertainment Group was founded by former manager, motion picture producer and President of United Artists, Jerry Weintraub to compete with the major motion picture studios in the production and distribution of theatrical motion pictures and television series and movies. WEG ceased operations in 1990.

- Created and administrated all business and legal forms and practices for the Motion Picture Division that produced such films as "Troop Beverly Hills" and "My Stepmother Is An Alien".
- Hired and supervised in house staff and outside counsel in all areas of business and legal affairs for the division.

**Paramount Pictures Corporation**, Motion Picture and Network Television Divisions
(1984 - 1987)
Los Angeles, California
*Senior Counsel*

- Responsible for all legal work and involved in all business affairs from development, production, post-production, marketing and advertising for such feature films as "Beverly Hills Cop II", "Tucker" and "The Golden Child", and such television series as "Cheers" and "Family Ties".

**Law Offices of Richard Marks** (1983 – 1984)
Los Angeles, California
Represented clients in all areas of Entertainment Law

**Ziegler Agency** (1978 - 1983)
Los Angeles, California
*Vice President and General Counsel (until closure)*

- The Ziegler Agency was founded and run by Evarts Ziegler until it was acquired in 1983 by International Creative Management and ceased operations. It was one of the premiere boutique literary and talent agencies representing such clients as William Goldman, Sidney

3

Pollack, Pat Conroy and the Estates of Raymond Chandler and John Steinbeck for employment and acquisition agreements. Packaged literary material from authors such as Irving Wallace and Ray Bradbury with producers such as Dick Berg and David Manson for television development and production.

- In charge of all business and legal affairs for agency including lease and personnel issues, supervising litigation and working with all senior agents and their clients including their outside counsel, managers, publicists, studio and independent employers, and guilds.

**Law Offices of Richard Marks** (1977 – 1978)
Lost Angeles, California
Represented clients in all areas of Entertainment Law

**Pollock, Rigrod & Bloom** (1974 – 1977)
Los Angeles, California
Associate Attorney in all aspects of Entertainment Law

**Hahn, Cazier, Thornton, Hough & Leff** (1973 - 1974)
Los Angeles, California
Associate Attorney in Intellectual Property Litigation

**Education**

**UCLA School of Law**
Juris Doctor 1973

- Chief Justice in Charge of Moot Court Program
- Represented clients at Venice Legal Aid office

**UCLA**
Bachelor of Arts, Magna Cum Laude 1970

- Phi Beta Kappa
- Valedictory Speaker
- Swim Team
- Yell Leader
- Congressional Intern

**Community Service**

- Leo Baeck Temple, Member of Board of Trustees
- Junior Great Books, Shared Inquiry Leader
- Jewish Big Brothers, Member of Board of Directors

**Marathon Athletics**

- Completed 140.6 Mile "Ironman" Triathlon in Kona, Hawaii
- Swam Catalina Channel from Catalina Island to Palos Verdes
- 2nd Place in 28.5 Mile Manhattan Island Marathon Swim
- National Masters 10 Mile Open Water Champion

Docusign Envelope ID: 4D053079-FB55-4FEE-AC2A-FE321ED59EBE

**Personal -** Married, two daughters

5

Docusign Envelope ID: 4D053079-FB55-4FEE-AC2A-FE321ED59EBE

**EXHIBIT 3**

Richard Marks/Testifying Expert Witness
Complete List of Cases

1. Kripke v. Warner Bros. TV Production – JAMS Arbitration No. 1220057510 Los Angeles – I was engaged in May 2021 and testified in May 2023.

2. Ou v. Li – L.A. Superior Court Case No. 21STCV36429 – I was engaged and deposed in December 2022, and testified at trial in September 2024.

3. Herrick Productions LLC v. Mattel Inc. – L.A. Superior Court Case No. 19SMCV0129 – I was engaged by Plaintiff in September 2022 and deposed in October/November 2022 and then in March/April 2024 and testified at trial in June 2024.

4. Novelstem International Corp. v. C.P. Group, Inc – AAA Arbitration No. 01-20-0015-2410-1-MK – I was engaged by Claimant in March 2022 and testified in October.

5. Depp v. Heard – Circuit Court of Fairfax County Virginia – I was engaged by Claimant in October 2019 by Plaintiff, deposed in March 2022, and testified at trial in May and in June 2022.

6. Dadi v. Millennium Media – IFTA Arbitration – I was engaged by Claimant in February 2022 and testified in March 2022.

7. WGA v. Netflix et al – WGA Arbitration – I was engaged in January 2022 by Claimant and testified in March 2022.

8. WGA v. Story Builders et al – WGA Arbitration – I was engaged in February 2021 by Claimant and testified in May 2021.

9. TWOWS v. Paramount – Jams Arbitration No. 1220064978 Los Angeles – I was engaged in October 2020 by Claimant and was deposed in December 2020.

10. Ballet Beauty v. Lions Gate Films – Jams Arbitration No. 1210034307 Los Angeles – I was engaged in mid-2018 by Claimant and deposed in January 2019.

