# EXHIBIT 38

CONFIDENTIAL

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---


BLAKE LIVELY,

                    Plaintiff,

     vs.          CASE NO. 24-CV-10049-LJL (LEAD CASE)

                            25-CV-449 (LJL) (MEMBER CASE)


WAYFARER STUDIOS LLC, ET AL.


                    Defendants.

_____

JENNIFER ABEL,

            Third-party Plaintiff,

     vs.

JONESWORKS, LLC,

            Third-party Defendant.

_____

WAYFARER STUDIOS LLC, et al.

            Consolidated Plaintiffs,

     vs.

BLAKE LIVELY, et al.

            Consolidated Defendants.

_____

                    **CONFIDENTIAL**

     VIDEO-RECORDED DEPOSITION OF RICHARD MARKS

               Los Angeles, California

             Wednesday, December 3, 2025




Stenographically Reported by:  Ashley Soevyn,
CALIFORNIA CSR No. 12019

Pages 1 - 123


                                              Page 1

CONFIDENTIAL

Q    And how long ago was that?                    10:11:46

A    Oh, that's got to be, you know, 45, you know, 50 years ago.  You know, in that range.

Q    Okay.  What law firm was that?

A    That was a law firm called Pollock                10:12:03
Woodrod and Bloom.  And we represented some young filmmakers like George Lucas and things like that.

Q    Okay.  And going back to the expertise that's the basis for the opinions you're going to tell us about today, I did read your report and I        10:12:24
just did want to clarify that your expertise in this case is confined to -- is confined to the structure of deals or the structure of financial deals that might have been available to Ms. Lively.  Is that a correct summary before we get into details?        10:12:55

MS. MOSES:  Objection.

THE WITNESS:  I'm -- yes, I am opining on the deals in my experience that would have been available to be made and documented but for the alleged conduct.                                    10:13:16

BY MS. GAROFALO:

Q    Okay.  So what I want to do is follow up a little bit with you before we actually get into specifics.  When you say you're opining on deals that would have been available, is part of the --      10:13:30

Page 15

CONFIDENTIAL

are you offering opinions on whether or not    10:13:35

Ms. Lively would, in fact, have been hired for

certain projects?

    A    I believe that's what the opinion is.

But for the alleged conduct, based on my experience    10:13:46

and her past career trajectory, I have laid out a

conservative five-year list of projects that she

would have been engaged upon or might have been.

    Q    Okay.  So, again, I want to understand

you correctly.  Your expert opinions have two    10:14:13

facets.  One is, what projects she might have

obtained but for her allegations of sexual

harassment or a smear campaign or whatever they are

in this case.

    And two --    10:14:35

    A    Did you read the complaint?

    Q    Oh, I read the complaint.  And what the

financial structure of those deals would have been.

Do you understand the question?  It's a little

convoluted so I can break it down if you'd like.    10:14:51

    A    I believe I understood it.  Yes.  I'm

opining on the projects and the range of -- the

actual range of projects and the range of

compensation.

    Q    Okay.  Just to be perfectly clear, I    10:15:04

Page 16

Then the basis for what you've told us is    10:16:46

your expertise in what work a performer might get is

based on observations in connection with your role

documenting transactions; would that be a correct

statement?                                      10:17:02

MS. MOSES:  Objection.

THE WITNESS:  My opinions are based on my

expertise and my observations and what I know about

the business and the deals I've made and what I've

observed.  And as I said, her career trajectory,    10:17:17

what I have learned from her agent, manager, yes.

BY MS. GAROFALO:

Q    As long as you bring it up now.  Let's

talk a bit about where you got the information on

which you based the assumptions and resulting    10:17:38

opinions reflected in your report.

So I would like you to tell me, let's

start with agents.  Who did you communicate with?

Who provided you information that in some way forms

the basis of the opinions that you'll be giving us    10:17:57

today?

A    As far as the agent, I read

Warren Zavala -- is that the correct pronunciation?

His deposition transcript.  I spoke to him twice.

And my goal in speaking to him was to lay out the    10:18:17

Page 18

CONFIDENTIAL

summary of my conclusions, the projects per year,    10:18:20

and to get his -- in effect, what I was doing was

reasonable and conservative and that he didn't have,

from his perspective, any criticism of the structure

I had laid out.    10:18:47

    Q   And is it correct, if you know, that

Mr. Zavala remains Ms. Lively's agent?

    A   Yes.

    Q   And Mr. Zavala, based on your years of

experience, would have a financial interest in    10:19:02

Ms. Lively's success; is that correct?

        MS. MOSES:   Objection.

        THE WITNESS:   Agents are paid 10 percent

of the deals they make.  I would doubt that he's

entitled to 10 percent of a judgment.    10:19:14

BY MS. GAROFALO:

    Q   Okay.  Mr. Zavala, based on your

expertise, has a financial interest in Ms. Lively's

professional success; is that a correct statement?

