**UNITED STATE DISTRICT COURT**
**DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY,<br><br>            Plaintiff,<br><br>        v.<br><br>WAYFARER STUDIOS LLC, et al,<br><br>            Defendants. | No. 24-cv-10049 (LJL) (lead case)<br>No. 25-cv-449 (LJL) (member case) |
| JENNIFER ABEL,<br><br>            Third-Party Plaintiff,<br><br>        v.<br><br>JONESWORKS LLC,<br><br>            Third-Party Defendant. | |

Esra A. Hudson, under the penalty of perjury, pursuant to 28 U.S.C. §1746, hereby declares that the following is true and correct:

1.      I am a partner of the law firm of Manatt, Phelps & Phillips, LLP ("Manatt"), attorneys for Defendant Blake Lively in the above-captioned matter and I submit this declaration in support of Ms. Lively's motion reasonable attorneys' fees and costs pursuant California Civil Code § 47.1. I was co-lead trial counsel for Ms. Lively and I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify thereto.

2.      Ms. Lively seeks $7,495,526.87 in attorneys' fees incurred in this matter, comprising of $2,951,432.37 in fees paid to Manatt and $4,544,094.50 in fees paid to our co-counsel, Willkie Farr & Gallagher LLP ("Willkie") in relation to the successful defense of the Wayfarer Parties' lawsuit against Ms. Lively, captioned as *Wayfarer Studios LLC v. Blake Lively, et al.*, Case No. 25-cv-449 (the "Wayfarer Action"). Ms. Lively will also seek any additional

attorneys' fees incurred in conjunction with this Motion and any related hearing or subsequent submissions, if any.  Ms. Lively also seeks  $539,514.01 in costs and expenses incurred in relation with the successful defense of the Wayfarer Action.

3.    A separate declaration is being provided by a representative of Willkie in further support of this Motion.  Below I describe work performed by Manatt in relation to the defense of the Wayfarer Action.

**Biographies and Roles of Manatt's Attorneys in this Matter**

4.    Manatt is a premier law firm based in Los Angeles, California with offices across the country, including New York.  Manatt's entertainment, litigation, and employment practices have been recognized as among the best in the country and are regularly ranked by *Chambers USA*, which lists the world's top law firms and lawyers.  The biographies of partners and associates who contributed more than 250 hours to this matter are set forth below.[1]

5.    I am a partner at Manatt and Leader of Manatt's Employment and Labor practice. I have been with the firm since 2001 and handle a wide range of high-stakes commercial and employment disputes, with a particular focus on matters involving entertainment.  I have received various professional recognitions, including: *Chambers USA* Top-Ranked Attorney, Labor & Employment (California), 2022–2026; *The Legal 500 United States' Leading Lawyer for Labor and Employment Disputes* (Including Collective Actions): Defense, 2022–2026; Hollywood's Top 100 Most Powerful Lawyers, *The Hollywood Reporter*, 2026; *Legal Impact Report*, *Variety*, 2026; Women's Impact Report: Los Angeles, *Variety*, 2025; America's Top Lawyers, *Forbes*, 2025; 500 Leading U.S. Corporate Employment Lawyers, *Lawdragon*, 2020–2025; Leaders of Influence: Labor & Employment Attorneys, *Los Angeles Business Journal*, 2023–2025; Leaders of Influence:

---

[1] The discussion that follows is for purposes of illustrating the credentials of the Manatt team that led the defense of the Wayfarer Action.  Lively's request for attorneys' fees and expenses is not limited to only the work performed by these attorneys.

Litigators & Trial Attorneys, *Los Angeles Business Journal*, 2025; Top Labor & Employment Lawyers, *Daily Journal*, 2023–2025; Southern California Legal Visionary, *Los Angeles Times*, 2025-2026; Top 100 Lawyers, *Los Angeles County Business Journal*, 2025; *Women, Influence and Power in Law* ("WIPL") finalist, *Corporate Counsel*, 2026, *The Best Lawyers in America*, 2022– 2026. I am also an invited member for the Americal Employment Law Council, the premier organization of the most experienced labor and employment attorneys representing and advising employers globally.

6.      I have served as co-lead trial counsel in this action and have been involved in the case from inception through today, including in setting overall case strategy, all major decisions in this matter and client counseling.  Fees for my work on this matter were discounted from my standard rate, which is currently $1,430.00/hr., for an effective rate ranging from $1,161 to $1,287 over the course of the litigation.  A true and correct copy of my biography is attached hereto as **Exhibit 1**.

