**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY, <br><br>              Plaintiff, <br><br>       v. <br><br> WAYFARER STUDIOS LLC, et al, <br><br>              Defendants. | No. 24-cv-10049 (LJL) (lead case) <br> No. 25-cv-449 (LJL) (member case) |
| JENNIFER ABEL, <br><br>              Third-Party Plaintiff, <br><br>       v. <br><br> JONESWORKS LLC, <br><br>              Third-Party Defendant. | |

**DECLARATION OF MICHAEL J. GOTTLIEB IN SUPPORT OF BLAKE LIVELY'S MOTION FOR ATTORNEYS' FEES PURSUANT TO CAL. CIV. CODE § 47.1**

Michael J. Gottlieb, under the penalty of perjury, pursuant to 28 U.S.C. § 1746, hereby declares that the following is true and correct:

1. I am a partner of the law firm of Willkie Farr & Gallagher LLP ("Willkie" or the "Firm"), and represented Consolidated Defendant Blake Lively in the above-captioned matter. I submit this declaration in support of Ms. Lively's Motion for Attorneys' Fees and Costs Pursuant to California Civil Code § 47.1. I was co-lead trial counsel for Ms. Lively and I have personal knowledge of the facts stated herein. If called to testify as a witness, I could and would testify competently to such facts under oath.

2.      Subject to the limitations in Paragraph 3, Ms. Lively seeks $7,495,526 in attorneys' fees incurred in this matter, comprising $4,544,094 in fees paid to Willkie and $2,951,432 in fees paid to our co-counsel, Manatt, Phelps & Phillips, LLP ("Manatt") in connection with the successful defense of the Wayfarer Parties'[1] lawsuit against Ms. Lively and others, captioned *Wayfarer Studios LLC v. Blake Lively, et al.*, Case No. 25-cv-449 (the "Wayfarer Action"), and Ms. Lively's recovery under California Civil Code § 47.1 ("Section 47.1").  Ms. Lively also seeks $539,514 in costs and expenses in connection with the same.

3.      The attorneys' fees and costs related to the Court's June 1, 2026 hearing on Ms. Lively's 47.1 Motion and the instant Motion have not yet been invoiced to Ms. Lively.  The sums reflected in Paragraph 2, in addition to the other sums referenced herein, account for attorneys' fees and costs incurred in May 2026, but exclude fees and costs for June 2026.  Based on the time billed and costs accounted for in Willkie's billing system as of today, I expect that Willkie's fees and costs for June 2026 will exceed $200,000.

4.      I understand a representative of Manatt will provide a separate declaration in further support of the Motion.  I describe work performed by Willkie in relation to the Wayfarer Action and recovery under Section 47.1 below.

**Biographies and Roles of Willkie's Attorneys in this Matter**

5.      Headquartered in New York, Willkie is a premier, international law firm of approximately 1,300 lawyers located in sixteen offices across six countries.  Willkie's litigation practice has been recognized as one of the best in the country, including by Chambers USA, The Legal 500 United States, and Benchmark Litigation.

---

[1] The "Wayfarer Parties" collectively refers to Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, It Ends With Us Movie LLC, Melissa Nathan, Jennifer Abel, and Steve Sarowitz.

6.      The biographies of the partners and associates who contributed substantial time to this matter are set forth below.

7.      I am a partner in Willkie's Litigation Department and a member of the firm's Executive Committee.  I am also Chair of the Crisis Management Group, Co-Chair of the Media & First Amendment Practice Group, and a member of the Appeals & Strategic Motions Practice Group.  I have been with the Firm since 2019, have been admitted to the New York bar since 2006, and have substantial experience handling complex, high-profile civil rights and First Amendment litigation matters, including other recent matters in the Southern District of New York.  I have received various professional recognitions, including being nominated as *American Lawyer's* 2023 Attorney of the Year; named by *Forbes* as one of America's Top 200 Lawyers (2024); ranked by *Chambers USA* as a leading practitioner for Litigation: General Commercial (2025–2026); named a National Star for Constitutional Litigation by *Benchmark Litigation* (2026), recognized by *Lawdragon 500* as one of America's Leading Lawyers, Leading Litigators, and Global Leaders in Crisis Management (2024–2026); named to *The Hollywood Reporter's* Power Lawyers list (2025–2026); selected for *Variety's* Legal Impact Report (2026); and named as Litigator of the Week by *The American Lawyer* on several occasions.  A true and correct copy of my profile on Willkie's website is attached hereto as Exhibit A.

