# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLAKE LIVELY,<br><br>Plaintiff,<br><br>v.<br><br>WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, and JENNIFER ABEL, JED WALLACE, and STREET RELATIONS INC.,<br><br>Defendants. | Civ. Action No. 1:24-cv-10049-LJL<br><br>Related to:<br>Civ. Action No. 1:25-cv-00779-LJL |
| JENNIFER ABEL,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>JONESWORKS LLC,<br><br>Third-Party Defendant. | |

**DECLARATION OF ELLYN S. GAROFALO IN SUPPORT OF DEFENDANTS' OPPOSITION TO THIRD-PARTY DEFENDANT JONESWORKS LLC'S MOTION FOR SPOLIATION SANCTIONS**

I, Ellyn S. Garofalo, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a partner with the law firm Liner Freedman Taitelman + Cooley, LLP, attorneys of record for Wayfarer Studios LLC ("Wayfarer"), Justin Baldoni ("Baldoni") Jamey Heath ("Heath"), Steve Sarowitz ("Sarowitz"), It Ends With Us Movie LLC ("IEWUM"), Melissa Nathan ("Nathan"), The Agency Group PR LLC ("TAG"), and Jennifer Abel ("Abel") (collectively, the "Wayfarer Parties").

2. Attached as **Exhibit 1** is a true and correct copy of an excerpt of the transcript of Jamey Heath's deposition, taken on October 9, 2025.

3. Attached as **Exhibit 2** is a true and correct copy of an excerpt of the transcript of Gordon Duren's deposition, taken on September 23, 2025.

4. Attached as **Exhibit 3** is a true and correct copy of an excerpt of the transcript of Jennifer Abel's deposition, taken on September 26, 2025.

5. Attached as **Exhibit 4** is a true and correct copy of an excerpt of the transcript of Jennifer Abel's deposition, taken on September 25, 2025.

6. Attached as **Exhibit 5** is a true and correct copy of an excerpt of the transcript of Blake Lively's deposition, taken on July 30, 2025.

7. Attached as **Exhibit 6** is a true and correct copy of a document bearing the Bates numbers BL-000021190-92.

8. Attached as **Exhibit 7** is a true and correct copy of an excerpt of the transcript of Justine Harris's deposition, taken on September 30, 2025.

9. Attached as **Exhibit 8** is a true and correct copy of a document bearing the Bates numbers VANZAN_000001-11.

10. Attached as **Exhibit 9** is a true and correct copy of an excerpt of the transcript of Justine Harris's deposition, taken on September 30, 2025.

11. Attached as **Exhibit 10** is a true and correct copy of an excerpt of a document bearing the Bates numbers VANZAN_000031-32.

12. Attached as **Exhibit 11** is a true and correct copy of a document bearing the Bates numbers VANZAN_000044-51.

13. Attached as **Exhibit 12** is a true and correct copy of a document bearing the Bates number VANZAN_000029.

14. Attached as **Exhibit 13** is a true and correct copy of an excerpt of the transcript of Blake Lively's deposition, taken on July 30, 2025.

15. Attached as **Exhibit 14** is a true and correct copy of a document bearing the Bates number WAYFARER_000141293.

16. Attached as **Exhibit 15** is a true and correct copy of an excerpt of the transcript of Andrea Giannetti's deposition, taken on September 23, 2025.

17. Attached as **Exhibit 16** is a true and correct copy of an excerpt of the transcript of Jamey Heath's deposition, taken on October 8, 2025.

18. Attached as **Exhibit 17** is a true and correct copy of an excerpt of the transcript of Jennifer Abel's deposition, taken on September 26, 2025.

19. Attached as **Exhibit 18** is a true and correct copy of a document bearing the Bates numbers HEATH_000049558-60.

20. Attached as **Exhibit 19** is a true and correct copy of an excerpt of the transcript of Jamey Heath's deposition, taken on October 9, 2025.

21. Attached as **Exhibit 20** is a true and correct copy of an excerpt of the transcript of Andrea Giannetti's deposition, taken on September 23, 2025.

22. Attached as **Exhibit 21** is a true and correct copy of an excerpt of the transcript of Jamey Heath's deposition, taken on October 8, 2025.

23. Attached as **Exhibit 22** is a true and correct copy of a document bearing the Bates numbers BALDONI_000026204-06.

24. Attached as **Exhibit 23** is a true and correct copy of a document bearing the Bates numbers BL-000020899-901.

25. Attached as **Exhibit 24** is a true and correct copy of a document bearing the Bates numbers BL-000018396-400.

26. Attached as **Exhibit 25** is a true and correct copy of a document bearing the Bates numbers BL-000019326-30.

27. Attached as **Exhibit 26** is a true and correct copy of a document bearing the Bates numbers BL-000019455-57.

28. Attached as **Exhibit 27** is a true and correct copy of a document bearing the Bates number SPE_WF0000641-42.

29. Attached as **Exhibit 28** is a true and correct copy of a document bearing the Bates number SPE_BL0022958-59.

30. Attached as **Exhibit 29** is a true and correct copy of an excerpt of the transcript of Justin Baldoni's deposition, taken on October 7, 2025.

31. Attached as **Exhibit 30** is a true and correct copy an excerpt of the transcript of Danny Greenberg's deposition, taken on September 19, 2025.

32. Attached as **Exhibit 31** is a true and correct copy of a document bearing the Bates number BALDONI_000018831.

33. Attached as **Exhibit 32** is a true and correct copy of a document bearing the Bates numbers SPE_WF0000415-17.

34. Attached as **Exhibit 33** is a true and correct copy of a document bearing the Bates numbers WME_00001254-55.

35. Attached as **Exhibit 34** is a true and correct copy of a document bearing the Bates numbers WME_00001266-67.

36. Attached as **Exhibit 35** is a true and correct copy of an excerpt of the transcript of Jamey Heath's deposition, taken on October 9, 2025.

37. Attached as **Exhibit 36** is a true and correct copy of an excerpt of the transcript of Steve Sarowitz's deposition, taken on October 3, 2025.

38. Attached as **Exhibit 37** is a true and correct copy of a document bearing the Bates number WAYFARER_000141754.

39. Attached as **Exhibit 38** is a true and correct copy of a document bearing the Bates number WAYFARER_000141765.

40. Attached as **Exhibit 39** is a true and correct copy of an excerpt of the transcript of Colleen Hoover's deposition, taken on September 29, 2025.

41. Attached as **Exhibit 40** is a true and correct copy of a document bearing the Bates numbers BL-000020979-81.

42. Attached as **Exhibit 41** is a true and correct copy of a document bearing the Bates numbers SPE_BL0008472-73.

43. Attached as **Exhibit 42** is a true and correct copy of a document bearing the Bates number WME_00001051.

44. Attached as **Exhibit 43** is a true and correct copy of a document bearing the Bates numbers SPE_BL0003328-335.

45. Attached as **Exhibit 44** is a true and correct copy of a document bearing the Bates numbers WAYFARER_000142484-90.

46. Attached as **Exhibit 45** is a true and correct copy of a document bearing the Bates numbers KCASE-000005773-78.

47. Attached as **Exhibit 46** is a true and correct copy of a document bearing the Bates numbers NATHAN_000003795-96.

48. Attached as **Exhibit 47** is a true and correct copy of a document bearing the Bates numbers SR 1.00000011-12.

49. Attached as **Exhibit 48** is a true and correct copy of a document bearing the Bates numbers NATHAN_000005497-98.

50. Attached as **Exhibit 49** is a true and correct copy of a document bearing the Bates numbers NATHAN_000000278-80.

51. Attached as **Exhibit 50** is a true and correct copy of a document bearing the Bates numbers NATHAN_000003599-611.

52. Attached as **Exhibit 51** is a true and correct copy of an excerpt of the transcript of Steve Sarowitz's deposition, taken on October 3, 2025.

53. Attached as **Exhibit 52** is a true and correct copy of an excerpt of the transcript of Jennifer Abel's deposition, taken on September 26, 2025.

54. Attached as **Exhibit 53** is a true and correct copy of an excerpt of the transcript of Melissa Nathan's deposition, taken on September 29, 2025.

55. Attached as **Exhibit 54** is a true and correct copy of an excerpt of the transcript of Katherine Case's deposition, taken on September 5, 2025.

56. Attached as **Exhibit 55** is a true and correct copy of a document bearing the Bates numbers ABEL_000021588-601.

57. Attached as **Exhibit 56** is a true and correct copy of excerpts of the transcripts of Jennifer Abel's depositions, taken on September 25 and 26, 2025.

58. Attached as **Exhibit 57** is a true and correct copy of excerpts of the transcripts of Jennifer Abel's depositions, taken on September 25 and 26, 2025.

59. Attached as **Exhibit 58** is a true and correct copy of an excerpt of the transcript of Jennifer Abel's deposition, taken on September 25, 2025.

60. Attached as **Exhibit 59** is a true and correct copy of an excerpt of the transcript of Jed Wallace's deposition, taken on October 9, 2025.

61. Attached as **Exhibit 60** is a true and correct copy of an excerpt of the transcript of Melissa Nathan's deposition, taken on September 29, 2025.

62. Attached as **Exhibit 61** is a true and correct copy of an excerpt of the transcript of Jamey Heath's deposition, taken on October 8, 2025.

63. Attached as **Exhibit 62** is a true and correct copy of an excerpt of the transcript of Justin Baldoni's deposition, taken on October 6, 2025.

64. Attached as **Exhibit 63** is a true and correct copy of an excerpt of the transcript of Jamey Heath's deposition, taken on October 8, 2025.

65. Attached as **Exhibit 64** is a true and correct copy of an excerpt of the transcript of Melissa Nathan's deposition, taken on September 29, 2025.

66. Attached as **Exhibit 65** is a true and correct copy of an excerpt of the transcript of Jamey Heath's deposition, taken on October 8, 2025.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 20, 2025
Los Angeles, CA

By: */s/ Ellyn S. Garofalo*____

LINER FREEDMAN TAITELMAN + COOLEY, LLP
Ellyn S. Garofalo
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Tel: (310) 201-0005
Email: egarofalo@lftcllp.com

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.,

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.,
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.,
Consolidated Defendants.

---

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF JAMEY HEATH
Los Angeles, California
Thursday, October 9, 2025

Stenographically Reported by: Ashley Soevyn,
CALIFORNIA CSR No. 12019

Wayfarer. So if this person was putting in their notice and moving on, what would that mean for Wayfarer? So it was something to consider.

But I do recall that in her notice, that that didn't mean she was leaving tomorrow. There was a duration of time. I don't know -- I don't know if that was a month or two months or three months or whatever it would have been. But certainly, that would have been on my mind.

BY MS. SHAH:

Q You just said something about Matthew not being the person you felt safe considering to be like the leader of the Wayfarer account, right? Who was the person that you felt safe with being the leader of the Wayfarer account?

A Jen.

Q Okay. Anyone else at Jonesworks?

A Jen.

Q Okay. How would you describe the cadence of your relationship and interactions with Jen as Wayfarer's publicist over the four years she had been on that account?

MS. SHAPIRO: Objection.

THE WITNESS: Jen is on top of it. She understands and gets what we're about and how we

like to operate. And I trusted her judgment. And based on that, we built a relationship that was a professional trusting of the path we wanted to take. While I liked Matthew Mitchell, he didn't feel to be a leader to me in the way that Jen is.

BY MS. SHAH:

Q Did you feel like you had that close relationship of trust on a professional level with anyone else than Jen at Jonesworks?

A I didn't have distrust with anybody, but Jen was our point.

Q Okay.

THE STENOGRAPHIC REPORTER: Was our what?

THE WITNESS: Point. Point person. Sorry.

BY MS. SHAH:

Q And I think you testified a little bit ago that, like, sure, when you found out Jen was considering leaving, Jonesworks, it was a consideration for you in terms of what would happen to Wayfarer after she left?

A Sure.

Q Can you tell me a little bit more about how you thought about that in your mind?

MS. SHAPIRO: Objection.

A She just never was. So other than some of these instances, but...
Q Now, there came a time in late August of 2024 where Wayfarer provided notice to Jonesworks that it was terminating Jonesworks; is that right?
A Late August?
Q Uh-huh.
A I probably need to see an email or something so I can confirm the date, but for the moment I can take your word for it.
Q Sure. Even apart from the date, you recall that there came a point in time when Wayfarer terminated Jonesworks, right?
A Yes.
Q Okay. Who made that decision?
A Ultimately?
Q Uh-huh.
A Me.
Q Okay. Why did you make that decision?
A I mean, I think I expressed it before so I will just give you the short version.
Q Please.
A I had come to the conclusion that I had lost faith. I don't like saying -- I had lost faith in what I believed Stephanie could provide and

Jonesworks felt like -- thank you so much -- a place that we've been for some years and, you know, changes happen. And also, our point person who I trusted with my kids, going back to the babysitter analogy, I just trusted her. And here she's going somewhere else. And this happens all the time with agencies and managers. You know, you have a relationship with -- with Ms. Shah, not the law firm you are at.

