# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY,<br><br>Plaintiff,<br><br>v.<br><br>WAYFARER STUDIOS LLC, et al.,<br><br>Defendants. | Civ. Action No. 1:24-cv-10049-LJL (Consolidated for pretrial purposes with 1:25-cv-00449-LJL)<br><br>rel. 1:25-cv-00449-LJL |
| JENNIFER ABEL,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>JONESWORKS LLC,<br><br>Third-Party Defendant. | |
| WAYFARER STUDIOS LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BLAKE LIVELY, et al.,<br><br>Defendants. | |

**DECLARATION OF KRISTIN N. TAHLER IN SUPPORT OF JONESWORKS LLC'S OPPOSITION TO THE WAYFARER PARTIES' MOTION TO SEAL**

I, Kristin N. Tahler, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an attorney admitted to practice before this Court, a partner in the law firm of Quinn Emanuel Urquhart and Sullivan LLP, 865 S Figueroa St 10th Floor, Los Angeles, CA 90017, and counsel of record for Jonesworks LLC ("Jonesworks") in the above-captioned action.

2. I respectfully submit this declaration in support of Jonesworks' opposition to the Wayfarer Parties' motion to seal certain exhibits and related textual references in the summary judgment and spoliation submissions.

3. Attached as **Exhibit A** is a true and correct copy of the Wayfarer Parties' proposed redactions to Exhibit 43 to Jonesworks' Opposition to Jennifer Abel's Motion for Summary Judgment.

4. Attached as **Exhibit B** is a true and correct copy of an excerpt from the September 30, 2025 deposition of Melissa Nathan.

5. Attached as **Exhibit C** is a true and correct copy of the cross-complaint filed in *Ghost v. Wilson*, Case No. 24STCV17314 (Cal. Sup. Ct.) on September 2, 2025.

6. Attached as **Exhibit D** is a true and correct copy of a motion for discovery filed in *Ghost v. Wilson*, Case No. 24STCV17314 (Cal. Sup. Ct.) on December 5, 2025.

7. Attached as **Exhibit E** is a true and correct copy of the Wayfarer Parties' proposed redactions to Exhibit 45 to Jonesworks' Opposition to Abel's Motion for Summary Judgment.

8. Attached as **Exhibit F** is a true and correct copy of the Wayfarer Parties' proposed redactions to Exhibit 49 to Jonesworks' Opposition to Abel's Motion for Summary Judgment.

9. Attached as **Exhibit G** is a true and correct copy of the Wayfarer Parties' proposed redactions to Exhibit 76 to Jonesworks' Opposition to Abel's Motion for Summary Judgment.

10. Attached as **Exhibit H** is a true and correct copy of excerpts from the October 8

and October 9, 2025 depositions of Jamey Heath.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED: January 12, 2026
Los Angeles, California

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By : */s/ Kristin N. Tahler*

Kristin N. Tahler
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
kristintahler@quinnemanuel.com

Maaren A. Shah
Morgan L. Anastasio
295 5th Avenue
New York, New York 10016
(212) 849-7000
maarenshah@quinnemanuel.com
morgananastasio@quinnemanuel.com

Nicholas Inns (*pro hac vice*)
1300 I Street NW
Suite 900
Washington, D.C. 20005
(202) 538-8000
nicholasinns@quinnemanuel.com

*Attorneys for Jonesworks LLC*

# EXHIBIT A

# EXHIBIT 43

FILED UNDER SEAL

## Short Message Report

| | |
|---|---|
| Conversations: 1 | Participants: 4 |
| Total Messages: 63 | Date Range: 8/5/2024 - 8/6/2024 |

## Outline of Conversations

[redacted]/**System Message chatroom** • 63 messages between 8/5/2024 - 8/6/2024 • Katherine Case [redacted]) • Katie Case [redacted] • Melissa Nathan [redacted] • System Message (System Message)

**Messages in chronological order** (times are shown in GMT -04:00)

**[redacted]/System Message chatroom**

MN **Melissa Nathan** [redacted] 8/5/2024, 10:52 PM
[url:'https://p40-content.icloud.com/MD4DB9417E1E14FEC4D80CA53C53B88F7D86C0430694B14053833DF993455B479.C01USN00']

*Attachment: __Library_SMS_Attachments_82_02_C59FF66A-E56A-4ABD-8A52-BF82EB292F7A_Voice_Message_8_5_24,_9_40_PM.m4a (308 KB)*

KC **Katie Case** [redacted] 8/6/2024, 8:29 AM
Good morning! Sorry I missed your call I was asleep! Do you mind filling me in on this when you can this morning?

MN **Melissa Nathan** [redacted] 8/6/2024, 9:36 AM
[url:'https://p52-content.icloud.com/MD4DB9417E1E14FEC4D80CA53C53B88F7D86C0430694B14053833DF993455B479.C01USN00']



*Image: __Library_SMS_Attachments_9c_12_9380B0BA-95A2-4EC0-8872-E0602243CE34_IMG_1911.jpeg (424 KB)*

KC **Katie Case** [redacted] 8/6/2024, 9:37 AM
Good for you!!!

MN **Melissa Nathan** [redacted] 8/6/2024, 9:37 AM
He cannot expect us to work with stephanie I won't do it

KC **Katie Case** [redacted] 8/6/2024, 9:38 AM
It's just not possible oh my gosh wait. What if you used the business insider thing as a reason not to do it??? This really showcases how little she can be trusted, I don't want her interacting with my team. We're working to hard and I'm worried about details being leaked internationally if there's a difference of opinion. It's so important to protect reputations… or is that too much?

KC **Katie Case** [redacted] 8/6/2024, 9:39 AM
Working with Jen and Matthew is fine but she can't be trusted

MN **Melissa Nathan** [redacted] 8/6/2024, 9:39 AM
I have said that 500 times

KC **Katie Case** [redacted] 8/6/2024, 9:39 AM
True… this article needs to run he NEEDS to see it

KC **Katie Case** [redacted] 8/6/2024, 9:39 AM
Also hi! How are you?

MN **Melissa Nathan** [redacted] 8/6/2024, 9:40 AM
Is 6:30
I'm already trying to kill one [redacted] story and dealing with [redacted] loss for Bryan

MN **Melissa Nathan** [redacted] 8/6/2024, 9:40 AM
So basically, Rebel wants a one of those sites

KC **Katie Case** [redacted] 8/6/2024, 9:40 AM
I know I'm sorry 🤦

KC **Katie Case** [redacted] 8/6/2024, 9:40 AM
And ok!

MN **Melissa Nathan** [redacted] 8/6/2024, 9:40 AM
Should be a mixture of that document that I think Carolina pulled about Amanda goes or the Intern pulled
The voice note and this
[url:'https://p59-content.icloud.com/MD4DB9417E1E14FEC4D80CA53C53B88F7D86C0430694B14053833DF993455B479.C01USN00']

*Attachment: __Library_SMS_Attachments_88_08_DB9BA138-EBEE-4043-803C-A39606AB4701_Amanda Ghost website.docx (26 KB)*

KC **Katie Case** [redacted] 8/6/2024, 9:41 AM
Okdokes! I'll pull this together this morning 🙂

MN **Melissa Nathan** [redacted] 8/6/2024, 9:41 AM
Thank you
It can be really really harsh and then link it to Jed S voice thing

MN **Melissa Nathan** [redacted] 8/6/2024, 9:46 AM
I just can't deal with this sb stuff what is wrong with him?

KC **Katie Case** [redacted] 8/6/2024, 9:47 AM
Loved "Thank you
It can be really really harsh and then l…"

KC **Katie Case** [redacted] 8/6/2024, 9:47 AM
I'm not entirely sure but I will resurface my "one of her kids is his" theory because anything else does not make sense

MN **Melissa Nathan** [redacted] 8/6/2024, 9:49 AM
Yep I checked in with Jen personally while I sent her that screenshot do you want to check in with the group and just seeing how day two is going

KC **Katie Case** [redacted] 8/6/2024, 9:51 AM
Yes! So far nothing bad on JB in the press that's run from yesterday. So everyone ostensibly is playing nice

MN **Melissa Nathan** [redacted] 8/6/2024, 9:51 AM
They are, but definitely check

KC **Katie Case** [redacted] 8/6/2024, 9:51 AM
I did!

MN **Melissa Nathan** [redacted] 8/6/2024, 9:56 AM
Len- Russian oglivarchs and making her a madam basically lol said Jed

KC **Katie Case** [redacted] 8/6/2024, 9:58 AM
Oh my god lol ok this one will be fun

KC **Katie Case** [redacted] 8/6/2024, 11:03 AM
[url:'https://p53-content.icloud.com/M8B9F3E38B2E2BA3E1F58D92231706476A8EED97DB38D4D79DD1DC333DA5B6E1F.C01USN00']




*Image: __Library_SMS_Attachments_98_08_3811F878-391F-47BD-86EC-C205BDD278D3_IMG_2683.PNG (458 KB)*

KC **Katie Case** [redacted] 8/6/2024, 11:03 AM
Lol

KC **Katie Case** [redacted] 8/6/2024, 11:24 AM
I do hope this is a nice reminder of how PR should work together and not just butt their way into any possible situation by force 😂

MN **Melissa Nathan** [redacted] 8/6/2024, 11:29 AM
Sure, but I still still don't trust this woman as far as I could throw her

KC **Katie Case** [redacted] 8/6/2024, 11:29 AM
Absolutely not

KC **Katie Cas**[redacted] 8/6/2024, 11:30 AM
She's not trustworthy

MN **Melissa Nathan** [redacted] 8/6/2024, 11:30 AM
Not one bit

MN **Melissa Nathan** [redacted] 8/6/2024, 11:30 AM
She didn't answer my text that speaks volumes [url:'https://p64-content.icloud.com/MD4DB9417E1E14FEC4D80CA53C53B88F7D86C0430694B14053833DF993455B479.C01USN00']

*Attachment: __Library_SMS_Attachments_85_05_1ADA5972-443E-44BF-BC2A-E8CA552C69B6_Screenshot 2024-08-*

06 at 08.30.40.heic (69 KB)

KC **Katie Case** [redacted] 8/6/2024, 11:31 AM
That's not good… She's also be an absolute idiot to go back on leaving

KC **Katie Case** [redacted] 8/6/2024, 11:31 AM
But in that case you know where she stands

MN **Melissa Nathan** [redacted] 8/6/2024, 11:31 AM
But also, she's screenshot me some shit so you know

KC **Katie Case** [redacted] 8/6/2024, 11:32 AM
Oh I know

KC **Katie Case** ([redacted] 8/6/2024, 11:32 AM
But still

KC **Katie Case** ([redacted] 8/6/2024, 11:33 AM
I'd be the most embarrassed if I quit and then came back. But SJ might have offered her tons of money or something.

KC **Katie Case** ([redacted] 8/6/2024, 11:46 AM
Have you and Melissa Z chatted about the [redacted]? They've asked if [redacted] can do it in the [redacted] spreadsheet and am happy to check in but didn't want to if you've already discussed!

MN **Melissa Nathan** [redacted] 8/6/2024, 11:53 AM
Defo check in

KC **Katie Case** [redacted] 8/6/2024, 11:53 AM
Okdokes! Just wanted to make sure

MN **Melissa Nathan** [redacted] 8/6/2024, 1:58 PM
Migraine incoming

MN **Melissa Nathan** [redacted] 8/6/2024, 1:58 PM
I have to drive to this fucking meeting. Do you think you'll have that copy for Jed today because I need to make it really hammy?

KC **Katie Case** [redacted] 8/6/2024, 1:59 PM
Yes! I'm going to draft it in between this call I'm on currently and my next call, but should have before 3:30 PM ET 🙂

KC **Katie Case** [redacted] 8/6/2024, 1:59 PM
I'm so sorry about the migraine

MN **Melissa Nathan** [redacted] 8/6/2024, 1:59 PM
I'm gonna take a quick shower and just try and get in the car and muddle my way through this meeting

KC **Katie Case** [redacted] 8/6/2024, 2:01 PM
Ok good luck and please don't push yourself too hard if you have a bad migraine!!

KC **Katie Case** [redacted] 8/6/2024, 3:11 PM
Ok running a little behind will have it in the next 45 mins to you 🙂

KC **Katie Case** [redacted] 8/6/2024, 4:02 PM
Is Jed doing anything on Justin? I'm having Zoe monitor but that's not the same lol

MN **Melissa Nathan** [redacted] 8/6/2024, 4:02 PM
Not yet

MN **Melissa Nathan** [redacted] 8/6/2024, 4:02 PM
They've not signed him on

KC **Katie Case** [redacted] 8/6/2024, 4:15 PM
Urg I wish they'd get a move on… all they care about is social right now and we can't do anything about it lol

KC **Katie Case** [redacted] 8/6/2024, 4:19 PM
Also what are we supposed to do about a journalist calling her like do your job Jen lol

MN **Melissa Nathan** [redacted] 8/6/2024, 4:46 PM
Jed and Bryan asking me for copy lol kill me

KC **Katie Case** [redacted] 8/6/2024, 4:46 PM
I just sent!

KC **Katie Case** [redacted] 8/6/2024, 4:46 PM
Should be in your inbox 🙂

MN **Melissa Nathan** [redacted] 8/6/2024, 6:11 PM
You need to get someone to help you with this so if Zoe can say the sentiment is positive in this and negative in this because she's obviously at the screening and can't look at everything like that

KC **Katie Case** [redacted] 8/6/2024, 6:12 PM
I'll ask Zoe to specify. Just trying to flag in real time like they asked but it's all more of the same.

MN **Melissa Nathan** [redacted] 8/6/2024, 6:13 PM
I know, but I feel like you shouldn't be doing this job

KC **Katie Case** [redacted] 8/6/2024, 6:16 PM
No it's not our job lol Zoe is flagging to me and I'm sending but overall social isn't our job!!!! Hahshshs

KC **Katie Case** [redacted] 8/6/2024, 7:59 PM
Gosh they hate me lol

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

STEPHANIE JONES, JONESWORKS LLC,

Plaintiffs,

vs. CASE NO. 1:25-CV-00779-LJL

JENNIFER ABEL, MELISSA NATHAN, JUSTIN BALDONI, WAYFARER STUDIOS LLC,

Defendants.

---

BLAKE LIVELY,

Plaintiff,

vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

***CONFIDENTIAL***

VIDEO-RECORDED DEPOSITION OF MELISSA NATHAN

Los Angeles, California

Tuesday, September 30, 2025

Stenographically Reported By: Ashley Soevyn, CALIFORNIA CSR No. 12019

"And okay!"
A Well, she -- "I know I'm sorry. And okay."
Q Then you write:
(As read):
"Should be a mixture of that document that I think Carolina pulled about Amanda goes or the intern pulled the voice note and this."
And then it has an attachment.
Do you see that?
A I see that.
Q Okay. Amanda goes is Amanda Ghost, right?
A Yes, I think so.
Q Carolina is Carolina Hurley from your office, right?
A Yes, it is.
Q So you were telling Katie Case that the website that Rebel Wilson wants should be a mixture of what is in document that Carolina pulled about Amanda Ghost, or that the intern pulled, a voice note, and that attachment, right?
MR. FREEDMAN: Objection.
THE WITNESS: That's your words, not

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 1st day of October, 2025.

ASHLEY SOEVYN

CSR No. 12019

# EXHIBIT C

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
CAMILLE M. VASQUEZ, Cal Bar No. 273377
CVasquez@sheppardmullin.com
SAMUEL A. MONIZ, Cal Bar No. 313274
SMoniz@sheppardmullin.com
HONIEH UDENKA, Cal Bar No. 319103
HUdenka@sheppardmullin.com
MELISSA MIKAIL, Cal Bar No. 323212
MMikail@sheppardmullin.com
650 Town Center Drive, 10th Floor
Costa Mesa, California 92626-1993
Telephone: 714.513.5100
Facsimile: 714.513.5130

Attorneys for Plaintiff, Cross-Defendant, and Cross-Complainant, AMANDA GHOST

**Electronically FILED by Superior Court of California, County of Los Angeles 9/02/2025 8:01 PM David W. Slayton, Executive Officer/Clerk of Court, By M. Gonzalez, Deputy Clerk**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

AMANDA GHOST, an individual; GREGOR CAMERON, an individual; and VINCE HOLDEN, an individual,

Plaintiffs,

v.

