# EXHIBIT 7

# EXHIBIT 4
# UNDER SEAL

WILLKIE FARR & GALLAGHER LLP

2029 Century Park East
Los Angeles, CA 90067-2905
Tel: 310 855 3000
Fax: 310 855 3099

December 19, 2025

**VIA ECF**

Hon. Lewis J. Liman
United States District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Liman:

Plaintiff Blake Lively respectfully moves for an order (1) imposing sanctions on two of Defendants' attorneys, Bryan Freedman and Kevin Fritz, for conduct that impeded, delayed, and frustrated the fair examination of one of their designated experts, Nicole Alexander, during her deposition on December 15, 2025 ("Deposition"); (2) compelling Ms. Alexander to sit for an additional deposition of up to one hour ("Supplemental Deposition") to answer questions that Mr. Fritz improperly instructed her not to answer;[1] (3) assigning all reasonable fees and costs for the Supplemental Deposition to opposing counsel whose conduct necessitated this relief; and (4) awarding Plaintiff half of its reasonable expenses and attorneys' fees incurred in connection with the Deposition and this Motion.

Opposing counsel's improper behavior began less than twenty minutes into the Deposition. Ms. Alexander began to testify about a "30-minute call" that occurred in August 2025—during a "vetting process" and ***at least a month prior*** to her engagement as an expert in the matter—that she had with two attorneys she could not identify who "were looking for someone with" her "background to come on as an expert witness" in this case ("Pre-Engagement Conversation").

> Q What do you recall about that call?
> A It was a --
> ***MR. FRITZ: Hold on. I would just instruct you not to disclose the substance of the conversation.***
> MS. GOVERNSKI: She wasn't engaged at that time.
> ***MR. FRITZ: Attorney-client privilege. I understand your position.***
> MS. GOVERNSKI: Q Are you following your counsel's advise [*sic*] not to answer questions?
> ***MR. FRITZ: She is.***
> THE WITNESS: Yes.
> MS. GOVERNSKI: Ms. Alexander, at the time you had this conversation, had you ever spoken with any of these individuals before?
> A No.

[1] Ms. Lively respectfully asks the Court to limit the Supplemental Deposition to questioning by her counsel, so Defendants do not inure benefit from their own misconduct.

> Q Did you understand that they were speaking with a number of individuals, you called it part of a vetting process?
> ***MR. FRITZ: Same instruction. To the extent that your answer would require you to disclose the substance of your conversation, I would instruct you not to answer that.***
> BY MS. GOVERNSKI: Q Are you following your counsel's instruction not to answer?
> A Yes.
> Q Well, you mentioned --
> ***MR. FRITZ: Just going forward, she's always going to follow my instruction not to answer, so...***
> MS. GOVERNSKI: Can you articulate your basis for instructing her not to answer?
> ***MR. FREEDMAN: Can we stop with the speaking objections?***
> ***MR. FRITZ: Sorry, I don't know who that is.***
> ***MR. FREEDMAN: That's Bryan Freedman.***
> MS. GOVERNSKI: Mr. Freedman, you're not entered in this -- in this, so you're --
> ***MR. FREEDMAN: You know what, you will need to stop with the -- you'll need to stop with the speaking objections.***
> MS. GOVERNSKI: It's my deposition.
> ***MR. FREEDMAN: Yeah, that's right, and you're improperly handling it and you don't know what you're doing or how to practice law. So stop with your speaking objections.***
> MS. GOVERNSKI: Counsel, please mute Mr. Freedman who has not entered an appearance in this deposition. And I am not giving speaking objections, you're instructing your own counsel not to give speaking objections. It's my deposition.
> ***MR. FREEDMAN: No, you're the one giving speaking objections, as your mouth is moving right now.***
> MS. GOVERNSKI: Can we please -- Mr. Fritz, can you please control your co-counsel or I'm going to have to seek relief from the Court.
> MR. FRITZ: I mean, he's not incorrect. You're, like, trying to engage –
> (Cross talk)
> MS. GOVERNSKI: I'm asking to understand -- I'm asking, Mr. Fritz, you to explain the basis for your objection so I can understand what your perception is on the line on privilege.
> MR. FRITZ: You have it.
> MS. GOVERNSKI: No, I would like you to explain to me -- I am asking you to explain to me your line on privilege when Ms. Alexander said she was not engaged at that time.
> MR. FRITZ: I'm not going to engage in the debate during the deposition.

Ex. 1 at 16:17-28:15, 65:17-66:6 (emphasis added). Mr. Fritz continued to instruct Ms. Alexander not to answer additional questions about the Pre-Engagement Conversation. *Id.*[2] He asserted frequent speaking objections, such as by: interrupting to ask if the questioning attorney wanted Ms. Alexander to "read" or "review" the materials cited in her report before answering questions about her current recollection or

[2] The transcript does not support Mr. Fritz's characterization of the privilege exchange to the Court (Ex. 2 at 14), nor his representation that counsel for Ms. Lively "gratuitously" asked about the "[redacted]" that necessitated rescheduling the Deposition. *Compare* Ex. 2 at 14:10-15:1, *with* Ex. 1 at 15:24-17:6 ("**Q**. You understand we originally were supposed to meet last week, and I understand that you came down with a [redacted]. Has your [redacted] resolved at this point? A. It was a [redacted] but yes, it has. **Q**. Is there any reason that the [redacted] would prevent you from giving truthful and complete testimony today? A. None.").

understanding of them (*id*. at 59:4-20; 93:13-94:2; 135:3-144:9); interjecting commentary so ***he*** could "understand" the questions and to demand advice or clarifications for which the witness did not ask or need (*id*. at 99:12-23; 120:13-20; 136:23-139:11; 184:16-185:5); and instructing the witness that she could "answer ***again***" (*id*. at 77:19-20; 126:13-14; 130:17-18; 133:20-21; 149:5-6). Mr. Fritz demanded that "***we're going to take a break now***" in the midst of a line of questioning and refused to stop talking until he got his way. *Id*. at 108:15-112:9. Mr. Fritz ignored repeated requests to desist from making speaking objections, which necessitated judicial intervention. *Id*. at 136:25-139:6; 185:1-5.

Because this behavior is part of an ongoing pattern of deposition misconduct, the Court should sanction Mr. Freedman and Mr. Fritz for disrupting a fair examination with speaking objections, disparaging comments, and improper privilege objections. *See* Rules 30(c)(2) & 30(d)(2); *Antolini v. McCloskey*, 2021 WL 5411176, at *12 (S.D.N.Y. Nov. 19, 2021), *adopted*, 2022 WL 1689331 (S.D.N.Y. May 26, 2022); *Fashion Exch. LLC v. Hybrid Promotions, LLC*, 333 F.R.D. 302, 309 (S.D.N.Y. 2019); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, 328 F.R.D. 100, 110, 124 (S.D.N.Y. 2018); *In re Omeprazole Pat. Litig.,* 227 F.R.D. 227, 229, 231 (S.D.N.Y. 2005); *Morales v. Zondo, Inc.*, 204 F.R.D. 50, 57–58 (S.D.N.Y. 2001); *see also Junger v. Singh*, 514 F. Supp. 3d 579, 603 (W.D.N.Y. 2021). Mr. Fritz's instructions to Ms. Alexander about the Pre-Engagement Conversation separately are sanctionable because, by her own admission, the conversation pre-dated her retention as part of a "vetting" process by Defendants' counsel. *Higher One, Inc. v. TouchNet Info. Sys., Inc.*, 298 F.R.D. 82, 87–88 (W.D.N.Y. 2014); *Nikkal Indus., Ltd. v. Salton, Inc.*, 689 F. Supp. 187, 190 (S.D.N.Y. 1988). Even if timing were not dispositive, attorney-client privilege (which is the only objection Mr. Fritz asserted in his speaking objections) does not apply to communications between counsel and a testifying expert. Ex. 1 at 18:24-28:15, 65:17-66:6; Ex. 2 at 14:10-15:14; *Heard v. Statue Cruises LLC*, 2020 WL 1285456, at *9 (S.D.N.Y. Mar. 18, 2020). If *arguendo* Mr. Fritz has preserved work product or Rule 26 privileges, they would be inapplicable to testimony about Ms. Alexander's purported expertise or any facts, data, and assumptions that the attorneys provided. *See Sec. & Exch. Comm'n v. Rio Tinto PLC*, 2021 WL 2186433, at *7 (S.D.N.Y. May 28, 2021); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 293 F.R.D. 568, 574 (2013).

