# EXHIBIT 9

# EXHIBIT 7
# UNDER SEAL

# Dkt. No. 940

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY,<br><br>Plaintiff,<br><br>-v-<br><br>WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, JENNIFER ABEL, JED WALLACE, and STREET RELATIONS INC.,<br><br>Defendants. | Case No. 1:24-cv-10049-LJL<br>(consolidated with 1:25-cv-00449-LJL) |
| JENNIFER ABEL,<br><br>Third-Party Plaintiff,<br><br>-v-<br><br>JONESWORKS LLC,<br><br>Third-Party Defendant. | |

# DECLARATION OF KEVIN A. FRITZ

I, Kevin A. Fritz, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an attorney admitted to practice before this Court, a partner in the law firm of Meister Seelig and Fein PLLC, 125 Park Avenue, 7th Floor, New York, NY 10017, and counsel of record for defendant/third-party plaintiff Jennifer Abel in the above-captioned action.

2. I respectfully submit this declaration in support of Jennifer Abel's motion for conditional summary judgment on her Second Cause of Action in the Amended Third-Party Complaint against third-party defendant Jonesworks LLC ("Jonesworks").

3. A true and correct copy of the Amended Third-Party Complaint is attached as Exhibit 1.

4. A true and correct copy of Jonesworks' Answer to the Amended Third-Party Complaint is attached as Exhibit 2.

5. A true and correct copy of excerpts from the transcript of the deposition of Stephanie Jones, taken on September 16, 2025, is attached as Exhibit 3.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: November 11, 2025
New York, NY

*/s/ Kevin A. Fritz*

MEISTER SEELIG AND FEIN PLLC
Kevin A. Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
(212) 655-3500
kaf@msf-law.com
*Counsel for defendant/third-party plaintiff Jennifer Abel*

# EXHIBIT A

# EXHIBIT C

Planet Depos
We Make It Happen™

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Transcript of Stephanie Jones

**Date:** September 16, 2025
**Case:** Joneswork -v- Abel

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - x

| | | |
|---|---|---|
| STEPHANIE JONES AND | : | |
| JONESWORKS LLC, | : | |
| Plaintiffs, | : | Civ. Action No. |
| v. | : | 1:25-cv-00779-LJL |
| JENNIFER ABEL, MELISSA | : | |
| NATHAN, JUSTIN BALDONI, | : | |
| WAYFARER STUDIOS LLC, | : | |
| AND JOHN DOES 1-10, | : | |
| Defendants. | : | |

\- - - - - - - - - - - - - x

Videotaped Deposition of STEPHANIE JONES
New York, New York
Tuesday, September 16, 2025
9:16 A.M.
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Job No.: 594347
Pages: 1 - 280
Reported By: Anita M. Trombetta, RMR, CRR,
California CSR No. 14647

Videotaped deposition of STEPHANIE JONES, held at the offices of:

Meister Seelig & Fein, LLP
125 Park Avenue
7th Floor
New York, NY 10017
212.655.3500

Pursuant to notice, before Anita M. Trombetta, a Certified Shorthand Reporter in the State of California, RMR, CRR, and Notary Public in and for the State of New York.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF STEPHANIE JONES AND
JONESWORKS LLC:
KRISTIN N. TAHLER, ESQUIRE
MAAREN A. SHAH, ESQUIRE (New York)
MORGAN ANASTASIO, ESQUIRE (New York)
NICHOLAS INNS, ESQUIRE (Washington, D.C.)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S Figueroa St, 10th Floor
Los Angeles, CA 90017
212.849.7000

ON BEHALF OF JENNIFER ABEL, MELISSA NATHAN,
JUSTIN BALDONI, WAYFARER STUDIOS LLC, AND
JOHN DOES 1-10:
BRYAN J. FREEDMAN, ESQUIRE
THERESA TROUPSON, ESQUIRE (via Zoom)
LINER FREEDMAN TAITELMAN COOLEY LLP
1801 Century Park West, 5th Floor
Los Angeles, CA 90067-6408
310.201.0005

(Appearances continued on next page.)

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF JENNIFER ABEL, MELISSA NATHAN, JUSTIN BALDONI, WAYFARER STUDIOS LLC, and JOHN DOES 1-10:

MITCHELL SCHUSTER, ESQUIRE
JORDAN BIENER, ESQUIRE
MARIE A. KESSEL, ESQUIRE
KEVIN A. FRITZ, ESQUIRE (via Zoom)
SUMMER BENSON, ESQUIRE (via Zoom)
MEISTER SEELIG & FEIN PLLC
125 Park Avenue, 7th Floor
New York, NY 10017
310.201.0005
-and-
MITRA AHOURAIAN, ESQUIRE (via Zoom)
AHOURAIAN LAW
2029 Century Park E #14
Los Angeles, CA 90067
310.376.7878

(Appearances continued on next page.)

A P P E A R A N C E S C O N T I N U E D

ATTORNEYS FOR STREET RELATIONS, INC. and
JED WALLACE:
JOEL GLOVER, ESQUIRE
JACKSON WALKER LLP
1401 McKinney St # 1900
Houston, TX 77010
713.752.4226

ATTORNEYS FOR BLAKE LIVELY:
ESRA HUDSON, ESQUIRE (via Zoom)
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East
Century City, CA 90067
310.312.4207
-and-
AARON E. NATHAN, ESQUIRE
MICHAEL J. GOTTLIEB, ESQUIRE (Los Angeles)
VINCE BIAGIOTTI, ESQUIRE
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, NY 10019
212.728.8904
(Appearances continued on next page.)

A P P E A R A N C E S C O N T I N U E D

ATTORNEYS FOR BLAKE LIVELY: (Continued)

LINDSEY STRASBERG, ESQUIRE (via Zoom)
SLOANE OFFER WEBER & DERN
10100 Santa Monica Boulevard, Suite 750
Los Angeles, CA 90067
310.248.5100
-and-
DUNN ISAACSON RHEE LLP
MERYL GOVERNSKI, ESQUIRE (via Zoom)
401 9th Street, NW
Washington, DC 20004
202.240.2927

ALSO PRESENT:

Robert Palos, Videographer
Steve Sarowitz (via Zoom)
Jamey Heath (via Zoom)
Melissa Nathan (via Zoom)
Jennifer Abel (via Zoom)

--------------------I N D E X------------------
WITNESS - STEPHANIE JONES

| EXAMINATION BY | Page |
|---|---|
| ATTORNEY FREEDMAN | 10 |

---------------E X H I B I T S-----------------

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 1 | Email Bearing Bates JONESWORKS_00030155 | 167 |
| Exhibit 2 | Email Chain Bearing Bates JONESWORKS_38566 through JONESWORKS_38590 | 181 |
| Exhibit 3 | Text Exchange, Bates JONESWORKS_00040102 Through JONESWORKS_00040103 | 183 |
| Exhibit 4 | Email, Bates JONESWORKS_20577 | 184 |
| Exhibit 5 | Text Exchange, Bates JONESWORKS_39988 Through 39991 | 193 |
| Exhibit 6 | Text Exchange, Bates JONESWORKS_40021 Through 40027 | 200 |
| Exhibit 7 | Text Exchange, Bates JONESWORKS_40573 | 208 |

| | | |
|---|---|---|
| | Through 40586 | |
| Exhibit 8 | Text Message, Bates BALDONI_21305 | 226 |
| Exhibit 9 | Message Chain, Bates JONESWORKS_12591 Through 12592 | 229 |
| Exhibit 10 | Text Exchange, Bates JONESWORKS_00039746 Through 39748 | 231 |
| Exhibit 11 | Text Exchange, Bates JONESWORKS_00040269 Through 40271 | 235 |
| Exhibit 12 | Text Exchange, Bates JONESWORKS_00039132 Through 38171 | 255 |
| Exhibit 13 | Text Exchange, Bates JONESWORKS_40323 Through 40332 | 263 |
| Exhibit 14 | Text Exchange, Bates JONESWORKS_40141 Through 40125 | 266 |
| Exhibit 15 | Message Chain, Bates BL-21190 Through BL-21196 | 267 |
| Exhibit 16 | Plaintiffs' Second Amended Initial Disclosures | 274 |

P R O C E E D I N G S

THE VIDEOGRAPHER: Here begins media number 1 in the videotaped deposition of Stephanie Jones, in the matter of Jonesworks vs. Abel, in the United States District Court, Southern District of New York, Case Number 00779.

Today's date is September 16th, 2025. The time on the video monitor is 9:16 A.M. The video deposition is taking place at 125 Park Avenue, New York, New York.

Would counsel please voice-identify themselves and state whom they represent.

ATTORNEY TAHLER: Kristin Tahler, Maaren Shah, Nicholas Inns, and Morgan Anastasio from Quinn Emanuel for the witness and Jonesworks.

ATTORNEY NATHAN: Aaron Nathan, Willkie Farr & Gallagher for Blake Lively, with Mike Gottlieb and Vincent Biagiotti.

ATTORNEY GLOVER: Joel Glover, Jackson Walker for defendant Street Relations.

ATTORNEY SCHUSTER: Mitchell Schuster from Meister Seeling & Fein on behalf of the Wayfarer defendants, here with my associate Jordan Biener, and Marie Kessel in the corner.

ATTORNEY FREEDMAN: Bryan Freedman for the

same parties. 09:17:39
THE VIDEOGRAPHER: All right. The court reporter today is Anita Trombetta representing Planet Depos. 09:17:41 09:17:42 09:17:45
The witness will now be sworn in. 09:17:45
S T E P H A N I E J O N E S, called as a witness, having been first duly sworn by a Notary Public, was examined and testified as follows: 09:17:47 09:17:47 09:17:47
EXAMINATION BY 09:17:47
ATTORNEY FREEDMAN: 09:17:57
Q Good morning. 09:17:57
A Good morning. 09:18:03
Q Is this the first time you've had your deposition taken? 09:18:04 09:18:10
A Yes. 09:18:11
Q Welcome. 09:18:12
Where did you go -- did you go to college? 09:18:15
A Yes. 09:18:18
Q Where did you go? 09:18:19
A I took -- well, I started getting college credits at Arkansas State University when I was in high school, and then I went to University of Memphis. And then I also -- when I moved here after college, I took classes at NYU as well. Creative writing, things like that. 09:18:20 09:18:23 09:18:25 09:18:27 09:18:31 09:18:35

ATTORNEY FREEDMAN: Yeah. I don't think I'll be there very long. 09:49:02 09:49:03
ATTORNEY TAHLER: Okay. 09:49:05
Q Generally, in 2011 when you said that you started working for Jonesworks -- is that right? 09:49:06 09:49:09
A Yes. 09:49:11
Q Generally, what services did Jonesworks provide at that time? 09:49:12 09:49:17
A Brand PR, corporate comms, like corporate comms, meaning -- I define that as -- for a brand, a corporation, their executives, like leadership executive positioning, leadership visibility, press. Really strategy. We were rooted, and still are, rooted in strategy. How a person and all their ancillary businesses or it might be a brand and all the different parts of that brand and what the siloed stories are and what the holistic story is. 09:49:19 09:49:26 09:49:30 09:49:34 09:49:39 09:49:42 09:49:47 09:49:50 09:49:53 09:49:57
Q So at that time, Jonesworks provided brand PR, corporate comms and press strategy; is that right? 09:49:58 09:50:02 09:50:07
ATTORNEY TAHLER: Objection. 09:50:07
A We did public relations, media relations, publicity, personal publicity, brand marketing. It's -- they all blend together depending on the 09:50:08 09:50:14 09:50:20

type of client. And we would make bespoke plans, still do that to this day, for each person. Like Kendra Scott is a perfect example. I believe she's their client as well. Kendra Scott was a founder, so we might tell her founder story. And then we might tell the brand story about how great these earrings are in Vogue or Harper's Bazaar or Elle, but then we might also have Kendra doing press. So it's the same that we do today. 09:50:22 09:50:25 09:50:28 09:50:31 09:50:36 09:50:39 09:50:42 09:50:47 09:50:49

Q Have the services been the same since you started Jonesworks that you provided, or have the services expanded over time? 09:50:54 09:50:57 09:51:00

A Well, I guess you could say that when I was three people or four people in a one-bedroom apartment, I wasn't -- we expanded our clientele, so our work expanded, yes. 09:51:02 09:51:08 09:51:13 09:51:19

Q So you discussed a bunch of different areas that -- that you started out providing in terms of services. 09:51:22 09:51:27 09:51:30

How did the business expand in terms of what it provided? 09:51:32 09:51:34

ATTORNEY TAHLER: And actually, with these questions, can we go AEO since we're talking about kind of overall strategy for the -- 09:51:35 09:51:37 09:51:40

ATTORNEY FREEDMAN: Sure. 09:51:43

A I've had two apartments in Los Angeles. 10:47:27
In what year, you're asking me? 10:47:32
Q At any time. 10:47:36
A I had an apartment on [redacted] that I was renting. And then we bought a place on [redacted]. I don't remember her coming by there. 10:47:37 10:47:46 10:47:51
Maybe, she could have come by my apartment, but I don't recall, no. 10:47:53 10:47:56
Q When did Jonesworks start working for Justin Baldoni? 10:47:59 10:48:02
A I believe it was the last season that he was in "Jane the Virgin," because I went to the CBS lot for my first meeting with him. 10:48:04 10:48:08 10:48:14
Q When did Jonesworks start working for Wayfarer Studios? 10:48:16 10:48:23
A He had had Wayfarer -- I believe he ended up naming -- there was a name change of Wayfarer, and then he ended up renaming it Wayfarer Studios. There was Wayfarer Entertainment. I don't -- so I don't know if we ever -- in my recollection, because we worked with him around eight years, I don't remember if we referred to it as Wayfarer, one of the old Wayfarer entities. But we -- he got an investment from Steve Sarowitz. We announced it. And then we started doing -- and 10:48:24 10:48:34 10:48:37 10:48:41 10:48:46 10:48:49 10:48:52 10:48:56 10:49:03 10:49:08

that's when we officially took it on -- 10:49:14
Q Did -- 10:49:17
A -- in addition to his personal. 10:49:17
Q Did Jonesworks start working with Justin Baldoni prior to working with Wayfarer? 10:49:20 10:49:24
A Yes. 10:49:25
Q Did Jonesworks have a written agreement with Justin Baldoni? 10:49:26 10:49:30
A When we first started working with him, I'm not sure. I think we went on and off cycle with him. So we worked with him, we quit working with him, we went off cycle. He wanted -- if I recall correctly, he wanted to come back on cycle. And then that also -- I believe was shortly thereafter when they did the event, the acquisition -- or the partnership with -- or got the cash infusion from Steve Sarowitz. 10:49:31 10:49:37 10:49:48 10:49:50 10:49:56 10:49:59 10:50:05 10:50:09 10:50:12
Q What do you mean by "cycle"? 10:50:14
A I'm sorry? 10:50:16
Q You used the word "cycle," off cycle? 10:50:17
A On and off cycle. When you work with someone and if they go into production, or whatever it is, you might go off cycle with them because they don't need you at that point in time because they can't do press, they're, you know, 10:50:20 10:50:25 10:50:28 10:50:32 10:50:34

shooting, whatever it is. So I remember being on cycle with him, going off cycle, if I recall correctly, and then came back on with him. And then shortly thereafter, Steve Sarowitz invested. 10:50:37 10:50:41 10:50:45 10:50:48

Q Do you remember Jonesworks having a written agreement at any time with Justin Baldoni? 10:50:54 10:50:59