11. Geoffrey Roy Rush v. Nationwide News - Federal Court of Australian Proceeding No. NSD2179 – I was engaged by Defendant in July of 2018 and testified in November of that year.

12. Jennings v. O'Neal - L.A. Superior Court Case N. YC071356 – I was engaged by Plaintiff in May 2018 and was deposed in June of that year.

1

Docusign Envelope ID: 4D053079-FB55-4FEE-AC2A-5E321EB59EBF

13. <u>Devito v. Legendary</u> – L.A. Superior Court Case No. BC 618465 – I was engaged by Defendant and deposed in February of 2018.

14. <u>Le et al v. Zuffa, LLC</u> – U.S. District Court, Nevada, Case 2:15-cv-01045-RFB-PAL – I was engaged by Defendant in 2017 and was deposed at the end of that year.

15. <u>Peg Yorkin v. Bud Yorkin Productions</u> – AAA Arbitration No. 011600041742 Los Angeles – I was engaged by Plaintiff in the Fall 2016, was deposed and testified at arbitration in Spring 2017.

16. <u>Jillian Michaels v. Lions Gate Films</u> – Jams Arbitration No. 1220050580 Los Angeles – I was engaged by Plaintiffs at the end of July 2016, was deposed, and testified at arbitration in November 2016.

17. <u>Frank Darabont v. AMC Networks</u> – NY Supreme Court No. 654328/2013 – I was engaged by Plaintiffs in early 2016 and have been deposed.

18. <u>Leslie Britton v. Conrad Riggs</u> - L.A. Superior Court Case No. BC 496298 - I was engaged by Defendant in 2015, was deposed at the end of that year and testified at trial in early 2016.

19. <u>Confidential AAA Arbitration</u> – I was engaged by Claimant at the end of 2015, was deposed and soon thereafter testified at the arbitration.  I can supply the name of the counsel that engaged me upon request.

20. <u>Campbell et al v. Arenas Entertainment, LLC, et al</u> – Nassau County Supreme Court, Case No. 019249/10 - I was engaged by Defendant and testified at trial in November of 2014.

21. <u>George Litto Productions, Inc., v. L/F Productions, LLC, et al</u> – LA Superior Court, Case No. BC484021 - I was engaged by Defendants and was deposed in February of 2014.

22. <u>Atlantique Productions, S.A. v. Ion Media Networks, Inc</u>. – US District Court, Central District of California, Case No. SACV 12-08632 DMG - I was engaged by Plaintiffs in late 2013 and was deposed in January 2014.

23. <u>Goodness Films, LLC et al  v. TV One LLC, et al</u> – US District Court, Central District of California Case No. CV 12-08688-GW - I was engaged by Defendant in 2013 and was deposed in the Fall of that year.

24. <u>Eclipse Film Partners No. 35 LLP v. The Commissioners For Her Majesty's Revenue and Customs</u> - In the Upper Tribunal (Tax and Chancery Chamber) FTC/57/2012, London:  I was engaged by HMRC in 2013 and testified via video conference at a hearing in November 2013.

2

Docusign Envelope ID: 4D053079-FB55-4FEE-AC2A-FE321ED59EBE

25. <u>Napoleon Pictures Limited vs. Fox Searchlight Pictures</u> – Superior Court of State of California Case No. SC 113978, Los Angeles - I was engaged by Plaintiff, was deposed in the spring of 2012 and testified at a judicial reference hearing in the Summer of 2012.

26. <u>MK Greentea vs. Maverick</u> – JAMS Arbitration No. 1220042112, Los Angeles -   I was engaged by Respondent, was deposed in early August 2011 and soon thereafter testified at the arbitration.

27. <u>In the Bankruptcy of Louis J. Pearlman, Trustee vs. MTV</u> - U.S. District Court, Case No. 10-CV181-Orl-28-DAB, Florida - I was engaged by the Trustee and was deposed in May 2011.

28. <u>Celador et al vs. Walt Disney et al - US District Court Case No. CV04-3541-VAP, Riverside, CA</u> -  I was engaged by Plaintiff, was deposed in August of 2008 and testified at trial in the summer of 2010.

29. <u>Joanne Siegel et al vs. Time Warner, Inc. et al</u> – US District Court Case No. CV04-8440/CV04-87776 SGL, Los Angeles -   I was engaged by Defendants and was deposed in February of 2007 and April of 2009.

30. <u>Cookie Jar Entertainment vs. WGBH Education Foundation</u> – AAA Arbitration No. 50-140-T-00173-08, Los Angeles:  I was engaged by Claimant and testified at the arbitration at the end of 2008.

31. <u>Monarch Consulting vs. Alliance Group Entertainment</u> – LA Superior Court, Case No. BC 355 812:  I was engaged by Defendant and was deposed in the summer of 2008.

32. <u>Jim Preminger Agency et al vs. CBS Studios et al</u> – JAMS Arbitration No. 1110010345, Los Angeles - I was engaged by Claimants, was deposed and then testified at the arbitration in the summer of 2007.

3