    A   That's correct.  He's employed to help    10:19:30

her succeed and get deals and have her career

proceed along a trajectory.

    Q   With respect to the issue of securing

deals, was Mr. Zavala your primary source of

information?    10:19:51

Page 19

CONFIDENTIAL

A     I also spoke to Justin Grey Stone, the     10:19:53
Plaintiff's manager.

Q     How many times did you speak to
Mr. Stone?

A     Once.     10:20:09

Q     What was that conversation?

A     It was very similar to my conversations
with the agent.   And it was basically, here are my
conclusions.   Here is my opinion top line.   Am I
overstating, understating?   Do you agree with this?     10:20:26
And I had the corroboration from the agent and the
manager that I was seeking.

Q     Okay.   With respect to Mr. Zavala and
Mr. Stone, do I understand you correctly that you
spoke to them only after you at least formed     10:20:49
preliminary opinions in this case?

A     Yes.

Q     And the information that you used in
forming those opinions included what is alleged in
Ms. Lively's complaint; is that correct?     10:21:05

A     That was one of the things I read, yes.

Q     And what were the others?

A     There's a list of documents attached to
my report.   And I knew what Ms. Lively had earned on
her previous projects within the last five, six     10:21:29

Page 20

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

film in question, It Ends with Us, she was launched   10:32:57
into the very rarefied era.  And I think I even read
in Mr. Wagner's report, he called her an A-list
actor.

Q    Based on your experience over many years   10:33:12
as an attorney in the industry, what are the factors
that one would use to determine whether an actor was
an A-list or leading talent specifically entitled to
best definition terms in a contract?

A    Number one, I'm looking at their   10:33:37
precedent, what they've gotten in the past.  And I
am looking at the performance of their recent
projects.  And I've sort of lost the question.

Q    That's okay.  I'm going to move on.

Now, in formulating your opinion on lost   10:34:07
opportunities over a five-year period as reflected
in your report, did you assume that Ms. Lively would
be available to accept any project that was offered
during that period of time?

A    I certainly made the assumption that she   10:34:29
would be available to accept the range of projects
that I projected, and it wasn't a complete
assumption.  It was, I believe I read that
Justin Grey Stone said that, you know, she had had
her kids.  She is 38.  For female actresses, there's   10:34:53

Page 28

CONFIDENTIAL

a limited lifespan, if you will, for a leading lady.    10:35:00
And that she was now ready to work and take
advantage of the opportunities that she had, in
effect, turned over a new leaf, and that's what I
got from the deposition and from speaking to    10:35:18
Justin Grey Stone.

Q    Please tell me in more detail what you
mean by Ms. Lively turned over a new leaf; you
understood that she turned over a new leaf.  What
are you referring to?    10:35:40

A    Well, prior to It Ends with Us and its
stratospheric success, she was having four children
and not completely available in the way -- to take
work in the way that she would be now after having
her kids and now.    10:36:09

Q    So when you evaluated the potential
opportunities, calculated the potential value of
lost opportunities, you knew that prior to
It Ends with Us, Ms. Lively was not available to
accept all projects that were presented; is that    10:36:31
correct?

        MS. MOSES:  Objection.

        THE WITNESS:  I know it from second-hand
sources, agent, manager and what -- the way she
conducted her career.    10:36:50

Page 29

BY MS. GAROFALO:                                          10:36:51

Q    So your opinion, in part, is based on the assumption that Ms. Lively had turned over a new leaf, and unlike her history, was now totally available to work; is that correct?          10:37:06

MS. MOSES:  Objection.

THE WITNESS:  Well, again, she was ready to work on a --

BY MS. GAROFALO:

Q    Okay.  I'm sorry to interrupt, but it          10:37:13
really requires a yes or no answer.  Would you like the court reporter to read the question back?

A    Sure.

THE STENOGRAPHIC REPORTER:  Sure.

Last question.                                           10:37:37

(Record read as follows:

"QUESTION:  So your opinion, in part, is based on the assumption that Ms Lively had turned over a new leaf, and unlike her history, was now totally 10:37:38 available to work; is that correct?")

MS. MOSES:  Same objection.

THE WITNESS:  It's correct in part, but I would have to -- not so on the totally part of it. Because as an actor, you don't work 50 weeks a year,          10:37:47

Page 30

CONFIDENTIAL

and even at a robust schedule, you have lots of time      10:37:52
off.

BY MS. GAROFALO:

Q     Understood.  That wasn't my question.  So      10:38:01
my question was --

A     You used "totally" in your question.

Q     I will rephrase the question rather than
go down a rabbit hole with you.

A     I basically --

Q     So prior to It Ends with Us, you      10:38:12
understood that Ms. Lively did not accept every
project that was offered.  She had young children
and so forth; is that correct?

A     Correct.

Q     Okay.  And you were told that post      10:38:29
It Ends with Us, she turned over a new leaf,
correct?

A     I was not given the phrase "turned over a
new leaf."