7.      Stephanie Roeser is a partner at Manatt, member of Manatt's Employment and Labor practice, and has been with the firm since 2015.  Ms. Roeser has received the following honors and awards: New Leaders, *Variety*, 2025; Leaders of Influence: Labor & Employment Attorneys, *Los Angeles Business Journal*, 2025; Top Labor & Employment Lawyers, *Daily Journal*, 2025; Ones to Watch, *Best Lawyers in America*, 2025-2026.  Ms. Roeser served as co-counsel in this case and has been involved in the case from inception through today, including in setting overall case strategy, all major decisions in this matter and client counseling.  Fees for Ms. Roeser's  work on this matter were discounted from her standard rate, which is currently $1,265, for an effective rate ranging from $1,026 to $1,138.50 over the course of the litigation.  A true and correct copy of Ms. Roeser's biography is attached hereto as **Exhibit 2**.

8.      Matthew Bruno is a partner at Manatt, member of Manatt's Trial and White Collar practice, and has been with the firm since 2021.  Mr. Bruno has a broad litigation practice, with a particular focus on antitrust, commercial disputes, and white-collar investigations.  Mr. Bruno has received the following honors and awards: New York's Most Powerful Entertainment Lawyers, *The Hollywood Reporter*, 2026 and Ones to Watch, *Best Lawyers in America*, 2022-2026.  Mr. Bruno has served as counsel in numerous commercial matters before this Court and in federal courts across the country, including many cases as lead trial counsel.  Mr. Bruno was involved in supervising day-to-day operations, including supervising the associate team working on the case, and developing and implementing case strategy.  Fees for Mr. Bruno's work on this matter were discounted from his standard rate, which is currently $1,245, for an effective rate ranging from $1,008 to $1,120.50 over the course of the litigation.  A true and correct copy of Mr. Bruno's biography is attached hereto as **Exhibit 3**.

9.      Sarah Moses is a partner at Manatt, member of Manatt's Entertainment Litigation practice, and has been with the firm since 2021.  Ms. Moses has a broad litigation practice, with a particular focus on intellectual property and entertainment litigation. Ms. Moses has been recognized by *Chambers USA* as a Top-Ranked Attorney in Media and Entertainment: Litigation and as a Leading Global Entertainment, Sports & Media Lawyer by *Lawdragon*.  Ms. Moses was involved in supervising day-to-day operations, including supervising the associate team working on the case, and developing and implementing case strategy. Fees for Ms. Moses's work on this matter were discounted from her standard rate, which is currently $1,290, for an effective rate ranging from $1,044 to $1,161 over the course of the litigation.  A true and correct copy of Ms. Moses' biography is attached hereto as **Exhibit 4**.

10.      Katelyn Climaco is a mid-level associate at Manatt, member of Manatt's Employment and Labor practice, and has been with the firm since 2025. Ms. Climaco graduated

*magna cum laude* from the Elisabeth Haub School of Law at Pace University and was previously a clerk to the Honorable Joseph A. Marutollo of the United States District Court for the Eastern District of New York.  Fees for Ms. Climaco's work on this matter were discounted from her standard rate, which is currently $1,130.00.  A true and correct copy of Ms. Climaco's biography is attached hereto as **Exhibit 5**.

**Manatt's Rates and Billing Practices**

11.     Manatt sets its standard rates consistent with the market for legal services based on the skill, experience and reputation of its attorneys and staff.  Manatt and Ms. Lively negotiated a 10% discount off of Manatt's standard hourly rates.  Over the duration of this matter, the effective rate for attorneys has ranged from $1,008 to $1,381 for partners, $616.50 to $1,098 for associates, and $243 to $418.50 for paralegals and other support personnel. Manatt also implemented discretionary individualized write-offs of additional fees and costs on each invoice beyond the override discount.  Based on my experience, including my review of public information regarding other firms' rates and my involvement in setting Manatt's rates, I believe that Manatt's rates are commensurate with rates charged for complex litigation by attorneys of comparable skill, experience and reputation.

12.     Manatt maintained billing records for this matter in accordance with its usual practices, and attorneys working on this matter were instructed to enter their time in accordance with firm policies. Manatt conducts thorough reviews of each invoice before sending it to Ms. Lively to confirm that each entry reflects time appropriately charged to Ms. Lively. In the end, each invoice is reviewed by a team of individuals, including attorneys, litigation support staff and accounting support staff, prior to being submitted to the client for payment.