8.      I have served as co-lead trial counsel and have been involved in the case from inception through today, including in setting overall case strategy, all major decisions in this matter, and client counseling.  From Q1 through Q3 2025, my standard hourly billing rate was $2,350.  Since Q4 2025, my standard hourly billing rate has been $2,795.  Fees for my work on this matter were discounted from my standard rate, for an average rate of $2,187 over the course

of the litigation.  I billed a total of 224 hours, totaling $457,000 in fees, on work related to Ms. Lively's defense against the Wayfarer Action and recovery under Section 47.1.

9.   Kristin Bender is a partner in Willkie's Litigation Department and has been with the Firm since 2020.  Ms. Bender is also a member of the firm's Crisis Management Group and the Appeals & Strategic Motions Group.  She served as a law clerk on the U.S. District Court for the Western District of New York, and on the U.S. Court of Appeals for the Second Circuit.  She has been admitted to the New York bar since 2017, and her practice centers on high-stakes disputes and crisis management on behalf of leading commercial entities and public individuals, and she has served as trial counsel for plaintiffs and defendants on numerous federal trials.  Ms. Bender has been involved in the case since inception, including in setting overall case strategy, the drafting of pleadings, dispositive motions, and discovery materials, deliberations regarding major decisions in this matter, and client counseling.  Hourly fees for Ms. Bender's work on this matter ranged from $1,551 to $1,764 over the course of the litigation.  Ms. Bender billed a total of 293 hours, totaling $454,808 in fees, on work related to Ms. Lively's defense against the Wayfarer Action and Ms. Lively's recovery under Section 47.1.

10.   Aaron Nathan is a partner in Willkie's Litigation Department, resident in the firm's New York office, and has been with the Firm since 2022.  Mr. Nathan is also a member of the firm's Appeals & Strategic Motions Practice Group and Media & First Amendment Practice Group.  He served as a law clerk on the U.S. District Court for the Southern District of New York, and on the U.S. Court of Appeals for the Second Circuit.  Mr. Nathan has been admitted to the New York bar since 2017, and has significant experience litigating high-stakes matters at every level, including in the United States Supreme Court.  Mr. Nathan has been involved in the case from January 2025 through today, including in setting overall case strategy, the drafting of

4

pleadings, dispositive motions, and discovery materials, deliberations regarding major decisions in this matter, and client counseling.  Hourly fees for Mr. Nathan's work on this matter ranged from $1,551 to $1,764 over the course of the litigation.  Mr. Nathan billed a total of 142 hours, totaling $224,672 in fees, on work related to Ms. Lively's defense against the Wayfarer Action and Ms. Lively's recovery under Section 47.1.

11.     Meryl Governski is a former partner at Willkie and was a member of the Firm's Litigation Department from September 2020 to July 2025.  Ms. Governski has extensive experience on trial teams in federal and state courts in cases involving defamation, privacy-related torts, and other matters implicating the First Amendment.  Ms. Governski was involved in the case from inception, including in setting overall case strategy, the drafting of pleadings, dispositive motions, and discovery materials, deliberations regarding major decisions in this matter, and client counseling.  Fees for Ms. Governski's work on this matter were billed at a rate of $1,551 over the course of the litigation.  Ms. Governski billed a total of 249 hours, totaling $381,856 in fees, on work related to Ms. Lively's defense against the Wayfarer Action and Ms. Lively's recovery under Section 47.1.

12.     Michaela Connolly is an associate in the New York office of Willkie's Litigation Department and has been with the Firm since 2018.  She graduated from Washington University School of Law in 2018, was admitted to the New York bar in 2019, and has been admitted to practice before the Southern District of New York and U.S. Court of Appeals for the Second Circuit, among other courts.  Her practice focuses primarily on complex commercial litigation, including contract and employment disputes, and she has substantial experience with civil litigation in the Southern District of New York.  Ms. Connolly has been involved in developing case strategy, managing complex offensive and defense discovery tasks and strategy, and

5

supervising the day-to-day operations of the case since March 2025. Hourly fees for Ms. Connolly's work on this matter ranged from $1,339 to $1,573 over the course of the litigation. Ms. Connolly billed a total of 620 hours, totaling $833,172 in fees, on work related to Ms. Lively's defense against the Wayfarer Action and Ms. Lively's recovery under Section 47.1.