THE WITNESS: Thank you.

MS. SHAPIRO: Do you want a break?

MS. SHAH: Yes. I think the reporter would like a break. Why don't we go off the record. How long would you like?

THE WITNESS: Was this for me?

THE VIDEOGRAPHER: We are going off the record. The time is 3:04 p.m.

(Recess.)

(Recess.)

THE VIDEOGRAPHER: We're back on record. The time is 3:44 p.m.

BY MS. SHAH:

Q You're aware that Wayfarer filed counterclaims against Jonesworks and Ms. Jones in this case, correct?

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 10th day of October 2025.



______________________________

ASHLEY SOEVYN

CSR No. 12019

# EXHIBIT 2

CONFIDENTIAL - GORDON DUREN

UNITED STATES COURT DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO. 1:25-cv-00779-UA

STEPHANIE JONES and JONESWORKS, :
Plaintiff, :
:
v. :
:
JENNIFER ABEL, MELISSA NATHAN, JUSTIN BALDONI, WAYFARER STUDIOS LLC, and JOHN DOES 1-10, :
Defendants. :
------------------------ x

VIDEOTAPE DEPOSITION OF:
GORDON DUREN
NEW YORK, NEW YORK
TUESDAY, SEPTEMBER 23, 2025

REPORTED BY:
SILVIA P. WAGE, CCR, CRR, RPR
JOB NO. 7624584

"ATTORNEYS' EYES ONLY"
go ahead and answer. 12:11:33
A. I don't have any non-privileged information. 12:11:35 12:11:36
Q. Okay. What attorneys did you communicate with about that topic? 12:11:37 12:11:40
MR. INNS: I'm going to caution the witness not to disclose the contents of any communications with attorneys. 12:11:46 12:11:47 12:11:48 12:11:50
But if you remember the identities of any attorneys, you can provide those. 12:11:50 12:11:51 12:11:53
A. I can't remember their name. But there was an attorney for our new employment law on the west side of our country, worked with Tricia. 12:11:59 12:12:01 12:12:07 12:12:09
Q. When did you first speak to her? 12:12:11 12:12:13
A. I believe it was the day of Jen's termination. 12:12:13 12:12:16
Q. August 21st? 12:12:16
A. Uh-huh. 12:12:17
Q. But on August 7th, Ms. Abel asked you to transfer the phone number to 12:12:23 12:12:25

CONFIDENTIAL - GORDON DUREN

CERTIFICATE OF REPORTER

I, SILVIA P. WAGE, CSR, CRR, RPR, herby certify that the witness in the foregoing deposition was by me duly sworn to tell the whole truth, nothing but the truth; said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated. The testimony of said witness was thereafter reduced to typewriting by computer under my direction and supervision. Before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

Dated: September 24, 2025

SIGNED

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF JENNIFER ABEL
Los Angeles, California
Friday, September 26, 2025
Stenographically Reported by: Ashley Soevyn,
CALIFORNIA CSR No. 12019

A Yes.
Q What are strategic partnerships?
A I would say my definition of a strategic partnership is when a client is coming out with a product or is an ambassador of an organization or clothing company, just to be specific, that that would be a strategic partnership. And I would work on behalf of my client to handle the communications surrounding that partnership.
Q Okay. Thank you, Ms. Abel.
From -- let's say from the August 1st, 2024 through, let's call it, the end of September 2024, that period of time, so we're specific about the time period we're talking about here. At some point during that period of time, RWA launched; is that right?
A In September.
Q In September?
A So you have to be specific. Yes.
Q Okay. So let's just say whenever -- do you know the date in September it launched?
A September 1st.
Q From September 1st through the end of 2024 then, did RWA have any other employees or staff besides yourself?

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 27th day of September, 2025.

ASHLEY SOEVYN
CSR No. 12019

# EXHIBIT 4

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF JENNIFER ABEL
Los Angeles, California
Thursday, September 25, 2025

Stenographically Reported by: Ashley Soevyn,
CALIFORNIA CSR No. 12019

MR. FREEDMAN: Objection. Same instruction.

THE WITNESS: Outside of that instruction, no.

BY MS. TAHLER:

Q Do you believe that any security measures were circumvented in accessing your iCloud?

A I am not sure. Sorry.

Q In your counterclaims, you assert -- or allege that you were ordered to provide your passcode to your company iPhone.

Who ordered you to provide your passcode?

A Gordon Duren, Stephanie's chief of staff.

Q What did he say?

A After I had clarified to both him and the lawyer who was present that if I were to leave, that they would release the number back to me if I were to go directly to Verizon, which would then render the cell phone inactive. I had specified to the lawyer who was there that it was also my personal phone.

THE VIDEOGRAPHER: Somebody from Liner's office.

THE WITNESS: So as I said before, it was communicated to me after I said, for clarity, it was

agreed that my personal cell phone number would be released back to me, which would render the phone inactive. I clarified with the lawyer who was present that it was my personal cell phone, that I had private stuff on there. And Gordon says, "Yes, right?" And looked at the lawyer, and the lawyer said, "Yes, that's fine. It would render that phone inactive." And so I said, okay. I handed it over. And as I was walking out, Gordon says, "We need your passcode."

Q What would have happened if you didn't provide your passcode?

MR. FREEDMAN: Objection.

THE WITNESS: I don't know. It was my assumption in the context of that conversation that they needed the passcode in order to release the phone back to me.

BY MS. TAHLER:

Q You provided your password, correct?

A Yes.

Q You didn't ask, Oh, can I not give you my passcode? I don't want to give you my passcode. Anything like that?

MR. FREEDMAN: Objection.

THE WITNESS: I wasn't given a choice.

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 26th day of September, 2025.

ASHLEY SOEVYN

# EXHIBIT 5

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - x

BLAKE LIVELY,

Plaintiff,

v.

| | |
|---|---|
| WAYFARER STUDIOS LLC, a Delaware Limited Liability Company, JUSTIN BALDONI, an individual, JAMEY HEATH, an individual, STEVE SAROWITZ, an individual, IT ENDS WITH US MOVIE LLC, a California Limited Liability Company, MELISSA NATHAN, an individual, THE AGENCY GROUP PR LLC, a Delaware Limited Liability Company, JENNIFER ABEL, an individual, JED WALLACE, an individual, and STREET RELATIONS INC., a California Corporation | Civ. Action No. 1:24-cv-10049-LJL (Consolidated for pretrial purposes with 1:25-cv-00449-LJL) Rel. 1:25-cv-00779-LJL |

Defendants.

- - - - - - - - - - - - - - x

Videotaped Deposition of BLAKE LIVELY

New York, New York

Wednesday, July 30, 2025

10:15 A.M.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Pages: 1 - 294

Reported By: Anita M. Trombetta, RMR, CRR, California CSR No. 14647

A Can you be more specific? 15:41:23
Q Sure. 15:41:24
Did Leslie Sloane call you and tell you that she received information from Stephanie Jones about a smear campaign or something similar to that? 15:41:25 15:41:29 15:41:38 15:41:39
A She did not. 15:41:39
Q Did you learn from Leslie Sloane that there were text messages in Jen Abel's phone? 15:41:40 15:41:46
A No. 15:41:51
Q Who did you learn that from? 15:41:52
A Ashley Avignon. 15:41:53
Q Who is that? 15:41:56
A She's a friend of mine. 15:41:58
Q And what did she tell you? 15:42:00
A She said that a woman that she knows named Stephanie Jones was trying to get in touch with me. She gave me more details. 15:42:04 15:42:13 15:42:20
Q When did she tell you that? 15:42:25
A Late August of 2024. 15:42:27
Q And did she tell you that in writing or on the telephone? 15:42:32 15:42:37
A On the phone. 15:42:38
Q And what else did she tell you? 15:42:39
A She told me that she works with a woman in 15:42:47

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, ANITA M. TROMBETTA, RMR, CRR, and Certified California Shorthand Reporter, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested [or not requested, as appropriate]; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 31st day of July, 2025.

My commission expires: 10.07.2025

______________________________

Anita M. Trombetta, RMR, CRR

# EXHIBIT 6

## Short Message Report

| | |
|---|---|
| Conversations: 1 | Participants: 3 |
| Total Messages: 18 | Date Range: 12/21/2024 |

### Outline of Conversations

**BL-FullMessages-0204807** • 18 messages on 12/21/2024 • Taylor _ <+[redacted]> • Ryan Reynolds
Ryan Reynolds <+[redacted] • ?B? <+[redacted]>

**Messages in chronological order** (times are shown in GMT -05:00)

**BL-FullMessages-0204807**

T Taylor _ <[redacted]> ▶ 12/21/2024, 7:20 PM
You won

T Taylor _ <[redacted]> ▶ 12/21/2024, 7:20 PM
You did it

# Ryan Reynolds <[redacted]> ▶ 12/21/2024, 7:20 PM
It's turning.

T Taylor _ <[redacted]> ▶ 12/21/2024, 7:20 PM
https://deadline.com/2024/12/justin-baldoni-dropped-wme-blake-lively-sexual-harassment-complaint-1236240243/Attachment Title: 6550374B-A78E-4755-AD06-776880AA2035.pluginPayloadAttachmentAttachment Title: 2766870F-4269-4FB1-87C5-7ABA520A65A6.pluginPayloadAttachmentAttachment Title: DD9C0A84-1817-4B8B-94CE-EB25725876EF.pluginPayloadAttachmentAttachment Title: 4AD4624D-430D-4371-9ABB-8C90D06BB504.pluginPayloadAttachmentAttachment Title: 190A9988-64BC-488B-9AA9-C82413F939D2.pluginPayloadAttachment

*Attachment: 6550374B-A78E-4755-AD06-776880AA2035.pluginPayloadAttachment (4 KB)*

*Attachment: 2766870F-4269-4FB1-87C5-7ABA520A65A6.pluginPayloadAttachment (194 KB)*

*Attachment: DD9C0A84-1817-4B8B-94CE-EB25725876EF.pluginPayloadAttachment (81 KB)*

*Attachment: 190A9988-64BC-488B-9AA9-C82413F939D2.pluginPayloadAttachment (80 KB)*

T Taylor _ <[redacted]> ▶ 12/21/2024, 7:20 PM
And you fucking helped so many people who won't have to go through this ever again

# Ryan Reynolds <[redacted]> ▶ 12/21/2024, 7:20 PM
Remember August?

# Ryan Reynolds <[redacted]> ▶ 12/21/2024, 7:21 PM
Loved "And you fucking helped so many people who won't ha…"

T Taylor _ <[redacted]> ▶ 12/21/2024, 7:21 PM
Never has a cancellation been reversed so fast

T Taylor _ <[redacted]> ▶ 12/21/2024, 7:21 PM
You guys don't understand how rare this is

T Taylor _ <[redacted]> ▶ 12/21/2024, 7:21 PM
To have proof and to take the perfect steps to bring that truth into the light

# ?B? <[redacted]> ◀ 12/21/2024, 7:22 PM
Ash

# ?B? <[redacted]> ◀ 12/21/2024, 7:22 PM
Like. My. God.

# ?B? <[redacted]> ◀ 12/21/2024, 7:22 PM
I love you so much. I would not be ok through any of this if it weren't for you

T Taylor _ <+[redacted]> ▶ 12/21/2024, 7:22 PM
Can you believe she just called

T Taylor _ <+[redacted]> ▶ 12/21/2024, 7:22 PM
And was like

T Taylor _ <+[redacted]> ▶ 12/21/2024, 7:23 PM
This pr chick wants to get info to blake

T Taylor _ <+[redacted]> ▶ 12/21/2024, 7:23 PM
That means the world

# ?B? <+[redacted]> ◀ 12/21/2024, 7:30 PM
It changed my life

# EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------

STEPHANIE JONES, JONESWORKS LLC,

Plaintiffs,

-against-

JENNIFER ABEL, MELISSA NATHAN, JUSTIN BALDONI, WAYFARER STUDIOS LLC, and JOHN DOES 1-10,

Defendants.

Case No. 1:25-cv-00779-LJL

-----------------------------------------

September 30, 2025
10:02 a.m.