REBEL WILSON, an individual; and DOES 1-50, inclusive,

Defendants.

---

REBEL WILSON, an individual; CAMP SUGAR PRODUCTIONS PTY LTD, an Australian Private Company; REBEL WILSON and CAMP SUGAR PRODUCTIONS PTY LTD, Derivatively on behalf of Dunburn Debutantes Commissioning Company Pty Ltd, an Australian Proprietary Company,

Cross-Complainants,

vs.

AMANDA GHOST, an individual; GREGOR CAMERON, an individual; VINCE HOLDEN, an individual; A.I. FILM

Case No. 24STCV17314

Assigned for All Purposes to:
Hon. Thomas D. Long, Department 48

**CROSS-COMPLAINT OF AMANDA GHOST**

Operative Complaint Filed: July 29, 2024
Cross-Complaint Filed: October 1, 2024
Trial Date: October 5, 2026

PRODUCTION LIMITED, a United Kingdom Private Limited Company; UNIGRAM MEDIA LIMITED, a United Kingdom Private Limited Company; DUNBURN DEBUTANTS PTY LTD, an Australian Proprietary Company; DUNBURN DEBUTANTES COMMISSIONING COMPANY PTY LTD, an Australian Proprietary Company; and DOES 1 through 30, inclusive,

Cross-Defendants,

and

DUNBURN DEBUTANTES COMMISSIONING COMPANY PTY LTD, an Australian Proprietary Company;

Nominal Cross-Defendant.

---

AMANDA GHOST, an individual,

Cross-Complainant,

vs.

REBEL WILSON, an individual; MELISSA NATHAN, an individual; THE AGENCY GROUP PR LLC, a Delaware limited liability company; and DOES 1-50, inclusive,

Cross-Defendants.

Plaintiff, Cross-Defendant, and Cross-Complainant Amanda Ghost ("Ms. Ghost") alleges on personal knowledge as to herself and her own conduct, and on information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1. Defendant, Cross-Complainant, and Cross-Defendant Rebel Wilson is at the center of a ruthless campaign to deceive and manipulate the public, tarnish and destroy the reputations of hardworking professionals, and smear and bully her business partners into making unwarranted business concessions. A well-known actress, Rebel has held herself out to the public as a champion of women and a funny, relatable comic actress. But behind the scenes, she has used paid PR professionals to launch a shockingly low and racially-charged attack on another professional woman, all to get her own way in a business dispute and destroy the reputation of a woman who dared to stand up to her.

2. Rebel participated in making a film, The Deb (the "Film" or "The Deb"), in which a number of other companies and individuals were involved, including Ms. Ghost, and Plaintiffs Gregor Cameron and Vince Holden (collectively, the "Producers"). The Film was based on a screenplay by an aspiring young writer named Hannah Reilly, and starred an aspiring young actress named Charlotte MacInnes. Rebel, much older and more experienced in the film industry, had an opportunity to mentor both young women. Instead, she chose to attack them. First, Rebel wanted credit for writing "The Deb," and demanded that Ms. Reilly agree to give Rebel credit for the screenplay. When Ms. Reilly refused, Rebel filed an arbitration against Ms. Reilly with the Australian Writer's Guild ("AWG"). Rebel lost; the AWG decided the dispute largely in favor of Ms. Reilly.

3. But Rebel refused to be told "no." She next attempted to extract credit for writing "The Deb" from the Producers. And, when the Producers could not agree to give it to her – being bound by the decision of the AWG – Rebel tried to intimidate them. Rebel began to spread a lie that Ms. MacInnes had been sexually harassed and made uncomfortable by Ms. Ghost. That was categorically untrue, and once Ms. MacInnes learned of this, she promptly set the record straight: she spoke to Rebel directly, and also provided a written statement confirming that Ms. Ghost had

never done anything inappropriate to her, and that any suggestion otherwise by Rebel was not true.

4. Again, Rebel would not be told "no." She raised the stakes and brought in lawyers, including her former lawyer Bryan Freedman, and outside entertainment professionals, making wild (and false) allegations of misconduct and doubling down on the lie that Ms. Ghost had sexually harassed or abused Ms. MacInnes. When this still failed to produce the desired result, Rebel escalated again. This time, she took to social media, where she broadcast some of the same bogus allegations about the Producers and Ms. MacInnes to her eleven million Instagram followers – accusing the Producers, collectively, of embezzling funds and sexual misconduct toward Ms. MacInnes. The Producers, having been falsely accused before an audience of millions, filed suit against Rebel to commence the above action.

5. Even this did not deter Rebel from her course of destructive conduct. Behind the scenes, she was working with industry and PR professionals on her payroll to spread even more vicious lies about the Producers far and wide through the Internet. The primary focus of Rebel's campaign of online defamation was Ms. Ghost. With the assistance of PR professionals and others in the industry, Rebel caused to be registered and published on the Internet a series of defamatory websites that set forth grotesque lies about Ms. Ghost. The websites, published as such addresses as amandaghost.com and amandaghostsucks.com ("Websites") are openly defamatory and clearly calculated to cause harm to Ms. Ghost's reputation and emotional wellbeing. Not content with that, Rebel caused links to those websites to be emailed to people in Ms. Ghost's life, such as Ms. Reilly. Rebel also orchestrated or caused, directly or indirectly, an entire social media campaign to post references to Ms. Ghost and the Websites publicly. References and links to the Websites were posted thousands of times on social media, as a result, on information and belief, of a targeted campaign by Rebel and her unethical PR team.

6. As noted above, the content of the Websites was patently defamatory – as well as racist and insulting. For instance, in September 2024, malevolent lies and smears about Ms. Ghost were published on amandaghost.com and amandaghostsucks.com, under the headline "AMANDA GHOST IS A DESTROYER OF WORLDS," to spread the outrageously false narrative that Ms. Ghost procures women for a "Russian mafia financier." The attacks, which amount to blatant racist

incitement, also extended to others involved in the dispute, including Ms. MacInnes. The cruel and outrageous nature of these lies is undeniable. For instance, the Websites included the following statements:

a. "We won't stop. We're in this until Amanda Ghost is exposed for the evil that she is. As the Indian Ghislaine Maxwell, she trades on pleasure for protection."

b. "When Amanda Ghost failed as a songwriter, she tried her hand at another commodity and became the madame for one of the world's richest men."

c. "The 2000's Heidi Fleiss, Amanda Ghost learned her trade in theft, discovering how easy it was to steal from talented artists. Her playbook was the same every time: demand writing credits on songs that she never wrote, trick or threaten artists into giving her their publishing rights, and lie – about anything from her ethnicity, education, and even name.

d. "Failing in music she turned full pimp, reinventing herself as a theatrical producer alongside her husband while really procuring young women for the pleasure of the extremely wealthy."

e. "This strain of constantly procuring women could explain her company UNIGRAM's financial loss of 4.7M pounds last year. And let's only hope the hookers made up for losing her financier $25M by mounting The Great Gatsby stage musical to simply reward an actress for remaining silent about the abuse she suffered at Ghost's hands."

f. "In exchange for women, this benefactor helps Ghost plant untrue stories and use attacks in the media as a threat, due to the billionaire's significant advertising spend at multiple publications."

g. "We have to ask ourselves the important questions, and encourage people in positions of power and in the press to do the same. Why is Amanda Ghost allowed to play procuress, affording her protection against the overwhelming evidence against her? What other dark secrets of this man is she hiding? What other dark secrets of hers are being hidden? Why do good looking women who

work for Ghost and her husband go missing?"

h. "My hope is to rally together and share our stories, so that other artists don't have to endure the pain so many have already felt. So that young women aren't subjected to the emotional torture and physical violation of their predecessors. She's the worst kind of malignant demon that preys on the innocent. But finally, the truth will win. This is the end for Amanda Ghost."

7. These statements, in context, carry the unmistakably defamatory meaning that Amanda Ghost is engaged in sex trafficking and pimping young women. That is a complete fiction, dreamed up by Rebel and her agents. Ms. Ghost has recently obtained further confirmation from publicly-filed court documents in another matter, *Lively et al. v. Baldoni et al.*, that various PR professionals working on behalf of Rebel, Cross-Defendant Melissa Nathan, and the Agency Group PR LLC, conspired with and/or aided and abetted Rebel in causing the Websites to be created and their defamatory content published. Communications among Ms. Nathan and others at The Agency Group PR LLC, openly discuss the creation of the Websites. Indeed, Ms. Nathan texted a document entitled "__library . . . _Amanda Ghost website.docx (26KB)," which upon information and belief, is a dossier of false information regarding Ms. Ghost. Ms. Nathan also wrote: **"So basically Rebel wants a one of those sites… Should be a mixture of that document that I think Carolina pulled about Amanda goes [sic] or the intern pulled… It can be really really harsh… Russian oligarchs and making her a madam basically lol[.]"**

8. To Rebel and her paid PR professionals, this cruel, public attack may have been something to "lol" about, but there was nothing humorous about it to Ms. Ghost. She is a professional, a wife, a mother. To have a powerful actress deliberately broadcasting to the world the grotesque lie that Ms. Ghost is the "Indian Ghislaine Maxwell" was devastating. And, incredibly, Rebel just kept going. In late September 2024, Ms. MacInnes, unwilling to allow herself to be used as a pawn of Rebel's gambit, made a public statement to news outlets, once again denying Rebel's false claims about her. Ms. MacInnes emphasized that "There is no truth to the allegations made involving me," and that "I won't be the subject of a fabricated narrative." In response to Ms. MacInnes' heartfelt statement, Rebel again took to social media, where she

doubled down on her false claims against the Producers; falsely accused Ms. MacInnes of lying to secure a lead role and record label from Ms. Ghost (neither of which were even within Ms. Ghost's power to give); and further perpetuated the malicious and false rumor that Ms. MacInnes was a victim of sexual misconduct by Ms. Ghost – all in front of an audience of millions of people. Specifically, Rebel wrote:

> When an actress on her first feature film is asked by a producer to stay in the same apartment as them, and then makes a complaint to me as the director saying said producer "asked her to have a bath and a shower with her and it made her feel uncomfortable" -- what am I supposed to do? Of course I reported it. There is no world where this is acceptable. The fact that this girl has been employed now by this "producer" in the lead role of a production called GATSBY (ART Boston) and given a record label -- should be all the proof you need as to why she has now changed her story.

9. When these intimidation tactics still failed to achieve Rebel's goals, she filed a salacious cross-complaint in the above action in which she brazenly linked to both amandaghost.com and amandaghostsucks.com, as if to brag that she was responsible for their publication.[1] Nor is that the last time Rebel has spread these lies. Indeed, as recently as July 25, 2025, Rebel again posted a series of false and defamatory statements to her millions of social media followers, writing, in part: "What would you do if you were me, a first time female director—and a young cast member says she's living with a producer and had a bath and shower with them and that she feels uncomfortable? What would you do if crew told you they were stealing money from the independent film's really tight budget? I reported both things. I'd do the same again."

10. It is clear that if she is allowed to do so, Rebel will, indeed, "do the same again" – she learns no lessons and seems impervious and indifferent to truth, professionalism, or common decency. Her use of the Websites is only the cruelest example of her misconduct. Ms. Ghost respectfully asks this Court to hold Rebel accountable for her shameless, dishonest, and bullying conduct, and set the record straight.

[1] For the avoidance of doubt, Ms. Ghost does not assert any claim based on the filing of Rebel's Cross-Complaint, and merely refers to its contents for context.

**PARTIES**

11. Plaintiff, Cross-Defendant, and Cross-Complainant Amanda Ghost (previously defined herein as "Ms. Ghost") is an individual residing in the United Kingdom, and a Producer of the Film.

12. Defendant, Cross-Complainant, and Cross-Defendant Rebel Wilson (previously defined herein as "Rebel") is an individual residing in Los Angeles, California, and is an actor, director, and producer of the Film.

13. Cross-Defendant Melissa Nathan ("Ms. Nathan") is an individual residing in the State of California, County of Los Angeles.

14. Cross-Defendant The Agency Group PR LLC ("TAG") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of California, County of Los Angeles.

15. Ms. Ghost is ignorant of the true names and capacities of the Cross-Defendants sued herein as Does 1-50, inclusive, and therefore sues these Does by such fictitious names. Ms. Ghost will amend this Complaint to allege the Does' true names and capacities when ascertained. Each of the Does is in some manner responsible for some or all of the acts and/or omissions alleged herein. Ms. Ghost is informed and believe and thereon alleges that one or more of the Does were involved in the making and/or dissemination of the defamatory statements complained of herein, including without limitation the defamatory comments on the Websites. Ms. Ghost is informed and believes, and thereon alleges that the Does include a person named "Jed" who was involved in coordinating and directing the publication of defamatory materials via the websites, in collusion with Ms. Nathan and her staff, and with Rebel. Ms. Ghost will amend this Cross-Complaint to add the correct name of the individual named "Jed" and sued herein as Doe after obtaining further evidence of his or her identity. Rebel, Ms. Nathan, TAG, and Does 1-50 are collectively referred to herein as "Cross-Defendants."

**JURISDICTION AND VENUE**

16. Jurisdiction exists and venue is proper in the State of California, County of Los Angeles pursuant to Code of Civil Procedure §§ 395 and 395.2 because Rebel, Ms. Nathan, TAG,

and are residents of or based in the County of Los Angeles, and because the actions complained of herein occurred, in whole or in part, in the County of Los Angeles.

17. This Court has personal jurisdiction over Cross-Defendants because they are residents of the State of California and/or conduct business in the State of California.

## GENERAL ALLEGATIONS

### Rebel and the Producers Agree to Produce "The Deb"

18. In or around February 2023, the Producers were brought on to co-produce a feature film called "The Deb" with Rebel. The Film had a budgeted initial funding limit of 15 million Australian Dollars. Rebel did not contribute any financing towards the production of the Film.

19. "The Deb" was to be directed by Rebel, and produced by the Producers and Rebel, as well as a local producer that would be mutually agreed to by the parties. Because Rebel was a novice director, the parties understood that she would cooperate with the producers to create the Film. Additionally, Rebel contracted to act in the Film.

20. Although Rebel was contracted to provide additional writing for the Film, she was never promised a "written by" credit for the Film. That is because the writing credit for the "The Deb" screenplay belongs to Ms. Reilly, who developed the concept, the original script, and the original screenplay for "The Deb." Ms. Reilly is a young and upcoming Australian writer, who conceived of the original idea for "The Deb," including its core plot, characters, and theme. Ms. Reilly drafted the original screenplay. Initially, Ms. Reilly adapted her script with celebrated Australian musician Megan Washington for a stage play of "The Deb" (the "Stage Play"), which ran in Sydney in mid-2022. Thereafter, a film production of "The Deb" was contemplated and Ms. Reilly revamped her original script into the script for "The Deb" film (the "Screenplay").