This type of disruptive behavior by opposing counsel is part of an unfortunate pattern. Throughout discovery, multiple defense counsel insisted on making speaking objections (often in depositions they were not defending) and consuming time on the record to demean and orate. Ms. Lively's attorneys consistently asked opposing counsel to stop, including by letter on September 29, 2025 highlighting their "inappropriate and unprofessional behavior," such as referring to questions as "STUPID," laughing on the record, and complaining that "we cannot get a real question" that does not "provoke laughter." *See* Ex. 3. Despite attempting to resolve the issue, the conduct continued. *See* Ex. 4 at 386-394 (lengthy improper speech offered with nine minutes of questioning remaining by a member of Defendants' defense team who, again, was *not* defending the deposition).[3] Accordingly, the record amply supports the imposition of sanctions in connection with the Deposition of Ms. Alexander.

---

[3] During another expert deposition, defense counsel, Kim Zeldin, objected to questions about a declaration submitted by Ms. Lively by offering her personal opinion (again on the record) about who drafted the declaration. Ex. 5.

Respectfully submitted,

/s/ *Michael J. Gottlieb*

*Counsel for Blake Lively*

# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.,

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.,
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.,
Consolidated Defendants.

---

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF NICOLE ALEXANDER
APPEARING REMOTELY FROM
New York, New York
Monday, December 15, 2025

Stenographically Reported by: Ashley Soevyn,
CALIFORNIA CSR No. 12019

MS. GOVERNSKI: I'm sorry. One more thing. Lindsey Strasberg, also co-counsel for Ms. Lively is on as well.

THE STENOGRAPHIC REPORTER: Good morning, everyone, Ashley Soevyn, California. Steno reporter, license 12019.

Ma'am, can I please have you raise your right hand?

Do you solemnly state that the testimony you're about to give in this deposition will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, I do.

THE STENOGRAPHIC REPORTER: Great. Thank you.

EXAMINATION

BY MS. GOVERNSKI:

Q Good morning, Ms. Alexander. Can you please state your full name for the record?

A Nicole Marie Alexander.

Q Is there any reason today, Ms. Alexander, that you won't be able to give truthful and complete testimony?

A None.

Q You understand we originally were supposed to meet last week, and I understand that

you came down with a [redacted]. Has your [redacted] resolved at this point?

A It was a [redacted], but yes, it has.

Q Is there any reason that the [redacted] would prevent you from giving truthful and complete testimony today?

A None.

MS. GOVERNSKI: I'm going to go ahead and we've marked as Exhibit 1, which is your report in this matter.

(Exhibit 1 marked for identification.)

BY MS. GOVERNSKI:

Q The first page of your report says it was prepared for Liner Freedman Taitelman & Cooley LLP. Did Liner Freedman retain you in this case?

A Yes.

Q And when did Liner Freedman retain you?

A September possibly. September, October.

Q September of 2025?

A '25, yes.

Q In the course of putting together your report, did you interact with any of the attorneys at Liner Freedman?

A Yes, I interacted with Amir -- I'm sorry, his last name is...

Q Kaltgrad?
A Yes, thank you.
Q Did you interact with any other attorneys at Liner Freedman?
A Not while I was preparing my report, no.
Q Well, when did you interact with any other attorneys at Liner Freedman?
A I met Kevin Fritz, who is on currently, afterwards. Probably three weeks ago.
Q Okay. And how often, during the course of putting together your report, did you speak with Mr. Kaltgrad?
A Maybe I touched base once a week via email. Email or call.
Q Since you were retained in September or October 2025?
A Correct.
Q And what is your understanding of which clients, on behalf of Liner Freedman, retained you?
A I believe it is Wayfarer and maybe partially Baldoni as well. I'm not quite sure. I know there are several different counsels. I'm not sure the inter- -- the operations.
Q Okay. So the defendants in this case include Mr. Baldoni, Wayfarer, Jamey Heath,

Steve Sarowitz, Melissa Nathan, Jennifer Abel, It Ends with Us and TAG PR?

A Uh-huh.

Q Do you understand that you are testifying on behalf of all of those defendants today?

A I believe I am, because I thought it was part of the collective. So...

Q Okay. So if I refer to the Wayfarer defendants throughout the day, you will understand that I'm referring to that big group of defendants?

A Yes.

Q Prior to this litigation, have you had any interactions with any of the Wayfarer defendants?

A No.

Q During the course of this litigation, have you had any interaction with any of the Wayfarer defendants?

A No.

Q And you refer to "other counsel." You understand that the Wayfarer defendants have counsel other than Liner Freedman, right?

A I believe so, yes.

Q To what extent have you interacted with any attorneys other than those at Liner Freedman and

Mr. Fritz, as you just mentioned?
A Prior to coming on board with the engagement with Amir, I had a conversation with separate counsel, which I believe is part of a separate law firm.
Q And who is that?
A I could not tell you. It was two -- two attorneys. It was part of a vetting process. They were looking to -- for someone with my background to come on as an expert witness.
Q And that was, you said, prior to you coming on with the engagement, right?
A With -- yes, correct.
Q So that conversation preceded your engagement?
A Correct.
Q Were those two attorneys with Shapiro Arato Bach?
A Honestly, I'm not sure.
Q Were they female or male attorneys?
A Both female.
Q Is it possible that they were at Liner Freedman?
MR. FRITZ: Objection.
THE WITNESS: I -- I don't want to guess.

BY MS. GOVERNSKI:

Q Do you remember their names --

A I don't --

Q -- their first names?

A I don't.

Q Kim?

A Honestly, it was about a 30-minute call and I -- back in August maybe. I'm not sure of their name.

Q Okay. What do you recall about that call?

A It was a --

MR. FRITZ: Hold on. I would just instruct you not to disclose the substance of the conversation.

MS. GOVERNSKI: She wasn't engaged at that time.

MR. FRITZ: Attorney-client privilege. I understand your position.

BY MS. GOVERNSKI:

Q Are you following your counsel's advise not to answer questions?

MR. FRITZ: She is.

THE WITNESS: Yes.

BY MS. GOVERNSKI:
Q Ms. Alexander, at the time you had this conversation, had you ever spoken with any of these individuals before?
A No.
Q Did you understand that they were speaking with a number of individuals; you called it part of a vetting process?
MR. FRITZ: Same instruction. To the extent that your answer would require you to disclose the substance of your conversation, I would instruct you not to answer that.
BY MS. GOVERNSKI:
Q Are you following your counsel's instruction not to answer?
A Yes.
Q Well, you mentioned --
MR. FRITZ: Just going forward, she's always going to follow my instruction not to answer, so...
MS. GOVERNSKI: Can you articulate your basis for instructing her not to answer?
MR. FREEDMAN: Can we stop with the speaking objections?
MR. FRITZ: Sorry, I don't know who that

is.

MR. FREEDMAN: That's Bryan Freedman.

MS. GOVERNSKI: Mr. Freedman, you're not entered in this -- in this, so you're --

MR. FREEDMAN: You know what, you will need to stop with the -- you'll need to stop with the speaking objections.

MS. GOVERNSKI: It's my deposition.

MR. FREEDMAN: Yeah, that's right, and you're improperly handling it, and you don't know what you're doing or how to practice law. So stop with your speaking objections.

MS. GOVERNSKI: Counsel, please mute Mr. Freedman who has not entered an appearance in this deposition. And I am not giving speaking objections. You're instructing your own counsel not to give speaking objections. It's my deposition.

MR. FREEDMAN: No, you're the one giving speaking objections, as your mouth is moving right now.

MS. GOVERNSKI: Can we please -- Mr. Fritz, can you please control your co-counsel or I'm going to have to seek relief from the Court.

MR. FRITZ: I mean, he's not incorrect. You're, like, trying to engage --

(Cross talk.)

MS. GOVERNSKI: I'm asking to understand -- I'm asking, Mr. Fritz, you to explain the basis for your objection so I can understand what your perception is on the line on privilege.

MR. FRITZ: You have it.

MS. GOVERNSKI: No, I would like you to explain to me -- I am asking you to explain to me your line on privilege when Ms. Alexander said she was not engaged at that time.