A I believe that we may have sent him one and he never executed it or -- I'm not -- I'm not sure. 10:51:01 10:51:17 10:51:24

Q As you sit here today, do you recall a written agreement between Jonesworks and Justin Baldoni? 10:51:26 10:51:28 10:51:31

ATTORNEY TAHLER: Objection. 10:51:33

A I don't know that we got an executed -- I -- I'm -- if I recall, I know we likely sent him an agreement, as we do with all clients. I'm not sure if he signed it or if it was just a verbal. But I believe we were doing his personal publicity at that time a long time ago for $5,000 a month. And he was paying us. And in my first meeting with him, Scooter Braun called me. I didn't answer, I don't think. And I -- he said something to the -- he FaceTimed when he found out I was with Justin. 10:51:34 10:51:47 10:51:50 10:51:54 10:52:01 10:52:03 10:52:07 10:52:09 10:52:21 10:52:24 10:52:26

And Justin said, "Tell him you're with 10:52:27

Q You mean like speaking engagements? 10:58:43
A Or press. It was part of his brand and who we would pitch accordingly based on what the needs were, if it was for film or his TV show, a book, whatever it was. 10:58:46 10:58:54 10:58:56 10:59:01
Q Would you pitch sponsorship deals to Justin Baldoni? 10:59:03 10:59:07
ATTORNEY TAHLER: Objection. 10:59:08
A I -- if I recall, I remember him asking if we could reach out to certain brands or sponsors. And then I recall -- and I always do this if I have a relationship somewhere or if it's a client and I know that they, you know, want to invest in something and maybe consider sponsoring it, I might ask. 10:59:08 10:59:16 10:59:20 10:59:26 10:59:28 10:59:33 10:59:37
I remember conversations about how can we find brands. He wanted brand partnerships to sponsor -- if I recall, it was his podcast, but it may have been something else. 10:59:39 10:59:46 10:59:49 10:59:54
Q Was there a time that you stopped the -- that Jonesworks stopped representing Justin Baldoni? 10:59:55 11:00:00 11:00:02
ATTORNEY TAHLER: Objection. 11:00:02
A They -- Jamey Heath, I believe it was, emailed me August, I think, 30th or 31st of 2024 11:00:03 11:00:11

and terminated Jonesworks. 11:00:21
Q Did he terminate Jonesworks from representing Justin Baldoni also or just representing Wayfarer? 11:00:25 11:00:29 11:00:32
A I don't recall the specifics of his email, but I can tell you he did not want us working with Justin or Wayfarer. 11:00:38 11:00:40 11:00:46
Q Did you speak to Justin Baldoni about continuing to work with him after Jamey terminated Jonesworks? 11:00:48 11:01:03 11:01:09
A I don't believe I did. I don't believe so. 11:01:10 11:01:17
Q How did Jamey Heath terminate Jonesworks services? 11:01:17 11:01:25
A I believe it was via email. It was in an email. 11:01:26 11:01:31
Q And did the email say that Jonesworks' services were terminated? 11:01:31 11:01:35
ATTORNEY TAHLER: Objection. 11:01:37
A I believe so. 11:01:38
Q And is there a writing which you're aware of where Jonesworks terminated Justin Baldoni as a client? 11:01:41 11:01:52 11:01:58
ATTORNEY TAHLER: Objection. 11:01:58
A Again, I can't remember the specifics of 11:01:59

correctly, it was head of crisis communications or something to that effect. 11:25:45 11:25:48
Q Had anyone had that role prior to that time? 11:25:49 11:25:52
A No. 11:25:52
Q And why did you want to give her that particular title? 11:25:53 11:26:03
Why did you think that would be good for Jonesworks? 11:26:05 11:26:08
ATTORNEY TAHLER: Objection. 11:26:08
A I recall her saying that that's what she loved, and that was what she wanted her area of focus to be. 11:26:09 11:26:15 11:26:19
Q Did you work on the Wayfarer account -- is that the right word? Is "account" the right word, do you call it? 11:26:20 11:26:44 11:26:49
A Justin Baldoni and Wayfarer accounts, yes, I worked on them both. 11:26:50 11:26:52
Q Do you consider them one in the same or are they separate? 11:26:53 11:26:56
A The scope of work was specific to Justin with regards to his personal publicity. And the scope of Wayfarer was different than that, because it was a studio company. 11:26:57 11:27:00 11:27:02 11:27:05
Q Were you personally involved in working on 11:27:10

behalf of Justin? 11:27:12
ATTORNEY TAHLER: Objection. 11:27:18
A Can you clarify by what you mean by 11:27:18
"personally involved"? 11:27:22
Q Sure. 11:27:23
Was there a particular person that was 11:27:23
responsible for the account or who would be more 11:27:25
active on Justin's behalf at the company? Was it 11:27:27
you or was it someone else that was the point 11:27:30
person? 11:27:32
ATTORNEY TAHLER: Objection. 11:27:33
A The way that we -- Justin was in LA, and 11:27:35
I'm based in New York. So we had a full team 11:27:44
around him. There was no one person. 11:27:48
Q Did that ever change? 11:27:55
A No. 11:27:57
Q So from the time that Justin started with 11:27:58
Jonesworks until the time that he no longer worked 11:28:04
with Jonesworks, he had some sort of team around 11:28:09
him, right; there wasn't one particular person 11:28:12
that was more involved? 11:28:15
A Correct. 11:28:16
Q And what about for Wayfarer, did Wayfarer 11:28:18
also have its own team? 11:28:23
A Yes. 11:28:24

Q Was that a different team -- 11:28:25
ATTORNEY TAHLER: Objection. 11:28:28
Q -- than Justin's team? 11:28:29
ATTORNEY TAHLER: Objection. 11:28:32
A We do bespoke work for our clients. So if we needed to bring in additional team members for something specific that Justin and/or Wayfarer needed, we might. But typically we had -- when we were asked by his COO to bundle the team together, we've put the team in place that was best suited for him, as well as Wayfarer. And there was a lot of crossover. So we had more people -- more work, rather, for Wayfarer than we would for a small, smaller-sized personal publicity. 11:28:32 11:28:39 11:28:42 11:28:44 11:28:50 11:28:59 11:29:01 11:29:07 11:29:13 11:29:17
Q And did you personally do work for Justin Baldoni? 11:29:24 11:29:26
ATTORNEY TAHLER: Objection. 11:29:26
A Yes. 11:29:27
Q What did you do? 11:29:28
ATTORNEY TAHLER: Objection. 11:29:30
A I did whatever Justin needed us to do. It was based on whatever -- the needs were ever evolving. It may be TV. It may be book. It might be the production studios. It might be do you have any contacts at this brand that can help 11:29:31 11:29:39 11:29:43 11:29:47 11:29:50

us? Do you know any brands? Can you get your client to watch this project and see if they would be interested in producing it with me?

It was very bespoke and ever-changing.

Q What did you specifically do, yourself?

ATTORNEY TAHLER: Objection.

A I'm sorry, I thought I just answered that. Did I not?

I did whatever Justin asked me to do and needed done. I'm not one of those publicists that just says I'm only, you know, this. I've become very close with clients and help them with whatever their needs are, even if it's not publicity.

Q Who else, if you recall, was on the team for Justin Baldoni?

ATTORNEY TAHLER: Objection.

A In the beginning or throughout the eight years?

Q We can start in the beginning.

What year was the first year?

A It was eight years from last year, so we had Kirby Allison, who worked with me for almost ten years. We had someone named Lindsay Shane, who I believe, if I recall correctly worked on

this account. Jennifer Abel, Matthew Mitchell. I don't recall -- Andy, I believe. They asked Matt Gibson to help on occasion. He was in our LA office. 11:31:27 11:31:44 11:31:51 11:31:54

Q Anyone else? 11:32:03

A I mean, I don't recall off the top of my head any additional. I know we had a large team. We had six or seven people on the account. 11:32:04 11:32:08 11:32:15

Q What about Wayfarer's account? 11:32:17

A Oh, I'm sorry. I thought you meant Justin and Wayfarer. I consider -- those are all the people who worked across. 11:32:20 11:32:24 11:32:29

Q Did -- 11:32:31

A I'm sorry, I was confused about the question. 11:32:32 11:32:34

Q Do those people work on both accounts? 11:32:37

A Well, we only had Justin initially, and I had Kirby and then the other people. And then we had Jen and Matthew, who were both very seasoned and senior because we had Wayfarer and Justin. And Matthew came from NBC, and we thought Wayfarer would be a good fit for him. So we put Matthew as an SVP. 11:32:39 11:32:44 11:32:49 11:32:53 11:32:57 11:32:59 11:33:04

Q Jonesworks was paid $20,000 a month to provide services to Wayfarer; is that correct? 11:33:05 11:33:15

A We were paid 25,000 a month for Wayfarer and Justin. It was combined. 11:33:20 11:33:22
Q Do those services include crisis PR? 11:33:25
ATTORNEY TAHLER: Objection. 11:33:39
A Again, crisis PR, we would have considered to handle some -- what Justin would consider crisis or Justin would be stressed about. If there were litigation matters, If there was -- you know, what he might consider a crisis, we might not refer to as crisis, but if he deemed it a crisis, yes, we would do it. 11:33:40 11:33:53 11:33:56 11:33:58 11:34:01 11:34:03 11:34:06
But, yes, we handled -- we handled things that could have been categorized as crisis for him; something that needed to be moved upon urgently, something that needed to be corrected or fixed, litigation that he was in, etc. 11:34:11 11:34:18 11:34:23 11:34:27 11:34:30
Q Was that at an additional cost to Wayfarer or Justin or was that covered under the same $25,000 per month for both of the clients? 11:34:36 11:34:42 11:34:46
ATTORNEY TAHLER: Objection. 11:34:51
A What I had also said earlier was that we went above and beyond, and we would often do things for our clients no matter what it was. 11:34:51 11:34:55 11:34:58
I don't recall that we ever charged him for extra hours or working on crises for him. No, 11:35:03 11:35:05

I don't -- I don't recall that we ever billed him for that ever. I don't recall. 11:35:12 11:35:14

Q Did Jonesworks ever refer Wayfarer or Justin to any crisis PR firms? 11:35:15 11:35:30

ATTORNEY TAHLER: Objection. 11:35:36

A Did we refer him to crisis PR? I don't recall ever referring him. But I do remember one of the legal cases I was concerned about, and I was worried that we might need it only because the scope -- it was big. It was -- it would have required a lot of work. So I may have, in conversation, said we need to look or perhaps someone on his team had asked if we should. But I don't recall -- I don't recall that we ever hired crisis for him. 11:35:37 11:35:47 11:35:59 11:36:08 11:36:11 11:36:13 11:36:18 11:36:21 11:36:29 11:36:32

I -- I think in that particular case that I'm thinking of, it was -- I helped him find a litigator, and I referred a litigator in Los Angeles. 11:36:33 11:36:36 11:36:42 11:36:50

And I don't think that we hired a crisis for that. I don't recall. I don't think that we did. 11:36:52 11:36:54 11:36:59

Q At some point in time, did Justin or Wayfarer bring a crisis PR person onto the team, so to speak? 11:36:59 11:37:06 11:37:12

ATTORNEY TAHLER: Objection. 11:37:14
A In July, I believe of 2024, Jennifer 11:37:15
Abel -- well, I'll just answer your question, yes. 11:37:34
Q And who was involved in -- making the 11:37:38
decision to bring a crisis person onto Justin and 11:37:45
Wayfarer's team? 11:37:50
ATTORNEY TAHLER: Objection. 11:37:51
A It was my understanding, Jamey Heath. 11:37:51
Q Were you involved at all in that decision? 11:37:58
ATTORNEY TAHLER: Objection. 11:38:02
A It was my understanding that it didn't 11:38:02
matter what I thought; that Jamey was making the 11:38:12
decision, and he made that clear to me. 11:38:15
Q What did you discuss about that decision 11:38:17
with Jamey? 11:38:22
A I said, "Without getting into too much 11:38:24
granular detail, this is not a crisis person that 11:38:31
you need to align with. I've personally 11:38:35
experienced something highly unethical that she 11:38:41
did, and I worry for Justin about it." 11:38:44
And I distinctly remember Jamey saying, 11:38:49
"Well, all crisis people have a little dirt on 11:38:52
their nose, don't they?" 11:38:57
Q Did you respond to that? 11:39:00
A If I recall, I said, "Jamey, no, that's 11:39:06

not accurate." 11:39:11
And Jen Abel had asked me for recommendations and I recommended two firms that are highly -- have highly specialized divisions doing this. And I asked if he had met either of them. And I recall him saying something to the effect of, no. So I was questioning, well, why did he even ask me, Jen ask me. 11:39:15 11:39:19 11:39:28 11:39:31 11:39:36 11:39:41 11:39:47
And then he said he had talked to her, he liked the way she thought or he -- he had a good takeaway from a Zoom or a call that he had had with her. 11:39:50 11:39:58 11:40:03 11:40:07
Q How did you learn that Wayfarer or Justin Baldoni were hiring a crisis person? 11:40:09 11:40:13
A I believe it was from a text that Tera Hanks sent me. 11:40:21 11:40:26
Q And who is Tera Hanks? 11:40:27
A She is the president of Wayfarer. 11:40:29
Q And how long have you known Tera Hanks for? 11:40:32 11:40:38
A I don't know how many years, but she worked with Scooter Braun for a very long time, and that's how I met her. 11:40:38 11:40:41 11:40:43
Q Where was she working at the time that you met her? 11:40:47 11:40:50

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, ANITA M. TROMBETTA, RMR, CRR, and Certified California Shorthand Reporter, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested [or not requested, as appropriate]; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 17th day of September, 2025.

My commission expires: 10.07.2025

______________________________

Anita M. Trombetta, RMR, CRR

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHANIE JONES, JONESWORKS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>JENNIFER ABEL, MELISSA NATHAN, JUSTIN BALDONI, WAYFARER STUDIOS LLC, AND JOHN DOES 1-10,<br><br>Defendants. | Case No: 1:25-cv-00779-LJL |
| BLAKE LIVELY,<br><br>Plaintiff,<br><br>v.<br><br>WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, and JENNIFER ABEL,<br><br>Defendants. | Civ. Action No. 1:24-cv-10049-LJL (Consolidated for pretrial purposes with 1:25-cv-00449-LJL)<br>rel. 1:25-cv-00449-LJL |
| JENNIFER ABEL,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>JONESWORKS LLC,<br><br>Third-Party Defendant | |

WAYFARER STUDIOS LLC,
JUSTIN BALDONI, JAMEY HEATH, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, JENNIFER ABEL, and STEVE SAROWITZ,

Plaintiffs,

v.

BLAKE LIVELY, RYAN REYNOLDS, LESLIE SLOANE, VISION PR, INC., and THE NEW YORK TIMES COMPANY,

Defendants.