Q     Okay.  That was your understanding?      10:38:41

A     My understanding was that now she was
going to -- my words -- strike while the iron was
hot, and take advantage of what she had built up
over 20 years and now, what would come to her after
the amazing success of It Ends with Us.      10:39:03

Page 31

CONFIDENTIAL

Q    Okay.  Prior to It Ends with Us, I believe your report looks at the period between 2017 and August 2024, during that period of time, that was the period of time that you based your projections or extrapolations on; isn't that correct?    10:39:06    10:39:24

MS. MOSES:  Objection.

MS. GAROFALO:  You can answer.

THE WITNESS:  As far as the dollar figures, those were the deals that I looked at.  As far as -- I also took into consideration that she was in this generational series called Gossip Girl, that she was in the Traveling Pants movie, that she had this amazing following.  But as far as numbers, I looked at what you've described.    10:39:39    10:40:05

BY MS. GAROFALO:

Q    We'll get back to some of that in more detail.  I just want to finish with your assumptions.

Did you assume in formulating your opinions that Ms. Lively would have at least had the opportunity to be involved in the prequel or sequel to It Ends with Us?    10:40:14

A    Yes.  I've included a prequel/sequel derivative work, if you will, to It Ends with Us.    10:40:40

Page 32

CONFIDENTIAL

five-year period beginning in August of 2024; is    11:00:50
that correct or incorrect?

    A    It begins with the smear campaign.  Which
I'm assuming began with the premiere of the film, if
not a little before.  And in films, there's usually    11:01:06
a lag time and, you know, the work might have
happened in '25, '26.  You know, not the tail end of
'24.

    Q    Using a five-year period?

    A    Yeah.  Yeah.  Definitely the five-year    11:01:22
period.  But, again, as you move towards the end of
the year, you know, things don't happen much.

    Q    Do you know when filming ended on
It Ends with Us?

    A    I would just be trying to wrack my    11:01:38
memory.  But it resumed after the strike settled in
'24.  And it ended fairly close to the release in
terms of, it wasn't a year later.  I think they
ended in, I will say the spring of 2024.  But I'm
not positive.  Or early summer.    11:02:05

    Q    Prior to August of 2024 when you
understand the smear campaign began, how many
projects are you aware of, other than those
mentioned in your report, that were offered to
Ms. Lively?    11:02:27

Page 46

CONFIDENTIAL

MS. MOSES:  Objection.                            11:02:33

THE WITNESS:  I did not look at offers.

My information comes from the agent and the manager

saying that she got lots of offers.  She was very

picky and, you know, what I'm primarily looking at    11:02:50

is what would happen after It Ends with Us.

BY MS. GAROFALO:

Q    What was the last project, if you know,

that Ms. Lively did before commencing work on

It Ends with Us?                                  11:03:13

A    I think it was -- again, I haven't

projected all the dates.  But I think the last

project was A Simple Favor 2, Another Simple Favor.

Q    And do you or did you have any

information in formulating your opinion about the     11:03:50

number or type of projects that may have been

offered to Ms. Lively between the end of her

services on Simple Favor 2, or Another Simple Favor,

and the beginning of her work on It Ends with Us?

A    I did not get that information on offers    11:04:16

not accepted, is what I assume you're asking about.

Q    Do you know of any offers that were

accepted in that period of time?

A    I believe those are the ones I'm opining

on.  Other than development deals, which, you know,    11:04:33

Page 47

CONFIDENTIAL

It Ends with Us, high-budget films?  And, again, I'm   11:12:14

using your words, Mr. Marks.

A    As part of my analysis, I didn't consider

them to be high-budget films that she would be

participating in after It Ends with Us.          11:12:31

Q    I'm going to ask it as many times as it

takes to get an answer.

Prior to It Ends with Us, is it your

opinion, was it your opinion in preparing your

expert report in which you use the term "high-budget   11:12:49

film production" that Ms. Lively had not had a

leading role in any high-budget film production?

MS. MOSES:  Objection.

THE WITNESS:  The way I'm using the

phrase, these are a new level of films.  And prior   11:13:05

to It Ends with Us, I wouldn't consider those films

high-budget.

BY MS. GAROFALO:

Q    Okay.  Thank you.

A    But I would like to know the budget of A   11:13:28

Simple Favor 2.  I can't remember.

Q    So you didn't know that at the time you

formulated your report?

MS. MOSES:  Objection.

THE WITNESS:  I can't recall if I knew   11:13:40

Page 53

Q    Have you ever seen a case like this?    11:37:51

MS. MOSES:  Objection.

THE WITNESS:  I've never seen a case like this where the internet and the capabilities of AI were allegedly used to ruin someone.    11:38:05

BY MS. GAROFALO:

Q    So you speculated that because this film was successful, no matter what had happened between Mr. Baldoni, Wayfarer, and Ms. Lively, she would have done a prequel or sequel had it been offered;    11:38:24 is that correct?