13. Manatt bills Ms. Lively for attorney time in one-tenth of an hour increments. For each month worked, Manatt provides an invoice to Ms. Lively that lists out separate billing entries with narratives specific to the billed task.

14. Ms. Lively has paid, and continues to pay, Manatt's invoices.

15. Manatt has incurred additional fees since June 1, 2026, which Ms. Lively has been paying in the ordinary course, and for which Ms. Lively is entitled to recovery as part of her pending motion. Manatt currently estimates work performed for June in connection with the 47.1 motion and the instant motion to be more than $100,000.

**Summary of Work Performed in Defense of the Wayfarer Action by Manatt**

16. Prior to the initiation of the Wayfarer Action, Manatt had previously been retained as counsel of record in relation to Ms. Lively's administrative complaint filed with the California Civil Rights Department ("CRD") and her complaint filed before this Court, captioned as *Blake Lively v. Wayfarer Studios, LLC*, Case No. 24-cv-10049 (the "Lively Action"). On December 23, 2024, I, along with my co-counsel Michael Gottlieb, served a cease and desist upon Bryan Freedman, as counsel for the Wayfarer Parties, to address defamatory statements that he publicly made in response to the CRD Complaint. In that cease and desist letter, we specifically identified ourselves as Lively's counsel in relation to a "dispute" between her and the Wayfarer Parties. A true and correct copy of this cease-and-desist letter is attached hereto as **Exhibit 6**.

17. Upon the initiation of the Wayfarer Action, Manatt was further retained to serve now as defense counsel on behalf of Ms. Lively and her husband Ryan Reynolds. The attorneys' fees and expenses Ms. Lively seeks only relate to work performed on behalf of Ms. Lively and only in relation to the Wayfarer Action.

18. *The Wayfarer Action and Consolidation*: On January 16, 2025, the Wayfarer Parties brought suit against Ms. Lively and others. WF Dkt. No. 1. The 345-paragraph Complaint asserted

6

seven causes of action against Ms. Lively, including defamation (Count II) and false light invasion of privacy (Count III).   Immediately upon receiving the Complaint, Manatt attorneys began researching defenses and arguments to advance in response to the causes of action asserted against Ms. Lively.   In addition, Manatt attorneys began to evaluate and assess the factual allegations asserted to determine the veracity of the same, including any contradicting documents and/or evidence.

19.     On January 30, 2025, the Court recognized that the Wayfarer Action and the Lively Action "involve common questions of law and fact" and issued an order to "consolidate these cases into a single action," requiring all filings in the consolidated action to be made only under the Lively Action's case number. *See* Dkt. No. 49. (hereinafter, the "Consolidated Action").

20.     The next day, on January 31, 2025, the Wayfarer Parties filed a 391-paragraph First Amended Complaint ("FAC") and a 168-page "timeline," (*see* Dkt. No. 50-1), which, at the Initial Pretrial Conference, the Court questioned its purpose and compliance with Federal Rules of Civil Procedure. *See* Dkt. No. 63, at 37:1-2 ("you can't just give me a complaint and then give me a whole bunch of documents").  The Court later held that the timeline failed to comply with the basic requirements of Federal Rules of Civil Procedure, since it "not a written instrument that 'evidences legal rights or duties' or otherwise forms the basis for the Wayfarer Parties' claims, but is simply an additional 'narrative summary.'" *See* Dkt. Nos. 50, 50-1, 296.

21.     Again, Manatt attorneys immediately began analyzing and evaluating the FAC against the original complaint and strategizing the potential grounds for dismissal.

22.     On February 3, 2025, immediately following the pretrial conference, the Court entered into protective orders in this case, including the application of Rule 3.6 of New York Rules of Professional Conduct to the Consolidated Action, governing trial publicity and out-of-court statements made by attorneys that could influence the proceedings. *See* Dkt. No. 57. The

Consolidated Action has had significant press attention, with thousands of indexed and syndicated media articles over the course of the matter.  The intense media scrutiny of the Consolidated Action, and in particular the FAC and Exhibit A (which was further sensationalized by the Wayfarer Parties' launching of a website specifically designed to publicize their lawsuit), also increased Ms. Lively's fees and costs in this matter. For example, Ms. Lively filed more than fifty motions to seal, which (consistent with the Court's practices) required her to file public and sealed pleadings.