13.    Melissa Taustine is an associate in the New York office of Willkie's Litigation Department and has been with the Firm since 2019. She graduated from Rutgers University School of Law in 2018, served as a law clerk on the Supreme Court of New Jersey, and has been admitted to the New York bar since 2021. Ms. Taustine's practice focuses primarily on complex commercial litigation and enforcement actions, and she has substantial civil litigation experience in the Southern District of New York. Ms. Taustine has been involved in developing case strategy, managing complex offensive and defense discovery tasks and strategy, and supervising the day-to-day operations of the case since March 2025. Hourly fees for Ms. Taustine's work on this matter ranged from $1,275 to $1,488 over the course of the litigation. Ms. Taustine billed a total of 210 hours, totaling $270,198 in fees, on work related to Ms. Lively's defense against the Wayfarer Action and Ms. Lively's recovery under Section 47.1.

14.    In addition to the above-referenced attorneys, the Willkie team on this matter included additional associates, as well as paralegals and support staff, including but not limited to reference librarians, litigation technology support specialists, and document review attorneys. Associate billing rates are determined by seniority and class year. For each associate, whose billing rates are reflected on the exhibits affixed to the contemporaneously-filed Declaration of Diana Kantner, I understand based on my experience as a member of the Firm's Executive Committee and my review of the Firm's standard time records and bills that the rates charged for each associate compares favorably to the publicly-disclosed billing rates charged for associates at

comparable seniority levels at Willkie's peer firms.  *See* Exhibit B.  The same is true for the paralegals and support staff who worked on this matter.  The overwhelming majority of these additional associates, paralegals and support staff are based in the New York office of Willkie's Litigation Department

**Willkie's Rates and Billing Practices**

15.    Willkie sets its standard rates consistent with the market for legal services based on the skill, experience, and reputation of its attorneys and staff.  Over the duration of this matter, the standard rack rate for attorneys has ranged from $1,825 to $2,795 for partners, $625 to $1,850 for associates, and $220 to $790 for paralegals and other support personnel.  Willkie provided Ms. Lively with a discount of 15% off of its standard hourly rates.  Based on my experience as a member of the Firm's Executive Committee, my work for many clients over my career, and my review of public information regarding other firms' rates, I understand that Willkie's rates are commensurate with the rates charged for complex litigation by law firms and attorneys of comparable skill, experience, and reputation.

16.    Willkie maintained billing records for this matter in accordance with its usual practices, and attorneys working on this matter were instructed to enter their time in accordance with firm policies.  Willkie conducts thorough reviews of each invoice before sending it to clients to confirm that each entry reflects time appropriately charged to the client and matter.  Each invoice is reviewed by a team of individuals, including attorneys, litigation support staff, and accounting support staff, prior to being submitted for payment.

17.    Willkie attorneys, paralegals and support staff track time spent on any case-related task in six-minute increments, and Willkie billed Ms. Lively in the same increments.  For each

month worked, Willkie provides an invoice to Ms. Lively that lists out separate billing entries with narratives specific to the billed task.

**Summary of Work Performed in Defense of the Wayfarer Action by Willkie**

18.     Prior to the initiation of the Wayfarer Action, Willkie represented Ms. Lively as co-counsel in connection with Ms. Lively's administrative complaint filed with the California Civil Rights Department and her lawsuit filed before this Court, captioned *Blake Lively v. Wayfarer Studios, LLC*, Case No. 24-cv-10049 (the "Lively Action").  Upon the initiation of the Wayfarer Action, Willkie was also retained by Ms. Lively and her husband, Ryan Reynolds to defend against the Wayfarer Action.  The attorneys' fees and expenses for which Ms. Lively seeks recovery relate only to work performed on behalf of Ms. Lively (as opposed to work performed in connection with, for example, Mr. Reynolds' own pleadings, discovery materials, case correspondence, and the like) in connection with the Wayfarer Action.