CONFIDENTIAL DEPOSITION of JUSTINE HARRIS, taken by Defendants, pursuant to Notice, held at the offices of MEISTER SEELIG & FEIN PLLC, 125 Park Avenue, New York, New York before Wayne Hock, a Notary Public of the State of New York.

ownership interests in the corporate entity. 10:08:50 10:08:51

There were also two public filings related to Vanzan that I also reviewed. 10:08:52 10:08:59 10:09:00

Q. Who are the owners of Vanzan? 10:09:01

A. Blake Lively and her husband Ryan Reynolds are each fifty percent owners in the company. 10:09:02 10:09:07 10:09:10

Q. Has that always been the case? 10:09:12 10:09:14

A. Yes. 10:09:14

Q. And who are the officers of Vanzan? 10:09:14 10:09:16

A. Ms. Lively is the president. Ryan Reynolds is the vice president and the CFO. 10:09:16 10:09:18 10:09:20

Q. And has that always been the case? 10:09:21 10:09:24

A. Yes. 10:09:24

Q. And what are their duties as each, if you know? 10:09:24 10:09:26

A. Their -- I could describe to you the general business and purpose of Vanzan and I think that would help 10:09:27 10:09:33 10:09:36

explain what their duties are.

Q. Sure.

A. Vanzan was established after they were married in 2019 to handle payroll and other administrative matters for a variety of household employees of Mr. Reynolds and Ms. Lively. As described as I learned from Allen Chanzis, there's a variety of paperwork, not only payroll, but each of the employees -- a hundred percent of the employees who are paid through Vanzan have nondisclosure agreements. There are health benefits and other employee benefits that are handled through Vanzan, sometimes paperwork related to other administrative matters, bonuses are paid out at year-end. And so Ms. Lively's role as president of Vanzan involves delegating and giving authority to Mr. Chanzis, who is the business manager with respect to matters relating to those topics.

Q. And has she given that

CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the State of New York, do hereby certify:

That the testimony in the within proceeding was held before me at the aforesaid time and place;

That said witness was duly sworn before the commencement of the testimony, and that the testimony was taken stenographically by me, then transcribed under my supervision, and that the within transcript is a true record of the testimony of said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, that I am not interested directly or indirectly in the matter in controversy, nor am I in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 1st day of October, 2025.

VERITEXT REPORTING COMPANY

(516) 608-2400 (212) 267-6868

# EXHIBIT 8

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| VANZAN, INC.,<br>Plaintiffs,<br>-against-<br>DOES 1-10, inclusive,<br>Defendants. | Index No.:<br>**SUMMONS**<br>The basis for venue is CPLR §§ 503(a) and (c) because Plaintiff's principal place of business is in New York County.<br>Plaintiff's address is 888 7th Avenue, New York, New York 10106. |

TO THE ABOVE NAMED DEFENDANTS:

You are hereby summoned to answer the Complaint in this action and to serve a copy of your answer, or if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York), and in case of your failure to appear or answer, judgment will be taken against you by default for relief demanded in the complaint.

//

//

//

//

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

The basis for venue designated in this action is CPLR §§ 503(a) and (c) because Plaintiff's principal place of business is in New York County. Plaintiff's address is 888 7th Avenue, New York 10106.

Dated: New York, New York
September 27, 2024

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

By: [signature]

Samantha J. Katze
7 Times Square
New York, New York 10036
Tel: (212) 790-4500
Fax: (212) 790-4545
Email: SKatze@manatt.com

*Attorneys for Plaintiff Vanzan, Inc.*

TO: DOES 1-10, inclusive



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| VANZAN, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>DOES 1-10, inclusive,<br><br>Defendants. | Index No.:<br><br>**COMPLAINT** |

Plaintiff Vanzan, Inc. ("Plaintiff"), by and through its attorneys Manatt, Phelps & Phillips, LLP, for its complaint against the unnamed DOES 1-10 (the "DOE Defendants"), inclusive, hereby alleges as follows:

## NATURE OF THE ACTION

1. This action arises out of an ongoing campaign to damage Plaintiff's business and Plaintiff's reputation.

2. Upon information and belief, the DOE Defendants have certain contractual and confidentiality obligations and obligations of good faith and loyalty to Plaintiff regarding Plaintiff's business and reputation, by way of oral promises and/or written agreements.

3. Despite these obligations, the DOE Defendants have undertaken direct efforts to contravene these agreements and instead have participated, and may continue to participate, in efforts to harm Plaintiff, including by: failing to act in Plaintiff's best interests, taking actions to their personal benefit at Plaintiff's expense, failing to freely communicate with Plaintiff regarding matters that impact Plaintiff's business and reputation, and disclosing to third parties and failing to keep strictly confidential Plaintiff's confidential and/or private information.

4. This conduct constitutes breach of the agreements and obligations owed by the DOE Defendants to Plaintiff, and has caused significant reputational and economic damages to Plaintiff.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

5. This Complaint seeks to recover compensatory economic and noneconomic damages, as well as other appropriate remedies, against the DOE Defendants.

## THE PARTIES

6. Plaintiff is a New York corporation with its principal place of business located in New York, New York.

7. Upon information and belief, each of the DOE Defendants are individuals and/or companies that are domiciled, reside, have their principal places of business and/or are incorporated or organized, in New York. At this time, Plaintiff is not privy to the names or identities of the individual defendants, DOES 1-10, and therefore sues these defendants by such fictitious names. Upon information and belief, the DOE Defendants are employees, contractors, agents, or representatives of Plaintiff who have participated in, and possibly conspired with others, in a scheme to damage Plaintiff's business and reputation in breach of their oral and/or written promises to Plaintiff and their duties of good faith and loyalty to Plaintiff. Pursuant to New York's Civil Practice Law and Rules ("CPLR") § 1024, upon discovery of the actual name and identity of DOES 1-10, Plaintiff will substitute such information in the caption and in an amended pleading.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the parties and subject matter pursuant to CPLR §§ 301, 302(a)(1), 302(a)(2), 302(a)(3) and/or 302(a)(4).

9. This Court has personal jurisdiction over the DOE Defendants who, upon information and belief, carried out activities against Plaintiff in close connection with their contractual relationship with and related duties owed to Plaintiff, and are domiciled, reside, have their principal place of business and/or are incorporated or organized in New York. Alternatively, the Court has personal jurisdiction over the DOE Defendants who, upon information and belief, transact business within the state, contract to supply services in the state, have committed tortious acts within the state, have committed tortious acts without the state that have caused injury to Plaintiff in the state and regularly do or solicit business or engage in



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

another persistent course of conduct or derive substantial revenue from services rendered in the state or expect or should reasonably expect their tortious acts to have consequences in the state and derive substantial revenue from interstate commerce and/or own, use or possess real property situated within the state.

10. Venue in New York County is proper pursuant to CPLR §§ 503(a) and (c) because Plaintiff's principal place of business is in New York County.

## FACTUAL BACKGROUND

11. Upon information and belief, the DOE Defendants have certain confidentiality obligations to Plaintiff regarding Plaintiff's business and reputation, arising from, among other things, oral or written agreement(s), and/or duties of good faith and loyalty (collectively, the "DOE Duties").

12. Specifically, Plaintiff provided consideration to the DOE Defendants in exchange for the DOE Defendants' agreement to act in Plaintiff's best interests, not take actions to their personal benefit at Plaintiff's expense, freely communicate with Plaintiff regarding matters that impacted Plaintiff's business and reputation, and keep strictly confidential, and not disclose to third parties, Plaintiff's confidential and/or private information.

13. Upon information and belief, in or around August 2024, the DOE Defendants breached the DOE Duties by acting in a manner that was inconsistent with, and damaging to, Plaintiff's business interests and reputation.

14. Upon information and belief, the DOE Defendants' conduct included, but was not limited to, failing to act in Plaintiff's best interests, taking actions to their personal benefit at Plaintiff's expense, failing to freely communicate with Plaintiff regarding matters that impacted Plaintiff's business and reputation, and disclosing to third parties and failing to keep strictly confidential Plaintiff's confidential and/or private information.

15. Upon information and belief, in or around August 2024, the DOE Defendants disclosed Plaintiff's confidential and private information to third parties.

16. Upon information and belief, in or around August 2024, the DOE Defendants

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

became aware of, and failed to inform Plaintiff about, conduct by third parties that had a reasonable likelihood of causing, was designed to cause, and did cause irreparable harm to Plaintiff, Plaintiff's business interests, and Plaintiff's reputation.

17. Upon information and belief, with regard to the foregoing, the DOE Defendants have acted with negligence and/or reckless disregard of the impact that their acts and omissions have had, and continue to cause monetary damages and irreparable harm to Plaintiff, Plaintiff's business interests, and Plaintiff's reputation.

18. Plaintiff has suffered significant monetary damages and irreparable harm as a direct result of the DOE Defendants' conduct.

**FIRST CAUSE OF ACTION**
**(Breach Of Contract Against DOES 1-10)**

19. Plaintiff repeats and realleges each and every part of paragraphs 1 through 18 above as if they were fully set forth herein.

20. Upon information and belief, Plaintiff and the DOE Defendants are parties to oral and/or written agreements which, impose certain confidentiality obligations regarding Plaintiff's business and reputation and require the DOE Defendants to act in Plaintiff's best interests, not take actions in bad faith or to their personal benefit at Plaintiff's expense, freely communicate with Plaintiff regarding matters that impact Plaintiff's business and/or reputation, and keep strictly confidential, and not disclose to third parties, Plaintiff's confidential and/or private information.

21. Plaintiff provided consideration to the DOE Defendants in exchange for the DOE Defendants' agreement to act in Plaintiff's best interests, not take actions in bad faith or to their personal benefit at Plaintiff's expense, freely communicate with Plaintiff regarding matters that impacted Plaintiff's business and/or reputation, and keep strictly confidential and not disclose to third parties Plaintiff's confidential and/or private information.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

22. Plaintiff has either performed, or was prevented or excused from performing by the actions of the DOE Defendants or the DOE Defendants' agents and/or representatives, all of Plaintiff's contractual obligations.

23. Upon information and belief, in or around August 2024, the DOE Defendants breached the DOE Duties by acting in a manner that was inconsistent with, and damaging to, Plaintiff's business interests and reputation, including but not limited to by failing to act in Plaintiff's best interests, taking actions in bad faith or to their personal benefit at Plaintiff's expense, failing to freely communicate with Plaintiff regarding matters that impacted Plaintiff's business and/or reputation, and disclosing to third parties and failing to keep strictly confidential Plaintiff's confidential and/or private information.

24. In addition, upon information and belief, in or around August 2024, the DOE Defendants became aware of, and failed to inform Plaintiff about, conduct by third parties that had a reasonable likelihood of causing, was designed to cause, and did cause monetary damages and irreparable harm to Plaintiff, Plaintiff's business interests and to Plaintiff's business and reputation.

25. Accordingly, the DOE Defendants breached their duties and obligations to Plaintiff set forth in their respective written and/or oral agreements with Plaintiff.

26. Upon information and belief, with regard to the foregoing, the DOE Defendants have acted with negligence and/or reckless disregard of the impact that their acts and omissions have had, and continue to cause irreparable harm and/or monetary damages to Plaintiff, Plaintiff's business interests and to Plaintiff's business and reputation.

27. Plaintiff has suffered, and will continue to suffer, significant and irreparable harm to its business and goodwill as well as monetary damages as a result of the DOE Defendants' breaches in an amount to be determined at trial.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**SECOND CAUSE OF ACTION**
**(Breach Of Covenant Of Good Faith And Fair Dealing Against DOES 1-10)**

28. Plaintiff repeats and realleges each and every part of paragraphs 1 through 27 above as if they were fully set forth herein.

29. Upon information and belief, Plaintiff and the DOE Defendants are parties to oral and/or written agreements which, impose certain confidentiality obligations regarding Plaintiff's business and reputation and require the DOE Defendants to act in Plaintiff's best interests, not take actions in bad faith or to their personal benefit at Plaintiff's expense, freely communicate with Plaintiff regarding matters that impact Plaintiff's business and reputation, and keep strictly confidential, and not disclose to third parties, Plaintiff's confidential and/or private information.

30. Plaintiff provided consideration to the DOE Defendants in exchange for the DOE Defendants' agreement to act in Plaintiff's best interests, not take actions to their personal benefit at Plaintiff's expense, freely communicate with Plaintiff regarding matters that impacted Plaintiff's business and reputation, and keep strictly confidential and not disclose to third parties Plaintiff's confidential and/or private information.

31. Despite these obligations, Plaintiff is informed and believes that, the DOE Defendants deprived Plaintiff of the benefits of their agreement and thus breached their duty to deal fairly and in good faith by, among other things, acting in a manner that was inconsistent with, and damaging to, Plaintiff's interests and reputation by, among other things, disclosing confidential and private information about Plaintiff to third parties and failing to inform Plaintiff of information and conduct that had a reasonable likelihood of causing irreparable harm to Plaintiff and to Plaintiff's goodwill and reputation.