### Rebel Tries to Take Credit for Ms. Reilly's Work

21. Once "The Deb" commenced production, Rebel sought to take the lion's share of the credit for the screenplay, and began to demand that she receive a writing credit for herself. Ms. Reilly did not agree that Rebel should receive the writing credit. On November 13, 2023, Rebel submitted the dispute over the writing credit for adjudication by binding arbitration before the Australian Writers' Guild ("AWG"). Neither the Producers nor the production companies involved

in the Film were part of the adjudication process before the AWG. Ms. Reilly and Rebel agreed to be bound by the decision of the AWG. On March 4, 2024, the AWG rendered a credit determination for the Film, finding largely in Ms. Reilly's favor and deciding that the on-screen credits for the Film would be:

*Screenplay by Hannah Reilly*

*Additional Writing by Rebel Wilson*

*Based on a stage-play by Hannah Reilly*

*With music by Megan Washington, and lyrics by Hannah Reilly and Megan Washington*

22. Though she had no legal basis to object to the AWG's decision (and has never filed a legal challenge to the decision), Rebel refused to accept the outcome. She now turned her focus on the Producers, demanding that they override the AWG's ruling and give her a full writing credit. This demand was based on what Rebel asserted was a "prior contractual agreement" to give her a writing credit. This was an after-the-fact invention by Rebel – no such "prior contractual agreement" existed – and the agreements that did exist (which Rebel had negotiated and signed) made clear that the ruling of the AWG was binding. The Producers could not accommodate Rebel's demand for a writing credit – and now found themselves the focus of her anger.

**Rebel Drags Another Young, Aspiring Artist into her Lies**

23. A perpetual source of unnecessary drama, Rebel also targeted the Film's young star, Ms. MacInnes, another young artist who thought her dreams were coming true when she was cast in projects linked to Rebel. Ms. MacInnes and Ms. Ghost became friends due to their mutual appreciation for music. From the outset, Ms. MacInnes and Ms. Ghost (an award winning song writer and music producer) discussed collaborating on other musical projects and even worked on a song together.

24. Instead of flying to and from Sydney from Ms. MacInnes' hometown for filming, to save time and money, Ms. Ghost extended an invitation for Ms. MacInnes to stay at the production apartment where Ms. Ghost was staying in Sydney with a senior member of the production team. Multiple members of the film crew intermittently used this apartment, including Rebel herself; there was nothing unusual about any member of the cast or crew doing so. Ms. MacInnes accepted

the offer.

25. In September 2023, while the dispute between Rebel and Ms. Reilly over the writing credit was coming to a head, an innocent incident occurred that Rebel has exploited and mischaracterized ever since. Ms. MacInnes and Ms. Ghost went swimming in the ocean and the very cold water caused Ms. Ghost to have a severe reaction that became a medical event. Ms. MacInnes aided Ms. Ghost by running a warm shower and bath to warm Ms. Ghost back up. Both women were in their bathing suits, another senior member of the production team staying in the apartment was also present, and there was nothing sexual or inappropriate about the incident whatsoever – it was a medical event.

26. In the days that followed, the cast and crew of the Film heard about this incident from both Ms. Ghost and Ms. MacInnes, who were casually describing the anecdote. Rebel learned the incident and called Ms. MacInnes to ask her about the incident and whether she was alright. Ms. MacInnes explained to Rebel that she had voluntarily assisted Ms. Ghost during her medical episode and had not been made to feel uncomfortable by Ms. Ghost in any way. She specifically and explicitly told Rebel that she was completely comfortable during the entire episode.

27. Rebel nonetheless seized an opportunity to create discord and try to secure an ally in her dispute with Ms. Reilly, and began to spread a lie that Ms. MacInnes had complained about being forced to shower with Ms. Ghost and feeling uncomfortable. Ms. MacInnes was shocked when she eventually realized that Rebel was spreading this false rumor, and promptly rectified the situation by providing a written statement vehemently denying any inappropriate behavior or misconduct by Ms. Ghost. Ms. MacInnes made her written statement on or around September 17, 2023 and it was shared with the producers, including Rebel, within days thereafter.

28. Meanwhile, Ms. MacInnes focused her efforts on a project she and Ms. Ghost had been discussing as far back as the Spring of 2023 and that Ms. Ghost was co-producing – a production called “Gatsby.” Ms. MacInnes auditioned for the role, and after auditioning for several of the industry’s leading Producers, landed the role in March 2024.

**Rebel Defames The Producer Plaintiffs and Ms. MacInnes**

29. By the summer of 2024, millions of dollars had been invested in "The Deb," the Film was nearly complete, and it was on track to be a success. But Rebel was unhappy. Her efforts to secure a writing credit had been rejected by Ms. Reilly and the AWG. Her various other demands, which included a record label and special publishing rights for the songs in the Film, had not been granted, as they were not contractually supported. Meanwhile, many of those invested in the Film, including the Producers, were trying to hold Rebel to her actual contractual and professional obligations to the Film and its stakeholders.

30. On June 14, 2024, Rebel, through her attorney Bryan Freedman, sent a demand letter to the Producers, attempting to renegotiate contract terms and threatening to publicly litigate a litany of ludicrous and demonstrably false allegations. The Producers and their affiliated companies did not capitulate to Rebel's demands, but made good faith efforts to attempt to resolve their business disputes with Rebel. On July 10, 2024, while those negotiations were in progress, Rebel suddenly posted a video to her Instagram page, with 11 million followers, in which she accused the Producer Plaintiffs of embezzling funds from the Film, sexual misconduct with the lead actress, engaging in bullying and intimidation tactics to conceal their misconduct, and forcing their victims to sign non-disclosure agreements.

31. These contentions are patently false and are the subject of the Producers' original Complaint in this action, which asserts claims against Rebel for defamation. Even after that Complaint was filed, Rebel continued making threats and accusations to those involved in the Film, including claiming to persons involved in the Film that many people (including specifically Sara Bareilles, Brandy, Shakira, Margot Robbie, and Baz Luhrmann) had problems with Ms. Ghost; that the Producers had been responsible for a financial loss on the Gatsby musical; and that if the Producers dared to continue litigating their defamation case, "it will very publicly ruin them."

32. On July 29, 2024, the Producers filed their First Amended Complaint in the Related Action, which was reported in the news media. Rebel's response was to announce that this was an "unfair and grossly abhorrent attack on me in the press," and that she was "cancelling Toronto and all sales/promotion of the film and will be going public as to why."

33. Soon afterwards, the first of the Websites was registered, amandaghost.com, and later that September amandaghostsucks.com was registered. As Ms. Ghost has now learned, Rebel's PR team were having written communications discussing the creation of websites to defame her, and assisted Rebel in creating the Websites and publishing outrageous lies about her. Indeed, Ms. Nathan texted a document entitled "__library . . . _Amanda Ghost website.docx (26KB)," which upon information and belief, is a dossier of false information regarding Ms. Ghost. Ms. Nathan also wrote: **"So basically Rebel wants a one of those sites… Should be a mixture of that document that I think Carolina pulled about Amanda goes [sic] or the intern pulled… It can be really really harsh… Russian oligarchs and making her a madam basically lol[.]"**

34. Outrageous (and blatantly racist) lies about Ms. Ghost, a well-regarded professional with a long record of accomplishment, were published via the Websites, which were, in turn, sought to be promoted on social media. Many of those lies echoed Rebel's previous and subsequent lies. For instance, the Website specifically mentions many of the same supposed "victims" of Ms. Ghost that had been referenced in Rebel's earlier communications (*e.g.*, the Website accuses Ms. Ghost of "the takedown of Sara Bareilles, Brandy, Shakira," and states that that "people like Margot Robbie and Baz Luhrmann choose never to work with Ghost again. She's rotten to the core"). The Websites are blatantly false and defamatory, including without limitation the following statements, which were published or republished on amandaghost.com and amandaghostsucks.com in September 2024:

a. "We won't stop. We're in this until Amanda Ghost is exposed for the evil that she is. As the Indian Ghislaine Maxwell, she trades on pleasure for protection. Enough is enough. There's been too much destruction. Her wrongdoings can no longer remain a Hollywood secret. I have to speak out."

b. "When Amanda Ghost failed as a songwriter, she tried her hand at another commodity and became the madame for one of the world's richest men."

c. "Amanda Ghost learned her trade in theft, discovering how easy it was to steal from talented artists. Her playbook was the same every time: demand writing credits on songs that she never wrote, trick or threaten artists into giving her

their publishing rights and lie – about anything from her ethnicity, education, and even name."

d. "Failing in music she turned full pimp, reinventing herself as a theatrical producer alongside her husband while really procuring young women for the pleasure of the extremely wealthy. Her lethalness and aptitude at this craft is evidence in her actions since – as she continuously seeks out talented people across the industry to control and coerce."

e. "This strain of constantly procuring women could explain her company UNIGRAM's financial loss of 4.7M pounds last year. And let's only hope the hookers made up for losing her financier $25M by mounting The Great Gatsby stage musical to simply reward an actress for remaining silent about the abuse she suffered at Ghost's hands."

f. "In exchange for women, this benefactor helps Ghost plant untrue stories and use attacks in the media as a threat, due to the billionaire's significant advertising spend at multiple publications. It's also the reason I have to write these things here, and cannot easily go to the press.."

g. "We have to ask ourselves the important questions, and encourage people in positions of power and in the press to do the same. Why is Amanda Ghost allowed to play procuress, affording her protection against the overwhelming evidence against her? What other dark secrets of this man is she hiding? What other dark secrets of hers are being hidden? Why do good looking women who work for Ghost and her husband go missing? Why is Ghost still allowed to assert power at Warner Music?"

35. The assertions made on the Websites are utterly and demonstrably false. Indeed, the only person to have ever accused Ms. Ghost of any form of sexual misconduct is none other than Rebel. Ms. Ghost is informed and believes and thereon alleges that Rebel caused this blatant libel to be posted on the Internet, on Websites, amangaghost.com and amandaghostsucks.com, that she specifically caused to be created for that purpose. Multiple individuals associated with Ms. Ghost

personally or professionally then began receiving emails linking to this defamatory language, as Rebel sought to ensure that the damage from the Websites was maximized. For instance, Ms. Reilly received an email linking to one of the websites with the comment "thought you should be aware of this." Rebel, who controls "The Deb's" Instagram page, also publicly posted the Website to that page, with words to the effect that "The Deb's" followers should "please read this." That post was deleted shortly thereafter – perhaps because even Rebel realized that she had been a little too obvious. Rebel's conduct was, in short, specifically intended to cause harm. The damage to Ms. Ghost from this campaign of defamation is enormous – not merely to her peace of her mind, but to her standing in the community and her professional career.

**FIRST CAUSE OF ACTION**

**Defamation and Defamation Per Se Against Rebel, Ms. Nathan, TAG, and Does 1-50**

36. Ms. Ghost repeats and hereby incorporates by reference the preceding paragraphs as though set forth in full.

37. Rebel, directly or indirectly, and with the material assistance of the other Cross-Defendants, intentionally caused the Websites to be created and caused defamatory statements about Ms. Ghost to be published or caused to be published on them. This includes, without limitation the following statements that were published or republished on amandaghost.com and amandaghostsucks.com in September 2024:

a. "We won't stop. We're in this until Amanda Ghost is exposed for the evil that she is. **As the Indian Ghislaine Maxwell, she trades on pleasure for protection.** Enough is enough. There's been too much destruction. Her wrongdoings can no longer remain a Hollywood secret. I have to speak out."

b. "When Amanda Ghost failed as a songwriter, she tried her hand at another commodity and **became the madame for one of the world's richest men."**

c. "Amanda Ghost learned her trade in theft, discovering how easy it was to steal from talented artists. Her playbook was the same every time: **demand writing credits on songs that she never wrote, trick or threaten artists into giving**

**her their publishing rights and lie – about anything from her ethnicity, education, and even name."**

d. "Failing in music she turned full pimp, reinventing herself as a theatrical producer alongside her husband **while really procuring young women for the pleasure of the extremely wealthy.** Her lethalness and aptitude at this craft is evidence in her actions since – as she continuously seeks out talented people across the industry to control and coerce."

e. **"This strain of constantly procuring women** could explain her company UNIGRAM's financial loss of 4.7M pounds last year. And let's only hope the hookers made up for losing her financier $25M by mounting The Great Gatsby stage musical to **simply reward an actress for remaining silent about the abuse she suffered at Ghost's hands."**

f. **"In exchange for women, this benefactor helps Ghost plant untrue stories** and use attacks in the media as a threat, due to the billionaire's significant advertising spend at multiple publications. It's also the reason I have to write these things here, and cannot easily go to the press.."

g. "We have to ask ourselves the important questions, and encourage people in positions of power and in the press to do the same. **Why is Amanda Ghost allowed to play procuress,** affording her protection against the overwhelming evidence against her? What other dark secrets of this man is she hiding? What other dark secrets of hers are being hidden? **Why do good looking women who work for Ghost and her husband go missing?** Why is Ghost still allowed to assert power at Warner Music?"

38. These statements expressed or implied that Ms. Ghost is corrupt and criminal, accused her of stealing other persons' work, of being a con artist, thief, and pimp, and sexually exploiting young women. The statements insinuate that she is responsible for the disappearance of young women, and that she is involved in procuring young women for a rich financier. The description of her as the "Indian Ghislaine Maxwell" – famously imprisoned for abetting a

billionaire's predatory behavior toward young women – is not merely racist, but a clear charge of heinous criminal conduct. The defamatory meaning of the statements set forth above is self-evident, as they have a natural tendency to harm Ms. Ghost's reputation, subject her to hatred, ridicule, or obloquy, and cause actual harm to her reputation and professional career.

39. The statements set forth above constitute defamation *per se* because, among other things, they impute the commission of a crime and prejudice Ms. Ghost in her business and career.

40. The statements are of and concerning Ms. Ghost.

41. The statements are false. They are simply made up and have no basis whatsoever in fact. Indeed, no one other than Rebel has ever accused Ms. Ghost of any such thing.

42. Rebel and the other Cross-Defendants knew that the statements were false when they caused them to be published, republished, and/or distributed. Rebel, aided by PR professionals simply made up and spread cruel, vicious, utterly false stories about Ms. Ghost. At minimum, the Cross-Defendants acted in reckless disregard of the truth because neither Rebel nor her paid PR professionals had any conceivable basis to make the statements, which are pure fantasy.

43. The statements are unprivileged.

44. As a result of the statements, Ms. Ghost has have suffered damages in an amount in excess of the jurisdictional minimum of this Court, including without limitation, damage to her reputation, damage to her personal brand and goodwill in the community as a successful businesswoman, emotional suffering and distress, loss of potential income and goodwill associated with lost opportunities as a result of the negative publicity associated with the defamatory statements, and associated long-term loss of goodwill and marketability.

45. Rebel was materially assisted in committing these defamatory acts by Ms. Nathan, TAG, and Does 1-50, who assisted Rebel in preparing the defamatory statements, registering the Websites, and causing them to be published and disseminated online.

46. In taking the actions alleged in this Cross-Complaint, Rebel acted willfully and wrongfully, with malice, oppression, and fraud, and in conscious disregard of Ms. Ghost's rights, for which conduct Ms. Ghost is entitled to an award of punitive or exemplary damages.