MR. FRITZ: I'm not going to engage in the debate during the deposition.

BY MS. GOVERNSKI:

Q Ms. Alexander, how did you come to be on that phone call in August?

A I was engaged via GLG, and GLG put me in contact with the two women I referenced earlier.

Q And what was your understanding of the purpose of that call?

MR. FRITZ: Objection.

BY MS. GOVERNSKI:

Q You can answer.

A I was asked to come on to meet them to talk about my background in social media and data analysis.

Q And what about your background did you understand prompted that call?

MR. FRITZ: Instruct the witness not to answer to the extent it would require the disclosure of a privileged communication.

THE WITNESS: I will follow his instructions.

BY MS. GOVERNSKI:

Q Ms. Alexander, what is your understanding of what in your background prompted GLG to reach out to you?

MR. FRITZ: Same instruction not to answer.

BY MS. GOVERNSKI:

Q Ms. Alexander, did you have any understanding before you got on that call of why you were getting on it?

A Yes, I did.

Q And what was that understanding?

A As part of GLG, which is an expert network of individuals with different backgrounds, I had been asked to come on the call to discuss how I would approach -- as an expert witness, how I would approach the opportunity to do data science and analytics as part of a case.

Q Are you part of GLG?
A I am.
Q And when did you become part of GLG?
A Twelve years ago.
Q And how did you describe your expertise within the GLG Network?
A So my background is -- my CV is published as part of the network. And a basic summary is 25 years of experience across data analytics, marketing, and some more of my credentials, just being in academia, my book, et cetera.
Q And so you've been part of GLG Network for 12 years. Have you ever been part of what you described as the vetting process before?
A For litigation work, is that the question?
Q Yes. Yes.
A No, this is the first time.
Q So in 12 years as being part of GLG, this was the first time you've received that call?
A For litigation work, yes.
Q And what did GLG say to you when they called you?
A I'm sorry. It was not a call. I shouldn't say that. It was outreach via electronic

correspondence. So it was a survey that I filled out, and I answered the question.

Q What were the questions in the survey?

A Honestly, I couldn't remember.

Q Do you have any recollection of the type of questions the survey was asking you?

MR. FRITZ: Objection.

You can answer.

THE WITNESS: I don't. I fill out many, many surveys.

BY MS. GOVERNSKI:

Q And this was the first survey you filled out that you've received a callback in a litigation matter; is that right?

A Correct.

Q How soon after that survey did you receive a callback?

A I would say within three weeks.

Q And after you filled out that survey, did you -- you receive a callback from GLG or was it directly from the counsel that you spoke with?

A No, it was GLG.

Q And what did GLG tell you when they called you back?

A They asked to set up a 30-minute Zoom

call with the attorneys.

Q Okay. And you used the term "vetting process." Why did you use that term?

A That would be what I call any -- any conversation like that. I -- I made the assumption that they were looking to understand my background to see if I was an appropriate fit. Specifically, also around like things like availability, is usually a part of any conversation that I've had with GLG, if I'm available for the work, things of that nature.

Q And did those individuals on the call tell you that they were looking for you to testify that there was no smear campaign?

MR. FRITZ: I would -- let me instruct the witness not to answer. And similarly, for any other question that seeks to obtain information that is protected by the attorney-client privilege, I would give you the same instruction.

BY MS. GOVERNSKI:

Q Ms. Alexander, when you had that call, did you understand that it would be protected by attorney-client privilege?

MR. FRITZ: Instruction not to answer.

BY MS. GOVERNSKI:
Q Did they tell you that anything you said on that call would be protected by attorney-client privilege?
MR. FRITZ: Same instruction.
BY MS. GOVERNSKI:
Q On that call, Ms. Alexander, did they tell you that -- what they want your opinions on this matter to be?
MR. FRITZ: Same instruction.
BY MS. GOVERNSKI:
Q Ms. Alexander, did they tell you how the drafting of the report would be handled during that call?
MR. FRITZ: Same instruction.
BY MS. GOVERNSKI:
Q Did you discuss your report with anyone other than Wayfarer defendants' counsel?
A No, no one else.
Q Your report refers to an assistant...
A I was going to say, I apologize. Let me rephrase. No one outside of my team, which is the assistant referenced, other than Wayfarer's counsel.
Q Who is the assistant?
A Taylor Hunter, T-A-Y-L-O-R.

BY MS. GOVERNSKI:
Q Do you see my screen?
A Yes.
Q And this is the expert report that you submitted in this case, right?
MR. FRITZ: Do you want the witness to access the document herself so she can scroll through it?
MS. GOVERNSKI: If she wants to.
MR. FRITZ: Okay.
Are you able to do that, Ms. Alexander?
THE WITNESS: I'm downloading it right now, yes.
MS. GOVERNSKI: Do we need to go off record for you to review it, or are you able to take a look and let me know if this is your expert report?
MR. FRITZ: She'll -- we'll stay on record and she will review it to ensure that it is what you say that it is.
THE WITNESS: I just want to confirm that this is the amended report.
BY MS. GOVERNSKI:
Q Is it your testimony that you've provided an amended report?

A Probably, yes.
Q Who -- how did you decide to modify your CV?
A My overall CV; is that the question, or the short bio?
Q Oh, sorry. The overall CV.
A I did it the way I would do it for academia. So this is more similar to my academic CV.
Q Why didn't you use your academic CV?
A Because it's outdated. I haven't updated it.
Q I see. You were just updating your academic CV?
A Yes. So I would normally take this and I would copy it to my academic CV moving forward.
Q Did anyone at Liner Freedman assist you in editing this CV in any way?
A No.
MR. FRITZ: Instruct the witness not to answer questions designed to disclose attorney-client privilege.
MS. GOVERNSKI: Is --
MR. FRITZ: Sorry. I wasn't finished with my objection. Attorney-client privilege.

MS. GOVERNSKI: It was a speaking objection.

MR. FRITZ: Sorry. I wasn't finished. I would just caution the witness not to disclose any information that would be protected from disclosure by the attorney-client privilege.

BY MS. GOVERNSKI:

Q Is all of the information in this CV accurate?

A So let me just go back to the CV. I apologize. I had my local one open and not this one.

Yes. Everything is accurate.

Q I should have asked. Do you have anything else open on your computer right now?

A No, no. Just my -- my original report, the one I didn't download. So I closed that.

Q Okay. So when you were looking at your local CV, you were looking at a copy other than what is in either of the reports?

A No. I had the amended report that was not downloaded, that's sitting on my desktop. I had that open in order to answer the earlier question of is this different, is this amended or not amended. So I've subsequently closed that. So I just want to

Q What does the program look like? How many times a week were you in school for this degree?
A In school? I'm sorry.
Q In classes?
MR. FRITZ: Objection. You can answer.
THE WITNESS: So there is a specific amount of classroom hours that any degree granting has to have. I don't know what that is offhand. I was physically in Cambridge around two weeks. Every quarter -- or every term, excuse me, they use a different verbiage. Every term. And then there was remote work where we had to log on. So long story short, I'm not sure offhand.
BY MS. GOVERNSKI:
Q So you're not sure how many total hours you needed to participate in order to receive that degree?
MR. FRITZ: Objection. You can answer again.
MS. GOVERNSKI: Sorry. I didn't hear your answer.
THE WITNESS: I'm not sure offhand.
BY MS. GOVERNSKI:
Q Any ballpark?

oddities. It could be user activity that would be outside of a normal timeframe. It would be things like amplification ratios. Looking at those kind of fingerprints.

Q Let's go down in Exhibit 3 to the first paragraph on the next page. Oh, sorry. Let me share.

MS. GOVERNSKI: Autumn, can you share your screen on this so we're all looking at the same thing?

MS. ADAMS-JACK: I think you have to stop sharing and then I can switch.

MR. FRITZ: Nicole, I would just download the document so you can look at it as you see fit.

MS. GOVERNSKI: Well, I won't share it if that's not helpful. I was doing it more as a helpful.

THE WITNESS: It's easier for me to look at it on my screen.

MS. GOVERNSKI: Okay. So if you look at the second page, it says --

MR. FRITZ: Just take a -- excuse me, sorry. Take a moment to look at the entire document and then let Meryl know when you're ready.