**ERRATA SHEET FOR THE DEPOSITION OF STEPHANIE JONES**

| Page: Line(s) | Existing | Revision | Reason |
|---|---|---|---|
| 17:6 | Segal | Siegel | Mistranscription |
| 49:4 | gage | gauge | Mistranscription |
| 49:19 | gage | gauge | Mistranscription |
| 99:17-18 | They found two condoms and drugs in her dead body and no else there. | They found two condoms and drugs **and** her dead body and no else there | Mistranscription |
| 148:2-5 | And I remember feeling that about you know, the boss, so I can -- but not in a -- it was never in a negative way that they were frightened of me. | And I remember feeling that about you know, **a** boss, so I can -- but not in a -- it was never in a negative way that they were frightened of me. | Mistranscription |
| 159:15 | Nestli | Nestlé | Mistranscription |
| 159:17 | Nestli | Nestlé | Mistranscription |
| 173:12-14 | I had worked with her years earlier when she was at New York Post doing a fashion supplement-- | I had worked with her years earlier when she was at New York Post doing a fashion supplement **lux ad and had Venus Williams on the cover.** | Mistranscription |

| Page: Line(s) | Existing | Revision | Reason |
|---|---|---|---|
| 178:1 | I believe it was July 25th. | I believe it was July **25**. | Mistranscription |
| 198:5-7 | I just knew that I wanted Scooter to relay back to Melissa, because I knew Melissa was behind the cite. | I just knew that I wanted Scooter to relay back to Melissa, because I knew Melissa was behind the **site**. | Mistranscription |
| 227:19-21 | Your strength and authenticity through this all truly embody the teachings of your Baha'm faith. | Your strength and authenticity through this all truly embody the teachings of your **Bahá'í** faith. | Mistranscription |
| 264:17-19 | I may have asked her if she was talking to Madeline or she may have told me. | I may have asked her if she was talking to **Mandelyn** or she may have told me. | Mistranscription |

Date: 10/15/2025 Signature: Stephanie Jones

No. 594347

Re: Deposition of **Stephanie Jones**
Date: 9/16/2025
Case: Joneswork -v- Abel
Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

I, Stephanie Jones, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

10/15/2025 — *Stephanie Jones*

(Date) (Signature)

# Dkt. No. 941

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BLAKE LIVELY,

Plaintiff,

-v-

WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, JENNIFER ABEL, JED WALLACE, and STREET RELATIONS INC.,

Defendants.

Case No. 1:24-cv-10049-LJL
(consolidated with 1:25-cv-00449-LJL)

JENNIFER ABEL,

Third-Party Plaintiff,

-v-

JONESWORKS LLC,

Third-Party Defendant.

**DECLARATION OF JENNIFER ABEL**

I, Jennifer Abel, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a defendant and the third-party plaintiff in the above-captioned action.

2. I respectfully submit this declaration in support of my motion for conditional summary judgment on the Second Cause of Action in my Amended Third-Party Complaint (Dkt. 639) against third-party defendant Jonesworks LLC ("Jonesworks").

**Background**

3. I am a publicist, who resides in Beverly Hills, California.

4. Jonesworks is a well-known public relations firm founded by Stephanie Jones ("Jones"), who serves as its CEO.

5. I was hired by Jonesworks as Vice President on or about July 9, 2020, with a mandate to oversee Jonesworks' talent department and to grow its Los Angeles office, which at the time had only four employees. A true and correct copy of Jonesworks' offer letter, which I co-signed, is attached as Exhibit 1.

6. In connection with and as a condition of my employment, I signed a Non-Disclosure and Intellectual Property Rights and Non-Solicitation Agreement (the "2020 Employment Agreement"). A true and correct copy of the 2020 Employment Agreement is attached as Exhibit 2.

7. The 2020 Employment Agreement characterized me as an "at-will" employee whose employment was "exclusive" to Jonesworks during the period of employment.

8. On or about November 22, 2021, Jonesworks and I entered into a modified employment agreement (the "2021 Employment Agreement") which changed my employment from at-will to a contractual term. A true and correct copy of the 2021 Employment Agreement

is attached as Exhibit 3.

9. The 2021 Employment Agreement also changed my compensation and provided that Jonesworks would indemnify me in certain circumstances. I performed all my obligations under the 2021 Employment Agreement.

10. The 2021 Employment Agreement states that my primary place of employment pursuant thereto shall be Los Angeles, California.

11. During my four years of employment with Jonesworks, and at its direction, I was based out of Jonesworks' Los Angeles office and performed all of my work within California, except for infrequent work-related trips.

12. Wayfarer Studios LLC ("Wayfarer") is a production studio founded by Justin Baldoni ("Baldoni") and others.

13. Baldoni was the director and co-star of the film *It Ends With Us* (the "Film").

14. In or about 2018, Baldoni engaged Jonesworks to provide public relations services to him.

15. On or about May 6, 2020, Jonesworks and Wayfarer entered into an agreement (the "Wayfarer Agreement") pursuant to which Jonesworks served as Wayfarer's "exclusive public relations counsel to provide strategic communications services" as described on an attached Schedule A (the "Services") in exchange for a fee. A true and correct copy of the Wayfarer Agreement is attached as Exhibit 4.

16. The Services included, among other things: assisting in developing, writing and updating communication materials related to all press outreach; managing media and press communications; and advising on marketing and campaign strategies to ensure brand messaging is consistent, opportunities are maximized, and the strongest press angles are aligned.

17. I was the primary point person with Wayfarer and Baldoni (together, the "Wayfarer Clients") during Wayfarer's multi-year engagement with Jonesworks.

18. I largely managed Jonesworks' work for Wayfarer out of the firm's Los Angeles office and developed a close and trusting relationship with Baldoni, Wayfarer CEO Jamey Heath ("Heath"), and the rest of the Wayfarer team.

19. Jonesworks, through Jones, directed me to carry out the duties of a public relations professional on behalf of the Wayfarer Clients, including but not limited to garnering good publicity and eliminating or minimizing bad publicity for them and the Film.

20. Jonesworks set up email distribution lists (*i.e.*, a collection of email addresses that enabled people to send a single email to multiple recipients at once) to help service the Wayfarer Clients. Emails sent to [redacted] and [redacted] were received by multiple Jonesworks' personnel, including Jones and me.

21. On or about July 10, 2024, I notified Jones of my departure from Jonesworks. I offered a six-week transition period, with an end date of August 23, 2024.

22. A few days later, I re-confirmed my decision to resign and advised Jones that I would be starting my own public relations firm.

23. However, Jonesworks terminated my employment on August 21, 2024.

24. Meanwhile, until August 21, 2024, and pursuant to the 2021 Employment Agreement, I continued to perform public relations activities for the Wayfarer Clients, in my capacity as a Jonesworks' employee, within the scope of my employment, and at the direction of Jonesworks.

25. Jonesworks profited and was enriched by fees paid by the Wayfarer Clients for my public relations services. True and correct copies of Jonesworks' *paid* invoices for public

relations services, rendered from May 2020 through August 2024 (the month at issue herein), are attached as Exhibit 5.

**Lively's Claims**

26. On July 30, 2025, Lively filed her Second Amended Complaint in which she asserted claims against me for: (a) aiding and abetting harassment and retaliation in violation of California's Fair Employment and Housing Act ("FEHA"); (b) false light invasion of privacy; and (c) civil conspiracy (collectively, "Lively's Claims") (Dkt. 520).

27. According to the Second Amended Complaint, Melissa Nathan, along with her separate crisis management company, The Agency Group PR LLC ("TAG"), and I "perpetrated a retaliation scheme against Ms. Lively" including via "the amplifying of negative content about Ms. Lively…." (Dkt. 520, ¶ 230). The pleading further alleges that Nathan, TAG and I "aided and abetted the discriminatory conduct of Defendants It Ends With Us Movie LLC, Wayfarer, Baldoni and Heath, including but not limited to by participating in the above-described coordinated 'astroturfing' campaign to discredit and 'bury' Ms. Lively." (Dkt. 520, ¶ 411). I deny Lively's allegations.

28. In her Third Amended Responses and Objections to my Second Set of Interrogatories (the "Interrogatory Responses"), Lively purports to identify the "negative content about [her] (including through the engagement of social media)" that she alleges was "amplified" by me. A true and correct copy of the Interrogatory Responses is attached as Exhibit 6.[1]

29. In her Interrogatory Responses, Lively further alleges that I "amplified" negative content about her "by virtue of recommending services to be performed by TAG and facilitating that engagement" and "by direct communications with TAG and/or digital teams identifying relevant narratives as well as content to be amplified, boosted, or similar conduct, in order to

[1] The Third Amended Responses and Objections contain links to the articles and videos referenced therein.

negatively affect the online conversation regarding [her]." (*Id.*).

30. The alleged conduct that forms the basis of Lively's Claims against me consists of public relations activities on behalf of the Wayfarer Clients during the time in which they were Jonesworks' clients, within the scope of my employment, and any such conduct was undertaken at Jonesworks' direction. The documents cited by Lively in her Interrogatory Responses are discussed below.

31. On July 24, 2024, I advised Jones that Wayfarer was seeking recommendations from Jonesworks for a crisis management professional to work with Jonesworks in connection with potential negative publicity related to issues on the set of the Film. Jones responded by asking for my recommendations for a crisis management professional. A true and correct copy of the text chain (JONESWORKS_00012591) is attached as Exhibit 7.

32. Wayfarer hired TAG to assist Jonesworks with crisis management. A true and correct copy of the agreement between Wayfarer and TAG is attached as Exhibit 8.

33. On July 31, 2024, I texted Jamey Heath and Mitz Toskovic of Wayfarer about a conversation that I had with an independent journalist concerning the exclusion of Baldoni from Film-related promotions and that such journalist was willing to publish a story of Lively's misconduct. I was providing public relations services to the Wayfarer Clients within the scope of my employment by Jonesworks. Moreover, I never followed up on the matter or referred the journalist to anyone else, and the story was never published. A true and correct copy of the text chain (TOSKOVIC_000000620) is attached as Exhibit 9.

34. On August 2, 2024, a representative of TAG sent me a "Scenario Planning" document referencing an objective to "[p]rotect the reputation of" the Wayfarer Clients "in the lead up, during, and following the premiere" of the Film and related goals. My understanding is

the "Scenario Planning" document was shared with me because I was a Jonesworks employee providing public relations services to the Wayfarer Clients.[2] A true and correct copy of the "Scenario Planning" document (BALDONI_000014598) is attached as Exhibit 10.

35. On August 5, 2024, I notified Baldoni that Sony (the co-producer of the Film) had an issue with the word "friction" being used in his press interviews about the on-set relationship between Baldoni and Lively, and I proposed the word "challenge" as a compromise to help downplay the ongoing social media narrative regarding speculation of an "on-set feud" resulting from Baldoni being unfollowed on social media and not being present in the marketing campaign. This was an effort to also highlight that, as director of the Film, Baldoni successfully brought all people together to "create something beautiful" amidst the very usual, and challenging, circumstances of working with multiple personalities on a film set. As set forth in my text message, the foregoing was part of public relations "strategy" which is what Jonesworks employed me to do for the Wayfarer Clients (and other clients). A true and correct copy of the text chain (BALDONI_000018710) is attached as Exhibit 11.

36. On August 7, 2024, I exchanged text messages with Jonesworks' employee Matthew Mitchell, Nathan, and TAG employee Katie Case about an online narrative concerning Baldoni and Lively's separate promotion of the Film (as opposed to both being present). My comments about how to handle that narrative were public relations services for the Wayfarer Clients within the scope of my employment by Jonesworks. A true and correct copy of the text chain (BBKOSLOW-000001800) is attached as Exhibit 12.

37. On August 7, 2024, Case sent Heath and me (at my Jonesworks email address) an email referring to "social and digital mitigation and remediation" and to public narratives concerning Baldoni and Wayfarer. My understanding is the email was sent to me because I was a

[2] I was in New York from August 4, 2024 to August 8, 2024 in connection with the premiere of the Film.

Jonesworks employee providing public relations services to the Wayfarer Clients. A true and correct copy of the email (ABEL_000005094) is attached as Exhibit 13.

38. On August 8, 2024, I sent a text message to Mitchell (of Jonesworks), Nathan and Case concerning negative social media posts about Baldoni by a content creator named Jenna Redfield. Taking note of (or "flagging") negative public commentary about Baldoni was part of my duties as a Jonesworks employee. A true and correct copy of the text chain (BBKOSLOW-000004011) is attached as Exhibit 14.

39. On August 9, 2024, I exchanged text messages with Nathan concerning articles about a "rift" or "feud" between Baldoni and Lively, as well as other potential media coverage of the situation. These text messages, which reflect my monitoring negative publicity of Baldoni and potentially garnering positive publicity for him, were sent and received by me as part of my duties as a Jonesworks employee. A true and correct copy of the text chain (NATHAN-000002124) is attached as Exhibit 15.

40. On August 10, 2024, I exchanged text messages with Heath, Mitchell (of Jonesworks), and Case concerning a *Hollywood Reporter* article and TikTok videos related to Lively and/or Baldoni. The TikTok video from May 17, 2023, included within the text chain shows Baldoni and Lively in a pleasant atmosphere on the set of the Film. The *Hollywood Reporter* article discusses why it was important for Baldoni to make a movie about domestic violence. These text messages were carried out in furtherance of public relations services rendered to the Wayfarer Clients, as I was employed by Jonesworks to do. A true and correct copy of the text chain (WAYFARER_000136136) is attached as Exhibit 16.

41. On August 11, 2024, and in my capacity as a Jonesworks employee, I advised Wayfarer via text message about whether the timing was appropriate for Baldoni to issue further

comments about domestic violence. A true and correct copy of the text chain (JONESWORKS_00013830) is attached as Exhibit 17.

42. On August 13, 2024, I exchanged text messages with Heath, Baldoni, Mitchell (of Jonesworks), Case, Brianna Koslow (of TAG) and Nathan concerning a TikTok video praising Baldoni and another video criticizing Lively for her marketing of the Film in a manner insensitive to domestic violence victims. My comments about the videos were public relations services for the Wayfarer Clients within the scope of my employment by Jonesworks. A true and correct copy of the text chain (BALDONI_000015463) is attached as Exhibit 18.

43. On August 15, 2024, I exchanged text messages with Heath, Baldoni, Mitchell (of Jonesworks), Case, Koslow and Nathan concerning the positive public comments made by Brandon Sklenar (an actor in the Film) about Baldoni and concerning other publicity related to the Film. My statements were made in furtherance of my role as the Jonesworks' point person assigned to the Wayfarer Clients. A true and correct copy of the text chain (BBKOSLOW-000002400) is attached as Exhibit 19.

44. On August 18, 2024, I exchanged text messages with Heath, Baldoni, Mitchell (of Jonesworks), Nathan and Koslow concerning TikTok videos related to the Film. The TikTok video from August 17, 2024 called the Film "one of the best movies ever made" and said the Film touched on domestic violence "in the best way possible." My comment about one of the videos was public relations services for the Wayfarer Clients within the scope of my employment by Jonesworks. A true and correct copy of the text chain (BALDONI_000019422) is attached as Exhibit 20.

45. I never published, planted, or pitched any negative content about Lively. I never communicated, or worked, with any content creators to plant negative stories or comments about

Lively.

46. I never "boosted" or "amplified" any negative content about Lively.

**Jonesworks is Responsible**

47. I am not at fault and bear no responsibility for Lively's Claims or the alleged loss or damage incurred by Lively, because, *inter alia*, I undertook the actions while I was an employee of Jonesworks and in the course of my employment for Jonesworks.

48. None of my actions at issue herein were taken in pursuit of my own interests.

49. Jonesworks foresaw my actions because Jonesworks directed me to render public relations services to the Wayfarer Clients (which Jonesworks had contracted to do), because Jonesworks knew that I was rendering public relations services to the Wayfarer Clients, and because my actions were not a significant departure from my normal method of performance of public relations duties (or from other Jonesworks' employees).