MS. MOSES:  Objection.

THE WITNESS:  I am looking at a right's deal.  Not a directing deal, not an acting deal. I'm looking at a right's deal.    11:38:35

BY MS. GAROFALO:

Q    So what I asked you is correct?

Is that your answer?

A    I don't know what you asked me.

Q    You assumed that Ms. Lively would've been    11:38:42 offered and would have accepted a sequel or prequel to It Ends with Us in formulating your opinion.

Is that a correct statement?

MS. MOSES:  Objection.

THE WITNESS:  Yes.  And the offer might    11:38:57

Page 61

CONFIDENTIAL

have come from a third party who bought the rights    11:38:59

from Wayfarer.  It may have come from a third party

that consolidated rights with the book.  I don't

know the rights situation.

BY MS. GAROFALO:                                      11:39:12

     Q    You have no factual basis for any of

those assumptions.  Is that a correct statement?

          MS. MOSES:  Objection.

          THE WITNESS:  I haven't seen the rights

agreements.  What I'm basing my opinion on is my      11:39:23

experience, you know, my estimates, if you will.

And what I've seen happen in Hollywood.

BY MS. GAROFALO:

     Q    But there are actual facts here that

would have informed your opinion such as who held     11:39:41

the rights and to what extent to the film or the

property, It Ends with Us; isn't that correct?

          MS. MOSES:  Objection.

          THE WITNESS:  I was making the assumption

that whoever held those rights would want to          11:39:54

monetize them rather than bury them.

BY MS. GAROFALO:

     Q    Throughout -- and we're going to look at

some of them specifically, but throughout your

report, there are a lot of qualifying terms like      11:40:16

Page 62

THE WITNESS:  I may have looked at it in    11:53:36

the volume of documents, but I don't recall it as I

sit here.

BY MS. GAROFALO:

Q    In formulating your opinion, did you    11:53:41

consider any contractual obligations for time or

services that Ms. Lively had to any of her

businesses?

A    As I sit here now, I don't recall

considering that.    11:54:00

Q    Would that be a factor in determining how

much time Ms. Lively might have to devote to other

opportunities in the future?

A    If she was committed to working eight

months a year in her businesses and she couldn't    11:54:23

work on films, certainly.  And that's one of the

reasons I spoke to her agent and her manager to make

sure that I had this correct and I also believe that

after the smear campaign, those businesses whatever

commitments she had to them, have diminished, just    11:54:40

like the films and other opportunities.

Q    Did Mr. Zavala tell you that Ms. Lively

had or did not have any commitments for her services

or time in -- contractual commitments in connection

with her businesses?  Did Mr. Zavala ever tell you    11:55:02

Page 72

CONFIDENTIAL

anything in that regard?                                    11:55:07

A    I don't recall that specific element of our conversation.  I looked at the uber analysis and he agreed with it.

Q    Did you ever ask Mr. Zavala about time    11:55:18 commitments that Ms. Lively might have that would have affected your opinion on the value of the lost opportunities caused by my clients?

A    Yes.  That was part of my conversation with him.  Not specifically.  I said "this is my    11:55:39 projection.  Do you see anything that is flawed in it or that is unreasonable or that is too aggressive?"  And both Mr. Zavala and Justin Grey Stone said "no, this looks very reasonable."

MS. GAROFALO:  Move to strike as    11:56:02 nonresponsive.

Q    My question, Mr. Marks, is pretty simple.

Did you ask or did Mr. Zavala at any time volunteer information regarding contractual commitments that Ms. Lively had for time or services    11:56:17 to her businesses?  Yes or no answer.

A    We did not get into those weeds.

Q    Same question for Mr. Grey Stone.

Did you have that conversation with him?

A    Same answer.                                    11:56:35

Page 73

Q    Okay.  Do you, in fact, or did you, in    11:56:36
fact, know in formulating your opinion how much time
Ms. Lively devoted to her businesses, let's say, in
2024?

A    No.    11:56:54

Q    2025.  Same question.

A    Same answers.  I did not see her
contracts with her businesses.  If they're with
financiers or people other than herself, I did not
see those.    11:57:10

Q    Let me be clear.  Separate and apart from
her contracts, do you -- did you know in formulating
your opinion how much time Ms. Lively devotes to the
operation, promotions, marketing of her businesses?

A    As I sit here now, I do not.    11:57:28

Q    Do you know whether the time she devotes
to her businesses would interfere with her ability
to take certain opportunities or might interfere
with her ability to take certain opportunities?

A    Again, without the facts, it might.  But    11:57:47
I don't have those in front of me.  I -- based on my
analysis, I made the assumption that she had the
space, based on my conversations with her agent and
manager.

Q    Anyone ever tell you that Ms. Lively,    11:58:11

Page 74

CONFIDENTIAL

prior to formulating your opinion, did anyone ever            11:58:13

tell you that Ms. Lively didn't accept jobs that

coincided with her husband's work in film?