23.    *The Motion to Dismiss*: On March 20, 2025, Ms. Lively filed her motion to dismiss, which, as part of that motion, sought relief pursuant to Section 47.1. *See* Dkt. No. 144.  The motion was complex, and was particularly complicated by a number of factors including, among other things: (1) the group pleading nature of the allegations, (2) the inclusion of the lengthy "timeline" in Exhibit A, (3) the attempt to hold Ms. Lively liable under various agency theories for the alleged statements of her spouse, Ryan Reynolds, and her publicist Leslie Sloane, (4) the jurisdictional and choice of law issues, and (5) the application of Section 47.1, which presented a novel privilege for which Ms. Lively articulated a standard for the first time in federal court.

24.    The Court granted Ms. Lively's motion to dismiss on June 9, 2025, with leave to amend. *See* Dkt. No. 296.  As demonstrated by the many arguments advanced by Ms. Lively in her motion to dismiss and this Court's 130+ page decision and order granting Ms. Lively's motion, the work performed in relation to her motion was comprehensive and necessary to achieve the complete win that was secured.

25.    Following the Court's grant of the motion to dismiss, counsel for the Wayfarer Parties publicly announced that they intended to amend the FAC and to appeal the ruling.[2]  Per the

---

[2] Pamela McClintock, *Justin Baldoni's $400 Million Defamation Lawsuit Against Blake Lively Tossed Out*, The Hollywood Reporter (June 9, 2025), https://www.hollywoodreporter.com/news/general-news/justin-baldoni-lawsuit-against-blake-lively-tossed-out-1236260173/ ("while the Court dismissed the defamation related claims, the Court has

Court's decision and order, the deadline for the Wayfarer Parties to file a second amended complaint was June 23, 2025. Dkt. No. 296.

26.     *Defensive Document Discovery*: Discovery in the Consolidated Action commenced immediately and was extensive.   In response to the Wayfarer Parties' more than 250 document requests, Manatt attorneys were tasked with reviewing and evaluating the requests propounded and to identify, collect, and review documents for responsiveness and privilege.  In total, Lively produced more than 7,000 documents.

27.     Likewise, Manatt separately prepared and propounded document requests upon the Wayfarer Parties, as well as subpoenas upon third parties.  Total document productions from the Wayfarer Parties and third parties were more than 44,000 and 36,000 documents, respectively. Manatt attorneys reviewed these productions, prepared deficiency letters (as needed), met and conferred with counsel, and prepared and filed numerous motions to compel, described further below.

28.     As the Court anticipated, discovery in the Consolidated Action involved common facts and evidence related to both cases. *See* Dkt. No. 47, 49.  The focus of the Lively Action centered on specific events of sexual harassment that took place on the set of *It Ends With Us* (the "Film") and the retaliatory smear campaign that followed. As the Wayfarer Parties, themselves, acknowledged those "two principal categories" separately formed the basis of their defamation claim.   *See* Dkt. No. 121 at 11 (describing the "two principal categories" of defamatory statements); *see also* Dkt. No. 127 at 16 (same).  As such, there was significant overlap in discovery in both actions, which shared, among other things, common factual issues relating to the Film, Lively's interactions with Heath and Baldoni, and the negative media attention Lively

---

invited us to amend four out of the seven claims against Ms. Lively, which will showcase additional evidence and refined allegations").

experienced beginning in August 2024.  Likewise, Ms. Lively's motion for spoliation sanctions, filed on October 22, 2026, addressed a common evidentiary issue that would have impacted both cases, and the 47.1 Motion to the extent that spoliation of evidence is relevant to Ms. Lively's damages claim and punitive damages remedies. *See* Dkt. No. 862.

29.    *The Rule 11 and 47.1 Motions*: While Ms. Lively's motion to dismiss remained pending, she separately served several Wayfarer Parties with Rule 11 safe harbor letters, outlining the various reasons their claims were patently frivolous and requesting their withdrawal of the same.  When these plaintiffs failed to take appropriate measures, Ms. Lively separately moved for sanctions under Rule 11 on May 19, 2025. *See* Dkt. No. 224.