19.     *The Motion to Dismiss*: On January 16, 2025, the Wayfarer Parties filed the Wayfarer Action against Ms. Lively and others.  Wayfarer Action, Dkt. No. 1.  The 345-paragraph Complaint asserted seven causes of action against Ms. Lively, including defamation (Count II) and false light invasion of privacy (Count III).  Immediately upon receiving the Complaint, Willkie attorneys began researching defenses and arguments in response to the causes of action asserted against Ms. Lively.  In addition, Willkie attorneys began to evaluate and assess the factual allegations asserted to determine the veracity of the same, including any contradicting documents and/or evidence.

20.     Two weeks later, on January 31, 2025, before Ms. Lively had filed a responsive pleading and well before any deadline for amendment, the Wayfarer Parties filed a 391-paragraph First Amended Complaint ("FAC"), which also included for the first time a document entitled

8

"Exhibit A,"—a 168-page document purporting to be a "timeline," which provided a distorted summary of the sequence of "key events" pled in the FAC—under the guise of publicly releasing "receipts." *See* Dkt. No. 50, 50-1. In reality, the timeline relied upon rambling fact narratives (without attribution to any narrator) as well as numerous text messages and emails that contained redactions that frustrated the ability to perform follow-up investigation. *Id.* Indeed, the Court ultimately did not consider any of Exhibit A because "[t]he document is not a written instrument that 'evidences legal rights or duties' or otherwise forms the basis for the Wayfarer Parties' claim, but is simply an additional 'narrative summary.'" Dkt. No. 296 at 5–6. Nevertheless, upon its filing, Willkie attorneys immediately began analyzing and evaluating the FAC against the original complaint and strategizing the potential grounds for dismissal, while also simultaneously initiating a thorough investigation of Exhibit A to fact check the numerous narratives unsupported by citations or locate unredacted copies of redacted exhibits within the "timeline."

21.    On March 20, 2025, Ms. Lively filed her motion to dismiss, which included a request for relief pursuant to Section 47.1. *See* Dkt. No. 144.

22.    As demonstrated by the many arguments advanced by Ms. Lively in her motion to dismiss, and this Court's 130+ page decision and order granting Ms. Lively's motion, the work performed in relation to Ms. Lively's motion was comprehensive and necessary to achieve the complete dismissal with prejudice that was ultimately secured. After the Court issued its order dismissing the FAC, Willkie undertook additional work to (i) assess the likelihood of the Wayfarer Parties' success in amending their complaint by the Court-ordered deadline of June 23, 2025; and (ii) strategize regarding the finality of the Court's order dismissing the FAC and any potential appeal thereof.

23.     *Defensive Document Discovery*: As early as February 21, 2025, the Wayfarer Parties began propounding extensive discovery requests on Ms. Lively.   In response to the Wayfarer Parties' 254 total document requests, Willkie attorneys were tasked with reviewing and evaluating the requests to identify, collect, and review documents for responsiveness and privilege. In total, Ms. Lively produced more than 7,000 documents.

24.     Likewise, Willkie prepared and propounded document requests upon the Wayfarer Parties, as well as numerous subpoenas upon third parties.  The Wayfarer Parties and third parties produced a total of approximately 44,000 and 36,000 documents, respectively.  Willkie attorneys reviewed these productions, prepared deficiency letters (as necessary), met and conferred with counsel, and prepared and filed numerous motions to compel.

25.     Certain third-party discovery was substantially, if not entirely, caused by the Wayfarer Parties' retaliatory lawsuit.  For example, the Wayfarer Parties' defamation claim against Ms. Lively (and against Ms. Lively's publicist, Leslie Sloane) was based upon purported comments the Wayfarer Parties alleged Ms. Sloane made to a Daily Mail reporter. *See* Dkt No. 50 ¶¶ 8, 190–94.  The Wayfarer Parties included these allegations in their Amended Complaint despite the fact that the Daily Mail reporter had explicitly denied ever hearing Ms. Sloane make said comments.  Dkt. Nos. 286-1, 684.  Such false allegations required Ms. Lively's team to undertake extensive investigatory discovery work that could and should have been avoided had the Wayfarer Parties not raised these factually baseless allegations.  Additionally, the Wayfarer Parties alleged a tortious interference claim against Ms. Lively based upon alleged interference with Mr. Baldoni's former agency, William Morris Endeavor, which required extensive discovery work that would have been unnecessary in the absence of those claims.  These are far from the only categories of discovery work necessitated by the Wayfarer Parties' retaliatory lawsuit.