32. Plaintiff has suffered, and will continue to suffer, significant and irreparable harm to its business and goodwill as well as monetary damages, as a result of the DOE Defendants' breaches in an amount to be determined at trial.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**THIRD CAUSE OF ACTION**
**(Faithless Servant Liability Against DOES 1-10)**

33. Plaintiff repeats and realleges each and every part of paragraphs 1 through 32 above as if they were fully set forth herein.

34. Upon information and belief, Plaintiff and the DOE Defendants are parties to oral and/or written agreements which, impose certain confidentiality obligations regarding Plaintiff's business and reputation and require the DOE Defendants to act in Plaintiff's best interests, not take actions in bad faith or to their personal benefit to the detriment of Plaintiff.

35. Notwithstanding these contractual obligations, the DOE Defendants engaged in misconduct and unfaithfulness by disclosing confidential and private information about Plaintiff to third parties and failing to inform Plaintiff of information and conduct that had a reasonable likelihood of causing irreparable harm to Plaintiff and to Plaintiff's goodwill and reputation.

36. The DOE Defendants' conduct substantially violated their contracts of service with Plaintiff and such violations permeated the DOE Defendants' service in their most material and substantial part, and were directly against Plaintiff's interests.

37. Further, as Plaintiff's employees, contractors, agents, or representatives, the DOE Defendants owed Plaintiff a duty of loyalty, which required them to exercise the utmost good faith and loyalty in the performance of their duties, prohibited them from acting in any manner inconsistent with the trust placed in them by Plaintiff, and required them to keep confidential Plaintiff's private and/or confidential information.

38. At the time that the DOE Defendants owed such duties to Plaintiff, they, solely for their own benefit, acted in a manner that was inconsistent with, and damaging to, Plaintiff's interests and Plaintiff's reputation by, among other things, disclosing confidential and private information about Plaintiff to third parties and failing to inform Plaintiff of information and conduct that had a reasonable likelihood of causing irreparable harm to Plaintiff and to Plaintiff's goodwill and reputation.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

39. The DOE Defendants' foregoing actions, individually and collectively, were adverse to Plaintiff and constituted a breach of the duties of good faith and loyalty owed to Plaintiff.

40. Plaintiff has suffered, and will continue to suffer, damages as a result of the DOE Defendant's material violation of their contracts with Plaintiff and their breaches of their duties of good faith and loyalty, in an amount to be determined at trial.

41. As a result of their misconduct, unfaithfulness, contractual breaches, and violation of their duties of good faith and loyalty to Plaintiff, the DOE Defendants, at a minimum, forfeited the right to receive, and are obligated to return to Plaintiff, any and all income they received from Plaintiff from and after the commencement of the DOE Defendants' wrongdoing, including, without limitation, all fees, bonuses and profits received in connection with their work for Plaintiff in an amount to be determined at trial.

42. In addition to compensatory damages and/or disgorgement, Plaintiff is entitled to an award of punitive damages against the DOE Defendants in an amount to be determined at trial because the conduct underlying their breaches evinces a high degree of moral turpitude and demonstrates such wanton dishonesty as to imply a criminal indifference to their civil obligations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in its favor and against the DOE Defendants as follows:

1. For compensatory damages in an amount to be determined at trial;

2. For an order requiring the DOE Defendants to return to Plaintiff all monies of any kind they received from Plaintiff from and after the commencement of the DOE Defendants' wrongdoing in connection with the work they performed for Plaintiff;

3. For exemplary or punitive damages in an amount to be determined at trial;

4. Pre- and post-judgment interest as permitted by law;

5. For its costs of suit, disbursements and reasonable attorneys' fees; and

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

6. For such other relief as the Court deems just and proper.

Dated: New York, New York
September 27, 2024

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

By: ______________________________

Samantha J. Katze
7 Times Square
New York, New York 10036
Tel: (212) 790-4500
Fax: (212) 790-4545
Email: SKatze@manatt.com

*Attorneys for Plaintiff Vanzan, Inc.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# EXHIBIT 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STEPHANIE JONES, JONESWORKS LLC,
Plaintiffs,
-against-
JENNIFER ABEL, MELISSA NATHAN, JUSTIN BALDONI, WAYFARER STUDIOS LLC, and JOHN DOES 1-10,
Defendants.
Case No. 1:25-cv-00779-LJL

---

September 30, 2025
10:02 a.m.

CONFIDENTIAL DEPOSITION of JUSTINE HARRIS, taken by Defendants, pursuant to Notice, held at the offices of MEISTER SEELIG & FEIN PLLC, 125 Park Avenue, New York, New York before Wayne Hock, a Notary Public of the State of New York.

voluntary dismissal of the lawsuit in December of 2024. 10:58:31 10:58:34

She also confirmed that other than whatever communications her lawyer -- excuse me, whatever communications Vanzan's lawyers had had with Quinn Emanuel about the service of the subpoena in connection with the state court litigation, she confirmed that Vanzan did not have any communications with Jones or Jonesworks at all. 10:58:37 10:58:44 10:58:47 10:58:49 10:58:51 10:58:53 10:58:57 10:58:59 10:59:02 10:59:03 10:59:06

Q. You testified that Ms. Lively told you that she authorized Vanzan to file the state court lawsuit; right? 10:59:09 10:59:14 10:59:17

A. On behalf of Vanzan, that's correct. 10:59:19 10:59:20

Q. Did you ask Ms. Lively why she didn't commence that suit in her own name? 10:59:20 10:59:23 10:59:25

MS. O'DONNELL: Objection. 10:59:26

You can answer. 10:59:28

THE WITNESS: I did not ask that question. 10:59:29 10:59:31

CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the State of New York, do hereby certify:

That the testimony in the within proceeding was held before me at the aforesaid time and place;

That said witness was duly sworn before the commencement of the testimony, and that the testimony was taken stenographically by me, then transcribed under my supervision, and that the within transcript is a true record of the testimony of said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, that I am not interested directly or indirectly in the matter in controversy, nor am I in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 1st day of October, 2025.

VERITEXT REPORTING COMPANY

(516) 608-2400 (212) 267-6868

# EXHIBIT 10

**From:** efile@nycourts.gov
**To:** Gonzalez, Hector; Katze, Samantha; Muse, Shonda
**Subject:** NYSCEF Notification: New York - Commercial - Contract - <NOTICE OF DISCONTINUANCE (PRE RJI)> 655130/2024 (VANZAN, INC. v. DOES 1-10, inclusive)
**Date:** Thursday, December 19, 2024 7:33:20 AM

[EXTERNAL] Please do not reply, click links, or open attachments unless you recognize the source of this message and know the content is safe.

# New York County Supreme Court
## Notification of Filing
## 12/19/2024

The NYSCEF System has received the documents listed below from filing user SAMANTHA J KATZE . Please keep this notice as a confirmation of this filing.

### Case Information

Index #: **655130/2024**
Caption: **VANZAN, INC. v. DOES 1-10, inclusive**
eFiling Status: **Partial Participation Recorded**
Assigned Case Judge: **No Judge Assigned**

### Documents Received

| Doc # | Document | Received Date |
|---|---|---|
| 2 | NOTICE OF DISCONTINUANCE (PRE RJI) | 12/19/2024 |

### E-mail Service Notifications Sent

| Name | Email Address |
|---|---|
| SAMANTHA J KATZE | skatze@manatt.com |

### E-mail Service Notifications NOT Sent

Court rules require hard copy service upon non-participating parties and attorneys who have opted-out or declined consent

| Party | Attorney |
|---|---|
| DOES 1-10, inclusive, Defendant/Respondent | No Representation Recorded |

### Filing User

**SAMANTHA J KATZE** | skatze@manatt.com | 212-790-4500 | 7 Times Square, New York, NY 10036

**Emergency Applications**
For Emergency Applications made after 5 p.m. or on days when the court is closed, please call 800-430-8457 or email emergency@nycourts.gov.

***NOTICE: This e-mail is intended only for the named recipient and for the purposes of the New York State Courts E-Filing System. If you are neither the intended recipient nor a person designated to receive messages on behalf of the intended recipient, notify the sender immediately.***

***If you are unsure of the contents or origin of this email, it is advised to NOT click on any links provided. Instead, log into your NYSCEF account to access the documents referred to in this email. Thank you.***

**Hon. Milton A. Tingling, New York County Clerk and Clerk of the Supreme Court**
**Phone:** 646-386-5956
**Website:** http://www.nycourts.gov/courts/1jd/supctmanh/county_clerk_operations.shtml

# EXHIBIT 11

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| VANZAN, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>DOES 1-10, inclusive,<br><br>Defendants. | Index No. 655130/2024<br><br>**SUBPOENA DUCES TECUM** |

TO: Stephanie Jones
Jonesworks, LLC
c/o Quinn, Emanuel, Urquhart & Sullivan LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

YOU ARE HEREBY COMMANDED, all business and excuses being laid aside, to produce at the law offices of Manatt, Phelps & Phillips, LLP, 7 Times Square, New York, New York 10036, by October 21, 2024, true and complete copies of the documents requested on Schedule "C" annexed hereto, which you have in your possession, custody or control. The documents sought by Vanzan, Inc. are material and necessary to the above-captioned action (the "Action") because they relate to issues and matters to be tried in the Action. Failure to comply with this subpoena is punishable as a contempt of court.

Dated: New York, New York
October 1, 2024

MANATT, PHELPS & PHILLIPS, LLP

By: ______________________
Samantha J. Katze
7 Times Square
New York, New York 10036
Tel.: (212) 790-4500
Fax: (212) 790-4545
*Attorneys for Plaintiff Vanzan, Inc.*

## SCHEDULE "A"

## DEFINITIONS

1. The term "document(s)" is used in the broadest sense and includes all written, typed, printed, electronic, recorded or graphic statements, communications or other matter, in any medium, however produced or reproduced, both original and copies, and all attachments and appendices thereto, in Your possession, custody or control from a cellular telephone, including but not limited to matter in the form of documents, communications, text and instant messages, emails and attachments, chats and chat logs from various third-party applications (including, but not limited to, Gmail, Outlook, Signal, WhatsApp, Telegram, Instagram, TikTok, and Facebook), notes, items, files, photos, video/sound recordings, browser history, location data, and/or other records.

2. The terms "and" and "or" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of each request all responses that might otherwise be construed as outside their scope.

3. The term "any" includes the word "all" and the term "all" includes the word "any."

4. The term "concerning" (and any variant thereof) shall mean relating to, referring to, reflecting, describing, evidencing, constituting, alluding to, responding to, pertaining to, connected with, commenting on or in respect of, analyzing, touching upon, being, regarding, supporting, refuting, arising out of, and/or in connection with, and shall be construed in the broadest sense of the word.

5. The term "communication" shall mean the transmittal or receipt of information by any means, including, without limitation, interviews, face-to-face conversations and meetings,

telephonic conversations and meetings, writings, letters, notes, documents given or received, facsimile transmissions, electronic mail (email), electronic bulletin boards, instant messages, text messages, video/sound recordings, photos, screenshots, voicemail messages, iMessages, chats and chat logs from various third-party applications (including, but not limited to, Gmail, Outlook, Signal, SnapChat, WhatsApp, Telegram, Instagram, TikTok, YouTube, Reddit and Facebook), or any other electronic means of transmitting information.

6. The singular includes the plural, and vice versa, and reference to any gender includes the other gender.

7. The past tense shall include the present tense, and vice versa.

8. The term "You" or "Your" shall refer to Jonesworks, LLC and any of Jonesworks, LLC's past or present employees, representatives, or agents, including but not limited to, Stephanie Jones, individually or collectively.

9. The term "Lively" shall refer to Blake Lively, and any of her past or present employees, representatives, or agents, individually or collectively.

10. The term "Reynolds" shall refer to Ryan Reynolds, and any of his past or present employee, representatives, or agents, individually or collectively.

11. The term "Lively/Reynolds Companies" shall refer to any of Lively and/or Reynolds' affiliated or related companies, including but not limited to Betty Buzz, LLC, Family Hive LLC dba Blake Brown Beauty, Aviation Gin LLC, Mint Mobile LLC, and Maximum Effort Productions LLC, and their respective employees, representatives or agents, individually or collectively.

12. The "Film" shall refer to the film *It Ends With Us*, released on August 2024, starring Blake Lively and Justin Baldoni.

## SCHEDULE "B"

## INSTRUCTIONS

1. The Subpoena concerns, refers, relates and applies to any and all electronic records, data, documents, and communications in Your possession, custody or control collected from a cellular telephone containing the requested information.