## SECOND CAUSE OF ACTION

**Aiding and Abetting Defamation Against Ms. Nathan, TAG and Does 1-50**

47. Ms. Ghost repeats and hereby incorporates by reference the preceding paragraphs as though set forth in full.

48. Rebel, directly or indirectly, intentionally caused the Websites to be created and caused defamatory statements about Ms. Ghost to be published or caused to be published on them. This includes, without limitation the following statements that were published on amandaghostsucks.com in September of 2024:

a. "We won't stop. We're in this until Amanda Ghost is exposed for the evil that she is. As the Indian Ghislaine Maxwell, she trades on pleasure for protection. Enough is enough. There's been too much destruction. Her wrongdoings can no longer remain a Hollywood secret. I have to speak out."

b. "When Amanda Ghost failed as a songwriter, she tried her hand at another commodity and became the madame for one of the world's richest men."

c. "Amanda Ghost learned her trade in theft, discovering how easy it was to steal from talented artists. Her playbook was the same every time: demand writing credits on songs that she never wrote, trick or threaten artists into giving her their publishing rights and lie – about anything from her ethnicity, education, and even name."

d. "Failing in music she turned full pimp, reinventing herself as a theatrical producer alongside her husband while really procuring young women for the pleasure of the extremely wealthy. Her lethalness and aptitude at this craft is evidence in her actions since – as she continuously seeks out talented people across the industry to control and coerce."

e. "This strain of constantly procuring women could explain her company UNIGRAM's financial loss of 4.7M pounds last year. And let's only hope the hookers made up for losing her financier $25M by mounting The Great Gatsby stage musical to simply reward an actress for remaining silent about the abuse

she suffered at Ghost's hands."

f. "In exchange for women, this benefactor helps Ghost plant untrue stories and use attacks in the media as a threat, due to the billionaire's significant advertising spend at multiple publications. It's also the reason I have to write these things here, and cannot easily go to the press.."

g. "We have to ask ourselves the important questions, and encourage people in positions of power and in the press to do the same. Why is Amanda Ghost allowed to play procuress, affording her protection against the overwhelming evidence against her? What other dark secrets of this man is she hiding? What other dark secrets of hers are being hidden? Why do good looking women who work for Ghost and her husband go missing? Why is Ghost still allowed to assert power at Warner Music?"

49. These statements expressed or implied that Ms. Ghost is corrupt and criminal, accused her of stealing other persons' work, of being a con artist, thief, and pimp, and sexually exploiting young women. The statements insinuate that she is responsible for the disappearance of young women, and that she is involved in procuring young women for a rich financier. The description of her as the "Indian Ghislaine Maxwell" – famously imprisoned for abetting a billionaire's predatory behavior toward young women – is not merely racist, but a clear charge of criminal conduct. The defamatory meaning of the statements set forth above is self-evident, as they have a natural tendency to harm Ms. Ghost's reputation, subject her to hatred, ridicule, or obloquy, and cause actual harm to her reputation and professional career.

50. The statements set forth above constitute defamation *per se* because, among other things, they impute the commission of a crime and prejudice Ms. Ghost in her business and career.

51. The statements are of and concerning Ms. Ghost.

52. The statements are false. They are simply made up and have no basis whatsoever in fact. Indeed, no one other than Rebel has ever accused Ms. Ghost of any such thing.

53. Rebel knew that the statements were false when she caused them to be published, republished, and/or distributed. She simply made up a cruel, vicious story about Ms. Ghost. At

minimum, she acted in reckless disregard of the truth because she had no basis to make the statements, which are pure fantasy.

54. The statements are unprivileged.

55. As a result of the statements, Ms. Ghost has suffered damages in an amount in excess of the jurisdictional minimum of this Court, including without limitation, damage to her reputation, damage to her personal brand and goodwill in the community as a successful businesswoman, emotional suffering and distress, loss of potential income and goodwill associated with lost opportunities as a result of the negative publicity associated with the defamatory statements, and associated long-term loss of goodwill and marketability.

56. Rebel was materially assisted in committing these defamatory acts by Ms. Nathan, TAG, and Does 1-50, who assisted Rebel in preparing the defamatory statements, registering the Websites, and causing them to be published and disseminated online.

57. Ms. Nathan, TAG and Does 1-50 knew that Rebel intended to defame and harm Ms. Ghost and acted with the intention of assisting her in that endeavor.

58. Ms. Nathan, TAG, and Does 1-50 helped Rebel defame Ms. Ghost and were, accordingly, a substantial factor in causing Ms. Ghost harm.

59. In taking the actions alleged in this Cross-Complaint, Cross-Defendants acted willfully and wrongfully, with malice, oppression, and fraud, and in conscious disregard of Ms. Ghost's rights, for which conduct Ms. Ghost is entitled to an award of punitive or exemplary damages.

**PRAYER**

WHEREFORE, Ms. Ghost request judgment with each item of this prayer being for relief additional to and alternative to each other item and not an election of remedies, as follows:

1. Compensatory damages according to proof;

2. Costs, expenses, and attorneys' fees, to the extent recoverable;

3. Punitive or exemplary damages;

4. Prejudgment and post-judgment interest in the maximum amounts provided by law; and

5. For such other and further relief as the Court deems just and proper.

DATED: September 2, 2025

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By: /s/ Camille M. Vasquez
CAMILLE M. VASQUEZ
Attorneys for Plaintiff, Cross-Defendant, and Cross-Complainant AMANDA GHOST

# EXHIBIT D

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
CAMILLE M. VASQUEZ, Cal Bar No. 273377
CVasquez@sheppardmullin.com
SAMUEL A. MONIZ, Cal Bar No. 313274
SMoniz@sheppardmullin.com
HONIEH UDENKA, Cal Bar No. 319103
HUdenka@sheppardmullin.com
MELISSA M. MIKAIL, Cal Bar No. 323212
MMikail@sheppardmullin.com
AVA HABIBIAN, Cal Bar No. 348319
AHabibian@sheppardmullin.com
650 Town Center Drive, 10th Floor
Costa Mesa, California 92626-1993
Telephone: 714.513.5100
Facsimile: 714.513.5130

Attorneys for Plaintiffs and Cross-Defendants
AMANDA GHOST, GREGOR CAMERON,
and VINCE HOLDEN

**Electronically FILED by
Superior Court of California,
County of Los Angeles
12/05/2025 4:58 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By V. Sino-Cruz, Deputy Clerk**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| AMANDA GHOST, an individual; GREGOR CAMERON, an individual; and VINCE HOLDEN, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>REBEL WILSON, an individual; and DOES 1-50, inclusive,<br><br>Defendants. | Case No. 24STCV17314<br><br>Assigned for All Purposes to:<br>Hon. Thomas D. Long, Department 48<br><br>**AMANDA GHOST'S MOTION FOR LEAVE TO TAKE LIMITED DISCOVERY IN RESPONSE TO ANTI-SLAPP MOTION**<br><br>*Filed concurrently with Declarations of Amanda Ghost and Samuel A. Moniz; and Request for Judicial Notice*<br><br>Date: January 8, 2026<br>Time: 8:30 a.m.<br><br>Reservation No.: 099894740620<br><br>Operative Complaint Filed: July 29, 2024<br>Cross-Complaint Filed: October 1, 2024<br>Cross-Complaint Filed: September 2, 2025<br>Trial Date: October 5, 2026 |
| AND RELATED CROSS-ACTIONS | |

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on January 8, 2026 at 8:30 a.m. in Department 48 of the above-entitled Court, located at 111 N. Hill Street, Los Angeles, California 90012, Plaintiff and Cross-Complainant Amanda Ghost ("Ms. Ghost") will and hereby does move ("Motion") for an Order granting her leave to take limited discovery in connection with her opposition to the pending Special Motion to Strike ("anti-SLAPP Motion") filed by Cross-Defendant Rebel Wilson ("Wilson") and joined by Cross-Defendants Melissa Nathan ("Ms. Nathan") and The Agency Group PR LLC ("TAG"). This Motion is made pursuant to California Code of Civil Procedure section 425.16(g), on the grounds that good cause exists to permit limited, specified discovery that pertains to the pending anti-SLAPP Motion. Ms. Ghost requires discovery so that she can fully and properly present a *prima facie* case of defamation, particularly as to the elements of publication and (to the extent required) actual malice. The Court should also continue the hearing on the anti-SLAPP Motion by at least 90 to 120 days to allow for such discovery to be completed.

The anti-SLAPP Motion is based on, and puts at issue, essentially ***factual*** questions. In particular, the anti-SLAPP Motion turns on whether Wilson, TAG, and Ms. Nathan were involved in the publication of defamatory materials on the Internet via websites dedicated to smearing Ms. Ghost with false accusations of criminal misconduct, which appeared at the domain names amandaghost.com and amandaghostsucks.com (the "Smear Websites") after Ms. Ghost's contractual disputes with Wilson escalated to litigation. Ms. Nathan and Wilson have both filed declarations denying involvement in the Websites. In fact, that is the central argument in the anti-SLAPP Motion. Ms. Ghost is confident that the evidence will eventually compellingly show that Wilson, Ms. Nathan, and TAG were, indeed, involved – and, troublingly, ***that their sworn declarations to the contrary are false.*** Targeted discovery is warranted to ensure that Ms. Ghost has a reasonable opportunity to present her *prima facie* case, including but not limited to the elements of publication and malice. The requested discovery includes the following:

- Ms. Ghost requests leave of court to issue a subpoena and conduct a short deposition of third party Katie Case ("Ms. Case"). Ms. Case is a former employee of TAG/Ms. Nathan who engaged in an exchange of written

messages with Ms. Nathan. Ms. Nathan instructed Ms. Case in writing to prepare written copy for websites about Ms. Ghost. Ms. Case is, thus, a critical witness who can authenticate and contextualize relevant written evidence. She will likely be able to provide direct testimony as to the involvement of Wilson, TAG, and Ms. Nathan in the Smear Websites, further controverting their declarations. In fact, Ms. Case has apparently already testified adversely to Ms. Nathan regarding such conduct in a separate consolidated action currently pending against TAG, Ms. Nathan, and others, in the District Court for the Southern District of New York, *Jones et al. v. Abel, et al.,* Case No. 1:25-cv-00779-LJL, consolidated with Case No. 1:24-cv-10049-LJL, and related to Case No. 1:25-cv-00449-LJL (collectively, the "New York Litigations"). For instance, in a filing dated November 13, 2025, counsel in the New York Litigations noted that based on "Ms. Case's own under oath testimony" it "is apparent that Ms. Case had a material role in the creation and drafting of copy… ***as part of a pattern and practice of drafting copy for and assisting with similar smear websites against many individuals, together with Melissa Nathan, Jed Wallace, and Bryan Freedman."*** (Emphasis added). Obtaining basic testimony and documents from Ms. Case pertaining to the creation, content, authorship, and purpose of the Smear Websites is well warranted.

- Ms. Ghost also seeks leave of Court to obtain certain basic documents and testimony from TAG and Ms. Nathan. In particular, as parties to the New York Litigations, TAG and Ms. Nathan are already in possession of transcripts of the depositions of Ms. Case and Ms. Nathan regarding the creation of derogatory websites – including, apparently the very Smear Websites at issue in this action. Those transcripts should be produced, with exhibits, so that Ms. Ghost and counsel can evaluate the testimony that has already been given on this topic. Further, Ms. Ghost should be permitted to

seek from Ms. Nathan and TAG all documents and communications pertaining to the Amanda Ghost Smear Websites – including any documents that reference (1) Amanda Ghost, (2) amandaghost.com, (3) amandaghostsucks.com, or (4) Rebel Wilson's dispute with Ms. Ghost. This should specifically include any documents pertaining to those topics that have been produced by any party in the New York Litigations.

- Ms. Ghost should be afforded an opportunity to take short depositions of both Wilson and Ms. Nathan. Such depositions are warranted to cross-examine them on their declarations, as well as documents and conduct that directly contradict those declarations. For instance, written messages in Ms. Ghost's possession already reflect that Ms. Nathan directed the creation of defamatory content for publication on the websites, at Rebel's behest. That is an appropriate topic of cross-examination. Such depositions would also be relevant to the question of actual malice, to the extent that the Court were to conclude that Ms. Ghost is required to show malice.
- In addition, Ms. Ghost should be authorized to issue subpoenas for follow-up depositions and records, to the extent necessary, from certain additional third parties who evidently had a role in the dissemination of defamatory material about Ms. Ghost via the Smear Websites. Specifically, and to the extent needed after Ms. Case's deposition, Ms. Ghost should be afforded an opportunity to depose persons identified in the messages between Ms. Nathan and Ms. Case as "Carolina," and "Jed," who are described as being involved in the creation of the websites. As well, documentary evidence, filings in the New York Litigations, and Wilson's own words all point to a connection between the Smear Websites and Wilson's former attorney Bryan J. Freedman, making him a potentially necessary witness as well.

**PLEASE TAKE FURTHER NOTICE** that Ms. Ghost requests a reasonable continuance of at least 90 to 120 days of the hearing on the anti-SLAPP Motion, which is currently set for

February 3, 2026, to allow for discovery to be concluded. The length of this request is dictated, in part, by the fact that some of the potential deponents – including, crucially, Ms. Case – are believed to reside outside the State of California, and may require additional time for service.

This Motion is made and based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently-filed Declaration of Samuel A. Moniz (“Moniz Decl.”), all papers and pleadings on file in this matter, and on such further evidence and argument as may be presented at or before the hearing on this Motion.

Dated: December 5, 2025

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By Camille M. Vasquez

CAMILLE M. VASQUEZ
SAMUEL A. MONIZ
Attorneys for Plaintiffs and Cross-Defendants
AMANDA GHOST, GREGOR CAMERON,
and VINCE HOLDEN

# TABLE OF CONTENTS

Page


MEMORANDUM OF POINTS AND AUTHORITIES ..... 8

I. INTRODUCTION ..... 8

II. BACKGROUND ..... 11

A. Factual Background And Summary Of Allegations ..... 11

B. The Smear Websites ..... 12

C. Evidence Of Cross-Defendants' Involvement And Avenues Of Discovery ..... 14

D. The Anti-SLAPP Motion ..... 15

III. ARGUMENT ..... 16

A. Good Cause Exists To Grant The Requested Discovery, Especially As To the Issues Of Publication And Malice ..... 16

1. Good Cause Exists For Discovery As To Publication ..... 17

2. Discovery Is Warranted As To Issues Of Malice ..... 19

B. The Request Is Narrowly Tailored And Will Not Prejudice Wilson ..... 20

C. The Court Should Continue The Anti-SLAPP Hearing By 90-120 Days ..... 20

IV. CONCLUSION ..... 21

## TABLE OF AUTHORITIES

**Page(s)**

Cases

*Balla v. Hall* (2021)
59 Cal.App.5th 652 ........ 16

*Burrill v. Nair* (2013)
217 Cal.App.4th 357 ........ 19

*Diamond Resorts U.S. Collection Development LLC v. Pandora Marketing, LLC* (C.D. Cal. 2020)
500 F.Supp.3d 1104 ........ 17

*Lafayette Morehouse, Inc. v. Chronicle Publishing, Co.* (1995)
37 Cal. App. 4th 855 ........ 11, 16

*Mitchell v. Twin Galaxies, LLC* (2021)
70 Cal.App.5th 207 ........ 19

*Reader's Digest Assn. v. Superior Court* (1984)
37 Cal.3d 244 ........ 19

*Sanchez v. Bezos* (2022)
80 Cal.App.5th 750 ........ 16, 17

*St. Amant v. Thompson* (1968)
390 U.S. 727 ........ 19

*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019)
6 Cal.5th 931 ........ 16

*Taus v. Loftus* (2007)
40 Cal.4th 683 ........ 17

Statutes

Code Civ. Proc. § 425.16(g) ........ 16

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The pending anti-SLAPP Motion filed by Cross-Defendant Rebel Wilson ("Wilson") and joined by Melissa Nathan ("Ms. Nathan"), and The Agency Group PR, LLC ("TAG," and collectively with Ms. Nathan, the "PR Professionals") is focused on a single disputed factual question*:* were Wilson and her PR Professionals behind certain websites ("Smear Websites"), that spread defamatory lies about Plaintiff Amanda Ghost ("Ms. Ghost")? Wilson and the PR Professionals claim the answer is "no." But Ms. Ghost contends that the answer is undoubtedly "yes" – and that the declarations filed by Wilson and Ms. Nathan in support of their anti-SLAPP motions are knowingly false and perjurious. Because the anti-SLAPP Motion turns on contested factual issues, the Court should grant Ms. Ghost leave to conduct specified discovery. Discovery is warranted to ensure that Ms. Ghost has a full and fair opportunity to present a *prima facie* case, and to enable the Court to decide the pending dispositive motion on a fully developed factual record.