MS. GOVERNSKI: I'm not going to ask

about the entire document, though.
MR. FRITZ: I understand.
THE WITNESS: Okay.
BY MS. GOVERNSKI:
Q Okay. If you can look at the first paragraph, and it says:
(As read):
"In line with our commitment to authenticity, we don't allow people to misrepresent themselves on our service, use fake accounts, artificially boost the popularity of content or engage in behaviors designed to enable other violations under our community standards."
Do you see that?
A Yes.
Q Did you engage in any of these type of behaviors while you were at Meta?
MR. FRITZ: Objection.
THE WITNESS: I'm sorry? Could you repeat that?
BY MS. GOVERNSKI:
Q When you were --
MR. FRITZ: Note my objection.

access to a myriad of different -- most likely, computers and algorithmic programs. Because, again, as I mentioned, human beings is extremely difficult to coordinate that. And am I trying to do it in order to impact something in either a negative or positive way.

Q And when it says "a network of inauthentic assets," what is your understanding of "inauthentic assets"?

A So the way that Meta is looking at this --

Q I'm asking how you are looking at it. Sorry.

MR. FRITZ: Sorry.

Objection.

MS. GOVERNSKI: I wanted to clarify my question.

MR. FRITZ: Why doesn't -- do you want to withdraw it? Are you withdrawing the first one or you're going to ask another one?

MS. GOVERNSKI: I specifically asked, how do you define the term "inauthentic assets"?

MR. FRITZ: Okay.

Go ahead, Nicole.

THE WITNESS: Outside of this context, I

what they thought were inauthentic customers.

Q And if someone wanted to appear to be an authentic customer, that would be possible, wouldn't it?

MR. FRITZ: Objection.

THE WITNESS: In this case, it would not have been.

BY MS. GOVERNSKI:

Q What about in any case?

MR. FRITZ: Objection.

THE WITNESS: That's a lot of different assumptions I would have to make. I couldn't answer that.

BY MS. GOVERNSKI:

Q Well, what would it take for someone to make a coordinated campaign look authentic?

MR. FRITZ: Objection.

THE WITNESS: I don't know all the factors to be able to answer that.

MR. FRITZ: We've been going for about two hours. Why don't we take a break now?

MS. GOVERNSKI: When I'm done with this line of questioning.

MR. FRITZ: Well, no, actually, we're going to --

MS. GOVERNSKI: When I'm done with this question -- I was in the middle of a question.

MR. FRITZ: You weren't in the middle of a question.

MS. GOVERNSKI: I was.

MR. FRITZ: You weren't.

MS. GOVERNSKI: The court reporter -- can you read --

(Cross talk.)

MR. FRITZ: -- we've been going for two hours and now you're trying to pose a question.

MS. GOVERNSKI: I will take a break after this.

So the court reporter, can you read back the question?

(Cross talk.)

MR. FRITZ: We're going to --

MS. GOVERNSKI: Kevin, there's a question pending.

(Cross talk.)

MR. FRITZ: There wasn't.

(Cross talk.)

MS. GOVERNSKI: Let's ask the court reporter.

MR. FRITZ: Frankly, with all due respect

to the court reporter, I don't care what this court reporter said. I suggest that we take a break and then you start to ask another question.

MS. GOVERNSKI: That's not true.

MR. FRITZ: I've never seen anyone do that before.

MS. GOVERNSKI: Ash -- there's a question pending. If she says no --

(Cross talk.)

MR. FRITZ: Nicole, we're going to come back at 11:25. You can put yourself --

(Cross talk.)

MS. GOVERNSKI: Kevin, if the court reporter says there is a question pending, I will -- we should believe her. If not, then I'll step -- Ash, please speak.

(Cross talk)

MS. GOVERNSKI: Please respect Ash.

MR. FRITZ: I know the sequence. I know the sequence.

MS. GOVERNSKI: Ash, what was the sequence?

MR. FRITZ: With all due respect to the court reporter, it doesn't matter.

(Cross talk.)

MS. GOVERNSKI: Ash --
(Cross talk.)
MR. FRITZ: You started asked the question, which you didn't finish, after I asked for a break. It's inappropriate. So we're going to take a break now. We'll come back at 1:25.
MS. GOVERNSKI: Kevin, I'm allowed to ask --
(Cross talk.)
MR. FRITZ: Nicole --
MS. GOVERNSKI: Stop talking, Kevin. Ash, please, was a question pending?
THE STENOGRAPHIC REPORTER: I would have to check.
MS. GOVERNSKI: Please check.
THE STENOGRAPHIC REPORTER: Here it is.
(The record read.)
MS. GOVERNSKI: Okay. Let's go on break. Ten minutes?
She answered that question. Right, Ash?
THE STENOGRAPHIC REPORTER: I don't know. I'll have to look at the --
MR. FRITZ: What happened after that? What happened after that?
(Cross talk.)

MR. FRITZ: So the record should reflect there was no question pending.
MS. GOVERNSKI: Well, I asked a question, but the record was not --
(Cross talk.)
MR. FRITZ: See you in ten minutes.
THE VIDEOGRAPHER: We are off the record. It's 1:16 p.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record. It is 1:26 p.m.
BY MS. GOVERNSKI:
Q Ms. Alexander, we moved into Exhibit Share -- actually, I should ask, Ms. Alexander, did you have any substantive conversations with your counsel during the break?
A No.
MS. GOVERNSKI: We've moved into Exhibit Share what will be marked as Exhibit 4. Can you look at that?
(Exhibit 4 marked for identification.)
BY MS. GOVERNSKI:
Q Can you look at that?
A Yes, I have it.
Q What is it?

also have to mitigate their own risk as well.

Q Okay. So other than the book, your CV doesn't list any other publications that you've authored. Have you authored any other publications?

A Do you mean like academic papers, I'm assuming you mean?

Q Anything.

MR. FRITZ: Objection.

THE WITNESS: I've authored other papers, yes.

BY MS. GOVERNSKI:

Q What papers?

A I've authored papers at all of my companies. So at Meta --

Q Okay --

MR. FRITZ: Objection.

THE WITNESS: Ipsos, Nielsen --

MR. FRITZ: Go ahead and finish your answer, Ms. Alexander.

THE WITNESS: That was it.

BY MS. GOVERNSKI:

Q Have you -- have any of your other publications that you've authored been published?

A No.

Q So the book is the only piece of

Q Did you consider any materials that are not listed in Appendix C?
A For the end report, no.
Q What does that mean, "for the end report"?
A For the report that you're looking at, no.
Q But did you consider any other materials for -- in the course of preparing your report?
A In the course of preparing it, no.
Q So Appendix C lists everything you considered in the course of preparing your report?
MR. FRITZ: Objection. You can answer again.
THE WITNESS: Just doing a read-through. Yes.
MS. GOVERNSKI: Okay. Autumn, go ahead and let's share this on the screen so at least I can look at it on the screen, please.
BY MS. GOVERNSKI:
Q What quality control steps did you ensure that Appendix C contained all of your sources?
A I used Zotero, which is a software for citation and reference clipping and storing.

THE WITNESS: I'm sorry. Hallucinated cite or citation?
BY MS. GOVERNSKI:
Q Hallucinated cite. Is there a difference?
A I'm not sure what a hallucinated cite is. That's why I wanted to clarify.
Q Okay. Well, is this a hallucination?
MR. FRITZ: Objection.
THE WITNESS: I wouldn't say that. No. I would say that it's probably wrong if the two don't match. But I wouldn't say it's a hallucination.
BY MS. GOVERNSKI:
Q Well, what is the explanation for the two not matching?
MR. FRITZ: Objection. You can answer again.
THE WITNESS: Possible error.
BY MS. GOVERNSKI:
Q Okay. Well, let's look at one of the articles that your counsel provided us. I'm going to move and mark as Exhibit -- where are we, 5?
THE STENOGRAPHIC REPORTER: Yes. We're on Exhibit 5.

Q Are you familiar with who those individuals are?
A No.
Q Do you know anything about them?
A No.
Q Do you know anything about the quality of their research?
A No.
Q How did you identify this article?
MR. FRITZ: Objection. You can answer.
THE WITNESS: I don't know how I identified it.
BY MS. GOVERNSKI:
Q How did you know about it?
A It could have been one of the ones that have it -- I have a myriad of references to different articles.
Q I understand. But how did you decide to review this article for purposes of your report?
MR. FRITZ: Objection. You can answer again.
THE WITNESS: I'm not sure how I selected this particular article.
BY MS. GOVERNSKI:
Q Well, who would have selected it for you?