50. Jonesworks' principal Jones knew that I was working with Baldoni on his press tour in connection with the premiere of the Film in late July/early August 2024, amid reports of strife between Baldoni and Lively. For instance, in a July 25, 2024 text message to Baldoni, Jones: (a) confirms that she is "on [the phone] with Jen now"; (b) tells Baldoni that she has "a plan" for him to attend the premiere of the Film; and (c) assures Baldoni that she has "his back and nothing is going to happen on [her] watch." A true and correct copy of a text message/chain, dated July 25, 2024, bearing beginning Bates number JONESWORKS_00039733, is attached as Exhibit 21. True and correct copies of text messages/chains, dated August 5, 2024 and August 6, 2024, bearing beginning Bates number JONESWORKS_00039977, is attached as Exhibit 22.

51. Jones also knew that Jonesworks employees were monitoring social media activity concerning Baldoni and the Film (which is a standard public relations procedure),

including online comments from Jenna Redfield. For instance, in an August 8, 2024 email, a Jonesworks employee passed along information related to such social media monitoring to Jones. A true and correct copy of an email message/chain, dated August 8, 2024, bearing beginning Bates number JONESWORKS_00022081, is attached as Exhibit 23.

52. Jones also knew that other Jonesworks employees and I were handling press inquiries concerning alleged issues on the set of the Film. On August 8, 2024, Jonesworks' Chief of Staff (Gordon Duren) forwarded [redacted] an inquiry from *The Hollywood Reporter* concerning alleged Film-related "drama…." I confirmed for Jones and Duren that the situation was being handled by the Jonesworks employees assigned to the Wayfarer Clients' accounts. A true and correct copy of an email message/chain, dated August 8, 2024, bearing beginning Bates number JONESWORKS_00017201, is attached as Exhibit 24.

53. As another example, on August 9, 2024, Jones forwarded (to [redacted] and [redacted] an inquiry from *The Daily Mail* concerning purported on-set issues. I confirmed for Jones that the matter was being handled. A true and correct copy of an email message/chain, dated August 9, 2024, bearing beginning Bates number JONESWORKS_00017221, is attached as Exhibit 25.

54. In yet another example, on August 9, 2024, Jones forwarded a press inquiry concerning alleged on-set drama to the aforementioned Jonesworks (internal) email distribution lists, and Jonesworks employee Matthew Mitchell confirmed that the inquiry would be handled. A true and correct copy of an email message/chain, dated August 9, 2024, bearing beginning Bates number HEATH_000031717, is attached as Exhibit 26.

55. My alleged actions were consistent with how Jonesworks rendered public relations services. For instance, in an August 9, 2024 text message, Jones noted that *People* had

reported that Baldoni was "largely absent from grouped promotional appearances, including at the New York premiere" and that he "didn't introduce the film ahead of the screening." Jones wrote that Baldoni "introduced at screening" and instructed me to "have [the story] corrected." A true and correct copy of a text message/chain, dated August 9, 2024, bearing beginning Bates number JONESWORKS_00040614, is attached as Exhibit 27.

56. As another example, in an August 14, 2024 email to Heath, Jones referred to herself as "a key member of both Justin's and Wayfarer's account" and "a keyman on Justin's account." In that same email, Jones provided the Wayfarer Clients with Jonesworks' "recommended strategy" for dealing with the publicity crisis: (1) "Flood the Zone with Positives" – "ensure that we promote positive narratives that media outlets cannot ignore" and because "[c]urrently, most stories are heavily biased towards Blake's perspective" it is "crucial" that "we fight for every inch of every story"; and (2) "Prepare Alternative Stories" – "mobilize a robust network of supporters and third-party advocates ready to counter these narratives on deep background as well as some on the record, making it clear that the claims being made are untrue and unfounded." Notably, Jones states in the email that she has "successfully managed every crisis for Justin without any negative press coming to light." A true and correct copy of an email message/chain, dated August 14, 2024, bearing beginning Bates number BALDONI_000026329, is attached as Exhibit 28.

57. Jones was also aware that Wayfarer had retained TAG to assist Jonesworks with crisis management. Indeed, even after Jonesworks terminated my employment on August 21, 2024, Jones herself continued to coordinate crisis management efforts with TAG. A true and correct copy of an email message/chain, dated August 22, 2024, bearing beginning Bates number JONESWORKS_000021631, is attached as Exhibit 29.

58. In sum, I was named as a defendant herein only because of, and as a direct consequence of, the discharge of my duties as a public relations professional employed by Jonesworks. Jonesworks has not agreed, but rather has declined, to defend me against Lively's Claims.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: November 10, 2025
Beverly Hills, CA

JENNIFER ABEL



ACTIVE\13133\1\9779166.v1-11/10/25

# Exhibit 1

# JONESWORKS

July 9, 2020

Jennifer Abel
[redacted]

Dear Jennifer,

I am pleased to make you the following offer to join JONESWORKS LLC (the "Agency") in the position of Vice President. Your first day of employment with the Agency will be on Thursday, July 23.

Should you accept this job offer, the following will confirm the terms of your acceptance:

1. You will report to Stephanie Jones.

2. Compensation: Your starting base salary will be at the gross annual rate of $160,000 per year, less applicable withholdings and taxes, paid in accordance with our standard payroll practices (currently, bi-weekly). Salary adjustments will be considered by Agency annually in conjunction with your annual performance evaluation and shall be at Agency's sole discretion. This shall be a full-time, exempt position.

3. Paid Time Off (PTO) Entitlement and Paid Sick Leave. Upon successful completion of your ninety (90)-day Introductory Period, JONESWORKS LLC has designed an annual Paid Time Off program (PTO) for all full-time employees. We recognize the need for employees to have flexibility when scheduling time away from work for vacation, personal business, and religious observance. You will be entitled to unlimited paid time off (PTO) subject to the limitations contained in any and all Agency written policies. All PTO days must be approved by Management in advance with not less than thirty (30) days notice. You will be eligible for benefits and 401(k) on the first of the month following 60 days of continuous full-time employment.

4. At-will employment. The Agency is an employer at will, and continuation of your employment with the Agency is not guaranteed for a specific length of time. Either party may terminate the relationship at any time with or without cause or notice. In addition, the Agency reserves the right to modify your position and duties to meet business needs and to use discretion in deciding on appropriate discipline. Any change to this at-will employment relationship must be by specific written agreement signed by you and an authorized representative of the Agency. You may at any time terminate this agreement and your employment by giving not less than two (2) business weeks written notice to your employer.

JONESWORKS

This offer is contingent upon the following:

- The execution by you of a Non-Disclosure, Intellectual Property Rights and Non-Solicitation Agreement in the form attached to this Offer Letter (the "Non-Disclosure Agreement"); and

- Your compliance with federal I-9 requirements (please bring suitable documentation with you on your first day of work verifying your identity and legal authorization to work in the United States); and

- Our verification of the information contained in your employment application, including satisfactory references.

The enclosed Non-Disclosure Agreement, along with this letter, represents the entire agreement between you and the Agency relating to this subject matter and supersedes all prior or contemporaneous agreements, understandings, negotiations or representations, whether oral or written, express or implied. This letter may not be modified or amended except by a specific, written agreement signed by you and an authorized representative of the Agency.

If you are in agreement with the foregoing, please sign below and return all pages of this offer letter to me. We look forward to working with you.

Sincerely,

Stephanie Jones
President

DocuSigned by:
Jennifer Abel
D378BAF7CD68410

Jennifer Abel

211 East 43rd Street, Suite 1501 New York, NY 10017
212.839.0111

# Exhibit 2

# NON-DISCLOSURE AND INTELLECTUAL PROPERTY RIGHTS AND NON-SOLICITATION AGREEMENT (EMPLOYEES)

AGREEMENT dated July 9, 2020, by and between JONESWORKS LLC, a Delaware limited liability company having an address at 211 East 43rd Street, New York, NY, 10017 (the "Agency") and Jennifer Abel, an individual residing at [redacted] ("Employee").

## BACKGROUND

The Agency values Employee's services, and desires to retain the services of Employee, and Employee wishes to be employed by the Agency.

NOW, THEREFORE, in consideration of employment by the Agency of Employee, and the compensation to be paid by the Agency to Employee now and hereafter, the Agency and Employee agree as follows:

1. **Confidential Information.**

(a) Agency Information. In the course of your employment, you will have access to information of and relating to the Agency, its clients, former clients and prospective clients and other third parties that is non-public, confidential or proprietary in nature ("Confidential Information"). Confidential Information specifically includes, without limitation, any data or information that is proprietary to the Company and not generally known to the public, whether in tangible or intangible form, whenever and however disclosed, including, but not limited to: (i) any marketing strategies, plans, financial information, or projections, operations, sales estimates, business plans and performance results relating to the past, present or future business activities of such party, its affiliates, subsidiaries and affiliated companies; (ii) plans for products or services; (iii) Company's accounts, customers and clients; (iv) any scientific or technical information, invention, design, process, procedure, formula, improvement, technology or method; (iv) any concepts, reports, data, know-how, works-in-progress, designs, development tools, specifications, computer software, source code, object code, flow charts, databases, inventions, information and trade secrets; and (v) any other information that should reasonably be recognized as confidential information of the Company including but not limited to any advertising, marketing or communications campaigns and content on which the Company works that has not been released to the public with the Company's client's authorization. Confidential Information does not include information which is in the public domain other than by breach of this Employee Agreement on the part of Employee. Employee agrees that, except as required in the lawful performance of employment duties to the Agency, Employee will not disclose to others, including, without limitation, privately, on the internet, via text message, on any blog, or on any social networking website, tool or device (such as Twitter, YouTube, Facebook, Pinterest, Instagram, etc.) or any other public forum, use for Employee's own benefit or for the benefit of anyone other than the Agency, or otherwise appropriate or copy, Confidential Information, whether or not developed by Employee and whether disclosed to Employee by the Agency, its clients or other third parties, either directly or indirectly, in writing or orally, or learned by Employee by observation or creation in the course of Employee's duties,

whether or not during working hours. Employee will also take all reasonable measures, in accordance with the Agency's policy and instructions from Employee's supervisor, to protect Confidential Information from any accidental, unauthorized, or premature use, disclosure, or destruction. Employee's obligation to protect Confidential Information will continue throughout Employee's employment with the Agency, and remain in effect after the termination of Employee's employment. If Employee is ordered by a competent court of law, governmental body, or pursuant to subpoena, to disclose any Confidential Information, Employee agrees to provide Agency with prompt notice, prior to any disclosure, so that Agency may seek other legal remedies to maintain the confidentiality of such Confidential Information, and Employee agrees to comply with any applicable protective order or equivalent.

(b) Former Employer Information. Employee represents and warrants that the execution of this Agreement and performance of Employee's obligations hereunder will not conflict with, result in the breach of any provision of or the termination of, or constitute a default under, any agreement with any other person or entity of which Employee is a party or by which Employee is bound. Furthermore, Employee will not, during Employee's employment with the Agency, improperly use or disclose any proprietary information or trade secrets of any former employer or other person or entity with which Employee has an agreement or duty to keep in confidence and that Employee will not bring onto the premises of the Agency or any client any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

(c) Third Party Information. Employee recognizes that the Agency has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Agency's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out Employee's work for the Agency consistent with the Agency's agreement with such third party.

(d) Notice Pursuant to Defend Trade Secrets Act, 18 U.S.C. § 1833(b). Employee hereby acknowledges that Agency has informed Employee, in accordance with 18 U.S.C. § 1833(b), that Employee may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret where the disclosure (a) is made (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (2) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b).

2. **Ideas and Creations.**

(a) All results and proceeds of Employee's services to the Agency, including without limitation treatments, pitches, scripts, notes, artwork, presentations, distribution plans, technical information, workflows, strategies, business plans, software design or code, discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods,





CONFIDENTIAL

designs, analyses, drawings, sketches, writings, photography, reports, patent applications or copyrightable work and other property or elements that Employee may conceive, develop or procure in connection with Employee's services for the Agency or its clients or prospective clients, including all materials incorporated therein and all preliminary or other copies thereof, (collectively, "Work Product") whether such Work Product was conceived or created by Employee individually or jointly, on or off the premises of the Agency or during or after working time, shall be "works made for hire" for Agency, and all rights therein, including but not limited to the exclusive copyright, shall be the property of the Agency or its clients. For purposes of clarity, this means that Agency or its clients shall be deemed the sole owner throughout the universe of any and all rights of every nature in such Work Product, with the right to license and dispose of the Work Product, in perpetuity, in any manner Agency or its clients determine in its or their sole discretion, without any payment to Employee, whether such rights or means or use are now known or hereafter defined or discovered.

(b) If, for any reason, any Work Product is considered not to be a work-made-for-hire, Employee hereby irrevocably assigns to the Agency, any and all right, title and interest in and to such Work Product, including without limitation, any and all copyrights, patents, trade secrets, trademarks and/or other rights of every nature, and Employee agrees to take all actions necessary (at the Agency's expense) to secure such Agency rights. Employee also waives any and all "moral rights" in and to any such Work Product created by Employee. To be clear, all rights granted by Employee pursuant to this paragraph are fully compensated by Employee's salary.

(c) For purposes of clarity, Work Product shall not include all copyrightable work that is created by Employee outside of his Services to the Agency and that is created on his own time and without use of the Agency's property or equipment or that of the Agency's clients.

(d) Employee acknowledges and understands that the provisions of this Section 2 requiring assignment of Work Product to the Company and or its clients do not apply to any Work Product that qualifies fully under the provision of California Labor Code Section 2870, to the extent that such provision applies to Employee. Employee agrees to advise the Company promptly in writing of any inventions that Employee believes meet the criteria in California Labor Code Section 2870.

3. **No Portfolio Use.** Employee agrees that Employee will not at any time (during or after Employee's employment) use or display (or authorize any third party to use or display) any Work Product which Employee creates in the course of Employee's employment in any manner, including, without limitation, as part of Employee's portfolio, "reel" or book or on a website or other medium, without the Agency's prior written approval.

4. **Interviews, Speeches or Writings about Agency**. Except in the performance of Employee's authorized duties for Agency, consistent with Agency's policies, Employee shall obtain the express authorization of the Agency before (i) giving any speeches or interviews; or (ii) preparing or assisting any person or entity in the preparation of any books, articles, radio broadcasts, electronic communications, television or motion picture productions or other creations, in any case concerning Agency, its affiliates, parent Agency or clients or any of their respective officers, directors, agents or employees. Employee may provide notice to the public

of Employee's separation from the Company, so long as such notice is done in a manner normal and customary in the PR community, however any notification to the Agency's clients must be pre-approved by Stephanie Jones.

5. **Non-Disparagement**. Employee shall not, directly or indirectly, in any communications with any reporter, author, producer or any similar person or entity, the press or other media, or any customer, client or supplier of Agency, criticize, ridicule or make any statement that disparages or is detrimental to Agency, its affiliates, parent Agency or clients or any of their respective officers, directors, agents or employees.

6. **Policies**. Employee agrees that Employee will abide by all of the Agency's policies, as such policies may be changed and updated from time to time.