        MS. MOSES:  Objection.

        THE WITNESS:  I have seen through my            11:58:34

research of the documents that have been provided to

me, that she was picky about her roles, that she

preferred not to work when her husband was working.

But I believe that she has worked when her husband

was working.  And she's worked on films back to      11:58:54

back.

BY MS. GAROFALO:

    Q    In formulating your opinions as reflected

in your report which is Exhibit A, did you consider

Mr. Reynolds' schedule of projects and whether or      11:59:05

not that might affect Ms. Ms. Lively's ability to

accept opportunities?

    A    I did not consider Mr. Reynolds'

schedule.  What I considered was the proposition

that her agent manager put forth, that she was now      11:59:31

ready to work and she had worked in the past

overlapping with him.  And that his -- I did not

limit the projects that she would have been offered

and the schedule by his schedule, which I don't

know.                                                   12:00:00

Page 75

CONFIDENTIAL

level she's at, you can negotiate schedule, you can    12:03:37

negotiate location, you can bring a nanny, you can

travel back and forth.

There's many ways to deal with someone's

personal life at the level that she had attained.    12:03:55

And I was told that she was in the limited lifespan

of an A-list female star.  That she was now ready to

do what I have projected.

BY MS. GAROFALO:

    Q    Okay.  Do you know whether Ms. Lively was    12:04:21

willing to accept a recurring role in a television

series that was produced outside of New York or

Los Angeles?

    A    I have not spoken to Ms. Lively.  I have

only spoken to her agent manager.  And they have    12:04:49

signed on to my projection.

    Q    Now, the television series you referred

to earlier I assume was Gossip Girl?

    A    Yes.

    Q    And that was, according to your own    12:05:03

report, between 2007 and 2012, correct?

    A    Yes.  That was in a different era of

television and television series.

    Q    I'm married to a television producer and

writer so I know how it works.  Thank you.    12:05:17

Page 78

A    Did you say you manage?                    12:05:20

Q    Married to.

A    Married.

Q    Okay.  So Gossip Girl, that television series --                                                   12:05:27

A    That must be hard.  Do you overlap schedules?  What happens?

Q    I don't work when he works.  Off the record.  Virtually hasn't worked in the last 20 years.  Sorry, back on.  Okay.          12:05:39

So between 2007 and 2012 that was before Ms. Lively had a family, correct?

A    Yes.  As far as I know, her children come after that series.  And that she was much younger during that series.                             12:06:00

Q    So subsequent to Gossip Girl, do you know if Ms. Lively has been offered another television series?

A    I don't know about her offers.  I just know about the deals that I used in my report.  I    12:06:14 could certainly look at, you know, the internet and look at all her credits.  But as I sit here now, I don't.

Q    Okay.  Now, in your report, and I'm looking at page seven if you --                      12:06:32

Page 79

CONFIDENTIAL

A    Thank you.

12:06:35

Q    -- care to make sure that I'm properly conveying the information here.  One of the films you refer to is The Sisterhood of the Traveling Pants.  I think you mentioned that.

12:06:44

A    Yes.

Q    That was in 2005, correct?

A    Correct.

Q    Okay.  And --

A    And she was a teenager at the time.

12:06:54

Q    Okay.  It was a long time ago.  You also mention -- let me withdraw that.

So we're talking about the projects that you looked at in forming your opinion as a basis to extrapolate five years in the future, what

12:07:36

Ms. Lively would have obtained.  You looked at The Sisterhood of the Traveling Pants in 2005, correct?

A    I didn't look at her salary or earnings. I just -- that is part of the gestalt of Ms. Lively and her following, if you will, from people.

12:08:00

Q    Form the basis of your opinion that she would have gotten certain work in the future or did you not consider Sisterhood of the Traveling Pants?

A    I certainly considered that she was a star who had a history and a following with a

12:08:15

Page 80

CONFIDENTIAL

generation, if you will.                                    12:08:21

Q    Okay.  All right.  And we talked about Gossip Girls, right, Gossip Girl, correct?

A    Uh-huh.

Q    And what other professional experiences       12:08:30 of Ms. Lively did you consider in formulating your opinion on projected opportunities that Ms. Lively, you opine, would have had or might have had but for my clients?

A    I think you know, you've just listed the     12:08:55 two projects that were kind of iconic and generational, if you will.  And then I've moved on to 2017.  I believe Gossip Girl ends in 2012.  So I haven't -- and I haven't looked at other projects.

Q    Okay.  You also mention something called     12:09:21 The Rhythm Section.  Do you see that?  That's actually on page nine near the top.

A    Yes.

Q    Okay.  And do you know when that film was released?                                             12:09:41

A    I believe it was 2020.  But do you know when it was released?