30.    On March 27, 2026, this Court granted Lively's Rule 11 motion, finding, among other things, (i) Sarowitz, Nathan, Abel and IEWUM "*simply had no basis* to sue Lively" for extortion, where no purported extortionate threat was made towards them; (ii) the R11 Plaintiffs *failed to identify "even an arguable basis in law or fact"* for their contract and economic relationship claims involving William Morris Endeavor, which only concerned Baldoni and Wayfarer; and (iii) "*there was no conceivable basis*" for Sarowitz, Nathan, Abel, or Heath to lodge a contract-based claim against Lively where a contractual relationship never existed. WP Dkt. No. 226, at 8-10 (emphasis added).  For violating Rule 11 and "making claims that were legally frivolous and factually baseless," this Court reprimanded the Wayfarer Parties' counsel. *Id.* at 10.

31.    In addition to Rule 11, and at this Court's direction, Ms. Lively separately moved for relief under Section 47.1. Relevant here, Lively highlighted the retaliatory motive underpinning the lawsuit:

- In early August 2024, Sarowitz divulged that "he was prepared *to spend $100 million to ruin the lives* of Lively and her family."

- In late August 2024, Sarowitz declared that if Lively or Mr. Reynolds "ever cross the line" he would go after them and "*protect the studio like Israel*

*protected itself from Hamas. . . . There will be two dead bodies when I'm done. Minimum.*"

- In late December 2024, the Wayfarer Parties received cease and desist letters from counsel, counsel for the Wayfarer Parties accused Lively of lying in her CRD Complaint.

- In early January 2025, after Lively filed her lawsuit here, counsel for the Wayfarer Parties confirmed their pled to sue Lively and others "into oblivion."

Dkt. No. 748-1, at 4-6.

32.    Given the novel nature of the statute, research and arguments associated with Section 47.1 required extensive research and legislative analyses to support the relief sought therein.  As this Court is aware, Section 47.1 does not provide a procedural mechanism for recovery, requiring Manatt to not only address the application of Section 47.1, but also articulate and argue for a procedural mechanism for obtaining recovery under the statute. For their part, the Wayfarer Parties vigorously defended against the application of Section 47.1 in their case. They advanced a number of novel (although unsuccessful) arguments to not only try to avoid liability and remedies under Section 47.1, but also to challenge the constitutionality and legality of the statute, putting the entire statute at risk even beyond this case.

33.    Separate from the drafting, because Section 47.1 contemplates the recovery of actual damages in addition to attorneys' fees and costs, Manatt continued to work to develop a factual record to support Ms. Lively's recovery for such damages and retained an expert to opine upon the same.

34.    *The Court Enters Final Judgment*: On October 17, 2025, this Court issued an order requesting that the parties "show cause . . . why final judgment should not be entered" in Case No. 25-cv-449, show cause "why The Times' motion should not be dismissed as moot," and to "address whether any pending motions for fees and costs, including those brought under anti-SLAPP statutes, mean that the decision in this case is not in fact final as to all parties." WF Dkt. No. 205,

at 2-3. Two weeks later, the Court entered final judgment. *See* WF Dkt. No. 207. In the accompanying memorandum and order, the Court reasoned that delaying finality of the Wayfarer Action was warranted to promote judicial efficiency and prevent piecemeal appeals. WF Dkt. No. 206. The Wayfarer Parties failed to timely file a notice of appeal by December 1, 2025.

35.     *Complexity of this Matter*: Given the tight discovery window for the Consolidated Action, discovery proceeded at a feverish pace, which was repeatedly stalled by the Wayfarer Parties' dilatory tactics and overall litigation approach.

36.     Among other things, the Wayfarer Parties, through their counsel, repeatedly made public statements that risked tainting the jury pool and required Manatt attorneys to research and determine appropriate redress. In fact, on one such occasion, counsel for the Wayfarer Parties filed a declaration so baseless and inflammatory that this Court immediately struck it from the docket and warned counsel that "future misuse of the Court's docket may be met with sanctions." Dkt. No. 220.

37.     The Wayfarer Parties' resistance to discovery further complicated this litigation and required Manatt attorneys to meet and confer with opposing counsel and prepare and file over fifteen discovery-related motions to compel during the course of these Actions (five of which were prior to the deadline for the Wayfarer Parties to amend their complaint). *See* Dkt. Nos. 200, 203, 228, 295, 344.

**Manatt's Staffing Decisions and Organization**

38.     Manatt staffs all of its matters, including the current case, as leanly as reasonably possible subject to ongoing consultation with the client. In this matter, Manatt's staffing decisions were commensurate with the challenges of an aggressive adversary and consistent with the daily needs of the litigation and the complexities of the Consolidated Action in mind.