26.    *The Rule 11 and 47.1 Motions*: While Ms. Lively's motion to dismiss remained pending, she separately served certain Wayfarer Parties with safe harbor letters pursuant to Federal Rule of Civil Procedure 11 ("Rule 11"), outlining the various reasons their claims were patently frivolous and requesting that they be withdrawn.  When these plaintiffs failed to take appropriate measures, Ms. Lively separately moved for sanctions under Rule 11 on May 19, 2025 (*see* Dkt. No. 222), which this Court granted in large part on March 27, 2026.  *See* Dkt. No. 1270.

27.    In addition, at this Court's invitation following its reservation of the issue in its ruling granting Ms. Lively's motion to dismiss, *see* Dkt. No. 296, Ms. Lively moved for relief under Section 47.1.  *See* Dkt. No. 748.  Given the dearth of case law examining the relatively new statute, briefing and oral arguments associated with Section 47.1 required extensive research and analysis to provide thorough support for the relief sought therein.

28.    Moreover, because Section 47.1 contemplates the recovery of actual damages in addition to attorneys' fees and costs, Willkie also continued to work to develop a factual record to support Ms. Lively's recovery for such damages and retained an expert to opine upon the same.

**Complexity of this Matter and Opposing Counsel's Conduct**

29.    Given the compressed discovery schedule for the consolidated actions, discovery proceeded at a feverish pace, which was repeatedly stalled by the Wayfarer Parties' dilatory tactics and overall litigation approach.

30.    The Wayfarer Parties were represented by numerous attorneys assembled to overwhelm Ms. Lively and her counsel.  The Wayfarer Parties engaged Bryan Freedman of Liner Freedman Taitelman & Cooley LLP ("LFTC"), a litigation boutique based in Los Angeles, California, as their lead counsel, in addition to Meister Seelig & Fein PLLC, a well-known litigation boutique, with experience handling high-profile entertainment litigation, based in New

11

York, New York. Additional law firms were involved on the Wayfarer Parties' side, including Ahouraian Law, on behalf of the Wayfarer Parties, and Pryor Cashman LLP on behalf of indemnified TAG and Wayfarer employees. In the midst of discovery, the Wayfarer Parties also retained Shapiro Arato Bach LLP, another well-known litigation firm based in New York.  In total, the Wayfarer Parties had seven lawyers from two law firms sign their operative complaint (supported, presumably, by many others not on the papers); they were represented by at least nine at the time of Ms. Lively's Motion to Dismiss filing, and eleven as of the Court's dismissal of their Complaint on June 9, 2025.  As of the Court's ruling on Ms. Lively's 47.1 Motion, twenty-two attorneys had appeared on behalf of the Wayfarer Parties.

31.     The Wayfarer Parties—whose financier pledged to spend $100 million against Ms. Lively and her husband, and whose lawyer publicly announced his intent to sue Ms. Lively into "oblivion"—spared no expense in mounting an extraordinarily aggressive litigation campaign. Their stated purpose went well beyond marshaling a vigorous defense—they sought out to "bury" Ms. Lively and "destroy" her reputation and career, ultimately hoping to leave her "dead" to people in her industry.  Dkt. No. 1230-47.

32.     Consistent with this stated objective, on January 16, 2025, the Wayfarer Parties filed a sprawling 345-paragraph Complaint asserting seven causes of action against Ms. Lively, accompanied two weeks later by a 391-paragraph First Amended Complaint that included as "Exhibit A" a purported "timeline" designed to attract maximum media attention.  When the Wayfarer Parties filed the FAC, Ms. Lively had not yet filed her motion to dismiss, nor were the Wayfarer Parties facing a deadline to amend.  The only conceivable reason that the Wayfarer Parties would sacrifice their opportunity to read Ms. Lively's motion to dismiss before amending their complaint, or reserve their chance to amend as of right, is because the Amended Complaint