2. Each individual request for documents herein shall be construed independently and without reference to any other request for document production for the purpose of limitation, unless otherwise specified in an individual request.

3. You are obligated to conduct a reasonable investigation in order to locate and produce any documents sought by this Subpoena. Thereafter, if any of the documents cannot be located in full, produce the portion of those documents that can be located, specifying the reasons for the inability to produce the remainder and with detailed explanations of all efforts made to locate and produced the requested documents.

4. If any documents within the scope of this Subpoena have been destroyed, lost, transferred to others or otherwise disposed of, You are requested to provide a list of the following information for each of the affected documents: (i) a description of the document and its contents; (ii) the number of pages; (iii) whether the document contained attachments or appendices and a description thereof; (iv) the date the document was prepared; (v) the date the document was destroyed, lost, transferred to others or otherwise disposed of; (vi) the recipient and location of all copies of the document; (vii) the names, employment positions and addresses of the author and/or preparer of the document as well as any recipients of the document; and (viii) a description in detail of all efforts made to find, recover, or produce the requested document.

5. This Subpoena is a continuing one. If, after producing documents, You obtain or become aware of any further documents responsive to this Subpoena, You are required to produce such additional documents.

6. To the extent that You consider any of these requests for documents to be objectionable, produce documents responsive to the portion of a given request to which there is no objection. Separately identify the portion of the request thereof to which You lodge an objection and state the specific grounds on which You object.

7. If any document covered by this Subpoena is withheld by reason of a claim of privilege, a written notice pursuant to CPLR 3122 is to be furnished at the time that documents are produced identifying each document for which the privilege is claimed specifically by its nature (e.g., letter, memorandum etc.) together with the following information: (a) the date of the document; (b) the names of its author(s) or preparer(s); (c) the names of each person who was sent or furnished with the document or received, viewed or has had custody of the document; (d) the general subject matter of the document; (e) a statement of the legal ground for the claim of privilege; (f) the length of the document; and (g) the individual document request(s) to which the document relates. In the event the parties agree to the use of a categorical approach to privilege logs in this action, such privilege log shall be provided in compliance with Section 202.20-a of the Uniform Civil Rules for the Supreme Court and the County Court and/or any agreement between the parties.

8. If refusal to comply with a document request is stated on the grounds of such production being burdensome, identify the efforts needed to search for and produce the documents, the location and present custodian of such documents, and the estimated number of hours and cost required to conduct a search for and produce the aforesaid documents.

9. If You encounter any ambiguity in construing any of the document requests, or a definition or construction relevant to a document request, You shall make Your best effort to interpret the request, definition or instruction within the context of this litigation. Along with the production, set forth the matter deemed ambiguous and the construction or interpretation You have used in responding.

10. Pursuant to CPLR 3122(c), the documents shall be produced as they are kept in the regular course of business or organized and labeled to correspond with the request to which they are responsive.

11. Each page of a produced document shall have a legible, unique page identifier ("Bates Number") and confidentiality legend (where applicable) on the face of the image at a location that does not obliterate, conceal, or interfere with any information from the source document. Redactions should be clearly marked or stamped on the page in such a way that it is clear from review that a portion of the image has been redacted.

12. These requests shall not be construed to require You to furnish to any information, documents or records related to Your clients, other than Justin Baldoni, Jamey Heath, and Wayfarer Studios LLC unless such information, documents or records concern the matters specifically addressed herein. These requests also shall not be construed and in no way to require production of any irrelevant personal, financial, employment, or otherwise private information related to any of Your employees.

13. Unless otherwise stated in a specific request, these requests seek responsive information and documents authored, generated, disseminated, drafted, produced, reproduced or otherwise created or distributed or relating to the period from December 1, 2022 through the present.

**SCHEDULE "C"**

**DOCUMENTS REQUESTED**

1. All documents and communications concerning Lively, Reynolds, their families, and/or the Lively/Reynolds Companies.

2. All documents and communications concerning instances of actual or apparent inappropriate conduct relating to sexual harassment or retaliation in connection with the production, development, marketing, publicity, or public relations of, for or related to the Film.

3. All documents and communications concerning allegations of actual or apparent inappropriate conduct relating to sexual harassment or retaliation in connection with the production, development, marketing, publicity, or public relations of, for or related to the Film.

4. All documents and communications concerning investigations or other responses to allegations of actual or apparent inappropriate conduct relating to sexual harassment or retaliation in connection with the production, development, marketing, publicity, or public relations of, for or related to the Film.

5. All documents and communications concerning the marketing and publicity efforts or press related to the Film, related to retaliatory efforts to disparage Lively, Reynolds and/or the Lively/Reynolds Companies for any reason, including for reporting inappropriate conduct relating to sexual harassment during the production of the Film and individuals involved in such efforts, or in anticipation of public disclosure of such conduct.

6. All documents and communications concerning with respect to each of categories 1-5, retaliatory actions taken in anticipation of the Lively, Reynolds, their families, and/or the Lively/Reynolds Companies making public disclosures or bringing claims regarding actual or apparent inappropriate conduct relating to sexual harassment, in an effort to discredit,

undermine credibility or otherwise harm Lively, Reynolds, their families, or the Lively/Reynolds Companies.



CONFIDENTIAL VANZAN_000051

# EXHIBIT 12

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

VANZAN, INC.,

Plaintiff,

-against-

DOES 1-10, inclusive,

Defendants.

Index No.: 655130/2024

**NOTICE OF VOLUNTARY DISCONTINUANCE WITHOUT PREJUDICE**

**PLEASE TAKE NOTICE** that pursuant to CPLR 3217(a)(1), Plaintiff Vanzan, Inc., by its undersigned attorneys, hereby discontinues this action against Defendants DOES 1-10, inclusive, **without prejudice** and without costs. This notice may be filed with the Clerk of the Court without further notice.

Dated: New York, New York
December 19, 2024

MANATT, PHELPS & PHILLIPS, LLP

By: *__/s/ Samantha J. Katze__________*
Samantha J. Katze
7 Times Square
New York, New York 10036
Tel.: (212) 790-4500
Fax: (212) 790-4545

*Attorneys for Plaintiff Vanzan, Inc.*

# EXHIBIT 13

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - x

BLAKE LIVELY,

Plaintiff,

v.

WAYFARER STUDIOS LLC, a Delaware Limited Liability Company, JUSTIN BALDONI, an individual, JAMEY HEATH, an individual, STEVE SAROWITZ, an individual, IT ENDS WITH US MOVIE LLC, a California Limited Liability Company, MELISSA NATHAN, an individual, THE AGENCY GROUP PR LLC, a Delaware Limited Liability Company, JENNIFER ABEL, an individual, JED WALLACE, an individual, and STREET RELATIONS INC., a California Corporation

Defendants.

Civ. Action No. 1:24-cv-10049-LJL (Consolidated for pretrial purposes with 1:25-cv-00449-LJL)

Rel. 1:25-cv-00779-LJL

- - - - - - - - - - - - - - x

Videotaped Deposition of BLAKE LIVELY

New York, New York

Wednesday, July 30, 2025

10:15 A.M.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Pages: 1 - 294

Reported By: Anita M. Trombetta, RMR, CRR, California CSR No. 14647

ATTORNEY HUDSON: Objection. 19:02:35
A No, that's not what I'm saying. 19:02:36
Q Okay. I didn't think so. I just wanted to be clear. 19:02:37 19:02:39
All right. I just want to get a timeline of things. 19:02:40 19:02:48
The production started in early May of 2023, is that right, of the movie it ends with us? 19:02:49 19:02:51
A The filming itself started, I believe, yeah, in May of 2023. 19:02:56 19:02:58
Q Okay. And was that in California? 19:02:59
A No, it was in New Jersey. 19:03:04
Q Oh, I thought everything was in California. 19:03:09 19:03:10
Okay. And then there was a writers' strike that stopped it in June of '23 -- 2023, correct? 19:03:11 19:03:16 19:03:24
A Correct. 19:03:25
Q And then production resumed maybe on January 5th of 2024; is that right? 19:03:26 19:03:33
A That sounds correct. 19:03:35
Q Okay. Was that also in New Jersey or was that in California? 19:03:36 19:03:38
A That was in New Jersey. We shot a couple days in California at the end. 19:03:39 19:03:42

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, ANITA M. TROMBETTA, RMR, CRR, and Certified California Shorthand Reporter, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested [or not requested, as appropriate]; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 31st day of July, 2025.

My commission expires: 10.07.2025

_____________________________

Anita M. Trombetta, RMR, CRR

# EXHIBIT 14

**From:** It Ends With Us [redacted]
**Sent:** Wed, 14 Jun 2023 18:47:35 -0400 (EDT)
**To:** Justin Baldoni [redacted]
**Subject:** IEWU | Production Shut Down

---

Dear Crew,

It is with a heavy heart that we share this news with you today.

Due to the ongoing WGA strike and the lost days we have experienced due to picketing, we must make the difficult decision to temporarily shut down production. We want to express our deepest gratitude for your incredible patience and unwavering dedication throughout this challenging period.

Working with each and every one of you has been an absolute privilege and a source of immense joy. The film we have shot together thus far is beautiful and a testament to all of your hard work and the magic we collectively created. Also there have been many people who started this journey and who have contributed greatly to this production who are no longer on this crew list. We want to take a moment to acknowledge them, as we wouldn't have made it this far without them.

While we must pause for now, we want to assure you that this is not the end. The story we set out to tell will continue at a later date, and we will come back stronger than ever. The journey may have been temporarily disrupted, but our shared vision and commitment remain unwavering.

Until we gather again, please take care of yourselves. We will overcome this hurdle together, and the beauty we have captured on film will be shared with the world.

It will get finished. It will get released. And God willing, will change lives.

With heartfelt appreciation.

Jamey, Justin and Wayfarer Studios

**It Ends With Us**
Production Office
[redacted]

Sent from Scenechronize

# EXHIBIT 15

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF ANDREA GIANNETTI
Culver City, California
Tuesday, September 23, 2025

Stenographically Reported by: Ashley Soevyn, CALIFORNIA CSR No. 12019

BY MR. FREEDMAN:
Q Well, her role in the movie continued to grow, correct?
MS. HUDSON: Objection.
THE WITNESS: In the -- I -- I didn't notice any change.
BY MR. FREEDMAN:
Q What about editing?
A Well, that's post. You're still talking about production. If we're moving to post, it's a whole different ball game.
Q Why do you say "it's a whole different ball game" in post?
A Because it's a whole different ball game.
Q Can you explain to me what you mean by that?
A I'm saying I did not notice a -- any distinct change from Blake on the set before strike, after strike, other than she was happier and we did good work. So that felt more consistent.
Post was very not consistent.
Q Did you understand that a formal HR process had not yet occurred, as stated in the letter with the 17-point list?
MS. HUDSON: Objection.

THE WITNESS: I didn't know about any HR -- I never heard about any HR complaints.
BY MR. FREEDMAN:
Q So that's a yes?
A That's a yes.
Q Had Blake Lively made an HR complaint to Sony?
MS. HUDSON: Objection.
THE WITNESS: Not that I know of.
BY MR. FREEDMAN:
Q Do you have any reason to believe that Blake Lively had filed an HR complaint with Wayfarer?
MS. HUDSON: Objection.
THE WITNESS: No.
BY MR. FREEDMAN:
Q When it says that "The complaints of our client and others have been repeatedly conveyed and well documented throughout preproduction and photography," what did you understand that to mean?
MS. HUDSON: Objection.
THE WITNESS: That -- that she was very vocal about things that she didn't like.
BY MR. FREEDMAN:
Q I'm -- I'm referring right now to

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 25th day of September, 2025.

ASHLEY SOEVYN

CSR No. 12019

# EXHIBIT 16

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF JAMEY HEATH
Los Angeles, California
Wednesday, October 8, 2025

Stenographically Reported by: Ashley Soevyn,
CALIFORNIA CSR No. 12019

Q And when she came to the trailer for the meeting, did she say anything about what had just occurred in her makeup trailer?
A She did not. This is on day two. This is May.
Q May 16th?
A May 16.
Q Did you ever learn that Ms. Lively had a different view of the incident in the trailer prior to her testimony?
A I learned that her different view is when I read the CRD complaint.
Q So you didn't hear any concerns raised by Ms. Lively regarding this incident in the trailer on the second day of shooting until the CRD complaint?
A We had a conversation about it on June 1st, two weeks later, but not that there was a concern.
Q Okay. And when you say, "we had a conversation about it two weeks later," who are you talking about?
A There was a conversation with Blake, Justin, myself, and Alex Saks, about she had got COVID and we returned to set. And we had a morning conversation before we started working.