***First,*** Ms. Ghost should be permitted to issue a subpoena for documents and testimony so that she may take the deposition of Katie Case, a subordinate of Ms. Nathan's at TAG. Ms. Case is a critical witness. ***Ms. Nathan instructed Ms. Case, in writing, to prepare copy for a malicious website about Ms. Ghost, writing:***

- **"So basically, Rebel wants a one of those sites"**
- **"Should be a mixture of that document that I think Carolina pulled about Amanda goes or the Intern pulled The voice note and this…** ***Attachment: __Library_SMS_Attachments_88_08_DB9BA138-EBEE-4043-803C-A39606AB4701_Amanda Ghost website.docx (26 KB)***
- **"It can be really really harsh"**
- **"Russian oglivarchs [sic] and making her a madam basically lol"** (Emphasis added.)

As a direct participant in creating content for the Smear Websites, Ms. Case's testimony can reasonably be expected to support Ms. Ghost's *prima facie* claim that Wilson and Ms. Nathan were responsible for their publication., which would refute Wilson and Nathan's self-serving denials of involvement. Indeed, ***Ms. Case appears to have already contradicted Ms. Nathan's***

***testimony*** when she was deposed in a separate consolidated action currently pending against TAG, Nathan, and others, in the District Court for the Southern District of New York, *Jones et al. v. Abel, et al.,* Case No. 1:25-cv-00779-LJL, consolidated with Case No. 1:24-cv-10049-LJL, and related to Case No. 1:25-cv-00449-LJL (collectively, the "New York Litigations"). The New York Litigations involve allegations against Ms. Nathan, TAG, and others for conducting smear campaigns, including through the use of derogatory websites. The Amanda Ghost Smear Websites have been included as exhibits in filings in the New York Litigations, and appear to have been the subject of testimony by Ms. Case, Ms. Nathan, and others. Ms. Case can reasonably be expected to provide information about Wilson and Ms. Nathan's involvement, and help controvert their declarations. Her testimony would also be relevant to issues of actual malice, as she can speak to the purpose, sources, and content of the Smear Websites, and whether those who prepared them believed them to be true.

***Second,*** Ms. Ghost seeks leave of Court to obtain certain basic documents and testimony from TAG, Wilson, and Ms. Nathan. As parties to the New York Litigations, TAG and Nathan are already in possession of transcripts of the depositions of Ms. Case, Ms. Nathan, and others regarding the creation of derogatory websites – including, apparently, the Smear Websites at issue in this action. Ms. Ghost should be authorized to propound discovery for those documents, including transcripts of Ms. Case's and Nathan's depositions, and any testimony that pertain to the Smear Websites about Ms. Ghost. Further, Nathan and TAG, as well as Wilson, should turn over all documents and communications pertaining to the Smear Websites about Ms. Ghost – including any documents regarding (1) Ms. Ghost, (2) amandaghost.com, (3) amandaghostsucks.com, or (4) Rebel Wilson's dispute with Ms. Ghost. This should specifically include any documents pertaining to those topics that have been produced by any party in the New York Litigations. Such documents are appropriately targeted to obtain information about the creation and publication of defamatory material via the Smear Websites.

***Third,*** Ms. Ghost should be afforded an opportunity to take short depositions of both Wilson and Nathan. Such depositions are needed to cross-examine them on their declarations, as well as on documents and conduct that contradict their testimony. For instance, Ms. Ghost should

be allowed to question both Nathan and Ghost about written messages that reflect that, at Wilson's behest, Nathan directed the creation of defamatory content for publication on the Smear Websites. Ms. Ghost should also be allowed to question Wilson about a broader pattern of conduct that supports the inference that she is involved in the Smear Websites. For instance, Wilson briefly posted the Smear Websites on her own social media and caused them to be included in her filings in this action. Wilson has also spread rumors about Ms. Ghost elsewhere that are virtually identical to the defamatory material appearing on the Smear Websites. In addition to exploring Wilson's and Nathan's involvement in publishing the defamatory content, the requested depositions would also be relevant to the question of actual malice (to the extent that the Court were to conclude that Ms. Ghost is required to show malice). To properly address the question of malice, Ms. Ghost should be permitted to explore at deposition such matters as (1) what sources were relied on to create the defamatory material on the Smear Websites; (2) what was the purpose of disseminating such material; (3) who came up with the defamatory material, and (4) whether any of the persons involved in doing so believed that a single word of it was true.

***Fourth,*** several additional follow-up depositions may be warranted depending on the foregoing discovery. Documentary evidence and filings in the New York Litigations reflect that Nathan and Wilson did not act alone, but were supported by others who were materially involved, including a person named Jed Wallace, a person named Carolina, and Bryan Freedman. Nathan's messages to Ms. Case reflect that a person named "Jed" was involved in discussing the content of the Smear Websites, and that the material was also based on materials about Ms. Ghost that had been compiled by a person named "Carolina." Wilson has conceded publicly that Nathan was employed by her former attorney, Bryan J. Freedman. In a recent interview with 60 Minutes Australia, Wilson was forced to concede that Nathan "worked for my lawyer at the time" and was unable to offer any innocent explanation for her obvious involvement. Mr. Freedman is also referenced in the written exchanges between Nathan and Ms. Case ("I'm already trying to kill one rebel story and deal with Mattel loss for Bryan" "Jed and Bryan asking me for copy lol kill me"). Notably, Mr. Freedman has been accused in the New York Litigations of facilitating similar smear

websites. For instance, in a filing dated November 13, 2025, counsel in the New York Litigations noted the following about Ms. Case's testimony at deposition:

> Ms. Case's own under oath testimony reveals that Ms. Case was integrally involved in planting and providing information for the Business Insider article, starting in March 2024—earlier than Jonesworks had previously been aware. It is also apparent that Ms. Case had a material role in the creation and drafting of copy for the defamatory website and social media handles regarding Stephanie Jones, ***as part of a pattern and practice of drafting copy for and assisting with similar smear websites against many individuals, together with Melissa Nathan, Jed Wallace, and Bryan Freedman."*** (Emphasis added).

Accordingly, Ms. Ghost should be permitted to issue subpoenas for documents (i.e., their communications about the creation or content of the Smear Websites) and testimony, if necessary, to conduct depositions of Jed Wallace, Carolina, and Mr. Freedman, to investigate their involvement in assisting Wilson's defamatory campaign again Ms. Ghost via the Smear Websites, their purpose in doing so, and the sources they relied on, if any.

An anti-SLAPP motion puts a plaintiff or cross-complainant's entire case to the test without the benefit of discovery. Because of this inherent procedural unfairness, the law mandates that courts should "liberally exercise" their discretion to permit discovery necessary to refute an anti-SLAPP motion. *Lafayette Morehouse, Inc. v. Chronicle Publishing, Co.* (1995) 37 Cal.App.4th 855, 868. Where, as here, an anti-SLAPP motion ***turns on disputed factual issues***, discovery is particularly appropriate. Ms. Ghost's request for discovery is targeted and manifestly appropriate. The Motion should be granted and the hearing on the anti-SLAPP Motion should be continued by an appropriate period of no less than 90-120 days to allow for discovery to take place.

## II. <u>BACKGROUND</u>

### A. <u>Factual Background And Summary Of Allegations</u>

As explained at greater length in prior briefing and declarations filed with the Court, this case arises out of a film, *The Deb* (the "Film") that was made in Australia. The three original plaintiffs, Ms. Ghost, Gregor Cameron, and Vince Holden are experienced producers (the "Producers"). The Producers and their companies partnered with Wilson to make the Film,

contemplating that Wilson would act and direct the Film, while the Producers, through their associated entities, would provide funding and producing services. The Film was governed by a number of contracts that were the subject of extensive negotiation over a period of months. Wilson was represented in these negotiations, including by her agent Charlies Collier. Wilson voluntarily signed the relevant contracts via DocuSign after lengthy negotiation. (*See* Declaration of Amanda Ghost ("Ghost Decl.") at ¶ 3.)

Wilson then became dissatisfied with the agreements she had made; in particular, she wanted to be given credit for writing the Film, which was based on a script by a young writer named Hannah Reilly. When Ms. Reilly declined Wilson's demands for shared writing credit, Wilson commenced an arbitration against Reilly in Australia. Wilson lost. Wilson then sought to obtain a writing credit from the Producers and renegotiate the Film's contracts, inventing a patently false narrative that she had been forced to sign the relevant contracts under duress. As part of this pressure campaign, Wilson then took to social media and accused Ms. Ghost, Mr. Cameron, and Mr. Holden of embezzlement and harassing an actress on the Film. This was a revival of a rumor Wilson had previously spread that the Film's lead actress, Charlotte MacInnes, had accused Ms. Ghost of harassment. In fact, that is categorically false, and has been denied by both Ms. Ghost and Ms. MacInnes. The Producers sued for defamation. (Ghost Decl. ¶ 4-5.)

B. <u>The Smear Websites</u>

In response to the lawsuit and subsequent news coverage, Wilson wrote that Ms. Ghost and the other Producers "leave a path of destruction" and that the lawsuit would "very publicly ruin them." Wilson also claimed in writing that a long litany of other people had supposedly had problems with Ms. Ghost, including Baz Lurhmann, Shakira, Brandy, and Sarah Bareilles, and asserted that Ms. Ghost and Mr. Cameron had lost a financier "a lot of money on the GATSBY stage project as well." (Moniz Decl. ¶ 7.) Wilson followed this with an email decrying the "grossly abhorrent attack on me in the press" and announcing that she was "cancelling Toronto and all sales/promotion of the film and will be going public as to why."

Shortly thereafter, the first of the website domain names – amandaghost.com – was registered, at which was eventually published profoundly false and defamatory content about Ms.

Ghost. Among other things, the Smear Websites labelled Ms. Ghost the "Indian Ghislaine Maxwell" and falsely accused her of accused her of being a "madame" and "procuring young women for the pleasure of the extremely wealthy." (Ghost Decl. ¶¶ 7-8, **Ex. 1**.) The Smear Websites also were notably reminiscent of Wilson's earlier private written messages. For instance, just as Wilson had previously written private messages claiming that Baz Lurhmann, Shakira, Brandy, and Sarah Bareilles supposedly had bad experiences with Ms. Ghost, the Smear Websites identified each of those individuals as "some of the people impacted by Amanda[.]" Just as Wilson had commented in private messages that Ms. Ghost had supposedly lost "a lot of money" for a financier on the "Gatsby stage project," the Smear Websites recycled the same charge ("let's only hope the hookers made up for losing her financier $25M by mounting The Great Gatsby stage musical to simply reward an actress for remaining silent about the abuse she suffered at Ghost's hands").[1] The statements in the Smear Websites are false and defamatory. (Ghost Decl. ¶ 8.)

Wilson has publicly denied involvement with the Smear Websites, while winking at their content. For instance, she commented publicly: "it is important to note that in my opinion, is the information on these websites probably true? Yes, I feel like it most likely is true with the information I'm aware of after speaking to so many people. You don't need to search very far to find a chequered history of Ghost!"[2] Wilson's Cross-Complaint filed on October 1, 2024 (which was sent to the media a week before it was served on the parties) notably cited to both amandaghost.com and amandaghostsucks.com. As part of an extraordinarily inappropriate rant against Ms. Ghost that appeared in Wilson's Cross-Complaint, Wilson and her counsel alleged, among other things, that: "Amanda Ghost has accumulated numerous enemies over the years. In

---

[1] Wilson would later echo this same libel about Ms. Ghost and Ms. MacInnes on her own social media: "The fact that this girl has now been employed by this 'producer' in the lead role of a production called GATSBY (ART Boston)… should be all the proof you need as to why she has now changed her story[.]" (Ghost Decl. ¶ 6.)

[2] See Request for Judicial Notice ("RJN") at ¶ 6, *Rebel Wilson Denies 'Malicious Websites' Claim*, Yahoo News U.K., https://uk.news.yahoo.com/rebel-wilson-denies-malicious-websites-080000233.html.

fact, a website has emerged that exposes some of her darker dealings, which can be found at **'amandaghost.com'** and **'amandaghostsucks.com'**." (Wilson Cross-Complaint at ¶ 2.) (Bold emphasis in original). In short, while Wilson has previously denied involvement in the Smear Websites, her denials are simply not credible; she has tried to be too cute by half.

C. Evidence Of Cross-Defendants' Involvement And Avenues Of Discovery

Public filings in the New York Litigations, where TAG and Nathan are both defendants, have revealed some additional evidence of Wilson's involvement. Counsel for Ms. Ghost recently became aware of documents publicly filed in the New York Litigations, which were circulating on social media, and which reflected involvement by Nathan, Wilson, and TAG in the Smear Websites. Counsel for Ms. Ghost promptly obtained copies of the filed documents in the New York Litigations, including a series of messages between Nathan and one of her subordinates at TAG, Ms. Case, discussing the preparation of websites targeting Ms. Ghost, for Wilson. (Moniz Decl. ¶ 4-5, **Ex. 2**.) In the messages, Nathan wrote instructions to Ms. Case that:

- **"So basically, Rebel wants a one of those sites"**
- **"Should be a mixture of that document that I think Carolina pulled about Amanda goes or the Intern pulled The voice note and this…** ***Attachment: __Library_SMS_Attachments_88_08_DB9BA138-EBEE-4043-803C-A39606AB4701_Amanda Ghost website.docx (26 KB)***
- **"It can be really really harsh"**
- **"Russian oglivarchs [sic] and making her a madam basically lol"**

(See Declaration of Samuel A. Moniz at ¶ 4-5, Exhibit 2.)

Documentary evidence and filings in the New York Litigations further reflect that Nathan and Wilson did not act alone, but were supported by others who were materially involved, including a person named Jed Wallace, Carolina, and Bryan Freedman. Nathan's messages to Ms. Case reflect that a person named "Jed" was involved in discussing the content of the Smear Websites, and that the material was also based on materials about Ms. Ghost that had been compiled by a person named "Carolina." (*Id.*) Wilson has conceded publicly that Nathan was employed by her former attorney, Bryan J. Freedman. In a recent interview with 60 Minutes Australia, Wilson acknowledged that Nathan "worked for my lawyer" but was unable to offer any

innocent explanation for her obvious involvement.[3] Mr. Freedman is specifically discussed in the written exchanges between Nathan and Ms. Case ("I'm already trying to kill one rebel story and deal with Mattel loss for Bryan*"* "Jed and Bryan asking me for copy lol kill me"). (**Ex. 2**.) Notably, Mr. Freedman has also been accused in the New York Litigations of facilitating similar smear websites. For instance, in a filing dated November 13, 2025, counsel in the New York Litigations noted the following about Ms. Case's testimony at deposition:

> Ms. Case's own under oath testimony reveals that Ms. Case was integrally involved in planting and providing information for the Business Insider article, starting in March 2024—earlier than Jonesworks had previously been aware. It is also apparent that Ms. Case had a material role in the creation and drafting of copy for the defamatory website and social media handles regarding Stephanie Jones, ***as part of a pattern and practice of drafting copy for and assisting with similar smear websites against many individuals, together with Melissa Nathan, Jed Wallace, and Bryan Freedman."*** (Emphasis added).[4]

D. The Anti-SLAPP Motion

In response to Ms. Ghost's Cross-Complaint for defamation based on the Smear Websites, Wilson filed an anti-SLAPP motion, the gravamen of which is that Wilson "had nothing to do with the websites" and that neither "Wilson nor anyone acting at her direction asked for, authorized, or caused the websites to be created." (anti-SLAPP Mot. 1:3-6.) Wilson has submitted a declaration to that effect.[5] Nathan and TAG joined in Wilson's anti-SLAPP Motion, and Nathan submitted a declaration stating that neither she nor TAG registered, created, or provided any of the content in the websites. The truth or falsity of Wilson's and Nathan's denials are at the core of their anti-SLAPP Motion.