October. Did you read it since then?
A Yes.
Q So can you summarize the contents of this paper for me, please?
MR. FRITZ: Objection.
THE WITNESS: I cannot. Offhand?
MR. FRITZ: You want her to read the entire article now?
BY MS. GOVERNSKI:
Q No. Ms. Alexander, you cite this article multiple times in your report. I'm asking for you to summarize it.
MR. FRITZ: Do you want her to read it first?
MS. GOVERNSKI: No. She's supposedly read it as she was preparing her report, Kevin.
Ms. Alexander, I'm asking you to please summarize the article that you cited multiple times.
MR. FRITZ: Objection.
THE WITNESS: I understand that. So the article in and of itself is about coordinated networks and the toolkit that the authors used to identify them. I believe that would be a succinct summary.

BY MS. GOVERNSKI:
Q Okay. And what are some of the specific tools that they identify?
MR. FRITZ: Objection.
THE WITNESS: I don't know this particular one just offhand.
BY MS. GOVERNSKI:
Q Okay. Can you name one of the tools that this article identifies?
A One from the toolkit? No.
Q Okay. Does this paper provide any formal definition of coordinated behavior in social media?
A I would have to go through and read it again.
Q Okay. Well, as you reviewed it for purposes of your report, did you rely on any definition in this article for coordinated behavior in social media?
A For this one, I'm not sure.
Q As you sit here today, can you explain how this paper defines coordinated behavior in social media?
MR. FRITZ: You want her to review the article?
MS. GOVERNSKI: Kevin, stop with the

speaking objections.

MR. FRITZ: I just want to make sure the question is clear --

MS. GOVERNSKI: No, she's --

MR. FRITZ: Sorry --

MS. GOVERNSKI: She cited this. I'm entitled to her information that she has in her recollection today, about this article.

MR. FRITZ: Please try not to interrupt me. I just want to make sure that the witness and I both understood what you're asking her. If you're asking her from memory, then we understood --

MS. GOVERNSKI: Ash, please repeat back my question which said, "as you sit here today."

MR. FRITZ: Sorry, I don't know why you interrupted me again. I excused it the first time because I thought it was a mistake, and now I'm learning it might not be. So you should just make clear whether you want her to go from memory or you want her to read the article. That's all I'm asking.

MS. GOVERNSKI: Mr. Fritz, you should stop with your speaking objections. Ash, please read back the question I asked.

THE REPORTER: All right. Last question.

(Record read as follows:
"QUESTION: As you sit here today, can you explain how this paper defines coordinated behavior in social media?")

MR. FRITZ: So sitting here today, do you want her to scroll through the entire thing?

MS. GOVERNSKI: Mr. Fritz, stop with the speaking objections. No, I am going to have to call the Court. It's my deposition. Stop with the speaking objections. Ms. Alexander, as you --

MR. FRITZ: We can call the Court if you'd like, because you keep interrupting me.

BY MS. GOVERNSKI:

Q Ms. Alexander, as you sit here today --

MR. FRITZ: I just want to understand your question.

MS. GOVERNSKI: As she sits here today, I'm entitled to her recollection as she sits here today.

MR. FRITZ: Just so the record is clear, you do not want her to read the article now?

MS. GOVERNSKI: No. She relied on it in her report. As you sit here today -- can you please repeat the question back, Ash, because Mr. Fritz's one minute long speaking objection has distracted me

from what the actual question was.

MR. FRITZ: I just wanted to make sure we're all understanding what your question was.

MS. GOVERNSKI: Mr. Fritz, stop with the speaking objections. Ash, please repeat back the question.

THE REPORTER: (Record read as follows:

"QUESTION: As you sit here today, can you explain how this paper defines coordinated behavior in social media?")

MR. FRITZ: Objection. You can answer.

THE WITNESS: I cannot offhand without going through and referencing the paper.

BY MS. GOVERNSKI:

Q Okay. You cite to this article in page 87 as the only source for your claim that, quote:

(As read):

"Coordinated influence operations exhibit distinctive network fingerprints, tight temporal synchronization, limited participant dispersion, high clustering coefficients, and centralized network structures with identifiable command

and control hubs."

Please identify what parts of this article you used to support that statement.

MR. FRITZ: Objection. You can answer.

THE WITNESS: Specifically, I would have to go through to reference the page and the location of -- I would have to look to see how I used it within the report and then go through the paper to see how I cited it.

MS. GOVERNSKI: Okay. So let's do that. Let's go to 109 in your report.

MR. FRITZ: Are you saying you want her to read the article now?

BY MS. GOVERNSKI:

Q No. Go to 109 of your report, is what I said. Paragraph 109. I'm sorry. Let's go to paragraph 87.

A Okay.

Q Are you at paragraph 87 of your report?

A Yes.

Q You refer to Graham, et al.

Do you see that?

A Yes.

Q You have a footnote, footnote 11.

Do you see that?

A Yes.
Q If you can look at this footnote, it says "Graham, et al." and you see the title here, right?
"Detecting coordination networks in social media."
Do you see that?
A Yes.
Q So that's a different title than what we just discussed which was "The coordination network toolkit: A framework for detecting and analyzing coordinated behavior on social media", right?
You can go back and look at Exhibit 5.
A Okay.
Q And you can see the two titles don't match again, right?
MR. FRITZ: Objection.
THE WITNESS: To what I have listed in the references?
BY MS. GOVERNSKI:
Q No. The actual article.
A Okay.
Q The actual article, you've read the title as being "The coordination network toolkit: A framework for directing and analyzing coordinated behavior on social media."

That's not the same title as "Detecting coordination networks in social media", right?

MR. FRITZ: Objection. You can answer.

THE WITNESS: That is not.

BY MS. GOVERNSKI:

Q So why is there different titles here?

A I am not sure.

Q Okay. And then we talked about the page numbers and we talked about the page numbers 1139 to 1160 represent the number of pages that reflect this article, right?

A Yes.

Q Okay. Let's look at this footnote. You cite pages 23 to 47.

Do you see that?

A I do.

Q And this is the -- those are the page numbers that you say supports this statement:

(As read):

"These findings align closely with recent computational social science research."

Which is the sentence I just read. So please direct me to pages 23 to 47 in Exhibit 5.

A So I'm assuming this is an error. But I

don't -- that's not part of your exhibit.

Q Those page numbers don't match the exhibit that your counsel provided to us, right?

A It doesn't match the paper that I submitted. No.

Q Is this a hallucinated cite -- citation?

MR. FRITZ: Objection.

THE WITNESS: No, I wouldn't call it hallucinated because it's an actual paper. It's incorrect on the way that it was picked up for the title and the year.

BY MS. GOVERNSKI:

Q So it says Graham, et al., but if you listed authors who were not the authors who appeared, would that be an indication of a hallucination?

A I'm sorry. If I listed authors that did not appear?

Q On the publication.

A So I think that you're using the word "hallucination." That is not hallucination to me. That is incorrect. But hallucination is different.

Q Well, if a citation includes authors who were not the authors of the paper, wouldn't that be a hallucination?

MR. FRITZ: Objection.
THE WITNESS: By definition, no.
BY MS. GOVERNSKI:
Q If it made up authors who were not the authors, that would not be a hallucination?
MR. FRITZ: Objection.
THE WITNESS: If a generative AI solution made up authors, then yes, that would be a hallucination.
BY MS. GOVERNSKI:
Q Okay. So let's look at Exhibit 55, which we already talked about. And we talked about the three authors. You recall that, Graham, Hames and Alpert. Do you recall that those were the only three authors identified in this article?
A In one that we're looking at, yes.
Q Okay. So let's go back to your report, which is Exhibit 002, and let's go to page 108. I'm going to share my screen so it's a little easier. Oh, I am showing my screen, I guess.
And you see right here, Graham -- this is the article we're talking about, right?
"Detecting coordination networks in social media. 'Journal of Computational Social Science.'"