7. **Nature of Agency's Business/Acknowledgement and Consent to Exposure to Materials**. Employee acknowledges that in the course and scope of Agency's business and Employee's duties while working for Agency, Employee may be exposed to Agency clients' indecent, offensive, and/or graphic material and profane language. Such graphic material may include, but is not limited to, sexually explicit photographs and video recordings, lewd or salacious video or audio recordings, audio or video recordings containing reference to or acts of sexual or physical violence and/or other criminal acts, video and photographs depicting or referencing the use of alcohol and/or other controlled substances, audio or video recordings featuring insensitive or offensive comments regarding race, religion, ethnicity, sexuality, national origin, and disabilities, and performance of its duties as a publicist, may be required to address a client's involvement in any of the foregoing acts and thus the likelihood of Employee's exposure thereto. Employee represents and acknowledges that s/he is comfortable and capable of working in an environment in which s/he may be exposed to such obscene, indecent, offensive and/or graphic materials and profane language. Employee further agrees that nothing in this paragraph shall be construed as Agency's condoning any such deplorable behavior. Further, Employee acknowledges, understands, and agrees that Employee may not engage in any behavior referred to in this section 7, and that Agency shall have the right to terminate Employee's employment in the event such conduct occurs.

8. **Agency Property**. Employee agrees that all Confidential Information, trade secrets, drawings, designs, reports, computer programs or data, books, handbooks, manuals, files (electronic or otherwise), computerized storage media, papers, memoranda, letters, notes, lists, photographs, facsimile, software, computers, PDAs and other documents (electronic or otherwise), materials, credit cards, keys, passwords, digital data, and equipment of any kind that Employee has acquired or will acquire during the course of Employee's employment with the Agency are and remain the property of the Agency. Upon termination of employment with the Agency, or sooner if requested by the Agency, Employee agrees to return all such documents, materials and records to the Agency and not to make or take copies of the same without the prior written consent of the Agency.

9. **Exclusive Employment**. Employee agrees that while Employee is employed by the Agency, Employee's employment shall be exclusive and Employee shall not provide services to any entity in the public relations, media communications, marketing, branding or talent management business or any similar business without the Agency's prior written approval.

10. **At Will**. Employee understands that Employee's employment with the Agency is at will, which means that the Agency may terminate Employee's employment at any time, with or without reason, and with or without advance notice, without any further obligation to Employee, and Employee may resign Employee's employment at any time, with or without reason, and with or without notice. This "at will" employment relationship may not be changed except in a writing signed by an executive officer of the Agency.

11. **Restrictions**.

(a) Agency's Business. Employee acknowledges (i) that the business and the industry in which the Agency competes is highly competitive; (ii) that as part of Employee's employment with the Agency, Employee will participate in the servicing of current clients and the solicitation of prospective clients, and in connection with these services, the Agency will disclose to Employee, and Employee will obtain, Confidential Information of the Agency, including, without limitation, knowledge of the proprietary methods, business practices, operations, prices and costs of the Agency; (iii) that Employee's employment requires the performance of services that are special, unique, extraordinary and intellectual in character; and (iv) in the course of Employee's employment with the Agency, Employee may develop a personal relationship with the clients of the Agency and a knowledge of those clients' affairs and requirements, and, during the course of Employee's employment, the relationship of the Agency with its clients will be placed in Employee's hands by the Agency in confidence and trust. Employee consequently agree that it is a legitimate interest of the Agency, and reasonable and necessary for the protection of the Agency's valuable Confidential Information, goodwill and business, that Employee make the covenants contained in this Employee Agreement.

(b) Restriction. Accordingly, Employee agrees that, for as long as Employee is employed by the Agency and for a period of twelve (12) months thereafter, Employee will not, directly or indirectly, individually, or through an entity, except on behalf of the Agency, (i) hire, engage or solicit (or attempt to hire, engage or solicit) any person who is, or at any time during the preceding six (6) months was, an employee, exclusive consultant or freelancer of the Company with whom Employee worked or became aware of during Employee's employment; (ii) use any Company Confidential Information in order to solicit business from, or in any way render services to, any Client (as defined below), or persuade any Client to cease to do business or to reduce the amount of business which such Client has customarily done or contemplates doing with the Company. The time period during which Employee is prohibited from being engaged in certain business practices pursuant to Section 11 shall be extended by any length of time during which Employee is in breach of such covenant.

(c) Client. As used in this Section 11, the term "Client" means any person, firm, corporation or other entity (i) that is, or at any time during the preceding one year period was, a client of the Agency's or a prospective client to which the Agency made a presentation or other offering of services during the preceding one year period; or (ii) that is a prospective client to which the Agency made a new business presentation (or similar offering of services) at any time within six (6) months after the date of termination of Employee's employment, if, during Employee's employ with the Agency, Employee was involved with the preparation of, or the strategy or discussions with respect to, such new business presentation (or similar offering of services).

(d) Reasonable. Employee further acknowledges and agrees that, because of the nature of the business engaged in by the Agency and the fact that Clients can be and are serviced by the Agency wherever located, the restrictions set forth in this Section 11 of this Employee Agreement are reasonable and necessary to protect the Agency's legitimate business interests; provided, however that if a court determines that the restrictions set forth herein are unreasonable based upon length of time, geographic scope or for other reason, the parties contemplate that such court shall modify, apply and enforce such restrictions to the maximum extent allowed by law, without affecting the validity of any other provision of this Employee Agreement. Employee also acknowledges that the restrictions set forth in this Employee Agreement will not prevent Employee from earning a livelihood or otherwise supporting yourself after employment with the Agency and/or during the term of the restrictions.

(e) Notice to Third Parties. Employee agrees that during the periods of time during which Employee is restricted in taking certain actions by the terms of this Employee Agreement, Employee shall inform any entity or person with whom Employee may seek to enter into a business relationship (whether as an owner, employee, independent contractor or otherwise) of Employee's contractual obligations under this Employee Agreement. Employee also understands and agrees that the Agency may, with or without prior notice to Employee and during or after the term of this Employee Agreement, notify third parties of Employee's agreements and obligations under this Employee Agreement.

(f) Other Covenants. The restrictions set forth herein shall be in addition to (and not in lieu of) the restrictions set forth in any other agreement entered into between you and the Company.

**12. Enforcement**. Employee understands that the obligations outlined in this letter are the concern and responsibility of all employees of the Agency. By signing this document, Employee understands that Employee has a legal commitment to abide by the above obligations. Employee recognizes that any violation or threatened violation of the terms and conditions set forth above in this Employee Agreement will cause the Agency irreparable injury and that in addition to whatever other remedies may be available to the Agency at law or otherwise, the Agency will be entitled to injunctive relief without being required to post a bond or other security.

**13. Governing Law**. This Employee Agreement has been made and shall be interpreted in accordance with the laws of the State of California without regard to conflicts of law principles.

14. **Miscellaneous**. This Employee Agreement represents the entire agreement between the Agency and Employee with respect to the subject matter of this Agreement. No modification of this Employee Agreement will be effective or binding, unless it is in a writing and signed by both Employee and the Agency. No waiver by either Employee or the Agency of the breach of any terms or condition of this Employee Agreement will constitute a waiver of any subsequent breach of such provision or a waiver of the provision itself. If any provision of this Agreement is held illegal or invalid for any reason, such illegality or invalidity shall not affect the remaining parts or provisions of this Agreement and this Agreement will be construed and enforced as if such illegal or invalid provision had not been included.

AGREED:

DocuSigned by:
Jennifer Abel
D378BAF7CD68410...

7/10/20

Date

Signature of Employee

Jennifer Abel

Print Name of Employee

# Exhibit 3

# EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT (this "Agreement") dated as of November 22, 2021 ("Effective Date") is by and between Jonesworks, LLC, a Delaware limited liability company with its principal place of business at 211 East 43rd Street, Suite 1501, New York, New York 10017 ("Company") and Jennifer Abel, an individual residing at [redacted] ("Employee" and, together with Company, the "Parties," and each individually, a "Party").

WHEREAS, the Company and Employee desire to enter into an employment agreement to memorialize the terms and conditions of Employee's employment with the Company.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties, and covenants contained herein, each Party agrees as follows:

1. Employment Term. The Company shall continue to employ Employee, and Employee agrees to continue to be employed with the Company, upon the terms and conditions set forth in this Agreement, for the period beginning on the Effective Date and ending on the first anniversary of the Effective Date (the "Employment Term"); provided, however, that commencing on the first anniversary of the Effective Date and on each subsequent anniversary of the Effective Date (each such anniversary, a "Renewal Date"), the Employment Term shall automatically be extended for one additional year unless, not later than sixty (60) days prior to such Renewal Date, the Company or Employee shall have given written notice not to extend the Employment Term; provided, further, however, that the Employment Term shall be subject to earlier termination as provided in Section 5 hereof (the "Term").

2. Responsibilities and Authority. Company hereby employs Employee to serve as Vice President, Talent. Employee shall perform such duties and responsibilities, consistent with Employee's title, training and experience, as are from time to time reasonably assigned to Employee. Employee's primary place of employment pursuant to this Agreement shall be Los Angeles, CA.

3. Acceptance of Employment. Employee accepts employment by Company on the terms and conditions herein provided and agrees, subject to the terms of this Agreement, to devote all of her business time, attention and energies to the performance of the duties assigned to Employee hereunder, and to perform such duties faithfully, diligently and to the best of her abilities and subject to such laws, rules, regulations and policies from time to time applicable to the Company's employees. Notwithstanding the foregoing, Employee shall be permitted to engage in charitable and civic activities and to manage Employee's personal investments so long as such activities do not materially interfere with the performance of Employee's duties hereunder and do not breach or conflict with any of Employee's obligations to the Company under this Agreement.

4. Compensation and Benefits. As compensation for Employee's services hereunder, Employee shall be entitled to the following:

4.1. Salary. Employee's starting base salary will be at the gross annual rate of $180,000 per year, less applicable withholdings and taxes, paid in accordance with the Company's standard payroll practices (currently, the 15th and the last day of each month). Salary adjustments will be considered by the Company annually in conjunction with Employee's annual performance evaluation and shall be at the Company's sole discretion.

4.2. Annual Cash Bonus. For fiscal years during Employee's employment with the Company, Employee shall be eligible to receive a cash bonus, as determined and in the sole discretion of the Company. Any annual cash bonus payable to Employee will be paid at the time the Company normally pays such bonuses.

4.3. Other Benefits. Employee will be eligible to participate in all fringe benefit plans and retirement plans of the Company, as are generally available to Company's employees ("Benefits"), such as health insurance plans, disability insurance plans, life insurance plans, expense reimbursement and the Company's 401(k) retirement plan, if any, which shall be in Company's sole discretion.

4.4. Paid Time Off Entitlement and Paid Sick Leave. Employee shall be entitled to preapproved unlimited paid time off ("PTO") per Employment Term to be used for time away from work due to vacation, personal business or religious observance.

4.5. Expenses. The Company shall reimburse Employee for all necessary, approved and reasonable business expenses incurred by Employee in the scope of Employee's employment hereunder, upon submission of itemized expense statements in the manner and at the time specified by Company in accordance with Company's expense policy as amended by Company from time to time (the "Business Expenses").

4.6. Distribution Based Bonus. During the Employment Term, and provided that Employee fully performs the services set forth hereunder and Employee is not in material breach of this Agreement, upon Company making a distribution, other than a tax distribution, to the members of the Company (the "Members"), which shall be at Company's sole discretion, Employee shall be entitled to a bonus of one percent (1%) of such aggregate distribution (a "Distribution Based Bonus"). It is specifically stipulated and agreed that the Distribution Based Bonus shall be reduced to the extent and in proportion that the Members of the Company as of the Effective Date have their equity interests diluted for any future interest in equity in the Company. For purposes of this Section 4.6, no repayment of any capital contributions made by any Members of the Company to the Company shall be considered a distribution.

4.7. Company Sale or Other Disposition. Upon any sale of the Company during the Term ("Company Sale"), the Company shall make or cause to be made payments to Employee (the "Sale Payment") in an amount equal to the product of the Net Transaction Proceeds (as defined below) multiplied by the Applicable Percentage (as hereinafter defined), less the repayment of any capital contributions paid by any Members of the Company. It is specifically stipulated and agreed that Employee shall have no entitlements whatsoever under this Section 4.7 should any such Company Sale not occur during the Employment Term. For purposes of this Section 4.7, the following shall apply:

4.7.1. The "Applicable Percentage" shall be one percent (1%) should the closing of an agreement to effect a Company Sale occur during the Term of this Agreement. It is specifically stipulated and agreed that the Applicable Percentage shall be reduced to the extent and in proportion that the Members as of the Effective Date have their equity interests diluted for any future interest in equity in the Company.

4.7.2. Unless the parties otherwise agree, payment of the Sale Payment shall be made (i) to Employee on or about the same time as proceeds of the Company Sale are paid to the Company's Members and (ii) to Employee wholly in cash or wholly in other assets or securities, or partly in cash and partly in other assets or securities, in the same proportions as the proceeds of the Company Sale

are paid to the Company's Members; provided that, if any portion of the Net Sale Proceeds is in the form of securities or other property, the Company will have the option to pay Employee in the same form of consideration as the purchase price is being received by the Company and/or Members of the Company, or in cash for the fair value thereof as reasonably determined by the Company. For greater clarity, in the event the Net Transaction Proceeds include any consideration that is contingent and/or payable over time, Employee shall be paid the portion of Employee's Sale Payment applicable to such portion of the Net Transaction Proceeds as, when, and if such portion of Net Transaction Proceeds are paid to the Company's Members; provided that Employee remains employed by the Company at the time such Net Sale Proceeds are paid. Notwithstanding any other provision of this Agreement, neither the Company's Members nor the Company itself, shall be obligated to proceed with any Company Sale transaction, and shall not have any liability to Employee for failing or refusing to proceed with any Company Sale transaction.

4.7.3. "Net Transaction Proceeds" means the gross consideration (determined as provided below) that is actually received by the Company's Members in connection with a Company Sale, less (1) all transaction and closing fees and expenses associated with such transaction (including but not limited to the fees of agents, investment bankers, brokers, finders and other third parties and all consultants', attorneys' and accountants' fees); (2) the full amount of all liabilities, obligations and indebtedness of the Company, other than deferred compensation, change-in-control or other similar obligations but specifically including obligations owed to the Company's Members or any of Company's affiliated entities ("Affiliated Entities") for advances provided to the Company or for trade payables incurred in the ordinary course of business to any of the Affiliated Entities, which are paid by Company or assumed by the Buyer or any Company's Members in connection with the Company Sale; (3) distributions from the operations of the Company that are consistent with the historical practices of Company prior to the closing of the Company Sale, specifically including profits that may have been accrued by the Company (in accordance with industry standards) prior to the date of closing of any Company Sale; and (4) the amount of any post-closing employment compensation payments to any Company's Members pursuant to employment or consulting covenants or agreements arising from the Company Sale that are not in excess of market compensation for the employment or consulting role and responsibilities in comparable businesses and transactions.

4.7.4. Notwithstanding anything to the contrary in this Agreement, in no event shall Employee be entitled to any Distribution Based Bonus or Sale Payment if Employee is not employed by the Company for any reason at the time of such payment.

5. Termination. This Agreement may be terminated upon the following terms:

5.1. Termination upon Death. If Employee dies during the Employment Term, this Agreement shall automatically terminate on the date of death. All Salary through such date and any amounts owed for Business Expenses, Distribution Based Bonus or Sale Payment, if any, that Employee incurs through such date will be paid to Employee's designated beneficiary as promptly as practicable following the date of death but not later than forty-five (45) days thereafter. All Benefits will terminate on the death of Employee's death unless a) expressly provided to the contrary in a written agreement between Employee and Company; b)expressly provided to the contrary by Company's policy applicable to its employees generally; or c) as otherwise required by law.