Q    I'm not providing an expert opinion.  And then you talk about Another Simple Favor.  And we've already talked about Simple Favor 2, correct?  And     12:09:56

Page 81

CONFIDENTIAL

of course, we talked about It Ends with Us.                12:10:00

Between 2005 and today, what other projects did you consider as the basis for your projection of potential opportunities to Ms. Lively in the future?                12:10:20

A    Nothing in specific that I can recall as I sit here.

Q    On page 11, half way down, you address Ms. Lively's agreeing to take reduced fixed compensation on It Ends with Us.                12:11:05

A    Yes.

Q    And did you form an opinion as to why what led Ms. Lively to agree to a reduced fixed compensation in connection with the film, It Ends with Us?                12:11:28

A    Yes.

Q    What did you conclude?

A    Just what her agent and -- says that this was something that she believed in.  The message, the story, the impact on women and her audience.                12:11:48
And she had a large audience of women.  She thought it was significant.  She thought that this was a very important project to do, and she agreed to a salary that fit within the budget.

Q    Can you call those passion projects?                12:12:17

Page 82

coming to mind was the -- being the narration on a    01:01:49

National Geographic series about penguins, you know.

But nothing that I'm really referring to here.

There were no offers.

Q    As far as you know, Ms. Lively has had no    01:02:10

offers other than some narrative or voiceover after

It Ends with Us?

MS. MOSES:  Objection.

THE WITNESS:  I believe that there are a

couple of development deals.  But what I'm talking    01:02:24

about is an offer to appear in a -- we've got our

budget, we've got our movie, we need a star.  That

type of an offer.

BY MS. GAROFALO:

Q    What is the last time you checked or did    01:02:40

something to investigate what Ms. Lively had been

offered and/or accepted?

A    I have been on this matter a very short

time.  And I assumed that if anything had happened

like that, I would have been informed by the agent,    01:03:05

the manager or counsel.  And I'm not aware of

anything.  I haven't spoken to her.

Q    By the way, when were you retained in

this matter?

A    I am not sure.  I would think the end of    01:03:24

Page 91

CONFIDENTIAL

her 20-year career prior to the alleged smear          01:15:32

campaign, Ms. Lively did more than one project a

year in film and/or television?

          MS. MOSES:  Objection.

          THE WITNESS:  I have not -- I am not          01:15:44

aware of that, no.

BY MS. GAROFALO:

     Q    Okay.  Are you aware of any year in which

Ms. Lively did two or more projects in the 20 years

of her career leading up to August 2024?          01:15:56

          MS. MOSES:  Objection.

          THE WITNESS:  I think she did

It Ends with Us back to back with Simple Favor 2.

Because she was moving into this space.  But again,

I haven't looked at that.          01:16:17

BY MS. GAROFALO:

     Q    Now, are you offering the opinion that

Ms. Lively would have been offered any of the

potential opportunities that you identify as part of

your opinion in your expert report, but for the          01:16:35

defendants' conduct?

     A    I am offering -- that is my opinion, that

she would have been offered this range of projects,

but-for the alleged smear campaign.  Exactly.

     Q    I'm trying to nail down the basis for          01:17:00

Page 100

that opinion.                                          01:17:02

     A    The basis for that opinion is my decades

in the business of watching and making deals; of

talking and corroborating my opinions with her agent

and manager; of -- I mean, I think I've stated this    01:17:20

prior.  What I have seen of the opportunities that

would have come in, in my career.  I've also seen

actors cancelled, where no opportunities came in.

     Q    Can you with certainty identify a single

project that Ms. Lively would have been offered in     01:17:45

your opinion but-for my clients?

          MS. MOSES:  Objection.

          THE WITNESS:  I think that's the whole

point of this litigation.  I can't identify it

because it wasn't offered.                             01:18:03

BY MS. GAROFALO:

     Q    So is it your opinion that these

opportunities --

     A    I looked at a year and a third and the

offers have not been there.                            01:18:13

          (Crosstalk.)

     Q    Is it your opinion that these offers

might have been made to Ms. Lively based on her past

performance?

          MS. MOSES:  Objection.                       01:18:24

Page 101

CONFIDENTIAL

THE WITNESS:  My opinion is based on her    01:18:27
past performance, based on the -- who she is, based
on the performance of It Ends with Us, that these
offers, my conservative approach to this over
five-years, would have been offered to her.    01:18:43
Exactly.

BY MS. GAROFALO:

Q    And I just want to make sure I understand
your opinion.

So is it your opinion that she would have    01:18:55
been offered all of the opportunities you identify
in your report or just some or some combination
thereof?

A    It's my opinion that she would have been
offered exactly what I said.  A range and to the    01:19:12
best, she might have been offered more.  She might
have been offered another exclusive deal like the
Amazon deal.  I didn't throw that in.  I was trying
to be conservative.  And that's -- that is my
opinion.    01:19:38

Q    And she might have been offered fewer
opportunities; isn't that true?

MS. MOSES:  Objection.