39.     Manatt also made its staffing decisions in light of the Wayfarer Parties' staffing of this matter. The Wayfarer Parties (who had once pledged to spend over $100 million in litigation and to sue Ms. Lively into "oblivion") had every reason to use their considerable resources to mount an aggressive response to the Lively Action. As such, the Wayfarer Parties engaged two litigation firms, Liner Freedman Taitelman & Cooley LLP (based in Los Angeles, CA) and Meister Seelig & Fein PLLC (based in New York, NY), to prosecute their case, later adding a third firm in Shapiro Arato Bach LLP. At least twenty (20) attorneys have entered notices of appearance on the docket for the Wayfarer Parties in the Consolidated Action.

40.     Manatt made its staffing decisions with the expectation that Ms. Lively would bear the cost of the litigation and that its decisions would be carefully vetted by Ms. Lively (as they in fact were). Manatt's hourly rates and overall fees were negotiated by Ms. Lively, who reviewed litigation decisions with an eye toward managing costs as appropriate. Further, Ms. Lively reviewed Manatt's invoices and asked questions about them; on occasion, those questions led to reductions in the bills.

41.     Manatt worked hard to avoid duplicating efforts and staffed attorneys into teams, coordinating closely with Willkie. As co-lead counsel, Mr. Gottlieb and I met routinely throughout each week to ensure efficient case management and lead our respective teams. For example, during discovery, attorneys were organized into teams, which included: (1) a fact discovery team; (2) a third-party discovery team; (3) an expert team; a (4) a liability team; and (5) a damages team. Separate team members were assigned to each of these teams, and each of these teams met regularly (typically weekly) throughout the litigation. The teams were supervised by one or two partners and further staffed with associates at various levels, appropriate to the tasks. There were sometimes overlaps with team members to ensure that teams coordinated to avoid duplicative work and pool knowledge.

13

**Costs and Expenses Incurred in Defending the Wayfarer Action**

42.     Throughout the course of this litigation, Manatt incurred costs and expenses on behalf of Ms. Lively in furtherance of the defense of the Wayfarer Action.  Manatt billed these costs and expenses to Ms. Lively and Ms. Lively has regularly paid for the work as invoiced.

43.     Total defense fees and costs sought in this motion in connection with work performed by Manatt are $2,951,432.37 and $8,593.33.

44.     Based on survey data, the rates charged by Manatt in this matter are comparable to rates charged by other large and established law firms of similar training, experience and expertise in New York for attorneys.  Attached hereto as **Exhibit 7** is a true and correct copy of 2025 data extracted from "Financial Insights," a Thomson Reuters tool that collects billing rate information from participating firms and provides a summary in a "de-identified" manner for legal benchmarking purposes.  This data compares Manatt's standard rates for its Litigation attorneys in New York—shown under the columns named "Manatt, Phelps & Phillips, LLP"—to the standard rates for Litigation attorneys in New York reported by 20 firms comparable to Manatt, whose collective data is shown under the column named "Peer Group."  The firms in question are Arnold & Porter Kaye Scholer LLP; Baker & Hostetler LLP; Cooley LLP; Crowell & Moring LLP; Dechert LLP; Fenwick & West LLP; Haynes and Boone LLP; Kelley Drye & Warren LLP; King & Spalding LLP; Mayer Brown LLP; Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.; Morrison & Foerster LLP; Munger Tolles & Olson LLP; Orrick, Herrington & Sutcliffe LLP; Perkins Coie LLP; Pillsbury Winthrop Shaw Pittman LLP; Sheppard Mullin Richter & Hampton LLP; Steptoe & Johnson LLP; Venable LLP; and Wilmer Cutler Pickering Hale and Dorr LLP.

45.     Below is an excerpt from the Financial Insights data, all of which pertains to Litigation Hourly rates in 2025 by the identified firms in New York:

|  | Manatt | Peer Group Median | Peer Group 25th Percentile | Peer Group 75th Percentile |
|---|---|---|---|---|
| **All Lawyers** | $1,132.00 | $1,169.00 | $1,070.00 | $1,266.00 |
| **All Partners** | $1,341.00 | $1,442.00 | $1,271.00 | $1,582.00 |
| **All Associates** | $884.00 | $964.00 | $892.00 | $1,080.00 |

I hereby declare under the penalty of perjury that the foregoing statements are true and correct. Executed on this 29th day of June, 2026 in Los Angeles, California.

/s/ Esra A. Hudson
Esra A. Hudson

15