12

was intended for the court of public opinion.  To that end, the Wayfarer Parties also created a dedicated website on which they published the FAC and Exhibit A.  Mr. Freedman misleadingly claimed that he was "more than willing to take every single text message that exists out there[,] [l]ay them out[,] [p]ut them on a website for the world to see," but in reality, the website released only a curated collection of text messages and emails that fit the Wayfarer Parties' narrative, many of which contained redactions.[2]

33.     Internal communications among the Wayfarer Parties' counsel confirm that the website and media strategy was designed to maximize public attention.  For example, in a February 14, 2025 text chain among Mr. Freedman, Roza Kalantari, and others, Mr. Freedman and Ms. Kalantari celebrated that their website publicizing their lawsuit filings was "getting SO much attention," noting it had been visited by 820,000 viewers within the first couple days of its publishing.  *See* Dkt. No. 1043-17.  These communications lay bare the Wayfarer Parties' strategy of using the litigation as a vehicle for a coordinated public relations campaign against Ms. Lively.

34.     The Wayfarer Parties' counsel also regularly used the press to maximize the impact of the Wayfarer Parties' retaliatory claims.  Just one such example was the curious publication of a litigation hold letter (a letter demanding that the recipient preserve relevant communications) sent by Liner Freedman to The Walt Disney Company, the kind of letter that in virtually all federal litigation is commonplace and not cause for press reporting.  Here, however, this boilerplate letter was published to further the press narrative that Wayfarer would sue Ms. Lively and her husband into "oblivion."[3]

---

[2] Liz Kreutz, Saba Hamedy & Kalhan Rosenblatt, *Justin Baldoni's Attorney Blasts New York Times Story About Blake Lively 'Smear Campaign' Story*, NBC News (Jan. 3, 2025 12:46pm EST), https://www.nbcnews.com/pop-culture/pop-culture-news/justin-baldonis-attorney-blasts-new-york-times-blake-lively-story-rcna186064.

[3] Tatiana Siegel, *Justin Baldoni Demands Disney, Marvel Preserve 'All Documents Relating' to Ryan Reynolds' Nicepool in 'Deadpool & Wolverine' Amid Blake Lively Legal Battle (EXCLUSIVE)*, VARIETY (January 14, 2025 1:45pm PT), https://variety.com/2025/film/news/justin-baldoni-legal-letter-disney-marvel-nicepool-ryan-reynolds-1236274162/.

35.     In addition to publicizing litigation filings and discovery correspondence, the Wayfarer Parties' counsel engaged in an incessant public relations campaign against Ms. Lively. This campaign began in December of 2024, but reached its apex around the filing of the Wayfarer Parties' $400 million lawsuit.  Mr. Freedman gave television interviews, appeared on podcasts (sometimes hosted by current or former clients), issued written press statements, and leaked information to the Hollywood press and tabloid media to generate news cycles.  *See, e.g.*, Dkt. Nos. 545-1–547-11.

36.     The Wayfarer Parties' strategy went well beyond typical litigation communications.  The strategy aimed to brand Ms. Lively as a liar, and the Wayfarer Parties as truth tellers, relying chiefly upon the so-called "receipts" contained in the FAC and Exhibit A thereto.  Among other things, Wayfarer's counsel publicly attacked Ms. Lively's character, credibility and reputation, by stating in the press that Ms. Lively is "afraid of the truth," has been "testifying since the moment she auditioned for this part," is "obviously uncomfortable . . . [with] the truth," and is a "privileged elite," who has been "abusing our legal system," to cover up for the "self-concocted disaster she initiated." *See* Dkt. Nos. 545-6, 545-9, 545-10.  By disseminating these themes as widely as possible, the Wayfarer Parties attempted to discourage Ms. Lively from pursuing her affirmative claims, while certain Wayfarer Parties witnessed their own lawyers' efforts to threaten fact witnesses and journalists with impunity.  *See* Dkt. No. 1233-114 (intimidating fact witnesses from coming forward); Dkt. No. 1233-113 (threatening reporters who may publish unfavorable stories).  This coordinated litigation-via-press approach required Willkie attorneys to research and determine appropriate responses and legal redress, including numerous motions directed at Wayfarer's improper media stunts.