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 10th day of October 2025.



ASHLEY SOEVYN

CSR No. 12019

# EXHIBIT 17

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF JENNIFER ABEL
Los Angeles, California
Friday, September 26, 2025
Stenographically Reported by: Ashley Soevyn,
CALIFORNIA CSR No. 12019

at this time sitting here, but I'm happy to review and I can speak to it.

Q Do you recall Mr. Baldoni comparing that video or any other to one where he made a social media post standing in front of a private jet during a promotion of the film?

MR. FREEDMAN: Objection.

THE WITNESS: I -- so just for clarity, I don't remember the comparison between the two. But I do recall the video. They had done a deal with a jet company to, during production as they needed to get to locations quickly, and in support of the film, they were able to do a deal with them to assist them during production.

BY MR. GOTTLIEB:

Q Okay. All right.

So we talked earlier about how you started representing Mr. Baldoni and Wayfarer early on. It was before filming of It Ends with Us began, right?

A Yes.

Q And during the filming of It Ends with Us, did you ever visit the set?

A No.

Q How often did you talk to either

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 27th day of September, 2025.

ASHLEY SOEVYN
CSR No. 12019

# EXHIBIT 18

# chat65623457853754656

| | |
|---|---|
| **Thread Participants:** | [redacted] Jamey Heath; [redacted] (Owner); [redacted] Jennifer Able; [redacted] Stephanie Jones; [redacted] J B (Owner) |
| **Active Participants:** | [redacted] Jamey Heath; [redacted] (Owner); [redacted] Jennifer Able; [redacted] Stephanie Jones |
| **First Message:** | 11/10/2023 9:53:51 PM |
| **Last Message:** | 11/10/2023 10:12:03 PM |

---

**[redacted] (Owner)**
Hey - sorry for last minute text - need you both for zoom if you can shortly
11/10/2023 9:53:51 PM

**[redacted] Jamey Heath**
And it begins…. Again….
11/10/2023 9:57:12 PM

**[redacted] Jennifer Able**
Hey Steph and I can call you and loop in jamey
11/10/2023 10:01:08 PM

**[redacted] Stephanie Jones**
I can't zoom but can do Conf call. Pls dont use zoom for any confidential conversations as there are lots of breaches there with program.
11/10/2023 10:01:17 PM

**[redacted] Owner)**
Oh wow I didn't know that
11/10/2023 10:01:40 PM

[redacted] Stephanie Jones



11/10/2023 10:07:18 PM

[redacted] Jamey Heath
If I text you something now. Will it only go to you and not any assistants?
11/10/2023 10:10:22 PM

[redacted] Jennifer Able
Text me and Steph directly don't email the Alias that has full team
11/10/2023 10:11:10 PM

[redacted] Jamey Heath

Dear Imene and Joseph,

With the tentative resolution of the SAG-AFTRA strike, we are writing to address how to handle a return to the set of "It Ends With Us" (the "Film"). It is no surprise to the Film's producers that the experience of shooting the Film has been deeply concerning on many levels. The complaints of our client and others have been repeatedly conveyed and well-documented throughout pre-production and photography.

While we reserve all legal rights, at this stage our client is willing to forego a more formal HR process in favor of everyone returning to work and finishing the Film as long as the set is safe moving forward. In order for our client to feel safe returning to the production, we are attaching a list of protections that will need to be guaranteed and observed by the Film's producers. If the production is unwilling to accept or uphold these protections, our client is prepared to pursue her full legal rights and remedies.

This letter is not intended to constitute a full statement of all facts and circumstances relating to this matter. It is not intended to be, nor should it be construed as, a waiver, release or relinquishment of any of our client's rights or remedies, legal or equitable, all of which are hereby expressly reserved.

Sincerely,

Lindsey

11/10/2023 10:11:27 PM

[redacted] Jamey Heath

<__Library_SMS_Attach_1_bf_15_at_0_1_1_FILE_8_1.docx>

11/10/2023 10:12:03 PM

# EXHIBIT 19

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.,

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.,
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.,
Consolidated Defendants.

---

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF JAMEY HEATH
Los Angeles, California
Thursday, October 9, 2025

Stenographically Reported by: Ashley Soevyn,
CALIFORNIA CSR No. 12019

whether the conversations referenced only incidents that happened within some ten-day or short period of time --

A Okay.

Q -- do you think that the fact that it kept being brought up over and over and over, at least on June 1st in the November 17-point letter and in the January 2024 meeting, was an indication that, perhaps, at least from Blake's perspective, whatever had happened before was not, in fact, resolved?

MS. SHAPIRO: Objection.

THE WITNESS: Again, I think there wasn't multiple, multiple ones. June 1st was the first conversation. There was the first conversation with Blake, right? Some thoughts had been shared. We had a conversation on June 1st. No other conversations about it. You're referencing the November 9th letter as if that's a conversation. But it was clear. I'm not trying to hide away from the language.

In lieu of an HR complaint, we know that there's a lot of things that happened on set. That involved a lot. There was a lot. We had a lot of strikes. We had COVID. We had issues, production,

that had nothing to do with you and me bumping heads. But to say it and characterize that as it's coming up again, it was like, here's the protections that I need to make sure that I feel safe, as she put it, moving forward.

It wasn't bringing back up the June 1st stuff, the conversation. It was like, here's what I need moving forward. Here's some guidelines. We'd give this to anybody, but it wasn't a conversation about it. We did not think it was kept being brought up and brought up. This is, contracts happen all the time of what they need to go on set. Here was one.

The January 4th is what I would consider the second conversation, no matter how you want to frame the other. And that meeting, with a Sony representative, the new Sony producer, myself, Justin, Alex Saks, our other producer, no one felt that this was a -- a nod to then, what do you do next? She got -- she wanted to express it. She said, just want to clear the air, after we talked about it, then we talked about production. See you guys tomorrow.

There was no indication that we were supposed to take another step. We thought the step

was done. We talked about it. She got it off her -- even though we disagreed. I still contend to this day that most of what she is saying, either all of it -- either it's twisted or fabricated.

She says I talked about my genitals. I still haven't had -- heard anybody ask me. She said I had a porn addiction in her complaint. No one has asked me where that came from as it pertains to me. But we talked about it.

And our belief -- I don't know if lawyers like it if I say this or not, whether we were right or wrong, our belief at the time was that it was handled, it was discussed, and then we moved on. I'm sorry.

BY MS. SHAH:

Q Don't be sorry.

THE WITNESS: Can we take a break?

MS. SHAH: Yes, absolutely. Why don't we take the lunch break?

MS. SHAPIRO: Forty-five minutes?

MS. SHAH: We can go off the record. Forty minutes?

MS. SHAPIRO: Forty minutes is fine.

THE VIDEOGRAPHER: We are going off the record. The time is 12:50 p.m.

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 10th day of October 2025.

______________________________

ASHLEY SOEVYN
CSR No. 12019

# EXHIBIT 20

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF ANDREA GIANNETTI
Culver City, California
Tuesday, September 23, 2025

Stenographically Reported by: Ashley Soevyn,
CALIFORNIA CSR No. 12019

MR. FREEDMAN: Objection.
THE WITNESS: Yeah, I mean -- yeah, it says here there will be one, but I did not -- I didn't remember that we had to have it, and I didn't know that it was scheduled at the end --
BY MS. HUDSON:
Q When did production start?
A January 5th.
Q Okay. And when was the meeting?
A January 4th.
Q Okay. And at the January 4th meeting...
MS. HUDSON: I'm going to hand you another document.
THE WITNESS: Okay.
THE STENOGRAPHIC REPORTER: Exhibit 20 for the record.
(Exhibit 20 marked for identification.)
MS. HUDSON: Okay.
MR. FREEDMAN: Time check?
THE VIDEOGRAPHER: Three hours, thirteen minutes.
THE WITNESS: Thank you.
BY MS. HUDSON:
Q Ms. Giannetti, this is Ms. Lively's

MS. HUDSON: Objection.
THE WITNESS: I don't know.
BY MR. FREEDMAN:
Q Do you know who David Weber is?
A Yes.
Q Did anyone at Sony discuss this document with anyone at Wayfarer?
MS. HUDSON: Objection.
THE WITNESS: I believe Michael Marshall discussed it with Wayfarer.
MR. FREEDMAN: Okay. Take a short break.
THE WITNESS: Yeah.
THE VIDEOGRAPHER: The time is 6:48 p.m. Off record.
(Recess.)
THE VIDEOGRAPHER: The time is 7:08 p.m. We're back on record.
BY MR. FREEDMAN:
Q Good evening now.
A Good evening.
Q Were you invited to attend a meeting on January 4, 2024 at Blake's apartment?
A I believe I asked for that meeting.
Q You asked for that meeting?
Was that supposed to be the

return-to-work production meeting?
A I thought it was a script meeting.
Q Did anyone tell you before what you were walking into?
MS. HUDSON: Objection.
THE WITNESS: No. But Blake did say, when we confirmed time and the place, that she -- you know, she wanted to do a clearing of the air at the beginning. And I was like, great.
BY MR. FREEDMAN:
Q Were you surprised by what you heard at the meeting?
A Very.
Q What surprised you about it?
A Many things surprised me. I was surprised at the beginning that Ryan was joining the meeting because I thought we were going to be talking about the script and the schedule.
And then they asked for the line producer to leave because we had had the -- was it the line producer or the -- I don't know. We had someone technical from the set to leave. Which was fine.
And then -- and then she proceeded to read a list of things. It -- it was a pretty shocking list.

Q Why was it shocking?
A I had not heard the majority of the things on the list. And I -- I didn't know that -- I just -- I wasn't prepared for that was the kind of meeting we were having.
Q And isn't it true that you heard things that were prefaced with "no more this" or "no more that"?
A I think so. Yes.
Q And did that surprise you also?
MS. HUDSON: Objection.
THE WITNESS: That specifically, I don't remember focusing on. The -- the content, to me, was more surprising.
BY MR. FREEDMAN:
Q And was anybody addressing Justin directly?
A Yeah. I mean, it was to the room, but yeah, I think it was mostly to Justin.
Q Was Ryan Reynolds yelling at Justin?
A It was a very long meeting. And there were times, yes, his voice was raised.
Q Did you feel bad for Justin?
MS. HUDSON: Objection.
THE WITNESS: Yes.

BY MR. FREEDMAN:
Q Why?
A I -- I think it went over five hours. And he -- he was visibly frozen.
Q Who was invited to the meeting?
A Myself, Justin, Jamey, Alex Saks, Todd Black, and I think it was the first AD or the line -- I can't -- I can't remember.
Q Did Todd Black talk to you about his reaction to the meeting?
A At length.
Q Did he tell you it was the -- one of the harshest meetings he had ever been to in his entire career?
A He did.
Q What did he say about that?
A It was -- it was the fact that we were not prepared for such that -- that we thought something else was going to occur and the length of the meeting. And that there -- there was -- I -- I don't even think there was a break. It just -- we never experienced -- just never experienced that.
Q Had you ever experienced that in your illustrious career?
MS. HUDSON: Objection.

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 25th day of September, 2025.

ASHLEY SOEVYN

CSR No. 12019

# EXHIBIT 21

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF JAMEY HEATH
Los Angeles, California
Wednesday, October 8, 2025

Stenographically Reported by: Ashley Soevyn, CALIFORNIA CSR No. 12019

there.

Q And you've given me a full scope of your memory about what was discussed in that five or six hours?

MS. SHAPIRO: Objection.

THE WITNESS: No, a lot of it was Ryan belittling Justin.

BY MS. HUDSON:

Q For five or six hours?

A A lot of it was.

Q And when you say "belittling," what do you mean by that?

A When this first -- when she first started reading a couple of her things and Justin was hearing this, taking this in, and trying to make sense of it, he was frozen by hearing this stuff. And instead of -- well, let me not say instead of -- and his reaction was -- was that he was being a coward. That what you do when a woman says this to you and points out these things, you just stand up and you just apologize and apologize. And Justin was just like, but I didn't do this. And then he raised his voice and used some language and insinuated that he was not a good guy.

Q That Mr. Baldoni was not a good guy?

A Yeah.
Q Yeah.
A And he -- and he did it very aggressively. He did it to me as well. More at him. It was -- it may have been the hardest thing I have ever witnessed someone talking to another person with such belittlement.
Q So after that meeting, did you have an understanding that there were things that were happening in connection with filming this movie that Ms. Lively was uncomfortable with?
MS. SHAPIRO: Objection.
THE WITNESS: I understood that she had shared some things that did not make sense, and I believe were fabricated.
BY MS. HUDSON:
Q You believe were fabricated?
A Not all of them.
Q Uh-huh.
A Either distorted --
Q Uh-huh.
A -- or fabricated.
Q Now, did you think it would be a good idea to conduct an investigation at that point?
MS. SHAPIRO: Objection.