---

[3] See Ms. Ghost's Request for Judicial Notice at ¶ 7. The full interview involving Wilson is available on YouTube at https://www.youtube.com/watch?v=Oiv6ikIwMXQ. Wilson's discussion of the Smear Websites begins at 18:09 minutes.

[4] Request for Judicial Notice at ¶ 5, S.D.N.Y. Case No. 1:25-cv-00779-LJL Document 170-10, at page 2.

[5] Wilson's credibility is squarely at issue in this case, and, as will be demonstrated more thoroughly in opposition to the anti-SLAPP Motion, she has shown no compunction in submitting false testimony under oath.

## III. ARGUMENT

### A. Good Cause Exists To Grant The Requested Discovery, Especially As To the Issues Of Publication And Malice

Ms. Ghost's request for limited, targeted discovery should be granted.

As stated by the California Supreme Court, "the SLAPP Act was 'intended to end meritless SLAPP suits early without great cost to the target,' *not* to abort potentially meritorious claims due to a lack of discovery." *Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 949 (citation omitted). Although the filing of an anti-SLAPP motion stays discovery in an action until the motion is resolved, "[t]he court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision." Code Civ. Proc. § 425.16(g). "Good cause" exists when "the specified discovery is necessary for the plaintiff to oppose the anti-SLAPP motion and is tailored to that end." *Balla v. Hall* (2021) 59 Cal.App.5th 652, 692 (cleaned up) (discovery was properly allowed where the plaintiffs "sought discovery on actual malice" and "narrowly tailored their requests by seeking the depositions of Hall, Siegel, and a handful of others"). Further, "the fact [that] evidence necessary to establish the plaintiff's prima facie case is in the hands of the defendant or a third party goes a long way toward showing good cause for discovery." *Sanchez v. Bezos* (2022) 80 Cal.App.5th 750, 778, citing *The Garment Workers Center v. Superior Court* (2004) 117 Cal.App.4th 1156, 1162. In *Lafayette Morehouse, Inc. v. Chronicle Publishing, Co.* (1995) 37 Cal.App.4th 855, 868, the court explained:

> Motions under section 425.16 commonly will be filed early in the legal proceedings, before the plaintiff has the opportunity to conduct (or complete) significant and necessary discovery. If the plaintiff makes a timely and proper showing in response to the motion to strike, that a defendant or witness possesses evidence needed by plaintiff to establish a *prima facie* case, ***the plaintiff must be given the reasonable opportunity to obtain that evidence through discovery before the motion to strike is adjudicated. The trial court, therefore, must liberally exercise its discretion by authorizing reasonable and specified discovery*** timely petitioned for by a plaintiff in a case such as this, when evidence to establish a *prima facie* case is reasonably shown to be held, or known, by defendant or its agents and employees. (emphasis added).

Here, the anti-SLAPP Motion centers on the factual contention by Wilson and Nathan that they were not involved in the publication of the Smear Websites. Those denials, however, are contradicted by a mountain of circumstantial evidence – including written admissions – that argue powerfully for further discovery on this issue. The Cross-Defendants' self-serving declarations are dubious at best. In fact, they are likely false and perjurious. Discovery is plainly permissible and justified to enable Ms. Ghost to present a prima facie case of defamation, including as to the element of publication, which is the threshold question put at issue by the anti-SLAPP Motion. *See, e.g., Sanchez, supra,* 80 Cal.App.5th at 779-80 (noting that discovery is permissible as to the element of publication); *see also, Diamond Resorts U.S. Collection Development LLC v. Pandora Marketing, LLC* (C.D. Cal. 2020) 500 F.Supp.3d 1104, 1112 (noting in the context of federal practice that "[w]hen a factual sufficiency challenge is made, discovery must be allowed, with opportunities to supplement evidence based on the factual challenges").

1. Good Cause Exists For Discovery As To Publication

Here, without disputing that false and defamatory materials were published about Ms. Ghost on the Smear Websites, the anti-SLAPP Motion primarily asserts that Wilson, Nathan, and TAG are not the persons responsible for the publication of those defamatory materials. Therefore, they assert that as a factual matter they are not subject to a defamation action. Those denials are highly suspect – and Ms. Ghost's believes they will be proven false. At this stage, however, they implicate one of the key elements of defamation that must be met in opposing an anti-SLAPP motion: *publication* of a defamatory statement. *See, e.g., Taus v. Loftus* (2007) 40 Cal.4th 683, 720. There is significant evidence to warrant the belief that these denials cannot be trusted and that discovery is likely to lead to substantial evidence that will support the element of publication. For instance, there is written evidence that Nathan, on Wilson's behalf, directed Ms. Case to prepare written copy for the Smear Websites. There is an undeniable symmetry between Wilson's statements and lies about Ms. Ghost and the content of the Smear Websites. The timing is likewise significant – the Smear Websites appeared when Wilson felt that she had been attacked in the media, as the parties' contractual dispute became public. And Wilson's subsequent conduct

(such as stating as her "opinion" that the content of the Smear Websites is true, and including links to the Smear Websites in her pleadings in this case) is strongly suggestive of her involvement.

Thus, there are strong reasons not to simply accept the Cross-Defendants' denials at face value. Ms. Ghost ought to be permitted to conduct discovery to further bolster her prima facie claims. The requested discovery on this topic is appropriately tailored to the issues raised by the anti-SLAPP Motion, as follows:

**Katie Case.** Ms. Case is a critical witness, who will be able to contextualize and authenticate Ms. Nathan's written instructions to her to prepare written copy for the Smear Websites on Wilson's behalf. Further, it appears that she has testified contrary to Ms. Nathan in the New York Litigations, and that her testimony in this action will undermine Ms. Nathan's credibility and support a *prima facie* case that Ms. Nathan and Wilson were involved in publication. Further depositions of other persons apparently involved could also help link the Smear Websites to the Cross-Defendants: this includes the person identified as "Carolina;" Jed Wallace; and Mr. Freedman, all of whom appear to have been involved based on the documents currently available. In addition, Ms. Case is likely to be in possession of additional documents and communications discussing the content and creation of the Smear Websites. In particular, she may be in possession of the word document sent to her by Ms. Nathan, entitled "Amanda Ghost Website.docx," which should certainly be turned over.

**TAG/Nathan Documents.** Ms. Ghost should be permitted to seek documents from TAG and Ms. Nathan pertaining to Ms. Ghost, the Smear Websites, and Wilson's dispute with Ms. Ghost. This should include any documents produced or deposition testimony given in the New York Litigations on those topics. For instance, TAG and/or Ms. Nathan ought to be in possession of the word document sent to Ms. Case by Ms. Nathan, entitled "Amanda Ghost Website.docx," which ought to be provided to Ms. Ghost. Such topics are calculated to controvert Nathan's denial of involvement, which is already controverted by her own words to Ms. Case.

**Wilson/Nathan Depositions.** The depositions of Wilson and Nathan are warranted on the issue of their involvement in publication, particularly so that they can be subjected to cross

examination on the numerous pieces of circumstantial and documentary evidence that controvert their denials.

2. Discovery Is Warranted As To Issues Of Malice

Ms. Ghost does not concede that she is required to show actual malice to defeat the anti-SLAPP Motion. However, to the extent that the Court requires a showing of actual malice, which turns on the defendants' subjective belief as to the truth or falsity of their statements, discovery is plainly warranted to develop a factual record to support it. "Factors such as failure to investigate, anger and hostility, and reliance on sources known to be unreliable or biased" will show malice. *Mitchell v. Twin Galaxies, LLC* (2021) 70 Cal.App.5th 207, 221. Malice can also be shown "where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call." *St. Amant v. Thompson* (1968) 390 U.S. 727, 732; *Burrill v. Nair* (2013) 217 Cal.App.4th 357, 391. "[E]vidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences," the presence of malice. *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 257.

Here, the discovery specified above is also tailored to issues of malice, because it will lead to discovery on such matters as the purpose and intent of the Smear Websites; how they were prepared; and what sources were relied on in their preparation.

**Katie Case.** Ms. Case, because of her near-certain involvement in drafting copy for the Smear Websites, can shed light on what went into the language; what sources, if any were relied on, and their reliability (or lack thereof); her instructions, purpose, and motive in preparing the copy; and whether she or the other persons involved believed in the truth of their contents. The same can be said for the potential follow-up depositions of "Carolina," Jed Wallace, and Mr. Freedman.

**TAG/Nathan Documents.** Likewise, documents, communications, and testimony about the Smear Websites in possession of Nathan and TAG are reasonably likely to lead to evidence of malice. It appears likely that the Smear Websites did not appear in isolation, but were part of a

broader pattern of defamatory tactics employed by Nathan and TAG on behalf of various clients, including Wilson, all of which, once established, will certainly support an inference of malice.

**Wilson/Nathan Depositions.** The depositions of Wilson and Nathan are warranted on the issue of their subjective beliefs, particularly so that they can be subjected to cross examination on the numerous pieces of circumstantial evidence that controvert their denial of involvement; and their motives in manufacturing a defamatory campaign against Ms. Ghost.

B. The Request Is Narrowly Tailored And Will Not Prejudice Wilson

The discovery requested herein is narrowly tailored, directly relevant to the issues, and minimally intrusive. Limited depositions and document discovery – the scope of which would be limited to only those factual matters put at issue by the pending anti-SLAPP Motion – will not cause any prejudice to the Cross-Defendants. Conversely, it is necessary for the Ms. Ghost to properly present evidence in support of her claims. Good cause exists for discovery. (Moniz Decl. 10.)

C. The Court Should Continue The Anti-SLAPP Hearing By 90-120 Days

A continuance of 90 to 120 days is requested to allow for the discovery requested herein. Such a continuance is warranted because certain of the requested elements of discovery (such as document requests) are inherently time consuming. Further, third party depositions require the service of subpoenas and at least some potential deponents – including Ms. Case – are believed to be located in other states. As a practical matter, it will be difficult to complete discovery proceedings in less than 90 days, even if there are no unexpected delays. (Moniz Decl. 11.)

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## IV. CONCLUSION

For the foregoing reasons, Ms. Ghost respectfully requests that the Court grant the Motion.

Dated: December 5, 2025

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By Camille M. Vasquez

CAMILLE M. VASQUEZ
SAMUEL A. MONIZ
Attorneys for Plaintiffs and Cross-Defendants
AMANDA GHOST, GREGOR CAMERON,
and VINCE HOLDEN

PROOF OF SERVICE

**Amanda Ghost, et al. v. Rebel Wilson**
**Case No. 24STCV17314**

STATE OF CALIFORNIA, COUNTY OF ORANGE

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Orange, State of California. My business address is 650 Town Center Drive, 10th Floor, Costa Mesa, CA 92626-1993.

On December 5, 2025, I served true copies of the following document(s) described as **AMANDA GHOST'S MOTION FOR LEAVE TO TAKE LIMITED DISCOVERY IN RESPONSE TO ANTI-SLAPP MOTION** on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address CSuda@sheppardmullin.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 5, 2025, at Orange, California.

Casey Suda

**SERVICE LIST**
**Amanda Ghost, et al. v. Rebel Wilson**
**Case No. 24STCV17314**

| | |
|---|---|
| Allyson Thompson<br>Hart Kienle Pentecost<br>4 Hutton Centre Drive, Suite 900<br>Santa Ana, CA 92707-8713<br>Telephone: (714) 432-8700<br>athompson@hkplawfirm.com<br>rfernandez@hkplawfirm.com | Attorneys for Defendant and Cross-Complainant<br>REBEL WILSON |
| Jean-Paul Jassy<br>Nicholas R. Hartmann<br>JASSY VICK CAROLAN LLP<br>355 South Grand Avenue, Suite 2450<br>Los Angeles, California 90071<br>Telephone: 310-870-7048<br>Facsimile: 310-870-7010<br>jpjassy@jassyvick.com<br>nhartmann@jassyvick.com<br>office@jassyvick.com | Attorneys for Defendant and Cross-Complainant<br>REBEL WILSON |
| Douglas Mirell<br>NOLAN HEIMANN LLP<br>16000 Ventura Blvd., Suite 1200<br>Encino, California 91436<br>Telephone: (818) 574-5710<br>dmirell@nolanheimann.com<br>schateauneuf@nolanheimann.com | Attorneys for Cross-Defendants<br>MELISSA NATHAN and THE AGENCY GROUP PR, LLC |

# Journal Technologies Court Portal

# Court Reservation Receipt

## Reservation

Reservation ID:
099894740620

Status:
RESERVED

Reservation Type:
Motion for Leave (to Take Limited Discovery in Response to Anti-SLAPP Motion)

Number of Motions:
1

Case Number:
24STCV17314

Case Title:
AMANDA GHOST, AN INDIVIDUAL, et al. vs REBEL WILSON, AN INDIVIDUAL

Filing Party:
Amanda Ghost (Cross-Complainant)

Location:
Stanley Mosk Courthouse - Department 48

Date/Time:
January 8th 2026, 8:30AM

Confirmation Code:
CR EWESZRJZ2VTR4GYD2

## Fees

| Description | Fee | Qty | Amount |
|---|---|---|---|
| Motion for Leave (name extension) | 0.00 | 1 | 0.00 |
| TOTAL | | | **$0.00** |

## Payment

Amount:
$0.00

Type:
NOFEE

‹ Back to Main

Print Page

Copyright © Journal Technologies, USA. All rights reserved.

# EXHIBIT E

# EXHIBIT 45

FILED UNDER SEAL

## Short Message Report

| | |
|---|---|
| Conversations: 1 | Participants: 2 |
| Total Messages: 73 | Date Range: 7/29/2024 |

### Outline of Conversations

**iMessage Chat: Melissa Nathan [redacted], Custodian: Abel, Jennifer [redacted]** • 73 messages on 7/29/2024 • Custodian: Abel, Jennifer [redacted] • Melissa Nathan [redacted]

**Messages in chronological order** (times are shown in GMT -04:00)

**iMessage Chat: Melissa Nathan [redacted], Custodian: Abel, Jennifer [redacted]**

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:03 AM
[redacted]

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:03 AM
[redacted]

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:03 AM
Do you know if they came to SJ for comment ? What is ridiculous is that the story literally says- he offered him the role. Then headline "rejected"

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:04 AM
[redacted] obvs on one

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 10:06 AM
This is ridiculous!

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 10:06 AM
I have no idea if they contacted Steph

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:06 AM
And for me [redacted] is useless but messaged her - but will get [redacted] to fix.

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 10:06 AM
Yeah I'd be pissed too if I was sb. What a bs article

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:07 AM
My meeting is at 10am so I am mid list of what I am saying - this isn't helpful.

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 10:07 AM
I wonder if he texted Steph about this too

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:07 AM
Oh FOR SURE

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 10:07 AM
Which usually she will text me to handle it but she didn't this time…

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:08 AM
Thats because you are now like me. An enemy of the state.

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 10:09 AM
Yes but… that means she would have had to tell scooter

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:09 AM
I will call you RIGHT after I drive away

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 10:09 AM
Should I shake shit up and text her about this and ask if they reached out to her for comment?

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:09 AM
Plz

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:09 AM
PLEASE

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 10:09 AM
On it

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:10 AM
I also said, jen and I are on it ( so not SJ and I are on it )

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:10 AM
So he knows its always us us us .

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:18 AM
https://mol.im/a/13684031

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:18 AM
Southport stabbing: 'One child dead' and seven people injured

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 10:19 AM
They didn't reach out but Steph said she will reach out to [redacted] lol

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:19 AM
I already did.

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:19 AM
But go for it

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 10:19 AM
I know I told her and said that scooter texted you about it

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:20 AM
I honestly do not think she does F all there anymore in her new role

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 10:20 AM
Nope

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:35 AM
Done

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:35 AM
[redacted]

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:36 AM
She cannot say this is her - fyi

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 10:36 AM
lol

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:36 AM
Thank you lord

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 10:37 AM

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:38 AM
SHE JUST RE WROTE ??