MR. FRITZ: Objection.
THE WITNESS: No.
BY MS. GOVERNSKI:
Q You have no explanation for that?
MR. FRITZ: Objection. You can answer again.
THE WITNESS: I do not. As I mentioned earlier, I don't believe in AI analysis for the use of identifying if something is generative AI. I think we talked about that earlier.
BY MS. GOVERNSKI:
Q So if another -- if Grammarly found the same paragraph had a 70 percent chance of being generated by AI, would that change your perception at all?
A So Grammarly has a feature that is also an AI checker --
Q Uh-huh.
A -- which, again, is -- is similar to what I mentioned earlier with the accuracy of overall AI checkers.
Q Okay. So what about the fact that GPTZero predicted this paragraph was 100 percent likely to be AI, and Grammarly predicted this paragraph to be 70 percent, your response is that

hypotheticals that I am not able to answer.
BY MS. GOVERNSKI:
Q Okay. Let's make it not a hypothetical.
You know Dr. Mayzlin's set includes more than a million social media items, right?
MR. FRITZ: Objection.
THE WITNESS: Her dataset includes 1.1 million, yes.
BY MS. GOVERNSKI:
Q How do you know that applying your methodology to her dataset would result in the same outcome?
A I'm sorry. Could you repeat the second part of that question?
Q If you were to run Dr. Mayzlin's --
MR. FRITZ: Could I make a suggestion?
MS. GOVERNSKI: No, you can't. I'm in the middle of a question.
MR. FRITZ: I'm sorry. If she's telling you she doesn't understand the question --
MS. GOVERNSKI: I'm rephrasing it.
MR. FRITZ: Excuse me. And she's explaining to you why she doesn't understand it, I'd suggest you wait until she's finished so you completely and fully understand why she's confused.

MS. GOVERNSKI: We're going to go off the record. Off the record. I'm going to call the Court about speaking objections. So let's go off the record, please.

MR. FRITZ: Go ahead.

THE VIDEOGRAPHER: We're off the record. It's 2:53 p.m.

(Recess.)

(Whereupon, a conference call was had with the Court which has been transcribed and bounded in a separate transcript.)

---0o0---

THE VIDEOGRAPHER: We are back on the record. It's 3:58 p.m.

MS. GOVERNSKI: Ms. -- Ashley, do you mind repeating back the last question I asked?

THE STENOGRAPHIC REPORTER: Okay. If you give me a few minutes, I have to go all the way back --

MS. GOVERNSKI: Oh, no. That's okay. That's okay. I'm good.

BY MS. GOVERNSKI:

Q Ms. Alexander, I was asking you if applying the methodology from your report to the dataset in Dr. Mayzlin's analysis would lead to the

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 16th day of December, 2025.

________________________

ASHLEY SOEVYN

CSR No. 12019

# Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---000---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**REPORTER'S TRANSCRIPT OF COURT CALL PROCEEDINGS**
TAKEN DURING THE VIDEO-RECORDED DEPOSITION OF
NICOLE ALEXANDER
WITH ALL PARTIES APPEARING TELEPHONICALLY
Monday, December 15, 2025

Stenographically Reported by: Ashley Soevyn,
CALIFORNIA CSR No. 12019

separately with the court reporter. But let me hear from Mr. Fritz.

MR. FRITZ: Thank you.

MS. GOVERNSKI: Your Honor, I just want to make one quick correction. We did not submit the 9/29 letter to the Court. I misspoke. We submitted it to the other side. I just wanted to make sure the record is clear.

THE COURT: Mr. Fritz.

MR. FRITZ: Thank you, Your Honor. Unfortunately, Ms. Governski's recitation is completely inaccurate. The way the deposition started was Ms. Governski gratuitously asking the witness what her illness was on the record. Even though we had memorialized it in a writing to your Honor, in general terms. And then to perhaps attempt to embarrass the witness, Blake Lively's counsel then asked her about her illness.

THE COURT: What is wrong? The illness was what justified the extension, right?

MR. FRITZ: That's right. But the specifics I don't believe were necessary, Your Honor.

Then there was an objection and instruction not to answer based on attorney-client

privilege.

THE COURT: With an expert? A testifying expert? I don't think that's an objection that you would enjoy with a testifying expert.

MR. FRITZ: The witness testified that different counsel, not my firm or the Liner Freedman firm had spoken to her. And Ms. Governski was asking her about communications with that other counsel who the witness was unable to identify. So in an abundance of caution, I instructed her not to answer. And I told Ms. Governski that I would meet and confer with her about it after the deposition so I could fully understand what counsel the witness was referring to.

And then Ms. Governski proceeded to lambaste into me, asked me if I knew what attorney-client privilege was and was completely improper, where I simply stated the basis for my objection and I was willing to move on and meet and confer off the record.

Then after two hours of questioning, Your Honor, after the witness finished the answer, I said, "We've been going for two hours, let's take a break." Ms. Governski then said "I want to finish my line of question" and she proceeded to then ask

another question. And then she tried to argue that because the question was purportedly pending, it was appropriate to ask for a break. We then conferred with the stenographer and the stenographer conferred my point of view and my recollection was that no question was pending. After which point, Ms. Governski finally backed down and allowed the witness to take a break.

In the last instance, Your Honor, the witness said she didn't understand the question or she was confused. And she was explaining to Ms. Governski why she was confused. And in the middle of that explanation, Ms. Governski abruptly and rudely and with a sharp tone interrupted her. And those interruptions had been frequent by Ms. Governski, and her tone and snide remarks to the witness.

So I explained to Ms. Governski, "Why don't you wait for the witness to explain to you why she's confused so that perhaps the next question will not be confusing." At which point, Ms. Governski was the one who asked for the conference with the Court. And of course I said, "if you want to do that, fine."

So this summary by Ms. Governski about

CERTIFICATE OF STENOGRAPHIC REPORTER

State of California )
)
County of Los Angeles)

I, ASHLEY SOEVYN, Stenographic Court Reporter at the Superior Court of California, County of Los Angeles, do hereby certify:

That I was present at the time of the above proceedings;

That I took down in machine shorthand notes all proceedings had and testimony given;

That I thereafter transcribed said shorthand notes with the aid of a computer;

That the above and foregoing is a full, true, and correct transcription of said shorthand notes, and a full, true and correct transcript of all proceedings had and testimony taken;

That I am not a party to the action or related to a party or counsel;

That I have no financial or other interest in the outcome of the action.

Dated: December 16, 2025

______________________________

ASHLEY SOEVYN
CSR No. 12019

# Exhibit 3

manatt

**Esra A. Hudson**
Manatt, Phelps & Phillips, LLP
Direct Dial: (310) 312-4381
ehudson@manatt.com

September 29, 2025

**VIA EMAIL**

Bryan Freedman
Liner Freedman Taitelman + Cooley LLP
1801 Century Park West, 5th Floor
Los Angeles, California 90067

Mitch Schuster
Meister, Seelig & Fein LLP
125 Park Avenue, 7th Floor
New York, NY 10017

Alexandra Shapiro
Shapiro Arato Bach LLP
1140 Avenue of the Americas, 17th Fl.
New York, NY 10036

Re: ***Lively v. Wayfarer Studios LLC, et al.*, No. 1:24-cv-10049-LJL [rel. No. 1:25-cv-00449]**

Counsel:

We write to address the inappropriate and unprofessional behavior that continues to be exhibited by certain counsel for the Wayfarer Defendants during depositions, including during testimony of out-of-jurisdiction witnesses, whose depositions will serve as trial testimony. Specifically we write to address (1) attorneys repeatedly obstructing deposition testimony with speaking objections as well as a lack of basic decorum through insulting comments, audible cross-talk and laughter during examination, in plain violation of the Federal Rules of Civil Procedure, the rules of civility and the rules of professional conduct, and (2) questions concerning Ms. Lively's sexual history and marital relationship in violation of Federal Rule of Evidence 412 ("FRE 412").