5.2. Termination upon Total Disability. Company may terminate this Agreement because of Employee's Total Disability upon at least ten (10) days' prior notice to Employee, which notice will specify the effective date of termination. All Salary through such date and any amounts owed for Business Expenses, Distribution Based Bonus or Sale Payment, if any, that Employee incurs through

such date will be paid to Employee's designated beneficiary as promptly as practicable following the date of Total Disability but not later than forty-five (45) days thereafter. All Benefits will terminate on the death of Employee's death unless a) expressly provided to the contrary in a written agreement between Employee and Company; b)expressly provided to the contrary by Company's policy applicable to its employees generally; or c) as otherwise required by law. "Total Disability" means an illness or other physical or mental disability of Employee that makes it impossible or impracticable for Employee to perform Employee's material duties and responsibilities hereunder (with whatever reasonable accommodation may be required by applicable law) for a period of at least four (4) weeks in the aggregate during any twelve (12) month period during the Employment Term.

5.3. Termination by Company with Cause. Company shall be entitled to terminate Employee's employment at any time for Cause. The Salary will continue to be paid to Employee through the date of termination, and any amounts owed for Business Expenses that Employee incurs through such date will be paid to Employee as promptly as practicable following termination but no later than forty-five (45) days thereafter. All Benefits will, unless otherwise required by law, terminate on the date of termination. Any of the following will constitute "Cause":

5.3.1. Employee's continued failure to perform Employee's material duties and responsibilities under this Agreement (other than a failure resulting from a Total Disability); and, to the extent such failure to perform is reasonably capable of being cured (as determined by Company in its good faith discretion) on a one (1) time basis, such performance is not cured within five (5) business days after written notice thereof;

5.3.2. Employee engaging in willful, reckless, or grossly negligent misconduct that is materially injurious to Company, whether such injury is to Company's finances, reputation or otherwise;

5.3.3. Employee is indicted of, or enters a plea of guilty or no contest to, a felony or of any other crime that has, or is reasonably likely to have, a material adverse effect on Company's finances, reputation or otherwise;

5.3.4. Employee commits an act of fraud or personal dishonesty that is injurious to Company's finances, reputation, or otherwise, or Employee commits an act of misappropriation of material funds or property of Company;

5.3.5. Employee takes actions requiring approval of the Board of Directors or Company's Members without having obtained such approval, commits a material breach of this Agreement or materially breaches any of Company's employment policies and procedures, and to the extent reasonably capable of being cured, fails to satisfactorily cure and correct such breach in all respects within ten (10) days (as determined by Company in good faith) on a one (1) time basis, or such lesser period of time as Company reasonably determines to be appropriate under the circumstances, from the date that Company gives notice thereof to Employee identifying the breach; or

5.3.6. Employee receives any payments or distributions of cash or other assets from any person or entity which has a substantial business relationship with Company.

5.4. Termination by Company Without Cause. Company may at any time terminate Employee's employment without Cause. If Employee's employment is terminated prior to the end of the Employment Term by Company without Cause, all Salary through such date and any amounts owed for Business Expenses, Distribution Based Bonus or Sale Payment, if any, that Employee incurs

through such date will be paid to Employee's designated beneficiary as promptly as practicable following the date of death but not later than forty-five (45) days thereafter. All Benefits will terminate on the date of termination unless a) expressly provided to the contrary in a written agreement between Employee and Company; b)expressly provided to the contrary by Company's policy applicable to its employees generally; or c) as otherwise required by law. Additionally, the Company shall pay Employee one (1) month severance (the "Without Cause Payment"). Company may require, as a condition to payment of the Without Cause Payment, that Employee execute and deliver, and does not revoke, a separation agreement that will include, among other things, a general release and waiver of all claims all in form and substance satisfactory to Company. The Without Cause Payment shall be the sole and exclusive remedy of Employee against Company if Employee's employment with Company is terminated by Company without Cause.

5.5. Effect of Termination. Except as expressly provided in this Section 5, and except for the obligations set forth in Sections 6 and 10, all further obligations of the Parties under this Agreement will terminate upon termination of Employee's employment with Company. Upon a termination of Employee's employment, all restrictive covenants set forth in Section 6 hereof shall remain effective. In addition, upon termination of Employee's employment for any reason, (i) Employee shall be deemed to have resigned from all other positions or offices with Company and all Company's Affiliates, (ii) Employee will not be considered an employee of Company for any purpose and (iii) Employee will no longer use or access Company resources and will no longer represent that Employee is an employee of Company.

5.6. Compliance with 409A. Company intends that all compensation referred to in this Agreement will be administered and paid to Employee in a manner that is intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended, including without limitation delaying the timing of any payments to be made under this Agreement by six (6) months as necessary if Employee is then a "specified employee" as defined under Section 409A, and the parties agree to amend this Agreement in any matter necessary to comply with Section 409A.

6. Restrictive Covenants.

6.1. Confidentiality.

6.1.1. Employee acknowledges and agrees that prior to and during the term of this Agreement, Employee has learned and will continue to learn and obtain information, tangible or intangible, relating to: (i) the Company and its respective owners (collectively, the "Company Parties"); (ii) employees or independent contractors of the Company; (iii) the customers and clients of the Company; and/or (iv) the business, operations, prospects and condition (financial or otherwise) of the Company, such employees, independent contractors, customers and clients (collectively, "Proprietary Information"). Proprietary Information includes, but is not limited to, any and all written or electronic research, developments, trade secrets, know-how, inventions, techniques, processes, customer lists, financial data, sales, marketing plans, specifications, designs, budgets, schedules, drawings, tapes, notes, and the like.

6.1.2. Employee agrees to hold all Proprietary Information (whether received prior to or during the Employment Term) in strict confidence and trust for the sole benefit of the Company and not to, directly or indirectly, disclose, use, copy, publish, or summarize any Proprietary Information, except or unless (i) during Employee's service to the Company, to the extent necessary to carry out Employee's responsibilities under this Agreement; (ii) after termination of this Agreement, as specifically authorized in writing by the Company or as required by any law, court order, or similar

process or proceeding (in which event Employee shall promptly consult with the Company on the advisability of taking legally available steps to resist or narrow such request or requirement, and if disclosure is required, disclose any such information which Employee is advised by legal counsel is legally required to be disclosed and exercise reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded); (iii) such Proprietary Information is or becomes publicly known through lawful means; (iv) the Proprietary Information was rightfully in Employee's possession or part of Employee's general knowledge prior to employment with the Company and Employee did not learn of it, directly or indirectly, from the Company, its agents or employees; or (v) such Proprietary Information is disclosed to Employee without confidential or proprietary restriction by a third party who rightfully possesses such Proprietary Information (without confidential or proprietary restriction) and did not learn of it, directly or indirectly, from the Company, its agents or employees. Employee agrees that all Company-related business procured by Employee and all Company-related business opportunities and plans made known to Employee while employed by Company, are and shall remain the permanent and exclusive property of the Company. Upon termination of this Agreement for any reason, Employee shall return to the Company all books, records, notes, manuals, recordings, technology equipment, and other personal property and tangible Proprietary Information obtained or prepared by Employee during the course of employment with the Company, or otherwise belonging to the Company.

6.2. Non-Competition. During the Employment Term, Employee shall not perform any professional services for any other person or entity, other than the Company or an affiliate of Company, except as permitted by Section 3 herein. Employee acknowledges that an employer is entitled to its employees' undivided loyalty during the period of employment and an employee may not transfer such employee's loyalty to a competitor during such period of employment. This duty of loyalty is breached if an employee acts against the best interests of Company during such period of employment. In addition, while employed by the Company and for six (6) months following Employee's date of termination, regardless of the reason for the employment termination, Employee shall not compete with the Company, or engage in or participate in any business that is in direct competition in any manner whatsoever with the Company, either as an employee, Company, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity. However, Employee may make passive or personal investments in companies that are publicly traded on a national stock exchange or the NASDAQ, but not exceeding more than five percent (5%) of the total outstanding shares of any such company, which might be in a competitive business or have competitive business practices with that of the Company, and Employee may own shares in a mutual fund that is registered under the Investment Company Act of 1940.

6.3. Non-Solicitation and Business Relationships. Employee agrees that during Employee's employment by the Company and for two (2) years following Employee's date of termination, regardless of the reason for the employment termination, Employee shall not, directly or indirectly

6.3.1. solicit, induce, or attempt to solicit or induce, any officer, director, employee, consultant, agent or joint venture partner of the Company or any of its affiliates to terminate his, her or its employment or other relationship with the Company or any of its affiliates for the purpose of associating with any competitor of the Company or any of its affiliates, or otherwise encourage any such person to leave or sever his, her or its employment or other relationship with the Company or any of its affiliates for any other reason, or authorize the taking of such actions by any other person or entity, or assist or participate with any such person or entity in taking such action; or

6.3.2. use any Company formula, practice, process, design, instrument, pattern, commercial method, or compilation of information that derives independent economic value, actual or potential, from not being generally known to the public or other persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy in order to, solicit, induce, or attempt to solicit or induce, any business from any of the Company's existing clients, employees, referral sources, or business contacts so long as the Company carries on its same business in the county of New York or Los Angeles. Nothing shall restrict Employee from notifying the public of Employee's separation from the Company, so long as such notice is done in a manner normal and customary in the PR community, however such notification to the Company's clients must be pre-approved by Stephanie Jones.

6.4. Company Policies. Employee shall adhere to all Company policies and practices of which Employee is notified in writing which are applicable to other employees of Company as the same may change from time to time.

6.5. Nature of Services and Remedies. Employee acknowledges, understands, and agrees that the breach or threatened breach of any of the provisions of this Section 6 may result in immediate and irreparable injury to Company, which cannot be fully compensable by damages. Therefore, Employee agrees that if any of the provisions of Section 6 are breached or threatened to be breached, Company shall be entitled to seek a decree of specific performance or other injunctive relief without posting a bond or other security and without the need to prove damages.

6.6. Blue Penciling. In the event any provision of this Section 6 is held by an arbitrator or court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall nevertheless continue in full force without being impaired or invalidated in any way. Without in any way limiting the generality of the preceding sentence, in the event the non-solicitation clause contained herein, in the view of a court or arbitrator asked to rule upon the issue, is deemed unenforceable by reason of covering too large an area, too long a period of time, or too many business activities, then the same shall be deemed to cover only the largest area, the longest time period, or the most business activities, as the case may be, which will not render it unenforceable. In the event in any proceeding, a court of competent jurisdiction or arbitrator shall refuse to enforce any of the separate covenants deemed included in this Section 6, then such unenforceable covenants shall be deemed deleted from this Section 6 to the extent necessary to permit the remaining separate covenants to be enforced.

6.7. Covenants Reasonable. Employee agrees that the covenants provided for in this Section 6, including the term and geographical area encompassed therein, are necessary and reasonable in order to protect the value of the Company's business and assets which the Company has expended substantial time, resources and money to develop and the confidentiality of the Proprietary Information of the Company, including goodwill.

6.8. The provisions of this Section 6 shall survive the Term of this Agreement.

7. Intellectual Property Rights.

7.1.1. Employee acknowledges and agrees that all Employee's contributions to Projects and all of the results and proceeds of Employee's services, retroactive to the date Employee began working with Company (including prior to the date hereof) and continuing through the termination of Employee's employment (collectively, the "Contributions") shall be "Works Made for Hire" under the U.S. copyright law and shall be owned exclusively by Company.

7.1.2. In the event that any of the Contributions are deemed not to be a work for hire, Employee hereby grants, assigns, and transfers to Company the sole and exclusive ownership of all right, title, and interest in and to the Contributions, without any residual rights therein belonging to Employee. Employee shall execute, acknowledge, and deliver any assignments, affidavits, and other instruments prepared by Company and shall do such other reasonable things as are required to assist Company to obtain, for the benefit of Company, at Company's sole expense, all of such ownership rights including, without limitation, trademarks, patents, or copyrights in and to any and all Contributions. Company shall have no obligation to use the Contributions in any manner.

8. Records. The ownership and right of control of all work, information, records, and reports and all documents in support of or relating to the business of Company shall be and remain the sole property of Company. Employee agrees that upon termination or expiration of this Agreement, Employee will promptly return to Company all information, records, reports and documents relating to Company's business which are then or were in Employee's possession or control and not theretofore returned to Company.

9. Conflicts of Interest.

9.1. Employee represents to Company (a) there are no restrictions, agreements, or understandings, oral or written, to which Employee is a party or by which Employee is bound that prevent, conflict with or make unlawful Employee's execution or performance of this Agreement, and (b) Employee does not have any business or other relationship that creates a conflict between the interests of Employee and Company.

9.2. Employee recognizes and agrees that Employee owes Company a fiduciary duty of loyalty, fidelity, and allegiance to act at all times in the best interests of Company and to do no act which might injure the business, interests, or reputation of Company. Employee's duty of loyalty will extend throughout the Employment Term and will continue following termination of this Agreement to the extent set forth in this Agreement and as recognized by law. Employee agrees to disclose in writing to Company any facts that could reasonably be expected to involve a material conflict of interest upon Employee's knowing that such a material conflict could exist.

10. Indemnification.

10.1. Except to the extent caused by Employee or resulting from a breach of this Agreement by Employee, Company shall indemnity, defend and hold harmless Employee from and against any and all liability, claims, costs, damages, and expenses (including reasonable outside attorneys' fees and court costs) arising out of or in connection with any breach by Company of the terms of this Agreement or any warranties and representations made herein.

10.2. Employee shall indemnity, defend and hold harmless Company, any affiliate of Company, and those individuals that comprise Company from and against any and all liability, claims, costs, damages, and expenses (including reasonable outside attorneys' fees and court costs) arising out of or in connection with any breach by Employee of the terms of this Agreement or any warranties and representations made herein.

11. Miscellaneous.

11.1. Nature of Company's Business/Acknowledgment and Consent to Exposure to Materials. Employee acknowledges that in the course and scope of Company's business and

Employee's duties while working for Company, Employee may be exposed to Company's clients' indecent, offensive, and/or graphic material and profane language. Such graphic material may include, but is not limited to, sexually explicit photographs and video recordings, lewd or salacious video or audio recordings, audio or video recordings containing reference to or acts of sexual or physical violence and/or other criminal acts, video and photographs depicting or referencing the use of alcohol and/or other controlled substances, audio or video recordings featuring insensitive or offensive comments regarding race, religion, ethnicity, sexuality, national origin, and disabilities, and other offensive material not herein mentioned. Employee understands that Company, in the performance of its duties as a publicist, may be required to address a client's involvement in any of the foregoing acts and thus the likelihood of Employee's exposure thereto. Employee represents and acknowledges that she is comfortable and capable of working in an environment in which she may be exposed to such obscene, indecent, offensive, and/or graphic materials and profane language. Employee further agrees that nothing in this paragraph shall be construed as Company's condoning any such deplorable behavior. Further, Employee acknowledges, understands and agrees that should Employee engage in any behavior referred to in this Section 11.1 Company shall have the right to terminate Employee pursuant to Section 5.3 of this Agreement.

11.2. Right to Insure. Company shall have the right to secure in its own name, or otherwise, and at its own expense, life, health, accident or other insurance covering Employee. Employee shall have no right, title or interest in and to such insurance. Employee shall assist Company, at Company's expense, in procuring such insurance by submitting to examinations and by signing such applications and other instruments as may be reasonably required by the insurance carriers to which application is made for any such insurance.