THE WITNESS:  Well, I didn't analyze the
offers.  I was analyzing the projects that she would    01:19:53

Page 102

CONFIDENTIAL

actually work on.  Not, you know, the offers to    01:19:56

acceptances.

BY MS. GAROFALO:

Q    So it's your opinion that all of the

opportunities that you have identified in your    01:20:05

expert report would, to a certainty, have been

offered to Ms. Lively; is that correct?

MS. MOSES:  Objection.

THE WITNESS:  With the information I

have, to a reasonable certainty, they would likely    01:20:21

have been offered to her.  Absolutely.

BY MS. GAROFALO:

Q    So to a reasonable certainty, they would

likely be offered.  Is that your response?

A    Yes.  I tried to be conservative with    01:20:40

this.  And the, you know, the report speaks for

itself.

MS. GAROFALO:  We up to four?

THE STENOGRAPHIC REPORTER:  Yes.

(Exhibit 4 marked for identification.)    01:20:52

MS. GAROFALO:  Exhibit 4 is a document

captioned "Promotional Services and License

Agreement, Execution Version" and Bates number on

the first page is BL-37820 and it runs all the way

through 37853.  Take a moment to look at this    01:21:22

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

document, Mr. Marks.  Let me know when you're ready.    01:21:32

A    This is a very long, detailed, complicated document.

Q    I'm not going to ask you about very much in the document.  So why don't I just ask the    01:23:01 questions.  Okay.  So this appears -- well, let me ask you this question.

Did you review this document before formulating your opinions as reflected in your report?    01:23:21

A    I don't specifically recall.  I'm sure if it's in the list, that I looked at it.  But I had a short period of time and this document is not one that jumps out at me.

Q    Okay.  So the document appears to be for    01:23:42 Ms. Lively's services in connection with the promotion of a company called Family Hive LLC.

Are you familiar with that company?

A    I am not.

Q    Are you aware that that is one of    01:23:58 Ms. Lively's business enterprises?

MS. MOSES:  Objection.

THE WITNESS:  It looks familiar but I would have to go back to check.

Page 104

CONFIDENTIAL

BY MS. GAROFALO:                                         01:24:14

Q    Okay.  I'd like to turn to Section 2.2 and the Bates number at the bottom ends in 825. It's actually page six of the document.  That's probably easier.                                          01:24:23

A    Thank you.

Q    Section 2.2 says "Exclusivity; Competitive Investments".  And it says:

(As read):

"Excluding the excluded endorsement      01:24:32 deals (as defined below) and the non-key market endorsement deals, lender."

"Lender" do you understand is Ms. Lively?

MS. MOSES:  Objection.                   01:24:43

THE WITNESS:  That would be normally yes, I'm looking back to the first page and it is her company.

BY MS. GAROFALO:

Q    So Family Hive?                       01:24:54

A    What is that?

Q    Family Hive or her loan out company, if you know?

A    Would you repeat the question.

Q    Okay.  Let's put it aside for a moment.  01:25:03

Page 105

CONFIDENTIAL

So sorry to repeat.                                    01:25:06

(As read):

"Excluding the excluded endorsement

deals (as defined below) and the

non-key market endorsement deals,   01:25:14

lender agrees that neither lender nor

talent will use or grant any third

party and/or immediate family

members -- there is an exclusion

there -- the rights to use talent --   01:25:27

the right to use the talent rights

within the territory to publicly

promote or endorse or license any

competitive products at any time during

the term."                              01:25:46

Now, we talked a little bit before as to

whether you considered any exclusivity provisions in

any contract that Ms. Lively was party to in

determining what her future opportunities might be

or how they might be limited.  Do you recall that?   01:26:00

A    Yes.

Q    Okay.  And would you agree that this

provision in the Family Hive/Ms. Lively agreement

is, to some extent, an exclusivity provision that

limits her ability to accept certain endorsements?   01:26:17

Page 106

CONFIDENTIAL

MS. MOSES:  Objection.                          01:26:22

THE WITNESS:  Without reading this long detailed document and studying it, that's what it appears to be.  But I would have to take a deeper dive.                                               01:26:38

BY MS. GAROFALO:

Q    But in formulating your opinion, at least with respect to endorsements that you projected Ms. Lively might likely get or was reasonably likely to get, you did not consider the exclusivity provision in Exhibit 4, correct?    01:26:50

A    I did not specifically consider the exclusivity non-compete language in Exhibit 4.  But this type of language is in every endorsement contract.  And I certainly considered that and it    01:27:13 doesn't impede talent from having multiple endorsements.

Q    Looking at your report, where does it tell me that you considered such exclusivity restrictions in opining about the endorsements that    01:27:36 Ms. Lively was reasonably likely to obtain?

A    In my report, I do not refer to that at all.  But it's certainly part of my analysis as an experienced transactional attorney.

Q    I want you to explain to me how it    01:28:02

Page 107

CONFIDENTIAL

factors into the analysis that I am looking at, in    01:28:05

the report, the expert report you've provided in

this case.