14

37.     Beyond their media campaign, the Wayfarer Parties actively litigated on the docket. As of June 23, 2025, the (lapsed) deadline by which the Wayfarer Parties were entitled to amend their complaint, the Wayfarer Parties filed over 100 motions, letters, and other submissions in this action, each of which required review and, in many cases, responsive briefing by Ms. Lively's counsel. The Wayfarer Parties' handling of discovery further complicated this litigation and required Willkie attorneys to meet and confer with opposing counsel and prepare and file 9 motions to compel—all of which were prior to the Court's June 9, 2025 ruling.

38.     On one such occasion, the Wayfarer Parties' lawyers filed a declaration that was so baseless and inflammatory that this Court immediately (upon Ms. Lively's motion) struck it from the docket, Dkt. No. 220, observing that the filing's "sole purpose" was "to 'promote public scandal' by advancing inflammatory accusations," and warned counsel that "future misuse of the Court's docket may be met with sanctions." *Id.* at 3.

39.     The collective effect of the Wayfarer Parties' aggressive litigation posture—their voluminous complaint, their publicly-facing website, their near-daily media campaign, and their repeated filings of self-serving and frivolous materials—required Ms. Lively's counsel to devote an unusually large amount of time and resources to responding ***in court*** to the simultaneous assault on Ms. Lively's reputation and character, all of which was occasioned by the Wayfarer Parties' affirmative suit. Willkie's staffing decisions were made with the understanding of the unusual— and, in fact, prohibited—litigation tactics described above, as well as an understanding that the objective of the Wayfarer Parties' litigation was to "bury" Ms. Lively.

**Willkie's Staffing Decisions and Organization**

40.     Willkie staffs all of its matters, including the current case, as leanly as reasonably possible given the particular demands of the matter and in consultation with the client. In this

matter, Willkie made staffing decisions in consultation with the client based upon the nature of the action, including both substantive and procedural considerations. For example, the Wayfarer Parties went to great lengths to advertise that they were seeking $400 million in damages (Ms. Lively's complaint, by contrast, contained no such declaration), an extraordinary claim that would (if awarded) be ruinous not just for Ms. Lively, but for most individuals and many successful corporations. In my experience, clients typically take such threatened claims seriously (even if the underlying claims are deemed to be meritless or frivolous) when retaining counsel, and sophisticated clients often retain multiple law firms to handle multi-party actions involving claims spanning different subject matter areas. Likewise, in my experience, no reasonable attorney would threaten to sue a party with the means to defend herself "into oblivion" and expect anything other than a vigorous, comprehensive, and costly defense—indeed, the threat of suing someone "into oblivion" cannot be understood as anything other than a prompt to "lawyer up."

41.    Willkie also made its staffing decisions with the understanding that the Wayfarer Parties would aggressively draw upon virtually unlimited resources (at least $100 million), numerous law firms and dozens of lawyers, already-retained crisis communications and digital remediation firms, control over most (if not all) of the relevant underlying discovery materials, and a strategy of deploying all of these resources in multiple settings at once. The lawyers retained by the Wayfarer Parties—Liner Freedman Taitelman & Cooley LLP (based in Los Angeles, CA) and Meister Seelig & Fein PLLC (based in New York, NY)—are aggressive litigators who were likely selected for precisely that reason. *See* Dkt. No. 1073-24 (Consolidated Plaintiff Jennifer Abel observing to her boss that she would recommend Mr. Freedman because he would "bury" Ms. Lively even if he was not well "respected").

16

42.     Willkie served as co-counsel with Manatt.  While the division of labor was flexible to avoid inefficient silos, Willkie's primary focus was on issues relating to defamation, false light, and other "reputation-based" claims and defenses, for which Willkie possesses substantial experience including numerous matters within this District.  Manatt's primary areas of focus included the employment and entertainment law issues at the core of Ms. Lively's affirmative claims, but which also appeared in substantial part in the Wayfarer Parties' suit.  The firms coordinated closely to avoid duplication and achieve efficiency across teams.

43.     Willkie made its staffing decisions with the expectation that Ms. Lively would bear the cost of the litigation and that its decisions would be carefully vetted by Ms. Lively (as they in fact were).  Willkie's hourly rates and overall fees were negotiated by Ms. Lively, who reviewed litigation decisions with an eye toward managing costs as appropriate.