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 10th day of October 2025.



ASHLEY SOEVYN
CSR No. 12019

# EXHIBIT 22

## Prayers and support

**Thread Participants:** [redacted] Ahmed Musiol (Owner); [redacted] Jamey Heath; [redacted] Cyrus Sigari; [redacted] Justin Baldoni; [redacted] Travis VanWinkle; [redacted] Andy Grammer; [redacted] Rainn Wilson; [redacted] Adam Mondschein; [redacted] Ahmed Musiol (Owner); [redacted]

**Active Participants:** [redacted] + [redacted] Justin Baldoni; [redacted] Travis VanWinkle; [redacted] Rainn Wilson; [redacted]

**First Message:** 1/5/2024 6:20:11 PM

**Last Message:** 1/5/2024 11:16:14 PM

---

[redacted] **Rainn Wilson**

Any update Brothers? 🤞♡

1/5/2024 6:20:11 PM

[redacted] **Justin Baldoni**

Sorry for not giving an update. Last night was one of the hardest nights of my life. It's hard to describe what happened exactly. The only way to describe it was an ambush. I had no words I couldn't formulate sentences. My brain was trying to defend itself when they were needing me to apologize for all of the ways I have fucked up and made her feel unsafe. Ryan was talking to me like a five-year-old and scolding me, They essentially said that Jamey and I are not who we claimed to be and that for us to have a podcast is unsafe because it makes people feel like we are safe. I was read from a phone all of the things that I did while many of them were based in actual situations. The events were wrong and things were taken completely out of context. The word creepy and abuse were used in reference to me in my behavior I was then given the words of what to say, and had to apologize which I was unable to do because my brain was trying to comprehend what was happening. I was in shock and basically went into feeling like I was a seven-year-old again when I got home last night. I was emotionally paralyzed. It was as bad as it sounds. Jamey did a beautiful job apologizing I did not have the words. I was embarrassed for myself as it happened in front of the team, but I was embarrassed that I was unable to even formulate the correct words to apologize and honestly just feel like a bad person. it's hard to feel so much of what they believe about me is false because they are so convinced that it's real. Looking for the nuggets of learning which there are many and somehow have showed up today. Thanks to Jamey and my wife and we are currently shooting. I love you all.

1/5/2024 6:35:25 PM

[redacted] Justin Baldoni
My brain was struggling because what I wanted to say, and do was run and blow this whole movie up because I feel this was so unjust and yet the only path forward was to acknowledge her and Ryan's feelings and apologize and take the wrath of an angry husband- yeah, I couldn't even do that correctly. I prayed and prayed and prayed for the words and I didn't come so I felt abandoned by God in that moment even though I know that's not what happened.
We were told this was the worst experience of her life and others have witnessed this behavior, and the behavior on our set was creepy. I was emotionally paralyzed, which is something I have an experienced in years.
@rainn- imagine that meeting all those years ago at Soul Pancake with golriz but times that by about 100.
I spoke to my therapist for an hour, and she tried to get me out of the haze as I literally could not get myself off the couch. I don't know how I will make it through, but I know that I will, and just knowing you're all there from me means the world to me because even with Jamey here and my wife and family I've never felt so alone.
Putting a smile on doing my best to lead the crew. I will unpack and process this when we wrap of course . I-apologize for the vulnerability dump. This is one of the few safe spaces I have right now. I love you all and thank you for your prayers.
1/5/2024 6:45:04 PM

[redacted] Justin Baldoni
Sorry for my dictation grammer . I'm in between shots.
1/5/2024 6:45:18 PM

[redacted]
Justin you were ambushed. You reacted the only way you could. Hold on to your beliefs and keep moving forward. God is all glorious and is with you. Our prayers for strength and protection continue. We are with you in spirit and love you with all our hearts.
1/5/2024 6:53:18 PM

[redacted] Rainn Wilson
Oh my God. I can't believe it. You were set up and ambushed and personally attacked. I'm stunned. I completely relate to you being stunned, like a deer in the headlights. Probably better that you didn't immediately Just start apologizing. So grateful that Jamey is your partner, and could step in diplomatically as needed. Onwards brother. Make a great and important and entertaining piece of storytelling. That's all you can do now. So sorry for what you went thru. 💔
1/5/2024 7:04:11 PM

[redacted]
I love you all and will keep praying for you! Congrats on getting them back to film even though you feel like you have been through a war. God answers all of our prayers just not in ways that are obvious at the time. You have many friends who love you and you are connected to your soul.
1/5/2024 7:16:33 PM

[redacted] **Travis VanWinkle**
Love you two so much. You're both frickin' warriors.
1/5/2024 11:16:14 PM

# EXHIBIT 23

## Short Message Report

| | |
|---|---|
| Conversations: 1 | Participants: 2 |
| Total Messages: 20 | Date Range: 1/14/2024 |

### Outline of Conversations

**BL-FullMessages-0462149** • 20 messages on 1/14/2024 • Jenny Slate <[redacted]> • ?B? [redacted]

**Messages in chronological order** (times are shown in GMT -05:00)

**BL-FullMessages-0462149**

# Redacted - Non-Responsive

# ?B? [redacted] ◄ 1/14/2024, 11:22 AM
Excited to have you back. I think you'll enjoy it this time. And you don't need to hug anyone is the best part

JS Jenny Slate [redacted] ► 1/14/2024, 11:22 AM
How WONDERFUL!

# ?B? [redacted] ◄ 1/14/2024, 11:22 AM
And he won't touch you

# ?B? [redacted] ◄ 1/14/2024, 11:22 AM
Or shouldn't.

# ?B? [redacted] ◄ 1/14/2024, 11:22 AM
I don't think he or Jamey will

JS Jenny Slate [redacted] ► 1/14/2024, 11:22 AM
did more discussion happen in these months off?

# ?B? [redacted] ◄ 1/14/2024, 11:22 AM
My god.

JS Jenny Slate [redacted] ► 1/14/2024, 11:22 AM
And how have YOU felt?

# ?B? [redacted] ◄ 1/14/2024, 11:22 AM
So much to fill you in on

# ?B? [redacted] ◄ 1/14/2024, 11:23 AM
Solid. It's a professional set and we're getting good work

JS Jenny Slate [redacted] ► 1/14/2024, 11:23 AM
I'm so so glad!!!!!!

JS Jenny Slate [redacted] ► 1/14/2024, 11:24 AM
I am so curious to hear anything you've got to share

JS Jenny Slate [redacted] ► 1/14/2024, 11:26 AM

Attached URL: https://p25-content.icloud.com/M92DB1BFB07ACEF08C150E0CCE974F9696A86BFC54C8F69E7B859B4491D175F34.C01USN00
Attachment Title: 72694238502__695AC9AF-A5B7-4219-B9C8-42A8F1473477.heic

Redacted - Non-Responsive

# EXHIBIT 24

Message

**From:** B [redacted]
**Sent:** 6/25/2024 3:11:30 AM
**To:** [redacted]
**CC:** [redacted]
**Subject:** Blake Lively PGA - IT ENDS WITH US - Time Sensitive, Please

Dear Producers Guild of America,

I'm writing you with meaningful urgency and also, respect. I'm sorry, but I'm asking for your attention to this in a crunched time period. I'm positive you have matters much more significant than this, but I bare my heart to you asking for you to take a look at my note, as this film, and my work in it *off camera* means more to me than anything I've done in my 20 year career.

There's been a recent update/change with regard to my official role in the upcoming film, IT ENDS WITH US, releasing AUGUST 9th. Just a few days ago, I was *officially granted* the title of *Producer*, after a year and a half of asking, and working tirelessly to prove the validity of that title. I've produced every moment of this film, from pre production, through production, into post, and now into marketing and worldwide release. I'm grateful that the contract has now been revised to reflect the immense work that I put in.

I'm writing to ask for the great honor of receiving the PGA tag. I don't take that lightly. In our household, that's the highest honor in film, so I understand the gravity of the ask. I also understand the absurdity of asking this late. Without the official title of Producer, my hands were tied, I couldn't apply when I wanted to. No crew could tick me in the box of "producers who should receive the tag" when polled. I'm pleading now because I'm confident with all my soul that if you saw what I did on this film, you would agree that this mark is, without question, deserved. I'll lay out how we got here below, because I appreciate that this isn't the way the process usually works.

You granted the PGA tag to two producers, Alex Saks and Jamey Heath, on April 18. I'm in full support of their tags. My understanding is that they both are in support of mine. I have a note from Alex below attached below, along with 16 other department heads, and Jamey, if asked, I'm sure would confirm the work I did.

So much has changed since they filed for their tag. The most significant being that the cut of the film that was selected to be released, is my cut. Which I'll lay out in more detail later. But I imagine you appreciate the gravity of that advancement alone since April 18.

As to not get too bogged down in more of the "why now?" details, I'll focus on the facts of the work I did in each stage of production, bulleted out below. I apologize for how dense it is, but it's important to me to lay out all I've done when asking for such a significant consideration from you all at the PGA.

I'm changing the font to make the read as easy as possible:

**<u>Development/Pre-Production</u>**

-I lead the location shift from Boston to New Jersey and helped to solve all cost and schedule logistics associated
-I personally called and/or wrote emails to crew and put forth names for dept head roles. Including Hair, Makeup, Director of Photography, Costume Design, Transportation, Security, Camera Operators, etc…
-I identified and onboarded freelance team members for the cast members (not just myself) to help achieve the goals for the screen including a fitness trainer, nutritionist, meal prep service, spray tanner, wig maker, hair colorist, etc…
-I reviewed and reshaped the creative of the production design for all key locations for all characters, also made changes to use existing elements of locations to save cost
-I called in favors with home design contacts to get items loaned, discounted or gifted to save production design costs
-I reviewed and reshaped the creative of the costume design for all characters
-I called in favors with fashion contacts to get items loaned, discounted or gifted to save costume design costs
-I reviewed and reshaped the creative of the prop and floral design for the key film element of the film (the protagonist is a florist)
-I did outreach to florists all over instagram and beyond, helping with the marketing activation to feature a florist in the film, and connected the best names with production
-I went through hundreds of casting tapes to help find the rest of the cast, including our stars Atlas, Young Lily, Young Atlas and Jenny Bloom.
-I rewrote the script to improve the role of Jenny Bloom after 3 actresses turned it down.

-I personally identified and put forth Amy Morton to play Jenny Bloom after the rewrite of Jenny Bloom was implemented. Amy accepted our offer.
-I worked along side my agents, as well as other talent agencies to put forth names for Atlas, sending links to their work, and in many cases, reaching out to their teams directly to get interest and availability.
-I screen tested with all options for Atlas. When we struck out with those actors, we offered the role to our original choice, Brandon Skelnar, who then turned it down, so I had my team get involved in convincing him to do it. I wrote him a personal letter as well. He accepted the role.
-I gave the director references for the characters, dialogue and visuals
-I zoomed with every cast member to get their notes and ideas
-I then did significant rewrites of the script to incorporate all the notes of the cast, studio, distributor, author, director, and myself since our writer was not available at that time because she was on another job
-I also addressed scheduling, financial, location, weather and/or other logistical constraints in that rewrite
-I pushed the studio, distributor, and director to change the rating of the film from an R rating to a PG 13 because there was a significantly bigger market opportunity with PG-13 which the book captured. I argued that in order the replicate the book's success in the screen adaptation, we needed to serve the same age range of audience. The issue was the studio already had a deal in place with the distributor to deliver an R-Rated film. I had multiple conversations with all parties, helping to convince everyone of the shared bigger opportunity for all, resulting in everyone agreeing to make the film PG-13, which is where it stands today