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 10:39 AM
Yep

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:40 AM

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 10:42 AM
It's all quite ridiculous isn't it

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:44 AM
Ifs beyond ridiculous - how she presents herself to him. And Melissa monitors LOL. Yes of course my team does so we can fix stories

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 10:54 AM
That was a dig at me because I didn't catch at 4am when it broke lol

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 10:54 AM
I'm gonna call you on my way up there.
I'm trying not to let this make me mad

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 10:57 AM
Don't. It's so ridiculous at this point and sb sees through it

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 11:03 AM
I know.
And once you are gone - we will be on accounts together and make really good money and be happy

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 11:48 AM
Let me know how it goes! Matt is going to see him later today for the first responder shoot

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 11:48 AM
I am calling you in the car- just need to get off the bloody toilet. Do not up the med

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 11:49 AM
Oh no

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 11:49 AM
I'm so sorry

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 1:16 PM
Oh
My
God

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 1:16 PM
I can't wait to call you I might call you mid this meeting

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 1:19 PM
Omg do it

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 1:25 PM
Say the shit she said to you .

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 1:57 PM
Shocked

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 1:58 PM
I'm working our plan

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 1:58 PM
Bear with me

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 2:19 PM
Am just with Andrew Sahn but calling you after when I leave

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 4:48 PM
I just left
I'm going to get my car to go home from home once I've taken some medicine .
I told all of them I want you on board as a separate contractor .

But I need meds before I talk to you

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 4:49 PM
As - my situation isn't good lol

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 4:49 PM
Hahaha oh no I'm so so sorry

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 4:49 PM
Did you by chance chat with Katie? The journo

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 4:49 PM
No, she's calling me soon. Actually, should be very soon, probably in the next 10 minutes.

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 4:50 PM
I'm so sorry you're not feeling well!!!!

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 4:50 PM
Matthew was laughing

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 4:50 PM
Of course he was lol

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 4:50 PM
How was sb

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 4:51 PM
We only really spoke at his house
Then I didn't stay for shoot as I went to see Sahn and finance people .
He was really shocked

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 4:51 PM
Wild to me

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 4:51 PM
Same

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 9:01 PM
I literally went home and went to sleep and now I'm working an [redacted].

She asked to move call to tomorow but don't worry am ON it

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 9:02 PM
Omg don't worry I appreciate you

JA **Custodian: Abel, Jennifer** [redacted] ◀ 7/29/2024, 9:02 PM
Btw I added you to the IEWU screening on Thursday. They will email you details

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 9:07 PM
We need to get you out of it. This is my priority now.

MN **Melissa Nathan** [redacted] ▶ 7/29/2024, 9:34 PM
I want to make sure you are not

# EXHIBIT F

# EXHIBIT 49

FILED UNDER SEAL

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF JENNIFER ABEL
Los Angeles, California
Friday, September 26, 2025
Stenographically Reported by: Ashley Soevyn,
CALIFORNIA CSR No. 12019

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**CONFIDENTIAL**

Video-recorded Deposition of JENNIFER ABEL, taken on behalf of the Plaintiff Blake Lively, Pursuant to Notice, at the offices of Willkie Farr & Gallagher, 2029 Century Park East, Los Angeles, California beginning at 9:12 a.m. and ending at 6:52 p.m. on Friday, September 26, 2025, before me, ASHLEY SOEVYN, California Certified Shorthand Reporter No. 12019.

"Agreed. It's horrible. We'll dig in for details on her indiscretions."

And then there's some emojis there, right?

A Yes.

Q And you don't respond to that in words, but you "heart" that or "love" that, right?

A Yes.

Q Did Mr. Mitchell prepare such a whatever, this arsenal of stuff on Ms. Lively's indiscretions?

MR. FREEDMAN: Objection.

THE WITNESS: Not -- not that I'm aware of.

BY MR. GOTTLIEB:

Q Who first suggested the hiring of Melissa Nathan and TAG on the Wayfarer -- Baldoni account?

A Melissa was one of my crisis recommendations.

Q Okay. And I think you testified yesterday that you had given a few names?

A Multiple.

Q And you -- did you recommend Ms. Nathan? Not in the sense of, you must hire this person, but, this would be a good person to work with, to

Do you recall me asking you that?
A I believe you phrased it differently.
Q Okay. In this chain, you are discussing with Ms. Abel the retention of your counsel, Mr. Freedman; is that right?
A We are discussing recommendations of lawyers.
Q Okay. And this is June 17th, and your client Wayfarer wants you to recommend a couple of great lawyers, right?
A Correct.
Q And you mentioned -- you say, by the way:
(As read):
"Steve Sarowitz will be paying for this."
Do you see that?
A Yes.
Q Is Steve Sarowitz paying for your lawyers in this case?
A I'm not sure who's paying.
Q You're not paying?
A No.
Q You ever seen a bill?
A No.
Q Do you have an indemnification agreement?

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 27th day of September, 2025.

ASHLEY SOEVYN

CSR No. 12019

# EXHIBIT G

# EXHIBIT 76

FILED UNDER SEAL

Docusign Envelope ID: 82FB6EE8-5152-4408-AF43-214D476B019A

**LINER FREEDMAN TAITELMAN + COOLEY, LLP**
ATTORNEYS AT LAW

1801 CENTURY PARK WEST, 5TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6007
TEL: (310) 201-0005
FAX: (310) 201-0045
E-MAIL: bfreedman@lftcllp.com

BRYAN J. FREEDMAN

December 24, 2024

Justin Baldoni
Wayfarer Studios LLC
417 S Beverly Dr.
Beverly Hills, CA 90212
[redacted]

Jennifer Abel
RWA Communications, LLC
[redacted]

Steve Sarowitz
[redacted]

Jed Wallace
Street Relations, Inc.
[redacted]

Jamey Heath
[redacted]

Melissa Nathan
The Agency Group PR LLC
[redacted]

Re: Hourly Fee Agreement for Legal Services

Dear Justin, Jamey, Steve, Melissa, Jennifer, and Jed:

It is Liner Freedman Taitelman + Cooley, LLP's belief that a clear understanding between attorney and client with respect to the terms of our employment and legal fees and expenses is fundamental to a good relationship between the parties. This letter will begin that process by explaining the terms of the relationship. It also will provide you with an accessible reference for any questions that might arise during the course of our attorney-client relationship.

## 1. IDENTIFICATION OF PARTIES:

This Hourly Fee Agreement (the "Agreement") is entered into between Liner Freedman Taitelman + Cooley, LLP ("LFTC"), as legal counsel, and Wayfarer Studios LLC (as "Client" and "Obligor") and Justin Baldoni, Jamey Heath, Steve Sarowitz, Melissa Nathan, The Agency Group PR LLC, Jennifer Abel, RWA Communications, LLC, Jed Wallace and Street Relations, Inc. (each individually as a "Client" and "Obligee") (collectively, the "Clients"). LFTC and Clients will collectively be referred to herein as the "Parties."

## 2. EFFECTIVE DATE OF AGREEMENT:

The effective date of this Agreement will the latest of the following dates: receipt of any required advance retainer, and LFTC's receipt of the Clients' signature on this Agreement. LFTC does not

represent Clients and therefore is under no obligation to render any legal services on Clients' behalf until after the effective date of this Agreement.

**3. <u>SCOPE OF SERVICES TO BE PROVIDED</u>:**

The legal services to be provided by LFTC to Clients under this Agreement are as follows: LFTC will represent Clients in connection with their dispute with Blake Lively and related parties, including, without limitation, Stephanie Jones and Jonesworks, LLC (referred to as "<u>the matter</u>" or "<u>the case</u>"). We have not been retained to represent Clients generally, or in connection with any other matter, at this time. However, the general terms of this Agreement will also apply to any other future matters on which LFTC is asked to and agrees to represent you, in the event there is no further engagement agreement.

This scope of legal services does **not** include LFTC providing any tax advice. Documents prepared by LFTC may have specific tax ramifications. To be sure Clients understand all potential tax consequences, Clients should consult with Clients' tax advisors regarding any issue involving taxes and taxation.

The scope of services also does not include LFTC doing insurance tenders or providing insurance coverage advice. Clients may possess insurance policies which provide Clients with first or third party coverage related to this matter. It is Clients' responsibility to locate any and all insurance policies which might apply to this matter, and to effectuate all necessary tenders and notifications to the applicable insurers. Though LFTC is not coverage counsel and cannot provide coverage advice to Clients, so that LFTC is aware of the status, please provide LFTC with any and all policies and copies of tenders/notifications. Please note that policies sometimes have language which conditions coverage on prompt reporting of claims with specific information in a specific manner. Clients' insurance broker and/or coverage counsel may be able to assist with any questions Clients have pertaining to insurance coverage.

**4. <u>CLIENTS' DUTIES</u>:**

Clients agree to be truthful with LFTC and will not withhold any information; will cooperate with LFTC; will keep LFTC reasonably informed of developments which may come to Clients' attention, including receipt of any notices or documents relating to this matter from others; will supply LFTC with all information requested by LFTC; and will supply LFTC with any changes of

Clients' addresses, telephone numbers, facsimile numbers, and whereabouts. Clients will assist LFTC by timely providing information and documents. Clients agree to appear at all legal proceedings when LFTC deems it necessary, and generally to cooperate fully with LFTC in all matters related to the preparation and presentation of Clients' claims and defenses.

5. **LEGAL FEES; CHARGING LIEN:**

Obligor, on behalf of Clients, agrees to pay LFTC by the hour at LFTC's rates as set forth below for all time spent on Clients' matter by LFTC attorneys and legal personnel. Current hourly rates for legal personnel are as follows:

| | |
|---|---|
| Senior Partners | [redacted] |
| Partners | |
| Associates | |
| Paralegals | |
| Law clerks | |

Any necessary travel on this matter will be billed at the full hourly rate for the attorney(s) travelling.

LFTC from time to time will make reasonable adjustments to the rates under this Agreement, and Clients and Obligor agree to same. Clients and Obligor will be informed of such reasonable rate increases in LFTC's billing statements, which will reflect the rate increases. In the event Clients and/or Obligor have any questions or concerns regarding said increases, Clients and/or Obligor are urged to reach out to LFTC upon receipt of LFTC's billing statement.

Clients and Obligor acknowledge and agree that LFTC has a charging lien on any and all claims, recovery, payments that are the subject of LFTC's representation under this Agreement. Attorney's lien will be for any sums owing to LFTC for any and all costs, expenses, and fees. The lien will attach to any recovery Clients may obtain, whether by arbitration award, judgment, settlement, sanctions, fee award, cost award, or otherwise. An effect of such a lien is that LFTC can compel payment of outstanding fees and costs from any such recovery. Because a lien may affect Clients' property rights, Clients are advised to and may seek the advice of an independent lawyer of Clients' own choice before agreeing to such a lien. Clients represent and agree that

Clients have had a reasonable opportunity to consult such an independent lawyer and prior to agreeing to this charging lien and all terms of this Agreement.

6. **NEGOTIABILITY OF LEGAL FEES**:

Clients understand that the rates set forth above are not set by law, but are negotiable between LFTC and Clients.

7. **COSTS AND OTHER FIRM CHARGES**:

In the course of Clients' matter, it will be necessary to incur various costs and expenses, as described in the next paragraph. Clients authorize LFTC, in its discretion, to incur these costs and expenses, including the costs of investigators, consultants and expert witnesses who are necessary for the advancement of Clients' matter, in LFTC's judgment. LFTC, in its discretion, may pay any such costs and expenses and bill Clients for the same. Clients agree to reimburse such costs and expenses within 30 days of receipt of the invoice for the same. If Clients have any questions regarding such invoices, or disputes any aspect of said invoices, Clients must notify LFTC within the same 30 days to discuss the same.

LFTC may also, in its discretion, send bills for costs and expenses directly to Obligor and Clients for payment. Obligor and Clients agree to pay the same within 30 days receipt of the invoice for the same, unless a third- party invoice requires payment sooner than 30 days, in which case Obligor and Clients agree to pay in accordance with the third-party terms.

In addition to investigators, consultants and expert witnesses, costs and expenses commonly include court filing fees, jury fees, service of process charges, court and deposition reporters' fees, interpreter/translator fees, outside photocopying and reproduction costs, messenger fees, service of process fees, notary fees, trial technology fees, mock jury trial fees, witness fees, parking costs, travel and hotel costs, meal costs, discovery referee costs, special master costs, subrosa costs, mediation costs, and arbitration costs.

Obligor and Clients also understand and agree that LFTC may provide certain services in-house at LFTC, and Obligor and Clients agree to pay reasonable charges for the same. These in-house costs include long distance telephone charges, computerized communication systems, individual file management and storage, postage, in-house copies, in-house scanning, in-house messenger

services, secretarial overtime, computerized research, and other services. LFTC will charge the following in-house costs as follows: (1) mileage - IRS Standard Mileage Rate; (2) in-house printing, photocopying, and scanning - $.20/page cents per page; (3) facsimile charges - $.20/page cents per page; and (4) postage – the amount charged by the carrier. For all other in-house costs, Obligor and Clients will be billed commensurate with LFTC's cost. If Obligor and/or Clients have any questions regarding in-house costs and expenses, or charges for the same, Obligor and/or Clients are urged to reach out to LFTC at any time regarding the same.

**8. <u>FEE DEPOSIT AND CREDIT CARD FEES</u>:**

Obligor, on behalf of Clients, agrees to advance a retainer of [redacted] for the professional services LFTC will provide to Clients before LFTC begins any work on this matter. Advance retainers are not intended to reflect the overall fees or costs for this matter, nor do they reflect the budget for any specific time frame or task. The entire amount of your retainer will be placed in LFTC's Client trust account.

LFTC requires Obligor, on behalf of Clients, to maintain a minimum balance of [redacted] in the Clients' trust account. If the balance in the trust account falls below that amount, LFTC will request, and Obligor agrees to provide, the additional retainer amount necessary to bring the total to [redacted] If Obligor and/or Clients do not maintain this minimum balance in the trust account, LFTC reserves the right to withdraw from the representation, and Clients agree to such withdrawal.

By way of Clients' signature on this Agreement, Clients agree that the amount of each bill is <u>fixed</u> as soon as it is issued to Clients, and Clients authorizes LFTC to automatically withdraw the entire amount of each monthly bill, including all costs LFTC has advanced on Clients' behalf and fees, from the LFTC Client trust account, in payment to LFTC for those services already rendered.

In the event that the matter becomes very active, LFTC may require a larger retainer, which Obligor, on behalf of Clients, agrees to pay upon ten (10) days written request. When the matter is concluded, LFTC will refund Obligor and/or Clients any amounts remaining in the trust account, after all fees and costs have been paid.

With regard to matters in litigation or arbitration, a pretrial retainer is required at least **one hundred and eighty (180) days** prior to the **originally scheduled** trial date, and Clients agree to pay the same. The retainer will be in the amount estimated to prepare for trial, and try the case, and will be presented to Clients at least ten (10) days before the due date. The entire amount of

Clients' retainer will be placed in the LFTC Client trust account. Failure to pay the pretrial retainer may result in LFTC requesting to be relieved as counsel.

Any estimates LFTC may provide from time to time and any deposits, retainers, or advances against costs LFTC may require are not a limitation on LFTC's fees and other charges.

If, as a result of the engagement, LFTC is required to produce documents or appear as a witness in connection with any governmental or regulatory examination, audit, investigation or other proceeding or any litigation, arbitration, mediation or dispute involving Clients or any related persons, Clients are responsible for costs and expenses reasonably incurred by LFTC (including professional and staff time at then scheduled hourly rates and reasonable attorneys' fees and costs incurred by LFTC).