**Improper Objections and Unprofessional Conduct**

Several counsel for the Wayfarer Defendants, including Attorneys Kim Zeldin and Ellyn Garofalo, have repeatedly engaged in improper, argumentative speaking objections, and insulting comments, despite multiple warnings by counsel for Ms. Lively and other parties, as well as non-compliant instructions not to answer. *Abu Dhabi Comm. Bank v. Morgan Stanley & Co. Inc.*, 2011 WL 4526141, at *8 (S.D.N.Y. Sept. 21, 2011) ("Objections should generally be limited to the statement "objection as to form and the basis for such objection, *i.e.,* compound question" or a direction not to answer as set forth in Rule 4 above."); *See Antolini v. McCloskey*, 2021 U.S. Dist. LEXIS 224360, *14-16 (S.D.N.Y. Nov. 19, 2021) ("In order to avoid the use of speaking objections, courts have instructed counsel to object to a deposition

question not calling for privileged information using the single word, 'objection,' or at most a short phrase."); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, 328 F.R.D. 100, 110 (S.D.N.Y. 2018) ("[C]ounsel . . . shall refrain from making speaking objections when defending depositions. . . . Objections as to the form of the question shall be made by opposing counsel, who shall simply state, 'Objection.' The objecting counsel shall not speak any additional words concerning the basis of the objection unless a clarification is requested.").

For example, during the September 12, 2025 deposition of Wayfarer President, Tera Hanks, Attorney Zeldin (who defended the witness) engaged in improper speaking objections, insulted the examining attorney, and improperly instructed the witness not to answer based on relevance and/or form. The following are just a few of the many examples of Attorney Zeldin's misconduct the deposition:

- "***I would appreciate if you'd ask a decent question***." (Hanks Tr. at 167:4-11 (emphasis added).)
- "Objection as to form. That's not what the document says. Please stop this. ***This is crazy***" and "***I'm very tired of you too***." (*Id.* at 179:19-180:15 (emphasis added).)
- "Objection as to form. You're asking her to assume four or five things. . . . No. I will -- I will instruct not to answer if you continue to badger the witness. . . . You are. Because ***this witness does not know when the darn article was published***. You're asking her to assume it was published at a certain time; assume this; assume that. Why are you asking the witness that question. Why?" (*Id.* at 129:13-130:1 (emphasis added).)
- "You've asked this question five times. . . . Instruct you not to answer. Go on." (*Id.* at 143:17-22.)
- "No. That's not what she said. Objection as to form. Instruction not to answer. Stop this. . . . ***I've had enough too. I've really had enough.*** You have asked the same question ten times." (*Id.* at 146:1-7 (emphasis added).)

In addition, during that same deposition, Attorney Zeldin engaged in concerning off-record behavior that has threatened to impact witness testimony. Specifically, Attorney Zeldin openly discussed an exhibit that was previously introduced during Ms. Hanks' deposition—while in the presence of the witness. Specifically, counsel for the Jones Parties examined the witness regarding a social media video that was the topic of discussion amongst the Wayfarer Defendants in a text thread, which concludes with Ms. Koslow writing "let us chat to Jed [Wallace] as well on this." (*See JONESWORKS_00036615 at 36678*.) In that video, a woman recounted an incident that she alleged to have had with Mr. Baldoni when she was a nineteen-year-old student. Following introduction and playing of that video, Attorney Zeldin made repeated speaking objections and also improperly instructed her client not to answer. Attorney Zeldin, for example, stated: "Objection as to form. Instruction not to answer. . . . On the basis that you're giving her an incomplete hypothetical. Where are the rest of the facts? You've established nothing through that video" and "Okay. Now, I'm instructing you not to answer. ***You go and talk to the judge about it. You're done***." (Hanks Tr. 210:9-23 (emphasis added).) During a break in the questioning, Attorney Zeldin then suggested—***in front of the witness***—that the video in question had been created by a "drug addled

teenager" and openly questioned its relevance as well as the veracity of the questions with respect to the same.

Attorney Garofalo engaged in similarly obstructive and insulting conduct during the deposition of another out-of-state witness, Anne Carroll, whose deposition testimony may be used at trial:

- MS. GAROFALO: "I will repeat what I said, if you'd like, for the record. I was wondering how any foundation was laid for her expert opinion on what is inappropriate and improper on the set. . . I have repeatedly stated my objections. ***It doesn't seem to have any effect***, so you can proceed." (Carroll Tr. at 93:3-16 (emphasis added).)
- MS. BENDER: "I'll note for the record that counsel for the Wayfarer parties are laughing." (*Id.* 100:11-101:17.)
- MS. GAROFALO: "Yes, because we cannot do, unfortunately, speaking objections. These questions totally and wholly lack foundation and are improper, and it doesn't seem to be getting better. ***So yes, listen I'm sorry a chuckling at my frustration that we cannot get a real question that relates to admissible evidence***. You asked; I've told you. We can proceed." (*Id.* 100:11-101:17 (emphasis added).)
- MS. BENDER: "Thank you, Ms. Garafalo. Your objection is both offensive and legally unsubstantiated. And we will ask in the future listen that you abstain from laughing during the testimony that's being provided." (*Id.*)
- MS. GAROFALO: "And I -- and ***I request that you abstain from questions that I can't help it if they provoke laughter***." (*Id.*)

At one point during Ms. Carroll's deposition, during questioning with respect to Wayfarer's response to instances of COVID on the set of the film, Attorney Zeldin, after muttering to herself, mouthed to Ms. Lively's counsel "***HOW STUPID***." (Carroll Tr. at 126:1-5.)

The foregoing conduct by Attorneys Zeldin and Garofolo violates the Court's standards with respect to appropriate conduct of court officers, intimidates third-party witnesses, coaches party witnesses, and, worst of all, impacts trial witness testimony. We demand that such conduct immediately cease. Ms. Lively currently intends to move for sanctions based on the foregoing conduct and, if such conduct does not cease, will suspend the deposition and seek to exclude counsel from further examination. *See Hindlin v. Prescription Songs LLC*, 2022 WL 3026015, at *5 (N.Y. Sup. Ct. July 30, 2022) (granting relief based on similar misconduct).

**Compliance with FRE 412**

We further write to address questions posed during certain depositions that probe into Ms. Lively's sexual or romantic history, which resulted in objections pursuant to FRE 412. FRE 412, also known as the rape shield law, bars evidence of a sexual assault victim's sexual behavior or sexual history unless its

probative value *substantially outweighs* the risk of unfair prejudice or harm. This rule has been extended to victims of sexual harassment in civil cases. *See Wolak v. Spucci*, 217 F.3d 157, 160 (2d Cir. 2000) ("We hold that Rule 412 . . . encompasses sexual harassment lawsuits."); *Hughes v. 21st Century Fox*, 327 F.R.D. 55, 58 (S.D.N.Y. 2018) (barring discovery into sexual harassment plaintiff's sexual history because "[Plaintiff's] prior sexual history has no relevance to her claims."); *Macklin v. Mendenhall*, 257 F.R.D. 596 (E.D. Cal. 2009) (Rule 412 bars evidence "whether offered as substantive evidence or for impeachment."). Ms. Lively's sexual and/or romantic history has no bearing on the matters at issue in this case and we will not tolerate such examination, which will be the subject of a protective order and sanctions motion if it happens again.

Should counsel for the Wayfarer Defendants continue to engage in any the foregoing conduct, we will suspend the deposition at issue and promptly seek guidance from the Court and reserve all available remedies.

Sincerely,

Esra A. Hudson

# Exhibit 4

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF JAMEY HEATH
Los Angeles, California
Wednesday, October 8, 2025

Stenographically Reported by: Ashley Soevyn,
CALIFORNIA CSR No. 12019

Q Are you refusing to answer questions unless you read this entire document?
MS. SHAPIRO: Objection.
THE WITNESS: If you're going to ask me something about a document, I just want to be able to read it.
BY MS. HUDSON:
Q I -- go ahead. Finish reading it. You've already read about half of it. You can finish.
A No, I hadn't. I would like to read it. If you're going to ask me, I just -- I just want to be -- understand what I'm responding to.
MS. HUDSON: Okay. Let's go off the record.
MS. SHAPIRO: We're not going off the record.
MS. HUDSON: I'm taking a break. Yes, we are.
MS. SHAPIRO: We're not going off the record.
MS. HUDSON: Yes, we are. Yes, we are. It's not up to you. This is my deposition. We're going to go off the record.
MR. BACH: How much time is left?