11.3. Taxes. All amounts paid to Employee hereunder shall be subject to the applicable withholding of social security, federal, state, and other taxes and deductions as required by law.

11.4. Successors. All of the terms, agreements, covenants, representations, warranties, and conditions of this Agreement are binding upon, and inure to the benefit of, and are enforceable by, the Parties and their respective successors or permitted assigns.

11.5. Assignment. Employee may not assign either this Agreement or any of Employee's rights, interests, or obligations hereunder without the prior written approval of Company, which may be withheld in Company's absolute and sole discretion. Company may freely assign its rights and obligations hereunder to any affiliate of Company, successor or assign which agrees to perform and discharge Company's duties and obligations hereunder.

11.6. Notices. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by commercial messenger or courier service requiring signed acknowledgment of delivery, or mailed by registered or certified mail (return receipt requested) or sent via electronic mail (with acknowledgment of complete transmission). If sent by registered or certified mail, notice shall be deemed to have been received and effective five (5) business days after mailing, and if by overnight mail, electronic mail or personal delivery, one (1) business day after being sent. All notices shall be addressed to the parties at the addresses set forth in the preamble to this Agreement. A copy of any notice to Company shall be sent to Frankfurt Kurnit Klein & Selz, P.C., 28 Liberty Street, New York, NY 10005, Attention Mara P. Canner, Esq. [redacted].

11.7. Governing Law. This Agreement and the performance of the Parties' obligations hereunder will be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law principles.

11.8. Disputes. Each Party submits to the jurisdiction of any state or federal court sitting in New York, New York with respect to any action relating to this Agreement, whether for injunctive or legal relief, and each party agrees that all claims in respect of any such action may be heard and determined in any such court. The prevailing party in any action shall be entitled to reimbursement of its reasonable attorneys' fees and costs of the action.

11.9. Injunctive Relief.

11.9.1. Employee acknowledges that remedies at law will be inadequate to protect the Company against any actual or threatened breach of Sections 6 and 7 of this Agreement and, without prejudice to the rights and remedies otherwise available to the Company, Employee agrees to the Company's right to injunctive relief in the Company's favor without proof of actual damages and to waive any requirement for the securing or posting of any bond in connection with such remedy.

11.9.2. Notwithstanding anything to the contrary in this Agreement, Employee understands and agrees that under no circumstances may Employee seek injunctive relief against Company for any reason, including without limitation relating to Company's breach of this Agreement or Company's use or non-use of any Contributions; Employee hereby waives such right in perpetuity and agrees further that Employee shall refrain from materially interfering in any manner with the Projects or the development, production, distribution or other exploitation thereof.

11.10. Remedies. Except as expressly provided herein, the rights, obligations and remedies created by this Agreement are cumulative and in addition to any other rights, obligations, or remedies otherwise available at law or in equity. Except as expressly provided herein, nothing herein will be considered an election of remedies.

11.11. Counterparts. This Agreement may be executed in two or more counterparts, including electronic transmissions (e.g., email, facsimile), each of which will be deemed an original but all of which together will constitute one and the same instrument.

11.12. Headings. The article and section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

11.13. Entire Agreement. This Agreement and any schedules and exhibits hereto constitute the entire agreement and understanding of the Parties in respect of the subject matter of this Agreement and supersedes all prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof. There are no third party beneficiaries having rights under or with respect to this Agreement.

11.14. Amendments and Waivers. No amendment, modification, replacement, termination, or cancellation of any provision of this Agreement will be valid, unless the same will be in writing and signed by the Parties. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence.

11.15. Severability. The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; provided that if any provision of this Agreement, as applied to any Party or to any

circumstance, is adjudged by a governmental body, arbitrator, or mediator not to be enforceable in accordance with its terms, the Parties agree that the governmental body, arbitrator, or mediator making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, and/or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced.

11.16. Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party because of the authorship of any provision of this Agreement. Any reference to any federal, state, local, or foreign Law will be deemed also to refer to Law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include," "includes," and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words "this Agreement," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. The Parties intend that each representation, warranty, and covenant contained herein will have independent significance. If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached will not detract from or mitigate the fact that the Party is in Breach of the first representation, warranty, or covenant.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the Effective Date.

Jonesworks, LLC

DocuSigned by:

By: ______________________

Stephanie Jones, President

Jennifer Abel

Jennifer Abel (Dec 10, 2021 09:25 PST)

Jennifer Abel

**Signature:**

**Email:** [redacted]



FKKS:2862641v.1 27179.100

# Exhibit 4

JONESWORKS®
NEW YORK | LOS ANGELES

[redacted]

Wayfarer Studios LLC
[redacted]

Dear Labid Aziz,

This agreement (the "Agreement") confirms that Wayfarer Studios LLC (the "Client") is retaining JONESWORKS, LLC and/or its affiliates (the "Company") as its exclusive public relations counsel to provide strategic communications services as described on the attached Schedule A (the "Services").

The initial term of Client's engagement of Company as contemplated in this Agreement shall commence on May 7, 2020 (the "Commencement Date") and conclude on May 6, 2021(the "Term"). This agreement shall automatically renew for additional one-year periods ("Extension Period(s)") unless notice is received by either party ninety (90) days prior to the expiration of the Initial Term of this Agreement, or any Extension Period. (The Initial Term and Extension Period(s) are hereinafter referred to as the "Term").

Company shall provide the Services in a professional manner and in accordance with the goals mutually established by Client and Company. Company shall take reasonable steps to keep Client informed of its progress, including current and upcoming placements. Nonetheless, Client understands and agrees that outside factors may affect the implementation of the Services and Company cannot make any representations or warranties that Client's desired placements or publicity will appear in media whenever or wherever desired.

As consideration for the Services, Client hereby agrees to pay the Company a sum of $20,000 ("Services Fee"). This first month's Services Fee shall be due at the signing of the agreement. If additional public relations services are requested (i.e., services other than those designated on Exhibit A), an additional fee shall be negotiated in good faith between Client and Company prior to the provision of such additional services and such fee shall be payable after mutual agreement regarding the fee therefor and in advance of the provision of such services.

Client understands and agrees that Client is responsible for all of Company's reasonable and customary third party costs and expenses incurred in connection with the Services as well as all travel costs including, but not limited to, airline transportation and accommodations ("Expenses") provided that Company shall not incur Expenses on Client's account greater than five hundred dollars ($500.00) in each instance or twenty five hundred dollars ($2,500) in aggregate in any given month with Company's prior written approval. Any and all air travel shall be no less than business class and all hotel accommodations shall not be less than four stars. It is specifically stipulated and agreed that a Company representative shall be entitled to attend any and all press opportunities originated by Company.

In addition, in the event that Company secures a speaking engagement or lecture whereby Client or Client's designee is a speaker, Client hereby agrees to pay the Company 20% of the total fee due to Client in connection therewith ("Speaking Fees"). Further, to the extent that Company develops creative material to pitch to production companies or other third parties, Company's designee, Stephanie Jones ("Jones") shall be attached as no less than a Co-Executive Producer on any project based on or derived from such creative materials and Jones shall be entitled to the customary Co-Executive Producer fees for the applicable form of media production ("Producer Fees").

In addition to the Services, it is hereby understood by Client and Company that Company shall use its best efforts to facilitate meetings, deals, and relationships with relevant third parties. In connection with the foregoing, to the extent that Company secures a Third Party Agreement (as defined below) for Client that Client accepts in its sole discretion, Company shall receive a commission fee of ten percent (10%) of the gross compensation due to Client in connection with such Third-Party Agreement (the "Commission"). For each Third-Party Agreement, (a) such Commission entitlement shall extend for as long as Client accrues compensation under such Third Party Agreement, irrespective of the Term, expiration or termination of this Agreement; and (b) Client shall remit to Company the Commission payments on terms to be mutually agreed by Client and Company in good faith. As used herein, "Third Party Agreement" means an agreement entered into by or on behalf of Client with a third party and shall include, but be limited to, an agreement regarding Client's merchandising, testimonial, and/or commercial tie-in rights, among other rights Client may license to a third party ("License Rights"). In connection with the foregoing and with respect to the License Rights, Company shall perform one or more of the following services (a) aid/advise in the creation of merchandise (b) implementation of the License Rights and (c) design/market merchandise.

With respect to the Services Fee, Client will be billed monthly in advance and payment shall be due to Company no later than ten (10) business days' of Client's receipt thereof. With respect to Expenses, Client will be billed monthly and payment shall be due to Company no later than ten (10) business days' of Client's receipt thereof. Client

acknowledges and agrees that in the event that payments due to Company hereunder are not received in accordance with this Agreement, Company reserves the right and is entitled to suspend any services hereunder, including the Services, until such time as all outstanding payments are received by Company.

Throughout Client's engagement of Company hereunder, Client may disclose or provide Company with confidential, proprietary and/or sensitive information about Client, its customers or other related parties ("Confidential Information"). Company shall use reasonable and diligent efforts to keep Confidential Information confidential provided that Company may disclose such information to third parties to the extent necessary to fulfill its obligations under this Agreement or to its legal representatives. Company shall not use such information for any purpose beyond the performance of Company's services hereunder unless otherwise required by law or a court of competent jurisdiction. Company may, however, use Client's name as part of its client list and publicly acknowledge that it is undertaking work for Client pursuant to this Agreement without specifying the nature of Services. For the avoidance of doubt, Confidential Information shall not include information (a) which is or later becomes publicly available through no wrongful act of Company, (b) known by Company prior to Client's disclosure to Company in connection with this Agreement or (c) independently developed by Company without reliance on information disclosed by Client. Notwithstanding the foregoing, Company is not liable for any third party's disclosure of Client's Confidential Information so long as such third party did not obtain the Confidential Information as a result of Company's breach or failure to uphold its obligations hereunder. Upon the expiration or termination of this Agreement and at the request of Client, Company shall return or destroy all of Client's Confidential Information in Company's possession and shall upon request of Client send a certification as to such return or destruction.

During the Term and for the one year (1) period following the expiration or termination of this Agreement, each party agrees not to (a) solicit or attempt to solicit for employment any officer, employee or agent of the other party (collectively, an "Employee") or (b) employ or attempt to employ, or otherwise induce or attempt to induce any Employee of the other party to terminate such Employee's employment or engagement with such party, without such party's prior written consent (collectively, the "Non- Solicitation Obligation").

Either party may terminate this Agreement upon the other party's material breach of this Agreement provided that the non-breaching party shall furnish notice of such breach to the breaching party and the breaching party shall have ten (10) days from receipt of such notice to cure the breach. If the breach is not cured within such ten (10) day period, the breaching party may terminate this Agreement immediately. Notwithstanding the foregoing, it is stipulated that if either party violates the Non-Solicitation Obligation, the non-violating party may terminate this Agreement

immediately, without any such cure period. In the event of a termination of this Agreement, Client shall remain liable for all payments due for all Services rendered and Expenses incurred up to the date of termination provided that if the Agreement terminates on a date other than the first of a month, the Services Fee for the final month shall be pro-rated accordingly.

Company shall have no obligation to indemnify Client for any third party claims, losses, damages, actions, liabilities or costs ("Losses") against Client arising out of, resulting from or in connection with Company's representation of Client, the Services or this Agreement unless such Losses are the result of the gross negligence or willful misconduct of Company. Without limiting the foregoing, Company shall not be liable for any delay in or omission of publication or transmission, or for any error in any press or other publication, to the extent that such delay, omission or error is outside Company's control or is the result of any third party's action or inaction. The indemnity provision herein shall survive the expiration and termination of this Agreement.

The parties shall use good faith efforts to resolve any disputes arising in connection with this Agreement and the relationship established hereunder amongst them. To the extent that the parties cannot reach a timely resolution (which shall be no later than twenty (20) days), any such disputes shall be submitted to final and binding arbitration in New York, New York. Such arbitration shall be conducted in compliance with the rules of the American Arbitration Association. Each party shall be responsible for its own costs in connection with such arbitration. Notwithstanding the foregoing, in the event of a breach or threatened breach of the Non-Solicitation Obligation, in addition to all other available remedies, the non-breaching party shall be entitled to injunctive relief from a court of competent jurisdiction without being required to post a bond and without being required to show the inadequacy of money damages. This Agreement shall be governed by, construed under and enforced in accordance with the laws of the State of New York applicable to agreements made and to be fully performed therein.

Sincerely,

Stephanie Jones, President

Agreed to and Accepted:

______________________

Labid Aziz

Date:

May 6th, 2020

**SCHEDULE A**

| | |
|---|---|
| Press Materials | • Assist in developing, writing and updating communication materials related to all press outreach such as biographies, media kits, boilerplates, press releases, and key messaging<br>• Manage media and press communications |
| Inter-Agency Programs | Advise on any marketing and campaign strategies to ensure brand messaging is consistent, opportunities are maximized, and the strongest press angles aligned |
| Executive Visibility | Position and utilize Wayfarer Studios key executives as thought-leaders and change agents in the film and television industry |
| On-Going/Proactive Outreach | • Develop a 12-month media and communications strategy to further drive awareness<br>• Strategize and execute select film and television project announcements<br>• Conduct proactive feature pitching to top-tier print, broadcast and online media outlets<br>▪ Conduct media monitoring and competitor tracking for industry press<br>▪ Conduct regular check-on calls surrounding the status of Wayfarer Studios projects, events and news |
| Measurement and Evaluation | ▪ Clip and Service media as published<br>▪ Create monthly clip books and activity reports that detail account activity and media impressions<br>▪ Create and maintain a media library on behalf of Wayfarer Studios |

# Exhibit 5

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 1680
**DATE** 05/07/2020
**DUE DATE** 05/17/2020
**TERMS** Net 10

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly Services for May 2020 for Wayfarer Studios | 16,129.00 |

PAID

For ACH Payment:

**Redacted - NR**

*** PLEASE REFERENCE INVOICE NUMBER ON ALL PAYMENTS

| | |
|---|---|
| PAYMENT | 16,129.00 |
| BALANCE DUE | **$0.00** |

JW

**JONESWORKS LLC**

[redacted]

# INVOICE

**BILL TO**

[redacted]

**INVOICE #** 1689
**DATE** 05/20/2020
**DUE DATE** 05/30/2020
**TERMS** Net 10

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly Services for June 2020 for Wayfarer Studios | 20,000.00 |

PAID

| | |
| --- | --- |
| PAYMENT | 20,000.00 |
| BALANCE DUE | **$0.00** |

For ACH Payment:

**Redacted - NR**

*** PLEASE REFERENCE INVOICE NUMBER ON ALL PAYMENTS

JW

JONESWORKS LLC
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 1704
**DATE** 06/18/2020
**DUE DATE** 06/28/2020
**TERMS** Net 10

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly Services for July 2020 for Justin Baldoni | 5,000.00 |
| Monthly Services for July 2020 for Wayfarer Studios | 20,000.00 |

PAID

For ACH Payment:

**Redacted - NR**

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

*** PLEASE REFERENCE INVOICE NUMBER ON ALL PAYMENTS

JW

JONESWORKS LLC
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 1764
**DATE** 07/17/2020
**DUE DATE** 07/27/2020
**TERMS** Net 10

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly Services for August 2020 for Justin Baldoni | 5,000.00 |
| Monthly Services for August 2020 for Wayfarer Studios | 20,000.00 |

PAID

For ACH Payment:

**Redacted - NR**

| | |
| --- | --- |
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

*** PLEASE REFERENCE INVOICE NUMBER ON ALL PAYMENTS

JW

JONESWORKS LLC
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 1803
**DATE** 08/18/2020
**DUE DATE** 08/28/2020
**TERMS** Net 10

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly Services for September 2020 for Justin Baldoni | 5,000.00 |
| Monthly Services for September 2020 for Wayfarer Studios | 20,000.00 |

PAID

For ACH Payment:

**Redacted - NR**

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

*** PLEASE REFERENCE INVOICE NUMBER ON ALL PAYMENTS

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 1836
**DATE** 09/18/2020
**DUE DATE** 09/28/2020
**TERMS** Net 10

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly Services for October 2020 for Justin Baldoni | 5,000.00 |
| Monthly Services for October 2020 for Wayfarer Studios | 20,000.00 |
| Fast Company 2021 Most Innovative Companies Early Submission | 695.00 |

PAID

For ACH Payment:

**Redacted - NR**

*** PLEASE REFERENCE INVOICE NUMBER ON ALL PAYMENTS

PAYMENT 25,695.00
BALANCE DUE **$0.00**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 1872
**DATE** 10/19/2020
**DUE DATE** 10/19/2020
**TERMS** Due on receipt

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly Services for November 2020 for Wayfarer Studios | 20,000.00 |
| Monthly Services for November 2020 for Justin Baldoni | 5,000.00 |

PAID

For ACH Payment:

**Redacted - NR**

or make check payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

*** PLEASE REFERENCE INVOICE NUMBER ON ALL PAYMENTS

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 1918
**DATE** 11/18/2020
**DUE DATE** 11/28/2020
**TERMS** Net 10

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly Services for December 2020 for Wayfarer Studios | 20,000.00 |
| Monthly Services for December 2020 for Justin Baldoni | 5,000.00 |

PAID

For ACH Payment:

**Redacted - NR**

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

or make check payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

*** PLEASE REFERENCE INVOICE NUMBER ON ALL PAYMENTS

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 1957
**DATE** 12/18/2020
**DUE DATE** 12/28/2020
**TERMS** Net 10

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly Services for January 2021 for Wayfarer Studios | 20,000.00 |
| Monthly Services for January 2021 for Justin Baldoni | 5,000.00 |

PAID

For ACH Payment:

**Redacted - NR**

| | |
| --- | --- |
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

or make check payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

*** PLEASE REFERENCE INVOICE NUMBER ON ALL PAYMENTS

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 2018
**DATE** 01/19/2021
**DUE DATE** 01/29/2021
**TERMS** Net 10

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly Services for February 2021 for Wayfarer Studios | 20,000.00 |
| Monthly Services for February 2021 for Justin Baldoni | 5,000.00 |

PAID

Wire Instructions:

**Redacted - NR**

| | |
| --- | --- |
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

JW

JONESWORKS LLC
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 2060
**DATE** 02/18/2021
**DUE DATE** 02/28/2021
**TERMS** Net 10

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly Services for March 2021 for Wayfarer Studios | 20,000.00 |
| Monthly Services for March 2021 for Justin Baldoni | 5,000.00 |

PAID

Wire Instructions:

**Redacted - NR**

PAYMENT 25,000.00
BALANCE DUE **$0.00**

JW

JONESWORKS LLC
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 2111
**DATE** 03/18/2021
**DUE DATE** 03/28/2021
**TERMS** Net 10

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly Services for April 2021 for Wayfarer Studios | 20,000.00 |
| Monthly Services for April 2021 for Justin Baldoni | 5,000.00 |

PAID

Wire Instructions:

**Redacted - NR**

PAYMENT 25,000.00
BALANCE DUE **$0.00**

JONESWORKS LLC
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 2161
**DATE** 04/19/2021
**DUE DATE** 04/29/2021
**TERMS** Net 10

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly Services for May 2021 for Wayfarer Studios | 20,000.00 |
| Monthly Services for May 2021 for Justin Baldoni | 5,000.00 |

PAID

Please make check payable to JONESWORKS LLC and send to:

AGS
c/o Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

Wire Instructions:

Redacted - NR

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 2210
**DATE** 05/18/2021
**DUE DATE** 05/28/2021
**TERMS** Net 10

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly Services for June 2021 for Wayfarer Studios | 20,000.00 |
| Monthly Services for June 2021 for Justin Baldoni | 5,000.00 |
| Travel to/from Kelly Clarkson appearance/ JB "Man Enough" - M Mitchell | 7.99 |
| Travel to/from Baldoni for LATM shoot and ET interview -M Mitchell | 81.25 |

Please make check payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,089.24 |
| BALANCE DUE | **$0.00** |

PAID

Wire Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 2254
**DATE** 06/18/2021
**DUE DATE** 06/18/2021
**TERMS** Due on receipt

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly Services for July 2021 for Wayfarer Studios | 20,000.00 |
| Monthly Services for July 2021 for Justin Balddoni | 5,000.00 |

PAID

Please make check payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
| --- | --- |
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

Wire Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 2302
**DATE** 07/29/2021
**DUE DATE** 07/29/2021
**TERMS** Due on receipt

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly Services for August 2021 for Wayfarer Studios | 20,000.00 |
| Monthly Services for August 2021 for Justin Balddoni | 5,000.00 |

PAID

Please make check payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

PAYMENT 25,000.00
BALANCE DUE **$0.00**

Wire Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**

[redacted]

# INVOICE

**BILL TO**

[redacted]

**INVOICE #** 2322
**DATE** 08/31/2021
**DUE DATE** 08/31/2021
**TERMS** Due on receipt

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly Services for September 2021 for Wayfarer Studios | 20,000.00 |
| Monthly Services for September 2021 for Justin Balddoni | 5,000.00 |

PAID

Please make check payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

Wire Instructions:

Redacted - NR

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 2360
**DATE** 09/30/2021
**DUE DATE** 09/30/2021
**TERMS** Due on receipt

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly Services for October 2021 for Wayfarer Studios | 20,000.00 |
| Monthly Services for October 2021 for Justin Balddoni | 5,000.00 |

PAID

Please make check payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

PAYMENT 25,000.00
BALANCE DUE **$0.00**

Wire Instructions:

**Redacted - NR**

JW

JONESWORKS LLC
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 2403
**DATE** 10/27/2021
**DUE DATE** 10/27/2021
**TERMS** Due on receipt

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly Services for November 2021 for Wayfarer Studios | 20,000.00 |
| Monthly Services for November 2021 for Justin Baldoni | 5,000.00 |

PAID

Please make check payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
| --- | --- |
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

Wire Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 2477
**DATE** 12/16/2021
**DUE DATE** 12/26/2021
**TERMS** Net 10

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly Services for December 2021 for Wayfarer Studios | 20,000.00 |
| Monthly Services for December 2021 for Justin Baldoni | 5,000.00 |

PAID

Please make check payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

PAYMENT 25,000.00
BALANCE DUE **$0.00**

Wire Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 2478
**DATE** 12/20/2021
**DUE DATE** 12/20/2021
**TERMS** Due on receipt

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly Services for January 2022 for Wayfarer Studios | 20,000.00 |
| Monthly Services for January 2022 for Justin Baldoni | 5,000.00 |

PAID

Please make check payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

Wire Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**

[redacted]

# INVOICE

**BILL TO**

[redacted]

**INVOICE #** 2597
**DATE** 02/01/2022
**DUE DATE** 02/11/2022
**TERMS** Net 10

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for February 2022 - Wayfarer Studios | 20,000.00 |
| Monthly PR Services for February 2022 - Justin Baldoni | 5,000.00 |

PAID

Please make check payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

Wire Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 2672
**DATE** 02/25/2022
**DUE DATE** 03/07/2022
**TERMS** Net 10

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for March 2022 - Wayfarer Studios | 20,000.00 |
| Monthly PR Services for March 2022 - Justin Baldoni | 5,000.00 |

PAID

Please make check payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

PAYMENT 25,000.00
BALANCE DUE **$0.00**

Wire Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 2727
**DATE** 03/22/2022
**DUE DATE** 04/01/2022
**TERMS** Net 10

**NOTES**
April 2022 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for April 2022 - Wayfarer Studios | 20,000.00 |
| Monthly PR Services for April 2022 - Justin Baldoni | 5,000.00 |

PAID

Please make check payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

Wire Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**

[redacted]

# INVOICE

**BILL TO**

[redacted]

**INVOICE #** 2793
**DATE** 04/21/2022
**DUE DATE** 05/01/2022
**TERMS** Net 10

**NOTES**

May 2022 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for May 2022 – Wayfarer Studios | 20,000.00 |
| Monthly PR Services for May 2022 - Justin Baldoni | 5,000.00 |

PAID

Please make check payable to JONESWORKS LLC and send to:

Jonesworks LLC

[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

Wire Instructions:

**Redacted - NR**

JW

JONESWORKS LLC
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 2842
**DATE** 05/20/2022
**DUE DATE** 05/30/2022
**TERMS** Net 10

**NOTES**
June 2022 Fees

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly PR Services for June 2022 - Wayfarer Studios | 20,000.00 |
| Monthly PR Services for June 2022 - Justin Baldoni | 5,000.00 |

PAID

Please make check payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
| --- | --- |
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

Wire Instructions:

Redacted - NR

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 2916
**DATE** 06/21/2022
**DUE DATE** 07/01/2022
**TERMS** Net 10

**NOTES**
July 2022 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for July 2022 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for July 2022 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 2983
**DATE** 07/20/2022
**DUE DATE** 07/30/2022
**TERMS** Net 10

**NOTES**
August 2022 Fees

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly PR Services for August 2022 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for August 2022 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
| --- | --- |
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 3049
**DATE** 08/22/2022
**DUE DATE** 09/01/2022
**TERMS** Net 10

---

**NOTES**
September 2022 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for September 2022 | 25,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

JONESWORKS LLC
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 3116
**DATE** 09/20/2022
**DUE DATE** 09/30/2022
**TERMS** Net 10

**NOTES**
October 2022 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for October 2022 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for October 2022 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 3179
**DATE** 10/20/2022
**DUE DATE** 10/30/2022
**TERMS** Net 10

**NOTES**
November 2022 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for November 2022 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for November 2022 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

PAYMENT 25,000.00
BALANCE DUE **$0.00**

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 3246
**DATE** 11/21/2022
**DUE DATE** 12/01/2022
**TERMS** Net 10

**NOTES**
December 2022 Fees

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly PR Services for December 2022 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for December 2022 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
| --- | --- |
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 3307
**DATE** 12/16/2022
**DUE DATE** 12/26/2022
**TERMS** Net 10

---

**NOTES**
January 2023 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for January 2023 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for January 2023 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 3385
**DATE** 01/20/2023
**DUE DATE** 01/30/2023
**TERMS** Net 10

---

**NOTES**
February 2023 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for February 2023 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for February 2023 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 3414
**DATE** 02/21/2023
**DUE DATE** 03/03/2023
**TERMS** Net 10

**NOTES**
March 2023 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for March 2023 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for March 2023 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

ACH Instructions:

**Redacted - NR**

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

JW

JONESWORKS LLC
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 3457
**DATE** 03/21/2023
**DUE DATE** 03/31/2023
**TERMS** Net 10

---

**NOTES**
April 2023 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for April 2023 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for April 2023 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 3516
**DATE** 04/20/2023
**DUE DATE** 04/30/2023
**TERMS** Net 10

---

**NOTES**
May 2023 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for May 2023 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for May 2023 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

Jonesworks LLC
[redacted]

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 3595
**DATE** 05/20/2023
**DUE DATE** 05/30/2023
**TERMS** Net 10

**NOTES**
June 2023 Fees

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly PR Services for June 2023 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for June 2023 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
| --- | --- |
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

JONESWORKS LLC
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 3660
**DATE** 06/20/2023
**DUE DATE** 06/30/2023
**TERMS** Net 10

**NOTES**
July 2023 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for July 2023 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for July 2023 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

JONESWORKS LLC
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 3724
**DATE** 07/20/2023
**DUE DATE** 07/30/2023
**TERMS** Net 10

**NOTES**
August 2023 Fees

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly PR Services for August 2023 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for August 2023 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
| --- | --- |
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 3805
**DATE** 08/20/2023
**DUE DATE** 08/30/2023
**TERMS** Net 10

---

**NOTES**
September 2023 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for September 2023 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for September 2023 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 3873
**DATE** 09/20/2023
**DUE DATE** 09/30/2023
**TERMS** Net 10

**NOTES**
October 2023 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for October 2023 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for October 2023 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 3929
**DATE** 10/20/2023
**DUE DATE** 10/30/2023
**TERMS** Net 10

**NOTES**
November 2023 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for November 2023 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for November 2023 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

PAYMENT 25,000.00
BALANCE DUE **$0.00**

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 3984
**DATE** 11/20/2023
**DUE DATE** 11/30/2023
**TERMS** Net 10

**NOTES**
December 2023 Fees

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly PR Services for December 2023 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for December 2023 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
| --- | --- |
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 4049
**DATE** 12/20/2023
**DUE DATE** 12/30/2023
**TERMS** Net 10

**NOTES**
January 2024 Fees

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly PR Services for January 2024 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for January 2024 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

ACH Instructions:

**Redacted - NR**

| | |
| --- | --- |
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 4112
**DATE** 01/19/2024
**DUE DATE** 01/29/2024
**TERMS** Net 10

---

**NOTES**
February 2024 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for February 2024 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for February 2024 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

JONESWORKS LLC
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 4264
**DATE** 02/20/2024
**DUE DATE** 03/01/2024
**TERMS** Net 10

---

**NOTES**
March 2024 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for March 2024 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for March 2024 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 4368
**DATE** 03/20/2024
**DUE DATE** 03/30/2024
**TERMS** Net 10

**NOTES**
April 2024 Fees

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly PR Services for April 2024 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for April 2024 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
| --- | --- |
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 4430
**DATE** 04/22/2024
**DUE DATE** 05/02/2024
**TERMS** Net 10

**NOTES**
May 2024 Fees

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly PR Services for May 2024 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for May 2024 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
| --- | --- |
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 5048
**DATE** 05/21/2024
**DUE DATE** 05/31/2024
**TERMS** Net 10

---

**NOTES**
June 2024 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for June 2024 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for June 2024 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 5088
**DATE** 06/20/2024
**DUE DATE** 06/30/2024
**TERMS** Net 10

**NOTES**
July 2024 Fees

| DESCRIPTION | AMOUNT |
|---|---|
| Monthly PR Services for July 2024 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for July 2024 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
|---|---|
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**

JW

**JONESWORKS LLC**
[redacted]

# INVOICE

**BILL TO**
[redacted]

**INVOICE #** 5146
**DATE** 07/22/2024
**DUE DATE** 08/01/2024
**TERMS** Net 10

---

**NOTES**
August 2024 Fees

| DESCRIPTION | AMOUNT |
| --- | --- |
| Monthly PR Services for August 2024 - Justin Baldoni | 5,000.00 |
| Monthly PR Services for August 2024 - Wayfarer Studios | 20,000.00 |

PAID

Please make checks payable to JONESWORKS LLC and send to:

Jonesworks LLC
[redacted]

| | |
| --- | --- |
| PAYMENT | 25,000.00 |
| BALANCE DUE | **$0.00** |

ACH Instructions:

**Redacted - NR**