I want you to show me where in that

report you have somehow factored in the potential    01:28:14

exclusivity provisions limiting Ms. Lively's

availability?

MS. MOSES:  Objection.

THE WITNESS:  I have -- as far as

endorsement deals, I have limited them and I haven't    01:28:27

said 100 deals.  And in my experience, the

exclusivity provision is there and I've taken that

into account in the numbers that I've given in the

report.

BY MS. GAROFALO:    01:28:48

Q    So you determined a number of

endorsement deals --

A    Is this an exclusive agreement?  Does

this bar her from all other endorsement agreements?

You've obviously studied it.    01:28:58

Q    I'm asking what you considered in your

report.  I'm not asking you to interpret the

agreement, and I'm certainly not going to interpret

it for you.

So you estimated a number of endorsement    01:29:08

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

deals that Ms. Lively was likely to obtain in the 01:29:15 five years following the alleged smear campaign, correct?

A    Yes.   She was expected to secure one or 01:29:27 two endorsement deals over five years.  And in my analysis, the non-compete exclusivity provisions in those one or two multiyear endorsement deals would of course been allowed the one or two to exist. They wouldn't have barred them.  She wouldn't have been in breach.  And that's my opinion. 01:29:49

Q    I understand that that's your opinion. What I'm asking you is to explain to us what the basis for that opinion is.

In other words, for example, did you conclude that she ordinarily would have gotten five 01:30:06 deals and then you subtracted three because there might be exclusivity provisions.  I'm asking you how you reached your opinion.  Because I may not be the smartest lawyer in the world, but it's not clear to me. 01:30:26

A    Okay.

MS. MOSES:  Objection.

THE WITNESS:  Leading up to the alleged smear campaign, she had multiple endorsement deals and after the alleged smear campaign, I am being 01:30:50

Page 109

CONFIDENTIAL

very conservative in the endorsement deals that I    01:30:54

believe she would have obtained.

BY MS. GAROFALO:

     Q      Okay.   So you can't tell me what the

basis for the calculation -- strike that.    01:31:06

          So what I believe you're saying is that

you looked at her past endorsement deals and

extrapolated this number from what she had been

awarded in the past endorsement deal wise, into

future opportunities.   How'd you come up with the    01:31:28

number one to two?

     A      She has now a more, in the five years I'm

projecting, a busier schedule than she has in the

past.   She's had multiple endorsement deals.   As I

recall, the L'Oreal deal was for seven and a half    01:31:46

million.   I came up with these numbers.   The number

of endorsement deals which is very low and the

compensation, which is very reasonable.   And based

on my experience.   And then I corroborate -- had

corroborated by the agent and the manager and that    01:32:06

is my considered opinion.

     Q      Do you know whether the L'Oreal deal

would have -- whether L'Oreal would have been a

competitor with any of Blake Lively's own

businesses?    01:32:26

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

A    I haven't looked at that issue.  Has    01:32:28
L'Oreal sued her for bad competition?

Q    Do you know whether the L'Oreal deal
preceded Blake Lively's formation of businesses
which might limit her endorsements?    01:32:47

A    I haven't looked at that issue.  The
timing or the limitation.

Q    You also say other than the endorsement
contracts, as well as:

(As read):    01:33:08

"Up to 10 to 15 smaller engagements
including personal appearances, brand
tie-ins, and speaking engagements each
valued at $250,000 to $400,000."

What is the basis for that conclusion?    01:33:24

A    Again, I looked at her preceding speaking
engagements and deals of this nature.  The number
and the amount and who she is and what she was with
the success.  And that's what my opinion.

Q    What did you look at?  What deals did you    01:33:45
look at prior to concluding that she was likely
would have been expected to secure 10 to 15 smaller
engagements?  What documents did you look at on past
engagements that allowed you to calculate or
speculate as to that number?    01:34:10

Page 111

CONFIDENTIAL

BY MS. GAROFALO:                                      01:36:36

Q   Other than people who worked for or
employed by or represent Ms. Lively, correct?

MS. MOSES:  Objection.

THE WITNESS:  Other than her counsel and    01:36:42
her agent and her manager.  It's limited to that
group.

BY MS. GAROFALO:

Q   Okay.  Thank you.  In your report, you
mention a project called The Rhythm Section.        01:36:54
Do you recall that?

A   Yes.

Q   And was The Rhythm Section successful?
Do you know?

A   It was not successful at the box office   01:37:03
at all.

Q   Now, you've projected out over a
five-year period based on several years preceding
the alleged smear campaign, correct?

A   I projected out based on several years    01:37:32
and what I have observed when you have a hit like
It Ends with Us.

Q   Now, assume --

A   And that she had -- it was changing her
way of being employed and doing her work.           01:37:50

Page 114

CONFIDENTIAL

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.  Dated this 4th day of December, 2025.

ASHLEY SOEVYN

CSR No. 12019

Page 121