44.     Willkie staffed attorneys to avoid unnecessary duplication of work.  For example, during discovery, attorneys were organized into teams coordinated with Manatt, and each team met regularly (typically weekly) throughout the litigation.  Willkie took the lead on pursuing third-party discovery, drafting responses and objections to the Wayfarer Parties' written discovery requests, and managing the collection and review of Ms. Lively's documents in response to the same.  The teams were supervised by partners and further staffed with associates.

**Costs and Expenses Incurred in Defending the Wayfarer Action**

45.     Throughout the course of this litigation, Willkie incurred costs and expenses on behalf of Ms. Lively in furtherance of the defense of the Wayfarer Action.  Willkie billed these costs and expenses to Ms. Lively and Ms. Lively paid them in full.  Such costs included, for example, costs associated with collecting, hosting, and processing hundreds of thousands of documents in connection with the parties' extensive discovery efforts, much of which was either

17

exclusively attributable to the Wayfarer Action or jointly attributable to the Wayfarer Action and the Lively Action.  Other costs, such as the roughly $173,000 in costs charged by GBX Holdings, LLC on behalf of one of Ms. Lively's retained experts, were incurred exclusively for the purpose of assessing the impact to Ms. Lively's reputation, if any from the Wayfarer Action.

46.    Total defense fees and costs are $7,495,526 and $539,514.

47.    Based on survey data, the attorney rates charged by Willkie in this matter are comparable to rates charged by other large and established law firms of similar training, experience and expertise in New York.  Attached hereto as Exhibit B is a true and correct copy of 2025 data extracted from Octus Intelligence, Inc. ("Octus").  Exhibit B reflects Octus-extracted data from fee applications filed in 2025 on the Bankruptcy Court dockets for the Southern District of New York and the District of Delaware for all of the following firms: Davis Polk & Wardwell LLP; Kirkland & Ellis LLP; Latham & Watkins LLP; Milbank LLP; Paul Hastings LLP; Paul, Weiss, Rifkind, Wharton & Garrison LLP; Sullivan & Cromwell LLP; Weil, Gotshal & Manges LLP; and Willkie Farr & Gallagher LLP.  From my service on Willkie's Executive Committee, I have come to learn that these law firms comprise the bulk of the "peer group" of law firms that Willkie's financial advisors consider as relevant comparators when analyzing Willkie's financial performance, including the competitiveness of Willkie's rates.  I also know from my service on the Executive Committee that Willkie's litigation attorney rates are comparable, and more often than not measurably lower, than the other firms in Willkie's peer group.  The below excerpt of Exhibit B confirms the same, as do recent fee decisions in this District.  For example, in a recent case in this District, the Court found Willkie's billed rates (including Willkie's rates as of early 2026) to be reasonable, after reducing them by 15%, based on the complexity of the litigation and the prevailing market rates for major law firms in the New York City area.  *PDV USA, Inc. v.*

*Interamerican Consulting Inc.*, No. 20-CV-3699 (JGK) (RWL), 2026 WL 1283316, at *4 (S.D.N.Y. May 11, 2026). Bankruptcy Courts in this District also regularly approve Willkie's rates as reasonable. *See, e.g.*, *In re Spirit Aviation Holdings Inc.*, No. 25-11897-SHL (Bankr. S.D.N.Y. Mar. 4, 2026), ECF No. 821; *In re SAS AB*, No. 22-10925-MEW (Bankr. S.D.N.Y. May 23, 2024), ECF No. 2601.

| Role | Willkie Litigation Median | Litigation Peer Median | Litigation Peer 25th Percentile | Litigation Peer 75th Percentile |
|---|---|---|---|---|
| All Lawyers | $1,450 | $1,450 | $1,140 | $1,745 |
| All Partners | $1,650 | $2,035 | $1,682 | $2,265 |
| All Associates | $1,225 | $1,260 | $995 | $1,450 |

I hereby declare under the penalty of perjury that the foregoing statements are true and correct. Executed on this 29th day of June, 2026 in Los Angeles, California.

/s/ Michael J. Gottlieb
Michael J. Gottlieb