**<u>Production</u>**

-I constantly broke schedule and budget. In pre production, and then daily, and often *hourly* during production
-I unfortunately was responsible for the firing of our 1st AD, Julie, as we were not making our days for the first many weeks and I had the twenty years of experience to see that the days were not boarded well enough from the get go, and her experience was not appropriate for the film we were making
-I flagged security risks and pushed to execute getting the entire crew Crew Badges. I'd never been on a set without them, yet they were not put in place for this production. We were having breaches where fans were filming our monitors and uploading the scenes to TikTok because no one knew who was crew and who wasn't. Badges were in places days later.
-I flagged and had the production name changed to an alias as is standard in my experience. This changed all signs for locations, call sheets, transportation, etc, as the film's true title was all over every sign, identifier and correspondence. As a result of using the actual title, we were being flooded with unwanted security breaches, paparazzi, large crowds, and leaks.
-I helped to block the staging of every scene for shooting efficiency, oftentimes asking to block the night before so the crew could pre-light without wasting the time of pulling the cast from hair and makeup to rehearse.
-When we came back after the strikes, I was writing as we were shooting to meet real time hurdles and demands with regard to schedule, budget and creative needs.
-I reviewed and instated covid protocols when we had an outbreak and lost many key crew members.
-I managed the politics and HR concerns on a daily basis, acting as an intermediary to keep crew and cast engaged, safe, and on board.
-I shot listed with the director, DP, and 1st AD. Not usually all at once, just when it was asked of me. On round two of the film (we shot half of the film before the strikes and half after) I would speak to our 1st AD Chris Surgent every night for nearly an hour on my drive home and once I arrived home to assess and rework our schedule to help make our days, which we were struggling to make
-I was able to omit 3+ days of shooting via rethinking the schedule, changeovers, locations, stunts, weather and adapting the script to accommodate
-I was the director's partner in all creative and logistical concerns, helping to execute the best outcome for the film. I would push back when needed. I would support when needed. The film is and *was* always my top priority.
-I watched the monitor between every take, to be sure everything that ended up on screen, from every department, was best servicing the film, and lead the changes needed to get there when applicable
-when issues arose, I led the hiring of a freelance producer to help balance the set, the incredible Todd Black.
-I led hiring a new intimacy coordinator and intimacy doubles to help block out the sensitive scenes for both safety and shooting efficiency.
-I helped to manage the logistics and protections of a closed set. And when there were oversights, I stopped production to make sure the set was safe and complying with all players nudity riders and contracts.
-I made sure cast members had mini green rooms on set when I noticed the time we lost to cast leaving to go back to their more distant green rooms
-I called and led meetings with all department heads, the studio and the distributor when we had extenuating circumstances challenging our production plan, including the wildfires, as well as picketers from the Writer's Strike. I acted as a liaison between cast and their reps in finding solutions to finishing the film. And I also acted as an intermediary between the other

actors, their reps and also crew members who were coming to me for guidance and help because they were concerned about being replaced with people who would cross the WGA picket line. I absolved them of their concerns of being replaced by standing in support of the WGA myself and not crossing a picket line myself.

**Post**

-I have spent at minimum 10 hours a day, every day since April 22 on the post of this film. My longest days have been 22 hours, and that has happened MULTIPLE times. I realize this sounds like an exaggeration, especially because, for periods of that, I was shooting another film, or raising my 4 children, but anyone on this post process will verify, this is unfortunately true. I've been sleeping on average 1.5-3 hours a night for over 2 months to get this film recut, reworked and done
-I worked with the film's original editor Oona for 10 days in NY starting April 22 to be sure the director's goals and preferences for the film were understood and honored before starting with my own editors to expand the audience and commerciality of this film. The plan was to start with my editors on May 2, but it was key to me to honor all players, so I offered the extra 10 days to handle this most responsibly and thoughtfully
-I worked with my own editors May 2, onward. Running a room of sometimes 3 editors at once as we pushed to meet the tight timing for 3 test screenings and eventually picture lock. I remain working with one of my editors Alan Baumgarten, as we finish out the final details of the film.
-I brought on a new composer, the duo Rob Simonsen and Duncan Blickenstaff, personally reaching out to Rob and convincing him to join us with very limited time, trouble shooting financial and logistical hurdles to get him on board
-I hand selected 90% of the songs in the film, and worked alongside Season Kent our music Supervisor to find the rest, or shape the ones we do have with our music editor Robby. I also work with her to this day on budget considerations and switch out songs as needed to meet our budget
- I worked with Spring the head of clearances at Sony on song budget and clearances. I've personally called and emailed many of the artists to convince them to let us use their songs, and have also negotiated with them on pricing. 4 of the biggest artists included in our film, passed on the film until I personally called them, wrote letters to them, and then finalized with their representatives
-I've worked with our sound designers and mixers for multiple test screenings, and now the final mix, sitting in the Sony Mix stage until 2am working every detail. And I remain in the thick of that work, listening into mix sessions on my custom dolby headphones made for our mix stage, as well as coming out to LA next week for the final week of mix in person
-I've worked with our music editor Robby to be sure every moment of each song is coming in and out at the exact right spots and with the right emotion. Often coordinating between him, Season our music supervisor, and our composers, Rob and Duncan
-I've been on zoom for the cast's ADR their sessions
-I've been working on the VFX, overseeing every shot that makes it into the film
-I've been working with the graphics team helping to chose and shape the fonts of the title and credits
-I've worked with legal, the studio and the distributor on credits and cards
-I appealed to Columbia Pictures to grant Isabella Ferrer the "introducing card" marking only the 6th time they've granted that title in their 100 year history
-I'm about to dive into the DI in person this week and next week alongside Stefan from Company 3 for the color timing
-I've been in touch with our DP Barry on the resizing or digital shifts in shots to be sure his vision is executed
-I've brought the author of the book that the film is based on, into the fold, involving her intimately in the edit to be sure we are best honoring the book and the audience in order to capture the success of her novel in our film,
-I pushed for 3 test screenings of the cut I was asked to execute and oversee so I could capture audience feedback and scores, as well as our creative teams opinions to shape the cut for maximum commercial success.
-I also had multiple calls with the distributor of the film and Screen Engine who ran our test screenings to evaluate the scores and integrate their feedback as well
-I would personally read all 100+ pages of every booklet and score cards to learn from the feedback of every screening
-I re-edited the film each time utilizing the learnings from the audience, the creative team, the distributor, the author, and the other producers.
-I held my own "friends and family" tests with the top filmmakers I know, asking for their input
-the cut of the film that I led was selected as the version of the film that will be released on August 9th

**Marketing/PR/Release**

-staring with the initial trailer, I called a meeting with Josh Greenstein (president of Sony) in February 2024 and the entire marketing team at Sony to lay out the angle of the campaign. There was no film for anyone to watch yet, so the trailer they made understandably didn't capture what the film would be. I walked them through the film, cited dailies and down to which take, with time codes where they could find footage to build the best trailer

-once they resubmitted the trailer, I worked with them on every frame of the creative, factoring in any social sensitivities. I worked hand in hand with Bridgette Wright on this.
-I personally secured Taylor Swift to loan her song to our trailer and marketing efforts, which helped it to be the largest debut of a film led film trailer of all time. Wild! So proud.
-I speak with marketing and PR at Sony no less that 5 times a day every day for 2 months now. I often have zooms with upwards of 10 people on their teams. I've worked in person with them, via texts, via calls, via zoom, on the ground during press. I am available and reachable to every single team member and their assistants at all hours, 7 days a week. Anyone can and will confirm
-I'm working closely with the international teams on everything from posters, commercials, book covers, and beyond by territory
-I'm working closely with the digital team on everything from the Social media pages, down to the color palette, graphics, language, copy, cadence, and even what font is used and when and how
-I'm working with the publishing side on book covers, the look, layout and usage
-I helped to design our first major pr/marketing event which was two weekends ago in Dallas. I personally begged Tom Rothman (head of Sony) to allow me show the film to 3000 fans as an early preview. I had to first finish the film with all of his and the audiences notes from our previous preview which I pulled off in time so he agreed. I went over all the talking points and scripts for the panel and helped tee up the film and the cast.
-when my costar had a scheduling conflict and had to drop out of the event, I got on the phone separately with him, his agent and his publicist to get him back on board
-I got our cast and author to help me personally introduce all 14 theaters screening the film.
- I bought patches myself on amazon to hand out to fans to match our outfits as a pr push and social media activation.
-I identified and bought on a photographer Jade Green to capture the weekend of content
-I helped build a creative content day in or downtime in Dallas, overseeing the creative of the scripts, and content used
-I reviewed and approved the influencers we collaborated with
-I personally styled my costar Isabella Ferrer because she didn't have clothes for the shoot
-When we were struggling to find an image for the poster, I went through the film to find the best still to be used for our first poster and helped identify the best layout to frame it in
-I reviewed, gave feedback and then approved the theater standee for all theaters
-I am producing two content days this week with my husband and my production company Maximum Effort to grab more PR and marketing materials with 8 cast members and two producers and the author for release
-I've had calls with the international team to help adjust the release schedule by territory and led the conversation about adding on international press stops and tour dates given the success of the response of the film and materials thus far
-I've led the conversation to get started on a China cut in an effort to be accepted for release there, and will have a zoom with the decision makers for release in China in the coming weeks
-I'm helping to oversee the sets being built for our content days and looking ahead to our junkets for ways to reuse these sets for cost effectiveness as well as to inspire maximum press and influencer engagement
-I've been on the phone with cast's representatives, producers, show runners, tour managers, spouses, travel agents, and beyond to coordinate their schedules for press, going as far as successfully begging their bosses to release them for press for our film
-I've reached out to sponsors to host screening to help absorb marketing costs, ie Chanel who will be hosting a screening the day after the premiere for us
-I've personally reached out to sponsors to help with costs for our premiere and afterparty, helping to secure a deal with the Boulud group to host our party there, etc…

And I still have months ahead of me to finish this film, in both what you see on screen, as well as how we sell it to audiences the world over. As much as this tag means to me, and it means EVERYTHING, what I'm in fight of most is the film being *as great as it can possibly be*, so ultimately that's taken all my most eloquent energy. I think you get the idea though.

As promised, I'm including below letters from our department heads, in support of my application for the PGA mark. You'll find:

**Alex Saks**: PGA approved producer
**Barry Peterson**: Director of Photography (round 1 pre strikes)
**Tobias Schliessler**: Director of Photography (round 2 post strikes)
**Chris Surgent**: 1st Assistant Director
**Eric Daman**: Costume Designer
**Robert Lugo**: Hair Dept Head
**Sarah Graalman**: Makeup Dept Head
**Andrea Ajemian**: Unit Production Manager/ Executive Producer
**Lisa Rodgers**: Post Production Supervisor
**Kami Agar**: Supervising Sound Editor

**Season Kent**: Music Supervisor
**Rob Simonsen & Duncan Blickenstaff**: Composers
**Alan Baumgarten**: Editor
**Colleen Hoover**: Author/ Executive Producer
**Ange Giannetti**: EVP Columbia Pictures
**Josh Greenstein**: President of Sony Motion Picture Group
**Todd Black**: Executive Producer

To be clear, while asking to be granted the PGA mark myself, I do believe that both Alex Saks and Jamey Heath should keep the PGA mark they received. They were both there every single day in every meeting and decision.

At this time, you will not find a letter from the director Justin Baldoni, or the other PGA producer Jamey Heath. Jamey and Justin will not be contesting my mark, they just, as of this moment, won't be writing a letter to you all like the rest of the department heads did.

I imagine if you reached out to them, they would confirm the extent of my involvement. Please don't take my word for it though, please take the rest of our department heads below, who you are more than welcome to reach out to at any time. Please do. Their contact info is included in their letters.

Finally, I thank you for reading all this. It's taken every bit of me, practically, logistically, creatively, and emotionally. So thank you for considering this. I also know and appreciate, again, this is not how this mark grant goes down.

I wish I was given the credit for my work sooner so I was able to be given a fair shot at applying the right way. I know precedent is important, and on that, my dear friend Bradley Cooper gave me a pep talk about pushing for this, citing -and he told me I could mention the to you all- that a similar situation happened to him on NIGHTMARE ALLEY. He was hired as an actor, but ended up extensively producing the film, and a month before release he was given Producer credit. He applied for a hail mary PGA mark with the support of the film's crew, was granted it. So I am hoping and praying that it's possible here as well.

As a woman in this industry for 20 years, and the mother of 3 daughters, a big reason I'm pushing to be acknowledged truthfully and accurately for the work I've done on this film is because I believe that it's an important thing in this day and age for a woman to be given credit for the work she did. It's as simple as that. I earned it 50x over again on this job. But I may not get credit for it. And that hurts, not just for me, but for all the women who are told they can't be given credit because "there are already too many female producers". We do the work anyway. We have to fight exponentially harder to be acknowledged. And each of our fight paves the way for the next female producer.

So I implore you at the Producers Guild of America to look into all the facts here. Please don't take my word for it. Please do the work. I'm sorry to ask this of you this late in the game, but as you see, I wasn't able to sooner. I promise you, you will be granting a tag to someone who gave everything of herself to this film, to earn this honor. And it's something I will cherish for life.

I hope you will join me in standing for what's right and true with regard to who has earned the PGA mark for the film, IT ENDS WITH US, while we still have time. We lock and ship picture *imminently*, so I thank you for your attention to this in such limited time.

It's in your hands now. I can sleep well knowing I did all I can do.

Thank you again for your time and consideration.

With respect and gratitude,

Blake "Lively" Reynolds