Advance retainers may be wired to LFTC's bank account as follows:

LINER FREEDMAN TAITELMAN + COOLEY, LLP CLIENT TRUST ACCOUNT

BANC OF CALIFORNIA
[redacted] PII
Routing # [redacted] PII
Account # [redacted]

LFTC will not change these wire instructions. If you receive amended or different wire instructions, please immediately contact the LFTC attorneys handling this matter at a phone number that you have previously used to contact those attorneys.

Clients can also pay by credit card. A fee of [redacted]% is charged for each credit card payment which will be charged to the Clients, and Clients agree to be responsible for the same.

## 9. CONSENT TO PAYMENT OF ATTORNEYS' FEES AND COSTS:

By signing this Agreement, Obligor agrees to pay for all legal services which LFTC provides to Clients and costs incurred in the representation of Clients. Clients will remain responsible for and will pay LFTC's bills in the event Obligor fails for any reason to pay LFTC's bills as they become

due. If a refund is due at the conclusion of the representation, the refund will be paid to the person or entity who paid the fees and costs.
Obligor further agrees that it will not interfere with the attorney-client relationship or LFTC's exercise of independent professional judgment on behalf of any other Client. In furtherance of the independent nature of the attorney-client relationship, Obligor acknowledges that it has no right to direct LFTC's handling of any other Client's matter.

**10. <u>BILLING</u>:**

LFTC's statements for fees, costs and other firm charges generally will be prepared and mailed either electronically or via U.S. Mail, and are due upon receipt. Obligor and Clients each agree, severally, to pay such statements in full upon receipt. Obligor and Clients agree to promptly review all bills rendered by LFTC and to promptly communicate any objections, questions, or concerns about their contents and any charges. Obligor and Clients hereby acknowledge and agree that the statements, which may include details regarding their representation will be provided to Obligor and Clients for payment.

**11. CLIENTS' RESPONSIBILITY FOR PREVAILING PARTY OR COURT ORDERED FEES AND COSTS TO OTHER PARTY:**

Clients understand that if Clients' case proceeds to court action or arbitration and Clients lose a motion or the case entirely, or is not the prevailing party, the court may award attorney's fees and costs against Clients. Payment of such attorney's fees and costs will be the sole responsibility of Clients.

**12. SANCTIONS:**

Clients agree that any award of fees and costs that may be awarded as any type of sanction related to discovery or otherwise shall belong exclusively to LFTC. Such awards shall be applied to outstanding or future invoices consistent with the charging lien stated above.

The court may assess monetary sanctions (including attorney's fees and costs) *against Clients* for discovery violations, bad faith conduct, inappropriate conduct, and otherwise. Any such award will be entirely the responsibility of Clients.

**13. FILE POLICY:**

LFTC maintains Clients' files electronically and Clients agree to the same. LFTC may delete or destroy all files 120 days after the conclusion of representation, without further notification to Clients, and Clients agree to the same. If Clients desire any file materials at the end of representation, Clients must make a prompt written request of LFTC for the same.

**14. NO GUARANTEES AS TO RESULT:**

Nothing in this Agreement and nothing in LFTC's statements to Clients will be construed as a promise or guarantee about the matter or outcome of the representation. LFTC makes no such promises or guarantees. LFTC's comments about the outcome of the matter are expressions of opinion only, are neither promises nor guarantees, and will not be construed as promises or guarantees.

**15. MEDIATION AND CONFIDENTIALITY:**

With any dispute, there is a possibility the matter may go into mediation, and Attorneys will serve as Clients' counsel in that process. California Evidence Code section 1119 provides that anything that occurs in the mediation process is inadmissible and not subject to discovery. Therefore, should Attorneys represent Clients in mediation, the events, reports, analyses, and discussions leading up to the mediation and the mediation itself will be inadmissible and not subject to discovery in any subsequent dispute—including, but not limited to, any fee dispute and/or legal malpractice claim—between Clients and LFTC, or Clients and others. By signing below Clients confirms Clients' understanding of the strict and indisputable confidentiality of mediation and the potential impact it could have on any future dispute between Clients and LFTC, including, but not limited to, the potential preclusion of a legal malpractice claim. LFTC urges Clients to consult with independent counsel regarding mediation confidentiality and the implications of it before signing this Agreement. With this understanding, Clients consent to LFTC representing Clients in this matter and representing Clients in the context of mediation. If Clients have any questions about this issue, please contact LFTC at any time.

**16. AUTHORITY AND APPLICATION OF PRIVILEGE:**

Clients hereby authorizes and instructs LFTC with regard to the following persons:

________________________________________________________ ("**Client Representatives**")

Clients hereby instruct LFTC to work with Client Representatives on this matter, and specifically authorize LFTC to: (a) report any and all developments to Client Representatives, including all confidential developments; (b) strategize with Client Representatives regarding the matter; (c) share privileged and confidential information with Client Representatives; (d) engage in communications, including confidential communications with Client Representatives without Clients as part of those communications; and (e) accept and execute upon any and all instructions from Client Representatives. Clients agree to inform Client Representatives that they are not represented by LFTC, and that LFTC's only attorney-client relationship in this matter is with Clients.

LFTC and Clients hereby agree that Client Representatives serve in that capacity and have the referenced involvement in the matter for the purpose of furthering Clients' interests in the matter. LFTC and Clients further agree that discussion of confidential information with, and disclosure of confidential information to, Client Representatives is necessary to accomplish the purpose for which LFTC is consulted. Accordingly, communications with Client Representative are protected by Evidence Code section 952, et seq., as well as principles of confidentiality in the attorney-client relationship.

Clients will inform LFTC of the additional of any Client Representatives. Clients will inform LFTC of the removal of any Client Representatives. Upon learning of the name of new Client Representatives, LFTC will amend this section under a separate writing to Clients.

**17. LITIGATION HOLD (FOR LITIGATION AND PRE-LITIGATION MATTERS):**

Pursuant to both Federal and California Law, Clients are obligated to identify and preserve materials that may relate to the case. This is known as a litigation hold. Where parties fail to meet their preservation obligations, Courts have imposed significant sanctions. As soon as litigation can be reasonably anticipated, parties to that litigation, together with their employees, officers, members, agents, etc. have a legal duty to preserve all materials that relate, directly or indirectly, to the underlying dispute between or among the parties and include both traditional paper documents and Electronically Stored Information ("ESI"). ESI includes, but is not limited to, e-mail messages and attachments, text messages, word processing documents, spreadsheets,

databases, calendar entries, computer drawings, or any other documents or files created or stored on your computer systems. The preservation must be sufficient to prevent destruction or alteration, including maintaining the integrity of all documents, data, and tangible things. The duty to preserve extends to materials in your possession, custody, or control, which would include relevant material that resides with an agent or third-party. While complying with this litigation hold is and must be kept Clients' obligation (since, among other factors, we do not have control of your documents or data), Clients are free to reach out to our team to ask questions that may help you facilitate Clients' internal preservation processes.

**18. <u>MEDIATION AND ARBITRATION OF DISPUTES</u>:**

In the event of a dispute arising out of or relating to this Agreement, including, but not limited to, any and all claims pertaining to malpractice and breach of fiduciary duty, the Parties (LFTC, Clients and Obligor) hereby agree to mediate the dispute in good faith. Thereafter, if the dispute remains unresolved, any dispute between Clients or Obligor or both and LFTC (including, without limitation, any of LFTC's individual attorneys) shall be subject to binding arbitration. All questions regarding the arbitrability of the dispute, including whether the Parties have agreed to arbitrate the dispute, shall be decided by the arbitrator and said arbitration. By agreeing to arbitrate, all Parties are agreeing to pay an equal portion of the arbitrator's fees and to bear their own attorney's fees in connection with any arbitration hereunder. Such arbitration shall be conducted in accordance with the rules of the Judicial Arbitration and Mediation Services (JAMS), Los Angeles. The arbitrator will be selected in accordance with the procedures of the Judicial Arbitration and Mediation Services (JAMS), Los Angeles for arbitrator selection.

The arbitration shall be conducted in accordance with the California Arbitration Act. Code of Civil Procedure section 1283.05 is incorporated into, and is made part of, this agreement to arbitrate, and shall apply accordingly. As set forth in Code of Civil Procedure section 1283.05, "the parties to the arbitration shall have the right to take depositions and to obtain discovery regarding the subject matter of the arbitration, and, to that end, to use and exercise all of the same rights, remedies, and procedures, and be subject to all of the same duties, liabilities, and obligations in the arbitration with respect to the subject matter thereof, as provided in Chapter 2 (commencing with Section 1985) of Title 3 of Part 4, and in Title 4 (commencing with Section 2016.010) of Part 4, as if the subject matter of the arbitration were pending before a superior court of [California] in a civil action other than a limited civil case, subject to the limitations as to depositions set forth in subdivision (e) of this section."

The Parties understand that by submitting their dispute to arbitration, they are waiving their right to a jury trial. The arbitrator shall not have the power to grant any remedy that could not be granted by a California court applying California law.

The Parties acknowledge that such binding arbitration may deprive them of various rights that they otherwise might have in a legal action, including, without limitation, the right to a jury trial and the right to appeal.

Any dispute relating to fees, costs or legal expenses in dispute, including any action to collect monies owed, is subject to the arbitration procedure established by the State Bar and codified at California Business and Professions Code section 6200 et seq. Any action relating to such a fee dispute shall be conducted in conformity with that statute, which gives you certain options. When the statutory obligations have been met or satisfied, you agree that any remaining dispute relating to fees, costs or legal expenses shall be arbitrated in accordance with the above paragraphs. This agreement to arbitrate shall survive the termination of LFTC's representation.

**19. SEVERABILITY IN EVENT OF PARTIAL INVALIDITY:**

If any provision of this Agreement is held in whole or in part to be unenforceable for any reason, the remainder of that provision and of the entire Agreement will be severable and remain in effect.

**20. MISCELLANEOUS:**

This Agreement is governed by California law and is intended to be the entire agreement for professional services between the Parties. No other agreement, statement, or promise made on or before the Effective date of this Agreement will be binding on the Parties. The Agreement may be amended or modified by subsequent agreement of the Parties only by an instrument in writing signed by both of them.

**21. BANKRUPTCY PROVISION:**

Obligor and Clients represent to LFTC that they are are not presently seeking nor contemplating filing for Bankruptcy protection; and that Obligor and/or Clients will inform LFTC should such a course of action be contemplated in the future.

**22. <u>JOINT/MULTIPLE CLIENT DISCLOSURE AND CONSENT</u>**

The undersigned Clients have requested that LFTC jointly represent them in the matter set forth in this Agreement. There may be potential conflicts of interest in the representation of more than one party in a case. As a result, LFTC will provide Clients with a Conflict Waiver explaining the potential conflicts of interest that may arise in this matter and of the consequences should an actual conflict arise and informing each of the Clients that they have had the opportunity to consult with independent counsel regarding these disclosures and their consent to joint representation.

**THE PARTIES HAVE READ AND UNDERSTOOD THE FOREGOING TERMS AND AGREE TO THEM AS OF THE DATE LFTC FIRST PROVIDED SERVICES. IF MORE THAN ONE CLIENTS SIGNS BELOW, EACH AGREES TO BE LIABLE, JOINTLY AND SEVERALLY, FOR ALL OBLIGATIONS UNDER THIS AGREEMENT. CLIENTS WILL RECEIVE A FULLY EXECUTED COPY OF THIS AGREEMENT.**

Date: 12/26/2024

LINER FREEDMAN TAITELMAN + COOLEY, LLP

Signed by:
Bryan Freedman
892CBF8CDA6478...
Bryan J. Freedman, Partner

WAYFARER STUDIOS LLC (Client/Obligor)

Date: 12/26/2024

DocuSigned by:
A1C7E6525300476...

By: Jamey Heath

Its: CEO

Docusign Envelope ID: 82FB6EE8-5152-4408-AF43-214D476B019A

Wayfarer Studios LLC
Justin Baldoni
Jamey Heath
Steve Sarowitz
Melissa Nathan
The Agency Group PR LLC
Jennifer Abel
RWA Communications, LLC
Jed Wallace
Street Relations, Inc.
*RE: Hourly Fee Agreement for Legal Services*
December 24, 2024
Page 13

JUSTIN BALDONI (Client)

Date: 12/26/2024 By: Signed by: Justin Baldoni 88D78787A79948F...

JAMEY HEATH (Client)

Date: 12/24/2024 By: DocuSigned by: A1C7ED5251D047E...

STEVE SAROWITZ (Client)

Date: 12/24/2024 By: Signed by: Steve Sarowitz 26E3188C7E79479...

MELISSA NATHAN (Client)

Date: 12/26/2024 By: Signed by: 88EA2FF79610406...

THE AGENCY GROUP PR LLC (Client)

Date: 12/26/2024 Signed by: 88EA2FF79610406...

By: Melissa Nathan

Its: CEO

Wayfarer Studios LLC
Justin Baldoni
Jamey Heath
Steve Sarowitz
Melissa Nathan
The Agency Group PR LLC
Jennifer Abel
RWA Communications, LLC
Jed Wallace
Street Relations, Inc.

*RE: Hourly Fee Agreement for Legal Services*

December 24, 2024
Page 14

JENNIFER ABEL (Client)

Date: 12/30/2024

Signed by:
Jennifer Abel
1ADCAC737D674C2...

RWA COMMUNICATIONS, LLC (Client)

Date: 12/30/2024

Signed by:
Jennifer Abel
1ADCAC737D674C2...

By: Jennifer Abel

Its: CEO

JED WALLACE (Client)

Date: 12/24/2024

DocuSigned by:
AAF9BB5E5043499...

STREET RELATIONS, INC. (Client)

Date: 12/24/2024

DocuSigned by:
AAF9BB5E5043499...

By: JED WALLACE

Its: Director

# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF JAMEY HEATH
Los Angeles, California
Wednesday, October 8, 2025

Stenographically Reported by: Ashley Soevyn,
CALIFORNIA CSR No. 12019

A That would be Brian Singer.
Q Do you know how Wayfarer funds its operations at operating at a net loss of $18 million?
MS. SHAPIRO: Objection.
THE WITNESS: Yeah.
BY MS. HUDSON:
Q How does it do that?
A Steve's investments.
Q So when Wayfarer needs funding, it looks to Steve Sarowitz to provide cash?
MS. SHAPIRO: Objection.
THE WITNESS: There has been a payment -- a funding schedule that he had committed to. And based on that funding, that is what allows Wayfarer to operate.
BY MS. HUDSON:
Q Do you have a contract with Mr. Sarowitz to provide funding at a certain rate for the company?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know.
BY MS. HUDSON:
Q If Mr. Sarowitz decided not to continue to provide the funding, would Wayfarer be able to

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 10th day of October 2025.

ASHLEY SOEVYN
CSR No. 12019

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.,

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.,
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.,
Consolidated Defendants.

---

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF JAMEY HEATH
Los Angeles, California
Thursday, October 9, 2025

Stenographically Reported by: Ashley Soevyn,
CALIFORNIA CSR No. 12019

have impact whether or not they make money. Of course we have to make money, but that's not our primary goal.

Q Is Wayfarer profitable?

A No.

Q Has it ever been?

A No.

Q I believe Mr. Sarowitz testified that Wayfarer is paying for the litigation fees and expenses of the various defendants in these two related litigations; is that correct?

A I don't know about -- well, the defendants, yes, we are paying for those.

Q And that includes litigation fees and expenses for Mr. Baldoni's defense?

A It does.

Q And for Ms. Abel's defense?

A It does.

Q And for Ms. Nathan's defense?

A It does.

Q And for Wayfarer's defense?

A Yes.

Q For Mr. Wallace's defense?

A Yes. Sorry. I just needed to -- there is a lot of expenses, so I'm just making sure.

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 10th day of October 2025.



______________________________

ASHLEY SOEVYN

CSR No. 12019