MS. SHAPIRO: There's six-minutes left. Oh, sorry, seven minutes.
MS. HUDSON: Okay. I have seven minutes.
THE VIDEOGRAPHER: Nine minutes left.
MS. HUDSON: Nine. There you go. We're gonna take a 10-minute break. We'll come back for the last nine.
MR. BACH: Let's make a record before you go. Let's make a record.
(Cross talk.)
MS. HUDSON: Not on the record. Not on my time.
MR. BACH: Can we go on the record?
MS. HUDSON: Absolutely not. Okay. You can go on the record and make any statement you want --
MR. BACH: I'm going to go on the record.
MS. HUDSON: -- but you're not taking my nine minutes. I'm not -- you are not taking my nine minutes to make a record.
MS. SHAPIRO: So you can ask more questions about a dead former client of one of the lawyers in this case?
MS. HUDSON: If you want to make a --
MS. SHAPIRO: And how is that -- how is

that proper?

MS. HUDSON: I understand that you are new to this case, and you don't understand everything.

MR. BACH: I want to go on the record. I don't care whether --

(Cross talk.)

MS. SHAPIRO: I'm new to this case, but I'm not new to the practice of law. I've been practicing law for over 30 years. I know the rules, ma'am.

MS. HUDSON: We're going off the record. I have nine minutes left, and I'm going to use them to ask some questions. If you want to make a record, you can add time and make whatever record you want.

MR. BACH: Okay.

MS. HUDSON: Okay? Will you agree that you will -- this is not counting against my nine minutes?

MR. BACH: That's fine. But I want it on the record. I want a record of what's happened.

MS. HUDSON: You -- you want a record of what's happened?

MR. BACH: Yes.

MS. HUDSON: You can make a record if -- if you will --

MR. BACH: I would like to, if you will let me.

MS. HUDSON: If -- I will let you if you will agree that it is not going to impact my nine minutes.

MR. BACH: I've already said fine to that. Do I need to say it again?

MS. HUDSON: Okay. You can make whatever record you want. I'm going to take a break.

MR. BACH: Okay. Can we go on the record for this?

MS. HUDSON: You don't need the video for this. You can just do it for the --

MR. BACH: I'll do it on the video. We're -- I don't need the video.

THE VIDEOGRAPHER: We're still on the record.

MR. BACH: Are we on the record?

Yeah, I just want to say, we had a break less than an hour ago. We made clear to counsel that we didn't want another break, that this same witness is being deposed tomorrow. That this process is exhausting. That he's expected to

testify for another seven hours plus breaks tomorrow.

She came back from a break and part of her questioning had nothing whatsoever to do with the claims and defenses in this case. She was clearly at the point where the questioning becomes optional and rhetorical, and she engaged in a series of questions aimed to drive a wedge between this deponent and his lawyer, and to tarnish the reputation of the lawyer. That is how she has used her time --

MS. HUDSON: This has nothing --

MR. BACH: Excuse me. I'm making a record.

MS. HUDSON: Then we are going to excuse the witness from the room because you are speaking and coaching the witness right now.

MR. BACH: I am not coaching the witness at all.

MS. HUDSON: This is totally inappropriate. This is totally inappropriate. You are coaching the witness. You are making a very long speaking objection. It -- there is no purpose. There's no judge in the room. Everything that you're saying is -- you can make an argument about

it. We're not going to do this in front of the witness.

MR. BACH: Technically, a speaking objection is when there's a question pending and you object to the question.

MS. HUDSON: No.

MR. BACH: I'm not objecting to --

(Cross talk.)

MS. HUDSON: Speaking on the record is not permitted like this. You're objecting to the break. Objection noted. We're taking a break.

MR. BACH: All right. This isn't -- this is silly.

MS. HUDSON: Okay.

MR. BACH: This is silly.

MS. HUDSON: I do not want you to coach the witness anymore and --

MS. SHAPIRO: We're not coaching the witness.

MS. HUDSON: -- make other statements on the record about the witness. If you insist on doing that, the witness should leave the room. Okay?

MR. BACH: I am going to defer to you in every respect. Whatever I need to do to let you

make my statement on the record, I'm going to do. Okay?

MS. HUDSON: Then you can excuse the witness from the room if you insist on making this statement.

MR. BACH: Okay. Jamey, go outside. Go outside, as I continue.

After we made clear our concerns about breaks, the witness is --

MS. HUDSON: Yeah. I would like to also note that you are not the -- the -- you are not the representative lawyer.

MR. BACH: If you cut me off again, I'm going to call Judge Hyman on the phone now.

MS. HUDSON: You want to tell him that you, who are not defending the deposition, are wanting to make a ten-minute speaking objection?

MR. BACH: Can you let me speak and then you can make whatever speech you want about me and you can say whatever you want about me. But you are going to let me --

(Cross talk.)

MS. HUDSON: Yeah, Mr. Bach, you are not defending this deposition. You are a participant here who has decided to make a speech on the record.

MR. BACH: We're not kids on a playground. You just said if Mr. Heath left the room, I could make my statement. Now you're not letting me make my statement. Can I make my statement?

MS. HUDSON: You can make your statement over my objection. Okay? That you --

MR. BACH: Just let me know when I can make my --

MS. HUDSON: -- you should --

MR. BACH: -- statement. I'm just going to sit here and not say --

MS. HUDSON: -- you should not be making any statement on the record.

MR. BACH: -- anything until you tell me I can make my statement.

MS. HUDSON: If you -- you are disrupting the deposition in order to make a statement as the non-defending lawyer in this deposition.

MR. BACH: Are you done?

MS. HUDSON: And if you -- I don't agree. I excused the witness. If you want to continue, I'm just going to let you do this so we can finish this deposition. And then we're going to take a break, and we're going to take our last nine minutes. So

if you want to make this statement, for whatever reason, go ahead.

MR. BACH: Are you done?

MS. HUDSON: I am done.

MR. BACH: Okay. Can I talk?

MS. HUDSON: You can talk.

MR. BACH: Okay.

As I've been saying, after we made clear that we're concerned about the breaks, we're concerned about the witness being tired, the next line of questioning had to do -- had nothing to do with the case, but simply had to do with the client and his lawyer and trying to drive a wedge. And now, the questioning lawyer wants to take yet another break. It's clear from the content of her questioning that she's no longer focused on the merits of the case, and that she's conducted her substantive questioning.

I don't see another need for a break. I think the deposition is practically over. The client is tired and has to go tomorrow. I think this is abusive. I think it's unnecessary, and I object.

MS. HUDSON: All right. Ten minutes. Off the record. Thank you.

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 10th day of October 2025.

ASHLEY SOEVYN
CSR No. 12019

# Exhibit 5

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**CONFIDENTIAL**
**CONTAINING ATTORNEYS' EYES ONLY PORTIONS**
VIDEO-RECORDED DEPOSITION OF ANN FROMHOLZ
Los Angeles, California
Thursday, December 11, 2025

Stenographically Reported by: Ashley Soevyn,
CALIFORNIA CSR No. 12019

Q If you go on into paragraph 12, Ms. Lively's declaration, on the top of page 4, she writes:

(As read):

"Monitors for the scene were also active, when the standard for closed sets is to restrict the feed."

Do you see that?

A I do.

MS. ZELDIN: Objection. Not to you, but to the sentence. How does she have any foundation for that statement? She doesn't.

MS. ROESER: Objection to your speaking objection.

MS. ZELDIN: Well, objection to the declaration you drafted for your client.

MS. ROESER: Kim.

MS. ZELDIN: What?

MS. ROESER: It's -- your speaking objections are totally inappropriate, as is the suggestion that anyone drafted this -- that I drafted this for the client.

MS. ZELDIN: I don't know if you did or Esra did or someone else did.

MS. ROESER: Kim.

MS. ZELDIN: Stephanie.

MS. ROESER: You know that you're being inappropriate.

MS. ZELDIN: Really? And you're not?

MS. ROESER: I'm not. Just asking questions.

MS. ZELDIN: You're asking questions and --

MS. ROESER: Kim, come on, do we really need to do this during the last expert deposition? Let's just leave it.

MS. ZELDIN: Go. Go.

THE WITNESS: Is this the last expert deposition?

MS. ZELDIN: No.

MS. ROESER: No, I'm wrong. But it might be our last deposition together, so...

MS. ZELDIN: Thank God.

MS. ROESER: Agreed.

BY MS. ROESER:

Q Okay. So --

A So where were we?

Q So in this declaration, Ms. Lively stated that monitors were active, right?

A She did.

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 12th day of December, 2025.



ASHLEY SOEVYN

CSR No. 12019